**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (___) |
| Debtors.¹ | (Joint Administration Requested) |

**DECLARATION OF JONATHAN RAMSDEN AS CHIEF FINANCIAL AND**
**ADMINISTRATIVE OFFICER OF THE DEBTORS IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS**

Jonathan Ramsden declares and says:

1.      I am the Chief Financial and Administrative Officer of Big Lots, Inc. (together with its direct and indirect subsidiaries, the "**Debtors**", "**Big Lots**" or the "**Company**"). I have served as the Big Lots' Executive Vice President, Chief Financial and Administrative Officer since August 2019. Prior to joining Big Lots, I had more than twenty years of experience in senior executive roles in the retail and marketing services industries, including serving as Chief Operating Officer, Chief Financial Officer and Executive Vice President of Abercrombie & Fitch and Chief Financial Officer of TBWA Worldwide. I hold an MA in philosophy, politics and economics from the University of Oxford, and I am a UK Chartered Accountant.

2.      On September 9, 2024 (the "**Petition Date**"), the Debtors commenced these cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of title 11 of the

---

¹ The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

United States Code (as amended, the "**Bankruptcy Code**"). As the Debtors' Chief Financial and Administrative Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading up to these Chapter 11 Cases.

3. I am over the age of 18 and authorized to submit this declaration (this "**Declaration**") on behalf of each of the Debtors in support of their petitions and requests for relief in the form of motions and applications (collectively, the "**First Day Pleadings**"), each filed contemporaneously herewith. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and/or professional advisors to the Company, information prepared or provided to me by employees of AlixPartners, LLP (the Company's proposed financial advisors) and/or my opinion based upon experience, knowledge and information concerning the operations of the Debtors. I have reviewed the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the above-captioned Chapter 11 Cases. If called upon to testify, I would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

4. To better familiarize the Court with the Debtors, their businesses, the circumstances leading up to the Chapter 11 Cases and the relief that the Debtors are seeking in the First Day Pleadings, I have organized this Declaration into three sections. Section I of this Declaration describes Big Lots' businesses; Section II describes the circumstances giving rise to the need for chapter 11 relief and Big Lots' various prepetition restructuring initiatives; and Section III sets forth the relevant facts in support of the First Day Pleadings. With respect to Section III of this

Declaration, capitalized terms used but not otherwise defined therein shall have the same meanings set forth in the relevant First Day Pleading being discussed.

## I. THE DEBTORS' BUSINESS

### A.    Corporate History and Business Operations

5.    Big Lots is a one-stop shop home discount retailer. Big Lots' mission is to help customers "Live BIG and Save LOTS" by offering bargains on everything for their homes, including furniture, décor, pantry essentials, kitchenware, groceries, and pet supplies. Headquartered in Columbus, Ohio, Big Lots operates more than 1,300 stores across 48 states in the United States, as well as an e-commerce store with expanded fulfillment and delivery capabilities.

6.    The Company was founded in 1967 by Sol Shenk, initially operating under the brand name Consolidated International, Inc. In the decades that followed, the Company completed a series of acquisitions and expansions, ultimately assembling a portfolio of closeout stores operating under various brand names. In 2001, Consolidated International changed its name (and the names of its portfolio of closeout stores) to Big Lots, Inc., bringing all brands under the Big Lots umbrella. Big Lots is now the fourth largest home goods retailer, generating operating revenues of approximately $4.7 billion in 2023.

7.    Big Lots markets and sells an assortment of products and merchandise in categories such as food, consumables (*e.g.*, health, beauty, cosmetic, plastic, paper, pet, infant, stationery, and chemical products), soft home products (*e.g.*, apparel, hosiery, jewelry, frames, fashion bedding, utility bedding, bath, window, decorative textile products, and area rugs), hard home products (*e.g.*, small appliances, table top, food preparation, home maintenance, and home organization products, toys, and electronics), furniture (*e.g.*, upholstery, mattresses, ready-to-assemble and home décor products, and case goods) and seasonal products (*e.g.*, lawn and garden,

summer, and holiday products) to customers across the country utilizing "brick and mortar" and online direct-to-customer sales channels.

8.      In the years immediately following the Company's consolidation under the Big Lots brand, the Company maintained competitive positioning as America's largest broadline closeout retailer. Big Lots focused on delivering extreme value to its customers, and as a result, it realized meaningful growth across its product categories and experienced five consecutive years of record earnings between 2007 and 2011.

9.      Between 2013 and 2018, the Company reoriented its commercial strategy to prioritize the sale of national brands and everyday items and deemphasize its closeout product categories and extreme bargain penetration. This change in the Company's commercial priorities resulted in higher average product prices, diminished customer traffic and stagnating sale volume. While the Company's furniture segment delivered steady growth throughout this period, the Company's shift away from its longtime commitment to sourcing discounted products contributed to the Company losing significant market share in its historically strong bargain merchandise vertical.

10.      In 2018 and 2019, a new leadership and management team was installed with a mandate to revitalize the Company's core mission. As a result, the Company emphasized its industry-leading dominance in the bargain sector and delivered unequivocal and appealing value. The Company focused on augmenting store relevance, excelling in omnichannel operations, and enhancing overall productivity. However, just as the Company began seeing early success in effectuating these key priorities, the Company's attention and resources were required to address the external challenges that hampered peers across the retail industry: namely the COVID-19 pandemic. In the months following the onset of the pandemic, Big Lots raised the hourly wages of

its non-exempt store and distribution employees, invested more than $50 million in COVID-19 response efforts and was well positioned to address the changing needs of its customers. Initially, customers stockpiled Big Lots' essential food and consumables merchandise. In the months thereafter, the release of government stimulus and unemployment funds, coupled with the continuation of social distancing policies, encouraged customers to make significant investments in their homes. These trends combined to drive continued demand in Big Lots' furniture, soft home, and hard home products through the balance of 2020. However, in the aftermath of COVID-19, the U.S. economy faced inflationary and macroeconomic pressures beyond the Company's control, which adversely impacted the buying power of Big Lots' core customers, decreased net sales, decreased gross margin as a percentage of net sales, and increased Big Lots' selling and administrative expenses.

11.     Despite the commercial challenges presented by a worsening macroeconomic environment, Big Lots continued to emphasize its commitment to providing bargains for its customers and right-sizing its cost structure. During the last two years, the Company sold excess high-cost inventory at record markdown rates and upgraded its merchandising team with veterans in the closeout goods space to drive bargain penetration. The Company continues to adjust its merchandising and operating models to position itself as the preeminent value-focused retailer.

**B.     Sales and Marketing**

12.     Big Lots' merchandising strategy focuses on product sourcing, particularly closeout sourcing and global sourcing, implemented primarily through "Bargains" (*i.e.,* offering products believed to provide a good value at lower prices) and "Extreme Bargains" (*i.e.,* offering products that provide unmistakable value to customers). The Company delivers unmatched value in all merchandise categories through high-quality closeouts on name brand items, affordable opening price points, and low prices on Big Lots' own brand assortment (*e.g.,* Broyhill, Real Living, Sound

Body, and Fresh Finds). These bargain offerings are complemented with a reliable assortment of simple-to-shop staple products that customers rely on and that bring consistency to Big Lots' product mix.

