# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

BIG LOTS, INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 24-11967 (___)

(Joint Administration Requested)

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY PREPETITION CRITICAL VENDOR CLAIMS, FOREIGN VENDOR CLAIMS, AND 503(B)(9) CLAIMS IN THE ORDINARY COURSE OF BUSINESS, (II) GRANTING ADMINISTRATIVE EXPENSE STATUS TO DEBTORS' UNDISPUTED OBLIGATIONS TO VENDORS ARISING FROM POST-PETITION DELIVERY OF GOODS ORDERED PREPETITION AND AUTHORIZING DEBTORS TO PAY THOSE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS, (III) AUTHORIZING DEBTORS TO RETURN GOODS, (IV) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF LIEN CLAIMANTS, AND (V) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin - Granville Road, Columbus, OH 43081.

*Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers* (this "**Motion**"). This Motion is supported by the *Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "**Ramsden Declaration**") filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

<u>**Relief Requested**</u>

1.      By this Motion, and pursuant to sections 105(a), 363(b), 503(b), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit B** and **Exhibit C** (the "**Proposed Orders**"), (a) establishing procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors, Foreign Vendors, Prepetition Order Vendors, 503(b)(9) Claimants, or Lien Claimants (each as defined below) regarding the validity and amount of their respective claims and to determine, in the Debtors' sole discretion, whether such parties so qualify for the relief requested herein, (b) authorizing, but not directing, the Debtors to pay in the ordinary course of business, in their sole discretion and business judgment, prepetition obligations related to Critical Vendors, Foreign Vendors, and 503(b)(9) Claimants; *provided*, that the maximum amounts that the Debtors shall pay in the aggregate on interim and final bases on account of all Critical Vendor Claims and Foreign Vendor Claims (each as defined below) shall be $40,000,000 and $60,000,000, respectively; *provided*, *further*, that the maximum amount that the Debtors shall pay in the aggregate on an interim basis on account of all

503(b)(9) Claims shall be $37,000,000, (c) granting Prepetition Order Vendors (as defined below) administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed obligations arising from Prepetition Orders for certain Goods (each as defined below) received and accepted by the Debtors on or after the Petition Date, and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business, in their sole discretion, under section 363 of the Bankruptcy Code, (d) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods purchased from Vendors by the Debtors prior to the Petition Date for credit against such Vendors' prepetition claims, (e) authorizing, but not directing, the Debtors to pay, in their sole discretion, all or a portion of the Lien Claims (as defined below); *provided*, that the maximum amount that the Debtors shall pay in the aggregate on an interim basis on account of all Lien Claims shall be $10,000,000, and (f) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

### Jurisdiction, Venue, and Authority

2.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

4. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A. General Background

5. On September 9, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

6. Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

7. Big Lots is a one-stop shop home discount retailer. Big Lots' mission is to help customers "Live Big and Save Lots" by offering bargains on everything for their homes, including furniture, décor, pantry essentials, kitchenware, groceries, and pet supplies. Headquartered in Columbus, Ohio, Big Lots operates more than 1,300 stores across 48 states in the United States, as well as an ecommerce store with expanded fulfillment and delivery capabilities.

8. Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Ramsden Declaration.

**B.** **Request for Authority To Pay Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims**

*Critical Vendors, Foreign Vendors, and Prepetition Order Vendors*

9. The Debtors are an American retail company that markets and sells an assortment of products and merchandise in categories such as food, consumables (*e.g.*, health, beauty, cosmetic, plastic, paper, pet, infant, stationery, and chemical products), soft home products (*e.g.*, apparel, hosiery, jewelry, frames, fashion bedding, utility bedding, bath, window, decorative textile products, and area rugs), hard home products (*e.g.*, small appliances, table top, food preparation, home maintenance, and home organization products, toys, and electronics), furniture (*e.g.*, upholstery, mattresses, ready-to-assemble and home décor products, and case goods), and seasonal products (*e.g.*, lawn and garden, summer, and holiday products) (collectively, the "**Goods**") to various customers across the country utilizing "brick and mortar" and online direct-to-customer sales channels. Vendors and suppliers (collectively, the "**Vendors**") provide the Debtors with the Goods, as well as certain essential services (collectively, the "**Services**") necessary for the operation, maintenance, and safety of the Debtors' retail stores and online sales platform. These Vendors are, by and large, the sole source or limited source for the Goods and Services (the Vendors for such critical Goods and Services, collectively, the "**Critical Vendors**"), and provide material economic or operational advantages when compared to other available vendors. Certain Critical Vendors provide the Debtors with Goods and Services that carry brand names for which there is no alternative purchasing option, and these brands represent a critical component of customer demand. Without these Critical Vendors, Goods, and Services, the Debtors could not maintain inventory and merchandise levels necessary to drive retail traffic to, and ensure the effective and safe operation of, the Debtors' retail stores and online sales platform. For the first seven months of 2024, the Debtors paid approximately $539,800,000 on account of

Goods and Services provided by Critical Vendors. The Debtors estimate that, as of the Petition Date, approximately $50,000,000 remains outstanding on account of Goods and Services provided by Critical Vendors (collectively, the "**Critical Vendor Claims**"). As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular Goods or Services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill, market share, and estates.

