**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (___) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) ESTABLISHING
PROCEDURES TO SELL CERTAIN LEASES, (II) APPROVING THE
SALE OF CERTAIN LEASES, AND (III) GRANTING RELATED RELIEF**

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Procedures To Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* (this "**Motion**"). This motion is supported by the *Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Filings* (the "**Ramsden Declaration**") filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

## Relief Requested

1.      By this Motion, and pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (the "**Lease Sale Procedures Orders**" or the "**Orders**"):    (a) establishing procedures authorizing, but not directing, the Debtors to sell or transfer certain unexpired leases of non-residential real property (each, a "**Lease**"), including with any related ancillary agreement(s) thereto or through the sale of designation rights related thereto (each, a "**Lease Sale**"), by public auction (the "**Lease Auction**"), pursuant to the procedures attached as **Exhibit 1** to the Orders; (b) approving the form and manner of notices of the Lease Auction and Lease Sale Hearing attached as **Exhibit 2** to the Orders (the "**Lease Auction, Cure Cost & Lease Sale Hearing Notice**"); (c) approving the form and manner of the Post-Auction Notice attached as **Exhibit 3** to the Orders; and (d) granting related relief.

## Jurisdiction, Venue, and Authority

2.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent, pursuant to rule Local Rule 9013-1(f), to the entry of

a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

4.      Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

**A.      General Background**

5.      On September 9, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

6.      Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

7.      Information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Ramsden Declaration.

**B.      The Lease Auction and Lease Sale Procedures**

8.      Big Lots is a one-stop shop home discount retailer.  Big Lots' mission is to help customers "Live Big and Save Lots" by offering bargains on everything for their homes, including

furniture, décor, pantry essentials, kitchenware, groceries, and pet supplies. Headquartered in Columbus, Ohio, Big Lots operates more than 1,300 stores (the "**Stores**") and five Distribution Centers (the "**Distribution Centers**") across 48 states in the United States, as well as an ecommerce store with expanded fulfillment and delivery capabilities.

9. As described more fully in the Ramsden Declaration, the Debtors currently face a challenging commercial retail environment as inflationary pressures, rising unemployment, and persistently high interest rates cumulatively result in diminished discretionary spending among Big Lots' core customer base. Acknowledging their liquidity needs, the Debtors formulated a business transformation plan focused on repositioning the Debtors as an extreme bargain retailer. As part of such efforts, the Debtors recognized the need to right-size their store portfolio to optimize their go-forward cost structure by eliminating underperforming Stores. Accordingly, the Debtors' management team, in consultation with their advisors, undertook an extensive analysis of the Debtors' existing store portfolio, evaluating, among other factors, historical and recent store profitability, sales, and gross margin trends, occupancy costs, changing location value, customer and competitive factors, the geographic market in which each store is located, and specific operational circumstances related to each store's performance. The Debtors and their advisors also evaluated the need to negotiate lease modifications (*e.g.,* cure cost waivers, rent concessions, and certain other contractual modifications) with certain of their landlords to achieve forecasted performance metrics for each of their remaining stores.

10. Based on the foregoing analyses, the Debtors commenced their store portfolio rationalization process and, since July 2024, have already commenced the process of closing multiple initial waves of Stores including approximately 300 Stores (the "**First Wave Stores**" and

the closings of such First Wave Stores, the "**First Wave Store Closings**").   The Debtors plan to initiate subsequent waves of store closings over the coming months (each, a "**Subsequent Wave Store Closings**", and together with the "**First Wave Store Closings**", the "**Store Closings**"), as more fully described in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* (the "**Store Closing Motion**"), filed concurrently herewith.   This multi-step closing process will allow the Debtors time to negotiate lease modifications and undergo a lease sale process for the leases that need to be addressed most urgently on a time-sensitive basis.   As the Debtors have a significant number of leases, the Debtors and their advisors believe that conducting a multi-step sale process will help them to maximize the value of the Lease Assets.   The total number of Store Closings will depend on the Debtors' progress in their negotiations with landlords for lease modifications contemplated by the *Motion of Debtors for Entry of an Order (I) Authorizing Debtors To Reject Certain Unexpired Leases of Nonresidential Real Property and (II) Authorizing and Establishing Procedures to Reject Executory Contracts and Unexpired Leases* (the "**Lease Rejection Motion**"), filed contemporaneously herewith, and in connection with the sale process for the sale of the Debtors' assets (the "**Sale Process**") detailed in the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption*

*and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "**Bidding Procedures Motion**"), filed contemporaneously herewith. The Sale Process described in the Bidding Procedures Motion is separate and distinct from the process described herein.

11.     By this Motion, the Debtors seek approval of the Lease Sale Procedures (as defined herein) to capitalize on certain of their lease assets (the "**Lease Assets**") that are not sold pursuant to the Sale Process. The Debtors have opted to run a separate sale process for the Lease Assets because certain of the Debtors' leases have significant amounts of time remaining under their term, or could otherwise be subject to renegotiation, leaving them with significant value that could be maximized through a discrete sale process.

