## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (\_\_\_) |
| Debtors.[1] | (Joint Administration Requested) |
|  | **Hearing Date: TBD** |
|  | **Objection Deadline:** **September 23, 2024 at 4:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS, (B) APPROVING THE STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' ASSETS, (D) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, AND (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) (A) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each

of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the

"**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of Orders (I) (A) Approving*

*Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections,*

*(C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

*Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (this "**Motion**"). This Motion is supported by the (a) *Declaration of Adam Rifkin in Support of Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "**Rifkin Declaration**"), which is attached hereto as **Exhibit A** and incorporated by reference herein, and (b) *Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 3] (the "**Ramsden Declaration**" and, together with the Rifkin Declaration, the "**Declarations**"), which was filed on the Petition Date and is incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

<div align="center">

**Relief Requested**

</div>

1.      By this Motion, and pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1, 6004-1, and 9006-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors request entry of the following:

a. an order, substantially in the form attached hereto as **Exhibit B** (the "**Bidding Procedures Order**"):

i. authorizing and approving the bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, and as otherwise modified by the Debtors in accordance with the bidding procedures (the "**Bidding Procedures**"), in connection with the sale of all or substantially all, or individual or any combination of, the Bid Assets (as defined below) (each, a "**Sale Transaction**");[2]

ii. approving the Bid Protections (as defined below) for the Stalking Horse Bidder (as defined below), in accordance with the terms and conditions set forth in the Stalking Horse APA;

iii. scheduling an auction of the Bid Assets (the "**Auction**") to be held on **October 18, 2024, at 10:00 a.m. (prevailing Eastern Time)**;

iv. scheduling a hearing (the "**Sale Hearing**") to consider approval of a proposed Sale Transaction to be held on **November 4, 2024 at 10:00 a.m. (prevailing Eastern Time)**;[3]

v. authorizing and approving the (A) notice of the sale of the Bid Assets, the Bid Deadline (each as defined below), the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "**Sale Notice**"), (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease listed on the Potential Assumed Contracts Schedule (as defined below) (collectively, the "**Contracts and Leases**" and each, an "**Assumed Contract**" or "**Assumed Lease**") regarding the Debtors' potential assumption and assignment of such Counterparty's Assumed Contracts or Assumed Leases (collectively, the "**Potential Assumed Contracts**") and the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Potential Assumption and Assignment Notice**"), and (C) notice to each Counterparty listed on the Proposed Assumed Contracts Schedule (as defined below), substantially in the form attached to the Bidding Procedures Order as Exhibit 4 (the "**Proposed Assumption and Assignment Notice**"); and

---

[2] As described herein, the Bidding Procedures provide that there may be one or several Sale Transactions. To the extent that this Motion refers to the Sale Transaction (or terms related thereto) or Sale Order (as defined below) in the singular, it shall include the plural as well, and vice versa.

[3] This date remains subject to Court (as defined herein) approval.

> vi.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**");

b.    an order (the "**Sale Order**") authorizing and approving:

> i.    the sale of the Bid Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Bid Assets; and

> ii.    the assumption and assignment of the proposed Assumed Contracts and Assumed Leases (collectively, the "**Proposed Assumed Contracts**") in connection with a proposed Sale Transaction; and

c.    granting related relief.

### Jurisdiction, Venue, and Authority

2.    The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). In addition, the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

4.    Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

#### A.    General Background

5.    On September 9, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of

their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases. Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.      Information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Ramsden Declaration.

**B.      The Bid Assets[4]**

7.      Big Lots is a one-stop shop home discount retailer. Big Lots' mission is to help customers "Live Big and Save Lots" by offering bargains on everything for their homes, including furniture, décor, pantry essentials, kitchenware, groceries, and pet supplies. Headquartered in Columbus, Ohio, Big Lots operates more than 1,300 stores across 48 states in the United States, as well as an e-commerce store with expanded fulfillment and delivery capabilities.

8.      As described more fully in the Ramsden Declaration, Big Lots sells an assortment of products and merchandise in categories such as food, consumables (*e.g.*, health, beauty, cosmetic, plastic, paper, pet, infant, stationery, and chemical products), soft home products (*e.g.*, apparel, hosiery, jewelry, frames, fashion bedding, utility bedding, bath, window, decorative textile products, and area rugs), hard home products (*e.g.*, small appliances, table top, food preparation, home maintenance, and home organization products, toys, and electronics), furniture (*e.g.*, upholstery, mattresses, ready-to-assemble and home décor products, and case goods) and

---

[4] The assets and operations described in this section are referred to herein, collectively, as the "**Bid Assets**."

seasonal products (*e.g.*, lawn and garden, summer, and holiday products) to customers across the country utilizing "brick and mortar" and online direct-to-customer sales channels.

9.      Big Lots' merchandising strategy focuses on product sourcing, particularly closeout sourcing and global sourcing, implemented primarily through "Bargains" (*i.e.,* offering products believed to provide a good value at lower prices) and "Extreme Bargains" (*i.e.,* offering products that provide unmistakable value to customers).  The Company delivers unmatched value in all merchandise categories through high-quality closeouts on name brand items, affordable opening price points, and low prices on Big Lots' own brand assortment (*e.g.,* Broyhill, Real Living, Sound Body, and Fresh Findings). These bargain offerings are complemented with a reliable assortment of simple-to-shop staple products that customers rely on and that bring consistency to Big Lots' product mix.

10.      Big Lots generally sources closeouts from production overruns, packaging changes, discontinued products, order cancellations, liquidations, returns, and other disruptions in the supply chains of manufacturers, but also from engineered closeouts and other sourcing options. Big Lots has increased its sourcing and purchasing of high-quality closeout merchandise directly from manufacturers and other vendors, typically at prices lower than those paid by traditional discount retailers, to enhance the ability to deliver unmistakable value. While certain of Big Lots' merchandise vendors deliver directly to Big Lots stores, the large majority of Big Lots' inventory is staged and delivered from five regional distribution centers located in Alabama, California, Ohio, Oklahoma, and Pennsylvania. Big Lots does not operate any stores or facilities outside of the United States.

11.      Big Lots believes that its brand image—rooted in unmistakable value, surprising products, and an exceptional shopping experience—is an important part of why its customers

choose to shop at its stores and a critical element of the value proposition conveyed through all customer touchpoints. Accordingly, Big Lots focuses its marketing strategy on communicating Bargains and Extreme Bargains, driving incremental visits from new and existing customers, increasing brand awareness, brand consideration, and customers, and driving personalized marketing based on Big Lots' customer data platform.

12.    Big Lots also employs an integrated approach for its marketing touchpoints and investments, consisting of (i) paid media, including television, print, digital, social media, internet, email, and payment card-linked marketing, (ii) earned media, including public relations and organic social media, and (iii) owned media, including Big Lots' website, customer loyalty programs, and in-store signage. Big Lots prioritizes its relationships with the approximately 20 million active members of its customer loyalty program (the "**BIG Rewards Program**"), as nearly 75% of the Company's fiscal year 2023 sales were tied to this group of key customers.

**C.    Marketing and Sale Process**

13.    To assist Big Lots in analyzing its financing needs and developing capital structure solutions and restructuring alternatives, in May 2024, Big Lots retained Guggenheim Securities, LLC ("**Guggenheim Securities**") as its investment banker and A&G Realty Partners, LLC ("**A&G**") as its real estate advisor and Davis Polk & Wardwell LLP as legal counsel. Big Lots also engaged AlixPartners, LLP ("**AlixPartners**") as its operational advisor to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and support contingency preparations.

14.    From May 2024 through the Petition Date, the Company, together with its advisors, considered and exhaustively pursued a range of possible options, including: (i) seeking to raise additional financing from new financing sources and existing stakeholders; (ii) soliciting interest in strategic combinations; (iii) attempting to market and sell all or a portion of its assets and/or

operations to third parties; and (iv) exploring a plan to close a portion (but not all) of its stores, with a view towards restructuring around a smaller, right-sized footprint. The Company went to great lengths to pursue all such options.

15.     Unfortunately, despite these comprehensive efforts, during June 2024, the Company concluded that, based on recent performance trends, the only viable pathway to maintain its business as a going concern and preserve liquidity was to rationalize its footprint, close underperforming stores, and identify a purchaser for the remaining assets. In July 2024, the Company initiated a first wave of store closing sales, which continued with a second wave of closings in August 2024.

16.     Big Lots conducted a marketing process for 13 weeks over the summer commencing on or about June 3, 2024. Big Lots, with the assistance of Guggenheim Securities, prepared marketing materials and contacted approximately 20 potential strategic and financial purchasers. Of those potential purchasers, 12 entities executed non-disclosure agreements and were provided with a confidential information memorandum and granted access to a virtual data room containing confidential information regarding the Bid Assets. Big Lots will use the chapter 11 process to complete the marketing process.

17.     Following an extensive prepetition marketing and sale process (as described above), and a robust and arm's-length negotiation, the Debtors exercised their business judgment (in consultation with the Consultation Parties (as defined below)) and secured a going concern stalking horse bid (the "**Stalking Horse Bid**") from Gateway BL Acquisition, LLC, an affiliate of Nexus Capital Management LP (the "**Stalking Horse Bidder**") to purchase substantially all of the Bid Assets for an aggregate purchase price (subject to certain adjustments) of approximately $760 million, consisting of $2.5 million in cash plus the Debt Payoff Amount (as defined in the Stalking

Horse APA) and the assumption of certain liabilities, on the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of September 8, 2024, by and among Big Lots, Inc. and each of its subsidiaries and the Stalking Horse Bidder (the "**Stalking Horse APA**"), a copy of which is attached hereto as **Exhibit C**.

