**Exhibit A**

**Services Agreement**



# REAL ESTATE SERVICES AGREEMENT WITH BIG LOTS, INC.

This Real Estate Services Agreement including the Schedules attached hereto (collectively the "<u>Agreement</u>") is made as of June <u>6</u>, 2024 (the "<u>Agreement Date</u>"), by and between **A&G REALTY PARTNERS**, **LLC**, a New York limited liability company, with its principal place of business at 445 Broadhollow Road, Suite 410, Melville, New York 11797 ("<u>A&G</u>"), and **BIG LOTS, INC.**, an Ohio corporation, with its principal place of business at 4900 E. Dublin-Granville Road, Columbus, Ohio 43081 (including its affiliates and subsidiaries, collectively the "<u>Company</u>" and, together with A&G, collectively, the "<u>Parties</u>" and, individually, a "<u>Party</u>").

WITNESSETH:

**WHEREAS**, the Company is the lessee or sublessee of certain non-residential real property leases as more particularly identified on <u>Schedule A</u> attached hereto and incorporated herein (each a "<u>Lease</u>" and, collectively, the "<u>Leases</u>") for its retail operations (the "<u>Stores</u>");[1]

**WHEREAS**, the Company desires to (i) reduce or amend its obligations under the Leases by modifying the terms and conditions thereof or reduce risk and provide optionality under certain Leases; (ii) obtain the right to terminate certain Leases prior to their expiration date; (iii) in the event of a Chapter 11 bankruptcy proceeding, sell certain of the Leases (including, designation rights); (iv) in the event of a Chapter 11 bankruptcy proceeding, obtain landlord consents for extensions of time to assume or reject certain Leases ("<u>Landlord Consents</u>"); and (v) obtain certain other real estate consulting and advisory services as set forth herein; and

**WHEREAS**, under the terms and conditions contained in this Agreement, the Company desires to retain A&G and A&G is willing to provide the Services (as defined below).

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Services to be Provided</u>.  In accordance with the terms and conditions of this Agreement, A&G will provide the following services (the "<u>Services</u>"), at the Company's direction:

    a. review the Company's portfolio of Leases (the "<u>Lease Portfolio</u>"), consult with the Company regarding its goals, objectives and financial parameters in relation to the Lease Portfolio and assist the Company with its overall strategy with respect to the Lease Portfolio;

    b. assist the Company in developing store segmentation buckets in view of, and that correspond to, the Company's goals and objectives for the Lease

---

[1] <u>Schedule A</u> includes approximately 270 Leases (the "<u>JLL Agreement Leases</u>") currently subject to a real estate services agreement between the Company and JLL (the "<u>JLL Agreement</u>").

2

      Portfolio, and determine Lease modification requests;

c. provide ongoing advice and guidance related to lease restructuring opportunities;

d. negotiate with the landlords of the Leases (collectively, the "Landlords" and, individually, a "Landlord") on behalf of the Company to obtain Lease Modifications (as defined below) acceptable to the Company in its sole discretion;

e. negotiate with Landlords on behalf of the Company to obtain Early Termination Rights (as defined below) acceptable to the Company in its sole discretion;

f. if requested by the Company, market some or all of the Leases, in a manner and form as determined by A&G and approved by the Company, and negotiate with the Landlords and other third parties on behalf of the Company to assist the Company in obtaining Lease Sales (as defined below) acceptable to the Company in its sole discretion;

g. if requested by the Company, negotiate with Landlords on behalf of the Company to assist the Company in obtaining Landlord Consents (as defined below) acceptable to the Company in its sole discretion;

h. work with the Company's financial advisors to provide reporting and supporting market data reasonably acceptable to the Company and A&G, such as is necessary for the Company to evaluate Lease Modifications, Lease Sales, Termination Rights, Landlord Consents and other proposals; and

i. provide weekly update reports to the Company regarding the status of the Services.

2. Term of Agreement. Subject to Section 15 herein, this Agreement shall be for a term of the later of one (1) year following the Agreement Date and the conclusion of any Chapter 11 bankruptcy case by the Company (the "Term"). In the event the Services are not completed at the end of the Term, the Agreement may be extended or renewed by written agreement of the Parties.

3. Compensation. The compensation for the Services is set forth on Schedule B, which is attached hereto and incorporated herein ("Compensation"). The Company acknowledges that the calculations necessary to determine Compensation are predicated on Company Information (as that term is defined below) provided by the Company to A&G.

