## EXHIBIT B

**Engagement Letter**

**GUGGENHEIM**

GUGGENHEIM SECURITIES, LLC
330 MADISON AVENUE
NEW YORK, NEW YORK 10017
GUGGENHEIMPARTNERS.COM

*__Execution Copy__*

Effective as of May 20, 2024

Big Lots, Inc.
4900 E. Dublin-Granville Road
Columbus, OH 43081

Attention:       Jonathan E. Ramsden
                 EVP, Chief Financial and Administrative Officer

Ladies and Gentlemen:

This letter agreement (together with the Annex and the Indemnification Provisions attached hereto, this "Agreement") confirms the agreement between Big Lots, Inc. (collectively with its subsidiaries and controlled affiliates and as more fully described below, the "Company") and Guggenheim Securities, LLC ("Guggenheim Securities") as follows:

1.  The Company hereby engages Guggenheim Securities to act as the Company's financial advisor and/or investment banker in connection with any Restructuring Transaction, Financing Transaction and/or Sale Transaction (each as defined below and each, a "Transaction") (and/or as the Company's placement agent in connection with any Financing Transaction that constitutes a private placement of securities, where Guggenheim Securities agrees to act in such capacity).

2.  Guggenheim Securities hereby accepts the engagement and, in that connection, to the extent requested by the Company and appropriate under the circumstances, agrees to assist the Company with respect to the following:

    (a)  Review and analysis of the business, financial condition and prospects of the Company;

    (b)  Evaluation of the liabilities of the Company, its debt capacity and its strategic and financial alternatives;

    (c)  In connection with any Transaction:

        (i)  Evaluation from a financial and capital markets point of view of alternative structures and strategies for implementing the Transaction;

        (ii)  Preparation of offering, marketing, disclosure or other transaction materials concerning the Company and the Transaction for distribution and presentation to the Company's creditors (the "Creditors"), Acquirors (as defined below) and/or investors (the "Investors," and together with the Creditors, the Acquirors and any other counterparty to a Transaction, each a "Transaction Counterparty");

Big Lots, Inc.
May 20, 2024
Page 2

(iii)  Development and implementation of a marketing plan with respect to such Transaction;

(iv)  Identification and solicitation of, and the review of proposals received from, the Investors and other prospective Transaction Counterparties; and

(v)  Negotiation of the Transaction.

(d)  In connection with any Transaction the Company determines to pursue or effect in connection with a Bankruptcy Case (as defined below) (including any time prior to, but in anticipation of, the occurrence of any such Bankruptcy Case), evaluation, from a financial point of view, of alternative strategies for implementing and seeking approval of any such Transaction, including pursuant to a plan of reorganization or liquidation (as the same may be modified from time to time, a "Plan"), which may be a plan under Chapter 11 (as defined below) of the Bankruptcy Code (as defined below) confirmed in connection with any Bankruptcy Case (as defined below) in Bankruptcy Court (as defined below).

(e)  Such other matters as may be agreed upon by Guggenheim Securities and the Company in writing (including without limitation via email) during the term of this engagement.

To the extent requested by the Company and appropriate under the circumstances, Guggenheim Securities agrees to assist the Company with respect to participating in hearings before any applicable Insolvency Authority (as defined below) with respect to the matters upon which Guggenheim Securities has provided advice, including, as relevant, coordinating with the Company's legal counsel with respect to providing testimony in connection therewith.

3.  For purposes herein:

(a)  The term "Company" includes Big Lots, Inc. and its subsidiaries and controlled affiliates, and any other entity that any of the foregoing may form or invest in to consummate any Transaction and will also include any successor to or assignee of all or a portion of the assets and/or businesses of any of the foregoing entities howsoever any portion of such assets or businesses are assigned or transferred to such entities.

(b)  The term "Restructuring Transaction" means and includes (A) any transaction whereby directly or indirectly and whether acting alone or with one or more other parties, the Company effects any restructuring, reorganization, rescheduling, recapitalization, reduction, cancellation, elimination, retirement, repayment, purchase, repurchase and/or modification or amendment of any portion of the Company's debt securities and/or other indebtedness, obligations or liabilities (including, without limitation, unfunded pension and retiree medical liabilities, capital lease obligations, trade credit facilities, contract or tort obligations, joint venture interests and/or partnership interests), preferred stock, common stock and/or hybrid securities, however such result is achieved, including without limitation through any one or a combination of the following: (i) a Plan confirmed in connection with a Bankruptcy Case and/or (ii) an exchange or tender offer, a consent solicitation, a solicitation of waivers, acceptances or authorizations, covenant relief, the rescheduling of debt maturities, a change in interest rates, the settlement or forgiveness of debt, the conversion of debt into equity, and other amendments to the terms, conditions or covenants of the Company's debt instruments or documents; and/or (B) the confirmation of a Plan in connection with a Bankruptcy Case.

(c)  The term "Financing Transaction" means and includes any transaction or series of related transactions whereby, directly or indirectly and whether acting alone or with one or more other

Big Lots, Inc.
May 20, 2024
Page 3

parties, the Company raises, sells, places, or issues, including through a rights offering, any (i) secured or unsecured debt (including, without limitation, any loan, debentures, bonds, notes, asset-backed debt financing or other structured debt securities, instruments or obligations and/or any "debtor-in-possession financing" or "exit financing" in connection with a Bankruptcy Case, including, with respect to any such "debtor-in-possession financing" or "exit financing," any amounts of then existing debt "rolled up," "rolled over" or "rolled into" such financing, as the case may be) (any of the foregoing, a "Debt Financing") or (ii) equity interests including, without limitation, any preferred stock or common stock, any equity-linked securities, any convertible debt or equity securities, or any options, warrants or other rights to acquire equity interests in the Company or any of its subsidiaries or affiliates (any of the foregoing, an "Equity Financing"), in all cases howsoever effected.

(d)  The term "Sale Transaction" means and includes any transaction or series of transactions (regardless of the form of the transaction, the nature of the transaction consideration or how such transaction is effected) whereby, directly or indirectly, any material portion of the equity securities in or of the Company or any of its subsidiaries or controlled affiliates or any material portion of any of the Company's or its subsidiaries' or controlled affiliates' businesses or assets are transferred to, disposed of, or combined with one or more persons, groups of persons, partnerships, corporations or any other entity (including, without limitation, one or more of the Company's or any of its subsidiaries' or controlled affiliates' creditors acquiring such businesses or assets through any credit bid process or any other similar process) (any of the foregoing, including any potential acquiror, each an "Acquiror" and collectively "Acquirors"), including without limitation via (i) a sale, acquisition, purchase or exchange of stock (including shares issuable upon conversion of any securities or debt convertible into stock) or options, (ii) the acquisition of assets, properties or businesses of the Company or any of its subsidiaries or controlled affiliates by way of a direct or indirect acquisition, purchase, exchange, joint venture, partnership, other business combination or other means, including, without limitation, transactions under Section 363 of the Bankruptcy Code (including, without limitation, one or more of the Company's or any of its subsidiaries' or controlled affiliates' creditors acquiring such businesses or assets through a credit bid), (iii) a lease or license of assets (with or without a purchase option), (iv) a joint venture or (v) a merger, reverse merger, consolidation, reorganization, scheme of arrangement, tender offer, exchange offer, leveraged buyout, recapitalization or any other such corporate transaction or business combination involving the Company or any of its subsidiaries or controlled affiliates.

In the event such Sale Transaction involves a direct or indirect sale, disposition or other transfer to one or more Acquirors of (x) beneficial or direct voting control of the Company, (y) all or substantially all of the assets of the Company or (z) a majority of the equity securities in or of the Company, then, in all such cases, whether effected pursuant to any one transaction or a series of transactions, such Sale Transaction will also be referred to herein as a "Sale of Control Transaction."

(e)  The term "Transaction Fee" refers to any Restructuring Transaction Fee, Financing Fee and/or Sale Transaction Fee (as each such term is defined below), as the context requires.

4.  In consideration of Guggenheim Securities' services pursuant to this Agreement, the Company agrees to pay Guggenheim Securities the following compensation:

(a)  *Monthly Fees:*

(i)  The Company will pay Guggenheim Securities a non-refundable cash fee of $200,000 per month (each, a "Monthly Fee"), which will be due and paid by the Company in advance promptly on the twentieth (20) day of each calendar month during the period of Guggenheim Securities'

Big Lots, Inc.
May 20, 2024
Page 4

engagement hereunder (with the first such Monthly Fee to become due and payable by the Company as of May 20, 2024), in each case, whether or not any Transaction is consummated.

Notwithstanding the foregoing, if the date (the "Signing Date") on which this Agreement is signed by the parties occurs after May 20, 2024, then, promptly upon such Signing Date, the Company will pay Guggenheim Securities the aggregate amount of all Monthly Fees that shall have become due prior to the Signing Date pursuant to the immediately preceding paragraph, together with any Monthly Fee, if any, actually due on such Signing Date.

