# **EXHIBIT A**

Lease

LEASE
TABLE OF CONTENTS

Date:                    June 22, 1995
Landlord:        Central City South Associates
                 a Missouri general partnership
Tenant:          PNS Stores, Inc.,
                 a California corporation
Location:        Lemay Ferry Road and Forder Road
County of:       St. Louis
State of:        Missouri
Store No.:       364

1.    PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.    TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
3.    CONSTRUCTION OF THE PREMISES . . . . . . . . . . . . . . . . . . 11
4.    RENT AND RENT COMMENCEMENT DATE . . . . . . . . . . . . . . . . 17
5.    COMMON AREA . . . . . . . . . . . . . . . . . . . . . . . . . . 24
6.    REAL PROPERTY TAXES . . . . . . . . . . . . . . . . . . . . . . 36
7.    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
8.    USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
9.    UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
10.   MAINTENANCE, REPAIRS AND ALTERATIONS . . . . . . . . . . . . . . 49
11.   SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
12.   DAMAGE TO THE PREMISES; SHOPPING CENTER . . . . . . . . . . . . 59
13.   LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
14.   RIGHTS OF ACCESS . . . . . . . . . . . . . . . . . . . . . . . . 64
15.   ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . 65
16.   EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . 66
17.   TENANT'S DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . 70
18.   LANDLORD'S DEFAULT . . . . . . . . . . . . . . . . . . . . . . . 76
19.   ESTOPPEL CERTIFICATES . . . . . . . . . . . . . . . . . . . . . 78
20.   SUBORDINATION AND NONDISTURBANCE . . . . . . . . . . . . . . . . 79
21.   END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . 79
22.   LANDLORD'S WARRANTY OF TITLE; QUIET POSSESSION . . . . . . . . . 80
23.   BROKERAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
24.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . 82
25.   LEASE MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . 82
26.   ATTORNEYS' FEES . . . . . . . . . . . . . . . . . . . . . . . . 83
27.   NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
28.   SUCCESSORS . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
29.   INTERPRETATION . . . . . . . . . . . . . . . . . . . . . . . . . 84
30.   RELATIONSHIP OF PARTIES . . . . . . . . . . . . . . . . . . . . 85
31.   ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . 85
32.   OFFER TO LEASE . . . . . . . . . . . . . . . . . . . . . . . . . 86
33.   AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
34.   HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . 86
35.   ANNOUNCEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 87
36.   LIMITATION OF LANDLORD'S LIABILITY . . . . . . . . . . . . . . . 87
37.   SALE OF CENTER . . . . . . . . . . . . . . . . . . . . . . . . . 88
EXHIBIT "A"   LEGAL DESCRIPTION OF SHOPPING CENTER
EXHIBIT "B"   SITE PLAN
EXHIBIT "C"   LANDLORD'S WORK
EXHIBIT "D"   EXISTING EXCLUSIVE USE PROVISIONS

06/13/95/CENTCITY/LEASE1.W52

LEASE


     THIS LEASE, dated for reference purposes on the 22nd day

of _____June_____, 1995, is entered into by and between Central

City South Associates, a Missouri general partnership,

hereinafter referred to as "Landlord", and PNS Stores, Inc., a

California corporation, hereinafter referred to as "Tenant".


W I T N E S S E T H:


     In consideration of the mutual covenants and agreements

herein contained and of the due and faithful performance of each

and all of the terms, covenants and conditions hereof to be

performed, the parties agree as follows:


     1.   PREMISES.

     1.1  <u>The Premises and the Shopping Center</u>.  Landlord,

as owner in fee simple, hereby leases to Tenant and Tenant hereby

leases from Landlord, for the term and at the rental and upon the

covenants and conditions set forth herein, a store building to be

constructed and located near the intersection of Lemay Ferry Road

and Forder Road in an unincorporated area of the County of

St. Louis, State of Missouri, which building will consist of

approximately eighteen thousand (18,000) square feet of ground

floor area and will have a minimum frontage of one hundred twenty

(120) linear feet, and the land on which it is situated

06/13/95/CENTCITY/LEASE1.W52

(collectively, the "Premises"), together with all easements,
rights and appurtenances belonging thereto (collectively, the
"Easements") and subject only to Permitted Liens (as defined in
Section 22 below).  The Premises are part of a shopping center
known as Central City South Shopping Center (the "Shopping
Center").  The Shopping Center is legally described upon
Exhibit "A" attached hereto and made a part hereof.  The Premises
are located within the Shopping Center substantially as shown on
the site plan (the "Site Plan") attached hereto as Exhibit "B"
and made a part hereof.

      1.2   Tenant's Proportionate Share.  Except as otherwise
stated elsewhere in this Lease, Landlord and Tenant acknowledge
and agree that Tenant's share of certain expenses provided for in
this Lease is anticipated to be nine and seventy-six hundredths
percent (9.76%) ("Tenant's Proportionate Share"), which
percentage is determined by dividing the total ground floor area
of the Premises by the total floor area of all Leasable Buildings
(defined in Paragraph 1.3) as anticipated by the parties as of
the Rent Commencement Date (as hereinafter defined).  The total
ground floor area of the Premises shall be calculated by
measuring from the interior of exterior walls and from the middle
of any common walls.  The ground floor area of the Premises shall
not include any loading dock area.  In the event additional
Leasable Buildings are added to the Shopping Center thereby
increasing the total floor area of all Leasable Buildings, or in
the event Leasable Buildings are deleted from the Shopping Center

- 2 -

06/13/95/CENTCITY/LEASE1.W52

thereby decreasing the total floor area of all Leasable Buildings, then Tenant's Proportionate Share shall be recomputed by dividing the total floor area of the Premises by the total floor area of all Leasable Buildings, including such additional Leasable Buildings, or excluding such deleted Leasable Buildings, as the case may be; provided, however, in no event at any time during the Lease Term (defined in Paragraph 2.1) shall Tenant's Proportionate Share be more than ten and one-half percent (10.5%).

1.3  <u>Leasable Buildings</u>.  As used in this Lease, the term "Leasable Buildings" shall mean all buildings located or to be located in the Shopping Center as shown on the Site Plan, to the extent such buildings have in fact been constructed at the time in question, together with any additional buildings which are not shown on the Site Plan but which may hereafter be constructed in the Shopping Center or added to the Site Plan. The computation of total floor area shall exclude mezzanines but shall include all floors of any multi-story building.  Landlord anticipates that as of the Rent Commencement Date the total floor area of all Leasable Buildings will be approximately one hundred eighty-four thousand two hundred seventy-five (184,275) square feet.

2.  TERM.

2.1  <u>Lease Term</u>.  The primary term of this **Lease** shall commence on the Rent Commencement Date and shall continue through

- 3 -

06/13/95/CENTCITY/LEASE1.W52

January 31 of the year immediately following the fifteenth (15th) anniversary of the Rent Commencement Date (the "Primary Term"). All references in this Lease to the "Lease Term" shall mean the Primary Term and, upon the exercise of any option pursuant to Paragraph 2.2, the Primary Term as extended by any such options.

2.2  Options to Extend Term.  Provided that Tenant is not in default under this Lease at the time any option period provided for below is scheduled to commence, Tenant is hereby granted four (4) separate options to extend the Primary Term for additional consecutive periods of five (5) years each with the first such option period following the expiration of the Primary Term and subsequent option periods following the expiration of the immediately preceding option period, subject to all the provisions of this Lease.  Each option shall be deemed to have been automatically exercised by Tenant unless Tenant shall have given written notice to Landlord of Tenant's election not to exercise the option at least two hundred seventy (270) days prior to the commencement of the period of years to which such option applies.

2.3  Conditions Precedent.

2.3.1  Tenant's Conditions Precedent.  The satisfaction of each of the conditions hereinbelow specified shall constitute a condition precedent to the commencement of the Lease Term and to Tenant's obligations under this Lease.  In the event any condition specified below is not satisfied within the

- 4 -

06/13/95/CENTCITY/LEASE1.W52

time period set forth herein, Tenant shall have the right to terminate this Lease by written notice delivered to Landlord.

      (a)   Intentionally Omitted.

      (b)   Not later than sixty (60) days after the date of this Lease, Landlord shall submit to Tenant a Phase I environmental audit with respect to the Shopping Center prepared at Landlord's sole cost by a licensed environmental firm acceptable to Tenant. The environmental audit shall be performed in accordance with specifications approved by Tenant, and the results disclosed in such environmental audit shall be satisfactory to Tenant in its sole discretion. Tenant shall have thirty (30) days from and after receipt of said Phase I environmental audit within which to approve or disapprove the same. Tenant's failure to disapprove the audit within said thirty (30) day period shall constitute Tenant's approval thereof.

      (c)   Not later than forty-five (45) days after the later of (i) the date of this Lease, or (ii) Tenant's receipt from Landlord of front elevations of the Premises sufficient to enable Tenant to apply therefor, Tenant shall have procured, on terms and conditions acceptable to Tenant in its sole discretion, all government required signage and other permits, licenses and approvals necessary to enable Tenant to install Tenant's signs as described in Section 11, to fixturize the Premises and to conduct its intended business in the Premises. This subparagraph (c) is not intended to refer to or include any permits, licenses and

- 5 -

06/13/95/CENTCITY/LEASE1.W52

approvals which are not possible for a tenant to obtain prior to commencement of construction of the tenant's premises. If Tenant has not procured such permits, licenses and approvals within the 45 day period provided for herein, then within ten (10) days after the end of said 45 day period Tenant shall, by notice to Landlord, either terminate this Lease or waive this condition. Tenant's failure to give such notice within said ten (10) day period shall constitute Tenant's waiver of this condition.

(d)  Not later than one hundred eighty (180) days after the Scheduled Completion Date (as defined in Paragraph 3.5) (the "Outside Date"), Landlord shall have (i) Substantially Completed Landlord's Work (as such terms and defined in Article 3 below) and provided written notice thereof to Tenant; and (ii) delivered (A) vacant possession of the Premises in broom clean condition, with all fixtures, equipment and personal property removed and in full compliance with Landlord's representations and warranties set forth below in Paragraphs 10.2 and 10.6.2, and (B) uncontested use of the Easements.

(e)  Not later than thirty (30) days after (i) satisfaction or Tenant's written waiver of the conditions set forth in subparagraphs (b) and (c) of this Paragraph 2.3.1, (ii) approval of the Final Plans pursuant to Paragraphs 3.1 and 3.2, and (iii) satisfaction or Landlord's written waiver of the condition set forth in Paragraph 2.3.2, at no expense to Tenant, Tenant shall have received a fully-executed Non-Disturbance, Recognition and Attornment Agreement(s) from each holder of a

- 6 -

06/13/95/CENTCITY/LEASE1.W52

deed of trust and from each lessor having superior title to
Tenant, including without limitation the maker of the financing
to Landlord described in Paragraph 2.3.2 below.  Such Non-
Disturbance, Recognition and Attornment Agreement(s) shall be
acceptable to Tenant, in Tenant's reasonable discretion.

(f)  Not later than sixty (60) days after the date
of this Lease, Landlord shall have obtained from Central Hardware
a written consent to the execution of this Lease and to the use
of the Premises for the sale of discount general merchandise.

The entry of Tenant into the Premises for any of the
purposes described in Paragraph 14.1 below shall not constitute a
waiver of any of the conditions of this Paragraph 2.3.1.  If
Tenant elects to terminate this Lease under the provisions of
this Paragraph 2.3, neither party shall have any further rights
or obligations under this Lease after the effective date of such
termination except as otherwise provided in this Lease.

2.3.2  Landlord's Conditions Precedent.  The
satisfaction of the condition hereinbelow specified shall
constitute a condition precedent to the commencement of the Lease
Term and to Landlord's obligations under this Lease.  Landlord
shall have the right to terminate this Lease by written notice
delivered to Tenant in the event Landlord has not secured
financing for the performance of Landlord's Work on terms and
conditions reasonably acceptable to Landlord, within ninety (90)
days after the date of this Lease.  If Landlord elects to
terminate this Lease under the provisions of this

- 7 -

06/13/95/CENTCITY/LEASE1.W52

Paragraph 2.3.2, neither party shall have any further rights or obligations under this Lease after the effective date of such termination except as otherwise provided in this Lease.

    2.4  Intentionally Omitted.

    2.5  <u>Early Termination For Failure of Co-Tenancy or Co-Occupancy</u>. As a material inducement to the execution by Tenant of this Lease, Landlord represents that Landlord has entered into leases with the following named tenants (the "Co-tenants") for occupation of portions of the Shopping Center for the following use, total floor area and term:

| Tenant | Use | Total Floor Area | Primary Term Expiration | No. of Options | Final Expiration Date Incl. Options |
|--------|-----|------------------|-------------------------|----------------|--------------------------------------|
| Central Hardware | Home Improvement Center | 88,348 | 6/30/12 | 6 5-yr | 6/30/42 |
| Omni Sports | Sport-goods store | 25,804 | 7/29/00 | 1 3-yr | 7/29/03 |

Notwithstanding anything contained in this Lease to the contrary, in the event either Co-tenant (or any Replacement Tenant [as defined below] thereof) ceases to conduct retail business operations to the public for any reason whatsoever for a Reduced Occupancy Period (as defined below), then Minimum Rent shall automatically, immediately and without notice to Landlord abate to an amount equal to fifty percent (50%) of the Minimum Rent otherwise then payable pursuant to Paragraph 4.2 for a

- 8 -

06/13/95/CENTCITY/LEASE1.W52

period of time (said period of time being hereinafter referred to as an "Abated Rent Period") ending on the first (1st) to occur of (A) the date on which both such Co-tenants have recommenced (or their respective Replacement Tenants have commenced) retail business operations to the public, or (B) twelve (12) full calendar months.  At any time prior to the expiration of the eleventh (11th) full calendar month of an Abated Rent Period, Tenant shall have the right and option, by written notice to Landlord, to either (i) terminate this Lease effective upon the expiration of the Abated Rent Period, or (ii) not terminate this Lease in which case Minimum Rent shall fully revert to the amount otherwise then payable pursuant to Paragraph 4.2 effective upon the commencement of the first (1st) calendar month immediately following expiration of the Abated Rent Period.  In the event Tenant fails to timely provide such written notice to Landlord, then Tenant shall be deemed to have elected to not terminate this Lease whereupon this Lease shall remain in full force and effect and Minimum Rent shall automatically and without notice to Tenant fully revert to the amount otherwise then payable pursuant to Paragraph 4.2 effective upon the commencement of the first (1st) calendar month immediately following expiration of the Abated Rent Period.

As used herein, the term "Reduced Occupancy Period" shall mean a continuous period of one hundred eighty (180) days. As used herein, the term "Replacement Tenant" shall mean any single-user anchor retail tenant of recognized national or

- 9 -

06/13/95/CENTCITY/LEASE1.W52

regional standing with substantially similar name recognition, size, market presence and market share as the Co-tenant (or any Replacement Tenant thereof) in question.

It is the intent of Landlord and Tenant that Tenant's rights under this Paragraph 2.5 shall apply and be available to Tenant in the event either Co-tenant (or any Replacement Tenant thereof) shall assign its leases or sublease its premises if any such assignment or subletting results in a deviation from their respective uses or total floor areas as set forth in the table above or where the assignee or sublessee fails to meet the qualifications of a Replacement Tenant.

Failure by Tenant to exercise the right and option to terminate this Lease as set forth above in connection with any Co-tenant (or any Replacement Tenant thereof) shall not constitute a waiver of Tenant's rights under this Paragraph 2.5 with respect to any other Co-tenant (or any Replacement Tenant thereof) or any subsequent cessation of operations.  If Tenant elects to terminate this Lease under the provisions of this Paragraph 2.5, neither party shall have any rights or obligations under this Lease from and after the effective date of such termination except as otherwise provided in this Lease.

Notwithstanding the foregoing, Tenant acknowledges that Landlord may amend the Central Hardware lease for the purposes of downsizing the Central Hardware store to a total floor area which is not less than forty thousand (40,000) square feet and that such amendment shall not by itself be deemed to have resulted in

- 10 -

06/13/95/CENTCITY/LEASE1.W52

a cessation of business operations by Central Hardware for
purposes of this Paragraph 2.5.

