IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| In re: ) | Chapter 11 |
| ) | |
| BIG LOTS, INC., *et al.*, ) | Case No. 24-11967 (JKS) |
| ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | Re:  Docket Nos. 9, 136 |
| ) | |
| ) | Obj. Deadline: 10/2/24 at 4:00 p.m. |
| ) | Hearing Date: 10/9/24 at 1:00 p.m. |
| _____ ) | |

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE
MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR
DISCONTINUING SERVICE, (II) DEEMING UTILITIES ADEQUATELY ASSURED
OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR
DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE**

Appalachian Power Company, Public Service Company of

Oklahoma, Southwestern Electric Power Company, Ohio Power

Company, Indiana Michigan Power Company (collectively, "AEP"),

Arizona Public Service Company ("APS"), Ohio Edison Company

("Ohio Edison"), Potomac Edison Company ("PE"), West Penn Power

Company ("WPP"), Pennsylvania Electric Company ("Penelec"),

Monongahela Power Company ("Mon Power"), Metropolitan Edison

Company ("Met-Ed"), Pennsylvania Power Company ("Penn Power"),

Jersey Central Power & Light Company ("JCP&L"), Toledo Edison

Company ("TE"), The Cleveland Electric Illuminating Company

("CEI"), Virginia Electric and Power Company d/b/a Dominion

Energy Virginia ("DEV"), Dominion Energy South Carolina, Inc.

("DESC"), Public Service Company of North Carolina Incorporated ("PSNC"), Georgia Power Company ("Georgia Power"), PSEG Long Island ("PSEGLI"), Salt River Project ("SRP"), San Diego Gas and Electric Company ("SDG&E"), Southern California Gas Company ("SoCalGas"), Southern California Edison Company ("SCE"), Baltimore Gas and Electric Company ("BGE"), Commonwealth Edison Company ("ComEd"), PECO Energy Company ("PECO"), The Potomac Electric Power Company ("Pepco"), Delmarva Power & Light Company ("DPL"), Atlantic City Electric Company ("ACE"), Tampa Electric Company ("TEC"), Peoples Gas System, Inc. ("Peoples Gas"), Entergy Arkansas, LLC ("Entergy "AR"), Entergy Louisiana, LLC ("Entergy LA"), Entergy Mississippi, LLC ("Entergy MS"), Entergy Texas, Inc. ("Entergy TX"), The Connecticut Light & Power Company ("CL&P"), Yankee Gas Services Company ("Yankee Gas"), Public Service Company of New Hampshire ("PSNH"), Eversource Gas of Massachusetts ("EGMA"), NStar Electric Company, Western Massachusetts ("NStar West"), NStar East Electric ("NStar East"), Boston Gas Company ("BGC"), KeySpan Energy Delivery Long Island ("Kedli"), Massachusetts Electric Company ("MEC"), Niagara Mohawk Power Corporation ("NIMO"), Orange & Rockland Utilities, Inc. ("ORU"), The East Ohio Gas Company d/b/a Enbridge Gas Ohio ("EGO"), Tucson Electric Power Company ("TEP"), UNS Electric, Inc. ("UNS Electric"), UNS Gas, Inc. ("UNS Gas"), Oklahoma Gas and Electric Company ("OGE"), Symmetry Energy Solutions, LLC

2

("SES"), Constellation NewEnergy, Inc. ("CNE"), Constellation NewEnergy – Gas Division, LLC ("CNEG"), CenterPoint Energy Resources Corp. ("CERC"), New York State Electric and Gas Corporation ("NYSEG"), Rochester Gas & Electric Corporation ("RG&E"), Florida Power & Light Company ("FPL"), Central Maine Power Company ("CMP") and Public Service Electric and Gas Company ("PSE&G") (collectively, the "Utilities"), hereby object to the *Motion of Debtors For Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures For Determining Requests For Additional Adequate Assurance* (the "Utility Motion")(Docket No. 9), and set forth the following:

## **Introduction**

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) of the Bankruptcy Code from seeking to modify the amounts of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amounts of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to avoid the plain language and requirements of Section 366(c).

Through the Utility Motion, the Debtors seek to have this Court approve their form of adequate assurance of payment, which

is a bank account containing approximately $3,000,000 that supposedly reflects an amount equal to two-weeks of utility charges, calculated as a historical average of utility charges over the first six months of 2024, net of any existing deposits held by the Debtors' utility providers (the "Bank Account").  As an initial matter, the Debtors' proposal that the monies contained in the Bank Account should be net of any prepetition deposits does not make sense because the Debtors do not know if any of the prepetition deposit amounts will remain after recoupment of prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

Moreover, the Debtors' proposed $3,000,000 to be contained in the Bank Account would only reflect less than thirteen days of the Debtors' average utility charges ($7,100,000 of average monthly utility charges/30 days = $236,667 per day of utility charges; $3,000,000/236,667 = 12.68 days), and not approximately two-weeks of the Debtors' average monthly utility charges.

