EXHIBIT A

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Intentionally Deleted
   D. Common Area Maintenance and Fixed CAM
   E. Real Estate Taxes
   F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Right of Entry

42.    Anti-Terrorism Law

43.    Waiver of Trial by Jury

44.    Limitation of Liability

45.    IRS Qualifications

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the ___day of _____, 2010, by and between Plaza at Buckland Hills, LLC, a Delaware limited liability company, whose mailing address is 225 W. Washington Street, Indianapolis, IN 46204 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-0512.

**WITNESSETH:**

1. **DEFINITIONS:**

   For purposes of this Lease, these terms are defined as follows:

   A. <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place up to two (2) drop/storage trailer(s) in the receiving area of the Demised Premises in a location reasonably approved by Shopping Center Management so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

   B. <u>Dates</u>:  Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

   1) Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, if any, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)

The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession of the Demised Premises; or (ii) the date on which Tenant has obtained from the local authority having jurisdiction all permits required for its construction and signage in the Demised Premises (the "Permits"). Tenant shall have thirty (30) days after the date of this Lease to inspect the condition of the Demised Premises ("Inspection Period") and Tenant may extend the Inspection Period to forty-five (45) days by sending Landlord written notice thereof prior to the end of the thirty (30) day period. Should the Demised Premises not meet the criteria set forth in Exhibit "C", Tenant may terminate this Lease upon written notice to Landlord given within ten (10) days after the end of the Inspection Period. Tenant shall submit its plans to the local authority for permits within sixty (60) days of the full execution of this Lease. With respect to structural alterations, signage changes and exterior façade work, if any, Tenant will submit plans to Landlord for approval prior to submitting plans for permits. All non-structural alterations will not require Landlord's approval. If Tenant has not obtained its permits within ninety (90) days following submittal to the local authority, Landlord shall then have ninety (90) days to obtain the permits on Tenant's behalf. In the event neither Tenant nor Landlord has been able to obtain the Permits within one hundred eighty (180) days following the full execution of this Lease, then either party may terminate the Lease upon written notice to the other. Any upgrades and/or alterations to the Shopping Center that are not part of Tenant's leased area, but are required by the governing authority to be completed as a condition of Tenant obtaining permits for its construction will be completed by Landlord at its sole expense. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if possession has been given. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant, construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions of which Landlord has actual knowledge prior to delivery of the Demised Premises to Tenant. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)

The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date, or (ii) the date on which Tenant opens for business in the Demised Premises.

4)

The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business in the Demised Premises; or (ii) the Rent Commencement Date.

5)

Provided this Lease is executed by Tenant no later than June 30, 2010, if Landlord fails to return properly executed Leases to Tenant by July 9, 2010, or if Landlord fails to tender possession of the Demised Premises to Tenant by July 20, 2010, then Tenant may terminate this Lease by written notice to Landlord. Subject to Section 14 of this Lease (Force Majeure) and delays due to Tenant or its agents, contractors and/or employees, Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by July 20, 2010, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon July 21, 2010 and continuing for each and every day Landlord is delayed in delivering possession to Tenant prior to July 30, 2010, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided

in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $664.13 per day. Commencing July 31, 2010 and continuing for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,328.26 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate") from the next installments(s) of Rent due under this Lease. The liquidated damages pursuant to this Section 1.B.6 shall not exceed $150,000.00, irrespective of when Landlord delivers the Demised Premises to Tenant.

6)    Notwithstanding anything to the contrary, in the event Landlord has not offered delivery of possession of the Demised Premises by August 11, 2010, Tenant will not be required to accept possession until February 7, 2011. The period of time between August 12, 2010 and February 7, 2011 will be the "Optional Blackout Period". In the event Landlord offers possession during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not offered delivery of possession to Tenant by February 7, 2011, then Tenant or Landlord may terminate this Lease by delivery of a termination notice at any time after February 7, 2011, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice. Notwithstanding the foregoing, delivery shall be deemed to have occurred when Landlord delivers possession of the Demised Premises to Tenant with Landlord's work on HVAC units serving the Premises. Landlord shall inspect and repair, if necessary, those HVAC units requiring repair no later than July 25, 2010. Should any HVAC units need to be replaced, Landlord shall do so by August 25, 2010. Until such time as all HVAC units are in good working order, Landlord will assure adequate air-flow in the Premises, including using, without limitation, large industrial fans, if necessary.

7)    In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 7, 2011. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit B -    Legal Description of Shopping Center

3)    Exhibit C -    Landlord Work – Not Applicable

4)    Exhibit D -    Tenant Building Sign Specifications

5)    Exhibit D – 1 Tenant Pylon Sign Location

6)    Exhibit E -    Delivery of Possession Letter

7)    Exhibit F -    Exclusive Use Provisions

D.    <u>Demised Premises</u>: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 26,934 square feet of ground floor area

with a minimum width of 119 feet for the Demised Premises. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount less than 250 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 250 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 26,934 square feet nor accept possession of any space under 24,241 square feet in size, and may terminate this Lease in such an event.

E.     <u>Shopping Center</u>: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Plaza at Buckland Hills, 1470 Pleasant Valley Road, Manchester, CT 06040. Landlord represents that the gross leasable area of the Shopping Center, not including the outlots, as of the date of this Lease is 313,106 square feet.

