# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors | (Jointly Administered) |
| | Re: D.I. 229 |

**DECLARATION OF JEFFREY H. THOMAS IN SUPPORT OF RESERVATION OF RIGHTS AND LIMITED OBJECTION IN RESPONSE TO D.I. 229, A NOTICE OF SUCCESSFUL AND BACKUP BIDDER WITH RESPECT TO AUCTION OF CERTAIN OF THE DEBTORS' LEASE ASSETS AND ASSUMPTION AND ASSIGNMENTOF CERTAIN UNEXPIRED LEASES**

I, JEFFREY H. THOMAS, declare under penalty of perjury as follows:

1. I submit this declaration ("Declaration") in support of the Reservation Of Rights And Limited Objection ("Objection") in response to D.I. 229, the *Notice of Successful and Backup Bidder With Respect to the Auction of Certain of the Debtors' Lease Assets and Assumption and Assignment of Certain Unexpired Leases* filed by Debtors in the above-captioned, jointly administered chapter 11 cases on September 19, 2024 (the "Notice").

2. The contents of this Declaration are based on my personal knowledge acquired in my capacity as a Member of River South Commons, LLC, a Louisiana limited liability company ("River South").



3.  I am over the age of twenty-one (21), of sound mind, and duly competent to make this Declaration.

4.  In support of the Objection, see attached as Exhibit 1, a true and correct copy of the Lease Agreement ("Lease"), effective February 25, 2022, between River South, as landlord, and Big Lots Stores, LLC, as tenant, of certain space within what was agreed therein to be "Landlord's 'Shopping Center'" as further described therein, titled "River South Commons Shopping Center," with an address of 339 South Drive, Natchitoches, LA 71457 (the "Shopping Center'). *See* Lease at 5, ¶ 1.E.

5.  As described in greater detail in the Lease, the term of the Lease is for seven (7) full years following certain triggering events described in the Lease. *See* Lease at pgs. 3-6. The Lease also contains options to extend term. *See id.*

6.  As shown (by site map and photos) and described in the Lease itself, including its attachments, the Shopping Center, in its entirety, is leased by the same Landlord, River South, and consists of several joined, contiguous leased spaces, with tenants sharing access and use of, among other things, a single parking lot, large signage on the road nearby, and certain "common areas" described therein. As described in greater detail in the Lease, permitted uses of the leases premises focus on "retail sale". *See* Lease at pg. 6, ¶ 4.A.

7.  I have personal knowledge that the documents and records attached hereto as Exhibit 1 were made at or near the time of the acts and events described therein, by, or from information transmitted by, someone with knowledge of the facts; and were kept by River South in the course of its regularly conducted activity,



and were made as part of the regular practice of that activity. The documents and records attached hereto as Exhibit 1 are duplicates of the original records.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration is executed this 26th day of September 2024 at Natchitoches, Louisiana.

Executed on September 26, 2024

Jeffrey H. Thomas
Member
River South Commons, LLC
319 South Drive
Natchitoches, LA 71457

# EXHIBIT 1

# TABLE OF CONTENTS

**Section**

| | | | |
|---|---|---|---|
| 1. | Definitions | 14. | Force Majeure |
| | A. Common Areas | 15. | Injunction |
| | B. Dates | 16. | Warranty of Title by Landlord; Representations |
| | C. Exhibits | | |
| | D. Demised Premises | 17. | Quiet Enjoyment |
| | E. Shopping Center | 18. | Mortgage and Estoppel Certificates |
| 2. | Demise | | |
| 3. | Term | 19. | Default |
| | A. Original Term | 20. | Condemnation |
| | B. Option to Extend Term | 21. | Mutual Waiver of Subrogation |
| 4. | Use and Operation | 22. | Assignment and Subletting |
| 5. | Rent and Construction Allowance | 23. | Surrender and Holdover |
| | A. Gross Rent | 24. | Notices |
| | B. Utilities Charges | 25. | Legality |
| | C. Intentionally Deleted | 26. | Binding Obligations |
| | D. Common Area Charges | 27. | No Recordation |
| | E. Real Estate Taxes | 28. | Real Estate Broker's Commission |
| | F. Intentionally Deleted | 29. | No Waiver, Laches or Accord and Satisfaction |
| | G. Construction Allowance | | |
| | H. Declarations | 30. | Hazardous Materials |
| 6. | Initial Buildout and Subsequent Alterations | 31. | Titles and Entire Agreement |
| | | 32. | Waiver of Claims |
| 7. | Maintenance and Repairs | 33. | Reasonable Consent |
| 8. | Signs | 34. | Intentionally Deleted |
| 9. | Trade Fixtures | 35. | No Presumption against Drafter |
| 10. | Governmental Regulations | 36. | Submission of Lease |
| 11. | Indemnification | 37. | Interlineation |
| 12. | Insurance | 38. | Time of the Essence |
| | A. Tenant | 39. | Intentionally Deleted |
| | B. Landlord | 40. | Attorney Fees |
| 13. | Fire Rebuilding and Altering | 41. | Waiver of Jury Trial |

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the _25_ day of February, 2022 (the "**Effective Date**"), by and between River South Commons, LLC, a Louisiana limited liability company, whose mailing address is 319 South Drive Natchitoches, LA 71457 ("**Landlord**"), and Big Lots Stores, LLC., an Ohio limited liability company, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("**Tenant**"), whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081-7651, Attention: Lease Administration.

## WITNESSETH:

**1.    DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

A.    <u>Common Areas</u>:  The improved portion of the Shopping Center not occupied by building area as shown in Exhibit A, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Pylons, and parking lot lighting poles and light fixtures of the Shopping Center (collectively the "**Common Areas**").  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

    Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to store up to two (2) drop/storage trailer(s)/container(s) in the receiving area of the Demised Premises shown on Exhibit A, so long as said trailer(s)/container(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the portion of the Common Areas crosshatched on Exhibit A ("**No Change Area**").  Landlord shall not construct additional buildings nor alter any of the Common Areas within Tenant's No Change Area without Tenant's consent.

