IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 13, 137 & 350** |

**DECLARATION OF TODD EYLER OF A&G REAL ESTATE
PARTNERS, IN SUPPORT OF ORDER (I) AUTHORIZING AND APPROVING THE
SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
CLAIMS, LIENS, RIGHTS, INTERESTS, ENCUMBRANCES, AND OTHER ASSUMED
LIABILITIES AND PERMITTED ENCUMBRANCES, (II) AUTHORIZING AND
APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Todd Eyler, declare under penalty of perjury:

1. I am the Senior Managing Director of A&G Realty Partners, LLC ("**A&G**"), proposed real estate consultant and advisor to the above captioned debtors and debtors in possession (collectively, the "**Debtors**"). I submit this declaration (this "**Declaration**") in support of the *Motions of Debtors for Entry of Interim and Final Orders (I) Establishing Procedures To Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [D.I. 13] (the "**Sale Motion**")[2].

---

[1] The Debtors in these cases, together with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Sale Motion.

1

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, real estate portfolio, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

### Professional Background and Qualifications

3. I am the Senior Managing Director of A&G, which was founded in 2012. A&G is a commercial real estate consulting and advisory firm with extensive experience providing high quality, specialized real estate services to both healthy and distressed companies. A&G's services include portfolio analytics and due diligence, lease optimization, real estate sales, auctions, new store growth, and capital solutions and acquisition strategies.

4. Since joining A&G, I have served as a go to resource for board members and C-suite executives at both healthy and distressed companies across all industries, including the retail, restaurant, movie theater, and supermarket industries. I specialize in lease renegotiations and terminations, real estate optimization and dispositions, and real estate valuations and sales. My representative engagements include *Toys R US*, *Rite Aid*, *GNC*, *Mattress Firm*, *RadioShack*, *Regal Cinemas*, *Ascena*, *West Marine*, *Tailored Brands* and *Tuesday Morning*.

5. A&G has been advising the Debtors since June 2024 with respect to optimizing their real estate portfolio. As a result, I am generally familiar with the Debtors' real estate portfolio and related marketing efforts. Members of the A&G team and I have assisted the Debtors with their ongoing efforts to right-size their retail footprint, among other things.

**The Real Estate Portfolio**

6.       The Debtors maintain a leased real estate portfolio that consists of approximately 1,300 properties spanning 48 states. In the lead up to the filing of these cases, A&G assisted the Debtors in a portfolio review. As a result of this analysis, A&G advised the Debtors that certain of these leases represented value.

7.       Following that review, the Debtors commenced a comprehensive marketing process (the "**Marketing Process**") for those various leases including the properties listed in the Sale Motion (the "**Lease Assets**").

**The Marketing Process**

8.       To initiate the Marketing Process, shortly after the Petition Date, the Debtors, with the assistance of A&G, circulated a flyer marketing two hundred ninety-six (296) of the Debtors' leases, including the Lease Assets, to approximately two hundred (200) potential purchasers. The Debtors, with the assistance of A&G, took additional steps to broadly market the Debtors' valuable leases, including publishing press releases, ultimately expanding the population of interested parties to over four hundred (400).

9.       In order to maximize the value of the Debtors' estate and to avoid incurring additional lease costs, the Debtors pursued an accelerated lease sale process for the month of September. Through this accelerated timeline, by the Bid Deadline, the Debtors had received a total of twenty-four (24) bids across twenty-two (22) "Wave One" properties.

10.       In light of competing bids on one of the Lease Assets, the Debtors held a live auction for Store #5415 located at 7743 Sudley Rd, Manassas, VA 20109 (the "**Manassas Property**") on September 18, 2024 (the "**Auction**") with a baseline bid price, determined as the

market floor for the Manassas Property following the bid negotiations (the "**Baseline Bid**"), of $150,181.

### The Auction

11. On September 18, 2024, Debtors' proposed counsel, Davis Polk & Wardwell LLP ("**Davis Polk**"), and A&G moderated the Auction for the Lease Assets. At the beginning of the Auction, Davis Polk and A&G confirmed that (i) each potential purchaser had not had communications with any other bidder with the goal of either controlling the price for the assets being auctioned or discouraging such other bidder's participation in this auction, (ii) each potential purchaser's bid was a good faith bona fide offer, and (iii) the potential purchaser intended to consummate the proposed transaction if selected as the successful bidder.

12. For the Manassas Property, A&G announced the Baseline Bid and minimum overbid increment. After numerous rounds of active bidding, Agree Central LLC (the "**Purchaser**") made the corresponding highest or otherwise best bid of $325,000 for the Manassas Property, which bid the Debtors selected as the winning bid at the Auction (the winning bid, a "**Purchase Price**"):

13. Certain other Lease Assets received only one bid. The Debtors, in consultation with their advisors the Consultation Parties (as defined in the *Interim Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving The Sale of Certain Leases and (III) Granting Related Relief* [D.I. 137] (the "**Bidding Procedures Order**"), engaged in dialogue with those solitary bidders and decided to pursue sales with certain of those bidders on the terms set forth in the Sale Motion, for each respective property therein.

