## **<u>EXHIBIT B</u>**

### **Omnibus Reply**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 16, 18 and 19** |

### DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE STORE CLOSING MOTION, BIDDING PROCEDURES MOTION AND DIP MOTION

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), file this omnibus reply (this "**Reply**") to the Objections (as defined below) to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 16] (the "**Store Closing Motion**"), the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

*(B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. 18] (the "**Bidding Procedures Motion**") and the *Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 19] (the "**DIP Motion**," and, together with the Store Closing Motion and the Bidding Procedures Motion, the "**Motions**").[2] In support of this Reply, and in further support of approval of the Motions, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.       The fact that only a narrow set of objections (most of which are self-described as "limited") to the Motions remain unresolved in a large national retail company case commenced just six weeks ago and involving more than 1,300 stores is a testament to the remarkable degree of consensus around the commercial logic behind the Debtors' restructuring. Indeed, from the outset of these Chapter 11 Cases, the Debtors have made clear that a successful restructuring is predicated on rightsizing their real estate portfolio and completing a going concern sale transaction. *See Amended Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 77] (the "**Ramsden Declaration**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Store Closing Motion, Bidding Procedures Motion or the DIP Motion, as applicable.

2.     The only remaining unresolved objections to the Motions are from: (i) the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the Bidding Procedures Motion [D.I. 494] (the "**U.S. Trustee Bidding Procedures Objection**") and the Store Closing Motion [D.I. 503] (the "**U.S. Trustee Store Closing Objection**," together with the U.S. Trustee Bidding Procedures Objection, the "**U.S. Trustee Objections**"); and (ii) certain landlords (the "**Objecting Landlords**") to the Bidding Procedures Motion, the Store Closing Motion and/or the DIP Motion, as applicable (filed at D.I. 385, 439, 454, 501, 523, 527, and 529, collectively, the "**Landlord Objections**," and together with the U.S. Trustee Objections, the "**Objections**"). A summary of the Objections, along with the Debtors' corresponding responses, is attached hereto as **Exhibit A** (the "**Objections Chart**"). The Debtors also received informal comments from numerous parties in interest. A summary of these informal comments is attached hereto as **Exhibit B** (the "**Informal Comments Chart**"). Notably, the Debtors have consensually resolved numerous formal and informal objections in advance of filing this reply and will continue to try to consensually resolve the remaining unresolved objections in advance of the hearing on the Motions.

3.     In its objection to the Store Closing Motion, the U.S. Trustee challenges (i) the long-standing position of this Court that liquidators are not professionals within the meaning of section 327 and (ii) the business judgment of the Debtors. The U.S. Trustee's section 327 arguments ignores prevailing Delaware jurisprudence and asks this Court to depart from precedent – precedent that this Court relied upon less than two weeks ago in overruling a similar objection from the U.S. Trustee to the Debtors' de minimis asset sale motion. Oct. 9, 2024 Hr'g Tr. at 50:9–23. The U.S. Trustee's objection to the Debtors' business judgment is equally unavailing. The Debtors are seeking to assume, on a final basis, the master services agreement (the "**MSA**") with Gordon Brothers Retail Partners, LLC (the "**Consultant**"). The U.S. Trustee contends that the

Consultant is disqualified by virtue of the presence of certain of its affiliates, which are separate legal entities, in different roles in these cases. In making this claim, the U.S. Trustee relies upon inapposite caselaw and applies the incorrect legal standard for contract assumption. The Debtors' assumption of the MSA is subject to the deferential business judgment standard, and the Debtors submit that the evidentiary record establishes that it is a sound exercise of their business judgment to assume the MSA on a final basis. Failure to assume the MSA would thwart the Debtors' plans to right-size their store count and maximize proceeds to the estates from store closing sales and significantly erode value coming into the estates.

4.     The U.S. Trustee Bidding Procedures Objection takes issue with the customary Bid Protections provided by the Debtors to secure the commitment of the Stalking Horse Bidder. The objection fails to acknowledge the commercial reality that the Bid Protections were and remain critical inducements to obtain the Stalking Horse Bid—which was only available with the Bid Protections—a bid that provided a baseline for the Debtors' sale process at the commencement of these Chapter 11 Cases and the Debtors' best available path to achieving a value-maximizing result in these Chapter 11 Cases. The Debtors' prepetition marketing process, while exhaustive, resulted in just a single proposal to purchase the Debtors as a going concern: the Asset Purchase Agreement (the "**APA**") with Nexus Capital Management LP ("**Nexus**"). The Bid Protections include a Break-Up Fee of $7.5 million and an Expense Reimbursement of $2 million, which together amount to approximately 1% of the total purchase price. Nexus also required that these Bid Protections be afforded superpriority status. The terms of the Bid Protections are reasonable and customary under the circumstances and were an integral component of the APA. *See* Rifkin Decl. ¶¶ 13-14.

5.     The U.S. Trustee criticizes the circumstances in which the Bid Protections may be paid, while ignoring the reality that they provide an actual and necessary benefit that preserves the

value of the Debtors' estates. The Bid Protections (which are now conditioned upon Nexus obtaining financing commitment letters by the Bid Deadline) incentivized Nexus to (i) provide a binding bid that establishes a floor for the Debtors' auction and (ii) actively pursue financing that will enable Nexus to close should it become the Successful Bidder at the Auction. The Bidding Procedures, including Nexus serving as Stalking Horse Bidder with the benefit of the Bid Protections, will allow the Debtors to obtain the highest and best price available for the sale of their business.

6.      The DIP Objections fare no better. Tellingly, the DIP Objections are "limited" and do not challenge the appropriateness of the DIP Facilities, but instead are thinly disguised requests for payment of "stub rent."  After weeks of negotiations with the Creditors' Committee, the Debtors have revised the DIP Order and the DIP Budget to clarify the Debtors' anticipated timeline to make the requested stub rent payments, addressing the concerns motivating the Landlord Objections. The Creditors' Committee is supportive of this approach and has not objected to the DIP Motion, and, importantly, the Debtors have satisfied section 364 and believe that the DIP Facilities, taken as a whole, are the best financing option presently available to the estates.

7.      The Debtors have an actionable path forward to maximize value for all stakeholders, and the parochial objections to the Store Closing Motion, Bidding Procedures Motion and DIP Motion that remain unresolved have no merit whatsoever and should be overruled. For the reasons set forth herein and in the Objections Chart, the Objections should be overruled, and the Motions should be approved.

## **REPLY**

**I.      The Bid Protections Should Be Approved as an Actual and Necessary Benefit to the Debtors' Estates and Be Granted Administrative Expense Status.**

**A.      The Bid Protections Provide an Actual and Necessary Benefit to the Debtors' Estates.**

8.      The U.S. Trustee, the sole party with an unresolved objection to approval of the Bid Protections (and the Bidding Procedures more generally), relies in its objection almost entirely on the rulings of this Court and the Third Circuit in the *In re Energy Future Holdings Corp.* cases. *See* U.S. Trustee Bidding Procedures Obj ¶¶ 15–19 (citing *In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) ("*Energy Future II*"); *In re Energy Future Holdings Corp.*, 990 F.3d 728 (3d Cir. 2021) ("*Energy Future III*")); *see also In re Energy Future Holdings Corp.*, 575 B.R. 616 (Bankr. D. Del. 2017) ("*Energy Future I*"), *aff'd*, *Energy Future II*. But that case is easily distinguishable from the facts present here. There, the bid protections represented not only a potential benefit to the Debtors' estates, but also a potentially significant and "disastrous" harm because the proposed $275 million break-up fee was payable even where the debtors failed to obtain certain regulatory approvals and subsequently terminated the proposed APA. *See Energy Future II*, 904 F.3d at 302–03 (summarizing that "if the [relevant regulatory body] flat-out rejected the merger, the [Break-Up] Fee would be payable, so long as it was the Debtors who terminated."). Both this Court and the Third Circuit viewed such uncertainty as a harm to the debtors' estates that outweighed the benefits. *See id.* ("In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous.").

9.      Conversely, the Bid Protections provided for in the APA should be approved because they are fair and reasonable, are appropriate in the context of the Debtors' marketing efforts and business circumstances, will maximize the value to be obtained in the sale process, and reflect the sound exercise of the Debtors' business judgment. The benefits outweigh the costs. The U.S. Trustee claims that the Bid Protections here might be paid in circumstances where it is unclear that the estates have been benefitted. *See* U.S. Trustee Bidding Procedures Obj. ¶ 20. To the contrary, regardless of the outcome of the Auction, the Debtors' estates have <u>already</u> benefitted

from the Stalking Horse Bid: (a) the Debtors entered chapter 11 with a Stalking Horse Bid that provided the Debtors with a clear path forward, avoiding potential value destruction and uncertainty that could arise with respect to customers, vendors, suppliers, and other parties if the Debtors had no path to exit chapter 11; and (b) the Stalking Horse Bid set a floor for the purchase of the Debtors' assets, increasing the likelihood of a successful Auction. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010) ("*Reliant*") (noting that an initial bid on a debtor's assets, "ordinarily or perhaps even always, will provide a benefit to an estate because it will establish a floor price for the assets to be sold"); Anthony J. Casey, *The Creditors' Bargain and Option-Preservation Priority in Chapter 11*, 78 U. CHI. L. REV. 759, 787 (2011) (explaining the "lemons" problem inherent to marketing distressed assets, which is "solved by way of the stalking-horse bid . . . who is given access to the inside information of the firm and performs the expensive due diligence to give itself comfort with regard to the firm's value.").

10. Further, the Break-Up Fee and Expense Reimbursement are payable only under certain conditions that are either firmly within the control of the Debtors or based on a material breach of the Stalking Horse APA by the Debtors—there is no scenario in which the Bid Protections could be awarded based solely on the monumental decision of a third party as was the case in *Energy Future I. See* Stalking Horse APA §§ 13.07(b)(ii)(A)–(B). Specifically, section 13.07(b)(ii)(A) of the Stalking Horse APA provides that the Break-Up Fee is payable only if both (a) the Stalking Horse APA is terminated based on (i) acceptance by the Debtors of a "Superior Proposal," (ii) a material breach of the Stalking Horse APA by the Debtors (subject to a cure period), (iii) acceptance by the Debtors of an "Alternative Transaction," (iv) if the Stalking Horse Bidder is not selected as the successful bidder at the Auction, or (v) solely at a time when the Stalking Horse APA could be terminated pursuant to the foregoing clauses (i) through (iv), the

occurrence of the outside date; and (b) a "Tail Transaction"[3] is consummated within 120 days of termination of the Stalking Horse APA. Section 13.07(b)(ii)(B) likewise provides that the Expense Reimbursement is payable if the Stalking Horse APA is terminated for any reason <u>other than</u> (a) by the Debtors for (i) a material breach of the Stalking Horse APA by the Stalking Horse Bidder (subject to a cure period), (ii) the Stalking Horse Bidder's failure to close the sale when required, or (iii) the occurrence of the outside date at a time when the Debtors were permitted to terminate the Stalking Horse APA pursuant to the foregoing, in each case other than as a result of a "Lending Failure," or (b) by the Stalking Horse Bidder for the occurrence of the outside date. Each such condition in the Stalking Horse APA is a typical circumstance in which bid protections are payable in this Court.

