## **Schedule 1**

**Services Agreement**

DocuSign Envelope ID: 5338F55A-701A-45ED-811C-C4EA39B18676

GB Comments 11/11/22

## MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement') is entered effective as of November 30, 2022 ("Effective Date"), by and between Gordon Brothers Retail Partners, LLC, a Delaware limited liability company with an address at 800 Boylston Street, 27th Floor, Boston, MA 02199 ("Contractor"), and Big Lots Stores, LLC, an Ohio corporation with an address at 4900 E. Dublin Granville Road, Columbus, OH 43081 ("Big Lots").

In consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

**1.      Definitions.**  Capitalized terms used in this Agreement will have the meanings ascribed to such terms in this Section 1 or elsewhere in this Agreement.

1.1      "Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party.  "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

1.2      "Applicable Law" means any applicable international, federal, state or local law, rule, regulation, or guideline, including, without limitation those related to labor, employment, data security, privacy, consumer engagement, marketing, advertising, e-mail, telecommunications, consumer protection, anti-bribery, and anti-corruption.

1.3      "Authorized Person(s)" means a party's employees, contractors, agents, legal counsel and auditors who: (a) have a need to know or otherwise access the other party's Confidential Information in order to enable the receiving party to perform its obligations or exercise its rights under this Agreement; and (b) are bound by confidentiality obligations sufficient to protect the disclosing party's Confidential Information in accordance with the terms of this Agreement.  In cases where the Big Lots' Confidential Information being provided or accessed includes PII, Contractor's employees, contractors, agents, legal counsel and auditors, including, without limitation, Contractor Personnel, will not be considered Authorized Persons, unless the provisions of Sections 1.3(a) and (b) are satisfied and an officer of Big Lots has consented in writing and in advance to such disclosure or access and the list of Authorized Persons.  The list of Authorized Persons will be reviewed by the parties for appropriateness at least once per quarter.

1.4      "Background Policy" means Big Lots' then current contractor background screening policy.

1.5      "Big Lots Indemnified Party(ies)" means Big Lots, its Affiliates, and their respective officers, directors, any third party contractors/agents engaged by Contractor for the purposes of this Agreement or SOW and employees.

1.6      "Big Lots Marks" means all names, trademarks, trade names, logos and service marks of Big Lots and its Affiliates.

1.7      "Big Lots Systems" means all hardware, software, service subscriptions, systems, applications, networks and communication services and devices, including, but not limited to desktop computers, laptop computers, mobile computing devices, storage devices, servers, network switches, network routers, e-mail, data, voicemail, telephone, and Internet, owned, leased, licensed or controlled by Big Lots or operated by a third-party on behalf of Big Lots.

1.8      "Cardholder Information" means any PII that includes: (a) with respect to a payment card, the account holder's name, account number, service code, card validation code/value, PIN or PIN block, valid to and from dates and magnetic stripe data; and (b) information relating to a payment card transaction that is identifiable with a specific account.

1.9      "Confidential Information" means records, documents, information and data, whether oral, written or demonstrative, concerning the other party's business, including, without limitation, information

GB Comments 11/11/22

regarding the other party's technology, customers, products, employees, vendors, financials, and/or strategy, together with analyses, compilations, studies, summaries, extracts or other documents or records prepared by or on behalf of the receiving party that contain or otherwise reflect or are generated therefrom.  Without limiting the generality of the immediately preceding sentence, any PII: (a) provided to Contractor, or to which Contractor was granted access, by or on behalf of Big Lots; or (b) otherwise Processed by Contractor on behalf of Big Lots, in connection with Services provided under this Agreement, will be considered Big Lots' Confidential Information.  Confidential Information does not include information that: (i) was generally available to the public at the time of disclosure; (ii) became generally available to the public after disclosure to the receiving party other than as a result of the receiving party's breach of this Agreement; (iii) was, at the time of disclosure, already lawfully in the receiving party's possession without restriction from a third party that was under no obligation to maintain such information in confidence; or (iv) was independently developed by the receiving party without access to or use of the disclosing party's Confidential Information and the receiving party has documentation evidencing same.

1.10    "Contractor Indemnified Party(ies)" means Contractor, its Affiliates (only to the extent of Services are performed by Affiliates), and their respective officers, directors, and employees

1.11    "Contractor Materials" means code, software programs, processes, methodologies, algorithms, documentation, materials, and related know-how and residual knowledge, that: (a) Contractor owned or licensed prior to the Effective Date; or (b) Contractor independently developed outside of the scope of this Agreement and any SOW; and (c) do not include or use, directly or indirectly, Big Lots Property or Work Product.

1.12    "Contractor Personnel" means all employees, consultants, agents, contractors and representatives of Contractor, its Affiliates or any subcontractor of Contractor or its Affiliates.

1.13    "Contractor Facilities & Systems" means any facility, physical storage system, or other system, including, without limitation, desktop computers, laptop computers, software, computer networks, servers, storage devices, or mobile computing devices, owned, leased, licensed or controlled by Contractor or operated by a third party on behalf of Contractor, in, on or through which Contractor or Contractor Personnel Process Big Lots' Confidential Information, whether in electronic or hard copy.

1.14    "Excluded Tax(es)" means any Tax other than a Transaction Tax.

1.15    "Intellectual Property Rights" means all of the following:  (a) patents, patent applications and related patent rights, including but not limited to divisional, continuations, continuations-in-part, and continued prosecution applications, and reissues thereof; (b) rights associated with works of authorship including moral rights, copyrights, and registrations therefor; (c) rights relating to trade secrets and Confidential Information; (d) rights relating to the protection of trademarks, service marks, design marks (including logos), trade names and World Wide Web addresses (including URLs, directory names included in or read by browser technology, or their successors); and (e) any other intellectual and industrial property and proprietary rights, in the United States or elsewhere.

1.16    "Losses" means any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, and fees, costs and expenses of whatever kind, including, without limitation, reasonable attorneys' fees, court costs and expert witness fees.

1.17    "Malicious Software and Code" means any software, or code in any part of a software system or script, that is intended to cause undesired effects, security breaches or damage to Big Lots Systems, including without limitation, any worm, virus, trojan horse, spyware, adware, self-destruct or other device, as such terms are understood in the computer industry.

1.18    "PII" means any information that, either individually or when combined with other information, can be used to identify a specific individual or derive information specific to a particular individual, and any information or data related to a current, past or potential customer or employee of Big Lots or its Affiliates. Without limiting the generality of the foregoing, PII will include the following: (a) an individual's first name and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email

GB Comments 11/11/22

address; (d) a telephone number; (e) a Social Security number; (f) credit or debit card information; (g) checking account information, including account number and check number; (h) a driver's license, military or state identification number; (i) a persistent identifier, such as a customer number held in a "cookie" or processor serial number, that is combined with other available data that identifies an individual; (j) human resources information, such as benefits plan information, employee ID number, salary information, performance history, and health information (including any health information regarding employees' dependents); (k) government passport number or alien registration number; (l) biometric data, information or identifiers; or (m) any other information that is identifiable to or identifies an individual, whether or not combined with any of (a) through (l) above.

1.19    "Process" (including "Processes" and "Processed") means collect, receive, access, store, maintain, use, transmit, disclose, dispose, and otherwise process.

1.20    "Security Breach" means: (a) any actual or reasonably suspected unauthorized use, acquisition, or disclosure of, or unauthorized access to, Big Lots' Confidential Information when on or in Contractor Facilities & Systems or otherwise in the possession, care, custody or control of Contractor, Contractor Personnel, or any Authorized Person; (b) any act or omission by Contractor or any Authorized Person that compromises the security, confidentiality, or integrity of Big Lots' Confidential Information or any Contractor Facilities & Systems; (c) a breach or alleged breach of this Agreement relating to the data security or privacy practices of Contractor or any Authorized Person; or (d) receipt of a complaint regarding the privacy practices of Contractor or any Authorized Person.

1.21    "Specifications" means the technical and functional descriptions, specifications and requirements describing Work Product and its operation as set forth in the applicable SOW or otherwise in documentation provided by Contractor to Big Lots.

1.22    "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

1.23    "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale transaction; (b) levied upon the seller or purchaser; (c) can be legally collected from the purchaser; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser.

1.24    "Work Product(s)" means all deliverables, materials and results, whether tangible or intangible, complete or partially complete, including, without limitation code, software, programs, designs, processes, methodologies, algorithms, documentation, materials, products, development, testing, maintenance, training, discoveries, ideas, inventions (whether or not patentable), reports, technologies, concepts, formulas, and know-how, conceived, created, provided or reduced to practice by or on behalf of Contractor, whether alone or with others, in connection with the Services, this Agreement or any SOW.

**2.    Services.**

2.1    <u>Statements of Work</u>.  Contractor will provide Big Lots with certain services (the "Services") and Work Product specified in one or more Statements of Work referencing this Agreement, which, upon execution by both parties, will be automatically incorporated into this Agreement (each a "SOW" and collectively the "SOWs").  A sample SOW form is attached hereto as Exhibit A.  Big Lots and Contractor agree that any Big Lots' Affiliate may enter into a SOW with Contractor pursuant to this Agreement and, by executing any such SOW, the subject Affiliate will have all of the rights and obligations of Big Lots under this Agreement as if it were an original party hereto.

GB Comments 11/11/22

2.2    <u>Change Orders</u>.  Any change to or modification of a SOW, including, without limitation, the scope of services or fees, will not become effective unless and until both parties have executed a written amendment to the subject SOW, which sets forth the agreed upon change or modification ("Change Order").

2.3    <u>Order of Precedence</u>. In the event of a conflict between the terms of this Agreement or the terms of a SOW, the terms of this Agreement will prevail, except as otherwise provided herein.

2.4    <u>Timetable</u>. Contractor will provide Services according to the timetable set forth in the applicable SOW.  In the event Contractor anticipates, at any time, that it will not reach one or more milestones or make deliveries according to the scheduled timetable, Contractor will immediately so inform Big Lots by written notice, submitting proposed revisions to the timetable and milestones that reflect Contractor's best estimate of what can be achieved, and continue to work under the original timetable and milestones until the parties execute a Change Order.

