PREPARED BY/WHEN RECORDED RETURN TO:
MICHAEL A. SCHROEDER, ESQ.
Michael A. Schroeder, P.L.
1031 Royal Palm Boulevard
Suite A
Vero Beach, FL 32960
(561) 241-0300 (phone)

PROPERTY CONTROL NO. 5041 03 56 0010

## SPECIAL WARRANTY DEED

This Indenture, made as of the 17th day of May, 2022, between **PLANTATION MARKETPLACE INVESTMENTS, LLC, a Florida limited liability company**, Grantor, whose post office address is 2199 Ponce de Leon Blvd., Ste 301, Coral Gables, FL 33134, and **7023 BROWARD, LLC, a Florida limited liability company**, Grantee, whose post office address is 1535 SE 17th Street, Suite 107, Fort Lauderdale, FL 33316.

Witnesseth that said Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations to said Grantor in hand paid by said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold and by these presents does hereby grant, bargain and sell to the said Grantee, and Grantee's heirs, successors and assigns forever, the following described land, situate, lying and being in the City of Plantation, Broward County, Florida, to-wit (the "Property"):

SEE EXHIBIT "A' ATTACHED HERETO AND MADE A PART HEREOF BY REFERENCE AS TO THE PROPERTY

SUBJECT TO: SEE EXHIBIT "B" ATTACHED HERETO AND MADE A PART HEREOF BY REFERENCE AS TO PERMITTED EXCEPTIONS

AND Grantor hereby covenants with Grantee that Grantor is lawfully seized of said land in fee simple; that Grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against no others.

"Grantor" and "grantee" are used for singular or plural, as context requires.

**COMPOSITE EXHIBIT A**

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

PLANTATION MARKETPLACE INVESTMENTS, LLC, a Florida limited liability company

_____

_____
(Print name of Witness)

BY:   CLAUDIO MEKLER
ITS:   MANAGER

_____

_____
(Print name of Witness)

STATE OF FLORIDA        )
                                            SS:
COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me on the _17th_ day of  May, 2022, by CLAUDIO MEKLER as Manager of PLANTATION MARKETPLACE INVESTMENTS, LLC, a Florida limited liability company, on behalf of the Company, by means of ☑ physical presence or ☐ online notarization. He is ___ personally known to me or ___ has produced a Florida Driver's License as identification.



_____
Print Name of Notary Public
State of Florida

My Commission Expires:
My Commission Number:
My Notary Seal:

Notary Public State of Florida
Javier Gomez
My Commission HH 119162
Expires 04/23/2025

D:\USERS\JENISE.MARCANO\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\H8H12GVM\ADS FINAL - SPECIAL WARRANTY DEED.DOCX

## EXHIBIT "A"
## LEGAL DESCRIPTION

**PARCEL 1:**

Tract A of PLANTATION CENTER, according to the plat thereof as recorded in Plat Book 102, Page 2, of the Public Records of Broward County, Florida.
Said lands situate, lying and being in the City of Plantation, Broward County, Florida.

**PARCEL 2:**

Non-Exclusive Easement for the benefit of Parcel 1, as created by Easement granted by Landmark First National Bank of Fort Lauderdale to M.P.I. Corporation, N.V., a Netherlands Antilles corporation and M.L. Development, Inc., a Florida corporation, doing business as Plantation Center Venture, dated August 13, 1979 and recorded August 14, 1979 in Official Records Book 8382, Page 834, of the Public Records of Broward County, Florida, for ingress and egress over and across the following described property:
A portion of Lot 1, LANDMARK PLAZA, according to the plat thereof as recorded in Plat Book 86, Page 24, of the Public Records of Broward County, Florida, more fully described as follows:

Commencing at the most Southwesterly corner of said Lot 1; thence North 01° 39' 10" East along the West line of said Lot 1, a distance of 605.00 feet to the Point of Beginning; thence continuing North 01° 39' 10" East along the said West line, a distance of 30.00 feet; thence South 58° 29' 23" East, a distance of 119.92 feet; thence South 88° 20' 50" East, a distance of 71.01 feet to a point on the East line of said Lot 1; thence South 01° 39' 10" West, along the East line of Lot 1, a distance of 25.00 feet; thence North 88° 20' 50" West, a distance of 79.71 feet; thence North 58° 29' 23" West, a distance of 109.87 feet to the Point of Beginning.
Said lands situate, lying and being in the City of Plantation, Broward County, Florida.

**PARCEL 3:**

Non-Exclusive easement for the benefit of Parcel 1 for the maintenance of wall, created by the Reciprocal Maintenance Easement between Marblehouse, Ltd., and SB Partners, recorded February 27, 1996 in Official Records Book 24537, Page 866, of the Public Records of Broward County, Florida. Subject to the terms, provisions and obligations contained therein.

3

EXHIBIT "B"
PERMITTED EXCEPTIONS

1. Property taxes for the year 2022 and subsequent years, which are not yet due and payable.

2. 12' utility easement as shown on the Plat of PLANTATION CENTER, recorded in Plat Book 102, Page 2, of the Public Records of Broward County, Florida.

3. Easement granted to Florida Power & Light Company, Southern Bell Telephone and Telegraph Company, and the City of Plantation recorded in Official Records Book 8577, Page 137; together with Corrective Easement recorded in Official Records Book 9263, Page 91, of the Public Records of Broward County, Florida.

4. Reciprocal Maintenance Easement between Marblehouse, Ltd. and SB Partners recorded in Official Records Book 24537, Page 866, of the Public Records of Broward County, Florida.

5. Notice of Lien Prohibition by GEHR Development recorded in Official Records Book 45160, Page 588, of the Public Records of Broward County, Florida.

6. Resolution of the City of Plantation Florida pertaining to the subject of storm water management and implementing the storm water management utility fee to be collected on the ad valorem tax bills recorded in Official Records Book 49365, Page 309, of the Public Records of Broward County, Florida.

7. Notice of Creation of New Impact Fees and Revising Certain Existing Impact Fees in the City of Plantation containing provisions for a fee or assessment recorded in Official Records Book 50063, Page 402, of the Public Records of Broward County, Florida.

8. Restrictions, covenants, conditions, easements and other matters as contained on the Plat of Lakes of Newport II, recorded in Plat Book 158, Page 27, of the Public Records of Broward County, Florida.  (Parcel 3)

9. Restrictions, covenants, conditions and easements, which include provisions for (i) an easement on the land; (ii) a lien for liquidated damages; (iii) a private charge or

4

assessments; and (iv) an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant, as contained in that certain Declaration recorded in Official Records Book 10672, Page 439, amended by instruments recorded in Official Records Book 10691, Page 234; Official Records Book 10693, Page 976; Official Records Book 11702, Page 486; Official Records Book 21301, Page 57, Official Records Book 21535, Page 405; and Official Records Book 21360, Page 453, of the Public Records of Broward County, Florida, as may be subsequently amended.  (Parcel 3)

10. Restrictions, covenants, conditions and easements, which include provisions for (i) an easement on the land; (ii) a lien for liquidated damages; (iii) a private charge or assessments; and (iv) an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant, as contained in that certain Declaration recorded in Official Records Book 23734, Page 725, amended by instruments recorded in Official Records Book 24700, Page 181, and Official Records Book 25378, Page 641, of the Public Records of Broward County, Florida, as may be subsequently amended.  (Parcel 3)

11. Perpetual Unrestricted Utility Easement and Easement for Governmental Services for City of Plantation recorded in Official Records Book 9952, Page 441, of the Public Records of Broward County, Florida.  (Parcel 3)

12. Covenant contained in instrument recorded in Official Records Book 9984, Page 394, of the Public Records of Broward County, Florida.  (Parcel 3).

