# EXHIBIT A

DocuSign Envelope ID: 991848A6-7769-4C18-96AD-2398A7B7B588



4900 EAST DUBLIN GRANVILLE ROAD
COLUMBUS, OHIO  43081-7651

July 6, 2023

**VIA FEDEX CERTIFIED MAIL**

Lafayette Place OMV, LLC
c/o Om Ventures Realty
3607 S West Shore Blvd.
Tampa, FL 33629

Re:    **BIG LOTS #5327 – Tallahassee, FL**
Lease Agreement by and between Lafayette Place OMV, LLC (Landlord) and Big Lots
Stores, LLC, an Ohio limited liability company, formerly known as Big Lots Stores, Inc.
("Tenant") dated May 16, 2014, (the "Lease").

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the term of the Lease commencing February 1,
2024 and expiring on January 31, 2029 ("First Option Term").  Fixed Minimum Rent will be Three Hundred
Forty-Eight Thousand Two Hundred Six and 25/100 Dollars ($348,206.25) per annum, payable in equal monthly
installments of Twenty-Nine Thousand Seventeen and 19/100 Dollars ($29,017.19).

Thank you,

**BIG LOTS STORES, LLC,**
**an Ohio limited liability company**
DocuSigned by:

*Jonathan Ramsden*
FF2E51629530412
Jonathan Ramsden
Executive Vice President,
Chief Financial & Administrative Officer

/smm

# TABLE OF CONTENTS

**Section**

1.  Definitions
    A.    Common Areas
    B.    Dates
    C.    Exhibits -
    D.    Demised Premises
    E.    Shopping Center

2.  Demise

3.  Term
    A.    Original Term
    B.    Option to Extend Term

4.  Use and Operation

5.  Rent and Construction Allowance
    A.    Fixed Minimum Rent
    B.    Utilities Charges
    C.    Intentionally Deleted
    D.    Common Area Charges and Cap
    E.    Real Estate Taxes
    F.    Construction Allowance

6.  Alterations

7.  Maintenance, Repairs and Initial Build Out

8.  Signs

9.  Fixtures

10.  Governmental Regulations

11.  Indemnification

12.  Insurance
    A.    Tenant
    B.    Landlord

13.  Fire Rebuilding and Altering

14.  Force Majeure

15.  Injunction

16.  Warranty of Title by Landlord; Representations

17.  Quiet Enjoyment

18.  Mortgage and Estoppel Certificates

19.  Default

20.  Condemnation

21.  Mutual Waiver of Subrogation

22.  Assignment and Subletting

23.  Surrender and Holdover

24.  Notices

25.     Legality

26.     Binding Obligations

27.     No Recordation

28.     Real Estate Broker's Commission

29.     No Waiver, Laches or Accord and Satisfaction

30.     Hazardous Materials

31.     Titles and Entire Agreement

32.     Waiver of Claims

33.     Reasonable Consent

34.     Intentionally Deleted

35.     No Presumption against Drafter

36.     Submission of Lease

37.     Interlineation

38.     Time of the Essence

39.     Tenant's Audit Rights

40.     Attorney Fees

41.     Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 14th day of May , 2014 (the "Effective Date"), by and between LSREF2 Gator (Lafayette), LLC, a Delaware limited liability company ("Landlord") whose mailing address is c/o Woolbright Development 2240 N.W. 19th St., Suite 801, Boca Raton, Florida 33431, and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

1. **DEFINITIONS:**

   For purposes of this Lease, these terms are defined as follows:

   A.  Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, as the same may be modified from time to time as a result of or following condemnation or casualty, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas of the Shopping Center, Shopping Center signs, and parking lot lighting poles and light fixtures, trash receptacles (excluding trash receptacles provided for the use of particular Shopping Center tenants), benches and other similar items customarily included in common areas of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall maintain the Common Areas and Landlord agrees that without Tenant's prior written consent which shall not be unreasonably withheld, delayed or conditioned, Landlord shall not erect any building or other structure in the "No Change Area" (defined below) or change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises, provided, however, that the foregoing shall not prohibit the construction of one (1) building on the outparcel designated on Exhibit A. Anything in the foregoing or elsewhere in this Lease to the contrary notwithstanding, it is expressly understood and agreed that Landlord shall have the right, at its option, to re-orient some or all of the parking spaces in the Shopping Center from diagonal parking to perpendicular parking so long as the number of parking spaces is not diminished.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not materially and adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances, applicable laws, or governmental mandate. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area") unless required by applicable law or governmental mandate (e.g., landscape codes, etc.)..

   B.  Dates: Landlord and Tenant agree, promptly following the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and, so long as Tenant does not open for business in the Demised Premises, such entry by Tenant shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify, defend and save and hold harmless Landlord against any injury, and any loss and/or damage which may occur to any person or property and against any loss, cost, expense (including reasonable attorneys fees), liability or obligation which Landlord may sustain and/or incur as a result of Tenant's early entry or as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)   The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession of the Demised Premises to Tenant following Landlord's notice to Tenant that Landlord has substantially completed any construction that may be required pursuant to Exhibit C, subject to punch list items, or (ii) the date on which Tenant receives all permits for its construction and signage (the "Permits"). Tenant will submit its plans for the Permits within sixty (60) days of the Effective Date and thereafter, diligently pursue obtaining such Permits. Landlord will reasonably cooperate with Tenant, but shall not be obligated to incur any cost in connection therewith, in obtaining said Permits. Tenant will make diligent, good faith efforts to obtain all permits. In the event Tenant is unable to obtain all Permits within ninety (90) days following the date of Tenant's initial application for same, then either party hereto shall have the right, upon not less than thirty (30) days prior written notice to the other party, to terminate this Lease, such termination to be effective upon the expiration of such 30-day period. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has substantially completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord within ten (10) business days if Landlord's Work has been substantially completed. If Landlord's Work is not substantially completed, then Tenant shall notify Landlord thereof within said ten (10) business day period, such notice to specify what portion(s) of Landlord's Work is (are) not so complete. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Demised Premises complies with all applicable laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges not specifically realted to tenant's buildout, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's

4

obligations with regard to payments of Rent and Additional Rent due hereunder which shall take effect as of the Rent Commencement Date.

3)   The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

Landlord and Tenant acknowledge that Tenant is a party to another existing lease agreement (the "1548 Lease") for certain store premises (the "1548 Premises") located within another shopping center owned by a third party.

Effective upon the Rent Commencement Date, or the date upon which Tenant shall vacate the 1548 Premises and relocate to the Demised Premises (and provided that Tenant shall not reoccupy or reopen in the 1548 Premises), Landlord shall assume all of Tenant's obligations for the payment of the regular monthly installments of base or minimum rent and charges for common area maintenance, real estate taxes and the landlord's insurance premiums, as and to the extent payable by Tenant pursuant to Tenant's existing lease for Store # 1548 (the "1548 Lease") through the earlier of January 31, 2016 or the termination date of the 1548 Lease (collectively, "1548 Rent"), under the 1548 Lease, or in the alternative, Landlord may provide in lieu of the above rent payment, a Rent Credit to Tenant for the Demised Premises in the amount of $18,330.00 per month (as the same may be adjusted as noted below) from the Rent Commencement Date through January 31, 2016. Any reduction in the 1548 Rent shall accrue to Landlord's benefit and be credited against Landlord's obligations under this paragraph. Landlord shall have and is hereby granted the right to negotiate with the landlord under the 1548 Lease for the right to make a discounted lump sum payment to such landlord in satisfaction of the obligations referred to in this paragraph, or for any other reduction or waiver of such obligations, so long as the same shall not subject Tenant to any liability. Tenant shall promptly deliver to Landlord a true, correct and complete copy of all invoices, reconciliation statements and other notices received by Tenant from the landlord under the 1548 Lease and, if directed by Landlord, Tenant shall exercise all audit rights granted to Tenant under the 1548 Lease with respect to the 1548 Rent, such audit rights to be exercised by Tenant in good faith, but at Landlord's reasonable expense (i.e., to the extent not paid by the landlord under the 1548 Lease [e.g., due to overcharges]).Landlord shall indemnify, defend and hold Tenant harmless against any claim for Rent under the 1548 Lease from the Rent Commencement Date through January 31, 2016.

