**Exhibit A**

LEASE AGREEMENT

This Lease Agreement (the "Lease") is made this 16th day of December, 2004, by and between FEDERAL REALTY INVESTMENT TRUST, a Maryland real estate investment trust ("Landlord"), and BIG LOTS STORES, INC., a ___Ohio___ corporation ("Tenant").





IN CONSIDERATION of the payments of rents and other charges provided for herein and the covenants and conditions hereinafter set forth, Landlord and Tenant hereby covenant and agree as follows:

ARTICLE I

REFERENCE PROVISIONS, DEFINITIONS AND EXHIBITS

As used in the Lease, the following terms shall have the meanings set forth in Sections 1.01 and 1.02 below.

**Section 1.01.    Reference Provisions.**

A.    Leased Premises: The "cross-hatched" space indicated on the site plan attached as Exhibit A, comprising approximately twenty-four thousand (24,000) square feet, commonly known as Store #10 and located at Route 46 and Van Houten Avenue, Clifton, New Jersey 07013, and as defined in Article II.

B.    Term: Ten (10) Lease Years from the Opening Date. See Addendum II.

C.    Term Commencement Date: The date upon which the Landlord delivers the Leased Premises to Tenant. Landlord anticipates that in no event will the Term Commencement Date occur later than February 15, 2005. Unless otherwise provided herein, possession of the Leased Premises shall be conclusively deemed to be delivered to Tenant upon the date that Landlord has substantially completed Landlord's Work (as defined in Exhibit B), so as to permit Tenant, without unreasonable interferences from Landlord, to commence Tenant's Work (as defined in Exhibit B).

D.    Rent Commencement Date: The Opening Date.

E.    Termination Date: The last day of the Term, or the earlier date on which this Lease is terminated in accordance with the provisions hereof.

F.    Opening Date: The earlier of (a) the date Tenant opens for business from the Leased Premises, or (b) one hundred twenty (120) days after the last to occur of the following dates: (i) the date Landlord delivers the Leased Premises to Tenant with Landlord's Work substantially completed, or (ii) the date Tenant obtains its building permit for Tenant's Work, provided (1) Tenant submits its plans and specifications for Tenant's Work, to the extent required pursuant to Exhibit B, to Landlord within the time frames specified in Exhibit B, (2) Tenant files for such permit on or before the expiration of sixty (60) days following the date of this Lease, provided that Landlord has approved such plans on or before the expiration of said sixty (60) day period, (3) such plans and specifications are consistent with plans and specifications submitted by Tenant to other governmental authorities for comparable premises, and Tenant in good faith, believes that such plans and specifications comply with applicable governmental code requirements, and (4) Tenant is diligently pursuing the issuance of such permit. In the event Tenant has not satisfied the foregoing subsections (1) through (4), then the Rent Commencement Date shall be the earlier of (a) the date Tenant opens for business from the Leased Premises, or (b) one hundred twenty (120) days after the date of delivery of possession of the Leased Premises from Landlord to Tenant.

The term "diligently pursue" shall include payment of all fees and charges, providing all requested information and data to any governmental agencies having appropriate jurisdiction in a timely manner, and otherwise reasonably cooperating with appropriate governmental agencies.

LEASE AGREEMENT

BETWEEN

FEDERAL REALTY INVESTMENT TRUST, LANDLORD

AND

BIG LOTS STORES, INC., TENANT

DATE: _December 16, 2004_

ARTICLE I
  REFERENCE PROVISIONS, DEFINITIONS AND EXHIBITS ........................................... 1
ARTICLE II
  LEASED PREMISES AND THE SHOPPING CENTER ........................................... 4
ARTICLE III
  TERM ........................................... 5
ARTICLE IV
  USE AND OPERATION OF THE LEASED PREMISES ........................................... 5
ARTICLE V
  RENT ........................................... 8
ARTICLE VI
  COMMON AREAS ........................................... 9
ARTICLE VII
  UTILITIES ........................................... 12
ARTICLE VIII
  INDEMNITY AND INSURANCE ........................................... 12
ARTICLE IX
  CONSTRUCTION AND ALTERATIONS ........................................... 16
ARTICLE X
  REPAIRS, MAINTENANCE, AND LANDLORD'S ACCESS ........................................... 18
ARTICLE XI
  CASUALTY ........................................... 19
ARTICLE XII
  CONDEMNATION ........................................... 20
ARTICLE XIII
  INTENTIONALLY DELETED ........................................... 21
ARTICLE XIV
  SUBORDINATION AND ATTORNMENT ........................................... 21
ARTICLE XV
  ASSIGNMENT AND SUBLETTING ........................................... 22
ARTICLE XVI
  DEFAULT AND REMEDIES ........................................... 24
ARTICLE XVII
  MISCELLANEOUS PROVISIONS ........................................... 26

LEASE AGREEMENT

This Lease Agreement (the "Lease") is made this 16th day of December, 2004, by and between FEDERAL REALTY INVESTMENT TRUST, a Maryland real estate investment trust ("Landlord"), and BIG LOTS STORES, INC., a ___Ohio___ corporation ("Tenant"). 

IN CONSIDERATION of the payments of rents and other charges provided for herein and the covenants and conditions hereinafter set forth, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

## REFERENCE PROVISIONS, DEFINITIONS AND EXHIBITS

As used in the Lease, the following terms shall have the meanings set forth in Sections 1.01 and 1.02 below.

Section 1.01.    Reference Provisions.

A.    Leased Premises: The "cross-hatched" space indicated on the site plan attached as Exhibit A, comprising approximately twenty-four thousand (24,000) square feet, commonly known as Store #10 and located at Route 46 and Van Houten Avenue, Clifton, New Jersey 07013, and as defined in Article II.

B.    Term: Ten (10) Lease Years from the Opening Date. See Addendum II.

C.    Term Commencement Date: The date upon which the Landlord delivers the Leased Premises to Tenant. Landlord anticipates that in no event will the Term Commencement Date occur later than February 15, 2005. Unless otherwise provided herein, possession of the Leased Premises shall be conclusively deemed to be delivered to Tenant upon the date that Landlord has substantially completed Landlord's Work (as defined in Exhibit B), so as to permit Tenant, without unreasonable interferences from Landlord, to commence Tenant's Work (as defined in Exhibit B).

D.    Rent Commencement Date: The Opening Date.

E.    Termination Date: The last day of the Term, or the earlier date on which this Lease is terminated in accordance with the provisions hereof.

F.    Opening Date: The earlier of (a) the date Tenant opens for business from the Leased Premises, or (b) one hundred twenty (120) days after the last to occur of the following dates: (i) the date Landlord delivers the Leased Premises to Tenant with Landlord's Work substantially completed, or (ii) the date Tenant obtains its building permit for Tenant's Work, provided (1) Tenant submits its plans and specifications for Tenant's Work, to the extent required pursuant to Exhibit B, to Landlord within the time frames specified in Exhibit B, (2) Tenant files for such permit on or before the expiration of sixty (60) days following the date of this Lease, provided that Landlord has approved such plans on or before the expiration of said sixty (60) day period, (3) such plans and specifications are consistent with plans and specifications submitted by Tenant to other governmental authorities for comparable premises, and Tenant in good faith, believes that such plans and specifications comply with applicable governmental code requirements, and (4) Tenant is diligently pursuing the issuance of such permit. In the event Tenant has not satisfied the foregoing subsections (1) through (4), then the Rent Commencement Date shall be the earlier of (a) the date Tenant opens for business from the Leased Premises, or (b) one hundred twenty (120) days after the date of delivery of possession of the Leased Premises from Landlord to Tenant.

The term "diligently pursue" shall include payment of all fees and charges, providing all requested information and data to any governmental agencies having appropriate jurisdiction in a timely manner, and otherwise reasonably cooperating with appropriate governmental agencies.

Prior to the Opening Date, the parking lot serving the Shopping Center will be in good condition with potholes, severe cracks and uneven areas resurfaced and adequate for customer parking and Tenant's use.

G.    Minimum Rent:

| Lease Year | Annually | Monthly | PSF |
|---|---|---|---|
| 1-5 | $264,000.00 | $22,000.00 | $11.00 |
| 6-10 | $290,400.00 | $24,200.00 | $12.10 |

H.    Percentage Rent Factor:  None.

I.    Tenant's Initial Monthly Tax Estimate:  $7,780.00.

J.    Tenant's Initial Monthly Operating Costs Estimate:  $3,060.00.

K.    Tenant's Initial Monthly Marketing Fund Dues:  None.

L.    Security Deposit:  None.

M.    Permitted Use:  The operation of a so-called "close-out store" which sells at retail general merchandise, closeout merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, health and beauty care products, food and frozen food, in a manner consistent with Tenant's other operations in the Northeastern United States, which, for the purposes of this Lease, is defined as the area located on the eastern seaboard of the United States beginning from Philadelphia, PA, northward through the state of Massachusetts, and for no other purpose. Notwithstanding anything to the contrary in this Lease, in no event shall the Leased Premises be used in a manner that violates an existing exclusive use provision or prohibited use provision in effect in the Shopping Center as of the date of this Lease, a list of which is attached hereto as Exhibit F.

N.    Minimum Store Hours:  Monday through Saturday, 10:00 A.M. to 6:00 P.M.; Sunday, 12:00 P.M. to 6:00 P.M.  See Section 4.01.

O.    Rent Payments:  The rent payments due herein shall be made payable to Landlord at:

FEDERAL REALTY INVESTMENT TRUST - Property #1324
c/o Levin Management Corporation
P.O. Box 326
Plainfield, NJ  07061

P.    Notice Addresses:

TO LANDLORD:
LEVIN MANAGEMENT CORPORATION
893 Route 22 West
North Plainfield, NJ  07060

AND

FEDERAL REALTY INVESTMENT TRUST
1626 East Jefferson Street
Rockville, MD  20852-4041
Attention:  Legal Department

TO TENANT:
BIG LOTS STORES, INC.
300 Phillipi Road
Columbus, OH  43228
Attention:  Lease Administration and
Adam C. Hirschfeld, Esquire

Q.    Shopping Center: That certain shopping center, commonly known as Clifton Plaza, located in the City of Clifton, County of Passaic, in the State of New Jersey.

R.    Tenant Trade Name: Big Lots.

S.    Schedules and Exhibits: The schedules and exhibits listed below are attached to the Lease and are hereby incorporated in and made a part of the Lease.

| | |
|---|---|
| Exhibit A | Site Plan |
| Exhibit B | Landlord and Tenant Improvements |
| Exhibit C | Signage Criteria |
| Exhibit C-1 | Tenant's Signage Drawing |
| Exhibit C-2 | Pylon Signage |
| Exhibit D | Rules and Regulations |
| Exhibit E | Gross Sales Statement Form |
| Exhibit F | Exclusive and Prohibited Uses |
| Exhibit G-1 | Recognition Agreement |
| Exhibit G-2 | Subordination, Non-Disturbance and Attornment Agreement |
| Addendum I | Asbestos Containing Material |
| Addendum II | Option To Extend |
| Addendum III | Competing Business |
| Addendum IV | Construction Allowance |
| Addendum V | Storage Trailer |
| Addendum VI | Lease Contingency |
| Addendum VII | Satellite Addendum |
| Addendum VIII | Prohibited Uses |
| Addendum IX | Environmental Indemnities |

Section 1.02.    Definitions.

A.    Common Areas: Any existing or future non-building improvements, equipment, areas and/or spaces for the non-exclusive, common and joint use or benefit of Landlord, Tenant and other tenants, occupants and users of the Shopping Center. The Common Areas include, without limitation, sidewalks, parking areas, access roads, driveways, landscaped areas, service drives and service roads, traffic islands, loading and service areas, and other similar non-building areas and improvements.

B.    Ground Lease: That certain Lease and Agreement dated December 12, 1988 between Janice H. Levin, and Adam K. Levin, Catherine M. Levin and Susan L. Tepper (by Janice H. Levin, as their attorney-in fact) ("Ground Landlord") and Landlord as ground lessee.

C.    Floor Area: When used with respect to the Leased Premises, the number of square feet set forth in Section 1.01.A., it being specifically understood and agreed that in no event shall the Floor Area of the Leased Premises include mezzanine space or basement space. When used with respect to any other space in the Shopping Center, the number of leasable square feet on the first floor of such space as determined by Landlord, provided, however, in no event shall said Floor Area include mezzanine space or basement space. Upon written request from Tenant within thirty (30) days from the date of Landlord's delivery of possession of the Leased Premises to Tenant, Landlord and Tenant hereby agree that within thirty (30) days after Landlord's receipt of Tenant's written request, a representative of each party shall jointly field measure the Leased Premises to determine the exact square footage. Such field measurement shall be made from the outside of exterior walls and from the centerline of interior demising walls. The Minimum Rent and Tenant's Floor Area set forth in Section 1.01.A. shall be adjusted in accordance with the new measurement of the square footage. Landlord and Tenant shall execute a letter agreement setting forth the new square footage and adjusted Rent. If Tenant fails to timely request measurement of the Leased Premises, then the square footage set forth in Section 1.01 of this Lease shall be deemed accurate and accepted by Tenant.

D.    Interest: A rate per annum of twelve percent (12%).

E.    Lease Year: Each twelve (12) month period beginning with the Opening Date, and each anniversary thereof, provided the Opening Date occurs on the first day of a month. If the Opening Date occurs on a day other than the first day of a month, then the first Lease Year shall begin on the first day of the month following the Opening Date.

F.    Partial Lease Year: Any period during the Term which is less than a full Lease Year.

G.    Person: An individual, firm, partnership, association, corporation, limited liability company, or any other entity.

H.    Additional Rent: All sums payable by Tenant to Landlord under the Lease, other than Minimum Rent.

I.    Rent: Minimum Rent plus Additional Rent.

J.    Tax Year: A twelve (12) month period established by Landlord as the year for purposes of computing Tax Rent. The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Shopping Center.

K.    Tenant's Proportionate Share: For a given accounting period, a fraction, the numerator of which is the Floor Area of the Leased Premises and the denominator of which is the total Floor Area of the Shopping Center. As of the date of this Lease, Tenant's Proportionate Share is thirty percent (30%), subject to the re-measurement clause set forth in Section 1.02.C. hereof, and changes from time to time in the Floor Area of the Shopping Center.

## ARTICLE II

## LEASED PREMISES AND THE SHOPPING CENTER

Landlord demises and leases to Tenant, and Tenant leases and takes from Landlord, the Leased Premises. The Leased Premises shall include any loading dock designated exclusively for Tenant's use. Landlord has the exclusive right to (i) use the exterior faces of the exterior walls of the Leased Premises and the roof of the Shopping Center (a) for the purpose of performing any obligations set forth in this Lease, and/or exercising any rights set forth herein, and (b) as may be required by applicable laws, rules and regulations, and (ii) install, maintain, use, repair and replace pipes, ducts, cables, conduits, plumbing, vents, utility lines and wires to, in, through, above and below the Leased Premises and other parts of the Shopping Center. If any of the foregoing are located within the Leased Premises, Landlord's exercise of such rights shall not materially interfere with the operation of Tenant's business in the Leased Premises, provided (a) such use does not interfere with or prohibit the placement of Tenant's exterior Sign(s) permitted in accordance with Section 4.04 and Exhibit C of this Lease, and (b) Landlord does not place any Signs on the exterior faces of the exterior walls of the Leased Premises.

Notwithstanding anything to the contrary contained herein, Landlord shall locate all pipes, conduits, wires and other materials or facilities which serve the Shopping Center and pass through the Leased Premises above the dropped ceiling of the Leased Premises, in the walls next to columns, under the floors, or in other locations hidden from view. Any change in said pipes, conduits, ducts, wires and other materials shall be performed by Landlord at its sole cost and expense unless the same is required in the conduct of the Tenant, in which event Tenant shall reimburse Landlord the reasonable cost thereof within ten (10) days after receiving Landlord's invoice therefor. Landlord shall perform all work within the Leased Premises pursuant to this Article II in such a manner so as to not materially interfere with Tenant's use and operation of the Leased Premises.

ARTICLE III

TERM

Section 3.01.       Term.

The Term shall commence on the Term Commencement Date and expire on the Termination Date.

Section 3.02.       End of Term.

This Lease shall terminate on the Termination Date without the necessity of notice from either Landlord or Tenant. Upon the Termination Date, Tenant shall quit and surrender to Landlord the Leased Premises, broom-clean, in good order and condition, ordinary wear and tear, Casualty (hereinafter defined), and the reasons set forth in Section 17.13 excepted; and shall surrender to Landlord all keys to or for the Leased Premises.

Section 3.03.       Holding Over.

If Tenant fails to vacate the Leased Premises on the Termination Date, Landlord shall have the benefit of all provisions of law respecting the speedy recovery of possession of the Leased Premises (whether by summary proceedings or otherwise). In addition to and not in limitation of the foregoing, occupancy subsequent to the Termination Date ("Holdover Occupancy") shall be a tenancy at will. Holdover Occupancy shall be subject to all terms, covenants, and conditions of the Lease (including those requiring payment of Additional Rent), except that the Minimum Rent for each day that Tenant holds over ("Holdover Minimum Rent") shall be equal to one and one-quarter (1-1/4) times the per diem Minimum Rent payable in the last Lease Year.

ARTICLE IV

USE AND OPERATION OF THE LEASED PREMISES

Section 4.01.       Continuous Operation by Tenant.

A.     Tenant shall: (i) open the Leased Premises for business on the Opening Date; (ii) while Tenant is open for business, carry at all times in the Leased Premises a full stock of merchandise consistent with Tenant's operations in New Jersey; (iii) while Tenant is open for business employ reputable business standards and practices; and (iv) operate the entire Leased Premises continuously and uninterruptedly prior to the completion of the first (1st) full Lease Year during the Term. Tenant shall use for storage and office space only those areas indicated for such use on Tenant's plans approved by Landlord.

Landlord recognizes, and it is specifically understood and agreed that the Leased Premises may, without being considered to have "gone dark", be closed during certain of the Minimum Store Hours for (i) such reasons as are set forth in Section 17.13 of this Lease, (ii) inclement weather, (iii) family death, and (iv) other matters beyond the reasonable control of Tenant (lack of funds not being deemed beyond Tenant's reasonable control). Furthermore, if such closing for one of the aforementioned reasons is reasonable in nature and duration, Tenant has notified Landlord in advance of such closing whenever reasonably possible under the circumstances and such closings in the aggregate do not exceed a total of thirty (30) days per Lease Year (on a non-cumulative basis), then the same shall not be considered a Default under the Lease or give rise to Landlord's right to increase the Minimum Rent as provided in Section 4.01.B. below. In addition, Tenant shall have the right to close the Leased Premises on two (2) non-consecutive days during any Lease Year for restocking and inventory purposes, and periods of ninety (90) consecutive days once every five (5) Lease Years, or more frequently if such closure is in connection with remodeling for a so-called "new concept" being introduced by Tenant, during the Term for renovations or necessary repairs; provided Landlord is given prior written notice in each instance. The foregoing are sometimes collectively referred to as "Permitted Closures".

B.     If Tenant fails to open the Leased Premises for business on the Opening Date, it is specifically understood and agreed that Tenant shall not be entitled to receive the Construction Allowance (as defined in Addendum IV).

C.    Notwithstanding anything to the contrary contained in this Lease, including but not limited to Sections 4.01.A. and 4.01.B. hereof, Tenant's obligation to continuously operate shall terminate, provided Tenant is not in monetary Default beyond applicable notice and cure periods under this Lease, after the first (1st) full Lease Year, after which Tenant may cease its business operations within and/or vacate the Leased Premises. If Tenant fails to continuously operate the entire Leased Premises for the first full Lease Year, then Tenant shall be deemed to be in Default hereunder, and shall be required to reimburse Landlord for the unamortized portion of the Construction Allowance, as Additional Rent. The parties hereby agree that the Construction Allowance shall be amortized on a straight line basis over the initial Term of the Lease. The foregoing shall survive any termination of this Lease, and the surrender of the Leased Premises.

Landlord shall have the right to terminate this Lease at any time after Tenant has "gone dark", hereinafter defined, for six (6) consecutive months by giving Tenant ninety (90) days' prior written notice thereof ("Termination Notice"). For the purposes of this Lease, "go dark" or "gone dark" shall mean that Tenant has ceased its business operations from substantially all of the Leased Premises for reasons other than Permitted Closures. Upon receipt of Landlord's Termination Notice, Tenant shall surrender the Leased Premises to Landlord, in accordance with the terms and conditions of this Lease, upon expiration of the ninety (90) day Termination Notice period. Furthermore, upon the expiration of the ninety (90) day Termination Notice period and Tenant's surrender of the Leased Premises to Landlord, the parties hereto shall be released from any further liability and obligations under this Lease.

Section 4.02.    Use and Trade Name.
A.    ,Tenant shall use the Leased Premises solely for the Permitted Use and for no other purpose. Tenant shall operate its business in the Leased Premises solely under the Tenant Trade Name and under no other name. Notwithstanding the foregoing, Tenant may, without Landlord's consent, change the Tenant Trade Name, so long as (i) concurrently therewith the trade name of all other similar stores owned, operated or controlled by Tenant and its affiliates in the State of New Jersey shall likewise be changed to the same trade name, (ii) such trade name does not conflict with the trade name of any other tenant in the Shopping Center, and (iii) Tenant pays the cost of all necessary Sign changes throughout the Shopping Center.

