**EXHIBIT "A"**



4900 EAST DUBLIN GRANVILLE ROAD
COLUMBUS, OHIO 43081-7651

July 1, 2019

**VIA CERTIFIED MAIL**
7018 1830 0002 2465 5428

(561) 860-9402

Lawrenceville Commercial Properties, LLC
5801 Congress Avenue
Suite 219
Boca Raton, FL 33487

Re:     **BIG LOTS #370 Lawrenceville, GA**
        Lease Agreement by and between Lawrenceville Commercial Properties, a Florida limited
        liability company (Landlord), successor-in-interest to MLV L.L.C., a Georgia limited liability
        company, successor-in-interest to The Equitable Life Assurance Society of the United States, a
        New York corporation and Big Lots Stores, Inc., an Ohio corporation, f/k/a Consolidated Stores
        Corporation ("Tenant") dated October 5, 1989 (the "Lease").

Dear Landlord:

Pursuant to the Lease Agreement, Tenant hereby exercises its option to extend the term of the Lease commencing
February 1, 2020 and expiring on January 31, 2025 ("Third Option Term"). Guaranteed Minimum Rent will be
One Hundred Forty-Nine Thousand Seventy-Two and 00/Dollars ($149,072.00) per annum, payable in equal
monthly installments of Twelve Thousand Four Hundred Twenty-Two and 67/100 Dollars ($12,422.67).

Thank you.


**BIG LOTS STORES, INC., an Ohio corporation**
**f/k/a Consolidated Stores Corporation**


Timothy A. Johnson
Executive Vice President
Chief Administrative Officer &
Chief Financial Officer


TAJ/smm

## FOURTH LEASE EXTENSION AND MODIFICATION AGREEMENT

This Fourth Lease Extension and Modification Agreement is made and entered into this 3rd day of July____, 2014 (this "Agreement") by and between Lawrenceville Commercial Properties, L.L.C., a Florida limited liability company, whose mailing address is 5801 Congress Avenue, Boca Raton, Florida 33487 (hereinafter referred to as "Landlord"), and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, whose mailing address is 300 Phillipi Road, Department 10051, Columbus, OH 43228-5311, (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated October 5, 1989, as amended, for approximately 27,104 square feet in the Lawrenceville, Georgia (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to extend the current term of the Lease for an additional five (5) years, and the addition of two (2) options to further extend the term of the lease for five (5) year periods each as provided for herein.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1. Landlord and Tenant hereby agree that the Term of the Lease is extended for five (5) years commencing February 1, 2015, and expiring on January 31, 2020 (the "Third Extended Term").

2. During the Third Extended Term, Guaranteed Minimum Rent shall be in the amount of ONE HUNDRED THIRTY-FIVE THOUSAND FIVE HUNDRED TWENTY AND 00/100 DOLLARS ($135,520.00) per annum, payable in equal monthly installments of ELEVEN THOUSAND TWO HUNDRED NINETY-THREE AND 33/100 DOLLARS ($11,293.33).

3. During the Third Extended Term, Tenant shall pay Percentage Rent in an amount equal to two and one half percent (2½%) of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $5,420,800.00.

4. During the Third Extended Term, Tenant shall continue to pay its pro rata share of such Common Area Charges pursuant to Section 5.D. of the Lease.

5. During the Third Extended Term, Tenant shall continue to pay its pro rata share of such Taxes and Assessment pursuant to Section 5.E. of the Lease.

6. During the Third Extended Term, Tenant shall continue to pay its pro rata share of Insurance Premiums pursuant to Section 13.B. of the Lease.

7. Landlord hereby grants to Tenant two (2), additional options to extend the term of the Lease for five (5) year periods each, referred to as the "Third Option Term" and the "Fourth Option Term". The Third Option Term, if exercised, shall commence at the end of the Third Extended Term of the Lease, and the Fourth Option Term, if exercised, shall commence at the end of the Third Option Term under the leases upon the same terms and conditions as contained in the Lease except as provided herein and shall terminate when exercised. If Tenant is then in possession of the Demised Premises, and not in default beyond any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) months prior to the expiration of the previous Term.

8. Guaranteed Minimum Rent applicable during the Third Option Term shall be in the amount of ONE HUNDRED FORTY-NINE THOUSAND SEVENTY-TWO AND 00/100 DOLLARS ($149,072.00) per annum, payable in equal monthly installments of TWELVE THOUSAND FOUR HUNDRED TWENTY-TWO AND 67/100 DOLLARS ($12,422.67); and Guaranteed Minimum Rent applicable during the Fourth Option Term shall be in the amount of ONE HUNDRED SIXTY-TWO THOUSAND SIX HUNDRED TWENTY-FOUR AND 00/100 DOLLARS

($162,624.00) per annum, payable in equal monthly installments of **THIRTEEN THOUSAND FIVE HUNDRED FIFTY-TWO AND $^{00}/_{100}$ DOLLARS** ($13,552.00)

9.  During the Third Option Term, Tenant shall pay Percentage Rent in an amount equal to two and one half percent (2½%) of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $5,962,880.00; and during the Fourth Option Term, Tenant shall pay Percentage Rent in an amount equal to two and one half percent (2½%) of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $6,504,960.00.

10. During the Third Option Term and the Fourth Option Term, Tenant shall continue to pay its pro rata share of such Common Area Charges pursuant to Section 5.D. of the Lease.

11. During the Third Option Term and the Fourth Option Term, Tenant shall continue to pay its pro rata share of such Taxes and Assessment pursuant to Section 5.E. of the Lease.

12. During the Third Option Term and the Fourth Option Term, Tenant shall continue to pay its pro rata share of Insurance Premiums pursuant to Section 13.B. of the Lease.

13. Landlord shall install a new façade on Tenant's Demised Premises no later than March 31, 2015 per the attached proposed exterior façade renovation referred to as Exhibit A.

Landlord hereby consents pursuant to 11 U.S.C. §365(d) (4) (B) (ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

Except as modified herein, all other terms and conditions of the Lease shall continue in full force and effect. In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

(signatures and acknowledgements follow immediately on the next page)

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**LANDLORD:**

LAWRENCEVILLE COMMERCIAL PROPERTIES, L.L.C., a Florida limited liability company

WITNESS: _____

BY: _____

ITS: _____

**TENANT:**

BIG LOTS STORES, INC., an Ohio corporation

WITNESS: _____

BY: _____
Timothy A. Johnson
ITS Executive Vice President
Chief Financial Officer

(Acknowledgements follow immediately on the next page)

(Tenant's Acknowledgement)

STATE OF OHIO                )
                             )
County of  Franklin          )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Big Lots Stores, Inc., an Ohio corporation,** by Kevin R. Day, its **Vice President,** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this 3rd day of July , 2014.

Courteney Robertson
Notary Public, State of Ohio
My Commission Expires 08/22/2016

_Courtney Robertson_
Notary Public

(Landlord's Acknowledgement)

STATE OF Florida

County of Palm Beach

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Lawrenceville Commercial Properties, L.L.C., a Florida limited liability company, by Rogelio Sarmora , its Vice President who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at 4:44 pm , this 26th day of June , 2014.

PHILLIP J. CANNON
MY COMMISSION EXPIRES
May 18, 2019
#EE 178706
Bonded thru
NOTARY PUBLIC, STATE OF FLORIDA

Notary Public

## THIRD LEASE EXTENSION AND MODIFICATION AGREEMENT

This Third Lease Extension and Modification Agreement is made and entered into this _14th_ day of _July_, 2009 (this "Agreement") by and between Lawrenceville Commercial Properties, L.L.C., a Florida limited liability company, whose mailing address is 5801 Congress Avenue, Boca Raton, Florida 33487 (hereinafter referred to as "Landlord"), and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, whose mailing address is 300 Phillipi Road, Department 10051, Columbus, OH 43228-0512, (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated October 5, 1989, as amended, for approximately 27,104 square feet in the Lawrenceville, Georgia (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to modify the Lease to replace Tenant's exercise of the Second Option Term at a modified rent.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1. Pursuant to the Lease, Tenant hereby exercises its option to extend the term of the Lease commencing February 1, 2010, and expiring January 31, 2015 (the "Second Option Term"), under the terms and conditions set forth herein.

2. During the Second Option Term, Tenant shall pay Guaranteed Minimum Rent in the amount of ONE HUNDRED THIRTY-ONE THOUSAND FOUR HUNDRED FIFTY-FOUR AND $^{40}/_{100}$ DOLLARS ($131,454.40) per annum, payable in equal monthly installments of TEN THOUSAND NINE HUNDRED FIFTY-FOUR AND $^{00}/_{100}$ DOLLARS ($10,954.54); and

3. During the Second Option Term, Tenant shall pay Percentage Rent in an amount equal to two and one-half percent (2- ½ %) of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of **$5,258,176.00**.

4. During the Second Option Term, Tenant shall continue to pay its pro rata share of Common Area charges pursuant to the terms specified therein.

5. During the Second Option Term, Tenant shall continue to pay its pro rata share of Real Estate Taxes pursuant to the terms specified therein.

6. During the Second Option Term, Tenant shall continue to pay its pro rata share of Insurance Premiums pursuant to the terms specified therein.

7. Tenant shall retain its two (2), remaining five (5) year options to extend the Term of the Lease pursuant to the terms and conditions set forth in the Lease.

