**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| BIG LOTS, INC., *et al.,*[1] | ) | Bankruptcy Case No. 24-11967 (JKS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Ref. D.I. 13, 511, 650 and 666 |

**BIG MIFL2 OWNER LLC'S OBJECTION AND RESERVATION OF RIGHTS
TO (I) THIRD NOTICE OF (A) BID DEADLINE, (B) SALE HEARING AND
(C) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED
LEASES FILED BY THE AND (II) TO THE SCHEDULED CURE AMOUNT**

Big Mifl2 Owner LLC ("**Big Mifl2**" or "**Landlord**") through its counsel,

JMCarbinoLaw, submits this objection and reservation of rights (collectively, the

"**Objection**") (I) to the Third Notice of (A) Bid Deadline, (B) Sale Hearing and (C) the

Potential Assumption and Assignment of Unexpired Leases and (II) the Proposed

Cure Amount (the "**Third Notice**") and respectfully represents as follows:

**JURISDICTION**

1       The Court has jurisdiction over the subject matter of this Motion pursuant to

28 U.S.C. §§ 157(b) and 1334(b). This is a core proceeding arising under Chapter 11

of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code") that the Court has authority to hear and determine within the meaning of 28

---

[1] ¹ The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin - Granville Road, Columbus, OH 43081.

U.S.C. §§ 157(b)(2)(A), (B) and (M). The statutory predicate for the relief sought herein is 11 U.S.C. § 365(b)(1), and 365(d)(2).  Venue before this Court is proper pursuant to 28 U.S.C. § 1409.

## BACKGROUND

2.      Big Lots, Inc. and its debtor affiliates in the above-captioned chapter 11 cases (the "**Debtors**") filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on September 9, 2024 (the "**Petition Date**").  Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§1107(a) and 1108.  No trustee or examiner has been appointed in these cases.

3.      On October 30, 2024, Debtor filed the Third Notice.  The Lease was listed on the Exhibit to the Third Notice.

4.      On October 30, 2024, the Debtor also filed its Fifth Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases (and the Abandonment of Property). [Dochet No. 666).  The Lease described hereinafter was also listed on the exhibit attached to this Notice.

5.      The Landlord, Big Mifl2[2]  and BLBO Tenant, LLC, ("**Tenant**") are parties to (i) a lease (the "**Lease**") dated effective as of August 25, 2023, and attached hereto as Exhibit A of nonresidential real property located at 18325 South Dixie Highway, Miami, Florida 33517 (the "**Premises**") and (ii) the Post-Closing Matters Agreement

---

[2] Big Mifl2 is the owner of the Premises as assignee of the Premises and Lease.

("**Post-Closing Agreement**")[3] also dated August 25, 2023, and as amended on October 5, 2023 and on October 24, 2023, and attached hereto as Exhibit B (collectively the "**Agreements**"), Notably, the performance of all the Tenant's obligations under the Lease and the Post-Closing Agreement are guaranteed by Big Lots, Inc. The Lease and the Post-Closing Agreement between Big Mifl2 and the Tenant were part of a comprehensive sale and leaseback transaction with Big Lots, Inc.

6.    The store located on the Premises and operated by the Tenant is referred to hereinafter as the "**Building.**"

7.    A third relevant document is a sublease and between SunTrust Bank, as the tenant to maintain and operate an ATM on the Premises, and PNS Stores, Inc., a Debtor and affiliate of Big Lots, Inc. (the "**ATM Lease**"). A copy of the ATM Lease is attached as Exhibit C.

8.    The Lease and Post-Closing Agreement constitute a single, indivisible contract. *In re Kafakis*, 162 B.R. 619 (Bankr. E.D.Pa. 1993). *See also, In re Abitibbowater Inc.* 418 B.R.815 (Bankr. D.Del. 2009) ("[A]ll of the contracts that comprise an integrated agreement must either be assumed or rejected, since they make up on contract.), citing *See Philip Servs. Corp. v. Luntz (In re Philip Servs., Inc.),* 284 B.R. 541, 547-48 (Bankr. D.Del.2002), *aff'd* 303 B.R. 574 (D.Del. 2003); *In re Karfakis,* 162 B.R. 719, 725 (Bankr.E.D.Pa.1993). Moreover, "[i]f the debtor

---

[3] The Tenant's obligations under the Post-Closing Agreement survive the real estate closing. *See* section 8 of the Post-Closing Agreement.

decides to assume a lease, [] it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed."). I*n re Buffets Holdings, Inc.,* 387 B.R. 115, 119 (Bankr.D.Del.2008).

