# EXHIBIT D

BL# 4224

## ATM LEASE

**THIS ATM LEASE** ("this Lease"), dated as of the 23rd day of June, 2017, between **SUNTRUST BANK**, a Georgia banking corporation (the "**Tenant**"), and **PNS STORES, INC.**, a California corporation (the "**Landlord**"), provides:

**THAT** for and in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Tenant and the Landlord hereby agree as follows:

1. **BASIC LEASE PROVISIONS.** The following constitute the basic terms, definitions and provisions of this Lease:

| | | |
|---|---|---|
| (a) | **PREMISES:** | Approximately .15 to .25 acres, as more particularly shown on **Exhibit A** attached hereto (the "**Premises**"), in the parking lot of the Big Lots anchored shopping center located at 18325 Dixie Highway, Miami, Florida, as more particularly shown on **Exhibit A** attached hereto (the "**Shopping Center**"). |
| (b) | **COMMENCEMENT DATE:** | The date of this Lease (the "**Commencement Date**"). |
| (c) | **INSPECTION AND PERMIT PERIOD:** | A period of one hundred twenty (120) days from and after the date of this Lease (the "**Inspection and Permit Period**"). |
| (d) | **RENT COMMENCEMENT DATE:** | One hundred eighty (180) days following the Commencement Date (the "**Rent Commencement Date**"). |
| (e) | **EXPIRATION DATE:** | The date immediately preceding the fifth (5th) anniversary of the Rent Commencement Date (the "**Expiration Date**"). |
| (f) | **INITIAL TERM:** | The period commencing on the Commencement Date and expiring on the Expiration Date (the "**Initial Term**"). |
| (g) | **RENEWAL TERMS:** | Two (2) additional consecutive terms of five (5) years each (the "**Renewal Terms**"). |
| (h) | **RENT:** | The following rent amounts (the "**Rent**"): |
| | | (i) $30,000 per year, payable in equal monthly installments of $2,500.00 per month, during the Initial Term; |
| | | (ii) $36,000 per year, payable in equal monthly |

                installments of $3,000.00 per month, during the first Renewal Term (if exercised by the Tenant); and

           (iii) $42,000 per year, payable in equal monthly installments of $3,500.00 per month, during the second Renewal Term (if exercised by the Tenant).

(i)  **LANDLORD'S ADDRESS:**   300 Phillipi Road
                 Columbus, OH 43228

(j)  **TENANT'S ADDRESS:**   SunTrust Bank
                 200 South Orange Avenue
                 Mail Code: 2032 SOAB-3
                 Orlando, Florida 32801
                 Attn: Corporate Real Estate & Workplace

2.  **PREMISES.** The Landlord hereby leases the Premises to the Tenant, and the Tenant hereby leases the Premises from the Landlord, upon the terms and conditions set forth herein. The Premises are leased to the Tenant together with the non-exclusive right of ingress and egress for vehicular and pedestrian access to and from the Premises by the Tenant, and its employees, agents, contractors and customers, over and across all entrances, driveways, parking areas, sidewalks and other common areas of the Shopping Center, which may now or hereafter exist, including a dedicated drive-up and stacking lane located immediately adjacent to the Premises as more particularly shown on **Exhibit A** attached hereto. The Landlord shall deliver possession of the Premises to the Tenant on the Commencement Date and the Tenant agrees to accept the Premises in their as is condition and acknowledges the Landlord shall have no obligation to make any improvements to prepare the Premises for the Tenant's occupancy.

3.  **INSPECTION AND PERMIT PERIOD.**

  (a)   Within fifteen (15) days after the Commencement Date, the Landlord shall furnish to the Tenant, at no cost or expense to the Tenant, copies of all information in the possession of the Landlord with respect to the Premises.

