UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| BIG LOTS, INC., ET AL | ) | Bankr. No. 24-11967 |
| | ) | |
| | ) | |
| Debtors[1] | ) | (Jointly Administered) |

**BIG MIFL2 OWNER LLC'S OBJECTION TO SCHEDULED CURE AMOUNT**

Big Mifl2 Owner LLC ("Landlord"), by its undersigned attorney, hereby submits this objection (the "Cure Claim Objection") to the Proposed Cure Amount (defined below) that the above-captioned debtors and debtors in possession (collectively, the "Debtors") have proposed to pay in connection with the potential assumption and assignment of the Lease of non-residential real property located at 18325 South Dixie Highway, Miami, Florida (the "Premises"), and in support of this Cure Claim Objection, Landlord respectfully states as follows:

**FACTUAL BACKGROUND**

**A.    Big Mifl2 Owner LLC's Lease with the Debtor.**

1.    The Landlord and BLBO Tenant, LLC ("Tenant") are parties to an unexpired lease (the "Lease") dated effective as of August 25, 2023, and the Post Closing Matters Agreement dated August 25, 2023, and as amended on October 5, 2023 and on October 24, 2023 (the "Post Closing Agreement"), of nonresidential real property located at 18325 South Dixie Highway, Miami, Florida 33517 (the "Premises"). Notably, the performance of all the Tenant's obligations under

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basom. LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores – PNS, LLC (5262); Big Lots Store, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores – CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

1

the Lease and the Post Closing Matters Agreement are guaranteed by Big Lots, Inc. The Lease and the Post Closing Matters between Big Mifl2 and the Tenant were part of a comprehensive sale and leaseback transaction with Big Lots, Inc.

2. The Post Closing Agreement that was executed contemporaneously with the Lease (the Lease and Post Closing are referred to collectively hereinafter as the "Agreements"). The Post Closing Agreement sets forth numerous obligations for the Tenant to complete in a specific timeframe following execution of the Post Closing Agreement. The original Post Closing Agreement required the Tenant to cure within 60 days certain code violations identified by the Miami-Dade Fire Rescue Department – Inspection Report (Permit Number 99125-19107), dated October 4, 2022. In addition, the Tenant was obligated to file applications for permits and make certain repairs and replacements (patching, crack sealing, sealing and striping; repair damaged aluminum and fabric canopies; TPO roof replacement) within certain specified deadlines. The time periods were extended in subsequent amendments to the Post Closing Matters Agreement. The fire code violation was cured by the Tenant, but the other required applications for permits and repair and replacement items were never completed.

**B.    Debtors' Bankruptcy Cases and the Proposed Assumption and Assignment of the Lease.**

3. On September 9, 2024 (the "Petition Date"), the Debtors, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4. On September 9, 2024, the Debtors filed a motion (the "Sale Motion"), which, among other things, seeks Court approval to sell substantially all the Debtors' assets and assume and assign various executory contract and unexpired leases to a stalking horse bidder subject to higher and better bids.

5.      In connection with and related to the proposed Sale Motion, the Debtors filed and served a Notice of Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and Cure Amount [Document No. 511] (the "Cure Notice").

6.      The Cure Notice identified the Lease as a lease to potentially be assumed and assigned as part of the proposed sale and indicated that the amount necessary to cure any pre-petition defaults under the Lease is $112,216 (the "Scheduled Cure Amount").

7.      The Cure Notice further provides that if Landlord fails to object to the Proposed Cure Amount prior to November 4, 2024 at 12:00 p.m. (prevailing Eastern Time), it will be barred from objecting to the proposed assumption and assignment of the Lease, including any cure costs or defaults associated with such proposed assumption and assignment of the Lease.

8.      As of the current date, the Debtor owes Landlord $108,974.94 for the base rent under the terms of the Lease.  The Debtor also owes Landlord for the 2024 real estate taxes in the amount of $191,422.57.  (The amounts are collectively hereafter referred to as the "Monetary Defaults").

9.      The Debtor is also in default under the Post Closing Agreement for its failure to perform its specified repair obligations.  These costs were set forth in the Post Closing Matters Agreement amount as $217,000.00 (hereafter referred to as "Post Closing Default").

