**EXHIBIT "B"**

## LEASE AGREEMENT

This Lease, made effective this _21_ day of _September_, 1999, by and between EIC-Pasco Limited Partnership, Landlord, at the address c/o Equity Investment Group, 111 East Wayne Street, Suite # 500, Fort Wayne, Indiana 46802 and Consolidated Stores Corporation, an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

## WITNESSETH:

I.    **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.    Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center sign, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.

Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Such Common Areas shall be subject to the reasonable rules and regulations as are prescribed by Landlord from time to time. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas. Landlord shall not materially alter the parking area outlined in green on Exhibit A without Tenant's approval, which shall not be unreasonably withheld. Tenant shall not be unreasonable in withholding approval if the number of parking spaces in the parking area outlined in green on Exhibit A is materially reduced.

B.    Dates:

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk and prior to any early entry by Tenant. Tenant shall provide Landlord with proof of insurance coverages described in this Lease prior to the Tenant Entrance Date.

2)    The Tenant Possession Date shall be the earlier of (i) the date Tenant accepts possession following Landlord's notice that it has substantially completed all construction required pursuant to Exhibit C, or (ii) ten (10) days after written notice from Landlord that it has completed all

olblrata 1/98                                    1

construction as required pursuant to Exhibit C. Landlord shall use the form shown on Exhibit F, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant; construction pursuant to Exhibit C is complete and the Demised Premises complies with all laws, ordinances, regulations and building restrictions. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)  The Rent Commencement Date shall be the ~~earlier of the date ninety (90)~~ ~~days~~ after the Tenant Possession Date, or the date on which Tenant opens for business.  *Tenant opened earlier than 90 days*

4)  The Term Commencement Date shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)  If Landlord fails to tender possession of the Demised Premises to Tenant by S~~eptember 15~~, *October* 1999 with all of Landlord's work completed in conformance with Exhibit C, except for HVAC work, which Landlord shall complete by ~~October 15, 1999~~ *November* and except for such minor punch-list items which Landlord shall have completed by ~~October 1, 1999~~ *November* which if not completed by such date, Tenant may complete at Landlord's expense and seek reimbursement as provided herein, unless such delay is due to acts of Tenant, Landlord and Tenant agree that the damages suffered by Tenant, through great and irreparable, are difficult or impossible to accurately ascertain. Therefore, for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day, unless said delay is due to causes not under the control of Landlord; provided however, no such liquidated damages shall be paid if Tenant refuses to accept possession of the Demised Premises when tendered. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next installment(s) of Rent due under this Lease.

C.  Exhibits:  The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1)  Exhibit A -  Site Plan of Shopping Center

2)  Exhibit B -  Legal Description of Shopping Center

3)  Exhibit C -  Landlord Work

4)  Exhibit C-1 - Landlord's Recapture Work

5)  Exhibit D -  Tenant Sign Specification

6)  Exhibit E -  Delivery of Possession Letter

7)  Exhibit F -  Tenant's Redemised Premises

olblrata 1/98                           2

D.    Demised Premises: Being the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 40,321 square feet.

E.    Shopping Center: Landlord's Shopping Center is known as Westgate Shopping Center at the address Allen Road and State Highway 54 in the City of Zephyrhills, State of Florida, County of Pasco, and 33541 zip code.

## 2.    DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

Landlord's Recapture and Demise: Landlord shall have the right upon 120 days written notice to Tenant to recapture a portion of the Demised Premises, and 30 days thereafter deliver to Tenant in a substantially similar condition to that at the time of initial delivery, except for the reduction in square footage, with all work per Exhibit C-1 completed at Landlord's sole cost and expense, no greater or less than 30,000 square feet of the Demised Premises, that being the portion of the Demised Premises outlined in blue on Exhibit F showing the specific location of the demising wall.

Landlord shall abate Fixed Minimum Rent for the period during which Tenant is unable to operate its business from the Demised Premises while Landlord is performing its recapture work, including such period during which Landlord is building the demising wall. Thereafter Fixed Minimum Rent shall continue at the rate stated in Section 5 herein, and Tenant shall continue to pay its pro rata share of Common Area Charges, Taxes, and Insurance, based upon the reduced square footage of the Premises.

