# Exhibit A

# TABLE OF CONTENTS

**Section**

1.    Definitions
    A.    Common Areas
    B.    Dates
    C.    Exhibits
    D.    Demised Premises
    E.    Shopping Center
    F.    Project

2.    Demise

3.    Term
    A.    Original Term
    B.    Option to Extend Term

4.    Use and Operation

5.    Rent and Construction Allowance
    A.    Fixed Minimum Rent
    B.    Utilities Charges
    C.    Intentionally Deleted
    D.    Common Area Charges and Fixed CAM
    E.    Real Estate Taxes
    F.    Taxes
    G.    Construction Allowance
    H.    Declarations

6.    Buildout and Other Alterations

7.    Maintenance and Repairs

8.    Signs

9.    Trade Fixtures

10.    Governmental Regulations

11.    Indemnification

12.    Insurance
    A.    Tenant
    B.    Landlord

13.    Fire Rebuilding and Altering

14.    Force Majeure

15.    Injunction

16.    Warranty of Title by Landlord; Representations

17.    Quiet Enjoyment

18.    Mortgage and Estoppel Certificates

19.    Default

20.    Condemnation

21.    Mutual Waiver of Subrogation

22.    Assignment and Subletting

23.    Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the ___ day of January, 2022 (the "Effective Date"), by and between CORTA STEVENS POINT, LLC, a Florida limited liability company, whose mailing address is 12632 SW 92nd Ave Miami, FL 33157 ("Landlord"), and Big Lots Stores – PNS, LLC, a California limited liability company, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081-7651, Attention:  Lease Administration.

## WITNESSETH:

**1.** **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.  <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Project not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Project signs, and parking lot lighting poles and light fixtures of the Project which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Project.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the area crosshatched on Exhibit A ("No Build Area").

B.  <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice,

4

Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession to Tenant with all Landlord Work complete or (ii) the date on which Tenant receives all permits for its construction and signage (the "Permits"). Tenant will submit its plans for the Permits within sixty (60) days of the Effective Date and thereafter, diligently pursue obtaining such Permits. Landlord will cooperate fully with Tenant in obtaining said Permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile or electronic mail (e-mail) with confirmed receipt, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred eighty (180) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B1969CA5E

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      Landlord and Tenant agree that Landlord shall make commercially reasonable efforts to complete Landlord's Work by August 31, 2023 (the "Target Delivery Date"). The period of time between October 1, 2023 and February 1, 2024 will be the "Optional Blackout Period". In the event Landlord completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not completed Landlord's Work by December 1, 2023, then Tenant may terminate this Lease by delivery of a termination notice at any time after December 1, 2023, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

6)      In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred eighty (180) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 2, 2024. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

7)      Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises on or before the Target Delivery Date, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, should Landlord not complete Landlord's Work in the Demised Premises on or before the Target Delivery Date, then Landlord shall pay liquidated damages in the amount of one hundred thousand ($100,000.00) dollars. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control. Furthermore, in the event that Landlord provides

written notice to Tenant not less than ninety (90) days before the Target Delivery Date that Landlord will not be able to complete Landlord's Work on or before the Target Delivery Date, then Landlord shall not be obligated to pay such liquidated damages unless Landlord subsequently fails to complete the Landlord's Work by September 15, 2023.

8)     Notwithstanding anything to the contrary contained herein, in the event that Dunham's Sports is not open and operating a store in the Shopping Center pursuant to a fully executed lease with Landlord on the Rent Commencement Date, then Tenant shall be permitted to abate Fixed Minimum Rent by fifty percent (50%) until such store has opened and commenced business operations.  In the event that Dunham's Sports has not opened a store in the Shopping Center pursuant to a fully executed lease with Landlord within twelve (12) months of the Rent Commencement Date, then Tenant shall have the right to termination this Lease with thirty (30) days written notice until such time that such store as opened and commenced business operations.  Notwithstanding the foregoing, if Tenant remains open for business after the twelve (12) month period following the Rent Commencement Date then Tenant shall return to paying full Fixed Minimum Rent.

C.     <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)     Exhibit A -    Site Plan

2)     Exhibit A-1    Tenant's Plans and Specifications

3)     Exhibit B -    Legal Description of Shopping Center

4)     Exhibit C -    Landlord's Work

5)     Exhibit D -    Tenant Building Sign Specifications

6)     Exhibit D – 1 Tenant Pylon Sign Location

7)     Exhibit E -    Completion of Landlord's Work Letter

8)     Exhibit F -    Exclusive Use Provisions

9)     Exhibit G -    Remeasurement Rider

D.     <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have a minimum width of 130 feet for the Demised Premises and 40,000 square feet of ground floor area, and shall be measured from the exterior face of any exterior walls and from the centerline of

any demising walls.  Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings.  Except as otherwise provided herein, should the findings of such remeasurement show that the square footage of the Demised Premises is less than 39,900 square feet, then the parties shall execute the Remeasurement Rider attached hereto as "Exhibit G" and all aspects of Rent and Additional Rent shall be adjusted accordingly.  Notwithstanding the foregoing, Landlord and Tenant acknowledge and agree that in the event that the actual rentable square footage of the Demised Premises is greater than 40,000 square feet, Tenant shall continue to pay all aspects of Fixed Minimum Rent and any Additional Rent based on 40,000 square feet.

Tenant shall not be obligated to accept possession of any space under 36,000 square feet in size, and may terminate this Lease in such an event. Tenant's Plans and Specifications for the Demised Premises are attached hereto as Exhibit A-1 and deemed approved by the parties hereto.

E.   <u>Shopping Center</u>:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area highlighted in blue on Exhibit A, the address of which is East Town Center, 5601 U.S. 10, Stevens Point, WI.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 116,000 square feet. Notwithstanding the foregoing, in no event shall Landlord be permitted to lease, rent, or otherwise receive any compensation whatsoever for any use of any portion of the Shopping Center in excess of 116,000 rentable square feet depicted on Exhibit A without entering into an amendment with Tenant memorializing the same and making equitable changes to Tenant's pro rata share of Common Area Charges (as hereinafter defined). Notwithstanding the foregoing, Landlord and Tenant acknowledge and agree that in connection with Landlord's development of the Project, the two outparcels shown on Exhibit A shall be parceled off and shall thereafter no longer be included in the legal description attached as Exhibit B. A revised legal description excluding such parcels shall be formalized in an amendment to this lease prior to the Lease Commencement Date. Notwithstanding the foregoing, irrespective of their inclusion in Exhibit B hereof, the Shopping Center for the purposes of this Lease shall be limited to those areas demarcated on Exhibit A attached hereto.

F.   <u>Project:</u> The "Project" is that area of land and improvements owned by Landlord and outlined in yellow in Exhibit A, inclusive of the Shopping Center.

## 2.   **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter

appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Project and their respective employees, agents, customers, and invitees.

3.   **TERM:**

A.   <u>Original Term</u>:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2034 (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any exercised Option Terms (as defined below), and any other extended period.

B.   <u>Options to Extend Term</u>:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises, and not in monetary default under the Lease, Tenant may elect to exercise each option by giving the Landlord written notice at least six(6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

4.   **USE AND OPERATION**:

A.   <u>Permitted Uses</u>:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), all similar or related merchandise and for any other lawful purpose.  Landlord represents and warrants to Tenant, as of the

9

effective date of this Lease, that no exclusive covenants granted to existing Project tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Project, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants open and operating for business in the Project as of the date of this Lease, no other general merchandise discount store, liquidator, close-out store, stores selling, leasing or renting furniture or mattresses, discount food stores, craft stores or dollar store operations ("Competing Business") may be permitted in the Project during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Dirt Cheap, Bargain Hunt, Rose's, Christmas Tree Shops, Encore and Ollie's Bargain Outlet, Aaron's, Rent A Center, Rent Way, Color Tyme, Show Place, Buddy's. Notwithstanding the foregoing it is explicitly noted that the terms of this paragraph shall not apply to the operation of a business by Sierra Trading Company, Inc., Homegoods, Inc., or Ross Dress for Less, Inc. (or their parent, or subsidiary companies, or affiliates, and any successors or assigns of the foregoing). For the purposes hereof, an "affiliate" is any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the specified organization. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a business organization, whether through the ownership of voting securities, by contract or otherwise. Further, Five Below shall not be deemed a competing business. In the event a Competing Business, as defined herein, is operated in the Shopping , Center, Tenant shall be entitled to any and all of the following remedies upon written notice: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent, and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies

herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Project, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Project violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash

receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas, immediately adjacent to the Demised Premises for the sale and display of merchandise for which such area shall be limited only to the area designated in Site Plan Exhibit A which shall be deemed to include four (4) parking spaces and the sidewalks adjacent to the Demised Premises.

B.   <u>Prohibited Uses</u>:   Landlord shall not lease any space, or permit any use in the Project, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea market" type of operation; (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self-storage facilities; (v) for any medical or health-oriented facilities or offices, including but not limited to plasma centers; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Project or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 150 linear feet away from the Demised Premises); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or

reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia.  All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**".

**5.**     **RENT AND CONSTRUCTION ALLOWANCE:**

A. From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent").  Tenant will not make any payment to Landlord until Landlord provides Tenant with a duly executed federal Form W-9.  Landlord will indemnify Tenant as a result of its failure to timely execute any withholding exemption requirements (e.g. Tenant is assessed unwithheld Tax (see below) related to its payments to Landlord).  The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

B. <u>Fixed Minimum Rent</u>:  From the Rent Commencement Date including any Partial Lease Year through January 31, 2029, the sum of $240,000.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $20,000.00.  From February 1, 2029 through January 31, 2034, the sum of $260,000.00 which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,666.67.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $270,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,500.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5F

of $280,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,333.33. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $290,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $24,166.67.

C.  <u>Utilities Charges</u>:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision.  Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant.  If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense.  Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use.  The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice.  In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service.  In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data.  Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be

charged by the utility company, if service were furnished directly to the Demised Premises.

D.    <u>Intentionally Deleted.</u>

E.    <u>Common Area Charges and Cap</u>:  Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Common Areas of the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees, including keeping the parking lot lights on during periods of darkness during normal Shopping Center hours and also, for the period commencing November 20th through December 31st each year, until midnight.

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)    cleaning, sweeping, and snow and ice removal as needed.  Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on site employees, to the

extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies; but only to the extent such costs are derived from the Shopping Center ("Common Area Charges"). Under no circumstances shall the foregoing Common Area expenses that are associated with the Project, but not the Shopping Center, be included in the Common Area Charges. Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves, any administrative, management or related fees. Notwithstanding the foregoing, Landlord and Tenant acknowledge and agree that subject to the CAM Cap (defined below) Landlord shall be permitted to include a management fee equal to three percent (3%) of tenant lease revenues.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center.  In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center.  In no event shall there be any duplication of expenses.  The initial gross leasable area of the Shopping Center is 116,000 square feet resulting in a 34.48% pro rata share.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein).  Such Common Area Charges may be adjusted and revised after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year.  Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first

day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto.  Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.  In the event Landlord fails to provide such a reconciliation statement within six (6) months following the end of a Lease Year, or Partial Lease Year, as the case may be, upon written notice to Landlord, Tenant may reduce its payments of estimated Common Area Charges by fifty percent (50%), commencing with the seventh (7th) month and continuing until such time as Landlord provides the reconciliation statement ("Reduced CAM").  At such time as Tenant has been paying Reduced CAM for a period of twelve (12) months, if Landlord has not yet provided the reconciliation statement, Tenant may further reduce its monthly payments of estimated Common Area Charges to zero until Landlord provides to Tenant the required reconciliation statement.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due;  provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease.  In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Notwithstanding anything to the contrary contained herein, in the event that the annual snowfall exceeds 55" in any given Lease Year, Tenant shall pay its pro rata share of the costs of snow removal above 55" outside of the CAM Cap.

<u>Common Area Charges Cap</u>:  Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at seventy cents (**$0.70**) per square foot of the Demised Premises for the first Lease Year during the Original Term, as well as the initial Partial Lease Year, if any.  After the first Lease Year, Tenant's pro rata share of Common Area Charges shall not increase by more than three percent (3%) on a non-cumulative basis (collectively, the Common Area Charges Cap described herein shall be known as the "CAM Cap").

F.    <u>Real Estate Taxes:</u>  Landlord shall timely pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes").  Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments, impositions, penalties or interest, or any Real Estate Taxes for property located outside of the Shopping Center.  Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord for the Shopping Center. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Notwithstanding the foregoing, in no event shall Tenant be obligated to reimburse Landlord for any Real Estate Taxes in excess of $0.66 per rentable square foot of the Demised Premises for the first Lease Year including any Partial Lease Year.  Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities.  Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.  Landlord represents that the Real Estate Taxes for the 2021 tax year were approximately $0.57 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes.  Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in

the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including property card requests, and the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing one sale, conveyance, change in ownership or other transfer may occur once every five years not subject to the above restrictive provisions.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental

charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

G.    Taxes:

1. "Excluded Tax(es)" means any Tax other than a Transaction Tax.

2. "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

3. "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale or rent transaction; (b) levied upon the purchaser/Tenant; (c) can be legally collected from the purchaser/Tenant; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser/Tenant.

4. The rent payments do not include any amount for Transaction Taxes. Tenant will pay, reimburse or indemnify (as the facts and circumstances dictate) Landlord for any applicable Transaction Taxes with respect to the rents, unless the particular rent is nontaxable.  For purposes of clarity, currently, only rents for locations in Florida and certain locations in Arizona are subject to Transaction Taxes.

5.  Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement.  For purposes of clarity but without limiting the foregoing, Landlord acknowledges that it may have gross receipts, license and/or income Tax obligations where the rent receipt may be assigned under applicable Tax law.  Any Taxes or license fees imposed on Landlord's rents or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes are not and, will not be construed as, Transaction Taxes and are Excluded Taxes and also will not be an itemized charge on any invoice.  Landlord and Tenant will, and will cause their respective affiliates and subcontractors, to reasonably cooperate in good faith on all Tax matters.

H. Declarations:   Landlord and Tenant acknowledge that Project is subject to certain covenants, conditions and restrictions of record, including but not limited to the Declaration of Restrictions dated November 4, 1991 recorded in Portage County

OR 449032 Volume 561 Page 1169 as well as Declaration of Easements and Restrictions dated December 15, 1982 recorded in Portage County OR 463954 Volume 589 Page 0928 (collectively, the "Declaration"). To the extent that the Declaration allocates any expenses or charges in connection with the Project (as defined in this Lease) or the Project (as defined in the Declaration) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant. In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the Declaration, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant. Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) arising out of any violation by Tenant of the Declaration to the extent it conflicts with the Lease as stated above. Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the Declaration, and Landlord agrees not to consent to any uses prohibited by the Declaration or this Lease in the Project.

6.    **INITIAL BUILDOUT AND OTHER ALTERATIONS:**

If Landlord fails to complete Landlord's Work at the Demised Premises by February 1, 2023, then at Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

During the Term of this Lease, following completion of initial buildout/alterations to the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which the Demised Premises are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term continue to remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any such alterations.

7.    **MAINTENANCE AND REPAIRS:**

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks. Notwithstanding anything to the contrary contained herein, If Tenant has had multiple issues with roof leaks and an inspection report by a reputable commercial roof company states that the roof is at the end of its useful life and recommends replacement, Landlord shall promptly replace the roof. If Landlord does not begin replacement within thirty (30) days of written notice by Tenant, Tenant may replace and withhold 100% of future rent payments until the cost is recouped plus any damages Tenant may have incurred due to the roof leaks. Tenant would also be entitled to an addition 15% administrative fee.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on

the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

## 8. **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Project pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Project Pylons. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Project which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **TRADE FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

## 11.    INDEMNIFICATION:

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

## 12.    INSURANCE:

A.   Tenant:   Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:   One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

B.   Landlord:   Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.   Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.   Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof for the Shopping Center (the "Insurance Costs").   Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation").   Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord for the Shopping Center.   Notwithstanding the foregoing, in no event shall Tenant be responsible for reimbursing Landlord for more than $0.29 per rentable square foot of the Demised Premises for the first Lease Year

26

including any Partial Lease Year. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B are anticipated to be approximately $0.25 per square foot per annum for the 2023 lease year but in no event shall they exceed $0.26 per square foot per annum.

If Tenant is able to secure an insurance policy or policies with the same coverages as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A.      If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.      In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty,

Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.      If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.     <u>FORCE MAJEURE:</u>

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.     <u>INJUNCTION:</u>

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.     <u>WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:</u>

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by

Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17.    QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18.    MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of

Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19. **<u>DEFAULT:</u>**

A.  If Tenant shall be adjudicated as bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed

the reasonable Rent value of the Demised Premises for the same period as the same becomes due.  In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant.  Rather, such amount shall remain payable monthly as they would have come due under this Lease.  Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.  Notwithstanding the foregoing as it pertains to late payment of Rent Landlord shall only be required to provide ten (10) days written notice of late payment twice in any calendar year.  After the second notice should Tenant pay Rent after its due date Tenant shall be in default under the Lease subject to notice and cure periods herein.

B.  If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full.  Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items.  It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided.  In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.  All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity.  All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.  <u>CONDEMNATION:</u>

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the

Demised Premises.  In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises.  In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith.  Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate.  Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21.    MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

## 22.    ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder.  Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and

to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee. Any sub-lessee shall be subject to all prohibited use and exclusive use provisions included in Exhibit F and shall not benefit from the Tenant's carve-out thereof.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition. Tenant may remove all of its trade fixtures from the Demised Premises. Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed. Any trade fixtures or other items which may have caused damage to walls or roof systems shall be professionally repaired and patched by Tenant.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof. If Landlord provides Tenant thirty (30) days written notice to vacate the Demised Premises upon the expiration of the Term and Tenant does not so vacate the Demised Premises within ninety (90) days, Fixed Minimum Rent shall increase by 50%.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile/electronic mail (e-mail), provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile/electronic mail (e-mail) transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a Florida limited liability company duly organized, validly existing and in good standing under the laws of Florida. Tenant represents it is a limited liability company duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26. <u>BINDING OBLIGATIONS:</u>

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27. <u>NO RECORDATION:</u>

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28. <u>REAL ESTATE BROKER'S COMMISSION:</u>

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease except for CBRE, Inc., which represents the Tenant, and will be paid by Landlord pursuant to a separate written agreement. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29. <u>NO WAIVER, LACHES OR ACCORD AND SATISFACTION:</u>

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

30.    **HAZARDOUS MATERIAL:**

Landlord represents and warrants that, to its actual knowledge and based on the professional services and reports performed and provided by environmental professional consultants of which have been presented to Tenant for review, the Demised Premises do not presently contain any Hazardous Materials.  "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety,  or property and/or the use and/or disposal of which is regulated by any governmental authority.  Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and  Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials.  If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.  Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.   **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable.  If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33.   **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission.  In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.  Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

34.   **CO-TENANCY:**

If at any time following the sixth (6th) anniversary of the Rent Commencement Date, including any options or extensions, fewer than three Key Tenant(s) (as hereinafter defined): shall fail to continuously open for business in the Shopping Center, and a substitute Key Tenant(s) satisfactory to Tenant does not commence operations in the Shopping Center within one hundred eighty (180) days thereafter, Tenant shall have the right to abate the monthly Fixed Minimum Rent provided for in this Lease by fifty percent (50%), such amount to be payable within thirty (30) days following the month for which it is due.

In the event that a Key Tenant(s) is not replaced at the Shopping Center within eighteen (18) months from the date it ceases operations, Landlord may terminate this Lease by giving Tenant ninety (90) days' notice of its intention to so terminate, and if Tenant does not elect to resume paying the Rent provided for in this Lease prior to the date of termination specified in such notice, this Lease shall then terminate with the same effect as if such date were the scheduled expiration date of this Lease and Tenant shall have no further liability hereunder.  Key Tenant(s) is (are) defined as Dunham's Sports, Hobby Lobby, Ross Dress for Less, and Five Below.

35.   **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

## 36. SUBMISSION OF LEASE:

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

## 37. INTERLINEATION:

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

## 38. TIME OF THE ESSENCE:

Time is of the essence of all conditions of this Lease in which time is an element.

## 39. TENANT'S AUDIT RIGHTS:

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any

overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter.  If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

**40.**    **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party.  This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.**    **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

**CORTA STEVENS POINT, LLC,**
a Florida limited liability company

By: _____

Cory Presnick

Title:  Manager

Witnesses as to Tenant:

**TENANT:**  **BIG LOTS STORES – PNS, LLC,**
a California limited liability company

By: _____

Jonathan Ramsden

Title:  Executive Vice President,
Chief Financial and Administrative Officer

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _____ by, _____ its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said limited liability company, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this _____ day of _____, 2022.

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores – PNS, LLC**, by Jonathan Ramsden, its Executive Vice President, Chief Financial and Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said limited liability company, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _____ day of _____, 2022.

<div align="center">
_____

Notary Public
</div>

**EXHIBIT A**

**SITE PLAN OF SHOPPING CENTER**



DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

# EXHIBIT A- 1

## TENANT'S PLANS AND SPECIFICATIONS



**BIG LOTS STORES, LLC.**
**STORE PLANNING DEPT.**
**4900 E DUBLIN GRANVILLE RD**
**COLUMBUS, OHIO 43081**
**PHONE: (614) 278-6800**

**STORE ADDRESS:**
BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

**DESIGNER:**
BIG LOTS STORES, LLC.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
CONTACT: LAUREN RENZI
PHONE: (614) 278-6869
EMAIL: lrenzi@biglots.com
FOR MEP RELATED ITEMS: ROB HILLIS
PHONE: (614) 278-6735

## Construction Schedule Template

PROJECT TITLE and REF NUMBER.

CONSTRUCTION START DATE:
PUNCH DATE:
CONSTRUCTION COMPLETION DATE:

Contractor Name:
Contractor Contact Name:
Contractor Contact Phone:
Contractor Contact Email:
Program Prepared by:

| REF | TITLE | START DATE | FINISH DATE | COMPLETION % | MATERIAL ORDER DATE | W1 | W2 | W3 | W4 | W5 | W6 | W7 | W8 | W9 | W10 | W11 | W12 | W13 | W14 | W15 | W16 | W17 | W18 | W19 | W20 | W21 | W22 | W23 | W24 | W25 | W26 | W27 | W28 | W29 | W30 | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PERMIT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | SITE PREPARATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | DEMOLITION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | CONCRETE WORK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | STRUCTURAL STEEL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | TRUCK WELL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 7 | CANOPY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8 | ROOFING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9 | ENTRY / VESTIBULE DOORS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 10 | EAS AREA PREP | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | INTERIOR DOORS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 12 | MASONRY / CMU BLOCK CONSTRUCTION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | SUSPENDED CEILINGS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 14 | FRAMING/DRYWALL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 15 | WALL PAINTING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | OPEN DECK PAINTING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | EXTERIOR PAINTING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 18 | PLUMBING AND DRAINAGE ROUGH IN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | RESTROOM COMPLETE WITH FIXTURES PER SPEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | ELECTRICAL INSTALLATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | LIGHTING INSTALL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 22 | ELECTRICAL GEAR INSTALLATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 23 | EMS INSTALLATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 24 | CURB INSTALL / CURB ADAPTER | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | MECHANICAL/HVAC INSTALLATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | AIR BALANCE / HVAC START UP REPORT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 27 | GLASS / GLAZING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 28 | FLOORING PREPARATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 29 | FLOORING INSTALLATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | SPRINKLER SYSTEM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 31 | FIRE ALARM SYSTEM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 32 | EXTERIOR WORK (EIFS) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 33 | CASH WRAP INSTALLATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 34 | FLOOR WAX COMPLETE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 35 | FINISHES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 36 | FINAL CLEAN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 37 | BUILDING TEMP CERTIFICATE OF OCCUPANCY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 38 | BUILDING CERTIFICATE OF OCCUPANCY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Initial Issue Date:
Amendments:
1.
2.
3.
4.
5.

Guide Notes:
1. Above week, insert the

2. Appropriately shade-in or cross-out each cell for the duration of the task ensuring that it corresponds with the start and finish dates.

## MATERIALS AND EQUIPMENT SCHEDULE

| PRODUCT | SUPPLIED BY | INSTALLED BY | MANUFACTURER & MODEL NUMBER | VENDOR AND CONTACT INFORMATION |
|---|---|---|---|---|
| BIG LOTS TRADE FIXTURES | BIG LOTS | BIG LOTS | MADIX / LOZIER | KRIS STORMS 816-805-3228 KSTORMS@MADIXINC.COM |
| INTERIOR / EXTERIOR PAINT | LANDLORD | LANDLORD GC | BEHR PAINTS | BEHR PAINTS: NATIONAL ACCOUNTS - GEOFF ROSS 817-300-4483 GROSS@BEHR.COM |
| WALK OFF CARPET TILE | LANDLORD | LANDLORD GC | PATH CARPET TILE / 37034 - LAVA 34549 24"X24" | SHAW CONTACT: JESSICA BEAVERS - PHONE: (706) 532-7483 - EMAIL: JESSICA.BEAVERS@SHAWINC.COM |
| PLANK LVT | LANDLORD | LANDLORD GC | SAR - FLOORO 463 CERVO | SAR FLOORS - ORDERS@SARFLOORS.COM - MEGAN HUFFMAN 800-555-1657 EXT. 324 |
| GREY VCT | LANDLORD | LANDLORD GC | AHF PRODUCTS- VCT STANDARD EXCELON IMPERIAL TEXTURE 12"X12" - 1/8" THICK -51904 STERLING | AHF PRODUCTS - ORDERSUPPORT@AHFPRODUCTS.COM - 888-243-4492 |
| COVE BASE | LANDLORD | LANDLORD GC | ARMSTRONG VINYL WALL BASE - BLACK #60 - .080 4" | SOURCE LOCALLY |
| CEILING TILE | LANDLORD | LANDLORD GC | CERTAINTEED BET197 | BERNARD SHALVEY - 704-779-7337 - BERNARD.G.SHALVEY@SAINT-GOBAIN.COM |
| MARLITE TILE PANEL | LANDLORD | LANDLORD GC | MARLITE - FRP - P100 WHITE | REGINA DICKEY- 330-602-2251 - RDICKEY@MARLITE.COM |
| MARLITE TILE PANEL | LANDLORD | LANDLORD GC | MARLITE - FRP -P470N DARK GREY | REGINA DICKEY- 330-602-2251 - RDICKEY@MARLITE.COM |
| STAINLESS STEEL COLUMN WRAPS | LANDLORD | LANDLORD GC | -STAINLESS STEEL COLUMN WRAPS - 22 GAUGE STEEL @ 48" A.F.F. OD2MYK, STAINLESS STEEL COLUMN WRAPS - 22 GAUGE STEEL @ 48" | RETAIL SPECIALTY INC. DAN HICKEY 586-566-7716 |
| STAINLESS STEEL CORNER GUARDS | LANDLORD | LANDLORD GC | 2'X2' - 48" HT 16 GAUGE - SATIN FINISH #4 S.S. - 400 GRADE - CG 4182 (MODEL) - OD2MYK - 22 GAUGE STAINLESS STEEL CORNER GUARDS 48" HT | RETAIL SPECIALTY INC. DAN HICKEY 586-566-7716 |
| PARKING LOT CART CORRALS | LANDLORD | LANDLORD GC | ADVANCE CARTS INC | ADVANCE CARTS INC -PAT FERRELL 908-451-8712 - PAT@ADVANCECARTS.COM |
| CART BUMPERS | LANDLORD | LANDLORD GC | MCCUE CART STOP RE CSR-(TBD)A-601 - CGB-35-400 (401) | CUSTOMERCARE@MCCUE.COM 800-800-8503 - BRIAN ZORNES 630-561-3269 - BZORNES@MCCUE.COM |
| STOREFRONT DOORS | LANDLORD | LANDLORD GC | RECORD DOORS SERIES 6100 AUTOMATIC SLIDING DOORS OR SLIMDRIVE DOORS 3000 SERIES | RECORD DAVID PICKERS 704-310-7392 - DAVID.PICKERS@RECORDDOORS.COM |
| ROOF LADDER WITH SAFETY-CAGE | LANDLORD | LANDLORD GC | FS INDUSTRIES | FSINDUSTRIES.COM PHONE: 800-421-0314 |
| DOOR HARDWARE | LANDLORD | LANDLORD GC | SEE HARDWARE SCHEDULE ON SHEET A-1 | TWIN CITY HARDWARE BOB HAEN PROJECT MANAGER 651-731-7142 - BIGLOTS@TCHCO.COM |
| DOOR LOCKING MECHANISMS | LANDLORD | LANDLORD GC | SEE HARDWARE SCHEDULE ON SHEET A-1 | TWIN CITY HARDWARE BOB HAEN PROJECT MANAGER 651-731-7142 - BIGLOTS@TCHCO.COM |
| STOCKROOM DOORS | LANDLORD | LANDLORD GC | ELIASON MODEL P-11 PLUS - COLOR: BLACK 108 | LANA AVERILL - DIRECT LINE: 513-714-2647 QUOTES-ORDERS@SENNECA.COM |
| RESTROOM MIRRORS | LANDLORD | LANDLORD GC | STAINLESS STEEL CHANNEL FRAME FIXED TILT 24" W X 36" H X 4" D | GC TO SELECT |
| BABY CHANGING TABLE | LANDLORD | LANDLORD GC | DIAPER-DEPOT MODEL#300 - OVAL BABY CHANGING STATION | SAFE-STRAP CO. - JENNIFER HIPPLEY 800-356-7786 EXT. 238 |
| TOILET SEAT COVER DISPENSER | LANDLORD | LANDLORD GC | KRYSTAL KD-100 W/ MOUNTING TAPE | BLACKHAWK - MIKE KROEPLIN 877-296-0908 |
| AIR MISTER DISPENSER | LANDLORD | LANDLORD GC | TIMEMIST 30-1131 | BLACKHAWK - MIKE KROEPLIN 877-296-0908 |
| PAPER TOWEL DISPENSER( MOP SINK) | LANDLORD | LANDLORD GC | STEFCO 91004 | BLACKHAWK - MIKE KROEPLIN 877-296-0908 |
| SANITARY NAPKIN DISPOSAL | LANDLORD | LANDLORD GC | GLOBAL INDUSTRIAL - STAINLESS NAPKIN DISPOSAL - 7-1/2" X 3-7/8" X 9-1/2" | GLOBAL INDUSTRIAL - ANDREW BERKOWITZ 516-608-7168 ABERK@GLOBALINDUSTRIAL.COM |
| SOAP DISPENSER | LANDLORD | LANDLORD GC | GOJO - FMX-20 BLACK | BLACKHAWK - MIKE KROEPLIN 877-296-0908 |
| TOILET PAPER DISPENSER | LANDLORD | LANDLORD GC | JRT DISPENSER - 41S304 - SOFIDEL | BLACKHAWK - MIKE KROEPLIN 877-296-0908 |
| ELECTRIC HAND DRYERS | LANDLORD | LANDLORD GC | WORLD DRYER - VERDEDRI - Q-973A | HJC INC.- BERRY JONES 479-657-0820 BERRY.JONES@HJCINC.COM |
| RESTROOM PARTITIONS | LANDLORD | LANDLORD GC | BLACK METAL RESTROOM PARTITIONS | TOTAL RESTROOM SCOTT@TOTALRESTROOM.COM - 414-899-4361 |
| ENERGY MANAGEMENT SYSTEM | BIG LOTS | LANDLORD GC | SITE CONTROLS 512-306-9400 | |
| FIRE ALARM PANEL, EQUIPMENT AND ACCESSORIES | LANDLORD | LANDLORD GC | GC TO SELECT | GC TO SELECT |
| CORD REELS | LANDLORD | LANDLORD GC | ALEMITE 7260 | LOCATE LOCAL DISTRIBUTOR |
| BEVERAGE COOLER / DAIRY COOLER POWER POLE | LANDLORD | LANDLORD GC | D&P 107SCL009-150WH 109"T WHITE BLANK POLE | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| CHECKOUT POWER POLES | LANDLORD | LANDLORD GC | D&P 107SCL009-150WH 109"T WHITE BLANK POLE | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| CHECKOUT COOLERS POWER POLES | LANDLORD | LANDLORD GC | D&P 107SCLP006-150WH 109"T WHITE POLE WITH 2 DUPLEX | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| WATT STOPPER LIGHT SWITCHES | LANDLORD | LANDLORD GC | LEVITON - ODS10 - IDW | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| DUAL TECH CEILING SENSOR | LANDLORD | LANDLORD GC | EATON OAC0T1000 | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| DUAL RELAY SWITCH PACK | LANDLORD | LANDLORD GC | EATON SPCD0WN0 | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| DOCK LIGHT (IF REQUIRED) | LANDLORD | LANDLORD GC | FOSTORIA DOCK LIGHT - DKL40VALED | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| 2X2 LED FLAT PANEL W/EMERGENCY BALLAST | LANDLORD | LANDLORD GC | COOPER #22FP3240C WITH #EBPLED7W - EM BALLAST | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| 2X2 LED FLAT PANEL | LANDLORD | LANDLORD GC | COOPER #22FP3240C | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| STRIP LIGHT (8 FIXTURE) | LANDLORD | LANDLORD GC | COOPER LTG 8TSLE3-2-T8-1P-B840-U | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| STRIP LIGHT (4 FIXTURE) | LANDLORD | LANDLORD GC | COOPER LTG 4SLE3-2-T8-1P-B840-U | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| STRIP LIGHT (EMERGENCY) | LANDLORD | LANDLORD GC | COOPER LTG 8TSLE3-2-EL-12-T8-1P-B840-U | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| STRIP LIGHT (LAMP) | LANDLORD | LANDLORD GC | PHILIPS 10.5/MAS/48-840/NF 16/P | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| CANOPY LIGHT | LANDLORD | LANDLORD GC | COOPER LIGHTING - HALO PART# HC81SD010, HM812835, 81MDH | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| EMERGENCY EXIT SIGN | LANDLORD | LANDLORD GC | COOPER LIGHTING - SURE LITES PART# APX6 | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| EMERGENCY EXIT SIGN REMOTE CAPABLE | LANDLORD | LANDLORD GC | COOPER LIGHTING - SURE LITES PART# APX7 | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |
| REMOTE EMERGENCY LIGHTING HEAD | LANDLORD | LANDLORD GC | COOPER LIGHTING - SURE LITES PART# APWR2 | CITY LIGHTING ROGER PUGLIANO 412-837-5626 |

## DRAWING INDEX

| SHEET | SHEET TITLE | REVISIONS | | | SHEET | SHEET TITLE | REVISIONS | | |
|---|---|---|---|---|---|---|---|---|---|
| | **ARCHITECTURAL** | | | | | **ELECTRICAL** | | | |
| | | | | | ED-1 | ELECTRICAL DEMOLITION PLAN | | | |
| T-1 | TITLE PAGE | | | | E-1 | ELECTRIC PLAN | | | |
| D-1 | DEMOLITION PLAN | | | | E-1.1 | ELECTRIC ROOF PLAN | | | |
| A-1 | CONSTRUCTION PLAN | | | | E-2 | ELECTRIC NOTES | | | |
| A-1.1 | CONSTRUCTION NOTES | | | | E-3 | EMS NOTES | | | |
| A-1.2 | FLOOR FINISH PLAN | | | | E-4 | EMS SPECIFICATIONS | | | |
| A-1.3 | STOREFRONT ELEVATIONS | | | | E-5 | EMS LIGHTING CONTROL PANEL | | | |
| A-2 | FIXTURE PLAN | | | | E-6 | LIGHTING PLAN | | | |
| A-2.1 | CHECKOUT DETAILS | | | | E-7 | POWER RISER DIAGRAM | | | |
| A-3 | REFLECTED CEILING PLAN | | | | E-8 | PANEL SCHEDULES | | | |
| A-5 | RESTROOM PLAN & DETAILS | | | | | **MECHANICAL** | | | |
| FP-1 | FIRE PROTECTION PLAN | | | | M-1 | MECHANICAL PLAN | | | |
| FP-2 | FIRE PROTECTION NOTES & DETAILS | | | | M-2 | MECHANICAL NOTES | | | |
| | | | | | M-3 | MECHANICAL DEMOLITION PLAN | | | |
| | | | | | | **PLUMBING** | | | |
| | | | | | P-1 | PLUMBING PLAN | | | |

DATE DRAWN: 12/12/2020
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

SQUARE FOOTAGE
Area — SqFt
SALES FLOOR — 28,810
TOTAL BUILDING — 42,128

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

**TITLE PAGE**

SHEET:
**T-1**



EXISTING TRUCK WELL

EXISTING SHELVING TO BE REMOVED

EXISTING DOORS TO REMAIN

EXISTING LANDLORD ELECTRICAL ROOM DOOR

EXISTING FDC

EXISTING 8" FIRE RISER W/(2) LINES

EXISTING ELECTRICAL PANELS

EXISTING PAIR OF 36" EGRESS DOORS TO REMAIN

EXISTING LADDER TO ROOF HATCH

EXISTING ROOF HATCH

LANDLORD ROOM N.I.C.

