# EXHIBIT A

Section

1.  Definitions
    A.  Common Areas
    B.  Dates
    C.  Exhibits
    D.  Demised Premises
    E.  Shopping Center
    F.  Gross Sales
    G.  Landlord's Rent Address

2.  Demise

3.  Term
    A.  Original Term
    B.  Option to Extend Term

4.  Use and Operation

5.  Rent
    A.  Fixed Minimum Rent
    B.  Utilities Charge and Exterior Lighting
    C.  Intentionally Deleted
    D.  Common Area Charges and Cap
    E.  Real Estate Taxes
    F.  Construction Allowance
    G.  Late Fees

6.  Alterations

7.  Maintenance, Repairs and Initial Build Out

8.  Signs

9.  Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A.  Tenant
    B.  Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

This Lease Agreement ("Lease"), shall be made effective the 1 day of April , 2011, by and between RREEF Collin Creek Shopping Center, L.P., a Texas limited partnership, whose mailing address is c/o RREEF, 200 Crescent Court, Suite 560, Dallas, TX 75201, Attn: LaRee Stein, CPM ("Landlord"), and PNS Stores, Inc., a California corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

<u>WITNESSETH:</u>

1.    **<u>DEFINITIONS:</u>**

For purposes of this Lease, these terms are defined as follows:

A.    <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the "Collin Creek Shopping Center" (defined below) not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.  Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises as shown on Exhibit A-2 so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the area crosshatched on Exhibit A-3 ("No Change Area").

B.    <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with "Landlord's Work" (as defined below) without interference with Landlord's Work and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or

accepts possession following Landlord's notice to Tenant that it has substantially completed any construction that may be required pursuant to Exhibit C (subject only to "punch list" items), or (ii) the date on which Tenant receives all permits for its construction and signage. Tenant will submit its plans for permits within seventy-five (75) days of the full execution of this Lease and thereafter, diligently and continuously pursue obtaining such permits and shall notify Landlord upon receipt thereof. Landlord will cooperate fully (but without cost to Landlord) with Tenant in obtaining said permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord provided that Landlord's Work has in fact been substantially completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)      The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      If Landlord fails to return a properly executed Lease to Tenant by April 15, 2011, or if Landlord fails to complete Landlord's Work in the Demised Premises by July 1, 2011, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to May 1, 2011. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by July 1, 2011, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon July 2, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to July 16, 2011, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,500.00 per day. Commencing July 16, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $3,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the

6)  Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by July 31, 2011, Tenant will not be required to accept possession until February 4, 2012. The period of time between August 1, 2011 and February 4, 2012 will be the "Optional Blackout Period".   In the event Landlord completes Landlord's Work during the Optional Blackout Period, then effective upon the date of such completion, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not completed Landlord's Work by February 4, 2012, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 4, 2012, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)  In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 4, 2012.  Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.  <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)  Exhibit A -    Site Plan of Shopping Center
    Exhibit A-1   Tenant's Drawing of the Demised Premises
    Exhibit A-2   Location of Storage Trailer/Receiving Area
    Exhibit A-3   Approximate Location of No Build Area

2)  Exhibit B -    Legal Description of Shopping Center

3)  Exhibit C -    Landlord's Work

4)  Exhibit D -    Tenant Building Sign Specifications

5)  Exhibit D – 1 Tenant Pylon Sign Panel Location

6)  Exhibit E -    Completion of Landlord's Work Letter

7)  Exhibit F -    Exclusive Use Provisions

8)  Exhibit G -    Remeasurement Rider

9)  Exhibit H -    Signage Criteria

10) Exhibit I -    Rules and Regulations

D.  Demised Premises:  The "Demised Premises" shall be the storeroom, indicated on

square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 200 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 200 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 37,576 square feet nor accept possession of any space under 33,818 square feet in size, and may terminate this Lease in such an event.

E.   <u>Shopping Center</u>: Landlord's "Shopping Center" is legally described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, being Phase 3 of the Collin Creek Shopping Center, the address of which is the 600 West 15th Street, Plano, Texas 75075. Landlord represents that the gross leasable area of the Shopping Center (Phase 3) as of the date of this Lease is 108,118 square feet.

F.   <u>Gross Sales</u>: The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

G.   Landlord's Rent Payment Address:  From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States, Fixed Minimum Rent and Additional Rent (each as defined below), at the following address:

> Lockbox Info:
> Collin Creek Shopping Center, L.P.
> 75 Remittance Drive, Suite 6106
> Chicago, IL 60675-6106
>
> Lock Box Overnite:
> Collin Creek Shopping Center, L.P.
> 350 N. Orleans
> Receipt & Dispatch, 8th Floor
> Lockbox #6106
> Chicago, IL 60654

Landlord, in consideration of the Rent and Additional Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees, subject to the terms of this Lease.

3. **TERM:**

A. Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2017 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein but all liabilities having accrued prior thereto shall survive and the Lease shall survive for purposes of the enforcement thereof. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Fixed Minimum Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B. Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, each renewal option being a five (5) year option term, collectively referred to as the "Option Terms", each referred to as an "Option Term" and consecutively referred to as the "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and the Lease has not been terminated, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. Each Option Term shall be subject to all the terms, covenants and provisions of the Lease, except as modified by this provision (but no then exercised or previously exercised Option Terms shall be reimposed).

4. **USE AND OPERATION:**

A. Permitted Uses: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, toys, plastics, crafts, home goods, party goods, greeting cards, seasonal merchandise, health and beauty products, food (including frozen food, beer and wine), and for any other lawful retail purpose, provided, however, that such "other lawful retail purpose" shall not violate any then existing exclusive use rights granted to other tenants in the

exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

<u>Exclusive</u>:  Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, and replacement tenants for the same use up to the same aggregate amount of square feet of ground floor area, no other general merchandise store, discount store, liquidator, closeout store, furniture store or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Christmas Tree Shops, Five & Below, Encore and Ollies Bargain Outlet.  In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall notify Landlord, in writing, of the violation (an "Exclusive Violation") and if Landlord has failed to cure the Exclusive Violation within thirty (30) days after receipt of Tenant's notice, Tenant shall be entitled to any and all of the following  remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense.  Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating.  All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein.  All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.  If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant will comply with the rules and regulations on Exhibit I, as same may in the future be reasonably amended if written notice of amendment is given to Tenant; but Landlord shall not discriminatorily enforce any rule against Tenant.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) place cart corrals within the No Change Area and store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise provided that any such sales shall be conducted in compliance with applicable laws..

