## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |

### DEBTORS' OBJECTION TO BLUE OWL CAPITAL LLC'S EMERGENCY MOTION TO EXTEND CHALLENGE PERIOD AND REMOVE BLANKET "PROFESSIONAL EYES ONLY" DESIGNATION FROM PRODUCTIONS OR, IN THE ALTERNATIVE, <u>APPOINT AN EXAMINER</u>

The Debtors respectfully submit the below opposition to creditor Blue Owl Capital LLC's ("**Blue Owl**") motion to extend the challenge deadline in the Final DIP Order[2] to November 22, 2024 and to lift the Professional Eyes Only ("**PEO**") designation assigned to the Debtors' productions to the Committee or, in the alternative, appoint an examiner under 11 U.S.C. § 1104 (Doc. No. 870) (the "**Motion**").

### <u>PRELIMINARY STATEMENT</u>

1.     The Debtors are committed to closing the sale of their assets, thus delivering the best outcome to their stakeholders, as soon as possible.  Nonetheless, one creditor, Blue Owl, seeks, in its Motion, to delay the Final DIP Order's Challenge Deadline, which puts at risk Debtors' ability to consummate their asset sale in a timely and efficient manner, and thus risks loss of value

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Unless otherwise specified, capitalized terms shall have the same meaning as in Blue Owl's Motion.

to Debtors' estate.  The Debtors thus oppose any request for more than a modest extension that would not disrupt the schedule for the Debtors' asset sale.

2.      Further, Blue Owl premises its Motion on the notion that the Debtors and their Secured Lenders have failed to timely produce discovery and that has somehow hindered the Committee's ability to conduct its investigation prior to the Challenge Deadline.  The facts, however, tell a story of immediate and prompt engagement.  Any purported delay or emergency here is completely of the movant's own making.

3.      Moreover, Blue Owl filed the instant Motion while the Committee's own request for an extension of the Challenge Deadline was pending and, indeed, later granted in order to give the parties more time to negotiate the Challenge Deadline (moving the deadline from November 7 to November 11).

4.      While the Debtors are not privy to the Committee's decision making process around when to commence discovery, what is clear is that once discovery was served, the Debtors immediately engaged.  The Debtors understand that the same is true for the Secured Lenders as well as for GBRP.  Indeed, the Debtors promptly met and conferred with Committee counsel to find the most expeditious way to produce documents from custodians at Big Lots, its Counsel Vorys, Sater, Seymour and Pease LLP ("**Vorys**") and from certain central files.  In order to expedite this process, it was agreed with Committee counsel that productions would not need to be reviewed for confidentiality designations and all documents produced would be treated as professional eyes only.  The Debtors understand that counsel for the Committee entered into similar agreements with counsel for the secured lenders.  It was always agreed that, should Committee professionals have desired to share any particular documents with individual

Committee members, there would be a further meet and confer to determine the appropriate confidentiality designation.

5.     Well after the review process commenced, Blue Owl requested for itself that it be allowed access to *all* documents produced to the Committee. The Debtors and the Secured Lenders promptly agreed that Blue Owl's professionals could have access, but given the expedited nature of the review and the potentially commercially sensitive nature of the information being shared with a contractual counterparty, requested that Blue Owl abide by the agreement made with Committee counsel regarding how confidentiality would be addressed.

6.     Given the absence of any delay on the part of the producing parties and the agreement to share documents with Blue Owl's counsel, the Debtors are of the firm position that Blue Owl's alternative request for the appointment of an examiner is not appropriate. The Debtors are also keenly aware of the need to ensure that the contemplated sale of its assets proceed without delay for the preservation of value for all stakeholders. To the extent any deadlines are moved, there should be no interference with the ability to move forward with the sale hearing and the closing of the anticipated sale as soon as practicable.

## BACKGROUND

### I.     The Debtors' Asset Sale

7.     Since initiating these Chapter 11 cases, the Debtors goal has been to provide the best outcome to its stakeholders by selling substantially all of their assets to a bidder and allowing the Debtors' business to carry on as a going concern. (*See, e.g.*, Doc. No. 77-2 ¶ 51.)

8.     In order to achieve that goal, the Debtors needed to obtain millions of dollars in post-petition funding from the Secured Lenders in the form of a DIP Term Loan Facility and the DIP ABL Facility (collectively, the "**DIP Facilities**"). (Doc. No. 584.) Both DIP facilities

followed an existing Term Loan Facility and ABL Facility with the Secured Lenders. (Motion ¶¶ 24, 26.)

