# EXHIBIT A

## DEED OF LEASE AGREEMENT

This Deed Of Lease Agreement, made effective this 2nd day of May, 2003 (the "Effective Date"), by and between **DARNESTOWN ROAD PROPERTY LIMITED PARTNERSHIP,** a Maryland limited partnership, whose notice address is c/o Womble, Carlyle Sandridge & Rice, PLLC, Seventh Floor, 1401 Eye Street, N.W., Washington, D.C. 20005, Attn: Erik D. Bolog, Esq., with a copy to The Shopping Center Group of the Virginias, LLC, 8003 Franklin Farms Drive, Suite 220, Richmond, Virginia 23229, Attn: Jeffrey D. Doxey ("Landlord"), and **BIG LOTS STORES, INC.,** an Ohio corporation, whose notice address is 300 Phillipi Road, Columbus, Ohio 43228-5311("Tenant").

### WITNESSETH:

1. **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.  <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

    B.  <u>Dates</u>:  Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

    1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes within two (2) weeks prior to the Delivery Date, as hereinafter defined. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibits C and H. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

    2)  The "Tenant Possession Date" shall be the earlier of (i) the date Tenant accepts possession following Landlord's notice that it has completed all construction required pursuant to Exhibit C (except for punchlist items), or (ii) ten (10) days after written notice from Landlord that it has completed all construction as required pursuant to Exhibit C (except for punchlist items).  Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises.  Said form shall be executed by Tenant and returned to Landlord.  Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant, construction pursuant to Exhibit C is complete, and the Demised Premises complies

1

Richmond, VA.final

with all laws, ordinances, regulations and building restrictions. Unless otherwise agreed to in writing, in no event shall the Tenant Possession Date occur during the period from September 1 to December 31. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder, which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date, or (ii) the date Tenant opens for business.

4)    The "Term Commencement Date" shall be the Rent Commencement Date.

5)    Landlord shall use commercially reasonable efforts to tender possession of the Demised Premises to Tenant on or about August 4, 2003 (the "Delivery Date"). If Landlord fails to tender possession of the Demised Premises to Tenant by January 31, 2004 (the "Drop Dead Date"), then Tenant may cancel this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to the Delivery Date. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by the Delivery Date, the damages suffered by Tenant, through great and irreparable, are difficult or impossible to accurately ascertain. Therefore, for each and every day beyond August 17, 2003 that Landlord is delayed in delivering possession to Tenant, except by reason of Tenant delays, Tenant shall, as of the Rent Commencement Date, be entitled to an abatement of one days' Rent and Additional Rent for each day of such delay; provided, however, in no event shall the amount of Tenant's abatement for late delivery exceed one months' Rent and Additional Rent.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit B -    Legal Description of Shopping Center

3)    Exhibit C -    Landlord's Work

4)    Exhibit D -    Tenant's Sign Specification

5)    Exhibit D-1    Tenant's Pylon Sign

6)    Exhibit E -    Delivery of Possession Letter

7)    Exhibit F -    Exclusive Uses and Use Restrictions of Record

8)    Exhibit G -    Rules and Regulations

9)    Exhibit H -    Tenant's Floor Plan

D.    Demised Premises: The "Demised Premises" shall be the storeroom, as outlined in yellow on Exhibit A and as further depicted on Exhibit H, which storeroom shall have approximately 32,343 square feet of gross leasable area, at the address 8028 West Broad Street, Richmond, VA  23228.

2

Richmond, VA.final

E.    <u>Gross Leasable Area</u>:  The "gross leasable area" shall mean the number of square feet of floor area on all levels, excluding any mezzanines, basements or balconies, measured from the exterior face of exterior walls and of service corridor walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment.  With respect to the Shopping Center, the gross leasable area shall be the total constructed gross leasable area available for the exclusive use and occupancy within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time.  Any change in gross leasable area, whether of the Demised Premises or Shopping Center, shall be deemed in effect on the first day of the next succeeding month following such change.

F.    <u>Interest Rate</u>:  The "Interest Rate" shall be interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually.

G.    <u>Shopping Center</u>:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof and is known as **FOUNTAIN SQUARE SHOPPERS' WORLD**, which is located on West Broad Street (Route 250), approximately 0.25 miles east of the intersection between West Broad Street and Old Parham Road (Route 73) in the City of Richmond, Commonwealth of Virginia and County of Henrico, 23294.  As of the Effective Date, the gross leasable area of the Shopping Center, for purposes of calculating Tenant's pro rata share of Real Estate Taxes (Section 5.E.), shall be 90,130 square feet (including the gross leasable area of Friendly's), and for purposes of calculating Tenant's pro rata share of Common Area Costs (Sections 5.C. and D.) and insurance (Section 12), the gross leasable area of the Shopping Center shall be 85,380 square feet (excluding the gross leasable area of Friendly's).

2.    <u>DEMISE:</u>

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. The dimensions and the gross leasable area of the Demised Premises shall be adjusted, if necessary, by Tenant within 120 days of the Tenant Possession Date to conform with actual field measurements, and the Rent and Additional Rent under this Lease shall be proportionately adjusted on the basis of the actual field measurements.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees

3.    <u>TERM:</u>

A.    <u>Original Term</u>:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2011 (the "Original Term").  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  The first Lease Year shall include the first Partial Lease Year, if any.  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extension or holdover period.

3

B.    Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and "Fourth Option Term", commencing upon the expiration of the Original Term or such prior Option Term, as the case may be. Each Option Term shall be upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, and Tenant is not in default beyond any applicable notice and cure period at the time it elects to exercise an option, Tenant may elect to exercise each option by giving the Landlord written notice at least two hundred seventy (270) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. The failure by Tenant to timely exercise any option shall render all future options null and void and of no force and effect, unless otherwise agreed to in writing by Landlord.

4.    **USE AND OPERATION:**

A.    Use: Subject to the exclusives and use restrictions attached hereto as Exhibit F, Tenant shall have the right to use and occupy the Demised Premises solely for the purpose of the sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, food and for the sale of any other merchandise typically sold in Tenant's stores. Landlord represents and warrants to Tenant, that (i) as of the Effective Date, except as set forth on Exhibit F attached hereto, no exclusive covenants granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises; and (ii) as of the Effective Date, all exclusive use provisions granted by Landlord to tenants in the Shopping Center and all use restrictions of record are attached hereto and incorporated herein as Exhibit F. At such time as an exclusive use or restriction of record is no longer applicable for the benefit of another tenant or occupant, the Demised Premises shall not be subject to such exclusive use or use restriction under this Lease and such use shall no longer be an exclusive or restricted use. Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with Landlord's violation of this provision.

