**<u>EXHIBIT A</u>**

17024169/1

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center
   F. Gross Sales

2. Demise

3. Term
   A.   Original Term
   B.   Option to Extend Term

4. Use and Operation

5. Rent and Construction Allowance
   A. Gross Rent
   B. Utilities Charges
   C. Intentionally Deleted
   D. Common Area  Maintenance
   E. Real Estate Taxes

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24. Notices

25.     Legality

26.     Binding Obligations

27.     No Recordation

28.     Real Estate Broker's Commission

29.     No Waiver, Laches or Accord and Satisfaction

30.     Hazardous Materials

31.     Titles and Entire Agreement

32.     Waiver of Claims

33.     Reasonable Consent

34.     Intentionally Deleted

35.     No Presumption against Drafter

36.     Submission of Lease

37.     Interlineation

38.     Time of the Essence

39.     Intentionally Deleted

40.     Attorney Fees

41.     Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the 2b day of March , 2012, by and between MORGAN BRITTON LLC, a New York limited liability company, whose mailing address is c/o Morgan Management LLC, 1170 Pittsford-Victor Road, Pittsford, NY 14534 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

1.   **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.   Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

B.   Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)   The "Tenant Possession Date" shall be the later of (i) the date Tenant accepts possession following Landlord's notice to Tenant that it has completed any construction that may be required pursuant to Exhibit C, or (ii) the date on which Tenant receives all permits for its storefront

3

signage, fixturing and merchandising. Tenant will submit its plans for permits within ninety (90) days of the full execution of this Lease and thereafter, diligently pursue obtaining such permits. Landlord will cooperate fully with Tenant in obtaining said permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises.  Said form shall be executed by Tenant and returned to Landlord if possession has been given. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)     The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)     The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)     If Landlord fails to return properly executed Leases to Tenant by March 26, 2012, or if Landlord fails to tender possession of the Demised Premises to Tenant by June 30, 2012, then Tenant may terminate this Lease by written notice to Landlord.  In no event shall Tenant be obligated to accept possession of the Demised Premises prior to June 1, 2012. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by June 30, 2012, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon July 1, 2012 and continuing for each and every day Landlord is delayed in delivering possession to Tenant prior to July 16, 2012, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,250.00 per day.  Commencing July 16, 2012 and continuing for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day.  If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction and/or signage in the Demised Premises.

6)     Notwithstanding anything to the contrary, in the event Landlord has not offered delivery of possession of the Demised Premises by July 31, 2012, Tenant will not be required to accept possession until February

4

4, 2013. The period of time between August 1, 2012 and February 4, 2013 will be the "Optional Blackout Period". In the event Landlord offers possession during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not offered delivery of possession to Tenant by February 4, 2013, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 4, 2013, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)      In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals for its work and signage; or (ii) February 4, 2013. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.      Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)      Exhibit A -   Site Plan of Shopping Center

2)      Exhibit A – 1 Tenant's Plans and Specifications

3)      Exhibit B -   Legal Description of Shopping Center

4)      Exhibit C -   Landlord Work

5)      Exhibit D -   Tenant Building Sign Specifications

6)      Exhibit E -   Delivery of Possession Letter

7)      Exhibit F -   Exclusive Use Provisions

8)      Exhibit G -   Remeasurement Rider

D.      Demised Premises:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 32,800 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises. Tenant's Plans and Specifications for the Demised Premises are attached hereto as Exhibit A-1 and are deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent on any space in excess of 32,800 square feet nor accept possession of any space under 29,520 square feet in size, and may terminate this Lease in such an event.

E.     Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the 3660 Dewey Avenue, Rochester, NY 14616. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 75,000 square feet.

F.     Gross Sales: The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

## 2.     DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.     TERM:

A.     Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B.4., above, and ending January 31, 2023 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.     Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the

6

end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

**4.    USE AND OPERATION:**

A.    <u>Permitted Uses:</u>  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, closeouts, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including frozen food), and all similar or related merchandise and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other discount general merchandise store, liquidator, closeout store, furniture store or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Marden's, Dollar Dreams, Christmas Tree Shops, Five Below, Encore and Ollie's Bargain Outlet. Notwithstanding the foregoing, the following business operations shall not be deemed a "Competing Business: (i) Lumber Liquidators, (ii) Savers and (iii) Goodwill. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may reduce by fifty percent (50%) its payments of Gross Rent under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all reductions in rent hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

7

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise.

B.     Prohibited Uses:     Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy" surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of an aggregate of 3,000 square feet of floor area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; provided, however, first class retail vehicle parts stores that do not provide on site repair of vehicles shall be permitted such as Auto Zone and Advanced Auto; (ix) for any governmental use or office or any social service functions or facilities in excess of an aggregate 5,000 square feet of floor area; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (provided that this restriction shall not prohibit the operation of a restaurant that sells alcoholic beverages); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling,

incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; provided, however, pet store operators, such as "Petco", "Petsmart" and "Pets Supplies Plus" shall be permitted; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; or (xxvii) for the use as a "head shop" selling drug paraphenalia. All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**". Notwithstanding the foregoing Prohibited Uses, a library which does not exceed 10,000 square feet of floor area shall be permitted in the Shopping Center if located in the area identified as the library on Exhibit A attached to this Lease.

5. **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Gross Rent (sometimes referred to as "Rent"). The Rent for any partial month shall be pro rated based on the actual number of days in such month. The parties agree that the Rent paid by Tenant to Landlord shall be a "gross rent", and Tenant shall not pay Landlord any additional rent or any other amounts including, but not limited to, costs, expenses and charges related to real estate taxes, common area maintenance and insurance, it being the intent of the parties that the Rent paid by Tenant pursuant to Section 5.A. be the only payments made by Tenant to Landlord.

A. <u>Gross Rent</u>: During the Original Term of this Lease, the sum of $295,200.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $24,600.00.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Gross Rent applicable for the First Option Term shall be the sum of $311,600.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $25,966.67. The Gross Rent applicable for the Second Option Term shall be the sum of $328,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $27,333.33. The Gross Rent applicable for the Third Option Term shall be the sum of $344,400.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $28,700.00. The Gross Rent applicable for the Fourth Option Term shall be the sum of $360,800.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $30,066.67.

B. <u>Utilities Charges</u>: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution company, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all direct public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing any utilities under a master meter account in Landlord's name, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility sub meters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent shall abate upon the later of the expiration of such twenty-four (24) hour period or Tenant's delivery of notice of such interruption to Landlord until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.  Intentionally Deleted

D.  Common Area Maintenance: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)  providing security, lighting and policing if necessary, and on-site and off-site traffic control;

10

(v) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

In addition to the above enumerated items, Landlord shall be responsible for refurbishing, repairing, maintaining, replacing, and improving, lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) for on site employees of Landlord and paying all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies. Tenant shall not pay or reimburse Landlord for the costs or expenses arising with respect to the Common Area maintenance. Tenant shall not pay or reimburse Landlord for any capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, and uninsured retentions, and any administrative, management or related fees. All Common Area maintenance shall be performed by Landlord at its sole cost and expense.

E.  Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). All such Real Estate Taxes shall be paid by Landlord, and Tenant shall not be obligated to pay or reimburse Landlord for the Real Estate Taxes.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

## 6.  ALTERATIONS:

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

## 7.  MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside

the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.   The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's  intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 200-300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date.  Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition.  Landlord shall, within ten (10) days from such notice,  put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such costs, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof.  If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15)

12

days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such costs, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's Work at the Demised Premises ("Landlord's Work") within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs ( collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant upon fifteen (15) days written notice to Landlord, shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein). Notwithstanding the foregoing, Tenant acknowledges that as of the effective date of this Lease, there is no Pylon. Once Landlord secures all requisite approvals from local governmental authorities to erect a Pylon, Landlord shall provide Tenant with a rendering of such approved Pylon. Landlord shall construct the approved Pylon and Landlord acknowledges and agrees that Tenant shall have the right to place its sign panels upon the approved Pylon in the marquee position, the size of which panel shall be at a minimum equal to Tenant's proportionate share thereof relative to the other panels on such Pylon. If Landlord fails to secure all requisite approvals to erect a Pylon or fails to construct the approved Pylon, then Tenant shall have the right to pursue and obtain

requisite approvals from governmental authorities for its own pylon or monument sign and erect a pylon or monument sign for its sign panels.

Landlord shall construct a panel for Tenant's sign on the Pylon pursuant to Exhibit C. Tenant shall have the right to place suitable sign panels upon the Shopping Center Pylon. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful

14

misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

A. <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord (and Landlord's mortgagee (provided Landlord has provided Tenant with written notice of such mortgagee) as an additional insured, with minimums of the following: Three Million Dollars ($3,000,000.00) each event combined single limit with a Five Million Dollar ($5,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B. <u>Landlord</u>: Landlord shall, at its sole cost and expense, at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall, at its sole cost and expense, at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

13. **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to

15

the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.  In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within ninety (90) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.  If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.   FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.   INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.   WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no

16

notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify of terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17. QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18. MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall request any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and

17

Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Gross Rent, hereunder has been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

## 19.    **DEFAULT:**

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. Upon Landlord's termination of this Lease following a default, Landlord shall be entitled to recover from Tenant, as additional rent, all reasonable costs incurred by Landlord in (i) obtaining possession of the Demised Premises, (ii) repairing, restoring or otherwise placing the Demises Premises into condition substantially similar to that at the time of Landlords' initial delivery to Tenant, (iii) collecting Rent and Additional Rent from Tenant and (iv) the costs of reletting including reasonable brokerage fees.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then

18

Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20. __CONDEMNATION:__

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center are taken in condemnation proceedings so that in the reasonable business judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event (i) more than ten percent (10%) of the parking spaces located in the Common Area (and Landlord cannot provide Tenant with substitute parking spaces within a reasonable location to the Demised Premises), or (ii) any of the three (3) approaches from Dewey Avenue, English Road or Britton Road, respectively, to the Shopping Center (and Landlord cannot provide Tenant with comparable alternative means of access to such approach) are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent shall equitably abate. Thereafter, Rent shall be reduced in proportion to the amount of land and/or building area permanently lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21. __MUTUAL WAIVER OF SUBROGATION:__

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any Prohibited Uses set forth in Section 4B. of this Lease or any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to

month at one hundred twenty-five percent (125%) of current Rent and otherwise subject to all the terms and provisions hereof.

