**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 24-11967 (JKS) |
| BIG LOTS, INC., *et al.*, | (Jointly Administered) |
| Debtors.[1] | **Re: Docket Nos. 18, 661** |

**LIMITED OBJECTION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Big Lots"), by and through its undersigned proposed counsel, hereby submits this limited objection (the "Limited Objection") to the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 18] (the "Bidding Procedures

---

[1]    The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows:  Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

Motion" or "Sale Motion," as applicable).[2]  In support of this Limited Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The Committee supports the proposed sale to Gateway BL Acquisition, LLC, an affiliate of Nexus Capital Management LP (the "Buyer" or "Nexus"), in principle.  Although the sale consideration will not yield any distributable value for unsecured creditors, the transaction provides for the assumption of millions of dollars of unsecured liabilities and will allow Big Lots to continue as a going concern for the benefit of those employees, landlords, vendors, and service providers who will transact with the Buyer post-closing.  Notwithstanding this support, the Court should not approve the sale absent to two key modifications.  First, the Court should not permit the Debtors to sell—for no apparent consideration—any litigation claims (and related insurance policies and proceeds) that are not necessary to the operations of the new business (the "Litigation Assets").[3]  Second, the Court should not approve the proposed amendment to the Stalking Horse APA granting Nexus the right to designate the Debtors' leases for assumption and assignment at any time prior to the effective date of a chapter 11 plan, and permitting Nexus to occupy the leased premises during such time (the "Designation Rights Amendment" and "Designation Rights Period," respectively).

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion or the *Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552, (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion") [Docket No. 20], as applicable.

[3]    For purposes of this Limited Objection, "Litigation Assets" means any and all estate claims and causes of action (and related insurance policies and proceeds) other than claims that arise in the ordinary course of business against the Debtors' current employees, vendors, landlords, and service providers that will continue to be employed by, or transact with, the post-sale business of Buyer (the "Go-Forward Creditor Claims").

Foremost, the Committee objects to the sale of the Litigation Assets.  Under the Stalking Horse APA, all estate claims will be sold to Nexus, regardless of whether they are necessary to the future operations of the new company.  As this Court is aware, the Committee is currently conducting a comprehensive investigation into potential claims against the Secured Parties,[4] which claims are subject to the Challenge Deadline set forth in the Final DIP Order (as defined herein), as well as claims against the Debtors' current and former directors and officers and other third parties.  Under the Stalking Horse APA, all of these claims will be sold to the Buyer and effectively released on the closing date of the sale.

This Court should not approve the sale of the Litigation Assets for the following reasons:

- The sale of claims against the Secured Parties will render the Committee's customary challenge rights illusory.  The Committee's investigation into claims against the Secured Parties is underway;[5] prior to the expiration of the Challenge Deadline, the Committee will determine whether to commence a Challenge or permit the release of these claims in accordance with the Final DIP Order.  The Secured Parties should not be permitted to bypass this process by obtaining backdoor releases through the sale.[6]

---

[4]   "Secured Parties" means, collectively, (i) 1903P Loan Agent, LLC ("1903P"), as administrative agent and collateral agent under the Term Loan Facility, (ii) 1903 Partners, LLC, Tiger Finance, LLC, and ReStore Capital (BIG), LLC, who together hold a majority of the outstanding term loans (the "Term Lenders"), (iii) PNC Bank, N.A. ("PNC"), as the administrative agent under the prepetition ABL Facility, and (iv) the lenders under the ABL Facility.

[5]   The Committee's investigation is particularly focused on the $122.5 million Term Loan Facility entered into on April 19, 2024, just five months before the Debtors' bankruptcy filing.  1903P is the agent under the Term Loan Facility and 1903 Partners, LLC is one of the lenders thereunder.  Both of these entities are affiliates of Gordon Brothers Retail Partners, LLC ("GBRP"), the party conducting the store closing sales pursuant to the *Final Order (I) Authorizing Debtors to Assume the Consulting Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [Docket No. 576].  Given the multiple roles held by, and potentially conflicting interests of, GRBP and its affiliates, the Committee is conducting a thorough investigation into the Debtors' historical transactions with these parties.

[6]   Further, because the Stalking Horse APA requires, as a condition to closing, the Buyer to directly repay the Secured Parties on account of their purported secured claims instead of the estates, the Committee requests that the Sale Order include the following proviso: "In the event the Committee timely commences a Challenge, the Committee's right to seek an equitable remedy to protect the estates' interests pending determination of such Challenge shall be expressly preserved, and the Court shall be authorized to fashion an equitable remedy to address such Challenge."

- The sale of claims against other third parties, such as directors, officers, and other insiders, will permit the Debtors to circumvent the protections afforded to creditors under the chapter 11 plan process. It is entirely inappropriate for the Debtors to release these claims outside of a chapter 11 plan, which has not yet been—and may never be—proposed here. If the Committee's investigation ultimately reveals valuable causes of action against these parties, such claims should be transferred to a trust and pursued for the benefit of unsecured creditors.

