## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BIG LOTS, INC., *et al.*, | ) Case No. 24-11967 (JKS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Hearing Date: Nov. 12, 2024, at 1:30 p.m. Eastern** |
| | ) **Objection Deadline: Nov. 6, 2024, at 4:00 p.m. Eastern** |
| | ) |
| | ) **Re: Docket No. 683** |
| | ) |

## OBJECTION OF CAMBRIDGE INVESTMENT INC.
## TO THE POTENTIAL ASSUMPTION AND ASSIGNMENT
## OF LEASE AND PROPOSED CURE AMOUNT

Cambridge Investment, Inc. ("Landlord"), by its undersigned counsel, hereby files this objection (the "Objection") to the potential assumption or assignment of its lease with the Debtors pursuant to the *Notice of Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "Cure Notice") [Docket No. 683] on the principal grounds that (i) the proposed cure payment fails to cure all known pre- and post-petition amounts owed to Landlord; (ii) the Debtors fail to cure or provide for the cure of existing non-monetary lease defaults; (iii) the Debtors have not met their burden of showing adequate assurance of future performance by the proposed assignee because they have not sufficiently demonstrated the assignee's ability to perform under the lease; and (iv) the proposed assumption and assignment improperly alters and impairs Landlord's rights under the lease and therefore fails to provide for the assumption and assignment of the Leases *cum onere* as required by the Bankruptcy Code.  In support of this Objection Landlord states as follows.

**BACKGROUND**

**A. The Noblesville Lease**

1.      Landlord is the owner of a shopping center located at 1930 Conner Street, Noblesville, Indiana (the "Shopping Center") where the Debtors operate Big Lots store number 5117 (the "Noblesville Store"), comprising approximately 31,000 square feet, pursuant to a certain Lease Agreement dated April 10, 2009 (as amended, the "Lease").  The Lease is attached hereto as Exhibit A.  The Lease is a "lease of real property in a shopping center" as that term is used in section 365(b)(3) of the Bankruptcy Code. *See, e.g., In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1087 (3d Cir. 1990); *In re Three A's Holdings, LLC*, 364 B.R. 550, 560 (Bankr. D. Del. 2007).

2.      The following Lease provisions are relevant to this Objection:

a.      <u>Prohibited Uses</u> – Section 4(B) of the Lease contains an extensive list of specifically prohibited uses of the Noblesville Store:

> Except for existing tenants as of the date of this Lease, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices provided however that such a use shall be permitted if it is limited to 5,500 square feet in floor area or less or if it is located more than 100 linear feet from the Demised Premises; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage payable by Tenant on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product

or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations provided however that such a use shall be permitted if it is limited to 5,500 square feet in floor area or less or if it is located more than 100 linear feet from the Demised Premises; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xxiii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia.

b. <u>Rent</u> – Section 5(A) of the Lease provides that rent is due to Landlord on the first day of each month.

c. <u>Reimbursable Expenses</u> – Sections 5(D) and (E) provides that the Debtors are responsible for paying their pro rata share of real estate taxes assessed with respect to the Shopping Center (the "Real Estate Taxes") and Common Area Maintenance ("CAM") charges.

d. <u>Maintenance and Repairs</u> – Section 7 of the Lease provides that the Debtors are responsible for the maintenance of and repairs to the interior portions and systems of the Noblesville Store as follows:

> Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

e. <u>Indemnification</u> – Section 11 of the Lease states that "Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder."

The Lease also obligates the Debtors to indemnify Landlord for various other liabilities, including liabilities with respect to any contest by the Debtors of real estate taxes asserted with respect to the Noblesville Store (Section 5(E)); fixtures or equipment installed by the Debtors (Section 9); failure to obtain such insurance subrogation waivers (Section 21); claims for fees or commissions asserted by real estate brokers (Section 28); and release of hazardous materials from the Noblesville Store caused by the Debtors (Section 30).

f. <u>Insurance</u> – Section 12 of the Lease requires the Debtors "to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar

4

($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date."

g.   Attorneys' Fees – Section 40 of the Lease provides that "[i]n the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party."

**B.  The Bankruptcy Case**

3.      On September 9, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these chapter 11 cases (collectively, the "Bankruptcy Cases").

