# Exhibit A

# TABLE OF CONTENTS

| Section | |
|---|---|
| 1. | Definitions |
| | A.  Common Areas |
| | B.  Dates |
| | C.  Exhibits |
| | D.  Demised Premises |
| | E.  Shopping Center |
| 2. | Demise |
| 3. | Term |
| | A.  Original Term |
| | B.  Option to Extend Term |
| 4. | Use and Operation |
| 5. | Rent & Additional Rent |
| | A. Fixed Minimum Rent |
| | B.  Utilities Charge and Exterior Lighting |
| | C.  Intentionally Deleted |
| | D.  Common Area Charges and Cap |
| | E.  Real Estate Taxes |
| 6. | Alterations |
| 7. | Maintenance, Repairs and Initial Build Out |
| 8. | Signs |
| 9. | Fixtures |
| 10. | Governmental Regulations |
| 11. | Indemnification |
| 12. | Insurance |
| | A.  Tenant |
| | B.  Landlord |
| 13. | Fire Rebuilding and Altering |
| 14. | Force Majeure |
| 15. | Injunction |
| 16. | Warranty of Title by Landlord; Representations |
| 17. | Quiet Enjoyment |
| 18. | Mortgage and Estoppel Certificates |
| 19. | Default |
| 20. | Condemnation |
| 21. | Mutual Waiver of Subrogation |
| 22. | Assignment and Subletting |
| 23. | Surrender and Holdover |
| 24. | Notices |

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 10th day of April , 2009, by and between Cambridge Investments, Inc., an Indiana corporation, whose mailing address is P. O. Box 549, 1100 S. 9th St., Suite 218, Noblesville, IN 46061 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-0512.

## WITNESSETH:

## 1.    DEFINITIONS:

For purposes of this Lease, these terms are defined as follows:

A.    Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place up to two (2) drop/storage trailer(s) in the receiving area in the rear of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

B.    Dates:Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)       The "Tenant Possession Date" shall be the later of (i) the date Tenant accepts possession following Landlord's notice that it has completed all construction required pursuant to Exhibit C; or (ii) the date on which Tenant has received all required building permits for its signage and construction, unless Tenant is not obligated to accept possession as provided herein.  Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if possession has been given.  Tenant shall submit plans to the building department having jurisdiction no later than sixty (60) days after the Demised Premises have been vacated and are available for access by Tenant's architects/planners. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant, construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)       The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date Tenant opens for business in the Demised Premises.

4)       The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)       If Landlord fails to return properly executed Leases to Tenant by April 10, 2009, or if Landlord fails to tender possession of the Demised Premises to Tenant by February 8, 2010, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to February 8, 2010. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by February 15, 2010, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon February 16, 2010 and continuing for each and every day Landlord is delayed in delivering possession to Tenant prior to February 28, 2010, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,500.00 per day.  Commencing March 1, 2010 and continuing for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $3,000.00 per day.  If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installments(s) of Rent due under this Lease.

6)       Notwithstanding anything to the contrary, in the event Landlord has not offered delivery of possession of the Demised Premises by June 30, 2010, Tenant will not be required to accept possession until February 8, 2011.  The period of time between July 1, 2010 and February 8, 2011 will be the "Optional Blackout Period".  In the event Landlord offers possession during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout

Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not offered delivery of possession to Tenant by February 8, 2011, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 8, 2011, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)     In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 8, 2011. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.     Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)     Exhibit A -    Site Plan of Shopping Center

2)     Exhibit B -    Legal Description of Shopping Center

3)     Exhibit C -    Landlord Work

4)     Exhibit D -    Tenant Building Sign Specifications

5)     Exhibit D – 1 Tenant Pylon Sign Location

6)     Exhibit E -    Delivery of Possession Letter

7)     Exhibit F -    Exclusive Use Provisions

8)     Exhibit G -    Remeasurement Rider

D.     Demised Premises: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 31,000 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 31,000 square feet nor accept possession of any space under 27,900 square feet in size, and may terminate this Lease in such an event.

E.     Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Noblesville Shopping

5

Center, Route 32 and South 19th Street, Noblesville, Indiana 46060. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 42,130 square feet.

F.      Gross Sales:  The term "Gross Sales" shall  mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks;  (5) sales of merchandise to employees at a discount;  (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges;  (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

## 2.   DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.   TERM:

A. Original Term:   The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2016 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B. Option to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end

6

of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

## 4.   USE AND OPERATION:

**A.    Permitted Uses.**  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, health and beauty products, food (including frozen food), and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the forgoing representations and warranties.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise store, discount store, liquidator, closeout store, furniture store or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof, without the written consent of Tenant. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams and Ollies Bargain Outlet. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following  remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state

and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise.

