# Exhibit "A"

# TABLE OF CONTENTS

**ARTICLE I          EXHIBITS, PREMISES, USE OF PREMISES AND TERM**

Section

| | |
|---|---|
| 1.0 | Covenants of Landlord's Authority |
| 1.1 | Definitions |
| 1.2 | Exhibits |
| 1.3 | Premises Leased by Tenant |
| 1.4 | Use of Premises |
| 1. 5 | Lease Term |
| 1.6 | Rent Commencement Date |
| 1.7 | Lease Year |

**ARTICLE II          RENT AND GROSS SALES REPORT**

| | |
|---|---|
| 2.1 | Fixed Minimum Rent |
| 2.2 | Fixed Minimum Rent Increase |
| 2.3 | Percentage Rent |
| 2.4 | Late Payment |
| 2.5 | Sales Records, Reports and Examination |
| 2.6 | Definitions of Gross Sales |
| 2.7 | Intentionally Omitted |
| 2.8 | Additional Rent – Definitions |

**ARTICLE III          COMMON AREAS AND FACILITIES**

| | |
|---|---|
| 3.1 | Common Areas |
| 3.2 | Use of Common Areas |
| 3.3 | Charge for Common Areas |
| 3.4 | Common Area Charges and Cap |
| 3.5 | Sign Program:  Intentionally Omitted |
| 3.6 | Merchants' Association |
| 3.7 | Participation in Promotional Programs:  Intentionally Omitted |

**ARTICLE IV          UTILITIY SERVICES**

| | |
|---|---|
| 4.1 | Utilities |
| 4.2 | Furnishing of Utility Services:  Intentionally Omitted |

**ARTICLE V          TAXES**

| | |
|---|---|
| 5.1 | Tenant's Taxes |
| 5.2 | Tenant's Participation in Real Estate Taxes |

**ARTICLE VI          REPAIRS AND MAINTENANCE**

| | |
|---|---|
| 6.1 | Repairs by Landlord |
| 6.2 | Repairs and Maintenance by Tenant |
| 6.3 | Right of Entry |
| 6.4 | Sidewalks and Outside Areas |
| 6.5 | Replacement of Glass |

**ARTICLE VII          RESTRICTIONS ON USE OF PREMISES**

| | |
|---|---|
| 7.1 | Restrictions on Use of Premises |
| 7.2 | Tenant's Normal Business Operation |
| 7.3 | Retail Restriction Limit:  Intentionally Omitted |
| 7.4 | Rules and Regulations |
| 7.5 | Signs, Awnings and Canopies |
| 7.6 | Hazardous Materials |

**ARTICLE VIII          ADDITIONS, ALTERATIONS REPLACEMENT AND TRADE FIXTURES**

| | |
|---|---|
| 8.1 | By Landlord |
| 8.2 | By Tenant |
| 8.3 | Construction Insurance and Indemnity |
| 8.4 | Mechanic's Liens and Additional Construction |
| 8.5 | Trade Fixtures |
| 8.6 | Government Regulations |

**ARTICLE IX**        **INSURANCE AND INDEMNITY**
  9.1 **Tenant's and Landlord's Insurance**
  9.2 **Extra Hazard Insurance Premiums**
  9.3 **Indemnity**
  9.4 **Definition and Liability of Landlord**
  9.5 **Mutual Waiver of Subrogation**

**ARTICLE X**        **DAMAGE, DESTRUCTION AND CONDEMNATION**
  10.1 **Damage or Destruction by Fire or Other Casualty**
  10.2 **Condemnations**

**ARTICLE XI**        **DEFAULT**
  11.1 **Default**
  11.2 **Landlord's Rights on Default**
  11.3 **Non-Waiver Provisions**
  11.4 **Inability to Perform**

**ARTICLE XII**        **SECURITY**
  12.1 **Security Deposit**
  12.2 **Personal Property**
  12.3 **Transfer of Amounts due Tenant**

**ARTICLE XIII**        **ADDITIONAL TENANT AGREEMENTS**
  13.1 **Mortgage Financing and Subordination**
  13.2 **Assignment or Subletting**
  13.3 **Tenant's Notice to Landlord of Default**
  13.4 **Short Form Lease**
  13.5 **Surrender of Premises and Holding Over**
  13.6 **Estoppel Certificate**

**ARTICLE XIV**        **MISCELLANEOUS PROVISIONS**
  14.1 **Notices**
  14.2 **Entire and Binding Agreement**
  14.3 **Provisions Severable**
  14.4 **Captions**
  14.5 **Relationship of the Parties**
  14.6 **Accord and Satisfaction**
  14.7 **Broker's Commission**
  14.8 **Corporate Status**
  14.9 **Reasonable Consent**

**ARTICLE XV**        **OPTIONS**
  15.1 **Option Term(s) and Fixed Minimum Rent**

1

## LEASE AGREEMENT

THIS LEASE, ("Lease"), made and entered into as of this *20th* day of March, 2003 by and between the Landlord and Tenant as specified in items 1 and 2 of the Definitions appearing in Section 1.1 hereof.

Landlord hereby demises and rents unto Tenant, and Tenant hereby leases from Landlord, certain Premises now existing in Landlord's Shopping Center ("Center" or "Shopping Center"), as described in item 3 of the Definitions appearing in Section 1.1 hereof, and upon the terms and covenants and conditions contained herein.

Landlord and Tenant acknowledge that Tenant is currently open and operating in the Center without a lease agreement. Tenant previously operated pursuant to a sublease agreement dated May 21, 1998 (the "Sublease") by and between Tenant and The Kroger Company. The Sublease expired on September 30, 2000.

## ARTICLE I
## EXHIBITS, PREMISES, USE OF PREMISES AND TERM

### Section 1.0 Covenants of Landlord's Authority

Landlord represents and covenants that: (a) prior to commencement of the Lease term it will have either good title to or a valid leasehold interest in the land and building of which the Premises form a part; and (b) upon performing all of its obligations hereunder, subject to any and all applicable notice and cure periods, Tenant shall peacefully and quietly have, hold and enjoy the Premises for the term of this Lease.

### Section 1.1 Definitions

The following items shall be defined or be referred to as indicated below for the purposes of this Lease and the Exhibits attached hereto:

Item 1 - Landlord:  Faulkner Plaza Shopping Center, an Arkansas corporation, 1154 Highway 65 N., P. O. Box 245, Greenbrier, Arkansas 72058

Item 2 - Tenant:  Big Lots Stores, Inc., an Ohio corporation, of the City of Columbus, County of Franklin, and State of Ohio.  300 Phillipi Road Department 10061, Columbus, Ohio  43228-5311

Item 3 - Shopping Center:  Faulkner Plaza, 150 E. Oak Street, Conway, Arkansas.

Premises (Section 1.3):   Store/Bay #three (3) having a gross leasable area of approximately 32,550 square feet.

Item 4 - Use of Premises, (Section 1.4), (Section 7.1):  Operation of a Big Lots store.

Item 5 - Tenant's Trade Name:  Big Lots or such other name used by Tenant in a majority of its stores.

Item 6 - Lease Term (Section 1.5):  Approximately Five (5) year(s) and   0 month(s)

Item 7 - Lease Commencement Date (Section 1.5):  The date Landlord delivers two (2) fully executed copies of this Lease to Tenant.
        Lease Expiration Date (Section 1.5):  December 31, 2007

Item 8 - Rent Commencement Date (Section 1.6):  Lease Commencement Date

#1257 Conway, AR.final

Item 9 - Annual Fixed Minimum Rent (Section 2.1):
$113.925.00 per year, $9,493.75 per month

Item 10 - Fixed Minimum Rent Increase(s) - (Section 2.2):  n/a

Item 11 - Percentage Rent (Section 2.3):
Percentage Rent Rate 3.0%
Gross Sales Breakpoint:
Original Term:       $3,797,500.00
Option One Term:  $4,340,000.00
Option Two Term: $5,425,000.00

Item 12 - Estimated Common Area Maintenance Costs (Section 3.4):
$10,172.00 per year, $847.67 per month

Item 13 - Participation in Promotional Programs (Section 3.7): n/a

Item 14 - Tenant's Participation in Real Estate Taxes (Section 5.2):
$8,126.41 per year, $ 677.20 per month

Item 15 - Security Deposit (Section 12.1): NONE

Item 16 - Notices (Section 14.1):
Tenant:          Big Lots Stores, Inc.
                       300 Phillipi Road
                       Dept.  10061
                       Columbus, Ohio 43228-5311

Landlord:       Faulkner Plaza Shopping Center, Inc.
                       1154 Highway 65 North
                       P.O. Box 245
                       Greenbrier, AR 72058

Item 17 - Option(s) - (Section 15.1):
Option One Term:  Commencement Date:  January 1, 2008
                          Expiration Date:  December 31, 2012
Option One Annual Fixed Minimum Rent:
$130,200.00 per year, $10,850.00 per month.

Option Two Term:  Commencement Date:  January 1, 2013
                          Expiration Date:  December 31, 2017
Option Two Annual Fixed Minimum Rent:
$162,750.00 per year, $13,562.50 per month.

Item 18 - Tenants Participation in Insurance (Section 9.1):
$ 4,385.36 per year, $ 365.45 per month

## Section 1.2 Exhibits

The exhibits listed hereunder and attached to this Lease are incorporated and made a part hereof by reference:

Exhibit A - Legal Description
Exhibit B - Site Plan
Exhibit C - Rules and Regulations
Exhibit D - Exclusive Uses
Exhibit E - Tenant's Sign Specifications

## Section 1.3 Premises Leased by Tenant

A.    The premises, also called the Demised Premises in this Lease Agreement, leased by Tenant are located at the Shopping Center set forth in Item 3 of the Definitions, which Premises are particularly described in Item 3 of the Definitions.

