# Exhibit "B"

Docusign Envelope ID: CF0BF930-4B73-4DED-B017-0B453BD86C40

BL #1847

## SECOND LEASE MODIFICATION AGREEMENT

This Second Lease Modification Agreement (the "Agreement") is made as of the **30** day of _**July**_, 2024, (the "Effective Date") by and between **Y&O 240 LLC, a Delaware limited liability company,** successor in interest to Walnut Square Shopping Center, L.L.C., having a business address of c/o Price Edwards & Co., 210 Park Avenue, Suite 700, Oklahoma City, OK 73102 ("Landlord"), and **BIG LOTS STORES, LLC, an Ohio limited liability company,** formerly known as Big Lots Stores, Inc., having a mailing address of 4900 East Dublin Granville Road, Columbus, OH 43081 (the "Tenant").

### RECITALS:

Landlord and Tenant are parties to a Lease Agreement dated March 30, 2004 ("Original Lease"), for approximately 33,280 square feet of storeroom ("Demised Premises") located in the Walnut Square Shopping Center, at 7301 S. Pennsylvania Ave., S, Oklahoma City, OK 73159, as more particularly described in the Lease. The Original Lease together with any amendments thereto shall hereinafter be collectively referred to as the "Lease."

A. The Term of the Lease is currently set to expire on January 31, 2025.

B. The parties desire to extend the Term of the Lease for approximately seven (7) years and further modify the Lease as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.    <u>Extension of Term</u>.  The Term of the Lease is hereby extended for approximately seven (7) years commencing on February 1, 2025 and expiring on January 31, 2032 (the "Extended Term") upon the same terms and conditions as contained in the Lease, except as set forth herein.

2.    <u>Fixed Minimum Rent.</u>  During the Extended Term, the Fixed Minimum Rent payable by Tenant to Landlord for the Demised Premises shall be as follows:

| Extended Term | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
|---|---|---|
| February 1, 2025 – January 31, 2029 | $208,000.00 ($6.25/sf) | $17,333.33 |
| February 1, 2029 – January 31, 2032 | $216,320.00 ($6.50/sf) | $18,026.67 |

3.    <u>Option Terms</u>.  Tenant shall retain its two (2) remaining five (5) year options to extend the Term of the Lease ("Third Option Term" and "Fourth Option Term"), pursuant to the terms specified in Lease, except Fixed Minimum Rent shall be modified per the table below:

Docusign Envelope ID: CF0BF930-4B73-4DED-B017-0B453BD86C40

BL #1847

| Option Terms | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
|---|---|---|
| Third Option Term | $216,320.00 ($6.50/sf) | $18,026.67 |
| Fourth Option Term | $232,960.00 ($7.00/sf) | $19,413.33 |

Tenant may elect to exercise each option by giving the Landlord written notice at least 270 days prior to the expiration of the immediately preceding Term or previous Option Term, as applicable.

4.      Full Force and Effect; Successors and Assigns.  Unless otherwise set forth herein, all capitalized terms shall have the meaning set forth in the Lease.  Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

5.      Counterpart Execution.  This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

Landlord and Tenant have respectively signed this Second Lease Modification Agreement as of the date first hereinabove set forth.

**LANDLORD:**

**Y&O 240 LLC**
**a Delaware limited liability company**

By: _____
Name: _PRICE EDWARDS AS A hcST_
Title: _FOR Y&o 240 LLC_

**TENANT:**

**BIG LOTS STORES, LLC**
**an Ohio limited liability company**

By: _Jonathan Ramsden_
Name:  Jonathan Ramsden
Title:  Executive Vice President, Chief
          Financial & Administrative Officer

Page **2** of **2**



4900 EAST DUBLIN GRANVILLE ROAD
COLUMBUS, OHIO  43081-7651

September 1, 2019

**VIA FEDEX**
(405) 843-7474

Walnut Square Shopping Center, LLC
c/o Price Edwards & Company
210 Park Avenue
Suite 700
Oklahoma City, OK 73102

Re:    **BIG LOTS #1847 – Oklahoma City, OK**
Lease Agreement by and between Walnut Square Shopping Center, LLC (Landlord), and Big
Lots Stores, Inc., an Ohio corporation, ("Tenant") dated March 30, 2004 (the "Lease").

Dear Landlord:

Pursuant to the Lease Agreement, Tenant hereby exercises its option to extend the term of the Lease commencing
February 1, 2020 and expiring on January 31, 2025 ("Second Option Term"). Fixed Minimum Rent will be One
Hundred Ninety-Nine Thousand Six Hundred Eighty and 00/100 Dollars ($199,680.00) per annum, payable in
equal monthly installments of Sixteen Thousand Six Hundred Forty and 00/100 Dollars ($16,640.00).

Thank you.

**Big Lots Stores, Inc., an Ohio corporation**

Jonathan Ramsden
Executive Vice President
Chief Financial & Administrative Officer

JR/smm

BL#1847

Big lots - WS

## FIRST LEASE MODIFICATION AGREEMENT

**FIRST LEASE MODIFICATION AGREEMENT** (the "Agreement") is made and entered into this 21st day of January, 2018 ("Effective Date"), by and between Walnut Square Shopping Center, LLC, an Oklahoma limited liability company ("Landlord") with a business address at c/o Price Edwards & Company, 210 Park Avenue, Suite 700 Oklahoma City, OK 73102 and Big Lots Stores Inc., an Ohio corporation ("Tenant") with its business address at 300 Phillipi Road, Columbus, OH 43228-5311.

