# Exhibit "C"

DocuSign Envelope ID: E921CAC0-2046-4A45-8EF1-F31B75C589CF

BL #1488

## FIFTH AMENDMENT TO LEASE

This Fifth Amendment to Lease (the "Agreement") is made as of the 25th day of ~~February~~ April, 2024 (the "Effective Date") by and between **Y & O Town & Country, LLC**, a Delaware limited liability company, having an address at c/o Price Edwards & Company, 210 Park Avenue, Suite 700, Oklahoma City, OK 73102 (the "Landlord") and Big Lots Stores, LLC, an Ohio limited liability company, formerly known as Big Lots Stores, Inc., having an address at 4900 East Dublin Granville Road, Columbus, OH 43081 (the "Tenant").

### RECITALS:

A.  Landlord and Tenant have heretofore entered that certain Lease Agreement, dated August 5, 1999, as amended (collectively the "Lease") for approximately 24,725 square feet of storeroom ("Leased Premises") located in the Town & Country Shopping Center, located at 160 Air Depot Drive, Midwest City, Oklahoma (the "Shopping Center"), as more particularly described in the Lease.

B.  The Term of the Lease is set to expire on January 31, 2025 (herein referred to as the "Third Extension Term" or "Extended Term").

C.  The parties desire to further amend the Lease as provided herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.  <u>Lease Extension:</u>  The Lease is hereby extended for a period of three (3) years ("Fourth Extension Term") starting February 1, 2025.

2.  <u>Additional Space:</u>  During the Fourth Extension Term, Tenant shall continue to lease from Landlord, #128 ("Additional Space") comprising of 2,460 square feet of storage space. Tenant and Landlord agree that the Additional Space shall be utilized solely as storage space and for no other purpose.

3.  <u>Leased Premises:</u>  During the Fourth Extension Term, the Leased Premises shall consist of 27,185 square feet to include the Additional Space.

4.  <u>Rent And Additional Rent:</u>  Tenant shall pay the same monthly rate that Tenant pays today $20,270.70 until January 31, 2028. No reconciliation will be done during this period.

5.  <u>Option to Renew:</u>  Tenant shall retain its remaining (1), (5) year option, (the "Fifth Extension Term") to extend the term of the Lease pursuant to the terms specified in the Lease. Tenant shall give written notice to Landlord of Tenant's exercise of such option not less than nine (9) calendar months prior to the expiration of the immediately preceding Term to which notice time

DocuSign Envelope ID: E921CAC0-2046-4A45-‌91-F31B75C589CF

BL #1488

is of the essence. As part of Tenant's notice to exercise its Fifth Extension Term, Tenant shall also notify Landlord of its intent to retain the Additional Space. Should Tenant elect not to retain the Additional Space, possession of the Additional Space shall be returned to Landlord in "as-is" condition no later than January 31, 2028.

6.  Rent during Fifth Extension Term: Tenant shall pay $190,295.00 ($7.00/sf) Annual Fixed Minimum Rent with retention of Additional Space or $173,075.00 ($7.00/sf) Annual Fixed Minimum Rent without retention of Additional Space. Tenant will pay Percentage Rent and Additional Rent (to include its share of Common Area Costs, Taxes and Insurance Payments) pursuant to the Lease.

7.  Full Force and Effect; Successors and Assigns. Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provision of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

8.  Counterpart Execution. This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all partis hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

**[Signatures Appear on the Following Page]**

DocuSign Envelope ID: E921CAC0-2046-4A45 | -F31B75C589CF

BL #1488

**IN WITNESS WHEREOF,** Landlord and Tenant have respectively signed this Agreement as of the date first hereinabove set forth.

LANDLORD:

Y & O TOWN & COUNTRY, LLC, a Delaware limited liability company

By: _____

*PRICE EDWARDS & COMPANY AS AGENT FOR Y&O TOWN & COUNTRY, LLC.*

TENANT:

BIG LOTS STORES, LLC,

an Ohio limited liability company

By: _Jonathan Ramsden_____
PP2E31029530412

Name: Jonathan Ramsden
_____

Title: EVP and CFO
_____

BL#1488

## FOURTH AMENDMENT TO LEASE

This Fourth Amendment to Lease (the "Agreement") is made as of the 6 <u>th</u> day of _February_, 2020, (the "Effective Date") by and between **Y & O Town & Country, LLC**, a _Delaware_ limited liability company, having an address at c/o Price Edwards & Company, 210 Park Avenue, Suite 100, Oklahoma City, Oklahoma 73102 (the "Landlord"), and **Big Lots Stores, Inc.**, an Ohio corporation, having an address at 4900 East Dublin Granville Road, Columbus, Ohio 43081 (the "Tenant").

## RECITALS:

A.    Landlord and Tenant have heretofore entered that certain Lease Agreement, dated August 5, 1999, as amended (collectively, the "Lease") for approximately 24,725 square feet of storeroom ("Leased Premises") located in the Town & Country Shopping Center, located at 160 Air Depot Drive, Midwest City, Oklahoma (the "Shopping Center"), as more particularly described in the Lease.

B.    The Term of the Lease is currently set to expire on January 31, 2025 (herein referred to as the "Third Extension Term" or "Extended Term").

C.    The parties desire to further amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.    Additional Space: Effective as of the Effective Date, Tenant shall lease from Landlord additional space in the shopping, as set forth on Exhibit A as #128 ("Additional Space"), attached hereto. Such Additional Space shall comprise a total of 2,460 square foot of storage space. Tenant and Landlord agree that the Additional Space shall be utilized solely as storage space and for no other purpose. Possession of the Additional Space shall occur on the Effective Date and shall be provide in "as-is" condition subject to repair and maintenance obligations as set forth in Article 9.01 of the Lease.

In addition to acquiring the Additional Space, Tenant agrees to remove a minimum of two (2) of its existing six (6) storage containers currently located at the Shopping Center.

2.    Leased Premises: Effective as of the Effective Date, the Leased Premises shall consist of a total of 27,185 square feet ("Revised Leased Premises") to include the Additional Space.

3.    Fixed Minimum Rent for Revised Demised Premises:  Effective on the Effective Date, the Fixed Minimum Rent payable by Tenant to Landlord for the Revised Demised Premises shall continue to be as follows:

| Period | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
|---|---|---|
| Effective Date – January 1, 2025 | $160,712.50 ($6.50/sf) | $13,392.71 |

BL #1488

Fixed Minimum Rent for the Revised Demised Premises includes a zero increase in Rent as a result of the Additional Space. Notwithstanding anything to the contrary, Fixed Minimum Rent shall continue to be due and payable by Tenant to Landlord in equal monthly installments (in the monthly amounts set forth above for the corresponding period), in advance, without offset or deduction and without prior demand, on or before the first day of each calendar month during the Extended Term and otherwise in accordance with the terms of the Lease.

During the Extended Term, Tenant shall continue to pay Percentage Rent and Additional Rent (to include Common Operating Costs, and its pro-rata share of Taxes and Insurance Payments) pursuant to the Lease.

    4.    Tenant Investment: As part of this Agreement, Tenant has agreed to investment approximately One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars towards renovations of the existing store.

    5.    Option To Renew: Provided that Tenant is not in monetary default of the terms and provision of this Lease beyond any applicable notice and cure period set forth in the Lease, if any, Tenant shall have the option to extend the Term of this Lease for one (1) successive period, consisting of five (5) years (the "Fourth Extension Term") from the expiration of the Extended Term. The Tenant shall have no further right to extend the Lease.

In order to exercise the option herein granted, Tenant shall give written notice to Landlord of Tenant's exercise of such option not less than nine (9) calendar months prior to the expiration of the immediately preceding Term as to which notice time is of the essence or April 30, 2024. All of the terms, covenants and conditions set forth in this Agreement shall apply during an Option Term. As part of Tenant's notice to exercise its Fourth Extension Term, Tenant shall also notify Landlord of its intent to retain the Additional Space. Should Tenant elect not to retain the Additional Space, the possession of the Additional Space shall be returned to Landlord in "as-is" condition no later than January 31, 2025.

Notwithstanding anything herein to the contrary the Fixed Minimum Rent for each lease year of the Option Term shall accrue as follows:

| Fourth Extension Term | Annual Fixed Minimum Rent | Monthly Fixed Minimum Rent |
|---|---|---|
| February 1, 2025 – January 31, 2030 (w/ retention of Additional Space) | $190,295.00 ($7.00/sf) | $15,857.92 |
| February 1, 2025 – January 31, 2030 (w/o retention of Additional Space) | $173,075.00 ($7.00/sf) | $14,422.92 |

During the Fourth Extension Term, Tenant will continue to pay Percentage Rent and Additional Rent (to include Common Operating Costs, and its pro-rata share of Taxes and Insurance Payments) pursuant to the Lease.

    6.    Full Force and Effect; Successors and Assigns. Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this

BL #1488

Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

7.    <u>Counterpart Execution</u>.    This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

[Signature page follows]

BL #1488

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed this Second Agreement as of the date first hereinabove set forth.

**LANDLORD:**
**Y& O TOWN & COUNTRY, LLC, a**
_____ **limited liability company**

By: _____

Stephen Werden
Authorized Signor

**TENANT:**
**BIG LOTS STORES, INC.**
**an Ohio corporation**

By: _____
Name:        Jonathan E. Ramsden
Title:        Executive Vice President, Chief Financial
             & Administrative Officer

BL #1488

(Landlord's acknowledgement)

STATE OF _Montana_ )
County of _Gallatin_ )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Y & O Town & Country, LLC, a _Delaware_ limited liability company who acknowledged that she/he did sign the foregoing instrument and that the same is the free act and deed of said limited liability company.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at _Bozeman_, _mT_ this _3rd_ day of _Feb_, 2020.

W H LEWIS
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
August 28, 2022

_____
Notary Public

(Tenant acknowledgement)

STATE OF OHIO    )
    )
County of Franklin    )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., an Ohio corporation, by Jonathan E. Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this _6th_ day of _February_, 2020.

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

_____
Notary Public

BL #1488

**EXHIBIT A**

**SITE PLAN**




NORTH

BL#1488

### THIRD AMENDMENT TO LEASE AND LEASE EXTENSION

THIS THIRD AMENDMENT AND EXTENSION OF LEASE (the "Agreement"), made and entered into this ___14___ day of _Septembe_ 2017 by and between Y&O Town & Country, LLC ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, of the City Columbus, County of Franklin and State of Ohio, whose mailing address is 300 Phillips Road, Department 10061, Columbus, OH 43228 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated August 5, 1999, for approximately 24,725 square feet in the Town & Country Shopping Center located at 160 N. Air Depot Drive, Midwest City, Oklahoma, as amended (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to renew the Term of the Lease for sixty (63) full calendar months, and

WHEREAS, Landlord acknowledges that pursuant to a letter dated April 24, 2014 Tenant exercised its 3rd option to extend the term of the Lease until October 31, 2019.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1.  Tenant desires to extend the term of the Lease for sixty (60) full calendar months from November 1, 2019, and expiring January 31, 2025 (the Extension Term").

2.  All the terms and conditions of the Lease shall apply during the Extension Term except that the Minimum Rent during the Extension Term shall be in the amount of One Hundred Sixty Thousand Seven Hundred and Twelve and 50/100 Dollars ($160,712.50) per annum, payable in equal monthly installments in advance of the first day of each and every month in the amount of Thirteen Thousand Three Hundred Ninety-Two and 70/100 Dollars ($13,392.70).

3.  During the Extension Term, Tenant shall continue to pay its Share of such Common Operating Costs which shall not be subject to the per square foot limit per year, pursuant to Section 22.01 D. of the Lease, which shall be deleted.

4.  The cost of managing the Common Area per section of 22.01A (which are currently estimated to be $493.21) shall not exceed 3.5% of gross rental receipt received from tenants and the administrative fee of 15% shall be removed.

5.  During the Extension Term, Tenant shall continue to pay its proportionate share of Taxes and Insurance Payments, pursuant to the Lease.

6.  For each Lease Year of the Extension Term, Tenant shall pay Percentage Rent in an amount equal to 2 ½% of Gross Sales in excess of Six Million Four Hundred Twenty-Eight Thousand Five Hundred and 00/100 Dollars ($6,428,500.00) per Lease Year.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease

In the event there is a conflict between the terms and provisions of this Amendment and Extension of Lease and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Amendment and Extension of Lease, the terms and provisions of this Amendment and Extension of Lease shall control.

Landlord and Tenant each represent and warrant to the other that the individual executing this Amendment and Extension of Lease on their behalf are each duly authorized to execute and deliver this Amendment and Extension of Lease.

This Amendment and Extension of Lease shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Amendment and Extension of Lease may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Amendment and Extension of Lease to be executed as of the date first written above.

By: Timothy A. Johnson
    Executive Vice President
    Chief Administrative Officer and
    Chief Financial Officer

**TENANT: BIG LOTS STORES, INC.,**

By: Stephan Garvin, authorized signer.
**LANDLORD: Y&O Town & Country, LLC**

7/16/2014    00005169

BL #1488

## SECOND AMENDMENT TO LEASE CONTRACT

THIS SECOND AMENDMENT TO LEASE CONTRACT (the "Agreement") is made and entered into this 8th day of July, 2014 (the "Effective Date") by and between Weingarten Nostat, Inc., a Texas corporation, whose mailing address is 2600 Citadel Plaza Drive, Suite 125, Houston, Texas 77008, Attn: General Counsel ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation (formerly known as Consolidated Stores Corporation), of the City Columbus, County of Franklin and State of Ohio, whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease Contract dated August 5, 1999, for approximately 24,725 square feet ("Leased Premises") in the Town & Country Shopping Center ("Shopping Center") located at 160 Air Depot Drive, Midwest City, Oklahoma, as amended (collectively, the "Lease");

WHEREAS, Landlord (as "Licensor") and Tenant (as "Licensee") also entered into that certain License Agreement dated February 3, 2011 ("License Agreement"), for approximately 160 square feet located in the common area of the Shopping Center; and

WHEREAS, Landlord and Tenant now desire (i) to further amend the Lease as hereinafter set forth, and (ii) to terminate the License Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. The foregoing recitals are true and correct and incorporated herein by reference.

2. Section 6.01 of the Lease is hereby amended as follows:

   A. The first grammatical sentence of Section 6.01 of the Lease is hereby amended, such that (subject to remaining terms and conditions of Section 6.01) Tenant will use the Leased Premises solely for the following purposes: for the retail sale of general merchandise, closeouts, furnishings, furniture, furniture accessories, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, food, frozen food, beer and wine [provided, however, that (i) Tenant shall, at its sole cost and expense, secure and maintain all required licenses necessary to sell beer and wine; (ii) the sale of beer and wine shall be for off-premises consumption only; and (iii) the sale of beer and wine shall be on an incidental basis only], health and beauty products and other items typically sold in a majority of Big Lots stores, all similar and related merchandise and any lawful retail use.

   B. The third grammatical sentence of Section 6.01 of the Lease is hereby deleted in its entirety and shall be null and void and of no further force and effect. From and after the Effective Date, there shall be no limitation on the square foot area Tenant may devote to the sale of food, and Tenant shall have the right to have coolers and freezers located within the Leased Premises for the sale of dairy (milk, eggs, cheese, etc.), packaged lunch meats, assorted juices, ice cream, frozen pizzas and miscellaneous other frozen entrees.

3. Sections 8.01, 8.02, 8.03, 8.04 and 8.05 of the Lease are hereby deleted in their entirety and replaced and superceded with the following:

   "Section 8.01. Tenant shall have the right at any time to sublet the Leased Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate existing use restrictions or prohibited uses or violate any exclusive use granted to any existing tenant of the Shopping Center, and Landlord agrees to provide Tenant

with copies of all tenant exclusives and restrictions at the Shopping Center within thirty (30) days after written request of Tenant. If Landlord fails to provide said exclusives and restrictions within said thirty (30) days, Tenant may proceed with said assignment or subletting regardless of any exclusives and restrictions granted to other tenants of the Shopping Center, subject to the terms of this Lease and any exclusives and restrictions affecting the Shopping Center."

4.  Section 4.02 is hereby deleted in its entirety and replaced with the following: "The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Leased Premises during any Lease Year and (2) charges for all services rendered in or from the Leased Premises during any Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Leased Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Leased Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Leased Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Leased Premises. Within ninety (90) days after the end of each Lease Year, Tenant will deliver to Landlord a statement, certified by Tenant to be accurate and complete, setting forth the amount of Gross Sales made during such Lease Year, itemized in reasonable detail."

5.  As of the Effective Date, the License Agreement shall terminate and the parties shall have no further obligations to one another pursuant to this License Agreement [including, without limitation, the obligation of Tenant (as Licensee) to pay the "License Fee" (as said term is more particularly provided in the License Agreement)], except for obligations which shall have accrued prior to the Effective Date; provided, however, that as to any incidents that occur prior to the Effective Date, the indemnity provisions of Article VIII of the License Agreement shall survive such termination.

