## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 18** |

### DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO THE
### PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), file this reply (this "**Reply**") to the Objections (as defined below) to the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. 18] (the "**Bidding Procedures**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

Motion").[2]  In support of this Reply, and in further support of approval of the Motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      Consummation of the Debtors' sale to the Successful Bidder is the lynchpin of these Chapter 11 Cases.  The transaction is the culmination of a nearly six-month process whose singular goal was for the Big Lots business to avoid the fate of similar retail companies and maximize the value of its assets by preserving its operations, maintaining tens of thousands of employees, keeping the lights on in hundreds of stores and paying its valued vendors through a competitive going-concern sale to a buyer.  The success of this process is reflected in the nearly universal support for the relief sought by the Debtors – even the Committee, which filed a "limited" objection, agrees and supports the Sale.  The Debtors are pleased to be seeking approval of a sale of substantially all of their assets to an affiliate of Nexus Capital Management LP ("**Nexus**") as the Successful Bidder (the "**Sale**") on a largely uncontested basis.

2.      Nonetheless, the Official Committee of Unsecured Creditors (the "**Committee**") and Blue Owl Real Estate Capital LLC ("**Blue Owl**") now seek to cherry-pick disfavored provisions of the Sale, even though they had previously supported (or, in the case of Blue Owl, did not object to) approval of the Nexus APA as the stalking horse bid, and, in the case of the Committee, reiterated that support at the Auction.  [D.I. 981] (the "**Committee Objection**") [D.I. 992] (the "**Blue Owl Objection**" and together with the Committee Objection, the "**Objections**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion.

3.      In addition to the Objections, the Debtors received multiple objections from Counterparties seeking clarity on adequate assurance of future performance of Nexus (the "**Adequate Assurance Objections**").  Additional objections with respect to cure amounts for certain executory contracts and unexpired leases (the "**Cure Amount Objections**") were raised, many of which the Debtors have reconciled on a consensual, out-of-court basis.  The Debtors intend to continue these commercial discussions with the aim of consensually resolving the remaining Cure Amount Objections.

4.      The Debtors respectfully request that the Court overrule the Objections.

- _First_, Blue Owl and the Committee allege that the Debtors are inappropriately seeking "backdoor blanket releases" of claims against current and former D&Os, which, they argue, "circumvent[s] the protections afforded to creditors under the chapter 11 plan process." Committee Objection at 4.  This assertion is wrong.  As recently as last week, this Court ruled that "[c]ourts in this district have held that causes of action can be property of the estate and can be sold."  To obtain the maximum possible value for their stakeholders, the Debtors offered to sell _all_ of their assets, including all claims held by debtors, and those are the assets that Nexus offered valuable consideration to acquire in a bid that was subjected to an open, transparent process that allowed qualified bidders to submit "Partial Bids" for certain assets.  No Partial Bid was made for the Litigation Assets, and the Successful Bid from Nexus was the only Qualified Bid received by the Debtors.  The Debtors are aware of no support in applicable case law, and neither the Committee nor Blue Owl has averred any case law, where parties in interest can cherry-pick provisions of an asset purchase agreement that they don't like and thwart a sale on that basis, especially where, as here, there is agreement that the APA provides significant benefits to the Debtors' stakeholders.

- _Second_, the Committee alleges that the Debtors have "not met, and cannot meet, their burden to demonstrate that the sale of the Litigation Assets serves a legitimate business purpose" or that the "sale price of the Litigation Assets is fair." Committee Objection at 4.  The Committee is again wrong – indeed, the Debtors have no such burden.  The Debtors do not need to show that each-and-every provision of a highly negotiated 91-page asset purchase agreement must "serve a legitimate business purpose" or allocate the sale price among each forklift and chair being purchased.  To the contrary, the sale _as a whole_ must satisfy this standard, and the evidence on the record unquestionably shows that it does.

- Even if the Debtors were required to show that the sale of the Litigation Assets on an individual, standalone basis is justified, they would satisfy this burden easily.

