**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 18, 661 & 981 |

**SUPPLEMENTAL LIMITED OBJECTION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Big Lots"), by and through its undersigned counsel, hereby submits this supplemental limited objection (this "Supplemental Objection") to the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 18] (the "Bidding Procedures

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

Motion" or "Sale Motion," as applicable). This Supplemental Objection supplements the *Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially All of the Debtors' Assets* [Docket No. 981] (the "Limited Objection").[2] In support of this Supplemental Objection, the Committee respectfully states as follows:

**SUPPLEMENTAL OBJECTION**

1. Since filing the Limited Objection on November 6, 2024, the Committee has learned two deeply troubling facts surrounding the Debtors' proposed sale of the Litigation Assets to Nexus for no consideration—assets that could form the sole source of recovery for unsecured creditors in these cases, are subject to ongoing investigation by the Committee, and should be retained by the estates pending conclusion of that investigation. First, the Committee learned that, in response to the Committee's informal objection to the sale of these claims and *de facto* releases resulting from that sale, the Debtors conducted an expedited "independent" investigation solely into potential causes of action against the Debtors' former directors and officers (the "D&O Claims"). The Debtors failed to mention such investigation to the Committee until *after* the investigation was complete.[3] Unsurprisingly, this eight-day investigation, conducted under the cloak of secrecy with no opportunity for the Committee to participate, revealed no valuable D&O Claims. Second, the Committee independently confirmed its suspicion that Nexus would be prepared to close the sale even if the D&O Claims were excised from the transaction, so long as such individuals will not continue to render services to the new business post-closing. These facts demonstrate that the proposed sale of the D&O Claims—the primary asset the Committee seeks

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Limited Objection.

[3] The Debtors also conveniently failed to mention this investigation, which had been ongoing for nearly a week at that point, at the November 5, 2024 hearing to consider *Blue Owl Real Estate Capital LLC's Emergency Motion To Extend Challenge Period* [Docket No. 870].

to preserve—serves no legitimate business purpose and was orchestrated by the Debtors to deliver backdoor releases to the Debtors' directors and officers outside of a Chapter 11 plan process.

2. Separately, the Committee files this Limited Objection to supplement its prior reservation of rights to seek an equitable remedy in the event the Committee later identifies colorable claims against the Secured Parties.[4] Since filing the Limited Objection, the Committee has made material progress on its investigation of potential claims against the Secured Parties. Specifically, as of the date hereof, the Committee has identified colorable causes of action for, among other things, (i) avoidance of prepetition liens on certain of the valuable assets that will be sold to Nexus through the Sale (and thus would arguably be used be used to repay the Secured Parties' claims) and (ii) avoidance of certain of the Prepetition Term Loan Obligations. In light of these recent developments, the Committee formally requests that the sale proceeds be held in escrow pending a ruling or other resolution of any Challenge.[5] Otherwise, the Secured Parties will walk away on the closing date having been paid in full, leaving the estates to later seek claw-back of such funds if the Committee's Challenge is ultimately successful.

**A.    In Response to the Committee's Objection, the Debtors Conducted a Secret Eight-Day "Independent" Investigation into the Litigation Assets.**

3. On November 1, 2024, the Committee served the Debtors with the *Notice of First Set of Interrogatories of the Official Committee of Unsecured Creditors Directed to the Debtors* [Docket No. 963] (the "Debtor Interrogatories"),[6] requesting, among other things, that the Debtors

---

[4] *See* Limited Objection p.3, n.6 ("In the event the Committee timely commences a Challenge, the Committee's right to seek an equitable remedy to protect the estates' interests pending determination of such Challenge shall be expressly preserved, and the Court shall be authorized to fashion an equitable remedy to address such Challenge.")

[5] As set forth in the *Emergency Motion of the Official Committee of Unsecured Creditors for an Order Further Extending the Challenge Deadline* (the "Extension Motion") [Docket No. 1151] filed contemporaneously herewith, the Committee requires more time and information from the Debtors to diligence an additional potential claim and has sought an additional 45-day extension of its Challenge Deadline from the Court to accomplish that objective.

[6] A true and correct copy of the Debtor Interrogatories is attached hereto as **Exhibit A**.

