**Exhibit B**

**Debtor Responses and Investigation Report**

**Davis Polk**

James I. McClammy
+1 212 450 4584
james.mcclammy@davispolk.com
davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

November 8, 2024

Re: *In re Big Lots, Inc.,* Case No. 24-11967 (JKS) (Bankr. D. Del. 2024)

Justin R. Alberto
Stacy L. Newman
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801

Darren Azman
Kristin Going
Stacy Lutkus
Natalie Rowles
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017

Dear Counsel:

On behalf of the Debtors in the above-captioned action, I am writing in response to the Notice of First Set of Interrogatories of the Official Committee of Unsecured Creditors Directed to the Debtors (the "Interrogatories") that you issued to the Debtors.  Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("FRCP") and Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure ("FRBP"), the Debtors object and respond to the Interrogatories as set forth below (capitalized terms not defined below shall have the meaning set forth in the Interrogatories).

The Debtors designate these responses as Confidential pursuant to the Bylaws of the Official Committee of Unsecured Creditors of Big Lots, Inc. et al., entered into as of October 2, 2024 by and among the Committee (the "**Bylaws**").  Big Lots submits these responses subject to and on the basis of the Confidentiality provision in Section 4 of the Bylaws.

## General Objections

The Debtors make the following General Objections, whether or not separately set forth in each response to each Definition, Instruction, and/or Interrogatory, and incorporates each of them by reference in each and every specific response below:

1. The Debtors' responses to the Interrogatories are made without in any way waiving or intending to waive: (a) any objections as to the relevancy, materiality, privileged status, or admissibility as evidence, for any purpose, of any information provided in response to the Interrogatories; (b) the right to object on any grounds to any use of the information provided in Debtor's responses to the Interrogatories at any hearing or trial; (c) the right to object on any grounds at any time to a demand for further responses to the Interrogatories; and (d) the right at any time to review, correct, add to, supplement, or clarify any of these responses and objections. Debtor's responses herein are not

**Davis Polk**

    intended to mean that the Debtors agree with any factual assumptions, implications, or any explicit or implicit characterization of facts, events, circumstances, or issues in the Interrogatories.

2.    These responses and objections reflect the Debtors' present knowledge, information, and belief, and may be subject to change or modification based on further discovery or on facts or circumstances that may come to the Debtors' attention.  The Debtors' search for information and documents is ongoing, and the Debtors reserve the right to rely on any facts, documents, evidence, or other contentions that may develop or come to its attention at a later time, and, to the extent required and/or as permitted by the FRCP, FRBP, the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), or any other applicable statutes, rules, or case law, at any time prior to the trial in this action.  The Debtors reserve the right to raise any additional objections deemed necessary or appropriate in light of any further review.

3.    The Debtors' object to these Interrogatories to the extent that they do not provide sufficient time for the Debtors to respond.

4.    The Debtors' response to any Interrogatory will be on behalf of the Debtors and will be limited to information currently available to them.

5.    The Debtors object to each Interrogatory to the extent it calls for the identification of "all," "any," or "each" of the matters on the grounds of undue burden and disproportionality and on the ground that the Debtors cannot guarantee that it has identified every single matter responsive to a particular Interrogatory.

6.    The Debtors object to each Interrogatory to the extent that it seeks information subject to the attorney-client privilege, attorney work product immunity, the common interest privilege, or any other applicable privilege or immunity against disclosure.

7.    The Debtors object to each Interrogatory to the extent it seeks information or documents protected by confidentiality rights of third parties pursuant to any agreement or undertaking prohibiting the Debtors from disclosing such information or imposing conditions on any such disclosure.  The Debtors will not produce any such information or documents until applicable conditions relative to third parties are satisfied.

<u>**Objections to Definitions**</u>

The Debtors object to the Definitions in the Interrogatories as overly broad, unduly burdensome, vague, and ambiguous.  More specifically, but without waiving any additional objections, the Debtors make the following objections:

The definition of "Board"(Definition No. 8) is overly broad, vague and ambiguous, particularly as it includes "any group or subcommittee with the responsibility of, among other things, governing the Debtors or overseeing the activities and operations of the Debtors."  The Debtors will construe the term "Board" to refer to the Big Lots, Inc. Board of Directors.

The definition of "Debtor(s)," "You," or "Your" (Definition No. 10) is overly broad, vague, ambiguous, particularly as it includes "their respective subsidiaries and Affiliates and all predecessors, Officers, Directors, employees, agents, consultants, advisors, attorneys, and representatives or other Persons acting on their behalf (including the outside counsel of such entities).  The Debtors further object to Definition No. 10 to the extent it seeks documents that are not in the Debtors' possession, custody, or control and to the extent it seeks documents protected by the attorney client privilege, work product privilege, or any other

**Davis Polk**

privilege and immunity.  The Debtors will construe the terms "Debtor(s)," "You," and "Your" to refer to the Debtors named in this Chapter 11 Case.

The definition of "Identify" (Definition No. 12) is overly broad and unduly burdensome.

The definition of "Officers" (Definition No. 14) is vague and ambiguous, particularly as it includes "any other executive of similar title."

### Objections to Instructions

Instructions Nos. 3, 5, 7, and 8 are overly broad and unduly burdensome, including to the extent they are inconsistent with the FRCP, FRBP, the Local Rules, or any other applicable statutes, rules, or case law.

### Responses and Objections to Interrogatories

With respect to the specific Interrogatories, the Debtors reiterate and incorporate their General Objections and Objections to Definitions and Objections to Instructions, as set forth above.  In addition, the Debtors respond as follows:

1.  The Debtors object to Interrogatory No. 1 as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the claims or defenses of any party, particularly on the ground that it asks the Debtors to identify "all" persons.  The Debtors further object to Interrogatory No. 1 on the ground that the term "discussed and/or negotiated" and "terms and provisions" are vague and ambiguous.

    Subject to and without waiving the foregoing general and specific objections, the Debtors respond that Bruce Thorn, Jonathan Ramsden, Ronald Robins, Michael Schlonsky, and Steven Hutkai of the Debtors; Adam Shpeen, Brian Wolfe, Oliver Smith, and Heather Weigel of Davis Polk & Wardwell LLP; and Stuart Erickson, Adam Rifkin, and Michael Gottlieb of Guggenheim Securities, LLC principally negotiated the Stalking Horse APA on behalf of the Debtors.

2.  The Debtors object to Interrogatory No. 2 as not relevant to the claims or defenses of any party.  The Debtors further object to Interrogatory No. 2 on the ground that the phrase "prepared the initial draft" is vague and ambiguous.

    Subject to and without waiving the foregoing general and specific objections, the Debtors respond that the initial draft was prepared by Davis Polk & Wardwell LLP.

