**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>**Related to D.I. 18, 981, 992, 1154** |

**1903P LOAN AGENT, LLC'S REPLY TO OBJECTIONS OF**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**AND BLUE OWL REAL ESTATE CAPITAL LLC TO SALE**

1903P Loan Agent, LLC ("DIP Term Agent"), through its undersigned counsel, submits this reply to (a) the *Limited Objection of the Official Committee of Unsecured Creditors* (the "Committee") *to Proposed Sale of Substantially All of the Debtors' Assets* (D.I. 981) (the "Committee Sale Objection"), (b) *Blue Owl Real Estate Capital LLC's* ("Blue Owl") *Objection to the Proposed Sale of Substantially All of the Debtors' Assets and Joinder in Support of the Official Committee of Unsecured Creditors' Sale Objection* (D.I. 992) (the "Blue Owl Sale Objection"), and (c) the *Supplemental Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially All of the Debtors' Assets* (D.I. 1154) (the "Committee Supplemental Sale Objection," and together with the Committee Sale Objection and the Blue Owl Sale Objection, the "Sale Objections") and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.  These cases stand at a crossroads, and only two viable paths lie ahead. The first path is approval of the Debtors' proposed going concern sale on the terms proposed by the Debtors—which by its terms requires payment of the Debtors' secured lenders in full in cash at closing. The second path is an immediate "pivot" to an orderly liquidation of the Debtors' assets. There is no viable third alternative as suggested by the Committee and Blue Owl. Indeed, unless

rejected by this Court, the Sale Objections risk a disorderly liquidation and impairment of not only the Debtors' secured lenders but also administrative creditors, including landlords and trade creditors.

2. The Committee and Blue Owl appear to dismiss this eventuality and seek to have their cake and eat it too. Notably, neither goes so far as objecting wholesale to the proposed sale; they each expressly support the proposed Sale "in principle." And there is ample reason for the Committee as a whole to support the proposed sale. The proposed sale will result in upwards of $250 million of administrative claims being assumed by the Nexus Buyer or funded and paid by the Debtors, such as rent cures, section 503(b)(9) claims, and other unsecured claims, and including $7.5 million to fund a wind-down budget. Any mention of this substantial benefit is glaringly absent from the Sale Objections, however. In seeking the relief that they seek in their Sale Objections, the Committee and Blue Owl seek to have the best of all worlds: close the proposed sale and obtain cash proceeds to pay administrative claims, but escrow the sale proceeds to allow for the possibility of indefinite litigation against the secured lenders as part of a Challenge, ignoring Court-ordered provisions requiring payment in full. Their proposal seems to be unprecedented (indeed, they have cited none), and further is unworkable for several key reasons.

3. First and foremost, the Committee's and Blue Owl's proposals fail to provide the DIP Term Agent with adequate protection as required by the Bankruptcy Code. The Committee's and Blue Owl's proposals would leave the DIP Term Agent exposed to a material risk of nonpayment of obligations that are currently fully secured obligations under the Final DIP Order. Nor does Blue Owl's (and now the Committee's) concept of an escrow resolve this infirmity, as the amounts of the indemnification obligations and future interest to which the DIP Term Agent is

entitled are not subject to being accurately estimated should the currently fluid potential Challenge be litigated.

4. Second, if adopted, the proposals would contravene the express terms of the Final DIP Order and the Bidding Procedures Order (neither of which were opposed by the Committee or Blue Owl). Indeed, the proposals fly in the face of the basic agreement since the outset these cases whereby the Nexus APA and any alternative bids for the Debtors' assets must provide for payment of the Debtors' secured lenders in full in cash at closing. All major actions taken in these cases have been taken on the basis of that agreement, including substantial new money funding being provided and consent to use of cash collateral to fund a sale process and a going concern business plan for the first few months of these cases that included budgeted items for section 503(b)(9) and other prepetition claims, stub rent and new inventory purchases. That agreement has been reflected in the operative documents and Court orders from the beginning and consistently throughout these cases, and was specifically confirmed most recently on the record at the Auction with no objection from the Committee. *See* Auction Tr. 13:25-15:3. For the fundamental bargain in these cases to be changed at the last step is highly inequitable, and should not be countenanced by this Court.

