IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>BIG LOTS, INC., *et al.*,<br>Debtors.[1] | Chapter 11<br>Case No. 24-11967 (JKS)<br>(Jointly Administered)<br>**Re Docket Nos. 18, 1152, & 1154** |

**PNC BANK, NATIONAL ASSOCIATION'S RESPONSE TO
(I) SUPPLEMENTAL LIMITED OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO PROPOSED
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(II) EMERGENCY MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR AN ORDER FURTHER EXTENDING
THE CHALLENGE PERIOD, AND (III) BLUE OWL CAPITAL
LLC'S SECOND MOTION TO EXTEND THE CHALLENGE PERIOD**

PNC Bank, National Association ("PNC"), in its capacity as (i) agent ("Prepetition ABL Agent") under the above-captioned Debtors' prepetition senior secured asset-based revolving credit facility (the "Prepetition ABL Facility"), (ii) agent (the "DIP ABL Agent") under the Debtors' senior secured superpriority debtor-in-possession asset-based revolving credit facility (the "DIP ABL Facility"), and agent (the "Exit ABL Agent") under the senior secured asset-based revolving credit facility (the "Exit ABL Facility") that is intended to finance the Sale[2] of the

---

[1] The Debtors in these cases, together with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption*

Purchased Assets to the Buyer under the APA, hereby files this response (this "Response") to the *Supplemental Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially all of the Debtors' Assets* [Docket No. 1154] (the "Committees' Supplemental Objection"), the *Emergency Motion of the Official Committee of Unsecured Creditors for An Order Extending the Challenge Period* [Docket No. 1151] and *Blue Owl Capital LLC's Second Motion to Extend the Challenge Period* [Docket No. 1152] (the "Blue Owl Motion"). In support of this Response, PNC respectfully states as follows:

## RESPONSE

PNC has been the primary source of financing to the Debtors for years. Prior to the Petition Date, PNC and the other lenders under the Prepetition ABL Facility provided liquidity that allowed the Debtors to fund payroll and operating expenses, as well as general working capital. The relationship continued as the Debtors sought chapter 11 relief to address the continued strain on their businesses and resources. PNC and the other lenders under the DIP ABL Facility are providing the Debtors with critical financial infrastructure that allows the Debtors to operate their business, administer their chapter 11 cases, and avoid the operational disruption and value destruction that would result if the Debtors lost access to liquidity. As part of the negotiations that allowed for entry into the DIP ABL Facility, PNC and the other lenders required that the Debtors reach an agreement with a potential buyer to purchase the Acquired Assets in an amount that *at a minimum* would repay all DIP Obligations and Prepetition Secured Obligations. Shortly after the Debtors selected the Stalking Horse as the Buyer, PNC and the other lenders under the proposed Exit ABL Facility (collectively, the "Exit ABL Lenders") began working with the Debtors and the

---

and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [Docket No. 1153] (the "Proposed Sale Order").

Stalking Horse (now Buyer) to facilitate an orderly closing of the Sale to the Buyer, with that Sale being financed in large part by the Exit ABL Lenders.

None of these financial accommodations that have been made, are being made, or may be made, by syndicates of commercial banks are unconditional. The Prepetition ABL Facility, DIP ABL Facility, and Exit ABL Facility each contain terms and conditions that are standard, both within the retail finance industry and, more specifically, within the context of commercial banks providing financing under debtor-in-possession and exit facilities. The Committee and Blue Owl Capital LLC ("Blue Owl") now request that the Court disregard the terms and conditions of those facilities—and the Court's prior orders incorporating those terms and conditions—and instead impose an "equitable remedy" in the form of escrowing proceeds of the Sale so that their investigation of claims against the Prepetition Secured Creditors can continue. The purpose of this Response is to make PNC's position crystal clear: anything short of the indefeasible repayment in full, in cash of the DIP Obligations and Prepetition Secured Obligations at Closing simply does not work.

