**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 1151, 1152, 1154** |

**DEBTORS' RESPONSE TO (A) EMERGENCY MOTIONS TO EXTEND THE
CHALLENGE DEADLINE, (B) SUPPLEMENTAL LIMITED OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROPOSED SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND (C) MOTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO SHORTEN NOTICE
AND SCHEDULE EXPEDITED HEARING**

Big Lots, Inc. and certain of its affiliates (collectively, the "Debtors" or "Big Lots"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases, file this response (this "Response") to the (a) (i) *Emergency Motion of the Official Committee of Unsecured Creditors for an Order Further Extending the Challenge Deadline* [D.I. 1151] (the "Committee Motion") and (ii) *Blue Owl Capital LLC's Second Motion to Extend Challenge Period* [D.I. 1152] (the "Blue Owl Motion" and, together with the Committee Motion, the "Motions"),[2] (b) *Supplemental Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially All of the Debtors' Assets* [D.I. 1154] (the "Supplemental Objection"), and

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motions.

(c) the *Motion of the Official Committee of Unsecured Creditors to Shorten Notice and Schedule Expedited Hearing on Emergency Motion of the Official Committee of Unsecured Creditors for an Order Further Extending the Challenge Deadline* [D.I. 1171] (the "Committee Motion to Shorten Notice").[3]

In support of this Response, the Debtors respectfully state as follows:

1. Fewer than 72 hours before the Debtors' hearing to approve the sale of substantially all of their assets to the Successful Bidder—a sale that has garnered near universal support among all parties in interest—Blue Owl and the Committee are doubling-down on a last-ditch gambit to extract value out of the Debtors' Prepetition Secured Lenders, despite the material and grave risk that this tactic (a) may jeopardize what is an indisputably value-maximizing transaction that preserves jobs and saves the Big Lots business from liquidation and (b) casts a shadow over the tangible benefits the Prepetition Secured Lenders have provided to the Debtors' estates in allowing the Sale process to come to fruition.

2. The gambit started two weeks ago. On November 4, Blue Owl rushed to this Court on an emergency basis arguing that cause existed for a "modest" two-week extension of the Challenge Period from November 7 to November 22 to investigate potential estate claims resulting from the "stunning plurality of hats" worn by the Secured Lenders in these cases. *See Blue Owl Capital LLC's Emergency Motion to Extend Challenge Period and Remove Blanket "Professional Eyes Only" Designation from Productions or, in the Alternative, Appoint an Examiner* [D.I. 870] (the "First Blue Owl Motion") ¶ 5. Blue Owl made much of the alleged "untimely production of documents" from various case parties—namely, the Debtors, 1903P Loan Agent, LLC ("1903P"), PNC Bank, N.A., and Gordon Brothers Retail Partners, LLC ("GBRP" and, together with 1903P,

---

[3] Blue Owl also filed a joinder to the Committee Motion to Shorten Notice at D.I. 1172.

"Gordon Brothers"). *Id.* ¶ 2(g). This alleged untimeliness purportedly prejudiced Blue Owl from conducting an investigation into the so-called "liquidator in possession" (*i.e.*, Gordon Brothers) who, according to Blue Owl, used its "stranglehold on the Debtors' business to exercise dominion and control over the Debtors" and whose control over the Debtors "cannot be overstated." *Id.* ¶ 30.

3. The Debtors and other parties disputed these allegations vigorously, observing that Blue Owl, despite having been appointed to the Committee on September 23 and having served as its chair since inception, sat on its hands for more than three weeks before authorizing the Committee to deliver its first discovery requests. These requests were served mere weeks before the then November 7 Challenge Period deadline—a deadline that Blue Owl never contested, and that the Committee consented to, in connection with entry of the Final DIP Order. Nonetheless, the Debtors and other case parties sought consensus and offered to extend the Challenge Period. This Court granted that extension to November 15 at an emergency hearing. Discovery followed from various case parties, including 1903P and GBRP. All responsive documents were produced as of November 9—nearly 22,000 documents in total, with nearly 11,000 produced by 1903P and GBRP. *See* Comm. Mot. ¶ 3.

4. Surely, after more than a week expending countless lawyer hours and precious estate resources reviewing nearly 22,000 documents from the parties who were alleged to have "exercise[d] dominion and control over the Debtors," the Committee and its chair Blue Owl would have ample evidence at its fingertips to form the basis of a challenge, if such evidence existed. Blue Owl First Mot. ¶ 30. Yet, in both Motions, not a word is written on the asserted "stunning plurality of hats" or "stranglehold" of Gordon Brothers, and no theory is advanced for what misconduct by the Secured Lenders purportedly gives rise to estate causes of action or why the

3

Committee and Blue Owl believe such causes of action are valuable.  Instead, for the first time, the Committee and Blue Owl propose new theories for why cause exists to extend the Challenge Period, this time not for a "modest" two-week period but instead for a jaw-dropping (and arbitrary) additional 45-days.

