# Exhibit B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS INC., *et al.*, | Case No. 24-11967 (JKS) (Jointly Administered) |
| Debtors[1]. | |

## DECLARATION OF ATTIC PRODUCTS IN SUPPORT OF MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIMS OF TRADE CREDITORS

1.  I am an authorized representative for Attic Products.

2.  I have personal knowledge of the facts herein, including access to and review of business records and information for Attic Products.

3.  I make this declaration in support of the motion of Attic Products, Dan Dee International, LLC, and Dewan & Sons for allowance and payment of administrative claims of trade creditors (the "Motion").

4.  To the best of my knowledge and belief formed after a reasonable inquiry, including review of business records, Big Lots and its subsidiaries have taken possession of goods, shipped by Attic Products, either within 20 days before the Petition Date of Sept. 9, 2024 or after the Petition Date. These goods are summarized in **Exhibit 1** attached hereto.

5.  The purchase orders, invoices, and forwarder cargo receipts for these goods orders are attached hereto as **Exhibit 2**. These documents are true and accurate copies of business records of Attic Products' fulfillment of Big Lots purchase orders.

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

6.    The invoices for these orders are unpaid, and no money or other valuable consideration has been received for the goods delivered.

7.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: November 22, 2024

_____
Pravesh Kumar
Asst. Manager - Administration
Attic Products

# Exhibit 1

## Summary of Claims

# EXHIBIT 1

*In re* Big Lots, Inc., Case No. 24-11967-JKS
**Claimant: Attic Products**

| Invoice | Big Lots PO Number | Order Total | FCR Issue Date | Big Lots Entity | Received by Big Lots | Claim Type |
|---|---|---|---|---|---|---|
| AJ-1054/24 | 95320743 | $ 5,654.88 | 22-Jul-24 | AVDC, LLC | 13-Sep-24 | Post-Petition Delivery |
| AJ-1055/24 | 95320744 | $ 2,877.93 | 30-Jul-24 | CSC Distribution, LLC | 29-Sep-24 | Post-Petition Delivery |
| AJ-1056/24 | 95320745 | $ 5,149.98 | 31-Jul-24 | Closeout Distribution, LLC | Note 1 | Post-Petition Delivery |
| AJ-1057/24 | 95320747 | $ 2,827.44 | 31-Jul-24 | Big Lots Stores, LLC | Note 1 | Post-Petition Delivery |
| AJ-1058/24 | 95322264 | $ 49,920.00 | 10-Aug-24 | Durant DC, LLC | 4-Oct-24 | Post-Petition Delivery |
| AJ-480/24 | 95217767 | $ 20,650.00 | 4-Jul-24 | Durant DC, LLC | 11-Sep-24 | Post-Petition Delivery |
| AJ-682/24 | 95217768 | $ 30,975.00 | 9-Jul-24 | Big Lots Stores, LLC | 21-Aug-24 | 503(b)(9) |
| AJ-918/24 | 95320746 | $ 2,928.42 | 22-Jul-24 | Durant DC, LLC | 11-Sep-24 | Post-Petition Delivery |

| | | |
|---|---|---|
| **Total Post-Petition Delivery** | $ | 90,008.65 |
| **Total 503(b)(9)** | $ | 30,975.00 |
| **Grand Total** | $ | 120,983.65 |

Note 1: LCL shipment, details not available

# Exhibit 2

Invoices, FCRs, and Big Lots Purchase Orders

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-480-24

**Invoice Date.:** May 04, 2024

**Sold To:**   DURANT DC, LLC
2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Delivery To:**   2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** OOCL BREMERHAVEN / 0VBHNW1MA

**Port of Loading:** MUNDRA

**Ship on or about:** July 06, 2024

**Port of Entry:** HOUSTON, TX

**Destination:** DURANT, OK

**Container Number (Factory Load) :** TCNU5166690, TCNU6449289

| Cargo Description | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|
| **P/O No.:** 95217767 | 350 | EA | 59.000/EA | 20,650.000 |
| **SKU No.:** 810732010 | 350 | CTNS | | |
| IRON MANGO WOOD COFFEE TABLE S/3          No. of Pallet: | | | | |
| **HTS Code.:** 9403200050 | | | | |
| | | | | |
| **Manufacturer Name & Address** | | | | |
| ATTIC PRODUCTS G-320 BORANADA PHASE-3 JODHPUR JODHPUR, RAJASTHAN 342012, INDIA | | | | |
| Total:          (350 CTNS) | 350 | | | 20,650.000 |
| TOTAL (USD) DOLLARS : TWENTY THOUSAND SIX HUNDRED FIFTY ONLY. | | | | |
| | | | | |

**Consolidator(Full Name & Address)**
ATTIC PRODUCTS
G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
TCNU5166690/R2416040/40H
TCNU6449289/R2416022/40H

**Container Stuffing Location(Full Name & Address )**
ATTIC PRODUCTS
G-320 BORANADA PHASE-3
JODHPUR , RAJASTHAN
342012 INDIA
Container No./Seal/Size:
TCNU5166690/R2416040/40H
TCNU6449289/R2416022/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES
350 CARTONS

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# PACKING LIST

**Invoice No.:** AJ-480-24

**Invoice Date.:** May 04, 2024

**Sold To:** DURANT DC, LLC
2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Delivery To:** 2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** OOCL BREMERHAVEN / 0VBHNW1MA

**Port of Loading:** MUNDRA

**Ship on or about:** July 06, 2024

**Port of Entry:** HOUSTON, TX

**Destination:** DURANT, OK

**Container Number (Factory Load) :** TCNU5166690, TCNU6449289

| Cargo Description | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|
| P/O No.: 95217767 | 350  EA | 6,951.00 | 9,541.00 | 134.326 |
| SKU No.: 810732010 | 350  CTNS | | | |
| IRON MANGO WOOD COFFEE TABLE S/3    No. of Pallet: | | | | |
| HTS Code.: 9403200050 | | | | |
| **Total:**        **(350 CTNS)** | **350** | **6,951.00** | **9,541.00** | **134.326** |

**Consolidator(Full Name & Address)**
ATTIC PRODUCTS
G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
TCNU5166690/R2416040/40H
TCNU6449289/R2416022/40H

**Container Stuffing Location(Full Name & Address )**
ATTIC PRODUCTS
G-320 BORANADA PHASE-3
JODHPUR , RAJASTHAN
342012 INDIA
Container No./Seal/Size:
TCNU5166690/R2416040/40H
TCNU6449289/R2416022/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES
350 CARTONS

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-682-24

**Invoice Date.:** May 13, 2024

**Sold To:** BIG LOTS STORES, LLC
500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Delivery To:** 500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** TENO / 4127W

**Port of Loading:** MUNDRA

**Ship on or about:** July 17, 2024

**Port of Entry:** NORFOLK, VA

**Destination:** COLUMBUS, OH

**Container Number (Factory Load) :** FFAU1527386, GCXU5907867, UACU5490926

| Cargo Description | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|
| **P/O No.:** 95217768 | 525 | EA | 59.000/EA | 30,975.000 |
| **SKU No.:** 810732010 | 525 | CTNS | | |
| IRON MANGO WOOD COFFEE TABLE S/3 | No. of Pallet: | | | |
| **HTS Code.:** 9403200050 | | | | |
| | | | | |
| **Manufacturer Name & Address** | | | | |
| ATTIC PRODUCTS G-320 BORANADA PHASE-3 JODHPUR JODHPUR, RAJASTHAN 342012, INDIA | | | | |
| **Total:** (525 CTNS) | 525 | | | 30,975.000 |
| **TOTAL (USD) DOLLARS : THIRTY THOUSAND NINE HUNDRED SEVENTY-FIVE ONLY.** | | | | |

**Consolidator(Full Name & Address)**
ATTIC PRODUCTS
G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
FFAU1527386/HLG6030597/40H
GCXU5907867/HLG6030595/40H
UACU5490926/HLG6030596/40H

**Container Stuffing Location(Full Name & Address )**
ATTIC PRODUCTS
G-320 BORANADA PHASE-3
JODHPUR , RAJASTHAN
342012 INDIA
Container No./Seal/Size:
FFAU1527386/HLG6030597/40H
GCXU5907867/HLG6030595/40H
UACU5490926/HLG6030596/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES
525 CARTONS

# ATTIC PRODUCTS

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# PACKING LIST

**Invoice No.:** AJ-682-24

**Invoice Date.:** May 13, 2024

**Sold To:**  BIG LOTS STORES, LLC
500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Delivery To:**  500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** TENO / 4127W

**Port of Loading:** MUNDRA

**Ship on or about:** July 17, 2024

**Port of Entry:** NORFOLK, VA

**Destination:** COLUMBUS, OH

**Container Number (Factory Load) :** FFAU1527386, GCXU5907867, UACU5490926

| Cargo Description | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|
| **P/O No.:** 95217768 | 525  EA | 10,426.50 | 14,311.50 | 201.489 |
| **SKU No.:** 810732010 | 525  CTNS | | | |
| IRON MANGO WOOD COFFEE TABLE S/3   **No. of Pallet:** | | | | |
| **HTS Code.:** 9403200050 | | | | |
| **Total:**     **(525 CTNS)** | 525 | 10,426.50 | 14,311.50 | 201.489 |

**Consolidator(Full Name & Address)**
ATTIC PRODUCTS
G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
FFAU1527386/HLG6030597/40H
GCXU5907867/HLG6030595/40H
UACU5490926/HLG6030596/40H

**Container Stuffing Location(Full Name & Address )**
ATTIC PRODUCTS
G-320 BORANADA PHASE-3
JODHPUR , RAJASTHAN
342012 INDIA
Container No./Seal/Size:
FFAU1527386/HLG6030597/40H
GCXU5907867/HLG6030595/40H
UACU5490926/HLG6030596/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES
525 CARTONS

**ATTIC PRODUCTS**

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-918-24

**Invoice Date.:** June 12, 2024

**Sold To:** DURANT DC, LLC
2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Delivery To:** 2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** EVER SAFETY / 114E

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 10, 2024

**Port of Entry:** HOUSTON, TX

**Destination:** DURANT, OK

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| **P/O No.:** 95320746 | | 174 | EA | 5.970/EA | 1,038.780 |
| **SKU No.:** 810747464 | | 58 | CTNS | | |
| ACACIA WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320746 | | 174 | EA | 6.240/EA | 1,085.760 |
| **SKU No.:** 810747644 | | 58 | CTNS | | |
| MANGO WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320746 | | 174 | EA | 4.620/EA | 803.880 |
| **SKU No.:** 810747992 | | 58 | CTNS | | |
| ACACIA WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |

**Manufacturer Name & Address**

ATTIC PRODUCTS
G-320 BORANADA PHASE-3 JODHPUR
JODHPUR, RAJASTHAN
342012, INDIA

| | Total: | (174 CTNS) | 522 | 2,928.420 |
|---|---|---|---|---|

TOTAL (USD) DOLLARS : TWO THOUSAND NINE HUNDRED TWENTY-EIGHT AND CENTS FORTY-TWO ONLY.

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
FFAU1832902/IN1482809/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
FFAU1832902/IN1482809/40H

We certify that there is no wood packing material in the shipment.

BIG LOTS
STORES
174 CARTONS

# ATTIC PRODUCTS

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

---

# PACKING LIST

**Invoice No.:** AJ-918-24

**Invoice Date.:** June 12, 2024

**Sold To:** DURANT DC, LLC
2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Delivery To:** 2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** EVER SAFETY / 114E

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 10, 2024

**Port of Entry:** HOUSTON, TX

**Destination:** DURANT, OK

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95320746 | | 174 EA | 339.30 | 408.90 | 2.356 |
| **SKU No.:** 810747464 | | 58 CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320746 | | 174 EA | 226.20 | 295.80 | 1.148 |
| **SKU No.:** 810747644 | | 58 CTNS | | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320746 | | 174 EA | 295.80 | 371.20 | 1.310 |
| **SKU No.:** 810747992 | | 58 CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| Total: (174 CTNS) | | 522 | 861.30 | 1,075.90 | 4.814 |

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
FFAU1832902/IN1482809/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
FFAU1832902/IN1482809/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES

**ATTIC PRODUCTS**                                                    Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

---

# INVOICE

**Invoice No.:** AJ-1054-24                    **Invoice Date.:** June 24, 2024

**Sold To:**    AVDC, LLC                       **Delivery To:**    18880 NAVAJO ROAD
               18880 NAVAJO ROAD                                   APPLE VALLEY, CA 92307
               APPLE VALLEY, CA 92307                              USA
               USA

**Shipment Terms:** TT 60 DAYS                  **Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA                    **L/C Number:** TT

**Vessel / Voyage:** SEASPAN GANGES / 4130      **Port of Loading:** NHAVA SHEVA

**Ship on or about:** July 30, 2024             **Port of Entry:** SAVANNAH, GA

                                               **Destination:** SAVANNAH, GA

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| P/O No.: 95320743 | | 336 | EA | 5.970/EA | 2,005.920 |
| SKU No.: 810747464 | | 112 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| HTS Code.: 4419209000 | | | | | |
| | | | | | |
| P/O No.: 95320743 | | 336 | EA | 6.240/EA | 2,096.640 |
| SKU No.: 810747644 | | 112 | CTNS | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| HTS Code.: 4419209000 | | | | | |
| | | | | | |
| P/O No.: 95320743 | | 336 | EA | 4.620/EA | 1,552.320 |
| SKU No.: 810747992 | | 112 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| HTS Code.: 4419209000 | | | | | |

Manufacturer Name & Address

ATTIC PRODUCTS
G-320 BORANADA PHASE-3 JODHPUR
JODHPUR, RAJASTHAN
342012, INDIA

| | Total: | (336 CTNS) | 1,008 | 5,654.880 |
|---|---|---|---|---|

TOTAL (USD) DOLLARS : FIVE THOUSAND SIX HUNDRED FIFTY-FOUR AND CENTS EIGHTY-EIGHT ONLY.

---

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
HLBU1013769/HLG9031057/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
HLBU1013769/HLG9031057/40H

We certify that there is no wood packing material in the shipment.

Page 1 of 2

BIG LOTS
STORES
336 CARTONS

# ATTIC PRODUCTS
Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

---

# PACKING LIST

**Invoice No.:** AJ-1054-24

**Invoice Date.:** June 24, 2024

**Sold To:** AVDC, LLC
18880 NAVAJO ROAD
APPLE VALLEY, CA 92307
USA

**Delivery To:** 18880 NAVAJO ROAD
APPLE VALLEY, CA 92307
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** SEASPAN GANGES / 4130

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** July 30, 2024

**Port of Entry:** SAVANNAH, GA

**Destination:** SAVANNAH, GA

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95320743 | | 336  EA | 655.20 | 789.60 | 3.541 |
| **SKU No.:** 810747464 | | 112  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320743 | | 336  EA | 436.80 | 571.20 | 2.718 |
| **SKU No.:** 810747644 | | 112  CTNS | | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320743 | | 336  EA | 571.20 | 716.80 | 3.040 |
| **SKU No.:** 810747992 | | 112  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **Total:** | **(336 CTNS)** | 1,008 | 1,663.20 | 2,077.60 | 9.299 |

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
HLBU1013769/HLG9031057/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
HLBU1013769/HLG9031057/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES

**ATTIC PRODUCTS**

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-1055-24            **Invoice Date.:** June 24, 2024

**Sold To:**     CSC DISTRIBUTION, LLC      **Delivery To:**     2855 SELMA HIGHWAY
               2855 SELMA HIGHWAY                        MONTGOMERY, AL 36108
               MONTGOMERY, AL 36108                 USA
               USA

**Shipment Terms:** TT 60 DAYS            **Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA            **L/C Number:** TT

**Vessel / Voyage:** TUCAPEL / 4133            **Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 21, 2024            **Port of Entry:** SAVANNAH, GA

                                             **Destination:** MONTGOMERY, AL

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| **P/O No.:** 95320744 | | 171 | EA | 5.970/EA | 1,020.870 |
| **SKU No.:** 810747464 | | 57 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320744 | | 171 | EA | 6.240/EA | 1,067.040 |
| **SKU No.:** 810747644 | | 57 | CTNS | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320744 | | 171 | EA | 4.620/EA | 790.020 |
| **SKU No.:** 810747992 | | 57 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | **Manufacturer Name & Address** | | | | |
| | ATTIC PRODUCTS G-320 BORANADA PHASE-3 JODHPUR JODHPUR, RAJASTHAN 342012, INDIA | | | | |
| | Total: | (171 CTNS) | | 513 | 2,877.930 |

TOTAL (USD) DOLLARS : TWO THOUSAND EIGHT HUNDRED SEVENTY-SEVEN AND CENTS NINETY-THREE ONLY.

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
FFAU1143230/HLG6291684/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
FFAU1143230/HLG6291684/40H

We certify that there is no wood packing material in the shipment.

BIG LOTS
STORES

171 CARTONS

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# PACKING LIST

**Invoice No.:** AJ-1055-24

**Invoice Date.:** June 24, 2024

**Sold To:** CSC DISTRIBUTION, LLC
2855 SELMA HIGHWAY
MONTGOMERY, AL 36108
USA

**Delivery To:** 2855 SELMA HIGHWAY
MONTGOMERY, AL 36108
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** TUCAPEL / 4133

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 21, 2024

**Port of Entry:** SAVANNAH, GA

**Destination:** MONTGOMERY, AL

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95320744 | | 171 EA | 333.45 | 401.85 | 2.438 |
| **SKU No.:** 810747464 | | 57 CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320744 | | 171 EA | 222.30 | 290.70 | 1.129 |
| **SKU No.:** 810747644 | | 57 CTNS | | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320744 | | 171 EA | 290.70 | 364.80 | 1.293 |
| **SKU No.:** 810747992 | | 57 CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| Total: | (171 CTNS) | 513 | 846.45 | 1,057.35 | 4.860 |

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
FFAU1143230/HLG6291684/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
FFAU1143230/HLG6291684/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES

**ATTIC PRODUCTS**

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-1056-24

**Invoice Date.:** June 24, 2024

| | |
|---|---|
| **Sold To:** | CLOSEOUT DISTRIBUTION, LLC<br>50 RAUSCH CREEK RD<br>TREMONT, PA 17981<br>USA |

| | |
|---|---|
| **Delivery To:** | 50 RAUSCH CREEK RD<br>TREMONT, PA 17981<br>USA |

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** APL SOUTHAMPTON / 418W

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 18, 2024

**Port of Entry:** NEW YORK, NY

**Destination:** TREMONT, PA

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| **P/O No.:** 95320745 | | 306 | EA | 5.970/EA | 1,826.820 |
| **SKU No.:** 810747464 | | 102 | CTNS | | |
| ACACIA WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320745 | | 306 | EA | 6.240/EA | 1,909.440 |
| **SKU No.:** 810747644 | | 102 | CTNS | | |
| MANGO WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| | | | | | |
| **P/O No.:** 95320745 | | 306 | EA | 4.620/EA | 1,413.720 |
| **SKU No.:** 810747992 | | 102 | CTNS | | |
| ACACIA WOOD SERVING BOARD | **No. of Pallet:** | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| <u>Manufacturer Name & Address</u><br>ATTIC PRODUCTS<br>G-320 BORANADA PHASE-3 JODHPUR<br>JODHPUR, RAJASTHAN<br>342012, INDIA | | | | | |
| Total: | (306 CTNS) | 918 | | | 5,149.980 |

**TOTAL (USD) DOLLARS : FIVE THOUSAND ONE HUNDRED FORTY-NINE AND CENTS NINETY-EIGHT ONLY.**

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
UETU5610836/OOLJSC2217/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
UETU5610836/OOLJSC2217/40H

We certify that there is no wood packing material in the shipment.

BIG LOTS
STORES
306 CARTONS

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# PACKING LIST

**Invoice No.:** AJ-1056-24

**Invoice Date.:** June 24, 2024

**Sold To:**      CLOSEOUT DISTRIBUTION, LLC
50 RAUSCH CREEK RD
TREMONT, PA 17981
USA

**Delivery To:**      50 RAUSCH CREEK RD
TREMONT, PA 17981
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** APL SOUTHAMPTON / 418W

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 18, 2024

**Port of Entry:** NEW YORK, NY

**Destination:** TREMONT, PA

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95320745 | | 306  EA | 596.70 | 719.10 | 4.364 |
| **SKU No.:** 810747464 | | 102  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320745 | | 306  EA | 397.80 | 520.20 | 2.020 |
| **SKU No.:** 810747644 | | 102  CTNS | | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320745 | | 306  EA | 520.20 | 652.80 | 2.313 |
| **SKU No.:** 810747992 | | 102  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| Total:          (306 CTNS) | | 918 | 1,514.70 | 1,892.10 | 8.697 |

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
UETU5610836/OOLJSC2217/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
UETU5610836/OOLJSC2217/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

---

# INVOICE

**Invoice No.:** AJ-1057-24

**Invoice Date.:** June 24, 2024

**Sold To:**     BIG LOTS STORES, LLC
500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Delivery To:**     500 PHILLIPI RD
COLUMBUS, OH 43228
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** TORRENTE / 4132

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 13, 2024

**Port of Entry:** NORFOLK, VA

**Destination:** COLUMBUS, OH

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| **P/O No.:** 95320747 | | 168 | EA | 5.970/EA | 1,002.960 |
| **SKU No.:** 810747464 | | 56 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320747 | | 168 | EA | 6.240/EA | 1,048.320 |
| **SKU No.:** 810747644 | | 56 | CTNS | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320747 | | 168 | EA | 4.620/EA | 776.160 |
| **SKU No.:** 810747992 | | 56 | CTNS | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |

<u>Manufacturer Name & Address</u>

ATTIC PRODUCTS
G-320 BORANADA PHASE-3 JODHPUR
JODHPUR, RAJASTHAN
342012, INDIA

| | | | | |
|---|---|---|---|---|
| Total: | (168 CTNS) | 504 | | 2,827.440 |

TOTAL (USD) DOLLARS : TWO THOUSAND EIGHT HUNDRED TWENTY-SEVEN AND CENTS FORTY-FOUR ONLY.

---

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
SEGU5618304/HLG6337897/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
SEGU5618304/HLG6337897/40H

We certify that there is no wood packing material in the shipment.

BIG LOTS
STORES
168 CARTONS

**ATTIC PRODUCTS**

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# PACKING LIST

**Invoice No.:** AJ-1057-24

**Invoice Date:** June 24, 2024

**Sold To:**      BIG LOTS STORES, LLC
          500 PHILLIPI RD
          COLUMBUS, OH 43228
          USA

**Delivery To:**      500 PHILLIPI RD
               COLUMBUS, OH 43228
               USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** TORRENTE / 4132

**Port of Loading:** NHAVA SHEVA

**Ship on or about:** August 13, 2024

**Port of Entry:** NORFOLK, VA

**Destination:** COLUMBUS, OH

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95320747 | | 168  EA | 327.60 | 394.80 | 2.395 |
| **SKU No.:** 810747464 | | 56  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320747 | | 168  EA | 218.40 | 285.60 | 1.109 |
| **SKU No.:** 810747644 | | 56  CTNS | | | |
| MANGO WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| **P/O No.:** 95320747 | | 168  EA | 285.60 | 358.40 | 1.270 |
| **SKU No.:** 810747992 | | 56  CTNS | | | |
| ACACIA WOOD SERVING BOARD | No. of Pallet: | | | | |
| **HTS Code.:** 4419209000 | | | | | |
| Total:      (168 CTNS) | | 504 | 831.60 | 1,038.80 | 4.774 |

**Consolidator(Full Name & Address)**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
TG TERMINALS CFS NHAVA SHEVA,
VILLAGE VESHVI, POST DIGHODE,TAL URAN, RAIGAD, NAVI
MUMBAI 400 702
NAVI MUMBAI , MAHARASHTRA
400702 INDIA
Container No./Seal/Size:
SEGU5618304/HLG6337897/40H

**Container Stuffing Location(Full Name & Address )**
YUSEN LOGISTICS (INDIA) PRIVATE LIMITED
CFS VILLAGE- VESHVI, POST- DIGHODE,TALUKA-URAN,
DISTRICT-RAIGAD NAVI
MUMBAI , MAHARASHTRA
410206 INDIA
Container No./Seal/Size:
SEGU5618304/HLG6337897/40H

We certify that there is no wood packing material in the shipment.

**Carton Marks And Number**

BIG LOTS
STORES

# ATTIC PRODUCTS

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

# INVOICE

**Invoice No.:** AJ-1058-24

**Invoice Date.:** June 24, 2024

**Sold To:**   DURANT DC, LLC
2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Delivery To:**   2306 ENTERPRISE DR
DURANT, OK 74701
USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** SAN DIEGO BRIDGE / 0VBHXW1MA

**Port of Loading:** MUNDRA

**Ship on or about:** August 08, 2024

**Port of Entry:** LOS ANGELES, CA

**Destination:** DURANT, OK

**Container Number (Factory Load) :** MOTU1429904, ONEU0191916

| Cargo Description | | Quantity (Unit) | | Unit Price (USD) | Total Amount (USD) |
|---|---|---|---|---|---|
| **P/O No.:** 95322264 | | 130 | EA | 96.000/EA | 12,480.000 |
| **SKU No.:** 810746854 | | 130 | CTNS | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130 | EA | 96.000/EA | 12,480.000 |
| **SKU No.:** 810746855 | | 130 | CTNS | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130 | EA | 96.000/EA | 12,480.000 |
| **SKU No.:** 810746970 | | 130 | CTNS | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130 | EA | 96.000/EA | 12,480.000 |
| **SKU No.:** 810747031 | | 130 | CTNS | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| | **Manufacturer Name & Address** | | | | |
| | ATTIC PRODUCTS G-320 BORANADA PHASE-3 JODHPUR JODHPUR, RAJASTHAN 342012, INDIA | | | | |
| **Total:** | **(520 CTNS)** | **520** | | | **49,920.000** |
| **TOTAL (USD) DOLLARS : FORTY-NINE THOUSAND NINE HUNDRED TWENTY ONLY.** | | | | | |

**Consolidator(Full Name & Address)**
ATTIC PRODUCTS

**Container Stuffing Location(Full Name & Address )**
MUNDHRA C F S PVT LTD

G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
MOTU1429904/IN1642090/40H
ONEU0191916/IN1642089/40H

MUNDRA PORT SEZ LTD MUNDRA
DISTT KUTCH
KUTCH , GUJARAT
370 421 INDIA
Container No./Seal/Size:
MOTU1429904/IN1642090/40H
ONEU0191916/IN1642089/40H

We certify that there is no wood packing material in the shipment.