13. Big Lots generally sources closeouts from production overruns, packaging changes, discontinued products, order cancellations, liquidations, returns, and other disruptions in the supply chains of manufacturers, but also from engineered closeouts and other sourcing options. Big Lots has increased its sourcing and purchasing of high-quality closeout merchandise directly from manufacturers and other vendors, typically at prices lower than those paid by traditional discount retailers, to enhance the ability to deliver unmistakable value. While certain of Big Lots' merchandise vendors deliver directly to Big Lots stores, the large majority of Big Lots' inventory is staged and delivered from five regional distribution centers located in Alabama, California, Ohio, Oklahoma, and Pennsylvania. Big Lots does not operate any stores or facilities outside of the United States.

14. Big Lots believes that its brand image—rooted in unmistakable value, surprising products, and an exceptional shopping experience—is an important part of why its customers choose to shop at its stores and a critical element of the value proposition conveyed through all customer touchpoints. Accordingly, Big Lots focuses its marketing strategy on communicating Bargains and Extreme Bargains, driving incremental visits from new and existing customers, increasing brand awareness, brand consideration, and customers, and driving personalized marketing based on Big Lots' customer data platform.

15. Big Lots also employs an integrated approach for its marketing touchpoints and investments, consisting of (i) paid media, including television, print, digital, social media, internet, email, and payment card-linked marketing, (ii) earned media, including public relations and

organic social media, and (iii) owned media, including Big Lots' website, customer loyalty programs, and in-store signage. Big Lots prioritizes its relationships with the approximately 20 million active members of its customer loyalty program (the "**BIG Rewards Program**"), as nearly 75% of the Company's fiscal year 2023 sales were tied to this group of key customers.

## C.    Intellectual Property

16.    Big Lots' success depends, in part, on brand recognition. As of the Petition Date, Big Lots utilizes trademarks, service marks, and other intangible assets in its retail operations. This intellectual property is generally owned by an intellectual property protection subsidiary, which is wholly owned and is included in the consolidated results of the Company.

## D.    Employees

17.    Big Lots employs a talented and dedicated workforce that is integral to its business and critical to Big Lots' ability to maintain its high standards of quality, safety, and customer service. As of the Petition Date, Big Lots employs 27,700 people (collectively, including the current members of the Debtors' boards of directors or similar governing bodies, the "**Employees**"). None of the Employees are represented by a union or are party to a collective bargaining agreement. As detailed below in connection with the "Wages Motion" (*see* Section III of this Declaration), the Employees are located in multiple sites across the United States.

## E.    Corporate Structure

18.    Big Lots, Inc. is a public holding company that is the ultimate parent of 18 direct or indirect subsidiaries (all of which are Debtors in these Chapter 11 Cases). A chart illustrating Big Lots' corporate structure is attached hereto as **Exhibit A**.

19.    The Company began trading on the American Stock Exchange in 1985. In 1986, the Company switched its listing to the New York Stock Exchange, where the Company's common shares (the "**Common Stock**") trades under the ticker symbol "BIG." As of the Petition Date, Big

Lots had 298,000,000 shares of Common Stock authorized and, as of June 7, 2024, 29,681,973 shares of Common Stock outstanding.

**F.      Prepetition Funded Debt[2]**

20.      The Debtors have incurred and/or issued debt through (i) an asset based revolving credit facility and (ii) a term loan facility. As of the Petition Date, Big Lots has approximately $556.1 million in the aggregate of outstanding principal funded debt obligations, as reflected below:[3]

| Funded Debt | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| ABL Facility | September 21, 2027 | $433.6 million |
| Term Loan Facility | September 21, 2027 | $122.5 million |
| **Total Funded Debt** | | $556.1 million |

*i.      ABL Facility*

21.      On September 21, 2022, Big Lots entered into a five-year asset-based revolving credit facility (the "**ABL Facility**") in an initial aggregate committed amount of up to $900 million, which amount was subsequently reduced to up to $800 million (the "**Commitments**"). The ABL Facility was entered into by and among Big Lots, Inc. and Big Lots Stores, LLC, as borrowers, the direct and indirect wholly-owned subsidiaries of Big Lots, Inc. that are not borrowers, as guarantors, the lenders named therein and PNC Bank, National Association, as administrative agent (the "**ABL Agent**").

---

[2] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

[3] The table is for illustrative and summary purposes only. The Debtors do not admit to the validity, priority and/or allowance of any claim, lien, or interest in property and reserve their rights in relation to such issues.

22.     As of August 31, 2024, Big Lots has a Borrowing Base (as defined under the ABL Facility) of $552.2 million under the ABL Facility. As of August 31, 2024, Big Lots has $412.0 million in borrowings outstanding under the ABL Facility and $61.2 million committed to outstanding letters of credit, leaving $79.0 million available under the ABL Facility. The ABL Facility requires the Debtors to satisfy certain financial covenants, including minimum excess availability.

23.     All obligations under the ABL Facility are guaranteed by each domestic subsidiary of Big Lots, Inc. and secured by (a) a first priority lien on substantially all working capital assets of the Loan Parties thereunder, including but not limited to receivables, inventory, cash and cash equivalents (the "**ABL Priority Collateral**"), and (b) a second priority lien on all Term Loan Priority Collateral (as defined below). Revolving loans under the ABL Facility are available in an aggregate amount equal to the lesser of (a) the aggregate Commitments and (b) a borrowing base consisting of eligible credit card receivables and eligible inventory (including in-transit inventory), subject to customary exceptions and reserves. Accordingly, the Debtors' ability to obtain financing under the ABL Facility is contingent upon the Debtors carrying a sufficient and appropriate volume of eligible inventory.

24.     The maturity date of the ABL Facility is September 21, 2027.

    *ii.    Term Loan Facility*

25.     On April 18, 2024, the Company entered into a term loan facility (the "**Term Loan Facility**"), among Big Lots, Inc. and Big Lots Stores, LLC, as borrowers, all other domestic subsidiaries of the Company as guarantors, 1903P Loan Agent, LLC, as administrative agent and collateral agent (the "**Term Loan Agent**"), and the other lenders named therein (the "**Term Loan Lenders**"). The Term Loan Facility provides for an initial term loan in an aggregate amount of $50 million and a delayed draw term loan facility in an aggregate committed amount up to $150

million. Draws on the Term Loan Facility exceeding an aggregate principal amount of $115 million require the approval of the Term Loan Lenders.

26.     Upon entering into the Term Loan Facility, the Company drew down the initial $50 million in total borrowings, and the lenders under the Term Loan Facility extended additional loans in the amount of $72.5 million prior to the filing of the Petitions.  As of the Petition Date, the Company owes $122.5 million under the Term Loan Facility.

27.     All obligations under the Term Loan Facility are guaranteed by the Company's domestic subsidiaries and secured by (a) a first priority lien on substantially all of the Loan Parties' non-working capital assets, including fixtures, machinery, equipment, intellectual property, and real estate (the "**Term Priority Collateral**") and (b) a second priority lien on the ABL Priority Collateral. Borrowings under the Term Loan Facility are available for general corporate purposes, working capital and to repay a portion of the indebtedness outstanding under the ABL Facility.