10. In addition, the Debtors purchase a significant portion of their Goods and Services in the ordinary course of business from certain Vendors that operate in foreign jurisdictions and have little to no connection to the United States (such Vendors and independent contractors, collectively, the "**Foreign Vendors**"). If the Foreign Vendors are not paid, they may withhold vital Goods and Services, thereby interrupting the Debtors' businesses and operations and impairing the value of the Debtors' estates. Therefore, the Debtors' ability to maintain their businesses and preserve and maximize the value of their estates depends, in part, on their ability to maintain key relationships with the Foreign Vendors. For the first seven months of 2024, the Debtors paid approximately $36,100,000 on account of Goods and Services provided by Foreign Vendors. The Debtors estimate that, as of the Petition Date, approximately $10,000,000 remains outstanding on account of Goods and Services provided by Foreign Vendors (collectively, the "**Foreign Vendor Claims**").

11. Despite the global reach of the automatic stay, it is possible that certain Foreign Vendors may seek to enforce claims against the Debtors in foreign jurisdictions, thereby (a) threatening the Debtors' ability to operate, maintain inventory and merchandise levels necessary to drive retail traffic, and attract new business and (b) imperiling the success of the Chapter 11

Cases. Furthermore, some of the Foreign Vendors, who are unfamiliar with United States bankruptcy law and who may be beyond the jurisdiction of the Court, may not be willing to conduct business with a "chapter 11 debtor" absent payment of claims, including accrued prepetition claims, in the ordinary course.

12.     While the Debtors hope and expect to ensure a continuing post-petition supply of Goods and Services by consensual negotiation with their Vendors, the Debtors recognize that their fiduciary duties require them to consider and plan for the potential that certain Vendors may refuse to provide future Goods or Services unless their prepetition claims are paid. Replacement Vendors and contractors, even where available, would likely result in substantially higher costs for the Debtors and severe operational disruption. Moreover, replacement Vendors or contractors may lack knowledge of the Debtors' businesses and operations or fail to meet the Debtors' high standards, thereby placing the Debtors' businesses and operations, and the safety of the Debtors' employees, at risk.

13.     A significant portion of the Goods and Services purchased by the Debtors are generally shipped directly to and received by the Debtors on an as-needed basis for the Debtors' businesses and operations, all as directed by the Debtors. As a consequence of the commencement of the Chapter 11 Cases, the Debtors believe that many of the Vendors may be particularly concerned that they will not be paid for the delivery or shipment of Goods or the provision of Services after the Petition Date if such deliveries, shipments, or provisions were based on prepetition purchase orders or other short and longer term contracts (collectively, the "**Prepetition Orders**"), or that their claims arising from the Prepetition Orders (such claims, "**Prepetition Order Claims**") would be treated as general unsecured claims. Accordingly, the Vendors holding such Prepetition Order Claims (such Vendors, the "**Prepetition Order Vendors**") may refuse to

provide Goods or Services to the Debtors (or may recall shipments of Goods) unless the Debtors issue substitute purchase orders post-petition or obtain an order of the Court (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed Prepetition Orders or (b) authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

14.     If the Debtors can pay Critical Vendors, Foreign Vendors, and Prepetition Order Vendors their respective Critical Vendor Claims, Foreign Vendor Claims, and Prepetition Order Claims, and thereby (a) ensure the provision of critical Goods and Services at lower costs during the post-petition period, (b) ensure the delivery of Goods ordered prepetition but not yet delivered, and (c) avoid the disruption and reputation risks to the Debtors' businesses and operations and the impairment of the value of the Debtors' estates that may result from the cessation of such essential Goods or Services, it is prudent for the Debtors to do so.  Failure to pay the Critical Vendors, the Foreign Vendors, or the Prepetition Order Vendors, and the consequent discontinuity of the Goods or Services rendered by these Vendors, may disrupt the Debtors' businesses and operations.  This would cause significant and irreparable harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the Critical Vendor Claims, the Foreign Vendor Claims, and the Prepetition Order Claims.