**C.     Marketing and Sale Process**

12.     The Debtors have engaged A&G Realty Partners, LLC ("**A&G**") as proposed real estate advisor to the Debtors, to assist the Debtors in appraising, marketing, and negotiating the sale of their Lease Assets. In consultation with A&G, the Debtors have developed proposed procedures for the sale of the Lease Assets (the "**Lease Sale Procedures**"), and the proposed Lease Sale Timelines (as defined herein), which will result in the most value-maximizing outcome with respect to such Lease Assets, on a timeline concurrent with the Store Closings. Selling the Lease Assets in connection with the Store Closings is a sound exercise of the Debtors' business judgment. In fact, failing to take every effort to sell the valuable rights tied to such Lease Assets for the maximum value upon consummation of the Store Closings and before the statutory deadline to assume or reject unexpired leases would implicate the Debtors' responsibility to maximize value for their stakeholders.

13.    The proposed Lease Sale Procedures are part of an ongoing marketing process headed by A&G to maximize the value of the Lease Assets being sold.  The Debtors, utilizing the services and expertise of A&G and their other advisors, have initiated a competitive marketing process for the sale of certain of the Lease Assets, and will continue marketing the remaining Lease Assets in the coming months.  Prior to beginning a formal marketing process, A&G had received outreach from numerous potential counterparties inquiring about the availability of certain of the Debtors' Lease Assets prior to the Petition Date.  Accordingly, as of the date hereof, A&G has engaged over one hundred parties that are known to A&G to be institutional investors, owners of, or investors in leases similar to those being sold, or parties known to be interested in particular properties based on direct inquiries over the last few months.  Given the actions undertaken as of the date hereof, the communications with existing potential bidders, and the general public awareness of these Chapter 11 Cases and related Store Closings, the Debtors fully believe that the Lease Sale Procedures will result in competitive, value-maximizing Lease Auctions that will inure to the benefit of all stakeholders and maximize the value of the Debtors' estates.

14.    The Debtors, in the exercise of their sound business judgement and in consultation with A&G, have determined that holding an expedited Lease Auction process in September for Lease Assets of the First Wave Stores (the "**First Wave Lease Auction**") will maximize the value of their estates and allow the Debtors to avoid incurring needless costs associated with undesired Lease Assets. As a result, the Debtors, in connection with A&G, have formulated a separate Lease Sale Timeline (as defined below) contemplating an expedited process for the First Wave Stores (the "**First Wave Lease Sale Timeline**"). In order to be able to hold the First Wave Lease Auction in September and serve its goal of maximizing the value of the Debtors' estates, the First Wave

Lease Sale Timeline, as further detailed below, must be initiated on or immediately after the date

hereof. Therefore, by this Motion, the Debtors respectfully seek interim approval of the Lease Sale

Procedures and Lease Sale Timelines on an emergency basis.

## **Summary of the Lease Sale Procedures and the Order.**

**D.**     **The Lease Sale Timelines**

15.     The Debtors are seeking approval of the Lease Sale Procedures and the following

proposed timelines related thereto (the dates set forth below, the "**Lease Sale Timelines**") to

establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids

on a timeline that allows the Debtors to consummate a sale transaction as expeditiously as possible

in order to maximize the value of the Lease Assets and minimize the cost of maintaining the unused

Leases.  Moreover, the Debtors, in their sound business judgment and in consultation with the

Consultation Parties,[2] reserve the right to alter the timing of the Lease Sale Timelines as necessary

under the circumstances, or to conduct multiple sale transactions across one or more Lease

Auctions in order to maximize the value of the estates, in each case in accordance with the Lease

Sale Procedures. The Debtors respectfully request that the Court approve the following Lease Sale

Timelines to apply to any Lease Auctions the Debtors conduct.

---

[2] "**Consultation Parties**" shall mean (a) Choate, Hall & Stewart LLP, as counsel to the ABL Agent; (b) Otterbourg P.C., as counsel to the Term Agent and (c) any official committee appointed in the Chapter 11 Cases (the "**Committee**"), including in each case the legal and financial advisors thereto, as applicable.