18.    To maximize the value of the estates' assets and elicit the highest or otherwise best offers for the Bid Assets, the Debtors and their advisors (in consultation with key stakeholders) developed the proposed Bidding Procedures to allow interested parties to provide bids that are superior to the Stalking Horse Bid and submit bids for (a) all of the Bid Assets, (b) particular lots of individual Bid Assets, or (c) combinations thereof, in each case, subject to the terms and provisions of the Bidding Procedures. Pursuant to the Bidding Procedures, the Debtors intend to continue marketing the Bid Assets to potential buyers and facilitating access to diligence materials. Such materials would include a non-confidential presentation and, for those executing a confidentiality agreement with the Debtors, access to a virtual data room, which would contain confidential presentation materials, additional legal, financial, operational, and other information on the Debtors, and, as appropriate, meetings with management.

19.    The Debtors and their advisors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe would maximize the value of their estates and produce maximum recoveries. This process principally includes approval of the Bidding Procedures that are designed to promote active bidding and obtain the highest or otherwise best offers available for the Bid Assets. Moreover, the Bidding Procedures provide the Debtors with the flexibility to consider bids in the form of chapter 11 plans of reorganization.

20.    The Debtors, in consultation with their advisors, believe that the process and time periods set forth in the Bidding Procedures are reasonable and would provide parties with

sufficient time and information necessary to formulate bids to purchase the Bid Assets. In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Bid Assets to maximize realizable value, all the while preventing the disclosure of confidential information to competitors that could be damaging to the business. As described above and more fully in the Rifkin Declaration, the Bid Assets have been marketed by the Debtors, with the assistance of Guggenheim Securities, to a broad group of strategic and financial buyers and substantial information regarding the Bid Assets has been made available during the marketing process. Accordingly, the Debtors believe that numerous parties that may have an interest in bidding at the Auction are already familiar with the Bid Assets for the purposes of formulating their bids. Furthermore, potential bidders would have access to updated information prepared by the Debtors, with the assistance of Guggenheim Securities, and a substantial body of information that resides in the Debtors' virtual data room.

21.     Speed and efficiency are critical, in light of the Debtors' liquidity profile and the Debtors' obligations under the DIP Facilities, and the completion of the sale process in a timely and efficient manner would help maximize the value of the Bid Assets for the benefit of all stakeholders. The time periods set forth in the Bidding Procedures are prudent and consistent with the case milestones under the DIP Facilities (the "**DIP Milestones**") and were negotiated and agreed to among the Debtors, with the advice of their advisors, and the DIP Agents: (i) PNC Bank, National Association and (ii) 1903P Loan Agent, LLC (together, the "**DIP Lenders**"), and failure to adhere to such time periods could jeopardize the closing of a Sale Transaction and the success of the Chapter 11 Cases. Indeed, without sufficient funds to operate the Debtors' businesses, the Debtors may be left with no choice but to cease operations and liquidate their assets for a much-

reduced value, to the detriment of all stakeholders. Thus, the Debtors have determined that pursuing one or more transactions in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and would provide interested parties with sufficient opportunity to participate.

22.    Accordingly, the Debtors believe that approval of the Bidding Procedures and the related relief requested in this Motion would allow the Debtors to efficiently maximize value and is in the best interests of the Debtors, their estates and creditors, and all other parties in interest. Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

**D.    The Stalking Horse Bid Protections**

23.    The Debtors seek authorization to enter into the transaction contemplated by the Stalking Horse APA unless a higher or otherwise better Qualified Bid (as defined below) is submitted with respect to such Bid Assets, as determined by the Debtors (in consultation with the Consultation Parties) in accordance with the Bidding Procedures, and for the Stalking Horse Bid to serve as the minimum bid for such Bid Assets.

24.    Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Stalking Horse APA, and the benefit that those efforts provided to the Debtors, their estates and creditors, and all other parties in interest, the Debtors agreed to provide the following bid protections to the Stalking Horse Bidder, payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which the Stalking Horse Bid relates): (a) payment of a break-up fee in an amount equal to $7.5 million (the "**Break-Up Fee**") and (b) reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**") in an amount up to $1.5 million; *provided* that the payment

of any Break-Up Fee and/or Expense Reimbursement shall be subject to the terms and conditions of the Stalking Horse APA and the DIP Order (as defined below).

**E.     The Stalking Horse APA**

25.     The Stalking Horse APA includes various customary representations, warranties and covenants by and from the parties thereto. In addition, the Stalking Horse APA includes certain conditions to closing the contemplated Sale Transaction and rights of termination related to the Chapter 11 Cases.

26.     The Stalking Horse Bidder has also agreed to act as an Alternative Bidder (as defined below) and, as such, if selected as an Alternative Bidder, hold open its binding offer to purchase the Bid Assets for a period of time after the Auction in case the Successful Bid (as defined below) is not timely consummated, in accordance with the Bidding Procedures.

27.     As the Stalking Horse APA is attached to this Motion, it is not restated herein in its entirety.  In accordance with Local Rule 6004-1, certain of the key terms of the Stalking Horse APA are highlighted in the chart below.

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| **Purchase Price** | The Purchase Price is approximately $760 million, consisting of $2.5 million in cash plus the Debt Payoff Amount and the assumption of certain liabilities. <br> *See* Stalking Horse APA § 3.01. |
| **Transferred Assets** | The Assets to be transferred include all right, title, and interest of the Debtors in, to, or under all of their respective assets, rights, and properties, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of the Selling Entities, in each case, as of the Closing, including in, to, or under the following (and excluding the Excluded Assets) (i) all offices and other facilities (ii) all tangible personal property and intangible property of the Selling Entities wherever located, including all such property in transit or in the possession of any Person, including all equipment, machinery, vehicles, fixtures, supplies, furniture, furnishings, leasehold improvements, signage, industry memorabilia, tools, vehicles, hardware, peripherals, Systems, telephone systems, and other personal, movable and fixed property, (iii) all inventory, (iv) all owned and leased real property, (v) all desired 365 contracts and other selected contracts, (vi) all transferable and assignable permits and orders (except those that would impose a liability after Closing), (vii) all books, databases, files, documents, instruments and other similar items, including telephone numbers, email addresses and accounts, customer and supplier lists and contact information, mailing lists, sales and promotional literature and other sales related materials and records (viii) all |

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | rights, claims, accounts, and causes of action and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, (ix) all rights to any proceeds with respect to (i) any loss, destruction or condemnation of any Asset or (ii) any Assumed Liabilities (other than with respect to Taxes) or the operation of such Assets, (x) all warranty, indemnity, or other claims made under any assign contract, (xi) all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, prepaid Property Taxes, and, in each case to the extent relating to Taxes that are Assumed Liabilities, other Tax assets, security and other deposits or the like (other than Tax assets that (A) are not prepaid Property Taxes and (B) do not relate to Taxes that are Assumed Liabilities), (xii) all owned intellectual property, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to assert, defend, sue, and recover damages for any infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in such intellectual property and any and all corresponding rights secured with respect to any owned intellectual property, (xiii) all goodwill, (xiv) any rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements, (xv) other than with respect to taxes, all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, or rights of recoupment, recovery or set off, (xvi) all rights, claims, or causes of action relating to or arising against suppliers, vendors, merchants, manufacturers, lease counterparties, license counterparties and any other counterparty to any assigned contract or real property interest, (xvii) all rights and benefits with respect to insurance policies (to the extent transferable), insurance recoveries under any insurance policies that relate to the assets or assumed liabilities, (xviii) all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state applicable law, and all other claims, causes of action, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or applicable laws, solely relating to vendors and service providers used in the business after the Closing, (xix) all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding, for the avoidance of doubt, any items related to income Taxes); (excluding any items related to income taxes), (xx) all Tax Returns that related exclusively to the assets (other than income Tax Returns); provided that, the Debtors may retain copies of such Tax Returns, (xx) all tax returns that related exclusively to the assets (other than income tax returns), (xxi) all acquired proceedings, (xxii) all cash and cash equivalents (other than retained cash), and (xxiii) all accounts receivable (and proceeds therefrom).