3

4. **Additional Services.** A&G may provide additional services requested by the Company that are not otherwise specifically provided for in this Agreement. Any additional services will be mutually agreed upon by the Parties and documented in an amendment to the agreement.

5. <u>Recordkeeping</u>. The Services to be provided by A&G pursuant to this Agreement are, in general, transactional in nature. Accordingly, A&G will not bill the Company by the hour or maintain time records.

6. <u>Expenses and Disbursements</u>. The Company shall reimburse A&G for A&G's reasonable and documented out-of-pocket expenses incurred in connection with its retention and provision of Services (including any service providers retained by A&G under Section 9 hereof with Company's prior written consent); <u>provided</u>, <u>however</u>, any expenses in excess of $5,000 require prior approval of the Company. This includes, but is not limited to, responding to any litigation or other type of inquiry, deposition or otherwise relating to the Services or this Agreement. Any reimbursable expenses shall be paid to A&G within fifteen (15) business days upon receipt of invoice, except as may be approved or directed otherwise in any Chapter 11 bankruptcy proceeding of the Company.

7. <u>Exclusive</u>. During the Term of this Agreement, A&G shall have the sole and exclusive authority to perform the Services for the Leases set forth on <u>Schedule A</u>, except that the JLL Agreement Leases shall not become part of A&G's exclusive hereunder until after the Company commences its Chapter 11 bankruptcy proceedings. he Company agrees to forward to A&G all relevant inquiries regarding the Leases made to the Company, its representatives or related parties. <u>Schedule A</u> may be amended from time to time during the term of this Agreement to add additional Leases, as applicable, upon mutual written consent by the Parties. The Company acknowledges that A&G may be engaged to provide the same or similar services as those referenced herein to other persons or entities and that any such engagement shall not constitute or be deemed to be a violation of this Agreement, provided that such other engagement is not a conflict of interest or otherwise does not materially interfere with A&G's ability to provide the Services.

8. <u>Company's Representative</u>. Jonathan Ramsden will be the Company's representative (the "<u>Company Representative</u>") in dealing with A&G. The Company reserves the right, at any time and from time-to-time, upon written notice to A&G, to designate a successor representative or additional representatives and to limit the authority of the representative in any respect. A&G will report regularly to the Company Representative in order to keep him fully apprised of A&G's performance. The designated principal representative for A&G will be Andy Graiser. If A&G seeks to change its principal representatives, the Company agrees to reasonably consent to any proposed replacement.

9. <u>Company Cooperation</u>. The Company shall, to the extent such information is in its actual possession: (a) provide A&G with all reasonable applicable information concerning the Leases necessary for the performance of A&G's obligations

4

hereunder, including, but not limited to (i) copies of the Leases and any Lease abstracts, and (ii) populating an Excel spreadsheet provided by A&G with, among other things, current rents, taxes and other charges relating to the Leases, rent bumps, percentage rent and breakpoints, premises size, the commencement and expiration dates of the Leases, any Lease options, up to date Landlord contact information (including name, email and phone number information for each Landlord), any outstanding or deferred rent, and any default letters sent by Landlords;(b) provide reasonable access to A&G to any internal lease administration reporting and tracking systems; (c) prepare a field questionnaire which will include, but not be limited to, information regarding (i) the quality of the Stores and shopping centers in which they are located, (ii) major co-tenants in each shopping center, (iii) whether each Store is free standing, drive through or in-line, (iv) historical financial performance and financial projections for each Store, (v) competition data (including proximity to the Store), and (vi) last remodel of each Store (the "Field Questionnaire"); and (d) provide such other information as A&G reasonably requests for the performance of its Services (collectively, the "Lease Information"). Additionally, the Company shall input the results of the Field Questionnaire and Real Estate Analysis into the Company's dashboard and tear sheets.

All information provided by the Company to A&G, including, but not limited to, the Company's goals and objectives, financial information and the Lease Information referenced above, shall collectively be referred to as "Company Information." It is understood and agreed by the Parties that while A&G shall have no obligation to verify the accuracy of such information and that A&G shall have no liability whatsoever resulting from, whether directly or indirectly, the inaccuracy or incompleteness of the Company Information, such Company Information will be furnished in its "as-is" capacity and without representation as to accuracy or completeness. In the event the Company Information turns out to be inaccurate, the Parties shall work together (and, in the case of the Company, including its financial advisors) in good faith to address it in a commercially reasonably matter. Furthermore, both Parties understand and agree that the commencement of this Agreement and the continuation of its Services are contingent upon A&G's receipt of the Company Information.