(ii) Commencing with the fourth full Monthly Fee actually paid hereunder, an amount equal to 50% of the Monthly Fees actually paid to Guggenheim Securities shall be credited against any Transaction Fee that thereafter becomes payable pursuant to Sections 4(b), 4(c) or 4(d) (it being understood that, once credited against any one of the foregoing fees, any such amount of the Monthly Fee so credited cannot be credited again against any other fee payable hereunder).

(b) *Restructuring Transaction Fee(s):*

(i) If any Restructuring Transaction is consummated, then, in each case, the Company will pay Guggenheim Securities a cash fee (each, a "Restructuring Transaction Fee") in an amount equal to 1.50% of the Aggregate Restructuring Value (as defined below) relating to such Restructuring Transaction.

(ii) Any such Restructuring Transaction Fee will be payable promptly upon the consummation of any Restructuring Transaction; *provided, however,* that (x) in connection with any Restructuring Transaction that is contemplated to be consummated in connection with a pre-packaged, pre-arranged or similar Plan in a Bankruptcy Case, (1) in connection with a pre-packaged or similar Plan, 100% of the Restructuring Transaction Fee and (2) in connection with a pre-arranged or similar Plan, 50% of the Restructuring Transaction Fee will, in the case of each of the foregoing clauses (1) and (2), be paid by the Company to Guggenheim Securities prior to the commencement of such Bankruptcy Case (with the balance thereof, in connection with a pre-arranged or similar Plan, to be paid by the Company promptly upon the consummation of a Restructuring Transaction); it being understood that, in the event that any portion of the Restructuring Transaction Fee is paid in connection with such a pre-packaged, pre-arranged or similar Plan in a Bankruptcy Case but a Restructuring Transaction is not thereafter consummated, then such fee previously paid shall be credited against any subsequent Transaction Fee that becomes payable hereunder by the Company to Guggenheim Securities or, if not able to be so credited, shall be returned to the Company.

(iii) For purposes hereof, the term "Aggregate Restructuring Value" with respect to any Restructuring Transaction will mean and include the aggregate (A) principal or face amount of all of the Company's outstanding borrowed money indebtedness (including accrued and unpaid interest, but excluding existing but undrawn revolver or other debt commitments), and (B) face amount of all other obligations (but excluding any operating leases and capital leases), in all such cases whether such indebtedness, credit facilities, and other obligations are restructured, recapitalized (including without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or modification or amendment to the terms, conditions or covenants thereof), refinanced, replaced, refunded, extended, defeased, assumed, acquired, retired, redeemed or repaid (directly or indirectly) in connection with the Restructuring Transaction or whether they remain on the Company's financial statements upon consummation of the Restructuring Transaction; *provided, that,* notwithstanding the foregoing,

Big Lots, Inc.
May 20, 2024
Page 5

in connection with any Restructuring Transaction consummated prior to the commencement of any Bankruptcy Case, the definition of "Aggregate Restructuring Value" will not include any category of indebtedness, liabilities or other obligations set forth in the foregoing clauses (A) or (B) that is not impacted in any way whatsoever in connection with such applicable Restructuring Transaction and in respect of which no portion thereof is paid down, refinanced, modified, amended or otherwise restructured in connection therewith.

(c) *Financing Fee(s):*

(i) If any Financing Transaction is consummated, then, in each case, the Company will pay Guggenheim Securities one or more cash fees (each, a "Financing Fee") in an amount equal to the sum of:

A. 125 basis points (1.25%) of the aggregate face amount of any debt obligations to be issued or raised by the Company (including the face amount of any related commitments) in any Debt Financing that is secured by first priority liens over the Company's assets, plus

B. 250 basis points (2.50%) of the aggregate face amount of any debt obligations to be issued or raised by the Company (including the face amount of any related commitments) in any Debt Financing that is not covered by Section 4(c)(i)(A), plus

C. 400 basis points (4.00%) of the aggregate amount of gross proceeds raised by the Company in any Equity Financing (including the face amount of any related commitments); plus

D. With respect to any other securities or indebtedness issued that is not otherwise covered by Sections 4(c)(i)(A) to 4(c)(i)(C) above, such financing fees, underwriting discounts, placement fees or other compensation as customary under the circumstances and mutually agreed in advance by the Company and Guggenheim Securities.

(ii) Financing Fees for any Financing Transaction will be payable upon the consummation of the related Financing Transaction; *provided, however,* that with respect to any Financing Transaction that is contemplated to be consummated in connection with a pre-packaged, pre-arranged or similar Plan relating to a Bankruptcy Case, the Financing Fee will in any event be paid by the Company prior to the commencement of such applicable Bankruptcy Case.

(iii) In connection with any Debt Financing constituting a "debtor-in-possession" financing consummated in connection with a Bankruptcy Case ("DIP Financing"), on account of which Guggenheim Securities has been actually paid a Financing Fee hereunder (such portion of any Financing Fee so paid specifically on account of any such DIP Financing, a "DIP Financing Fee"), then, to the extent that the amount of any such DIP Financing Fee exceeds $2,500,000 (the amount of any such excess, the "Relevant DIP Fee Amount"), an amount equal to 50% of any such Relevant DIP Fee Amount shall be credited against any Restructuring Transaction Fee or Sale Transaction Fee that thereafter becomes payable pursuant to Sections 4(b) or 4(d); it being understood that such portion of any such Relevant DIP Fee Amount can only be credited once against any one of the foregoing fees and cannot be credited against any other fee payable hereunder.

(d) *Sale Transaction Fee(s):*

(i) If any Sale Transaction is consummated, then in each case, the Company will pay Guggenheim

Big Lots, Inc.
May 20, 2024
Page 6

Securities a cash fee (each, a "Sale Transaction Fee") in an amount equal to 1.50% of the Aggregate Sale Consideration (as defined below) relating to such Sale Transaction.

(ii)    Any such Sale Transaction Fee will be payable promptly upon the consummation of any Sale Transaction; *provided, however,* that in connection with any Sale Transaction that is contemplated to be consummated in connection with a pre-packaged, pre-arranged or similar Plan in a Bankruptcy Case, (1) in connection with a pre-packaged or similar Plan, 100% of the Sale Transaction Fee and (2) in connection with a pre-arranged or similar Plan, 50% of the Sale Transaction Fee will, in the case of each of the foregoing clauses (1) and (2), be paid by the Company to Guggenheim Securities prior to the commencement of such Bankruptcy Case (with the balance thereof, in connection with a pre-arranged or similar Plan, to be paid by the Company promptly upon the consummation of a Sale Transaction); it being understood that, in the event that any portion of the Sale Transaction Fee is paid in connection with such a pre-packaged, pre-arranged or similar Plan in a Bankruptcy Case but a Sale Transaction is not thereafter consummated, then such fee previously paid shall be credited against any subsequent Transaction Fee that becomes payable hereunder by the Company to Guggenheim Securities or, if not able to be so credited, shall be returned to the Company.

(iii)    For purposes hereof, the term "Aggregate Sale Consideration," with respect to any Sale Transaction, will mean and include (A) the value of all cash, securities and/or other property or consideration in any form paid or to be paid, directly or indirectly, by the applicable Transaction Counterparty to the Company and/or its contract parties, claim holders, security holders and employees in connection with the Sale Transaction or any transaction related thereto (including, without limitation, the face amount of any indebtedness, securities or other property "credit bid" in any Sale Transaction and amounts paid by the applicable Transaction Counterparty (I) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements of the Company and (II) to holders of any warrants, stock purchase rights, convertible securities or similar rights of the Company and to holders of any options or stock appreciation rights issued by the Company, whether or not vested) plus (B) the principal or face amount of any liabilities (including the principal amount of any indebtedness for borrowed money and any obligations relating to any capitalized leases (but not operating leases)) or preferred stock assumed, acquired, redeemed or repaid (directly or indirectly) following the execution of definitive documents with respect to a Sale Transaction or in connection with the Sale Transaction or related transaction or, in connection with a Sale of Control Transaction (but without limiting the foregoing), which remains on the Company's financial statements at the time of the Sale Transaction plus (C) with respect to a Sale of Control Transaction, and only to the extent greater than zero, (I) the value of any current assets not sold to the applicable Transaction Counterparty minus (II) the value of any current liabilities not assumed by the applicable Transaction Counterparty, each such value as of the closing date of the Sale Transaction and as determined by Guggenheim Securities in good faith plus (D) to the extent in connection with or in contemplation of the Sale Transaction or any related transaction, any (I) amounts paid into escrow, (II) consideration that is contingent upon the occurrence of some future event (*e.g.*, the net present value of any expected future earnout payments, milestone payments or royalties on future sales), (III) in connection with a Sale of Control Transaction (but without limiting the foregoing), the aggregate amount of any dividends or other distributions declared by the Company (other than regularly scheduled dividends) and (IV) in connection with a Sale of Control Transaction (but without limiting the foregoing), amounts paid by the Company to repurchase any securities of the Company (other than pre-existing, ordinary course repurchase programs).  In calculating "Aggregate Sale Consideration," any shares issuable upon exercise of "in-the-money" options, warrants or other "in-the-money"

Big Lots, Inc.
May 20, 2024
Page 7

rights of conversion, whether or not vested, will be deemed to be acquired by such applicable Transaction Counterparty for the same consideration paid or to be paid with respect to such shares. As used in this Agreement, the terms "payment," "paid" or "payable" will be deemed to include, as applicable, the issuance or delivery of securities or other property other than cash.