    3.    CONSTRUCTION OF THE PREMISES.

        In accordance with the terms and conditions of this
Section 3, Landlord agrees to construct, at its expense, the
store building and other improvements that are to comprise the
Premises as generally described on Exhibit "C" attached hereto
and made a part hereof.  The construction of such building and
other improvements is collectively referred to in this Lease as
"Landlord's Work."  Notwithstanding the foregoing, Tenant shall
reimburse Landlord for Tenant's pro rata share of Landlord's
reasonable cost to acquire and install the multi-tenant pylon
sign which constitutes part of Landlord's Work.  Tenant's pro
rata share of such cost shall be that proportion thereof which
the size of Tenant's sign panel(s) bears to the total size of all
available sign panels on such sign pylon.  Tenant's pro rata
share shall be paid to Landlord within thirty (30) days after
Tenant's receipt of an invoice and reasonable supporting
documentation in connection therewith.

        3.1  Preparation of Final Plans.  Landlord acknowledges
receipt of a booklet entitled "PNS Stores, Inc. Developer Design
Criteria" dated March, 1995, hereinafter referred to as the
"Design Criteria".  The Design Criteria, which is hereby approved
by Landlord, contains a general description of Landlord's Work,
consisting of a building shell and certain interior improvements.

- 11 -

06/13/95/CENTCITY/LEASE1.W52

Prior to the date of this Lease, Tenant delivered to Landlord a set of criteria drawings and specifications for the Premises based upon and consistent with the Design Criteria. Within ten (10) days after the date of this Lease, Landlord shall have the right to approve in writing (which approval shall not be unreasonably withheld, delayed or conditioned) said criteria drawings and specifications for the Premises to the extent, and only to the extent, that same reflect differences from the Design Criteria. Landlord's failure to reasonably disapprove said differences, if any, within said ten (10) day period shall constitute Landlord's written approval thereof. Within thirty (30) days after approval of such criteria drawings and specifications, Landlord at its expense, shall cause the preparation and delivery to Tenant of a full set of working drawings and detailed specifications (collectively, the "Final Plans") for the construction of Landlord's Work, which Final Plans shall be prepared in accordance with the Design Criteria and the criteria drawings and specifications. Tenant shall have the right to approve the Final Plans, which approval shall not be unreasonably withheld. Within fifteen (15) working days after its receipt of the Final Plans, Tenant shall review such plans and notify Landlord, in writing, of any modifications thereto which Tenant deems necessary. Tenant's notice shall specify in reasonable detail any requested modifications. If Tenant's requested modifications are not acceptable to Landlord, and Landlord and Tenant do not resolve any unresolved issues within

- 12 -

06/13/95/CENTCITY/LEASE1.W52

twenty (20) days after Landlord's receipt of Tenant's notice,
then either Landlord or Tenant may terminate this Lease upon
written notice to other party.  After the Final Plans have been
approved by Landlord and Tenant, either Landlord or Tenant may
make reasonable modifications to the Final Plans with the
approval of the other party, which approval shall not be
unreasonably withheld, conditioned or delayed.

     3.2  <u>Governmental Approval</u>.  Promptly following
Tenant's approval of the Final Plans, Landlord shall apply for,
and exercise due diligence in obtaining approval from all
appropriate governmental agencies of the Final Plans and issuance
of all permits required to perform Landlord's Work.  After the
Final Plans have been so approved, a copy thereof shall be
initialled and dated by the parties.

     3.3  <u>Substantial Completion</u>.  As used in this Lease,
the terms "Substantial Completion" and "Substantially Completed"
shall mean (i) completion of construction of Landlord's Work in
accordance with the Final Plans, in such a condition that all
electrical, mechanical and building systems are fully operable
and in good working order (with all applicable tests for such
systems having been satisfactorily passed), and to the extent
that Tenant may reasonably begin the installation of its trade
fixtures, equipment and inventory and conveniently begin the
operation of its retail business in the Premises, without
hinderance from governmental authorities, construction operations
or inadequate parking facilities, loading facilities or ingress

- 13 -

06/13/95/CENTCITY/LEASE1.W52

and egress, with only minor work left to be completed by
Landlord; (ii) issuance by the appropriate governmental
authorities of a temporary certificate of occupancy or its
equivalent permitting the use and occupancy of the Premises by
Tenant for its intended purposes; and (iii) completion of all
work necessary to prepare any pylon or monument sign for the
installation of Tenant's sign panel thereon and to illuminate
such sign panel once installed.

3.4   Construction Schedule; Delivery of Possession.
Not later than thirty (30) days after the execution of this
Lease, Landlord shall provide Tenant with a schedule specifying
the expected progress in stages of Landlord's Work and showing
the Scheduled Completion Date (defined in Paragraph 3.5).
Thereafter, Landlord shall notify Tenant in writing of any
changes in the schedule or the date of Substantial Completion.
Landlord shall give Tenant written notice when Landlord believes
that Substantial Completion will be achieved within forty-five
(45) days.  When Landlord determines that Substantial Completion
has occurred, Landlord shall provide Tenant written notice
thereof.  Within thirty (30) days after Tenant's acceptance of
delivery of possession of the Premises, Tenant shall deliver to
Landlord a list of all items of Landlord's Work, if any, which
are incomplete or incorrect (the "Punch List").  Landlord shall
complete and correct all items on such Punch List within
thirty (30) days of the date of receipt of the Punch List in a
manner that shall not unreasonably interfere with Tenant's

- 14 -

06/13/95/CENTCITY/LEASE1.W52

activities in or access to the Premises.  Failure to include an
item on the Punch List shall not alter the responsibility of
Landlord to complete Landlord's Work.  Notwithstanding anything
to the contrary contained in this Lease, Tenant's entry into the
Premises shall not relieve Landlord of Landlord's obligations to
complete Landlord's Work (including, without limitation, items
listed on the Punch List) to the point of full and final
completion nor shall such entry constitute a waiver of Tenant's
rights to rent abatement under Paragraph 3.5 or a waiver of any
warranty or obligation of Landlord set forth in Paragraphs 10.2
or 10.3 of this Lease.

      3.5   <u>Scheduled Completion Date; Late Delivery; Rent</u>
<u>Abatement</u>.  Landlord shall, in compliance with all applicable
codes, laws, regulations and ordinances, completely construct
Landlord's Work in accordance with and in substantial conformity
to the Final Plans.  Landlord shall proceed diligently to
construct the Premises in accordance with and in substantial
conformity to the Final Plans.  Landlord shall cause Landlord's
Work to be Substantially Completed on or before the earlier of
(i) one hundred eighty (180) days after the date Landlord obtains
approval of the Final Plans and issuance of the permits described
in Paragraph 3.2, or (ii) two hundred seventy (270) days after
the date of this Lease (the "Scheduled Completion Date").

      (a)   Notwithstanding anything in this Lease to the
contrary, but subject to Section 24, in the event Landlord has
not tendered possession of the Premises to Tenant with Landlord's

- 15 -

06/13/95/CENTCITY/LEASE1.W52

Work Substantially Completed on or before the Scheduled Completion Date, then for each day after the Scheduled Completion Date that Landlord has not delivered possession of the Premises to Tenant with Landlord's Work Substantially Completed, through and including the thirtieth (30th) day after the Scheduled Completion Date, Tenant shall be entitled as liquidated damages to one (1) day of abatement of Minimum Rent and all other charges payable by Tenant under this Lease.

(b)   Notwithstanding anything in the Lease to the contrary, but subject to Section 24, in the event Landlord has not tendered possession of the Premises to Tenant with Landlord's Work Substantially Completed on or before the thirtieth (30th) day after the Scheduled Completion Date, then for each day from and after the thirty-first (31st) day after the Scheduled Completion Date that Landlord has not tendered possession of the Premises to Tenant with Landlord's Work Substantially Completed, Tenant shall be entitled as liquidated damages to one and one-half (1½) days abatement of Minimum Rent and all other charges payable by Tenant under this Lease.

(c)   It is hereby agreed that the liquidated damages to which Tenant is entitled hereunder is just compensation for the harm that would be caused by Landlord's failure to complete construction of Landlord's Work by the date(s) set forth herein.  Any abatement of Minimum Rent and other charges to which Tenant may become entitled pursuant to this Paragraph 3.5 shall be applied commencing with the first day

- 16 -

06/13/95/CENTCITY/LEASE1.W52

following the Rent Commencement Date with respect to which Tenant
would otherwise be obligated to begin paying Minimum Rent
pursuant to Paragraph 4.1 below and shall continue thereafter
until all such abatement is fully applied.

3.6  <u>Arbitration</u>.  In the event of a dispute during the
course of construction concerning Landlord's construction
obligations under this Article 3, such dispute shall be resolved
by agreement between Landlord's and Tenant's architects, and such
agreement shall be binding upon the parties.  If Landlord's and
Tenant's architects cannot resolve a dispute within five (5)
business days following the submission to them of the disputed
issue, Landlord's and Tenant's architects shall appoint a third
architect, who is unrelated to either party and who has no
interest in the project, to submit the disputed issue for
resolution.  The appointed architect shall resolve said disputed
issue and the determination of the third architect shall be
conclusive and binding upon both Landlord and Tenant.  Each party
shall pay for the expenses of its own architect and for fifty
percent (50%) of the expenses of the third architect.

4.  RENT AND RENT COMMENCEMENT DATE.

4.1  <u>Rent Commencement Date</u>.  Tenant's obligation to
pay Minimum Rent (defined in Paragraph 4.2), Percentage Rent
(defined in Paragraph 4.3), Taxes (defined in Paragraph 6.1),
Common Area Expenses (defined in Paragraph 5.4(a)) and all other
monetary obligations of Tenant under this Lease shall not

- 17 -

06/13/95/CENTCITY/LEASE1.W52

commence until the date which is the earlier of (i) the date upon which Tenant opens for business to customers in the Premises, or (ii) the date occurring sixty (60) days after the satisfaction or waiver of all conditions set forth in Paragraph 2.3 above (the "Rent Commencement Date" or "RCD").  Tenant shall provide written notice to Landlord of the occurrence of the RCD not later than fifteen (15) days after such occurrence.  Notwithstanding the foregoing, if the RCD has not occurred prior to November 15 of any given calendar year, then the RCD shall not occur until January 15 of the next succeeding calendar year unless Tenant opens the Premises for business to customers prior to such January 15 in which event the RCD shall be the date on which Tenant opens the Premises for business to customers.

4.2  <u>Minimum Rent</u>.  Commencing with the RCD, Tenant shall pay to Landlord, at such place or places as Landlord shall designate from time to time in writing, a fixed minimum monthly rent ("Minimum Rent"), payable in advance on the first day of each and every calendar month during the Lease Term, as follows:

(a)  for each month commencing on the RCD and continuing through the sixtieth (60th) full calendar month of the Primary Term, the sum of Twelve Thousand Three Hundred Seventy-Five Dollars ($12,375);

(b)  for each month commencing with the sixty-first (61st) full calendar month following the RCD and continuing through and including the one hundred twentieth (120th) full

- 18 -

06/13/95/CENTCITY/LEASE1.W52

calendar month of the Primary Term, the sum of Twelve Thousand
Seven Hundred Fifty Dollars ($12,750);

      (c)   for each month commencing with the one
hundred twenty-first (121st) full calendar month following the
RCD and continuing through and including the last month of the
Primary Term, the sum of Thirteen Thousand One Hundred Twenty-
Five Dollars ($13,125);

      (d)   for each month of the first five-year option
period immediately following the expiration of the Primary Term,
the sum of Fourteen Thousand Two Hundred Fifty Dollars
($14,250);

      (e)   for each month of the second five-year option
period immediately following the expiration of the Primary Term,
the sum of Fifteen Thousand Dollars ($15,000);

      (f)   for each month of the third five-year option
period immediately following the expiration of the Primary Term,
the sum of Fifteen Thousand Seven Hundred Fifty Dollars
($15,750); and

      (g)   for each month of the fourth five-year option
period immediately following the expiration of the Primary Term,
the sum of Sixteen Thousand Five Hundred Dollars ($16,500).

      Upon Tenant's acceptance of possession of the Premises
from Landlord, Tenant may measure the ground floor area of the
Premises.  In the event such measurement indicates that the
ground floor area of the Premises is less than the square footage
set forth in Paragraph 1.1 above, then Tenant's Proportionate

- 19 -

06/13/95/CENTCITY/LEASE1.W52

Share shall be redetermined in accordance with the formula set
forth in Paragraph 1.2 above, Minimum Rent for each period of the
Lease Term specified in Paragraphs 4.2(a) through (g) above shall
be decreased on a pro rata basis determined by multiplying the
Minimum Rent for each such period by a fraction, the numerator of
which shall be the ground floor area of the Premises as measured
pursuant to this paragraph and the denominator of which shall be
the square footage set forth in Paragraph 1.1 above.

        If the RCD occurs on a day other than the first day of
a calendar month, then Minimum Rent and all other monetary
obligations of Tenant under this Lease shall be prorated on a per
diem basis for the partial month extending from the RCD to the
beginning of the next full calendar month and shall be payable on
the first day of such next calendar month or when otherwise due
and payable in accordance with the terms hereof.

        4.3  <u>Percentage Rent</u>.  In addition to Minimum Rent,
Tenant shall pay an amount equal to one and one-half percent
(1.5%) of that portion, if any, of Gross Receipts which are in
excess of the following amounts (the "Breakpoints") with respect
to each Lease Year ("Percentage Rent"):

| Lease Years | Breakpoints |
|---|---|
| RCD through 5 | $ 9,900,000 |
| 6 through 10 | $10,200,000 |
| 11 thru end of Primary Term | $10,500,000 |
| First Option Period | $11,400,000 |
| Second Option Period | $12,000,000 |

- 20 -

06/13/95/CENTCITY/LEASE1.W52

| | |
|---|---|
| Third Option Period | $12,600,000 |
| Fourth Option Period | $13,200,000 |

4.3.1 <u>Statements and Payments</u>. Tenant shall deliver to Landlord a statement, within sixty (60) days after the end of each Lease Year, reporting the Gross Receipts of Tenant during such Lease Year and calculating the Percentage Rent required to be paid by Tenant with respect to such Lease Year. Concurrently with the submission of said statement, Tenant shall pay to Landlord the Percentage Rent shown as due thereon. The statement of Gross Receipts shall be certified to be correct by a responsible employee of Tenant.

4.3.2 <u>Books and Records</u>. Tenant shall maintain at its principal business office an accurate set of books and records of all sales of merchandise and all revenue derived from the conduct of business upon the Premises from which Gross Receipts can be determined. Tenant shall retain for at least twenty four (24) months after the expiration of each Lease Year all sales records therefor customarily preserved or kept by Tenant in the normal conduct of its business.

4.3.3 <u>Audit</u>. Landlord and Landlord's authorized agents shall have the right upon at least thirty (30) days' prior written notice, during business hours, but not more often than once each Lease Year, to inspect and audit the books, records and other documents of Tenant relating to Gross Receipts. Landlord's right to audit with respect to any Lease Year shall expire twenty

- 21 -

06/13/95/CENTCITY/LEASE1.W52

two (22) months after the end of each such Lease Year.  If it is determined by any audit or otherwise that any annual statement of Gross Receipts delivered by Tenant to Landlord was not correct, the statement shall be adjusted and one party shall pay to the other upon demand such sum as may be necessary so that the correct amount of Percentage Rent will have been paid by Tenant to Landlord.  If the Gross Receipts shown by any annual statement for any Lease Year are found to be understated by five percent (5%) or more, and additional Percentage Rent is due on account of such understatement, Tenant shall pay to Landlord the reasonable cost of such audit or inspection.

4.3.4  <u>Gross Receipts</u>.  The term "Gross Receipts" shall mean the aggregate of all gross sales by Tenant of merchandise to the public made for cash or credit at, upon or from the Premises during the Lease Term, excluding the following:

(1)   the selling price of all merchandise returned by customers and accepted for full credit or the amount of discounts, refunds or allowances made thereon;

(2)   the amount of credit sales determined to be uncollectible or any penalty charged by Tenant for a returned check;

(3)   the cost of goods returned to suppliers or transferred to another store or warehouse owned by or affiliated with Tenant not for the purpose of completing a sale of such goods made at or from the Premises;

- 22 -

06/13/95/CENTCITY/LEASE1.W52

          (4)   sums and credits received in settlement of claims for loss of, or damage to, merchandise;

          (5)   proceeds from the sale of merchandise sold in bulk to buyers other than regular retail customers or of store equipment or trade fixtures;

          (6)   interest, service charges, sales carrying charges or similar charges however designated paid by customers for extension of credit on sales and which were not included in the sales price of the merchandise or services;

          (7)   interest, discounts or other charges however designated paid by Tenant to credit card companies for the extension of credit on sales charged by customers on credit card purchases;

          (8)   receipts from public telephones, stamp machines, slot machines, sales of lottery tickets, public toilet locks, money orders, scales, candy, peanut, gum and other vending machines and mechanical entertainment devices;

          (9)   the amount of gift certificates or similar vouchers, until such time as the same shall have been converted into a sale by redemption;

          (10)   sales taxes, use taxes, luxury taxes, consumer excise taxes, gross receipts taxes, and other similar taxes now or hereafter imposed upon the sale of merchandise or services, whether or not such taxes are added separately to the selling price of merchandise or services and collected from

- 23 -

06/13/95/CENTCITY/LEASE1.W52

customers or paid by the seller and included in the retail selling price; and

(11)    the selling price of all merchandise sold at a discount to employees of Tenant or any corporation controlling, controlled by or under common control with, Tenant.