The Utility Services List attached at Exhibit "B" to the Utility Motion reflects that the Bank Account would contain the following on behalf of the Utilities:  (a) AEP - $138,965; (b) APS - $23,354; (c) Ohio Edison - $9,508; (d) PE - $3,463; (e) WPP - $12,724; (f) Penelec - $13,607; (g) Mon Power - $9,355; (h) Met-Ed- $6,714; (i) Penn Power - $892; (j) JCP&L - $8,597; (k) TE - $4,775; (l) CEI - $6,510; (m) DEV - $31,761; (n) DESC -

4

$22,298; (o) PSNC - $2,213; (p) Georgia Power – $61,985; (q) PSEGLI - $16,478; (r) SRP - $0; (s) SDG&E - $13,053; (t) SoCalGas - $1,938; (u) SCE - $95,762; (v) BGE - $18,279; (w) ComEd - $2,831; (x) PECO - $10,363; (y) Pepco - $3,788; (z) DPL 7,286; (aa) ACE - $24,736; (bb) TEC - $9,525; (cc) Peoples Gas - $26; (dd) Entergy AR - $4,462; (ee) Entergy LA - $13,460; (ff) Entergy MS - $4,252; (gg) Entergy TX - $6,562 (hh) Eversource (CPL&P, Yankee Gas, PSNH, EGMA, NStar West and NStar East) – $35,912; (ii) National Grid (BGC, Kedli, MEC and NIMO) – $48,735; (jj) ORU - $3,157; (kk) EGO - $4,874; (ll) TEP – $7,452; (mm) UNS Electric - $4,521; (nn) UNS Gas - $479; (oo) OGE - $27,384; (pp) SES - $0; (qq) CNE - $32,777; (rr) CNEG – $5,708; (ss) CERC - $1,313; (tt) NYSEG - $12,199; (uu) RGE – $6,292; (vv) FPL - $67,971; (ww) CMP - $5,707; and (xx) PSE&G – $21,612.

The Court should reject the Debtors' proposed Bank Account because:  (1) The Utilities bill the Debtors on a monthly basis and provide the Debtors with generous payment terms pursuant to applicable state law, tariffs, regulations and/or contract, such that a supposed two-week account maintained by the Debtors is not sufficient in amount or in form to provide the Utilities with adequate assurance of payment; (2) Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include

a segregated bank account; (3) the Debtors' propose that the amounts contained in the Bank Account on behalf of a utility would be net of any prepetition deposit held by the utility; and (4) Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities (which it should not), this Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

As discussed below, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* (the "Store Closing Sales Procedures Motion") (Docket No. 16) requesting approval of Store Closing Procedures and other relief.  The Store Closing Sales Procedures Motion does not include procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor store locations once a store closing sale is completed.  Also as discussed below, the Debtors filed the *Motion of Debtors For Entry of An Order (I) Authorizing Debtors To Reject Certain Unexpired Leases of Nonresidential Real Property and (II) Authorizing and Establishing Procedures To Reject Executory Contracts and Unexpired Leases* (the "First Lease Rejection Motion")(Docket No. 17).  The First Lease

Rejection Motion does not include procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor locations as of the proposed lease rejection dates (the Petition Date and September 30, 2024).  As such, there is no way for a Utility to know when the Debtors no longer require service at a store location where (i) store closings have been completed, or (ii) a lease is rejected.  Outside of bankruptcy, applicable state law and/or tariffs require the Debtors to close accounts when they no longer require utility service.  Accordingly, the Debtors should be required to close their accounts with the Utilities on the date that the Debtors no longer require post-petition utility service or remain administratively obligated for the payment of such charges until they close the applicable account(s).

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contract:  (a) AEP - $550,522 (2-month); (b) APS - $230,322 (2.5-month); (c) Ohio Edison - $45,426 (2-month); (d) PE - $31,164 (2-mont); (e) WPP - $52,520 (2-month); (f) Penelec - $58,858 (2-month); (g) Mon Power - $47,650 (2-month); (h) Met-Ed - $32,710 (2-month); (i) Penn Power - $1,328 (2-month); (j) JCP&L - $40,838 (2-month); (k) TE - $23,098 (2-month); (l) CEI - $31,066 (2-month); (m) DEV - $140,098 (2-month); (n) DESC - $121,935 (2-month); (o) PSNC -