F.     <u>Gross Sales</u>: The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises (including any sidewalk sales) during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises to the extent they were previously included in Gross Sales; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks, not to exceed three percent (3%) of Gross Sales per annum; (5) sales of merchandise to employees at a discount not to exceed three percent (3%) of Gross Sales per annum for use by Tenant's employees only; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges, not to exceed three percent (3%) of Gross Sales; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises. Tenant shall furnish Landlord an accurate statement of Gross Sales made at the Demised Premises within thirty (30) days after the end of each Lease Year or partial Lease Year.

2.     **<u>DEMISE:</u>**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.   **TERM:**

    A.   <u>Original Term</u>:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2016 (the "Original Term").   Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

    B.   <u>Option to Extend Term</u>:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term" and "Third Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises and not in monetary default beyond applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.  Any such notice shall be mailed to Landlord (ATTN:  Executive Vice President -Development), at Landlord's Notice Address, by United States mail, postage prepaid, certified or registered, return receipt requested, or by national overnight delivery service, with a copy to the attention of Managing Attorney - Legal Leasing.  Notwithstanding anything to the contrary in this Lease contained, the term "Lease Term" whenever used in this Lease, shall be defined to include the original term and all renewals and extensions thereof

4.   **USE AND OPERATION:**

    A.   <u>Permitted Uses</u>:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, closeouts, furniture, furniture accessories, mattresses, appliances, toys, seasonal merchandise, furnishings, health and beauty products, food (including frozen food), and all similar or related merchandise and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.

        Except for tenants open and operating for business in the Shopping Center as of the date of this Lease and so long as Tenant is not in default of this Lease beyond any applicable notice and cure periods, except for a Dollar Tree store or Deals store, no other discount general merchandise, discount, liquidator, closeout store, discount furniture or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing

Business" shall include, without limitation the following business operations: Dollar General, Family Dollar, 99 Cent Stores, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Tuesday Morning, Ollies Bargain Outlet and Christmas Tree Shops. In the event a Competing Business, as defined herein, is operated in the Shopping Center (an "Exclusive Violation:") and such Violation is not cured within sixty (60) days of notice to Landlord, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; or (ii) Tenant may pay in lieu of Fixed Minimum Rent, and all other charges payable hereunder (except for consumable charges such as utilities, whether supplied by Landlord or not, trash service and other such services, whether supplied by Landlord or not) (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales ("Alternate Rent") for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Notwithstanding anything to the contrary contained herein, Landlord may lease space in the Center or sell or lease ground in the Center to users for a discount department store, department store, furniture store, grocery store or wholesale club.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder after the date of such termination except as specifically provided to the contrary in this Lease.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures,

appliances, flooring or ceiling in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises, provided such storage does not impair pedestrian or vehicular traffic in the Common Areas; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise, subject to local code and provided such use does not impair pedestrian or vehicular traffic in the Common Areas and is presented in a neat and clean manner.

No public or private auction or any fire, "going out of business", bankruptcy or similar sales or auctions shall be conducted in or from the Demised Premises and the Demised Premises shall not be used in a disreputable or immoral manner or in violation of national, state or local laws.

B.    <u>Prohibited Uses:</u>  Except as existing as of the date of this Lease, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises, except as ordered by a Court of Law; (ii) to sell any so-called "Army and Navy", or surplus, as those terms are generally used at this time and from time to time hereafter, except for such national chains as "Play It Again Sports" or "Once Upon a Child" or "Goodwill"; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 3,000 square feet of floor area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities in excess of 3,000 square feet of floor area; (x) for the operation of a sexually-oriented massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment"; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines which are not incidental to a tenant's operations, bowling alley; health spa, health club, exercise club, gymnasium or other similar operations, provided however, that this restriction shall not apply to a health spa, club or gymnasium provided that such use is at least 100 linear feet away from the front door of the Demised Premises; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day

operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation) but specifically excluding such operations as Huntington Learning Centers or Sylvan Learning Centers; (xxi) for any veterinary hospital, animal boarding, training or raising facilities, except as an ancillary use of a big box pet supply retailer such as Pets Mart or Petco; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxv) for any astrology, palm reading, tarot card or other like service or facility; or (xxvi) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

## 5.   RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, and without demand, Fixed Minimum Rent (sometimes referred to collectively as "Rent"). The Rent for any partial month shall be pro rated based on the actual number of days in such month. The parties agree that the Rent paid by Tenant to Landlord shall be a "gross rent" with respect to Common Area maintenance charges, and Tenant shall not pay Landlord any additional rent or any other amounts including, but not limited to, costs, expenses and charges related to common area maintenance, it being the intent of the parties that the Rent paid by Tenant pursuant to Section 5.A. shall be the only payments made by Tenant to Landlord, except for consumable charges such as utilities supplied by Landlord and trash service, for which Tenant shall pay Landlord upon receipt of invoice, Real Estate Taxes pursuant to Section 5.E. and Insurances Costs pursuant to Section 12.B.

A.   <u>Fixed Minimum Rent</u>:   During the Original Term of this Lease, the sum of $242,406.00 per annum (based upon $9.00 per square foot of floor area of the Demised Premises) which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $20,200.50.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $255,873.00 per annum (based upon $9.50 per square foot of floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,322.75. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $269,340.00 per annum (based upon $10.00 per square foot of floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,445.00. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $282,807.00 per annum (based upon $10.50 per square foot of floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,567.25.