B.    <u>Dates</u>:

    1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work, to be done simultaneously with Landlord's Work, as set forth in Exhibit C and defined below. Upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "**Tenant Entrance Date**" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work.    Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

2)      The "**Tenant Possession Date**" shall be the later of: (i) the date Landlord delivers possession to Tenant with all Landlord's construction pursuant to Exhibit C ("**Landlord's Work**") substantially complete except for minor punch list items and in compliance with all applicable laws, ordinances, and regulations, or (ii) the date on which Tenant receives all necessary building permits for its construction, fixturing, merchandising, and/or signage (the "**Permits**"). Tenant will submit its plans for the Permits within ninety (90) days of full Lease execution and thereafter, diligently pursue obtaining such Permits. Landlord will cooperate fully with Tenant in obtaining said Permits. In the event Tenant has not obtained the Permits by May 1, 2022, Landlord shall have the right to pursue such Permits on Tenant's behalf. Landlord's Work shall be substantially completed by June 1, 2022, with the exception of: (x) installation of HVAC units (due to ninety (90) day order time of HVAC units, and provided that such units shall be ordered by Landlord on the Effective Date and may be installed by Landlord during Tenant's buildout of the Tenant's Work), as HVAC units will be installed within thirty (30) days of arrival at contractor's facility but in no event later than ninety (90) days of Tenant opening for business), (y) repair of loading dock area, and (z) repair and striping of parking lot, which items of Landlord's Work may be completed after June 1, 2022. Landlord shall execute and submit the form shown on Exhibit E, which may be sent via email, to notify Tenant when it has substantially completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been substantially completed. Notwithstanding anything to the contrary, any punch list items identified by Tenant within thirty (30) days of the date Landlord tenders possession of the Demised Premises to Tenant shall be completed by Landlord within thirty (30) days of the date Landlord receives the punch list, and Landlord shall not be responsible for any items not included on the punch list. Any exterior improvements to the Shopping Center parking lot, landscaping or façade and/or any impact fees required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("**Exterior Improvements**") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, Tenant accepts the Demised Premises subject to all zoning regulations, building codes, and other laws and regulations now in effect or hereafter promulgated by any governmental authority having jurisdiction therefore and all easements, servitudes, encumbrances and other matters of record affecting the Premises and/or the Shopping Center. Tenant's taking possession of the Demised Premises shall be an indication that the Demised Premises is ready for Tenant's Work and  upon the Possession Date, Tenant agrees to assume

3

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

responsibility and liability for the condition of the Demised Premises to the fullest extent allowed under Louisiana Revised Statute 9:3221.

3) The "**Term Commencement Date**" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

4) The "**Rent Commencement Date**" shall be the earlier of (i) the date which is one hundred eighty (180) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

5) The Estimated Delivery Date (as hereinafter defined) shall be June 1, 2022 ("**Estimated Delivery Date**"). Subject to Force Majeure events or delays caused by Tenant (in which event the Estimated Delivery Date shall be extended on a day-for-day basis for each day of delay suffered by Landlord as a result of either of the foregoing), in the event Landlord does not use its best efforts to deliver possession of the Demised Premises to Tenant with Landlord's Work substantially complete (not including punch list items described above) by the Estimated Delivery Date, without waiving any other remedies available to Tenant under the Lease, at law or in equity, including its rights under Section 7 herein, commencing upon June 1, 2022 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to June 15, 2022, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day. Commencing June 15, 2022 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of five percent (5%) annually (the "**Lease Interest Rate**"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its Permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its Permits due to Landlord's default.

6) Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by July 15, 2022 and/or Tenant has not received the Permits by July 15, 2022, Tenant will not be required to accept possession of the Demised Premises until February 1, 2023. The period of time between July 15, 2022 and February 1, 2023 will be the "**Optional Blackout Period**". In addition, in the event Landlord has not completed Landlord's Work by February 1, 2023, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 1, 2023, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7) In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred eighty (180) days after delivery of possession of the Demised Premises by Landlord or (ii) ninety (90) days after Tenant has received the Permits; or (iii) February 1, 2023.  Notwithstanding anything in this Lease to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center and Location of Trailers
2)    Intentionally Deleted
3)    Exhibit B -    Legal Description of Shopping Center
4)    Exhibit C -    Landlord's Work
5)    Exhibit D -    Tenant Building Sign Specifications
6)    Exhibit D – 1 Tenant Pylon Sign Location
7)    Exhibit E -    Completion of Landlord's Work Letter
8)    Exhibit F -    Exclusive Use Provisions
9)    Exhibit G -    Remeasurement Rider

D.    Demised Premises:  The "**Demised Premises**" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 35,583 square feet of ground floor area with a minimum width of 150 feet for the Demised Premises.    Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings.  The Demised Premises shall be measured (a) from the center of the demising wall of the adjacent tenant premises, and (b) with respect to the depth thereof, from the exterior face of the storefront to the exterior face of the rear exterior wall.  Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 250 square feet, Landlord and Tenant shall mutually agree on the actual square footage, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 250 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.  Notwithstanding the foregoing, Tenant shall not be obligated to accept possession of any space under 32,025 square feet in size and may terminate this Lease in such an event.

E.    Shopping Center:  Landlord's "**Shopping Center**" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the River South Commons Shopping Center, 339 South Drive Natchitoches, LA 71457.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 139,944 square feet.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

2.    **DEMISED PREMISES:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.    **TERM:**

A.    Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending on the January 31st a full seven (7) years thereafter (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The **"Lease Year"** shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a **"Partial Lease Year."** If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, **"Term"** shall mean the Original Term, any exercised Option Terms (as defined below), and any other extended period.

B.    Options to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) Lease Year option terms, consecutively referred to as **"First Option Term"**, **"Second Option Term"**, **"Third Option Term"** and **"Fourth Option Term"**. The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default hereunder, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Term.

4.    **USE AND OPERATION:**

A.    Permitted Uses: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

beauty products, food (including refrigerated and frozen food, beer and wine not to exceed ten percent (10%) of floor space) all similar or related merchandise, and for any lawful retail use ("**Permitted Use**").    Tenant agrees that the display of furniture, furniture accessories, furnishings and/or mattresses shall not exceed 5,500 square feet of the Demised Premises.    Tenant further agrees not to advertise any rent-to-own products. Landlord represents and warrants to Tenant, as of the Effective Date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict, other than as set forth herein, Tenant's Permitted Use of the Demised Premises.    Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are set forth in Exhibit F.    Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not materially adversely affect Tenant's business operation and do not conflict with the terms of this Lease.