14. The Debtors, with the assistance of A&G and in consultation with the Consultation Parties, selected each purchaser as the winning bidder for each respective Property

4

after careful review and consideration of all competing offers submitted at the Auction. I believe that the significant increase of the Manassas Property's Purchase Price over its Baseline Bid properly evidences the comprehensive and robust nature of the Marketing Process and Auction for the Lease Assets, and I believe that each Purchase Price represents the highest or otherwise best offer for each Lease Asset.

15.    Furthermore, I believe that each sale agreement related to a sale of one of the Lease Assets (each, a "**Sale Agreement**," and together, the "**Sale Agreements**") was negotiated at arm's-length and in good faith. To my knowledge, no purchaser acted in a collusive or fraudulent manner with any person, and each Purchaser's prospective performance and payment of amounts owing under the applicable Sale Agreement is in good faith and for a valid business purpose.

### The Supplemental Auction

16.    As part of the Marketing Process, the Debtors marketed Store #5457 located at 3331 Corridor Marketplace, Laurel, MD 20724 (the "**Corridor Lease**"). The Corridor Lease received one Qualified Bid before the Bid Deadline from American Signature, Inc. ("**ASI**") for $100,000 plus cure amounts of $25,761. Consistent with the Bidding Procedures Order, the Debtors provided adequate assurance information to the Corridor Lease landlord, (the "**Landlord**"), via email the day after the Bid Deadline.

17.    Because there was only one Qualified Bid, the Corridor Lease was not up for bid at the Auction. However, the Landlord requested to attend the Auction and was provided a Zoom link by Davis Polk. During the Auction, the Landlord stated that he had only become aware of the sale process for the Corridor Lease upon receiving the adequate assurance email the night before and expressed interest in potentially bidding on the Corridor Lease (his property). The

Landlord was advised that the Corridor Lease was not being auctioned at that time and the Auction proceeded without further comment from the Landlord.

18. On Monday, September 23, 2024, counsel for the Landlord contacted Davis Polk and indicated that the Landlord wished to bid for the Corridor Lease in the amount of $125,000 plus a waiver of cure costs. The Debtors determined that it was in the best interest of their estates and consistent with the Bidding Procedures Order to reopen the bidding for the Corridor Marketplace. In the interest of time, for cost-efficiency purposes, and to elicit the highest bids, the Debtors proposed that each ASI and the Landlord submit their highest and best offers via email as a blind bid by 2:00 p.m. ET on September 24, 2024, at which point the Debtors would select the Successful Bidder.

19. Counsel for the Landlord submitted a timely "highest and best" bid in accordance with the Debtors request in the amount of $225,000 plus a full waiver of any cure amounts. ASI, however, requested that instead of a blind "highest and best" bid format, the Debtors hold a supplemental live auction (the "**Supplemental Auction**"). Notwithstanding their request for a live auction, ASI did increase their bid by $5,000.

20. The Debtors asked the Landlord if he was agreeable to hold a live auction instead of the "highest and best" blind bid format. The Landlord agreed to proceed with the live auction format as requested by ASI and authorized the Debtors to consider his bid of $225,000 plus cure amounts as the starting bid for the Supplemental Auction.

21. The Debtors scheduled the Supplement Auction for September 25, 2024, at 11:00 a.m. (prevailing Eastern Time) and filed a notice of the Supplemental Auction [D.I. 266]. The Supplemental Auction was held in a timely fashion and bidding opened with the Landlord's

$225,000 plus cure bid. ASI declined to outbid the Landlord, and the Landlord was declared the Successful Bidder while ASI was declared the Backup Bidder.

22. I believe that the Debtors engagement with the Landlord and ASI was a value-maximizing process that was in the best interests of the Debtors' estates and consistent with the Bidding Procedures Order and their fiduciary duties. I further believe that the Purchase Price of $225,000 plus cure for the Corridor Lease is the highest and best offer and that the open auction provided a fair process for ASI to bid equally with the Landlord's bid. To my knowledge, neither the Landlord nor ASI acted in a collusive or fraudulent manner with any person and the process was fair, transparent and value maximizing and should be approved.

## Conclusion

23. For the foregoing reasons, I believe that the sale of each of the Lease Assets should be approved. The robust Marketing Process undertaken by the Debtors, with the assistance of A&G, has resulted in each Lease Asset receiving a winning bid that represents the highest and best value that the Debtors can reasonably expect to receive for the Lease Assets. Accordingly, for the reasons stated herein and in the Sale Motion, I believe that entering into the Sale Agreements and consummating the sale of each of the Lease Assets is fair, reasonable, and represents a sound exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 29, 2024     */s/ Todd Eyler*
                              Name:  Todd Eyler
                              Title:  Sr. Managing Director