11.    First, payment of a break-up fee or expense reimbursement as applicable under these circumstances is consistent with recent precedent. *See, e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024) [D.I. 290] (permitting payment of an expense reimbursement and break-up fee upon occurrence of the following conditions: (a) if the debtor or the debtor's board determined that proceeding with the proposed sale transaction or failing to terminate the proposed APA would be inconsistent with its fiduciary duties; (b) if (i) any seller entered into an alternative transaction with someone other than successful bidder or back-up bidder; (ii) the court approved an alternative transaction with someone other than successful bidder or back-up bidder; or (iii) the sellers consummated an alternative transaction with the successful bidder; (c) if, following the sale hearing, the purchaser was not the successful bidder or back-up bidder; and (d) if the bidding procedures order or sale order were voided, reversed, or vacated); *In*

---

[3] As set forth in the Stalking Horse APA, a "Tail Transaction" means either (a) an "Alternative Transaction" that repays in full all "Repaid Indebtedness," or (b) in the case of termination of the Stalking Horse APA for any reason other than a material breach by the Debtors of an applicable covenant, representation, or warranty, a transaction pursuant to a "Superior Proposal."

*re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 13, 2024) [D.I. 427, 471] (permitting (a) payment of expense reimbursement if the proposed APA were terminated for any reason other than certain conditions, including written mutual consent of the parties, material breach of a representation, warranty, or covenant by the buyer, or failure to consummate the sale by the purchaser and (b) payment of a break-up fee to the buyer upon the occurrence of numerous conditions similar the ones provided for the in Stalking Horse APA).[4]

12.     Second, the U.S. Trustee Bidding Procedures Objection suggests that the burden lies specifically with the Stalking Horse Bidder to show on an *ex post facto* basis that the Bid Protections are actual, necessary costs of the Debtors' estates. *See* U.S. Trustee Bidding Procedures Obj. ¶ 21 (stating "[o]ther than as a result of the Debtors accepting a higher and better offer for their assets through the auction process and a sale premised upon that offer closing, payment of the Bid Protections would not truly function as bid protections, but rather as liquidated damages for breach of the APA," which, notably, can only be shown following the conclusion of the sale process). No such limitation is found in the relevant case law. As set forth by the Third Circuit in *O'Brien*, whether bid protections should be approved depends primarily on whether such protections are necessary to preserve the value of a debtor's estate. *In re O'Brien Env'tl Energy,*

---

[4] *See also In re Virgin Orbit Holdings, Inc., et al.*, No. 23-10405 (KBO) (Bankr. D. Del. May 22, 2023) [D.I. 326] (permitting payment of a breakup fee and expense reimbursement if (i) the APA was terminated by buyer for inaccuracy of certain representations and warranties, (ii) the APA was terminated by the buyer for failure to perform or comply with any of the covenants or agreements contained in the APA for the selling entities to perform and comply with prior to the Closing Date, (iii) the debtors entered into an alternative transaction or (iv) various other process milestones were not met); *In re AD1 Urban Palm Bay, LLC, et al.*, No. 23-10074 (KBO) (Bankr. D. Del. May 8, 2023) [D.I. 284, 298] (authorizing payment of a breakup fee and expense reimbursement if, among other reasons, the proposed APA was terminated by (i) the stalking horse bidder because (a) the representations and warranties made by the seller under the APA were or became untrue or incorrect, (b) the seller failed to perform or comply with certain covenants or agreements under the APA, or (ii) by the stalking horse bidder, with respect to any property if (a) the seller entered into a definitive agreement for an alternative transaction, or (a) the bankruptcy case was dismissed or converted to a case under chapter 7).

*Inc.*, 181 F.3d 527, 536 (3d Cir. 1999) ("*O'Brien*"). "[Such] inquiry stems directly from §
503(b)(1)(A), which requires that an expense provide some benefit to the debtor's estate." *Id.*

13.     The Third Circuit has likewise made clear that there are, generally, three primary
ways to satisfy the 503(b) standard, any one of which is sufficient to justify such protections as
actual and necessary. *See Energy Future II*, 904 F.3d at 313–14 (noting that *O'Brien* did not
mandate that any of the three factors must be met, but rather that they are bases by which a
bankruptcy court may approve bid protections, and that the inquiry is ultimately a flexible,
discretionary one for the court). First, such benefit is found "if assurance of a break-up fee
promoted more competitive bidding, such as by inducing a bid that otherwise would not have been
made and without which bidding would have been limited." *Id.* at 537. Second, "if the availability
of break-up fees and expenses were to induce a bidder to research the value of the debtor and
convert the value to a dollar figure on which other bidders can rely, the bidder may . . . provide[ ]
a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will
reflect its true worth." *Id.* And, third, by assuming that a bidder "adhered to its bid rather than
abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction
for [the] sale of the relevant asset." *Reliant*, 594 F.3d at 207.

14.     As set forth herein and in the Rifkin Declaration, though only one of these reasons
is needed to establish bid protections as actual and necessary under section 503(b), each factor is
present here. First, as set forth in the Rifkin Declaration, the Stalking Horse Bidder would not have
placed a going-concern bid for the Debtors' assets without the Bid Protections. *See* Rifkin Decl. ¶
14. Indeed, after a three-month marketing process, although several parties provided indications
of interest, the Stalking Horse Bid represented the only available bid to serve as the stalking horse,
and the Stalking Horse Bidder was unwilling to provide a binding bid absent the Bid Protections.

Without the Bid Protections, the Debtors would likely have filed for chapter 11 without a stalking horse and without a clear path to a going concern sale.

15.    Second, as further set forth in the Rifkin Declaration, the Stalking Horse Bid was the only bid submitted after a robust prepetition marketing process. *See id.* ¶ 8. That the Stalking Horse Bidder stepped up to provide value by setting a floor for the Auction of the Debtors' assets, increasing the likelihood that the Debtors are sold for their true value and not at a "fire-sale" price. *See Reliant*, 594 F.3d at 207.

16.    Third, the Bid Protections contemplated here have ensured that the Stalking Horse Bidder adhered to its bid. *See id.* Indeed, the Expense Reimbursement and Break-Up Fee have incentivized the Stalking Horse Bidder to continue working on its bid and to remain engaged as a potential buyer of the Debtors' assets, including by actively pursuing financing to ensure that the Stalking Horse Bidder will close pursuant to the terms of the APA if it is the successful bidder at the Auction. The Debtors understand that the Stalking Horse Bidder is close to finalizing the terms of its financing, to the point that the Stalking Horse Bidder has agreed that the Bid Protections shall only be payable if the Stalking Horse Bidder obtains financing commitments by the bid deadline. *See* Bidding Procedures Order ¶ 16. If the Bid Protections are not approved, the Stalking Horse Bidder may well abandon its bid and its efforts to pursue such financing, a result that would put the entirety of the Debtors' restructuring efforts at risk. It is difficult to imagine a circumstance where Bid Protections were more essential to ensuring that a Stalking Horse Bidder remain committed to its purchase agreement.

17.    Even if the Stalking Horse APA is ultimately terminated and the Debtors pursue an alternative transaction that is not a "Superior Proposal," the Debtors' estates will have benefitted from the Bid Protections, for the reasons described above. If, as the U.S. Trustee suggests, the

Debtors were able to inform the Stalking Horse Bidder that the Bid Protections were not payable, they would have afforded substantially less protection to the Stalking Horse Bidder. As set forth in the Rifkin Declaration, *see* ¶ 14, the Bid Protections set forth in the Stalking Horse APA were negotiated heavily and at arm's-length. The Debtors determined in their business judgment that the value and benefits of the Stalking Horse Bid with the Bid Protections outweighed their cost. As the Third Circuit stated in *Energy Future I*, "the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms." 904 F.3d at 314. The Debtors submit that the benefits of the Bid Protections here (which at 1.1% of the total purchase price are significantly below the typical 3% routinely approved by this Court), in light of the circumstances in which they are payable, clearly outweigh any such purported (but as-yet-unidentified) harms. *See, e.g.*, *In re Alamo Drafthouse Cinemas Holdings, LLC*, No. 21-10474 (MFW) (Bankr. D. Del. Apr. 1, 2021) [D.I. 123] (approving a break-up fee of up to 2% of the aggregate purchase price, including non-cash consideration, and granting superpriority administrative status to same); *In re Biolase, Inc.*, No. 24-12245 (KBO) (Bankr. D. Del. Oct. 17, 2024) [D.I. 115] (approving break-up fee of up to 3% of the purchase price); *In re Agspring Miss. Region, LLC*, No. 21-11238 (CTG) (Bankr. D. Del. Oct. 14, 2021) [D.I. 103] (same); *In re Sequential Brands Grp., Inc.*, No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) [D.I. 138] (approving a break-up fee of 3.65% of the purchase price); *In re Celadon Grp., Inc.*, No. 19–12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 219] (authorizing a break-up fee of up to 3% of the purchase price).

18.     Fundamentally, the Bid Protections at issue here are actually necessary expenses under section 503(b) as that standard has been applied under *O'Brien*, *Reliant*, and *Energy Future*: they induced the Stalking Horse Bidder to enter into the APA, set a floor for the Debtors'

postpetition marketing process and incentivize the Stalking Horse Bidder to remain committed to the APA, including its ongoing pursuit of financing. That the Bid Protections have ultimately garnered the support of the Committee is further indication that they are actual and necessary.

**B.    The Bid Protections Should Be Granted Superpriority Administrative Expense Status.**

19.    Contrary to this Court's precedents and the evidence set forth in the Rifkin Declaration, the U.S. Trustee argues the Bid Protections should not be afforded superpriority administrative expense status. *See* U.S. Trustee Bidding Procedures Obj. ¶¶ 2, 20, 23–27. The Debtors' decision to afford superpriority status to the Bid Protections was likewise a reasonable exercise of business judgment and provides an actual and necessary benefit to the Debtors.

20.    This Court should—as it has consistently in the past—overrule the U.S. Trustee's institutional objection that expense reimbursement claims should not be allowed as superpriority administrative claims. *See, e.g.*, *In re Phasebio Pharms.*, Inc., No. 22-10995 (LSS) (Bankr. D. Del. November 28, 2022) (authorizing superpriority status for break-up fee and expense reimbursement over an objection); *In re Lucky Brand Dungarees, LLC*, No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) (authorizing superpriority status for break-up fee and expense reimbursement over the objection of the U.S. Trustee); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) (authorizing superpriority status for break-up fee and expense reimbursement over the objection of the U.S. Trustee); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (authorizing superpriority status for break-up fee and expense reimbursement); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (authorizing superpriority status for break-up fee and expense reimbursement over the objection of the U.S. Trustee); *In re BPS US Holdings, Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (authorizing superpriority status for break-up fee and expense reimbursement); *In re Point Blank*

*Sols., Inc.*, No. 10-11255 (PJW) (Bankr. D. Del. Oct. 5, 2011) [D.I. 1723] (authorizing superpriority status for break-up fee and expense reimbursement).