2.5    <u>Testing & Acceptance</u>.  Unless otherwise specified in the applicable SOW, testing and acceptance criteria for Services and Work Product will be as provided herein.  Big Lots may test, or request Contractor to test, each Work Product and the Work Products together as an entire system, to ensure conformance with the acceptance criteria in the applicable SOW and the Specifications.  Big Lots will accept Work Product, except in the event of non-conformance as described in this Section 2.5.  In the event testing reveals that a Work Product does not meet the applicable acceptance criteria and/or Specifications, Big Lots agrees to identify in writing to Contractor (email will suffice), with reasonable specificity, the nature and events surrounding the non-conformance (the "Non-Acceptance Notice").  Upon receipt of the Non-Acceptance Notice, Contractor will correct the identified non-conformance as soon as commercially practicable, but in no event more than thirty (30) days' after the date of the Non-Acceptance Notice ("Cure Period").  If Contractor fails to correct the non-conformance within the Cure Period, Contractor will be deemed to be in material breach of this Agreement and the applicable SOW.

2.6    <u>Facilities & Supplies</u>.  If a SOW provides that Contractor Personnel will perform Services on-site at Big Lots' Premises (defined below), then, to the extent reasonably requested by Contractor, Big Lots will supply such Contractor Personnel with office space, desks, storage, furniture and other normal office equipment, including computer workstation, printer, telephone service, and general office supplies.  Big Lots will not be responsible or liable for any theft of or loss to the personal property of any Contractor Personnel while on-site at Big Lots' Premises.  Except as provided in this Section 2.6 or in a SOW, Contractor, at its own cost, will furnish all facilities, tools, equipment and materials necessary for the performance of Services.

**3.    Fees & Payment.**

3.1    <u>Fees</u>. Big Lots agrees to compensate Contractor for Services and Work Product provided under this Agreement as specified in the applicable SOW.

3.2    <u>Expenses</u>. Big Lots will reimburse Contractor for reasonable out-of-pocket expenses actually incurred by Contractor and necessary to complete Services under the applicable SOW (the "Expenses"), provided that: (a) with regard to travel Expenses, Big Lots will reimburse Contractor for coach class airfare, hotel accommodations and per diem meal expenses; (b) Expenses must be detailed as separate line items on the invoice therefor; and (c) any Expense that is greater than $500 must be preapproved in writing by Big Lots. If applicable, the SOW must include an estimate of Expenses and, to the extent individual Expense estimates are set forth in a budget under an SOW approved by Big Lots, that shall be sufficient to satisfy the preapproval requirement contained in this Section 3.2(c).

3.3    <u>Invoicing and Payment</u>. Contractor will invoice Big Lots as agreed in the Statement of Work. Each invoice will separately itemize: (a) charges by location for each Service rendered; (b) any Services that are training Services (by location); and (c) any lawfully imposed Transaction Taxes.  Contractor's invoices will contain the content and be in the format requested by Big Lots to support Big Lots' business practices and facilitate efficient integration into Big Lots' enterprise business systems. Upon Big Lots' request, Contractor will provide backup materials and documentation supporting charges in the subject invoice.  Big Lots, or an Affiliate on its behalf, will pay undisputed amounts reflected in Contractor invoices issued in accordance with the terms of this Section 3.3 and the applicable SOW. The SOW shall provide the applicable payment terms.  Big Lots

DocuSign Envelope ID: 5338F55A-701A-41ED-8416-C4FA29B18676

GB Comments 11/11/22

will not make any payment to Contractor until Contractor provides Big Lots with a duly executed federal Form W-9.  If, at any time during the term of this Agreement, Contractor's Services may be provided in or attributed, assigned, or otherwise sourced to, California, or any other state or jurisdiction where Big Lots may be deemed a withholding agent related to payments to Contractor hereunder, Contractor must timely notify Big Lots of same and provide Big Lots with a duly executed California Form 590, or its successor or progeny, and/or other subject states' or jurisdictions' withholding exemption form, as applicable, and no payment will be made to Contractor until such duly executed forms are provided.  Big Lots will have no obligation to pay Contractor any fees for Services invoiced later than sixty (60) days (for third party contractors no later that 120 days) after: (i) invoice date(s) provided for in the applicable SOW and, if none, the date of termination or expiration of the applicable SOW, for Services rendered on a fixed fee basis; and (ii) the date on which the Services being invoiced were provided, for Services rendered on a time and materials basis.

      3.4    <u>Taxes</u>.  The fees for Services do not include any amount for Transaction Taxes. Big Lots will pay, reimburse or indemnify (as the facts and circumstances dictate) Contractor for any applicable Transaction Taxes with respect to the fees for Services, unless the particular charge is nontaxable or Contractor does not legally have a Transaction Tax collection obligation.  Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement.  For purposes of clarity but without limiting the foregoing, Contractor acknowledges that it may have gross receipts, license and/or income Tax obligations where the fees receipt or revenue for Services, or the benefit thereof, may be assigned under applicable Tax law.  Any Taxes or license fees imposed on Contractor's fees or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes will not be construed as Transaction Taxes and are Excluded Taxes and will not be an itemized charge on any invoice.  The titleholder of any property shall be responsible for any applicable property Tax that may be imposed.  Contractor and Big Lots will, and will cause their respective Affiliates and subcontractors to, reasonably cooperate in good faith on all Tax matters including, without limitation, configuration and format of invoices.

      3.5    <u>Records</u>.  Contractor will maintain books, records, documents and other evidence detailing and supporting fees and Expenses charged, including, without limitation, if applicable, time spent by each individual Contractor Personnel who performed Services under this Agreement (the "Records").  Contractor will make the Records available to Big Lots, either remotely or at Contractor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice during the term of this Agreement, and for a period of one (1) year thereafter, for inspection, audit or reproduction by Big Lots or its representative.

**4.**    **Relationship of the Parties & Contractor Personnel**.

      4.1    <u>Independent Contractors</u>.  The parties agree that nothing in this Agreement is intended to, or shall be deemed to, establish any partnership or joint venture between them, constitute any party as the agent of the other party, or authorize any party to make or enter into any commitments for or on behalf of the other party. The parties are acting as independent contractors in making and performing under this Agreement. Contractor and Big Lots acknowledge and agree that all Contractor Personnel providing Services under the Agreement are employees of Contractor or a Contractor subcontractor approved in accordance with Section 4.5 hereof and are not, and shall not be deemed to be, employees of Big Lots, whether jointly with Contractor or otherwise.  With respect to Contractor Personnel, Contractor will: (a) comply with all applicable national, federal, state and local employment and labor laws, including, without limitation, the Affordable Care Act, Fair Labor Standards Act, Occupational Safety & Health Act, and Employee Retirement Income Security Act and will accept all liability for the breach of same; and (b) be solely responsible for, and Big Lots will have no responsibility for, without limitation: (i) paying all wages and other employment related benefits; (ii) making all appropriate tax, social security, Medicare and other withholding deductions and payments; (iii) providing workers' compensation insurance coverage as required; (iv) making all appropriate unemployment tax payments; (v) hiring; skill testing; orientation and training; performance monitoring, evaluation, counseling, discipline and resolution; and employment termination; and (vi) control, management and supervision of assigned work.  Contractor and Big Lots agree and acknowledge that nothing in this Agreement is meant to create an employment relationship, joint or otherwise, between Big Lots and any Contractor Personnel and Contractor Personnel will not be eligible for, nor may they participate in, any Big Lots' retirement, bonus, incentive, health or other fringe benefit plan.

GB Comments 11/11/22

4.2     <u>Assignment of Contractor Personnel</u>.  Contractor shall assign Contractor Personnel to provide Services under each SOW, and such Contractor Personnel will have the appropriate qualifications, skill and experience to perform the Services. If any Contractor Personnel are designated in a SOW as "Key Personnel," or otherwise listed specifically by name in a SOW, such individuals will not be removed from Services under the subject SOW without the written consent of Big Lots.  If any Key Personnel leave the employ of Contractor during the term of the applicable SOW, Contractor will immediately replace such Key Personnel with an individual of equal or greater experience, skill and qualifications.

4.3     <u>Background Screening</u>.  All Contractor Personnel are required to undergo (or have undergone) successful background screening generally consistent with the terms of the Background Policy prior to assignment to Big Lots' Premises or projects. The term "Premises" is used in its broadest sense and includes, but is not limited to, the general office, distribution centers, and all jobsites, facilities, stores and property owned, leased, operated or otherwise under the control of Big Lots.   Contractor will be solely responsible to conduct background screening on all persons planned or scheduled for assignment on Big Lots' Premises or on a Big Lots project (if it has not done so already) that are generally consistent with Big Lots' Background Policy.  By assigning Contractor Personnel to Big Lots' Premises or projects, Contractor attests that Contractor has completed a satisfactory background check on the Contractor Personnel being assigned.  Big Lots reserves the right, in its sole discretion, to require Contractor to be available, and to make Contractor Personnel available, at any time, for re-screening or for internal or external investigation purposes ("Investigations"). Contractor agrees to make good faith, commercially reasonable efforts to cooperate with Big Lots and to make Contractor Personnel available for Investigations. Big Lots agrees, where reasonably practical, without jeopardy to an Investigation, to provide Contractor with notice of Investigation activities.

4.4     <u>Exclusion & Removal</u>.  Big Lots reserves the right to exclude or remove any Contractor Personnel from Big Lots' Premises by denial of access, by suspension or revocation of access authorization, by expulsion or by any other reasonable means, if, in Big Lots' reasonable and good faith opinion, such exclusion or removal is deemed advisable in the interest of Services completion, employee safety, or security at any Big Lots Premises.

4.5     <u>Subcontractors</u>.  Contractor will not subcontract or delegate its duties and/or obligations under this Agreement or any SOW without obtaining Big Lots' prior written consent in each instance and for each specific subcontractor.  Contractor will be responsible for ensuring that each of its subcontractors who provide Services comply with provisions consistent with and no less restrictive than those in Sections 4.6 (if applicable), 5, 6 and 9 of this Agreement and will, upon request, certify to Big Lots compliance with this Section 4.5.  Contractor will be responsible and liable for the acts and omissions of, and breach of this Agreement by, any Contractor Personnel or Contractor subcontractor, as if the same were Contractor's acts, omissions and breach.

4.6     <u>Big Lots Systems Security Policies</u>.  Contactor agrees to comply with, and will cause all Contractor Personnel to comply with, Big Lots' policies and procedures designed to protect the security and integrity of Big Lots Systems and maintain an environment free of Malicious Software and Code.  Contractor acknowledges and agrees, on its own behalf and on the behalf of all Contractor Personnel, that such policies and procedures require Contractor Personnel to provide to Big Lots, if applicable, before accessing or connecting to Big Lots Systems, all equipment that Contractor Personnel will use to access or connect to Big Lots Systems for the purpose of: (a) testing the security profile of such equipment; (b) installing or updating any security or anti-virus software that Big Lots deems necessary; and (c) performing any other test or actions as Big Lots deems necessary to protect the security and integrity of Big Lots Systems and keep them free from Malicious Software and Code.  If Contractor or Contractor Personnel fail to strictly adhere to the terms of this Section 4.6, Contractor Personnel will refrain from accessing or connecting to Big Lots Systems and Big Lots will have the right to immediately terminate this Agreement, and any SOW upon written notice to Contractor.  For the avoidance of doubt, Contractor and Contractor Personnel shall not have any obligations under this Section 4.6 if they do not access or intend to access or connect to Big Lots Systems.