13. Easement to the City of Plantation recorded in Official Records Book 10006, Page 214, of the Public Records of Broward County, Florida.  (Parcel 3)

14. Assignment of Reservations recorded in Official Records Book 21301, Page 60, of the Public Records of Broward County, Florida.  (Parcel 3)

15. Assignment of Agreements contained in instrument recorded in Official Records Book 21505, Page 222 and in Official Records Book 21505, Page 228, of the Public Records of Broward County, Florida.  (Parcel 3)

16. Right-of-Way Easement to Southern Bell Telephone and Telegraph Company recorded in Official Records Book 10564, Page 296, of the Public Records of Broward County, Florida.  (Parcel 3)

17. Easement granted to City of Plantation recorded in Official Records Book 23809, Page

69, of the Public Records of Broward County, Florida.   (Parcel 3)

18. Easement granted to BellSouth Telecommunications, Inc. recorded in Official Records Book 24170, Page 897, of the Public Records of Broward County, Florida.   (Parcel 3)

19. Agreement between Broward County and Marblehouse, Ltd. recorded in Official Records Book 23464, Page 50, of the Public Records of Broward County, Florida. (Parcel 3)

20. Traffic Signalization Agreement recorded in Official Records Book 23464, Page 60, of the Public Records of Broward County, Florida.   (Parcel 3)

21. Courtesy Notice of City of Plantation, Special Risk Properties Ordinance (Foreclosure Registration and Lender Responsibility) filed October 18, 2016 under Instrument Number 113989986 of the Public Records of Broward County, Florida.

22. Terms, provisions and conditions in that Easement granted by Landmark First National Bank of Fort Lauderdale to M.P.I. Corporation, N.V., a Netherlands Antilles corporation and M.L. Development, Inc., a Florida corporation, doing business as Plantation Center Venture, dated August 13, 1979 and recorded August 14, 1979 in Official Records Book 8382, Page 834, of the Public Records of Broward County, Florida. (As to Parcel 2)

23. Existing recorded and unrecorded leases for tenants, as tenants only on Parcel 1.

ALL OF THE FOREGOING OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA UNLESS OTHERWISE NOTED

THE RECITAL OF THE FOREGOING SHALL NOT SERVE TO REIMPOSE SAME

145910

# TABLE OF CONTENTS

**Section**

1.     Definitions
   - A. Common Areas
   - B. Dates
   - C. Exhibits
   - D. Demised Premises
   - E. Shopping Center

2.     Demise

3.     Term
   - A.    Original Term
   - B.    Option to Extend Term

4.     Use and Operation

5.     Rent
   - A. Fixed Minimum Rent
   - B. Utilities Charge and Exterior Lighting
   - C. Percentage Rent
   - D. Common Area Charges
   - E. Real Estate Taxes
   - F. Construction Allowance/Rent Abatement

6.     Alterations

7.     Maintenance, Repairs and Initial Build Out

8.     Signs

9.     Fixtures

10.    Governmental Regulations

11.    Indemnification

12.    Insurance
    - A. Tenant
    - B. Landlord

13.    Fire Rebuilding and Altering

14.    Force Majeure

15.    Injunction

16.    Warranty of Title by Landlord

17.    Quiet Enjoyment

18.    Mortgage and Estoppel Certificates

19.    Default

20.    Condemnation

21.    Mutual Waiver of Subrogation

22.    Assignment and Subletting

23.    Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Exculpation; Transfer of Interest

40.    Authority

41.    Landlord's Trademarks



## LEASE AGREEMENT

This Lease, made effective this 19 day of April , 2001 , by and between Plantation Center Partners, Ltd., a Florida limited partnership, with its business address at 777 Brickell Avenue, Suite 1200, Miami, FL 33131, Landlord, and Consolidated Stores Corporation, an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

### WITNESSETH:

1. ### DEFINITIONS:

   For purposes of this Lease, these terms are defined as follows:

   A.  Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall have the right to modify, alter or reconfigure the Common Areas provided that: (i) the visibility of and accessibility to the Demised Premises from West Broward Boulevard shall not be materially and adversely impacted; (ii) Landlord will not make material alterations to the Common Areas within the area identified as "Tenant Control Area" on Exhibit A of this Lease, without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed; and (iii) the number of parking spaces in the Common Areas shall not be reduced below four (4) spaces per 1,000 square feet of gross leasable area in the Shopping Center.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not materially adversely affect Tenant's business operation.

   B.  Dates:  Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in the Section along with other key dates contained in this Lease following execution of this Lease.

   1)  The "Tenant Possession Date" shall ten (10) days after written notice from Landlord that it has completed (with the exception of minor "punch list" type items) all construction as required pursuant to Exhibit C.  Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises.  Said form shall be executed by Tenant and returned to Landlord.  Possession of the Demised Premises shall not be deemed to have been given to Tenant unless construction pursuant to Exhibit C is complete (with the exception of minor "punch list" type items) and the Demised Premises complies with all laws, ordinances, regulations and building restrictions.  Within fifteen (15) days after the date on which Landlord delivers possession of the Demised Premises to Tenant, Tenant shall provide Landlord with a "punch list" of all items of Landlord's Work not yet complete.  Landlord shall complete such items of Landlord's Work contained in the "punch list" within ten (10) days after the date on which Landlord receives the "punch list" or such greater time in the event such repairs cannot be completed within ten (10) days provided Landlord shall have commenced such repairs promptly upon receipt from Tenant and provided Landlord is diligently undertaking such repairs.

olblrata 1/00                                3

As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

2) The "Rent Commencement Date" shall be the date which is the later of ninety (90) days after the Tenant Possession Date, or ninety (90) days from the date on which Tenant receives all permits and approvals for its construction. Tenant shall apply for all necessary permits or approvals for Tenant's construction within thirty (30) days after the date of this Lease and shall thereafter diligently pursue issuance of the same. If Tenant has not applied for all necessary permits or approvals for its construction within thirty (30) days after the date of this Lease, Landlord may provide notice to Tenant of its intent to terminate this Lease. Should Tenant fail or refuse to apply for such permits within fifteen (15) days of such notice, then Landlord may terminate this Lease upon written notice to Tenant, which notice shall be delivered to Tenant subsequent to expiration of such fifteen (15) day period but prior to Tenant applying for such permits. If the necessary permits or approvals for Tenant's construction have not been issued within one hundred twenty (120) days after the date on which Tenant applies for such permits or approvals, Landlord or Tenant shall have the right to terminate this Lease upon written notice to the other which notice shall be delivered to Landlord or Tenant, as appropriate, subsequent to the expiration of such 120-day period but prior to Tenant obtaining such permits.



3) The "Term Commencement Date" shall be the Rent Commencement Date.