4)   The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)   If Landlord fails to return properly executed Leases to Tenant by May 16, 2014, or if Landlord fails to complete Landlord's Work in the Demised Premises by July 1, 2014, then Tenant may terminate this Lease by written notice to Landlord. Landlord and Tenant agree that if Landlord fails to substantially complete Landlord's Work in the Demised Premises by June 1, 2014, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon June 2, 2014 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to June 16, 2014, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,500.00 per day. Commencing June 16, 2014 and continuing for each and every day Landlord is delayed in completing

5

Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $3,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6) Notwithstanding anything to the contrary, in the event Landlord has not substantially completed Landlord's Work in the Demised Premises and/or Tenant has not received the Permits by August 1, 2014, Tenant will not be required to accept possession until February 2, 2015. The period of time between August 2, 2014 and February 2, 2015 will be the "Optional Blackout Period". In the event Landlord substantially completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not substantially completed Landlord's Work by February 2, 2015, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 3, 2015, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7) In the event Landlord substantially completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 2, 2015. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1) Exhibit A -    Site Plan of Shopping Center

2) Exhibit B -    Legal Description of Shopping Center

3) Exhibit C -    Landlord's Work

4) Exhibit D -    Tenant Building Sign Specifications

5) Exhibit D – 1 Tenant Pylon Sign Location

6) Exhibit E -    Completion of Landlord's Work Letter

7) Exhibit F -    Exclusive Use Provisions and Certain other restricted Uses

8) Exhibit G -    Remeasurement Rider

6

9)    Exhibit H-   Title Report

D.    <u>Demised Premises</u>: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 39,795 square feet of ground floor area with a minimum width of approximately 130 feet for the Demised Premises. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 39,795 square feet nor accept possession of any space under 36,000 square feet in size, and if less than 36,000 square feet in size, Tenant may terminate this Lease in such an event.

E.    <u>Shopping Center</u>: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Lafayette Place Shopping Center, 3111 Mahan Dr., Suite 18 Tallahassee, FL 32308. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 94,875 square feet. Subject to the limitations imposed by the third sentence of Section 1A above (relating to the No Change Area, and visibility and accessibility issues), Landlord reserves the right, from time to time, to modify the buildings and/or other improvements and/or facilities in the Shopping Center, provided that Landlord shall not be permitted to demolish and rebuild any portion of the Shopping Center, other than in connection with casualty or condemnation.

## 2. **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided, all of the foregoing to be used and enjoyed by Tenant on a non-exclusive basis in common with Landlord and other tenants, occupants and other parties now or hereafter having same.. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3. **TERM:**

A.    <u>Original Term</u>: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and, unless sooner terminated pursuant hereto, ending January 31, 2024 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period, which Landlord may, but shall not be obligated to grant to Tenant. The Term shall end on the last day of the Original Term , the last day of any Option Term, the last day of any extended period, or on any earlier date upon which this Lease shall be terminated by Landlord or Tenant in accordance with the terms hereof..

B.  <u>Options to Extend Term</u>:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4) successive, five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and "Fourth Option Term", such option to be available only if Tenant is then in possession of, and open for business in, the Demised Premises. The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term each upon the same terms and conditions as contained in this Lease except as provided herein, except that Landlord's Work and the Construction Allowance shall not again become due during the Option Terms.  If Tenant is then in possession of, and open for business in, the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable, time being of the essence.

Upon the failure of Tenant to timely exercise any of the options herein, and in any event upon expiration of the Fourth Option Term, Tenant shall have no further or additional options to renew or extend the Lease.

## 4.  <u>USE AND OPERATION</u>:

A.  <u>Permitted Uses</u>:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, closeouts, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine for off premises consumption only), and for any other lawful retail purpose, provided, however, that Tenant shall not have the right to engage in the sale of used merchandise or any merchandise described on Exhibit F hereto. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that, except as provided in Exhibit F, no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises in the manner described in this Section 4A. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants (and their respective assignees and sublessees) with existing leases for premises in the Shopping Center as of the date of this Lease, their renewals and replacements, no other general merchandise store, liquidator, closeout store, furniture store or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  In addition to the foregoing, a "Competing Business" shall include and Landlord shall not lease premises in the Shopping Center to: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Christmas Tree Shops, Five Below, Encore and Ollie's Bargain Outlet.  In the event a Competing Business, as defined herein, is operated in the Shopping Center in violation of Landlord's covenant in this Paragraph, Tenant shall be entitled to any and all of the following  remedies: (i) Tenant may

8

terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, however, that Landlord shall have no duty to file any appeal of an adverse decision of the trial court in any enforcement action that Landlord may bring unless Tenant shall resume and continue to pay full Rent and Additional Rent from and after the date of the filing of such appeal, and provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease. Tenant agrees to open for business for one (1) day fully fixtured, stocked and staffed within 180 days of the Tenant Possession Date, but shall not be obligated to remain open or operating thereafter.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability thereafter accruing hereunder and except for those liabilities and/or obligations which expressly survive the expiration or earlier termination of this Lease.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to

9

burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Tenant shall procure, at its sole expense, all permits and licenses required for its operations and the transaction of business in the Demised Premises, including without limitation, all licenses and permits relating to the sale of alcoholic beverages.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, in compliance with all applicable laws to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises and Tenant will use reasonable efforts on a regular basis each day to retrieve shopping carts provided by Tenant for the use of its customers from the parking lot serving the Shopping Center; and (ii) use the sidewalk immediately adjacent to the Demised Premises and the portion of the No Change Area depicted on the Site Plan and labeled "Outdoor Sales Area" for the periodic sale and display of merchandise ("Outdoor Sales"), which shall not unreasonably and materially interfere with the flow of traffic and parking within the Shopping Center.

Subject to applicable law, the sidewalk immediately adjacent to the Demised Premises may be used for such purposes year-round.

Tenant shall be responsible for the cleaning and regular removal of trash and refuse from the adjacent sidewalks and Outdoor Sales Area during such sales periods and Tenant shall be required to cause its liability insurance to cover personal injuries and property damage occurring in and about said adjacent sidewalks and Outdoor Sales Area during such sales periods.

B.  <u>Prohibited Uses:</u> Except for existing Tenants as of the Effective Date, , and their respective assignees and sublessees and except also for replacements of such existing tenants provided that such replacements occupy the same or smaller premises than those which were occupied by the tenant being replaced, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, or a store selling used apparel or other used merchandise (provided, however, that this restriction shall not be deemed to prohibit Landlord from leasing other premises in the Shopping Center to operations such as Plato's Closet, Play It Again Sam, Gamestop, antique shops and similar operations); (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices, provided, however, that this restriction is subject to the 15,000 square feet Non-Retail Cap and shall not apply if same is not exceeded; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers, provided, however, that this restriction shall not be deemed to apply to any outparcel or free standing building now or hereafter located in or a part of the Shopping Center; (ix) for any governmental use or governmental office or any social service functions or facilities; (x) for the operation of a massage parlor (provided, however, that this

restriction shall not apply to massage parlors such as Massage Envy or Elements Massage) or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material (except as carried in a national book store such as Barnes and Noble) and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment (provided, however, that this restriction shall not apply to businesses greater than 100 linear feet away from the Demised Premises), or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant and excluding any full-service restaurants which may be operated by other tenants or occupants of the Shopping Center, it being understood and agreed that such restaurants may offer beer, wine, distilled spirits and other alcoholic beverages; provided, however, that any restaurant other than the sandwich shop located in bay 19 as shown on Exhibit A must be located at least 100 linear feet away from the Demised Premises); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation), provided, however, that this restriction shall not apply if they are located more than 180 linear feet away from the Demised Premises; (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop, provided, however, that this restriction shall not apply to businesses greater than 50 linear feet away from the Demised Premises; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises provided Tenant shall use Landlord's roofing contractor for any roof penetrations required in connection with the same and such installation shall comply with all applicable laws); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**".

Notwithstanding anything to the contrary, Landlord shall be limited to an aggregate of 15,000 square feet of non-retail space (Non-Retail Cap). The Non-Retail Cap shall not apply to any restaurants, nail salons, hair salons, optical shops, banks and other quasi-retail uses typically found in shopping centers.

Notwithstanding anything to the contrary, Landlord shall be permitted to lease bay 19, as shown on Exhibit A (being the bay located immediately east of the Demised Premises), to a sandwich shop subject to the following conditions: (a) The food preparation area within the sandwich shop shall not be along the

demising wall shared with the Demised Premises (b) Landlord shall install an additional layer of drywall on the sandwich shop's side of the demising wall shared with the Demised Premises and (c) Landlord shall be responsible for the reasonable cost of removing any rodents from the Demised Premises.