B.    Tenant shall comply with all statutes, laws, rules, orders, regulations and ordinances affecting the Leased Premises and all the orders or recommendations of any insurance underwriters, safety engineers, and loss prevention consultants as may from time to time be consulted by Landlord. Subject to Section 10.01, Tenant shall perform, at its sole cost and expense, all alterations to the Leased Premises as are required to comply with all statutes, laws, rules, orders, regulations and ordinances, provided, however, in no event shall Tenant be obligated to make any structural alterations to the Leased Premises, or alterations that are necessary to place the Leased Premises into compliance with the Americans with Disabilities Act, as now exists or may be amended in the future, (the "ADA") following the completion of Tenant's Work, unless any such ADA requirements are necessary solely as a result of the operation by Tenant of its particular business. In no event shall Tenant use the Leased Premises for purposes which are prohibited by zoning or similar laws or regulations, or covenants, conditions or restrictions of record. Tenant acknowledges and agrees it is solely responsible for determining if its business complies with the applicable zoning regulations, and that Landlord makes no representation (explicit or implied) concerning such zoning regulations. Landlord hereby represents that as of the date of this Lease, the zoning classification of the Shopping Center is BD (Intensive Business).

Section 4.03.    Minimum Store Hours.
Subject to the provisions of Section 4.01, Tenant shall conduct its business in the Leased Premises continuously during the Minimum Store Hours.

Section 4.04.    Signs and Advertising.
A.    Prior to the Opening Date, Tenant shall install any sign, placard, decoration, lettering, advertising matter or descriptive material ("Signs") required pursuant to the Signage Criteria attached as Exhibit C. Tenant shall obtain and pay for all Sign permits required for Tenant's Signs. Design and installation of Signs shall be subject to the provisions of Exhibit C.

Notwithstanding the foregoing, Landlord has conceptually approved the design of Tenant's building Signs as shown on Exhibit C-1. Tenant shall submit detailed plans and specifications for Tenant's exterior Signs to Landlord for Landlord's approval. Landlord's approval shall not be unreasonably withheld provided such plans and specifications are consistent with Exhibit C-1 and the Signage Criteria attached hereto as Exhibit C.

B.     Tenant shall not place Signs on the doors, windows, roof or exterior of the Leased Premises, or in any display window space. Hand lettered Signs and flashing Signs visible from the Common Areas are prohibited. Any Signs within five (5) feet behind the storefront of the Leased Premises must comply with the following criteria: (a) the Signs are (i) professionally designed and manufactured; and (ii) used in substantially all of its (and its affiliates') stores operating under the Trade Name; (b) the Signs do not flash, blink or otherwise light in an alternate fashion; (c) Signs do not individually exceed two (2) feet by three (3) feet in size, or in the aggregate exceed more than one-third (1/3) of the glass portion of the storefront; and (d) the Signs are not taped or affixed to the glass of the storefront windows or doors. Signs may be mounted on Plexiglas and hung with thin wire behind the storefront or displayed on an easel.

Tenant shall have the right to display a Sign on the Landlord's pylon, provided Tenant agrees (i) its Sign shall comply with Landlord's pylon sign criteria, (ii) its Sign shall be located on the pylon in the location shown therefor on Exhibit C-2, (iii) to maintain its Sign in good order and condition throughout the Term, and (iv) to pay for all costs of designing, installing, and lighting its pylon Sign. Landlord agrees that, as a condition precedent to all of Tenant's obligations under this Lease becoming effective, Landlord shall remove the Dollar Tree panel currently occupying Tenant's pylon location on the pylon sign. Landlord shall have the right to obtain governmental approval to add additional panels to the existing pylon, provided, however, any such panel shall be located beneath the sign box within which Tenant's Sign panel is located. If Landlord redesigns or reconstructs the existing pylon (the "New Pylon"), Tenant shall have the right, at its sole cost and expense, to display a Sign on the New Pylon. Subject to the rights of existing tenants as of the date of this Lease, Tenant shall have the right to place its Sign on a portion of the top panel of the New Pylon that is designated for tenants (the "Top Panel"). The size of Tenant's Sign on the New Pylon will be based on the size of the Leased Premises as compared to the size of the premises leased by any other tenant that has the right to display a sign on the Top Panel, or elsewhere on the New Pylon.

C.     Landlord shall have the right, upon notice to Tenant and at Tenant's sole risk and expense, to remove any items which are in violation of the provisions of this Section 4.04. Tenant shall maintain all Signs in good operating order and repair at all times. Tenant shall repair any Signs that have been damaged within a commercially reasonable time after such damage occurs, provided, however, that Landlord shall be responsible for any pylon repairs within a commercially reasonable time following the occurrence of damage thereto. If Tenant fails to repair any of its Signs as specified above, and such failure continues for a period of three (3) business days following receipt of notice from Landlord, Landlord shall have the right to make such repairs at Tenant's sole cost and expense.

Section 4.05.          Tenant's Use Of Roof.

Tenant shall not use or penetrate the roof for any purpose. Landlord may at any time relocate any of the equipment serving the Leased Premises which is located on the roof of the Shopping Center, provided such relocation does not materially adversely interfere with Tenant's use and occupancy of the Leased Premises. Tenant shall have the right to erect or install an antenna or satellite dish, at its sole cost and expense, on the rear exterior wall or roof of the Leased Premises, provided Tenant complies with the provisions of Addendum VII of this Lease.

Section 4.06.          INTENTIONALLY DELETED

ARTICLE V

RENT

Section 5.01.        Rent Payable.

A.      Tenant shall pay all Rent to Landlord, without prior notice or demand and without offset, deduction or counterclaim whatsoever (except as expressly set forth in this Lease), in the amounts, at the rates and times set forth herein, and at such place as is provided in Section 1.01, or at such other place as Landlord may from time to time designate by notice to Tenant.

B.      Commencing on the second occasion within any twelve (12) month period that Tenant fails to make any payment of Rent within ten (10) days from the date that such Rent is due, Tenant shall pay Landlord a late payment charge equal to the greater of (i) five percent (5%) of such payment of Rent, or (ii) Twenty Dollars ($20.00) per day from the date such Rent is due until the date such Rent is received.

C.      INTENTIONALLY DELETED.

D.      Any payment by Tenant of less than the total Rent due shall be treated as a payment on account. Acceptance of any check bearing an endorsement, or accompanied by a letter stating, that such amount constitutes "payment in full" (or terms of similar import) shall not be an accord and satisfaction or a novation, and such statement shall be given no effect. Landlord may accept any check without prejudice to any rights or remedies which Landlord may have against Tenant.

E.      For any portion of a calendar month at the beginning of the Term, Tenant shall pay in advance the pro-rated amount of the Rent for each day included in such portion of the month.

Section 5.02.        Payment of Minimum Rent.

Tenant shall pay Landlord the Minimum Rent in equal monthly installments, in advance, commencing on the Rent Commencement Date, and on the first day of each calendar month thereafter throughout the Term.

Section 5.03.        Reporting of Gross Sales.

Tenant shall report Gross Sales, as that term is hereinafter defined, to Landlord in accordance with the provisions hereinafter set forth.

Section 5.04.        "Gross Sales" Defined.

The term "Gross Sales" shall mean: the dollar aggregate of the price charged or allowed for all goods, wares, merchandise, trade-ins, beverages and food sold, leased or licensed, and the income, receipts, revenues and charges of and for all services or other operations or businesses, sold or rendered, at, in, on or from the Leased Premises by any Person occupying a portion of the Leased Premises, for cash, charge, or credit, on time basis or otherwise, without any reserve or deduction whatsoever, whether prior to or subsequent to the Term Commencement Date. Gross Sales shall include such sales, leases or licenses of goods, wares, merchandise, trade-ins, beverages, food, services or businesses (i) where orders originate or are accepted by Tenant at the Leased Premises but delivery or performance is made from or at a place other than the Leased Premises; and (ii) made pursuant to mail, telegraph, computer, telephone or other similar orders (such as catalogue orders) received, filled or taken at, in or from the Leased Premises. Gross Sales shall also include (i) amounts includable as Gross Sales pursuant to Section 4.06. above; and (ii) all other gross income derived by Tenant from its operations in, at, on or from the Leased Premises. Except as may be required by law, in connection with a sale or re-financing of the Shopping Center, or as may be required by the Ground Lease, Landlord shall maintain the confidentiality of the Gross Sales.

Section 5.05.        Statements of Gross Sales.

On or before the thirtieth (30th) day following the end of each Lease Year or Partial Lease Year, Tenant shall deliver to Landlord a written statement, certified to be complete and correct by Tenant, showing the amount of Gross Sales for such Lease Year or Partial Lease Year.

Section 5.06.        Records and Audits.
INTENTIONALLY DELETED.

Section 5.07.        Taxes.

The term "Taxes" means all governmental or quasi-governmental real estate taxes, fees, charges and assessments (whether general, special, ordinary, or extraordinary) applicable to the Shopping Center, together with all reasonable costs and fees (including reasonable appraiser, consultant and attorney's fees) incurred by Landlord in any tax contest, appeal or negotiation. It is specifically understood and agreed any special assessments or impositions shall be billed to Tenant as though they are paid by Landlord over the longest period permissible by applicable governmental activities. "Taxes" shall not include personal income taxes, personal property taxes, inheritance taxes, or franchise taxes levied against the Landlord, and not directly against said property, even though such taxes might become a lien against said property.

Section 5.08. .        Payment of Tax Rent.

A.        Landlord shall compute Tenant's share of Taxes ("Tax Rent") for each Tax Year by multiplying the amount of the Taxes by Tenant's Proportionate Share.

B.        Tenant shall pay Tax Rent in such equal monthly installments (the "Tax Estimates") as Landlord estimates from time to time, with the first installment being due on the Rent Commencement Date and each succeeding installment being due on the first day of each calendar month thereafter. The initial Tax Estimate and all succeeding installments shall be in the amount set forth in Section 1.01, until Landlord issues notice of change. After the end of each Tax Year, Landlord shall send Tenant a statement setting forth the amount of the Tax Rent and the sum of the Tax Estimates which have been paid by Tenant for such Tax Year. **Upon request, Landlord shall provide Tenant with copies of all Tax bills or other statements provided to Landlord by the appropriate taxing authority.** If the amount of the Tax Rent for such period exceeds the total of the Tax Estimates paid by Tenant, Tenant shall pay the difference to Landlord within twenty (20) days after receipt of such statement. If the total of the Tax Estimates paid by Tenant for such period exceeds the Tax Rent for such period, Landlord shall credit the difference toward the Tax Estimates next due and, at the end of the Term, refund any excess amount of Tax Rent paid by Tenant, less the amount of any moneys owed to Landlord by Tenant. Landlord shall credit Tenant with its proportionate share of any refund received by Landlord of any Tax to which Tenant has contributed. **Tenant shall not be obligated to pay Landlord any underpayment of Taxes, nor increase its Tax Estimates until Landlord has provided Tenant copies of all requested Tax bills or other available statements provided to Landlord by the appropriate taxing authority.**

Section 5.09.        Taxes on Tenant's Personal Property.

Tenant shall pay all governmental taxes, charges, fees and assessments applicable to Tenant's personal property, trade fixtures, inventory before they become delinquent.


ARTICLE VI

COMMON AREAS

Section 6.01.        Use of Common Areas.

**Tenant, its agents, employees, contractors and customers** shall have a non-exclusive license to use the Common Areas, subject to the exclusive control and management of Landlord and the rights of Landlord and of other tenants. Tenant shall comply with such rules and regulations as Landlord prescribes regarding use of the Common Areas. Tenant shall not use the Common Areas for any sales or display purposes, or for any purpose which would impede or create hazardous conditions for the flow of pedestrian or other traffic. **Notwithstanding the foregoing, Tenant shall have the right to conduct up to six (6) seasonal sales on the sidewalk immediately in front of, and within the lease lines of the storefront of the Leased Premises, provided, however, in no event shall such sidewalk sales create hazardous conditions or impair the flow of pedestrian traffic.** Tenant shall use only such entrances, exits, and service lanes in the rear of the stores as designated by Landlord for the loading or unloading of trucks or other vehicles. Tenant and Tenant's employees shall use only the employee parking areas designated by Landlord.

Section 6.02.       Management and Operation of Common Areas.

Subject to the provisions of Section 9.08.D. of this Lease, Landlord shall operate, repair, equip and maintain the Common Areas and shall have the exclusive right and authority to employ and discharge personnel with respect thereto. Without limiting the foregoing, Landlord may: (i) use the Common Areas for promotions, exhibits, displays, outdoor seating, food facilities and any other use which tends to attract customers to or benefits the Shopping Center; (ii) grant the right to conduct sales in the Common Areas; (iii) erect, remove and lease kiosks, planters, pools, sculptures, buildings and other improvements within the Common Areas; (iv) enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the Shopping Center; (v) construct, maintain, operate, replace and remove lighting, equipment, and Signs on all or any part of the Common Areas; (vi) provide security personnel for the Shopping Center; (vii) restrict parking in the Shopping Center; (viii) discourage non-customer parking; and (ix) temporarily close all or any portion of the Shopping Center as may be necessary to prevent a dedication or accrual of any rights to any person or to the public.

Section 6.03.       Tenant's Share of Operating Costs.

A.       Subject to the provisions of Section 6.03.C., Landlord shall compute Tenant's share of Operating Costs ("Tenant's Share of Operating Costs") for each full or partial calendar year (the "Operating Costs Year") by multiplying the amount of Operating Costs by Tenant's Proportionate Share.

B.       Tenant shall pay Tenant's Share of Operating Costs in equal monthly installments ("Operating Costs Estimates") in such amounts as Landlord estimates from time to time, with the first installment being due on the Rent Commencement Date and each succeeding installment being due on the first day of each calendar month thereafter. The initial Operating Costs Estimate and all succeeding installments shall be in the amount set forth in Section 1.01, until Landlord issues notice of change. After the end of each Operating Costs Year, Landlord shall send to Tenant a statement setting forth the amount of Tenant's Share of Operating Costs for the Operating Costs Year in question and the sum of the Operating Costs Estimates that have been paid by Tenant. Upon request, Landlord will provide Tenant with a copy of Landlord's general ledger in connection with the Operating Costs year in question. If the amount of Tenant's Share of Operating Costs exceeds the sum of the Operating Costs Estimates paid by Tenant for such period, Tenant shall pay Landlord the difference within twenty (20) days after receipt of such statement. If the sum of the Operating Costs Estimates paid by Tenant for such period exceeds Tenant's Share of Operating Costs for such period, Landlord shall credit the difference toward the Operating Costs Estimate payment(s) next due and, at the end of the Term, refund any excess amount of Operating Costs Estimates paid by Tenant, less the amount of any moneys owed to Landlord by Tenant. **Tenant shall not be obligated to pay Landlord any underpayment of Operating Costs, nor increase in its Operating Costs Estimates until Landlord has provided Tenant copies of requested general ledgers.**

C.       "Operating Costs" shall mean all costs and expenses associated with the operation, equipping, painting, maintenance, repair of and replacement to the **Common Areas of** the Shopping Center including, but not limited to, the costs and expenses of: (i) operating, equipping, maintaining, repairing, securing, replacing, lighting, cleaning, striping, and removing snow, ice, garbage, trash and debris from, the parking areas and sidewalks of the Shopping Center; (ii) operating, equipping, maintaining, repairing and replacing sanitary drainage systems and other utility systems, signs and markers, on and off-site traffic regulation and control signs and devices, and compliance with all laws and regulations; (iii) all premiums, fees and other charges for insurance applicable to the Shopping Center **(including buildings located in the Shopping Center**, notwithstanding anything **to the contrary contained in this Lease)**, including self-insurance; (iv) exterior landscaping; (v) seasonal decorations; (vi) all replacements and improvements of or to the Common Areas including **exterior lighting**, parking areas and similar facilities; (vii) machinery, vehicles and equipment; (viii) all license and permit fees and any and all parking surcharges; (ix) **INTENTIONALLY DELETED;** (x) employing personnel **(at or above the level of property manager)**, including the allocation of salaries, benefits and insurance costs of such personnel and other direct, on-site costs related to such personnel and their distribution and communication of Shopping Center operations-related material; (xi) all utility costs relating to the Common Areas; and (xii) an administrative charge equal to ten percent (10%) of the total of all costs included in Operating Costs except any management fee **(such administrative charge to be included in the so-called Operating Costs "cap"** hereinafter referred to). Tenant's Share of Operating Costs shall not contain as a component

thereof in any one Operating Costs Year a charge for capital expenditures incurred, or depreciation or amortization thereof, in excess of the product of seventy-five cents ($.75) times the Floor Area of the Leased Premises, and in no event shall Tenant's Share of Operating Costs include any capital expenditures in connection with buildings located in the Shopping Center. Notwithstanding the foregoing, (1) capital expenditures shall be depreciated over the useful life of the applicable item in accordance with generally acceptable accounting principals, and (2) in no event shall Tenant's Share of Operating Costs contain a charge for capital expenditures incurred, or depreciation or amortization more than one time every seven (7) Lease Years.

Notwithstanding the foregoing, Tenant's Share of Operating Costs for the first (1st) Operating Costs Year shall not exceed an amount equal to One and 53/100 Dollars ($1.53) per square foot of Floor Area of the Leased Premises (determined on an annualized basis).

Tenant's Share of controllable (hereinafter defined) Operating Costs payable during the second (2nd) Operating Costs Year shall be the actual amount of Tenant's Share of controllable Operating Costs for the first (1st) Operating Costs Year (i.e., what Tenant's share of controllable Operating Costs would have been without the "cap" set forth in the immediately preceding paragraph). In no event, however, shall Tenant's share of so-called "controllable" Operating Costs during the second Lease Year exceed $2.06 per square foot of Floor Area during the second (2nd) Operating Costs Year. Tenant shall pay Operating Costs Estimates for the second (2nd) Operating Costs Year based upon the actual amount of controllable Operating Costs payable in the first (1st) Operating Costs Year, with an annual reconciliation at the end of the second (2nd) Operating Costs Year as between estimates paid and the actual amount due as provided herein, subject, however, to the foregoing cap on controllable Operating Costs. Thereafter, Tenant's Share of controllable Operating Costs shall not increase by more than five percent (5%) (on a non-cumulative basis) from year to year.

So-called "controllable" Operating Costs shall include all Operating Costs other than insurance, snow removal, utilities and security. In all events, for the purposes of determination and calculation of Tenant's Share of controllable Operating Costs, no limitation on increases shall apply to the costs of insurance, security, snow removal and utilities. Following the first (1st) Operating Costs Year, the aforesaid excluded items shall be deducted from the Operating Costs before the applicable limitation is applied and, after the limitation on controllable Operating Costs is determined, added to the limited controllable Operating Costs to determine Tenant's Share of Operating Costs in any Operating Costs Year.

Provided no Default shall have occurred and be continuing, Tenant shall have the right to audit Landlord's records and books concerning Operating Costs subject to the following conditions:

(i)     Tenant gives Landlord thirty (30) days' prior written notice of its intent to audit;

(ii)     the audit occurs during Landlord's normal business hours and in Landlord's principal offices;

(iii)     Tenant may only audit said records and books once during each Lease Year;

(iv)     the audit of a Lease Year's books and records must be conducted and completed within twelve (12) months after receipt of the final Operating Costs statement for such Lease Year;

(v)     Tenant provides Landlord a copy of the auditor's report;

(vi)     Tenant shall keep the results of such audit and Landlord's books and records strictly confidential;

(vii)     the audit must be conducted by an accountant, or employee of Tenant who is experienced in conducting such audits; and

(viii)   the auditor shall not be retained on a contingency basis, i.e., the auditor's fee shall not be based upon the results of the audit.

## ARTICLE VII

### UTILITIES

Section 7.01.          Utility Charges.

Tenant shall pay, when due, all charges for water, sewer, electricity, gas, telephone service and other utilities supplied to the Leased Premises ("Utility Charges"). Landlord represents that (i) the Leased Premises will have separate utilities and separate meters as of the Term Commencement Date, and (ii) said utilities and meters will be in good working order as of the Term Commencement Date.

Section 7.02.          Discontinuance and Interruption of Service.

Landlord shall not be liable to Tenant in damages or otherwise for the quality, quantity, failure, unavailability or disruption of any utility service and the same shall not constitute a termination of this Lease, or an actual or constructive eviction of Tenant, or entitle Tenant to any abatement of Rent.

Notwithstanding anything to the contrary contained in this Lease, in the event of a disruption or discontinuation of utility service resulting from the failure of Landlord to make payments to the appropriate utility, which payments Landlord is responsible to make, then Tenant's Rent shall abate until the disrupted or discontinued utility is restored. Such an event shall not constitute an actual or constructive eviction of Tenant.

Notwithstanding anything to the contrary in this Lease, if utilities serving the Leased Premises are disrupted due to the negligence or acts of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored by Landlord within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its business in the Leased Premises due to the disruption of utility service, the Minimum Rent shall be abated during the period commencing on the expiration of the aforementioned forty-eight (48) hours and ending on the date Tenant is able to resume conducting its business. Landlord shall not be liable for consequential damages resulting from any disruption of utilities. In addition, a disruption of utility service shall not constitute a termination of this Lease or a constructive or actual eviction of Tenant.

Section 7.03.          Landlord's Right to Alter Utilities.

Landlord may at any time alter any utility, and related equipment, serving the Shopping Center, provided such alteration does not materially interrupt service to the Leased Premises and does not unreasonably interfere with Tenant's business operations within the Leased Premises. If the exercise of the foregoing rights materially and substantially interferes with the use and occupancy of the Leased Premises to the extent Tenant is unable to conduct its business in the Leased Premises for a period of forty-eight (48) or more consecutive hours, then Tenant shall have the right to an abatement of all Rent and other charges, for the total period of time Tenant is unable to operate its business in the Leased Premises. In all cases, Landlord shall return the Leased Premises, all leasehold improvements and Tenant's Property to substantially the same condition as existed immediately prior to undertaking such work.

## ARTICLE VIII

### INDEMNITY AND INSURANCE

Section 8.01.          Indemnity.