Landlord hereby consents pursuant to 11 U.S.C. §365(d) (4) (B) (ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

Except as modified herein, all other terms and conditions of the Lease shall continue in full force and effect. In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**LANDLORD:**

LAWRENCEVILLE COMMERCIAL
PROPERTIES, L.L.C., a Florida limited liability
company

WITNESS: _____

BY: _____

ITS: _Managing Member_

**TENANT:**

BIG LOTS STORES, INC., an Ohio corporation

WITNESS: _____

BY: _____
Kevin R. Day
ITS:    Vice President

(Acknowledgements follow immediately on the next page)

(Tenant's Acknowledgement)

STATE OF OHIO          )
                       )
County of  Franklin    )

     Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Big Lots Stores, Inc., an Ohio corporation**, by Kevin R. Day, its **Vice President**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

     **IN WITNESS WHEREOF**, I hereunto set my hand and the official seal, at Columbus, Ohio, this _14th_ day of _July_ , 2009.

                               Notary Public

                                      ANDREA L. TURNER
                              NOTARY PUBLIC, STATE OF OHIO
                        MY COMMISSION EXPIRES 4/24/2010

(Landlord's Acknowledgement)

STATE OF _Florida_

County of _Palm Beach_

     Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Lawrenceville Commercial Properties, L.L.C., a Florida limited liability company, by _Fred Bilowit_ , its _Managing Member_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

     **IN WITNESS WHEREOF**, I hereunto set my hand and the official seal, at _____, this _10_ day of _July_ , 2009.

                                 Notary Public

                        PHILLIP J. CANNON
                        MY COMMISSION EXPIRES
                        May 18, 2012
                        #DD 758345
                        NOTARY PUBLIC, STATE OF FLORIDA

## SECOND LEASE EXTENSION AND MODIFICATION
## AGREEMENT BL #370

This Second Lease Extension and Modification Agreement is made and entered into this ___29th___ day of ___March___, 2004, by and between MLV L.L.C., a Georgia limited liability company ("Landlord") with its business address at c/o Stavins & Axelrod Properties, Inc., 1730 Rhode Island Avenue, N.W., Suite 909, Washington, D.C. 20036 and Big Lots Stores, Inc., an Ohio corporation (fka Consolidated Stores Corporation) ("Tenant") with its business address at 300 Phillipi Road, Department 10061, Columbus, OH 43228-0512.

**WHEREAS,** Landlord and Tenant entered into a Lease dated October 5, 1989, as amended (collectively, the "Lease") for the premises located in the city of Lawrenceville, state of Georgia, as more particularly described in the Lease.

**WHEREAS,** Landlord and Tenant mutually desire to provide for certain additions and modifications to the terms and provisions of said Lease.

**NOW THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    The term of the Lease is hereby extended for five (5) years from February 1, 2005 through and including January 31, 2010 (the "Second Extended Term"), at the Guaranteed Minimum Rent of One Hundred Twenty-Four Thousand Six Hundred Seventy-Eight and 40/100 Dollars ($124,678.40) per annum, payable in equal monthly installments of Ten Thousand Three Hundred Eighty-Nine and 87/100 Dollars ($10,389.87). Percentage Rent during the Second Extended Term shall be an amount equal to two and one-half percent (2 1/2%) of Tenant's Gross Sales in excess of Two Million Seven Hundred and Fifty Thousand and 00/100 Dollars ($2,750,000.00) and otherwise upon the same terms and conditions as contained in the Lease except as provided herein; and

2.    Common Area Maintenance: Throughout the Term of this Lease, Landlord shall be responsible for the following: operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas (including all non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees, the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center); and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs and other traffic control signs as are reasonably required to effect the site plan;

(i)    providing security, lighting and policing if necessary, and on-site and offsite traffic control;

(ii)    maintaining all paved surfaces in a level and smooth condition, reasonably free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(iii)    cleaning, sweeping, snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

3.    Common Area Charges: Tenant agrees to pay to Landlord a pro rata share of the Common Area Charges (hereinafter defined) as set forth herein. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the ground leasable floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center.

Common Area Charges shall consist of all reasonable costs and expenses of any kind incurred by Landlord in operating, policing, protecting, insuring, managing, equipping, lighting, repairing, replacing, supervising, and maintaining the Shopping Center and the Common Areas, including, but not limited to, the cost and expense of: management and supervision, refurbishing, repairing, maintaining, replacing, and improving (but less the

amount of any insurance proceeds, or condemnation awards) (subject to certain limitations set forth below), lighting, line painting, landscaping, providing security, providing public liability, property damage, and fire and extended coverage on the common facilities, total compensation and benefits (including premiums for worker's compensation and other insurance paid to or on behalf of employees; personal property, supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, and parking area surcharges or levies, and a ten percent (10%) administrative fee on all of such charges (except any management fee included therein) for administering same.

Notwithstanding provisions hereof to the contrary, for the purpose of determining Tenant's pro rata share of such Common Area Charges: the cost of any replacements (of parking areas and the like) which are properly characterized as capital expenditures in accordance with generally accepted accounting principles shall (for the purpose of their inclusion in the Common Area Charges payable by Tenant), be amortized, on a straight line basis, over at least a five (5) year period (or such other period as may be appropriate under the circumstances); and

(i)    notwithstanding the terms of clause (i) above, the parties agree that any repaving of any portion of the Common Areas of which costs in excess of $15,000.00 during any calendar year shall constitute a capital expenditure which must be amortized in accordance with the terms of clause (i) above, and a repaving of any portion of the Common Areas which costs less than $15,000.00 during any calendar year shall not constitute a capital expenditure, but rather a "repair";" and

(ii)   Tenant's total obligation with respect to Common Area Charges (including insurance) during the first Lease Year will not exceed $48,271.00 ($1.78 per square foot);

(iii)  For the purpose of calculating Tenant's pro rata share of Common Area Charges for calendar years during the Term after 2005, the Controllable Common Area Charges (as defined below) for any calendar year shall be limited to the Controllable CAM Cap (as hereinafter defined). The Controllable CAM Cap for any such calendar year shall be an amount equal to Landlord's actual Controllable Common Area Charges for calendar year 2005 increased by five percent (5%) annually, on a cumulative basis, for each calendar year following 2005 through the calendar year in question. For the purposes hereof the term "Controllable Common Area Charges" shall mean all Common Area Charges except: utilities costs, sales, use and any other taxes, cost of insurance, and costs associated with procuring permits and licenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimate pro rate share of Common Area Charges as reasonably determined by Landlord. If the Rent Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of Common Area Charges for the fractional month between the Rent Commencement Date and the last day of the calendar month in which such Rent Commencement Date occurs shall be prorated on a per diem basis (calculated on the number of days in such month) and shall be paid together with the first payment of Fixed Minimum Rent.

After the end of 2005 (the first calendar year during the Term), Tenant shall continue to pay such estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein) . Such estimated Common Area Charges may be adjusted and revised by Landlord after the end of each calendar year during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding calendar year and the expected Common Area Charges for the upcoming calendar year. Upon Landlord furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-

twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within one hundred fifty (150) days following each calendar year during the Term, Landlord shall furnish to Tenant a written statement in reasonable detail setting forth the Common Area Charges for the calendar year just expired showing the total Common Area Charges for such calendar year, the amount of Tenant's pro rata share thereof and payments made by Tenant with respect thereto. If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction within one (1) year of Tenant's receipt thereof, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books relating to such Common Area Charges, which audit is to be made by Tenant's accountants. If any such audit conclusively reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit conclusively demonstrates that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable under this Paragraph is not paid by Landlord within thirty (30) days after Landlord's receipt of an invoice therefor from Tenant: (i) Landlord shall also be obligated to pay Tenant interest thereon from such due date until the date paid at the rate specified in Section 19.1) hereof, and (ii) Tenant shall be free to exercise its offset rights set forth in Section 19.1) hereof.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, Tenant shall pay to Landlord the deficiency within fifteen (15) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, is not indebted to Landlord and has vacated in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

4.      Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (as the same is described in Exhibit B hereto and any improvements thereon) (hereinafter referred to as "Real Estate Taxes"). Tenant will pay to Landlord its pro rata share of such Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. If the Term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made to cover the fraction of a year included within the terms of this Lease.

The Real Estate Taxes on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and expense of obtaining the same) to be payable with respect to the Shopping Center for such period. For any Partial Lease Year, the amount of Real Estate Taxes shall be pro rated on a per diem basis.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

Tenant shall pay its estimated monthly pro rata share of the Real Estate Taxes, based upon the actual amount of the last Real Estate Taxes which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be determined as provided in this Section. If requested by Tenant, Landlord shall furnish Tenant with copies of actual Real Estate Tax bills when same are issued. An adjustment shall be made as soon as the actual Real Estate Taxes for the period, and Tenant's pro rata share

thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

5.     Landlord hereby grants to Tenant one (1) additional, five (5) year option term consecutively referred to as the "Second Option Term." The Second Option Term shall commence at the end of the Second Extended Term, upon the same terms and conditions as contained in the Lease except as provided herein:

Guaranteed Minimum Rent for the Second Option Term shall be an amount equal to One Hundred Thirty-Eight Thousand Two Hundred Thirty and 40/100 Dollars ($138,230.40) per annum, payable in equal monthly installments of Eleven Thousand Five Hundred Nineteen and 20/100 Dollars ($11,519.20). Percentage Rent during the Second Option Term shall be an amount equal to two and one-half percent (2 $^1$/2%) of Tenant's Gross Sales in excess of Three Million and 00/100 Dollars ($3,000,000.00); and (i) Tenant shall pay its pro rated share of Common Area Maintenance charges. (ii) Tenant shall pay its pro rated share of Real Estate Taxes. (iii) Tenant shall also pay its pro rated share of Insurance charges.