9.    The Tenant made no attempt to fulfill its obligations under the Post-Closing Agreement. On August 29, 2024, Big Mifl2 gave notice of the defaults to the Debtors. *See* Exhibit D.

10.    Big Mifl2 objects to the sale of the Agreements and opposes any attempted sale and/or attempted assumption and assignment of the Lease by the Debtor, including the Agreements to a successful bidder at an auction of unexpired leases, and further objects to the seriously understated and "Preliminary Estimated Cure Cost" scheduled by the Debtors at only $112,216 on the Schedule to Docket No. 511, at page 10 of 79.

11.    While Big Mifl2 has not fully liquidated the cure cost, that cost will likely be greater, and possibly significantly greater, than One Million Thousand Dollars ($1,000,000.00) as more fully set forth below.

12.    The details of the damage and anticipated cost to repair that damage to the Premises, including the Building, resulting from the Debtors' numerous defaults under the Agreements require notice to this Court, all parties in interest and the general public of the deteriorating and dangerous conditions of the Premises and Building both internally and externally (as further detailed below). Additionally, the public should be aware of the significant potential safety and health hazards arising from the Debtors' dereliction. The parking lot has not been maintained

and members of the public could be exposed to serious injury should they trip and fall. As significantly, there is evidence of significant mold infestation in the Building where Big Lots is currently operating a going out of business sale.

13.    Big Mifl2 reserves the right to file a supplemental objection and by this Objection expressly reserves the right to file that supplemental objection. Furthermore, Big Mifl2 reserves the right to take any action to protect its interests as authorized by Order of this Court, by law, equity or otherwise.

14.    Since a buyer/assignee of the Lease has not yet been identified, and should never be identified, Big Mifl2 cannot yet make any objection respecting the specific bidder, including its financial condition and/or ability to provide adequate assurance of future performance. Big Mifl2 expressly reserves the right to make those further objections if Big Mifl2 is not successful in opposing the potential assumption and assignment of the Lease by the defaulting Debtors, including Big Lots, Inc.

15.    To that end, Big Mifl2 reserves all rights in connection, once again, with any future objection Big Mifl2 may have as to: (i) the identity of a successful bidder; (ii) the terms of the actual transfer or assignment of its Agreements; and/or (ii) the adequate assurance of future performance provided by a successful bidder, in the event of a sale and attempted assumption, assignment or transfer of the Agreements to a successful bidder.

16.    It is Big Mifl2's understanding, and by this Objection and Reservation of Rights, Big Mifl2 seeks clarification to confirm its understanding, that any

assumption of the Agreement by the Debtors and ultimate assignment to a successful bidder would include the assumption by the successful bidder of any remaining warranty obligation for the repairs and maintenance obligations of the Debtors, including Big Lots, Inc.,  as set forth in the Agreements and Big Mifl2 hereby reserves any and all rights in connection with the same.

17.    By filing this Objection, Big MIFL2 is not making an admission that the Agreements are executory contracts and/or unexpired leases, and Big Mifl2 reserves all rights with respect thereto.

18.    Big Mifl2 further reserves all rights in connection with the Agreements in the event the Agreements are not ultimately assumed and assigned to a successful bidder over Big Mifl2's objections, including, but not limited to, asserting a claim against the Debtors based on any amounts due or other defaults under the Agreements, including any non-monetary defaults.

19.    Big Mifl2 respectfully requests and reserves the right to supplement or amend this Objection prior to or at a final hearing on any issues relating to the Third Notice and subsequent related filings by the Debtors.

## OBJECTION

20.    Big MIFL2 Objects to the sale of the Lease or Post-Closing Agreement and will oppose any attempted sale and/or attempted assumption and assignment of the Lease and the Post-Closing Agreement by the Debtor to a successful bidder at an auction of the leases, and further objects to the seriously understated and scheduled cure amount costs as set forth on the Schedule to Docket No. 511.

### The Debtor or the assignee must cure all monetary defaults.

21.    The Debtor or its assignee will have significant monetary and nonmonetary defaults to cure.

22.    The past due rent for September to November 2024 is due and owing in the amount of $112,216.00 will have to be paid.

23.    The Debtor currently owes 2024 real estate taxes in the amount of $191,422.57 -- which will also have to be paid to cure any default. Exhibit D.

24.    The Tenant is responsible for paying real estate taxes that will become due on November 1, 2024. *Centerpoint Props. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 268. F.3d 205, 212 (3d Cir. 2001).30.