  (b)   During the Inspection and Permit Period, the Tenant may, at the Tenant's expense, (i) conduct and perform all inspections, investigations, surveys, testing and undertakings with respect to the Premises as the Tenant desires to confirm the suitability of the Premises for the Tenant's operations (the "**Inspections**"), and (ii) seek all permits, approvals and licenses from local governmental authorities and third parties as may be required for the Tenant to construct and operate the ATM and install its signage on the Premises (the "**Permits**"). The Landlord agrees, at the Tenant's request but at no cost or expense to the Landlord, to reasonably cooperate with the Tenant to obtain any required Permits. If the results of the Inspections are deemed unsatisfactory in the Tenant's sole discretion or if the Tenant is unable to obtain the Permits on terms and conditions acceptable to the Tenant, in its sole discretion, on or before the expiration of the Inspection and Permit Period, then the Tenant may terminate this Lease by providing written notice thereof to the Landlord before the expiration of the Inspection and Permit Period, in which event neither party shall have any further liabilities, rights or obligations

hereunder, except for prior defaults and the indemnities expressly set forth in this Lease. Notwithstanding, Tenant shall be liable to Landlord for any damage caused by the Inspections. Notwithstanding anything to the contrary, if Tenant is unable to obtain Permits within ninety (90) days of the Effective Date, Landlord shall have sixty (60) days to obtain Permits on Tenant's behalf, at Landlord's sole cost and expense. If Landlord is unable to obtain Permits on Tenant's behalf within such 60 days, either party may terminate this Lease by delivering notice to the other party before Permits are obtained.

(c) The Tenant agrees to indemnify, defend and hold the Landlord harmless from and against any loss, damage or expense (including reasonable attorneys' fees and expenses) arising from any death, personal injury or property damage caused by the negligence or willful misconduct of the Tenant during the performance of its Inspections of the Premises.

4. **TERM.**

(a) The Initial Term of this Lease shall commence on the Commencement Date and expire on the Expiration Date, unless earlier terminated or renewed as provided herein. The Tenant's obligation to pay Rent under this Lease shall commence on the Rent Commencement Date. Upon the occurrence of the Rent Commencement Date, the Landlord and the Tenant shall each execute and deliver a statement confirming the Rent Commencement Date and the Expiration Date in the form of **Exhibit B** attached hereto.

(b) The Tenant shall have the option to renew this Lease for the Renewal Terms. The Tenant may exercise such renewal option by sending written notice of such exercise to the Landlord at least one hundred fifty (150) days prior to the end of the then current Term. In the event the Tenant elects to renew the Term, each of the Renewal Terms shall be upon the same terms and conditions as set forth in this Lease, including the adjustment to the Rent as set forth above. For purposes hereof, the "**Term**" shall mean the Initial Term and any Renewal Terms exercised by the Tenant as provided herein.

(c) Notwithstanding any other provision of this Lease to the contrary, the Tenant's obligations under this Lease are expressly subject to the Tenant's receipt of all necessary governmental and regulatory approvals to install and operate the ATM in the Premises (collectively, the "**Approvals**"). The Tenant agrees to exercise commercially reasonable efforts to obtain the Approvals promptly after the execution of this Lease.

5. **PAYMENTS.** Commencing on the Rent Commencement Date, the Tenant shall pay the Rent to the Landlord without prior notice or demand and without any deduction, counterclaim, offset, or diminution, whatsoever, in equal monthly installments in advance on the first day of each month during the Term, at the Landlord's address identified above. If the Rent Commencement Date occurs on a day other than the first day of a calendar month or if the Expiration Date occurs on a day other than the last day of a calendar month, the Rent for any such partial month will be prorated for the portion of such month that this Lease is in effect. The Tenant shall have no obligation to pay any portion of the real estate taxes, operating expenses, common area maintenance or repair costs, insurance expenses or any other similar costs and expenses incurred by the Landlord in connection with the operation, repair and maintenance of the Shopping Center. Tenant shall be responsible for any taxes associated with Tenant's personal property or any sales taxes imposed upon this Lease.

6. **USE AND OCCUPANCY.**

FL01919 – Cutler Ridge ATM - Lease

3

(a) The Tenant shall use the Premises solely for the installation, operation, maintenance, replacement and removal of an automated teller machine, or any similar machine or computer terminal that may be initially or subsequently installed by the Tenant (collectively, the "**ATM**"), and such ATM (or similar machine or computer terminal) may provide or promote at the Premises any services the Tenant may lawfully offer including, without limitation, banking, insurance, consumer finance, trust services and investment services and products. The Landlord acknowledges that such services, products and offerings will change over time as the industry evolves, and consents to such changes so long as they remain consistent with the Tenant's primary business. The Tenant shall not use or permit the Premises to be used for any other purpose or purposes without the prior written consent of the Landlord. The Tenant shall, at its expense, procure any and all governmental licenses and permits required for the conduct of the Tenant's business at the Premises and shall, at all times, comply with the requirements of each such license and permit.