10.     The Debtor has significant outstanding maintenance defaults under Paragraph 10 of the Lease which must also be cured in addition to the Post Closing Default. (hereinafter referred to a "Maintenance Defaults"). To the extent these defaults are known, they are outlined Exhibit A attached hereto.  This may not be an exhaustive list as the Landlord has not had the opportunity for a full inspection.  The Landlord does not yet have quotes for all repairs but to the extent the

quotes are available, the amounts are referenced in Exhibit A and will exceed $900,000.00 in addition to the Post Closing Default.

## OBJECTION TO PROPOSED CURE CLAIM

11. To the extent that the Debtors seek to assume and assign the Lease, the Debtors are required to pay the outstanding Post Closing Defaults and Monetary Defaults to Landlord to satisfy the Debtors' cure obligations under 11 U.S.C. § 365(b). In addition, Debtors must cure the Post Closing Defaults and the Maintenance Defaults under Paragraph 10 of the Lease.

12. Landlord objects to the Proposed Cure Amount and any proposed assumption and assignment of the Lease to the extent that any proposed order approving such assumption and assignment fails to provide that the Debtors or the proposed purchaser/assignee of the Lease shall promptly pay Landlord the Monetary Defaults and Maintenance Defaults. *See* 11 U.S.C. § 365(b).

13. Landlord also claims an ongoing entitlement to rent for every month that the Debtor remains in possession, or fails to surrender possession to the Landlord, starting with the September 2024 rent.

14. Landlord thus objects to entry of an order approving a sale of the Lease that does not (a) require that the full amount of the cure cost under the Lease be paid at or prior to assumption and assignment, and (b) provide that any and all unliquidated obligations shall survive the assumption and assignment, and that any assignee shall take the Lease subject to all of its respective terms and undertake to satisfy all monetary and non-monetary obligations under the Lease, regardless of whether such obligation could be argued to have existed, occurred, or accrued prior to the assumption and assignment of the Lease.

15. Nothing in this Objection is intended to be, or should be construed as, a waiver by the Landlord of any of its rights under the Lease, the Bankruptcy Code, or applicable law.

Landlord expressly reserves all such rights including, without limitation, the right to: (a) supplement and or amend this Objection to assert any additional objections with respect to the Cure Notice and/or any proposed assumption and assignment of the Lease; (b) amend the cure costs under the Lease; (c) assert any additional unliquidated obligations and/or nonmonetary defaults under the Lease; (d) object to the assumption and assignment of the Lease to any proposed purchaser with providing adequate assurance of future performance; (e) assert a claim for allowance of administrative expense under § 503 of the Bankruptcy Code; and (f) demand immediate payment of all amounts due under, and full compliance with, the Lease to the extent required under § 365 of the Bankruptcy Code.

WHEREFORE, Big MIFL2 respectfully requests that the Court: (i) enter an order determining that Big MIFL2 is entitled to the prompt payment of the Monetary Default and the Post Closing Default and any additional unpaid post-petition rent (if any) that may be due as a condition of the assumption and assignment of the Lease; (ii) enter an order directing the Debtors or the purchaser/assignee of the Lease to promptly pay Landlord the Monetary Default amount as well as cure the Post Closing Defaults and the Maintenance Defaults to the extent that the Debtors are authorized to assume or assign the Lease and have provided Landlord with adequate assurance

of future performance; (iii) survival of any unliquidated obligations after the assumption and assignment, and (iv) grant Landlord such other and further relief as this Court may deem just and proper.

November 3, 2024
Wilmington, Delaware

Respectfully submitted,

JMCARBINO LAW

By: */s/Jeffrey M. Carbino*
Jeffrey M. Carbino (DE No. 4062)
1007 N. Orange Street, Suite 420
Wilmington, DE 19801
Telephone: (610) 639-3695
Email: jcarbinolaw@outlook.com

Attorneys for the Big Mifl2 Owner LLC

# EXHIBIT A

## CORRECTED CURE AMOUNTS

Tenant:     BLBO Tenant, LLC
Landlord:   Big MIFL2 Owner LLC
Address:    18325 South Dixie Highway, Miami, Florida 33517

### Lease Cure Amounts

**Lease Monetary Defaults**

| | |
|---|---|
| Rent: September, October and November 2024 | $108,974.94 |
| 2024 Real Estate Taxes | |
|     Folio: 33-5032-047-0010 | $163,658.24 |
|     Folio: 33-5032-047-021 | $27,764.33 |