## 3.    TERM:

A.    Original Term: The Original Term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2006. Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period of time between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date.

B.    Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term" and "Second Option Term". The First Option Term shall commence at the end of the Original Term of this Lease and the Second Option Term shall commence at the end of the First Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect

to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the Original Term or the previous Option Term.

4.   **USE AND OPERATION:**

Tenant covenants and agrees that the Demised Premises shall be used and occupied for the purpose of the sale of general merchandise and furnishings similar to other Big Lots stores and for no other purpose or purposes. Tenant's use and occupancy of the Demised Premises shall also be in compliance with any and all applicable laws. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenant's restrict Tenant's use. Landlord agrees to indemnify Tenant for any and all costs associated with violation of this provision.

Unless the Tenant is in default under this Lease beyond any notice and cure periods and except for (i) tenants that have either signed a lease agreement or are open and operating for business in the Shopping Center as of the date of this Lease, or (ii) "dollar-store" type operations, including but not limited to Family Dollar, Dollar·General, and Dollar Tree, no other general merchandise store similar to Big Lots ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees to, when possible, operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and 11:00 A.M. To 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder; it is understood that any exclusive rights granted Tenant hereunder this Section 4 are unenforceable by Tenant during the period the Demised Premises remains closed. In the event that Tenant closes the Demised Premises under this Section 4 and fails to reopen the Demised Premises within sixty (60) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in the places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping

Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised
Premises to be ruined or damaged by freezing, excessive heat or lack of care,
maintenance or repair; with notice of such, permit Tenant's agents, employees, customers
or invitees to break the law or reasonable rules and regulations adopted by Landlord; or
do anything to damage, injure or interfere with Landlord, other tenants or occupants of
the Shopping Center or their customers or invitees.

The Demised Premises shall not be used in any manner or occupied for any purpose
constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over
the normal cost of such insurance, absent that use, for the type and location of the
building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the
right to (i) store shopping carts and baskets in the Common Areas immediately adjacent
to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the
Demised Premises for the periodic sale and display of merchandise; provided neither the
shopping carts nor the periodic sale and display of merchandise interfere with the free
flow of pedestrian traffic.

5.    **RENT:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby
covenant and agree to pay to the Landlord in lawful money of the United States at, c/o
Equity Investment Group, 111 East Wayne Street, Suite 500, Fort Wayne, Indiana
46802-2603, or at such other place as Landlord may from time to time direct in writing,
the following which, along with all other charges due from Tenant to Landlord under this
Lease, are collectively referred to hereinafter as "Rent". The Rent for any partial month
shall be pro rated based on the actual number of days in such month:

A.    Fixed Minimum Rent: During the Original Term of this Lease, the sum of
$ 100,802.50 per annum which shall be paid in equal monthly installments in
advance on the first day of each and every month, in the amount of $ 8,400.21. If
during the Original Term Landlord recaptures and re-demises the Premises then
the Fixed Minimum Rent shall be $ 99,900.00 per annum which shall be paid in
equal monthly installments of $ 8,325.00.

All the terms and conditions of this Lease shall apply during the option terms
except that (1) each option to extend the Term shall terminate when exercised; (2)
the Fixed Minimum Rent applicable for the First Option Term shall be the sum of
$ 120,963.00 per Lease Year which shall be paid in equal monthly installments, in
advance of the first day of each and every month in the amount of $ 10,080.50. If
during the First Option Landlord recaptures and re-demises the Premises then the
annual Fixed Minimum Rent shall be $ 114,900.00 which shall be paid in equal
monthly installments of $ 9,575.00.

The Fixed Minimum Rent applicable for the Second Option Term shall be the
sum of $ 141,123.50 per Lease Year which shall be paid in equal monthly
installments, in advance of the first day of each and every month in the amount of
$ 11,760.29. If during the Second Option Landlord recaptures and re-demises the
Premises then the annual Fixed Minimum Rent shall be $ 129,900.00 which shall
be paid in equal monthly installments of $ 10,825.00.

B.    Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access
to all utilities necessary to conduct business in the Demised Premises. Tenant
shall be solely responsible for and shall promptly pay for all public utility and
private services rendered or furnished to or for the benefit of Tenant and to the
Demised Premises during the Term hereof including heat, water, gas, electricity,

and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant would otherwise pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs, Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof.