EXISTING ROOF HATCH TO BE REMOVED - PATCH AND REPAIR ROOF - G.C. TO ENSURE ROOF HATCH IS REMOVED ENTIRELY

EXISTING WALLS AND DOORS SHOWN DASHED TO BE REMOVED

EXISTING WALLS TO BE REMOVED

EXISTING FLOOR FINISHES TO BE REMOVED

MEN (T.B.R.)

WOMEN (T.B.R.)

EXISTING RESTROOM FIXTURES, WALLS AND ACCESSORIES TO BE REMOVED

EXISTING WALLS TO BE REMOVED

EXISTING DEMISING WALL TO REMAIN, PATCH AND REPAIR AS REQUIRED TO MAINTAIN ONE HOUR FIRE SEPARATION

LEASE LINE

FUTURE ADJACENT TENANT

LEASE LINE

REMOVE ALL TABLES, CHAIRS, WALLS AND SOFFITS THIS AREA

EXISTING WALLS AND DOORS SHOWN DASHED TO BE REMOVED

EXISTING FLOOR FINISHES TO BE REMOVED

EXISTING FLOOR FINISHES TO BE REMOVED

EXISTING COLUMN TO REMAIN - GC TO PREP FOR NEW FINISHES (TYP.)

EXISTING RESTROOM FIXTURES, WALLS AND ACCESSORIES TO BE REMOVED

EXISTING WALLS TO BE REMOVED

3'x7" SERVICE DOOR TO BE REMOVED. WIDEN OPENING TO ACCOMMODATE A NEW 4'x7' EXIT DOOR.

EXISTING FLOOR FINISHES TO BE REMOVED

EXISTING FLOOR FINISHES TO BE REMOVED

EXISTING FLOOR FINISHES TO BE REMOVED

EXISTING COLUMN TO REMAIN - GC TO PREP FOR NEW FINISHES (TYP.)

CEILING GRID TO REMAIN THIS AREA

REMOVE PORTION OF WALL AS REQUIRED FOR NEXT EXIT DOOR

EXISTING WALL TO REMAIN

EXISTING SOFFIT TO REMAIN, REMOVE WOOD PANELING FINISH. EXTEND STUDS TO DECK IF NOT REMOVED

EXISTING WALLS AND DOORS SHOWN DASHED TO BE REMOVED

CEILING GRID TO REMAIN THIS AREA

EXISTING WALL TO REMAIN

EXISTING STOREFRONT ENTRY AND VESTIBULE DOORS TO BE REMOVED

EXISTING STOREFRONT CONSTRUCTION TO BE REMOVED - REPLACE WITH STRUCTURAL STEEL AS REQUIRED

EXISTING STOREFRONT SYSTEM TO REMAIN - G.C. TO ENSURE STOREFRONT DOOR HAS BEEN REMOVED AND REPLACED WITH STOREFRONT GLAZING

VESTIBULE (T.B.R.)

ADJACENT TENANT "DUNHAM'S SPORTS"

ALL PREVIOUS TENANT FIXTURES TO BE REMOVED THROUGHOUT EXISTING SPACE

ALL FLOORING TO BE REMOVED THROUGHOUT EXISTING SPACE DOWN TO CONCRETE - PATCH AND REPAIR AS REQUIRED FOR INSTALLATION OF NEW FLOORING (TYP.)

ALL PREVIOUS TENANTS CEILING FIXTURES AND CEILING ELEMENTS TO BE REMOVED THROUGHOUT SPACE (TYP.)

ALL EXISTING CEILING GRID & TILE TO BE REMOVED THROUGHOUT SALES AREA (TYP.)

## DEMOLITION LEGEND

| | |
|---|---|
| ──────── | EXISTING WALL |
| ‑ ‑ ‑ ‑ ‑ | ITEM TO DEMOLISH |

## DEMO GENERAL NOTES:

- MECHANICAL CONTRACTOR TO SEE SHEET M-3 FOR ADDITIONAL DEMO INFORMATION.

- ELECTRICAL CONTRACTOR TO SEE SHEET ED-1 FOR ADDITIONAL DEMO INFORMATION.

- PLUMBING CONTRACTOR TO SEE SHEET M-3 AND P-1 FOR ADDITIONAL DEMO INFORMATION.

- DEMO CONTRACTOR NOT TO REMOVE ANY PANELS UNTIL ELECTRICAL CONTRACTOR CONFIRMS NO EXTERIOR LIGHT CIRCUITS ARE ON PANEL BEING REMOVED. CONTACT BIG LOTS IF EXTERIOR CIRCUITS ARE IN PANEL.

- BEFORE REMOVING PANELS, ELECTRICAL CONTRACTOR SHALL VERIFY THE PANEL BEING REMOVED DOES NOT FEED ANY LIGHTING, RECEPTACLES, EQUIPMENT, OR LOADS THAT ARE REQUIRED TO REMAIN. IF ANY CIRCUIT IS IN ANY QUESTION, PLEASE CONTACT ROB HILLIS (614-278-6735).

- CONTRACTOR TO CONFIRM THERE ARE NO EXTERIOR LIGHTING IN DEMOLISHED PANELS. CONTACT BIG LOTS IF CIRCUITS ARE LOCATED AND NOT LISTED IN DRAWINGS.

- FIRE ALARM CONTROL PANEL. CONFIRM IF THE EXISTING FIRE ALARM CONTROL PANEL IS IN GOOD WORKING CONDITION, SIZED CORRECTLY, HAS CELLULAR CAPABILITIES AND IS NON-PROPRIETARY. RE-USE AND RELOCATE IF ALL CRITERIA ARE MET, OTHERWISE PROVIDE NEW PANEL.

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | | |
|---|---|---|
| Area | SqFt | |
| SALES FLOOR | 28,810 | |
| TOTAL BUILDING | 42,128 | |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

## DEMOLITION PLAN

SHEET:
**D-1**



DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B1969CA5E

284' OVERALL LEASED DIMENSION
ADJACENT TENANT
EXTERIOR
EXISTING TRUCK WELL
RECEIVING
NEW 1 HOUR TENANT SEPARATION WALL
EXISTING DEMISING WALL
EXISTING EXPOSED COLUMNS TO BE PAINTED (P-10) (TYP.)
LANDLORD ROOM N.I.C.
ELECTRICAL
STOCKROOM
SALES
NOTE: G.C. TO CONFIRM ALL WALLS ON SALES FLOOR AND ENTRY AREA ARE IN GOOD CONDITION. PATCH AND REPAIR WALLS AND COLUMNS AS REQUIRED.
NOTE: G.C. TO INSTALL SAFE IN THE CASH ROOM PER SHEET A-2 AND SECURE TO FLOOR WITH BOLTS PER SAFE MANUFACTURER'S SPECIFICATIONS.
REFER TO A-2 FIXTURE PLAN FOR LOCATION OF NEW COUNTER
HOT WATER HEATER TO BE MOUNTED 96" AFF ABOVE MOP SINK
MANAGER
CASH
MEN
LOUNGE
WOMEN
NEW PLUMBING FIXTURES AND RESTROOM ACCESSORIES TO BE INSTALLED PER CURRENT ADA REQUIREMENTS. REFER TO A-1.1 FOR FINISH AND A-5 FOR MOUNTING INSTALLATION. COORDINATE WITH PLUMBING DRAWINGS (TYP.)
INSTALL CORNER GUARDS (P-13) ON SALES SIDE OF RESTROOM ENTRY (TYP.)
EXISTING DEMISING WALL TO REMAIN, PATCH & REPAIR TO MAINTAIN ONE HOUR FIRE RATING
ADJACENT TENANT
"DUNHAM'S SPORTS"
EXISTING BOLLARDS TO REMAIN, INSTALL NEW POST GUARD CONE TOP BOLLARD COVERS (ORANGE COLOR), TYP. AT STOREFRONT. CONTRACTOR TO VERIFY DIAMETER AND HEIGHT
VESTIBULE
NEW STRUCTURE AT PREVIOUS CMU WALL
EXISTING STOREFRONT SYSTEM WITH (3) EQUAL WINDOWS

# DOOR SCHEDULE

| SYMBOL | SIZE | DESCRIPTION | FRAME TYPE | FRAME FIN. | HARDWARE | DOOR FINISH METAL | DOOR FINISH WOOD | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 1A | 9' PACKAGE | NEW SINGLE SLIDER - FULL OPEN | ALUM | | 1B | DARK BRONZE | | RECORD SERIES 5100 SINGLE SLIDE DOOR TO RECEIVE 10" BOTTOM RAIL |
| 1B | 14' PACKAGE | NEW BI-PART SLIDER - FULL OPEN | ALUM | | 1A | DARK BRONZE | | RECORD SERIES 5100 BI-PART DOOR TO RECEIVE 10" BOTTOM RAIL |
| 1C | 14' PACKAGE | NEW BI-PART SLIDER - FULL OPEN | ALUM | | 1B | DARK BRONZE | | RECORD SERIES 5100 BI-PART DOOR TO RECEIVE 10" BOTTOM RAIL |
| 2 | 4'-0" x 7'-0" | NEW METAL EXTERIOR DOOR | METAL | P-4 | 2A | P-4 | | EXTERIOR DOOR FINISH TO MATCH EXTERIOR WALL FINISH |
| ~~3~~ | ~~3'-0" x 6'-8"~~ | ~~NEW H.C. METAL OR S. C. WOOD RESTROOM DOOR~~ | ~~METAL~~ | ~~P-4~~ | ~~3A~~ | ~~P-4~~ | ~~P-4~~ | |
| 4 | 3'-0" x 6'-8" | NEW H.C. METAL OR S. C. WOOD LOUNGE DOOR | METAL | P-4 | 4 | P-4 | P-4 | |
| 5 | 3'-0" x 6'-8" | NEW H.C. METAL OR S. C. WOOD CASH ROOM DOOR | METAL | P-4 | 5 | P-4 | P-4 | PEEP HOLE @ 5'-0" A.F.F. |
| 6 | 3'-0" x 6'-8" | NEW H.C. METAL OR S. C. WOOD OFFICE DOOR | METAL | P-4 | 6 | P-4 | P-4 | |
| 7 | PR. 3'-0" x 7'-0" | NEW DOUBLE-ACTING STOCKROOM DOORS | CASED | | 7 | | | |
| 8 | (E) 8'-0" x 8'-0" | EXISTING ROLLING SERVICE DOOR W/ CHAIN HOIST | METAL | GRAY | X | | | |
| 9A | (E)PR. 3'-0" x 7'-0" | (EXISTING) METAL EXTERIOR DOORS | METAL | P-4 | 2B | P-4 | P-4 | |
| 9B | (E)PR. 3'-0" x 7'-0" | (EXISTING) METAL EXTERIOR DOORS | METAL | P-4 | 2B | P-4 | P-4 | PEEP HOLE @ 5'-0" A.F.F. |

# HARDWARE NOTES

## GROUP 1A (EXTERIOR SLIDING GLASS DOORS)

EACH TO RECEIVE:
- FULLY AUTOMATIC OPERATORS
- THRESHOLD ADA APPROVED

LOCK MECHANISMS:
- 1 KEYED MORTISE CYLINDER ON EXTERIOR SIDE - 7P SFIC HOUSING - 1E7-6-C181-RP1-626 DKUSA OR EQUIVALENT
- 1 MORTISE THUMBTURN CYLINDER INTERIOR SIDE 7161TK2-26D * ILCO OR EQUIVALENT*
- 1 CONST TEMP KEYED 7P SFIC CORE 1C-7-A-2-622-BLACK DKUSA

***AS NEEDED GENERAL CONTRACTOR OR SUPPLIER FOR AUTOMATIC OPERATORS TO INSTALL KEYED CYLINDER ON STREET SIDE OF DOOR, REQUIRING OPERATING KEY TO LOCK AND UNLOCK TO GAIN ENTRY TO VESTIBULE FROM STREET.**

## GROUP 1B (INTERIOR SLIDING GLASS DOORS)

EACH TO RECEIVE:
- FULLY AUTOMATIC OPERATORS
- THRESHOLD ADA APPROVED

LOCK MECHANISMS:
- 1 BLANK MORTISE CYLINDER 7160DC-26D ILCO OR EQUIVALENT
- 1 MORTISE THUMBTURN CYLINDER INTERIOR SIDE 7161TK2-26D * ILCO OR EQUIVALENT*

***AS NEEDED GENERAL CONTRACTOR OR SUPPLIER FOR AUTOMATIC OPERATORS TO INSTALL ON STORE RETAIL SIDE OF DOOR(S), USING THUMBTURN CYLINDER(S) TO LOCK AND UNLOCK AND TO GAIN ENTRY TO VESTIBULE FROM STORE RETAIL AREA.**

## GROUP 2A (TYPICAL H.M. SINGLE DOOR-ALARMED EXIT)

EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB5, 4-1/2 X 4-1/2 , NRP, US32D — DESIGN HARDWARE
- 1 THRESHOLD S424A-XX" REQUIRED LENGTH — REESE
- 1 SET WEATHER-STRIPPING - DS75C (REQUIRED LENGTH) — REESE
- 1 DOOR SWEEP 36" - 323-C-36 — REESE
- 1 DRIP CAP - REQUIRED LENGTH — REESE
- 1 CLOSER, CONTROLLER -316-AL — DESIGN HARDWARE
- 1 180 DEGREE DOOR VIEWER - U698B-26D — IVES
  (INSTALL AT 5'-0" A.F.F. ONLY IN NON-SALES AREA DOORS)

LOCK MECHANISMS:
- 1 DETEX ECL-230X — DETEX
- 1 RIM CYLINDER C953-626-SFIC — FALCON
- 1 CONST-TEMP KEY - 7P SFIC CORE 1C-7-A-2-622-BLACK — DKUSA

## GROUP 2B (TYPICAL H.M. PAIR OF DOORS-ALARMED EXIT)

EACH TO RECEIVE:
- 3 PAIR BUTTS, BB5, 4-1/2 X 4-1/2 , NRP, US32D — DESIGN HARDWARE
- 1 THRESHOLD S424A-XX" REQUIRED LENGTH — REESE
- 1 SET WEATHER-STRIPPING - DS75C (REQUIRED LENGTH) — REESE
- 1 DOOR SWEEP 36" - 323-C-36 — REESE
- 1 DRIP CAP - REQUIRED LENGTH — REESE
- 2 DOOR CLOSER, CONTROLLER -316-AL — DESIGN HARDWARE
- 1 180 DEGREE DOOR VIEWER - U698B-26D — IVES
  (INSTALL AT 5'-0" A.F.F. ONLY IN NON-SALES AREA DOORS)

LOCK MECHANISMS:
- 1 DETEX ECL-230X — DETEX
- 1 RIM CYLINDER C953-626-SFIC — FALCON
- 1 CONST-TEMP KEY - 7P SFIC CORE 1C-7-A-2-622-BLACK — DKUSA
- 1 DOUBLE DOOR STRIKE DDSK — DETEX
- 1 DOUBLE DOOR HOLDER DDH-2250 — DETEX
- 1 DOOR PULL 4G-US32D — HAGER

## GROUP 4 (TYPICAL LOUNGE DOOR ACCESSIBLE IN STOCKROOM AREA)

EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB5-NRP-US32D 4-1/2 X 4-1/2 — DESIGN HARDWARE
- 1 FLOOR STOP FS438-US28 — IVES
- 1 CLOSER, CONTROLLER - 316-AL — DESIGN HARDWARE
- 1 PULL PLATE AND HANDLE - 33G-4X16-US32D — HAGER
- 1 PUSH PLATE - 30S-6X16-US32D — HAGER

## GROUP 5 (CASH ROOM DOORS)

EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB5-NRP-US32D 4-1/2 X 4-1/2 — DESIGN HARDWARE
- 1 FLOOR STOP -FS438-US28 — IVES
- 1 CLOSER, CONTROLLER -316-AL — DESIGN HARDWARE
- 1 180 DEGREE DOOR VIEWER - U698B26D — IVES
  -MOUNTING HEIGHT TO BE 5'-0" A.F.F.

LOCK MECHANISMS:
- 1 CYLINDRICAL LOCK-STOREROOM - X-86IC-F-26D * — DESIGN HARDWARE *
- 1 DEADBOLT - SINGLE CYLINDER - D2-S-IC-26D ** — DESIGN HARDWARE **
- 2 CONST TEMP KEYED 7P SFIC CORES 1C-7-A-2-622-BLACK — DKUSA

## GROUP 6 (TYPICAL OFFICE DOORS)

EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB5-NRP-US32D 4-1/2 X 4-1/2 — DESIGN HARDWARE
- 1 FLOOR STOP -FS438-US28 — IVES
- 1 CLOSER, CONTROLLER -316-AL — DESIGN HARDWARE

LOCK MECHANISMS:
- 1 CYLINDRICAL LOCK-STOREROOM - X-86IC-F-26D — DESIGN HARDWARE
- 1 CONST TEMP KEYED 7P SFIC CORES 1C-7-A-2-622-BLACK — DKUSA

## GROUP 7 (STOCKROOM DOORS)

STOCKROOM DOORS TO BE:
- ELIASON MODEL P-11 PLUS
- COLOR: BLACK 108
- 18" SPRING BUMPERS - BLACK
- 5" X 18" JAMB GUARDS
- 9" X 14" HIGH IMPACT WINDOWS
- WITH BLACK FRAME

## GROUP X (SECURITY HARDWARE FOR OVERHEAD DOORS / ROOF ACCESS)

EACH TO RECEIVE:
- 1 PADLOCK 6521WO BY BIG LOTS — MASTER LOCK

GENERAL NOTE:
G.C TO INSTALL FURRING STRIPS ON ALL SALES FLOOR WALLS WHERE MERCHANDISE FIXTURES WILL BE INSTALLED. G.C. TO INSTALL 1X4'S AT 72" A.F.F. AND AT 12" A.F.F. SEE SHEET A-2 FIXTURE PLAN FOR FURRING LOCATIONS.

ADDITIONAL HARDWARE NOTES:
- GENERAL CONTRACTOR TO ENSURE ALL EXISTING DOORS AND DOOR SYSTEMS ARE IN GOOD WORKING CONDITION. GENERAL CONTRACTOR TO ENSURE ALL EXISTING EXTERIOR DOORS, THRESHOLD, WEATHER-STRIPPING, DRIP CAP AND DOOR SYSTEMS ARE IN GOOD WORKING CONDITION. NOTIFY BIG LOTS REPRESENTATIVE OF ANY ISSUES.
- GENERAL CONTRACTOR TO INSTALL ALL CONSTRUCTION TEMPORARY KEYED CORES IN ALL HARDWARE AND/OR LOCK CYLINDERS WITH CONTROL KEY, AND TO TEST OPERATION WITH OPERATING KEY BEFORE TURN OVER.
- FOR USE WITH ALL CONSTRUCTION -TEMPORARY KEYED CORES, HARDWARE SUPPLIER TO ALSO INCLUDE ONE (1) CONROL KEY AND AT LEAST TWO (2) OPERATING KEYS AND LABELED AS SUCH.
- BIG LOTS SUPPLIER FOR DIVISION 8: TWIN CITY HARDWARE CO., BOB HAEN BHAEN@TCHCO.COM, 888-747-1989.
- PERMANENT KEYS AND CORES BY BIG LOTS PRIOR TO TURN-OVER DATE FOR INSTALLATION BY LOCAL BIG LOTS ASSET PROTECTION MANAGER AND/OR BIG LOTS STORE TEAM.
- LOCAL FIRE JURISDICTION KNOX BOX TO BE SUPPLIED BY GC AND/OR BY LANDLORD.

GENERAL NOTE:
G.C. TO LOCATE SAFE PER PLAN AND BOLT TO THE FLOOR.

## LEGEND

| | |
|---|---|
| (hatched) | NEW WALL |
| (open) | EXISTING WALL |
| # / A-1.1 | DETAIL/NOTE SHEET NUMBER |
| (circle) # / A-1.1 | WALL DETAIL/NOTE SHEET NUMBER |
| P-# / A-1.1 | FINISH SCHEDULE SHEET NUMBER |

GENERAL NOTE:
CONTRACTOR TO PAINT RED LINE ON STOCKROOM WALLS. SEE FINISH SCHEDULE ON SHEET A-1.1.

# CONSTRUCTION PLAN

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
|---|---|
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORES, LLC.

SHEET: A-1





DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B1969CA5E

## FINISH SCHEDULE

| ROOM & OR AREA | FLOOR: FLOOR TYPE | FLOOR: EXISTING | BASE: WALL BASE | BASE: EXISTING | WALL AND SURFACE: DRYWALL | WALL AND SURFACE: TILE | WALL AND SURFACE: SURFACE | WALL AND SURFACE: BLOCK | CEILING MATERIAL: DRYWALL PAINTED | CEILING MATERIAL: ACCOUSTICAL TILE CERTAINEED BET197 | CEILING MATERIAL: EXPOSED DECKING | CEILING HEIGHT: 8'-0" AFF | CEILING HEIGHT: 10'-0" AFF | CEILING HEIGHT: 14'-0" AFF | CEILING HEIGHT: EXISTING | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VESTIBULE | CT-1 | | WB-1 | | P-1 | | | | | ● | | | ● | | ● | EXISTING CEILING GRID WITH NEW TILES |
| PERIMETER SALES AREA | FL-2 | | WB-1 | | P-1 | | | | | | P-12 | | | | | |
| FURNITURE SALES AREA | FL-1 | | | | | | | | | | P-12 | | | | | |
| INTERIOR STEEL COLUMNS | | | | | | | P-10 | | | | | | | | | |
| INTERIOR COLUMNS | | | | | P-1 | | P-13 | | | | | | | | | |
| WOMEN'S RESTROOM | FL-2 | | WB-1 | | | WT-1,WT-2 | | | | ● | | ● | | | | SEE ENLARGED RESTROOM FINISH/DETAIL PLAN |
| MEN'S RESTROOM | FL-2 | | WB-1 | | | WT-1,WT-2 | | | | ● | | ● | | | | SEE ENLARGED RESTROOM FINISH/DETAIL PLAN |
| RESTROOM PARTITIONS | | | | | | | P-6 | | | | | | | | | SEE ENLARGED RESTROOM FINISH/DETAIL PLAN |
| WATER COOLER AREA | FL-2 | | WB-1 | | | WT-1,WT-2 | | | | ● | | ● | | | | SEE ENLARGED RESTROOM FINISH/DETAIL PLAN |
| RESTROOM ENTRY | FL-2 | | WB-1 | | P-2 | WT-1,WT-2 | P-13 | | | ● | | ● | | | | SEE ENLARGED RESTROOM FINISH/DETAIL PLAN |
| MANAGER'S OFFICE | FL-2 | | WB-1 | | P-1 | | | | | ● | | ● | | | | |
| CASH ROOM | FL-2 | | WB-1 | | P-1 | | | | | ● | | ● | | | | |
| LOUNGE | FL-2 | | WB-1 | | P-1 | | | | | ● | | ● | | | | |
| STOCK ROOM | P-11 | | | | P-9,P-15 | | | | | | ● | | | | | |
| ~~JANITOR CLOSET~~ | ~~FL-2~~ | | ~~WB-1~~ | | ~~P-1, P-8~~ | | | | | ● | | ● | | | | |
| ELECTRIC & SPRINKLER | P-11 | | | ● | P-1 | | | | | | ● | | | | | |

*G.C. TO LEAVE A GALLON OF EACH PAINT COLOR AT THE STORE AT THE END OF THE PROJECT.

## INTERIOR FINISH LEGEND

- P-1 — BEHR - PRO INT EGGSHELL - COLOR - ULTRA PURE WHITE (NO TINT)
- P-2 — BEHR - PRO INT EGGSHELL- COLOR - BIG LOTS ORANGE- CL:1Y176-KXL:4Y246-LL:0Y100-RL:13Y8-TL:39Y194.
  EXTERIOR PAINT; BEHR - ALKYD SEMI GLOSS-COLOR-BIG LOTS ORANGE- CL:1Y181-KXL:4Y269-LL:0Y100-RL:13Y194-TL:39Y194.
- P-3 — BEHR - PRO INT EGGSHELL - COLOR - FLANNEL GREY 520-3.
- P-4 — BEHR - PACKAGE BLACK - 7900 (SATIN FINISH)
- P-5 — WOOD CLASSICS INTERIOR STAIN - WALNUT WITH POLYURETHANE SEMI GLOSS FINISH. (SPEC FORTHCOMING)
- P-6 — NEW BLACK METAL RESTROOM PARTITIONS- SEE VENDOR CONTACT ON MATERIAL EQUIPMENT SCHEDULE.
- P-8 — FIBERGLASS REINFORCED PLASTIC "FRP" BRITE WHITE WITH T- MOLDING & J-MOLDING ON WALL BEHIND MOP SINK FROM FLOOR TO MAX. 8'-0" A.F.F.
- P-9 — INSTALL PLYWOOD ON THE BACK OF ALL EXPOSED STOCKROOM DRYWALLS TO 24" A.F.F.
- P-10 — BEHR - BEHR DTM GLOSS - COLOR- ULTRA PURE WHITE - 1850
- P-11 — CONCRETE FLOOR SEALER EUCO DIAMOND CLEAR #18178 APPLICATION - FLOOR TO BE SCRUBBED AND APPLY 3 COATS WITH ROLLER - NO SPRAY APPLICATIONS
- P-12 — BEHR- PRO DRYFALL-COLOR-890 WHITE. PAINT ALL ROOF DECKS, JOISTS, DUCTWORK, CONDUIT, ETC.
- P-13 — STAINLESS STEEL CORNER GUARDS - 2"X2" - 48" HT 18 GAUGE - SATIN FINISH #4 S.S. - 430 GRADE - CG 4182 (MODEL)
- P-15 — BEHR- FLIRT ALERT - P150-7. PAINT 6" RED LINE ON ALL WALLS OF STOCKROOM. TOP OF LINE TO BE AT 12'-0" A.F.F. THE FOLLOWING LETTERING TO BE PAINTED WHITE ON THE LINE. " DO NOT STOCK ABOVE 12 FT "
- CT-1 — SHAW WALK OFF CARPET TILE - PATH CARPET TILE / 5T034 LAVA 34549 24"X24"
- FL-1 — SAR WOOD PLANK - LEGNO #83 CERVO
- FL-2 — AHF PRODUCTS - 51904 STERLING - VCT STANDARD EXCELON IMPERIAL TEXTURE 12" X 12" X 1/8" THICK.
- WB-1 — ARMSTRONG VINYL WALL BASE - BLACK #60 .080 4"
- WT-1 — MARLITE PANELS (P100-WHITE). INSTALL FROM TOP OF GREY MARLITE TO CEILING.
- WT-2 — MARLITE PANELS (FRP-P470N DARK GREY). INSTALL FROM FLOOR TO 48" A.F.F.

14 TOP CONNECTION AT WALL (14A SECTION, 14B SECTION, 14C SECTION, 14D SECTION)

ENLARGED RESTROOM FINISH PLAN

SCALE: 1/4"=1'-0"

## RESTROOM FINISH CODED NOTES:

1. INSTALL MARLITE PANELS (P100 - WHITE) -FROM TOP OF GREY MARLITE TO CEILING.
2. INSTALL MARLITE PANELS (FRP P470N DARK GREY) FROM FLOOR TO 48" A.F.F.
3. ~~INSTALL MARLITE PANELS (FRP P470N DARK GREY) FROM FLOOR TO 54" A.F.F.~~
4. NEW BLACK METAL PARTITIONS
5. PAINT SHEETROCK WALLS FROM FLOOR TO CEILING WITH BEHR - PRO INT EGGSHELL- COLOR - BIG LOTS ORANGE- CL:1Y176-KXL:4Y246-LL:0Y100-RL:13Y8-TL:39Y194.

1A VESTIBULE WALL SECTION 1/4" = 1'-0"; 1B VESTIBULE WALL SECTION 1/4" = 1'-0"; 2 VESTIBULE WALL SECTION 1/4" = 1'-0"; 3 FULL HEIGHT STOCK WALL SECTION 1/4" = 1'-0"; 4 SECT. THRU STOCK ROOM DOOR JAMB 1/4" = 1'-0"; 5 STOCK ROOM / OFFICE WALL SECTION 1/4" = 1'-0"

6 CASH / STOCKROOM WALL SECTION 1/4" = 1'-0"; 7 CASH / OFFICE WALL SECTION 1/4" = 1'-0"; 8 SALES FLOOR/OFFICE WALL SECTION 1/4" = 1'-0"; 9 RESTROOM/LOUNGE WALL SECTION 1/4" = 1'-0"; 10 RESTROOM WALL SECTION 1/4" = 1'-0"; 12 BULKHEAD RESTROOM WALL SECTION 1/4" = 1'-0"

11 OFFICE COUNTER ELEVATIONS 1/4" = 1'-0"

15 METAL STUD BASE CONNECTION DETAIL 1 1/2" = 1'-0"

16 DEMISING WALL SECTION 1/4" = 1'-0"

C VESTIBULE PLAN 3/16" = 1'-0"

## MAXIMUM STUD HEIGHT TABLE (SSMA TECHNICAL GUIDE)

**NON-COMPOSITE BRACED AT 48" O.C. LIMITING WALL HEIGHTS**

| DEPTH | STUD SIZE | SPACING O.C. (IN) | L/240 |
|---|---|---|---|
| 3-5/8" | 362S125-15 | 16 | 10'-9" |
| | 362S125-19 | 16 | 13'-7" |
| | 362S125-30 | 16 | 15'-9" |
| | 362S125-33 | 16 | 16'-3" |
| 6" | 600S125-30 | 16 | 23'-2" |
| | 600S125-33 | 16 | 24'-1" |

### MAXIMUM STUD HEIGHT TABLE NOTES:

1. ALLOWABLE NON-COMPOSITE BRACED AT 48" O.C. LIMITING HEIGHTS ARE CALCULATED USING 2007 NORTH AMERICAN SPECIFICATION S100-07.
2. NO FASTENERS ARE REQUIRED FOR ATTACHING THE STUD TO THE TRACK.
3. STUD END BEARING MUST BE A MINIMUM OF 1 INCH.
4. NON-COMPOSITE BRACED AT 48" O.C. LIMITING HEIGHTS ARE BASED ON A SINGLE LAYER OF 5/8" TYPE X GYPSUM BOARD INSTALLED ON ONE SIDE OF THE WALL OVER ANY HEIGHT USING MINIMUM NO. 6 TYPE S DRYWALL SCREWS SPACED A MAXIMUM OF 16" OC FOR STUDS AT 16" SPACING. CHANNEL BRIDGING AND BRACING TO BE 0.0528" MINIMUM BASE METAL THICKNESS WITH MINIMUM 1/2" WIDE FLANGES SPACE AT 48" O.C.
5. HEIGHTS DESIGNATED "f" INDICATED FLEXURAL STRESS CONTROLS ALLOWABLE HEIGHT.
6. USE STRUCTURAL STEEL STUDS 162 (1 5/8" FLANGE) WHEN WALLS CARRY LOADS FOR SHELVING OR TILE. REFER TO TABLE - INTERIOR WALL HEIGHTS WITH STRUCTURAL FRAMING.

### STUD SIZE DESIGNATION

WEB DEPTH (D), EXPRESSED IN 1/100TH INCHES

FLANGE WIDTH (B), EXPRESSED IN 1/100TH INCHES

MINIMUM BASE METAL THICKNESS (t), EXPRESSED IN MILS (1/1000TH INCHES)

(S) = STUD OR JOIST SECTION WITH FLANGE STIFFENERS (C-SHAPES)

(T) = TRACK SECTIONS

(U) = COLD-ROLLED CHANNEL OR CHANNEL STUDS (WITHOUT FLANGE STIFFENERS)

(F) = FURRING CHANNELS

**INTERIOR WALL HEIGHTS WITH STRUCTURAL FRAMING**

| DEPTH | STUD SIZE | SPACING O.C. (IN) | L/240 |
|---|---|---|---|
| 3 5/8" | 362S162-33 | 16 | 17'-7" |
| | 362S162-43 | 16 | 19'-1" |
| | 362S162-54 | 16 | 20'-6" |
| | 362S162-68 | 16 | 21'-11" |
| | 362S162-97 | 16 | 24'-2" |
| 6" | 600S162-33 | 16 | 26'-0" |
| | 600S162-43 | 16 | 28'-4" |
| | 600S162-54 | 16 | 30'-5" |
| | 600S162-68 | 16 | 32'-7" |
| | 600S162-97 | 16 | 36'-2" |

SAMPLE METAL STUD DESIGNATION

362 S 125 -33

- -33: MINIMUM METAL THICNKNESS IN MILS (.033 INCHES = 33 MILS)
- 125: 1-1/4" FLANGE IN 1/100TH INCHES
- S: STUD WITH FLANGE STIFFENERS
- 362: 3 5/8" WEB DEPTH IN 1/100TH INCHES (OUTSIDE TO OUTSIDE DIMENSION)

WEB DEPTH CONVERSION: 137 = 1 3/8", 162 = 1 5/8", 200 = 2", 250 = 2 1/2", 350 = 3 1/2", 362 = 3-5/8", 400 = 4", 550 = 5", 600 = 6", 800 = 8"

THICKNESS CONVERSION: 20GA = 33MIL, 18GA = 43MIL, 16GA = 54MIL, 14GA = 68MIL, 12GA = 97MIL

### STRUCTURAL STUD NOTE

ALL STUDS DESIGNATED AS 20ga. MUST BE 33 MIL AND COMPLY WITH THE MAXIMUM STUD HEIGHT TABLE ABOVE. NO 30 MIL NON-STRUCTURAL STUDS WILL PERMITTED.

## CODED NOTES:

1. BUILT-UP BOX COLUMN - DBL 6" DP, 18 GA STUDS WITH 6", 18 GA TRACK, EA SIDE. ATTACH BEAM TO COLUMN. CONSULT WITH A STRUCTURAL ENGINEER FOR FINAL DESIGN (#12 SCREW @ 8" O.C.)
2. DBL 8" DP, 18 GA BEAM WITH 6", 18 GA TRACK TOP & BOTTOM. CONSULT WITH A STRUCTURAL ENGINEER FOR BEAM SIZE & FINAL DESIGN (#12 SCREW @ 8" O.C.)
3. STRUCTURAL STOREFRONT MULLION

NOTE: NEW ALUMINUM STOREFRONT/VESTIBULE FRAMING, AND GLASS TO BE PROVIDED AND INSTALLED BY G.C. PER MANUFACTURER'S RECOMMENDATIONS.

G.C. TO ENSURE ADEQUATE BLOCKING FOR STOREFRONT SYSTEM ATTACHMENT.

B VESTIBULE ELEVATION 3/16" = 1'-0"

A VESTIBULE ELEVATION 3/16" = 1'-0"

# CONSTRUCTION NOTES

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
|---|---|
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORES, LLC.

SHEET: A-1.1

## FLOOR INSTALLATION NOTES
- INSTALL FLOORING IN A BRICK LIKE PATTERN FROM LEFT TO RIGHT.
- FLOORING IN THE CENTER OF SALES FLOOR TO BE INSTALLED LEFT TO RIGHT FOLLOWING A QUARTER BONDED PATTERN AND PICTURE FRAMED AROUND THE PERIMETER.
- CARPET TILE TO BE INSTALLED WITH A QUARTER TURN PATTERN.
- INSTALLER IS TO ENSURE THAT THE DIFFERENT FLOOR FINISHES FLUSH OUT TO ADA SPECIFICATIONS.

### FLOOR TILE PATTERN DETAIL

## FLOOR LEGEND

FL-1 — WOOD PLANK - SAR LEGNO #83 CERVO

FL-2 — GREY VCT 12"X12" - 51904 STERLING

FL-3 — EXISTING

CT-1 — WALK OFF CARPET TILE - LAVA 24"X24" SHAW - 5T034 - LAVA 34549

P-11 — CONCRETE FLOOR SEALER EUCO DIAMOND CLEAR 18178

### THRESHOLD AND LEVEL CHANGE NOTE:
LANDINGS OR FLOOR LEVEL AT DOORS SHALL NOT BE MORE THAN 1/2-INCH BELOW THE THRESHOLD. RAISED THRESHOLDS AND FLOOR LEVEL CHANGES GREATER THAN 1/4-INCH AT DOORWAYS SHALL BE BEVELED WITH A SLOPE NOT GREATER THAN ONE UNIT VERTICAL IN TWO UNITS HORIZONTAL. (ICC/ANSI A117.1, SECTION 303)

### FLOOR INSTALLER GENERAL NOTE:
FLOOR INSTALLER IS TO ENSURE THAT THE DIFFERENT FLOOR FINISHES FLUSH OUT TO ADA SPECIFICATIONS

RECEIVING

EXISTING TRUCK WELL

LANDLORD ROOM N.I.C.