B.    <u>Prohibited Uses</u>: Except for tenants open and operating in the Shopping Center as of the date of this Lease, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises (provided Landlord shall be immune from any claim of liability under this part (i) where such action nonetheless occurs upon the express direction of a court of competent jurisdiction including bankruptcy court); (ii) to sell any so-called "Army and Navy" surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter (but this restriction shall have no bearing on a use such as an Army / Navy or other military or governmental recruiter location); (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities (excluding Tenant's Trailer(s) hereunder); (v) for any medical or health-oriented facilities or offices; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material (but the foregoing recitation of "massage parlor" shall not prohibit an up-scale, first class retail operation commonly accepted as appropriate in a family-oriented retail environment such as a Hand & Stone, Massage Envy, La Vida Massage or similar type of operation); (xi) in a manner which is a public or private nuisance including any which creates undue

(excluding a full-service restaurant and any incidental beer or wine sales by Tenant); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines (but the foregoing will not operate to prohibit a retailer catering to the electronic "gaming" community of consumers selling console, hand-held and related gaming products, such as GameStop, irrespective of the inclusion in such retailer of any demonstration-for-sale products in the nature of video or arcade or mechanical game machines), bowling alley, "larger sized" health spa, health club, exercise club, gymnasium or other similar operations ("larger sized" means any such operation in more than 5,000 square feet; and by this language Landlord expressly is not restricted or prohibited from leasing for the use of space which is not larger sized (5,000 square feet or under) among other things for spa, health club, exercise club, gymnasium or similar operations inclusive of a private work-out studio, pilates, yoga or other exercise and health-oriented service and/or merchandising operations); (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities (except that the same shall be permitted as ancillary and/or incidental use to a full-line pet and pet supply store such as PetSmart, provide such full-line pet or pet supply is not located adjacent to the Demised Premises); (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

5.    <u>**RENT AND CONSTRUCTION ALLOWANCE:**</u>

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at Landlord's Rent Payment Address, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Fixed Minimum Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:  During the Original Term of this Lease, the sum of $281,820.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $23,485.00.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and

of $353,590.16 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $29,465.85. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $396,051.04 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $33,004.25. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $443,396.80 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $36,949.73.

B.    <u>Utilities Charges</u>:   Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage.  Tenant shall be solely responsible for and shall promptly pay for all direct public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises and so long as any additional costs or charges to effectuate the switch are paid by Tenant.

In the event Landlord is providing any utilities to the Demised Premises under a master meter account, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities.  For utilities provided under a master meter account, Landlord shall provide and maintain separate utility submeters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage.  All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision.  Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant.  If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense.  Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use.  The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice.  In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service.  In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored.  Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use.  Installation shall be the cost and responsibility of the Tenant.  The monitoring equipment can be installed at any time during the lease Term.  Tenant reserves the right to leave monitoring equipment in place indefinitely.  Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data.  Landlord shall provide

C. Intentionally Deleted.

D.  Common Area Charges and Cap: Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

(i)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)  providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)  maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)  cleaning, sweeping, salting, sanding and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred by Landlord in operating, refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies, all as determined in accordance with generally accepted accounting principles ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the

Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall then pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within one hundred twenty (120) days following each calendar year, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such calendar year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last calendar year (or a partial calendar year leading to the expiration of the then current Term without further Option Term existing or being exercised), Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

<u>Common Area Charges Cap</u>: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at sixty cents ($0.60) per square foot of ground floor area of the Demised Premises for the first Lease Year, and initial Partial Lease Year, if any,. Thereafter, during the remainder of the Original Term and any renewals or extensions thereof, in no event shall Tenant's pro-rata share of Common Area Charges increase by more than four percent (4%) per year (on a non-cumulative basis) above that amount of Common Area Charges payable by Tenant for the previous Lease Year. The $0.60 Common Area Charges cap, and the said four percent (4%) non-cumulative cap on increases

Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2011 tax year shall be approximately $1.52 per square foot (of the Demised Premises) per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith, provided that Landlord has failed to contest such Real Estate Taxes within thirty (30) days of receipt from Landlord requesting the same.. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to

to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time every five (5) years during the Term. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from more than one transaction in any five (5) year consecutive period which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.    Construction Allowance: Landlord shall pay to Tenant an amount equal to Twelve and no/00 Dollars ($12.00) per square foot of the Demised Premises within thirty (30) days of the latest to occur of the following: (i) Tenant's opening for business in the Demised Premises; (ii) Landlord's receipt of a copy of Tenant's certificate of occupancy; and (iii) Landlord's receipt of final lien waivers from all contractors and subcontractors supplying services in excess of $5,000.00 for Tenant's construction. If said amount is not paid by Landlord to Tenant when due, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.    Late Fees: If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not exceed a cost of $200,000.00 (exclusive of Tenant's initial improvements in the Demised Premises); shall not affect the structural parts of the building of which they are a part nor load-bearing walls, and shall not materially affect mechanical, electrical or plumbing systems within the Demised Premises; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.  During Tenant's completion of any alterations, Tenant shall not obstruct or use any portion of the exterior of the Demised Premises for the staging of such alterations.

7.   **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls (and all areas behind such interior faces to the extent any work, alterations, improvements or changes were made thereto by Tenant and to the extent thereof), (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.  Tenant shall maintain a service contract on the HVAC units exclusively serving the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.  The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.  Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date.  Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition.  Further, Landlord shall provide

Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expenses from the next Fixed Minimum Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Fixed Minimum Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Should Tenant discover that the HVAC system requires repair and/or replacement during the Original Term; and the cost thereof exceeds Two Thousand and no/00 Dollars ($2,000.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand and no/00 Dollars ($2,000.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs required of Landlord under the terms of this Lease within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof provided such fifteen (15) days shall be reasonably extended as necessary while Landlord is in fact diligently prosecuting its efforts and provided that if Landlord awaits a governmental consent or approval to continue prosecuting a repair or other cure required of Landlord under this Lease, then, the time frame for Landlord to prosecute such repair or cure shall be reasonably extended as necessary so long as Landlord continues to seek such governmental consent or approval with commercially reasonable diligence. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such

or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of copies of paid invoice(s) therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Fixed Minimum Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    <u>SIGNS:</u>

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylon. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    <u>FIXTURES:</u>

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting

when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. ___GOVERNMENTAL REGULATIONS:___

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11. ___INDEMNIFICATION:___

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct where the law applicable in any such related claim recognizes such proportional allocation concept. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct where the law applicable in any such related claim recognizes such proportional allocation concept.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

A. <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord, its property manager and lender as additional insureds, with minimums of the following: Two Million Dollars ($2,000,000.00) each event combined single limit (that is, per occurrence) with a Three Million Dollar ($3,000,000.00) general total combined single limit (annual aggregate), and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements so long as the Tenant is PNS Stores, Inc. or an affiliate.

B. <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: Two Million Dollars ($2,000,000.00) each event combined single limit with a Three Million Dollar ($3,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center covered by such insurance. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B. shall be approximately $0.18 per square foot per annum for the 2011 calendar year.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another

13.  **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Fixed Minimum Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.   In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eight (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all otherwise future accruing or arising liability and obligations under this Lease.

C.   If the Demised Premises are damaged or destroyed during the last year of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects within thirty (30) days of such notice of termination to exercise its next option to extend the Term of the Lease.

14.  **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises nor shall this provision apply to either party's obligations for the payment of money as Fixed Minimum Rent or otherwise or to meet any of its financial or monied obligations in a timely manner.

15.  **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.  **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises to the extent it interferes with Tenant's ability to operate its business and enjoy its rights under this Lease; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for use as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Fixed Minimum Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed, if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder thereafter otherwise accruing. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

In event of a sale or conveyance by Landlord of the Shopping Center, the same shall operate to release Landlord from any future liability under this Lease and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord. This Lease shall not otherwise be affected by any such sale and Tenant agrees to attorn to the purchaser or assignee.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed by Landlord or by any claim made by, through or

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory reasonable form of subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall use commercially reasonable efforts to cause any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, within thirty (30) days following request therefore, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord. In addition, near inception of the Term, from time to time Landlord may in writing request Tenant confirm, by way of a written certificate, the Tenant Entrance Date, Tenant Possession Date, Delivery date, Rent Commencement Date, and Term Commencement Date.