9. On October 30, 2024, the Debtors held an auction for the sale of their assets and accepted a winning bid from an affiliate of Nexus Capital Management LP ("**Nexus**"). Under the terms of the Debtors' Asset Purchase Agreement with Nexus (the "**APA**"), Nexus will provide over $750 million of value to the Debtors' estate and their creditors. The APA expires if the transaction does not close by December 31, 2024. (Doc. No. 18-3 at 85.) Moreover, the amended APA sets a target closing date of December 2-3, which is essential to keeping the Debtors' business on track, including by providing assurances to their vendors.

10. In addition, under the DIP Order, if the Debtors do not meet certain milestones, there will be an event of default that could cut off future funding and subject the Debtors to various penalties. (Doc. No. 584 at 45.) Among other milestones, the Debtors must obtain court approval for the sale by December 1, 2024 and the Debtors must consummate the sale by December 13, 2024. (Doc. No. 584-1 at 8.)

## II. The UCC Agrees to the Challenge Deadlines but Waits Weeks To Seek Discovery

11. The Committee was appointed on September 23, 2024. (Doc. No. 248.)

12. On October 22, 2024, with the Committee's agreement, the Court entered the Final DIP Order, which set a challenge deadline of November 7, 2024. (Doc. No. 584 at 69.) That shortened challenge period, however, was something that the Committee was made aware of at or close to the time of its formation, so the approval of the November 7 deadline came as no surprise. (Doc. No. 114 at 68 (setting the Challenge Deadline at the earlier of the date of the hearing approving the sale of the Debtors' assets or 75 days).)

Case 24-11967-JKS    Doc 905    Filed 11/05/24    Page 5 of 15

13.     Moreover, the Debtors and their professionals have been working diligently and expeditiously to provide the Committee with all information needed to carry out their duties in these cases since the very beginning.  Among other things, shortly after it was formed, the Committee was given access to a data room that contained documents relating to the DIP Facilities and was given access to the underlying credit agreements.

14.     However, the Committee did not send the discovery requests that are at issue here until October 17.  Indeed, it was not until October 16, 2024—23 days after the Committee was formed and 22 days before the November 7 challenge deadline—that the Committee even indicated, for the first time, that it planned to serve formal requests for documents relating to the prepetition ABL and Term Loan.  (Ex. 1.) [3]

15.     The Requests asked the Debtors to produce massive amounts of information, including "All Documents and Communications" relating to the negotiation and execution of the Prepetition ABL and the Prepetition Term Loan, "All Documents and Communications" concerning due diligence performed on the Prepetition ABL and the Prepetition Term Loan, and all of the Debtors' board minutes and board materials going back to 2020. (Ex. 2.)  The Committee requested that the Debtors produce all responsive information by the following week.  (*Id*.)

### III.    The Debtors Quickly Engage With the Committee and Produce Documents

16.     Upon receiving these requests, the Debtors immediately began collecting documents and engaging with the Committee.  Less than a day of receiving these Requests, the Debtors asked the Committee to meet and confer.  (Ex. 3.)  Because it was a Friday, Debtors agreed to make themselves available over the weekend to discuss.  (*Id*.)

---

[3] "Ex. __" refers to exhibits to the Declaration of James I. McClammy filed herewith.

17.     The Committee and the Debtors ultimately met and conferred by teleconference that Sunday evening on October 20, 2024.  On the call, the Debtors explained that it would be impossible to collect, review, and produce all of the documents responsive to the Requests on the requested timeframe.  The Debtors offered alternatives, such as producing all board minutes and board materials—which included extensive discussions about the Prepetition ABL and Prepetition Term Loan—and having relevant custodians self-identify non-privileged, responsive communications for fast production to the Committee.  The Committee, however, rejected the Debtors' proposal and insisted that the Debtors pull the custodians' full email inboxes and outboxes and apply search terms—an immensely time consuming process.  The Debtors reiterated that it would be impossible to collect the requested documents; review them for privilege, confidentiality, and other issues; and produce them by the requested date, but agreed to endeavor to produce documents over the coming week and to produce custodial documents as soon as possible.  The Committee stated that it would provide search terms, which it wanted the Debtors to run.