B.    Exclusive: Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other discount, liquidator, closeout store, furniture, or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Term of this Lease. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall have the right, after giving Landlord prior written notice of the Competing Business and sixty (60) days within which to cure same, either to (i) pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly rent equal to the lesser of one and one-half percent (1.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent ("Alternate Rent"), such Alternate Rent to be payable within thirty (30) days after the month for which it is due, or (ii) to terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate. Tenant's failure to exercise its right to terminate shall not waive Tenant's continuing right to do so as long as such Competing Business is operating in the Shopping Center beyond the sixty (60) day notice and cure period. Provided Tenant has not elected to terminate this Lease as herein provided, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

4

Richmond, VA.final

C.    <u>Operation</u>:  Tenant agrees to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.  It is expressly understood and agreed by the parties hereto that the foregoing hours of operation impose no obligation on Tenant to continuously operate from the Demised Premises.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder.  In the event that Tenant closes the Demised Premises under this Section 4 and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.  For purposes of this Section 4.C., the Demised Premises shall be deemed closed if the Demised Premises are operated less than 25 hours per week for at least twelve (12) consecutive weeks, for reasons other than damage and destruction, remodeling, eminent domain, force majeure, or such other right as provided for under this Lease or under law or equity.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord) by contracting with a refuse service for regular pick-up, vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations.  Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the sidewalks immediately adjacent to the Demised Premises for the periodic sale and display of merchandise so long as such actions do not impair the free flow or safety of pedestrians. Any merchandise displayed on the sidewalks by Tenant shall be removed from the sidewalks at the close of business each day.  Tenant agrees to place such merchandise on the sidewalks at Tenant's sole risk.

D.    <u>Prohibited Uses:</u>  In no event shall the Shopping Center or any portion thereof be used as or for a movie theater; auditorium; meeting hall; church; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles; bar serving alcoholic beverages except as incidental to a restaurant (on either side of the Demised Premises); funeral parlor; massage parlor; animal clinic; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate, gymnasium; skating rink; car wash; off-track betting establishment; game room; amusement arcade or gallery; pinball arcade; so-called "flea market"; second hand or used goods store (excepting such national retail

5

consignment chains such as "Once Upon A Child" or "Play It Again Sports") or store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa; so-called "head shop"; night club; school; gun range or gun shop; or any business or use which creates a fire or explosive hazard (on either side of the Demised Premises); warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit materials (all of the foregoing collectively referred to as the "Prohibited Uses").

5.    **RENT AND ADDITIONAL RENT:**

From the Rent Commencement Date and throughout the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord (Federal Identification Number: 52-6109768) in lawful money of the United States at The Shopping Center Group of the Virginias address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"), without notice, demand or set off, except as otherwise provided for by the terms of this Lease. The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent: During the Original Term, the sum of $194,058.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $16,171.50.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $210,229.50 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $17,519.12. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $226,401.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $18,866.75. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $242,572.50 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $20,214.38. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $258,744.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $21,562.00.

B.    Percentage Rent: In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's Gross Sales (as hereinafter defined) which exceeds the annual base sum of $7,762,320.00 during the Original Term; $8,409,180.00 during the First Option Term; $9,056,040.00 during the Second Option Term; $9,702,900.00 during the Third Option Term; and $10,349,760.00 during the Fourth Option Term.

The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year, including non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and filled from the Demised Premises and consummated on the internet, and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from

6

stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) credit card company finance or service charges; (8) proceeds from vending machines located in the Demised Premises; and (9) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month. Tenant shall furnish to Landlord within sixty (60) days immediately following the end of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by Tenant. Tenant shall pay any Percentage Rent due with its annual statement of Gross Sales.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), so that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above. Within thirty (30) days of Landlord's written request, Tenant shall provide Landlord with a statement of Tenant's gross sales for the aforementioned 365 day period.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event. Landlord shall use commercially reasonable efforts to ensure that any information obtained from such an audit shall remain confidential and shall be used only for the purpose for which the audit is being conducted; provided, however, Landlord shall be permitted to divulge the contents of any such statements in connection with financing arrangements or assignments of Landlord's interest in the Demised Premises or in conjunction with any administrative or judicial proceeding in which Landlord is involved and required to divulge such information.

C.    Common Area Operation and Maintenance: Landlord shall maintain the Common Areas, which shall remain under Landlord's control, and Landlord agrees not to change such Common Areas in a manner that would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the Rules and Regulations which are attached hereto as Exhibit G, provided such Rules and Regulations, as may be modified from time to time by Landlord: (i) do not adversely affect Tenant's business operation, (ii) are uniformly applied to all tenants, and (iii) do not limit the rights or expand the obligations of Tenant under this Lease. Landlord shall not materially alter the parking area outlined in green on Exhibit A (the "No Build Area") without the prior written consent of Tenant.

7

Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities for the Common Areas (not individual tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs;

(iv) providing lighting, and if necessary in Landlord's reasonable business judgment, providing security and policing the Common Areas;

(v) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs ("Common Area Charges") shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred in refurbishing, repairing, maintaining, replacing, and improving the Common Areas (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies.

Subject to the provisions of Section 5.D. hereof, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the gross leasable area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant that is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses. Notwithstanding anything contained herein to the contrary, excluded from such Common Area Charges shall be any expenses related to an individual occupants of the Shopping Center or to a particular tenant space; all capital expenditures (as defined by generally accepted accounting principles consistently applied); reserves for replacements; any insurance deductible and/or self-insured retentions; any depreciation of the Shopping Center; the insurance carried by Landlord pursuant to Section 12.B. hereof, including public liability, property damage, and fire and extended coverage on the Shopping Center and/or Common Areas; and any administrative charges, management fees, fees based upon a percentage calculation or leasing commissions; provided, however, Tenant's pro

8

rata share of Common Area Charges throughout the Term shall include a flat fee of six cents ($.06) per square foot of the gross leasable area of the Demised Premises per annum towards Landlord's bookkeeping costs.

On the first day of each calendar month during that portion of the Term hereof falling within the first calendar year, or partial calendar year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior calendar year. As of the Effective Date, Tenant's pro rata share of Common Area Charges is equal to 37.88%.

After the first calendar year, or partial calendar year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each calendar year or partial calendar year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding calendar year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each calendar year or partial calendar year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such calendar year or partial calendar year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any calendar year or partial calendar year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent and Additional Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

D.    Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's Common Area Charges, inclusive of the permitted bookkeeping cost and exclusive of the snow and ice removal costs and of the Common Area utility charges, shall be capped at $0.55 per square foot of the gross leasable area of the Demised Premises (the "CAM Cap") during the 2003 calendar year. Thereafter, the CAM Cap shall increase by 3% per annum for each calendar year during the Term (i.e., the CAM Cap shall be $.57 in 2004, $.58 in 2005, $.60 in 2005, and so on.) Excepted from the foregoing cap on Common Area Charges shall be those costs incurred and paid by Landlord in any calendar year for snow and ice removal and for all Common Area utility charges.

9

Richmond, VA.final

E.    <u>Real Estate Taxes:</u>  Landlord shall pay all real property taxes and special assessments which may be levied or assessed by any lawful authority against the land (tax parcel number(s) 763-753-5421) and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes").  If any governmental taxing authority acting under any present or future law, ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than an income or franchise tax) upon or against or in any way related to the land and buildings comprising the Shopping Center, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, such tax, excise and/or assessment shall be included in the definition of Real Estate Taxes.

Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord.  Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the gross leasable area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the gross leasable area leased to any Shopping Center tenant which is solely responsible for payment of real estate taxes for its separately assessed parcel shall be deducted from the gross leasable area of the Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority.  Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes and reasonable verification for the computation of Tenant's pro rata share promptly upon receipt of tax bills from taxing authorities.  Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.  As of the Effective Date, Tenant's pro rata share of Real Estate Taxes is equal to 35.88%  Landlord represents that the Real Estate Taxes for the 2002 tax year were $.55 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Tax increases.  Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.  Tenant's pro rata share shall be reduced to the extent of net abatements, refunds or rebates granted to Landlord.  Any refund received as a result of such proceedings shall be applied first to reimburse Landlord for its expenses of prosecuting such proceedings, including reasonable attorney's fees.  Tenant shall pay to Landlord, Tenant's pro rata share of Real Estate Taxes paid by Landlord for tax years or portions there of which occur during the Term.  In no event shall Tenant pay for Real Estate Taxes for a time period longer than the Term.  For example, if the Term is for five (5) Lease Years, then notwithstanding if the Real Estate Taxes are paid in advance, contemporaneously, or in arrears to the taxing authority, Tenant shall reimburse Landlord for Real Estate Taxes paid during the five (5) Lease Years of the Term regardless of when such Real Estate Taxes are levied or the time period for when such Real Estate Taxes are placed on the Shopping Center and/or the Demised Premises.  It is expressly understood and agreed that Tenant shall not be required to pay, or reimburse Landlord for (i) any local, state or federal capital levy, franchise tax, revenue tax, income tax or profits tax of Landlord or (ii) any estate, inheritance, devolution, succession or transfer tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Demised Premises.

Richmond, VA.final

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may, with the prior written consent of Landlord, contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. Any refund received as a result of such proceedings shall be applied first to reimburse Tenant for its expenses of prosecuting such proceedings, including reasonable attorney's fees, second to Tenant as proportional reimbursement for Real Estate Taxes paid by Tenant to Landlord for the tax year or years which are the subject of such proceedings, and the balance shall become the property of Landlord. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. In the event Tenant contests Real Estate Taxes pursuant to the foregoing and such contest by Tenant results in an assessment greater that the assessment that was contested, Tenant shall be required to pay any increase in the Real Estate Taxes for the Shopping Center which are attributable solely to such contest by Tenant.   If anyone other than Tenant (including Landlord) successfully contests such Real Estate Taxes, the resulting refund, if any, after deduction of expenses for conducting such proceedings, shall be prorated and Tenant's pro rata share shall be paid to Tenant.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.     Late Payment Penalty:  In the event Tenant fails to pay Rent or Additional Rent due and owing Landlord when same is due and payable, then for each and every such late payment, Tenant shall pay Landlord interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually on any such sum due Landlord from the due date to the date of payment of such sums.

G.     Utilities Charge and Exterior Lighting:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters that shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises.

6.     **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that the cost of such work, in each instance, does not exceed $75,000.00, such work shall not affect the structural parts of the building of which they are a part; that such are done in a good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing. Tenant shall not permit any mechanic's liens to remain filed against the Demised Premises for any work performed or materials furnished in connection with Tenant's work. If, because of any act or omission of Tenant, a mechanic's or other lien or order for

11

the payment of money shall be filed against the Premises or upon the Shopping Center or lands of which the Premises is a part, Tenant shall, at Tenant's own cost and expense, within thirty (30) days after notice of the filing thereof, cause the same to be canceled and discharged of record, or furnish Landlord with a surety bond issued by a surety company, protecting Landlord from any loss because of non-payment of such lien claim. In the event Tenant does post bond, Tenant shall be entitled to contest any such lien claims by appropriate judicial proceedings. Landlord's prior written consent shall be required in the event Tenant intends to make any exterior or structural alterations to the Demised Premises, and Tenant shall submit plans and specifications with regard to such exterior or structural alterations when it submits its request for Landlord's consent to same, and Landlord's prior written consent shall be required for all changes, additions or alterations to the Demised Premises costing in excess of $75,000.00. Tenant agrees that any proposed exterior or structural changes to the Demised Premises shall be in keeping with the structural harmony of the Shopping Center and shall be in keeping with the general style and format of Tenant's other stores in the Commonwealth of Virginia.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

   A.    Tenant's Repairs: Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises. Throughout the Term, Tenant shall maintain the HVAC system serving the Demised Premises in good condition.

   Should Tenant discover that the HVAC system requires repair and/or replacement during the first 24 months of the Term; and the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate in any 12 month period within the first 24 months of the Term, Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Interest Rate, from its next Rent and Additional payments owing. Tenant shall use commercially reasonable efforts to give Landlord prior notice of its election to offset its costs, as herein provided. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

   Any reservation of a right by Tenant to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

Richmond, VA.final

B.    <u>Landlord's Repairs</u>. Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

If Landlord fails to complete Landlord's Work or fails to commence and diligently complete the making of any repairs to the Demised Premises or the Common Areas immediately adjacent to the Demised Premises within thirty (30) days after notice by Tenant of the need for such repairs (provided that if Landlord commences to cure the default within the initial 30-day period and diligently prosecutes the same to completion, Landlord shall be afforded such additional time as is reasonably necessary to effect such cure if such failure cannot reasonably be cured within the initial 30-day period), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days.   In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Interest Rate, from the next Rent and Additional Rent payment(s) owing.

C.    <u>Initial Build Out</u>. Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall warrant that the HVAC system shall be in good working condition as of the Tenant Possession Date. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Interest Rate, from its next Rent and Additional Rent payment(s) owing.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of (i) any punchlist items with respect to Landlord's Work and (ii) any defects or items not in operating condition within thirty (30) days after the Tenant Possession Date, by providing Landlord with written notice of same. Landlord shall, within thirty (30) days from such notice, put such

13

Richmond, VA.final

inoperative items listed on the punch-list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Interest Rate, from the next installment of Rent and Additional Rent.

**8.    SIGNS:**

Tenant shall have the right, at its sole cost and expense, to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. All of Tenant's signs shall comply with all requirements of the applicable governmental authorities and all necessary permits or licenses shall be obtained by Tenant. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores in the state in which the Demised Premises are located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Tenant shall have the right, at its sole cost and expense, to place suitable sign panels upon the existing Shopping Center pylons, if pylons exist in the Shopping Center. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on a space within the top one-half (1/2) portion of the existing pylons as indicated on Exhibit D-1. If space is unavailable on any existing pylon, Landlord grants Tenant a right to install and maintain its sign panels on the top position of the new monument sign to be constructed by Landlord as indicated on Exhibit D-1. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once Tenant's sign panels and/or Tenant's pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

Landlord shall ensure that Shopping Center pylons and/or monuments (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational pylon sign or monument to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

If Landlord renovates all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord shall first notify Tenant at least forty-five (45) days prior to the removal of such sign(s) and the cost of such removal and reinstallation together with the cost of any damage to said sign(s) as a result of such removal and/or reinstallation shall be borne solely by Landlord. Further, Landlord agrees to provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) shall be approved by Tenant prior to such installation.

**9.    FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised

Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition.

10.   **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. In the event Tenant is required by local, state or federal code, Landlord shall provide Tenant with a complete set of "as built" drawings. Subject to the foregoing, Tenant shall be responsible for making any interior non-structural alterations of or improvements to the Demised Premises that are required by any law, statute, ordinance, order or regulation of any governmental authority following the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next sentence or otherwise under this Lease. Landlord shall be responsible, at its sole cost and expense, for making all alterations of or improvements to the Demised Premises that are required by any law, statute, ordinance, order or regulation of any governmental authority that (i) are structural in nature, (ii) relate to the exterior thereof, (iii) relate to the sprinkler, utility or life safety systems therein, or (iv) relate to the handicapped or disabled. Notwithstanding the foregoing, Tenant shall be responsible for (a) ADA compliance within the Demised Premises, and (b) for making all alterations of or improvements to the Demised Premises that are required by any law, statute, ordinance, order or regulation of any governmental authority that relate to the sprinkler, utility or life safety systems therein to the extent either (a) or (b) hereof are necessitated by the manner in which Tenant uses the Demised Premises; the specific manner in which Tenant displays its merchandise; or any interior modification of the Demised Premises made by Tenant.