## 24. NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25. LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of New York. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26. BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27. NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28. REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties, other than Vanguard-fine, LLC ("Vanguard") and Donovan Real Estate Services ("Donovan"), are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. Landlord agrees to pay the brokerage fees owed to Vanguard and Donovan in accordance with the terms of a separate agreement between Landlord and such brokers. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29. NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor

21

to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.  **HAZARDOUS MATERIAL:**

Landlord represents and warrants that, to the best of its knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.  **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.  **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant

of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.    REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

**34.    Intentionally deleted.**

**35.    NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.    TENANT'S AUDIT RIGHTS:**   Intentionally deleted.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

**41.   WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:  MORGAN BRITTON LLC, a**
**New York limited liability company**

By: _____

Title: _____
Robert C. Morgan
Manager

Witnesses as to Tenant:

**TENANT:        BIG LOTS STORES, INC., an Ohio**
**corporation**

By: _____
Charles W. Haubiel II
Title: Executive Vice President – Legal & Real Estate,
General Counsel and Corporate Secretary

{Acknowledgements on following page.}

24

**STATE OF** *New York*

**COUNTY OF** *Monroe*

       Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Morgan Britton LLC_ by, _Robert Morgan_ its _Manager_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

       IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _12:02 pm_ this _20th_ day of _March_, 2012.

_Diane Volkman_
Notary Public

DIANE VOLKMAR
Notary Public State of New York
Lic. #01VO6193134
Comm. Exp. _9-8-2012_
Commission in Monroe County

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

       Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

       IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _19th_ day of _March_, 2012.

Notary Public

Andrea L. Turner
Notary Public, State of Ohio
My Commission Expires 05-12-2015

25

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



## EXHIBIT A- 1

**TENANT'S PLANS AND SPECIFICATIONS
ATTACHED**



# BIG LOTS STORES, INC.
# STORE PLANNING DEPT.
# 300 PHILLIPI ROAD
# COLUMBUS, OHIO 43228
# PHONE: (614) 278-6800

**STORE ADDRESS:**

BIG LOTS STORE #
SHOPPING CENTER
3660 DEWEY AVE
GREECE, NY.  14616

**BUILDING AREA:**

| | |
|---|---|
| TOTAL SALES | 24,656 |
| (FURNITURE SALES 3,211) | |
| OTHER | 2,757 |
| STOCKROOM | 5,451 |
| GROSS TOTAL AREA | 32,864 |

## MATERIALS AND EQUIPMENT SCHEDULE

| Product | Supplied by | Installed by | Manufacturer & Model Number | Vendor and Contact Information |
|---|---|---|---|---|

## SITE PLAN



Proposed Big Lots
Greece, NY

## DRAWING PAGE AND TITLE

- T-1    TITLE PAGE

**ARCHITECTURAL**

- D-1    DEMO PLAN
- A-1    CONSTRUCTION PLAN
- A-1.1    CONSTRUCTION NOTES
- A-2    FIXTURE PLAN
- A-3    LIGHTING PLAN
- FP-1    FIRE ALARM PLAN

**ELECTRICAL**

- E-1    ELECTRICAL PLAN
- E-2    ELECTRICAL NOTES
- E-3    EMS NOTES
- E-4    EMS SPECIFICATIONS

**MECHANICAL**

- M-1    MECHANICAL PLAN
- M-2    MECHANICAL NOTES
- M-3    MECHANICAL DEMO

## CODE INFORMATION

**1. APPLICABLE CODES:**

BUILDING: –
MECHANICAL: –
PLUMBING: –
ELECTRICAL: –
FIRE: –
ACCESSIBILITY: –

**2. BUILDING DESCRIPTION:**

BUILDING TYPE: –
CONSTRUCTION TYPE: –
USE GROUP: –
EXITS PROVIDED: –
EXISTING HEIGHT: –

FIRE SPRINKLERS PROVIDED: –

ALLOWABLE AREA: –
SPRINKLER INCREASE: –
= x × % PER = = SF

**3. BUILDING AREA:**

SALES
(FURNITURE SALES =
OFFICE&LOUNGE
STORAGE/SHIPPING&ANELEC
RESTROOMS
GROSS TOTAL AREA

**4. OCCUPANT LOAD:**

MERCHANDISE
= SF / = SF PER PERSON:
OFFICE
= SF / = SF PER PERSON:
STORAGE
= SF / = SF PER PERSON:
TOTAL CALCULATED OCCUPANCY

REQUIRED EGRESS WIDTH
= × = INCHES/OCC. =
PROVIDED EGRESS WIDTH
DOOR # =
DOOR # =
DOOR # =
DOOR # =
TOTAL CALCULATED WIDTH

**5. PLUMBING FIXTURES:**

OCCUPANT LOAD FOR PLUMBING =
PLUMBING FIXTURES REQUIRED:
TOILETS:
LAVATORIES:
DRINKING FOUNTAIN:
PLUMBING FIXTURES PROVIDED:
MENS RESTROOM:
TOILETS:
LAVATORIES:
URINALS:
WOMENS RESTROOM:
TOILETS:
LAVATORIES:

DRINKING FOUNTAIN:
SERVICE SINK:

PROJECT NARRATIVE:
PROJECT SCOPE TO CONSIST OF INTERIOR TENANT IMPROVEMENTS TO THE EXISTING BIG BOX RETAIL LEASE SPACE TO ACCOMMODATE NEW BIG BOX RETAIL TENANT. NO INCREASES IN AREA ARE PLANNED. NO STRUCTURAL MODIFICATIONS TO THE BUILDING ARE PART OF THE PROJECT SCOPE. IMPROVEMENTS TO THE EXTERIOR OF THE BUILDING ARE LIMITED TO A MINOR BRAND ELEMENT ON FRONT FACE OF BUILDING.

## DEVELOPMENT CONTACTS

CITY BUILDING DEPT:

FIRE:

## ISSUE DATES

PERMIT
BID
CONSTRUCTION

## NOTES

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800




**TITLE PAGE**

SHEET:
**T-1**



DEMOLITION PLAN

DEMOLITION LEGEND

EXISTING WALL

ITEM TO DEMOLITION

CURB CUT

SHEET:
D-1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN:
3-5-2012
DRAWN BY:
BWM
SCALE:
3/32" = 1'-0"

SQUARE FOOTAGE

SALES: 24,656
(INCLUDES FURNITURE DEPT.)

TOTAL: 32,864

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY.  14616

3/14/2012    REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES.



## DOOR SCHEDULE

| SYMBOL | SIZE | DESCRIPTION | FRAME TYPE | FRAME FIN. | HARDWARE | DOOR FINISH METAL | DOOR FINISH WOOD | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 1 | 4' OPENING | NEW SINGLE SLIDER - FULL OPEN | ALUM | | 9 | NATURAL ALUMINUM | | [illegible] |
| 2 | 6' OPENING | NEW BI-PART SLIDER - FULL OPEN | ALUM | | 9 | NATURAL ALUMINUM | | [illegible] |
| 3 | 3'-0" x 7'-0" | EXISTING METAL EXTERIOR DOOR | METAL | P-4 | 1 | P-4 | | |
| 4 | 3'-0" x 6'-8" | NEW H. C. METAL OR S. C. WOOD | METAL | P-4 | 2 | P-4 | P-5 | |
| 5 | 3'-0" x 6'-8" | NEW H. C. METAL OR S. C. WOOD | METAL | P-4 | 5 | P-4 | P-5 | PEEP HOLE @ 5'-0" A.F.F. |
| 6 | 3'-0" x 6'-8" | NEW H. C. METAL OR S. C. WOOD | METAL | P-4 | 6 | P-4 | P-5 | |
| 7 | PR. 3'-0" x 7'-0" | NEW DOUBLE-ACTING STOCKROOM DOORS | CASED | | 7 | | | |
| 8 | 3'-0" x 7'-0" | NEW METAL EXTERIOR DOOR | METAL | P-4 | 1 | P-4 | | |
| 9 | PR. 3'-0" x 7'-0" | NEW METAL EXTERIOR DOORS | METAL | P-4 | 1 | P-4 | | [illegible] |
| 10 | 3'-8" x 7'-0" | EXISTING METAL EXTERIOR DOOR | METAL | P-4 | 1 | P-4 | | |
| 11 | 3'-0" x 6'-8" | NEW H. C. METAL OR S. C. WOOD | METAL | P-4 | 1 | P-4 | P-5 | |
| 12 | 8'-0" x 10'-0" | EXIST'G ROLLING SERVICE DOOR W/ CHAIN HOIST | METAL | GRAY | | P-4 | | OVERHEAD DOOR |

## HARDWARE NOTES

NOTE:
GENERAL CONTRACTOR TO ENSURE ALL EXISTING DOORS AND DOOR SYSTEMS ARE IN GOOD WORKING CONDITION. NOTIFY BIG LOTS REPRESENTATIVE OF ANY ISSUES.

### GROUP 1 (TYPICAL H.M. SERVICE DOORS)
EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- 1 EACH THRESHOLD 887 X REQUIRED LENGTH — NATIONAL GUARD
- 1 SET WEATHER-STRIPPING — ZERO
- 1 EACH DRIP CAP — RE: CONST. DOC'S
- 1 EACH PANIC DEVICE - GUARD-X 2670 w/ CYLINDER TO ACCEPT 7 PIN KEYWAY — VON DUPRIN
- 1 CLOSER, 1461, AL — LCN
- 1 180 DEGREE DOOR VIEWER - TA-3310
- * IF DOUBLE DOORS:
- -1 EACH DOUBLE-DOOR HOLDER DDH-2250 — DETEX

### GROUP 2 (TYPICAL TOILET ROOM & LOUNGE DOORS)
EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- 1 FLOOR STOP 438B 26D — IVESS
- 1 PUSH PLATE & PULL HANDLE
- 1 CLOSER, 1461, AL — LCN

ADDITIONAL NOTE:
SINGLE OCCUPANCY A.D.A. RESTROOMS
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- 1 FLOOR STOP 438B 26D — IVESS
- 1 CLOSER, 1461, AL — LCN
- 1 SINGLE OCCUPANCY RESTROOM PRIVACY LOCK #AL40PD-SAT-626 — ARROW