- The Debtors have not met, and cannot meet, their burden to demonstrate that the sale of the Litigation Assets serves a legitimate business purpose. The Committee has no objection to the sale of Go-Forward Creditor Claims. The Litigation Assets, however, can easily be carved out from the sale and litigated without impacting the post-close business. The Debtors' desire to improperly secure broad plan releases for their directors, officers, and other insiders outside of a chapter 11 plan is not a legitimate business purpose justifying the sale of these claims.

- The Debtors have not met, and cannot meet, their burden to demonstrate that the proposed sale price for the Litigation Assets is fair. The Stalking Horse APA does not allocate any value to these assets. Upon information and belief, the Debtors have not conducted, and do not intend to conduct, any investigation into these claims, and the Committee doubts that Nexus explicitly sought to purchase these claims during the parties' negotiations.[7] The Debtors have not met their burden to demonstrate that the proposed purchase price for these assets is fair or to support their apparent position that these claims have no value.

- The sale of the Litigation Assets will strip the estates of the only remaining potential source of recovery for unsecured creditors. As discussed, the proposed sale is expected to fully satisfy the Secured Parties' claims, but will not yield any distributable value to unsecured creditors. It is critical that the Litigation Assets be retained by the estates, subject to a fulsome investigation, and, if such claims are valuable, pursued for the benefit of unsecured creditors.

The Committee also objects to the Designation Rights Amendment, which was negotiated at the Auction in the absence of any competing bid. The amendment will allow Nexus to direct the Debtors to keep remaining stores open through the effective date of a chapter 11 plan, during which time Nexus may designate such leases for assumption and assignment to Nexus, its

---

[7] On November 1, 2024, the Committee served targeted discovery requests on the Debtors and Nexus seeking documents and communications evidencing the parties' negotiations regarding the sale of the Litigation Assets, if any. *See* Docket Nos. 960, 962, 963, 965. These requests remain pending as of the date hereof.

affiliates, or unrelated third parties (presumably for a fee).[8]  The amendment further permits Nexus

to operate in the leased premises during the Designation Rights Period "to the maximum extent

permitted by law."

The Court should not approve the Designation Rights Amendment for the following

reasons:

- The Designation Rights Amendment will expose the estates to significant administrative liability.  Although the Buyer has agreed to be responsible for any "additional costs incurred by the Debtors' estates in connection with such designation, assumption, and/or assignment" of these leases,[9] the Debtors, as the tenant, would remain primarily liable for any damages and claims (including personal injury incidents that may occur due to Buyer's negligence) that arise during the Designation Rights Period.

- The Designation Rights Amendment will prejudice the Debtors' landlords. Following conclusion of the final wave of store closing sales in December 2024, the Debtors will cease operations.  Thus, the Debtors' stores will either be unoccupied/dark or occupied by Nexus during the Designation Rights Period, either of which will likely violate the terms of the Debtors' leases.  Further, absent an agreement between Nexus and the Debtors' landlords, the landlords' only recourse for damages incurred during the Designation Rights Period may be filing claims against the estates, which will likely have no material assets at that time.  In short, the Designation Rights Amendment effectively creates a sublease or assignment without proper landlord consent and without complying with the formal lease assignment process (and protections therein) under the Bankruptcy Code.

- The Designation Rights Amendment, which was negotiated for no additional consideration, will permit Nexus to usurp the existing lease sale process and retain the upside from the Debtors' leasehold assets for itself.  The Debtors originally intended to market any leases not acquired by Nexus for sale or termination by the landlord, with the estates receiving the benefit (*i.e.*, cash or claims waivers) of those transactions.

- The Designation Rights Amendment runs afoul of section 365(d)(4) of the Bankruptcy Code, which requires the Debtors to assume or reject leases by the

---

[8]    Prior to the negotiation of this amendment, Nexus was required to designate contracts for assumption and assignment before the Sale Hearing, subject to potential modification, amendment, or supplement prior to closing, with such contracts to be assumed and assigned at closing.

[9]    It is unclear whether the Buyer has agreed to reimburse the Debtors for any and all claims that may arise during the Designation Rights Period, including non-ordinary course claims, such as personal injury claims and claims for damages to the premises by third parties.

earlier of 120 days from the Petition Date or the date a plan of reorganization is confirmed, absent an extension of the Court.  The Designation Rights Period will extend through the effective date of a chapter 11 plan, which could occur well after the existing January 7, 2025 section 365(d)(4) deadline.

Finally, before the sale can be approved, the Debtors must clarify the date they have used to determine whether claims are entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code for goods received by the Debtors in the 20 days prior to the Petition Date.  The Committee has reason to believe that the Debtors are incorrectly calculating the estates' outstanding section 503(b)(9) liabilities under Third Circuit law by using the date title to the goods was transferred to the Debtors instead of the date the goods were physically received by the Debtors in the United States.[10]  The Buyer's assumption of certain 503(b)(9) claims is an integral component of the sale consideration.  The Committee cannot adequately evaluate the transaction and whether the estates will be administratively solvent following sale closing absent clarification from the Debtors on the record regarding this point.