4.      On September 9, 2024, the Debtors filed their *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. 18].

5.      On September 20, 2024, the Debtors filed their *Notice of Filing of List of Additional Closing Stores Pursuant to the Interim Order (I) Authorizing Debtors to Assume the Consulting Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* (the "Notice of Closing Stores") [Docket No. 239].  The Notice of Closing Stores lists the Noblesville Store as a store at which the Debtors intend to conduct a store closing sale.  Following the filing of the Notice of Closing Stores, the Debtors prominently posted signage

5

both outside and inside the Noblesville Store announcing the store closing sale and liquidation of the store's inventory.  Photographs of the signage advertising the store closing and liquidation sale posted in and around the Noblesville Store are attached as <u>Exhibit B</u> to this Objection.  The Debtors also posted signs advertising the sale of the equipment and fixtures necessary to operate the store, including store shelving and racks, stock picking ladders, beverage coolers, and hand trucks and carts, with several items already noted as being sold.  *See* Exhibit B.

6.     On October 16, 2024, the Debtors filed the Cure Notice listing the Noblesville Lease as an unexpired lease that may be assumed or assigned in connection with the Bidding Procedures Motion.  The Cure Notice asserts that the cure amount with respect to the Noblesville Lease is $38,275.70 (the "Proposed Cure Amount").

7.     On October 25, 2024, the Court entered its *Order (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 612] (the "Bidding Procedures Order").  The Bidding Procedures Order states, among other things, that the Debtors shall provide to contract and lease counterparties adequate assurance information with respect to the stalking horse bidder, Nexus Capital Management LP ("Nexus"), and any other qualified bidders within twenty-four hours of the Bid Deadline (as defined therein), and that any Assumption and Assignment Objection (as defined in the Bidding Procedures Order) must be filed by November 6, 2024, at 4:00 p.m. Eastern.

8.     On October 31, 2024, the Debtors provided Landlord with a two-page Adequate Assurance Package from Nexus, the sole qualified bidder for the Debtors' assets.  The Adequate Assurance Package describes the business to be conducted by Nexus as the continuation of the Big Lots business enterprise and states that certain leases will be assumed and assigned by Nexus to an affiliated third-party entity.[1]

## OBJECTION

### I.     The Debtors must cure all existing defaults under the Lease as a condition to the assumption and assignment of the Lease.

9.     Section 365(b)(1)(A) requires that, at the time of assumption, a debtor either cures all existing defaults or provides a lessor with adequate assurance that it will promptly cure those defaults in order to assume and assign a lease. "Cure is a critical component of assumption." *In re Thane International, Inc.*, 586 B.R. 540, 549 (Bankr. D. Del. 2018). "The language and intent behind § 365 is decisive… [and it] was clearly intended to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance." *Id.* (citing *In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996)). "If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain." *Id.* (citations omitted). "[T]he term 'full benefit of his bargain' refers to 'the full amount due' under the contract or lease in question, as opposed to liabilities solely for future performance." *Id.*

10.     A debtor bears the burden of proving that it has met the requirements of Section 365(b) by a preponderance of the evidence. *See In re Citrus Tower Boulevard Imaging Ctr., LLC*, 2012 Bankr. LEXIS 2208, at *8 (Bankr. N.D. Ga. Apr. 2, 2012) ("Debtor has the burden of proof on

---

[1] Landlord has not attached the Adequate Assurance Package as an exhibit or quoted specific language therein in this Objection because such information has been designated Private and Confidential.  Landlord reserves the right to use and admit into evidence the Adequate Assurance package at any hearing on this Objection.

the Motion, including the burden to show the proposed twelve month cure 'promptly cures' the

default and that its has offered 'adequate assurance of future performance' under the lease."); *In re*

*PRK Enterprises, Inc.*, 235 B.R. 597, 602 (Bankr. E.D. Tex. 1999).

11.    Here, the Proposed Cure Amount fails to either cure or provide for the cure of the

several existing defaults under the Lease.

**A. The Proposed Cure Amount does not pay all outstanding rent and other amounts reimbursable under the Lease.**

12.    The Debtors' Cure Notice acknowledges an outstanding balance owed to Landlord

and asserts that the total Proposed Cure Amount is $38,275.70.  But the correct cure amount is much

higher.  According to Landlord's books and records attached as Exhibit C hereto, the amount due to

Landlord for unpaid rent for the months of August 2024 and September 2024, CAM charges, real

estate taxes, and prepetition legal fees in connection with the Debtors' default under the Lease is no

less than $82,754.78.