**B.** **Prohibited Uses.** Except for existing tenants as of the date of this Lease, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices provided however that such a use shall be permitted if it is limited to 5,500 square feet in floor area or less or if it is located more than 100 linear feet from the Demised Premises; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage payable by Tenant on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations provided however that

8

such a use shall be permitted if it is limited to 5,500 square feet in floor area or less or if it is located more than 100 linear feet from the Demised Premises; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

## 5. RENT AND ADDITIONAL RENT:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

    A.    Fixed Minimum Rent: During the Original Term of this Lease, the sum of $170,500.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $14,208.33.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $186,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $15,500.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $201,500.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $16,791.67. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $217,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $18,083.33. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $232,500.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $19,375.00.

    B.    Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. With the exception of charges for the sprinkler cap

inspections, for which Landlord shall invoice Tenant its pro-rata share, Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs. In such event, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof.

C.      Intentionally deleted.

D.      Common Area Charges and Cap:  Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center, provided that Tenant shall dispose of its own trash and keep the area immediately behind the Demised Premises neat and clean;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan, provided that Tenant shall maintain its own signage including its panel(s) on the pylon;

(iv)  providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)   maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)  cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's

store entrance and designated parking areas. (Tenant shall be responsible for removing snow from the sidewalk in front of the Demised Premises.)

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be 73.6%, which is the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at forty cents (**$0.40**) per square foot of the Demised Premises for each Lease Year during the Original Term, as well as the initial Partial Lease Year, if any. Should Tenant elect to exercise any available option periods, such charges shall be capped at fifty cents (**$0.50**) per square foot of the Demised Premises for each Lease Year during the First Option Term; sixty cents (**$0.60**) per square foot of the Demised Premises for each Lease Year during the Second Option Term; seventy cents (**$0.70**) per square foot for each year during the Third Option Term; and eighty cents (**$0.80**) per square foot for each year during the Fourth Option Term (collectively, the Common Area Charges Cap described herein shall be known as the "CAM Cap").

E.    Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.  Landlord represents that the Real Estate Taxes for the 2009 tax year shall be approximately $0.90 per square foot per annum.

12

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of any increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting solely from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or reassessment. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

13

**6. ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom. Tenant shall notify Landlord of any structural changes, additions or alterations costing more than $75,000.00.

**7. MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the existing HVAC system is in good working condition.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30)

14

days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

**8. SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs ( collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon any existing Shopping Center Pylons, as depicted on Exhibit D-1, and Landlord grants Tenant the right to place its sign panels in the location formerly occupied by Marsh as depicted on Exhibit D-1. Further, should Landlord later construct another pylon at the Shopping Center, Tenant shall have the right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not then currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).     Tenant shall pay its prorata share of the maintenance costs of any Pylon on which it maintains a sign panel.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall, at Landlord's request, remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all current requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with a sprinkler system; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all existing HVAC equipment in compliance with the Clean Air Act of 1992.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the

failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.   Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.  When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.   **INSURANCE:**

A.   Tenant:  Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant hall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.   Landlord:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the peril of flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.  Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.   Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies

referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B shall be approximately $0.40 per square foot per annum for the 2009 calendar year.

If Tenant is able to secure an insurance policy or policies with the same coverages as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

## 13.   FIRE REBUILDING AND ALTERING:

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.   In the event more than fifty percent (50%) of the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within ninety (90) days from the date of such casualty, either Landlord or Tenant may, at their option, terminate this Lease by giving sixty (60) days prior written notice to the other party and thereupon, both parties shall be released from all future liability and obligations under this Lease.

C.   If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the

18

extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

## 14.  FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.  This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.  INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.  WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured; and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured.  Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be

19

unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17.   QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants. Upon at least twenty-four (24) hours prior written notice to Tenant, Landlord shall have the right to enter the Demised Premises to make repairs required under this Lease.

## 18.   MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

## 19.   DEFAULT:

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it

cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.      If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.  All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.   CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are

21

taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21.   MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

## 22. ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord at least 30 days in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the

Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

## 23.   SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent, plus a 25% premium, and otherwise subject to all the terms and provisions hereof.

## 24.   NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.   LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest

extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State of Indiana, without regard to choice of law rules of that state.