The boundaries and location of the Premises are crosshatched in yellow on the Site Plan diagram of the Shopping Center (Exhibit "B"), which sets forth the general layout of the Shopping Center, but shall not be deemed to be a warranty, representation or agreement upon the part of the Landlord that said Shopping Center will be exactly as indicated on said diagram.

The Premises includes, for the purpose of this Lease, the Premises within Landlord's Shopping Center leased to Tenant herein and shall extend to the exterior faces of all walls or to the building line where there is no wall, or to the center line of those walls separating the Premises from other premises in the Shopping Center, together with the appurtenances specifically granted in the Lease. Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not lessen the ceiling height of the Premises. In exercising the foregoing right, Landlord shall not interfere with the use or occupancy of the Premises or commence any such work without first notifying Tenant, at least ten (10) days in advance, of the commencement of such work.

Consistent with Section 3.2 hereof, Tenant shall have the non-exclusive use of the driveways, parking spaces, entrance-ways, exits and all Common Areas of the Shopping Center for its employees, agents, customers, suppliers or invitees, so long as such use shall not unreasonably interfere with the use of such areas by Landlord or other tenants of the Shopping Center.

## Section 1.4 Use of Premises

A.    **Tenant's Uses**: Tenant shall have the right to use the Premises for the retail sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, and food herein referred to as "Permitted Use". Landlord represents and warrants to Tenant that, aside from those exclusives listed in Exhibit "D" attached hereto, no exclusive covenants or item / category restrictions granted to, or for the benefit of, existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises for the Permitted Use, or the sale of any specific item typically sold in Tenant's stores. Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with Landlord's failure to disclose all exclusives.

B.    **Prohibited Uses**: Tenant shall not use the Demised Premises or Common Areas, or any part thereof, in violation of rules and regulations which are promulgated by Landlord and delivered to Tenant from time to time governing the Common Areas and the Demised Premises, provided that they are not inconsistent with any express provisions of this Lease, and are applied in a non-discriminatory manner as to all tenants. Tenant shall not, without Landlord's prior written consent, given in Landlord's sole discretion, use any portion of the Demised Premises or Shopping Center; (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) auditorium, activity facility, or meeting hall; (iv) any self storage facilities; (v) any medical or health-oriented facilities or offices; (vi) any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of

4

the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undo noise, sound, vibration, litter or odor; (xii) for a nigh club or discotheque, tavern, bar, cocktail lounge or similar establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment or the sale of alcoholic beverages; (xii) for a roller skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R. V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; or (xxvi) for any astrology, palm reading, tarot card or other like service or facility.  All of the foregoing uses are sometimes collectively referred to herein as the "Prohibited Uses".

C.    **Tenant's Exclusive Use:**  Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, and such other leases for premises in the Shopping Center executed prior to the date of this Lease over which Landlord has no control regarding that tenant's rights to sublet or assign the lease, no other liquidator or closeout store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  In the event Landlord leases to a Competing Business, as defined herein, or in the event some other person or entity, without the knowledge of, or consent from Landlord engages in a Competing Business, and Landlord fails to enjoin and prohibit such Competing Business within 60 days from Tenant's written notice that such person or entity is in violation of Tenant's exclusive, Tenant shall have the right to pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of three percent (3.0%) of Gross Sales for such month or regular monthly Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due.  At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

**Section 1.5 Lease Term**

The term of this Lease shall be for the period specified in Item 6 of the Definitions commencing and expiring as provided in Item 7 of the Definitions, unless sooner terminated or extended as hereinafter provided.

**Section 1.6 Rent Commencement Date**

Tenant shall commence payment of Rent on the date specified in Item 8 of the Definitions. If the Rent Commencement Date falls on a day other than the first day of a calendar month, the Fixed Minimum Rent for such month shall be prorated on a per diem basis, calculated on the basis of a thirty (30) day month.

#1257 Conway, AR.final

**Section 1.7 Lease Year**

For the purpose of this Lease, the term Lease Year is defined to mean calendar year (beginning January 1 and extending through December 31 of any given year).  Any portion of a year which is less than a Lease Year, that is, from the Lease Commencement Date through the next December 31, and from the last January 1 falling within the term of the Lease through the last day of the term, shall be defined as Partial Lease Year.

## ARTICLE II
## RENT AND GROSS SALES REPORT

**Section 2.1 Fixed Minimum Rent**

The total Fixed Minimum Rent for the Lease Term as specified in Item 9 of the Definitions shall be payable by Tenant as specified in Item 9 of the Definitions.
The term " Annual Fixed Minimum Rent" shall be the Fixed Minimum Rent above specified, payable monthly in advance on the first day of each month, without prior demand therefor and without any deduction or setoff whatsoever, unless otherwise provided for herein.

In addition, Tenant covenants and agrees to pay Landlord all applicable sales or other taxes which may be imposed on the above specified rents or payments hereinafter provided for to be received by Landlord when each such payment is made.

**Section 2.2 Fixed Minimum Rent Increase**

There are no Fixed Minimum Rent Increases during the Initial Term of this Lease Agreement. Increases in the Fixed Minimum Rent during the Option Term(s) are specified in Item 17 of the Definitions.

**Section 2.3 Percentage Rent**

A.      In addition to the Fixed Minimum Rent, and all other sums specified herein, Tenant shall pay Landlord percentage rent (herein called "Percentage Rent") as determined by this Section. The Percentage Rent for each Lease Year shall be an amount equal to the Percentage Rent Rate set forth in Item 11 of the Definitions times the amount of Gross Sales made during such Lease Year in excess of the Gross Sales Breakpoint set forth in Item 11 of the Definitions (herein called the "Gross Sales Breakpoint").  The Percentage Rent for each Partial Lease Year shall be an amount equal to the Percentage Rent Rate times the amount of Gross Sales made during such Partial Lease Year in excess of the Partial Lease Year Breakpoint.  The term "Partial Lease Year Breakpoint" shall mean an amount equal to the Gross Sales Breakpoint over the term of the Partial Lease Year.

B.      Each Lease Year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent, if any.  The amount of Gross Sales of any Lease Year shall not be carried over into any other Lease Year. Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month.  Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by Tenant.  Tenant shall pay any Percentage Rent due with its annual statement of Gross Sales.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), so that 365 days are calculated.  In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in

#1257 Conway, AR.final

accordance with the payment procedures set forth above.

## Section 2.4 Late Payment

Should Tenant fail to pay when due any installment of Fixed Minimum Rent, then Landlord shall assess a servicing fee of fifty dollars ($50.00) per month from and after the tenth (10th) day following the date on which any sum shall be due and payable, until the required payments are made.

If Tenant pays any installment of Fixed Minimum Rent or any other sum by check and such check is returned for insufficient funds or other reasons not the fault of the Landlord, then Tenant shall pay to Landlord on demand a processing fee of $25.00 per returned check. Should Tenant remit a partial payment for any outstanding Fixed Minimum Rent or Additional Rent due, Landlord shall apply said partial payment to the outstanding Fixed Minimum Rent or Additional Rent as Landlord deems necessary, in its sole discretion.

## Section 2.5 Sales Records, Reports and Examination

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event. Any information obtained from such an audit shall remain confidential and shall be used only for the purpose for which the audit is being conducted. Landlord shall be liable for any direct and consequential damages resulting from violation of this Lease provision and/or from the illegal dissemination of such information. This information will be held in confidence, except that Landlord may reveal such reported revenue to any mortgagee or prospective mortgagee to the Landlord under any ground lease or to any encumbrancer or prospective purchaser of the Center. The acceptance by Landlord of sales reports thereon shall be without prejudice and shall in no case constitute a waiver of Landlord's right to examination of Tenant books and records of its Gross Sales.

## Section 2.6 Definitions of Gross Sales

The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) credit card company finance or service charges; (8) proceeds from vending machines located in the Demised Premises; (9) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; and (10) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet.

## Section 2.7: Intentionally omitted.

**Section 2.8 Additional Rent - Definitions**

In addition to the foregoing Fixed Minimum Rent and Percentage Rent all payments to be made under this Lease by Tenant to Landlord shall be deemed to be and shall become Additional Rent hereunder and, together with Fixed Minimum Rent, shall be included in the term "Rent" whenever such term is used herein.  Unless another time shall be herein expressly provided for the payment thereof, any Additional Rent shall be due and payable together with the next succeeding installment of Fixed Minimum Rent, , together with all applicable State taxes, and Landlord shall have the same remedies for failure to pay the same as for non-payment of Fixed Minimum Rent.  Landlord, at its election, after the expiration of any and all applicable notice and cure periods, shall have the right to pay or do any act which requires the expenditure of any sums of money by reason of the failure or neglect of Tenant to perform any of the provisions of this Lease, and in the event Landlord elects to pay such sums or do such acts requiring the expenditure of monies, all such sums so paid by Landlord, together with interest thereon, shall be deemed to be Additional Rent and payable as such by Tenant to Landlord within thirty 30 days of demand and substantiation of the costs incurred by Landlord.

**ARTICLE III**
**COMMON AREAS AND FACILITIES**

**Section 3.1 Common Areas**

Landlord shall make available within the Center such Common Areas, including but not limited to parking areas, driveways, truck-ways, delivery passages, loading docks, pedestrian sidewalks and ramps, access and egress roads, open and enclosed courts and malls, landscaped and planted areas, public restrooms and other facilities, as Landlord in its reasonable business judgment discretion shall deem appropriate.

Landlord shall operate, manage, equip, light, repair and maintain said Common areas for their intended purposes in such manner as Landlord, in its reasonable business judgment, shall determine, and Landlord reserves the right to change from time to time the size, location, nature and use of any Common Area, to sell or lease any portion thereof and to make additional installations therein and to move and remove the same, and Landlord shall not be subject to liability therefore nor shall Tenant be entitled to any compensation, or diminution or abatement or rent, nor shall any such action be deemed an actual or constructive eviction of Tenant. Notwithstanding the foregoing, Landlord agrees not to change such Common Areas in a manner that would substantially impair the visibility of or accessibility to the Demised Premises. Landlord shall not alter the parking area outlined in green on Exhibit "B" (the "No Build Area"). Landlord and Tenant agree the "Hobby Lobby Expansion Area" as shown on Exhibit "B" may be removed from the parking area and used to expand the existing Hobby Lobby store.