**WHEREAS**, Landlord and Tenant are parties to a Lease Agreement dated March 30, 2004, as modified (collectively, the "Lease") for approximately 33,280 square feet of retail space (the "Demised Premises") located in the shopping center commonly known as Walnut Square Shopping Center located at 7301 S. Pennsylvania Avenue Suite A, Oklahoma City, OK 73159-3318 (the "Shopping Center"), as more particularly described in the Lease; and

**WHEREAS**, all capitalized terms not defined herein shall have the same meaning given them in the Lease; and

**WHEREAS**, Landlord and Tenant mutually desire to amend the Lease by waiving the Competing Business restriction outlined in Section 4.A. of the Lease with regard to certain space at the Shopping Center in exchange for reduced Fixed Minimum Rent as provided for herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows, effective as of the Effective Date, as hereinafter defined:

1. Effective upon full execution hereof, lines 6 through 15 in the second paragraph of Section 5.A. of the Lease are hereby deleted entirely and replaced with the following paragraph:

   "The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of **$199,680.00** per annum, which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of **$16,640.00**. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of **$216,320.00** per annum, which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of **$18,026.67**. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of **$232,960.00** per annum, which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of **$19,413.33**."

2. Notwithstanding anything to the contrary contained in the Lease, and for this one-time request only, Tenant hereby waives its Competing Business restriction outlined in Section 4.A. of the Lease and does not object to Landlord leasing the area cross hatched on the attached Exhibit A - Site Plan to dd's Discounts and Tenant hereby agrees that such use will not be deemed to violate Tenant's Lease (the "Waiver"). It is understood and agreed that this Waiver shall apply only to such use as dd's Discounts, and the provisions set forth in Section 4.A. of the Lease shall not otherwise be deemed waived or modified in any way except as provided herein.

3. Landlord agrees to repair the parking lot and hazardous sidewalk located in the common areas of the Shopping Center within thirty (30) days of full execution of the Effective Date of this Agreement.

4. Except as modified herein, all other terms and conditions of the Lease shall continue in full force and effect.

5. Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

6. In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

7. Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on their behalf are each duly authorized to so execute and deliver this Agreement.

1

BL#1847

8. This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

9. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original

10. The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to each other.

11. If a party returns this Agreement by facsimile machine or email pdf, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine or email pdf to be its original signature.

(the remainder of this page is intentionally left blank)

2

BL#1847

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

**Walnut Square Shopping Center, LLC, an Oklahoma limited liability company**

By: _____

(Landlord's Acknowledgement)

STATE OF                    )
                                       ) ss
County of                     )

Before me, a Notary Public, in and for said State and County, personally appeared the above-named Prime Landlord, _____, by _____, its _____, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF**, I hereunto set my hand and the official seal, at _____, this _____ day of January 2018.

_____
Notary Public

[Notary Seal]

Witnesses as to Tenant:

**TENANT:**

**Big Lots Stores, Inc., an Ohio corporation**

By: _____
Name: Timothy A. Johnson
Its:    Executive Vice President
        Chief Administrative Officer &
        Chief Financial Officer

(Tenant's Acknowledgement)

STATE OF OHIO                )
                                            )ss:
COUNTY OF FRANKLIN   )

Before me, a Notary Public, in and for said State and County, personally appeared the above-named Tenant, **Big Lots Stores, Inc., an Ohio corporation**, by Timothy A. Johnson, its Executive Vice President – Chief Administrative Officer & Chief Financial Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF**, I hereunto set my hand and the official seal, at Columbus, Ohio, this 21st day of January March 2018.

Andrea L. Muhammad
Notary Public
In and For the State of Ohio
My Commission Expires
10 June 2020

_____
Notary Public

3

BLJ#1847

Exhibit A



4



300 PHILLIPI ROAD
COLUMBUS, OHIO  43228-5311

September 12, 2014

**<u>VIA FedEx—OVERNIGHT DELIVERY</u>**
405-843-7474

WALNUT SQUARE SHOPPING CENTER, LLC
C/O PRICE EDWARDS & COMPANY
210 PARK AVENUE-SUITE 1000
OKLAHOMA CITY, OK 73102

Re:     **<u>BIG LOTS #1847—Oklahoma City, OK</u>**
Lease Agreement by and between Walnut Square Shopping Center, LLC, am Oklahoma
limed liability company ("Landlord") and Big Lots Stores, Inc., an Ohio corporation
("Tenant") dated March 30, 2004, as amended (collectively, the "Lease").

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the term of the Lease commencing
February 1, 2015, and expiring on January 31, 2020 ("First Option Term"). Fixed Minimum Rent will be
One Hundred Ninety-Nine Thousand Six Hundred Eighty and 00/100 Dollars ($199,680.00) per annum,
payable in equal monthly installments of Sixteen Thousand Six Hundred Forty and 00/100 Dollars
($16,640.00). Thank you.

**Big Lots Stores, Inc., an Ohio corporation**



Timothy A. Johnson
Executive Vice President,
Chief Financial Officer

TAJ /lms

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term
   C. Tenant's Right to Terminate

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Percentage Rent-
   D. Common Area Charges
   E. Real Estate Taxes
   F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

## LEASE AGREEMENT

This Lease Agreement (this "Lease") is made effective this 31 day of March, 2004 (the "Effective Date"), by and between Walnut Square Shopping Center, L.L.C., an Oklahoma limited liability company having an address of 7301 South Pennsylvania Avenue, Oklahoma City, Oklahoma 73159 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, having an address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-0512 ("Tenant").

## WITNESSETH:

1. **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.  Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the Site Plan attached hereto as Exhibit A, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises (hereinafter defined). Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas. Landlord shall not alter the areas outlined in green on Exhibit A without the prior written consent of Tenant.

B.  Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work, which shall be completed pursuant to Exhibit C attached hereto. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverage described in this Lease.

2)  The "Tenant Possession Date" shall be the earlier of: (i) the date Tenant accepts possession following Landlord's notice that it has

completed all construction required pursuant to Exhibit C; or (ii) ten (10) days after written notice from Landlord that it has completed all construction as required pursuant to Exhibit C. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless: (i) the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant; (ii) construction pursuant to Exhibit C is complete; and (iii) the Demised Premises complies with all laws, ordinances, regulations and building restrictions to the extent possible prior to the installation of Tenant's fixtures and completion of Tenant's work. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)      The "Rent Commencement Date" shall be the earlier of: (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business at the Demised Premises provided Tenant has received all permits and approvals for its construction.