6.  Throughout the Term of the Lease, Tenant shall be permitted to place drop/storage trailers in the receiving area of the Leased Premises in the location designated as "Big Lots Trailer Area" on the site plan attached hereto as Exhibit "A" so long as said trailers (i) do not materially interfere with the business operations of the other tenants of the Shopping Center and/or the rear service drives of the Shopping Center, and (ii) do not violate any local codes/ordinances or restrictions currently in effect at the Shopping Center. Notwithstanding the fact that the Big Lots Trailer Area is not a part of the Leased Premises and is a part of the Common Area, Tenant hereby assumes liability for any injury to any person or damage to any property occurring within the Big Lots Trailer Area and Tenant shall notify Tenant's general liability insurance carrier in writing of the provisions of this Paragraph 6 and will cause said carrier to include coverage for the Big Lots Trailer Area in Tenant's general liability policy.

7.  Section 20.01 of the Lease is hereby amended to delete the phrase "one hundred twenty-five percent (125%)", and to insert in lieu thereof: "one hundred ten percent (110%)".

8.  Tenant hereby consents to the Landlord leasing space to Ross Dress For Less, Inc., or any of its affiliates, subsidiaries, or related companies, assignees or sublessees (collectively "Ross Dress For Less") in the Shopping Center in the area identified as "Ross Dress For Less" on the site plan attached hereto as Exhibit "A". Further, contemporaneously with the execution of this Agreement, Tenant agrees to execute the consent letter attached hereto as Exhibit "B" memorializing Tenant's consent to Landlord leasing such space to Ross Dress For Less (the "Ross Consent Letter").

9.  As consideration for Tenant's consent (as provided in Paragraph 8 above), Landlord shall pay to Tenant the sum of Forty-Nine Thousand Four Hundred Fifty and 00/00 Dollars ($49,450.00), which sum shall be paid by check within thirty (30) days of the later of: (i) the full execution of this Agreement; and (ii) Landlord's receipt of the Tenant executed Ross Consent Letter.

BL #1488

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on their behalf are each duly authorized to so execute and deliver this Agreement.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof from Landlord to Tenant.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the Effective Date.

Witnesses as to Tenant

TENANT: **BIG LOTS STORES, INC., an Ohio corporation**

BY: _____
Timothy J. Johnson
ITS:    Executive Vice President, Chief Financial Officer

Witnesses as to Landlord

LANDLORD: **WEINGARTEN NOSTAT, INC., a Texas corporation**

BY: _____
PRINT: _____ Jan W. Odom _____
TITLE: ____ Associate General Counsel ____

| KMB |
| Legal |
| KuB |

**\*\*\*\* THIS DOCUMENT IS NOT TO BE RECORDED \*\*\*\***

7/16/2014   00005171

BL #1488

**\*\*\*\* THIS DOCUMENT IS NOT TO BE RECORDED \*\*\*\***

(Tenant's Acknowledgement)

STATE OF OHIO )
)
County of Franklin )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc., an Ohio corporation,** by Timothy A. Johnson, its Executive Vice President, Chief Financial Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this 30 day of July , 2014.

Courteney Robertson
Notary Public, State of Ohio
My Commission Expires 08/22/2016

_Courteney Robertson_
Notary Public

**\*\*\*\* THIS DOCUMENT IS NOT TO BE RECORDED \*\*\*\***

(Landlord's Acknowledgement)

STATE OF TEXAS )
)
County of Harris )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Weingarten Nostat, Inc., by Jan W. Odom , its Associate General Cown who acknowledged that he did sign the foregoing instrument and that the same is her free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Houston, Texas , this 14th day of July , 2014.

TERRI EDWARDS
Notary Public, State of Texas
My Commission Expires
MARCH 19, 2017

_Terri Edwards_
Notary Public

**\*\*\*\* THIS DOCUMENT IS NOT TO BE RECORDED \*\*\*\***

7/16/2014  0000S173

BL #1488



"BIG LOTS TRAILER AREA"

EXHIBIT "A"

DATE: 06-11-2014
REV.: 06-27-2014

Town and Country

Project No: 0132

BL #1488

**EXHIBIT "B"**

**ROSS CONSENT LETTER**

[Consisting of two (2) pages, attached hereto.]



300 PHILLIPI ROAD
COLUMBUS, OHIO  43228-5311
Timothy A. Johnson, Executive Vice President
Chief Financial Officer
PHONE: 614-278-6800
FAX: 614-278-6763

July 1, 2014

**VIA FEDEX-OVERNIGHT DELIVERY**

WEINGARTEN NOSTAT, INC.
2600 CITADEL PLAZA DRIVE, SUITE 125
HOUSTON, TX 77008
ATTENTION:  GENERAL COUNSEL

RE:    Lease Contract by and between Weingarten Nostat, Inc. ("Landlord") and Big Lots Stores, Inc., an Ohio corporation (formerly known as Consolidated Stores Corporation) ("Tenant") dated August 5, 1999, as amended (collectively, the "Lease") for store #1488, located in Midwest City, Oklahoma.

To whom it may concern:

Pursuant to your request, Tenant hereby consents to Landlord's leasing of certain space in the Shopping Center as identified on the attached Exhibit A to Ross Dress For Less, Inc., or any of its affiliates, subsidiaries, or related companies, assignees or sublessees (collectively "Ross").

Tenant's grant of this consent shall not be interpreted as a waiver of any other covenant or condition in the Lease, shall not be considered a general waiver of its exclusive, nor shall Tenant be obligated to grant any additional waiver of its exclusive in the future.

Very truly yours,

Acknowledged and agreed to this _____ day of _____, 2014

Big Lots Stores, Inc., an Ohio corporation

By:_____
Print Name: Timothy A. Johnson
Title: Executive Vice President, Chief Financial Officer

7/16/2014   0000S174

BL #1488

7/16/2014  00005175



NORTH

AIR DEPOT ROAD

BIG LOTS

ROSS
DRESS FOR LESS

Owned By
Others

RENO AVENUE

EXHIBIT "A"

DATE: 06-11-2014    **Town and Country**    Project No: 0132

✓ 132

6/5/2014  0000044



300 PHILLIPI ROAD
COLUMBUS, OHIO  43228-5311

April 24, 2014

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
#7008 2810 0000 7928 7818

WEINGARTEN NOSTAT, INC.
C/O WEINGARTEN REALTY MANAGEMENT COMPANY
600 SOUTH SHERMAN STREET
SUITE 106
RICHARDSON, TEXAS  75081

> Re:  **BL #1488 – Midwest City, Oklahoma**
>      Lease Contract by and between Weingarten Nostat, Inc., a Texas corporation
>      ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as
>      Consolidated Stores Corporation ("Tenant") dated August 5, 1999, as amended
>      (collectively, the "Lease")

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the Lease from November 1, 2014 through October 31, 2019 (the "3rd Extension Term").  Thank you.

**BIG LOTS STORES, INC., an Ohio corporation**

Timothy A. Johnson
Executive Vice President – Chief Financial Officer

TAJ/alt



300 PHILLIPI ROAD
COLUMBUS, OHIO 43228-5311

April 28, 2009

*LO132*
*LBIG0LS01*

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
#7008 1830 0003 9688 6968

**VIA FEDEX – OVERNIGHT DELIVERY**
(972) 907-0004

WEINGARTEN NOSTAT, INC.
C/O WEINGARTEN REALTY MANAGEMENT COMPANY
600 SOUTH SHERMAN STREET
SUITE 106
RICHARDSON, TEXAS  75081

      Re:   **BL #1488 – Midwest City, Oklahoma**
            Lease Contract by and between Weingarten Nostat, Inc., a Texas corporation
            ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as
            Consolidated Stores Corporation ("Tenant") dated August 5, 1999, as amended
            (collectively, the "Lease")

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the Lease from November 1,
2009 through October 31, 2014 (the "2nd Extension Term"). Minimum Rent will be One Hundred
Thirty-Four Thousand Seven Hundred Fifty-One and 24/100 Dollars ($134,751.24) per annum,
payable in equal monthly installments of Eleven Thousand Two Hundred Twenty-Nine and
27/100 Dollars ($11,229.27). Thank you.

**BIG LOTS STORES, INC., an Ohio corporation**


Kevin Day
Vice President

KD/alt

RECEIVED
APR 2 9 2009
BY:

F:\Documentation\Real Estate Legal\Andrea Turner\CORRESPONDENCE\OPTION\BL#1488-2.doc



300 PHILLIPI ROAD
COLUMBUS, OHIO 43228-5311



RECEIVED
APR 1 9 2004
By_____

April 12, 2004

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**#7001 2510 0000 6292 6120**

WEINGARTEN REALTY MANAGEMENT CO.
600 SOUTH SHERMAN ST.
SUITE 106
RICHARDSON, TX  75081

Re:    **BL #1488, Midwest City, OK**
       Lease by and between Weingarten Nostat, Inc., a Texas corporation ("Landlord") and Big
       Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores
       Corporation ("Tenant") dated August 5, 1999, as amended (collectively, the "Lease")

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the lease term from
November 1, 2004 through October 31, 2009 (the "1st Extension Term").  Minimum Rent will be
One Hundred Twenty-Two Thousand Three Hundred Eighty-Eight and 72/100 Dollars
($122,388.72) per annum, payable in equal monthly installments of Ten Thousand One Hundred
Ninety-Nine and 06/100 Dollars ($10,199.06). Thank you.

Sincerely,

Kathleen Hupper
Vice President

KH/alt

F:\Documentation\Real Estate Legal\Andrea Turner\CORRESPONDENCE\OPTION\BL#1488.doc



**WEINGARTEN REALTY INVESTORS**

2600 Citadel Plaza Drive
Houston, Texas 77008

P.O. Box 924133
Houston, Texas 77292-4133

(713) 866-6000 Main Number
(800) 688-8865 Toll Free

May 5, 2004

Ms. Kathleen Hupper
Vice President
Big Lots Stores, Inc.
300 Phillipi Road
Columbus, Ohio 43228-5311

RE:  Lease Contract Dated:  August 5, 1999
     Landlord:    Weingarten Nostat, Inc.
     Tenant:      Big Lots Stores, Inc.
     Premises:    Approximately 24,725 square feet in Landlord's
                  Town & Country Shopping Center, Midwest City, OK

Dear Ms. Hupper

I am in receipt of your letter dated April 12, 2004, in which you exercise the first
option to extend the term of the captioned Lease Contract.  This letter shall confirm
the exercise of said option for the period commencing November 1, 2004 and expiring
October 31, 2009.

Please accept our best wishes for your continued success.

Sincerely,

WEINGARTEN NOSTAT, INC.

By:  Weingarten Realty Management Company

By:  _Janet E. Brown_
     Janet E. Brown
     Manager - Legal Administrators

JEB/paj

cc:  P0132 LBIGOLS01
     Brooke Harvey
     Patty Bender
     Maria Brewer
     Lessie Griggs
     Collections

Weingarten Realty Investors (the trust) is an unincorporated trust organized under the Texas Real Estate Investment Trust Act. Neither the shareholders of the trust nor its trust managers, officers, employees or other agents are personally, corporately or individually liable for any debt, act, omission or obligation of the trust, and all persons having claims of any kind against the trust must look solely to the property of the trust for the enforcement of their rights.

BL #1488

## AMENDMENT AND EXTENSION OF LEASE

THIS AMENDMENT AND EXTENSION OF LEASE (the "Agreement"), made and entered into this 19 day of _May_, 2009 by and between Weingarten Nostat, Inc., a Texas corporation, whose mailing address is c/o Weingarten Nostat, Inc., a Texas corporation, P.O. Box 924133, Houston, Texas 77292-4133 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, of the City Columbus, County of Franklin and State of Ohio, whose mailing address is 300 Phillipi Road, Department 10061, Columbus, OH 43228 (hereinafter referred to as "Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant have heretofore entered into a Lease, dated August 5, 1999, for approximately 24,725 square feet in the Town & Country Shopping Center located at 160 N. Air Depot Drive, Midwest City, Oklahoma, as amended (collectively, the "Lease"), and

WHEREAS, Landlord and Tenant now desire to renew the Term of the Lease for sixty (60) full calendar months, and to add one (1) additional sixty (60) month option.

WHEREAS, Landlord acknowledges that pursuant to a letter dated April 28, 2009 and in accordance with the terms of the Option Rider attached to the Lease, Tenant exercised the second of two (2) five (5) year options to extend the term of the Lease.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lease is hereby amended as follows:

1. Pursuant to the Lease, Tenant hereby exercises its option to extend the Lease for a term commencing November 1, 2009, and expiring October 31, 2014 (the "2nd Extension Term").

2. Minimum Rent during the 2nd Extension Term shall be in the amount of ONE HUNDRED THIRTY-FOUR THOUSAND SEVEN HUNDRED FIFTY-ONE AND 24/100 DOLLARS ($134,751.24) per annum, payable in equal monthly installments of ELEVEN THOUSAND TWO HUNDRED TWENTY-NINE AND 27/100 DOLLARS ($11,229.27).

3. Landlord hereby grants Tenant the option to extend the lease term for one (1) additional period of sixty (60) full calendar months (the "3rd Extension Term"). The 3rd Extension Term, if exercised, shall commence at the end of the 2nd Extension Term of the Lease, upon the same terms and conditions as contained in the Lease except as provided herein. Provided Tenant is not in default under the terms of the Lease beyond applicable notice and cure periods, Tenant may elect to extend the Lease Term by giving the Landlord written notice not less than one hundred eighty (180) days prior to the expiration of the 2nd Extension Term.

4. All the terms and conditions of the Lease shall apply during the 3rd Extension Term except that the Minimum Rent applicable for the 3rd Extension Term shall be the sum of $147,113.75 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $12,259.48.

5. During the 3rd Extension Term, Tenant's Share of Common Operating Costs shall not exceed $.80 per square foot per year, pursuant to the Lease.

6. During the 3rd Extension Term, Tenant shall continue to pay its proportionate share of Taxes and Insurance Payments, pursuant to the Lease.

7. For each Lease Year of the 3rd Extension Term, Tenant shall pay Percentage Rent in an amount equal to 2 ½% of Gross Sales in excess of Five Million Eight Hundred Eighty-Four Thousand Five Hundred Fifty and 00/100 Dollars ($5,884,550.00) per Lease Year.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the

BL #1488

Lease.

In the event there is a conflict between the terms and provisions of this Amendment and Extension of Lease and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Amendment and Extension of Lease, the terms and provisions of this Amendment and Extension of Lease shall control.

Landlord and Tenant each represent and warrant to the other that the individual executing this Amendment and Extension of Lease on their behalf are each duly authorized to so execute and deliver this Amendment and Extension of Lease.

This Amendment and Extension of Lease shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Amendment and Extension of Lease may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Amendment and Extension of Lease to be executed as of the date first written above.

Witnesses as to Tenant

TENANT: **BIG LOTS STORES, INC., an Ohio corporation**

BY: _____
       Kevin R. Day
ITS:   Vice President

Witnesses as to Landlord

LANDLORD: **WEINGARTEN NOSTAT, INC., a, Texas corporation**

BY: _____
PRINT: Mark D. Stout
TITLE:   Vice President /
            Associate General Counsel

CLD Legal

(Acknowledgements on immediately following page.)

BL #1488

(Tenant's Acknowledgement)

STATE OF OHIO      )
                          )
County of  Franklin    )

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc., an Ohio corporation**, by Kevin R. Day, its **Vice President**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this _19_ day of _JUNE_, 2009.

Notary Public

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES _4/24/2010_

(Landlord's Acknowledgement)

STATE OF TEXAS

County of Harris

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Weingarten Nostat, Inc., a Texas corporation**, by _Mark D. Stout_, its _VP/Asso. Gen Cow_ who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at _Houston, TX_, this _27th_ day of _May_, 2009.

CHRISTINA TILLEY
Notary Public State of Texas
My Comm. Exp. 11-06-2010

Notary Public

4/1/84

RDS/BW/j1
04/19/99
07/01/99
07/29/99

T-8343

I N D E X

TO LEASE CONTRACT
BY AND BETWEEN

WEINGARTEN NOSTAT, INC.
AS "LANDLORD"

AND

CONSOLIDATED STORES CORPORATION
AS "TENANT"

Town & Country Shopping Center (Location 0132)

| ARTICLE | CAPTION | PAGE |
|---------|---------|------|
| ARTICLE I | PREMISES | 1 |
| ARTICLE II | CONSTRUCTION WORK | 1 |
| ARTICLE III | TERM | 1 |
| ARTICLE IV | RENTAL | 2 |
| ARTICLE V | UTILITIES | 4 |
| ARTICLE VI | USE | 4 |
| ARTICLE VII | COMMON AREA | 6 |
| ARTICLE VIII | ASSIGNMENT AND SUBLETTING | 8 |
| ARTICLE IX | REPAIR AND MAINTENANCE | 10 |
| ARTICLE X | ADDITIONS AND FIXTURES | 12 |
| ARTICLE XI | FIRE AND DESTRUCTION OF PREMISES | 12 |
| ARTICLE XII | LIABILITY AND INDEMNITY | 13 |
| ARTICLE XIII | DIVERSION OF SALES | 14 |
| ARTICLE XIV | SECURITY DEPOSIT | 15 |
| ARTICLE XV | DISPOSITION OF PROPERTY | 15 |
| ARTICLE XVI | DEFAULT, REMEDIES AND DETERMINATION OF DAMAGES | 15 |
| ARTICLE XVII | NON-WAIVER | 17 |
| ARTICLE XVIII | LANDLORD-TENANT RELATION | 18 |
| ARTICLE XIX | EMINENT DOMAIN | 18 |
| ARTICLE XX | HOLDING OVER | 19 |
| ARTICLE XXI | LANDLORD'S MORTGAGEE | 20 |
| ARTICLE XXII | ADDITIONAL RENT | 21 |
| ARTICLE XXIII | NOTICE | 24 |
| ARTICLE XXIV | TENANT'S SIGNS | 24 |
| ARTICLE XXV | TERMINOLOGY AND MISCELLANEOUS | 24 |
| ARTICLE XXVI | TENANT'S BANKRUPTCY | 27 |
| ARTICLE XXVII | CONDITION OF LEASE (Intentionally Deleted) | 28 |
| ARTICLE XXVIII | ENTIRE AGREEMENT | 28 |

RIDERS:    CONSTRUCTION RIDER
           OPTION RIDER

EXHIBITS:  "A"   - LOCATION OF THE LEASED PREMISES
           "A-1" - LOCATION OF ASBESTOS-CONTAINING MASTIC
           "B"   - LEGAL DESCRIPTION OF THE SHOPPING CENTER
           "C"   - PLANS AND SPECIFICATIONS
           "D"   - SCOPE OF WORK
           "E"   - SIGNAGE

2600 Citadel Plaza Drive    P. O. Box 924133    Houston, Texas 77292 (713) 866-6000

L E A S E    C O N T R A C T

THIS LEASE CONTRACT entered into by and between WEINGARTEN NOSTAT, INC., a Texas corporation, duly organized and operating under the laws of the State of Texas, with principal place of business in Houston, Harris County, Texas, hereinafter called "Landlord"; and CONSOLIDATED STORES CORPORATION, hereinafter called "Tenant".