The Debtors are aware of no claims against any of its current and former D&Os and, out of an abundance of caution after the Committee first raised this issue around the time of the auction (despite having the APA since the outset of these Chapter 11 Cases), the Debtors commissioned the Porter Wright law firm to conduct an investigation into the same.  The investigation confirmed what the Debtors already knew – no such valuable claims exist.  Ex. 1.  While these claims have no value to the estates, they have material value to Nexus, who intends to operate the Big Lots business and has an interest in preventing the distraction and reputational damage that could arise if meritless claims are alleged against former Big Lots directors or officers.  Furthermore, if these claims were not sold, but rather, pursued by a representative of the Debtors' estates (despite them having no merit), any current Big Lots employees who remain with the business may be distracted by discovery and the Buyer would likely be forced to pay for their counsel under an indemnity.

- *Third*, the Committee's arguments regarding the Designation Rights Amendment are either premature or lack a basis in law.  Provisions akin to the Designation Rights Amendment are routinely granted in connection with sales, and the Designation Rights Amendment provides notice rights, protections and other provisions that safeguard the rights of affected landlords.  The ability of Nexus to later designate a lease as an assumed leave will not add to the administrative costs of the chapter 11 process or violate applicable law.

- *Fourth*, the Blue Owl Objection should be overruled both insofar as it attempts to create an unnecessary hurdle to effectuating the Sale by requesting that the Sale proceeds be placed in escrow subject to the resolution of any challenges brought by a party-in-interest, rather than immediately directed to the DIP Lenders to repay the DIP Obligations as is required pursuant to the terms of the DIP Facility.  Escrowing proceeds runs counter to the rights afforded to the DIP lenders under the DIP order (to which Blue Owl did not object) and there is no basis in the law for the Court to fashion such a remedy.

5.      Lastly, the Debtors and Nexus have worked diligently to resolve nearly all of the Adequate Assurance Objections consensually and intend to file, prior to the Sale Hearing, a revised Sale Order and Stalking Horse APA amendment that the Debtors believe address the remaining few.

6.      For the reasons explained in the Sale Motion, the declaration of Adam Rifkin dated September 17, 2024 [D.I. 197], any related testimony, and herein, the Court should overrule the

Objections, approve the Sale, and authorize the Debtors to realize a transformative and value-maximizing Sale Transaction for the benefit of their creditors and other stakeholders.[3]

## **REPLY**

### I.    **The Objections to the Debtors' Sale of the Litigation Assets Misstates the Record and Discounts the Debtors' Sound Business Judgment**

7.    The Committee acknowledges that it "supports the proposed sale" because it "provides for the assumption of millions of dollars of unsecured liabilities and will allow Big Lots to continue as a going concern for the benefit of those employees, landlords, vendors, and service providers who will transact with the Buyer post-closing." Committee Objection at 2.  Indeed, the Committee represented at the auction held on October 30, 2024, that it "supports the Debtors' choice selecting Nexus as the winning bidder in this auction," subject to a limited reservation of rights unrelated to the APA's disposition of the Litigation Assets.  *See* Oct. 30, 2024 Hr'g Tr. at 14:18-23.  Blue Owl, the Committee's chair, joins in the Committee's objection and likewise offers no opposition to the overall sale of the Debtors Assets.  But despite this support and the immense value that all parties recognize the Sale is providing to stakeholders, the Committee and Blue Owl ask this Court to let them pick and choose which provisions of the Stalking Horse APA should be approved. First, the Committee and Blue Owl argue that the estate should retain certain Litigation Assets, insofar as they include unspecified claims against "the Debtors' current and former […] directors [and] officers"[4] (the "**D&O Claims**") as well as claims against the Debtors' Lenders (the

---

[3] The Committee also raised an objection with regard to the date the Debtors used to assess claims under Section 503(b)(9).  Committee Objection ¶¶ 41-42.  The parties have separately resolved this issue, and the Debtors no longer understand there to be a dispute.