3

68457/0001-48813918

disclose the details of any investigation or analysis of potential causes of action that the Debtors had undertaken to date.[7] At the time the Committee served the Debtor Interrogatories, it understood, by virtue of two separate conversations with Debtors' counsel, that no such investigation had been conducted. Given the nature of these conversations, the Committee would have expected the Debtors to notify it of their intent to conduct any investigation.

4. On November 8, 2024, the Debtors served responses to the Debtor Interrogatories on the Committee (the "Debtor Responses"),[8] which revealed for the first time that:

   a. Prior to October 31, 2024, the Debtors had not conducted any investigation into potential estate claims that could be pursued for the benefit of creditors, including potential D&O Claims.

   b. "In light of recent questions raised by the [Committee] and Blue Owl in the Bankruptcy Proceedings," on October 31, 2024, the Debtors retained the law firm of Porter Wright Morris & Arthur LLP ("Porter Wright") to conduct an investigation into potential D&O Claims (the "Investigation").

5. The Debtors attached a copy of Porter Wright's "Independent Investigation Report" detailing the Investigation form, substance, and conclusions as Exhibit 1 to the Debtor Responses (the "Investigation Report"). The Investigation Report reveals that Porter Wright's Investigation lasted approximately eight days, spanning October 31, 2024 to November 8, 2024, during which time Porter Wright interviewed eighteen (18) current and former directors and officers of Big Lots, some of which interviews appear to have consisted of a simple telephone call without reviewing any relevant documents. The Investigation Report broadly concluded that there are no colorable D&O Claims.

---

[7] *See* Debtor Interrogatory No. 4

[8] A true and correct copy of the Debtor Responses and the Investigation Report (as defined herein) are attached hereto as **Exhibit B**. While such documents were originally designated as confidential, the Debtors consented to the public filing of both the Debtor Responses and the Investigation Report.

4

6. Further, based on statements made in the Investigation Report, the one-week investigation appears to have focused exclusively on three topics: (i) dividend payments, (ii) stock repurchase plans, and (iii) key employee retention plans and executive compensation generally. The Investigation Report provided no detail about the aggregate payments received by the Debtors' directors and officers prior to the Petition Date, but generally concluded such payments were appropriate. The Committee views the limited scope of the Investigation as inadequate.

7. Notwithstanding the fact that the Debtors have been engaged in active discussions with the Committee for the nearly eight weeks since it first selected counsel, the Debtors never alerted the Committee that they were undertaking such an investigation until *after* the Investigation was complete and only *after* the Committee served discovery requests seeking such information.

8. Immediately after learning of the Investigation, on November 11, 2024, the Committee served additional discovery requests upon the Debtors seeking certain documents and communications related to the Investigation and the matters discussed in the Investigation Report. In addition, the Committee served a Rule 30(b)(6) deposition notice on Porter Wright[9] and deposition notices on the eighteen individuals Porter Wright interviewed in connection with the Investigation. Since serving such notices, the Committee has been working with the Debtors and other parties-in-interest regarding the requested depositions. Specifically, the Committee, reserving all rights, has agreed to informal interviews of certain of the eighteen individuals in the interest of time. Discussions remain ongoing.

---

[9] On November 4, 2024, the Committee served a Rule 30(b)(6) deposition notice on the Debtors, together with a request for production of documents (the "Committee's Third RFP") seeking documents and communications concerning the claims and causes of action the Debtors are seeking to sell under the Stalking Horse APA. The Rule 30(b)(6) deposition took place on Monday, November 18, 2024. On the evening of Thursday, November 14, 2024, the Debtors produced 658 documents in response to the Committee's Third RFP.

68457/0001-48813918

9. The Committee is deeply troubled by the Debtors' actions and seemingly purposeful lack of transparency regarding the Investigation. Had the Committee received advance or even contemporaneous notice of the Investigation, it would have requested, among other things, to participate in the eighteen interviews, eliminating the need for the Committee to separately interview those individuals in the short amount of time before the sale hearing. Rather, the Debtors deliberately foreclosed the Committee's participation in this process. At this stage, it appears the Investigation and the attendant report is nothing more than a superficial, last-minute and *post hoc* attempt to justify the sale of the Litigation Assets, the bulk of which Nexus has confirmed it has *no desire* to purchase.