3.  The Debtors object to Interrogatory No. 3 as not relevant to the claims or defenses of any party.  The Debtors further object to Interrogatory No. 3 on the ground that the phrase "proposed section 2.01(b)(viii) of the Stalking Horse APA for inclusion in the Stalking Horse APA" is vague and ambiguous.

    Subject to and without waiving the foregoing general and specific objections, the Debtors respond that a version of section 2.01(b)(viii) of the Stalking Horse APA was included in the initial draft prepared by Davis Polk & Wardwell LLP on behalf of the Debtors.

4.  The Debtors object to Interrogatory No. 4 as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the claims or defenses of any party, particularly on the ground that it asks the Debtors to identify "any" investigation or analysis.  The Debtors object to Interrogatory No. 4 on the ground that it seeks information that is protected by the attorney-client privilege, work product privilege, or any other privilege and immunity.  The Debtors object to

**Davis Polk**

Interrogatory No. 4 on the ground that the phrases "Describe, in detail"; "any investigation or analysis of claims or potential causes of action" and "mandate, scope and/or parameters of such investigation or analysis" are vague and undefined.

Subject to and without waiving the foregoing general and specific objections, the Debtors respond that the Debtors had not conducted any investigation into claims against their officers and directors nor were they aware of any colorable basis to support undertaking such an investigation. Nonetheless, in light of recent questions raised by the UCC and Blue Owl in the Bankruptcy Proceedings, the Debtors retained Porter Wright Morris & Arthur LLP on October 31, 2024 to conduct an investigation into potential claims that the Debtors may have against the Debtors' officers and directors.  A report summarizing that investigation and setting out the conclusions of Porter Wright is attached hereto as Exhibit 1.

5.  The Debtors object to Interrogatory No. 5 as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the claims or defenses of any party.  The Debtors further object to Interrogatory No. 5 on the ground that it assumes the existence of facts that do not exist. The Debtors further object to Interrogatory No. 5 insofar as the terms "projected value" and "rights, claims, amounts, and causes of action (including warranty or similar claims)" are vague and ambiguous.

Subject to and without waiving the foregoing general and specific objections, the Debtors refer the Committee to the Debtors' Schedules A/B, filed on October 31, 2024, as amended on November 5, 2024, for a list of the Debtors' causes of action against third parties, together with their respective valuations.

<u>**Reservation of Rights**</u>

The Debtors the right to assert other, additional objections to the Interrogatories.  By notifying you of its objections herein, the Debtors do not waive their right to seek to seek a protective order or an order modifying the Interrogatories or to obtain any other relief to which it is entitled under the FRCP, FRBP, Local Rules, or otherwise.

Sincerely,

*/s/ James I. McClammy*

James I. McClammy

**Electronic Mail**

November 8, 2024    4

**Exhibit 1**



CONFIDENTIAL

**INDEPENDENT INVESTIGATION
REPORT**

**prepared for**

**BIG LOTS, INC.**

Porter, Wright, Morris & Arthur LLP

November 8, 2024

*CONFIDENTIAL*
**INDEPENDENT INVESTIGATION REPORT – BIG LOTS, INC.**

**TABLE OF CONTENTS**

I.    **EXECUTIVE SUMMARY.** ........................................................................................ 1

II.   **BIG LOTS, INC.** ..................................................................................................... 2

    A.    Corporate Background and Structure............................................................. 2

    B.    Board Members and Officers 2020 to 2024................................................... 3

III.  **BANKRUPTCY OF BIG LOTS.** ........................................................................... 6

IV.  **PORTER WRIGHT'S INVESTIGATION.** ........................................................... 6

    A.    Engagement of Porter Wright. ...................................................................... 6

    B.    Scope of Investigation................................................................................... 8

    C.    Documents and Information Reviewed. .......................................................... 9

    D.    Interviews Conduct and Requested................................................................ 10

V.   **LEGAL BACKGROUND RELEVANT TO FIDUCIARY DUTIES OF BIG LOTS' DIRECTORS AND OFFICERS.** ......................................................... 11

    A.    Fiduciary Duties of Directors and Officers under Ohio Law. ........................ 11

        1.    Duty of Care.................................................................................... 12

        2.    Duty of Loyalty............................................................................... 13

        3.    Business Judgment Rule. ................................................................ 14

        4.    Determination of Director or Officer Liability for Damages.................. 16

    B.    Specific Applications of the Law Relevant to Big Lots. ..................................... 17

        1.    Dividend Payments. ...................................................................... 17

        2.    Stock Repurchase Plans. ............................................................... 18

        3.    Key Employee Retention Plans and Executive Compensation Generally................................................................................................ 19

**VI.    WHETHER ANY COLORABLE CLAIMS FOR BREACH OF
       FIDUCIARY DUTY MAY BE MADE AGAINST BIG LOTS'
       DIRECTORS AND OFFICERS FOR TRANSACTIONS, ACTS, AND
       OMISSIONS FROM JANUARY 1, 2020, TO THE PRESENT .................................. 20**

**APPENDIX ........................................................................................................................ A-1**

## I.    EXECUTIVE SUMMARY.

On October 31, 2024, the law firm of Porter, Wright, Morris & Arthur LLP ("Porter Wright") was retained by Big Lots, Inc. ("Big Lots") to undertake an investigation into whether any colorable claims may be made against any of its current or former directors or executive officers, namely claims for breach of fiduciary duty.  The question whether any such claims could be made is an issue that has recently arisen in the bankruptcy proceeding involving Big Lots.  Porter Wright agreed to conduct the investigation.

It was explained to Porter Wright at the outset of the investigation that it needed to be finished, and a report on the results of the investigation needed to be prepared, by November 8, 2024.  This allowed a little more than one week to complete the investigation.  As a consequence, Porter Wright formed a team of more than ten attorneys (including several partners and several associates) to complete the work.  During the eight days Porter Wright had to do the investigation and prepare a report, the team incurred approximately 426 attorney hours and 3 paralegal hours on the engagement.  Those hours were spent largely reviewing and analyzing thousands of pages of documents and interviewing 18 individuals.

Based on the investigation, Porter Wright has concluded that there are no colorable claims for breach of fiduciary duty that may be made against Big Lots' current or former directors or principal officers.  To the contrary, Porter Wright's investigation shows that, during the relevant time period of January 1, 2020, to the present, Big Lots' board and management team discharged their duties with the utmost degree of professionalism and care.  Board votes reflected conscious deliberation and were well-informed not only by robust disclosures from the management team but also by third-party advisors and counsel.  The board and management team also took great care to avoid any conflict or the appearance of any conflict.  Porter Wright's

investigation did not uncover any facts that even approached those that would need to be alleged to support a claim for breach of fiduciary duty.  One director that served on the board from 2015 through May 2024 remarked that the Big Lots board and management team operated in a "squeaky clean" manner, never "pushing the envelope."  Those sentiments were echoed by the other board members and executives Porter Wright interviewed, and they were confirmed in the documents Porter Wright reviewed.