5. Given these facts, if the Court were to enter an order approving the Sale without requiring payment of the Debtors' secured lenders in full in cash at closing, the DIP Term Agent would have little choice but to declare an event of default under the Final DIP Order and revoke its consent to use of cash collateral, to ensure that its collateral is not used instead to pay junior creditors. Those steps may also (unfortunately) put at risk the closing of the Sale itself, including due to Debtors' failure to satisfy closing conditions, and would introduce a greatly increased likelihood of administrative insolvency of these estates. Put simply, if the Committee and Blue

8212225.1

Owl were permitted to actually force the Debtors down their purported third path, they would be tugging a string that could lead to unraveling the Sale, intentionally or not.

6. Of course, any Challenge that remains pending at the time of a potential closing of the Sale will have similar disruptive effects on the closing of the Sale itself (because the purchase price becomes impossible to calculate in light of the pending Challenge and because the Challenge creates potential allocation and priority issues among lenders that may not be resolvable prior to closing). The Committee and Blue Owl will need to carefully consider the potential consequences to their constituents in light of these factors, and the purported value of any Challenges to those constituents, and proceed accordingly. But for now, the Court should overrule the Sale Objections for the reasons set forth herein.

## BACKGROUND

### A. The Salient Terms of the Nexus APA, the Final DIP Order, and the Proposed Sale

7. On September 9, 2024, the Debtors filed the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (D.I. 18) (the "Bidding Procedures Motion").

8. The Bidding Procedures Motion attached as Exhibit C an executed Asset Purchase Agreement, dated as of September 8, 2024, by and among Gateway BL Acquisition, LLC, an affiliate of Nexus Capital Management LP (the "Nexus Buyer") and the Debtors (the "Nexus

APA"), which the Debtors designated as the proposed stalking horse bid for substantially all of their assets.

9. Under the Nexus APA, the purchase price that the Nexus Buyer is obligated to deliver is as follows:

- at the closing, the Debt Payoff Amount, payable by wire transfer as instructed in certain payoff letters directing payment to the Debtors' secured lenders;
- At the closing, $2.5 million, payable by wire transfer (or release of deposited funds) to accounts designated by the Debtors; and
- assumption of the Assumed Liabilities.

*See* Nexus APA, §§ 3.01; 4.02.

10. The Debt Payoff Amount is defined in the Nexus APA to mean essentially all unpaid obligations owing pursuant to the Debtors' secured lenders' respective credit agreements, including contingent obligations for indemnification to the extent a claim has been made.[1]

11. The proposed Bidding Procedures attached to the Bidding Procedures Motion required that any alternative bid or collection of partial bids could only be considered if it provided for a purchase price "sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion." As described below (see ¶ 19), the Court approved these requirements in the October 25, 2024 Bidding Procedures Order.

12. On October 20, 2024, the Debtors filed a proposed form of sale order which contains language requiring payment in full in cash at closing consistent with the Nexus APA and the then-proposed Bidding Procedures, as follows:

---

[1] "Debt Payoff Amount" (as defined in the Nexus APA) means "the amount of cash necessary to pay in full the Repaid Indebtedness (excluding any contingent indemnification obligations for which no claim has been made as of the date of such payment)." "Repaid Indebtedness" (as defined in the Nexus APA) means, "collectively, the ABL DIP Obligations, the Pre-Petition ABL Obligations, the Term DIP Obligations and the Pre-Petition Term Obligations." These terms are defined the Nexus APA by incorporating the definitions of the respective obligations under the DIP and prepetition ABL and term credit agreements.