The request from the Committee and Blue Owl violates the terms of the Final DIP Order—which is a final, non-appealable (and never appealed) Order of this Court—and the DIP Loan Documents. Furthermore, if that request is granted and the Sale proceeds are escrowed, the conditions precedent that must be satisfied in order to close the Exit ABL Facility, as well as those conditions that must be satisfied to close the senior secured asset-based term loan facility upon which the Buyer is relying to close the Sale (the "Exit FILO Facility", and, together with the Exit ABL Facility, the "Exit Facilities"), will never be met. The Committee and Blue Owl claim to support the Sale but ask that the structure of the negotiated deal be changed. Those parties cannot have it both ways: either the Sale is approved and closes on the terms and conditions that were

carefully negotiated and have been memorialized in the DIP Orders, Proposed Sale Order, and commitment letters for the Exit Facilities, or the parties pivot to a liquidation so that the Committee and Blue Owl can continue their seemingly indefinite investigation.[3]

## I. The Proposed Sale Order Complies with the DIP Orders and Should Be Entered in Its Current Form.

The Proposed Sale Order should be entered in the form in which the Debtors filed it with the Court on November 18, 2024. *See* Docket No. 1153. The Order approving the Sale to the Buyer must be in form and substance acceptable to the DIP ABL Agent. DIP ABL Credit Agreement § 5.23(a)(iii); *see also* Final DIP Order, Ex. 5. For the avoidance of doubt, PNC, in its capacity as Prepetition ABL Agent, DIP ABL Agent, and Exit ABL Agent, supports entry of the Proposed Sale Order in its current form. PNC hereby reserves all rights under the DIP Orders and the DIP Loan Documents if the form of Proposed Sale Order is modified and PNC does not consent to such modification.

The Proposed Sale Order in its current form provides that, *at the Closing*, the Debtors shall apply the Sale proceeds "for permanent application against the DIP Obligations and the Prepetition Secured Obligations **in accordance with the terms and conditions of the DIP Orders and the DIP Loan Documents** until the DIP Obligations and the Prepetition Obligations have been Paid in Full[.]" Proposed Sale Order ¶ 19 (emphasis supplied). The application of proceeds of the Sale

---

[3] At the first day hearing, the Court advised the parties that if the Committee were to ask for the Challenge Period to run for 75 days following entry of the Interim DIP Order, "that's what they're going to get." Sept. 10, 2024 Hr'g Tr. 119: 24-25, 120: 1-2. As part of a global settlement of disputes related to the Final DIP Order, however, the Committee agreed to an abbreviated Challenge Period that would expire prior to the Court holding a sale hearing. That hearing originally was scheduled to occur in early November. Nevertheless, the Prepetition Secured Creditors have agreed to multiple extensions of the Challenge Deadline to accommodate the Committee's and Blue Owl's requests to continue their investigation. The standard 75-day period in this case is scheduled to lapse in less than one week (on November 24) and yet the Committee and Blue Owl have now asked that the Court extend the period—for them to make a decision as to whether they will even seek standing—to January 2, 2025. Granting such a request will, in all likelihood, force the estates to liquidate or, at best, suspend all efforts to exit bankruptcy until next year.

to repay the DIP Obligations and the Prepetition Obligations complies with the DIP Orders. Final DIP Order ¶ 17; DIP ABL Credit Agreement § VII(r) (identifying as an event of default under the DIP ABL Credit Agreement "the entry of any order by the Bankruptcy Court granting . . . authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent").

To ensure that the DIP Obligations and Prepetition Obligations have been indefeasibly Paid in Full, the Proposed Sale Order releases any and all claims that the Debtors may have against the DIP Credit Parties as of the Closing. Proposed Sale Order ¶ 63; *see* Final DIP Order ¶ H n.5 (establishing that in order to be "Paid in Full", among other things, "each of the Prepetition Agents, Prepetition Lenders, DIP Agents and DIP Lenders, as the case may be, shall have received a release from each Debtor and the Committee" of any and all claims). If the Debtors or any party were to bring claims against any of the DIP Secured Parties following the Closing, the Debtors' estates would be obligated to indemnify the DIP Secured Parties against such claims. *See, e.g.,* Final DIP Order ¶ 12(b) (requiring that each of the Prepetition Agents continue to receive adequate protection "[u]ntil the Prepetition Secured Obligations have been indefeasibly Paid in Full"). Thus, the Proposed Sale Order operates to provide finality and closure to the financing and sale transactions that have animated these chapter 11 cases.