5.      No cause exists whatsoever, and the three "colorable claims" that the Committee and Blue Owl claim to have "discovered"—(a) avoidance of a $7.5 million early termination fee (the "Termination Fee Claim"), (b) avoidance of security interests on trivial amounts of property (the "Lien Avoidance Claim"), and (c) a constructive fraudulent conveyance derived from an asset-based loan given to one of the Debtors' subsidiaries (the "Constructive FC Claim")—are ***not based on any new facts revealed in discovery since the Challenge Period was extended***.

6.      Specifically:

- The Debtors disclosed the existence of the Prepetition Term Loan Agent's amended fee letter (which memorialized the $7.5 million early termination fee) publicly in the DIP Motion, *see* D.I. 18 at ¶ 11, on September 9, 2024, the Petition Date.  The Debtors subsequently shared this fee letter with the Committee upon request on October 13, 2024.  *See* **Exhibit A**.[4]  If the Committee had concerns about the validity or legality of this fee, those issues could have been raised in a challenge well before the original November 7 Challenge Period expiration date.

- The Debtors provided the Committee with lien search results on September 26, 2024, almost immediately following the Committee's appointment.  *See* **Exhibit B**. Schedules to the Prepetition Credit Agreements and related perfection certificates were shared on October 6, 2024, October 8, 2024, and October 15, 2024, which contained detailed descriptions of the property constituting the Prepetition Secured Lenders' collateral.  *See* **Exhibit C**; **Exhibit D**; **Exhibit E**.  The Committee has not explained why issues relating to the validity of these liens could not have been raised in a challenge well before the original November 7 Challenge Period expiration date.

---

[4] "Exhibit __" refers to exhibits to the *Declaration of Adam L. Shpeen in Support of Debtors' Response to (A) Emergency Motions to Extend the Challenge Deadline, (B) Supplemental Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially All of the Debtors' Assets, and (C) Motion of the Official Committee of Unsecured Creditors to Shorten Notice and Schedule Expedited Hearing*, filed contemporaneously herewith.

- The Debtors filed an organizational chart with its chapter 11 petitions, which showed the various guarantor entities of the Prepetition Term Loan Facility.[5] The Committee's financial advisor waited until November 6, 2024, *see* **Exhibit H**, to request from AlixPartners, the Debtors' financial advisor, the underlying financial information on Big Lots Stores, LLC and Big Lots Stores – PNS, LLC, which were provided within 48 hours of the request, on November 8, 2024, *see* **Exhibit I**.

7. Even if the Committee or Blue Owl had brought a Challenge based on these theories prior to the original expiration of the Challenge Period, which they fail to explain in the Motions why they could not have, the Debtors would have successfully opposed such Challenge and sought resolution on an expedited basis so that the Challenge could have been swiftly dismissed as meritless well before the Sale Hearing.

8. *First,* with respect to the Termination Fee Claim, the Committee conveniently neglects to mention that the original quantum of the early termination fee under the Prepetition Term Loan Credit Agreement would have been ***more than $30 million*** had the Debtors not negotiated the fee down to $7.5 million as part of 1903P's DIP proposal. Prior to the aforementioned amendment to the Prepetition Term Loan Lenders' fee letter, upon an "Early Termination Trigger Date," the Debtors would have been required to pay an amount equal to (i) the aggregate amount of interest and fees which would have otherwise been payable on the principal amount of the loans paid or prepaid during the first year after the closing date of the Prepetition Term Loan Facility (*i.e.*, April 4, 2024) *minus* (ii) the amount of interest and fees received by the Prepetition Term Loan Lenders from such closing date to the Early Termination Trigger Date. See **Exhibit F**. By the Debtors' calculations, the amount that would have been owed, assuming a September 1, 2024 Early Termination Trigger Date, would have been approximately $30.13 million. As such, the Debtors' negotiation of an amendment to the

---

[5] The Debtors subsequently shared the annotated organizational chart with the Committee on September 26, 2024.

5

Prepetition Term Loan Lenders' fee letter was value accretive to the estates and avoided potential risk and litigation surrounding the fee. *See Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 18] (the "<u>DIP Motion</u>") ¶ 4.  The Committee asserts confidently that the make-whole fee would have been "subject to disallowance in the Chapter 11 Cases," but provide no support—case law or otherwise—whatsoever for their claim.  *See* Comm. Mot. ¶ 17.