## Carton Marks And Number

BIG LOTS
STORES
520 CARTONS

# ATTIC PRODUCTS

Seller reference

X-6, OKHLA INDUSTRIAL AREA , PHASE-2 , NEW DELHI, DELHI, 110 020 , INDIA

---

# PACKING LIST

**Invoice No.:** AJ-1058-24

**Invoice Date:** June 24, 2024

**Sold To:**     DURANT DC, LLC
               2306 ENTERPRISE DR
               DURANT, OK 74701
               USA

**Delivery To:**     2306 ENTERPRISE DR
                   DURANT, OK 74701
                   USA

**Shipment Terms:** TT 60 DAYS

**Payment Term / OAT #(Open Account Transaction):**

**Country of Origin:** INDIA

**L/C Number:** TT

**Vessel / Voyage:** SAN DIEGO BRIDGE / 0VBHXW1MA

**Port of Loading:** MUNDRA

**Ship on or about:** August 08, 2024

**Port of Entry:** LOS ANGELES, CA

**Destination:** DURANT, OK

**Container Number (Factory Load) :** MOTU1429904, ONEU0191916

| Cargo Description | | Quantity (Unit) | Net Weight (KGS) | Gross Weight (KGS) | CBM |
|---|---|---|---|---|---|
| **P/O No.:** 95322264 | | 130  EA | 3,967.60 | 4,856.80 | 32.804 |
| **SKU No.:** 810746854 | | 130  CTNS | | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130  EA | 3,967.60 | 4,856.80 | 32.804 |
| **SKU No.:** 810746855 | | 130  CTNS | | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130  EA | 3,967.60 | 4,856.80 | 32.804 |
| **SKU No.:** 810746970 | | 130  CTNS | | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| **P/O No.:** 95322264 | | 130  EA | 3,967.60 | 4,856.80 | 32.804 |
| **SKU No.:** 810747031 | | 130  CTNS | | | |
| MANGO WOOD 2 DOOR CABINET/MANGO WOOD 2 DOOR CABINET | **No. of Pallet:** | | | | |
| **HTS Code.:** 9403608081 | | | | | |
| Total:          (520 CTNS) | | 520 | 15,870.40 | 19,427.20 | 131.216 |

**Consolidator(Full Name & Address)**

ATTIC PRODUCTS
G-320 BORANADA IINDUSTRIAL AREA PH-3
JODHPUR , RAJASTHAN
342008 INDIA
Container No./Seal/Size:
MOTU1429904/IN1642090/40H
ONEU0191916/IN1642089/40H

**Container Stuffing Location(Full Name & Address )**

MUNDHRA C F S PVT LTD
MUNDRA PORT SEZ LTD MUNDRA
DISTT KUTCH
KUTCH , GUJARAT
370 421 INDIA
Container No./Seal/Size:
MOTU1429904/IN1642090/40H
ONEU0191916/IN1642089/40H

We certify that there is no wood packing material in the shipment.

<u>**Carton Marks And Number**</u>

BIG LOTS
STORES
520 CARTONS

# Yusen Logistics

*Yusen Logistics - Yusen Logistics*   *Yusen Logistics - Yusen Logistics*

FORWARDER'S CARGO RECEIPT No.   **CNS-MUN-2400105**

| Maker/Supplier : | **ATTIC PRODUCTS** | Maker/Supplier's INVOICE No. |
| | **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | **AJ-480-24** |
| Buyer/Consignee : | **DURANT DC, LLC** | Dated: **May 04, 2024** |
| | **2306 ENTERPRISE DR, DURANT, OK 74701, USA** | |
| Shipment From : | **MUNDRA**    To : **DURANT, OK** | Date of Receipt of Cargo **June 26, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|

```
BIG LOTS STORES                  NOTIFY PARTY: GEODIS
PO NO: 95217767                               5101 S. BROAD STREET
SKU NO: 810732010                             PHILADELPHIA, PA 19112-1404, U.S.A.
CARTON 1 - 350                                ATTN: ALENA LAMINA
MADE IN INDIA                    ALSO NOTIFY: EDRAY 2020 LLC.
                                              1300 SOUTH MINT STREET SUITE 200
                                              CHARLOTTE NC 28203 USA
                                              TEL: 704-593-6329
                                              EMAIL: DATAQUALITY@EDRAYCPL.COM

                                 CY-CY

                                 OTHER FURNITURE
                                 PO NO: 95217767
                                 SKU NO: 810732010
                                 QTY: 350
                                 GR.WT: 9541.000 KGS
                                 SB.NO: 1871523 DT. 22/06/2024

                                 *NEW DELHI-110020

                                 SHIPPER'S LOAD, COUNT AND SEAL
                                 SAID TO CONTAIN
                                 TCNU5166690          SEAL# R2416040       40H  DRY
                                 TCNU6449289          SEAL# R2416022       40H  DRY

                                 SHIP TO CODE & LOCATION : 00879-DURANT, OK
                                 SHIPPER DECLARED ALL CONTAINER(S) CONTAIN NO WOOD PACKAGING
                                 MATERIAL
                                 350 CARTONS                    134.326 CBM    9,541.00 KGS
                                 ==============================================================
                                 TOTAL : THREE HUNDRED FIFTY (350) CARTONS ONLY
               "FREIGHT COLLECT"
SHIPMENT PER S.S. "OOCL BREMERHAVEN" VOY NO. 0VBHNW1MA   DISCHARGED AT HOUSTON, TX
SAILING ON / ABOUT July 6, 2024. CARGO RECEIVED ON June 26, 2024.
```

| THIS IS NOT A DOCUMENT OF TITLE | **MUNDRA**                    **July 4, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.) **YUSEN LOGISTICS** **For Yusen Logistics (India) Private Limited** *Authorised Signatory* As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)                  V1 |

ORIGINAL

**1. DEFINITIONS**

1.1. "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its capacity as an origin services provider for its customer who is the ultimate consignee of this shipment.

1.2. "Conditions" means the entire undertakings, terms, conditions, and clauses embodied herein, and includes terms and conditions on the front and any Shippers' Instructions received in writing at the time of receipt.

1.3. "Shipper" means the vendor tendering items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of those cargoes to Company.

1.4. "Shippers' Instructions" means any of Shipper's specific written shipping instructions or requirements delivered to Company at the time of receipt of the cargoes.

1.5. "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to these Conditions.

1.6. "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage, warehousing, collection, delivery, local transportation, insurance, customs clearance, packing, unpacking, and other handling of goods and other services intended to accomplish delivery of the cargoes to Company's customer, the ultimate consignee.

1.7. "Owner" means the owner of the cargoes (including any packings, containers, or equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2. COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1 In the event that any provisions contained herein are inconsistent with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency, shall be null and void in relation to such element of the Services by Company, but the remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2 Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3 Any and all actor information or Services provided by Company gratuitously is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3. SHIPPER'S WARRANTIES**

3.1 Shipper warrants as follows:

a) By accepting these Conditions, Shipper agrees to be bound by all stipulations, exceptions, terms, and conditions on the front and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b) By accepting these Conditions and agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c) The description and particulars relating to the cargoes set out on the front hereof: (a) have been checked by Shipper on receipt of these Conditions; and (b) are full and accurate;

d) The cargoes contain no drugs, prohibited or stolen goods, contraband, or other illegal material or substance or stowaways;

e) The cargoes have been properly and sufficiently prepared, packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation, packing, stowage, labelling, and/or marking are appropriate to the storage, handling, and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f) Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g) Shipper shall provide the total gross mass established value and certified equipment of each packed Container (FCL) or each package of cargoes (LCL) in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company, have been properly and sufficiently packed and/or prepared, and that Company has no liability for any loss of or damage to cargoes which are improperly or insufficiently packed or prepared, no matter how such loss or damage is caused.

h) Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks, igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i) The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and

ii) The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

j) Description of Cargoes: All descriptions, values, and other particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that such information is true, complete, and accurate.

k) Fitness of Cargoes: The cargoes are fit and suitable for the carriage (international as well as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l) Delivery of Cargoes: The consignee or other person entitled to the delivery of the goods shall take delivery of the goods upon their arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4. DANGEROUS GOODS**

4.1 Cargoes tendered by Shipper to Company are not of such nature that they are or may become dangerous, hazardous, noxious (including radioactive materials), inflammable, explosive, or which do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods") unless Shipper, or someone acting on its behalf, has given Company written notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company has expressly accepted in writing to deal with the Dangerous Goods. Shipper's notice will include all information necessary for Company to perform its obligation in connection with the Dangerous Goods in accordance with all applicable Laws or requirements (or any combination of the foregoing), including without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2 Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and to so comply with all Laws.

4.3 Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5. COMPANY'S AUTHORITY**

5.1 SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE ENTITLED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2 Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary or desirable in Shipper's interests.

5.3 Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior consultation with or further authorization from Shipper.

5.4 Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's commission or remuneration or profit. Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account to Shipper for Company's commissions, remunerations, or profits.

5.5 Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6 Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately. Company is authorized (but not obliged) to consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7 Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations. Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6. LIABILITY AND LIMITATIONS**

6.1 SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL, OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2 Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3 Liability for Loss or Damage to Cargoes -- Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a) A force majeure event;

b) Strike, lock-out, stoppage or restraint of labor, the consequences of which Company is munable to avoid by the exercise of reasonable diligence;

c) Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d) Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4 Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a) The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b) Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5 No insurance will be arranged by Company for the benefit of Shipper.

6.6 Entire Liability -- Except as set forth in this Section, Company shall not be liable for loss of or damage to any cargoes or have any liability whatsoever for any events arising out or in connection with the storage and handling of cargoes and/or this FCR.

6.7 Application of Defenses, Limits, and Exclusions of Liability - The defenses, limits and exclusions of liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or in connection with the Services (including loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or implied warranty, or otherwise, even if the loss or damage arose as a result of negligence, willful misconduct, or fundamental breach of contract.

6.8 By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional charges for accepting such increased liability.

**7. INDEMNITY**

7.1. Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2. Advice and information, in whatever form as may be given by Company, are provided by Company for Shipper only and Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out of any other person relying on such advice or information. Except under special arrangements previously made in writing, advice, or information which is not related to specific instructions accepted by Shipper is provided gratuitously and without liability.

7.3. Shipper undertakes that no claim shall be made against any officer, servant, agent, or sub-contractor of Company which imposes or attempts to impose upon them any liability in connection with any Services provided or to be provided by Company. If any such claim should nevertheless be made Shipper shall indemnify Company against all consequences thereof. Without prejudice to the foregoing every such officer, servant, agent, and sub -contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit. For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4. Shipper shall defend, indemnify, and hold harmless Company from and against all claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions, and without prejudice to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8. WAREHOUSING**

8.1 Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9. DECLARED VALUE**

9.1 Company shall not be obliged to make any declaration for the purpose of any statute or convention or contract as to the nature or value of any goods or as to any special interest in delivery unless express instructions in writing were previously given to and accepted by Company. A mere statement or declaration of the value or nature of cargoes for insurance or export or customs or other purposes is not and shall not be construed to be Shipper's Instructions to Company to make any such declaration.

**10. SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1 Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied by the authorities at any port or place for or in connection with cargoes and for any payments, storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or sustained by Company in connection therewith.

**11. LIEN, DISPOSAL OF GOODS, ETC.**

11.1 Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper, directly or indirectly in Company's possession, custody, control, or enroute for all monies due to Company and/or its affiliates from Shipper or the ultimate consignee. Company may at its sole discretion exercise its lien at any time and at any place. The lien shall cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing and preserving its lien (including but not limited to storage charges) and in recovering or attempting to recover any sums due from Shipper or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2 Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private treaty or by public auction or other means, without giving prior notice or incurring any liability to Shipper and to apply the proceeds of such sale (net of expenses) in or towards the payment of any amount due to Company. Company shall be entitled to claim the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do not discharge in full the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes.

11.3 Perishable cargoes which are not taken up immediately upon arrival or which are insufficiently addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to delivery. All charges and expenses arising in connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4 The rights of Company under this Section are independent and cumulative.

**12. RATES AND CHARGES**

12.1 Shipper is directly and primarily liable for the payment of all charges owed to Company in performance of the Services at origin for its benefit. Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set -off.

12.2 Company at its discretion may request an advance to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice is rendered. Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3 On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13. NOTICE OF CLAIM**

13.1 Any claim against Company must be in writing and delivered to Company at its registered office or its principal place of business in Hong Kong within 3 days of:

a) In the case of damage to goods, the date of delivery of cargoes;

b) In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c) In any other case, the date of the event giving rise to the claim.

13.2 No action shall lie against Company if the claim is not made within the times and in the manner specified herein.

**14. TIME BAR**

14.1 Any right of action against Company shall be extinguished if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes arrived at the destination or the date cargoes should have arrived at the destination (whichever date is the earlier).

**15. NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1 Shipper agrees that: (a) Company shall have no obligation to Shipper whatsoever related to Collect on Delivery (C.O.D.) shipments and commensurate obligations for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16. GOVERNING LAW**

16.1 These Conditions and any act or contract to which they apply shall be governed by and construed according to the laws of the Hong Kong Special Administrative Region. Any dispute arising out of these Conditions or any such act or contract shall be subject to the non exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region.

# Yusen Logistics

Yusen Logistics - Yusen Logistics    Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-MUN-2400112**

| | | Maker/Supplier's INVOICE No. |
|---|---|---|
| Maker/Supplier : | ATTIC PRODUCTS<br>X-6, OKHLA INDUSTRIAL AREA PHASE-2, | **AJ-682-24** |
| Buyer/Consignee : | BIG LOTS STORES, LLC<br>500 PHILLIPI RD, COLUMBUS, OH 43228, USA | Dated: **May 13, 2024** |
| Shipment From : | MUNDRA        To : COLUMBUS, OH | Date of Receipt of Cargo<br>**July 04, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| PLEASE REFER TO ATTACHED SHEET(S). | | NOTIFY PARTY: GEODIS<br>5101 S. BROAD STREET<br>PHILADELPHIA, PA 19112-1404, U.S.A.<br>ATTN: ALENA LAMINA<br>ALSO NOTIFY: EDRAY 2020 LLC.<br>1300 SOUTH MINT STREET SUITE 200<br>CHARLOTTE NC 28203 USA<br>TEL: 704-593-6329<br>EMAIL: DATAQUALITY@EDRAYCPL.COM<br>CY-CY | | |
| | 525 CARTONS | | 201.489 CBM | 14,311.50 KGS |

TOTAL : FIVE HUNDRED TWENTY-FIVE (525) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "TENO" VOY NO. 4127W    DISCHARGED AT NORFOLK, VA
SAILING ON / ABOUT July 17, 2024. CARGO RECEIVED ON July 4, 2024.

| THIS IS NOT A DOCUMENT OF TITLE | MUNDRA        July 9, 2024 |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.)<br>**YUSEN LOGISTICS**<br><br>For Yusen Logistics (India) Private Limited<br><br>Authorised Signatory        As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)        V2 |

ORIGINAL

Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics

# Yusen Logistics

Yusen Logistics - Yusen Logistics                    Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-MUN-2400112**

| | | Maker/Supplier's INVOICE No. |
|---|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** | **AJ-682-24** |
| | **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | |
| Buyer/Consignee : | **BIG LOTS STORES, LLC** | Dated:  **May 13, 2024** |
| | **500 PHILLIPI RD, COLUMBUS, OH 43228, USA** | Date of Receipt of Cargo |
| Shipment From : | **MUNDRA**          To : **COLUMBUS, OH** | **July 04, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| PLEASE REFER TO ATTACHED SHEET(S). | | **NOTIFY PARTY: GEODIS**<br>    5101 S. BROAD STREET<br>    PHILADELPHIA, PA 19112-1404, U.S.A.<br>    ATTN: ALENA LAMINA | | |

**NOTIFY PARTY: GEODIS**
    5101 S. BROAD STREET
    PHILADELPHIA, PA 19112-1404, U.S.A.
    ATTN: ALENA LAMINA
**ALSO NOTIFY: EDRAY 2020 LLC.**
    1300 SOUTH MINT STREET SUITE 200
    CHARLOTTE NC 28203 USA
    TEL: 704-593-6329
    EMAIL: DATAQUALITY@EDRAYCPL.COM

**CY-CY**

| | | | | |
|---|---|---|---|---|
| | 525 CARTONS | | 201.489 CBM | 14,311.50 KGS |

**TOTAL : FIVE HUNDRED TWENTY-FIVE (525) CARTONS ONLY**

                "FREIGHT COLLECT"
SHIPMENT PER S.S. "TENO" VOY NO. 4127W    DISCHARGED AT NORFOLK, VA
SAILING ON / ABOUT July 17, 2024. CARGO RECEIVED ON July 4, 2024.

| THIS IS NOT A DOCUMENT OF TITLE | **MUNDRA**                      **July 9, 2024** |
|---|---|
| **Non-Negotiable**<br><br>Copy | (Place and date of issue.)<br><br>**YUSEN LOGISTICS**<br><br><br>As Agent<br>V2 |

Non-Negotiable Copy

# Yusen Logistics

V2

FCR No.   CNS-MUN-2400112

Attachment Page 1/1

**Shipping Mark**

BIG LOTS STORES

PO NO: 95217768

SKU NO: 810732010

CARTON 1 - 525

MADE IN INDIA

**Description of Goods**

OTHER FURNITURE

PO NO: 95217768

SKU NO: 810732010

QTY: 525

GR.WT: 14311.5 KGS

SB.NO: 2140527 DT. 03/07/2024

HS. CODE. NO: 94032090

INV.NO: AJ-682/24    DT: 13.05.2024

*NEW DELHI-110020

SHIPPER'S LOAD, COUNT AND SEAL

SAID TO CONTAIN

| FFAU1527386 | SEAL# HLG6030597 | 40H DRY |
| GCXU5907867 | SEAL# HLG6030595 | 40H DRY |
| UACU5490926 | SEAL# HLG6030596 | 40H DRY |

SHIP TO CODE & LOCATION : 00890-COLUMBUS, OH

SHIPPER DECLARED ALL CONTAINER(S) CONTAIN NO WOOD PACKAGING

MATERIAL

# Yusen Logistics

V2

FCR No.    CNS-MUN-2400112                                    Attachment Page 1/1

**Shipping Mark**

BIG LOTS STORES
PO NO: 95217768
SKU NO: 810732010
CARTON 1 - 525
MADE IN INDIA

**Description of Goods**

OTHER FURNITURE
PO NO: 95217768
SKU NO: 810732010
QTY: 525
GR.WT: 14311.5 KGS
SB.NO: 2140527 DT. 03/07/2024
HS. CODE. NO: 94032090
INV.NO: AJ-682/24    DT: 13.05.2024

*NEW DELHI-110020

SHIPPER'S LOAD, COUNT AND SEAL
SAID TO CONTAIN
FFAU1527386          SEAL# HLG6030597          40H  DRY
GCXU5907867          SEAL# HLG6030595          40H  DRY
UACU5490926          SEAL# HLG6030596          40H  DRY

SHIP TO CODE & LOCATION : 00890-COLUMBUS, OH
SHIPPER DECLARED ALL CONTAINER(S) CONTAIN NO WOOD PACKAGING
MATERIAL

Forwarders' Cargo Receipt
Terms and Conditions

**1.    DEFINITIONS**

1.1.    "Company" means Yusen Logistics Global  Management Limited trading  or any of its affiliate  entities issuing these Conditions in its  capacity as an origin services  provider for its customer who  is the ultimate consignee of this shipment.

1.2.    "Conditions" means the entire understandings,  terms, conditions, and clauses embodied herein, and includes terms and conditions on the  front and any Shippers'  Instructions received  in writing at the time of receipt of the cargoes.

1.3.    "Shipper" means the vendor tendering  items to Company for Services and any person at whose request  or on whose behalf Shipper undertakes any tender of  those cargoes to Company.

1.4.    "Shippers' Instructions" means any of Shipper's specific written shipping instructions or  requirements delivered to Company at the time of receipt of the cargoes.

1.5.    "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily  to any element of the Services or any subject matter incidental to these Conditions.

1.6.    "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage,  warehousing,  collection, delivery, local transportation, insurance, customs clearance, packing,  unpacking, and other  handling of goods and other  services intended to accomplish delivery of the  cargoes to Company's customer, the ultimate consignee.

1.7.    "Owner" means the owner of the cargoes (including any packings, containers, or  equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2.    COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1    In the event that any provisions contained herein are  inconsistent  with any Laws that apply compulsorily to any element of the Services, those provisions,  to the extent of such inconsistency,  shall be null and void in relation to such element of the Services by Company, but the  remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2    Nothing in these Conditions shall operate  to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3    Any and all such information or Services provided by Company gratuitously  is provided on the basis that Company will not accept any liability whatsoever thereto  re, whether in tort, bailment, or otherwise.

**3.    SHIPPER'S WARRANTIES**

3.1    Shipper warrants as follows:

a)    By accepting these Conditions, Shipper  agrees to be bound by all stipulations, exceptions, terms, and conditions on the front  and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b)    By accepting these Conditions and  agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c)    The description and  particulars relating to the  cargoes set out on the front hereof: (a) have been checked by Shipper  on receipt of these Conditions; and (b)  are full and accurate;

d)    The cargoes contain no drugs, prohibited  or stolen goods, contraband, or other illegal material or substance or stowaways;

e)    The cargoes have been properly and sufficiently prepared,  packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation,  packing,  stowage, labelling, and/or  marking are appropriate to the storage, handling,  and any  operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f)    Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g)    Shipper shall provide the total gross  mass established and certified and certified equipment of each packed Container (FCL) or  each package of cargoes (LCL)  in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the  accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance  with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company,  have been properly and sufficiently packed and/or prepared, and that Company has no liability for any  loss of or damage to cargoes which are improperly or  insufficiently packed or prepared, no matter how such loss or damage is caused.

h)    Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks,  igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i)    The transport unit is in good condition, is suitable to carry the goods loaded therein  or thereon, and is suitable for the intended carriage and other handling; and

ii)    The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

j)    Description of Cargoes: All descriptions, values, and other  particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that  such information is true, complete, and accurate.

k)    Fitness of Cargoes: The cargoes are fit  and suitable for the carriage (international as well  as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l)    Delivery of Cargoes: The consignee or  other person entitled to the  delivery of the goods shall take delivery of the goods upon their  arrival at destination  and shall  pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4.    DANGEROUS GOODS**

4.1    Cargoes tendered by Shipper to Company are  not of such nature that they are or may become  dangerous, hazardous, noxious (including  radioactive materials), inflammable, explosive, or which  do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods")  unless Shipper, or  someone acting on its behalf, has given Company written  notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company  has expressly accepted in writing to deal  with the Dangerous Goods. Shipper's notice  will include all information necessary for Company to perform  its obligation in connection with the Dangerous Goods in accordance  with all applicable Laws or requirements (or any combination of the foregoing), including  without limitation information about the characteristics of the Dangerous Goods, the appropriate manner  and method of storage and handling of the Dangerous Goods.

4.2    Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and to  so comply with all Laws.

4.3    Additional charges may apply to the storage  and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5.    COMPANY'S AUTHORITY**

5.1    SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE ENTITLED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2    Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary  or desirable in Shipper's interest.

5.3    Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior  consultation with or further  authorization from Shipper.

5.4    Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference  between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's  commission or remuneration or profit.  Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account  to Shipper for Company's commissions, remunerations, or profits.

5.5    Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6    Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately.  Company is authorized (but not obliged) to  consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7    Shipper expressly agrees to be bound in all respects by any act, contract, or  arrangement entered  into by Company with third-parties pursuant to the aforesaid authorizations.  Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6.    LIABILITY AND LIMITATIONS**

6.1    SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2    Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3    Liability for Loss or Damage to Cargoes — Without prejudice to any other right or remedies Company may have, Company shall be relieved of  liability for any loss or damage to cargoes if,  and to the extent that, such loss or damage is caused by:

a)    A force majeure event;

b)    Strike, lock-out, stoppage or restraint of labor, the consequences of  which Company is munable to avoid by the exercise of reasonable diligence;

c)    Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d)    Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4    Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a)    The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b)    Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5    No insurance will be arranged by Company for the benefit of Shipper.

6.6    Entire Liability – Except as set forth in  this Section, Company shall not  be liable for loss of  damage to any cargoes or have any liability whatsoever  for any events arising out  or in connection with the storage and handling of cargoes and/or this FCR.

6.7    Application of Defenses, Limits, and Exclusions of  Liability - The defenses, limits and exclusions of  liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or  in connection with the Services (including  loss or damage to cargoes) and whether the action  be founded in contract, bailment, tort, breach of express or  implied warranty, or otherwise, even if the loss or  damage arose as a result of negligence, willful misconduct, or fundamental breach of  contract.

6.8    By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and  has paid, Company's additional  charges for accepting such increased liability.