28.     The maturity date of the Term Loan Facility is September 21, 2027.

*iii.     Intercreditor Agreement*

29.     On April 18, 2024, the ABL Agent, Term Loan Agent, Big Lots, Inc. and all of its direct and indirect wholly-owned subsidiary guarantors entered into an Intercreditor Agreement (as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**ABL/Term Loan Intercreditor Agreement**"). The ABL/Term Loan Intercreditor Agreement sets forth the agreements between the ABL Agent and the Term Loan Agent with respect to the priority of the collateral securing the ABL Facility and the Term Loan Facility, and the respective rights and remedies of the various lenders thereto, among other things.

**G.     Liquidity**

30.     The Company's primary source of liquidity is its borrowing base capacity under the ABL Facility and Term Loan Facility. The Company principally uses this liquidity to provide

working capital for operations, service interest and principal payments, and fund capital expenditures. As of August 31, 2024, the Company had $108.5 million of liquidity, prior to the impact of the minimum excess availability covenant.

**H.    Senior Management**

31.    As noted above, I serve as Big Lot's Chief Financial and Administrative Officer. The senior management team also includes the Chief Executive Officer, General Counsel and Chief Human Resources Officer.

32.    Bruce K. Thorn has served as Big Lots' President and Chief Executive Officer since September 2018. Prior to serving in these roles, Mr. Thorn served as President and Chief Operating Officer of Tailored Brands, Inc., a specialty retailer of men's tailored clothing and formal wear, from 2015 to 2018. Mr. Thorn also held various enterprise-level roles with PetSmart, Inc., most recently as Executive Vice President, Store Operations, Services and Supply Chain, as well as leadership positions with Gap, Inc., Cintas Corp, LESCO, Inc. and The United States Army.

33.    Ronald A. Robins, Jr. serves as Big Lots' Executive Vice President, Chief Legal and Governance Officer, General Counsel and Corporate Secretary. Mr. Robins was promoted to Executive Vice President in September 2019, and now serves as the Chief Legal and Governance Officer. Prior to that time, Mr. Robins served as Senior Vice President, General Counsel and Corporate Secretary since joining Big Lots. Prior to joining Big Lots, Mr. Robins was a partner at Vorys, Sater, Seymour and Pease LLP and also previously served as General Counsel, Chief Compliance Officer, and Secretary of Abercrombie & Fitch Co.

34.    Michael A. Schlonsky serves as Big Lots' Executive Vice President, Chief Human Resources Officer. Mr. Schlonsky was promoted to Executive Vice President in August 2015, and now serves as the Chief Human Resources Officer. He was promoted to Senior Vice President, Human Resources in August 2012 and to Vice President, Associate Relations and Benefits in 2010.

Mr. Schlonsky was previously promoted to Vice President, Associate Relations and Risk Management in 2005. Mr. Schlonsky joined Big Lots in 1993 as Staff Counsel and was promoted to Director, Risk Management in 1998, and to Vice President, Risk Management and Administrative Services in 2000.

## II. EVENTS LEADING TO THE CHAPTER 11 CASES

35.     Over the last several years, Big Lots, like many retailers, has been forced to contend with numerous significant macroeconomic and industry-specific headwinds that have strained its business and resources, and ultimately led the Debtors to seek chapter 11 relief. This section describes the circumstances and immediate catalysts motivating the filing of the Chapter 11 Cases.

**A.      Recent Macroeconomic Trends**

36.     The legacy discount retail industry is highly competitive. Over the past decade, multiple large brand store-front retailers have experienced distress attributed to a common set of underlying factors: the marked shift by consumers towards e-commerce, the resulting loss of in-store foot traffic and in-store sales, the difficulties presented by maintaining a right-sized real estate portfolio and distribution network, and diminishing profit margins across a broad spectrum of retail product verticals.

37.     Additionally, in recent years, the Company has faced increased competition across multiple market segments, including from supermarket retailers, convenience stores, national general merchandisers and discount retailers, membership clubs, warehouse stores, big box retailers and online retailers. Some of these competitors are large in scale and, as a result, have greater resources and purchasing power than Big Lots, making it increasingly difficult for the Company to compete while maintaining solid profit margins.

38.     Like many of Big Lots' competitors and peers, the last several years have been extremely challenging. The cumulative effect of increased competition across all segments of the

retail industry, the disruptions of the COVID-19 pandemic, a shifting interest rate environment, a less dependable supply chain ecosystem and resulting increases in operating costs had a significant impact on the Company's bottom line and its ability to continue to operate as an extreme value retailer. Worse yet, in November 2022, United Furniture Industries, Inc. ("**UFI**") unexpectedly ceased operations and terminated its employees. At that time, UFI was the Company's largest supplier and the primary vendor for its signature Broyhill furniture brand. Furniture products supplied by UFI represented approximately 6% of the Company's merchandise purchases in 2022. While the Company worked tirelessly to source the forgone products from alternative vendors, disruptions such as these only compounded the difficulty of operating in an inflationary macroeconomic environment. The prevailing economic trends were disproportionately challenging to Big Lots, as its core customers curbed their discretionary spending on the high-margin home and seasonal product categories that significantly contribute to the Company's bottom line.

**B.      Strategic Initiatives**

39.      In response to these challenges, Big Lots engaged in a number of strategic initiatives to prioritize growth and maintain its position as a leader in the home goods market. The Company's 2019 comprehensive review of its operating strategy resulted in a multi-year strategic transformation plan titled "Operation North Star," which centered around three primary objectives: (1) driving profitable growth; (2) funding the journey; and (3) creating long-term shareholder value. Beginning in 2023, Big Lots defined five key actions for Operation North Star: (1) Big Lots' campaign to own the bargain and extreme bargain product categories; (2) the communication of unmistakable value; (3) the increase of Big Lots store relevance to catalyze foot traffic and customer frequency; (4) winning Big Lots customers for life through an omnichannel, customer-friendly shopping experience; and (5) driving productivity to reduce working capital investment,

improve profitability of stores, strengthen available liquidity and maximize the Company's buying power.

40.     In spring 2023, Big Lots launched a cost reduction and productivity initiative that the Company refers to as "Project Springboard," with the goal of improving the Company's operating income by over $200 million. Project Springboard was designed to improve operating income results by reducing the costs of goods sold, identifying areas to improve gross margins, and reducing selling and administrative expenses. Big Lots' efforts to reduce the costs of goods sold are primarily focused on minimizing input costs via improved purchasing practices and competitive bidding processes, among other improvements. Big Lots identified opportunities to achieve gross margin improvements by optimizing its inventory allocation processes and improving its marketing, pricing, and promotion. Lastly, Big Lots realized selling and administrative expense savings through the optimization of store payroll, improved efficiency in its supply chain (including shutting down its forward distribution centers to lower costs and remove excess capacity), procurement improvements, and other workforce efficiencies.

41.     Further operational components of the Project Springboard campaign included an increased proportion of bargains, heightened product freshness, reduced freight expenses, sustained cost-cutting initiatives, more effective promotional strategies and a return to standardized markdown levels.