15.     The Debtors estimate that the maximum amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims during the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $40,000,000 (the "**Interim Vendor Claims Cap**").  In addition, the Debtors estimate that the amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims during the pendency of the Chapter 11 Cases is, in the aggregate, approximately $60,000,000 (the "**Final Vendor Claims Cap**" and, together with the Interim Vendor Claims Cap,

the "**Vendor Claims Caps**").[2]  The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts, in their sole discretion, as necessary and as they become due and payable in the ordinary course of business.  The Debtors' cash on hand, the cash generated by the Debtors' business, and the proceeds of the post-petition credit facilities would provide ample liquidity for the payment of the Critical Vendors Claims, the Foreign Vendors Claims, and the Prepetition Order Claims, as well as the ongoing obligations of the Debtors' continued operations in the ordinary course during the pendency of the Chapter 11 Cases.

*503(b)(9) Claimants*

16.    The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to Critical Vendors or Foreign Vendors, would be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims are on account of Goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date (the "**503(b)(9) Claims**" and, the Vendors holding such 503(b)(9) Claims, the "**503(b)(9) Claimants**").  The Debtors estimate that the maximum amount needed to pay the 503(b)(9) Claims during the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $37,000,000 (the "**Interim 503(b)(9) Claims Cap**").   As they are administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors request authority to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the Bankruptcy Code.  The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts, in their sole discretion, as necessary

---

[2]    The Vendor Claims Caps do not include any prepetition claims that the Debtors seek to pay pursuant to other orders requested to be entered by the Court in the Chapter 11 Cases.

and as they become due and payable in the ordinary course of business. The Debtors' cash on hand, the cash generated by the Debtors' businesses, and the proceeds of the post-petition credit facilities would provide ample liquidity for the payment of the 503(b)(9) Claims, as well as the ongoing obligations of the Debtors' continued operations in the ordinary course during the pendency of the Chapter 11 Cases.

*Lien Claimants*

17.     In operating their businesses, the Debtors use and make payments to third-party shippers, warehousemen, logistics providers, contractors, maintenance workers, and other service providers (collectively, the "**Lien Claimants**") that, among other things, (a) transport, ship, deliver (via sea, air, rail, and road freight services), and store Goods on behalf of the Debtors and (b) provide various Services to the Debtors, including remodeling and on-site construction, maintenance, and repairs to the Debtors' retail stores and distribution/fulfillment centers. The Debtors have, over time, nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive. In addition, these Lien Claimants have developed in-depth knowledge of the Debtors' specific operational, shipping, delivery, and storage requirements. It is essential to the continuity of the Debtors' operations, businesses, and the preservation and maximization of value of the Debtors' estates that the Debtors maintain their relationships with these Lien Claimants.

18.     In the event that the prepetition claims of the Lien Claimants (collectively, the "**Lien Claims**") remain unpaid, the Lien Claimants may assert Liens (as defined below) on the Goods in their possession, equipment, or property under applicable non-bankruptcy law, or refuse to deliver or release such Goods (even where payment for the Goods themselves has already been made), or otherwise impede the Debtors' use of their property until their claims are satisfied and

their Liens redeemed.[3] In order to maintain access to and preserve the value of the Goods essential to the continued operation of the Debtors' stores and online sales platform, the Debtors seek authority to honor outstanding invoices on account of the Lien Claims. Additionally, should the Lien Claimants refuse to continue performing their Services due to the Debtors' failure to satisfy the Lien Claims, the Debtors would be forced to seek, on an emergency basis, similar Services in the marketplace with uncertain results as to availability, costs, and time. Any transition to alternative providers would likely result in (a) the loss of Goods in transit that the Debtors have already paid for, (b) an inability to timely receive critical repairs or service at stores or distribution/fulfillment centers, and (c) increased expenses that could ultimately jeopardize the Debtors' ability to generate revenue and return for the Debtors' estates. The Debtors do not believe that there are viable alternatives to timely replace the Lien Claimants.

19. Accordingly, any disruption in the provision of the aforementioned transportation, shipping, delivery, logistics, storage, construction, maintenance, and repair services by the Lien Claimants would immediately impact the operation of the Debtors' businesses. Further, any disruption in the flow of Goods or the withholding of Services, as applicable, would erode the Debtors' ability to operate, maintain inventory and merchandise levels necessary to drive retail traffic, and attract new business, thereby jeopardizing the Debtors' ability to efficiently administer the Chapter 11 Cases. The cost of such disruption to the Debtors' estates in many cases would likely be greater than the amount of the applicable Lien Claims. Moreover, pursuant to section

---

[3] Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such Liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay. Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that … permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." 11 U.S.C. § 546(b)(1)(A). For the avoidance of doubt, any such claims shall constitute Lien Claims.