## The Lease Sale Timelines

| First Wave Lease Sale Timeline[3] | | |
|---|---|---|
| **Action** | **Description** | **Deadline** |
| Lease Auction, Cure Cost & Lease Sale Hearing Notice | Time to file and serve the initial notice of leases being subject to the "First Wave" and the various deadlines below. | As soon as practicable after entry of the Interim Order |
| Bid Deadline | The deadline by which all binding Bids must be actually received. | September 16, 2024 at 5:00 p.m. (prevailing Eastern Time). |
| Notice of Qualified Bids | The deadline by which the Debtors shall notify the Bidders for Lease Assets whether their Bids are Qualified Bids and notify Counterparties of the Adequate Assurance terms of any Qualified Bids. | September 17, 2024 at 5:00 p.m. (prevailing Eastern Time). |
| Lease Auction | The date and time by which the Lease Auction with respect to the Lease Sale Procedure, if one is needed, will be held virtually, through Zoom. | **September 18, 2024 at 10:00 a.m. (prevailing Eastern Time).** |
| File Post-Auction Notice | The deadline by which the Debtors must file with the Court a list of all proposed final Lease Sales. | **September 19, 2024 at 5:00 p.m. (prevailing Eastern Time).** |
| Lease Sale Objection Deadline | The deadline to object to a sale of Lease Assets on any grounds, including on account of Cure Costs. | September 25, 2024 at 5:00 p.m. (prevailing Eastern Time). |
| Adequate Assurance Objection Deadline | If applicable, the deadline to object solely to the Successful Bidder's proposed form of adequate assurance of future performance with respect to Lease Assets. | September 25, 2024 at 5:00 p.m. (prevailing Eastern Time). |
| Lease Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate any Lease Sales. | September 30, 2024, or as soon thereafter as the Debtors may be heard. |

---

[3] This Timeline applies to the Lease Auction process for First Wave Store Closings only.

| Subsequent Wave Lease Sale Timeline | | |
|---|---|---|
| **Action** | **Description** | **Deadline** |
| Lease Auction, Cure Cost & Lease Sale Hearing Notice | Time to file and serve the initial notice of leases being subject to the "Subsequent Wave" and the various deadlines below. | As soon as practicable, and no later than 21 days prior to the anticipated Lease Sale Hearing for the applicable Lease Sales. |
| Bid Deadline | The deadline by which all binding Bids must be actually received. | 14 days after filing of the Lease Auction, Cure Cost & Lease Sale Hearing Notice, at 5:00 p.m. (prevailing Eastern Time) |
| Notice of Qualified Bids | The deadline by which the Debtors shall notify the Bidders for Lease Assets whether their Bids are Qualified Bids and notify Counterparties of the Adequate Assurance terms of any Qualified Bids. | Within 1 day after the Bid Deadline at 10:00 a.m. (prevailing Eastern Time) |
| Lease Auction | The date and time by which the Lease Auction with respect to the Lease Sale Procedure, if one is needed, will be held virtually. | Within 2 days after the Bid Deadline at 10:00 a.m. (prevailing Eastern Time) |
| File Post-Auction Notice | The deadline by which the Debtors must file with the Court a list of all proposed final Lease Sales. | Within 1 business day after the conclusion of the Lease Auction (if necessary) |
| Lease Sale Objection Deadline | The deadline to object to a sale of Lease Assets on any grounds, including on account of Cure Costs. | No later than 14 days after filing of the Lease Auction, Cure Cost & Lease Sale Hearing Notice, at 5:00 p.m. (prevailing Eastern Time) |
| Adequate Assurance Objection Deadline | If applicable, the deadline to object solely to the Successful Bidder's proposed form of adequate assurance of future performance with respect to Lease Assets. | No later than 2 business days after filing of the Post-Auction Notice, at 5:00 p.m. (prevailing Eastern Time) |
| Lease Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate any Lease Sales. | At least 21 days after filing of the Lease Auction, Cure Cost & Lease Sale Hearing Notice, subject to the Court's availability. |

16.     The timetable contemplated by the foregoing Lease Sale Timelines is essential to

maximize value for the Debtors' estates and could enable a faster emergence from chapter 11.  The

Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, afford the Debtors sufficient time to generate interest in any or all of the Lease Assets, and provide the Debtors with an expeditious process commensurate with the Debtors' liquidity constraints.  In short, the relief sought by this Motion is the Debtors' best chance to maximize value of the Lease Assets, while simultaneously minimizing rent obligations and other occupancy-related costs with respect to the Lease Assets.  Accordingly, the Debtors believe the relief requested herein is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate in the process, and, therefore, should be approved.

E.     **Key Provisions of the Lease Sale Procedures**

17.     To efficiently solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Lease Sale Procedures to govern the Lease Sales.  The Lease Sale Procedures are designed to encourage all entities to put their best bids forward and to maximize the value for the Debtors' estates.  The key provisions of the Lease Sale Procedures are summarized below:[4]

(a)     **Qualified Bidders**: Only a Qualified Bidder may participate in and make subsequent Bids at any Lease Auction.  The Debtors shall have the right to determine, in the exercise of their business judgment in consultation with the Consultation Parties, whether a bidder is a Qualified Bidder.  A Qualified Bidder must (among other requirements set forth in the Lease Sale Procedures) (i) deliver to the Debtors by the corresponding Bid Deadline an irrevocable, good faith, and bona fide offer (a "**Bid**") to purchase all or a portion of the Lease Assets that is a Qualified Bid pursuant to the Lease Sale Procedures, as set forth on a bidder registration form, substantially in the form attached to the Lease Sale Procedures as **Exhibit C**; (ii) demonstrate the financial wherewithal to enter into the proposed