*See* Stalking Horse APA § 2.01(b). |
| **Assumed Liabilities** | The Assumed Liabilities include (a) all Liabilities solely to the extent arising from the ownership or operation of the Business or Assets by Stalking Horse Bidder after the Closing, (b) all of the Debtors' obligations to perform under the Assigned Contracts in accordance with their terms, solely to the extent such performance is required after the Closing (and not arising from any pre-Closing breach or other failure to perform or satisfy such obligations prior to the Closing by the Debtors), (c) all of Debtor's and its Subsidiaries Liabilities under the Real Property Interests, to the extent arising or attributable to any period after the Closing, (d)(i) all Taxes solely to the extent resulting from the use or operation of the Assets and the Business attributable to the Post-Closing Tax Period, (ii) Taxes of the Debtors for a Pre-Closing Tax Period that would not have been incurred but for an election by Buyer on the Closing Date that is retroactive to the Pre-Closing Tax Period and not expressly contemplated by this Agreement or otherwise agreed upon by the Debtors and (iii) and all Transfer Taxes; provided, that in no case will Assumed Liabilities include Taxes or other Liabilities with respect to the Assets or the Business with respect to which "responsible person" or similar claims may be made against any Selling Entity's or any Affiliate of a Selling Entity's employees, managers, officers, |

| | |
|---|---|
| | directors or similar persons with respect to any action or refusal to take action of such Selling Entity or Affiliate of Selling Entity, including pursuant to any wage payment statute, (e) the Assumed 503(b)(9) Claims, (f) the Assumed Accounts Payable, (g) all Liabilities that are the responsibility of Buyer pursuant to Section 8.04(e) of the Stalking Horse APA, and (h) Liabilities arising out of claims for workers' compensation and general liability claims and health care claims (including "IBNR"), including (i) Liabilities in connection with the administration of such programs that are incurred after the Closing and (ii) with respect to such IBNR under any Seller Benefit Plan.<br><br>*See* Stalking Horse APA § 2.03. |
| **Sale to Insider**<br><br>Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code, of any of the Debtors. |
| **Agreements with Management or Key Employees**<br><br>Local Rule 6004-1(b)(iv)(B) | Prior to the Closing Date, the Debtors shall reasonably cooperative with the Stalking Horse Bidder (i) to discuss the functions of the Company Employees, and (ii) the post-Closing needs of the Business. For a period of at twelve (12) months following the Closing Date (or until the date of termination of employment of the relevant Transferred Employee, if sooner), the Stalking Horse Bidder shall provide each Transferred Employee with compensation and other employee and fringe benefits (excluding any deferred compensation, severance, retention, change in control, transaction, defined benefit pension, stock purchase plans or post-employment welfare benefits) that are no less favorable in the aggregate than the compensation and other employee and fringe benefits (subject to the same exclusions) provided to such Transferred Employee immediately prior to the Closing<br><br>*See* Stalking Horse APA § 8.04(a)-(b). |
| **Releases**<br><br>Local Rule 6004-1(b)(iv)(C) | As of Closing, each of the Debtors and the Stalking Horse Bidder (each a "Releasing Party"), mutually releases discharges each other Releasing Party, and each other Releasing Parties' affiliated parties from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities of every kind, nature and description, except for any rights or obligations under the Stalking Horse APA, the other Transaction Documents and the Confidentiality Agreement.<br><br>*See* Stalking Horse APA § 13.12(b). |
| **Private Sale/No Competitive Bidding**<br><br>Local Rule 6004-1(b)(iv)(D) | This Motion contemplates an auction, and there is no provision in the Stalking Horse APA pursuant to which, prior to the selection of a successful bidder, the Debtors have agreed not to solicit competing offers for the Bid Assets or to otherwise limit shopping of the Bid Assets. |
| **Closing and Other Deadlines**<br><br>Local Rule 6004-1(b)(iv)(E) | Subject to the terms of the Sale Order and any other applicable order entered by the Bankruptcy Court, the Closing shall occur two business days after the satisfaction or waiver of conditions set forth in Article 9, Article 10, and Article 11, unless another place, date or time is agreed to in writing; *provided* that the Closing shall not occur without the Stalking Horse Bidder's prior written consent prior to the date that is 30 days following its receipt of the fully executed Debt Commitment Letters.<br><br>*See* Stalking Horse APA § 4.01. |
| **Good Faith Deposit**<br><br>Local Rule 6004-1(b)(iv)(F) | No later than two business days after the execution of the Stalking Horse APA, the Stalking Horse Bidder will make a deposit in cash in the amount equal to the Cash Purchase Price (the "Deposit Amount").<br><br>*See* Stalking Horse APA § 3.02. |

**MATERIAL TERMS OF THE STALKING HORSE APA**

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| **Interim Arrangements with Stalking Horse Bidder**<br><br>Local Rule 6004-1(b)(iv)(G) | The Debtors and the Stalking Horse Bidder are not entering into any interim agreements or arrangements in connection with the Stalking Horse Bid or pursuant to the Stalking Horse APA. |
| **Use of Proceeds**<br><br>Local Rule 6004-1(b)(iv)(H) | If the Break-Up Fee and Expense Reimbursement become due and payable to the Stalking Horse Bidder under the Stalking Horse APA, such amounts shall be paid in accordance with the terms and conditions provided for in the Stalking Horse APA, and the DIP Order.<br><br>*See* Stalking Horse APA § 13.07. |
| **Tax Exemption**<br><br>Local Rule 6004-1(b)(iv)(I) | The Debtors do not seek to have the sale of the Stalking Horse Assets in the Stalking Horse Bid declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention**<br><br>Local Rule 6004-1(b)(iv)(J) | Until the earlier of the closure of the Bankruptcy Cases and seven years after the Closing Date, Stalking Horse Bidder will use reasonable best efforts to not dispose or destroy any of the Records received as Assets and will allow the Selling Entity and any of its respective directors, officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notices, to any Record included in the Assets for the purposes relating to the Bankruptcy Cases and the wind-down of the operations.<br><br>*See* Stalking Horse APA § 8.05. |
| **Sale of Avoidance Actions**<br><br>Local Rule 6004-1(b)(iv)(K) | The Stalking Horse Bidder will purchase all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state applicable law, and all other claims, causes of action, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or applicable laws, solely relating to vendors and service providers used in the business after the Closing.<br><br>*See* Stalking Horse APA §§ 2.01(b)(xviii), 2.02(l). |
| **Requested Findings as to Successor Liability**<br><br>Local Rule 6004-1(b)(iv)(L) | The assets sold in the Sale Transaction will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale Transaction, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale Transaction, other than Assumed 503(b)(9) Claims, the Assumed Accounts Payable and Assumed Welfare Claims.<br><br>*See* Stalking Horse APA §§ 2.03, 2.04. |
| **Sale Free and Clear of Unexpired Leases**<br><br>Local Rule 6004-1(b)(iv)(M) | The transferred Assets do not include any unexpired Leases that are 365 Contracts.<br><br>*See* Stalking Horse APA § 2.01(b)(iv). |
| **Credit Bid**<br><br>Local Rule 6004-1(b)(iv)(N) | The Debtors do not seek to allow, disallow or affect in any manner credit bidding pursuant to section 363(k) of the Bankruptcy Code. |

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)**<br><br>Local Rule 6004-1(b)(iv)(O) | See paragraph 68 below. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | <u>Break-up fee</u>: payment of a break-up fee in an amount equal to $7.5 million.<br><br><u>Expense Reimbursement</u>: reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder, up to a maximum of $1.5 million.<br><br>*See* Stalking Horse APA §§ 1.01, 13.07. |

## F.    The Proposed Sale and Bidding Procedures

### i.    *Overview*

28.    The Bidding Procedures are designed to promote a competitive and efficient sale process to maximize the value of the Bid Assets. If approved, the Bidding Procedures would allow the Debtors to solicit and identify bids from potential buyers or investors that constitute the highest or otherwise best offer for the Bid Assets on a schedule consistent with the deadlines under the Stalking Horse APA, the DIP Milestones, and the Debtors' strategy for maximizing value for their stakeholders.

29.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated herein in their entirety. In accordance with Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below.[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Consultation Rights** | Throughout the Bidding Process, the Debtors, with the assistance of their advisors, will regularly and timely consult with the following parties (collectively, the "**Consultation Parties**"): (i) PNC Bank, National Association, solely in its capacity as DIP ABL Agent, Prepetition ABL Agent, and lender under the DIP ABL Facility and Prepetition ABL |

---

[5]    To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures or the DIP Motion, as applicable.

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
|---|

| | Facility (in such capacities, collectively, the "**ABL Agent**"); (ii) 1903P Loan Agent, LLC, solely in its capacity as DIP Term Agent, Prepetition Term Loan Agent, and lender under the DIP Term Loan Facility and Prepetition Term Loan Facility (in such capacities, the "**Term Agent**"); and (iii) any official committee appointed in the Chapter 11 Cases (the "**Committee**"), including in each case the legal and financial advisors thereto, as applicable. The Debtors will provide updates as reasonably appropriate to the Consultation Parties as to the status of the Bidding Process.<br><br>Each of the ABL Agent and the Term Agent shall be a Consultation Party unless and until the ABL Agent and Term Agent, as applicable, has indicated to the Debtors (including their advisors) in writing (which may be by email) that it intends to submit a bid in the Bidding Process, at which point such ABL Agent and Term Agent, as applicable, shall not be a Consultation Party. |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br><br>Local Rule 6004-1(c)(i)(A)-(B) | **Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified Bidder requirements.**<br><br>A party may participate in the Bidding Process by submitting a bid for (a) all or substantially all of the Bid Assets and/or (b) one or more, or any combination of, Bid Assets as that party may desire.<br><br>The Bidding Procedures also provide that the Debtors, in consultation with the Consultation Parties, may consider competing bids (each, a "**Chapter 11 Plan Bid**") in the form of a chapter 11 plan of reorganization (a "**Chapter 11 Plan Transaction**"), subject to the requirements set forth in the Bidding Procedures.<br><br>    A.    **Interested Parties.** Unless otherwise determined by the Debtors in consultation with the Consultation Parties, to participate in the Bidding Process, Interested Parties must deliver (unless previously delivered) the following items to Guggenheim Securities:<br><br>    1.    an executed confidentiality agreement in form and substance satisfactory to the Debtors (a "**Confidentiality Agreement**");<br><br>    2.    a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Interested Party has a *bona fide* interest in purchasing some or all of the Bid Assets;<br><br>    3.    a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline by which such due diligence will be completed; and<br><br>    4.    sufficient information, as ascertained by the Debtors, to allow the Debtors, to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close a Sale Transaction pursuant to the Bidding Procedures, which may include current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors) or, if the Interested Party is an entity formed for the purpose of acquiring some or all of the Bid Assets, (i) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party (or such other form of financial disclosure acceptable to the Debtors) and (ii) a written commitment acceptable to the Debtors that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the Bidding Process.<br><br>If the Debtors determine after receipt of the items identified above, that an Interested Party has a *bona fide* interest in purchasing some or all of the Bid Assets, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will provide such Potential |

17

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

Bidder with access to the Debtors' confidential electronic data room concerning the Bid Assets (the "**Data Room**"). Each of PNC Bank, National Association, solely in its capacity as the ABL Agent, and 1903P Loan Agent, LLC, solely in its capacity as the Term Agent, shall automatically be deemed a Potential Bidder and shall not be required to submit any of the foregoing information.