Additionally, the Company agrees to assist A&G in the performance of its Services, including but not limited to, by providing (i) a response within seven (7) business days of A&G's transmittal to the Company of a deal sheet for each Lease, which states whether a proposed Service is approved or not, and (ii) all necessary legal support to review Documents (as defined below) submitted by A&G in connection with a Service and getting all Documents in form and substance acceptable to the Company executed accurately and timely. In addition, the Company shall track the status of all Documents through an A&G legal tracking report provided by A&G and provide such Lease Information as reasonably requested by A&G in an A&G usable format.

10. <u>Use of Company Name</u>.  In the event the Company files for Chapter 11, A&G may use the Company's name and logo to identify the Company as one of A&G's clients, with the written permission of the Company, which permission shall not be unreasonably withheld.

11. <u>No Authority to Execute Agreements.</u>  A&G shall have no right or power to enter into any agreement in the name of or on behalf of the Company or to otherwise obligate the Company in any manner unless authorized in writing.

12. <u>Meetings</u>.  After the commencement of the Agreement, A&G shall meet with, in a manner reasonably agreed to by the Parties, the Company's Representative(s) to review the Company's goals, objectives and financial parameters. Thereafter, A&G shall meet with or participate in telephone conferences, at least once a week or more if designated by the Company, with the Company and/or the Company's Representative(s) regarding the status of the Services as reasonably designated by the Company.

13. <u>Disclosures/Reports</u>.  All information, advice, recommendations (whether written or oral) or any reports, presentations or other communications that A&G provides under the terms of this Agreement are solely for the benefit of the Company and no such opinion, advice, recommendations or reports shall be used for any other purpose, or reproduced, disseminated, quoted or referred to at any time, in any manner, other than as provided herein, without the prior written consent of A&G. Notwithstanding the foregoing, the Company may provide such information, advice and recommendations to its representatives, consultants, advisors, Board of Directors and attorneys as required to effectuate the Services, provided however that both Parties understand and agree that A&G shall have no liability to such Parties and such Parties are not intended to be third-party beneficiaries to this Agreement.

If the Company receives a subpoena, summons or court order by any federal, state or other regulatory agency having jurisdiction over the Company relating in any respect to A&G or its Services, the Company shall promptly notify A&G, if legally permissible, so that A&G may obtain, at its sole cost, a protective order for such information.  If A&G is unable to obtain a protective order and the Company is required to provide information regarding A&G and/or the Services, the Company agrees to provide only that information which is legally required and to use reasonable efforts to ensure the confidentiality of such information and documentation.

14. <u>Independent Contractor</u>. Each Party acknowledges and agrees that the arrangements contemplated herein are and will be for the provision of the Services and that nothing contained herein shall create or be construed as creating a contract or other arrangement of employment between the Company and A&G.  A&G shall provide the Services as an independent contractor and not as an employee, agent, partner or joint venture of the Company.

15. <u>Early Termination</u>. Either Party may terminate this Agreement without cause upon thirty (30) days' prior written notice in accordance with the notice provision below. Additionally, if either Party fails to perform its obligations in accordance with the terms herein and does not cure such failure within ten (10) days after written notice of default, the other Party will have the right to terminate this Agreement by notice of termination to the non-performing Party, effective ten (10) days after the date of such notice. Additionally, if for any reason either Party becomes unable to perform its duties as a result of a legal, contractual or regulatory restriction, such Party shall have the right to terminate this Agreement. Any rights or obligations incurred or accrued by either Party prior to termination shall survive termination of this Agreement.

16. <u>Assignment</u>. Neither Party may delegate or assign its rights and obligations under this Agreement in whole or in part to an unaffiliated third party without the prior written consent of the other Party.

17. <u>Bankruptcy</u>.