In the event that a Sale Transaction takes the form of a recapitalization of the Company (including, without limitation, an extraordinary dividend, a spin-off, split-off or similar transaction), Aggregate Sale Consideration will also include the fair market value of (i) the equity securities of the Company retained by the Company's security holders and/or creditors following the consummation of such Transaction and (ii) any cash, securities (including securities of subsidiaries) or other consideration received by the Company's security holders and/or creditors in exchange for or with respect to any securities of and/or claims against the Company in connection with such Transaction (all such cash, securities or other consideration received by such security holders and/or creditors being deemed to have been paid to such security holders and/or creditors in such Transaction). In the event the Sale of Control Transaction does not involve the acquisition of full legal or economic ownership of the Company, Aggregate Sale Consideration will be calculated as if all the legal or economic interests in the Company were acquired in the Sale Transaction for the same per share consideration as the interests actually so acquired.

If any portion of the Aggregate Sale Consideration is paid in the form of securities, the value of such securities, for purposes of calculating the Sale Transaction Fee, will be determined based on the average of the closing price for such securities on the five trading days ending three trading days prior to the date of the closing. If such securities do not have an existing trading market, the value of the securities will be the fair market value on the day prior to the closing as determined by Guggenheim Securities in good faith.

(e) *Maximum Fee Cap.* The parties hereto expressly agree that, notwithstanding anything to the contrary in this Section 4, the aggregate amount of Monthly Fees, Restructuring Transaction Fees, Financing Fees and Sale Transaction Fees that is actually paid to Guggenheim Securities hereunder shall not exceed an amount equal to $16,000,000 (unless otherwise agreed in writing among the parties hereto).

(f) *Miscellaneous.* The Company expressly acknowledges and agrees, for the avoidance of doubt (and without in any way limiting the foregoing provisions of this Section 4), that (i) in connection with any Transaction, in the event that more than one such Transaction is effected or occurs, the Company will, in each case, separately pay Guggenheim Securities the applicable Transaction Fee on account of each such Transaction as and when specified in the foregoing provisions of this Section 4, and (ii) more than one fee and more than one type of fee may be payable to Guggenheim Securities hereunder in connection with any single Transaction or a series of Transactions, and in each case, each such fee will be paid to Guggenheim Securities; *provided, that,* notwithstanding the foregoing, if a transaction is consummated that constitutes both a Restructuring Transaction and a Sale Transaction, then Guggenheim Securities shall not be paid on account thereof both a Restructuring Transaction Fee and a Sale Transaction Fee, but shall instead, as between such two fees and on account of such transaction, only be paid the higher of the Restructuring Transaction Fee and the Sale Transaction Fee. No fee or compensation payable to any third party by the Company or any other person or entity in connection with the subject matter of this engagement will reduce or otherwise affect any fee payable by the Company to Guggenheim Securities hereunder.

5. In addition to any fees payable by the Company to Guggenheim Securities hereunder, the Company will, whether or not any Transaction contemplated by this Agreement will be proposed or consummated,

Big Lots, Inc.
May 20, 2024
Page 8

promptly reimburse Guggenheim Securities, upon request, for its reasonable and documented travel and all other reasonable and documented out-of-pocket expenses incurred in connection with or arising out of this Agreement, including Guggenheim Securities' entering into this Agreement, Guggenheim Securities' activities under or as contemplated by this Agreement or Guggenheim Securities' enforcing its rights hereunder, including all reasonably incurred (and documented) fees, disbursements and other charges of (x) any legal counsel retained by Guggenheim Securities (without the requirement that the retention of such legal counsel be approved by the applicable Insolvency Authority) and (y) any other consultants and advisors reasonably required to be retained by Guggenheim Securities. The Company will also reimburse Guggenheim Securities, at such times as Guggenheim Securities will request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by this Agreement.

All fees, expenses or other amounts payable or reimbursable pursuant to this Agreement will be settled in United States Dollars in New York City, without any deduction or withholding of any amounts whatsoever that may be required under federal or state or any other law.

Such reimbursements will be made promptly upon submission by Guggenheim Securities of customary statements for such expenses.

Prior to commencing a Bankruptcy Case, the Company will reimburse Guggenheim Securities for all travel and other reasonable out-of-pocket expenses as outlined above that have not been reimbursed as of the date immediately preceding the commencement of such Bankruptcy Case.

6. The Company's obligation to pay any fee, expense or indemnity set forth herein (in accordance with the terms hereof, including without limitation Section 9 below) will be absolute and unconditional and will not be subject to any reduction by way of setoff, recoupment or counterclaim. The Company further acknowledges and agrees that the various fees set forth in this Agreement have been agreed upon in anticipation that a substantial professional commitment of time and effort will be required of Guggenheim Securities in connection with this complex engagement (which actual time and effort to perform its services hereunder may vary substantially during the period of this engagement) and that such commitment may foreclose other business opportunities for it. Given the numerous and complex issues that may arise in engagements of this nature, the aforementioned issues with Guggenheim Securities' commitment to the variable level of time and effort necessary to address all such complex issues as they arise, the value and ultimate benefit to the Company and its constituents derived in substantial part from Guggenheim Securities' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities (some or all of which may be required during the term of Guggenheim Securities' engagement hereunder), and the market prices for professionals of Guggenheim Securities' stature and reputation for engagements of this nature, the Company expressly acknowledges and agrees that the fee and expense arrangements in this Agreement are just and reasonable under all applicable legal standards and provide the requisite certainty to the Company, regardless of the number of hours expended by Guggenheim Securities' professionals in the performance of the services to be provided hereunder, and none of the fees hereunder shall be considered to be "bonuses" or fee enhancements under applicable law.

7. The Company and Guggenheim Securities agree to the following termination and tail provisions:

   (a) Guggenheim Securities' engagement hereunder may be terminated at any time by either Guggenheim Securities or the Company upon written notice thereof to the other party, in each case without liability or continuing obligation on the part of the Company or Guggenheim Securities, except as set forth below.

Big Lots, Inc.
May 20, 2024
Page 9

(b)   In the event of any expiration or termination of Guggenheim Securities' engagement pursuant to this Agreement, Guggenheim Securities will continue to be entitled to payment (or its bankruptcy estates) of (i) any unpaid fees pursuant to Section 4 of this Agreement and (ii) any unreimbursed expenses pursuant to Section 5 of this Agreement that were incurred by Guggenheim Securities as a result of services rendered prior to the date of such expiration or termination, all of which amounts will become immediately payable by the Company (or its bankruptcy estates) in full. Furthermore, Sections 5 through 13 inclusive, and the Annex and the Indemnification Provisions attached hereto, will survive any expiration or termination of Guggenheim Securities' engagement hereunder.

(c)   In addition, if, prior to the expiration of twelve (12) full months following any expiration or termination of Guggenheim Securities' engagement hereunder (other than any termination arising as a result of Guggenheim Securities' unilateral termination of its engagement or as a result of the Company's termination of Guggenheim Securities' engagement for cause (as defined below)) (such 12-month period, the "Tail Period"), any Transaction is consummated or any agreement (including any Plan) to effect a Transaction is entered into (or otherwise becomes binding on the Company) pursuant to which a Transaction is subsequently consummated (including following the expiration of the Tail Period), the Company will pay Guggenheim Securities the full amount of the fees as and when specified in Section 4 above.   For purposes of this clause (c), the term "cause" means Guggenheim Securities' gross negligence, bad faith or willful misconduct in rendering its services hereunder.

8.   The Company agrees to indemnify Guggenheim Securities and certain related persons in accordance with the Indemnification Provisions attached hereto.   The Company acknowledges and agrees that the Annex and the Indemnification Provisions are integral parts of this Agreement, and the provisions thereof are incorporated by reference herein in their entirety. Such Annex and Indemnification Provisions will survive any termination or completion of Guggenheim Securities' engagement hereunder.   Any and all of the Company's obligations hereunder, including, without limitation, any obligation to pay any fee, expense or indemnity, are intended to be and are the joint and several obligations of all entities included in the definition of the term "Company."

9.   In the event a Bankruptcy Case is commenced:

(a)   The Company will apply reasonably promptly to the Bankruptcy Court for the approval, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, of this Agreement (including, without limitation, the compensation, expense reimbursement and indemnification provisions hereof) and Guggenheim Securities' retention by the Company under the terms of this Agreement pursuant to, and subject to the standards of review set forth in, section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in section 330 of the Bankruptcy Code or any other standard of review), *nunc pro tunc* to the date the Bankruptcy Case is commenced, and will use commercially reasonable efforts to obtain a final order of the Bankruptcy Court for authorization thereof.   The retention application and the proposed final order authorizing Guggenheim Securities' retention must be acceptable to Guggenheim Securities and to the Company.