4.3.5  <u>Lease Year Defined</u>.  As used in this Lease, the term "Lease Year" shall mean:

(a)    With respect to the first Lease Year, that period of time commencing on the RCD and ending on the next succeeding January 31; and

(b)    With respect to each Lease Year other than the first Lease Year, each twelve (12) month period ending on January 31 during the Lease Term.


5.    COMMON AREA.

5.1  <u>Definition of Common Area</u>.  As used in this Lease, the term "Common Area" means all portions of the Shopping Center shown upon the Site Plan other than those which are depicted as building areas or loading docks, and shall include, without limitation, any future building areas until such time as construction is commenced thereon (at which time such areas shall be deemed "building areas") and all parking areas, aisles, driveways, landscaping, sign monuments and pylons, entrances, exits, walkways, sidewalks, roadways, service roads, lighting facilities used to illuminate the Common Area, surface drainage facilities, traffic control signs and fences.

- 24 -

06/13/95/CENTCITY/LEASE1.W52

5.2   <u>Tenant's Rights in the Common Area</u>.

(a)   Landlord hereby grants to Tenant, its successors and assigns, for the use of Tenant, its customers, employees, invitees, licensees, visitors and contractors free of charge (except Tenant's Proportionate Share of Common Area Expenses), a non-exclusive easement over all portions of the Common Area and to and from streets and highways adjoining the Shopping Center and access easements appurtenant thereto for the purpose of parking, delivery and transportation of merchandise, and for pedestrian and vehicular ingress and egress.   In addition, Tenant shall have the right to the exclusive use of loading facilities and related areas adjacent to the Premises as may be reasonably necessary for loading and unloading merchandise and for the parking of its trucks and trailers.   Tenant agrees that all deliveries to the Premises shall be accomplished through or from the side or rear of the Premises.   Tenant shall also have the right to (i) install and maintain a courier box in front of the Premises for Tenant's internal operations; and (ii) conduct sales on the sidewalk or walkway located immediately in front of the Premises.

(b)   Landlord covenants and agrees to provide, maintain and preserve during the Lease Term all of the Common Area for the non-exclusive use and benefit of Tenant, its successors and assigns, other occupants, tenants and subtenants of the Shopping Center and their respective customers, employees, invitees, licensees, visitors and contractors.   Except by written

- 25 -

06/13/95/CENTCITY/LEASE1.W52

amendment to this Lease, which amendment shall substitute a new
Site Plan showing such changes to the Common Area, Landlord shall
not make and shall not allow anyone to make any changes
whatsoever to the shape, size, location, layout, nature or extent
of any portion of the Common Area including, without limitation
(i) the construction of any buildings, signs, kiosks or other
structures, whether temporary or permanent; (ii) the erection of
any barriers or fences or other alterations affecting parking or
access in or to the Common Area; or (iii) the construction of any
building in excess of one story on any area depicted on the Site
Plan as a future building area.  Without limitation of the
foregoing, Landlord agrees that any building to be constructed in
the building area designated "Future Fast Food" on the Site Plan
shall contain no more than 4,000 square feet of floor area and
shall not be greater than one story in height.  Notwithstanding
the foregoing, Landlord shall have the right to close all or any
portion of the Common Area to such extent, and only to the
extent, as may be legally sufficient to prevent a dedication
thereof or the accrual of any right therein to any person or the
public.  The easements, covenants and restrictions herein set
forth shall run with the land and shall be a burden upon the
Common Area for the benefit of the Premises and binding upon
Landlord and Landlord's heirs, successors and assigns.

        5.3  <u>Landlord's Common Area Responsibilities</u>.  Landlord
at all times during the Lease Term shall insure, maintain and
replace the Common Area so that the Common Area is kept in good

- 26 -

06/13/95/CENTCITY/LEASE1.W52

and clean condition throughout the Lease Term.  Landlord's Common Area responsibilities shall include but not be limited to the following:

        (a)  Maintaining the parking, driveway areas and sidewalks in good condition and repair, free of ice and snow and in compliance with all applicable laws, rules, regulations and ordinances;

        (b)  Removing all debris and thoroughly sweeping the Common Area to the extent reasonably necessary to maintain them in a clean and orderly condition;

        (c)  Maintaining all exits, monument signs, sign pylons, directional signs, markers, refuse receptacles and lights in good repair and condition;

        (d)  Providing utilities for lighting and landscaping and sign monuments and pylons;

        (e)  Cleaning all lighting fixtures and common signs and relamping as needed;

        (f)  Repainting and restriping of parking areas and repairing parking bumpers as necessary;

        (g)  Maintaining all landscaped areas in good and healthy condition and repairing automatic sprinkler systems, if any, and water lines and making replacements of landscaping as necessary;

        (h)  Trimming or pruning landscaping **where** necessary to preserve maximum visibility of Tenant's building and pylon or monument signs;

- 27 -

06/13/95/CENTCITY/LEASE1.W52

(i)   Maintaining and repairing all storm drain lines, sewers, utility lines and other services located in the Common Area necessary for the operation of the Common Area;

(j)   Providing adequate security over all parts of the Common Area for the benefit of all occupants of the Shopping Center and their customers and employees and their personal property; and

(k)   Maintaining the following insurance policies with respect to the Common Area:

(I)   Comprehensive general liability insurance of One Million Dollars ($1,000,000) each occurrence limit and Two Million Dollars ($2,000,000) general aggregate limit for bodily injury and property damage occurring in or upon the Common Area and naming Tenant as an additional insured thereon and issued by companies meeting the standards set forth in Paragraph 7.3 below; and

(II)   Property insurance covering the Common Area in an amount not less than the full Replacement Cost (as defined in Paragraph 12.3 below) thereof and issued by companies meeting the standards set forth in Paragraph 7.3 below.

A certificate or certificates of insurance evidencing the policies described in Paragraph 5.3(k) above shall be delivered to Tenant within ten (10) days after commencement of Landlord's Work and shall provide that such policies may not be cancelled or modified without at least thirty (30) days prior written notice to Tenant.  The certificate or certificates shall

- 28 -

06/13/95/CENTCITY/LEASE1.W52

also provide that Tenant shall receive notice of renewal of such insurance not later than thirty (30) days prior to the scheduled expiration date of each such policy.

5.4  Common Area Expenses.

(a)  Definition.  Subject to Paragraph 5.4(b) below, as used in this Lease the term "Common Area Expenses" means all costs reasonably incurred by Landlord in performing Landlord's obligations under Paragraph 5.3 hereof with respect to the Common Area including premiums for public liability and property insurance as described in Paragraph 5.3(k) above to the extent applicable to the Common Area.  Common Area Expenses shall also include an administrative fee to Landlord as reimbursement for Landlord's overhead cost and administrative services in an amount not to exceed nine percent (9%) of Common Area Expenses excluding (w) property management services performed by independent contractors of Landlord, (x) insurance premiums, (y) utilities, and (z) the amount by which any single expenditure or item of Common Area Expenses exceeds Twenty Thousand Dollars ($20,000).  In no event shall such administrative fee be applied to Taxes.

(b)  Exclusions.  Notwithstanding Paragraph 5.4(a) above, in no event shall any of the following be included in Common Area Expenses: (i) expenses for accounting, legal or other professional services; (ii) salaries, benefits and other expenses or compensation of officers, employees (except for on-site janitorial personnel) and agents of Landlord, including without

- 29 -

06/13/95/CENTCITY/LEASE1.W52

limitation, any on-site or off-site management personnel;
(iii) costs related to repairs or other work occasioned by any
cause for which Landlord is obligated to maintain insurance under
this Lease or as to which Landlord receives reimbursement from
third parties; (iv) costs related to repairs, maintenance or
other work performed on any building in the Shopping Center or
costs related to any repairs, maintenance or other work which
exclusively benefits one other occupant of the Shopping Center;
(v) construction costs for the Common Area or costs related to
correcting defects in the construction of the Common Area or
costs related to making the Common Area comply with laws, rules
and orders of federal, state and municipal authorities;
(vi) expenses resulting directly or indirectly from the
negligence or willful misconduct of Landlord or its agents or
employees; (vii) expenditures which in accordance with generally
accepted accounting principles are not fully chargeable to
current expense in the year the expenditure is incurred, except
to the extent of a reasonable allowance for amortization over the
useful life of those capital expenditures which are directly
related to the repair, maintenance or replacement of the Common
Area pursuant to Paragraph 5.3 of this Lease and which
expenditures are reasonably necessary under the circumstances;
(viii) expenditures for individual items which exceed Twenty
Thousand Dollars ($20,000) per expenditure (other than for snow
removal expenses and insurance premiums) unless Landlord shall
have first advised Tenant of any such proposed expenditure and

- 30 -

06/13/95/CENTCITY/LEASE1.W52

Tenant shall have approved the same in writing prior to incurring
the expense, such approval not to be unreasonably withheld or
delayed; (ix) premiums for any insurance policies not required by
this Lease to be maintained by Landlord, except that Common Area
Expenses may include premiums for an umbrella policy of
comprehensive general liability insurance covering the Common
Area, with coverage limits not to exceed Nine Million Dollars
($9,000,000.00) combined single limit pertaining to bodily injury
and property damage occurring in or upon the Common Area, in
addition to the insurance policy required pursuant to Paragraph
5.3(k)(I); (x) depreciation on any personal or real property;
(xi) financing costs associated with any personal or real
property including, without limitation, interest, principal
amortization, ground lease payments, points, late payment fees,
commissions and legal fees; (xii) expenses in the nature of
interest, fines or penalties; (xiii) contributions to charitable
and political groups; (xiv) fees, dues or expenses incurred for
or relating to any merchants' association or for the purpose of
advertising, promoting or otherwise marketing the Shopping
Center; and (xv) expenses related to the investigation and/or
remediation of Hazardous Materials (whether such Hazardous
Materials exist in the Common Area) except if first brought into
the Shopping Center by Tenant, or its agents, employees,
licensees or contractors.  Common Area Expenses shall be reduced
by the amount of any insurance proceeds or other reimbursement,
recoupment, payment, discount or allowance or the like received

- 31 -

06/13/95/CENTCITY/LEASE1.W52

or receivable by Landlord that is properly allocable to Common Area Expenses.

   (c) <u>Payment by Tenant</u>.  Within thirty (30) days after execution of this Lease and thereafter not less than sixty (60) days prior to the commencement of each calendar year during the Lease Term, Landlord shall notify Tenant in writing of the amount of Common Area Expenses and Tenant's Proportionate Share thereof which Landlord reasonably estimates will be incurred during the calendar year then commencing.  Commencing on the Rent Commencement Date, and on the first day of each month thereafter, Tenant shall pay to Landlord one-twelfth (1/12) of Tenant's Proportionate Share of such estimated Common Area Expenses for the then current calendar year.  Within forty-five (45) days after the end of each calendar year, Landlord shall furnish to Tenant an itemized statement of Common Area Expenses with respect to such calendar year, certified as correct by Landlord or by a responsible officer, employee or agent of Landlord in the event Landlord is a corporation.  Such Common Area Expenses statement shall show, in reasonable detail, the individual items comprising Common Area Expenses, the aggregate amount of Common Area Expenses for the calendar year, the computation of Tenant's Proportionate Share thereof and the total estimated payments previously made by Tenant with respect to such calendar year.  At Tenant's request, Landlord shall provide Tenant with copies of cancelled checks, invoices and other reasonable verification of the expenses shown on the statement.

     - 32 -

06/13/95/CENTCITY/LEASE1.W52

If such statement indicates that Tenant's Proportionate Share of Common Area Expenses for any calendar year exceeds the total payments previously made by Tenant with respect to such calendar year, Tenant shall pay Landlord the deficiency within forty-five (45) days after the receipt of Landlord's statement. If Landlord's statement indicates that the total payments made by Tenant for any calendar year exceed Tenant's Proportionate Share of Common Area Expenses incurred with respect to such calendar year, then Landlord shall pay the excess to Tenant concurrently with the delivery to Tenant of Landlord's statement.  In the event Landlord fails to timely provide any such annual statement, Tenant may defer remitting to Landlord Tenant's Proportionate Share of estimated Common Area Expenses as required by the second sentence of Paragraph 5.4(c) until such time as Tenant receives such statement.

(d)   <u>Limitation of Tenant's Proportionate Share of Certain Expenses</u>.  Landlord has estimated that the aggregate of Tenant's Proportionate Share of Taxes, Common Area Expenses (excluding those related to providing security) and property insurance premiums pursuant to Paragraph 7.1 below will be Two Dollars ($2.00) per square foot for the first full calendar year following the RCD.  Notwithstanding anything contained in this Lease to the contrary, (i) in no event shall Tenant's obligation to pay Tenant's Proportionate Share of Taxes, Common Area Expenses (excluding those related to providing security) and property insurance premiums pursuant to Paragraph 7.1 exceed Two

- 33 -

06/13/95/CENTCITY/LEASE1.W52

Dollars ($2.00) per square foot of ground floor area in the
Premises for the first full calendar year following the RCD, and
(ii) in no event shall Tenant's obligation to pay Tenant's
Proportionate Share of Common Area Expenses (excluding snow
removal expenses) or earthquake insurance premiums pursuant to
Paragraph 7.1 increase in any calendar year by more than five
percent (5%) from the actual amount expended by Tenant for Common
Area Expenses (excluding snow removal expenses) or earthquake
insurance premiums with respect to the preceding calendar year.

      (e)  <u>Landlord's Maintenance of Records</u>. Landlord
shall maintain accurate records and books of account prepared in
accordance with generally accepted accounting principles for the
Common Area Expenses.  Landlord shall retain such books and
records for a period of twenty four (24) months after the
delivery to Tenant of the annual statement with respect to which
such books and records relate.  Tenant may, upon thirty (30)
days' prior notice to Landlord, inspect and make copies of such
books and records and other supporting information at Tenant's
expense.  In the event that a review of said books and records
conducted by Tenant discloses that Tenant's Proportionate Share
of Common Area Expenses for any calendar year has been overbilled
by more than five percent (5%), then Landlord shall pay to Tenant
the reasonable cost of such review.  If it is determined by any
review or otherwise that any annual statement of Common Area
Expenses delivered by Landlord to Tenant was not correct, the
statement shall be adjusted and one party shall pay to the other

- 34 -

06/13/95/CENTCITY/LEASE1.W52

upon demand such sum as may be necessary so that the correct amount of Common Area Expenses will have been paid by Tenant to Landlord.

5.5  Competitive Pricing.  Landlord agrees that any and all Common Area maintenance and related work which is performed by a person or entity other than Landlord shall be performed (a) by persons and/or entities not affiliated with Landlord, and (b) at prices which are competitive with comparable services available in the geographical region where the Shopping Center is located.

5.6  REAs.

Without Tenant's prior written consent, Landlord will not enter into or amend any reciprocal easement agreements, development agreements, operating agreements, maintenance agreements or other instruments affecting the use, occupancy, benefits or burdens pertaining to the Premises or the Shopping Center or any portion thereof (collectively, the "REAs") if such REA would or could reasonably be considered to impair (i) pedestrian or vehicular ingress or egress from the Shopping Center or the Premises, whether for customers, for the delivery of merchandise, or otherwise; (ii) the visibility of the Premises including, without limitation, the storefront of the Premises, any of Tenant's signage on the Premises or on any sign monument or sign pylon on which Tenant is represented in the Shopping Center, or (iii) the proximity, quantity or accessibility of parking spaces within the Common Area.  Landlord hereby assigns

- 35 -

06/13/95/CENTCITY/LEASE1.W52

to Tenant all rights and benefits which Landlord may hereafter
acquire under any REAs relating to the operation or maintenance
of the Shopping Center or any portion thereof, including, without
limitation, the right to exercise any and all remedies which
Landlord may have or hereafter acquire under the REAs.