$7,370 (2-month); (p) Georgia Power - $156,180 (2-month); (q)
PSEGLI - $79,866 (2-month); (r) SRP - $146,616 (2-month); (s)
SDG&E - $25,222 (2-month); (t) SoCalGas - $8,615 (2-month); (u)
SCE - $590,492 (2-month); (v) BGE - $56,365 (2-month); (w) ComEd
- $36,215 (2-month); (x) PECO - $41,450 (2-month); (y) Pepco -
$8,640 (2-month); (z) DPL - $20,980 (2-month); (aa) ACE - $32,390
(2-month); (bb) TEC - $62,848 (2-month); (cc) Peoples Gas - $407
(2-month); (dd) Entergy AR- $32,820 (2-month); (ee) Entergy LA -
$88,950 (2-month); (ff) Entergy MS - $31,490 (2-month); (gg)
Entergy TX - $31,774 (2-month); (hh) CL&P - $6,090 (1.5-month);
(ii) Yankee Gas - $865 (1.5-month); (jj) PSNH - $825 (2-month);
(kk) EGMA - $18,495 (2-month); (ll) NStar West - $9,390 (2-
month); (mm) NStar East - $18,841; (nn) BGC - $8,468 (2-month);
(oo) Kedli - $12,800 (2-month); (pp) MEC - $53,650 (2-month);
(qq) NIMO - $90,916 (2-month); (rr) ORU - $13,850 (2-month); (ss)
EGO - $14,784; (tt) TEP - $97,461 (2.5-month); (uu) UNS Electric
- $35,209 (2.5-month); (vv) UNS Gas - $6,224 (2.5-month); (ww)
OGE - $149,875 (2-month); (xx) SES - $26,850 (2-month); (yy) CNE
- $139,591 (2-month); (zz) CNEG - $65,734 (2-month); (aaa) CERC -
$15,875 (2-month); (bbb) NYSEG - $47,670; (ccc) RGE - $28,420 (2-
month); (ddd) FPL - $390,230 (2-month); (eee) CMP - $36,210 (2-
month); and (fff) PSE&G - $45,718.  Based on all of the
foregoing, this Court should deny the Utility Motion as to the
Utilities because the amounts of the Utilities' post-petition

deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.     On September 9, 2024 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.     The Debtors' Chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.     On the Petition Date, the Debtors filed the Utility Motion.

4.     On September 11, 2024, the Court entered the *Interim Order (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures For Determining Requests For Additional Adequate Assurance* (the "Interim Utility Order")(Docket No. 136).  The Interim Utility Order set (i) an objection deadline of October 2, 2024 and (ii) the final hearing on the Utility Motion to take place on October 9, 2024 at 1:00 p.m.

9

5.    The Debtors claim that during the first six months of 2024, they paid an average of approximately $7.1 million per month for utility charges.  Utility Motion at ¶ 10.

6.    Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Bankruptcy Code Sections 366(c)(2) and (3) by seeking Court approval for their own proposed form of adequate assurance of payment, which is the Bank Account containing approximately $3,000,000 that supposedly reflects an amount equal to two-weeks of utility charges, calculated as a historical average of utility charges over the first six months of 2024, net of any existing deposits held by the Debtors' utility providers.  Utility Motion at ¶ 12.

7.    The Debtors' proposal that the monies contained in the Bank Account should be net of any prepetition deposits does not make sense because the Debtors do not know if any of the prepetition deposit amounts will remain after recoupment of prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

8.    The Debtors' proposed $3,000,000 to be contained in the Bank Account would only reflect less than thirteen days of the Debtors' average utility charges ($7,100,000 of average monthly utility charges/30 days = $236,667 per day of utility charges; $3,000,000/236,667 = 12.68 days), and not approximately two-weeks of the Debtors' average monthly utility charges.

10

9.    The Utility Services List attached as Exhibit "C" to the Utility Motion reflects that the Bank Account would contain $0 on behalf of SRP and SES, presumably because those two Utilities hold surety bonds that they will make claims upon for the payment of prepetition debt.  The Debtors did not mention in the Utility Motion that their proposed amounts to be contained in the Bank Account would also be net of any surety bonds held by utility companies.

10.    The Debtors propose to "deposit" approximately $3,000,000 into the Bank Account, refer to the monies contained in the Bank Account as the "Adequate Assurance Deposit," and refer to the Bank Account as the "Utility Deposit Account." Utility Motion at ¶ 12.  Additionally, the Debtors state that "Section 366(c)(1)(A) of the Bankruptcy Code defines 'assurance of payment' to mean, among other things, a cash deposit." Utility Motion at fn. 3.  However, monies contained in an escrow account controlled by a customer of a utility such as the proposed Bank Account are not recognized as a "cash deposit" provided by a customer to a utility by any state public utility commission.  Additionally, Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated utility bank account.  Simply put, the Debtors are not proposing to provide any of their utilities with cash deposits as adequate

11

assurance of payment pursuant to Section 366(c) of the
Bankruptcy Code.

11.  The proposed Bank Account is not acceptable to the
Utilities and should not be considered relevant by this Court
because Sections 366(c)(2) and (3) do not allow the Debtors to
establish the form or amount of adequate assurance of payment.
Under Sections 366(c)(2) and (3), this Court and the Debtors are
limited to modifying, if at all, the amount of the security
sought by the Utilities under Section 366(c)(2).

12.  The Debtors claim that they have "established a good
payment history with the Utilities, making payments on a regular
and timely basis."  Utility Motion at ¶ 10.  However, even if
true, Section 366(c)(3)(B)(ii) expressly provides that in making
an adequate assurance of payment determination, a court may not
consider a debtor's timely payment of prepetition utility
charges.