B.   <u>Utilities Charge and Exterior Lighting</u>:   Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately

reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. All utilities to the Demised Premises are separately metered by the utility provider.

C.    <u>Intentionally Deleted</u>.

D.    <u>Common Area Maintenance and Fixed CAM</u>: Throughout the Term of this Lease, Landlord shall be responsible for the following:

    (i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

    (ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

    (iii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

    (iv)    maintaining all paved surfaces in a condition commensurate with other shopping centers of similar age and quality in the geographic area in which the Shopping Center is located, free of potholes; restriping and repainting as required to keep same clearly visible and appropriately marked; and

    (v)    cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's cost ("Common Area Charges") shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security (as needed, in Landlord's reasonable discretion), and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures in excess of $100,000.00 in any calendar year, any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees in excess of fifteen percent (15%).

Fixed Common Area Charges:    Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be fixed at One and 50/100 Dollars ($1.50) per square foot of the Demised Premises per Lease Year from the Rent Commencement Date through January 31, 2011 (the "Fixed CAM Charges"). Thereafter, the Fixed CAM Charges payable by Tenant shall increase by three percent (3%) per Lease Year throughout the Term, including any extensions or renewals thereof. Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. The $1.50 Fixed CAM Charges and the three percent (3%) fixed annual increase in the Fixed CAM

Charges shall, collectively, be known as the "Fixed CAM". In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the Fixed CAM set forth herein.

E.    Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions related to the development of the Center. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) under Landlord's control and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2010 tax year are approximately $2.00 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of any increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

Provided Landlord has not contested the Real Estate Taxes, if Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.   Construction Allowance:  Landlord shall pay to Tenant an amount equal to Ten and 00/100 Dollars ($10.00) per square foot of the Demised Premises, subject to the remeasurement provisions of Section 1.D., within thirty (30) days of Tenant's opening for business and the provision to Landlord of final waivers of lien from Tenant's general contractor, its subcontractors and materialmen (for labor and materials provided in excess of $5,000.00) and a copy of its Certificate of Occupancy.  If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code.  Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

6.   **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom and that such comply with all local building codes.

All alterations, changes and additions and all improvements, including leasehold improvements, made by Tenant whether part of Tenant's work or not, shall immediately upon installation attach to the fee and become Landlord's property and shall not be removed unless replaced by like property. If Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Demised Premises prior to the end of the Lease Term, they shall become Landlord's property and Tenant shall repair or pay for the repair of any damage done to the Demised Premises resulting from removing same but not for painting or redecorating the Demised Premises.

Tenant shall not suffer any mechanics' or materialmen's lien to be filed against the Premises or the Shopping Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith, but, notwithstanding such contest, Tenant shall, within thirty (30) days after the filing thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise. In the event of Tenant's failure to release of record any such lien within the aforesaid period, Landlord may remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of said lien, together with interest thereon at the rate of twelve percent (12%) per annum and reasonable expenses incurred in connection therewith, including reasonable attorneys' fees, which amounts are due and payable to Landlord as additional rent on the first day of the next following month. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of the State where the Shopping Center is located. Tenant's obligation to observe and perform any of the provisions of this Section 6 shall survive the expiration of the Lease Term or the earlier termination of this Lease

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises (including any components located on the roof) and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises. In conjunction with its obligations to maintain the HVAC system serving the Demised Premises, Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to periodically inspect, adjust, clean and repair such system.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located

outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, and Landlord shall guarantee that the HVAC system is in good working condition as of the Tenant Possession Date. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such reasonable expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all reasonable work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such reasonable costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such reasonable costs with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence, or more culpable conduct, of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. If after a second (2nd) notice to Landlord, Attention: Vice President – Accounts Payable, of Landlord's failure to pay should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be

deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in this Lease.

8.  **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises, subject to local code and provided such do not compromise the structural integrity of the building and are safely attached. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its professionally prepared standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs on which Tenant has a panel (collectively "Pylon") (i) are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylon in the portion previously used by Comp USA. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on the existing Pylon on the space as indicated on Exhibit D-1 attached hereto. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s), except that Tenant must maintain, repair and replace said panels if damaged and keep them in good condition.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.  **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction of which Landlord has actual knowledge prior to delivery of possession of the Demised Premises to Tenant; if said Demised Premises do not conform, Landlord shall

promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant or Tenant's particular use in the Demised Premises.

11.   **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.   **INSURANCE:**

A.   Tenant:   Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord, Simon Property Group, Inc., as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Three Million Dollar ($3,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements. Tenant's right to self-insure is personal to Tenant and said right shall be granted to any assignee of this Lease at Landlord's sole discretion.

Upon the Term Commencement Date and annually thereafter, Tenant shall provide Landlord with certificates evidencing that such insurance is in full force and effect and stating the terms thereof, including all endorsements at the following address (or such other address as Landlord may notify Tenant); Donald P. Pipino Company, Ltd., 7600 Market Street, PO Box 3849, Youngstown, Ohio 44513-3849).