Except for tenants open and operating for business in the Shopping Center as of the Effective Date of this Lease (which includes but is not limited to Affordable Home Furnishings), and provided Tenant is continuously operating from the Demised Premises for the Permitted Use and has committed no event of default hereunder, Landlord will not lease space within the Shopping Center to a tenant or permit the primary operation of another general merchandise discount store, liquidator, close-out store, or dollar stores operations where its merchandise is priced at less than five dollars ("**Competing Business**") during the Term of this Lease.    In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Dollar Express, Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Dirt Cheap, Bargain Hunt, Christmas Tree Shops, Ollie's Bargain Outlet, Aaron's, Rent A Center, or Rent Way (unless existing tenant, Affordable, sells or merges its business or assigns its interest under its lease to any party, which party may continue to operate a rent-to-own business of furniture, appliances and electronics in the Shopping Center).    A tenant operating a portion of the Shopping Center as a "Burke's Outlet" shall not be deemed a Competing Business hereunder.    If Goodwill is purchased, Landlord may continue to lease to its new entity, Landlord may lease to a department store specializing in clothing and items for hunting (such as Nichols). In the event Landlord leases space within the Shopping Center to a tenant operating a Competing Business in violation of its lease ("**Rogue Tenant**"), Tenant at any time thereafter may deliver to Landlord a written notice of such violation of the prohibition against the Competing Business provisions set forth above by the Rogue Tenant.    Landlord agrees to pursue commercially reasonable efforts to stop the Rogue Tenant's continued operation of a Competing Business.    Such efforts may include but not be limited to (1) filing of pleadings in a court of competent jurisdiction and diligently pursuing such litigation to conclusion; however, Landlord shall be obligated to pursue an appeal of a final decision of the court; and (2) filing for temporary or permanent injunctive relief asking the

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

court to stop the Rogue Tenant from operating the Competing Business.   In the event Landlord fails to cure such violation by the Rogue Tenant within thirty (30) days following written notice thereof to Landlord, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may pay, in lieu of Gross Rent, an amount equal to fifty percent (50%) of the Gross Rent then effective under this Lease; or (ii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a Competing Business. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein.  All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.  At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. In addition, in the event Landlord fails to cure such violation within twelve (12) months following receipt of written notice thereof from Tenant, Tenant shall have the right to terminate this Lease by providing written notice to Landlord at any time thereafter but prior to Landlord's cure.  Notwithstanding the foregoing, if the operation of the Competing Business by the Rogue Tenant continues for more than twelve (12) months from the date Landlord received written notice of same from Tenant, Tenant shall either: (x) terminate the Lease by delivering written notice Landlord within thirty (30) days following the expiration of such twelve (12) month period, or (y) recommence paying full Gross Rent hereunder providing Landlord has pursued the commercial reasonable efforts set forth above.  The prohibition against a tenant of the Shopping Center operating a Competing Business shall terminate on the first to occur of: (a) Tenant ceasing to continuously operating the Demised Premises for the Permitted Use, or (b) the expiration or earlier termination of the Lease.

Tenant agrees subject to temporary closures due to Force Majeure, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder.  In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises, loading dock and trash receptacle area free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal, and such trash receptacle shall be located in a location approved by Landlord. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas, including up to six (6) parking spaces, and sidewalks immediately adjacent to the Demised Premises for the sale and display of merchandise up to four (4) times per calendar year for special sales.

B.     Prohibited Uses: With the exception of existing tenant leases of space within the Shopping Center, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises:

1)     to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises;

2)     to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea market" type of operation (excluding Play It Again Sports, Once Upon a Child and Goodwill);

3)     for an auditorium, activity facility, meeting hall, church or other place of worship;

4)     for any self-storage facilities;

5)     for any plasma center, or for any medical or health oriented facilities or offices in excess of 3,000 square feet and provided the same is not within 150 feet of the Demised Premises;

6)     for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating);

7)     for any automotive, tire, gasoline, or oil service centers;

8)     for any governmental use or office or any social service functions or facilities;

9)     for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material, provided that this prohibition shall not prevent the operation of a first-class massage business such as Massage Envy;

10)    in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor;

11)    for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment (excluding

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

any incidental beer or wine sales and any restaurants); provided, however, that any restaurant and any establishment selling alcoholic beverages must be located at least 225 linear feet away from the Demised Premises (provided that this restriction does not apply to the existing restaurant tenant known as "Sam's Southern Eatery" located at the Shopping Center end cap or its immediate successors and assigns continuing such restaurant use);

12)     for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley;

13)     for lodging, including a hotel, motor inn, apartments or condominiums;

14)     for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations);

15)     for a funeral parlor or mortuary;

16)     for a mobile home or trailer court;

17)     for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time);

18)     for any commercial laundry (although a dry cleaning drop off location shall be permitted) or coin operated laundromat;

19)     for any day care center (other than in conjunction with a retail or, in the case of day care, office operation and provided that schools or tutoring businesses such as Sylvan Learning Center are expressly permitted);

20)     for any veterinary hospital, animal boarding, training or raising facilities or pet shop, provided that this prohibition shall not prevent the operation of a first-class retail pet store such as Petsmart;

21)     for any separately demised newsstand;

22)     for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets, lottery sales from retail establishments) or facility;

23)     for any astrology, palm reading, tarot card or other like service or facility;

24)     for the use of a "call center" or

25)     for the use as a "head shop" selling drug paraphernalia, or marijuana dispensary (even if allowable by applicable law), provided that in no event shall this prohibit the operation of a pharmacy.

All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**".

C.     <u>Roof of the Demised Premises</u>:  Landlord and Tenant shall each have the right to place, at its own cost and expense, aerials, satellite dishes or antennas which do not penetrate the roof membrane of the Demised Premises.


5.     <u>**RENT AND CONSTRUCTION ALLOWANCE:**</u>

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Gross Rent (sometimes referred to as "**Rent**") along with all other charges due from Tenant to Landlord under this Lease ("**Additional Rent**"). Tenant will not make any payment to Landlord until Landlord provides Tenant with a duly executed federal Form W-9. The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Gross Rent</u>: Commencing from the Rent Commencement Date thru the Original Term, the sum of $245,522.70 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $20,460.23, without notice, demand, deduction or offset.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Gross Rent applicable for the First Option Term shall be the sum of $263,314.20 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,942.85. The Gross Rent applicable for the Second Option Term shall be the sum of $281,105.70 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,425.48. The Gross Rent applicable for the Third Option Term shall be the sum of $298,897.20 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $24,908.10. The Gross Rent applicable for the Fourth Option Term shall be the sum of $316,688.70 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $26,390.73.

B.    <u>Utilities Charges</u>: Landlord shall provide Tenant with access to all existing utilities to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, trash, and tap/ impact fees based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available and separately metered to the Demised Premises.