21.     The U.S. Trustee acknowledges that certain sections of the Bankruptcy Code permit debtors to provide parties in interest with a superpriority administrative expense claim, but asserts that a debtor may only do so in two scenarios: incurring post-petition financing and granting adequate protection. *See* U.S. Trustee Bidding Procedures Objection ¶ 25. This assertion is unnecessarily narrow and ignores the fact that, pursuant to section 364(c)(1), when a debtor is unable to induce a potential bidder to submit a bid by affording bid protections ordinary administrative priority status, a court may sanction characterizing such inducements as superpriority administrative expense claims. *See* 11 U.S.C. § 364(c)(1) ("If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title."). The evidence supports that the Debtors have done so here. *See* Rifkin Decl. ¶ 14. Accordingly, the Debtors request that this Court approve the superpriority administrative expense status of the Bid Protections.

   **C.     The Debtors Determined, in Their Business Judgment, that the Expense Reimbursement Will Not Be Subject to Notice or Objection.**

22.     The U.S. Trustee asserts, without providing a basis in the Bankruptcy Code or caselaw, that the Expense Reimbursement must be made available to objection by certain parties in interest prior to payment. *See* U.S. Trustee Bidding Procedures Obj. ¶¶ 28–29. To be clear, the Expense Reimbursement is not subject to the U.S. Trustee fee guidelines. Further, the total amount which could be disbursed is $2 million, which is further subject to the provision of reasonable and documented out-of-pocket fees and expenses by Nexus. *See* APA, "Expense Reimbursement." The

U.S. Trustee cites to no case law supporting the proposition that, in order to approve stalking horse bid protections under section 503(b), payment of an expense reimbursement must be conditioned the provision of 10 days' notice by the Debtors prior to making Expense Reimbursement payments. This position is not appropriate and seeks to displace the Debtors' sound business judgment.

23.    Indeed, the Debtors determined, in their business judgment, that the Expense Reimbursement would not be made subject to third-party review or objection. If Nexus was confronted with the risk that it might be required to bear the costs of its advisors, or if Nexus's expense reimbursement process was subject to public scrutiny or challenge by parties in interest, Nexus may have determined not to move forward with a Stalking Horse Bid in the first place. The Debtors reasonably determined, in their business judgment, that the reputational, commercial and strategic benefits that accompany commencing these Chapter 11 Cases with a Stalking Horse Bidder in hand were worth the costs presented by the Expense Reimbursement, which is capped at $2 million and will only be made available for Nexus's reasonable and documented out of pocket fees and expenses.

24.    Despite the U.S. Trustee's contention that a 10-day notice period is "standard," *see* U.S. Trustee Bidding Procedures Obj. ¶ 29, the objection provides no support for this assertion. To the contrary, it is standard in this district for expense reimbursement to be approved with the bidding procedures, with no further notice or objection period required. *See, e.g.*, *In re Fulcrum BioEnergy, Inc.*, No. 24-12008 (TMH) (Bankr. D. Del. Oct. 11, 2024) [D.I. 153] (approving Bid Protections with no further notice requirement); *In re Biolase, Inc.*, No. 24-12245 (KBO) (Bankr. D. Del. Oct. 17, 2024) [D.I. 115] (same); *In re Alamo Drafthouse Cinemas Holdings, LLC.*, No. 21-10474 (MFW) (Bankr. D. Del. Apr. 1, 2021) [D.I. 123] (same); *In re Celadon Grp., Inc.,* No. 19–12606 (KBO) (Bankr. D. Del. Jan.6, 2020) [D.I. 219] (same*); In re Bumblebee Parent Inc.*, et

al., No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) [D.I. 171] (same); *In re Bayou Steel BD Holdings, L.L.C.*, No. 19–12153 (KBO) (Bankr. D. Del. Nov. 8, 2019) [D.I. 224] (same).  The U.S. Trustee is not entitled to further notice, and provides no legal basis in support of its assertion to the contrary.  Accordingly, the Debtors request that this Court rule that the Expense Reimbursement not be subject to review and objection.

**II.    The Debtors' Assumption of the MSA Is a Sound Exercise of Business Judgment.**

25.    The U.S. Trustee asserts that the Consultant is a "professional" within the meaning of 11 U.S.C. § 327(a). The U.S. Trustee further contends that, regardless of whether the Consultant is a professional, the Debtors cannot assume the MSA because the presence of certain of the Consultant's affiliates in these cases necessarily means that the Consultant cannot be disinterested. These arguments are plainly contrary to settled law in this district.

**A.    The Consultant is Not a Professional as Contemplated by Section 327.**

26.    This Court determined in *In re Brookstone Holdings Corp.*, 592 B.R. 27 (Bankr. D. Del. 2018), after careful analysis, that the mandate of a store closing liquidator is "not sufficiently central to the development and implementation" of the Debtor's reorganization to support a finding that a store closing liquidator is a professional within the meaning of section 327(a). 592 B.R. at 29. In the nearly 60 retail bankruptcy cases that have been filed in this district since that decision, the *Brookstone* holding has not been disturbed. *See, e.g. In re Salt Life Beverage, LLC*, No. 24-11468 (LSS) (Bankr. D. Del. May 23, 2024) (approving the assumption of a store closing agreement without finding that the store closing consultant was a 327(a) professional); *In re New Rue HoldCo, Inc.*, No. 24-10939 (BLS) (Bankr. D. Del. May 23, 2024) (same); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 9, 2024) (same); *In re Sears Authorized Hometown Stores, LLC*, No. 23-11303 (BLS) (Bankr. D. Del. Jan. 11, 2023) (same); *In re Francesca's Holdings Corp.*, No. 20-13076 (BLS) (Bankr. D. Del. Jan. 4, 2021) (same); *In re*

*Lucky's Market Parent Company, LLC*, No. 20-10166 (LJH) (Bankr. D. Del. Mar. 3, 2020) (same);

*In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019) (same).

27.    Ignoring this body of caselaw, the U.S. Trustee brazenly asserts that the *Brookstone*

court established the wrong precedent because it "did not weigh the *First Merchants* factors

appropriately." *See* U.S. Trustee Store Closing Obj. ¶ 36. This ignores the careful consideration

which is evident in the *Brookstone* opinion and the scores of cases in this district which followed

its lead.

28.    In *Brookstone*, the debtors requested authority to engage Gordon Brothers Retail

Partners, LLC as a store closing liquidator. There, as here, a Gordon Brothers affiliate was a

prepetition and DIP term loan lender. There, as here, the U.S. Trustee objected to the assumption

of the consulting agreement, arguing that Gordon Brothers was required to be retained pursuant to

Section 327. To address the objection, the *Brookstone* court analyzed the *First Merchants* factors.[5]

29.    After a comprehensive application of the six *First Merchants* factors, the

*Brookstone* court found that only *one* factor supported the U.S. Trustee's proposition that a store

closing liquidator must be considered a professional pursuant to section 327(a). That sole factor,

whether the actions undertaken by the employee are "routine," turned on the fact that Gordon

Brothers was assisting Brookstone in closing its entire retail business segment, which was certainly

not routine. *Brookstone*, 592 B.R. at 29-36.

---

[5] The *First Merchants* factors are as follows: (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization; (2) whether the employee is involved in negotiating the terms of a plan of reorganization; (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate (i.e., the qualitative approach); (5) the extent of the employee's involvement in the administration of the debtor's estate (i.e., the quantitative approach); and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term. *Brookstone*, 592 B.R. at 35.

30.    Applying the *First Merchants* factors in the context of the present case, factor one weighs against the U.S. Trustee's argument: the Debtors maintain control of and administer the sale of store closing assets while the Consultant simply provides pricing, timing and related advice. The U.S. Trustee concedes factor two. Factor three weighs in favor of the Debtors' position: the store closings in these cases are not "extraordinary" but instead within the normal purview and contemplation of the Debtors. Here, the "routine" *First Merchant* factor three weighs even more strongly in favor of the Debtors than in *Brookstone*. Debtors have engaged the Consultant to assist in closing only a subset of their stores and have been conducting periodic store closings for nearly two years preceding these cases. Ramsden Declaration, ¶¶ 67–68. The Consultant has no power to influence the administration of the debtor's estate, and there is no evidence that it does so. Thus, factors four and five are, again, not supportive of the position of the U.S. Trustee, which has read the "administration of the debtor's estate" language found in these factors far too broadly. Lastly, the Consultant certainly brings a degree of special knowledge or skill to the table, but as the *Brookstone* court noted, that would be true of any professional entity and carries little weight in this analysis. Weighing the *First Merchants* factors *in toto*, it is clear that the analysis is consistent with *Brookstone* and all other recent precedents that have considered this question: the Consultant is not a professional within the contemplation of section 327(a).

31.    Tellingly, the U.S. Trustee Store Closing Objection does not assert that the Consultant's mandate is atypically broad or impermissible. The responsibilities described in the MSA do not give the Consultant the requisite agency, authority or discretion to correctly be characterized as a "professional." *See* Store Closing Motion, MSA, "Independent Contractors" ("[N]othing in this Agreement is intended to, or shall be deemed to, establish any partnership or joint venture between them, constitute any party as the agent of the other party, or authorize any

party to make or enter into any commitments for or on behalf of the other party."). Rather, the Consultant is asked to recommend commercial and marketing strategies, supervise the conduct of the sales, maintain certain communication with the Debtors' employees, designate certain items not to be sold, and sell merchandise. *See* Store Closing Motion, MSA Amendment No. 1, "Scope of Services & Work Product." Each of these activities is subject to the Debtors' review, oversight, rejection and control. *See* Store Closing Motion, MSA Amendment No. 2, "Project Management/Miscellaneous Terms." Notably, the U.S. Trustee does not make the case that this store closing liquidation is aberrant in any fashion—the U.S. Trustee is instead asking this Court to overturn the *Brookstone* holding outright, as a matter of law.

### B.     The Debtors' Assumption of the MSA Is a Sound Exercise of Business Judgment.

32.     The U.S. Trustee alleges that purported conflicts of interest prevent the Debtors from assuming the MSA. *See* U.S. Trustee Store Closing Obj. ¶ 37–40. This argument rings hollow. As a result of the pre- and postpetition services provided by the Consultant, the Debtors have been able to execute on their wind-down strategy while maintaining the Company's commercial reputation and its relationships with its vendors, employees, customers and local communities. The evident success of these store closings informed the Debtors' decision to assume the MSA and continue to engage the Consultant on this basis. Ramsden Declaration, ¶ 68.