4.7     <u>Reporting</u>.  At Big Lots' request, Contractor will provide Big Lots with requested information and reporting regarding the Services performed under this Agreement.

**5.      Ownership.**

GB Comments 11/11/22

5.1     Contractor Materials.  Prior to incorporating any Contractor Materials into any Work Product, Contractor will notify Big Lots of same in writing, either by inclusion in the applicable SOW or otherwise. To the extent that any Contractor Materials are contained in or incorporated into any Work Product, Contractor hereby grants Big Lots a perpetual, irrevocable, royalty-free, non-exclusive, worldwide license to transmit, perform, display, reproduce, modify, distribute, adapt, sell, sublicense, create derivative works from, and otherwise use such Contractor Materials to facilitate full and unhindered use of such Work Product.  Except for the rights granted to Big Lots in this Section 5.1, Contractor reserves all right, title, and interest to the Contractor Materials.

5.2     Big Lots Property.  Big Lots reserves all rights, title and interest in and to: (a) any programs, information, data, software, systems, processes, and other materials provided by or on behalf of Big Lots to Contractor or accessed by or on behalf of Contractor, in connection with this Agreement, and all associated Intellectual Property Rights; (b) Big Lots Marks; and (c) Big Lots' Confidential Information (collectively, "Big Lots Property"). Additionally, Big Lots reserves all right, title and interest in and to any changes, enhancements, modifications and updates to Big Lots Property, whether made by or on behalf of Big Lots, Contractor or any third party, and all Intellectual Property Rights therein.  Contractor has and acquires no interest in any Big Lots Property by virtue of this Agreement or otherwise.

5.3     Work Product.  Solely to the extent applicable to Contractor, Contractor, on its own behalf and on behalf of all Contractor Personnel, hereby irrevocably assigns and transfers to Big Lots, without further consideration and free and clear of all liens and encumbrances, Contractor's and any Contractor Personnel's entire right, title and interest in and to all Work Product, including, without limitation, all associated Intellectual Property Rights.  Big Lots will own the Work Product, and all associated Intellectual Property Rights, and Contractor, on its own behalf and on behalf of all Contractor Personnel, disclaims any ownership interests.

**6.     Confidentiality, Data Processing, & Data Security.**

6.1     Confidentiality Obligations.  The parties acknowledge and agree that each may learn, obtain and/or have access to Confidential Information of the other in connection with its performance under this Agreement.  Each receiving party agrees to: (a) hold the disclosing party's Confidential Information in confidence and to take reasonable precautions to protect such Confidential Information from unauthorized access, use or disclosure (including, without limitation, all precautions the receiving party employs with respect to its own similar confidential information as long as those precautions rise to the level of reasonable care); (b) not to divulge any such Confidential Information to any third person, other than Authorized Persons, or use, sell, rent, transfer, distribute or otherwise disclose or make available such Confidential Information for its own benefit or for the benefit of any other person; (c) restrict access of the disclosing party's Confidential Information to Authorized Persons; (d) use the disclosing party's Confidential Information for the sole purpose of, and only to the extent necessary to, perform its obligations hereunder. For clarity, Contractor will not retain, use, disclose, or otherwise Process Big Lots' Confidential Information for any purpose other than to perform its obligations under this Agreement.  In no event may Contractor sell or otherwise disclose Big Lots' Confidential Information to any third party for the commercial benefit of Contractor or any third party.  Contractor certifies that it understands and will comply with all restrictions placed on its Processing of Big Lots' Confidential Information under this Agreement. The receiving party will be responsible and liable for the acts, omissions and breach of any Authorized Person in connection with this Section 6 as if the same were the acts, omissions and breach of the receiving party.

6.2     Required Disclosures.  In the event that the receiving party is required by law or court order to disclose any of the disclosing party's Confidential Information, the receiving party will: (a) unless prohibited by law or court order, promptly notify the disclosing party in writing prior to disclosure to permit the disclosing party to seek appropriate protective measures; (b) reasonably cooperate with the disclosing party to preserve the confidentiality of such Confidential Information consistent with Applicable Law; and (c) use commercially reasonable efforts to limit any such disclosure to the minimum disclosure necessary to comply with such law or court order. Contractor will promptly notify Big Lots in writing, unless specifically prohibited by laws applicable to Contractor, if Contractor receives: (i) any requests from an individual with respect to Big Lots' Confidential Information Processed by Contractor; or (ii) any complaint relating to the Processing of Big Lots' Confidential Information.  Contractor will not respond to any such request or complaint unless expressly authorized to do so by Big Lots or compelled to do so by law or court order, will cooperate with Big Lots with

GB Comments 11/11/22

respect to any action taken relating to such request or complaint, and will seek to implement appropriate processes to assist Big Lots in responding to complaints or requests from individuals, including, without limitation, deletion requests.

6.3 <u>Return of Confidential Information</u>. All Confidential Information supplied by a party to the other party in connection with this Agreement, and all copies, reprints, reproductions or translations thereof made and retained by a receiving party or an Authorized Person, will, at any time upon written request of the disclosing party, and at the termination or expiration of this Agreement or the applicable SOW, be returned by the receiving party to the disclosing party or, in accordance with the disclosing party's express written direction, Applicable Law, and accepted industry standard, destroyed with certification of destruction in compliance with this Section 6.3.

6.4 <u>Contractor Safeguards & Controls</u>.  Contractor agrees to establish and maintain a comprehensive data privacy and information security program, including physical, technical, administrative, organizational and procedural safeguards (the "Safeguards"), each solely as applicable to the Services, that is designed to: (a) protect and ensure the security, confidentiality, integrity and availability of PII and Big Lots' Confidential Information; (b) protect against and prevent the unauthorized disclosure, use or Processing of, or access to, PII and Big Lots' Confidential Information; (c) protect against and prevent the unauthorized use of, or access to, Contractor's Facilities & Systems; (d) ensure the disposal of Big Lots' Confidential Information in compliance with this Agreement, Applicable Law, and accepted industry standard; (e) ensure the disposal of PII in compliance with Applicable Law and accepted industry standard; (f) prevent a Security Breach or infection of Big Lots' Systems by Malicious Software and Code; and (g) ensure the compliance of all Authorized Persons with the applicable terms of this Agreement and Contractor's data privacy and information security program.  The Safeguards must be no less rigorous than accepted industry practices and Big Lots' practices for securing Big Lots Systems.  Contractor represents, warrants and agrees that: (i) Contractor's and all Authorized Persons' Processing of Big Lots' Confidential Information will comply with this Agreement and Applicable Law, and will occur only in the continental United States; and (ii) Contractor's Processing of PII will comply with Applicable Law.

6.5 <u>Minimum Safeguards</u>.  In no way limiting the generality of Section 6.4, at a minimum, the Safeguards must include, each solely as applicable to the Services: (a) limiting access to Authorized Persons; (b) implementing network, device application, database and platform security, including network firewall provisioning and intrusion detection, the timely application of patches, fixes and updates to operating systems and applications; (c) securing information transmission, storage and disposal; (d) implementing authentication and access controls within media, applications, operating systems and equipment; (e) strictly segregating Big Lots' Confidential Information from Contractor's own information and that of third parties so that Big Lots' Confidential Information is not commingled with any other types of information; (f) implementing appropriate security and integrity procedures and practices for Authorized Persons, including, but not limited to, conducting background checks consistent with Applicable Law; and (g) encrypting PII at rest and in transit: (i) using recognized industry standards and a commercially supported encryption solution; (ii) changing the data encryption keys at minimum once per calendar year; (iii) storing the encryption keys in a secure location with limited access; and (iv) maintaining a list of which Authorized Persons are encryption key holders, restricting access to only those indicated Authorized Persons, and reviewing the appropriateness of the indicated Authorized Persons at least once per quarter; and (h) ensuring that Big Lots' Confidential Information, other than PII, is transmitted in a mutually agreed upon secure manner. Contractor further agrees that Big Lots' Confidential Information will not be Processed on any portable or laptop computing devices or any portable storage medium, unless the Big Lots' Confidential Information Processed thereon is encrypted at rest and in transit, using a commercially supported encryption solution.  To the extent Contractor receives or accesses any information in a deidentified or aggregated form, Contractor will make no attempt to identify any individual to whom such information relates and will take commercially reasonable measures to prevent such reidentification of the information. Contractor will immediately notify Big Lots if any Contractor Facilities & Systems do not conform to the standards set forth in Sections 6.4 and 6.5 of this Agreement.

6.6 <u>Security Breach Response</u>.  Contractor shall notify Big Lots of a Security Breach as soon as practicable, but no later than 24 hours after Contractor becomes aware of it, by telephone at 614-395-2821, and leaving a voicemail if there is no response.  Contractor shall also send notification via email to

GB Comments 11/11/22

privacy@biglots.com, or such other addresses as provided by Big Lots from time-to-time.  Contractor shall remedy any Security Breach and prevent any further Security Breach, including the recurrence of any such Security Breach, in accordance with Applicable Law and accepted industry standards.  Immediately following Contractor's notification to Big Lots of a Security Breach, the parties will coordinate with each other to investigate the Security Breach.  Contractor agrees to fully cooperate with Big Lots and its designees, including, without limitation: (a) assisting with any investigation; (b) providing Big Lots and its designees with physical access to affected Contractor Facilities & Systems; (c) facilitating interviews with Contractor's employees and others involved in the matter; and (d) making available all relevant records, logs, files, data reporting and other materials required to comply with Applicable Law and industry standards, or as otherwise required by Big Lots.  In order to facilitate the investigation of a Security Breach, Contractor shall retain all authentication and other relevant system logs for a minimum of sixty (60) days from the creation of such logs, and provide such logs to Big Lots in connection with the investigation of a Security Breach.  Except as otherwise expressly required by Applicable Law, Contractor agrees not to inform any third party of any Security Breach without first obtaining Big Lots' prior written consent, other than to inform a complainant that the matter has been forwarded to Big Lots' legal counsel.  Contractor agrees that Big Lots shall have the sole right to determine: (i) whether notice of the Security Breach is to be provided to any individuals, regulators, law enforcement agencies, consumer reporting agencies or others as required by Applicable Law, or otherwise in Big Lots' discretion; and (ii) the contents of such notice, whether any type of remediation may be offered to affected persons, and the nature and extent of any such remediation.  In the event of a Security Breach, Contractor will, at Big Lots' option, pay or reimburse Big Lots for: (1) all reasonable and documented/agreed costs and expenses incurred by Big Lots in providing notices and/or credit monitoring to parties whose information may have been subject to unauthorized use, access or disclosure; and (2) all fines, penalties and assessments paid by Big Lots to its governmental regulators in connection with the Security Breach.