4) If Landlord fails to tender possession of the Demised Premises to Tenant by the later of forty-five (45) days subsequent to (i) the date of this Lease or (ii) Landlord's receipt of all permits and approvals for its construction, if any, at the Demised Premises, then Tenant may cancel this Lease by written notice to Landlord. Landlord shall apply for all necessary permits or approvals for Landlord's construction as provided in Exhibit C within thirty (30) days after the date of this Lease and shall thereafter diligently pursue issuance of the same. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to May 30, 2001 nor subsequent to October 1, 2001.

C. Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1) Exhibit A - Site Plan of Shopping Center

2) Exhibit B - Legal Description of Shopping Center

3) Exhibit C - Landlord Work

4) Exhibit D - Tenant Sign Specification

5) Exhibit D-1 Pylon Sign Drawing

6) Exhibit E - Delivery of Possession Letter

7) Exhibit F - Shopping Center Exclusives

8) Exhibit G - Monument Sign Photograph

D. Demised Premises: The "Demised Premises" shall be the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 25,800 square feet.

E.    <u>Shopping Center</u>: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof and is known as Plantation Marketplace at the address 7067B West Broward Blvd., #110 in the City of Plantation, State of Florida, County of Broward, and 33317 zip code.

**2.**    **<u>DEMISE:</u>**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas for parking and the ingress and egress of vehicles and pedestrians and for the storage of shopping carts (in the area identified as "Shopping Cart Storage" on Exhibit A attached hereto) and storage trailers (at the loading dock serving the Demised Premises).

**3.**    **<u>TERM:</u>**

A.    <u>Original Term</u>: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2007 (as hereinafter defined) (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." Such Partial Lease Year shall be in addition to any and all entire Lease Years as provided in this Lease. If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.    <u>Option to Extend Term</u>: Provided Tenant is not in default of this Lease beyond any notice and cure period at the time Tenant exercises each option term, Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. If Tenant should fail to exercise any Option Term, all subsequent Option Terms shall be null and void and of no force or effect.

**4.**    **<u>USE AND OPERATION:</u>**

Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furnishings, furniture, and food provided Tenant shall comply with the existing Shopping Center Exclusives attached hereto as Exhibit F ("Anticipated Use"). Landlord represents and warrants to Tenant, as of the effective date of this Lease, that with the exception of the exclusive rights in favor of other tenants in the Shopping Center as shown on Exhibit F of this Lease, no exclusive covenants granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises. Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associ-

ated with violation of this provision. Tenant covenants and agrees that it shall open for business, fully fixtured, stocked and staffed, as a "Big Lots" or, in Tenant's sole discretion, as a "Big Lots with Furniture" or "Big Lots Furniture", for not less than one (1) day within thirty (30) days after the Rent Commencement Date.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other discount, liquidator, closeout store, furniture, or dollar store operation in excess of seven thousand (7,000) square feet ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In the event a Competing Business, as defined herein, is operated in the Shopping Center, and Landlord is unable to cause such Competing Business permanently to cease operating within thirty (30) days after Tenant provides Landlord written notice thereof, Tenant shall pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may, at Landlord's sole option, terminate this Lease at any time thereafter upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder accruing after the date of termination except pursuant to any provisions which survive this Lease.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

Beginning on the Tenant Possession Date and throughout the Term of this Lease, Tenant shall cause all trash, garbage and refuse generated by the Demised Premises to be placed in a dumpster to be provided or caused to be provided by Tenant at Tenant's sole cost and expense on a regular basis so that trash, garbage and refuse do not accumulate within any portion of the Demised Premises. Tenant shall arrange directly with the hauler for removal of such trash, garbage and refuse as frequently as is reasonably necessary at Tenant's sole cost and expense and shall pay for such services prior to delinquency.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises in the space identified as "Shopping Cart Storage" on Exhibit A attached hereto and incorporated by reference herein.  Tenant shall comply with existing Shopping Center Exclusives as attached hereto as Exhibit F.

5.    **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent, Percentage Rent and all other charges due from Tenant to Landlord under this Lease (sometimes referred to collectively as "Rent").  Rent shall be payable without notice, demand or setoff, except as expressly provided otherwise in this Lease.  The Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:  During the Original Term of this Lease, the sum of  One Hundred Three Thousand, Two Hundred Dollars ($103,200.00) per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Eight Thousand, Six Hundred Dollars ($8,600.00).

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of One Hundred Sixteen Thousand, One Hundred Dollars ($116,100.00) per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of Nine Thousand, Six Hundred Seventy Five Dollars ($9,675.00).  The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of One Hundred Twenty Nine Thousand Dollars ($129,000.00) per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of Ten Thousand Seven Hundred Fifty ($10,750.00).  The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of One Hundred Forty One Thousand, Nine Hundred Dollars ($141,900.00) per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of  Eleven Thousand, Eight Hundred Twenty Five Dollars ($11,825.00).

B.    <u>Utilities Charge and Exterior Lighting</u>:  Landlord shall provide Tenant with access to electrical, water, and sewer as are reasonably necessary for Tenant to conduct a general retail operation  in the Demised Premises.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities.  Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises.

C.    <u>Percentage Rent</u>:  In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Gross Sales (as hereinafter defined) which exceeds the annual base sum of $4,128,000.00 during the Original Term; $4,644,000.00 during the First Option Term; $5,160,000.00 during the Second Option Term; and $5,676,000.00 during the Third Option Term.

The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from or orders filled at Demised Premises during any Lease Year or Partial Lease Year (including, but not limited to, catalog sales and internet orders filled at the Demised Premises) and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such

sales, charges, and receipts shall include those of Tenant and Tenant's sublessees, licensees and concessionaires. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks, which amount shall be included in Gross Sales if subsequently collected; (5) sales of merchandise to employees at a discount to the extent such do not exceed two percent (2%) of Gross Sales; (6) insurance proceeds; (7) credit card company finance or service charges; (8) proceeds from vending machines located in the Demised Premises; and (9) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month. Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by Tenant. Tenant shall pay any Percentage Rent due with such annual Gross Sales statement.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), so that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event.

D.   <u>Common Area Charges</u>:  Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)   operating, maintaining, , repairing, replacing, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)   operating, maintaining, , repairing, replacing, and lighting the service areas, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)   operating, maintaining, repairing, replacing, and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) maintaining all paved surfaces in a level and smooth condition, reasonably (and substantially) free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(v) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Common Area Charges are limited to refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and public liability, property damage, and fire and extended coverage on the Common Areas, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies.

Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses. Excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, and any administrative, management or related fees.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's accountants. Tenant may not audit Landlord's books and records more than one (1) time per Lease Year or Partial Lease Year. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next Rent payments due from Tenant to Landlord hereunder.

**Cap:** Notwithstanding anything herein to the contrary, Tenant's pro rata share of Common Area Charges shall not exceed $16,770.00 per Lease Year during the Original Term, $19,350.00 per Lease Year during the First Option Term, $21,930.00 per Lease Year during the Second Option Term, and $24,510.00 per Lease Year during the Third Option Term; for any Partial Lease Year, such amounts shall be pro rated based on the actual number of days in such Partial Lease Year.

E.    <u>Real Estate Taxes:</u>  The term "Real Estate Taxes" shall mean all real property taxes and assessments (including sanitary taxes, extraordinary or special assessments) levied, imposed, or assessed upon the Shopping Center. Excluded from such Real Estate Taxes shall be (i) the amount of any abatements, refunds or rebates, (ii) the amount of any interest and/or penalties for late payments and (iii) the amount of any discounts available for prompt payment, regardless of whether in fact such prompt payment is made. Landlord shall pay all Real Estate Taxes. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.



Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes and work papers evidencing allocation of Real Es-

tate Taxes to the Demised Premises and to all Shopping Center parcel(s) promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.



If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay, prior to delinquency, all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, Florida sales tax on the rentals provided for in this Lease, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.     Construction Allowance/Rent Abatement:

    1.     Construction Allowance.

        Upon completion of the following conditions, Tenant shall be entitled to payment of Forty Eight Thousand Four Hundred and 00/100 Dollars ($48,400.00) as consideration for Tenant's construction to and improvement of the Demised Premises (hereinafter referred to as "Construction Allowance"):

        (a)     Tenant shall provide fully executed lien waivers for each contractor and/or materialman which performed work and/or supplied materials, provided the aggregate cost of such work or materials in each instance exceeded $500.00;

        (b)     Landlord's receipt of a letter from an officer of Tenant's Real Estate Department stating that Tenant's construction has been completed; and

        (c)     Landlord's receipt of a copy of Tenant's certificate of occupancy or its equivalent;

        (d)     Tenant's opening for business from the Demised Premises;

        (e)     Tenant is not in monetary default of this Lease beyond any notice and cure period.

    Landlord shall pay to Tenant the Construction Allowance within thirty (30) days of Tenant's completion of the above requirements. If the Construction Allowance is not paid by Landlord to Tenant within thirty (30) days after Tenant's completion of the above requirements, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York from the due date of the date of payment, and Tenant may deduct such sum for subsequent installments of Rent until sum is fully paid.

2.    Rent Abatement.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be obligated to pay Fixed Minimum Rent during the first six (6) full months of the Original Term of this Lease as consideration for Tenant's construction to and improvement of the Demised Premises (hereinafter referred to as "Rent Abatement"). The total amount of the Rent Abatement shall be equal to Fifty One Thousand Six Hundred and 00/100 dollars ($51,600.00).

Landlord and Tenant recognize and agree that the Construction Allowance and Rent Abatement are for the purpose of constructing or improving long term real property at the Demised Premises and Landlord and Tenant intend for the Construction Allowance and Rent Abatement to be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

Consolidated Stores Corporation          Plantation Center Partners, Ltd
EIN: 06-1119097                          EIN: _____
300 Phillipi Road                        777 Brickell Avenue, Suite 1200
Columbus, Ohio 43228-0512                Miami, Florida 33131

G.    Late Fee: Tenant shall pay Landlord a late fee on any Rent due in the event such Rent is not paid within ten (10) days after its due date; provided, however, no such late fee shall be assessed or collected by Landlord on any two (2) late payments in a consecutive twelve (12) month period unless such amounts remain unpaid more than ten (10) days subsequent to notice from Landlord to Tenant that the Rent payment was not received by Landlord on the due date.

6.    **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations only to the inside of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that the cost thereof does not exceed $100,000.00 in any Lease Year or Partial Lease Year; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing. If Tenant desires to make structural or exterior alterations to the Demised Premises, Tenant shall provide plans and specifications to Landlord for Landlord's consent which consent may be withheld or delayed in Landlord's sole discretion.

Tenant shall have no authority to subject the Demised Premises or the Shopping Center or any interest of Landlord therein to any mechanics or other lien. Should any mechanic's or other lien be filed against the Demised Premises or the Shopping Center or any part thereof or any interest of Landlord therein, by reason of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by bond or otherwise within thirty (30) days after Tenant's receipt of Landlord's notice thereof. Tenant hereby indemnifies, defends and saves harmless Landlord from and against all mechanics liens or other such liens arising from any work performed, material furnished or obligations incurred by Tenant in connection with the Demised Premises or the Shopping Center.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the De-

mised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises. Notwithstanding item (vi) of this paragraph, Tenant agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines. Tenant shall be responsible for repairing damage to the slab at the Demised Premises caused by coolers and freezers and water lines serving them to the extent such damage is caused by the negligence or willful misconduct of Tenant.    Landlord agrees, at Landlord's sole cost and expense, to make all repairs (including replacements as required in Landlord's reasonable judgment) necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as (capacity of 1 ton per 400 square feet). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense, which expense shall be reasonable. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work reasonably required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually,  from its next Rent payment(s) owing.

Within the first nine months subsequent to the Tenant Possession Date, should  Tenant discover that the HVAC system requires repair and/or replacement, the cost of which thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate during such nine-month period,  Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant.  In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually from its next Rent payments owing. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition, as of the Tenant Possession Date.   Tenant shall notify Landlord of any defects within fifteen (15) days after the Tenant Possession Date by providing Landlord with written notice of such items not in operating condition.  Landlord

shall, within ten (10) days from such notice, or such greater time in the event such repairs cannot be completed within ten (10) days provided Landlord shall have commenced such repairs promptly upon receipt of notice from Tenant and provided Landlord is diligently undertaking such repairs, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate.  Subject to the preceding provisions, if Landlord fails to commence and to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof.  Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installment of Rent ("Interest Rate").

If Landlord fails to commence and diligently complete the making of any repairs which Landlord is obligated to make pursuant to the terms of this Lease to the Demised Premises within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof.  If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days.  Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives.  In performing any such repairs pursuant to this Section, Tenant shall use licensed contractors and perform all such repairs in a first class and workmanlike manner.  Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing.

If Tenant fails to commence and diligently complete the making of any repairs which Tenant is obligated to make pursuant to the terms of this Lease within thirty (30) days after notice by Landlord of the need for such repairs, Landlord shall have the right to perform such repairs and to charge Tenant the reasonable cost thereof.  If the repair is necessary to end, mitigate, or avert an emergency and if Tenant, after receiving confirmation from Landlord or such necessity, fails to commence repair as soon as reasonably possible, Landlord may do so at Tenant's cost, without waiting thirty (30) days.  Should Landlord perform repairs pursuant to this Section, Tenant shall and does hereby indemnify and hold harmless Landlord for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Landlord or Landlord's authorized representatives.  In performing any such repairs pursuant to this Section, Landlord shall use reputable licensed contractors and perform all such repairs in a first class and workmanlike manner.  Tenant shall reimburse Landlord the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor.  Should Tenant refuse to reimburse Landlord for such costs within thirty (30) days of receipt of an invoice therefor, Landlord shall have the right to deduct such cost with interest at the Interest Rate.

8.   **SIGNS:**

Tenant shall at its sole cost and expense have the right to place, suffer or erect a storefront sign, in compliance with Exhibit D of this Lease, on the exterior walls of the Demised Premises.  Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize and to freely change its standard window signs, its pre-opening signs, building signs, and pylon sign panels so long as the same are used in a majority of Tenant's stores in south Florida market with-

out Landlord consent. Tenant shall at its own expense obtain the necessary permits and comply with local codes and ordinances related to its storefront sign.

Landlord shall ensure that Shopping Center pylons, if pylons exist in the Shopping Center, conform to all requirements of any authorities having jurisdiction.