## 5.    <u>RENT AND CONSTRUCTION ALLOWANCE:</u>

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to timely pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent without deduction or offset except as permitted by this Lease (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease, together with all applicable sales taxes ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:  During the Original Term of this Lease, the sum of $318,360.00 per annum, plus applicable sales tax which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $26,530.00, plus applicable sales tax.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $348,206.25 per Lease Year, plus applicable sales tax which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $29,017.19, plus applicable sales tax. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $368,103.75 per Lease Year, plus applicable sales tax which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $30,675.31, plus applicable sales tax. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $388,001.25 per Lease Year, plus applicable sales tax which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $32,333.44, plus applicable sales tax. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $407,898.75 per Lease Year, plus applicable sales tax which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $33,991.56, plus applicable sales tax.

B.    <u>Utilities Charges</u>:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate water, sewer, and electric utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers (except this shall not apply to water, sewer or electric unless and until same become deregulated) for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord shall provide Tenant with access to all such utilities necessary to conduct business in the Demised Premises, and Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect

Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use for those utilities that are not separately metered. Installation shall be the sole cost and responsibility of the Tenant and shall be performed in a lien-free, good and workmanlike manner, in accordance with all applicable law, ordinances, rules and regulations, including permitting requirements. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    <u>Intentionally Deleted.</u>

D.    <u>Common Area Maintenance</u>: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

13

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items plus applicable sales taxes as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Commencing with calendar year 2015, Tenant's only obligation with respect to Common Area Charges shall be to pay to Landlord its pro rata share of any increase in Common Area Charges in excess of the Common Area Charges during Lease Year year 2014 (The "Base Year"), provided, however, that the Common Area Charges for the Base Year will not be less than $1.51 per square foot, subject to the CAM Cap (defined below). Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses. To the extent that any other tenant shall be responsible for performing part of the items included as a part of Common Area Charges, then the portion of Common Area Charges payable by Tenant shall be equitably calculated to take into account those portions of such items that are so performed by such other tenants and those portions not so performed. Tenant shall pay any such increase in Common Area Charges, commencing in 2015 and for each calendar year thereafter during the Term, on a monthly basis, in equal installments, in an amount equal to one-twelfth (1/12th) of such increase as determined in good faith by Landlord for such Calendar Year, payable on the first day of each calendar month. Landlord shall provide to Tenant a detailed statement substantiating the Common Area Charges for the Base Year. Thereafter, Landlord shall deliver to Tenant a statement of Common Area Charges within one hundred twenty (120) days after the end of each Calendar Year.

Within one hundred twenty (120) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Within ninety (90) days from receipt of the statement, Tenant may request that, Landlord furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein. Except as otherwise provided in Section 32 of this Lease, Landlord's failure to submit statement as called for herein shall not be deemed a waiver by Landlord of Tenant's obligation to pay such sums and shall not be considered a breach of Landlord's obligations set forth in this Lease.

14

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, commencing with Lease Year 2016, Tenant's pro-rata share of Common Area Charges shall increase by three percent (3%) per year above that amount of Common Area Charges payable by Tenant for the previous Lease Year. Thereafter, during the remainder of the Original Term and any renewals or extensions thereof, increases in the Common Area Charges Cap shall be fixed at three percent (3%) per calendar year (the Common Area Charges Cap and fixed increases described in this paragraph shall be known, collectively, as the "CAM Cap").

E.   Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Additionally, the amount of any special assessments or impositions may be included in Real Estate Taxes provided the same are amortized over the maximum period allowed by the local taxing authority.. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes applicable to its leased premises shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Commencing with calendar year 2015 and continuing for each calendar year thereafter during the Term, Tenant's only obligation with respect to Real Estate Taxes shall be to pay to Landlord its pro rata share of any increase in Real Estate Taxes paid by Landlord in excess of those Real Estate Taxes paid by Landlord during calendar year 2014 (the "Base Year For Taxes"), provided, however, that the amount of real Estate Taxes for Base Year Real Estate Taxes will not be less than $1.25 per square foot. Landlord shall provide to Tenant a copy of the tax bills paid by Landlord during the Base Year for Taxes. Thereafter, Landlord shall deliver to Tenant a statement of Real Estate Taxes within one hundred twenty (120) days after the end of each calendar year. If, in calendar year 2015, the Real Estate Taxes paid by Landlord during such calendar year exceed the Real Estate Taxes paid by Landlord during the Base Year for Taxes, Tenant shall pay its pro rata share of such increase to Landlord within thirty (30) days of its receipt of such statement. If, in any subsequent calendar year, the amount of Real Estate Taxes paid by Landlord during such calendar year exceeds the amount of the Real Estate

15

Taxes paid by Landlord during the immediately preceding calendar year, Tenant shall pay its pro rata share of such increase to Landlord within thirty (30) days of its receipt of Landlord's year-end Real Estate Taxes statement.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes unless such interest or penalty arose due to Tenant's failure to pay the Real Estate Taxes by the date due, provided Landlord has promptly delivered the tax bill to Tenant.. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord net of any customary expenses incurred in obtaining such abatement, refund or rebate, if applicable..

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least twenty (20) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant, acting reasonably and in good faith, deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, then, so long as Landlord has not initiated its own challenge thereto, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant reasonable assistance at no cost to Landlord in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use commercially reasonable efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. If the Shopping Center is transferred more than one (1) time in any five (5) year period during the term of this Lease, then Tenant shall not be responsible for any increases in Real Estate Taxes resulting from any transfer after the first transfer during such five (5) year period.

Tenant shall timely pay all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees,

including, without limitation, the Ohio commercial activity tax, imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.    Construction Allowance: Landlord shall pay to Tenant an amount equal to $500,000.00 within thirty (30) days of Tenant's opening for business. If said amount is not paid by Landlord to Tenant within thirty (30) days after satisfaction of all of the following conditions (i) Tenant's delivery to Landlord of a copy of a final certificate of occupancy for the Demised Premises, (ii) Tenant's delivery of lien waivers executed by Tenant's general contractor (along with a copy of the general contractor's final affidavit as required by the Florida Construction Lien Law), (iii) lien waivers executed by all other lienors having contracts in excess of $5,000.00, and (iv) Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Fixed Minimum Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.    Late Fees: If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year.

6.    **ALTERATIONS:**

During the Term of this Lease, following completion of Tenant's initial improvements in the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part or the water-tightness of the roof of such building; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any such alterations. Nothwithstanding anything to the contrary, in the event Tenant shall be required to make any roof penetrations, Tenant shall use Landlord's roofing contractor.

The interest of Landlord is not subject to liens for improvements made by Tenant.

Tenant shall not permit any mechanic's, materialmen's or other liens to be filed against all or any part of the Shopping Center, nor against Tenant's leasehold interest in the Demised Premises, by reason of or in connection with any repairs, alterations, improvements or other work contracted for or undertaken by Tenant or any other act or omission of Tenant or Tenant's agents, employees, contractors, or licensees. If any such liens are filed or a notice of intent to file has been given, Tenant will, at its sole cost and expense, promptly cause such liens to be released of record or bonded so that such lien or potential lien shall no longer affect title to the Shopping Center.

If Tenant shall fail to cause such lien or notice of lien to be discharged or bonded within sixty (60) days after the filing thereof, then, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amounts so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in paying, bonding off or procuring the discharge of such lien, shall be due and payable by Tenant to Landlord as Additional Rent within thirty (30) days of Landlord's demand therefor.

7.   **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including both the interior and exterior thereof and also including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises, including roof-top HVAC equipment notwithstanding that the same is not located in the interior portions of the Demised Premises, and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make (or cause to be made) all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any, as it exists at the time of lease execution), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the reasonable cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report as to the existing HVAC system serving the Demised Premises no later than two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant. In the event that such report shall disclose that the HVAC system is not in good working order, then Landlord shall promptly make all necessary repairs required to ensure that the HVAC system is in good working condition on the Tenant Possession Date.

Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition, at Landlord's sole cost and expense, provided, however, that Tenant shall not be entitled to perform any such work unless Landlord shall have failed to promptly make the repairs necessary to place the HVAC system in such condition as noted above in this Paragraph

Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice (subject to Acts of God only), put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period (subject to Acts of God only), Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs (or longer period of time if such repairs, replacements and/or maintenance shall reasonably take longer than fifteen (15) days, provided Landlord shall commence any such repairs, replacements, and maintenance within fifteen (15) days following receipt of notice from Tenant),, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a lien-free, first class and workmanlike manner in accordance with all applicable laws, ordinances, codes, rules and regulations.. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days (subject to Acts of God only) after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be

deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

**8.**   **SIGNS:**

Tenant, at its sole cost and expense and in compliance with all applicable laws, ordinances, rules and regulations and subject to the size and other restrictions set forth on Exhibit D hereto, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises subject to compliance with all applicable laws. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease. Any changes to Tenant's Sign Specifications shall be subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed so long as such changes comply with all applicable laws.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant, at it sole cost and expense, shall have the right to place suitable sign panels upon the existing Shopping Center Pylons. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon or monument signs on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove ( except upon the expiration or earlier termination of this lease), replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping (except landscaping required by any applicable law or governmental mandate) or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

**9.**   **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's sole cost and expense and in compliance with all applicable laws, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition.    Should Tenant have installed lighting fixtures, and/or HVAC

equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled, at Tenant's sole cost and expense and in compliance with all applicable laws, to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

**10.**  **GOVERNMENTAL REGULATIONS:**

Landlord, to the best of its knowledge, agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to deliver the sprinkler system on the Tenant Possession Date in operational condition as required by the authority having jurisdiction; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

**11.**  **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord, its agents or lender from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

Nothing contained in this Sectioni 11 is intended to override the insurance coverages afforded by the respective insurance policies maintained or required to be maintained by Landlord and Tenant in accordance with Section 12 below.

The provisions of this Section 11 shall survive termination of this Lease.

21

**12.** **INSURANCE:**

A.     Tenant:  Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord and Landlord's lender and property manager as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and Tenant agrees to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and fixtures.

B.     Landlord:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of windstorm, terrorism, earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.  Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.  Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.  Landlord shall pay the insurance premiums without reimbursement from Tenant.

In addition to the payment of Fixed Minimum Rent, Tenant's only obligation with respect to Insurance Costs (as defined herein) shall be to pay to Landlord its pro rata share of any increase in the premiums paid by Landlord for maintaining all insurance maintained by Landlord for the Shopping Center (including the insurance required herein) for the Term hereof (the "Insurance Costs") in excess of a base year which shall be the Insurance Costs paid by Landlord for 2014 (the "Base Year for Insurance").  Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for all items included as part of Insurance charges shall be deducted from the gross leasable area of the Shopping Center.  In no event shall there be any duplication of expenses. Landlord shall provide to Tenant a copy of invoices to support the Insurance Costs for the Base Year for Insurance and to confirm the dates of Landlord's policy year. Commencing with calendar year 2015 and for each calendar year thereafter during the Term, Landlord shall deliver to Tenant a statement of Insurance Costs as and when Landlord receives the applicable premium bill therefor.  If, in any calendar year, the Insurance Costs exceed the Insurance Costs for the Base Year for Insurance, Tenant shall pay its pro rata share of such increase to Landlord within thirty (30) days of its receipt of such statement.

All insurance required under this Article 12 shall be in companies duly licensed to transact business in the State of Florida, and maintaining during the policy

term a "General Policyholders Rating" of at least A, XI, or such other rating as may be reasonably required by a lender having a lien on the Demised Premises, as set forth in the most current issue of "Best's Insurance Guide." Neither party shall do or permit to be done anything which shall invalidate the insurance policies referred to in this Section 12.

13. **FIRE REBUILDING AND ALTERING:**

    A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any substantial portions of any buildings or other improvements located within the "Restoration Area" (as designated on Exhibit A) of the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business, and in fact does not conduct business, from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

    B.    In the event the Demised Premises or the Restoration Area, because of such damage or destruction, are not repaired and restored to tenantable condition within three hundred sixty five (365) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

    For avoidance of doubt, and anything in the foregoing to the contrary notwithstanding, it is expressly understood and agree that if any such casualty shall occur which affects any portion of the Shopping Center that is not located in the Restoration Area, Landlord may (but shall not be obligated to) repair, rebuild or restore same.

    If Landlord shall elect not to repair such portion, then Landlord shall be obligated to clear and remove all damaged structures and debris in the area outside of the Restoration Area that was affected by such casualty and sod or pave such area converting same to part of the Common Areas (subject, however, to the right of Landlord to subsequently redevelop any or all of such areas, in which event such redeveloped areas shall cease to be part of the Common Areas).

    C.    If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or during the last six (6) months of any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects by written notice delivered to Landlord within ten (10) business days following Tenant's receipt of Landlord's termination notice, to exercise its next option to extend the Term of the Lease.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises or to the respective obligations of Landlord or Tenant to make any payment(s) required by this Lease.

15.   **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.   **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises, subject to the matters set forth in the title report attached hereto as Exhibit H; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title set forth on Exhibit H hereto; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) to Landlord's knowledge, the Demised Premises is properly zoned for commercial retail use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and to Landlord's knowledge, construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) to Landlord's knowledge, Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and to Landlord's knowledge, there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's under this Lease, Tenant shall, at its option, have the right to terminate this Lease, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification,

24

termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17.   **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions by anyone claiming by, through or under landlord. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.   **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually and reasonably satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.  If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Within thirty (30) days following request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Shopping Center of the Demised Premises, or to any prospective purchaser or mortgagee of the Shopping Center, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; and (v) such other factual matters as may be reasonably requested.

19.   **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent or Additional Rent reserved herein, or any installment thereof for more than ten (10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary so long as Tenant commences the cure within such thirty (30) day period and is

diligently pursuing completion of the cure), then in any of such events, Landlord shall have the right to terminate this Lease, if the Landlord so elects, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed are being performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof at a commercially reasonable rental rate, as the agent of the Tenant, and the Tenant shall pay the Rent due under this Lease minus the Rent actually collected from a replacement Tenant. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

Following an uncured default by Tenant, Landlord shall be entitled to recover the costs of: (a) obtaining possession of the Demised Premises and removing abandoned property, (b) repairing damage, (c) restoring premises to the condition it was in when originally delivered to Tenant and (d) brokerage fees for finding a new tenant.

All rights and remedies of Landlord herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity.

All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

In no event, however, shall Landlord have any right to accelerate rent.

B.   If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. If in Tenant's reasonable judgment, Tenant is unable to operate, and in fact does not operate in the Demised Premises by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein

26

created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20. **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings in the Restoration Area, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Restoration Area to proper tenantable condition forthwith. Until the Demised Premises and/or Restoration Area is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages. Tenant's claim in condemnation proceedings shall not reduce the value of Landlord's claim.

21. **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications,

27

consolidations and extensions thereof. Any subletting or assignment shall not be for non-retail use nor shall it violate the restrictions and exclusives set forth in Section 4 and Exhibit F to the Lease, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition (with existing floor tile, if any, as-is), ordinary wear and tear and damage by fire and other casualty excepted. Tenant may remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred twenty five percent (125) of the Rent and otherwise subject to all the terms and provisions hereof.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.   LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26.   BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.   NO RECORDATION:

If requested by either Landlord or Tenant, Landlord and Tenant will execute a recordable memorandum of lease. The party requesting same may record such memorandum at its expense and shall provide the other party with a copy of such recorded memorandum of lease. Such memorandum of lease will contain the following statement as contemplated by Section 713.10 of the Florida Statutes: "The interest of Landlord is not subject to liens for improvements made by Tenant."

Neither party shall record this Lease.