A.       Except to the extent of the negligence or willful misconduct of Landlord's Indemnitees, Tenant shall indemnify, defend and hold Landlord, its lessors, partners and members, and their respective shareholders, partners, members, trustees, agents, representatives, directors, officers, employees and Mortgagee(s) (collectively, "Landlord's Indemnitees")

harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of Landlord's Indemnitees and arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the acts or negligence of Tenant or any Person claiming by, through or under Tenant, or the agents, contractors, employees, servants, invitees, guests or licensees of any such Person, in, on or about the Leased Premises, (iii) the use or occupancy of the Leased Premises or the Shopping Center by Tenant, its agents, servants, employees, and contractors, or (iv) the use or occupancy of the Leased Premises (or the Shopping Center) by Tenant's invitees while in, on or about the Leased Premises (or the Shopping Center). **In no event shall Tenant's indemnity cover consequential damages (e.g., lost profits), punitive damages or any other damages other than direct, actual and compensatory damages incurred by Landlord.** If any action or proceeding is brought against any of Landlord's Indemnitees by reason of any of the foregoing, Tenant shall reimburse Landlord for the cost of defending such action or proceeding or, upon Landlord's request and at Tenant's sole cost and expense, resist and defend such action and proceeding by counsel reasonably approved by Landlord. Tenant shall not be obligated to indemnify Landlord's Indemnitees against loss, liability, damage, cost or expense arising out of a claim for which Tenant is released from liability pursuant to Section 8.07 below (or a claim arising out of the willful or negligent acts or omissions of Landlord or its agents, employees or contractors).

B.       Except to the extent of the negligence or willful misconduct of Tenant's Indemnitees, Landlord shall indemnify, defend and hold Tenant, its officers, shareholders, members, trustees, principals, agents and employees (collectively "Tenant's Indemnitees") harmless from and against all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Tenant's Indemnitees and arising out of (i) the negligence or willful acts or omissions of Landlord, its agents, contractors, servants and/or employees, and (ii) the use of the Common Areas except as shall be occasioned by the negligence or willful acts or omissions of Tenant, its agents, servants and/or employees (in which event Tenant shall indemnify and hold harmless Landlord to the extent of such negligence or willful act or omission). In no event, however, shall Landlord's indemnity cover consequential damages (e.g., lost profits), punitive damages or any damages other than direct, actual and compensatory damages incurred by Tenant. Landlord shall not be obligated to indemnify Tenant's Indemnitees against loss, liability, damage, cost or expense arising out of a claim for which Landlord is released from liability pursuant to Section 8.07 below (or a claim arising out of the willful or negligent acts or omissions of Tenant or its agents, employees or contractors).

Section 8.02.        Landlord Not Responsible for Acts of Others.

Except to the extent of the negligence or willful misconduct of Landlord's Indemnitees, to the maximum extent permitted by law, Landlord's Indemnitees shall not be liable for, and Tenant waives all claims for, loss or damage to Tenant's business or injury or damage to Person or property sustained by Tenant, or any Person claiming by, through or under Tenant, resulting from any accident or occurrence in, on, or about the Shopping Center, including claims for loss, theft, injury or damage resulting from: (i) any equipment or appurtenances being or becoming out of repair; (ii) wind or weather; (iii) any defect in or failure to operate any sprinkler, HVAC equipment, electric wiring, gas, water or steam pipe, stair, railing or walk; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the escape of gas, steam or water; (vii) water, snow or ice being upon the Shopping Center or coming into the Leased Premises; (viii) the falling of any fixture, plaster, tile, stucco or other material; or (ix) any act, omission or negligence of other tenants, licensees or any other Persons including occupants of the Shopping Center, occupants of adjoining or contiguous buildings, owners of adjacent or contiguous property, or the public.

Section 8.03.        Tenant's Insurance.

Commencing on the date upon which Landlord delivers the Leased Premises to Tenant and at all times thereafter, Tenant shall carry and maintain, at its sole cost and expense:

A.       Commercial General Liability Insurance (ISO form or equivalent) naming Tenant as the named insured and Landlord and (at Landlord's request) Landlord's mortgagee (and managing agent), if any, and Federal Realty Investment Trust ("FRIT"), if FRIT is not the Landlord under this Lease, as additional insureds, protecting Tenant and the additional insureds

against liability for bodily injury, death and property damage occurring upon or in the Leased Premises, with a minimum combined single limit of One Million Dollars ($1,000,000.00) and a general aggregate limit of Two Million Dollars ($2,000,000.00). If the policy also covers locations other than the Leased Premises, the policy shall include a provision to the effect that the aggregate limit of Two Million Dollars ($2,000,000.00) shall apply separately at the Leased Premises. If Tenant sells, serves or distributes alcoholic beverages in or on the Leased Premises, then such General Liability Insurance shall include, at the same minimum limits of liability as shown above, Liquor Legal Liability coverage.

B.    "All Risks" or "Special Form" property insurance covering all of Tenant's Property (as defined in Section 9.05 below), and the floor and wall coverings within the Leased Premises, and written for at least the full replacement cost with a deductible of not more than One Thousand Dollars ($1,000.00).

C.    Plate glass insurance covering all plate glass in the Leased Premises. Tenant shall be and remain liable for the repair and restoration of all such plate glass (except in the event of a Casualty, hereinafter defined, in which case Landlord shall restore the Leased Premises as described herein, including all plate glass).

D.    Business interruption, loss of income and extra expense insurance consistent with Tenant's insurance for a majority of Tenant's stores.

Section 8.04.        Tenant's Contractor's Insurance.

Tenant shall cause any contractor performing work on the Leased Premises to obtain, carry and maintain, at no expense to Landlord: (i) worker's compensation insurance and employer's liability insurance as required by the jurisdiction in which the Shopping Center is located; (ii) builder's risk insurance with a deductible no greater than Ten Thousand Dollars ($10,000.00), in the amount of the full replacement cost of the Tenant's Property and the Leasehold Improvements; (iii) Commercial General Liability Insurance providing on an occurrence basis a minimum combined single limit of One Million Dollars ($1,000,000.00) per occurrence (and Two Million Dollars ($2,000,000.00) general aggregate, if applicable); and (iv) business automobile liability insurance including the ownership, maintenance and operation of the automotive equipment, owned, hired, and non-owned coverage with a combined single limit of not less than One Million Dollars ($1,000,000.00) for bodily injury and property damage. If the contractor fails to acquire such insurance, Tenant shall provide such insurance (except worker's compensation insurance and employer's liability) at its sole cost and expense.

Section 8.05.        Policy Requirements.

Any company writing any insurance which Tenant is required to maintain or cause to be maintained under Sections 8.03 and 8.04 as well as any other insurance pertaining to the Leased Premises or the operation of Tenant's business therein (all such insurance being referred to as "Tenant's Insurance") shall at all times be licensed and qualified to do business in the jurisdiction in which the Leased Premises are located and shall have received an A or better (and be in a financial size category of class VII or higher) rating by the latest edition of A.M. Best's Insurance Rating Service. All of Tenant's Insurance may be carried under a blanket policy covering the Leased Premises and any other location of Tenant, if (i) the coverage afforded Landlord and any designees of Landlord shall not be reduced or otherwise adversely affected, and (ii) such blanket policy allocates to the properties and liabilities to be insured under this Article VIII an amount not less than the amount of insurance required to be covered pursuant to this Article VIII, so that the proceeds of such insurance shall not be less than the proceeds that would be available if Tenant were insured under a unitary policy. All policies of Tenant's Insurance shall contain endorsements requiring the insurer(s) to give to all additional insureds at least thirty (30) days' advance notice of any material reduction, cancellation, termination or non-renewal of said insurance. Tenant shall be solely responsible for payment of premiums for all of Tenant's Insurance. Tenant shall deliver to Landlord at least fifteen (15) days prior to the time Tenant's Insurance is first required to be carried by Tenant, and upon renewals at least fifteen (15) days prior to the expiration of the term of any such insurance policy, a certificate of insurance of all policies procured by Tenant in compliance with its obligations under this Lease. The limits of Tenant's Insurance shall not limit Tenant's liability under the Lease, at law, or in equity. If Tenant fails to deposit a certificate of insurance with Landlord for a period of three (3) days after notice from Landlord, Landlord may acquire such insurance, and Tenant shall pay

Landlord the amount of the premium applicable thereto within five (5) days following notice from Landlord.

Section 8.06.        Increase in Insurance Premiums.

Tenant shall not keep or do anything in the Leased Premises that will: (i) result in an increase in the rate of any insurance on the Shopping Center; (ii) violate the terms of any insurance coverage on the Shopping Center carried by Landlord or any other tenant; (iii) prevent Landlord from obtaining such policies of insurance acceptable to Landlord or any Mortgagee of the Shopping Center; or (iv) violate the rules, regulations or recommendations of Landlord's insurers, loss prevention consultants, safety engineers, the National Fire Protection Association, or any similar body having jurisdiction over the Leased Premises. If Tenant does so, Tenant shall pay to Landlord upon demand the amount of any increase in any such insurance premium. In determining the cause of any increase in insurance premiums, the schedule or rate of the organization issuing the insurance or rating procedures shall be conclusive evidence of the items and charges which comprise the insurance rates and premiums on such property. Notwithstanding anything to the contrary in the foregoing, Landlord hereby represents that the Permitted Use will not cause an increase in Landlord's insurance premiums. Landlord, however, has no knowledge of and makes no representations, actual or implied, of Tenant's actual use and operations within the Leased Premises.

Section 8.07.  '        Waiver of Right of Recovery.

A.        Landlord and Tenant (each, a "Waiving Party") each hereby waives and releases all rights of recovery against the other and the other's agents and employees (the "Released Parties") on account of loss or damage to the property of the Waiving Party to the extent that such loss or damage is required to be insured against under any property damage insurance policies required to be carried by this Lease. By this waiver it is the intent of the parties that the Released Parties shall not be liable to the Waiving Party or any insurance company (by way of subrogation or otherwise) insuring the Waiving Party for any loss or damage insured against (or that could have been insured against) under any property damage insurance required by this Article, even though such loss or damage might be caused by the negligence of one (1) or more of the Released Parties; provided, however, the mutual release contained herein shall not apply to damage to the Waiving Party's property caused by the willful misconduct of any of the Released Parties. If the Waiving Party does not carry, or is not required to carry, property damage insurance pursuant to this Lease, this release shall apply to damage to the Waiving Party's property that would have been covered by a policy of "all risk" or "special form" property damage insurance if the Waiving Party had maintained such insurance.

B.        Each of Landlord and Tenant shall include in each of its property damage insurance policies a waiver of the insurer's right of subrogation against the other party and the officers, directors, agents and employees of, and the partners and members in, the other party. If such waiver is not, or ceases to be, obtainable without additional charge (other than a nominal administrative charge) or at all, the insuring party shall so notify the other party promptly after notice thereof. If the other party agrees in writing to pay the insurer's additional charge therefor, such waiver shall (if obtainable) be included in the policy. Landlord and Tenant hereby acknowledge that such waiver is obtainable under normal commercial insurance practice on the date of this Lease at no additional charge (other than a nominal administrative charge).

C.        The waiver and release in Section 8.07.A. above shall not apply to loss or damage to property of the Waiving Party to the extent of the deductible contained in the Waiving Party's policies of property damage insurance.

Section 8.08.        Landlord's Insurance Requirements.

Landlord shall maintain (i) "all risk" or "special form" property insurance insuring the buildings composing the Shopping Center to the extent of the full replacement value of such buildings (excluding footings and foundations), and (ii) Comprehensive General Liability Insurance (ISO form or equivalent) covering the Shopping Center with minimum limits of liability as follows: (a) One Million Dollars ($1,000,000.00) for bodily injury (or death) to any one person, (b) Two Million Dollars ($2,000,000.00) for bodily injury (or death) to more than one person, and (c) One Million Dollars ($1,000,000.00) for property damage; or, in lieu of the foregoing, Two Million Dollars ($2,000,000.00) combined single limit aggregate. Notwithstanding anything to the contrary contained in this Lease, Landlord may self insure against the risks covered by the aforementioned insurance

provided: (1) Landlord has a tangible net worth of Twenty-Five Million Dollars ($25,000,000.00); (2) Landlord maintains loss histories evidencing the losses incurred by Landlord; and (3) Landlord establishes and funds a reserve adequate to cover the amount of losses projected by the loss histories. Furthermore, provided the insurance coverage carried by Landlord pursuant to (i) above shall not be reduced or otherwise adversely affected, all of Landlord's insurance may be carried under a blanket policy covering the Shopping Center and any other property owned, leased or operated by Landlord or its affiliates, provided the insurance requirements in this Lease are fulfilled and the insurance coverage is not diminished in any way.

ARTICLE IX

CONSTRUCTION AND ALTERATIONS

Section 9.01.        Condition of Leased Premises.

Except for the completion of Landlord's Work (as defined in Exhibit B attached hereto), Tenant acknowledges: (i) it has inspected the Leased Premises; (ii) it accepts the Leased Premises, and all improvements, betterments and equipment "AS IS", with no representation or warranty by Landlord as to the condition or suitability of the Leased Premises or of the Shopping Center for Tenant's purpose; and (iii) Landlord has no obligation to improve or repair the Leased Premises, or the Shopping Center, except as specifically set forth in this Lease.

Section 9.02.        Tenant Improvements.

Tenant shall provide all improvements to the Leased Premises in accordance with its obligations set forth in Exhibit B.  Tenant shall use only new fixtures and furnishings in the Leased Premises, and shall have the Leased Premises fully constructed and fixtured by the Opening Date.

Section 9.03.        Alterations.

After completion of Tenant's Work, Tenant shall not make or cause to be made any exterior and/or structural alterations, additions, renovations, improvements or installations in or to the Leased Premises without Landlord's prior consent, which such consent may be granted or withheld in Landlord's sole and absolute discretion.  After completion of Tenant's Work, Tenant shall not make any interior alterations without Landlord's prior written consent, which consent shall not be unreasonably withheld, other than interior, non-structural and non-mechanical alterations costing less than One Hundred Twenty Thousand Dollars ($120,000.00) for which Landlord's consent shall not be required

Section 9.04.        Work Requirements.

All work performed by Tenant in the Leased Premises shall be performed: (i) promptly and in a workmanlike manner with new or "like new" materials; (ii) by duly qualified or licensed persons; (iii) without interference with, or disruption to, the operations of Landlord or other tenants or occupants of the Shopping Center; and (iv) in accordance with (a) plans and specifications, as and to the extent required by Section 9.03. and Exhibit B, and (b) all applicable governmental permits, rules and regulations.

Section 9.05.        Ownership of Improvements.

All present and future alterations, additions, renovations, improvements and installations made to the Leased Premises, including the HVAC system ("Leasehold Improvements") shall be deemed to be the property of Landlord when made and, upon Tenant's vacation or abandonment of the Leased Premises, unless Landlord directs otherwise, shall remain upon and be surrendered with the Leased Premises in good order, condition and repair.  All movable goods, inventory, office furniture, equipment, trade fixtures (including exterior Signs) and other movable personal property belonging to Tenant that are not permanently affixed to the Leased Premises, shall remain Tenant's property ("Tenant's Property") and shall be removable by Tenant at any time, provided that Tenant (i) is not in default under this Lease, and (ii) shall repair any damage to the Leased Premises or the Shopping Center caused by the removal of any of Tenant's Property.

Section 9.06.        Removal of Tenant's Property.

Tenant shall remove all of Tenant's Property (and any Leasehold Improvements as Landlord may direct) prior to the Termination Date or the termination of Tenant's right to

possession. Tenant shall repair any damage to the remaining Leasehold Improvements, the Leased Premises or any other portion of the Shopping Center caused by such removal. If Tenant fails to timely remove said items, they shall be considered as abandoned and shall become the property of Landlord, or Landlord may have them removed and disposed of.

Section 9.07.          Mechanic's Liens.

No mechanic's or other lien shall be allowed against the Shopping Center as a result of Tenant's improvements to the Leased Premises. Tenant shall promptly pay all persons furnishing labor, materials or services with respect to any work performed by Tenant on the Leased Premises. If any mechanic's or other lien shall be filed against the Leased Premises or the Shopping Center by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to or for the benefit of Tenant, Tenant shall cause the same to be discharged of record or bonded to the satisfaction of Landlord within ten (10) days subsequent to receiving notice of the filing thereof. If Tenant fails to discharge or bond any such lien, Landlord, in addition to all other rights or remedies provided in this Lease, may bond said lien or claim (or pay off said lien or claim if it cannot with reasonable effort be bonded) without inquiring into the validity thereof and all expenses incurred by Landlord in so discharging said lien, including reasonable attorney's fees, shall be paid by Tenant to Landlord as Additional Rent on ten (10) days' demand.

Section 9.08.          Changes to Shopping Center.

A.     Exhibit A sets forth the general layout of the Shopping Center. Exhibit A is not and shall not be deemed Landlord's representation or agreement that all or any part of the Shopping Center is, will be, or will continue to be, configured as indicated therein. Landlord reserves the right to determine all tenancies in the Shopping Center, and Tenant does not rely on, nor does Landlord represent, the tenancy of any specific tenant(s).

B.     Landlord shall have the right, at any time, to: (i) make alterations or additions to, or demolish all or any part of, the Shopping Center; (ii) build other buildings or improvements in or about the Shopping Center; and (iii) convey to others or withdraw portions of the Shopping Center. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease.

C.     If Landlord renovates or remodels the front exterior of the Leased Premises or the Shopping Center, Tenant agrees at its sole risk and expense to: (i) upon request of Landlord, remove its then existing Signs to facilitate the remodeling work, provided that Landlord shall install a banner sign reasonably acceptable to Tenant in replacement of Tenant's exterior sign until such exterior work is complete, (ii) upon direction of Landlord, re-install Signs as appropriate under the new criteria and consistent with such exterior remodeling; (iii) replace Tenant's storefront if such replacements are part of Landlord's renovation plans; and (iv) otherwise cooperate with Landlord to facilitate such renovation and remodeling. Tenant consents to the performance of all work deemed appropriate by Landlord to accomplish any of the foregoing, and to any inconvenience or disruption caused thereby.

D.     Notwithstanding anything to the contrary contained in this Lease, Landlord shall not, in exercising its right under this Section 9.08:

(i)          materially adversely interfere with access to or from the Leased Premises;

(ii)          reduce the number of parking spaces in the Shopping Center below 4.0 spaces per 1,000 square feet of Floor Area;

(iii)          impair Tenant's unimpeded access to and from its loading facilities, it being understood that at all times there shall be unimpeded access to and from the rear of the Leased Premises that can accommodate an eighty foot (80') so-called tractor trailer truck;

(iv)          construct, erect or install any buildings or similar improvements (excluding lighting standards, landscaping, curbs, planters or other similar improvements) within the area marked "No Build Area" on Exhibit A of this Lease. The foregoing provisions of this paragraph shall not apply in instances where access and/or visibility is temporarily affected as a result of repairs, remodeling, renovation or other construction to

the Shopping Center or to the area designated as Redevelopment Area designated on Exhibit A; or

(v)      make changes to the Shopping Center or to the Common Areas which would materially adversely affect the visibility of Tenant's storefront identification sign, entrance and display windows from the immediately adjacent Common Areas.

Tenant further acknowledges that, notwithstanding anything to the contrary contained in this Lease, (i) Landlord shall have the right to construct ~~a building~~ <ins>buildings</ins> within the area designated as "~~FUTURE BUILDING~~ AREA" on Exhibit A attached hereto, and (ii) the "curb cut" designated as "Condemnation Area" will be eliminated as a result of a condemnation proceeding. <ins>FUTURE DEVELOPMENT</ins>



Furthermore, Landlord shall use its good faith efforts to minimize any interference with Tenant's business operations in the Leased Premises during any such remodeling or renovation of the Shopping Center.



The restrictions in the foregoing paragraph shall be deemed to be null and void and of no force and effect if Tenant is in breach of its obligation to operate under Section 4.01 of this Lease, and/or if Tenant "goes dark" (as defined in Section 4.01.C).

## ARTICLE X

### REPAIRS, MAINTENANCE, AND LANDLORD'S ACCESS

Section 10.01.      Repairs by Landlord.

Subject to the terms of this Lease, including without limitation Sections 10.02 and 11.03 below, and subject to reimbursement by Tenant pursuant to Section 6.03.C., Landlord shall make or cause to be made all repairs to the Common Areas and structural repairs to the Leased Premises and to the buildings composing the Shopping Center. If any such repairs are necessitated by Tenant's breach of this Lease, or by any act or negligence of Tenant, its agents, employees, assigns, concessionaires, contractors or invitees, Tenant shall reimburse to Landlord the reasonable cost incurred in completing such repairs.

Notwithstanding anything to the contrary contained herein, Landlord shall, at its own expense, comply with all laws, orders, ordinances and regulations of Federal, State, County, Municipal and other governmental authorities respecting all matters relating to the Landlord's maintenance and repair obligations under this Section 10.01.

If Landlord fails to commence the making of such repairs or the performance of such maintenance as it is obligated to do under Section 10.01 hereof within thirty (30) days after notice from Tenant (except if an emergency situation exists and the immediate curing of such breach or failure is necessary to protect the Leased Premises, property located therein, or persons from imminent injury or damage, the thirty (30) days grace period shall be reduced to twenty-four (24) hours after written notice), Tenant shall have the right to cause such repairs to be made or maintenance to be performed and to make a claim against Landlord for the reasonable cost thereof. Landlord shall reimburse to Tenant the reasonable and actual cost of such repairs within thirty (30) days after receipt from Tenant of a statement of its reasonable repair expenses together with evidence (e.g., paid invoices) supporting said expenses. Tenant has no right to perform any of Landlord's obligations in regard to the Common Areas outside of the No Build Area, or to any premises other than the Leased Premises. If Landlord fails to pay Tenant the aforementioned costs within thirty (30) days after Landlord's receipt of Tenant's invoice therefor, Tenant shall have the right to offset the amount due Tenant from Landlord, including Interest accrued thereon from the date when due, against future Rent payments until the amount due Tenant is fully paid; provided, however, Tenant shall not offset more than fifty percent (50%) of any other component of Minimum Rent due each month.