The Second Option Term shall be upon the same terms and conditions of the Lease except as provided herein. If Tenant is then in possession of the Demised Premises and operating its business in the Premises and Tenant is not in default of any of the terms and conditions of this Lease, then, Tenant may elect to exercise the option by giving the Landlord written notice at least six (6) months prior to the expiration of the Second Extended Term.

Except as herein amended and modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Second Lease Extension and Modification Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Second Lease Extension and Modification Agreement, the terms and provisions of this Second Lease Extension and Modification Agreement shall control.

This Second Lease Extension and Modification Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Second Lease Extension and Modification Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Second Lease Extension and Modification Agreement to be executed as of the date first written above.


Signed and acknowledged in the presence of:


Witnesses as to Landlord:          **LANDLORD:**

                                   **MLV L.L.C.,** a Georgia limited liability company
                                   **By: Square Mark, Inc.,** *Manager*

                                   By: _____
                                   Name: Robert A. Axelrod
                                   Its: President

*(Signatures continued on next page.)*

4

Witnesses as to Tenant:

**TENANT:**
**BIG LOTS STORES, INC.**
an Ohio Corporation

By _____

Name: Kathleen Hupper

Its:  Vice President

## DISTRICT OF COLUMBIA

Before me, a Notary Public, in and for the District of Columbia, personally appeared the above named Landlord, **MLV L.L.C.**, by **Robert A. Axelrod**, its **President**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation and the free act and deed of him personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at this 26th day of _April_ _____, 2004.

_____
Notary Public

Sylvia H. French
Notary Public, District of Columbia
My Commission Expires 05-14-2007

STATE OF OHIO          )
                       )ss:
COUNTY OF FRANKLIN     )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Kathleen Hupper, its Vice President, who acknowledged that she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Columbus, Ohio, this 29th day of _April_ _____, 2004.

_____
Notary Public

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 12/11/2006

5

#370

## LEASE EXTENSION AND MODIFICATION AGREEMENT

This Lease Extension and Modification Agreement is made and entered into this _13th_ day of September, 1999 by and between MLV L.L. C., a Georgia limited liability company ("Landlord") with its business address 1730 Rhode Island Avenue, Suite 909, Washington, D.C. 20036 and Consolidated Stores Corporation, an Ohio corporation ("Tenant") with its business address at 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, OH 43228-0512.

 **WHEREAS**, Landlord and Tenant entered into a Lease dated October 5, 1989 (the "Lease") for the premises located in Lawrenceville, Georgia as more particularly described in the Lease.

 **WHEREAS**, Landlord and Tenant mutually desire to provide for certain additions and modifications to the terms and provisions of said Lease.

 **NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

 1. Landlord and Tenant hereby agree to extend the term of the Lease for five (5) years (hereinafter referred to as "the Extended Term"). Commencing February 1, 2000 and continuing through January 31, 2005, Tenant shall pay Guaranteed Minimum Rent of One Hundred Twenty Four Thousand Six Hundred Seventy Eight and 40/100 Dollars ($124,678.40) per annum, payable in equal monthly installments of Ten Thousand Three Hundred Eighty Nine and 87/100 Dollars ($10,389.87); and

 2. During the Extended Term, Tenant shall pay percentage rent equal to two and one-half percent (2 1/2%) of gross sales in excess of Two Million Five Hundred and No/100 Dollars ($2,500,000.00) per annum.

 Except as herein amended and modified, all other terms, conditions, covenants and agreements thereof are hereby incorporated by reference and shall control and govern.

 In the event there is a conflict between the terms and provision of this Lease Extension and Modification Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Lease Extension and Modification Agreement, the terms and provisions of this Lease Extension and Modification Agreement shall control.

 This Lease Extension and Modification Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

 This Lease Extension and Modification Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

 **IN WITNESS WHEREOF**, Landlord and Tenant have caused this Lease Extension and Modification Agreement to be executed as of the date first written above.

Signed acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD: MLV L.L.C., a Georgia limited liability company**

By: Square Mark, Inc.

By: _____

  Robert A. Axelrod

Title: _____President_____

Witnesses as to Tenant:

**TENANT: Consolidated Stores Corporation, an Ohio corporation**

By _____

  Albert J. Bell

Title: _____Executive Vice President_____

(notary clauses on following page)

*City*
~~STATE~~ OF *Washington*
~~County~~ of *Columbia*

*District*

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **MLV L.L.C., a Georgia limited liability company** by **Square Mark, Inc., Manager, by Robert A. Axelrod** its **President**, who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Washington, D.C., this _13th_ day of September, 1999.

_____
Notary Public

Cheryl Aviva Amitay
Notary Public, District of Columbia
My Commission Expires 5-31-04

STATE OF <u>Ohio</u>

County of <u>Franklin</u>          )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation, an Ohio corporation,** by **Albert J. Bell,** its **Executive Vice President,** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this _10th_ day of September, 1999.

_____
Notary Public

BRANDIE FLOWERS
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES OCTOBER 14, 2003

**LEASE**

This Lease, made effective this **5th** day of **October**, 1989, by and between The Equitable Life Assurance Society of the United States, a New York corporation, with its business address at 787 Seventh Avenue, New York, New York 10019, LANDLORD, and Consolidated Stores International Corporation, an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, TENANT, whose mailing address is Post Office Box 18273, Columbus, Ohio 43218.

**WITNESSETH:**

1. **DEFINITIONS:** For purposes of this Lease, these terms are defined as follows:

   A. Common Areas: The term "Common Area" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center sign, and parking lot lighting poles and light fixtures of the Shopping Center are collectively referred to as Common Areas.

   Landlord shall maintain the Common Areas which shall remain under Landlord's control and be subject to rearrangement, enlargement or diminution and to such reasonable rules and regulations as are prescribed by Landlord from time to time. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas.

   In order to establish that the Shopping Center or any portion thereof is and will continue to remain private property and to prevent a dedication thereof or the accrual of any rights to any person or the public therein, Landlord hereby reserves the unrestricted right to close all or any portion of the Shopping Center to the general public for one (1) day in each calendar year and Tenant hereby acknowledges, consents and agrees to such temporary suspension provided Tenant is not open for business, e.g., holiday. Landlord agrees not to decrease the number of parking spaces below that minimum ratio required by law.

   Landlord agrees not to materially decrease the number of parking spaces contained in the Common Areas, to block access to the Demised Premises or to obstruct the visibility of the Demised Premises from motorists using Highway 20 and South Clayton Street except for such reasonable blockage resulting from construction of buildings on the Shopping Center building reserve and any outlots reserved.

   B. Dates:

   1) The Tenant Entrance Date shall be the date first appearing above or whenever Tenant or any agent, employee or contractor of Tenant commences work in the Demised Premises or stores equipment or materials therein, whichever is later. From the Tenant Entrance Date until the Rent Commencement Date, Tenant shall have all of the duties, obligations and responsibilities under this Lease except those set forth in Sections 3, 4, and 5, and Tenant may install trade fixtures and equipment in the Demised Premises and store materials therein at Tenant's sole risk providing that such activity does not interfere with Landlord or its contractor's work in the Demised Premises. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises is ready for the installation of Tenant's fixtures and finishing work by Tenant, and are free of any violation of laws, ordinances, regulations and building restrictions relating to the construction upon the Demised Premises.

   2) The Rent Commencement Date shall be the date Tenant opens for business in the Demised Premises or forty-five (45) days after the Tenant Possession Date, whichever is earlier. Upon the request of either Landlord or Tenant, the parties hereto shall join in the execution of a letter agreement stipulating the Possession Date.

   As of the Rent Commencement Date, all provisions of this Lease shall be applicable.

   3) The Term Commencement Date shall be the date that the term of this Lease commences which shall coincide with the Rent Commencement Date if the latter is on the first day of a month, but if not, then it shall be the first day of the month following the Rent Commencement Date.

4) Lease Year shall mean each successive twelve (12) month period beginning with the 1st day of February of each year during the term hereof.

5) The Tenant Possession Date shall be the date Landlord, after having substantially completed (less any punch list items) all construction required of him under the Remodeling Rider, tenders possession of the Demised Premises to Tenant.

6) "Effective Date" shall mean the date that Landlord receives from Tenant duplicate copies of the Lease fully and properly executed by Tenant. Except if delayed by those causes set forth in Section 15, in the event Landlord fails to return a properly executed counterpart of the Lease to Tenant, or tender possession of the Demised Premises within fifteen (15) business days of the Effective Date, then Tenant may cancel this Lease by written notice received by Landlord on or before (1) the Landlord returns an executed counterpart of the Lease to Tenant, and (2) the Possession Date.

C. Exhibits: The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1) Exhibit A - Legal Description of Shopping Center

2) Exhibit B - Rider for Remodeling

3) Exhibit C - Sign Specifications



4) Exhibit D - Plot Plan of Shopping Center

~~5) Exhibit E - Tenant's Plans and Specifications~~

~~6) Exhibit F - List of Permitted Exceptions~~

D. Demised Premises: Being a storeroom, which storeroom shall have approximately 27,104 square feet and is located at 250 South Clayton Street. Demised Premises is as crosshatched and/or designated as the "Major Tenant A" space on Exhibit "D" annexed hereto and made a part hereof, containing approximately 27,104 square feet and shall extend to the exterior faces of exterior walls or to the building line where there is no wall, or the center line of those walls separating said premises from other premises in the Shopping Center, together with the appurtenances specifically granted in this Lease, but reserving and accepting to Landlord the right to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines and wires through hung ceilings space, column space and partitions in or beneath the floor slab or above or below the Demised Premises or other parts of the Shopping Center.