25.    Under subsection 21 E of the Lease, upon default, the Landlord was entitled to collect the rents being paid by subtenants while such Events of Default continue.  This will include rent paid pursuant to an ATM lease between Big Lots Stores -PNS, LLC and SunTrust Bank dated June 23, 2017 (Exhibit C), which is also referred to in section 4E of the Lease.

26.    Further, the Debtors are obligated to the Landlord or Landlord's attorney's fees pursuant to paragraph 5C of the Lease incurred in connection with enforcing his contractual rights under the Lease.

**The Debtors will have to cure
significant other defaults in accordance with
11 U.S.C. §§ 365(b)(1)(C) and (f)(2) before assuming the Agreements.**

27.     The cure notice at Docket No. 511 (Schedule at page 10 of 79) does not

address the Debtors obligations under the Agreements including, but not limited to,

the TPO Replacement of the Roof and Maintenance of the Parking Lot.  Under

Section 10 of the Lease, the Tenant is obligated to maintain the Building and

Premises in good condition.

## 10.  TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES.

Throughout the Term, Tenant, at its sole cost and expense, will keep the Premises in a substantially similar condition as existed on the Commencement Date (reasonable wear and tear, damage from fire or other casualty excepted), whether or not the need for such repairs occurs as a result of Tenant's use, the elements, or the age of the Building, the Property or Tenant's Personal Property, or otherwise, and will commit or allow no physical waste with respect thereto, and with reasonable promptness, will make all necessary and appropriate repairs and replacements thereto of every kind and nature, including without limitation those necessary to ensure continuing compliance with all Laws and insurance requirements, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen. Tenant's maintenance, repair and replacement obligations shall extend to and include, without limitation, all systems serving the Premises and, subject to any Permitted Encumbrances, any parking areas and landscaping on the Property. The necessity for and adequacy of repairs to any Building or other improvements forming a part of the Premises shall be measured by the standard which is appropriate for and equivalent in quality to such Building's Comparable Buildings. Tenant's 22 obligations under this Section 10 shall, without limitation, include the maintenance, repair and replacement (a) at all times, of any and all building systems, machinery and equipment which exclusively serve the Premises, and (b) of the bearing walls, floors, foundations, roofs and all structural elements of the Premises. Tenant will not take or omit to take any action the Tenant will not take or omit to take any action the taking or omission of which would reasonably be expected to (i) create (or permit to continue) any dangerous condition, or (ii) create (or permit to continue) any condition which might reasonably be

8

expected to involve any loss, damage or injury to any person or property. All repairs and replacements shall be in quality and class at least equal to the original work and shall be made promptly as and when necessary. Repairs and replacements called for as a result of fire and/or other casualty and condemnation shall be made pursuant to the provisions of Sections 18 and 19 hereof, respectively. In connection with the foregoing, Tenant's obligations shall include without limitation with respect to the Premises, to the extent applicable:

1.      Maintaining, repairing, and replacing, as necessary, the roof of the Building on the Premises;

2. Maintaining and repairing the bearing walls, floors, foundations, and all structural elements of the Building on the Premises;

3.  Maintaining (including periodic window washing and periodic painting) and repairing the facade and exterior walls of the Building on the Premises;

4.      Repairing and replacing, as necessary, the doors (including, without limitation, any overhead doors) and windows of the Building on the Premises, and the mechanisms therefor;

5.      Causing the regular removal of garbage and refuse from the Premises;

6.      Causing the regular spraying for and control of insect, rodent, animal and pest infestation, and maintaining in good working order taking or omission of which would reasonably be expected to (i) create (or permit to continue) any dangerous condition, or (ii) create (or permit to continue) any condition which might reasonably be expected to involve any loss, damage or injury to any person or property. All repairs and replacements shall be in quality and class at least equal to the original work and shall be made promptly as and when necessary. Repairs and replacements called for because of fire and/or other casualty and condemnation shall be made pursuant to the provisions of Sections 18 and 19 hereof, respectively. In connection with the foregoing,

Tenant's obligations shall include without limitation with respect to the Premises, to the extent applicable;

7.      Servicing, maintaining, repairing and replacing all systems and equipment serving the Premises, including, without limitation, heating, ventilation, and air-conditioning equipment, and generators;

8.      Regular sweeping, cleaning and removal of trash, debris, other materials and stains from the Premises and from the immediately adjacent sidewalks, service drives and loading or delivery areas, if any, of the Premises, as necessary to keep the same clean and regular sweeping, cleaning and washing of the interior of the Building, including, without limitation, floors, windows and fixtures, and periodic washing and painting of interior walls;