(b) The Landlord agrees that during the Term the Tenant shall have the exclusive right to operate an ATM or any similar machine within the Shopping Center, excluding any ATMs located inside the Landlord's Big Lots store. The Landlord acknowledges and agrees that a breach of the Tenant's exclusive rights hereunder shall cause the Tenant irreparable harm and the Tenant shall have the right, in addition to all other remedies available to the Tenant, to obtain injunctive or other relief for the enforcement of such exclusive rights and the Landlord agrees to reimburse the Tenant for all reasonable attorneys' fees and other costs incurred by the Tenant in connection with the enforcement of such exclusive rights. The Landlord represents, warrants and agrees that no lease or other agreement for the Shopping Center recognizes or grants an exclusive right or privilege to any other tenant, or other person or entity, to offer any product or service that conflicts with the Tenant's exclusive rights hereunder and this Lease and the exercise by the Tenant of its rights hereunder will not cause a breach or default to occur under any lease, mortgage, agreement or other encumbrance affecting the Landlord, the Premises or the Shopping Center.

(c) The Landlord agrees not to limit or obstruct access to and from the ATM by the customers, visitors, employees and invitees of the Shopping Center or obscure the visibility of the ATM in the Shopping Center.

(d) The Tenant shall have the right to discontinue business operations from the Premises at any time and from time to time and such discontinuance of business operations shall not constitute a default by the Tenant under this Lease so long as the Tenant continues to pay the Rent and comply with the Tenant's other obligations under this Lease.

(e) The Tenant shall have the right, without the Landlord's consent, to: (i) provide lighting during non-daylight hours in accordance with the applicable law and the Tenant's lighting standards, and (ii) modify its lighting in connection with the Premises at any time. If required by applicable law or deemed necessary by the Tenant, in its sole discretion, to protect the health and safety of its customers, agents, employees, and invitees, the Tenant shall have the right, at the Tenant's sole cost and expense and subject to the Landlord's prior reasonable approval, to add supplemental lighting to common areas outside of the

Premises. Any of Tenant's utilities shall be separately metered and Tenant's sole responsibility.

7.     **SIGNS.** Subject to compliance with all laws, ordinances, and regulations from the authority having jurisdiction, Tenant may place signage identifying itself and its operations and the names and logos of network providers on the ATM and the Premises in accordance with the signage plans attached hereto as **Exhibit B**, as well as directional signage in the immediate vicinity within the Shopping Center and on the pylon signs adjacent to the entrances to the Shopping Center. The Tenant may, with the Landlord's reasonable approval, place temporary "coming soon" or "arriving soon" signage on the Premises. Any change to such approved signage shall be subject to the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. The Tenant shall be obligated, at its expense, to obtain all required consents and approvals for any exterior signs from the applicable local governmental authorities. The Tenant may conduct its operations at the Premises under its current trade name or any other trade name that the Tenant may lawfully use in the jurisdiction in which the Premises are located.

8.     **FIXTURES AND EQUIPMENT.** The Tenant, at its expense, may construct and install on the Premises a free-standing facility for the operation of the ATM and may install within such facility all fixtures and equipment as the Tenant deems necessary or desirable for the operation of the ATM. Tenant shall be responsible for the design and construction of the ATM and Premises Improvements and Landlord hereby consents to Tenant's construction of the Premises Improvements substantially in accordance with **Exhibit A**. All fixtures and equipment installed by the Tenant on the Premises shall at all times during the Term remain the property of the Tenant. The Tenant agrees that if any mechanics' or similar liens shall be filed against the Premises or the Shopping Center by any contractor, subcontractor, materialman or laborer for work performed or materials furnished at the request of the Tenant, the Tenant shall, within fifteen (15) days after it is provided with written notice of such lien, cause such lien to be released or bonded off and removed of record. The Landlord expressly waives and releases any right the Landlord may have to a lien under the common or statutory laws of the jurisdiction in which the Premises are located upon the ATM or any other fixtures or equipment installed by the Tenant on the Premises. As used herein, the "**Premises Improvements**" shall consist of all construction and preparation of the Premises in order for Tenant to be in position to install and operate the ATM, including without limitation:

(i)     Construction of the footings, foundation, pad, bolts, and bollards for the ATM;

(ii)    Installing conduit for electrical and data (cabling, and phone) service for the ATM to Premises; and

(iii)   Providing access for the electrical and data sources to be located on or adjacent to the Premises (or at another location acceptable to Tenant) that is to be constructed, which source box shall be accessible by Tenant and under Tenant's control.

9.     **MAINTENANCE AND REPAIR.** The Tenant, at its expense, shall keep and maintain the Premises in good order and repair, reasonable wear and tear excepted. The Landlord, at its expense, shall keep and maintain the common areas of the Shopping Center in good order and repair.

10.    **UTILITIES.** The Tenant, at its expense, shall be responsible for all necessary utilities including, without limitation, lighting, air conditioning, heating, electricity, telephone and other utilities, for the operation of the ATM on the Premises. The Landlord agrees to reasonably cooperate with the Tenant for the extension of any such utilities to the Premises including, without limitation, the granting of any reasonable easements to the utility service providers. If the utility service to the ATM is interrupted

due to the gross negligence or willful misconduct of Landlord or its agents for a period of more than three (3) days, the Rent hereunder shall be abated until such utilities have been repaired and restored.

11. **INSURANCE.**

   (a) Commencing on the Commencement Date, and during the balance of the Term of this Lease, the Tenant, at its expense, shall maintain (i) an extended coverage insurance policy with respect to the ATM and any fixtures or equipment installed by the Tenant on the Premises in the replacement value thereof, and (ii) a commercial general liability insurance, including public liability and property damage, with respect to the Tenant's operations at the Premises, with a minimum combined single limit of liability of $2,000,000 for personal injury or death of persons occurring on the Premises. The general liability insurance policy shall name each of the Landlord and its mortgagee as an additional insured.

   (b) The Tenant may affect the foregoing insurance coverages by a policy or policies of blanket insurance, provided the required coverage shall not be reduced or diminished by reason thereof and all other requirements hereof are otherwise satisfied. All policies of insurance shall be for the mutual and joint protection of the Landlord and the Tenant and the Landlord's mortgagee(s), and shall contain, by endorsement or otherwise, a provision that the company writing the same shall give the Landlord at least thirty (30) days' prior written notice of any cancellation or lapse in coverage, and/or any reduction in coverage initiated by the insurance company. The Tenant shall deliver to the Landlord a certificate of each such policy upon the Commencement Date and thereafter a renewal certificate for such policy on or before the expiration date thereof. Tenant shall name Landlord as an additional insured.

   (c) The Landlord, at its expense, shall maintain (i) an extended coverage insurance policy with respect to the Shopping Center, and (ii) a commercial general liability insurance, including public liability and property damage, with respect to the Landlord's operations at the Shopping Center, with a minimum combined single limit of liability of $2,000,000 for personal injury or death of persons occurring on the Shopping Center.

   (d) Notwithstanding any provisions of this Lease to the contrary, the Landlord and the Tenant, on behalf of themselves and all others claiming under them (including any insurers), hereby waive all claims against each other (including all rights of subrogation) for loss or damage to their respective property arising from fire and any other casualty that are covered under an extended coverage insurance policy or would have been covered had the Landlord or the Tenant carried the insurance coverage required pursuant to the terms of this Lease.

12. **INDEMNIFICATION.** The Tenant agrees to indemnify, defend and hold the Landlord, and its officers, members, directors, employees and agents, harmless from any and all claims for injury, death, damages or expenses (including reasonable attorneys' fees) caused by the negligence or willful misconduct of the Tenant or any employee, agent or contractor of the Tenant. The Landlord agrees to indemnify, defend and hold the Tenant, and its officers, directors, employees and agents, harmless from any and all claims for injury, death, damages or expenses (including reasonable attorneys' fees) caused by the negligence or willful misconduct of the Landlord or any employee, agent or contractor of the Landlord.