**Post Closing Agreement Scheduled and Understated Amounts**

| | |
|---|---|
| Patching, crack sealing, sealing and striping | $13,500.00 |
| Repair damaged aluminum and fabric canopies | $2,000.00 |
| TPO roof replacement | $201,500.00 |

The amounts set forth in the Post-Closing Agreement are significantly less than the current quotes obtained by the Landlord for the required repairs, which are now estimated as follows:

- Roof Repairs      $512,800.00 to $758,800.00
- Asphalt Repairs, and Sealing and Striping      $56,600.00 to $92,817.00

**Repair and Maintenance Defaults Under Section 10 of Lease**

Following list is not exhaustive and is subject to further inspection of the property. The following are the items known to date:

- Multiple instances of exposed electrical wiring both inside and outside the building. Specifically, exposed light pole wiring and a damaged electrical box are present in the rear parking lot, along with exposed fire system wiring at the fire riser.
- Exposed wiring can be found in the sales floor ceiling, at the front parking lot pylon sign, and at the side entrance.
- Inside, the storeroom contains further exposed wiring, along with multiple unrepaired punctures in the walls.
- Exterior electric concerns include a missing light pole with exposed wiring in the rear parking

- lot, a loose light fixture with exposed wiring at the back of the building, and improperly sealed punctures, including an unprotected pipe on the roof.
- Loose and cut wiring is found at the side of the building, as well as an improperly sealed puncture at the base.
- The Tenant has multiple open penetrations throughout the Building that facilitate water and potential pest intrusion.
- For example, disposable plastic grocery bags have been improperly used to fill a wall penetration at the back of the building.
- There is also an open penetration on the exterior wall near the fire system and another at the side of the Building, where exposed wiring is present, failing to comply with local codes.
- Holes in the front soffit panels at the pedestrian walkway and several open penetrations on the exterior walls at both the rear and front of the Building further contribute to these issues.
- Severe deterioration of concrete at both the garage door opening and a damaged concrete beam poses structural risks.
- The storefront's failing sealants lead to potential water intrusion, which is exacerbated by unsealed exterior joints at the rear.
- Water damage is evident at the rear of the building, indicating a lack of preventative maintenance.
- The front entrance features cracked and unsealed stucco, while the exterior façade is inadequately sealed, further compromising the building's integrity.
- Loose and unsecured soffit panels at the pedestrian walkway not only create safety hazards but also reflect a general neglect of maintenance.
- The condition of the lighting fixtures is alarming; many are rusted, failing, and loose, creating dangerous conditions for pedestrians.
- Damaged signage, including exposed electrical components at the side of the building, raises further safety and aesthetic concerns.
- On the roof, disconnected piping is causing rust on the HVAC unit, indicating neglect in maintenance and posing risks to other components.
- Unsecured conduits threaten the overall safety and functionality of the building, while improper roof maintenance has led to vegetation growth.
- A broken and unmaintained light fixture at the rear service door presents a safety hazard.
- The trash enclosure is missing gates, resulting in overflowing trash that is unsightly and out of compliance with local codes.
- Miscellaneous hazardous debris is scattered throughout the rear parking lot, obstructing emergency exits and posing serious risks to occupant safety.
- Signs of water intrusion and damage throughout the Building, particularly in the sales floor ceiling, where water damage is compromising structural roof panels. Water intrusion has also been detected in the rear stock room and is contributing to the deterioration of the Building.
- Structural concrete beams are showing significant water damage, raising serious concerns about the overall integrity and safety of the Building.
- The broken curbing on the Premises presents a trip hazard and is not compliant with safety codes.

- Damaged and misaligned wheel stops further increase the risk of accidents, while exposed steel pins create serious hazards for both pedestrians and vehicles. This combination of issues underscores the urgent need for repairs to ensure the safety of all individuals on the Premises.
- Overall, significant water intrusion damage throughout the Premises raises concerns about potential mold growth. Suspect mold has been identified on the HVAC equipment, ceiling, and interior walls, as well as at the ventilation diffusers. Additionally, walls and ceilings show signs of water damage alongside suspect mold growth, particularly on masonry walls and drywall partitions. The sales floor ceiling exhibits similar issues, with ceiling tiles saturated and displaying suspect mold growth, necessitating immediate attention to address both the water intrusion and associated mold hazards.
- Failure to maintain the tree overgrowth surrounding the Building poses significant hazards to both the Premises and the public. The unchecked growth threatens the Building's structural integrity and creates safety risks to the public.