C.     Percentage Rent: In addition to the "Fixed Minimum Rent" herein before expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual Gross sales and income, as hereinafter defined, which exceeds the annual base sum of $ 4,032,100.00 during the Original Term. If during the Original Term Landlord recaptures and re-demises the Premises then the Breakpoint shall be $ 3,996,000.00. During the First Option Term the Breakpoint shall be $ 4,838,520.00. If during the First Option Landlord recaptures and re-demises the Premises then the Breakpoint shall be $ 4,596,000.00. During the Second Option Term the Breakpoint shall be $ 5,644,940.00. If during the Second Option Landlord recaptures and re-demises the Premises then the Breakpoint shall be $ 5,196,000.00.

In the event Landlord does recapture and redemise the Premises, Percentage Rents and Breakpoint for the year in which Landlord recaptures the Premises, shall be calculated based upon the Breakpoint then in effect at the beginning of that Lease Year.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales and income ("Gross Sales") for the previous month. Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, an accurate statement of the Gross Sales for such period, certified to by Tenant, and shall therewith pay to Landlord, any Percentage Rent then due at the percentage above stated. Percentage Rent payments required to be made by Tenant under the terms of this Lease shall be made promptly when due. The term "Gross Sales" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises and (2) charges for all services rendered in or from the Demised Premises. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessee. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned to the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from

the Demised Premises; (8) credit card company finance or service charges; and (9) proceeds from vending machines located in the Demised Premises.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), such that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles at any reasonable time upon ten (10) days prior written notice, provided such right to audit shall be limited to one (1) time per Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales and income which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event.

D.    Common Area Charges: Throughout the Term of this Lease, Landlord shall be responsible for the following:

   (i)   operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

   (ii)  operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

   (iii) operating, maintaining, refurbishing, repairing, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

   (iv)  providing security, lighting and policing if necessary, and on-site and off-site traffic control;

   (v)   maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

   (vi)  cleaning, sweeping, snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Common Area Charges are limited to refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, providing public liability, property damage, and fire and extended coverage on the common facilities, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees; supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, parking area surcharges or levies, and a five percent (5%) administration fee, which administration fee shall be included under the cam cap described herein this Section 5D.

Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges as set forth herein. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. Excluded from such Common Area Charges shall be the capital costs of improvements, replacements, additions and alterations of the Common Areas and any management or related fees.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year. If the Rent Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of Common Area Charges for the fractional month between the Rent Commencement Date and the Term Commencement Date shall be prorated on a per diem basis and shall be paid together with the first payment of Fixed Minimum Rent.

After the first Full Lease Year, Tenant shall continue to pay such estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein) by the aforesaid estimated amount of Tenant's pro rata share of such Common Area Charges. Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each Lease Year or Partial Lease Year, Landlord shall furnish to Tenant a written statement in reasonable detail covering the Common Area Charges just expired showing the total Common Area Charges for such Lease Year, the amount of Tenant's pro rata share thereof and payments made by Tenant with respect thereto. Upon request by Tenant, Tenant shall be allowed to review copies of actual invoices paid for such Common Area Charges as stated herein in the main offices of Landlord.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books relating to the Demised Premises to be made by Tenant's accountants. If any such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, against the next Rent payments due from Tenant to Landlord hereunder.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, is not indebted to Landlord and has vacated in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

E.   CAM Cap: Notwithstanding anything to the contrary contained in this Lease, Tenant's pro rata share of Common Area Charges shall not exceed fifty cents ($ 0.50) per square foot in each Lease Year during the Original Term, sixty cents ($0.60) per square foot in each Lease Year during the First Option Term and seventy cents ($ 0.70) per square foot in each Lease Year during the Second Option Term; for any Partial Lease Year, such amounts shall be pro rated based upon the actual number of days in such Partial Lease Year.

F.   Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). If any special assessments or impositions are payable at the option of Landlord in installments, said special assessments or impositions for each tax year shall be deemed to include only the installments which become due in such tax year. Tenant shall pay to Landlord its pro rata share of such Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. If the Term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made to cover the fraction of a year included within the Term of this Lease.