ELECTRICAL

EXTERIOR

STOCKROOM
P-11

ADJACENT TENANT

SALES

FL-1

FL-2

SEE FLOOR PATTERN DETAIL THIS SHEET

EXTERIOR

VESTIBULE
CT-1

MANAGER
FL-2

CASH
FL-2

MEN

WOMEN

LOUNGE
FL-2

P-11

ADJACENT TENANT
"DUNHAM'S SPORTS"

EXTERIOR

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | | |
| --- | --- | --- |
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

FLOOR FINISH PLAN

SHEET:
A-1.2

## EXTERIOR FINISH LEGEND

| EP-1 | BEHR - EXT SEMI GLOSS - COLOR - SMOKEY TROUT-MQ2-53 |
| EP-2 | BEHR - PPE 5050 EXT SEMI GLOSS - WHITE VEIL-OR-W14 |
| EP-3 | BEHR - PPE 5050 EXT SEMI GLOSS - CASCADE BEIGE - N240-1 |
| EP-4 | DARK BRONZE WINDOW MULLIONS |

NOTE:
GENERAL CONTRACTOR TO ENSURE ALL
EXISTING WINDOW MULLIONS ARE IN
GOOD WORKING CONDITION. NOTIFY BIG LOTS
REPRESENTATIVE OF ANY ISSUES.

**UPPER**
*(EIFS FOAM BAND)*

3 — CORNICE DETAILS
N.T.S.

2 — PROPOSED STOREFRONT ELEVATION
3/32" = 1'-0"

1 — EXISTING STOREFRONT ELEVATION
3/32" = 1'-0"

BIG LOTS!

ADJACENT TENANT
SIGNBAND

EIFS CORNICE -
SEE DETAIL 3/A-1.3,
PAINT EP-2

NEW SIGNAGE
UNDER
SEPARATE
PERMIT

RAISED EIFS SIGNBAND,
PAINT EP-1

NEW PREFINISHED
METAL COPING, PAINT
EP-3

EXISTING PREFINISHED
METAL COPING, PAINT
EP-3

EXISTING EIFS FASCIA
GRID, PAINT EP-3

LEASE LINE

±133'-5" A.F.F.
T.O. SIGN

±126'-0" A.F.F.
T.O. WALL

±110'-0" A.F.F.
T.O. STOREFRONT

±100'-0" A.F.F.
FINISHED FLOOR

±137'-0" A.F.F.
T.O. WALL

±126'-0" A.F.F.
T.O. WALL

±122'-4" A.F.F.
T.O. WALL

±110'-0" A.F.F.
T.O. STOREFRONT

±100'-0" A.F.F.
FINISHED FLOOR

EXISTING CMU,
PAINT

LEASE LINE

EXISTING
STOREFRONT
GLAZING AND SILL

ADJACENT TENANT

NEW 14'
BI-PART ENTRY
DOOR &
STOREFRONT
GLAZING INFILL  EP-4

EXISTING DARK
BRONZE ALUMINUM
WINDOWS TO REMAIN

EXISTING CMU,
PAINT

EXISTING SMOOTH
FACE CMU PAINT
EP-3

EXISTING SPLIT
FACE CMU PAINT
EP-3

EXISTING SMOOTH
FACE CMU, PAINT

ADJACENT TENANT

EXISTING BOLLARDS TO REMAIN (NOT
SHOWN FOR CLARITY - REFER TO PLAN).
INSTALL NEW POST GUARD CONE TOP
BOLLARD COVERS (ORANGE COLOR), TYP
AT STOREFRONT. CONTRACTOR TO
VERIFY DIAMETER AND HEIGHT

ADJACENT TENANT
SIGNBAND

EXISTING EIFS FASCIA

EXISTING PREFINISHED
METAL COPING

EXISTING EIFS FASCIA
GRID

LEASE LINE

±133'-5" A.F.F.
T.O. SIGN

±126'-0" A.F.F.
T.O. WALL

±110'-0" A.F.F.
T.O. STOREFRONT

±100'-0" A.F.F.
FINISHED FLOOR

±126'-0" A.F.F.
T.O. WALL

±122'-4" A.F.F.
T.O. WALL

±110'-0" A.F.F.
T.O. STOREFRONT

±100'-0" A.F.F.
FINISHED FLOOR

LEASE LINE
EXISTING DOOR
TO BE REMOVED

EXISTING STOREFRONT
DOORS TO BE REMOVED

EXISTING DARK BRONZE
ALUMINUM WINDOWS TO REMAIN

EXISTING SMOOTH
FACE CMU

EXISTING SPLIT FACE CMU

ADJACENT TENANT    EXISTING VACANT TENANT SPACE

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| | Area | SqFt |
| SQUARE FOOTAGE | SALES FLOOR | 28,810 |
| | TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

STOREFRONT ELEVATIONS

SHEET:
A-1.3



## FIXTURE NOTES:

1. TRADE FIXTURES TO BE DELIVERED AND INSTALLED BY BIG LOTS

2. CHECKOUT QUELINE TO CONSIST OF 54" GONDOLA RUNS THAT HAVE 12" BASE DECKS. RUNS WILL INCLUDE 4' SECTIONS AND 3' SECTIONS. RUNS WILL EITHER BE DOUBLE SIDED OR SINGLE SIDED GONDOLAS. SEE FIXTURE PLAN FOR NUMBER OF SECTIONS.

3. 72" FURNITURE DEPT. GONDOLA RUNS TO HAVE 25" (HD) DEEP BASE DECKS, (2) SHEETS OF FLATBOARD OF 48"X 67", ONE ON EACH SIDE PER 4' SECTION. EACH SEPARATE GONDOLA RUN TO HAVE SOLID END PANEL AT EACH END.

   *HD (HEAVY DUTY) INDICATES THE UPRITES AND BASE BRACKETS ARE HD TYPE AND WILL BE MARKED ACCORDINGLY.

4. 84" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (4) SHEETS OF PEGBOARD, (2) 48"X 42" & (2) 48" X 37", ONE SIZE OF EACH ON EITHER SIDE PER 4' SECTION.

5. 84" END CAPS TO HAVE 48"X 22" BASE DECKS, 84" UPRITES, 4) SHEETS OF PEGBOARD, (2) 48"X 42" & (2) 48" X 37", ONE SIZE OF EACH ON EITHER SIDE PER 4' SECTION, (2) BASE END TRIMS & (2) UPRITE END TRIMS.

6. 84" WALLCASE RUNS TO HAVE 25" DEEP BASE DECKS, (2) SHEETS OF PEGBOARD, (1) 48"X 42" & (1) 48"X 37" PER 4' SECTION.

7. 84" WIDESPAN WALL SECTIONS TO HAVE (2) UPRIGHTS, (10) CROSS BARS, AND (5) SHELFS.



## FIXTURE PLAN

**SHEET:**

## A-2



## FURNITURE CHECKOUT
SCALE: 1/2"=1'-0"

## STANDARD CHECKOUT
SCALE: 1/2"=1'-0"

## SERVICE DESK
SCALE: 1/2"=1'-0"

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

SQUARE FOOTAGE

| Area | SqFt |
|---|---|
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/13/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800



CHECKOUT DETAILS

SHEET:
A-2.1



## LIGHTING LEGEND

REFER TO SHEET E-6 LIGHTING PLAN FOR ACTUAL LIGHT SPECIFICATIONS

| | |
|---|---|
| | REMOTE EMERGENCY LIGHTING HEAD |
| | EMERGENCY EXIT SIGN |
| | EMERGENCY EXIT SIGN - REMOTE CAPABLE |
| O | CANOPY LIGHT |
| | NEW 2 LAMP 8FT STRIP |
| | NEW 4 LAMP 8FT STRIP |
| | NEW 4 LAMP 8FT EMERGENCY NIGHT LIGHT STRIP |
| | NEW 4 LAMP 8FT EMERGENCY STRIP |
| | NEW 2X2 LED FLAT PANEL |
| | NEW 2X2 LED FLAT PANEL W/EMERGENCY BALLAST |
| | NEW 2X2 LED FLAT PANEL W/EMERGENCY NIGHT LIGHT BALLAST |

## CEILING LEGEND

| | |
|---|---|
| | (GYP) GYPSUM BOARD |
| | (ACT) ACOUSTIC TILE |
| 8'-0" GYP | CEILING HEIGHT GYPSUM BOARD |
| 8'-0" ACT | CEILING HEIGHT ACOUSTIC TILE |

## CEILING GENERAL NOTES:

1. ELECTRICAL CONTRACTOR SHALL PROVIDE SHALLOW STRUT BETWEEN BAR JOIST THAT RUN THE SAME DIRECTION WITH THE LIGHTING.
2. SALES AREA EXPOSED DECK, STRUCTURE, DUCTS, CONDUIT, ETC TO BE PAINTED P-12
3. REFER TO CEILING GRID INSTALLATION DETAIL 14/A-4 FOR NEW CEILING GRIDS.



**BIG LOTS STORES, LLC.**
STORE PLANNING DEPT.
4900 E. DUBLIN-GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

**BIG LOTS STORE**
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
|---|---|
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

| DATE DRAWN: | 12/1/2022 |
|---|---|
| DRAWN BY: | AC |
| SCALE: | 3/32" = 1'-0" |

SHEET:
**A-3**

## REFLECTED CEILING PLAN



WATER HEATER w/GALV DRIP PAN (150 LBS. MAX TOTAL WEIGHT, SEE P-1)
8'-0" A.F.F. B.O. SHELF
WELDED L1 1/2 x 1 1/2 x 1/4 FRAME
L1 1/2 x 1 1/2 x 1/4 DIAGS
CONNECT VERTICAL ANGLES TO WALL W/(5)-#12 SCREWS THRU DRYWALL FINISH INTO WALL STUDS
ADD'L 18 GA STUD AT EA VERT L1 1/2x1 1/2
B SECTION
2'-0"
3/4" FRT PLYWOOD
12B A-5
CONNECT FRT PLYWOOD DECKING TO SUPPORTS w/#8 SCREWS @ 6" c/c AROUND PERIMETER OF DECK.
WELDED L1 1/2 x 1 1/2 x 1/4 FRAME
ADD'L 18 GA STUD AT EA VERT L1 1/2x1 1/2
A PLAN

## 12 WATER HEATER PLATFORM DETAIL

1" = 1'-0"

ISOMETRIC N.T.S.
0'-0" A.F.F. FINISH FLOOR
FRONT ELEVATION
SIDE ELEVATION

## 15 BABY CHANGING STATION DETAIL

N.T.S.

1 1/2" MIN.
SOLID IN-WALL BLOCKING SECURED TO STUDS.
1 1/2" DIA.
TOILET TANK (WHERE OCCURS)
33" MIN. TO BOT 36" MAX TO TOP

GRAB BAR NOTES:

GRAB BARS SHALL NOT ROTATE AND THERE ARE TO BE NO SHARP, OR ABRASIVE ELEMENTS ON OR ADJACENT TO THEM. EDGES ARE TO HAVE A MINIMUM OF 1/8" RADIUS.

GRAB BAR BACKING AND ATTACHMENT SHALL BE CONSTRUCTED FOR A 250 POUND POINT LOAD.

## 11 GRAB BAR DETAIL

1/2" = 1'-0"

SPOUT SHALL BE LOCATED MIN 15" FROM THE VERTICAL SUPPORT AND MAX 5" FROM THE FRONT EDGE OF THE UNIT.
30" x 48" MINIMUM CLEAR FLOOR SPACE CENTERED UNDER LOW DRINKING FOUNTAIN UNIT

DRINKING FOUNTAIN NOTE:

IF THE DRINKING FOUNTAIN IS LOCATED IN THE PATH OF TRAVEL, A TEXTURED AREA, 1'-0" AROUND THE FOUNTAIN AND CLEARLY IDENTIFIABLE BY THE BAND, IS REQUIRED. BUBBLER IS TO BE ACTIVATED BY A HANDICAP PUSH BAR ON THE FRONT FACE OF THE UNIT. DRINKING FOUNTAINS MUST BE APPROACHED FROM THE FRONT AND ARE TO BE LOCATED WITHIN ALCOVES SO AS NOT TO BE IN THE CORRIDOR OR WALKWAY. PROVIDE CANE APRON WHEN INSTALLED IN PATH OF TRAVEL.

G.C. TO INSTALL MARLITE PANELS ON ALL THREE ALCOVE WALLS. SEE FINISH SCHEDULE/PLAN ON SHEET A-1.1.

15" MIN.
15" MIN.
CLEAR FLOOR SPACE
ADA APPROVED HI/LO
(INSTALLATION CLEARANCE)

## 14 DRINKING FOUNTAIN DETAIL

1/2" = 1'-0"

SIGNS - REFER TO DETAIL 13-A OR 13-B THIS SHEET
9" MIN.
NOTE: TOILET ROOM DOOR SYMBOL SHALL BE IN CONTRASTING COLOR TO SIGN BACKGROUND.
#RRE-125 BLACK ON WHITE WITH BRAILLE (PREFERRED)
NOTE: ACCESSIBILITY SYMBOL TO BE MOUNTED ON WALL ADJACENT TO THE LATCH SIDE OF THE DOOR, AND AT (MAX.) 60" A.F.F. TO CENTERLINE OF PICTOGRAM SIGN. MAINTAIN (MIN.) 18x18" CLEAR FLOOR AREA IN FRONT OF SIGN (FROM ® OF SIGN).
NOTE: IF RESTROOMS HAVE NO DOORS, SIGNAGE TO BE MOUNTED ON THE WALL NEAREST THE OPENING TO THE RESTROOMS AS INDICATED ON PLAN.
48" MIN. BOTTOM OF LOWEST TACTILE CHARACTER
60" MAX. BOTTOM OF HIGHEST TACTILE CHARACTER

SIGNAGE NOTES:

1. LETTERS AND NUMBERS SHALL BE RAISED 1/32", UPPER CASE, SANS SERIF OR SIMPLE SERIF TYPE AND SHALL BE ACCOMPANIED WITH GRADE 2 BRAILLE. RAISED CHARACTERS SHALL BE AT LEAST 5/8" HIGH, BUT NO HIGHER THAN 2". MAINTAIN 18"X18" MIMIMUM CLEAR FLOOR SPACE IN FRONT OF SIGN (FROM CENTERLINE OF SIGNAGE).
2. SIGN SHALL BE PLACED ON THE DOOR. MOUNTING HEIGHT SHALL BE 60" A.F.F. TO THE CENTERLINE OF THE SYMBOL. TOILET ROOM DOOR NON-TACTILE SYMBOL SHALL BE IN CONTRASTING COLOR.
3. CHANGING STATION SIGNAGE SHALL BE 1/16-IN. ADA ACRYLIC CORE WITH MANUFACTURED WITH A 1/32-IN. PRECISION-CUT TOP COLOR LAYER. SIGN HAS A MATTE FINISH FOR IMPROVED VISIBILITY AND TACTILE FEEL FOR THE VISUALLY IMPAIRED. BRAILLE DOTS MEET ADA REQUIREMENTS FOR SIZE, SHAPE AND SPACING.
4. EDGES OF SIGNS SHALL BE ROUNDED, CHAMFERED OR EASED - CORNERS OF SIGNS SHALL HAVE A MINIMUM RADIUS OF 1/8"

MEN
WOMEN
BABY CHANGING AREA
GRADE 2 BRAILLE
A WALL SIGNAGE
RESTROOM
GRADE 2 BRAILLE
B UNISEX WALL SIGNAGE

## 13 ACCESSIBLE SIGNAGE DETAIL

N.T.S.

**GENERAL NOTES:**

1. **INSTALL ACCESSORIES WITH SCREWS OR BOLTS EXTENDING AT LEAST 1" INTO SOLID BLOCKING.**
2. **60" TURNING RADIUS TO BE PROVIDED IN ACCESSIBLE LAVATORIES.**
3. **REFER TO SHEET T-1, MATERIALS AND EQUIPMENT SCHEDULE FOR ACCESSORY RESPONSIBILITY. ALL RESTROOM ITEMS TO BE INSTALLED BY G.C..**
4. **REFER TO A-1.1 FOR RESTROOM FINISHES.**
5. **REFER TO P-1 FOR PLUMBING FIXTURE SCHEDULE.**
6. **REFER TO E-1 FOR ELECTRICAL REQUIREMENTS.**

**SINK NOTES:**

1. **HOT WATER PIPES AND DRAIN PIPES UNDER LAVATORIES SHALL BE INSULATED TO COMPLY WITH ALL LOCAL, STATE, AND FEDERAL ACCESSIBILITY AND ENERGY CODE REQUIREMENTS.**
2. **NO SHARP OR ABRASIVE SURFACES ALLOWED UNDER SINKS.**
3. **FAUCET CONTROLS AND OPERATING MECHANISMS MUST BE EASILY OPERATED BY ONE HAND AND MUST NOT REQUIRED TIGHT GRASPING, PINCHING OR TWISTING OF THE WRIST.**
4. **THE FORCE NEEDED TO ACTIVATE CONTROLS SHALL NOT EXCEED 5 LBS. FOR LEVER OPERATED OR 15 LBS. FOR PUSH TYPE.**

**WATER CLOSET NOTES:**

1. **CONTROLS FOR FLUSH VALVES SHALL BE MOUNTED ON THE WIDE SIDE OF THE WATER CLOSET AREA, NO MORE THAN 44" A.F.F.**

KEYED NOTES:

1. WATER CLOSET. NOTE CONTROLS FOR FLUSH VALVE SHALL BE MOUNTED ON THE OPEN SIDE OF THE WATER CLOSET AREA, NO MORE THAN 44" A.F.F.
2. ACCESSIBLE SINK - REFER TO SINK NOTES THIS SHEET.
3. COMMERCIAL GRADE URINAL - NEW URINAL MUST HAVE A PROJECTION OF 13 1/2" MINIMUM FROM WALL.
4. 1 1/2" DIA. METAL GRAB BAR, MUST COMPLY WITH LOCAL AND STATE CODES - G.C. TO SUPPLY AND INSTALL IN WALL BLOCKING SECURED TO STUDS PER DETAIL 11 THIS SHEET.
5. ELECTRIC HAND DRYER MOUNTED PER DETAIL ELEVATIONS 2 & 7 THIS SHEET. REFER TO ELECTRICAL PLANS.
6. TOILET PAPER DISPENSER - REFER TO ELEVATION 3 THIS SHEET. DISPENSER SHALL NOT BE THE TYPE THAT CONTROLS DELIVERY OR THAT DOES NOT ALLOW CONTINUOUS PAPER FLOW.
7. 24" X 36" TILT MIRROR - G.C. TO SUPPLY AND INSTALL MIRROR PER ELEVATIONS THIS SHEET. SEAL ALL EDGES WITH CAULK. BOTTOM OF REFLECTIVE SURFACE TO BE MOUNTED AT 40" A.F.F.
8. 1 1/2" DIA. VERTICAL METAL GRAB BAR TO COMPLY WITH LOCAL AND STATE CODES - G.C. TO SUPPLY & INSTALL IN-WALL BLOCKING SECURED TO STUDS PER DETAIL 11 THIS SHEET.
9. BABY CHANGING STATION - INSTALLED PER DETAIL 15 THIS SHEET. G.C. TO SUPPLY & INSTALL IN-WALL BLOCKING SECURED TO STUDS.
10. SANITARY NAPKIN DISPOSAL - INSTALL 24" MIN, 42" MAX. FROM BACK WALL.
11. HI-LO WATER COOLER - INSTALL MARLITE PANELS ON WALL BEHIND PER FINISH PLAN ON A-1.1. G.C. TO REFER TO DETAIL 14 THIS SHEET FOR MOUNTING REQUIREMENTS.
12. 30" X 48" CLEAR FLOOR SPACE
13. 56" X 60" CLEAR FLOOR SPACE
14. NEW 24" X 24" COMMERCIAL GRADE FLOOR MOUNTED SERVICE SINK - G.C. TO CAULK AT MOP SINK AND ADJACENT SURFACES FOR WATER TIGHT CONDITION. REFER TO DETAILS ON P-1.
15. WATER HEATER MOUNTED ON PLATFORM ABOVE MOP SINK AT 96" A.F.F., REFER TO DETAIL 12 THIS SHEET.
16. 60" DIAMETER TURNING SPACE
17. ACCESSIBLE SIGNAGE - REFER TO DETAIL 13 THIS SHEET
18. TOILET SEAT COVER DISPENSER
19. SOAP DISPENSER

4"
3'
17" - 25"
8"
MIN
11"
MIN.
BOT. OF REFLECTIVE SURFACE 40" MAX
9" MIN.
27" MIN.
29" MIN.
34" MAX. TO TOP/SINK

## 8 ACCESSIBLE TOILET ROOM ELEVATION

1/2" = 1'-0"

36" MIN.
12" MIN.
60" MIN CLEAR
16" (MIN.)
18" (MAX.)
1'-6"
2'-8"
3'-6"

## 7 ACCESSIBLE TOILET ROOM ELEVATION

1/2" = 1'-0"

39"-41"
54" MIN.
42" MIN.
12" MAX.
18" MIN.
42" MAX.
33" MIN - 36" MAX. TOP OF GRIPPING SURFACE

## 3 ACCESSIBLE TOILET ROOM ELEVATION

1/2" = 1'-0"

30" MIN.
15" MIN.
15" MIN.
36" MINIMUM
24" MIN.
60" MIN CLEAR
16" (MIN.)
18" (MAX.)
3'-6"
2'-8"
1'-6"

## 2 ACCESSIBLE TOILET ROOM ELEVATION

1/2" = 1'-0"

WH
MEN
WOMEN
(34" CLEAR)
(44" MIN.)
(54" MIN.)
(36" MIN.)
16" MIN.
18"MAX.
15" MIN.
9'-6"

## 1 ACCESSIBLE RESTROOM PLAN

1/2" = 1'-0"

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
|---|---|
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORES, LLC

SHEET:
A-5



**GENERAL NOTE:**

CLASS A PLASTICS WILL BE STORED IN STOCKROOM AREA. PRODUCT NOT TO EXCEED 12' A.F.F.

REFER TO SHEET FP-2 FOR ADDITIONAL FIRE PROTECTION REQUIREMENTS, NOTES & STOCKROOM RACKING ELEVATIONS

ON ALL BIG LOTS BUILD OUTS, GENERAL CONTRACTOR TO COMPLETE THE DESIGN OF THE FIRE ALARM DRAWINGS AND SUBMIT FOR PERMITTING AT THE BEGINNING OF THE JOB

FIRE PROTECTION PLAN

SHEET:
FP-1

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
| --- | --- |
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

RECEIVING

EXISTING TRUCK WELL

DUMPSTER

LANDLORD ROOM N.I.C.

ELECTRICAL

STOCKROOM
12,546 SqFt

EXTERIOR

IT RACK

SEASONAL PAD
1,291 SqFt

SALES

FURNITURE DEPARTMENT
6,696 SqFt

THE LOT
486 SqFt

MANAGER    CASH

MEN

LOUNGE

WOMEN

VESTIBULE

EXTERIOR

EXTERIOR

ADJACENT TENANT

ADJACENT TENANT
"DUNHAM'S SPORTS"

EXIT DOOR #2

## Big Lots Fire Protection Requirements

### FIRE ALARM SYSTEMS:

Big Lots requires that all Fire Alarms (FA) be installed per the Authority Having Jurisdiction for the area. If the AHJ does not require a FA for the space Big Lots will require that the flow and tamper switches from the sprinkler system serving the space be monitored.

Big Lots (BL) uses Consolidated Fire Protection (CFP) to monitor all FA's installed in all stores. Following the installation of the FA by the LL or GC, CFP will take over the monitoring. No third party monitoring will be needed. CFP needs to monitor any FA system directly from a cellular communication if permitted by AHJ. If the AHJ insists on phone lines, two dedicated phone lines are required. Depending on the needs of the GC to pass C of O inspections the GC may install these lines and transfer them to BL following the inspections. If the FA has been installed by a third party the LL or GC should be prepared to supply CFP with all necessary programming information including zones, passwords, etc. The GC and FA installers should be prepared for direct contact by a CFP representative to facilitate scheduling for the reprogramming of the FA panel.

LL or GC must provide Big Lots with answers to the following questions following the execution of the lease:

- Does the GC intend to install a FA exclusive to our space or is it going to be integrated into a larger LL system? If the FA is exclusive to Big Lots please see notes below.
- If the FA is part of a larger LL system please provide information regarding monitoring company and contact numbers to add Big Lots store associates to the call list.

LL or GC must provide Big Lots with the following information after the FA installer has been selected:

- Site drawings in CAD format of the proposed FA
- Any plan review notes regarding FA installation as required by the AHJ.
- Contact information for the installing FA company
- FA installer specifications such as panel type, devices, etc.
- Inspection forms, record of completion, and as-builts left at the panel location in a binder per NFPA standards.
- CFP request for non-proprietary panels to be installed (Firelite or Silent Knight) to avoid proprietary systems.

Big Lots requires that the fire alarm company install a fire alarm system that has cellular communication capabilities. Fire Alarm Contractor is responsible for providing and installing cellular dialers. Below is a list of compatible cellular dialers to be installed.

Telular Telguard (Any signal format):

- TG-7FS LTE MODULE # TG7LAF01/TG7LAF02 (AT&T LTE &OR POTS)
- TG-7FS LTE MODULE # TG7LVF01/TG7LVF02 (VERIZON LTE &OR POTS)

Honeywell Alarmnet (Contact ID only ):

- HWF2V-CGM (VERIZON LTE &OR IP)
- HWF2A-CGM (AT&T LTE &OR IP)
- LTE-CFV (VERIZON LTE &OR IP FOR VISTA FIRE ALARM CONTROL PANELS)
- LTE-CFA (AT&T LTE &OR IP FOR VISTA FIRE ALARM CONTROL PANELS)

DSC Connect 24 ( Contract ID or 5IA signal formats)

- LE4010CF(AT&T LTE)

**Fire alarm company should contact CFP during the design phase to ensure all equipment is compatible and then notify CFP two weeks prior to date of requested conversion.**

All communications formats for monitoring are to be in Contact ID.

Permitting and Inspections - Please communicate all ongoing FA permitting issues , timelines, installation deadlines, and completion dates with Adam Estep and Johnda Townsend.

The GC will be responsible for contacting Big Lots to transfer phone lines following the installation of the FA.

Big Lots contacts

Johnda Townsend - Assets Protection - Ph: 614-278-7183 - Email: jtownsen@biglots.com
Adam Estep - Assets Protection - Ph: 614-278-6908 - Email: aestep@biglots.com
Brian Young - IT - PH: 614-278-2027 - Email: byoung1@biglots.com

Consolidated Fire Protection contact

A Big Lots representative at Consolidated Fire Protection can be reached at Ph: 949-727-3277 or via email: biglots@cfpfire.com

### FIRE SUPPRESSION SYSTEM:

Big Lots requires that all Fire Suppression Systems be installed or altered per the Authority Having Jurisdiction for the area and be adequate for Big Lots intended use.

Big Lots is a retailer that sells a broad range of commodities to include the following:

- Food
- Health and Beauty
- Household cleaners
- Paper towels / tissue
- Small appliances
- Dishes / Cookware
- Bedding
- Textiles
- Mattresses / Foundations
- Upholstered furniture
- Boxed - Ready to assemble furniture
- Home decor
- Pet supplies
- Baby products
- Seasonal products to include: Seasonal decor, Lawn and Garden accessories, Outdoor furniture, etc.

All stored product in stockroom will be in open floor areas and within 10" high racking systems with stored merchandise not to exceed 12' A.F.F.

Class A plastics will be stored in open floor areas and within 10' high racking systems. Product not to exceed 12' A.F.F.

All product on sales floor will be displayed within open floor areas and on fixtures. Product will not exceed 2' below acoustic ceiling tile or light fixture height, whichever is less.

All suppression systems will be required to be inspected and certified by a licensed contractor or system designer. Certification to be provided to Big Lots upon completion.

Flow and tamper switches to be connected to Fire Alarm system or Big Lots security system.

### PORTABLE FIRE EXTINGUISHERS:

Big Lots requires that all Fire Extinguishers be installed per the Authority Having Jurisdiction for the area.

## GENERAL NOTE:

**ON ALL BIG LOTS BUILD-OUTS, GENERAL CONTRACTOR TO COMPLETE THE DESIGN OF THE FIRE ALARM DRAWINGS AND SUBMIT FOR PERMITTING AT THE BEGINNING OF THE JOB.**

---



**UPHOLSTERED FURNITURE**
SCALE: NTS

NO COMMODITIES TO EXCEED 9'-0" AFF

LOVE SEAT · BOXED RECLINER · SOFA · SECTIONAL SOFA · BOXED RECLINER

**LIGHT DUTY RACKING**
SCALE: NTS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.

**A - MATTRESS RACKING**
SCALE: NTS
EACH SECTION HAS 3 BEAMS / 2 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
MATTRESS · MATTRESS



**B - RTA (READY TO ASSEMBLE) RACKING**
SCALE: NTS
EACH SECTION HAS 5 BEAMS / 4 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.

---



**C - RTA (READY TO ASSEMBLE) RACKING**
SCALE: NTS
EACH SECTION HAS 7 BEAMS / 6 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.



**D - RTA (READY TO ASSEMBLE) RACKING**
SCALE: NTS
EACH SECTION HAS 7 BEAMS / 6 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF



**E - RTA (READY TO ASSEMBLE) RACKING**
SCALE: NTS
EACH SECTION HAS 9 BEAMS / 8 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.

---



**F - RTA (READY TO ASSEMBLE) RACKING**
SCALE: NTS
EACH SECTION HAS 9 BEAMS / 8 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.
PEG HOOKS · SIGN HOLDERS · SHELVES

**G - FIXTURE STORAGE RACKING**
SCALE: NTS
EACH SECTION HAS 5 BEAMS / 4 GRIDS

NO COMMODITIES TO EXCEED 12'-0" AFF
SEE F-15 FINISH ON INTERIOR FINISH LEGEND ON SHEET A-1.1.

---

**GENERAL NOTE:**

**CLASS A PLASTICS WILL BE STORED IN STOCKROOM AREA. PRODUCT NOT TO EXCEED 12' A.F.F.**

---

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| | SQUARE FOOTAGE | SqFt |
|---|---|---|
| Area | SALES FLOOR | 28,810 |
| | TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: AC
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800



**FIRE PROTECTION NOTES & DETAILS**

SHEET:
**FP-2**



## ELECTRICAL DEMOLITION NOTES

REMOVE ALL EXISTING ELECTRICAL EQUIPMENT NOT BEING REUSED. THIS INCLUDES RECEPTACLES, LIGHT SWITCHES, PANELS , DISCONNECT SWITCHES, TRANSFORMERS, ETC. WIRE AND CONDUIT BACK TO ITS SOURCE.

REMOVE THE EXISTING LIGHTING FIXTURES IN THE  SPACE (UNLESS NOTED OTHERWISE), INCLUDING WIRE AND CONDUIT BACK TO ITS SOURCE. THIS INCLUDES EXISTING EMERGENCY EGRESS LIGHTING (NEW EMERGENCY EGRESS LIGHTING WILL BE PROVIDED IN NEW WORK SCOPE)

REMOVE ALL EXISTING POWER AND DATA OUTLETS THROUGHOUT THE SPACE INCLUDING WIRE AND CONDUIT BACK TO SOURCE.

REMOVE ALL EXISTING ROOF TOP MECHANICAL EQUIPMENT, INCLUDING WIRE AND CONDUIT BACK TO SOURCE. SEE MECHANICAL DEMOLITION PLAN SHEET M-3 FOR EQUIPMENT TO BE REMOVED ON ROOF.

ELECTRICAL CONTRACTOR SHALL VERIFY NO EXTERIOR LIGHTING CIRCUITS ARE FEED FROM PANELS BEING REMOVED PRIOR TO REMOVING PANELS

## DEMO CODED NOTES:

1.  LANDLORD TO RELOCATE EXISTING 200A, 277/480V HOUSE PANEL, LIGHTING CONTROLS AND DISCONNECT SWITCH TO OUTSIDE OF BIG LOTS' DEMISED PREMISES.

2.  EXISTING FIRE ALARM CONTROL PANEL, E.C. SHALL CONFIRM CONDITION AND RELOCATE OR REPLACE IF NEEDED.

3.  EXISTING PHONE/BOARD TO BE REMOVED.

4.  EXISTING ELECTRIC PANEL AND ASSOCIATED TRANSFORMER (IF APPLICABLE) TO BE REMOVED.

5.  EXISTING ROOFTOP UNIT TO BE REMOVED BY LANDLORD. LANDLORD ELECTRICAL CONTRACTOR TO REMOVE ALL CONDUITS AND CONDUCTORS BACK TO SOURCE. DO NOT ABANDON.

## DEMOLITION LEGEND

☐ EXISTING WALL

┄┄ ITEM TO DEMOLISH

**NOTE TO CONTRACTOR:**
BEFORE REMOVING PANELS, ELECTRICAL CONTRACTOR SHALL VERIFY THE PANEL BEING REMOVED DOES NOT FEED ANY LIGHTING, RECEPTACLES, EQUIPMENT, OR LOADS THAT ARE REQUIRED TO REMAIN. IF ANY CIRCUIT IS IN ANY QUESTIONS, PLEASE CONTACT:
ROB HILLIS TELEPHONE # (614) 278-6735

CONTRACTOR TO CONFIRM THERE ARE NO EXTERIOR LIGHTING IN DEMOLISHED PANELS! CONTACT BIG LOTS IF CIRCUITS ARE LOCATED AND NOT LISTED IN DRAWINGS.

DEMOLISH EXISTING FEEDERS, CONDUIT AND WIRING BACK TO SOURCE. DO NOT ABANDON.

ELECTRICAL CONTRACTOR SHALL INCLUDE THE COST IN THEIR BID TO INSPECT AND CLEAN EXISTING ELECTRICAL SERVICE EQUIPMENT.
TORK DOWN ALL LUGS AND ENSURE EQUIPMENT IS IN GOOD WORKING CONDITION.

**BIG LOTS STORES, LLC.**
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| DATE DRAWN | 12/12/2022 |
| DRAWN BY: | WP |
| SCALE: | 3/32" = 1'-0" |

**ELECTRICAL DEMOLITION PLAN**

SHEET:
**ED-1**



**ELECTRICAL CODED NOTES**

1. EXHAUST FAN TO BE CIRCUITED AND CONTROLLED WITH RESTROOM LIGHTING AS SHOWN IN THE RESTROOM LIGHTING CONTROL DETAIL ON SHEET E-6.

2. FIRE ALARM CONTROL PANEL. CONFIRM IF EXISTING FIRE ALARM CONTROL PANEL IS IN GOOD WORKING CONDITION, SIZED CORRECTLY, HAS CELLULAR CAPABILITIES, AND IS IN NON-PROPRIETARY RE-USE AND RELOCATE EXISTING PANEL IF ALL CRITERIA ARE MET, OTHERWISE PROVIDE NEW PANEL.

3. ELECTRICAL CONTRACTOR TO SUBMIT DRAWINGS FOR PERMITTED FIRE ALARM SYSTEM AND DETERMINE WHICH EXISTING FIRE ALARM DEVICES, IF ANY, CAN BE RE-USED OR RELOCATED AND RECONNECTED TO THE NEW FIRE ALARM SYSTEM. FIELD DETERMINE QUANTITY AND LOCATION OF DEVICES TO ACHIEVE PROPER COVERAGE OF ALL AREAS WITH VISUAL/AUDIBLE DEVICES.

4. NEW UNIT HEATER. RUN (2) #12 CU & (1) #10 CU GRD. FROM INTEGRAL DISCONNECT SWITCH TO 20-AMP BREAKER WITHIN PANEL BOARD. MAKE ALL FINAL CONNECTIONS.

**SENSOR CODED NOTES**

A. NEW G2C TEMPERATURE SENSOR TO BE MOUNTED AT 66" A.F.F. REFER TO SHEET E-6 FOR MORE INFORMATION.

B. CO2 SENSOR MOUNT AT 72" A.F.F. REFER TO SHEET E-6 FOR MORE INFORMATION.

C. ROOM HUMIDITY SENSOR TO BE MOUNTED AT 72" A.F.F. REFER TO SHEET E-6 FOR MORE INFORMATION.

D. RESET SWITCH TO BE MOUNTED AT 44" A.F.F. ELECTRICAL CONTRACTOR TO PROVIDE RACEWAY AND BACKBOX. REFER TO SHEET E-6 FOR MORE INFORMATION.

ELECTRICAL CONTRACTOR TO READ EVERY GENERAL AND CODED NOTE BEFORE STARTING CONSTRUCTION. CONTACT ROB HILLIS WITH ANY QUESTIONS.

**NOTE TO CONTRACTOR:**
BEFORE REMOVING PANELS OR ELECTRICAL CIRCUITS FROM EXISTING PANELS, THE ELECTRICAL CONTRACTOR SHALL CONFIRM THERE AREN'T ANY LIGHTING, RECEPTACLES, EQUIPMENT, OR LOADS THAT ARE REQUIRED TO REMAIN WITH THE BUILDING. IF ANY CIRCUITS ARE IN QUESTION,
PLEASE CONTACT:
ROB HILLIS TELEPHONE # (614) 278-6735

**LEGEND**

- NEW WALL
- EXISTING WALL
- DETAIL/NOTE
- SHEET NUMBER

**ELECTRICAL LEGEND**

COMMON GROUND CONVENIENCE DUPLEX RECEPTACLE TO BE NEMA 5-20R (HUBBLE MODEL #HBL5352)

COMMON GROUND CONVENIENCE DOUBLE DUPLEX RECEPTACLE TO BE NEMA(2)-(5-20R (HUBBLE MODEL #HBL5352))

DEDICATED GROUND TWIST LOCK DUPLEX RECEPTACLE TO BE NEMA L5-15R HUBBELL IG4710

J-BOX FOR SIGN

TELECOM: ROUGH-IN

POS - CAT-5 ROUGH-IN

EMS - CAT-5 ROUGH-IN

DOORBELL

DISCONNECT SWITCH

CORD REEL (SEE NOTE #5 SHEET E-2)

ELECTRIC PANEL

EAS EQUIPMENT

**ELECTRICAL GENERAL NOTES:**

- SHARED NEUTRALS ARE NOT PERMITTED.