19. **DEFAULT:**

A. If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Fixed Minimum Rent or any other sum reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the non-monetary performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary) so long as Tenant is diligently prosecuting same in good faith to completion; and in any case Tenant shall promptly commence to cure upon notice thereof), then, any such instance of failure to timely so cure after such notice is herein called an "Event of Default". Upon any such Event of Default, this Lease, if the Landlord so elects, shall thereupon be terminated, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an

any such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the Rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.   If Landlord shall fail to pay any taxes, assessments, or insurance premiums, accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then the same shall be deemed a "Landlord Default". In the event Landlord fails to timely cure such Landlord Default, Tenant shall give Landlord a second notice of default and an additional thirty (30) days to cure such Landlord Default, and if Landlord fails to cure such default within such additional thirty (30) day period, or such additional time as is reasonably necessary so long as Landlord is diligently prosecuting the cure to completion, Tenant shall have the right, at its option, to (i) if Landlord's default has a material adverse impact on Tenant's business operations in the Demised Premises, terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Fixed Minimum Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Fixed Minimum Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

Limitation of Landlord's Liability: Redress for any claim against Landlord under this Lease shall be limited to and enforceable only against and to the extent of Landlord's interest in the Shopping Center. The obligations of Landlord under this Lease are not intended to and shall not be personally binding on, nor shall any resort be had to the private properties of Landlord's investment manager or any trustees or board of directors and officers, as the case may be, general partners, beneficiaries, stockholders, employees, or agents of Landlord or the investment manager.

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21. <u>**MUTUAL WAIVER OF SUBROGATION:**</u>

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. <u>**ASSIGNMENT AND SUBLETTING:**</u>

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives

receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("a Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

## 23. SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have thirty (30) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Fixed Minimum Rent and Additional Rent as applied during the last full month of the then expired Term and otherwise subject to all the terms and provisions hereof, except any holdover tenancy beyond the expiration of the Original Term or any Option Term, shall not be deemed subject to this provision (so as not to reimpose another month to month tenancy otherwise by these terms automatically arising) but instead such holdover shall then be deemed an unconsented to holdover for which Landlord shall have all rights and remedies at law and in equity.

## 24. NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective

The date of actual receipt of the written notice shall be deemed the date of service of such notice in all cases. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited partnership duly organized, validly existing and in good standing under the laws of Texas. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a commercially reasonable form of recordable memorandum of lease, the terms of which in any case shall not include the specific economic terms of this Lease. Tenant may record such memorandum at its expense. Tenant shall within thirty (30) days of recordation provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease other than Landlord's broker, UCR (United Commercial Realty) and/or UCR Asset Management and the co-broker The Woodmont Company. If any other individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Fixed Minimum Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Fixed Minimum Rent nor shall any endorsement or statement on any

30. <u>HAZARDOUS MATERIAL:</u>

Landlord represents and warrants to the best of its knowledge the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb and mold as it arises from leaks in the roof (unless caused by leaks in the HVAC system, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31. <u>TITLES AND ENTIRE AGREEMENT:</u>

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32. <u>WAIVER OF CLAIMS:</u>

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Fixed Minimum Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, Insurance Costs, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within twenty-four (24) months

33.    <u>REASONABLE CONSENT:</u>

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto. Landlord and Tenant agree that attorneys' fees incurred with respect to defaults and bankruptcy are actual pecuniary losses within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code or any successor statute.

34.    <u>CO-TENANCY:</u>

Landlord and Tenant agree that Phase 3 and Phase 4 of the Collin Creek Shopping Center (as such Phases are identified on Exhibit A of this Lease) shall remain not less than sixty percent (60%) leased (in the aggregate of both Phases) to retail users at all times during the Original Term (meaning, the ratio of the aggregate of all square feet in both Phases 3 and 4 of the Collin Creek Shopping Center which are leased to retail users, divided by the aggregate of all leasable square feet in Phases 3 and 4, yields a percentage which is 60% or higher) ("**Occupancy Threshold**"). Should the Shopping Center fall below the Occupancy Threshold at any time and remain so for more than nine (9) months, Tenant shall have the right to reduce by fifty percent (50%) the Fixed Minimum Rent payable under this Lease ("Alternate Rent") from that moment forward until such time as Landlord has cured the deficiency in the Occupancy Threshold or to terminate this Lease with no further obligation to Landlord. Tenant shall continue to pay one hundred percent (100%) of all Additional Rent while paying Alternate Rent. If Tenant has been paying the Alternate Rent for twelve (12) months and Landlord still has not met the Occupancy Threshold by such time, Tenant shall either return to paying the full Fixed Minimum Rent and Additional Rent for the remainder of the Term (without further reference to these co-tenancy provisions of this Section) or terminate this Lease by giving Landlord written notice of termination within thirty (30) business days following the end of such twelve-month period, with such termination to be effective ninety (90) days after Landlord's receipt of such termination notice. For these purposes, "business days" means all days of the week other than weekends and national holidays on which Federal banks are closed. For these purposes, "**retail users**" means all tenants whose primary business is to sell merchandise or services at retail, meaning directly to consumers.

35.    <u>NO PRESUMPTION AGAINST DRAFTER:</u>

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36.    <u>SUBMISSION OF LEASE:</u>

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

## 38. TIME OF THE ESSENCE:

Time is of the essence of all conditions of this Lease in which time is an element.

## 39. TENANT'S AUDIT RIGHTS:

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to engage in an audit of Landlord's books and records, for the two (2) year period immediately preceding such audit, in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit reveals any underpayment by Tenant, the amount of such underpayment shall be promptly paid to Landlord. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount properly payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Fixed Minimum Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

## 40. ATTORNEYS FEES:

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

## 41. WAIVER OF JURY TRIAL:

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease. The parties further waive trial by jury in any action or proceeding where such waiver has not been made if it is consolidated with another action in which such waiver has been made.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**   **RREEF Collin Creek Shopping Center,**
**L.P., a Texas limited partnership**
**By:   RREEF America REIT III Corp D,**
**a Maryland corporation**
**Its:  General Partner**

By:   LaRee Stein, CPM

Title:   Assistant Vice President

Witnesses as to Tenant:

**TENANT:**   **PNS STORES, INC., a California**
**corporation**

By:   Charles W. Haubiel II

Title: Executive Vice President – Legal & Real Estate,
General Counsel and Corporate Secretary

**Acknowledgements appear on immediately following page.**

STATE OF

COUNTY OF

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, *RREEF Collin Creek Shopping Center, both Lakew Slean* its *Vice President* who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at *Dallas Texas* this *4th* day of *April*, 2011.



Wanda F. Brinlee
Notary Public,
State of Texas
Comm. Exp. 12-16-13

_____
Notary Public

### Tenant's Acknowledgement

STATE OF OHIO

COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this **5th** day of **April**, 2011.