18.     The Committee was satisfied with the results of the October 20 call and the speed at which the Debtors were collecting documents.  At the October 21 hearing, the Committee's counsel told the Court that "Everybody, as recently as this morning and meet-and-confers last night with the debtors and their professionals, and this morning with the lenders and their professionals, seems to be cooperating."  (Oct. 21, 2024 Hr'g Tr. 113:7-10.)

19.     Over the following week, the Debtors worked quickly and diligently to compile the requested documents and provide information to the Committee.  On October 24, 2024, the Debtors confirmed to the Committee that the Committee already had all deposit account control agreements responsive to the Committee's Requests.  (Ex. 4.)  The Debtors also provided updated

schedules to the Debtors' Amended and Restated Security Agreement, dated April 18, 2024, which the Committee had requested.  (*Id*.)

20.     The Committee never provided its anticipated search terms to the Debtors. Nonetheless, in order to expedite the production of the requested documents, the Debtors developed their own search terms and began collecting and processing emails and other documents from both central files as well as four separate document custodians for production to the Committee.  As anticipated, because the Debtors were producing these materials on an extremely condensed timeframe, they did not have adequate time to individually review each document for potential confidentiality concerns.  However, the Debtors maintain ongoing commercial relationships with members of the Committee such that giving each and every member of the Committee unrestricted access to their documents could risk commercial harm.  Further, the bulk of the requested documents include communications with the Debtors' Secured Lenders, which the Debtors understand that the Secured Lenders wish to keep confidential.

21.     Accordingly, before the Debtors made their first production, the Debtors and the Committee agreed that, in order for the Debtors to search and produce the Debtors' employees full inboxes on an expedited basis, the Debtors would be unable to review each individual document and thus would need to designate all documents as PEO.  The Committee reached a similar agreement with the Secured Lenders.  The Debtors agreed that, if the Committee's counsel determined that it was necessary to share certain documents with individual members of the Committee, they would meet and confer with the Committee's counsel to resolve any dispute. (Ex. 5.)

22.     The Committee's agreement to maintain these documents as PEO is also set forth in the Bylaws of the Official Committee of Unsecured Creditors (the "**Bylaws**").  The Bylaws

provide that the Committee will maintain information provided to them by the Debtors as confidential. The Bylaws specifically state that the Debtors can designate information given to the Committee as PEO, without qualification, and that if the Committee's professionals desire to share any such information with the Committee's members, those professionals shall seek to meet and confer with the Debtors.

23.    Then, as promised, the Debtors made their initial production by Friday, October 25, 2024—less than a week after initially meeting and conferring with the Committee—producing 3,650 pages of documents, comprising a portion of the Debtors' board minutes and board materials. (Ex. 6.)[4] The following Monday, October 28, the Debtors produced an additional 8,736 pages of board materials. (Ex. 7.)

24.    That same day, the Debtors also produced 95,126 pages of documents collected by Vorys, the outside counsel who represented the Debtors in connection with the Prepetition ABL and the Prepetition Term Loan and who led negotiations concerning both agreements on behalf of the Debtors. (Ex. 8.) The Debtors then completed their production by producing 19,212 pages of documents collected from its email custodians on Wednesday, October 30 (Ex. 9), and an additional 2,646 pages on Sunday, November 3. (Ex. 10.)

25.    In total, the Debtors produced over 10,000 documents totaling 129,370 pages over the course of 17 days following receipt of the Committee's Requests. Because it was not possible to review each of those 129,370 pages of documents over that short timeframe, the Debtors produced the bulk of these documents site unseen, without identifying confidentiality concerns on a document-by-document basis, in reliance on the Committee's agreement to maintain all such documents as PEO.

---

[4] Thus Blue Owl's Motion repeated assertion that "No documents were produced as of October 26, 2024" is simply false. (*See, e.g.*, Doc. No. 870 ¶ 3.)

26.     At no point has the Committee's counsel asked to meet and confer with the Debtors about any of the documents designated PEO, as contemplated by the Bylaws and the Committee's October 25 agreement, or otherwise identified any documents that they wish to share with their clients, which they believe did not merit a PEO designation.

**IV.     Blue Owl Asks To Review Documents**

27.     On October 28, 2024, the Committee asked to share documents that the Debtors produced with outside counsel for one of the Committee members.  (Ex. 11.)  The Debtors agreed to the request.

28.     The following day on October 29, 2024—a mere nine days before the challenge deadline—Blue Owl, which serves as the chair of the Committee, revealed itself to be the subject of the Committee's requests and asked the Debtors to lift the PEO designation on the materials and extend the Challenge Deadline to November 21, 2024.  (Ex. 12.)  This request went beyond the Committee's request a day earlier, which only sought to share documents with Blue Owl's counsel.  (Ex. 11.)