11.   **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents, contractors or employees, Tenant's duty to indemnify and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by defects in Landlord's Work (as set forth in Exhibit C), the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents, contractors or employees, Landlord's duty to indemnify and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

15

Richmond, VA.final

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section. The provisions of this Section 11 shall survive the expiration or earlier termination of this Lease. The provisions of this Section 11 are subject to the provisions of Section 21.

12.   **INSURANCE:**

A.    <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout the Term of this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: $3,000,000 for bodily injury or death in any one accident and for property damage in any one accident, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    <u>Landlord</u>: Landlord shall, throughout the Term of this Lease, carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under "Special Form Coverage" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, with minimum limits of the following: $3,000,000 for bodily injury or death in any one accident and for property damage in any one accident, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Tenant will pay to Landlord monthly Tenant's estimated pro rata share of premiums for the aforementioned casualty and general liability insurance policies, based on Landlord's premiums. In calculating Tenant's pro rata share, the gross leasable area leased to any Shopping Center tenant which is solely responsible for payment of insurance for its building shall be deducted from the gross leasable area of the Shopping Center. Landlord represents that its insurance costs for the 2002 calendar year were $.18 per square foot per annum.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium with Landlord's year end reconciliation of Common Area Charges. An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined.

13.   **FIRE REBUILDING AND ALTERING:**

A.    If the Demised Premises, or any permanent additions or leasehold improvements thereto, and/or less than 35% of any buildings or other improvements comprising the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term, except as otherwise provided herein, Landlord, promptly at its own expense, caused the Demised Premises or such applicable portions of the Shopping Center to be restored (exclusive of Tenant's work and Tenant's Property) to such condition substantially similar to that as existed prior to the casualty ("Landlord's Restoration Work"), and Tenant

16

shall, promptly at its own expense, restore Tenant's work and Tenant's Property to such condition substantially similar to that as existed prior to the casualty ("Tenant's Restoration Work").

In the event Landlord, as provided above, is obligated to restore such damaged portions of the Demised Premises and/or the Shopping Center, and fails to complete Landlord's Restoration Work within one hundred eighty (180) days from the date of any such casualty, and such failure materially impairs Tenant's ability to operate from the Demised Premises, Tenant may, at its option, terminate this Lease by giving thirty (30) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided that if Landlord tenders delivery of the Demised Premises to Tenant, or reopens the damaged portions of the Common Areas to the public with its repair and restoration fully completed within said 30 day period, and if such event does not occur within the final Lease Year of the Term, Tenant's termination notice shall be void, and this Lease shall continue in full force and effect upon Tenant taking possession of the Demised Premises.  After written notice to Tenant that Landlord has completed Landlord's Restoration Work, Tenant shall proceed with Tenant's Restoration Work with reasonable diligence.

During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced in proportion to the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease when the Demised Premises are restored, and Tenant has taken possession of such in tenantable condition.

B.      Notwithstanding anything contained in this Section to the contrary, if (a) any of any buildings or other improvements comprising the Shopping Center shall be damaged or destroyed by fire or any other casualty to the extent that (1) thirty-five percent (35%) or more of the cost of replacement thereof, or (2) thirty-five percent (35%) or more of the gross leasable area contained therein shall be rendered untenantable, or (b) the Demised Premises or the buildings comprising the Shopping Center shall be damaged or destroyed by any casualty other than those covered by Landlord's Insurance, or (c) the holder of any indebtedness secured by a mortgage covering the Demised Premises or Shopping Center shall require that any insurance proceeds be applied to such indebtedness, Landlord may, within sixty (60) days following the date of such casualty, at its option, either (a) terminate this Lease or (b) promptly proceed with Landlord's Restoration Work as provided by Section 13A.  In either such event Landlord shall give Tenant written notice of its intention within said sixty (60) day period.

14.    **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.  This provision shall not apply to the initial delivery of possession of the Demised Premises or to the payment of Rent due hereunder.

15.    **Intentionally Omitted.**

16.    **WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; and (b) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that if Tenant shall perform all of the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have peaceable and quiet enjoyment and possession of the Demised Premises and of the rights granted hereunder without any hindrance from Landlord or anyone claiming by or through Landlord.

18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that Tenant and the holder of any mortgage lien hereafter created shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall use commercially reasonable efforts to require any future mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

Tenant agrees that it shall, within thirty (30) days of receipt of Landlord's written request in connection with a financing or sale of the Shopping Center or an interest in Landlord therein or at the reasonable request of Landlord's lender, but not more often than once per Lease Year, furnish Landlord or Landlord's lender, with a letter of Tenant's net worth.

18

Richmond, VA.final

19.    **DEFAULT:**

      A.      Each of the following events shall be a "Default" by Tenant under this Lease:

      1)      If Tenant shall fail to pay any Rent, Additional Rent, or any other sums due herein, and such failure continues for ten (10) days after Landlord gives Tenant written demand of such;

      2)      If Tenant shall fail to observe or perform any other covenants and/or agreements for which it is responsible hereunder, and such failure continues for thirty (30) days from the date Tenant receives written notice from Landlord advising of such failure (provided that if Tenant commences to cure the default within the initial 30-day period and diligently prosecutes the same to completion, Tenant shall be afforded such additional time as is reasonably necessary to effect such cure if such failure cannot reasonably be cured within the initial 30-day period);

      3)      If any petition is filed by or against Tenant (a) in any bankruptcy or other insolvency proceeding, or (b) seeking any relief under any state or federal debtor relief law, or (c) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease, and any such action is not dismissed within 30 days of said filing or appointment;

      4)      If Tenant makes an assignment for the benefit of its creditors.

      B.      Upon the occurrence of any such Default, Landlord shall have the option to pursue any one or more of the following remedies without further notice or demand, in addition to all other rights and remedies available to Landlord at law or in equity, all of such rights and remedies being cumulative; provided, however, in no event shall Landlord be entitled to accelerate any amount due under this Lease following a Default by Tenant.

      1)      Terminate this Lease by giving written notice thereof to Tenant, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so Landlord may, without prejudice to any other remedy which Landlord may have, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying the Demised Premises without being liable for any claim of damages, and at the election of Landlord, Tenant shall remain liable, as damages, for an amount equal to such Rent and Additional Rent on a monthly basis required to be paid by Tenant according to the terms of the Lease for the remainder of the Term but for such termination, diminished by any net sums thereafter received by Landlord through reletting the Demised Premises on commercially reasonable terms during such period; Landlord having an obligation to use commercially reasonable efforts to mitigate its damages.

      If Landlord terminates this Lease under this provision, then Tenant shall pay to Landlord the sum of (i) all Rent and Additional Rent accrued through the date of termination, and (ii) all amounts due under Section 19.C. below.