### GROUP 3 (ALUMINUM STOREFRONTS)
EACH TO RECEIVE:
- PUSH BAR & PULL HANDLE
- 1 CLOSER, 1461, AL — LCN
- THRESHOLD ADA APPROVED — NATIONAL GUARD
- MANUFACTURER STANDARD OFFSET PIVOTS
- ONE DOOR LEAF TO RECEIVE: KEYED CYLINDER EXTERIOR 317-601-26D (CYLINDER TO ACCEPT 7 PIN KEYWAY) w/ THUMB TURN INTERIOR M.S. LCO# 7161TK2-26D — ARROW
- THE OTHER DOOR LEAF OF A PAIR TO RECEIVE: DUMMY MORTISE CYLINDER LCO# 7160DC-26D W/ THUMBTURN INTERIOR LCO# 7161 TK2-26D — ARROW
- INSTALL ALUM. CART GUARDS ON EXTERIOR & INTERIOR OF DOORS

### GROUP 4 (ALUMINUM STOREFRONTS - AUTO)
EACH TO RECEIVE:
- FULLY AUTOMATIC OPERATORS
- THRESHOLD ADA APPROVED — NATIONAL GUARD
- MANUFACTURER STANDARD OFFSET PIVOTS
- ONE DOOR LEAF TO RECEIVE: KEYED CYLINDER EXTERIOR 317-601-26D (CYLINDER TO ACCEPT 7 PIN KEYWAY) w/ THUMB TURN INTERIOR M.S. LCO# 7161TK2-26D — ARROW
- THE OTHER DOOR LEAF OF A PAIR TO RECEIVE: DUMMY MORTISE CYLINDER LCO# 7160DC-26D W/ THUMBTURN INTERIOR LCO# 7161 TK2-26D — ARROW
- INSTALL ALUM. CART GUARDS ON EXTERIOR & INTERIOR OF DOORS

### GROUP 5 (CASH ROOM DOORS)
CASH OFFICE
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- 1 STOREROOM SET, AL80BD-SAT-626 (CYLINDER TO ACCEPT 7 PIN KEYWAY) — ARROW
- 1 FLOOR STOP 438B 26D — IVESS
- 1 CLOSER, 1461, AL — LCN
- 1 180 DEGREE DOOR VIEWER - TA-3310 (MOUNTING HEIGHT TO BE 5'-0" A.F.F.)
- 1 SINGLE CYLINDER DEADBOLT #E61IC-26D EXTERIOR KEYWAY (TO ACCEPT 7 PIN KEYWAY) INTERIOR THUMBTURN — ARROW

COUNT OFFICE
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- * 1 STOREROOM SET, AL80BD-SAT-626 (CYLINDER TO ACCEPT 7 PIN KEYWAY) — ARROW
- 1 FLOOR STOP 438B 26D — IVESS
- 1 CLOSER, 1461, AL — LCN
- 1 180 DEGREE DOOR VIEWER - TA-3310 (MOUNTING HEIGHT TO BE 5'-0" A.F.F.)

### GROUP 6 (TYPICAL OFFICE DOORS)
EACH TO RECEIVE:
- 1-1/2 PAIR BUTTS, BB1279, 4-1/2 X 4-1/2, NRP, US26D — HAGER
- * 1 STOREROOM SET, AL80BD-SAT-626 (CYLINDERS TO ACCEPT 7 PIN KEYWAY) — ARROW
- 1 FLOOR STOP 438B 26D — IVESS
- 1 CLOSER, 1461, AL — LCN

### GROUP 7 (STOCKROOM DOORS)
STOCKROOM DOOR TO BE:
ELIASON MODEL P-11 PLUS
- COLOR: BLACK 108
- 18" SPRING BUMPERS - BLACK
- 5" X 18" JAMB GUARDS
- 9" X 14" HIGH IMPACT WINDOWS WITH BLACK FRAME

### GROUP 8 (ALUMINUM STOREFRONT EMERGENCY EXITS)
EACH TO RECEIVE:
- PUSH BAR & PULL HANDLE
- 1 CLOSER, 1461, AL — LCN
- THRESHOLD ADA APPROVED — NATIONAL GUARD
- MANUFACTURER STANDARD OFFSET PIVOTS
- 1 EACH PANIC DEVICE - GUARD-X 2670 w/ CYLINDER TO ACCEPT 7 PIN KEYWAY — VON DUPRIN

### GROUP 9 (SLIDING GLASS DOORS)
EACH TO RECEIVE:
- FULLY AUTOMATIC OPERATORS
- THRESHOLD ADA APPROVED — NATIONAL GUARD
- TO RECEIVE: KEYED CYLINDER EXTERIOR 317-601-26D (CYLINDER TO ACCEPT 7 PIN KEYWAY) w/ THUMB TURN INTERIOR M.S. LCO# 7161TK2-26D — ARROW
- INSTALL ALUM. CART GUARDS ON EXTERIOR & INTERIOR OF DOORS

### ADDITIONAL HARDWARE NOTE:
- BASS LOCK WILL PROVIDE PADLOCKS FOR OVERHEAD DOORS AND ROOFHATCH. THEY WILL ALSO PROVIDE ONE (1) SPARE LOCK.

SIDE ELEVATION
SCALE: 3/32" = 1'-0"

FRONT ELEVATION
SCALE: 3/32" = 1'-0"

1 / A-1 VESTIBULE WALL SECTION

## LEGEND

- NEW WALL
- EXISTING WALL
- # / A1.1 — DETAIL/NOTE SHEET NUMBER
- # / A1.1 — WALL DETAIL/NOTE SHEET NUMBER
- P-# / A1.1 — FINISH SCHEDULE SHEET NUMBER

NOTE: IN-FILL OPENINGS WITH LIKE MATERIALS AND FINISHES TO MATCH SURROUNDING AREAS

CONSTRUCTION PLAN

| | |
|---|---|
| 3/14/2012 | REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES. |

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN: 3-8-2012
DRAWN BY: BWH
SCALE: 3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 24,656 (INCLUDES FURNITURE DEPT.)
TOTAL: 32,864

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY. 14616

SHEET: A-1



CONSTRUCTION NOTES

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN: 3-8-2012
DRAWN BY: BW84
SCALE: 3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 24,656 (INCLUDES FURNITURE DEPT.)
TOTAL: 32,864

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY. 14616

3/14/2012    REVISED STOREFRONT LOCATION, RESTROOMS, AND OFFICES.



## ATTENTION FIXTURE INSTALLER

### FIXTURE NOTES:

1) 48" GONDOLA RUN AT THE SERVICE COUNTER TO HAVE 22" DEEP BASE DECKS, (2) SHEETS OF 46"x 40" PEGBOARD ONE ON EACH SIDE PER 4' SECTION.

2) 72" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (2) SHEETS OF PEGBOARD OF 48"x 64", ONE ON EACH SIDE PER 4' SECTION.

   72" END CAPS TO HAVE 48"x 22" BASE DECKS, 72" UPRITES, (2) SHEETS OF PEGBOARD OF 48"x 64" ONE ON EACH SIDE PER 4' SECTION, (2) BASE END TRIMS & (2) UPRITE END TRIMS.

3) 84" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (4) SHEETS OF PEGBOARD, (2) 48"x 40" & (2) 48" x 36", ONE SIZE OF EACH ON EITHER SIDE PER 4' SECTION.

   84" END CAPS TO HAVE 48"x 22" BASE DECKS, 84" UPRITES, (4) SHEETS OF PEGBOARD, (2) 48"x 40" & (2) 48" x 36", ONE SIZE OF EACH ON EITHER SIDE PER 4' SECTION, (2) BASE END TRIMS & (2) UPRITE END TRIMS.

4) 54" WALLCASE RUNS HAVE 25" DEEP BASE DECKS, (2) SHEETS OF 46" x 46" PEGBOARD, ONE ON EACH SIDE PER 4' SECTION.

5) 84" WALLCASE RUNS HAVE 25" DEEP BASE DECKS, (2) SHEETS OF PEGBOARD, (1) 46"x 40" & (1) 46"x 36" PER 4' SECTION.

FIXTURE PLAN

**A-2**

## LIGHTING NOTES

1. ALL LIGHT FIXTURES IN THE STOCK OR STORAGE AREA TO BE HUNG AT 14'AFF.

2. WHEN APPLICABLE ALL LIGHT FIXTURES IN THE SALES FLOOR TO BE HUNG FROM THE BOTTOM OF THE CEILING GRID BY THE CLIPS PROVIDED.

3. ALL PERIMETER LIGHTING FIXTURES ON THE SALES FLOOR TO BE MOUNTED BETWEEN 4' TO 8' FROM ANY WALL AND 10' ON CENTER WHERE APPLICABLE, ROWS SHOULD RUN LEFT TO RIGHT FROM STORE FRONT.

4. ALL THE LIGHT FIXTURES IN THE STOCK AND STORAGE AREAS TO BE MOUNTED AT 12'-0" ON CENTER

5. ALL TRACK LIGHTING TO BE INSTALLED AT 6' BELOW STRIP LIGHTING

6. ALL LIGHT FIXTURES TO BE (METAL UX) #3SF-232-OS-QHE2X32T8UN/SNSC-U (K) AND (METAL UX) #8TSSF-232-UNV-OS-QHE4X32T8UNVISNSC-U (F) AND SHALL HAVE 4' T-8 SYLVANIA LAMPS, PART# SYL FO28/841XP/SS/ECO AND SYLVANIA ELECTRONIC BALLAST PART# QHE3X32T8UNVISNSCU (K) AND QHE4X32T8UNVISNSC-U (F).