The Committee submits that these objections are not material to the sale—the Litigation Assets can be carved out from the transaction and, if valuable, pursued without disrupting the new business.   Likewise, the Designation Rights Amendment was negotiated for no additional consideration only days ago after the Debtors failed to receive a competing Qualified Bid.  While the Committee supports the sale to Nexus generally, it cannot support the sale in its current form.  Absent the requested modifications, the sale will abrogate the Committee's investigation rights, immunize the Secured Parties from challenge, release potentially valuable estate claims against

---

[10]   As this Court is aware, in *In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017), the Third Circuit held that goods are not "received by the debtor" under section 503(b)(9) of the Bankruptcy Code at the time title is transferred and the debtor takes constructive possession of the goods, nor are they "received by the debtor" when delivered to a common carrier.  Here, with respect to at least certain vendors, the Debtors have taken the position that the goods were "received" when title transferred well before the Debtors received the goods in the United States, which position the Committee asserts does not comply with governing law.

the Debtors' directors, officers, and insiders outside of a chapter 11 plan, and subject the estates and their creditors to significant damages through an indefinite Designation Rights Period for the Buyer's sole benefit.  For the foregoing reasons, the Court should sustain this Limited Objection.

## BACKGROUND

### I.      The Chapter 11 Cases

1.      On September 9, 2024 (the "Petition Date"), each of the Debtors commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  These Chapter 11 Cases have been jointly consolidated for administrative purposes only.

2.      On September 23, 2024, the United States Trustee for Region 3 appointed the Committee.  *See* Docket No. 248.

3.      Additional information regarding the Debtors, including their businesses and affairs, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Pleadings* [Docket No. 3].

### II.     The Stalking Horse APA and Sale Process

4.      On September 9, 2024, the Debtors filed the Bidding Procedures Motion, which sought, among other things, approval of bidding procedures and approval to designate Nexus as the Stalking Horse Bidder for substantially all of the Debtors' assets.  The Stalking Horse APA is attached to the Bidding Procedures Motion as Exhibit C.

#### A.      Claims to Be Sold Under the Stalking Horse APA

5.      Under the Stalking Horse APA, Nexus will purchase substantially all of the Debtors' assets unless such assets are expressly designated as "Excluded Assets" thereunder. Specifically, section 2.01(b)(viii) provides that Nexus will purchase:

> all rights, claims, accounts, and causes of action (including warranty and similar claims) of Seller or any of its Subsidiaries against any Persons (other than another Selling Entity) (regardless of whether such claims and causes of action have been asserted) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement, and other rights of recovery, including rights to insurance proceeds, possessed by Seller or any of its Subsidiaries (regardless of whether such rights are currently exercisable).

*See S*talking Horse APA, § 2.01(b)(viii).  This subsection designates all estate claims and causes of action as "Assets" to be sold to Nexus.

6.      Although such claims would be encompassed under the purview of section 2.01(b)(viii), the Stalking Horse APA further provides that Nexus will purchase (i) "all rights, claims, or causes of action relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interests" and (ii) "all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state Applicable Law . . . solely relating to vendors and service providers used in the Business after the Closing[.]"  *See* Stalking Horse APA, §§ 2.01(b)(xvi), (xviii).

7.      Under the Stalking Horse APA, the "Excluded Assets" include, among other things, "all Avoidance Actions or similar causes of action arising under Sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, other than any such Avoidance Actions or causes of action that relate to, or constitute part of, the Assets…[.]"  *See* Stalking Horse APA, § 2.02(l).  This carve-out is illusory because under section 2.01(b)(viii) all estate claims are "Assets"

that will be sold to Nexus.  Thus, under the plain language of the Stalking Horse APA, Nexus will acquire any and all estate causes of action.

**B.    The Consideration to the Estates Under the Stalking Horse APA**

8.    The purchase price under the Stalking Horse APA is comprised of: (i) $2,500,000 in cash, (ii) the "Debt Payoff Amount" (i.e., the outstanding secured debt obligations),[11] and (iii) the assumption of certain "Assumed Liabilities."  *See* Stalking Horse APA, § 3.01.

9.    The Stalking Horse APA requires, as a condition to closing, Buyer to fully repay the outstanding secured debt obligations directly to the applicable Secured Parties.  *See* Stalking Horse APA, §§ 4.02(b), 4.03(a), 11.04.

10.    Thus, the proposed sale will not provide for any cash proceeds to the estates that could form the basis of distributions to general unsecured creditors, nor will it leave any valuable assets in the estates that could be monetized for unsecured creditors following closing.