13.    Further, Landlord has not paid postpetition rent for November 2024 as of the filing

of this Objection.  Section 365(b)(1) measures defaults as of the "time of assumption," meaning that

the Debtors are required to timely pay accruing post-petition rent and other charges.  *See, e.g., In re*

*Rachels Industries, Inc*., 109 B.R. 797, 811-12 (Bankr. W.D. Tenn. 1990). In the event that the

November payment or any subsequently-due monthly payment is not received by the date of

assumption, the cure amount owed to Landlord will be increased by an additional $16,000.01 per

month.

14.    The Proposed Cure Amount also does not include or provide for payment of post-

petition legal fees incurred in enforcing Landlord's rights under the Lease.  Bankruptcy courts have

held that attorneys' fees incurred in the enforcement of a lease are recoverable as part of a landlord's

pecuniary loss under Bankruptcy Code section 365(b)(1)(B) due upon assumption and assignment

8

of a lease if the underlying lease allows for collection of such amounts. *In re Williams*, 2011 Bankr. LEXIS 2463, *3 (Bankr. D. Del. June 24, 2011) ("It is beyond cavil that attorneys' fees incurred because of actions taken to enforce the underlying lease or contract may be properly recoverable as part of a cure payment if such lease or contract provides for attorneys' fees."); *In the Child World, Inc.*, 161 B.R. 349, 353 (Bankr. S.D.N.Y. 1993) ("Although attorneys' fees are not independently recoverable under the Bankruptcy Code, section 365(b)(1)(B) allows for such recovery if based upon the existence of a separate agreement between the parties."). Here, Section 40 of the Lease specifically provides for the payment of reasonable attorney's fees incurred in enforcing the provisions of the Lease. Landlord continues to accrue legal fees in connection with its pursuit of unpaid amounts due under the lease as well as in protecting its interests in connection with the Debtors' proposed assumption and assignment of the Lease. These amounts are properly reimbursable under the Lease and therefore must be cured along with other amounts due to Landlord for the Lease to be assumed and assigned. Landlord reserves its right to supplement this Objection to quantify and provide any required support for its reimbursable legal fees incurred in connection with these bankruptcy cases.

**B. The Proposed Cure Amount does not address the Debtor's unperformed maintenance and repair obligations with respect to the Noblesville Store.**

15.    The Debtor's Proposed Cure Amount is insufficient because it does not include any amounts to remedy the numerous unperformed maintenance and repair obligations owed by the Debtors under the Lease. As noted above, section 7 of the Lease provides that the Debtors are responsible for the maintenance of and repairs to the interior portions and systems of the Noblesville Store. In connection with this Objection, Landlord commissioned a third-party property inspection of the Noblesville Store to identify any unperformed maintenance and repair obligations and to

quantify the cost of remedying these issues to bring the property into compliance with the Lease. The resulting inspection report (the "Inspection Report") is attached hereto as Exhibit D.

16.     The Inspection Report details numerous maintenance and repair issues designated by the inspector as "action items," which term is defined in the Inspection Report as including items that are no longer functioning as intended, conditions that present safety issues, and items or conditions that may require repair, replacement, or further evaluation by a specialist.  *See* Exhibit D at 3.  The "action items" identified in the Inspection Report include but are not limited to: a rusting water heater in need of replacement; broken or leaky sinks and toilets; exposed electric junction boxes; inoperative electrical outlets; non-working ceiling-mounted heating units; damaged HVAC unit cooling fins; damaged or missing doors; peeling paint; damaged floor tiles; and stained or damaged drop down ceiling panels.  *See* Exhibit D at 4-9.  The Inspection Report estimates the cost to cure these maintenance and repair action items to range from $12,200 to $18,500, though the inspector was unable to provide cost estimates for certain issues without the assistance of a specialist or until the Debtors vacate the premises and the full extent of the damage becomes known.  *Id.*  The Debtors may not assume or assign the Lease unless they cure or provide for the cure of all unperformed maintenance and repair issues identified in the Inspection Report.