Landlord represents that it is a corporation organized, validly existing and in good standing under the laws of Indiana. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26.   BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.   NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28.   REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29.   NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.   HAZARDOUS MATERIAL:

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord

24

shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31. TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

## 32. WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

## 33. REASONABLE CONSENT:

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

## 34. Intentionally Deleted.

25

**35.    NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.    TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.   If such audit shows that any statement rendered by Landlord is overstated by more than ten percent (10%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter.  If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

40. **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

41. **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**   **CAMBRIDGE INVESTMENTS, INC.,**
an Indiana corporation

By: LUKE KENLEY

Its: CEO

Witnesses as to Tenant:

**TENANT:**   **BIG LOTS STORES, INC., an Ohio**
corporation

By: _____
Charles W. Haubiel II
Title: Senior Vice President – Legal & Real Estate, General Counsel and Corporate Secretary



**(Acknowledgements on immediately following page.)**

27

**Landlord's Acknowledgement**

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Cambridge Investments Inc** by, __Luke Kenley_____ its ___CEO_____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _200 W. Washington St._ this _6th_ day of _April_____, 2009.

_____
Notary Public

COMMISSION EXPIRES
10/21/16

**Tenant's Acknowledgement**

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Senior Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _10th_ day of _April_____, 2009.

_____
Notary Public

RUTH HUNTER SMITH
Attorney at Law
Notary Public, State of Ohio
Lifetime Commission
Section 147.03 R.C.

28

## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

A part of the Southeast Quarter of Section 31, Township 19 North, Range 5 East, in Hamilton County, Indiana, more particularly described as follows:

Commencing at the Southeast corner of said Quarter section; running thence North on and along the Eastline thereof a distance of 651.70 feet to a point in the center line of State Road 32 and 38; running thence West on an along said center line a distance of 1130 feet to the place of beginning of ths tract; thence North parallel with the East line of said Southeast Quarter 601.00 feet; thence West parallel with said center line of State Road 32 and 38 365.8 feet to a point which point is 1156.80 feet East of the West line of said Southeast Quarter; thence South parallel with said West line 386.00 feet to a point which is 215.00 North of the center line of State Road 32; running thence North 89 degrees 48 minutes 00 seconds East parallel with the aforementioned center line a distance of 150.00 feet to a point ; running thence South 00 degrees 00 minutes 00 seconds West parallel with the aforementioned West line a distance of 215.00 feet to a point in the center line of State Road 32 and 38; running thence East on and along said center line a distance of 217.35 feet to the place of beginning, containing 4.32 acres, more or less.

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**The following work is subject to the review of a Big Lots' Construction Director: Landlord covenants and agrees to deliver the premises to Tenant as follows:**

**STOREFRONT:**  The existing exterior storefront shall be in good condition.

**UTILITIES:**  Existing utility services are to be in good working condition throughout the demised premises including all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. Landlord shall also provide Tenant with assurance that utilities are available and include legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage.

**HVAC & EQUIPMENT:** Landlord shall provide the existing HVAC in good working condition. Landlord and Tenant shall each provide an inspection report and agree to the necessary repairs to the HVAC units to ensure it is in good working condition. The agreed upon inspection report and required repairs will be attached as an exhibit to the lease.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:**  All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification. and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term and Options, Terms or Extensions. Landlord shall install any device(s) or system(s) for the suppression, detection or reporting of fire as required by Authority Having Jurisdiction (AHJ). All devices and systems installed for the suppression, detection or reporting of fire shall be in compliance with all applicable National, State and Local codes. (If a sprinkler system does not exist, Landlord is to install a sprinkler system at its sole cost and expense if required by code. If code does not require a sprinkler system, Landlord to install, at its sole cost and expense, a smoke detection system that is to be monitored by the Tenant and any other device required by code.)

**EXTERIOR LIGHTING:**  All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name.

**FLOORING:**  Landlord is to remove the existing floor covering.

**ROOF:**  Roof shall be professionally inspected and certified to be in good condition and free of leaks. Landlord shall provide an inspection report to tenant and make the necessary repairs to the roof to ensure it has a minimum life expectancy over Tenant's initial lease term. Tenant may also have the roof inspected and landlord shall make the necessary repairs/replacement per its inspection report. The agreed upon roof report and scope of repairs will be attached as an exhibit to the lease.

**REMOVAL OF FIXTURES AND EQUIPMENT:**  Landlord to remove all fixtures, refrigeration equipment, meat/poultry/fish prep rooms, partitions, walls, coolers, mezzanine and make all repairs to the ceiling, floor, walls, etc. necessitated by such removal. Landlord to remove the electric and plumbing to such equipment. Landlord to block in any openings in exterior walls to match existing walls.

**Exhibit C, cont.**
**LANDLORD'S WORK:**

**PARKING**
**LOT:**             Parking lot shall be in good condition (paved, patched, sealed and striped) - with
                     potholes, severe cracks and uneven areas resurfaced – adequate for customer parking and
                     Tenant's use.