**Section 3.2 Use of Common Areas**

During the term of this Lease only, Tenant and its permitted concessionaires, officers, employees, agents, customers and invitees shall have the non-exclusive right, in common with Landlord and all others to whom Landlord has or may hereafter grant rights, to use the Common Areas as designated from time to time by Landlord, subject to such reasonable rules and regulations as Landlord may from time to time impose, including the designation of reasonable areas in which vehicles owned by Tenant, its concessionaires, officers, employees and agents must be parked. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided such rules and regulations do not adversely affect Tenant's business operation, are uniformly applied to all tenants, and do not limit the rights or expand the obligations of Tenant under this Lease.  Tenant shall not at any time interfere with the rights of Landlord and other tenants, its and their concessionaires, officers, employees, agents, customers, and invitees, to use any part of the parking areas and other Common Areas.  Neither Tenant nor Tenant's employees, concessionaires, officers, or agents may solicit business in the parking or other Common Areas or distribute any handbills or other advertising matter in such areas or place any such handbills or advertising matter in or on any vehicles parked therein without Landlord's prior written consent.

8

Landlord reserves the right to grant to third persons the non-exclusive right to cross over and use in common with Landlord and all tenants of the Center the Common Areas as designated from time to time by Landlord.

## Section 3.3 Charge for Common Areas

Tenant's pro rata share of the Common Areas Charges shall be the portion of such costs which the floor area of the Premises bears to the gross leasable area in the Center, which Landlord represents to be 114,534 square feet as of the date of this Lease.  Tenant shall pay to Landlord, in the manner provided in Section 3.4, Tenant's pro rata share of the Common Area Charges as such terms are defined as follows: All costs and expenses of every kind and nature paid or incurred by Landlord, its agents or any contractor employed by Landlord with respect to the day-to-day operation, maintenance, equipping and repairing the Common Areas.  Such costs and expenses shall include, but not be limited to: maintaining lighting fixtures, including costs of light bulbs and electric current (provided, however, that if a Tenant requires that the Center remain illuminated after 11:00 p.m., Tenant shall be responsible for the cost allocable to said requirement), salaries and related costs of all on-site personnel, repairs and maintenance, costs and expenses of planting, maintaining, replanting and replacing flowers and other landscaping, sound systems, removal of Common Area trash, rubbish, garbage and other refuse, cleaning, supplies, uniforms, and dry cleaning thereof, costs of operating, maintaining and repairing truck service-ways, tunnels, loading docks, retaining walls, pedestrian malls (open or enclosed), courts, plazas, stairs, ramps, sidewalks, washrooms and other elements of the Common Areas, illumination and maintenance of signs, equipment depreciation, comforts and first-aid stations, parcel pick-up stations, and service contracts with independent contractors. Tenant's pro rata share of Common Area Charges shall also include a prorated share of the cost of electricity to the pylon sign on which Tenant occupies a panel.  Tenant's prorated share with regard to said electricity shall be the portion of such costs which the square footage of Tenant's sign panels bears to the total square footage of all sign panels on the pylon sign.  Landlord represents that Tenant's prorated share of electricity to the pylon was $239.35 for the 2002 calendar year.  Notwithstanding anything contained herein to the contrary, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), reserves for replacements, any insurance deductible and/or self-insured retentions, any depreciation of the Shopping Center, and any administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of name, related to the management or operation of the Shopping Center.

## Section 3.4 Common Area Charges and Cap

 On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior Lease Year, and which estimated amount for Lease Year One is specified in item 12 of the Definitions.

Within one hundred twenty (120) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto.  Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for any of such Common Area Charges as stated herein which Tenant may dispute or challenge.

Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at thirty five cents ($0.35) per square foot for the first partial and full Lease Year of the initial term and shall not increase thereafter by more than 5 % per annum (on a non-cumulative basis) over the amount paid by Tenant for the Tenant's previous Lease Year's Common Area Charges.

#1257 Conway, AR.final

**Section 3.5 Sign Program:**  Intentionally omitted.

**Section 3.6 Merchants' Association**

Tenant agrees that, at its option, and at no cost to Tenant, it may become a member of and participate in an association of merchants composed primarily of tenants in the Shopping Center, herein referred to as the Merchants' Association, and if Tenant so elects, Tenant agrees to abide by the reasonable rules and regulations of such Merchants' Association, if and when an association is formed, except with respect to any obligation to pay any amounts to same.  Each member tenant shall have one vote and Landlord shall also have one vote in the operation of the Merchants' Association.

**Section 3.7 Participation in Promotional Programs:**  Intentionally Omitted.

**ARTICLE IV**
**UTILITY SERVICES**

**Section 4.1 Utilities**

Tenant agrees that it shall not install any equipment which will exceed or overload the capacity of any existing utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's expense in accordance with plans and specifications to be approved in writing by Landlord.  Tenant shall promptly pay for all public utilities rendered or furnished to the Premises and exclusively serving same from and after the date Tenant assumes possession of the Premises (irrespective of whether Tenant shall have opened for business in the Premises) including, but not limited to, water, gas, electricity and sewer charges and all taxes thereon.  Landlord, at its election, may install re-registering meters and collect any and all charges aforesaid from Tenant as and when bills are rendered by Landlord, making returns to the proper public utility company or governmental unit, provided that Tenant shall not be charged more than the rates it would be charged for the same services if furnished direct to the Premises by such companies or governmental units.

**Section 4.2 Furnishing of Utility Services:**  Intentionally omitted.

**ARTICLE V**
**TAXES**

**Section 5.1 Tenant's Taxes**

Tenant covenants and agrees to pay promptly when due all taxes imposed upon its business operations and its personal property situated in the Premises.

**Section 5.2 Tenant's Participation in Real Estate Taxes**

Landlord will pay in the first instance all real property taxes, including extraordinary and/or special assessments (and all costs and fees incurred in contesting the same), hereinafter collectively referred to as Real Estate Taxes, which may be levied or assessed by the lawful tax authorities against the land, buildings, and all other improvements in the Shopping Center.

Tenant, for each Lease Year or Partial Lease Year, as defined in Section 1.7 during the term of this Lease or any renewal or option term thereof, shall pay to Landlord its proportionate share, as hereinafter defined, of all Real Estate Taxes assessed or levied against the land and buildings of the Shopping Center.  Tenant's proportionate share for said Real Estate Taxes for each Lease Year or Partial Lease Year of the term of this Lease or any renewal thereof shall be determined by multiplying the Real Estate Taxes by a fraction, the numerator of which shall be the number of square feet contained in Tenant's Premises and the denominator of which shall be the total number of square feet of all leasable building space within the Shopping Center.  Tenant shall pay to Landlord the Estimated Tax Charge specified in Item 14 of the Definitions, payable in advance equal monthly installments, together with the payment of the monthly Fixed Minimum

#1257 Conway, AR.final

Rent, during the first Lease Year or Partial Lease Year of the Lease Term. Tenant's Real Estate Tax payments shall be subject to annual adjustments by Landlord to reflect actual changes in the Real Estate Taxes due. Within thirty (30) days after the end of each Lease Year, Landlord shall provide Tenant with a statement assessing and prorating the Real Estate Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's pro rata share. Tenant shall pay to Landlord within thirty (30) days of such receipt, any deficiency owed to Landlord. In the event that Tenant's estimated payments are in excess of Tenant's pro rata share in any Lease Year, then such excess shall be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case such overpayment by Tenant shall be refunded to Tenant within thirty (30) days after the end of such Lease Year. In no event shall Tenant pay for Taxes for a time period longer than the Term. For example, if the Term is for five (5) Lease Years, then notwithstanding if the Real Estate Taxes are paid in advance, contemporaneously, or in arrears to the taxing authority, Tenant shall reimburse Landlord for Real Estate Taxes paid during the five (5) Lease Years of the Term regardless of when such Real Estate Taxes are levied or the time period for when such Real Estate Taxes are placed on the Shopping Center and/or the Demised Premises.

Interest and/or penalties for late payment shall not be included in determining Real Estate Tax increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord. It is expressly understood and agreed that Tenant shall not be required to pay, or reimburse Landlord for (i) any local, state or federal capital levy, franchise tax, revenue tax, income tax or profits tax of Landlord or (ii) any estate, inheritance, devolution, succession or transfer tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Demised Premises.

Should any governmental taxing authority, acting under any present or future law, ordinance, or regulation, levy, assess or impose a tax, excise and/or assessment (other than income or franchise tax) upon or against or in any way related to the land and buildings comprising the Shopping Center, either by way of substitution or in addition to any existing tax on land or buildings or otherwise, Tenant shall be responsible for and shall pay to Landlord its proportionate share as set forth above such tax, excise and/or assessment.

## ARTICLE VI
## REPAIRS AND MAINTENANCE

### Section 6.1 Repairs by Landlord

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to Section 6.2. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior faces of the exterior walls of the Demised Premises; (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights; (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (excluding the HVAC system exclusively serving the Demised Premises) whether or not exclusively serving the Demised Premises located outside the exterior surface of the demising walls or shared walls.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for

11

all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work: provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner.  All property of Tenant, including merchandise and furnishings, kept or stored on the Premises shall be so kept or stored at the risk of Tenant only and Tenant shall hold Landlord harmless from any and all claims arising out of damage to same.  If, after the expiration of all applicable notice and cure periods, Landlord is required to make repairs by reason of any negligent act or omission of Tenant, any permitted subtenants, concessionaires or their respective employees, agents, licensees or contractors, the cost of such repairs shall be borne by Tenant and shall be due and payable within thirty (30) days after receipt of Landlord's notification of the amount due and substantiation thereof.