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      If Landlord fails to return properly executed Leases to Tenant by April 1, 2004, or if Landlord fails to tender possession of the Demised Premises to Tenant by June 15, 2004, then Tenant may cancel this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to June 1, 2004. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by June 15, 2004, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon June 16, 2004 and continuing for each and every day Landlord is delayed in delivering possession to Tenant for fifteen (15) days thereafter, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day. Commencing on July 2, 2004 and continuing for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or it successors and assigns) annually, from the next installments(s) of Rent due under this Lease.

6)      Notwithstanding anything to the contrary, in the event Landlord has not offered delivery of possession of the Demised Premises by August 15, 2004, Tenant will not be required to accept possession until January 3, 2005. The period of time between August 15, 2004, and January 3, 2005 will be the "Optional Blackout Period". In the event Tenant elects to accept possession of the Demised Premises in 2005, then effective upon the date of such election, no Liquidated Damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not offered delivery of possession to Tenant by August 1, 2004, then Tenant may terminate this Lease by delivery of a termination notice at any time within fifteen (15)

days after August 1, 2004 provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to such date.

7)      In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until ninety (90) days after delivery of possession of the Premises by Landlord. Notwithstanding anything in this Lease to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.      <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)      Exhibit A -    Site Plan of Shopping Center

2)      Exhibit A – 1 Tenant's Drawing of Demised Premises

3)      Exhibit B -    Legal Description of Shopping Center

4)      Exhibit C -    Landlord Work

5)      Exhibit D -    Tenant Building Sign Specifications

6)      Exhibit D – 1 Tenant Pylon Sign Location

7)      Exhibit E -    Delivery of Possession Letter

8)      Exhibit F -    Exclusive Use Provisions

9)      Exhibit G -    Remeasurement Rider

D.      <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 33,280 square feet with dimensions of 160' by 208', exclusive of mezzanine and basement space ("Tenant's Square Footage"). Tenant's Drawing of the Demised Premises is attached hereto as Exhibit A-1 and is deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide Landlord with written notice of its findings. Should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than five percent (5%), then all aspects of Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than five percent (5%), then Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with Landlord.

E.      Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, commonly known as Walnut Square and having an address of I-240 and Penn, Oklahoma City, Oklahoma County, Oklahoma 73159. The term "Shopping Center" shall not include the former Wal-Mart space designated on Exhibit A, which Landlord represents is not a part of Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with violation of this representation.

2.    **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.    **TERM:**

A. Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2015 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant, except as otherwise expressly provided herein, shall be released from all liability under this Lease thereafter accruing. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B. Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and Fourth Option Term (collectively, the "Option Terms"). The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred twenty (120) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

C. Tenant's Right to Terminate: Tenant shall have the one time right to terminate this Lease, in Tenant's sole and absolute discretion, upon written notice ("Termination Notice") to Landlord, which Termination Notice must be given within ninety (90) days subsequent to January 31, 2010 provided that Tenant's Gross Sales at the Demised Premises do not meet or exceed the sum of $3,500,000.00; and in such event, Tenant shall: (i) vacate the Demised Premises within ninety (90) days following such Termination Notice; and (ii) pay to Landlord the sum of $50,000.00. In such event, this Lease shall terminate on the date Tenant vacates as if such date were the scheduled expiration date of this Lease.

The term "Gross Sales" shall mean: (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year; and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts

shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

## 4.    USE AND OPERATION:

**A.    Permitted Uses.** Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, food (including frozen food), and for any other lawful purpose.    Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises.    All exclusive use provisions granted by Landlord, or any successor thereto, to tenants in the Shopping Center are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with violation of this provision.

Except for tenants open and operating for business in the Shopping Center as of the Effective Date, no other general merchandise, discount, liquidator, closeout store, furniture, or dollar store operation ("Competing Business") may be permitted in the Shopping Center during Term. Expressly excluded from the definition of Competing Business is a Dollar General store, provided such store shall not exceed 8,000 square feet in dimension. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall pay in lieu of the current amounts of Rent then owing monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-half (1/2) of the annual Fixed Minimum Rent, in addition to Tenant's pro rata share of other costs due hereunder, such amount to be payable within thirty (30) days after the month for which it is due.  At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder.  In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in

closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to: (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises, and Tenant agrees to use commercially reasonable efforts to keep such carts and baskets in such areas; (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise, provided that there shall not be more than one (1) such sale per month, and provided further that Tenant shall give Landlord prior written notice of such sale, and such sales will be conducted so as not to materially disturb the operation of any other tenant's business and comply with all local laws, codes, and ordinances; and (iii) have drop/storage trailers in the receiving area of the Demised Premises so long as such trailer(s) do not interfere with other tenants and the operation of the Shopping Center and are in compliance with all local laws, codes, and ordinances.

**B.     Prohibited Uses.**     Except for tenants open and operating for business at the Shopping Center as of the Effective Date, Landlord shall not lease any space in the Shopping Center and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) auditorium, activity facility, or meeting hall; (iv) any self storage facilities; (v) intentionally omitted; (vi) any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities, provided that any or all such types of business are located at least 200 feet from Tenant's front door; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment or the sale of alcoholic beverages; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operation (except that a health spa, health club, or exercise club may be placed in the Shopping Center so long as such business is at least 200 feet from Tenant's front door); (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or

coin operated laundromat, except that a facility used for the dropping off and picking up of laundry may be permitted; (xx) day care center or school (except for the business school currently operating at the Shopping Center) (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop that is not at least 200 feet from Tenant's front door; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; or (xxvii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the "Prohibited Uses".