W I T N E S S E T H:

ARTICLE I

Premises

Section 1.01.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the leased premises (the "Leased Premises") which shall be a portion of a building, which portion contains or will contain approximately 24,725 square feet of floor area, situated or to be situated substantially in the location which is shown outlined or hatched on the plat designated Exhibit "A", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes, such building to be constructed or being constructed on part of the tract of property described in Exhibit "B", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes.  The land described in Exhibit "B" and any existing and future buildings, parking area, sidewalks, service area and other improvements now existing thereon are sometimes herein referred to as the "Shopping Center".  Landlord reserves the right to place in, under, over or through the Leased Premises pipes, wires, lines, and facilities serving other areas of the Shopping Center provided such right is exercised in a manner which does not unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 1.02.  In determining the floor area of the Leased Premises, distances shall be measured from the exterior face of all exterior walls and the center of all partition walls which separate the Leased Premises from any interior area.  Walls separating the Leased Premises from a mall and corridor walls shall be deemed to be exterior walls of the Leased Premises.

ARTICLE II

Construction Work

Section 2.01.  The Leased Premises shall be constructed in accordance with the Construction Rider attached hereto and incorporated by reference herein for all purposes.  Tenant agrees to exercise diligence in completing all of its construction work as quickly as practicable.

Section 2.02.  Landlord shall deliver possession of the Leased Premises to Tenant within five (5) days following receipt of three (3) copies of this Lease executed by Tenant.

ARTICLE III

Term

Section 3.01.  The term of this Lease shall commence either: (i) sixty (60) days after tender of possession of the Leased Premises to Tenant by Landlord, or (2) on the date upon which Tenant opens for business in the Leased Premises, whichever occurs sooner.  The term of this Lease shall terminate on the last day of the sixtieth (60th) full calendar month after its commencement, unless sooner terminated in accordance with the terms and conditions hereinafter set forth.  At the request of Landlord or Tenant from time to time made, the other party will execute one or more memoranda or letters stating the commencement and termination dates of the Lease.  During the last ninety (90) days of the lease term, Landlord shall have the right to place signs on the Leased Premises advertising it for rent.

Section 3.02.  Notwithstanding the fact that the lease term will commence at a date subsequent to the execution of this instrument by Landlord and Tenant, such parties intend that each shall have vested rights immediately upon the signing of

this instrument and that this instrument shall be fully binding and in full force and effect from and after execution hereof by Landlord and Tenant.  In the event that the lease term shall not have, in fact, commenced within two (2) years from the date hereof (and if this Lease shall not theretofore have been cancelled by Landlord as herein permitted), then, in addition to all the other rights and remedies of Landlord set forth herein, this Lease shall thereupon be automatically null and void and of no further force and effect, and neither party shall have any further obligation or liability hereunder.

ARTICLE IV

Rental

Section 4.01.  As "Minimum Rent", Tenant covenants and agrees to pay to Landlord in Houston, Harris County, Texas, at P. O. Box 200518, Houston, Texas 77216, or at such other address as Landlord may from time to time designate in writing, the sum of Nine Thousand One Hundred Sixty-Eight and 85/100 Dollars ($9,168.85) multiplied by the number of full calendar months in the term of this Lease (plus a pro rata portion thereof for any partial month occurring at the commencement of the term of this Lease if such commencement be other than the first day of a calendar month), such sum to be payable in equal monthly installments of Nine Thousand One Hundred Sixty-Eight and 85/100 Dollars ($9,168.85) per month.  All such Minimum Rent payments shall be made on the first day of each calendar month, monthly in advance, for each and every month in the term of this Lease.  Upon commencement of the term of this Lease, Tenant will pay Landlord Minimum Rent for the first full calendar month of the lease term; but if the lease term does not commence on the first day of a calendar month, Tenant will, in lieu of a full month's Minimum Rent, pay in advance a pro rata part of such sum as Minimum Rent for such partial month.

Section 4.02.  In addition to Minimum Rent, Tenant agrees to pay to Landlord, as "Percentage Rent", the following:

A sum equal to two and one-half percent (2 1/2%) of all "Gross Sales" (as hereinafter defined) in excess of Four Million Four Hundred One Thousand Fifty and 00/100 Dollars ($4,401,050.00) (hereinafter referred to as the "Breakpoint") during each "Lease Year" (as hereinafter defined).

Percentage Rent due for each Lease Year shall be payable within ninety (90) days after the end of each Lease Year.

In the event that the Minimum Rent for any Lease Year shall be reduced or abated in accordance with Articles XIX or XI, the Breakpoint for such Lease Year shall be reduced by a percentage thereof equal to the percentage decrease in the Minimum Rent payable for said Lease Year.  In the event that any Lease Year contains more or less than twelve (12) full calendar months, the Breakpoint shall be proportionately increased or decreased, as the case may be, for any such Lease Year.

The term "Gross Sales" includes all moneys or things of value received or receivable, including lease or rental revenue by Tenant, its sublessees, licensees or concessionaires or others, for merchandise sold or services performed or business conducted (including finance charges and service charges on time-payment sales, credit sales or lay-a-way sales) in, about or from the Leased Premises (including, without limitation, orders received in person or by mail, telephone or telegraph), including transactions in which delivery is made to the customer at the Leased Premises but the order is taken elsewhere, transactions in which the order is taken at the Leased Premises but delivery is made elsewhere, deposits not refunded to purchasers.  The term "Gross Sales" shall not include (1) governmental excise or sales taxes added to the selling price of the item and paid by the Tenant directly to the Government, or (2) refunds or allowances to customers not in excess of the original selling price of the item, or (3) transfers or exchanges of merchandise to another of Tenant's stores or warehouses made in the regular course of Tenant's business and not for the purpose of avoiding consummation of a sale in the Leased Premises, or (4) returns to shippers or manufacturers, or (5) sales of Tenant's "Removable Trade Fixtures "as hereinafter defined" after use by Tenant in the Leased Premises, or (6) income from stamp machines and public telephones, or (7) bad debts on credit sales and bad checks, or (8) sales of merchandise to employees at a discount, or (9) insurance proceeds, or (10) proceeds from vending machines located in the Leased Premises.  Under no circumstances shall there be any deduction from Gross Sales by reason of Tenant's being liable to pay any franchise tax, capital

2

stock tax, income tax or similar or dissimilar tax based upon Tenant's income, capital structure, or profits.

All Gross Sales will be recorded either (i) through modern cash registers from which a cash receipt shall be given to each customer for each purchase or (ii) in such other manner as is commercially reasonable. Full and adequate records and books of account shall be accurately maintained by Tenant on all business operations in or about Tenant's principal office. All books of account, records, daily cash register total slips, sales slips and Federal income tax returns relating to Tenant's operation in or about the Leased Premises or other commercially reasonable records will be retained by Tenant for a period of three (3) years after preparation, and will be open to inspection by Landlord (or its representative) at all reasonable times, as provided below.

"Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be the "First Partial Lease Year".

Each subsequent "Lease Year" shall mean a period of twelve (12) full calendar months commencing with the date following the last day of the first Lease Year, and commencing with each subsequent annual anniversary of such day.

The last Lease Year of the lease term shall be the period which commences on the day immediately following the last day of the preceding Lease Year and terminates on the last day of the lease term, and the parties recognize that such last Lease Year may be less than twelve (12) full calendar months, depending upon the date of termination of the lease term.

Within thirty (30) days after the end of each month in the lease term, Tenant will deliver to Landlord a statement signed by Tenant (if Tenant is an individual), or a general partner of Tenant (if Tenant is a partnership) or a responsible agent of Tenant (if Tenant is a corporation) accurately setting forth the amount of Gross Sales made during such month, itemized in reasonable detail. Within ninety (90) days after the end of each Lease Year, Tenant will furnish to Landlord a statement signed and by the same party who is to sign the monthly statement of sales according to the foregoing provisions hereof, accurately showing Gross Sales for the preceding Lease Year itemized in reasonable detail and will contemporaneously therewith pay any Percentage Rent due for such Lease Year.

Landlord may, at any time or times, upon ten (10) days prior written notice but not more than once per Lease Year, have an audit made of any such statement, may examine Tenant's sales tax reports, Tenant's inventory movement sheets, and other relevant records for such period, and acceptance of the Percentage Rent tendered by Tenant shall not prejudice these rights. Except as provided in the following paragraph, the cost of the audit shall be borne by Landlord unless such audit shows that Tenant's statement was in error by three percent (3%) or more of the Gross Sales of Tenant for the relevant Lease Year, in which event Tenant will pay the reasonable cost of such audit.

In the event Tenant fails to submit to Landlord its statement of Gross Sales in accordance with the terms and conditions contained herein, and within thirty (30) days after notice by Landlord, Percentage Rent shall be payable by Tenant based upon Gross Sales generated by Tenant in the Leased Premises during the same period of the immediately preceding Lease Year and such sum shall be immediately due and payable by Tenant to Landlord. At any time after the date upon which such statement should have been submitted, Landlord shall have the right to audit Tenant's books and records at Tenant's sole cost and expense and Tenant shall pay to Landlord upon demand the reasonable cost of such audit. Any additional Percentage Rent due following such audit shall be immediately due and payable and any overpayment shall be refunded.

Computation of the Percentage Rent shall be made separately and independently for each Lease Year of the lease term, without regard to the Gross Sales made during or rental paid for any other Lease Year.

Section 4.03. All rent (including both Minimum Rent and Percentage Rent) and other sums hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or off-set except as expressly provided herein. Rent and other payments not received within ten (10) days following written

notice to Tenant shall bear interest from maturity at the rate of twelve percent (12%) per annum.

All other sums and charges of whatsoever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease (including, without limitation, all payments set forth in Article XXII, below entitled "Additional Rent") constitute additional rent (whether or not same be designated "Additional Rent") and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay Minimum Rent.

ARTICLE V

Utilities

Section 5.01.    Tenant will at its own cost and expense pay for all water, sanitary sewer, gas, electricity and other utilities used in the Leased Premises and will save and hold Landlord harmless from any charge or liability for same.    Such payments shall be made directly to the supplier of any utility separately metered. Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Leased Premises.    Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage.    In the event Landlord supplies any utility to Tenant, the rate charged for such service shall not exceed the applicable consumer rate which Tenant would otherwise pay as a direct customer of the public or municipal utility company providing such service.

Section 5.02.    No interruption or malfunction of any utility services (including, without limitation, interruption of such utilities as a result of the enactment or promulgation, regardless of the ultimate validity or enforceability thereof, of any federal, state or local law, statute, ordinance, decree, order, guideline or regulation now or hereafter enacted or promulgated by any governmental, quasi-governmental, regulatory or executive authority) shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for any damages (including, without limitation, consequential or special damages) or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant any right of off-set or recoupment.    In the event of any such interruption of any such services, Landlord shall use reasonable diligence to restore such service in any circumstances in which such interruption is caused by Landlord's fault.    Notwithstanding any term or provision to the contrary contained herein, in the event that such utility services are interrupted due to the negligence of Landlord for a period longer than twenty-four (24) hours, and provided that Tenant shall have given notice of such interruption to Landlord, Minimum Rent and additional charges shall abate until such interrupted utility services have been restored.

ARTICLE VI
Use

Section 6.01.    Tenant will use the Leased Premises solely for the following purpose: for the retail sale of general merchandise and furnishings.    In no event, however, may Tenant: (1) operate a business primarily devoted to the wholesale and/or retail sale of beauty proucts, equipment and accessories; (2) operate a business which derives more than sixty percent (60%) of it sales volume from, and/or devotes more than sixty percent (60%) of its sales area to, the retail sale of pre-recorded music (in tape, CD, or any other format) and/or the retail sale and/or rental of pre-recorded videos; or (3) operate a business that is principally a retail shoe store.    Tenant is prohibited from the sale of dairy products requiring refrigeration, fresh produce, fresh meat and fresh fish, and the area that may be devoted to the sale of all other food items may not exceed 4,000 square feet; provided, however, if the Tenant hereunder shall ever cease to be Consolidated Stores Corporation or any transferee pursuant to a "Permitted Assignment" under Section 8.02 below, Tenant shall no longer be permitted to sell food items in the Leased Premises.    Tenant will not use or permit use of the Leased Premises for any other purpose without the written consent of Landlord.    Tenant may also, with Landlord's prior written consent which shall not be unreasonably withheld or delayed, use the Leased Premises for any other existing or future retail merchandising concept which is not directly competitive with the existing businesses of another tenant then in the Shopping Center and/or does not violate any restrictions contained in other tenants' leases or an existing exclusive granted to any other tenant leasing space in the Shopping Center prior to Tenant's proposal to

4

change its use.  Landlord represents and warrants to Tenant, as of the effective date of this Lease, that Tenant's aforementioned use is not in violation of any exclusive covenants granted to existing tenants in the Shopping Center.  Landlord agrees to indemnify Tenant for any all costs associated with violations of this provision.  Such store will be advertised as and operated under the name Big Lots unless and until the majority of the similar stores Tenant (or its parent corporation, if Tenant is a corporation) is now or hereafter so operating should change their names, in which event at Tenant's election the Leased Premises will be advertised as and operated under such new name.  Tenant, at its own expense: will comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations applicable to the interior or nonstructural portions of the Leased Premises and the business conducted therein by Tenant; will install, remove and alter such fixtures, equipment and facilities in, and make such alterations to, such portions of the Leased Premises as may be necessary so to comply; will comply with such reasonable and nondiscriminatory regulations as Landlord may promulgate regarding sanitation, cleanliness and other matters (not inconsistent with any other provision of this instrument), including without limitation removal of garbage, trash and other waste; and will furnish and maintain an adequate number of fire extinguishers in good operating condition.  Tenant will not engage in any activity or permit any nature of construction by Tenant or any other condition at the Leased Premises which would cause Landlord's fire and extended coverage insurance to be canceled, or the rate therefor increased above the highest rates applicable for the use of the Leased Premises permitted herein (or at Landlord's option will upon demand pay any such increase); will comply with such safety recommendations and loss prevention and loss reduction recommendations as Landlord or Landlord's insurance carriers (or both) may, from time to time, require to the extent the same only applies to the interior nonstructural portions of the Leased Premises; will not conduct any auction or bankruptcy or fire or "lost-our-lease" or (except during the last ninety (90) days of the Lease term) or "going-out-of-business" or similar sale; will not make any unlawful use of the Leased Premises or permit any unlawful use thereof; will not use any loudspeaker, phonograph, radio or sound amplifier audible within other tenants' premises; and will not commit any act which is a nuisance or annoyance to Landlord or to other tenants, or which might, in the reasonable judgment of Landlord, appreciably damage Landlord's goodwill or reputation, or tend to injure or depreciate the Shopping Center.  Landlord shall comply and cause the exterior portions of the Leased Premises, the structural (including sprinkler system) portions of the Leased Premises and the Common Area of the Shopping Center to comply with all laws, orders, rules, regulations, ordinances, directives and other requirements of all county, municipal, state and federal governments and of their administrative departments, agencies, bureaus and officials and other applicable governmental authorities, now in force, or which may hereinafter be in force, except to the extent that may be required due Tenant's changing its use to other than the sale of general merchandise and furnishings and the particular nature of the new business conducted within the Leased Premises.

Section 6.02.A.  Tenant agrees to open initially for business in the Leased Premises.  Tenant will remain open on regular business days during reasonable business hours but Tenant shall remain open for business not less than the hours of 10:00 o'clock A.M. until 6:00 o'clock P.M. Monday through Saturday (or until 9:00 o'clock P.M. on such evenings as may be reasonably designated by Landlord from time to time during the term hereof if tenants occupying eighty percent [80%] of the floor area of the Shopping Center remain open until such time).