[4] The Committee and Blue Owl also nominally object to the transfer of any claims relating to the Debtors' affiliates and equity holders, but not only do they fail to articulate any potential claims against affiliates or equity holders that have any value, they do not even intend to investigate such claims.  Committee Objection ¶¶ 24-25 (Committee investigating claims relating to the Debtors' lenders as well as "directors, officers, and other insiders").  Nor is any justification provided for not transferring any pending claims to Nexus given the fact that there can be no dispute that Nexus bargained for the purchase of all such claims.

"**Lender Claims**," together with the D&O Claims, the "**Subject Claims**").  Committee Objection ¶ 30; *see also* Blue Owl Objection ¶ 2.  Their position is not surprising—every unsecured creditor would like to see more value come into the estate in exchange for fewer assets leaving.  But neither the Committee nor Blue Owl cite any authority allowing them to overrule the Debtors' business judgment and rewrite the APA negotiated with the only viable and willing bidder for the Debtors' business.  The Committee and Blue Owl would like Nexus to provide the full, agreed-upon value to the Debtors but not receive all of the promised Assets.  That is not the bargain Nexus and the Debtors struck.

8.      Here, the sale of the Debtors' assets to Nexus, including the Subject Claims, falls within the Debtors' sound business judgment.[5]  An asset sale will be approved where the sale "constitutes a reasonable and sound exercise of the Debtor's business judgment[.]" *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007).  The Third Circuit has held that a Debtor's business judgment is entitled to substantial deference.  *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005) (indicating the "business judgment rule is a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest") (internal quotations omitted).  The Committee and Blue Owl can only overcome that deference by showing that the challenged decision was irrational, meaning that "no reasonable business person could possibly authorize the action in good faith."  *Id*. at 238.  But the Committee and Blue Owl cannot meet this standard

---

[5] Neither the Committee nor Blue Owl contest that the business judgment standard applies.  *See, e.g.*, Committee Objection ¶ 32 (arguing that the Debtors failed to meet this business judgment standard).  Nonetheless and, for the avoidance of doubt, the Sale should be approved even if a higher standard applies given (1) the clear benefit of the sale to all stakeholders, (2) the benefit of the sale of the Subject Claims to debtors' business, and (3) the fact that all evidence shows that these clams are worthless and would convey no benefit if they were left with the estate.

because the Debtors' decision to enter the Stalking Horse APA, as drafted, is reasonable and, as is readily admitted, provides significant benefits to all stakeholders.

> A.    **Neither the Committee nor Blue Owl Denies that the Stalking Horse APA Provides Maximal Value to the Estates and Is the Product of a Fair and Open Process**

9.      The Debtors, in their business judgment, made the highly-rational determination that it was in the best interest of all stakeholders to attract a stalking horse bidder—a fact that the Committee and Blue Owl have both conceded. *See* Oct. 25, 2024 Hr'g Tr. at 7:12–8:8.  In order to secure that stalking horse bidder and receive the maximum possible consideration, the Debtors made a deliberate and intentional effort to include *all* items of value in the proposed sale— including the Subject Claims.  The Debtors' decision, informed by their business judgment, to enter into this Sale should be appraised holistically and afforded deference.

10.     The Sale is an integrated transaction that arose from an extensive marketing process and months of arm's-length negotiation.  After extensive considerations, the Debtors determined that they could maximize value for their stakeholders by selling substantially all assets—including the Subject Claims—to Nexus.  And, to be clear, while Blue Owl suggests that the Debtors may not be receiving any consideration for the Subject Claims, Blue Owl Objection ¶ 1, all of the value that the Debtors are receiving is in consideration for selling *all* Assets, including the Subject Claims.  Further, in addition to the value provided by the Sale, locking in a Stalking Horse Bidder on its own provided additional benefits, including certainty and downside protection against the credible risk that the Debtors' Chapter 11 Cases would devolve into a liquidation.  Securing this viable transaction by agreeing to sell substantially all assets, including the Subject Claims, was thus consistent with the Debtors' fiduciary duties to all stakeholders and their goal of maximizing and preserving the value of the estates.