10. The Committee is also troubled by the fact that the Debtors seek to retain Porter Wright as an ordinary course professional outside the usual protections of Section 327 of the Bankruptcy Code. Porter Wright was not designated as an ordinary course professional in the list of ordinary course professionals (the "Ordinary Course Professionals List") attached to the *Motion of Debtors for Entry of an Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals Nunc Pro Tunc to the Petition Date* filed on September 26, 2024.[10] On November 12, 2024, Porter Wright filed a three-page declaration with the Court in support of its retention as an OCP in these cases.[11] Contemporaneously therewith, the Debtors filed a supplemental Ordinary Course Professionals List designating Porter Wright and listing "legal services" and "independent internal investigation" for Porter Wright's work description.[12] The

---

[10] *See* Docket No. 321.

[11] *See Declaration of Disinterestedness of Robert J. Tanouss in Support of Employment of Porter, Wright, Morris & Arthur LLP as a Professional Utilized in the Ordinary Court of Business* [Docket No. 1063].

[12] *See* Docket No. 1064.

Debtors provided no advance notice of this fact to the Committee. The Committee reserves all rights to object to Porter Wright's retention as an ordinary course professional in these cases.

11. The Court should not permit the sale of potentially valuable assets for no consideration, especially where such assets were subject to only a cursory investigation conducted by a law firm retained at the direction of the very individuals who would benefit from the sale and release of these claims.

**B.     Nexus Did Not Demand the Specific Inclusion of the D&O Claims in the Sale and Would be Willing to Close the Transaction Without Acquiring Such Assets.**

12. In order to probe the intent and rationale behind the inclusion of the Litigation Assets among the assets to be sold under the Stalking Horse APA, on November 1, 2024, the Committee served Nexus with the *Notice of First Set of Interrogatories of the Official Committee of Unsecured Creditors Directed to Gateway BL Acquisition, LLC* [Docket No. 963] (the "Nexus Interrogatories").[13]

13. Nexus Interrogatory No. 5 requested that Nexus state whether it would terminate the Stalking Horse APA if the Litigation Assets were carved out of the transaction. Specifically, Interrogatory No. 5 requested that Nexus:

> State whether You would terminate the Stalking Horse APA if section 2.01(b)(viii) of the Stalking Horse APA were modified so as to exclude from the Assets rights, claims, accounts, and causes of action (including warranty and similar claims) of Seller or any of its Subsidiaries (as defined in the Stalking Horse APA) against any Persons other than any (i) Company Employee employed by You after the Closing Date, (ii) vendor continuing to transact with You after the Closing Date, or (iii) counterparty to an Assigned Contract.

---

[13] A true and correct copy of the Nexus Interrogatories is attached hereto as **Exhibit C**.

68457/0001-48813918

14. On November 11, 2024, Nexus served the Committee with *Gateways' Responses and Objections to the Committee's Request for Production and Interrogatories in Connection with Sale Hearing* (the "Nexus Responses").[14]

15. In response to Nexus Interrogatory No. 5, Nexus confirmed, among other things, that (i) it did not demand the inclusion of the D&O Claims in the Stalking Horse APA and (ii) it would be willing to close the Stalking Horse APA if the D&O Claims were carved out. Specifically, Nexus's response to Interrogatory No. 5 stated that:

> . . . Gateway did not demand the specific inclusion of and would be prepared to proceed to close the APA even if it were modified by the Court so as to exclude from the Assets, all claims and causes of action of the Seller or any of its Subsidiaries (as defined in the Stalking Horse APA) against (i) any of the Seller's lenders, and (ii) any of the Seller's or its Subsidiaries' current or former employees, officers, and directors; *provided, however,* that Gateway must acquire any rights, claims, accounts, and causes of action against each current employee, officer, or director of the Seller or its Subsidiaries that is employed or retained (including on a consulting basis) by Gateway or NewCo on or within 90 days after the Closing Date, a list of which would be identified by Gateway or NewCo on a confidential basis prior to the Sale Hearing.

Nexus Response No. 6.