## II.    BIG LOTS, INC.

### A.    Corporate Background and Structure.

Big Lots is an Ohio corporation.  It is a large home discount retailer operating in the United States.  Big Lots offers a variety of merchandise, including food, consumables, furniture, home décor, appliances, electronics, and seasonal products.  A few of Big Lots' notable competitors include Ollie's, Target, Walmart, the Dollar stores, and Home Goods.

The company that eventually became Big Lots was incorporated in 1967 under the name Consolidated International, Inc. ("Consolidated").[1]  In 1982, Consolidated launched the Odd Lots/Big Lots chain centered on closeout deals.  Over the years, the Consolidated chain expanded to include stores doing business as Big Lots, Odd Lots, Mac Frugal's Bargain Closeouts, and Pic 'N Save.  In 2001, all stores converged into the Big Lots® national brand, and the company changed its name from Consolidated Stores, Inc. to Big Lots, Inc. in connection with a reincorporation merger from Delaware to Ohio.

Today, Big Lots maintains its focus on providing value through discounted prices and closeout deals.  Big Lots sources the majority of its closeouts from production overruns,

---

[1]    *See* Big Lots, "*Our History*," https://www.biglots.com/corporate/about-us/our-history (last visited November 4, 2024).

discontinued products, liquidations, packaging changes, returns, and order cancellations, and

passes those deals onto customers.

As of February 2024, Big Lots had approximately 30,000 associates, 1,392 retail stores,

and an e-commerce platform.  Big Lots also owns or controls the following subsidiaries:

Big Lots F&S, LLC
Big Lots Stores, LLC
Closeout Distribution, LLC
Consolidated Property Holdings, LLC
CSC Distribution, LLC
Big Lots Stores – CSR, LLC
Durant DC, LLC
Great Basin, LLC
Big Lots Stores – PNS, LLC
Big Lots eCommerce LLC
AVDC, LLC
Big Lots Management, LLC
Broyhill, LLC
GAFDC LLC
PAFDC LLC
WAFDC, LLC
INFDC, LLC
BLBO Tenant, LLC

Of these 18 subsidiaries, 13 are located in Ohio, with the remainder in Pennsylvania,

Nevada, Alabama, Delaware and California.

Big Lots began trading on the American Stock Exchange in 1985, switching its listing to

the New York Stock Exchange in 1986.  Since 2001, Big Lots' common shares have traded on

the New York Stock Exchange under the ticker symbol "BIG."  As of September 9, 2024, the

date of Big Lots' bankruptcy petition, Big Lots had 298,000,000 common shares authorized.  As

of June 7, 2024, Big Lots had 29,681,973 common shares outstanding.

**B.    Board Members and Officers 2020 to 2024.**

The individuals who served as members of Big Lots' Board of Directors and the periods

of time in which they served between January 1, 2020, and the date of this report are as follows:

*CONFIDENTIAL*
INDEPENDENT INVESTIGATION REPORT – BIG LOTS, INC.

| Director | Start Date | End Date |
|---|---|---|
| Jeffrey P. Berger | Pre-2020 | June 10, 2020 |
| James R. Chambers | Pre-2020 | Present |
| Andrew C. Clarke | April 2020 | May 26, 2021 |
| Sebastian J. DiGrande | Pre-2020 | Present |
| Aaron Goldstein | April 2020 | October 1, 2020 |
| Marla C. Gottschalk | Pre-2020 | May 29, 2024 |
| Cynthia T. Jamison | Pre-2020 | Present |
| Christopher J. McCormick | Pre-2020 | Present |
| Nancy A. Reardon | Pre-2020 | May 29, 2024 |
| Wendy L. Schoppert | Pre-2020 | Present |
| Bruce K. Thorn | Pre-2020 | Present |
| Sandra Y. Campos | April 2021 | May 29, 2024 |
| Thomas A. Kingsbury | April 2020 | February 3, 2023 |
| Kimberly A. Newton | April 2021 | Present |
| Maureen B. Short | March 2024 | Present |

Big Lots' corporate officers between January 1, 2020, and the date of this report are as

follows:

| Name | Position(s) | Start Date | End Date |
|---|---|---|---|
| Bruce K. Thorn | President and Chief Financial Officer | Pre-2020 | Present |
| Lisa M. Bachmann | Executive Vice President, Chief Merchandising and Operating Officer | Pre-2020 | September 2020 |
| Jonathan E. Ramsden | Executive Vice President, Chief Financial Officer and Chief Administrative Officer | Pre-2020 | Present |
| Stephen M. Haffer | Senior Vice President, Chief Customer Officer | Pre-2020 | May 2020 |

*CONFIDENTIAL*
**INDEPENDENT INVESTIGATION REPORT – BIG LOTS, INC.**

| <u>Name</u> | <u>Position(s)</u> | <u>Start Date</u> | <u>End Date</u> |
|---|---|---|---|
| Gene Eddie Burt | Executive Vice President, Chief Supply Chain Officer | January 2021 | June 2023 |
| Andrej Mueller | Executive Vice President, Strategy and Chief Customer Officer | May 2020 | September 2023 |
| Nicholas E. Padovano | Executive Vice President, Chief Stores Officer | March 2021 | August 2023 |
| Jack A. Pestello | Executive Vice President, Chief Merchandising Officer | July 2020 | May 2022 |
| Ronald A. Robins, Jr. | Executive Vice President, Chief Legal and Governance Officer, General Counsel and Corporate Secretary | Pre-2020 | Present |
| Michael A. Schlonsky | Executive Vice President, Chief Human Resources Officer | Pre-2020 | Present |
| Gurmeet Singh | Executive Vice President, Chief Technology Officer | July 2021 | July 2022 |
| Margarita Giannantonio | Executive Vice President, Chief Merchandising Officer | November 2022 | March 2024 |
| John Alpaugh | Senior Vice President, Chief Marketing Officer | September 2022 | Present |
| Bruce Millard | Senior Vice President, Chief Marketing Officer | May 2024 (consultant); August 2024 | Present |
| Kristen Cox | Senior Vice President, Chief Stores Officer | December 2023 | Present |

| Name | Position(s) | Start Date | End Date |
|------|-------------|------------|----------|
| Juan Guerrero | Senior Vice President, Chief Supply Chain Officer | August 2023 | Present |
| Matthew Weger | Senior Vice President, Chief Digital and Technology Officer | August 2022 | September 2024 |

## III.    BANKRUPTCY OF BIG LOTS.

On September 9, 2024, Big Lots, Inc. and each of its subsidiaries (collectively, the "Debtors") initiated voluntary Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have secured a going concern stalking horse bid from Gateway BL Acquisition, LLC, an affiliate of Nexus Capital Management LP ("Nexus"), to purchase substantially all of the Debtors' assets on the terms and conditions set forth in an Asset Purchase Agreement dated September 8, 2024.  Among the assets that would be sold to Nexus under that Asset Purchase Agreement are any claims that Big Lots may have against its current or former directors and officers.  The Official Committee of Unsecured Creditors has filed a Limited Objection to the sale of any such claims that are not necessary to the operations of the new business.  In anticipation of that objection, Big Lots retained Porter Wright to conduct this investigation for the purpose of determining whether there are any colorable claims against Big Lots' directors and officers.