5

8212225.1

> At the Closing, the Debtors shall transfer, or cause to be transferred, proceeds generated from the sale of the Assets contemplated herein to the DIP Agents and the Prepetition Agents, as applicable, which shall be in an amount not less than necessary to fully fund the following two items and shall be applied as follows: (i) first, to fully fund the Carve Out Reserves in accordance with the DIP Orders (whereupon such funding, the DIP Credit Parties and Prepetition Secured Creditors shall have no further obligation to fund the Carve Out Reserves); and (ii) second, for permanent application against the DIP Obligations and the Prepetition Secured Obligations in accordance with the terms and conditions of the DIP Orders and the DIP Loan Documents until the DIP Obligations and the Prepetition Secured Obligations have been Paid in Full (which for the avoidance of doubt includes amounts used to fund the Carve Out in item (i)).

*Notice of Filing of (I) Revised Proposed Bidding Procedures Order and (II) Proposed Stalking Horse Sale Order*, dated October 20, 2024, Ex. C, ¶ 18 (D.I. 558-3).  The term "Paid in Full" as used in paragraph 18 of the proposed order approving the Sale has the meaning set forth in the Final DIP Order (as defined below).  *Id*. at ¶ 6, footnote 4.

13. On October 22, 2024, the Court entered the *Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* (D.I. 584) (the "Final DIP Order").

14. "Paid in Full" (as defined in the Final DIP Order) means:

> the indefeasible repayment in full in cash of all obligations (**including** principal, accrued and unpaid interest and fees, reimbursable expenses and **indemnities, other than contingent indemnification obligations for which no claim has been asserted and threatened**, and all other amounts due and owing by the Debtors) under the applicable credit facility and this Final Order, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable facility **and that each of the Prepetition Agents, Prepetition Lenders, DIP Agents and DIP Lenders, as the case may be, shall have received a release from each Debtor** and the Committee of and from all demands, actions, causes of action, suits, covenants, contracts,

6

8212225.1

controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities (including, without limitation any obligations or liabilities of any kind related to the Carve-Out upon payment in full of the Prepetition Secured Obligations or DIP Obligations) in form and substance acceptable to Prepetition Agents or DIP Agents, as applicable or **in the case of the Committee, instead of such release, (A) if the Challenge Deadline (as defined in this Final Order) has not elapsed, a written notice or other confirmation that no Challenge or any other claims of any kind (including with respect to the Carve-Out upon payment in full of the Prepetition Secured Obligations or DIP Obligations) will be asserted or (B) if the Challenge Deadline has elapsed, then no Challenge or any other claim has been asserted or any Challenge or other claim asserted has been dismissed pursuant to a final, non-appealable order of a court of competent jurisdiction and a written notice or other confirmation that no claim of any kind with respect to the Carve Out will be asserted against any Prepetition Agent, Prepetition Lender, DIP Agent or DIP Lender**.

Final DIP Order, ¶ H n.5 (emphasis added).

15. To summarize, the DIP Term Agent is entitled to a release from the Debtors in form and substance acceptable to it at the time of being Paid in Full (which the current draft of the proposed Order approving the Sale currently provides[2]), and to coverage for indemnification obligations so long as a claim has been asserted or even threatened. The Committee does not need to give a similar release to satisfy the definition of Paid in Full but instead just needs to confirm either:

- if the Challenge Deadline has not expired, that no Challenge or any claims of any kind will be asserted, or
- if the Challenge Deadline has expired and either (i) no Challenge has been asserted or (ii) any Challenge that has been asserted has been dismissed by a final order, that no claim of any kind with respect to the Carve Out (as defined in the Final DIP Order) will be asserted.

16. Notably, the foregoing does not contemplate any circumstances whereby Paid in Full could have occurred while a Challenge remains outstanding.