The notion that the DIP Orders can somehow now be disregarded for convenience or to accommodate the Committee's fishing expedition is misplaced. The findings and rulings under the DIP Orders and DIP Loan Documents, including those that require any Sale proceeds to go first to satisfy the DIP Obligations and Prepetition Secured Obligations, continue until such obligations are Paid in Full. Final DIP Order ¶ 47. In sum, the Proposed Sale Order in its current form comports with the DIP Orders and is acceptable to PNC. Amending the Proposed Sale Order to include an "equitable remedy" such as the escrowing of Sale proceeds or the possibility that

lenders under the Prepetition ABL Facility and/or DIP ABL Facility may be required to disgorge repayment after Closing is inconsistent with the DIP Orders and is not a concept that is acceptable to PNC.

**II.     The Sale Cannot Close Unless the DIP Obligations and the Prepetition Secured Obligations Have Been "Paid in Full" and the Challenge Period Has Terminated.**

As noted, the Proposed Sale Order requires that proceeds of the Sale be applied at Closing to the DIP Obligations and the Prepetition Secured Obligations until such obligations are "Paid in Full" (as defined in the DIP Orders). Under the Final DIP Order, the obligations are only Paid in Full if they are indefeasibly paid in full in cash "**including** principal, accrued and unpaid interest and fees, reimbursable expenses and **indemnities**, **other than contingent indemnification obligations for which no claim has been *asserted or threatened***, and all other amounts due and owing by the Debtors[.]" Final DIP Order ¶ H n.5 (emphasis supplied).

The Committee now claims to have "identified colorable causes of action" regarding the "Secured Parties" and "determined that the Secured Parties did not hold valid, properly perfected prepetition liens on certain of the Debtors' assets[.]" Committee Objection ¶¶ 2, 19. Blue Owl expressly threatens claims against PNC, claiming that "Blue Owl believes the estate has more-than-colorable claims against the Prepetition Secured Parties, including agents PNC Bank, N.A. and 1903P Loan Agent LLC, sounding in fraudulent transfer under Bankruptcy Code sections 544 and 548." Blue Owl Motion ¶ 19.

Even if PNC were to successfully defend against these asserted (or threatened) claims—which it fully intends to do if necessary—this threatened litigation gives rise to *secured* indemnification claims against the estates for defense costs in an amount that cannot be determined

as of the Closing.[4]  *See* Final DIP Order ¶ 12(b) (requiring that each of the Prepetition Agents continue to receive adequate protection "[u]ntil the Prepetition Secured Obligations have been indefeasibly Paid in Full").  Such secured indemnification claims are entitled to priority treatment before any amounts remaining with the estates after repayment of the DIP Obligations and Prepetition Secured Obligations can be distributed to junior creditors (including members of the Committee).  If the Challenge Period does not terminate prior to the Closing, it is impossible for PNC and the other Prepetition Secured Creditors to be Paid in Full or adequately protected for any ongoing indemnification claims.  At a minimum, the Prepetition Secured Creditors would have a senior claim to any proceeds currently contemplated to fund a wind down of the estates.

Beyond the fact that imposing the requested "equitable remedy" violates the DIP Orders, it guarantees that the Sale will not close.  The commitment letters for each of the Exit Facilities contain a number of conditions precedent.  Among others, the closing of each of the Exit Facilities is conditioned upon the repayment in full in cash of the Prepetition Secured Obligations and DIP Obligations, *including* any indemnification claims.  As noted above, both the Committee and Blue