9. *Second,* the Lien Avoidance Claim is a classic red herring.  Even if the Prepetition Term Loan Lenders did not have perfected liens on the discrete assets described by the Committee, such lenders would still be oversecured and, therefore, would be entitled to payment in full from the proceeds of the sale to Nexus.  The Prepetition Term Loan Lenders lend according to a borrowing base calculated based on the net orderly liquidation or appraised value of collateral, taking into account reserves, eligibility requirements and discounts.  According to the last borrowing base certificate validly certified by the Debtors prior to the Petition Date, the Prepetition Term Loan Lenders were oversecured by *at least* approximately $29.85 million, and real property and commercial tort claims are *not* part of the borrowing base.  *See* **<u>Exhibit G</u>**.  The Committee alleges that the Prepetition Agents did not have perfected liens on cash worth, in the aggregate, $8.4 million.  Comm. Mot. ¶ 8.  Even if true, that fact would be of no consequence—the Prepetition Secured Lenders would still be oversecured by *at least* $20 million, and likely significantly more. *See* **<u>Exhibit G</u>**.  Accordingly, the Prepetition Term Loan Lenders are entitled to full repayment from the proceeds of the Sale.  Put differently, even if the Committee and Blue Owl were

6

successful in avoiding the allegedly unperfected liens, the distribution of the Sale proceeds would remain unchanged, and the Prepetition Term Loan Lenders would still be entitled to a full payout of outstanding amounts under the Prepetition Term Loan Facility, based on the remaining collateral.

10. *Third*, the Constructive FT Claim is wholly unfounded. Like most "first-in, last-out" asset-based credit facilities, the Prepetition Term Loan Facility provides for the extension of credit and borrowings to the Debtors based on a borrowing base formula, and the cash loaned by such lenders is directly related to the underlying appraised value of the collateral. *See* DIP Mot., Ex. 3 [D.I. 20-1], § 1.01 (definition of "Borrowing Base"). Accordingly, the Committee's assertion that "the value received by BLS under the Term Loan Facility would have been significantly less than the value it gave up by incurring the related liens," *see* Comm. Mot. ¶ 20, is misguided considering that the amount of funding from the Prepetition Term Loan Facility **_was directly proportional to the value of the underlying collateral_**. The Committee and Blue Owl attempt to get around this inconvenient fact by asserting (1) that "BLS did not need additional financing at the time," given that the stores owned by BLS were among the highest performing, and (2) that BLS "was not provided the lion's share of the term loans," even though it was selling the most assets. *See id.*; Blue Owl Mot. ¶ 19. Both assertions are of no moment. It is undisputed that, at the time of entry into the Prepetition Term Loan Facility, the Big Lots enterprise as a whole required funding, and all of the Debtors received a benefit from entering into the facility based on the cash received in proportion to the borrowing base. *See* Ramsden Decl. ¶ 45. And, despite the Committee's and Blue Owl's statements to the contrary, it would be highly impractical and very likely unworkable to require an asset-based lender to loan cash against assets and then vigilantly ensure that the entity against whose assets cash is loaned actually receives precisely the amount of

funds in proportion to those assets, or else they could be subject to a constructive fraudulent conveyance suit. It is no surprise that the Committee offers no case law or precedent for its fraudulent conveyance theory, likely because there is none.

11. The Motions in general are bereft of supportive case law, comparable precedents or any meaningful evidence that would give any credence to the theories behind these "colorable claims." Indeed, the remarkably thin analysis in the Committee and Blue Owl's papers underscore the absence of any basis for these the claims, despite both parties having had ample time to develop their theories and file a challenge.

12. This absence of legal analysis, combined with the deafening silence in the Motions regarding the actions and conduct of Gordon Brothers—which only two weeks ago was the predominant reason why Blue Owl sought to extend the Challenge Period in the first place—and shifting theories for why cause exists to extend the Challenge Period, ***make plain that the Motions are tactical in nature, filed to introduce risk to the repayment of the DIP Lenders' loans in an attempt to inappropriately extract value from the DIP Lenders, even at the risk of jeopardizing the Sale***. If the Challenge Period were extended, it is far from clear how the Sale could close on the timeline required under the APA and the DIP Documents, putting the Debtors in a perilous position of potentially losing the Sale. The Committee and Blue Owl are playing with fire, and such a high-risk tactic should not be countenanced. Simply put, the Motions fail to establish the "cause" required under the Final DIP Order to warrant an extension of the Challenge Deadline.