**7.    INDEMNITY**

7.1.    Shipper shall save harmless and  indemnify and keep indemnified Company  from and against all claims, liabilities, losses, damages, costs, and expenses (including without  limitation all duties,  taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature  levied by any authority) arising out of Company acting in accordance with Ship per's Instructions,  or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate  or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2.    Advice and information, in whatever form as may be given  by Company, are provided  by Company for Shipper only and Shipper shall save harmless and indemnify and keep  indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out  of any other person relying on such advice or information.  Except under special arrangements previously  made in writing, advice, or information which is not related to specific instructions accepted  by Shipper is provided  gratuitously and without liability.

7.3.    Shipper undertakes that no claim shall be made against any officer,  servant, agent, or  sub-contractor of Company which imposes or attempts to impose upon them any liability in  connection with any Services provided or to be provided by Company.  If any such claim should nevertheless be made Shipper  shall indemnify Company against all consequences  thereof.  Without prejudice to the foregoing  every such officer, servant, agent, and sub -contractor shall have the benefit  of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit.  For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4.    Shipper shall defend, indemnify, and hold harmless Company from and against all  claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions,  and without prejudice  to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or  in connection with the negligence of Company, its officers, servants, agents, or sub  -contractors.

**8.    WAREHOUSING**

8.1    Pending release of the cargoes after  provision of Services at origin, cargoes may be warehoused  or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9.    DECLARED VALUE**

9.1    Company shall not be obliged to make any declaration for the purpose of any  statute or convention or contract as to the nature or value of any goods or  as to any special interest  in delivery unless express instructions in  writing were previously given to and accepted by Company.  A mere statement or declaration of the value or nature of cargoes for  insurance or export  or customs or other purposes is not and shall not be construed to be Shipper's Instructions to Company to make any such declaration.

**10.    SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1    Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied  by the authorities at any port or place for or in connection with cargoes and for  any payments,  storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or  sustained by Company in connection therewith.

**11.    LIEN, DISPOSAL OF GOODS, ETC.**

11.1    Company shall have a general lien on all cargoes (and documents relating thereto)  and any other property belonging to Shipper,  directly or indirectly  in Company's possession, custody, control, or enroute for  all monies due to Company and/or its affiliates from Shipper or  the ultimate consignee.  Company may at its sole discretion exercise its lien at any  time and at any place. The lien shall  cover without limitation all charges, expenses, and advances of whatsoever  nature due to Company and/or its affiliates  and inclusive of any costs incurred enforcing  and preserving its lien (including  but not limited to storage charges) and in recovering or attempting to recover  any sums due from Shipper  or the ultimate consignee (whether  in respect of the storage and handling herein or otherwise).

11.2    Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or  any such other property by private  treaty or by public auction or  other means, without giving prior  notice or incurring any liability to Shipper and  to apply the proceeds of such sale (net of expenses) in or  towards the payment of any amount due to Company.  Company shall be entitled to claim  the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do  not discharge in full  the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes.

11.3    Perishable cargoes which are not  taken up immediately upon arrival or which are insufficiently  addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any  notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to  delivery.  All charges and expenses arising in  connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4    The rights of Company under this Section are independent and cumulative.

**12.    RATES AND CHARGES**

12.1    Shipper is directly and primarily liable for the  payment of all charges owed to Company in  performance of the Services at origin for its benefit.  Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any  claim, counterclaim, or set  -off.

12.2    Company at its discretion  may request an advance  to cover fees, duties, charges, taxes,  and/or other expenses payable before Shipper's invoice is  rendered.  Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3    On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof  at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13.    NOTICE OF CLAIM**

13.1    Any claim against Company must be in writing  and delivered to Company  at its registered office  or its principal place of business in Hong Kong within 3 days of:

a)    In the case of damage to goods, the date of delivery of cargoes;

b)    In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c)    In any other case, the date of the event giving  rise to the claim.

13.2    No action will lie against Company if  the claim is not made within the times and in the manner specified herein.

**14.    TIME BAR**

14.1    Any right of action against Company shall be extinguished  if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes  arrived at the destination or the date cargoes should have arrived  at the destination (whichever  date is the earlier).

**15.    NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1    Shipper agrees that: (a) Company shall have no obligation to Shipper whatsoever related  to Collect on Delivery (C.O.D.) shipments and commensurate obligations  for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts  or otherwise; and (b) Shipper bears all risk for  the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16.    GOVERNING LAW**

16.1    These Conditions  and any act or contract to which they apply  shall be governed  by and construed according to the laws of the Hong Kong Special Administrative Region.  Any dispute arising out  of these Conditions or any such act or contract shall be subject  to the non-exclusive jurisdiction of  the courts of the Hong Kong Special Administrative Region.

# Yusen Logistics

Yusen Logistics - Yusen Logistics          Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.     **CNS-NSA-2400719**

| | |
|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** <br> **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** |
| Buyer/Consignee : | **DURANT DC, LLC** <br> **2306 ENTERPRISE DR, DURANT, OK 74701, USA** |
| Shipment From : | **NHAVA SHEVA**     To : **DURANT, OK** |

Maker/Supplier's INVOICE No.
**AJ-918-24**

Dated: **June 12, 2024**

Date of Receipt of Cargo
**July 15, 2024**

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES <br> PO NO: 95320746 <br> SKU NO: 810747464, <br> 810747644,810747992 <br> CARTON 1 - 174 <br> MADE IN INDIA | | NOTIFY PARTY: GEODIS <br>      5101 S. BROAD STREET <br>      PHILADELPHIA, PA 19112-1404, U.S.A. <br>      ATTN: ALENA LAMINA <br> ALSO NOTIFY: EDRAY 2020 LLC. <br>      1300 SOUTH MINT STREET SUITE 200 <br>      CHARLOTTE NC 28203 USA <br>      TEL: 704-593-6329 <br>      EMAIL: DATAQUALITY@EDRAYCPL.COM <br><br> CFS-CY <br><br> KITCHENWARE <br> PO NO: 95320746 <br> SKU NO: 810747464,810747644,810747992 <br> QTY: 522 <br> GR.WT: 1075.900 KGS <br> SB.NO: 2313541 DT. 10/07/2024 <br><br> *NEW DELHI-110020 <br><br> FFAU1832902 (PART)    SEAL# IN1482809    40H DRY <br><br> SHIP TO CODE & LOCATION : 00879-DURANT, OK <br> SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING <br> MATERIAL | | |
| | 174 CARTONS | | 4.814 CBM | 1,075.90 KGS |

===============================================================
TOTAL : ONE HUNDRED SEVENTY-FOUR (174) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "EVER SAFETY" VOY NO. 114E    DISCHARGED AT HOUSTON, TX
SAILING ON / ABOUT August 10, 2024. CARGO RECEIVED ON July 15, 2024.

---

| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**          **July 22, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.) <br> **YUSEN LOGISTICS** <br><br> **For Yusen Logistics (India) Private Limited** <br><br> **Authorised Signatory**          As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** <br> (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)          V1 |

ORIGINAL

# Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400719**

| | |
|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** |
| Buyer/Consignee : | **DURANT DC, LLC** **2306 ENTERPRISE DR, DURANT, OK 74701, USA** |
| Shipment From : | **NHAVA SHEVA**          To : DURANT, OK |

Maker/Supplier's INVOICE No.
**AJ-918-24**

Dated: **June 12, 2024**

Date of Receipt of Cargo
**July 15, 2024**

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES PO NO: 95320746 SKU NO: 810747464, 810747644,810747992 CARTON 1 - 174 MADE IN INDIA | | NOTIFY PARTY: GEODIS 5101 S. BROAD STREET PHILADELPHIA, PA 19112-1404, U.S.A. ATTN: ALENA LAMINA ALSO NOTIFY: EDRAY 2020 LLC. 1300 SOUTH MINT STREET SUITE 200 CHARLOTTE NC 28203 USA TEL: 704-593-6329 EMAIL: DATAQUALITY@EDRAYCPL.COM CFS-CY KITCHENWARE PO NO: 95320746 SKU NO: 810747464,810747644,810747992 QTY: 522 GR.WT: 1075.900 KGS SB.NO: 2313541 DT. 10/07/2024 *NEW DELHI-110020 FFAU1832902 (PART)    SEAL# IN1482809    40H  DRY SHIP TO CODE & LOCATION : 00879-DURANT, OK SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING MATERIAL | | |
| | 174 CARTONS | | 4.814 CBM | 1,075.90 KGS |

TOTAL : ONE HUNDRED SEVENTY-FOUR (174) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "EVER SAFETY" VOY NO. 114E    DISCHARGED AT HOUSTON, TX
SAILING ON / ABOUT August 10, 2024. CARGO RECEIVED ON July 15, 2024.

| | |
|---|---|
| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**                    **July 22, 2024** |
| **Non-Negotiable** Copy | (Place and date of issue.) **YUSEN LOGISTICS** As Agent V1 |

Non-Negotiable Copy (watermark)

Forwarders' Cargo Receipt
Terms and Conditions

**1. DEFINITIONS**

1.1. "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its capacity as an origin services provider for its customer who is the ultimate consignee of this shipment.

1.2. "Conditions" means the entire undertakings, terms, conditions, and clauses embodied herein, and includes terms and conditions on the front and any Shippers' Instructions received in writing at the time of receipt.

1.3. "Shipper" means the vendor tendering items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of those cargoes to Company.

1.4. "Shippers' Instructions" means any of Shipper's specific written shipping instructions or requirements delivered to Company at the time of receipt of the cargoes.

1.5. "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to these Conditions.

1.6. "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage, warehousing, collection, delivery, local transportation, insurance, customs clearance, packing, unpacking, and other handling of goods and other services intended to accomplish delivery of the cargoes to Company's customer, the ultimate consignee.

1.7. "Owner" means the owner of the cargoes (including any packings, containers, or equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2. COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1 In the event that any provisions contained herein are inconsistent with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency, shall be null and void in relation to such element of the Services by Company, but the remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2 Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3 Any and all advice information or Services provided by Company gratuitously is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3. SHIPPER'S WARRANTIES**

3.1 Shipper warrants as follows:

a) By accepting these Conditions, Shipper agrees to be bound by all stipulations, exceptions, terms, and conditions on the front and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b) By accepting these Conditions and agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c) The description and particulars relating to the cargoes set out on the front hereof: (a) have been checked by Shipper on receipt of these Conditions; and (b) are full and accurate;

d) The cargoes contain no drugs, prohibited or stolen goods, contraband, or other illegal material or substance or stowaways;

e) The cargoes have been properly and sufficiently prepared, packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation, packing, stowage, labelling, and/or marking are appropriate to the storage, handling, and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f) Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g) Shipper shall provide the total gross mass established value substantiated and certified equipment of each packed Container (FCL) or each package of cargoes (LCL) in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company, have been properly and sufficiently packed and/or prepared, and that Company has no liability for any loss of or damage to cargoes which are improperly or insufficiently packed or prepared, no matter how such loss or damage is caused.

h) Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks, igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i) The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and

ii) The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

j) Description of Cargoes: All descriptions, values, and other particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that such information is true, complete, and accurate.

k) Fitness of Cargoes: The cargoes are fit and suitable for the carriage (international as well as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l) Delivery of Cargoes: The consignee or other person entitled to the delivery of the goods shall take delivery of the goods upon their arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4. DANGEROUS GOODS**

4.1 Cargoes tendered by Shipper to Company are not of such nature that they are or may become dangerous, hazardous, noxious (including radioactive materials), inflammable, explosive, or which do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods") unless Shipper, or someone acting on its behalf, has given Company written notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company has expressly accepted in writing to deal with the Dangerous Goods. Shipper's notice will include all information necessary for Company to perform its obligation in connection with the Dangerous Goods in accordance with all applicable Laws or requirements (or any combination of the foregoing), including without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2 Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and to do so comply with all Laws.

4.3 Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5. COMPANY'S AUTHORITY**

5.1 SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDERTAKE THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE ENTITLED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2 Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary or desirable in Shipper's interests or is expedient.

5.3 Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior consultation with or further authorization from Shipper.

5.4 Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's commission or remuneration or profit. Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account to Shipper for Company's commissions, remunerations, or profits.

5.5 Company is authorized (but not obligated) to inspect or arrange for the cargoes to be inspected.

5.6 Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately. Company is authorized (but not obliged) to consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7 Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations. Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6. LIABILITY AND LIMITATIONS**

6.1 SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2 Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3 Liability for Loss or Damage to Cargoes – Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a) A force majeure event;

b) Strike, lock-out, stoppage or restraint of labor, the consequences of which Company is munable to avoid by the exercise of reasonable diligence;

c) Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d) Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4 Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a) The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b) Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5 No insurance will be arranged by Company for the benefit of Shipper.

6.6 Entire Liability – Except as set forth in this Section, Company shall not be liable for loss of or damage to any cargoes or have any liability whatsoever for any events arising out or in connection with the storage and handling of cargoes and/or this FCR.

6.7 Application of Defenses, Limits, and Exclusions of Liability - The defenses, limits and exclusions of liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or in connection with the Services (including loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or implied warranty, or otherwise, even if the loss or damage arose as a result of negligence, willful misconduct, or fundamental breach of contract.

6.8 By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional charges for accepting such increased liability.

**7. INDEMNITY**

7.1. Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2. Advice and information, in whatever form as may be given by Company, are provided by Company for Shipper only and Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out of any other person relying on such advice or information. Except under special arrangements previously made in writing, advice, or information which is not related to specific instructions accepted by Shipper is provided gratuitously and without liability.

7.3. Shipper undertakes that no claim shall be made against any officer, servant, agent, or sub-contractor of Company which imposes or attempts to impose upon them any liability in connection with any Services provided or to be provided by Company. If any such claim should nevertheless be made Shipper shall indemnify Company against all consequences thereof. Without prejudice to the foregoing every such officer, servant, agent, and sub -contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit. For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4. Shipper shall defend, indemnify, and hold harmless Company from and against all claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions, and without prejudice to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8. WAREHOUSING**

8.1 Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9. DECLARED VALUE**

9.1 Company shall not be obliged to make any declaration for the purpose of any statute or convention or contract as to the nature or value of any goods or as to any special interest in delivery unless express instructions in writing were previously given to and accepted by Company. A mere statement or declaration of the value or nature of cargoes for insurance or export or customs or other purposes is not and shall not be construed to be Shipper's instructions to Company to make any such declaration.

**10. SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1 Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied by the authorities at any port or place for or in connection with cargoes and for any payments, storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or sustained by Company in connection therewith.

**11. LIEN, DISPOSAL OF GOODS, ETC.**

11.1 Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper, directly or indirectly in Company's possession, custody, control, or enroute for all monies due to Company and/or its affiliates from Shipper or the ultimate consignee. Company may at its sole discretion exercise its lien at any time and at any place. The lien shall cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing and preserving its lien (including but not limited to storage charges) and in recovering or attempting to recover any sums due from Shipper or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2 Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private treaty or by public auction or other means, without giving prior notice or incurring any liability to Shipper and to apply the proceeds of such sale (net of expenses) in or towards the payment of any amount due to Company. Company shall be entitled to claim the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do not discharge in full the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes.

11.3 Perishable cargoes which are not taken up immediately upon arrival or which are insufficiently addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to delivery. All charges and expenses arising in connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4 The rights of Company under this Section are independent and cumulative.

**12. RATES AND CHARGES**

12.1 Shipper is directly and primarily liable for the payment of all charges owed to Company in performance of the Services at origin for its benefit. Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set -off.

12.2 Company at its discretion may request an advance to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice is rendered. Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3 On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13. NOTICE OF CLAIM**

13.1 Any claim against Company must be in writing and delivered to Company at its registered office or its principal place of business in Hong Kong within 3 days of:

a) In the case of damage to goods, the date of delivery of cargoes;

b) In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c) In any other case, the date of the event giving rise to the claim.

13.2 No action shall lie against Company if the claim is not made within the times and in the manner specified herein.

**14. TIME BAR**

14.1 Any right of action against Company shall be extinguished if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes arrived at the destination or the date cargoes should have arrived at the destination (whichever date is the earlier).

**15. NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1 Shipper agrees that: (a) Company shall have no obligation to Shipper whatsoever related to Collect on Delivery (C.O.D.) shipments and commensurate obligations for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16. GOVERNING LAW**

16.1 These Conditions and any act or contract to which they apply shall be governed by and construed according to the laws of the Hong Kong Special Administrative Region. Any dispute arising out of these Conditions or any such act or contract shall be subject to the non exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region.

# Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400720**

| | | Maker/Supplier's INVOICE No. |
|---|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** <br> **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | **AJ-1054-24** |
| Buyer/Consignee : | **AVDC, LLC** <br> **18880 NAVAJO ROAD, APPLE VALLEY, CA 92307, USA** | Dated: **June 24, 2024** |
| Shipment From : | **NHAVA SHEVA**    To : **APPLE VALLEY, CA** | Date of Receipt of Cargo <br> **July 15, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES <br> PO NO: 95320743 <br> SKU NO: 810747464, <br> 810747644, 810747992 <br> CARTON 1 - 336 <br> MADE IN INDIA | | NOTIFY PARTY: GEODIS <br>     5101 S. BROAD STREET <br>     PHILADELPHIA, PA 19112-1404, U.S.A. <br>     ATTN: ALENA LAMINA <br> ALSO NOTIFY: EDRAY 2020 LLC. <br>     1300 SOUTH MINT STREET SUITE 200 <br>     CHARLOTTE NC 28203 USA <br>     TEL: 704-593-6329 <br>     EMAIL: DATAQUALITY@EDRAYCPL.COM <br><br> CFS-CY <br><br> TABLEWARE & KITCHENWARE <br> PO NO: 95320743 <br> SKU NO: 810747464, 810747644, 810747992 <br> QTY: 1008 <br> GR.WT: 2077.600 KGS <br> SB.NO: 2313540 DT. 10/07/2024 <br><br> *NEW DELHI-110020 <br><br> HLBU1013769 (PART)    SEAL# HLG9031057    40H DRY <br><br> SHIP TO CODE & LOCATION : 00869-APPLE VALLEY, CA <br> SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING <br> MATERIAL | | |
| | 336 CARTONS | | 9.299 CBM | 2,077.60 KGS |

TOTAL : THREE HUNDRED THIRTY-SIX (336) CARTONS ONLY

"FREIGHT COLLECT"

SHIPMENT PER S.S. "SEASPAN GANGES" VOY NO. 4130    DISCHARGED AT SAVANNAH, GA
SAILING ON / ABOUT July 30, 2024. CARGO RECEIVED ON July 15, 2024.

| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**    **July 22, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.) <br> **YUSEN LOGISTICS** <br><br> For Yusen Logistics (India) Private Limited <br><br> *Authorised Signatory*    As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** <br> (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)    V1 |

ORIGINAL

Yusen Logistics - Yusen Logistics    **Yusen Logistics**    Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400720**

| | |
|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** |
| | **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** |
| Buyer/Consignee : | **AVDC, LLC** |
| | **18880 NAVAJO ROAD, APPLE VALLEY, CA 92307, USA** |
| Shipment From : | **NHAVA SHEVA**    To : **APPLE VALLEY, CA** |

Maker/Supplier's INVOICE No.
**AJ-1054-24**

Dated: **June 24, 2024**

Date of Receipt of Cargo
**July 15, 2024**

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES<br>PO NO: 95320743<br>SKU NO: 810747464,<br>810747644, 810747992<br>CARTON 1 - 336<br>MADE IN INDIA | | NOTIFY PARTY: GEODIS<br>    5101 S. BROAD STREET<br>    PHILADELPHIA, PA 19112-1404, U.S.A.<br>    ATTN: ALENA LAMINA<br>ALSO NOTIFY: EDRAY 2020 LLC.<br>    1300 SOUTH MINT STREET SUITE 200<br>    CHARLOTTE NC 28203 USA<br>    TEL: 704-593-6329<br>    EMAIL: DATAQUALITY@EDRAYCPL.COM<br><br>CFS-CY<br><br>TABLEWARE & KITCHENWARE<br>PO NO: 95320743<br>SKU NO: 810747464, 810747644, 810747992<br>QTY: 1008<br>GR.WT: 2077.600 KGS<br>SB.NO: 2313540 DT. 10/07/2024<br><br>*NEW DELHI-110020<br><br>HLBU1013769 (PART)    SEAL# HLG9031057    40H  DRY<br><br>SHIP TO CODE & LOCATION : 00869-APPLE VALLEY, CA<br>SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING<br>MATERIAL | | |
| | 336 CARTONS | | 9.299 CBM | 2,077.60 KGS |

==============================================================
TOTAL : THREE HUNDRED THIRTY-SIX (336) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "SEASPAN GANGES" VOY NO. 4130    DISCHARGED AT SAVANNAH, GA
SAILING ON / ABOUT July 30, 2024. CARGO RECEIVED ON July 15, 2024.

| | |
|---|---|
| THIS IS NOT A DOCUMENT OF TITLE<br><br>**Non-Negotiable**<br><br>Copy | **NHAVA SHEVA**    **July 22, 2024**<br><br>(Place and date of issue.)<br><br>**YUSEN LOGISTICS**<br><br><br>As Agent<br>V1 |

Non-Negotiable Copy (watermark)

**1.    DEFINITIONS**

1.1.    "Company" means Yusen Logistics Global  Management Limited trading or any of its affiliate  entities issuing these Conditions in its  capacity as an origin services  provider for its customer who is the ultimate consignee of this shipment.

1.2.    "Conditions" means the entire undertakings,  terms, conditions, and clauses embodied herein, and includes terms and conditions on the  front and any Shippers'  Instructions received  in writing at the time of  issuance.

1.3.    "Shipper" means the vendor tendering  items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of  those cargoes to Company.

1.4.    "Shippers' Instructions" means any of Shipper's specific written shipping instructions or  requirements delivered to Company at the time of  receipt of the cargoes.

1.5.    "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to  these Conditions.

1.6.    "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage,  warehousing, collection, delivery, local transportation, insurance, customs clearance, packing,  unpacking, and other  handling of cargoes and other services intended to accomplish delivery of the  cargoes to Company's customer, the ultimate consignee.

1.7.    "Owner" means the owner of the cargoes (including any packings, containers, or  equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2.    COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1    In the event that any provisions contained herein are  inconsistent  with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency,  shall be null and void in relation to such element of the Services by Company, but the  remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2    Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3    Any and all Active information or Services provided by Company gratuitously  is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3.    SHIPPER'S WARRANTIES**

3.1    Shipper warrants as follows:

a)    By accepting these Conditions, Shipper  agrees to be bound by all stipulations, exceptions, terms, and conditions on the front  and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b)    By accepting these Conditions and  agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c)    The description and  particulars relating to the  cargoes set out on the front hereof: (a) have been checked by Shipper  on receipt of these Conditions; and (b)  are full and accurate;

d)    The cargoes contain no drugs, prohibited  or stolen goods, contraband, or other illegal material or substance or stowaways;

e)    The cargoes have been properly and sufficiently prepared,  packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation,  packing,  stowage, labelling, and/or  marking are appropriate to the storage, handling,  and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f)    Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g)    Shipper shall provide the total gross  mass established using calibrated and certified equipment of each packed Container (FCL) or  each package of cargoes (LCL)  in accordance with SOLAS.  Shipper acknowledges and agrees that Company will rely on the  accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance  with SOLAS.  Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company,  have been properly and sufficiently packed and/or  prepared, and that Company has no liability for any  loss of or damage to cargoes which are improperly or  insufficiently packed or prepared, no matter how such loss or damage is caused.

h)    Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats,  tilts, railway wagons, tanks,  igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i)    The transport unit is in good condition, is suitable to carry the goods loaded therein  or thereon, and is suitable for the intended carriage and other handling; and

ii)    The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

j)    Description of Cargoes: All descriptions, values, and other  particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that  such information is true, complete, and accurate.

k)    Fitness of Cargoes: The cargoes are fit  and suitable for the carriage (international as well  as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l)    Delivery of Cargoes: The consignee or  other person entitled to the  delivery of the goods shall take delivery of the goods upon their  arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4.    DANGEROUS GOODS**

4.1    Cargoes tendered by Shipper to Company are  not of such nature that they are or may become  dangerous, hazardous, noxious (including  radioactive materials), inflammable, explosive, or which  do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods")  unless Shipper, or someone acting on its behalf, has given Company written  notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company  has expressly accepted in writing to deal with the Dangerous Goods.  Shipper's notice  will include all information necessary for Company to perform  its obligation in connection with the Dangerous Goods in accordance  with all applicable  Laws or requirements (or any combination of the foregoing), including  without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2    Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and so as to comply with all Laws.

4.3    Additional charges may apply to the storage  and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5.    COMPANY'S AUTHORITY**

5.1    SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE IDENTIFIED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2    Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary  or desirable in Shipper's instructions is expedient.

5.3    Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior  consultation with or further  authorization from Shipper.

5.4    Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's  commission or remuneration or profit.  Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account  to Shipper for Company's commissions, remunerations, or profits.

5.5    Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6    Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately.  Company is authorized (but not obliged) to  consolidate or  arrange to be consolidated cargoes of Shipper with other goods.

5.7    Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered  into by Company with third-parties pursuant to the aforesaid  authorizations.  Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6.    LIABILITY AND LIMITATIONS**

6.1    SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2    Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3    Liability for Loss or Damage to Cargoes -- Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability  for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a)    A force majeure event;

b)    Strike, lock-out, stoppage or restraint of labor, the consequences of  which Company is munable to avoid by the exercise of reasonable diligence;

c)    Any cause or event which Company is unable to avoid and the consequences  whereof Company is unable to prevent by the exercise of reasonable diligence; or

d)    Compliance with instructions or directions of Shipper or the consignee or any person  authorized to give them.

6.4    Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a)    The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b)    Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5    No insurance will be arranged by Company for the benefit of Shipper.