42.     Operation North Star, Project Springboard, and the Company's other strategic initiatives collectively strengthened the Company's balance sheet and streamlined its operational processes. Though these strategic initiatives were not sufficient to fully address the Company's liquidity needs, they did increase the attractiveness of the Company and its assets to potential buyers.

### C.       Cost-Cutting Measures

43.       In addition to its strategic initiatives, Big Lots explored and executed several cost-saving measures and operational improvements. First, in 2023, Big Lots decreased its net store count by 33 stores, which included the closure of 48 store locations. The decrease in net store count was principally the result of Big Lots management identifying underperforming store locations where the facts and circumstances supported closure. Second, the Company continued to reduce operating and overhead costs to better align the operation to its optimized store footprint. These efforts to lower selling, general, and administrative ("**SG&A**") expenses generated approximately $140 million in savings in 2023 and reduced capital expenditures by almost 60% year over year. Third, at its retail locations, the Company rationalized its merchandise offerings to improve working capital, refresh its assortment, and reduce inventory by nearly $200 million.

### D.       Sale Leaseback Transaction

44.       In July 2023, Big Lots announced its entry into a sale and leaseback agreement with affiliates of Blue Owl Capital relating to the company's distribution center in Apple Valley, CA, and 23 owned store locations. This transaction raised $305.7 million, which Big Lots used to pay transaction expenses, pay off a 2023 synthetic lease transaction and repay borrowings under the ABL Facility.

### E.       Term Loan Facility Financing

45.       As described in Section II.F above, Big Lots entered into the Term Loan Facility to obtain additional financing for general corporate purposes, improve its liquidity position, repay a portion of the indebtedness outstanding under the ABL Facility and remain focused on the Company's strategic objectives. Unfortunately, the financing made available by the Term Loan Facility, together with the sale leaseback transaction and cost-cutting measures, was not sufficient to fully address Big Lots' continuing financial obligations and commitments.

F.     **Advisor Engagement**

46.     To assist Big Lots in analyzing its financing needs and developing capital structure solutions and restructuring alternatives, in May 2024, Big Lots retained Guggenheim Securities, LLC ("**Guggenheim Securities**") as its investment banker, A&G Realty Partners, LLC ("**A&G**") as its real estate advisor and Davis Polk & Wardwell LLP as legal counsel. Big Lots also engaged AlixPartners, LLP as its operational advisor to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and support contingency preparations.

47.     From May 2024 through the Petition Date, the Company, together with its advisors, considered and exhaustively pursued a range of possible options, including: (i) seeking to raise additional financing from new financing sources and existing stakeholders; (ii) soliciting interest in strategic combinations; (iii) attempting to market and sell all or a portion of its assets and/or operations to third parties; and (iv) exploring a plan to close a portion (but not all) of its stores, with a view towards restructuring around a smaller, right-sized footprint. The Company went to great lengths to pursue all such options.

48.     Unfortunately, despite these comprehensive efforts, during June 2024, the Company concluded that, based on recent performance trends, the only viable pathway to maintain its business as a going concern and preserve liquidity was to rationalize its footprint, close underperforming stores, and identify a purchaser for the remaining assets. In July 2024, the Company initiated a first wave of store closing sales, which continued with a second wave of closings in August 2024.

49.     On July 31, 2024, Big Lots entered into certain amendments to the ABL Facility and the Term Loan Facility. These amendments, among other things, (i) increased the number of stores which Big Lots is permitted to close from 150 to 315, (ii) reduced the aggregate commitments under the ABL Facility from $900 million to $800 million and increased the interest

rate of borrowings under the ABL Facility by 50 basis points and (iii) required Big Lots to share certain additional reporting with the lenders to the ABL Facility and the Term Loan Facility. The Company, in consultation with its advisors, is continuing to review its store commitments to identify the real estate portfolio that is consistent with the Company's go-forward operational needs and represents the greatest potential for a value maximizing recovery to the estates.

50.     Big Lots conducted a marketing process for substantially all of its assets for 13 weeks over the summer of 2024. Big Lots, with the assistance of Guggenheim Securities, prepared marketing materials and contacted approximately 20 potential strategic and financial purchasers. Of those potential purchasers, 12 entities executed non-disclosure agreements and were provided with a confidential information memorandum and granted access to a virtual data room containing confidential information regarding the Bid Assets. Big Lots will use the chapter 11 process to complete the marketing process.

51.     The Company was successful in negotiating a going concern sale transaction for certain of its core business lines to Nexus Capital Management LP (the "**Stalking Horse**"), setting the floor for other potential bids to acquire certain assets during these Chapter 11 Cases. Under the September 8, 2024 asset purchase agreement between the Company and the Stalking Horse (as modified from time to time, the "**Stalking Horse APA**"), the Stalking Horse has committed, subject to Court approval, to acquire substantially all of the assets of the Company in exchange for a purchase price of $620 million, inclusive of the assumption of certain liabilities on the terms and conditions set forth in the Stalking Horse APA.

## G.    DIP Financing

52.     In parallel with the sale process, Big Lots, with the assistance of its advisors, negotiated the DIP Facilities (as defined in the DIP Motion) and secured postpetition financing in the aggregate amount of $707.5 million, of which $35 million is provided in the form of new

money term loans. Big Lots believes that the financing terms and related obligations negotiated in the DIP Facilities provide Big Lots with the best opportunity to meet its near-term financial obligations and position the Company to run a value maximizing sale process.

53.     As Stuart Erickson details in his accompanying declaration, the Debtors' businesses are cash-intensive, with significant daily and monthly cash needs to meet obligations to vendors, employees, and landlords, among others. The DIP Facilities will bolster liquidity, and the Debtors will benefit from the strong message the DIP Facilities provide to the Debtors' key stakeholders— that operations will continue post-petition in the ordinary course as the Company charts its path out of bankruptcy. The DIP Facilities provide the financing required for the Company to continue to operate during these Chapter 11 Cases and position the Company to consummate a sales transaction and maximize recoveries for stakeholders in a timely manner. The Debtors recognize that speed within chapter 11 is key for a business to preserve value for all stakeholders. The longer that the Debtors linger in chapter 11, significant administrative claims (including DIP interest and professional fees) will accrue, and the Company will risk the loss of employee, customer and supplier confidence. The Debtors are mindful of these time considerations and believe that the DIP and sale milestones will guide these Chapter 11 Cases towards a value-maximizing outcome for all stakeholders.

### III. **FIRST DAY MOTIONS**

54.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in the Chapter 11 Cases and has requested that each of the First Day Pleadings be granted, as each is a critical element of an orderly and constructive transition into chapter 11.

55.     As a result of my first-hand knowledge, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief

18

sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders and (c) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

56.    As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. I, or other members of the Debtors' management and/or operational teams, participated in the analysis that informed each First Day Motion and assisted in developing the relief requested therein, and reviewed the pleadings related thereto. At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor in possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases. It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.