363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would further drain estate assets.

20.    The Debtors estimate that the amount needed to pay the Lien Claimants on account of their Lien Claims during the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $10,000,000 (the "**Interim Lien Claims Cap**").  The Debtors therefore seek the authority to pay all or a portion of the Lien Claims as they determine, in their sole discretion, are necessary or appropriate to avoid disruption in the Debtors' businesses and operations and to preserve and maximize the value of the Debtors' estates.  The Debtors are not seeking to pay amounts owed on accounts of Lien Claims immediately or in one lump sum; rather, the Debtors intend to pay these amounts, in their sole discretion, as necessary and as they become due and payable in the ordinary course.

*Conditions to Payment of Critical Vendor Claims, Foreign Vendor Claims,*
*503(b)(9) Claims, and Lien Claims*

21.    The Debtors seek the authority to pay, in their sole discretion, Critical Vendor Claims, Foreign Vendor Claims, 503(b)(9) Claims, and Lien Claims in the ordinary course of business.  The Debtors propose that they may, in their sole discretion, condition payment of any such Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim upon an agreement to continue to supply Goods or Services to the Debtors on such Vendor's or Lien Claimant's "Customary Trade Terms"[4] during the pendency of the Chapter 11 Cases, or on other such terms and conditions as are acceptable to the Debtors.  However, in certain circumstances, a

---

[4] As used herein, "Customary Trade Terms" means, with respect to a Vendor or a Lien Claimant, (a) the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) that were most favorable to the Debtors and in effect between such creditor and the Debtors in the one-year period prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such creditor.

Vendor or Lien Claimant may refuse to provide Goods or Services to the Debtors on its Customary Trade Terms even after payment of its claim. To accommodate these circumstances, the Debtors seek approval to enter into other agreements, in the Debtors' sole discretion, with each such Vendor or Lien Claimant on a case-by-case basis.

22. To ensure that such Vendors or Lien Claimants transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying Critical Vendor Claims, Foreign Vendor Claims, 503(b)(9) Claims, and Lien Claims: (a) a letter or contract substantially in the form of the letter attached hereto as **Exhibit A** (a "**Vendor Agreement**") to be delivered to, and executed by, the Critical Vendors, the Foreign Vendors, the 503(b)(9) Claimants, or the Lien Claimants, along with a copy of the order granting the relief sought herein; *provided*, *however*, that the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim when, in their sole discretion, such payment is necessary to the Debtors' businesses or operations or the preservation and maximization of the value of the Debtors' estates, and (b) payment of a Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim, as applicable, to be accompanied by a statement substantially similar to the below:

> By accepting this payment, the payee agrees to the terms of the Order of the United States Bankruptcy Court for the District of Delaware, dated [●], 2024, in the jointly administered chapter 11 cases of Big Lots, Inc., *et al.* (No. 24-11967), entitled "*[Interim] [Final] Order (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien*

*Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers*," a copy of which can be found at https://www.cases.ra.kroll.com/BigLots, and, submits to the jurisdiction of that Court for enforcement thereof.

23.     As a further condition to receiving payment on account of a Critical Vendor Claim Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim, the Debtors also request authority to require, in their sole discretion, that the applicable Vendor or Lien Claimant agree to take whatever action is necessary to remove any existing Liens at such Vendor's or Lien Claimant's sole cost and expense and waive any right to assert a Lien on account of the paid claim of such Vendor or Lien Claimant.

24.     The Debtors further propose that if a Vendor or Lien Claimant accepts payment for a Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim, and, thereafter, refuses to continue to supply Goods or Services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such creditor, then the Debtors may, in their sole discretion, and without further order of the Court (a) declare that the payment of such Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Vendor or Lien Claimant in cash or in Goods (including by setoff against post-petition obligations) and (b) demand that such Vendor or Lien Claimant immediately return such payments in respect of its Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever.  Upon recovery of such payment by the Debtors, such creditor's Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim shall be reinstated in such an amount as to restore the Debtors and

the applicable Vendor or Lien Claimant to their original positions, as if the agreement had never been entered into and the payment of the creditor's Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim had not been made. In sum, the Debtors would return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

25.     To the extent that an agreement relating to a Critical Vendor Claim, Foreign Vendor Claim, 503(b)(9) Claim, or Lien Claim is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute post-petition assumption, reaffirmation, or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code, and the Debtors reserve all of their rights under the Bankruptcy Code in connection therewith. In addition, nothing in this Motion shall be an admission as to any lien or interest, including any possessory lien.