---

[4] This summary is qualified in its entirety by the Lease Sale Procedures attached as **Exhibit 1** to the Order.  To the extent there are any conflicts between this summary and the Lease Sale Procedures, the terms of the Lease Sale Procedures shall govern.

transaction to the satisfaction of the Debtors; and (iii) provide, at the Debtors request, adequate assurance of future performance (which the Qualified Bidder agrees may be disseminated to affected landlords if such Qualified Bidders' Bid is determined to be a Qualified Bid), which may include, without limitation, information regarding the Qualified Bidders' financial condition such as tax returns, current financial statements, or bank accounts. Lease Sale Procedures, § D.

(b)     **Qualified Bids**: No bid will be a Qualified Bid unless it is made by a Qualified Bidder.  Lease Sale Procedures, § D.

(c)     **Bids for Individual Lease Assets or Combinations of Lease Assets**: A Qualified Bid must consist of a bidder registration form, substantially in the form attached to the Lease Sale Procedures as **Exhibit C**, which must detail which of the Lease Assets up for sale the Qualified Bidder proposes to be assumed and assigned and provides for the payment of all Cure Costs related to such Lease Assets.  The Lease Sale Procedures contemplate that a single bidder or group of bidders may purchase all or a portion of the Lease Assets.  If a bidder or group of bidders submits an offer for a combination of assets, such bidder or group of bidders must indicate (i) if it would be willing to purchase any of such assets if not sold as a group and, if so, (ii) a schedule indicating the Bid as to any individual or sub-group of assets that such bidder would purchase.  The Debtors, in consultation with the Consultation Parties, reserve the right to determine whether to auction any Lease Assets as part of a group or individually up through and including at any Lease Auction, or to conduct a Lease Auction of any Lease Asset both individually and as part of a group in order to determine which option maximizes value of the assets.  Lease Sale Procedures, § D(i)(b).

(d)     **Committed Financing**: A Qualified Bid must contain documentation acceptable to the Debtors (in the Debtors' business judgment in consultation with the Consultation Parties) evidencing that the Qualified Bidder has financial resources or committed financing sufficient to close the transaction within fourteen (14) days after the corresponding Lease Auction.  Lease Sale Procedures, § D(i)(d).

(e)     **Deposit**: Contemporaneous with the submission of a Qualified Bid, a Qualified Bidder shall tender an earnest money deposit of ten percent (10.0%) of the proposed purchase price.  Lease Sale Procedures, § D(ii).

(f)     **Markup of Assignment and Assumption Agreement**: A Qualified Bid must include an executed form of the assignment and assumption agreement that may not deviate substantially from the terms of the form assignment and assumption agreement attached as **Exhibit A** to the Lease Sale Procedures, as well as a "redline" to the form assignment and assumption agreement; *provided* that any landlord bidding on a Lease Asset related to a property which such landlord owns shall instead provide with its Qualified Bid an executed form of the lease

termination agreement that may not deviate substantially from the terms of the form lease termination agreement, substantially in the form attached as **<u>Exhibit B</u>** to the Lease Sale Procedures, marked to show any proposed revisions, which are acceptable to the Debtors in consultation with the Consultation Parties. Lease Sale Procedures, § D(i)(a).

(g)    **Due Diligence**: Any Qualified Bidder may request diligence from the Debtors, and the Debtors, in consultation with the Consultation Parties, may grant or deny any such request that they deem to be unreasonable. The Debtors may require such Qualified Bidder to execute a non-disclosure agreement prior to providing diligence to such Qualified Bidder. All due diligence must be completed prior to the submission of any bid. Lease Sale Procedures, § G.

(h)    **No Contingencies**: A Qualified Bid must contain no contingencies to the validity, effectiveness, and/or binding nature of the bid, including without limitation, contingencies for due diligence and inspection or financing of any kind. Lease Sale Procedures, § D(i)(c).

(i)    **Irrevocability**: A Qualified Bid, if determined to be the Successful Bid or Backup Bid, will be irrevocable for a period of thirty (30) days after the conclusion of the corresponding Lease Auction. Lease Sale Procedures, § D(i)(f).

(j)    **As-Is, Where-Is**: All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer the assets to the Successful Bidder and the Successful Bidder shall accept the assets "AS IS, WHERE IS, WITH ALL FAULTS." Lease Sale Procedures, § N.

(k)    **Initial Overbid**: Any Qualified Bidder may submit successive bids in minimum increments, which will be determined by the Debtors, in consultation with the Consultation Parties, at any Lease Auction depending on the total dollar value of the Lease Assets being sold at such Lease Auction. The minimum increments may be different with respect to each asset or group of assets being auctioned. Lease Sale Procedures, § I(iii)(c).