**B.    Due Diligence.** Until the Bid Deadline, in addition to granting access to the Data Room, the Debtors will provide Potential Bidders with due diligence access and additional information as may be requested by a Potential Bidder, to the extent that the Debtors determine that such requests are reasonable and appropriate under the circumstances. All due diligence requests shall be directed to Guggenheim Securities. The Debtors, with the assistance of Guggenheim Securities, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

For any Potential Bidder that is a competitor of the Debtors (or an affiliate thereof), the Debtors reserve the right to withhold any diligence materials that the Debtors deem commercially sensitive or otherwise not appropriate for disclosure to such Potential Bidder, or to require that the Potential Bidder enter into a "clean team" or similar arrangement acceptable to the Debtors in order to receive such diligence materials.

Unless otherwise determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) the Bidding Process is terminated in accordance with its terms.

**C.    Bid Deadline.** A Potential Bidder who desires to be deemed a Qualified Bidder must deliver to Guggenheim Securities, with a copy to Davis Polk & Wardwell LLP ("**Davis Polk**"), 450 Lexington Avenue, New York, NY 10017 (Attn: Brian M. Resnick, Adam L. Shpeen, Stephen D. Piraino, and Ethan Stern), the Required Bid Documents (as defined below), so as to be received no later than **October 15, 2024 at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

The Debtors, without the need for further Court approval, may extend the Bid Deadline by a reasonable period of time, so long as such extensions are consistent with the DIP Milestones set forth in the DIP Credit Agreements or otherwise with the prior written consent of each DIP Agent, if the Debtors believe that such extension would further the goal of attaining the highest or otherwise best offer for the Bid Assets.

**D.    Bid Requirements.**

1.    Required Bid Documents. All bids must be accompanied by the following items (collectively, the "**Required Bid Documents**"):

a.    a letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the Bid Asset(s) identified in such offer;

b.    other than for any Chapter 11 Plan Bid, a duly authorized and executed purchase agreement based on the form Stalking Horse APA, marked to show any revisions, including the purchase price for the subject Bid Assets, together with all exhibits and schedules thereto (including, a proposed form of order approving the transaction(s) contemplated in such purchase agreement). For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form Stalking Horse APA would not satisfy this requirement;

c.    each Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such bidder, pursuant to which the bidder proposes to effectuate the Chapter 11 Plan Transaction, in the form of a recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization, and must provide for a fully-committed investment

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  |  | of capital in exchange for substantially all of the equity of the reorganized Debtors; |
|---|---|---|
|  | d. | written evidence (i) demonstrating financial wherewithal, operational ability, and corporate authorization to consummate the proposed transaction and (ii) to the extent applicable, of a firm commitment for financing to consummate the proposed transaction, in both cases, acceptable to the Debtors in their sole discretion; and |
|  | e. | a written acknowledgment that the bidder (i) has had an opportunity to conduct any and all due diligence regarding the subject Bid Assets, the Sale Transaction, and/or a Chapter 11 Plan Transaction, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and any other information in making the bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or any of their advisors (including Guggenheim Securities, AlixPartners and Davis Polk) or other representatives regarding the bid, the Bid Assets, the Sale Transaction, the Chapter 11 Plan Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except, solely with respect to the Debtors and their estates, as expressly stated in these Bidding Procedures, and (iv) the bidder did not engage in any collusive conduct and acted in good faith in submitting its bid. |
| 2. | | Identity of Purchaser. Full disclosure of the legal identity of the purchaser (including any Sponsor(s), if the purchaser is an entity formed for the purpose of consummating the proposed transaction). |
| 3. | | Bid Assets; Consideration. |
|  | a. | Other than for a Chapter 11 Plan Bid, identification of the Bid Asset(s) to be purchased and the Contract(s) and Lease(s) to be assumed. |
|  | b. | Other than for a Chapter 11 Plan Bid, clearly states which liabilities of the Debtors or the Bid Assets would be assumed. |
|  | c. | Includes a statement of proposed terms for employees, including a description if its intentions with respect to the Debtors' current management team and other employees who are employed primarily in connection with the applicable Bid Assets, (and a description of any contemplated incentive plan, to the extend applicable). |
|  | d. | Sets forth the consideration, including the form thereof, for the Bid Asset(s) to be purchased and the Contract(s) and Lease(s) to be assumed (the "**Bid Consideration**"); *provided* that, if not a Partial Bid, the consideration must be at least equal to the following: (i) the consideration set forth in the Stalking Horse Bid; *plus* (ii) the aggregate amount of the Bid Protections; *plus* (iii) $2,000,000 (the "**Minimum Overbid**"). |
| 4. | | No Financing/Diligence Contingency. No condition on (i) the obtainment of financing or (ii) further due diligence. |
| 5. | | Regulatory Approvals. Includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors of the ability to obtain such approvals or consents as soon as reasonably practicable, and in no event later than 30 days |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

|  | after the submission of such Bid, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents. |
| --- | --- |
| 6. | Not Less Favorable. If not a Partial Bid, such bid is not materially more burdensome, less favorable, or more conditional than the terms of the Stalking Horse APA, as determined by the Debtors in their sole discretion. |
| 7. | Payment of DIP Obligations and Prepetition Secured Obligations. If not a Partial Bid, such bid includes a purchase price sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by the DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion. If a Partial Bid, the sum of all Partial Bids collectively results in a purchase price sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion. |
| 8. | Alternate Bidder. Must expressly state that the bidder agrees to serve as an Alternate Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid with respect to the subject Bid Assets. |
| 9. | Good Faith Deposit. Is accompanied by a cash deposit by wire transfer to a Deposit Agent in an amount equal to ten percent (10%) of the consideration set forth in connection with such bid (the "**Good Faith Deposit**"). |
| 10. | Authorized Representatives. A list setting forth the representatives that are authorized to appear and act on behalf of the bidder in connection with the proposed transaction. |
| 11. | No Bid Protections. Statement that the bidder, with the exception of the Stalking Horse Bidder, will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment and that it waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code. |
| 12. | Adequate Assurance. Evidence supporting the bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance of such bidder's ability to perform in the future under any Contract(s) and Lease(s) proposed in its bid to be assumed by the Debtors and assigned to the bidder, in a form that would permit the Debtors to disseminate immediately such evidence to the non-Debtor counterparties to such Contract(s) and Lease(s). |
| 13. | Cure Costs. Indication whether or not the bidder will assume all Cure Costs associated with any Contracts and Leases it intends to assume. |
| **E.** | **Designation of Qualified Bids; Cure of Non-Qualifying Bids.** The Debtors shall have the right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents; *provided* that such bid, or, in the case of a Partial Bid, the total amount of all Partial Bids, provides for a purchase price sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by the DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion. The Debtors will be authorized to approve joint bids in their reasonable discretion on a case-by-case basis. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies through and after the Bid Deadline. If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with the |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Bidding Procedures, the Debtors, to the extent applicable, shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit. Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder and the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes in connection with these Bidding Procedures (including with respect to any Partial Bids), and the Stalking Horse Bidder shall, without any further action, be entitled to participate in any Auction, including with respect to any Partial Bids.<br><br>**F.    Deemed Acknowledgments and Representations.** Each Qualified Bidder shall be deemed to acknowledge and represent that such bidder:<br><br>1.  has reviewed, understands, and accepts the Bidding Procedures;<br><br>2.  has consented to the jurisdiction of the Court;<br><br>3.  intends to consummate its Qualified Bid if it is selected as the Successful Bidder; and<br><br>4.  waives any and all rights (whether actual or potential) to contest any of the Debtors' determinations made during, or in connection with, any aspect of the Bidding Process. |
| **Provisions Governing Credit Bidding**<br><br>Local Rules 6004-1(c)(i)(A)-(B) and 6004-1(b)(iv)(N) | **Part 3 of the Bidding Procedures sets forth the provisions governing Credit Bidding**<br><br>Pursuant to section 363(k) of the Bankruptcy Code and subject to the terms and conditions set forth in the DIP Order[6], the DIP Loan Documents, and the Prepetition Credit Documents, the DIP Credit Parties and the Prepetition Secured Creditors, consistent with the terms of that certain Intercreditor Agreement, dated as of April 18, 2024, by and among the ABL Agent and Term Agent (the "**Intercreditor Agreement**"), shall have the right to credit bid up to the full amount of the applicable outstanding DIP Obligations and Prepetition Secured Obligations, as the case may be, in any bulk or piecemeal sale of all, substantially all, or any portion of the Bid Assets constituting DIP Collateral or Prepetition Collateral, as applicable; *provided* that any such credit bid must be submitted no later than the Bid Deadline and include cash consideration sufficient to satisfy the Carve Out, any senior liens on the collateral that is subject to the credit bid (except to the extent otherwise agreed by the holders of such senior liens in their sole and absolute discretion), and the applicable Bid Protections payable to the Stalking Horse Bidder. If the DIP Credit Parties or the Prepetition Secured Creditors submit a credit bid in accordance with the foregoing, and such bid is received by the Bid Deadline, such bidder shall be deemed to be a Qualified Bidder and any such credit bid shall be deemed to be a Qualified Bid (without the need for any Good Faith Deposit or satisfying any other conditions set forth in Section 2). |
| **Provisions Ensuring Funding of the Wind-Down Budget**<br><br>Local Rule 6004-1(c)(i)(A)-(B) | **Part 4 of the Bidding Procedures sets forth the provisions governing the Wind-Down Budget**<br><br>At the closing of a Sale Transaction, after paying in full in cash all DIP Obligations and Prepetition Secured Obligations, the Debtors shall deposit into a segregated account any additional net cash proceeds to be used for funding a reasonable wind-down budget negotiated in good faith (the "**Wind-Down Budget**"). |