    a. In the event the Company files for bankruptcy protection during the Term of this Agreement, the Company agrees to apply promptly to the bankruptcy court for an order, in a form acceptable to A&G, authorizing the Company to retain A&G effective as of the filing date and to compensate A&G in accordance with the terms of this Agreement, and to use its reasonable best efforts to obtain such order. The Company agrees to (a) seek the hiring and retention of A&G under sections 327 and 328 of the Bankruptcy Code and (b) file any applications necessary and otherwise assist A&G in obtaining Bankruptcy Court approval of the payment of its fees and costs hereunder. The Company agrees to provide A&G with a copy of the pleadings requesting retention of A&G prior to submission to the bankruptcy court for A&G's review and comments and advise A&G of any objection or hearings pertaining to A&G's retention. The order authorizing A&G's retention must be acceptable to A&G and A&G's obligations hereunder are conditioned upon the grant of such order. Furthermore, if such order is not obtained within sixty days from the date that it is filed, A&G shall have the right to terminate this Agreement at any time thereafter. If an acceptable order is not obtained authorizing A&G's services and fees as set forth herein, the Company agrees to amend the application in conjunction with and the approval of A&G and request a hearing to review the application. In the event the Company is unable to obtain a reasonably acceptable order authorizing the hiring and retention of A&G under the terms of this Agreement and the Agreement is terminated, A&G reserves the right to seek a substantial contribution claim for any rights or obligations incurred or accrued prior to such termination.

    b. Before finalizing any cash collateral/debtor in possession financing budget with the applicable lender, the Company shall provide A&G with a reasonable opportunity to review and provide input into the budget

    regarding its estimated fees and expenses during the relevant budget period(s).

18. <u>Notices.</u>  Unless otherwise expressly provided herein or waived in writing by the Party to whom notice is given, any notice or other communication required or permitted hereunder will be effective if given in writing (i) when delivered by hand; (ii) three days after sent by certified mail, return receipt requested; (iii) when delivered by electronic email communication to the email address set forth below and verified by confirmed receipt; or (iv) one day after delivery to a commercial overnight courier, and addressed to the Parties as follows:

    To the Company:  Big Lots, Inc.
             4900 E. Dublin-Granville Road
             Columbus, Ohio 43081
             Attn: Jonathan Ramsden,
             EVP, Chief Financial and Administrative Officer
             Email: JRamsden@biglots.com

    To A&G:     A&G Realty Partners, LLC
             445 Broadhollow Road, Suite 410
             Melville, New York 11747
             Attn:  Andy Graiser, Co-President
             Email: andy@agrep.com

19. <u>Representations, Warranties and Covenants</u>. Each Party has all requisite power and authority to enter into this Agreement. This Agreement has been validly authorized by all necessary corporate action and constitutes a legal, valid and binding agreement of the Company and A&G.  Each Party represents that this Agreement does not and will not violate any applicable law or conflict with any agreement, instrument, judgment, order or decree to which it is a party or by which it is bound.  Furthermore, each Party represents and agrees that it will comply with all applicable laws, rules, regulations, orders or decrees during the term of this Agreement in performing its obligations hereunder. Each Party agrees to deal with the other fairly and in good faith so as to allow each Party to perform their duties and earn the benefit of this Agreement.  A&G agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement.  The Company agrees to terminate the JLL Agreement before the date on which the Company commences its Chapter 11 bankruptcy proceedings.

20. <u>Survival of Fee</u>.  In the event that following the termination or earlier expiration of this Agreement, the Company or its successors or assigns, enters into a transaction with a Landlord or other third party and A&G has substantially performed the Services, which is the proximate cause of the transaction being entered into with such Landlord or other third party  and the result of which would have entitled A&G to a fee pursuant to this Agreement, then in that event, A&G shall be entitled to and paid its fee pursuant to the terms of this Agreement notwithstanding the fact that the

Agreement has terminated or expired (the "Survival of Fee"). Such Survival of Fee will terminate 90 days after the termination or earlier expiration of this Agreement.

21. Intellectual Property. A&G may use data, software, designs, utilities, tools, models, systems and other methodologies that it owns or licenses in performing the Services hereunder. Notwithstanding the delivery of any reports by A&G to the Company, A&G shall retain all intellectual property rights in such materials (including any improvements or knowledge developed while performing the Services) and in any working papers compiled in connection with the Services. Notwithstanding the foregoing, A&G shall have no right to own or use proprietary information of the Company for any purpose other than for providing the Services.

22. Indemnification. Each Party agrees to indemnify the other Party and its affiliates, officers, directors, employees, agents and independent contractors, and hold each of them harmless from and against all third party claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted against, resulting from (directly or indirectly), or related to the Services or actions or omissions of A&G or the Company taken pursuant to this Agreement or in any written agreement entered into in connection herewith except to the extent that such claims or liabilities arise as a direct result of the indemnified Party's fraud, gross negligence or willful misconduct. For the avoidance of doubt, this indemnification shall apply to any claims JLL may make against A&G stemming from the JLL Agreement.