(b)   Guggenheim Securities will have no obligation to provide services under this Agreement or any other agreement unless Guggenheim Securities' retention under this Agreement or such other agreement is approved by a final order of the Bankruptcy Court, not subject to appeal, acceptable to Guggenheim Securities in its sole discretion in accordance with the foregoing, within 60 days of the date of the commencement of any Bankruptcy Case. If such final order is not obtained within such 60-day period, or such order is later reversed, vacated, stayed or set aside for any reason, then

Big Lots, Inc.
May 20, 2024
Page 10

Guggenheim Securities may terminate its engagement under this Agreement.

(c) The Company agrees that Guggenheim Securities' post-petition fees as set forth in this Agreement, the payments made pursuant to the expense reimbursement provisions of this Agreement and the Indemnification Provisions attached hereto shall be entitled to priority as expenses of administration under sections 503(b)(1)(A), 503(b)(2) and 507(a)(2) of the Bankruptcy Code, as well as to the benefits of any "carve-outs" for professional fees and expenses (which carve-outs will be adequate to enable the Company to promptly pay Guggenheim Securities the fees and expense reimbursements contemplated hereby taking into account the Company's obligations to other professionals entitled to the benefit of the carve-outs) in effect pursuant to one or more financing or other orders entered by the Bankruptcy Court.

(d) The Company will use commercially reasonable efforts to ensure that, to the fullest extent permitted by law, any confirmed Plan in the Bankruptcy Case contains typical and customary release provisions (both from the Company and from third parties) and exculpation provisions releasing and discharging Guggenheim Securities and the other Covered Persons (as defined in the Annex) from any claims or causes of action related to the Company or the engagement described in this Agreement.

Without limiting any of the Company's obligations in this Section 9, the parties acknowledge that after the commencement of a Bankruptcy Case, the Company's obligations to pay fees and expenses are subject to the provisions of the applicable Debtor Relief Laws governing such Bankruptcy Case. To the extent Debtor Relief Laws other than the Bankruptcy Code apply to the Bankruptcy Case, the Company unconditionally agrees, for the avoidance of doubt, to continue to be bound by each of the provisions of this Section 9 and to implement, pursuant to equivalent provisions under such other Debtor Relief Laws, any and all of its obligations described herein with reference to the Bankruptcy Code, *mutatis mutandis*.

As used herein, the term "Bankruptcy Case" means any liquidation, bankruptcy, conservatorship, receivership, insolvency or other similar proceeding or arrangement entered into or commenced in any bankruptcy court (the "Bankruptcy Court") or other court or subject to any other authority or agency in the United States or any other applicable jurisdiction (each, together with any court, an "Insolvency Authority") by or against the Company or any of its subsidiaries or controlled affiliates, whether individually or on a consolidated basis, under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code") or any other applicable liquidation, bankruptcy, conservatorship, receivership, insolvency or similar debtor relief laws (collectively, the "Debtor Relief Laws") of the United States or other applicable jurisdiction.

10. THE COMPANY ACKNOWLEDGES AND AGREES THAT (I) GUGGENHEIM SECURITIES WILL ACT SOLELY IN THE CAPACITIES DESCRIBED IN SECTION 1 HEREOF IN CONNECTION WITH ANY TRANSACTION AND (II) THIS AGREEMENT DOES NOT CONSTITUTE AN EXPRESS OR IMPLIED COMMITMENT OR UNDERTAKING ON THE PART OF GUGGENHEIM SECURITIES AND/OR ITS AFFILIATES TO UNDERWRITE, PROVIDE OR PLACE ALL OR ANY PART OF ANY FINANCING TRANSACTION AND DOES NOT ENSURE OR GUARANTEE THE SUCCESSFUL ARRANGEMENT, PLACEMENT OR COMPLETION OF ANY RESTRUCTURING TRANSACTION, FINANCING TRANSACTION OR ANY PORTION THEREOF OR ANY SALE TRANSACTION.

11. EACH OF GUGGENHEIM SECURITIES AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY LAW, ON BEHALF OF ITS RESPECTIVE EQUITY HOLDERS AND CREDITORS) HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED UPON, ARISING OUT OF OR IN CONNECTION

Big Lots, Inc.
May 20, 2024
Page 11

WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

12. This Agreement will be deemed to be made in the State of New York.  This Agreement and all controversies arising hereunder or directly or indirectly relating hereto will be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to such state's rules concerning conflicts of laws that might provide for any other choice of law.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein will remain in full force and effect and will in no way be affected, impaired or invalidated.

13. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which will be an original instrument and all of which taken together will constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by e-mail in portable document format or comparable means of digital transmission will constitute valid and sufficient delivery thereof.



Big Lots, Inc.
May 20, 2024
Page 12

We are delighted to accept this engagement and look forward to working with you on this important assignment. Please confirm that the foregoing is in accordance with your understanding by signing in the space provided below and returning to us a duplicate of this Agreement, which will thereupon constitute a binding agreement between Guggenheim Securities and the Company.

Very truly yours,

GUGGENHEIM SECURITIES, LLC

By: _____
Stuart Erickson
Senior Managing Director

ACCEPTED AND AGREED TO:

BIG LOTS, INC.

By: _____    6/6/24.
Jonathan E. Ramsden
EVP, Chief Financial and Administrative Officer

## ANNEX

### Additional Provisions

Capitalized terms used herein without definition will have the meanings ascribed thereto in the letter agreement dated as of May 20, 2024 (as amended from time to time) between Big Lots, Inc. and Guggenheim Securities, LLC.

A.   Guggenheim Securities understands and acknowledges that the Company may separately engage at any time (or may have separately engaged) other advisors or consultants to assist them with any Transaction and/or other matters (collectively, "Other Advisors"). The Company hereby acknowledges and agrees that (i) the respective engagements of Guggenheim Securities and any such Other Advisor are and will remain several and not joint, (ii) Guggenheim Securities is responsible to the Company solely pursuant to the terms and conditions of this Agreement, (iii) Guggenheim Securities and any such Other Advisor are not and will not be authorized to act for or bind one another, (iv) Guggenheim Securities will have no responsibility or liability to the Company or any other party for any act or omission by any such Other Advisor in connection with their separate engagement by the Company, and (v) the compensation and other amounts payable to Guggenheim Securities under this Agreement will be solely for the account of Guggenheim Securities and no services performed by, and no fee or compensation payable to, any Other Advisor will reduce or otherwise affect any fee, compensation or other amount payable by the Company to Guggenheim Securities hereunder.

B.   During the period of Guggenheim Securities' engagement hereunder, the Company will furnish or arrange to have furnished to Guggenheim Securities all information concerning the Company, any Transaction and, to the extent within the Company's control, any Transaction Counterparty that Guggenheim Securities reasonably requests for purposes of this engagement and will provide Guggenheim Securities with reasonable access to the Company's and, to the extent within the Company's control, any such Transaction Counterparty's officers, directors, employees, affiliates, appraisers, independent accountants, legal counsel and other agents, consultants and advisors (collectively with respect to any person or entity, its "Representatives"). In addition, the Company agrees promptly to advise Guggenheim Securities of any material event or change in the business, affairs and/or condition (financial or otherwise) of the Company and, to the extent within the Company's knowledge, any Transaction Counterparty that occurs during the period of Guggenheim Securities' engagement hereunder. The Company represents and warrants that all information (other than Forward-Looking Information (as defined below)) (i) made available by the Company or its Representatives to Guggenheim Securities or any Transaction Counterparty, (ii) contained in any offering or sales memorandum, offering circular or similar disclosure document for any Transaction and/or posted on any online data-room in connection with any Transaction (as amended and supplemented from time to time, any "Disclosure Materials"), or (iii) contained in any filing by the Company with (a) any Insolvency Authority (including, without limitation, any Plan) or (b) with the U.S. Securities and Exchange Commission (the "SEC") or any other governmental or regulatory agency or commission or any rating agency (each of the foregoing, an "Agency") with respect to any Transaction, in all such cases will, at all times during the period of the engagement of Guggenheim Securities hereunder, be true, complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which such statements are made, not misleading (and the Company agrees to promptly notify Guggenheim Securities upon becoming aware of any material inaccuracy or misstatement in, material omission from or material change in any such information). The Company further represents and warrants that any Forward-Looking Information furnished by or on behalf of the Company or its Representatives to Guggenheim Securities, any Transaction Counterparty, any applicable Insolvency Authority and/or any Agency, or contained in any Disclosure Materials, will have been prepared in good faith and will be based upon assumptions which, in the light of the circumstances under which they are made, are reasonable and will reflect the best then-currently available estimates and judgments of the

Company's senior management as to the expected future performance of the relevant business, legal entity or assets. Each of the parties hereto acknowledges and agrees that the information provided by the Company hereunder is subject to the terms of that certain Non-Disclosure Agreement dated May 24, 2024 between Big Lots, Inc. and Guggenheim Securities (the "Confidentiality Agreement"), and that any Confidential Information (as defined in the Confidentiality Agreement) may be used by Guggenheim Securities and its Representatives for purposes of Guggenheim Securities' and its Representatives' provision of advice and services pursuant to this Agreement.