6.    REAL PROPERTY TAXES.

6.1  Payment by Landlord.  Landlord shall pay in full
before delinquency all ad valorem real property taxes and
assessments, general and special, which shall be assessed or
imposed upon and which shall become due and payable during the
Lease Term with respect to the Shopping Center or any part
thereof or any improvements thereon (collectively, "Taxes").

6.2  Reimbursement by Tenant.  Subject to Paragraph 6.3
below, Tenant shall reimburse Landlord for Tenant's Proportionate
Share of the amount of Taxes less any discount available to
Landlord for prompt payment of such Taxes regardless of whether
such prompt payment is actually made.  Taxes shall be prorated
between Landlord and Tenant as of the RCD or the date of
termination, as the case may be.

6.3  Time of Reimbursement.  All reimbursements for
Taxes to be made by Tenant as provided in Paragraph 6.2 above
shall be made on or before the later of (i) thirty (30) days
after written request therefor is given to Tenant by Landlord, or
(ii) thirty (30) days prior to the date that the payment to the
taxing authority becomes delinquent.  Notwithstanding the

- 36 -

06/13/95/CENTCITY/LEASE1.W52

foregoing, in no event shall Tenant be obligated to reimburse
Landlord for the amount of any Taxes unless Landlord shall first
have delivered to Tenant (y) a copy of the tax statement, and
(z) a schedule setting forth the method of determining Tenant's
Proportionate Share including calculations of any tax allocation
and documents supporting such calculations.  Within thirty (30)
days after receipt of Tenant's written request, Landlord shall
deliver to Tenant copies of cancelled checks or copies of
receipts from the taxing authority evidencing Landlord's payment
of Taxes to the taxing authority.  In the event that Landlord at
any time fails to deliver such evidence to Tenant within said
thirty (30) day period, Tenant shall be entitled to make all
future checks for Tenant's Proportionate Share of Taxes payable
directly to the order of the taxing authority.

6.4  <u>Bonded Assessments</u>.  If any general or special
assessment is levied and assessed against the Premises which by
law is payable at the option of the taxpayer in installments,
Tenant may pay its share of such assessment in installments as
the same become due together with any interest due thereon,
notwithstanding the fact that Landlord may elect to pay such
assessment in full.

6.5  <u>Right to Contest</u>.

(a)  Tenant shall have the right at its expense to
contest the rate, legality or validity of any tax or assessment
provided herein to be paid by Tenant, but no such contest shall
be carried on or maintained by Tenant after such taxes or

- 37 -

06/13/95/CENTCITY/LEASE1.W52

assessments become delinquent unless Tenant shall (i) pay its
share of the amount involved under protest, or (ii) procure and
maintain a stay of all proceedings to enforce collection,
forfeiture and sale and provide for payment thereof together with
all penalties, interest, costs and expenses by the deposit of a
sufficient sum of money or by a good and sufficient undertaking
or other means required or permitted by law to accomplish such
stay.  At the request of Tenant, Landlord will execute or join in
the execution of any instrument or documents reasonably required
by Tenant in connection with any such contest.  Upon the final
determination of any such contest in which Tenant prevails and
upon receipt by Landlord of the refund of Taxes, Landlord shall
reimburse (i) Tenant's reasonable expenses and costs incurred in
connection with such contest upon demand by Tenant to the extent
in excess of Tenant's Proportionate Share of such expenses and
costs, and (ii) Tenant's Proportionate Share of such refund.

            (b)   Landlord may contest the rate, legality or
validity of any tax or assessment imposed upon the Shopping
Center or the Premises, but no such contest shall be carried on
or maintained by Landlord after such taxes or assessments become
delinquent unless Landlord shall (i) pay the amount involved
under protest, or (ii) procure and maintain a stay of all
proceedings to enforce collection, forfeiture and sale and
provide for payment thereof together with all penalties,
interest, costs and expenses by the deposit of a sufficient sum
of money or by a good and sufficient undertaking or other means

- 38 -

06/13/95/CENTCITY/LEASE1.W52

required or permitted by law to accomplish such stay.  Upon the
final determination of any such contest in which Landlord
prevails and upon receipt by Landlord of the refund of Taxes,
Landlord shall deduct from the refund Landlord's reasonable
expenses incurred in connection with such contest and return to
Tenant Tenant's Proportionate Share of the remaining portion of
such refund.  Landlord's expenses in connection with any such
contest shall be supported by documentation reasonably
satisfactory to Tenant.

      6.6  <u>Limitation</u>.  Nothing in this Lease shall require
Tenant to pay any business tax, personal property tax, rent tax,
franchise tax, income tax, excess profits tax, estate tax,
inheritance tax, succession tax, capital levy, transfer tax or
any other tax assessed or levied against the Landlord except as
provided in this Section 6; provided, however, the reference in
this Paragraph 6.6 to "rent tax" shall not be construed to
relieve Tenant from paying its Proportionate Share of any Taxes
which are assessed by the taxing authority by reference to the
attributed rental value of the property in question.


      7.    INSURANCE.

      7.1  <u>Property Insurance</u>.  After the date of this Lease
and at all times during the Lease Term, Landlord at its expense
shall maintain an "all risk" (as such term is customarily used
and accepted in the insurance industry) form policy of insurance
covering the Shopping Center (excluding Tenant's alterations,

- 39 -

06/13/95/CENTCITY/LEASE1.W52

additions, other leasehold improvements, furniture, fixtures, trade fixtures, equipment or other personal property at the Premises) against physical loss or damage (excluding flood) in an amount not less than the full Replacement Cost thereof. A certificate of insurance evidencing the insurance coverage required hereunder shall be delivered to Tenant within ten (10) days after commencement of Landlord's Work and shall provide that the policy may not be cancelled or modified without at least thirty (30) days prior written notice to Tenant. The certificate shall also provide that Tenant shall receive notice of renewal of such insurance policy annually not later than thirty (30) days prior to the policy's scheduled expiration date. In case of loss or damage, the proceeds of such insurance shall be applied on account of Landlord's obligations pursuant to Section 12 below.

In the event such policy covers all Leasable Buildings, Tenant shall reimburse Landlord for Tenant's Proportionate Share of the policy premium. In the event such policy does not cover all Leasable Buildings, Tenant shall reimburse Landlord for a portion of the policy premium based upon a fraction, the numerator of which shall be the ground floor area of the Premises and the denominator of which shall be the total floor area of all Leasable Buildings covered by such insurance premium. Provided that Tenant is in possession of a current certificate of insurance or renewal notice, as the case may be, Tenant shall, commencing with the Rent Commencement Date, make such reimbursement within thirty (30) days after Landlord delivers

- 40 -

06/13/95/CENTCITY/LEASE1.W52

written notice to Tenant of the amount due from Tenant hereunder accompanied by a copy of the insurance policy premium invoice and a computation of Tenant's share thereof.

        If Tenant receives notice that the insurance required to be obtained by Landlord pursuant to this Paragraph 7.1 is to be cancelled or will expire, and if prior to twenty (20) days before the effective date of cancellation or expiration Tenant has not received written notice from the insurance carrier or agent that the policy will be extended or a new policy substituted in its place, then Tenant shall have the right without notice, but shall have no obligation, to procure such substitute insurance insuring the Premises and/or the Shopping Center as Tenant in its discretion deems reasonable.  Landlord shall reimburse Tenant upon demand for that portion of the insurance premium paid by Tenant applicable to any such buildings other than the Premises which are insured by such policy.

        7.2  Liability Insurance.  Concurrently with Tenant's entry into the Premises pursuant to Paragraph 14.1 and at all times during the Lease Term, Tenant shall maintain at its expense general public liability insurance against claims for bodily injury, death or property damage occurring in or upon the Premises.  The limitation of liability of such insurance shall be not less than One Million Dollars ($1,000,000) combined single limit in respect to any one occurrence for bodily injury and property damage.  Such insurance policy shall be issued in the name of Tenant and shall name Landlord as an additional insured.

- 41 -

06/13/95/CENTCITY/LEASE1.W52

A certificate of insurance evidencing the policy required
hereunder shall be delivered to Landlord no later than
thirty (30) days after Tenant takes possession of the Premises,
and shall reflect that the policy may not be cancelled or
modified without at least thirty (30) days prior written notice
to Landlord.

      7.3  Rating.  All policies of insurance required under
Paragraphs 5.3, 7.1 and 7.2 shall be written by companies of
generally accepted responsibility and credit, licensed to do
business in the State in which the Premises are located.  Such
insurance companies shall at all times have a policyholder's
rating of "B+" or better and financial rating of Class X or
better as reflected in the most recent edition of "Best's
Insurance Guide".

      7.4  Self-Insurance.  If Tenant, either alone or in
conjunction with any of its affiliated companies, adopts a
program of self-insurance against claims for bodily injury, death
or property damage, then, provided Tenant then has a net worth of
at least One Hundred Million Dollars ($100,000,000.00), Tenant
may substitute such self-insurance program in lieu of providing
the insurance described in Paragraph 7.2, provided that Landlord
is protected by such program for no less coverage than provided
for in such Paragraphs.

      7.5  Waiver of Subrogation.  To the extent permitted by
law, Landlord and Tenant each hereby release each other and their
respective officers, employees and agents from any claims for

- 42 -

06/13/95/CENTCITY/LEASE1.W52

bodily injury to or death of any person and from property damage
to the Premises, to the other buildings and improvements in the
Shopping Center including the Common Area, and to the fixtures
and personal property of either Landlord or Tenant located in the
Shopping Center that are caused by or result from risks insured
against under any insurance policy which is required by this
Lease to be maintained by Landlord or Tenant.  This release shall
not be effective if the releasing party's loss was uninsured due
to a breach by the other party of its obligation to maintain an
insurance policy required by this Lease to be maintained by such
other party.  Each party shall cause each insurance policy
obtained by such party pursuant to this Lease to provide that the
insurance carrier waives all right of recovery by way of
subrogation against both parties and their respective officers,
employees and agents in connection with any injury or damage
covered by such policy.

        7.6  <u>Blanket Policies</u>.  In lieu of providing individual
policies of insurance, the insurance protection required under
this Section 7 may be provided in the form of blanket policies of
insurance covering the Premises and other properties.  In such
event, however, certificates of insurance evidencing the coverage
required hereunder shall be provided as herein required and any
such blanket policy shall provide that the amount of insurance
required under this Lease shall not be prejudiced in any manner
by other losses covered by the policy.

- 43 -

06/13/95/CENTCITY/LEASE1.W52

8.    USE.

8.1  <u>Use of Premises</u>.  (a) The Premises may be used for
the operation of a retail store for the sale of general
merchandise including, without limitation, bargain and close-out
merchandise or for any other lawful use which does not cause
Landlord to be in violation of one of the exclusive use
provisions in effect as of the date of this Lease and which are
specified in Exhibit D attached hereto.  Notwithstanding the
foregoing, Tenant agrees that it shall not use the Premises, or
any portion thereof, for the sale of alcoholic beverages for on-
premises consumption.  Except as specified in Exhibit D, Landlord
warrants and represents that there is currently in effect no
covenant of exclusive use or other restriction affecting the use
of the Premises and, based thereon, Landlord believes that
nothing restricts the use of the Premises for the sale of general
merchandise including bargain and close-out merchandise and
alcoholic beverages and non-perishable packaged food.  Without
limiting the generality of the foregoing, Landlord warrants and
represents that the lease with The Great Atlantic and Pacific Tea
Company, Inc., a Maryland corporation, as assigned to Wetterau
Incorporated, a Missouri corporation, is no longer in effect.

(b)  Nothing contained in this Lease shall be
deemed or construed to impose any affirmative obligation on
Tenant to make any particular use of the Premises, or any use
thereof at all; and nothing contained in this Lease shall be
deemed or construed to require Tenant to keep the Premises open

- 44 -

06/13/95/CENTCITY/LEASE1.W52

for the conduct of business during any particular hours, or any particular days, or at all. However, in the event Tenant ceases business operations in the Premises for a continuous period of at least three hundred sixty-five (365) consecutive days (excepting therefrom (i) any period of time when Tenant is not able to operate its business in the Premises as a result of damage or destruction or taking by eminent domain, or as a result of any other matter (other than financial) beyond Tenant's reasonable control, or (ii) any period of time during which the Premises are temporarily closed for purposes of remodeling, renovations, alterations, repairs or remerchandising), then Landlord shall have the right and option, exercisable by written notice delivered not later than thirty (30) days after the expiration of such three hundred sixty-five (365) day period, to terminate this Lease effective upon sixty (60) days written notice. Notwithstanding the foregoing, in the event Tenant recommences business operations in the Premises within such sixty (60) day period or in the event Tenant provides notice to Landlord prior to the expiration of such sixty (60) day period that Tenant has, with Landlord's consent if required by Section 15, assigned this Lease or subleased the Premises, and such assignee or sublessee intends to commence business operations within ninety (90) days from the date of Tenant's notice, then this Lease shall not terminate and Landlord's termination notice shall be null and void and of no force or effect. Upon the effective date of a termination of this Lease in accordance with this Paragraph

- 45 -

06/13/95/CENTCITY/LEASE1.W52

8.1(b), neither party shall have any further rights or
obligations under this Lease except as otherwise herein provided.

     8.2  <u>Restrictions on Use</u>.

     (a)  Landlord covenants that Landlord shall not
allow any part of the Shopping Center, and Tenant covenants that
Tenant shall not allow any part of the Premises to be used or
operated for or as a house of worship; massage parlor; adult
bookstore; so-called "head-shop"; tattoo parlor; off-track
betting establishment; any manufacturing, industrial, warehouse
or office use (except incidental to a retail operation); funeral
parlor; animal breeding or storage; flea market or swap meet;
junk yard; drilling for and/or removal of subsurface substances,
dumping, disposal, incineration or reduction of garbage or
refuse; automobile body shop; car wash; automobile, boat, trailer
or truck leasing or sales; amusement park; carnival; movie
theater; hotel or motor inn; pool hall; laundromat; or pawn shop.

     (b)  Landlord does further covenant that no part
of the Shopping Center will be used for the following purposes
(except in connection with and as an incidental part of a use by
any tenant occupying at least 18,000 square feet, but which use
shall not be the primary use of any tenant occupying at least
18,000 square feet and with the following uses not to exceed, per
use, five percent (5%) of the leased space), to-wit: gymnasium,
bowling alley, skating rink, automobile repair or automotive
service, school (except for the operation of "Junior Achievement
of Missouri Valley" in its size and location as of the date of

- 46 -

06/13/95/CENTCITY/LEASE1.W52

this Lease so long as its existing lease remains in force and effect) or library, video game room, arcade or other amusement center, or other sports or recreational facility.

(c)   Landlord does further covenant and agree that Landlord shall not allow any part of the Shopping Center to be used or operated for a cocktail lounge, tavern, bar, disco, night club or banquet facility except as a part of a restaurant. Landlord does further covenant and agree that Landlord will not allow more than 15,000 square feet of the Shopping Center to be occupied by tenants operating restaurant businesses.

(d)   Landlord does further agree Landlord shall not allow a dance hall or dance school in the Shopping Center which exceeds 6,000 square feet.

(e)   Notwithstanding the foregoing, Tenant acknowledges that Landlord's lease with (i) Midwest Petroleum Company, Inc. permits the tenant to operate and conduct an "Express Lane" operation, (ii) The Frame Factory, Ltd. permits the tenant to conduct, advertise and arrange for classes, assemblages, gatherings and other associations and workshops for dissemination, instruction and teaching of techniques and art forms of the assembly and construction of pictures and framing of same, (iii) Central Hardware allows the tenant to sell items normally sold in its other stores in the Metropolitan St. Louis area, (iv) Omni Sports allows the tenant to assign the lease or sublet the premises for any lawful use, and (v) Boatmen's Bank does not contain provisions dealing with the tenant's permitted

- 47 -

06/13/95/CENTCITY/LEASE1.W52

use.  Tenant acknowledges and agrees that Landlord's leases with

Midwest Petroleum Company, Inc., The Frame Factory, Ltd., Central

Hardware, Omni Sports and Boatmen's Bank may, to the extent and

only for the reasons specified above, prohibit Landlord from

preventing a violation of this Paragraph 8.2 during the term of

such leases, and any such violation related to or resulting from

the reason specified above is not to be construed as a violation

or breach of this Lease by Landlord.