13.  The Debtors propose that monies contained in the Bank
Account attributable to a utility shall be returned to the
Debtors, without further Court order on the earlier of (i) the
reconciliation and payment of the final invoice of a utility,
(ii) solely for utilities who provide services to the Debtors'
assets that are sold, the closing date for the sale of all or
substantially all of the Debtors' assets, (iii) the effective
date of a Chapter 11 Plan, or (iv) the date upon which the

Chapter 11 cases are dismissed or converted to cases under Chapter 7.  Utility Motion at ¶ 17.  Even if monies were contained in the Bank Account on behalf of all of the Utilities, the Utilities bill the Debtors in arrears and will likely provide post-petition utility goods/services to the Debtors through the effective date of a plan, a sale closing date, a store closing date or lease rejection date, meaning that any monies contained in the Bank Account should not be returned to the Debtors until the Debtors confirm that they have paid in full their post-petition utility expenses owed to their utility companies.

14.  Even if monies were contained in the Bank Account on behalf of all of the Utilities, the Utility Motion does not address why the Bank Account would be underfunded with supposedly two-weeks of utility charges when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contracts to bill the Debtors monthly.  Moreover, presumably the Debtors want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition.  Accordingly, if the Bank Account is relevant, which the Utilities dispute, and two-week amounts were actually contained in the Bank Account for each of the Utilities, the Debtors need to explain: (A) Why they are only proposing to deposit supposed two-week amounts (less

13

prepetition deposits and surety bonds amounts) into the Bank Account; (B) How such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills; and (C) Why the monies contained in the Bank Account should be net of any prepetition deposits because the Debtors do not know if any of the prepetition deposit amounts will remain after the Utilities recoup prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

15.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors ability to pay for future Utility Services in the ordinary course of business," constitutes sufficient adequate assurance of payment.  Utility Motion at ¶ 16.

## The Debtors' Financing Motion

16.   On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552, (I) Authorizing the Debtors To (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative*

14

*Expense Claims, (III) Providing Adequate Protection To Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Financing Motion") (Docket No. 20).

17.   Through the Financing Motion, the Debtors seek authority to obtain post-petition financing consisting of the obligations under a superpriority senior asset-based credit facility in the aggregate principal amount of $550 million. Financing Motion at ¶ 1.

18.   The Debtors also seek through the Financing Motion a carve-out for payments to the Debtors' professionals incurred prior to the delivery of a Carve-Out Trigger Notice, plus an additional $3.5 million after delivery of a Carve-Out Trigger Notice (the "Carve-Out").   Financing Motion at pages 19-20.

19.   The Debtors have the following Case Milestones: (i) no later than 35 days after the Petition Date – entry of order approving the DIP Facilities on a final basis; and (ii) no later than 90 days after the Petition Date – the Debtors shall have filed a motion to extend the lease assumption/rejection period by the maximum amount of time permitted under Section 365 of the Bankruptcy Code.   Financing Motion at page 20.

20.   The Debtors have the following Store Closing and Sale Milestones:  (i) During or prior to the week of September 28, 2024 – DIP Loan Parties shall commence with the next phase of

store closings of approximately 250 additional stores, which
store closings shall be consummated by no later than January 15,
2025, provided that any stores for which the Debtors have
received a bid on or prior to such additional phase shall not be
included in such phase of store closings; (ii) no later than 35
days after the Petition Date – the Sale Procedures Motion shall
be approved by the Court; (iii) 73 days after the Petition Date –
deadline for submission of bids to purchase any portion of, or
all or substantially all, of the Debtors' assets in connection
with the Sale; (iv) no later than 74 days after the Petition Date
– the Debtors shall distribute to the DIP Agents all bids
received for the Sale; (v) no later than 78 days after the
Petition Date – auction to be completed (if necessary); (vi) no
later than 83 days after the Petition Date – Court approval of
Sale; and (vii) no later than 95 days after the Petition Date –
the Debtors shall consummate the sale.  Financing Motion at pages
20-21.

21.  On September 10, 2024, the Court entered the *Interim
Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364,
503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003,
6004, and 9014 (I) Authorizing Debtors To (A) Obtain
Postpetition Financing and (B) Use Cash Collateral, (II)
Granting (A) Liens and Providing Superpriority Administrative
Expense Status and (B) Adequate Protection To Prepetition*

*Secured Creditors, (III) Modifying Automatic Stay, (IV)*

*Scheduling a Final Hearing, and (V) Granting Related Relief* (the

"Interim Financing Order")(Docket No. 114).

22.  The Interim Financing Order approved the Carve-Out.
Interim Financing Order at pages 52-53.

23.  Attached as Exhibit "4" to the Interim Financing Order
is a 13-week budget through the week ending November 30, 2024
(collectively, the "Budget").  Importantly, however, the Budget
does not include a line-item for the payment of post-petition
utility charges.  As such, it is not apparent from the Budget
whether sufficient funds have in fact been budgeted for the
timely (and full) payment of the Debtors' post-petition utility
charges.