B.   Landlord:   Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings, improvements, and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all

the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord and the type of insurance plan used, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B are approximately $0.25 per square foot per annum for the 2010 calendar year. Tenant acknowledges that Landlord pays Insurance Costs annually in advance and that Tenant's reimbursement to Landlord will, therefore, be paid annually in advance.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.  In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within two hundred ten (210) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.  If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

14.  **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. Notwithstanding the foregoing, the provisions of this Section 14 shall at no time operate to excuse Tenant from any obligations for payment of Fixed Minimum Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

15.  **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations of the violating party, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.  **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title on record; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and to the best of Landlord's actual knowledge, construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) to the best of Landlord's knowledge, Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made

by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify of terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting Tenant's occupancy and use in the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant and does not cure said breach within thirty (30) days after written notice to Landlord, Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17.   **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.   **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord, provided, that as a condition to such attornment, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent and Percentage Rent have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19.   **DEFAULT:**

A.      If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition,

-18-

rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefore, with or without termination of this Lease. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises, but shall not be required to give preference to lease the Demised Premises over other space in the Shopping Center.

Notwithstanding anything to the contrary herein contained, if Tenant commits any monetary default hereunder for or precedent to which or with respect to which notice is herein required, and repeats such default two (2) times within twelve (12) months thereafter and Tenant has received notice for each prior default, no notice shall thereafter be required to be given by Landlord as to or precedent to any such subsequent default during such twelve (12) month period (as Tenant hereby waiving the same) before exercising any or all remedies available to Landlord.

In the event of any breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief as if no other remedies were provided for herein for such breach.

Any rights and remedies reserved by, or granted to, Landlord under this Lease, at law or in equity, are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, after notice to Landlord, Attention: Vice President – Lease Accounting, and Landlord's failure to cure within ten (10) days after such second notice, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to

19

promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered reasonably untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

**20.** **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, including parking lots or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent shall abate. Thereafter, Rent shall be reduced in proportion to the amount of land and/or building area lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

**21.** **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

**22.** **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to

which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within thirty (30) days after written request of Tenant. If Landlord fails to provide said exclusives within thirty (30) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord at least 30 days in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used, up to twenty-five percent (25%) of the ground floor area, for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment") provided the surviving entity has a tangible net worth at least as great as Tenant as of the date of this Lease. The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

Neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the part leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the

exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at 125% of the monthly Rent payable at the expiration of the immediately preceding Term and otherwise subject to all the terms and provisions hereof.

## 24.   NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i)   a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery.  Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.   LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited partnership duly organized, validly existing and in good standing under the laws of Delaware. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio.  Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26.   BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.   NO RECORDATION:

If requested by either party, the non-requesting party will execute a recordable memorandum of lease.  The requesting party may record such memorandum at its expense.  The requesting party shall provide the other party with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28.   REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease.  If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or

prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

"Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, and pcb, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent

payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within twelve (12) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said twelve (12) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34. **CO-TENANCY:**

To further induce Tenant to enter into this lease and to fulfill its obligations hereunder, Landlord covenants and warrants that it has entered into (or shall enter into prior to the Tenant Possession Date) and shall maintain binding leases with tenants for the use and occupancy of their space in the Shopping Center for various retail purposes at a minimum threshold level. The "Threshold Requirements" shall be defined as at least fifty percent (50%) of the gross leasable area of the Shopping Center, excluding the Demised Premises, being leased to tenants open and operating for business for uses not prohibited under this Lease. Subject to closures due to casualty or condemnation, if at any time during the Term the Threshold Requirement is not met for six (6) consecutive months, then commencing with the seventh (7th) month and continuing during such time as the Threshold Requirement continues to remain unsatisfied, Tenant may: (i) continue its tenancy upon the terms and conditions of this Lease, but may reduce by fifty percent (50%) its payments of Fixed Minimum Rent under this Lease ("Alternate Rent") until the Threshold Requirement is against satisfied, or (ii) terminate this Lease by giving ninety (90) days prior written notice to Landlord. In the event Tenant elects to terminate this Lease, all further obligations hereunder shall terminate effective ninety (90) days following the date of Tenant's notice and surrender of the Demised Premises, and in such event any Rent paid in advance shall be immediately refunded to Tenant. If Landlord has not cured such deficiency after a period of twenty (20) months and after receiving 120 days written notice from Landlord, Tenant must either (i) resume paying the full Fixed Minimum Rent and Additional Rent at the end of the 120 day notice period; or (ii) terminate this Lease.

35. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37. **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38. **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39. **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and upon at least fourteen (14) days advance written notice and at Landlord's home office, Tenant shall be entitled to an audit of Landlord's books and records pertaining to said items to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant or credited to Tenant's account, at Landlord's discretion. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit, not to exceed $1,000.00. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the rate of the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year. Notwithstanding anything to the contrary contained herein, Tenant shall not have the right to exercise, inspect or audit Landlord's records pertaining to Landlord's Common Area costs or expenses.

40. **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and reasonable attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

41. **RIGHT OF ENTRY:**

Upon no less than 24 hours advance notice to Tenant (except in case of emergency), Landlord, its agents and employees shall have the right to enter the Demised Premises from time to time at reasonable times to examine the same, show them to prospective purchasers and other persons, and make such repairs, alterations, improvements or additions as Landlord deems desirable. Rent shall not abate while any such repairs, alterations, improvements, or additions are being made. During the last three (3) months of the Lease Term, Landlord may exhibit the Demised Premises to prospective tenants. Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation,

responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided.