If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord (and excluding utilities provided by utility companies) shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Intentionally Deleted

D.    Common Area Charges: Landlord shall maintain the Common Areas and agrees not to change, use or allow the use of such Common Areas in a manner which would materially substantially impair the visibility or accessibility to the Demised Premises from South Drive. Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

1)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Common Areas of the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees, including keeping the parking lot lights on during periods of darkness during normal Shopping Center hours and also, for the period commencing November 20th through December 31st each year, until midnight.

2)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, common garbage and refuse disposal facilities (but specifically excluding any garbage and refuse disposal facilities for tenant spaces), Shopping Center maintenance and storage room, and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

3)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to affect the site plan;

4)    providing reasonable lighting and on-site traffic control (deemed necessary by Landlord);

5)    subject to the initial delivery requirements of Exhibit C, maintaining all parking areas in good condition in keeping with the commercially reasonable standard practice of shopping centers of similar size; restriping and repainting as necessary (provided, in no event shall Landlord be required to stripe the rear parking areas of the Shopping Center); and

6)    cleaning, sweeping, and snow and ice removal as needed.  Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("**Common Area Charges**"). Excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, reserves and any administrative, management or related fees. Notwithstanding anything to the contrary, Tenant shall not pay or reimburse Landlord for the costs or expenses arising with respect to the Common Area Charges.  All Common Area Charges shall be performed by Landlord at its sole cost and expense.

E.    <u>Real Estate Taxes:</u>  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "**Real Estate Taxes**").  All such Real Estate Taxes shall be paid by Landlord, and Tenant shall not be obligated to pay or reimburse Landlord for the Real Estate Taxes.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    <u>Intentionally Deleted</u>.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

G.   Construction Allowance: Landlord shall pay to Tenant an amount equal to Three Hundred Fifty Five Thousand Eight Hundred Thirty Dollars ($355,830.00) for the hard costs of construction of Tenant's Work in the Demised Premises ("**Construction Allowance**"), fifty percent (50%) of which is payable to Tenant upon Tenant's completion of fifty percent (50%) of Tenant's Work with Tenant providing Landlord documentation regarding the same (including lien waivers from all contractors, subcontractors and materialmen providing over $5,000.00 of work or materials as part of the Tenant's Work). Landlord shall pay Tenant the remaining fifty percent (50%) of the Construction Allowance within thirty (30) days of the last to occur of: (i) Tenant's opening for business for the Permitted Use from the Demised Premises, (ii) Tenant obtaining a certificate of occupancy for the Demised Premises, (iii) Tenant providing Landlord documentation regarding the expenditure of the remaining Construction Allowance, and (iv) Tenant providing Landlord with final lien waivers from all contractors, subcontractors and materialmen providing over $5,000.00 of work or materials as part of the Tenant's Work. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to source construction materials and will not be required to provide lien waivers for the cost of such materials. If said amount is not paid by Landlord to Tenant within thirty (30) days after satisfaction of all of the requirements above, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Construction Rent Abatement:  In addition to the above Construction Allowance, for a period of six (6) months commencing upon the Rent Commencement Date, Tenant shall not be obligated to pay Gross Rent, as consideration for Tenant's construction to and improvement of the Demised Premises (hereinafter referred to as "**Rent Abatement**"). The total amount of the Rent Abatement shall be equal to $122,761.38.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance and Rent Abatement are used for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Rent Abatement shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code.  Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

H.   Declarations:  Landlord and Tenant acknowledge that Shopping Center is subject to certain covenants, conditions and restrictions of record, including but not limited to Declaration of Restrictions and Privileges on the use of Common Areas and Facilities, dated July 26, 1978, of record as No. 153242 in the Official Records of Natchitoches Parish, Louisiana (collectively, the "**Declaration**").  To the extent that the Declaration allocates any expenses or charges in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the Declaration) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant.  In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

agrees that any payments required be made under the Declaration, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant.

6.      **INITIAL BUILDOUT AND SUBSEQUENT ALTERATIONS:**

If Landlord fails to complete Landlord's Work at the Demised Premises within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, then at Tenant's discretion, Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work.  In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work.  Tenant shall complete such work in a timely manner.

During the Term of this Lease, following completion of initial buildout to the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which the Demised Premises are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term continue to remain the property of Landlord. Tenant shall remove any mechanic's lien placed on the Demised Premises resulting from any construction materials sourced by Tenant or such alterations within thirty (30) days of the date same are filed of record.

7.      **MAINTENANCE AND REPAIRS:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.  Tenant shall be required to use Landlord's designated roofer for any roof penetrations and a mutually agreeable HVAC contractor in connection with Tenant's required maintenance activities.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.  The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) canopy lights, (viii) building lights, (ix) electrical, plumbing, sprinkler and other mechanical systems and equipment including backflow preventor valves for the domestic water and for the sprinkler riser (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the reasonable cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks; provided, Tenant shall have provided Landlord written notice of such leak causing the damaged or stained ceiling tiles in the Demised Premises within three (3) days of its occurrence.

Landlord shall install six (6) new twenty (20) ton RTU's per Exhibit C. If the Tenant Possession Date occurs between October 2022 through May 2023, Tenant shall be granted one hundred twenty (120) days from Tenant Possession Date to test the air conditioning system

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems Landlord is required to provide pursuant to Exhibit C, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects in the foregoing items as part of the punch list process described in Section 1(B)(2). If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs of the roof or structural portion of the Demised Premises within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is a roof leak or structural failure and is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors. All such repairs shall be made in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to

do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises (the "**Building Signs**"). Tenant agrees to maintain such Building Signs in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located, provided, that the Building Signs shall comply with all applicable governmental requirements.  Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "**Pylon**") (i) are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction.  If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease.

Tenant shall have the right to place suitable one sign panel upon the existing Shopping Center Pylons.  Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion of any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the additional available Pylon space.  Absent an existing Pylon in compliance with applicable law, Tenant shall have the right to erect a Pylon for its sign panels.  Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs.  Once Tenant's Business Signs and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs (unless it relocates its pylon to the replacement location described above) and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Term, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs. Landlord shall obtain Tenant's prior written consent as to the proposed location, height and size of any billboard or sign, whether free standing, painted upon or affixed to the exterior of any structure, that Landlord hereinafter wishes to construct or place within the No Change Area.