33.     Contrary to the U.S. Trustee's unfounded suppositions, a court should not second guess a debtor's business judgment simply because the debtor is transacting with the party whose affiliates are also involved in the case.[6] The U.S. Trustee cites *In re Classica Group*, 2006 WL

---

[6] The Consultant's affiliates, 1903P Loan Agent, LLC and 1903 Partners, LLC (the "**1903 Parties**"), are the administrative and collateral agent and a lender, respectively, under a term loan facility entered into with the Debtors, as borrowers and guarantors, dated as of April 18, 2024 (the "**Prepetition Term Facility**"). The 1903 Parties are also the administrative agent and a lender under the Debtors' senior secured superpriority debtor-in-possession term loan agreement dated as of September 11, 2024 (the "**DIP Term Facility**"). The Consultant's affiliate, Gordon Brothers

2818820 at *7 (Bankr. D.N.J. 2006) for the proposition that the "relatively deferential [business judgment] standard does not apply when the action is tainted by a conflict of interest." *Classica Group* is inapplicable in this context because it concerns conflicts of the directors and officers of a company with respect to a proposed business decision. *Id*. In other words, it protects decision makers except in instances of fraud, self-dealing, or unconscionable conduct, no evidence of which exists here. The facts in these cases demonstrate that the Debtors acted in an informed manner and with the good faith and honest belief that they were acting in the best interests of the Company in an effort to liquidate assets and maximize value for all parties. Ramsden Declaration, ¶¶ 71–72.

34.     Further, the fact that the Debtor has separate and distinct dealings with affiliates of the Consultant which provide goods, services or capital which are beneficial to a distressed retailer is not cause for alarm. Instead, it is precisely the circumstance already contemplated in *Brookstone*, namely that the Consultant's affiliates "might be called upon or invited to play other roles in the case as circumstances may require," including, for the avoidance of doubt, "buying estate assets or even serving as a lender." *Brookstone*, 592 B.R. at 31. In considering this issue, this Court has consistently reached the same result—Debtors that exercise their business judgment to engage store closing liquidators, even where affiliates of those liquidators are present in a given case, are permitted to do so. *See, e.g.*, *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr. D.N.J. June 5, 2024) (overruling an objection of the U.S. Trustee asserting that the store closing consultant's connection to the DIP Lender was disqualifying); *In re Christmas Tree Shops*, *LLC*, Case 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (approving the assumption of a store closing agreement

---

Commercial & Industrial, LLC is an ordinary course seller of goods to the Debtors and is a creditor of the Debtors based on amounts outstanding on account of the sale of such goods. An affiliate of one of the Consultant's syndication partners, Tiger Capital Group, LLC, is similarly a lender under the Prepetition Term Facility and the DIP Term Facility. An affiliate of the Consultant's second syndication partner, Hilco Merchant Resources, LLC, has previously sold inventory to and transacted with Debtor Big Lots, Inc, with a current account balance outstanding of $916,372.51.

where the liquidator's affiliates occupied the roles of prepetition lender, DIP lender, consignor of inventory and a potential stalking horse bidder); *In re Christopher & Banks Corp.*, Case 21-10269 (ABA) (Bankr. D.N.J. Feb. 8, 2021) (overruling an objection of the U.S. Trustee asserting that the store closing consultant's connections to certain affiliates acting as secured creditors and the stalking horse bidder was disqualifying). The Consultant and its syndication partners, Tiger Capital Group, LLC and Hilco Merchant Resources, LLC, each proactively filed comprehensive declarations which provide additional detail about their operations and, in the Consultant's case, the presence of certain of its affiliates in these cases.[7]   In light of the foregoing, the U.S. Trustee Store Closing Objection should be overruled.

### C.   Landlord Objections to the Store Closing Motion Requesting the Payment of Stub Rent Misapply Section 365(d)(3).

35.   Certain Objecting Landlords have filed objections to the Store Closing Motion on the basis that section 365(d)(3) of the Bankruptcy Code compels the Debtors to pay stub rent from the proceeds of the Store Closing Sales and on various timelines that the Objecting Landlords have proposed. *See, e.g.*, Objections filed at D.I. 385 ¶¶ 21–23; 523 ¶¶ 9–13; and 527 ¶ 12. These objections misstate the requirements of section 365(d)(3). Instead, section 365(d)(3) simply mandates that the trustee or debtor-in-possession timely perform postpetition obligations under any unexpired lease of nonresidential real property until the lease is either assumed or rejected. *In re Chi-Chi's*, Inc., 305 B.R. 396, 400 (Bankr. D. Del. 2004). Importantly, the Debtors have revised

---

[7] *See Declaration of Joseph Malfitano in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 257], *Declaration of Joseph Malfitano in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 258] and *Declaration of Eric W. Kaup in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 259].

the DIP Budget to explicitly budget for such payments during these cases, and the relief requested

by the Store Closing Motion does not limit the ability of Objecting Landlords to file a claim

seeking payment of an administrative expense.

### III. The Objections to the DIP Motion Assume, Incorrectly, that Objecting Landlords Are Entitled to Preferential and Premature Satisfaction of Their Claims.

#### A. Debtors Are Appropriately Waiving Their Rights Under Section 506(c) and 552(b).

36.     Certain Objecting Landlords contend that the Debtors should not be permitted to

waive their rights under sections 506(c) or 552(b) of the Bankruptcy Code in exchange for consent

to use cash collateral because the Debtors have purportedly not sufficiently provided for payment

of "stub rent" claims. These objections misrepresent the Debtors' statutory right to determine the

application of sections 506(c) and 552(b) of the Bankruptcy Code and ignore that the Debtors have

revised the proposed DIP Order and accompanying DIP Budget to explicitly contemplate stub rent

payments, which are anticipated to be made within the coming weeks.

37.     Indeed, several Objecting Landlords have withdrawn their objections after

reviewing the revised DIP Order and DIP Budget. At the time of this filing, this includes the

objections filed at D.I. 237, 323, 396, 395, 398 and 400. Nevertheless, the remaining Objecting

Landlords are attempting to obtain preferential treatment at the expense of the Debtors' broad

universe of stakeholders. The Objecting Landlords contend that a waiver of surcharge rights,

marshalling, and equities of the case exception is impermissible because there is a risk of

administrative insolvency, and such relief would shift value to the DIP Secured Parties at the

expense of the Objecting Landlords. *See, e.g.*, Objections filed at D.I. 385 ¶¶ 1–2; 523 ¶¶ 19–26;

and 527 ¶ 11.

38.     Although the Objecting Landlords' underlying concerns have been addressed

through the modifications made to the DIP Order and DIP Budget, the Debtors' waiver of section

506(c) and 552(b) is nevertheless still appropriate under the circumstances of these Chapter 11 Cases.

39.     Claims pursuant to section 506(c) of the Bankruptcy Code are the sole property of the Debtors' estates, and the Debtors believe that such a waiver is justified. Here, the DIP Secured Parties did not (and would not) provide their commitments under the DIP Facilities or consent to use of their cash collateral without a section 506(c) waiver, and the Debtors determined, in their business judgment, that no postpetition financing would become available on similar terms without providing such a waiver. *See, e.g.*, *In re Salt Life Beverage, LLC*, No. 24-11468 (LSS) (Bankr. D. Del. Sept. 13, 2024); *In re Number Holdings, Inc.*, No. 24-10719 (KJS) (Bankr. D. Del. May 9, 2024); *In re iMedia Brands, Inc.*, No. 23-10852 (KBO) (Bankr. D. Del. Aug 15, 2023).

40.     Certain Objecting Landlords argue that the Debtors' waiver of sections 506(c) and 552(b) will inequitably provide a "windfall" to the DIP Secured Parties. *See, e.g.*, Objections filed at D.I. 385 ¶¶ 11–14; 523 ¶¶ 25–27; 527 ¶¶ 14–16; and 529 ¶¶ 10–12. However, the Debtors have stipulated that the Prepetition Secured Parties hold valid, perfected liens on the Prepetition Collateral and the Prepetition Secured Parties have also allowed the Debtors' consensual use of Cash Collateral. The section 506(c) and 552(b) waivers contemplated by the DIP Motion simply ensure that secured creditors will not pay twice to preserve the Debtors' assets and have a further surcharge forced upon them in excess of the substantial surcharge they have negotiated and agreed to. *In re Mineral Park, Inc.*, No. 14-11996 (KJC) (Bankr. D. Del. Sept. 23, 2014), Hr'g Tr. 43:10–12 (overruling the committee's objection and stating "given what [the secured lenders are] funding, I think [they've] paid for a 506(c) waiver and I would be willing to grant it").

41.     This Court has regularly granted section 506(c) waivers over objections from creditors, including in retail cases. *See, e.g.*, *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS)

(Bankr. D. Del. May 29, 2020) [D.I. 281], Hr'g Tr. at 38:10–17 (overruling official committee's objection to 506(c) waiver and noting "[w]ith regard to the 506(c) waiver, again, given the budget that has been put together, the new money that has come in, and the new money that is going to be coming in I don't think it's at all inappropriate to waive 506(c) because the lender has really done what you would ask a 506(c) defendant to do. It's funded the administrative solvency of the estate through its loan and its new money. So, I will approve that waiver."); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) [D.I. 354], Hr'g Tr. at 68:5–9 (overruling objection from Aspen American Insurance Company to the surcharge waiver, where official committee's objection was resolved before the hearing; "yes, certain things are being waived like 506(c) and 552(a) . . . [b]ut . . . this is part of a global package, a not unusual global package at all for a combination of new money from an existing lender and a new lender in a borderline administratively insolvent case. I think they would be insane and commercially unreasonable if they were to lend under different terms."); *In re Quorum Health Corp.*, No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [D.I. 296], Hr'g. Tr. at 221, 225–26 (overruling objection from equity holder Mudrick Capital Management, L.P. as to the 506(c) waiver and noting "in its papers, Mudrick takes issue with the 506(c) surcharge, the 552(b) equities of the case and marshaling waivers, as well as the grant of DIP liens on avoidance actions . . . . I am prepared to overrule the objection of Mudrick and I will enter the proposed form of order . . . . Moreover, the various waivers given to DIP lenders are reasonable requested protections that are appropriate and customarily approved in exchange for the lender's agreement to adequately fund a case and provide an acceptable carve-out."); *In re Central Grocers, Inc.*, No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) [D.I. 343], Hr'g Tr. at 91:1–2 (overruling Midwest Pension Fund's objection to 506(c) waiver, where the official committee had cut a deal with the debtors before the hearing and noting

"I am going to approve the deal that the committee struck and permit the waiver of 506(c) claims in this case. Having said that, that does not cut off any administrative creditor's right to come before this Court to seek payment, to seek payment prior to a plan, if they think it's appropriate. And we will deal with those claims of administrative creditors as and when they come before me."); *In re Ctr. City Healthcare, LLC*, No. 19-11466 (MFW) (Bankr. D. Del. Aug. 21, 2019) [D.I. 543], Hr'g Tr. at 37 (overruling objections from official committee and 503(b)(9) claimant on 506(c) waiver; "[f]or the court to, basically, shut down the financing, and I believe that would happen at this time. I think that MidCap has probably reached its limit in agreeing to terms and almost all of the terms except the 506(c) waiver have been addressed. So, I will overrule the objections to the 506(c) waiver and I will approve the financing subject, obviously, to looking at the order and approving the order as well as hearing from the committee on the order."). Indeed, waivers of sections 506(c) and 552(b) of the Bankruptcy Code are particularly appropriate where a secured creditor has agreed to pay, from its collateral, estate administrative costs and subordinate its liens to a carve out for professional fees and other administrative expenses.