6.7    Data Security Audit.  Prior to the provision of Services under this Agreement, and on a bi-annual basis, Contractor grants Big Lots, or Big Lots' third party auditor, permission to perform an on-site assessment, audit, and/or examination, including, without limitation, review of all controls in Contractor's physical and/or technical environment, and the right to review Contractor's data privacy and information security program ("Security Audit"), at such time that will not interrupt or negatively impact Contractor's day-to-day operations.  Contractor will fully cooperate with each Security Audit by providing access to knowledgeable personnel, physical premises, documentation, infrastructure and application software involved in the Processing of Big Lots' Confidential Information.  Any and all Security Audits will be conducted at Big Lots' own expense.  In lieu of an on-site audit, upon Big Lots' request, Contractor agrees to complete and return to Big Lots, within forty-five (45) days of receipt, an audit questionnaire provided by Big Lots regarding Contractor's data privacy and information security program.

6.8    [Reserved]

6.9    Irreparable Harm.  Contractor agrees that any actual or threatened breach of the provisions of this Section 6 would cause Big Lots irreparable harm for which monetary damages would not be adequate compensation.  In each such case, Contractor agrees that Big Lots is entitled to seek equitable relief, including, without limitation, a restraining order, injunctive relief, or specific performance, with respect to any such actual or threatened breach.  Contractor further agrees that Big Lots will have the right to seek a remedy at law, as well as, or in lieu of, equitable relief in the event of any such actual or threatened breach.

**7.    Representations & Warranties.**

7.1    General.  Contractor represents and warrants that: (a) Contractor has the right and full authority to enter into this Agreement and to perform its obligations hereunder; (b) Contractor has the right to disclose to Big Lots and to grant Big Lots access to any information disclosed to Big Lots; (c) Services and Work Product, and performance and use thereof, do not and will not violate, infringe upon, or misappropriate the rights of any third party, including, without limitation, Intellectual Property Rights or non-disclosure or contractual rights; (d) Contractor has all rights, title and interest necessary to convey to Big Lots the rights and licenses granted herein and in any SOW; (e) Services and Work Product will not contain, and will not introduce into Big Lots Systems any Malicious Software and Code;  and (f) all Services and Work Product will be provided in accordance with Applicable Law.

GB Comments 11/11/22

    7.2    <u>Services Warranty</u>.  Contractor warrants that all Services provided under this Agreement will be performed in a professional and workman like manner by individuals with appropriate qualifications, skill and experience and in accordance with generally accepted industry standards.

    7.3    [Reserved]

    7.4    <u>Disclaimer</u>.  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, NEITHER PARTY MAKES ANY OTHER WARRANTY, WHETHER EXPRESS, IMPLIED, ORAL OR WRITTEN AND, TO THE EXTENT APPLICABLE, SPECIFICALLY DISCLAIMS THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**8.**    **Indemnification.**

    8.1    <u>General</u>.  Contractor will be responsible for, and will defend (at Big Lots option), indemnify and hold harmless the Big Lots Indemnified Parties from and against, any and all Losses arising from or related to: (a) personal injury to or death of persons or damage to property caused by Contractor, its Affiliates, or their respective employees, agents or contractors, including any Contractor Personnel; (b) violation of Applicable Law by, or the willful misconduct or criminal, fraudulent or negligent act or omission of, Contractor, its Affiliates, or their respective employees, agents or contractors, including any Contractor Personnel; (c) Contractor's breach of this Agreement; (d) a Security Breach; (e) an employment related claim brought against a Big Lots Indemnified Party by any Contractor Personnel; or (f) any unwithheld Tax from Contractor where a Big Lots Indemnified Party was deemed a withholding agent related to payments to Contractor. Big Lots will be responsible for, and will defend (at Contractor's option), indemnify and hold harmless the Contractor Indemnified Parties from and against, any and all Losses arising from or related to: (a) personal injury to or death of persons or damage to property not caused by Contractor which either occurs at Big Lots' Premises or is caused by Big Lots, its Affiliates, or their respective employees, (collectively, "Big Lots Personnel"); (b) violation of Applicable Law by, or the willful misconduct or criminal, fraudulent or grossly negligent act or grossly negligent omission of Big Lots Personnel; (c) Big Lots' material breach of this Agreement; or (d) any third party claims relating to Big Lots' goods with respect to which Contractor is providing the Services related to product liability or intellectual property infringement claims.

    8.2    <u>Intellectual Property</u>.  Contractor agrees, at its own expense, to defend, or at its option, to settle, any demand, claim, suit or action brought against a Big Lots Indemnified Party arising from, related to or alleging that the Services, Contractor Materials or Work Product, or any part thereof, violate, infringe or misappropriate any third party's Intellectual Property Rights ("Infringement Claim"), and to indemnify and hold harmless the Big Lots Indemnified Parties against all Losses that may be assessed against or incurred by a Big Lots Indemnified Party as a result of an Infringement Claim.  Big Lots agrees to provide Contractor with: (a) written notice of any Infringement Claim promptly after obtaining knowledge of same, provided that Big Lots' failure to timely provide such notice will not reduce or eliminate Contractor's indemnification obligation; (b) sole control of the defense or settlement of any Infringement Claim, subject to Section 8.3 and except that Big Lots may, at its own expense, employ separate counsel in any Infringement Claim; and (c) reasonable assistance, at Contractor's expense and request, to settle and/or defend any Infringement Claim.

    8.3    <u>Settlement and Immunity</u>.  Contractor may not, without Big Lots' prior written consent, enter into any settlement that would affect any Big Lots Indemnified Party's rights or obligations, exclusive of the payment of any amount for which Contractor will indemnify such Big Lots Indemnified Party.  Contractor specifically and expressly agrees that with respect to any and all claims against a Big Lots Indemnified Party by any Contractor Personnel, any indemnification available hereunder shall not be limited by reason of any immunity to which Contractor may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Contractor to such Contractor Personnel with respect to any such claim.  For the sake of clarity, Contractor's waiver of immunity under this Section 8.3 extends only to indemnification claims against Contractor by or on behalf of a Big Lots Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by any Contractor Personnel directly against Contractor. Big Lots may not, without Contractor's prior written consent, enter into any settlement that would affect any Contractor Indemnified Party's rights or obligations, exclusive of the payment of any amount for which Big Lots will indemnify such Contractor Indemnified Party.  Big Lots specifically and expressly agrees

GB Comments 11/11/22

that with respect to any and all claims against a Contractor Indemnified Party by any Big Lots Personnel, any indemnification available hereunder shall not be limited by reason of any immunity to which Big Lots may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for Big Lots to such Big Lots Personnel with respect to any such claim.  For the sake of clarity, Big Lots' waiver of immunity under this Section 8.3 extends only to indemnification claims against Big Lots by or on behalf of a Contractor Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by any Big Lots Personnel directly against Big Lots.

**9.      Insurance.**

9.1      At all times during the term of this Agreement, Contractor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described below.  Upon execution and otherwise at Big Lots' request, Contractor will provide Big Lots with certificates of insurance evidencing the required insurance coverages and, with the exceptions of workers' compensation and professional liability, naming "Big Lots, Inc. and all of its direct and indirect subsidiaries" as an additional insured.  The policies will provide that the insurance companies issuing the policies shall notify Big Lots at least thirty (30) days prior to any policy cancellation or modification.

| Coverage Type | Coverage Limits |
| --- | --- |
| Worker's Compensation | Statutory |
| Employer's Liability | $1,000,000 Each Accident<br>$1,000,000 Disease – Policy Limit<br>$1,000,000 Disease – Each Employee |
| Commercial General Liability (including coverage for bodily injury and property damage) | $2,000,000 Each Occurrence<br>$2,000,000 Personal and Advertising Injury<br>$2,000,000 General Aggregate<br>$2,000,000 Products/Completed Operations Aggregate |
| Business Automobile Liability (including coverage for bodily injury and property damage suffered by third persons resulting from any Contractor Personnel's use or operation of automobiles) | $1,000,000 combined single limit for bodily injury and property damage |
| Professional Liability (including coverage for the negligent acts, errors, or omissions of Contractor, its subcontractors and Contractor Personnel) | $1,000,000 Each Occurrence<br>$2,000,000 General Aggregate |
| Cyber Liability (including third party coverage for litigation, regulatory, notification costs, credit monitoring, crisis management, and privacy liability) | $5,000,000 Each Occurrence<br>$5,000,000 General Aggregate |
| Umbrella (policy must be on an occurrence based policy form and coverage to apply excess of Commercial General Liability, Business Automobile Liability, and Employer's Liability coverages) | $5,000,000 Each Occurrence<br>$5,000,000 General Aggregate<br>$5,000,000 Products/Completed Operations Aggregate |

9.2 Big Lots represents that it maintains insurance policies relating to general commercial liability and within 30 days from execution of this Agreement, Big Lots will provide Contractor with certificate of commercial general liability insurance policy naming "Contractor" as an additional insured for the period December 12, 2022 to February 4, 2023.

GB Comments 11/11/22

**10.    Term and Termination.**

10.1    <u>Term</u>.  The term of this Agreement will commence on the Effective Date and will be effective until terminated in accordance with applicable provisions hereof.  Unless otherwise stated in a SOW, the term of each SOW will last until performance thereunder is completed or the SOW is terminated in accordance with its provisions or the provisions hereof, whichever is earlier.

10.2    <u>Termination for Cause</u>.    In the event that either party breaches a material term of this Agreement or of a SOW, and said breach is not cured within thirty (30) days following receipt of written notice from the other party describing the breach, the non-breaching party may terminate any SOW impacted by the breach upon written notice to the other party.  Notwithstanding the provisions of this Section 10.2, Big Lots may terminate this Agreement and/or any or all SOWs immediately, and without any cure period, upon written notice to Contractor in the event Contractor breaches the provisions of Section 6 of this Agreement or a Security Breach occurs.