Tenant shall have the right to place sign panels on a certain monument sign (s) located at the Shopping Center in such position as identified on Exhibit G attached hereto and incorporated by reference hereby. Tenant shall have the right to place suitable sign panels upon the existing Shopping Center pylon sign in space formerly occupied by World Gym and as identified on Exhibit D-1 attached hereto and incorporated by reference hereby. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on a space within the top one-half (1/2) portion of the Shopping Center. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once Tenant's sign panels are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs. Tenant agrees to maintain its sign panels on the Shopping Center pylon sign in good condition and repair.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially adversely obstruct or interfere with the visibility or legibility of Tenant's signs.

Upon the expiration or earlier termination of this Lease, Tenant shall remove its storefront sign and its pylon sign panels and repair any damage caused by such removal.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

To Landlord's actual knowledge, except for ADA compliance of the bathrooms at the Demised Premises, the Demised Premises conforms to all requirements by authority having jurisdiction. If the Demised Premises as of the Tenant Possession Date do not conform to all requirements by authority having jurisdiction, Landlord shall promptly cause the Demised Premises to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord agrees to make all repairs, alterations, additions, or replacements to the portions of the Demised Premises which Landlord is required to repair pursuant to Section 7 of this Lease required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future (and Tenant shall have all such obligations with respect to the portions of the Premises which Tenant is required to repair pursuant to Section 7 above). In no event shall Tenant be required to make structural or capital improvements to the Demised Premises or Shopping Center. Tenant shall not knowingly violate any law, statute, ordi-

nance, order or regulation of any governmental authority having jurisdiction in conducting business for the Anticipated Use at the Demised Premises.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.    **INSURANCE:**

A.    Tenant: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance (including contractual liability coverage) covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: Two Million Dollars ($2,000,000.00) each event combined single limit with a Three Million Dollar ($3,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Provided Tenant maintains a tangible net worth of at least $5,000,000.00, Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

The insurance required to be carried by Tenant in this Section 12.A shall be with firms licensed to do business in the State of Florida with a "Bests" rating of A – X or better. Tenant's insurance shall not be canceled or reduced in coverage without 30 days prior written notice to Landlord.

Tenant shall provide Landlord with certificates of insurance for the insurance Tenant is required to carry pursuant to this Lease within thirty (30) days after Tenant's receipt of Landlord's written request therefor.

B.    Landlord: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord

shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: Two Million Dollars ($2,000,000.00) each event combined single limit with a Three Million Dollar ($3,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

The insurance required to be carried by Landlord in this Section 12.A shall be with firms licensed to do business in the State of Florida with a "Bests" rating of A – X or better. Landlord's insurance shall not be canceled or reduced in coverage without 30 days prior written notice to Tenant.

 Tenant will pay to Landlord monthly Tenant's estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of competing said premium within thirty (30) days after Tenant's written request therefor. An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

13.  **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition. If Landlord repairs and restores the Demised Premises to proper tenantable condition (provided Tenant has not terminated the Lease pursuant to the Section 13), Tenant covenants and agrees to open for business fully fixtured, stocked and staffed for not less than one (1) day.

B.   In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within three hundred (300) days from the date of such casualty, Tenant may, at its option, terminate this Lease by written notice to Landlord and thereupon Landlord and Tenant shall be released from all future liability and obligations under this Lease.

C.   If the Demised Premises are damaged or destroyed during the last two (2) years of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant

shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to financial inability.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16. **WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which are not inconsistent with this Lease and do not adversely impact Tenant's business operation; and (c) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease. When satisfactory proof of the party entitled to receive Rent is provided to Tenant, Tenant shall pay any amount of Rent withheld to the party entitled to receive such Rent.

17. **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions.

18. **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to Tenant's agreement to subordinate this Lease, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, nondisturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease,

olblrata 1/00                                    18

and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, any prospective purchasers of the Shopping Center, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information:  (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

19. **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after written notice of such default by the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord (provided that if the default is of such a nature that if cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), Landlord may, at Landlord's option, in addition to any and all other legal and equitable remedies and rights:  (i) terminate this Lease by giving not less than three (3) days written notice and end this Lease and re-enter upon the Demised Premises; or (ii) take possession of the Demised Premises without terminating this Lease and rent the same for the account of Tenant (which may be for a term extending beyond the Term of this Lease) in which event the Tenant covenants and agrees to pay any deficiency after crediting it with the Rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim if may have to any rent obtained on such reletting which may be in excess of the Rent required to be paid herein by Tenant; or (iii) perform such obligation (other than the payment of Rent) on Tenant's behalf and charge the cost thereof, together with a reasonable fee for Landlord's time and effort, to Tenant as additional Rent;  and interest at the Interest Rate or (iv) accept partial rent without waiving any rights Landlord has hereunder as the result of a default; or (v) exercise any and all other rights granted to Landlord herein or by applicable law; or (vi) the Landlord may resort to any two or more of such remedies or rights.  The exercise of any of the options herein contained shall not be deemed to be the exclusive Landlord's remedy.  The various rights and remedies herein granted to Landlord may be exercise concurrently and shall be cumulative and in addition to any others Landlord may be entitled to by law or at equity, and the exercise of one or more rights or remedies shall not impair Landlord's right to exercise of one or more rights or remedies shall not impair Landlord's right to exercise any other right or remedy.  The failure of forbearance of Landlord to enforce any right or remedy in connection with any default shall not be deemed a waiver of such default at any subsequent date.  In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant.  Rather, such amount shall remain payable monthly as they would have come due under this Lease. Tenant may raise as an affirmative defense to any claim for damages that Landlord failed  to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.  Landlord shall not, however, be required to take any of the following actions in that regard: (i) to lease the Demised Premises for less than five (5) years; (ii) to lease less than all the Demised Premises; (iii) to lease to a tenant with less than Five Million and 00/100 Dollars ($5,000,000.00) tangible net

worth; or (iv) lease the Demised Premises for less than ninety-five percent (95%) of fair market value.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, may be deducted by Tenant from Rent thereafter to become due. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

20.    <u>**CONDEMNATION:**</u>

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or common area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith. Until the Demised Premises or Shopping Center is restored to proper tenantable condition, Rent shall abate and thereafter, Rent shall be reduced in proportion to the amount of the Demised Premises so taken. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21.    <u>**MUTUAL WAIVER OF SUBROGATION:**</u>

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights or recovery against Landlord relating to property damage to the extent the loss is insurable under standard, broad form fire and casualty policies; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage to the extent the loss is insurable under standard, broad form fire and casualty policies. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease provided Tenant shall have obtained the prior written consent of the Landlord.  No such subletting or assignment shall relieve Tenant of any of its obligations hereunder.  No such assignment or subletting shall divide the Demised Premises into greater than two (2) units; subsequent to such assignment or subletting, one unit of which shall be not less than 25,000 square feet.    Each sublease assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.  The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

Notwithstanding anything contained in this Lease to the contrary, Landlord shall not unreasonably withhold its consent to any assignment of this Lease or subletting of the Demised Premises, provided that: (i) the proposed transferee has the financial capacity and net worth sufficient to fulfill the terms of this Lease, as reasonably determined by Landlord, based on the financial information about such transferee provided by Tenant or such transferee; (ii) the proposed transferee possesses sufficient experience and qualifications for successful operation of the Demised Premises in a manner consistent with all provisions of this Lease; (iii) such transferee continues to operate the business conducted in the Demised Premises for the same use set forth in this Lease; (iv) the proposed transferee is not an existing tenant in the Landlord Parcel or the Shopping Center; and (v) Tenant is not in default of this Lease beyond any notice and cure period.