## 28.   REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease except for Woolbright Development, Inc., which shall be paid by Landlord pursuant to a separate agreement.. If any other individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29.   NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than

the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.   **HAZARDOUS MATERIAL:**

Landlord represents and warrants that, to the best of landlord's knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall, if required by applicable law, promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials Rent and Additional Rent due under this Lease shall abate, based upon the percentage of the Demised Premises not being used by Tenant, during the period of time necessary to complete such work. Notwithstanding anything to the contrary, Tenant, in its sole and reasonable judgment, shall decide if it can operate in the Demised Premises.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises caused by Tenant while in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.   **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.   **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common

30

Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within twelve (12) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said twelve (12) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.   REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented

**34.   INTENTIONALLY DELETED.**

**35.   NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.   SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.   INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.   TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.   TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction not later than twelve (12) months following Landlord's delivery to tenant of Landlord's annual statement as to the amount(s) payable by Tenant for such items,, and

31

Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. In no event shall any such audit be conducted by any party whose compensation will be calculated, either in whole or in part, on any contingency fee or similar basis. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated and as a result, Tenant's prior payments exceeded the actual amount due by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Fixed Minimum Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year. Tenant shall keep (and cause its employees, agents and representatives to keep) the results of all such audit(s) confidential and Tenant shall not disclose (or suffer or permit any of its employees, agents or representatives to disclose) any information obtained in the course of any such audit, or any results of any such audit, except as required by law, and in such event, only after providing Landlord with adequate notice of any demand for the disclosure of such information or results, along with a reasonable opportunity for Landlord to seek a protective order or other relief in respect thereof.

## 40. ATTORNEYS FEES:

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and reasonable attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor. For avoidance of doubt, it is expressly understood and agreed that any provision of this Lease which requires the payment of attorneys' fees by either party shall be construed to required payment of only **reasonable** attorneys' fees.

## 41. WAIVER OF JURY TRIAL:

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

## 42. RADON:

In accordance with the requirements of Florida Statutes Section 404.056(8), the following notice is hereby given to Tenant:

RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.

## 43. LANDLORD'S LIABILTIY:

The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy

or use of the Demised Premises shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Demised Premises and the profits, rents and proceeds thereof (subject to the rights of lender's and other third-parties that may have a priority interest in such items), and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency. The provisions of this Section 43 shall survive any expiration or termination of this Lease.

44.   **LIMITATION ON DAMAGES**:

Anything in this Lease to the contrary notwithstanding, it is expressly understood and agreed that neither party hereto shall be entitled to seek or recover punitive damages, exemplary damages, consequential damages or special damages from the other.

45.   **U.S.A. PATRIOT ACT**:

Landlord and Tenant each hereby certifies that: (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the office of Foreign Assets Control; and (b) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation. Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:                 **LANDLORD:**   LSREF2 GATOR (LAFAYETTE), LLC,
                                            a Delaware limited liability company

By: _____

Title: _____Summer Trejo_____
                   Assistant Vice President

Witnesses as to Tenant:                   **TENANT:      BIG LOTS STORES, INC., an Ohio corporation**

By: _____
            Timothy A. Johnson
Title: Executive Vice President,
       Chief Financial Officer

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, LSREF2 GATOR (LAFAYETTE), LLC, by, _SUMMER K TREJO_ its _ASS'T. VP_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _DALLAS, TX_ this _16_ day of _May_, 2014.

Jonnie L. Callahan
Notary Public,
State of Texas
Comm. Exp. 12-31-14

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by Timothy A. Johnson, its Executive Vice President, Chief Financial Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _2nd_ day of _May_, 2014.

_____
Notary Public

**Courteney Robertson**
Notary Public, State of Ohio
My Commission Expires 08/22/2016

34

EXHIBIT A

SITE PLAN OF SHOPPING CENTER

LAFAYETTE PLACE - EXHIBIT "A"



## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

PARCEL 1:

A PARCEL OF LAND SITUATE IN THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 1 NORTH, RANGE 1 EAST, LEON COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT AN OLD CONCRETE MONUMENT MARKING THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 1 NORTH, RANGE 1 EAST AND RUN NORTH 00 DEGREES 25 MINUTES 42 SECONDS WEST ALONG THE SECTION LINE 2.71 FEET TO A CONCRETE MONUMENT; THENCE SOUTH 68 DEGREES 38 MINUTES 06 SECONDS EAST 29.42 FEET TO AN IRON PIN, THENCE NORTH 67 DEGREES 16 MINUTES 09 SECONDS EAST 182.0 FEET TO A CONCRETE MONUMENT, THENCE NORTH 22 DEGREES 43 MINUTES 51 SECONDS WEST 150.0 FEET TO AN IRON PIN ON THE SOUTHERLY BOUNDARY LINE OF RIGHT OF WAY FOR STATE ROAD NO. 10 (EAST TENNESSEE STREET) AS IT EXISTED IN 1974, THENCE RUN NORTH 67 DEGREES 16 MINUTES 09 SECONDS EAST (BEARING BASE) ALONG SAID RIGHT OF WAY BOUNDARY LINE (65 FEET FROM AND PARALLEL TO THE SURVEY LINE FOR SAID STATE ROAD NO. 10) 270.15 FEET, THENCE NORTH 22 DEGREES 43 MINUTES 51 SECONDS WEST 15.00 FEET, THENCE NORTH 67 DEGREES 16 MINUTES 09 SECONDS EAST ALONG SAID RIGHT OF WAY BOUNDARY LINE (50 FEET FROM AND PARALLEL TO SAID SURVEY LINE) 350.0 FEET, THENCE NORTH 22 DEGREES 43 MINUTES 51 SECONDS WEST 17.0 FEET, THENCE NORTH 67 DEGREES 16 MINUTES 09 SECONDS EAST ALONG SAID RIGHT OF WAY BOUNDARY LINE (33 FEET FROM AND PARALLEL TO SAID SURVEY LINE) 23.32 FEET TO AN IRON PIN, THENCE SOUTH 22 DEGREES 43 MINUTES 51 SECONDS EAST 160.0 FEET TO AN IRON PIN, THENCE NORTH 67 DEGREES 16 MINUTES 09 SECONDS EAST 164.34 FEET TO AN IRON PIN, THENCE SOUTH 00 DEGREES 12 MINUTES 35 SECONDS EAST ALONG AN OLD FENCE LINE AND TREE LINE 302.16 FEET TO AN IRON PIPE, THENCE SOUTH 00 DEGREES 19 MINUTES 57 SECONDS EAST 99.14 FEET TO AN IRON PIPE, THENCE CONTINUE SOUTH 00 DEGREES 19 MINUTES 57 SECONDS EAST 60.0 FEET TO AN IRON PIN, THENCE SOUTH 46 DEGREES 31 MINUTES 18 SECONDS WEST 395.0 FEET TO THE CENTER OF A DRAINAGE DITCH, THENCE NORTH 81 DEGREES 51 MINUTES 49 SECONDS WEST 197.0 FEET TO AN IRON PIPE, THENCE SOUTH 89 DEGREES 40 MINUTES 38 SECONDS WEST 100.0 FEET TO AN IRON PIPE, THENCE SOUTH 89 DEGREES 40 MINUTES 49 SECONDS WEST 349.83 FEET TO AN IRON PIPE, THENCE NORTH 00 DEGREES 25 MINUTES 42 SECONDS WEST 313.0 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT PARCEL FOR ADDITIONAL STATE ROAD NO. 10 RIGHT-OF-WAY AS DESCRIBED IN ORDER OF TAKING RECORDED IN BOOK 2199, PAGE 1784, PUBLIC RECORDS OF LEON COUNTY, FLORIDA.

PARCEL 2:

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, PARKING, AND UTILITY PURPOSES AS DESCRIBED IN OFFICIAL RECORDS BOOK 1250, PAGE 370, AS MODIFIED IN OFFICIAL RECORDS BOOK 1260, PAGE 862, PUBLIC RECORDS OF LEON COUNTY, FLORIDA.

PARCEL 3:

NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND UTILITY PURPOSES AS DESCRIBED IN OFFICIAL RECORDS BOOK 1405, PAGE 581, PUBLIC RECORDS OF LEON COUNTY, FLORIDA.