Section 10.02.      Repairs and Maintenance by Tenant.

A.      Throughout the Term Tenant shall maintain the non-structural portions of the Leased Premises (including the storefront), the loading dock exclusively designated for Tenant's use, the Leasehold Improvements and Tenant's Property in good order, condition and repair.

the Shopping Center or to the area designated as Redevelopment Area designated on Exhibit A; or

(v)    make changes to the Shopping Center or to the Common Areas which would materially adversely affect the visibility of Tenant's storefront identification sign, entrance and display windows from the immediately adjacent Common Areas.

Tenant further acknowledges that, notwithstanding anything to the contrary buildings contained in this Lease, (i) Landlord shall have the right to construct~~a building~~ within the area designated as "~~FUTURE BUILDING~~ AREA" on Exhibit A attached hereto, and (ii) the "curb cut" designated as "Condemnation Area" will be eliminated as a result of a condemnation proceeding. └FUTURE DEVELOPMENT



Furthermore, Landlord shall use its good faith efforts to minimize any interference with Tenant's business operations in the Leased Premises during any such remodeling or renovation of the Shopping Center.

The restrictions in the foregoing paragraph shall be deemed to be null and void and of no force and effect if Tenant is in breach of its obligation to operate under Section 4.01 of this Lease, and/or if Tenant "goes dark" (as defined in Section 4.01.C).

ARTICLE X

REPAIRS, MAINTENANCE, AND LANDLORD'S ACCESS

Section 10.01.    Repairs by Landlord.

Subject to the terms of this Lease, including without limitation Sections 10.02 and 11.03 below, and subject to reimbursement by Tenant pursuant to Section 6.03.C., Landlord shall make or cause to be made all repairs to the Common Areas and structural repairs to the Leased Premises and to the buildings composing the Shopping Center. If any such repairs are necessitated by Tenant's breach of this Lease, or by any act or negligence of Tenant, its agents, employees, assigns, concessionaires, contractors or invitees, Tenant shall reimburse to Landlord the reasonable cost incurred in completing such repairs.

Notwithstanding anything to the contrary contained herein, Landlord shall, at its own expense, comply with all laws, orders, ordinances and regulations of Federal, State, County, Municipal and other governmental authorities respecting all matters relating to the Landlord's maintenance and repair obligations under this Section 10.01.

If Landlord fails to commence the making of such repairs or the performance of such maintenance as it is obligated to do under Section 10.01 hereof within thirty (30) days after notice from Tenant (except if an emergency situation exists and the immediate curing of such breach or failure is necessary to protect the Leased Premises, property located therein, or persons from imminent injury or damage, the thirty (30) days grace period shall be reduced to twenty-four (24) hours after written notice), Tenant shall have the right to cause such repairs to be made or maintenance to be performed and to make a claim against Landlord for the reasonable cost thereof. Landlord shall reimburse to Tenant the reasonable and actual cost of such repairs within thirty (30) days after receipt from Tenant of a statement of its reasonable repair expenses together with evidence (e.g., paid invoices) supporting said expenses. Tenant has no right to perform any of Landlord's obligations in regard to the Common Areas outside of the No Build Area, or to any premises other than the Leased Premises. If Landlord fails to pay Tenant the aforementioned costs within thirty (30) days after Landlord's receipt of Tenant's invoice therefor, Tenant shall have the right to offset the amount due Tenant from Landlord, including Interest accrued thereon from the date when due, against future Rent payments until the amount due Tenant is fully paid; provided, however, Tenant shall not offset more than fifty percent (50%) of any other component of Minimum Rent due each month.

Section 10.02.    Repairs and Maintenance by Tenant.

A.    Throughout the Term Tenant shall maintain the non-structural portions of the Leased Premises (including the storefront), the loading dock exclusively designated for Tenant's use, the Leasehold Improvements and Tenant's Property in good order, condition and repair.

Tenant shall not cause or permit any waste, damage or injury to the Leased Premises or the Shopping Center. **Except for repairs necessitated by Casualty**, Tenant's obligations shall include, without limitation, repairing, maintaining, and making replacements to items such as the following: floor coverings; walls (other than structural walls) and wall coverings; ceilings; utility meters; pipes and conduits exclusively serving the Leased Premises; fixtures; the HVAC system; plumbing, electrical and other mechanical systems exclusively serving the Leased Premises; sprinkler and other fire protection equipment exclusively serving the Leased Premises; the storefront(s); security grilles or similar enclosures; locks and closing devices; window sashes, casements and frames; glass; doors and door frames. Tenant agrees to maintain with a reputable contractor a regular service and maintenance contract on the HVAC equipment and system serving the Leased Premises, with routine inspections and servicing as recommended by the HVAC manufacturer. Furthermore, Tenant shall remodel or refurbish the Leased Premises, as reasonably necessary.

B.     Tenant shall install and maintain such fire extinguishers and other fire protection devices as may be required by any agency having jurisdiction over, or by the underwriters issuing insurance for, the Shopping Center. Tenant agrees to routine inspections of fire protection devices by contractors acceptable to Landlord. If any governmental authority with jurisdiction over the Shopping Center requires the installation, modification, or alteration of the sprinkler system, or other equipment, by reason of Tenant's business, or the location of any partitions, trade fixtures, or other contents of the Leased Premises, then Tenant shall promptly install such sprinkler system or changes therein.

C.     Tenant shall keep the service areas, sidewalks, and loading docks or bays adjoining the Leased Premises free from ice and snow and shall not permit the accumulation of garbage, trash or other waste in or around the Leased Premises.

Section 10.03.     Inspections, Access and Emergency Repairs by Landlord.

Upon reasonable prior notice and without materially adversely affecting Tenant's business within the Leased Premises, Tenant shall permit Landlord or its designee to enter all parts of the Leased Premises during the Store Hours to inspect the same. In the event of an emergency, Landlord may enter the Leased Premises at any time and make such inspection and repairs as Landlord deems necessary, at the risk and for the account of Tenant.

## ARTICLE XI

## CASUALTY

Section 11.01.     Fire or Other Casualty.

Tenant shall give prompt notice to Landlord in case of fire or other casualty ("Casualty") to the Leased Premises or the Shopping Center.

Section 11.02.     Right to Terminate.

A.     If (i) the buildings (taken in the aggregate) in the Shopping Center are damaged to the extent of more than fifty percent (50%) of the cost of replacement thereof; or (ii) during the last two Lease Years or in any Partial Lease Year at the end of the Term the Leased Premises are damaged to the extent of more than twenty-five percent (25%) of the cost of replacement thereof; or (iii) the Leased Premises are damaged to the extent of fifty percent (50%) or more of the cost of replacement thereof and such damage cannot be repaired within one hundred fifty (150) days from the date of such occurrence; then Landlord may terminate this Lease by notice to Tenant within one hundred fifty (150) days after the date of the Casualty. If Landlord so terminates this Lease then the Termination Date shall be the date set forth in the notice to Tenant, which date shall not be less than thirty (30) days nor more than ninety (90) days after the giving of said notice. The "cost of replacement" shall be determined by the company or companies insuring Landlord against the Casualty, or, if there shall be no such determination, by a qualified Person selected by Landlord to determine such "cost of replacement."

B.     If during the last two (2) Lease Years or in any Partial Lease Year at the end of the Term either (i) the Leased Premises are damaged to the extent of twenty-five percent (25%) or more of the cost of replacement thereof, or (ii) more than fifty percent (50%) of the Floor Area of the Shopping Center immediately before such Casualty is rendered untenantable, Tenant may terminate this Lease by giving Landlord sixty (60) days' prior notice given within sixty (60)

days after the date of the Casualty. Notwithstanding anything to the contrary contained herein, in the event of a Casualty to the Leased Premises, and provided the Lease is not terminated pursuant to the provisions contained in this Article XI, if Landlord fails to commence and diligently pursue the restoration and/or repairs to the Leased Premises in accordance with the provisions of Section 11.03 below within one hundred twenty (120) days of the date of such Casualty, Tenant shall have the right to terminate this Lease upon thirty (30) days' prior written notice to Landlord, said notice to be given within thirty (30) days after the expiration of the aforesaid one hundred twenty (120) day period. If the Casualty shall render the Leased Premises untenantable, in whole or in part, all Rent shall abate proportionately during the period of such untenantability, computed on the basis of the ratio which the amount of Floor Area of the Leased Premises rendered untenantable bears to the total Floor Area of the Leased Premises. Such abatement shall terminate on the earlier of (i) thirty (30) days after the date any such repair and restoration work is substantially completed by Landlord, or (ii) the date Tenant reopens for business in the portion of the Leased Premises previously rendered untenantable. Except to the extent specifically set forth in this Section 11.02, neither the Rent nor any other obligations of Tenant under this Lease shall be affected by any Casualty.

Section 11.03.       Landlord's Duty to Reconstruct.

Subject to Landlord's ability to obtain the necessary permits and the availability of insurance proceeds, and either party's right to terminate this Lease pursuant to the provisions of this Article XI, Landlord shall repair the Leased Premises (excluding Tenant's Property, which shall be Tenant's obligation to repair, restore or replace) to a substantially similar condition as existed prior to the Casualty; provided, Landlord shall not be required to expend an amount in excess of the insurance proceeds received by Landlord in performing such repairs or reconstruction.

Section 11.04.       Tenant's Duty to Reconstruct.

Tenant shall promptly commence and diligently pursue to completion the redecorating and refixturing of the Leased Premises, including repairing, restoring or replacing Tenant's Property, to a substantially similar condition as existed prior to the Casualty. Tenant shall reopen for business in the Leased Premises as soon as practicable after the occurrence of the Casualty.

## ARTICLE XII

## CONDEMNATION

Section 12.01.       Taking of Leased Premises.

A.       If more than twenty-five percent (25%) of the Floor Area of the Leased Premises shall be appropriated or taken under the power of eminent domain, or conveyance shall be made in anticipation or in lieu thereof ("Taking"), either party may terminate this Lease as of the effective date of the Taking by giving notice to the other party of such election within thirty (30) days prior to the date of such Taking.

B.       If there is a Taking of a portion of the Leased Premises and this Lease is not terminated pursuant to Section 12.01.A., then: (i) as of the effective date of the Taking, this Lease shall terminate only with respect to the portion of the Leased Premises taken; (ii) after the effective date of the Taking, the Rent shall be reduced proportionately by multiplying the same by a fraction, the numerator of which shall be the Floor Area taken and the denominator of which shall be the Floor Area of the Leased Premises immediately prior to the Taking; and (iii) as soon as reasonably possible after the effective date of the Taking, Landlord shall, to the extent feasible, restore the remaining portion of the Leased Premises to a complete unit of a similar condition as existed prior to any work performed by Tenant.

Section 12.02.       Taking of Shopping Center.

If there is a Taking of any portion of the Shopping Center so as to render, in Landlord's judgment, the remainder unsuitable for use as a shopping center, Landlord shall have the right to terminate this Lease upon thirty (30) days' notice to Tenant. Provided Tenant is not then in default under this Lease, Tenant shall receive a proportionate refund from Landlord of any Rent Tenant paid in advance.

Section 12.03.    Condemnation Award.

All compensation awarded for a Taking of any part of the Leased Premises (including the Leasehold Improvements) or a Taking of any other part of the Shopping Center shall belong to Landlord. Tenant hereby assigns to Landlord all of its right, title and interest in any such award. Tenant shall have the right to collect and pursue any separate award as may be available under local procedure for moving expenses or Tenant's Property or other sum that is legally permissible, so long as such award does not reduce the award otherwise belonging to Landlord, Ground Landlord, or the existing mortgagee of the Shopping Center, as aforesaid. If the Lease is terminated as a result of any Taking of the Leased Premises and/or the Shopping Center, Tenant shall be entitled to make a claim for and recover from the condemning authority the unamortized cost of Tenant's Work, amortized on a straight line basis over the initial Term of this Lease, provided that Tenant has furnished Landlord with a list of Tenant's Work and the itemized cost of those improvements within ninety (90) days after the date on which Tenant opens for business from the Leased Premises.

## ARTICLE XIII

### INTENTIONALLY DELETED

## ARTICLE XIV

### SUBORDINATION AND ATTORNMENT

Section 14.01.    Subordination.

Tenant's rights under this Lease are subordinate to (i) the Ground Lease and the existing mortgage affecting the Shopping Center, and (ii) any easement, license, mortgage, deed of trust or other security instrument now or hereafter affecting the Shopping Center (those documents referred to in (i) and (ii) above being collectively referred to as a "Mortgage" and the Person or Persons having the benefit of same being collectively referred to as a "Mortgagee"). Tenant's subordination provided in this Section 14.01 is self-operative and no further instrument of subordination shall be required. Notwithstanding the foregoing, Tenant shall, within twenty (20) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination of this Lease to any Mortgage.

Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a non-disturbance agreement from the lessor under the Ground Lease and the existing mortgagee of the Shopping Center, on the forms attached hereto as Exhibits G-1 and G-2.

Section 14.02.    Attornment.

If any Person succeeds to all or part of Landlord's interest in the Leased Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, Tenant shall, without charge, attorn to such successor-in-interest upon request from Landlord, provided such successor-in-interest agrees to recognize Tenant's rights under this Lease and agrees to assume all of Landlord's obligations under the Lease.

Section 14.03.    Estoppel Certificate.

Each of Landlord and Tenant, within twenty (20) days after receiving notice from, and without charge or cost to, the other, shall certify by written instrument to the other or any other Person designated by Landlord or Tenant: (i) that this Lease is in full force and effect and unmodified (or if modified, stating the modification); (ii) the dates, if any, to which each component of the Rent due under this Lease has been paid; (iii) whether Landlord or Tenant has failed to perform any covenant, term or condition under this Lease, and the nature of Landlord's or Tenant's failure, if any; and (iv) such other relevant information as Landlord or Tenant may request.

Section 14.04.    Quiet Enjoyment.

Landlord covenants that it has full right, power and authority to enter into this Lease and that Tenant, upon performing all of Tenant's obligations under this Lease and timely paying all

Rent, shall peaceably and quietly have, hold and enjoy the Leased Premises during the Term without hindrance, ejection or molestation by any Person lawfully claiming by, through or under Landlord, subject, however, to all Mortgages, encumbrances, easements, and matters of record to which this Lease is or may become subject.

Section 14.05.    Landlord's Representations and Warranties.

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the ground tenant under the Ground Lease; (b) at the time of the execution by Landlord of this Lease, the Ground Lease is in full force and effect, that Landlord is not in default under the Ground Lease, and that rent under the Ground Lease has been paid through the date of this Lease, (c) Landlord has full right and power to execute this Lease and to lease the Leased Premises for the Term provided in this Lease without the consent of the Ground Landlord or any other party; and (d) to the best of Landlord's knowledge, without independent inquiry, Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances, to the best of Landlord's knowledge without independent inquiry that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.

## ARTICLE XV

## ASSIGNMENT AND SUBLETTING

Section 15.01.    Landlord's Consent Required.

A.    Tenant and any permitted Transferee, as hereinafter defined, shall not voluntarily or involuntarily, by operation of law or otherwise: (i) transfer, assign, mortgage, encumber, pledge, hypothecate, or assign all or any of its interest in this Lease; (ii) sublet or permit the Leased Premises, or any part thereof, to be used by others including, but not limited to concessionaires or licensees; (iii) issue new stock (or partnership shares or membership interests), create additional classes of stock (or partnership shares or membership interests), or sell, assign, hypothecate or otherwise transfer the outstanding voting stock (or partnership shares or membership interests) so as to result in a change in the present control of Tenant or any permitted Transferee, provided, however, that this subparagraph (iii) shall not be applicable to Tenant so long as it is a publicly owned corporation whose outstanding voting stock is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded actively in the over-the-counter market; or (iv) sell, assign or otherwise transfer all or substantially all of Tenant's or any permitted Transferee's assets; without the prior consent of Landlord, in each instance, which consent Landlord may withhold in its sole and absolute discretion. All of the foregoing transactions shall be referred to collectively or singularly as a "Transfer", and the Person to whom Tenant's interest is transferred shall be referred to as a "Transferee".

B.    Any Transfer without Landlord's consent, to the extent such consent is required, shall not be binding upon Landlord, shall confer no rights upon any third Person, and shall, without notice or grace period of any kind, constitute a Default by Tenant under this Lease. Acceptance by Landlord of Rent following any Transfer shall not be deemed to be a consent by Landlord to any such Transfer, acceptance of the Transferee as a tenant, release of Tenant from the performance of any covenants herein, or waiver by Landlord of any remedy of Landlord under this Lease, although amounts received shall be credited by Landlord against Tenant's Rent obligations. Consent by Landlord to any one Transfer shall not be a waiver of the requirement for consent to any other Transfer. No reference in this Lease to assignees, concessionaires, subtenants or licensees shall be deemed to be a consent by Landlord to occupancy of the Leased Premises by any such assignee, concessionaire, subtenant or licensee.

C.    Tenant shall remain fully and primarily liable and obligated under this Lease for the entire Term in the event of any Transfer, and in the event of a Default by the Transferee, Landlord shall be free to pursue Tenant, the Transferee, or both, without prior notice or demand to either.

D.      Notwithstanding anything to the contrary contained herein, provided Tenant shall not be in Default under the Lease beyond any applicable notice or cure periods, Tenant shall have the right, without Landlord's prior written consent, to assign the Lease to any entity which is and remains throughout the Term a wholly owned subsidiary of Tenant, or to any parent corporation, partnership or limited liability company of Tenant, or to any subsidiary of any parent corporation, partnership or limited liability company of Tenant, provided, however, that said assignment shall be subject to the following express conditions:

(i)      no such assignment shall be deemed to release Tenant or any guarantor from continuing liability throughout the Term of the Lease;

(ii)     Tenant's assignee must expressly assume in an instrument delivered to and reasonably acceptable by Landlord all the obligations of Tenant under the Lease;

(iii)    Landlord is given written notice within thirty (30) days following any such assignment pursuant to this Section 15.01.D., together with sufficient documentation which verifies that all of the requirements set forth herein have been fulfilled and the conditions have been met.

E.      Notwithstanding anything to the contrary contained herein, provided Tenant shall not be in Default under the Lease beyond applicable notice and cure periods, Tenant shall have the right, without Landlord's prior written consent, to assign the Lease (or to sell or transfer Tenant's stock) in connection with a merger, consolidation, corporate reorganization (other than pursuant to the bankruptcy laws), sale of corporate assets or sale or other transfer of stock, provided however, that said assignment shall be subject to the following express conditions:

(i)      concurrently with any assignment of the Lease or transfer of stock, the assignee or transferee, as the case may be, must also acquire the operation and control of all of Tenant's retail outlets in New Jersey (or any other similar stores operating under the same or similar trade name as the Leased Premises is being operated under), but in no event fewer than ten (10) such outlets, whether then owned by Tenant or any of its affiliates (i.e., affiliates meaning corporations, partnerships or limited liability companies which either control Tenant, are controlled by Tenant, or are in common control with Tenant);

(ii)     such assignee must have a tangible net worth (excluding goodwill) of at least Ten Million Dollars ($10,000,000.00) after the assignment;

(iii)    no such assignment shall be deemed to release Tenant or any guarantor from continuing liability throughout the Term of the Lease;

(iv)    Tenant's assignee must expressly assume in a written instrument delivered to and reasonably acceptable by Landlord all the obligations of Tenant under the Lease; and

(v)     Tenant must provide notice and a representation that the above conditions are met to Landlord thirty (30) days before the effective date of such assignment, sale, or transfer.

F.      Except as otherwise set forth in this Article XV, notwithstanding the foregoing or anything to the contrary contained elsewhere in this Lease, provided Tenant shall not be in Default under this Lease beyond applicable notice or cure periods, Landlord agrees that Tenant shall have the right, after opening and operating for the Permitted Use in the Leased Premises for one (1) Lease Year, to notify Landlord in writing (the "Assignment Notice") of its intent to assign the Lease. Within sixty (60) days of receipt of the Assignment Notice from Tenant, Landlord may elect by notice in writing (the "Assignment Termination Notice") to terminate this Lease and recapture the Leased Premises. Upon receipt of the Assignment Termination Notice, Tenant shall surrender the Leased Premises to Landlord, in accordance with the terms and conditions of this Lease, upon the expiration of the sixty (60) day Assignment Notice Period. Furthermore, upon the expiration of the sixty (60) day Assignment Notice period and Tenant's surrender of all of the Leased Premises to Landlord (the "Assignment Termination Date") the parties shall be released from any further liability or obligations accruing subsequent to the Assignment

Termination Date. If Landlord does not exercise its right of termination within the aforesaid sixty (60) day period, Landlord shall conclusively be deemed to have consented to a proposed assignment of this Lease and Tenant may assign this Lease pursuant to its Assignment Notice provided that all the following criteria are fulfilled:

(i)       Tenant shall not be released from any liability under the Lease throughout the Term;

(ii)      Tenant's proposed assignee must expressly assume in a written instrument delivered to and reasonably acceptable by Landlord all the obligations of Tenant under the Lease; provided, however, in the event that the Lease is assigned, Tenant's assignee shall have the one time right to change the Permitted Use to any retail use of the type typically found in and consistent with the character of the Shopping Center at that time; provided, however, that such proposed new use does not: (i) conflict with or violate any exclusives or restrictions in any other leases entered into by Landlord with other tenants; (ii) conflict with, or is not substantially similar to, any primary use of any existing tenant within the Shopping Center at that time; (iii) violate any governmental rules, regulations, codes or other requirements; or (iv) cause Landlord's existing parking facilities to be in violation of code requirements or require Landlord to increase the parking area or number of parking spaces to meet code requirements. Notwithstanding the foregoing, in no event may Tenant's assignee change its Permitted Use in connection with an assignment or sublease under this paragraph to any "Prohibited Use" (as defined in Addendum VIII of this Lease);

(iii)     Tenant's proposed assignee (if an individual) or the principal operating officer or managing partner of such assignee (if a corporation or partnership) has a minimum of five (5) years' experience operating the same type of business as is being proposed for the Leased Premises in connection with such assignment;

(iv)      Tenant's proposed assignee, on the effective date of the assignment or sublease, owns and/or operates at least five (5) locations of a similar type of business as is being proposed for the Leased Premises in connection with such assignment;

(v)       Tenant provides written notice that the above conditions are met to Landlord ten (10) days before the effective date of such assignment. In connection with any such proposed assignment, Landlord shall receive the name of the proposed assignee, the proposed use and trade name for the Leased Premises, information regarding the proposed assignee's business history and experience and the proposed assignee's business plan and projections for the Leased Premises. Landlord shall consent to a proposed assignee who meets the foregoing requirements.