E. Shopping Center: Landlord's Shopping Center is known as The Meadows Shopping Center in the City of Lawrenceville, State of Georgia, and County of Gwinnett.

## 2. DEMISE:

Landlord, in consideration of the rents to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises during the term and for the use hereinafter provided. Landlord further grants to Tenant a non-exclusive license to use the Common Areas to be shared with the other Tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees, provided, however, that Landlord reserves the right to grant to third persons, the non-exclusive right to cross-over and use in common with Landlord and all tenants of the Shopping Center the Common Areas as designated from time to time by Landlord.

## 3. TERM:

A. Original Term:

The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B (3) above and ending January 31st of the third (3rd) full year following such Term Commencement Date. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be the "First Partial Lease Year." Tenant's obligations to pay rent shall commence on the Rent Commencement Date.

- 2 -

B.  Option to Extend Term:

So long as the Tenant is not in default under the terms of this Lease and Tenant's Gross Sales have exceeded ___$2,000,000.00___ for the twelve (12) months immediately preceding the Date of Notice , Landlord hereby grants to Tenant the option to extend the term of this Lease for one (1)  three (3) year option term, referred to as "option term".  The option term shall commence at the end of the term of this Lease upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then ' in possession of the Demised Premises, Tenant will be deemed to have exercised the option to extend the term unless Tenant gives Landlord written notice at least three (3) months prior to the end of the term of the Lease that the option will not be exercised.

## 4.   USE AND OPERATION:

Tenant covenants and agrees that the Demised Premises shall be used and occupied solely for the purpose of the retail sale of general merchandise as customarily sold under the "Big Lots" tradename.  Tenant, in addition, covenants that the Demised Premises shall, during the Term of this Lease, be used only and exclusively for lawful and moral purposes, and no part of the Demised Premises or improvements thereon shall be used in any manner whatsoever for any purpose in violation of the laws, ordinances, regulations or orders now in effect or hereafter enacted or passed during the Term of this Lease insofar as the Demised Premises and any signs of the Tenant are concerned (including, but not limited to, zoning ordinances, building codes and fire codes).

Tenant agrees to, when possible, operate and open the Demised Premises for business at least between the hours of 9:30 A.M. and 9:00 P.M., Monday through Saturday, and 1:30 P.M. to 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the term of this Lease.

In the event Tenant (a) shall fail to take possession and open for business in the Demised Premises fully fixtured, stocked and staffed within thirty (30) days after the Rent Commencement Date, or (b) shall vacate, abandon or desert the Demised Premises, or (c) shall cease operating Tenant's business therein (except where the Demised Premises are rendered untenantable by reason of fire, casualty or other causes beyond Tenant's control not resulting from the negligent acts or omissions of Tenant or Tenant's employees, agents, contractors, licensees, concessionaires or invitees), then and in any such events (hereinafter collectively referred to as "failure to do business") Landlord shall have the right, in addition to other remedies herein provided, to collect the Guaranteed Minimum Rent, plus all other charges due and payable hereunder or terminate the Lease on thirty (30) days prior written notice to Tenant.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, esthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, or refuse (except that reasonable amounts may be kept temporarily in closed containers in the places provided in the service areas), noxious or injurious materials or odors and free from vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances.  Tenant further agrees not to burn trash or garbage in the Shopping Center; allow deliveries, shipments or pick-ups through the front entrance to the Demised Premises; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair; permit Tenant's agents, employees, customers or invitees to repeatedly or routinely break the law or reasonable rules and regulations adopted by Landlord; anything to damage, injure or interfere with Tenant, other tenants or occupants of the shopping center or their customers or invitees; or engage in any conduct, activity, or omission which serves to reduce trade in the Shopping Center or place Landlord's family oriented Shopping Center in disrepute.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

5. **RENT:**

From the Rent Commencement Date during the term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States, at, 787 Seventh Avenue, New York, New York 10019, or at such other place as Landlord may from time to time direct in writing, the following which are collectively referred to hereinafter as "rent":

A. Guaranteed Minimum Rent: During the original term of this Lease, the sum of ___$108,416.00___ per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of ___$9,034.67___ each. The Guaranteed Minimum Rent for any partial month shall be prorated on the basis of a 30 day month.

All the terms and conditions of this Lease shall apply during the option terms except that (1) this option to extend term shall terminate when exercised; (2) the Guaranteed Minimum Rent applicable for the option term shall be the sum of ___$121,968.00___ per annum which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of ___$10,164.00___ .

B. Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary to conduct business on the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Should any such services be furnished by Landlord, Tenant agrees to pay Landlord for same. The rates charged by Landlord shall not exceed those of a public utility company furnishing similar service in the area. All billings by Landlord for any such service shall be paid within fifteen (15) days of receipt thereof, or among Landlord's other remedies, such services may be discontinued. The parties agree that all utilities necessary to conduct business in the Demised Premises are available. Such discontinuance not resulting from Landlord's negligence of services shall not subject Landlord to any liability therefor, n- or shall Tenant be entitled to compensation or diminution or abatement of Rent therefor, nor shall it be deemed an actual or constructive eviction.

C. Percentage Rent: In addition to the "Guaranteed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional rent for each Lease Year, in the manner following, a "Percentage Rent" equal to Two and One Half percent (2½%) of the excess of Tenant's annual gross sales and income, as hereinafter defined, which exceeds the annual base sum of ___$4,336,640.00___ during the initial term and ___$4,878,720.00___ during the option term.

Within fifteen (15) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of gross sales and income for the previous month. Tenant shall furnish to Landlord within thirty (30) days immediately following the end of each twelve (12) month period, an accurate statement of the gross sales and income for such period, certified to by Tenant, in form satisfactory to Landlord, and shall therewith pay to Landlord, any percentage rental then due ,at the percentage above stated. If at the end of any Lease Year, the total amount of Percentage Rent so paid by Tenant exceeds the total amount of Percentage Rent required to be paid by Tenant during such Lease Year, Landlord shall have the option of either refunding the excess to Tenant or issuing credit against the next ensuing installments of Guaranteed Minimum Rent. Percentage rental payments required to be made by Tenant under the terms of this Lease shall be made promptly when due. The term "gross sales and income" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises even though filled elsewhere; (2) charges for all services rendered in or from the Demised Premises; (3) and all such other gross receipts including income from vending machines located in the Demised Premises excluding those used solely for the benefit of Tenant's employees. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees, licensees and concessionaires. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned for cash, and (3) income from stamp machines and public telephones.

- 4 -

Should Tenant have opened for business during the month preceding the Term Commencement Date, the gross sales and income for the fractional month shall be added to the gross sales and income for the first month of this term, and the annual base sum shall be proportionately increased and the Percentage Rent paid thereon. Should this Lease expire or be sooner terminated leaving a fractional Lease Year, for purpose of computation of Percentage Rent payable hereunder, the annual base sum shall be proportionately reduced and Percentage Rent shall be paid thereon.

Tenant agrees to keep books of account, in accordance with good accounting practice, in form satisfactory to Landlord, of the business conducted on said Demised Premises, accurately showing all gross sales and income. Landlord or its authorized agents may audit the same at any reasonable time. Should Landlord's audit of Tenant's books and records disclose gross sales and income which are three percent (3%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the cost of such audit and any Percentage Rent found to be due by such audit. If Landlord's audit shall disclose a deficiency of gross sales for such period of less than three percent (3%), Tenant shall promptly pay to Landlord the amount of such Percentage Rent due on such deficiency, if any. Acceptance of any Percentage Rent by Landlord shall not constitute a waiver of Landlord's right to additional Percentage Rent justified by an audit provided for herein.

Should Tenant fail to furnish such sales report within the period required, Landlord may have said sales report prepared by an accounting firm of Landlord's choice after reasonable notice to Tenant, and Tenant shall promptly pay the cost thereof and any Percentage Rent required to be paid pursuant to such sales report.

D.  Common Area Charges:  Throughout the term of this Lease, Landlord shall be responsible for cleaning, snow and ice removal in the parking lot. Landlord shall also be responsible for:

(i)  operating, maintaining, refurbishing, replacing, improving, repairing, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)  operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii) operating, maintaining, repairing, replacing, and improving appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the plot plan;

(iv) providing security and on-site and off-site traffic control; and

(v)  maintenance of paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality, restriping as required to keep same clearly visible and appropriately marked.

Such expenses·shall include, but not be limited to, costs of on-site management and supervision, refurbishing, repairing, maintaining, replacing, and improving, (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, providing public liability, property damage, fire and extended coverage on the common facilities and such other insurance as Landlord deems appropriate, total compensation and benefits (including premiums for workers' compensation and other insurance), paid to or on behalf of employees; personal property, supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, parking area surcharges or levies, reasonable depreciation of equipment used in operating, maintaining, refurbishing, repairing, replacing and improving the common areas and service areas and rent paid for the leasing of any such equipment.

- 5 -

~~Tenant agrees to pay to Landlord a proportionate share of such common area~~
maintenance charges as set forth herein. Tenant's ~~prorata share shall~~ be
determined by the use of a formula, ~~the numerator of~~ which is the square
footage of Tenant's premises ~~and the denominator~~ of which is the gross leasable
area of ~~the Shopping~~ Center, with the resulting percentage being Tenant's
~~proportionate share.~~

Tenant shall pay in monthly installments when rent is payable as its share of
the costs of Common Area expenses the amount of __$8,131.20__ for each Lease
Year (and a prorata portion of this amount for any Partial Lease Year) during
the initial term and option term of the Lease.