9.      Regular sweeping, cleaning and washing of the interior of the Building, including, without limitation, floors, windows and fixtures, and periodic washing and painting of interior walls;

10.     Repairing broken, damaged or leaking walls, bathrooms, ceilings, or fixtures and equipment in the interior of the Building, including, without limitation, plate glass windows, windows, floors and lighting fixtures;

11.     Irrigating and performing all gardening and landscaping of all lawns, trees, shrubs and plantings comprising part of the Premises; and

12.     Tenant shall maintain a contract on at least an annual basis for regular servicing and maintenance (at least once annually) of the heating, ventilating, air conditioning and vertical transportation systems serving the Building, unless Landlord shall otherwise direct. Upon written request of Landlord, Tenant shall submit to Landlord a copy of such fully paid contract and any extensions, renewals or replacements thereof. At a minimum, each maintenance contract for any such equipment shall include a provision that such contractor shall be required to coordinate any activities performed on the roof of the Building by a roofing contractor, so as to not void any roof or related warranties.

B.        Landlord shall not be required to furnish any services or facilities or make any repairs or alterations in or to the Premises, and Landlord shall not under any circumstances be required to (i) build or rebuild any improvements on the Premises; (ii) make any repairs, replacements, alterations, restorations or renewals of any nature to the Premises, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto; or (iii) maintain the Premises (including any parking or common areas which comprise part of the Premises or the Property) in any way. Tenant hereby expressly and unconditionally waives, to the fullest extent now or hereafter permitted by Law, the right to make repairs or perform any maintenance at the expense of Landlord which right may be provided for in any Law in effect at the time of the execution and delivery of this Lease or which may hereafter be enacted. Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises. However, on default of Tenant beyond the expiration of any applicable notice and cure periods in making such repairs or replacements, Landlord may, but shall not be required to, make such repairs and 24 replacements for Tenant's account and the expense thereof shall be paid by Tenant to Landlord upon demand with interest at the Default Rate. Except as expressly set forth herein, nothing contained in this Lease and no action or inaction by Landlord shall be construed as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition or maintenance of or to the Premises or any part thereof or any improvements thereto; or (ii) giving Tenant any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord in respect thereof.

Section 10 of the Lease.  Section 11 of the Lease provides, as follows:

## 11.  COMPLIANCE WITH LAWS.

Tenant shall, at its sole cost and expense, use and maintain the Premises in compliance with all Laws, and Tenant shall, at its sole cost and expense, comply with all Laws applicable to or having jurisdiction over the use, occupancy, operation, and maintenance of the Premises, including without limitation, all Environmental Laws, the ADA and other access laws and those which require the

11

making of any structural, unforeseen or extraordinary changes and including those which involve a change of policy on the part of the governmental body enacting the same. Tenant shall, at its sole cost and expense, comply with all Encumbrances affecting the Premises or any portion thereof (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage).

Section 11 of the Lease.

28.     In addition to Tenant's failure to satisfy the obligations set forth in the Post-Closing, Tenant has failed to maintain the Building and Premises as required by the Lease. As it stands, both the Building and Premises have experienced significant damage and neglect. Several of these present defects that remain unaddressed at the Building and the Premises present environmental health hazards as well as significant safety hazards and risks to the public and the Building and Premises.

29.     The outstanding maintenance and repair issues have been set forth in more detail in the exhibit to Big MIFL2's Objection to Cure Costs. *See* Exhibit E.

30.     Based upon Tenant's failure to perform its obligations under the Agreements, the Leased Property is subject to, among others serious problems, water damage. On a post-petition basis, Big MIFL2 is being subjected to serious damage to the Building through water damage. But the evidence itself will show that there is pervasive and ongoing water damage to the Building suffered by BigMIFL2 – which damage continues and is overwhelming to the point where the Tenant is covering its inventory with heavy plastic sheeting.

31.     It also appears that the Building suffers from mold infestation. While Big MIFL2 has not yet had the apparent mold infestation tested to confirm its existence, the preliminary reports include the expressly stated concern that mold exists and such mold is depicted in pictures. *See,* Visual Indoor Air Quality Assessment Report dated October 29, 2024, Exhibit F.