FL01919 – Cutler Ridge ATM - Lease

6

13. **TAXES.** The Landlord shall pay all taxes assessed against the Premises and the Shopping Center. The Tenant shall pay all personal property taxes imposed specifically against the ATM and any other fixtures or equipment installed by the Tenant on the Premises.

14. **TERMINATION BY LANDLORD.** If the Tenant fails to pay any installment of the Rent when it becomes due and payable and such failure continues for ten (10) days after written notice of such failure from the Landlord to the Tenant or, if the Tenant breaches any other covenant of this Lease and fails to cure same within thirty (30) days after written notice of such breach from the Landlord to the Tenant or, if such breach cannot be cured within such thirty (30) day period and the Tenant fails to pursue diligently the curing of such breach within a reasonable period of time thereafter, then the Landlord may, at its option, terminate this Lease by providing ten (10) days prior written notice of such termination to the Tenant, in which event neither party shall have any further rights or obligations hereunder (except as specifically provided herein).

15. **TERMINATION BY TENANT.** If the Landlord breaches any covenant of this Lease and fails to cure same within thirty (30) days after written notice of such breach from the Tenant to the Landlord or, if such breach cannot be cured within such thirty (30) day period and the Landlord fails to pursue diligently the curing of such breach within a reasonable period of time thereafter, then the Tenant may, at its option, terminate this Lease by providing ten (10) days prior written notice of such termination to the Landlord, in which event neither party shall have any further rights or obligations hereunder (except as specifically provided herein).

16. **SURRENDER.** The Landlord acknowledges and agrees that the ATM and any other fixtures or equipment installed by the Tenant on the Premises shall remain the property of the Tenant. Within thirty (30) days after any termination or expiration of the Term, the Tenant, at its expense, shall remove the ATM and repair any damages to the Premises caused by the Tenant's installation or removal of the ATM, and surrender possession of the Premises to the Landlord in good condition, reasonable wear and tear excepted.

17. **CASUALTY.** If (a) the Premises are totally destroyed or damaged by fire or other casualty, or (b) the Premises are destroyed or damaged to the extent that the repair or replacement of the Premises would take more than sixty (60) days to complete or the casualty occurs during the last twelve (12) months of the Term, then the Tenant shall have the right to terminate this Lease as of the date such casualty occurred by providing written notice thereof to the Landlord. Such notice shall be given by the Tenant to the Landlord by no later than thirty (30) days after the date of the damage or destruction. If the Tenant elects to so terminate, this Lease shall terminate as of the date of such damage or destruction and be of no further force and effect, except as to obligations theretofore accrued, and any prepaid Rent attributable to the period after the date of such destruction shall be refunded to the Tenant by the Landlord. If the Tenant does not elect to terminate this Lease, the Rent shall be abated for a period commencing on the date of the damage or destruction and expiring on the earlier to occur of (i) ninety (90) days after the date of the damage or destruction or (ii) the date the Tenant's ATM is re-opened for use by banking customers at the Premises. If the Tenant does not elect to terminate this Lease, the Tenant shall make all necessary applications to reconstruct or restore the Premises as soon as possible after the date of the damage or destruction, and after obtaining all necessary governmental approvals, and after the Tenant has commenced such reconstruction or restoration work, the Tenant shall diligently and continuously proceed with such work, without any intentional delay, and complete all restoration and reconstruction as soon as possible.

18. **CONDEMNATION.** If the whole or any part of the Premises or the common areas of the Shopping Center shall be taken or condemned by any competent authority (including, without limitation, sale under the threat of such a condemnation) to such an extent that the Tenant is unable to operate the ATM in a manner satisfactory to the Tenant, then either party shall have the right to terminate this Lease as of the date of such condemnation by providing written notice thereof to the other party within thirty (30) days of the date of such condemnation. Upon such termination, neither party shall have any further liabilities, rights or obligations hereunder (i.e., which accrue after the termination date) except for prior defaults and the indemnities expressly set forth in this Lease. All awards made by reason of condemnation shall be made to the Landlord and the Tenant shall assign to the Landlord all of its rights, title and interest in and to any such award. If any award includes an amount of compensation for moving expenses, the Tenant shall be entitled to a portion of such amount in the amount of the Tenant's actual moving expenses.