The Real Estate Taxes on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and

expense of obtaining the same) to be payable with respect to the Shopping Center for such period.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance excluding financial contributions reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay its estimated monthly pro rata share of the Real Estate Taxes, based upon the actual amount of the last Real Estate Taxes which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. Tenant's pro rata share of Real Estate Taxes shall be determined as provided in this Section. Landlord shall furnish Tenant with copies of actual Real Estate Tax bills when same are issued. An adjustment shall be made as soon as the actual Real Estate Taxes for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

G.    Other Taxes: Tenant shall pay all sales taxes and taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

H.    Interest on Late Payment: Landlord shall be entitled to interest on overdue Rent at the rate of two percent (2%) above prime rate as established by the Chase Manhattan Bank of New York annually from the date such overdue Rent was due and payable, if Tenant fails to pay such overdue Rent within ten (10) days after such overdue Rent was due and payable.

I.    Construction Allowance: Tenant shall be entitled to payment of $ 60,000.00 upon completion of the following conditions:

1.    Tenant shall provide fully executed lien waivers for each contractor, subcontractor and/or materialman which performed Tenant's work. (In the event that Landlord's contractor or other representatives finish Tenant's Work instead of Tenant's contractor, this requirement shall be inapplicable);

2.    Landlord's receipt of a letter from an officer of Tenant's Real Estate Department stating that Tenant's Work has been performed per this Lease;

3.     Tenant's opening for business in the Demised Premises.

Upon completion of the above requirements, Landlord shall pay to Tenant the stated amount within thirty (30) days of Tenant's completion of the above requirements. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's completion of the above requirements, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York from the due date of the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

6.   **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, provided Landlord has not requested such changes to be removed, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

Tenant shall not suffer any mechanic's lien to be filed against the Leased Premises or the Shopping Center or any interest therein by reason of any work, labor, services or materials performed at or furnished to the Demised Premises, to Tenant, or to anyone holding the Demised Premises through or under the Tenant. If any such mechanic's lien shall at any time be filed, Tenant shall forthwith cause the same to be discharged of record by payment, bond, order or a court competent jurisdiction or otherwise, but Tenant shall have the right to contest any and all such liens. If Tenant shall fail to contest the same with due diligence or shall fail to cause such lien to be discharged within thirty (30) days after being notified of the filing thereof and in any case before judgment of sale thereunder, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obliged to, discharge the same by paying the amount claimed to be due or by bonding or other proceeding reasonably deemed appropriate by Landlord, and the amount so paid by Landlord and/or all costs and expenses, including reasonable attorney's fees, incurred by Landlord in procuring the discharge of such lien, shall be deemed to be additional rent and shall be due and payable by Tenant to Landlord on the first day of the next following month. Nothing in this Lease contained shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Demised Premises to any lien or liability under the mechanic's lien law of the state.

7.   **MAINTENANCE AND REPAIRS:**

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost, damage or claim resulting from such breakage or the replacement thereof unless such damage is due to the negligence of Landlord, its agents, contractors or employees.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, if any, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the Tenant Possession Date under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Tenant also agrees to keep the entrance to the Demised Premises in a clean

and safe condition by removing snow and ice from the doorways. Tenant further agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary.

As a part of its air conditioning maintenance obligation, above, Tenant shall enter into an annual contract with an air conditioning repair firm, fully licensed to repair air conditioning units in the State of Florida, which firm shall:

(1)     Regularly service the air conditioning unit(s) on the leased premises on a monthly basis, changing belts, filters and other parts as required; and supply Landlord with copies of the maintenance reports should Landlord request them to do so.

(2)     Perform energy and extraordinary repairs on the air conditioning unit(s);

(3)     Keep a detailed record of all services performed on the leased premises and prepare a yearly service report to be furnished to the Tenant at the end of each calendar year.

Tenant shall furnish to Landlord at the end of each calendar year, a copy of said yearly service report. Not later than thirty (30) days prior to the date of commencement of the term of this Lease and annually thereafter, Tenant shall furnish to Landlord a copy of the air conditioning maintenance contract described above, and proof that the annual premium for the maintenance contract has been paid. Nothing stated herein above shall limit Tenant's obligation to maintain the air conditioning unit(s) in good condition and repair throughout the term of this Lease.