- ELECTRICAL CONTRACTOR TO COORDINATE LOCATION OF JUNCTION BOX FOR STORE SIGNS WITH SIGN VENDOR PRIOR TO ROUGH-IN.

- ELECTRICAL CONTRACTOR SHALL INCLUDE THE COST IN THEIR BID TO PROVIDE NEW TYPE WRITTEN PANEL SCHEDULES. ELECTRICAL SHALL TRACE DOWN ALL UNKNOWN LOADS AND RECORD INFORMATION ON PANEL SCHEDULES AND AS-BUILT DRAWINGS.

- ELECTRICAL CONTRACTOR TO PROVIDE ELECTRIC METER NUMBER AT THE BEGINNING OF THE PROJECT TO BIG LOTS.

- NOTE TO CONTRACTOR: ANY / ALL EXISTING ELECTRICAL EQUIPMENT, CONDUIT, OR WIRE BEING REUSED SHALL BE CLEANED AND BROUGHT UP TO CODE OR REPLACED AS REQUIRED. ANY EXISTING CIRCUIT CONDUIT OR WIRE THAT IS TO BE RE-USED AND INTERFERES WITH NEW CONSTRUCTION SHALL BE REMOVED AND REPLACED OR MODIFIED / RE-ROUTED TO AVOID ANY CONFLICT WITH NEW CONSTRUCTION.

- REMOVE ANY/ALL CONDUITS STUBBED UP THROUGH FLOOR NOT BEING REUSED. CUT BELOW SLAB AND PLUG FOR SMOOTH APPEARANCE. (TYPICAL FOR ENTIRE SPACE).

- ELECTRICAL CONTRACTOR SHALL INCLUDE THE COST IN HIS BID TO INSPECT AND CLEAN EXISTING ELECTRICAL SERVICE EQUIPMENT. TORQUE DOWN ALL LUGS AND ENSURE EQUIPMENT IS IN GOOD WORKING CONDITION.

- ELECTRICAL CONTRACTOR SHALL NOT DEVIATE FROM PLANS FOR ALL EXISTING ELECTRICAL CIRCUITING.

- LCP (LIGHTING CONTROL PANEL) AND SLP (SCREAM LOGIC PANEL) ARE PROVIDED BY SIEMENS AND INSTALLED BY ELECTRICAL CONTRACTOR. ELECTRICAL CONTRACTOR SHALL PROVIDE 1" CONDUIT FROM LCP TO SLP.

- REFER TO M-1 FOR OZC, CO2, AND RH SENSOR MOUNT LOCATIONS.

- ALL ELECTRICAL HOME RUNS AND BRANCH CIRCUITS TO BE RAN IN CONDUIT. MINIMUM SIZE 3/4" CONDUIT. NO FLEXIBLE METAL CONDUITS LONGER THAN 6'-0" ARE PERMITTED. ELECTRICAL CONTRACTOR SHALL INSTALL CIRCUITS AS SHOWN ON THE PLANS.

- ANY CIRCUIT RUN LONGER THAN 100' TO BE UP-SIZED TO MINIMUM OF #10 WIRE.

- ELECTRICAL CONTRACTOR TO FURNISH AND INSTALL JUNCTION BOX/ES AND CONDUIT (WITH PULL STRING) FOR ALL OZC,DIGITAL ZONE CONTROLLERS, RH (RELATIVE HUMIDITY SENSORS) AND CO2 (CARBON DIOXIDE SENSORS). E.C. SHALL FURNISH AND INSTALL CONTROL WIRE AND MAKE FINAL CONNECTION. COORDINATE MOUNTING LOCATIONS AND HEIGHT WITH MECHANICAL CONTRACTOR PRIOR TO ROUGH-IN. ELECTRICAL CONTRACTOR TO REFER TO SHEET E-3 AND E-4 FOR ADDITIONAL WORK TO BE INCLUDED IN THEIR BID.

- PROVIDE ALL MATERIAL, EQUIPMENT, AND PERFORM ALL LABOR AS REQUIRED TO INSTALL NEW AND COMPLETE ELECTRICAL SYSTEM AS INDICATED ON DRAWINGS AND SPECIFICATIONS AND AS REQUIRED BY CODE.

- ELECTRICAL CONTRACTOR TO COORDINATE LOCATION OF JUNCTION BOX FOR STORE BUILDING SIGNS WITH VENDOR PRIOR TO ROUGH-IN.

- ELECTRICAL CONTRACTOR TO PROVIDE AND INSTALL BOX AND RACEWAY FOR TEST KEY SWITCH.

- BEFORE REMOVING PANELS OR ELECTRICAL CIRCUITS FROM EXISTING PANELS, THE ELECTRICAL CONTRACTOR SHALL CONFIRM THERE ARE NOT ANY LIGHTING, RECEPTACLES, EQUIPMENT, OR LOADS THAT ARE REQUIRED TO REMAIN WITH THE BUILDING. IF ANY CIRCUITS ARE IN QUESTION PLEASE CONTACT ROB HILLIS (614-278-6735).

- CHECK CABLE RUN DISTANCE, NOT TO EXCEED 300'-0".

**BIG LOTS STORES, LLC.**
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| | SqFt |
|---|---|
| Area | 28,810 |
| SALES FLOOR | |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/13/2022
DRAWN BY: WP
SCALE: 3/32" = 1'-0"

**ELECTRIC PLAN**

SHEET:
**E-1**



LANDLORD TO PROVIDE OCPD AND ASSOCIATED
CONDUIT/WIRE TO RTU UNITS ONCE FINAL SELECTIONS
HAVE BEEN MADE BASED ON WHETHER GAS CAN BE
PROVIDED TO THE BUILDING OR NOT.  SHOW CIRCUIT
DESIGNATIONS AND DISCONNECT SIZES ON THIS SHEET.
RE-USE EXISTING CIRCUITS AND OCPD WHERE APPLICABLE.

**A** RTU LIGHT/RECEPTACLE
E-1.1   N.T.S.

STANCHION MOUNT LIGHT FIXTURE
WITH GLOBE AND GUARD AND  LED
LAMP

3/4" RIGID GALVANIZED STEEL CONDUIT

ALIGN BOTTOM OF
FIXTURE WITH
TOP OF RTU

SINGLE POLE TOGGLE SWITCH
WITH PILOT LIGHT.

GFI DUPLEX RECEPTACLE WITH
WEATHERPROOF COVER

ROUTE CONDUIT UP
THRU OPENING

3/4" RIGID GALVANIZED
STEEL CONDUIT

FINISHED ROOF SURFACE

NOTE:  COORDINATE EXACT LOCATION OF RECEPTACLE
& LIGHT WITH MECH. CONTR. SO AS NOT TO BLOCK
ACCESS PANELS

NOTE:  IN ADDITION TO THE RECEPTACLE PROVIDED WITH
THE NEW RTU THE ELECTRICAL CONTRACTOR SHALL
PROVIDE THE WEATHERPROOF LIGHT/RECEPTACLE AS
SHOWN IN THE DETAIL. (OR EQUAL)

## FIELD VERIFY ALL CONDITIONS

DESIGN DRAWINGS ARE SCHEMATIC. THIS CONTRACTOR SHALL VISIT THE
SITE PRIOR TO BIDDING OR AWARD OF CONTRACT TO INSPECT EXISTING
FIELD CONDITIONS. THIS CONTRACT SHALL INCLUDE ALL LABOR AND
MATERIALS NECESSARY FOR FIELD MODIFICATIONS DUE TO EXISTING
CONDITIONS.

THE CONTRACTOR SHALL CONTACT THE ARCHITECT, ENGINEER OR
OWNER PRIOR TO BIDDING FOR INTERPRETATIONS AND CLARIFICATIONS
OF THE DESIGN AND INCLUDE IN HIS BID ALL COSTS TO MEET THE DESIGN
INTENT. CLARIFICATIONS MADE BY THE ARCHITECT, ENGINEER OR OWNER
AFTER BIDDING WILL BE FINAL AND SHALL BE IMPLEMENTED AT
CONTRACTORS COST.

BIDDING CONTRACTORS SHALL HAVE A WORKING KNOWLEDGE OF LOCAL
CODES AND ORDINANCES AND SHALL INCLUDE IN THEIR BIDS THE COSTS
FOR ALL WORK INSTALLED IN STRICT ACCORDANCE WITH GOVERNING
CODES. THE PLANS AND SPECIFICATIONS NOT WITHSTANDING. THE
CONTRACTOR SHALL ALERT ARCHITECT, ENGINEER OR OWNER OF ANY
APPARENT DISCREPANCIES BETWEEN GOVERNING CODES AND DESIGN
INTENT.

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

DATE DRAWN:
12/12/2022

DRAWN BY:
WP

SCALE:
3/32" = 1'-0"

SHEET:
E-1.1

## ELECTRIC ROOF PLAN

## BASIC WIRING REQUIREMENTS

- PLEASE REVIEW SPECIFICATIONS BELOW AND REFER TO SHEET E-1 FOR DESIGNATED LOCATIONS.
- NO ADDITIONS OR CHANGES TO THIS SCOPE OF WORK CAN BE MADE WITHOUT PRE-APPROVAL BY AUTHORIZED BIG LOTS REPRESENTATIVE.
- ALL WORK IS TO BE DONE IN A WORKMANLIKE MANNER, AND THE CONTRACTOR IS RESPONSIBLE FOR ALL PERMITS, INSPECTIONS, AND COMPLIANCE TO ALL NATIONAL AND LOCAL CODES AND REQUIREMENTS. EXISTING CIRCUITS AND RECEPTACLES ARE TO BE UTILIZED IN ALL CASES IF COST EFFECTIVE. PLEASE BREAK YOUR BID DOWN BY LINE ITEM WITH SPECIFICATIONS ON LABOR COSTS AND MATERIAL.
- ELECTRICIAN IS ALSO TO RETURN TO THE STORE 3-7 DAYS PRIOR TO DRY RUN OPENING TO VERIFY STORE LIGHTING IS FULLY FUNCTIONAL AND MAKE WHATEVER REPAIRS THAT MAY BE NEEDED.

ANY QUESTIONS PLEASE CALL: 614-278-6719 or 614-278-6946.
THANK YOU FOR YOUR ATTENTION IN THIS MATTER.

### TABLE OF CONTENTS
1. CASHWRAP CABINETS / FURNITURE CABINETS
2. EXTERIOR SIGNS
3. AUTOMATIC DOORS
4. CONVENIENCE RECEPTACLE
5. CORD REELS / SEASONAL OUTLET
6. ELECTRICAL WATER HEATER
7. CASH ROOM
8. EMPLOYEE LOUNGE
9. MANAGER OFFICE
10. BALER
11. BEVERAGE COOLER / DAIRY COOLER
12. DOORBELL
13. PHONE SYSTEM & ALARM BOARD
14. PVM OUTLET
15. STORE LIGHTING
16. DOCK LIGHT
17. WATER COOLER
18. HAND DRYER
19. MOTION SENSOR
20. VOLTAGE CEILING SENSOR
21. EAS
22. CHECKOUT COOLERS

### 1) CASHWRAP CABINETS / FURNITURE CABINETS

ELECTRICAL CONTRACTOR TO PROVIDE ONE (1) 120V/20AMP DEDICATED GROUND CIRCUIT FOR DG OUTLETS PER SECTION. ELECTRICAL CONTRACTOR TO PROVIDE ONE (1) DEDICATED 120V/20AMP CIRCUIT FOR CONVENIENCE OUTLETS PER SECTION. EACH STORE WILL BE PROVIDED WITH ONE SECTION OR TWO SECTIONS OF CASHWRAP CABINETS. IF ONLY ONE (1) SECTION OF CHECKOUT CABINETS IS PROVIDED, ELECTRICAL CONTRACTOR MUST PROVIDE TWO (2) DEDICATED GROUND CIRCUITS. ELECTRICAL CONTRACTOR TO PROVIDE TWO (2) DEDICATED GENERAL 120V/20AMP CONVENIENCE CIRCUITS. ELECTRICAL CONTRACTOR TO SEE SHEET E-1 FOR QUANTITY OF SECTIONS OF CASHWRAP CABINETS AND LOCATION OF POWER POLES. ELECTRICAL CONTRACTOR TO SEE SHEET E-1 FOR ELECTRICAL CIRCUIT DESIGNATION.

#### CASHWRAP CABINETS
- EACH SECTION OF CABINETS TO BE SUPPLIED WITH ELECTRICAL CONDUCTORS VA 2.25" X 2.25" TWIN CHANNEL. TELE-POWER POKE FROM OVERHEAD TO THE CABINET. LENGTH OF TELE-POWER POLE TO BE DETERMINED BY THE CEILING/DECK HEIGHT. TELE-POWER POLE, WHITE IN COLOR.
- EACH CABINET IS TYPICALLY CONSTRUCTED WITH ELECTRICAL BOXES AND DEVICES SUPPLIED. WIRE CONDUCTORS AND CONDUIT ARE SUPPLIED BY ELECTRICAL CONTRACTOR. ALL WIRE CONDUCTORS AND CONDUIT ARE TO BE RUN HORIZONTALLY THROUGH THE CABINET AS TO NOT INTERFERE WITH ADJUSTABLE SHELF PLACEMENT. ELECTRICAL CONTRACTOR WILL BE RESPONSIBLE FOR ALL CHASES THROUGH CASHWRAP CABINETS.

IN THE EVENT THAT THE CABINETS DO NOT CONTAIN ELECTRICAL BOXES, AND DEVICES, THE CONTRACTOR IS TO SUPPLY AND INSTALL THE FOLLOWING COMPONENTS PER THE DIAGRAM BELOW.

#### EACH CASHWRAP CABINET REQUIRES:
- ONE (1) 4"x 4" JUNCTION BOX
- THREE (3) 2"x 4" ELECTRICAL BOX
- ONE (1) NEMA L5-15R ORANGE TWISTLOCK RECEPTACLE (HUBBELL IG4710 2 POLE 3 WIRE GROUNDING 15A/125VAC)
- TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, 20A/125VAC)
- ALL BOXES AND DEVICES TO HAVE APPROPRIATE COVER PLATES.



| DESCRIPTION | CATALOG NUMBER |
|---|---|
| SPECIAL PURPOSE DUPLEX RECEPTACLES BACK AND SIDE WIRED | NEMA L5 15R 15A 125V UL/CSA 0.5 HP |
| DEDICATED GROUND, FLUSH, ORANGE RTP FACE | IG4710 |

FRONT END CHECKOUT WIRING
SCALE: NTS

1 SECTION - 3 CHECKOUT CONFIGURATION

1 SECTION - 4 CHECKOUT CONFIGURATION

2 SECTION - 5 CHECKOUT CONFIGURATION

2 SECTION - 6 CHECKOUT CONFIGURATION

### 2) EXTERIOR SIGNS

CONTRACTOR TO PROVIDE FOR EACH BUILDING SIGN LOCATION, ONE (1) 120v/20amp CIRCUIT AND CONTROLLED BY EMS EQUIPMENT. REFER TO E-1 & E-6 SHEETS FOR CIRCUIT AND CONTACTOR INFORMATION. JUNCTION BOX FOR EACH CIRCUIT TO BE LOCATED ON THE BACKSIDE OF SIGN WALL AND CENTERED WITHIN SIGN AREA (IF ANY QUESTIONS, CONTACT MICHAEL NEU @ 614-278-6868). AFTER SIGN IS INSTALLED, FINAL ELECTRICAL CONNECTIONS TO BE COMPLETED BY ELECTRICIAN.

ELECTRICAL CONTRACTOR TO VERIFY ELECTRICAL SOURCE AND OPERATION OF PYLON IS ADEQUATE FOR TENANTS INTENDED USE.

### 3) AUTOMATIC DOOR OPERATORS

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp CIRCUIT TO EACH ENTRY AND EXIT STOREFRONT DOOR LOCATION. TYPICALLY FOUR (4) LOCATIONS. CIRCUITS TO TERMINATE TO A 2x4 BOX w/COVER PLATE AT THE HEADER LOCATION OF DOOR DOOR.

### 4) CONVENIENCE RECEPTACLE :

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp CIRCUIT. CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE (HUBBELL HBL 5352, OR EQUIVALENT). RECEPTACLES TO BE MOUNTED 18" AFF (OR 48" AFF IF MOUNTED IN A COLUMN).

### 5A) CORD REELS

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE, FLUSH MOUNTED IN CEILING AT EACH DESIGNATED CORD REEL LOCATION. CONTRACTOR TO INSTALL A CORD REEL AT EACH LOCATION PER THE DIAGRAM BELOW.

CORD REEL DETAILS AND SPECIFICATIONS:
ALEMITE CORD REEL MODEL 7280 OR EQUIVALENT TO BE:
- COMMERCIAL GRADE
- 20 AMP
- UL RATED
- 45' CORD
- GFCI RECEPTACLE

### 5B) SEASONAL OUTLET :

CONTRACTOR TO PROVIDE ONE (1) 120V/20AMP CIRCUIT. CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT) WITHIN A 4" BOX MOUNTED @ 6'-0" A.F.F.

### 6) ELECTRIC WATER HEATER

CONTRACTOR TO PROVIDE (1) 120 VOLT / 35 AMP SINGLE POLE CIRCUIT FOR 20 GALLON - 3KW ELECTRICAL WATER HEATER.

### 7) CASH ROOM:

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp CIRCUIT. CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT) WITHIN A 4" BOX. MOUNTED @ 36" A.F.F. DIRECTLY ABOVE THE COUNTERTOP MOUNTED AT 30" A.F.F.

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp ISOLATED GROUND CIRCUIT CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R ORANGE ISOLATED GROUND DUPLEX RECEPTACLES (HUBBELL CR5352G). RECEPTACLES TO BE MOUNTED @ 36" A.F.F. DIRECTLY ABOVE THE COUNTERTOP MOUNTED AT 30" A.F.F.

CONTRACTOR TO PROVIDE AN EMS/TELE-DATA/CAT-3 ROUGH-IN. PROVIDE TWO (2) 2.5" SURFACE MOUNTED CONDUITS AT 48" A.F.F. TO ABOVE CEILING TO THE NEAREST ACCESSIBLE OFFICE CEILING. PROVIDE PLASTIC BUSHINGS AND PULL STRING IN CONDUIT. THIS ROUGH-IN TO BE UTILIZED BY THE EMS, TELEPHONE, TELECOM & I.T. CONTRACTOR AT A LATER DATE.

### BURGLAR ALARM & MUZAK SYSTEMS:

ALARM - CONTRACTOR TO PROVIDE ONE(1) 120V/20A CIRCUIT TO SUPPLY TWO(2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBLE HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX @ 84" AFF. CIRCUIT TO HAVE BREAKER.

MUZAK - CONTRACTOR TO PROVIDE (1) 120V/20A CIRCUIT TO SUPPLY TWO(2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBLE HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX @ 78" AFF. CIRCUIT TO HAVE BREAKER.



ELEVATION VIEW



PLAN VIEW

### 8) EMPLOYEE LOUNGE:

CONTRACTOR TO PROVIDE FOUR (4) 120v/20 amp CIRCUITS. CIRCUITS TO SUPPLY NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT).

### 9) MANAGER OFFICE :

CONTRACTOR TO PROVIDE TWO (2) 120v/20 AMP CIRCUITS. CIRCUITS TO SUPPLY NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT).

### 10) BALER OR COMPACTOR:

CONTRACTOR TO PROVIDE -
- IF 277/480v SERVICE IS AVAILABLE - PROVIDE ONE (1) 480V/30 AMP, 3 PHASE CIRCUIT. CONTRACTOR TO SUPPLY ONE (1) 30 AMP FUSED DISCONNECT

- IF 120/208v SERVICE IS AVAILABLE - PROVIDE ONE (1) 208/60 AMP, 3 PHASE CIRCUIT. CIRCUIT TO SUPPLY ONE (1) 60 AMP FUSED DISCONNECT

### 11) BEVERAGE COOLERS / DAIRY COOLER:

CONTRACTOR TO PROVIDE -
- (1) 120 VOLT 20 AMP DEDICATED CIRCUIT TO SUPPLY 2 GENERAL PURPOSE OUTLETS.
CONTRACTOR TO INSTALL -
- (1) WHITE COLOR POWER POLE.



BEVERAGE COOLER ELECTRICAL DETAILS

VIEW 1
OVERVIEW

VIEW 2
DETAIL

### 12) DOOR BELLS:

CONTRACTOR TO PROVIDE TWO (2) 24v, COMMERCIAL GRADE DOORBELLS, MINIMUM OF 90db. ONE (1) AT THE RECEIVING DOOR AND ONE (1) AT THE STOREFRONT DOORS.

### 13) PHONE SYSTEM:

CONTRACTOR TO PROVIDE TWO (2) 120V/20AMP CIRCUITS. CIRCUITS TO SUPPLY TWO (2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBELL HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX (DOUBLE DUPLEX) ALL CIRCUITS TO HAVE BREAKER LOCKS.

### 14) PVM OUTLET:

CONTRACTOR TO PROVIDE ONE (1) 120V/20AMP CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE (HUBBELL HBL 5352, OR EQUIVALENT). RECEPTACLE TO BE MOUNTED TO BOTTOM OF BAR JOIST, 2' FROM MAIN EXIT DOOR FOR OPEN DECK. CONTRACTOR TO INSTALL RECEPTACLE TO UNDERSIDE OF DROP CEILING FOR STORES WITH ACOUSTICAL CEILING.

### 15) STORE LIGHTING:

CONTRACTOR TO LABEL BREAKERS WITH DESCRIPTION AND AMP DRAW PER CIRCUIT.

WIRING INSTRUCTIONS ARE AS FOLLOWS: CONTRACTOR TO WIRE EVERY OTHER FIXTURE AND EVERY OTHER ROW ON A SEPARATE CIRCUIT BREAKER ON SALES FLOOR AND STOCK ROOM. CIRCUIT BREAKERS ARE TO BE GROUPED BY CONTACTOR THE FOLLOWING WAY: EMPLOYEE CONTACTOR (CONTROLS ALL OFFICE, CASH, COUNT, BATHROOMS, RECEIVING AREA, AND STOCK ROOM. GROUP A 25% CONTACTOR (CONTROLS APPROXIMATELY THE NEXT 25% OF SALES FLOOR LIGHTS); GROUP B 50% CONTACTOR, (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING) GROUP C 75% CONTACTOR, (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING); GROUP D 100% CONTACTOR (CONTROLS THE BALANCE 25% OF SALES FLOOR LIGHTING). GROUP E CONTACTOR EXTERIOR SIGNS (CONTROLS ALL EXTERIOR BUILDING SIGNS INCLUDING PYLON SIGN). GROUP F CONTACTOR (CONTROLS ANY WALL PACK LIGHTING, PARKING LOT LIGHTING AND CANOPY LIGHTING NOT CONTROLLED BY LANDLORD).

### 16) DOCK LIGHT (if applicable):

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP CIRCUIT. CIRCUIT TO SUPPLY NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE (HUBBELL HBL 5352, OR EQUIVALENT). SWITCH REQUIRED AT RECEPTACLE LOCATION. MOUNT RECEPTACLE/SWITCH @ 48" A.F.F. BETWEEN DOORS OR WITHIN 12" OF DOOR FRAME.

### 17) WATER COOLER:

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP CIRCUIT. CIRCUIT TO SUPPLY A FLEXAY MODEL EZSTLBLC HI-LO WATER COOLER MOUNTED PER ALL LOCAL, STATE, FEDERAL AND ADA CODES OR REGULATIONS.

### 18) HAND DRYER:

CONTRACTOR TO PROVIDE HAND DRYERS AND ONE (1) 120V/20 AMP CIRCUIT (per unit). CIRCUIT TO SUPPLY A WORLD DRYER MODEL Q-973A HAND DRYER, MOUNTED PER ALL LOCAL, STATE, FEDERAL AND ADA CODES OR REGULATIONS.

### 19) MOTION SENSOR SWITCHES:

INSTALL LEVITON ODS10 - IDW OR LEVITON OSSMD-FT MOTION SENSOR SWITCHES AS INDICATED ON LIGHTING PLAN. SEE SHEET E-5 FOR WIRING DIAGRAM

### 20) VOLTAGE CEILING SENSOR:

INSTALL EATON OAC-DT - MICROSET DUAL TECH LOW VOLTAGE CEILING SENSOR AS INDICATED ON LIGHTING PLAN. SEE SHEET E-5 FOR WIRING DIAGRAM

### 21) ELECTRONIC ARTICLE SURVEILLANCE (EAS):

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP DEDICATED CIRCUIT FOR ALL EAS SYSTEM. RECEPTACLES AND LOW VOLTAGE CONDUIT TO BE LOCATED PER DETAIL BELOW. CONTRACTOR TO PROVIDE A BREAKER LOCK AT PANEL.

SEE BELOW FOR INSTALLATION DETAIL



EAS UNDER FLOOR INSTALLATION DETAIL

### 22) CHECKOUT COOLERS:

CONTRACTOR TO PROVIDE ONE (1) DEDICATED 120v/20amp CIRCUIT. CONTRACTOR TO SUPPLY TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE (HUBBELL HBL 5352, OR EQUIVALENT). ELECTRICAL CONTRACTOR TO INSTALL POWER POLE. ELECTRICAL CONTRACTOR SHALL SECURE POWER POLE TO FLOOR WITH FLOOR BRACE. ELECTRICAL CONTRACTOR TO SECURE TOP OF POWER POLE WITH STRUT TO BAR JOIST ABOVE. ELECTRICAL CONTRACTOR TO MOUNT RECEPTACLES 6" A.F.F. RECEPTACLES TO BE MOUNTED ON BOTH SIDES OF POWER POLE. ELECTRICAL CONTRACTOR TO SEE SHEET E-1 FOR LOCATION OF POWER POLE.

### 23) I.T. RACK (2ND SWITCH):

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp DEDICATED GROUND CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R ORANGE ISOLATED GROUND DUPLEX RECEPTACLES (HUBBELL CR5352G). RECEPTACLES TO BE MOUNTED @ 30" A.F.F.

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORE
5601 US-51
STEVENS POINT, WI 54482

| | SQUARE FOOTAGE | |
|---|---|---|
| Area | SqFt | |
| SALES FLOOR | 28,810 | 42,128 |
| TOTAL BUILDING | | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: VIP
CHK BY: VIP
SCALE: 3/32" = 1'-0"

ELECTRIC NOTES

SHEET:
E-2

## DEVICE SCHEDULE

| SYMBOL | DEVICE | QUANTITY | DEVICE LOCATION | DEVICE BOX TYPE | NOTES |
|--------|--------|----------|-----------------|-----------------|-------|
| | CARBON DIOXIDE SENSOR | 1 | MAIN SPACE, MOST CENTRALLY LOCATED, ABOVE/BESIDE DZC | 18/2 (X2) | |
| | DUCT TEMPERATURE SENSOR | 1 PER ROOFTOP UNIT | BOTTOM OF MAIN SUPPLY AIR DUCT DROP | 18/2 | 1 |
| | DIGITAL ZONE CONTROLLER | 1 PER ROOFTOP UNIT (UNIT AND ADDITIONAL HVAC) | IN ZONE BEING SERVED | 18/10 | 2 |
| | ENERGY METER | 1 PER MDP | MAIN 3-PHASE SUPPLY NEAR UTILITY METER | 24/1P (COMM CABLE TO SLP) | 3 |
| | LIGHTING CONTROL PANEL | 1 | NEAR BREAKER PANEL | 18/10 PLUS ALL REQ'D LINE VOLTAGE | |
| | OUTSIDE SENSING DEVICE | 1 | ROOF | 18/2 (X2) | |
| | OVERRIDE (4-BUTTON) | 1 (OPTIONAL) | | 18/2 (X4) | |
| | POWER INTERFACE PANEL | 1 | ELECTRICAL ROOM (UNDER SLP) | (1) 18/2, OTHER (SEE POINT TO POINT DWG'S) | 5 |
| | RELATIVE HUMIDITY | 1 | MAIN SPACE, MOST CENTRALLY LOCATED, ABOVE/BESIDE DZC | 18/2 (X2) | |
| | REMOTE I/O PANEL | 1 | ELECTRICAL ROOM | 24/1P | |
| | SCREAM LOGIC PANEL | 1 | ELECTRICAL ROOM | VARIES PER CONNECTED DEVICE | |

## INSTALLATION RESPONSIBILITIES

| SYMBOL | DEVICE | PROVIDED BY | MOUNTING | BOX/RACEWAYS | TERMINATION OF WIRES AT BOTH ENDS | NOTES |
|--------|--------|-------------|----------|--------------|-----------------------------------|-------|
| | CARBON DIOXIDE SENSOR | SIEMENS | MC | EC | MC | |
| | DUCT TEMPERATURE SENSOR | SIEMENS | MC | EC | MC | 1 |
| | DIMMING CONTROL PANEL | SIEMENS | MC | EC | EC/MC | 10 |
| | DIGITAL ZONE CONTROLLER | SIEMENS | MC | EC | MC | 2 |
| | ENERGY METER | SIEMENS | MC | EC | EC | 3 |
| | INTERIOR LIGHT SENSOR | SIEMENS | MC | EC | MC | |
| | LIGHTING CONTROL PANEL | SIEMENS | MC | EC | MC | 4,8 |
| | OUTSIDE SENSING DEVICE | SIEMENS | MC | EC | MC | |
| | LIGHTING OVERRIDE PANEL (4 BUTTON) | SIEMENS | MC | EC | MC | |
| | RELATIVE HUMIDITY | SIEMENS | MC | EC | MC | |
| | REMOTE I/O PANEL | SIEMENS | EC | EC | EC | |
| | POWER INTERFACE PANEL | SIEMENS | MC | EC | EC/MC | 4,5,6 |
| | SECURITY INTERFACE SYSTEM | SIEMENS | EC | EC | SIEMENS | |
| | SCREAM LOGIC PANEL | SIEMENS | EC | EC | EC/MC | 7 |
| CAT-5 | CAT-5 COMMUNICATION CABLE | EC | EC | EC | MC | 9 |
| WCWF | WALK-IN COOLER / WALK-IN FREEZER | OTHERS | EC | EC | EC | |

## NOTES

1. ONE DUCT SENSOR IN THE SUPPLY AIR DUCT OF EACH RTU.
2. ONE DZC FOR EACH ROOFTOP. ONE DZC FOR ANY OTHER HVAC DEVICE (IF SPECIFIED).
3. MOUNT EM CTS ON 3-PHASE BUSS BARS AT MDP AFTER UTILITY METER AND BEFORE TRANSFORMERS AND BRANCH CIRCUITS.
4. M.C. SHALL INSTALL LOW VOLTAGE CABLE IN RACEWAYS PROVIDED BY E.C. AND TERMINATE BOTH ENDS - LINE VOLTAGE WIRING AND TERMINATIONS BY E.C.
5. E.C. SHALL PROVIDE AND INSTALL A DEDICATED 120V, 20A CIRCUIT TO POWER THE PIP. LABEL BREAKER EMS-2.
6. LOW VOLTAGE WIRING BETWEEN THE PIP AND SLP SHALL BE INSTALLED BY THE M.C. AND THE GROUND CONNECTION BY THE E.C.
7. WITH THE EXCEPTION OF THE OSD AND ENERGY METERS THE M.C. SHALL TERMINATE ALL LV CABLES IN THE SLP.
8. E.C. SHALL PROVIDE AND INSTALL A DEDICATED 120V, 20A CIRCUIT TO POWER THE LCP. LABEL BREAKER EMS-1.
9. E.C. TO INSTALL CAT-5 COMMUNICATION CABLE FROM TERMINATION POINT IN SLP TO DATA DROP IN CASH OFFICE. 10'-0' OF EXCESS CABLE WITHIN OFFICE LOCATION. E.C. TO INSTALL RJ45 CONNECTORS TO EACH END OF CABLE.

## CABLE SCHEDULE

| CABLE | SIZE | TYPE | MFG./MODEL |
|-------|------|------|------------|
| 18/2 | 18AWG/2-CONDUCTOR | SHIELDED, STRANDED, PLENUM RATED | BELDEN 6300FE NON-PAIRED |
| | | | COMTRAN 3644 |
| | | | TAPPAN 1880A82M-CMP |
| 18/4 | 18AWG/4-CONDUCTOR | SHIELDED, STRANDED, PLENUM RATED | BELDEN 6302FE NON-PAIRED |
| | | | LAKE CABLE/P164C5 |
| | | | TAPPAN 1880A84M-CMP |
| 18/10 | 18AWG/10-CONDUCTOR | UNSHIELDED, STRANDED, PLENUM | BELDEN 6308UE NON-PAIRED |
| | | | LAKE CABLE/P1810C-WIN |
| | | | TAPPAN 1880A810-CMP |
| 24/1P | 24AWG/1-TWISTED PAIR | SHIELDED, STRANDED, PLENUM RATED, TWISTED PAIR | BELDEN 82841 PAIRED |
| | | | LAKE CABLE/P242C5 |
| | | | TAPPAN 2469AT84-CMP |
| CAT5 | 24AWG/ 4-UTP | UNSHIELDED SOLID CONDUCTOR TWISTED PAIR | BELDEN 1583A CAT5 |

## GENERAL EMS CONSTRUCTION NOTES:

1. THE MECHANICAL CONTRACTOR SHALL PROVIDE THE INSTALLATION LABOR AND MATERIALS TO INSTALL THE LOW VOLTAGE PORTION OF THE CUSTOMER SUPPLIED EMS SYSTEM ACCORDING THE EMS SCHEDULES AND THE FOLLOWING:

   I. INSTALL EMS DEVICES AT LOCATIONS SHOWN ON THE MECHANICAL DRAWINGS AND ACCORDING TO THE EMS DETAILS.

   II. PROVIDE AND INSTALL THE LOW VOLTAGE CABLING FROM THE EMS DEVICES TO THE RTU'S, SLP, AND LCP

   III. TERMINATE THE LOW VOLTAGE CABLING AT BOTH ENDS.

   IV. CLEARLY IDENTIFY (LABEL) THE CABLES AT BOTH ENDS.

2. THE ELECTRICAL CONTRACTOR SHALL PROVIDE THE INSTALLATION LABOR AND MATERIALS TO INSTALL THE LINE VOLTAGE PORTION OF THE CUSTOMER SUPPLIED EMS SYSTEM ACCORDING THE EMS SCHEDULES AND THE FOLLOWING:

   I. PROVIDE AND INSTALL ELECTRICAL BOXES WITH 3/4" EMT STUB-UPS TO ABOVE CEILING GRID FOR WALL MOUNTED EMS AND CONTROL DEVICES.

   II. MOUNT EMS PANELS AND PIPE TOGETHER ACCORDING TO THE EMS DRAWINGS.

   III. INSTALL THE ENERGY METER AT THE MAIN DISTRIBUTION PANEL. INSTALL AND TERMINATE COMMUNICATIONS CABLE.

   IV. PROVIDE AND INSTALL AN E SECTION OF 1/2" RIGID FOR ROOF MOUNTED OSD. INSTALL AND TERMINATE OSD AND CABLE.

   V. PROVIDE AND INSTALL (1) EACH 120V, 20A CIRCUIT TO POWER THE PIP. LABEL PIP BREAKER "EMS-2".

3. ALL WIRING SHALL CONFORM TO NATIONAL AND STATE ELECTRICAL CODES.

4. NOTES ABOVE DO NOT ALLEVIATE CONTRACTORS OF OVERALL RESPONSIBILITIES OF PROVIDING A COMPLETE AND OPERATIONAL SYSTEM.

## INSTALLATION SUMMARY

1. LOW VOLTAGE CABLE

   I. THE M.C. SHALL FURNISH THE LOW VOLTAGE CABLE FOR THE EMS SYSTEM. THE CABLE SHALL BE AS SPECIFIED IN THE CABLE SCHEDULE.

2. EQUIPMENT DELIVERY

   I. SIEMENS SHALL PROVIDE THE EMS EQUIPMENT IN 1 SHIPMENT.

   II. IT SHALL BE UP TO THE G.C. TO CALL FOR EMS EQUIPMENT DELIVERY. THE EQUIPMENT WILL BE SHIPPED WITHIN 2 DAYS OF RECEIVING A VALID REQUEST. A VALID REQUEST SHALL CONSIST OF THE FOLLOWING:

      1.NAME AND PHONE NUMBER OF PERSON RESPONSIBLE FOR RECEIVING THE EMS EQUIPMENT AND STORE NUMBER

      2.A VALID SHIPPING ADDRESS (CONFIRMABLE BY THE DELIVERY AGENT).