TRACY L. SNOW
Notary Public, State of Ohio
My Commission Expires 10-07-2014

_____
Notary Public



The following is deemed incorporated onto the site plan sketch here pictured: This Exhibit A is diagrammatic and is intended only for the purposes of indicating the approximate location of constructed areas comprising the Collin Creek Shopping Center and its Phases, including the Shopping Center within which is situated the Demised Premises, and the approximate location of the Demised Premises and for the purpose of indicating approximately the boundaries of the Shopping Center and the other phases of the Collin Creek Shopping Center. It is not to be scaled; any measurements or distances shown or parking counts should be taken as approximate. It does not purport to show the exact or final location of columns, division walls or other required architectural, structural, mechanical or electrical elements. Dimensions indicated (if any) are measured to the center line of interior and party walls, and to the exterior face of exterior walls, or lease lines. References to tenants (if any) are not and shall not be deemed representations of existing or future tenancies nor of any particular tenant-mix or tenant physical arrangement or placement or operation or closures, now or in the future anticipated.

Landlord hereby approves Tenant's plans and specifications to construct a typical "Big Lots" store in the Demised Premises. On or before the Term Commencement Date of the Lease, Tenant will provide to Landlord a set of its plans and specifications as approved for permits by the local authority having jurisdiction. In the event Tenant desires to make any exterior or structural improvements or alterations to the Demised Premises, Tenant shall first obtain Landlord's consent to such exterior or structural improvements or alterations.



The following is deemed incorporated onto the site plan sketch here pictured: This Exhibit A is diagrammatic and is intended only for the purposes of indicating the approximate location of constructed areas comprising the Collin Creek Shopping Center and its Phases, including the Shopping Center within which is situated the Demised Premises, and the approximate location of the Demised Premises and the Trailer area and for the purpose of indicating approximately the boundaries of the Shopping Center and the other phases of the Collin Creek Shopping Center. It is not to be scaled; any measurements or distances shown or parking counts should be taken as approximate. It does not purport to show the exact or final location of columns, division walls or other required architectural, structural, mechanical or electrical elements. Dimensions indicated (if any) are measured to the center line of interior and party walls, and to the exterior face of exterior walls, or lease lines. References to tenants (if any) are not and shall not be deemed representations of existing or future tenancies nor of any particular tenant-mix or tenant physical arrangement or placement or operation or closures, now or in the future anticipated.



FIRST AMERICAN TITLE INSURANCE COMPANY                    074415 O

Exhibit A                                    GF-Number 02R23279B

TRACT ONE

BEING all that certain lot, tract or parcel of land situated in the Joseph
Klepper Survey, Abstract No. 213, City of Plano, Collin County, Texas, as
conveyed to Collin Creek Partners, Ltd., by deed dated June 13, 1996 and
recorded under County Clerk's File No. 96-0049880, Deed Records, Collin County,
Texas, same being all of Lot 1R, Block B of the Replat of Lot 1 Block B of
Collin Creek Phase II, an addition to the City of Plano as recorded in Cabinet
H, Page 408 of the Plat Records of Collin County, Texas, and ratified by
instrument recorded in County Clerk's File #92-0052944, and being more
particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod found for corner in the Southerly line of 15th
Street (F.M. 544), a 100.00 foot right of way, said iron rod being South 85
degrees 24 minutes 54 seconds East along said Southerly line of 15th Street a
distance of 216.64 feet from the intersection of the said Southerly line of
15th Street with the Easterly line of Alma Road (100.00 foot right of way);
said point being the Northeast corner of Lot 2, Block B of Collin Creek Phase
II as recorded in Cabinet "G", Page 393 of the Plat Records of Collin County,
Texas, and the most northerly Northwest corner of said Lot 1R, Block B;

THENCE South 85 degrees 24 minutes 54 seconds East, along the southerly line of
said 15th Street (F.M. 544) a distance of 556.63 feet to a 5/8" iron rod found
for corner;

THENCE South 04 degrees 35 minutes 06 seconds West, a distance of 143.92 feet
(138.14 feet-Plat) to an "X" found in concrete for corner;

THENCE South 85 degrees 24 minutes 54 seconds East, a distance of 152.22 feet
to a 5/8" iron rod for corner in the Westerly line of called Center Drive as
shown on the plat of Lot 6, Block A of the Regional Mall Addition, an addition
to the City of Plano as recorded in Cabinet C, Slide 320 of the Plat Records of
Collin County, Texas;

THENCE South 04 degrees 35 minutes 06 seconds West along said called westerly
right of way line a distance of 268.26 feet to a 5/8" iron rod found for
corner; said point being the beginning of a curve to the left having a central
angle of 06 degrees 00 minutes 30 seconds and a radius of 1030.00 feet and
whose chord bears South 01 degrees 34 minutes 51 seconds West at 107.96 feet;

THENCE southeasterly along said curve to the left an arc distance of 108.01
feet to a hilti nail found for corner at the end of said curve to the left;

THENCE South 01 degrees 25 minutes 24 seconds East and continuing along said
called westerly right-of-way line, a distance of 199.97 feet to a hilti nail
found at the beginning of a curve to the right having a central angle of 90
degrees 00 minutes 00 seconds and a radius of 20.00 feet and whose chord bears
South 43 degrees 34 minutes 36 seconds West at 28.28 feet;

FIRST AMERICAN TITLE INSURANCE COMPANY                    074415 O

Exhibit A  (Continued)                    GF-Number 02R23279B

BEGINNING at the intersection of the South line of Lot 1R in Block A of the
Replat of Dallas North Shopping Center 1988 Addition, an addition to the City
of Plano, Texas according to the plat thereof as recorded in Cabinet H, Slide
399 of the Plat Records of Collin County, Texas with the new West line of U.S.
Highway No. 75 (North Central Expressway); said point being South 74 degrees 57
minutes 00 seconds West a distance of 10.00 feet from the Southeast corner of
said Lot 1R in Block A of the Dallas North Shopping Center 1988 Addition, and
also being the Northeast corner of the aforesaid Lot 1 in Block A of Janwood
Addition;

THENCE South 14 degrees 56 minutes 30 seconds East along the West line of said
U.S. Highway No. 75, a distance of 124.57 feet to an "X" in concrete found for
corner, said point being the beginning of a curve to the right having a central
angle of 06 degrees 14 minutes 02 seconds and a radius of 5569.58 feet and
whose chord bears South 06 degrees 35 minutes 55 seconds East at 605.68 feet;

THENCE southerly along said curve to the right and the West right-of-way line
of U.S. Highway No. 75, an arc distance of 605.98 feet to a 5/8" iron rod found
for corner;

THENCE South 03 degrees 28 minutes 53 seconds East and continuing along the
West right-of-way line of U.S. Highway No. 75, a distance of 10.60 feet to a
5/8" iron rod found for corner;

THENCE South 02 degrees 32 minutes 04 seconds East along the West right-of-way
line of U.S. Highway No. 75, a distance of 33.08 feet to a 5/8" iron rod found
in the North limits of an access roadway as shown on plat of the Regional Mall
Addition, an addition to the City of Plano according to the plat thereof
recorded in Volume "C", Page Nos. 79-81 of the Map Records of Collin County,
Texas; said point being in a curve to the right having a central angle of 32
degrees 41 minutes 01 seconds, a radius of 50.00 feet, a radial bearing of
North 34 degrees 06 minutes 25 seconds West and whose chord bears South 72
degrees 14 minutes 05 seconds West at 28.14 feet;

THENCE westerly along said curve to the right, a distance of 28.52 feet to a
5/8" iron rod found for corner;