29.     On October 30, 2024, the Debtors provided Blue Owl's counsel with all of the documents produced to date, which included substantially all of the documents responsive to the Committee's Request, save for a handful of documents that followed later that week.  (Ex. 13, Ex. 14, Ex. 15.)  Blue Owl's counsel agreed to maintain these documents as PEO, without prejudice to its request that that designation be lifted.  (Ex. 12.)

30.     On that same day, the Debtors met and conferred with Blue Owl's counsel to discuss Blue Owl's request regarding lifting the PEO designations.  The Debtors suggested that, if there were specific documents that Blue Owl's counsel wished to share with its client, the Debtors were willing to promptly evaluate whether to lift the PEO designation for those specific

documents.  Blue Owl acknowledged that this approach made sense but stated that it could not agree to it given that Blue Owl would only have eight days to review the documents in advance of the November 7 Challenge Deadline.

**V.     The Committee Requests an Extension to the Challenge Deadline**

31.     On October 30, 2024—a day after Blue Owl requested that the Challenge Deadline be extended to November 21, 2024—the Committee wrote to the Debtors to request that the Challenge Deadline only be extended to November 11, 2024.  (Ex. 16.)

32.     On November 4, 2024, the Committee wrote to counsel and amended its earlier request, this time asking the Debtors and their Secured Lenders to agree to move the Challenge Deadline to November 22, 2024.  (*Id.*)  That same day, the Secured Lenders agreed to extend the Challenge Deadline.

33.     In the same email, despite its earlier agreement to maintain the documents the Debtors produced as PEO, the Committee asked that the Debtors "undertake a further review of their produced documents to re-designate as 'Confidential' those documents that are acceptable for review by members of the Committee."  (*Id.*)

34.     Despite the fact that the Secured Lenders agreed, the with Committee, to extend the Challenge Deadline to November 11, 2024 in order to allow time for the parties to brief the Committee's extension request, the Committee's chair, Blue Owl, elected to file the instant Motion requesting relief on an expedited basis.

**<u>ARGUMENT</u>**

**I.     Any Modification of the Challenge Period Should be Limited**

35.     The Debtors are concerned that extending the Challenge Period will risk delaying the sale of the Debtors' assets.  Such a result risks loss of value to these estates and is wholly

unwarranted given the Committee's full engagement through its counsel in the investigation needed with respect to whether any claims should be brought prior to the expiration of the Challenge Period. Furthermore, the absence of any delay on the part of the producing parties further counsels against the need for an extension of time as long as that requested by Blue Owl. The Debtors firmly believe the current Challenge Deadline is more than sufficient time for the Committee to conduct its investigation and for Blue Owl to make itself comfortable with the investigation conducted by the Committee.

## II.    The Court Should Uphold The Debtors' PEO Designation Pending Further Meet and Confers

36.    The Debtors and the Committee agreed that, because the Committee wanted the Debtors to search its custodians' full inboxes, rather than having individual custodians conduct targeted searches of their own documents, the Debtors could not review every document responsive to the Committee's Requests in the time requested. In order to achieve that result, both the Debtors and the Secured Lenders agreed to forego a customary review whereby they assessed the confidentiality concerns of each individual document and, instead, produced the bulk of their documents sight unseen so that the Committee could begin reviewing them as soon as possible. Under this approach, the Debtors only need to review the specific documents that counsel for the Committee, or Blue Owl, wish to share with their clients—as opposed to the full set of over 10,000 documents—thus ensuring that the Debtors are able to assess the confidentiality implications of those documents as quickly as possible and, as a result, allow those documents to be shared as quickly as possible

37.    The fact that the Debtors and the Secured Lenders designated their documents PEO has done nothing to hinder the Committee's investigation, or Blue Owl's. Both the Committee and Blue Owl retained competent counsel and other professionals to investigate potential claims,

and those professionals have had full access to the Debtors' production and have been able to undertake a fulsome investigation.  Blue Owl identifies no way in which that investigation has been hindered by the mere fact that these professionals have to meet and confer with the Debtors and the Secured Lenders before sharing specific documents with their clients.  Nor have any of these professionals asked the Debtors or the Secured Lenders to share specific documents with their clients.  Accordingly, there is no reason to lift the PEO designation.