      2)      Terminate Tenant's right to possess the Demised Premises and re-enter the Demised Premises with or without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (i) all Rent, Additional Rent and other amounts accrued hereunder to the date of termination, (ii) all amounts due from time to time under Section 19.C. below, and (iii) such Rent, Additional Rent and other

Richmond, VA.final

net sums on a monthly basis required to be paid by Tenant according to the terms of the Lease for the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Demised Premises on commercially reasonable terms during such period; Landlord having an obligation to use commercially reasonable efforts to mitigate its damages. Landlord shall not be obligated to re-let the Demised Premises before leasing other portions of the Shopping Center.

3)    Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Demised Premises in connection therewith if necessary) without being liable for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in performing Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the Interest Rate.

C.    Upon any event of Default, Tenant shall pay to Landlord, as additional rent, all reasonable costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (i) obtaining possession of the Demised Premises, (ii) removing and storing Tenant's or any other occupant's property, (iii) repairing, restoring, altering, remodeling, or otherwise putting the Demised Premises into condition substantially similar to that at the time of Landlord's initial delivery to Tenant, (iv) the costs of reletting all or any part of the Demised Premises, including brokerage commissions, (v) performing Tenant's obligations which Tenant failed to perform, and (vi) recovering any unpaid Rent and Additional Rent due hereunder.

D.    Following the termination of Tenant's right to possess the Demised Premises, Tenant's liability following an event of default for Percentage Rent shall be the average annual Percentage Rent paid for the three (3) previous Lease Years prior to such termination (or, if shorter, the period from the Rent Commencement Date to termination).

E.    <u>Landlord's Default:</u> If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant shall give written notice of such default to Landlord (except in the event of an emergency, in which case such right is exercisable by Tenant at any time without prior notice) and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default, and upon the completion of such work by Tenant, Tenant shall provide Landlord with a detailed statement of the work completed, together with copies of paid invoices for such work, and Landlord shall reimburse Tenant for such work within thirty (30) days after its receipt of such statement. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the Interest Rate from the next Rent and Additional Rent payment(s) owing. In the event Tenant does not exercise its right to cure such default of Landlord as hereinbefore provided, and in the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repairs, all Rent due hereunder shall equitably abate in proportion to the square footage of the Demised Premises rendered untenantable until Landlord shall have satisfactorily performed such obligation.

20

Richmond, VA.final

F.    Remedies Cumulative: All rights and remedies of Landlord and Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the parties to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem desirable. The failure of Landlord or Tenant to insist upon strict performance by the other party of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any of said rights and remedies concerning any subsequent or continuing breach or default by the breaching party of any of the covenants, conditions, or agreements of this Lease.

## 20.    CONDEMNATION:

A.    Taking. If there is any taking of, or damage to, all or any portion of the Shopping Center or the Demised Premises because of the exercise of the power of eminent domain, condemnation or conveyed in lieu thereof, whether by condemnation proceedings, or any transfer made in avoidance of, or because of a threat or imminence of such taking (all of the foregoing being hereinafter referred to as "Taken" or "Taking") before or during the Term of this Lease, as the same may be extended, the rights and obligations of the parties with respect to such Taking shall be as provided in this Section 20. For purposes of this Section, the "Date of Taking" means the earlier of the date of entry into possession by, or the vesting of title in, the condemning authority or third-party transferee.

B.    Total Condemnation. If there is a Taking of all of the Demised Premises, this Lease shall terminate as of the Date of Taking.

C.    Partial Condemnation:

(i)    Right to Terminate. If thirty five percent (35%) or more of the Demised Premises is Taken, or such amount of the customer parking area of the Shopping Center shall be Taken to the extent the number of remaining spaces are not in conformance with applicable parking codes, or if fifty percent (50%) or more of the gross leasable area of the Shopping Center is Taken, except as otherwise provided in Section 20.C.(ii) below, either Landlord or Tenant shall be entitled to terminate this Lease so long as either Party in good faith determines that it cannot operate its own business in the manner contemplated by this Lease. The terminating party shall give the other party written notice of such election not later than sixty (60) days after the date the condemning authority actually takes the property. In the event these contingencies are not met, this Lease shall remain in full force and effect and Fixed Minimum Rent, Additional Rent, and all other charges due under this Lease shall be adjusted, if at all, as provided in Section 21E below.

(ii)    Repair and Restoration. If this Lease is not terminated as provided in Section 20.C., Landlord shall restore, at its sole cost and expense, the Shopping Center and the Demised Premises to a complete architectural unit of like quality, character and condition as that which existed immediately prior to the Taking, except for such leasehold improvements made by Tenant.

D.    Rent Adjustment. If this Lease is not terminated as provided in Section 20.C., the Rent, Additional Rent, and all other charges due under this Lease shall be reduced in proportion to the amount by which the Demised Premises Taken bears to the total floor area of the Demised Premises immediately prior to the Taking.

21

E.   <u>Award</u>. Except as otherwise herein provided as between Landlord and Tenant, the entire award or compensation paid on account of any partial or total condemnation or Taking under power of eminent domain, or threat of exercise thereof, of the Demised Premises, Shopping Center or Common Area shall be the property of Landlord, provided that Tenant shall be entitled to claim and recover from the condemning authority or third-party transferee such compensation as may be separately awarded for any loss to which Tenant may be entitled for Tenant's moving expenses or other relocation costs, loss of profits, the unamortized value of leasehold improvements or injury to Tenant's good will, trade fixtures or equipment, and retain any such award applicable thereto, but only to the extent that such compensation is in addition to and shall not diminish the compensation provided to Landlord; provided, however, in no event shall Tenant have any claim against Landlord or the condemning authority for loss or diminution in value of leasehold improvements paid for by Landlord, whether installed as part of Landlord's Work or Tenant's work, and Tenant hereby assigns to Landlord the amounts representing such value.

21.   <u>MUTUAL WAIVER OF SUBROGATION:</u>

Notwithstanding anything to the contrary contained in this Lease, and to the extent such damage is covered, or is required to be covered by either party's insurance coverage pursuant to the terms of this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same.

Landlord and Tenant agree promptly to provide notice, if necessary, to their respective insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

22.   <u>ASSIGNMENT AND SUBLETTING:</u>

Tenant may assign this Lease or sublet all or any part of the Demised Premises with, in each case, Landlord's prior consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Tenant may assign this Lease or sublet all or any part of the Demised Premises, in each case without the prior consent of Landlord, to a parent; subsidiary; affiliated corporation; successor to Tenant or the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or any entity that acquires all or substantially all of Tenant's stores either generally or at least twenty (20) of Tenant's stores in the state where the Demised Premises are located. Tenant shall notify Landlord of any assignment not requiring Landlord's consent. Any assignment requiring Landlord's consent shall be on a form reasonable acceptable to Landlord, Tenant and the proposed transferee. No such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

23.   <u>SURRENDER AND HOLDOVER:</u>

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures on or before the end of the Term hereof.

Richmond, VA.final

If Tenant shall remain in possession of the Demised Premises after expiration of the Term, such occupancy shall be a tenancy from month to month (terminable by either party on thirty (30) days prior written notice to the other) at 125% of the Fixed Minimum Rent then in effect, and otherwise subject to all the terms and provisions hereof.

24.   **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the next business day in the case of delivery by overnight courier, or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.   **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the state of in which the Demised Premises are located without regard to choice of law rules of that state.