7. ALL EMERGENCY FIXTURES TO BE (METAL UX) #8TSSF-232-120v-OS-EL-FBP24OH-OSQHE4X32T8UNVISNSCU.

8. THE EMERGENCY EXIT SIGN WILL BE A TECHNICAL CONSUMER PRODUCTS PART# TCP 22740 AND A REMOTE HEAD TECHNICAL CONSUMER PRODUCTS PART# TCP 207R4

9. ALL CHANGES TO BE APPROVED BY A BIG LOTS,INC. REPRESENTATIVE.

10. ALL WORK TO BE DONE IN A WORKMAN LIKE MANOR, WITH A ONE YEAR WARRANTY ON THE LABOR AND MATERIAL OF INSTALLATION.

11. ALL LOCATIONS TO BE FIELD VERIFIED.

## LIGHTING LEGEND

REMOTE HEAD
-TECHNICAL CONSUMER PRODUCTS PART# TCP 207R4

EMERGENCY/EXIT RED LED EXIT SIGN
-TECHNICAL CONSUMER PRODUCTS PART# TCP 22743

NEW 2 LAMP 4'FT STRIP
-(METAL UX) #3SF-232-OS-QHE2X32T8UN/SNSC-U
-SYLVANIA LAMP PART# SYL FO28/841XP/SS/ECO (48W)

NEW 4 LAMP 8'FT STRIP
-(METAL UX) #8TSSF-232-UNV-OS-QHE4X32T8UNV/SNSC-U
-SYLVANIA LAMP PART# SYL FO28/841XP/SS/ECO (96W)

NEW 4 LAMP 8'FT EMERGENCY STRIP
-(METAL UX) #8TSSF-232-120v-OS-EL-FBP24OH-OSQHE4X32T8UNV/SNSC-U
-SYLVANIA LAMP PART# SYL FO28/841XP/SS/ECO (96W)

### LIGHTING TAKE-OFF

| Count | Name |
|-------|------|
| 5 | TCP# 207R4 - REMOTE HEAD |
| 7 | TCP#22743 - RED LED EXIT SIGN |
| 12 | 2 LAMP 4' STRIP |
| 38 | 4 LAMP - 8' EMERGENCY STRIP |
| 334 | 4 LAMP 8' STRIP |



LIGHTING PLAN

SHEET:
A-3

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY, 14616

SQUARE FOOTAGE
SALES: 24,664
TOTAL: 32,864



## Big Lots New Store FA System Requirements

**FA System Information Contact**

Michael Poe (614) 278-6846, epoe@biglots.com

**Fire Alarm Systems:**

Big Lots requires that all Fire Alarms (FA) be installed per the Authority Having Jurisdiction for the area. If the AHJ does not require a FA for the space Big Lots will require that the flow and tamper switches from the sprinkler system serving the space be monitored.

Big Lots (BL) uses Consolidated Fire Protection (CFP) to monitor all FA's installed in new stores. Following the installation of the FA by the LL or GC, CFP will take over the monitoring. No third party monitoring will be needed. CFP needs to monitor any FA directly from two installed phone lines. Depending on the needs of the GC to pass C of O inspections the GC may install two phone lines and transfer them to BL following the inspections. If the FA has been installed by a third party the LL or GC should be prepared to supply CFP with all necessary programming information including zones, passwords, etc. The GC and FA installers should be prepared for direct contact by a CFP representative to facilitate scheduling for the reprogramming of the FA panel.

LL or GC must provide Big Lots with answers to the following questions following the execution of the lease:

- Does the GC intend to install a FA exclusive to our space or is it going to be integrated into a larger LL system? If the FA is exclusive to Big Lots please see notes below.
- If the FA is part of a larger LL system please provide information regarding monitoring company and contact numbers to add Big Lots store associates to the call list.

LL or GC must provide Big Lots with the following information after the FA installer has been selected:

- Site drawings in CAD format of the proposed FA
- Any plan review notes regarding FA installation as required by the AHJ.
- Contact information for the installing FA company
- FA installer specifications such as panel type, devices, etc.
- Inspection forms, record of completion, and as-builts left at the panel location in a binder per NFPA standards.

Big Lots require the installing FA company install a FA that can be monitored and repaired by CFP. BL requires use of one of the FACP's as listed below:

- FireLite MS9050
- Firelite MS9200UDLS
- Firelite MS9600
- Firelite S
- Honeywell Vista 128FB
- EST 2
- EST 3
- Bosch 7412
- Bosch 9412
- Honeywell Vista 300
- Silent Knight 5208
- Silent Knight 5808
- Silent Knight 5820

CFP to be notified two weeks before date of requested conversion.

All communications formats for monitoring are to be in Contact ID.

Permitting and inspections - Please communicate all ongoing FA permitting issues, timelines, installation deadlines, and completion dates with Michael Poe

If the LL is interested in contacting CFP directly for FA installation quotes:

Elizabeth Parker - Consolidated Fire Protection - 949-870-3979, eparker@cfpfire.com

The GC will be responsible for contacting Celeste Doane (614-278-7041) to transfer phone lines following the installation of the FA.

FURNITURE DEPARTMENT
3,211 Sqft

STOCKROOM
GLASS

RECEIVING
BIG BOX

RACKING

SECURITY
RACK

SEASONAL
AISLE

**FIRE ALARM PLAN**

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE (614) 278-6800

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY. 14616

SQUARE FOOTAGE
SALES: 24,656
TOTAL: 32,664

SHEET:
**FP-1**



**ELECTRICAL LEGEND**

COMMON GROUND CONVENIENCE DUPLEX RECEPTACLE TO BE NEMA 5-20R (HUBBLE MODEL #HBL5352)

COMMON GROUND CONVENIENCE DOUBLE DUPLEX RECEPTACLE TO BE NEMA(2)-(5-20R (HUBBLE MODEL #HBL5352))

ISOLATED GROUND TWIST LOCK DUPLEX RECEPTACLE TO BE NEMA L5-15R HUBBELL IG4700A

MOTION ACTIVATED SWITCH LEVITON PART# ODS10-IDW (SEE NOTE #20 SHEET E-2)

J BOX FOR SIGN

TELECOM. ROUGH-IN

CAT-5 ROUGH-IN

DOORBELL

DISCONNECT SWITCH

CORD REEL (SEE NOTE #5 SHEET E-2)

ELECTRIC PANEL

**LEGEND**

NEW WALL

EXISTING WALL

DETAIL/NOTE
SHEET NUMBER

ELECTRIC PLAN

SHEET:
E-1

## BASIC WIRING REQUIREMENTS:

- PLEASE REVIEW SPECIFICATIONS BELOW AND REFER TO SHEET E-1 FOR DESIGNATED LOCATIONS.
- NO ADDITIONS OR CHANGES TO THIS SCOPE OF WORK CAN BE MADE WITHOUT PREAPPROVAL BY AUTHORIZED BIG LOTS REPRESENTATIVE.
- ALL WORK IS TO BE DONE IN A WORKMANLIKE MANNER, AND THE CONTRACTOR IS RESPONSIBLE FOR ALL PERMITS, INSPECTIONS, AND COMPLIANCE TO ALL NATIONAL AND LOCAL CODES AND REQUIREMENTS. EXISTING CIRCUITS AND RECEPTACLES ARE TO BE UTILIZED IN ALL CASES IF COST EFFECTIVE. PLEASE BREAK YOUR BID DOWN BY LINE ITEM WITH SPECIFICATIONS ON LABOR COSTS AND MATERIAL.
- ELECTRICIAN IS ALSO TO RETURN TO THE STORE 3-7 DAYS PRIOR TO DRY RUN OPENING TO VERIFY STORE LIGHTING IS FULLY FUNCTIONAL AND MAKE WHATEVER REPAIRS THAT MAY BE NEEDED.

ANY QUESTIONS PLEASE CALL: 614-278-6710 or 614-278-6846.
THANK YOU FOR YOUR ATTENTION IN THIS MATTER.

## TABLE OF CONTENTS

1. CASHWRAP CABINETS/FURNITURE CABINETS
2. EXTERIOR SIGNS
3. AUTOMATIC DOORS
4. CONVENIENCE RECEPTACLE
5. CORD REELS
6. COUNTDOWN ROOM
7. CASH ROOM
8. EMPLOYEE LOUNGE
9. MANAGER OFFICE
10. BALER
11. DOCK LIFT
12. RECEIVING LIGHT & DOORBELL
13. PHONE SYSTEM & ALARM BOARD
14. LAMP WALL PLUG MOLD
15. STORE LIGHTING
16. DOCK LIGHT
17. WATER COOLER
18. HAND DRYER
19. MOTION SENSOR
20. DOOR KIT

## 1) CASHWRAP CABINETS / FURNITURE CABINETS

CONTRACTOR TO PROVIDE ONE (1) 120V/20AMP ISOLATED GROUND CIRCUIT (IDENTIFIED ON DIAGRAM AS I.G.) AND TWO (2) 120V/20AMP CONVENIENCE CIRCUITS (IDENTIFIED ON DIAGRAM AS A & B.) ALL CIRCUITS TO HAVE BREAKER LOCKS. FOR EACH CASHWRAP CABINET WITHIN THE STORE.

### CASHWRAP CABINETS:

- EACH CABINET TO BE SUPPLIED ELECTRICAL CONDUCTORS VIA 2.25" X 2.25" TWIN CHANNEL TELE-POWER POLE FROM OVERHEAD TO THE CABINET. LENGTH OF TELE-POWER POLE TO BE DETERMINED BY THE CEILING/DECK HEIGHT. TELE-POWER POLE, WHITE IN COLOR. SUPPLIED BY CONTRACTOR.
- EACH CABINET IS TYPICALLY CONSTRUCTED WITH ELECTRICAL BOXES AND DEVICES SUPPLIED. WIRE CONDUCTORS AND CONDUIT ARE SUPPLIED BY CONTRACTOR. ALL WIRE CONDUCTORS AND CONDUIT ARE TO BE RUN HORIZONTALLY THROUGH THE CABINET AS TO NOT INTERFERE WITH ADJUSTABLE SHELF PLACEMENT.

IN THE EVENT THAT THE CABINETS DO NOT CONTAIN ELECTRICAL BOXES, CONDUIT, AND DEVICES, THE CONTRACTOR IS TO SUPPLY AND INSTALL THE FOLLOWING COMPONENTS PER THE DIAGRAM BELOW.

### EACH CABINET REQUIRES:

- ONE (1) 4"x 4" JUNCTION BOX
- FOUR (4) 2"x 4" ELECTRICAL BOXES
- ONE (1) NEMA L5-15R ORANGE TWISTLOCK RECEPTACLE (HUBBELL IG4700A 2 POLE 3 WIRE GROUNDING 15A/125VAC)
- THREE (3) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352 20A/125VAC)
- ALL BOXES AND DEVICES TO HAVE APPROPRIATE COVER PLATES.



| SPECIAL/GENERAL DUPLEX RECEPTACLES BLACK AND SIDE WIRED | NEMA L5 15R 15A 125V US/CSA 0.5 HP |
|---|---|
| DESCRIPTION | CATALOG NUMBER |
| ISOLATED GROUND, FLUSH, ORANGE IG5T FACE | IG4700A |

### FRONT END CHECKOUT WIRING
SCALE: NTS



RIGHT ELEVATION

## 2) FURNITURE CABINET

- CONTRACTOR TO PROVIDE ONE (1) 120V/20AMP CIRCUIT. CONTRACTOR IS RESPONSIBLE FOR PROVIDING AND CONNECTING THE FURNITURE CABINET. CIRCUIT (IDENTIFIED ON DIAGRAM AS A). ALL CIRCUITS TO HAVE BREAKER LOCKS. FOR THE FURNITURE CABINET/WRAP CABINET.
- CABINET TO BE SUPPLIED ELECTRICAL CONDUCTORS VIA 2.25" X 2.25" TWIN CHANNEL TELE-POWER POLE FROM OVERHEAD TO THE CABINET. LENGTH OF TELE-POWER POLE TO BE DETERMINED BY THE CEILING/DECK HEIGHT. TELE-POWER POLE SUPPLIED BY CONTRACTOR.
- EACH CABINET IS TYPICALLY CONSTRUCTED WITH ELECTRICAL BOXES AND DEVICES SUPPLIED. WIRE CONDUCTORS AND CONDUIT ARE SUPPLIED BY CONTRACTOR.