11.    The main source of value to unsecured creditors stems from Nexus' agreement to acquire the "Assumed Liabilities," including, among other things, all "Liabilities against any of the Selling Entities arising under section 503(b)(9) of the Bankruptcy Code" subject to the "503(b)(9) Liabilities Adjustment[.]"[12]  *See* Stalking Horse APA, § 2.03.

---

[11]    "Debt Payoff Amount" is defined as the "amount of cash necessary to pay in full the Repaid Indebtedness (excluding any contingent indemnification obligations for which no claim has been made as of the date of such payment)."  In turn, "Repaid Indebtedness" is defined as the "ABL DIP Obligations, the Pre-Petition ABL Obligations, the Term DIP Obligations and the Pre-Petition Term Obligations."  *See* Stalking Horse APA, § 1.01. The Committee understands Buyer will satisfy this component of the purchase price through third-party financing.

[12]    "503(b)(9) Liabilities Adjustment" means, as of immediately before the Closing, an amount, which may be a positive or negative number, equal to (a) all Liabilities against any of the Selling Entities arising under section 503(b)(9) of the Bankruptcy Code (whether paid or unpaid) as reasonably determined by Seller in good faith consistent with the principles and methods used to prepare the $49,900,000 estimate, minus (b) $49,900,000.  *See* Stalking Horse APA, § 1.01.

12.     Based on information provided to date, the Committee understands that, with respect to certain vendors, the Debtors have taken the position that the goods were received by the Debtors for purposes of section 503(b)(9), and by extension section 503(b)(1), of the Bankruptcy Code when the title to the goods transferred to the Debtors while the goods were still in transit abroad.  As discussed herein, the Committee asserts this position is legally incorrect under governing Third Circuit law and thus has reason to believe the Debtors' estimate of the 503(b)(9) claims pool is inaccurate.

###### C.     The Results of the Sale Process

13.     On October 25, 2024, the Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Docket No. 612] (the "<u>Bid Procedures Order</u>"), which, among other things:

     a.    established certain bidding procedures to govern the sale of the Debtors' assets;

     b.    scheduled the Bid Deadline as October 28, 2024 at 12:00 p.m. (ET), the Auction for October 30, 2024 at 10:00 a.m. (ET); and the Sale Hearing for November 12, 2024 at 1:30 p.m. (ET);

     c.    approved Nexus as the Stalking Horse Bidder; and

     d.    granted Nexus certain Bid Protections in connection with its bid.

14.     Although the Debtors received one additional bid in advance of the Bid Deadline, the Debtors ultimately determined, in consultation with the Committee, that such bid was not a Qualified Bid.

15.     On October 30, 2024, the Auction was held.   At the Auction, (i) the Debtors announce the Stalking Horse Bid as the Successful Bid, subject to certain modifications to the Stalking Horse APA read into the record, and (ii) the Committee reserved all rights with respect to the Stalking Horse APA, including the recently proposed modifications thereto.

16.     That same day, the Debtors filed the *Notice of Successful Bidder for the Sale of the Debtors' Assets* [Docket No. 661] (the "Auction Notice"), which set forth the proposed modifications to the Stalking Horse APA on Exhibit A thereto (the "APA Amendments").   The APA Amendments include, among other things:

**1. Target Closing Date**: December 2, 2024 or December 3, 2024, assuming all conditions to closing have been met and so long as any additional costs associated with December rent and other December monthly costs are assumed and paid by the Buyer.

**2. Transition Services Agreement**: Debtors agree to provide TSA services that Buyer reasonably requests at fully loaded cost (subject, for the avoidance of doubt, to the Debtors' ability to provide such services), including (a) certain employee benefits specified by Buyer until February 15, 2025 and (b) use of existing bank accounts to operate business for a reasonable period of time to permit orderly transition, if necessary (to be clear, Buyer would not be acquiring any cash that the Debtors are entitled to retain that is held in their bank accounts).

**3. Post-Closing Designation of Leases**: From and after the Closing through the effective date of a chapter 11 plan of liquidation, the Buyer shall have the right to cause any Debtor to designate additional leases that have not yet been rejected by such Debtor to Buyer, its affiliates, and third parties (subject to appropriate notice and opportunity to object for counterparties); provided that any additional costs incurred by the Debtors' estates in connection with such designation, assumption, and/or assignment (including in respect of notice and objection) shall be paid for by the Buyer at the fully loaded cost.   To the maximum extent permitted by law, if requested by Buyer, Buyer and the Debtors will agree to reasonable accommodations under the TSA to permit the operation of any leased facilities retained by the Debtors for that period, at the direction of Buyer and at Buyer's sole cost and expense.

**4. Management of Real Estate/Lease Sales:** Before the Closing, parties will reasonably consult with each other regarding the disposition of real estate and leases upon the other party's request, and Debtors will reasonably cooperate (at the sole cost and expense of Buyer) with Buyer to (a) provide Buyer with information regarding parties that have expressed or in the future express interest in owned and leased real property, and (b) facilitate conversations that Buyer may request regarding such matters with prospective buyers and the Debtors' employees and consultants (the "Lease Sale Amendment").