## II.     **The Debtors have not provided evidence of compliance with their obligation to maintain required insurance coverage under the Lease.**

17.     Section 40 of the Lease requires the Debtors to maintain commercial general liability insurance with policy limits of at least "One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit" and to provide Landlord with certificates of insurance reflecting that the required coverage.  By email sent on October 30, 2024, Landlord requested that the Debtors provide proof of current insurance complying with these minimum coverage requirements.  As of the filing of this Objection, no

insurance certificates or other proof of insurance has been provided.  The Debtors may not assume or assign the Lease before proof of adequate insurance has been provided.

**III.** **The Debtors have not provided adequate assurance of future performance under the Lease.**

18.    Section 365(b)(1)(C) of the Bankruptcy Code states that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee . . . provides adequate assurance of future performance under such contract or lease." 11 U.S.C. § 365(b)(1)(C).   "The language and intent behind § 365 is decisive… [and it] was clearly intended to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance." *In re Thane International, Inc.*, 586 B.R. 540, 549 (Bankr. D. Del. 2018) (citing *In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996)).  Where a lease is to be assigned, section 365(f)(2)(B) provides that a trustee or debtor-in-possession may assign an unexpired nonresidential lease only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." *See In re Sun TV and Appliances, Inc.*, 234 B.R. 356, 370 (Bankr. D. Del. 1999).

19.    The purpose of adequate assurance of performance is to afford such lessor "with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy." *In re Natco Indus., Inc.,* 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985).  "Adequate assurance therefore demands a foundation that is non-speculative and sufficiently substantive" so as to assure that a landlord will receive the bargained-for performance. *In re World Skating Center, Inc.,* 100 B.R. 147, 148-49 (Bankr. D. Conn. 1989).  Courts require a specific factual showing to determine whether adequate assurance of future performance has been provided. *See, e.g., Matter of Haute Cuisine, Inc.,* 58 B.R. 390, 393-94 (Bankr. M.D. Fla. 1986).  Mere general assertions that a proposed

assignee is capable of curing defaults and performing under a lease are insufficient to constitute

adequate assurance, as an "empty declaration does not provide the compensation and assurances

required by section 365(b)(1)." *Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077, 1080 (9th

Cir. 1989).

20.     Further, a lease must be assumed and assigned *cum onere*; a debtor may not pick

and choose certain favorable terms to be assumed or burdensome terms to be excised. *See, e.g., In

re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) ("Section 365(f) requires a debtor to assume a

contract subject to the benefits and burdens thereunder. 'The [debtor] . . . may not blow hot and

cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt

the burdens. He cannot accept one and reject the other.'" (quoting *In re Italian Cook Corp.*, 190

F.2d 994, 997 (3d Cir. 1951)); *Pirinate Consulting Grp., LLC v. C. R. Meyer & Sons Co. (In re

Newpage Corp.)*, 2017 Bankr. LEXIS 413, at *14 (Bankr. D. Del. Feb. 13, 2017) ("A debtor 'can

only assume a contract *cum onere* – accepting the benefits along with the burdens.'") (citation

omitted); *In re New York Skyline, Inc.*, 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010) ("Neither the

debtor nor the bankruptcy court may excise material obligations owing to the non-debtor

contracting party.") (citation omitted).

21.     Specifically with respect to shopping center leases, "[t]he Bankruptcy Code

imposes heightened restrictions on the assumption and assignment of leases of shopping centers."

*In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990).  Section 365(b)(3) provides that

adequate assurance of future performance of a lease of real property in a shopping center includes

adequate assurance:

> A)      of the source of rent and other consideration due under such
> lease, and in the case of an assignment, that the financial
> condition and operating performance of the proposed
> assignee and its guarantors, if any, shall be similar to the
> financial condition and operating performance of the debtor

12

and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B)     that any percentage rent due under such lease will not decline substantially;

(C)     that *assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision*, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D)     that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3) (emphasis added).