**CART CORRAL:**     Tenant shall be allowed to install cart corrals in the parking lot area in front of the
                     Demised Premises and in reasonable proximity thereto.

**SIGNAGE:**         Tenant to have the right to use its color and logo on building sign(s) at the maximum size
                     per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the
                     governing body for the city, town, municipality, township, etc. which jurisdiction includes
                     the demised premises within the center. Landlord is to ensure the existing pylon(s) meets
                     all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s).
                     Tenant to receive the former Marsh position on the pylon(s).

**DRAWINGS:**        Landlord is to provide Tenant with "as built" drawings or a floor plan of the Demised
                     Premises adequate for Tenant to draw its floor and fixture plan. Tenant to approve all
                     drawings prior to submission for permits and prior to the commencement of work.
                     Tenant's plans will be attached as an exhibit to the lease and deemed approved upon lease
                     execution. Any changes to the plans required by the Authority issuing permits, will not be
                     subject to Landlord approval. Additional improvements outside the demised premises
                     that may be required by the Authority issuing permits will be the responsibility of the
                     Landlord.

**MISCELLANEOUS:**   Landlord shall provide to governmental authorities having jurisdiction all necessary
                     documentation as is required or may be required by the Asbestos Health Protection Act
                     including, without limitation, an asbestos survey or, in the alternative, necessary
                     certification.   Landlord to be responsible for the removal of any and all Hazardous
                     Materials and provide Tenant a Phase I report covering the demised premises.

**GENERAL**
**CONDITIONS:**      Landlord agrees the Demised Premises conforms to all requirements by authority having
                     jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them
                     conform at all times unless such is necessitated by changes, alterations, or additions made
                     by Tenant

All above work to be completed before the Tenant Possession Date.

**MAINTENANCE**
**& REPAIR:**        Landlord: Roof, structure, exterior, parking lots, sidewalks, loading docks and driveways.

                     Tenant: All interior and HVAC system after same having been delivered to Tenant in
                     good working condition.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**



If you need additional information that is
not contained in this packet contact:

Store Planning:
**Mike Stiles 614-278-6805**
**Michael Neu 614-278-6868**



02/2007

### Stacked Logo

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

### This is the preferred way to present the sign.

File Name: BLst1C.eps



## STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
|---|---|---|---|---|---|---|
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4½" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5½" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17½" | 6½" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19½" | 7½" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21½" | 8½" |

### SIGN SPECIFICATIONS: BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

### SIGN SPECIFICATIONS: EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

# BIG LOTS - THE LOGO

The logo can be used in either of the shown versions (stacked or horizontal)
with the stacked logo being the preferred version.
The logo proportions cannot be distorted nor colors changed.*

### Stacked Logo
This is the preferred way to present the logo.

File Name: BLst2C.eps



### Horizontal Logo

File Name: BLh2C.eps

**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE
PROCESS MIX - 50% MAGENTA, 100% YELLOW

*See: Boxed Sign or Awning One Color.

# BOXED SIGN OR AWNING

To be used as pylon sign or a boxed sign.

## Boxed Stacked

This is the preferred way to present the logo.

File Name: BLst2C.eps



## Boxed Horizontal

File Name: BLh2C.eps



| SIGN SPECIFICATIONS: | SIGN SPECIFICATIONS: |
|---|---|
| **BIG LOTS AND TRADE MARK** | **EXCLAMATION** |
| BLACK | MATCH TO PANTONE 021 ORANGE |

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

Date: _____

To: _____(insert Tenant)
   via facsimile: (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed. Accordingly, possession of the Demised Premises is hereby delivered to Tenant. You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**LANDLORD:**

**Cambridge Investments, Inc.**

_____
By:
Its:

**TENANT:**

**BIG LOTS STORES, INC.**

By:_____

Title: _____

## EXHIBIT F

### EXCLUSIVE USE PROVISIONS

No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.

## EXHIBIT G

### REMEASUREMENT RIDER

This Rider dated _____ ____, 200__ is attached to and made a part of the Lease dated (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.      Demised Premises: (Section 1(D)) = _____.

2.      A.      Fixed Minimum Rent—Original Term (Section 5(A)):
                _____ annually; _____ per month.

3.      A.      Fixed Minimum Rent--First Option (Section 5(A)):
                _____ annually; _____per month.

4.      A.      Fixed Minimum Rent—Second Option (Section 5(A)):
                _____annually; _____per month.

5.      A.      Fixed Minimum Rent—Third Option (Section 5(A)):
                _____ annually; _____per month.

6.      A.      Fixed Minimum Rent—Fourth Option (Section 5(A)):
                _____ annually; _____per month.

## EXHIBIT A

## SITE PLAN OF SHOPPING CENTER