## Section 6.2 Repairs and Maintenance by Tenant

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to Section 6.1 or any other sections of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls; (ii) ceilings; (iii) floor coverings; (iv) non structural portions of the storefront including doors, windows, window frames and plate glass; (v) any heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises,  but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the exterior face of the exterior or demising walls of the Demised Premises  including within the floor slab of the Demised Premises.   Tenant also agrees to repair and replace HVAC equipment located on the rooftop and serving the Demised Premises.  Any air conditioning unit supplied by Tenant shall remain in the Premises for the duration of the Lease Term and any renewals thereof, and shall become the property of the Landlord upon installation of such unit. Any damage to the exterior walls caused by a sign of Tenant which may be attached, including, but not limited to, rust stains caused by Tenant's sign, shall be repaired by Tenant at its own cost.  Tenant shall keep in force a standard maintenance agreement on all HVAC equipment exclusively serving the Demised Premises.

If Tenant refuses or neglects to properly repair and/or maintain the Premises as required herein and to the reasonable satisfaction of Landlord within the prescribed notice and cure period, Landlord may, but shall not be obligated to, make such repairs and/or maintenance, without liability for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay Landlord's costs for making such repairs within thirty (30) days of upon presentation of the bill and substantiation thereof.

## Section 6.3 Right of Entry

Landlord or its representative shall have the right to enter the Premises on prior written notice during Tenant's normal business hours during the Lease Term to: (a) ascertain if the Premises are in proper repair and condition, and further, Landlord or its representatives shall have the right, without liability, to enter the Premises for the purposes of making repairs thereto or to the building in which the same are located, including the right to take the required materials therefor into and upon the Premises without the same constituting an eviction of Tenant in whole or in part, and the Rent shall not abate while such repairs are being made by reason of loss or interruption of Tenant's business due to the performance of any such work; provided, however, Landlord shall use its best efforts not to unreasonably interfere with Tenant's business operations, and (b) within the last 6 months of the term, show the Premises to prospective purchasers, lenders and tenants.   During the ninety (90) days prior to the expiration or earlier termination of the Lease Term, Landlord may place one "For Lease" sign within the front window of the Premises.

#1257 Conway, AR.final

12

**Section 6.4 Sidewalks and Outside Areas**

Tenant shall not sweep trash or debris from the doors or windows of Tenant's Premises onto sidewalks, entrances, passages, courts, plazas or any of the Common Areas.

**Section 6.5 Replacement of Glass**

Tenant shall, at its own expense, replace all broken or damaged glass of the Premises.

**ARTICLE VII**
**RESTRICTIONS ON USE OF PREMISES**

**Section 7.1 Restrictions on Use of Premises**

Tenant covenants and agrees to use the Premises only for the permitted uses set forth in Item 4 of the Definitions and for no other purpose without the prior written consent of Landlord. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment. The Premises and all building and improvements thereon shall, during the term of this Lease be used only and exclusively for lawful and moral purposes and not part of the Premises or improvements thereon shall be used in any manner whatsoever that will injure the reputation of the Center nor for any purposes in violation of the laws, ordinances, regulations or orders of the United States, or the State, County and/or City where the Premises are located or the Fire Insurance Rating organization and/or the Board of Fire Insurance Underwriters, or any duly constituted subdivision, department or board thereof. Tenant shall comply with all such laws, ordinances, regulations or orders now in effect or hereafter enacted or passed during the term of this Lease insofar as the interior nonstructural portions of the Premises and any signs of Tenant are concerned, and shall make at Tenant's own cost and expense all interior nonstructural repairs, additions and alterations to the Premises and signs ordered or required by such authorities, whether to meet the special needs of Tenant, or by reason of the occupancy of Tenant, or otherwise.

**Section 7.2 Tenant's Normal Business Operation**

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section 7.2 and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from further liability hereunder.

**Section 7.3 Retail Restriction Limit:** Intentionally Omitted.

#1257 Conway, AR.final

13

## Section 7.4 Rules and Regulations

Tenant's use of the Premises shall be subject, at all times during the term of this Lease, to Landlord's right to adopt in writing, from time to time, modify and/or rescind reasonable Rules and Regulations not in conflict with any of the express provisions hereof governing the use of the parking areas, malls, walks, driveways, passageways, signs, exterior of buildings, lighting and other matters affecting other tenants in and the general management and appearance of the Center of which the Premises are a part, but no such rule or regulation shall discriminate against Tenant. The current rules and Regulations are attached hereto as Exhibit "C" and made a part hereof.

## Section 7.5 Signs, Awnings and Canopies

Landlord may, within the Common Areas, erect and maintain such suitable signs as it, in its sole discretion, may deem appropriate to advertise the Center. Tenant shall erect and maintain on the exterior of the Premises wall signs and under-canopy signs which shall be of such size and type used by Tenant in a majority of its locations. Tenant shall keep insured and shall maintain such signs in good condition and repair at all time, and such signs must be lighted at all time after sunset when the Center is in operation, while Tenant's Premises are open for business. If any damage is done to Tenant's signs, Tenant shall repair same within a reasonable period of time. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the state in which the Demised Premises are located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit "E" prior to or simultaneously with its execution of this Lease.

Tenant further agrees to maintain such sign, awning, canopy decoration, lettering, and advertising matter in good condition and repair at all times.

## Section 7.6 Hazardous Materials

Landlord represents and warrants that to the best of Landlord's knowledge the Demised Premises do not presently contain any materials currently deemed Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/ or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Term of this Lease, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Delivery Date or is determined to have been placed thereon by Landlord during the Term of this Lease, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials.

Throughout the Term of the Sublease, the time Tenant operated in the Demised Premises without a Lease, and the original Term of this Lease or any Option Terms or extensions, Tenant has not or shall not directly cause the presence, use generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises or the Shopping Center, other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall remove any Hazardous Materials from the Demised Premises and shall indemnify Landlord, and Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

#1257 Conway, AR.final

14

## ARTICLE VIII
## ADDITIONS, ALTERATIONS, REPLACEMENT AND TRADE FIXTURES

### Section 8.1 By Landlord

Landlord hereby reserves the right at any time to make alterations or additions to the building in which the Premises are contained and to build additional stores thereon, but not above the Demised Premises. Subject to the No Build Area and to the provisions of Section 3.1 hereof, Landlord also reserves the right to construct other buildings or improvements in the Shopping Center or Common Areas from time to time and to make alterations thereof or additions thereof and to build additional stores on any such other building or buildings so constructed.

### Section 8.2 By Tenant

Tenant may from time to time, at its own expense, alter, renovate or improve the interior of the Premises provided the same be performed in a good and workmanlike manner, in accordance with accepted building practices and so as not to weaken or impair the strength or lessen the value of the building in which the Premises are located. No changes, alterations or improvements affecting the exterior of the Premises shall be made by Tenant without the prior written approval of Landlord, which approval shall not be unreasonably withheld or delayed. Any work done by Tenant under the provision of this Section shall not interfere with the use by the other tenants of their premises in the Shopping Center. Tenant also agrees to pay 100% of any increase in the Real Estate Taxes or Landlord's Personal Property Taxes resulting from Tenant's improvements.

All alterations, decorations, additions and improvements made by Tenant, or made by Landlord on Tenant's behalf as provided in this Lease, shall remain the property of the Tenant for the term of this Lease or any extension or renewal thereof, but they shall not be removed from the Premises without the prior written consent of Landlord.

### Section 8.3 Construction Insurance and Indemnity

Landlord and Tenant shall indemnify and hold the other harmless from any and all claims for loss or damages or otherwise upon or in any manner growing out of any alterations or construction undertaken by each of them under the terms of this Lease, including all costs, damages, expenses, court costs and attorney's fees, incurred in or resulting from claims made by any person or person, by other tenants of premises in the Shopping Center, their subtenants, agents, employees, customers and invitees.

Before undertaking any material alterations or construction, Tenant shall obtain and pay for a public liability policy insuring Landlord and Tenant against any liability which may arise on account of such proposed alterations or construction work in limits of not less than $1,000,000.00 for any one person, $1,000,000.00 for more than one person in any one accident and $200,000.00 for property damage; and a certificate of such policy shall be delivered to Landlord prior to the commencement of such proposed work.

### Section 8.4 Mechanic's Liens and Additional Construction

If by reason of any alteration, repair, labor performed or materials furnished to the Premises for or on behalf of Tenant any mechanic's or other lien shall be filed, claimed, perfected or otherwise established as provided by law against the Premises, Tenant shall discharge or remove the lien by bonding or otherwise, within 30 days after Tenant receives notice of the filing of same. Notwithstanding any provision of this Lease seemingly to the contrary, Tenant shall never, under any circumstances, have the power to subject the interest of Landlord in the Premises to any mechanics' or material-men's liens of any kind, nor shall any provision contained in this Lease ever be construed as empowering the Tenant to encumber or cause the Landlord to encumber the title or interest of Landlord in the Premises.

15

Landlord and Tenant hereby expressly acknowledges and agrees that no alterations, additions, repairs or improvements to the Premises of any kind are required or contemplated to be performed as a prerequisite to the execution of this Lease and the effectiveness thereof according to its terms or in order to place the Premises in a condition necessary for use of the Premises for the purpose set forth in this Lease, that the Premises are presently complete and usable for the purposes set forth in this Lease and that this Lease is in no way conditioned on Landlord or Tenant making or being able to make alterations, additions, repairs or improvements to the Premises notwithstanding the fact that alterations, repairs, additions, or improvements may be made by Tenant for Tenant's convenience or for Tenant's purposes, subject to Landlord's prior written consent, at Tenant's sole cost and expense.

## Section 8.5 Trade Fixtures

All trade fixtures and equipment installed by Tenant in the Premises shall remain the property of Tenant.