5. **RENT AND CONSTRUCTION ALLOWANCE:**
From and after the Rent Commencement Date and subject to Tenant's entitlement to offset the amount of rent abatement described herein, during the Term, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent, Percentage Rent (hereinafter referred to from time to time as "Rent") and all other charges due from Tenant to Landlord under this Lease ("Additional Rent")The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

    A.   Fixed Minimum Rent: During the first Partial Lease Year and the first five Lease Years of the Original Term, the sum of $166,400.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $13,866.67; during the final five Lease Years of the Original Term, the sum of $183,040.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $15,253.33.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $199,680.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $16,640.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $216,320.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $18,026.67. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $232,960.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $19,413.33. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $249,600.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $20,800.00.

*[Handwritten margin notes: "Replaced w/ 15 Lease Mod. Agmt"; "199,680"; "16,640"; "216,320"; "18,026.67"; "19,413.33"; "232,960"]*

    B.   Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary for Tenant to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation of such devices shall be at the

cost and responsibility of the Tenant. The monitoring equipment may be installed at any time during the Term. Tenant reserves the right to leave the monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of: (i) the bulk rate paid by Landlord; or (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof.

C.    Percentage Rent:  In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's Gross Sales (as hereinafter defined) which exceeds the annual base sum of: (i) $6,656,000.00 during the first Partial Lease Year and the first five Lease Years of Original Term; (ii) $7,321,600.00 during the final five Lease Years of the Original Term; (iii) $7,987,200.00 during the First Option Term;(iv) $8,652,800.00 during the Second Option Term; (v) $9,318,400.00 during the Third Option Term; and (vi) $9,984,000.00 during the Fourth Option Term. The parties hereby agree and understand that the foregoing shall not constitute a representation nor warranty that Tenant may or shall actually achieve the stated base sums in sales. In addition, the parties hereto agree that the provisions of this Section 5C shall not in any way be construed as to create any partnership or joint venture between Landlord and Tenant and that the relationship of the parties shall be that of landlord and tenant only.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month. Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by Tenant. Tenant shall pay any Percentage Rent due within thirty (30) days of receipt of an invoice for Percentage Rent from Landlord.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), so that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any

reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event. Any information obtained from such an audit shall remain confidential and shall be used only for the purpose for which the audit is being conducted. Landlord shall be liable for any direct and consequential damages resulting from violation of this Lease provision and/or from the illegal dissemination of such information.

D.     Common Area Charges and Cap: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)   providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)   cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Common Area Charges are limited to refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and public liability, property damage, and fire and extended coverage on the Common Areas, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies.

Subject to the CAM Cap, Tenant agrees to pay to Landlord its pro rata share of such Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is Tenant's Square Footage the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

Excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, and uninsured retentions, and any administrative, management or related fees.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein. If Landlord has not provided such reconciliation within 90 days, Tenant shall be obligated to pay Landlord Seventy-Five Percent (75%) of such monthly Common Area Charges as Tenant paid Landlord for the final month of the immediately preceding Lease Year until the month following Tenant's receipt of such reconciliation.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's accountants. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five

percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually against the next Rent payments due from Tenant to Landlord hereunder.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's Common Area Charges shall be capped at $0.75 per square foot of the Demised Premises for each Lease Year during the Original Term. Should Tenant elect to exercise any available option periods, such charges shall be capped at $0.90 per square foot of the Demised Premises for each Lease Year during the First Option Term, $1.05 per square foot of the Demised Premises for each Lease Year during the Second Option Term, $1.20 per square foot for each year during the Third Option Term, and $1.35 per square foot for each Lease Year during the Fourth Option Term (collectively, the Common Area Charges Cap described herein shall be known as the "CAM Cap").

E.  Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be Tenant's Square Footage and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) Leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes and work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the tax year immediately preceding the Effective Date were $0.56 per square foot per annum.

Within ninety (90) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Real Estate Taxes for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Real Estate Taxes as stated herein. If Landlord has not provided such reconciliation within 90 days, Tenant shall be obligated to pay Landlord Seventy-Five Percent (75%) of such Real Estate Taxes as Tenant paid Landlord for the immediately preceding Lease Year until the month following Tenant's receipt of such reconciliation.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of any increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate predecessor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Construction Allowance: Tenant shall be entitled to payment of $100,000.00 from Landlord as of the date Tenant has substantially completed Tenant's work and provided Landlord with executed lien releases from all contractors, subcontractors and material suppliers in connection with Tenant's work for all

contracts with respect to Tenant's work in excess of $5,000.00,. Furthermore, Tenant shall receive rent abatement in the amount of $15,000.00 as an inducement for Tenant to perform ductwork to the HVAC at the Demised Premises on the Tenant Possession Date. The aforementioned sums are collectively referred to as the "Construction Allowance".

If the Construction Allowance is not paid by Landlord to Tenant as specified above, Landlord shall, in addition to payment thereof, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York (or its successors or assigns) from the due date of the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

Tenant's EIN: 06-1119097

Landlord's EIN: 73 1466755

6. **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations to the interior portions of the Demised Premises without consent from Landlord, provided that such changes, additions, and alterations shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of the Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

7. **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls; (ii) ceilings; (iii) floor coverings; (iv) non structural portions of the storefront including doors, windows, window frames and plate glass; (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises after the same is delivered to Tenant in good working order or condition; and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements Tenant is required to make pursuant to this Section 7.  The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following:

(i) exterior walls of the Demised Premises and exterior faces thereof; (ii) the roof; (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any); (vii) marquee lights or rear or side floodlights; (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises; and (ix) any loading docks and driveways at the Shopping Center and serving the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Rent Commencement Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense and to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually (or its successors and assigns), from its next Rent payment(s) owing.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within thirty (30) days after the Tenant Possession Date or during the first periodic maintenance visit, whichever is later, by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or its successors and assigns) annually, from the next installment of Rent.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repairs are necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or its successors and assigns) annually, from the next Rent payment(s) owing.