It is expressly understood that, notwithstanding anything to the contrary contained herein, subject to the limitation set forth in Section 13.02, after having opened initially, upon thirty (30) days prior written notice to Landlord, Tenant may close the Leased Premises when in Tenant's reasonable judgment the operation of the Leased Premises as provided herein cannot be economically justified or when the operation of the Leased Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, than any such closing shall not relieve Tenant from any of its obligations hereunder.  In the event that Tenant closes the Leased Premises under this Section and fails to reopen the Leased Premises within ninety (90) days thereafter, Landlord shall thereafter have the continuing right to terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall thereafter be released from all further liability hereunder, except for accrued, undischarged obligations as of the date of termination.

Section 6.02.B.  So long as Tenant is open and operating its business in the Leased Premises as provided by the terms of this Lease and the primary purpose of such business is the operation of a discount general merchandise store and there is

5

no "Event of Default" (as defined in Article XVI hereof) beyond any applicable notice and/or cure period, then should Landlord, after the date hereof, lease space in the Shopping Center to, or permit the operation for business of any other premises in the Shopping Center by, any other tenant whose primary business will be the operation of discount general merchandise store, liquidator, close out store or "dollar store" operation (hereinafter a "Competing Business"), Tenant shall have the right to pay in lieu of Minimum Rent, Percentage Rent and all other charges due hereunder (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center) monthly rent ("Alternative Rent") equal to the lesser of two and one half percent (2 1/2%) of Gross Sales for such month or monthly Minimum Rent at the rate set forth in Section 4.01. Alternative Rent shall be paid within thirty (30) days after the month for which it is due and shall be accompanied by a statement of Tenant's Gross Sales for such month. At such time that the Competing Business ceases to operate in the Shopping Center, Tenant shall no longer be entitled to pay Alternative Rent, and shall again commence paying Minimum Rent and Percentage Rent as provided herein.

The provisions of this Section 6.02.B. granting Tenant the right to pay Alternative Rent shall not apply to present tenants (or their assignees or sublessees) provided they engage only in uses permitted under provisions in such parties' leases in effect as of the date of this Lease, or any tenant, present or future, who occupies 7,000 square feet or less. If, at any time during the term of the Lease, Tenant should cease operating its business at the Leased Premises, (except for cessation of operations caused and continuing by reasons of Force Majeure or other reasons permitted by this Lease excluding, however, Tenant's right to cease operations pursuant to Section 6.02.A. above), then the provisions of this Section 6.02.B. granting Tenant the right to pay Alternative Rent as a result of Landlord's leasing space in the Shopping Center to a Competing Business shall be immediately rendered null and void.

Section 6.03. Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish.

Section 6.04. Tenant shall install and maintain a locking system for the Leased Premises in accordance with commercially reasonable standards.


ARTICLE VII

Common Area

Section 7.01.A. Landlord will provide a "Common Area" (as hereinafter defined) in the Shopping Center and make necessary repairs thereto, and, Landlord will also provide lighting in the parking area in the Shopping Center from dusk until the later of (i) 9:30 o'clock P.M. or (ii) one hour after the closing hour of tenants occupying ninety percent (90%) of the floor area of all stores in the Shopping Center. Tenant, its employees, customers and invitees shall have the non-exclusive use, along with others, of the Common Area, except, however, that with respect to the parking area in the Shopping Center: (i) Tenant's customers and invitees (but not Tenant or its employees) may have the non-exclusive use along with others of any available parking space in the Shopping Center; (ii) Tenant and its employees may have the non-exclusive use, along with other tenants and their employees, of only that available parking space from time to time specifically designated by Landlord for such use in areas within a reasonable proximity to the Leased Premises (and neither Tenant nor its employees shall use any other parking space in the Shopping Center); and (iii) to effectuate this provision, Tenant will, within five (5) days after written request from Landlord, furnish to Landlord the automobile license numbers of any or all automobiles owned or used by Tenant's employees. In the event of the failure by Tenant's employees to park in the space specifically designated by Landlord from time to time for such use, Landlord shall have the right, at Landlord's option, to tow off any such automobile parked in violation of the terms hereof. Landlord shall have the right, from time to time, to change the arrangement, layout and/or size of the Common Area; to close all or any portion of the Common Area on Sundays (or other legal or bank holidays) to such extent as may, in the reasonable opinion of Landlord's counsel, be legally to required to prevent a dedication thereof or any diminution of the rights of Landlord with respect thereto; and to do and perform such other acts in the Common Area as Landlord shall, in its good faith reasonable judgment, determine to be advisable. The non-exclusive usage rights to the Common Area herein granted to Tenant shall constitute a non-exclusive license existing during the term of this Lease but not thereafter. Landlord shall have the right, from time to time, to establish, modify

and enforce reasonable and nondiscriminatory rules and regulations with respect to the Common Area and to police same.

Notwithstanding anything to the contrary contained herein, Landlord will not voluntarily reduce the number of parking spaces within the Common Area to a ratio of less than 4.0 parking spaces per each 1,000 square feet of leaseable building area in the Shopping Center. Additionally, Landlord will not build any new buildings or expand existing buildings other than in the areas designated on Exhibit "A" as "Existing Building Area" or "Maximum Possible Building Area".

B.    For purposes of this Lease, the phrase "Common Area" includes the aforesaid customer's parking area, employees' parking area, service drives and service roads, traffic islands, landscaped areas, loading and service areas, sidewalks, roofs, gutters and downspouts, sprinkler risers serving all or any buildings located in the Shopping Center, electrical gutters serving all or any buildings located in the Shopping Center, and such other portion or portions of the Shopping Center (not leased or rented or held by Landlord for the purposes of being leased or rented to other tenants) as may from time to time be designated or treated by Landlord as part of the Common Area, as well as drainage facilities and lighting facilities servicing any one or more of the aforesaid areas.

Section 7.02.    Tenant will at all times keep all merchandise and displays within the Leased Premises and will not at any time display any merchandise or offer it for sale or (other than during essential loading or unloading operations within the area referred to in Section 7.03 below) permit it to be on adjacent sidewalks or at any other point outside the Leased Premises, nor will Tenant in any other way use or obstruct such sidewalks or other area outside the Leased Premises. Notwithstanding the foregoing, Tenant may conduct sidewalk sales on a portion of the sidewalk immediately in front of the Leased Premises, subject to the following:

1.    Tenant may conduct sidewalk sales not more frequently than on four (4) occasions per year, seven (7) days per occasion.

2.    Tenant shall ensure that an unobstructed walkway, not less than five feet (5') wide, is maintained at all times in front of the Leased Premises for pedestrian traffic.

3.    Tenant shall not use any portion of the sidewalk area abutting any premises other than the Leased Premises.

4.    Except for the negligence of Landlord, its agents, contractor's and employees, Tenant shall indemnify Landlord and hold it harmless from and against all claims for personal injury and property damage attributable to Tenant's use of the sidewalk for sales purposes, and Tenant shall be responsible for cleaning up trash and debris generated from use of the sidewalk for sales purposes.

5.    If any existing tenant complains that Tenant's use of the sidewalk for sales purposes constitutes a violation of the terms of such other tenant's lease, upon written notice from Landlord Tenant shall cease using the sidewalk for sales purposes.

Section 7.03.    Tenant will not load or unload any trucks or permit any trucks serving the Leased Premises, whether owned by Tenant or not, to be loaded or unloaded in the Shopping Center except in the dock and service area and other areas specifically designated for such use by Landlord.

Section 7.04.    Nothing in this Article or elsewhere in this Lease shall be construed as constituting the Common Area, or any part thereof, as part of the Leased Premises.

ARTICLE VIII

Assignment and Subletting

Section 8.01.A.    Except for a "Permitted Assignment" (as defined in Section 8.02 below) neither Tenant nor Tenant's legal representatives or successors in interest by operation of law or otherwise shall assign this Lease or sublease the premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein without the prior express written permission of

Landlord (which consent shall not be "unreasonably" withheld as such term is defined in Section 8.01.B.), and any attempt to do any of the foregoing without the prior express written permission of Landlord shall be void and of no effect. In the event of any such attempted assignment or attempted sublease, or should Tenant, in any other nature of transaction, permit or attempt to permit anyone to occupy the Leased Premises (or any portion thereof), Landlord shall thereupon have the right and option (but no obligation) to cancel and terminate this Lease Contract effective upon fifteen (15) days notice to Tenant given by Landlord at any time thereafter either as to the entire Leased Premises or as to only the portion thereof which Tenant shall have attempted to assign or sublease or otherwise permitted some other party's occupancy; and if Landlord elects to cancel and terminate this Lease Contract as to the aforesaid portion of the Leased Premises, then the Minimum Rent (but no other charges) as to the remainder of the Leased Premises shall thereafter be proportionately reduced. Except as otherwise provided herein, this prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law.

Section 8.01.B. Without intending to limit Landlord's right to be "reasonable", in the event Tenant should request Landlord's written consent to a proposed assignment or subletting and Tenant's proposed assignee or sublessee does not satisfy all of the three (3) conditions set forth below, then, should Landlord withhold consent to such proposed assignment or subletting, such withholding of consent shall be deemed "reasonable" and not "unreasonable".

Condition 1:    That the proposed assignee or sublessee will continue to use the premises for that use as set forth in Article VI, hereof, or such other retail use as Landlord may approve.

Condition 2:    That the proposed assignee or sublessee has at least five (5) years experience in managing and operating the type of business as is described in Article VI, hereof.

Condition 3:    That the proposed assignee has a net worth (based upon generally accepted accounting principles and excluding property exempt from levy of execution under the Oklahoma Property Code) of not less than Three Million Dollars ($3,000,000.00).

Section 8.01.C. In the event of a proposed assignment or subletting, Tenant shall notify Landlord in writing of its desire to assign or sublet the Leased Premises. Along with such notice, Tenant shall supply Landlord with the name of the proposed assignee or sublessee, a financial statement of the proposed assignee or sublessee (including both an income statement and balance sheet), and a resume covering the business experience of the proposed assignee or sublessee. Within forty-five (45) days after receipt of said written notice from Tenant, Landlord shall exercise one of the following options on ten (10) days prior written notice to Tenant:

Option 1:    Landlord may accept the proposed assignee or sublessee and Tenant may proceed with its assignment or subletting.

Option 2:    Landlord may reject the proposed assignee or sublessee based upon the criteria set forth in Section 8.01.B., above. In the event Tenant believes that Landlord is unreasonably withholding the granting of its consent, the exclusive remedy of Tenant shall be to seek a declaratory judgment relating solely to this issue and said judgment shall be binding on both Landlord and Tenant. Following a decision in favor of Tenant, if Landlord fails to exercise Option 3 within ten (10) days thereafter, Landlord shall be deemed to have exercised Option 1.

Option 3:    Landlord may exercise a right of first refusal to retake the Leased Premises and terminate this Lease, notwithstanding that the qualifications of the proposed assignee or sublessee might conform to the reasonableness criteria set forth in Section 8.01.B., above. In such event, the parties would have no further obligations to one another except for monetary obligations which accrued prior to the effective date of termination.

8

Section 8.02. The term "Permitted Assignment" as said term is used herein shall be defined as any transfer of this Lease in connection with the sale of substantially all of the assets or capital stock of Tenant or its parent corporation; or the merger or consolidation of Tenant or its parent corporation with or into another entity; or the transfer of this Lease by assignment or sublease to any of Tenant's parent, subsidiary or affiliated corporations; or in connection with the sale of all, or substantially all, of an operating division of Tenant involving the transfer to the assignee of not fewer than ten (10) stores.

In the event of a Permitted Assignment, Tenant shall provide Landlord, within fifteen (15) days following the effective date thereof, with written notice of such Permitted Assignment and a fully executed copy of the assignment and assumption documents which are used to effectuate the transfer contemplated herein.

In no event shall Tenant be permitted to use a series of one or more Permitted Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party, such that the result of what would otherwise be two, independent Permitted Assignments would become a transfer of this Lease to an independent third party. Any such transfer is prohibited by the terms of Section 8.01 above.

Nothing contained herein shall ever be deemed to restrict or prohibit the transfer, assignment or hypothecation of any stock of Tenant so long as (i) the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on the New York Stock Exchange, American Stock Exchange or NASDAQ National Market, or (ii) such transfer is otherwise a "Permitted Assignment" as defined above. Further, nothing contained herein shall be deemed to restrict or prohibit Tenant from licensing departments within the Leased Premises for periodic events; provided, however, the maximum area of all portions of the Leased Premises licensed at any given time shall not exceed twenty-five percent (25%) of the total floor area of the Leased Premises.

Section 8.03. Notwithstanding that the prior express written permission to any of the aforesaid transactions may have been obtained, or in the event of a Permitted Assignment, the following shall apply: (1) in the event of an assignment, contemporaneously with the granting of Landlord's aforesaid consent or prior to the effective date of a Permitted Assignment, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties, and obligations of Tenant hereunder, and such assignee shall be jointly and severally liable therefor along with Tenant; (2) a signed counterpart of all such instruments relative thereto executed by all parties to such transaction (with the exception of Landlord) shall be submitted by Tenant to Landlord within ten (10) days of execution of the same (it being understood that no such instrument other than evidence of a Permitted Assignment shall be effective without the written consent of Landlord); and (3) in any case where Landlord consents to an assignment or subletting or in the event of a Permitted Assignment, the undersigned Tenant will nevertheless remain directly and primarily liable for the performance of all of the covenants, duties, and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rent and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant and/or any assignee without demand upon or proceeding in any way against any other person.

Section 8.04. If this Lease be assigned or if the Leased Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge or hypothecation of the leasehold interest or grant of any concession or license within the Leased Premises or if the Leased Premises be occupied in whole or in part by anyone other than Tenant, Landlord may nevertheless collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and apply the net amount collected to the rent payable hereunder, but no such transaction or collection of rent or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

Section 8.05. Notwithstanding any term or provision contained in the Option Rider attached to this Lease, except for a "Permitted Assignment" (as defined in Section 8.02 above), if Tenant assigns this Lease or subleases the Leased Premises, then upon such assignment or sublease any unexercised option to extend the term of

this Lease provided for in the Option Rider shall automatically lapse and be of no further force or effect.

ARTICLE IX

Repair and Maintenance

Section 9.01. Landlord will repair the following damage to the Leased Premises (including replacement):

(i) damage to the roof and damage to structural portions of the Leased Premises (said "structural portions" including the foundation and members supporting the roof, any exterior wall and sprinkler system; and

(ii) damage to any utility lines (sewer, water, gas or electrical) located outside the boundaries of the Leased Premises.

Tenant will promptly give Landlord written notice of any damage to the Leased Premises requiring repair by Landlord of which Tenant is aware. The plumbing facilities shall not be used for any purpose other than that for which they were constructed, and no foreign objects of any kind shall be introduced therein. Tenant shall be responsible for the expense of any breakage, stoppage or other drainage to such facilities within and exclusively servicing the Leased Premises resulting from a violation of this provision by Tenant.

Landlord shall supply Tenant with an HVAC inspection report two (2) weeks prior to the date upon which Landlord tenders possession of the Leased Premises to Tenant. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant and shall guarantee that the HVAC system is in good working condition and adequate for Tenant's intended use (1 ton per 400 square foot). Should Landlord not provide Tenant with such report, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense, not to exceed One Hundred Fifty Dollars ($150.00). Landlord will perform all work required pursuant to the inspection report.

Tenant shall provide written notice to Landlord of the need for repairs pursuant to the terms of this Lease. If Landlord fails to commence and diligently complete the making of repairs with thirty (30) days after such notice (plus such additional time as may be reasonably necessary under the circumstances, as long as Landlord promptly commences repairs after receipt of Tenant's notice and thereafter diligently and continuously continues with such repairs until completion of same), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency, and if Landlord after receiving confirmation for Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost without waiting thirty (30) days; provided, however, Tenant shall incur only reasonable costs necessary to end or avert the emergency. For purposes hereof, an "emergency" shall be deemed to be any circumstance that poses an immediate threat of personal injury of major damage to the property. In performing such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord refuse to reimburse Tenant the cost of any such repair work, Tenant shall have the right to deduct such cost from the next monthly installment(s) of Minimum Rent (provided, however, that no more than twenty-five percent (25%) of Minimum Rent may be deducted for any single month).

Section 9.02. All damage to the interior, non-structural portions of the Leased Premises, other than that which Landlord undertakes to repair in Section 9.01 or Articles XI or XIX will be repaired and all maintenance will be performed and replacements and renewals will be made by Tenant at Tenant's cost and expense including without limitation all other maintenance and repairs necessary or appropriate to cause the Leased Premises to be suitable for Tenant's intended commercial purpose and occupancy; and Tenant will make all repairs, perform all maintenance and provide all renewals and replacements to such portions of the Leased Premises, including but not limited to the floor covering, heating and air conditioning equipment (whether any such equipment is roof mounted or otherwise affixed outside the Leased Premises). Tenant will be responsible for all repairs to electrical wiring and plumbing lines exclusively serving the Leased Premises, but only to the extent such repairs do not require work below the floor slab or through load bearing walls or other structural elements. Tenant will replace all broken or cracked plate glass and glass windows. Tenant shall not make, or permit to be made,

any penetration in the roof of the building of which the Leased Premises are a part. In the event that any such roof penetration is required in connection with any repairs, maintenance, renewals or replacements required to be made by Tenant hereunder, Landlord shall perform such roof penetration at Tenant's cost within a reasonable time after notice from Tenant, and Tenant shall pay the cost thereof upon demand.