11.     Importantly, Nexus's offer to purchase the Debtors' assets was the Debtors' best and only option for continuing their business as a going concern to the benefit of the Debtors' stakeholders.  Out of the 18 potential bidders the Debtors reached out to before signing the Stalking Horse APA, Nexus was the *only* party to return a proposed stalking horse asset purchase agreement.  *See* Declaration of Adam Rifkin [D.I. 197].  Moreover, the Debtors subsequently held an auction in which there was only a single other bidder, whose bid the Debtors determined was inferior to Nexus's, confirming that the Stalking Horse APA, with its assignment of the Subject Claims, provides the more value to relevant stakeholders than any available alternative. Accordingly, Debtors had strong reasons to offer all conceivable assets for sale in order to secure this value-maximizing offer.

12.     Due to the compelling business justifications for the overarching Sale, which includes preserving the going concern business to avoid the legitimate possibility that these cases would slide into a value-destructive liquidation, it is readily apparent that the Debtors' decision to use the sale of all of its assets, including the Subject Claims, to attract and secure a Stalking Horse Bidder represents a sound exercise of the Debtors' business judgment.

13.     Rather than raise any objection to this complete, value-maximizing transaction, the Committee and Blue Owl fixate on discrete aspects of a single provision that assigns all existing and potential litigation claims held by the Debtors, including Subject Claims, to the Purchaser.  In so doing, the Committee and Blue Owl fail to assess the transaction on a holistic basis and disregards that each of the agreed terms, including the sale of the Subject Claims, is integral, material and indispensable within the context of the broader transaction.  Bankruptcy Courts routinely evaluate proposed agreements as a whole rather than evaluating each individual provision separately.  *See, e.g.*, *In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568,

at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that postpetition financing transactions should be evaluated comprehensively, including with respect to "timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization"); *Matter of Ellingsen MacLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986), aff'd, 834 F.2d 599 (6th Cir. 1987) (Bankruptcy Courts focus on the overarching legal standard rather than "a picayune examination of every legal argument that could be brought against separate provisions of the proposed agreement"). Applying that approach here, the Committee and Blue Owl *agree* that the Stalking Horse APA, in total, provides benefit to the state and that the Sale should be consummated. Accordingly, this transaction falls squarely within the Debtors' business judgment and Court should overrule the Objections.

### B.    The Sale of Subject Claims Provides Clear Benefits

14.    Beyond the fact that consummating the Sale of the Debtors' Assets, including the Subject Claims, provides massive benefit to all stakeholders, the sale of the Subject Claims specifically provides clear commercial benefits to the Debtors' go forward business. And, contrary to the Committee's claim that "[t]he Litigation Assets can easily be carved out," Committee Objection ¶ 33, giving the Subject Claims to the estate would be extremely disruptive to the Sale and to the Debtors' business. First, the Sale is predicated on a Wind-Down Budget that does not contemplate litigation over whether the Committee should be given standing to prosecute the Litigation Assets. To provide sufficient funds to address any such claims, Nexus would need to pay additional consideration to indemnify the estate—consideration that it did not agree to pay and is not willing to pay. And, without additional contribution from Nexus, allowing the Committee to pursue these Claims would waste what limited assets the Debtors will have left.

15.    Second, leaving the Subject Claims with the estate would disrupt the Buyer's business going forward. The Committee and Blue Owl have not identified any actual Subject

Claims that could potentially be asserted, which is of no surprise given that, as discussed below, there is no reason to think any such claims exist. Instead, what the Committee and Blue Owl want to do is conduct an open-ended fishing expedition into any and all aspects of the business Nexus is buying in order to find some claim that could provide some recovery. In pursuit of these D&O Claims, for instance, the Committee has already stated that it would like to depose each and every member of Debtors' management. Subjecting management to extensive discovery would distract them from the arduous and important task of transferring the Debtors' business to Nexus and streamlining the business to bring it back to profitability, to the benefit of all stakeholders, and the Buyer would likely be forced to pay for those continuing employees' counsel under an indemnity. Further, this investigation and any resulting suits, if any, would generate negative publicity for the business that Nexus is acquiring. Accordingly, the Debtors, in their business judgment, concluded that it was in the best interest of all stakeholders to transfer all Litigation Assets, including the Subject Claims, to Nexus in order to benefit the business in exchange for valuable consideration.