16. The Nexus Responses demonstrate that the proposed sale of the D&O Claims serves no legitimate business purpose and that designating such claims as "Excluded Assets" under the Stalking Horse APA will not adversely affect the proposed sale. Coupled with the lack of consideration and inadequate investigation into the D&O Claims, the Committee respectfully requests that any order approving the sale exclude the D&O Claims from the assets purchased by Nexus.

---

[14] A true and correct copy of the Nexus Responses is attached hereto as **Exhibit D**.

68457/0001-48813918

**C.    Sale Proceeds Should Be Held in Escrow Pending a Ruling on, or Resolution of, the Claims Identified by the Committee**

17.    Finally, the Committee files this Supplemental Objection to supplement the reservation of its right to request an equitable remedy in the event of a Challenge in its Limited Objection. Both the Stalking Horse APA and the Debtors' Proposed Stalking Horse Sale Order [Docket No. 558-3] (the "Proposed Sale Order") make clear that the vast majority of the Sale proceeds will immediately be transferred to the Secured Parties to satisfy the purported Pre-Petition ABL Obligations, Pre-Petition Term Obligations, ABL DIP Obligations, and Term DIP Obligations in full at closing.[15]

18.    To address this issue in light of the Committee' pending investigation, the Committee initially requested the inclusion of the following reservation of rights in the Sale Order: "In the event the Committee timely commences a Challenge, the Committee's right to seek an equitable remedy to protect the estates' interests pending determination of such Challenge shall be expressly preserved, and the Court shall be authorized to fashion an equitable remedy to address such Challenge." *See* Limited Objection p.3, n.6. The proposed language was intended to protect the interests of unsecured creditors in the event the Committee ultimately did identify colorable claims against the Secured Parties.

19.    Since filing the Limited Objection, the Committee has made material progress on its investigation. As set forth more fully in the Extension Motion, the Committee has identified colorable claims to avoid certain of the Secured Parties' prepetition liens and claims, and has also identified an additional potential claim that the Committee requires more time and information to

---

[15] *See* Proposed Sale Order at ¶ 18 (requiring Debtors to fully repay claims of Secured Parties at sale closing); Stalking Horse APA, §§ 4.02(b), 4.03(a), 11.04 (requiring, as a condition to closing, Buyer to fully repay the outstanding secured debt obligations directly to the applicable Secured Parties).

9

properly assess.[16] Notably, the Committee has determined that the Secured Parties did not hold valid, properly perfected prepetition liens on certain of the Debtors' assets (namely cash, certain parcels of real estate, and commercial tort claims) as of the Petition Date.  These assets will be sold to Nexus on the closing date, and thus will arguably be used to repay the claims of the Secured Parties.

20.     In light of the foregoing, the Committee requests that the Sale Order be modified to require that Sale proceeds be held in escrow pending a determination on (or other resolution of) the claims identified by the Committee in the Extension Motion.  Absent such relief, the Secured Parties may receive a windfall at the expense of unsecured creditors, and the estates will bear the burden to seek the affirmative claw-back of these funds if the Secured Parties' claims or liens are successfully challenged.  As such, any Sale Order should provide for an escrow into which proceeds are deposited subject to the resolution of any Challenge by the Committee or further order of the Court.

*[Remainder of Page Left Intentionally Blank]*

---

[16] As set forth in the Extension Motion, has requested additional time to further diligence an additional claim as more information from the Debtors is needed.  To the extent that the Court ultimately denies the relief requested in the Extension Motion, the Committee has requested a modest three business day extension from the date of entry of an order denying such relief in order to allow the Committee to convene and determine how to proceed.

**WHEREFORE**, the Committee respectfully requests that this Court sustain the Limited Objection, as supplemented herein, and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated: November 18, 2024
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel:   (302) 652-3131
Fax:  (302) 652-3117
Email: jalberto@coleschotz.com
         snewman@coleschotz.com

**MCDERMOTT WILL & EMERY LLP**

Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
Stacy Lutkus (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY, 10017
Tel:   (212) 547-5400
Fax:  (212) 547-5444
Email: dazman@mwe.com
         kgoing@mwe.com
         salutkus@mwe.com
         nrowles@mwe.com

*Counsel to the Official Committee of Unsecured Creditors*