## IV.    PORTER WRIGHT'S INVESTIGATION.

### A.    Engagement of Porter Wright.

Porter Wright is a regional law firm based in Columbus, Ohio, with approximately 200 attorneys.  In addition to Columbus, the firm has offices in Cincinnati, Cleveland, and Dayton,

Ohio; Tampa and Naples, Florida; Chicago, Illinois; Pittsburgh, Pennsylvania; and Washington, D.C.

On October 31, 2024, Porter Wright was engaged by Big Lots to conduct an independent investigation into whether any colorable claims may exist against the current and former directors and executive officers of Big Lots, namely claims for breach of fiduciary duty. The investigation was requested to be completed by November 8, 2024. Porter Wright formed a team to conduct the investigation, led by the chair of Porter Wright's Litigation Department James A. King. Others who participated in the investigation included the firm's Managing Partner and former chair of the firm's Corporate and Securities Practice Group Robert J. Tannous; litigation partners David S. Bloomfield, Jr., Jared M. Klaus, and Matthew F. Stowe; litigation associates Alexis R. Pannell, Adanna M. Smith, and Eleanor R. Tosti; corporate associates Diana Lingyu Jia, Rochelle Qin, and Diego De La Vega; and labor and employment associate Helen K. Sudhoff. In total, Porter Wright attorneys expended approximately 426 hours in conducting the investigation and preparing this report. Porter Wright also utilized litigation paralegal Barbara A. Harrison, who expended approximately three hours supporting the investigation.

Porter Wright has not previously represented Big Lots or any of its corporate affiliates or subsidiaries. Porter Wright has never represented any of Big Lots' directors or officers individually, including any of the current directors or officers. Porter Wright, however, was engaged by a Special Litigation Committee of Big Lots' Board of Directors that was formed on August 1, 2016, in connection with certain shareholder derivative litigation pending at the time. The members of that Special Litigation Committee were current directors Cynthia T. Jamison and Wendy L. Schoppert, and former director Marla C. Gottschalk. The attorney-client relationship was with the Special Litigation Committee, not with any individual member of it.

7

Porter Wright's engagement by the Special Litigation Committee ended in 2018.  Other than this engagement, Porter Wright had no previous attorney-client relationship with any person or business related to Big Lots.

**B.      Scope of Investigation.**

Porter Wright was asked by Big Lots to conduct an independent investigation to determine whether any colorable claims, namely for breach of fiduciary duty, may exist against the current and former directors and principal officers of Big Lots.  Porter Wright was asked to complete and submit a written report on the results of the investigation by November 8, 2024 – eight days from the date of the engagement.  Due to these time constraints, Porter Wright assumed that statements contained in the board minutes, securities filings, and other documents that the firm reviewed were truthful.  While Porter Wright attorneys questioned those whom they interviewed about particular statements, the compressed schedule for completing the investigation did not allow for independent verification of those statements by outside experts.

Porter Wright's investigation focused on the period from January 1, 2020, to the present – a period of nearly five years – because the applicable statute of limitations for breach of fiduciary duty claims against corporate directors and officers is four years.  *See* Ohio Rev. Code § 2305.09(D).  Porter Wright was informed, and verified, that no specific allegations of wrongdoing had been made against any directors and officers during this time through either shareholder demands, government investigations, lawsuits, or other circumstances.  The only exception is a shareholder lawsuit that was filed on April 30, 2021, in the Common Pleas Court of Franklin County, Ohio, captioned *Corpus Christi Firefighters' Retirement System v. Macellum Capital Management, L.P., et al.*, No. 21CV002695 (the "Lawsuit").  Former Big Lots director Aaron Goldstein is named as a defendant in the Lawsuit.  The Lawsuit generally alleges that Mr.

Goldstein and the other defendants participated in an unlawful campaign for control of Big Lots in violation of Ohio Revised Code § 1707.043.  Judge Dan Hawkins of the Franklin County, Ohio Court of Common Pleas granted complete summary judgment to the defendants on March 20, 2024, and the case is currently on appeal to Ohio's Tenth District Court of Appeals.  As the claims in the Lawsuit are currently being litigated, Porter Wright did not undertake to analyze those claims, and the claims are outside the scope of this investigation.

### C.    Documents and Information Reviewed.

In carrying out the investigation, Porter Wright collected and reviewed thousands of pages of documents related to the conduct of Big Lots' Board of Directors and management team from January 1, 2020, to the present.  The documents included:

- Big Lots' Articles of Incorporation and Code of Regulations;

- Minutes of meetings and meeting materials (including financial statements) for the Board of Directors of Big Lots during the time period January 1, 2020, to the present;

- Minutes of meetings and meeting materials for all committees (the Capital Allocation Planning Committee, the Audit Committee, the Nominating/Corporate Governance Committee, and the Human Capital and Compensation Committee) of the Board of Directors of Big Lots during the time period January 1, 2020, to the present;

- SEC filings for Big Lots, including all 10-Ks, 10-Qs, 8-Ks, and proxy statement filings from January 1, 2020, to the present;

- Filings in legal proceedings involving Big Lots from January 1, 2020, to the present;

- Filings in the Big Lots bankruptcy proceeding; and

- Personnel files of Bruce K. Thorn; Jonathan E. Ramsden; Ronald A. (Rocky) Robins, Jr.; Michael A. Schlonsky; Margarita Giannantonio; Gene Eddie Burt; Jack Pestello; and Lisa Bachmann.