---

[2] As is required in order for the Paid in Full definition to be satisfied, the Debtors are contemplated to provide the Debtors' secured lenders a full and final release at closing under the terms of the proposed order approving the Sale. *See* D.I. 558-3, ¶ 52.

7

8212225.1

17. The DIP Term Agent, each of the term lenders, and various of their related parties are entitled to a broad indemnification (under Section 9.03 of both the DIP and prepetition term Credit Agreements) from the Debtors, subject to an exclusion for claims determined by a court to have resulted from gross negligence, bad faith, or willful misconduct.[3] As noted above, these indemnification obligations are required to be satisfied under the Nexus APA, the proposed form of order approving the Sale, and the Final DIP Order.

18. The Final DIP Order contains the following Milestones, among others: (i) on or before December 1, 2024, the Bankruptcy Court shall approve the Sale pursuant to an order in form and substance acceptable to the DIP Agents and (ii) on or before December 13, 2024, the Debtors shall consummate the Sale which shall result in the DIP Agents and Prepetition Agents being indefeasibly Paid in Full in Cash, except as otherwise agreed to by the DIP Agents. The Debtors' failure to satisfy these Milestones constitute events of default under the Final DIP Order. *See* Final DIP Order, ¶ 21.

19. On October 25, 2024, the Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* (D.I. 612) (the "Bidding Procedures Order"), which among other things, (i) approved the Nexus Buyer's entitlement to certain bid

---

[3] Specifically, Section 9.03(b) of both the DIP Term Credit Agreement and the Prepetition Term Credit Agreement provides for indemnification by the Debtors in favor of Administrative Agent and each Lender, and each Related Party of any of them (each an "Indemnitee") against any and all losses, claims, damages, liabilities and related expenses ("Losses") incurred by any Indemnitee or asserted against any Indemnitee by any Person arising out of, in connection with, or as a result of, among other things, any actual or prospective claim, litigation, investigation or proceeding relating to the loan transactions thereunder; other than (i) Losses that are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, or willful misconduct of such Indemnitee and (ii) Losses arising from certain actions between Indemnitees.

8212225.1

protections as the Debtors' stalking horse bidder, and (ii) approved certain Bidding Procedures attached thereto as Exhibit 1 (the "Bidding Procedures") which contained the same requirements originally contained in the previously proposed version of the Bidding Procedures attached to the Bidding Procedures Motion whereby any alternative bid or collection of partial bids could only be considered if it provided for a purchase price "sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion."[4]

20. Moreover, with respect to timing of payment, the provisions of the Bidding Procedures Order and the Bidding Procedures explicitly require payment in full at closing prior to setting aside other funds from the proceeds of the Sale. *See, e.g.*, Bidding Procedures Order, ¶¶ 18, 33; Bidding Procedures, ¶ 4.

21. On October 30, 2024, the Debtors filed a *Notice of Successful Bidder for the Sale of the Debtors' Assets* (D.I. 661) (the "Notice of Successful Bidder") which announced that at an auction that day (the "Auction")[5] the Debtors selected, as highest and best, the bid of the Nexus Buyer pursuant to the Nexus APA, with certain modifications read into the record at the Auction and attached to the Notice of Successful Bidder as Exhibit A, and which will be reflected in an amended Nexus APA to be filed with the Court in advance of the hearing to approve the Debtors' sale to the Nexus Buyer (such proposed transaction as modified, the "Sale"). The amendments to the Nexus APA do not affect the Debt Payoff Amount.

---

[4] On October 20, 2024, the Debtors filed a redline comparison of the two versions of the Bidding Procedures. *See Notice of Filing of (I) Revised Proposed Bidding Procedures Order and (II) Proposed Stalking Horse Sale Order*, dated October 20, 2024, Ex. B (D.I. 558-2).