---

[4] Through this Response, PNC does not seek to address each of the baseless and vague allegations that the Committee and Blue Owl have asserted against PNC and the other asset-based lenders through their emergency motions seeking to extend the Challenge Deadline. *See* Docket Nos. 1151 & 1152.  PNC learned about those allegations for the first time when the Committee and Blue Owl filed their motions late on the evening of November 18, 2024.  At no point has any member of the Committee, Blue Owl, or any of those parties' counsel reached out to PNC or its counsel to discuss what the Committee and Blue Owl characterize as "colorable claims" against the Debtors' lenders.  If the general allegations against the Prepetition Secured Parties include claims against PNC, PNC will respond to those allegations at the appropriate time.  Nevertheless, PNC is compelled to highlight the futility of bringing the one claim that the Committee appears to assert against PNC and the other asset-based lenders.  The Committee seems to allege that the Prepetition Secured Parties are not properly perfected on cash from store accounts that are not subject to a deposit account control agreement with PNC.  However, when the proceeds of collateral over which a secured party is properly perfected (which is the case here) are placed into a deposit account, a security interest attaches to those proceeds as long as they are identifiable.  This is true even absent a control agreement. *See* N.Y. U.C.C. Law § 9-315(a)(2).  Perfection as to the original collateral suffices for perfection as to these cash proceeds. *See id*. at § 9-315(c) and (d).  Moreover, the commentary and case law interpreting Section 9-332 of the Uniform Commercial Code make clear that intercompany transfers of proceeds within a corporate enterprise do not extinguish liens on those proceeds. *See id*. at § 9-332, cmt 2.  For these and other reasons that PNC will articulate as needed, any claims against PNC and the other asset-based lenders fail as a matter of law.

Owl have asserted what they deem to be "colorable claims" against the Prepetition Secured Creditors. Those parties have identified specific claims against the Debtors' Prepetition Term Loan Lenders. If the Challenge Period extends beyond Closing, or if the Sale proceeds are escrowed or deemed subject to disgorgement, the Prepetition Secured Obligations and the DIP Obligations (including indemnification claims) cannot be repaid in full in cash, meaning the conditions precedent will not be satisfied. The Sale will not be able to close, and the Debtors will be forced to pivot to a liquidation.

## CONCLUSION

The Committee and Blue Owl continue to hunt for claims that they could bring against the Prepetition Secured Creditors. PNC respectfully submits that the pursuit is fruitless. Among other reasons, even if viable claims exist against PNC, the APA does not require that the Buyer pay a sum certain for the Acquired Assets. Rather, the Purchase Price is based primarily on the "Debt Payoff Amount" that, in turn, is calculated based on the amount of DIP Obligations and Prepetition Secured Obligations existing as of the Closing. As set forth herein, the Closing cannot and will not occur until the Challenge Period expires. Any successful Challenge brought against the Debtors' lenders therefore would only result in a reduction in the DIP Obligations or Prepetition Secured Obligations. That would mean the Purchase Price that the Buyer pays is reduced, not that money is suddenly made available for the benefit of general unsecured creditors.

The Committee must decide how it wishes to proceed. The Committee and its members, including Blue Owl, can continue to seek extensions of the Challenge Period for purposes of determining whether to assert their "colorable claims" against the Debtors' secured lenders. If that is the path that the Committee picks, they will be choosing a liquidation of the Debtors over the closing of a value-maximizing going concern sale. PNC respectfully submits that continuing to

prioritize litigation over consummation of the Sale will have devastating consequences not only for the Committee and its members, but for all creditors of the Debtors' estates.

[*Remainder of page intentionally left blank*]

Dated: November 20, 2024
Wilmington, Delaware

**BLANK ROME LLP**

*/s/ Regina Stango Kelbon*
Regina Stango Kelbon (DE No. 5444)
Stanley B. Tarr (DE No. 5535)
Jordan L. Williams (DE No. 7128)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:     (302) 425-6400
Facsimile:      (302) 425-6464
Email:             regina.kelbon@blankrome.com
                       stanley.tarr@blankrome.com
                       jordan.williams@blankrome.com

-and-

**CHOATE, HALL & STEWART LLP**
John F. Ventola (*pro hac vice*)
G. Mark Edgarton (*pro hac vice*)
Jonathan D. Marshall (*pro hac vice*)
Jacob S. Lang (*pro hac vice*)
Two International Place
Boston, Massachusetts 02110
Telephone:     (617) 248-5000
Facsimile:      (617) 502-5000
Email:             jventola@choate.com
                       medgarton@choate.com
                       jmarshall@choate.com
                       jslang@choate.com

*Counsel to PNC Bank, National Association*