13. Additionally, both the Committee's Supplemental Objection and portions of the Blue Owl Motion relating to the investigation performed by Porter Wright Morris & Arthur LLP ("Porter Wright") warrant brief responses as well, even though these attacks are irrelevant to the Challenge Period extension request. In addition to the points raised in the *Debtors' Omnibus Reply*

*to Objections to the Proposed Sale of Substantially All of the Debtors' Assets* [D.I. 1146] (the "Sale Reply"), the Debtors respond to several of the Committee's and Blue Owl's assertions as follows:

- The Committee purports to be "deeply troubled by the Debtors' actions and seemingly purposeful lack of transparency." Comm. Supp. Obj. ¶ 9. This is misleading. Immediately after the Committee raised the issue of the sale of the D&O Claims, the Debtors hired Porter Wright and delivered the report within hours of its completion. Sale Reply ¶ 17; Ex. 1, at 1. The Debtors had no obligation to affirmatively inform the Committee of the Porter Wright investigation, just as the Committee would have no obligation to keep the Debtors informed of its progress on an investigation, and doing so may have been disruptive to the outcome. The Debtors were extraordinarily transparent.

- Both the Committee and Blue Owl claim that the Debtors "deliberately foreclosed the Committee's participation in the process" and assert that they should have been permitted to participate in the Porter Wright investigation. Comm. Supp. Obj. ¶ 9. But the former assertion is misleading, as the Debtors have made Porter Wright, Ronald A. Robins, Jr. (the Debtors' Executive Vice President, Chief Legal and Governance Officer), and others available for depositions and as witnesses at the upcoming Sale Hearing. Moreover, the Debtors maintain that such participation would have been inappropriate under the circumstances, as it may have caused delay that would have jeopardized the ability of the Debtors to complete the investigation by the Sale Hearing that was then scheduled to occur on November 12. The Committee's and Blue Owl's complaints that the Debtors rushed the Porter Wright investigation only in response to the Committee's Sale objection ring hollow, as the Committee and Blue Owl failed to raise any potential issues with the assets being transferred as part of the Sale until nearly six weeks after the Committee's appointment, *see* D.I. 248, and following the Committee's expression of support for the Sale process made after reviewing the APA that provided for the transfer of substantially all of the Debtors' assets, including existing and potential litigation claims. *See* Sale Reply ¶ 7 (citing Oct. 30, 2024 Hr'g Tr. at 14:18–23).

- Both the Committee and Blue Owl view the scope of the investigation as "inadequate," "cursory," and "half-baked." Comm. Supp. Obj. ¶¶ 6, 9; Blue Owl Mot. ¶ 3. The plain text of the report says otherwise. As set forth herein and in the Sale Reply, the Porter Wright investigation involved over 400 attorney hours reviewing thousands of pages of the Debtors' documents and interviewing 18 of the Debtors' current and former directors, officers, and advisors. Sale Reply ¶ 17. Far from being "half-baked," Porter Wright's comprehensive report makes clear that, as the Debtors have always suspected, the D&O Claims are valueless and meritless. In addition, the Porter Wright team reviewed a series of transactions over a period of five years which, as set forth in the Sale Reply, exceeds the applicable statutes of limitations under Ohio law. *See id.*; Sale Reply, Ex. 1, at 8.

9

14. Furthermore, the Debtors respectfully request that the Court grant the Committee's Motion to Shorten Notice and schedule a hearing on the relief requested by the Motions at the Sale Hearing currently scheduled for November 21, 2024 at 10:30 a.m. (prevailing Eastern Time). Because the proposed Sale Order contemplates releases for the DIP Lenders, *see Notice of Filing of Proposed Sale Order* [D.I. 1153-1] ¶ 63, which could not be granted absent expiration of the Challenge Period, it is critical such determination be made before the Sale Order can be entered.

15. For the reasons set forth herein, the Debtors respectfully request that the Court (a) deny the Motions, (b) deem the Challenge Deadline to have expired as of November 18, 2024, (c) grant the Committee Motion to Shorten Notice and schedule a hearing on the Motions on November 21, 2024, at 10:30 a.m. (prevailing Eastern Time), and (d) grant any such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank]*

Dated:   November 20, 2024
         Wilmington, Delaware

                                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Sophie Rogers Churchill*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4277)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com

-and-

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
Stephen D. Piraino (admitted *pro hac vice*)
Ethan Stern (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
james.mcclammy@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Counsel to the Debtors and Debtors in Possession*