6.6    Entire Liability -- Except as set forth in this  Section, Company shall not  be liable for loss of  damage to any cargoes or have any liability whatsoever  for any events arising out  or in connection with the storage and handling of cargoes and/or this FCR.

6.7    Application of Defenses, Limits, and Exclusions of  Liability - The defenses, limits and exclusions of  liability provided for in these Conditions  of receipt shall apply in any action against Company arising out of or  in connection with the Services (including  loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or  implied warranty, or otherwise, even if the loss or  damage arose as a result of negligence, willful misconduct, or fundamental breach of  contract.

6.8    By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional  charges for accepting such increased liability.

**7.    INDEMNITY**

7.1.    Shipper shall save harmless and  indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without  limitation all duties,  taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising  out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate  or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2.    Advice and information, in whatever form as may be given  by Company, are provided  by Company for Shipper only and Shipper shall save harmless and indemnify and keep  indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out  of any other person relying on such advice or information.  Except under special arrangements previously  made in writing, advice, or information which is not related to specific instructions accepted  by Shipper is provided  gratuitously and without liability.

7.3.    Shipper undertakes that no claim shall be made against  any officer,  servant, agent, or  sub-contractor of Company which imposes or attempts to impose upon them any liability in  connection with any Services provided or to be provided by Company.  If any such claim should nevertheless be made Shipper  shall indemnify Company against all consequences  thereof.  Without prejudice to the foregoing  every such officer, servant, agent, and sub -contractor shall have the benefit  of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit.  For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4.    Shipper shall defend, indemnify, and hold harmless Company from and against all  claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions,  and without prejudice  to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or  in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8.    WAREHOUSING**

8.1    Pending release of the cargoes after  provision of Services at origin, cargoes may be warehoused  or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion  of Company and the cost therefore shall be for the account of Shipper.

**9.    DECLARED VALUE**

9.1    Company shall not be obliged to make any declaration for the purpose of any  statute or convention  or contract as to the nature or value of any goods or  as to any special interest  in delivery unless express instructions in writing were previously given to and accepted by  Company.  A mere statement or declaration of the value or nature of cargoes for  insurance or export  or customs or other purposes is not and shall not be construed to be Shipper's Instructions to Company to make any such declaration.

**10.    SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1    Shipper shall be liable  for any duties, taxes, levies, deposits, or outlays of any kind levied  by the authorities at any port or place for or in connection with cargoes and for  any payments,  storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or  sustained by Company in connection therewith.

**11.    LIEN, DISPOSAL OF GOODS, ETC.**

11.1    Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper,  directly or indirectly  in Company's possession, custody, control, or enroute for  all monies due to Company and/or its affiliates from Shipper or  the ultimate consignee.  Company may at its sole discretion exercise its lien at any  time and at any place. The lien shall  cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing  and preserving its  lien (including but not limited to storage charges) and in recovering or attempting to recover  any sums due from Shipper  or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2    Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private  treaty or by public auction or  other means, without giving prior  notice or incurring any liability to Shipper and  to apply the proceeds of  such sale (net of expenses) in or  towards the payment of any amount due to Company.  Company shall be entitled to  claim the difference against Shipper or the ultimate consignee  in the event that the (net) sale proceeds do  not discharge in full  the amount due from Shipper or the ultimate consignee.  Company's lien shall survive delivery or  deemed delivery of cargoes.

11.3    Perishable cargoes which are not  taken up immediately upon arrival or which are insufficiently  addressed or marked or otherwise not readily identifiable,  may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of  any sale after deduction of charges and expenses shall be equivalent to  delivery.  All charges and expenses arising in  connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4    The rights of Company under this Section are independent and cumulative.

**12.    RATES AND CHARGES**

12.1    Shipper is directly and primarily liable for the  payment of all charges owed to Company in  performance of the Services at origin for its benefit.  Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set  -off.

12.2    Company at its discretion  may request an advance  to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice  is rendered.  Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3    On all amounts overdue to Company,  Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof  at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13.    NOTICE OF CLAIM**

13.1    Any claim against Company must be in writing and delivered to Company at its registered office  or its principal place of business in Hong Kong within 3 days of:

a)    In the case of damage to goods, the date of delivery of cargoes;

b)    In the case of loss or non-delivery or mis-delivery of cargoes, the date  that cargoes should have been delivered; and

c)    In any other case, the date of the event giving rise to the claim.

13.2    No action shall lie against Company if  the claim is not made within the times and in the manner specified herein.

**14.    TIME BAR**

14.1    Any right of action against Company shall be extinguished  if suit is not brought in the proper forum and written notice thereof received by Company within three  3 months from the date cargoes  arrived at the destination or the date cargoes should have arrived  at the destination (whichever  date is the earlier).

**15.    NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1    Shipper agrees that: (a) Company shall not accept shipments under this Agreement where Shipper related  to Collect on Delivery (C.O.D.) shipments and commensurate obligations  for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts  or otherwise; and (b) Shipper bears all risk for the  payment of costs and/or collection of the invoice price from its customer and the consignee.

**16.    GOVERNING LAW**

16.1    These Conditions  and any act or contract to which they apply  shall be governed  by and construed according to the laws of the Hong Kong Special  Administrative Region.  Any dispute arising out  of these Conditions or any such act or contract shall be subject  to the non exclusive jurisdiction of  the courts of the Hong Kong Special Administrative Region.

Yusen Logistics - Yusen Logistics # Yusen Logistics Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400770**

| | |
|---|---|
| | Maker/Supplier's INVOICE No. **AJ-1055-24** |
| Maker/Supplier : **ATTIC PRODUCTS** <br> **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | |
| | Dated: **June 24, 2024** |
| Buyer/Consignee : **CSC DISTRIBUTION, LLC** <br> **2855 SELMA HIGHWAY, MONTGOMERY, AL 36108, USA** | Date of Receipt of Cargo |
| Shipment From : **NHAVA SHEVA**      To : **MONTGOMERY, AL** | **July 26, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| **BIG LOTS STORES** <br> **PO NO: 95320744** <br> **SKU NO: 810747464,** <br> **810747644, 810747992** <br> **CARTON 1 - 171** <br> **MADE IN INDIA** | | **NOTIFY PARTY: GEODIS** <br>        **5101 S. BROAD STREET** <br>        **PHILADELPHIA, PA 19112-1404, U.S.A.** <br>        **ATTN: ALENA LAMINA** <br> **ALSO NOTIFY: EDRAY 2020 LLC.** <br>        **1300 SOUTH MINT STREET SUITE 200** <br>        **CHARLOTTE NC 28203 USA** <br>        **TEL: 704-593-6329** <br>        **EMAIL: DATAQUALITY@EDRAYCPL.COM** <br><br> **CFS-CY** <br><br> **TABLEWARE & KITCHENWARE** <br> **PO NO: 95320744** <br> **SKU NO: 810747464, 810747644, 810747992** <br> **QTY: 513** <br> **GR.WT: 1057.350 KGS** <br> **SB.NO: 2561624 DT. 20/07/2024** <br><br> **\*NEW DELHI-110020** <br><br> **FFAU1143230 (PART)      SEAL# HLG6291684      40H DRY** <br><br> **SHIP TO CODE & LOCATION : 00870-MONTGOMERY, AL** <br> **SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING MATERIAL** | | |
| | **171 CARTONS** | | **4.860 CBM** | **1,057.35 KGS** |

========================================================
**TOTAL : ONE HUNDRED SEVENTY-ONE (171) CARTONS ONLY**

                "FREIGHT COLLECT"
**SHIPMENT PER S.S. "TUCAPEL" VOY NO. 4133    DISCHARGED AT SAVANNAH, GA SAILING ON / ABOUT August 21, 2024. CARGO RECEIVED ON July 26, 2024.**

| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**        **July 30, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.) <br> **YUSEN LOGISTICS** <br><br> For Yusen Logistics (India) Private Limited <br><br><br> Authorised Signatory <br>                    As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** <br> (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)        V3 |

ORIGINAL

# Yusen Logistics

Yusen Logistics - Yusen Logistics          Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.        **CNS-NSA-2400770**

| | |
|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS**<br>**X-6, OKHLA INDUSTRIAL AREA PHASE-2,** |
| Buyer/Consignee : | **CSC DISTRIBUTION, LLC**<br>**2855 SELMA HIGHWAY, MONTGOMERY, AL 36108, USA** |
| Shipment From : | **NHAVA SHEVA**        To : **MONTGOMERY, AL** |

Maker/Supplier's INVOICE No.
**AJ-1055-24**

Dated : **June 24, 2024**

Date of Receipt of Cargo
**July 26, 2024**

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES<br>PO NO: 95320744<br>SKU NO: 810747464,<br>810747644, 810747992<br>CARTON 1 - 171<br>MADE IN INDIA | | NOTIFY PARTY: GEODIS<br>5101 S. BROAD STREET<br>PHILADELPHIA, PA 19112-1404, U.S.A.<br>ATTN: ALENA LAMINA<br>ALSO NOTIFY: EDRAY 2020 LLC.<br>1300 SOUTH MINT STREET SUITE 200<br>CHARLOTTE NC 28203 USA<br>TEL: 704-593-6329<br>EMAIL: DATAQUALITY@EDRAYCPL.COM<br><br>CFS-CY<br><br>TABLEWARE & KITCHENWARE<br>PO NO: 95320744<br>SKU NO: 810747464, 810747644, 810747992<br>QTY: 513<br>GR.WT: 1057.350 KGS<br>SB.NO: 2561624 DT. 20/07/2024<br><br>*NEW DELHI-110020<br><br>FFAU1143230 (PART)    SEAL# HLG6291684    40H DRY<br><br>SHIP TO CODE & LOCATION : 00870-MONTGOMERY, AL<br>SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING<br>MATERIAL | | |
| | 171 CARTONS | | 4.860 CBM | 1,057.35 KGS |

==================================================
TOTAL : ONE HUNDRED SEVENTY-ONE (171) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "TUCAPEL" VOY NO. 4133    DISCHARGED AT SAVANNAH, GA
SAILING ON / ABOUT August 21, 2024. CARGO RECEIVED ON July 26, 2024.

| | |
|---|---|
| THIS IS NOT A DOCUMENT OF TITLE<br><br>**Non-Negotiable**<br><br>Copy | **NHAVA SHEVA**                **July 30, 2024**<br>.........................................<br>(Place and date of issue.)<br><br>**YUSEN LOGISTICS**<br><br><br>As Agent<br>V3 |

Non-Negotiable Copy

**1.    DEFINITIONS**

1.1.    "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its capacity as an origin services provider for its customer who is the ultimate consignee of this shipment.

1.2.    "Conditions" means the entire undertakings, terms, conditions, and clauses embodied herein, and includes terms and conditions on the front and any Shippers' Instructions received in writing at the time of receipt.

1.3.    "Shipper" means the vendor tendering items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of those cargoes to Company.

1.4.    "Shippers' Instructions" means any of Shipper's specific written shipping instructions or requirements delivered to Company at the time of receipt of the cargoes.

1.5.    "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to these Conditions.

1.6.    "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage, warehousing, collection, delivery, local transportation, insurance, customs clearance, packing, unpacking, and other handling of goods and other services intended to accomplish delivery of the cargoes to Company's customer, the ultimate consignee.

1.7.    "Owner" means the owner of the cargoes (including any packings, containers, or equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2.    COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1    In the event that any provisions contained herein are inconsistent with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency, shall be null and void in relation to such element of the Services by Company, but the remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2    Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3    Any and all advice information or Services provided by Company gratuitously is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3.    SHIPPER'S WARRANTIES**

3.1    Shipper warrants as follows:

a)    By accepting these Conditions, Shipper agrees to be bound by all stipulations, exceptions, terms, and conditions on the front and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b)    By accepting these Conditions and agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c)    The description and particulars relating to the cargoes set out on the front hereof: (a) have been checked by Shipper on receipt of these Conditions; and (b) are full and accurate;

d)    The cargoes contain no drugs, prohibited or stolen goods, contraband, or other illegal material or substance or stowaways;

e)    The cargoes have been properly and sufficiently prepared, packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation, packing, stowage, labelling, and/or marking are appropriate to the storage, handling, and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f)    Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g)    Shipper shall provide the total gross mass established using calibrated and certified equipment of each packed Container (FCL) or each package of cargoes (LCL) in accordance with SOLAS.

h)    Shipper acknowledges and agrees that Company will rely on the accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS.

i)    Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company, have been properly and sufficiently packed and/or prepared, and that Company has no liability for any loss of or damage to cargoes which are improperly or insufficiently packed or prepared, no matter how such loss or damage is caused.

j)    Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks, igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i)    The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and

ii)    The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

k)    Description of Cargoes: All descriptions, values, and other particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that such information is true, complete, and accurate.

l)    Fitness of Cargoes: The cargoes are fit and suitable for the carriage (international as well as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l)    Delivery of Cargoes: The consignee or other person entitled to the delivery of the goods shall take delivery of the goods upon their arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4.    DANGEROUS GOODS**

4.1    Cargoes tendered by Shipper to Company are not of such nature that they are or may become dangerous, hazardous, noxious (including radioactive materials), inflammable, explosive, or which do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods") unless Shipper, or someone acting on its behalf, has given Company written notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company has expressly accepted in writing to deal with the Dangerous Goods. Shipper's notice will include all information necessary for Company to perform its obligation in connection with the Dangerous Goods in accordance with all applicable Laws or requirements (or any combination of the foregoing), including without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2    Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and so as to comply with all Laws.

4.3    Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5.    COMPANY'S AUTHORITY**

5.1    SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE IDENTIFIED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE OFFERED SOLELY AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2    Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary or desirable in Shipper's interests or is expedient.

5.3    Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior consultation with or further authorization from Shipper.

5.4    Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's commission or remuneration or profit. Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account to Shipper for Company's commissions, remunerations, or profits.

5.5    Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6    Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately. Company is authorized (but not obliged) to consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7    Shipper expressly agrees to be bound in all respects by any act, conduct, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations. Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6.    LIABILITY AND LIMITATIONS**

6.1    SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2    Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3    Liability for Loss or Damage to Cargoes -- Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a)    A force majeure event;

b)    Strike, lock-out, stoppage or restraint of labor, the consequences of which Company is munable to avoid by the exercise of reasonable diligence;

c)    Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d)    Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4    Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a)    The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b)    Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5    No insurance will be arranged by Company for the benefit of Shipper.

6.6    Entire Liability -- Except as set forth in in this Section, Company shall not be liable for loss of or damage to any cargoes or have any liability whatsoever for any events arising out or in connection with the storage and handling of cargoes and/or this FCR.

6.7    Application of Defenses, Limits, and Exclusions of Liability - The defenses, limits and exclusions of liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or in connection with the Services (including loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or implied warranty, or otherwise, even if the loss or damage arose as a result of negligence, willful misconduct, or fundamental breach of contract.

6.8    By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional charges for accepting such increased liability.

**7.    INDEMNITY**

7.1.    Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2.    Advice and information, in whatever form as may be given by Company, are provided by Company for Shipper only and Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out of any other person relying on such advice or information. Except under special arrangements previously made in writing, advice, or information which is not related to specific instructions accepted by Shipper is provided gratuitously and without liability.

7.3.    Shipper undertakes that no claim shall be made against any officer, servant, agent, or sub-contractor of Company which imposes or attempts to impose upon them any liability in connection with any Services provided or to be provided by Company. If any such claim should nevertheless be made Shipper shall indemnify Company against all consequences thereof. Without prejudice to the foregoing every such officer, servant, agent, and sub-contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit. For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4.    Shipper shall defend, indemnify, and hold harmless Company from and against all claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions, and without prejudice to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8.    WAREHOUSING**

8.1    Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9.    DECLARED VALUE**

9.1    Company shall not be obliged to make any declaration for the purpose of any statute or convention or contract as to the nature or value of any goods or as to any special interest in delivery unless express instructions in writing were previously given to and accepted by Company. A mere statement or declaration of the value or nature of cargoes for insurance or export or customs or other purposes is not and shall not be construed to be Shipper's Instructions to Company to make any such declaration.

**10.    SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1    Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied by the authorities at any port or place for or in connection with cargoes and for any payments, storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or sustained by Company in connection therewith.

**11.    LIEN, DISPOSAL OF GOODS, ETC.**

11.1    Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper, directly or indirectly in Company's possession, custody, control, or enroute for all monies due to Company and/or its affiliates from Shipper or the ultimate consignee. Company may at its sole discretion exercise its lien at any time and at any place. The lien shall cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing and preserving its lien (including but not limited to storage charges) and in recovering or attempting to recover any sums due from Shipper or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2    Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private treaty or by public auction or other means, without giving prior notice or incurring any liability to Shipper and to apply the proceeds of such sale (net of expenses) in or towards the payment of any amount due to Company. Company shall be entitled to claim the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do not discharge in full the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes.

11.3    Perishable cargoes which are not taken up immediately upon arrival or which are insufficiently addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to delivery. All charges and expenses arising in connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4    The rights of Company under this Section are independent and cumulative.

**12.    RATES AND CHARGES**

12.1    Shipper is directly and primarily liable for the payment of all charges owed to Company in performance of the Services at origin for its benefit. Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set -off.

12.2    Company at its discretion may request an advance to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice is rendered. Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3    On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13.    NOTICE OF CLAIM**

13.1    Any claim against Company must be in writing and delivered to Company at its registered office or its principal place of business in Hong Kong within 3 days of:

a)    In the case of damage to goods, the date of delivery of cargoes;

b)    In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c)    In any other case, the date of the event giving rise to the claim.

13.2    No action shall lie against Company if the claim is not made within the times and in the manner specified herein.

**14.    TIME BAR**

14.1    Any right of action against Company shall be extinguished if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes arrived at the destination or the date cargoes should have arrived at the destination (whichever date is the earlier).

**15.    NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1    Shipper agrees that: (a) Company shall have no obligation to Shipper whatsoever related to Collect on Delivery (C.O.D.) shipments and commensurate obligations for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16.    GOVERNING LAW**

16.1    These Conditions and any act or contract to which they apply shall be governed by and construed according to the laws of the Hong Kong Special Administrative Region. Any dispute arising out of these Conditions or any such act or contract shall be subject to the non exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region.

Yusen Logistics - Yusen Logistics    # Yusen Logistics    Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400773**

| Maker/Supplier : | **ATTIC PRODUCTS**<br>**X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | Maker/Supplier's INVOICE No.<br>**AJ-1056-24** |
|---|---|---|
| Buyer/Consignee : | **CLOSEOUT DISTRIBUTION, LLC**<br>**50 RAUSCH CREEK RD, TREMONT, PA 17981, USA** | Dated:  **June 24, 2024** |
| Shipment From : | **NHAVA SHEVA**          To : **TREMONT, PA** | Date of Receipt of Cargo<br>**July 27, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| **BIG LOTS STORES**<br>**PO NO: 95320745**<br>**SKU NO: 810747464,**<br>**810747644, 810747992**<br>**CARTON  1 - 306**<br>**MADE IN INDIA** | | **NOTIFY PARTY: GEODIS**<br>          **5101 S. BROAD STREET**<br>          **PHILADELPHIA, PA 19112-1404, U.S.A.**<br>          **ATTN: ALENA LAMINA**<br>**ALSO NOTIFY: EDRAY 2020 LLC.**<br>          **1300 SOUTH MINT STREET SUITE 200**<br>          **CHARLOTTE NC 28203 USA**<br>          **TEL: 704-593-6329**<br>          **EMAIL: DATAQUALITY@EDRAYCPL.COM**<br><br>**CFS-CY**<br><br>**KITCHENWARE**<br>**PO NO: 95320745**<br>**SKU NO: 810747464, 810747644, 810747992**<br>**QTY: 918**<br>**GR.WT: 1892.100 KGS**<br>**SB.NO: 2561610 DT. 20/07/2024**<br><br>**\*NEW DELHI-110020**<br><br>**UETU5610836 (PART)      SEAL# OOLJSC2217      40H  DRY**<br><br>**SHIP TO CODE & LOCATION : 00874-TREMONT, PA**<br>**SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING**<br>**MATERIAL** | | |
| | **306 CARTONS** | | **8.697 CBM** | **1,892.10 KGS** |

**TOTAL : THREE HUNDRED SIX (306) CARTONS ONLY**

**"FREIGHT COLLECT"**

**SHIPMENT PER S.S. "APL SOUTHAMPTON" VOY NO. 418W   DISCHARGED AT NEW YORK, NY**
**SAILING ON / ABOUT August 18, 2024. CARGO RECEIVED ON July 27, 2024.**

| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**          **July 31, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.)<br>**YUSEN LOGISTICS**<br><br>**For Yusen Logistics (India) Private Limited**<br><br>**Authorised Signatory**          As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1** (Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)          V3 |

ORIGINAL

Yusen Logistics - Yusen Logistics   **Yusen Logistics**   Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.     **CNS-NSA-2400773**

| | | |
|---|---|---|
| Maker/Supplier : | ATTIC PRODUCTS<br>X-6, OKHLA INDUSTRIAL AREA PHASE-2, | Maker/Supplier's INVOICE No.<br>**AJ-1056-24** |
| Buyer/Consignee : | CLOSEOUT DISTRIBUTION, LLC<br>50 RAUSCH CREEK RD, TREMONT, PA 17981, USA | Dated: **June 24, 2024** |
| Shipment From : | NHAVA SHEVA          To : TREMONT, PA | Date of Receipt of Cargo<br>**July 27, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES<br>PO NO: 95320745<br>SKU NO: 810747464,<br>810747644, 810747992<br>CARTON  1 - 306<br>MADE IN INDIA | | NOTIFY PARTY: GEODIS<br>         5101 S. BROAD STREET<br>         PHILADELPHIA, PA 19112-1404, U.S.A.<br>         ATTN: ALENA LAMINA<br>ALSO NOTIFY: EDRAY 2020 LLC.<br>         1300 SOUTH MINT STREET SUITE 200<br>         CHARLOTTE NC 28203 USA<br>         TEL: 704-593-6329<br>         EMAIL: DATAQUALITY@EDRAYCPL.COM<br><br>CFS-CY<br><br>KITCHENWARE<br>PO NO: 95320745<br>SKU NO: 810747464, 810747644, 810747992<br>QTY: 918<br>GR.WT: 1892.100 KGS<br>SB.NO: 2561610 DT. 20/07/2024<br><br>*NEW DELHI-110020<br><br>UETU5610836 (PART)       SEAL# OOLJSC2217       40H  DRY<br><br>SHIP TO CODE & LOCATION : 00874-TREMONT, PA<br>SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING<br>MATERIAL<br><br><br>306 CARTONS | | 8.697 CBM | 1,892.10 KGS |

TOTAL : THREE HUNDRED SIX (306) CARTONS ONLY

"FREIGHT COLLECT"

SHIPMENT PER S.S. "APL SOUTHAMPTON" VOY NO. 418W   DISCHARGED AT NEW YORK, NY
SAILING ON / ABOUT August 18, 2024. CARGO RECEIVED ON July 27, 2024.

| | |
|---|---|
| THIS IS NOT A DOCUMENT OF TITLE<br><br>**Non-Negotiable**<br><br>Copy | NHAVA SHEVA              July 31, 2024<br>................................................<br>(Place and date of issue.)<br><br>**YUSEN LOGISTICS**<br><br><br>                                    As Agent<br>V3 |

Non-Negotiable Copy

Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics - Yusen Logistics

**1.    DEFINITIONS**

1.1.    "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its capacity as an origin services provider for its customer who is the ultimate consignee of this shipment.

1.2.    "Conditions" means the entire undertakings, terms, conditions, and clauses embodied herein, and includes terms and conditions on the front and any Shippers' Instructions received in writing at the time of receipt.

1.3.    "Shipper" means the vendor tendering items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of those cargoes to Company.

1.4.    "Shippers' Instructions" means any of Shipper's specific written shipping instructions or requirements delivered to Company at the time of receipt of the cargoes.

1.5.    "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to these Conditions.

1.6.    "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage, warehousing, collection, delivery, local transportation, insurance, customs clearance, packing, unpacking, and other handling of goods and other services intended to accomplish delivery of the cargoes to Company's customer, the ultimate consignee.

1.7.    "Owner" means the owner of the cargoes (including any packings, containers, or equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2.    COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1    In the event that any provisions contained herein are inconsistent with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency, shall be null and void in relation to such element of the Services by Company, but the remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2    Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3    Any and all advice information or Services provided by Company gratuitously is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3.    SHIPPER'S WARRANTIES**

3.1    Shipper warrants as follows:

a)    By accepting these Conditions, Shipper agrees to be bound by all stipulations, exceptions, terms, and conditions on the front and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b)    By accepting these Conditions and agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c)    The description and particulars relating to the cargoes set out on the front hereof: (a) have been checked by Shipper on receipt of these Conditions; and (b) are full and accurate;

d)    The cargoes contain no drugs, prohibited or stolen goods, contraband, or other illegal material or substance or stowaways;

e)    The cargoes have been properly and sufficiently prepared, packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation, packing, stowage, labelling, and/or marking are appropriate to the storage, handling, and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f)    Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g)    Shipper shall provide the total gross mass established and certified equipment of each packed Container (FCL) or each package of cargoes (LCL) in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company, have been properly and sufficiently packed and/or prepared, and that Company has no liability for any loss of or damage to cargoes which are improperly or insufficiently packed or prepared, no matter how such loss or damage is caused.

h)    Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks, igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:
    i)    The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and
    ii)    The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

i)    Description of Cargoes: All descriptions, values, and other particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that such information is true, complete, and accurate.

j)    Fitness of Cargoes: The cargoes are fit and suitable for the carriage (international as well as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

k)    Delivery of Cargoes: The consignee or other person entitled to the delivery of the goods shall take delivery of the goods upon their arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4.    DANGEROUS GOODS**

4.1    Cargoes tendered by Shipper to Company are not of such nature that they are or may become dangerous, hazardous, noxious (including radioactive materials), inflammable, explosive, or which do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods") unless Shipper, or someone acting on its behalf, has given Company written notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company has expressly accepted in writing to deal with the Dangerous Goods. Shipper's notice will include all information necessary for Company to perform its obligation in connection with the Dangerous Goods in accordance with all applicable Laws or requirements (or any combination of the foregoing), including without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2    Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and to so comply with all Laws.