57.    For a more detailed description of the First Day Pleadings than set forth below, I respectfully refer the Court to the respective First Day Pleadings. I have reviewed each of the First Day Motions and believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief. To the extent that this Declaration and the provisions of any of the First Day Pleadings are inconsistent, the terms of the First Day Pleadings shall control. Capitalized terms that are used in this Part III but not otherwise

defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

**A.      Administrative Pleadings**

> *i.      Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases and Granting Related Relief (the "**Joint Administration Motion**")*

58.      Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their Chapter 11 Cases for procedural purposes only and granting certain related relief. Given the integrated nature of the Debtors' operations, I believe that the joint administration of these cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest. Joint administration will also allow parties in interest to monitor these cases with greater ease and efficiency.

59.      Because many of the motions, hearings, and orders in these cases will affect each Debtor, the entry of an order directing joint administration of these cases should reduce costs by avoiding duplicative filings and objections that would be required absent such relief, as well as ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of nineteen separate Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

> *ii.      Motion of Debtors for Entry of a Standing Order Confirming the Statutory Protections of the Bankruptcy Code (the "**Automatic Stay Motion**")*

60.      Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code. Certain of the Debtors are party to various commercial contracts with counterparties, or otherwise purchase merchandise from vendors, that are non-U.S. entities. Many of these creditors do not transact business on a regular basis with companies that

have filed for chapter 11 and therefore may be unfamiliar with the scope of a debtor in possession's authority to conduct its business and the scope of the Bankruptcy Code's protections.

61.     The Debtors thus seek the relief requested in the Automatic Stay Motion out of an abundance of caution. There is a risk that various interested parties may attempt to take actions against the Debtors outside of the United States to the detriment of the Debtors, their estates, and creditors, or take other actions in contravention of section 362 of the Bankruptcy Code, as well as attempt to terminate leases and executory contracts pursuant to *ipso facto* provisions therein in contravention of section 365 of the Bankruptcy Code. For the avoidance of doubt, the relief requested under the Automatic Stay Motion does not seek to expand or enlarge the rights afforded to the Debtors under the Bankruptcy Code.

  *iii.* *Application of Debtors for Entry of an Order Authorizing the Debtors to Employ and Retain Kroll Restructuring Administration LLC as Claims and Noticing Agent for Debtors Nunc Pro Tunc to the Petition Date (the "**Claims Agent Application**")*

62.     Pursuant to the Claims Agent Application, the Debtors request entry of a retention order appointing Kroll Restructuring Administration LLC ("**Kroll**") as the Claims and Noticing Agent for the Debtors and their Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases. The Debtors' selection of Kroll to act as the Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I believe, based on all engagement proposals obtained and reviewed, that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise. The terms of Kroll's retention are set forth in an engagement agreement; *provided*,

*however*, that the Debtors are seeking approval solely of the terms and provisions as set forth in the Section 156(c) Application and the proposed retention order.

63.     I believe that given Kroll's experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of Chapter 11 Cases and experience in matters of this size and complexity, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be a significant number of claims.

64.     By separate application, the Debtors will seek authorization to retain and employ Kroll as administrative advisor in these Chapter 11 Cases pursuant to section 327(a) of the Bankruptcy Code because the administration of these Chapter 11 Cases will require Kroll to perform duties outside the scope of 28 U.S.C. § 156(c).

65.     Accordingly, on behalf of the Debtors, I respectfully submit that the Section 156(c) Application should be approved.

**B.      Operational Pleadings Requiring Immediate Relief**

> i.     *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief (the "**Store Closing Motion**")*

66.     Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders: (a) authorizing the to assume that certain Master Services Agreement by and between Gordon Brothers Retail Partners, LLC (the "**Consultant**") and BL Stores, dated as of November 30, 2022 (as amended as of April 18, 2024, as further amended as of July 19, 2024, and as may be further altered, amended, modified, or supplemented from time to time in accordance with the terms thereof), a copy of which is attached to the proposed Approval Orders (as defined below) as Schedule 1 (collectively, the "**Services Agreement**"), (b) authorizing and approving the continuation of sales of the Debtors' Merchandise (as defined below) by means of "store closings,"

"going out of business," "sale on everything," "everything must go," or similar themed sales (the "**Sales**") in the Debtors' retail stores (the "**Stores**"), with such Sales being free and clear of all liens, claims, interests, and encumbrances, (c) authorizing the sale of the furniture, fixtures, equipment, signage, black-out pylons, and other personal property located in or at the Stores or otherwise under the Debtors' control (the "**FF&E**" and, together with the Merchandise, the "**Store Closing Assets**" and, the sale of the Store Closing Assets, the "**Store Closing Sales**"), (d) approving the guidelines for conducting the Store Closing Sales and abandoning certain Store Closing Assets, substantially in the form attached to the proposed Approval Orders as Schedule 2 (the "**Store Closing Procedures**"), and (e) granting related relief.

67.     Prior to the Petition Date, the Debtors recognized the need to right-size their store portfolio to optimize their go-forward cost structure by eliminating underperforming stores. Accordingly, the Debtors' management team, in consultation with their advisors, undertook an extensive analysis of the Debtors' existing store portfolio, evaluating, among other factors, historical and recent store profitability, sales, and gross margin trends, occupancy costs, changing location value, customer and competitive factors, the geographic market in which each store is located, and specific operational circumstances related to each store's performance. The Debtors and their advisors also evaluated the need to negotiate lease modifications (*e.g.,* cure cost waivers, rent concessions, and certain other contractual modifications) with certain of their landlords to achieve forecasted performance metrics for each of their remaining stores.

68.     The Debtors conducted a fulsome process to identify third party experts with the requisite experience, capabilities, and expertise to evaluate the Debtors' real estate interests, conduct the Store Closing Sales, and prepare the Closing Stores for turnover to the applicable landlords or third parties, all on terms that would maximize recoveries to their estates. In

consultation with their advisors, the Debtors determined that the Consultant presented the best proposal. This determination was based on the Consultant's logistical capabilities, resources, and experience in performing large-scale going out of business sales in a controlled process. The Store Closing Sales are critical for the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closing Sales in an efficient, controlled manner that will maximize value for the Debtors' estates.

69.     The Debtors seek approval of streamlined procedures (the "**Store Closing Procedures**") to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances with proceeds thereof distributed in accordance with the Proposed Interim Order (as defined in the DIP Motion). The Store Closing Procedures are substantially similar to sale guidelines approved in retail bankruptcies around the United States. The Debtors also seek approval of the Store Closing Procedures to provide newspapers and other media in which the Sales may be advertised with comfort that the Debtors are conducting the Store Closing Sales in compliance with applicable law and with the Bankruptcy Court's approval. Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "**Liquidation Sale Laws**") which hamper the Debtors' ability to maximize value in selling their inventory. Subject to the Court's approval, the Debtors intend to conduct the Store Closing Sales in accordance with the Store Closing Procedures, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Store Closing Procedures shall control.

70.     Additionally, for the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the Dispute Resolution Procedures. The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Store Closing Procedures and Dispute Resolution Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize the value of the Debtors' estates.

71.     I believe that the Store Closing Sales represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of other parties in interest. Delay in approving the continuance of the Store Closing Sales would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, including paying unnecessary postpetition rent at many of the Closing Stores, which would use scarce funds that would otherwise go to other creditors. The Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Closing Stores.