## Basis for Relief

**A.     Payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims Constitutes a Sound Exercise of the Debtors' Business Judgment and is Necessary for the Preservation of the Debtors' Estates**

26.     Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business, however, must be based upon a "sound business purpose" of the debtor. *In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015); *see also In re Lionel Corp.* ("*Lionel*"), 722 F.2d 1063, 1070 (2d Cir. 1983) (holding that the debtor must articulate a "business justification" to satisfy section 363(b) of the Bankruptcy Code). This Court adopted the Second Circuit's *Lionel* decision, such

that courts deciding whether a debtor satisfied the business judgment standard must consider "all salient factors pertaining to the proceeding." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (quoting *Lionel*). The business judgment standard "is not a difficult standard to satisfy," and merely requires a court to find that "a reasonable business person would make a similar decision under similar circumstances." *Cf. In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (applying the business judgment standard in the context of section 365 of the Bankruptcy Code); *see also In re Network Access Sols., Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) ("There is, however, no discernable difference in the . . . standard for approval under section[s] 363 and 365 [of the Bankruptcy Code].") (citation omitted).

27.     The Debtors submit that the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is within the Debtors' ordinary course of business, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code. Indeed, the relief sought herein is amply justified by the critical need for the continued receipt and/or distribution of Goods and Services and the preservation and maximization of the value of the Debtors' estates. The prompt payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims, which may be necessary to obtain the delivery and/or provision of the related Goods and Services, is within the Debtors' ordinary course of business and crucial for orderly and efficient operation of the Debtors' businesses. Unless the Debtors have the authority to pay for these essential Goods and Services, their businesses and estates will suffer irreparable harm.

28.     In fact, courts in this jurisdiction routinely grant relief similar to that requested herein. *See, e.g.*, *In re Hardinge Inc.*, No. 24-11605 (JKS) (Bankr. D. Del. Aug. 20, 2024) [D.I. 173]; *In re Salt Life Beverage, LLC*, No. 24-11468 (LSS) (Bankr. D. Del. July 24, 2024) [D.I.

138]; *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) [D.I. 228]; *In re Optio Rx, LLC*, No. 24-11188 (TMH) (Bankr. D. Del. July 1, 2024) [D.I. 129]; *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) [D.I. 165]; *In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 5, 2024) [D.I. 261]; *(In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 13, 2023) [D.I. 517]; *In re ExpressJet Airlines LLC*, No. 22-10787 (MFW) (Bankr. D. Del. Sept. 12, 2022) [D.I. 88]; *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CSS) (Bankr. D. Del. Feb. 7, 2022) [D.I. 119]. The Debtors submit that the circumstances described herein warrant similar relief.

29.     Finally, the Debtors submit that payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims is necessary and appropriate and, therefore, may be authorized by the Court under section 105(a) of the Bankruptcy Code, pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule." The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable powers to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that a court may authorize payment of prepetition claims when payment is essential to continued operation of the debtor, such as where there is a "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (noting that the doctrine of necessity "permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D.

Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for the payment of pre-petition claims" under the doctrine of necessity).

30.     The United States Supreme Court first articulated the doctrine of necessity over 140 years ago, in *Miltenberger v. Logansport, Crawfordsville & Southwestern Railway Company*, in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See Miltenberger v. Logansport, Crawfordsville & Sw. Ry. Co.*, 106 U.S. 286, 311–12 (1882). This doctrine has become an accepted component of modern bankruptcy jurisprudence and its application by courts largely adheres to the Supreme Court's reasoning in *Miltenberger*. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. at 824-25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

31.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (finding that section 105(a) of the Bankruptcy Code is "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." (citations omitted)). As such, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) ("It is well settled that the court's power under § 105(a) is broad." (citation omitted)); *In re Nortel Networks, Inc.*, 532 B.R. 494, 554

(Bankr. D. Del. 2015) ("The Third Circuit has construed [section 105 of the Bankruptcy Code] to give bankruptcy courts 'broad authority' to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to 'craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.'" (citations omitted)); *Patrick v. Dell Fin. Servs., L.P. (In re Patrick)*, 344 B.R. 56, 58 (Bankr. M.D. Pa. 2005) ("There is no doubt that § 105(a) is a 'powerful [and] versatile tool' designed to empower bankruptcy courts to fashion orders in furtherance of the Bankruptcy Code." (quoting *Joubert v. ABN AMRO Mortg. Grp., Inc. (In re Joubert)*, 411 F.3d 452, 455 (3d Cir. 2005))).