(l)    **Closing**: The closing of the sale of the Lease Assets will occur no later than fourteen (14) days after entry of an order approving the Lease Sale, unless otherwise extended by the Debtors, in consultation with the Consultation Parties. Lease Sale Procedures, § K.

18.    Most importantly, the Lease Sale Procedures recognize the Debtors' fiduciary obligations to maximize value for the benefit of their estates, and, as such, do not impair the

Debtors' ability to consider all potential bids and preserve the Debtors' right to modify the Lease Sale Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**Summary of the Noticing for the Lease Sale Procedures**

19.     The Debtors propose the following notice procedures to be implemented in connection with the Lease Sale Procedures.

**A.      Notice of the Lease Auction, Cure Costs, and Lease Sale Hearing**

20.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of any Lease Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the corresponding Lease Auction and Lease Sale Hearing, and the deadline for filing any objections to the relief requested.

21.     The Debtors shall cause a "Lease Auction, Cure Cost & Lease Sale Hearing Notice" to be served upon the Notice Parties (as defined herein) and the counterparties (the "**Counterparties**") to the affected unexpired leases (the "**Leases**") within (i) three business days of the entry of the Order or as soon thereafter as practicable for the First Wave Store Closings, and (ii) no later than 21 days prior to the corresponding Lease Sale Hearing for any Subsequent Wave Store Closings.  Each Lease Auction, Cure Cost & Lease Sale Hearing Notice will indicate that copies of this Motion and any future sale documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC, https://www.cases.ra.kroll.com/BigLots (the "**Case Website**").

22.     Similarly, the Debtors will post a publication version of the corresponding Lease Auction, Cure Cost & Lease Sale Hearing Notice onto the Case Website within (i) three business days of the entry of the Order or as soon thereafter as practicable for the First Wave Store Closings,

14

and (ii) no later than 21 days prior to the corresponding Lease Sale Hearing for any Subsequent Wave Store Closings.

23.     Each Lease Auction, Cure Cost & Lease Sale Hearing Notice will include, among other things, the: (i) the Lease or Leases subject to the particular Lease Auction, Cure Cost & Lease Sale Hearing Notice; (ii) the names and addresses of the Counterparties to such Leases; (iii) the proposed cure amount (the "**Cure Costs**"), if any for each such Lease;  and (iv) the proposed date, time, and place of the corresponding Lease Auction and Lease Sale Hearing and the deadline for filing any Lease Sale Objection or Adequate Assurance Objection (each as defined and described below), and will therefore, comply with Bankruptcy Rule 2002(c).

24.     The inclusion of an Assumed Lease on any Lease Auction, Cure Cost & Lease Sale Hearing Notice will not: (a) obligate the Debtors to sell or assume any Assumed Lease listed thereon or the Successful Bidder to take assignment of such Assumed Lease; or (b) constitute any admission or agreement of the Debtors that such Assumed Lease is an executory contract.  Only those Assumed Leases that are included on a schedule of assumed and acquired leases attached to a final assignment and assumption agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such assignment and assumption agreement) will be assumed and assigned to the applicable Successful Bidder.  No Assumed Lease shall be assumed absent closing on the assignment thereof to the applicable Successful Bidder.

25.     The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed Lease Sales of the Lease Assets.  The Debtors request that such notice be deemed sufficient and proper notice of the Lease Sales with respect to known interested parties.

B.      **Lease Sale Objections**

26.     Parties and Counterparties objecting to approval of a proposed Lease Sale or to the Cure Costs listed in the Lease Auction, Cure Cost & Lease Sale Hearing Notice must file a written objection (each, a "**Lease Sale Objection**") so that such Lease Sale Objection is filed with the Court and served so as to be **actually received** by **fourteen (14) days after filing of the Lease Auction, Cure Cost & Lease Sale Hearing Notice, at 5:00 p.m. (prevailing Eastern Time)** and serve such Lease Sale Objection on: (a) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn.: Brian M. Resnick, Esq., Adam L. Shpeen, Esq., Stephen D. Piraino, Esq., and Ethan Stern, Esq. (notice.biglots@davispolk.com); and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Robert J. Dehney, Sr., Esq., Andrew R. Remming, Esq., Daniel B. Butz, Esq., Tamara K. Mann, Esq., and Casey B. Sawyer, Esq. (biglots.mnat@morrisnichols.com), proposed co-counsel to the Debtors; (b) the Office of the United States Trustee for the District of Delaware, Attn: Linda Casey; and (c) counsel to any official committee appointed in these Chapter 11 Cases (collectively, the "**Objection Notice Parties**").