---

[6] "DIP Order" shall mean the Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors To (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection To Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Bid Protections to Stalking Horse Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | **Part 5 of the Bidding Procedures sets forth the provisions governing the Bid Protections being provided to the Stalking Horse Bidder**<br><br>**Bid Protections.** Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Stalking Horse APA, and the benefit that those efforts provided to the Debtors, their estates and creditors, and all other parties in interest, the Debtors agreed to provide the following bid protections to the Stalking Horse Bidder, payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which the Stalking Horse Bid relates): (i) payment of a Break-Up Fee in an amount equal to $7.5 million and (ii) Expense Reimbursement in an amount up to $1.5 million; *provided* that the payment of any Bid Protections shall be (a) subject to the terms and conditions of the Stalking Horse APA and the DIP Order.<br><br>Until paid, any approved Break-Up Fee or Expense Reimbursement shall constitute allowed superpriority administrative expense claim(s) arising in the Chapter 11 Cases under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code; *provided, however,* that such superpriority administrative expense claim(s) shall be subject to the Carve-Out (as defined in the DIP Order) and the Wind-Down Budget, and shall in no circumstance be *pari passu* or senior to the claims granted to the DIP Credit Parties or the Prepetition Secured Creditors; *provided, further,* that any requirement that the Stalking Horse Bidder file a proof of claim for, or otherwise request allowance of, such superpriority administrative expense claim(s) is hereby waived. |
| **Provisions Governing the Auction and Permitting the Modification of Bidding and Auction Procedures**<br><br>Local Rules 6004-1(c)(ii) and 6004-1(c)(i)(D) | **Part 6 of the Bidding Procedures sets forth the procedures governing the Auction.**<br><br>**A.    Date, Time, and Location.** An Auction shall be held at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 on **October 18, 2024 at 10:00 a.m. (prevailing Eastern Time)**, or such later time on such day or such other place as the Debtors, in consultation with each DIP Agent, shall notify all Participating Parties.<br><br>**B.    Participating Parties and Attendees.** Attendance will be limited to the representatives or agents (including legal and financial advisors) of (i) the Debtors, (ii) the Consultation Parties, and (iii) the Qualified Bidders (including the Stalking Horse Bidder).<br><br>**C.    Auction Procedures.**<br><br>1.  <u>Notice of Qualification</u>. Prior to the Auction, the Debtors will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders with (i) copies of the Starting Bid, (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the Qualified Bidders.<br><br>2.  <u>Starting Bid</u>. The first round of bidding at the Auction shall commence at the Starting Bid. For the avoidance of doubt, the Starting Bid may be comprised of multiple Qualified Bids if the aggregate consideration of such Qualified Bids is higher and better than the Stalking Horse Bid.<br><br>3.  <u>Subsequent Bids</u>. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one Subsequent Bid is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors, in consultation with the Consultation Parties, determine is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | rounds, a higher or otherwise better offer than the Leading Bid, in each case taking into account other Qualified Bids for other Bid Assets; *provided* that, with respect to the first round, any Qualified Bid must provide incremental consideration at least equal to the Minimum Overbid. In each subsequent round after the first round, the Debtors, in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding. Notwithstanding anything herein to the contrary, any Subsequent Bid by the Stalking Horse Bidder to the bid embodied in the Stalking Horse APA, in any and all rounds of bidding, will be deemed to be comprised of a credit in the full amount of the Break-Up Fee and Expense Reimbursement Amount plus a cash bid for the remainder of the Purchase Price. |
| | 4.  <u>Highest or Best Offer</u>.  After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in consultation with the Consultation Parties, will determine and announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "**Leading Bid**").  Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided* that the value for such non-cash consideration shall be determined by the Debtors, in consultation with the Consultation Parties. |
| | 5.  <u>Partial Bids</u>.  If any of the Qualified Bids submitted by the Bid Deadline are structured as a Partial Bid, the Debtors (in consultation with the Consultation Parties) may conduct separate auctions at the Auction for each lot of assets (each, an "**Auction Lot**") subject to a Partial Bid. The Debtors may, in consultation with the Consultation Parties, combine multiple Partial Bids into an Auction Lot to compete against the Stalking Horse Bid; *provided*, that the sum of all Partial Bids collectively results in a purchase price sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by the DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion.  The Debtors may designate each Auction Lot at any time prior to the Auction. |
| | 6.  <u>Modification of Bidding and Auction Procedures</u>.  The Debtors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, the amount of time allotted to submit Subsequent Bids); *provided* that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith and (b) be disclosed to all Qualified Bidders. |
| **Provisions Regarding Selection of Successful Bid and Alternate Bid** Local Rule 6004-1(c)(i)(E) | **Part 7 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bid(s) and Alternate Bid(s).** A.    **Selection of Successful Bids.**  Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, shall (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the Bidding Process, including those factors affecting the speed and certainty of consummating the Sale Transaction and, in the case of a Chapter 11 Plan Transaction, the structure, confirmability, and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document, and obtain confirmation of such proposed chapter 11 plan), (ii) determine and identify the highest or otherwise best offer or collection of offers (the "**Successful Bid(s)**"), (iii) determine and identify the next highest or otherwise best offer or collection of offers (the "**Alternate Bid(s)**"), and (iv) notify all Qualified Bidders participating in the Auction of (a) the identity of the party or parties that submitted the Successful Bid(s) |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | (the "**Successful Bidder(s)**"), (b) the amount and other material terms of the Successful Bid(s), (c) the identity of the party or parties that submitted the Alternate Bid(s) (the "**Alternate Bidder(s)**"), and (d) the amount and other material terms of the Alternate Bid(s).<br><br>Each Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated.<br><br>**B.    Execution of Definitive Documentation.** As soon as reasonably practicable after the completion of the Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction(s) contemplated by the applicable Successful Bid(s). Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors will file a notice of the Successful Bid(s) and Alternate Bid(s) with the Court, together with a proposed Sale Order. |
| **Provisions Regarding Sale Hearing and Closing with Successful Bidders and Alternative Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | **Part 8 of the Bidding Procedures sets forth procedures regarding closing with Successful Bidder(s) or Alternative Bidder(s).**<br><br>The Sale Hearing will be held on **November 4, 2024** at **10:00 a.m. (prevailing Eastern Time)**[7] before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, or by such other virtual or electronic means as may be determined by the Court.<br><br>The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, by an announcement of the adjourned date at a hearing before the Court or by filing a notice on the Court's docket. At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid(s) and, at the Debtors' election, the Alternate Bid(s).<br><br>The Debtors' presentation to the Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Court. Following the Court's entry of the Sale Order, the Debtors and the Successful Bidder(s) shall promptly proceed to consummate the transaction(s) contemplated by the Successful Bid(s). If the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), then the Debtors will file a notice with the Court advising of such failure. Upon the filing of such notice with the Court, the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate the transaction(s) with the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Court. If the failure to consummate the transaction(s) contemplated by the Successful Bid(s) or Alternate Bid(s), as applicable, is the result of a breach by the Successful Bidder(s) or Alternate Bidder(s), as applicable (the "**Breaching Bidder(s)**"), of its (their) asset purchase agreement(s), the Debtors reserve the right to seek all available remedies from such Breaching Bidder(s), subject to the terms of the applicable asset purchase agreement. |

ii.    *Key Dates and Deadlines*

30.    Consistent with the Debtors' need to consummate any sale of the Bid Assets as efficiently as practicable in accordance with the DIP Milestones, the Debtors propose the following

---

[7] This date remains subject to Court approval.

key dates and deadlines for the Bidding Process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| October 4, 2024 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as the Debtors may reasonably be heard | Hearing to consider approval of the Bidding Procedures and Stalking Horse Bidder's Bid Protections for entry of the Bidding Procedures Order |
| --- | --- |
| October 8, 2024 | Target date for the Debtors to file Potential Assumed Contracts Schedule |
| October 15, 2024, at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| October 18, 2024, at 10:00 a.m. (prevailing Eastern Time) | Auction (if any) to be held at the New York offices of Davis Polk & Wardwell LLP |
| October 22, 2024 | Target date for the Debtors to file with the Court the Notice of Successful Bidder (as defined below) |
| October 25, 2024 at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale Transaction to the Successful Bidder, the Assumption and Assignment Objection Deadline (as defined below), and the Cure Objection Deadline (as defined below) |
| November 4, 2024 at 10:00 a.m. (prevailing Eastern Time) or as soon thereafter as the Debtors may reasonably be heard | Hearing to consider approval of the Sale Transaction(s) and for entry of the Sale Order(s) |