23. Limitation on Liability. Neither Party shall be responsible for any indirect, incidental, consequential, exemplary, punitive or other special damages (including, but not limited to, loss of profits and damage to reputation or business) arising under or by reason of this Agreement, the Services or any act or omission hereunder. Neither Party shall be liable if it is unable to perform its responsibilities hereunder as a result of events beyond its control. Furthermore, in no event shall A&G's liability for a default or breach of this Agreement exceed the amount of fees paid to A&G hereunder.

24. Binding Effect. No Third-Party Beneficiaries. This Agreement binds and inures to the benefit of the Parties hereto and their respective successors and permitted assigns and except as expressly provided herein, is not intended to confer any rights or remedies upon any person not a party to this Agreement.

25. Waivers and Amendments. Waiver by either Party of any default by the other Party shall not be deemed a waiver of any other default. This Agreement (including the Schedule (s) attached hereto) may not be waived, amended, or modified by either Party unless in writing and signed by the Parties hereto.

26. Severability. If any provision, or any portion of any provision, contained in this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, then it is the intent of the Parties to modify or limit such provision or portion thereof

so as to be valid and enforceable to the extent permitted under applicable law. In the event that such provision or portion thereof cannot be modified, then such provision or portion thereof shall be deemed omitted, and this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

27. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

28. <u>Counterpart Execution/Facsimile and Electronic Signatures</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document. Facsimile and electronic signatures on this Agreement and any document contemplated hereby shall be deemed to be original signatures.

29. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of New York without reference to its conflict of laws rules. Any dispute resulting from this Agreement shall be resolved by binding arbitration with the proceedings to be conducted in New York City, New York, by one arbitrator, following the applicable rules of the American Arbitration Association, and administered by a respectable dispute resolution provider as reasonably selected by the Party commencing the proceedings. To the extent arbitration proceedings are not feasible or if to enforce an arbitration award or otherwise, any court action under this Agreement shall be brought in the federal or state courts of the State of New York. In the event the Company files a Chapter 11 bankruptcy petition, then the Bankruptcy Court shall have exclusive jurisdiction over any matters arising out of or relating to this Agreement.

30. <u>Waiver of Jury Trial</u>. Each of the Parties unconditionally waives, to the fullest extent allowed by law, the right to a jury trial in connection with any claim arising out of or related to this Agreement.

31. <u>Headings/Tenses</u>. The section headings and use of defined terms in the singular or plural or past or present tenses in this Agreement are solely for the convenience of the Parties. To the extent that there may be any inconsistency between the headings and/or the tenses and the intended meaning, the intent of the Parties or the provision, the terms of such provision shall govern.

32. <u>No Presumptions</u>. This Agreement shall be deemed drafted by both Parties and there shall be no presumption for or against either Party in the interpretation of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives effective as of the Agreement Date.

BIG LOTS, INC.

By: *Jonathan Ramsden*
Name: Jonathan Ramsden
Title: EVP, CF&AO

A&G REALTY PARTNERS, LLC

By: *Andrew Graiser*
Name: Andy Graiser
Title: Co-President

**Schedules**

Schedule A    List of Leased Locations
Schedule B    Compensation

11

# SCHEDULE A
## List of Leased Locations

## SCHEDULE B
## Compensation

### A.  Definitions

"Document" - shall be defined as any amendment or agreement that modifies a Lease in any manner, including, but not limited to, the granting of a Lease Modification, Early Termination Right or Landlord Consent. It also includes any amendment or agreement that effectuates a Lease Sale, or any part thereof. A Document also shall include any letter agreement relating to a Lease or any other written communication (including, but not limited to, an email communication) from a Landlord or third party consenting to the applicable Service. For the avoidance of doubt, a Document can be generated by the Landlord, a third party or the Company.

"Early Termination Right" - shall be defined as the Company's exclusive right to terminate the Lease prior to the expiration date of the Lease.

"Gross Occupancy Cost" - shall be defined as the sum of the remaining base rent, any annual increases, percentage rent, CAM, taxes payable directly to the Landlord, insurance, rental tax, marketing and merchants' association charges, utility charges, HVAC usage charges, trash removal charges, sprinkler usage charges, unpaid rents, or any other sums due to the Landlord under a particular Lease as of the Agreement Date, except with respect to the JLL Agreement Leases, as of the date on which any Monetary Lease Modification obtained by JLL with respect to those Lease becomes effective. For clarification purposes, Gross Occupancy Cost is calculated using the first date that the Service commences (i.e., the date that the rent reduction commences) through the earlier of the end of the Lease term in effect as of the Agreement Date (or longer if a Lease extension is also requested and negotiated by A&G on behalf of the Company) or when the Service is no longer in effect. CAM, taxes, insurance, marketing and merchants' association charges and all other applicable charges will be calculated using the last available full year charge for each item (which may be a calendar year or a lease year, depending upon which is the most recent full year charge available). In the event that rent increases periodically based upon the change in the Consumer Price Index (CPI), the assumed annual CPI increase shall be three percent (3%), unless there is a lower inflation cap in any particular lease as reflected in the Lease Information, in which case the lower cap shall apply.