C.  The Company acknowledges, agrees and confirms that the Company will be solely responsible for the contents of any Disclosure Materials and that, in providing its services pursuant to this Agreement, Guggenheim Securities (i) is and will be entitled to rely upon and assume – and does not and will not assume responsibility, obligation or liability for – the accuracy, completeness, reasonableness and achievability of any and all information furnished by or discussed with the Company, any Transaction Counterparty and their respective Representatives, or available from public sources, data suppliers and other parties; (ii) will have no responsibility or obligation to independently verify such information or to conduct any independent evaluation or appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of the Company, any Transaction Counterparty or any other party; (iii) will assume that all financial projections, other estimates and other forward-looking information (collectively, "Forward-Looking Information") that may be furnished by or discussed with the Company, any Transaction Counterparty and their respective Representatives will have been reasonably prepared and reflect the best then-currently available estimates and judgments of the furnishing party's senior management as to the expected future performance of the relevant business, legal entity or assets and the realization of any such synergies; (iv) will express no view, opinion, representation, guaranty or warranty regarding the reasonableness or achievability of any such Forward-Looking Information or the assumptions upon which they are based; and (v) will have no responsibility or obligation to evaluate the solvency of the Company, any Transaction Counterparty or any other party under any relevant law relating to bankruptcy, insolvency or similar matters. The Company further acknowledges and agrees that any due diligence investigation conducted by Guggenheim Securities in connection with its engagement hereunder will be limited solely to performing such review as it may deem necessary for its own purposes in connection with its engagement hereunder and will not be on behalf of the Company or any other party.

D.  The Company hereby authorizes Guggenheim Securities to use and distribute the Disclosure Materials and other information and documents provided by the Company pursuant to this Agreement to solicit Transaction Counterparties in connection with any Transaction. The Company further authorizes the negotiation and execution by Guggenheim Securities of confidentiality agreements (in a form approved by or on behalf of the Company) on the Company's behalf with Transaction Counterparties in connection with any Transaction.

In the event that, during the period of the engagement of Guggenheim Securities hereunder, the Company and/or any of its Representatives is/are contacted by or on behalf of any party concerning the possibility of a Transaction, the Company will promptly so inform Guggenheim Securities so that it can evaluate such party and its interest and assist the Company in any subsequent discussions. The Company also will as promptly as practicable disclose any discussions, negotiations or inquiries with respect to the Company and/or any Transaction that have occurred during the one year period prior to the date of this Agreement. In addition, the Company also will promptly inform Guggenheim Securities in the event that the Company retains any legal counsel, consultant or other advisor or Representative in connection with any Transaction. The Company will keep confidential and will not disclose or distribute to any person (other than on a confidential need-to-know basis to the Company's officers, directors, employees, independent accountants and legal counsel) the Disclosure Materials or any other materials related to any Transaction, or otherwise advertise to or solicit Transaction Counterparties with respect to any Transaction without Guggenheim Securities' prior consent.

E.  All advice (written or oral) provided by Guggenheim Securities in connection with Guggenheim Securities' engagement (i) is intended solely for the benefit and use of the Company's Board of Directors (solely in its capacity as such) and senior management, (ii) is not and will not be deemed to constitute a recommendation to the Company's Board of Directors (or any similar governing body) or the Company with respect to any Transaction or any other matter and (iii) is not intended for the benefit or use by, and with respect to any Transaction will not constitute any recommendation to, the Company's controlling stockholder(s) or member(s) or other stockholders, members, creditors or any other constituency. The Company agrees that, notwithstanding any expiration or termination of Guggenheim Securities' engagement, no such advice provided by Guggenheim Securities will be used or relied upon for any other purpose or by any other person or entity, and neither the terms and conditions of this Agreement nor any such advice will be disclosed publicly or made available to third parties or be reproduced, disseminated, quoted from or referred to at any time, in any manner or for any purpose, nor will any public references to Guggenheim Securities be made by the Company or any of its Representatives, in each case without Guggenheim Securities' prior written consent, except that such disclosure of such information or advice may be made (A) on a confidential, need-to-know basis to the Company's officers, directors, employees and legal counsel, and (B) to the Company's other professional advisors, but only to the extent the Company (a) first ensures that each such other professional advisor has entered into a customary non-reliance/confidentiality letter with Guggenheim Securities in a form reasonably satisfactory to Guggenheim Securities, (b) only discloses any written advice or written presentation materials in their entirety without selective disclosure and (c) offers such other professional advisor the opportunity to discuss with Guggenheim Securities the nature of Guggenheim Securities' advice as well as any relevant assumptions and caveats underlying, and the rationale for any conclusions contained in, any such written advice or written presentation materials.

In providing its services to the Company pursuant to this Agreement, Guggenheim Securities is not assuming any responsibility for the Company's underlying business and financial decision to pursue, endorse, support or effect (or not pursue, endorse, support or effect) any business or financial strategy or to effect or not to effect any Restructuring Transaction, Financing Transaction, Sale Transaction and/or any other transaction. The Company agrees that Guggenheim Securities will not have any obligation or responsibility to provide, nor will Guggenheim Securities be deemed to have provided, any (i) legal, accounting, audit, tax, actuarial or other specialist advice for or to the Company, (ii) "crisis management" or business consultant services for or to the Company, (iii) professional services related to designing or implementing operational, organizational, administrative, cash management or liquidity improvements related to the Company or (iv) fairness or valuation opinions or any advice or opinions with respect to solvency in connection with any Transaction or a liquidation analysis prepared in connection with a Bankruptcy Case or any other purpose.

F.  In connection with any Transaction constituting a Financing Transaction or otherwise involving any offer or sale of securities ("Securities") within the meaning of the Securities Act (any of the foregoing transactions, a "Covered Transaction"), the Company represents, warrants and agrees that:

(i)  During the period of the engagement of Guggenheim Securities hereunder, neither the Company nor any person or entity acting on its behalf will, directly or indirectly (except through Guggenheim Securities), sell or offer, or attempt or offer to dispose of, or solicit any offer to buy, or otherwise approach or negotiate with respect to, any Securities to be issued or sold in connection with any Covered Transaction, or any securities of the same or similar class as such Securities, or take any other action so as to cause the offer and sale of the Securities to fail to be entitled to exemption from the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act"). None of the Company and its affiliates and related entities nor any person or entity acting on its or their behalf has done any of the foregoing during the six months preceding the date of this Agreement, and no such offers or sales are currently being made or contemplated (in each case, whether pursuant to outstanding warrants, options, convertible or exchangeable securities,

acquisition agreements or otherwise). As used in this Agreement, the terms "offer" and "sale" have the meanings specified in Section 2(a)(3) of the Securities Act.

(ii)  Neither the Company nor any other person or entity acting on its behalf will offer or sell any Securities by any form of general solicitation or general advertising, including but not limited to the methods described in Rule 502(c) under the Securities Act, or engage in any directed selling efforts within the meaning of Regulation S thereunder. No person or entity acting on the Company's behalf is subject to a disqualification described in Rule 506(d) as promulgated under the Securities Act.

(iii)  In connection with any Transaction involving any offer or sale of Securities, the Company will furnish and make available to each Transaction Counterparty the information and provide each such Transaction Counterparty with the opportunity to ask questions and receive answers as required by Rule 502(b) under the Securities Act. Without duplication of the foregoing, in connection with any Financing Transaction, the Company will actively cooperate with Guggenheim Securities in connection with (i) the preparation of marketing materials and other Disclosure Materials in form and substance satisfactory to Guggenheim Securities to be used in connection with the marketing of the Transaction, including, without limitation, (a) providing all of the information described above in paragraph (B) of this Annex and (b) using commercially reasonable efforts to obtain all such credit ratings from such applicable rating agencies as deemed advisable by Guggenheim Securities in connection with such marketing efforts, and (ii) the presentation of one or more information packages acceptable in format and content to Guggenheim Securities in meetings and other communications with prospective Transaction Counterparties or agents in connection with the marketing of the Transaction (including, without limitation, direct contact between senior management and other Representatives, with appropriate seniority and expertise, of the Company with prospective Transaction Counterparties and participation of such persons in applicable meetings or road shows).

(iv)  Each Covered Transaction will be documented through definitive transaction documents (the "Covered Transaction Documents") entered into among the Company and the applicable Transaction Counterparties, which will be in form and substance reasonably satisfactory to Guggenheim Securities and which will contain customary representations, warranties, covenants, indemnification provisions and closing conditions. The Company agrees that upon any sale of Securities it will deliver or cause to be delivered to Guggenheim Securities and/or its affiliates and related entities an opinion from the Company's legal counsel as to the absence of a requirement to register the Securities under the Securities Act.