(f)   In the event of a breach of the foregoing

covenants as set forth in this Paragraph 8.2 by either party to

this Lease, the other party shall be entitled to injunctive

relief and any other available remedy.

8.3   _Compliance with Laws_.  Tenant agrees promptly at

its expense to comply with all laws, rules and orders of federal,

state and municipal authorities applicable to Tenant's particular

and specific use of the Premises, except that Tenant shall not be

required to make structural repairs or improvements to the

Premises nor to make any other repairs or replacements which are

the responsibility of Landlord under any other provision of this

Lease.  Landlord agrees promptly, at no expense to Tenant, to

comply with all laws, rules and orders of federal, state and

municipal authorities applicable to (i) the Premises other than

those which are applicable to Tenant's particular and specific

use of the Premises; and (ii) the Common Area.  Tenant shall have

the right at its expense to contest or review by legal

proceedings the validity or legality of any such law, rule or

06/13/95/CENTCITY/LEASE1.W52

order with which it is required to comply hereunder, and during

such contest Tenant may refrain from complying therewith.  Tenant

shall indemnify and hold Landlord harmless from any loss or

damage suffered by Landlord as a result of any such contest or

delay in compliance.


        9.   UTILITIES.

        Tenant shall pay or cause to be paid all charges for

gas, water, electricity, light, heat or power, telephone or other

communication services used or supplied upon or in connection

with the Premises from and after the date on which Tenant accepts

possession of the Premises and throughout the Lease Term.

However, Tenant shall not be required to pay for the cost of

installing, maintaining or repairing utility lines and

installations which serve the Premises but which are located

outside of the Premises, all of which shall be the responsibility

of Landlord.


        10.   MAINTENANCE, REPAIRS AND ALTERATIONS.

        10.1 <u>Obligations of Tenant</u>.  Subject to Landlord's

obligations under Section 3 and Paragraphs 8.3, 10.2 and 10.3 and

provided that the following items are not damaged as a result of

structural failure, Tenant at its expense shall maintain the

interior of the Premises and all fixtures, mechanical systems,

equipment and improvements located in and exclusively serving the

Premises, and all of Tenant's signs, exterior doors, plate glass

- 49 -

06/13/95/CENTCITY/LEASE1.W52

and glazing material, in good condition and repair throughout the Lease Term, ordinary wear and tear and damage from casualty governed by the provisions of Section 12 hereof excepted.

Notwithstanding any of Landlord's duties under this Lease to the contrary, but subject to and except as provided in Paragraph 7.5, to the extent that any repair or replacement which is otherwise the responsibility of Landlord arises directly and solely out of Tenant's willful misconduct or active negligence, such repair or replacement shall be deemed the responsibility of Tenant under this Paragraph 10.1.

10.2 <u>Warranty of Landlord</u>.  Landlord warrants that the roof, doors and windows, lighting, electrical, plumbing, heating, ventilating and air conditioning systems located in the Premises at the time possession of the Premises is accepted by Tenant shall be in good working order and condition and of sufficient capacity to serve Tenant's needs.  Landlord, at Landlord's sole cost and expense, shall effect all repairs and make any necessary replacements to any such systems which are required within one (1) year following the Rent Commencement Date provided such repairs and replacements are not caused by Tenant's negligence. In addition, and without reducing Landlord's obligations under the preceding sentence, Landlord hereby assigns to Tenant all assignable warranties of materialmen, subcontractors and equipment manufacturers in effect, if any, applicable to work performed upon or materials and equipment incorporated in or installed upon the Premises.

- 50 -

06/13/95/CENTCITY/LEASE1.W52

10.3 <u>Obligations of Landlord</u>.   In addition to
Landlord's obligations under Paragraphs 5.3, 8.3 and 10.2 above,
Landlord shall, at its sole expense:

(a)   Perform all maintenance and make all repairs,
replacements and alterations necessary or appropriate to keep the
structure of the store building located on the Premises
watertight and in good order, condition and repair, including,
without limitation, each of the following:

(1)   The exterior walls, interior load
bearing walls, and interior roof structural columns;

(2)   The roof, including the roof membrane,
structure and supports, such that absolute watertight conditions
shall be maintained at all times during the Lease Term;

(3)   The foundations, floor slab and
structural supports;

(4)   The gutters, downspouts and roof drain
system;

(5)   All wiring, plumbing, pipes, conduits
and other water, sewage, utility and sprinkler fixtures and
equipment (including, without limitation, all connections with
and components of any private sewage system serving the Premises)
which are located within the slab of the store building portion
of the Premises, beneath the Premises or between said store
building and the main public utility lines; and

(b)   Landlord shall also perform all maintenance
and make all repairs and replacements which result from any

- 51 -

structural failure of the Premises or which become necessary or appropriate at any time because of any act, negligence or default under this Lease of Landlord, its agents, employees or contractors.

10.4 <u>Installations</u>.  Tenant at its expense may install in the Premises such fixtures and equipment as Tenant may desire, and Tenant may from time to time remove, replace, alter or add to such fixtures and equipment.  All fixtures and equipment installed by Tenant shall remain the property of Tenant and may be removed by Tenant at any time during or at the expiration of the Lease Term provided that Tenant, at its cost, repairs any and all damage resulting from such removal.

10.5 <u>Alterations</u>.  Tenant at its expense may alter or remodel the Premises at any time or times during the Lease Term. However, no changes shall be made which affect the exterior or structural elements of the Premises without the prior written approval of Landlord, which approval shall not be unreasonably withheld, delayed or conditioned.  All such alterations or remodeling shall be performed in accordance with all applicable legal requirements and shall become the property of Landlord upon termination of this Lease.

10.6 <u>Hazardous Materials</u>.

10.6.1 <u>Definitions</u>.  As used in this Lease, the term "Hazardous Materials" shall mean any substance, material, chemical, gas, waste or other matter (including but not limited to asbestos), the existence, release, movement, migration, use,

- 52 -

06/13/95/CENTCITY/LEASE1.W52

handling, storage, treatment, transportation or disposal of which is or may be harmful to the environment, public health or safety or the source of liability based upon the contamination of property or the environment or the existence of which requires remediation thereof.  The term "Environmental Law" shall mean any law, code, regulation, ruling, ordinance or order of any federal, state or local governmental authority which regulates, prohibits or imposes liability for the contamination of property, soil, water or air by Hazardous Materials, the release, movement, migration, use, handling, storage, treatment, transportation or disposal of Hazardous Materials; the remediation of Hazardous Materials; or the repair and/or replacement of any part of the Premises necessary to make the Premises comply with applicable standards concerning the environment and/or public health and safety.

            10.6.2   Representations and Warranties;

Indemnification.   (a)   Landlord represents and warrants that as of the date hereof to the best knowledge of Landlord (i) the Shopping Center and the soil and ground water on and under the Shopping Center are free of Hazardous Materials; (ii) the Shopping Center is in compliance with all Environmental Law regulating the handling, transportation, storage, treatment, use and disposition of Hazardous Materials; (iii) there are no underground storage tanks at the Shopping Center; (iv) there are no Hazardous Materials used, handled or stored at the Shopping Center except in compliance with Environmental Law; (v) there are

- 53 -

06/13/95/CENTCITY/LEASE1.W52

no governmental investigations regarding possible Hazardous
Materials at the Shopping Center; and (vi) Landlord has received
no notices of an anticipated investigation regarding possible
Hazardous Materials at the Shopping Center. Notwithstanding the
foregoing, but subject to Paragraph 10.6.2(c), Tenant
acknowledges that as of the date of this Lease the Shopping
Center contains a gasoline service station and that such gasoline
service station may or may not have underground storage tanks
servicing its operation and, as such, the operation of such
service station may have resulted in violations of the foregoing
representations and, subject to Paragraph 10.6.2(c), such service
station operation is not to be construed as a violation or breach
of this Lease by Landlord. Landlord shall be responsible for all
costs and expense incurred at any time in complying with all
Environmental Law affecting or relating to the Common Area and
the Premises arising out of conditions existing as of the date
Tenant accepts delivery of possession of the Premises or which
occur at any time thereafter (including any time following the
expiration of the Lease Term), other than as a result of the
actions of Tenant or that of its employees, agents or
contractors. In furtherance of the foregoing, and without
limiting the scope thereof, if it is determined at any time in
connection with any construction work or maintenance of the
Premises or otherwise that the Premises contain Hazardous
Materials which were present at the time possession of the
Premises was accepted by Tenant, then Landlord shall cause the

- 54 -

06/13/95/CENTCITY/LEASE1.W52

same to be removed, contained or neutralized in accordance with
Environmental Law by a licensed, certified and qualified
abatement contractor acceptable to Tenant, at Landlord's sole
cost and expense.  Tenant shall be entitled to an equitable
abatement of Minimum Rent and all other amounts payable
hereunder, to the extent any Hazardous Materials remediation
interferes with Tenant's use of the Premises and/or Common Area.

      (b)  Landlord shall require the other occupants of
the Shopping Center to comply with all applicable Environmental
Law governing Hazardous Materials.  In the event of any release
of any Hazardous Materials in the Shopping Center by another
occupant thereof in violation of any applicable Environmental
Law, Landlord shall require such occupant to promptly remediate
any such release in a manner prescribed by Environmental Law.
Should such occupant fail to promptly remediate any such release,
and if Landlord, at its sole cost, shall not thereafter remediate
such release in a manner prescribed by Environmental Law, and if
such failure to remediate materially interferes with the conduct
of Tenant's business, Tenant shall have the right to terminate
this Lease upon notice to Landlord.  Landlord agrees, to the
extent permissible, to make available to Tenant the opportunity
to participate in any indemnification provided to Landlord by
such occupant to the extent of the damage incurred by Tenant by
reason of such release.

      (c)  Landlord shall indemnify, defend and hold
Tenant harmless from and against any and all claims, judgments,

- 55 -

06/13/95/CENTCITY/LEASE1.W52

damages, statutory and other penalties, fines, costs, liabilities
or losses (including, without limitation, sums paid in settlement
of claims, attorneys' fees, consultant fees and expert fees,
whether or not litigation has been commenced) which arise at any
time (including at any time after the expiration of the Lease
Term) from or in connection with Hazardous Materials existing in
the Shopping Center or any portion thereof as of the date Tenant
accepts delivery of possession of the Premises or which occur at
any time thereafter, other than as a result of the actions of
Tenant or Tenant's employees, agents or contractors.

        10.6.3  Use.  Tenant shall have the right to
store, use and handle Hazardous Materials on the Premises in the
usual operation of Tenant's retail business on the Premises
provided that such Hazardous Materials are stored, used, handled
and disposed of in compliance with all Environmental Law;
provided, however, any Hazardous Materials brought upon,
transported, used, kept or stored in or about the Premises in the
usual and customary operation of Tenant's business may be brought
upon, transported, used, kept and stored only in such quantities
as are typical for the usual and customary operation of Tenant's
business and in a manner that complies with (i) all Environmental
Laws; (ii) any required permits issued for any such Hazardous
Materials (which permits Tenant shall obtain prior to bringing
any Hazardous Materials in, on or about the Premises); and (iii)
all producers' and manufacturers' instructions and
recommendations, to the extent they are stricter than

- 56 -

06/13/95/CENTCITY/LEASE1.W52

Environmental Laws.  Tenant shall be responsible for all costs
incurred in complying with all Environmental Law relating to
Hazardous Materials which Tenant or its agents or contractors
bring into or onto the Premises at any time during the Lease
Term.

        10.6.4  <u>Interpretation</u>.  The provisions of this
Paragraph 10.6 shall supersede any other provisions in this Lease
regarding the use, maintenance, repair, remediation,
construction, remodel or reconstruction of the Premises or the
Common Area or any part thereof, to the extent inconsistent with
the provisions hereof.  The representations, warranties and
agreements of the parties set forth herein shall survive the
expiration of the Lease Term or the termination of this Lease for
any reason whatsoever.


    11.  SIGNS.

        Tenant may, at its sole cost, install and maintain upon
the Premises, including the front and rear exterior parapet
walls, the maximum size building identification signs as are
permitted by applicable law.  In addition, Tenant shall be
entitled, at its sole cost, to affix and maintain throughout the
Lease Term an electrically illuminated sign panel bearing its
business name and logo in the third (3rd) position from the top
upon each side of each sign pylon or monument presently located
in the Common Area and upon each sign pylon or monument hereafter
installed in the Shopping Center at any time during the Lease

06/13/95/CENTCITY/LEASE1.W52

Term.  Tenant's panel upon each side of each such pylon or
monument sign shall be not less than twenty percent (20%) of the
total area of each such side.  Prior to the RCD, Landlord shall
provide to such sign pylons and monuments all electrical lines
and hookups necessary for Tenant to affix and maintain its
electrically illuminated sign panels thereon and Landlord shall
maintain such lines and hookups thereafter during the Lease Term.
All building signs and pylon and monument sign panels installed
by Tenant (i) shall be of the size, type and logo which Tenant
customarily uses from time to time in its business, (ii) shall
comply with all applicable laws, rules and ordinances of state or
local governmental authorities, (iii) shall remain the property
of Tenant, and (iv) may be removed by Tenant at the termination
of this Lease.

Immediately after the execution of this Lease, Tenant
may construct a hardboard sign in the Common Area to announce
Tenant's store opening and Tenant may maintain such sign until
Tenant has installed Tenant's building identification sign(s).
Immediately after execution of this Lease and continuing until
fourteen (14) days after Tenant's store opening at the Premises,
Tenant shall also be permitted to hang such banners and other
temporary signs outside the Premises as Tenant deems desirable to
announce Tenant's store opening.

06/13/95/CENTCITY/LEASE1.W52

12.   DAMAGE TO THE PREMISES; SHOPPING CENTER.

12.1 <u>Repair and Restoration</u>.

(a)   Except as otherwise specifically provided in
this Section 12, if the Premises or any other part of the
Shopping Center is damaged by any cause whatsoever, this Lease
shall remain in full force and effect and Landlord shall, at its
sole expense, repair, restore and rebuild the same with all
reasonable dispatch and diligence, so far as practicable and
lawful, to a complete unit of like quality, nature and condition,
with the same layout and parking to floor area ratio as that
which existed immediately prior to the occurrence of such damage.
Except to the extent (i) any such item or items is(are) damaged
or destroyed as a proximate result of the negligence or willful
misconduct of Landlord, its agents, employees or contractors,
and/or (ii) such repair, restoration and rebuilding is covered by
proceeds of any insurance policy actually maintained by Landlord
or required to be maintained by Landlord pursuant to this Lease,
Landlord shall not be required to make any restoration or
replacement of any paneling, decorations, partitions, ceilings,
floor covering, office fixtures, utility installations or any
other improvements or property installed in the Premises by or at
the direct or indirect expense of Tenant (excluding, without
limitation, any and all items comprising Landlord's Work).
Landlord's obligation to repair, restore and rebuild as set forth
in this Paragraph 12.1(a) shall supersede any provision of
applicable law to the contrary, which provisions the parties

- 59 -

06/13/95/CENTCITY/LEASE1.W52

hereby waive.  Any such repair, restoration and rebuilding of the
Premises shall be performed in accordance with plans and
specifications approved in writing by Tenant, prepared by a
licensed architect selected and employed by Landlord and approved
in writing by Tenant, and performed by a licensed general
contractor selected and employed by Landlord and approved in
writing by Tenant.  None of the approvals to be obtained from
Tenant in the previous sentence shall be unreasonably withheld.
During such repair, restoration and rebuilding of the Premises,
Tenant shall at all times have access to the Premises for the
purpose of inspecting the work in progress and for the purpose of
installing trade fixtures, equipment, merchandise, advertising
and signs.