**The Debtors' Critical Vendor Motion**

24.  On the Petition Date, the Debtors filed the *Motion of
Debtors For Entry of Interim and Final Orders (I) Authorizing
Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor
Claims, and 503(b)(9) Claims In the Ordinary Course of Business,
(II) Granting Administrative Expense Status To Debtors'
Undisputed Obligations To Vendors Arising From Post-Petition
Delivery of Goods Ordered Prepetition and Authorizing Debtors To
Pay Those Obligations In the Ordinary Course of Business, (III)
Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To
Pay Certain Prepetition Claims of Lien Claimants, and (V)*

17

*Authorizing Financial Institutions To Honor and Process Related Checks and Transfers* (the "Critical Vendor Motion")(Docket No. 11).  Through the Critical Vendor Motion, the Debtors sought authority to pay Critical Vendor Claims and Foreign Vendor Claims in an amount up to $40 million on an interim basis, and Critical Vendor Claims of up to $50 million on a final basis.  Critical Vendor Motion at ¶¶ 1, 9.

25.  On September 10, 2024, the Court entered the *Interim Order (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims In the Ordinary Course of Business, (II) Granting Administrative Expense Status To Debtors' Undisputed Obligations To Vendors Arising From Post-Petition Delivery of Goods Ordered In the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers* (the "Interim Critical Vendor Order")(Docket No. 106).  The Interim Critical Vendor Order authorized the Debtors to pay Critical Vendor Claims and Foreign Vendor Claims in an amount not to exceed $40 million on an interim basis.  Interim Critical Vendor Order at ¶ 3.

26.  The Debtors' state in Paragraph 19 of the Utility Motion that "[u]interrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the preservation and

maximization of the value of the Debtors' assets." However, the Critical Vendor Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

### The Debtors' Store Closing Sales Procedures Motion

27.   On the Petition Date, the Debtors filed the Store Closing Sales Procedures Motion (Docket No. 16), requesting approval of Store Closing Procedures and other relief.

28.   On September 11, 2024, the Court entered the *Interim Order (I) Authorizing Debtors To Assume the Consulting Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* (the "Interim Store Closing Sales Procedures Order")(Docket No. 134).

29.   The Interim Store Closing Sales Procedures Order does not set forth procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor store locations as of a store closing date.

### The First Lease Rejection Motion

30.   On the Petition Date, the Debtors filed the First Lease Rejection Motion (Docket No. 17).

31.   Through the First Lease Rejection Motion, the Debtors seek authorization to reject certain leases effective as of the Petition Date or September 30, 2024 as set forth in Exhibit "1" thereto.

32.   The First Lease Rejection Motion does not set forth

19

procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor stores as of a lease rejection date.

### The Bid Procedures Motion

33.   On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Order (I)(A) Approving Bidding Procedures For Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction For, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Bid Procedures Motion")(Docket No. 18).

34.   The Debtors' propose the following key dates and deadlines:  (i) October 4, 2024 – hearing on Bid Procedures Motion; (ii) October 8, 2024 – target date for the Debtors to file Potential Assumed Contracts Schedule; (iii) October 15, 2024 – bid deadline; (iv) October 18, 2024 – auction (if necessary); (v) October 22, 2024 – target date for the Debtors to file Notice of Successful Bidder; (vi) October 25, 2024 – deadline to object to the Sale Transaction to the Successful Bidder, the Assumption and Assignment Objection deadline, and the Cure Objection deadline; and (vii) November 4, 2024 – hearing to consider

approval of the Sale Transaction(s) and for entry of the Sale Order(s).  Bid Procedures Motion at ¶ 30.

## Facts Regarding CNE

35.   CNE provides electricity and related services to the Debtors pursuant to numerous electricity supply agreements (collectively, the "Electricity Agreements") that set forth the terms and conditions concerning CNE's provision of electricity and related services to the Debtors.  CNE has continued to provide the Debtors with electricity and related services pursuant to the Electricity Agreements since the Petition Date.

36.   Pursuant to the Electricity Agreements, the Debtors receive approximately one month of electricity and related services before CNE issues a bill.  Once a bill is issued, the Debtors have several weeks after an invoice date to pay the bill. Accordingly, the Debtors could receive at least two months of electricity and related services before CNE could terminate the Electricity Agreements after a post-petition payment default.

37.   The pre-petition debt owed by the Debtors to CNE is estimated to be not less than $163,542.  CNE is requesting a two-month cash deposit of $139,591 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Electricity Agreements.

**Facts Regarding CNEG**

38.   CNEG provides natural gas and related services to the Debtors pursuant to Debtors pursuant to numerous gas supply agreements (collectively, the "Gas Agreements") that set forth the terms and conditions concerning CNEG's provision of natural gas and related services to the Debtors.   CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

39.   Pursuant to the Gas Agreements, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.   Once a bill is issued, the Debtors have several weeks after the date of an invoice to pay the applicable bill.   Accordingly, the Debtors could receive more than two months of natural gas and related services before CNEG could terminate the Gas Agreements after a post-petition payment default.