42. **ANTI-TERRORISM LAW:**

To the best of Tenant's knowledge Tenant is not a person or entity with whom Landlord is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any related statute, Executive Order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other similar governmental action.

To the best of Landlord's knowledge, Landlord is not a person or entity with whom Tenant is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any related statute, Executive Order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other similar governmental action.

43. **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

44. **LIMITATION OF LIABILITY:**

Anything to the contrary herein notwithstanding, no general or limited partner of the Landlord, or any general or limited partner of any partner of the Landlord, or any shareholder of any corporate partner of any partner of the Landlord, or any other holder of any equity interest in the Landlord, or in any entity comprising the Landlord or its partners, shall be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease, nor shall Landlord or any of said constituent parties have any liability to Tenant for any consequential damages such as, but not limited to, lost profits. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Center, and Tenant shall look solely to the interest of Landlord, its successors and assigns, in the Center, for the satisfaction of each and every remedy of Tenant against Landlord. Tenant shall not look to any of Landlord's other assets seeking either to enforce Landlord's obligations under this Lease, or to satisfy any money or deficiency judgment for Landlord's failure to perform such obligations, such exculpation of personal liability is and shall be absolute and without any exception whatsoever.

The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Center. In the event of a sale or transfer of the Center (by operation of law or otherwise) or in the event of the making of a lease of all or substantially all of the Center, or in the event of a sale or transfer (by operation of law or otherwise) of the leasehold estate under any such lease, the grantor, transferor or lessor, as the case may be, shall be and hereby is (to the extent of the interest or portion of the Center or leasehold estate sold, transferred or leased) automatically and entirely released and discharged, from and after the date of such sale, transfer or leasing of all liability with respect of the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed; provided that the purchaser, transferee or lessee (collectively, "Transferee") shall be deemed to have assumed and agreed to perform, subject to the limitations of this Section (and without further agreement between the other parties hereto, or among such parties and the Transferee) and only during and in respect of the Transferee's period of ownership of the Landlord's interest under this Lease, all of the

terms of this Lease on the part of Landlord to be performed during such period of ownership, it being intended that Landlord's obligations hereunder shall, as limited by this Section, be binding on Landlord, its successors and assigns only during and in respect of their respective, successive periods of ownership.

## 45.    IRS QUALIFICATIONS:

It is the intent of the parties that all items of rent paid to Landlord    under this Lease shall qualify as "rents from real property" as defined in the Internal Revenue Code ("Code") Section 856(d) and as further defined in Treasury Regulation ("Regulation") Section 1.856-4. Should the requirements of the code section and Regulation section be amended so that any Rent payable to Landlord under this Lease no longer qualifies as "rents from real property" for the purposes of the Code and associated Regulation, such rent payable to Landlord under this Lease shall be adjusted so that it will qualify as "rents from real property" under the Code and Regulation, as amended;  provided, however, that any adjustments required pursuant to this Section 45 shall be made so as to produce the equivalent (in economic terms) rent as payable prior to such adjustment; and provided further, that Tenant and Landlord shall enter into such amendment or amendments as may be required to effect the foregoing provisions.  In no event shall the foregoing provisions of this Section 45 increase Tenant's monetary obligations under this Lease.

[Signatures Appear on Immediately Subsequent Page.]

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD: PLAZA AT BUCKLAND HILLS, LLC**, a Delaware limited liability company

By:    DOWNEAST ASSOCIATES LIMITED PARTNERSHIP, a Connecticut limited partnership, its sole member

By:    SIMON PROPERTY GROUP, L.P., a Delaware limited partnership, its general partner

By:    SIMON PROPERTY GROUP, INC., a Delaware corporation, its general partner

By: _____
Myles Minton, President
Community/Lifestyle Centers

Witnesses as to Tenant:

**TENANT:**    **BIG LOTS STORES, INC.**, an **Ohio corporation**

By: _____
Charles W. Haubiel II
Title: Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary

**(Acknowledgements on immediately following page.)**

-28-

### Landlord's Acknowledgement

STATE OF *Indiana*

COUNTY OF *Marion*

      Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord *Hope & Richland Hills* by, *Myles Minton* its *President* who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

      IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at *Indpls, Indiana* this *4th* day of *July*, 2010.

_____
Notary Public

CHARLA LAYFULOE
My Commission Expires: June 12, 2016
County of Residence: Marion

### Tenant's Acknowledgement

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

      Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

      IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this *28th* day of *June*, 2010.