9.    **TRADE FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.  At the end of the Term, Tenant shall remove such trade fixtures or equipment and repair, at its cost, all damage caused by such removal.  Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of Landlord when affixed (the "**Leasehold Improvements**").  For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment in the Demised Premises (provided same are not in violation of any Declaration or Prohibitive Use affecting the Shopping Center).  Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify, defend and hold Landlord harmless from and against any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction on the date Landlord substantially completes the Landlord's Work and delivers the Demised Premises to Tenant; if said Demised Premises does not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.  Landlord has provided Tenant with all "as built" drawings of the Demised Premises that Landlord has in its possession.  Landlord agrees to make all repairs, alterations, additions, or replacements to the portions of the Demised Premises which Landlord is required to maintain pursuant to this Lease which are required by any law, statute, ordinance, order or regulation of any governmental authority (including the Americans with Disabilities Act "**ADA**").  Tenant agrees to make all repairs, alterations, additions, or replacements to the portions of the Demised Premises which Tenant is required to maintain pursuant to this Lease which are required by any law, statute, ordinance, order or regulation of any governmental authority (including the ADA).  Landlord shall deliver the Demised Premises equipped with the smoke and fire alarms and sprinkler system described on Exhibit C in good working condition, subject to Tenant's responsibility for modifications to same to its intended use (including turning up sprinkler heads if required by applicable code).

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agree to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.

Landlord, its successors and assigns, agree to indemnify, defend and hold harmless Tenant from any liability for injury to or death of any person or damage to personal property of every kind and

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

nature arising from or in connection with the use and occupancy of the Common Areas caused by defects therein, or caused by Landlord's failure to maintain the portions of the Demised Premises (including latent or patent defects therein) which are Landlord's responsibility hereunder, or caused by the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

    A.    <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: Two Million Dollars ($2,000,000.00) each occurrence and Three Million Dollars ($3,000,000.00) general aggregate. Tenant shall provide Landlord with certificates of insurance evidencing such coverages prior to the Tenant Possession Date.

            Tenant shall insure Tenant's Work, Tenant's trade fixtures, furnishings and inventory.

            Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

    B.    <u>Landlord</u>: Landlord shall, at its sole cost and expense, all times carry insurance covering the Shopping Center, all improvements (including Leasehold Improvements) located in the Shopping Center, including the Demised Premises, except for Tenant's Work, Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" property insurance ("**Casualty**"), in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

            Landlord shall at all times carry commercial general liability insurance covering the Common Areas, with minimum limits of the following: One Million Dollars ($1,000,000.00) each occurrence and Two Million Dollars ($2,000,000.00) general aggregate, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

13. **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other Casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such Casualty (excluding Tenant's Work, Tenant's trade fixtures, furnishings and inventory) but in compliance with all regulations by authority having jurisdiction as of the date of restoration; provided, however, if the insurance proceeds are inadequate or Landlord's lender does not provide the insurance proceeds to Landlord, Landlord shall have the right to terminate this lease.   In the event of a Casualty, Rent and Additional Rent shall remain unchanged.

B.   In the event as a result of such damage or destruction, the Demised Premises or a substantial portion of the Shopping Center, are not repaired and restored to tenantable condition within two-hundred seventy (270) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided, however, if Landlord completes such restoration of the Demised Premises during the foregoing sixty (60) day notice period, this Lease shall remain in full force and effect.

C.   If more than one-third (1/3) of the ground floor area of the Demised Premises are damaged or destroyed during the last six (6) months of the Term Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party within sixty (60) days following the date of such Casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or obligation (but specifically excluding any monetary obligations hereunder), Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, pandemic or epidemic, supply chain delays, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to seek to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16. **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

Landlord hereby warrants, represents, and covenants to Tenant that, as of the Effective Date: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant, or as a result of any Landlord obligation and warranties set forth herein; (c) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; and (d) Landlord is not aware of any Landlord default under any of the terms of any restriction, easement, or covenant of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, or covenant of record that has not been cured, and Landlord is not aware of any circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, or covenant of record.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record, nor permit any other entity to do so, that would materially limit Tenant's rights or expand Tenant's obligations as set forth in the Lease, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed. Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement materially limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant, and fails to cure such breach within all applicable cure periods, Landlord shall be in default hereunder. Further, if it is determined that Landlord does not have the title to the Demised Premises and the rights aforesaid, or breaches the representations as set forth in this Section 16, if Landlord fails to cure such breach within all applicable cure periods and such failure negatively impacts Tenant, then in addition to any other rights of Tenant's hereunder, Tenant shall have the option to (a) terminate the Lease and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or (b) Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured, and upon such cure, Tenant shall repay Landlord any Rent and Additional Rent so withheld.

## 17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's peaceful possession of the Demised Premises will not be disturbed during the Term of this Lease. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center. Tenant and the holder of any mortgage lien shall enter into a mutually agreeable subordination, non-disturbance, and attornment ("**SNDA**") agreement which shall include a covenant by the mortgagee not to disturb the tenancy

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall use commercially reasonable efforts to ensure that any such holder or mortgagee agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon the receipt of a written request from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Rent, Common Area Charges, Additional Rent and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19. **DEFAULT:**

A.  If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of two (2) written notices of such default from the Landlord within any twelve (12) month period or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary provided Tenant is diligently pursuing such cure), this Lease, if the Landlord so elects, shall thereupon terminate, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate the amount due under this Lease following a default

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.  If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, (i) to terminate this Lease without penalty or default on the part of Tenant, or (ii) cure such default and the amount expended by it therefore, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations involving imminent damage to person or property which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by email, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.  **CONDEMNATION:**

In the event the Demised Premises hereby leased, or more than fifty (50%) percent of the Common Area of the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant, the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event that any portion of the Common Areas consisting of less than fifty (50%) percent thereof is taken in condemnation proceedings so that in the reasonable judgment of Tenant, the amount taken materially and adversely affects Tenant's business operations from the Demised Premises, Tenant shall retain the Demised Premises, subject to Landlord's restoration obligations and the reductions of Rent and Additional Rent described below. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises, Common Areas and/or Shopping Center to proper tenantable condition forthwith. Thereafter, Rent and Additional Rent shall be reduced: (i) with respect to takings of the Demised Premises, in proportion to the amount of the Demised Premises lost, and, (ii) with respect to takings of the Common Area in proportion to the amount of Common Areas lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21. **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to inventory, equipment, fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord, its members, officers, agents, and employees from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("**Notice**"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("**Termination Notice**"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("**Recapture Right**"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("**Termination Date**"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Subject to the provisions of the foregoing paragraph, Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent upon Notice to Landlord; provided, that no such subletting or assignment (including a Related Party Assignment) shall relieve Tenant of any of its obligations hereunder nor violate any then-existing exclusives or Prohibited Uses. Each sublease or assignment shall be subject and

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without Notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "**Related Party Assignment**"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

## 23. <u>SURRENDER AND HOLDOVER:</u>

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition reasonable wear and tear or damage by fire or other Casualty excepted. Tenant may remove all of its trade fixtures from the Demised Premises. Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed.