42.    The Objecting Landlords are not harmed by the DIP Motion, and are indeed made better off by it because failure to obtain financing would likely result in significant harm to the estates and jeopardize the Debtors' ability to pay the Objecting Landlords' claims. The relief requested by the Debtors pursuant to the DIP Motion does not foreclose the ability of the Objecting Landlords to file administrative claims for their stub or postpetition rent payments, which is the appropriate mechanism to protect their interests. Adequate protection, which is meant to protect a creditor against the risk that its property will diminish in value as a result of the debtor's postpetition use, is inapposite in these cases and not appropriate to address the Objecting Landlords' concern, which, rather than property value diminishment, is simply the payment in full

of an administrative claim. As a result, the DIP Objections should be overruled, and the Debtors respectfully request entry of the proposed DIP Order.

      **B.**      **Objecting Landlords are not Entitled to Adequate Protection Under Section 361 or 363(e) of the Bankruptcy Code.**

     43.    Certain Objecting Landlords contend that they are entitled to adequate protection pursuant to sections 361 and 363(e) of the Bankruptcy Code and that such adequate protection should be in the form or a reserve and payment of any remaining Stub Rent. *See, e.g.*, Objections filed at D.I. 385 ¶¶ 15–20; 523 ¶¶ 12–14; and 527 ¶ 12. Landlords are not entitled to adequate protection under 363(e), and even if they were, such adequate protection would only be for the decrease in the value of the "interest in property" that section 363(e) is intended to protect. *Matter of Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("[C]ourts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

     44.    Contrary to the position of the Objecting Landlords, this Court has previously held that landlords are not entitled to stub rent protections that are tantamount to adequate protection or the grant of a security interest. *See In re HQ Glob. Holdings, Inc. ("HQ Global")*, 282 B.R. 169, 175 (Bankr. D. Del. 2002). In *HQ Global*, certain landlords argued that they were entitled to payment of stub rent pursuant to sections 503(b)(1)(A) and 365(d)(3) of the Bankruptcy Code. *See id.* at 172. The Court held that section 503(b)(1)(A) provided the grounds for the landlords' stub rent claim. *See id.* at 173. But the landlords also argued in the alternative that the debtors should reserve the stub rent to mitigate the landlords' risk of the debtors' insolvency. *Id.* The Court rejected that suggestion, reasoning that reserving the stub rent would have "the same effect as providing adequate protection or granting a security interest to the Landlords. Such rights have no basis in the Bankruptcy Code and go beyond the rights granted under section 365(d)(3) or 503(b)."

*Id.* at 175. Consequently, the Court concluded by noting that the landlords should have no greater rights "than other section 503(b) claimants." *Ibid.*

45.    This Court's decision in *HQ Global* should be dispositive. Here, as in *HQ Global*, the Objecting Landlords request that the Debtors pay or reserve the stub rent in its entirety to provide the landlords with adequate protection of payment in the event of the Debtors' insolvency. As in *HQ Global*, the Objecting Landlords' demand should be rejected; the only statutory protection that Congress provided for stub rent is to be found in sections 365(d)(3) and 503(b)(1)(A) of the Bankruptcy Code, not sections 361 or 363(e). Objections requesting the payment of stub rent pursuant to sections 361 or 363(e) should be overturned.

46.    Moreover, the Third Circuit has adopted the "billing theory," which attributes an entire month's rent obligation to the date upon which that obligation became due. *See In re Goody's Family Clothing ("Goody's Family Clothing"),* 610 F.3d 812 (3d Cir. 2010). As such, because the obligation to pay stub rent is deemed to crystallize on the (pre-petition) rent payment date, the Debtors are not obligated to pay stub rent pursuant to 365(d)(3). *See id.* (holding that obligations which arose prepetition are not administrative expenses under 365(d)(3)). Further, the timing of the payment of claims, and particularly the payment of rent by debtors operating in the commercial retail industry, is subject to a debtor's business judgment and is entitled to deference. *See id.* at 616–617. Where, as here, there is no evidence that a debtor's decision to delay the payment of rent is attributable to anything other than a business judgment made in good faith upon a reasonable basis, a court should not entertain an objection to the timing of the payment of stub rent. *Id.* at 617.

47.    Even assuming that the Objecting Landlords were entitled to some form of adequate protection, which they are not, any such relief must be measured not by the Debtors' use of the

property and potential that the landlords will not recover on stub rent, but rather by (a) the demonstrated decrease in the value of such landlords' interest in property or (b) evidence from the Objecting Landlords that they are not receiving the indubitable equivalent when the Debtors pay rent under section 365(d)(3) of the Bankruptcy Code. *See* 11 U.S.C. § 363(p)(2) (providing that "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of" its interest in need of adequate protection); *United Savings Assn. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988) (rejecting notion that adequate protection is meant to compensate for the "use" value of collateral); *Cont'l Airlines,* 154 B.R. at 180 (finding that adequate protection is available under section 363(e) for a decrease in value due to the use, sale, or lease of an entity's interest in property). The Objecting Landlords have not provided any evidence of a decrease in value of their property resulting from the Debtors' continued use. Accordingly, the Objecting Landlords are not entitled to the payment or reservation of stub rent, and such relief should not be granted.

## **CONCLUSION**

48.     The Debtors respectfully request that the Court overrule the Objections and grant the Motions and any such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated:    October 21, 2024
          Wilmington, Delaware

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                        /s/ *DRAFT* _____
                                        Robert J. Dehney, Sr. (No. 3578)
                                        Andrew R. Remming (No. 5120)
                                        Daniel B. Butz (No. 4277)
                                        Tamara K. Mann (No. 5643)
                                        Casey B. Sawyer (No. 7260)
                                        1201 N. Market Street, 16th Floor
                                        Wilmington, DE 19801
                                        Tel: (302) 658-9200
                                        rdehney@morrisnichols.com
                                        aremming@morrisnichols.com
                                        dbutz@morrisnichols.com
                                        tmann@morrisnichols.com
                                        csawyer@morrisnichols.com

                                        *-and-*

                                        DAVIS POLK & WARDWELL LLP

                                        Brian M. Resnick (admitted *pro hac vice*)
                                        Adam L. Shpeen (admitted *pro hac vice*)
                                        Stephen D. Piraino (admitted *pro hac vice*)
                                        Jonah A. Peppiatt (admitted *pro hac vice*)
                                        Ethan Stern (admitted *pro hac vice*)
                                        450 Lexington Avenue
                                        New York, NY 10017
                                        Tel.: (212) 450-4000
                                        brian.resnick@davispolk.com
                                        adam.shpeen@davispolk.com
                                        stephen.piraino@davispolk.com
                                        jonah.peppiatt@davispolk.com
                                        ethan.stern@davispolk.com

                                        *Proposed Counsel to the Debtors and Debtors in
                                        Possession*