10.3    <u>Termination for Convenience</u>.  Unless a SOW is then outstanding, either party may terminate this Agreement upon written notice to the other party.  Big Lots may terminate any SOW, in whole or in part, by giving Contractor at least thirty (30) days' prior written notice of its intent to terminate.

10.4    <u>Compensation upon Termination</u>. If either party terminates a SOW pursuant to Section 10.3, Big Lots will pay for Services and Work Product actually and properly rendered and delivered and Expenses actually and properly incurred prior to the date of termination, in each case to the extent such amounts were not previously paid, within thirty (30) days after Big Lots' receipt of the initial invoice therefor.  Contractor shall also provide Big Lots with a final invoice for amounts due and owing as of the termination (the "Final Invoice"). Once Big Lots has paid the amounts reflected in the Final Invoice, no further amounts will be due to Contractor or paid by Big Lots under the subject SOW.

10.5    <u>Delivery of Work Product</u>.  Upon termination or expiration of a SOW, Contractor will deliver to Big Lots all completed and uncompleted Work Product (if any) in connection with such SOW.

10.6    <u>Transition Services</u>.  If requested by Big Lots, upon termination or expiration of any SOW, Contractor will, for the duration of the Transition Period (defined below), continue to make the Services available and provide reasonable assistance in order to allow Big Lots to effectively transition the Services under the subject SOW to Big Lots or a third party of Big Lots' choosing (the "Transition Services").  Contractor will provide the Transition Services at an agreed upon, commercially reasonable cost, which will not exceed corresponding rates in the subject SOW.  The "Transition Period" will be of a length determined by Big Lots, up to a maximum of 180 days after the date of termination or expiration; provided that the parties can mutually agree on a longer Transition Period.  If Big Lots requests a Transition Period, all provisions of this Agreement and the subject SOW necessary to give effect to the transition shall survive and govern Contractor's performance of the Transition Services until the end of the Transition Period.  If the parties cannot agree on a commercially reasonable cost for the Transition Services, Contactor shall have no obligation to provide Transition Services.

10.7    <u>Effect of Termination</u>.    Expiration or termination of this Agreement and any SOW will not affect any right or obligation arising prior thereto and any provision that expressly states that it survives expiration or termination will so survive.  Additionally, Sections 2.3, 3.3, 3.4, 4.1, 5, 6, 7.3 (according to its terms), 7.4, 8, 10.4 through 10.7, 11 and 12 will survive expiration or termination of this Agreement.

**11.    Liability Exclusions.**  NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY, ITS AFFILIATES, EMPLOYEES, CONTRACTORS OR OTHER PERSONNEL FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER SUCH PARTY WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW OF THE POSSIBILITY OF LIABILITY.

GB Comments 11/11/22

## 12.    General.

12.1    <u>Assignment</u>.  Contractor will not assign this Agreement, or delegate or otherwise transfer any of Contractor's rights or obligations under this Agreement, without the prior written consent of Big Lots.  Any purported assignment made without such consent is void.  Big Lots may assign this Agreement, or delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, to a Big Lots' Affiliate in Big Lots' sole discretion or to any other party with Contractor's prior written consent.  The duties and obligations of each party in this Agreement shall be binding upon, and the rights and benefits of each party shall inure to, the successors, successors-in-interest, permitted assigns and permitted transferees of the respective party.

12.2    <u>Notices</u>.  All notices required under this Agreement shall be in writing and shall be deemed given when (a) delivered personally; (b) placed for delivery with a nationally recognized overnight courier; (c) sent via email at the email addresses listed below or (d) sent by registered or certified mail, return receipt requested, to the parties at the respective addresses set forth below or such other address notified to the other party according to this Section 12.2:

**If to Contractor:**

The address set forth in the first paragraph of this Agreement, Attention: Contract NoticesAndy Stone and David Braun.
Emails:  astone@gordonbrothers.com
             dbraun@gordonbrothers.com

**If to Big Lots:**

Big Lots Stores, LLC
4900 E. Dublin Granville Road
Columbus, OH 43081
Attn: Office of the General Counsel
Email: rrobins@biglots.com, sdillard@biglots.com

12.3    <u>Force Majeure</u>. The parties will not be liable for any delay or failure to perform if the delay or failure to perform is without the fault or negligence of the party claiming excusable delay or failure and is due to causes beyond the control of such party, including, but not limited to, acts of God, war, acts of government, fires, floods, epidemics, or quarantine restrictions. The party claiming excusable delay or failure will immediately inform the other party in writing.

12.4    <u>Non-Waiver</u>. No course of dealing, course of performance, or failure of either party to strictly enforce any provision in this Agreement or in a SOW is to be construed as a waiver thereof.

12.5    <u>Governing Law; Venue & Jury Trial Waiver</u>.  This Agreement is governed by the laws of the State of Ohio, without application of conflicts of law principles. Each party hereby irrevocably agrees that any dispute or action relating to this Agreement will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to disputes in connection with this Agreement.

12.6    <u>Severability</u>. Provisions of this Agreement will be interpreted to be valid and enforceable under Applicable Law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate this Agreement. This Agreement's remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

GB Comments 11/11/22

12.7    Entire Agreement. This Agreement and each SOW constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. No modification, amendment, supplement to, or waiver of this Agreement is binding upon the parties unless made in writing and signed by authorized representatives of both parties.  Without limiting the generality of the foregoing, should the parties choose to issue purchase orders, invoices sales acknowledgments, or other similar documents for their administrative convenience, no term or condition of any such document shall constitute a modification of this Agreement.

12.8    Counterparts; Originals.  This Agreement and any SOW may be executed and delivered in counterparts, each of which will be deemed an original, but all of which, taken together, will constitute one and the same instrument.  A signature transmitted via facsimile or electronic mail, or a scanned original, will be deemed an enforceable signature for purposes of demonstrating the signing party's assent to this Agreement or any SOW.  A facsimile, scanned or other copy of this Agreement and any SOW evidencing execution by both parties shall be deemed an original.

12.9    Publicity.  Except as otherwise agreed in this Agreement, Contractor is not permitted to use Big Lots Marks in any advertising or publicity without the prior written consent of Big Lots' Chief Financial Officer or General Counsel, which consent may be given or withheld in Big Lots' sole and absolute discretion.

12.10    Cumulative Remedies.  Except as otherwise expressly stated in this Agreement, all rights and remedies specified herein are cumulative with, and are not exclusive of, any other rights or remedies that may be available to the parties at law, in equity or otherwise.

12.11    Compliance with Law.  Contractor will comply with Applicable Law in its performance under this Agreement.

12.12    No Assurances or Exclusivity.  No party to this Agreement is obligated to enter into a SOW. Contractor agrees and acknowledges that its provision of Services to Big Lots under this Agreement is on a non-exclusive basis and that Big Lots may engage other third party service providers to provide, or to provide itself, the same or similar Services.

12.13    Mutual Drafting.  Each party has had the opportunity to be represented by counsel of its choice in the negotiation of this Agreement. This Agreement shall be deemed to have been drafted by each of the parties hereto jointly, and no rule of construction shall be invoked respecting the authorship hereof.

12.14    Headings.    Headings used in this Agreement are for reference purposes only, have no substantive effect, and will not enter into the interpretation hereof.

By signing below, each party represents it has read this Agreement, understands it, and agrees to be bound by it as of the Effective Date.

**BIG LOTS**
**Big Lots Stores, LLC**

By: _Shannon Letts_____
AB80CA32EED5475...

Print Name: _____Shannon Letts_____

Title: __Sr VP of RE, Sustainability and Procureme__

**CONTRACTOR**
**Gordon Brothers Retail Partners, LLC**

By: _Andy Stone_____
05CCFBA0EE34431...

Print Name: _____Andy Stone_____

Title: __Managing Director Retail Operations__

GB Comments 11/11/22

## Exhibit A

**Sample SOW Form**

**[Note:  This form is for example only.  DO NOT COMPLETE AND/OR SIGN.]**

**Statement of Work #____**

Project Title: _____

This Statement of Work #_____ (this "SOW") is made and entered into as of _____, 20__ (the "SOW Effective Date"), by and between Big Lots Stores, LLC ("Big Lots") and _____ ("Contractor") pursuant to the Master Services Agreement between Big Lots and Contractor dated _____, 20__ (the "Agreement").  The parties agree that, upon execution, this SOW will be automatically incorporated into, and governed by the provisions of, the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

**1.      Term**

The term of this SOW shall begin on the SOW Effective Date and will continue until _____.

**2.      Scope of Services & Work Product**

*[Provide a detailed description of services, including a list of deliverables]*

*3.*      **Performance and Delivery Schedule**

*[Provide a detailed timeline for project performance, milestones and delivery of deliverables]*

**4.      Location**

*[Specify location where services will be performed]*

**5.      Fees; Expenses & Invoicing**

*[Provide a detailed description of fees, including any applicable hourly rates and not to exceed amounts; expense estimates, including not to exceed amounts; and invoicing schedule]*

**6.      Project Management**

*[Include any details on project management, such as naming project managers, providing contact information and change management procedures]*

*7.*      ***Additional/Miscellaneous Terms (if applicable)***

IN WITNESS WHEREOF, the parties have caused this SOW to be executed by their duly authorized representative as of the SOW Effective Date.

**BIG LOTS**                                                          **CONTRACTOR**
**Big Lots Stores, LLC**


By: _____          By: _____

Print Name: _____          Print Name: _____

Rev. 08.2020 – US Service Providers                                                          15

GB Comments 11/11/22

Title: _____     Title: _____

## AMENDMENT NO. 1 TO MASTER SERVICES AGREEMENT

This **AMENDMENT NO. 1 TO MASTER SERVICES AGREEMENT** (this "Amendment") is entered effective as of April 18, 2024 (the "Effective Date") by and between Gordon Brothers Retail Partners, LLC, a Delaware limited liability company ("Contractor"), and Big Lots Stores, LLC, an Ohio limited liability company ("Big Lots").

### Recitals

A.      Contractor and Big Lots are parties to that certain Master Services Agreement dated as of November 30, 2022 (as amended, modified, supplemented or restated from time to time, the "Agreement"). Capitalized terms used in this Amendment and not otherwise defined will have the meanings ascribed to them in the Agreement.