Notwithstanding anything in this Lease to the contrary, (i) Tenant may assign this Lease or sublet the Demised Premises without Landlord's consent so long as the intended use does not materially differ from the use of Tenant herein, when such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, provided that the entity which will be the Tenant under this Lease following such an assignment or subletting shall have at least 50 stores, (ii) Tenant may assign this Lease, without Landlord's consent, in connection with a merger or consolidation of the same or all or substantially all of the assets or stock of Tenant provided that the entity which will be the Tenant under this Lease following such an assignment or subletting shall have at least 50 stores, and (iii) Tenant may assign this Lease, without Landlord's consent, in connection with the sale of all or substantially all of an operating division of Tenant in connection with the sale of Tenant's stores provided that the entity which will be the Tenant under this Lease following such an assignment or subletting shall have at least 50 stores; provided that in case of any such assignment referred to above, such assignee shall assume all of Tenant's obligations hereunder in writing, and Tenant shall not be relieved of its obligations hereunder.

Notwithstanding anything herein to the contrary, the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as (i) the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange, or (ii) such transfer is otherwise a permitted transfer without Landlord's consent as provided for above.

Within thirty (30) days after Landlord's receipt of Tenant's request to assign this Lease or sublet the Demised Premises (if consent is required pursuant to this Lease), Landlord shall, by notice to Tenant, grant or deny its consent to such request.  If Landlord shall fail to notify Tenant within such thirty (30) days period of Landlord's approval or rejection of Tenant's sublet or assignment request such request shall be conclusively deemed granted.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises and repair any damage to the Demised Premises caused by such removal.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred fifty percent (150%) of the Fixed Minimum Rent and otherwise subject to all the terms and provisions hereof.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the next business day in the case of delivery by overnight courier, or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.    **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State of Florida without regard to choice of law rules of that state.

26.    **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.    **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease, which memorandum of lease shall be reasonably satisfactory to Landlord and Tenant. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease. At the expiration or earlier termination of this Lease, at Landlord's request and at Tenant's sole cost and expense, Tenant shall execute and deliver to Landlord for recordation a recordable memorandum of termination of lease reasonably satisfactory to Landlord and Tenant.

Neither party shall record this Lease.

28.    **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.    **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.    **HAZARDOUS MATERIAL:**

Landlord represents and warrants, to the best of Landlord's actual knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent due under this lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant or any of Tenant's agents, contractors, employees or subtenants while in possession of the Demised Premises, or elsewhere if directly caused by Tenant or any of Tenant's agents, contractors, employees or subtenants. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months

after the expiration of the Lease Year in which such payments or adjustments are appli-
cable. If Landlord does not notify Tenant of such amount owed within said six (6) month
period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.  INTENTIONALLY DELETED:**

**34.  INTENTIONALLY DELETED:**

**35.  NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been
freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over
the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or
conditions there shall be no inference, presumption, or conclusion drawn whatsoever
against either party by virtue of that party having drafted this Lease or any portion
thereof.

**36.  SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect,
shall not constitute an option for the leasing of the Demised Premises, nor confer any
rights or impose any obligations upon either party until the execution thereof by Landlord
and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of
this authorized signature printed by the receiving facsimile machine to be its original sig-
nature.

**37.  INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, whether or not any relative
provision has been added, this Lease shall be construed as if the material so stricken was
never included herein and no inference shall be drawn from the material so stricken
which would be inconsistent in any way with the construction or interpretation which
would be appropriate if such material were never contained herein.

**38.  TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.  EXCULPATION; TRANSFER OF INTEREST:**

Notwithstanding any provision of this Lease to the contrary, Tenant agrees to look solely
to Landlord's interest in the Shopping Center and the rents or other forms of considera-
tion receivable therefrom or on account thereof for recovery of any judgment against
Landlord, it being understood that none of Landlord's representatives, agents, partners,
shareholders, directors, employees, fiduciaries, members or officers shall ever be person-
ally liable for such judgment. Landlord shall be liable only with respect to its period of
ownership and shall be released from any further liability accruing under this Lease from
and after the date of transfer of Landlord's interest in this Lease or the Shopping Center,
provided however, that as a condition precedent to Landlord's interest in this Lease or the
Shopping Center assumes in writing all such liability.

**40.  AUTHORITY:**

Tenant represents and warrants that this Lease has been duly authorized, executed and de-
livered by and on behalf of Tenant and constitutes the valid and binding agreement of
Tenant in accordance with the terms hereof.

**41.  LANDLORD'S TRADEMARKS:**

Tenant shall not have nor acquire any property right or interest in or to any name or dis-
tinctive designation which may become identified or associated with the Shopping Cen-

ter.  All property rights or rights of use of such name or distinctive designation shall be and will remain the property of the Landlord.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD:**
Plantation Center Partners, Ltd.
By:  Plantation Center Partners, LLC, as General
                                          Partner

By: _____

Title: _Ira M. Levenshon, Member_____

Witnesses As To Tenant:

**TENANT:**    **CONSOLIDATED STORES CORPORATION, an Ohio corporation**

By: _____
          Kathleen Hupper
Title: _____
          Vice President

STATE OF _FLORIDA_

COUNTY OF _DADE_

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Plantation Center Part_ by, _Ira M. Levenshon_ its _Member_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Miami, Florida_ this _19th_ day of _April_, 2001.

_Rebeca Payo_
( Notary Public

REBECA PAYO
MY COMMISSION # CC 912785
EXPIRES: February 21, 2004
Bonded Thru Notary Public Underwriters

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation**, by Kathleen Hupper, its **Vice President**, who acknowledged that she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Columbus, Ohio_; this _17th_ day of _April_, 2001.

_Candice S. Hendry_
Notary Public

CANDICE S. HENDRY
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES APRIL 25, 2005

**EXHIBIT A**

# Plantation Center Shopping Plaza



Plantation

**EXHIBIT B**

## LEGAL DESCRIPTION OF SHOPPING CENTER

E X H I B I T   " A "

PARCEL 1:  Tract A of PLANTATION CENTER, according to the Plat thereof recorded in Plat Book 102, at Page 2, of the Public Records of Broward County, Florida, being a Resubdivision of portions of Blocks 3 and 4, Everglades Plantation Company's Subdivision Amended of Section 3, Township 50 South, Range 41 East, recorded in Plat Book 2, at Page 7, Dade County Records.

Said land situate, lying and being in the City of Plantation, Broward County, Florida.

PARCEL 2:  Easement for the benefit of parcel 1 as created by Easement granted by Landmark First National Bank of Fort Lauderdale to M.P.I Corporation, N.V., a Netherlands Antilles Corporation, and M.L. Development, Inc., a Florida corporation, doing business as Plantation Center Venture, dated August 13, 1979 and filed August 14, 1979 in Official Records Book 8382, at Page 834, of the Public Records of Broward County, Florida, for ingress and egress over and across the following described property.    Subject to the terms, provisions and conditions set forth in said easement.