# EXHIBIT C

## LANDLORD'S WORK

| | |
|---|---|
| **STOREFRONT:** | The exterior storefront façade shall be in good condition, freshly painted and repaired from previous tenant's signage |
| **DOORS:** | All doors to be sound and secure in good working condition. |
| **GLASS:** | All store front glass to be in good condition. |
| **UTILITIES:** | Tenant to utilize the existing utilities to be in good working condition and to include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. |
| **HVAC EQUIPMENT & MECHANICALS:** | All HVAC and HVAC equipment, duct work, diffusers etc. to be in good working condition. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. . |
| **PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** | All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to ensure the existing sprinkler system meets code requirements for Tenant's use and provide a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions.   All devices and systems, if any, which were previously installed for the suppression, detection or reporting of fire shall be in compliance in all material respects with all applicable National, State and Local codes including backflow preventer devices. |
| **EXTERIOR LIGHTING:** | All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, All exterior lighting is to be on a separately metered house panel in the Landlord's name. |
| **ROOF:** | Roof shall be professionally inspected and certified to be in water-tight condition and free of leaks. Both Landlord and Tenant shall have the roof inspected prior to the Tenant Possession Date and  landlord shall make the necessary repairs as per the inspection reports. |
| **RECEIVING AREA:** | The existing loading docks are to be in good working order (including all seals, bumpers, bollards, doors, etc.). Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use |
| **REMOVAL OF FIXTURES & EQUIPMENT:** | Landlord to remove all previous tenant's fixtures and equipment and deliver the space in broom clean condition. |
| **PARKING LOT:** | Parking lot shall be in good condition (paved, patched, sealed and striped) with potholes, severe cracks repaired |
| **PESTS:** | Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free. |
| **CART CORRAL:** | Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto, subject to Landlord's approval as to the number and location of such cart corrals, such approval not to be unreasonably withheld. |
| **SIGNAGE:** | Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s.) Tenant to receive the former Publix position on the pylon per |

the attached Pylon Exhibit. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position.

**DRAWINGS:** Landlord is to provide Tenant with an "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan, if available.

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all presently existing hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises including the roof, prior to lease execution. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:** Landlord agrees the Demised Premises and building structure conforms in all material respects to all requirements by authority having jurisdiction (including current seismic requirements if applicable). If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; HVAC report evidencing all repairs have been completed; and pest inspection report, prior to Tenant's possession.

All above work to be completed before the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**



# BIGLOTS!

# EXTERIOR SIGNING

# SPECIFICATIONS

**If you need additional information that
is not contained in this packet contact:**

**BIGLOTS!** Store Planning Department:

Michael Neu - 614-278-6868
Mike Stiles - 614-278-6905

## HORIZONTAL LOGO

### INDIVIDUAL LED ILLUMINATED
### REVERSE CHANNEL LETTER SET



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 146 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

## STACKED LOGO

### INDIVIDUAL LED ILLUMINATED
### REVERSE CHANNEL LETTER SET



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-8" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-9" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |



# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet





**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE

11/200P

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**

Visual Area 87"

Visual Area 18"

**BIG LOTS!**

Qty (2) Vinyl graphics only applied to existing tenant panel on double sided road sign.



**Color Sample and Color Specifications**

| | |
|---|---|
| VINYL: PMS 021/ BLACK | |
| REVEAL: | |
| CABINET: | |
| ACRYLIC: | |
| SIDEWALLS: | |
| TRIMCAPS: | |
| LED: | |
| RACEWAY: | |
| Power | Illumination |

**General Information**

(PRINTED COLORS ARE FOR CONCEPTUAL USE ONLY) ACTUAL COLORS TO BE CONFIRMED

UL Underwriters Laboratories, Inc. LISTED



**MASSTAR SIGNS**

11801 Anderson Road  Greenville, SC 29611
864.295.2287  Fax: 864.269.7711
www.masstarsigns.com

CLIENT APPROVAL: _____  DATE: _____  LANDLORD APPROVAL: _____  DATE: _____

© 2011 Masstar Sign Corporation. All rights reserved.  This design is the property of Masstar Sign Corporation and may not be reproduced in any way without written permission by Masstar Sign Corporation.

SALESPERSON: *Casey Smith*

| CLIENT: **Big Lots** | LOCATION: **Tallahassee, FL** | DATE: **03.04.14**  REVISION# | BY: **CDS** |

**Wall Sign: 145 sq ft**
**Building Width: 214'-4"**



29'-1½"

5'

5'-10½"

Qty (1): Reverse channel letters with
white Sloan LED's for halo illumination

Qty (1): Reverse channel letters with
white Sloan LED's for halo illumination
and flat acrylic faces with orange trim
caps and returns. Face to illuminate
orange

| Color Sample and Color Specifications | |
|---|---|
| FACES: PMS 021/ BLACK | |
| ALUM CLOUD: | |
| CABINET: | |
| ACRYLIC: PMS 021 | |
| SIDEWALLS: PMS 021/ BLACK | |
| TRIMCAPS: PMS 021/ BLACK | |
| LED: WHITE | |
| RACEWAY: | |

| Power | Illumination |
|---|---|
| **120 V** | **LED 12v** |

| General Information |
|---|
| (PRINTED COLORS ARE FOR CONCEPTUAL USE ONLY) ACTUAL COLORS TO BE CONFIRMED |





**Underwriters**
**Laboratories, Inc.**
LISTED

**MASSTAR SIGNS**
11801 Anderson Road, Greenville, SC 29611
864 295 2287 Fax: 864 269 7711
www.masstarsigns.com

CLIENT APPROVAL: _____    DATE: _____    LANDLORD APPROVAL: _____    DATE: _____

© 2011 Masstar Sign Corporation. All rights reserved. This design is the property of Masstar Sign Corporation and may not be reproduced in any way without written permission by Masstar Sign Corporation.

SALESPERSON: *Casey Smith*

**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date:** _____

**To**:  _____ (insert Tenant)
   via facsimile:  (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been substantially completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

Accordingly, delivery of the Demised Premises with Landlord's Work substantially completed is hereby made to Tenant.

You may pick up the keys at
_____ .

If you have any questions, please feel free to contact me at
_____ .

Thank You.

**LANDLORD:**

_____
a _____

By: _____
Title: _____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Title: _____

## EXHIBIT F

## EXCLUSIVE USE PROVISIONS AND CERTAIN OTHER RESTRICTIONs

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use, except as follows:**

**Exclusives:**

(1) Advance America:

>  "…Landlord agrees that during the original term of this lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is payday cash advance loans…."

(2)    Chen's Massage Clinic

>  "…Landlord agrees not to authorize any other tenant in the Shopping Center except for Tenant to operate a clinical massage therapy clinic as its primary business …"

(3) H & R Block

>  "…Landlord agrees not to lease any space at the Shopping Center to Jackson Hewitt or Liberty Tax Service.

(4) Kumon Math and Reading Center

>  "…Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is supplemental education sessions for children …"

(5) Nagasaki Japanese Steak House & Sushi

>  "… Landlord agrees not to authorize any other tenant in the Shopping Center except for Nagasaki Japanese Steak House & Sushi to operate as a Japanese restaurant as its primary business …"

(6) Tropical Smoothies:

>  "… Landlord agrees not to authorize any other tenant in the Shopping Center except for Café Ventures, Inc. to sell smoothie drinks as its primary business …"

(7) Wing Stop:

>  "…Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is the sale of chicken wings. …"

(8) You Fit Health Club:

>  Tenant has been given an exclusive to operate a fitness center as its primary use.

**Other Restrictions:**

(1)    Any use which emits or results in an obnoxious odor, noise or sound which may constitute a public or private nuisance; provided this provision shall not prohibit an outdoor paging system for restaurants, nor shall it prohibit the reasonable emanation of cooking odors from any restaurants;

(2) Any use which is physically damaging to other portions of the Shopping Center or which creates dangerous hazards;

(3) Any assembly or manufacturing operation which would be permitted only in a heavy manufacturing or industrial zone; or any distillation, refining, smelting, industrial, agricultural, drilling or mining operation;

(4) Any trailer court, mobile home park, junkyard, stock yard or animal raising operation (other than pet shops and veterinarians), except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance;

(5) Any dump or disposal, or any operation for the incineration or reduction of garbage or refuse, unless the same is intended solely for the handling or reducing of waste produced within the Property by occupants thereof conducting permitted uses, if handled in a reasonably clean and sanitary manner;

(6) Any operation primarily used as a warehouse;

(7) Any central laundry, dry cleaning plant, or laundromat; provided this restriction shall not apply to any facility providing on-site service oriented to pick-up and delivery by the ultimate consumer, including nominal supporting facilities;

(8) Any mortuary;

(9) Any establishment selling or exhibiting pornographic material;

(10) Any flea market;

(11) Any activity which unreasonably physically interferes with the business of any other occupant of the Shopping Center;

(12) Any activity or use which conflicts with or violates any other applicable zoning or other governmental law, statute, rule, regulation or order;

(13) Any motion picture theater(s);

(14) Any night club, discotheque or dance hall;

(15) Any lot for the sale of new or used motor vehicles;

(16) Any motor vehicle repair or service shop, or any car wash;

(17) Any pool or billiard hall (unless operated as a part of a large-scale recreation or entertainment facility);

(18) Any bowling alley, ice skating or roller skating rink, miniature golf course, or other similar sports, recreation and/or entertainment facility;

(19) Any video, pinball and/or amusement arcade, or other similar entertainment facility; and

(20) Any home improvement store in excess of 25,000 square feet (i.e., a store used for the sale and display of home improvement items such as paint, wallpaper, lumber, kitchen cabinets, bathroom cabinets, plumbing fixtures and materials, garden tools, and/or other such similar items).