If Landlord does not exercise such right to terminate, Tenant's proposed assignee shall nonetheless be required to meet the above conditions (i) through (v). If Tenant's proposed assignee does not meet all of the above conditions (i) through (v), Landlord may grant or withhold its consent to the proposed assignment in its sole and absolute discretion. Landlord shall furnish the appropriate documentation in connection with any such assignment.

ARTICLE XVI

DEFAULT AND REMEDIES

Section 16.01.        Default.

Each of the following events shall constitute a default ("Default") by Tenant under this Lease: (i) if Tenant fails to pay any Rent (or any installment thereof) within ten (10) days after the same shall be due and payable (without the necessity of demand or notice); or (ii) if Tenant fails to submit or resubmit any plans, specifications or other construction drawings within the time period set forth in Exhibit B and such failure continues for five (5) days after written notice from Landlord; or (iii) if Tenant breaches or fails to observe or perform any term, condition or covenant of this Lease, other than those involving the payment of Rent or failure to continuously occupy and operate the Leased Premises as required, and such breach or failure is not cured within thirty (30) days after Tenant's receipt of written notice thereof, unless such condition

cannot reasonably be cured within such thirty (30) days, in which case Tenant must commence such cure within said thirty (30) days and diligently pursue said cure to its completion (provided, however, if such breach or failure creates a hazard, public nuisance or excessively dangerous situation, said thirty (30) day grace period shall be reduced to forty-eight (48) hours after Tenant's receipt of notice); or (iv) **intentionally deleted**; or (v) if Tenant vacates, abandons or ceases to continuously operate the Leased Premises **prior to the expiration of first Lease Year** as required; or (vi) if Tenant fails to carry and maintain the insurance required by this Lease. Notwithstanding anything to the contrary contained herein, if the Default can be cured by the payment of money, Tenant shall, except as hereinafter provided, have **ten (10)** days after notice from Landlord to cure the Default.

Section 16.02.    Remedies and Damages.

A.    If a Default described in Section 16.01 occurs, Landlord shall have all the rights and remedies provided in this Section 16.02, in addition to all other rights and remedies available under this Lease or provided at law or in equity.

B.    Landlord may, upon notice to Tenant, terminate this Lease, or terminate Tenant's right to possession without terminating this Lease (as Landlord may elect). If the Lease or Tenant's right to possession under this Lease are at any time terminated under this Section 16.02 or otherwise, Tenant shall immediately surrender and deliver the Leased Premises peaceably to Landlord. If Tenant fails to do so, Landlord shall be entitled to the benefit of all provisions of law respecting the speedy recovery of possession of the Leased Premises (whether by summary proceedings or otherwise).

C.    Landlord may also perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant fails to perform, the cost of which shall be paid by Tenant to Landlord upon demand. In performing any obligations of Tenant, Landlord shall incur no liability for any loss or damage that may accrue to Tenant, the Leased Premises or Tenant's Property by reason thereof, except if caused by Landlord's **negligence or willful misconduct**. The performance by Landlord of any such obligation shall not constitute a release or waiver of any of Tenant's obligations under this Lease.

D.    Upon termination of this Lease or of Tenant's right to possession under this Lease, Landlord may at any time and from time to time relet all or any part of the Leased Premises for the account of Tenant or otherwise, at such rentals and upon such terms and conditions as Landlord shall deem appropriate. Landlord shall receive and collect the rents therefor, applying the same first to the payment of such expenses as Landlord may incur in recovering possession of the Leased Premises, including legal expenses and attorneys' fees, in placing the Leased Premises in good order and condition and in preparing or altering the same for re-rental; second, to the payment of such expenses, commissions and charges as may be incurred by or on behalf of Landlord in connection with the reletting of the Leased Premises; and third, to the fulfillment of the covenants of Tenant under the Lease, including the various covenants to pay Rent. Any such reletting may be for such term(s) as Landlord elects. Thereafter, Tenant shall pay Landlord until the end of the Term of this Lease the equivalent of the amount of all the Rent and all other sums required to be paid by Tenant, less the net avails of such reletting, if any, on the dates such Rent and other sums above specified are due. Any reletting by Landlord shall not be construed as an election by Landlord to terminate this Lease unless notice of such intention is given by Landlord to Tenant. Notwithstanding any reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease. In any event, Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Leased Premises or any failure by Landlord to collect any sums due upon such reletting. **Notwithstanding anything to the contrary contained herein, upon default by Tenant and a subsequent eviction by Landlord, Landlord agrees to use reasonable efforts to relet the Leased Premises for a term or terms which may, at Landlord's option, be less than or exceed the balance of the Term of the Lease. Landlord does not necessarily agree to rent the Leased Premises at its then fair market value in the event it enters into a new lease agreement. The foregoing, however, shall in no way obligate Landlord to lease the Leased Premises in any manner which is not in keeping with the type and caliber of tenants at the Shopping Center, nor shall the same obligate Landlord to relet the Leased Premises in preference to other vacant space therein.**

E.    If, as the result of Tenant's Default at any time prior to the Term Commencement Date, this Lease shall be terminated, Tenant shall pay to Landlord on account of such Default, as

liquidated and agreed damages (and not as a penalty), immediately upon demand by Landlord, a sum equal to such amount as would have constituted **six (6) months** Rent had the Rent Commencement Date occurred.

Section 16.03.      Remedies Cumulative.

No reference to any specific right or remedy in this Lease shall preclude Landlord from exercising any other right, from having any other remedy, or from maintaining any action to which it may otherwise be entitled under this Lease, at law or in equity.

Section 16.04.      Waiver.

A.      Landlord shall not be deemed to have waived any provision of this Lease, or the breach of any such provision, unless specifically waived by Landlord in a writing executed by an authorized officer of Landlord. No waiver of a breach shall be deemed to be a waiver of any subsequent breach of the same provision, or of the provision itself, or of any other provision.

B.      **INTENTIONALLY DELETED.**

C.      In any litigation (whether or not arising out of or relating to the Lease) in which Landlord and Tenant shall be adverse parties, both Landlord and Tenant knowingly, voluntarily and intentionally waives their respective rights to trial by jury.

Section 16.05.      **Landlord's Default.**

If Landlord shall breach, or fail to perform or observe, any agreement or condition in this Lease contained on Landlord's part to be performed or observed, and if Landlord shall not cure such breach or failure within thirty (30) days after Landlord's receipt of written notice from Tenant specifying such breach or failure (or, if such breach or failure shall reasonably take more than thirty (30) days to cure, and Landlord shall not have commenced to cure within the thirty (30) days and diligently prosecuted the cure to completion), Tenant may, at Tenant's option, cure such breach or failure for the account of Landlord and any reasonable amount paid or incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and Landlord shall reimburse Tenant therefor; provided, however, Tenant may cure any such breach or failure as aforesaid prior to the expiration of said waiting period if an emergency situation exists and the immediate curing of such breach or failure is necessary to protect the Leased Premises, property located therein, or persons from imminent injury or damage. Landlord shall pay Tenant the reasonable amount paid or incurred by Tenant within thirty (30) days from the date Landlord receives copies of invoices from Tenant detailing such work performed by Tenant. Tenant shall have no right to deduct or withhold from its Rent any amount owed by Landlord under this Section 16.05. Notwithstanding anything to the contrary in the foregoing, Tenant's right to cure Landlord's breaches or failures shall be limited to the performance of Landlord's maintenance and repair obligations under this Lease which directly relate to the Leased Premises and Common Areas, located within the No Build Area. In no event, however, shall such right to cure apply to any other tenant premises in the Shopping Center.

If Landlord fails to pay Tenant the aforementioned costs within thirty (30) days after Landlord's receipt of Tenant's invoice therefor, Tenant shall have the right to offset the amount due Tenant from Landlord, including Interest accrued thereon from the date when due, against future Rent payments until the amount due Tenant is fully paid; provided, however, Tenant shall not offset more than fifty (50%) of any other component of Minimum Rent due each month.

ARTICLE XVII

MISCELLANEOUS PROVISIONS

Section 17.01.      Notices.

A.      Whenever any demand, request, approval, consent or notice (singularly and collectively, "Notice") shall or may be given by one party to the other, such Notice shall be in writing and addressed to the parties at their respective addresses as set forth in Section 1.01 and served by (i) hand, (ii) a nationally recognized overnight express courier, or (iii) registered or

certified mail return receipt requested. The date the Notice is received shall be the date of service of Notice. If an addressee refuses to accept delivery, however, then Notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day after the Notice was sent in the case of attempted delivery by overnight courier, or (iii) five (5) business days after mailing the Notice in the case of registered or certified mail. Either party may, at any time, change its Notice address by giving the other party Notice, in accordance with the above, stating the change and setting forth the new address.

Section 17.02.    Recording.

Neither this Lease nor a memorandum thereof shall be recorded without the prior written consent of Landlord. Notwithstanding anything to the contrary contained herein, Tenant may record at its sole cost and expense a memorandum of this Lease in form and substance mutually satisfactory to the parties hereto, provided Tenant at its sole cost and expense records a release of the memorandum upon the expiration or earlier termination of the Lease. This provision shall survive the termination of the Lease.

Section 17.03.    **INTENTIONALLY DELETED**

Section 17.04.    Legal Expenses.

If Landlord or Tenant institutes any suit against the other in connection with the enforcement of their respective rights under this Lease, the violation of any term of this Lease, the declaration of their rights hereunder, or the protection of Landlord's or Tenant's interests under this Lease, the non-prevailing party shall reimburse the prevailing party for its reasonable expenses incurred as a result thereof including court costs and attorneys' fees.

Section 17.05.    Successors and Assigns.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective permitted successors and assigns. Upon any sale or other transfer by Landlord of its interest in the Leased Premises, Landlord shall be relieved of any obligations under this Lease accruing subsequent to such sale or other transfer.

Section 17.06.    Limitation on Right of Recovery Against Landlord.

No shareholder, member, trustee, partner, director, officer, employee, representative or agent of Landlord shall be personally liable in respect of any covenant, condition or provision of this Lease. If Landlord breaches or defaults in any of its obligations in this Lease, Tenant shall look solely to the equity of the Landlord in the Shopping Center for satisfaction of Tenant's remedies.

Section 17.07.    Security Deposit.
        INTENTIONALLY DELETED.

Section 17.08.    Entire Agreement; No Representations; Modification.

This Lease is intended by the parties to be a final expression of their agreement and as a complete and exclusive statement of the terms thereof. All prior negotiations, considerations and representations between the parties (oral or written) are incorporated herein. No course of prior dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Lease. No representations, understandings, agreements, warranties or promises with respect to the Leased Premises or the Building or Shopping Center of which they are a part, or with respect to past, present or future tenancies, rents, expenses, operations, or any other matter, have been made or relied upon in the making of this Lease, other than those specifically set forth herein. This Lease may only be modified, or a term thereof waived, by a writing signed by an authorized officer of Landlord and Tenant expressly setting forth said modification or waiver.

Section 17.09.    Severability.

If any term or provision of this Lease, or the application thereof to any Person or circumstance, shall be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**Section 17.10.**    **INTENTIONALLY DELETED**

Section 17.11.    Broker's Commission.

Except for Howard Seiden of Katz & Associates Corp., whom Landlord agrees to pay a commission under the terms of a separate agreement, Landlord and Tenant each warrants and represents to the other that no broker, finder or agent has acted for or on its behalf in connection with the negotiation, execution or procurement of this Lease. Landlord and Tenant each agrees to indemnify and hold the other harmless from and against all liabilities, obligations and damages arising, directly or indirectly, out of or in connection with a claim from a broker, finder or agent with respect to this Lease or the negotiation thereof, including costs and attorneys' fees incurred in the defense of any claim made by a broker alleging to have performed services on behalf of the indemnifying party.

Section 17.12.    Irrevocable Offer, No Option.

The submission of this Lease by Landlord to Tenant for examination shall not constitute an offer to lease or a reservation of or option for the Leased Premises. Tenant's execution of this Lease shall be deemed an offer by Tenant **revocable by Tenant at any time prior to the execution hereof by Landlord and delivery hereof to Tenant**, but this Lease shall become effective only upon execution thereof by both parties and delivery thereof to Tenant.

Section 17.13.    Inability to Perform.

Except for the payment of monetary obligations, if Landlord or Tenant is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles, or any similar cause whatsoever beyond their control, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord or Tenant.

Section 17.14.    Survival.

Occurrence of the Termination Date shall not relieve Tenant from its obligations accruing prior to the expiration of the Term. All such obligations shall survive termination of the Lease.

Section 17.15.    Corporate Tenants.

If Tenant is not an individual, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that Tenant is duly formed, qualified to do business and in good standing in the state in which the Shopping Center is located, and such Person(s) are duly authorized by Tenant to execute and deliver this Lease on behalf of Tenant. Tenant shall remain qualified to do business and in good standing in said state throughout the Term.

Section 17.16.    Construction of Certain Terms.

The term "including" shall mean in all cases "including, without limitation." Wherever either party is required to perform any act hereunder, such party shall do so at its sole cost and expense, unless expressly provided otherwise. All payments to Landlord, other than Minimum Rent, whether as reimbursement or otherwise, shall be deemed to be Additional Rent, regardless of whether denominated as "Additional Rent."

Section 17.17.    Showing of Leased Premises.

Landlord may enter upon the Leased Premises for purposes of showing the Leased Premises to Mortgagees or prospective Mortgagees at any time during the Term and to prospective tenants during the last six (6) months of the Term.

Section 17.18.    Relationship of Parties.

This Lease shall not create any relationship between the parties other than that of Landlord and Tenant.

Section 17.19.    Rule Against Perpetuities.

If Landlord fails to deliver the Leased Premises to Tenant within twelve (12) months from the date of this Lease, either party may terminate this Lease upon providing the other party thirty (30) days' prior written notice. Notwithstanding any provision in this Lease to the contrary, if the Term has not commenced within twenty-one (21) years after the date of this Lease, this Lease shall automatically terminate on the twenty-first (21st) anniversary of the date of this Lease. The sole purpose of this provision is to avoid any possible interpretation of this

Lease as violating the Rule Against Perpetuities, or any other rule of law or equity concerning restraints on alienation.

Section 17.20.        Choice of Law.

This Lease shall be construed, and all disputes, claims, and questions arising hereunder shall be determined, in accordance with the laws of the state within which the Shopping Center is located.  (For purposes of this provision, the District of Columbia shall be deemed to be a state.)

Section 17.21.        Choice of Forum.

Any action involving a dispute relating in any manner to the Lease, the relationship of Landlord/Tenant, the use or occupancy of the Leased Premises, and/or any claim of injury or damage shall be filed and adjudicated solely in the state or federal courts of the jurisdiction in which the Leased Premises are located.

Section 17.22.        Time is of the Essence.

Time is of the essence with respect to each and every obligation arising under this Lease.


IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have executed this Lease under their respective hands and seals as of the day and year first above written.

WITNESS:                                LANDLORD:
                                        FEDERAL REALTY INVESTMENT TRUST, a
                                        Maryland real estate investment trust

                                        By: _____
                                        Name:      Deborah A. Colson
                                        Title:     Vice President-Legal Operations

ATTEST:                                 TENANT:
                                        BIG LOTS STORES, INC., a    Ohio
                                        corporation

By: _____             By: _____
Name: _____             Name: _____
Title: _____             Title: _____
                                              KATHLEEN HUPPER
                                              VICE PRESIDENT

[Corporate Seal]

EXHIBIT "A"



**KEY**

* — Protected Access Point

- - - — Redevelopment Area

⊠ — No Build Area

NOTE: 4/1,000 parking ratio required.

Entrance/Exit to remain

ROUTE 46

Entrance to be permanently closed (Condemnation Area)

9 DRUG FAIR

9A

10 PREMISES

14

VAN HOUTEN AVENUE

| FEDERAL REALTY INVESTMENT TRUST 1626 East Jefferson Street Rockville, Maryland 20852 (301) 998-8100 | project CLIFTON PLAZA Clifton, New Jersey | revised | LEASE PLAN drawn BJO  date 12/8/04 property no. 500-1324 |

## EXHIBIT B
## BIG LOTS - SPACE NO. 10
## LANDLORD AND TENANT IMPROVEMENTS

### LANDLORD IMPROVEMENTS

The following improvements ("Landlord's Work") will be constructed in the Leased Premises at Landlord's sole cost and expense. Any improvements not specified below shall be made at Tenant's sole cost and expense:

1.    All exterior lighting shall be operational and working, including pole lights, entrance and exit lighting, and building lighting.

2.    The roof shall be professionally inspected and certified to be in good condition and free of leaks.

3.    Landlord to demolish and remove all fixtures, refrigeration equipment, meat/poultry/fish prep rooms, partitions, walls and coolers. Landlord to "safe off" the electric and plumbing to all demolished fixtures back to their original source. Existing mezzanine to remain "as is".

Except for Landlord's Work, Tenant accepts the Leased Premises in its "As-Is" condition.

### TENANT IMPROVEMENTS

Tenant shall remodel, renovate and refurbish the Leased Premises in accordance with Tenant's plans and specifications **approved by Landlord as and to the extent required below. Tenant shall make all other interior improvements, alterations and changes to the Leased Premises necessary to place same in accordance with code, a first class, modern condition to enable Tenant to use the Leased Premises for the purposes set forth in this Lease. All of the foregoing improvements are hereinafter referred to as "Tenant's Work".

#### Plan Submittal Procedure

Tenant shall submit detailed plans and specifications, to be prepared by Tenant's architect in reproducible form (sepias), including Tenant's material sample board, **for any structural and/or exterior work to be performed by Tenant,** all of which shall be submitted to Landlord within **thirty (30) days** of the date of this Lease for Landlord's written approval (as to both to design and materials). **Landlord shall act reasonably in approving Tenant's plans and specifications and material sample board to the extent that plans for the exterior of the Leased Premises are architecturally compatible with the balance of the Shopping Center, and any proposed structural modifications do not adversely impact the structural integrity of the Leased Premises.** It is expressly agreed that Tenant shall not commence any such work until said plans and specifications and material sample board have been approved by Landlord and any required building permits issued by the applicable local governmental authorities. **Tenant shall provide Landlord with plans and specifications for the interior of the Leased Premises for informational purposes only.**

No changes of materials or finishes are permitted after final approval by Landlord of working drawings unless approved in writing by Landlord.

Within **thirty (30) days** of the date upon which Tenant has received Landlord's approval of the foregoing final working drawings and specifications **as and to the extent required,** application shall be made by Tenant for all appropriate building permits. When the building permit is issued, Tenant shall promptly give a copy of the permit to Landlord.

#### Construction Requirements

Tenant shall commence construction of Tenant's Work in the Leased Premises no later than five (5) days after whichever of the following shall be the later to occur:



CONSTRUCTION PLAN

| | SQUARE FOOTAGE: | BIG LOTS STORE # | BIG LOTS STORES, INC. | DATE: | REVISION 1 |
|---|---|---|---|---|---|
| | | CLIFTON PLAZA | STORE PLANNING DEPT. | DATE: | REVISION 2 |
| BIG LOTS! | SALES:17,146 | 1008 ROUTE 46 WEST | 300 PHILLIPI ROAD | DATE: | REVISION 3 |
| | TOTAL:24,000 | CLIFTON, NJ 07015 | COLUMBUS , OHIO   43228 | DATE: | REVISION 4 |
| | | | PHONE: (614)  278-6800 | DATE: | REVISION 5 |

SHEET: A-1

SCALE: 1/8" = 1'-0"   DATE: 11/08/04

FIXTURE PLAN

| | | BIG LOTS STORE # | BIG LOTS STORES, INC. | | |
| BIG LOTS! | SQUARE FOOTAGE: | CLIFTON PLAZA | STORE PLANNING DEPT. | | |
| | SALES:17,146 | 1006 ROUTE 46 WEST | 300 PHILLIPI ROAD | | |
| | TOTAL:24,000 | CLIFTON, NJ 07015 | COLUMBUS , OHIO  43228 | | |
| | | 1/8" = 1'-0"   11/22/24 | PHONE: (614) 278-6800 | | |



LIGHTING PLAN

| | SQUARE FOOTAGE: | BIG LOTS STORE # | BIG LOTS STORES, INC. | | |
|---|---|---|---|---|---|
| BIG LOTS! | SALES:17,146 | CLIFTON PLAZA 1006 ROUTE 46 WEST CLIFTON, NJ 07015 | STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS , OHIO 43228 PHONE: (614) 278-6800 | | |
| | TOTAL:24,000 | | | | |

SHEET: A-1



ELECTRIC PLAN

ELECTRICAL LEGEND

| SHEET | | | | | | | |
|---|---|---|---|---|---|---|---|
| E-1 | | SQUARE FOOTAGE: SALES:17,146 TOTAL:24,000 | BIG LOTS STORE # CLIFTON PLAZA 1006 ROUTE 46 WEST CLIFTON, NJ 07015 | BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS , OHIO 43228 PHONE: (614) 278-6800 | | | |



# ELECTRIC NOTES

**BIG LOTS**

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

SQUARE
FOOTAGE
SALES:24,000
TOTAL:24,000

BIG LOTS STORE #
CLIFTON, IN 07015

SHEET E-2

EXHIBIT B

BIG LOTS - SPACE NO. 10

LANDLORD AND TENANT IMPROVEMENTS

## LANDLORD IMPROVEMENTS

The following improvements ("Landlord's Work") will be constructed in the Leased Premises at Landlord's sole cost and expense. Any improvements not specified below shall be made at Tenant's sole cost and expense:

1.    All exterior lighting shall be operational and working, including pole lights, entrance and exit lighting, and building lighting.