E.  Taxes and Assessments:   Landlord will pay all real estate taxes and
installments of assessments levied and assessed against the Demised Premises as
they become due and payable.   Beginning with the second full Calendar Year
(1990) and for each Calendar Year thereafter, Tenant will pay to Landlord,
annually that portion of any increase in the amount actually due and payable by
Landlord of real property taxes and assessments against the Shopping Center and
all improvements thereon over such taxes and assessments for the first full
Calendar Year (being 1989) that the floor area of the Demised Premises bears to
the total rentable floor area of all buildings in the Shopping Center, except
that for the Calendar Year in which this Lease terminates, Tenant's share of
such real estate tax and assessment increases shall be computed on the basis of
the real estate taxes and assessments for the preceding Calendar Year, and
prorated.

Interest and/or penalties for late payment shall not be included in determining
tax and assessment increases, provided Tenant pays its prorata share of taxes
and assessments on a timely basis.

If the assessed valuation of the improvements is increased by reason of any
improvements made by Landlord or any tenant of space in the Shopping Center,
the base period taxes, to the extent they do not reflect any such valuation
increases, shall be appropriately increased to reflect said increase.

In addition to the increases above, Tenant shall pay as its proportionate share
of taxes and assessments __$5,420.80__ per Lease Year in monthly installments
when rent is payable.

If Tenant deems any taxes, assessments, or charges payable by Tenant hereunder,
or any part thereof, to be illegal or excessive, Tenant may contest the same by
proper proceedings commenced at its own expense and in good faith.   If such
proceedings are resolved against Tenant, Tenant shall pay its prorata share of
all taxes, assessments, and charges, and all penalties and interest thereon,
found to be due and owing.  Tenant shall indemnify Landlord against any loss or
damage by reason of such contest, including all costs and expenses thereof
during the pendency of any such proceeding, and shall fully protect and
preserve the title and rights to Landlord, as well as Tenant's leasehold estate
in and to the Demised Premises.  If as a result of Tenant's actions taxes are
increased, Tenant shall pay any and all such increases.  In addition, in the
event Tenant elects to contest taxes, Tenant shall provide any amount of
reasonable security requested of Landlord to Landlord prior to proceeding.

Tenant shall pay all taxes assessed against its trade fixtures, equipment,
machinery, appliances, and other personal property, and any other license fees,
occupational .taxes, lease taxes, and other governmental charges arising in
connection with this Lease or Tenant's use or occupancy of the Demised Premises
or operation of its business.

6.  ~~ALTERATIONS~~

Tenant shall have the right to make changes, additions, and alterations inside
the Demised Premises, provided that   such work shall not affect the structural
parts of the building of which they are a part; that such are done in good and
workmanlike manner; that permits therefor from all public authorities, as
required, are obtained and paid for; that all cost and expense arising from such
undertaking as well as all damages occasioned in connection therewith shall be
paid by Tenant; that all such changes shall at the end of this term remain the
property of Landlord, unless Landlord otherwise agrees in writing, and that
Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises
resulting therefrom.

Tenant's work shall not affect the exterior of the building of which it is a part. Tenant's right under this Section shall be of no force and effect if tenant is in default. All work shall be in accordance with accepted building practices and applicable laws including, but not limited to, building codes and zoning ordinances. Prior to the commencement of all work, Tenant shall obtain Landlord's prior written approval, which shall not be unreasonably withheld or delayed, of plans and specifications therefore and cause Landlord's requirements for bonding, insurance and other contractor requirements to be satisfied. Any work done by Tenant under the provisions of this Section shall not interfere with the use of other tenants or their premises in the Shopping Center.

Notwithstanding the foregoing, Tenant's rights to change and alter the Demised Premises provided under this Section 6 are personal to Consolidated Stores International Corporation as the original Tenant under this Lese, and shall not be assignable or transferable in any manner whatsoever. In addition, at Landlord's option, any and all such changes and/or alterations shall be removed from the Demised Premises at Tenant's sole cost and expense and upon the termination of this Lease.

## 7. MAINTENANCE AND REPAIRS:

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost, damage or claim resulting from such breakage of the replacement thereof unless such damage is due to the willful or wanton act or negligence of Landlord.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, if any, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the date of possession under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Should the HVAC system require repair and/or replacement during the first two lease years, which the cost thereof exceeds $2,500.00 in the aggregate in any one lease year, Landlord shall be solely responsible for such costs over and above $2,500.00, unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. Tenant shall maintain a service and maintenance contract with respect to the heating, ventilating and air conditioning contract. In addition, notwithstanding anything to the contrary herein, Tenant's maintenance and repair obligations shall also include its loading dock and any and all systems servicing the Demised Premises.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition as of the Tenant Entrance Date. Landlord further agrees that Tenant shall have no obligation to repair or maintain any such item as is not in operating condition until put in operating condition by Landlord at its expense. Tenant shall notify Landlord of any defects within thirty (30) days after Tenant Entrance Date by providing Landlord with a "punch list" of such items not in operating condition. Landlord shall promptly put such inoperative items listed on the punch list in operating condition and, thereupon, Landlord's obligation under this warranty shall terminate. Notwithstanding the foregoing, if Tenant Entrance Date occurs during the months of October through May, Tenant shall be granted until June 15 to test the air conditioning system. The Tenant also agrees to keep the area adjoining the entrance to the Demised Premises in a clean and safe condition by removing snow and ice from the doorways and sidewalks.

Tenant further agrees to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary.

Landlord agrees to keep and maintain the roof, roof drains, exterior walls, exclusive of doors and windows and exterior utility lines, during the term and will make required structural repairs to the building of which the Demised Premises are a part. However, Tenant agrees to make and pay for all repairs of damage to the same caused through the fault or negligence of Tenant, his or its agents, employees, invitees, and customers. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or display them or to make repairs to common facilities or those facilities required to be maintained by Landlord.

As a condition precedent to all obligations of Landlord to perform repairs to the Demised Premises and Shopping Center, Tenant will notify Landlord in writing of the need for such repair. If Landlord fails to commence the making of repairs within fifteen (15) days after such notice, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency and if Landlord after receiving notice from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work, Tenant shall have the right to deduct such cost from the next monthly rent payment(s) owing.

Tenant shall make and pay for all other repairs to the Demised Premises or serving the Demised Premises not listed in the foregoing paragraph and shall replace all things which are necessary to keep the same in good state of repair and operating order. If (i) Tenant does not repair properly as required hereunder to the reasonable satisfaction of Landlord, or (ii) emergency repairs are necessary, or (iii) repairs or replacements to the Shopping Center and/or the Common Areas and/or to the Demised Premises are necessary by any act or omission or negligence of Tenant, its agents, employees, subtenants, assignees, concessionaires or contractors, then in any such event, Landlord may make such repairs without liability to Tenant for any loss or damage that may occur to Tenant's merchandise, fixtures or other property of Tenant by reason thereof, and upon completion thereof, Tenant shall pay Landlord's cost of making such repairs as Additional Rent.

8. **SIGNS:**

Tenant shall not place, suffer or erect signs, awnings, canopies, decorations on the exterior walls of the Demised Premises without the approval of Landlord, which shall not be unreasonably withheld. When so approved, such sign shall only contain the name and business of Tenant and Tenant agrees to maintain such sign in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, existence or removal of the same. After receiving Landlord's written approval, Tenant shall not be required to remove, replace, change, or alter any exterior signs during the term of this Lease or any renewals thereof. Upon vacating the Demised Premises, Tenant agrees to remove all such signs and to repair all damage caused or resulting from such removal. Landlord may erect and maintain such suitable signs as it in its sole discretion may deem appropriate in the Shopping Center. Tenant may erect and maintain the signage customarily used in its Big Lots stores. The right proscribed to Tenant in the foregoing sentence are personal to Consolidated Stores International Corporation as the original Tenant under this Lease.

This section is intended to permit reasonable scope for individuality in signs and to assist in maintaining the high architectural and business character of the Shopping Center. Tenant shall submit to Landlord for approval, which shall not be unreasonably withheld, drawings showing all proposed sign work to be erected in connection with Tenant's Demised Premises. Drawings submitted for approval shall clearly show graphic as well as construction and attachment details of all signs including electrical load requirement and brightness in foot-candles. No sign or advertising medium shall be used so as to be a nuisance or menace to Landlord or other tenants, nor shall any advertising medium or display within the Demised Premises employ moving or flashing lights. Display windows and store signs shall be well lighted during hours when the Shopping Center is open. The plans and specifications for Tenant's proposed exterior sign, which are attached hereto and made a part hereof, are approved by Landlord. Tenant shall have the right, subject to approval of Landlord, which shall not be unreasonably withheld or delayed, to erect and maintain a pylon road sign. The parties agree that a pylon sign presently exists on the Shopping Center site. Upon Landlord's reasonable approval, Tenant shall have the right to erect its identification sign band on the pylon sign in the position and upon the specifications designated by Landlord.

9.  **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At all times while Tenant is not in default under the terms and conditions of this Lease, Tenant may replace such trade fixtures or equipment. At the end of the term, provided that all rents have been paid to Landlord, Tenant may remove such trade fixtures or equipment but shall repair any damage to the Demised Premises caused by or resulting from such removal, except that should Tenant have installed lighting fixtures, and/or air conditioning equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. Landlord shall not be responsible for and Tenant shall indemnify and hold Landlord harmless against any liability incurred pursuant to this Section.