32.     This Report concludes: The observed water staining indicates building envelope issues, which are suspected to be associated with the roof based upon the location of water staining. Suspect visible growth was observed in many areas where water staining was present, which may indicate that moisture issues are still present or suspect visible growth was not addressed after moisture issues were resolved. The author of report, GHP recommends assessing the building envelope for moisture intrusion issues. GHP also recommends assessing the HVAC system for moisture intrusion issues and/or condensation issues. Any observed water staining and suspect visible growth should be addressed. Ceiling tiles with water staining and/or suspect visible

growth should be removed and replaced. Note that if underlying envelope and HVAC systems are not resolved, the potential exists for the reoccurrence of water staining and suspect visible growth after they have been initially observed.

33.    The ongoing mold infestation presents a public safety hazard to the Debtors' employees and to the public. the possible presence of mold is a violation of paragraph 21 of the lease regarding Hazardous Materials which are defined to include "mold or other microbial matter…) *See,* Lease at paragraph 2 BB. The Lease requires that the Tenant, and as a result any assignee, conduct such investigation, remediation or other response action necessary to address the Hazardous Materials, and is also required to indemnify the Landlord from any and all liability claims, as well as the cost of investigation remediation and any corrective costs including reasonable attorneys' fees, consultant's or contractor's fees.

34.    The Premises continue to deteriorate and pose a hazard for the lack of maintenance because of the structural issues, leaks and electrical issues.

35.    Under the Post-Closing Agreement, the Tenant was required to make any necessary repairs to the parking lot surrounding the Leased Property. The Post-Closing Agreement was executed contemporaneously with the Lease. The Post-Closing Agreement set forth a variety of obligations for the Tenant to complete in a specific time frame following execution of the Post-Closing Agreement. The original Agreements required the Tenant to cure within 60 days certain code violations identified by the Miami-Dade Fire Rescue Department – Inspection Report (Permit Number 99125-19107), dated October 4, 2022. In addition, the Tenant was obligated to file applications for permits and make certain repairs and replacements (patching, crack sealing, sealing and striping; repair damaged aluminum and fabric canopies; TPO roof replacement) within certain specified deadlines. The time periods were extended in subsequent amendments to the Post-Closing Matters Agreement. The fire code violation was cured by the Tenant, but the other required applications for permits and repair and replacement items were never completed.

36.     Based on the status of the parking lot, such repairs will need to take the form of a full repaving.  In accordance with Exhibit A to the Post-Closing Agreement, the Tenant is required to perform patching, crack sealing, sealing and striping of the parking lot. Landlord understands that Tenant failed to even obtain Permits within the contractually agreed-upon 60-to-90-day period to obtain permits for the remediation (or replacement) of the parking lot.

37.     The Tenant's failure to address the problems with the parking lot could potentially result in a significant injury to a member(s) of the public based upon the ongoing deterioration of the parking lot including ever-growing cracks, etc.

38.     As set forth in the Landlord's Objection to the Debtors' Preliminary Estimated Cure Cost (Page 10 of 79 in Schedule to Docket Number 511), the scheduled cure cost is $112,211.00.  The current estimates for the repair of the roof range from $512,800 to $758,800.  The cost for the asphalt repairs, sealing and striping ranges from $56,600 to $92,817.  In other words, repairing the roof and parking lot only will cost between $578,800 and $$850,817.00.  Additionally, the Tenant currently owes (i) $108,794.94 for the quarterly rent for the period of September 1 through November 30, 2024, (ii) taxes in the amount of $191,422.57 and the costs to repair the Tenant's other defaults under the Agreement as set forth on Exhibit E.

39.     The Debtors' scheduled cure cost of $112,211.00 is woefully inadequate.  Big Mifl2 strenuously objects to the schedule cure cost.

40.     Big Mifl2 also objects to the sale of the Agreements and will oppose any attempted sale and/or attempted assumption and assignment of the Agreements by

the Debtor to a successful bidder, if any, at an auction of the Lease, and once again

objects to the scheduled Preliminary Estimated Cure Cost of $112,211.00 when, in

fact, without taking into account the cost of mold remediation (if it exists), the

actual cure amount is, at least, $878,217.51 ($578,000 + $$108,794.94 +

$191,422.57 = $878,217.51) without taking into account (i) the cost of remediation if

mold exists and (ii) the other necessary repairs as set forth on Exhibit E. On the

other hand, the actual cure cost may be, at least, $1,058,217.51 ($858,000 +

108,794.94 + 191,422.57 = $1,058,217.51) without considering (i) the cost of

remediation if mold exists and (ii) the other necessary repairs as set forth on

Exhibit E.

## Debtor or its assignee will have to provide adequate assurance of future performance including for nonmonetary defaults.