19. **ASSIGNMENT AND SUBLEASE.** Except as otherwise provided in this Section, the Tenant may assign its interests in this Lease or sublease the Premises only with the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, the Tenant may assign this Lease or sublease all or part of the Premises, without the Landlord's consent, (i) to any entity that is a parent, subsidiary or affiliate of the Tenant, and (ii) to any successor in interest to the Tenant by merger, consolidation, acquisition or reorganization; provided any such assignment or sublease shall not release the Tenant from its obligations hereunder.

20. **ENTIRE AGREEMENT.** This Lease and any exhibits attached hereto set forth the entire agreement between the parties hereto with respect to the Tenant's right to install, operate, replace, maintain and remove the ATM. There are no promises, agreements or understandings, whether oral or written, between the parties regarding such matters other than as set forth in this Lease. Any amendment or modification to this Lease shall not be binding upon either party unless such amendment or modification is reduced to writing and signed by both parties. This Lease does not create a partnership, agency or joint venture relationship between the Landlord and the Tenant for the operation of the ATM or for any other purpose.

21. **CAPTIONS.** The captions of the sections of this Lease are not part of the context of this Lease and shall be ignored in construing this Lease. They are intended only as aids in locating various provisions of this Lease.

22. **SEVERABILITY.** Each provision contained in this Lease shall be independent and severable from all other provisions hereof and the invalidity of any such provision shall in no way affect the enforceability of the other provisions hereof.

23. **GOVERNING LAW; ATTORNEYS' FEES.** This Lease shall be governed by and construed in accordance with the laws of the jurisdiction in which the Premises are located without regard to conflict of laws principles. If either the Landlord or the Tenant shall default in the performance of any covenant on its part to be performed by virtue of any provision of this Lease and if in connection with the enforcement of the non-defaulting party's rights or remedies, such non-defaulting party shall properly and reasonably incur fees and expenses for services rendered (including actual and reasonable attorneys' fees), then such fees and expenses shall, if said non-defaulting party shall prevail in litigation, be immediately reimbursed by the defaulting party on demand.

24. **BINDING EFFECT.** This Lease shall be binding upon and shall inure to the benefit of the Landlord and the Tenant and their respective heirs, legal representatives, successors and permitted assigns.

25. **NOTICES.** All notices and communications under this Lease shall be in writing and signed by a duly authorized representative of the party sending the same and personally delivered or sent by the United States certified mail, return receipt requested postage prepaid or sent via overnight receipted courier (such as, but not limited to, Federal Express) designated for "next day delivery" addressed to the addressee's address set forth above. Notwithstanding anything contained in this Lease to the contrary, any notice or other communication given by a party under this Lease shall be deemed validly given only upon actual receipt by the Tenant or the Landlord, as the case may be, at the above address or when delivery is refused by the addressee. Either party may change its address by giving written notice of such change to the other party in the manner provided herein. Until any such written notice is actually received, the most recent address of record shall be deemed to continue in effect for all purposes.

26. **BROKERS.** The Landlord and the Tenant acknowledge that McConnell Capital represents the Tenant in connection with this Lease. The Tenant agrees to pay the foregoing broker a commission in accordance with the terms of a separate agreement. Except for the foregoing broker, the Landlord and the Tenant represent and warrant to each other that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease. The Landlord and the Tenant agree to indemnify, defend and hold the other party harmless from and against all liabilities, expenses, fees, commissions and/or costs (including reasonable attorneys' fees) arising from a breach of the foregoing representation.

27. **AUTHORIZATION.** Each party to this Lease hereby represents that this Lease has been duly authorized, executed and delivered by all necessary action on behalf of such party, constitutes the valid and binding agreement of such party and is enforceable in accordance with its terms.

28. **WAIVER OF JURY TRIAL.** The Landlord and the Tenant hereby waive, to the extent permitted by law, the right to trial by jury in any action or proceeding or counterclaim between the parties hereto, or their successors or permitted assigns, arising out of or in any way connected with this Lease or any of its provisions, the Tenant's use or occupancy of the Premises and/or any claim of injury or damage.