Tenant shall store all trash and garbage within the Leased Premises and arrange for the regular pickup of such trash and garbage at the Tenant's expense. Tenant shall not burn any trash or garbage at any time in or about the building and Tenant shall attend to the daily disposal thereof in the manner designated by Landlord. If Landlord shall provide any services or facilities to such pickup, the Tenant shall be obligated to use the same and shall pay a proportionate share of the actual cost thereof within thirty (30) days after being billed therefor.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and shall guarantee that the HVAC system is in good working condition and adequate for Tenant's intended use (1 ton per 400 square foot).

Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from its next Rent payment(s) owing.

Should the HVAC system require repair and/or replacement (other than Tenant's standard maintenance contract) during the first two (2) Lease Years, which the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with

interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually from its next Rent payments owing. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition as of the Tenant Possession Date. Landlord further agrees that Tenant shall have no obligation to repair or maintain any such item as is not in operating condition until put in operating condition by Landlord at its expense. Tenant shall notify Landlord of any defects within thirty (30) days after the Tenant Possession Date by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next installment of Rent.

Landlord agrees to keep or cause to be kept, repaired, replaced and maintained, at Landlord's sole cost and expense the roof, roof drains, canopy, if any, exterior utility lines, and exterior walls, exclusive of doors and windows during the Term and will make required structural repairs to the building of which the Demised Premises are a part. Landlord's performance of each of its covenants contained in this Lease shall be a condition precedent to its right to collect rents and to enforce this Lease; provided that Tenant shall remain bound to the extent Landlord is afforded the opportunity to cure such nonperformance. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or to make repairs to Common Areas or, upon written notice, to those facilities required to be maintained by Landlord, provided the same does not substantially interfere with Tenant's operation.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after notice by Tenant of the need for such repairs unless Landlord is diligently proceeding with such repair, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency and if Landlord after receiving confirmation from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work, provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner causing no mechanic's liens. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing.

8.   SIGNS:

Tenant shall at its sole cost and expense have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. The

olblrata 1/98                                       13

location of any such signs shall be approved by Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center pylons, if there are pylons existing and if space is available. Landlord agrees that Tenant shall have the right to install and maintain its sign on a space within a portion of the existing pylons. Absent an existing pylon, with the approval of Landlord, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right to erect a pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once the pylon signs are installed Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

During the Original Term, options or extensions of this Lease; Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

At lease termination, at Tenant's expense all signage shall be removed and all surfaces where signage was located must be repaired to the condition which existed prior to Tenant's occupancy.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.   At the end of the Term, Tenant shall, unless otherwise agreed to in writing by Landlord, remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or air conditioning equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.

10. **GOVERNMENTAL REGULATIONS:**

To the reasonable knowledge of Landlord, Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have it conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. In the event Tenant is required by local or state code, Landlord shall provide Tenant with a complete set of "as built" drawings. Unless requirement is due to Tenant's unique operation, Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required (except licenses and permits required for the operation of Tenant's business); and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11.   **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises, other than that due to the negligence of Landlord, or Landlord's employees, contractors, and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Common Areas and all other areas of the Shopping Center outside the Demised Premises, other than that due to the negligence of Tenant, or Tenant's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

12.   **INSURANCE:**

A.   <u>Tenant</u>:  Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, which insurance, shall include Landlord as an additional insured, as its interest may appear with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.   <u>Landlord</u>:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under broad form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full insurable value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry public liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, as its interest may appear, with minimum limits of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant will pay to Landlord monthly, its estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center excluding the outlots

which are to be developed on the peripheral property as marked on Exhibit A with the resulting percentage being Tenant's pro rata share.

Landlord shall furnish Tenant with copies of insurance premium bills when the same are issued. An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, unless such repair or casualty is due to the fault of Tenant, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition. Notwithstanding the above, if all or substantially all of the Demised Premises shall be damaged, destroyed, or rendered untenable by or as the result or consequence of fire or other casualty during the term hereof, Landlord shall have the right to terminate this Lease, with the parties having no further obligations hereunder.

B.   In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred twenty (120) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant and Landlord shall be released from all future liability and obligations under this Lease.

C.   If the Demised Premises are damaged or destroyed during the last one (1) year of the Original Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or

control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises or rental payments.