3. CONTACT INFORMATION

   I. PLEASE DIRECT ALL SHIPPING REQUESTS TO SIEMENS AT (512) 529-9116

4. EMS COMMISSIONING

   I. IT SHALL BE UP TO THE G.C. TO CALL STEVEN VAN-AUKEN AT (512) 529-9116 FOR EMS COMMISSIONING AT LEAST 2 WEEKS PRIOR TO TURN OVER AND BEFORE THE INSTALLING CONTRACTOR HAS LEFT THE PROJECT.

      a. SIEMENS WILL COMMISSION THE EMS SYSTEM UPON RECEIVING A VALID REQUEST AND AFTER THE FOLLOWING CONDITIONS HAVE BEEN MET:

      1-ALL EMS DEVICES AND PANELS HAVE BEEN INSTALLED, WIRED AND TERMINATED

      2-ALL LINE VOLTAGE WIRING HAS BEEN COMPLETED

      3-ALL CONTROLLED EQUIPMENT HAS BEEN INSTALLED AND STARTED

   II. FAILURE TO MEET THESE CONDITIONS COULD RESULT IN DELAY OF STORE OPENING

## GENERAL LV CABLE INSTALLATION INSTRUCTIONS

1. HOME RUNS

   I. LOW VOLTAGE CABLES SHALL BE PULLED FROM DEVICE TO CONTROL PANEL WITHOUT SPLICING.

2. COMMUNICATIONS CABLING

   I. IN THE CASE OF MULTIPLE DEVICES SUCH AS COMMUNICATIONS CABLING, THE CABLE SEGMENTS SHALL BE PULLED FROM DEVICE TO DEVICE WITHOUT SPLICING.

3. CABLE SHIELD GROUNDING

   I. EACH CABLE RUN SHALL BE GROUNDED AT ONE END ONLY. GROUND SHIELD DRAIN WIRE AT CONTROL PANEL END. DRAIN WIRE TO EARTH GROUND SCREWS PROVIDED. THE SHIELD AND DRAIN WIRE SHALL BE REMOVED FROM THE OPPOSITE (DEVICE) END AND ISOLATED FROM GROUND.

   II. IN THE CASE OF MULTIPLE DEVICES SUCH AS COMMUNICATIONS WIRING, THE SHIELD DRAIN WIRES AT THE INTERMEDIATE DEVICES SHALL BE MECHANICALLY SPLICED TOGETHER AND ISOLATED FROM GROUND.

4. TESTING SHIELD GROUNDS

   I. DURING COMMISSIONING THE FIELD SERVICE REPRESENTATIVE (FSR) WILL TEST THE SHIELD GROUNDING AT THE CONTROL PANEL. SHIELDS FOUND TO HAVE CONTINUITY LESS THEN 100K OHM TO GROUND SHALL BE REJECTED. THE CONTRACTOR SHALL BE RESPONSIBLE FOR CLEARING SHIELD GROUND FAULTS.

## GENERAL NON-EMS CONTROLS NOTES:

1. COMBUSTION AIR VENTILATION AND OTHER EQUIPMENT

   I. CONTROLS FOR COMBUSTION AIR VENTILATION AND ANY OTHER EQUIPMENT NOT SPECIFICALLY MENTIONED IN THE EMS SCHEDULES SHALL BE FURNISHED AND INSTALLED ACCORDING TO THE MECHANICAL AND ELECTRICAL BID DOCUMENTS.

2. EXHAUST FAN, TRANSFER FAN AND OTHER "HARD-WIRED" INTERLOCKS (SEE INTERLOCK EXAMPLE BELOW)

   I. WHEN HARD-WIRED INTERLOCKING IS SPECIFIED IN THE MECHANICAL AND/OR ELECTRICAL SCHEDULES, THE INTERLOCKS SHALL BE FURNISHED AND INSTALLED BY THE TRADES SPECIFIED. INTERLOCKING IS NOT PART OF THE EMS SYSTEM.

   II. WHERE EXHAUST FAN AND RTU INTERLOCKS ARE CALLED OUT, THE CONTRACTOR SHALL CONNECT DIRECTLY TO THE SUPPLY FAN CONTACTOR COIL AND WIRE IN PARALLEL TO THE COIL OF A PROPERLY SIZED CONTACTOR OR STARTER SERVING THE INTERLOCKED EQUIPMENT. DO NOT USE THE EMS SYSTEM TO INTERLOCK EQUIPMENT.

3. LIFE SAFETY AND FIRE ALARM SYSTEMS

   I. LIFE SAFETY AND FIRE ALARM SYSTEMS ARE NOT PART OF THE EMS SYSTEM AND SHALL BE FURNISHED AND INSTALLED AS SPECIFIED IN THE MECHANICAL AND ELECTRICAL BID DOCUMENTS.

   II. MECHANICAL EQUIPMENT SHUTDOWN SHALL BE WIRED AS TO NOT AFFECT THE EMS SYSTEM.

4. MANUFACTURER SUPPLIED HUMIDITY CONTROLLERS

   I. DEHUMIDIFYING ROOFTOP UNITS

      a. SOME ROOFTOP UNITS MAY COME EQUIPPED WITH A DEHUMIDIFICATION CYCLE AND SPACE HUMIDITY SENSOR. THIS SENSOR SHALL BE INSTALLED IN ADDITION TO THE EMS SYSTEM AND ACCORDING TO THE MANUFACTURER'S INSTRUCTION.

### EXAMPLES FOR 3-PHASE EQUIPMENT INTERLOCKING



### MULTIPLE SEGMENT EXAMPLE



MECHANICALLY SPLICE SHIELD DRAIN WIRES TOGETHER AT INTERMEDIATE DEVICES AND ISOLATE FROM GROUND.

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

DATE DRAWN
12/12/2022
DRAWN BY: WP
SQUARE FOOTAGE
RENT: 28,810
SALES FLOOR: 28,810
TOTAL BUILDING: 42,128

SHEET:

**E-3**

EMS NOTES

## KEYED NOTES

1. REFER TO DETAIL OSD 1 FOR MOUNTING AND WIRING INSTRUCTIONS.
2. OPTIONAL RELAY ISOLATION BOARD REQUIRED IF ISOLATION RELAYS ARE NOT PROVIDED BY THE MANUFACTURER.
3. REFER TO ENERGY METER WIRING DETAILS.
4. REFER TO SLP FIELD WIRING DIAGRAM NOTE 3 FOR WIRING TERMINATIONS. CONTACT BIGLOTS CONSTRUCTION MANAGER FOR LOCATION.
5. DAISY CHAIN COMMUNICATION CABLE TO EACH ADDITIONAL RTU.

SL 1 SINGLE LINE DIAGRAM NO SCALE

## KEYED NOTES

1. INTERFACE MINIMUM OF 4 18AWG CONDUCTORS AND MUST BE SHIELDED. CUT AND TAPE BACK UNUSED CONDUCTORS AND SHIELD AT SECURITY END AND TERMINATE AT DESIGNATED TERMINAL IN SPLICE BOX.
2. SECURITY COMPANY OR 3RD PARTY PULLS CABLE. IF SIEMENS HAS ALREADY MOUNTED SPLICE BOX AND TERMINATED SIGNALS, SECURITY COMPANY SHOULD REMOVE RESISTERS AND TERMINATE SECURITY RELAY SIGNALS AS SHOWN. OTHERWISE, SECURITY COMPANY TO LEAVE ADEQUATE SERVICE LOOP AND SIEMENS WILL TERMINATE WHEN SPLICE BOX IS INSTALLED.
3. JOIN THESE CONDUCTORS USING WIRE NUT OR DOLPHIN CRIMP
4. GROUND SHIELD ONLY AT THE SLP OR UPAD.

SEC 1 SECURITY INTERFACE SYSTEM NO SCALE

OSD 1 OUTSIDE SENSING DEVICE MOUNTING AND WIRING DETAILS NO SCALE

## SINGLE LINE DIAGRAM

## GENERAL NOTE

1. SELECTION OF MATERIALS & INSTALLATION SHALL BE IN ACCORDANCE WITH NATIONAL AND LOCAL ELECTRICAL CODES.
2. REFER TO DOCUMENT "SIEMENS ENERGY METER INSTALLATION" FOR ADDITIONAL INFORMATION.

## LEGEND

EM- SIEMENS ENERGY METER
MDP- MAIN DISTRIBUTION PANEL
DCP- DIMMING CONTROL PANEL
SLP- SCREAM LOGIC PANEL

## KEYED NOTES

1. FOR ALL EXCEPT THE LAST METER (WHEN INSTALLING 2+ METERS) TIE SHIELDS TOGETHER USING DOLPHIN CRIMP. FOR THE LAST METER OR ONLY ONE METER - SHIELD AND DRAIN WIRE TO BE TAPED BACK TO PREVENT ACCIDENTAL GROUNDING.
2. ADDRESS FOR EACH ADDITIONAL METER SHALL BE INCREASED BY ONE.
   EXAMPLE: 1st METER = ADDRESS 32 DECIMAL OR 20 HEX
   2nd METER = ADDRESS 33 DECIMAL OR 21 HEX
   SIEMENS METER IS ADDRESSED IN HEX.
3. OBSERVE THE ORIENTATION OF THE CT (ARROW MUST FACE LOAD SIDE).
4. N/A
5. NEUTRAL CONNECTION REQUIRED.
6. PROVIDE TRANSITION FROM 600V TO PLENUM RATED CABLE WHEN:
   a) ELECTRICAL CONDUIT IS NOT REQUIRED FROM MDP TO SLP (APPLICABLE TO 24VDC AND RS485 CONDUCTORS IN A FREE AIR RUN).
   b) THE LENGTH OF THE ELECTRICAL CONDUIT FROM MDP TO SLP EXCEEDS LENGTH OF THE PROVIDED CABLE. (APPLICABLE ONLY TO CABLE CARRYING COMM. SIGNAL RS485)
7. REFER TO ELECTRICAL CODE FOR SELECTION OF ENCLOSURE AND LOCATION OF THE ENERGY METER.
8. DO NOT MOUNT ENERGY METER WITHIN 2" OF CURRENT CARRYING CONDUCTORS.

## CABLE SCHEDULE

| CABLE | DESCRIPTION | REFERENCE |
|---|---|---|
| 18/2 (600V) | 18 AWG 2 CONDUCTORS, SHIELDED, STRANDED, NON PLENUM, TYPE TC-600V | BELDEN 27325AS |
| 24 1P (PLENUM) | 24 AWG 1-TWISTED PAIR, SHIELDED, STRANDED, PLENUM RATED | BELDEN 82841 |
| 18/2 (PLENUM) | 18 AWG 2 CONDUCTORS, SHIELDED, STRANDED, PLENUM RATED | BELDEN 6300 FE |

EM 1 ENERGY METER INSTALLATION DETAILS NO SCALE

## KEYED NOTES

1. TERMINATE SHIELDS TO ONE OF NINE AVAILABLE GROUND SCREWS PER DEVICE WIRING DETAILS DRAWING.
2. IF MORE THAN ONE EMS-1 TYPE CIRCUIT IS REQUIRED, LABEL AS EMS-1A, EMS-1B, ETC. AS REQUIRED AND TERMINATE ON THE NEXT AVAILABLE INPUT. DOCUMENT EACH BREAKER NUMBER AND LOCATION (PANEL NAME & ROOM) IN THE COMMISSIONING FORM.
3. TERMINATE REMOTE OVERRIDE BUTTON DIRECTLY TO I/O MODULE PARALLEL WITH SLP OVERRIDE BUTTONS
   - INPUT 1 EMP
   - INPUT 2 SALES A/B
   - INPUT 3 SALES C/D
   - INPUT 4 EXTERIOR
4. REMOVED NOTE

## KEYED NOTES

1. MAXIMUM FLOOR TO TOP OF ANY PANEL 75". PANELS MAY BE LOWERED TO MEET EXISTING CONDITIONS.
2. EMT SIZES SHOWN FOR LOW VOLTAGE CABLE ONLY

M 3 CONTROL PANEL MOUNTING DETAIL NO SCALE

NOTES:
- ONLY APPLIES WHEN EMS IS LOCATED IN MEZZANINE AREA OR LOCATION NOT EASILY ACCESSABLE.
- INSTALL IN MANAGERS OFFICE.

OV 1 4-BUTTON OVERRIDE NO SCALE

RLY DZC RELAY ISOLATION BOARD TO DZC NO SCALE

DZC CO2 DZC TO CO2 SENSOR WIRING DETAILS NO SCALE

DZC S DZC TO SPACE TEMP SENSOR NO SCALE

DZC D DZC TO DUCT TEMP. SENSOR NO SCALE

## KEYED NOTES

1. IF LAST DZC, CUT SHIELD AND DRAIN WIRE AND TAPE BACK.

DZC RTU DZC TO ROOFTOP WIRING DETAIL NO SCALE

## KEYED NOTES

1. CUT BACK SHIELD AND DRAIN WIRE THEN HEAT SHRINK TO AVOID ACCIDENTAL SHORT TO GROUND
2. OPTIONAL GND FOR SHIELD DRAIN WIRE IF TERMINAL DOESN'T EXIST
4. DO NOT CUT SPARE CONDUCTOR, WRAP BACK AND TAPE (AT BOTH ENDS)
5. COLOR CODE TYPICAL OF AN 18/4 CABLE, COLOR CODE MAY VARY DEPENDING ON THE TYPE OF CABLE SELECTED
7. REFER TO SLP FIELD WIRING DRAWING FOR DETAILS

rH 1 RELATIVE HUMIDITY SENSOR NO SCALE

# EMS SPECIFICATIONS

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | |
|---|---|
| Area | SqFt |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: WP
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

SHEET: E-4



DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B1969CA5E

## (LCP) LIGHTING CONTROL PANEL - CONTACTOR SCHEDULE

| SPARE CONTACTOR 1 | | EMPLOYEE B CONTACTOR 2 | | EMPLOYEE A CONTACTOR 3 | | SALES A CONTACTOR 4 | | SALES B CONTACTOR 5 | | SALES C CONTACTOR 6 | | SALES D CONTACTOR 7 | | EXTERIOR CONTACTOR 8 | | OVERNIGHT CONTACTOR 9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL |
| | R2 | M | R2 | L | R2 | A | R2 | B | R2 | C | R2 | D | R2 | T | R2 | W | R2 |
| | R4 | P | R4 | N | R4 | E | R4 | F | R4 | G | R4 | H | R4 | | R4 | U | R4 |
| | R6 | R | R6 | O | R6 | I | R6 | J | R6 | K | R6 | | R6 | | R6 | | R6 |
| | R8 | | R8 | | R8 | V | R8 | | R8 | | R8 | | R8 | | R8 | | R8 |

OFFICES AND LOUNGE WIRING DIAGRAM

AUTOMATIC MODE OPERATION:

1. WHEN SENSOR ACTIVATES, BOTH LOADS TURN ON.

2. LOADS TURN OFF WHEN SENSOR TIMES OUT.

RECOMMENDED WIRE:
18-3 AWG STRANDED WIRE SHIELDED OR NON/SHIELDED

STORE LIGHTING:

CONTRACTOR TO LABEL BREAKERS WITH DESCRIPTION AND AMP DRAW PER CIRCUIT.

WIRING INSTRUCTIONS ARE AS FOLLOWS: CONTRACTOR TO WIRE EVERY OTHER FIXTURE AND EVERY OTHER ROW ON A SEPARATE CIRCUIT BREAKER ON SALES FLOOR AND STOCK ROOM. CIRCUIT BREAKERS ARE TO BE GROUPED BY CONTACTOR THE FOLLOWING WAY: EMPLOYEE CONTACTOR (CONTROLS ALL OFFICE, CASH, COUNT, BATHROOMS, RECEIVING AREA, AND STOCK ROOM. GROUP A 25% CONTACTOR (CONTROLS APPROXIMATELY THE NEXT 25% OF SALES FLOOR LIGHTS); GROUP B 50% CONTACTOR, (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING); GROUP C 75% CONTACTOR, (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING; GROUP D 100% CONTACTOR (CONTROLS THE BALANCE 25% OF SALES FLOOR LIGHTING); GROUP E CONTACTOR EXTERIOR SIGNS (CONTROLS ALL EXTERIOR BUILDING SIGNS INCLUDING PYLON SIGN). GROUP F CONTACTOR (CONTROLS ANY WALL PACK LIGHTING, PARKING LOT LIGHTING AND CANOPY LIGHTING NOT CONTROLLED BY LANDLORD).

2) DUAL RELAY SWITCHPACK RESTROOM LIGHTING / EXHAUST FAN WIRING DIAGRAM

# EMS LIGHTING CONTROL PANEL

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

SQUARE FOOTAGE

| Area | SqFt |
|---|---|
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: WP
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORES, LLC

SHEET: E-5



## LIGHTING TAKE OFF

| Count | Name |
|---|---|
| 21 | 2 LAMP - 4' STRIP |
| - | 2 LAMP - 4' EMERGENCY -SECURITY LT |
| 10 | 2 LAMP - EM- 2x2 TROFFER |
| 32 | 2 LAMP - 2x2 TROFFER |
| 36 | 4 LAMP - 8' EMERGENCY -SECURITY LT |
| 409 | 4 LAMP - 8' STRIP |
| 4 | REMOTE HEAD |
| 4 | EMERGENCY EXIT SIGN - REMOTE |
| 2 | EMERGENCY EXIT SIGN |
| | WALL PACKS |

GENERAL NOTE:
LIGHTING IS DESIGNED BASED OFF OF 277 VOLT CONNECTIONS TO LIGHTING FIXTURES IN ALL AREAS EXCEPT RESTROOMS. RESTROOM LIGHTING FIXTURES ARE TO HAVE 120V CONNECTIONS.

ELECTRICAL CONTRACTOR SHALL PROVIDE SHALLOW STRUT BETWEEN BAR JOIST THAT RUN THE SAME DIRECTION WITH THE LIGHTING

GENERAL NOTE:
ELECTRICAL CONTRACTOR TO COORDINATE LOCATION OF JUNCTION BOX FOR STORE SIGNS WITH SIGN VENDOR PRIOR TO ROUGH-IN

E.C. SHALL INTERCEPT EXISTING EXTERIOR WALLPACK LIGHTING OVER BIG LOTS SPACE IF APPLICABLE AND ROUTE THROUGH LCP CONTACTOR 8 CIRCUIT 'W'

E.C. SHALL INTERCEPT EXISTING EXTERIOR WALLPACK LIGHTING OVER BIG LOTS SPACE IF APPLICABLE AND ROUTE THROUGH LCP CONTACTOR 8 CIRCUIT 'U'

ALL LIGHTING TO BE MINIMUM #10 AWG COPPER WIRE.

ALL LIGHTING IS TO BE ORDERED THROUGH CITY LIGHTING. NO ALTERNATE LIGHTING FIXTURES.

ELECTRICAL CONTRACTOR TO READ EVERY GENERAL AND CODED NOTE BEFORE STARTING CONSTRUCTION. CONTACT ROB HILLIS WITH ANY QUESTIONS.

## LIGHTING NOTES

1. ALL LIGHT FIXTURES IN THE STOCK AND STORAGE AREA ARE TO BE HUNG AT 14'AFF.

2. ALL LIGHT FIXTURES IN THE SALES FLOOR TO HUNG FROM THE BOTTOM OF THE CEILING GRID WHEN APPLICABLE. BY THE CLPE PROVIDED, OR AT 14' AFF IF AN EXPOSED DECK.

3. ALL PERIMETER LIGHTING FIXTURES ON THE SALES FLOOR TO BE MOUNTED BETWEEN 4' TO 6' FROM ANY WALL, AND 10' ON CENTER WHERE APPLICABLE. ROWS SHOULD RUN LEFT TO RIGHT FROM STORE FRONT.

4. ALL THE LIGHT FIXTURES IN THE STOCK OR STORAGE AREAS TO BE MOUNTED AT 12'-0' ON CENTER.

5. ANY LIGHTING FIXTURES THAT ARE INSTALLED AT 10' OR BELOW MUST HAVE PROTECTIVE CAGES.

6. SALES FLOOR, STOCK ROOM, AND MEZZANINE (IF APPLICABLE) EMERGENCY LIGHTING TO HAVE A DEDICATED CIRCUIT FROM THE PANEL TO THE LIGHT FIXTURE. EMERGENCY FIXTURE WILL TURN ON ONE BULB IF CONSTANT POWER IS LOST. THE LIGHT FIXTURE SHOULD BE WIRED AS A NIGHT LIGHT IN THESE AREAS. THE EMERGENCY

7. LIGHT SHOULD NOT BE RUN THROUGH LIGHTING CONTACTOR. ONLY REGULAR LIGHTING IN THESE AREAS TO RUN THROUGH LIGHTING CONTACTOR.

7. RESTROOM LIGHTING TO HAVE A DEDICATED 120V CIRCUIT. EMERGENCY LIGHT MUST ACT AS A NIGHT LIGHT. LIGHT FIXTURES IN THE RESTROOM THAT AREN'T EMERGENCY FIXTURES SHOULD BE RUN THROUGH THE LIGHTING CONTROL PANEL.  SEE DETAIL 1 ON SHEET E-5 FOR WIRING CONFIGURATION.

8. OFFICES AND LOUNGE - EMERGENCY LIGHTING FIXTURES TO HAVE CONSTANT HOT AND SWITCHED HOT. THE LIGHTS IN THESE ROOMS SHOULD RUN THROUGH LIGHTING CONTROL PANEL AND THEN TO SWITCH.  THESE ROOMS WILL HAVE A CONSTANT HOT AND AND A SWITCHED HOT FROM THE SAME CIRCUIT.  REFER TO DETAIL 2 ON SHEET E-5 FOR WIRING CONFIGURATION.

9. ALL CHANGES TO BE APPROVED BY A BIG LOTS, INC. REPRESENTATIVE.

10. ALL WORK TO BE DONE IN A WORKMAN LIKE MANOR, WITH A ONE YEAR WARRANTY ON THE LABOR AND MATERIAL OF INSTALLATION.

11. ALL LOCATIONS TO BE FIELD VERIFIED.

NOTE:
ALL FIXTURES NOTED WITH CONTROL DESIGNATIONS 'X', 'Y', 'Z', & 'Z1' OR FOR SALES 'X' AND 'Z' FOR 277V EMAIL, 'Z1' IS UNSWITCHED LEG OF 'R' FOR 120V EMAIL IN RESTROOMS) SHOULD NOT BE RUN THROUGH THE 'LCP' CONTROL PANEL.

Labels on plan: LANDLORD ROOM N.I.C., ELECTRICAL, EXTERIOR, STOCKROOM, SALES, RECEIVING, LOADING AREA, MANAGER, CASH, MEN, WOMEN, LOUNGE, VESTIBULE, ADJACENT TENANT, ADJACENT TENANT "DUNHAM'S SPORTS", ADJACENT TENANT "GUNHAM'S SPORTS", EXTERIOR

## GENERAL NOTES:

- SHARED NEUTRALS ARE NOT PERMITTED.

- ELECTRICAL CONTRACTOR SHALL PROVIDE #8 WIRE TO THE FIRST FIXTURE FOR ALL LIGHTING CIRCUITS AND THEN #10 WIRE (MINIMUM) FOR ALL ADDITIONAL FIXTURES IN THE ROW. ALL HOME RUNS SHALL BE IN MINIMUM 3/4" CONDUIT. FLEX WHIPS SHALL BE NO LONGER THAN 6 FEET.

- ELECTRICAL CONTRACTOR TO COORDINATE LOCATION OF JUNCTION BOX FOR STORE SIGNS WITH SIGN VENDOR PRIOR TO ROUGH-IN.

- ELECTRICAL CONTRACTOR SHALL CONFIRM PARKING LOT LIGHTS ARE ON LANDLORDS HOUSE PANEL. IF THIS IS NOT THE CASE NOTIFY ROB HILLIS AT BIG LOTS IMMEDIATELY (614-278-6735).

- ELECTRICAL CONTRACTOR SHALL REMOVE ALL UNUSED ELECTRICAL EQUIPMENT, DEVICES, BOXES, WIRE AND CONDUIT BACK TO ITS SOURCE. DO NOT ABANDON UNUSED EQUIPMENT IN PLACE.

- CONTRACTOR SHALL NOT DEVIATE FROM PLANS. CIRCUITS TO BE RUN AS SHOWN.

- PER EXHIBIT "C" ALL EXTERIOR LIGHTING SHALL BE OPERATIONAL AND WORKING INCLUDING POLE LIGHTS, ENTRANCE/EXIT LIGHTING, BUILDING LIGHTS, ETC. PARKING LOT LIGHTING AS IS. ALL EXTERIOR LIGHTING TO BE ON A SEPARATELY METERED HOUSE PANEL IN THE LANDLORD'S NAME. CANOPY LIGHTING AND WALL PACKS SERVICING TENANT'S ELECTRICAL SERVICE.

- ELECTRICAL CONTRACTOR SHALL CHECK AND VERIFY CONDITION OF ALL EXTERIOR LIGHTING AT THE BEGINNING OF THE PROJECT. NOTIFY BIG LOTS IF ANY EXTERIOR LIGHTS ARE DAMAGED OR NOT WORKING PROPERLY. ALL EXTERIOR LIGHTING SHALL BE OPERATIONAL AND WORKING INCLUDING PARKING LOT LIGHTING POLE LIGHTS, ENTRANCE/EXIT LIGHTING, BUILDING LIGHTS, ETC.

- ELECTRICAL CONTRACTOR TO CONTACT ROB HILLIS (614-278-6735) PRIOR TO INSTALLING LIGHTING FIXTURES AND CIRCUITS.

- FOR SPACES WITH LOW CEILINGS UNDER A MEZZANINE OR ABOVE A MEZZANINE WHERE NEW LIGHTING IS BEING INSTALLED, ELECTRICAL CONTRACTOR IS TO INSTALL LIGHTING IN BETWEEN BAR JOIST AND PROVIDE ANY STRUT REQUIRED TO INSTALL THE LIGHTING.

## (LCP) LIGHTING CONTROL PANEL - CONTACTOR SCHEDULE

| SPARE CONTACTOR 1 | | EMPLOYEE B CONTACTOR 2 | | EMPLOYEE A CONTACTOR 3 | | SALES A CONTACTOR 4 | | SALES B CONTACTOR 5 | | SALES C CONTACTOR 6 | | SALES D CONTACTOR 7 | | EXTERIOR CONTACTOR 8 | | OVERNIGHT CONTACTOR 9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL | CIRCUIT | TERMINAL |
| | R2 | M | R2 | L | R2 | A | R2 | F | R2 | C | R2 | D | R2 | T | R2 | W | R2 |
| | R4 | P | R4 | N | R4 | E | R4 | J | R4 | G | R4 | B | R4 | V | R4 | U | R4 |
| | R6 | | R6 | O | R6 | I | R6 | | R6 | H | R6 | | R6 | | R6 | | R6 |
| | R8 | | R8 | | R8 | V | R8 | | R8 | K | R8 | | R8 | | R8 | | R8 |

## LIGHTING LEGEND

(legend with symbols)

- REMOTE EMERGENCY LIGHTING HEAD -COOPER LIGHTING - SURE LITES, PART# APMR2

- EMERGENCY EXIT SIGN -COOPER LIGHTING - SURE LITES, PART# APX7R

- EMERGENCY EXIT SIGN - REMOTE CAPABLE -COOPER LIGHTING - SURE LITES, PART# APCH7R

- CANOPY LIGHT -COOPER LIGHTING - HALO, PART# HC615D010, HC1020DL 616EH

- NEW 2 LAMP 4FT STRIP -COOPER)L#45LES-2-TS-1P-B840-U -PHILIPS LAMP PART# TII-5-MAG/48-840/WF16/P

- NEW 4 LAMP 8FT STRIP -COOPER)L#47LES-2-TS-1P-B840-U -PHILIPS LAMP PART# TII-5-MAG/48-840/WF16/P

- NEW 4 LAMP 8FT EMERGENCY STRIP -COOPER)L#47LES-2-EL-12-T8-1P-B840-U -PHILIPS LAMP PART# TII-5-MAG/48-840/WF16/P SEE LIGHTING NOTES 6, 7, AND 8 FOR WIRING INSTRUCTIONS

- NEW 2 LAMP 2X2 EMERGENCY TROFFER -COOPER)L#22EF2E-LED-EL-12-T8-1P-B840-U SEE LIGHTING NOTES 6, 7, AND 8 FOR WIRING INSTRUCTIONS

- NEW 2X2 LED FLAT PANEL #22FP32HXC (30W)

- NEW 2X2 LED FLAT PANEL W/EMERGENCY BALLAST #22FP32HXC-W/EBPLED7W (30W) SEE LIGHTING NOTES 6, 7, AND 8 FOR WIRING INSTRUCTIONS

- NEW 2X2 LED FLAT PANEL W/EMERGENCY BALLAST #22FP32HXC-W/EBPLED7W (30W) SEE LIGHTING NOTES 6, 7, AND 8 FOR WIRING INSTRUCTIONS

- MOTION ACTIVATED SWITCH LEVITON PART# ODS10-IDW (SEE NOTE #15 SHEET E-2)

- LOW VOLTAGE CEILING SENSOR PART# OAC0T1000 WITH COOPER #DPDS1004/IDG-DUAL RELAY SWITCH PACK (SEE NOTE #35 SHEET E-2)

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORE
5601 USH 10
STEVENS POINT, WI 54482

DATE DRAWN: 12/12/2022
DRAWN BY: WP
SCALE: 3/32" = 1'-0"

| | SQUARE FOOTAGE | |
|---|---|---|
| Area | SqFt | |
| SALES FLOOR | 28,810 | |
| TOTAL BUILDING | 42,128 | |

SHEET: E-6

LIGHTING PLAN

DocuSign Envelope ID: 21EE9E42-3ADD-4D9A-8D42-988B1966CA8E

LANDLORD TO ENSURE ALL ELECTRICAL
DISTRIBUTION EQUIPMENT HAS
GROUNDING WIRES AS REQUIRED AND AS
INDICATED ON THIS SHEET.  MAKE ALL
MODIFICATIONS IN FIELD AS REQUIRED TO
PROVIDE GROUND WIRES TO EQUIPMENT
THAT IS CURRENTLY UNGROUNDED.

LANDLORD TO DETERMINE AVAILABLE
FAULT CURRENT AT SECONDARY OF
UTILITY TRANSFORMER AND ENSURE MDP
AND PANELBOARDS ARE RATED
APPROPRIATELY FOR AVAILABLE FAULT
CURRENT AT EACH.

LEGEND

——————— NEW

– – – – – – EXISTING



E.C. SHALL REPAIR/ REPLACE COVERS, BREAKERS,
ETC. AS NEEDED TO MAKE REMAINING EQUIPMENT IN
GOOD WORKING ORDER. CONTACT ROB HILLIS WITH
ANY SCOPE QUESTIONS PRIOR TO BEGINNING WORK.

SEE SHEET ED-1 FOR
PANELS TO BE REMOVED.

LANDLORD TO CONFIRM ONE
LINE IS CORRECT. CONFIRM
WIRE AND CONDUIT SIZES.

**BIG LOTS STORE**
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | | |
|---|---|---|
| | Area | SqFt |
| SALES FLOOR | | 28,910 |
| TOTAL BUILDING | | 42,128 |

| DATE DRAWN: | 12/12/2022 |
|---|---|
| DRAWN BY: | WP |
| SCALE: | 3/32" = 1'-0" |

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

**POWER RISER DIAGRAM**

SHEET:

**E-7**

DocuSign Envelope ID: 21EE9EA2-3ADD-4D9A-8DA2-586B1988CA9E

# LANDLORD ELECTRICAL ENGINEER TO PROVIDE PANEL SCHEDULES ON THIS SHEET

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | | |
|---|---|---|
| Area | SqFt | |
| SALES FLOOR | 28,810 | |
| TOTAL BUILDING | 42,128 | |

| DATE DRAWN: | 12/12/2022 |
|---|---|
| DRAWN BY: | WP |
| SCALE: | 3/32" = 1'-0" |

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

PANEL SCHEDULES

SHEET:
E-8

NOTE TO MECHANICAL CONTRACTOR:

- ALL NEW ROOF TOP UNITS AND FACTORY CURBS TO BE SUPPLIED BY LANDLORD.

- ALL REPLACEMENT ROOF TOP UNITS TO BE SUPPLIED BY LANDLORD. ALL RELATED CURB ADAPTORS TO BE SUPPLIED BY MECHANICAL CONTRACTOR.

- CONTRACTOR TO TEST HVAC IN HEATING AND COOLING MODE BEFORE TURNING SPACE OVER TO BIG LOTS. PROVIDE HVAC UNIT START UP REPORT.

- MECHANICAL CONTRACTOR TO SEE SHEETS E-3 AND E-4 FOR ADDITIONAL EMS WORK TO BE COMPLETED.

- ALL CONTRACTORS ARE TO ENGAGE WITH LANDLORDS ROOFING CONTRACTOR FOR ALL ROOF PENETRATIONS, REPAIRS, ETC..

- MECHANICAL CONTRACTOR TO PROVIDE AIR BALANCE REPORT BY CERTIFIED COMPANY.

- MECHANICAL CONTRACTOR AND FIRE ALARM CONTRACTOR TO COMPLETE SMOKE TEST OF ALL RTU UNITS PRIOR TO LIFE SAFETY.

- MECHANICAL CONTRACTOR TO INSTALL NEW MERV-8 FILTER ON ALL NEW RTU'S WHEN UNITS ARE SET. MECHANICAL CONTRACTOR TO INSTALL NEW MERV-8 FILTERS ON EXISTING UNITS AT THE BEGINNING OF THE PROJECT. REPLACE WITH NEW FILTERS PRIOR TO TURNOVER TO BIG LOTS FOR ALL UNITS.

- MECHANICAL CONTRACTOR TO ORDER AES DROP BOXES OR EP CUSTOM PRODUCTS FOR CONCENTRIC DIFFUSERS ONE WEEK PRIOR TO CONSTRUCTION START DATE. MECHANICAL CONTRACTOR TO CONTACT AES FOR DROP BOX QUOTES. 800-786-0402. CONTACT EP CUSTOM PRODUCTS FOR CONCENTRIC DIFFUSER QUOTES 716-864-4069.

- CONTRACTOR TO CONTACT GAS UTILITY COMPANY AT THE BEGINNING OF THE PROJECT TO VERIFY EXISTING AVAILABLE GAS PRESSURE MATCHES DESIGN. NO GAS PIPING SHALL BE ORDERED OR INSTALLED UNTIL THE MECHANICAL CONTRACTOR CONFIRMS WITH THE UTILITY GAS COMPANY THE PRESSURE THAT WILL BE DELIVERED TO THE SITE. CONTRACTOR TO PROVIDE GAS METER NUMBER TO BIG LOTS.

- ALL OTHER HVAC EQUIPMENT TO BE VERIFIED AS EXISTING AND TO BE PUT INTO GOOD WORKING CONDITION. THIS MAY BE A REQUIREMENT OF THE LEASE AS A LANDLORD RESPONSIBILITY.

- MECHANICAL CONTRACTOR IS RESPONSIBLE FOR THE FINAL T&B AND WILL PROVIDE ANY DRIVES OR BELTS TO MEET THE ACTUAL CONDITIONS.

- MECHANICAL CONTRACTOR IS RESPONSIBLE TO INSTALL GASKET ON TOP OF THE NEW CURB BEFORE SETTING RTU UNIT.

- MECHANICAL CONTRACTOR TO SET HIGH LIMIT SHUT OFF FOR ECONOMIZER TO 65°F AND BALANCE MINIMUM OUTSIDE AIR DAMPER TO VALUE IN RTU SCHEDULE ON M-2.

- MECHANICAL CONTRACTOR TO REMOVE ALL EXISTING HVAC CONTROLS NOT COMPATIBLE WITH SIEMENS CONTROLS, INCLUDING BUT NOT LIMITED TO NOVAR CONTROLS. REFER TO E-3, E-4, AND M-1 FOR NEW SIEMENS CONTROLS SCOPE OF WORK. SIEMENS DZC CONTROLLERS ARE WIRED AS CONVENTIONAL THERMOSTAT CONTROL.

- PROVIDE AIR BALANCE REPORT AND START UP REPORT TO BIG LOTS BY END DATE ON PROJECT. MECHANICAL CONTRACTOR IS TO HAVE ECONOMIZER PROGRAMMED PER DRAWINGS BEFORE CONSTRUCTION END DATE.

MECHANICAL CONTRACTOR TO READ EVERY GENERAL AND CODED NOTE BEFORE STARTING CONSTRUCTION.

MECHANICAL CONTRACTOR IS TO CONTACT THE LOCAL RHEEM REP. TO BE PRESENT AND OVERSEE THE MECHANICAL CONTRACTOR PERFORMING THE HVAC COMMISSIONING STARTUP OF EACH PIECE OF EQUIPMENT.