THENCE South 88 degrees 34 minutes 36 seconds West, and continuing along said
access roadway a distance of 276.94 feet to a 5/8" iron rod found for corner at
the beginning of a curve to the right having a central angle of 90 degrees 00
minutes 00 seconds and a radius of 20.00 feet and whose chord bears North 46
degrees 25 minutes 24 seconds West at 28.28 feet;

THENCE Northwesterly along said curve to the right an arc distance of 31.42
feet to a 5/8" iron rod found for corner in the East line of Plano Shopping
Center Ring Road;

THENCE North 01 degrees 25 minutes 24 seconds West along said Ring Road, a
distance of 251.22 feet to a 5/8" iron rod found for corner and the beginning

FIRST AMERICAN TITLE INSURANCE COMPANY          074415 O

Exhibit A  (Continued)          GF-Number 02R23279B

of a curve to the left having a central angle of 57 degrees 30 minutes 00 seconds and a radius of 119.50 feet and whose chord bears North 30 degrees 10 minutes 24 seconds West at 114.96 feet;

THENCE northwesterly along said curve to the left an arc distance of 119.93 feet to a 5/8" iron rod found for corner;

THENCE North 58 degrees 55 minutes 24 seconds West, and continuing along the East limits of said Ring Road, a distance of 244.36 feet to a 5/8" iron rod found for corner and the beginning of a curve to the right having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 20.00 feet and whose chord bears North 13 degrees 56 minutes 30 seconds West at 28.28 feet;

THENCE northerly along said curve to the right an arc distance of 31.42 feet to a 5/8" iron rod found for corner; and being the beginning of a curve to the right having a central angle of 43 degrees 52 minutes 30 seconds and a radius of 425.36 feet and whose chord bears North 53 degrees 00 minutes 45 seconds East at 317.83 feet;

THENCE northeasterly along said curve to the right, and along the South limits of an access roadway, an arc distance of 325.73 feet to an "X" in concrete found for corner in the South line of the aforesaid Dallas North Shopping Center 1988 Addition;

THENCE North 74 degrees 57 minutes 00 seconds East along the South line of the aforesaid Dallas North Shopping Center 1988 Addition, a distance of 255.31 feet to the PLACE OF BEGINNING and containing 6.5187 acres of land.

TRACT FOUR

BEING a tract of land situated in the City of Plano, Collin County, Texas, out of the Joseph Klepper Survey, Abstract No. 213, and being known as Lot 1R, Block 1, PACE ADDITION, an addition to the City of Plano, Texas according to the plat thereof recorded in Cabinet "K", Slide 90 of the Map Records of Collin County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at the Southwest corner of Lot 1R, Block A of REPLAT OF DALLAS NORTH SHOPPING CENTER 1988 ADDITION, an addition to the City of Plano, Texas according to the plat thereof recorded in Cabinet "H", Slide 399 of the Map Records of Collin County, Texas, a 5/8" iron rod found for corner;

THENCE North 74 degrees 57 minutes 06 seconds East (Bearing Basis - Plat - Cabinet "K", Slide 90, Map Records, Collin County, Texas), along the South line of said Dallas North Shopping Center 1988 Addition, a distance of 12.65 feet to a 5/8" iron rod found for corner, said point being the beginning of a curve to the left, having a central angle of 15 degrees 05 minutes 17 seconds, a radius of 485.36 feet, and whose chord bears South 38 degrees 37 minutes 15 seconds West, a distance of 127.44 feet;

FIRST AMERICAN TITLE INSURANCE COMPANY          074415 O

Exhibit A  (Continued)          GF-Number 02R23279B

THENCE Southwesterly along said curve to the left, an arc distance of 127.81 feet to an "X" found in concrete for the beginning of a curve to the right, having a central angle of 90 degrees 00 minutes 00 seconds, a radius of 20.00 feet, and whose chord bears South 76 degrees 04 minutes 30 seconds West, a distance of 28.28 feet;

THENCE Southwesterly along said curve to the right, an arc distance of 31.42 feet to the end of said curve, an "X" found in concrete for corner;

THENCE North 58 degrees 55 minutes 24 seconds West, a distance of 258.64 feet to an "X" found in concrete for the beginning of a curve to the left, having a central angle of 16 degrees 15 minutes 00 seconds, a radius of 119.50 feet, and whose chord bears North 67 degrees 02 minutes 54 seconds West, a distance of 33.78 feet;

THENCE Northwesterly along said curve to the left, an arc distance of 33.89 feet to the end of said curve, an "X" found in concrete for corner;

THENCE North 75 degrees 10 minutes 24 seconds West, a distance of 194.97 feet to an "X" found in concrete for the beginning of a curve to the left, having a central angle of 16 degrees 15 minutes 00 seconds, a radius of 119.50 feet, and whose chord bears North 83 degrees 17 minutes 54 seconds West, a distance of 33.78 feet;

THENCE Northwesterly along said curve to the left, an arc distance of 33.89 feet to the end of said curve, an "X" found in concrete for corner;

THENCE South 88 degrees 34 minutes 36 seconds West, a distance of 162.94 feet to an "X" found in concrete; said point being the beginning of a curve to the right, having a central angle of 90 degrees 00 minutes 00 seconds, a radius of 20.00 feet, and whose chord bears North 46 degrees 25 minutes 24 seconds West, a distance of 28.28 feet;

THENCE Northwesterly along said curve to the right, an arc distance of 31.42 feet to an "X" found in concrete; said point being in the East line of a 60.00 foot right of way known as Center Drive;

THENCE North 01 degrees 25 minutes 24 seconds West, along said East line a distance of 200.00 feet to an "X" found in concrete; said point being the beginning of a curve to the right, having a central angle of 6 degrees 00 minutes 30 seconds, a radius of 970.00 feet, and whose chord bears North 01 degrees 34 minutes 51 seconds East, a distance of 101.67 feet;

THENCE Northeasterly along said curve to the right, an arc distance of 101.72 feet to an "X" found in concrete for corner;

THENCE North 04 degrees 35 minutes 06 seconds East, a distance of 391.06 feet to an "X" found in concrete for the beginning of a curve to the right, having a

FIRST AMERICAN TITLE INSURANCE COMPANY          074415 O

Exhibit A  (Continued)          GF-Number 02R23279B

central angle of 44 degrees 49 minutes 46 seconds, a radius of 30.00 feet, and whose chord bears North 26 degrees 59 minutes 59 seconds East, a distance of 22.88 feet;

THENCE Northeasterly along said curve to the right, an arc distance of 23.47 feet to a 5/8" iron rod found for corner in the South right-of-way line of F.M. Road 544;

THENCE South 85 degrees 24 minutes 58 seconds East and continuing along the South line of F.M. Road 544, a distance of 47.00 feet to a 5/8" iron rod found for corner; said point being the beginning of a curve to the left, having a central angle of 19 degrees 07 minutes 54 seconds, a radius of 562.28 feet, and whose chord bears North 85 degrees 01 minutes 10 seconds East, a distance of 186.88 feet;

THENCE Northeasterly along said curve to the left and said South right-of-way line, an arc distance of 187.75 feet to an "x" in concrete found for corner at a Northeast corner of said Lot 1R and the common Northwest corner of Lot 2, Block 1, PACE ADDITION, an addition to the City of Plano, Texas according to the plat thereof recorded in Cabinet "K", Slide 90 of the Map Records of Collin County, Texas;