38.    Conversely, if Blue Owl's request were granted, the Debtors would have to go back and review each of the 129,370 pages that they produced to the Committee to determine whether they contain sensitive information that merits a PEO designation.  In addition to imposing a substantial expense on the Debtors' estate, such a review would take days, if not weeks, and would eliminate any benefit from postponing the Challenge Deadline.  Indeed, there is significant risk that the delay caused by forcing the Debtors to review their entire production would prompt Blue Owl to ask the Court to move the Challenge Deadline yet again, at which point there would be a substantial risk that Blue Owl's requests could disrupt the sale of the Debtors' assets to Nexus, including by causing the Debtors' to miss the December 31, 2024 closing deadline, the December 2-3 targeted closing date, or one of the milestones in the Final DIP Order.  The only result from such delay is thus to endanger whatever recovery Blue Owl and the Debtors' other creditors may hope to obtain from the Debtors' estate.

39.    Accordingly, the Court should permit the parties to continue their current approach of designating all documents PEO and meeting and conferring with counsel for the Committee or Blue Owl if they want to share specific documents with their counsel.  The Debtors agree that they will promptly review any such reasonable requests and endeavor in ood faith to respond in no more than 24 hours.

### III.    The Court Should Not Appoint An Examiner

40.    It is inappropriate to appoint an examiner to do nothing other than attempt to duplicate the investigation that the Committee has already been undertaking for weeks.  The Committee—of which Blue Owl is the chair—is represented by experienced counsel and is undertaking a fulsome investigation of potential claims at the Debtors' expense in advance of the Challenge Date, serving requests for production on the Debtors and their Secured Lenders and receiving thousands of documents in response.  Indeed, Blue Owl acknowledges that the most efficient way for this investigation to proceed is for it to be led by the Committee.  (Motion ¶ 52.)

41.    But, despite this ongoing and fulsome investigation by the Committee, the Committee's chair now argues, in the alternative, that it may be appropriate to bring on an examiner if the Debtors and its Secured Lenders "stifle the investigation" by "providing untimely and deficient discovery."  (Motion ¶ 52.)  But here there can be no credible suggestion that there has been any stifling of the investigation or untimely or deficient productions.  The Debtors, for their part, have been in regular contact with counsel for the Committee and have not only provided responses to discovery requests on an expedited basis, but have not heard anything to date to suggest that productions were in any way deficient.  There is simply no factual basis to support Blue Owl's request for alternative relief.

42.    To the extent the Court does elect to appoint an examiner, it should limit the scope of that examiner's authority to only investigating those matters that the Court determines that the Committee has not adequately investigated.  The Court has "broad discretion to direct the examiner's investigation, including its scope, degree, duration, and cost.  *In re FTX Trading Ltd*, 91 F.4th 148, 156 (3d Cir. 2024) (internal citations omitted).  The Court may use such authority to "ensure that the examiner is not duplicating the other parties' efforts and the investigation is not

unnecessarily disrupting the reorganization process." *Id.*; *see also In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) (noting that courts may appoint an examiner with no duties where there would not be "any useful purpose for an examiner") (quoting *In re Erickson Retirement Communities LLC*, 425 B.R. 309, 317 (Bankr. N.D. Tx. 2010)).

43.     Here, there is no question that appointing an examiner to undertake the exact same investigation that the Committee is already conducting would be duplicative, unnecessary, and a waste of the Debtors' precious resources.  Blue Owl provides no explanation of what, if anything, an examiner could do that would not already be achieved by the Committee's own investigation. It does nothing to suggest, for instance, that the Committee's investigation is somehow compromised and, as discussed, admits that the most efficient solution is for the Committee to conduct any such investigation.  Further, appointing an examiner would unnecessarily disrupt the Debtors' reorganization process.  As discussed, even a minor delay risks causing the Debtors to miss the December 2-3 targeted closing date or December 31, 2024 closing deadline set forth in the APA or cause an event of default under the Final DIP Order, thus destroying all of the value that Debtors are currently working to provide to their creditors, including Blue Owl.

44.     Accordingly, the Court should deny Blue Owl's request to appoint an examiner or should, at the very least, limit the role of the examiner to those areas in which the Committee's investigation is deemed insufficient.

## CONCLUSION

45.     For the foregoing reasons, the Debtors respectfully request that the Court deny Blue Owl's motion.

Dated:   November 5, 2024
         Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Andrew R. Remming
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4277)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com

-and-

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
james.mcclammy@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*