26.   **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.   **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.   **REAL ESTATE BROKER'S COMMISSION:**

Landlord and Tenant agree that The Shopping Center Group of the Virginias LLS and NAI Commonwealth Commercial Partners (the "Brokers") are recognized as the sole procuring brokers in this transaction and Landlord and Tenant have not dealt with any other brokers in regard to the Demised Premises. Landlord agrees that Tenant shall not be required to pay any brokerage commission to the Brokers in regard to this transaction, and Landlord and Tenant shall save and hold the other harmless from any and all other demands and claims for brokerage commission in regard to this transaction, including, without limitation, the cost of legal fees in connection therewith.

29.   **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest

Richmond, VA.final

stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.    **HAZARDOUS MATERIAL:**

Landlord represents and warrants that to the best of its knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Landlord shall, at its sole cost and expense, promptly remove and dispose of any Hazardous Material in, on, under or around the Demised Premises at any time during the Term of this Lease, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord during the Term of this Lease. The removal and disposal of such Hazardous Material shall be performed in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate in proportion to the Demised Premises rendered untenantable during the period of time necessary to complete such work.

Throughout the Term of this Lease, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises caused by Tenant (or persons acting under Tenant) while in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of this Lease.

31.    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent or Additional Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Percentage Rent or Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable; provided, however, with respect to Percentage Rent, the six (6) month period shall begin on the date that Landlord receives Tenant's annual statement of Gross Sales and any payment of Percentage Rent, without waiving any of Landlord's audit rights as provided by Section 5.B. If Landlord does not notify Tenant of

Richmond, VA.final

such amount owed within said six (6) month period, then Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.   REASONABLE CONSENT:**

If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that, unless otherwise expressly set forth herein, it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that either party fails to respond to any request for consent, approval or permission within thirty (30) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other party may proceed without further action, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented, unless otherwise expressly set forth herein.

**34.   CO-TENANCY:**

Intentionally Omitted.

**35.   NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.   SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of the authorized signature printed by the receiving facsimile machine to be its original signature.

**37.   INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.   TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.   LIMITATION OF LANDLORD LIABILITY**

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from such property receivable by Landlord, or out of the consideration received

Richmond, VA.final

by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, and neither Landlord, nor any shareholder, member or officer if Landlord is a corporation or a limited liability company, nor the general partner or any of the other partners comprising the partnership which is the Landlord herein, nor any shareholder, officer, employee or agent thereof, shall be liable for any deficiency.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party.  This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.    WAIVER OF JURY TRIAL AND COUNTERCLAIM:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with the payment or nonpayment of Rent or Additional Rent.  In the event Landlord commences any proceedings for nonpayment of Rent or Additional Rent, Tenant shall not interpose any counterclaim of whatever nature or description in any such proceeding, unless the failure to raise the same would constitute a waiver thereof.  This shall not, however, be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.

**42.    TENANT'S AUDIT RIGHTS:**

If Landlord does not furnish Tenant with any year-end reconciliation statements as required by this Lease or if Tenant is not satisfied with Landlord's written statement(s) with respect to the Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, Tenant shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records to be made by Tenant's employees or accountants.  If Landlord has not provided Tenant with the requisite reconciliation, Tenant may defer payment of 25% of the Additional Rent otherwise accruing until Tenant's receipt of such reconciliation, whereupon Tenant shall promptly pay the deferred amount of Additional Rent.  If Tenant's audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.  If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit.  If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof, with interest at the Interest Rate, against the next Rent and Additional Rent payments due from Tenant to Landlord hereunder.  If Landlord, in good faith, disputes the validity of Tenant's audit, Landlord may, within thirty (30) days after receipt of the audit findings, submit the dispute to binding arbitration, with one arbitrator, administered by the American Arbitration Association in accordance with its Arbitration Rules for the Real Estate Industry.  The arbitration shall take place in Richmond, Virginia.  The arbitrator's decision shall be conclusive and binding upon Landlord and Tenant.  The cost of the arbitration shall be shared equally between the parties, unless otherwise determined by the arbitrator. Landlord's failure to submit the dispute to arbitration within said thirty (30) day period shall be deemed Landlord's waiver of its right to do so.

Richmond, VA.final

43. <u>**RULE AGAINST PERPETUITIES**</u>:

Notwithstanding any provision in this Lease to the contrary, if the Term of this Lease has not commenced within three (3) years after the Effective Date, this Lease shall automatically terminate on the third (3rd) anniversary of the Effective Date hereof.  The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

45. <u>**LANDLORD'S RIGHT OF ENTRY**</u>:

Landlord and its agents may enter the Demised Premises on at least three (3) days prior written notice to Tenant (except in the event of an emergency when such notice shall not be required), during Tenant's customary business hours, to inspect same; to make a repair or alteration to the Demised Premises required to be made pursuant to the terms of this Lease; and to place and maintain one "FOR RENT" sign (not to exceed a size of 3'x3') within the front window of the Demised Premises at any time within six (6) months prior to expiration of the Term.

END OF LEASE
Signature Pages and Exhibits follow.

Richmond, VA.final

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed under seal as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**DARNESTOWN ROAD PROPERTY LIMITED PARTNERSHIP**

By:

By: _____ (SEAL)

Title: Erik D. Balog, Authorized Agent

**LANDLORD**

Witnesses As To Tenant:

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____ (SEAL)
Kathleen Hupper

Title:  Vice President

**TENANT**

**DISTRICT OF COLUMBIA**

~~CITY OF WASHINGTON~~

      Before me, a Notary Public, in and for said ~~State and County~~ the above jurisdiction, personally appeared the above named Landlord, Darnestown Road Property, Limited Partnership, by Erik D. Balog its ~~officer~~ authorized agent, who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said ~~corporation~~ limited partnership, and the free act and deed of him/her personally and as said officer.

      IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Washington, D.C. this 2nd day of May, 2003.

_____
Notary Public

**STATE OF OHIO**

My Commission Expires: July 14, 2007

**COUNTY OF FRANKLIN**

      Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **BIG LOTS STORES, INC.,** by Kathleen Hupper, its Vice President, who acknowledged that she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of her personally and as said officer.

      IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this ___1___ day of MAY, 2003.

_____
Notary Public

PENNY J. SAVAGE
Notary Public, State of Ohio
My Commission Expires May 10, 2003

28

Richmond, VA.final

**EXHIBIT A**

**SITE PLAN OF SHOPPING CENTER**



The Shopping Center Group, LLC

4801 Radford Avenue
Suite A
Richmond, Virginia 23230

Phone: 804.673.1100
Fax: 804.515.5796
theshoppingcentergroupva.com

32,343

8,530

| SPACE | TENANT | SIZE S.F. |
|---|---|---|
| 1 | Ritz Camera | 1,000 |
| 2 | Fountain Square Cleaners | 1,700 |
| 3 | Bed Quarters | 3,419 |
| 4 | JoAnn Fabrics | 12,838 |
| 5 | *AVAILABLE* | 6,120 |
| 6 | Salon Plaza | 5,000 |
| 7 | Once Upon a Child | 3,000 |
| 8 | Mac Pro | 4,000 |
| 9 | Jackson Hewitt | 2,000 |
| 10 | CitiFinancial | 1,800 |
| 11 | Nouveau Hair | 1,200 |
| 12 | Saigon 2000 | 3,000 |
| 13 | *AVAILABLE* | 3,000 |
| 14 | Bellicino's Pizza & Subs | 3,000 |
| 15 | Enterprise Rent-A-Car | 1,760 |
| 16 | Ideal Computer | 1,200 |
| 17 | *AVAILABLE* | 2,000 |
| | TOTAL | 8,530 |