IN THE EVENT THAT THE CABINET DOES NOT CONTAIN ELECTRICAL BOXES, CONDUIT, AND DEVICES THE CONTRACTOR IS TO SUPPLY AND INSTALL THE FOLLOWING COMPONENTS PER THE DIAGRAM BELOW.

### EACH CABINET REQUIRES:

- ONE (1) 4"x 4" JUNCTION BOX
- ONE (1) 4"x 4" ELECTRICAL BOX
- ONE (1) 2"x 4" ELECTRICAL BOX
- ONE (1) NEMA L5-15R ORANGE TWISTLOCK RECEPTACLE (HUBBELL IG4700A 2 POLE 3 WIRE GROUNDING 15A/125VAC)
- TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352 20A/125VAC)
- ALL BOXES AND DEVICES TO HAVE APPROPRIATE COVER PLATES.

### POS/CASH REGISTER NOTES:

*NOTE:
UNDER NO CIRCUMSTANCES IS ANYTHING TO BE WIRED INTO THE IG RECEPTACLES. THESE ARE FOR THE DESIGNATED CASH REGISTER TWIST LOCK PLUGS ONLY! NOTE: THE GROUND WIRE IS TO TERMINATE AT THIS PANEL GROUNDING CONDUCTOR. IF SUB-PANEL IS USED FOR THESE CIRCUITS AND NO GROUND CONDUCTOR IS PRESENT, BOND TO PANEL ENCLOSURES AND CONTINUE GROUND TO CLOSEST WATER PIPE OR BUILDING STEEL. A SEPARATE HOT, NEUTRAL AND LOW RESISTANCE PATH GROUND IS REQUIRED FOR THESE CIRCUITS. CONTRACTOR TO LABEL AND RECORD AMP DRAW, PER CIRCUIT, IN PANEL BOX CIRCUIT LABEL.

*NOTE:
DROPS TO EACH OF THE DESIGNATED CHECK-OUTS SHOULD BE RUN IN 2 CHANNEL TELE-POLES. I.G. CIRCUITS AND CONVENIENCE CIRCUITS ARE TO BE FED THROUGH THE SAME DROP.

### FURNITURE CHECKOUT WIRING
SCALE: NTS



LEFT SIDE

LEFT ELEVATION

RIGHT ELEVATION

## 3) EXTERIOR SIGNS

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp CIRCUIT.
CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5251, OR EQUIVALENT). SIGNS TO BE MOUNTED @ 50' A.F.F. DIRECTLY ABOVE THE COUNTERTOP MOUNTED AT 40' A.F.F.

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp ISOLATED GROUND CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R ORANGE ISOLATED GROUND DUPLEX RECEPTACLES (HUBBELL IG5262).
RECEPTACLES TO BE MOUNTED @ 30" A.F.F. DIRECTLY ABOVE THE COUNTERTOP MOUNTED AT 36" A.F.F.

CONTRACTOR TO PROVIDE A TELE/DATA ROUGH-IN, A-8" BOX @ 48" A.F.F. WITH TWO(2)-3/4" EMT STUBBED ABOVE THE HARD CEILING. PULL STRING TO BE INCLUDED. THIS ROUGH-IN TO BE UTILIZED BY THE TELECOM CONTRACTOR AT A LATER DATE.

## 3) AUTOMATIC DOOR OPERATORS:

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp CIRCUIT TO EACH ENTRY AND EXIT STOREFRONT DOOR LOCATION. TYPICALLY FOUR (4) LOCATIONS. CIRCUITS TO TERMINATE TO A 2x4 BOX w/COVER PLATE AT THE HEADER LOCATION OF EACH DOOR.

## 4) CONVENIENCE RECEPTACLE :

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE (HUBBELL HBL 5352, OR EQUIVALENT). RECEPTACLES TO BE MOUNTED 18" AFF (OR 48" AFF IF MOUNTED TO A COLUMN).

## 5) CORD REELS:

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp CIRCUIT. CIRCUIT TO SUPPLY ONE (1) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLE. FLUSH MOUNTED IN CEILING AT EACH DESIGNATED CORD REEL LOCATION. CONTRACTOR TO INSTALL A CORD REEL AT EACH LOCATION PER THE DIAGRAM BELOW.

CORD REEL DETAILS AND SPECIFICATIONS:
ALEMITE CORD REEL MODEL 7256 OR EQUIVALENT TO BE:
- COMMERCIAL GRADE
- 20 AMP
- UL RATED
- 45' CORD
- GFCI RECEPTACLE



ELEVATION VIEW



PLAN VIEW

## 6) COUNTDOWN ROOM

CONTRACTOR TO PROVIDE ONE (1) 120V/20amp CIRCUIT.
CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT).
RECEPTACLES TO BE MOUNTED @ 48" A.F.F. DIRECTLY ABOVE THE COUNTERTOP MOUNTED AT 40" A.F.F.

## 8) EMPLOYEE LOUNGE :

CONTRACTOR TO PROVIDE THREE (3) 120v/20 amp CIRCUITS.
CIRCUITS TO SUPPLY THREE (3) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT).

## 9) MANAGER OFFICE :

CONTRACTOR TO PROVIDE TWO (2) 120v/20 AMP CIRCUITS.
CIRCUITS TO SUPPLY FOUR (4) NEMA 5-20R GENERAL DUTY DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT).

## 10) BALER OR COMPACTOR:

CONTRACTOR TO PROVIDE:
- IF 277/480v SERVICE IS AVAILABLE - PROVIDE ONE (1) 480v/30 AMP CIRCUIT. CIRCUIT TO SUPPLY ONE (1) 30 AMP FUSED DISCONNECT.
- IF 120/208v SERVICE IS AVAILABLE - PROVIDE ONE (1) 208/60 AMP CIRCUIT. CIRCUIT TO SUPPLY ONE (1) 60 AMP FUSED DISCONNECT

## 11) DOCK LIFT (if applicable)

CONTRACTOR TO PROVIDE ONE (1) THREE PHASE DISCONNECT TO BE INSTALLED MINIMUM(18) EIGHTEEN INCHES A.F.F., NEAR RECEIVING DOOR. AS DIRECTED, THE MOTOR IS MULTI TAP, ABLE TO OPERATE AT 208/230/460V OR 460V/60. FROM THE SOURCE CIRCUIT. IF A DOCK/PYLON LIFT IS PROVIDED THE MOTOR SIZE IS 3.2 HP, AND IF HARDWIRED THE MOTOR SIZE IS 5 HP, WIRE AND FUSE ACCORDINGLY.

## 12) DOOR BELLS:

CONTRACTOR TO PROVIDE TWO (2) 24v, COMMERCIAL GRADE DOORBELLS. ONE (1) AT THE RECEIVING DOOR AND ONE (1) AT THE STOREFRONT DOORS.

## 13) PHONE SYSTEM:

CONTRACTOR TO PROVIDE TWO (2) 120v/20amp CIRCUITS.
CIRCUITS TO SUPPLY TWO (2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBELL HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX (DOUBLE OUTLET) ALL CIRCUITS TO HAVE BREAKER LOCKS.

## 14) LAMP WALL PLUG MOLD:

CONTRACTOR TO PROVIDE TWO (2) 120V/20 AMP CIRCUITS.
CIRCUITS TO SUPPLY 14' OF PLUG MOLD WITH RECEPTACLES @ 6" ON CENTER, ATTACHED TO THE WALL/CASE GONDOLA @ 40" A.F.F., SWITCH REQUIRED AT PLUG MOLD LOCATION.

## 15) STORE LIGHTING:

CONTRACTOR TO LABEL BREAKERS WITH DESCRIPTION AND AMP DRAW PER CIRCUIT.

WIRING INSTRUCTIONS ARE AS FOLLOWS: CONTRACTOR TO WIRE EVERY OTHER FIXTURE AND EVERY OTHER ROW ON A SEPARATE CIRCUIT. BREAKER ON SALES FLOOR AND STOCK ROOM CIRCUIT BREAKERS ARE TO BE GROUPED BY CONTRACTOR IN THE FOLLOWING WAY: EMPLOYEE CONTRACTOR (CONTROLS ALL OFFICE, CASH, COUNT, BATHROOMS, RECEIVING AREA, AND STOCK ROOM.)GROUP A 25% CONTRACTOR (CONTROLS APPROXIMATELY THE NEXT 25% OF SALES FLOOR LIGHTS),GROUP B 50% CONTRACTOR. (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING) GROUP C 75% CONTRACTOR. (CONTROLS THE NEXT 25% OF SALES FLOOR LIGHTING) GROUP D 100% CONTRACTOR.(CONTROLS THE BALANCE 25% OF SALES FLOOR LIGHTING) GROUP E CONTRACTOR (EXTERIOR SIGNS)(CONTROLS ALL EXTERIOR BUILDING SIGNS )(INCLUDING PYLON SIGN). GROUP F CONTRACTOR (CONTROLS ANY WALL PACK LIGHTING, PARKING LOT LIGHTING AND CANOPY LIGHTING NOT CONTROLLED BY LANDLORD).





## 16) DOCK LIGHT (if applicable):

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP CIRCUIT.
CIRCUIT TO SUPPLY ONE (1) 4x4 BOX w/TWO (2) SWITCHES.
- SWITCH (A) TO SUPPLY TWO (2) IF PLUGMOLD w/RECEPTACLES @ 6" ON CENTER.
- PLUGMOLD (A) TO BE LOCATED ACROSS TOP-CENTER OF GONDOLA FIXTURE.
- PLUGMOLD (B) TO BE LOCATED INSIDE DOOR KIT DISPLAY, ATTACHED TO GONDOLA FIXTURE PEGBOARD @ 54" A.F.F.
- SWITCH (B) TO SUPPLY TWO (2) UNDER SHELF LIGHT FIXTURES (ANTARES GT554L-C-HO MOUNTED TO THE UNDERSIDE OF THE FRONT EDGE OF THE TOP SHELF INSIDE THE DOOR KIT DISPLAY.