11

*See* Auction Notice, Ex. A, ¶¶ 1-4.

17.    As of the date hereof, the Debtors have not yet filed a revised Stalking Horse APA incorporating the APA Amendments.  However, based on the information provided to date, taken together, the Designation Rights Amendment and Lease Sale Amendment will:

a.    Permit Nexus to direct the Debtors to keep stores open, even after the Debtors have ceased operations, during the Designation Rights Period which will run through the effective date of a chapter 11 plan;

b.    Allow Nexus to designate any leases that have not been rejected for assumption and assignment to Buyer, an affiliate, or an unrelated third party during the Designation Rights Period;

c.    Allow Nexus (and potentially an affiliate) to operate in the leased premises prior to assumption and assignment of the applicable lease "to the maximum extent provided by law", notwithstanding the fact that such landlords will only be in privity of contract with the Debtors;[13] and

d.    Require the Debtors to provide Buyer with information about parties who may be interested in purchasing the Leases that the Debtors were, prior to the negotiation of the APA Amendments, directly marketing and selling for the benefit of the estates and their creditors.

18.    The Debtors have not yet proposed a chapter 11 plan or discussed the terms (including the timing) of any such plan with the Committee.  The Debtors' 120-day exclusivity period to file a plan of reorganization will expire on January 7, 2025.  *See* 11 U.S.C. § 1121(b).

19.    Prior to negotiation of the APA Amendments, Nexus was required to designate any leases and contracts for assignment prior to the Sale Hearing, subject to potential modification, amendment, or supplement prior to closing, which would then be assumed and assigned at closing. *See* Stalking Horse APA, § 2.05; Bid Procedures Order, ¶¶ 24, 26.

---

[13]    As discussed herein, the Designation Rights Amendment will likely violate most, if not all, of the Debtors' leases, which typically have restrictions prohibiting the unauthorized sublease, third party occupancy, or unoccupancy of the leased premises.

20.     Following the sale closing, the Debtors will have limited assets and employees. Their only remaining obligations will be to conclude the final wave of store closing sales (expected to end no later than December 2024), and to provide the TSA services to the Buyer.

21.     Absent an extension approved by this Court, the Debtors' time to assume or reject their unexpired real property leases under section 365(d)(4) of the Bankruptcy Code will expire on January 7, 2025.

### III.    The Committee's Investigation

22.     Shortly following its appointment, the Committee commenced its investigation into potential estate claims and causes of action against the Debtors' Secured Parties and other third parties, such as the Debtors' current and former directors and officers.  Based on information provided to date, the Committee understands that the Debtors did not conduct, and does not intend to conduct, any meaningful investigation into such claims.

23.     On October 22, 2024, the Court entered the *Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 584] (the "Final DIP Order").  The Final DIP Order established November 7, 2024 at 12:00 p.m. (ET) as the Challenge Deadline for parties in interest, including the Committee, to commence a Challenge against the Secured Parties (and certain related entities).[14]  *See* Final DIP Order, ¶ 42.

---

[14]    The Committee agreed to a shortened Challenge Period in connection with an agreed resolution of the Committee's objection to the relief sought in the DIP Motion.  As stated on the record during the October 21, 2024 hearing to consider the relief sought in the DIP Motion on a final basis, the Committee's agreement to shorten the Challenge Period was expressly contingent on cooperation from the Debtors and Secured Parties. *See*

24.     Given the impending deadline, the Committee prioritized its investigation of potential claims and causes of against the Secured Parties and, to that end, on October 17, 2024 and October 18, 2024, the Committee served comprehensive discovery requests on the Debtors, 1903P, PNC, and GBRP (collectively, the "Producing Parties").  *See* Docket Nos. 599, 600, 601, 602.  After various meet and confer sessions with each of the Producing Parties, the Committee and the Producing Parties were able to avoid significant discovery disputes.  To date, the Committee has received over 13,500 documents from the Producing Parties and has reviewed the vast majority of documents produced.  However, because certain of the Producing Parties are still in the process of producing documents that the Committee will require time to review and analyze, the Committee engaged the Secured Parties in good faith discussions regarding a further extension of its Challenge Deadline.  At a hearing held on November 5, 2024, the Court extended the Challenge Deadline for the Committee and Blue Owl Real Estate Capital LLC through and including November 15, 2024, without prejudice for these parties to seek an additional extension for cause.  The Committee is currently conferring in good faith with the Secured Parties regarding a further extension of the Challenge Deadline to accommodate the Committee's pending discovery requests.

25.     With respect to the Committee's investigation of estate claims not subject to the Challenge Deadline (*i.e.*, claims against directors, officers, and other insiders), the Committee's investigation into such claims is in its early stages, and the Committee expects to focus on these claims after concluding its investigation of the Secured Parties.