22.     A debtor has the burden of proof with respect to adequate assurance that it will both promptly cure existing defaults under an unexpired lease and to adequate assurance of future performance under such lease. *See In re Everest Crossing, LLC*, No. 09-16664-FJB, 2010 Bankr. LEXIS 6409, at *6 (Bankr. D. Mass. Feb. 24, 2010) ("The Debtor bears the burden of proof as to both adequate assurance issues."); *In re Citrus Tower Boulevard Imaging Ctr., LLC*, 2012 Bankr. LEXIS 2208, at *8 (Bankr. N.D. Ga. Apr. 2, 2012).

**A. The Debtors cannot provide adequate assurance of performance under the Lease by Nexus because they have not identified Nexus's intended future use of the Noblesville Store.**

23.     Landlord is unable to assess Nexus's ability to perform under the Lease because neither the Debtors nor Nexus have not disclosed the intended future use of the Noblesville Store, which upon information and belief will no longer be operated as a Big Lots store. The Adequate Assurance Package states that Nexus will acquire Big Lots' assets and business operations and continue the Big Lots business enterprise. However, the Debtors' actions to date suggest that the Noblesville Store will not be part of those ongoing Big Lots business operations. The Noblesville Store was listed in the Notice of Closing Stores as a store at which the Debtors intend to conduct a

store closing sale.  *See* Docket No. 239.  The Debtors then posted signs prominently announcing the closure of the Noblesville Store and liquidation of the store's merchandise on both the outside and interior of the building, and are actively conducting a store closing sale.  *See* Exhibit B.  The Debtors are even actively selling the fixtures and equipment necessary to operate the store including the store shelving and stock picking ladders, among others.  *Id.*  All available evidence suggests that the Noblesville Store is closing.

24.     But neither the Debtors nor Nexus has disclosed how Nexus intends to use the Noblesville Store space once the current Big Lots store closes.  Without this disclosure, Landlord cannot fairly evaluate whether Nexus can perform under the Lease.  First and foremost, section 4(B) of the Lease lists numerous specifically prohibited uses of the Noblesville Store.  These prohibited uses specifically remain binding on the Debtors and any assignee pursuant to section 365(b)(3)(C) of the Bankruptcy Code, which provides that with respect to shopping center leases "assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center."  Nexus must disclose its intended use of the Noblesville Store to allow Landlord to determine whether such use is in compliance with the Lease.

25.     Further, Landlord is unable to sufficiently assess Nexus's industry experience and ability to operate another business in the Noblesville Store space if even the type of proposed business or even general industry of such business is not known.  Without this information, Nexus's Adequate Assurance Package and the Debtor's other disclosures do not meet their burden under section 365 of the Bankruptcy Code to show adequate assurance of Nexus's ability to perform under the Lease.

14

**B. The proposed releases of liability in favor of Nexus improperly impair Landlord's rights under the Lease and thus any assumption and assignment of the Lease must expressly remain subject to unbilled or unasserted monetary and non-monetary obligations.**

26.    The Lease imposes numerous obligations on the Debtors that are either ongoing or may involve existing but presently unknown claims.  For example, certain amounts reimbursable by the Debtors under the Lease such as CAM charges and real estate taxes are reconciled and billed in arrears, and thus Landlord may, in accordance with its ordinary practice, seek to recover amounts properly payable under the Lease that pertain to the pre-assignment period.  The Lease also imposes continuing obligations, like the Debtors' obligation to indemnify Landlord against certain claims and to conduct required maintenance and repairs to the Noblesville Store.  While Landlord has attempted in good faith to identify and quantify all known claims related to these continuing obligations, other latent claims may exist or may arise between the filing of this Objection and the date of assignment that are not yet known but nevertheless are the Debtors' responsibility under the Lease.  The Debtors' responsibility for these claims continues throughout the term of the Lease, regardless of when the issue or specific obligation arises.

27.    However, the Debtors appear to be attempting to cut off Nexus's responsibility for any claims *existing or arising as of the Petition Date*, whether or not the claims are known or have been assessed against the Debtors.  Paragraph 25 of the Bidding Procedures Order states:

> Notwithstanding anything to the contrary in the Assumed Contract or Assumed Lease, or any other document, the Cure Costs set forth in the Potential Assumed Contracts Schedule or the Supplemental Assumed Contracts Schedule . . .  shall be controlling and shall be the only amount necessary to cure any alleged outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code *arising out of or related to any events occurring prior to the Petition Date, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise*, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to prepetition defaults under such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder, or the property of any of them.