Tenant shall have the right, at the termination of this Lease, to remove any and all trade fixtures, equipment and other items of personal property not constituting a part of the freehold which it may have stored or installed in the Premises including, but not limited to, counters, shelving, showcases, chairs, and moveable machinery purchased or provided by Tenant and which are susceptible of being moved without damage to the building, and the Premises, provided this right is exercised before the Lease is terminated or during the 30 day period immediately following such termination and provided that Tenant, at its own cost and expense, shall repair any damage to the Premises caused thereby, ordinary wear and tear and damage by fire and other casualty excepted.  The right granted Tenant in this Section 8.5 shall not include the right to remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor coverings (including wall to wall carpeting) glued or fastened to the floors or any paneling, tile or other materials fastened or attached to the walls or ceilings, all of which shall be deemed to constitute a part of the freehold, and, as a matter of course, shall not include the right to remove any fixtures or machinery that were furnished or paid for by Landlord.  The Premises shall be left in a broom-clean condition.  If Tenant shall fail to remove its trade fixtures or other property at the termination of this Lease or within 30 days thereafter, such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant, and, at the option of Landlord, shall become the property of Landlord.

## Section 8.6   Government Regulations.

Except as otherwise provided for herein, Landlord shall be responsible, at its sole cost and expense, for making all alterations of or improvements to the Demised Premises that are required by any law, statute, ordinance, order or regulation of any governmental authority and that are structural in nature or relate to the exterior thereof.  Except as otherwise provided for herein, Tenant shall be responsible for making any interior non-structural alterations of or improvements to the Demised Premises that are required by any law, statute, ordinance, order or regulation of any governmental authority following the Tenant possession date (except to the extent that such responsibility is imposed upon Landlord in the previous sentence or otherwise under this Lease) including ADA compliance within the Demised Premises to the extent necessitated by a change in the manner in which Tenant uses the Demised Premises; the specific manner in which Tenant displays its merchandise; or any interior modification of the Demised Premises made by Tenant.

## ARTICLE IX
## INSURANCE AND INDEMNITY

## Section 9.1 Tenant's and Landlord's Insurance

Tenant: During the Term, and any renewal or Option Term, Tenant shall maintain with respect to the Premises the following insurance (collectively, "Tenant's Insurance"):

16

(a)     Public liability insurance with a minimum combined limit of $3,000,000 for bodily injury or death in any one accident and for property damage in any one accident and which insurance shall name Landlord as an additional insured as its interests may appear.

(b)     Plate glass insurance covering all plate glass located in the Demised Premises.

(c)     At all times that tenant shall be performing Tenant's Work and until such time as such Tenant's Work shall be completed, builders risk insurance on Tenant's Work in the minimum amount of the total budget for Tenant's Work.

(d)     Fire and extended coverage insurance on (i) Tenant's Work and (ii) Tenant's inventory, equipment, furniture, trade fixtures, signs, and all other property kept on the Demised Premises (collectively, "Tenant's Property").

Each policy of Tenant's Insurance shall be issued by an insurance company that is licensed to do business in the state in which the Shopping Center is located and shall contain a provision that said policy shall not be canceled or changed in scope or amount of coverage without 30 days' prior written notice to Landlord.  Prior to the Term Commencement Date, Tenant shall provide Landlord with certificates or other evidence of Tenant's Insurance reasonably acceptable to Landlord.  Notwithstanding the foregoing, Tenant shall have the option to self-insure for all plate glass, inventory, equipment and trade fixtures.

Landlord: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's, and other tenants, trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises.  Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

During the Lease Term and any renewals, extensions or Option Terms, Tenant will pay to Landlord monthly, Tenant's estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year an amount as set forth in Item 18 of the Definitions to the extent not otherwise included in Common Area Charges.  Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium within ten (10) days of when the same are issued.  An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the unusual or hazardous use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance.  Tenant shall not be responsible for any increase in the payments toward such insurance cost.

#1257 Conway, AR.final

## Section 9.2   Extra Hazard Insurance Premiums

Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premise any article or permit any activity which may be prohibited by the standard form of fire or public liability insurance policy.  Tenant agrees to pay any increase in premiums for fire and extended coverage or public liability insurance which may be carried by a Landlord on the Premises or the building of which they are a part, resulting from the type of merchandise sold or services rendered by Tenant or activities in the Premises, whether or not Landlord has consented to the same.  In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule, issued by the organization making the insurance rate on the Premises, showing various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire and public liability insurance rate on the Premises.

Tenant shall not knowingly use or occupy the Premises or any other part thereof, or suffer or permit the same to be used or occupied for any business or purpose deemed extra hazardous on account of fire or otherwise.  In the event Tenant's use and/or occupancy causes any increase of a premium for the fire, boiler and/or casualty rates on the Premises or any part thereof above the rate for the last hazardous type of occupancy legally permitted in the Premises, Tenant shall pay such additional premium on the fire, boiler and/or casualty insurance policy that may be carried by Landlord for its protection against rent loss through fire.  Bills for such additional premiums shall be rendered by Landlord to Tenant at such times as Landlord may elect, and shall be due from and payable by Tenant when rendered in writing, but such increases in the rate of insurance shall not be deemed a breach of this covenant by Tenant.  Failure to pay amounts due hereunder shall be a breach of the Lease.

## Section 9.3 Indemnity

Tenant, its administrators, successor and assigns hereby agrees to indemnify, defend and hold harmless Landlord, its administrators, agents, contractors, employees, managers, successors and assigns, from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with: (i) any occurrence in the Demised Premises, except to the extent caused by the negligence or willful misconduct of Landlord, its agents, contractors, employees, managers, successors or assigns; (ii) Tenant's or its agents', contractors', employees', managers', successors' or assigns' negligence or willful misconduct in the Common Areas, or (ii) the failure of Tenant, its administrators, agents, employees, managers, successors or assigns to fulfill Tenant's obligations hereunder.  Landlord, its administrators, successors and assigns, hereby agrees to indemnify, defend and hold harmless Tenant, its administrators, agents, contractors, employees, managers, successors, and assigns, from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with: (i) the use and occupancy of the Common Areas, except to the extent caused by the negligence or willful misconduct of Tenant, its agents, contractors, employees, managers, successors, or assigns; (ii) Landlord's or its agents', contractors', employees', managers', successors', or assigns' negligence or willful misconduct in the Common Areas and Demised Premises; or (iii) the failure of Landlord, its administrators, agents, employees, managers, successors or assigns to fulfill Landlord's obligations hereunder.  When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord, each party's obligation to indemnify the other as set forth herein shall be in proportion to such party's allocable share of such joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 9.3 shall survive termination of this Lease.

18

## Section 9.4 Definition and Liability of Landlord

The term Landlord as used in this Lease means only the owner or the mortgagee in possession for the time being of the building in which the Premises are located or the owner of a leasehold interest in the building and/or the land thereunder so that in the event of sale of the building or an assignment of this Lease, or a demise of the building and/or land, Landlord shall be and hereby is entirely freed and relieved of all obligations of Landlord hereunder provided such purchaser(s), assignee(s) or lessee(s) that the purchaser, assignee or lessee has assumed and agreed to observe and perform all prior and future obligations of Landlord hereunder.

It is specifically understood and agreed that there shall be no personal liability on Landlord in respect to any of the covenants, conditions or provisions of this Lease; in the event of a breach or default by Landlord or any of its obligations under this Lease, Tenant shall look solely to the equity and rent stream of Landlord in the Shopping Center for the satisfaction of Tenant's remedies.

## Section 9.5 Mutual Waiver of Subrogation

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights or recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured.  Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 9.5 will survive termination of this Lease.

## ARTICLE X
## DAMAGE, DESTRUCTION AND CONDEMNATION

### Section 10.1 Damage or Destruction by Fire or Other Casualty

A.      Tenant shall give prompt notice to Landlord in case of fire or other damage to the Premises or the building(s) containing the Premises.  In the event the Premises are damaged by fire, explosion, flood, and tornado or by the elements, or through any casualty, or otherwise, after the commencement of the term of this Lease, the Lease shall continue in full force and effect.  If the extent of the damage is less than fifty percent (50%) of the cost of replacement of the Premises, the damage shall promptly be repaired by Landlord at Landlord's expense, provided that Landlord shall not be obligated to so repair if such fire, explosion or other casualty is caused directly by the negligence of Tenant, its subtenants, permitted concessionaires, or their agents, servants or employees, and provided further that Landlord shall not be obligated to expend for such repair an amount in excess of the insurance proceeds recovered or recoverable as a result of such damage, and that in no event shall Landlord be required to replace Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings and equipment.  In the event of any such damage and (a) Landlord is not required to repair as herein above provided, or (b) the Premises shall be damaged to the extent of fifty percent (50%) or more of the cost of replacement, or (c) the building of which the Premises are a part is damaged to the extent of seventy-five percent (75%) or more of the cost of replacement, or (d) all buildings (taken in the aggregate) in the Center shall be damaged to the extent of more than seventy-five percent (75%) of the aggregate cost of replacement, Landlord may elect either to repair or rebuild the Premises or the building or

19

buildings, or Landlord or Tenant may elect to terminate this Lease upon giving notice of such election to the other within ninety (90) days after the occurrence of the event causing the damage.

B.      If the casualty, repairing, or rebuilding shall render the Premises untenantable, in whole or in part, and the damage shall not have been due to the default or neglect of Tenant, a proportionate abatement of the Rent shall be allowed from the date when the damage occurred until the date Landlord completes the repairing or rebuilding, said proportion to be computed on the bases of the relation which the gross square foot area of the space rendered untenantable bears to the floor area of the Premises. If Landlord is required or elects to repair the Premises as herein provided, Tenant shall repair or replace its stock in trade, fixtures, furniture, furnishings, floor coverings and equipment, and if Tenant has closed for business, Tenant shall promptly reopen for business upon the completion of such repairs.