If Landlord fails to complete Landlord's Work at the Demised Premises within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, then Tenant, in Tenant's sole discretion may: (i) refuse to accept possession of the Demised Premises; or (ii) be permitted to enter the Demised Premises and complete the Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.   **SIGNS:**

Tenant shall at its sole cost and expense have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State of Oklahoma.

Landlord shall ensure that Shopping Center pylons shown on Exhibit D-1: (i) are fit for Tenant's intended use including, without limitation, proper wiring, maintenance and construction; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof without prior notice.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center pylons as depicted on Exhibit D-1. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on a space within the top one-half (1/2) portion of any other pylon existing in the future. In the event space is unavailable on any future pylon, Landlord grants Tenant a right of first refusal to occupy, in accordance with the provisions herein, any pylon space which may become available during the Term or during any holdover period. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the vacated pylon space. Absent an existing pylon, Tenant shall have the right to erect a pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once Tenant's sign panels and/or Tenant's pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

During the Term, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.   **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.   At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting

from such removal, reasonable wear and tear excepted, and shall deliver the Demised
Premises to Landlord in broom clean condition. Should Tenant have installed lighting
fixtures, and/or HVAC equipment, the parties agree that such installations are not trade
fixtures or equipment and the same may not be removed from the Demised Premises at
the end of the Term since they will have become the property of the Landlord when so
affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to
place vending machines and equipment (including, but not limited to public telephones
and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall
be responsible for maintaining said machines and equipment in good condition and shall
indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees that the Demised Premises conform to all requirements by authority
having jurisdiction; if the Demised Premises do not conform, Landlord shall promptly
cause them to conform at all times unless such non-conformity is necessitated by changes,
alterations or additions made by Tenant. In the event Tenant is required by local, state or
federal code, Tenant shall provide Landlord with a complete set of "as built" drawings.
Landlord agrees to make all repairs, alterations, additions, or replacements to the
Demised Premises required by any law, statute, ordinance, order or regulation of any
governmental authority; to keep the Demised Premises equipped with all fire and safety
appliances, devices, equipment and applications so required, including, but not limited to,
smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and
number recommended; to procure any licenses and permits required; and to comply with
the orders and regulations of all governmental authorities, including all requirements as
set forth in the Americans with Disabilities Act as said Act now exists or may be
amended in the future; and to place all HVAC equipment in compliance with the Clean
Air Act of 1992.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from
any liability for injury to or death of any person or damage to personal property of every
kind and nature arising from or in connection with the use and occupancy of the Demised
Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant
or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's
employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim
is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant
and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty
to indemnify and hold harmless Landlord shall be in proportion to Tenant's allocable
share of the joint negligence or willful misconduct. Landlord, its heirs, executors,
administrators, successors and assigns, agrees to indemnify and hold harmless Tenant
from any liability for injury to, or death of any person or damage to personal property of
every kind and nature arising from or in connection with the use and occupancy of the
Demised Premises and Common Areas caused by defects therein, the negligent acts or
omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors
and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents,
to fulfill Landlord's obligations hereunder. When a claim is caused by the joint
negligence or willful misconduct of Landlord and Tenant or Landlord and a third party
unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to
indemnify and hold harmless Tenant shall be in proportion to Landlord's allocable share
of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective property insurance carriers of the
indemnity and hold harmless agreement contained in this Section. The provisions of this
Section 11 shall survive termination of this Lease.

12.    **INSURANCE:**

A.    Tenant:  Tenant agrees to carry at its own expense, throughout the Term, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    Landlord:  Landlord shall at all times carry insurance covering  all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood,  in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Further, Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant will pay to Landlord  Tenant's  estimated pro rata share of premiums for such insurance (but not umbrella or excess insurance) based on Landlord's premiums for the previous Lease Year.  Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium within ten (10) days of when the same are issued.  An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.  Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B were $0.26 per square foot per annum for the calendar year immediately preceding the Effective Date.  Within sixty (60) days following Tenant's request for such supporting documentation, Landlord shall furnish to Tenant a written statement in reasonable detail showing Tenant's total pro rata share of Insurance charges for such period and payments made by Tenant with respect thereto.  Upon request by Tenant,  Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such pro rata share of insurance charges.  If Landlord fails to provide such reconciliation within 90 days, Tenant shall be obligated to pay Landlord Seventy-Five Percent (75%) of Tenant's estimated monthly pro rata share of insurance charges for the immediately preceding Lease Year until the month following receipt of such reconciliation.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such

insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B. In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, is not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C. If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term, any Option Term or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

14. **FORCE MAJEURE:**

Whenever a period of time is provided for in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. Notwithstanding the foregoing, this provision shall not apply to initial delivery of possession of the Demised Premises.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16. **WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does

warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises; and (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. If Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced Rent and other payments shall be returned by Landlord to Tenant, or Tenant may withhold Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent, and Landlord will defend, indemnify, and protect Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

17.  **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Term. Tenant's covenant to pay Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.  **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

19.  **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of Tenant for thirty (30) days after

written notice of such default by Landlord (provided that if the default is of such a nature that if cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if Landlord so elects, shall thereupon become null and void, and Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of Tenant, and the Tenant shall pay Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. On the second occasion that Tenant is in default of payment of Rent (other than for bona fide disputes with respect to CAM Costs, Real Estate Taxes, or Percentage Rent) in a given Lease Year, then commencing ten (10) days after receipt of written notice from Landlord, Tenant shall also be required to pay a late charge equal to one and one-half percent (1.5%) interest per month until such time as Tenant brings current the Rent then owing in addition to such Rent as a late charge.

B.  If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, may be deducted by Tenant from Rent thereafter to become due. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, Tenant shall promptly notify Landlord; or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

## 20.  **CONDEMNATION:**

In the event the Demised Premises or any part thereof are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, Common Areas, rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be

unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith. Until the Demised Premises or Shopping Center is restored to proper tenantable condition, Rent shall abate entirely. Thereafter, Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21.    **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage to the extent insurable whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage to the extent insurable whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by their respective insurers.