If Landlord considers necessary any repairs, maintenance, renewals or replacements required by the provisions of this Lease to be made or provided by Tenant, Landlord shall request that Tenant make such repairs or perform such maintenance or provide such renewal or replacements, and, upon Tenant's failure or refusal to do so within thirty (30) days, plus such additional time as may be reasonably necessary under the circumstances, as long as Tenant promptly commences repairs after receipt of Landlord's notice and thereafter diligently and continuously continues with such repairs until completion of same (and in any event in case of an emergency irrespective of whether Landlord shall have requested or obtained Tenant's prior consent), Landlord shall have the right (but shall not be obligated), either itself or through a third party contractor, to make such repair, perform such maintenance or provide such renewal or replacement; thereupon Tenant will, at Landlord's election, on demand pay (or reimburse Landlord for) the reasonable cost thereby incurred by Landlord. For these purposes an "emergency" shall be deemed to exist if, in the good faith judgment of Landlord, prompt action is needed in order to prevent death, bodily injury or major property damage. Any such sum which Tenant becomes liable to pay to or reimburse Landlord for hereunder may be treated by Landlord as a portion of the rental due and owing by Tenant to Landlord with the Minimum Rent due hereunder, for purposes of determining Landlord's remedies in the event of any failure by Tenant to pay such sum to Landlord contemporaneous with the Minimum Rent due hereunder.

Section 9.03. Tenant will not commit waste and will not injure the Leased Premises or the building of which they are a part, but will maintain the Leased Premises in a clean condition and in good repair (as provided herein). Upon termination of this Lease, Tenant will surrender and deliver up the Leased Premises to Landlord broom-clean condition, excepting only ordinary wear and tear and damage arising from acts of God, and excepting also any damage required hereunder to be repaired by Landlord. Upon termination of this Lease, Tenant will also surrender to Landlord all keys to the Leased Premises at the place stated herein for the payment of rent and inform Landlord, in writing, of all combinations on locks, safes and vaults, if any, at the Leased Premises.

Section 9.04. Landlord (and any mortgagee or Deed of Trust beneficiary as to the Leased Premises) will have a right to enter the Leased Premises at any reasonable time after ten (10) days notice (including during Tenant's business hours) to inspect the condition thereof, to make necessary repairs and improvements, or to repair or maintain pipes, wires, and other facilities serving its nearby property and for other lawful purposes; provided however, such right shall not be exercised in a manner which would interfere with Tenant's conduct of its business at the Leased Premises.

Section 9.05. Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Leased Premises or any portion thereof or interest therein for any reason whatsoever incident to the acts or omissions of Tenant or any contractor of Tenant or any such contractor's subcontractor or any laborer performing labor or materialman furnishing materials at or for the Leased Premises or by reason of any specially fabricated materials whether or not placed at the Leased Premises, Tenant shall cause the same to be cancelled and discharged of record by payment, bonding or otherwise, within thirty (30) days after notice by Landlord, or at such earlier time as is necessary to prevent the foreclosure thereof.

ARTICLE X

Additions and Fixtures

Section 10.01. Tenant will make no alterations or additions to the structural or exterior portions of the Leased Premises without the prior written consent of Landlord. Tenant shall submit plans and specifications for any structural or exterior alterations or additions to Landlord.

Section 10.02. Tenant shall remove "Removable Trade Fixtures", as hereinafter defined, (excluding, however, ducts, conduits, wiring, pipes, paneling or other wall

covering or floor covering), and, in addition to other applicable provisions of this Lease regarding such removal, the following shall apply: (1) such removal must be made prior to the termination of the term of this Lease; (2) Tenant must not be in default of any obligation or covenant under this Lease beyond any applicable notice and/or cure period at the time of such removal; and (3) such removal must be effected without damage to the Leased Premises or the building of which the Leased Premises are a part and Tenant must promptly repair all damage caused by such removal ordinary wear and tear excepted.   For the purposes hereof, the phrase "Removable Trade Fixtures" includes the following: all of Tenant's signs, tables, chairs, desks, racks, merchandisers and displayers, standards, wall brackets, hang-rods, shelves, mirrors, marking equipment, cash registers and other business machines.

In the event that Tenant shall have assigned this Lease or subleased the Leased Premises (in whole or in part), subject to and in accordance with the provisions of Article VIII above, alterations in the Leased Premises of any scope or extent made (without prior notice to or consent of Tenant) by Landlord or by the party occupying (or contemplating occupancy of) the Leased Premises (with or without the consent of Landlord) shall not have the effect of discharging or otherwise impairing or affecting the continuing liability under this Lease of Tenant or any one holding under Tenant; provided however, the preceding shall not be interpreted as dispensing with the necessity for consent of Landlord to alterations of the structural and exterior portions of the Leased Premises in circumstances in which such consent is required under other provisions of this Lease.

Section 10.03.    Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon Tenant's personal property installed or placed or permitted at the Leased Premises by Tenant.   Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the governmental authority or other taxing authority assessing such charges.

ARTICLE XI

Fire and Destruction of Premises

Section 11.01.    If the Leased Premises are damaged or destroyed (1) to any extent at a time when at least twenty-four (24) months remain in the Lease term; or (2) to the extent of less than twenty-five percent (25%) of replacement cost (above the foundation) at a time when less than twenty-four (24) months but more than twelve (12) months remain in the Lease term; or (3) to the extent repairs will cost less than $20,000.00 at a time when fewer than twelve (12) months remain in the Lease term, then Landlord shall be obligated to repair and reconstruct the Leased Premises to the condition that existed immediately prior to the casualty (except that Landlord will not be responsible for repairing or reconstructing leasehold improvement made by Tenant subsequent to the Commencement Date of this Lease).   (For purposes hereof, the phrase "Lease term" shall include any Extension Term for which Tenant shall have theretofore, or within fifteen (15) days after the occurrence of a casualty shall have, exercised its option pursuant to the terms of the Option Rider attached to this Lease.)   Should the Leased Premises be damaged to an extent and at a time when Landlord is not required to repair and reconstruct as set forth above, Landlord and Tenant shall each have the right to terminate this Lease upon written notice to the other party; provided, however, such notice must be given if at all, within thirty (30) days after the date of the casualty.   If neither party elects to terminate, Landlord shall repair and reconstruct the damaged portion of the Leased Premises to substantially the condition which existed at the time of Landlord's tender of possession of the Leased Premises to Tenant.

Section 11.02.    Notwithstanding that the Leased Premises may not be destroyed or damaged by fire or other risk, in the event that other buildings containing fifty percent (50%) or more of the ground floor building area of the Shopping Center shall be damaged or destroyed by fire or other risk, whether or not covered by Landlord's fire and extended coverage insurance, Landlord shall have the election to terminate this Lease or to continue this Lease in full force and effect, and Landlord will notify Tenant of Landlord's election within thirty (30) days after such other damage or destruction.

Section 11.03.    In any circumstances described above where Landlord is either obligated to repair and restore the Leased Premises, or where Landlord elects to

repair and restore the Leased Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord within a reasonable time thereafter, subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other cause beyond the control of Landlord (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"). Minimum Rent and all other charges shall abate proportionately during the period and to the extent that the Leased Premises are unfit for use by Tenant and not actually used by Tenant in the ordinary conduct of its business. For purposes of computing the Percentage Rent due hereunder during any such period, the computation shall be based upon the proportionately abated Minimum Rent provided for in the preceding sentence.

Notwithstanding anything to the contrary contained in this Lease, should Landlord fail to restore any damaged portion of the Leased Premises within one hundred fifty (150) days after a casualty, or (in the case of damage to other portions of the Shopping Center) if Landlord shall fail to rebuild to the extent of at least sixty percent (60%) of the presently existing floor area of the Shopping Center within two hundred seventy (270) days from the date of a casualty, Tenant shall have the right to terminate this Lease upon thirty (30) days prior written notice; provided, however, such notice must be given, if at all, prior to the date Landlord completes the required repairs.

## ARTICLE XII

### Liability and Indemnity

Section 12.01. Except only as to injury, death or property damage proximately caused by the negligence of Landlord for which Landlord is legally liable, Tenant agrees to indemnify and hold Landlord and Landlord's employees harmless from all losses, claims, suits, actions, damages, and liability (including costs and expenses of defending against all of the aforesaid) arising (or alleged to arise) from any act or omission of Tenant or Tenant's agents, employees and contractors. Except only as to injury, death or property damage proximately caused by the negligence of Tenant for which Tenant is legally liable, Landlord agrees to indemnify and hold Tenant and Tenant's employees harmless from all losses, claims, suits, actions, damages, and liability (including costs and expenses of defending against all of the aforesaid) arising (or alleged to arise) from any act or omission of Landlord or Landlord's agents, employees, or contractors.

Section 12.02. Tenant agrees to take out and maintain at all times during the lease term a policy of fire and extended coverage insurance on its fixtures, equipment, and merchandise placed at the Leased Premises (including but not limited to, the rooftop HVAC unit and plate glass, which Tenant may self-insure). In the event that either Landlord or Tenant sustains a loss by reason of fire or other casualty, and such loss is caused in whole or in part by acts or omissions of the other party, its agents, servants or employees, then the party sustaining such loss agrees to look solely to its insurance proceeds (if any); and such party shall have no claim or right of recovery against the other party to this Lease, or its agents, servants or employees; and no third party shall have any claim or right of recovery by way of subrogation or assignment or otherwise. Landlord shall insure all improvements located in the Shopping Center, including the Leased Premises, except for Tenant's trade fixtures, furnishings and inventory and other personal property against loss or damage by fire and such other risks as are normally insurable under the standard form of fire insurance with broad from extended coverage endorsement, including malicious mischief and vandalism, in an amount not less than eighty percent (80%) of replacement cost of all the improvements located in the Shopping Center, including the Leased Premises. Such policy may be maintained under Landlord's "blanket" insurance policy that covers other properties owned by Landlord and subject to such self-insured retentions (not to exceed twenty percent [20%] of the replacement cost of the Shopping Center) as may be applicable from time to time.

Section 12.03. Tenant will take out and maintain, at its own cost and expense, commercial general liability insurance coverage in a minimum amount of $1,000,000.00 combined single limit, which commercial general liability policy shall include coverage for bodily injury and death, property damage.

Section 12.04. The policies of insurance required to be maintained by Tenant under the terms of this Lease are referred to in this Section 12.04 in the singular as a "Required Policy" and in the plural as "Required Policies". Tenant agrees to

deliver to Landlord a duplicate original or certificate of each Required Policy upon tender of possession of the Leased Premises to Tenant. At all times during the lease term (and prior thereto and subsequent thereto under the circumstances stated in the succeeding sentence), Tenant shall cause a certificate of all Required Policies to be deposited with Landlord. If Tenant fails to have a certificate of any Required Policy on deposit with Landlord at any time during the lease term upon request from Landlord (and prior thereto in the event of any entry into possession by Tenant prior to the commencement date of the lease term or subsequent to the termination date hereof in the event of a holdover), then Landlord shall have the right (but no obligation) to take out and maintain such Required Policy, and if Landlord does so and gives notice thereof to Tenant, then Tenant shall be obligated to pay Landlord the amount of the premium applicable to such Required Policy within thirty (30) days following any such notice from Landlord. Any failure of Tenant to make such payment to Landlord may be treated by Landlord as a default by Tenant in the payment of Minimum Rent required to be paid by Tenant hereunder.

ARTICLE XIII

Diversion of Sales

Section 13.01. Tenant agrees that if, during the term of this Lease, Tenant ceases operations in the Leased Premises as permitted in Section 6.03.A. and thereafter during the remainder of the then current term, either Tenant or any person, corporation, partnership, joint stock association, trust or other firm or entity which controls Tenant or is controlled by Tenant or is under common control with Tenant (and also, in the event Tenant is a corporation (other than a corporation listed on a National stock exchange), if any officer or director thereof or shareholder owning more than ten percent (10%) of the outstanding stock thereof, or parent, subsidiary or related or affiliated corporation) either directly or indirectly, commences operation of any new Odd Lots or Big Lots store within a radius of one (1) mile of the Leased Premises, which Tenant acknowledges is a reasonable area for the purpose of this provision, then in such event, the rent payable by Tenant hereunder shall be adjusted as follows: (a) thereafter, during the period of such other store's operation or other sales, the monthly Minimum Rent shall be the greater of: (i) one hundred twenty-five percent (125%) of the amount stipulated in Section 4.01 hereof for each calendar month during the term hereof during which such operations are conducted; or (ii) the aggregate Minimum Rent and Percentage Rent payable hereunder for the last Lease Year prior to the commencement of such operations divided by twelve (12); and (b) thereafter, during the period of such other store's operation or other sales, the Percentage Rent shall be computed by adding fifty percent (50%) of all amounts sold at such other store, which would be "Gross Sales" (as herein defined) if the merchandise had been sold, services rendered or business conducted at or from the Leased Premises (in lieu of or from such other store) to the amount of Gross Sales (as herein defined). Such adjustment in rent reflects the estimate of the parties as to the damages which Landlord would be likely to incur by reason of the diversion of business and customer traffic from the Leased Premises and Shopping Center to such other store within such radius, as a proximate result of the establishment of such other store. This provision shall not apply to the following store(s) presently being operated by Tenant as of the date hereof (if none, state "None"): NONE.

Section 13.02. Additionally, if Tenant or any person, corporation, partnership, joint stock association, trust or other firm or entity which controls Tenant or is controlled by Tenant or is under common control with Tenant either directly or indirectly commences operation of any store that sells merchandise or services of the type to be sold by Tenant in the Leased Premises as provided in Section 6.01 or similar or related items, and commencement of such operation occurs at a time when Tenant is operating within the Leased Premises, the right of Tenant to cease operations in the Leased Premises as provided in Section 6.03.A shall automatically become void and of no further force or effect.

ARTICLE XIV

(Intentionally Omitted)

14

ARTICLE XV

Disposition of Property

Section 15.01.  In the event that Landlord shall have taken possession of the Leased Premises pursuant to the authority hereinafter granted in connection with an Event of Default or for any other lawful reason, Landlord shall also have the right to remove from the Leased Premises and Shopping Center (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Leased Premises are located or dispose of same in any manner reasonable acceptable to Landlord; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal, storage and/or disposal and shall indemnify and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal, storage and/or disposal.


ARTICLE XVI

Default, Remedies and Determination of Damages

Section 16.01.  Each of the following acts or omissions of Tenant or occurrences shall constitute an "Event of Default":

(a)  Failure or refusal by Tenant to timely pay Minimum Rent or any other sum when due following ten (10) days written notice of such failure; provided that, in no event shall Landlord be required to give such notice more than three (3) times during any calendar year, and from and after Tenant's fourth (4th) such failure or refusal during any calendar year, Landlord shall be entitled to exercise any or all of the remedies set forth in Article XVI without prior notice to Tenant; or

(b)  Failure or refusal by Tenant to comply with the obligations of Tenant set forth in Article VI pertaining to permitted uses and/or Article VIII of this Lease following ten (10) days written notice to Tenant of such failure; or

(c)  Failure or refusal by Tenant to timely perform or observe any other covenant, duty or obligation of Tenant under this Lease; provided, however, notwithstanding the occurrence of such Event of Default, Landlord shall not be entitled to exercise any of the remedies provided for in this Lease or by law unless such Event of Default continues beyond the expiration of thirty (30) days following notice to Tenant of such Event of Default. However, in the event such other covenant, duty or obligation reasonably requires more than thirty (30) days for the curing thereof, such failure to cure shall not be deemed to be an "Event of Default" if Tenant shall have commenced the curing of such failure within such thirty (30) day period and having commenced such curing carries forward the curing thereof to completion with reasonable diligence; or

(d)  The entry of a decree or order for relief by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenant's obligations hereunder or for any substantial part of either of said parties' property, or ordering the winding-up or liquidation of either of said parties' affairs; or

(e)  The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by either of said parties to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of the property of Tenant or any guarantor of Tenant's obligations hereunder, or to the taking possession of any such property by any such functionary or the making of any assignment for the benefit of creditors by either Tenant or any guarantor of Tenant's obligations hereunder, or the failure of Tenant or any

15

guarantor of Tenant's obligations hereunder generally to pay its debts as such debts become due.

Section 16.02. This Lease and the term and estate hereby granted and the demise hereby made are subject to the limitation that if and whenever any Event of Default shall occur, after such notice, if any, as is provided in Section 16.01, Landlord may, at its option, in addition to all other rights and remedies given hereunder or by law or equity, do any one or more of the following:

(a) Terminate this Lease, in which event, Tenant shall immediately surrender possession of the Leased Premises to Landlord; or

(b) Enter upon and take possession of the Leased Premises and expel or remove Tenant and any other occupant therefrom, with or without having terminated the Lease.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Leased Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. Upon the occurrence of an Event of Default, Landlord shall be obligated to give notice to vacate the Leased Premises prior to institution of proceedings in forcible detainer. To the extent of any inconsistency between this Lease and any statutory or common law, it is the agreement of the parties that this Lease shall prevail. No removal or other exercise of dominion by Landlord over the property of Tenant or others at the Leased Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any Event of Default, to the aforesaid exercise of dominion over Tenant's property within the Leased Premises. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise.

If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Leased Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees to pay Landlord, upon demand, all reasonable costs, expenses and disbursements incurred by Landlord in taking such remedial action.