> **C.    The Requested Relief Provides No Benefit to the Estate**

16.    Whereas assigning all Assets, including the Subject Claims, to Nexus provides significant benefit to the Debtors' stakeholders, neither the Committee nor Blue Owl identify any benefit that would result from leaving the Subject Claims with the estate. While the Committee claims that there is no reason to think that the Subject Claims have no value, Committee Objection ¶ 34, tellingly, the Committee and Blue Owl do not even identify a *potentially* valuable Subject Claim that could provide *any* value were it left with the estate, despite having had months to investigate such claims since the Debtors publicly filed the Stalking Horse APA and its assignment of Subject Claims on September 9, 2024. And where, as here, the challenged claims are "of little value," the sale of those assets should be upheld. *Blink Holdings*, Nov. 12, 2024 Hr'g at 14:7–18.

17.    The Committee and Blue Owl's failure to identify any potential claim with any potential value is of no surprise.  First, the Debtors have never had any reason to suspect that they had any reason to bring any claims against any of their directors and officers, or any other D&O Claims, and have always considered such D&O Claims to be valueless.  Further, in order to test this understanding in the face of the Committee's and Blue Owl's questions, the Debtors retained Porter Wright Morris & Arthur LLP ("**Porter Wright**") to conduct an investigation into whether any colorable claims for breach of fiduciary duty may be made against the Debtors' current and former directors or executive officers.  A report produced by Porter Wright summarizing this investigation is attached hereto as __Exhibit 1__.  The Porter Wright investigation unequivocally confirmed the Debtors' assessment that there are *no colorable claims* for fiduciary breach against the Debtors' directors or executive officers.  Porter Wright's investigation was comprehensive, looking back for a period of nearly five years (which exceeds the both the four-year statute of limitations for breach of fiduciary duty claims and the two-year statute of limitations for improper dividends or share repurchases under applicable Ohio law).  During an admittedly compressed time period, Porter Wright spent more than 400 attorney hours reviewing thousands of pages of the Debtors' documents and conducting interviews of 18 of the Debtors' current and former directors, officers, and advisors.  After critically assessing the Debtors' sensitive documents and testimony from senior personnel, Porter Wright determined that it could not identify any colorable claims or causes of action for fiduciary breach against the Debtors' directors or executive officers.  To the contrary, Porter Wright's investigation did not uncover any information that would "even remotely" approach the factual bases necessary to overcome the strong protections of the business

judgment rule under Ohio law.[6]  Porter Wright's determination that there are no colorable claims against the Debtors' directors, officers, and other insiders significantly supports the Debtors' business judgment to include them in the Sale Assets.

18.    In sum, leaving the Subject Claims with the Debtors' estates would convey no conceivable value to the Debtors' general unsecured creditors.[7]  Conversely, as discussed above, transferring the Subject Claims to Nexus conveys significant value to Nexus by eliminating unnecessary cost, distraction, and bad publicity.  Accordingly, the Debtors determined, in their business judgment, that transferring the Subject Claims to Nexus as part of a value-maximizing transaction would provide far more benefit to all stakeholders than leaving these worthless Subject Claims with the estate.  The Debtors are entitled to the benefit of their business judgment.

19.    Indeed, just last week, this Court considered a nearly identical objection raised by an unsecured creditors' committee, which challenged the inclusion of certain claims against the debtors' directors and officers in the assets of a going concern sale and asserted that they should be retained by the estates for the benefit of general unsecured creditors.  *See Blink Holdings, Inc.*, No. 24-11686 (JKS) (Bankr. D. Del.) [D.I. 528].  In overruling the committee's objection, this Court cited favorably an independent investigation conducted by counsel—exactly like the Porter Wright investigation—which, like the Porter Wright investigation, determined that the investigated causes of action were "of little value."  *Blink Holdings*, Nov. 12, 2024 Hr'g Tr. at 14:7–18.  As a result, the Court found that the sale of the causes of action was "reasonable under

---

[6] Specifically, under Ohio law officers and directors may only be held liable based on a showing of clear and convincing evidence that their "action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation."  Ohio Rev. Code §§ 1701.59; 1701.641.