*CONFIDENTIAL*
**INDEPENDENT INVESTIGATION REPORT – BIG LOTS, INC.**

    **D.**    **Interviews Conduct and Requested.**

Porter Wright identified the individuals to be interviewed and the areas of inquiry for

each individual.  Porter Wright separately interviewed 18 individuals.  After each interview, a

detailed memorandum regarding the interview was prepared.  The individuals interviewed were:

- Bruce K. Thorn, President, CEO, and board member;

- Jonathan E. Ramsden, EVP, Chief Financial and Administrative Officer;

- Ronald A. ("Rocky") Robins, Jr., EVP, Chief Legal & Governance Officer, General Counsel, and Corporate Secretary;

- Michael A. Schlonsky, EVP Chief Human Resources Officer;

- Margarita Giannantonio, former EVP, Chief Merchandising Officer;

- Lisa Bachmann, former EVP, Chief Merchandising and Operating Officer;

- James R. Chambers, board member;

- Christopher J. McCormick, board member;

- Sebastian DiGrande, board member;

- Cynthia T. Jamison, board member;

- Wendy L. Schoppert, board member;

- Kimberly A. Newton, board member;

- Maureen B. Short, board member;

- Sandra Y. Campos, former board member;

- Jeffrey P. Berger, former board member;

- Nancy A. Reardon, former board member;

- Marla C. Gottschalk, former board member; and

- Andrew C. Clarke, former board member.

Porter Wright made requests to interview additional individuals who never responded to multiple requests for interviews.  These individuals were:

- Jack Pestello, former EVP, Chief Merchandising Officer;

- Gene Eddie Burt, former EVP, Supply Chain; and

- Thomas A. Kingsbury, former board member.

In addition, given the allegations in the Lawsuit, Porter Wright decided not to contact former board member Aaron Goldstein.

## V.    LEGAL BACKGROUND RELEVANT TO FIDUCIARY DUTIES OF BIG LOTS' DIRECTORS AND OFFICERS.

### A.    Fiduciary Duties of Directors and Officers under Ohio Law.

Big Lots is an Ohio corporation.  Ohio law, therefore, applies.  In determining whether Big Lots' directors and officers breached or satisfied their fiduciary duties, Porter Wright applied applicable Ohio law to their conduct.  To the extent Ohio law has not addressed a particular issue, Porter Wright looked to Delaware law.  It is well settled that Ohio courts will turn to Delaware law for guidance on corporate law questions.  *See In re Cardinal Health Derivative Litig.*, 518 F. Supp. 3d 1046, 1064 n.7 (S.D. Ohio 2021).

In Ohio, both directors and officers occupy a position of trust to the corporation and its shareholders known as a fiduciary relationship.  This relationship imposes basic fiduciary duties on corporate directors and officers.

The duties of directors are prescribed by Ohio Revised Code § 1701.59(B):

A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

In the words of one court, these fiduciary duties include "a duty of care, a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure." *Antioch Co. Litig. Trust v. Morgan*, No. 3:10-cv-156, 2013 U.S. Dist. LEXIS 108771, *23-24 (S.D. Ohio Aug. 2, 2013).

Corporate officers in Ohio owe the same duties. Section 1701.641 provides that, unless the articles, regulations, or a contract say otherwise, "[a]n officer shall perform the officer's duties to the corporation in good faith, in a manner the officer reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Rev. Code § 1701.641(A) &(B). Nothing in Big Lots' Articles of Incorporation or Code of Regulations say otherwise.

### 1. Duty of Care.

The duty of care requires corporate directors and officers to be responsible for protecting the financial interests of the company and its shareholders. *See McMullin v. Beran*, 765 A.2d 910, 920 (Del. 2000). Directors and officers have an affirmative duty to act diligently and prudently in carrying out the affairs of the corporation. Generally, the duty of care requires directors and officers to perform their duties in good faith and in a manner each director and officer believes is in the corporation's best interests. Directors and officers must act on a reasonably informed basis and exercise such care "as an ordinarily prudent person in a like position would exercise under similar circumstances." *Antioch*, 2013 U.S. Dist. LEXIS 108771, at *24. A director or officer's fiduciary duty includes the duty to prevent breaches by fellow directors and officers. "[W]hen a director has knowledge of a fellow director's improprieties and does not act upon that information, the [director's] decision to stand by idly is not a defense." *In*

*re Nat'l Century Fin. Enter., Inc.*, 504 F. Supp. 2d 287, 313-14 (S.D. Ohio 2007).  Liability will be found even if the director or officer does not benefit from self-dealing of others.  *Id.*

In performing their duties, directors are entitled to rely upon information, opinions, reports, or statements, including financial statements or other financial data, prepared or presented by one or more of the following:  (1) one or more directors, officers or employees of the corporation whom the director reasonably believes are reliable and competent in such matters; (2) legal counsel, public accountants or other persons as to matters the director reasonably believes are within their professional or expert competence; or (3) a committee of directors upon which the director does not serve, duly established in accordance with the articles or regulations, as to matters within its designated authority that the director reasonably believes to merit confidence.  Ohio Rev. Code § 1701.59(C).  Corporate officers also are entitled to rely on similar information prepared or presented by directors, officers, or employees whom the officer believes are reliable and competent, and counsel, public accountants, or other persons as to matters which the officer reasonably believes are within the person's professional or expert competence.  Ohio Rev. Code*.* § 1701.641(B)(1) & (2).

### 2.    Duty of Loyalty.

The duty of loyalty mandates that fiduciaries cannot use their position of trust for their own benefit or appropriate for themselves an opportunity which properly belongs to the company.  *Blue Fire Capital, LLC v. Pies & Pints Dev. Partners, LLC*, No. 21-4098, 2023 U.S. App. LEXIS 17963, *13 (6th Cir. July 13, 2023).  The duty of loyalty requires that the best interests of the corporation and its shareholders take precedence over any personal interest or bias of a director or officer not shared by the shareholders generally.  *Id*. at *14; *see also* Ohio Rev. Code §§ 1701.59(B) & 1701.641(B).  All transactions between directors and officers of the

corporation must be fair and reasonable to the corporation, conducted in the utmost good faith, and on an arms-length basis. *See* Ohio Rev. Code § 1701.60.

If a director has an interest in a transaction that differs from, or is in addition to, the interests of the shareholders, that interest must be fully disclosed to the rest of the board so a decision may be reached as to whether the interested director should abstain from deliberations and voting on the transaction. *See id.* Self-dealing by directors and officers for personal profit at the expense of the corporation violates the duty of loyalty, unless the transaction is approved by disinterested directors and shareholders who are fully informed of the conflict. *See* Ohio Rev. Code § 1701.60; *see also Antioch Litig. Trust v. McDermott Will & Emery LLP*, 738 F. Supp. 2d 758, 766 (S.D. Ohio 2010) (citing Ohio Rev. Code § 1701.60); *United States v. Skeddle*, 940 F. Supp. 1146, 1150 (N.D. Ohio 1996) ("In Ohio self-dealing for personal profit at the expense of the employer violates the duty of loyalty."). As the Sixth Circuit explained in a case applying Ohio law:

> When a director breaches his duty of trust and benefits at the expense of the corporation, under Ohio law the director is liable for any profits he received. It matters not that the director acted absent actual fraudulent intent; as long as the director places himself in a position of conflicting loyalties and subsequently violates his primary obligation to the corporation, liability attaches.