[5] At the Auction, counsel for the DIP Term Agent and the DIP ABL Agent each requested specific confirmation that, despite the announced modifications to the Nexus APA, their respective debt was still contemplated to be paid in full, which counsel for the Debtors confirmed. *See* Auction Tr. 13:25-14:12. Committee counsel was present during the Auction and raised no objection to this point. *See* Auction Tr. 14:13-15:3.

8212225.1

B. **The Sale Objections**

22. On November 6, 2024, the Committee and Blue Owl filed the Committee Sale Objection and the Blue Owl Sale Objection. The objections were filed before the Sale hearing was adjourned to November 21, 2024 and before the Challenge Period was extended on consent (as described below) to November 18, 2024.

23. The Committee Sale Objection voices support for the Sale "in principle" but objects to approval of the Sale on the basis that the Committee opposes: (i) inclusion in the Sale of any litigation claims (and related insurance) that are not necessary to operation of the go-forward business and (ii) a proposed amendment to the Nexus APA that would give the Successful Bidder the right to designate the Debtors' leases for assumption and assignment at any time prior to the effective date of a chapter 11 plan. The Committee Sale Objection specifically discusses claims against the Debtors' secured lenders as among those it wants to preserve for future litigation, and accordingly suggests that the following provision be added to the order approving the Sale: "In the event the Committee timely commences a Challenge, the Committee's right to seek an equitable remedy to protect the estates' interests pending determination of such Challenge shall be expressly preserved, and the Court shall be authorized to fashion an equitable remedy to address such Challenge."

24. The Blue Owl Sale Objection joins "in substance" in the Committee Sale Objection and further requests that, instead of payment in full in cash of the Debtors' secured obligations at closing of the Sale as currently contemplated, "the Sale should provide for an escrow into which proceeds are deposited subject to the resolution of any Challenge."

8212225.1

25. In the early hours of November 19, 2024, the Committee filed the Committee Supplemental Sale Objection, in which the Committee, among other things, adopts Blue Owl's proposed escrow concept.

**The Challenge Deadline**

26. The Final DIP Order established the Challenge Deadline as November 7, 2024 at 12:00 p.m. (ET). *See* Final DIP Order, ¶ 42.

27. On November 5, 2024, the Court issued an oral ruling extending the Challenge Deadline to November 15, 2024 at 12:00 p.m. (ET) for the Committee and Blue Owl only, and entered an order on November 8, 2024 providing for the same (D.I. 1052). The DIP Term Agent had previously advised the Court and parties that it consented to the extension of the Challenge Deadline to November 15, 2024 at 12:00 p.m. (ET) for the Committee and Blue Owl.

28. By November 13, 2024, the DIP Term Agent, the ABL Agent, the Committee, and Blue Owl agreed to a further extension of the Challenge Deadline to November 18, 2024.

29. On November 18, 2024, each of the Committee and Blue Owl filed motions (D.I. 1151 and 1152) to extend the Challenge Deadline to January 2, 2025, on the stated basis that the Committee and Blue Owl have identified certain potential claims that allegedly could materially improve the position of unsecured creditors in these cases.

**ARGUMENT**

**A. The Alternative Sale Order Proposals by the Committee and Blue Owl Fail to Provide Adequate Protection to the DIP Term Agent**

30. Section 363(e) of the Bankruptcy Code provides, as relevant here, that:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. …

8212225.1

31. In order to provide adequate protection to a secured party such as the DIP Term Agent, the secured party must be provided with the equivalent of its existing secured interest, such as a replacement lien on proceeds.

32. Here, in order to protect the DIP Term Agent's interests, it is necessary to adequately provide for at least two important existing rights: first, the DIP Term Agent has a right to indemnification for fees and expenses incurred in connection with the loans (which would include defending against a Challenge), and second, the DIP Term Agent is entitled to ongoing accrual of interest on outstanding obligations until Paid in Full pursuant to the Final DIP Order.