4.3    Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5.    COMPANY'S AUTHORITY**

5.1    SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMERWILL BE ENTITLED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2    Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary or desirable in Shipper's interest.

5.3    Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior consultation with or further authorization from Shipper.

5.4    Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's commission or remuneration or profit. Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account to Shipper for Company's commissions, remunerations, or profits.

5.5    Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6    Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately. Company is authorized (but not obliged) to consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7    Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations. Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6.    LIABILITY AND LIMITATIONS**

6.1    SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2    Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3    Liability for Loss or Damage to Cargoes – Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a)    A force majeure event;

b)    Strike, lock-out, stoppage or restraint of labor, the consequences of which Company is munable to avoid by the exercise of reasonable diligence;

c)    Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d)    Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4    Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a)    The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b)    Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5    No insurance will be arranged by Company for the benefit of Shipper.

6.6    Entire Liability – Except as set forth in this Section, Company shall not be liable for loss of or damage to any cargoes or have any liability whatsoever for any events arising out or in connection with the storage and handling of cargoes and/or this FCR.

6.7    Application of Defenses, Limits, and Exclusions of Liability - The defenses, limits and exclusions of liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or in connection with the Services (including loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or implied warranty, or otherwise, even if the loss or damage arose as a result of negligence, willful misconduct, or fundamental breach of contract.

6.8    By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional charges for accepting such increased liability.

**7.    INDEMNITY**

7.1.    Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2.    Advice and information, in whatever form as may be given by Company, are provided by Company for Shipper only and Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out of any other person relying on such advice or information. Except under special arrangements previously made in writing, advice, or information which is not related to specific instructions accepted by Shipper is provided gratuitously and without liability.

7.3.    Shipper undertakes that no claim shall be made against any officer, servant, agent, or sub-contractor of Company which imposes or attempts to impose upon them any liability in connection with any Services provided or to be provided by Company. If any such claim should nevertheless be made Shipper shall indemnify Company against all consequences thereof. Without prejudice to the foregoing every such officer, servant, agent, and sub -contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit. For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4.    Shipper shall defend, indemnify, and hold harmless Company from and against all claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions, and without prejudice to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8.    WAREHOUSING**

8.1    Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9.    DECLARED VALUE**

9.1    Company shall not be obliged to make any declaration for the purpose of any statute or convention or contract as to the nature or value of any goods or as to any special interest in delivery unless express instructions in writing were previously given to and accepted by Company. A mere statement or declaration of the value or nature of cargoes for insurance or export or customs or other purposes is not and shall not be construed to be Shipper's instructions to Company to make any such declaration.

**10.    SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1    Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied by the authorities at any port or place for or in connection with cargoes and for any payments, storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or sustained by Company in connection therewith.

**11.    LIEN, DISPOSAL OF GOODS, ETC.**

11.1    Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper, directly or indirectly in Company's possession, custody, control, or enroute for all monies due to Company and/or its affiliates from Shipper or the ultimate consignee. Company may at its sole discretion exercise its lien at any time and at any place. The lien shall cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing and preserving its lien (including but not limited to storage charges) and in recovering or attempting to recover any sums due from Shipper or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2    Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private treaty or by public auction or other means, without giving prior notice or incurring any liability to Shipper and to apply the proceeds of such sale (net of expenses) in or towards the payment of any amount due to Company. Company shall be entitled to claim the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do not discharge in full the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes. Perishable cargoes which are not taken up immediately upon arrival or which are insufficiently addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to delivery. All charges and expenses arising in connection with the sale or disposal of cargoes shall be paid by Shipper.

11.3    The rights of Company under this Section are independent and cumulative.

**12.    RATES AND CHARGES**

12.1    Shipper is directly and primarily liable for the payment of all charges owed to Company in performance of the Services at origin for its benefit. Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set -off.

12.2    Company at its discretion may request an advance to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice is rendered. Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3    On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13.    NOTICE OF CLAIM**

13.1    Any claim against Company must be in writing and delivered to Company at its registered office or its principal place of business in Hong Kong within 3 days of:

a)    In the case of damage to goods, the date of delivery of cargoes;

b)    In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c)    In any other case, the date of the event giving rise to the claim.

13.2    No action shall lie against Company if the claim is not made within the times and in the manner specified herein.

**14.    TIME BAR**

14.1    Any right of action against Company shall be extinguished if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes arrived at the destination or the date cargoes should have arrived at the destination (whichever date is the earlier).

**15.    NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1    Shipper agrees that: (a) Company will not perform Shipper whatsoever related to Collect on Delivery (C.O.D.) shipments and commensurate obligations for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16.    GOVERNING LAW**

16.1    These Conditions and any act or contract to which they apply shall be governed by and construed according to the laws of the Hong Kong Special Administrative Region. Any dispute arising out of these Conditions or any such act or contract shall be subject to the non exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region.

# Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-NSA-2400774**

| | |
|---|---|
| Maker/Supplier : **ATTIC PRODUCTS**<br>**X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | Maker/Supplier's INVOICE No.<br>**AJ-1057-24** |
| Buyer/Consignee : **BIG LOTS STORES, LLC**<br>**500 PHILLIPI RD, COLUMBUS, OH 43228, USA** | Dated: **June 24, 2024** |
| Shipment From : **NHAVA SHEVA**      To : **COLUMBUS, OH** | Date of Receipt of Cargo<br>**July 26, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|
| BIG LOTS STORES<br>PO NO: 95320747<br>SKU NO: 810747464,<br>810747644, 810747992<br>CARTON 1 - 168<br>MADE IN INDIA | | NOTIFY PARTY: GEODIS<br>5101 S. BROAD STREET<br>PHILADELPHIA, PA 19112-1404, U.S.A.<br>ATTN: ALENA LAMINA<br>ALSO NOTIFY: EDRAY 2020 LLC.<br>1300 SOUTH MINT STREET SUITE 200<br>CHARLOTTE NC 28203 USA<br>TEL: 704-593-6329<br>EMAIL: DATAQUALITY@EDRAYCPL.COM<br><br>CFS-CY<br><br>KITCHENWARE<br>PO NO: 95320747<br>SKU NO: 810747464, 810747644, 810747992<br>QTY: 504<br>GR.WT: 1038.800 KGS<br>SB.NO: 2561615 DT. 20/07/2024<br><br>*NEW DELHI-110020<br><br>SEGU5618304 (PART)      SEAL# HLG6337897      40H  DRY<br><br>SHIP TO CODE & LOCATION : 00890-COLUMBUS, OH<br>SHIPPER DECLARED ALL ITEM(S) CONTAIN NO WOOD PACKAGING<br>MATERIAL | | |
| | 168 CARTONS | | 4.774 CBM | 1,038.80 KGS |

===============================================================
TOTAL : ONE HUNDRED SIXTY-EIGHT (168) CARTONS ONLY

"FREIGHT COLLECT"
SHIPMENT PER S.S. "TORRENTE" VOY NO. 4132    DISCHARGED AT NORFOLK, VA
SAILING ON / ABOUT August 13, 2024. CARGO RECEIVED ON July 26, 2024.

| THIS IS NOT A DOCUMENT OF TITLE | **NHAVA SHEVA**                    **July 31, 2024** |
|---|---|
| The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only. | (Place and date of issue.)<br>**YUSEN LOGISTICS**<br><br>For Yusen Logistics (India) Private Limited<br><br>Authorised Signatory                    As Agent |
| No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1**<br>(Terms and conditions are to be continued to the reverse side hereof.) | (Authorized Signature)                    V2 |

ORIGINAL

Forwarders' Cargo Receipt
Terms and Conditions

**1. DEFINITIONS**

1.1. "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its capacity as an origin services provider for its customer who is the ultimate consignee of this shipment.

1.2. "Conditions" means the entire undertakings, terms, conditions, and clauses embedded herein, and includes terms and conditions on the front and any Shippers' Instructions received in writing at the time of receipt.

1.3. "Shipper" means the vendor tendering items to Company for Services and any person at whose request or on whose behalf Shipper undertakes any tender of those cargoes to Company.

1.4. "Shippers' Instructions" means any of Shipper's specific written shipping instructions or requirements delivered to Company at the time of receipt of the cargoes.

1.5. "Laws" means any laws, statutes, regulations, or conventions which apply compulsorily to any element of the Services or any subject matter incidental to these Conditions.

1.6. "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage, warehousing, collection, delivery, local transportation, insurance, customs clearance, packing, unpacking, and other handling of goods and other services intended to accomplish delivery of the cargoes to Company's customer, the ultimate consignee.

1.7. "Owner" means the owner of the cargoes (including any packings, containers, or equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2. COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1 In the event that any provisions contained herein are inconsistent with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency, shall be null and void in relation to such element of the Services by Company, but the remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2 Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3 Any and all action information or Services provided by Company gratuitously is provided on the basis that Company will not accept any liability whatsoever therefo re, whether in tort, bailment, or otherwise.

**3. SHIPPER'S WARRANTIES**

3.1 Shipper warrants as follows:

a) By accepting these Conditions, Shipper agrees to be bound by all stipulations, exceptions, terms, and conditions on the front and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b) By accepting these Conditions and agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c) The description and particulars relating to the cargoes set out on the front hereof: (a) have been checked by Shipper on receipt of these Conditions; and (b) are full and accurate;

d) The cargoes contain no drugs, prohibited or stolen goods, contraband, or other illegal material or substance or stowaways;

e) The cargoes have been properly and sufficiently prepared, packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation, packing, stowage, labelling, and/or marking are appropriate to the storage, handling, and any operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f) Shipper complies with all Laws, requirements, directives, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g) Shipper shall provide the total gross mass established using calibrated and certified equipment of each packed Container (FCL) or each package of cargoes (LCL) in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company, have been properly and sufficiently packed and/or prepared, and that Company has no liability for any loss of or damage to cargoes which are improperly or insufficiently packed or prepared, no matter how such loss or damage is caused.

h) Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks, igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i) The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and

ii) The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

i) Description of Cargoes: All descriptions, values, and other particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that such information is true, complete, and accurate.

j) Fitness of Cargoes: The cargoes are fit and suitable for the carriage (international as well as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

k) Delivery of Cargoes: The consignee or other person entitled to the delivery of the goods shall take delivery of the goods upon their arrival at destination and shall pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4. DANGEROUS GOODS**

4.1 Cargoes tendered by Shipper to Company are not of such nature that they are or may become dangerous, hazardous, noxious (including radioactive materials), inflammable, explosive, or which do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods") unless Shipper, or someone acting on its behalf, has given Company written notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company has expressly accepted in writing to deal with the Dangerous Goods. Shipper's notice will include all information necessary for Company to perform its obligation in connection with the Dangerous Goods in accordance with all applicable Laws or requirements (or any combination of the foregoing), including without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2 Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and to so comply with all Laws.

4.3 Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5. COMPANY'S AUTHORITY**

5.1 SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMER WILL BE ENTITLED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2 Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary or desirable in Shipper's circumstances or as is expedient.

5.3 Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior consultation with or further authorization from Shipper.

5.4 Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies), and the charges payable by Shipper to Company is Company's commission or remuneration or profit. Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account to Shipper for Company's commissions, remunerations, or profits.

5.5 Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6 Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately. Company is authorized (but not obliged) to consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7 Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations. Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6. LIABILITY AND LIMITATIONS**

6.1 SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE, CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL, OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE, OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2 Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3 Liability for Loss or Damage to Cargoes – Without prejudice to any other right or remedies Company may have, Company shall be relieved of liability for any loss or damage to cargoes if, and to the extent that, such loss or damage is caused by:

a) A force majeure event;

b) Strike, lock-out, stoppage or restraint of labor, the consequences of which Company is munable to avoid by the exercise of reasonable diligence;

c) Any cause or event which Company is unable to avoid and the consequences whereof Company is unable to prevent by the exercise of reasonable diligence; or

d) Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4 Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a) The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b) Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5 No insurance will be arranged by Company for the benefit of Shipper.

6.6 Entire Liability – Except as set forth in this Section, Company shall not be liable for loss of or damage to any cargoes or have any liability whatsoever for any events arising out or in connection with the storage and handling of cargoes and/or this FCR.

6.7 Application of Defenses, Limits, and Exclusions of Liability - The defenses, limits and exclusions of liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or in connection with the Services (including loss or damage to cargoes) and whether the action be founded in contract, bailment, tort, breach of express or implied warranty, or otherwise, even if the loss or damage arose as a result of negligence, willful misconduct, or fundamental breach of contract.

6.8 By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional charges for accepting such increased liability.

**7. INDEMNITY**

7.1. Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses (including without limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2. Advice and information, in whatever form as may be given by Company, are provided by Company for Shipper only and Shipper shall save harmless and indemnify and keep indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out of any other person relying on such advice or information. Except under special arrangements previously made in writing, advice, or information which is not related to specific instructions accepted by Shipper is provided gratuitously and without liability.

7.3. Shipper undertakes that no claim shall be made against any officer, servant, agent, or sub-contractor of Company which imposes or attempts to impose upon them any liability in connection with any Services provided or to be provided by Company. If any such claim should nevertheless be made Shipper shall indemnify Company against all consequences thereof. Without prejudice to the foregoing every such officer, servant, agent, and sub -contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit. For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4. Shipper shall defend, indemnify, and hold harmless Company from and against all claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions, and without prejudice to the generality of the foregoing this indemnity shall include (without limitation) all claims, costs, and demands arising from or in connection with the negligence of Company, its officers, servants, agents, or sub -contractors.

**8. WAREHOUSING**

8.1 Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9. DECLARED VALUE**

9.1 Company shall not be obliged to make any declaration for the purpose of any statute or convention or contract as to the nature or value of any goods or as to any special interest in delivery unless express instructions in writing were previously given to and accepted by Company. A mere statement or declaration of the value or nature of cargoes for insurance or export or customs or other purposes is not and shall not be construed to be Shipper's instructions to Company to make any such declaration.

**10. SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1 Shipper shall be liable for any duties, taxes, levies, deposits, or outlays of any kind levied by the authorities at any port or place for or in connection with cargoes and for any payments, storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or sustained by Company in connection therewith.

**11. LIEN, DISPOSAL OF GOODS, ETC.**

11.1 Company shall have a general lien on all cargoes (and documents relating thereto) and any other property belonging to Shipper, directly or indirectly in Company's possession, custody, control, or enroute for all monies due to Company and/or its affiliates from Shipper or the ultimate consignee. Company may at its sole discretion exercise its lien at any time and at any place. The lien shall cover without limitation all charges, expenses, and advances of whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing and preserving its lien (including but not limited to storage charges) and in recovering or attempting to recover any sums due from Shipper or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2 Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private treaty or by public auction or other means, without giving prior notice or incurring any liability to Shipper and to apply the proceeds of such sale (net of expenses) in or towards the payment of any amount due to Company. Company shall be entitled to claim the difference against Shipper or the ultimate consignee in the event that the (net) sale proceeds do not discharge in full the amount due from Shipper or the ultimate consignee. Company's lien shall survive delivery or deemed delivery of cargoes.

11.3 Perishable cargoes which are not taken up immediately upon arrival or which are insufficiently addressed or marked or otherwise not readily identifiable, may be sold or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to delivery. All charges and expenses arising in connection with the sale or disposal of cargoes shall be paid by Shipper.

11.4 The rights of Company under this Section are independent and cumulative.

**12. RATES AND CHARGES**

12.1 Shipper is directly and primarily liable for the payment of all charges owed to Company in performance of the Services at origin for its benefit. Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set -off.

12.2 Company at its discretion may request an advance to cover fees, duties, charges, taxes, and/or other expenses payable before Shipper's invoice is rendered. Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3 On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13. NOTICE OF CLAIM**

13.1 Any claim against Company must be in writing and delivered to Company at its registered office or its principal place of business in Hong Kong within 3 days of:

a) In the case of damage to goods, the date of delivery of cargoes;

b) In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c) In any other case, the date of the event giving rise to the claim.

13.2 No action will lie against Company if the claim is not made within the times and in the manner specified herein.

**14. TIME BAR**

14.1 Any right of action against Company shall be extinguished if suit is not brought in the proper forum and written notice thereof received by Company within three 3 months from the date cargoes arrived at the destination or the date cargoes should have arrived at the destination (whichever date is the earlier).

**15. NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1 Shipper agrees that: (a) Company shall handle cargoes for Shipper whatsoever related to Collect on Delivery (C.O.D.) shipments and commensurate obligations for collection of bank drafts or otherwise, or to collect on any specified terms by time drafts or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16. GOVERNING LAW**

16.1 These Conditions and any act or contract to which they apply shall be governed by and construed according to the laws of the Hong Kong Special Administrative Region. Any dispute arising out of these Conditions or any such act or contract shall be subject to the non exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region.

# Yusen Logistics

Yusen Logistics - Yusen Logistics    Yusen Logistics - Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-MUN-2400132**

| | |
|---|---|
| Maker/Supplier : | **ATTIC PRODUCTS** |
| | **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** |
| Buyer/Consignee : | **DURANT DC, LLC** |
| | **2306 ENTERPRISE DR, DURANT, OK 74701, USA** |
| Shipment From : | **MUNDRA**    To : **DURANT, OK** |

Maker/Supplier's INVOICE No.
**AJ-1058-24**

Dated: **June 24, 2024**

Date of Receipt of Cargo
**August 03, 2024**

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|

```
BIG LOTS STORES                  NOTIFY PARTY: GEODIS
PO NO: 95322264                       5101 S. BROAD STREET
SKU NO: 810746854, 810746855,         PHILADELPHIA, PA 19112-1404, U.S.A.
810746970, 810747031                  ATTN: ALENA LAMINA
CARTON 1 - 520                   ALSO NOTIFY: EDRAY 2020 LLC.
MADE IN INDIA                         1300 SOUTH MINT STREET SUITE 200
                                      CHARLOTTE NC 28203 USA
                                      TEL: 704-593-6329
                                      EMAIL: DATAQUALITY@EDRAYCPL.COM

                                 CY-CY

                                 FURNITURE
                                 PO NO: 95322264
                                 SKU NO: 810746854, 810746855, 810746970, 810747031
                                 QTY: 520
                                 GR.WT: 19427.200 KGS
                                 SHIPPING BILL # 2909988 DT : 02-AUG-24

                                 *NEW DELHI-110020

                                 SHIPPER'S LOAD, COUNT AND SEAL
                                 SAID TO CONTAIN
                                 MOTU1429904        SEAL# IN1642090      40H  DRY
                                 ONEU0191916        SEAL# IN1642089      40H  DRY

                                 SHIP TO CODE & LOCATION : 00879-DURANT, OK
                                 SHIPPER DECLARED ALL CONTAINER(S) CONTAIN NO WOOD PACKAGING
                                 MATERIAL

                                 520 CARTONS              131.216 CBM   19,427.20 KGS
                                 ===================================================
                                 TOTAL : FIVE HUNDRED TWENTY (520) CARTONS ONLY

                       "FREIGHT COLLECT"
SHIPMENT PER S.S. "SAN DIEGO BRIDGE" VOY NO. 0VBHXW1MA   DISCHARGED AT LOS ANGELES, CA
SAILING ON / ABOUT August 8, 2024. CARGO RECEIVED ON August 3, 2024.
```

| THIS IS NOT A DOCUMENT OF TITLE | MUNDRA | **August 10, 2024** |
|---|---|---|

The Goods and instructions are accepted and dealt with subject to the **YUSEN LOGISTICS GLOBAL MANAGEMENT LIMITED** Standard Trading Conditions printed reverse side. Forwarding instructions can only be cancelled or altered if the original of this document is surrendered to the Company and then only provided the Company is still in a position to comply with such cancellation or alteration. Instructions authorizing disposal by a third party can only be cancelled or altered if the original of this document is surrendered to the Company, and then only provided the Company have not yet received instructions under the original authority. The Company does not act as Carrier but a forwarding agent only.

No. of ORIGINAL FORWARDER'S CARGO RECEIPT ISSUED: **1**
(Terms and conditions are to be continued to the reverse side hereof.)

(Place and date of issue.)
**YUSEN LOGISTICS**

For Yusen Logistics (India) Private Limited

Authorised Signatory
As Agent

(Authorized Signature)    V3

# Yusen Logistics

FORWARDER'S CARGO RECEIPT No.    **CNS-MUN-2400132**

| | |
|---|---|
| Maker/Supplier : **ATTIC PRODUCTS** | Maker/Supplier's INVOICE No. |
| **X-6, OKHLA INDUSTRIAL AREA PHASE-2,** | **AJ-1058-24** |
| Buyer/Consignee : **DURANT DC, LLC** | Dated: **June 24, 2024** |
| **2306 ENTERPRISE DR, DURANT, OK 74701, USA** | Date of Receipt of Cargo |
| Shipment From : **MUNDRA**          To : DURANT, OK | **August 03, 2024** |

| Marks & Nos. | Nos. of P'kgs | Supplier's description of goods | Measurement (cbm.) | Weight (kgs.) |
|---|---|---|---|---|

```
BIG LOTS STORES               NOTIFY PARTY: GEODIS
PO NO: 95322264                      5101 S. BROAD STREET
SKU NO: 810746854, 810746855,       PHILADELPHIA, PA 19112-1404, U.S.A.
810746970, 810747031                ATTN: ALENA LAMINA
CARTON 1 - 520              ALSO NOTIFY: EDRAY 2020 LLC.
MADE IN INDIA                        1300 SOUTH MINT STREET SUITE 200
                                     CHARLOTTE NC 28203 USA
                                     TEL: 704-593-6329
                                     EMAIL: DATAQUALITY@EDRAYCPL.COM

                             CY-CY

                             FURNITURE
                             PO NO: 95322264
                             SKU NO: 810746854, 810746855, 810746970, 810747031
                             QTY: 520
                             GR.WT: 19427.200 KGS
                             SHIPPING BILL # 2909988 DT : 02-AUG-24

                             *NEW DELHI-110020

                             SHIPPER'S LOAD, COUNT AND SEAL
                             SAID TO CONTAIN
                             MOTU1429904        SEAL# IN1642090        40H  DRY
                             ONEU0191916        SEAL# IN1642089        40H  DRY

                             SHIP TO CODE & LOCATION : 00879-DURANT, OK
                             SHIPPER DECLARED ALL CONTAINER(S) CONTAIN NO WOOD PACKAGING
                             MATERIAL

                             520 CARTONS              131.216 CBM    19,427.20 KGS
                             ============================================================
                             TOTAL : FIVE HUNDRED TWENTY (520) CARTONS ONLY

                  "FREIGHT COLLECT"
SHIPMENT PER S.S. "SAN DIEGO BRIDGE" VOY NO. 0VBHXW1MA    DISCHARGED AT LOS ANGELES, CA
SAILING ON / ABOUT August 8, 2024. CARGO RECEIVED ON August 3, 2024.
```

| | |
|---|---|
| THIS IS NOT A DOCUMENT OF TITLE | **MUNDRA**                    **August 10, 2024** |
| **Non-Negotiable** | (Place and date of issue.) |
| Copy | **YUSEN LOGISTICS** |
| | As Agent |
| | V3 |

Non-Negotiable Copy

**1.    DEFINITIONS**

1.1.    "Company" means Yusen Logistics Global Management Limited trading or any of its affiliate entities issuing these Conditions in its  capacity as an origin services  provider for its customer who  is the ultimate consignee of this shipment.

1.2.    "Conditions" means the entire undertakings,  terms, conditions, and clauses embodied herein, and includes terms and conditions on the  front and any Shippers' Instructions received  in writing at the time of receipt.

1.3.    "Shipper" means the vendor tendering  items to Company for Services and any person at whose request  or on whose behalf Shipper undertakes any tender of  those cargoes to Company.

1.4.    "Shippers' Instructions" means any of Shipper's specific written shipping instructions or  requirements delivered to Company at the time of receipt of the cargoes.

1.5.    "Laws" means any laws, statutes, regulations,  or conventions which apply compulsorily  to any element of the Services or any subject matter incidental to these Conditions.

1.6.    "Services" means the origin services to be provided by Company and includes the receipt of cargoes from Shipper and subsequent arranging for the storage,  warehousing, collection, delivery,  local transportation, insurance, customs clearance, packing,  unpacking, and other  handling of goods and other services intended to accomplish delivery of the  cargoes to Company's customer, the ultimate consignee.

1.7.    "Owner" means the owner of the cargoes (including any packings, containers, or  equipment other than those provided by Customer or carriers) to which any business concluded under these Conditions relate s and any other person who is or may become interested in them depending upon the commercial terms of sale and including the ultimate consignee.

**2.    COMPULSORY LEGISLATION AND STATUTORY PROTECTION**

2.1    In the event that any provisions contained herein are  inconsistent  with any Laws that apply compulsorily to any element of the Services, those provisions, to the extent of such inconsistency,  shall be null and void in relation to such element of the Services by Company, but the  remaining provisions of this forwarders' certificate of receipt ("FCR") shall remain valid and enforceable.

2.2    Nothing in these Conditions shall operate to limit or deprive Company of any statutory protection, defense, exception, or limitation of liability authorized by any applicable Laws.

2.3    Any and all extra information or Services provided by Company gratuitously  is provided on the basis that Company will not accept any liability whatsoever therefo  re, whether in tort, bailment, or otherwise.