72.     I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.

     *ii.*    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing (A) Debtors To Continue To Maintain Existing Cash Management System, Bank Accounts, and Business Forms, (B) Debtors To Open and Close Bank Accounts, and (C) Financial Institutions To Administer the Bank Accounts and Honor and Process Related Checks and Transfers, (II) Waiving Deposit and Investment Requirements, and (III) Allowing Intercompany Transactions and Affording*

*Administrative Expense Priority to Post-Petition Intercompany Claims (the "**Cash Management Motion**")*

73.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue operating their prepetition cash management system with respect to intercompany cash management, as further described below (the "**Cash Management System**"), (ii) maintain their existing bank accounts (together with any accounts opened after the date hereof, the "**Bank Accounts**" and each, a "**Bank Account**") located at certain banks and financial institutions (each, a "**Bank**" and, collectively, the "**Banks**"), with the ability to open and close Bank Accounts post-petition in the ordinary course of business, and (iii) maintain their existing Business Forms, (b) authorizing the applicable financial institutions to treat, service, and administer the Bank Accounts in the ordinary course of business and to receive, process, honor, and pay all checks or wire transfers used by the Debtors, (c) waiving the requirements of section 345(b) of the Bankruptcy Code, rules 2015-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), and section 2 of the U.S. Trustee Guidelines on an interim basis, (d) allowing the Debtors to continue to enter into and perform Intercompany Transactions and (e) affording post-petition Intercompany Claims administrative expense priority treatment under sections 503(b)(1) and 364(a) of the Bankruptcy Code.

74.     In the ordinary course of business, the Debtors utilize an integrated and centralized Cash Management System, consisting of depository, disbursement, payroll, and other accounts, allowing the Debtors to efficiently collect and concentrate cash receipts from their approximately 1,300 stores and their distribution facilities and make necessary disbursements. The Cash Management System is specifically tailored to the Debtors' operational needs and enables the Debtors to, among other things, accurately forecast and report their cash flow requirements and

monitor the collection and disbursement of funds to and from the Bank Accounts. The Cash Management System is essential to the efficient operation of the Debtors' business in the ordinary course and any disruption to the Cash Management System is likely to materially impair the Debtors' ability to continue operations of their stores and to maximize the value of their estates.

75.     As of the Petition Date, the Debtors maintain 832 primary Bank Accounts with eight different Banks—PNC Bank, National Association, US Bank National Association, Bank of America, N.A., Citizens Bank, N.A., Fifth Third Bank, National Association, The Huntington National Bank, Truist Bank, and Wells Fargo Bank, N.A.—each of which has executed a Uniform Depository Agreement with the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**") and is thus designated as an authorized depository by the U.S. Trustee. Money circulates in, out, and between the Bank Accounts in a variety of manners, including checks, drafts, wire transfers, and ACH transfers. Additional detail regarding the Cash Management System, including a summary diagram of the system, is provided in the Cash Management Motion.

76.     In the Cash Management Motion, the Debtors seek authorization to continue to operate their Cash Management System, as well as honor any prepetition obligations related thereto (including Bank Fees) in the ordinary course of business, maintain existing Business Forms, and continue to engage in Intercompany Transactions. The Debtors also request that the Court grant administrative expense priority treatment to Intercompany Claims.

77.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid significant interruptions to the operation of the Debtors' businesses. Big Lots' businesses relies upon its ability to use cash to, among other things, (a) satisfy payroll, pay vendors and suppliers, and meet overhead expenses, (b) fund working capital needs and capital expenditures, (c) pay for goods or services critical to the operation of its business, (d) pay property

taxes and other taxes, and (e) finance other general corporate purposes. It is, therefore, critical that the Debtors have uninterrupted access to sufficient cash. Any limitation on the Debtors' use of cash would have disastrous effects on Big Lots' businesses and operations, threatening its ability to continue as a going concern and resulting in the rapid deterioration of the value of the enterprise, as the Company would lack sufficient working capital to make payments to Employees, vendors, suppliers, and other key providers of goods and services on a timely basis.

78.     In order to avoid any business disruption and to ensure a smooth transition into chapter 11 and a sale process, the Debtors must signal to their Employees, constituents, vendors, and counterparties that the Company still has access to sufficient liquidity to, among other things, continue business operations, maintain relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy its working capital and operational needs, all of which are required to preserve and maintain its enterprise value.

79.     I believe that authorizing the Debtors to continue operating their Cash Management System as it was operated as of the Petition Date, pay Bank Fees, maintain existing Business Forms, and continue engaging in Intercompany Transactions is essential to the Debtors' operational stability and the success of these cases. In my opinion, this relief will facilitate the Debtors' operation in chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system, by minimizing delays in the payment of postpetition obligations, thereby ensuring the efficient administration of these Chapter 11 Cases, and by maximizing the value of the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

iii.   *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors To (A) Honor Prepetition Employee Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees To Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Wages Motion**")*

80.     Pursuant to the Wages Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to (i) pay all or a portion of the Prepetition Employee Obligations, (ii) continue the Employee Programs, and (iii) reject the Prepetition LTIP Agreements in their entirety, effective *nunc pro tunc* to the Petition Date, (b) permitting current and former Employees holding claims under the Workers' Compensation Program to proceed with such claims in the appropriate judicial or administrative fora and (c) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing. As described in detail in the Wages Motion, the Debtors employ approximately 27,700 individuals, including approximately 9,600 full-time Employees and approximately 18,100 part-time Employees. This workforce relies on the compensation and benefits provided or funded by the Debtors to continue to pay their daily living expenses and will be exposed to significant financial difficulties if the Debtors are not permitted to pay these obligations. I believe that if they are unable to honor all such obligations immediately, employee morale and retention will be jeopardized at a critical juncture.

81.     Moreover, a stable workforce is required for the uninterrupted continuation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' estates during these Chapter 11 Cases. Any significant number of departures or deterioration in morale among the Debtors' workforce at this time will immediately and substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors. There is a real, immediate risk that if the Debtors are not authorized to

continue to honor their prepetition obligations to these parties in the ordinary course, the employees and temporary workers would no longer support and maintain the operations of the Debtors, thereby crippling them. Absent an order granting the relief requested by the Wages Motion, many employees would undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtors would be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives. Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

82.     I strongly believe it is critical that the Debtors be permitted to pay prepetition wages and continue with their ordinary course personnel policies, programs and procedures, including, but not limited to, maintenance of workers' compensation programs and health care programs, that were in effect prior to the Petition Date.