32. The doctrine of necessity is frequently invoked early in a restructuring, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims. For instance, courts have acknowledged that the "doctrine of necessity stands for the proposition that a bankruptcy court may allow payment outside of a plan of reorganization on account of a pre-petition obligation where such payment is critical to the reorganization process." *Friedman's Inc. v. Roth Staffing Cos. (In re Friedman's Inc.)*, No. 09-10161 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) (cleaned up); *see also Off. Comm. of Unsecured Creditors v. Motor Coach Indus. Int'l (In re Motor Coach Indus. Int'l)*, No. 09-078-SLR, 2009 WL 330993, at *2 n.5 (D. Del. Feb. 10, 2009) ("The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor." (citations omitted)). Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

33. Here, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders. The Debtors believe that payment

of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims will be necessary to continue operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with the Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants, and maximize and preserve the value of the Debtors' assets and estates for the benefit of all stakeholders. The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date. During this period, the Debtors, their attorneys and financial advisors, and other professionals will be focusing on stabilizing the Debtors' businesses and operations and maximizing and preserving the value of the Debtors' estates in chapter 11; however, at the same time, while the Debtors are distracted with steadying their businesses and strategic planning, Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants may attempt to assert their considerable leverage and deny the provision of Goods and Services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought herein is not granted, such Vendors and Lien Claimants would have no incentive to continue to supply Goods or Services to the Debtors on Customary Trade Terms.

34. The Debtors strongly believe that the uninterrupted supply of Goods and Services, on Customary Trade Terms, and the continuing support of their customers are imperative to the Debtors' ongoing businesses and operations and the preservation and maximization of the value of the Debtors' estates. The continued availability of trade credit, in amounts and on terms consistent with those that the Debtors have worked hard to obtain over time, is also clearly advantageous to the Debtors, as it allows the Debtors to maintain and enhance necessary liquidity and to focus on returning to profitability and preserving and maximizing the value of the Debtors'

estates. The Debtors believe that maintaining working capital through the retention and reinstatement of their normally advantageous trade credit terms would enable the Debtors to maximize and preserve the value of their businesses and estates for the benefit of all interested parties. Conversely, any disruption or cancellation of deliveries of Goods or provision of essential Services, and any concurrent deterioration of trade credit, could spell disaster for the Debtors' efforts in the Chapter 11 Cases.

35. In addition, the Debtors believe that, if the Lien Claims are not paid, there could be significant negative repercussions. The Lien Claimants could assert Liens that, at the very least, could result in a disruption of the flow of Goods and Services. For example, the Lien Claimants could potentially assert Liens against or maintain possession of the Debtors' Goods, which would no doubt jeopardize the Debtors' ability to operate, maintain inventory and merchandise levels necessary to drive retail traffic, and attract new business. Although the Debtors can, in theory, obtain Services elsewhere, doing so represents a significant financial and logistic hurdle. Based on these potentially value-destroying consequences, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders. Absent this relief, the value of the Debtors' estates would suffer, possibly precipitously. Consequently, the Debtors' stakeholders would benefit if the requested relief is granted.

36. After carefully vetting all Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, the Debtors designed the Vendor Claims Caps, 503(b)(9) Claims Caps, and Lien Claims Caps as estimates of how much must be paid on account of prepetition obligations (a) in the first 30 days of the Chapter 11 Cases and (b) during the pendency of the Chapter 11 Cases, to such Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants to continue the supply of critical Goods and Services.

37.     Based on the foregoing, the Debtors' ability to pay the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to preserve and maximize the value of the Debtors' estates. Accordingly, the Debtors seek the authority to pay all or a portion of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims as they determine, in their sole discretion, are necessary or appropriate to avoid disruption in the Debtors' businesses and operations and to maximize and preserve the value of the Debtors' estates.

**B.      The 503(b)(9) Claims Would Give Rise to Priority Claims Under Section 507(a)(2) of the Bankruptcy Code**

38.     Under section 507(a)(2) of the Bankruptcy Code, the 503(b)(9) Claims would be afforded priority status. As priority claims, the 503(b)(9) Claims must be paid in full before any general unsecured obligations of the Debtors can be satisfied. Accordingly, to the extent that the 503(b)(9) Claims give rise to priority claims, the relief requested herein would only affect the timing of the payment of these priority 503(b)(9) Claims and should not prejudice the rights of general unsecured creditors.