27.     If the Counterparty to the Assumed Lease does not file and serve a Lease Sale Objection in a manner that is consistent with the requirements set forth herein, and absent a subsequent order of the Court in connection with such objection establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Lease Auction, Cure Cost & Lease Sale Hearing Notice shall be controlling, notwithstanding anything to the contrary in any Assumed Lease or any other document, and (b) the Counterparty to the Assumed Lease will be deemed to have consented to the assumption and assignment of the Assumed Lease and the Cure Costs, if any, and will be

16

forever barred from asserting any other claims related to such Assumed Lease against the Debtors or the Successful Bidder, or the property of any of them.

**C.      Notice of Qualified Bid(s)**

28.      Within one business day after the Bid Deadline, the Debtors shall notify (email being sufficient) the Counterparties of any Lease Asset receiving a Qualified Bid of the terms of proposed Adequate Assurance contained in such Qualified Bid(s).

**D.      Notice of Successful Bidder(s)**

29.      As soon as reasonably practicable after the conclusion of any Lease Auction, the Debtors will file on the docket a notice (the "**Post-Auction Notice**") identifying (a) the proposed assignee(s) of such Lease(s) (the "**Assignee**" or "**Successful Bidder**"); (b) the effective date of the assumption for each such Lease (the "**Assumption Date**"); and (c) a description of any material amendments to the Lease made outside of the ordinary course of business, substantially in the form attached to the Order as **Exhibit 3**.

**E.      Adequate Assurance Objections**

30.      Counterparties objecting to a Successful Bidder's proposed form of adequate assurance of future performance must file a written objection (each, an "**Adequate Assurance Objection**") so that such Adequate Assurance Objection is filed with the Court and **actually received** by **two business days after filing of the Post-Auction Notice at 5:00 p.m. (prevailing Eastern Time)** and serve such Adequate Assurance Objection on the Objection Notice Parties (as defined herein).

31.      Pursuant to section 363(f) of the Bankruptcy Code, the sale or assignment of any Leases shall: (a) be free and clear of (i) all liens (and any liens shall attach to the proceeds in the

same order and priority subject to all existing defenses, claims, setoffs, and rights) and (ii) any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees of or by the Debtors, debts, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, claims, and encumbrances that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or Assignee, as the case may be, in the Lease(s) (but only in connection with the assignment by the Debtor to the Assignee)), and (b) constitutes a legal, valid, and effective transfer of such Lease(s) and vests the applicable Assignee with all rights, titles, and interests to the applicable Lease(s).  For the avoidance of doubt, all provisions of the applicable assigned Lease(s), including any provisions limiting future assignment, shall be binding on the applicable Assignee after consummation of the sale or assignment of such Lease.

### Basis for Relief

**A.**     **The Lease Sale Procedures are an Exercise of Sound Business Judgment, are Fair, and are Designed to Maximize the Value Received for the Lease Asset**

32.     Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Such sales of property outside of the ordinary course of business may be by private sale or by public auction. *See* Fed. R. Bankr. P. 6004(f)(1).

33.     A debtor must demonstrate a "sound business purpose" for a sale or use of assets outside the ordinary course of business. *See*, *e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d

Cir. 2015); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).  Courts typically consider the following factors in determining whether a proposed sale meets this standard:

    a) whether a sound business justification exists for the sale;

    b) whether adequate and reasonable notice of the sale was given to interested parties;

    c) whether the sale will produce a fair and reasonable price for the property; and

    d) whether the parties have acted in good faith.

*In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

      34.    Before selling and assigning an unexpired lease, a debtor must first assume the lease.  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy court").  The business judgment standard "is not a difficult standard to satisfy," and merely requires a court to find that "a reasonable business person would make a similar decision under similar circumstances."  *Cf. In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (applying the business judgment standard in the context of section 365 of the Bankruptcy Code); *see also In re Network Access Sols., Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) ("There is, however, no discernable difference in the . . . standard for approval under section[s] 363 and 365 [of the Bankruptcy Code].") (citation omitted).

**B.     There is a Sound Business Justification for the Debtors' Sale of the Leases and Sale of the Lease Assets**

35.     For the reasons set forth in the Ramsden Declaration, and detailed herein, the Debtors' sale of the Lease Assets is supported by a sound business purpose.  The Debtors have begun the process of liquidating certain of their assets through the Store Closings.  Unless the Lease Assets are sold, the Debtors will continue to incur obligations related to the Leases, including significant administrative costs, until the Leases are rejected.  The ongoing cost of maintaining the unused leases will significantly dwindle the value of the estate.  In fact, without an efficient and expedient process for monetizing the Lease Assets, the administrative costs of maintaining the Leases may exceed the value that could be obtained by the Debtors through an assumption and assignment of the Leases.  By contrast, the relief requested in this motion will permit the Debtors to minimize administrative expenses and maximize value of the estate.  As a result, exploring an orderly but expeditious sale of the Lease Assets is critical to maximizing recoveries for the Debtors' economic stakeholders.