## G.    Noticing Procedures

31.    The Debtors propose the following "**Noticing Procedures**":

a.    <u>**Sale Notice and Publication**</u>.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class mail) upon the following:  (i) the U.S. Trustee; (ii) Choate, Hall & Stewart LLP, as counsel to the ABL Agent; (iii) Otterbourg P.C., as counsel to the Term Agent; (iv) counsel to the Committee (if any); (v) counsel to the Stalking Horse Bidder; (vi) Counterparties to Contracts and Leases; (vii) the Securities and Exchange Commission; (viii) the Internal Revenue Service; (ix) the United States Attorney's Office for the District of Delaware; (x) the state attorneys general for states in which the Debtors conduct business; (xi) all other

parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (xii) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Bid Assets (or lot thereof); (xiii) all other known parties with any interest in the Bid Assets; (xiv) all of the Debtors' other known creditors; and (xv) any party that, as of the filing of this Motion, has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**"); *provided* that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided*, *further*, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence. The Debtors would also cause the Sale Notice to be published once in the national edition of *USA Today* or another publication with similar national circulation as soon as practicable following entry of the Bidding Procedures Order and would post the Sale Notice and the Bidding Procedures Order on the Debtors' case information website located at https://www.cases.ra.kroll.com/BigLots (the "**Case Information Website**"). This publication of the Sale Notice would provide notice of the sale to all interested parties whose identities are unknown to the Debtors. The Sale Notice would include the date, time, and place of the Auction and the Sale Hearing and the deadline for filing any objections relating to the Bidding Procedures or any Sale Transaction, once they are set by the Court.

b.   **Notice of Determination of Qualified Bids**. The Debtors shall make a determination regarding which bids qualify as Qualified Bids. Prior to the Auction, the Debtors would (i) notify each Qualified Bidder that has timely and properly submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders with (A) a copy of the Starting Bid, (B) an explanation of how the Debtors value the Starting Bid, and (C) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

c.   **Notice of Hearing if Auction Not Held**. If (i) no Qualified Bid other than the Stalking Horse Bid is timely and properly submitted by the Bid Deadline for the Bid Assets comprising the Stalking Horse Bid, (ii) multiple Partial Bids are timely and properly submitted by the Bid Deadline for non-overlapping lots of the Bid Assets that, in the aggregate, do not exceed the amount of the Stalking Horse Bid for such Bid Assets, or (iii) multiple Partial Bids are submitted by the Bid Deadline for non-overlapping lots of Bid Assets excluded from the Stalking Horse Bid, the Debtors may, in their sole discretion and in consultation with the Consultation Parties, elect to cancel the Auction and seek approval of the transactions contemplated in

the Stalking Horse Bid and Partial Bids, as applicable, at the Sale Hearing. If no Auction is to be conducted, the Debtors would file with the Court, serve on the Sale Notice Parties, and cause to be published on the Case Information Website a notice (i) indicating that the Auction for the Bid Assets has been canceled, (ii) indicating that the Stalking Horse Bid and Partial Bids (as applicable) is or are the Successful Bid(s) with respect to the Bid Assets, and (iii) setting forth the date and time of the Sale Hearing.

d.  **<u>Notice of Auction Results</u>**.  Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors will file a notice of the (i) Successful Bidder(s) for the Assets, (ii) the Alternate Bidder(s), if applicable, (iii) the key terms of the proposed Sale Transaction, (iv) the date, time, and place of the Sale Hearing, and (v) the Sale Objection Deadline (the "**Notice of Successful Bidder**") with the Court and cause the Notice of successful Bidder to be published on the Case Information Website.

32.     The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the Bidding Process, including the objection deadline, the Bid Deadline, and the times and locations of the Auction and Sale Hearing.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**H.     Assumption and Assignment Procedures**

33.     In connection with one or more Sale Transactions, the Debtors anticipate that they would assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the Assumed Contracts and Assumed Leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby also seek approval of the proposed Assumption and Assignment Procedures set forth herein, which are designed to, among other things, (a) outline the process by which the Debtors would serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding a Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases.  Specifically, the Assumption and Assignment Procedures are as follows:

27

a.  **Potential Assumed Contracts Schedule**.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assumed Contracts (the "**Potential Assumed Contracts Schedule**") that specifies (i) each of the Contracts and Leases that potentially could be assumed and assigned in connection with the sale of the Bid Assets, including the name of each Counterparty, and (ii) the proposed Cure Cost with respect to each Potential Assumed Contract.

b.  **Potential Assumption and Assignment Notice**.  The Debtors shall, as soon as reasonably practicable after entry of the Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (i) include the Potential Assumed Contracts Schedule, (ii) list the Debtors' good faith calculation of the Cure Costs with respect to the Potential Assumed Contracts identified on the Potential Assumed Contracts Schedule, (iii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to designation by the Successful Bidder and Court approval, (iv) prominently display the deadline to file an Assumption and Assignment Objection (as defined below), and (v) prominently display the date, time, and location of the Sale Hearing.

c.  **Proposed Assumption and Assignment Notice**.  The Debtors shall, in conjunction with the filing of the Notice of Successful Bidder, file, cause to be published on the Case Information Website, and serve on each relevant Counterparty a Proposed Assumption and Assignment Notice, which shall (i) include a schedule of the Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**") as agreed between the Debtors and the applicable Successful Bidder, (ii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iii) prominently display the deadline to file an Assumption and Assignment Objection, and (iv) prominently display the date, time, and location of the Sale Hearing.

d.  **Assumption and Assignment Objections**.

i.  <u>Objection Deadlines</u>.  Any Counterparty may object to the potential or proposed assumption or assignment of its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  All Assumption and Assignment Objections must (A)

be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, (D)(1) for objections relating to proposed Cure Costs, be filed no later than **October 21, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure Objection Deadline**") and (2) for all other objections, **October 25, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Assumption and Assignment Objection Deadline**"), and (E) be served on (1) proposed counsel to the Debtors, (y) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian M. Resnick, Esq., Adam L. Shpeen, Esq., Stephen D. Piraino, Esq., and Ethan Stern Esq. (notice.biglots@davispolk.com) and (z) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Robert J. Dehney, Sr., Esq., Andrew R. Remming, Esq., Daniel B. Butz, Esq., Tamara K. Mann, Esq., and Casey B. Sawyer, Esq. (biglots.mnat@morrisnichols.com), (2) counsel to the ABL Agent, (y) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola, Esq. (jventola@choate.com), Jonathan D. Marshall, Esq. (jmarshall@choate.com), and Jacob S. Lang, Esq. (jslang@choate.com), and (z) Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com) and Stanley Tarr, Esq. (stanley.tarr@blankrome.com), (3) counsel to the Term Agent, (y) Otterbourg P.C., 230 Park Avenue, New York, NY 10169, Attn: Chad B. Simon, Esq. (CSimon@otterbourg.com), James V. Drew, Esq. (JDrew@otterbourg.com), and Sarah L. Hautzinger, Esq. (shautzinger@otterbourg.com) and (z) Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801, Attn: John H. Knight, Esq. (knight@rlf.com), (4) counsel to the Committee (if any), (5) counsel to the Stalking Horse Bidder, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Christopher Marcus, P.C. (cmarcus@kirkland.com), Douglas A. Ryder, P.C. (douglas.ryder@kirkland.com), and Nicholas M. Adzima (nicholas.adzima@kirkland.com), and (6) the U.S. Trustee, Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda J. Casey (linda.casey@usdoj.gov) (collectively, the "**Assumption and Assignment Objection Notice Parties**").

ii.  <u>Resolution of Assumption and Assignment Objections</u>.  If a Counterparty timely files an Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in their sole discretion and in consultation with the Successful Bidder, shall determine (subject to the Court's calendar).

If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court or by agreement with the Counterparty), each Successful Bidder may elect, in its sole and absolute discretion, one of the following options: (A) treat such Counterparty's contract or lease as property excluded from the Bid Assets (an "**Excluded Contract**" or "**Excluded Lease**," respectively) or (B) temporarily treat the Proposed Assumed Contract as an Excluded Contract or Excluded Lease, as applicable (a "**Designated Agreement**"), proceed to the closing of the Sale Transaction with respect to all other Bid Assets, and determine whether to treat the Designated Agreement as an Assumed Contract or Assumed Lease, as applicable, or an Excluded Contract or Excluded Lease, as applicable, within ten business days after resolution of such objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the applicable Successful Bidder).

iii.   <u>Failure To File Timely Assumption and Assignment Objection.</u>  If a Counterparty fails to timely and properly file with the Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract or Assumed Lease.  Notwithstanding anything to the contrary in the Assumed Contract or Assumed Lease, or any other document, the Cure Costs set forth in the Potential Assumed Contracts Schedule or the Supplemental Assumed Contracts Schedule (as defined below) shall be controlling and would be the only amount necessary to cure any alleged outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the Petition Date, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to prepetition defaults under such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder, or the property of any of them.

e.   **Modification of Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule**.

i.   In addition to the rights of a Successful Bidder described above with respect to an Assumption and Assignment Objection at or prior to the closing of a Sale Transaction, each Successful Bidder may elect, in its sole and absolute discretion, to (A) exclude from the Proposed Assumed Contracts Schedule any Contract or Lease on the Potential Assumed Contracts Schedule (as amended or supplemented) (in

which case it shall become an Excluded Contract or Excluded Lease, as applicable) or (B) include on the Proposed Assumed Contracts Schedule any Contract or Lease listed on the Potential Assumed Contracts Schedule (in each case, as amended or supplemented), by providing to the Debtors written notice of its election to exclude or include such Contract or Lease, as applicable.