"Gross Proceeds" - shall be defined as the total consideration paid or payable to the Company by a landlord, investor, purchaser, or any other party to either waive, terminate, sublease, or purchase a Lease or any right related to a Lease. It includes, but is not limited to, cash and any other form of currency paid or waived by the Landlord, sub-tenant or other third party to the Company in relation to a Lease Sale. This list is not meant to be exhaustive and Gross Proceeds shall include any consideration or other quantifiable economic benefit paid or payable to the Company in conjunction with a Lease Sale, including all (i) Company debt assumed, satisfied or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness "credit bid" at any sale), and (ii) amounts placed in escrow and deferred, contingent payments and installment payments.

13

DocuSign Envelope ID: EDD7BAEA-8A04-4D1B-B6CD-5FFBF3BCADE3
Case 24-11967-JKS    Doc 207-2    Filed 09/18/24    Page 15 of 20

"Lease Modification" - shall be defined as any alteration, amendment or modification to the terms and conditions of a Lease agreement as in effect as of the Agreement Date.

"Lease Sale" - shall be defined as the sale or assignment, whether all or part, of a Lease and includes the sale of designation rights.

"Monetary Lease Modification" - shall be defined as any modification to or inclusion of additional provisions relating to the monetary terms of a Lease agreement, including, but not limited to, reduction in rent/other Lease charges, reduction in Lease Term, reduction in Lease space, deferral of/termination of/waiver of/free rent or other Lease charges (including any previously deferred rent payment due or other Lease charges), reduction or elimination of any outstanding amounts due under a Lease, reduction in square footage of premises covered by a Lease, the granting of tenant allowance or capital improvement dollars from the Landlord, the waiver of Company's capital expenditure obligations, extensions of existing rent reductions past their original end date, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, reductions in or returns of security deposits and FF&E if otherwise non-refundable (either pursuant to the terms of the Lease or as determined by the Landlord), or any other amendment to a Lease that results in Occupancy Cost Savings to the Company.

"New Gross Occupancy Cost" - shall be defined as the reduced Gross Occupancy Cost which results from a Lease Modification or any other amendment to the Lease.

"Non-Monetary Lease Modification" - shall be defined as any modification to the non-monetary terms of a Lease agreement, including, but not limited to, change of use, co-tenancy clause, sublease rights, the negotiation of a lease extension, the granting of an additional option term or terms, an amendment to the current option term or terms (Early Termination Right fees are set forth separately for fee purposes), relocation of Lease spaces that do not result in a reduction in Gross Occupancy Cost and any other amendments to the Lease that is or would be beneficial to the Company that do not fall within the above definition of Monetary Lease Modifications.

"Occupancy Cost Savings" - shall be defined as the difference between the original Gross Occupancy Cost and the New Gross Occupancy Cost for the period the date in which the Lease Modification or other Service becomes effective or the date in which A&G becomes entitled to its Fees under the terms herein, through the end of the then-current Lease Term, the Revised Lease Term, or the date on which the Company no longer realizes the savings, pursuant to the terms of the Services, less any payment(s) or costs payable by the Company to effectuate the Lease Modification or other Service, excluding legal fees. "Lease Term" shall be defined as the commencement date and expiration date of the then-current term of the Lease as set forth in the Lease as of the Agreement Date. "Revised Lease Term" shall be defined as the new Lease expiration date pursuant to any Lease extensions obtained by A&G on behalf of the Company. For example, if a Service includes a Monetary Lease Modification and an extension of the Lease, the Occupancy Cost Savings shall be applicable through the duration of such Lease extension (i.e., the Revised Lease Term).