(v)  All representations, warranties or agreements made or given by the Company to any Transaction Counterparty and by any Transaction Counterparty to the Company in connection with any Covered Transaction also will extend for the benefit of Guggenheim Securities in its capacity as the Company's financial advisor, investment banker, placement agent and/or arranger (or other similar title or role), as the case may be; and upon any closing of any Covered Transaction, the Company will deliver or cause to be delivered to Guggenheim Securities copies of the Covered Transaction Documents and other closing deliverables (including, without limitation, opinions and "*comfort*" and "*negative assurance*" letters from the Company's independent auditors and counsel). Any document referred to in the preceding sentence that is provided to any Transaction Counterparty also will be addressed to Guggenheim Securities as the Company's financial advisor, investment banker, placement agent and/or arranger (or other similar title or role), as the case may be, or will state that Guggenheim Securities will be entitled to rely upon such document to the same extent as if it had been addressed to Guggenheim Securities in such capacity.

(vi)  The Covered Transaction Documents will contain representations of each Transaction Counterparty (for itself and for each account for which such Transaction Counterparty is acquiring Securities or

otherwise participating in such Transaction) including that (x) such person (1) is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act and an "institutional account" within the meaning of Rule 4512 of the Financial Industry Regulatory Authority, (2) in connection with a Transaction involving an offer or sale of Securities, is purchasing the Securities without a view to distribution thereof within the meaning of the Securities Act and agrees not to reoffer or resell the Securities except pursuant to an exemption from registration under the Securities Act or pursuant to an effective registration statement thereunder (it being understood, however, that the disposition of such person's property will at all times be within such person's control), (3) has carefully reviewed any Disclosure Materials and has been furnished with all other materials that it considers relevant to its participation in such Transaction and, if applicable, its investment in the Securities, (4) has had a full opportunity to ask questions of and receive answers from the Company or any person or persons acting on behalf of the Company concerning the terms and conditions of such Covered Transactions and, if applicable, such investment in the Securities, and (5) is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, including, without limitation, Guggenheim Securities, except for the statements, representations and warranties contained in the relevant Covered Transaction Documents, and (y) no statement or printed material which is contrary to the Disclosure Materials has been made or given to any Transaction Counterparty by or on behalf of the Company.

(vii)    The Company agrees promptly from time to time to take such actions as Guggenheim Securities may reasonably request in connection with marketing the Covered Transaction (including the Securities), including but not limited to registration or qualification of the Securities for offering and sale as a private placement under the laws of such jurisdictions as Guggenheim Securities may reasonably request. Any applicable filings will be prepared by the Company's legal counsel, whose fees and disbursements in connection therewith will be for the account of the Company.

(viii)    In connection with any such Transaction that takes the form of a "private investment in public equity" (such transaction, commonly referred to as a PIPE transaction, shall be referred to herein as a "PIPE Financing"), (w) the Company acknowledges and agrees that the terms of the PIPE Financing may (among other matters) require the Company (i) promptly following the date of execution of the relevant purchase agreement entered into in connection therewith (the "Signing"), to file a registration statement (the "Registration Statement") with the SEC with respect to the possible resale, from time to time, of the Securities to be purchased in the PIPE Financing and (ii) to keep the Registration Statement effective until such time as such securities become eligible for resale by non-affiliates and related entities pursuant to Rule 144(k) under the Securities Act, (x) the Company agrees that it will not modify any executed purchase agreement, nor will it execute and deliver any additional purchase agreements after the time the Company has filed the Registration Statement with the SEC, (y) on the date of Signing and again on the date of each closing of the PIPE Financing, the Company will cause its independent auditors and counsel to address and deliver to the Company and Guggenheim Securities opinions and "*comfort*" and "*negative assurance*" letters, dated as of such dates, which will all be in form and substance as reasonably requested by Guggenheim Securities; and the Company also will furnish to Guggenheim Securities and its legal counsel such additional certificates, opinions or other documents as they may reasonably request, and (z) at the time of Signing, the Company will execute and deliver to Guggenheim, and will cause each person who is a director or officer of the Company and/or a significant stockholder or member of the Company to execute and deliver to Guggenheim Securities, agreements in form and substance reasonably requested by Guggenheim Securities, in which the Company and such other persons undertake (subject to certain customary exceptions) for a period ending ninety (90) days after the effective date of the Registration Statement, not to sell, contract to sell or otherwise dispose of or issue any securities of the Company, without the prior written consent of Guggenheim Securities.

In the event that any Covered Transaction takes the form of an offering under Rule 144A or Regulation S under the Securities Act and/or an exchange or tender offer in respect of which Guggenheim Securities may act as a dealer manager (or in such other similar role or capacity), it is understood and agreed, as a predicate to Guggenheim Securities providing advice or services hereunder in connection therewith, that the Company will upon request enter into a separate purchase agreement, dealer manager agreement or other similar agreement with Guggenheim Securities appointing Guggenheim Securities as lead initial purchaser or lead manager or dealer manager (or in such other similar role or capacity), as the case may be, in connection with such Covered Transaction on terms and conditions (including receipt of internal committee approvals), and containing representations, warranties, covenants, indemnification and other provisions, as are, in each case, customary for Guggenheim Securities for similar transactions, which terms and conditions will be mutually acceptable to the Company and Guggenheim Securities.

G.    The Company agrees that, until the expiration or termination of Guggenheim Securities' engagement hereunder, neither the Company nor any person or entity acting on its behalf will (other than through Guggenheim Securities) initiate, solicit or enter into any substantive discussions or negotiations with any potential Investors or other third parties (including without limitation, financial institutions, consultants, brokers, placement agents, underwriters or similar parties) intended to result in a Financing Transaction, in whole or in part.

H.    The Company hereby acknowledges that Guggenheim Securities and its affiliates and related entities engage in a wide range of financial services activities for their own accounts and the accounts of customers, including asset and investment management, insurance services, investment banking, corporate finance, mergers and acquisitions, restructuring, merchant banking, fixed income and equity sales, trading and research, derivatives, foreign exchange and futures. In the ordinary course of these activities, Guggenheim Securities or its affiliates and related entities may (i) provide such financial services to the Company and/or any other Interested Party (as defined below), for which services Guggenheim Securities or certain of its affiliates and related entities have received, and may receive, compensation and (ii) directly or indirectly, hold long or short positions, trade and otherwise conduct such activities in or with respect to certain debt or equity securities, bank debt, trade- and vendor-related obligations and liabilities and derivative products of or relating to any Interested Party. In particular, certain of Guggenheim Securities' asset management affiliates and related entities and accounts managed by such affiliates and related entities may arrange or participate in financing for or by any Interested Party in connection with any Transaction or otherwise. Furthermore, Guggenheim Securities and its affiliates and related entities and its and their respective Representatives may have public and private investments, lending arrangements and other relationships, including investments and business relationships held in a personal capacity as an advisor, consultant, board member or otherwise, in or with the Company and other Interested Parties.

For purposes hereof, the term "Interested Party" includes, without limitation, the Company, the Company's equity holder(s) or member(s) or creditors (including without limitation holders of debt issued under the Company's credit facilities), any Transaction Counterparty, other participants in any Transaction and the respective affiliates, subsidiaries, investment funds and portfolio companies of each of the foregoing parties.

In addition, at any given time, Guggenheim Securities and its affiliates and related entities and its and their respective Representatives may be engaged by and have business and personal relationships with one or more entities that may be competitors with, or otherwise adverse to, the interests of the Company or another Interested Party. As a result, it is possible that Guggenheim Securities and its affiliates and related entities and its and their respective Representatives may from time to time be involved in one or more capacities that, directly or indirectly, may be or may be perceived as being adverse to the interests of the Company or another Interested Party in the context of a potential Transaction or otherwise. Moreover, Guggenheim Securities and its affiliates and related entities, and its and their respective Representatives

may, in the course of such other relationships, have or in the future acquire or come into possession of information material to the interests of the Company or another Interested Party in the context of a potential or actual Transaction or otherwise, which, by virtue of such other relationships, Guggenheim Securities is not and will not be at liberty to disclose.

The Company understands and acknowledges that Guggenheim Securities, its affiliates or related entities and/or its or their respective directors, officers and/or employees may participate as a principal in connection with any Transaction effected by the Company. The Company hereby expressly acknowledges the benefits to it of Guggenheim Securities' and/or such parties' activities in this regard and waives and releases, to the fullest extent permitted by law, any claims that it may have against Guggenheim Securities, its affiliates or related entities and/or its or their respective directors, officers and/or employees with respect to any actual or perceived conflict of interest that may result from Guggenheim Securities' and/or such parties' activities in this regard.

Notwithstanding the foregoing, Guggenheim Securities agrees that, during the period of its engagement pursuant to this Agreement, Guggenheim Securities' investment banking department will not provide any investment banking services to any Transaction Counterparty specifically in connection with any Transaction.

Consistent with applicable legal and regulatory guidelines, Guggenheim Securities has adopted certain policies and procedures to establish and maintain the independence of its research departments and personnel. As a result, Guggenheim Securities' research analysts may hold views, make statements or investment recommendations and/or publish research reports with respect to the Company, any other Interested Party and/or any Transaction that differ from the views of Guggenheim Securities' investment banking personnel.