   (b) In the event that the Premises or the
Shopping Center are damaged to the extent that the Premises are
not suitable in Tenant's sole discretion for the normal conduct
of Tenant's business as carried on prior to said damage, Tenant
may nevertheless elect to continue occupancy during the repair,
restoration and rebuilding period or discontinue occupancy until
satisfaction of the conditions set forth below.  In the event
Tenant elects to continue occupancy of the Premises, then from
the date of such damage until completion of repair, restoration
and rebuilding, there shall be an equitable adjustment in Minimum
Rent and all other amounts payable hereunder, taking into account
the interference with Tenant's normal conduct of business.  In
the event Tenant elects to discontinue occupancy, then Minimum

- 60 -

06/13/95/CENTCITY/LEASE1.W52

Rent and all other amounts payable hereunder shall completely abate from the date of damage for the duration of the period of repair, restoration and rebuilding.  Tenant shall not be required to accept delivery of possession of the Premises and to commence paying Minimum Rent and other charges payable by Tenant to Landlord hereunder until the earlier of (i) the date on which Tenant recommences to conduct business on the entire Premises, or (ii) sixty (60) days after the last to occur of all of the following events:

(1)   The architect in charge of the construction certifies in writing to Tenant that said construction has been completed in substantial accordance with the approved plans and specifications and that the Premises is in compliance with all laws, ordinances, regulations and requirements of governmental authorities having jurisdiction thereof;

(2)   A certificate of occupancy or an equivalent use permit and all other requisite permits and approvals necessary for Tenant to conduct business on the Premises and for the public to have access to the Premises are issued by the appropriate legal authorities and Tenant shall have received certified or photostatic copies of the same; and

(3)   If the location of the foundations or exterior walls has been changed, Landlord delivers to Tenant an as-built drawing of the restored Premises.

- 61 -

06/13/95/CENTCITY/LEASE1.W52

     (c)   Tenant may cancel and terminate this Lease upon thirty (30) days written notice to Landlord in the event Landlord fails or is unable to (1) obtain a building permit for any repairs, rebuilding or restoration required under this Section 12 within three (3) months from the date of damage to the Premises; or (2) complete such repairs, rebuilding and restoration and comply with the conditions in Section 12.1(b) for the resumption of Minimum Rent and other charges payable by Tenant hereunder with all reasonable dispatch and diligence.

     12.2 <u>Last Twelve Months Exception</u>.  If the Premises and/or the Shopping Center are destroyed within the last twelve (12) months of the Primary Term or the last twelve months of any extension of the Lease Term, to the extent that the cost of repair and restoration of either the Premises or the Shopping Center exceeds thirty-three percent (33%) of the then Replacement Cost of the Premises or the Shopping Center, as the case may be, Tenant shall have the option, exercisable by written notice within sixty (60) days after the date of the occurrence of such damage, to (i) terminate this Lease, provided that it releases to Landlord all of Tenant's claim or interest in and to insurance proceeds otherwise allowable for the repair and restoration of said improvements; or (ii) affirm its obligations under this Lease by waiving Tenant's rights pursuant to Paragraph 2.2 above to elect not to exercise the next succeeding option to extend the Lease Term, provided, however, that Landlord shall immediately undertake the repair, restoration and rebuilding of the Premises

- 62 -

06/13/95/CENTCITY/LEASE1.W52

and/or the Shopping Center in accordance with Paragraph 12.1
above.

   12.3 "Replacement Cost" Defined.  As used in this
Lease, the term "Replacement Cost" means the reasonably estimated
cost of fully repairing and restoring the building(s) and other
improvements in question as nearly as practicable to the
condition existing immediately prior to the damage or
destruction.


   13.  LIENS.

       Tenant shall do all things reasonably necessary to
prevent the filing of any mechanic's liens or other liens against
the Premises or any part thereof by reason of work, labor,
services or materials supplied or claimed to have been supplied
to Tenant.  If any such lien shall at any time be filed against
the Premises, Tenant shall either cause the same to be discharged
of record within thirty (30) days after the date of filing the
same or, if Tenant in its discretion and in good faith determines
that such lien should be contested, furnish security or a bond in
the amount of at least one hundred fifty percent (150%) of the
lien, such bond to be written by a bonding company reasonably
acceptable to Landlord in Landlord's reasonable discretion and
having terms and conditions reasonably acceptable to Landlord in
Landlord's reasonable discretion.

06/13/95/CENTCITY/LEASE1.W52

        14.  RIGHTS OF ACCESS.

        14.1 <u>By Tenant</u>.  Provided Tenant does not cause any
material interference with the performance of Landlord's Work,
Tenant may enter the Premises prior to the RCD for the purposes
of inspecting the Premises and constructing Tenant's Improvements
and installing its trade fixtures, equipment, merchandise,
advertising and signs.

        14.2 <u>By Landlord</u>.  Provided that Tenant's business is
not interfered with, Landlord and its authorized agents and
representatives shall be entitled to enter the Premises at
reasonable times, upon at least five (5) business days prior
notice, for the purpose of inspecting the same and showing the
Premises to prospective purchasers and lenders.  Landlord shall
notify Tenant in writing at least five (5) business days prior to
beginning any maintenance or repairs to the Premises required
under this Lease to be made by Landlord except in case of an
emergency in which case Landlord shall provide such prior notice
as shall be reasonable under the circumstances.  For purposes of
the foregoing sentence, an emergency shall be deemed to exist
where immediate action is necessary to prevent injury to persons
or substantial damage to property.  Landlord shall perform all
such maintenance or repair work in a manner which shall cause the
least interference reasonably possible with the operation by
Tenant of its business in the Premises and with the Common Area
rights of Tenant and Tenant's customers, agents and invitees.
Tenant shall be entitled to an equitable abatement of Minimum

- 64 -

06/13/95/CENTCITY/LEASE1.W52

Rent and all other amounts payable hereunder to the extent any such maintenance or repair work materially interferes with the use of the Premises and/or the Common Area by Tenant.  Landlord agrees that no forcible entry of the Premises will be made except to prevent injury to persons or substantial damage to property.

15.  ASSIGNMENT AND SUBLETTING.

Tenant shall have the right to assign this Lease or sublet the Premises or any portion thereof with the consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding the foregoing, the consent of Landlord shall not be required for the assignment of this Lease or the sublet of any portion of the Premises to (i) any entity which controls Tenant or which is controlled by or under common control with, Tenant or (ii) any entity resulting from the consolidation or merger of Tenant or (iii) any entity which acquires substantially all of the store assets of Tenant or substantially all of the store locations of Tenant in the state or region of a state where the Premises are located.  In the event Tenant sublets all or any portion of the Premises, Landlord agrees to enter into a written nondisturbance, recognition and attornment agreement with such subtenant, in form and substance reasonably satisfactory to Landlord.  Tenant shall not be released from its obligations under this Lease in connection with any assignment of this Lease or any subleasing of the Premises without the prior written consent of Landlord.  Any assignment,

- 65 -

06/13/95/CENTCITY/LEASE1.W52

sublease or other transfer shall be subject to all of the terms
of this Lease, including but not limited to the use limitations
contained in Paragraph 8.1.

    16.   EMINENT DOMAIN.

    16.1 <u>Taking Defined</u>.  If there is any taking of all or
any part of the Premises or the Shopping Center or access roads
to the Shopping Center because of the exercise of the power of
eminent domain, whether by condemnation proceedings or otherwise,
or any transfer of any part of the Premises or of the Shopping
Center or access roads to the Shopping Center made in avoidance
of the exercise of the power of eminent domain (all of the
foregoing being hereinafter referred to as a "taking") during the
Lease Term, the rights and obligations of the parties with
respect to such taking shall be as provided in this Section 16.

    16.2 <u>Substantial Taking</u>.  If title to all of the store
building comprising the Premises is taken, or if title to so much
of any portion of the Shopping Center is taken, so that a
reasonable amount of restoration thereof will not, result in the
Premises being viable for Tenant's continued occupancy, then this
Lease shall terminate on the date that possession of the
Premises, or such part of the Shopping Center, is taken.  In such
event, neither party shall have any further rights or obligations
hereunder except that Tenant shall have the right to participate
in any condemnation award or in the purchase price paid, in
accordance with Paragraph 16.6 below.

06/13/95/CENTCITY/LEASE1.W52

16.3 <u>Partial Taking</u>.  If title to any part of the store
building comprising the Premises is taken and the remaining part
of the Premises, after restoration of such store building, is
suited in Tenant's reasonable judgment for Tenant's continued
occupancy, this Lease shall terminate only as to the part of the
Premises so taken as of the date that possession of such part is
taken and shall continue in effect as to the part of the Premises
remaining.  In such event, neither party shall have any further
right or obligation with respect to the portion of the Premises
so taken except that Tenant shall have the right to participate
in any condemnation award or in the purchase price paid in
accordance with Paragraph 16.6 below.  In the event that the
Premises, following restoration thereof, is not suited in
Tenant's reasonable business judgment for Tenant's continued
occupancy, this Lease shall terminate pursuant to the terms of
Paragraph 16.2.

16.4 <u>Temporary Taking</u>.  If the whole or any part of the
Premises or Shopping Center is taken for ninety (90) days or
less, this Lease shall not terminate and Tenant shall continue to
pay the full amount of Minimum Rent and other charges payable by
Tenant hereunder and to perform and observe all of the other
terms and conditions hereof as though the taking had not occurred
(except to the extent to which Tenant is prevented from so doing
by the terms of the order of the taking authority).  Tenant shall
be entitled to receive the entire award made for the temporary
taking of the Premises.  If the taking extends beyond the

- 67 -

06/13/95/CENTCITY/LEASE1.W52

expiration of the Lease Term the award shall be apportioned
between Landlord and Tenant.

     16.5 Repair, Restoration, Rebuilding.

     (a)  In the event of a taking, unless this Lease
is terminated as provided in Paragraphs 16.2 or 16.3, Landlord
shall, at its sole expense, promptly repair, restore and rebuild
the remainder of the Premises (to the extent of Landlord's Work
as defined in Section 3) and/or the Shopping Center, so far as
practicable to a complete unit of like quality, nature and
condition as that which existed immediately prior to the taking.
With respect to the Premises only, repair, restoration and
rebuilding shall be conducted in the same manner, with the same
approvals and the same rights of Tenant to inspect the work as
are provided for in Paragraph 12.1(a) above.  Tenant may cancel
and terminate this Lease upon thirty (30) days written notice to
Landlord in the event Landlord fails to:  (1) obtain a building
permit for any repair, rebuilding or restoration required under
this Section 16 within three (3) months from the date of taking;
or (2) complete such repairs, rebuilding and restoration with all
reasonable dispatch and diligence.

     (b)  During the period between the effective date
of taking and the completion of repair, restoration and
rebuilding of the Premises and/or the Shopping Center, Minimum
Rent and all other charges payable by Tenant under this Lease,
shall be equitably abated to the extent that the Premises and/or
the other portions of the Shopping Center are not then suitable

- 68 -

06/13/95/CENTCITY/LEASE1.W52

in Tenant's reasonable discretion for the conduct of Tenant's business.  Upon the completion of repair, restoration and rebuilding of the Premises, other portions of the Shopping Center and access necessary for the fullest possible use of the Premises or the remaining portion thereof, Minimum Rent shall thereafter and throughout the balance of the Lease Term be reduced in that proportion which the ground floor area of the Premises taken bears to the ground floor area of the Premises existing immediately prior to such taking, and all other charges required to be paid by Tenant to Landlord under this Lease shall likewise be reduced in the same proportion, except as set forth below. The repair, restoration and rebuilding of the Premises will not be deemed complete until the earlier of the dates referred to in Paragraph 12.1(b).

    16.6 <u>Notices; Compensable Interests</u>.

        (a)   In the event Landlord or Tenant receives any notice of any kind specified below, Landlord or Tenant shall promptly give the other party a photocopy of the notice received:

            (1)   Notice of intended taking;

            (2)   Service of any legal process relating to condemnation of any portion of the Premises or the Shopping Center or any improvement located thereon, or any easement appurtenant thereto;

            (3)   Notice in connection with any proceedings or negotiations with respect to such a condemnation; or

06/13/95/CENTCITY/LEASE1.W52

(4)   Notice of intent or willingness to make or negotiate a private purchase, sale or transfer in lieu of condemnation.

(b)   Landlord and Tenant shall be entitled to compensation for the appropriation of their respective rights and interests by the condemning authority in accordance with the law of the State in which the Premises are located.  Landlord, Tenant and all persons and entities holding under Tenant shall have the right to represent his or its respective interest in each proceeding or negotiation with respect to a taking or intended taking and to make full proof of his or its claims.  Landlord and Tenant each agree to execute and deliver to the other any instruments that may be necessary or appropriate to effectuate or facilitate the provisions of this Lease relating to condemnation.

17.   TENANT'S DEFAULT.

17.1 <u>Events of Default</u>.  The following shall constitute an "Event of Default" under this Lease:

(a)   Tenant's failure to pay any installment of Minimum Rent or any other amount payable by Tenant under the terms of this Lease, when and as the same shall become due and payable under the terms hereof, and any such failure continues for a period of more than ten (10) days after notice thereof in writing is given to Tenant by Landlord.

- 70 -

06/13/95/CENTCITY/LEASE1.W52

(b)   Tenant's failure to keep and perform any of the
other covenants, conditions or agreements set forth in this
Lease and agreed to be kept and performed by it, and any
such failure continues for a period of more than thirty (30)
days after notice thereof in writing stating the nature of
said failure is given to Tenant by Landlord; provided,
however, that if the cause for giving such notice involves
making repairs or taking other acts reasonably requiring a
longer period of time than thirty (30) days to complete or
remedy, then Tenant shall not be in default hereunder so
long as Tenant has commenced to cure the failure referred to
in said notice within said thirty (30) day period and
thereafter continues diligently until completion to cure
such failure.

(c)   if Tenant shall suffer its interest in this Lease
to be taken under any writ or execution which is not
discharged or released within thirty (30) days after
issuance.

If any Event of Default occurs, Landlord, besides all
such other rights or remedies it may have under this Lease or in
law or in equity, shall have the immediate right to enter the
Premises and take possession thereof and of all permanent
improvements thereon and may remove all persons and property from
the Premises in accordance with applicable law, and such property

06/13/95/CENTCITY/LEASE1.W52

may be removed and stored in a public warehouse or elsewhere at
the cost of and for the account of Tenant, all without service of
notice and without being deemed guilty of trespass or becoming
liable for any loss or damage which may be occasioned thereby.
Tenant agrees that Tenant shall have no further claim under this
Lease and shall quit and deliver up the possession of the
Premises, including permanent improvements to the Premises, when
this Lease terminates by limitation or in any other manner
provided for herein.

17.2  Remedies.  If an Event of Default occurs,
Landlord may elect to re-enter, as herein provided, or take
possession pursuant to legal proceedings or pursuant to any
notice provided for herein, and it may either terminate this
Lease, or it may from time to time without terminating this Lease
make such alterations and repairs as may be necessary in order to
relet the Premises or any part thereof for such term or terms
(which may be for a term extending beyond the Lease Term of this
Lease) and at such rental or rentals and upon such other terms
and conditions as Landlord, in its reasonable discretion, may
deem advisable.  Upon each such reletting all rental received by
Landlord from such reletting shall be applied first to the
payment of any indebtedness other than rent due hereunder from
Tenant to Landlord; second, to the payment of any costs and
expenses of such reletting, including brokerage fees and
attorneys' fees, and of costs of such alterations and repairs;
third, to the payment of the most current rent owed at that time;

- 72 -

06/13/95/CENTCITY/LEASE1.W52

and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder from Tenant.  If such rentals received from such reletting during any month be less than that to be paid during that month by Tenant hereunder, Tenant shall be liable for the payment of such deficiency to Landlord.  Such deficiency shall be calculated and become payable monthly.  No such re-entry or the taking of possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease or to accept a surrender thereof unless a written notice of such intention be given to Tenant.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.  Should Landlord at any time terminate this Lease for any Event of Default, in addition to any other remedies it may have, it may recover from Tenant all damages it may incur by reason of such breach, including the cost of recovering the Premises, and the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this Lease for the remainder of the stated Lease Term over the then-reasonable rental value of the Premises for the remainder of the stated Lease Term, all of which amount shall be immediately due and payable from Tenant to Landlord.  As used in the preceding sentence, "worth at the time of such termination" shall be computed by discounting such amount at the discount rate at the

- 73 -

06/13/95/CENTCITY/LEASE1.W52

time of the award of the Federal Reserve Bank located nearest to
the Premises, plus one percent (1%).  Tenant shall have the
burden of proof with respect to the determination of the then-
reasonable rental value of the Premises for the remainder of the
stated Lease Term.  In determining the rent which would be
payable by Tenant hereunder subsequent to an Event of Default,
the annual Minimum Rent and Percentage Rent for each year of the
unexpired Lease Term shall be equal to the average annual Minimum
Rent plus Percentage Rent paid by Tenant from the commencement of
the Lease Term to the time of an Event of Default, or during the
preceding three (3) full Lease Years, whichever period is
shorter.  Notwithstanding anything to the contrary contained in
this Lease, Landlord shall use reasonable efforts to mitigate
damages due to an Event of Default.  Tenant agrees that this
Lease is a lease of "real property in a shopping center" and that
a debtor in possession and/or trustee in bankruptcy acting
pursuant to the provisions of the revised Bankruptcy Code may
assume this Lease only if, in addition to such other conditions
of this Lease and of applicable law, said debtor in
possession/trustee shall provide Landlord with such written
assurances of future performance as are reasonably acceptable to
Landlord in accordance with the Bankruptcy Code.  In addition to
other remedies available under this Lease, in the event of an
occurrence of an Event of Default Landlord shall have the right
to seek an injunction and the right to invoke any remedy allowed
at law or in equity as if re-entry, summary proceedings and other

- 74 -

06/13/95/CENTCITY/LEASE1.W52

remedies were not herein provided for.  Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy, in law or in equity.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Tenant is evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises.  No receipt of monies by Landlord from or for the account of Tenant or from anyone in possession or occupancy of the Premises after the termination in any way of this Lease or after the giving of any notice of termination shall reinstate, continue or extend the Lease Term or affect any notice given to Tenant prior to the receipt of such money; it being agreed that after the service of notice of termination or commencement of a suit based thereon, or after final judgment for possession of the Premises, Landlord may receive and collect any rent or other amounts due Landlord and such payment shall not in any respect reinstate this Lease and shall not waive, affect or impair said notice, said suit or said judgment without the express written consent of Landlord.  No delay or omission of Landlord to exercise any right or remedy under this Lease, or in law or in equity, shall be construed as a waiver of such right or remedy or of any Event of Default.