40.   The pre-petition debt owed by the Debtors to CNEG is estimated to be not less than $5,546.   CNEG is requesting a two-month cash deposit of $65,734 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreements.

**Facts Regarding SES**

41.   SES provides natural gas and related services to the

Debtors pursuant to the Gas Sales Agreement and related Transaction Confirmations (collectively, the "Gas Agreement"), which set forth the terms and conditions concerning SES's provision of natural gas and related services to the Debtors. SES has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

42.   Pursuant to the Gas Agreement, the Debtors receive approximately one month of natural gas and related services before SES issues a bill.  Once a bill is issued, the Debtors have approximately 15 days to pay the applicable bill.  If the Debtor fails to timely pay a bill, a late fee may be subsequently imposed on the account.  Accordingly, the Debtors could receive approximately 70 days of natural gas and related services before SES could terminate a Gas Agreement after a post-petition payment default.

43.   SES is requesting a two-month cash deposit in the amount of $26,850 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreement.

44.   SES holds a surety bond in the amount of $30,000 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to SES.

23

**Facts Regarding the Utilities Other Than CNE, CNEG and SES**

45. Each of the Utilities provided the Debtors with prepetition utility goods and/or services, and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

46. Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 15 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

47. To avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on

24

the voluminous size of the applicable documents, the Utilities'
web-site links to their tariffs and/or state laws, regulations
and/or ordinances are set forth in **Exhibit "A"** attached hereto.

48.  Subject to a reservation of the Utilities' right to
supplement their post-petition deposit requests if additional
accounts belonging to the Debtors are subsequently identified,
the Utilities' estimated prepetition debt and post-petition
deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| AEP | 98 | $339,965.54 | $550,522 (2-month) |
| APS | 18 | $72,256.03 | $230,322 (2.5-month) |
| Ohio Edison | 21 | $35,106.09 | $45,426 (2-month) |
| PE | 6 | $13,185.46 | $31,164 (2-month) |
| WPP | 13 | $51,915.06 | $52,520 (2-month) |
| Penelec | 14 | $48,173.92 | $58,858 (2-month) |
| Mon Power | 8 | $34,037.95 | $47,650 (2-month) |
| Met-Ed | 10 | $23,927.29 | 32,710 (2-month) |
| Penn Power | 3 | $4,191.02 | $1,328 (2-month) |
| JCP&L | 8 | $47,084.68 | $40,838 (2-month) |
| TE | 8 | $22,501.19 | $23,098 (2-month) |
| CEI | 13 | $26,150.35 | $31,066 (2-month) |
| DEV | 26 | $216,620.00 | $140,098 (2-month) |
| DESC | 19 | $101,077.40 | $121,935 (2-month) |
| PSNC | 16 | $689.96 | $7,370 (2-month) |

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---------|---------------|-------------------|--------------|
| Georgia Power | 34 | To be supplemented | $156,180 (2-month) |
| PSEGLI | 7 | $52,768.55 | $79,866 (2-month) |
| SRP | 13 | $102,630.80 | $146,616 (2-month) |
| SDG&E | 8 | $49,054.23 | $25,222 (2-month) |
| SoCalGas | 30 | $1,268.24 | $8,615 (2-month) |
| SCE | 35 | $523,407.66 | $590,492 (2-month) |
| BGE | 12 | $86,506.24 | $56,365 (2-month) |
| ComEd | 12 | $35,466.39 | $36,215 (2-month) |
| PECO | 13 | $29,222.97 | $41,450 (2-month) |
| Pepco | 2 | To be supplemented | $8,640 (2-month) |
| DPL | 7 | $28,392.64 | $20,980 (2-month) |
| ACE | 7 | $36,715.47 | $32,390 (2-month) |
| TEC | 9 | $140,206.46 | $62,848 (2-month) |
| Peoples Gas | 3 | $993.14 | $407 (2-month) |
| Entergy AR | 5 | $17,110.00 | $32,820 (2-month) |
| Entergy LA | 10 | $73,570.00 | $88,950 (2-month) |
| Entergy MS | 3 | $23,350.00 | $31,490 (2-month) |
| Entergy TX | 6 | $35,925.00 | $31,772 (2-month) |
| CL&P | 5 | $7,597.48 | $6,090 (1.5-month) |
| Yankee Gas | 1 | $397.05 | $865 (1.5-month) |
| PSNH | 1 | $510.00 | $825 (2-month) |
| EGMA | 8 | $395.81 | $18,495 (2-month) |
| NStar West | 1 | $15,386.62 | $9,390 (2-month) |