TRACY L. SNOW
Notary Public, State of Ohio
My Commission Expires 10-07-2014

_____
Notary Public

-29-

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



**NO CHANGE AREA >**

# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

Commencing at a point, said point marking the intersection of the South Windsor/Manchester Townline and the easterly street line of Pleasant Valley Road; thence running N60°42'25"W along the easterly street line of Pleasant Valley Road a distance of 87.28 feet to a point of curvature; thence running along the easterly street line Pleasant Valley Road along the arc of a curve to the left having a central angle of 33°30'01" a radius of 602.96 feet and an arc length of 352.54 feet to a point of tangency; thence running S85°47'35"W along the easterly street line of Pleasant Valley Road a distance of 183.36 feet to a point of curvature; thence along a curve to the right having a central angle of 90°00'00" a radius of 30.00 feet and an arc length of 47.12 feet to a point of tangency; thence running N04°12'25"W along the easterly street line of Wheeler Road a distance of 70.82 feet to a point of curvature; thence continuing along the easterly street line of Wheeler Road along the arc of a curve to the right having a central angle of 29°08'50" a radius of 452.47 feet and an arc length of 230.18 feet to a point of tangency; thence running N24°56'25"E along the easterly street line of Wheeler Road a distance of 432.97 feet to a point marked by an iron pin; thence running N23°38'54"E along the easterly street line of Wheeler Road a distance of 130.03 feet to a point, said point marking the northwest corner of the herein described parcel; thence running S86°42'11"E through land of Downeast Associates Limited Partnership, 612.69 feet to a point; thence running N48°17'49"E a distance of 96.17 feet to a point; thence running S86°42'11"E a distance of 699.70 feet to a point; thence running S15°16'48"W a distance of 13.70 feet to a point; thence running S86°42'11"E a distance of 210.29 feet to a point; thence running S03°17'49"W a distance of 495.52 feet to a point on the South Windsor/Manchester townline; thence running N71°15'13"E along said townline a distance of 1,444.05 feet to a point in the westerly property line of land now or formerly of Gurrie A. Fandozzi and Barbara R. Fandozzi; thence running S22°13'00"E along the westerly line of Fandozzi a distance of 0.61 feet to a point marked by an iron pin, said point being the southwest corner of Fandozzi; thence running S86°26'58"E a distance of 180.01 feet to a point; thence N83°47'12"E a distance of 18.78 feet to a point marking the proposed westerly street line of Buckland Street, the last two courses being along the southerly line of Fandozzi; thence running S07°15'12"E along the proposed westerly line of Buckland Street a distance of 226.73 feet to a point; thence running N81°30'34"E a distance of 5.00 feet to a point; thence, along a curve to the left having a central angle of 03°28'08", a radius of 3250.00 feet and an arc length of 196.76 feet to a point, said

point can be found 196.73 feet at a bearing of S10°13'29"E from the last course herein described, the last three courses being along a proposed street line of Buckland Street; thence running S34°21'58"W along the proposed northerly street line of Pleasant Valley Road a distance of 66.89 feet to a point; thence running S67°37'32"W a distance of 262.63 feet to a point; thence running S66°16'17"W a distance of 275.08 feet to a point; thence running S71°54'53"W a distance of 100.28 feet to a point; thence running S67°37'32"W a distance of 256.93 feet to a point; thence running S22°22'28"E a distance of 12.00 feet to a point; thence running S67°37'32"W a distance of 455.07 feet to a point; thence running S66°10'13"W a distance of 483.80 feet to a point of curvature; thence along a curve to the right having a central angle of 51°40'03" a radius of 629.00 feet and an arc length of 567.21 feet to a point, said point can be found N86°32'26"W at a distance of 548.19 feet from the last point herein described; thence running N62°19'18"W a distance of 286.58 feet to a point; thence running N61°51'14"W a distance of 295.91 feet to a point; thence running N62°48'40"W a distance of 54.47 feet to the point and place of beginning. The last twelve courses being along the proposed northerly street line of Pleasant Valley Road.

The parcel herein described contains 2,872,699 s.f. or 65.95 acres.

# EXHIBIT C

## LANDLORD WORK

**STOREFRONT:** Landlord to ensure that there are curb cuts within reasonable proximity to the storefront.

**UTILITIES:** Landlord to provide separate utilities and provide separate meters adequate for Tenant's intended use. Existing electrical service to be in good working condition and include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. Landlord shall also provide Tenant with assurance that utilities are available and include legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage.

**HVAC EQUIPMENT & MECHANICALS:** Landlord will deliver HVAC and mechanical in good working condition.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification .

**EXTERIOR LIGHTING:** All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc.

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks. Landlord shall have the roof inspected, and Landlord shall make the necessary repairs/replacement as reasonably required, per inspection reports.

**RECEIVING AREA:** Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**REMOVAL OF FIXTURES & EQUIPMENT:** Landlord to remove all fixtures, equipment, debris, etc and deliver demised premises in broom clean condition.

**PARKING LOT:** Parking lot shall be in good condition (paved, patched, sealed and striped) with potholes, severe cracks and uneven areas resurfaced and adequate for customer parking and Tenant's use.

**SIGNAGE:** Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon. Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. Tenant shall receive the leasing panel on the pylon as indicated on the attached pylon exhibit. Any pylon remodels or newly constructed pylons shall reflect Big Lots in a similar position.

**DRAWINGS:** Landlord is to provide Tenant with available "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. Tenant shall approve all drawings prior to the submission for permits and the commencement or work. Upon fully executing a lease document, Landlord shall supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress.

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all hazardous material, within the premises. Landlord shall provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:** Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction upon the Tenant Possession Date.