If Landlord provides Tenant notice of a new tenant taking possession of the Demised Premises following the expiration or earlier termination of the Original Term or any Option Term, as the case may be, and Tenant thereafter retains possession of the Demised Premises or any part thereof, without prior written approval of Landlord such occupancy shall be a tenancy from day-to-day at one twenty-five (125%) percent of the daily Rent which was due hereunder immediately prior to such holding over and otherwise subject to all the terms and provisions hereof.

If Landlord does not provides Tenant notice of a new tenant taking possession of the Demised Premises following the expiration or earlier termination of the Original Term or any Option Term, as the case may be, and Tenant retains possession of the Demised Premises or any part thereof, such holding over shall constitute an extension of this Lease on a month to month basis. Upon receipt of a notice to vacate received by Tenant from Landlord ("**Notice to Vacate**"), Tenant shall have sixty (60) days in which to return possession of the Demised Premises back to Landlord. Should Tenant continue to holdover past such sixty (60) day period, then Tenant's further occupancy of the Demised Premises shall be subject to the provisions of the previous paragraph.

## 24. <u>NOTICES:</u>

Whenever any demand, request, approval, consent or notice ("**Notice**") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via electronic mail with such notice attached. The parties hereby acknowledge and agree that any

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

electronic notices shall be legal and binding and shall have the same full force and effect as if a paper original of such Notice had been delivered and signed using a handwritten signature  The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery.  Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.  **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.  Tenant waives all representations and warranties on the part of Landlord implied by law that the Demised Premises and Shopping Center are fit for any particular purpose and/or free from defects or deficiencies, whether hidden or apparent, including all warranties under Louisiana Civil Code articles 2696-2702 or any other provision applicable under Louisiana law; provided, however, that this waiver of implied warranties under Louisiana law shall not reduce or limit Landlord's delivery obligations set forth in this Lease.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Louisiana.  Tenant represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Ohio.  Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26.  **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.  **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease.  Tenant may record such memorandum at its expense.  Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.  **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease except Buff Teague with JLL representing Tenant and whose commission shall be paid by Landlord under a

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

separately stipulated agreement. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.    **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.    **HAZARDOUS MATERIAL:**

Landlord represents and warrants that, to the actual knowledge of John Wingo, the Demised Premises do not as of the Tenant Possession Date, contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste the use and/or disposal of which is currently regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, or under the Demised Premises at any time during the Term of this Lease, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord or Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Term of this Lease, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and restore the contaminated areas; i.e., walls, floor, ceiling, etc. to good condition with like materials and standard as existed prior to such restoration. If Landlord's cost to remediate is in excess of $50,000, Landlord shall have the right to terminate the Lease. Landlord shall indemnify, defend and hold harmless Tenant, except for the negligence or willful misconduct of Tenant, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) related to such Hazardous Materials determined to have been placed thereon by Landlord or Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's.

Throughout the Term of this Lease, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify, defend and hold harmless Landlord, Landlord's agents, contractors, or employees, except for the negligence or willful misconduct of Landlord, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney

fees and court costs) related to any release of Hazardous Materials caused by Tenant, or Tenant's agents, contractors, or employees or invitees. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31.   TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease, Exhibits, and Rider(s), if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both.

## 32.   WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, Insurance Costs, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

## 33.   REASONABLE CONSENT:

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

## 34.   INTENTIONALLY DELETED

## 35.   NO PRESUMPTION AGAINST DRAFTER:

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

## 36.   SUBMISSION OF LEASE:

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant.

The parties hereby acknowledge and agree that electronic signatures may be used in connection with the execution of this Lease and electronic signatures or signatures transmitted by electronic mail in so-called pdf format shall be legal and binding and shall have the same full force and effect as if a paper original of this Lease had been delivered and signed using a handwritten signature.

37.    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39.    **INTENTIONALLY DELETED.**

40.    **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party.  This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

41.    **WAIVER OF JURY TRIAL:**

The parties hereto shall, and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

[Signatures Appear on Immediately Subsequent Page.]

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

**LANDLORD: RIVER SOUTH COMMONS, LLC, a Louisiana limited liability company**

By: _____
    John A. Wingo

Title:  Managing Member

Date:  2.25.2022

**TENANT:    BIG LOTS STORES, LLC., an Ohio limited liability company**

By: _____
    Jonathan E. Ramsden

Title:  Executive Vice President, Chief Financial & Administrative Officer

Date:  2/24/2022

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

### EXHIBIT "A"

That certain tract, piece or parcel of land, together with all buildings and improvements thereon, situated and located in the City and Parish of Natchitoches, State of Louisiana, known as the Cane River Shopping Center, and being more particularly described as follows, to-wit:

Begin at the Southwest corner of Lot 1, Block G, Pecan Park Subdivision, in the City and Parish of Natchitoches, State of Louisiana, which is identified as Point "A" on said plat and which is the Point of Beginning, and run South 85°00' East along the South line of Pecan Park Subdivision a distance of 869.70 feet to the point of intersection of Pecan Park Subdivision and the West line of Parkway Estates, Unit No. 3; thence run South 05°57' West along the West line of Parkway Estates, Unit No. 3, a distance of 713.10'; thence run North 83°53' West a distance of 764.00' to a point on the East right of way of La. Hwy. 1; thence run North 02°40' West along said right of way a distance of 43.39'; thence run South 85°00' East a distance of 125.00'; thence run North 05°00' East a distance of 170.00'; thence run North 85°00' West a distance of 147.80' to a point on the East right of way of La. Hwy. 1; thence run North 02°40' West along said right of way a distance of 282.73'; thence run South 85°00' East a distance of 200.00'; thence run North 05°00' East a distance of 150.00'; thence run North 85°00' West a distance of 220.10' to a point on the East right of way of La. Hwy. 1; thence run North 02°40' West a distance of 55.50' along said right of way of La. Hwy. 1 to Point "A", the Point of Beginning.