**Exhibit A**

**Summary of Objections**

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| | | | *Objections to Bidding Procedures Motion* | |
| 237 | 1600 Eastchase Parkway Leasing LLC ("**Eastchase Parkway**") | Objection to treatment of outstanding rent | The Court should limit the Debtors' authority to assume and assign and/or reject leases. *See* Eastchase Parkway Objection ¶¶ 7-11. | This objection has been **resolved**. |
| | | | The Court should require the Debtors to provide adequate protection for the continued use and occupancy of the leased premises by the Debtors. *See* Eastchase Parkway Objection ¶¶ 15-21. | This objection has been **resolved**. |
| 244 | WPG Management Associates, Inc. ("**WPG Management**") | Reservation of rights relating to continuation of possessory interest | WPG Management as lessee to one of the Debtors' properties, reserves its right to object to the successful bid of such property if such bid seeks to acquire the property free and clear of WPG Management's lease. *See* WPG Management Objection ¶¶ 3–16. | This reservation of rights **need not be adjudicated**. |
| 246 | American National Insurance Company ("**American National**") | Objection to certain procedural protections | American National objects to the proposed objection timeline to a proposed sale or lease assumption and assignment. *See* American National Objection ¶ 11. | This objection has been **resolved**. |
| | | | American National objects to any provision in the order that waives the 14-day stays imposed by Fed. R. Bankr. P. 6004(h) and 6004(d). *See* American National Objection ¶ 12. | This objection has been **resolved**. |
| 247 | The Gerson Company ("**Gerson**") | Reservation of rights relating to intellectual property litigation | Gerson reserves all its rights to object to the sale, the terms of the APA, or any final sales agreement that purports to transfer the disputed intellectual property free and clear of Gerson's claims. *See* Gerson Objection ¶¶ 6–10. | This reservation of rights **need not be adjudicated**. |
| 487 | Official Committee of Unsecured Creditors (the "**Committee**") | Objection with respect to Bid Protections | The Stalking Horse Bid should only be approved if it is modified to provide that, in the event Nexus is deemed the Successful Bid, it shall forfeit its Expense Reimbursement and the Deposit Amount if the sale cannot close due to the Stalking Horse Bidder's failure | This objection has been **resolved**. |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| | | | to obtain financing necessary to satisfy the Debt Payoff. *See* Committee Objection ¶ 4. | |
| 494 | United States Trustee for the District of Delaware (the "**U.S. Trustee**") | Objection with respect to Bid Protections | The Debtors are required to pay the Break-Up Fee and Expense Reimbursement in situations where it is, at best, presently unclear how the Debtors' estates will have been benefitted and its value preserved. *See* U.S. Trustee Objection ¶¶ 20–21. | This objection should be **overruled**.<br><br>• The Bidding Procedures Order has been revised to provide that the Bid Protections shall only be earned, due and/or payable if, prior to the Bid Deadline, the Stalking Horse Bidder has delivered Debt Commitment Letters to the Debtors evidencing committed Debt Financing. *See* Bidding Procedures Order ¶ 16. |
| | | | Bid Protections are not entitled to superpriority status. *See* U.S. Trustee Objection ¶¶ 23–27. | This objection should be **overruled**.<br><br>• The Debtors determined in their business judgment that the Bid Protections would be entitled to superpriority status in order to secure the Stalking Horse Bid. |
| | | | Nexus must be required to provide the Debtors, the Committee and the U.S. Trustee with sufficient detail regarding their actual and necessary and provide such parties an opportunity to object prior to payment of such expenses. *See* U.S. Trustee Objection ¶ 29. | This objection should be **overruled**.<br><br>• The Debtors determined in their business judgment that the Expense Reimbursement would be made available to the Stalking Horse Bidder without making such expenses subject to third-party review or challenge procedures in order to secure the Stalking Horse Bid. |
| | | | *Objection to Store Closing Motion* | |
| 323 | Casitas Oceanside Three LP ("**Casitas**") | Objection to treatment of stub rent | The Court should require the Debtors to provide adequate assurances for the continued use and occupancy of the leased premises by the Debtors. *See* Casitas Objection ¶ 3. | This objection has been **resolved**. |
| 388 | Texas Tax Authorities (the "**Texas Tax Authorities**") | Objection to treatment of tax obligations | The Court should enter an order providing the Texas Tax Authorities with assurances relating to certain outstanding tax claims. *See* Texas Tax Authorities Objection ¶¶ 1–11. | This objection has been **resolved**. |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| 396 | Cactus Crossing, LLC ("**Cactus Crossing**") | Objection to treatment of stub rent | The Court should (i) require the Debtors to deposit Store Closing proceeds into a segregated account or (ii) provide that landlord liens attach to the proceeds of the Store Closing Sales. *See* Cactus Crossing Objection ¶¶ 7–25. | This objection has been **resolved**. |
| 454 | Columbia Park Retail Owner, LLC. ("**Columbia Park**") | Objection to treatment of stub rent | The Court should require the Debtors to pay all postpetition rent owed under the lease by December 1, 2024 in order to conclude the Store Closing Sales. | This objection should be **overruled**.<br><br>• The Debtors have made and will continue to make postpetition rent payments as they become due and payable. The Debtors have revised the proposed DIP Order and DIP Budget to provide for stub rent payments. |
| 501 | Westerville Square, Inc. ("**Westerville Square**") | Objection to treatment of stub rent | The Court should require the Debtors to provide adequate protection for the continued use and occupancy of the leased premises by the Debtors. *See* Westerville Square Objection ¶¶ 1–7. | This objection should be **overruled**.<br><br>• The Debtors have made and will continue to make postpetition rent payments as they become due and payable. The Debtors have revised the proposed DIP Order and DIP Budget to provide for stub rent payments. |
| 503 | The U.S. Trustee | Objection with respect to assumption of MSA | The Consultant is a "professional" under the terms of 11 U.S.C. § 327(a). *See* U.S. Trustee Objection ¶¶ 24–36. | This objection should be **overruled**.<br><br>• It is settled precedent in this district that liquidation consultants are not professionals as contemplated by § 327(a) and need not be retained according to this standard. *See In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024); *In re Number Holdings, Inc.*, No. 24-10719 (KJS) (Bankr. D. Del. May 9, 2024); *In re New Rue Holdco, Inc.*, No. 24-10939 (BLS) (Bankr. D. Del. May 7, 2024); *In re Brookstone Holdings Corp.*, 592 B.R. 27, 29 (Bankr. D. Del. Oct. 1, 2018).<br>• The Consultant is engaged on customary terms and is operating within a typical mandate, such that the *First Merchants* analysis leads to the same result found in *Brookstone* and other precedential analyses. |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| | | | The Consultant is subject to disqualifying conflicts of interest due to the presence of affiliate entities in these Chapter 11 Cases. *See* U.S. Trustee Objection ¶¶ 37–45. | This objection should be **overruled**.<br><br>• It is the Debtors' responsibility to assess, in its business judgment, possible conflicts of interest prior to engaging a contractual counterparty. The Debtors did so here and determined that the Consultant's engagement did not present a conflict of interest.<br>• It is not uncommon for non-debtor third parties, and store liquidators in particular, to wear multiple hats, especially within the context of a retail bankruptcy. *See In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr. D.N.J. 2024); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. 2023); *In re Christopher & Banks Corp.*, No. 21-10269 (ABA) (Bankr. D.N.J. 2021); *In re Brookstone Holdings Corp.*, 592 B.R. 27, 29 (Bankr. D. Del. Oct. 1, 2018).<br>• The Consultant's interests are aligned with those of the Debtors (maximizing the proceeds of store closing sales for the benefit of the Debtors' estates).<br>• The Consultant and its affiliate entities in these cases are meaningfully distinct, staffed by different personnel, subject to discrete contractual arrangements, and represented by separate counsel. |
| | | | *Objections to DIP Motion* | |
| 387 | Texas Tax Authorities (the "**Texas Tax Authorities**") | Objection to treatment of certain tax obligations | The Court should enter an order providing the Texas Tax Authorities with assurances relating to certain outstanding tax claims. *See* Texas Tax Authorities Objection ¶¶ 1–11. | This objection has been **resolved**. |
| 395 | Pomeroy Enterprises, LLC ("**Pomeroy**") | Objection to treatment of stub rent | The Court should require the Debtors to budget and pay all postpetition rent, including stub rent, for the continued use and occupancy of the leased premises by the Debtors. *See* Pomeroy Objection ¶¶ 12–14. | This objection has been **resolved**. |
| 398 | Northtowne Plaza Properties, Ltd. ("**Northtowne**") | Objection to treatment of stub rent | The Court should require the Debtors to budget and pay all postpetition rent, including stub rent, for the continued use and occupancy of the leased premises by the Debtors. *See* Northtowne Objection ¶¶ 15–16. | This objection has been **resolved**. |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| 523 | Certain Landlords represented by Ballard Spahr LLP (the "**Ballard Spahr Landlords**") | Objection to treatment of stub rent | The Court should require the Debtors to budget and pay all postpetition rent, including stub rent, and tax obligations as adequate protection for the continued use and occupancy of the leased premises by the Debtors. *See* Ballard Spahr Landlords Objection ¶¶ 9–28. | This objection should be **overruled**.<br><br>• The provision of adequate protection for the payment of postpetition rent results in inequitable treatment favoring landlords at the expense of other stakeholders and is contrary to the intent of adequate protection (to protect against the deterioration of an asset). |
| | | | The Ballard Spahr Landlords oppose the entry of a Final DIP Order to the extent the Debtors seek to waive the protections under sections 506(c) and 552(b) of the Bankruptcy Code without providing for the payment of stub rent and the payment of all ongoing post-petition rent under the leases to the Ballard Spahr Landlords. *See* Ballard Spahr Landlords Objection ¶¶ 23–27. | This objection should be **overruled**.<br><br>• It is the Debtors' right to determine whether it chooses to waive sections 506(c) and 552(b) of the Bankruptcy Code, and it has done so here in its business judgment in acknowledgement of the DIP Lenders' prepetition secured positions and to secure the financing commitments of the DIP Lenders. |
| | | | The Debtors should not be permitted to treat similarly situated administrative claims differently. *See* Ballard Spahr Landlords Objection ¶ 28. | This objection should be **overruled**.<br><br>• The Debtors are not treating similarly situated administrative claims differently. Landlords are scheduled to be paid their stub rent amounts on a timeline that treats the landlords present in these cases equally. |
| 527 | Certain Landlords represented by Allen Matkins Leck Gamble Mallory and Natsis LLP (the "**Allen Matkins Landlords**") | Objection to treatment of stub rent | The Court should require the Debtors to budget and pay all postpetition rent, including stub rent, as adequate protection for the continued use and occupancy of the leased premises by the Debtors. *See* Allen Matkins Landlords Objection ¶¶ 7–13. | This objection should be **overruled**.<br><br>• The provision of adequate protection for the payment of postpetition rent results in inequitable treatment favoring landlords at the expense of other stakeholders and is contrary to the intent of adequate protection (to protect against the deterioration of an asset). |
| | | | The Allen Matkins Landlords opposes the entry of a Final DIP Order to the extent the Debtors seek to waive the protections under sections 506(c) and 552(b) of the Bankruptcy Code without providing for the payment of stub rent and the payment of all ongoing post-petition rent under the leases to the Allen Matkins Landlords. *See* Allen Matkins Landlords Objection ¶¶ 14–16. | This objection should be **overruled**.<br><br>• It is the Debtors' right to determine whether it chooses to waive sections 506(c) and 552(b) of the Bankruptcy Code, and it has done so here in its business judgment in acknowledgement of the DIP Lenders' prepetition secured positions and to secure the financing commitments of the DIP Lenders. |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| | | | The Final Order should be revised to provide that (i) any DIP Liens and Adequate Protection Liens with respect to leasehold interests are limited to the proceeds of the sale or disposition and (ii) the DIP Lenders do not have unrestricted rights of access and use of Debtors' leased premises. *See* Allen Matkins Landlords Objection ¶¶ 17–18. | This objection should be **overruled**.<br><br>• The Debtors have determined in their business judgment not to provide for these accommodations, which the landlords have no statutory basis to require. |
| 529 | WPG Legacy LLC, as managing agent for certain landlords (**"WPG"**) | Objection to treatment of stub rent | WPG opposes the entry of a Final DIP Order to the extent the Debtors seek to waive the protections under sections 506(c) and 552(b) of the Bankruptcy Code without providing for the payment of stub rent and the payment of all ongoing post-petition rent under the Leases to WPG. *See* WPG Objection ¶¶ 10–12. | This objection should be **overruled**.<br><br>• It is the Debtors' right to determine whether it chooses to waive sections 506(c) and 552(b) of the Bankruptcy Code, and it has done so here in its business judgment in acknowledgement of the DIP Lenders' prepetition secured positions and to secure the financing commitments of the DIP Lenders. |
| | | | The Court should require the Debtors to budget and pay all postpetition rent, including stub rent, as adequate protection for the continued use and occupancy of the leased premises by the Debtors. *See* WPG Objection ¶¶13–15. | This objection should be **overruled**.<br><br>• The provision of adequate protection for the payment of postpetition rent results in inequitable treatment favoring landlords at the expense of other stakeholders and is contrary to the intent of adequate protection (to protect against the deterioration of an asset). |
| | | | *Omnibus Objections to DIP Motion, Store Closing Motion* | |
| 293 | Orange County Tax Collector (**"Orange County"**) | Objection to treatment of tax obligations | The Court should enter an order providing Orange County with adequate protection relating to certain outstanding tangible personal property taxes. *See* Orange County Objection ¶¶ 9–15. | This objection has been **resolved** with respect to the relevant Store Closing and DIP relief. |
| 339 | Broward County Tax Collector (**"Broward County"**) | Objection to treatment of tax obligations | The Court should enter an order providing Broward County with adequate protection relating to certain outstanding tangible personal property taxes. *See* Broward County Objection ¶¶ 1–13. | This objection has been **resolved** with respect to the relevant Store Closing and DIP relief. |
| 385 | Certain Landlords represented by Kelley Drye & Warren LLP (the **"Kelley Drye Landlords"**) | Objection to treatment of stub rent | The Court should require the Debtors to pay stub rent obligations on or before the earlier of (i) 10 business days after lease rejection or (ii) 60 days after the Petition Date. *See* Kelley Drye Landlords Objection ¶¶ 10–23. | This objection should be **overruled**.<br><br>• The Debtors have made and will continue to make postpetition rent payments as they become due and payable. The Debtors have revised the proposed DIP |

| Docket No. | Objector | Objection Type | Basis for Objection | Response to Objection |
|---|---|---|---|---|
| | | | | Order and DIP Budget to provide for stub rent payments. |
| 400 | Grove Shops LLC (the "**Grove Shops LLC**") | Objection to treatment of stub rent | Adopting the arguments raised and asserted in D.I. 385, the Court should require the Debtors to pay stub rent obligations on or before the earlier of (i) 10 business days after lease rejection or (ii) 60 days after the Petition Date. *See* Grove Shops LLC Objection ¶ 1. | This objection has been **resolved**. |
| 439 | Milelli Realty-Lehigh Street, LLC ("**Milelli Realty**") | Objection to treatment of stub rent | The DIP Order should not impair, prejudice or modify the rights of Milelli Realty to recover certain outstanding postpetition lease amounts. *See* Milelli Realty Objection ¶¶ 6–9. | This objection should be **overruled**.<br>• The Debtors have made and will continue to make postpetition rent payments as they become due and payable. The Debtors have revised the proposed DIP Order and DIP Budget to provide for stub rent payments. |