B.      On the Effective Date, 1903P Loan Agent, LLC, an Affiliate of Contractor, Big Lots and certain of its Affiliates, and the lenders party thereto are entering into that certain Credit Agreement (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"). As a condition precedent to the entry thereto, the parties hereto require that the Agreement be amended as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual agreements set forth in this Amendment, the parties hereby agree as follows:

1.      **Amendment.**  The Agreement is hereby amended to add the following as the new Section 13 of the Agreement to provide in its entirety as follows:

"13.      **Store Closure Consulting**. Without limiting any other scope of Services or Work Product specified in any SOW, on and after the Effective Date and until the Secured Obligations (as defined in the Credit Agreement among 1903P Loan Agent, LLC, an Affiliate of Contractor, Big Lots and certain of its Affiliates, and the lenders party thereto from time to time, and as the same may be amended, modified, supplemented or restated from time to time, the "Credit Agreement") are paid in full in accordance with the terms of Section 1.03 of the Credit Agreement (the "Exclusivity Term"), the provisions of this Section 13 shall apply to any Services relating to a Sale (defined below) not otherwise governed by a SOW in existence prior to the Effective Date; provided that the foregoing shall not limit any termination rights of Big Lots set forth in Section 10.2 of the Agreement.

13.1      Scope of Services & Work Product.

13.1.1  Big Lots hereby retains Contractor as its exclusive, independent consultant to provide services with respect to the disposition of owned merchandise ("Merchandise") and owned furniture, fixtures and equipment ("FF&E") at any Big Lots' retail store locations (each, a "Closing Store" or "Store") during the Exclusivity Term, which will be part of a "Store Closing" or similar themed sale (each, a "Sale"). In each case, the Closing Stores shall be identified in a Store Closure Statement of Work in the form attached hereto as Exhibit B (each, a "Store Closure SOW"; for the avoidance of doubt, each Store Closure SOW shall constitute a SOW under this Agreement).

13.1.2  Contractor will recommend appropriate discounting and other strategies to effectively market and sell all of the goods at the Stores in accordance with a "store closing," "everything must go," "sale on everything" and other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith.

13.1.3. Contractor will provide qualified supervision to oversee the conduct of each Sale and coordinate with Big Lots with respect to appropriate staffing levels, loss prevention strategies and permitting requirements.

13.1.4  Contractor will maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Big Lots' employees to customers and others about the Sale.

13.1.5  With respect to each Closing Store, Big Lots and Contractor shall mutually agree upon those items of FF&E located at such Closing Store which are not to be sold in connection with the Sale and such FF&E shall be marked through the green dot process, and all other items of FF&E not so designated shall be permitted to be sold in the Sale (collectively, the "Offered FF&E").

13.1.6  Contractor will recommend appropriate strategies to effectively market and sell the Offered FF&E and coordinate the pick-up and removal of sold Offered FF&E from the Closing Stores.

13.1.7  Offered FF&E sold through orderly sales at a Store and all sales of Merchandise at a Store will be completed through Big Lots' existing POS system and Big Lots shall be responsible for the computing, collecting, holding, reporting, and paying of any related sales taxes.

13.1.8  With respect to Offered FF&E sold through other methods ("Bulk Offered FF&E Sales"), Contractor shall be responsible for the computing and collection of, any lawfully imposed sales taxes, if applicable, associated with the sale of Offered FF&E. Contractor shall ensure that such amounts are remitted to Big Lots along with gross proceeds of the Sale (net of the FF&E Fee) so that Big Lots may hold report and pay such sales taxes to the relevant taxing authorities.

13.1.9  The provisions set forth on Exhibits C and D hereto shall be incorporated by reference into each Store Closure SOW.

13.2   Performance and Delivery Schedule.  Each Sale shall commence at the Stores according to the schedule set forth in the applicable Store Closure SOW and shall terminate at the applicable Stores as set forth in the applicable Store Closure SOW.

13.3   Closing Stores. Each Sale shall take place at the Stores as identified on the applicable Store Closure SOW. Big Lots shall continue to make the applicable Stores accessible to Contractor after the applicable Sale has ended to allow for the disposition and removal of the Offered FF&E during at least the Stores' customary operating hours. Big Lots and Contractor shall mutually agree to extend the hours at which access to the Stores is granted to allow the disposition and removal of the Offered FF&E as may be reasonably needed.

13.4   Fees; Expenses & Invoicing.

13.4.1  As consideration for Contractor's services hereunder, Big Lots shall pay Contractor (i) a fee equal to two percent (2%) of gross proceeds (including any gift card/certificate or credit redemptions and net only of sales tax) ("Gross Proceeds") from the sale of Merchandise, which percentage shall be increased by an additional 0.25% annually on each anniversary of the date hereof (the "Merchandise Fee")[1] and (ii) a fee

---

[1] By way of example, the Merchandise Fee shall be (i) 2.25% of Gross Proceeds from April 18, 2025 through April 17, 2026; and (ii) 2.50% of Gross Proceeds from April 18, 2026 through April 17, 2027.

equal to fifteen percent (15%) of the gross proceeds (net only of sales tax) ("Gross Proceeds") from the sale of the Offered FF&E (the "FF&E Fee").

13.4.2   All expenses incident to the conduct of a Sale ("Expenses") and the operation of the Stores during a Sale shall be borne by Big Lots, except to the extent any such Expenses exceed the budgeted amount set forth on the applicable Store Closure SOW (as may be amended by the parties from time to time upon mutual consent, the "Budget").

13.4.3   If applicable, any auctioneer may be paid its additional compensation by means of an industry-standard buyer's premium added to the "gavel" price of any sold Offered FF&E via online auction and collected from the buyers thereof.

13.4.4   Contractor shall submit invoices to Big Lots no more frequently than weekly setting forth any expenses incurred and the applicable portion of the FF&E Fee, and Merchandise Fee that has been earned during the period since the prior invoice. Big Lots, or an Affiliate on its behalf, will pay undisputed amounts within thirty (30) days from the date of receipt of invoice in accordance with the terms of this Agreement.

13.5    Project Management/Miscellaneous Terms

13.5.1   Big Lots shall have control over the personnel in the Stores. Big Lots shall retain the appropriate amount of Store staff (as agreed upon between the parties) to assist with the Sale and the disposition and removal of FF&E. Contractor shall communicate to Big Lots the staff required to complete the project by Closing Store. Big Lots shall handle the cash, debit and charge card payments for the Merchandise and Offered FF&E in accordance with its normal cash management procedures, subject to Contractor's right to audit any such items in the event of a good faith dispute as to the amount thereof.

13.5.2   Big Lots shall be solely responsible for computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Offered FF&E during a Sale, and Contractor shall have no responsibilities or liabilities therefor.

13.5.3   No later than twenty (20) days following the end of a Sale at a Closing Store, the Parties shall complete a final reconciliation and settlement of the FF&E Fee, Merchandise Fee, budgeted Expenses, proceeds of Bulk Offered FF&E Sales and all other amounts contemplated by this Agreement.

13.5.4   Big Lots shall provide Contractor with reporting of FF&E and Merchandise sales at the Closing Stores at a mutually agreed upon cadence. From time to time upon request, each Party shall also prepare and deliver to the other party such other reports as either party may reasonably request. Each party to this Agreement shall, at all times during the sale term (set forth in the applicable Store Closure SOW) and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to applicable Sale and to this Agreement. All records and reports shall be made available to Contractor and Big Lots during regular business hours upon reasonable notice.

13.5.5   Although Contractor shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of a Sale and to maximize the recovery, Big Lots expressly acknowledges that Contractor is not guaranteeing the results of any Sale.

13.5.6   Big Lots acknowledges that (i) the parties are not conducting an inventory of the Merchandise or FF&E and Contractor shall not bear any liability for shrink or other loss at the Stores unless such loss is primarily attributed to Contractor's negligence or willful misconduct.

13.5.7  All sales shall be made in the name, and on behalf, of Big Lots, shall be "final" "as is" sales, and all advertisements and sales receipts will reflect the same.

13.5.8  Notwithstanding any other provision contained herein, Big Lots and Contractor agree that Contractor shall not be deemed to be in possession or control of the Closing Stores or Big Lots' employees and shall not be deemed liable for third party claims related to the Offered FF&E (e.g., products liability).

2.      **Amendment.**  The Agreement is hereby amended to add Exhibits B, C and D hereto as Exhibits B, C and D to the Agreement.

3.      **Miscellaneous.**  Except as amended hereby, all of the terms and conditions of the Agreement shall remain in full force and effect. This Amendment shall be subject to the same governing law as the Agreement. This Amendment may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, shall be deemed to constitute a single instrument. Facsimile or other electronically scanned signatures shall be deemed originals for purpose of this Amendment.

[Signature page to follow]

IN WITNESS WHEREOF, the parties have caused this Amendment to be signed by their duly authorized representatives to be effective as of Effective Date.

**BIG LOTS:**

**Big Lots Stores, LLC**

By: _Jonathan E. Ramsden_
Name: Jonathan E. Ramsden
Title: _EVP and CFO_

**CONTRACTOR:**

**Gordon Brothers Retail Partners, LLC**

By: _Rick Edwards_
Name: Rick Edwards
Title: _Head of North American Retail_

**Exhibit B**

**Sample Store Closure SOW Form**

**[Note: This form is for example only. DO NOT COMPLETE AND/OR SIGN.]**

**Store Closure SOW #____**

Project Title: _____

This Store Closure Statement of Work #_____ (this "Store Closure SOW") is made and entered into as of _____, 20__ (the "Store Closure SOW Effective Date"), by and between Big Lots Stores, LLC ("Big Lots") and Gordon Brothers Retail Partners, LLC ("Contractor") pursuant to the Master Services Agreement between Big Lots and Contractor dated November 30, 2022 (as amended, the "Agreement"). The parties agree that, upon execution, this Store Closure SOW will be automatically incorporated into, and governed by the provisions of, the Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

**1. Term**

The term of this SOW shall begin on the Store Closure SOW Effective Date and will continue until _____ (unless mutually extended in writing by the parties).

**2. Closing Stores**

*[Specify location of closing stores]*

**3. Budget**

*[Provide a detailed description of expense estimates, including not to exceed amounts]*

***4. Additional/Miscellaneous Terms (if applicable)***

*[insert if applicable]*

IN WITNESS WHEREOF, the parties have caused this Store Closure SOW to be executed by their duly authorized representative as of the Store Closure SOW Effective Date.