A portion of Lot 1, LANDMARK PLAZA, as recorded in Plat Book 86, at page 24, of the Public Records of Broward County, Florida, more fully described as follows:

Commencing at the most Southwesterly corner of said Lot 1; thence North 1 degrees 39 minutes 10 seconds East along the West line of said Lot 1, a distance of 605.00 feet to the Point of Beginning; thence continuing North 1 degrees 39 minutes 10 seconds east along the said West line, a distance of 30.00 feet; thence South 58 degrees 29 minutes 23 seconds East, a distance of 119.92 feet; thence South 88 degrees 20 minutes 50 seconds East, a distance of 71.01 feet to a point on the East line of said Lot 1; thence South 1 degrees 39 minutes 10 seconds West, along the said East line of Lot 1, a distance of 25.00 feet; thence North 88 degrees 20 minutes 50 seconds West, a distance of 79.71 feet; thence North 58 degrees 29 minutes 23 seconds West, a distance of 109.87 feet to the Point of Beginning.

Said lands, situate, lying and being in the City of Plantation, Broward County, Florida.

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date. In the event of any conflict between the terms and conditions of the Lease document and this Exhibit C, the terms and conditions of the Lease document shall control.

**Landlord covenants and agrees to deliver the premises to Tenant as follows:**

1.    HVAC equipment to be in good working condition and adequate for Tenant's intended use (a minimum of one ton per 400 square feet.)

2.    All plumbing, electrical, and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification.

3.    Landlord to ensure existing pylon meets all local and state codes and ordinances in order for Tenant to place its panel on the pylon.

4.    Roof to be in good condition and free of leaks.

5.    With the exception of ADA compliance for the bathrooms at the Demised Premises, upon delivery of possession of the Demised Premises to Tenant (and thereafter only if expressly provided in the Lease), Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction and no Hazardous Materials are present. If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.

6.    All above work to be completed before the Tenant Possession Date.

ofbirata 1/00

EXHIBIT D

TENANT SIGN SPECIFICATION

C



A

B

D

E

CHANNELED RETURN
TRIMCAP
PLEXIGLAS FACE
NEON TUBING
WEATHER TITE DISCONNECT
SWITCHES ON EXTERIOR OF
CHANNELED PER EACH LETTER
3/8" X 4" LONG LAG BOLTS

SIGN CABINET AND
RETAINERS
3/8" X 4" LONG LAG BOLTS
HO FLUORESCENT LAMPS

PAN STYLE PLASTIC FACES
WITH EMBOSSED COPY
1 1/2" X 1 1/2" X 1/4" VERTICAL
ALUMINUM ANGLES IN BACK OF
CABINET 0'-0" CENTER TO CENTER

TYP. WALL SECTION

70/120 VOLT ELECTRICAL 60 CYCLE    20 AMP
CIRCIT CONNECTION BY LOCAL LICENSED ELECTRICIAN

SIGN SPECIFICATIONS
CUSTOM FABRICATED 8" ALUMINUM CHANNELED LETTERS
FINISHED PMS 293 BLUE  PREFINISHED HERON BLUE WHEN AVAILABLE

3/16" PLEXIGLAS FACES 2793 RED WITH 2"  BLUE TRIM
CAP RETAINERS PMS 293 BLUE

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON
TUBING POWERED BY 3MA SELF CONTAINED TRANSFORMERS

LETTERS MOUNTED OVER:
CUSTOM FABRICATED 8" EXTRUDED ALUMINUM SIGN BOX
FINISHED PMS 293 BLUE

FLAT FLANGE STYLE FORMED PLASTIC FACES WITH EMBOSSED COPY
FACE BACKGROUND PMS 2037 BRIGHT YELLOW WITH PMS 293
BLUE COPY AND PMS 185 RED DOT

INTERNALLY ILLUMINATED WITH HO FLUORESCENT LAMPS
TWO PIECE BOX, HIDDEN MOUNTING (NO CLIPS)

| STANDARD SIZES | | | | |
|---|---|---|---|---|
| A | B | C | D | E |
| 3'-0" | 1'-8" | 15'-10" | 13'-3" | 5'-8" |
| 4'-0" | 2'-4" | 21'-1" | 17'-7" | 7'-6" |
| 5'-0" | 1'-6 1/2" | 26'-4" | 22'-1" | 7'-8" |

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS

3/1/99

**EXHIBIT D-1**

**PYLON SIGN DRAWING**

**[Intentionally Omitted]**

olblrata 1/00

**EXHIBIT F**
**EXISTING EXCLUSIVE USES AND RESTRICTIVE USES**

Tenant shall comply with each and every exclusive use and restrictive use provision listed below. Landlord shall not be obligated to Tenant to enforce against any other tenant in the Shopping Center any of the exclusive use and restrictive use provisions listed below.

1.  <u>Blockbuster Lease:</u> No premises in the Shopping Center (other than the Blockbuster Premises) shall be used to sell, rent and/or distribute pre-recorded videos cassettes, video games, video tapes, video discs, video software and home entertainment software. Notwithstanding the above:

    (1)  tenants who may lease 7,500 square feet or less in the Shopping Center now or in the future may sell prerecorded video tapes or technological evolutions of video tapes (AVideo Products") whose content is related to that particular tenant's primary business (i.e., a Christian bookstore may sell religious tapes) provided the sale of Video Products is not that particular tenant's primary business;

    (2)  tenants leasing 7,500 square feet of more in the Shopping Center now or in the future may sell or rent prerecorded Video Products at its premises provided such tenant's tape display shall never exceed eight percent (8%) of Tenant's actual floor area;

    (3)  A ANational or Regional Tenant"may sell or rent prerecorded Video Products at its premises, provided such tenant limits the number of titles sold to eight (8). A ANational or Regional Tenant' shall mean a tenant operating at the Shopping Center who leases space or owns premises in at least forty (40) other locations in the United States which other sites are being utilized by such tenant for the same primary business purpose as such tenant's primary business at the Shopping Center; and

    (4)  Landlord may lease space in the Shopping Center to a tenant whose primary business activity is the sale of children's toys or educational supplies which may include the sale or rental of prerecorded Video Products whose content is related to such particular tenant's primary business.

    (5)  Notwithstanding anything contained in  subparagraphs (1) through (5) above, the foregoing exclusive shall be fully applicable to any party whose primary business activity at the Shopping Center is the operation of a music store.

    Landlord shall not lease any space in the Shopping Center with an entrance within two hundred (200) linear feet of the entrance to the Blockbuster Premises to any party whose primary business activity is the operation of a health club.

2.  <u>Famous CJ=s Restaurant</u>: No unit of the Shopping Center of 2,250 square feet or less (other than the Famous CJ=s Restaurant Premises) shall be leased to any person or party whose primary business activity in such space is the operation of a full-service Italian restaurant which offers sit down, take-out and delivery services.  The foregoing will not prevent leasing any space in the Shopping Center to any other kind of restaurant or any other party which may offer some but not all Italian entrees.

3.  <u>Dry Clean USA</u>: No premises in the Shopping Center (other than the Dryclean USA Premises) shall be used for dry cleaning, laundry and alterations.

4.  <u>Eckerd Drugs</u>: No premises in the Shopping Center (other than the Eckerd Drugs premises) shall be used to operate a drug prescription department.  No premises in the Shopping Center shall be leased to any type of stores commonly known as army-navy store, surplus store, or non-categorized discount store, or with any stores or business devoting more than 1,000 square feet of their retail floor area to the sale of cosmetics, health and beauty aids and related items without the express written consent of the tenant under the Eckerd Drugs lease.  No premises in the Shopping Center (other than the Eckerd Drugs premises) shall be used as a drug store.  Notwithstanding the foregoing, by

letter agreement dated April 11, 2001, Eckerd Corporation has agreed that Consolidated Stores Corporation may enter into a lease for Unit #110 for the purpose of the sale of general merchandise, furnishings, furniture and food.