## EXHIBIT G

## REMEASUREMENT RIDER

This Rider dated _____ ____, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

    Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    A.    Fixed Minimum Rent – Original Term (Section 5.A.):
            _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent – First Option (Section 5.A.):
            _____ annually; _____ per month.

4.    A.    Fixed Minimum Rent – Second Option (Section 5.A.):
            _____ annually; _____ per month.

5.    A.    Fixed Minimum Rent – Third Option (Section 5.A.):
            _____ annually; _____ per month.

6.    A.    Fixed Minimum Rent – Fourth Option (Section 5.A.):
            _____ annually; _____ per month.

**EXHIBIT "H"**

**TITLE REPORT**



**Fidelity National Title**
Insurance Company

POLICY NO.: FL6745-10-NT12-3441-2013.2730609-88051407

### OWNER'S POLICY OF TITLE INSURANCE
Issued by
**Fidelity National Title Insurance Company**

*Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.*

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, (the "Company") insures, as of Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1.  Title being vested other than as stated in Schedule A.

2.  Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
    (a)  A defect in the Title caused by
        (i)    forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
        (ii)   failure of any person or Entity to have authorized a transfer or conveyance;
        (iii)  a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
        (iv)  failure to perform those acts necessary to create a document by electronic means authorized by law;
        (v)   a document executed under a falsified, expired, or otherwise invalid power of attorney;
        (vi)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
        (vii) a defective judicial or administrative proceeding.

    (b)  The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c)  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3.  Unmarketable Title.

4.  No right of access to and from the Land.

5.  The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (a) the occupancy, use, or enjoyment of the Land;
    (b) the character, dimensions, or location of any improvement erected on the Land;
    (c) the subdivision of land; or
    (d) environmental protection
    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to

2730609                                    1 of 8                          ALTA Owner's Policy (6/17/06)
                                                                          (with Florida Modifications)

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

*In Witness Whereof,* FIDELITY NATIONAL TITLE INSURANCE COMPANY, has caused this policy to be signed and sealed as of Date of Policy shown in Schedule A,    the policy to become valid when countersigned by an authorized signatory of the Company.

FL6745          NT12-3441
Fidelity National Title Insurance Company
5690 W Cypress St Ste A
Tampa, FL 33607
Tel: (813) 254-2101
Fax: (813) 885-3322

*Fidelity National Title Insurance Company*

(SEAL)

By: 

ATTEST                                          President

Secretary

Countersigned: _____
                    Authorized Signatory
                 Constance V. Selfridge

ALTA Owner's Policy (6/17/06)
(with Florida Modifications)

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i)  the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy; or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

CONDITIONS

## 1. DEFINITION OF TERMS

The following terms when used in this policy mean:
(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
(d) "Insured": The Insured named in Schedule A.
   (i) The term "Insured" also includes
      (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
      (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
      (C) successors to an Insured by its conversion to another kind of Entity;
      (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
         (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
         (2) if the grantee wholly owns the named Insured,
         (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
         (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.
   (ii) With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
(e) "Insured Claimant": An Insured claiming loss or damage.
(f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
(h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(j) "Title": The estate or interest described in Schedule A.
(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to

---

ALTA Owner's Policy (6/17/06)<br/>(with Florida Modifications)

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

## 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

## 5. DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as

<table>
<tr><td>2730609</td><td>5 of 8</td><td>ALTA Owner's Policy (6/17/06)<br>(with Florida Modifications)</td></tr>
</table>

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association 

confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7. **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:
(a) To Pay or Tender Payment of the Amount of Insurance. To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.
Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.
(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or
(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.
Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8. **DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of
(i) the Amount of Insurance; or
(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,
(i) the Amount of Insurance shall be increased by 10%, and
(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9. **LIMITATION OF LIABILITY**

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

## 11. LIABILITY NONCUMULATIVE

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

## 12. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

## 14. ARBITRATION

Unless prohibited by applicable law, arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association may be demanded if agreed to by both the Company and the Insured at the time of a controversy or claim. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the Insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys'

---

ALTA Owner's Policy (6/17/06)
(with Florida Modifications)

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



fees only if the laws of the state in which the Land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim whether or not based on negligence shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 16. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 17. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 18. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at Fidelity National Title Insurance Company, Attn: Claims Department, P.O. Box 45023, Jacksonville, FL 32232-5023.

2730609                             8 of 8                             ALTA Owner's Policy (6/17/06)
                                                                        (with Florida Modifications)

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



**Fidelity National Title®**
Insurance Company

Policy No.:  FL6745-10-NT12-3441-2013.2730609-88051407
**SCHEDULE A**

Fidelity National Title Insurance Company
5690 West Cypress Street, Suite A
Tampa, FL 33607

File No.: NT12-3441
Address Reference:  3111 Mahan Dr., Tallahassee, FL (For information only)

Amount of Insurance: $8,910,823.00
Premium: $23,874.53

Date of Policy:  December 28, 2012 at 11:32 AM

1.    Name of Insured:

LSREF2 Gator2 (Lafayette) LLC, a Delaware limited liability company

2.    The estate or interest in the Land that is encumbered by this policy is:

Fee Simple

3.    Title is vested in:

LSREF2 Gator2 (Lafayette) LLC, a Delaware limited liability company

4.    The Land referred to in this policy is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

THE TELEPHONE NUMBER TO PRESENT INQUIRIES OR OBTAIN INFORMATION ABOUT COVERAGE AND TO
PROVIDE ASSISTANCE IS 1-800-669-7450

**THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED**

30609                                    1 of 8

ALTA Owner's Policy (6/17/06)
(with Florida Modifications)

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA
members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title
Association



 **Fidelity National Title**
Insurance Company

Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407
## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

1.  All assessments and taxes for the year 2013 and all subsequent years which are not yet due and payable.

2.  Terms, conditions and provisions in that certain unrecorded Lease Agreement in favor of Publix Super Markets, Inc., a Florida corporation, as evidenced by the Memorandum of Lease dated January 22, 1986, recorded in Official Record Book 1194, page 29, as affected by the Subordination, Non-Disturbance and Attornment Agreement recorded in Official Record Book 3738, page 2085 and in Official Record Book 4161, page 1950, of the Public Records of Leon County, Florida.

3.  Terms, conditions, and provisions in that certain Easement Agreement recorded in Official Record Book 1203, page 1453, of the Public Records of Leon County, Florida.

4.  Easement in that certain Special Warranty Deed recorded in Official Record Book 1250, page 365, of the Public Records of Leon County, Florida.

5.  Terms, conditions, and provisions in that certain Easement Agreement recorded in Official Record Book 1250, page 370, as affected by the Modification and Amendment to Easement Agreement recorded in Official Record Book 1260, page 862, all of the Public Records of Leon County, Florida.

6.  Easement in favor of the City of Tallahassee recorded in Official Record Book 1268, page 706, of the Public Records of Leon County, Florida.

7.  Easement in favor C.J.U. Ltd recorded in Official Record Book 1405, page 581, of the Public Records of Leon County, Florida.

8.  Terms, conditions, and provisions in that certain Order of Taking recorded in Official Record Book 2199, page 1784, of the Public Records of Leon County, Florida.

9.  Notice of Non-Responsibility of Landlord Pursuant to Florida Statutes Section 713.10 recorded in Official Record Book 3838, page 1512, of the Public Records of Leon County, Florida.