2.    The roof shall be professionally inspected and certified to be in good condition and free of leaks.

3.    Landlord to demolish and remove all fixtures, refrigeration equipment, meat/poultry/fish prep rooms, partitions, walls and coolers. Landlord to "safe off" the electric and plumbing to all demolished fixtures back to their original source. Existing mezzanine to remain "as is".

Except for Landlord's Work, Tenant accepts the Leased Premises in its "As-Is" condition.

## TENANT IMPROVEMENTS

Tenant shall remodel, renovate and refurbish the Leased Premises in accordance with Tenant's plans and specifications approved by Landlord as and to the extent required below. Tenant shall make all other interior improvements, alterations and changes to the Leased Premises necessary to place same in accordance with code, a first class, modern condition to enable Tenant to use the Leased Premises for the purposes set forth in this Lease. All of the foregoing improvements are hereinafter referred to as "Tenant's Work".

Plan Submittal Procedure

Tenant shall submit detailed plans and specifications, to be prepared by Tenant's architect in reproducible form (sepias), including Tenant's material sample board, for any structural and/or exterior work to be performed by Tenant, all of which shall be submitted to Landlord within thirty (30) days of the date of this Lease for Landlord's written approval (as to both to design and materials). Landlord shall act reasonably in approving Tenant's plans and specifications and material sample board to the extent that plans for the exterior of the Leased Premises are architecturally compatible with the balance of the Shopping Center, and any proposed structural modifications do not adversely impact the structural integrity of the Leased Premises. It is expressly agreed that Tenant shall not commence any such work until said plans and specifications and material sample board have been approved by Landlord and any required building permits issued by the applicable local governmental authorities. Tenant shall provide Landlord with plans and specifications for the interior of the Leased Premises for informational purposes only.

No changes of materials or finishes are permitted after final approval by Landlord of working drawings unless approved in writing by Landlord.

Within thirty (30) days of the date upon which Tenant has received Landlord's approval of the foregoing final working drawings and specifications as and to the extent required, application shall be made by Tenant for all appropriate building permits. When the building permit is issued, Tenant shall promptly give a copy of the permit to Landlord.

Construction Requirements

Tenant shall commence construction of Tenant's Work in the Leased Premises no later than five (5) days after whichever of the following shall be the later to occur:

EXHIBIT B

BIG LOTS - SPACE NO. 10

LANDLORD AND TENANT IMPROVEMENTS

    (a)    The date of receipt by Tenant of Landlord's approval of Tenant's working drawings and specifications; or

    (b)    The date of issuance of all appropriate building permits.

Tenant shall diligently pursue to completion all of Tenant's Work.

It is expressly understood and agreed that any such alterations, changes or improvements shall in no way harm the structure of the Leased Premises or diminish the value of same or of the Shopping Center.

Tenant must place the electric, water and/or gas meters in its name with the appropriate utility companies within five (5) days from the date Landlord delivers the Leased Premises to Tenant but in all events prior to the commencement of any of Tenant's Work in the Leased Premises.

All work to be performed by Tenant shall be performed in a good and workmanlike manner, in accordance with all rules, regulations, codes and ordinances of any local, municipal, state and/or federal authorities having jurisdiction thereof. Permits, licenses or approvals required for said work from such authorities shall be obtained by Tenant at its sole cost and expense.

Tenant expressly agrees to protect, indemnify and save the Landlord harmless from any liability to any person or estate for damage to person or property occurring during the work proposed hereunder.

At the completion of Tenant's Work, Tenant shall deliver to Landlord a copy of its Certificate of Occupancy.

                                    CLIFTON PLAZA

EXHIBIT C
SIGNAGE CRITERIA

SECTION 1.

The advertising or informative content of all signs shall be limited to letters designating the store name and/or type of store only (which such designation of the store type shall be by general descriptive terms and shall not include any specification of the merchandise offered for sale therein or the services rendered therein) and shall contain no advertising devices, slogans, symbols or marks (other than the store name and/or type of store).  Crests and corporate shield designs must be submitted to Landlord for approval.

SECTION 2.

The letters on all signs shall be either in script or block; the size of the letters shall be approved by Landlord, the light source shall be contained wholly within the depth structure of the letters or sign.

SECTION 3.

The character, design, color and layout of all signs shall be subject to Landlord's approval, which shall not be unreasonably withheld.

SECTION 4.

Excepting small-scale "signature signs", as provided in Section 7 (c) of this Exhibit, Tenant shall not install more than one (1) sign.

SECTION 5.

All signs shall be in accordance with the following requirements:

(a)     Prior to fabrication of the sign, Tenant shall submit three (3) sets of shop drawings to Landlord for approval.  These drawings are to be to scale, showing a front elevation and section through the sign, dimensioned to show overall length, height and letter depth, along with distance from end of letters to store demising lines.  In addition, said drawings shall specify all details of sign construction, including materials, thickness, colors, wiring, tubing, transformer specifications and mounting details.  Attachments to and penetrations through the masonry wall must be located so as to minimize damage to the building.  Attachments and penetrations are to occur only at mortar joints. Drawings shall be submitted to the following address:

FEDERAL REALTY INVESTMENT TRUST
1626 East Jefferson Street
Rockville, MD  20852-4041
Attention: Property Manager

(b)     The sign and any part or parts thereof, except as otherwise provided in this Exhibit C, and in this Section 5, shall be located within the physical limits of the storefront of the Leased Premises.

(c)     No sign or any part or parts thereof shall be located on the roof of the Leased Premises.

(d)     No sign or any parts thereof shall project more than six inches (6") beyond the lease line, or sign fascia, if provided by Landlord.

(e)     Signs previously used by Tenant or sign contractors must conform to the conditions and limitations of this Exhibit.

(f)     Signs, symbols and/or trade marks must have preliminary approval by Landlord, before shop drawings are made.  Tenant shall submit shop drawings to Landlord for approval, showing sizes of all letters and spacing, type of material, color and dimensions in relation to the Leased Premises.

(g)     No sign shall be placed in final position without approval of Landlord.

(h)     No sign shall be unnecessarily bright.

EXHIBIT C

SIGNAGE CRITERIA

(i)  All signs shall be fabricated and installed in compliance with all applicable building and electrical codes and bear a U.L. Label.

SECTION 6.

The fabrication, installation and operation of all signs shall be subject to the following restrictions:

(a)  No exposed neon or fluorescent tubing, incandescent lamps, raceways, ballast boxes, electrical transformers, crossover, conduit or sign cabinets shall be permitted.

(b)  No flashing, moving, flickering or blinking illumination shall be permitted.

(c)  No animation, moving lights or floodlight illumination shall be permitted.

(d)  The name and/or stamp of the sign contractor, sign company, or both, shall not be exposed to view.

(e)  All signs shall be back-lighted, except as described in Subsection (c).

SECTION 7.

Without Landlord's prior written consent, the following types of signs shall be prohibited:

(a)  Paper signs or stickers utilized as signs inside or outside glass storefront.

(b)  Signs of a temporary character or purpose, irrespective of the composition of the sign or material used.

(c)  Painted or printed signs, except one (1) non-illuminated, small-scale "signature" sign or "store hours" sign, which is lettered on the glass portion of the storefront of the Leased Premises, and provided such sign does not exceed three inches (3") in height.

(d)  Outrigger signs.

(e)  Moving signs, rooftop signs, parapet signs, or pylon signs.

EXHIBIT C-1
TENANT'S SIGNAGE DRAWING

[To be inserted]

### Stacked Logo
# INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS

This is the preferred way to present the sign.

File Name: BLst1C.eps



## STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
|------|------|------|--------|------|--------|--------|
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4 1/2" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5 1/2" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17 1/2" | 6 1/2" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19 1/2" | 7 1/2" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21 1/2" | 8 1/2" |

### SIGN SPECIFICATIONS: BIG LOTS

CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS (NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

### SIGN SPECIFICATIONS: EXCLAMATION

CUSTOM FABRICATED 9" ALUMINUM EXTRUDED CHANNELED LETTER FINISHED BLACK

FACE .150" ACRYSTEEL # 2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with the N.E.C..
All signage equipped with disconnect switches.

EXHIBIT C-2

PYLON SIGNAGE



EXHIBIT D

RULES AND REGULATIONS

Tenant expressly covenants and agrees, at all times during the Term, and at such other times as Tenant occupies the Leased Premises or any part thereof, to comply, at its own cost and expense, with the following:

1.      Any handling of freight for any purpose, or deliveries to or from the Leased Premises, shall be made in a manner which is consistent with good shopping center practice and only at such times, in such areas, and through such entrances and exits as are from time to time designated for such purposes by Landlord. Any truck or machine used for handling freight or making deliveries in the Leased Premises or in the Shopping Center shall have rubber wheels only.

2.      All garbage and other refuse shall be kept in places specified by Landlord. Tenant shall be solely responsible for contracting for the removal of all garbage and other refuse from the Leased Premises and shall pay promptly all charges therefor.

3.      Tenant shall not (i) suffer, allow or permit any vibration, noise, odor or flashing or bright light to emanate from the Leased Premises or from any machine or other installation located therein, or otherwise suffer, allow or permit the same to constitute a nuisance to or interfere with the safety, comfort or convenience of Landlord or of any other occupant or user of the Shopping Center; (ii) display, paint, or place any handbills, bumper stickers or other advertising devices on any vehicle(s) parked in the parking area(s) of the Shopping Center, whether belonging to Tenant, its employee(s), or any other Person(s); (iii) solicit business or distribute any handbills or other advertising materials in the Common Areas; (iv) conduct or permit any activities in the Shopping Center that might constitute a public or private nuisance; (v) permit the parking of any vehicles or the placement of any displays, trash receptacles or other items, so as to interfere with the use of any driveway, fire lane, corridor, walkway, parking area, mall or any other Common Area; (vi) use or occupy the Leased Premises or permit anything to be done therein which in any manner might cause injury or damage in or about the Shopping Center; or (vii) use or occupy the Leased Premises in any manner which is unreasonably annoying to other tenants in the Shopping Center unless directly occasioned by the proper conduct of Tenant's business in the Leased Premises.

4.      Tenant shall secure and protect the Leased Premises, and all property located within the Leased Premises. Tenant acknowledges and agrees that it, and not Landlord, is solely responsible for securing and protecting the Leased Premises, and all property located within the Leased Premises.

5.      Tenant shall use the plumbing within the Leased Premises and the Shopping Center only for the purpose for which it is designed. Tenant shall be solely responsible for any breakage, stoppage or damage resulting from its violation of this provision, and shall pay any costs associated therewith to Landlord upon demand as Additional Rent.

6.      Tenant shall contract for and use termite and pest extermination services for the Leased Premises, and with such contractor, as Landlord may from time to time designate. Tenant shall not be obligated to pay more for such service than the prevailing competitive rate charged by reputable, independent contractors. If Landlord does not designate such contractor, Tenant may employ a reputable contractor of its choosing, subject to Landlord's prior written consent.

7.      Tenant shall install and maintain at all times a display of merchandise in the display windows (if any) of the Leased Premises and shall keep such display windows well lighted during all Shopping Center business hours and for at least one (1) hour thereafter. All articles, and the arrangement, style, color and general appearance thereof, shall be in keeping with the character and standards of the Shopping Center as reasonably determined by Landlord.

8.      Tenant shall participate in any window cleaning program that may be established by Landlord. Tenant shall not be obligated to pay more for its participation in such window cleaning program than the prevailing competitive rate charged by reputable independent window cleaning contractors for equal service on a direct and individual basis.

EXHIBIT D

RULES AND REGULATIONS

9.      If Tenant undertakes any construction activities which cause any work stoppage, picketing, labor disruption or dispute, so as to interfere with the activities at the Shopping Center, Tenant shall, upon request from Landlord, immediately suspend any construction work being performed in the Leased Premises giving rise to such labor problems. Tenant shall have no claim for damages of any nature against Landlord for such suspension nor shall the Term Commencement Date be extended as a result thereof.

10.      Tenant shall promptly obtain all permits, including occupancy permits, for the Leased Premises or its use thereof. Tenant shall pay before delinquency all license and permit fees, and other charges of a similar nature, for the conduct of any business in, or any use of, the Leased Premises. Upon request Tenant shall provide to Landlord a copy of all its permits, including the certificate of occupancy.

11.      Tenant shall use the Shopping Center name and logo and include the Tenant Trade Name and the address and identity of Tenant's business in the Leased Premises in all advertisements made by Tenant in any manner and in any medium.

12.      Tenant shall not conduct or permit to be conducted any auction, fire, "going out of business" or similar type of sale (whether real or fictitious) from the Leased Premises; provided, however that this provision shall not restrict the absolute freedom (as between Landlord and Tenant) of Tenant to determine its own selling prices nor shall it preclude periodic, seasonal, promotional or clearance sales held in the ordinary course of business.

13.      Tenant shall not place a load on any floor in the Shopping Center which exceeds the load which the floor was designed to carry, or which may result in improper weight distribution on such floors.

14.      Tenant shall not install, operate or maintain in the Leased Premises, or in any other area of the Shopping Center, electrical equipment which does not bear the Underwriters Laboratories seal of approval, or which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation.

15.      To the extent required by Landlord or by any law, rule, regulation, guideline or order, Tenant shall provide sound barriers for all mechanical systems serving the Leased Premises.

16.      Tenant shall not store, display, sell, or distribute any alcoholic beverages, dangerous materials, flammable materials, explosives, or weapons in the Leased Premises, or conduct any unsafe activities therein, unless permitted pursuant to Section 1.01.

17.      Except to the extent permitted in Section 1.01, Tenant shall not sell, distribute, display or offer for sale (i) any paraphernalia commonly employed in the use or ingestion of illicit drugs, or (ii) any X-rated, pornographic, lewd, or so-called "adult" newspaper, book, magazine, film, picture, video tape or video disk.

18.      Tenant shall not operate or permit to be operated in the Leased Premises any automatic teller machines, lockers, toilets, scales, and amusement devices.

19.      Except as otherwise specifically permitted pursuant to this Lease, no radio or television aerial or other device may be erected by Tenant on the roof or on any exterior wall of the Leased Premises, or the building in which the Leased Premises is located, without Landlord's prior written consent. Any aerial or other device installed without such written consent shall be subject to removal by Landlord, at Tenant's sole risk and expense, without notice.

20.      Tenant shall comply with all other reasonable rules and regulations from time to time established by Landlord which apply generally to all other stores in the Shopping Center.

# EXHIBIT E

## GROSS SALES STATEMENT FORM

Please mail to:

Federal Realty Investment Trust
ATTN: Sylvia Korzan, Senior Sales Analyst
1626 East Jefferson Street
Rockville, Maryland  20852-4041

Phone: 301-998-8261
Fax:   301-998-3719

Tenant Name:  Big Lots

Shopping Center:  Clifton Plaza

Date: _____

I hereby certify that, to the best of my knowledge, Gross Sales as defined in the Lease for the above location are as follows:

Month:_____

Sales Amount:_____

Signature:_____

Phone No.:_____

EXHIBIT F

EXCLUSIVE AND PROHIBITED USES

### Acme

**Exclusive Use:** (a)  In consideration for the termination of the Lease, the Parties agree that as of the Termination Date if, and only if, Tenant has opened its new supermarket store located at the SEC of Bloomfield and Allwood in Clifton, New Jersey (the "New Store"), no part of the Leased Premises or the Shopping Center (subject to the rights of existing tenants in the Shopping Center on the date hereof) shall be used as (i) a traditional grocery store, such as, by way of example only, Stop & Shop, A&P, Pathmark, Shop Rite, Genuardi's, IGA, Aldi Foods, or Sav-A-Lot; (ii) a specialty grocery store (including without limitation, a grocery store that specializes in the sale of natural food items), such as, by way of example only, Whole Foods Market, Wild Oats, Zagara's, and The Fresh Market; and/or (iii) a gourmet grocer, such as, by way of example only, Sutton Place Gourmet, Dean & DeLuca, Trader Joes, Fairway Market, Zabar's, Citarella, and Gourmet Garage (collectively, the "Restriction").  If in any judicial proceeding a court shall hold that the scope and/or duration (defined below) of the Restriction are unreasonable under circumstances then existing, the Parties, and their respective successors, assigns and affiliates, agree that the maximum allowable duration and/or scope reasonable under the circumstances shall be substituted for the duration and/or scope stated in this Restriction. "Affiliates" shall mean a branch, division, parent or subsidiary of a Party, it successors or assigns, or any company in which a Party, its successors or assigns own (directly or indirectly) five percent (5%) or more of the voting stock or interest or which is a company that owns (directly or indirectly) five percent (5%) or more of the voting stock or interest of a Party, its successors or assigns.

(b)    The Restriction created hereby shall inure to the benefit of Tenant and its heirs, successors, assigns, affiliates and personal representatives.  The Restriction shall be a burden on the Leased Premises and the Shopping Center and shall run with the land until the earlier of (i) July 31, 2009, or (ii) the date the New Store shall discontinue its operations as a supermarket for any reason other than strikes, lockouts or other labor difficulties, acts of God, the requirements of any local, state or federal law, rule or regulation, fire or other casualty, condemnation, war, riot, insurrection or any other event or circumstance beyond Tenant's reasonable control or temporary closure of Tenant's New Store due to the restoration, reconstruction, expansion, alteration, modification or remodeling of Tenant's New Store building or any associated common area improvements.  The Restriction solely benefits Tenant and its affiliates and may be waived in writing by Tenant or its affiliates in its sole and absolute discretion.  In no event shall Tenant be permitted to assign the rights granted by this Agreement to a third party unless such third party operates the New Store as a supermarket.  The Restriction created hereby shall be binding upon Landlord, and any successor, assign, affiliates or subtenant by, through and/or under Landlord.

(c)    In the event of any violation or threatened violation by any person of the Restriction, each Party shall have the right to enjoin such violation or threatened violation in a court of competent jurisdiction.  The right of injunction shall be in addition to all other remedies as provided by law.

(d)    The failure of Tenant or Tenant successors or assigns to insist upon strict performance of the Restriction shall not be deemed a waiver of any rights or remedies that Tenant, its successors or assigns, may have and shall not be deemed a waiver of any subsequent breach.

(e)    Landlord represents and warrants that it is the ground lessee of the Shopping Center and the Leased Premises, and has full right and authority to restrict the Leased Premises and that, except for Metropolitan Life Insurance Company ("Met Life"), no third parties (including, without limitation, any other lender or mortgagee) have or will have any right to prevent, approve or control in any manner the terms of this restriction.  Landlord agrees to use reasonable effort to obtain the consent of Met Life to this Agreement on the form attached hereto as Exhibit "C."  In the event the consent of Met Life is not obtained on or before the Termination Date, Tenant may, in its sole discretion, terminate this Agreement in writing to Landlord and it shall have no force or effect.

### Angel Tips Nail Spa

**Exclusive Use:**  Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord

## EXHIBIT F

### EXCLUSIVE AND PROHIBITED USES

hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily operates a nail salon.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

### Drug Fair

**Exclusive Use:** Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use, or any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which includes as part of its business, a pharmacy selling items requiring dispensation by or through a pharmacy or requiring dispensation by or through a registered or licensed pharmacist.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any grocery store and/or supermarket which is a tenant in the Shopping Center whose Floor Area is at least forty-two thousand five hundred (42,500) square feet.

Landlord and Tenant hereby agree that this Lease shall be contingent upon Tenant obtaining all necessary governmental permits, approvals and licenses for the building and operation of Tenant's business in the Leased Premises, including any permits, approvals and licenses necessary for the sale of beer and wine for on-premise consumption.

Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which includes as part of its business, a pharmacy selling items requiring dispensation by or through a pharmacy or requiring dispensation by or through a registered or licensed pharmacist.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any grocery store and/or supermarket which is a tenant in the Shopping Center whose Floor Area is at least forty-two thousand five hundred (42,500) square feet.

### Field Liquors

**Exclusive Use:** As long as this Lease is in full force and effect and the Tenant is not in Default under this Lease and is using and occupying the Demised Premises for the Permitted Use, with Tenant's Trade Name, the Landlord agrees that it will not enter into a lease for premises in the Shopping Center with any tenant whose main or primary business is the operation of a package liquor store for the retail sale of packaged liquor for off-premises consumption. However, this restriction shall be wholly inapplicable to and shall not limit or restrict any use whatsoever of: (i) any premises leased to a supermarket or drug store; (ii) any premises in the Shopping Center which sell alcoholic beverages for off-premises consumption as an incidental use; (iii) any premises which sell liquor, beer and/or wine for on-premises consumption; or (iv) any use in contravention of the foregoing restriction which is permitted by any existing lease or any extension, renewal or modification thereof.

### Game Stop

EXHIBIT F

EXCLUSIVE AND PROHIBITED USES

**Exclusive Use:** Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business equal to or less than two thousand (2,000) square feet which primarily sells entertainment software, video software or video game cartridges.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

## L.A. Weight Loss Center

**Exclusive Use:** Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily operates a weight loss center.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

## Sally Beauty Supply

**Exclusive Use:** Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily sells beauty supplies and beauty equipment.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant; or (iii) any drugstore.