10.  **GOVERNMENTAL REGULATIONS:**

Landlord agrees Demised Premises conform to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations or additions made by Tenant or manner of operation not consistent with Tenant's other stores.

11.  **PERSONAL PROPERTY:**

Tenant assumes all risk of damage to or destruction, loss or pilferage of fixtures or personal property within the Demised Premises or loss suffered by Tenant's business resulting from any cause whatsoever and shall save and hold Landlord harmless from all claims resulting therefrom, except those resulting from the intentional act or omission or the willful negligence of Landlord.

12.  **INDEMNIFICATION:**

To the extent of insurance proceeds received, Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant with respect to any and all fire or extended coverage losses, except if caused to Tenant's property. To the extent of insurance proceeds received, Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord with respect to Tenant's property located in or about the Premises. Landlord and Tenant agree to notify their respective fire and extended coverage insurance carriers of the indemnity and hold harmless agreement contained in this paragraph. Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Premises unless caused by the negligent acts or omissions to act of Landlord or Landlord's servants and agents to fulfill Landlord's obligations hereunder. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Premises, unless caused by the negligent acts or omissions to act of Tenant, or Tenant's servants and agents (or by failure of Tenant, or Tenant's servants and agents, to fulfill Tenant's obligations hereunder).

13.  **INSURANCE:**

A.  Liability:

Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, which insurance, shall include Landlord as an additional named insured, in companies and in a form satisfactory to Landlord, with minimums of the following (i) Comprehensive General Liability Insurance, with contractual liability endorsement relating to the Demised Premises and its appurtenances on an occasion basis with a minimum single limit of $5,000,000.00; (ii) Worker's Compensation Insurance as required by the State of Georgia and to deposit said policy or policies or certificates thereof with Landlord prior to the date of occupancy by Tenant. Such liability insurance policy or policies and the certificate shall bear endorsements to the effect that the insurer agrees to notify Landlord not less than thirty (30) days in advance of modification or cancellation thereof.

B.  Insurance:

Landlord has insured the Demised Premises against loss or damage by fire and such other risks as are normally insurable under the standard form of fire insurance with broad form extended coverage endorsement, including malicious mischief and vandalism, in an amount not less than Eighty Percent (80%) of the full insurable value of all the buildings in the Shopping Center.

14.  **FIRE REBUILDING AND ALTERING:**

(a)  Landlord shall at all times during the term of this Lease, carry fire, casualty, and extended coverage insurance on all the buildings and permanent improvements on the building.

(b)  Provided such casualty is insured under Landlord's fire insurance policy applicable to the Demised Premises,  if the Demised Premises or any permanent additions or leasehold improvements thereto shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the term hereof, Landlord shall repair and restore the same to a good tenantable condition within a reasonable time. During such period of repair, the rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable, or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  Said abatement shall cease when the premises are restored to tenantable condition.  Landlord's obligations hereunder shall be limited to the performance of Landlord's work, if any, in accordance with Exhibit B hereto.  Landlord shall not be obligated to commence such repairs or rebuilding until insurance proceeds are released to Landlord.   Landlord's obligation hereunder shall be further limited to the insurance proceeds received and obtained by Landlord which are allocable to the Demised Premises.  Nothing hereinabove contained shall impose upon Landlord any liability or responsibility to repair, rebuild or replace any property belonging to Tenant.  The abatement of Tenant's rent shall only be to the extent of the proceeds actually received by Landlord under the policy of rent insurance.  Unless this Lease is terminated by Landlord, as hereinafter provided, Tenant shall repair, redecorate and refixture the Demised Premises and restock the contents thereof in a manner to at least the condition equal that existing prior to the destruction or casualty and the proceeds of all insurance carried by Tenant on its personal property, decorations, trade fixtures, furniture, furnishings, equipment and contents to the Demised Premises shall be held in trust by Tenant for such pruposes.

(c)  In the event the Demised Premises, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of receipt of insurance proceeds for such damage or destruction, Tenant or Landlord may, at its option, terminate this Lease by giving sixty (60)  days prior written notice to the other party and thereupon Landlord and Tenant shall be released from all future liability and obligations under this Lease.

(d)  If the Demised Premises are damaged or destroyed during the last six (6) months of the original or any extended term of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days following such damage or destruction, unless Tenant shall, within thirty (30) days following receipt of such notice, offer to extend the term of this Lease for an additional period of five (5) years from the date such damage or destruction is·repaired and restored.  If the Tenant makes said offer to extend, Landlord and Tenant shall determine the terms and conditions of said extension within thirty (30) days thereafter or Tenant's offer shall not be deemed to estop Landlord from canceling this Lease.  If the terms and conditions have been mutually agreed to by the parties, then Landlord shall accept Tenant's offer and shall repair and restore the premises within the time and in the manner set forth above.

(e)  Notwithstanding anything else to the contrary contained in this Section or elsewhere in the Lease, Landlord, at its option, may terminate this Lease on thirty (30) days notice to Tenant, given within one hundred eighty (180) days after the occurrence of the following:  (i) the Demised Premises or the building in which the Demised Premises are located shall be damaged or destroyed as a result of an occurrence which is not covered by Landlord's insurance; or (ii) the Demised Premises shall be damaged or destroyed during the last year of the Term or any extended Term; or (iii) any or all of the buildings of the Common Areas or the Shopping Center are damaged (whether or not the Demised Premises are damaged) to such an extent that, in the sole judgment of Landlord, the Shopping Center cannot operate as an economically viable unit.

## 15.  FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.  This provision shall not apply to the payment of money.

## 16.  INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 17.  WARRANTY OF TITLE BY LANDLORD:

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Premises; and (d)  Landlord has full right and power to execute this Lease and to lease the Demised Premises for the term provided in this Lease.  In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

Tenant may obtain, at his own expense, a Title Insurance Policy issued by a title  insurance company acceptable to Tenant.  Landlord agrees to cooperate with Tenant in obtaining said policy.

## 18.  QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that if Tenant shall not be in default beyond any period for the cure thereof, Tenant shall, at all times during the original term of this Lease and any renewal term, have peaceable and quiet enjoyment and possession of the Demised Premises without any manner of let or hindrance from the Landlord or any other person, firm, or corporation acting under Landlord.

## 19.  MORTGAGE AND ESTOPPEL CERTIFICATES:

This Lease and the rights of Tenant shall, at all times be subject and subordinate to any mortgage upon the Demised Premises, whether in being or hereafter created, without further evidence thereof.  However, should any mortgage require that this Lease be subordinated to the mortgage or evidence that this Lease is in effect and there are no setoffs, Tenant shall execute and deliver to Landlord the subordination agreement and/or estoppel certificates.

- 11 -

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord within ten (10) days of request thereof, or to the holder of the mortgage lien on the Demised Premises, a statement in writing satisfactory to Landlord or the holder of the mortgage, certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Guaranteed Minimum Rent, Common Area Charge and other charges hereunder have been paid, and the amount of any security deposit held by Landlord; (iii) the date that the Demised Premises were ready for occupancy and all conditions precedent to the Lease taking effect were satisfied or waived by Tenant; (iv) the dates on which Tenant accepted possession and Tenant's store will be open for business; (v) the Tenant is occupying the Demised Premises; and (vi) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable. With respect to any mortgage lien of the Demised Premises, Landlord agrees to obtain from such mortgagee a Non-Disturbance and Attornment Agreement satisfactory to Tenant under this Lease stating that Tenant shall not be disturbed so long as Tenant attorns to the mortgagee, its successors, and assigns, and is not in default hereunder.

Upon the request of any mortgagee of record, Tenant shall give prompt written notice in a manner provided in this Lease of any default of Landlord hereunder and the nature of such default and Tenant shall allow such mortgagee a reasonable length of time (in any event, not less than sixty (60) days from the date of such notice) in which to cure any such default. Any such notice shall be sent to the mortgagee loan department of any such mortgagee at its home office address.

20. **DEFAULT:**

A. If the Demised Premises shall be deserted for a period of over thirty (30) days, or if there shall be a filing against Tenant of a bankruptcy (which filing is not removed within sixty (60) days), or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the rent reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Landlord, or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord, if the Landlord so elects it may cure Tenant's default at Tenant's cost and expense and/or terminate the Lease whereupon it shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the leased property, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor or any damages therefrom. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent and charges equivalent to rent reserved herein for the balance of the term shall exceed the reasonable rental value of the Demised Premises for the same period. Tenant agrees, irrespective of other provisions of this Lease, that in the event any monthly installment of rent is not paid by the 10th of the month, additional rent of ten percent (10%) of the monthly rental shall be paid for each such month. If Landlord attempts to relet the Demised Premises, Landlord shall be the sole judge as to whether or not the proposed Tenant is suitable. Notwithstanding the foregoing but in addition thereto, upon a Tenant default, Landlord will have the right to invoke any remedy allowed at law or in equity to enforce Landlord's rights as if reentry and other remedies were not herein provided. With respect to any litigation arising out of this Lease, Tenant hereby expressly waives the right to a trial by jury and the right to file any countersuit against Landlord. Tenant agrees that no demand for rent, no re-entry for condition broken, and no notice to quit possession or other notice as prescribed by statute shall be necessary to enable Landlord to recover such possession but that all right to any such demand and any such re-entry and any notice to quit possession or other statutory notice or prerequisite are superseded by notices, provisions set forth in this Lease.