41.     Prior to any assumption or assignment of unexpired leases in these

bankruptcy cases, the Debtors are required by section 365(b)(1) of the Bankruptcy

Code to provide adequate assurance that the debtors will promptly cure all defaults

under the unexpired leases to be assumed and assigned and provide adequate

assurance of future performance by the proposed assignee in the under the terms of

the unexpired Lease and Post-Closing Agreement.

42.     Bankruptcy Code section 365(b)(1) provides that in the event of a

default under an unexpired lease, a debtor may not assume the lease unless, at the

time of the assumption of the lease , the debtor "(A) cures, or provides adequate

assurance that the debtor will promptly cure, such default; (B) compensates or

provides adequate assurance that the debtor will promptly compensate, the non-

debtor party to the contract for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract. 11 U.S.C. § 365(b)(1).

43.     Section 365 further requires that the Debtors provide adequate assurance that it or any assignee will have the ability to perform under the Lease as a condition to assuming such lease. 11 U.S.C. § 365(b)(1)(C) and (f)(2). The Debtors bear the ultimate burden of persuasion as to this issue. *In re Rachels Industry, Inc.,* 109 B.R. 797 (Bankr. W.D. Tenn 1990).

44.     Adequate assurance of future performance is determined by the existing factual conditions, and the court may look too many factors in determining what is necessary to provide adequate assurance of future performance under section 365(b), including sufficient economic backing, economic conditions, credit reports, escrow deposits or other similar forms of security or guarantee. *In re Lafayette Radio Electronics Corp.,* 9 B.R. 993 (Bankr. E.D.N.Y. 1981)*; In re Belize Airways,* 5 B.R. 152 (S.D. Fla. 1980).

45.     Section 365(d)(3) of the Bankruptcy Code provides, in relevant part, that:

[t]he debtor-in-possession] shall timely perform all of the obligations of the debtor arising from and after the order for relief under any unexpired lease of non-residential property . . .until such lease is assumed or rejected . . .

46.     Under Section 5 of the ATM Lease, "the Tenant shall pay the Rent directly to the Landlord without prior notice or demand and without any deduction, counterclaim, offset, or diminution, whatsoever, in equal monthly

installments in advance of on the first day of each month during the Term" to the Landlord directly.  ATM Lease at Section 5, page 3.  Big MIFL2, as the assignee of the Agreements, is the Landlord.  Both prepetition and post-petition the debtor Tenant has been acting in bad faith and withholding the monthly payment from SunTrust Bank.

47.    The withholding of rent by the debtor Tenant from the sublet tenant, SunTrust Bank, constitutes the ongoing conversion of Big Mifl2's money by the Debtors both prepetition and post-petition, and similarly, constitutes one more bad faith act of the Debtor Tenant and its guarantor, Big Lots, Inc, on a post-petition basis.

48.    In total, the cure costs due and owing by the Tenant to Big Mifl2 are in an amount of, at least, $878,217.51 without considering (i) the cost of remediation if mold exists and (ii) the cost of the other necessary repairs which the Tenant is obligated to perform under the Agreements as set forth on Exhibit ___.

## RESERVATION OF RIGHTS

49.    Nothing contained herein is intended to be, nor shall it be construed as, a waiver of Big Mifl2s rights under the Agreements, the Bankruptcy Code, applicable law, equity or otherwise, and Big Mifl2 expressly reserves all rights as to any determination that the Agreements are executory contracts and/or unexpired leases and further reserves all rights to object to the sale, assumption and assignment, or transfer of the Agreements, including any non-monetary obligations or performance of the Debtors or a successful bidder who attempts to take an assignment of the Agreements from the Debtors.

50.     Based upon the Debtors' bad faith behavior both prepetition and post-petition, Big Mifl2 does not believe that the Debtors can transfer the Lease under the Bankruptcy Code, applicable law, equity or otherwise.

51.     Big Mifl2 objects to (i) the scheduled $112,211 cure cost and (ii) the assumption and assignment of the Agreements by the Debtors.

Respectfully submitted,

JMCARBINO LAW


Date:  November 4, 2024        By: */s/Jeffrey M. Carbino*
Wilmington, Delaware              Jeffrey M. Carbino (DE No. 4062)
                                  1007 N. Orange Street, Suite 420
                                  Wilmington, DE 19801
                                  Telephone: 610.639.3695
                                  Email: jcarbinolaw@outlook.com


*Attorneys for the Big Mifl2 Owner LLC*