29. **OFAC DISCLOSURE.** The Landlord represents and warrants to the Tenant (i) that neither the Landlord nor any person or entity that directly or indirectly owns any interest in the Landlord nor any of its officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U. S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Landlord's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Lease, the Landlord shall comply with the Executive Order and with the Money Laundering Act.

30. **FORCE MAJEURE.** If the Landlord or the Tenant is delayed, hindered or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor or materials, strikes, fire, or any other reasons beyond its reasonable control, the performance of such act

FL01919 – Cutler Ridge ATM - Lease

9

shall be excused for the period of delay, and the period for performance of any such act shall be extended as necessary to complete performance after the delay period. However, the provisions of this Section shall in no way be applicable to the Tenant's obligations to pay Rent or any other sums, monies, costs, charges or expenses required by this Lease.

31.  **QUIET ENJOYMENT.** The Landlord represents and warrants to the Tenant that the Landlord is the sole owner of fee simple title to the Shopping Center. The Landlord hereby covenants and agrees that if the Tenant shall perform all of the covenants and agreements required to be performed by the Tenant under this Lease, the Tenant shall at all times during the continuance of this Lease have peaceable and quiet enjoyment and possession of the Premises subject to the terms of this Lease.

32.  **LANDLORD'S LIABILITY.** Notwithstanding anything to the contrary contained elsewhere in this Lease, the Tenant shall look solely to the estate and property of the Landlord in the Premises and the Landlord's interest in the balance of the Shopping Center for the satisfaction of the Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by the Landlord in any claims arising out of or related to this Lease or any of the terms, covenants and conditions hereof to be observed and/or performed by the Landlord and no other property or assets of the Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of the Tenant's remedies and neither the Landlord nor any of its members, partners, officers, agents or employees, or its or their successors or assigns, shall be personally liable hereunder. In no event shall either party be liable for any consequential, special or punitive damages as a result of any default hereunder.

33.  **SUBORDINATION OF LEASE.** This Lease is and shall be and remain, subject and subordinate to the lien of any and all existing or future mortgages, deeds of trust or security instruments now or hereafter entered into and covering all or any part of the Premises. If the Tenant so requests, the Landlord shall exercise reasonable efforts to obtain from the Landlord's mortgagee, a Subordination, Non-Disturbance and Attornment Agreement in a form and substance reasonably acceptable to the Tenant.

34.  **ESTOPPEL CERTIFICATE.** Within thirty (30) days after request by the other party, the Landlord or the Tenant, as the case may be, will execute, acknowledge and deliver to such other party or to any prospective purchaser, assignee or mortgagee designated by such other party, an estoppel certificate in a form reasonably acceptable to such party.

35.  **COUNTERPARTS.** This Lease may be executed in any number of separate counterparts by the parties hereto, each of which, when so executed and delivered, shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. Any signature page from any such counterpart may be attached to any other counterpart to complete a fully executed counterpart of this Lease. Signatures to this Lease (or to any assignment or amendment to this Lease) transmitted in a commonly accepted electronic format that reproduces an image of the actual executed signature page shall be deemed a binding original and shall have the same legal effect, validity, and enforceability as a manually executed counterpart of the document to the extent and as provided for in the Federal Electronic Signatures in Global and National Commerce Act and the applicable state law based on the Uniform Electronic Transactions Act. In no event shall any party be obligated hereunder unless and until this Lease has been fully executed and delivered by all parties hereto.

36.  **AUTOMATIC RESCISSION.** This Lease shall be automatically rescinded and null and void in the event this Lease has not been executed on behalf of the Landlord and returned to the Tenant no later than 5:00 p.m. Eastern time on July 31, 2017, TIME BEING OF THE ESSENCE.

[SIGNATURES ON NEXT PAGE]

FL01919 – Cutler Ridge ATM - Lease

11

**IN WITNESS WHEREOF**, the Tenant and the Landlord have executed or caused this Lease to be executed on their behalf by their duly authorized representatives as of the date set forth above.