## 15.    INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    WARRANTY OF TITLE BY LANDLORD:

As of the date hereof, Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant and except for matter of record; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises arising after the execution by Landlord of this Lease except for encumbrances and restrictions permitted under this Lease; and (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

## 17.    QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees so long as Tenant is not in default in its obligations under this Lease beyond any applicable notice and cure periods that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any options or extensions.

## 18.    MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory non-disturbance, subordination and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. The form of such agreement shall be at mortgagee's reasonable discretion. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the

transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

19.  **DEFAULT:**

A.     If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Landlord, or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord, this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor and terminate the Lease and recover all monies due hereunder as of the date of such termination. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. Should the Landlord choose not to terminate this Lease then, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due plus the cost of reletting. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.     If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same) then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, may be deducted by Tenant from Rent thereafter to become due. Tenant shall,

upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, in writing or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

## 20.    CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease should such taking materially and adversely affect Tenant's ability to carry on business as contemplated herein. In the event any part of the buildings of the Shopping Center, or common area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant the Demised Premises remaining would materially and adversely effect Tenant's business operation, Tenant may cancel this Lease, or at its option, retain the Demised Premises, in which event Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith; provided such restoration is reasonably financially feasible. Until the Shopping Center is restored to proper tenantable condition, Rent shall abate proportionately. Thereafter, Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21.    MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease and to the extent such damage is covered by insurance: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same.

## 22.    ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease provided Tenant's use as stated herein remains the same, or if the contemplated use is not the same, the Landlord must approve the new use (which approval will not be unreasonably withheld, conditioned, or delayed) prior to the occupancy of such sublessee or assignee; and provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder; provided further that any such assignee or sublessee agrees to abide by and assume all of the terms and conditions to this Lease, including exclusives, restrictions and/or covenants, affecting the

Demised Premises. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and heating, ventilating, and air conditioning equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred twenty-five percent (125%) of the Rent and otherwise subject to all the terms and provisions hereof.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) hand, (ii) a nationally recognized overnight express courier, (iii) registered or certified mail return receipt requested, or (iv) via facsimile, provided a copy of said notice is sent in accordance with (i), (ii), or (iii) within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day in the case of delivery by overnight courier, or (iii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.    **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the laws of the State of Florida.

26.    **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.    **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease which may be in the form shown on Exhibit F. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.   **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.   **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.   **HAZARDOUS MATERIAL:**

Landlord represents and warrants to the best of Landlord's knowledge the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date (not caused by Tenant) or is determined to have been placed thereon by Landlord during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all governmental laws and regulations and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials in a manner that causes Tenant to cease business operation all Rent due under this lease shall abate during the period of time necessary to complete such work. Notwithstanding the foregoing, Landlord advises Tenant that asbestos may be present in the floor tile or mastic located within the Demised Premises, and Tenant agrees at its sole cost and expense to remediate such condition by and at Tenant's option, either removal and disposal of such or by encapsulating such.

Throughout the Original Term of this Lease or any options or extensions, Tenant and/or its contractors shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders and with notice to the Landlord. Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused

by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

31. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is a year-end adjustment or an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in a deficiency owed by Tenant, Landlord shall notify Tenant of any deficiency within twelve (12) months after the expiration of the Lease Year in which such adjustments are applicable. If Landlord does not notify Tenant of such deficiency within said twelve (12) month period, Landlord's claim to such deficiency shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

Unless otherwise expressly provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that either party fails to respond to any request for consent, approval or permission within fifteen (15) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other party may proceed without further action, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

35. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

**36.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**37.    BINDING EFFECT OF LEASE:**

The covenants, agreements and obligations herein contained, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns. Landlord, at any time and from time to time, may make an assignment of its interests in this Lease.

**38.    LENDER APPROVAL OF LEASE:**

Notwithstanding anything herein this Lease to the contrary, Landlord shall have the right to terminate this Lease prior to September 15, 1999, should its lender ("Lender") not approve this Lease. Landlord covenants and agrees to immediately submit this Lease to Lender and diligently seek its approval. Landlord further covenants and agrees to immediately commence Landlord Work hereunder this Lease and to diligently prosecute the same.