## CODED NOTES

1. MECHANICAL CONTRACTOR TO PROVIDE RTU ID TAG AT BOTTOM OF DROP BOX DIFFUSER.

2. NEW ROOF TOP UNIT AND CURB. FURNISHED BY LANDLORD AND INSTALLED BY MECHANICAL CONTRACTOR. PROVIDE ALL NECESSARY ROOF OPENINGS FOR NEW UNIT. COORDINATE SIZE AND LOCATION IN FIELD.

3. NEW 4 - WAY DROP BOX WITH DRUM DIFFUSER FURNISHED AND INSTALLED BY MECHANICAL CONTRACTOR. BOTTOM OF BOX DIFFUSERS TO BE 6' ABOVE LIGHT FIXTURE. MAKE CONNECTIONS FROM DUCT TO DIFFUSER WITH METAL DUCT. ADJUST AIR PATTERN FOR EVEN THROW. DROP BOX TO BE PURCHASED THROUGH AES. DROP BOX TO BE PURCHASED THROUGH AES, DROP BOX QUOTES (800)-786-0402.

4. NEW 3 - WAY DROP BOX WITH DRUM DIFFUSER AND OBD DAMPERS FURNISHED AND INSTALLED BY MECHANICAL CONTRACTOR. MAKE CONNECTIONS FROM DUCT TO DIFFUSER WITH METAL DUCT. ADJUST AIR PATTERN FOR EVEN THROW. SEE SHEET M-2 FOR MOUNTING INFORMATION. DROP BOX TO BE PURCHASED THROUGH AES. DROP BOX TO BE PURCHASED THROUGH AES, DROP BOX QUOTES (800)-786-0402.

5. EXTEND RETURN AIR DUCT AND PROVIDE BALANCING DAMPER. BALANCE RETURN AIR TO CFM SHOWN ON PLAN.

6. MECHANICAL CONTRACTOR TO TEST UNIT IN HEATING AND COOLING. PROVIDE BIG LOTS WITH TEST REPORT.

7. NEW RTU LOCATION CAN BE ADJUSTED TO BEST UTILIZE THE BUILDING STRUCTURE. ANY ADJUSTMENT MUST BE REVIEWED AND APPROVED BY A BIG LOTS REPRESENTATIVE.

8. AIR DEVICES IN CASH COUNT OFFICES MUST BE CEILING SURFACE STRUCTURE TO PREVENT REMOVAL.

9. MECHANICAL CONTRACTOR TO PROVIDE NEW BALANCING DAMPER.

10. MECHANICAL CONTRACTOR TO INSTALL NEW MERV-8 FILTER ON ALL NEW RTU'S AT THE BEGINNING OF PROJECT. REPLACE WITH NEW FILTERS PRIOR TO TURNOVER TO BIG LOTS.

11. NEW EXHAUST FAN SHALL BE USED FOR RESTROOM EXHAUST. SEE FAN SCHEDULE ON SHEET M-2 FOR FAN CONTROL INFORMATION. PROVIDE 14"X14" EXHAUST DUCT UP TO FAN UP THRU ROOF. PROVIDE NEW CURB. NEW FAN PROVIDED BY MECHANICAL CONTRACTOR.

12. MECHANICAL CONTRACTOR TO PROVIDE FULL SIZE RETURN AIR OPENING. KEEP OPENING AS TIGHT TO STEEL AS POSSIBLE. MECHANICAL CONTRACTOR TO PROVIDE ALL ROOF AND DUCT MODIFICATIONS AS NEEDED. PROVIDE ½" SCREEN OVER OPENING. SEE DETAIL ON M-2.

13. TRANSFER / R.A. GRILLES: MECHANICAL CONTRACTOR SHALL PROVIDE AND INSTALL TRANSFER / R.A. GRILLES AS INDICATED ON DRAWINGS. GRILLES SHALL BE OF ADEQUATE SIZE PER DELIVERED CFM FOR SPACE.

14. CONDENSATE TO BE ROUTED TO SPLASH BLOCK.

15. NEW DUCTWORK SIZED TO BE RECTANGULAR, ROUND SPIRAL DUCT MAY BE USED IF DESIGNED FOR EQUAL PRESSURE LOSS. PROVIDED BY MECHANICAL CONTRACTOR.

16. MECHANICAL CONTRACTOR TO PROVIDE ALL DUCTWORK WITH INTERNAL INSULATION.

17. NEW 3 - WAY DROP BOX WITH DRUM DIFFUSER FURNISHED AND INSTALLED BY MECHANICAL CONTRACTOR. BOTTOM OF BOX DIFFUSERS TO BE 6' ABOVE LIGHT FIXTURE. MAKE CONNECTIONS FROM DUCT TO DIFFUSER WITH METAL DUCT. ADJUST AIR PATTERN FOR EVEN THROW. DROP BOX TO BE PURCHASED THROUGH AES. DROP BOX TO BE PURCHASED THROUGH AES, DROP BOX QUOTES (800)-786-0402.

18. NEW SUPPLY DUCT SENSOR INSTALLED TO EMS SYSTEM.

19. NEW DZC TEMPERATURE SENSOR TO BE MOUNTED AT 66" A.F.F. SEE SHEET E-4 FOR MORE INFORMATION.

20. CONTRACTOR TO PROVIDE AND INSTALL TEST KEY SWITCH FOR DUCT DETECTOR.

21. HUMIDITY SENSOR MOUNT AT 72" A.F.F.

22. $CO_2$ SENSOR MOUNT AT 72" A.F.F.

23. NEW RTU UNIT WITH DUCT SMOKE DETECTOR IN RETURN AIR. CONFIRM WITH AUTHORITY HAVING JURISDICTION IF REQUIRED IN SUPPLY AIR. IF NEEDED MECHANICAL CONTRACTOR TO PROVIDE DUCT DETECTOR FOR SUPPLY AIR. MECHANICAL CONTRACTOR TO REUSE SMOKE DETECTOR IF EXISTING RTU SUPPLIED BY LANDLORD IS NOT PROVIDED WITH DETECTOR.

24. PROVIDE NEW SUPPLY DIFFUSERS, EXHAUST GRILLES AND RETURN GRILLES AS SHOWN ON PLAN. SIZE PER CFM SHOWN.

25. SMOKE DETECTOR TO BE CONNECTED TO FIRE ALARM SYSTEM.

26. EXTEND AND CONNECT NEW MEDIUM PRESSURE 2 PSI GAS PIPING INTO EXISTING NATURAL GAS SERVICE WITH EXISTING METER. VERIFY EXACT LOCATION IN FIELD.

27. CONTRACTOR TO SUPPLY AND INSTALL BLACK POLYCARBONATE CONSTRUCTED PILLOW BLOCK PIPE SUPPORTS. UNITS TO BE MIRO #24R OR SIMILAR. PROVIDE SUPPORTS FOR GAS PIPING EVERY 10'-0" O.C AND AT ALL CHANGES IN DIRECTION. INCREASE IN HEIGHT AS REQUIRED FOR ROUTING ABOVE ANY ROOF MOUNTED ACCESSORIES SUCH AS EXPANSION JOINTS. GAS LINES ABOVE ROOF TO BE PAINTED YELLOW. USE METAL PRIMER AND TOP COAT PAINT.

28. CONTRACTOR TO PROVIDE GAS PRESSURE REGULATOR, UNION, SHUT OFF VALVE AND DIRT LEG AND MAKE FINAL CONNECTION AT ROOFTOP UNIT.

29. THE INSTALLING CONTRACTOR IS RESPONSIBLE FOR THE FINAL TEST & BALANCE AND IS RESPONSIBLE TO PROVIDE ANY DRIVES OR BELTS TO MEET THE ACTUAL CONDITIONS. MECHANICAL CONTRACTOR IS TO PROGRAM ECONOMIZER PER DRAWINGS BEFORE COMPLETION OF THE ECONOMIZER. WORK TO BE COMPLETED BY CONSTRUCTION END DATE.

30. DASHED LINE IS FOR UNIT CLEARANCES (TYPICAL).

31. ALL DUCT MOUNTED SMOKE DETECTORS ARE TO BE CONNECTED TO FIRE ALARM SYSTEM. TO BE COORDINATED WITH GC PRIOR TO BID. MECHANICAL CONTRACTOR IS TO ENSURE SMOKE DETECTOR IS CONNECTED TO FIRE ALARM SYSTEM. MECHANICAL CONTRACTOR SHALL CARRY THE COST OF ROOFTOP UNITS SMOKE DETECTORS TO BE WIRED AND CONNECTED TO THE FIRE ALARM SYSTEM BY THE FIRE ALARM CONTRACTOR.

32. GAS LINES TO BE PAINTED YELLOW. USE METAL PRIMER AND TOP COAT PAINT.

33. NEW UNIT HEATER FURNISHED AND INSTALLED BY MECHANICAL CONTRACTOR. SEE M-2 EQUIPMENT SCHEDULE. ROUTE 4" TYPE "B" VENT UP THRU ROOF. TERMINATE WITH ROOF CAP. STORM COLLAR AND FLASHING. SEAL WATER TIGHT. THERMOSTAT TO BE SET TO 55 DEGREES.

34. NEW ROOF TOP UNIT FURNISHED BY LANDLORD. NEW CURB ADAPTOR TO BE SUPPLIED BY GC. CONTRACTOR TO REMOVE EXISTING CURB ADAPTOR DOWN TO ORIGINAL CURB. ENSURE CURB ADAPTOR RAISES RTU AT LEAST 18" ABOVE ROOF TO ACCOMMODATE SNOW BUILDUP.

## HVAC LEGEND

| Symbol | Description |
|---|---|
| | DROPPER DESIGNATION |
| | THERMOSTAT |
| | DIGITAL ZONE CONTROL |
| | RELATIVE HUMIDITY SENSOR |
| | NEW DUCTWORK BY HVAC CONTRACTOR |
| | NEW DROP BOX |
| | GAS REGULATOR |
| | DUCT DETECTOR TEST KEY |
| | SUPPLY AIR |
| | SUPPLY AIR |
| | RETURN AIR |
| | DUCT SMOKE DETECTOR |
| | REMOTE TEST STATION |
| | GAS UNIT HEATER |
| | FLEXIBLE CONNECTION |
| | TRANSFER GRILLE |
| | SIDEWALL REGISTER |

LANDLORD TO PREPARE AND PROVIDE MECHANICAL HVAC PLAN FOR BIG LOTS REVIEW AND APPROVAL

RECEIVING

STOCKROOM

SALES

MANAGER

CASH

VESTIBULE

MEN

WOMEN

LOUNGE

## MECHANICAL PLAN

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 EAST DUBLIN-GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORES
5601 US-51
STEVENS POINT, WI 54482

| DATE DRAWN | 12/12/2022 |
| DRAWN BY | ML |
| SCALE | 3/32" = 1'-0" |

SHEET:
M-1

# DIVISION 15 - MECHANICAL
## BASIC MECHANICAL REQUIREMENTS

A. NOTE
1. DRAWINGS AND GENERAL PROVISIONS OF CONTRACT, INCLUDING GENERAL AND SUPPLEMENTARY CONDITIONS AND ALL OTHER SPECIFICATION SECTIONS, APPLY TO THIS AND THE OTHER SECTIONS OF DIVISION 15.
2. THE CONTRACTOR FOR THIS DIVISION OF WORK IS REQUIRED TO READ THE SPECIFICATIONS AND REVIEW DRAWINGS FOR ALL DIVISIONS OF WORK AND IS RESPONSIBLE FOR THE COORDINATION OF THEIR WORK AND THE WORK OF THEIR SUBCONTRACTORS WITH ALL DIVISIONS OF WORK. IT IS THIS CONTRACTOR'S RESPONSIBILITY TO PROVIDE THEIR SUBCONTRACTORS WITH A COMPLETE SET OF BID DOCUMENTS.
3. THIS CONTRACTOR IS RESPONSIBLE FOR SCHEDULING THE COMPLETION AND INSPECTION OF THEIR WORK AND THE WORK OF THEIR SUBCONTRACTORS TO COMPLY WITH THE SCHEDULE AND THE PROJECT COMPLETION DATE.
4. THIS CONTRACTOR SHALL VISIT THE SITE PRIOR TO SUBMITTAL OF BID TO DETERMINE CONDITIONS AFFECTING THE WORK. ANY ITEMS WHICH ARE NOT COVERED IN THE BID DOCUMENTS OR ANY PROPOSED SUBSTITUTIONS SHALL BE LISTED SEPARATELY AND QUALIFIED IN THE CONTRACTORS BID. SUBMITTAL OF BID SHALL SERVE AS EVIDENCE OF KNOWLEDGE OF EXISTING CONDITIONS AND ANY MODIFICATIONS WHICH ARE REQUIRED TO MEET THE INTENT OF THE DRAWINGS AND SPECIFICATIONS. FAILURE TO VISIT THE SITE DOES NOT RELIEVE THE CONTRACTOR OF RESPONSIBILITY IN PERFORMANCE OF WORK.
5. REFER TO RESPONSIBILITY SCHEDULE ON THE MECHANICAL DRAWINGS FOR INFORMATION IN REGARD TO RESPONSIBILITY OF WORK OR ITEMS WHICH MAY AFFECT BID.

B. GENERAL REQUIREMENTS
1. THIS CONTRACTOR SHALL PROVIDE ALL LABOR, MATERIALS, EQUIPMENT, SERVICES, TOOLS, TRANSPORTATION, INCIDENTALS AND DETAILS NECESSARY TO PROVIDE A COMPLETE MECHANICAL SYSTEM AS SHOWN ON THE DRAWINGS, CALLED FOR IN THE SPECIFICATIONS, AND AS REQUIRED BY JOB CONDITIONS. ALL WORK NOT SPECIFICALLY NOTED AS BEING BY THE LANDLORD OR BIG LOTS SHALL BE PROVIDED BY THE MECHANICAL CONTRACTOR. CLOSELY COORDINATE THE ENTIRE INSTALLATION WITH THE LANDLORD AND THE G.C. CONSTRUCTION MANAGER, AS REQUIRED.
2. THE DRAWINGS AND SPECIFICATIONS ARE INTENDED TO SUPPLEMENT EACH OTHER AND ANY MATERIAL OR LABOR CALLED FOR IN ONE SHALL BE FURNISHED AND INSTALLED EVEN THOUGH NOT SPECIFICALLY MENTIONED IN BOTH. ANY MATERIAL OR LABOR WHICH IS NEITHER SHOWN ON THE DRAWINGS NOR CALLED FOR IN THE SPECIFICATIONS, BUT WHICH IS OBVIOUSLY NECESSARY TO COMPLETE THE WORK, AND WHICH IS USUALLY INCLUDED IN WORK OF SIMILAR CHARACTER, SHALL BE FURNISHED AND INSTALLED AS PART OF CONTRACT.
3. WHERE THE DRAWINGS OR SPECIFICATIONS CALL FOR ITEMS WHICH EXCEED CODES OR THE LANDLORD'S TENANT CRITERIA, THE CONTRACTOR IS RESPONSIBLE FOR FURNISHING AND INSTALLING THE SYSTEM WITH THE MORE STRINGENT REQUIREMENTS AS DESIGNED AND DESCRIBED ON THESE DRAWINGS, UNLESS SPECIFICALLY NOTED OTHERWISE.
4. ALL MECHANICAL WORK SHALL BE INSTALLED SO AS TO BE READILY ACCESSIBLE FOR OPERATING, SERVICING, MAINTAINING, AND REPAIRING. THIS CONTRACTOR IS RESPONSIBLE FOR PROVIDING SUFFICIENT SERVICE ACCESS TO ALL EQUIPMENT.
5. ALL WORK SHALL BE PERFORMED IN A NEAT PROFESSIONAL MANNER USING GOOD ENGINEERING AND CONSTRUCTION PRACTICES.
6. UNLESS SPECIFICALLY NOTED OTHERWISE, MATERIALS, PRODUCTS, AND EQUIPMENT, INCLUDING ALL COMPONENTS THEREOF, SHALL BE NEW, UNDERWRITERS LABORATORIES LISTED AND LABELED AND SIZED IN CONFORMITY WITH REQUIREMENTS OF STATE AND LOCAL CODES, WHICHEVER IS MORE STRINGENT.
7. ALL OF THE EXISTING EQUIPMENT IS TO BE CLEANED, AND SURVEYED FOR OPERATION AND A COPY OF THIS SURVEY SHALL BE SENT TO BIG LOTS TEN DAYS BEFORE THE FINAL INSPECTION. ANY REPAIRS THAT NEED TO BE MADE NEED TO BE QUOTED AND SENT WITH THE SURVEY ALL OF THE REPAIRS WILL BE MADE UNDER A CHANGE ORDER.
8. THE HVAC CONTRACTOR WILL BE RESPONSIBLE TO CHANGE ALL AIR FILTERS AND CLEAN ALL OF THE CONDENSER COILS, EVAPORATOR COILS, AND RETURN AIR CHAMBERS OF THE EQUIPMENT TEN DAYS BEFORE THE SOFT OPENING OF THIS STORE. THIS DATE WILL BE SPECIFIED IN THE LETTER OF AGREEMENT ATTACHED TO THE CONTRACT DOCUMENT.
9. ALL OF THE WORK MUST BE COMPLETED TEN DAYS BEFORE THE SOFT OPENING OF THIS STORE. INCLUDING ALL FINAL INSPECTIONS, LIFE SAFETY, AND FIRE MARSHALL VISIT.

C. CODES
1. ALL WORK SHALL CONFORM TO THE LANDLORDS' CRITERIA, THE STATE'S, COUNTY'S, CITY'S AND LOCAL CODES AND ORDINANCES, SAFETY AND HEALTH CODES, NFPA CODES, ENERGY CODES AND ALL OTHER APPLICABLE CODES AND REQUIREMENTS. THIS CONTRACTOR SHALL INQUIRE INTO AND COMPLY WITH ALL APPLICABLE CODES, ORDINANCES, AND REGULATIONS. THIS CONTRACTOR SHALL INCLUDE ANY CHANGES REQUIRED BY CODES IN THE BID AND IF THESE CHANGES ARE NOT INCLUDED IN THE BID, THEY MUST BE QUALIFIED AS A SEPARATE LINE ITEM IN THE BID AFTER CONTRACT IS ISSUED, NO ADDITIONAL COST DUE TO CODE ISSUES SHALL BE REIMBURSED BY BIG LOTS TO THE CONTRACTOR.

D. LICENSES, PERMITS, INSPECTIONS & FEES
1.. THIS CONTRACTOR SHALL OBTAIN AND PAY FOR ALL LICENSES, PERMITS, INSPECTIONS, AND FEES REQUIRED OR RELATED TO THEIR WORK.
2. FURNISH TO G.C.'S CONSTRUCTION MANAGER ALL CERTIFICATES OF INSPECTION AND FINAL INSPECTION APPROVAL AT COMPLETION OF PROJECT.

E. TRADE NAMES, MANUFACTURERS AND SHOP DRAWINGS
1. WHERE TRADE NAMES AND MANUFACTURERS ARE USED ON THE DRAWINGS OR IN THE SPECIFICATIONS, THE EXACT EQUIPMENT SHALL BE USED AS A MINIMUM FOR THE BASE BID. ANY PROPOSED SUBSTITUTIONS MUST BE PRE-QUALIFIED, LISTED IN THIS CONTRACTOR'S BID AND HAVE A COST SAVINGS FOR BIG LOTS OF AT LEAST $500 PER TYPE OF EQUIPMENT. ADDITIONALLY, ONLY MANUFACTURERS CONSIDERED AS AN EQUAL OR BETTER IN ALL ASPECTS TO THAT SPECIFIED WILL BE REVIEWED. ALL SUBSTITUTIONS ARE SUBJECT TO APPROVAL IN WRITING, THROUGH SHOP DRAWINGS PROCESS, BY BIG LOTS HVAC REPRESENTATIVE PRIOR TO ACCEPTANCE. BIG LOTS RESERVES THE RIGHT TO REJECT ANY PROPOSED SUBSTITUTIONS. THE USE OF ANY UNAUTHORIZED EQUIPMENT SHALL BE SUBJECT TO REMOVAL AND REPLACEMENT AT THE CONTRACTOR'S EXPENSE.
2. MECHANICAL CONTRACTOR SHALL SUBMIT ONLY SUBSTITUTION REQUESTS TO BIG LOTS HVAC REPRESENTATIVE FOR APPROVAL. SUBMISSIONS SHALL BE MADE EARLY ENOUGH IN PROJECT TO ALLOW FOUR (4) WORKING DAYS FOR BIG LOTS HVAC REPRESENTATIVE REVIEW WITHOUT CAUSING DELAYS OR CONFLICTS TO THE JOB'S PROGRESS. SUBMITTALS SHALL BEAR THE SIGNATURE OF BIG LOTS HVAC REP. AND THE SUB-CONTRACTOR SHOWING THAT THEY HAVE REVIEWED AND CONFIRMED THAT THE SUBMITTALS ARE IN CONFORMANCE WITH THE CONTRACT DRAWINGS AND SPECIFICATIONS OR INDICATE WHERE EXCEPTIONS HAVE BEEN TAKEN.

F. GUARANTEE
1. THIS CONTRACTOR SHALL GUARANTEE ALL MATERIALS AND WORK PROVIDED UNDER THEIR CONTRACT AND SHALL MAKE GOOD, REPAIR OR REPLACE AT THEIR OWN EXPENSE, ANY DEFECTIVE WORK, MATERIAL, OR EQUIPMENT WHICH MAY BE DISCOVERED WITHIN A PERIOD OF 12 MONTHS FROM THE DATE OF ACCEPTANCE (IN WRITING) OF THE INSTALLATION BY G.C.'S CONSTRUCTION MANAGER. EXTENDED WARRANTIES ARE AS SPECIFIED WITH INDIVIDUAL EQUIPMENT.
2. THIS CONTRACTOR SHALL PROVIDE A COMPLETE 12-MONTH WARRANTY FOR ALL PARTS ON EQUIPMENT PROVIDED BY THIS CONTRACTOR AND G.C.'S VENDORS. THIS CONTRACTOR SHALL NOT BEAR ADDITIONAL WARRANTIES BEYOND A COMPLETE WORKING SYSTEM, AND AS SUCH, NO ADDITIONAL MONIES SHOULD BE INCLUDED IN THE BID.

G. RECORD DRAWINGS
1. THIS CONTRACTOR SHALL MAINTAIN ONE COPY OF DRAWINGS ON THE JOB SITE TO RECORD DEVIATIONS FROM CONTRACT DRAWINGS, SUCH AS:
   A. LOCATION OF CONCEALED PIPING VALVES AND DUCTS.
   B. REVISIONS, ADDENDUMS, AND CHANGE ORDERS.
   C. SIGNIFICANT DEVIATIONS MADE NECESSARY BY FIELD CONDITIONS, APPROVED EQUIPMENT SUBSTITUTIONS, AND CONTRACTOR'S COORDINATION WITH OTHER TRADES.
2. AT COMPLETION OF THE PROJECT AND BEFORE FINAL APPROVAL, THE CONTRACTOR SHALL MAKE ANY FINAL CORRECTIONS TO DRAWINGS AND CERTIFY THE ACCURACY OF EACH PRINT BY SIGNATURE THEREON. ONE COPY OF THE MOST RECENT SET OF DRAWINGS WITH TEMPERATURE CONTROL DRAWINGS INCLUDED SHALL BE STAMPED "DO NOT REMOVE" AND PLACED IN DRAWING TUBE LOCATED NEXT TO THE ELECTRICAL PANELS.

H. DISCREPANCIES IN DOCUMENTS
1. DRAWINGS (PLANS, SPECIFICATIONS, AND DETAILS) ARE DIAGRAMMATIC AND INDICATE THE GENERAL LOCATION AND INTENT OF THE MECHANICAL SYSTEMS. WHERE DRAWINGS, EXISTING SITE CONDITIONS, SPECIFICATIONS OR OTHER TRADES CONFLICT OR ARE UNCLEAR, ADVISE G.C.'S CONSTRUCTION MANAGER, IN WRITING OF VARIATIONS TO CONTRACT DOCUMENTS PRIOR TO SUBMISSION OF BID. OTHERWISE, G.C. CONSTRUCTION MANAGER'S INTERPRETATION OF CONTRACT DOCUMENTS OR CONDITIONS SHALL BE FINAL WITH NO ADDITIONAL COMPENSATION PERMITTED.

I. PHASING REQUIREMENTS
1. THIS CONTRACTOR IS TO INCLUDE IN HIS BID ALL NECESSARY SERVICE REQUIRED TO KEEP THE OPERATING PHASE OF THE STORE'S HVAC, PLUMBING AND SPRINKLER SERVICE IN OPERATION. CONTRACTOR MUST SCHEDULE WITH G.C.'S CONSTRUCTION MANAGER AND THE LANDLORD ONE WEEK PRIOR TO ANY SHUT DOWN OF THE HVAC, PLUMBING OR FIRE PROTECTION SYSTEMS.

J. DEMOLITION
1. THIS CONTRACTOR SHALL BE RESPONSIBLE FOR THE COORDINATION OF THE DEMOLITION OF EXISTING WORK AND THE DEMOLITION PROVIDED BY G.C.. COORDINATE WITH G.C. ANY EXISTING EQUIPMENT REQUIRED TO BE LEFT INTACT.
2. EACH CONTRACTOR SHALL VERIFY SCOPE OF WORK WITH G.C. FOR THE REMOVAL OF ALL EXISTING FIRE PROTECTION, PLUMBING FIXTURES, PIPING, HVAC UNITS, REFRIGERANT RECAPTURE, EXHAUST FANS, ETC. AND ASSOCIATED ROOF CURBS NOT BEING REUSED ON THIS PROJECT, UNLESS SPECIFICALLY NOTED OTHERWISE. CONTRACTOR MUST VERIFY WITH THE LANDLORD ALL PRESUMED ABANDONED EQUIPMENT, PIPES, DUCTWORK, AND EQUIPMENT PRIOR TO REMOVAL. ROOF CURBS SHALL BE REMOVED AND THE ROOF PATCHED. ALL EXTRANEOUS ITEMS IN THE SPACE OR ON THE ROOF NOT APPLICABLE TO THE NEW WORK MUST BE REMOVED AND ROOF/WALL/FLOOR PATCHED/REPAIRED TO MATCH EXISTING STRUCTURE. EXISTING ABANDONED PIPES, DUCTS, OR EQUIPMENT IN THE FLOOR, EMBEDDED IN CONCRETE, OR OTHERWISE INACCESSIBLE ARE TO BE CUT OFF AND SEALED BELOW OR WITHIN FLOOR OR WALL LEVEL WHEN THEY ARE NOT TO BE REUSED IN THIS PROJECT. IF REQUIRED BY LANDLORD OR CODES, ABANDONED PIPING AND/OR DUCTWORK MUST BE REMOVED TO POINT OF ORIGIN. CONFIRM THE EXTENT OF DEMOLITION WITH G.C. PRIOR TO BID AND INCLUDE IN BID PROPOSAL AS DIRECTED BY G.C.

K. SLEEVES
1. THIS CONTRACTOR SHALL PROVIDE SLEEVES TO PROTECT EQUIPMENT OR FACILITIES IN THE INSTALLATION. EACH SLEEVE SHALL EXTEND THROUGH IT'S RESPECTIVE FLOOR, WALL OR PARTITION AND SHALL BE CUT FLUSH WITH EACH SURFACE EXCEPT SLEEVES THAT PENETRATE THE FLOOR, WHICH SHALL EXTEND 2" ABOVE THE FLOOR. CONTRACTOR MUST COORDINATE THROUGH THE LANDLORD ANY CORE DRILLING OR CUTTING OF OPENINGS IN MASONRY FLOORS OR WALLS.
2. ALL SLEEVES AND OPENINGS THROUGH FIRE RATED WALLS AND/OR FLOORS SHALL BE FIRE SEALED WITH CALCIUM SILICATE, SILICONE "RTV" FOAM, "3M" FIRE RATED SEALANTS OR EQUAL, SO AS TO RETAIN THEIR FIRE RATING.
3. SLEEVES IN BEARING AND MASONRY WALLS, FLOORS, AND PARTITIONS SHALL BE STANDARD WEIGHT STEEL PIPE FINISHED WITH SMOOTH EDGES. FOR OTHER THAN MASONRY PARTITIONS, THROUGH SUSPENDED CEILINGS, OR FOR CONCEALED VERTICAL PIPING, SLEEVES SHALL BE NO. 22 U.S.G. GALVANIZED STEEL MINIMUM.

L. HANGERS
1. HANGERS SHALL INCLUDE ALL MISCELLANEOUS STEEL SUCH AS ANGLE IRON, BANDS, C-CLAMPS WITH RETAINING CLIPS, CHANNELS, HANGER RODS, ETC., NECESSARY FOR THE INSTALLATION OF WORK.
2. HANGERS SHALL BE FASTENED TO BUILDING STEEL, CONCRETE, OR MASONRY, BUT NOT TO PIPING. HANGING FROM METAL DECK IS NOT PERMITTED. HANGERS MUST BE ATTACHED TO BAR JOIST EVERY 4' WITH 1" GALVANIZED STRAP WRAPPED AROUND BAR JOIST WITH AT LEAST (2) #8 SHEET METAL SCREWS ON EACH SIDE. WHERE INTERFERENCES OCCUR, AND IN ORDER TO SUPPORT DUCTWORK OR PIPING, THE CONTRACTOR MUST INSTALL TRAPEZE TYPE HANGERS OR SUPPORTS WHICH SHALL BE LOCATED WHERE THEY DO NOT INTERFERE WITH ACCESS TO FIRE DAMPERS, VALVES, AND OTHER EQUIPMENT. HANGER TYPES AND INSTALLATION METHODS ARE ALSO SUBJECT TO LANDLORD CRITERIA.

# DIVISION 15 - MECHANICAL
## SECTION 15500
## HEATING, VENTILATION, AND AIR CONDITIONING

A. SCOPE OF WORK
1. THIS CONTRACTOR SHALL FURNISH ALL LABOR, MATERIALS, EQUIPMENT, SERVICES, TOOLS, TRANSPORTATION AND FACILITIES NECESSARY FOR, REASONABLY IMPLIED AND INCIDENTAL TO, THE FURNISHING,INSTALLATION, COMPLETION AND TESTING OF ALL THE WORK FOR THE MECHANICAL SYSTEMS AS SHOWN ON THE DRAWINGS, CALLED FOR IN THE SPECIFICATIONS, AND AS REQUIRED BY JOB CONDITIONS, TO INCLUDE, BUT NOT BE LIMITED TO THE FOLLOWING:
   A. HVAC UNITS, EQUIPMENT, AND APPURTENANCES (UNLESS NOTED OTHERWISE).
   B. DUCTWORK, FITTINGS, DAMPERS, AND INSULATION.
   C. CURBS, ROOFING, AND STEEL FRAMING FOR SUPPORT (AS APPLICABLE, REFER TO PLANS).
   D. CONDENSATE PIPING SYSTEMS (AS APPLICABLE, REFER TO PLANS).
   E. TESTING, ADJUSTING, AND BALANCING.
2. BEFORE STARTING WORK, THIS CONTRACTOR SHALL VISIT THE JOBSITE AND EXAMINE THE ARCHITECTURAL, STRUCTURAL, MECHANICAL AND ELECTRICAL PLANS AND SPECIFICATIONS TO SEQUENCE, COORDINATE, AND INTEGRATE THE VARIOUS ELEMENTS OF THE HVAC SYSTEM, MATERIALS, AND EQUIPMENT WITH OTHER CONTRACTORS TO AVOID INTERFERENCES AND CONFRONTATIONS.
3. RELOCATION OF EXISTING DUCT MAINS OR BRANCHES TO MEET STORE DESIGN CRITERIA MUST BE INCLUDED IN BID PROPOSAL.

B. HVAC EQUIPMENT
1. PRIMARY HEATING AND AIR CONDITIONING UNITS ARE TO BE FURNISHED BY G.C. AS SCHEDULED UNLESS NOTED OTHERWISE. REFER TO PLANS AND SCHEDULES FOR REQUIREMENTS. ALL EQUIPMENT SHALL INCLUDE A FIVE (5) YEAR COMPRESSOR AND TEN (10) YEAR HEAT EXCHANGER WARRANTY.
2. ALL EQUIPMENT SHALL BE COMPLETE IN EVERY RESPECT WITH ALL DEVICES, APPURTENANCES, AND ACCESSORIES PROVIDED TO MEET THE DESIGN INTENT AND OPERATION OF THE SYSTEMS SHOWN ON THE DRAWINGS AND SPECIFIED HEREIN.
3. EQUIPMENT SHALL BE INSTALLED AND START-UP PERFORMED IN STRICT ACCORDANCE WITH THE MANUFACTURER'S INSTRUCTIONS. ALL AIR CONDITIONING EQUIPMENT MUST BE TRAPPED IN ACCORDANCE WITH MANUFACTURERS DATA. SEE DRAWINGS FOR ADDITIONAL DETAILS.

C. METAL DUCTWORK - NO FIBERGLASS DUCT ALLOWED
1. NO DUCTWORK SHALL BE FABRICATED PRIOR TO JOB SITE VISIT AND APPROVAL BY G.C. SIGNIFICANT DEVIATIONS IN ROUTING OR SIZING OF THE DUCTWORK/PIPING SYSTEMS MUST BE CLOUDED AND NOTED ON THE SHOP DRAWINGS. THESE SIGNIFICANT DEVIATIONS MUST BE APPROVED BY BIG LOTS ENGINEER PRIOR TO FABRICATION OR INSTALLATION.
2. EXCEPT AS OTHERWISE INDICATED, FABRICATE AND INSTALL RECTANGULAR AND ROUND DUCTWORK WITH GALVANIZED STEEL, IN ACCORDANCE WITH SMACNA "HVAC DUCT CONSTRUCTION STANDARDS" OF THE LATEST EDITION. WHERE OTHER CODES ARE ENFORCED, (IE. UMC, BOCA, ETC.) USE THE MOST STRINGENT CODE FOR DUCT CONSTRUCTION STANDARDS.
3. EXCEPT WHERE OTHERWISE INDICATED, CONSTRUCT DUCT SYSTEMS TO THE FOLLOWING PRESSURE CLASSIFICATIONS: SUPPLY DUCTS: 2" W.G., POSITIVE RETURN AND EXHAUST DUCTS: 2" W.G., NEGATIVE EXCEPT WHERE OTHERWISE INDICATED, USE DUCT SEALANTS OF THE FOLLOWING PRESSURE CLASSIFICATIONS: SUPPLY DUCTS CLASS B - 3" W.G. RETURN AND EXHAUST DUCTS: CLASS C - 2" W.G. IN ACCORDANCE WITH THESE CONSTRUCTION AND SEALANT PRESSURE CLASSIFICATIONS, MAXIMUM DUCT AIR LEAKAGE WILL NOT EXCEED 5% AS REQUIRED FOR FINAL AIR BALANCE APPROVAL.
4. MEDIUM PRESSURE DUCT
   A. WHERE DUCTWORK IS SPECIFICALLY NOTED AS MEDIUM PRESSURE, IT SHALL BE CONSTRUCTED IN ACCORDANCE WITH SMACNA STANDARDS FOR A PRESSURE RATING OF 4 INCHES WATER COLUMN MINIMUM OR GREATER AS REQUIRED BY LANDLORD.
   B. ALL GAUGES AND REINFORCEMENT MUST MEET WITH THE LATEST EDITION OF SMACNA STANDARDS FOR MEDIUM PRESSURE DUCT AND WITH THE LANDLORD'S CRITERIA.
   C. CONNECTION TO THE LANDLORD'S MEDIUM PRESSURE DUCTWORK SHALL BE MADE WITH "LO-LOSS" SADDLE TEE TAPS BY UNITED MCGILL CORP., OR AS OTHERWISE REQUIRED BY THE LANDLORD.
   D. ALL OTHER ITEMS FROM METAL DUCTWORK SPECIFICATION SECTION APPLY TO THIS SECTION, WITH THE EXCEPTION THAT ALL MEDIUM PRESSURE DUCTWORK MUST BE WRAPPED INSULATION, NOT LINED.
5. ROUND AND FLAT OVAL DUCTWORK SHALL BE GALVANIZED STEEL WITH SPIRAL LOCKSEAM CONSTRUCTION. ROUND DUCTWORK SIZES 12" DIAMETER AND SMALLER IN CONCEALED AREAS MAY BE SNAP-LOCK CONSTRUCTION. ALL SNAP-LOCK SEAMS SHALL BE SEALED AS DESCRIBED IN THESE SPECIFICATIONS. DUCT AND FITTINGS SHALL BE G90 GALVANIZED STEEL CONFORMING TO ASTM A-653 AND A-924. ALL FITTINGS THAT ARE SPOT WELDED OR BUTTON PUNCHED CONSTRUCTION SHALL BE INTERNALLY SEALED.
6. AS A MINIMUM, CROSS BREAK ALL FLAT SURFACES OR REINFORCE WITH A BEAD APPROXIMATELY 3/8" WIDE X 3/16" DEEP ON 12" CENTERS TO PREVENT VIBRATIONS, REGARDLESS OF DUCT GAUGE.
7. INSTALL DOUBLE THICKNESS TURNING VANES IN ALL 90 DEGREE ELBOWS OVER 36" IN LENGTH. INSTALL SINGLE THICKNESS TURNING VANES IN ALL OTHER ELBOWS. TURNING VANES NOT REQUIRED IN RADIUS TYPE ELBOWS.
8. INSTALL RIGID ROUND AND RECTANGULAR METAL DUCT WITH SUPPORT SYSTEMS INDICATED IN SMACNA STANDARDS. SUPPORT HORIZONTAL DUCTS WITHIN 2 FEET OF EACH ELBOW AND WITHIN 4 FEET OF EACH BRANCH INTERSECTION USING DOUBLE STRAP HANGERS ON EACH SIDE OF FITTING. SUPPORT VERTICAL DUCTS AT A MAXIMUM INTERVAL OF 16 FEET AND AT EACH FLOOR. NO WOOD SHALL BE USED TO SUPPORT OR BRACE DUCTS. PROVIDE SWAY AND SEISMIC BRACING AS REQUIRED BY STATE AND LOCAL CODES.
9. WHERE DUCTS PASS THROUGH ROOFS AND FLOORS, PROVIDE AS MINIMUM 1-1/2"X1-1/2" X1/8" STEEL ANGLE FRAMES AT EACH SIDE OF OPENING. THE ANNULAR SPACE BETWEEN DUCT AND ANGLE FRAMES SHALL BE CAULKED WITH SILICONE SEALANT OR FIREPROOFED AS REQUIRED BY ASSEMBLY FIRE RATING.
10. ALL JOINTS AND SEAMS SHALL BE SEALED WITH 2" WIDE, GLASS-FIBER-FABRIC REINFORCED TAPE. JOINTS ALSO SHALL BE RIVETED OR CONNECTED WITH SHEET METAL SCREWS. LIQUID SEALANTS BY UNITED MCGILL CORP., DOW CORNING, MIRACLE ADHESIVES AND SUREBOND INC. WILL BE ACCEPTED IN LIEU OF TAPE. NOTE: LINDAB FACTORY GASKETED JOINTS DO NOT REQUIRE ADDITIONAL SEALER.
11. SOFT ELASTOMER BUTYL GASKET WITH ADHESIVE BACKING SHALL BE USED TO SEAL FLANGED JOINTS.
12. DUCT TRANSITIONS SHALL NOT EXCEED 30 DEGREES SLOPE EXCEPT AS SPECIFICALLY NOTED OTHERWISE.
13. PROVIDE ACCESS TO ALL MOTORIZED ZONE DAMPERS, FIRE DAMPERS, CONTROLS, AND OTHER ITEMS IN DUCTWORK THAT REQUIRE SERVICE OR INSPECTION. IF THE ACCESS PANEL LOCATION IS EXPOSED TO THE SALES AREA, IT MUST BE APPROVED BY G.C.'S CONSTRUCTION MANAGER PRIOR TO INSTALLATION. LAY-IN SUPPLY AND RETURN AIR DIFFUSERS, GRILLES AND REGISTERS WITH PLASTER FRAMES MAY BE USED AS ACCESS LOCATIONS WHEN WITHIN 3'-0" OF DEVICE.
14. DUCTWORK SHALL BE INSTALLED WITH INSIDE CLEAR DIMENSIONS UNLESS NOTED ON DRAWINGS. WHERE DUCTWORK SIZE IS LARGER THAN CONNECTED DEVICE (IE. DIFFUSER, REGISTER) SMOOTH DUCT TRANSITIONS ARE TO TAKE PLACE JUST PRIOR TO DEVICE CONNECTION. REFER TO DETAILS.