THENCE departing said F.M. Road 544, along the common lines of said Lot 1R and said Lot 2R, South 14 degrees 32 minutes 48 seconds East, a distance of 54.00 feet to an "x" found in concrete for corner;

THENCE North 75 degrees 27 minutes 12 seconds East, continuing along said common line of Lots 1R and 2R, a distance of 44.58 feet to an "x" found in concrete for corner;

THENCE South, continuing along said common line of Lots 1R and 2R, a distance of 164.24 feet to an "x" found in concrete for corner;

THENCE East, continuing along said common line of Lots 1R and 2R, a distance of 128.00 feet to an "x" found in concrete for corner;

THENCE South, continuing along said common line of Lots 1R, and 2R, a distance of 72.00 feet to an "x" found in concrete for corner;

THENCE East, continuing along said common line of Lots 1R and 2R, a distance of 37.00 feet to a 5/8" iron rod found for corner;

THENCE North, continuing along said common line of Lots 1R and 2R, a distance of 205.27 feet to a 5/8" iron rod found for corner;

THENCE North 09 degrees 41 minutes 32 seconds West, continuing along said common line of Lots 1R and 2R, a distance of 157.54 feet to a 5/8" iron rod found for corner at the Northeast corner of said Lot 2R and a common Northwest corner of said Lot 1R, and being in the South line of aforesaid F.M. Road 544;

FIRST AMERICAN TITLE INSURANCE COMPANY                    074415 O

Exhibit A  (Continued)          GF-Number 02R23279B

THENCE departing said Lot 2R, North 63 degrees 44 minutes 06 seconds East, along the South line of said F.M. Road 544, a distance of 52.17 feet to a point for corner; said point being the Northwest corner of aforesaid Dallas North Shopping Center 1988 Addition;

THENCE South 09 degrees 41 minutes 32 seconds East, along the West line of Dallas North Shopping Center 1988 Addition, a distance of 421.90 feet to a point for corner;

THENCE South 23 degrees 08 minutes 21 seconds East and continuing along said West line, a distance of 330.05 feet to a point for corner;

THENCE South 09 degrees 31 minutes 38 seconds East, a distance of 227.20 feet to the PLACE OF BEGINNING and containing 10.8387 acres of land.

TRACT FIVE

BEING a non-exclusive easement for ingress and egress for pedestrian and vehicular traffic on, over, and across the Ring Road and each of the eight (8) Access Roads, to and from the public streets to which they connect, as created by, and as such terms are defined in, that certain Agreement dated 08/13/1979, recorded in Volume 1189, Page 143, and Volume 1189, Page 183, Deed Records, Collin County, Texas.

TRACT SIX

Being a non-exclusive easement as created by Reciprocal Easement and Operation Agreement (the "REOA") dated 09/16/1991, filed 07/20/1992, under cc#92-0048172, Land Records, Collin County, Texas, as amended by First Amendment filed 02/25/1993, under cc#93-0013555, Land Records, Collin County, Texas, for ingress and egress for pedestrian and vehicular traffic, parking, and utilities over and across the Common Areas (as defined in the REOA) of Lot 3R, Block B, Replat of Lot 1, Block B, Collin Creek Phase II, an addition to the City of Plano, as recorded in Cabinet H, Page 408, Plat Records, Collin County, Texas.

TRACT SEVEN

Being a non-exclusive easement as created by Reciprocal Easement Agreement (the "REA") dated 04/23/1992, filed 06/10/1992, under cc#92-0038612, Land Records, Collin County, Texas, for ingress and egress for pedestrian and vehicular traffic, parking, and utilities over and across the Common Areas (as defined in the REA) of Lot 3R, Block A, Replat of DALLAS NORTH SHOPPING CENTER 1988 ADDITION, an addition to the City of Plano, as recorded in Cabinet H, Page 399, Plat Records, Collin County, Texas.

TRACT EIGHT

Being a non-exclusive easement as created by Easement Agreement (the "EA")

## LANDLORD WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative.**

**STOREFRONT:** The canopy and building fascia shall be repaired, if needed, and painted. The Landlord ensures that there are curb cuts within reasonable proximity to the store front.

**DOORS:** All doors and door systems to be sound and secure, in good working condition and in compliance with ADA requirements.

**GLASS:** The Landlord will replace all broken and damaged glass and remove all materials blocking or covering windows and glass doors.

**UTILITIES:** The Landlord will provide separate utilities and provide separate meters adequate for Tenant's intended use. The Tenant will have a minimum of 800 amps for 208v service or 600 amps for 480v service and will include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. Landlord believes we are OK on all items above; however, Tenant and Landlord will re-verify and confirm. The Landlord will also provide Tenant with assurance that utilities adequate for Tenant's use are available and include legal access across other properties if necessary to serve the Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All existing plumbing, electrical, mechanical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an interior access door located inside the adjacent space in which it shall maintain the sprinkler riser used to any sprinkler system used in common with other Tenants throughout the Original Term and Options, Terms or Extensions. The Landlord will install any other type of fire suppression or alarm system as required by local codes and ordinances.

**HVAC & EQUIPMENT:** All existing HVAC equipment, duct work, diffusers, and other air distribution equipment commonly used and required by Tenant will be clean, in good working condition, and adequate for Tenant's intended use. All existing HVAC units are to be inspected and cleaned by Landlord prior to Tenant's possession date and Landlord will provide to Tenant a copy of the inspection report. If the Tenant Possession Date occurs during the months of October through May, the Landlord will grant the Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. The Landlord shall also warrant the HVAC system for the initial lease term for any repairs over $2,000 during a single lease year.

**INTERIOR LIGHTING:** Electric service to the existing lighting will be in good working condition

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name.

**FLOORING:** The Landlord will remove the existing flooring and any hazardous materials from tiles, mastic, and any other flooring materials.

**ROOF:** The roof shall be professionally inspected and certified to be in good condition and free of leaks. Repairs per inspection shall be made prior to possession.

| | |
|---|---|
| **REMOVAL OF FIXTURES & EQUIPMENT:** | Landlord to remove all fixtures from the previous tenants. |
| **PARKING LOT:** | Parking lot shall be good condition - paved, patched, sealed and striped with potholes, major cracks and uneven areas resurfaced. |
| **PESTS:** | Landlord will make the space pest free. |
| **SIGNAGE:** | The Tenant will have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the pylon(s) subject to Landlord's sign criteria. The Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. Tenant to have marquee signage on the pylon in place of the former Homeplace panel. |
| **DRAWINGS:** | The Landlord will provide the Tenant with "as built" CAD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. The Tenant will approve all drawings prior to submission for permits and prior to work commencement. The Landlord will deliver a construction timeline schedule within one week of the permits being issued or the commencement of Landlord's Work. |
| **HAZ MATS:** | The Landlord will be responsible for the removal of any and all hazardous materials. |
| **POSSESSION DATE:** | All above work will be completed before the Tenant Possession Date. |

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Tenant to approve all drawings prior to the commencement of work.