TOTAL PARKING= 556

LEGEND

Scale in feet
0  25'  50'  100'  150'

FOUNTAIN SQUARE SHOPPING CENTER
West Broad Street, Richmond, VA

SHRADER ROAD

TO PARHAM ROAD

AMF BOWLING ALLEY

JOANN FABRICS

KABUTO STEAK HOUSE

FRIENDLY'S ICE CREAM

FIRST VIRGINIA BANK

BROAD STREET ROAD U.S. RT. 250

Traffic Signal

## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

ALL that certain lot, piece or parcel of land, with all the improvements thereon and appurtenances thereunto belonging, lying and being in Brookland District, Henrico County, Virginia, containing 10. 045 acres and designated as a portion of Lot 2 , Section A, Fountain Square , as shown on a plat made by LaPrade Bros. dated April 20 , 1987 , revised December 30, 1992 , entitled "Map Showing Improvements Fountain Square Shoppers World , Brookland District , Henrico County, Virginia , a copy of which plat is attached to that certain Deed of Trust, Security Agreement and Assignment of Rents dated July 12 , 1993, recorded August 26 , 1993, in the Clerk' s Office, Circuit Court, Henrico County, Virginia, in Deed Book 2453, page 2304, and being more particularly bounded and described in accordance with said plat as follows:

BEGINNING at a point on the western line of Shrader Road, distant thereon 723. 02 feet south of the southern line of Carousel Lane; thence along the western line of Shrader Road S. 35 degrees 52 minutes 20 seconds E. 177.41 feet to a rod; thence leaving the western line of Shrader Road S. 36 degrees 59 minutes 10 seconds W. 643.01 feet to a rod; thence N. 35 degrees 46 minutes 30 seconds W. 282. 94 feet to a cross; thence S. 54 degrees 13 minutes 30 seconds W. 180. 06 feet to a cross on the eastern line of Broad Street Road - U. S. Route 250; thence along the eastern line of Broad Street U. S. Route 250 the following courses and distances: (1) N. 39 degrees 41 minutes 44 seconds W. 54. 67 feet to a rod; (2) thence N. 39 degrees 37 minutes 00 seconds W. 118. 11 feet to a rod; and (3) thence N. 36 degrees 35 minutes 30 seconds W. 208.36 feet to a rod; thence leaving the eastern line of Broad Street Road - U. S. Route 250 N. 54 degrees 13 minutes 30 seconds E. 169 feet to a P. K. Nail; thence N. 35 degrees 46 minutes 30 seconds W. 150. 00 feet to a P. K. Nail; thence S. 54 degrees 13 minutes 30 seconds W. 171.82 feet to a cross on the eastern line of Broad Street Road - U. S. Route 250; thence along the eastern line of Broad Street Road U. S. Route 250 N. 36 degrees 35 minutes 30 seconds W. 99.14 feet to a rod; thence leaving the eastern line of Broad Street Road - U. S. Route 250 N. 57 degrees 25 minutes 20 seconds E. 198. 15 feet to a rod; thence S. 35 degrees 47 minutes 40 seconds E. 57.08 feet to a nail; thence N. 54 degrees 13 minutes 30 seconds E. 360. 51 feet to a nail; thence S. 35 degrees 46 minutes 30 seconds E. 358.50 feet to a spike; thence N. 54 degrees 13 minutes 30 seconds E. 34.00 feet to a spike; thence S. 35 degrees 46 minutes 30 seconds E. 118.21 feet to a spike; thence N.54 degrees 13 minutes 30 seconds E. 219.69 feet to the point and place of beginning.

BEING the same real estate conveyed to Darnestown Road Limited Property Partnership, a Maryland limited partnership, by deed from Fountain Square Shoppers ' World Associates Limited Partnership, a Virginia limited partnership, dated July 8, 1996, recorded July 8, 1996, in the Clerk' s Office, Circuit Court, Henrico County, Virginia, in Deed Book 2660, page 1678. By Confirmatory Deed, dated October 3, 1996, recorded December 10, 1996, in the aforesaid Clerk's Office, in Deed Book 2688, page 2235, title passed unto Darnestown Road Property Limited Partnership, a Maryland limited partnership.

TOGETHER WITH non-exclusive easements for parking and/or vehicular and/or pedestrian ingress and egress as set forth in Declaration of Easements and Restrictions by and between Realty Industries, Incorporated, a Virginia corporation, Fountain Square Shoppers ' World Associates Limited Partnership, a Virginia limited partnership, and Raleigh Recreation , Inc. , a Virginia corporation, dated August 13 , 1976, and recorded August, 1976, in the Clerk' s Office, Circuit Court of Henrico County, Virginia, in Deed Book 1691 , page 153.

# EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**Landlord covenants and agrees to deliver the Demised Premises to Tenant as follows:**

1.      HVAC equipment to be in good working condition and adequate for Tenant's intended use, including but not limited to all duct work, diffusers and any other air distribution equipment commonly used and required by Tenant. Tonnage requirements to meet Tenant's specifications of one ton per 300 square feet throughout the Demised Premises, sales floor and stockroom. Landlord shall certify the HVAC system to be in good working condition at the time of Tenant's occupancy. Tenant has the right to inspect the system during the month of May 2003 (or within 60 days of possession) and Landlord shall repair any problems with the system found at that time that were not caused by Tenant's agents, contractors or employees.

2.      All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification. Landlord to provide separate room with an exterior entry access door in which it shall, throughout the Original Term and any Option Terms or extensions, maintain the sprinkler riser to any sprinkler system used in common with other tenants.

3.      Landlord to install new energy efficient 8' florescent strip lighting. Lighting fixtures to be used are 8' strip - 4 lamp tandem 4' T8 with electronic ballasts. Lighting to be installed 10' on center side-to-side and within 2' from all perimeter walls throughout the sales floor. Lighting in the stockroom to be 12' on center.

4.      Remove existing floor covering, fill channels in floor and install new commercial grade VCT Armstrong Excelon 1/8'' #51899 "Cool White" floor tile or approved equivalent throughout the sales floor area. Stock room floor to be smooth and level throughout entire stockroom area.

5.      Remove existing ceiling tiles and install new 2' x 4' white acoustic ceiling tiles and paint existing grid to remain at its current height of 13'9'' above the finished floor. Landlord to raise a portion of the ceiling on the far right of the space to match the existing ceiling height of 13'9''. Tenant acknowledges that a portion of the ceiling in the far right area cannot be raised and will be a lower ceiling of approximately 10'ft.

6.      Provide the existing vestibule entrance and doors in good working condition with a minimum of 36' of glass store front that meet ADA requirements (Exit doors to have automatic openers). Landlord to install a new pair of 3' x 7' doors and glass to create an air lock in the exiting vestibule area per Tenant's Plans.

Landlord to ensure there are curb cuts within reasonable proximity to the store front and that vestibule has adequate HVAC for Tenant's use (vestibule to have slip retardant tile).