## 17) WATER COOLER:

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP CIRCUIT.
CIRCUIT TO SUPPLY A FLAY MODEL EZ8TL/LC HI-LO WATER COOLER MOUNTED PER ALL LOCAL, STATE, FEDERAL AND ADA CODES OR REGULATIONS.

## 18) HAND DRYER:

CONTRACTOR TO PROVIDE HAND DRYERS AND ONE (1) 120V/20 AMP CIRCUIT (per bath) CIRCUIT TO SUPPLY X-CELL MODEL XL-W ELECTRIC HAND DRYER. MOUNTED PER ALL LOCAL, STATE, FEDERAL AND ADA CODES OR REGULATIONS.

## 19) MOTION SENSOR SWITCHES:

CONTRACTOR TO PROVIDE & INSTALL WATTSTOPPER/LEVITON - ODS10 - IGW MOTION SENSOR SWITCHES AS INDICATED ON SHEET E-1.

## BURGLAR ALARM & MUZAK SYSTEMS:

ALARM: CONTRACTOR TO PROVIDE ONE(1) 120V/20A CIRCUIT TO SUPPLY TWO(2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBLE HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX @ 72" AFF, CIRCUIT TO HAVE BREAKER.

MUZAK: CONTRACTOR TO PROVIDE ONE(1) 120V/20A CIRCUIT TO SUPPLY TWO(2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBLE HBL 5352 OR EQUIVALENT) WITHIN A 4" BOX @ 60" AFF, CIRCUIT TO HAVE BREAKER.

## 7) CASH ROOM:

CONTRACTOR TO PROVIDE ONE (1) 120v/20amp CIRCUIT.
CIRCUIT TO SUPPLY TWO (2) NEMA 5-20R DUPLEX RECEPTACLES (HUBBELL HBL 5352, OR EQUIVALENT). JUNCTION BOX FOR EACH CIRCUIT TO BE LOCATED ON THE BACKSIDE OF SIGN WALL AND CENTERED WITHIN SIGN AREA (IF ANY QUESTIONS, CONTACT MICHEAL HEU @ 614-278-6685)AFTER SIGN IS INSTALLED, FINAL ELECTRICAL CONNECTIONS TO BE COMPLETED BY ELECTRICIAN.

CONTRACTOR TO PROVIDE POWER TO PYLON/STREET SIGN, POWER TO PYLON MUST ADEQUATE TO HANDLE SPECIFIED LOAD AND BE CONTROLLED BY EMS EQUIPMENT.

## 20) DOOR KIT DISPLAY:

CONTRACTOR TO PROVIDE ONE (1) 120V/20 AMP CIRCUIT.
CIRCUIT TO SUPPLY ONE (1) 4x4 BOX w/TWO (2) SWITCHES.





| BIG LOTS #<br>SHOPPING CENTER | GREECE, N.Y. 14616 | SALES: 24,664 | SQUARE FOOTAGE | TOTAL: 32,864 |
|---|---|---|---|---|

| DATE DRAWN<br>1-24-2012 | REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES | BIG LOT'S STORES, INC.<br>4900 EAST DUBLIN GRANVILLE RD.<br>300 PHILLIPI ROAD<br>COLUMBUS, OHIO 43228<br>PHONE: (614) 278-6800 |
|---|---|---|

SHEET:

# E-2

ELECTRIC NOTES

## DEVICE SCHEDULE

| SYMBOL | DEVICE | QUANTITY | DEVICE LOCATION | DEVICE CABLE TYPE | NOTES |
|---|---|---|---|---|---|
| ① | CARBON DIOXIDE SENSOR | | MAIN SPACE, MOST CENTRALLY LOCATED, ABOVE/INSIDE D20 | 18/2 (X2) | |
| ② | DUCT TEMPERATURE SENSOR | 1 PER ROOFTOP UNIT | BOTTOM OF MAIN SUPPLY AIR DUCT DROP | 18/2 | 1 |
| ③ | DIGITAL ZONE CONTROLLER | 1 PER ROOFTOP UNIT (AND ADDITIONAL HVAC) | IN ZONE BEING SERVED | 18/50 | 2 |
| ④ | ENERGY METER | | MAIN 3-PHASE SUPPLY NEAR UTILITY METER | 24HP (COMM CABLE TO SLP) | 3 |
| ⑤ | LIGHTING CONTROL PANEL | 1 | NEAR BREAKER PANEL | 18/50 PLUS ALL REQ'D LINE VOLTAGE | |
| ⑥ | OUTSIDE SENSING DEVICE | 1 | ROOF | 18/50 | |
| ⑦ | POWER INTERFACE PANEL | 1 | ELECTRICAL ROOM (UNDER SLP) | (S) 18/2, OTHER (SEE POINT TO POINT DWG'S) | 5 |
| ⑧ | SCREAM LOGIC PANEL | 1 | ELECTRICAL ROOM | VARIES PER CONNECTED DEVICE | |
| ⑨ | SECURITY INTERFACE | 1 | COIL WIRES NEXT TO SECURITY PANEL | 18/2 (X3) | |

## INSTALLATION RESPONSIBILITIES

| SYMBOL | DEVICE | PROVIDED BY | MOUNTING | BOX/RACEWAYS | TERMINATION OF WIRES AT BOTH ENDS | NOTES |
|---|---|---|---|---|---|---|
| ① | CARBON DIOXIDE SENSOR | SIEMENS | MC | | MC | |
| ② | DUCT TEMPERATURE SENSOR | SIEMENS | MC | | MC | 1 |
| ③ | DIGITAL ZONE CONTROLLER | SIEMENS | MC | | MC | 2 |
| ④ | ENERGY METER | SIEMENS | EC | | MC | 3 |
| ⑤ | LIGHTING CONTROL PANEL | SIEMENS | EC | | MC | 4,8 |
| ⑥ | OUTSIDE SENSING DEVICE | SIEMENS | MC | | MC | |
| ⑦ | LIGHTING OVERRIDE PANEL (4 BUTTON) | SIEMENS | MC | | EC | |
| ⑧ | POWER INTERFACE PANEL | SIEMENS | EC | | EC/MC | 4,5,6 |
| ⑨ | SCREAM LOGIC PANEL | SIEMENS | EC | | EC/MC | 7 |
| ⑩ | SECURITY INTERFACE | SIEMENS | EC | | N/A | 9 |

### NOTES

1. ONE DUCT SENSOR IN THE SUPPLY AIR DUCT OF EACH RTU.
2. ONE DZC FOR EACH ROOFTOP. ONE DZC FOR ANY OTHER HVAC DEVICE (IF SPECIFIED).
3. MOUNT CM CTS ON 3-PHASE BUSS BARS AT MDP AFTER UTILITY METER AND BEFORE TRANSFORMERS AND BRANCH CIRCUITS.
4. N.C. SHALL INSTALL LINE VOLTAGE CABLING FROM THE E.C. DEVICES TO RTU, SLP, AND LOP AND TERMINATE BOTH ENDS. - LINE VOLTAGE WIRING AND TERMINATIONS BY E.C.
5. E.C. SHALL PROVIDE AND INSTALL A DEDICATED 120V, 20A CIRCUIT TO POWER THE PIP, LABEL BREAKER EMS-4.
6. INTERCONNECTING CABLING BETWEEN THE PIP AND SLP SHALL BE INSTALLED BY THE N.C. AND THE GROUND CONNECTION BY THE E.C.
7. WITH THE EXCEPTION OF THE OSD AND ENERGY METER THE N.C. SHALL TERMINATE ALL CABLES IN THE SLP.
8. E.C. SHALL PROVIDE AND INSTALL A DEDICATED 120V, 20A CIRCUIT TO POWER THE LCP, LABEL BREAKER EMS-1.
9. FOR FUTURE USE, M.C PULLS WIRE THROUGH BOX/RACEWAY PROVIDED BY E.C. COIL LIP AND LABEL IN SLP AND CONNECT TO SECURITY PANEL.

## CABLE SCHEDULE

| CABLE | SIZE | TYPE | MFG./MODEL |
|---|---|---|---|
| 18/2 | 18AWG/2-CONDUCTOR | SHIELDED, STRANDED, PLENUM RATED | BELDEM 8760FE NON-PAIRED<br>CONTRAN/5664<br>TAPPAN/1800AB3M-CMP |
| 18/50 | 18AWG/50-CONDUCTOR | UNSHIELDED, STRANDED, PLENUM | BELDEM 8555UE NON-PAIRED<br>LAKE CABLE/LP1610C-WIN<br>TAPPAN/188SAB18-CMP |
| 24HP | 24AWG/1-TWISTED-PAIR | SHIELDED, STRANDED, PLENUM RATED, TWISTED PAIR | BELDOWN/9241 PAIRED<br>LAKE CABLE/LPP24C05<br>TAPPAN/248AT18-CMP |
| CAT5 | 24AWG/4-UTP | UNSHIELDED SOLID CONDUCTOR TWISTED PAIR | BELDEN 1583A CAT5 |

## GENERAL EMS CONSTRUCTION NOTES:

1. THE MECHANICAL CONTRACTOR SHALL PROVIDE THE INSTALLATION LABOR AND MATERIALS TO INSTALL THE LOW VOLTAGE PORTION OF THE CUSTOMER SUPPLIED EMS SYSTEM ACCORDING THE EMS SCHEDULES AND THE FOLLOWING:
   I. INSTALL EMS DEVICES AT LOCATIONS SHOWN ON THE MECHANICAL DRAWINGS AND MOUNT ACCORDING TO THE EMS DETAILS
   II. PROVIDE AND INSTALL THE LOW VOLTAGE CABLING FROM THE EMS DEVICES TO THE RTU'S, SLP, AND LOP
   III. TERMINATE THE LOW VOLTAGE CABLING AT BOTH ENDS.
   IV. CLEARLY IDENTIFY (LABEL) THE CABLES AT BOTH ENDS.