---

Oct. 21, 2024 Hr'g Tr. at 112:23-113:3 ("The committee did agree to a shortened challenge period here.  That, of course, presumes that the company, its advisors, as well as the lenders, will be responsive to the various discovery requests, if the committee needs, in an expedited fashion to allow the committee to do this work on an expedited basis.").

26.     In furtherance of this Limited Objection, on October 30, 2024, Committee counsel emailed counsel for the Debtors and Nexus requesting that the parties carve out the Litigation Assets from the sale.  On November 1, 2024, the Committee served targeted discovery requests on both the Debtors and Nexus requesting all documents and communications evidencing the negotiations of the value or purchase of any estate claims and causes of action under the Stalking Horse APA.  *See* Docket Nos. 960, 962, 963, 965.  The Committee has not yet received a response to these requests from either party.

## LIMITED OBJECTION

27.     One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of all creditors.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate).  In determining whether to authorize the use, sale, or lease of property of the estate under section 363(b), courts require the debtor to show that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith.  *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  As set forth herein, certain aspects of the Stalking Horse APA and the proposed APA Amendments do not satisfy these requirements and therefore should not be approved by the Court.

**A.     The Court Should Not Approve the Sale of Litigation Assets**

**i.     Through the Sale of Litigation Assets, the Debtors Seek *De Facto* Plan Releases Without the Protections Afforded to Creditors Under the Plan Confirmation Process**

28.     Section 363 asset sales should not be used to circumvent the protections for unsecured creditors mandated by the Bankruptcy Code.  *In re WestPoint Stevens, Inc.*, 333 B.R.

30, 52 (S.D.N.Y. 2005), *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures").  Pre-plan sales are sometimes approved if there is a sound business justification supported by a multitude of factors, with the most important factor often being whether the debtor's assets are rapidly decreasing in value such that an expeditious sale is necessary to maximize the value of the assets. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (noting that relevant factors may include the proportionate value of the asset to the estate as a whole, the amount of time elapsed since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale, or lease the proposal envisions, and whether the asset is increasing or decreasing in value); *see also In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) ("Typically, courts have approved § 363(b) sales to preserve wasting asset[s].") (internal quotations omitted), *vacated as moot sub. nom.*, *Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009).

29.    Further, in *Abbotts Dairies*, the Third Circuit held that the "good faith" requirement of a section 363 sale should be used as assurance that a debtor does not, by means of an asset sale, abrogate the protections afforded to creditors and shareholders by section 1129 of the Bankruptcy Code and the plan confirmation process.  *In re Abbotts Dairies, Inc.,* 788 F.2d 143, 150 (3d Cir. 1986).  Additionally, the court expressed concern that section 363 sales should not be used to circumvent the protections afforded to creditors under the plan confirmation process and section 1129 of the Bankruptcy Code.  *See id.*

30.     The sale of the Litigation Assets essentially amounts to a restructuring without observing the creditor protections mandated in the chapter 11 plan process.  If the Court approves the sale of the Litigation Assets, it will essentially be granting blanket backdoor releases to the Debtors' current and former lenders, directors, officers, affiliates, equity holders, and countless unidentified third parties outside of a chapter 11 plan, which has not been—and may never be— proposed here.  *See, e.g.*, *In re Dewey Ranch Hockey, LLC,* 414 B.R. 577, 592 (Bankr. D. Ariz. 2009) ("Because there is a real danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under Section 363 must be scrutinized closely by the court."); *see also In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("At issue is Debtor's sale of all or substantially all of its assets, outside of a plan of reorganization.  Such relief is not unusual or inappropriate, but requires a bankruptcy court's careful review.").

31.     Here, the Debtors have not offered any evidence to support that the sale protects the estate, creditors, and other parties-in-interest, or that the sale of the Litigation Assets was proposed in good faith.  As discussed, the Litigation Assets represent the only potential source of recovery for unsecured creditors.  The Debtors should not be permitted to release these claims outside of a chapter 11 plan process, which would provide full disclosure to creditors regarding the nature of the proposed releases and any investigation conducted with respect to such claims, and the opportunity to object to and/or vote in favor of such releases thereunder.

### ii.     The Debtors Have Not Met Their Burden to Demonstrate that the Sale of the Litigation Assets Serves a Sound Business Purpose and that the Proposed Consideration for the Sale of the Litigation Assets is Fair

32.     Under the business justification standard, courts must consider whether the purchase price is fair and whether there is a sound business purpose for the sale.  *See Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (holding that when a debtor sells substantially all of its assets

outside of the ordinary course of business it must demonstrate that: "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair and reasonable; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith").  It is the Debtors' burden to demonstrate that the sale satisfies these requirements.  *See id.* at 175.