*See* Docket No. 612 at ¶ 25.

28.     The final form of *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* attached to the Bidding Procedures Order reinforces the Debtors' apparent intention to categorically eliminate Nexus's responsibility for all prepetition liabilities, as it states in the section titled "Consequences of Failing to Timely Assert an Objection" that:

> Notwithstanding anything to the contrary in such Contract or Lease, or any other document, the Cure Costs set forth on a Potential Assumed Contracts Schedule or a Supplemental Assumed Contracts Schedule shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the Petition Date, *whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Petition Date*.

*See* Docket No. 612-1 (emphasis added).

29.     These provisions would materially change the terms of and effectively constitute a compelled modification of the Lease and Nexus's post-assumption obligations under the Lease. Such involuntary modification violates section 365(b)(1)(C)'s requirement "that assumption or assignment of [a shopping center lease] is subject to all the provisions thereof" as well as case law holding that a debtor may not modify or excise material obligations owing to lessors.  *See, e.g., In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) ("If the debtor decides to assume a lease [], it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed.").  For example, Nexus could refuse to indemnify Landlord for any prepetition but presently unknown injury, such as a customer slip-and-fall injury, occurring in the Noblesville Store if such claim is lodged after the date of assignment.  The Debtors also could later

refuse to repair any presently undiscovered damage to the Noblesville Store if they could show that the issue existed on the date of assignment.

30.     This is not the bargain that the Debtors and Landlord struck in the Lease. The Debtors may not carve out obligations of any kind owed to Landlord and thereby materially change the terms of the Lease as enforceable against Nexus post-assignment. *See, e.g., In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) ("Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder. 'The [debtor] . . . may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.'" (quoting *In re Italian Cook Corp.*, 190 F.2d 994, 997 (3d Cir. 1951)); *Pirinate Consulting Grp., LLC v. C. R. Meyer & Sons Co. (In re Newpage Corp.)*, 2017 Bankr. LEXIS 413, at *14 (Bankr. D. Del. Feb. 13, 2017) ("A debtor 'can only assume a contract *cum onere* – accepting the benefits along with the burdens.'") (citation omitted).

31.     Accordingly, any assumption and assignment of the Lease must ensure that *all obligations* of the Debtors are preserved and binding upon the assignee, whether or not in existence on the date of assignment, including but not limited to indemnification obligations, accrued but not yet due nonmonetary obligations such as maintenance and repairs obligations, and accrued but not yet due monetary obligations such as CAM charges and Real Estate Taxes.

## RESERVATION OF RIGHTS

32.     Landlord reserves its rights to further supplement or amend this Objection and assert any additional objections, including any additional cure obligations that may arise under the Lease, and to further object to the assumption and assignment of the Lease on additional grounds based upon any new information obtained by Landlord, or upon any different relief requested by Debtors, including a proposed assignment of the Lease to an entity other than Nexus.

## **JOINDER**

33.     Landlord joins in the objections of other shopping center landlords to the proposed assumption and assignment of retail leases to Nexus to the extent such other objections are not inconsistent with this Objection.

## **CONCLUSION**

34.     The assumption and assignment of the Lease to Nexus should be denied because the Debtors have not carried their burden of demonstrating adequate assurance of future performance. At a minimum, the Debtors and/or Nexus must be required to pay the full amount of existing monetary defaults and provide for the cure of all other known defaults as outlined in this Objection, and must provide that any assumption and assignment of the Lease will preserve all lease obligations, including unknown or unquantified obligations arising prior to assignment.  Unless and until these conditions are met, Landlord objects to the assumption and assignment of its Lease.

Dated: November 6, 2024
Wilmington, Delaware

/s/ Richard W. Riley
Richard W. Riley (DE No. 4052)
**Whiteford, Taylor & Preston LLC**[2]
600 North King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 353-4144
Email: rriley@whitefordlaw.com

- and -

David W. Gaffey, Esq.
**Whiteford, Taylor & Preston LLP**
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042-4510
Telephone: (703) 280-9260
Email: dgaffey@whitefordlaw.com

*Attorneys for Cambridge Investment Inc.*

---

[2] Whiteford operates as Whiteford, Taylor & Preston LLC in Delaware.