C.      In the event the Premises or the building(s) shall be damaged in whole or in substantial part within the last twenty-four (24) months of the original term, or within the last twenty-four (24) months of the last renewal term, if renewals are provided for herein, Landlord shall have the option, exercisable within ninety (90) days following such damage, of terminating this Lease, effective as of the date of receipt of mailing notice to the other thereof. If any such termination occurs during the initial term, any options for renewal shall automatically be of no further force or effect.

D.      No damage or destruction of the Premises or the building(s) shall allow Tenant to surrender possession of the Premises or affect Tenant's liability for the payment of rent or any other covenant contained herein, except as may be specifically provided in this Lease. Not withstanding any of the provisions herein to the contrary, Landlord shall have no obligation to rebuild the Premises or the building(s) and may at its own option cancel this Lease if the damage or destruction is a result of a casualty not covered by the insurance required to be carried by Landlord's insurance policy pursuant to the terms of this Lease.

**Section 10.2 Condemnations**

(a)      Total: In the event the entire Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, this Lease shall terminate and expire as of the date of title vesting in such proceeding, and Landlord and Tenant shall thereupon be released from any further liability hereunder.

(b)      Partial: If any part of the Premises shall be taken as aforesaid, and such partial taking shall render that portion not so taken unsuitable for the business of Tenant, as determined by Landlord, then this Lease and the term herein shall cease and terminate as aforesaid. If such partial taking is not extensive enough to render the Premises unsuitable for the business of Tenant, then this Lease shall continue in effect, except that the Fixed Minimum Rent shall be reduced in the same proportion that the floor area of the Premises taken bears to the original floor area leased and Landlord shall, upon receipt of the award in condemnation, make all necessary repairs or alterations to the building in which the Premises are located so as to constitute the portion of the building not taken a complete architectural unit, but such work shall not exceed the scope of the work to be done by Landlord in originally constructing said building, nor shall Landlord, in any event, be required to spend for such work an amount in excess of the amount received by Landlord as damages for the part of the Premises so taken. "Amount received by Landlord" shall mean that part of the award in condemnation which is free and clear to Landlord of any collection by mortgagee for the value of the diminished fee.

(c)      Termination: If more than twenty percent (20%) of the floor area of the building in which the Premises are located shall be taken as aforesaid, Landlord may, by written notice to Tenant, terminate this Lease, such termination to be effective as aforesaid.

(d)      Rent on Termination: If this Lease is terminated as provided in this paragraph, the rent shall be paid up to the date that possession is so taken by public authority and Landlord shall make an equitable refund of any rent paid by Tenant in advance.

20

(e)     Award: Tenant shall not be entitled to and expressly waives all claim to any condemnation award for any taking, whether whole or partial, and whether for diminution in value of the leasehold or to the fee although Tenant shall have the right, to the extent that the same shall not reduce Landlord's award, to claim from the condemner, but not from Landlord, such compensation as may be recoverable by Tenant in its own right for damage to Tenant's business, fixtures and improvements installed by Tenant at its expense.

**ARTICLE XI**
**DEFAULT**

**Section 11.1 Default**

Landlord may, at its option, terminate this Lease, as provided below and take the action outlined in Paragraph 11.2 hereof, IF:

A.     Tenant defaults in the payment of any rentals or any other payments when due, and such default shall continue for 10 days after written notice from Landlord to Tenant; OR

B.     Tenant defaults in fulfilling any of the other covenants or obligations of this Lease on Tenant's part to be performed hereunder, and such default has not been cured within 30 days after written notice from Landlord to Tenant specifying the natures of said default; OR

C.     The default so specified shall be of such a nature that the same cannot be reasonably cured or remedied within said 30 day period, if Tenant shall not in good faith have commenced the curing or remedying of such default within such 30 day period and shall not thereafter diligently proceed therewith to completion; OR

D.     At any time during the term should there be filed by or against Tenant or against any successor tenant then in possession, in any Court, pursuant to any statute, either of the United States or any state, a petition;

(1)     In bankruptcy;
(2)     Alleging insolvency;
(3)     For reorganization;
(4)     For the appointment of a receiver or trustee;
(5)     For an arrangement under the Bankruptcy Acts, OR
(6)     If a similar type of proceeding shall be filed and any such petition or filing against Tenant has not been dismissed within a period of twenty (20) days; OR

E.     Tenant makes or proposes to make an assignment for the benefit of creditors.

**Section 11.2 Landlord's Rights on Default**

If the notice provided shall have been given and the cure period shall have lapsed and should Landlord elect to terminate this Lease, Landlord shall have the immediate right to re-entry and may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, all without service of notice or resort to legal process, and Landlord shall not be deemed guilty of trespass, or become liable for any loss or damage which may be occasioned thereby. Upon the occurrence of any such default, Landlord shall have the option to pursue any one or more of the remedies provided for herein, in addition to all other rights and remedies available to Landlord at law or in equity, all of such rights and remedies being cumulative; provided, however, in no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant and in no event shall Landlord have a lien for the payment of all sums agreed to be paid by Tenant herein upon any of Tenant's property, which is to be in addition to Landlord's lien now or that may hereafter be provided by law.

#1257 Conway, AR.final

Should Landlord elect to re-enter or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by law, it may make such alterations and repairs as may be necessary in order to relet the Premises or any part hereof, for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rentals and upon such other terms and conditions as Landlord, in its sole discretion, may deem advisable. Upon each such reletting, all rentals received by Landlord from such reletting shall be applied first, to the payment of any indebtedness, other than rent due hereunder, from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including brokerage fees and to costs of such alterations and repairs; third, to the payment of Rent due and unpaid hereunder, the residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder. If such rentals received from such reletting during any month be less than that to be paid during that month by Tenant as set forth herein, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Landlord shall use commercially reasonable efforts to mitigate its damages; provided, however, Landlord shall not be obligated to relet the Demised Premises before leasing other portions of the Shopping Center.

The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either or the parties hereto against the other or any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or claim of injury or damage.

In the event of a breach by Landlord or Tenant of any of the covenants or provisions hereof, both parties shall have, in addition to any other remedies which it may have, the right to invoke any remedy allowed by law or in equity, including injunctive relief, to enforce Landlord's or Tenant's rights or any of them, as if re-entry and other remedies were not herein provided for.

In the event of any litigation arising out of enforcement of this Lease, the prevailing party in such litigation shall be entitled to recovery of all costs, including reasonable attorney's fees.

This agreement shall be deemed to have been made in Faulkner County, Arkansas and shall be interpreted, and the rights and liabilities of the parties here determined, in accordance with the laws of the State of Arkansas.

## Section 11.3 Non-Waiver Provisions

All rights and remedies of Landlord and Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Parties to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem desirable. The failure of Landlord or Tenant to insist upon strict performance by the other party of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any of said rights and remedies concerning any subsequent or continuing breach or default by the breaching party of any of the covenants, conditions, or agreements of this Lease.

## Section 11.4 Inability to Perform

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

# ARTICLE XII
# SECURITY

## Section 12.1 Security Deposit

Tenant is not required to deposit with Landlord an amount of money to be held as a security deposit.

## Section 12.2 Personal Property

Tenant is not required to give Landlord a security interest in Tenant's personal property as additional security for the performance of Tenant's obligations under this Lease Agreement.

## Section 12.3 Transfer of Amounts due Tenant

In the event of a sale or transfer of the Shopping Center or any portion thereof which includes the Premises or in the event of the making of a lease of the Shopping Center or of any portion , or in the event of a sale or transfer of the leasehold estate under any such underlying lease, the grantor, transferor or Landlord, as the case may be, shall thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under this Lease to the extent of the interest or portion so sold, transferred or leased, and it shall be deemed and construed, without further agreement between the parties and the purchaser, or transferee, as the case may be, has assumed and agreed to carry out any and all covenants of Landlord hereunder; provided that (i) any amount then due and payable to Tenant or for which Landlord or the then grantor, transferor or Landlord would otherwise then be liable to pay to Tenant (it being understood that the owner of an undivided interest in the fee or any such lease shall be liable only for his or its proportionate share of such amount) shall be paid to Tenant; (ii) the interest of the grantor, transferor or Landlord, as Landlord, in any funds then in the hands of Landlord or then grantor, transferor or Landlord in which Tenant has an interest, shall be turned over, subject to such interest, to the then grantee, transferee or Tenant; and (iii) notice of such sale, transfer or lease shall be delivered to Tenant.


# ARTICLE XIII
# ADDITIONAL TENANT AGREEMENTS

## Section 13.1 Mortgage Financing and Subordination

This Lease and all of Tenant's rights hereunder are and shall be subordinate to the present mortgage upon the Shopping Center, as well as to any existing ground lease; however, Tenant shall, upon request of either Landlord, the holder of any mortgage or Deed of Trust now or hereafter placed upon the Landlord's interest in the Premises or future additions thereto, and to any ground lease now or hereafter affecting the Premises, execute and deliver within 30 days of request therefor, such further instruments subordinating this Lease to the lien of any such mortgage or mortgages, and such ground lease, provided such subordination shall be upon the express condition that this Lease shall be recognized by the mortgagees and ground lessors and that the rights of Tenant shall remain in full force and effect during the term of this Lease and any extension thereof, notwithstanding any default by the mortgagors with respect to the mortgages or any foreclosure thereof, or any default by the ground lessee, so long as Tenant shall perform all of the covenants and conditions of this Lease.  Tenant agrees to execute all reasonable agreements required by Landlord's mortgagee or ground lessor or any purchaser at a foreclosure sale or sale in lieu of foreclosure by which agreements, and subject to the terms hereof, Tenant will attorn to the mortgagee or purchaser or ground lessor.

23

## Section 13.2 Assignment or Subletting

All assignments of this Lease or subleases of the Premises by Tenant shall be subject to and in accordance with all of the provisions of this Section.