Landlord and Tenant each shall indemnify the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers. The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at 150% of the Fixed Minimum Rent then owing and otherwise subject to all the terms and provisions hereof.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by: (i) a nationally recognized overnight express courier; (ii) registered or certified mail return receipt requested; or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i)or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either: (i) the next business day in the case of delivery by overnight courier; or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State of Oklahoma without regard to choice of law rules of that state.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

Neither party shall record this Lease. If requested by Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease other than Karleen Krywucki of Price Edwards and Company, whose commission shall be paid solely by Landlord and Tenant shall have no liability or obligation whatsoever therefor. If any other individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. As used herein, "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, PCBs, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Term, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord, or Landlord's agents, employees or authorized representatives during the Term, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent due under this Lease shall abate entirely during the period of time necessary to complete such work.

Throughout the Term, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31.   TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and executed.

## 32.   WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is: (i) a year-end adjustment; or (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease,, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year or Partial Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

## 33.   REASONABLE CONSENT:

If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that either party fails to respond to any request for consent, approval or permission within fifteen (15) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other party may proceed without further action, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

Big Lots

**34.    CO-TENANCY:**

If at any time during the Term the Shopping Center shall fall below seventy percent (70%) occupancy (the "Percentage") for a period of 180 days, Tenant shall have the right to: (i) terminate this Lease, in which case neither party will have any further liabilities or obligations hereunder; or (ii) pay, in lieu of the monthly Fixed Minimum Rent provided for in this Lease, a monthly Fixed Minimum Rent equal to fifty percent (50%) of the Fixed Minimum Rent then owing. Landlord shall immediately provide Tenant with written notice that the Shopping Center has fallen below the Percentage, such notice to include the date on which the Shopping Center fell below the Percentage and the date Landlord anticipates the Percentage will be restored. If Landlord fails to so notify Tenant at any time, Tenant's right to pay reduced rental as described in this section shall commence on the date Tenant receives such notice, and may be applied retroactively in the event that Tenant is not ever so notified of such reduction in occupancy.

**35.    NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken,  whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD: Walnut Square Shopping Center, L.L.C.**

By: _____

Title: _____

Witnesses As To Tenant:

**TENANT:    BIG LOTS STORES, INC.,  an Ohio corporation**

By: _____

Albert J. Bell
Title: _____  Vice Chairman

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Walnut Square Shpg. Cntr._  by, _Carl Edwards_ its _manager_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this _31st_ day of _March_, 2004.

_June A Thomas_
Notary Public

Expires  4-13-05
Commission # 1004585

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by Albert J. Bell, its Vice Chairman, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _29th_ day of _March_, 2004.

Notary Public
ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES _12/10/2006_

**EXHIBIT A**

**SITE PLAN OF SHOPPING CENTER**



**EXHIBIT A- 1**

**TENANT'S DRAWING OF DEMISED PREMISES**



FLOOR PLAN

A-1

BIG LOTS STORE #STORE #
WALNUT SQUARE
I-240 & PENN
OKLAHOMA CITY, OK 73159

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300   PHILLIPI   ROAD
COLUMBUS , OHIO   43228
PHONE: (614)   278-6800



LIGHTING PLAN

LIGHTING LEGEND

EMERGENCY LIGHT WITH BATTERY PICK-UP.

EMERGENCY LIGHT EXIT SIGN COMBO.

LIGHTED EXIT SIGN

4' FLUORESCENT LIGHT

8' FLUORESCENT LIGHT

2' x 4' LAY-IN LIGHT

LIGHTING NOTES

| | | |
|---|---|---|
| A-2 | BIG LOTS STORE #STORE # | BIG LOTS STORES, INC. |
| | WALNUT SQUARE | STORE PLANNING DEPT. |
| | I-240 & PENN | 300 PHILLIPI ROAD |
| | OKLAHOMA CITY, OK 73159 | COLUMBUS , OHIO 43228 |
| | | PHONE: (814) 278-6800 |

**EXHIBIT B**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

A tract of land lying in the Southeast Quarter (SE/4) of Section Thirty (30), Township Eleven (11) North, Range Three (3) West of the Indian Meridian, City of Oklahoma City, Oklahoma County, Oklahoma and being more particularly described as follows: Commencing at the Southeast corner of said Southeast Quarter; Thence North 00 deg.00'00" East a distance of 63.00 feet; Thence South 87 deg.46'07" West a distance of 485.26 feet to the point of beginning; Thence South 87 deg.46'07" West a distance of 226.78 feet; Thence North 89 deg.49'00" West a distance of 39.95 feet; Thence North 00 deg.00'00" East a distance of 261.02 feet; Thence North 90 deg.00'00" West a distance of 294.00 feet; Thence South 00 deg.00'00" West a distance of 260.08 feet; Thence North 89 deg.49'00" West a distance of 47.79 feet to the beginning of a tangent curve; Thence Westerly on a curve to the right having a radius of 3689.72 feet (said curve subtended by a chord which bears North 88 deg.58'03" West a distance of 109.00 feet) an arc distance of 109.00 feet to a point of intersection with a non-tangent line; Thence North 00 deg.00'40" West a distance of 258.00 feet; Thence North 89 deg.59'20" East a distance of 30.00 feet; Thence North 00 deg.00'40" West a distance of 407.00 feet; Thence North 89 deg.59'20" East a distance of 27.00 feet; Thence North 00 deg.00'40" West a distance of 289.00 feet; Thence South 89 deg.59'20" West a distance of 430.00 feet; Thence South 00 deg.00'40" East a distance of 292.00 feet; Thence North 89 deg.59'20" East a distance of 75.00 feet; Thence South 00 deg.00'40" East a distance of 407.00 feet; Thence South 89 deg.59'20" West a distance of 235.54 feet; Thence North 00 deg.00'40" West a distance of 796.27 feet; Thence North 89 deg.59'20" East a distance of 416.00 feet; Thence North 00 deg.00'40" West a distance of 6.45 feet; Thence South 89 deg.59'56" East a distance of 285.55 feet; Thence South 37 deg.20'04" East a distance of 138.54 feet to the beginning of a tangent curve; Thence Southeasterly on a curve to the left having a radius of 443.57 feet (said curve subtended by a chord which bears South 49 deg.33'49" East a distance of 187.92 feet) an arc distance of 189.35 feet to a point of intersection with a non-tangent line; Thence North 70 deg.46'42" East a distance of 34.85 feet to a point of intersection with a non-tangent curve; Thence Southeasterly, and Easterly on a curve to the left having a radius of 418.57 feet (said curve subtended by a chord which bears South 74 deg.50'57" East a distance of 142.88 feet) an arch distance of 143.58 feet to a point of intersection with a non-tangent line; Thence North 05 deg.19'27" East a distance of 110.00 feet; Thence North 73 deg.10'10" East a distance of 159.77 feet; Thence North 86 deg.53'49" East a distance of 423.98 feet; Thence South 00 deg.00'00" West a distance of 412.98 feet; Thence North 90 deg.00'00" West a distance of 29.00 feet; Thence North 00 deg.00'00" East a distance of 89.00 feet; Thence North 90 deg.00'00" West a distance of 70.00 feet; Thence South 00 deg.00'00" West a distance of 139.00 feet; Thence South 90 deg.00'00" East a distance of 99.00 feet; Thence South 00 deg.00'00" West a distance of 334.65 feet; Thence South 87 deg.46'07" West a distance of 150.00 feet; Thence North 00 deg.00'00" East a distance of 64.37 feet; Thence North 90 deg.00'00" West a distance of 285.00 feet; Thence South 00 deg.00'00" West a distance of 233.77 feet to the point of beginning.