In the event of termination of this Lease or of Tenant's right to possession of the Leased Premises or repossession of the Leased Premises for an Event of Default, Landlord agrees to take the following steps: (1) Landlord will notify at least one (1) commercial real estate broker of the availability of the Leased Premises, (2) Landlord will notify its internal leasing staff in writing of the availability of the Leased Premises, and (3) Landlord will post a "For Lease" sign in the window of the Leased Premises, but Landlord shall have no obligation to relet the Leased Premises, or any portion thereof, unless the lease terms, tenant and use and purpose are satisfactory to Landlord, and Landlord shall not be responsible for failure (after reasonable efforts) or inability to collect rent in the event the Leased Premises are re-let.

Section 16.03. In the event Landlord elects to terminate this Lease by reason of an Event of Default, or in the event Landlord elects to terminate Tenant's right to possession of the Leased Premises without terminating this Lease, Landlord may hold Tenant liable for all rent and other indebtedness accrued to the date of such termination, plus such rent and other indebtedness as would otherwise have been required to be paid by Tenant to Landlord during the period following termination of the lease term (or Tenant's right to possession of the Leased Premises, as the case may be) measured from the date of such termination by Landlord until the date which would have been the date of expiration of the term as stated in Article III (had Landlord not elected to terminate the Lease or Tenant's right to possession on account of such Event of Default) diminished by any net sums thereafter received by Landlord through reletting the Leased Premises during said period (after deducting expenses incurred by Landlord as provided in the succeeding paragraph). Actions to collect amounts due by Tenant provided for in this paragraph of Section 16.03 may be brought from time to time by Landlord during the aforesaid period, on one or more occasions, without the necessity of Landlord's waiting until expiration of such period; and in no event shall Tenant be entitled to any excess of rent (or rent plus other sums) obtained by reletting over and above the rent herein reserved.

Notwithstanding any term or provision to the contrary contained herein, in no event may Landlord "accelerate" any rentals due hereunder, and following any Event of Default (and regardless of whether Landlord elects to terminate this Lease or, alternatively, Tenant's right to possession of the Leased Premises), Minimum Rent and all additional charges shall continue to be due and payable monthly as though no Event of Default had occurred.

In case of an Event of Default, Tenant shall also be liable for and shall pay to Landlord at Houston, Harris County, Texas, in addition to any sum provided to be paid above:  reasonable and customary broker's fees incurred by Landlord in connection with reletting the whole or any part of the Leased Premises; the reasonable costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Leased Premises into condition acceptable to a new tenant or tenants (provided that Tenant's liability for any alteration, remodel and construction costs shall not exceed Landlord's original costs to remodel the Leased Premises for Tenant pursuant to the Construction Rider attached to this Lease, and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies.

Section 16.04.  For the purpose of computing Tenant's liability under this Article, the annual amount of Percentage Rent for which Tenant shall be liable after termination of the Lease or Tenant's right to possession of the Leased Premises shall be the total of all the amounts Tenant was obligated to pay as Percentage Rent two (2) years immediately preceding the termination divided by two (2); Tenant will also pay a pro rata part of such annual Percentage Rent, based upon the length of time between the previous payment of Percentage Rent and the date of termination; and upon such termination Tenant will be obligated to submit to Landlord a statement accurately showing Gross Sales made since submission of its last previous statement.

Section 16.05.  In the event of any default by Landlord, except as otherwise expressly provided in this Lease, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event more than thirty (30) days, in which to cure any such default, unless the default is of a nature that it cannot be cured within thirty (30) days, in which case Landlord shall have such additional time as may be reasonably necessary under the circumstances, provided that Landlord diligently and continuously continues to work towards a cure until the cure has been completed.

Section 16.06.  Except as expressly set forth in the succeeding sentence, irrespective of which party is the prevailing party, neither Landlord nor Tenant shall be entitled to any attorneys' fees incurred in connection with the institution of any action or proceeding in court to enforce any provision hereof or any action or proceeding for damages by reason of any alleged breach or default of any provision of this Lease or any action or proceeding for a declaration of either party's rights or obligations hereunder or any action or proceeding for any other judicial remedy, at law or in equity.

ARTICLE XVII

Non-Waiver

Section 17.01.  Neither acceptance of rent (or any portion thereof) or any other sums payable by Tenant hereunder (or any portion thereof) by Landlord nor failure by Landlord to complain of any action, non-action or default of Tenant shall constitute a waiver as to any breach of any covenant or condition of Tenant contained herein nor a waiver of any of Landlord's rights hereunder.  Waiver by Landlord or Tenant of any right for any default of the other shall not constitute a waiver of any right for either a prior or subsequent default of the same obligation or for any prior or subsequent default of any other obligation.  No right or remedy of Landlord or Tenant hereunder or covenant, duty or obligation of Tenant or Landlord hereunder shall be deemed waived unless such waiver be in writing, signed by the party waiving such consent, duty or obligation.

17

ARTICLE XVIII

Landlord-Tenant Relation

Section 18.01.   The relation created by this Lease Contract is that of landlord and tenant.   Neither the provisions for Percentage Rent nor any other provision of this Lease shall be construed in such a way as to constitute Landlord and Tenant joint venturers or co-partners or to make Tenant or Landlord the agent of the other or to make Landlord or Tenant liable for the debts of the other.   The provisions of this instrument relating to the Percentage Rent, if any, payable by Tenant hereunder are included solely for the purpose of providing for the payment of rental in excess of the Minimum Rent, and providing for a method whereby such additional rental is to be measured, ascertained and paid.

ARTICLE XIX

Eminent Domain

Section 19.01.   If there shall be taken during the term of this Lease any portion of the Leased Premises, by any authority having the power of eminent domain, then and in that event, either party may terminate this Lease upon written notice to the other party, and the date of such termination shall be, the election of the terminating party, either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority. If less than the entire Leased Premises is taken and the parties elect to continue this Lease in effect, all amounts due under this Lease shall be reduced in proportion to the area of the Leased Premises so taken.   Immediately upon the taking of possession of the portion of the Leased Premises taken by the condemning authority, Percentage Rent shall be computed with reference to the proportionately reduced Minimum Rent provided for under the preceding sentence rather than the amount of Minimum Rent set forth in Section 4.01 above.   When any such reduction in Minimum Rent has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Minimum Rent and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV relating to the time and manner of Tenant's payment of Minimum Rent.   At the request of either party, both parties will execute a letter or other memorandum setting forth the amount of such Minimum Rent payable by Tenant.   In the event that this Lease continues in effect, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by way of compensation and damages, Landlord shall restore the remaining portion of the Leased Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as existed prior to such taking.   Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for Force Majeure.   Neither the restoration work, if any, by Landlord with respect to the Leased Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Shopping Center shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or Shopping Center or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Minimum Rent).   During the course of restoration of the Leased Premises, to the extent Tenant cannot and does not use the Leased Premises, Minimum Rent and all additional charges shall abate until the earlier to occur of (i) the date Tenant again conducts business in the restored portion of the Leased Premises, or (ii) sixty (60) days after Landlord completes restoration of the Leased Premises .

Section 19.02.   Whether or not any portion of the Leased Premises may be taken by such authority, Landlord or Tenant may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event more than fifty percent (50%) of the building area in the Shopping Center or more than twenty-five percent (25%) of the Common Area of the Shopping Center be taken by such authority.

Section 19.03.A.   Except as provided in Section 19.03.B below, all sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord.   Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, otherwise payable to Tenant for the leasehold interest by reason of such taking.   Tenant further grants to Landlord the exclusive authority to negotiate with such authority for payment both with respect to the interest of Landlord and the interest of Tenant in the Leased Premises and Tenant

agrees that the authority having the power of eminent domain shall cause all checks and drafts issued by it in connection with any such taking of the fee or leasehold estate, whether as compensation or as damages, to be issued payable to the order of Landlord above or payable to the order of Landlord and "Landlord's Mortgagee" (as hereinafter defined). Upon request of Landlord, Tenant agrees to forthwith execute such instrument or instruments as Landlord may reasonably request for the purpose of evidencing the cessation of Tenant's interest in such portion of the Leased Premises as is taken by such authority and the continued effectiveness of this Lease as to the balance of the Leased Premises not taken. Any amounts specifically awarded or agreed upon by the Tenant and the condemning authority for the taking of Tenant's Removable Trade Fixtures shall be the property of Tenant.

Section 19.03.B.  Notwithstanding anything contained herein to the contrary, in the event that this Lease is terminated due to a complete or partial taking of the Leased Premises, and to the extent (and only to the extent) then compensable under Oklahoma law, Tenant may apply to the condemning authority for (i) the value of any non-removable personal property, fixtures, equipment or leasehold improvements installed or made by Tenant in the Leased Premises, (ii) interruption or damage to Tenant's business, and (iii) moving and relocation expenses; provided, however, that in no event whatsoever shall compensation to Tenant for any of the foregoing reduce (and Tenant shall have no interest in) the award to Landlord provided for in Paragraph A. of this Section 19.03.

Section 19.04.  If this Lease should be terminated under any provision of this Article, rental and other sums due and payable by Tenant hereunder shall be payable up to the date that possession is taken by the taking authority, and Landlord will refund to Tenant a proportionate amount of any such rental and other sums paid in advance but not yet earned by such date.

Section 19.05.  In the event that any authority having the power of eminent domain requests that Landlord convey to such authority all or any portion of the Shopping Center or all or any portion of the Leased Premises, Landlord shall have the right to make a voluntary conveyance to such authority of all or any portion of the Shopping Center or all or any portion of the Leased Premises whether or not proceedings have been filed by such authority; and in the event of any such voluntary conveyance, it shall nevertheless for all purposes hereunder be deemed that there has been a taking by such authority of the property voluntarily conveyed by Landlord. Accordingly, all of the provisions of Sections 19.01, 19.02, 19.03 and 19.04 hereof shall be applicable notwithstanding such voluntary conveyance.

ARTICLE XX

Holding Over

Section 20.01.  If Tenant should remain in possession of the Leased Premises after the expiration of the term of this Lease, without the execution of a new lease, then Tenant shall be deemed to be occupying the Leased Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease, except that as liquidated damages by reason of such holding over, the amounts payable by Tenant under this Lease shall be increased such that the Minimum Rent payable during such period shall be at one hundred twenty-five percent (125%) of the rate in effect during the last month of the stated term of this Lease.

Section 20.02.   The above described tenancy from month-to-month may be terminated by either party upon thirty (30) days notice to the other.

Section 20.03.  Any rent due after notice has been given is to be calculated according to Section 20.01 on a prorata basis. If upon notice of termination by Landlord, Tenant tenders rent in excess of the amount due and payable pursuant to the formula in Section 20.01, and Landlord accepts such payment, the acceptance of such payment will not operate as a waiver by Landlord of the notice of termination, unless such waiver is in writing and signed by Landlord. Any such excess amounts tendered and accepted shall be promptly refunded by Landlord, after deducting therefrom any amounts owed Landlord.

ARTICLE XXI

Landlord's Mortgagee

Section 21.01.   Tenant agrees that its interest under this Lease shall be subordinate to any mortgage, deed of trust or similar device now or hereafter placed upon the Leased Premises or all or any portion of the Shopping Center by Landlord if the mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created so elects, provided that as a condition to Tenant's subordination, Tenant and such mortgagee, beneficiary or lender shall enter into a mutually satisfactory subordination, nondisturbance and attornment agreement within fifteen (15) days of the date of the execution of the mortgage by Landlord, which agreement shall provide, inter alia, that the mortgagee shall not disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods and Tenant agrees to attorn to such mortgagee.  Likewise, such mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created may elect, by notice to Tenant, to make this Lease superior to such mortgage or deed of trust or other security device; and in the event of any such election, Tenant will execute any instruments required to evidence such superiority.

Section 21.02.   For purposes of this Article, the term "Landlord's Mortgagee" means any party holding a mortgage or deed of trust on the Leased Premises or any part thereof or all or any portion of the Shopping Center who has given Tenant written notice that such party holds such lien or deed of trust together with notice of the post office address of such Landlord's Mortgagee.  A lien held by a Landlord's Mortgagee on the Leased Premises or any portion thereof or Shopping Center or any portion thereof is herein referred to as a "Landlord's Mortgage".

Section 21.03.   If the Leased Premises are at any time during the term of this Lease subject to a Landlord's Mortgage then, in any instance in which Tenant gives notice to Landlord alleging default by Landlord in performance of any covenant or obligation under this Lease, Tenant will also simultaneously give a copy of such notice to Landlord's Mortgagee (at the post office address as to which such Landlord's Mortgagee shall have given Tenant notice pursuant to Section 21.02, above) and the Landlord's Mortgagee shall have the right (but no obligation) to cure or remedy such default of Landlord during the same time that is permitted to Landlord hereunder for the remedying or curing of such default; and Tenant will accept such curative or remedial action taken by a Landlord's Mortgagee with the same effect as if such action had been taken by Landlord, and Tenant shall not seek damages from Landlord or any other relief by reason of any such default of Landlord if Landlord's Mortgagee shall have cured or remedied such default within the time allowed herein without damages accruing.

Section 21.04.   Landlord and Tenant shall execute and deliver to each other, at such time or times as either Landlord or Tenant may request, a certificate stating:

(a)  Whether or not the Lease is in full force and effect;

(b)  Whether or not the Lease has been modified or amended in any respect, and specifying such modifications or amendments, if any;

(c)  Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any; and

(d)  Such other information as may be reasonably requested.

The aforesaid certificate(s) shall be delivered to Landlord or Tenant, as the case may be, promptly upon receipt of a written request therefor, but in no event more than fifteen (15) days following receipt of such request.

ARTICLE XXII

Additional Rent

Section 22.01.   In addition to and separate from the Minimum Rent and Percentage Rent, Tenant shall pay to Landlord as additional rent a "Common Area Payment", "Tax Payment", and "Insurance Payment" (as such quoted terms are

hereinafter defined).  For purposes of this Lease, the following terms shall have the hereinafter indicated meaning:

A.  The phrase "Common Area Operating Costs" shall mean, for each calendar year (or portion thereof) during the term of this Lease, the aggregate of all costs, expenses and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord, in its good faith judgment, regards it as reasonably necessary or appropriate to provide the services and materials hereafter referred to and to pay and incur the costs, expenses and liabilities hereafter referred to) in connection with: sweeping, cleaning, removing debris from, maintaining, restriping and repairing the Common Area; lighting the Common Area (including replacement of bulbs and ballasts, and painting, repairing and maintaining of light standards); providing project identification signs; providing signs and/or personnel for assisting in traffic control at the Common Area; providing and maintaining planting and landscaping with respect to the Common Area; providing security services with respect to the Common Area; operating any loudspeakers or other equipment supplying music; utilities charges for any services to the Common Area; repairing and maintaining the roof of the Leased Premises and the building of which they are a part (including repairs to provide for adequate drainage and to gutters and downspouts); repairing and maintaining the structural portions of the Leased Premises and the building of which they are a part; repairing and maintaining utility lines located in the Common Area which do not exclusively serve one tenant in the Shopping Center; exterminating and pest control in and about the Leased Premises and Shopping Center; periodic repainting of exterior walls of the buildings comprising a portion of the Shopping Center (including steam cleaning or sandblasting, thereof or other grafitti-removal procedures); repairing and maintaining overhead canopies at the Shopping Center (including, without limitation, lighting and tile); repairing and maintaining sprinklers and sprinkler-risers serving the Leased Premises and the building of which they are a part; repairing and maintaining sidewalks in the Common Area (including, without limitation, periodic steam cleaning thereof); plus all other costs and expenses of every kind or nature paid or incurred by Landlord relative to operating, managing and equipping the Common Area including, without limitation, subdivision maintenance fees or dues; property owners association fees or dues and similar charges, annual charges for reserves (the "Capital Reserve") established by Landlord for future replacements or improvements to the Common Area (inclusive of periodic new blacktopping of the parking areas and major roof repairs and major structural repairs) plus an administrative fee of fifteen percent (15%) of the aggregate of all of the aforesaid costs and expenses and liabilities (including, without limitation, the aforesaid reserve) paid or incurred by Landlord.  In no event will Tenant be required to contribute to the Capital Reserve an amount greater than ten percent (10%) of the aggregate of Tenant's proportionate share of all other Common Area Operating Costs. Any "Capital Item" (which is defined as any single incident of repair, maintenance, renewal or replacement costing more than $5,000.00) shall be charged against the Capital Reserve and not otherwise included in Common Area Operating Costs; and to the extent that the Capital Reserve should ever be insufficient to defray the cost of a Capital Item, Tenant shall not be responsible for payment of any portion of the deficiency.

B.  The word "Taxes", as used herein, shall mean all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums (whether now existing or hereafter arising, and whether under the present system of real estate taxation or some other system), levied, assessed, charged or imposed by any governmental authority or other taxing authority or which accrue on the land and buildings comprising the Shopping Center for each calendar year (or portion thereof) during the term of this Lease, including, without limitation, all penalties, interest and other charges (with respect to Taxes) payable by reason of any delay in or failure or refusal of Tenant to make timely payment as required under this Lease. In no event shall the word "Taxes" be deemed to include any of Landlord's income taxes or the estate, inheritance, or gift taxes of any party "Landlord".  Interest and/or penalties for late payment shall not be included in determining the Tax Payment.  Further, if a discount of said tax bills is available by prompt payment, Tenant's Share shall be based upon the discounted amount.