[7] The Lender Claims, for which the Debtors have stipulated they are not aware hold any value, are subject to a separate process in connection with the Challenge Period.  Debtors understand that those claims remain under investigation by the Committee and Blue Owl and are the subject of ongoing discussions between the relevant parties.

the facts and circumstances" of the case. *Id*. The Court should reach the same conclusion here and overrule the Committee Objection.

## II.     The Designation Rights Amendment is a Permissible Exercise of the Debtors' Business Judgment

20.     The Designation Rights Amendment was agreed to by the Debtors at the Auction in order to obtain material concessions from the Buyer under the APA – namely, the assumption of various taxes and other liabilities that would further unburden the estates with potential administrative or priority liabilities. See *Notice of Successful Bidder for the Sale of the Debtors' Assets* [D.I. 661]. The Committee objects to the Designation Rights Amendment on the basis that it may increase the estates' administrative claim exposure and prejudices the Debtors' landlords. Committee Objection ¶ 36. This argument ignores a critical feature of the Designation Rights Amendment that the Debtors specifically negotiated for—that the Buyer is obligated to "reimburse the Selling Entities for the Selling Entities' reasonable, documented out-of-pocket fully-loaded costs to the extent such costs are incurred by the Selling Entities in connection with such designation". Committee Objection ¶ 40. The Committee contends that this language is "cursory" and its concerns regarding administrative claim exposure are built on hypothetical fact patterns that, if costs materialized, the Buyer will dishonor its promise and fail to reimburse the estates, leaving the estates primarily liable. This argument has no merit. The Committee has provided no evidence to suggest that Nexus will not honor its commitment.

21.     Further, the Committee Objection argues that the Designation Rights Amendment "will prejudice the Debtors' landlords" for a litany of reasons, all of which are entirely speculative. The Committee argues that: the Designation Rights Amendment (a) "will likely violate every one of the Debtors' leases, which typically prohibit non-occupancy or 'dark' periods [and] unauthorized subleases", even though the Debtors do not purport to sublease any properties to the

Buyer during the Designation Rights Period and may not "go dark" prior to rejection or designation.; (b) "effectively creates a sublease or assignment" even though by its term it does not – the Debtors remain in privity with the landlord and will not be assigning or subleasing any leases to the Buyer; (c) "could run afoul of various tenant use/compliance provisions", without specifying why that would be the case; and (d) "will likely run afoul of the Debtors' deadline to assume or reject leases under section 365(d)(4) of the Bankruptcy Code" even though the Debtors may seek a 90 day extension of such deadline for cause.   Committee Objection ¶ 40.   At bottom, the Committee's grievances over the Designation Rights Amendment are speculative and unripe, and the relief sought does not prejudice any landlord's rights to object to the Debtors' actions with respect to its leases in the future if in fact such landlord believes that the Debtor is violating the applicable lease or the Bankruptcy Code.

22.     The Designation Rights Amendment is not novel.  Indeed, courts permit a sale involving lease designation rights.  *See BurgerFi International, Inc*., No. 24-12017 (CTG) (Bankr. D. Del. Nov. 8, 2024) [D.I. 311] (approving the sale of designation rights); *MRRC HoldCo*, No. 24-11164 (CTG) (Bankr. D. Del. Sept. 25, 2024) [D.I. 339] (same); *Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 14, 2024) [D.I. 471] (same); *Number Holdings, Inc*., No. 24-10719 (JKS) (Bankr. D. Del. May 24, 2024) [D.I. 699] (same); *Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. May 4, 2023) [D.I. 988] (same).  Courts presented with this question have unequivocally held that designation rights are included in property of the estate, and that debtors are permitted to sell these rights.  *See In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 118-25 (Bankr. S.D.N.Y. 2002) (finding that the sale of designation rights is "fully permissible in bankruptcy cases" and merely subject to the satisfaction of the business judgment rule and other requirements of section 363); *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 985 (Bankr. W.D. Wash. 1997).