*United States v. Skeddle*, 989 F. Supp. 873, 882 (N.D. Ohio 1997) (quoting *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir. 1980)).

### 3.    Business Judgment Rule.

The business judgment rule is a rebuttable "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Reister v. Gardner*, 164 Ohio St. 546, 2020-Ohio-5484, 174 N.E.2d 713, at ¶ 12 (quoting *Aronson v. Lewis*, 473

A.2d 805, 812 (Del. 1984)).  The rationale underlying the business judgment rule is avoidance of second-guessing of director decisions in a business environment in which information can be costly and judgment calls must often be made on the basis of imperfect or incomplete information.  The rule reflects judicial recognition "that directors are better equipped than the courts to make business judgments." *Tuttle v. Collins*, 2020-Ohio-4062, ¶ 30 (8th Dist.).  A party challenging a board's decision bears the burden of rebutting the presumption that the decision was a proper exercise of business judgment.  *NCS Healthcare, Inc. v. Candlewood Partners, L.L.C.*, 160 Ohio App. 3d 421, 2005-Ohio-1669, 827 N.E.2d 797, ¶ 26 (8th Dist.); *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009).

For directors, Ohio Revised Code § 1701.59(D)(1) codifies the business judgment rule and provides that a director shall not be found to have violated the director's duties unless the plaintiff has proved by clear and convincing evidence that the director has not acted in good faith, in or not opposed to the best interests of the corporation, or with due care.  Ohio Revised Code § 1701.641(C)(1) sets out the business judgment rule for corporate officers, also requiring clear and convincing evidence to overcome the protections of the rule.  Although Ohio corporate law generally aligns with Delaware law on most issues, Ohio's codification of the business judgment rule is actually stronger than Delaware's common-law business judgment rule.  Ohio requires clear and convincing evidence to rebut the presumption of the business judgment rule, whereas Delaware law applies the usual preponderance standard.  *See Gavin v. Tousignant (In re Ultimate Escape Holdings, LLC)*, 551 B.R. 749, 762 (D. Del. 2016).

The business judgment rule applies to a director's or officer's actions unless the claimant establishes a conflict of interest, lack of due care, abuse of discretion, or lack of good faith.  *See Gries Sports Enters., Inc. v. Cleveland Browns Football Co.*, 26 Ohio St. 3d 15, 20, 496 N.E.2d

959 (1986); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995).  Once a

claimant establishes that the business judgment rule does not apply, the standard of review

transitions to the "entire fairness standard," discussed below.  The burden of proving fairness

rests on the defendant.  *In re Match Group, Inc. Derivative Litig.*, 315 A.3d 446, 465 (Del.

2024).  Directors and officers "cannot claim protection of the business judgment rule when they

have ... breached the duty of loyalty."  *Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 866

(S.D. Ohio 2013) (quoting *Kelly v. Wellsville Foundry Inc.*, No. 99-CO-27, 2000 Ohio App.

LEXIS 6287, *24 (Ohio App. Dec. 6, 2000)).

### 4.      Determination of Director or Officer Liability for Damages.

In Ohio, personal liability for damages against a corporate director or officer is

determined under a gross negligence standard.  For directors, damages for breach of fiduciary

duty requires proof by clear and convincing evidence "that the director's action or failure to act

involved an act or omission undertaken with deliberate intent to cause injury to the corporation

or undertaken with reckless disregard for the best interests of the corporation.  Ohio Rev. Code

§ 1701.59(E).  The standard is the same for corporate officers.  Damages may be imposed only

"if it is proved by clear and convincing evidence in a court of competent jurisdiction that the

officer's action or failure to act involved an act or omission undertaken with deliberate intent to

cause injury to the corporation or undertaken with reckless disregard for the best interests of the

corporation."  *Id*. § 1701.641(D).

Before imposing liability, the conduct of each director or officer is considered separately.

Both Delaware and Ohio law make director liability determinations on an individual basis, rather

than evaluating, for example, the conduct of the board as a whole and imposing, or not imposing,

liability on all directors equally.  *Official Comm. of Unsecured Creditors of HH Liquidation,*

16

*LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 274 (Bankr. D. Del. 2018) (citing *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 252 (Del. Ch. 2014)) ("Liability is assessed on a director-by-director basis."); *Huang*, 144 Ohio App. 3d at 296 (applying Delaware law and stating that "[t]he actions of interested directors are evaluated according to a higher standard of review than those of disinterested directors").

**B.    Specific Applications of the Law Relevant to Big Lots.**

In addition to the above general law, certain transactions and events may give rise to the application of specific legal principles governing the conduct of directors and officers.  During the time period January 1, 2020, to present, Porter Wright identified the following events/transactions at Big Lots that warrant discussion of these specific principles:  (1) the payment of dividends; (2) the buy-back of shares; and (3) payments under key employee retention plans (KERPs).

**1.    Dividend Payments.**

Ohio Revised Code § 1701.33 allows directors to declare dividends and distributions on outstanding shares of the company unless the corporation is insolvent or there is reasonable grounds to believe that by the dividend payment it would render the corporation insolvent. *Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Natl. Century Fin. Ents.)*, 617 F. Supp. 2d 700, 722 (S.D. Ohio 2009).

Ohio Revised Code § 1701.95 imposes liability on directors who participate in the payment of improper dividends.  Section 1701.95(A)(1)(a) states that "directors shall be jointly and severally liable to the corporation … if they vote for or assent to … [t]he payment of a dividend or distribution, the making of a distribution of assets to shareholders, or the purchase or redemption of the corporation's own shares, contrary in any such case to law or the articles."

17

Section 1701.95(A)(2)(a) states that "[i]n cases under division (A)(1)(a) of this section, directors shall be jointly and severally liable up to the amount of the dividend, distribution, or other payment, in excess of the amount that could have been paid or distributed without violation of law or the articles but not in excess of the amount that would inure to the benefit of creditors of the corporation if it was insolvent at the time of the payment or distribution or there was reasonable ground to believe that by that action it would be rendered insolvent, plus the amount that was paid or distributed to holders of shares of any class in violation of the rights of holders of shares of any other class."  Directors are shielded from liability, however, by Section 1701.95(B)(1), which states:

> A director is not liable under division (A)(1)(a) or (b) of this section if, in determining the amount available for any dividend, purchase, redemption, or distribution to shareholders, the director in good faith relied on a financial statement of the corporation prepared by an officer or employee of the corporation in charge of its accounts or certified by a public accountant or firm of public accountants, the director in good faith considered the assets to be of their book value, or the director followed what the director believed to be sound accounting and business practice.

Unlike claims for breach of fiduciary duty, which are subject to a 4-year statute of limitations, claims for violation of Ohio Revised Code § 1701.95 are subject to a 2-year statute of limitations that accrues on the date of the violation.  Ohio Rev. Code § 1701.95(F).