33. As discussed above, the Sale as proposed by the Debtors contemplates payment of the DIP Term Agent's debt in full at closing – indeed that is part of the purchase price. Plainly, that requires resolution of any Challenge prior to closing and for the Debtors to provide a release at closing, which allows for the obligations owing to the DIP Term Agent to be calculated through a date certain including interest and with no need to fund Debtors' contingent indemnification obligations relating to a Challenge.

34. But if a Challenge is allowed to continue beyond the closing of the Sale, there becomes a need to fund Debtors' contingent indemnification obligations relating to a Challenge. Further, if any portions of the payments are held back (in escrow or otherwise), then interest must continue to accrue until payment in full of the held-back amounts, consistent with the DIP Term Agent's currently existing rights under the Final DIP Order and otherwise. It is difficult if not impossible to address these issues with a fixed amount set aside in escrow, because the amounts of the indemnification obligations and future interest are not subject to being accurately estimated given the uncertainty around litigation of a Challenge. Accordingly, any escrow would need to be

12

8212225.1

combined with a reliable backstop, such as an indemnity—which no party is offering, and which the Debtors will not have the resources to adequately provide post-closing.

35. Alternatively, if the DIP Term Agent is paid in full its principal and interest amount at closing but is required to continue defending a Challenge, thereby bearing the risk of potential future disgorgement or other liability, then this would still require a source of compensation for the DIP Term Agent for its indemnifiable fees and expenses in defending the ongoing Challenge (which again is unavailable as far as the DIP Term Agent is aware). Moreover, what party would benefit from the disgorgement? Presumably the Nexus Buyer would be the beneficiary—not unsecured creditors—as payment in full of the Debtors' obligations owing to the DIP Term Agent is a component of the purchase price.

36. In sum, there is no feasible option available here to provide the DIP Term Agent with adequate protection against a closing of the Sale with a Challenge still pending, and the Committee's and Blue Owl's proposals only inject uncertainty and attendant ramifications that are not likely to benefit administrative and unsecured creditors.

B. **Approval of the Sale on the Terms Proposed by the Committee and Blue Owl Would Violate Court Orders Embodying the Fundamental Agreement Among the Parties Since Inception of these Cases**

37. The Sale Objections seek to flagrantly violate the terms agreed by the Debtors and approved by the Court as a condition of a sale of the Debtors' assets under the Bidding Procedures Order and significant new money financing under the Final DIP Order, and as such should be rejected.

38. To briefly recap, this case was filed in early September 2024 with an executed asset purchase agreement (the Nexus APA) providing for a sale to a proposed going concern purchaser (the Nexus Buyer). The Nexus APA contemplates payment in full of the Debtors' secured debt in cash at closing as part of the purchase price, plus $2.5 million plus assumption of certain liabilities.

13

8212225.1

On the first day of these cases, the Debtors filed, and the Court subsequently entered an Order approving, proposed Bidding Procedures that required that any competing bids would be "sufficient to pay in full in cash all DIP Obligations and Prepetition Secured Obligations or otherwise be agreed to by DIP Credit Parties and the Prepetition Secured Creditors, all in their sole discretion" and contemplated payment in full at closing prior to funding of other necessary amounts such as a wind-down budget.

39. Also on the first day of the cases, the Debtors accepted, and the Court subsequently entered an Order approving, financing from Debtors' existing secured lenders, which likewise requires that the DIP Agents and Prepetition Agents be indefeasibly Paid in Full in cash by a date certain (December 13, 2024). As a component of being Paid in Full, the Final DIP Order provides for payment of indemnification and a release from the Debtors in favor of the DIP Term Agent and, at minimum, confirmation from the Committee that no Challenge has been asserted, will be asserted, or is pending. After the Committee was appointed, it negotiated a Challenge Deadline shortly prior to the then-scheduled hearing on approval of the Sale. The Challenge Deadline has since been extended twice (on consent), each time to a date shortly prior to the Sale hearing, in recognition of the fact that any Challenge should at least be identified prior to a Sale hearing, and will need to be resolved prior to the closing of the Sale.