**3.    SHIPPER'S WARRANTIES**

3.1    Shipper warrants as follows:

a)    By accepting these Conditions, Shipper  agrees to be bound by all stipulations, exceptions, terms, and conditions on the front  and back hereof, whether written, typed, stamped, or printed, as fully as if signed by Shipper;

b)    By accepting these Conditions and  agreeing to the terms hereof, Shipper is, or is the agent of and has the authority of, the Owner or person owning or entitled to the possession of the cargoes or of the person who is or may become interested in the cargoes;

c)    The description and  particulars relating to the  cargoes set out on the front hereof: (a) have been checked by Shipper  on receipt of these Conditions; and (b) are full and accurate;

d)    The cargoes contain no drugs, prohibited  or stolen goods, contraband, or other illegal material or substance or stowaways;

e)    The cargoes have been properly and sufficiently prepared,  packed, stowed, labelled, and/or marked by or on behalf of Shipper, and the preparation,  packing, stowage, labelling, and/or  marking are appropriate to the storage, handling,  and any  operations or transactions that may affect the cargoes and are in compliance with all applicable Laws;

f)    Shipper complies with all Laws, requirements, directions, recommendations, rules, guidelines of customs, port, import, export, and other authorities;

g)    Shipper shall provide the total gross  mass established and certified equipment of each packed Container (FCL) or  each package of cargoes (LCL)  in accordance with SOLAS. Shipper acknowledges and agrees that Company will rely on the  accuracy and timeliness of such gross mass information and will use this to comply with its obligations in accordance with SOLAS. Proper Packing, etc.: All the cargoes, the subject of any Service provided by Company,  have been properly and sufficiently packed and/or prepared, and that Company has no liability for any  loss of or damage to cargoes which are improperly or  insufficiently packed or prepared, no matter how such loss or damage is caused.

h)    Transport Unit: Where the cargoes delivered by or on behalf of Shipper are already carried in or on containers, trailers, flats, tilts, railway wagons, tanks,  igloos, or any other unit load device (each hereafter referred to as a "transport unit") then:

i)    The transport unit is in good condition, is suitable to carry the goods loaded therein or thereon, and is suitable for the intended carriage and other handling; and

ii)    The cargoes are suitable for carriage and other handling in or on the transport unit and has been properly and competently packed or loaded in or on the transport unit.

j)    Description of Cargoes: All descriptions, values, and other  particulars of the goods furnished to Company are true, complete, and accurate, it being the duty of Shipper to provide such information to Company and to ensure that  such information is true, complete, and accurate.

k)    Fitness of Cargoes: The cargoes are fit  and suitable for the carriage (international as well  as local), storage, packing, unpacking, and other handling in accordance with, pursuant, related, or incidental to Shipper's Instructions.

l)    Delivery of Cargoes:  The consignee or  other person entitled to the  delivery of the goods shall take delivery of the goods upon their  arrival at destination  and shall  pay all necessary charges, taxes, and duties and shall comply with all necessary formalities and procedures.

**4.    DANGEROUS GOODS**

4.1    Cargoes tendered by Shipper to Company are  not of such nature that they are or may become  dangerous, hazardous, noxious (including  radioactive materials), inflammable, explosive, or which  do or may present a risk of damage to any property or person whatsoever ("Dangerous Goods")  unless Shipper, or  someone acting on its behalf, has given Company written  notice of the nature of the Dangerous Goods prior to Company's receipt of such Dangerous Goods and Company  has expressly accepted in writing to deal with the Dangerous Goods.  Shipper's notice  will include all information necessary for Company to perform its obligation in connection with  the Dangerous Goods in accordance  with all applicable Laws or requirements (or any combination of the foregoing), including  without limitation information about the characteristics of the Dangerous Goods, the appropriate manner and method of storage and handling of the Dangerous Goods.

4.2    Any Dangerous Goods must be distinctly marked on the outside so as to indicate the nature and characteristics of the Dangerous Goods and so as to comply with all Laws.

4.3    Additional charges may apply to the storage and handling of Dangerous Goods. If any Dangerous Goods are tendered in  breach of this Section, they may, at any time or place be unloaded, destroyed, disposed, abandoned, or rendered harmless, as circumstances may require, at Shipper's cost.

**5.    COMPANY'S AUTHORITY**

5.1    SHIPPER ACKNOWLEDGES AND AGREES THAT COMPANY'S: A) ROLE IS SOLELY THAT OF ORIGIN SERVICES PROVIDER, AND THAT COMPANY WILL NOT UNDER THESE CONDITIONS PERFORM IN THE CAPACITY OF A CARRIER, NON-VESSEL-OPERATING COMMON CARRIER, CUSTOMS HOUSE BROKER, OR AS A SHIPPER AS THAT TERM IS UNDERSTOOD UNDER APPLICABLE LAWS; B) CUSTOMER IS THE ULTIMATE CONSIGNEE OF THE CARGOES PROVIDED BY SHIPPER TO COMPANY UNDER THESE CONDITIONS AND CUSTOMERWILL BE IDENTIFIED AS THE LAWFUL SHIPPER FOR INTERNATIONAL OCEAN CARRIAGE; AND C) SERVICES ARE DELIVERED AS A CONVENIENCE TO SHIPPER IN ITS TRANSACTION WITH THE ULTIMATE CONSIGNEE AND FOR WHICH COMPANY IS ENTITLED TO COLLECT FROM SHIPPER FOR THOSE SERVICES RENDERED AT ORIGIN.

5.2    Company is authorized to depart or deviate from Shipper Instructions in any respect if in the opinion of Company such departure or deviation is necessary  or desirable in Shipper's interest or is expedient.

5.3    Company is authorized by Shipper to act or to enter into any contract or arrangement with third-parties for performance of the Services without prior  consultation with or further  authorization from Shipper.

5.4    Company is authorized to agree with any 3rd Party the charges payable to such 3rd Party without reference to or further authorization from Shipper, it being agreed that the difference between the charges payable by Company to 3rd Party(ies),  and the charges payable by Shipper to Company is Company's  commission or remuneration or profit.  Shipper waives any and has no right of enquiry of the charges payable to 3rd Party(ies) and Company is not under any duty to account  to Shipper for Company's commissions, remunerations, or profits.

5.5    Company is authorized (but not obligated) to inspect or arrange for cargoes to be inspected.

5.6    Company is not obliged to arrange for Shipper's goods to be carried, forwarded, packed, unpacked, stored, or handled separately.   Company is authorized (but not obliged) to  consolidate or arrange to be consolidated cargoes of Shipper with other goods.

5.7    Shipper expressly agrees to be bound in all respects by any act, contract, or arrangement entered into by Company with third-parties pursuant to the aforesaid authorizations.  Company is not and does not act as Shipper's agent with respect to any cargoes or shipments under these Conditions, and Company does not accept any such purported appointment of agency.

**6.    LIABILITY AND LIMITATIONS**

6.1    SHIPPER ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES ALL CLAIMS AGAINST COMPANY: (A) FOR CARGO LOSS, DAMAGE, OR DELAY, EXCEPT TO THE EXTENT SHIPPER CAN PROVE THAT SUCH HARM OCCURRED WHILE SUCH CARGOES WERE IN THE CARE,  CUSTODY, AND CONTROL OF COMPANY DURING PERFORMANCE OF THE SERVICES PURSUANT TO THESE CONDITIONS; (B) RELATED TO THE RELEASE OF THE CARGOES TO THE CONSIGNEE OR OTHER PARTIES INCLUDING CARRIERS AND SERVICE PROVIDERS; AND (C) FOR LOSS OF PROFIT, LOSS OF SALES, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, THIRD-PARTY CLAIMS OF ANY NATURE  OR ASSERTING SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND.

6.2    Company's liability for the cargoes, if any, shall be determined and limited in accordance with this Section.

6.3    Liability for Loss or Damage to Cargoes -- Without prejudice to any other right or remedies Company may have, Company shall be relieved of  liability for any loss or damage to cargoes if,  and to the extent that, such loss or damage is caused by:

a)    A force majeure event;

b)    Strike, lock-out, stoppage or restraint of labor, the consequences of  which Company is munable to avoid by the exercise of reasonable diligence;

c)    Any cause or event which Company is unable to avoid and the consequences  whereof Company is unable to prevent by the exercise of reasonable diligence; or

d)    Compliance with instructions or directions of Shipper or the consignee or any person authorized to give them.

6.4    Amount of Compensation - Subject to these Conditions, if Company is liable for loss of or damage to cargoes, the liability of Company shall be limited to the lesser of:

a)    The landed cost at the destination of only those cargoes damaged or lost (excluding insurance); or

b)    Two (2) SDRs per kilo of the gross weight of any cargoes lost or damaged.

6.5    No insurance will be arranged by Company for the benefit of Shipper.

6.6    Entire Liability -- Except as set forth in  this Section, Company shall not  be liable for loss of  damage to any cargoes or have any liability whatsoever for any events arising out or  in connection with the storage and handling of cargoes and/or this FCR.

6.7    Application of Defenses, Limits, and Exclusions of  Liability - The defenses, limits and exclusions of  liability provided for in these Conditions of receipt shall apply in any action against Company arising out of or  in connection with the Services (including  loss or damage to cargoes) and whether the action  be founded in contract, bailment, tort, breach of express or  implied warranty, or otherwise, even if the loss or  damage arose as a result of negligence, willful misconduct, or fundamental breach of  contract.

6.8    By special arrangement which must be agreed to in writing, Company may accept liability in excess of the limit set forth herein if Shipper agrees to pay, and has paid, Company's additional  charges for accepting such increased liability.

**7.    INDEMNITY**

7.1.    Shipper shall save harmless and  indemnify and keep indemnified Company  from and against all claims, liabilities, losses, damages, costs, and expenses (including without  limitation all duties, taxes, imposts, levies, deposits, fines, and outlays of whatsoever nature levied by any authority) arising out of Company acting in accordance with Ship per's Instructions, or arising from a breach of warranty or obligation by Shipper, or arising from Shipper's inaccurate  or incomplete or ambiguous information or instructions, or arising from the negligence of Shipper or Owner.

7.2.    Advice and information, in whatever form as may be given  by Company, are provided  by Company for Shipper only and Shipper shall save harmless and indemnify and keep  indemnified Company from and against all claims, liabilities, losses, damages, costs, and expenses arising out  of any other person relying on such advice or information.  Except under special arrangements previously  made in writing, advice, or information which is not related to specific instructions accepted  by Shipper is provided  gratuitously and without liability.

7.3.    Shipper undertakes that no claim shall be made against any officer,  servant, agent, or  sub-contractor of Company which imposes or attempts to impose upon them any liability in  connection with any Services provided or to be provided  by Company.  If any such claim should nevertheless be made Shipper  shall indemnify Company against all consequences  thereof.  Without prejudice to the foregoing every such officer, servant, agent, and sub-contractor shall have the benefit of all provisions herein benefiting Company as if such provisions were expressly for his or its benefit.  For the foregoing purposes, Shipper contracts for itself as well as agents for all the aforesaid persons.

7.4.    Shipper shall defend,  indemnify, and hold harmless Company from  and against all  claims, costs, and demands whatsoever and by whomsoever made or preferred in excess of the liability of Company under the terms of these Conditions,  and without prejudice to the generality  of the foregoing this indemnity shall include (without  limitation) all claims, costs, and demands arising from or  in connection with the negligence of Company, its officers, servants, agents, or  sub-contractors.

**8.    WAREHOUSING**

8.1    Pending release of the cargoes after provision of Services at origin, cargoes may be warehoused  or otherwise held at the risk of Shipper or the Owner at any place at the sole discretion of Company and the cost therefore shall be for the account of Shipper.

**9.    DECLARED VALUE**

9.1    Company shall not be obliged to make any declaration for the purpose of any  statute or convention  or contract as to the nature or value of any goods or  as to any special interest  in delivery unless express instructions in  writing were previously given to and accepted by Company.  A mere statement or declaration of the value or nature of cargoes for  insurance or export  or customs or other purposes is not and shall not be construed to be Shipper's Instructions to Company to make any such declaration.

**10.    SHIPPER'S OBLIGATION TO PAY DUTIES, TAXES, ETC.**

10.1    Shipper shall be liable  for any duties, taxes, levies, deposits, or outlays of any kind levied  by the authorities at any port or place for or in connection with cargoes and for  any payments,  storage, demurrage, fines, expenses, loss, or damage whatsoever incurred or  sustained by Company in connection therewith.

**11.    LIEN, DISPOSAL OF GOODS, ETC.**

11.1    Company shall have a general lien on all cargoes (and documents relating thereto)  and any other property belonging to Shipper,  directly or indirectly  in Company's possession, custody, control, or enroute for all monies due to Company and/or  its affiliates from Shipper or  the ultimate consignee.   Company may at its sole discretion exercise its lien at any  time and at any place. The lien shall  cover without limitation all charges, expenses, and advances of  whatsoever nature due to Company and/or its affiliates and inclusive of any costs incurred enforcing  and preserving its  lien (including  but not limited to storage charges) and in recovering or attempting to recover  any sums due from Shipper  or the ultimate consignee (whether in respect of the storage and handling herein or otherwise).

11.2    Company shall be entitled to sell (at any time and at any place) at the costs of Shipper cargoes and/or any such other property by private  treaty or by public auction or  other means, without giving prior  notice or incurring any liability to Shipper and  to apply the proceeds of  such sale (net of expenses) in or  towards the payment of any amount due to Company.  Company shall be entitled to  claim the difference against Shipper or the ultimate consignee  in the event that the (net) sale proceeds do  not discharge in full  the amount due from Shipper or the ultimate consignee.  Company's lien shall survive delivery or deemed delivery of cargoes. Perishable cargoes which are not  taken up immediately upon arrival or which are insufficiently  addressed or marked or otherwise not readily identifiable,  may be sold  or otherwise disposed of without any notice to Shipper or the Owner and payment or tender of the net proceeds of any sale after deduction of charges and expenses shall be equivalent to  delivery.   All charges and expenses arising in  connection with the sale or disposal of cargoes shall be paid by Shipper.

11.3    The rights of Company under this Section are independent and cumulative.

11.4

**12.    RATES AND CHARGES**

12.1    Shipper is directly and primarily liable for the  payment of all charges owed to Company in  performance of the Services at origin for its benefit.  Shipper shall pay to Company all sums immediately when due without deduction or deferment on account of any claim, counterclaim, or set  -off.

12.2    Company at its discretion  may request an advance  to cover fees, duties, charges, taxes,  and/or other expenses payable before Shipper's invoice is rendered.  Forthwith upon such request being made, Shipper shall make such advance to Company.

12.3    On all amounts overdue to Company, Company shall be entitled to interest calculated on a monthly basis from the date such accounts are overdue until payment thereof  at 2% per month (compounded monthly) during the period that such amounts are overdue.

**13.    NOTICE OF CLAIM**

13.1    Any claim against Company  must be in writing and delivered to Company at its registered office or  its principal place of business in Hong Kong within 3 days of:

a)    In the case of damage to goods, the date of delivery of cargoes;

b)    In the case of loss or non-delivery or mis-delivery of cargoes, the date that cargoes should have been delivered; and

c)    In any other case, the date of the event giving rise to the claim.

13.2    No suit will lie against Company if  the claim is not made within the times and in the manner specified herein.

**14.    TIME BAR**

14.1    Any right of action against Company shall be extinguished  if suit is not brought in the proper forum and written notice  thereof received by Company within three 3 months from the date cargoes  arrived at the destination or the date cargoes should have arrived  at the destination (whichever date is the earlier).

**15.    NO COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

15.1    Shipper agrees that: (a) Company shall have no obligation to Shipper whatsoever related  to Collect on Delivery (C.O.D.) shipments and commensurate obligations  for collection of  bank drafts or otherwise, or to collect on any specified terms by  time drafts  or otherwise; and (b) Shipper bears all risk for the payment of costs and/or collection of the invoice price from its customer and the consignee.

**16.    GOVERNING LAW**

16.1    These Conditions and any act or contract to which they apply  shall be governed  by and construed according to the laws of the Hong Kong Special  Administrative Region.  Any dispute arising out  of these Conditions or any such act or contract shall be subject  to the non-exclusive jurisdiction of the  courts of the Hong Kong Special Administrative Region.



**PO #**    **95217767**

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

| | |
|---|---|
| Date Created | 03/08/2024 |
| Version: | 0 |
| Buyer: | MERRIMAN, SAVANNAH |
| Do Not Ship Before: | 05/27/2024 |
| Cancel if not Shipped by: | 06/03/2024 |
| Must be Routed by: | 05/06/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | MUNDRA    , IN |

---

**SHIP TO**

DURANT DC - #0879
DURANT DC, LLC
2306 ENTERPRISE DR
DURANT OK  74701-1964

Telephone:  580-931-2100       Fax:  580-931-2197

---

**BILL TO**

DURANT DC, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone:  614-278-6800       Fax:  614-278-6871

---

**Purchase From Vendor:  1009673**

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA

Contact:    PRAVENDRA THAKUR
Telephone:  91-11-41357720    Fax   91-11-2638102
E-Mail:   m2@attic-products.com

---

**ADDITIONAL COMMENTS**

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 384 | 111,348.48 | 22,656.00 | 64.979 |

Vendor Signature  _____

Signee's Name  _____

Title  _____

Date  _____

OFFICE-COPY



# IMPORTANT Terms and Conditions

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

Definitions

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped", "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.      Purchase Order.  Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates.  Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.      Shipping Goods to a DC.  Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons.  Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.      Shipping Goods to a Buyer Store.  Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual.  A detailed packing slip must accompany each shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons.  Vendor should see the Vendor Manual for full instruction and must comply therewith.  Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.      Inspection of Goods.  Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof.  Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.      Cancellation.  Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods.  In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions).  If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.      Buyer Remedies.  If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified.  In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.  Buyer may also impose chargebacks as set out in the Vendor Manual.  Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments.  Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.      Disposition of Rejected Goods.  Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate.  In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.      Vendor Disposal of Goods.  Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer.  In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.      Payment & Taxes.  Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO.  Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating.  No additional charges of any type may be added without Buyer's prior express written consent.  Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements.  In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved.  Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes



title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or


securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail
operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.


AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION.  EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country.  Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| 340 | 810732010 | IRON/WOOD METAL STO | 0.00 | IN | 1 | | 384 | 59.00 | 38,995.20 | 07/22/2024 |
| 61006 | ATP-36585-S/3 | COFFEETABLES | | | 1 | | 384 | 42.55 | 111,348.48 | |
| 61006004 | NA | PRODUCTION | HST | | | | | 289.97 | 65.284 | |
| 1 | 481073201004 | | GRM | 13.810 | A1 | | | | | |
| -->> The | above assortment | (810732010) | consists of | | | | | | | 07/22/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810731908 | METAL & MANGO WOOD | 0.00 | IN | | | 384 | 32.00 | 12,288.00 | 07/22/2024 |
| 61006 | ATP-36585-A | COFFEETABLES | | | | | 384 | | 57,596.16 | |
| 61006004 | NA | PRODUCTION | HST | | | | | 149.99 | 78.665 | |
| 2 | 481073190803 | | | 13.810 | A1 | | | | | |
| 340 | 810731909 | LG METAL & MANGO WO | 0.00 | IN | | | 384 | 14.00 | 5,376.00 | 07/22/2024 |
| 61006 | ATP-36585-B | END TABLES | | | | | 384 | | 30,716.16 | |
| 61006001 | NA | PRODUCTION | HST | | | | | 79.99 | 82.498 | |
| 3 | 481073190902 | | | 5.208 | A1 | | | | | |
| 340 | 810732278 | SM METAL & MANGO WO | 0.00 | IN | | | 384 | 13.00 | 4,992.00 | 07/22/2024 |
| 61006 | ATP-36585-C | END TABLES | | | | | 384 | | 23,036.16 | |
| 61006001 | NA | PRODUCTION | HST | | | | | 59.99 | 78.330 | |
| 4 | 481073227806 | | | 3.750 | A1 | | | | | |
| *--End of | assortment list | for -810732010 | | | | | | | | 07/22/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |



| PO # | **95217768** | See attached Terms and Conditions for additional Big Lots requirements. A complete list of requirements can be found on the Big Lots website www.biglots.com/corporate/vendors | Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program. |
|---|---|---|---|

Date Created            03/08/2024
Version:                0
Buyer:                  MERRIMAN, SAVANNAH
Do Not Ship Before:     06/03/2024
Cancel if not Shipped by: 06/10/2024
Must be Routed by:      05/13/2024
Payment Terms:          Wire Transfer + 60 Days Upon Receipt in DC
Freight Terms:          Collect
FOB:                    MUNDRA          ,  IN

**SHIP TO**

COLUMBUS DC - #0890
BIG LOTS STORES, LLC
500 PHILLIPI RD
COLUMBUS OH  43228-9006

Telephone:  614-278-6800        Fax:   614-278-3809

**BILL TO**

BIG LOTS STORES, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800        Fax:  614-278-6871

Purchase From Vendor:   1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:    PRAVENDRA THAKUR
Telephone:  91-11-41357720    Fax    91-11-2638102
E-Mail:     m2@attic-products.com

**ADDITIONAL COMMENTS**

Vendor Signature  _____

Signee's Name     _____

Title             _____

Date              _____

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 528 | 153,104.16 | 31,152.00 | 64.979 |

OFFICE-COPY



These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

Definitions

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped," "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.        Purchase Order.  Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates.  Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.        Shipping Goods to a DC.  Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.        Shipping Goods to a Buyer Store.  Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual.  A detailed packing slip must accompany each shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons.  Vendor should see the Vendor Manual for full instruction and must comply therewith.  Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.        Inspection of Goods.  Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof.  Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.        Cancellation.  Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods.  In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions).  If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.        Buyer Remedies.  If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified.  In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.  Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.        Disposition of Rejected Goods.  Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs").  Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate.  In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.        Vendor Disposal of Goods.  Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.        Payment & Taxes.  Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO.  Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating.  No additional charges of any type may be added without Buyer's prior express written consent.  Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements.  In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved.  Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or


securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,
without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION. EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country. Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| 340 | 810732010 | IRON/WOOD METAL STO | 0.00 | IN | 1 | | 528 | 59.00 | 53,618.40 | 07/15/2024 |
| 61006 | ATP-36585-S/3 | COFFEETABLES | | | 1 | | 528 | 42.55 | 153,104.16 | |
| 61006004 | NA | PRODUCTION | HST | | | | | 289.97 | 65.284 | |
| 1 | 481073201004 | | GRM | 13.810 | A1 | | | | | |
| -->> The | above assortment | (810732010) | consists of | | | | | | | 07/15/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810731908 | METAL & MANGO WOOD | 0.00 | IN | | | 528 | 32.00 | 16,896.00 | 07/15/2024 |
| 61006 | ATP-36585-A | COFFEETABLES | | | | | 528 | | 79,194.72 | |
| 61006004 | NA | PRODUCTION | HST | | | | | 149.99 | 78.665 | |
| 2 | 481073190803 | | | 13.810 | A1 | | | | | |
| 340 | 810731909 | LG METAL & MANGO WO | 0.00 | IN | | | 528 | 14.00 | 7,392.00 | 07/15/2024 |
| 61006 | ATP-36585-B | END TABLES | | | | | 528 | | 42,234.72 | |
| 61006001 | NA | PRODUCTION | HST | | | | | 79.99 | 82.498 | |
| 3 | 481073190902 | | | 5.208 | A1 | | | | | |
| 340 | 810732278 | SM METAL & MANGO WO | 0.00 | IN | | | 528 | 13.00 | 6,864.00 | 07/15/2024 |
| 61006 | ATP-36585-C | END TABLES | | | | | 528 | | 31,674.72 | |
| 61006001 | NA | PRODUCTION | HST | | | | | 59.99 | 78.330 | |
| 4 | 481073227806 | | | 3.750 | A1 | | | | | |
| *--End of | assortment list | for -810732010 | | | | | | | | 07/15/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |



**PO #**  **95320746**

| | |
|---|---|
| Date Created | 04/18/2024 |
| Version: | 0 |
| Buyer: | TREMPE, KAREN |
| Do Not Ship Before: | 06/03/2024 |
| Cancel if not Shipped by: | 06/10/2024 |
| Must be Routed by: | 05/13/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | LCL-NHAVA SHEWA |

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

**SHIP TO**

DURANT DC - #0879
DURANT DC, LLC
2306 ENTERPRISE DR
DURANT OK 74701-1964

Telephone: 580-931-2100       Fax: 580-931-2197

**BILL TO**

DURANT DC, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800       Fax: 614-278-6871

Purchase From Vendor: 1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:      PRAVENDRA THAKUR
Telephone:  91-11-41357720      Fax    91-11-2638102
E-Mail:      m2@attic-products.com

**ADDITIONAL COMMENTS**

Vendor Signature _____

Signee's Name _____

Title _____

Date _____

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 522 | 7,476.78 | 2,928.42 | 58.215 |