> iv.     *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers (the "**Vendor Motion**")*

83.     Pursuant to the Vendor Motion, the Debtors seek entry of an order authorizing the Debtors to (a) establish procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors, Foreign Vendors, Prepetition Order Vendors, 503(b)(9) Claimants, or Lien Claimants regarding the validity and amount of their respective claims and to determine, in the Debtors' sole discretion, whether such parties so qualify for the relief requested herein, (b) authorizing, but not directing, the Debtors to pay in the ordinary course

of business, in their sole discretion and business judgment, prepetition obligations related to Critical Vendors, Foreign Vendors, and 503(b)(9) Claimants; *provided*, that the maximum amounts that the Debtors shall pay in the aggregate on interim and final bases on account of all Critical Vendor Claims and Foreign Vendor Claims shall be $40,000,000 and $60,000,000, respectively, (c) granting Prepetition Order Vendors administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed obligations arising from Prepetition Orders for certain Goods received and accepted by the Debtors on or after the Petition Date, and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business, in their sole discretion, under section 363 of the Bankruptcy Code, (d) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods purchased from Vendors by the Debtors prior to the Petition Date for credit against such Vendors' prepetition claims, (e) authorizing, but not directing, the Debtors to pay, in their sole discretion, all or a portion of the Lien Claims (as defined below), and (f) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

84.     <u>Critical Vendors</u>. The Debtors' business and path in Chapter 11 requires them to rely heavily on certain vendors and service providers (collectively, the "**Critical Vendors**") to continue the delivery of key inventory, and to ensure the safe and effective operation of the Debtors' retail stores. Many of the Critical Vendors are the sole provider of certain Goods or Services or have specific requisite knowledge and experience with the Debtors' business or store locations. Attempting to replace such Critical Vendors on short notice would prove catastrophic to the Debtors' value maximization efforts in these Chapter 11 Cases. This is especially true with respect to certain vendors who are responsible for security, operations, and maintenance of the

Debtors' over 1,300 stores. Accordingly, to maximize value for the Debtors' estates, it is essential that the Debtors maintain their business relationships with the Critical Vendors.

85.     The Debtors have determined that paying prepetition claims owing to the Critical Vendors (the "**Critical Vendor Claims**") is the most effective way to ensure that the Critical Vendors continue providing critical Goods and Services during these Chapter 11 Cases. Without the ability to make such payments, the Debtors face the significant and very real possibility that the Critical Vendors will refuse to continue delivering Goods or providing Services that are essential to maximizing the value of the Debtors' estates.

86.     The Debtors believe that jeopardizing their relationships with any of the entities identified as Critical Vendors would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the Critical Vendors' Goods and Services would impede the Debtors' operations, and the cumulative impact of such interruptions could have a catastrophic adverse effect on the Debtors and the ability to maximize the value of the Debtors' estates during this critical period. The Debtors seek authority to pay Critical Vendor Claims in the ordinary course of business, pursuant to the terms of any contracts under which such claim arose in an amount not to exceed, in the aggregate and together with amounts paid to Foreign Vendors, $40,000,000 on an interim basis and $60,000,000 on a final basis.

87.     <u>Foreign Vendors</u>. The Debtors transact a significant portion of their business with a group of foreign vendors and independent contractors (collectively, the "**Foreign Vendors**") that operate in foreign jurisdictions and have little to no connection to the United States. To the extent such amounts remain unpaid, the Foreign Vendors may take legal action against the Debtors outside the United Sates, which would be time consuming and costly to defend and consume estate

resources. Failure to pay such Foreign Vendors would also jeopardize the Debtors' ability to maintain their businesses and key relationships with the Foreign Vendors. Therefore, the Debtors request authority to pay the Foreign Vendor Claims as they become due and payable where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, in an amount not to exceed, in the aggregate and together with amounts paid to Critical Vendors, $40,000,000 on an interim basis and $60,000,000 on a final basis.

88.     <u>Prepetition Order Vendors</u>. A significant portion of the Goods and Services purchased by the Debtors are generally shipped directly to and received by the Debtors on an as-needed basis for the Debtors' businesses and operations, all as directed by the Debtors. As a consequence of the commencement of the Chapter 11 Cases, the Debtors believe that many of the Vendors may be particularly concerned that they will not be paid for the delivery or shipment of Goods or the provision of Services after the Petition Date if such deliveries, shipments, or provisions were based on prepetition purchase orders or other short and longer term contracts (collectively, the "**Prepetition Orders**"), or that their claims arising from the Prepetition Orders (such claims, "**Prepetition Order Claims**") would be treated as general unsecured claims.

89.     The Vendors holding such Prepetition Order Claims (such Vendors, the "**Prepetition Order Vendors**") may refuse to provide Goods or Services to the Debtors (or may recall shipments of Goods) unless the Debtors issue substitute purchase orders post-petition or obtain an order of the Court (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed Prepetition Orders or (b) authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

90.     <u>503(b)(9) Claimants</u>. The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to Critical Vendors or

Foreign Vendors, would be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims are on account of Goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date (the "**503(b)(9) Claims**" and, the Vendors holding such 503(b)(9) Claims, the "**503(b)(9) Claimants**"). As 503(b)(9) Claims are administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors request authority to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the Bankruptcy Code.

91.    <u>Lien Claimants</u>. In operating their businesses, the Debtors use and make payments to third-party shippers, warehousemen, contractors, maintenance workers and other service providers (collectively, the "**Lien Claimants**") that, among other things, (a) transport, ship, deliver (via sea, air, rail, and road freight services), and store Goods on behalf of the Debtors and (b) provide various Services to the Debtors, including remodeling and on-site construction, maintenance, and repairs to the Debtors' retail stores and distribution/fulfillment centers. The Debtors have, over time, nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive. In addition, these Lien Claimants have developed in-depth knowledge of the Debtors' specific operational, shipping, delivery, and storage requirements. It is essential to the continuity of the Debtors' operations, businesses, and the preservation and maximization of value of the Debtors' estates that the Debtors maintain their relationships with these Lien Claimants.

92.    In the event that the prepetition claims of the Lien Claimants (collectively, the "**Lien Claims**") remain unpaid, the Lien Claimants may assert Liens on the Goods in their possession, equipment, or property under applicable non-bankruptcy law, or refuse to deliver or release such Goods (even where payment for the Goods themselves has already been made), or

otherwise impede the Debtors' use of their property until their claims are satisfied and their Liens redeemed. In order to maintain access to and preserve the value of the Goods essential to the continued operation of the Debtors' stores and online sales platform, the Debtors seek authority to honor outstanding invoices on account of the Lien Claims.

93.     I believe that each of the forms of relief requested in the Vendors Motion is critical to the continued receipt and/or distribution of Goods and Services and the preservation and maximization of the value of the Debtors' estates. Any disruption in the provision of the aforementioned transportation, shipping, delivery, logistics, storage, construction, maintenance, and repair services by the Lien Claimants would immediately impact the operation of the Debtors' businesses. Further, any disruption in the flow of Goods or the withholding of Services, as applicable, would erode the Debtors' ability to operate, maintain inventory and merchandise levels necessary to drive retail traffic, and attract new business, thereby jeopardizing the Debtors' ability to efficiently administer the Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Vendors Motion should be approved.

> v.    *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors To Honor Prepetition Obligations to Customers and Otherwise Continue Customer Practices and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Customer Programs Motion**")*

94.     By this motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) honor and fulfill the Customer Obligations as they deem appropriate and (ii) continue, renew, replace, implement new, and terminate any Customer practices as they deem appropriate, in the ordinary course of business, and (b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to satisfy the foregoing.

95.     Through both their retail and consumer products business segments, the Debtors provide certain incentives, discounts, promotions, and accommodations, and administer related

programs (the "**Customer Programs**"), to attract customers and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brands.