**C.      Goods Ordered Prepetition and Delivered to the Debtors Post-Petition are Entitled to Administrative Expense Status Under Section 503(b)(1) of the Bankruptcy Code, and Payment of the Prepetition Order Claims is within the Ordinary Course of Business**

39.     Vendor claims for certain prepetition Goods would likely be administrative in nature. Under section 503(b)(1) of the Bankruptcy Code, claims are accorded administrative expense priority where such claims are for the actual, necessary costs and expenses of preserving the bankruptcy estate. *See* 11 U.S.C. § 503(b)(1). To be awarded an administrative expense claim, a claimant must demonstrate that it conducted a transaction with a debtor in possession that, in turn, provided a benefit to such debtor's estate. *See Calpine Corp. v. O'Brien Env't Energy, Inc.*

*(In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999) (noting that, to establish a priority claim under section 503(b)(1)(A) of the Bankruptcy Code, the debt must arise post-petition and benefit the estate (citations omitted)).

40.     The Debtors submit that, pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the post-petition delivery of desired and necessary Goods, including Goods ordered prepetition, are in fact administrative expense priority claims in virtually all instances.  Indeed, even if the Goods had been received in the ordinary course of the Debtors' business 20 days *before* the Petition Date, the related claims would receive administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  *See In re GWLS Holdings, Inc.*, No. 08-12430 (PJW) (Bankr. D. Del. Oct. 22, 2008); *In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d Cir. 1993) (holding that an obligation from post-petition performance related to a prepetition transaction is entitled to administrative expense priority).  Further, where transactions involve both the delivery of goods and associated services, courts have granted priority under section 503(b)(9) of the Bankruptcy Code to the portion of the claim relating to the sale of goods.  *See In re NE Opco, Inc.*, 501 B.R. 233, 257 (Bankr. D. Del. 2013).  Thus, the granting of the relief requested herein would likely not provide the Prepetition Order Vendors with any greater priority than they would otherwise have if the relief herein is not granted.

41.     The relief requested herein to pay Prepetition Order Claims in the ordinary course would merely confirm the treatment of such obligations under the Bankruptcy Code and assure the Prepetition Order Vendors that they would be paid for Goods received and accepted by the Debtors post-petition in the ordinary course of business.  The relief would also help ensure a continuous supply of Goods that add value to the Debtors' businesses and operations.  Absent the relief requested in this Motion, however, the Debtors would be required to expend substantial time and

resources convincing many Prepetition Order Vendors of the Debtors' authority to make certain payments, reissuing Prepetition Orders, or even obtaining further relief from the Court to provide the Prepetition Order Vendors with the assurance of such administrative priority, causing disruption to the Debtors' businesses and operations. Without the Goods, the Debtors' businesses and operations would be harmed, and their opportunity to preserve and maximize the value of their assets and estates would be jeopardized. The authorization sought in this Motion would not prejudice the Debtors' ability to contest the validity of any invoices, and it would not extend to any amounts that are disputed by the Debtors or that are in respect of Goods that are not received and accepted by the Debtors subsequent to the Petition Date.

42. Accordingly, in light of the importance and necessity of the Goods to the Debtors' businesses and operations, especially compared to the amount owed, the Debtors submit that the Court should grant the relief requested herein.

### D. The Debtors Are Authorized To Return Goods Under Section 546(h) of the Bankruptcy Code

43. The Debtors also occasionally receive various Goods that may be defective, not up to standards, or otherwise not suitable or necessary for their operations. In some cases, the Debtors return such Goods to Vendors (critical or otherwise). Notwithstanding the filing of the Chapter 11 Cases and the distinction between prepetition and post-petition claims, the Debtors request that they be authorized, in their sole discretion, to return Goods that were delivered before the Petition Date based on prepetition orders for credit against such prepetition orders if the Debtors determine that such Goods are of little or no value to the Debtors' estates.

44. Section 546(h) of the Bankruptcy Code permits a debtor, with the consent of a creditor and subject to the prior rights of holders of security interests in such goods or the proceeds of such goods, to return goods shipped to the debtor by the creditor before the commencement of

the case for credit against the creditor's prepetition claim; *provided* that the court determines (on a motion made no later than 120 days after the order for relief and after notice and a hearing) that such return is in the best interests of the estate. *See* 11 U.S.C. § 546(h).

45.     The Debtors submit that an order authorizing, but not directing, returns of Goods to Vendors for credit against their prepetition claims, subject to the prior rights of holders of security interests in such Goods or the proceeds of such Goods, to the extent of such interests, is in the best interests of the Debtors' estates. Such relief would enable the Debtors to (a) obtain proper credit for otherwise unusable Goods, cost-effectively and without undue financial risk, and (b) effectively manage inventory and enhance the Debtors' financial performance and the value of the assets of their estates.