**C.     Adequate and Reasonable Notice of the Sale Will Be Given to Interested Parties**

36.     As described above, the Lease Auction, Cure Cost & Lease Sale Hearing Notices are reasonably calculated to provide all of the known parties in interest with adequate, timely notice of, among other things, the potential sale of the Lease Assets, the Lease Sale Procedures, the Lease Auction(s), and the Lease Sale Hearing(s).

**D.     The Lease Sale Procedures Will Produce a Fair and Reasonable Price for the Lease Assets**

37.     It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (explaining that the "best way to determine value is exposure to a market"); *see also, In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction procedure for the disposition of the debtor's property can be structured to "maximize the value of estate property"). In fact, courts uniformly recognize that procedures established to enhance competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536–37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Psychrometric Sys., Inc.*, 367 B.R. 670, 676 (Bankr. D. Colo. 2007) (recognizing the "strong policy favoring competitive bidding" for sales in bankruptcy proceedings (citations omitted)); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

38.     The Lease Sale Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Lease Assets. Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Lease Sale Procedures to promote active bidding by interested parties and to elicit the highest or otherwise best offer(s) reasonably available for the Lease Assets. The implementation of the Lease Sale Procedures is a sound use of business judgment, as it will allow the Debtors to maximize value of the estate for the benefit of their creditors. Additionally, the Lease Sale Procedures would allow the Debtors to conduct the Lease Auctions in a fair and transparent manner that would encourage participation by financially capable bidders. Finally, the

Lease Sale Procedures allow all interested parties the opportunity to raise and resolve any objections with the proposed assumption and sale process. As a result, the process proposed here will allow the market to set a fair and reasonable price for the Lease Assets.

**E.    Any Successful Bidder Will Be a Good-Faith Purchaser and Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

39.    Although the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147. A good-faith determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *Id.*; *see also Pursuit Capital Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Capital Mgmt., LLC)*, 874 F.3d 124, 135 (3d Cir. 2017); *In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) (citations omitted). To constitute lack of good faith, a purchaser's conduct in connection with a sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))

40.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.

41.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42.    Section 363(m) of the Bankruptcy Code "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) of the Bankruptcy Code furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings").

43.    The Debtors submit that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. As set forth in the Lease Sale Procedures, each Qualified Bidder participating in each Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Lease Assets.  Only then will the Debtors enter into good-faith, arms'-length negotiations with the Qualified Bidders. Therefore, the Debtors will not engage with any party that, the Debtors' knowledge, has engaged in any conduct that would cause the Lease Sales to be set aside under section 363(m) of the Bankruptcy Code.

44.    Further, as set forth above, the Lease Sale Procedures are designed to produce a fair, transparent, and competitive sale process.  The consideration to be received by the Debtors pursuant to the Lease Sales will be substantial, fair, and reasonable.  Accordingly, the Debtors seek a finding that any Successful Bidder under the Lease Sale Procedures should be entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**F.    The Lease Assets Should be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

45.    In the interest of attracting the best offers, the Lease Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

> (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> (2)    such entity consents;
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
> (4)    such interest is in bona fide dispute; or
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens." (citation omitted)); *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 568 (Bankr. D. Del. 2022), *supplemented*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023).

46.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see also In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *8

(Bankr. D. Del. 2001) (highlighting the bankruptcy courts' equitable authority to authorize the sale of estate assets free and clear), *aff'd sub nom. In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003).

47.    The Debtors submit that the sale of the Lease Assets free and clear of liens, claims, interests, and encumbrances would satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent that a party objects to a Lease Sale on the basis that it allegedly holds a prepetition lien or encumbrance on the subject Lease Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

48.    Moreover, the Debtors have sent or will send the Lease Auction, Cure Cost & Lease Sale Hearing Notices to any purported prepetition lienholders.  If such lienholders do not object to a Lease Sale, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on any of the Lease Assets (other than those assumed or permitted, if any, in connection with one or more Lease Sales) timely and properly objects to this Motion, such party shall be deemed to have consented to any Lease Sale approved at the corresponding Lease Sale Hearing.  *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein); *accord In re BSA*, 642 B.R. at 569 (citing *In re Tabone, Inc.*, 175 B.R. at 858).

49.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could

thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate in the Lease Auction, to the detriment of the Debtors' economic stakeholders.  Accordingly, the Debtors request that the Court authorize the sale of the Lease Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (including all DIP Liens, Adequate Protection Liens, Prepetition Liens, DIP Obligations, Adequate Protection Obligations, Prepetition Obligations, and DIP Superpriority Claims (as each is defined in the DIP Motion)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

## G. Assumption and Assignment of the Unexpired Leases Satisfies the Requirements of the Bankruptcy Code

50.     Upon finding that a debtor has exercised its business judgment in determining that assuming an unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b)(1) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.