ii.     If the Debtors or any Successful Bidder identify during the pendency of the Chapter 11 Cases (before or after the closing of the applicable Sale Transaction) any Contract or Lease that is not listed on the Proposed Assumed Contracts Schedule, and such Contract or Lease has not been rejected by the Debtors, such Successful Bidder may, in its sole and absolute discretion, elect by written notice to the Debtors to treat such Contract or Lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors may seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures.

iii.    Following the conclusion of the Auction, if any, and the selection of the Successful Bidder(s), the Debtors reserve the right, at any time before the closing of the Sale Transaction(s), to modify the previously-stated Cure Costs associated with any Proposed Assumed Contract, subject to notice requirements in the Assumption and Assignment Procedures.

iv.     In the event that any Contract or Lease is added to the Potential Assumed Contracts Schedule or the Proposed Assumed Contracts Schedule, or previously-stated Cure Costs are modified, in accordance with the procedures set forth in this Motion, the Debtors would promptly file, cause to be published on the Case Information Website, and serve a supplemental assumption and assignment notice, by email or ECF where available, or otherwise by first class mail, on the applicable Counterparty (each, a "**Supplemental Assumption and Assignment Notice**"). Each Supplemental Assumption and Assignment Notice shall (A) include a schedule of the modified Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule (the "**Supplemental Assumed Contracts Schedule**"), (B) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (C) prominently display the deadline to file a Supplemental Assumption and Assignment Objection (as defined below), and (D) prominently display the date, time, and location of the Sale Hearing.

v.      Any Counterparty listed on a Supplemental Assumed Contracts Schedule whose Contract or Lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of

its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of a Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**"). All Supplemental Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, and (D) no later than 14 days from the date of service of such Supplemental Assumption and Assignment Notice, (1) be filed with the Court and (2) be served on the Assumption and Assignment Objection Notice Parties. Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

f.      **Reservation of Rights**.   The inclusion of an Assumed Contract, an Assumed Lease, or, in each case, Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, Supplemental Assumption and Assignment Notice, or Supplemental Assumed Contracts Schedule shall not constitute, nor be deemed, a determination or admission by the Debtors, the Successful Bidder(s), or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Assumed Contract and Assumed Lease listed on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, or Supplemental Assumed Contracts Schedule. The Debtors' inclusion of any Assumed Contract or Assumed Lease on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, or Supplemental Assumed Contracts Schedule shall not be a guarantee that such Assumed Contract or Assumed Lease ultimately would be assumed or assumed and assigned.

## Basis for Relief

**A.    The Bidding Procedures are Fair and Appropriate and Should Be Approved**

34.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize the value of the estate's assets); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that the main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established to enhance competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 536–37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Psychrometric Sys., Inc.*, 367 B.R. 670, 676 (Bankr. D. Colo. 2007) (recognizing the "strong policy favoring competitive bidding" for sales in bankruptcy proceedings (citations omitted)); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

35.    The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Bid Assets.  Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to elicit the highest or otherwise best offer(s) reasonably available for the Bid Assets.  Additionally, the Bidding Procedures would allow the Debtors to conduct the Auction in a fair and transparent manner that

would encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction. Finally, the Bidding Procedures explicitly provide that the net proceeds of any sale pursuant to the Bidding Procedures shall, after paying in full in cash all DIP Obligations and Prepetition Secured Obligations, be deposited into a segregated account to fund the Wind-Down Budget before repayment of any 507(b) Claims or any other claims against the Debtors. Accordingly, at the closing of a Sale Transaction, the Debtors, after paying in full in cash all DIP Obligations and Prepetition Secured Obligations, expect to have sufficient cash to administer the wind-down of the Debtors' estates subsequent to the closing of a Sale Transaction.

36. This court routinely approves procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales. *See, e.g.*, *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 6, 2024) [D.I. 427]; *In re Amyris, Inc.*, No. 23-11131 (TMH) (Bankr. D. Del. Dec. 20, 2023) [D.I. 969]; *In re Kidde-Fenwal, Inc.*, No. 23-10638 (LSS) (Bankr. D. Del. Dec. 12, 2023) [D.I. 735]; *In re Proterra Inc.*, No. 23-11120 (BLS) (Bankr. D. Del. Sept. 7, 2023) [D.I. 218]; *In re KDC Agribusiness LLC*, No. 23-10786 (CTG) (Bankr. D. Del. July 20, 2023) [D.I. 208]; *In re Aero Farms*, *Inc*, No. 23-10737 (MFW) (Bankr. D. Del. July 20, 2023) [D.I. 191]; *In re Fast Radius, Inc*., No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022) [D.I. 77]; *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. May 31, 2022) [D.I. 233]; *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136]. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

**B.     The Designation of the Stalking Horse Bidder and the Offering of the Bid Protections Have Sound Business Purposes and Should Be Approved**

37. Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Stalking Horse APA, and the benefit

that those efforts provided to the Debtors, their estates and creditors, and all other parties in interest, the Debtors agreed to provide the Bid Protections to the Stalking Horse Bidder, payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which the Stalking Horse Bid relates).

38.    Approval of bid protections in connection with sales pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. The Third Circuit has held that the administrative expense provisions of section 503(b) of the Bankruptcy Code govern the standard for approval of bid protections in the bankruptcy sale context. Accordingly, bid protections must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets. *See In re O'Brien Env't Energy, Inc.*, 181 F.3d at 533–35; *In re Reliant Energy Channelview L.P.*, 594 F.3d 200, 208–09 (3d Cir. 2010) (holding that the business judgment rule may not be used as an alternative to the administrative expenses section of the Bankruptcy Code as a basis for approving certain bid protections). Whether a proposed break-up fee benefits the estate depends on the "totality of the circumstances" and ultimately requires "a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3d Cir. 2018).

39.    The Third Circuit has identified several instances in which bid protections in the form of a break-up fee or expense reimbursement may be necessary to preserve the value of estate assets. *First*, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Env't Energy, Inc.*, 181 F.3d at 537. S*econd*, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the

value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id. Third*, such bid protections could preserve an estate's value by "assuring that a bidder 'adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale' of the relevant asset." *In re Energy Future Holdings Corp.*, 904 F.3d at 314 (quoting *In re Reliant Energy Channel View L.P.*, 594 F.3d at 207).

40.     Here, the Bid Protections would satisfy these factors.  As for the first factor, the Debtors only offered the Bid Protections to the extent that they believe, in the exercise of their business judgment and consistent with their fiduciary duties, that offering these protections would enhance and incentivize bidding.  The Bid Protections have enabled the Debtors to secure an adequate floor for the Bid Assets and ensure that competing bids be materially higher or otherwise better than the Stalking Horse Bid, benefiting the Debtors' estates and stakeholders.  Moreover, the Stalking Horse Bidder would not agree to hold out its bid and act as a stalking horse without Court approval of the Bid Protections; thus, the Debtors could risk losing out on the opportunity to obtain the highest or otherwise best offer for the Bid Assets and would certainly lose out on the downside protection the Stalking Horse Bid would provide.

41.     Moreover, for the reasons set forth in the Rifkin Declaration, the Stalking Horse APA and the Bid Protections are customary and usual under the circumstances and were negotiated at arm's length.  The Bid Protections would make up only a small percentage of the price for the Bid Assets that the Stalking Horse Bidder has offered—the Break-Up Fee, for instance, represents only approximately one percent (1%) of the consideration offered by the Stalking Horse Bidder.  In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Bid

Assets at a price they believe to be fair, while, at the same time, providing them with the potential to achieve an even greater benefit to the Debtors' estates in the form of a higher or otherwise better offer for the Bid Assets.

42.    This Court has approved protections similar to the Bid Protections proposed here as reasonable.  *See, e.g.*, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 12, 2023) [D.I. 487] (approving a break-up fee of up to 3.0% of the purchase price and expense reimbursement of up to 0.5% of the stalking horse bid, not to exceed $1.25 million); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. May 31, 2022) [D.I. 233] (authorizing debtors to grant break-up fee and expense reimbursement amount in the aggregate not to exceed 3.0% of the cash portion of the purchase price); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136] (approving break-up fee of 3.0% of the stalking horse bid plus expense reimbursements of up to 0.5% of the stalking horse bid); *In re Valeritas Holdings, Inc.*, No. 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) [D.I. 129] (approving a break-up fee of up to 3.0% of the purchase price and expense reimbursement of up to $1 million); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 218] (authorizing the debtors to grant a break-up fee of up to 3.0% of the purchase price and an expense reimbursement of up to 1.5% of the purchase price).  Accordingly, the Debtors submit that the Bid Protections will be necessary to preserve the value of the estate, are fair and appropriate under the circumstances, and therefore should be approved.