Occupancy Cost Savings include, but are not limited to, reduction in rent/other Lease charges, reduction in term, reduction in Lease space, deferral of/termination of/waiver of/free rent or other Lease charges (including any previously deferred rent or other Lease charges), reduction or elimination of any outstanding amounts due under a Lease, reduction of unamortized tenant allowance, reduction or elimination of the obligation to repay tenant allowance to the Landlord, reduction or elimination of the requirement to improve the Lease space that have a direct monetary benefit to the Company, the granting of tenant allowance or capital improvement dollars from Landlord or Landlord improvements to the property, the waiver of Company's capital expenditure obligations, reduction in square footage of premises covered by a Lease, extensions of existing rent reductions past their original end date, any lease extensions that result in a rent decrease, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, or any or any other amendment to a Lease that results in direct monetary savings to the Company.

For Occupancy Cost Savings resulting from the extension of a rent reduction past the Lease Term in effect as of the Agreement Date, the savings shall be based upon the original rent and option rent set forth in the Lease, allocated proportionately to the time period during the Lease Term and the extended term, as the case may be.  For example purposes only, if A&G obtains a 4-year rent reduction and only 2 years remain on the Lease Term, A&G's fee will be based upon the blended Occupancy Costs Savings resulting from the reduced rent as compared to the rent in effect during the Term for a period of 2 years, and the Occupancy Costs Savings resulting from the reduced rent as compared to the option rent set forth in the Lease, provided the Company exercises such option.  For Occupancy Cost Savings resulting from lease extensions where there is no rent increase, the savings shall be based upon the option price for the period of the duration of the extension or if there is no option price, the rent price for the immediately preceding period increased by an assumed annual CPI increase of three percent (3%), unless there is a lower inflation cap in any particular lease as reflected in the Lease Information, in which case the lower cap shall apply.

In the event base or gross rent (i.e., contract rent) is converted to percentage rent based on sales, Occupancy Cost Savings will be calculated based on the difference between the contract rent and the percentage rent using sales figures for the twelve (12) months ended April 30, 2024.

B.     **Fees**

A&G shall be compensated for the Services as follows:

1. Security Retainer. The Company shall pay A&G an aggregate security retainer in the amount of one hundred fifty thousand dollars ($150,000) upon execution of this Agreement. The security retainer shall be applied to the final invoice for fees and expenses due under the terms of this Agreement, with any unused portion of the security retainer refunded to the Company at the expiration of the Term or earlier termination of this Agreement.

2. <u>Monetary Lease Modifications</u>. For each Monetary Lease Modification obtained by A&G on behalf of the Company and agreed to by the Company in its sole discretion, A&G shall earn and be paid a fee, in the amount of two and one-half percent (2.5%) of the Occupancy Cost Savings in years 1 through 5 of remaining Lease term and one and one-half percent (1.5%) of the Occupancy Cost Savings in any years of the Lease remaining thereafter including any option terms.

3. <u>Non-Monetary Lease Modifications.</u> For each Non-Monetary Lease Modification obtained by A&G on behalf of the Company and agreed to by the Company in its sole discretion, A&G shall earn and be paid a fee of $750.00 per Lease.

4. <u>Early Termination Rights.</u> For each Early Termination Right obtained by A&G on behalf of the Company and agreed to by the Company in its sole discretion, A&G shall earn and be paid a fee of twenty percent (20%) of one (1) month's Gross Occupancy Cost, up to $3,000 per Lease.

5. <u>Lease Sales</u>. For each Lease Sale obtained by A&G on behalf of the Company and agreed to by the Company in its sole discretion, A&G shall earn and be paid a fee in the amount of three percent (3%) of the Gross Proceeds, <u>provided</u>, <u>however</u>, if a Lease is listed for sale and a closing on such Lease Sale does not occur, A&G shall earn and be paid a fee of five hundred dollars ($500) for such Lease.

6. <u>Landlord Consents</u>. If requested by the Company, for each consent obtained by A&G to extend the Company's time to assume or reject a Lease as a part of any applicable Chapter 11 case, A&G shall earn and be paid a fee in the amount of five hundred dollars ($500) per Lease.

7. <u>Rejected Leases</u>. Except to the extent A&G otherwise has earned its fee as set forth herein, A&G shall earn no fee for any Lease rejected in a bankruptcy proceeding.

8.