Any financing, derivative or other transactions executed by Guggenheim Securities, its affiliates or related entities and/or its or their respective directors, officers and/or employees as principal, lender, noteholder, initial purchaser or other similar role arising out of or relating to any Transaction or otherwise, including any commitment to underwrite, provide, place or purchase any financing or securities, will be negotiated, entered into and performed on an arm's length basis independent of this engagement. Nothing herein will constitute an express or implied agreement or commitment of any kind by Guggenheim Securities and/or its affiliates and related entities with respect to any such financing, derivative or other transactions. The Company, on its own behalf and on behalf of its affiliates, hereby expressly confirms that it and its affiliates will independently make their own analyses and decisions with respect to any such financing, derivative or other transactions based on such information as they deem appropriate and without reliance upon this engagement or any services or financial advice provided by Guggenheim Securities hereunder.

Without limitation of the foregoing, the Company hereby acknowledges and agrees that Guggenheim Securities, any of its affiliates and related entities and/or any of its or their respective Representatives (collectively, "GS Persons") may at any time (whether on, prior to or after the date hereof) be or become an investor in respect of the debt, equity and/or equity-linked securities of any Interested Party (in such capacity, a "Participating Investor," and any such investment, a "Participating Investment"). The Company acknowledges and agrees for itself and its affiliates that any Participating Investor (a) will be under no obligation or duty, whether as a result of Guggenheim Securities' role, engagement and/or provision of its advice or services pursuant to this Agreement or otherwise, to take any action or refrain from taking any action, or exercising any rights or remedies, that such Participating Investor may be entitled to take or exercise in respect of its Participating Investment, and (b) may manage its exposure and take any action or refrain from taking any action with respect to such Participating Investment without regard to Guggenheim Securities' engagement hereunder. The Company further agrees not to assert any claim against Guggenheim Securities or any GS Person based on any actual or potential conflict of interest that might be asserted to arise or result from, on the one hand, the engagement of Guggenheim Securities

to provide financial advisory services under this Agreement and, on the other hand, any GS Person's relationship with any Interested Party as a Participating Investor.

I.  The Company agrees that Guggenheim Securities may, at any time after public announcement of any proposed or definitive Transaction, (i) publicize (whether in the form of a so-called "tombstone," case study or otherwise) its involvement in such Transaction in customary investment banking pitchbooks, other client-oriented marketing materials (including e-mail blasts), Guggenheim Partners, LLC's and/or Guggenheim Securities' websites and certain other customary media (including, without limitation, newspapers, periodicals, annual reports and other publicly-disseminated marketing materials) and (ii) include in such publicity the Company's name and logo and a description of Guggenheim Securities' role in connection with such Transaction; *provided, however,* that Guggenheim Securities will not disclose any information regarding such Transaction which is not already publicly available (except that, in any event, Guggenheim Securities may disclose its involvement in connection with such Transaction). If requested by Guggenheim Securities, the Company agrees to use its commercially reasonable efforts to include a mutually acceptable reference to Guggenheim Securities and its role in connection with such Transaction in any press release or other public announcement which may be issued in connection with the matters described in this Agreement.

J.  To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing such business. Accordingly, the Company will provide Guggenheim Securities upon request with certain identifying information or documents sufficient to verify the Company's identity, including a government-issued identification number (*e.g.,* a US taxpayer identification number) and certain other information or documents necessary to verify the Company's identity (*e.g.,* a certificate of incorporation, a government-issued business license, a partnership agreement or a trust instrument). The Company represents and warrants that (x) the Company and each of its affiliates has complied and will comply with the USA Patriot Act, the U.S. Bank Secrecy Act and locally applicable anti-money laundering and anti-terrorism laws and regulations ("AML Laws") and (y) none of the proceeds of any Transaction will, directly or indirectly, be derived from or used for any purpose in violation of AML Laws.

K.  The Company represents and warrants that none of (i) the Company nor any of its directors, officers or employees, (ii) any person or entity controlling or controlled by the Company, (iii) any person or entity having a beneficial ownership interest in the Company and (iv) to the best of its knowledge, any subsidiary or affiliate or other person or entity for whom the Company acts as an agent or nominee is the subject of sanctions imposed by the United States (including, without limitation, by the Office of Foreign Assets Control of the U.S. Department of the Treasury or by the U.S. Department of State), the European Union, the United Nations, His Majesty's Treasury-UK or locally applicable sanctions laws ("Sanctions Laws") or located in or a resident of a country who is, or whose government is, the subject of Sanctions Laws, including Cuba, Iran, North Korea, Syria or the Crimea, Donetsk, Luhansk, Zaporizhzhia and Kherson regions of Ukraine (each, a "Sanctioned Jurisdiction"). The Company represents and warrants that it will not, in connection with the services rendered under this Agreement, engage or transact, either directly or indirectly, with any person or entity that is the subject of Sanctions Laws or located in or a resident of a Sanctioned Jurisdiction. The Company further represents that none of the proceeds of any Transaction will, directly or indirectly, be derived from or used for any purpose prohibited under Sanctions Laws or involving a Sanctioned Jurisdiction.

L.  The Company represents and warrants that it has complied and will comply with the US Foreign Corrupt Practices Act, the UK Bribery Act and any locally applicable anti-bribery or corruption laws ("Anti-Bribery Laws"), and has not and will not violate these laws. In connection with this Agreement, neither the Company nor any person or entity acting on its behalf, shall authorize the giving of, offer or promise to give, undue pecuniary or other advantage, or anything of value to a Public Official, or any other party in

violation of Anti-Bribery Laws.  As used herein, the term "Public Official" includes (a) any officer or employee of a government or any government department or agency; (b) any person or entity acting in an official capacity for or on behalf of a government or any government department or agency; (c) any officer or employee of a government investment vehicle owned or funded by a government, including but not limited to currency reserve funds, government-employee pension funds, and sovereign wealth funds; (d) any officer or employee of a company or business that is 25% or more owned or controlled by a government agency (even if such agency is not considered a public official under local law); (e) any officer or employee of a public international organization, such as the World Bank or the United Nations; (f) any officer or employee of a political party or any person or entity acting in an official capacity on behalf of a political party; and (g) any candidate for political office.  The Company further represents that none of the proceeds of any Transaction will, directly or indirectly, be derived from or used for any purpose in violation of Anti-Bribery Laws.

M.  Notwithstanding anything to the contrary herein, the Company and its Representatives will have no obligation to Guggenheim Securities to maintain the confidentiality of the tax treatment and tax structure of any Transaction or any portions of any materials of any kind (including opinions or other analyses) that are provided to the Company relating to such tax treatment and tax structure.  Regardless of any discussion of federal tax issues contained or referred to in any materials prepared by Guggenheim Securities in connection with its engagement hereunder, the Company understands and acknowledges that Guggenheim Securities does not provide, and will not be deemed to have provided, legal, tax, accounting, actuarial or other specialist advice; accordingly, the Company will consult its own legal, tax, accounting, actuarial and other professional advisors in connection with any Transaction or any other matter.

N.  Each of the Company and Guggenheim Securities irrevocably (i) submits to the jurisdiction of any court of the State of New York located in the Borough of Manhattan and/or the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of this Agreement or any of the agreements or transactions contemplated hereby (each, a "Proceeding"), (ii) agrees that all claims in respect of any Proceeding may be heard and determined in any such court, (iii) waives, to the fullest extent permitted by law, any immunity from jurisdiction of any such court or from any legal process therein, (iv) agrees that such courts will have exclusive jurisdiction over any claims in any Proceeding, (v) agrees not to commence any Proceeding other than in such courts and (vi) waives, to the fullest extent permitted by law, any claim that such Proceeding is brought in an inconvenient forum or venue that is otherwise improper.

Notwithstanding the foregoing, in the event the Company is or becomes a debtor in a Bankruptcy Case (whether voluntarily or involuntarily) and that Guggenheim Securities has been retained (pursuant to a final order by the Bankruptcy Court) to advise the Company in connection with such Bankruptcy Case in accordance with the terms of the Agreement, then during any such Bankruptcy Case any actions and proceedings arising out of or relating to this Agreement also may be heard and determined by the Bankruptcy Court or any court having appellate jurisdiction over the Bankruptcy Court.  If the Bankruptcy Court declines to assert jurisdiction over such proceedings or if the reference is withdrawn to the United States District Court, then such proceedings will be heard and determined as described in clause (i) of the immediately preceding paragraph.

The Company hereby irrevocably consents to the service upon it of process of any of the aforementioned courts in any such Proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Company at its address set forth above (or at such other address where it is located, if the above address is no longer correct), such service to become effective ten (10) business days after such mailing.