16.3 <u>Failure to Pay; Interest</u>.  To the extent such failure constitutes an Event of Default, if Tenant at any time shall fail to pay any taxes, assessments or liens, provide insurance or perform any act required by this Lease to be made or

- 75 -

06/13/95/CENTCITY/LEASE1.W52

performed by it, or fail to pay any charge payable by Tenant or
to timely discharge any other monetary obligation of Tenant
required by this Lease, Landlord, without waiving or releasing
Tenant from any obligation or Event of Default under this Lease,
may (but shall be under no obligation to) at any time thereafter
make such payment or perform such act for the account and at the
reasonable expense of Tenant.  All reasonable sums so paid by
Landlord and all reasonable costs and expenses so incurred shall
accrue interest at a rate equal to the lesser of one percent (1%)
per month or the maximum rate permitted by law, from the date of
payment or incurring thereof by Landlord and shall constitute
additional rent payable by Tenant under this Lease and shall be
paid by Tenant to Landlord upon demand.

    18.   LANDLORD'S DEFAULT.

        (a)   Landlord shall be in default under this Lease
if:

        (i)   Landlord fails to make a repair or
perform any maintenance required by Landlord to the roof of the
Premises and such failure continues for ten (10) days after
Landlord's receipt of written notice or if Landlord fails to make
any other repair or perform any other maintenance required to be
made or performed by it under the terms of this Lease, and such
failure continues for a period of twenty (20) days after delivery
of written notice to Landlord of the necessity for such repairs
or maintenance or, in the case of an emergency, within such

- 76 -

06/13/95/CENTCITY/LEASE1.W52

shorter period after delivery of such notice as shall be reasonable under the circumstances; provided, however, that if the cause for giving any such notice involves taking acts reasonably requiring a longer period of time to complete or remedy than the time period specified herein, then Landlord shall not be in default hereunder so long as Landlord has commenced to cure the failure referred to in said notice within the period specified herein and thereafter continues diligently until completion to cure such failure; or

(ii)    Landlord fails to keep and perform any of the other covenants, conditions or agreements set forth in this Lease and agreed to be kept and performed by Landlord, or if Landlord fails to timely pay any tax or other charge which is a lien upon the Premises, and any such failure continues for a period of more than thirty (30) days after notice thereof in writing stating the nature of said failure is given to Landlord by Tenant; provided, however, that if the cause for giving such notice involves taking acts reasonably requiring a longer period of time than thirty (30) days to complete or remedy, then Landlord shall not be in default hereunder so long as Landlord has commenced to cure the failure referred to in said notice within said thirty (30) day period and thereafter continues diligently until completion to cure such failure.

(b)    In the event of a default by Landlord, Tenant may, without waiving any claim for damages or other remedy available to it under this Lease, at law, in equity or otherwise,

- 77 -

06/13/95/CENTCITY/LEASE1.W52

at any time thereafter cure such default for the account of
Landlord.  Any amount paid or any contractual liability incurred
by Tenant in curing such default shall be deemed paid or incurred
for the account of Landlord, and Landlord agrees to hold Tenant
harmless therefrom and reimburse Tenant upon demand therefor plus
interest thereon at a rate equal to the lesser of (i) twelve
percent (12%) per annum, or (ii) the maximum rate of interest
permitted by law.  If Landlord fails to reimburse Tenant upon
demand for any amount paid for the account of Landlord hereunder
or otherwise due Tenant from Landlord, said amount may be offset
by Tenant against Minimum Rent or other charges payable
hereunder.  Notwithstanding the foregoing, Tenant may cure any
default described in Paragraph 18(a)(i) prior to the expiration
of the period set forth therein if the curing of such default
prior to the expiration of such period is reasonably necessary to
protect the Shopping Center or Tenant's interest therein or to
prevent injury or damage to persons or property.

     19.   ESTOPPEL CERTIFICATES.

          At any time after the RCD either party, within
thirty (30) days after delivery of a request in writing from the
other, shall execute and deliver a statement in writing
certifying that this Lease is unmodified and in full force and
effect (or if there have been modifications, that the same is in
full force and effect as modified and stating the modifications),
the dates to which Minimum Rent and other charges payable

- 78 -

06/13/95/CENTCITY/LEASE1.W52

hereunder have been paid and any other factual information a
purchaser, lender, assignee or sublessee may reasonably request.

20.   SUBORDINATION AND NONDISTURBANCE.

This Lease is and shall be prior to any deed of trust
recorded after the date of this Lease affecting all or any part
of the Premises.  If, however, the holder of any deed of trust
requires that this Lease be subordinated to such deed of trust,
Tenant agrees to subordinate this Lease to that deed of trust if
Landlord first obtains from such holder a written nondisturbance
agreement in form and substance reasonably satisfactory to
Tenant.  In no event shall Tenant's obligations be increased or
Tenant's rights decreased by such nondisturbance agreement.  Such
nondisturbance agreement shall be recorded in the office of the
county recorder of the county in which the Premises are located.
The term "deed of trust" as used herein includes mortgages, deeds
of trust, other monetary liens or encumbrances, all
modifications, extensions, renewals and replacements thereof,
given as collateral security for any obligation affecting the
Premises.

21.   END OF TERM.

At the expiration or earlier termination of the Lease
Term, Tenant shall: (i) surrender the Premises in the same
condition as they were upon acceptance of possession thereof at
the commencement of the Lease Term, subject to normal wear and

- 79 -

06/13/95/CENTCITY/LEASE1.W52

tear, damage by the elements, alterations, additions and
improvements permitted under Paragraph 10.5, damage that pursuant
to Sections 12 and 16 does not have to be repaired and repairs
that are the Landlord's responsibility to make; (ii) deliver all
keys to the Premises to Landlord; and (iii) have the right to
remove from the Premises and the Shopping Center all of its
signs, sign panels, sign supports and pylons, trade fixtures,
equipment and other personal property.

        22.   LANDLORD'S WARRANTY OF TITLE; QUIET POSSESSION.

        (a)   Landlord represents and warrants that it has good
title to the Shopping Center including without limitation, the
Premises and the Common Area, subject only to Permitted Liens (as
defined below), that it has full right and authority to make this
Lease and to perform as required under this Lease, and that this
Lease does not conflict with any other agreement to which
Landlord is bound.  Landlord will furnish to Tenant upon request
evidence reasonably satisfactory to Tenant of its title and
authorization.  "Permitted Liens" means (a) current taxes not
past due, (b) utility easements and leases not conflicting with
Tenant's rights under this Lease, and (c) those priority
mortgages, deeds of trust or leases for which Tenant has received
a nondisturbance agreement as contemplated by Section 20 or
Paragraph 2.3.1(e).  Landlord represents and warrants to the best
of Landlord's knowledge, information and belief that Tenant's use
of the Premises for the sale of general merchandise including

                            - 80 -

06/13/95/CENTCITY/LEASE1.W52

bargain and close-out merchandise and the use of the Common Area

for access to the Premises and other purposes contemplated by

this Lease, shall not be prevented or materially impaired by any

zoning, building, health, safety, environmental or other

governmental law or regulation in effect as of the date of this

Lease.  Landlord represents and warrants that Tenant's use of the

Premises for the sale of general merchandise including bargain

and close-out merchandise and the use of the Common Area for

access to the Premises and other purposes contemplated by this

Lease, shall not be prevented or materially impaired at any time

during the Lease Term, by any restriction, covenant, lease or

agreement entered into by Landlord, whether of record or not.

(b)  Landlord covenants that upon payment of the rental

herein reserved and the due performance by Tenant of the

covenants and agreements herein contained on its part to be

performed, Tenant shall at all times peaceably and quietly hold

and enjoy the Premises and all of the rights granted it under

this Lease during the Lease Term.


23.  BROKERAGE.

Each party represents and warrants that it has caused

or incurred no claims for brokerage commissions or finders' fees

in connection with the execution of this Lease, other than to

Wm. Boudoures Company and its agent, Bill Boudoures, the payment

of which shall be the sole responsibility of Landlord.  Each

party shall indemnify and hold the other harmless from and

- 81 -

06/13/95/CENTCITY/LEASE1.W52

against any other claims for commissions or finder's fee caused
by the party whose actions or alleged commitments form the basis
of such claim.


    24.  FORCE MAJEURE.

        Whenever a period of time is provided for in this Lease
for Landlord or Tenant to perform or do any act or thing, there
shall be excluded from the computation of such period of time any
period during which performance is delayed due to strikes, riots,
acts of God, weather, shortages of labor, governmental laws,
rules or regulations, or from any other cause or causes beyond
the reasonable control of the party (other than financial
inability to perform) required to perform such act or do such
thing, or that of its agents, servants, employees or contractors.


    25.  LEASE MEMORANDUM.

        Within ten (10) days after Landlord's receipt thereof,
Landlord shall execute, acknowledge and deliver to Tenant a
memorandum of this Lease.  Tenant may cause said memorandum to be
recorded in the office of the county recorder of the county in
which the Premises are located.  Upon the expiration of the Lease
Term or termination of this Lease for any reason, and within ten
(10) days after receipt of Landlord's written request, Tenant
shall execute, acknowledge and deliver an instrument in
recordable form, prepared by Landlord and reasonably acceptable

06/13/95/CENTCITY/LEASE1.W52

to Tenant, which shall have the sole purpose of removing the effect of this Lease from the public records.

26.   ATTORNEYS' FEES.

The prevailing party in any arbitration, action or proceeding instituted by one party against the other for the enforcement or construction of this Lease shall be entitled to reasonable attorneys' and/or expert fees and costs incurred in such action in addition to all other relief to which such party may be entitled.

27.   NOTICES.

Any and all notices by Landlord to Tenant, or by Tenant to Landlord, shall be in writing and either personally served or sent by registered or certified mail, postage prepaid, or by a nationally recognized overnight courier or delivery service (such as Federal Express or UPS), addressed as follows:

| | |
|---|---|
| Notices to Landlord: | Central City South Associates<br>c/o Kister Company<br>225 So. Meramec, Suite 508<br>Clayton, MO 53105<br>Attn.: George Kister |
| Notices to Tenant: | PNS Stores, Inc.<br>2430 East Del Amo Boulevard<br>Dominguez, California  90220-6306<br>Attention:  Senior Vice President<br>Real Estate & Const. |
| With a copy to: | PNS Stores, Inc.<br>2430 East Del Amo Boulevard<br>Dominguez, California  90220-6306<br>Attention:  General Counsel |

- 83 -

06/13/95/CENTCITY/LEASE1.W52

Either party at any time may change its address by notice to the other party in writing given as provided in this Section.  The earlier of the (i) date of receipt or (ii) three (3) days after the date such notice is given in accordance with this Section shall constitute the initial date of notice in computing the elapsed time as specified in any notice requirement in this Lease.  Minimum Rent shall be payable by check sent by ordinary mail to Landlord at the address as set forth in this Section or as set forth in any change of address for which notice is given pursuant to this Section.

28.   SUCCESSORS.

Each of the terms, covenants and conditions of this Lease shall extend to and be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective legal representatives, successors and assigns.  Whenever in this Lease reference is made to either Landlord or Tenant, the reference shall be deemed to include, wherever applicable, the legal representatives, successors and assigns of such parties.

29.   INTERPRETATION.

This Lease shall be interpreted in accordance with the laws of the State in which the Premises are located.  The language in all parts of this Lease shall be construed in all cases as a whole and according to its fair meaning and not

- 84 -

06/13/95/CENTCITY/LEASE1.W52

strictly for or against Landlord or Tenant, nor shall the fact that any portion of this Lease was drafted by Landlord or by Tenant be reason for the construction of such portion against or in favor of either party.  If any clause or provision herein contained is adjudged invalid, the same shall not affect the validity of any other clause or provision of this Lease.  The parties acknowledge and agree that this Lease is a lease of premises in a shopping center for purposes of the Bankruptcy Code.

    30.   RELATIONSHIP OF PARTIES.

        Nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent or of a partnership or joint venture between the parties hereto.  It is understood and agreed that neither the method of computation of rent nor any provision contained herein, nor any of the acts of the parties hereto, shall create a relationship other than the relationship of landlord and tenant.

    31.   ENTIRE AGREEMENT.

        This Lease constitutes the entire agreement between the parties hereto and supersedes all previous agreements and understandings between the parties in any way relating to the subject matter hereof, including without limitation, any letter of intent or proposal to lease.  No amendment to or modification

- 85 -

06/13/95/CENTCITY/LEASE1.W52

of this Lease shall be binding unless the same is in writing and
signed by both Landlord and Tenant.

    32. OFFER TO LEASE.

        Execution and delivery by Landlord of this Lease
constitutes an offer which shall not be deemed accepted by Tenant
until Tenant has executed this Lease and delivered a duplicate
original thereof to Landlord.

    33. AUTHORITY.

        Each individual signing on behalf of a party hereto
represents and warrants that he or she is authorized by the Board
of Directors, managing partner or other appropriate body or
individual, as the case may be, to execute this Lease on behalf
of such party.

    34. HOLDING OVER.

        Landlord hereby consents to Tenant remaining in
possession of the Premises after expiration or termination of the
Lease Term on a month-to-month basis, terminable upon sixty (60)
days' written notice. Such month-to-month tenancy shall be upon
the same terms and conditions contained herein so far as
applicable, with Minimum Rent equal to the amount of Minimum Rent
in effect immediately prior to the expiration or termination of
the Lease Term, prorated and payable in arrears at the end of
each month for the period of such tenancy.

06/13/95/CENTCITY/LEASE1.W52

35.  ANNOUNCEMENTS.

Without the prior written consent of Tenant, Landlord
will not make any oral or written public announcement of Tenant's
execution of this Lease or the transactions contemplated hereby.

36.  LIMITATION OF LANDLORD'S LIABILITY.

The obligations of Landlord under this Lease do not
constitute personal obligations of the individuals or entities
comprising Landlord, and Tenant shall look solely to "Landlord's
Interest in the Shopping Center" and to no other assets of
Landlord for satisfaction of any liability in respect of this
Lease and will not seek recourse against Landlord, nor against
any personal assets of Landlord, for such satisfaction.
"Landlord's Interest in the Shopping Center" shall include,
without limitation, (i) any equity or leasehold interest therein,
(ii) any rents, issues and profits generated therefrom, (iii) any
proceeds from the sale or other disposition thereof, and (iv) any
insurance proceeds for a casualty or proceeds or awards for a
taking received or receivable by Landlord in connection with the
Shopping Center.  Notwithstanding the foregoing, this Section
shall (a) not apply to liability of Landlord incurred pursuant to
Paragraph 10.6 of this Lease, and (b) apply only if the value of
Landlord's Interest in the Shopping Center (over and above the
amounts secured by any mortgages, deeds of trust or other liens
thereon) equals or exceeds fifteen percent (15%) of the fair
market value of the Shopping Center as of the date Tenant

- 87 -

attempts to enforce its judgment against Landlord's Interest in the Shopping Center.