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| NStar East | 4 | $35,717.51 | $18,841 (2-month) |
| BGC | 7 | $637.84 | $8,468 (2-month) |
| Kedli | 7 | $271.43 | $12,800 (2-month) |
| MEC | 14 | $73,578.49 | $53,650 (2-month) |
| NIMO | 35 | $68,329.71 | $90,916 (2-month) |
| ORU | 1 | $19,230.04 | $13,850 (2-month) |
| EGO | 23 | $3,642.93 | $14,784 (2-month) |
| TEP | 9 | $59,988.41 | $97,461 (2.5-month) |
| UNS Electric | 2 | $22,582.31 | $35,209 (2.5-month) |
| UNS Gas | 3 | $99.74 | $6,224 (2.5-month) |
| OGE | 14 | $153,180.69 | $149,875 (2-month) |
| CERC | 22 | $1,168.51 | $15,875 (2-month) |
| NYSEG | 27 | $36,082.74 | $47,670 (2-month) |
| RGE | 9 | $18,946.70 | $28,420 (2-month) |
| FPL | 54 | $304,927.72 | $390,230 (2-month) |
| CMP | 5 | To be supplemented | $36,210 (2-month) |
| PSE&G | 16 | $60,785.36 | $45,718 (2-month) |

49.   AEP held prepetition cash deposits totaling $16,689.03 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

50.   PE held a prepetition cash deposit in the amount of $7,958 that it recouped against prepetition debt pursuant to

Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

51.  WPP held a prepetition cash deposit in the amount of $348 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

52.  Met-Ed held prepetition cash deposits totaling $5,204 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

53.  CEI held a prepetition cash deposit in the amount of $3,244 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

54.  DEV held prepetition cash deposits totaling $134,863 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.  DEV also holds a surety bond in the amount of $6,351 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to DEV.

55.  SRP holds a surety bond in the amount of $142,000 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to SRP.

56.  BGE held prepetition cash deposits totaling $116,650

that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. Any prepetition deposit amount remaining after recoupment can be applied to the BGE post-petition deposit request.

57. ComEd held prepetition cash deposits totaling $12,035.03 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

58. Pepco held prepetition cash deposits totaling $4,320 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. If any prepetition deposit amount remains after recoupment, it can be applied to the Pepco post-petition deposit request.

59. TEC holds a surety bond in the amount of $69,025 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to TEC.

60. Peoples Gas held prepetition cash deposits totaling $515 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

61. EGO held a prepetition cash deposit in the amount of $523 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

29

62.   TEP held prepetition cash deposits totaling $11,706.98 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

63.   UNS Electric held prepetition cash deposits totaling $8,143.50 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

64.   UNS Gas held a prepetition cash deposit in the amount of $204.40 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

65.   CERC held prepetition cash deposits totaling $575 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit remains after recoupment.

66.   FPL held prepetition cash deposits totaling $398,342 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the FPL post-petition deposit request.

**Discussion**

A.   **THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;
>
> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the Supreme Court of the United States, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd- is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. *In re* Lucre,

31

333 B.R. 151, 154 (Bankr. W.D. Mich. 2005).  If a debtor
believes the **amount** of the utility's request needs to be
modified, then the debtor can file a motion under Section
366(c)(3) requesting the court to modify the **amount** of the
utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to
improperly shift the focus of their obligations under Section
366(c)(3) from modifying the amount of the adequate assurance of
payment requested under Section 366(c)(2) to setting the form
and amount of the adequate assurance of payment acceptable to
the Debtors.  Accordingly, this Court should not reward the
Debtors for their failure to comply with the requirements of
Section 366(c), and it should deny the Utility Motion as to the
Utilities.

> **1.    The Debtors' Proposed Bank Account Is Not
>         Relevant And Even If It Is Considered, It Is
>         Unsatisfactory Because It Does Not Provide the
>         Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a
form of adequate assurance of payment because: (1) It is not
relevant because Section 366(c)(3) provides that a debtor can
only modify "the amount of an assurance of payment under
paragraph (2)"; and (2) The Bank Account is not a form of
adequate assurance of payment recognized by Section
366(c)(1)(A).  Moreover, even if this Court were to consider the

32

Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutorily approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because even if the Debtors were to place two-week amounts in the Bank Account for the Utilities, the Utilities issue monthly bills and by the time a default notice is issued, the Debtors will have received approximately 60 days of commodity or service.

3. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

4. The Debtors should not reduce the amount of the Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

5. The Debtors propose that the Bank Account would be net of prepetition deposits and would contain $0 on behalf of SRP and SES apparently because those Utilities held prepetition security.

Accordingly, this Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account: (a) Has no funds for SRP or SES; (b) Is not the **form** of adequate assurance requested by the Utilities; (c) Is not a form recognized by Section 366(c)(1)(A); and (d) Is an otherwise unreliable form of adequate assurance.

**2.   The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Request Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide this Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, this Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.   THIS COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), holding that an administrative expense, without more, could constitute adequate assurance of payment in

34

certain cases.  Section 366(c)(1)(A) specifically defines the
forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed
> upon between the utility and the debtor or the
> trustee.