All above work to be completed before the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG!LOTS™

## LOGOS
## WITH
## SPECIFICATIONS
## for exterior signage

**If you need additional information that is
not contained in this packet contact:**

Store Planning:
Mike Stiles 614-278-6805
Michael Neu 614-278-6868



02/2007

EXHIBIT "D"

## Stacked Logo
# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

This is the preferred way to present the sign.    File Name: BLst1C.eps



| STANDARD SIZE CHARACTERISTICS | | | | | | |
|---|---|---|---|---|---|---|
| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4½" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5½" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17½" | 6½" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19½" | 7½" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21½" | 8½" |

### SIGN SPECIFICATIONS: BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

### SIGN SPECIFICATIONS: EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

# BIG LOTS - THE LOGO

The logo can be used in either of the shown versions (stacked or horizontal)
with the stacked logo being the preferred version.
The logo proportions cannot be distorted nor colors changed.*

## Stacked Logo

This is the preferred way to present the logo.

File Name: BLst2C.eps



## Horizontal Logo

File Name: BLh2C.eps





| | |
|---|---|
| ■ | **BIG LOTS AND TRADE MARK**<br>100% BLACK |
| ■ | **EXCLAMATION**<br>PANTONE 021 ORANGE<br>PROCESS MIX - 50% MAGENTA, 100% YELLOW |

*See: Boxed Sign or Awning One Color.

# BOXED SIGN OR AWNING

To be used as pylon sign or a boxed sign.

## Boxed Stacked

This is the preferred way to present the logo.



File Name: BLst2C.eps

## Boxed Horizontal

File Name: BLh2C.eps

| SIGN SPECIFICATIONS: | SIGN SPECIFICATIONS: |
|---|---|
| **BIG LOTS AND TRADE MARK** | **EXCLAMATION** |
| BLACK | MATCH TO PANTONE 021 ORANGE |

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

Date: _____

**To:**    Big Lots Stores, Inc.
      via facsimile: (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE:** The Plaza at Buckland Hills, Manchester, Connecticut

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed.  Accordingly, possession of the Demised Premises is hereby delivered to Tenant.  You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**LANDLORD:**

**PLAZA AT BUCKLAND HILLS, LLC,**
**a Delaware limited liability company**

By: _____

Title: _____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____

Title: _____

# EXHIBIT F

# EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.**

## EXCLUSIVE USES

Tenant, or any assignee, shall not use the premises in violation of the following:

1. For the principal use of the retail sale of men's, young men's, big and tall clothing;
2. For the principal use of the sale of bagels, bagel sticks and bagel chips as a primary use, nor for the primary use of the sale of food prepared on the premises to sell bagels from the premises;
3. For the principal use of that of a dry cleaning and tailoring service;
4. For the principal use of that of a business whereby tenant sells or rents new or previously played, or prerecorded video games, along sales of related hardware and accessory items;
5. For the primary use of that of a Chinese restaurant;
6. For the principal use of that of a full price/full service hair salon (as opposed to discount hair salons such as but not limited to, Great Clips, Supercuts, Borics and Fantastic Sam's). This exclusive includes the sale of Paul Mitchell, TIGI, Aveda, Goldwell and Sebastian products limited to hair salons and shall be limited to Phase I of the Center;

TRU - SEE ATTACHED LEASE LANGUAGE

7. For the sale of toys, juvenile furnishings, juvenile sporting goods and wheel goods;
8. For the principal use as a catalog showroom or a jewelry store;

JO-ANN - SEE ATTACHED LEASE LANGUAGE

9. For the sale of fabrics of all kinds, yard goods, upholstery materials, patterns, knitting, supplies, needlepoint, macramé, artificial flowers and accessories, arts and crafts materials and supplies, yarns of all types of notions, sewing machines, sewing machine furniture, fabric care items, products and accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and/or arts and crafts store;
10. For the principal use of that of a computer-generated graphics and signage store;
11. A party goods store including costumes;
12. For the principal use of the sale of mattresses; and
13. For the operation of a store which devotes more than the lesser of 10% of its sales floor area or 5,000 square feet to the display and sale of bedding, bath items, kitchenware, tabletop items such as dishes and flatware, and closet storage.

## PROHIBITED USES

Tenant shall not use the Premises in violation of the following:

1. For any public or private auctions, fire, going out of business, bankruptcy or similar sales or auctions;
2. For office purposes or other than lawful retail sales and service purposes;
3. Industrial, assembly or manufacturing plant, warehousing or distribution facility (except in connection with a retail store; church, school or other educational facility (except in connection with a retail store); any auditorium or convention center, lodge, meeting hall, sleeping or residential quarters;
4. The operation of a business which creates a nuisance;
5. Any activity which violates a law, ordinance or other governmental regulation;

EXHIBIT "F"

6.   For a movie theater (except as shown on the site plan); auditorium; meeting hall; church; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles; bar serving alcoholic beverages except as incidental to a restaurant; funeral parlor; massage parlor; animal clinic; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate, gymnasium; skating rink; car wash; off-track betting establishment; game room (within 150 feet from the exterior of the Jo-Ann Fabrics premises); amusement arcade (within 150 feet from the exterior of the Jo-Ann Fabrics premises), gallery or store (within 150 from the exterior of the Jo-Ann Fabrics premises); pinball arcade (within 150 feet from the exterior of the Jo-Ann Fabrics premises); so-called "flea market"; second hand or used goods store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa; so-called "head shop"; night club; school; gun range or gun shop; creates fire, explosive or other hazard; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit materials;

## JoAnn Fabrics

(n)   "Protected Use" shall mean the sale of fabrics of all kinds, yard goods, upholstery materials, patterns, knitting supplies, needlepoint, macrame, artificial flowers and accessories, arts and crafts materials and supplies, yarns and all types of notions, sewing machines, sewing machine furniture, fabric care items, products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and/or arts and crafts store.