Together with all right, title and interest, if any, of Seller, in and to any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining said tract to the center line thereof, and together with all right, title and interest of Seller in and to any award made or to be made in lieu thereof, and in and to any unpaid award for damages to tract or improvements by reason of change of grade of any street, and any improvements of any sort.

SUBJECT TO the following:

(1)     Right-of-way by Mrs. Amy Rhodes to Cleco, dated April 20, 1956, and recorded in Conveyance Book 226, page 433 of the Records of Natchitoches Parish, Louisiana.

(2)     Drainage Easement by Joseph E. Rhodes, Jr., et al, to Kerlin C. Sutton, dated November 13, 1973, and recorded in Conveyance Book 315, page 34 of the Records of Natchitoches Parish, Louisiana.

(3)     Right-of-way by Charles Gremillion to Cleco, dated September 19, 1977, and recorded in Conveyance Book 339, page 31 of the Records of Natchitoches Parish, Louisiana.

(4)     Release of Portion of Servitude by Trans La, recorded in Conveyance Book 468, page 268 and Conveyance Book 422, page 9, all of the Records of Natchitoches Parish, Louisiana.

(5)     Easement by Charles M. Gremillion, et ux,  to the City of Natchitoches, dated September 13, 1977, and recorded in Conveyance Book 339, page 209 of the Records of Natchitoches Parish, Louisiana.

(6)     Release of Portion of Servitude by Trans La, recorded in Conveyance Book 422, page 42 and Conveyance Book 468, page 396A, all of the Records of Natchitoches Parish, Louisiana.

(7)     Restrictions by Charles M. Gremillion, et al, dated July 26, 1978, and recorded in Conveyance Book 346, page 131, as amended by Amendment recorded in Conveyance Book 346, page 180, all of the Records of Natchitoches Parish, Louisiana.

(8)   Easement by Charles M. Gremillion-781 to the City of Natchitoches, dated August 13, 1980, and recorded in Conveyance Book 363, page 695 of the Records of Natchitoches Parish, Louisiana.

(9)   Release of Easement by City of Natchitoches, recorded in Conveyance Book 422, page 42, and Conveyance Book 468, page 396A, all of the Records of Natchitoches Parish, Louisiana.

(10)  Utility Easement by Charles M. Gremillion to the City of Natchitoches, dated November 30, 1981, and recorded in Conveyance Book 374, page 702 of the Records of Natchitoches Parish, Louisiana.

(11)  Release of Portion of Servitudes by City of Natchitoches, recorded in Conveyance Book 422, page 9, and Conveyance Book 468, page 396A, all of the Records of Natchitoches Parish, Louisiana.

(12)  Driveway Easement by Charles M. Gremillion to George L. Celles, III, as shown in deed dated April 5, 1978, recorded in Conveyance Book 343, page 187 of the Records of Natchitoches Parish, Louisiana.

(13)  Order of Expropriation in the matter entitled "State of Louisiana vs. Cane River Associates", dated August 10, 1998, recorded in Conveyance Book 532, page 694 of the Records of Natchitoches Parish, Louisiana.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## EXHIBIT C

## CONDITION OF PREMISES

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to Big Lots Construction Site visit**

**STOREFRONT:**  The exterior storefront façade shall be in good condition and repaired from previous tenant's signage

**GLASS:**  All store front glass to be in good condition.

**UTILITIES**:

Landlord to provide separate utilities and separate utility meters with service direct from the local distribution company (including but not limited to gas, electric, water, etc.) in good working condition. Landlord shall furnish and install an 800 277-480 MDP direct from the utility company. Landlord to furnish and install two 277/480 volt 200 amp 42 spot panels, two 120/208 volt 200 amp 42 spot panels and one 112.5 KVA step down transformer. The electrical service shall be inspected and fully functional prior to the possession date. The MDP and panels shall be ordered with breakers per Tenant's plans. Tenant shall provide Landlord a copy of Tenant's plans prior to execution of the lease. Landlord shall also provide Tenant with legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage.

**HVAC**
**EQUIPMENT**
**& MECHANICALS:**

Landlord will install six (6) new 20-ton Carrier RTU's with vent boxes per equipment specifications attached hereto and the RTU roof layout attached hereto.. Landlord will be responsible for providing electrical to new HVAC units from MDP. Landlord is responsible for installing new RTU's on roof, gas lines to RTU's and 18-10 wire to thermostats. Tenatn's contractor is responsible for all other work.

**PLUMBING,**
**ELECTRICAL,**
**SPRINKLER**
**& FIRE SYSTEMS:**

All plumbing, electrical, and sprinkler equipment to be in good working condition and rated for Class A Plastic requirements. Tenant shall be responsible for all sprinkler modifications for its intended use, and shall be responsible for turning up sprinkler heads if required by applicable code.

**EXTERIOR**
**LIGHTING:**

All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, exterior wall packs, under canopy lighting, etc, throughout

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Canopy lighting, sign lighting and wall packs servicing Tenant's Demised Premises are to be on Tenant's meter.

| | |
|---|---|
| **ROOF:** | Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof above the Demised Premises. All gutters and downspouts servicing the Demised Premises shall be in good working condition. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports. To ensure the repairs have been made and the roof is free of leaks, Landlord shall be required to conduct a roof flood test, at Tenant's expense, with a Tenant representative present prior to delivery of possession. Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease via a ladder existing/installed on the exterior wall in the rear. Tenant will notify Landlord in advance of accessing the roof. Roof was replaced in 2019. |
| **RECEIVING AREA:** | Landlord to provide adequate receiving area with a minimum of one loading dock to accommodate over-the road tractor-trailers (53' trailers). The existing loading dock is 45.5" from the floor of the dock well to the roll-up door sill. Tenant shall be responsible for any equipment necessary to bridge the 2.5" between a 48" truck bed and the door sill. All seals, bumpers, bollards, doors, and related equipment will be in good working condition. All repairs to the loading dock shall be completed 90 days before Tenant opens for business. Tenant shall have exclusive use of the eastern door and the existing hallway behind Goodwill and along the east side of the shopping center. Landlord shall not be required to make any modifications to the concrete dock well currently in existence. Goodwill shall have exclusive use of the dock door adjacent and west of Tenant's dock door. |
| **REMOVAL OF FIXTURES & EQUIPMENT:** | Landlord to remove all previous tenant's fixtures and equipment and deliver the space in broom clean condition. Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant and patch the roof as necessary. Landlord shall remove the interior demising wall between the two suites and patch and repair as needed. Tenant will remove drop ceiling tiles and grid, and anything above it, including lighting, electrical wiring, and duct work if so elected. Landlord to demo space between the exterior walls (front and rear) and demising wall on the north side of Goodwill and the south side of Affordable. Landlord will remove the wooden mezzanines in the rear of the Demised Premises. |
| **PARKING LOT:** | Parking lot in front of the Demised Premises shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises |

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

shall be re-sealed and re-striped at least 30 days prior to Tenant opening for business. Fire lanes, curbs and pole bases shall be freshly painted as well.