**Exhibit B**

**Summary of Informal Comments**

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | *Informal Comments to Bidding Procedures Order* | |
| Committee | The Committee requested reservation of rights language to preserve its rights to request an extension of dates and deadlines provided in the Bidding Procedures Order. | The Debtors provided for such a reservation of rights in paragraph 34. |
| | The Committee requested consultation rights relating to Qualified Bids. | The Debtors provided for such rights in Section 2 of the Bidding Procedures. |
| | The Committee requested that certain Bid Protections should only be made available upon the Stalking Horse Bidder's securing of committed debt financing. | The Debtors revised Section 5 of the Bidding Procedures to provide that Bid Protections shall only be earned, due and/or payable if the Stalking Horse Bidder has delivered Debt Commitment Letters to the Debtors prior to the Bid Deadline. |
| U.S. Trustee | The U.S. Trustee noted that email service is not appropriate service unless the party has consented to such service through registration with ECF. | The Debtors revised paragraph 10 of the Bidding Procedures Order to provide that that email service will be provided only to such parties has consented to such service through registration with ECF, and mail service will be used for all other parties. |
| | The U.S. Trustee requested that the Bidding Procedures Order shall provide that proposed form of sale order will be filed at least forty-eight (48) hours before the sale hearing. | The Debtors added in paragraph 15 of the Bidding Procedures Order that by no later than three (3) days after the conclusion of the Auction, the Debtors shall file a proposed final form of sale order. |
| | The U.S. Trustee requested inclusion of an assumption and assignment deadline by which all such notices must be served such that parties will have appropriate notice. | The Debtors added in paragraph 20 of the Bidding Procedures Order that the Potential Assumed Contracts Schedule will be filed with the Court and published on the Case Information Website on October 16, and served on each relevant Counterparty within two (2) business days. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | The U.S. Trustee noted that given that the various objection deadlines are just four days apart, there doesn't seem to be any valid reason to have the cure objections due prior to the sale objections. | The Debtors updated in the Bidding Procedures Order and the Bidding Procedures, the Sale Objection Deadline, the Assumption and Assignment Objection Deadline, and the Cure Objection Deadline, such that all such objection deadlines are on November 4, 2024 at 12:00 p.m. (prevailing Eastern Time). |
| | The U.S. Trustee inquired how the contract/lease counterparties are able to access adequate assurance information? | The Debtors added in paragraph 21 of the Bidding Procedures Order including details regarding how counterparties will receive adequate assurance information. Any (i) landlord Counterparty and (ii) other Counterparty upon request not less than twenty-four (24) hours prior to the Bid Deadline, will be provided with adequate assurance information no later than twenty-four (24) hours after the Bid Deadline (by email if available or otherwise by first class mail). |
| | The U.S. Trustee requested the deletion of the Debtors' sole discretion in the paragraph governing the resolution of Assumption and Assignment Objections and added that such determination shall be made by the Debtors and the objecting counterparty, as the Local Rules require that an objecting party consent to any continuance of the hearing. | The Debtors made this change in paragraph 24 of the Bidding Procedures Order. |
| | The U.S. Trustee requested that the Bidding Procedures Order be amended to clarify that the counterparty cannot object to the assignment or the cure amount solely in connection with this sale process. | The Debtors added this clarification in paragraph 25 of the Bidding Procedures Order. |
| | The U.S. Trustee noted that paragraph 33 of the Bidding Procedures Order, providing that the Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee, needs to be deleted on the grounds that any chapter 7 or 11 trustee will exercise its own fiduciary duties regarding the stalking horse agreement, the auction, operating the debtors' business, etc. | The Debtors made this change and deleted paragraph 33 of the Bidding Procedures Order. |
| | The U.S. Trustee noted it typically objects to a buyer's assumption of any administrative claim of an insider regarding bonuses or severance, and given the bid procedures require a bidder to disclose the treatment | The Debtors removed this requirement from the Bidding Procedures. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | of the Debtors' management team, including any incentive plans to be offered to them, how does this not create a conflict of interest? | |
| | The U.S. Trustee commented that the credit bid rights under the Bidding Procedures must be subject to the Challenge Period. | The Debtors noted that Section 3 of the Bidding Procedures already provides that the credit bid rights are subject to, among other things, "the terms and conditions set for in the DIP Order, the DIP Loan Documents…", but specified in the Bidding Procedures, for the avoidance of doubt, paragraphs 42 and 43 of the DIP Order, which make the DIP lenders' credit bid rights subject to the Challenge Period. |
| | The U.S. Trustee noted that Local Rule 6004-1 requires that all creditors may attend the auction, and that the Debtors may include a registration-like requirement for the Auction attendance. | The Debtors made the Auction open for any Counterparty to a Contract or Lease or any other party in interest, in each case that requests attendance at least two days prior to the Auction, in paragraph 6 of the Bidding Procedures. |
| | The U.S. Trustee asked why the Good Faith Deposits of the Qualified Bidders (other than the Successful Bidder and Alternative Bidder) be held until the sale order is entered and/or the sale closes? | The Debtors modified Section 9 of the Bidding Procedures to provide for the Good Faith Deposits of the other Qualified Bidders to be returned promptly following the conclusion of the Auction. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | The U.S. Trustee commented that the court needs to approve the Bidding Procedures and so giving the Debtors unlimited ability to modify the Bidding Procedures removes the court from the process. | The Debtors added in paragraph 3 of the Bidding Procedures Order, "In accordance with and subject to the Bidding Procedures, the Debtor, in the exercise of its reasonable business judgment and in a manner consistent with its fiduciary duties and applicable law, shall have the right, in consultation with the Consultation Parties, to modify the Bidding Procedures, including to (i) extend or waive deadlines or other terms and conditions set forth herein or therein; (ii) adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders; and (iii) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets", and clarified that such modifications to the Bidding Procedures shall not be inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other Court Order. |
| WPG | WPG requested that the Notice of Successful Bidder should be filed within twenty-four (24) hours of the conclusion of the Auction. | This is agreed and provided for in the Bidding Procedures and Bidding Procedures Order, and the chart with the Relevant Dates in the Bidding Procedures has been updated to accordingly. |
| | WPG suggested only one objection deadline for cure, assumption and assignment and sale. | The Debtors updated in the Bidding Procedures Order and the Bidding Procedures, the Sale Objection Deadline, the Assumption and Assignment Objection Deadline, and the Cure Objection Deadline, such that all such objection deadlines are on November 4, 2024 at 12:00 p.m. (prevailing Eastern Time). |
| | WPG commented that parties should have at least fourteen (14) days to object to the potential assumption/assignment notice | The Debtors deleted the parenthetical in paragraph 20 of the Bidding Procedures Order which had implied that responses from Counterparties were due prior to the Auction. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | WPG noted that the bidding procedures were silent as to the transmission of adequate assurance information to contract counterparties, and that the Bidding Procedures should expressly set forth the process for delivering adequate assurance information to contract counterparties—including, to whom a request for adequate assurance information be made, the deadline for sending out adequate assurance information to counterparties that request such information, and method of delivery. | The Debtors added in paragraph 21 of the Bidding Procedures Order details regarding how counterparties will receive adequate assurance information. |
| | WPG commented that the Notice of Successful Bidder should include the Successful Bidder's APA if the Successful Bidder is not the Stalking Horse Bidder. | The Debtors made this modification in paragraph I of the Bidding Procedures Order. |
| | WPG commented the paragraph 24 of the Bidding Procedures Order provides that unresolved Cure Objections shall be heard at the Sale Hearing or a later date as determined by the Debtors, and suggested that the language be included that any subsequent hearing on unresolved cure objections be on not less than 10 days' notice to affected Counterparties. | The Debtors added in paragraph 24 of the Bidding Procedures Order that a Cure Objection timely filed shall be heard at (a) the sale hearing or at a later date on at least seven (7) days' notice or (b) such later that as the parties agree. |
| | WPG commented that landlords should be permitted to attend/observe any auction. | The Debtors made the Auction open for any Counterparty to a Contract or Lease or any other party in interest, in each case that requests attendance at least two days prior to the Auction, in paragraph 6 of the Bidding Procedures. |
| Allen Matkins Landlords | The Allen Matkins Landlords commented that with respect to backup bidders, the filing of a notice of intent to proceed with a back-up bidder followed by an expedited status and scheduling conference (where objection deadlines and a new hearing are set) is the common procedure. | The Debtors revised Section 8 of the Bidding Procedures such that the Court will not be considering any assumption and assignment considerations to any Alternative Bidder(s) at the Sale Hearing, and that if the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), the debtors shall file a Notice of Intent to Proceed with Alternative Bid(s), which shall include the Alternative Bidder's adequate assurance information, and Counterparties shall have seven days from receipt of such notice to object solely on the basis of adequate assurance. |
| Ballard Spahr Landlords | The Ballard Spahr Landlords commented that some updates to the Bidding Procedures are necessary to clarify the assets that are subject | The Debtors made this clarification in the Bidding Procedures, and limited the Bid Assets to "all, |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | to these procedures shall be limited to the all or substantially all of the Debtors' assets, as opposed to the separate lease sale procedures, which shall govern individual or lots of lease bids. | substantially all, or a substantial portion of the Debtors' assets…", and removed the ability to bid on an individual or any combination of the Debtors' assets. The Debtors also clarified in section 6 of the Bidding Procedures that a Partial Bid cannot be solely for assignment of individual or lots of Contracts or Leases. |
| | The Ballard Spahr Landlords requested that requesting counterparties shall receive adequate assurance information within 24 hours of the Bid Deadline. | The Debtors added in paragraph 21 of the Bidding Procedures Order including details regarding how counterparties will receive adequate assurance information. Any (i) landlord Counterparty and (ii) other Counterparty upon request not less than twenty-four (24) hours prior to the Bid Deadline, will be provided with adequate assurance information no later than twenty-four (24) hours after the Bid Deadline (by email if available or otherwise by first class mail). |
| Certain Landlords represented by Barclay Damon LLP (the "**Barclay Damon Landlords**") | The Barclay Damon Landlords asked why October 8 and October 22 were only "target dates" for filing the Potential Assumed Contracts Schedule and Notice of Successful Bidder. | The Debtors removed "target" from the deadlines to file the file the Potential Assumed Contracts Schedule and Notice of Successful Bidder in the Relevant Dates chart in the Bidding Procedures. |
| | The Barclay Damon Landlords asked when the adequate assurance information regarding the Stalking Horse Bidder will be delivered to counterparties, and noted that the adequate assurance information of any other bidder should be provided within 24 hours of the bid deadline. | The Debtors added in paragraph 21 of the Bidding Procedures Order including details regarding how counterparties will receive adequate assurance information for all Qualified Bidders, including the Stalking Horse Bidder. Any (i) landlord Counterparty and (ii) other Counterparty upon request not less than twenty-four (24) hours prior to the Bid Deadline, will be provided with adequate assurance information no later than twenty-four (24) hours after the Bid Deadline (by email if available or otherwise by first class mail). |
| | The Barclay Damon Landlords noted that the Bidding Procedures Order incorrectly states that required responses from counterparties will be due prior to the scheduled date of the Auction. | The Debtors deleted the parenthetical in paragraph 20 of the Bidding Procedures Order which had implied that responses from Counterparties were due prior to the Auction. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | The Barclay Damon Landlords commented that there should not be separate objection deadlines for cure costs and assumption and assignment/adequate assurance. | The Debtors updated in the Bidding Procedures Order and the Bidding Procedures, the Sale Objection Deadline, the Assumption and Assignment Objection Deadline, and the Cure Objection Deadline, such that all such objection deadlines are on November 4, 2024 at 12:00 p.m. (prevailing Eastern Time). |
| | The Barclay Damon Landlords requested that Landlords should be deemed qualified bidders for their leases and they should be excused from complying with certain portions of the proposed bidding procedures. | The Debtors clarified in the Bidding Procedures that such procedures are intended to result in a going concern bid for the entirety or substantial portion of the Debtors' businesses, rather than for individual leases or contracts. |
| | The Barclay Damon Landlords requested that the court should not consider any sale to an alternate bidder at the sale hearing and should only consider such sale if the successful bidder(s) fail to close and on at least seven days' notice to parties in interest, including landlords. | The Debtors revised Section 8 of the Bidding Procedures such that the Court will not be considering any assumption and assignment considerations to any Alternative Bidder(s) at the Sale Hearing, and that if the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), the debtors shall file a Notice of Intent to Proceed with Alternative Bid(s), which shall include the Alternative Bidder's adequate assurance information, and Counterparties shall have seven days from receipt of such notice to object solely on the basis of adequate assurance. |
| | The Barclay Damon Landlords asked for the Bidding Procedures Order to include known counsel for counterparties as a recipient of adequate assurance information. | The Debtors added this language in paragraph 21 of the Bidding Procedures Order. |
| Kelley Drye Landlords | The Kelley Drye Landlords commented that they need time to review and object to the form of sale order and have agreed to limit that to 4 days. | The Debtors added in paragraph 15 of the Bidding Procedures Order that by no later than three (3) days after the conclusion of the Auction, the Debtors shall file a proposed final form of sale order. The Debtors also noted that they would be filing the form of sale order with the Stalking Horse Bidder prior to the Bidding Procedures Hearing. |
| | The Kelley Drye Landlords noted that they need time to object to the assumption and assignment notice and 14 days is reasonable. | The Debtors added in paragraph 20 of the Bidding Procedures Order that the Potential Assumed Contracts Schedule will be filed with the Court and published on the |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | | Case Information Website on October 16, which is 19 days prior to the Objection Deadline, and served on each relevant Counterparty within two (2) business days. |
| | The Kelley Drye Landlords requested four (4) days to object to the Proposed Assumption and Assignment Notice. | The Debtors clarified in paragraph 22 of the Bidding Procedures Order that the Proposed Assumption and Assignment Notice will be filed and published on the Case Information Website by no later than the earlier of (i) twenty-four (24) hours after conclusion of the Auction and the selection of the Successful Bid(s) and Alternative Bid(s) and (ii) four (4) business days prior to the Objection Deadline (as long as the Successful Bid(s) and Alternative Bid(s) have been selected at least 12 hours prior to such time). |
| | The Kelley Drye Landlords commented that contested cure amounts and lease assignments should not be heard at the sale hearing. There should be a subsequent hearing at which these issues are heard so that we have time for briefing and discovery if necessary. The standard is typically on at least 7 days' notice. Cure issues are almost always resolved on a consensual basis outside of the Court. | The Debtors added in paragraph 24 of the Bidding Procedures Order that a Cure Objection timely filed shall be heard at (a) the sale hearing or at a later date on at least seven (7) days' notice or (b) such later that as the parties agree. |
| | The Kelley Drye Landlords noted that the bidding procedures order should control over the bidding procedures and proposed notices if there is a discrepancy. | The Debtors added in paragraph 38 of the Bidding Procedures Order that to the extent any provisions of the Bidding Procedures Order shall be inconsistent with the Motion, the Bidding Procedures, the Proposed Assumption and Assignment Notice, or the Potential Assumption and Assignment Notice, the terms of the Bidding Procedures Order shall control. |
| | The Kelley Drye Landlords commented that landlords should be considered qualified bidders for their own leases. | The Debtors clarified in the Bidding Procedures that such procedures are intended to result in a going concern bid for the entirety or substantial portion of the Debtors' businesses, rather than for individual leases or contracts. |
| *Informal Comments to Store Closing Order* | | |
| Committee | The Committee requested the ability to review certain reports and expenses related to the Consultant's services. | The Debtors revised paragraph 42 to permit the Committee to review (i) the periodic reports and |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | | information relating to the Consultant's fees and (ii) the Expense Budget within two business days of making such a request. |
| Texas Taxing Authorities | The Texas Tax Authorities requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 47 to confirm that the Store Closing Order shall not modify the terms of the DIP Order as it relates to the Texas Tax Reserve. |
| Orange County | Orange County requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 46 to confirm that the Debtors will pay applicable personal property taxes within 30 days after the conclusion of an applicable Store Closing and receipt of corresponding invoice. |
| Broward County | Broward County requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 46 to confirm that the Debtors will pay applicable personal property taxes within 30 days after the conclusion of an applicable Store Closing and receipt of corresponding invoice. |
| National Association of Attorneys General | The National Association of Attorneys General requested language which clarifies that the Store Closing Order does not relieve the Debtors of any police or regulatory obligations. | The Debtors incorporated the following language in paragraph 45: Notwithstanding anything to the contrary in the Interim Order and this Final Order nothing in this Final Order or the Interim Order shall relieve the Debtors of any obligations under federal, state, or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law and nothing herein shall create new defenses to obligations under police or regulatory laws or 28 U.S.C. § 959(b). Further, nothing in the Interim Order or Final Order limits any governmental unit in the exercise of its police powers in accordance with 11 U.S.C. § 362(b)(4), included, but not limited to, the governmental units' ability to bring any such police and regulatory case in the forum of their choice. |
| | The National Association of Attorneys General requested certain clarifying language related to Personal Identifying Information. | The Debtors revised paragraph G to clarify that a consumer privacy ombudsman is not necessary at this |