**BIG LOTS:**                                              **CONTRACTOR:**

**Big Lots Stores, LLC**                          **Gordon Brothers Retail Partners, LLC**

By: _____           By: _____
Name: _____           Name: _____
Title: _____           Title: _____

## Exhibit C

### FF&E Disposition Procedures

**Day 0 - Preparation**

Contractor Onsite Lead connects with Big Lots local point of contact (the "POC") to verify entry time on Day 1

1. Contractor enters building and performs assessment walk with Big Lots local POC (usually SM & DM)
   a. Photo documentation of store condition upon entry
   b. Confirm assets being repurposed by Big Lots
      i. Tag and stage (when able) to a designated area
      ii. Set timeframe on removal/pickup by Big Lots
      iii. If applicable, check for fixtures to be packed, shipped, and held for shipment (the "Saved Fixtures") back to Big Lots facility (may include Lot, Queue, Lots Under $5 and Broyhill fixtures)
   c. Validate plan for access entry/exit
   d. Safe
      i. Assess removal, sale, or abandonment
      ii. Combination(s)
         1. Verify doors are open
         2. Placard safe with written combination for each door the safe has
      Note: May happen on a proceeding day based on cash removal by Big Lots
   e. Review entry/exit doors, emergency doors, receiving & dock for operation

2. Continue mass purging of trash (trash removal started during merchandise sale and will carry through all days of project)
   a. Big Lots will provide one Open Top container for each site on agreed upon date(s) and will be serviced at agreed upon frequency, or as needed per site
   b. If additional open tops are required, Contractor will be responsible for the procurement

3. Contractor Lead performs inventory of assets of value
   a. Validate color and brand
   b. Gondola and Backroom Steel count by run, includes width, height, depth, and section count
   c. Shelf count by size where applicable
   d. Photo documentation for records

4. Contractor lead performs photo inventory of assets of no value for local marketing sales

5. Contractor deinstalls "Offered FF&E". Contractor packages and ships out as directed by Big Lots

6. Contractor conduct onsite liquidation sales as per mutually agreed upon marketing strategy
   a. Inclusive of the assets below, if applicable:
      i. Offered FF&E (excludes DM transfers tagged prior to start of merchandise sale)
      ii. Two door dairy cooler
         1. Any supplier owned coolers (i.e. Red Bull, etc.) are not in scope for removal and shall not be removed by suppliers
      iii. Walk behind forklifts
      iv. Safe
      v. EAS Pedestals and deactivators

7

      vi.  CCTV
      vii.  Cashwrap
      viii.  Baler

b. Assets excluded from Offered FF&E, but not limited to, and out of scope for removal:
   i. Supplier owned coolers (i.e. Red Bull, etc.)
   ii. Ceiling Mounted Cord Reels shall be disconnected by Big Lots electricians and will remain at the Store Closing Store

7. Ship out assets of value to Contractor warehouse, if applicable

8. Final Broom sweep and trash removal
   a. Contractor shall leave such Store Closing Store in broom clean condition, with all unsold Offered FF&E removed therefrom on or before the "Vacate Date" for a Closing Store Closing Store specified in Exhibit A

**Vacate Day**
1. Walk facility with local Big Lots POC to verify all work has been completed.
   a. Obtain Notice of Vacate signed
   b. Return keys to Big Lots POC, if applicable
2. Photo document facility as "Exit Photos"

**Post Project Completion**

**1-3 Days**
1. Email POC with link of "Exit Photos" and contact to verify all aspects of project are to Big Lots' satisfaction
   a. Contractor to address any of POC's issues and concerns within a mutually agreed upon timeframe
2. Rental Equipment removed by vendor (if applicable)
3. Debris bin and hazardous waste final haul off by vendor (if applicable)

**30-45 Days**
1. Contractor to validate expenses, reconcile project
2. Contractor to present project site recovery value
3. Contractor to issues funds via check, ACH payment, or other mutually agreed upon method, to Big Lots for recovery

**Exhibit D**

**Fixture Shipping**

**Responsibilities**

1. Big Lots will identify quantities of each specialty category from each store to package and ship. Contractor will acquire packaging material and ship as outlined above. In addition:

   a. Arrange shipping from Closing Store to destination. Contractor will act as agent and assist the carrier on pick up day if Contractor is still onsite for other project tasks related to the 2023 Closure program. If Contractor is no longer onsite, Big Lots will use local team to assist the carrier with pick up.

   b. Big Lots to remove all merchandise from fixtures.

2. Contractor will, at each Closing Store, systematically deinstall the specialty fixtures, package for both shipping and/or possible storage at a Closing Store designated by Big Lots and/or ship direct to store Closing Store for immediate use. In addition:

   a. Label shipping pallets with parts descriptions and quantity of items on each pallet, then provide this detail to Big Lots for each Closing Store.

   b. Label shipping pallets with to and from placards for use by the carrier and receiving Closing Store(s).

   c. Provide photos via sharing platform of pallets and condition after packaging has been completed.

   d. Big Lots is responsible for handling all merchandise in a Closing Store. If merchandise exists that is damaged and/or written off, and in need of being discarded, Big Lots will coordinate debris container(s) and self-execute the discarding of said items. Big Lots staff will condense merchandise to the front of the store during the clearance cadence and have all residual merchandise removed from all fixtures by the end of the day after the last day of business.

3. Contractor will provide pricing quotes for the fees and expenses associated with any of the fixture shipping services set forth herein.  Upon approval of such quotes, Big Lots will be responsible for reimbursement of any such fees and expenses incurred by Contractor.

## AMENDMENT NO. 2 TO MASTER SERVICES AGREEMENT

This **AMENDMENT NO. 2 TO MASTER SERVICES AGREEMENT** (this "Amendment") is entered effective as of July 19, 2024 (the "Effective Date") by and between Gordon Brothers Retail Partners, LLC, a Delaware limited liability company ("Contractor"), and Big Lots Stores, LLC, an Ohio limited liability company ("Big Lots").

### Recitals

A.      Contractor and Big Lots are parties to that certain Master Services Agreement dated as of November 30, 2022 (as amended, modified, supplemented or restated from time to time, the "Agreement"). Capitalized terms used in this Amendment and not otherwise defined will have the meanings ascribed to them in the Agreement.

B.      On April 18, 2024, Contractor and Big Lots entered into that certain Amendment No. 1 to Master Services Agreement.

C.      Contractor and Big Lots wish to further amend the Agreement as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual agreements set forth in this Amendment, the parties hereby agree as follows:

1.      **Amendments.**

I.      The first sentence of Section 8.1 of the Agreement is hereby amended by (a) deleting the "or" before subsection (f) thereof, (b) replacing the "." at the end thereof with "; and", and (c) adding the following as the new subsection (g) thereof:

> (g) third party product liability or intellectual property infringement claims brought against any Big Lots Indemnified Party relating to the sale of Additional Contractor Goods in Big Lots' stores.

II.      The Agreement is hereby amended to add the following language to the end of Section 13.1.6:  "Big Lots shall reimburse Contractor for its reasonable sale expenses associated with the sale of the Offered FF&E, not to exceed the amount shown on an FF&E expense budget (which shall be in addition to the Budget), to be mutually agreed upon by the parties promptly after Big Lots identifies the Offered FF&E for each SOW.  Contractor may abandon any unsold Offered FF&E (and all FF&E that is not Offered FF&E) at the Stores at the conclusion of the applicable Sale Term without liability."

III.      The Agreement is hereby amended by replacing Section 13.4.4 in its entirety with: "On a weekly basis, Contractor and Big Lots shall perform a reconciliation and payment of all amounts accrued and outstanding between the parties hereunder in respect of the FF&E Fee, Merchandise Fee, proceeds of Additional Contractor Goods, the Additional Contractor Goods Fee, budgeted Expenses, proceeds of Bulk Offered FF&E Sales and all other amounts contemplated by this Agreement (including, without limitation, allocation of insurance amounts contemplated by Section 13.6.5) that has been earned or accrued during the period since the prior invoice. No later than twenty (20) days following the end of a Sale at a Closing Store, the parties shall determine the definitive amounts payable in respect of the foregoing and complete a final reconciliation and settlement of such amounts"

IV.      The Agreement is hereby amended by replacing Section 13.5.3 in its entirety with: "Reserved".

V.    The Agreement is hereby amended to add the following as the new Sections 13.6, 13.7, 13.8 and 13.9 of the Agreement:

13.6    <u>Additional Contractor Goods</u>

13.6.1   In connection with a Sale, and subject to compliance with applicable law, Contractor shall have the right, at Contractor's sole cost and expense, to supplement the Merchandise in such Sale with additional goods procured by Contractor which meet all of the following criteria: (a) are of like kind, consistent with existing merchandise categories currently sold in Big Lots' stores, and no lesser quality to the Merchandise currently sold in Big Lots' stores and (b) comply with all applicable federal, state and local laws ("<u>Additional Contractor Goods</u>").  The Additional Contractor Goods shall be purchased by Contractor and delivered to the Stores at Contractor's sole expense (including labor, freight and insurance relative to shipping such Additional Contractor Goods to the Stores).  Sales of Additional Contractor Goods shall be run through Big Lots' cash register systems; provided, however, that Contractor shall mark the Additional Contractor Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Contractor Goods from the sale of Merchandise. Contractor and Big Lots shall also cooperate so as to ensure that the Additional Contractor Goods are marked in such a way that a reasonable consumer could identify the Additional Contractor Goods as non-Big Lots goods. Additionally, Contractor shall provide signage in the Stores notifying customers that the Additional Contractor Goods have been included in such Sale.  Absent Big Lots' written consent, and Contractor's agreement to reimburse Big Lots for any associated expenses, Contractor shall not use Big Lots' distribution centers for any Additional Contractor Goods.

13.6.2   Contractor shall pay to Big Lots an amount equal to five percent (5%) of the gross proceeds (excluding sales taxes) from the sale of the Additional Contractor Goods (the "<u>Additional Contractor Goods Fee</u>"), and Contractor shall retain all remaining amounts from the sale of the Additional Contractor Goods for its own account.  The Additional Contractor Goods Fee shall be paid to Big Lots, and the remaining proceeds of the Additional Contractor Goods (excluding sales taxes) shall be remitted to Contractor, in each case, as provided in Section 13.4.4. Big Lots shall be responsible for the computing, collecting, holding, reporting and payment of any sales taxes relating to Additional Contractor Goods sold in a Store during a Sale.

13.6.3   Contractor and Big Lots intend that the transactions relating to the Additional Contractor Goods are, and shall be construed as, a true consignment from Contractor to Big Lots under Article 9 of the Uniform Commercial Code (the "<u>UCC</u>") and not a consignment for security purposes. Subject solely to Contractor's obligations to pay to Big Lots the Additional Contractor Goods Fee, at all times and for all purposes the Additional Contractor Goods and their proceeds shall be the exclusive property of Contractor, and no other person or entity shall have any claim against any of the Additional Contractor Goods or their proceeds.