5. <u>Uniforms for America Lease</u>: No premises (other than the Uniforms for America premises) shall be used for the principal business (principal business being defined as deriving more than twenty five percent (25%) of its gross sales from said principal use) for the following use: a store selling uniforms at retail or wholesale for medical, hotel and other uniformed employees and other uniform related items, including medical accessories, school uniforms, shoes for medical personnel, and other types of career apparel, accessories and shoes.  This exclusive shall not apply to Winn-Dixie or Eckerds, PetsMart or future anchors, an anchor shall be defined as a tenant who exceeds 24,000 square feet, or their successors or assigns, or any outparcels, now or in the future. Furthermore, no premises in the Shopping Center (other than the Uniforms for America premises) shall be used for the principal business  to sell uniforms at retail and wholesale for medical, hotel, and other uniformed employees.

6. <u>Dr. Richard Pomella</u>:   No Premises in the Shopping Center (other than the Dr. Richard Pomella Premises) may be used for the primary business of a chiropractic office.  The foregoing shall not apply to an anchor space.

7. <u>Mailboxes Etc.</u>: No premises in the Shopping Center (other than the Mailboxes Etc. premises) shall be used for the primary business of the operation of a Mailboxes Etc. store.  The foregoing shall not prevent Landlord from leasing to a party whose primary business activity is other the operation of a private mail service but who may offer private mail services including the rental of mail boxes and/or delivery and receipt of packages and correspondence as incidental to its primary business activity.

8. <u>Winn-Dixie</u>: No premises in the Shopping Center (other than the Winn-Dixie premises) shall be used as a supermarket, grocery store, meat, fish or vegetable market, nor for a business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods or frozen foods, without written permission of the tenant under the Winn-Dixie lease, the sale of such items is not to exceed the lesser of 500 square feet of sales area, or 10% of the square footage area of any storeroom within the Shopping Center, as an incidental only to the conduct of another business except the sale by a restaurant operation of prepared ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof; provided, however, as to the storeroom to be occupied by Eckerd Drug Store only, the permitted sale of such food items shall be expanded to be 1,500 square feet of sales area.  Further, it is expressly agreed that the tenant under the Winn-Dixie lease reserves the right to operate a bakery and/or delicatessen department in its demised premises at any time, and only shall have the right to sell beer and wine for off-premises consumption in the Shopping Center, with the exception of bars and package stores. Landlord shall be permitted within the Shopping Center, or any enlargement thereof, to lease one storeroom for use as a seafood market of not to exceed 3,000 square feet (provided the same is located at least 150 feet from any part of the Winn-Dixie building; one storeroom for use as an bakery and not to exceed 2,000 square feet; one storeroom for use as an ice cream parlor of not to exceed 2,000 square feet; and one storeroom for use as a German-type combination restaurant and delicatessen of not to exceed 3,500 square feet (provided the same shall be located at least 350 feet from any part of the Winn-Dixie building).  Notwithstanding the foregoing, as to the premises to be occupied by the Woolco Department Store only, its successors and assigns, such premises shall be restricted only to the extent that there shall not be permitted to be operated therein, or elsewhere in the Shopping Center by such tenant, a food supermarket, grocery store, meat, fish, fruit or vegetable market, or any department or concession which would constitute the equivalent thereof.

The Premises may be used only for retail and service stores, and the following shall not be located in the Premises: spa, bowling alley, skating rink, bingo parlor, office building, theatre (either motion picture or legitimate), or health and recreational or entertainment-type activities.

# EXHIBIT G

TENANT'S SIGN



## Lease pages 17 & 29 replaced for Consolidated Stores

## Plantation Shopping Plaza as of April 19, 2001

M$^2$ Realty Corporation

777 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 373 - 9800

· DocuSign Envelope ID: 3BF32444-4066-4FBE-8515-B7A742FF999D

BL #1628

## FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT, made and entered into as of the _18th_ day of _August_, 2021 (this "Agreement") by and between **PLANTATION MARKETPLACE INVESTMENTS, LLC, a Florida limited liability company**, successor in interest to G&I VI South Florida Portfolio SPE LLC, successor in interest to Gehr Development Florida, LLC, successor in interest to Plantation Center Partners, Ltd, whose mailing address is c/o Miami Manager Property Managers, 179 NW 136th Avenue, Sunrise, FL 33325 (hereinafter referred to as "Landlord") and **BIG LOTS STORES, INC., an Ohio corporation** (f/k/a Consolidated Stores Corporation), whose mailing address is 4900 E. Dublin Granville Road, Columbus, Ohio 43081 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant are parties to a Lease Agreement dated April 19, 2001, as amended (collectively the "Lease"), for approximately 25,800 square feet of retail space (the "Demised Premises") located at Plantation Marketplace, 7067 West Broward Blvd, Suite #110, Plantation, FL 33317 (the "Shopping Center"), as more particularly described in the Lease;

WHEREAS, the parties hereby acknowledge that Tenant is currently operating from the Demised Premises during the Third Option Term which is set to expire January 31, 2022 (the "Third Option Term"); and

WHEREAS, Landlord and Tenant now desire to extend the Term of the Lease for a five (5) year period as provided for herein below.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. Upon the Effective Date, the Term of the Lease is hereby extended through January 31, 2027. The period from February 1, 2022 through January 31, 2027 shall hereinafter be referred to as the "Extended Term". All obligations for the remaining Third Option Term and the Extended Term shall continue upon the same terms and conditions as contained in the Lease except as provided herein.

2. Effective and commencing February 1, 2022 (the "Effective Date") and continuing throughout the Extended Term, Tenant shall pay Fixed Minimum Rent at the rate of Seven and 00/100 Dollars ($7.00) per square foot, in the amount of One Hundred Eighty Thousand Six Hundred and 00/100 Dollars ($180,600.00) per annum, payable in monthly installments of Fifteen Thousand Fifty and 00/100 Dollars ($15,050.00).

3. Tenant shall pay its full pro rata share of Common Area Charges, Real Estate Taxes and Insurance in accordance with Sections 5.D, 5.E, and 12, respectively, of the Lease, during the Third Option Term and Extended Term.

1

DocuSign Envelope ID: 3BF32444-4066-4FBE-8515-B7A742FF999D

BL #1628

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine or other means of electronic transfer (such as email), the signing party intends the copy of this authorized signature printed by the receiving facsimile machine or other means of electronic transfer to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

WITNESSES:                                LANDLORD:

                                          **PLANTATION MARKETPLACE
                                          INVESTMENTS, LLC**, a Florida limited
_____                   liability company

_____                   By: _Alex Sirulnik_____

                                          Its: _Manager_____


                                          TENANT:

                                          **BIG LOTS STORES, INC.**, an Ohio
                                          corporation
_____                   _Jonathan Ramsden_____
                                          FF2E5162D539442...
_____
                                          By: Jonathan Ramsden
                                          Its: Executive Vice President
                                               Chief Administrative Officer and
                                               Chief Financial Officer

3