10. Matters as shown on the survey prepared by Broward Davis &Assoc., Inc., dated December 13, 2012, as follows:
    a) overhead utility lines with poles and guy wires located on he subject property without an apparent easement;
    b) wood retaining wall and steps extend beyond property boundary line
    c) dumpster and pad extend \beyond property line

THE TELEPHONE NUMBER TO PRESENT INQUIRIES OR OBTAIN INFORMATION ABOUT COVERAGE AND TO PROVIDE ASSISTANCE IS 1-800-669-7450

**THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED**

ALTA Owner's Policy (6/17/06)
(with Florida Modifications)

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



 **Fidelity National Title**
Insurance Company

Policy No.:  FL6745-10-NT12-3441-2013.2730609-88051407

11.    Mortgage With Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by LSREF2 Gator2 (Lafayette) LLC, a Delaware limited liability company, in favor of Wells Fargo Bank, National Association, dated December 28, 2012, recorded December 28, 2012, in Official Record Book 4461, page 1705, of the Public Records of Leon County, Florida.

12.    UCC Financing Statement showing LSREF2 Gator2 (Lafayette) LLC, a Delaware limited liability company, as Debtor, and Wells Fargo Bank, National Association, as Secured Party, December 28, 2012, in Official Record Book 4461, page 1727, of the Public Records of Leon County, Florida.

13.    Terms and conditions of the unrecorded lease agreement with YF Lafayette Place, INC., DBA You Fit Health Club, as tenant, pursuant to the Subordination Agreement, Acknowledgment of Lease Assignment, Estoppel, Attornment and Non-Disturbance Agreement dated December 7, 2012, recorded January 28, 2013, in Official Records Book 4474, page 1160, of the Public records of Leon County, Florida.

THE TELEPHONE NUMBER TO PRESENT INQUIRIES OR OBTAIN INFORMATION ABOUT COVERAGE AND TO PROVIDE ASSISTANCE IS 1-800-669-7450

**THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED**

| 30609 | 3 of 8 | ALTA Owner's Policy (6/17/06)<br>(with Florida Modifications) |

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association



 **Fidelity National Title**
Insurance Company

Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407

**Exhibit "A"**
**Legal Description**

PARCEL 1:

A parcel of land situate in the Northwest Quarter of the Northwest Quarter of Section 27, Township 1 North, Range 1 East, Leon County, Florida, being more particularly described as follows:

Begin at an old concrete monument marking the Southwest corner of the Northwest Quarter of the Northwest Quarter of Section 27, Township 1 North, Range 1 East and run North 00 degrees 25 minutes 42 seconds West along the Section line 2.71 feet to a concrete monument; thence South 68 degrees 38 minutes 06 seconds East 29.42 feet to an iron pin, thence North 67 degrees 16 minutes 09 seconds East 182.0 feet to a concrete monument, thence North 22 degrees 43 minutes 51 seconds West 150.0 feet to an iron pin on the Southerly boundary line of right of way for State Road No. 10 (East Tennessee Street) as it existed in 1974, thence run North 67 degrees 16 minutes 09 seconds East (bearing base) along said right of way boundary line (65 feet from and parallel to the survey line for said State Road No. 10) 270.15 feet, thence North 22 degrees 43 minutes 51 seconds West 15.00 feet, thence North 67 degrees 16 minutes 09 seconds East along said right of way boundary line (50 feet from and parallel to said survey line) 350.0 feet, thence North 22 degrees 43 minutes 51 seconds West 17.0 feet, thence North 67 degrees 16 minutes 09 seconds East along said right of way boundary line (33 feet from and parallel to said survey line) 23.32 feet to an iron pin, thence South 22 degrees 43 minutes 51 seconds East 160.0 feet to an iron pin, thence North 67 degrees 16 minutes 09 seconds East 164.34 feet to an iron pin, thence South 00 degrees 12 minutes 35 seconds East along an old fence line and tree line 302.16 feet to an iron pipe, thence South 00 degrees 19 minutes 57 seconds East 99.14 feet to an iron pipe, thence continue South 00 degrees 19 minutes 57 seconds East 60.0 feet to an iron pin, thence South 46 degrees 31 minutes 18 seconds West 395.0 feet to the center of a drainage ditch, thence North 81 degrees 51 minutes 49 seconds West 197.0 feet to an iron pipe, thence South 89 degrees 40 minutes 38 seconds West 100.00 feet to an iron pipe, thence South 89 degrees 40 minutes 49 seconds West 349.83 feet to an iron pipe, thence North 00 degrees 25 minutes 42 seconds West 313.0 feet to the POINT OF BEGINNING.

LESS AND EXCEPT parcel for additional State Road No. 10 right-of-way as described in Order of Taking recorded in Official Record Book 2199, page 1784, of the Public Records of Leon County, Florida.

PARCEL 2:

Non-exclusive easements for ingress, egress, parking, and utility purposes as described in Official Record Book 1250, page 370, as modified in Official Record Book 1260, page 862, all of the Public Records of Leon County, Florida.

PARCEL 3:

Non-exclusive easement for ingress, egress and utility purposes and described in Official Record Book 1405, page 581, of the Public Records of Leon County, Florida.

THE TELEPHONE NUMBER TO PRESENT INQUIRIES OR OBTAIN INFORMATION ABOUT COVERAGE AND TO PROVIDE ASSISTANCE IS 1-800-669-7450

**THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED**

30609                                   4 of 8

ALTA Owner's Policy (6/17/06)
(with Florida Modifications)

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association





**Fidelity National Title**
Insurance Company

Policy No.:  FL6745-10-NT12-3441-2013.2730609-88051407

**ENDORSEMENT**
**RESTRICTIONS, ENCROACHMENTS, MINERALS – OWNER'S POLICY – IMPROVED LAND**
(with Florida Modifications)

Attached to Policy No: FL6745-10-NT12-3441-2013.2730609-88051407

Issued by:  **FIDELITY NATIONAL TITLE INSURANCE COMPANY**

The Company insures the insured against loss or damage sustained by reason of:
1.     The existence, at Date of Policy, of any of the following unless expressly excepted in Schedule B:
     (a) Present violations on the Land of any enforceable covenants, conditions or restrictions, or any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the Public Records.
     (b) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the Land which, in addition, (i) establishes an easement on the land; (ii) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant; or (iii) provides a right of re-entry, possibility of reverter, or right of forfeiture because of violations on the Land of any enforceable covenants, conditions or restrictions.
     (c) Any encroachment of existing improvements located on the Land onto adjoining land, or any encroachment onto the Land of existing improvements located on adjoining land.
     (d) Any encroachment of existing improvements located on the Land onto that portion of the Land subject to any easement excepted in Schedule B.
     (e) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the Public Records.

2.     Damage to buildings existing at Date of Policy:
     (a) Which are located on or encroach upon that portion of the Land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;
     (b) Resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals excepted from the description of the Land or excepted in Schedule B.

3.     Any final court order or judgment requiring the removal from any land adjoining the Land of any encroachment, other than fences, landscaping or driveways, excepted in Schedule B.

4.     Any final court order or judgment denying the right to maintain any existing building on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the Public Records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(a) and 4, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or limitations relating to environmental protection.



**Fidelity National Title**
Insurance Company

Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: December 28, 2013

BY: _____
    Authorized Signatory

ALTA 9.2-06 Restrictions,
Encroachments, Minerals
Owner's Policy-Improved Land
(6/17/06) (with Florida Modifications)

 **Fidelity National Title**
Insurance Company

Policy No.:  FL6745-10-NT12-3441-2013.2730609-88051407

**ENDORSEMENT**
**Survey**

Attached to and forming a part of Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407
of FIDELITY NATIONAL TITLE INSURANCE COMPANY

The Company hereby acknowledges the lands described in Schedule A are the same lands described in
the survey prepared by Broward Davis &Assoc., Inc., dated December 13, 2012, however, the Company
does not insure the accuracy or completeness of said survey.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any
of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of the
Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous
endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.
Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior
endorsements.

Dated:  December 28, 2012

Countersigned:

BY:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　Authorized Signatory

Survey Endorsement (6/17/06)

 **Fidelity National Title**
Insurance Company

Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407

## ENDORSEMENT
## CONTIGUITY

Attached to Policy No.: FL6745-10-NT12-3441-2013.2730609-88051407

Issued by

Fidelity National Title Insurance Company

The Company insures the Insured herein against loss or damage by virtue of any inaccuracy in the following statement, to wit:

Parcel 1 of the legal description and Parcel 2 of the legal description are contiguous to each other along their common boundaries; Parcel 2 of the legal description and Parcel 3 of the legal description are contiguous to each other along their common boundaries, and, taken as a tract, constitute one Parcel of land.

This endorsement is issued a part of the policy. Except as it expressly stated, it does not (1) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: December 28, 2012

BY: _____
Authorized Signatory

Contiguity Endorsement