## Valley National Bank

**Exclusive Use:** Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily operates a full service bank.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

EXHIBIT G-1

NON-DISTURBANCE, RECOGNITION
AND ATTORNMENT AGREEMENT

Reference is made to a certain Lease and Agreement, dated December 12, 1988, between Levin Properties, L.P., successor-in-interest to Janice H. Levin and Adam K. Levin, Catherine M. Levin and Susan L. Tepper (hereinafter referred to as "Parent Landlord"), as Lessor, and Federal Realty Investment Trust (hereinafter referred to as "Landlord"), as Lessee, of certain real property and improvements described therein, including certain real property (the "Entire Premises") located in Brunswick Shopping Center, Route 1 and Milltown Road in the Township of North Brunswick, County of Middlesex, and State of New Jersey, and more particularly described in Exhibit A. Said Lease and Agreement, as amended and modified to date, is hereinafter referred to as the "Parent Lease." A Memorandum of the Parent Lease is recorded in Deed Book 3749 at Page 878 of the Land Records of Middlesex County, New Jersey.

Further reference is made to a certain lease between Federal Realty Investment Trust ("the Sublease"), dated _____, between Landlord, as the sublessor, and Big Lots Stores, Inc., as subtenant (hereinafter referred to as "Tenant") of a portion ("the Demised Premises") of the Entire Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.      Parent Landlord does hereby warrant and represent to Tenant that the Parent Lease has not been amended, except as aforesaid, and is valid and in full force and effect as of the date hereof, that the term of the Parent Lease has heretofore commenced, that, to the best of knowledge of Parent Landlord, there are no defaults by either lessor or lessee thereunder, that Landlord is, as of the date hereof, the lessee under the Parent Lease and that nothing in the Parent Lease prohibits or restricts the execution and delivery of the Sublease or any term or condition contained in the Sublease.

2.      Tenant does hereby warrant and represent to Parent Landlord that the Sublease is valid and presently in full force and effect and unmodified.

3.      Parent Landlord does hereby acknowledge receipt of a fully executed copy of the Sublease. Parent Landlord does hereby consent to the execution and delivery of the Sublease. Parent Landlord does hereby recognize the Sublease and all of Tenant's rights thereunder. Notwithstanding anything in the Parent Lease contained to the contrary, Parent Landlord does hereby agree that, whether or not the term of the Parent Lease shall be cancelled or shall terminate prior to the expiration of the term of the Sublease or Parent Landlord shall come into possession of all or any part of the Demised Premises described in the Sublease prior to the expiration of the term of the Sublease, or Parent Landlord shall seek to exercise any of the rights or remedies under the Parent Lease, the Sublease shall continue in full force and effect in accordance with its terms, and Tenant's rights under the Sublease, and Tenant's use, possession and enjoyment of the Demised Premises shall not be modified or disturbed except for such cause as would entitle Landlord to terminate the Sublease in accordance with the terms and conditions contained in the Sublease. Except as provided in the Sublease, Parent Landlord shall take no action which shall in any way interfere with any right or privilege of Tenant under the Sublease, and the Entire Premises and the Demised Premises shall be and remain subject to the Sublease.

4.      All proceeds of condemnation awards (and other awards by reason of the exercise of the power of eminent domain) and insurance paid or payable with respect to the Demised Premises or any other part of the Entire Premises and actually received by Parent Landlord shall be applied and paid in the manner set forth in the Sublease.

5.      Upon the cancellation or termination of the term of the Parent Lease, prior to the expiration of the term of the Sublease as extended, whether the Parent Lease shall so terminate, or be cancelled, upon the expiration of its term as stated therein or on any other date, and whether upon the election of either Parent Landlord or Landlord thereunder, or in any other manner, Tenant shall not be made (except in connection with any action Landlord could bring against Tenant in connection with the Sublease) a party in any litigation to evict or dispossess Landlord nor shall Tenant be evicted or disturbed as a result thereof, and Parent Landlord shall

## EXHIBIT G-1
### NON-DISTURBANCE, RECOGNITION
### AND ATTORNMENT AGREEMENT

recognize Tenant as tenant of the Demised Premises for the balance of the term of the Sublease, as extended, in accordance with all of the provisions of the Sublease.

6.     Tenant does hereby agree that, if the term of the Parent Lease shall be cancelled or terminated prior to the expiration of the Sublease, Tenant shall recognize, and attorn to, Parent Landlord as the landlord under the Sublease in accordance with the terms and conditions contained in the Sublease. Parent Landlord shall then assume, subject to the provisions of Section 7 below, and thereafter perform and observe all of the terms and conditions contained in the Sublease on the part of the landlord thereunder to be performed or observed. Notwithstanding anything to the contrary herein, except for continuing defaults and obligations of which Parent Landlord has received written notice prior to expiration of Parent Lease, Parent Landlord shall not be liable for any act or omission of any prior landlord under the Sublease except to the extent which the same is of a continuing nature, shall not be subject to any defense or offsets which Tenant may have against any prior landlord under the Sublease unless expressly set forth in the Sublease, shall not be bound by any obligation to make any payment to Tenant which was required to be made prior to the time Parent Landlord succeeded to the Landlord's interest under the Sublease and shall not be bound by any obligation to perform Landlord's Construction work (as that term is defined in the sublease) or any other work or to make any other improvements to the Demised Premises except to the extent Landlord is obligated to do so under the Sublease.

**Landlord shall indemnify, defend and hold Parent Landlord harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses including, without limitation, reasonable attorney fees, which may be imposed upon, incurred by or asserted against Parent Landlord by Tenant with respect to the Sublease for any act or omission of Landlord occurring or arising prior to the date upon which Parent Landlord became the Landlord under the Sublease.**

7.     In the event Parent Landlord becomes the Landlord under the Sublease, in accordance with the Agreement, Tenant specifically understands and agrees that there shall be no personal liability on Parent Landlord or any other person or entity with respect to any of the liabilities and obligations under the Sublease. Tenant and any person claiming by, through or under Tenant shall look solely to the equity of the Parent Landlord in the Entire Premises, and the rents, proceeds and profits therefrom, for the satisfaction of Tenant's and such person's remedies and claims for damages. Nothing in this Section 7 shall be construed as a bar to any injunctive relief or remedy available to Tenant or as limiting any rights or remedies Tenant may have under the Sublease as a result of any such breach or default, except the right to seek personal liability against Parent Landlord as set forth herein. .

8.     All notices pursuant hereto shall be given as provided in the Sublease and if addressed to Parent Landlord shall be c/o Levin Management Corporation, 893-917 Highway 22, North Plainfield, New Jersey 07060, Attention: Evelyn S. Leonard; and if to Tenant shall be to 770 Cochituate Road, Framingham, Massachusetts 01701; and if to Landlord at 1626 East Jefferson Street, Rockville, Maryland 20852-4041, attention Legal Department.

9.     References herein contained to the term of the Parent Lease and the term of the Sublease shall mean the terms thereof as then extended pursuant to the provisions thereof.

10.     The agreements contained herein shall be self-executing without the requirement of any further instrument or act by any party referred to herein. This Agreement shall be binding upon, and inure to the benefit of, each of the parties hereto and its successors and assigns. This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

11.     Notwithstanding anything to the contrary herein, this Agreement shall not be effective after December 31, 2037.

12.     This document may be executed in counterparts.

EXHIBIT G-1

NON-DISTURBANCE, RECOGNITION

AND ATTORNMENT AGREEMENT


IN WITNESS WHEREOF, each of the parties hereto has caused this instrument to be executed and delivered all as of the _____ day of _____, 2004.

ATTEST:                          LEVIN PROPERTIES, L.P.Parent Landlord
                                 By: JHL Holdings, Inc., general partner


By: _____        By: _____
                                       William A. Farber, President


ATTEST:                          BIG LOTS STORES, INC. (Tenant)


By: _____        By: _____


Witness:                         Federal Realty Investment Trust (Landlord)


By: _____        By: _____

EXHIBIT G-2

SUBORDINATION, NON-DISTURBANCE

AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made as of the _____ day of _____ 2004 by and among METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation, having a principal place of business at 200 Park Avenue, 12th Floor, New York, New York 10166 ("Mortgagee"), LEVIN PROPERTIES, L.P., having an address c/o Levin Management Corporation, 893-917 Highway 22, North Plainfield, New Jersey 07060 ("Parent Landlord") and Federal Realty Investment Trust, having an address of 1626 East Jefferson Street, Rockville, Maryland 20852-4041 ("Parent Tenant") (Parent Landlord and Parent Tenant are hereinafter sometimes referred to as "Landlord"), and BIG LOTS STORES, INC., a _____ corporation, ("Tenant").

WITNESSETH

WHEREAS, Parent Tenant and Tenant entered into that certain lease dated as of the ___ day of July, 2003 (the "Lease") whereby Landlord leases to Tenant those certain premises more specifically described in the Lease (the "Demised Premises") and located in a portion of the Brunswick Shopping Center located in North Brunswick, New Jersey as described on Exhibit A attached hereto (the "Mortgaged Premises"); and

WHEREAS, Parent Tenant and Parent Landlord's predecessor-in-interest entered into that certain Lease and Agreement dated December 12, 1988 ("Parent Lease") whereby Parent Landlord leases to Parent Tenant the Mortgaged Premises; and

WHEREAS, Parent Landlord or its nominee has executed that certain Mortgage and Security Agreement dated executed by Parent Landlord, to Mortgagee recorded

_____(the "Mortgage").

NOW THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed among the parties as follows:

1.      The Lease is and shall at all times hereafter be subordinate to the lien of (but not the terms and conditions of) the Mortgage and all increases, amendments, renewals, modifications, substitutions, consolidations and extensions thereof.

2.      Mortgagee covenants and agrees that, in the event Mortgagee comes into possession of or acquires title to all or any portion of the Mortgaged Premises as a result of foreclosure or other enforcement of the Mortgage, or as a result of any other means, so long as Tenant is not in default of its obligations under the Lease beyond all applicable cure periods, Tenant shall peaceably and quietly have, hold and enjoy the Demised Premises and the appurtenant rights thereto for the full term of the Lease, as the same may be extended or earlier terminated in accordance with the provisions of the Lease, subject to the terms, covenants, conditions, provisions and agreements thereof.

3.      Parent Landlord has agreed in the Mortgage and in that certain Assignment of Rents and Leases from Parent Landlord to Mortgagee of even date therewith, as amended, (the "Assignment") that the rent payable under the Parent Lease shall be paid directly by Parent Tenant to Mortgagee upon the occurrence of a default beyond any applicable notice and cure period by Parent Landlord under the Mortgage. Accordingly, after notice in form reasonably acceptable to Tenant is given by Mortgagee to Tenant that the rents under the Lease should be paid to or at the direction of Mortgagee, Tenant shall pay to Mortgagee without further inquiry, or in accordance with the directions of Mortgagee, all rents and other moneys due and to become due to Landlord under the Lease. Tenant shall have no responsibility to ascertain whether such demand by Mortgagee is permitted under the Mortgage or the Assignment. Landlord hereby waives any right, claim or demand it may now or hereafter have against Tenant by reason of such payment to Mortgagee, and any such payment to Mortgagee shall discharge the obligations of Tenant to make such payment to Landlord and Landlord agrees to indemnify and hold harmless

## EXHIBIT G-2

## SUBORDINATION, NON-DISTURBANCE

## AND ATTORNMENT AGREEMENT

Tenant from and against any expense, claims, losses or damages incurred by Tenant resulting from or arising out of claims by Landlord, its successors or assigns that such rental payments should not have been or cannot be made to Mortgagee or the like.

4.     In the event Mortgagee comes into possession of or acquires title to all or any portion of the Mortgaged Premises as a result of foreclosure or other enforcement of the Mortgage, or as a result of any other means, Tenant agrees to attorn to and accept mortgagee as landlord under the Lease for the balance then remaining of the term of the Lease, subject to all of the terms and conditions of the Lease.

5.     Tenant agrees not to terminate the Lease by reason of any default by Landlord without prior written notice thereof to Mortgagee, and Mortgagee shall have the same opportunity to cure such default as is available to Landlord under the Lease. It is further agreed that such notice will be given to any successor in interest to Mortgagee, provided that, prior to sending any such default notice to Landlord, such successor in interest shall have given written notice to Tenant of its acquisition of Mortgagee's interest and designated the address to which such notice is to be directed.

6.     In consideration of the foregoing agreements of Tenant, Mortgagee agrees that, so long as Tenant is not in default of its obligations under the Lease beyond all applicable cure periods, Mortgagee will not join or name Tenant as a party in any proceedings to foreclose the Mortgage, it will not disturb Tenant's possession of the Demised Premises under the Lease upon Mortgagee's coming into possession of or acquisition of title to all or any portion of the Mortgaged Premises, it will accept the attornment of Tenant, and it will assume and perform (but only while owner of or in possession or control of all or any portion of the Mortgaged and/or Demised Premises) all of Landlord's obligations under the Lease.

7.     Tenant agrees that, if Mortgagee shall succeed to the interest of the landlord under the Lease, Mortgagee shall not be (a) liable for any damages then accrued as the result of any act or omission of any prior landlord (including Landlord) under the Lease, unless Mortgagee was previously notified of such act or omission; (b) subject to any offset against rent or other charges due under the Lease or defense which Tenant might have against any prior landlord, except to the extent such right of offset or defense is specifically set forth in the Lease, or unless Mortgagee was previously notified of the act or event giving rise to such offset or defense; (c) bound by any rent or additional rent which Tenant may have paid for more than the current month to any prior landlord, unless such pre payment was required pursuant to the terms of the Lease; (d) bound by any security deposit which Tenant paid to any prior landlord, unless such security deposit has been received by Mortgagee; or (e) obligated or liable with respect to any representations, warranties or indemnities contained in the Lease.

8.     If Lender acquires title to the Mortgaged Premises as a result of a foreclosure sale or deed in lieu of foreclosure, the Lease shall be automatically amended as follows:

(a)     Section 1.3 shall be deleted and replaced with the following:

> 1.3 Landlord warrants to Tenant that Tenant, while operating a retail store in the Demised Premises, will not be in violation of any agreements which Landlord may have with lenders, governmental entities or any other parties, and Landlord further warrants: that the Demised Premises are zoned to permit use of the Demised Premises as a retail store, as of right (i.e., without any special permit, approval, variance or other waiver).

(b)     The following sentence in Schedule H shall be deleted.

> Landlord shall indemnify, defend and hold Tenant harmless from any liability, loss, cost, damage, claim or expense associated with any asbestos assessment and removal work within the Demised Premises, including, without limitation, any liabilities or clean-up costs

## EXHIBIT G-2
### SUBORDINATION, NON-DISTURBANCE
### AND ATTORNMENT AGREEMENT

associated with the off site disposal or release of any ACM originating from the Demised Premises.

9.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The term "Mortgagee" as used herein shall include, without limitation, the Mortgagee herein specifically named and any of its successors, participants and assigns, including without limitation anyone who shall have succeeded to Landlord's interest in the Lease by, through or under foreclosure of the Mortgage, deed in lieu of foreclosure or other enforcement of the Mortgage.

10.    If the Mortgage is secured by a deed of trust or security deed rather than by a mortgage, all references herein to the Mortgage shall be construed as referring to such other type of security instrument.

11.    In the event that Mortgagee acquires title to the Mortgaged Premises, Mortgagee shall have no obligation nor incur any liability in an amount in excess of Seven Million and No/100 Dollars ($7,000,000) and Tenant's recourse against Mortgagee shall in no event exceed the amount of $7,000,000.

12.    All notices and other communications pursuant to the provisions of this Agreement shall be in writing and shall be sent by registered or certified mail, postage prepaid, return receipt requested, or by a reputable commercial overnight carrier that provides a receipt, such as Federal Express, and shall be deemed given when received and addressed as noted below, or to such' other address or addresses as shall from time to time be designated by notice by any party to the others as herein provided.

If to Tenant:

If to Mortgagee:

        Metropolitan Life Insurance Company
        10 Park Avenue, 3rd Floor
        Morristown, New Jersey 07962
        Attn:  Senior Vice President
            Real Estate Investments

If to Parent Landlord:

        C/o Levin Management Corporation
        893-917 Highway 22
        North Plainfield, New Jersey 07060

If to Parent Tenant:

        1626 East Jefferson Street
        Rockville, Maryland 20852-4041
        Attention:  Legal Department

13.    Landlord agrees to record this Agreement promptly upon full execution of the same. Upon recorded satisfaction of the Mortgage, this Agreement shall become null and void and be of no further effect.

EXHIBIT G-2

SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT

The individuals executing this Agreement hereby represent and warrant that they are empowered and duly authorized to so execute this Agreement on behalf of the parties they represent.

IN WITNESS WHEREOF, the parties have executed this Subordination, Non-Disturbance and Attornment Agreement as of the date hereof.

IT IS RECOMMENDED THAT THE PARTIES CONSULT WITH THEIR ATTORNEYS PRIOR TO THE EXECUTION OF THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT.

WITNESS/ATTEST:

MORTGAGEE:
METROPOLITAN LIFE INSURANCE
COMPANY, a New York corporation

By:_____

_____

CORPORATE SEAL

WITNESS/ATTEST:

PARENT TENANT:
FEDERAL REALTY INVESTMENT
TRUST

By:_____
        Deborah A. Colson
        Vice President, Legal Operations

WITNESS/ATTEST:

TENANT:
BIG LOTS STORES, INC., a
_____ corporation

By:_____
   _____
   _____

By: _____
   _____
   _____

WITNESS/ATTEST:

PARENT LANDLORD:
LEVIN PROPERTIES, L.P.

JHL HOLDINGS, INC., general partner

By:_____
        Janice H. Levin, President

## EXHIBIT G-2
### SUBORDINATION, NON-DISTURBANCE
### AND ATTORNMENT AGREEMENT

STATE OF _____

COUNTY OF _____

On _____, 2004 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

STATE OF _____

COUNTY OF _____

On _____, 2003 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

EXHIBIT G-2

SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT

STATE OF _____

COUNTY OF _____

On _____, 2003 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

STATE OF _____

COUNTY OF _____

On _____, 2003 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

ADDENDUM I

ASBESTOS CONTAINING MATERIALS

Landlord retained an environmental consultant ("Consultant") to perform an asbestos survey (the "Survey") of the Leased Premises. The results of the Survey identified certain items within the Leased Premises that contained asbestos ("Asbestos Containing Materials" or "ACM").

Landlord retained an asbestos abatement contractor ("Contractor") to remove all identified ACM in the Leased Premises. However, in the event that additional ACM are discovered in the Leased Premises, Tenant will not abrade, remove, or engage in any activity that will disturb the ACM. Landlord shall, at Landlord's expense, remove any additional ACM, as and to the extent required by law, provided that such additional ACM were not introduced into the Leased Premises by Tenant, its employees, agents or contractors.

Notwithstanding any other provision in this Lease, in the event that suspected or presumed ACM which were not previously tested ("Suspect ACM") are identified in the Leased Premises, Tenant will not abrade, remove, or engage in any activity that will disturb the Suspect ACM without Landlord's prior written consent, which may be withheld in Landlord's sole discretion. **Landlord shall, at its sole cost and expense, test any Suspect ACM and, if required by applicable laws, rules and regulations, remove any ACM identified by Landlord. To the extent that Tenant is unable to use all or any part of the Leased Premises during any such required removal or inspection period, Rent shall abate proportionately, or, if applicable, the Rent Commencement Date will be extended by one (1) day for each day that Tenant is unable to perform Tenant's Work.**

In addition to any other rights of access to the Leased Premises granted to Landlord in this Lease, Tenant grants Landlord access to the Leased Premises to inspect, sample and abate any Suspect ACM. Landlord hereby agrees to provide Tenant reasonable advance notice of such activities, which will occur, to the extent possible, during non-business hours.

ADDENDUM II

OPTION TO EXTEND

Tenant shall have the option to extend the Term hereof for two (2) additional periods of five (5) years each (hereinafter "Option Period"), subject to the following terms and conditions:

A.      Tenant may exercise such option by giving Landlord written notice, via certified mail-return receipt requested, of its intent to exercise said option, such notice to be received by Landlord at least **nine (9)** months prior to the expiration of the original Term, or the then-current Option Period, as the case may be.

B.      At the time of exercise, (i) Tenant is not in Default under any of its obligations under the Lease, and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use.

C.      All other terms and conditions of this Lease shall remain unchanged and apply during the Option Period except that the Minimum Rent shall be as set forth below:

OPTION I

| LEASE YEAR | ANNUALLY | MONTHLY | PSF |
|------------|----------|---------|-----|
| 11-15 | $319,440.00 | $26,620.00 | $13.31 |

OPTION II

| LEASE YEAR | ANNUALLY | MONTHLY | PSF |
|------------|----------|---------|-----|
| 16-20 | $351,360.00 | $29,280.00 | $14.64 |

D.      If such option is not timely exercised, Tenant's right to renew shall expire and the Lease shall terminate at the end of the Term, or the then-current Option Period, as the case may be.

## ADDENDUM III
### COMPETING BUSINESS

Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease any portion of the Shopping Center as a "Competing Business." A Competing Business is hereby defined as any business which operates as a so-called "closeout store" such as, by way of example only, "Odd Jobs", "Mazel", "Ocean State Job Lots", "Building 19", "Grossman's Bargain Outlet", "Ollie's Bargain Outlet" or "National Wholesale Liquidators".

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business".