B. If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the shopping center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of ten percent (10%) annually, may be deducted by Tenant from the rents thereafter to become due. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the heating, air conditioning or sprinkler systems, the Tenant shall immediately notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all rental due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

## 21. CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, either Landlord or Tenant may cancel this Lease. In the event more than fifteen percent (15%) of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may cancel this Lease. Until the Shopping Center is restored to proper tenantable condition rental shall abate. Thereafter, rental shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such area on Tenant's business, which shall be calculated by the percentage by which gross sales made by Lessee at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages for the unamortaized cost of its proposed improvements, and trade fixtures or its moving expenses. In the event of such cancellation, the parties thereupon shall be released from all liability hereunder which accrues after the date of such taking.

## 22. WAIVER OF SUBROGATION:

Landlord shall not be liable for any insurable damage by fire or other peril includable in the coverage afforded by the form of fire insurance policy required of Landlord under this Lease whether or not such coverage is in effect no matter how caused, it being understood that Tenant will look solely to its insurer for reimbursement. Tenant shall not be liable for any damage by fire or other peril includable in the coverage afforded by the fire insurance policy required of Tenant under this Lease whether or not such coverage is in effect no matter how caused, it being understood that Landlord will look solely to its insurer for reimbursement. Any waiver of either party's rights against the other party contained in this Section shall be ineffective if such waiver shall be unobtainable or result in an increase in the cost of said party's insurance, unless the other party shall pay for such increase within ten (10) days after notice thereof.

## 23. ASSIGNMENT AND SUBLETTING:

Tenant shall have only the right to assign this Lease or sublet the Demised Premises (but not a portion thereof) to a parent or wholly owned affiliate or subsidiary of Tenant or in the event of consolidation, merger or the sale of substantially all of Tenant's stock thereunder, provided that the use of the Demised Premises shall remain unchanged. Tenant shall make no other assignment or subletting without the Landlord's prior written consent which consent shall not be unreasonably withheld or delayed. In the event Landlord consents to any assignment or subletting the option to extend the Term set forth in Section 3(B) of this Lease shall be null and void and of no further force and effect. No such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall provide that it is subject and subordinate to the rights of Landlord and its mortgagee under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by an mortgagee.

## 24. SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in the same or better condition than existed when Tenant entered possession, loss by fire, wind and ordinary wear and tear excepted. Tenant agrees to remove all of his trade fixtures with the exception of lighting fixtures and air conditioning whether or not attached to the Demised Premises and to repair all damage done by the removal of said fixtures. Should Tenant thereafter remain in possession or occupancy of any part of the Demised Premises or hold the keys, a tenancy shall be deemed to continue from month to month only at one hundred fifty percent (150%) of the Guaranteed Minimum Rent rate above provided and on the terms herein expressed, where applicable, but should the same occur without Landlord's consent, no tenancy of any duration shall be created and Tenant's use and occupancy fee while in possession of the Demised Premises shall be the Guaranteed Minimum Rent, plus all other charges due under this Lease, and Percentage Rent based on the twelve (12) months (or fraction thereof if less than 12 months of the Lease Term has elapsed) prior to the breach.

## 25. NOTICES:

Whenever notice is required hereunder, it shall be given in writing and delivered or sent by registered or certified mail, United States Mail, postage prepaid, with return receipt, to the address of the party to be served as first herein given or to such other address as either may hereafter designate in writing·to the other. If such notice is mailed, it shall be deemed to have been served either when received or forty-eight (48) hours after deposited in the United States Mail, whichever is earlier.

## 26. LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under·the laws of the State of Georgia. Neither party shall record this Lease.  ·

## 27. BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of ᴜᴜ shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors, and assigns.

## 28. NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable Memorandum of Lease which Tenant may record at its expense. Tenant shall provide Landlord with a copy of such recorded Memorandum of Lease.

Neither party shall record this Lease.

**29. REAL ESTATE BROKER'S COMMISSION:**

Landlord and Tenant warrant and represent that no broker other than thos herein was involved on their behalf in negotiating and consummating this Lese, and agrees to indemnify and hold the other party harmless from and against any and all claims for brokerage commissions arising out of any communications or negotiations had with any broker regarding the Demised Premises or any other premises in the Shopping Center or in the consummation of this Lease. Landlord agrees to pay a commission to the broker who represented Landlord in connection with this Lease, Kyle Realty Company, Inc., Spence Real Estate Services, and Richard Alterman and Associates, all Georgia brokers.

**30. NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the rental herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such rent or pursue any remedy provided for in this Lease or available at law or in equity.

**31. TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them. This Lease is not binding upon Landlord until it has been signed by its authorized officers and delivered to the Tenant.

**32. DEFINITION AND LIABILITY OF LANDLORD:**

The term "Landlord" as used in this Lease means only the owner or mortgagee in possession for the time being of the building in which the Demised Premises are located or the owner of the leasehold interest in said building and/or the land thereunder so that in the event of a sale of said building or leasehold interest or assignment of this Lease, or demise of said building and/or land, Landlord shall be and is hereby entirely freed and relieved of all obligations of Landlord subsequently accruing.

It is specifically understood and agreed that there shall be no personal liability of Landlord (nor Landlord's agent, if any) in respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of Landlord in the Shopping Center for the satisfaction of Tenant's remedies.

**33. RELATIONSHIP OF THE PARTIES:**

Nothing contained in this Lease shall be deemed or construed as creating the relationship of principal and agent or a partnership or joint venture between the parties thereto, it is being understood and agreed that neither the method of computing Rent nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that between the Landlord and Tenant.

**34. ALTERATIONS BY LANDLORD:**

In the event that Landlord shall hereafter determine during the Term, as extended, to erect additional buildings or structures, add stories or additions to existing buildings, enclose open areas in the Shopping Center (or any portion thereof as may be designated by Landlord) as said Shopping Center shall be enlarged or reduced at the sole option of Landlord by addition to the Shopping Center of land or buildings or by the diminution thereof, Tenant hereby consents thereto and to the performance of work necessary to effect the same and any convenience caused thereby. Design, materials and performance of work therefore shall be in the sole unrestricted discretion of Landlord. In the event the flow of customer traffic to the Demised Premises is substantially diminished, Tenant is entitled to an appropriate rent reduction.

**35. LIENS:**

Tenant shall discharge any lien filed against the Shopping Center or any part thereof for work done or materials furnished with respect to the Demised Premises within twenty (20) days after such lien is filed. If Tenant fails to keep this covenant, in addition to any other remedies available to Landlord under this Lease or otherwise, Landlord may at its option discharge such lien, in which event Tenant agrees to pay Landlord a sum equal to the amount of the lien thus discharged plus Landlord's internal administrative costs, attorney's fees, expenses and damages thereby caused by Landlord.

**36. RETAIL RESTRICTION LIMIT:**

The parties acknowledge that the realization of the benefits of a Percentage Rent Lease are dependent upon Tenant's maximizing its gross sales. The parties further acknowledge that the Minimum Rent was negotiated together with and giving consideration to the Percentage Rent rate and base and that any other stores of Tenant near the Shopping Center will deprive Landlord of a bargained-for consideration. Accordingly, Tenant covenants and agrees that during the Term and any extensions or renewals thereof, Tenant will not, directly or indirectly, engage in any business similar to or in competition with that for which the Demised Premises are let within a radius of two (2) miles of the Shopping Center measured from the perimeter of the Shopping Center, without Landlord's prior written consent. If Tenant shall breach the covenant contained in this Section, then in addition to the rights and remedies provided in this Lease, Landlord may, at its option, terminate this Lease upon thirty (30) days' written notice to Tenant.

**IN TESTIMONY WHEREOF,** The Landlord and Tenant have caused this Lease to be signed in triplicate as of the respective acknowledgement dates:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

LANDLORD: **EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

By: _____  Vincent L. Crowell
                                Attorney-in-Fact

Title:   VICE PRESIDENT

Witnesses as to Tenant:

TENANT: **CONSOLIDATED STORES INTERNATIONAL CORPORATION**

_Vice President_

By: _____
    JAMES M. GUINAN

Title: CHIEF EXECUTIVE OFFICER

- 16 -

**STATE OF** _Georgia_

**COUNTY OF** _DeKalb_


Before me, a Notary Public in and for said State and County, personally appeared the above named Landlord, _Equitable Life Assurance Society of the United States_, by _Vincent L. Crowell_, its _Attorney-in-fact_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _DeKalb County, Georgia_, this _5th_ day of _October_ _____, 19 _89_ .

_Ann A. Woodard_
_____
Notary Public

Notary Public, ··· ··· ··· , Georgia
My Commission Expires July 17, 1993


**STATE OF OHIO**

**COUNTY OF FRANKLIN**


Before me, a Notary Public in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores International Corporation**, by **James M. Guinan**, its **Chief Executive Officer**, who acknowledged that he did sign the foregoing instrument and that the same is the free act of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _19th_ day of _Sept._ _____, 19 _87_ .