**WITNESSES:**

By: _[signature]_
Print Name: Chontell Barnett

By: _[signature]_
Print Name: Michelle Carter

**TENANT:**

**SUNTRUST BANK,** a Georgia banking corporation

By: _[signature]_
Print Name: Dionne N. Edwards
Title: Vice President

Federal Tax ID No: 58-0466330

**WITNESSES:**

By: _[signature]_
Print Name: Courtney Robertson

By: _[signature]_
Print Name: Stacey McPherson

**LANDLORD:**

**PNS STORES, INC.,** a California corporation

By: _[signature]_
Print Name: Timothy A. Johnson
Title: EVP, CAO and CFO

## EXHIBIT A

## PREMISES, SHOPPING CENTER AND PREMISES IMPROVEMENTS



FL01919 – Cutler Ridge ATM - Lease

## EXHIBIT B

## SIGNAGE





FL01919 – Cutler Ridge ATM – Lease

**Meginnis, Becca**

| | |
|---|---|
| **From:** | Meginnis, Becca |
| **Sent:** | Tuesday, August 22, 2017 2:29 PM |
| **To:** | 'Thompson.Tara' |
| **Subject:** | RE: New ATM Lease, Miami, FL (Big Lots #4224, 18325 Dixie HWY) |

That's fine. Our copy doesn't have the date on it, but I can make it the 23rd of June.

Thanks,

Becca Meginnis
Manager, Lease Administration & Audit
Phone  614-278-7203
Big Lots Stores Inc.
300 Phillipi Rd
Columbus, OH  43228



**From:** Thompson.Tara [mailto:Tara.Thompson@SunTrust.com]
**Sent:** Tuesday, August 22, 2017 1:47 PM
**To:** Meginnis, Becca <bmeginni@biglots.com>
**Subject:** RE: New ATM Lease, Miami, FL (Big Lots #4224, 18325 Dixie HWY)

Becca,

The dates I have are:

Commencement Date= 6/23/2017
Inspection/Permit Period= 10/21/2017
Rent Commencement Date (RCD)=12/20/2017
Expiration Date =12/19/2022
Initial Term=6/22/2017-12/19/2022

## ATM LEASE

THIS ATM LEASE ("this Lease"), dated as of the 23rd day of June, 2017, between SUNTRUST BANK, a Georgia banking corporation (the "**Tenant**"), and PNS STORES, INC., a California corporation (the "**Landlord**"), provides:

Thanks!
Tara Thompson
Lease Administrator

1

Lincoln Harris CSG
SunTrust Account – Mail Code: CS-HDQ-8614
919 East Main Street, 14th Floor
Richmond, VA 23219
804.819.6161
Tara.Thompson@suntrust.com

---

**From:** Meginnis, Becca [mailto:bmeginni@biglots.com]
**Sent:** Tuesday, August 22, 2017 1:30 PM
**To:** Thompson.Tara
**Subject:** FW: New ATM Lease, Miami, FL (Big Lots #4224, 18325 Dixie HWY)

Hi Tara!

Here's that email. Can you confirm that we're on the same page with regards to the dates? Thanks,

Becca Meginnis
Manager, Lease Administration & Audit
Phone  614-278-7203
Big Lots Stores Inc.
300 Phillipi Rd
Columbus, OH  43228



---

**From:** Meginnis, Becca
**Sent:** Wednesday, August 16, 2017 9:27 AM
**To:** 'Sean@McConnellCapital.com' <Sean@McConnellCapital.com>
**Subject:** New ATM Lease, Miami, FL (Big Lots #4224, 18325 Dixie HWY)

Hi Sean,

I'm reaching out to you to solidify some dates pursuant to the new ATM Lease.  It's my understanding that the lease was fully executed on June 22nd.

Commencement Date= 6/22/2017
Inspection/Permit Period= 10/20/2017 (6/22+120 days)
Rent Commencement Date (RCD)=12/19/2017 (6/22+180 days)
Expiration Date =12/18/2022 (RCD + 5 years)
Initial Term=6/22/2017-12/18/2022

Please review & let me know if you're in agreement with these dates.  Thanks!

Becca Meginnis
Manager, Lease Administration & Audit

2