END OF LEASE
Signature Page and Exhibits follow

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD: EIC-Pasco Limited Partnership**

By: ___EIG FL, Limited Partnership___

Its: _____General Partner_____

By: ___EIG Florida, L.L.C.___

Its: _____General Partner_____

By: _____

George B. Huber

Title: _____CEO_____

Witnesses As To Tenant:

**TENANT:    CONSOLIDATED STORES CORPORATION, an Ohio corporation**

By: _____

Albert J. Bell

Title: _____Executive Vice President_____

STATE OF INDIANA    )
COUNTY OF ALLEN     )

Before me, the undersigned, a Notary Public in and for said County and State, this __21__ day of __Sept.__, 1999, personally appeared GEORGE B. HUBER, President of Equity Investment Corp., General Partner of EIC-Pasco, Limited Partnership an Indiana Limited Partnership, and acknowledged that he signed the above and foregoing instrument in the name and on behalf of said limited partnership as such officer in its capacity as the President of Equity Investment Corp., General Partner of EIC - Pasco, L.P.; that the same is the free act and deed as such officer, and the free and corporate act and deed of said corporation in its capacity as a General Partner of said limited partnership; and that he was duly authorized thereunto by the Board of Directors of said corporation for and on behalf of said limited partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the date above written.

_____
Notary Public
SANDRA CARDEN   Exp. 9/15/06

**STATE OF OHIO**
**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation**, by **Albert J. Bell**, its **Executive Vice President** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ _____, this __ day of _____, 1998.

_____
Notary Public

olblrata 1/98                                    24

TERESA MARTIN
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES MARCH 28, 2004

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER

### WESTGATE SHOPPING CENTER
South Allen Road & State Road 54 • Zephyrhills, Florida 33541



**NORTH**

Gross Leasable Area : 170,835 S.F.

| | | |
|---|---|---|
| 1 | FANTASY STAR TRAVEL | 1,600 S.F. |
| 2 | WESTGATE HAIR | 900 S.F. |
| 3 | RETAIL | 720 S.F. |
| 4 | I & J ICE CREAM | 1,000 S.F. |
| 5 | RETAIL | 2,340 S.F. |
| 6 | BEALLS OUTLET #188 | 17,500 S.F. |
| 7 | ECKERDS #2402 | 10,356 S.F. |
| 8 | FABRIC KING | 4,850 S.F. |
| 9 | FRANK'S CHIROPRATIC | 1,250 S.F. |
| 10 | RETAIL | 1,608 S.F. |
| 11 | RETAIL | 20,373 S.F. |
| 12 | WINN DIXIE (dark) | 40,371 S.F. |
| 13 | BEALLS #78 | 20,425 S.F. |
| 14 | SCOTTY'S | 24,523 S.F. |
| 15 | SCOTTY'S | 7,427 S.F. |

olblrata 1/98                        24

# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

Parcel 1:

Tract 25 and a portion of Tracts 8, 9 and 24, ZEPHYRHILLS COLONY COMPANY LANDS in Section 15, Township 26 South, Range 21 East as shown on the plot recorded in Plot Book 1, page 55; Public Records of Pasco County Florida and being more fully described as follows:

Commence at the Northwest corner of said Section 15, thence South 00°15'25" East along the West line thereof for 40.00 feet to the Southerly right – of – way of State Road No. 54; thence North 89°59'23" East along said Southerly right – of – way line for 230.00 feet to the East line of the West 215.00 feet of aforesaid Tract 8 and POINT OF BEGINNING; thence continue North 89°59'23" East along said Southerly right – of – way line for 213.66 feet to the West line of the East 225.00 feet of said Tract 8; thence South 00°15'20" East along said West line for 135.00 feet to the South line of the North 150.00 feet of said Tract 8; thence North 89°59'23" East along said South line for 175.00 feet to the West line of the East 50.00 feet of said Tract 8; thence North 00°15'20" West along said West line for 135.00 feet to the aforesaid Southerly right- of –way  line  of State  Road No.54 thence North 89°59'23" East along said Southerly right – of – way  line for 50.00 feet to the East line of Tract 8; thence South 00°15'20" East along the East line of Tracts 8,9, 24 and 25 for 1289.40 feet to the South line of Tract 25 thence North 89°58'39" West along said South line of Tract 25 for 653.63 feet to the West line of Tract 25 and Easterly right- of – way line (15.00 feet from the centerline thereof when measured at right angles) of South Allen Road ; thence along said Easterly right – of – way line the following courses: run North 00°15'25" West along said West line of Tract 25 for 332.30 feet to the North line of Tract 25; thence South 89°59'54" East along said South line for 10.00 feet: thence North 00°15'25" West for 756.91 feet to the South line  of the North 225.00 feet of aforesaid Tract 8; thence departing said Easterly right – of – way  line of South Allen Road run North 89°59'23" East along said South line for 205.00 feet to the East line of the West 215.00 feet of said Tract 8; thence North 00°15'25" West, along said East line for 200.00 feet to the POINT OF BEGINNING.