D. FLEXIBLE CONNECTIONS
1. FLEXIBLE COLLARS SHALL BE FURNISHED AND INSTALLED IN ALL BETWEEN VIBRATING EQUIPMENT (FANS, AIR HANDLERS, ROOFTOP UNITS, ETC.) AND DUCTS OR CASINGS. ALSO, FURNISH AND INSTALL FLEXIBLE CONNECTIONS WHERE DUCTS CROSS BUILDING EXPANSION JOINTS.
2. FLEXIBLE CONNECTIONS SHALL BE CONSTRUCTED OF NEOPRENE-COATED FLAMEPROOF FABRIC. PROVIDE ADEQUATE JOINT FLEXIBILITY TO ALLOW FOR MOVEMENT AND PREVENT THE TRANSMISSION OF VIBRATION.

E. VIBRATION ISOLATION DEVICES
1. VIBRATION ISOLATION DEVICES SHALL BE FURNISHED AND INSTALLED IN ALL SUPPORTS BETWEEN VIBRATING EQUIPMENT (FANS, AIR HANDLERS, ETC.) AND STRUCTURE. THE BID.
2. VIBRATING EQUIPMENT HUNG FROM STRUCTURE SHALL BE ISOLATED WITH RUBBER AND SPRING DEVICES. VIBRATING EQUIPMENT SUPPORTED FROM FLOOR OR DECK SHALL BE ISOLATED WITH HOUSED SPRING MOUNT DEVICES.
3. EXAMINE DEAD LOAD AND OPERATING LOAD CONDITION WHEN SELECTING DEVICES. ADJUST FOR PROPER ALIGNMENT AND LOADING.AVOID TWO "GROUNDING" THE ISOLATOR.
4. CHECK HANGER ROD SIZE FOR ALLOWABLE LOADS AT THE ISOLATING DEVICE AND AT THE UPPER AND LOWER ATTACHMENTS TO STRUCTURES, DUCTS, EQUIPMENT, ETC.
5. CONSULT MANUFACTURER FOR APPLICATION DATA.

F. FLEXIBLE AIR DUCT
1. FLEXIBLE AIR DUCT SHALL BE 1" INSULATED CLASS 1 AND RATED FOR THE OPERATING PRESSURE OF THE SYSTEM. DUCT CONSTRUCTION MATERIAL (PLASTIC, CLOTH, ALUMINUM) MUST ADHERE TO LOCAL CODES AND LANDLORD'S REQUIREMENTS AND BE INCLUDED AS SUCH.
2. FLEXIBLE AIR DUCT SHALL BE ATTACHED PER DETAILS. FLEXIBLE AIR DUCT MAY ONLY BE USED IN CONCEALED VERTICAL APPLICATIONS WITHOUT PRIOR APPROVAL FROM G.C.'S CONSTRUCTION MANAGER UNLESS NOTED OTHERWISE.
3. FLEXIBLE DUCT SHALL NOT EXTEND OVER 5'-0" IN LENGTH AT ANY ONE LOCATION.

G. MANUAL DAMPERS
1. FURNISH AND INSTALL MANUAL LOCKING QUADRANT VOLUME CONTROL DAMPERS WITH HANDLE OPERATORS AS SHOWN ON PLANS TO FACILITATE AIR BALANCING.

H. FIRE DAMPERS & SMOKE FIRE DAMPERS
1. FIRE DAMPERS SHALL BE RUSKIN MODEL NO. FD36, FD60FA OR FDR25.
2. PROVIDE FIRE DAMPERS WITH ACCESS DOORS INSTALLED WHERE REQUIRED BY ALL LOCAL CODES.
3. COMBINATION SMOKE FIRE DAMPERS SHALL BE RUSKIN MODEL NO. FSD36, FSD60FA, OR FSDR25.

I. DUCTWORK INSULATION
1. FURNISH AND INSTALL INSULATION PRODUCTS IN ACCORDANCE WITH MANUFACTURER'S WRITTEN INSTRUCTIONS, AND IN ACCORDANCE WITH RECOGNIZED INDUSTRY PRACTICES. INSULATION MUST COMPLY WITH LOCAL CODE.
2. DUCTWORK SIZES SHOWN ON DRAWINGS ARE INSIDE CLEAR DIMENSIONS. INCREASE DUCTWORK SIZES AS REQUIRED FOR INTERNALLY LINED DUCT TO MAINTAIN INSIDE CLEAR DIMENSIONS.
3. INSULATE ALL OF THE FOLLOWING DUCTWORK: CONCEALED SUPPLY DUCTWORK THAT IS NOT INTERNALLY LINED UNTREATED OUTSIDE AIR DUCTWORK LOCATED WITHIN THE INTERIOR SPACE SUPPLY & RETURN DUCTWORK INSULATION SHALL BE 2" REINFORCED FOIL FACED, VAPOR SEALED FIBREGLASS. INSTALLED THERMAL RESISTANCE SHALL BE AT LEAST 6.0 FOR INTERIOR DUCTWORK AND 8.0 FOR EXTERIOR DUCTWORK, OR AS REQUIRED BY LOCAL CODES. PROVIDE EXTERIOR DUCTWORK INSULATION WITH WEATHERPROOF JACKETING WHEN APPLICABLE. LINER MAY BE USED IN LIEU OF FIBERGLASS WRAP.
4. ALL INSULATION AND LINING SHALL HAVE A FLAME SPREAD RATING OF NOT MORE THAN 25 AND A SMOKE DEVELOPED RATING OF NO HIGHER THAT 50 WHEN TESTED IN ACCORDANCE WITH ASTM C 411, OR AS REQUIRED BY LOCAL CODES.

J. CURBS AND STEEL FRAMING FOR SUPPORT
1. THIS CONTRACTOR WILL FURNISH AND INSTALL ALL NECESSARY CURBS AND BLOCKING REQUIRED TO INSTALL ALL HVAC EQUIPMENT AS DESCRIBED OR IMPLIED ON THE DRAWINGS. CURBS SHALL BE A MINIMUM OF 14" HIGH OF THE SAME MANUFACTURER OF THE EQUIPMENT SUPPORTED, UNLESS NOTED OTHERWISE. INSULATE UNDER THE COMPRESSOR SECTION. ALL CURBS MUST BE INSTALLED SO THAT TOP OF CURBS ARE "DEAD" LEVEL. ALL PENETRATIONS OF EXISTING STRUCTURE SHALL BE DONE IN ACCORDANCE TO THE LANDLORD'S GUIDELINES AT THIS CONTRACTOR'S EXPENSE. COORDINATE STEEL FRAMING REQUIREMENTS, ROOF PENETRATIONS, AND ROOF FLASHING WITH G.C. TO DETERMINE SCOPE OF WORK PRIOR TO BID. THIS CONTRACTOR MUST RECEIVE WRITTEN APPROVAL BEFORE ANY ADDITIONAL WORK TAKES PLACE.
2. WHEN APPLICABLE THE HVAC CONTRACTOR IS RESPONSIBLE TO GET THIS DRAWING STAMPED BY A MECHANICAL ENGINEER AND HAVE A STRUCTURAL STUDY OF THE ROOF STRUCTURE, OF THE SITE, FOR PROPER SUPPORT OF THE UNITS BY A STRUCTURAL ENGINEER, THIS IS TO BE SUBMITTED TO BIG LOTS IN WRITING BEFORE ANY WORK STARTS. ALL OF ROOFTOP PENETRATIONS TO BE FRAMED WITH 2.5" ANGLE IRON ON ALL SIDES, AT LEAST .025" THICK. ALL EXHAUST FAN OPENINGS TO BE FRAMED WITH 1.5" ANGLE IRON, AT LEAST .025" THICK ALL FOUR SIDES. THE HVAC CONTRACTOR IS ALSO RESPONSIBLE FOR ALL STRUCTURAL STEEL AND LABOR TO INSTALL IT. THE HVAC CONTRACTOR IS ALSO RESPONSIBLE FOR ALL PERMITS, MECHANICAL, STRUCTURAL PERTAINING TO STRUCTURAL STEEL, AND ENGINEERING FEES LISTED ABOVE. THE HVAC CONTRACTOR WILL ALSO BE RESPONSIBLE FOR HAVE IN THE ROOF PENETRATIONS FLASHED BY THE LANDLORDS ROOFER.

K. CONDENSATE PIPING
1. INTERIOR CONDENSATE PIPING SHALL BE TYPE "L" DRAWN COPPER TUBE WITH 95-5 TIN-ANTIMONY SOLDERED JOINTS AND WROUGHT COPPER FITTINGS WITH DIELECTRIC SEPARATION BETWEEN DISSIMILAR METALS. DRAIN SHALL TERMINATE AT A CODE APPROVED LOCATION. ALTERNATE PIPING MATERIALS ARE ACCEPTABLE AS A SUBSTITUTION WHEN THEIR USE IS PERMITTED BY THE LANDLORD, LOCAL CODES AND BUILDING DEPARTMENT OFFICIALS AND DOES NOT AFFECT OTHER TRADES. SUBSTITUTIONS MUST BE LISTED AND QUALIFIED IN BID.
2. EXTERIOR CONDENSATE PIPING SHALL BE SCHEDULE 40 U.V. RESISTANT PVC PIPING. PVC JOINTS SHALL BE SLIP FIT. DRAIN SHALL TERMINATE AT A CODE APPROVED LOCATION.
3. INSULATE ALL INTERIOR CONDENSATE PIPING WITH 1" THICK (K=0.23 @ 75 F) PIPE INSULATION WITH AN ALL SERVICE JACKET TO MEET LOCAL CODES AND UL FLAME SPREAD AND SMOKE DEVELOPED RATINGS.
4. INSTALL ALL NECESSARY PIPE HANGERS, AND SADDLES TO PROPERLY SUPPORT ALL CONDENSATE PIPING. HANGERS SHALL SUIT TYPE OF PIPING PROVIDED AND BE SPACED AT A MAXIMUM SPAN OF 5 FEET. PROVIDE SWAY AND SEISMIC BRACING WHERE REQUIRED BY CODES.

L. REFRIGERANT PIPING
1. CONTRACTOR SHALL FURNISH AND INSTALL A COMPLETE REFRIGERANT PIPING SYSTEM BETWEEN THE INDOOR FAN UNITS AND OUTDOOR FAN UNITS. REFRIGERANT PIPING SHALL BE TYPE "L" HARD DRAWN COPPER TUBING (ASTMB88). TUBING SHALL BE CLEAN, CAPPED AND NITROGEN CHARGED.
2. ALL FITTING AND JOINTS SHALL BE WROUGHT COPPER OR CAST BRONZE (ANSI B16.22). ALL COPPER TO COPPER JOINTS SHALL BE BRAZED WITH A COPPER-PHOSPHORUS ALLOY AND ALL OTHER JOINTS SHALL BE BRAZED WITH SILFOS-5 ALLOY.
3. ALL ELBOWS SHALL BE LONG RADIUS TYPE.
4. INSTALLATION
   A. SUCTION LINES SHALL HAVE ADEQUATE LIFT TRAPS AND/OR DOUBLE SUCTION RISERS TO MEET THE REQUIREMENTS OF FIELD CONDITIONS AND EQUIPMENT MANUFACTURER'S RECOMMENDATIONS.
   B. BRAZE ALL JOINTS WITH SILFOS-5 STARTING AT THE INDOOR UNIT AND WORKING TOWARD THE OUTDOOR UNIT. THE SEALS ON THE OUTDOOR UNIT SHALL BE BROKEN LAST. A NITROGEN BLEED SHALL BE USED DURING ALL BRAZING AND ANY TIME THE SYSTEM IS OPEN. ALL OPEN LINES SHALL BE CAPPED AND SEALED BEFORE LEAVING THE SITE DURING CONSTRUCTION. PRESSURE TEST FOR LEAKS WITH AN INERT GAS UP TO 245 PSI. REDO LEAKING JOINTS AND RETEST UNIT SYSTEM IS TIGHT. EVACUATE ENTIRE SYSTEM TO 200 MICRONS OF MERCURY. CHARGE SYSTEM WITH 25 PSI OF R-22 AND AN INERT GAS TO 245 PSI AND RETEST SYSTEM WITH HALIDE LEAK DETECTOR. ALL LEAKING JOINTS MUST BE COMPLETELY RESEALED UNTIL NO LEAKS EXIST. TURN ON CRANK CASE HEATERS 24 HRS PRIOR TO STARTING COMPRESSOR TO BE SURE ALL REFRIGERANT LIQUID IS OUT OF THE COMPRESSOR.
   C. UPON COMPLETION OF TESTING, BUT BEFORE THE REFRIGERANT PIPING INSULATION IS APPLIED, THE PIPING MUST BE INSPECTED BY A REPRESENTATIVE OF THE LOCAL GOVERNING AUTHORITY AS NECESSARY.
   D. INSULATE THE REFRIGERANT SUCTION LINES AND CONDENSATE LINES ONLY WITH RUBATEX OR ARMSTRONG 1 INCH THICK PIPE INSULATION WITH FLAME SPREAD RATING OF NOT MORE THAN 50 IN ACCORDANCE WITH INDUSTRY STANDARDS. DO NOT INSULATE THE HOT GAS (LIQUID) LINES OR ANY HOT GAS BYPASS LINES IF APPLICABLE.
5. INSPECTION
1. CONTRACTOR MUST PREPARE AND SUBMIT A COMPLETE PIPING SCHEMATIC TO THE LOCAL CARRIER FIELD REPRESENTATIVE FOR APPROVAL PRIOR TO BEGINNING INSTALLATION. UPON COMPLETION OF PIPING, THIS CONTRACTOR MUST CALL THE LOCAL CARRIER INSPECTOR FOR FIELD INSPECTION OF WORK PERFORMED AT G.C.'S EXPENSE. ALL ITEMS FOUND TO BE INADEQUATE FOR PROPER PERFORMANCE BY CARRIER FIELD REPRESENTATIVE MUST BE CORRECTED AT NO ADDITIONAL CHARGES TO G.C. OR BIG LOTS

M. TEMPERATURE SYSTEM
1. ALL EXISTING AND NEW EQUIPMENT TO HAVE NEW IN DUCT SMOKE DETECTORS AND KEYED RESETS INSTALLED. DUCT DETECTORS TO BE INSTALLED IN BOTH SUPPLY AND RETURN AIR DUCTS. SEE THE DETAIL FOR LOCATION AND WIRING DIAGRAM. THE SMOKE DETECTORS ARE TO BE INSTALLED AS EARLY IN THE PROJECT AS POSSIBLE TO ALLOW THE FIRE ALARM COMPANY TO HOOK UP THE DETECTOR TO THE FIRE PANEL AT THEIR CONVENIENCE. THE SMOKE DETECTORS SHALL BE A TRANE SYSTEM SENSOR TYPE AND THE TEST STATIONS ARE FIREX MODEL 3PB53, AVAILABLE THROUGH GRANGER. THERE WILL BE SUBSTITUTIONS OF THESE PARTS ALLOWED. THE HVAC CONTRACTOR WILL BE RESPONSIBLE FOR WIRING THESE DETECTORS FOR POWER, UNIT SHUTDOWN, AND THE KEY RESETS. IF YOUR LOCAL CODE REQUIRES THAT ALL OF THE UNITS SHUT DOWN ON CALL FROM ONE OF THE SMOKE DETECTORS, THE FIRE ALARM CONTRACTOR SHALL BE RESPONSIBLE FOR ALL PARTS AND LABOR TO MAKE THIS POSSIBLE. THE ELECTRICAL CONTRACTOR IS RESPONSIBLE FOR ALL ELECTRICAL CONDUIT, BOXES, WIRE, AND OTHER PARTS. THE MANUFACTURERS INSTRUCTIONS SHALL BE FOLLOWED WITHOUT ANY OMISSIONS.
2. THERMOSTATS INSTALLED BY THE MECHANICAL CONTRACTOR SHALL BE TEMPORARY TYPE, NON-PROGRAMMABLE CONNECTED TO ALL THE ROOF TOP UNITS VIA 18-10 TSTAT WIRE. THE MECHANICAL CONTRACTOR IS RESPONSIBLE FOR THE LOW VOLTAGE WIRING FROM ALL TEMPORARY TSTAT LOCATIONS IN THE STORE TO ALL RTU LOCATIONS ON THE ROOF. DZC MOUNTING SHALL BE 66" AFF. IF THE STORE HAS AN EMS SYSTEM DIFFERENT FROM BIG LOTS STANDARD SITE CONTROLS SYSTEM THE MECHANICAL CONTRACTOR SHALL BE RESPONSIBLE FOR REMOVING THIS SYSTEM FROM THE HVAC EQUIPMENT ONLY. IF THE HVAC EQUIPMENT HAS LINE VOLTAGE CONTROLS, THE HVAC CONTRACTOR SHALL BE RESPONSIBLE FOR CONVERTING TO A 24 VOLT CONTROL SYSTEM INCLUDING ALL WIRING, RELAYS, BOX'S, AND CONDUIT.

O. GAS PIPING
1. GAS PIPING SHALL BE BLACK STEEL, SCHEDULE 40, CONFOMING TO ANSI Z21-30 AND AGA INDUSTRIAL AND COMMERCIAL AS REQUIREMENTS. FITTING SHALL BE WELDED AS ACCORDING TO ANSI-16.9 OR SCREWED AS SPECIFIED.
2. CONTACTOR SHALL PROVIDE ALL PIPING AS SHOWN BY THE DRAWINGS. FINAL CONNECTIONS TO MECHANICAL EQUIPMENT SHALL BE BY CONTRACTOR. ALL EQUIPMENT FURNISHED UNDER THIS CONTRACT NOT HAVING "OFF-ON" GAS COCKS FURNISHED SHALL HAVE GAS COCKS FURNISHED AND INSTALLED BY CONTRACTOR.
3. TEST AS PIPING AT A PRESSURE OF 100 PSIG FOR A PERIOD OF 24 HOURS WITHOUT A DROP IN PRESSURE. ANY LEAKS SHALL BE REPAIRED BY CONTRACTOR AND LINES RETESTED. ALL TESTS SHALL BE IN ACCORDANCE WITH THE LOCAL UTILITY AND SHALL BE WITNESSED BY UTILITY AND BIG LOTS REPRESENTATIVE.
4. ELECTRICALLY ISOLATE SERVICE PIPING FROM THE BUILDING GAS PIPING WITH INSULATOR AT BUILDING ENTRANCE, IF REQUIRED.
5. PROVIDE BUILDING SHUT-OFF VALVE IMMEDIATELY AFTER ENTERING BUILDING.

P. TESTING, ADJUSTING, AND BALANCING
1. TESTING, ADJUSTING AND BALANCING OF HVAC WORK SHALL BE PERFORMED BY AN AABC, NEBB, NBI, OR NCI CERTIFIED CONTRACTOR. THE HVAC CONTRACTOR SHALL INCLUDE THE COST IN BID FOR TESTING AND BALANCING WORK.
2. TESTING, ADJUSTING, AND BALANCING REPORT MUST BE COMPLETE AND TURNED OVER TO THE BIG LOTS HVAC REPRESENTATIVE 1 WEEK PRIOR TO MERCHANDISING DATE. THE HVAC CONTRACTOR SHALL BE RESPONSIBLE FOR SCHEDULING THEIR WORK AND THE WORK OF THEIR SUBCONTRACTORS WITH G.C. TO ALLOW ADEQUATE TIME FOR THE AIR BALANCING WORK TO BE COMPLETED.
3. THE HVAC CONTRACTOR SHALL COMPLETE THE AIR BALANCE REVIEW START-UP VERIFICATION CHECKLIST BELOW AND FAX A COPY AS NOTED TO THE AIR BALANCER. A COPY SHALL ALSO BE PROVIDED TO THE BIG LOTS HVAC REPRESENTATIVE AT THIS TIME.
4. THE HVAC CONTRACTOR SHALL BE PRESENT FOR AIR BALANCE TO VERIFY ACCESSIBILITY TO ALL DEVICES, VERIFY ALL OPERATING SEQUENCES AND INSTALL NEW FILTERS IN ALL UNITS JUST PRIOR TO THE AIR BALANCE. HVAC CONTRACTOR SHALL INSTALL A NEW SET OF FILTERS AFTER PROJECT IS COMPLETE.
5. THE HVAC CONTRACTOR MAY ACT AS THE AIR BALANCING CONTRACTOR PROVIDED THEY HOLD ONE OF THE LISTED AIR BALANCING CERTIFICATIONS. IN THIS CASE, THE HVAC CONTRACTOR MAY BE SUBJECT TO HAVE THIER BALANCING REPORT REVIEWED BY AN INDEPENDENT AGENCY. IN THE EVENT OF ANY DISCREPANCIES, THE HVAC CONTRACTOR SHALL BE RESPONSIBLE FOR ANY INCURRED CHARGES DUE TO CORRECTIONS.

## LANDLORD PROVIDED PACKAGED ROOFTOP UNIT SCHEDULE

KEY: CENT - CENTRIFUGAL; PROP - PROPELLER; F.C. 0 FORWARD CURVE; B.I. - BACKWARD INCLINED; A.F. - AIR FOIL

| Tag # | NEW/ EXISTING | MAKE | MODEL | TONS | AIRFLOW SUPPLY (CFM) | AIRFLOW RETURN (CFM) | AIRFLOW OUTSIDE (CFM | SUPPLY FAN ESP (IN. H20) | SUPPLY FAN HP | COOLING AMBIENT (F°) | COOLING EAT (°F) DB/WB | COOLING LAT (°F) DB/WB | COOLING TOT. MBH | COOLING SENS. MBH | COOLING S/EER | COOLING STEPS CAPACITY | HEATING EAT (°F) | HEATING LAT (°F) | HEATING INPUT MBH | HEATING OUTPUT MBH | ELECTRICAL DATA MOCP | ELECTRICAL DATA VOLTS/PH. | WEIGHT (LBS) | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RTU-1 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 3600 | 400 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-2 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-3 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-4 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-5 | NEW | RHEEM | RKNL-H180DS35EDPJ | 15.00 | 6000 | 5400 | 600 | 0.50 | 5.00 | 95 | 80 | 67 | 185.80 | 135.70 | 11.10 | 2.00 | 55 | 108 | 350 | 284 | 45 | 460-3 | 2380 | 1.2.3.4.5.6.7.8 |
| RTU-6 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 3600 | 400 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-7 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.3.4.5.6.7.8 |
| RTU-8 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.3.4.5.6.7.8 |
| RTU-9 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-10 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| RTU-11 | NEW | RHEEM | RGEDZT120ADG22BAADK3 | 10.00 | 4000 | 2920 | 1080 | 0.50 | 3.00 | 95 | 80 | 67 | 125.80 | 95.80 | 11.00 | 2.00 | 55 | 106 | 225 | 182 | 30 | 460-3 | 1450 | 1.2.4.5.6.7.8.9 |
| TOTALS | | | | 115.00 | 46,000 | 35,960 | 10040 | | | | | | 1,444 | 1,094 | | | | | 2,600 | 2,104 | | | | |

FACTORY AND FIELD OPTIONS:
1. FACTORY PROVIDED NON-FUSED DISCONNECT AND THRU THE BASE ELEC.
2. FACTORY PROVIDED DUCT SMOKE DETECTOR IN RETURN AIR.
3. FACTORY FURNISHED (FIELD INSTALLED) CURB. PROVIDE 18" CURB TO ACCOMMODATE SNOW BUILDUP.
4. FACTORY FURNISHED ENTHALPY ECONOMIZER, HOOD WITH BIRDSCREEN AND BAROMETRIC RELIEF (SOME FIELD ASSEMBLY REQUIRE
5. FACTORY PROVIDED (FIELD WIRED) NON-POWERED GFI OUTLET.
6. FACTORY PROVIDED HINGED ACCESS DOORS.
7. FACTORY FURNISHED (FIELD INSTALLED) HAIL GUARD.
8. FACTORY PROVIDED WITH 2" FILTER RACK.
9. CURB ADAPTOR. ENSURE ADAPTOR RAISES UNIT ATLEAST 18" ABOVE ROOF TO ACCOMMODATE SNOW BUILDUP.

NOTES: TO LANDLORD'S M.C.
A. WIRING OF CONTROLS TO BE BY CONTRACTOR.
B. REFER TO CONTROL WIRING SCHEMATICS FOR ANY FIELD INSTALLED CONTROL DEVICES NOT FACTORY INSTALLED.
C. FIELD SET MINIMUM OUTSIDE AIR AS SPECIFIED ABOVE. OUTSIDE AIR DAMPER SHALL FULLY CLOSE ON UNIT SHUTDOWN.
D. GENERAL CONTRACTOR TO PROVIDE ALL STRUCTURAL SUPPORT.
E. MECHANICAL CONTRACTOR TO PROVIDE UNITS SERIAL NUMBER TO BIG LOTS AND ON THIS SCHEDULE.
F. MECHANICAL CONTRACTOR TO PROVIDE UNITS YEAR OF MANUFACTURE TO BIG LOTS AND ON THIS SCHEDULE.

NOTE:
THE MECHANICAL CONTRACTOR IS RESPONSIBLE FOR THE FINAL T&B AND WILL PROVIDE ANY DRIVES OR BELTS TO MEET THE ACTUAL CONDITIONS.

NOTE:
CONTRACTOR TO TEST HVAC IN HEATING AND COOLING MODE BEFORE TURNING SPACE OVER TO BIG LOTS. PROVIDE BIG LOTS REPRESENTATIVE HVAC UNIT START UP REPORT.

## EXHAUST FAN SCHEDULE

| MARK | LOCATION | MANUFACT. MODEL # | EX. AIR (CFM) | ST. PRESS. " OF W.G. | POWER | VOLTS/ PHASE | WEIGHT (LBS) | NOTES |
|---|---|---|---|---|---|---|---|---|
| EF-1 | RESTROOM | COOK 80 ACEB-80C3B | 450 | 0.375 | 1/4 HP | 115/1 | 30 | 1, 2, 3 |

EXHAUST FAN SCHEDULE NOTES:
1. FAN TO BE TIED INTO LIGHT SWITCH FOR ROOM SERVED.
2. PROVIDE WITH BACKDRAFT DAMPER AT UNIT, WHITE GRILLE.
3. PROVIDE WITH SOUND ATTENUATION HINGED CURB AND NEMA DISCONNECT SWITCH.

## AIR DISTRIBUTION DEVICE SCHEDULE

| SYMBOL | CATALOG NUMBER | SIZE MOD. | SIZE NECK | MOUNTING CLG. | MOUNTING OTHER | MATERIAL STEEL | MATERIAL ALUM. | FINISH | DPR. | BORDER STYLE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SD-1 | TMS | 12"x12" 24"x24" | SEE M-1 | • | | • | | A | - | C OR B | SURFACE MOUNT FOR CASH/COUNT |
| ~~SW-1~~ | ~~DL~~ | ~~42"x14"~~ | ~~40"x12"~~ | | • | • | | ~~A~~ | - | ~~A~~ | ~~DRUM LOUVER W/ OPTIONAL OPPOSED BLADE DAMPER~~ |
| ~~SW-2~~ | ~~DL~~ | ~~11"x8"~~ | ~~9"x6"~~ | | • | • | | ~~A~~ | - | ~~A~~ | ~~DRUM LOUVER W/ OPTIONAL OPPOSED BLADE DAMPER~~ |
| ~~SW-3~~ | ~~300-RS~~ | ~~14"x8"~~ | ~~12"x6"~~ | | • | • | | ~~A~~ | - | ~~A~~ | ~~DOUBLE DEFLECTION~~ |
| ~~SW-4~~ | ~~300-RS~~ | ~~18"x8"~~ | ~~16"x6"~~ | | • | • | | ~~A~~ | - | ~~A~~ | ~~DOUBLE DEFLECTION~~ |
| RG-1 | 50F | 24"x24" | SEE M-1 | • | | • | | A | - | A | 2'X2' PAN, EGGCRATE ACCEPTABLE |
| ~~RG-2~~ | ~~50F~~ | ~~12"x12"~~ | ~~SEE M-1~~ | • | | • | | ~~A~~ | | ~~A~~ | ~~SURFACE MOUNT~~ |
| RG-3 | 350RL | 24"x12" | SEE M-1 | • | | • | | A | - | A | SURFACE MOUNT |
| EG-1 | 50R-SS | 24"x24" | SEE M-1 | • | | • | | A | - | C | |
| MD | SEE DETAIL AND TABLE ON THIS SHEET FOR DROP BOX SIZING BASED AIR VOLUME (CFM) AND NUMBER OF DIRECTIONAL THROWS | | | | | | | | | | |

NOTES :
1. SYMBOL KEY - FIRST LETTER: S=SUPPLY, R=RETURN SECOND LETTER: D=DIFFUSER, R=REGISTER, G=GRILLE
2. CATALOG NUMBERS S & R REFER TO TITUS AIR DEVICES.
3. FINISH- "A" STANDARD WHITE FINISH. "B" UNPAINTED.
4. DAMPERS SHALL BE OPERABLE FROM FACE
   "A" OPPOSED BLADE #AG-35.
   "B" RADIAL OPPOSED BLADE #D-75.
   "C" RUSKIN CFD OR CFDR FIRE DAMPER W/VOLUME CONTROL.
   "D" YOUNG'S REGULATOR, DPR MODEL # 5020-CC
   "E" OPPOSED BLADE #AG-15-HD.
5. BORDER STYLE-
   "A" SURFACE MOUNTED
   "B" LAY-IN, PROVIDE WITH TITUS MODEL #XY-13363 FRAME FOR DRYWALL CEILING MOUNTING.
   "C" LAY-IN FRAME FOR T-BAR CEILING.

## VENTILATION RATE SCHEDULE

Mechanical Ventilation Schedules
Based upon ASHRAE 62.1, 2010; IMC 2012

| Room Name | Classification | Room Area (sq.ft.) | Area OA Rate (cfm/sq.ft.) | Default Occupancy (#/1000 sq.ft.) | Occupancy (#) | People OA Rate (cfm/person) | Fixtures (#) | Fixture Exhaust Rate (cfm/fixture) | **If Req'd** Zone Effectiveness | Total OA (cfm) | Total Exhaust |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RTU-2,3,4,7,8,9,10,11 | | | | | | | | | | | |
| Sales | Sales | 28,791 | 0.12 | 15 | 432 | 7.50 | - | - | 0.8 | 8,367 | - |
| | | | | | | | | | | | |
| RTU-1, 5, 6 | | | | | | | | | | | |
| Stock/Receiving | Stock | 11,229 | 0.06 | 5 | 56 | 5.00 | - | - | 0.8 | 1,193 | - |
| Manager | Office | 134 | 0.06 | 5 | 1 | 5.00 | - | - | 0.8 | 14 | - |
| Restrooms | Exhaust | 400 | 0.00 | 0 | 0 | 0.00 | 6 | 75 | 0.8 | 0 | 450 |
| Lounge | Lounge | 240 | 0.12 | 5 | 1 | 5.00 | - | - | 0.8 | 44 | - |
| Cash | Office | 120 | 0.06 | 5 | 1 | 5.00 | - | - | 0.8 | 13 | - |
| | Total (square feet) | 40,794 | | | 490 | | | | Space Total | 9,631 | 450 |

## GAS UNIT HEATER SCHEDULE

| MARK | MFR | MODEL | HEATING CAPACITY (BTU/HR) INPUT | HEATING CAPACITY (BTU/HR) OUTPUT | BURNER EFFICIENCY | FLUE DIAMETER VERT. INCHES | FLUE DIAMETER HORZ. INCHES | FAN DATA CFM | FAN DATA EFFECTIVE THROW FEET | ELECTRICAL MOTOR HP | ELECTRICAL INPUT W | ELECTRICAL AMPS | ELECTRICAL VOLT/PH/HZ | WEIGHT LBS | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UH-1 | LENNOX | LF24-060A | 60,000 | 48,000 | 80.0 | 4 | 5 | 830 | 40 | 1/10 | 75 | 4.1 | 115/1/60 | 87 | 1, 2 |

REMARKS:
1 PROVIDE WALL MOUNTED MANUAL THERMOSTAT HONEYWELL MODEL T822.
2 PROVIDE INTEGRAL DISCONNECT SWITCH.
3 HORIZONTAL POWER VENTING KIT 79J15 (USE FOR HORIZONTAL VENTING APPLICATIONS ONLY).
4 HIGH ALTITUDE PRESSURE SWITCH KIT (USE FOR HIGH ALTITUDE APPLICATIONS ONLY).

EXHAUST FAN
ROOF CURB
ROOFING
ROOF TRUSS
8"Ø TO CEILING
14/14 DUCT UP TO THE CURB

REST ROOM EXHAUST DETAIL
N.T.S.

SCH 40 PVC PIPING
METAL STRAPPING
GALVANIZED SCREWS
PRESSURE TREATED WOOD BLOCKING
ROOFING

ROOF CONDENSATE DETAIL
N.T.S.

RTU
ADAPTOR PANS
ROOF CURB
ROOFING
P-TRAP
ROOF TRUSS
RETURN AIR METAL DUCTING
SUPPLY AIR METAL DUCTING
SMOKE DETECTOR - RETURN
SMOKE DETECTOR - SUPPLY
CEILING
CONCENTRIC DIFFUSER

ROOF TOP UNIT DETAIL w/ ACT
N.T.S.