# BIGLOTS!

# LOGOS
## WITH
# SPECIFICATIONS
## for exterior signage

**If you need additional information that is not contained in this packet contact:**

**Store Planning:**
Mike Stiles - 614-278-6805
Michael Neu - 614-278-6868

11/2009

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS



## STANDARD SIZE STACKED LAYOUTS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ | Ⓗ* |
|----|----|----|----|----|----|----|----|
| 5' 0" | 3' 11" | 7' 0" | 13' 7" | 9' 8" | 22" | 7½" | 131 SF |
| 4' 6" | 3' 6" | 6' 4" | 12' 3" | 8' 8½" | 19½" | 6½" | 107 SF |
| 4' 0" | 3' 1½" | 5' 7½" | 10' 10½" | 7' 9" | 17½" | 6" | 84 SF |
| 3' 0" | 2' 4" | 4' 2½" | 8' 2" | 5' 9½" | 13" | 4½" | 47 SF |
| 2' 6" | 1' 11½" | 3' 6" | 6' 9½" | 4' 10" | 11" | 3½" | 33 SF |

*SF = SQ. FEET TOTALS

## SIGN SPECIFICATIONS FOR BIG LOTS!

5" .063 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS
LETTER FACES .150 ACRYSTEEL #2119 ORANGE W/1" ORANGE JEWELITE TRIM CAP
INTERNALLY ILLUMINATED W/SLOAN V SERIES - ORANGE L.E.D.s AS PER SLOAN LAYOUTS

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C.
All signage equipped with disconnect switches.

11/2009

# Horizontal Logo

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS



## STANDARD SIZE HORIZONTAL LAYOUTS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ* |
|---|---|---|---|---|---|
| 2' 0" | 11' 7 ½" | 2' 4" | 8 ½" | 3 ½" | 24 SF |
| 2' 6" | 14' 6 ½" | 2' 11 ½" | 11" | 4 ½" | 38 SF |
| 3' 0" | 17' 5 ½" | 3' 6 ½" | 13" | 5 ½" | 52 SF |
| 3' 6" | 20' 4 ½" | 4' 1 ½" | 15 ½" | 6 ½" | 77 SF |
| 4' 0" | 23' 3 ½" | 4' 8 ½" | 17 ½" | 7 ½" | 92 SF |
| 4' 6" | 26' 2 ½" | 5' 3 ½" | 19 ½" | 8 ½" | 119 SF |
| 5' 0" | 29' 1 ½" | 5' 10 ½" | 22" | 9 ½" | 145 SF |
| 6' 0" | 34' 11" | 7' ½" | 2' 2" | 11" | 207 SF |

*SF = SQ. FEET TOTALS

## SIGN SPECIFICATIONS FOR BIG LOTS!

5" .063 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS

LETTER FACES .150 ACRYSTEEL #2119 ORANGE W/1" ORANGE JEWELITE TRIM CAP

INTERNALLY ILLUMINATED W/SLOAN V SERIES - ORANGE L.E.D.s AS PER SLOAN LAYOUTS

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C..
All signage equipped with disconnect switches.

11/2009

# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet



**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE

11/2009



Date: _____

To: _____ (insert Tenant)
　　　via facsimile: (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been substantially completed subject only to certain punch list items. Accordingly, delivery of the Demised Premises with Landlord's Work substantially completed is hereby made to Tenant. You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**LANDLORD:**

_____
a _____

By: _____

Title: _____

**TENANT:**

**PNS STORES, INC., a California corporation**

By: _____

Title: _____

## PHASE III

*For Phase III, Collin Creek*
**Creek Shopping, Plano, Texas**

| TENANT (TRADE NAME) | EXCLUSIVE/RESTRICTIVE COVENANT AND RELATED LANGUAGE OR SUMMARY OF SAME, PHASE III |
|---|---|
| Chipotle Mexican Grill (Chipotle Mexican Grill, Inc.) | **THIS TENANT'S EXCLUSIVE MAY APPLY TO ALL 4 PHASES** Exhibit H Landlord will not lease space within the Shopping Center with a tenant whose **primary business is the sale of specialty burritos, wraps, fajitas and/or tacos**, with examples given of LaSaisa, Chuy's, The Mexican Grill, Jalapeno Mexican Grill, Chez Jose, Taco cabana, Z-Teca, Todo Loco, World Wraps, Bocaza, Rubio's Una Mas, N.Y. Burrito, Baha Fresh, Wahoo's Fish tacos or any similar restaurant. |
| Dollar Tree* This exclusive shall be deemed inapplicable to Tenant upon Landlord securing an amendment of this tenant's lease, contemplated to be secured prior to execution of this Lease. | **THIS TENANT'S EXCLUSIVE BELOW ALSO APPLIES TO PHASE IV** A.14 Tenant shall have an **exclusive for a single price point variety retail store** ("Exclusive" or "Exclusive Use"). A single price point variety retail store is hereby defined as a store that offers all of its merchandise for sale at a single price point. In addition, Landlord will not permit any other occupant in the Shopping Center to operate the following without Tenant's consent and such consent shall be in Tenant's sole and absolute discretion: (1) a close-out store; (2) a retail store whose "principal business" (defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area [including one-half (1/2) of the adjacent aisle space]) is:     (a) selling variety retail merchandise at a single price point;     (b) selling gifts, cards, and other party supplies (individually or collectively); or     (c) selling artificial flowers and picture frames (individually or collectively); (3) variety retail operations with the word "Dollar" in their trade name. This exclusive shall govern all buildings owned by Landlord in the Phase III and Phase IV of the Shopping Center including the former K-Mart building to the east (which building is in Phase IV). Notwithstanding the foregoing, this Section shall not apply to (1) any tenant or occupant selling single price point apparel as its principal business, (2) incidental bargain table sales, or (3) any current occupant or tenant of the Shopping Center who is operating under their current use clause as of the date of this Lease... |
| Regency Beauty Institute | Lease, Addendum A-6 During the term of this Lease (as the same may be earlier terminated or extended), provided Tenant is not in default beyond any applicable notice and curative period of any of the terms or conditions of the Lease, and, provided the Lease has not been terminated for any other reason otherwise permitted herein or by law, and, provided Tenant has not ceased operating business in the Premises for any reason ...then Landlord agrees hereafter (that is, after the Effective Date of this Lease), subject to the following terms and conditions, not to enter into any lease for space in any of the other phases of the Shopping Center owned by Landlord (thus these restrictions do not affect outparcels) as indicated on **Exhibit A**, being Phases I, II, III and IV, with any tenant ("**Competing User**") whose "primary business" (hereafter defined) is the operation of a professional school of cosmetology, esthiology and/or related training ("**Cosmetology School**") (for these purposes, "**primary business**" means such tenant |