7.      All doors and door systems to be sound and secure and in good working condition, and in compliance with ADA requirements.

8.      Landlord to provide Tenant with three (3) offices, one (1) lounge, and rest rooms to Tenant's specifications, accessible from Tenant's sales floor and in compliance with all applicable local and state codes and ADA requirements. Restrooms to have a minimum of two (2) commodes and one urinal in the men's and three (3) commodes in the women's. Further, the aforesaid offices, lounges and restrooms shall have adequate HVAC, ceiling and floor tile (restrooms to have floor covering that meet code requirements for the sale of food), electrical and plumbing, lighting, sinks, fixtures, partitions, FRP board, etc. Cash Office to have solid plywood ceiling (minimum 1/2" thickness). Tenant shall have the right to verify the number of fixtures in the Demised Premises. Tenant shall work with Landlord to utilize the existing offices and rest rooms where possible. Landlord shall bring the existing toilets to ADA standards.

**EXHIBIT C - continued**

9.      Roof to be in good condition and free of leaks. Canopy and building fascia to be repaired and painted to match the existing colors of the Shopping Center.

10.     Landlord to remove all fixtures, refrigeration equipment, meat prep rooms, coolers and make all repairs necessitated by such removal including repairing the ceiling, floor, walls, etc. and the removal of the electric and plumbing to such equipment. Landlord to block in any openings in exterior walls to match existing walls.

11.     Landlord to repair (i.e., spackle and sand) the existing demising wall separating sales area from stockroom and make any changes to it required to comply with code.

12.     Loading dock(s) to be in good working condition including all doors, bumpers, ballards, seals, etc and be at the standard truck height of 48''.

13.     Replace all broken glass.

14.     Demised Premises to be professionally inspected for pestilence and termites, and Tenant to be provided with a certified report that the Demised Premises is pest free, and if not, Landlord will make pest free.

15.     As and if permitted by code, Landlord to install cart corral in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

16.     Landlord to ensure existing pylon meets all local and state codes and ordinances in order for Tenant to place its panel on the pylon. Tenant to receive the marquee and/or former Ukrop's position on the pylon. (If no pylon is available, Tenant shall have the right to erect its own pylon per all city codes and ordinances).

17.     Landlord will provide Tenant with "as built" drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan.

18.     Landlord will certify that the Landlord's Work performed will receive all applicable approvals in order for Tenant to obtain a Certificate of Occupancy. Any additional work done by Tenant that may affect receipt of such Certificate of Occupancy must be in compliance with all building codes and receive the proper approvals with authorities.

19.     Tenant to approve all drawings prior to the commencement of work, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall verify with the Landlord prior to construction commencement any existing improvements that can be used for Tenant's improvements. Within five (5) business days after receipt of drawings from Landlord, Tenant shall either approve the drawings or shall advise Landlord of its objections or recommended changes thereto.

20.     All above work to be substantially completed before the Tenant Possession Date.

# EXHIBIT D

## TENANT SIGN SPECIFICATION



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

**SIGN SPECIFICATIONS: BIG LOTS**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES, .160" ACRYSTEEL #21119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SIGMA SELF CONTAINED TRANSFORMERS
(NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

**SIGN SPECIFICATIONS: EXCLAMATION**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES, .160" ACRYSTEEL #21119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SIGMA SELF CONTAINED TRANSFORMERS

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS
INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE EQUIPT WITH DISCONNECT SWITCHES

STANDARD SIZE CHARACTERISTICS

| A | B | C | D | E |
|---|---|---|---|---|
| 2'-0" | 12'-3" | 2'-10" | 7" | 4 1/2" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5 1/2" |
| 3'-0" | 17'-7" | 4'-3" | 13" | 5 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-9" | 17 1/2" | 6 1/2" |
| 4'-6" | 25'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 26'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 9'-8" | 25" | 13" |

**EXHIBIT D-1**

**TENANT'S PYLON SIGN**



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

Date: _____

To:  **Big Lots Stores, Inc.**
     via facsimile: (614) 278-6546

From:

_____
(insert name of Landlord contact person)

Re:  _____
     (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated

_____ has been substantially completed.  Accordingly, possession of the Demised

Premises is hereby delivered to Tenant.  You may pick up the keys at _____

_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**EXHIBIT F**

**EXCLUSIVE USE PROVISIONS**

**Bellacino Pizza:** To the extent permitted by law, and except as otherwise provided in this Section, Landlord covenants that during the Term and Extension Period (if exercised) of this Lease it shall not permit any other tenant in the Center to operate a restaurant whose primary business is the sale of pizza, submarine sandwiches and "grinder" sandwiches. The provisions of this Article 36 shall be enforceable only so long as Tenant is operating a Bellacino Pizza and Grinders restaurant in the Premises.

**Salon Plaza:** To the extent permitted by law, and except as otherwise provided in this Section, Landlord covenants that during the Term of this Lease it shall not permit any other tenant in the Center to operate a hair salon and/or a day spa. The provisions of this Section 33 shall be enforceable only so long as Tenant is operating the Premises in accordance with the Permitted Uses and there is no uncured default by Tenant hereunder.

**Jackson Hewitt:** To the extent permitted by law, and except as otherwise provided in this Section, Landlord covenants that during the Extension Period it shall not lease to any other tenant in the Center who is primarily engaged in the business of preparing and transmitting income tax returns. The provisions of this Section shall be enforceable only so long as Tenant is operating an income tax preparation service at the Premises and there is no uncured default by Tenant hereunder.

## EXHIBIT G

## RULES AND REGULATIONS

The purpose of these Rules and Regulations is to summarize the Tenant's responsibilities in the day-to-day operation of the Shopping Center.

Common Area Use

Tenant shall:

1.      Except as expressly provided for by the Lease, not place any objects in the Common Areas of the Shopping Center.

2.      Not solicit business in the Common Areas.

3.      Not mount or string anything (other than Tenant's storefront sign or banners as permitted by this Lease) on the outside walls of the Demised Premises without the prior written consent of Landlord.

Storefronts and Signs

1.      Tenant shall keep the storefront glass and glass door of the Demised Premises in good repair and clean condition.

2.      Any temporary sign used by Tenant on its door or window must be professionally made and shall not cover more than twenty percent (20%) of the total door or window area.

3.      Any lighted window sign must be approved by Landlord.

Tenant Advertising

1.      Tenant shall not utilize any advertising medium (other than its permitted signs) within the Shopping Center which can be seen, heard, or experienced outside of the Premises, including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radios or televisions.

2.      Tenant will not display, paint, place or cause to be displayed, painted, or placed, any handbills, bumper stickers, sandwich boards or other advertising devices in any Common Area.

3.      Tenant will not distribute, or cause to be distributed, in the Shopping Center, any handbills or other advertising devices.

Loading and Unloading

All shipping, receiving, loading or unloading of Tenant's merchandise, supplies or other property shall take place only in the areas and entrances reasonably designated therefor by Landlord. Tenant shall not permit any trucks, trailers, or other vehicles or equipment engaged in such activities for the benefit of Tenant to interfere with the use of any Common Area or any pedestrian or vehicular use.

Employee Parking

Tenant shall require its employees to park only in the areas reasonably designated by Landlord for employee parking, provided said areas are in reasonable proximity to the Demised Premises and same are adequately lit.

EXHIBIT H

TENANT'S FLOOR PLAN