2. THE ELECTRICAL CONTRACTOR SHALL PROVIDE THE INSTALLATION LABOR AND MATERIALS TO INSTALL THE LINE VOLTAGE PORTION OF THE CUSTOMER SUPPLIED EMS SYSTEM ACCORDING THE EMS SCHEDULES AND THE FOLLOWING:
   I. PROVIDE AND INSTALL ELECTRICAL BOXES WITH 3/4" EMT STUB-UPS TO ABOVE CEILING GRID FOR WALL MOUNTED EMS AND CONTROL DEVICES.
   II. MOUNT EMS PANELS AND PIPE TOGETHER ACCORDING TO THE EMS DRAWINGS.
   III. INSTALL THE ENERGY METER AT THE MAIN DISTRIBUTION PANEL, INSTALL AND TERMINATE COMMUNICATIONS CABLE.
   IV. PROVIDE AND INSTALL AN 8' SECTION OF 1/2" RIGID FOR ROOF MOUNTED OSD. INSTALL AND TERMINATE OSD AND CABLE.
   V. PROVIDE AND INSTALL (5) EACH 120V, 20A CIRCUIT TO POWER THE PIP BREAKER "EMS-2"

3. ALL WIRING SHALL CONFORM TO NATIONAL AND STATE ELECTRICAL CODES.

4. NOTES ABOVE DO NOT ALLEVIATE CONTRACTORS OF OVERALL RESPONSIBILITIES OF PROVIDING A COMPLETE AND OPERATIONAL SYSTEM.

## INSTALLATION SUMMARY

1. LOW VOLTAGE CABLE
   I. THE M.C. SHALL FURNISH THE LOW VOLTAGE CABLE FOR THE EMS SYSTEM. THE CABLE SHALL BE AS SPECIFIED IN THE CABLE SCHEDULE.

2. EQUIPMENT DELIVERY
   I. SIEMENS SHALL PROVIDE THE EMS EQUIPMENT IN 1 SHIPMENT.
   II. IT SHALL BE UP TO THE G.C. TO CALL FOR EMS EQUIPMENT DELIVERY THE EQUIPMENT WILL BE SHIPPED WITHIN 3 DAYS OF RECEIVING A VALID REQUEST. A VALID REQUEST SHALL CONSIST OF THE FOLLOWING:
      1-NAME AND PHONE NUMBER OF PERSON RESPONSIBLE FOR RECEIVING THE EMS EQUIPMENT AND STORE NUMBER
      2-A VALID SHIPPING ADDRESS (CONFIRMABLE BY THE DELIVERY AGENTS).

3. CONTACT INFORMATION
   I. PLEASE DIRECT ALL SHIPPING REQUESTS TO SIEMENS AT (612) 706-9400

4. EMS COMMISSIONING
   I. IT SHALL BE UP TO THE G.C. TO CALL FOR EMS COMMISSIONING AT LEAST 2 WEEKS PRIOR TO TURN OVER AND BEFORE THE INSTALLING CONTRACTOR HAS LEFT THE PROJECT.
      a. SIEMENS WILL COMMISSION THE EMS SYSTEM UPON RECEIVING A VALID REQUEST AND AFTER THE FOLLOWING CONDITIONS HAVE BEEN MET:
         1-ALL EMS DEVICES AND PANELS HAVE BEEN INSTALLED, WIRED AND TERMINATED
         2-ALL LINE VOLTAGE WIRING HAS BEEN COMPLETED
         3-ALL CONTROLLED EQUIPMENT HAS BEEN INSTALLED AND STARTED
      II. FAILURE TO MEET THESE CONDITIONS COULD RESULT IN DELAY OF STORE OPENING

## GENERAL LV CABLE INSTALLATION INSTRUCTIONS

1. HOME RUNS
   I. LOW VOLTAGE CABLES SHALL BE PULLED FROM DEVICE TO CONTROL PANEL WITHOUT SPLICING.

2. COMMUNICATIONS CABLING
   I. IN THE CASE OF MULTIPLE DEVICES SUCH AS COMMUNICATIONS CABLING, THE CABLE SEGMENTS SHALL BE PULLED FROM DEVICE TO DEVICE WITHOUT SPLICING.

3. CABLE SHIELD GROUNDING
   I. EACH CABLE RUN SHALL BE GROUNDED AT ONE END ONLY. GROUND SHIELD DRAIN WIRE AT CONTROL PANEL END. FASTEN DRAIN WIRE TO EARTH GROUNDED SCREWS PROVIDED. THE THE SHIELD AND DRAIN WIRE SHALL BE REMOVED FROM THE OPPOSITE DEVICE END AND ISOLATED FROM GROUND.
   II. IN THE CASE OF MULTIPLE DEVICES SUCH AS COMMUNICATIONS WIRING, THE SHIELD DRAIN WIRES AT THE INTERMEDIATE DEVICES SHALL BE MECHANICALLY SPLICED TOGETHER AND ISOLATED FROM GROUND.

4. TESTING SHIELD GROUNDS
   I. DURING COMMISSIONING THE FIELD SERVICE REPRESENTATIVE (FSR) WILL TEST THE SHIELD GROUNDING AT THE CONTROL PANEL. SHIELDS FOUND TO HAVE CONTINUITY LESS THEN 100K OHM TO GROUND SHALL BE REJECTED. THE CONTRACTOR SHALL BE RESPONSIBLE FOR CLEARING SHIELD GROUND FAULTS.

## GENERAL NON-EMS CONTROLS NOTES:

1. COMBUSTION AIR VENTILATION AND OTHER EQUIPMENT
   1. CONTROLS FOR COMBUSTION AIR VENTILATION AND ANY OTHER EQUIPMENT NOT SPECIFICALLY MENTIONED IN THE EMS SCHEDULES SHALL BE FURNISHED AND INSTALLED ACCORDING TO THE MECHANICAL AND ELECTRICAL BID DOCUMENTS.

2. EXHAUST FAN, TRANSFER FAN AND OTHER 'HARD-WIRED' INTERLOCKS (SEE INTERLOCK EXAMPLE BELOW)
   1. WHEN HARD-WIRED INTERLOCKING IS SPECIFIED IN THE MECHANICAL AND/OR ELECTRICAL SCHEDULES, THE INTERLOCKS SHALL BE FURNISHED AND INSTALLED BY THE TRADES SPECIFIED. INTERLOCKING IS NOT PART OF THE EMS.
   2. WHERE EXHAUST FAN AND RTU INTERLOCKS ARE CALLED OUT, THE CONTRACTOR SHALL CONNECT DIRECTLY TO THE SUPPLY FAN CONTACTOR COIL AND WIRE IN PARALLEL TO THE COIL OF A PROPERLY SIZED CONTACTOR OR STARTER SERVING THE INTERLOCKED EQUIPMENT. DO NOT USE THE EMS SYSTEM TO INTERLOCK EQUIPMENT.

3. LIFE SAFETY AND FIRE ALARM SYSTEMS
   1. LIFE SAFETY AND FIRE ALARM SYSTEMS ARE NOT PART OF THE EMS SYSTEM AND SHALL BE FURNISHED AND INSTALLED AS SPECIFIED IN THE MECHANICAL AND ELECTRICAL BID DOCUMENTS.
   2. MECHANICAL EQUIPMENT SHUTDOWN SHALL BE WIRED AS TO NOT AFFECT THE EMS SYSTEM.

4. MANUFACTURER SUPPLIED HUMIDITY CONTROLLERS
   1. DEHUMIDIFYING ROOFTOP UNITS
      a. SOME ROOFTOP UNITS MAY COME EQUIPPED WITH A DEHUMIDIFICATION CYCLE AND SPACE HUMIDITY SENSOR. THIS SENSOR SHALL BE INSTALLED IN ADDITION TO THE EMS SYSTEM AND ACCORDING TO THE MANUFACTURER'S INSTRUCTION.

## EXAMPLES FOR 3-PHASE EQUIPMENT INTERLOCKING





## MULTIPLE SEGMENT EXAMPLE



MECHANICALLY SPLICE SHIELD DRAIN
WIRES TOGETHER AT INTERMEDIATE
DEVICES AND ISOLATE FROM GROUND.



EMS NOTES

SHEET:

E-3

BIG LOTS STORES, INC.<br>BIG LOTS PLANNING DEPT.<br>300 PHILLIPI ROAD<br>COLUMBUS, OHIO 43228<br>PHONE (614) 278-6800

EMS SPECIFICATIONS



| | | | | |
|---|---|---|---|---|
| BIG LOTS STORES, INC.<br>STORE PLANNING DEPT.<br>300 PHILLIP ROAD<br>COLUMBUS, OHIO 43228<br>PHONE: (614) 278-6800 | DATE DRAWN:<br>3-9-2012<br>DRAWN BY:<br>BMH<br>SCALE:<br>3/32" = 1'-0" | SQUARE FOOTAGE<br><br>SALES: 24,656<br>(INCLUDES FURNITURE DEPT.)<br><br>TOTAL: 32,864 | BIG LOTS #<br>SHOPPING CENTER<br>3660 DEWEY AVE.<br>GREECE, NY.  14616 | 3/14/2012 | REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES. |

SHEET:
E-4



MECHANICAL PLAN

MECHANICAL PLANS TO BE
COMPLETED BY LANDLORDS
ENGINEERS AND TO BE
APPROVED BY TENANT

SHEET:
M-1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN:
3-8-2012
DRAWN BY:
BMH
SCALE
3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 24,656
(INCLUDES FURNITURE DEPT.)
TOTAL: 32,864

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY.  14616

5/14/2012    REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES.



# MECHANICAL NOTES

## AIR BALANCE

## AIR DISTRIBUTION DEVICE SCHEDULE

## MECHANICAL EQUIPMENT SCHEDULE

## VENTILATION SCHEDULE

## EXHAUST FAN SCHEDULE

**SHEET M-2**

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN: 3-15-2012
DRAWN BY: BWH
SCALE: 3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 24,656
(INCLUDES FURNITURE DEPT.)
TOTAL: 32,864

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE.
GREECE, NY. 14616

3/14/2012   REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES.



MECHANICAL PLANS TO BE
COMPLETED BY LANDLORDS
ENGINEERS AND TO BE
APPROVED BY TENANT

MECHANICAL DEMOLITION

SHEET:
M-D

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN:
3-6-2012
DRAWN BY:
BMH
SCALE:
3/32" = 1'-0"

SQUARE FOOTAGE

SALES: 24,656
(INCLUDES FURNITURE DEPT.)

TOTAL: 32,664

BIG LOTS #
SHOPPING CENTER
3660 DEWEY AVE,
GREECE, NY.  14616

3/14/2012    REVISED STOREFRONT LOCATION, RESTROOMS AND OFFICES.