33.    The Debtors have failed to demonstrate that the sale of the Litigation Assets serves a legitimate business purpose.  Unlike the Go-Forward Creditor Claims, the Litigation Assets are not necessary to the operations of the new business.  The Litigation Assets can easily be carved out from the Sale Transaction, and litigation against these parties would not interfere with the operations of the Buyer's business.  The Debtors' desire to secure broad plan releases for directors and officers who will not be involved in the operations of the go-forward business is not a "sound business purpose" sufficient to justify a sale of those claims under section 363(b) of the Bankruptcy Code.

34.    Further, neither the Debtors nor the Buyer have offered any evidence to value the Litigation Assets to support that the proposed sale price—presumably $0[15]—is in fact a fair sale price.  It is the Debtors' burden to establish that the price at which they propose to sell substantially all of their assets is fair, which requires information on the value of the assets being sold, including the business itself and the claims being released.  *Exaeris*, 380 B.R. at 744 ("It is the burden of the proponents of the sale to establish that the price is fair which would require information on the value of the assets being sold, including the… claims being released.").  Upon information and belief, the Debtors have not conducted any investigation into these claims.  Accordingly, the Litigation Assets should be preserved for the benefit of unsecured creditors, or at the very least

---

[15]    The Stalking Horse APA does not allocate any value to any subset of the Debtors' assets.  Upon information and belief, however, the Debtors and Buyer value these claims at $0, notwithstanding the fact that no meaningful investigation has been conducted.

releases should only be granted in the context of a chapter 11 plan once the Committee has had the opportunity to complete its investigation.

35.     For these reasons, section 363 sales approved in this jurisdiction and others routinely limit the claims sold to only those against the Debtors' employees, vendors, landlords, and contract counterparties that the Buyer has designated as essential to the new business.  *See, e.g.*, *In re LL Flooring, Inc.*, Case No. 24-11680 (BLS) (Bankr. D. Del. Sept. 16, 2024) [Docket No. 336] (approving asset purchase agreement limiting sale of litigation claims to those counterparties to assigned contracts and leases, customers, suppliers, vendors, and merchants); *In re Rockport Co., LLC*, Case No. 23-10774 (BLS) (Bankr. D. Del. July 7, 2023) [Docket 275] (approving asset purchase agreement contemplating sale of only those claims against "any customer, supplier, manufacturer, distributor, broker, vendor of any seller or any other person with whom any seller ha[d] an ordinary course commercial relationship"); *In re NewAge, Inc.*, Case No. 22-10819 (LSS) (Bankr. D. Del. Oct. 17, 2022) [Docket No. 224] (approving asset purchase agreement limiting sale to only those claims relating to "vendors and service providers that are counterparties to assigned Contracts or to the extent relating to assumed liabilities").

**B.     The Court Should Not Approve the Designation Rights Amendment**

36.     The Designation Rights Amendment should not be approved because it materially increases the estates' administrative claim exposure (for no apparent consideration) and prejudices the Debtors' landlords.  Prior to the negotiation of this amendment only days ago, Nexus was required to designate any leases for assignment prior to the Sale Hearing, subject to potential modification, amendment, or supplement prior to closing, which would then be assumed and assigned at closing.  Any leases not acquired by Nexus at closing would then either be sold to a third party or terminated by the landlord by the end of December 2024 pursuant to the Lease Sale

Procedures approved by this Court or rejected by the end of December 2024 after the completion of the final store closing sales.  The Designation Rights Amendment permits Nexus to direct the Debtors to keep these locations open during the Designation Rights Period, either with no occupant or with Nexus operating in the Debtors' stead.

37.    Although the Designation Rights Amendment contemplates that "any additional costs incurred by the Debtors' estates in connection with such designation, assumption, and/or assignment (including in respect of notice and objection) shall be paid for by the Buyer at the fully loaded cost," the estates will still be primarily liable for claims that arise during the Designation Rights Period as the tenant under the Lease.  For example, if a patron is injured on the leased premises during the Designation Rights Period (during which time Nexus would be operating as Big Lots), the estates would still be liable for such damages, notwithstanding the agreement between the Debtors and Nexus.  Likewise, if the leased premises are damaged during the Designation Rights Period, the landlords would be entitled to assert claims against the estates.  Although the amendment includes cursory language suggesting that Nexus will compensate the Debtors for "costs incurred by the Debtors' estates in connection with such designation, assumption, and/or assignment," it is not clear that Nexus will compensate the Debtors for non-ordinary course expenses and claims that arise during the Designation Rights Period.  Further, *even if* Nexus did agree to a broad reimbursement policy, the estates would nonetheless remain primarily liable for such liabilities as the tenant under the leases.  In short, the Designation Rights Amendment will subject the estates to nothing but additional risk and downside and should not be approved.