Unless otherwise agreed to in writing by Landlord, any assignment or sublease of the entire Premises by Tenant shall be only for the purpose specified in Item 4 of the Definitions and in Section 1.4, Use of Premises, and for no other purpose, and in no event shall any assignment or sublease of the premises release or relieve Tenant from any obligations of this Lease, any such assignee or sublessee shall agree to abide by and assume all of the terms and conditions of this Lease, including exclusives, restrictions, and /or covenants affecting the Premises.

In the event that Tenant shall seek Landlord's permission to assign this Lease or sublet the Premises if and when Landlord's consent is required by the terms of this Lease, Tenant shall provide to Landlord the name, address, financial statement and business experience resume of the proposed assignee or subtenant and such other reasonable information concerning such proposed assignee or subtenant as Landlord may require. This information shall be in writing and shall be received by Landlord no less than thirty (30) days prior to the effective date of the proposed assignment of sublease. Any consent by Landlord to any assignment or sublease, or to the operation of a concessionaire or licensee, shall not constitute a waiver or the necessity for such consent to any subsequent assignment or sublease, or operation by a concessionaire or licensee.

Notwithstanding anything contained herein to the contrary, Tenant may assign this Lease or sublet all or any part of the Premises, in each case without the prior consent of Landlord, to a parent; subsidiary; affiliated corporation; successor to Tenant or the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area where the Demised Premises are located. No such subletting or assignment shall relieve Tenant of any of its obligations hereunder.

Any proposed assignee of Tenant shall assume Tenant's obligations hereunder and deliver to Landlord an assumption agreement in form satisfactory to Landlord not less than ten (10) days prior to the effective date of the proposed assignment.

## Section 13.3 Tenant's Notice to Landlord of Default

If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant shall give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default, and upon the completion of such work by Tenant, Tenant shall provide Landlord with a detailed statement of the work completed, together with copies of paid invoices for such work, and Landlord shall reimburse Tenant for such work within thirty (30) days after its receipt of such statement. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest from the next Rent payment(s) owing.

## Section 13.4 Short Form Lease

Tenant and Landlord agree not to record this Lease.

## Section 13.5 Surrender of Premises and Holding Over

At the expiration of the tenancy Tenant shall surrender the Premises in good condition, reasonable wear and tear excepted, and damage by unavoidable casualty (except to the extent that the same is covered by Landlord's fire insurance policy with extended coverage endorsement), and Tenant shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of Rent and shall inform Landlord of all combinations on locks, safes and vaults, if any,

in the Premises. Tenant shall remove all its trade fixtures before surrendering the Premises, and shall repair, at its own expense, any damage to the Premises caused thereby. Tenant's obligations to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease. In the event Tenant remains in possession of the Premises after the expiration of the tenancy created hereunder, whether or not with the consent or acquiescence of Landlord, and without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Premises as a Tenant at will on a month-to-month tenancy. The rent during this tenancy shall be payable weekly at 125% of the then payable Fixed Minimum Rent, and otherwise Tenant shall be subject to all the other terms, conditions, covenants, provisions and obligations of this Lease, and except as provided for herein, no extension or renewal of this Lease shall be deemed to have occurred by such holding over. Tenant's obligations to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease.

### Section 13.6 Estoppel Certificate

Tenant agrees to provide at any time, within thirty (30) days of Landlord's written request, a statement certifying that this Lease is unmodified and in full force and effect, or, if there have been modifications, that same are in full force and effect as modified and stating the modifications, and the dates to which the Fixed Minimum Rent and other charges have been paid in advance, if any. It is intended that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser or mortgagee of the Premises.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

### Section 14.1 Notices

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by: (i) a nationally recognized overnight express courier; or (ii) registered or certified mail return receipt requested; or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either: (i) the next business day in the case of delivery by overnight courier; or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address. Notice to Landlord shall be sent to the address specified in Item 16 of the Definitions. Notice to Tenant shall be sent to the address specified in Item 16 of the Definitions.

### Section 14.2 Entire and Binding Agreement

This Lease contains all of the agreements between the parties hereto, and it may not be modified, in any manner other than by agreement in writing signed by all parties hereto or their successors in interest. The terms, covenants and conditions contained herein shall inure to the benefit of and be binding upon Landlord and Tenant and their respective heirs, successors and assigns, except as may be otherwise expressly provided in this Lease.

### Section 14.3 Provisions Severable

If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be illegal, invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstance other than those to which it is held illegal, invalid or unenforceable shall not be affected hereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

25

## Section 14.4 Captions

The captions contained herein are for convenience and reference only and shall not be deemed as part of this Lease or construed as in any manner limiting or amplifying the terms and provisions of this Lease to which they relate.

## Section 14.5 Relationship of the Parties

Nothing herein contained shall be deemed or construed as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto; it being understood and agreed that neither the method of computing rent nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of Landlord and Tenant.

## Section 14.6 Accord and Satisfaction

No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudiced to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease or available at law or in equity.

## Section 14.7 Broker's Commission

Landlord and Tenant warrant that there are no claims for broker's commissions or finder's fees in connection with its execution of this Lease and each agrees to indemnify and save the other harmless from any liability that may arise from such claim, including reasonable attorney's fees.

## Section 14.8 Corporate Status

Tenant, a corporation, and Landlord, a corporation, represents and warrants to the other that it has all necessary authority as bestowed by its Board of Directors to execute this Lease.

## Section 14.9 Reasonable Consent

If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission.

**ARTICLE XV**
**OPTIONS**

## Section 15.1 Option Term(s) and Fixed Minimum Rent

Provided Tenant is not in default beyond any applicable notice and cure period at the time of its election to renew the term of this Lease, then the Tenant, by giving Landlord written notice not less than one hundred eighty (180) days prior to the expiration of the initial lease term or the option term as the case may be,  shall have the right to renew this Lease for two (2) five (5) year option terms,  referred to as  "Option Term One" and "Option Term Two".   Each option to extend the Term shall terminate once exercised.  The Option Terms shall commence at the end of the Original Term or at the end of Option Term One, as the case may be, upon the term(s) and Fixed Minimum Rent as specified in Item 17 of the Definitions and Percentage Rent specified in Item 11 of the Definitions.  All of the terms, covenants and conditions of the Lease, except those as set forth in Items 11 and 17 of the Definitions shall remain in full force and effect for any option term(s).

END OF LEASE – SIGNATURE PAGES AND EXHIBITS FOLLOW

#1257 Conway, AR.final

26

IN TESTIMONY WHEREOF, Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

LANDLORD:  Faulkner Plaza Shopping Center, an Arkansas corporation

By: _____
Joe T. Benton III
TITLE: President

Witnesses As To Tenant:

TENANT:  BIG LOTS STORES, INC., an Ohio Corporation

By: _____
Albert J. Bell
TITLE:  Vice Chairman

STATE OF ARKANSAS
COUNTY OF FAULKNER

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Faulkner Plaza Shopping Center, Inc.  by, Joe T. Benton III,  its President,  who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Greenbrier_ _Arkansas_____, this _19th_ day of _March_____, 2003.

_____
Notary Public

"OFFICIAL SEAL"
CAROLYN J. ENGLAND
NOTARY PUBLIC-STATE OF ARKANSAS
FAULKNER COUNTY
My Commission Expires 3/15/2004

STATE OF OHIO

COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Albert J. Bell, its Vice Chairman who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this ___11___ day of March, 2003.

_____
Notary Public

PENNY J. SAVAGE
Notary Public, State of Ohio
My Commission Expires May 10, 2003

#1257 Conway, AR.final

LEGAL DESCRIPTION
EXHIBIT "A"

A part of SE ¼ SW ¼ and a part of SW ¼ of SE ¼ of Section 6, Township 5 North, Range 13 West, Faulkner County, Arkansas, more particularly described as follows: Beginning at a nail where the north right-of-way line of U. S. Highway 64 intersects the west line of W ½ of SE ¼ of said Section 6, which point is north 1 degree 53 minutes 30 seconds east for 56.4 feet from the southwest corner or W ½ of SE ¼ of said Section 6; thence north 89 degrees 22 minutes east along and with the north right-of-way line of said U. S. Highway 64 for 73.85 feet to a 5/8" pipe; thence north 8 degrees 29 minutes west for 201.65 feet to a cotton spindle; thence north 89 degrees 23 minutes east for 172.70 feet to a "PK" nail; thence south 3 degrees 28 minutes 32 seconds west for 96.28 feet to a "PK" nail; thence south 15 degrees 34 minutes west for 107.96 feet to a 5/8" pipe on said north right-of-way line of U. S. Highway 64; thence north 89 degrees 22 minutes east along said north right-of-way line for 89.07 feet to a 5/8" pipe; thence north 1 degree 59 minutes 38 seconds east for 200 feet to a 5/8" pipe; thence north 89 degrees 23 minutes 33 seconds east for 150.08 feet (north 89 degrees 23 minutes east for 150 feet deed) to a 5/8" pipe at the northeast corner of Tract One conveyed to Shell Oil Company by the March 6, 1970, deed appearing of record in the office of the recorder of Faulkner County, Arkansas, in Deed Record Book 189, Page 528; thence north 1 degree 57 minutes 16 seconds east for 353.24 feet (north 01 degree 58 minutes east for 353.35 feet deed) to a 5/8" pipe; thence south 87 degrees 43 minutes 07 seconds east (south 87 degrees 48 minutes east deed) for 100.4 feet to a 5/8" pipe; thence north 2 degrees 06 minutes 31 seconds east for 283.53 feet (north 2 degrees 03 minutes east for 283.54 feet deed) to the west right-of-way line of Interstate Highway I-40; thence north 35 degrees 00 minute 06 seconds west (north 35 degrees 02 minutes west deed) along said I-40 right- of-way line for 399.28 feet to a 5/8" pipe at the most easterly corner of Lot 2, Waller's Replat of the north 15 feet of Lot 19 and all of Lots 20 through 25, Block 2, Erbacher Addition; thence north 35 degrees 00 minutes 06 seconds west (north 35 degrees 02 minutes west deed) along said right-of-way line and Lot 2 for 13.4 feet to a concrete monument; thence north 39 degrees 09 minutes 18 seconds west along said right-of-way line and Lot 2 for 4.61 feet to a 5/8" pipe; thence south 55 degrees 06 minutes 15 seconds west along the northerly line of said Lot 2 for 135.64 feet to a "PK" nail; thence south 88 degrees 52 minutes 28 seconds west (south 88 degrees 46 minutes 15 seconds west deed) for 157.09 feet to a 5/8" pipe; thence south 2 degrees 01 minute 11 seconds east (south 02 degrees 05 minutes 30 seconds east deed) for 197 feet to a 5/8" pipe; thence north 89 degrees 01 minute 57 seconds west (north 89 degrees 05 minutes 30 seconds west deed) for 169.6 feet to a R/R spike on the east right-of-way line of Gum Street; thence south 2 degrees 01 minute 44 seconds west (south 01 degree 53 minutes 30 seconds east deed) along the east right-of- way line of Gum Street for 35.0 feet to a R/R spike at the southwest corner of Lot 19, Erbacher Addition; thence south 87 degrees 56 minutes 48 seconds east (south 88 degrees 01 minute 30 seconds east deed) along the south line of said Lot 19 for 150 feet to a 5/8" pipe at southeast corner of said Lot 19 and which corner is on the west line of W ½ SE ¼ of said Section 6; thence south 1 degree 55 minutes 20 seconds west (south 01 degree 53 minutes 30 seconds west deed) along the west line of W ½ SE ¼ of said Section 6 and along the rear lot lines of Lots 18 through 4 and along the east line of Lot 3, said Erbacher Addition, for 863.95 feet (863.7 feet deed) to the north right-of-way line of U. S. Highway 64 and the point of beginning, containing 442,455 square feet of 10.157 acres, more or less. Subject to an easement for ingress and egress over and across the following described lands, in favor of JayJon, Inc.:

Fifteen (15) feet either side of a line that is described as follows: Begin at a point where the North right-of-way line of U. S. Highway 64 intersects the west line of the W ½ SE ¼ of Section 6, which point is North 1 degree 53 minutes 30 seconds East 56.4 feet from the Southwest corner of the W ½ SE ¼ of Section 6; run thence North 89 degrees 22 minutes East 230 feet to the true point of beginning of a line; from said true point of beginning run thence North 01 degree 57 minutes East 215 feet; run thence North 89 degrees 23 minutes East 176 feet; thence North 1 degree 58 minutes East 353.35 feet; thence South 87 degrees 48 minutes East 115.4 feet to the end of the line.

28

EXHIBIT "A"(PAGE 2)

Subject also to an easement for parking purposes over and across the following described lands, in favor of JayJon, Inc.:

TRACT 1: Part of the SW ¼ SE ¼, Section 6, Township 5 North, Range 13 West described as follows: Begin at a concrete monument where the North right-of-way line of U. S. Highway intersects the West line of the SW ¼ SE ¼ of Section 6, which point is North 01 degree 53 minutes 30 seconds East 56.4 feet from the Southwest corner of the SW ¼ SE ¼ of Section 6; thence North 89 degrees 22 minutes East along the North right of way line of U. S. Highway 64 73.85 feet to an iron pin; thence North 08 degrees 29 minutes West 201.65 feet to an iron pin and the true point of beginning; from the true point of beginning run thence North 89 degrees 23 minutes East 158.77 feet; run thence North 40 feet; run thence South 89 degrees 23 minutes West 158.77 feet; run thence South 40 feet to the true point of beginning, commonly referred to as parking South of Krogers.

TRACT 2: Part of the SW ¼ SE ¼, Section 6, Township 5 North, Range 13 West, described as follows: Begin at the Southwest corner of the said SW ¼ SE ¼; run thence North 1 degree 53 minutes 30 seconds Est along the West line of the W ½ SE ¼, Section 6, 955.1 feet to a point; run thence South 89 degrees 05 minutes 30 seconds East 480.98 feet to an iron pin on the Westerly right of way of Interstate 40; thence South 35 degrees 02 minutes East 68.83 feet to the true point of beginning; from said true point of beginning run thence South 02 degrees 03 minutes West 253.53 feet; run thence North 87 degrees 47 minutes West 132 feet: run thence North 155 feet; run thence Northeastwardly 171 feet, more or less, but nevertheless to the true point of beginning, commonly referred to as parking West of Shoneys.

BL#1257

## FIRST AMENDMENT TO LEASE AND LEASE EXTENSION

THIS FIRST AMENDMENT AND EXTENSION OF LEASE (the "Agreement"), made and entered into this __14__ day of __September__ 2017 by and between Y&O Faulkner, LLC ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, of the City Columbus, County of Franklin and State of Ohio, whose mailing address is 300 Phillips Road, Department 10061, Columbus, OH 43228 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated March 20, 2003, for approximately 32,550 square feet in the Faulkner Plaza Shopping Center, located at 150 E. Oak St., Conway, AR, as amended (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to extend the Term of the Lease for sixty (60) full calendar months, and

WHEREAS, Landlord acknowledges that pursuant to a letter dated June 8, 2012 Tenant exercised its second option to extend the term of the Lease until December 31, 2017.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1. Tenant desires to extend the term of the Lease for sixty (60) full calendar months from January 1, 2018 and expiring January 31, 2024 (the "Extension Term").

2. The Annual Fixed Minimum Rent will remain at $5.00 per sq. ft. ($162,750.00 annually), payable in equal monthly installments of $13,562.50.

3. Tenant agrees to contract for and control the construction for the following improvements (with estimated costs) to the Demised Premises, to be completed within the first year of the Extension Term: HVAC replacement ($120,000), LED lighting retrofit ($32,000), door replacement ($20,000), interior painting ($7,500), restroom remodel ($15,000), and building signage ($25,000).

4. Landlord will reimburse Tenant $50,000.00 for the above referenced improvements, which will be paid by Landlord within thirty days of Tenant's completion of all of the above referenced improvements and of the Tenant providing invoices and proof of lien releases.

5. The last sentence of Section 3.3 of the Lease shall read as follow: Notwithstanding anything contained herein to the contrary, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), reserves for replacements, insurance deductible and/or self-insured retentions, repairs and maintenance to the building excluding any common area and administrative fees, any depreciation of the Shopping Center, , and leasing commissions Management Fee (currently estimated to be $483.82) shall not exceed 3.5% of gross rental receipt received from tenants.

6. Paragraph 3 of Section 3.4 of the Lease shall be deleted in its entirety.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease

In the event there is a conflict between the terms and provisions of this Amendment and Extension of Lease and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Amendment and Extension of Lease, the terms and provisions of this Amendment and Extension of Lease shall control.

Landlord and Tenant each represent and warrant to the other that the individual executing this Amendment and Extension of Lease on their behalf are each duly authorized to execute and deliver this Amendment and Extension of Lease.

This Amendment and Extension of Lease shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Amendment and Extension of Lease may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Amendment and Extension of Lease to be executed as of the date first written above.


By: Timothy A. Johnson
    Executive Vice President
    Chief Administrative Officer and
    Chief Financial Officer
TENANT:  **BIG LOTS STORES, INC.**


By: Stephan Gardner, authorized signer
LANDLORD:  **Y&O FAULKNER, LLC**

DocuSign Envelope ID: 2E2A7FE3-EA58-40B7-9D7B-0B918B742E55

BL #1257

## SECOND AMENDMENT TO LEASE AND LEASE EXTENSION

THIS SECOND AMENDMENT AND EXTENSION OF LEASE (the "Agreement"), made and entered into this _____ of _July_____, 2023 by and between Y&O Faulkner, LLC ("Landlord"), and Big Lots Stores, LLC, an Ohio limited liability company, formerly known as Big Lots Stores, Inc., having a mailing address of 4900 East Dublin Granville Road, Columbus, OH 43081(hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated March 20, 2003, and subsequent amendments for approximately 32,550 square feet in the Faulkner Plaza Shopping Center, located at 150 E. Oak St., Conway, AR, as amended (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to extend the Term of the Lease for sixty (60) full calendar months, and

WHEREAS, Landlord acknowledges that pursuant to the FIRST AMENDMENT TO LEASE AND LEASE EXTENSION dated September 14, 2017 the Lease will expire on January 31, 2024.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1.  Tenant desires to extend the term of the Lease for sixty (60) full calendar months from February 1, 2024 and expiring January 31, 2029 (the "Second Extended Term").

2.  The Annual Fixed Minimum Rent shall be $5.75 per sq. ft. ($187,162.50 annually), payable in equal monthly installments of $15,596.88.

3.  Kelley Commercial Partners is Agent for Landlord in this transaction and shall be paid under a separate agreement. Tenant was not represented by an agent in this transaction.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease

In the event there is a conflict between the terms and provisions of this Amendment and Extension of Lease and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Amendment and Extension of Lease, the terms and provisions of this Amendment and Extension of Lease shall control.

Landlord and Tenant each represent and warrant to the other that the individual executing this Amendment and Extension of Lease on their behalf are each duly authorized to execute and deliver this Amendment and Extension of Lease.

This Amendment and Extension of Lease shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Amendment and Extension of Lease may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment and Extension of Lease to be executed as of the date first written above.

TENANT: BIG LOTS STORES, LLC, an Ohio limited liability company

By: *Jonathan Ramsden*

Name:   Jonathan Ramsden

Title:   Executive Vice President,

   Chief Financial & Administrative Officer

LANDLORD: **Y&O FAULKNER, LLC**

By: *Henry Kelley, CEO*
*Kelley Commercial Partners, Agent for owner*