**EXHIBIT C**

**LANDLORD WORK**

(Attached)

<u>3/4/2004</u>
**AMENDED CONSTRUCTION EXHIBIT "C"**
**LANDLORD'S WORK**
**FORMER SERVICE MERCHANDISE**
**WALNUT SQUARE SC  OKLAHOMA CITY, OK**

## The following work is subject to the review of the Big Lots Director of Construction:

| | |
|---|---|
| **STOREFRONT:** | The exterior storefront, canopy, and fascia shall be remodeled as shown on the previously e-mailed attachment.<br>Big Lots will use the existing vestibule entrance.<br>*<u>Restrooms, offices, lounge and vestibule HVAC supply duct to this area will be provided by Tenant. The Landlord shall issue Tenant a $15,000.00 credit (free rent or cash) toward cost of such ductwork</u>* |
| **DOORS:** | All doors and door systems to be sound and secure, in good working condition adequate for Tenant's use and in compliance with ADA requirements. |
| **WALLS:** | All interior walls to be smooth and free of large holes. |
| **GLASS:** | Replace all broken and damaged glass. Remove all materials blocking or covering windows and glass doors. |
| **UTILITIES:** | Landlord to provide separate utilities and provide separate meters adequate for Tenant's intended use (Tenant to have a minimum of 800 amps for 208v service or 600 amps for 480v service). Landlord shall also provide Tenant with assurance that utilities adequate for Tenant's use are available and include legal access across other properties if necessary to serve the Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. *<u>Landlord will provide electrical service per code,</u>* **and per  requirements defined in this paragraph,** *at the electrical panels in the rear of space.* |
| **HVAC & EQUIPMENT:** | Landlord shall provide all new HVAC equipment <u>and</u>  at a minimum of one ton per 300 square feet throughout the sales floor and stockroom (110 tons).  Big Lots will inherit all manufacturers warranties for the new equipment. |
| **PLUMBING, ELECTRICAL & MECHANICAL:** | All **<u>drains</u>**, *<u>water service, mechanical</u>*, and sprinkler equipment to be in good working condition.  Landlord to provide Tenant with sprinkler certification. *<u>Electrical service as established above will be provided at the electrical panels at the rear of the space. Code will require that Tenant furnish equipment and telephone lines necessary to monitor the sprinkler system at Tenant's expense.  Additional sprinkler work will be required at Tenant's expense based on Tenant's floor plan including stockroom sprinkler.</u>* |
| **INTERIOR LIGHTING:** | *<u>Tenant shall be responsible for new lighting package and circuits.</u>* |
| **EXTERIOR LIGHTING:** | All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. |
| **FLOORING:** | Landlord will remove any hazardous materials from tiles, mastic, and any other flooring materials. |
| **ROOF:** | Roof shall be professionally inspected and certified to be in good condition and free of leaks. Repairs per inspection shall be made prior to possession. |
| **CEILING:** | Ceiling height shall be a minimum of 12' feet in the sales area. *<u>Landlord will remove all grid and ceiling tile throughout space.</u>* |

Landlord Initials _____

1

walnut.square

| | |
|---|---|
| **RESTROOMS:** | Existing **restrooms** *water service and sewer* to be in good working condition. |
| **STOCKROOM WALL:** | To be installed by Big Lots. |
| **RECEIVING AREA:** | Big Lots will install new receiving doors and a concrete pad to accommodate Tenant's hydraulic lift. |
| **REMOVAL OF FIXTURES & EQUIPMENT:** | Landlord to remove all fixtures and equipment left behind by previous users of the space. Landlord will leave the premises in broom-swept condition for Big Lots. |
| **PARKING LOT:** | Parking lot shall be good condition - paved, patched, sealed and striped with potholes, cracks and uneven areas resurfaced – adequate for customer parking and Tenant's use. |
| **PESTS:** | Premises to be professionally inspected for pestilence and termites. The Tenant is to be provided with a certified report that the Demised Premises is pest free. Otherwise, the Landlord will make the space pest free. |
| **SIGNAGE:** | Tenant to have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the pylon(s). Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Tenant to have marquee signage on the pylon. |
| **DRAWINGS:** | Landlord is to provide Tenant with "as built" drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. Tenant to approve all drawings prior to the commencement of work. |
| **HAZ MATS:** | Landlord shall provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, an asbestos survey or, in the alternative, necessary certification. Landlord will be responsible for the removal of any and all hazardous materials. |
| **POSSESSION DATE:** | All above work to be completed before the Tenant Possession Date. |

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Tenant to approve all drawings prior to the commencement of work.