If Tenant deems any taxes, assessments, or charges payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may after prior written notice to Landlord, contest the same by proper proceedings commenced at its own expense and in good faith.  Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file.

Landlord shall furnish Tenant with copies of actual tax bills when the same are issued. An adjustment shall be made as soon as the actual taxes for the period, and Tenant's Share thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

C.    The phrase "Insurance Premiums" shall mean the total annual insurance premiums which accrue on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance (not to exceed $.02 per square foot per year) and other insurance which Landlord is required to carry pursuant to this Lease with respect to the Shopping Center during any applicable calendar year (or portion thereof) occurring during the term of this Lease.

D.    The phrase "Common Area Payment" shall refer to the sum specified in Section 22.02. A., below. After the expiration of the calendar year in which the Lease term commences (the "Base Year"), the amount which Tenant shall be obligated to pay to Landlord as the Common Area Payment (calculated on an annual per square foot basis) shall not exceed an amount equal to the "Base Costs" (as hereinafter defined) increased by five percent (5%) per year (compounded annually) for each calendar year after the Base Year. For purposes hereof, the term "Base Costs" shall be defined as Tenant's Share of Common Area Operating Costs computed on an average monthly basis for the Base Year. The foregoing limitation on increases in the Common Area Payment shall not apply to security costs or utility costs for the Shopping Center. During the original sixty (60) month term of the Lease, Tenant's Share of Common Area Operating Costs shall not exceed $.50 per square foot per year. If Tenant exercises its rights pursuant to the Option Rider attached hereto and made a part hereof, then during the "1st Extension Term", Tenant's Share of Operating Costs shall not exceed $.60 per square foot per year; and during the "2nd Extension Term", Tenant's Share of Operating Costs shall not exceed $.70 per square foot per year.

E.    The phrase "Tax Payment" shall refer to the sum set forth in Section 22.02. B., below.

F.    The phrase "Insurance Payment" shall refer to the sum set forth in Section 22.02. C., below.

G.    The phrase "Tenant's Share" as applied to Common Area Operating Costs, Taxes and Insurance Premiums shall refer to a sum calculated by multiplying the Common Area Operating Costs, Taxes and Insurance Premiums (as the case may be) by a fraction, the numerator of which is the ground floor area (in square feet) of the Leased Premises (as indicated in Section 1.01 of this Lease Contract) and the denominator of which is the aggregate leasable floor area (in square feet) in all buildings in the Shopping Center, excluding mezzanines and other non-leasable area.

In the event one or more third party tenants in the Shopping Center ("Major Tenants") are (i) maintaining portions of the Common Area, and/or (ii) paying real estate taxes directly to the taxing authority based on a separate rendering of said tenant's premises, and/or (iii) paying their own insurance premiums for the types of insurance identified in this Article XXII, then as to Common Area Operating Costs and/or Taxes and/or Insurance Premiums (as the case may be), the term Tenant's Share shall be amended by adjusting the denominator of the fraction referenced hereinabove by excluding therefrom the ground floor area (in square feet) of any premises in the Shopping Center leased to "Major Tenants."

Section 22.02.A.  Unless and until Landlord exercises the rights set forth in Section 22.03 of this Lease, Tenant will pay Landlord the sum of $844.77 per month, monthly in advance, for each and every month during the term of this Lease, except, however, if the lease term does not begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month; such applicable amount being herein referred to as the "Common Area Payment".

B.    Unless and until Landlord exercises the rights set forth in Section 22.03 of this Lease, Tenant will pay to Landlord the sum of $597.52 per month, monthly in advance, for each and every month during the term of this Lease, except, however, if the lease term does not begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month; such applicable amount being herein referred to as the "Tax Payment".

C.    Unless and until Landlord exercises the rights set forth in Section 22.03 of this Lease, Tenant will pay to Landlord the sum of $329.67 per month, monthly in advance, for each and every month during the term of this Lease, except, however, if

22

the lease term does not begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month; such applicable amount being herein referred to as the "Insurance Payment".

Section 22.03.  In lieu of any (or all) of the aforesaid sums referred to in Section 22.02, but subject to the limits on Tenant's Share of Common Area Operating Costs as set forth in Section 22.01.D. above, Landlord shall have the right, exercisable by notice from Landlord to Tenant at any time during the term of this Lease to require Tenant to pay to Landlord as the Common Area Payment and/or Tax Payment and/or Insurance Payment a sum of money for the twelve (12) months prior to the notice equal to Tenant's actual proportionate share of Common Area Operating Costs and/or Taxes and/or Insurance Premiums (as the case may be) with credit given for sums actually paid by Tenant during such period for the Common Area Payment and/or Tax Payment and/or Insurance Payment (as the case may be); and during the remainder of the term of this Lease Landlord may require Tenant to pay prospectively, on a monthly basis, and amount equal to Landlord's reasonable estimate of one-twelfth (1/12th) of the annual amount of Tenant's Share of the Common Area Operating Costs, Taxes or Insurance Premiums (as the case may be).  Any of the aforesaid items (Common Area Operating Costs, Taxes or Insurance Premiums) as to which Landlord shall have given such notice are collectively referred to in this Section 22.03 as "Such Costs".  Landlord shall have no obligation to exercise the right of adjustment herein granted.

In the event Landlord shall have given notice to Tenant of the exercise of any of its rights under the preceding paragraph, then (with respect to any such sum as to which Landlord shall have so given notice) the following shall apply:

(1)  Landlord shall estimate Tenant's Share of any of Common Area Payment, Tax Payment and Insurance Payment for the relevant calendar year indicated by Landlord, whereupon, commencing on the date designated by Landlord and continuing for the balance of the period during the term of this Lease indicated by Landlord, Tenant shall pay Landlord on the first day of each month, monthly in advance, one-twelfth (1/12th) of the amount(s) so estimated by Landlord.

(2)  Within ninety (90) days after the end of each calendar year occurring (and subsequent to the expiration or other termination of this Lease if such occurs on a date other than the last day of a calendar year), Landlord will give Tenant notice of the total amount(s) paid by Tenant for the relevant calendar year together with the actual amount of Tenant's Share of any of Such Costs for such calendar year in a statement which covers the Common Area Operating Costs in reasonable detail. If the actual amount of Tenant's Share of any of Such Costs with respect to such period exceeds the aggregate amount(s) previously paid by Tenant with respect thereto during such period, Tenant shall pay to Landlord the deficiency within thirty (30) days following notice from Landlord; however, if the aggregate amount(s) previously paid by Tenant with respect thereto exceeds Tenant's Share of any of Such Costs for such period, then, at Landlord's election, such surplus (net of any amounts then owing by Tenant to Landlord) shall be credited against the next ensuing installment of any of Such Costs due hereunder by Tenant, or Landlord may refund such net surplus to Tenant.  Upon written request from Tenant, Landlord will supply Tenant with copies of invoices of any unusual, non-recurring expenses.

Section 22.04.  If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), then in addition to all rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax.  The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord.

Section 22.05.  If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books to be made by Tenant's accountants.  If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.  If such audit shows that any statement rendered by Landlord is overstated by more than three percent (3%), Landlord shall pay to Tenant, in addition to any overpayment, the costs of such audit.  Tenant may conduct an audit at Landlord's offices not more frequently than once per year upon ten (10) days prior written notice.  In no event may Tenant engage an auditor or auditing service whose fee is wholly or partly contingent upon disallowances discovered by the auditor.

ARTICLE XXIII

Notice

Section 23.01. Any notice which may or shall be given under the terms of this Lease shall be in writing and shall be either delivered by hand or sent by United States Registered or Certified Mail, adequate postage prepaid, if for Landlord to its President, addressed to his attention, P. O. Box 924133, Houston, Texas 77292-4133, if for Tenant, to it at 300 Phillipi Road, P. O. Box 28512, Columbus, Ohio 43228-0512; Attn: Dept. 80061. Either party's address may be changed from time to time by such party by giving notice as provided above, except that the Leased Premises may not be used by Tenant as the sole notice address. No change of address of either party shall be binding on the other party until notice of such change of address is given as herein provided. A post office receipt for registration of such notice or signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above. For purposes of the calculation of various time periods referred to herein, notice delivered by hand shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided. Finally, any written notice addressed as provided hereinabove and actually received by the addressee, shall constitute sufficient notice for all purposes under this Lease.

ARTICLE XXIV

Tenant's Signs

Section 24.01. Tenant shall be responsible for the costs and installation of a sign above the undercanopy of the building of which the Leased Premises are a part. Tenant's storefront sign criteria is attached as Exhibit "E". Except as approved by Landlord in writing, no exterior sign, placard or advertisement, or exterior placard or advertisement shall be painted, erected or displayed and no awnings shall be erected on the exterior of the Leased Premises.

ARTICLE XXV

Terminology and Miscellaneous

Section 25.01. With respect to terminology in this Lease, each gender (male, female or neuter) shall include all genders. If any provision of this Lease should ever be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Lease, but such other provisions shall continue in full force and effect.

The titles of the Articles in this Lease shall have no effect and shall neither limit nor amplify the provisions of the Lease itself. This Lease shall be binding upon and shall accrue to the benefit of Landlord, its successors and assigns, and Tenant, its successors and assigns (or heirs, executors, administrators and assigns, as the case may be); however, this clause does not constitute a consent by Landlord to any assignment by Tenant, but instead refers only to those instances in which an assignment by Tenant is hereafter made in strict compliance with Article VIII above, or in the case of a deceased natural person Tenant, refers to the instances previously referred to in this sentence and also circumstances in which title to Tenant's leasehold estate under this Lease passes, after the demise of Tenant, pursuant to Tenant's will or the laws of intestate succession. The words "hereof," "herein," "hereunder," "hereinafter" and the like refer to this entire instrument, not just to the specific article, section or paragraph in which such words appear.

Section 25.02. In any circumstances where Landlord is permitted to enter upon the Leased Premises during the lease term, whether for the purpose of curing any default of Tenant, repairing damage resulting from fire or other casualty or an eminent domain taking or is otherwise permitted hereunder or by law to go upon the Leased Premises, no such entry shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages for loss of business or otherwise or entitle Tenant to be relieved from any of its obligations hereunder or grant Tenant any right of off-set or recoupment or other remedy (provided such

entry is in compliance with the terms of this Lease); and in connection with any such entry incident to performance of repairs, replacements, maintenance or construction, all of the aforesaid provisions shall be applicable notwithstanding that Landlord may elect to take building materials in, to or upon the Leased Premises that may be required in connection with such entry by Landlord, provided Landlord does not interrupt Tenant's business.

Section 25.03.    The term "rent" or "rental" when used in this instrument includes Minimum Rent and Percentage Rent, and all other sums payable hereunder.

Section 25.04.    The remedies of Landlord and Tenant hereunder shall be deemed cumulative and no remedy of Landlord or Tenant, whether exercised or not, shall be deemed to be in exclusion of any other.  Except as may be otherwise herein expressly provided, in all circumstances under this Lease where prior consent or permission of one party ("first party") is required before the other party ("second party") is authorized to take any particular type of action, the matter of whether to grant such consent or permission shall be within the sole and exclusive judgment and discretion of the first party; and it shall not constitute any nature of breach by the first party hereunder or any defense to the performance of any covenant, duty or obligation of the second party hereunder that the first party delayed or withheld the granting of such consent or permission, whether or not the delay or withholding of such consent or permission was prudent or reasonable or based on good cause.

Section 25.05.    In all instances where Landlord or Tenant are required hereunder to pay any sum or do any act at a particular indicated time or within an indicated period, it is understood that time is of the essence.

Section 25.06.    Unless expressly provided to the contrary, the obligations of each party to this Lease constitute independent, unconditional covenants to be performed at all times provided for hereunder and are not conditioned upon the discharge by the other party of its obligations; and in this connection the parties agree that the doctrine of independent covenants shall apply in all matters pertaining to this Lease.

Section 25.07.    Under no circumstances whatsoever shall either party ever be liable hereunder for consequential damages or special damages.  The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

Section 25.08.    Venue for purposes of any litigation under this Lease shall be in the state in which the Leased Premises are located.

Section 25.09.    In the event of any proposed assignment of this Lease or subletting (in whole or in part) of the Leased Premises or grant of any concession or license within the Leased Premises or allowance of any other nature of occupancy rights within the Leased Premises (any such assignment or subletting or grant of a license or concession or other occupancy rights being subject to the provisions of Article VIII, above) then notwithstanding that the prior express written permission of Landlord to any of the aforesaid transactions may have been obtained, if the rent due and payable by a sublessee under any such permitted sublease (or a combination of the rent payable under such sublease plus any bonus or other consideration therefor or incident thereto), such previously mentioned amounts payable to be determined on a per square foot basis, exceeds the hereinabove provided Minimum Rent payable under this Lease Contract (determined on a per square foot basis) or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration (determined on a per square foot basis) payable to Tenant by the assignee, licensee or other transferee exceeds the Minimum Rent payable under this Lease Contract (determined on a per square foot basis), then Tenant shall be bound and obligated to pay Landlord all such excess rental and other excess consideration within thirty (30) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case might be.  In addition to the foregoing, in the event of any proposed assignment of this Lease or subletting (in whole or in part) of the Leased Premises or grant of any concession or license within the Leased Premises or allowance of any other nature of occupancy rights within the Leased Premises (any such assignment or subletting or grant of a license or concession or other occupancy rights being subject to the provisions of Article VIII above), then Tenant acknowledges that in addition to any

other rights of Landlord set forth in this Lease or at law, as a condition to Landlord's granting such consent (if Landlord does, in fact, consent to any such proposed assignment, subletting, grant concession or other occupancy rights, it being acknowledged by Tenant that Landlord is under no obligation to so consent). Nothing contained herein shall be deemed to prohibit any in-store promotions or entitle Landlord to any compensation in connection therewith.

Section 25.10.    Intentionally omitted.

Section 25.11.    Intentionally omitted.

Section 25.12.    Intentionally omitted.

Section 25.13.    Intentionally omitted.

Section 25.14.    Intentionally omitted.

Section 25.15.    Landlord and Tenant covenant and represent to each other no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

Section 25.16.    Landlord represents and warrants the Leased Premises do not presently contain any hazardous materials.  "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority.   Upon discovery of any Hazardous Material in, on, under or around the Leased Premises at any time during the term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Leased Premises prior to the Tenant possession date or is determined to have been placed thereon by Landlord during the term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all governmental laws and regulations.  Notwithstanding the foregoing, the parties acknowledge the presence of non-friable asbestos containing materials in the mastic between the slab and bottom-most layer of floor tiles within the area outlined in "red" on Exhibit "A-1", attached hereto and made a part hereof.  Landlord shall not be required to remove such asbestos-containing mastic unless and until a governmental authority requires such removal.  Tenant agrees to notify its local store management and contractors of the presence of the asbestos-containing mastic and instruct such persons not to disturb the layer of floor tiles overlaying such mastic in any manner that will render such mastic friable.

*[handwritten note in right margin: non-friable Asbestos]*

Throughout the term of this Lease or any options or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in above, to, or from the Leased Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.   In all events, Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors or employees from any release of Hazardous Materials from the Leased Premises directly caused by Tenant while in possession or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of this Lease.

Section 25.17.    Tenant shall and may peacefully and quietly have, hold and enjoy the premises hereby demised, for the term aforesaid.

ARTICLE XXVI

Tenant's Bankruptcy

Section 26.01.    Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition, or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or

hereafter amended, then "adequate protection" of Landlord's interest in the Leased Premises pursuant to the provisions of Sections 361 and 363 (or their successor sections) of the Bankruptcy Code, 11 U.S.C. Paragraph 101 et seq. (such Bankruptcy Code as amended from time to time being herein referred to as the "Bankruptcy Code") prior to assumption and/or assignment of the Lease by Tenant shall include, but not be limited to all (or any part) of the following:

(a)   The continued payment by Tenant of all Minimum Rent, Percentage Rent and all other sums due and owing this Lease; the performance of all other covenants and obligations under this Lease by Tenant;

(b)   The hiring of security guards to protect the Leased Premises if Tenant abandons and/or ceases operations; such obligation of Tenant only to be effective so long as Tenant remains in possession and control of the Leased Premises to the exclusion of Landlord;

(c)   The furnishing of an additional security deposit by Tenant in the amount of the then-current monthly Minimum Rent payable hereunder.

Section 26.02.   Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or hereafter amended, then "adequate assurance of future performance" by Tenant and/or any assignee of Tenant pursuant to Bankruptcy Code Section 365 (or its successor section) will include (but not be limited to) payment of an additional, new security deposit in the amount of the then-current monthly Minimum Rent payable hereunder.

Section 26.03.   Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, shall be deemed without further act or deed to have assumed all of the obligations of Tenant arising under this Lease on and after the effective date of such assignment. Any such assignee shall, upon demand by Landlord, execute and deliver to Landlord an instrument confirming such assumption of liability.

Section 26.04.   This is a lease of real property in a "shopping center" within the meaning of Section 365(b)(3) of the Bankruptcy Code.

Section 26.05.   Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as "rent", shall constitute "rent" for the purposes of Section 502(b)(7) of the Bankruptcy Code.