23.     The Committee further posits that the Designation Rights Amendment impermissibly authorizes Nexus to "displace the Debtors' business judgment" by requiring the Debtors to operate in the leased premises.  Committee Objection ¶ 39.   As with any post-petition transaction, a sale of the designation rights and decisions regarding whether to assume or reject assets requires an exercise of a debtor's business judgment.  The Debtors exercised their business judgment in choosing to enter into the Designation Rights Amendment, and nothing further is required.  *See Ames*, 287 B.R. at 125–26 (finding that "sales of valuable property of the estate" necessarily involve analyses by a debtor of its business judgment that must be undertaken "before the [d]ebtor seeks to commit itself," and not at any specific juncture).   Comparable designation provisions are regularly approved by courts as a proper exercise of a debtor's business judgment. *See, e.g., In re Weinstein Co. Holdings LLC*, No. 18-10601, (Bankr. D. Del. May 9, 2018) [D.I. 846] (order approving asset purchase agreement under which the purchaser had the right to designate contracts for assumption and assignment); *In re DirectBuy Holdings, Inc*., No. 16-12435, 2017 WL 5496219 (Bankr. D. Del. Feb. 14, 2017) [D.I. 377] (order approving asset purchase agreement that defined "Assumed Contracts" according to a schedule that the buyer was permitted to amend in its sole discretion); *In re Ames Dep't Stores, Inc*., 287 B.R. 112, 125–27 (Bankr. S.D.N.Y. 2002) (holding that the sale of the right to designate executory contracts for assumption and assignment was an appropriate exercise of the debtor's business judgment); *In re G Survivor Corp.*, 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994) (holding that the purchaser's "ability to designate which contracts it wished to have rejected was a valuable right, for which [the purchaser] bargained," and that the debtor's "decision to sell that right was a proper exercise of its business judgment").

15

**III.     There is No Authority to Support Blue Owl's Request for Sale Proceeds to be Placed into Escrow.**

24.     The Blue Owl Objection requests that the proceeds from the Sale be placed into escrow until the "resolution of any Challenge by the Committee or any other party-in-interest" on the theory that the immediate transfer of the funds to the Secured Parties violates the Challenge Period provisions of the DIP Order.  Blue Owl Objection ¶ 4.  This requested relief, which the Committee does not join, runs contrary to the negotiated financing provided under the DIP Order and the relief granted thereunder, which had always contemplated, as a key feature of the DIP financing, the DIP Agents and Prepetition Agents being indefeasibly paid in cash upon consummation of the Sale.  DIP Order, Exhibit 5.  The DIP Credit Agreement, as approved by the DIP Order, obligates the Debtors to apply 100% of the net proceeds of the sale of DIP Term Priority Collateral within one business day of receipt to repay the outstanding principal amount of the DIP Term Loans, and thereafter, the Revolving Loans. DIP ABL Credit Agreement, ¶ 2.11(c). Notably, the Committee and Blue Owl were present and involved in these Chapter 11 Cases prior to the hearing on the DIP Order, and they did not raise any objection at that hearing or at any other time until shortly prior to the Sale Hearing.  The DIP financing has provided substantial benefits for the Debtors' estates and these Chapter 11 Cases, and Blue Owl should not be allowed to now undo a complete and bargained-for financing package that has already been approved by this Court.

25.     Furthermore, Blue Owl cites no precedent or provision of the Bankruptcy Code which supports the propriety of its request, and the Debtors are not required to acquiesce to it.  To the contrary, sale orders in this district customarily provide for the immediate transfer of sale proceeds to secured creditors.  *See Blink Holdings, Inc.*, No. 24-11686 (JKS) (Bankr. D. Del. Nov. 7, 2024) [D.I. 591]; *Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 14, 2024) [D.I. 471];

*NanoString Technologies, Inc.*, No. 24-10160 (CTG) (Bankr. D. Del. Apr. 19, 2024) [D.I. 470];

*Brooks Brothers Group, Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) [D.I. 444];

*Forever 21, Inc.*, No. 19-12122 (KG), (Bankr. D. Del. Feb. 13, 2020) [D.I. 927].  As discussed,

the Debtors have determined that there are no colorable Lender Claims for parties-in-interest to

prosecute.  At the earliest opportunity, the Debtors intend to repay the DIP Lenders that provided

critical financing at the onset of these cases, and the Debtors do not believe it would be appropriate

to hold the Sale proceeds in escrow until the conclusion of the dilatory, open-ended investigations

of the Committee and Blue Owl.