## 2.    Stock Repurchase Plans.

While case-law recognizes that stock or share repurchase plans can vary, the repurchase plan cannot be inequitable.  *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387 (Del. 1995) (citing *Unocal Corp v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985)).  Often times, a repurchase plan is used to remove a threat to control or other perceived threat, to boost the stock price, or incentivize employees.  *See id.*; *Simons v. Brookfield Asset Mgt.*, Ch. No. 2020-

18

0841-KSJM, 2022 Del. Ch. LEXIS 15, *8 (Del. Ch. Jan. 21, 2022); *Jalovec v. Therma-Tru Corp.*, No. L-93-323, 1994 Ohio App. LEXIS 4066, *3 (Ohio App. Sept. 16, 1994).

Under Ohio law, a corporation may purchase its shares: (1) to collect or compromise a debt, (2) if the articles authorize redemption of shares, (3) to avoid or eliminate fractional shares, (4) to retain shares from a subscriber who has not paid for the same in full, (5) to grant the option or offer for sale of shares to employees, (6) to pay fair cash value to a dissenting shareholder, and (7) when authorized by two-thirds of shareholders. Ohio Rev. Code § 1701.35(A). A corporation may not repurchase its own shares if the corporation is insolvent or if, immediately after the repurchase, the corporation's assets would be less than its liabilities or the corporation would be rendered insolvent. *See* Ohio Rev. Code § 1701.35(B); *see also Milo v. Milo Co.*, No. 15251, 1992 Ohio App LEXIS 3143, *2 (Ohio App. June 17, 1992); *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997). Ohio Revised Code § 1701.35 requires a corporation to strictly adhere to the statute's provisions to repurchase its own shares. *See Lowry v. Sunday Creek Coal Co.*, 2 Ohio App. 2d 260, 207 N.E.2d 678 (1964) (syllabus).

Similar to improper dividend payments, Ohio Revised Code § 1701.95 imposes liability on directors who authorize the improper redemption of the corporation's shares. Ohio Rev. Code § 1701.95(A)(1)(a). The same provisions that govern liability for improper dividend payments also govern liability for improper redemptions, including the good-faith reliance provision of Section 1701.95(B)(1) and the 2-year statute of limitations of Section 1701.95(F).

### 3.    Key Employee Retention Plans and Executive Compensation Generally.

A corporation's directors may set executive compensation or appoint a committee and delegate to the committee responsibility for setting executive compensation. *Feuer v. Redstone*, Ch. No. 12575-CB, 2018 Del. Ch. LEXIS 127, *27 (Del. Ch. Apr. 19, 2018). In general,

executive compensation is measured by the value of the services rendered. *Berwitz v. Humphrey*, 163 F. Supp. 78, 92 (N.D. Ohio 1958). This does not mean, however, that the value of the services must be precisely balanced with the amount of the compensation. *Id.* A board's decision on executive compensation is "entitled to great deference." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (internal citations omitted).

These same principles apply to payments made under key employee retention plans (KERPs) made prior to a bankruptcy petition. In general, a KERP is a compensation program designed to provide economic incentives to critical employees as an inducement to remain at the company and assist the company in the reorganization process. Following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the use of a KERP is sharply restricted after a corporation has entered bankruptcy. KERPs, however, are still freely permitted pre-petition and have become a common method for companies preparing to file for bankruptcy to ensure that their key executives stay on board during the reorganization. Pre-petition KERPs are analyzed under normal business judgment principles applicable to executive compensation generally.

## VI.    WHETHER ANY COLORABLE CLAIMS FOR BREACH OF FIDUCIARY DUTY MAY BE MADE AGAINST BIG LOTS' DIRECTORS AND OFFICERS FOR TRANSACTIONS, ACTS, AND OMISSIONS FROM JANUARY 1, 2020, TO THE PRESENT.

Whether a director or officer of Big Lots violated their fiduciary duties necessarily requires analysis of the precise circumstances surrounding the transaction and the director's or officer's acts or omissions. Breach of fiduciary duty cases are fact-specific. As such, they require the exercise of judgment by the individual or individuals tasked with deciding whether a company's directors or officers have violated their duties. Here, Porter Wright's analysis of fiduciary duties focused on transactions and other events from January 1, 2020, to the present.

As noted, Porter Wright reviewed the board and committee minutes (including the board and committee packages), SEC filings, and other documents relevant to this period. Porter Wright also interviewed 18 current or former directors and officers of Big Lots. Porter Wright's analysis also was informed by legal research and the high bar to liability created by the business judgment rule that has been codified in Ohio Revised Code §§ 1701.59 and 1701.641.

Porter Wright found no specific allegations of wrongdoing against Big Lots' directors or officers during the period January 1, 2020, to the present. The only exception, as noted above, is the Lawsuit filed in Franklin County, Ohio, alleging an unlawful campaign for control of Big Lots in violation of Ohio Revised Code § 1707.043 and naming former director Aaron Goldstein as a defendant. Otherwise, Porter Wright uncovered no shareholder demands, whistleblower claims, governmental investigations, or any other matters in which the company's directors or officers were accused of misconduct or unlawful activity. Big Lots also maintained and publicly disclosed an ethics hotline ((866) 834-REAL) at all times during the relevant time period and invited employees or third parties to call the hotline or write to the company's Ethics Department to anonymously report any ethical concerns. During the relevant time period, there were no calls to the ethics hotline or written reports to the Ethics Department concerning any of Big Lots' directors or executive officers.

Likewise, no individual whom Porter Wright interviewed made any allegation of wrongdoing against any director or officer. To the contrary, many of the individuals interviewed commented on how professional the board and management team were and how they always acted by the book. Former board member Nancy Reardon, who served on the board from 2015 through May 2024, remarked that Big Lots' board was "squeaky clean," and "not one to push the envelope." Former board member Sandra Campos, who served on the board from April 2021

through May 2024, commented that the board was "extraordinarily professional."  And Big Lots'
President and CEO Bruce Thorn, who also sits on the board, described the board as a "blue
ribbon board" that was the most "studious" board he has ever sat on.

Each of the 18 individuals interviewed were directly asked, among other things, whether,
during the time period January 1, 2020, through the present, (1) anyone voiced any ethical
concerns to them involving a director or officer of the company; (2) they voiced any ethical
concerns involving a director or officer of the company; (3) they were aware of any decisions by
the board or the company's officers that diverged from advice of counsel, accountants, or
advisors; (4) they were aware of any claims or allegations against any director or officer of the
company; (5) they were aware of any interested director/officer transactions; (6) they were aware
of any decisions by the board or the company's officers that diverged from company policy or
protocol; (7) they were aware of any conduct by any board member or officer of the company
that was concerning in any way; (8) they were aware of any alleged financial or accounting
irregularities; (9) they were aware of any unusual or suspicious trading activity by any director or
officer of the company; or (10) they were aware of any decision by the board or any officer of
the company that exceeded the board's or the officer's authority or did not go through the
necessary voting or approval process.  Every individual interviewed decisively answered "no" to
each of those questions.  A common sentiment expressed throughout the interviews was that,
although the directors and officers were disheartened by the bankruptcy filing, they were each
strident in their belief that every member of the board and management team had at all times
acted in a deliberative, reasoned, and informed manner and made the decisions they reasonably
believed were in the best interest of the company and its shareholders at the time.