40. Throughout these cases the DIP Term Agent has accommodated the Debtors' efforts at a sale in a constructive manner, in recognition that a going concern sale is likely value-maximizing for all stakeholders, and assured in the protection that any such sale will pay the DIP Term Agent in full in cash at closing. Specifically, the DIP Term Agent has consented to funding under an Approved Budget that included very substantial sums for critical vendors, section

8212225.1

503(b)(9) claims, stub rent and new inventory purchases, all as requested by the Debtors to support a going concern business plan.

41. Now, at the eleventh hour, the Committee and one of its members, Blue Owl, seek to upend this fundamental bargain struck among the parties. Such an effort is prohibited under the Bankruptcy Code and the Final DIP Order as described above and, at bottom, is simply unfair and inappropriate.

42. To be clear, the DIP Term Agent is not arguing that the Committee and Blue Owl cannot seek to assert a Challenge as provided in the Final DIP Order (as to which the DIP Term Agent reserves all rights). But if that Challenge is not resolved prior to closing of the Sale consistent with the fundamental agreement among the parties since the outset of these cases, the Sale cannot go forward.

C. **Approval of the Sale on the Terms Proposed by the Committee and Blue Owl Would Require the DIP Term Agent to Exercise Rights and Remedies to Prevent Dissipation of its Collateral and Threaten Closing of the Sale Itself**

43. Finally, if the Court enters an order consistent with the Sale Objections, it will have significant disruptive effects on the Debtors and will endanger closing of the Sale.

44. Among other things, entry of such an order would be a default under the Final DIP Order and may cause the DIP Term Agent to exercise its rights in accordance with the Final DIP Order and DIP Loan Documents that may result specifically in, among other things, revoked consent by the DIP Term Agent to funding of contemplated amounts under the Approved Budget, including in particular "stub rent" as currently contemplated during the week ending December 7, 2024. *See* Final DIP Order, ¶ 14.[6] Any such steps would be necessary to preserve the DIP Term

---

[6] As the Court is aware, the inclusion of very material amounts of stub rent (approximately $30 million) in the Approved Budget was the result of an agreement reached during a hearing before this Court on October 22, 2024, at which Committee counsel was present. If the Committee and Blue Owl are successful through their Sale Objections they cannot have it both ways and be heard to insist on the benefit of that prior bargain under the Final DIP Order.

15

8212225.1

Agent's rights to recover against collateral in light of a potentially lengthy litigation fight, the increased risk posed to a closing of the Sale, and the DIP Term Agent having no other available means of assuring payment in full.

45. Notably, such actions are likely to have substantial "knock-on" effects on the Debtors' liquidity and inventory purchases, which, given certain closing conditions present in the Nexus APA, will only further increase the likelihood that the Sale will not close at all.

46. Such a result would be unfortunate and potentially prejudicial to the DIP Term Agent, but very likely much worse for unsecured creditors of these estates. The Court should prevent the Committee and Blue Owl from pushing the Debtors down this value-destructive path.

[*Remainder of page intentionally left blank*]

**CONCLUSION**

47. For all the reasons set forth herein, the DIP Term Agent respectfully requests that the Sale Objections be denied. The DIP Term Agent reserves all rights and, to be clear, objects to entry of any order approving the Sale that would not require payment in full in cash at closing as currently required under the Nexus APA.

Dated: November 19, 2024
Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

/s/ *John H. Knight*
John H. Knight (No. 3848)
920 N. King Street
Wilmington, DE 19801
Tel. (302) 651-7700
Knight@RLF.com

-*and*-

OTTERBOURG P.C.
Chad B. Simon (*pro hac vice*)
James V. Drew (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Tel.: (212) 661-9100
csimon@otterbourg.com
jdrew@otterbourg.com

*Counsel to 1903P Loan Agent, LLC*

8212225.1