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

**Definitions**

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped," "Shipping," or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.    Purchase Order. Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates. Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.    Shipping Goods to a DC. Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.    Shipping Goods to a Buyer Store. Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual. A detailed packing slip must accompany each shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.    Inspection of Goods. Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof. Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.    Cancellation. Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods. In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions). If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.    Buyer Remedies. If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of any of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified. In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions. Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.    Disposition of Rejected Goods. Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate. In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.    Vendor Disposal of Goods. Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.    Payment & Taxes. Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO. Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating. No additional charges of any type may be added without Buyer's prior express written consent. Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements. In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved. Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or


securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses'), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI') signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail
operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION.  EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country.  Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | | Total  Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | | PDQ Pkg | | |
| 320 | 810747464 | SERVE BOARD ACACIA | 0.00 | IN | 3 | | 174 | 5.97 | 1,278.69 | 08/12/2024 |
| 32002 | J-87505 | WOODSERVE | | | 3 | | 58 | 1.38 | 2,608.26 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.573 | 18.98 |
| 1 | 481074746405 | | GRM | 0.993 | A1 | | | | | |
| 320 | 810747644 | SERVE BOARD BEADED | 0.00 | IN | 3 | | 174 | 6.24 | 1,278.83 | 08/12/2024 |
| 32002 | J-90396 | WOODSERVE | | | 3 | | 58 | 1.11 | 2,608.26 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.595 | 18.98 |
| 2 | 481074764409 | | GRM | 0.689 | A1 | | | | | |
| 320 | 810747992 | SERVE BOARD ROUND W | 0.00 | IN | 3 | | 174 | 4.62 | 999.60 | 08/12/2024 |
| 32002 | J-73071-M | WOODSERVE | | | 3 | | 58 | 1.12 | 2,260.26 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 12.99 | 56.309 | 16.99 |
| 3 | 481074799203 | | GRM | 0.835 | A1 | | | | | |



**PO #**  **95320743**

| | |
|---|---|
| Date Created | 04/18/2024 |
| Version: | 0 |
| Buyer: | TREMPE, KAREN |
| Do Not Ship Before: | 06/10/2024 |
| Cancel if not Shipped by: | 06/17/2024 |
| Must be Routed by: | 05/20/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | LCL-NHAVA SHEVA |

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

**SHIP TO**

APPLE VALLEY DC - #0869
AVDC, LLC
18880 NAVAJO ROAD
APPLE VALLEY CA  92307

Telephone:  760-503-0520      Fax:

**BILL TO**

AVDC, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone:  614-278-6800      Fax:  614-278-6871

**Purchase From Vendor:**  1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:    PRAVENDRA THAKUR
Telephone:  91-11-41357720      Fax    91-11-2638102
E-Mail:    m2@attic-products.com

**ADDITIONAL COMMENTS**

Vendor Signature _____

Signee's Name _____

Title _____

Date _____

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 1,008 | 14,437.92 | 5,654.88 | 58.216 |

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

Definitions

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped," "Shipping," or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.      Purchase Order. Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates. Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.      Shipping Goods to a DC. Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.      Shipping Goods to a Buyer Store. Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual. A detailed packing slip must accompany each shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.      Inspection of Goods. Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof. Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.      Cancellation. Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods. In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions). If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.      Buyer Remedies. If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified. In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions. Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.      Disposition of Rejected Goods. Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate. In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.      Vendor Disposal of Goods. Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.      Payment & Taxes. Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO. Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating. No additional charges of any type may be added without Buyer's prior express written consent. Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements. In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved. Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or


securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,

description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION.  EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country.  Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

PO#:  95320743

Page 6 of 6

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| 320 | 810747464 | SERVE BOARD ACACIA | 0.00 | IN | 3 | | 336 | 5.97 | 2,469.20 | 08/12/2024 |
| 32002 | J-87505 | WOODSERVE | | | 3 | | 112 | 1.38 | 5,036.64 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.573 | 18.98 |
| 1 | 481074746405 | | GRM | 0.993 | A1 | | | | | |
| 320 | 810747644 | SERVE BOARD BEADED | 0.00 | IN | 3 | | 336 | 6.24 | 2,469.47 | 08/12/2024 |
| 32002 | J-90396 | WOODSERVE | | | 3 | | 112 | 1.11 | 5,036.64 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.594 | 18.98 |
| 2 | 481074764409 | | GRM | 0.689 | A1 | | | | | |
| 320 | 810747992 | SERVE BOARD ROUND W | 0.00 | IN | 3 | | 336 | 4.62 | 1,930.25 | 08/12/2024 |
| 32002 | J-73071-M | WOODSERVE | | | 3 | | 112 | 1.12 | 4,364.64 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 12.99 | 56.309 | 16.99 |
| 3 | 481074799203 | | GRM | 0.835 | A1 | | | | | |



**PO #**　　　**95320744**

| | |
|---|---|
| Date Created | 04/18/2024 |
| Version: | 0 |
| Buyer: | TREMPE, KAREN |
| Do Not Ship Before: | 06/17/2024 |
| Cancel if not Shipped by: | 06/24/2024 |
| Must be Routed by: | 05/27/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | LCL-NHAVA SHEWA, INDIA |

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

**SHIP TO**

MONTGOMERY DC - #0870
CSC DISTRIBUTION, LLC
2855 SELMA HWY
MONTGOMERY AL  36108-5035

Telephone:  334-286-6633　　Fax:  334-286-7024

**BILL TO**

CSC DISTRIBUTION, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800　　Fax: 614-278-6871

Purchase From Vendor:  1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:　PRAVENDRA THAKUR
Telephone:　91-11-41357720　　Fax　91-11-2638102
E-Mail:　m2@attic-products.com

**ADDITIONAL COMMENTS**

Vendor Signature　_____

Signee's Name　_____

Title　_____

Date　_____

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 513 | 7,347.87 | 2,877.93 | 58.216 |

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

PO#:   95320744

Page 2 of 6

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

**Definitions**

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped", "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.      Purchase Order. Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates. Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.      Shipping Goods to a DC. Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.      Shipping Goods to a Buyer Store. Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual. A detailed packing slip must accompany each shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.      Inspection of Goods. Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof. Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.      Cancellation. Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods. In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions). If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.      Buyer Remedies. If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified. In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions. Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.      Disposition of Rejected Goods. Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate. In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.      Vendor Disposal of Goods. Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.      Payment & Taxes. Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO. Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating. No additional charges of any type may be added without Buyer's prior express written consent. Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements. In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved. Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or



securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail
operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION.  EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country.  Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | | PDQ Pkg | | |
| 320 | 810747464 | SERVE BOARD ACACIA | 0.00 | IN | 3 | | 171 | 5.97 | 1,256.64 | | 08/12/2024 |
| 32002 | J-87505 | WOODSERVE | | | 3 | | 57 | 1.38 | 2,563.29 | | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.573 | | 18.98 |
| 1 | 481074746405 | | GRM | 0.993 | A1 | | | | | | |
| 320 | 810747644 | SERVE BOARD BEADED | 0.00 | IN | 3 | | 171 | 6.24 | 1,256.78 | | 08/12/2024 |
| 32002 | J-90396 | WOODSERVE | | | 3 | | 57 | 1.11 | 2,563.29 | | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.595 | | 18.98 |
| 2 | 481074764409 | | GRM | 0.689 | A1 | | | | | | |
| 320 | 810747992 | SERVE BOARD ROUND W | 0.00 | IN | 3 | | 171 | 4.62 | 982.36 | | 08/12/2024 |
| 32002 | J-73071-M | WOODSERVE | | | 3 | | 57 | 1.12 | 2,221.29 | | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 12.99 | 56.309 | | 16.99 |
| 3 | 481074799203 | | GRM | 0.835 | A1 | | | | | | |



**PO #**      **95320745**

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

| | |
|---|---|
| Date Created | 04/18/2024 |
| Version: | 0 |
| Buyer: | TREMPE, KAREN |
| Do Not Ship Before: | 06/17/2024 |
| Cancel if not Shipped by: | 06/24/2024 |
| Must be Routed by: | 05/27/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | LCL-NHAVA SHEVA |

**SHIP TO**

TREMONT DC - #0874
CLOSEOUT DISTRIBUTION, LLC
50 RAUSCH CREEK RD
TREMONT PA  17981-1734

Telephone:  570-695-2848      Fax:  570-695-2862

**BILL TO**

CLOSEOUT DISTRIBUTION, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800      Fax: 614-278-6871

**Purchase From Vendor:  1009673**

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:     PRAVENDRA THAKUR
Telephone:  91-11-41357720      Fax    91-11-2638102
E-Mail:      m2@attic-products.com

**ADDITIONAL COMMENTS**

Vendor Signature  _____

Signee's Name  _____

Title  _____

Date  _____

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 918 | 13,148.82 | 5,149.98 | 58.215 |

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

PO#:   95320745

Page 2 of 6

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms").  The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

Definitions

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party.  "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped", "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.        Purchase Order.  Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates.  Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.        Shipping Goods to a DC.  Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC").  A detailed packing slip must accompany each Shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons.  Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.        Shipping Goods to a Buyer Store.  Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual.  A detailed packing slip must accompany each shipment of Goods.  The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons.  Vendor should see the Vendor Manual for full instruction and must comply therewith.  Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.        Inspection of Goods.  Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof.  Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.        Cancellation.  Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods.  In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions).  If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.        Buyer Remedies.  If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified.  In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.  Buyer may also impose chargebacks as set out in the Vendor Manual.  Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments.  Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.        Disposition of Rejected Goods.  Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs").  Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate.  In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.        Vendor Disposal of Goods.  Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer.  In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.        Payment & Taxes.  Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO.  Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating.  No additional charges of any type may be added without Buyer's prior express written consent.  Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements.  In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved.  Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or



securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution, description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.


# IMPORTANT Terms and Conditions

AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION. EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country. Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | | PDQ Pkg | | |
| 320 | 810747464 | SERVE BOARD ACACIA | 0.00 | IN | 3 | | | 306 | 5.97 | 2,248.73 | 08/12/2024 |
| 32002 | J-87505 | WOODSERVE | | | 3 | | | 102 | 1.38 | 4,586.94 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | | 14.99 | 51.573 | 18.98 |
| 1 | 481074746405 | | GRM | 0.993 | A1 | | | | | | |
| 320 | 810747644 | SERVE BOARD BEADED | 0.00 | IN | 3 | | | 306 | 6.24 | 2,248.98 | 08/12/2024 |
| 32002 | J-90396 | WOODSERVE | | | 3 | | | 102 | 1.11 | 4,586.94 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | | 14.99 | 51.594 | 18.98 |
| 2 | 481074764409 | | GRM | 0.689 | A1 | | | | | | |
| 320 | 810747992 | SERVE BOARD ROUND W | 0.00 | IN | 3 | | | 306 | 4.62 | 1,757.91 | 08/12/2024 |
| 32002 | J-73071-M | WOODSERVE | | | 3 | | | 102 | 1.12 | 3,974.94 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | | 12.99 | 56.309 | 16.99 |
| 3 | 481074799203 | | GRM | 0.835 | A1 | | | | | | |



**PO #**          **95320747**

| | | See attached Terms and  Conditions for additional Big Lots requirements. A complete list of requirements can be found on the Big Lots website www.biglots.com/corporate/vendors | Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program. |

Date Created       04/18/2024
Version:             0
Buyer:              TREMPE, KAREN
Do Not Ship Before:  06/17/2024
Cancel if not Shipped by:  06/24/2024
Must be Routed by:   05/27/2024
Payment Terms:      Wire Transfer + 60 Days Upon Receipt in DC
Freight Terms:      Collect
FOB:                LCL-NHAVA SHEVA, IN

---

**SHIP TO**

COLUMBUS DC - #0890
BIG LOTS STORES, LLC
500 PHILLIPI RD
COLUMBUS OH  43228-9006

Telephone:  614-278-6800        Fax:  614-278-3809

---

**BILL TO**

BIG LOTS STORES, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800        Fax: 614-278-6871

---

Purchase From Vendor:   1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA
Contact:      PRAVENDRA THAKUR
Telephone:  91-11-41357720     Fax    91-11-2638102
E-Mail:    m2@attic-products.com

---

**ADDITIONAL COMMENTS**

---

Vendor Signature  _____

Signee's Name  _____

Title  _____

Date  _____

| Units | Retail | Vendor Cost | IMU |
|-------|--------|-------------|-----|
| 504 | 7,218.96 | 2,827.44 | 58.215 |

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

Definitions

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped", "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1.        Purchase Order.  Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates. Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2.        Shipping Goods to a DC.  Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3.        Shipping Goods to a Buyer Store.  Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual. A detailed packing slip must accompany each shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4.        Inspection of Goods.  Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof. Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5.        Cancellation.  Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods. In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions). If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6.        Buyer Remedies.  If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified. In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions. Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7.        Disposition of Rejected Goods.  Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate. In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8.        Vendor Disposal of Goods.  Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9.        Payment & Taxes.  Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO. Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating. No additional charges of any type may be added without Buyer's prior express written consent. Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements. In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved. Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes


title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or



securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverage (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail
operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner,

without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION.  EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country.  Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

PO#:   95320747

Page 6 of 6

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| 320 | 810747464 | SERVE BOARD ACACIA | 0.00 | IN | 3 | | 168 | 5.97 | 1,234.60 | 08/12/2024 |
| 32002 | J-87505 | WOODSERVE | | | 3 | | 56 | 1.38 | 2,518.32 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.572 | 18.98 |
| 1 | 481074746405 | | GRM | 0.993 | A1 | | | | | |
| 320 | 810747644 | SERVE BOARD BEADED | 0.00 | IN | 3 | | 168 | 6.24 | 1,234.73 | 08/12/2024 |
| 32002 | J-90396 | WOODSERVE | | | 3 | | 56 | 1.11 | 2,518.32 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 14.99 | 51.594 | 18.98 |
| 2 | 481074764409 | | GRM | 0.689 | A1 | | | | | |
| 320 | 810747992 | SERVE BOARD ROUND W | 0.00 | IN | 3 | | 168 | 4.62 | 965.13 | 08/12/2024 |
| 32002 | J-73071-M | WOODSERVE | | | 3 | | 56 | 1.12 | 2,182.32 | |
| 32002002 | NA | PRODUCTION | 999 | | | | | 12.99 | 56.308 | 16.99 |
| 3 | 481074799203 | | GRM | 0.835 | A1 | | | | | |



**PO #**    **95322264**

| | |
|---|---|
| Date Created | 04/19/2024 |
| Version: | 1 |
| Buyer: | MERRIMAN, SAVANNAH |
| Do Not Ship Before: | 07/15/2024 |
| Cancel if not Shipped by: | 07/22/2024 |
| Must be Routed by: | 06/24/2024 |
| Payment Terms: | Wire Transfer + 60 Days Upon Receipt in DC |
| Freight Terms: | Collect |
| FOB: | MUNDRA    , IN |

See attached Terms and Conditions for additional Big Lots requirements.
A complete list of requirements can be found on the Big Lots website
www.biglots.com/corporate/vendors

Should any item on this PO require a Safety Data Sheet (SDS), please submit it to BigLotsmsds@chemtelinc.com prior to the time of shipment in compliance with OSHA 29 CRF.1910.1200. If the product does not require a Safety Data Sheet (SDS), please disregard this request. Thank you for assisting Big Lots with our Environmental Health and Safety compliance program.

---

**SHIP TO**

DURANT DC - #0879
DURANT DC, LLC
2306 ENTERPRISE DR
DURANT OK  74701-1964

Telephone:  580-931-2100        Fax:  580-931-2197

---

**BILL TO**

DURANT DC, LLC
4900 E. Dublin Granville Rd
Columbus, OH 43081-7651 US

Telphone: 614-278-6800        Fax:  614-278-6871

---

**Purchase From Vendor:**  1009673

ATTIC PRODUCTS
PRAVENDRA THAKUR
X6 OKHLA INDUSTRIAL AREA
NEW DELHI
INDIA

Contact:    PRAVENDRA THAKUR
Telephone:  91-11-41357720      Fax    91-11-2638102
E-Mail:  m2@attic-products.com

---

**ADDITIONAL COMMENTS**

| Units | Retail | Vendor Cost | IMU |
|---|---|---|---|
| 520 | 155,984.40 | 49,920.00 | 65.606 |

Vendor Signature  _____

Signee's Name  _____

Title  _____

Date  _____

OFFICE-COPY



OFFICE-COPY

## IMPORTANT Terms and Conditions

These Purchase Order Terms and Conditions (these "Terms & Conditions") are an agreement between Buyer and Vendor consisting of these Terms & Conditions; all Purchase Orders; the terms contained on Buyer's Vendor Resource Website, including, without limitation, those in the Vendor Manual, and in Buyer's vendor portal; any Buyer addenda referencing the Purchase Order; and any attachments, instructions or requirements provided by Buyer to Vendor (all of the foregoing are incorporated herein by this reference and collectively referred to as the "PO Terms"). The PO Terms are binding with respect to all purchases of Goods by Buyer from Vendor

**Definitions**

"Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party. "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

"Buyer" means Big Lots Stores, Inc. or its Affiliate, as named in the Ship To box on the applicable PO, or that is otherwise the purchaser of Goods from Vendor.

"Buyer's Vendor Resource Website" means the site located at www.biglots.com/corporate/vendors.

"Goods" means the items of merchandise referenced in a PO, or that are otherwise the subject of the PO Terms, including all components, packaging, labeling, printed materials, designs, images, logos, copyrights, trademarks, service marks, trade names, trade dress, and visual and digital information of or related to such merchandise.

"Purchase Order" or "PO" means any Buyer order or other purchasing agreement or document for the purchase of Goods from Vendor whether issued in hard or electronic copy, through electronic data interchange ("EDI"), or otherwise.

"Ship," "Shipped", "Shipping", or "Shipment" means transporting the Goods by Vendor into the hands of the ocean/ freight carrier for delivery to Buyer.

"Vendor" means the entity or person that is named in the Purchased From box on the applicable PO, or that is otherwise the seller of Goods to Buyer.

"Vendor Manual" means the then-current Import Supplier Manual, and its related documents, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-and-compliance.

1. Purchase Order. Buyer's commitment to purchase Goods arises only upon Buyer's issuance of a PO to Vendor. Any forecasts, commitments, projections, representation about quantities to be purchased or other estimates provided to Vendor are for planning purposes only and shall not be binding on Buyer, and Buyer will not be liable for any amounts incurred by Vendor in reliance on such estimates. Unless Buyer agrees in writing in advance, regardless of industry standards, no variances with respect to quality, quantity, size, capacity, volume, content or other standard measure of Goods are allowed. Buyer and Vendor agree that any PO may be transmitted to Vendor by Electronic Data Interchange (EDI) and Vendor will be bound by all such POs and all such POs will be governed by these PO Terms which are automatically incorporated therein.

2. Shipping Goods to a DC. Vendor must comply with all processes and instructions contained in the Vendor Manual for routing and Shipping Goods to a Buyer distribution center or other non-store location designated by Buyer or listed in the PO (each a "DC"). A detailed packing slip must accompany each Shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the bill of lading ("BOL"), invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to Buyer upon receipt of the Goods at Buyer's DC or the location otherwise designated by Buyer in the PO.

3. Shipping Goods to a Buyer Store. Vendor must comply with all processes and instructions for shipping Goods to a Buyer store contained in the Vendor Manual. A detailed packing slip must accompany each shipment of Goods. The PO number and all other information as required by the Vendor Manual must appear on the BOL, invoice, packing slip and shipping cartons. Vendor should see the Vendor Manual for full instruction and must comply therewith. Unless expressly stated differently on the PO from Buyer, title to and risk of loss of the Goods passes from Vendor to the Buyer Affiliate operating the store to which the Goods are delivered.

4. Inspection of Goods. Goods are subject to Buyer's inspection, but Buyer is under no obligation to unpack or inspect the Goods before resale thereof. Buyer's inspection, testing, payment for or retention of Goods does not: (a) constitute acceptance of Goods not in compliance with the PO Terms; (b) affect Buyer's right to reject or return Goods; or (c) constitute a waiver by Buyer of any of Vendor's representations, warranties or covenants, or any of Buyer's rights or remedies, under the PO Terms, at law, in equity or otherwise.

5. Cancellation. Buyer may cancel a PO, in whole or in part, for its convenience, without liability, at any time prior to Shipment of Goods. In the event of Buyer's cancellation for convenience, Buyer's liability to Vendor will be limited to the unit price of Goods Shipped prior to such cancellation (as such Goods are otherwise in compliance with specifications and these Terms & Conditions). If Vendor fails to Ship Goods before the "cancel if not shipped by date" in the subject PO, that PO will be cancelled automatically on such date, unless otherwise directed by Buyer in writing, and Buyer will have no liability to Vendor in connection therewith including acceptance of back ordered Goods (and without waiver of any remedies in Section 6 of these Terms & Conditions that may accrue to Buyer). Buyer has the right to reject late Shipments at Vendor's expense and Buyer shall be subject to the remedies available hereunder.

6. Buyer Remedies. If: (a) Vendor fails to route, Ship or deliver as required by a PO; (b) Goods are not the same as the approved samples; (c) Goods are not as ordered and/or do not conform to the specifications in the PO; (d) Vendor does not Ship the Goods in the quantities specified in the PO; (e) Buyer deems that the Goods are damaged or defective; or (f) Vendor is otherwise in breach of the PO Terms, including without limitation any breach of the Vendor Manual, Buyer may, at any time, as to any or all Goods, without authorization from Vendor, and subject to the other terms hereof: (i) accept the Goods; (ii) cancel the subject PO for cause; (iii) reject the Goods; (iv) refuse to receive the Goods; (v) revoke prior to acceptance of the Goods; and/or (vi) in the case of early Shipment of Goods, reject and return the Goods to Vendor, with all Return Costs (defined below) to be borne by Vendor, to be held by Vendor, at Vendor's cost, for Buyer until the original date specified. In the event of any of the foregoing, Buyer will not be liable to Vendor for any amount, except to pay for any goods Buyer accepts based on the unit price of the Goods ordered, subject to the right to offset and withhold payment as provided in Section 9 of these Terms & Conditions. Buyer may also impose chargebacks as set out in the Vendor Manual. Any cancellation, rejection, refusal to receive or revocation of prior acceptance by Buyer with respect to any Goods will not serve as a cancellation or rejection of any future shipments of Goods, unless Buyer exercises its right to cancel future POs or shipments. Acceptance of any Goods is not a waiver of any of Buyer's rights or remedies under the PO Terms, at law, in equity, or otherwise.

7. Disposition of Rejected Goods. Unless Buyer and Vendor have signed an agreement to the contrary, with respect to Goods Buyer has rejected, refused or revoked acceptance of, Buyer, at its sole option, may return such Goods to Vendor and Vendor will be liable for all costs and expenses related to the return, including, without limitation, the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging and any other processing or handling costs and charges incurred or charged by Buyer; and lost profits ("Return Costs"). Unless Buyer and Vendor have signed an agreement to the contrary, if Buyer elects not to return the Goods because: (a) the return of Goods is precluded by applicable law or regulation; (b) the Goods contain a defect that could create substantial risk of injury to person or property; (c) Buyer has reasonable cause to believe Vendor intends to dispose of Goods in violation of Section 8 of these Terms & Conditions; or (d) Buyer, in its reasonable discretion, deems return of the Goods unadvisable, then Buyer may dispose of the Goods in a manner Buyer deems appropriate. In the event of such disposal, Vendor will be liable for all costs and expenses related to the disposal, including the landed cost of Goods; freight (inbound and outbound); storage, labor, packaging, disposal and destruction, and any other processing or handling costs and charges incurred or charged by Buyer; and lost profit.

8. Vendor Disposal of Goods. Vendor agrees that it will, at its sole expense, remove, or otherwise make permanently illegible, all of Buyer's and its Affiliates' names, trademarks, trade names, logos, service marks, and other identifying information from all Goods returned by Buyer. In addition, Vendor agrees that it will not use, resell or otherwise transfer to any third-party Goods returned by Buyer without the express prior written consent given by an officer of Buyer. If any Goods incorporate Buyer's trademarks or if any Goods are proprietary or incorporate designs exclusive to Buyer, Vendor must provide to Buyer a reasonable opportunity to inspect such products before disposal or resale and follow all such instructions of Buyer regarding modifications to or destruction of such Goods. Vendor agrees to abide by all of Buyer's guidelines relating to the proper disposal of rejected goods and the issuance of appropriate certificates of destruction, as applicable.

9. Payment & Taxes. Vendor may not charge Buyer, and Buyer will have no obligation to pay, prices for Goods higher than those specified in the applicable PO. Prices in the applicable PO are complete and include, without limitation, shipping, packaging, labeling, custom duties, storage, insurance, boxing and crating. No additional charges of any type may be added without Buyer's prior express written consent. Buyer may deduct from any payments to Vendor any amounts owed by Vendor to Buyer under the PO Terms, including, without limitation, amounts due in connection with Vendor's indemnification obligations, any damages for breach to which Buyer is entitled, and any charges or penalties for non-compliance with Buyer's requirements. In addition, following Buyer's receipt of any demand, claim or action that may give rise to Buyer's right to receive indemnification from Vendor, Buyer may withhold full or partial payment, in Buyer's sole discretion, to Vendor until such demand, claim or action is fully and finally resolved. Buyer will have no obligation to compensate Vendor for or return to Vendor any goods Shipped to Buyer in excess of or different from those Goods referenced in the applicable PO, and Buyer will take title to any such goods in the same manner in which it takes



title to those Goods referenced in the applicable PO. The per unit price of the Goods ordered under the applicable PO will be automatically reduced to account for all such excess or different Goods received by Buyer. A BOL in duplicate must accompany all Vendor invoices. A forwarding cargo receipt ("FCR"), packing list and certificate of product liability insurance must accompany Vendor's invoice and the PO number must appear on the FCR. Payments may be made by Buyer or a Buyer Affiliate on Buyer's behalf and will be paid in accordance with the Vendor Manual. Vendor and Buyer will have the right to verify the accuracy of amounts invoiced and paid for Goods within 180 days after Buyer's receipt of such Goods; provided that timeframes for instituting compliance disputes will be as set forth in the Vendor Manual ("Review Period"). After the Review Period, any payments made for the subject Goods will and will be deemed to conclusively reflect the actual amount owed to Vendor for such Goods, and neither Vendor nor Buyer will have the right to seek further payment or adjustment with respect to such Goods. Each party shall remain responsible (and hold the other party harmless) for its taxes, collection and reporting obligations resulting from the transactions covered by the PO Terms. For purposes of clarity, but without limiting the foregoing, Vendor acknowledges that it may have business activity, business privilege, commercial activity, gross receipts, income tax, license and reporting obligations where the receipt of revenue, or the benefit thereof, may be assigned, sourced, apportioned or allocated under applicable tax law. As a prerequisite to payment and as further described in the Vendor Manual, Vendor must provide Buyer and/ or Buyer's designated freight forwarder with the following documentation in connection with this PO: commercial invoice showing manufacturer's name, address, telephone number; commercial packing list indicating weights and measurements in kgs and cbm's; FCR; a certificate of product liability insurance naming "Big Lots, Inc. and all subsidiaries and affiliates" as additional insured; Buyer-approved import product data sheet; product testing certificate (s) from a Buyer-approved testing laboratory; factory inspection certificate from a Buyer-approved inspector; commercial bill-of-lading; and pre-pricing sticker approval sheet. Additional documentation may be required prior to shipping and/or invoice payment based on Goods ordered.