96.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the Chapter 11 Cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable customer relationships, goodwill, and market share. If the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating their customers, and might suffer corresponding losses in customer loyalty and goodwill that will harm the Debtors' prospects of maximizing the value of their estates. I also believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.

vi.     *Motion of Debtors for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for, and Approving Restrictions on, Certain Transfers of, and Declarations of, Worthlessness with Respect to, Interests in the Debtors' Estates (the "**Tax Attributes Motion**")*

97.     The Debtors estimate that, as of February 3, 2024, they had NOL carryforwards for U.S. federal income tax purposes of approximately $329 million, NOL carryforwards for state and local tax purposes of approximately $332 million, other federal carryforwards of approximately $84 million, other state carryforwards of approximately $48 million, approximately $2.8 million federal employment tax credits, and certain other federal and state tax attributes. The Debtors further expect that they may generate additional NOLs and other Tax Attributes for their 2024 tax year and during the pendency of the Chapter 11 Cases. The Tax Attributes are potentially of significant value to the Debtors because they may offset future federal taxable income or federal tax liability in future years.

98.     Accordingly, pursuant to the Tax Attributes Motion, the Debtors seek entry of interim and final orders establishing certain procedures that would preserve the value of the Tax Attributes for the benefit of the Debtors' estates. Specifically, the Debtors are seeking to establish procedures with respect to (i) trading of the equity securities of Big Lots, Inc. or any beneficial interests therein and (ii) restricting the ability of shareholders that are, or were, or become 50% Shareholders to claim a deduction for the worthlessness of their Big Lots, Inc. stock for any tax year ending before the Debtors' emergence from chapter 11 protection.

99.     I believe that implementation of the proposed procedures is necessary to avoid an irrevocable loss or reduction in the availability of the Tax Attributes and the irreparable harm which could be caused by unrestricted trading in the Big Lots, Inc. stock or claims against the Debtors and the Debtors' resulting inability to offset taxable income with the Tax Attributes. Accordingly, I believe that the relief requested is in the best interests of the Debtors' estates and creditors, and on behalf of the Debtors, I respectfully submit that the Tax Attributes Motion should be approved.

> vii.  *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors To (A) Continue and Renew Their Liability, Property, Casualty, Surety Bond, and Other Insurance Programs, and Honor All Obligations in Respect Thereof, (B) Honor and Renew the Terms of the Premium Financing Agreements and Pay the Financing Agreement Payments Thereunder, and (C) Enter into New Premium Financing Agreements in the Ordinary Course of Business and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Insurance Motion**")*

100.     Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing (a) authorizing, but not directing, the Debtors to maintain, continue, review, purchase, renew or extend, and obtain, in their sole discretion, their various liability, property, casualty, and other insurance and reinsurance programs in the ordinary course of their business (collectively, the "**Insurance Programs**") through numerous private insurance carriers (collectively, the

"**Carriers**") on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date (as defined below), (b) authorizing, but not directing, the Debtors to maintain, continue, review, purchase, renew or extend, obtain, and post, in their sole discretion, surety bonds in the ordinary course of their business (each, a "**Surety Bond**" and, collectively, the "**Surety Bond Programs**"), (c) authorizing, but not directing, the Debtors to honor and renew the terms of the Premium Financing Agreement and pay the Financing Agreement Payments thereunder (each as defined below), (d) authorizing, but not directing, the Debtors to enter into new premium financing agreements, and (e) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to fund the foregoing.

101.    The Debtors' existing insurance and surety programs are essential to preserve the value of the Debtors' business, properties, and assets. I understand that, in many cases, the insurance coverage provided by the existing insurance policies is required by diverse regulations, laws, and contracts. Failure to make the payments required to maintain the Debtors' insurance policies could have a significant negative impact on the Debtors' operations. Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to operate in certain key jurisdictions.

102.    Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

viii.   *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**")*

103.    The Debtors seek entry of an order authorizing the Debtors to ensure continued provision of utility services at the Debtors' leased properties, the Debtors seek entry of an order (a) prohibiting the Utilities from altering, refusing, or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (b) determining that the Debtors' proposed offer of deposits, as set forth herein, provides the Utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and (c) approving procedures for resolving requests by Utilities for additional or different assurances beyond those set forth in this Motion. The Debtors propose to fund a segregated account with a deposit equal to approximately two (2) weeks of the Debtors' estimated aggregate utility expenses as adequate assurance of future payment required under the Bankruptcy Code and, additionally, have proposed standard procedures to address any request made by the utility providers for additional adequate assurance.

104.    Any disruption of the Debtors' utility services would cause irreparable harm to the Debtors' business operations, their estates, and their ability to maximize value through these Chapter 11 Cases. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

ix.   *Motion of Debtors for Entry of an Order (I) Establishing Procedures To Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (iii) Granting Related Relief (the "**Contract and Lease Procedures Motion**")*

105.    Pursuant to the Contract and Lease Procedures Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to sell or transfer certain

unexpired leases of non-residential real property by public auction pursuant to the Lease Sale Procedures; (b) approving the form and manner of notices of the Lease Auction and Lease Sale Hearing; (c) scheduling Lease Auctions to sell the assets detailed in the Lease Sale Procedures and hearings to approve one or more Lease Sales; and (d) approving the form and manner of the Post-Auction Notices.

106.    The disposition of the Lease Assets pursuant to the Contract and Lease Procedures Motion will facilitate an efficient and expedient process for obtaining value for the Lease Assets while avoiding the accrual of unnecessary administrative claims. The Debtors believe that the Lease Sale Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offer available for the Lease Assets offered for sale in a format that is controlled, fair and open to all eligible participants. In addition, the Lease Sale Procedures preserve the Debtors' right to not sell any particular Lease Asset that the Debtors do not believe would maximize the value of the asset on the terms received at a Lease Auction. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable in light of the circumstances and at or above market-value. For the foregoing reasons, I believe that the relief requested in the Contract and Lease Procedures Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

   x. *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors To Pay Certain Prepetition Taxes, Governmental Assessments, and Fees and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Taxes Motion**")*

107.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, the Taxes and Fees (as defined below) as described herein, whether asserted prior to, on, or after the Petition Date (as defined below); *provided*, that the maximum amounts that the Debtors shall pay in the aggregate

on an interim basis, on account of all Taxes and Fees owed for periods prior to the Petition Date, shall be $44,050,000 respectively, and (b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

108.    The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations. Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if taxes and fees are not timely paid. Similarly, tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay or even seek to hold the Debtors' directors and officers personally liable for any unpaid amounts. Moreover, I understand that certain taxes and fees may give rise to tax liens and some or all may be entitled to priority, which would therefore require that these amounts be paid in full. Because the Debtors' failure to pay Taxes and Fees would likely erode the Debtors' reputation, impair the value of the Debtors' estates, and negatively affect the Chapter 11 Cases, I submit that the proposed relief is in the best interest of the Debtors' estates and should be granted.

[*Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    September 9, 2024
             Columbus, Ohio

                                            */s/ Jonathan Ramsden*
                                            Jonathan Ramsden
                                            Chief Financial and Administrative Officer
                                            Big Lots, Inc.