46.     Through this Motion, the Debtors seek only the relief that is contemplated by section 546(h) of the Bankruptcy Code. Accordingly, the Debtors should be permitted to return Goods, in their discretion, as permitted by the Bankruptcy Code and as set forth herein.

**E.     Failure To Pay Lien Claims Could Subject the Debtors' Assets to the Perfection of Statutory Liens**

47.     Many of the Lien Claimants who have provided prepetition Goods or Services to the Debtors may hold liens against the Debtors' property under applicable warehousemen's, shipping lien, and other statutes (the "**Liens**" and, interests arising from the Liens, the "**Interests**"). The Lien Claimants' Liens and/or Interests may be perfected notwithstanding the automatic stay established by section 362(a) of the Bankruptcy Code. Although the Liens and Interests of the Lien Claimants may not be perfected presently, applicable law generally provides that they may be perfected in the future, which perfection may relate back to the creation of the relevant Liens and Interests. Section 546(b) of the Bankruptcy Code explicitly respects such relation back, and section 362(b)(3) of the Bankruptcy Code exempts post-petition actions to perfect liens from the

automatic stay otherwise established by section 362(a) of the Bankruptcy Code, so long as such perfection would relate back to before the petition date under the applicable law respected by section 546(b) of the Bankruptcy Code.[5]

48.     Therefore, to the extent that such Liens and/or Interests are perfected or may be perfected, paying the Lien Claims would not reduce unsecured creditor recoveries in the Chapter 11 Cases.  Indeed, payment now only provides such parties with what they would be entitled to receive eventually upon consummation of a chapter 11 plan, without any interest costs that might otherwise accrue during the Chapter 11 Cases.  Far from being harmed, the Debtors' unsecured creditors would benefit from the Debtors' smooth transition into chapter 11 bankruptcy.

49.     Accordingly, the Debtors seek the authority to pay all or a portion of the Lien Claims as they determine, in their sole discretion, are necessary or appropriate to avoid disruption in the Debtors' businesses and operations and to preserve and maximize the value of the Debtors' estates.

**F.      The Court Should Authorize Applicable Financial Institutions To Honor and Process Related Checks and Transfers**

50.     The Debtors also request that all applicable financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date and (b) rely on the Debtors' designation of any particular check as approved by the Proposed Orders.

---

[5]  The Debtors reserve the right to contest any Lien or Interest and efforts to exercise associated remedies during the Chapter 11 Cases.

## Debtors' Reservation of Rights

51.     Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the amount, priority, character, or validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lien Claim, or any other claim related thereto, under applicable bankruptcy and non-bankruptcy law. Likewise, if the Court grants the relief sought herein, any payment or transfer made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the amount, priority, character, or validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Emergency Consideration

52.     Pursuant to Local Rule 9013-1(m), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  Fed. R. Bankr. P. 6003.  As set forth in this Motion and the Ramsden Declaration, the Debtors believe that an (a) orderly transition into chapter 11 is critical to preserve and maximize the value of the Debtors' estates and (b) any delay in granting the relief requested herein could cause immediate and irreparable harm by damaging the Debtors' ability to sustain their day-to-day businesses and

operations and meet their various obligations, likely resulting in the substantial loss of business and value. If the Debtors are not permitted to continue paying the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lien Claims as they become due, and to reassure the Vendors and Lien Claimants that authority has been granted to honor all such claims, the Debtors could suffer immediate and irreparable harm. Accordingly, the Debtors submit that the relief requested herein satisfies Bankruptcy Rule 6003.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

53.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances. The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve and maximize value for their estates and economic stakeholders. Accordingly, the Debtors respectfully submit that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

54.     Notice of this Motion will be provided to the following parties: (a) the office of the United States Trustee for Region 3; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the

District of Delaware; (f) the state attorneys general for states in which the Debtors conduct business; (g) Choate, Hall & Stewart LLP, as counsel to the ABL Agent; (h) Otterbourg, P.C., as counsel to the Term Agent; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

55.     As this Motion is seeking "first-day" relief, the Debtors will serve copies of this Motion and any order entered in respect thereto as required by Local Rule 9013-1(m).  A copy of this Motion and any order entered in respect thereto will also be made available on the Debtors' case information website located at https://www.cases.ra.kroll.com/BigLots.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders, substantially in the forms attached hereto as **Exhibit B** and **Exhibit C**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:  September 9, 2024
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Sophie Rogers Churchill*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

-and-

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (*pro hac vice* forthcoming)
Adam L. Shpeen (*pro hac vice* forthcoming)
Stephen D. Piraino (*pro hac vice* forthcoming)
Ethan Stern (*pro hac vice* forthcoming)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*