## H. Defaults Under the Assumed Leases Will Be Cured in Connection with the Lease Sales and Non-Debtor Parties Will Be Adequately Assured of Future Performance

51.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Assumption and Assignment Agreement requires the cure of all defaults associated with, or that are required to properly assume, the

Assumed Leases.  Because the Lease Sale Procedures provide a clear process by which to resolve

disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that

must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the

Bankruptcy Code and with due respect to the rights of non-Debtor parties.

52.     Similarly, the Debtors submit that the third requirement of section 365(b) of the

Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts

and circumstances present here.  The meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but should be given a "practical, pragmatic

construction.  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora*

*Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of

an absolute guarantee of payment.").  Among other things, adequate assurance may be given by

demonstrating the assignee's financial health and experience in managing the type of enterprise or

property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance present where a prospective assignee has financial resources and

has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood

of succeeding).

53.     The Debtors submit that the information required for any bidder to become a

Qualified Bidder satisfies any adequate assurance inquiry.  Further, the Lease Sale Procedures

provide that the Debtors may disseminate certain information of a Qualified Bidder to affected

landlords to satisfy the requirement of providing adequate assurance of future performance.

**I.      The Form and Manner of the "Lease Auction, Cure Cost & Lease Sale Hearing Notice" Should Be Approved**

54.      As described above, pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of any Lease Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the corresponding Lease Auction and the Lease Sale Hearing and the deadline for filing any objections to the relief requested herein.

55.      The Debtors shall cause a Lease Auction, Cure Cost & Lease Sale Hearing Notice to be served upon the Notice Parties (as defined herein) within (i) three business days of the entry of the Order or as soon thereafter as practicable for the First Wave Store Closings, and (ii) no later than 21 days prior to the corresponding Lease Sale Hearing for any Subsequent Wave Store Closings.  Each Lease Auction, Cure Cost & Lease Sale Hearing Notice will indicate that copies of this Motion and any future sale documents, if applicable, can be obtained on the Case Website.

56.      The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order, coupled with service of each Lease Auction, Cure Cost & Lease Sale Hearing Notice, and the Lease Sale Procedures as provided for herein, constitutes good and adequate notice of the Lease Sales and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that the Court approve the form and manner of each Lease Auction, Cure Cost & Lease Sale Hearing Notice.

### Emergency Consideration

57.      Pursuant to Local Rule 9013-1(m), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the

court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition ...." Fed. R. Bankr. P. 6003. As set forth in this Motion and the Ramsden Declaration, the Debtors believe that (a) approval of the First Wave Lease Sale Timeline is critical to preserve and maximize of the value of the Debtors' estates, and (b) any delay in granting the relief requested herein relating to the First Wave Lease Sale Timeline could cause immediate and irreparable harm. If the Debtors are not permitted to immediately initiate auction procedures for the First Wave Stores pursuant to the First Wave Lease Sale Timeline, the Debtors would be forced to either reject potentially valuable Lease Assets or incur rent costs for additional months unnecessarily. Accordingly, the Debtors submit that the relief requested herein satisfies Bankruptcy Rule 6003.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rules 6004(h) and 6006(d)

58.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

59.     The Debtors have already commenced the marketing and sale process to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Lease Sale Procedures Order, and any order authorizing the assumption and assignment of an Assumed Lease in connection with one or more Lease Sales be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Debtors' Reservation of Rights

60.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or should be construed as, or deemed to constitute, an agreement or admission as to the amount, priority, character, or validity of any claim against the Debtors on any grounds (whether under bankruptcy law or otherwise), a commitment or requirement to pay any claim, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code (other than the assumption of the Services Agreement), or an admission as to the amount, priority, enforceability, perfection, or validity of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  The Debtors expressly reserve their rights to contest any claims under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment or transfer made pursuant to an Approval Order is not intended, and should not be construed, as an admission as to the amount, priority, character, or validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

61.     Notice of this Motion will be provided to the following parties: (a) the U.S. Trustee; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a

consolidated basis); (c) the state attorneys general for states in which the Debtors conduct business; (d) the county consumer protection agency or similar agency in which the Debtors conduct business; (e) the United States Attorney's Office for the District of Delaware; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) the landlords of the Stores; (i) Choate, Hall & Stewart LLP, as counsel to the ABL Agent; (k) Otterbourg P.C., as counsel to the Term Agent (j) any other party with liens, claims, interests, or encumbrances on the Lease Assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders, substantially the form attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other further relief as the Court deems just and proper.

Dated: September 9, 2024
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Casey B. Sawyer*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

-and-

DAVIS POLK & WARDWELL LLP
Brian M. Resnick (*pro hac vice* forthcoming)
Adam L. Shpeen (*pro hac vice* forthcoming)
Stephen D. Piraino (*pro hac vice* forthcoming)
Ethan Stern (*pro hac vice* forthcoming)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*