**C.    The Potential Sale Transaction(s) Satisfy the Requirements of Section 363 of the Bankruptcy Code**

43.    Ample authority exists for approval of the potential Sale Transaction(s) contemplated by this Motion.  Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business, however, must be based upon a "sound business purpose" of the debtor. *In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015); *see also In re Lionel Corp. ("Lionel"),* 722 F.2d 1063, 1070 (2d Cir. 1983) (holding that the debtor must articulate a "business justification" to satisfy section 363(b) of the Bankruptcy Code). This Court adopted the Second Circuit's *Lionel* decision, such that courts deciding whether a debtor satisfied the business judgment standard must consider "all salient factors pertaining to the proceeding." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–54 (D. Del. 1999) (quoting *Lionel*). The business judgment standard "is not a difficult standard to satisfy," and merely requires a court to find that "a reasonable business person would make a similar decision under similar circumstances." *Cf. In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (applying the business judgment standard in the context of section 365 of the Bankruptcy Code); *see also In re Network Access Sols., Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) ("There is, however, no discernable difference in the . . . standard for approval under section[s] 363 and 365 [of the Bankruptcy Code]." (citation omitted)).

44.    Moreover, section 105(a) of the Bankruptcy Code confers a bankruptcy court with broad equitable powers to confer relief in alignment with bankruptcy policies. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235–36 (3d Cir. 2004) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings" (citing *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990))); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) ("It is well settled that the court's power under § 105(a) is broad." (citation omitted)); *In re Nortel Networks, Inc.*, 532 B.R. 494, 554 (Bankr. D. Del. 2015) ("The Third Circuit has construed [section 105 of the Bankruptcy Code] to give bankruptcy courts 'broad authority' to

provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to 'craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.'" (citation omitted)); *Patrick v. Dell Fin. Servs., L.P. (In re Patrick)*, 344 B.R. 56, 58 (Bankr. M.D. Pa. 2005) ("There is no doubt that § 105(a) is a 'powerful [and] versatile tool' designed to empower bankruptcy courts to fashion orders in furtherance of the Bankruptcy Code." (quoting *Joubert v. ABN AMRO Mortg. Grp., Inc. (In re Joubert)*, 411 F.3d 452, 455 (3d Cir. 2005))).

**i. *The Debtors Have Demonstrated a Sound Business Justification for the Potential Sale Transaction(s)***

45. A strong business justification exists for the sale of the Bid Assets as described herein. Exploring an orderly but expeditious sale of the Bid Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders. To that end, the DIP Milestones expressly require that the Debtors timely consummate any Sale Transaction by no later than December 12, 2024. Additionally, the Debtors believe that any Sale Transaction consummated in accordance with the Bidding Procedures would produce fair and reasonable purchase prices for the Bid Assets.

46. The Bidding Procedures were carefully designed to facilitate a flexible, robust, and competitive Bidding Process. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their economic stakeholders. Any transaction governed by the Bidding Procedures undoubtedly would serve the important objectives of obtaining a fair and reasonable purchase price for the Bid Assets, along with the highest or otherwise best value for the Bid Assets, which would inure to the benefit of all parties in interest in the Chapter 11 Cases.

47.     Further, the Stalking Horse Bid is an offer to purchase the Bid Assets for a price that the Debtors, with the assistance of their advisors, have determined to be fair and reasonable. Given that the Stalking Horse Bid, together with the Bid Protections, will serve as a floor for Qualified Bids for the Bid Assets, the Debtors are confident that the sale process will culminate in the Debtors' obtaining the highest or otherwise best value for the applicable Assets.

48.     Finally, nothing in the Bidding Procedures requires the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines that taking such action, or refraining from taking such action, is required to comply with applicable law or its fiduciary duties under applicable law, thereby allowing the Debtors to pivot to an alternative transaction.

49.     For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transaction(s) and related relief requested herein.

### ii.     *The Noticing Procedures Are Reasonable and Appropriate*

50.     The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known relevant creditors and all other parties in interest (including parties interested in purchasing the Bid Assets and parties with potential liens on or claims against the Bid Assets) with adequate, timely notice of, among other things, the potential Sale Transaction(s), Bidding Procedures, Auction, and Sale Hearing.

### D.     Each Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

51.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) of the Bankruptcy Code furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings").

52.    Although the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147. A good-faith determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *Id.*; *see also Pursuit Cap. Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Cap. Mgmt., L.L.C.)*, 874 F.3d 124, 135 (3d Cir. 2017); *In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) (citations omitted). To constitute lack of good faith, a purchaser's conduct in connection with a sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

53.    The Debtors submit that the Stalking Horse Bidder, or any Successful Bidder, would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse APA in good

faith and through extensive arm's-length negotiations. *See* Rikfin Decl. at ¶ 14. Indeed, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse APA and in the sale process generally. To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse APA to be set aside under section 363(m) of the Bankruptcy Code.

54.      Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive Bidding Process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Bid Assets. *See* Bidding Proc. § 2(b). Any asset purchase agreement with a Successful Bidder executed by the Debtors would be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder under the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

55.      Based on the foregoing, the Debtors submit that the Debtors' entrance into any Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**E.      The Bid Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

56.      In the interest of attracting the best offers, the Bid Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor

to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the

estate if any one of the following conditions is satisfied:

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> (2)     such entity consents;
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
> (4)     such interest is in bona fide dispute; or
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens." (citation

omitted)); *In re Boy Scouts of Am.*, 642 B.R. 504, 568 (Bankr. D. Del. 2022), *supplemented*, No.

20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del.

2023).

57.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the

Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that

is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C.

§ 105(a); *see also In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *8

(Bankr. D. Del. 2001) (highlighting the bankruptcy courts' equitable authority to authorize the sale

of estate assets free and clear), *aff'd sub nom. In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d

Cir. 2003).

58.     The Debtors submit that the sale of the Bid Assets free and clear of liens, claims,

interests, and encumbrances would satisfy one or more of the requirements under section 363(f)

of the Bankruptcy Code.  For example, to the extent that a party objects to a Sale Transaction on

the basis that it allegedly holds a prepetition lien or encumbrance on the subject Bid Assets, the

Debtors believe that any party could be compelled to accept a monetary satisfaction of such claims,

under section 363(f)(5) of the Bankruptcy Code, or that such lien is bona fide dispute under section

363(f)(4) of the Bankruptcy Code.

59.    Moreover, the Debtors have sent or will send the Sale Notice to any purported

prepetition lienholders.  If such lienholders do not object to a Sale Transaction, then their consent

should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition

lien, claim, interest, or encumbrance on any of the Bid Assets (other than those assumed or

permitted, if any, in connection with one or more Sale Transactions) timely and properly objects

to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at

the Sale Hearing.  *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858

(Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the

relief requested therein); *accord In re BSA*, 642 B.R. at 569 (citing *In re Tabone, Inc.*, 175 B.R. at

858).

60.    The purpose of a sale order purporting to authorize the transfer of assets free and

clear of all claims, liens, interests, and encumbrances would be defeated if claimants could

thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-

sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate

in the Auction, to the detriment of the Debtors' economic stakeholders.  Accordingly, the Debtors

request that the Court authorize the sale of the Bid Assets free and clear of any liens, claims,

interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to

such liens, claims, interests, and encumbrances (including all DIP Liens, Adequate Protection

Liens, Prepetition Liens, DIP Obligations, Adequate Protection Payments, Prepetition Secured

44

Obligations, and DIP Superpriority Claims (as each is defined in the DIP Motion)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

**F.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

61.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The decision to assume or reject an unexpired lease is a matter within the "business judgment" of the debtor.  *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (noting that a bankruptcy court will generally approve a debtor's choice to assume or reject an executory contract under the deferential business judgment rule (citation omitted)).

62.    Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for their Bid Assets.  The assumption and assignment of Proposed Assumed Contracts is a critical element of the value of the Bid Assets.  Given that the ability to consummate an agreed Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

63.    The consummation of any Sale Transaction involving the assignment of a Proposed Assumed Contract would be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts and Leases to be assumed be cured and

that the Debtors provide adequate assurance that such defaults would be promptly cured. The Debtors' assumption and assignment of Proposed Assumed Contracts would be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale Transaction or any later applicable effective date. As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which would set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on the Potential Assumed Contracts Schedule. As a result, Counterparties would have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the applicable Sale Hearing.

64. Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (citation omitted). "Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance." *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted)).

65. As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Proposed Assumed Contracts. Each affected Counterparty would have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order. Further, the Debtors propose to file with the Court a Proposed Assumption and Assignment Notice, which

would set forth a list of the Proposed Assumed Contracts, in advance of the Sale Hearing.  To the extent necessary, the Debtors would present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder to perform under the Proposed Assumed Contracts.

66.    In addition, to facilitate the assumption and assignment of Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract or Assumed Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[8]

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rules 6004(h) and 6006(d)

67.    To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the

---

[8]    Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

68.     The Debtors have already commenced the marketing and sale process, and have entered into the Stalking Horse APA with the Stalking Horse Bidder, to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with one or more Sale Transactions be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

69.     Notice of this Motion will be provided to the following parties: (a) the U.S. Trustee; (b) Choate, Hall & Stewart LLP, as counsel to the ABL Agent; (c) Otterbourg P.C., as counsel to the Term Agent; (d) counsel to the Committee (if any); (e) counsel to the Stalking Horse Bidder; (f) the Internal Revenue Service; (g) the United States Attorney's Office for the District of Delaware; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party identified in section E of the Complex Procedures (collectively, the "**Notice Parties**"). A copy of this Motion and any order entered in respect thereof will also be made available on the Debtors' Case Information Website located at https://www.cases.ra.kroll.com/BigLots.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:  September 9, 2024
        Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Sophie Rogers Churchill
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

-and-

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (*pro hac vice* forthcoming)
Adam L. Shpeen (*pro hac vice* forthcoming)
Stephen D. Piraino (*pro hac vice* forthcoming)
Ethan Stern (*pro hac vice* forthcoming)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*