C. **Payment of Fees**.

A&G shall provide the Company with a reasonably detailed deal sheet with the terms of the proposed Lease Modification, Early Termination Right or Landlord Consent (the "<u>Deal Sheet</u>"). For clarification purposes, a Deal Sheet can include, but not be limited to, an email or other written communication from A&G setting forth the terms of the proposed Service. If: (i) the Company approves the terms of the Deal Sheet and the Landlord or other third party (if applicable) submits, approves or executes a Document that reflects the Company accepted Deal Sheet in all material ways; (ii) the Company approves a Document that embodies a Lease Modification, Early Termination Right or

16

Landlord Consent to be transmitted to a Landlord and that Landlord agrees to the terms of such Document with no contingencies pursuant to Landlord's signature to the Document or confirming email; or (iii) the Company begins to receive the benefit of the terms set forth in the Deal Sheet, A&G shall be entitled to, and be paid, its fees in accordance with the above fee structure. For the avoidance of doubt, A&G shall be entitled to its fees notwithstanding the fact that the Service transaction is not fully executed by the Company, except with respect to a Lease Sale, which has to be executed by both parties for A&G to earn its fees. A Service may incur more than one fee.

With respect to Services provided by A&G, the Company shall pay all fees to A&G payable under this Agreement within ten (10) business days of the receipt of an invoice therefor, except that for Lease Sales, A&G shall be paid its fee upon the closing of the applicable sale, except, in each case, as may be approved or directed otherwise in the Company's Chapter 11 bankruptcy proceeding. In the event of any dispute of an invoice, the Parties shall work in good faith to resolve the dispute before resorting to their remedied under Section 29 of this Agreement.

**AMENDMENT TO REAL ESTATE SERVICES
AGREEMENT WITH BIG LOTS, INC.**

This Amendment (the "Amendment") is made as of August 21, 2024 (the "Amendment Date"), to the Real Estate Services Agreement by and between **A&G REALTY PARTNERS, LLC**, a New York limited liability company, with its principal place of business at 445 Broadhollow Road, Suite 410, Melville, New York 11797 ("A&G"), and **BIG LOTS, INC.**, an Ohio corporation, with its principal place of business at 4900 E. Dublin-Granville Road, Columbus, Ohio 43081 (including its affiliates and subsidiaries, collectively the "Company" and, together with A&G, collectively, the "Parties").

WITNESSETH:

**WHEREAS**, the Parties entered into a Real Estate Services Agreement dated as of June 6, 2024 (the "Agreement");

**WHEREAS**, the Parties wish to amend the Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties agree as follows:

1. Add at the end of subparagraph (b) of Section 1 of the Agreement the following: (collectively, the "Real Estate Analysis Work");

2. Add new subparagraphs (j) through (m) to Section 1 of the Agreement as follows:

    (j) assist in the reconciliation of Company data of, and relating to, the Leases and premises covered thereby (the "Data Reconciliation Work");

    (k) revise Landlord projections and asks based on revised Company data and perform additional store-by-store reviews with the Company;

    (l) consult real estate team regarding management of rent payments, exercise of options, and Lease defaults; and

    (m) obtain NDA's for retailers seeking specific information on store closings and address store closures with Landlords (subparagraphs (k), (l) and (m), collectively, the "Chapter 11 Preparatory Work").

3. Replace subsection (1) of Section B (Fees) of Schedule B (Compensation) of the Agreement, entirely, as follows:

    1. Security Retainer/Advance. Upon execution of this Agreement, the Company shall pay A&G a non-refundable security retainer in the amount of one hundred and fifty thousand dollars ($150,000) (the "Security Retainer"). Within five (5) business days of August 21, 2024, the Company shall pay A&G a non-

   refundable advance in the amount of one hundred and fifty thousand dollars ($150,000) (the "Advance").

4. Add a new first paragraph to Section C (Payment of Fees) of Schedule B (Compensation) of the Agreement as follows:

   As of August 1, 2024, A&G shall be paid the sum of one hundred and fifty thousand dollars ($150,000) from the Security Retainer for the Real Estate Analysis Work, Data Reconciliation Work and Chapter 11 Preparatory Work for the month of July 2024. Within five (5) business days of August 21, 2024, A&G shall be paid the Advance for Real Estate Analysis Work, Data Reconciliation Work and Chapter 11 Preparatory Work for the month of August 2024; provided, however, the amount of the Security Retainer and Advance shall be credited against any future invoices for Monetary Lease Modifications.

All other terms and conditions of the Agreement shall remain in full force and effect and not changed by this Amendment. Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their respective duly authorized representatives effective as of the Amendment Date.

BIG LOTS, INC.

By: *Jonathan Ramsden* (DocuSigned)
Name: Jonathan Ramsden
Title: EVP, CF&AO

A&G REALTY PARTNERS, LLC

By: *Andrew Graiser* (DocuSigned)
Name: Andy Graiser
Title: Co-President