O.  The Company acknowledges and agrees that Guggenheim Securities will act under this Agreement as an independent contractor with obligations solely to the Company and is not being retained hereunder to

advise the Company as to the underlying business and/or financial decision to consummate any Transaction or with respect to any related financing, derivative or other transaction.  Nothing in this Agreement or the nature of Guggenheim Securities' financial advisory or other services will be deemed to create a fiduciary or agency relationship between (i) Guggenheim Securities and (ii) the Company or its equity holders, members, creditors, employees or any other Interested Party in connection with any Transaction or otherwise.  The Company further acknowledges and agrees that Guggenheim Securities is not the agent of and is not authorized to bind the Company with respect to any action or decision.  Other than as set forth in the Indemnification Provisions attached hereto or with respect to the Covered Persons (as defined and discussed below), nothing in this Agreement is intended to confer upon any other person or entity (including, without limitation, any of the Company's equity holders, members, creditors or employees, or any other Interested Party) any rights or remedies hereunder or related hereto.  The Company agrees that Guggenheim Securities and its affiliates and related entities, each of its and their controlling persons (within the meaning of the US federal securities laws), stockholders, members, directors, officers, managers, employees, consultants, legal counsel and agents and each of its and their respective heirs, successors and assigns (all of the foregoing, "Covered Persons") will not have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) in contract, tort or otherwise to the Company or to any person or entity claiming through the Company or in the Company's right in connection with the engagement of Guggenheim Securities pursuant to this Agreement, the matters contemplated hereby or any Transaction or conduct in connection therewith, except, with respect to any Covered Person, to the extent such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence, bad faith or willful misconduct of such Covered Person.  The Company further agrees that Guggenheim Securities will have no responsibility for any act or omission by any of the Company's other Representatives.

P.    The Company hereby represents and warrants that: (a) it is an "institutional account" within the meaning of FINRA Rule 4512(c), and that it has sufficient knowledge and experience in financial and business matters to be capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies involving a security or securities, as well as with regard to the economic risks and merits of any Transaction, and of assessing the suitability of such investments for its purposes, and (b) it has made and will continue to exercise its own independent judgment in evaluating Guggenheim Securities' advice hereunder and make its own inquiry and analysis with respect to any Transaction, and other terms thereof, and it has not relied upon and does not intend to rely upon any statement by Guggenheim Securities or any of the Covered Persons in connection with such inquiry or analysis or in connection with entering into and/or consummating any Transaction.

Q.    Each of Guggenheim Securities and the Company has all requisite power and authority to enter into this Agreement and perform its obligations hereunder.  This Agreement has been duly and validly authorized by all necessary action on the part of each such party and has been duly executed and delivered by each such party and constitutes a legal, valid and binding agreement of each such party, enforceable in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity).

R.    This Agreement (including this Annex and the Indemnification Provisions attached thereto) and the Confidentiality Agreement embody the entire agreement and understanding of the Company and Guggenheim Securities with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.  The provisions of this Agreement may not be waived, modified, amended or supplemented except pursuant to a writing (email being acceptable) agreed between Big Lots, Inc. and Guggenheim Securities.  This Agreement will inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns (including, in the case of the Company, any successor to all or a portion of the assets and/or the businesses of the Company under a Plan).

## INDEMNIFICATION PROVISIONS

Capitalized terms used herein without definition will have the meanings ascribed thereto in the letter agreement dated as of May 20, 2024 (as amended from time to time) between Big Lots, Inc. and Guggenheim Securities, LLC. As used in these Indemnification Provisions, the term "Guggenheim Securities" will be deemed to refer to and include each of Guggenheim Securities, LLC and its affiliates, each of its and their controlling persons (within the meaning of the US federal securities laws), stockholders, members, directors, officers, managers, employees, consultants, legal counsel and agents and each of its and their respective heirs, successors and assigns.

The Company hereby agrees to (a) indemnify and hold harmless Guggenheim Securities, to the fullest extent permitted by law, from and against any and all losses, claims, damages, obligations, penalties, judgments, awards and other liabilities (whether direct, joint and several or otherwise) as and when incurred by Guggenheim Securities (collectively, "Liabilities") and (b) fully reimburse Guggenheim Securities for any and all reasonable and documented fees, costs, expenses and disbursements (in all such cases, whether legal or otherwise) as and when incurred by Guggenheim Securities (collectively, "Expenses"), including those of investigating, preparing for (including, without limitation, preparing, reviewing or furnishing documents), participating in, defending against or giving testimony with respect to any private, regulatory, self-regulatory or governmental requests, inquiries, investigations, actions, claims, interrogatories, subpoenas, suits, litigation, proceedings or injunctions, whether or not in connection with any threatened or actual litigation, arbitration or other dispute resolution process and whether or not Guggenheim Securities is a direct party thereto (collectively, "Actions"), in the case of each of the foregoing clauses (a) and (b) whether directly or indirectly caused by, relating to, based upon, arising out of or in connection with any of the following: (w) any advice or services requested of, or rendered or to be rendered by, Guggenheim Securities pursuant to the Agreement, (x) any actions or inactions by Guggenheim Securities with respect to the Agreement, (y) any transaction or financing in connection with or related to the Agreement or (z) the determination and enforcement by Guggenheim Securities of its rights pursuant to the Agreement (including, without limitation, these Indemnification Provisions); *provided, however*, such indemnification agreement will not apply to any portion of any such Liability or Expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence, bad faith or willful misconduct of Guggenheim Securities (an "Excluded Portion") (and Guggenheim Securities shall refund to the Company any payment previously paid or reimbursed hereunder in respect of an Excluded Portion).

If any Action is commenced as to which Guggenheim Securities proposes to demand indemnification hereunder, it will notify the Company with reasonable promptness; *provided, however*, that any failure by Guggenheim Securities to notify the Company will not relieve the Company from its obligations hereunder, except to the extent to which the Company is materially prejudiced by such delay. If at any time during the pendency of any such Action, Guggenheim Securities determines in its good faith reasonable judgment that its interests with respect to such Action differ and/or conflict with the Company's interests with respect to such Action, then Guggenheim Securities will have the right to retain legal counsel of its own choice to represent it, and the Company will pay the reasonable and documented Expenses of such legal counsel; and such legal counsel will, to the extent it believes consistent with its professional responsibilities, cooperate with the Company and any legal counsel designated by the Company. The Company will be liable for any settlement of any claim against Guggenheim Securities made with the Company's written consent, which consent will not be unreasonably withheld. The Company will not, without the prior written consent of Guggenheim Securities, (a) settle or compromise any claim, (b) permit a default or (c) consent to any settlement or other such agreement or the entry of any judgment, in all of the foregoing cases in connection with or related to any Action with respect to which indemnification or contribution may be sought hereunder (whether or not Guggenheim Securities is an actual or potential party to such Action) or as to which any allegation of wrongful acts or omissions by Guggenheim Securities is not denied; *provided, however,* that the Company may agree to any such settlement, compromise or judgment that (x) includes a full and unconditional release of Guggenheim Securities from all liability arising out of such Action and (y) does not include a statement as to or an admission of fault,

culpability or failure to act by or on behalf of Guggenheim Securities, so long as in each case the Company confirms in writing and complies with its indemnification obligations hereunder with respect to such settlement, compromise or judgment.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these Indemnification Provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification is unavailable, in whole or in part, for any reason, then the Company, on the one hand, and Guggenheim Securities, on the other hand, will contribute to the Liabilities and Expenses to which the indemnified persons may be subject (a) in accordance with the relative benefits received (or anticipated to be received) by the Company, on the one hand, and Guggenheim Securities, on the other hand, in connection with Guggenheim Securities' engagement pursuant to the Agreement or (b) if the allocation provided by clause (a) immediately above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a), but also the relative fault of the Company, on the one hand, and Guggenheim Securities, on the other hand, in connection with the statements, acts or omissions which resulted in such Liabilities and Expenses. The Company agrees for purposes of this paragraph that the relative benefits to the Company and Guggenheim Securities of any contemplated transaction or financing (whether or not consummated) will be deemed to be in the same proportion as the total value paid, received or issued or contemplated to be paid, received or issued to or by the Company and its equity holders, creditors or contract counterparties in connection with such transaction or financing bears to the fees paid or payable to Guggenheim Securities pursuant to the Agreement. Notwithstanding the foregoing, Guggenheim Securities will not be obligated to contribute any amount pursuant to this paragraph that exceeds the amount of fees previously received by Guggenheim Securities pursuant to the Agreement. Each of the Company and Guggenheim Securities hereby agrees that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method which does not take into account the considerations referred to in this paragraph.

The Company's indemnification, contribution, reimbursement and other obligations pursuant to these Indemnification Provisions will be in addition to any liability that the Company may otherwise have, at common law or otherwise, to Guggenheim Securities and will be binding on the Company's successors and assigns. These Indemnification Provisions will (a) apply to Guggenheim Securities' engagement pursuant to the Agreement, any activities or actions of Guggenheim Securities relating to such engagement occurring prior to the date of such Agreement and any subsequent modification of or amendment to such Agreement and (b) remain in full force and effect following consummation of any Transaction and any termination or expiration of Guggenheim Securities' engagement pursuant to the Agreement.