37.   SALE OF CENTER.

In the event of any sale, exchange or other conveyance of Landlord's interest in the Shopping Center or any portion or portions thereof by Landlord, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises, the Shopping Center or this Lease occurring after the consummation of such sale, exchange, conveyance or assignment provided that such transferee assumes in writing all of Landlord's obligations arising after the effective date of the sale, exchange, conveyance or assignment, a copy of which shall be delivered to Tenant.  Landlord expressly agrees that Landlord will continue to be responsible for any acts, occurrences or omissions prior to the effective date of such sale, exchange, conveyance or assignment.

IN WITNESS WHEREOF, the parties have executed this Lease as of the date and year first above mentioned.

**THIS LEASE CONTAINS A BINDING ARBITRATION PROVISION WHICH**

06/13/95/CENTCITY/LEASE1.W52

**MAY BE ENFORCED BY THE PARTIES.**

LANDLORD:      Central City South Associates,
               a Missouri general partnership

               By: _____
               Name: MICHAEL O. FARRELL
               Title: ~~General~~ Partner
                      MANAGING

               By: _____
               Name: GEORGE KISTER
               Title: ~~General~~ Partner
                      MANAGING

               By: _____
               Name: _____
               Title: ~~General~~ Partner
                      MANAGING

               By: _____
               Name: _____
               Title: ~~General~~ Partner
                      MANAGING

               Landlord's Taxpayer
               Identification Number:
               43-1482483

TENANT:        PNS STORES, INC.,
               a California corporation

               By: _____
                   Philip L. Carter
                   President and
                   Chief Executive Officer

               By: _____
                   Patricia J. Wehner
                   Senior Vice President
                   Real Estate & Construction

06/13/95/CENTCITY/LEASE1.W52

LEGAL DESCRIPTION OF SHOPPING CENTER


Landlord:        Central City South Associates

Tenant:          PNS Stores, Inc.

Date of Lease: _____June 22___, 1995


A parcel of ground being part of Blocks 21 and 22, of "CARONDELET COMMONS
SOUTH OF RIVER DES PERES", being partly in Township 43 North, Range 6 east,
and Township 44 North, Range 6 East, said parcel being more particularly
described as follows:  Beginning at a point in the Northwestern line of Lemay
Ferry road, 80 feet wide, distant South 48 degrees 08 minutes West 73.75 feet
from its intersection with the Southwestern line of Forder Road, formerly
20.46 feet wide; thence South 48 degrees 08 minutes West 692.61 feet along
the Northwestern line of said Lemay Ferry Road; thence continuing
Southwestwardly 293.00 feet along the Northwestern line of said Lemay Ferry
Road, along a curve to the right having a radius of 2069.24 feet, the chord
of which bears South 52 degrees 11 minutes 25 seconds West 292.75 feet to the
Southwestern line of said Block 22; thence North 52 degrees 17 minutes West
716.12 feet along the Southwestern line of said Lots 22 and 21, to the
Southeastern line of property described in deed to Storage Equities, et al,
recorded in Book 8074, page 1029, St. Louis County Recorder's Office; thence
North 45 degrees 38 minutes East 830.56 feet along the Southeastern line of
said Storage Equities property, to the Eastern line of Interstate I-55/I-270;
thence North 82 degrees 20 minutes East 250.26 feet along the Eastern line of
said Interstate I-55/I-270, to the Southwestern line of Forder Road, as
widened, by instrument recorded in Book 6784, page 185, St. Louis County
Recorder's Office; thence in a generally Southeastwardly direction, along the
Southwestern line of said Forder Road, as widened, the following courses and
distances: South 54 degrees 11 minutes East 138.55 feet, South 51 degrees 13
minutes 15 seconds East 280.38 feet, and South 54 degrees 14 minutes East
170.02 feet, to a point of curve; thence Southwardly 62.53 feet, along a
curve to the right having a radius of 35 feet, to a point of tangency, in the
Northwestern line of said Lemay Ferry Road, and the point of beginning.


This Exhibit "A" is attached to this Lease pursuant to

Paragraph 1.1 hereof.

EXHIBIT A



SITE PLAN

LANDLORD:    Central City South Associates
TENANT:      PNS Stores, Inc.
DATE OF LEASE:   June 22, 1995

06/13/95/CENTCITY/LEASE1.W52

LANDLORD'S WORK


Landlord:        Central City South Associates

Tenant:          PNS Stores, Inc.

Date of Lease: _____June 22_, 1995


This Exhibit "C" is attached to this Lease pursuant to

Paragraph 3.1 hereof.  Landlord's Work means all work required to

fully construct the Premises including, without limitation:

     1.   All interior and exterior improvements to the

Premises necessary to construct a finished retail store, on a

turnkey basis, including without limitation: (a) perimeter walls

and interior partitions (with studs and dry wall sanded, taped

and painted); (b) finished concrete slab floor, which shall be

level throughout the entire Premises, with vinyl floor tile

installed; (c) electrical service and lighting systems (including

service circuits and walker duct assembly); (d) mechanical

systems (including heating, ventilating and air conditioning

having a capacity engineered to local conditions but not less

than one ton per 400 square feet); (e) fire sprinklers if and as

required by applicable law; (f) handicap rest rooms as required

by applicable law including health department regulations;

(g) canopied storefront and two automatic customer doors having a

3 1/2 foot width each; and (h) freight entrance with roll-up

door.  Landlord's Work shall be completed in compliance with the

EXHIBIT C

06/13/95/CENTCITY/LEASE1.W52

last version of the Final Plans approved by Landlord and Tenant
and all applicable governmental agencies and in compliance with
all applicable building, handicap, landscaping, fire, health,
safety, occupancy and other laws, regulations, codes and
requirements.

     2.  All improvements in and to the Common Area
surrounding the Premises including, without limitation,
sidewalks, service drives, driveways, parking areas, landscaping,
lighting and a multi-tenant pylon sign.

EXHIBIT C

06/13/95/CENTCITY/LEASE1.W52

EXISTING EXCLUSIVE USE PROVISIONS


Landlord:        Central City South Associates

Tenant:          PNS Stores, Inc.

Date of Lease: _____June 22_____, 1995


This Exhibit "D" is attached to this Lease pursuant to
Paragraph 8.1 hereof.


        1.   The lease with The Right Cut provides that Landlord
"shall not lease space in the Central City South Shopping Center
to another tenant whose primary business is a hair salon."

        2.   The lease with "Castelli" grants the tenant "the
exclusive right to operate a retail store the principal purpose
of which is the sale and rental of men's formal wear and men's
formal wear and accessories" and the right to "be the only tenant
with such exclusive right to sell or rent tuxedos and related
accessories."

        3.   The lease with Frame Factory, Ltd. provides that
"Lessee shall have the exclusive right in the Shopping Center to
operate a store whose principal purposes are custom framing and
do-it-yourself framing."


EXHIBIT D

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE is made and entered into effective as of this *15th* day of July, 2002 by and between SOUTHPOINT PLAZA, L.L.C., a Missouri limited liability company (successor in interest to Central City South Associates) as Landlord, and PNS STORES, INC., a California corporation, as Tenant. *(August)*

### WITNESSETH:

WHEREAS, effective as of June 22, 1995, Landlord intended to enter into that certain lease for premises consisting of approximately 18,000 square feet as situated in the shopping center commonly known as Southpoint Plaza located at the intersection of Lemay Ferry Road and Forder Road, St. Louis, Missouri; and

WHEREAS, the parties hereto desire to amend the Lease as set forth hereinbelow.

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.  With respect to Section 8.2(a), following the words "animal breeding or storage" on the eighth line thereof, the Lease shall now include the following language:

    "(except that this prohibition shall not prohibit pet stores or such veterinary services as are typically provided in conjunction with a PETsMART store or similar retail operation, including overnight boarding of animals in conjunction with veterinary, grooming or other pet services, emergency services or surgery performed thereby, and pets which are typically kept overnight in the store for sale and/or adoption)".

2.  Except as modified hereinabove, the Lease shall remain in full force and effect according to the terms and provisions set forth therein.

IN WITNESS WHEREOF, the foregoing has been executed effective as of the day and year first above written.

TENANT:                                         LANDLORD:

PNS STORES, INC. a                              SOUTHPOINT PLAZA, L.L.C., a
California corporation                           Missouri limited liability company

By: _____                   By: _____
Name: _____                   Name: GEORGE Kirton
Title: _____                   Title: Managing Member
            KATHLEEN HUPPER
            VICE PRESIDENT

By: _____
Name: _____
Title: _____

ODMA\PCDOCS\DOCS\553019\1

BL#1314

## SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT (the "Agreement"), made and entered into this __16__ day of __October__, 2019 (the "Effective Date"), by and between Southpoint Plaza Shopping Center, LLC, a Missouri limited liability company and GKK I, LLC, a Missouri limited liability company as Tenants in Common, whose business address is c/o White Company, 1600 S. Brentwood Boulevard, Suite 770, St. Louis, Missouri 63144 (the "Landlord") and PNS Stores, Inc., a California corporation, doing business as Big Lots, whose mailing address is 4900 Dublin Granville Road, Columbus, Ohio 43081 (the "Tenant").

### WITNESSETH

WHEREAS, Landlord's predecessor and Tenant have entered into that certain Lease, dated June 22, 1995, as amended (collectively, the "Lease"), for approximately 18,000 square feet of ground floor area (the "Demised Premises") located in Central City South Shopping Center at 4433 Lemay Ferry Road, Saint Louis, MO 63129 (the "Shopping Center"), as more particularly described in the Lease.

WHEREAS, the Term of the amended Lease is set to expire on January 31, 2020.

WHEREAS, Landlord and Tenant now desire to modify and further extend the Lease for a three (3) year period as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. Effective as of the Effective Date, the Term of the Lease is hereby extended for a three (3) year period commencing on February 1, 2020 and expiring on January 31, 2023 (the "Second Extended Term"). For purposes of this Agreement, all references to the term "Extended Term" shall be deemed to refer to the Extended Term as defined in this Agreement. In addition, from and after the Effective Date, all references to the term "Term" or "Lease Term" contained in the Lease shall be deemed to mean the term of the Lease as extended by the Extended Term.

2. During the Extended Term, Tenant shall continue to pay Minimum Rent in the amount of One Hundred Seventy-One Thousand and 00/100 Dollars (**$171,000.00**) per annum, payable in equal monthly installments of Fourteen Thousand Two Hundred Fifty and 00/100 Dollars (**$14,250.00**).

3. During the Extended Term, Tenant shall continue to pay its Proportionate Share of Common Area Expenses pursuant to Section 5.4 of the Lease; Real Property Taxes pursuant to Section 6 of the Lease; and Insurance pursuant to Section 7 of the Lease.

4. Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions

BL #1314

of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

5. This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

[SIGNATURES ON NEXT PAGE]

BL #1314

IN WITNESS WHEREOF, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**LANDLORD:**                                    **TENANT:**

SOUTHPOINT PLAZA, LLC              PNS STORES, INC.

By: *James Ferrick*                        By:_____
                                                    Print Name: Jonathan Ramsden
                                                    Title:  Executive  Vice  President,  Chief
                                                    Financial & Administrative Officer

GKKI, L.L.C.

BY: _____

3

BL #1314

Tenant's Acknowledgement)

STATE OF OHIO            )
                         )
County of  Franklin      )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, PNS Stores, Inc., a California corporation, by Jonathan Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this 11ᵗʰ day of October_____, 2019.

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

Notary Public

(Landlord's Acknowledgement)

STATE OF Missouri    )
                     )
County of St. Louis  )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, South Point Plaza, LLC and GKK I, LLC., by James H. Ferrick____, its Managing Partner____, who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at 1600 So. Brentwood, St. Lou., 63144_____, this 16 day of October_____, 2019.

FLORENCE J. STEINMEYER
Notary Public - Notary Seal
State of Missouri, St. Louis County
Commission #12662020
My Commission Expires: 11/26/2020

Notary Public

4

BL #1314

STATE OF _Missouri_ )
                     )
County of _St. Louis_ )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, GKK I, LLC, by _Karen Moculeski_, its _Managing Partner GKK I_, who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at _1600 So. Brentwood St. Louis, mo 63144_, this _16_ day of _October_, 2019.

FLORENCE J. STEINMEYER
Notary Public - Notary Seal
State of Missouri, St. Louis County
Commission #12662020
My Commission Expires: 11/26/2020

Notary Public

5

DocuSign Envelope ID: 42674145-B38A-422A-88A2-CBB7010E85AB

BL #1314

## THIRD LEASE MODIFICATION AGREEMENT

This Third Lease Modification Agreement (the "Agreement") is made as of the 3ʳᵈ day of _July_, 2022, (the "Effective Date") by and between **SOUTHPOINT PLAZA, L.L.C.** and **GKKI, L.L.C.** (collectively, "Landlord") having a business address of C/O KCM Management and Consulting, LLC, 11939 Manchester Rd., Suite 316, St. Louis, MO 63131 ("Landlord"), and **BIG LOTS STORES – PNS, LLC, a California limited liability company, formerly known as PNS Stores, Inc.**, ("Tenant") having a mailing address of 4900 East Dublin Granville Road, Columbus, OH 43081 (the "Tenant").

### RECITALS:

Landlord and Tenant are parties to a Lease Agreement dated June 22, 1995 (the "Original Lease") for approximately 18,000 square feet of ground floor ("Premises") located in the Central City South Shopping Center, at 4433 Lemay Ferry Rd., Saint Louis, MO 63129 (the "Shopping Center"), as more particularly described in the Lease. The Original Lease together with any amendments thereto shall hereinafter be collectively referred to as the "Lease."

A.      The current Term of the Lease is currently set to expire on January 31, 2023.

B.      The parties desire to extend the Term of the Lease for approximately three (3) years and further amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.      <u>Extension of Term</u>. Effective as of the Effective Date, the Term of the Lease is hereby extended for approximately three (3) years commencing on February 1, 2023 and expiring on January 31, 2026 (the "Third Extended Term") upon the same terms and conditions as contained in the Lease, except as set forth herein.

2.      <u>Minimum Rent</u>. During the Third Extended Term, the Minimum Rent payable by Tenant to Landlord for the Premises shall be as follows:

| **Period** | **Annual Minimum Rent** | **Monthly Installments of Minimum Rent** |
|---|---|---|
| February 1, 2023 – January 31, 2026 | $180,000.00 ($10.00/sf) | $15,000.00 |

DocuSign Envelope ID: 42674145-B38A-422A-88A2-CBB7010E85AB

3.      Percentage Rent. Effective and commencing February 1, 2023, Section 4.3 of the Lease shall be deleted in its entirety.  Tenant's payment of Percentage Rent and Tenant's reporting of Gross Receipts pursuant to Section 4.3.1 of the Lease shall be null and void and of no further force and effect on and after February 1, 2023.

4.      Consent.  In consideration of this Agreement, Tenant hereby consents to Landlord leasing space in the Shopping Center for general office use, as seen on the attached site plan marked Exhibit A provided that: (i) the total aggregate rentable square footage of such office use shall not exceed 15,000 rentable square feet and (ii) such office use does not otherwise violate the prohibited uses in Section 8.2 of the Lease.  It is understood and agreed that the Prohibited Use provision set forth in Section 8.2 of the Lease shall not be deemed waived or modified in any way except as provided herein.

5.      Full Force and Effect; Successors and Assigns.  Unless otherwise set forth herein, all capitalized terms shall have the meaning set forth in the Lease.  Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto.  In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects.  The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

6.      Counterpart Execution.  This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

Landlord and Tenant have respectively signed this Third Modification Agreement as of the date first hereinabove set forth.

**LANDLORD:**
**SOUTHPOINT PLAZA L.L.C.**

By: _____
Name: KAREN MOCULESKI
Title: Managing Member

GKKI, L.L.C.

By: _____
Name: KAREN MOCULESKI
Title: managing member

**TENANT:**
**BIG LOTS STORES – PNS, LLC, a California limited liability company**

By: _____
Name: Jonathan Ramsden
Title:    Executive Vice President, Chief
          Financial & Administrative Officer

DocuSign Envelope ID: 42674145-B38A-422A-88A2-CBB7010E85AB

BL #1314

DocuSign Envelope ID: 42674145-B38A-422A-88A2-CBB7010E85AB

BL #1314

## EXHIBIT A