Section 366 of the Bankruptcy Code was enacted to balance a
debtor's need for utility services from a provider that holds a
monopoly on such services, with the need of the utility to
ensure for itself and its rate-payers that it receives payment
for providing these essential services. *See In re Hanratty*, 907
F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security
"should bear a reasonable relationship to expected or
anticipated utility consumption by a debtor." *In re Coastal Dry
Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).
In making such a determination, it is appropriate for the Court
to consider "the length of time necessary for the utility to
effect termination once one billing cycle is missed." *In re
Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the
charges already incurred by the Debtors in the prior month.  They
then provide the Debtors with 20 to 30 days to pay the bill, the
timing of which is set forth in applicable state laws, tariffs,

regulations, or contracts.  Based on the foregoing state-mandated, or contract-mandated, billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 60 days or more based on their billing cycles.  Furthermore, the forms and amounts of the Utilities' adequate assurance requests are the forms and amounts that the applicable public service commission, which is a neutral third-party entity, or contract, permits a Utility to request from its customers.  The Utilities are not taking the position that the cash deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but instead are introducing those forms and amounts as evidence of the forms and amounts that the applicable regulatory entity or contract permit the Utilities to request from their customers.

In contrast, the Debtors failed to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely asked this Court to approve the Bank Account supposedly containing approximately two-weeks of the Debtors' utility charges, net of

prepetition deposits.  The Debtors did not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of the Bank Account.  Moreover, in contrast to the improper treatment proposed to the Utilities, the Debtors have made certain that supposed "critical vendors" and post-petition professionals are favored creditors over the Utilities by ensuring (i) to pay Critical Vendor Claims of up to $50 million on a final basis, and (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of DIP financing and cash collateral, by obtaining a $3.5 million professionals' carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default.

Additionally, the store closing sales procedures and lease rejection procedures do not include procedures or requirements for the Debtors to timely: (i) Contact the applicable Utilities to terminate utility service to any Debtor store locations as of a proposed lease rejection date; (ii) Contact the applicable Utilities to terminate utility service to any Debtor store locations once a store closing sale is completed and the Debtors no longer require utility services at an applicable closed Debtor store; or (iii) Close a post-petition account with the Utilities when the Debtors no longer require post-petition service for that account.  As such, there is no way for a

Utility to know when the Debtors no longer require service at a store location where (i) store closings have been completed or (ii) the lease is rejected.  The Debtors should be required to close accounts with the Utilities when they no longer require post-petition service for such accounts, or remain administratively responsible for such charges until they do close the applicable account(s).

Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the risk of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to receive for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security that they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein;

3.    Require the Debtors to close accounts with the Utilities when they no longer require post-petition service from the Utility for that account or remain administratively responsible for such charges until they do close the account(s); and

4.    Providing such other and further relief as the Court deems just and appropriate.

Dated: September 25, 2024    WHITEFORD TAYLOR & PRESTON LLC

/s/ *William F. Taylor, Jr.*
William F. Taylor, Jr. (#2936)
600 North King Street, Suite 300
Wilmington, Delaware 19801
wtaylor@whitefordlaw.com

and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for Appalachian Power Company,
Public Service Company of Oklahoma,
Southwestern Electric Power Company,
Ohio Power Company, Indiana Michigan
Power Company, Arizona Public Service
Company, Ohio Edison Company, Potomac
Edison Company, West Penn Power Company,
Pennsylvania Electric Company,
Monongahela Power Company, Metropolitan
Edison Company, Pennsylvania Power
Company, Jersey Central Power & Light
Company, Toledo Edison Company, The
Cleveland Electric Illuminating Company,
Virginia Electric and Power Company*

*d/b/a Dominion Energy Virginia, Dominion Energy South Carolina, Inc., Public Service Company of North Carolina Incorporated, Georgia Power Company, PSEG Long Island, Salt River Project, San Diego Gas and Electric Company, Southern California Gas Company, Southern California Edison Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, PECO Energy Company, The Potomac Electric Power Company, Delmarva Power & Light Company, Atlantic City Electric Company, Tampa Electric Company, Peoples Gas System, Inc., Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy Texas, Inc., The Connecticut Light & Power Company, Yankee Gas Services Company, Public Service Company of New Hampshire, Eversource Gas of Massachusetts, NStar Electric Company, Western Massachusetts, NStar East Electric, Boston Gas Company, KeySpan Energy Delivery Long Island, Massachusetts Electric Company, Niagara Mohawk Power Corporation, Consolidated Edison Company of New York, Inc., Orange & Rockland Utilities, Inc., The East Ohio Gas Company d/b/a Enbridge Gas Ohio, Tucson Electric Power Company, UNS Electric, Inc., UNS Gas, Inc., Oklahoma Gas and Electric Company, Symmetry Energy Solutions, LLC, Constellation NewEnergy, Inc., Constellation NewEnergy – Gas Division, LLC, CenterPoint Energy Resources Corp., New York State Electric and Gas Corporation, Rochester Gas & Electric Corporation, Florida Power & Light Company, Central Maine Power Company and Public Service Electric and Gas Company*