MARKET CONDITION

SECTION 14.    Except for leases in affect as of the date of this Lease, where such lease allows for such party to sell such items in violation of the Protected Use or where Landlord has no right to consent or deny consent to a change of use, in the event that any portion of the Shopping Center, or any additions thereto, other than the Premises, are used or occupied for the Protected Use or if any sales area therein is designated for the Protected Use (either of the foregoing being referred to as a "Market Condition"), Tenant shall have the right and option either to (i) pay as substitute rent only an amount equal to five percent (5%) of Tenant's Gross Sales of all goods and services except pattern sales, and zero percent (0%) of pattern sales, in lieu of the Rent required to be paid hereunder (hereinafter referred to as "Substitute Rent"), or (ii) terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate (but Tenant shall not be permitted to terminate if such Market Condition violates the Lease of such Tenant and Landlord agrees to try to cause such party to cease such violation of such Market Condition, but failure to take legal action shall not cause Landlord to be in breach of this section); provided, however, that the foregoing provision shall not apply to any department store, junior department store, or variety store in which the Protected Use accounts for no more than ten percent (10%) of the floor area of such tenant  during any period of thirty (30) days or more as verified to Tenant from time to time upon request of Tenant. If Tenant elects the option in (i) above, it shall be without prejudice to a future election of the option set forth in (ii) above.  Substitute Rent shall be paid in monthly installments within thirty (30) days after the end of each month for which Substitute Rent is computed.  The covenants set forth above are hereby acknowledged to be a material consideration to Tenant in executing this Lease.  The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

**Toys R Us**

ARTICLE XIV.   LANDLORD'S COVENANTS AND WARRANTIES

Section 14.01.   Landlord represents, warrants and covenants to Tenant and any Leasehold Mortgagee as follows:

(a)   Landlord has the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder;

(b)   Landlord is the fee owner of good and marketable title to the Demised Premises, free and clear of any mortgages or liens, leases or tenancies, agreements, easements or restrictions, or other matters which would adversely affect Tenant's use or occupancy of the Demised Premises or the easements and rights granted Tenant in this Lease or which would adversely affect the priority of any Leasehold Mortgage, except for any of the "Permitted Encumbrances" listed on Exhibit D annexed hereto;

(c)   The Demised Premises are presently zoned and are in conformity with applicable law so as to permit: (i) the construction of the Improvements in accordance with the Preliminary Plans and (ii) the operation of a retail business on, in, and from the Store upon completion thereof in accordance with the Preliminary Plans;

(d)      (i) Provided that Tenant is operating as a toy store (except for temporary closings due to repairs or alterations to the Improvements which closings in any event exceed three-hundred sixty five (365) days); Landlord, with respect to the balance of Landlord's Parcel or on any other property owned or leased by Landlord within a three (3) mile radius of the Shopping Center, shall not hereafter operate, lease or permit to be leased or operated (subject to leases in existence as of the Execution Date and provided the same are in full force and effect) any area in the Shopping Center for the sale of toys; juvenile furnishings; juvenile sporting goods; and wheel goods; provided this restriction shall not apply to any other space within the Shopping Center leased by Toys R Us, Inc., its affiliates, subsidiaries or assigns.

(ii) Notwithstanding the provisions of paragraph (i) hereof, the restrictions contained in paragraph (i) shall not apply to the space occupied by Service Merchandise, its subsidiaries, affiliates and assigns, and with regard to the space occupied by Lechmere, its affiliates, subsidiaries and assigns, the restriction contained in paragraph (i) against wheel goods shall not apply, and furthermore the restrictions set forth in paragraph (i) shall not apply to any presently operating tenants or a store which is used or occupied for the sale of any of said items if such sale is "incidental" to the business of the tenant or occupant therein.  For purposes of this paragraph (ii), with regard to the space occupied by Lechmere, its successors and assigns incidental shall mean a use which comprises no more than fifty percent (50%) of the gross leasable floor area of such store in the aggregate for the sale of any such items and for the balance of the Shopping Center, "incidental" shall mean a use which comprises no more than twenty percent (20%) of the gross leasable floor area of such store in the aggregate for the sale of any such item.  Furthermore, the restriction against "wheel goods" contained in paragraph (i) shall not prohibit Landlord from leasing or operating one bike shop not in excess of 5,000 square feet in the Shopping Center.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 2010 is attached to and made a part of the Lease dated _____ (the "Lease") by and between Plaza at Buckland Hills, LLC, a Delaware limited liability company ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.  Demised Premises: (Section 1(D)) = _____.

2.  A.  Fixed Minimum Rent – Original Term (Section 5(A)):
       _____ annually; _____ per month.

3.  A.  Fixed Minimum Rent – First Option (Section 5(A)):
       _____ annually;_____per month.

4.  A.  Fixed Minimum Rent – Second Option (Section 5(A)):
       _____annually; _____per month.

5.  A.  Fixed Minimum Rent – Third Option (Section 5(A)):
       _____ annually;_____per month.