**PESTS:** Demised Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**CART CORRALS:** Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises. Cart corrals shall be in front of the Demised Premises and not in front of Goodwill or Affordable.

**SIGNAGE:** Tenant to have the right to use its color and logo on building signs at the maximum size per code and on pylons. Tenant to have the Top position (former Stage) on the pylon. Landlord shall provide a rendering of the existing pylon signs highlighting Tenant's panel position. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position.

**DRAWINGS:** Landlord is to provide Tenant with "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. Already Completed,

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all hazardous material up to $50,000. Landlord shall provide to Tenant a Phase I or, in the alternative, necessary certification.

**GENERAL CONDITIONS:** Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made or required by                               by Tenant. Furthermore, the building structure shall meet governmental and local codes, including current seismic requirements if applicable.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

This Letter of Intent is not intended to create any legal rights or obligations, but rather is intended only to summarize the basic business terms agreed upon to date. All of the legal rights and obligations of the parties will be set forth in the lease agreement to be prepared by River South Commons, LLC, or by Big Lots, Inc. and approved by River South Commons, LLC and no such rights or obligations shall take effect until the lease agreement has been fully executed by both parties. Neither Big Lots, Inc. nor River South Commons, LLC shall have any legal obligation to the other party until such time as a lease agreement and all terms, conditions, and provisions, including the scope of any build-out work to be performed by Big Lots, Inc. or River South Commons, LLC have been agreed to in writing and the lease agreement approved and executed by both parties. It is understood that any cost or expense which has been or will be incurred by Big Lots, Inc. in pursuing the matters dealt with herein (including, without limitation, attorney's fees, design cost, labor and material costs, and any cost for lost opportunity) shall be borne solely by Big Lots, Inc. and will not be reimbursed by River South Commons, LLC in the event the lease agreement contemplated herein is not consummated. Time is of the essence, therefore, if this Letter of Intent is not accepted and signed by Landlord and Tenant within 30 days of Tenant's signature above, this Letter of Intent is null and void.

Unless a different delivery date is provided, all above work to be completed before the Tenant Possession Date.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION AND**

**TENANT SIGN SPECIFICATION**

## First Option Building Exterior
## Primary Stacked Logo



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## Second Option Building Exterior
## Primary Horizontal Logo



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## Channel Letters – Section Details





DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## Pylon / Monument Panels

### Square Panels

**Preferred:**                                    **2nd Option:**

                    

### Rectangular Panels

**Preferred:**



**2nd Option:**



**Colors:**

  Orange – Match PMS 021c Orange (3M color 44)

  White

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4



DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

# EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## EXHIBIT E

### COMPLETION OF LANDLORD'S WORK LETTER

**Date**: _____

**To**: _____ (insert Tenant)

   via email at: _____

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE**: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs.  Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below.

_____  Roof Survey with evidence that the required      _____  Pest Survey certifying the premises.
           repairs have been made.

                                                     _____  Completion of Exhibit C

_____  Asbestos Survey (with evidence of required
           remediation, if necessary)                     _____  Utility Information:  Meter numbers for
                                                     electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at

_____.

If you have any questions, please feel free to contact me at

_____.

Thank You.

**LANDLORD:**                               **TENANT:**

_____          **BIG LOTS STORES, LLC., an Ohio limited liability company**

a _____

By: _____             By: _____
Title: _____         Title: _____

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

# EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**Affordable Rent to Own**

4.    USE OF THE PREMISES

The leased premises may be used for the operation of retail, rental, or purchase of home furnishings, appliances, electronics, jewelry, and tax refund processing.

5.    EXCLUSIVE USE

As long as Lessee is operating within the Cane River Shopping Center Lessor shall not allow any other rent-to-own store or retail furniture, appliance or electronic type store to become an occupant in the Cane River Shopping Center.

**Factory Connection**

No portion of the Shopping Center shall be used or occupied for automobile repairs, bars serving alcoholic beverages (except as incident to a full kitchen restaurant operation); funeral parlor; massage parlor; any business or use which emits foul or offensive odors, fumes, dust or vapors, or constitutes a public or private nuisance or emits loud noise or sounds which are objectionable; manufacturing facility; warehouse; adult bookstore or similar store selling or exhibiting pornographic materials; night club, discotheque or dance hall.

On any violation of the terms of this paragraph, Tenant may (a) file suit to enjoin the same, in which case Landlord shall reimburse Tenant for Tenant's attorneys fees and other expenses of litigations; (b) pay reduced Rent in the amount of fifty percent (50%) of the Rent, until the violation is cured; (c) terminate this lease, in which case Landlord shall pay to Tenant the unamortized portions (as of the date of termination) of the sums spent by Tenant (as set forth on Tenants books) in the performance of Tenant's work on the Premises and any subsequent leasehold improvements without amortization to be on a straight-line basis over ten (10) years; or (d) any one or more of the foregoing.

DocuSign Envelope ID: 762FB722-1F28-4E79-9ECE-1DBF4CC51AC4

## EXHIBIT G

### REMEASUREMENT RIDER

This Rider dated _____ ___, 20___ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, LLC., an Ohio limited liability company, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1.D.) = _____.

2.    A.    Gross Rent – Original Term (Section 5.A.):
            _____ annually; _____ per month.

3.    A.    Gross Rent – First Option (Section 5.A.):
            _____ annually; _____ per month.

4.    A.    Gross Rent – Second Option (Section 5.A.):
            _____ annually; _____ per month.

5.    A.    Gross Rent – Third Option (Section 5.A.):
            _____ annually; _____ per month.

6.    A.    Gross Rent – Fourth Option (Section 5.A.):
            _____ annually; _____ per month.


**Signed and acknowledged:**


**LANDLORD:**                                          **TENANT:**
                                                      **BIG LOTS STORES, LLC., an Ohio**
_____                           **limited liability company**

a _____


By: _____                       By: _____
Title: _____                      Title: _____