9

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | | time, but Governmental Units retain the right to file a motion requesting such an appointment. |
| | The National Association of Attorneys General requested certain clarifying language related to latent product defects. | The Debtors revised paragraph 21 to include the following language:<br><br>However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of such goods or the use of the terms "as is" or "final sales." As to the Closing Stores, the Debtors shall accept return of any goods purchased during the Store Closing Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven (7) days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. |
| | The National Association of Attorneys General requested notice of any Additional Closing Stores. | The Debtors revised paragraph 34 to provide for such notice to certain state Attorneys General. |
| | The National Association of Attorneys General requested the ability to review certain reports and expenses related to the Consultant's services. | The Debtors revised paragraph 42 to permit the National Association of Attorneys General to review certain reports relating to the Consultant's services. |
| Chubb | Chubb requested language clarifying that none of the Debtors' insurance policies would be abandoned, sold, assigned or transferred pursuant to any Store Closing Sale without the express written consent of the applicable insurer. | The Debtors provided for such clarifying language in paragraph 44. |
| *Informal Comments to DIP Order* | | |
| Committee | The Committee requested assurances relating to the payment of certain stub rent obligations. | The Debtors revised paragraph G(v) to clarify that the Approved Budget shall provide for the payment of certain stub rent obligations. |
| | The Committee requested consultation rights relating to amendments to the DIP Loan Documents. | The Debtors revised paragraph 13 to provide for such consultation rights. |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | The Committee requested assurances relating to the equitable doctrine of "marshaling" or any other similar doctrine. | The Debtors revised paragraph 34 to provide that the DIP Lenders and the Prepetition Secured Creditors shall use reasonable efforts to first satisfy their liens and claims from DIP Collateral other than unencumbered assets. |
| | The Committee requested assurance that the Committee's rights to file Challenges shall not be limited because an applicable Debtor is a limited liability company. | The Debtors revised paragraph 42 to provide for such assurances. |
| Landlords | Certain Landlords requested assurances relating to the payment of certain stub rent obligations. | The Debtors revised paragraph G(v) to clarify that the Approved Budget shall provide for the payment of certain stub rent obligations. |
| Orange County | Orange County requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 53 to confirm that nothing in the DIP Order shall prime or otherwise alter any valid and enforceable tax lien held by Orange County. |
| Broward County | Broward County requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 52 to confirm that nothing in the DIP Order shall prime or otherwise alter any valid and enforceable tax lien held by Broward County. |
| Liberty Mutual Insurance Company ("**Liberty Mutual**") | Liberty Mutual requested assurances relating to certain insurance obligations. | The Debtors added language in paragraph 54 to confirm that nothing in the DIP Order shall limit, impair or prime any Liberty Mutual rights or interests in any surety collateral. |
| Texas Taxing Authorities | The Texas Taxing Authorities requested assurances relating to certain tax obligations. | The Debtors added language in paragraph 55 to (i) confirm that nothing in the DIP Order shall prime or otherwise alter any valid and enforceable tax lien held by Broward County and (ii) provide for a segregated account holding funds in an amount corresponding to the Texas tax liens. |
| Comenity Capital Bank ("**Comenity**") | Comenity requested certain assurances relating to the Debtors' Private Label Credit Card Program Agreement. | The Debtors added language in paragraph 50 to provide that Comenity's rights of setoff and/or recoupment shall (i) not be impaired by the DIP Order or (ii) made subject |

| Party in Interest | Nature of Comment | Corresponding Revision(s) |
|---|---|---|
| | | to, subordinated by or *pari passu* with any financing or adequate protection claims. |
| Chubb | Chubb requested assurances relating to certain insurance obligations. | The Debtors added language in paragraph 51 to confirm that the Debtors shall not grant liens or security interests in any insurance policy issued by Chubb, to clarify the circumstances in which Chubb insurance proceeds may be considered DIP collateral, and confirm that the DIP Order shall not alter or modify the terms of any Chubb insurance policy. |