13.6.4   If, notwithstanding the express intent of the parties hereto that the transactions relating to the Additional Contractor Goods constitute a true consignment, it is determined that the consignment hereby created is one intended as security or that the consignment is a sale or return or other sale, this Agreement shall constitute a security agreement pursuant to Article 9 of the UCC in effect in the State of Ohio, pursuant to which Big Lots grants, creates, and gives to Contractor a purchase money security interest ("<u>PMSI</u>") in the Additional Contractor Goods and the proceeds thereof as security for Big Lots' obligation to remit to Contractor the proceeds of the Additional Contractor Goods (net of the Additional Contractor Goods Fee).  Contractor is hereby authorized to sign and file, pursuant to Article 9 of the UCC, financing statements and issue notices to other secured

parties of record, as are reasonably necessary to secure Contractor's consignment and PMSI rights in and to the Additional Contractor Goods.

13.6.5  Big Lots shall, at Contractor's sole cost and expense, insure the Additional Contractor Goods and, if required, Big Lots shall promptly file any proofs of loss with regard to same with Big Lots' insurers; provided that Contractor shall cooperate with any reasonable request from Big Lots in respect thereof. Contractor shall be responsible for payment of any deductible (but only in relation to the Additional Contractor Goods) under any such insurance in the event of any casualty affecting the Additional Contractor Goods; provided that in the event of a loss involving Additional Contractor Goods and goods owned by Big Lots, the deductible shall be shared pro rata based on the insured value of the goods at the time of loss.

13.7    Special Purpose Payment.  Concurrently with the execution of, and as a condition to Contractor's obligations under, this Agreement and any applicable SOW, Merchant shall fund to Consultant any advance amount specified on a SOW (the "Special Purpose Payment") which shall be held by Contractor until the final reconciliation for all Stores subject to such SOW (and Big Lots shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Contractor under this Agreement prior to such final reconciliation). Without limiting any of Contractor's other rights, Contractor may apply the Special Purpose Payment to any unpaid obligation owing by Big Lots to Contractor under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Big Lots within three days following the final reconciliation for all Stores that are the subject of the applicable SOW.

13.8    Right to Syndicate.  Contractor may partner with Hilco Merchant Resources and/or Tiger Group to provide a portion of the services in connection with a Sale; provided that Contractor will remain as the sole "Contractor" hereunder and will solely manage each Sale, and Big Lots shall deal solely with, and have no duties or obligations hereunder to any party other than, Contractor, and any amounts owing to either Hilco Merchant Resources and/or Tiger Group in respect hereof shall be payable solely by Contractor.

13.9    Bankruptcy Provisions.  In addition to, and not as part of, the Budget, Big Lots shall reimburse Contractor for its reasonable and documented out-of-pocket legal fees and expense incurred in connection with any bankruptcy or insolvency proceeding involving Big Lots and the negotiation of any "side letters" with landlords of the Stores in an aggregate amount not to exceed $75,000. In the event of Big Lots' filing under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), this Agreement, including retention of Contractor and conduct of any Sale set forth herein, shall be subject to the approval of the applicable United States Bankruptcy Court (the "Bankruptcy Court"). Big Lots shall promptly seek to have this Agreement, and the transactions contemplated by this Agreement approved by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code (and not pursuant to sections 327, 328, 330, or 331 thereof) and an order with terms acceptable to both Big Lots and Contractor that provides, among other things, for: (i) the payment of all fees and reimbursement of expenses hereunder to Contractor is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) approval of the transaction contemplated hereby; and (iv) protection of Contractor's fees and expenses to ensure the payment of such fees and expenses are included in the carve-out from first priority liens granted under any debtor-in-possession financing or cash collateral order (the "Approval Order").  In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Big Lots, and

each party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Contractor shall conduct each applicable Sale in accordance with the terms of the Approval Order in all material respects.

2.    **Miscellaneous.** Except as amended hereby, all of the terms and conditions of the Agreement shall remain in full force and effect. This Amendment shall be subject to the same governing law as the Agreement. This Amendment may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, shall be deemed to constitute a single instrument. Facsimile or other electronically scanned signatures shall be deemed originals for purpose of this Amendment.

[Signature page to follow]

IN WITNESS WHEREOF, the parties have caused this Amendment to be signed by their duly authorized representatives to be effective as of Effective Date.

**BIG LOTS:**                                              **CONTRACTOR:**

**Big Lots Stores, LLC**                          **Gordon Brothers Retail Partners, LLC**


By: _Jonathan Ramsden_____          By: _Richard Edwards_____
Name: Jonathan Ramsden                             Name: Richard Edwards
Title:  EVP, Chief Financial and                   Title:  Head of North America Retail
        Administrative Officer

## Schedule 2[1]

### Store Closing Procedures

1.      The Store Closing Sales shall be conducted during normal business hours or such hours as otherwise permitted by the respective Leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," and, thus, where such a law is applicable, no Store Closing Sales shall be conducted on Sunday unless the Debtors have been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, neither the Debtors nor the Consultant shall distribute handbills, leaflets, or other written materials to customers outside of any Stores' premises unless permitted by the applicable Lease or if distribution is customary in the "shopping center" in which such Store is located; *provided* that the Debtors and the Consultant may solicit customers in the Stores themselves.  On "shopping center" property, neither the Debtors nor the Consultant shall use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable Lease or agreed by the landlord.

4.      The Debtors and the Consultant shall have the right to use and sell the Store Closing Assets and the Additional Consultant Goods.  The Debtors and the Consultant may advertise the Store Closing Sales and the Additional Consultant Goods Sales in a manner consistent with these Store Closing Procedures.  The purchasers of any the Store Closing Assets or Additional Consultant Goods sold during the Store Closing Sales shall be permitted to remove the Store Closing Assets or the Additional Consultant Goods either through the back or alternative shipping areas at any time, or through other areas after Store business hours; *provided*, *however*, that the

---

[1]  Capitalized terms used but not defined in these Store Closing Procedures shall have the meanings ascribed to them in the Motion.

foregoing shall not apply to the sale of *de minimis* Store Closing Assets or Additional Consultant Goods, whereby the item(s) can be carried out of the Store in a shopping bag.

5.       At the conclusion of the Store Closing Sales (such date, the "**Termination Date**"), the Consultant shall vacate the Stores; *provided* that the Consultant may abandon any Store Closing Assets (including machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) not sold in the Store Closing Sales at the Termination Date, without cost or liability of any kind to the Consultant.  The Consultant shall notify the Debtors and the DIP Agents (as defined in the DIP Orders) of its intention to abandon any Store Closing Assets at least three (3) days prior to the Termination Date.  The Debtors will have the option to remove the Store Closing Assets, at its own cost prior to the Termination Date, or abandon the Store Closing Assets. For the avoidance of doubt, as of the Termination Date, the Consultant may leave in place, and without further responsibility, any of the Store Closing Assets.

6.       The Consultant and the Debtors may advertise each Store Closing as a "going out of business," "store closing," "sale on everything," "everything must go," or similar themed sale. The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures.  All signs, banners, ads and other advertising collateral, promotions, and campaigns shall be approved by the Debtors in accordance with these Store Closing Procedures.

7.       The Consultant and the Debtors shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Store Closing Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners if prohibited by the applicable Lease

or applicable law.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent that the entrance to the applicable Store does not require entry into the enclosed mall common area; *provided, however*, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores and shall not be wider than the storefront of the Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner, and in accordance with the terms of the Agreed Orders.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable Lease.  No property of the landlord of a Store shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

8.    Except with respect to the hanging of exterior banners, neither the Debtors nor the Consultant shall make any alterations to the storefront, roof, or exterior walls of any Stores or shopping centers, or to interior or exterior store lighting, except as authorized by the applicable Lease.

9.    Affected landlords will have the ability to negotiate with the Debtors or, at the Debtors' direction, the Consultant any particular modifications to the Store Closing Procedures.

10.    The Debtors and/or the Consultant and the landlord of any Store are authorized to enter into the Side Letters without further order of the Court; *provided* that such agreements do not have a material adverse effect on the Debtors or their estates.

11.     At the conclusion of each Store Closing Sale, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.  The Debtors and their agents and representatives shall continue to have access to the Stores pending assumption or rejection of applicable leases.

12.     Conspicuous signs shall be posted in each of the affected Stores to the effect that all sales are "as is" and "final."

13.     The Consultant and the Debtors will keep Store premises and surrounding areas clear and orderly, consistent with past practices.

14.     An unexpired nonresidential real property lease shall not be deemed rejected by reason of a Store Closing or the adoption of these Store Closing Procedures.

15.     The rights of landlords against the Debtors for any damages to a Store shall be reserved in accordance with the provisions of the applicable Lease; *provided* that, to the extent certain Leases of Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

16.     If and to the extent that a landlord of any Store contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall provide at least three business days' written notice, served by email or overnight delivery, on:

<u>If to the Debtors</u>:
Big Lots, Inc.
4900 E. Dublin-Granville Road
Columbus, Ohio 43081
Ronald A. Robins
rrobins@biglots.com

With copies to:

DAVIS POLK & WARDWELL LLP
450 Lexington Ave
New York, NY 10017

Attn: Brian M. Resnick, Adam L. Shpeen,
Stephen D. Piraino, and Ethan Stern
Tel: 212-450-4000
Email: brian.resnick@davispolk.com, adam.shpeen@davispolk.com,
stephen.piraino@davispolk.com, and ethan.stern@davispolk.com

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Attn: Robert J. Dehney, Sr., Andrew R. Remming, Daniel B. Butz,
Tamara K. Mann, and Casey B. Sawyer
Tel: (302) 658-9200
Email: rdehney@morrisnichols.com, aremming@morrisnichols.com,
dbutz@morrisnichols.com, tmann@morrisnichols.com, and
csawyer@morrisnichols.com

If to the Consultant:

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Avenue, Suite 1100
Boston, MA 02199
Attn: Andy Stone and David Braun
Tel: (516) 375-7739
Email: astone@gordonbrothers.com and dbraun@gordonbrothers.com

With copies to (which shall not constitute notice):

RIEMER & BRAUNSTEIN LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn:  Steven E. Fox
Tel: (212) 789-3150
Email: sfox@riemerlaw.com

17.    Notwithstanding anything stated herein, the proceeds of the Store Closing Sales,

with the exception of those proceeds from the sale of the Additional Consultant Goods that are due

and payable to the Consultant, shall be payable in accordance with the DIP Orders and the

Approved Budget (as defined in the DIP Orders).

18.     If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than three business days' written notice to the other party, served by email or overnight delivery, subject to the Court's availability.