If Landlord violates the provisions of this Addendum III, and such violation continues for thirty (30) days after notice from Tenant, provided Tenant continues to operate in the Leased Premises and is not otherwise in default of the Lease, then Tenant may pay, in lieu of Rent an amount equal to the lesser of (a) four percent (4%) of the amount of all Tenant's Gross Sales made from or at the Leased Premises or (b) fifty percent (50%) of the then current Rent ("Reduced Rent") until such violation is cured. Notwithstanding the foregoing, if another tenant or occupant in the Shopping Center violates a provision of its lease or license agreement regarding its premises, and Landlord, after receipt of notice from Tenant advising of such violation, commences an action (or arbitration, if required by such lease or license agreement) against such other tenant or occupant, and thereafter uses diligent efforts to enforce its rights under such lease or license agreement and to obtain Judicial Relief, Tenant shall not have the right to pay Reduced Rent. For purposes hereof, "Judicial Relief" shall mean a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the lease violation. Upon the request of Tenant, Landlord shall be required to appeal any adverse decision denying Judicial Relief. Landlord shall include in every lease for the Shopping Center entered into hereafter a specific prohibition against violating Tenant's exclusive rights.

ADDENDUM IV

CONSTRUCTION ALLOWANCE

Landlord and Tenant hereby agree that Landlord shall pay to Tenant as a construction allowance an amount equal to Three Hundred Twelve Thousand Six Hundred Twenty-Four and 00/100 Dollars ($312,624.00) (hereinafter "Construction Allowance"). **Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Leased Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.**

1.    Payment of Construction Allowance.

Providing (i) Tenant is not in monetary default **beyond applicable notice and cure periods** at the time the payment is due, as that term is defined in Section 1.01 of this Lease, the Construction Allowance will be paid by Landlord to Tenant within thirty (30) days after the later of the following occurs: (i) the following list of documents have been submitted to Landlord for Landlord's prior approval (hereinafter "Required Documentation"); and (ii) the date Tenant actually opens the Leased Premises for business to the general public in compliance with the Lease.

2.    Required Documentation.

(i)    **Notice of Completion.** Notice from Tenant or its general contractor certifying in writing to Landlord, and Landlord approves such certification, that one hundred percent (100%) of the Tenant's Work, as specified in Exhibit "B", is completed.

(ii)    **Lien Waivers.** Final unconditional releases of liens (which <u>must</u> be on the form attached hereto as Schedule I) executed by all applicable suppliers, materialmen, contractors and subcontractors **performing work in excess of Five Thousand Dollars ($5,000.00).**

(iii)    **Affidavit of Payment.** The affidavit (which <u>must</u> be on the form attached hereto as Schedule II) listing on the attached Schedule A (a) the names of all contractors, subcontractors, suppliers and materialmen **performing work in excess of Five Thousand Dollars ($5,000.00)** who provided or supplied, labor, services, goods and materials to the Leased Premises, and (b) that all listed contractors, subcontractors, suppliers and materialmen have been paid in full for the labor, services, goods and materials provided or supplied to the Leased Premises as of the date of the affidavit.

(iv)    **Certificate of Occupancy.** A permanent or temporary Certificate of Occupancy for the Leased Premises.

(v)    **Form W-9 Request for Taxpayer Identification Number and Certification.** Tenant must submit to Landlord a Form W-9 with Tenant's taxpayer identification number completed.

Failure to satisfactorily supply any of the above stated Required Documentation shall result in the Construction Allowance being held by Landlord until such Required Documentation has been satisfactorily submitted to Landlord.

3.    Third Persons.

Under no circumstances shall this Lease, or any Addendum thereto, be construed to confer upon any third person or entity any right or cause of action against the Landlord or Tenant, including, but not limited to, all contractors, subcontractors, suppliers, laborers or materialmen.

ADDENDUM IV

CONSTRUCTION ALLOWANCE

4.    Tenant's Right to Set-Off.

Provided that Tenant has satisfied all of the conditions set forth herein and is not otherwise in Default under this Lease, if Landlord fails to pay Tenant the Construction Allowance in accordance with the provisions of this Addendum IV, Tenant shall have the right to offset the amount due Tenant from Landlord, including Interest accrued thereon from the date when due, against future Rent payments until the amount due Tenant is fully paid.

ADDENDUM IV
CONSTRUCTION ALLOWANCE

SCHEDULE I
WAIVER AND RELEASE UPON FINAL PAYMENT

OWNER:          FEDERAL REALTY INVESTMENT TRUST

GENERAL CONTRACTOR/SUBCONTRACTOR/SUPPLIER SUPPLYING THIS WAIVER
AND RELEASE: _____

PROJECT NAME: _____


STATE OF _____

COUNTY OF _____

My/our contract with _____ [Other Contracting Party] to
provide _____ for the improvement to the property described
as _____ having been fully paid and satisfied, all my/our
construction lien rights against such property are hereby waived and released.

ADDITIONAL WARRANTIES AND REPRESENTATIONS

1.     The undersigned signatory warrants and represents that he has full authority to
execute this Waiver and Release Upon Final Payment for the firm or company listed below.

2.     The undersigned signatory has personal knowledge of the facts sworn to in this
Waiver and Release Upon Final Payment and such facts are true and correct.

3.     The undersigned has performed all work required under its contract, pursuant to
the terms and conditions of its contract, and in conformance with all plans and specifications for
the work.

4.     Any and all contractors, subcontractors, laborers, suppliers and materialmen that
have provided labor, material or services to the undersigned for use or incorporation into the
construction of the improvements to the Property have been paid and satisfied in full, and there
are no outstanding claims of any character arising out of, or related to, the undersigned's
activities on, or improvements to, the Property.

5.     There are no unsatisfied claims for damages resulting from injury or death to any
employees, subcontractors, or the public at large arising out of any of the undersigned's activities
on or improvements to the Property.

6.     There are no Claims of Lien, Preliminary Notices of Lien, or any suits or claims
for payment, loss or damage of any kind, nature or description which might constitute a lien
upon the Property as of the date of this Waiver and Release Upon Final Payment.

7.     This Waiver and Release Upon Final Payment is specifically made for the benefit
of the Owner and the Owner's lender, any tenant and lender of any tenant, and any other person
or entity with a legal or equitable interest in the Property, and may be relied unconditionally
upon by any of the aforementioned parties.

8.     The undersigned is executing this Waiver and Release Upon Final Payment, as
provided by law, for and on behalf of the undersigned for the express purpose of inducing and
receiving final payment from the Owner (or Tenant or Lender) for work or improvements to the
Property.

9.     This Waiver and Release Upon Final Payment constitutes a representation by the
undersigned signatory, for and on behalf of the undersigned, that the payment referenced above,
once received, constitutes full and complete payment for all work performed, and all costs or
expenses incurred (including, but not limited to, costs for supervision, field office overhead,
home office overhead, interest on capital, profit, and general conditions costs) relative to the
work or improvements at the Property. The undersigned hereby specifically waives, quitclaims

ADDENDUM IV

CONSTRUCTION ALLOWANCE

and releases any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have against the Owner, the Tenant, or any other person or entity with a legal or equitable interest in the Property, relative to the work or improvements at the Property.

In Witness Whereof, the person signing this document, acting for and on behalf of the undersigned and all of its employees, subcontractors, laborers, suppliers and materialmen, has placed his hand and seal this _____ day of _____, 20__.

Sworn to and subscribed before me this ___ day of _____, 20__.

FIRM OR COMPANY:

_____

By: _____

_____

Notary Public

(NOTARY SEAL)

Print Name: _____

Its: _____

My Commission Expires:

_____

ADDENDUM IV
CONSTRUCTION ALLOWANCE

SCHEDULE II
AFFIDAVIT

_____, being duly sworn according to law, deposes and states that he/she is the _____ of _____, that he/she is executing this agreement on behalf of _____, and that the following facts are true and correct to the best of his/her knowledge, information and belief:

1.    Attached hereto as Schedule A is a true and correct list of all contractors, subcontractors, materialmen and other parties who have furnished labor, services, goods or materials in the construction, installation, modification and repair of improvements commonly known as the _____, located at _____, _____, _____; and

2.    That all of the parties listed on Schedule A have been paid in full for all labor, services, goods or materials utilized in the construction, installation, modification and repair of improvements commonly known as _____, except for the monies owed to those parties, if any, listed in Schedule A attached hereto.

Further Affiant Sayeth Not.

Firm: _____

)

By: _____
Name: _____
Title: _____

*********************************************************

STATE OF _____    )
                                                          )
COUNTY OF _____    )

I, _____, a Notary Public for said County and State, do hereby certify that _____ personally appeared before me this day and acknowledged that due execution of the foregoing instrument.

Witness my hand and notarial seal this ____ day of _____, 20___.

_____
Notary Public

[Notarial Seal]    My Commission Expires: _____

ADDENDUM IV
CONSTRUCTION ALLOWANCE

SCHEDULE A

| FIRM NAME | CONTRACT AMOUNT | TELEPHONE NUMBER |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## ADDENDUM V

### STORAGE TRAILER

Tenant shall have the right, subject to applicable laws, rules and regulations, at its sole cost and expense and pursuant to plans approved in advance by Landlord, to place a storage trailer in an area immediately behind the Leased Premises, the specific location of which will be mutually agreed upon between Landlord and Tenant (the "Trailer Area"). Tenant, at its sole cost and expense, shall be responsible for maintaining the Trailer Area and the areas adjacent thereto. For all purposes under the Lease the Trailer Area shall be deemed to be a part of the Leased Premises, except for the purposes of determining Tenant's Minimum Rent, Tax Rent and Tenant's Share of Controllable Operating Costs and Tenant's Share of Non-Controllable Operating Costs. Tenant shall, at its sole cost and expense, arrange for the furnishing of all utilities, if any, necessary for the utilization of the Trailer Area.

## ADDENDUM VI

### LEASE CONTINGENCY

A.     Landlord and Tenant hereby agree that this Lease shall be contingent upon Tenant obtaining all necessary governmental permits, approvals and licenses for the building and operation of Tenant's business in the Leased Premises in accordance with the Permitted Use as defined in Section 1.01 of this Lease.  Tenant agrees to diligently pursue obtaining such governmental permits, approvals and licenses (hereinafter "Permits").  Tenant shall be deemed to be diligently pursuing the Permits if Tenant is in compliance with the following:  (i) Tenant submits to the proper governmental authority all required documents, plans and specifications detailed in full to obtain all Permits required for Tenant's work detailed in Exhibit B within the time specified therefor in Exhibit B of this Lease; (ii) Tenant pays in a timely manner all fees required by the governmental authorities in order to obtain Permits required for Tenant's work detailed in this Exhibit B; and (iii) Tenant cooperates with the governmental authority by submitting additional information or documents as required by the governmental authority in a timely manner and by responding to any questions or comments from the governmental authority in a timely manner.

In the event Tenant is unable to obtain the necessary permits, approvals and licenses as set forth above within sixty (60) days from the date of this Lease, either party shall have the right to terminate this Lease upon ten (10) days' prior written notice to the other party, provided, however, notice of termination by a party which has not acted reasonably, in good faith, and in accordance with the terms of this Addendum shall be null and void.

B.     Landlord and Tenant hereby agree that this Lease shall be contingent upon Landlord approving Tenant's plans and specifications for Tenant's Work as and to the extent required by Exhibit B.  If Tenant's plans and specifications have not been approved on or before thirty (30) days following Landlord's receipt thereof, then either party shall have the right to terminate this Lease upon ten (10) days' prior written notice to the other party, provided, however, notice of termination by a party which has not acted reasonably, in good faith, and in accordance with the terms of this Addendum shall be null and void.

## ADDENDUM VII

## SATELLITE DISH/ANTENNA INSTALLATION

Landlord hereby agrees that Tenant may install a satellite dish/antenna meeting the specifications as detailed in this Addendum (hereinafter the "Equipment") on the roof of the Leased Premises provided that Tenant is in full compliance with the following:

1.      The Equipment shall be installed by a contractor and in a location both approved in advance by Landlord. Tenant shall obtain Landlord's approval of detailed plans for the Equipment which shall include, without limitation, the proposed dimensions, type, design, location and the method and manner of installation (the "Final Plans"); however, in no event shall the Equipment be visible from the front of the Shopping Center, and if required by Landlord, shall be shielded from public view with materials consistent with the overall design of the Shopping Center. Tenant agrees that the Final Plans shall not be changed by Tenant without the prior written consent of Landlord.

2.      For the purpose of this Addendum VII only, Tenant acknowledges that it accepts the area of the roof designated by Landlord for such installation in its "AS IS" condition, with no representation or warranty by Landlord as to the condition or suitability of the roof or of the Shopping Center for Tenant's purpose.

3.      Tenant shall obtain all governmental approvals and permits required for the installation and operation of the Equipment and otherwise perform all work in a good, workmanlike manner and operate the Equipment in compliance with all applicable Federal, state and local laws, ordinances, statutes, codes and regulations, including without limitation, the Federal Communications Commission (FCC). Furthermore, Tenant, at its sole cost and expense, shall comply with all applicable laws relating to the Shopping Center, to the extent that compliance with same arises out of Tenant's use of the Equipment, including without limitation, its installation or operation of the Equipment thereon.

4.      Tenant's use of the Equipment shall be subject to the rights of any existing tenants and shall not interfere with any existing tenant's frequencies. In the event the Equipment does interfere with any existing tenants' frequencies, Tenant, at Tenant's sole cost and expense, shall be responsible for correcting any interference which occurs.

5.      Tenant shall maintain the Equipment, in good order, condition and repair.

6.   .   Tenant shall promptly repair any damage to the roof or any other portion of the Shopping Center caused by the installation, maintenance, operation and/or removal of the Equipment.

7.      In the event that any work is required to be done to the roof in connection with or related to the installation, maintenance, operation and/or removal of the Equipment, including without limitation, any roof or ceiling penetrations, such work shall be performed by Landlord's roofer, or a roofer acceptable to Landlord. Tenant shall employ such roofer as Tenant's own agent and contractor and the work shall be performed in such a manner that will not damage the roof or invalidate any roof warranties.

8.      Tenant's right to install, transmit signals from and receive signals through, the Equipment shall be personal to Tenant, and shall be null and void and of no further force or effect upon the earlier of (a) the expiration or earlier termination of this Lease or (b) a transfer or other assignment of Tenant's interest in the Lease to a third party. In addition to such other rights and remedies which Landlord may have in the event of a breach of this provision, Landlord may (i) seek mandatory injunctive relief enjoining the operation of the Equipment; and (ii) as partial and temporary liquidated damages, collect from Tenant all profits generated by the use of the Equipment by entities other than Tenant.

9.      Tenant shall not voluntarily or involuntarily, by operation of law or otherwise: (i) transfer, assign, mortgage, encumber, pledge, hypothecate, or assign all or any of its interest in the Equipment, or (ii) sublet or permit the Equipment, or any part of the roof, to be used by others including, but not limited to concessionaires or licensees; without the prior written consent of Landlord, in each instance, which consent Landlord may withhold in its sole and absolute discretion.

### ADDENDUM VII
### SATELLITE DISH/ANTENNA INSTALLATION

10.     Tenant shall remove the Equipment at the expiration or earlier termination of the Lease or in the event that Tenant is no longer operating a business within the Leased Premises. If Tenant fails to remove the Equipment or make repairs as and when required pursuant to this Addendum Landlord may immediately dispose of same or perform said repairs at Tenant's expense (which shall be deemed to be Additional Rent under the Lease) without giving notice.

11.     Tenant shall indemnify, defend and hold Landlord and Federal Realty Investment Trust (if Federal Realty Investment Trust is not the Landlord under the Lease), their agents, officers, directors, trustees and employees, harmless against any and all claims, damages, costs and expenses arising out of the installation, maintenance, operation and removal of the Equipment or the use and occupancy of the roof by the Tenant.

12.     Landlord shall have access to the area surrounding the Equipment as needed in order to (i) inspect the Equipment, (ii) properly maintain and repair the roof and other areas of the Shopping Center, and (iii) exhibiting the roof for purpose of sale, lease, ground lease or financing of the Shopping Center. In the event that Landlord is performing work on the roof, Tenant agrees at its sole risk and expense, if required by Landlord, to temporarily remove or relocate the Equipment in order to facilitate such work.

## ADDENDUM VIII
## PROHIBITED USES

Landlord, its subsidiaries, affiliates, successors, assigns, officers, and managers shall not lease any space in the Shopping Center (except as hereinafter specified), and Tenant shall not use the Leased Premises for any of the following uses: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Leased Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall, excluding the Redevelopment Area as shown on Exhibit A; (iv) for any self storage facilities, excluding the Redevelopment Area; (v) for any medical facilities or offices other than medical uses typically found in Shopping Centers such as dental, chiropractic, optical, pediatric or small doctors' offices other than the Redevelopment Area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers, excluding the Redevelopment Area; (ix) for any governmental use or office or any social service functions or facilities, excluding the Redevelopment Area; (x) for the operation of a massage parlor or bath house, adult book (which shall not be deemed to include any general interest book stores such as Barnes & Noble or Borders Books) or adult video store (which shall not be deemed to include a general video store such as Blockbuster or Hollywood Video), or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas which are visible from outside of any such premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates noxious noise, sound, vibration, litter or odor; (xii) for a night -club or discotheque, tavern, bar (unless incidental to a permitted restaurant use), cocktail lounge or similar establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment (unless incidental to a permitted restaurant use) or the sale of alcoholic beverages unless incidental to a permitted restaurant use; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor (unless incidental to a permitted restaurant use), amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa (excluding day spas under 4,000 s.f.), health club, exercise club, gymnasium or other similar operations excluding the Redevelopment Area and excluding a "Curves" or "Ladies Fitness" type operation or small health club under 2,500 square feet of Floor Area; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations) except that car leasing shall be permitted within the Redevelopment Area; (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant (excluding pickup stores or a plant operated on a closed loop system or other recognized up-to-date system) or coin operated laundromat unless the laundromat is under 4,000 square feet of Floor Area; (xx), unless located in the Redevelopment Area, for a day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, unless located within the Redevelopment Area, animal boarding, training or raising facilities; (xxii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility excluding lottery tickets sold in convenience stores; (xxiii) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxiv) for any astrology, palm reading, tarot card or other like service or facility; or (xxv) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the "Prohibited Uses".

Notwithstanding anything to the contrary contained herein, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, or replacements who currently have leases which permit such tenants to operate for a "Prohibited Use".

ADDENDUM IX

ENVIRONMENTAL INDEMNITIES

"Hazardous Substances" shall mean (i) hazardous or toxic substances, wastes, materials, pollutants and contaminants which are included in or regulated by any federal, state or local law, regulation, rule or ordinance, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, and the Toxic Substances Control Act, as any of the foregoing may be amended from time to time, and (ii) petroleum products, (iii) halogenated and non-halogenated solvents, and (iv) all other regulated chemicals, materials and solutions.

"Environmental Law" or "Environmental Laws" shall mean: (i) the Comprehensive Environmental Response, Compensation, and Liability Act, (42 U.S.C. Section 6901 et seq.), as amended; (ii) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), as amended; (iii) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 11001 et seq.), as amended; (iv) the Clean Air Act (42 U.S.C. Section 7401 et seq.), as amended; (v) the Clean Water Act (33 U.S.C. Section 1251 et seq.), as amended; (vi) the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), as amended; (vii) the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), as amended; (viii) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 136 et seq.), as amended; (ix) the Safe Drinking Water Act (42 U.S.C. Section 300F et seq.), as amended; (x) any state, municipal or local statutes, laws or ordinances similar or analogous to the federal statutes listed in parts (i)-(ix) of this provision; (xi) any amendments to the statutes, laws or ordinances listed in part's (i)-(x) of this provision, regardless of whether in existence on the date hereof; (xii) any rules, regulations, guidelines, directive, orders or the like adopted pursuant to or implementing the statutes, laws, ordinances and amendments listed in parts (i)-(xi) of this provision; and (xiii) any other law, statute, ordinance, amendment, rule, regulation, guideline, directive, order or the like in effect now or in the future relating to environmental, health or safety matters.

Tenant will defend, indemnify and hold harmless Landlord, its agents, employees, contractors, successors and assigns, from and against any and all liabilities, actions, demands, penalties, losses, costs and expenses (including, without limitation, reasonable attorneys' fees, consultants' fees and remedial costs), suits, costs of any settlement or judgment and claims which may be paid, incurred or suffered by Landlord as a result of the presence on or under the Leased Premises or Shopping Center of Hazardous Substances, which such presence is due to any act or omission of Tenant (its agents, employees, contractors or invitees) which is (a) negligent, (b) unlawful, or (c) in violation of Tenant's obligations pursuant to the Lease.

Subject to Section 17.06 of the Lease, Landlord will defend, indemnify and hold harmless Tenant from and against any and all liabilities, actions, demands, penalties, losses, costs or expenses (including, without limitation, reasonable attorneys' fees, consultants' fees and remedial costs), suits, costs of any settlement or judgment and claims which may be paid, incurred or suffered by Tenant as a result of the presence on or under the Leased Premises of Hazardous Substances, which presence is due to any act or omission of Landlord (its agents, employees and contractors) which is (a) negligent, (b) unlawful, or (c) in violation of Landlord's obligations pursuant to this Lease.

Landlord shall not be liable under this provision for the acts or omissions of third parties.

Landlord, at its own cost and without undue delay, shall provide for the defense of Tenant in judicial, regulatory and administrative proceedings against Tenant arising out of any actual or alleged violation of any Environmental Law with regard to pre-existing contamination (i.e., contamination that existed as of the Term Commencement Date), and Landlord shall indemnify and hold harmless Tenant from any liability, loss, cost or expense resulting to Tenant from any finding, judgment, injunction, order, or decree against Tenant in or arising out of any such judicial, regulatory or administrative proceeding, provided that Tenant shall notify Landlord in writing within ten (10) days of the date that Tenant first becomes aware of any such judicial, regulatory or administrative proceedings or any claim which may give rise thereto, and provided further that any actual violation of

### ADDENDUM IX
### ENVIRONMENTAL INDEMNITIES

any Environmental Law giving rise to such proceeding shall not be the result of any act of omission on the part of Tenant.