_Jodi L. Harbert_
_____
Notary Public

**JODI L. HARBERT**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES DEC. 5, 1993

- 17 -

Exhibit A

## LEGAL DESCRIPTION OF SHOPPING CENTER

ALL THAT TRACT or parcel of land lying and being in Land Lot 147 of the 5th District of Gwinnett County, Georgia, and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING, commence at the point of the intersection of the line dividing Land Lots 147 and 148 of said District and the northeasterly line of the right-of-way of South Clayton Street S. R. 20 (being 80 feet in width at said point); run thence north 26 degrees 52 minutes 13 seconds west along the northeasterly line of the right-of-way of said South Clayton Street a distance of 99.8 feet to an iron pin set and THE POINT OF BEGINNING; FROM SAID TRUE POINT OF BEGINNING AS THUS ESTABLISHED, running thence north 26 degrees 52 minutes 13 seconds west along the northeasterly line of the right-of-way of South Clayton Street a distance of 34.00 feet to a point; running thence north 63 degrees 07 minutes 47 seconds east a distance of 150.00 feet to a point; running thence north 26 degrees 52 minutes 13 seconds west a distance of 145.00 feet to a point; running thence south 63 degrees 07 minutes 47 seconds west a distance of 150.00 feet to a point on the northeasterly line of the right-of-way of South Clayton Street; running thence north 26 degrees 52 minutes 13 seconds west along the northeasterly line of the right-of-way of South Clayton Street a distance of 246.00 feet to a concrete monoment; running thence south 63 degrees 22 minutes 18 seconds west along the right-of-way of South Clayton Street a distance of 10.00 feet to an iron pin found; running thence north 26 degrees 51 minutes 13 seconds west along the northeasterly line of the right-of-way of South Clayton Street (being 60 feet in width at said point) a distance of 164.48 feet to an iron pin; running thence north 27 degrees 14 minutes 32 seconds west along the northeasterly line of the right-of-way of South Clayton Street a distance of 90.15 feet to an iron pin; running thence north 71 degrees 34 minutes 37 seconds east a distance of 588.56 feet to an iron pin located in the centerline of Neal Boulevard; running thence south 12 degrees 52 minutes 53 seconds east along the centerline of Neal Boulevard a distance of 179.65 feet to an iron pin; running thence north 63 degrees 43 minutes 18 seconds east a distance of 70.00 feet to an iron pin; running thence south 24 degrees 16 minutes 10 seconds east a distance of 442.60 feet to an iron pin; running thence south 63 degrees 07 minutes 47 seconds west a distance of 580.00 feet to an iron pin and THE POINT OF BEGINNING.

## RIDER FOR REMODELING

This Rider is prepared to be attached to and become part of the foregoing Lease as the Tenant's premises therein described is to be repaired and remodeled by Landlord prior to commencement of the term.

**Landlord covenants and agrees to deliver the Premises to Tenant as follows:**

1. HVAC to be in good working condition and adequate for Tenant's intended use. If Tenant Entrance Date occurs during the months of October through May, Tenant shall be granted until June 15 to have the HVAC system inspected to determine the needed repairs by the Landlord.

2. All plumbing, electrical, and mechanical equipment to be in good working condition, including sprinkler system.

3. All lighting inside and out to be in good working condition.

4. Fill channels in floors and cover with matching commercial grade tile.

5. All damaged or missing ceiling and floor tiles to be replaced with similar tile.

6. All doorways to be sound and secure and in good working condition.

7. Roof to be in good condition and free of leaks. Canopy and building facia to be repaired and painted.

8. Premises to be professionally inspected for pestilents and termites, and Tenant to be provided with a certified report that the premises is pest free, and if not, Landlord will make pest free.

9. All above work to be completed before Rent Commencement Date.

10. Landlord agrees premises conform to all requirements by authority having jurisdiction; if said premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant.

**Tenant covenants and agrees to do and perform the following:**

Any work, installation, or equipment not called for in the Landlord's covenants above shall be furnished and performed by and at the expense of Tenant.

Landlord shall complete such work ~~on or before the 30th day of   October~~    , ~~19 89 .~~ within thirty days from delivery of premises to Landlord by Kroger. In the event premises shall not be completed by October 30, 1989, then Tenant shall not be required to accept possession of the premises until February 1, 1990.

Exhibit C

## SIGN SPECIFICATIONS

Single Face, Internally Illuminated Sign
Individually illuminated letters 5 feet in height
with layout area of 40 feet in length

**SIGN FACING:**

Letters are fabricated with high impact plastic-2119 orange .150 in thickness with dark bronze trim cap cemented to face.

**SIGN CABINET:**

Letters are fabricated with a 3/8" alumaply back with sides of 24 gauge bonderized steel fastened to back of letter.  Letters are painted dark bronze. Depth of letters are 9 inches.

**ILLUMINATION:**

Letters are illuminated with three rows of 15mm red neon with self-contained 30MA transformers.

**INSTALLATION:**

Letters are individually mounted on front of building with appropriate mounting hardware for specific type of front.  In case of mansard roof or canopy mounting, letters are mounted on 2 x 2 x 2 x 1/4" angle iron framing secured.

* Type style, color of copy and background color of sign face at discretion of Tenant.


## SIGN SPECIFICATIONS

### Under Canopy Signs

**FABRICATIONS SPECIFICATIONS:**

V-shaped sign with high impact face with metal and end caps and metal cabinet.  Maximum length 72 inches, minimum length 48 inches, to be determined by existing conditions.

**SIGN FACINGS:**

V-shaped with high impact orange 2119 with black vinyl letters.

**SIGN CABINET:**

Metal end caps and metal frame to be 24 gauge bonderized steel with interior painted white and exterior cabinet to be dark bronze.

**ILLUMINATION:**

High output illumination with self-contained ballast in wiring channel.

**INSTALLATION:**

Sign to be mounted on ceiling of canopy and secured as per existing conditions.

# GUARANTY OF LEASE

In consideration of the foregoing lease between ___The Equitable Life Assurance Society___ of __the United States___, as Landlord, and___ ___Consolidated Stores International___ ___Corporation___, as Tenant, and to induce Landlord to enter into said lease, the undersigned, jointly and severally if there be more than one (collectively, "Guarantor"), covenants and agrees as follows:

1. Guarantor hereby unconditionally and absolutely guarantees to Landlord the prompt and full payment of rent and all other sums due to Landlord under said lease and the prompt and complete performance of all covenants contained in said lease on the Tenant's part to be performed. Guarantor agrees to indemnify and hold Landlord harmless from any loss, costs or damages arising out of Tenant's failure to pay the aforesaid rent and other sums and/or Tenant's failure to perform any of the aforesaid covenants.

2. Guarantor waives diligence, demand for payment or performance, extension of time of payment or performance, notice of acceptance of this Guaranty, notice of nonpayment, nonperformance and indulgences, and notices of every kind and consents to any and all forbearances and extensions of the time of payment and performance, and to any and all modifications in the terms, covenants and conditions of said lease hereafter made or granted and to all extensions and assignments thereof. Guarantor waives all right of subrogation whatsoever with respect to any collateral securing the aforesaid obligations.

3. Guarantor agrees that its obligations hereunder are primary and agrees that this Guaranty may be enforced by Landlord without first resorting to or exhausting any other remedy, security or collateral; provided, however, that nothing herein contained shall prevent Landlord from suing on the aforesaid obligations with or without making Guarantor a party to the suit or exercising any other rights under said lease, and if such suit or any other remedy is availed of, only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the aforesaid obligations. No action brought under this Guaranty and no recovery in pursuance thereof shall be a bar or defense to any further action which may be brought under this Guaranty by reason of any further default(s) hereunder or in the performance and observance of the terms, covenants and conditions of said lease. Guarantor agrees that a release or settlement with one or more of the persons or entities comprising Guarantor or Tenant shall not release any other Guarantor, and all such remaining Guarantors shall remain jointly and severally liable as though they were the only persons or entities executing this Guaranty. Guarantor hereby submits to personal jurisdiction in the state where the leased premises are located for the enforcement of this Guaranty, and waives any and all rights under the laws of any state or of the United States to object to jurisdiction within the state where the leased premises are located for the purposes of litigation to enforce this Guaranty. In the event such litigation is commenced, Guarantor agrees that service of process may be made and personal jurisdiction over Guarantor obtained by serving a copy of the summons and complaint upon the Secretary of State of the state where the leased premises are located, who is hereby appointed Guarantor's agent for service of process.

4. Guarantor agrees that Guarantor's obligation to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Tenant or its estate in bankruptcy (including without limitation any rejection of the lease by Tenant or by any Trustee or Receiver in bankruptcy) resulting from the operation of any present or future provision of the Bankruptcy Code, other similar statute, or from the decision of any court. The liability of Guarantor shall not be affected by any repossession of the leased premises by Landlord.

5. Guarantor agrees that in the event this Guaranty is placed in the hands of an attorney for enforcement, Guarantor shall reimburse Landlord for all expenses incurred, including reasonable attorney's fees.

6. Guarantor agrees that this Guaranty shall inure to the benefit of and may be enforced by Landlord, its successors and assigns and any mortgagee(s) of the leased premises, and shall be binding and enforceable against Guarantor and Guarantor's legal representatives, successors and assigns.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty this_____2nd_____day of _____October_____, 19 89 .

090184

CONSOLIDATED STORES CORPORATION

_Albert J. Bell_, Vice President

**Exhibit D**

To: Dawn

## PLOT PLAN OF SHOPPING CENTER



Adventures in Video 1200 sf

Vacant 1600 sf
Dominos Pizza 1200 SF
The Arrangement 1200 SF
Friar Franklin 1200 SF
Vacant 1200 sf
Vacant 1200 sf

8640 SF
Payless Shoes 3200 SF

27,104 SF

Proposed

SOUTH CLAYTON STREET / GEORGIA HIGHWAY 20

Winner's

Mrs.

Kroger

Wal-Mart