Together with all easements vested in Zephyrhills Associates Ltd. Under that certain Cross-Easements and Restrictive Covenants Agreement recorded in O.R. Book 1223, page 01497 as modified by Modification of Cross – Easements and Restrictive Covenants Agreement recorded in O.R. Book 1263 page 1775; all of the Public Records of Pasco County, Florida.

Together with Out – Parcel 1 described as follows:

The West 175.00 feet of the East 225.00 feet of the North 160.00 feet of Tract 8, Zephyrhills Colony Company Lands, in Section 15, Township 26, South, Range 21 East, as shown on the plot recorded in Plot Book 1, page 55 of the Public Records of Pasco County, Florida; LESS the North 25.00 for State Road No.54 right of way.

## EXHIBIT C
## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**Landlord covenants and agrees to deliver the premises to Tenant as follows:**

1.  HVAC equipment to be in good working condition and adequate for Tenant's intended use (a minimum of 1 ton per 400 square feet).

2.  All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification.

3.  Tenant to have exclusive use of existing store front.

4.  Roof to be in good condition and free of leaks.

5.  Landlord to ensure existing pylon meets all local and city codes and zoning ordinances. Tenant to have ~~exterior~~ signage on the pylon.

6.  Tenant to have exclusive use of existing receiving dock.

7.  All above work to be completed before the Tenant Possession Date.

EXHIBIT C - 1 (SPLIT)

LANDLORD'S WORK

*ZEPHYRHILLS, FL*

1.      Landlord to ensure the HVAC equipment to be in good working condition and
        adequate for Tenant's intended use a minimum of 1 ton per 400 square feet after
        the new demising wall is built. If no event will duct work from the demised
        premises serve the adjacent space.

2.      Landlord to rework lighting fixtures as needed to erect demising walls. Lighting
        to be within three feet of new demising wall.  (Landlord may have to add new
        fixtures to ensure is within three feet)

3.      Landlord to separate all utilities and provide separate meters.
        (Adequate for Tenants intended use).

4.      Landlord to erect demising wall, to roof deck, separating Tenants.  Landlord
        to re-tie ceiling to demising walls and finish floor to include cove base and walls
        ready for paint.

5.      Landlord will use all reasonable efforts including working during off hours to
        ensure that tenant's business will not be interrupted during construction.
        Construction will not be allowed during the months of October, November and
        December.

6.      Landlord to ensure that the work to be performed to be of professional quality
        and meet all local, city, state and ADA requirements. Landlord to also ensure that
        as a result of this construction, any changes required by any governmental
        agency to the tenant's demised premises will be the full responsibility of the
        landlord.

EXHIBIT D

## TENANT SIGN SPECIFICATION



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

Date: _10/1/99_

To:_Consolidated_   (insert Tenant) Stores
    via facsimile: (614) 278-6546

From: _EIC Pasco Lim. Part_(insert Landlord & name of contact person)

RE: _Westgate Shop. Ctr._ (insert Shopping Center, City/State of Demised Premises)
    _Zephyrhills, Fl_

You are hereby notified that all work required of Landlord pursuant to the Lease dated
_____ has been completed. Accordingly, possession of the Demised Premises is
hereby delivered to Tenant. You may pick up the keys at _by paging the_
_maintenance person for the center. @ 813-271-8464_ .

If you have any questions, please feel free to contact me at _(219) 426-4704_ .

ThankYou.

## EXHIBIT F
### TENANT'S REDEMISED PREMISES