AES INDUSTRIES, INC.
Model ADB-1
AES Drop Box Diffusers
Optional Configurations
ISO VIEW
SIDE VIEW
TOP VIEW
3 WAY
2 WAY (A)
2 WAY (B)
AIR DIVERTER

DROP BOX DETAIL - OPEN DECK
N.T.S.

| AES Drop Box Model No. | Box Type | Total CFM | Louver Size | Dim. A | Dim. B | Dim. C |
|---|---|---|---|---|---|---|
| ~~ADB -1-5-4~~ | ~~4-way~~ | ~~2000~~ | ~~6 x 12~~ | ~~14~~ | ~~22~~ | ~~9~~ |
| ~~ADB -1-5-3~~ | ~~3-way~~ | ~~2000~~ | ~~6 x 18~~ | ~~19~~ | ~~32~~ | ~~9~~ |
| ~~ADB -1-5-2 (A or B)~~ | ~~2-way~~ | ~~2000~~ | ~~10 x 25~~ | ~~28~~ | ~~39~~ | ~~13~~ |
| ~~ADB -1-7-4~~ | ~~4-way~~ | ~~3000~~ | ~~6 x 18~~ | ~~19~~ | ~~32~~ | ~~9~~ |
| ~~ADB -1-7-3~~ | ~~3-way~~ | ~~3000~~ | ~~10 x 25~~ | ~~28~~ | ~~39~~ | ~~13~~ |
| ~~ADB -1-7-2 (A or B)~~ | ~~2-way~~ | ~~3000~~ | ~~10 x 25~~ | ~~28~~ | ~~39~~ | ~~13~~ |
| ~~ADB -1-8-4~~ | ~~4-way~~ | ~~3400~~ | ~~6 x 24~~ | ~~20~~ | ~~38~~ | ~~9~~ |
| ~~ADB -1-8-3~~ | ~~3-way~~ | ~~3400~~ | ~~10 x 20~~ | ~~24~~ | ~~34~~ | ~~13~~ |
| ~~ADB -1-8-2 (A or B)~~ | ~~2-way~~ | ~~3400~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ADB -1-10-4 | 4-way | 4000 | 10 x 20 | 24 | 34 | 13 |
| ADB -1-10-3 | 3-way | 4000 | 10 x 25 | 28 | 39 | 13 |
| ~~ADB -1-10-2 (A or B)~~ | ~~2-way~~ | ~~4000~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ~~ADB -1-12-4~~ | ~~4-way~~ | ~~5000~~ | ~~10 x 20~~ | ~~24~~ | ~~34~~ | ~~13~~ |
| ~~ADB -1-12-3~~ | ~~3-way~~ | ~~5000~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ~~ADB -1-12-2 (A or B)~~ | ~~2-way~~ | ~~5000~~ | ~~12 x 50~~ | ~~30~~ | ~~64~~ | ~~15~~ |
| ADB -1-15-4 | 4-way | 6000 | 10 x 25 | 28 | 39 | 13 |
| ~~ADB -1-15-3~~ | ~~3-way~~ | ~~6000~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ~~ADB -1-15-2 (A or B)~~ | ~~2-way~~ | ~~6000~~ | ~~12 x 50~~ | ~~38~~ | ~~64~~ | ~~15~~ |
| ~~ADB -1-20-4~~ | ~~4-way~~ | ~~8000~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ~~ADB -1-20-3~~ | ~~3-way~~ | ~~8000~~ | ~~12 x 50~~ | ~~38~~ | ~~64~~ | ~~15~~ |
| ~~ADB -1-20-2 (A or B)~~ | ~~2-way~~ | ~~8000~~ | ~~15 x 50~~ | ~~38~~ | ~~56~~ | ~~19~~ |
| ~~ADB -1-25-4~~ | ~~4-way~~ | ~~10000~~ | ~~12 x 30~~ | ~~30~~ | ~~45~~ | ~~15~~ |
| ~~ADB -1-30-4~~ | ~~4-way~~ | ~~12000~~ | ~~12 x 50~~ | ~~38~~ | ~~64~~ | ~~15~~ |

RTU
ADAPTOR PANS
ROOF CURB
P-TRAP
ROOFING
ROOF TRUSS
ACCESS DOOR
ACCESS DOOR
SMOKE DETECTOR
SUPPLY AIR METAL DUCTING
SMOKE DETECTOR
1/2" SCREEN
RETURN AIR METAL DUCTING
BOTTOM OF DROP BOX DIFFUSER TO BE AT 6" ABOVE TOP OF LIGHTING STRIP
SEE DETAIL DRAWINGS OF DROP BOX
NOTE: VERIFY WITH LOCAL AUTHORITIES HAVING JURISDICTION ON LOCATION OF SMOKE DETECTORS. CONTRACTOR TO VERIFY RETURN, SUPPLY, OR BOTH.

ROOF TOP UNIT DETAIL - OPEN DECK
N.T.S.

# MECHANICAL NOTES

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE Area | SqFt |
|---|---|
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

DATE DRAWN: 12/12/2022
DRAWN BY: ML
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS! BIG LOTS STORES, LLC

SHEET:
M-2



**DEMO CODED NOTES:**

1. LANDLORD TO REMOVE EXISTING ROOFTOP UNIT. EXISTING CURB TO BE CAPPED. INSTALL 3/4" PLYWOOD AND CAP CURB WITH TAMPER RESISTANT SCREWS. REMOVE ALL ADAPTORS. LANDLORD TO COMPLETE ALL ROOF WORK. REMOVE ALL DUCT WORK AND ASSOCIATED GRILLES AND DIFFUSERS. REMOVE ALL ASSOCIATED ELECTRICAL BACK TO SOURCE.

2. LANDLORD TO REMOVE EXISTING ROOFTOP UNIT, CURB AND ALL EXISTING DUCT WORK AND ASSOCIATED GRILLES AND DIFFUSERS. ALL REMOVED MATERIALS TO BE DISPOSED OF PROPERLY. EXISTING ROOF OPENING TO REMAIN AND BE REUSED FOR NEW WORK. REFER TO M-1 FOR NEW MECHANICAL WORK.

3. EXISTING PLUMBING FIXTURES IN THIS AREA TO BE DISCONNECTED AND REMOVED IN THEIR ENTIRETY. REMOVE SANITARY PIPING BACK TO BELOW FLOOR AND WATER LINES BACK TO CEILING SPACE. ALL PIPING TO BE CAPPED WATER TIGHT.

NOTE: MECHANICAL CONTRACTOR TO SEE SHEET M-3 FOR ADDITIONAL DEMO INFORMATION.

NOTE: ELECTRICAL CONTRACTOR TO SEE SHEET ED-1 FOR ADDITIONAL DEMO INFORMATION

NOTE: PLUMBING CONTRACTOR TO SEE SHEET M-3 AND P-1 FOR ADDITIONAL DEMO

NOTE: DEMO CONTRACTOR NOT TO REMOVED ANY PANELS UNTIL ELECTRICAL CONTRACTOR CONFIRMS NO EXTERIOR LIGHTS CIRCUITS ARE ON PANEL BEING REMOVED. CONTACT BIG LOTS IF EXTERIOR CIRCUITS ARE IN PANEL

MECHANICAL CONTRACTOR TO REMOVE ALL EXISTING HVAC CONTROLS NOT COMPATIBLE WITH SIEMENS CONTROLS, INCLUDING BUT NOT LIMITED TO NOVAR CONTROLS. REFER TO E-3, E-4, M-1 FOR NEW HVAC CONTROLS SCOPE OF WORK. SIEMENS D2C CONTROLLERS ARE WIRED AS CONVENTIONAL THERMOSTAT CONTROL

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 EAST DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

| SQUARE FOOTAGE | SqFt |
|---|---|
| Area | |
| SALES FLOOR | 28,810 |
| TOTAL BUILDING | 42,128 |

| DATE DRAWN: | 12/12/2022 |
|---|---|
| DRAWN BY: | ML |
| SCALE: | 3/32"=1'-0" |

**MECHANICAL DEMOLITION PLAN**

SHEET:
**M-3**

DocuSign Envelope ID: 21EE9D42-3ADD-4D9A-8D42-588B1989CA5E

# DIVISION 15 - MECHANICAL PLUMBING

1. PROVIDE ALL LABOR, EQUIPMENT, AND MATERIALS NECESSARY TO EXECUTE THE PLUMBING WORK INDICATED ON THE DRAWINGS, AND AS REQUIRED BY LOCAL CODES AND ORDINANCES.

2. PAY ALL FEES AND ARRANGE FOR EXECUTION OF ALL TAPS, METERS WITH REQUIRED ENCLOSURES (IF ANY), ETC. INHERENT TO THE INSTALLATION OF NEW PLUMBING SERVICE.

3. PLUMBING WORK FOR THIS CONTRACT SHALL INCLUDE ALL PIPING FOR DOMESTIC HOT AND COLD WATER LINES AND SANITARY LINES, HOOK-UP OF ALL FIXTURES SCHEDULED ON THE DRAWINGS, AND INSULATION OF DESIGNATED PIPING RUNS. WORK SHALL ALSO INCLUDE ALL GAS PIPING AND EQUIPMENT HOOK-UP AS NOTED ON THE DRAWINGS.

4. ALL ITEMS SUCH AS FITTINGS, ETC. NOT MENTIONED BUT UNDERSTOOD TO BE NECESSARY TO COMPLETE THE PLUMBING SYSTEM SHALL BE INCLUDED.

5. SOIL, WASTE, AND VENT PIPING TO BE OF MATERIAL APPROVED BY LOCAL CODES. PVC, DWV PIPING AND FITTINGS TO BE SCHEDULE 40 AS A MINIMUM.

6. PROVIDE CLEANOUTS FOR SOIL AND WASTE LINES AS SHOWN ON DRAWINGS, AND OF TYPE APPROVED BY LOCAL CODES.

7. ALL WATER SUPPLY PIPING BELOW GROUND SHALL BE TYPE K SOFT COPPER TUBING. (AVOID FITTINGS BELOW SLAB WHENEVER POSSIBLE). ALL WATER SUPPLY PIPING ABOVE GROUND SHALL BE TYPE L HARD COPPER TUBING.

8. PROVIDE FOR DRAINAGE WATER SYSTEM, AND CAP ALL STUBS UNTIL FINISH WORK IS INSTALLED. INSTALL DRAIN VALVE AT WATER METER WITH 3/4" HOSE THREAD AND VACUUM BREAKER.

9. PROVIDE STOPS ON WATER SUPPLIES TO EACH FIXTURE.

10. GAS PIPING FOR HEATING SYSTEMS WITH GAS-FIRED EQUIPMENT SHALL BE INCLUDED IN THIS CONTRACT. GAS PIPING SHALL BE STANDARD WEIGHT, BLACK STEEL PIPE, SCHEDULE 40. PIPING EXPOSED TO ATMOSPHERE OR RUN BELOW GRADE SHALL HAVE POLYETHYLENE PLASTIC COATING AND VENTED TO OUTDOORS. ALL GAS PIPING, FITTINGS AND INSTALLATION SHALL BE IN ACCORDANCE WITH REQUIREMENTS OF UTILITY COMPANY AND ALL GOVERNING CODES.

11. INSTALL ALL COLD AND HOT WATER PIPING WITH ARMSTRONG COMPANY ARMAFLEX "11" PIPE INSULATION. SEAL JOINTS WITH ARMSTRONG 520 ADHESIVE. IMPORTANT - HOLD ALL COLD AND HOT WATER PIPING TO WARM SIDE OF INSULATION TO PROHIBIT FREEZING. INSULATION SHALL MEET FLAME SPREAD AND SMOKE DEVELOPED RATINGS REQUIRED BY LOCAL CODES.

12. PLUMBING FIXTURES SHALL BE FURNISHED AND INSTALLED WHERE SHOWN ON THE DRAWINGS. ALL FIXTURE FITTINGS AND EXPOSED FIXTURE PIPING SHALL BE BRASS CHROMIUM PLATED. ALL TRAPS SHALL BE CAST BRASS. ALL FIXTURES SHALL BE BONE, FIXTURES SHALL BE AS MANUFACTURED BY AMERICAN STANDARD, KOHLER OR CRANE, AND EQUAL IN ALL RESPECTS TO FIXTURES SPECIFIED. CLOSET BOLTS SHALL BE BRASS.

**WATER CLOSET (WC-1)**
NO. 2234-001     AMERICAN STANDARD ELONGATED "WHITE" WATER-SAVER "MADERA" VITREOUS CHINA TOILET
NO. 98          ELONGATED "OLENTE" WN OPEN FRONT SEAT. NOT SELF-SUSTAINING RIM
NO. 111-1.28    SLOAN FLUSH VALVE

**WATER CLOSET (WC-2)**
NO. 3043.001    AMERICAN STANDARD ELONGATED "WHITE" WATER-SAVER "MADERA" VITREOUS CHINA TOILET 1.2" RIM HEIGHT
NO. 100         ELONGATED "OLENTE" WN OPEN FRONT SEAT. NOT SELF-SUSTAINING RIM
NO. 111-1.28    SLOAN FLUSH VALVE

**LAVATORY (LAV-1)**
NO. 0356.421    AMERICAN STANDARD WALL MOUNT, CONCEALED ARMS
NO. 9972        MCGUIRE ADJUSTABLE CAST BRASS "P" TRAP WITH TUBING DRAIN TO WALL
NO. 701-HDF     1 1/4"X 1 1/2 INLET AND OUTLET. CLEANOUT PLUG ESCUTCHEON
NO. 167         DELTA FAUCET WITH GRID STRAINER

**URINAL (UR-1)**
NO. WEUS-1002.1401-0.25   SLOAN, "OPTIMA PLUS" WHITE URINAL CHINA. WASHDOWN FLUSH ACTION, WALL HUNG, PROVIDE STRAINER

## FIXTURES AND EQUIPMENT:
FURNISH, INSTALL AND COMPLETE OPTIONS. ROUGH-IN AND FINAL CONNECTIONS OF REQUIRED WASTE, VENT, AND WATER SUPPLY PIPING BY PLUMBING CONTRACTOR. ALL SUPPLY PIPING SHALL BE VALVED.

13. WATER METER IS A POSITIVE DISPLACEMENT METER OF THE NUTATING DISC TYPE OR AS REQUIRED BY LOCAL UTILITY COMPANY.

14. WATER HEATER SHALL BE MANUFACTURED BY A.O. SMITH, RUUD, OR STATE. INSTALL SHUT OFF VALVE IN COLD AND HOT WATER LINES AT SUPPLY OF HEATER. PROVIDE DIELECTRIC COUPLINGS WHERE FERROUS AND NON-FERROUS MATERIALS ARE IN CONTACT. PROVIDE TEMPERATURE-PRESSURE RELIEF VALVE AT HEATER. VALVE SETTING SHALL BE 125 PSIG DISCHARGE FULL SIZE THRU DRAIN PIPE TO FLOOR DRAIN.

15. WALL HYDRANTS SHALL BE FREEZELESS AUTOMATIC DRAINING TYPE AS MANUFACTURED BY WOODFORD, MODEL #67 OR EQUAL BY ZURN OR MUG.

16. COORDINATE ALL WORK WITH ELECTRICAL AND HVAC CONTRACTORS.

17. THIS CONTRACTOR SHALL GUARANTEE ALL WORK INSTALLED UNDER THE CONTRACT TO BE FREE FROM DEFECTIVE WORKMANSHIP AND MATERIALS. USUAL WEAR EXPECTED, AND SHOULD ANY SUCH DEFECTS DEVELOP WITHIN A PERIOD OF ONE YEAR AFTER ACCEPTANCE OF THE BUILDING BY THE OWNER, THIS CONTRACTOR SHALL REPAIR AND/OR REPLACE ANY DEFECTIVE ITEMS AND ALL DAMAGE RESULTING FROM FAILURE OF THESE ITEMS, AT NO EXPENSE WHATSOEVER TO THE OWNER.

18. BACKFLOW PREVENTER TO BE INSTALLED WHEN REQUIRED BY LOCAL CODE AND IS TO BE PROVIDED BY AND INSTALLED BY THE PLUMBING CONTRACTOR.

19. ALL CONTRACTORS ARE TO ENGAGE WITH LINDLORDS ROOFING CONTRACTOR FOR ALL ROOF PENETRATIONS, REPAIRS, ETC.

## GENERAL NOTE:
PLUMBING CONTRACTOR TO PROVIDE WATER METER NUMBER TO BIG LOTS AT THE BEGINNING OF THE PROJECT.

PLUMBING CONTRACTOR TO JET ALL PLUMBING LINES OUT AT THE END OF THE PROJECT.

PLUMBING CONTRACTOR TO CAMERA LINES AT THE BEGINNING AND END OF THE PROJECT.

REFER TO M-J FOR PLUMBING DEMO SCOPE

KEYED NOTES:

1. CONNECT NEW 4" SANITARY LINE TO EXISTING MAIN SANITARY LINE. VERIFY EXACT LOCATION AND SIZE OF EXISTING MAIN SANITARY LINE. PROVIDE ADDITIONAL CLEANOUTS AS REQUIRED AND AT CONNECTION TO LANDLORD MAIN.

2. CONNECT NEW 2" CW LINE TO EXISTING CW LINE BY LANDLORD. EXISTING METER AND BACKFLOW TO BE REUSED IF POSSIBLE. PROVIDE NEW AS NEEDED. VERIFY EXACT REQUIREMENTS WITH LANDLORD AND HALL. VERIFY EXACT LOCATION AND SIZE IN FIELD PRIOR TO BID.

3. NEW WATER HEATER LOCATED ABOVE MOP SINK. PROVIDE PLATFORM FOR WATER HEATER. SEE DETAIL THIS SHEET FOR MORE INFORMATION.

4. CONNECT NEW 2" VENT LINE INTO EXISTING BUILDING VENT SYSTEM. VERIFY EXACT SIZE AND LOCATION IN FIELD.



## TRAP PRIMER DETAIL
SCALE: NTS





NOTE:
ALL WATER LINES SHALL BE INSULATED

## WATER HEATER DETAIL
SCALE: NTS




## MOP SINK AND SERVICE FAUCET
SCALE NTS

## RISER DIAGRAM
SCALE NTS

## STACK DIAGRAM
SCALE: NTS



MEN

WOMEN

LOUNGE

## PLUMBING PLAN
SCALE: 1" = 1'-0"

NOTE:
SEE STACK AND RISER DIAGRAMS FOR PIPE SIZES

### PLUMBING FIXTURE SCHEDULE

| ITEM | DESCRIPTION | ROUGH-IN PIPING | | | | | SPECIFICATIONS | | | | REMARKS |
|------|-------------|-------|------|---------------|---------------|------|------|-------|-------|-------------|---------|
| | | WASTE | VENT | HOT WATER | COLD WATER | WSFU | MFR. | MODEL | COLOR | ACCESSORIES | |
| WC-1 | WATER CLOSET | 4" | 2" | | 1" | 10 | AMERICAN STANDARD | 2234.001 | WHITE | | 1.28 GPF |
| WC-2 | WATER CLOSET | 4" | 2" | | 1" | 10 | AMERICAN STANDARD | 3043.001 | WHITE | ① | 1.28 GPF |
| UR-1 | URINAL | 2" | 1 1/2" | | 3/4" | 5 | SLOAN | WEUS-1002.1001-0.25 | WHITE | | .25 GPF |
| LAV-1 | LAVATORY | 1 1/2" | 1 1/2" | 1/2" | 1/2" | 2 | AMERICAN STANDARD | 0356.421 | WHITE | DELTA B7100 | |
| MS-1 | MOP SINK | 3" | 1 1/2" | 1/2" | 1/2" | 3 | FIAT | MSB-2424 | | 830 AA 1483 BB | |
| DF-1 | DRINKING FOUNTAIN | 1 1/2" | 1 1/2" | | 1/2" | 0.5 | ELKAY | EZSTL8LC | GRAY | EZSTL8LC | ① DUAL HEIGHT |
| FCO | FLOOR CLEAN OUT | | | | | | ZURN | ZN1406-HD | | | |
| FD | FLOOR DRAIN | 3" | | | | | ZURN | ZN400C | | | |
| WH-1 | 30 GALLON ELECTRIC WATER HEATER | | | 3/4" | 3/4" | | A.O. SMITH | DEL-20 | | | ②③④ |
| TP | TRAP PRIMER | | | | | | PRECISION PLUMBING PRODUCTS | PR-500 | | | ④ |
| WHA | WATER HAMMER ARRESTOR | | | | LINE SIZE | | PRECISION PLUMBING PRODUCTS | SC | | | |
| WCO | WALL CLEAN OUT | | | | | | ZURN | Z1441 | | | |
| ET-1 | EXPANSION TANK | | | | 3/4" | | BELL & GOSSETT | PT-12 | | | |

### REMARKS:
① ADA
② PROVIDE 120V, 3KW SINGLE ELEMENT
③ WITH DRAIN PAN UNDER WATER HEATER
④ T&P RELIEF FULL SIZE
⑤ INSTALLED IN WALL WITH ACCESS PANEL ELKHOR VB
⑥ PROVIDE MIXING VALVE FOR TEMPERED HOT WATER SET AT 110 DEG F OUTLET

PROVIDE SPECIFIED FIXTURE OR APPROVED EQUAL

BIG LOTS STORE
5601 US-10
STEVENS POINT, WI 54482

SQUARE FOOTAGE
Area          SqFt
SALES FLOOR   28,810
TOTAL BUILDING 42,128

DATE DRAWN: 12/1/2022
DRAWN BY: ML
SCALE: 3/32" = 1'-0"

BIG LOTS STORES, LLC.
STORE PLANNING DEPT.
4900 E. DUBLIN GRANVILLE RD
COLUMBUS, OHIO 43081
PHONE: (614) 278-6800

# PLUMBING PLAN

SHEET:
**P-1**

# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

File No.: NCS-1120650-ATL

LOT TWO (2) OF CERTIFIED SURVEY MAP NO. 5174 AS RECORDED IN VOLUME 18 OF SURVEYS ON PAGE 199, AS DOCUMENT NO. 459801, BEING PART OF LOT ONE (1) OF CERTIFIED SURVEY MAP NO. 4906 AS RECORDED IN VOLUME 17 OF SURVEYS ON PAGE 161, LOCATED IN AND BEING PART OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER (SW1/4-NW1/4) OF SECTION THIRTY-SIX (36), TOWNSHIP TWENTY-FOUR (24) NORTH, RANGE EIGHT (8) EAST, CITY OF STEVENS POINT, PORTAGE COUNTY, WISCONSIN.

EXCEPT LOT ONE (1) OF CERTIFIED SURVEY MAP NO. 11276 AND THAT PART OF JEFFERSON STREET DEDICATED TO THE CITY OF STEVENS POINT AS SHOWN ON CERTIFIED SURVEY MAP NO. 11276, AS RECORDED IN VOLUME 52 OF SURVEYS, PAGE 106, AS DOCUMENT NO. 855685.

ALSO EXCEPT LAND DEED FOR HIGHWAY PURPOSES AS DISCLOSED IN AWARD OF DAMAGES RECORDED FEBRUARY 7, 2006 AS DOCUMENT NO. 684956.

## EXHIBIT C

### LANDLORD'S WORK:

**STOREFRONT FACADE:**
The exterior storefront shall have an "ANCHOR" type façade and canopy, it is to be centered within the frontage of the demised premises, and to be acceptable to Tenant. The canopy and building facade shall be new, or repaired to like new condition, and finished per Tenant's specifications.

Big Lots standard building paint colors:

-Sign Façade area (if applicable)- Behr – PPE 5400 Ext Semi-Gloss – Smoky Trout MQ2-53

-Trim areas, Cornices and Copings - Behr – PPE 5400 Ext Semi-Gloss – White Veil OR-W14

-Main Building - Behr – PPE 5400 Ext Semi-Gloss – Cascade Beige – N240-1

Any alternate colors and finishes must be approved by Tenant.  Exterior walls shall be painted as needed.

**STOREFRONT GLASS:** Landlord is to provide a minimum of 48' feet of glass storefront including a vestibule entrance with four (4) sets of bi-part, fully automatic, sliding doors (STANLEY Dura-Glide Series 3000). The vestibule is to have new commercial grade walk-off carpet tiles (SHAW 5T034-LAVA34549) and adequate HVAC per Tenant's specification. Landlord to provide curb cut ramps directly aligned with entry and exit doors. Ramps to be flush with parking lot and meet ADA Requirements.  Any and all broken or damaged glass, and storefront mullions to be replaced (mullions to be clear aluminum or dark bronze finish). Remove all materials blocking or covering windows and glass doors.

**WINDOW TINTING:**
1) 3M SOLID BLACK TINT FROM FLOOR UP TO 40" AFF, LOCATION SHOWN ON PLANS.
2) 3M NV-25 SMOKED TINT FROM 40" AFF TO TOP OF GLASS, LOCATION SHOWN ON PLANS.
3) ALL TINTING IS TO BE INSTALLED ON INSIDE OF WINDOWS NOT ON EXTERIOR.

**DOORS:**
All doors and door systems (exterior and overhead included) to be sound, secure, in good working condition, and adequate for Tenant's use. All doors are to have locking hardware, closers, weather stripping, thresholds, and be sealed to prevent outside elements from entering the building.

**DEMISING WALL:** Landlord to erect demising wall(s) separating the demised premises per Tenant's specifications. Landlord to re-tie the ceiling to demising wall(s) and finish floor to include cove base.

**STOCKROOM &**
**INTERIOR WALLS:** Landlord to erect all new interior walls including doors per Tenant specifications. All walls to be smooth, spackled, sanded and painted per Tenant's specifications.

45

**OFFICES, LOUNGE,**
**REST ROOMS, ETC.:** Landlord is to provide Tenant with two offices, one lounge, one utility closet, and a minimum of two restrooms to Tenant's specifications and finishes. Restroom fixtures and finishes shall be new and to have a minimum of three commodes in the women's and two commodes and one urinal in the men's. Rest rooms shall include baby changing stations, partitions, and electric hand dryers. Additionally, drinking fountains and utility sink to be provided per Tenant's specifications. All offices, lounge and restrooms shall have adequate HVAC, new ceilings and new floor tile (restrooms to have floor covering that meet code requirements for premises with the sale of food), electrical, plumbing, lighting, sinks, fixtures, partitions, FRP, Marlite panels, etc per Tenant's specifications.

**PAINTING:** Landlord shall paint all interior areas per Tenant drawings and specifications.

**FLOORING:** Landlord is to remove the existing floor covering, ensure that all floors are smooth, level and at same elevation throughout entire premises. Landlord to remove the existing floor tile and mastic and provide new Grey Armstrong 51904 Sterling VCT 12' x 12' floor tile per Tenant's specs around the perimeter of the sales floor, offices, rest rooms etc. and install new commercial grade luxury vinyl floor tile (Shaw: Highland Forest 6" I800vlight Oak 20220 6"x48") in the middle of the sales floor area as indicated on Tenant's plans. The stockroom to be sealed concrete.

**CEILINGS:** Sales Area:

Acoustical Ceiling Tile systems shall be at same height (a minimum of 14' feet) throughout. Landlord shall install new 2' x 4' white ceiling tile and new grid per Tenant's specifications.

OR

Exposed, open deck roof structure. Roof deck insulation must have adequate and compliant R-factor ratings. Landlord shall paint the interior open deck including but not limited to all roof decking, bar joists and duck work per Tenant's specifications.

Offices, Restrooms, Lounge, Utility Closet, and Vestibule:

Acoustical Ceiling Tile systems per Tenant specifications.

**INTERIOR**

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

**LIGHTING:**     Landlord to install all new energy efficient strip lighting with LED lamps and circuits per Tenant's specifications. Lighting fixtures to be used are 8' and 4' strip-type T8and with4' tandem LED lamps. Lamp color to be 841 with 10.5 watt rating, lamp type minimum orequivalent, Philips 0.5T8/MAS/48-840/MF16/P 10/1. Lighting fixtures are to run side – to – side in continuous rows with 10' spacing including a perimeter row of lighting. The perimeter lighting is to be installed within 4'-6' feet off the front, back and side walls running parallel to the walls and within 2'-3' feet of the end of thefixture runs. The back row of the perimeter lighting is to extend past the rows of lighting on each side wall. Lighting in the stockroom should be a maximum height of 16' feet and a minimum height of 12' feet. Stockroom lighting fixtures to be 12'feet on center.

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting     lighting, building lights, exterior wall packs, under canopy lighting, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot in the area of the Project owned by the Landlord. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Canopy lighting and wall packs servicing Tenant's Demised Premises are to be on Tenant's meter and controlled with storefront signage.

**UTILITIES**:     Landlord to provide separate utilities and separate utility meters with service direct from the local distribution company (including but not limited to gas, electric, water, etc.) adequate for Tenant's intended use per the following specifications. Tenant to have a minimum electrical service of 1,600 amps for 120/208v service or 800 amps for 277/480v service and include all switch gear, main distribution panels, transformers, and circuit panels. All electrical equipment to be located within the demised premises and connected to all HVAC, lighting, receptacles, other electrical supplied systems throughout the demised premises. Any existing electrical gear being used to be approved by Tenant.

If the existing electric service is not in Tenant's Demised Premises, Landlord is to set a new transformer, providing a basic service to Tenant's Demised Premises with the above minimums. Landlord will be responsible for installing the new Main Distribution Panel (MDP) per Tenant's specifications. The Main Distribution Panel (MDP) and panels will be inspected and energized before turning the space over to Tenant. The Landlord will be responsible to distribute the service throughout the space including any circuit panels, step down transformers per Tenant's specifications. Landlord will be responsible for all branch circuitsout of

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-18D42-5B6B4969CA5E

panels and gear installed by Landlord. Landlord to install Tenant supplied Energy Management System (EMS) per Tenant's specifications.

Landlord shall also provide Tenant with assurance that utilities per the specifications above are adequate for Tenant's use, are available and include legal access across other properties, if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. All existing sanitary lines to be video scoped to ensure they not obstructed or damaged, video to be provided to Tenant.

**HVAC EQUIPMENT & MECHANICALS:**

Landlord shall provide a minimum of one ton per 300 square feet of HVAC throughout the sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. All mechanicals to meet ASHREA standard and comply with all state and local code. All mechanical designs shall be submitted to Tenant's engineering and construction departments for review and approval two weeks prior to applying for permits. All HVAC units that are often (10) years or older are to be replaced with new standard RTU units with new concentric diffusers (unless otherwise specified by a Big Lots HVAC/Energy representative). New units shall be either Lennox, Carrier, Rheem or Trane and no larger than 10-20 tons each. Landlord is required to either install new or modify existing ducting from units in order to serve sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date with Landlord providing Tenant a copy of the inspection report. Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant; and patch the roof as necessary. If the Tenant Possession Date occurs during the months of October through June, Landlord shall grant Tenant until June 15th or a minimum of 90 days to have the HVAC system inspected to determine the needed repairs. Landlord shall also warrant any existing HVAC units for the initial lease term for any repairs over $2,000 during a single lease year. All warranties for new units shall be passed on to Tenant.

**PLUMBING, ELECTRICAL, SPRINKLER**
**& FIRE SYSTEMS:**
All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system meets the requirements that are adequate for Tenant's use (including Class A Plastics with 12' Ft. Racking AFF in Stock Room) and required by local code.

Where required, Landlord shall also provide a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions.

Landlord shall install any devices or systems for the suppression (including fire extinguishers), detection, reporting of fire, and backflow prevention as required by the AHJ. Any fire alarm systems must meet the requirements for monitoring by Tenant's contractor and Tenant to approve the fire alarm plans prior to installation of equipment to verify panel compatibility and coordinate monitoring.

**REMOVAL OF FIXTURES**
**& EQUIPMENT**: Landlord to remove all fixtures, equipment, rooms, partitions, walls, mezzanine and make all repairs to the ceiling, floor, walls, etc. necessitated by such removal. Landlord to remove the electric and plumbing to such equipment and block any openings in exterior walls with matching material.

**RECEIVING:**
Landlord to provide 48" receiving dock or truck well with the top of the dock at stockroom floor

elevation. The receiving dock/truck well slope should not to exceed 5% grade and 48" inch depth to accommodate over-the road tractor-trailers (53' trailers). The loading dock platform shall be enclosed and under roof, including all seals, bumpers, bollards, doors, etc to be in good working order and like new condition. Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**ROOF:**
Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term.

Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports. Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease, either via a roof hatch (existing or newly installed in a mutually agreeable location of the stock room) OR via a ladder existing/installed on the exterior wall in the rear.

**STRUCTURE &**

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969GA5E

**BUILDING:**  Landlord shall make any and all repairs/replacement to the building structure as necessary. This shall include all existing brick/masonry block and mortar.  The exterior walls shall also be treated as necessary to ensure the Demised Premises is free of leaks.  Landlord shall also install new gutters and downspouts on the building as necessary. All conditions and materials must meet or exceed all ADA, ANSI, ASHRE, NFPA, and AHJ codes and requirements.

**PARKING LOT:**  Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking).  The parking lot serving the Demised Premises shall be re-sealed and re-striped prior to delivery of Demised Premises to Tenant. Fire lanes, curbs and pole bases shall be freshly painted as well.  The number of parking spaces provided for the demised premises must meet the requirements of the AHJ and ADA. A minimum of four, van accessible, handicap parking spaces and related signage required by Tenant.

**CART CORRAL:**  Landlord to install 2 cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

**SIGNAGE:**  Tenant shall receive a panel on the existing pylons per the pylon Exhibit D-1 in the lease in a position based on relative square footage to co-tenants. Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center.  Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s).  Landlord to ensure that the pylon(s) is properly wired, maintained, constructed and deliver fully operational.
Any Pylon remodels or newly constructed signs, shall reflect Tenant in a similar position & size.

**PESTS:**  Premises to be professionally inspected for pestilence and termites.  Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**HAZARDOUS MATERIALS:**  Landlord is responsible for remediation of any and all hazardous material.  Landlord to provide Tenant with an asbestos inspection report of the Demised Premises prior to lease execution.  Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**DRAWINGS:**  Landlord is to provide Tenant with a complete set of "as-built" drawings (CAD format) of the Demised Premises adequate for Tenant to produce Tenant's plans and specifications.  Tenant shall approve all Landlords' Construction Documents prior to the submission for permits and the commencement of Landlord's work.  Upon fully executing a lease document, Landlord shall supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress. Landlord will be required to provide detailed information to Tenant with General Contractor contact information and a weekly cadence of construction progress throughout the construction process.

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

**GENERAL
CONDITIONS:**  Landlord agrees the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable).  If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; HVAC report evidencing all installations and/or repairs have been completed and all HVAC is operating properly; and pest inspection report showing building is pest free, prior to Tenant's possession.

All above work to be completed prior to the Tenant Possession Date.

**EXHIBIT D**
**TENANT BUILDING SIGN SPECIFICATION AND**

**TENANT SIGN SPECIFICATION**

## First Option Building Exterior
## Primary Stacked Logo



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

## Second Option Building Exterior
## Primary Horizontal Logo



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

# Channel Letters – Section Details





# Pylon / Monument Panels

## Square Panels

**Preferred:**



**2nd Option:**



## Rectangular Panels

**Preferred:**



**2nd Option:**



**Colors:**

 Orange – Match PMS 021c Orange (3M color 44)

 White

# EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date**: _____

**To**:    _____ (insert Tenant)
   via facsimile:  (614) 278-6546

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE**: _____ (insert Project, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs.  Landlord shall deliver to Tenant with this notice, the required surveys and initial  completion of each item below prior to possession being accepted by Tenant.

_____    Roof Survey with evidence that the required repairs have been made.

_____    HVAC Survey with evidence that all required repairs have been made.

_____    Asbestos Survey (with evidence of required remediation, if necessary)

_____    Pest Survey certifying the premises.

_____    Sprinkler Certification.

_____    Completion of Exhibit C

_____    Utility Information:  Meter numbers for electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You**.**

**LANDLORD:**

_____
a _____

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

By: _____

Title: _____

**TENANT:**

**BIG LOTS STORES – PNS, LLC, a California
limited liability company**


By: _____

Title: _____

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4969CA5E

## EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Project affect Tenant's use except as follows:**
Dunham's Sports

SECTION 25.13. Landlord warrants and agrees that, so long as Tenant is operating predominantly a sporting goods store, Landlord has not, nor will it, enter into any lease for other premises in the Shopping Center with any tenant which, as its principal business, sells sporting goods or active sports apparel (as opposed to "designer sportswear"). This clause shall not apply to Rogan's Shoes or their replacement tenant in the same space. If Landlord has or does violate this agreement, Landlord shall have sixty (60) days from the notice of violation within which to cure; if Landlord fails to cure within said sixty (60) day period, Tenant may terminate this Lease upon thirty (30) days' notice any time thereafter. In addition to the aforesaid termination right, Tenant shall have the right, immediately upon notice of Landlord's violation of this agreement, to reduce the Minimum Rent payable by Tenant to one-half (½) of the applicable Minimum Rent set forth in Article I of this Lease, and such reduced Minimum Rent shall not be increased during the remainder of the Term.

DocuSign Envelope ID: 21EE5E42-3ADD-4D9A-8D42-5B6B4069CA5F

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 20___ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and Big Lots Stores – PNS, LLC, a California limited liability company, ("Tenant").

     Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1.D.) = _____.

2.    A.    Fixed Minimum Rent – Original Term (Section 5.A.): _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent – First Option (Section 5.A.): _____ annually; _____ per month.

4.    A.    Fixed Minimum Rent – Second Option (Section 5.A.): _____ annually; _____ per month.

5.    A.    Fixed Minimum Rent – Third Option (Section 5.A.): _____ annually; _____ per month.