| NAME) | |
|---|---|
| | Center, from the operation of such Cosmetology School, so as to then qualify as a Competing User); subject however to the following terms and conditions. In addition to the foregoing agreement whereby Landlord shall not enter into any such lease, Landlord further agrees not to enter into any modification of an existing lease for any space in the Shopping Center owned by Landlord in contravention of the foregoing provisions…, nor to consent to a request for a change of use of another tenant to a use which is in contravention of the foregoing provisions …, where Landlord lawfully is free without liability to decline to give such consent and where Landlord is lawfully able to so decline to give its consent to such a requested change of use without violating the terms and conditions of such tenant's lease or of applicable law. However, notwithstanding anything in this Lease, nothing contained [herein]…shall limit, impair or otherwise affect (x) Landlord's leases (existing as of the date of full execution and delivery hereof), tenants thereunder, and their successors and assigns and sublessees or the uses or permitted uses under their leases, as extended, renewed, assigned, sublet or otherwise transferred, relocated or replaced, nor shall anything contained [herein]…limit, impair or otherwise affect (y) the rights of any tenant or occupant now or hereafter existing in any premises in the Shopping Center which contains at least 10,000 square feet of gross leasable area, nor shall anything contained [herein]…limit, impair or otherwise affect (z) the rights of any tenant or occupant now or hereafter existing in any premises in the Shopping Center which is operated as a department store or a grocery market or a grocery store or a grocery super-store. |
| Restrictions | **The Shopping Center is subject to the following specific restrictions among certain Public Record documents and Tenant shall abide by and not violate the same to the extent applicable to Tenant:** (a) requirements to protect and avoid interferences with the non-exclusive easements and rights concerning the common areas to facilitate pedestrian and vehicular traffic, parking, and utilities (Reciprocal Easement and Operation Agreement dated September 16, 1991, recorded as cc#92-0048172, Land Records of Collin County, Texas; herein "REA1"); (b) outparcel restrictions on building height, leasable feet, and against various noxious uses of skating or roller rink, bingo hall, gambling establishment, church, funeral parlor, bar for on-site consumption of alcoholic beverages (permitting as incidental to primarily food businesses), nightclub, discotheque, social club, bowling alley, flea market, adult bookstore or pornography (except incidental to a permitted use, such as a magazine or drugstore), automobile dealership, health club, pool room, billiard hall, shooting gallery, antique store in excess of 10,000 square feet, auction house, swimming pool, consignment store in excess of 5,000 square feet, a close-out, bankruptcy/fire sale or damaged merchandise store, use creating strong, unusual or offensive odors, fumes, dust or vapors or public or private nuisance, unusual fire or other hazard (REA1); (c) requirements to protect and avoid interferences with the non-exclusive easements and rights concerning the common areas to facilitate pedestrian and vehicular traffic, parking, and utilities (Reciprocal Easement Agreement dated April 23, 1992, recorded as cc#92-0038612, Land Records of Collin County, Texas; and Easement Agreement dated May 30, 1997, recorded in Volume 3978, Page 0808, Land Records of Collin Creek County, Texas; herein "REA2"). |

## MODIFICATION OF LEASE AGREEMENT

THIS MODIFICATION OF LEASE AGREEMENT (this "Modification"), is made and entered into and effective as of the ____ day of ___April___ 2011 (the "Effective Date"), by and between DOLLAR TREE STORES, INC., a Virginia corporation ("Tenant"), doing business as of the date of execution hereof, as "Dollar Tree", whose address is 500 Volvo Parkway, Chesapeake, Virginia 23320; and RREEF COLLIN CREEK SHOPPING CENTER, L.P. , a Texas limited partnership ("Landlord"), whose address is c/o RREEF, 200 Crescent Court, Suite 560, Dallas, TX 75201, Attn: LaRee Stein, CPM.

### W I T N E S S E T H :

RECITALS:

A.    WHEREAS, Landlord and Tenant, as landlord and tenant, are parties to that certain Lease Agreement dated September 22, 2004 ("Original Lease"), as affected by that certain renewal letter from _____ to _____ dated _____ ("Renewal Letter") (collectively, the Original Lease and the Renewal Letter are herein referred to as the "Lease") with respect to certain space located at **900** West 15th Street, Suite **900 C**, Plano, Texas 75075, containing approximately **23,900** square feet of gross leasable area as more particularly described in the Lease ("Premises"), in that certain Shopping Center commonly known as Collin Creek ("Shopping Center"), comprised of phases, each phase in adjacent or nearby similarly operated retail areas lying, being and situate in Plano, Texas, all as more particularly described in the Lease. The Premises are in Phase IV of the Shopping Center; and

B.    WHEREAS, Landlord is not holding a security deposit under the Lease; and

C.    WHEREAS, the Lease is for a term of years therein stated ("Term"), which Lease naturally expires by its terms on January 31, 2015 ("Current Expiration Date"), unless sooner terminated or expiring in accordance with the terms of the Lease or law. The Lease is subject to two (2) remaining options to renew, each for a term of five (5) years, all as described in and subject to the terms of Article A(10) and Article C(4) of the Original Lease (collectively, the "Remaining Options"); and

D.    WHEREAS, the Lease contains restrictions (the "Dollar Restrictions") which impair Landlord's free right to lease space in the Shopping Center, such as, without limitation, for: "…a single price point variety retail store…", "a close-out store" or for "a retail store whose "principal business" is… selling variety retail merchandise at a single price point"; and

E.    WHEREAS, Landlord requests that Tenant execute that certain waiver letter agreement attached hereto as Exhibit A contemporaneously herewith in order to waive the Dollar Restrictions ("Dollar Waiver") so that Landlord can pursue and finalize lease negotiations with that certain proposed tenant commonly known as "Big Lots" ("Big Lots") to potentially lease ("Big Lots Lease") approximately 37,140 square feet of space in Phase III of the Shopping Center ("Big Lots Space"), pursuant to which Big Lots contemplates (if it enters into the Big Lots Lease) the following use under the Big Lots Lease: retail sales of general merchandise, furniture, furniture accessories, mattresses, appliances, toys, seasonal merchandise and food, and for any other lawful retail purpose (the "Big Lots Proposed Use").

F.    WHEREAS, the parties desire to modify the Lease, together with all rights and obligations contained therein, subject to and in accordance with the following terms and conditions.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, TEN DOLLARS ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    RECITALS: The foregoing recitals are true and correct and are incorporated herein by this reference.

2.    CONTINGENCIES: This Modification is expressly contingent upon, and in the event of Landlord's execution and delivery hereof nonetheless this Modification shall not be deemed fully delivered or binding, unless and until the following contingencies have been fully satisfied as evidenced by a writing from Landlord ("Landlord's Confirmation"): (a) Tenant has executed and delivered the Dollar Waiver to Landlord contemporaneously with Tenant's execution and delivery of this Modification, (b) Landlord and Big Lots have each fully executed the proposed Big Lots Lease, (c) Big Lots has opened and commenced operating in the Big Lots Space (collectively, the "Contingencies"). Landlord agrees that upon satisfaction of the Contingencies, Landlord shall promptly deliver Landlord's Confirmation.

3.    BASE RENT DURING INDULGENCE PERIOD: Notwithstanding anything contained in the Lease, as of the first day of the next month following Tenant's receipt of Landlord's Confirmation ("Indulgence Commencement Date"), the following provisions shall be effective, and same shall expire on the one (1) year anniversary of such Indulgence Commencement Date ("Indulgence Expiration Date"). Subject to the foregoing, the Lease shall be deemed amended as of the Indulgence Commencement Date so that, from the Indulgence Commencement Date through the Indulgence Expiration Date (the "Indulgence Period"), the annual Base Rent under the Lease shall equal **$88,071.50**, and shall be payable in equal monthly installments of **$7,339.29**, plus applicable sales tax ("Reduced Base Rent"), due and payable on the first day of each month of the Indulgence Period, and payable otherwise in the time and manner as provided in the Lease. Immediately following the Indulgence Expiration Date Base Rent shall immediately revert to the full Base Rent amounts set forth in the Lease without further reference hereto. Throughout the Indulgence Period, Tenant shall be and remain obligated to pay the full amount of all other items of rents and additional rents due under the Lease.

1