# EXHIBIT C

## LANDLORD WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative. As clarification to this Exhibit C, Tenant's plans are attached to the Lease and any discrepancies between the Exhibit C and Tenant's Plans shall be resolved by Tenant's Plans controlling.**

**STOREFRONT:** The exterior storefront shall have an "ANCHOR" type façade and canopy acceptable to Tenant. The canopy and building fascia shall be repaired and painted (Sherwin Williams #SW6350 Intricate Ivory for the building, fascia, canopies, etc. & Sherwin Williams #SW6258 Tricorn Black for the trim, columns, copings, etc.) per Tenant's specifications. Landlord is to provide a vestibule entrance with a minimum of 48' feet of glass storefront including four (4) sets of bi-part, fully automatic, sliding doors (NABCO GT-1175) that meet ADA, ANSI and AHJ requirements. The vestibule is to have new commercial grade floor tile (AZROCK #SR-120 slip retardant) per Tenant's specifications. Landlord to ensure that there are curb cuts within reasonable proximity to the storefront and that the vestibule has adequate HVAC for Tenant's use.

**DOORS:** All doors and door systems (exterior and overhead included) to be sound , secure, in good working condition adequate for Tenant's use and in compliance with ADA, ANSI and AHJ requirements. All doors are to have weather stripping, thresholds, and be sealed to prevent outside elements from entering the building.

**WALLS:** All interior walls to be smooth, spackled, sanded and painted per Tenant's specifications (side walls to be painted with Sherwin Williams #SW6385 Dover White gloss, front and rear walls to be painted with Sherwin Williams #SW6258 Tricorn Black).

**GLASS:** Replace all broken or damaged glass, and storefront mullions (mullions to be clear aluminum or dark bronze finish). Remove all materials blocking or covering windows and glass doors.

**UTILITIES:** Landlord to provide separate utilities and separate utility provider meters (including but not limited to gas, electric, water, etc.) adequate for Tenant's intended use. Tenant to have a minimum of 800 amps for 208v service or 600 amps for 480v service and include all circuit panels, transformers, switch gear connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. Landlord shall install Tenant's Energy Management System (EMS) that will be supplied by Tenant. Landlord shall also provide Tenant with assurance that utilities are adequate for Tenant's use, are available and include legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. (If separate metering is not permitted or possible, Landlord shall notify Tenant where the utility is sub-metered and billed through Landlord and/or its representatives. Tenant shall not be obligated to pay more for utilities then the negotiated rate it would receive directly from the respective utility provider if contracted directly)

**DEMISING WALL:** Landlord to erect demising wall(s) to the roof deck, to code, separating the demised premises per Tenant's plans. Landlord to re-tie the ceiling to demising wall(s) and finish floor to include cove base and walls painted (side walls to be painted with Sherwin Williams #SW6285Dover White Gloss, front and rear walls to be painted with Sherwin Williams #SW6258 Tricorn Black).

**HVAC**
**EQUIPMENT**
**& MECHANICALS:** Landlord shall provide a minimum of one ton per 400 square feet of HVAC throughout the sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. All mechanicals to meet ASHREA standard and comply with all state and local code. All mechanical designs shall be submitted to Tenant's engineering and construction departments for review and approval two weeks prior to applying for permits. All HVAC units to be replaced with new concentric units.. New units shall be either Carrier or Trane (or other brand approved by Tenant's Energy & Engineering Department) and no larger than 10-20 tons each. Landlord is required to install new ducting from units in order to serve sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. If the Tenant Possession Date occurs during the months of October through May, Landlord shall grant Tenant until June 15th to have the HVAC system inspected to determine any needed repairs. Landlord shall also pass on

warranty of the new HVAC system. Tenant shall be responsible for all maintenance and for any repairs during its entire lease term and options.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to ensure the existing sprinkler system meets code requirements for Tenant's use and where required provide a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions. Landlord shall install any device(s) or system(s) for the suppression, detection or reporting of fire as required by Authority Having Jurisdiction (AHJ). All devices and systems installed for the suppression, detection or reporting of fire shall be in compliance with all applicable National, State and Local codes including backflow preventer devices. The fire alarm system will meet the requirements for monitoring by Tenant's contractor and Tenant to approve the fire alarm plans prior to installation of equipment to verify panel compatibility and coordinate monitoring. (If a sprinkler system does not exist, Landlord is to install a sprinkler system at its sole cost and expense if required by code. If code does not require a sprinkler system, Landlord to install, at its sole cost and expense, a smoke detection system that is to be monitored by the Tenant and any other device required by code.)

**LIGHTING:** Landlord to install all new energy efficient 8' florescent strip lighting and circuits per Tenant's specifications. Lighting fixtures to be used are 8' strip - 4 lamp tandem 4' T8 with electronic ballasts. Lighting fixtures are to run side-to-side in continuous rows with 10' spacing including a perimeter row of lighting. The perimeter lighting is to be installed within 4'-6' off the front, back and side walls running parallel to the walls and within 2'-3' of the end of the fixture runs. The back row of the perimeter lighting is to extend past the rows of lighting on each side wall. Lighting in the stockroom should be a maximum height of 16' and a minimum height of 12'. Stockroom lighting fixtures to be 12' on center. Lamp color for the lighting fixtures is to be #841 with 28 watt capacity.

**EXTERIOR LIGHTING:** All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name (except wall packs).

**FLOORING:** Landlord is to remove the existing floor covering (fill channels in floors if applicable) and install new commercial grade floor tile throughout the sales floor, offices, rest rooms, lounge and vestibule areas per Tenant's specifications. Sales floor and Stockroom floor shall be smooth, level and at the same elevation throughout entire Premises. Stockroom floor to be sealed concrete.

**CEILING:** Drop ceiling shall be at same height (a minimum of 14') throughout the sales area. The stockroom shall have no ceiling tiles or grid and be open to roof deck. Landlord shall install new 2' x 4' white ceiling tile and grid per Tenant's plans throughout sales floor, lounge, rest rooms and office areas.

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports.

**OFFICES, REST ROOMS LOUNGE, ETC:** Landlord is to provide Tenant with three offices, one lounge, and a minimum of two restrooms to Tenant's specifications and in compliance with all applicable local and state codes and ADA requirements. Rest room fixtures shall be new and to have a minimum of three commodes in the women's and two commodes and one urinal in the men's. Rest rooms shall include baby changing stations and electric hand dryers. Additionally, drinking fountains, mop sink and utility closet to be located per Tenant's plans. Offices, lounge and rest rooms shall have adequate HVAC, new ceiling and new floor tile (restrooms to have floor covering that meet code requirements for premises with the sale of food), electrical, plumbing, lighting, sinks, fixtures, partitions, FRP board, etc per Tenant's specifications. Cash office and Count room to have solid plywood ceiling of a minimum 1/2" thickness.

**STOCKROOM WALL:** Landlord is to install a new stockroom wall, to code, with two pairs of 3'0 x 7'0 double-acting traffic doors per Tenant's specifications.

**RECEIVING AREA:** The loading docks are to be 48" high and in good working order (including all seals, bumpers, bollards, doors, etc.). The truck/trailer area to be level. Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**REMOVAL OF FIXTURES & EQUIPMENT:** Landlord to remove all fixtures, refrigeration equipment, meat/poultry/fish prep rooms, partitions, walls, coolers, mezzanine and make all repairs to the ceiling, floor, walls, etc. necessitated by such removal. Landlord to remove the electric and plumbing to such equipment. Landlord to block in any openings in exterior walls to match existing walls.

**PARKING LOT:** Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises shall be re-sealed and re-striped prior to delivery of Demised Premises to Tenant.

**PESTS:** Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**CART CORRAL:** Landlord to install cart corral(s) in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

**SIGNAGE:** Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Landlord to ensure that the pylon(s) is properly wired, maintained and constructed. Landlord to deliver pylon(s) fully operational. Tenant to have the marquee position on the pylon(s). Landlord shall provide a rendering of the proposed pylon sign(s) highlighting Tenant's panel position. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position. (If no pylon is available, Tenant shall have the right to erect its own pylon per all city codes and ordinances.)

**DRAWINGS:** Landlord is to provide Tenant with a complete set of "as-built" and AutoCAD drawings of the Demised Premises adequate for Tenant to prepare construction documents. Tenant shall approve all drawings prior to the submission for permits and the commencement of work. Upon fully executing a lease document, Landlord shall supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress.

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises including roof, prior to lease execution. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:** Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Furthermore, the building structure shall meet governmental and local codes including current seismic requirements if applicable. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to, sprinkler certification completed within the last 60 days, roof report and HVAC report evidencing all repairs have been completed, and pest inspection report, prior to Tenant's possession.

All above work to be completed prior to the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS!

## EXTERIOR SIGNING

## SPECIFICATIONS

If you need additional information that
is not contained in this packet contact:

**BIG LOTS!** Store Planning Department:

Michael Neu - 614-278-6968
Mike Stiles - 614-278-6905

## HORIZONTAL LOGO

### INDIVIDUAL LED ILLUMINATED
### REVERSE CHANNEL LETTER SET



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

# STACKED LOGO
## INDIVIDUAL LED ILLUMINATED
## REVERSE CHANNEL LETTER SET



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |





# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet





**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE

11/2009

## EXHIBIT E

## COMPLETION OF LANDLORD'S WORK LETTER

**Date:** _____

**To:** _____(insert Tenant)
   via facsimile:  (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs.  Landlord shall deliver to Tenant with this notice, the required surveys and initial  completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at

_____.

If you have any questions, please feel free to contact me at

_____.

Thank You.

**LANDLORD:**

**MORGAN BRITTON LLC,**
**a New York limited liability company**

By:_____

Title:_____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio**
**corporation**

By:_____

Title: _____

# EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.**

## EXHIBIT G

## REMEASUREMENT RIDER

This Rider dated _____ ___, 200__ is attached to and made a part of the Lease dated
(the "Lease") by and between MORGAN BRITTON LLC, a New York limited liability company
("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall
apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    Gross Rent—Original Term (Section 5(A)):
      _____ annually; _____ per month.

3.    Gross Rent--First Option (Section 5(A)):
      _____ annually;_____per month.

4.    Gross Rent—Second Option (Section 5(A)):
      _____annually; _____per month.

5.    Gross Rent—Third Option (Section 5(A)):
      _____ annually;_____per month.

6.    Gross Rent—Fourth Option (Section 5(A)):
      _____ annually;_____per month.