38.    For substantially the same reasons, the Designation Rights Amendment will prejudice the Debtors' landlords because:

a. The amendment will likely violate every one of the Debtors' leases, which typically prohibit non-occupancy or "dark" periods, unauthorized subleases, assignments, and occupancy by third parties other than the tenant.[16]  Pending assumption and assignment or rejection, the Debtors must comply with these lease terms in accordance with section 365(d)(3) of the Bankruptcy Code.  *See* 11 U.S.C. § 365(d)(3).

b. The amendment effectively creates a sublease or assignment without proper landlord consent and without going through a formal lease assignment process pursuant to the Bankruptcy Code and the terms of the lease itself.

c. Permitting the Buyer to operate the store could run afoul of various tenant use/compliance provisions in the lease.  In the case of a shopping center, the leases of adjoining tenants could potentially be violated.

d. Absent a separate contract with Nexus, the landlords only recourse for damages incurred during the Designation Rights Period will be to file claims against the estates.  At that juncture in the Chapter 11 Cases, the Debtors will be mere shells, with no operating assets and limited employees.

e. The amendment will likely run afoul of the Debtors' deadline to assume or reject leases under section 365(d)(4), which is currently set to expire on January 7, 2025.  As currently drafted, the Designation Rights Period will extend through the effective date of a chapter 11 plan, which has not yet been proposed.  Absent compliance with 365(d)(4), landlords may have difficulty making arrangements to timely re-let the space.

39.    In short, there is no authority for the Debtors and Nexus to manufacture a new form of occupancy through contract provisions purporting to allow Nexus to use and occupy the leased premises.  Indeed, it has been held that, where a debtor has ceased operations, "any continued use of the leased premises by [a] successful auction bidder would be tantamount to an assignment of the Debtors' interest in those affected premises," requiring compliance with sections 365(b) and (f)(2) of the Bankruptcy Code.  *In re Antwerp Diamond, Inc.,* 138 B.R. 865, 867 (Bankr. N.D. Ohio 1992).  Moreover, Nexus should not be permitted to displace the Debtors' business judgment

---

[16]    While section 365(f) of the Bankruptcy Code invalidates prohibitions and restrictions on the assignment of real property leases, the statute does not speak to subletting, license agreements, or other occupancy arrangements.

by requiring them to operate in the leased premises at Nexus' direction during the Designation Rights Period as a potential workaround the legal issues outlined herein.

40.    For the reasons discussed above, the Court should not approve the Designation Rights Amendment.  It should also be noted that, as of the date hereof, the Debtors have not yet filed a Revised Stalking Horse APA incorporating the Designation Rights Amendment and any related procedures that may govern this process.  The Committee reserves its rights with respect to the revised APA and asserts that the Debtors' landlords should be afforded a meaningful opportunity to review these provisions and, if necessary, object before any hearing to consider such relief.

## C.    The Debtors Must Clarify Their 503(b)(9) Allocation Method at or Prior to the Sale Hearing

41.    Finally, the Court should not approve the sale absent clarification from the Debtors regarding the date the Debtors have used to assess the section 503(b)(9) claims pool.  The Committee disagrees with the Debtors' position that, with respect to at least certain vendors, the claims were "received" by the Debtors for purposes of section 503(b)(9) when title was transferred while the goods were still in transit abroad.  The Third Circuit has expressly rejected this position in *In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017) (rejecting argument that goods were "received by the debtor" when title is transferred and the debtor takes constructive possession of the goods, and when goods are delivered to a common carrier.).

42.    Under the Stalking Horse APA, Buyer has agreed to assume the 503(b)(9) Claims subject to certain caps.  The Committee cannot evaluate this component of the bid without clarity on the Debtors' allocation methodology.  If the Debtors are, as the Committee suspects, improperly estimating the 503(b)(9) claims pool, these liabilities may be much higher than what is currently reflected in the Debtors' forecasts.  Absent clarity on this point, the Committee cannot ascertain

how many 503(b)(9) claims will remain unpaid after the sale, whether the budget is accurate, or whether these estates will be administratively solvent post-closing.  Given the foregoing, the Committee requests that the Debtors clarify, either on the record or through a supplemental declaration, their position regarding which date they are using to determine whether goods are "received by the Debtors" under the statute.

*[Remainder of Page Left Intentionally Blank]*

**WHEREFORE**, the Committee respectfully requests that this Court sustain this Limited Objection and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated: November 6, 2024
       Wilmington, Delaware

COLE SCHOTZ P.C.

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel:   (302) 652-3131
Fax:   (302) 652-3117
Email: jalberto@coleschotz.com
       snewman@coleschotz.com

*-and-*

Sarah A. Carnes, Esq. (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Tel:   (212) 752-8000
Fax:   (212) 752-8393
Email: scarnes@coleschotz.com

*-and-*

MCDERMOTT WILL & EMERY LLP

Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
Stacy Lutkus (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY, 10017
Tel:   (212) 547-5400
Fax:   (212) 547-5444
Email: dazman@mwe.com
       kgoing@mwe.com
       salutkus@mwe.com
       nrowles@mwe.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*