Landlord Initials_____

Landlord Initials_____

2

walnut.square

# EXHIBIT D

## TENANT BUILDING SIGN SPECIFICATION

## TENANT SIGN SPECIFICATION



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

**SIGN SPECIFICATIONS: BIG LOTS**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES: .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SOMA SELF CONTAINED TRANSFORMERS
(NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

**SIGN SPECIFICATIONS: EXCLAMATION**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES: .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SOMA SELF CONTAINED TRANSFORMERS

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE EQUIPT WITH DISCONNECT SWITCHES

**STANDARD SIZE CHARACTERISTICS**

| A | B | C | D | E |
|---|---|---|---|---|
| 2'-0" | 12'-3" | 2'-10" | 9" | 4 1/2" |
| 2'-6" | 16'-1" | 3'-5" | 11" | 5 1/2" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-6" | 17 1/2" | 8 1/2" |
| 4'-6" | 26'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 28'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 8'-5" | 26" | 13" |

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**

[ page 1 of 2 ]



**EXHIBIT E**

**DELIVERY OF POSSESSION LETTER**

**Date:** _____

**To:**   Big Lots
   via facsimile:  (614) 278-6763

**From:** Walnut Creek Square, L.L.C. (insert Landlord, name of contact person and
**LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL
NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** Big Lots, Oklahoma City, Oklahoma

You are hereby notified that all work required of Landlord pursuant to the Lease dated
_____ has been completed.  Accordingly, possession of the Demised Premises is
hereby delivered to Tenant.  You may pick up the keys at _____
_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**EXHIBIT F**

**SUMMARY OF EXCLUSIVE USE PROVISIONS**

(Attached)

NOVEMBER 2002

| | |
|---|---|
| ALOHA GARDENS | RADIUS RESTRICTION 2 MILES |
| BERINA | NO |
| CASUAL MALL | NO |
| FAMOUS FOOTWEAR | THEY ARE THE ONLY NAME BRAND OFF-PRICE SHOE STORE OTHER THAN PAYLESS |
| FANTASTIC SAMS | NO OTHER W/IN 500 FEET OF SHOPPING CENTER BOUNDRY OR FRANCHISED HAIR CARE SERVICES |
| GAMES X CHANGE | NO |
| JENNY CRAIG | NO OTHER WEIGHT LOSS CENTERS |
| J'S HALLMARK | NO |
| KINKOS | PRINTING, PHOTOCOPIES, COLOR COPIES, DESKTOP PUBLISHING, VIDEO TELECONFERENCES AND BUSINESS EQUIPMENT RENTALS |
| MANPOWER | NO OTHER PERSONNEL SERVICES, INCLUDING NOT LIMITED TO TEMPORARY HELP AND RELATED SERVICES |
| MERLE NORMAN | NO |
| MIDFIRST BANK | NO OTHER BANK OR SAVINGS BANK |
| MICHAELS | NO PRIMARY CRAFT, HOBBY FRAME, FLORAL STITCHING ART OR PARTY GOODS EXCEPT TO PAPER WAREHOUSE |
| AT&T | N/A |
| OLIVE GARDEN | NOT PART OF CENTER |

| | |
|---|---|
| OK DIAGNOSTIC | NO |
| ONE PRICE CLOTHING | NO OTHER TENANT W/ "ONE PRICE CONCEPT" OR "CEILING PRICE CONCEPT" |
| OUTBACK STEAKHOUSE | NO HEALTH CLUB, HEALTH SERVICE, FLEA MARKET, 2ND HAND STORES, PORNOGRAPHIC MATERIALS W/IN 300 FEET AND NO OTHER STEAKHOUSE |
| PAPER WAREHOUSE | NO OTHER TENANT WHOSE PRIMARY USE IS A PARTY GOOD STORE |
| PARIS NAILS | NO |
| PAYLESS SHOES | NO |
| PIONEER PIES | NOT AVAILABLE IN OUR FILES |
| SALLY BEAUTY | NO OTHER BEAUTY SUPPLY IN CENTER |
| HONEY BAKED HAM | NO |
| SIMPLY SAMPLES | NO |
| TRENDS EXPRESS | RADIUS RESTRICTION 3 MILES EXCEPT CROSSROADS STORE, SHOE SALES PROHIBITED |
| WELLS FARGO | NO OTHER GENERAL LOAN & FINANCE |
| WHEREHOUSE MUSIC | NO |
| WHOLE FOODS | NO |
| WRIGHT BUSINESS SCHOOL | NO |

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 2004 is attached to and made a part of the Lease dated (the "Lease") by and between Walnut Creek Square, ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.  Demised Premises: (Section 1(D)) = _____ .

2.  A.  Fixed Minimum Rent—Original Term (Section 5(A)):
        _____ annually; _____ per month.
    B.  Percentage Rent: Original Term (Section 5(C)):_____ .

3.  A.  Fixed Minimum Rent--First Option (Section 5(A)):
        _____ annually;_____per month.
    B.  Percentage Rent: First Option (Section 5(C)): _____ .

4.  A.  Fixed Minimum Rent—Second Option (Section 5(A)):
        _____annually; _____per month.
    B.  Percentage Rent: Second Option (Section 5(C)): _____ .

5.  A.  Fixed Minimum Rent—Third Option (Section 5(A)):
        _____ annually;_____per month.
    B.  Percentage Rent: Third Option (Section 5(C)):_____ .

6.  A.  Fixed Minimum Rent-Fourth Option (Section 5(A)):
        annually;                    per month.
    B.  Percentage Rent: Fourth Option (Section 5(C)):_____ .