Section 26.06.   If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the Estate of Tenant within the meaning of the Bankruptcy Code.   Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust by Tenant for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

Section 26.07.   If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code (the "Bankruptcy Code") to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the Tenant, then notice of such proposed offer/assignment, setting forth (i) the name and address of such person or entity, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such person's or entity's future performance under this Lease, including, without limitation, the assurance referred to in Section 365(b)(3) of the Bankruptcy Code, shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assumption and assignment, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such persons or entity, less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

ARTICLE XXVII

Condition of Lease - Intentionally Deleted

ARTICLE XXVIII

Entire Agreement

Section 28.01.  This instrument consisting of twenty-eight (28) pages and Construction Rider, Option Rider, and Exhibits "A", "A-1", "B", "C", "D" and "E", constitutes the entire agreement between Landlord and Tenant; no prior written or prior or contemporaneous oral promises or representations shall be binding.  The submission of this Lease for examination by Tenant and/or execution thereof by Tenant does not constitute a reservation of or option for the Leased Premises and this Lease shall become effective only upon execution by all parties hereto and delivery of a fully executed counterpart hereof by Landlord to Tenant.  This Lease shall not be amended, changed or extended except by written instrument signed by both parties hereto.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original, this the ___5th___ day of ___august___, 1999.

Witnesses as to Landlord:                  WEINGARTEN NOSTAT, INC.

_M Bren_                                   By: _____
_Sharon P. Mork_                               Jeffrey A. Tucker, Sr. Vice President

                                                          "LANDLORD"


Witnesses as to Tenant:                    CONSOLIDATED STORES CORPORATION,
                                           an Ohio corporation

_Kriseff Weltins_                          By: _____
                                           ~~Albert J. Bell~~  Kathleen Hupper
_____                  ~~Senior Vice President and Secretary~~
                                           Vice President

                                                          "TENANT"


Execution Page to Shopping Center Lease


28

GBP-MAJ/FUND
Rev. 11/11/94

CONSTRUCTION RIDER

This Construction Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated _August 5th_____, 1999, between WEINGARTEN NOSTAT, INC., as "Landlord" and CONSOLIDATED STORES CORPORATION, as "Tenant".

Section 1.01. A.  Tenant agrees that it has examined the Leased Premises and, except for work to be performed by Landlord pursuant to Section 1.08 below, accepts the same in their present physical condition on an "AS IS" basis.  Tenant may construct improvements at the Leased Premises in conformance with the drawing attached hereto (approval of such drawing being constructively issued by Landlord upon its execution of the Lease), and that Tenant has tendered to Landlord: a true copy of a "Building Permit" (meaning all required governmental, regulatory authority and other permits and consents) for the work of Tenant and its contractors, and certificates of all insurance required to be obtained by Tenant pursuant to the Lease Contract; provided, however, in the event that the Lease Contract is in full force and effect but Tenant has not provided Landlord with a Building Permit within thirty (30) days after the date condition (i) is satisfied, either Landlord or Tenant may terminate the Lease Contract upon written notice to the other party, so long as notice of termination is given prior to the date (if any) Tenant obtains the Building Permit.  After mutual approval of plans and specifications, Tenant agrees to apply promptly for its Building Permit and to exercise diligence and good faith in securing same.

B.  Upon tender of possession of the Leased Premises by Landlord to Tenant, Tenant shall enter the Leased Premises and Tenant will perform such construction work and provide and install such materials as are provided in Exhibit "C" and this Lease Contract to be constructed or performed and installed by Tenant.  Tenant will also provide and install all other interior work, trade equipment, furniture, fixtures, and effects of every description necessary or appropriate for Tenant's business and all such items to be provided and installed by Tenant shall be modern and of first-class quality.

C.  At all times while Tenant is constructing the improvements at the Leased Premises and installing its trade equipment, furniture and fixtures, Tenant shall not unreasonably interfere with the conducting of business at the Shopping Center. Tenant shall comply with said reasonable requests of Landlord as Landlord might make for the purpose of avoiding such interference.  If at any time during the course of Tenant's work at the Leased Premises the storefront of the Leased Premises is not fully secure, Tenant shall construct a barricade of plywood or other material approved by Landlord to secure the Leased Premises and adjoining lease spaces.

Section 1.02.  With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than thirty (30) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof.  All of Tenant's construction at the Leased Premises shall be performed by Tenant in substantial compliance with the working drawing attached hereto and approved by Landlord by its execution of the Lease, in strict compliance with applicable codes and other legal requirements, and in a good and workmanlike manner.

Section 1.03.  Tenant agrees that its construction at the Leased Premises will be completed in accordance with Exhibits "C" within seventy-five (75) days after the aforesaid tender of possession of the Leased Premises to Tenant by Landlord.  If

Tenant shall not have so completed such construction by the expiration of <u>one hundred twenty (120)</u> days after tender of possession (plus additional time for "excusable delays" defined as delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Tenant), then Landlord shall have the right to terminate the Lease Contract at any time thereafter (but in any event prior to the date Tenant completes construction) by giving written notice of such termination within such time to Tenant; upon the giving of such notice, all obligations of all parties under the Lease Contract shall cease and Tenant shall immediately vacate and relinquish possession of the Leased Premises to Landlord. In the event that Landlord exercises the aforesaid right to cancel and terminate the Lease Contract (or Tenant's right to possession of the Leased Premises) prior to the stated expiration date of the term of the Lease Contract (under Article III of the Lease Contract), Tenant shall have no right or claim against Landlord on account of improvements constructed by Tenant at the Leased Premises.

Section 1.04. A. Upon full completion of construction of the improvements by Tenant in accordance with Exhibit "C" Landlord shall pay to Tenant as an "Allowance", the sum of <u>One Hundred Twenty-Eight Thousand and 00/100 Dollars ($128,000.00)</u> toward Building Improvement Costs with respect to the Leased Premises, provided that Tenant has furnished to Landlord the following (on forms to be furnished by Landlord where applicable):

(1)   A certificate of occupancy (or other certificates evidencing inspection and acceptance of all of Tenant's construction by appropriate government authorities);

(2)   Tenant's affidavit that such construction has been completed to its satisfaction and in substantial accordance with Exhibit "C";

(3)   Lien Waiver with respect to the Leased Premises executed by the general contractor(s) performing such work stating that construction has been fully completed in accordance with Exhibit "C" and that all subcontractors, laborers and material suppliers engaged in or supplying materials for such work have been paid in full;

(4)   Notice from Tenant to Landlord that Tenant has opened for business at the Leased Premises and execution by Tenant and delivery to Landlord of a commencement letter indicating the commencement and termination dates of the lease term;

(5)   Delivery to Landlord of certificates or duplicate originals of all insurance which Tenant is required to carry under the terms of the Lease; and

(6)   Payment by Tenant to Landlord of such Minimum Rent and other sums as shall have come due between the commencement date of the lease term and the date upon which Tenant makes application for payment of its Allowance.

B.   The phrase "Building Improvement Costs", as used herein, means the total reasonable costs paid by Tenant to all contractors furnishing labor and materials for erection and improvement of those items constructed in accordance with Exhibit "C".

"Building Improvement Costs" shall not include any sum paid or liability incurred by Tenant for: any brokerage or finder's fee or similar fee; any sum which is paid pursuant to a liability incurred prior to the date of the Lease Contract; or any item of "Removable Trade Fixtures" (as defined in Article X of the Lease Contract).

Section 1.05.   In connection with any construction of improvements at the Leased Premises by Tenant, the following shall apply:

Tenant shall take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) public liability insurance in a minimum amount of $1,000,000.00 combined single limit. Said liability insurance shall name Landlord as an additional insured with Tenant (and shall contain a cross-liability endorsement) and shall be non-cancellable with

2

respect to Landlord except upon thirty (30) days' notice to Landlord (given in the same manner as provided in the Lease Contract). Tenant shall also take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) all builder's risk insurance to the full insurable value of improvements constructed and materials stored at the Leased Premises. Said builder's risk insurance shall name Landlord as an additional insured and shall be non-cancellable with respect to Landlord. Certificates of all such insurance shall be delivered by Tenant to Landlord within five (5) days following Tenant's entering into any such construction contract(s) (but in all events prior to Tenant or Tenant's general contractor commencing construction).

Section 1.06. All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease Contract. The aforesaid improvements, if constructed by Tenant, are not intended as any nature of rent or compensation to Landlord.

Section 1.07. Any work at the Leased Premises involving the sprinkler system (if any) serving the Leased Premises shall be performed by a licensed sprinkler contractor.

Section 1.08. Prior to the Tenant possession date, Landlord shall complete repair and/or replacement of the HVAC system serving the Leased Premises and place same in the condition required under Section 9.01 of the Lease Contract.

Section 1.09. Tenant shall be responsible for ensuring that, upon completion of its work, the Leased Premises (including, without limitation the restroom facilities), comply with the Americans With Disabilities Act.

3



(DRAWING REFERENCED IN SECTION 1.01.A
OF CONSTRUCTION RIDER)

APPROVED BY ED FRYER_____

| SQUARE FOOTAGE: | BIG LOTS # TOWN & COUNTRY SHOPPING CENTER 160 AIR DEPOT DR. MIDWEST CITY, OK | CONSOLIDATED STORES STORE PLANNING DEPT. 300 PHILLIPI ROAD P.O. BOX 28512 COLUMBUS OHIO 43220 | DATE REVISION |
|---|---|---|---|
| SALES 19,188 | | | |

# *OVERSIZED DRAWINGS*

# *TO BE INSERTED HERE*

BIG LOTS FURNITURE

0132

OPT

<div align="center">OPTION RIDER</div>

This Option Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated _August 5th_ , 1999, between WEINGARTEN NOSTAT, INC. as "Landlord," and CONSOLIDATED STORES CORPORATION, as "Tenant."

Contingent upon Tenant satisfying all of the following conditions, Tenant is hereby granted an option to extend the lease term, as set forth in Section 3.01. of the Lease Contract (the "Primary Term") for two (2) additional periods of sixty (60) full calendar months each (the "1st Extension Term" and "2nd Extension Term"), said conditions being that:

    (i)   Tenant shall not then be in default of any of its obligations under the Lease Contract, beyond any applicable notice and cure periods;

    (ii)  Tenant shall have given notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Primary Term of Tenant's exercise of the option for the 1st Extension Term;

            Tenant shall have given notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the 1st Extension Term of Tenant's exercise of the option for the 2nd Extension Term.

Time is of the essence in the exercise of these options and should Tenant fail to exercise said options by timely notice, said option shall lapse and be of no further force or effect.

Tenant further acknowledges that a failure to properly exercise the option for the 1st Extension Term as provided hereinabove, shall render Tenant's option for the 2nd Extension Term null and void and without further force and effect.

In the event that Tenant effectively exercises the option(s) herein granted, then all of the terms and provisions of the Lease Contract as are applicable during the Primary Term shall likewise be applicable during the 1st and 2nd Extension Terms, except:

    (a)   Tenant shall have no further right to renew or extend the lease term after the expiration or other termination of the 1st and 2nd Extension Term;

    (b)   The "Minimum Rent" (as defined in Article IV of the Lease Contract) which shall be due and payable each month during each Extension Term at the same time and place, and in the same manner, as set forth in Section 4.01 of the Lease Contract (relative to payment of MiniMum Rent during the Primary Term), shall be:

            For each Lease Year of the 1st Extension Term, the sum of Ten Thousand One Hundred Ninety-Nine and 06/100 Dollars ($10,199.06) per month; For each Lease Year of the 2nd Extension Term, the sum of Eleven Thousand Two Hundred Twenty-Nine and 27/100 Dollars ($11,229.27) per month; and

    (c)   The "Breakpoint" (as defined in Article IV of the Lease Contract) shall be defined as follows:

            For each Lease Year of the 1st Extension Term, the sum of Four Million Eight Hundred Ninety-Five Thousand Five Hundred Fifty and 00/100 Dollars ($4,895,550.00) per Lease Year; For each Lease Year of the 2nd Extension Term, the sum of Five Million Three Hundred Ninety Thousand Fifty and 00/100 Dollars ($5,390,050.00) per Lease Year.

References in this Rider and the Lease Contract to the "term" or the "lease term" shall be understood to refer to both the Primary Term and (if Tenant's option therefor is effectively exercised in accordance with the provisions hereof) also the hereinabove stated Extension Term unless such interpretation is expressly negated.



"Leased Premises"
Approx.:24,725sf.
160 Air Depot Road
Midwest City, Oklahoma

The "Leased Premises" as shown hereon is for CONSOLIDATED STORE'S CORPORATION

Landlord shall not build any buildings beyond the areas labeled "Maximum Possible Building Area" or "Existing Building Area". Designation of such areas as "Maximum Possible Building Area" or "Existing Building Area" shall not constitute any agreement or covenant on the part of Landlord as to future use, layout, or size of such areas.

The "Parking Area" may be used by Landlord for signs, parking spaces, drives, aisles, curb stops, traffic control devices, sidewalks, esplanades, landscaping, light standards, sign pylons, trash enclosures, and similar parking lot improvements.

DATE: 04-22-99
Rev.:

EXHIBIT "A"

TOWN and COUNTRY CENTER



Floor No: A00
Unit No: A0H
Project No: 0132

EXHIBIT A-1
(Page 1 of 1)



AIR DEPOT ROAD

Red Area - See Section 25.16 Of the Lease

INITIAL

A tract of land lying in the Southwest Quarter of Section 34, Township 12 North, Range 2 West of the Indian Meridian, Oklahoma County, Oklahoma, and being more particularly described as follows:

Commencing at the Southwest Corner of said Southwest Quarter of Section 34; thence N. 00°00'00" E. along the West line of said Southwest Quarter a distance of 200.00 feet;

Thence S. 89°19'54" E., parallel with the South Line of said Southwest Quarter a distance of 50.00 feet to a point on the East right-of-way line of Air Depot Boulevard and the POINT OF BEGINNING; then N. 00°00'00" E. along said East right-of-way line a distance of 150.00 feet;

Thence continuing along said East right-of-way line N. 11°18'36" E. a distance of 152.97 feet;

Thence continuing along said East right-of-way line N. 00°00'00" E. parallel with and 80 feet East of the West line of said Southwest Quarter, a distance of 657.65 feet;

Thence S. 89°19'54" E., parallel with the South line of said Southwest Quarter a distance of 497.50 feet;

Thence S. 00°00'00" W., parallel with the West line of said Southwest Quarter a distance of 1108.00 feet to a point on the North right-of-way line of Reno Avenue;

Thence N. 89°19'54" W. along said North right-of-way line, parallel with and 50 feet North of the South line of said Southwest Quarter a distance of   377.50 feet;

Thence N. 00°00'00" E. a distance of 150.00 feet;

Thence N. 89°19'54" W. a distance of 150.00 feet the point of beginning, Containing 539,949 square feet or 12.3955 acres.

EXHIBIT "B"

EXHIBIT "C"

<u>PLANS AND SPECIFICATIONS</u>

Need Not Be Attached

INITIAL

SCOPE OF WORK

Rev. 07/29/99                    "EXHIBIT D"

Landlord shall perform the following work prior to Tenant's Opening Date :

Rooftop HVAC equipment (only) to be in good working condition and adequate for Tenant's intended use (All necessary supplies, return, duct work, to be provided by Tenant).

Tenant shall perform the following work prior to funding by Landlord.  All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system.  Tenant to obtain sprinkler certification if required by code.

1)   All lighting inside and out to be in good working condition. Lighting to be a minimum 80 foot candles on the sales floor and 60 foot candles in the stockroom.  If additional lighting is required in order to meet the foregoing minimums in the stockroom or sales floor area, the same shall be installed by Tenant.

2)   All damaged or missing ceiling and floor tiles to be replace with similar tiel.  Clean A/C diffusers and dirty ceiling tiles.  Raise ceiling height as noted in plans by Tenant.

3)   Provide two (2) pairs of 3'0" x 7'0" doors that meet A.D.A. requirements.  (One additional pair is needed and one of the existing doors needs repair.)

4)   All doors and door systems to be sound and secure and in good working condition.

5)   Tenant to build three (3) offices, lounge, and restrooms to Tenants specs and in compliance with all applicable local and state codes and A.D.A. requirements.  Cash Office to have solid plywood ceiling (minimum 1/2" thickness).  Further, the aforesaid offices, lounge and restrooms shall have adequate heating, cooling and ventilation.

6)   Roof to be in good condition and free of leaks. Canopy and building fascia to be repaired as needed.  Remove 50% OFF sign on building front and repaint front of building to match the rest of shopping center.

7)   Replace all broken glass prior to tender.

8)   Premises to be professionally inspected for pestilents and termites, and Tenant to provide Landlord with a certified report that the Demised Premises is pest free.

9)   New stockroom wall and pair of double doors in rear of sales area per Tenant's plans and specs.

10)  Tenant to construct concrete pad to Tenants specs to accommodate Tenant's hydraulic lift if no loading dock is available per plans approved by Landlord.

11)  Tenant will install handicap ramp in front of store entrance if required by local code.

12)  Remove single front door in right front sales area and level floor in front of door to be removed.  Lay new VCT to match. Black out windows in same area.

13)  Paint and floorcover by Tenant.

| INITIAL | |
|---|---|
| | KPH |
| Landlord | Tenant |

EXHIBIT "E"

TENANT'S SIGN CRITERIA

To Be Attached