### IV.    Nexus is Assuming the Assigned Contracts and Leases *Cum Onere* and has Adequately Assured Counterparties of Future Performance

26.    The Adequate Assurance Objections request adequate assurance of future

performance required under 11 U.S.C. § 365(b)(1)(C) and 365(b)(3)(A) – (D).  While the majority

of Adequate Assurance Objections do not challenge Nexus' ability to perform under the Contracts

and Leases, they do seek confirmation that Nexus intends to assume the Contracts and Leases *cum*

*onere*, including the obligations under the Contracts and Leases that are billed post-Closing but

accrued prior to Nexus assuming the Contracts and Leases (such as annual real estate tax bills,

insurance bills, indemnification obligations, and common area maintenance reconciliations,

among others).  Certain Adequate Assurance Objections also seek confirmation that Nexus will

comply with the Contract and Lease provisions subject to section 365(b)(3)(A)-(D), including

provisions relating to radius, location, use and exclusivity.

27.    In an effort to resolve the Adequate Assurance Objections, the Debtors, with

Nexus's support, revised the Sale Order to ensure consistency with Nexus' declared intentions that

it will (i) assume the Lease obligations and pay obligations in compliance with the terms of the

applicable assigned Lease;  (ii) comply with the terms of any assigned contract or lease, including,

as applicable, the (1) the restrictive use covenants, (2) signage provisions, (3) rent provisions, (4) indemnification provisions, (5) assignment consent provisions, and (6) non-severability provisions; (iii) comply with applicable law, including § 365(b)(3) of the Bankruptcy Code, as applicable, upon assumption of the Lease; and (iv) as a general matter, operate the Assumed Leases as Big Lots.

28.    Additionally, the following or substantially similar language will be added to the revised Sale Order to be filed prior to the Sale Hearing:

> Notwithstanding anything to the contrary in this Sale Order or the APA, with respect to each Assigned Contract, from and after the date that such Assigned Contract is assumed, assigned and sold to the Buyer, the Buyer shall be responsible for continuing obligations under such Assigned Contract, *cum onere* after giving effect to the Agreed Modifications, if any, including, without limitation, liabilities for any breach of or default under such Assigned Contract, in each case arising or occurring after such assumption, assignment and sale, and for payment or performance of any and all obligations under such Assigned Contract arising after such assumption, assignment and sale when due in accordance with the terms of such Assigned Contract, including with respect to year-end adjustment and reconciliation amounts that become due or accrue after the entry of this Sale Order (irrespective of whether such obligations accrued before, on, or after assumption, assignment and sale of the Assigned Contract), including for royalties, rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent, in each case subject to the terms and conditions of the Assigned Contract, and subject to any defenses provided by such Assigned Contract and applicable non-bankruptcy law and unless otherwise agreed.

29.    The Debtors believe that these changes satisfy the requirements of 11 U.S.C. §§ 365(b)(1)(C) and 365(b)(3)(A) – (D) and anticipate that they will result in the withdrawal of the remaining Adequate Assurance Objections prior to the Sale Hearing.

## **CONCLUSION**

30.    For the reasons set forth herein, the Debtors respectfully request that the Court overrule the Objections and grant the Motion and any such other and further relief as the Court may deem just and proper.

Dated:   November 18, 2024
         Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Sophie Rogers Churchill*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4277)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
Stephen D. Piraino (admitted *pro hac vice*)
Jonah A. Peppiatt (admitted *pro hac vice*)
Ethan Stern (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
jonah.peppiatt@davispolk.com
ethan.stern@davispolk.com

*Counsel to the Debtors and Debtors in Possession*