The board and committee minutes also reflect this.  Indeed, during the time period January 1, 2020, through the present, there has been only one board vote that has been less than unanimous.  That vote concerned the board's decision in February 2023 to continue the quarterly $0.30/share dividend that had been in place since the first quarter of 2018.  Former board member Marla Gottschalk was the sole dissenting vote on that issue, but she respected the board's decision to continue the dividend at that time and believes the board made an informed decision to do so.  Big Lots' management had provided the Capital Allocation Planning Committee with data on active investor perception of dividend cuts along with materials prepared by an independent investment banking firm, which set forth data on dividend yield benchmarks, motivations for dividend cuts, and the market's reaction to dividend cuts.  As was the case for every quarterly dividend made during the relevant period, the Capital Allocation Committee's recommendation and the board's decision to declare a dividend were supported by memoranda from Big Lots' Chief Financial Officer and General Counsel and financial statements affirming that the dividend was legal and that the company had sufficient statutory capital, was not insolvent, and would not be rendered insolvent as a result of the dividend.  At that time, the management recommended maintaining dividends with the assumption that Big Lots would be performing in line with certain expectations, and the Capital Allocation Planning Committee unanimously agreed with that approach.  The board unanimously voted to suspend the dividend the following quarter, in May 2023.  Again, that vote was based on a unanimous recommendation by the Capital Allocation Planning Committee and management's recommendations, which in turn were informed by relevant data points including liquidity, dividend yield and payout ratio, and peer benchmarking data provided by third-party advisors.

The board and management team acted in a similarly deliberative and informed manner regarding Big Lots' share repurchase programs approved in August 2020 and November 2021. In both cases, management had provided the Capital Allocation Planning Committee with financial statements and projections showing sufficient liquidity and solvency and data showing that the company's stock was trading below its intrinsic value. The board's decisions were thus consistent with Big Lots' Capital Allocation Philosophy and Principles at the time, which stated that the company would execute share repurchases when it had available liquidity and when its stock was undervalued. The August 2020 share repurchase program was also based on the recommendation and materials provided by an independent investment banking firm. The board unanimously voted to suspend the November 2021 program in May 2022 based on the recommendation of management due to liquidity concerns.

Decisions on matters of executive compensation were also squarely in line with the business judgment rule. During the relevant time period the Compensation Committee retained Meridian Compensation Partners, LLC ("Meridian") to advise it on matters of executive and director compensation. Meridian provided the Human Capital and Compensation Committee with comprehensive data points, including executive compensation benchmarking data, and Meridian participated in designing incentive plans. Not once during the relevant time period did the Human Capital and Compensation Committee or the board diverge from Meridian's recommendations.

The board went even further in its diligence concerning the Key Employee Retention Plan (KERP) approved in August 2024. In May 2024, Big Lots engaged Willis Tower Watson ("WTW"), a consulting firm with niche expertise in KERPs, to develop the KERP (and to propose a Key Employee Incentive Plan (KEIP) that was ultimately not adopted) and provide

related benchmarking and market data to the Human Capital and Compensation Committee and the board. The Human Capital and Compensation Committee and the board met multiple times over the course of many weeks to consider and discuss matters related to a potential KERP and consulted with outside consultants and investment banks, outside counsel, and an external public relations firm before unanimously voting to approve the KERP.

## VII.    CONCLUSION.

Porter Wright performed a tremendous amount of work in a compressed amount of time to complete its internal investigation.  But despite the expedited nature of the investigation, Porter Wright can say with a high degree of confidence that we do not believe there are any colorable claims for breach of fiduciary duty against Big Lots' current or former board members or principal executive officers.  This is especially true given the high threshold in Ohio for recovering damages against directors and officers for an alleged breach of fiduciary duty.  In fact, Porter Wright's investigation did not uncover any facts that would even remotely approach the type of facts necessary to overcome the strong protections of the business judgment rule under Ohio law.  Porter Wright also uncovered no evidence to suggest any impropriety in the issuance of dividends or the repurchase of shares.  Nor did Porter Wright uncover any facts that even remotely suggested a conflict, the appearance of a conflict, or any other circumstances that would negate operation of the business judgment rule during the time period January 1, 2020, to the present.

*CONFIDENTIAL*
**INDEPENDENT INVESTIGATION REPORT – BIG LOTS, INC.**

## APPENDIX

List of Supplemental Materials Supporting the Investigation:

1.    List of Interview Memoranda:

    a.    Interview of Kim Newton – 2024.11.05

    b.    Interview of Nancy Reardon – 2024.11.04

    c.    Interview of Sandra Campos – 2024.11.03

    d.    Interview of Margarita Giannantonio – 2024.11.04

    e.    Interview of Marla Gottschalk – 2024.11.04

    f.    Interview of Ronald A. ("Rocky") Robins, Jr. – 2024.11.05

    g.    Interview of Bruce K. Thorn – 2024.11.05

    h.    Interview of Jonathan Ramsden – 2024.11.05

    i.    Interview of Christopher McCormick – 2024.11.04

    j.    Interview of Michael A. Schlonsky – 2024.11.04

    k.    Interview of Cynthia T. Jamison – 2024.11.04

    l.    Interview of Lisa Bachmann – 2024.11.05

    m.    Interview of Andrew C. Clarke – 2024.11.04

    n.    Interview of Jeffrey Berger – 2024.11.04

    o.    Interview of Maureen Short – 2024.11.04

    p.    Interview of Sebastian DiGrande – 2024.11.04

    q.    Interview of Wendy Schoppert – 2024.11.05

2.    List of Additional Memoranda:

    a.    Personnel Documents Reviewed for Investigation – 2024.11.06

    b.    Information Gathered from Personnel File Review – 2024.11.06

c.       Summary of Procedures for Personnel File Review – 2024.11.06

d.       Memo re Review of SEC Filings– 2024.11.07

e.       Memo re Big Lots Materials Reviewed – Sent from Davis Polk – 2024.11.08

f.       Memo re Review of Bankruptcy Docket – 2024.11.08

g.       Memo re Review of Litigation Involving Big Lots – 2024.11.08 (with three attachments)

h.       Memo re Review of Big Lots Board/Committee Materials – 2024.11.08