10. Records, Audit and Certification. Vendor will keep complete and accurate books, records and documents relating to the subject matter of POs and Vendor's fulfillment of POs, including, without limitation those: (a) evidencing and detailing amounts charged; (b) regarding the Goods' origin, manufacture location, content, testing, and inspection; (c) regarding order receipt, fulfillment and Shipment of Goods; and (d) otherwise required by applicable law to be maintained ("Records"). Vendor will make the Records available to Buyer, either remotely or at Vendor's offices, at all reasonable times upon at least three (3) calendar days' prior written notice, for inspection, audit or reproduction by Buyer or its representative. Vendor will promptly pay Buyer for any overcharges made by Vendor that are disclosed by such audit. In addition, Buyer, itself or through its representative, has the right to inspect Vendor's, and Vendor's contractors' facilities, warehouses and manufacturing plants at all reasonable times upon at least three (3) calendar days' prior written notice. Vendor agrees, at Vendor's cost, to subscribe to and be a part of Buyer's risk management process as part of onboarding process with Buyer and agrees to comply with the requirements thereof. Vendor agrees to comply with all of Buyer's vendor ongoing compliance program(s) operated by Buyer (or an agent of Buyer) and Vendor will promptly provide such information as reasonably required from time to time in accordance with such programs. Vendor acknowledges that if it fails Buyer's compliance program requirements, it will be deemed a breach of these Terms & Conditions and Buyer may terminate any or all POs with Vendor without liability.

11. Recalls. A "Recall" is any recall of, or corrective action involving, Goods that is: (a) required by the United States Consumer Product Safety Commission ("CPSC") or other relevant governmental agency, applicable law, or in Buyer's commercially reasonable judgment; (b) agreed upon between Buyer and Vendor; (c) instituted voluntarily by Vendor; or (d) instituted by Buyer because Buyer has reason to believe the subject Goods are (i) defective, dangerous, or incomplete; (ii) infringe upon Buyer's or a third party's intellectual property rights; or (iii) are not in compliance with applicable laws or regulations. In the event of a Recall, Buyer reserves the right to, at Buyer's option: (w) use reasonable means to remove the Goods that are subject to a Recall ("Recalled Goods") from sale; (x) correct the condition necessitating the Recall through relabeling, repackaging or other corrective action as Buyer deems appropriate; (y) return the Recalled Goods to Vendor; or (z) dispose of the Recalled Goods in a manner Buyer deems appropriate. Vendor will be liable for all costs and expenses arising from or related to such Recall, including, without limitation Return Costs, Disposal Costs, Buyer's own and third-party labor costs, lost profits and other costs and expenses incurred in taking the actions stated in Sections 11(w), (x), (y) and/or (z) above. When effectuating a Recall, Buyer reserves the right to, at Buyer's option, include in the Recall all Goods bearing the SKU or UPC of the Recalled Goods, regardless of date code, lot code or expiration date. Vendor will provide Buyer with no less than 24-hours written notice prior to the public announcement of any Recall or safety-related issues in connection with the Goods to the extent permitted by applicable law. Such notification shall include, without limitation, all of Vendor's item numbers affected by the Recall or safety related issue, expected inventory levels affected, and a detailed description of the nature of the public announcement.

The PO Terms will continue to apply to Recalled Goods. Upon Buyer's request, Vendor will, at its cost, change the SKU or UPC on all existing, non-impacted Goods bearing the same SKU or UPC as the Recalled Goods if the Recalled Goods bear any Buyer or Buyer Affiliate brand or private label and Vendor acknowledges that such SKU or UPC

changes may require Vendor, at its cost, to relabel or repack such non-Recalled Goods.

12. Confidentiality. Subject to the provisions of any confidentiality, non-disclosure or similar agreement executed by Buyer and Vendor, which agreement will control over the terms of this Section 12 and is incorporated herein by this reference, Vendor may not disclose to a third party or use or for its own purposes or the purposes of others, any of Buyer's trade secrets, proprietary information, data or materials, or any other information Buyer reasonably considers to be confidential ("Buyer's Confidential Information"). "Buyer's Confidential Information" includes, without limitation, the PO Terms and the price paid for Goods. Vendor may disclose Buyer's Confidential Information: (a) to its contractors only to the extent necessary to enable Vendor to perform its obligations under the PO Terms only if such contractors are bound by confidentiality obligations sufficient to protect Buyer's Confidential Information in accordance with the terms of this Section 12; and (b) to the extent required by court order, subpoena or applicable law with, if permitted by applicable law, prior notice to Buyer.

13. Warranties. Vendor warrants that: (a) all Goods, and the design, production, manufacture, importation, distribution, transportation, labeling, packaging, pricing and sale of all Goods, and all representations, warranties and advertising made by Vendor, or authorized by Vendor to be made, in connection with Goods, shall be in accordance with, comply with, and where required, be registered under, all applicable laws, rules, regulations, standards, codes, orders, directives, judicial and administrative decisions, and ordinances, whether now in force or hereinafter enacted, of the country of origin, the country of transit, the United States of America ("USA"), and each state or subdivision thereof, and any agency or entity of the foregoing, including, without limitation, the Consumer Product Safety Improvement Act of 2008, as amended, the California Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and other substantially similar federal, state or local laws, as amended, those related to environmental protection, labor, health, consumer product safety, agriculture, food and drug, and the regulations promulgated under such laws ("Laws") and that Vendor complies, and will comply at all times, with all other applicable laws in the operation of Vendor's business; (b) none of the articles of food Shipped or sold by Vendor are or will be adulterated, misbranded or improperly labeled within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, the Nutrition Labeling and Education Act of 1991, as amended, and the Food Safety Modernization Act, as amended; (c) all processes used or engaged in with respect to processing, manufacturing, packaging, labeling, storing and Shipping Goods comply with all Laws; (d) it has full and clear title, free of all liens and encumbrances whatsoever to the Goods and that the Goods are hereby sold and can be resold, advertised, and used: (i) in full compliance with all contracts, laws, rules and regulations, including those governing the use of trade names, trademarks, trade dress, trade secrets, copyright and patents; and (ii) in a manner that assures the safety of the representatives, patrons, and customers of Buyer and consumers of the Good; (e) the Goods are in new, good and saleable condition; and (f) the Goods are manufactured in the country of origin stated on the commercial documents required for customs entry. Vendor will regularly have independent tests performed on all Goods prior to Shipping to ensure compliance with the PO Terms, including, without limitation, the provisions of this Section 13. Vendor will provide Big Lots with copies of: (y) any and all test reports, Safety Data Sheet (SDS) information, Proposition 65 product information, ingredient information, and any information Big Lots' deems necessary to comply, or support its compliance with, any Laws; and (z) upon Big Lots' request, signed copies of any and all license agreements relating to the Goods. Vendor acknowledges and agrees that it will be a breach of warranty if any Goods are in violation of any Laws at any time, including after the sale of such Goods by Vendor to Buyer. The parties agree that no personal identifiable information, as defined under California Consumer Privacy Act, 2018, as updated from time to time ("PII") will be shared or provided under this PO Terms. In the event Vendor receives any PII, Vendor shall forthwith notify Buyer of the same and use best efforts to remove such PII and comply with applicable privacy laws. In the event Goods fail to comply with the warranties set forth in the PO Terms at any time, Vendor agrees that it will immediately notify Buyer and take all measures to identify the Goods that are or may be affected. The PO Terms are not intended to and will not negate or replace any of, but will supplement, the warranties, express or implied, provided by the Uniform Commercial Code, at law, or in equity.

14. Anti-corruption. Vendor shall comply with all applicable laws. Vendor specifically acknowledges and agrees that Vendor's performance of the PO Terms is subject to the United States Foreign Corrupt Practices Act and other applicable anti-bribery and anti-corruption laws of the United States and other countries where the Vendor operates (collectively, "Anti-corruption Laws"). Vendor warrants and agrees that Vendor, its employees, agents, and anyone acting on Vendor's behalf will not violate any Anticorruption Laws for the benefit of or on behalf of Buyer or Vendor. Further, Vendor warrants and agrees that Vendor and anyone acting on Vendor's behalf will not, directly or indirectly, offer, promise, make, give, or authorize the payment of any money or transfer of anything else of value to: (a) an officer, employee, agent or representative of any national, state, regional, or local government, including any department, agency or instrumentality of any government or any government-owned or government-controlled entity, or public international organization, or any person acting in an official capacity on behalf thereof, or any political party, political party official, or candidate for political office (each a "Government or Political Official"); (b) a close associate or relative of any Government or Political Official; or (c) any other person or entity while knowing or having reason to believe that some or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any Government or Political Official, for the purpose of: (i) improperly influencing an act or decision of such Government or Political Official, including expediting or



securing the performance of a routine government action; (ii) obtaining, retaining or directing any business; or (iii) securing an improper business advantage. Vendor will provide Buyer such information and further written certifications as Buyer may request from time-to-time to assist Buyer' efforts to assure compliance with Anti-corruption Laws. Vendor specifically agrees to comply at all times with (a) all applicable laws prohibiting child labor, prison labor, indentured labor or bonded labor, (b) all applicable laws pertaining to safe and healthy workplaces and working conditions, (c) all applicable laws pertaining to minimum wage, maximum work periods, and the payment of overtime, and (f) all environmental laws applicable to the Goods.

15. Indemnification. Vendor shall indemnify, defend (at Buyer' sole option) and hold harmless Buyer, its Affiliates, and their respective officers, directors, contractors, employees and agents, from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Buyer's rights under the PO Terms, whether in connection with a breach of the PO Terms or otherwise ("Losses"), arising from or related to: (a) the acts or omissions of Vendor, its Affiliates or contractors, or their respective contractors, employees, or agents; (b) Recall of the Goods; (c) personal injury or property damage resulting from any actions or inactions of Vendor, or from the manufacture, storage, movement, use or consumption of the Goods; (d) breach of Vendor's warranties or a term of the PO Terms; (e) infringement of a third party's intellectual property or proprietary rights, including, but not limited to, trade names, trademarks, trade dress, trade secrets, patents and copyrights, in connection with the use, manufacture, distribution,
description, advertising, marketing sale or offer for sale of the Goods; and (f) an employment related claim brought by an employee, agent or contractor of Vendor, its Affiliates, or a Vendor contractor.

16. Insurance. Vendor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described in the Big Lots Certificate of Insurance and Indemnification Policy, the most current version of which can be obtained by visiting Buyer's Vendor Resource Website and clicking "Routing and Compliance," or by going directly to www.biglots.com/corporate/vendors/routing-andcompliance. The insurance companies issuing the policies must: (a) have Standard & Poor's rating of BBB or better or A.M. Best's rating of A-VII or better; and (b) be licensed to operate in the country from where the subject Good is sold and invoiced to Buyer, and have an extensive North American presence. Prior to the first PO being issued, annually thereafter (within sixty (60) days after policy renewal), and at any other time upon Buyer's request, Vendor will provide Buyer with certificates of insurance ("COI") signed by an authorized representative of the insurance carrier evidencing the required insurance coverages (unless lower coverage limits are agreed upon in writing by an officer of Buyer). In addition, upon Buyer's request, Vendor will provide Buyer with copies of the actual endorsements and/or policies. With the exception of workers' compensation, the COI must show a broad form vendor's endorsement or name "Big Lots, Inc. and all of its direct and indirect subsidiaries and affiliates" as an additional insured. The policies must: (i) respond as primary coverage and non-contributory to any other insurance policy available to Buyer; (ii) not contain any exclusion, limitation or endorsement that restricts or limits applicable liability coverage; (iii) provide for the investigation, defense, and satisfaction (by settlement or otherwise), at no cost to Buyer, of any Losses incurred by Buyer; and (iv) provide that the insurance companies issuing the policies will notify Buyer at least thirty (30) days prior to any policy cancellation or modification. Vendor will bear its own insurance and insurance-related expenses and Vendor's liability will not be limited to its insurance coverage.

17. Cumulative Remedies. Each of Buyer's rights and remedies under the PO Terms is cumulative and in addition to any other rights and remedies provided at law, in equity, elsewhere in the PO Terms, or otherwise, including, without limitation, the Uniform Commercial Code.

18. Force Majeure. Buyer may delay delivery or acceptance of any or all Goods, or cancel any PO in the event that such delay or cancellation is due to causes beyond Buyer's reasonable control. In such case, Buyer will not be liable to Vendor for any amount except to pay for the unit cost of Goods that are fully delivered and accepted by Buyer, subject to Buyer's right to offset and withhold payment as provided in Section 9 of these Terms & Conditions.

19. Use of Goods; Content & Marks. Vendor is not permitted to use Buyer's, or Buyer's Affiliates', names, trademarks, trade names, logos or service marks in any marketing, advertising or publicity without the prior written consent of B buyer's Chief Executive Officer, Chief Financial Officer, or General Counsel, which consent may be given or withheld in Buyer's sole and absolute discretion. Vendor hereby grants to Buyer the royalty-free, sublicensable, worldwide right to use the Goods and Vendor Content in or related to Buyer's retail
operations, both brick and mortar and eCommerce. "Vendor Content" means text, graphics, names, marks, images, audio or digital files, audio-visual content and all other data, information, marketing and promotional materials and content in any medium, and all copyrights, logos, trademarks, service marks, trade names, and other intellectual property rights therein or related to the Goods.

20. Assignment & Subcontracting. Vendor will not assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms), voluntarily or involuntarily, by operation of law, or in any other manner, without the prior written consent of an officer of Buyer. Any purported assignment or delegation made without this consent is void. Buyer may assign the PO Terms in whole or in part (by assigning any right or delegating any duty under the PO Terms) to an Affiliate or to any other party in Buyer's sole discretion. In the event Buyer assigns the entire PO Terms to another party, Buyer will have no further obligation to Vendor under the PO Terms and Vendor hereby consents that Buyer's assignment will constitute a novation. Buyer's payment to Vendor constitutes payment for Goods, services, equipment or other deliverables provided by any subcontractor of Vendor or Vendor's agents or representatives. Vendor remains fully responsible and liable to Buyer for the acts and omissions of its subcontractors and performance of all Vendor's duties and obligations under the PO Terms.

21. Governing Law; Venue; Jury Waiver; and Arbitration. The laws of the State of Ohio, without application of conflicts of law principles, govern the PO Terms and all matters arising out of or related to the PO Terms. Each party hereby irrevocably agrees that any disagreement, dispute, action, controversy or claim with respect to: (a) the validity of the PO Terms; (b) breach of the PO Terms; or (c) otherwise arising out of, or in relation to the PO Terms, a PO, or any agreement in which either is incorporated ("Dispute"), will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to Disputes. Any Dispute may, in Buyer's sole and absolute discretion, be settled by binding arbitration by an arbitration service of Buyer's choice, in accordance with the laws of the state of Ohio governing voluntary arbitrations. The location of such arbitration will be in Columbus, Ohio. Discovery will be permitted as provided by applicable state law or as the parties may otherwise mutually agree. The parties may also mutually elect to seek mediation as an alternative precursor to arbitration. If the PO Terms govern an international transaction, the applicable state law regarding the arbitration of international disputes will apply. The arbitrator will agree to conduct proceedings under the laws relating to arbitration cited above, or such other rules to which the parties mutually agree. The United Nations Convention on Contracts for the International Sale of Goods shall have no application to this Agreement or actions hereunder or contemplated hereby.

22. Severability. Provisions of the PO Terms will be interpreted to be valid and enforceable under applicable law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate the PO Terms. The PO Terms' remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

23. Entire Agreement. The PO Terms constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. The PO Terms may not be modified by course of dealing, course of performance, or any oral communication between Buyer and Vendor. The PO Terms may only be modified by, and a waiver will be effective only if set forth in, a written instrument that references the PO Terms, expressly describes the terms herein to be modified, and is signed by a representative of Vendor and an officer of Buyer. Without limiting the generality of the foregoing, no term or condition of any document issued by Vendor, including, without limitation, invoices, sales acknowledgments, or other similar documents, will constitute a modification of or addition to the PO Terms and will have no force or effect and are hereby rejected. The Vendor Guide as in effect from time to time is made a part hereof and is expressly incorporated herein. In the event of any conflict between the any terms and conditions or any other document of Vendor, Vendor Guide and these PO Terms, the PO Terms is binding to the extent of such conflicts. Vendor will comply with (a) applicable industry standards with respect to privacy and data security relating Buyer's Confidential Information and (b) applicable privacy and security laws ("Privacy Policy"). Any updates to the Vendor Guide or the Privacy Policy immediately take effect and are binding on the parties.

24. No Third-Party Beneficiaries. Certain sections of the PO Terms are for the benefit of Buyer's Affiliates. As a result, any of Buyer's Affiliates may enforce the PO Terms. Except for Buyer's Affiliates, the PO Terms do not create any enforceable rights by anyone other than Buyer and Vendor.

25. LIMITATION OF LIABILITY. EXCEPT IN THE CASE OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, BUYER WILL NOT BE LIABLE TO VENDOR OR ITS AFFILIATES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERRUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA, IN CONNECTION WITH THE PO TERMS, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER BUYER WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW, OF THE POSSIBILITY OF LIABILITY.

26. Acceptance of PO Terms. Vendor agrees to and accepts all of the terms and conditions in the PO Terms by doing any of the following: (a) acknowledging or accepting a PO; (b) acknowledging or agreeing to the PO Terms through Buyer's EDI process, by click-through, click to accept, or otherwise; (c) signing these Terms & Conditions; (d) Shipping any portion of the Goods referenced in a PO or otherwise fulfilling any portion of its obligations under a PO; or (e) accepting any complete or partial payment for the Goods, transportation of the Goods, or otherwise in connection with a PO or the Goods, or by any other means of acceptance recognized at law or in equity.



AS AN INDUCEMENT FOR BUYER TO ENTER INTO A PO, VENDOR WARRANTS THAT IT HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THE PO TERMS, INCLUDING THE VENDOR GUIDE, WITHOUT MODIFICATION. EACH PO IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, VENDOR'S ACCEPTANCE OF THE PO TERMS AND BUYER OBJECTS TO AND REJECTS ANY DIFFERENT OR ADDITIONAL TERMS.

27. Import/Export Laws. Vendor shall be responsible for timely obtaining and maintaining any required export license, permit or approval and pay all required fees, assessments, duties, charges, taxes, tariffs, levies or other charges necessary to lawfully export the Goods from Vendor's country. Vendor shall ensure that the Goods are properly marked and accompanied by such true, complete, and correct invoices, packing lists, certifications, declarations and other documentation necessary for their proper classification and importation into the United States and clearance through United States customs.



OFFICE-COPY

PO#:  95322264

Page 6 of 9

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 340 | 810746970 | COMBO 1 CABINET/2 B | 0.00 | IN | 1 | | 130 | 96.00 | 16,209.70 | 09/09/2024 |
| 61006 | ATP-54870 | ACCENT CHESTS/CABIN | | | 1 | | 130 | 28.69 | 38,996.10 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 299.97 | 58.913 | |
| 1 | 481074697004 | | GRM | 8.540 | A1 | | | | | |
| -->> The | above assortment | (810746970) | consists of | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810747010 | 2DOOR MANGO WOOD C | 0.00 | IN | | | 130 | 50.00 | 6,500.00 | 09/09/2024 |
| 61006 | ATP-54870-A | ACCENT CHESTS/CABIN | | | | | 130 | | 19,498.70 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 149.99 | 66.664 | 299.99 |
| 2 | 481074701008 | | | 8.540 | A1 | | | | | |
| 340 | 810747021 | MANGO WOOD BEDSIDE | 0.00 | IN | | | 260 | 23.00 | 5,980.00 | 09/09/2024 |
| 61006 | ATP-54870-B | SIDE TABLES | | | | | 130 | | 12,997.40 | 09/09/2024 |
| 61006001 | NA | CLOSEOUT | HST | | | | | 49.99 | 53.991 | 79.99 |
| 3 | 481074702104 | | | | A1 | | | | | |
| End of | assortment list | for -810746970 | | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810747031 | COMBO 1 CABINET/2 B | 0.00 | IN | 1 | | 130 | 96.00 | 16,209.70 | 09/09/2024 |
| 61006 | ATP-54871 | ACCENT CHESTS/CABIN | | | 1 | | 130 | 28.69 | 38,996.10 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 299.97 | 58.913 | |
| 4 | 481074703101 | | GRM | 8.540 | A1 | | | | | |


OFFICE-COPY

PO#:  95322264

Page 7 of 9

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total  Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| | | | | | | | | | | |
| -->> The | above assortment | (810747031) | consists of | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810747069 | 2DOOR MANGO WOOD C | 0.00 | IN | | | 130 | 50.00 | 6,500.00 | 09/09/2024 |
| 61006 | ATP-54871-A | ACCENT CHESTS/CABIN | | | | | 130 | | 25,998.70 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 199.99 | 74.999 | 299.99 |
| 5 | 481074706904 | | | 8.540 | A1 | | | | | |
| 340 | 810747070 | MANGO WOOD BEDSIDE | 0.00 | IN | | | 260 | 23.00 | 5,980.00 | 09/09/2024 |
| 61006 | ATP-54871-B | SIDE TABLES | | | | | 130 | | 12,997.40 | |
| 61006001 | NA | CLOSEOUT | HST | | | | | 49.99 | 53.991 | 79.99 |
| 6 | 481074707000 | | | | A1 | | | | | |
| End of | assortment list | for -810747031 | | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810746854 | COMBO 1 CABINET/2 B | 0.00 | IN | 1 | | 130 | 96.00 | 16,209.70 | 09/09/2024 |
| 61006 | ATP-54872 | ACCENT CHESTS/CABIN | | | 1 | | 130 | 28.69 | 38,996.10 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 299.97 | 58.913 | |
| 7 | 481074685407 | | GRM | 8.540 | A1 | | | | | |
| -->> The | above assortment | (810746854) | consists of | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |
| 340 | 810746824 | 2DOOR MANGO WOOD C | 0.00 | IN | | | 130 | 50.00 | 6,500.00 | 09/09/2024 |
| 61006 | ATP-54872-A | ACCENT CHESTS/CABIN | | | | | 130 | | 25,998.70 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 199.99 | 74.999 | 299.99 |
| 8 | 481074682406 | | | 8.540 | A1 | | | | | |
| 340 | 810746825 | MANGO WOOD BEDSIDE | 0.00 | IN | | | 260 | 23.00 | 5,980.00 | 09/09/2024 |
| 61006 | ATP-54872-B | SIDE TABLES | | | | | 130 | | 12,997.40 | |
| 61006001 | NA | CLOSEOUT | HST | | | | | 49.99 | 53.991 | 103.99 |
| 9 | 481074682505 | | | | A1 | | | | | |
| End of | assortment list | for -810746854 | | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810746855 | COMBO 1 CABINET/2 B | 0.00 | IN | 1 | | 130 | 96.00 | 16,209.70 | 09/09/2024 |
| 61006 | ATP-54873 | ACCENT CHESTS/CABIN | | | 1 | | 130 | 28.69 | 38,996.10 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 299.97 | 58.913 | |
| 10 | 481074685506 | | GRM | 8.540 | A1 | | | | | |
| -->> The | above assortment | (810746855) | consists of | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |
| 340 | 810746853 | 2DOOR MANGO WOOD C | 0.00 | IN | | | 130 | 50.00 | 6,500.00 | 09/09/2024 |
| 61006 | ATP-54873-A | ACCENT CHESTS/CABIN | | | | | 130 | | 25,998.70 | |
| 61006003 | NA | CLOSEOUT | HST | | | | | 199.99 | 74.999 | 299.99 |
| 11 | 481074685308 | | | 8.540 | A1 | | | | | |



OFFICE-COPY

| Dept | Article | Article Description | Size | Country of Origin | Master | | Total Units | Cost | Ext. Cost | Delivery Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Class | MFG# | Merch Cat Descrption | | Dangerous Goods | Inner | Package Art | # of Cartons | Additionals | Ext. Retail | Promo Event |
| Merch. Cat | Brand | Merchandise. Type | Release Week | CS Weight | | | | Retail | IMU | Compare TO |
| Line Item# | UPC | Expiration Date | Goods Class | CS Cube | Ticket Type | | EAS Tag | PDQ Pkg | | |

| 340 | 810746969 | MANGO WOOD BEDSIDE | 0.00 | IN | | | 260 | 23.00 | 5,980.00 | 09/09/2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| 61006 | ATP-54873-B | SIDE TABLES | | | | | 130 | | 12,997.40 | |
| 61006001 | NA | CLOSEOUT | HST | | | | | 49.99 | 53.991 | 103.99 |
| 12 | 481074696908 | | | | A1 | | | | | |
| *--End of | assortment list | for -810746855 | | | | | | | | 09/09/2024 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 0 | | | | | | | | | | |