Exhibit 1

# LEASE AGREEMENT

This Lease, made effective this _31ˢᵗ_ day of _October_, 2001, by and between **EIG BOONE LLC**, a Delaware limited liability company, with its business address at c/o Equity Investment Group, ~~One Buckhead Plaza, 3060 Peachtree Road, Suite 1560, Atlanta, GA 30305-2242~~, Landlord, and **BIG LOTS STORES, INC.**, an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

* 111 East Wayne Street
  Suite 500
  Fort Wayne, Indiana 46802

**WITNESSETH:**

## 1.  DEFINITIONS:

For purposes of this Lease, these terms are defined as follows:

A.  <u>Common Areas</u>: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.

Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Such Common Areas shall be subject to the reasonable rules and regulations as are prescribed by Landlord from time to time. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas. Landlord shall not alter the parking area designated the "No Build Area" on Exhibit A.

B.  <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk and prior to any early entry by Tenant. Tenant shall provide Landlord with proof of insurance coverages described in this Lease prior to the Tenant Entrance Date.

2)  The Tenant Possession Date shall be the earlier of (i) the date Tenant accepts possession following Landlord's notice that it has completed all construction required pursuant to Exhibit C, or (ii) ten (10) days after written notice from Landlord that it has completed all construction as required pursuant to Exhibit C. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord. Possession of the Demised Premises

Boone, NC.final

shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant; construction pursuant to Exhibit C is complete and the Demised Premises complies with all laws, ordinances, regulations and building restrictions. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The Rent Commencement Date shall be the later of (i) ninety (90) days after the Tenant Possession Date or (ii) ninety (90) days from the date on which Tenant receives all permits and approvals for its construction.

4)    The Term Commencement Date shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    If Landlord fails to tender possession of the Demised Premises to Tenant by February 28, 2002, then Tenant may cancel this Lease by written notice to Landlord. Tenant may at its sole discretion accept Landlord's earlier delivery of the Premises. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to February 28, 2002. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by February 28, 2002, the damages suffered by Tenant, through great and irreparable, are difficult or impossible to accurately ascertain. Therefore, for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day, unless said delay is due to causes not under the control of Landlord; provided however no such liquidated damages shall be paid if Tenant refuses to accept possession of the Demised Premises pursuant to Section 1(B)(2) of this Lease. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next installments(s) of Rent due under this Lease.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit B -    Legal Description of Shopping Center

3)    Exhibit C -    Landlord's Work

4)    Exhibit D -    Tenant Sign Specification

5)    Exhibit E -    Delivery of Possession Letter

6)    Exhibit F-    Shopping Center Exclusives

D.    Demised Premises: Being the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 31,750 square feet.

E.    Shopping Center: Landlord's Shopping Center is known as New Market Centre at the address 1490 E. King Street, in the City of Boone, County of Watauga and State of North Carolina, 28607.

2.    **DEMISE:**

A.    Initial Demise: Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.    **TERM:**

A.    Original Term: The Original Term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2008 . Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period of time between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date.

B.    Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", the "Second Option Term", and the "Third Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence a the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is not in default beyond any applicable cure period, open and operating from the Demised Premises and then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the Original Term or the previous Option Term.

4.    **USE AND OPERATION:**

A.    Use. Tenant covenants and agrees that the Demised Premises shall be used and occupied for the purpose of the sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, food items (subject to all terms and conditions of Exhibit F), and furnishings, and for no other purpose or purposes. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenant restrict Tenant's use. Landlord agrees to indemnify Tenant for any and all costs associated with Landlord's violation of this provision.

B.    Exclusive. Unless Tenant is in default under this Lease beyond any notice and cure periods or not open and operating from the Demised Premises (for reasons other than an assignment or subletting, damage and destruction, remodeling, eminent domain, force majeure, or such other right as provided for under this Lease or under law or equity), Landlord shall not lease to any other general merchandise discount operation over 7000 square feet or dollar store operation over 7,000 square feet, nor to any liquidator or closeout store, nor to any operation which engages in the sale of discount furniture [as

Boone, NC.final

used herein, discount furniture is not intended to preclude those business operations specializing in the sale of "fine" furniture as that term is customarily used within the furniture industry] ("Competing Business") during the Original Term of this Lease or any Option Terms or extensions thereof. The foregoing shall have no application or effect on (a) tenants that have either signed a lease agreement or are open and operating for business in the shopping center as of the date of this Lease; (b) anchor tenant leases (defined as tenants occupying greater than 25,000 square feet); or (c) any TJX concept. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth ($1/12^{th}$) of the annual Fixed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder..

C.    Operation. Tenant agrees to, when possible, operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and 11:00 A.M. To 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees (the "Go Dark Condition(s)"); provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder; it is understood that any exclusive rights granted Tenant under this Section 4 are unenforceable by Tenant during the period the Demised Premises remains closed by reason of a Go Dark Condition. In the event that Tenant closes the Demised Premises under this Section 4 and fails to reopen the Demised Premises within sixty (60) days thereafter, Landlord may terminate this Lease upon thirty (30) days' written notice to Tenant, in which event Tenant shall be released from all further liability hereunder. In the event Landlord enters into a new lease with a Competing Business ("Competing Lease") for Shopping Center premises during Tenant's closure by reason of a Go Dark Condition, and should Tenant thereafter elect to reopen for business from the Demised Premises, then Tenant's exclusive rights hereunder are waived with respect to said Competing Lease; provided, however, in no event shall Tenant's use of the Demised Premises be bound by or subject to any provisions of said Competing Lease, including any restrictions or exclusives granted thereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in the places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair; permit Tenant's agents, employees, customers or invitees to repeatedly or routinely break the law or reasonable rules and regulations adopted by Landlord; do anything to damage, injure or interfere with Landlord, other tenants or occupants of the Shopping Center or their customers or invitees.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over

the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets either on the sidewalks immediately adjacent to the Demised Premises or in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the sidewalks immediately adjacent to the Demised Premises for the periodic sale and display of merchandise, provided that (1) neither the shopping carts, nor the periodic sale and display of merchandise shall interfere with the free flow of pedestrian traffic, (2) such sales and displays are not in direct violation of any restrictions imposed on the Shopping Center by leases or instruments of record existing as of the date of this Lease , and (3) sidewalk sales shall be conducted no more than one hundred seventy-five (175) days per calendar year..

    D.    <u>Tenant Prohibited Uses</u>.  Tenant agrees not to use the Demised Premise in the following manners: for use as a massage parlor or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials; for the operation involving assembly, manufacturing, distilling, refining, smelting, agricultural or mining operations; for a second hand store, pawn shop, government surplus store, salvage store, Salvation Army Store, surplus store, flea market; headshop; mobile home park, trailer park, labor camp, junk yard or stockyard; boat, vehicle or trailer storage; for any dumping, disposing, incineration or reduction of garbage; for any fire sale, bankruptcy sale or auction house operation; for use as a laundry or dry cleaning plant which provides dry cleaning services; for use as living quarters, sleeping apartments or lodging rooms; for use as a veterinary hospital or animal raising facility; for a theater, bowling alley, funeral parlor, game room, auto repair operation; in a manner which shall present danger or hazard to the Shopping Center; for any trade, service activity or purpose which is noxious or excessively obnoxious or offensive; or for any business or use which emits offensive odors, fumes, dust or vapors, is a public or private nuisance, emits loud noise or sounds which are objectionable, or creates fire, explosive or other hazard; for nightclub or dance hall; for bar, tavern or restaurant or off track betting establishment; for bingo or other game room; for health spa, beauty salon, church, auditorium, meeting hall, school or skating rink; drive-thru car wash or auto sales (all of the foregoing collectively referred to as the "Tenant Prohibited Uses").

**5.**    **<u>RENT</u>:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at EIG Boone, LLC, c/o Equity Investment Group, 111 East Wayne Street, Suite # 500, Fort Wayne, Indiana 46802-2603 or at such other place as Landlord may from time to time direct in writing, the following which, along with all other charges due from Tenant to Landlord under this Lease, are collectively referred to hereinafter as "Rent".  The Rent for any partial month shall be pro rated based on the actual number of days in such month:

    A.    <u>Fixed Minimum Rent</u>:  During the Original Term of this Lease, the sum of $111,125.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $9,260.42.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $119,062.50 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $9,921.88.  The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $134,937.50 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $11,244.79. The Fixed Minimum Rent applicable for the third Option Term shall be the sum of $150,812.50 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $12,567.71.

B.    Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant would otherwise pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs which interrupt Tenant's business, Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof.

C.    Percentage Rent: In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual Gross Sales and income, as hereinafter defined, which exceeds the annual base sum of $4,445,000.00 during the Original Term; $4,762,500.00 during the First Option Term; and $5,397,500.00 during the Second Option Term and $6,032,500.00 during the Third Option Term.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales and income ("Gross Sales") for the previous month. Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, an accurate statement of the Gross Sales for such period, certified to by Tenant, and shall therewith pay to Landlord, any Percentage Rent then due at the percentage above stated. Percentage Rent payments required to be made by Tenant under the terms of this Lease shall be made promptly when due. The term "Gross Sales" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises and (2) charges for all services rendered in or from the Demised Premises. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned to the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; (8) credit card company finance or service charges; and (9) proceeds from vending machines located in the Demised Premises.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for

the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), such that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles at any reasonable time upon ten (10) days prior written notice, provided such right to audit shall be limited to one (1) time per Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales and income which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event.

D.    Common Area Maintenance: Throughout the Term of this Lease, Landlord shall be responsible for the following:

    (i)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

    (ii)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

    (iii)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

    (iv)    providing, lighting, on-site traffic control, and, if necessary in the reasonable business judgment of Landlord, security and policing;

    (v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; seal-coating, restriping and repainting as required to keep same clearly visible and appropriately marked; and

    (vi)    cleaning, sweeping, snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs (the "Common Area Charges") shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred in refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, providing public liability, property damage, and fire and extended coverage on the common facilities, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees; supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges,

licenses and permit fees, and parking area surcharges or levies, and a 5% administrative fee, which shall be included under the Common Area Charges cap described in Section 5E.

Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges as set forth herein. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. Excluded from such Common Area Charges shall be the capital costs of improvements, replacements, additions and alterations of the Common Areas and any management or related fees.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior calendar year. If the Rent Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of Common Area Charges for the fractional month between the Rent Commencement Date and the Term Commencement Date shall be prorated on a per diem basis and shall be paid together with the first payment of Fixed Minimum Rent.

After the first Full calendar year, Tenant shall continue to pay such estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein) by the aforesaid estimated amount of Tenant's pro rata share of such Common Area Charges. Such Common Area Charges may be adjusted and revised by Landlord after the end of each calendar year during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding calendar year. Upon Landlord furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each calendar year or Partial calendar year, Landlord shall furnish to Tenant a written statement in reasonable detail covering the Common Area Charges just expired showing the total Common Area Charges for such calendar year, the amount of Tenant's pro rata share thereof and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual invoices paid for such Common Area Charges as stated herein.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books relating to the Demised Premises to be made by Tenant's accountants. If any such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the rate of two

percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, against the next Rent payments due from Tenant to Landlord hereunder.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last calendar year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, is not indebted to Landlord and has vacated in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

E.   Common Area Charges Cap:  Tenant's pro rata share of Common Area charges shall be capped at fifty cents ($0.50) per square foot for each year during the Original Term. Should Tenant elect to exercise any available option periods, such charges shall be capped at sixty cents ($0.60) per square foot for each year during the First Option Term, seventy cents ($0.70) per square foot for each year during the Second Option Term, and eighty cents ($ 0.80) per square foot for each year during the Third Option Term. Excepted from the foregoing caps on Common Area Charges shall be those "excessive costs" incurred and paid by Landlord in any calendar year for snow and ice removal. As used herein," excessive costs" shall mean those costs in excess of 8¢ per square foot of ground floor area per calendar year.

F.   Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). If any special assessments or impositions are payable, at the option of Landlord, in installments, said special assessments or impositions shall only be deemed to include the installments which become due in such tax year. Tenant shall pay to Landlord its pro rata share of such Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. If the Term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made to cover the fraction of a year included within the Term of this Lease.

The Real Estate Taxes on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and expense of obtaining the same) to be payable with respect to the Shopping Center for such period.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper

proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, excluding financial contributions, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay its estimated monthly pro rata share of the Real Estate Taxes, based upon the actual amount of the last Real Estate Taxes which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. Tenant's pro rata share of Real Estate Taxes shall be determined as provided in this Section. Upon the request of Tenant, Landlord shall furnish copies of actual Real Estate Tax bills. An adjustment shall be made as soon as the actual Real Estate Taxes for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

Tenant shall pay all sales tax, and other taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

G.      Late Charge:   Landlord shall be entitled to interest on overdue Rent at the annual rate of 2% above the Prime Rate as established by the Chase Manhattan Bank of New York from the day from which the overdue Rent was due and payable, if Tenant fails to pay such overdue rent within 10 days of such due date.

H.      Construction Allowance: Tenant shall be entitled to payment of $200,000.00 upon completion of the following conditions:

1.      Tenant shall provide fully executed lien waivers for each contractor, subcontractor and/or materialman which performed Tenant's work. (In the event that Landlord's contractor or other representatives finish Tenant's Work instead of Tenant's contractor, this requirement shall be inapplicable);

2.      Landlord's receipt of a letter from an officer of Tenant's Real Estate Department stating that Tenant's Work has been performed per this Lease;

3.      Tenant's opening for business in the Demised Premises.

Upon completion of the above requirements, Landlord shall pay to Tenant an amount equal to $200,000.00 within thirty (30) days of Tenant's completion of the above requirements. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's completion of the above requirements, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York from the due date of the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as

defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

6.  **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, provided Landlord has not requested such changes to be removed, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

Tenant shall not suffer any mechanic's lien to be filed against the Leased Premises or the Shopping Center or any interest therein by reason of any work, labor, services or materials performed at or furnished to the Demised Premises, to Tenant, or to anyone holding the Demised Premises through or under the Tenant. If any such mechanic's lien shall at any time be filed, Tenant shall forthwith cause the same to be discharged of record by payment, bond, order or a court competent jurisdiction or otherwise, but Tenant shall have the right to contest any and all such liens. If Tenant shall fail to contest the same with due diligence or shall fail to cause such lien to be discharged within thirty (30) days after being notified of the filing thereof, Landlord shall have the right to discharge the same by paying the amount claimed to be due or by bonding or other proceeding reasonably deemed appropriate by Landlord, and the amount so paid by Landlord and/or all costs and expenses, including reasonable attorney's fees, incurred by Landlord in procuring the discharge of such lien, shall be deemed to be additional rent and shall be due and payable by Tenant to Landlord on the first day of the next following month. Nothing in this Lease contained shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Demised Premises to any lien or liability under the mechanic's lien law of the state.

7.  **MAINTENANCE AND REPAIRS:**

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost, damage or claim resulting from such breakage or the replacement thereof unless such damage is due to the negligence of Landlord, its agents, contractors or employees.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, if any, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the Tenant Possession Date under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Tenant also agrees to keep the entrance to the Demised Premises in a clean and safe condition by removing snow and ice from the doorways. Tenant further agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use (1 ton per 400 square feet). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's

sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from its next Rent payment(s) owing.

Should Tenant discover that the HVAC system requires repair and/or replacement during the first Partial Lease Year, if any, and the first two (2) Lease Years; and the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually from its next Rent payments owing. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

As part of its air conditioning maintenance obligation, above, Tenant shall enter into an annual contract with an air conditioning repair firm, fully licensed to repair air conditioning units in the State of North Carolina, which firm shall:

(1)     Regularly service the air conditioning unit(s) on the leased premises on a monthly basis, changing belts, filters and other parts as required; and supply Landlord with copies of the maintenance reports should Landlord request them to do so.

(2)     Keep a detailed record of all services performed on the Demised Premises and prepare a yearly service report to be furnished to the Tenant at the end of each calendar year.

Tenant shall furnish to Landlord at the end of each calendar year, a copy of said yearly service report. Not later than thirty (30) days prior to the date of commencement of the term of this Lease and annually thereafter, Tenant shall furnish to Landlord a copy of the air conditioning maintenance contract described above, and proof that the annual premium for the maintenance contract has been paid. Nothing stated herein above shall limit Tenant's obligation to maintain the air conditioning unit(s) in good condition and repair throughout the term of this Lease.

Landlord warrants the HVAC system in the manner prescribed in Exhibit C.

Tenant shall store all trash and garbage within the Leased Premises and arrange for the regular pickup of such trash and garbage at the Tenant's expense. Tenant shall not burn any trash or garbage at any time in or about the building and Tenant shall attend to the daily disposal thereof in the manner designated by Landlord. If Landlord shall provide any services or facilities to such pickup, the Tenant shall be obligated to use the same and shall pay a proportionate share of the actual cost thereof within thirty (30) days after being billed therefor.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that to the best of Landlord's knowledge all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition as of the Tenant Possession Date. Landlord further agrees that Tenant shall have no obligation to repair or maintain any such item as is not in operating condition until put in operating condition by Landlord at its expense. Tenant shall notify Landlord of any defects within thirty (30) days after the Tenant Possession Date by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition,

Boone, NC.final

and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs, Tenant shall have the right to deduct such cost, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next installment of Rent.

Landlord agrees to keep or cause to be kept, repaired, replaced and maintained, at Landlord's sole cost and expense, the roof; roof drains; canopy, if any; utility cables, mains and conduits; and all major repairs or replacements to the electrical, plumbing or sewer systems or any portion thereof up to the exposed interior of the Demised Premises (to the extent that the expenses related to such work are not included in Common Area Charges as permitted and provided for by Section 5 hereof); sprinkler systems and component/integrated parts and systems, sprinkler risers and related equipment; and exterior walls, exclusive of doors and windows during the Term and will make required structural repairs to the building of which the Demised Premises are a part. Landlord's performance of each of its covenants contained in this Lease shall be a condition precedent to its right to collect rents and to enforce this Lease. Tenant shall remain bound to the terms of this Lease during any period in which Landlord is diligently pursuing a cure of any Landlord non-performance. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or to make repairs to Common Areas or, upon written notice, to those facilities required to be maintained by Landlord, provided the same does not substantially interfere with Tenant's operation.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof, unless Landlord is diligently proceeding with such repair. If the repair is necessary to end or avert an emergency and if Landlord after receiving confirmation from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work, provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing.

8. **SIGNS:**

Tenant shall at its sole cost and expense have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises in accordance with Landlord's signage criteria. Notwithstanding the foregoing, Landlord covenants and warrants that it has approved Tenant's Sign Specification attached hereto as Exhibit D prior to or simultaneously with its execution of this Lease. The location of any such signs shall be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

If space becomes available, Tenant shall have the first right of refusal, subject to existing tenant's rights, to place suitable sign panels, which may be subject to Landlord's reasonable approval, upon the existing Shopping Center pylon(s). Tenant shall not be

obligated to remove, replace, diminish, or change the location of its pylon signage. Absent an existing pylon, Tenant shall have the right to erect a pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once the pylon signs are installed Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

During the Original Term, options or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

Upon Lease termination, at Tenant's expense, all of Tenant's signage shall be removed, and all surfaces where Tenant's signage was located shall be repaired to the condition as it existed prior to Tenant's occupancy.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall, unless otherwise agreed to in writing, remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or air conditioning equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.

10. **GOVERNMENTAL REGULATIONS:**

To the best of Landlord's knowledge, Landlord agrees that as of the Tenant Possession Date the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly make it conform as of the Tenant Possession Date and at all times thereafter unless such is necessitated by changes, alterations or additions made by Tenant. In the event Tenant is required by local or state code, Landlord shall provide Tenant with a complete set of "as built" drawings, if available. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority, unless such requirement is unique to Tenant's specific use or is necessitated by an interior modification of the Demised Premises made by Tenant in the performance of its work; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, a sprinkler system and its integrated/component parts or systems; to procure any licenses and permits required, except for such licenses and permits required for the operation of Tenant's business or is necessitated by an interior modification of the Demised Premises made by Tenant in the performance of its work; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

Landlord represents and warrants that the Demised Premises are currently equipped with a sprinkler system, which system (and its integrated/component parts or systems) is in compliance with any and all governmental law, regulation, or code. Landlord further represents that the sprinkler system (and its integrated/component parts or systems) has been and shall be inspected annually and that it passed its last inspection in January 2001.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act of Tenant or Tenant's

Boone, NC.final

employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to, or death of any person or damage to personal property of every kind and nature, unless caused by the negligence of Tenant, or its agents, employees, and contractors, arising from or in connection with Landlord's performance of its Lease obligations pertaining to the Demised Premises and its use and occupancy of the Common Areas, caused by defects therein, the negligent acts or omissions to act of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

12.   **INSURANCE:**

A.   <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, which insurance, shall include Landlord as an additional insured, as its interest may appear with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.   <u>Landlord</u>: Landlord shall at all times <u>carry insurance covering all improvements located in the Shopping Center</u>, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under broad form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full insurable value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry <u>public liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured</u>, as its interest may appear, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant will pay to Landlord monthly, its estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center.

Within thirty (30) days after the end of each Lease Year Landlord shall provide Tenant with a statement assessing and prorating the actual insurance premiums together with copies of all bills for which payment is sought. Tenant shall pay to Landlord within thirty (30) days of such receipt any deficiency owed to Landlord, and Landlord shall promptly give credit for any overage.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

Notwithstanding the above, if all or substantially all of the Demised Premises shall be damaged, destroyed, or rendered untenantable by, or as a result of fire or other casualty during the Lease Term, Landlord shall have the right to terminate this Lease as if such were the natural expiration of the Lease Term, and neither party shall have any continuing liability hereunder.

B.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred twenty (120) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.    If the Demised Premises are damaged or destroyed during the last one (1) year of the Original Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises, or the payment of Rent.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

Boone, NC.final

16. **WARRANTY OF TITLE BY LANDLORD:**

As of the date hereof, Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant, or such exceptions which are a matter of public record; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises, except for encumbrances of record and restrictions permitted under this Lease; and (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

17. **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that so long as Tenant is not in default beyond any applicable notice and cure periods, in its obligations under this Lease, Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any options or extensions.

18. **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory non-disturbance, subordination and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall use its best efforts to require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there

is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

19. **DEFAULT:**

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Landlord, or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the defaults as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor, and terminate the Lease and recover all monies then currently due as of the date of such termination. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. Should Landlord choose not to terminate this Lease, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due, plus the reasonable cost of reletting. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, may be deducted by Tenant from Rent thereafter to become due. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in

addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

## 20.   CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease should such taking, in Tenant's reasonable discretion, materially and adversely affect Tenant's ability to carry on business as contemplated under this Lease. In the event any part of the buildings of the Shopping Center, or common area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant, Tenant's business operation would be materially and adversely affected, Tenant may cancel this Lease, or at its option, retain the Demised Premises, in which event Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith, provided such restoration is reasonably financially feasible. Until the Shopping Center is restored to proper tenantable condition, Rent shall abate in proportion to the remaining portion of the Demised Premises from which Tenant is actually operating. Thereafter, Rent shall be reduced in proportion to the amount of the Demised Premises lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21.   MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease, and to the extent such damage is covered, or is required to be covered by either parties insurance coverage pursuant to the terms of this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same.

## 22.   ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease; provided, (i) Tenant's use as stated herein remains the same, or if the contemplated use is not the same, the Landlord must approve the new use which approval shall not be unreasonably withheld, conditioned or delayed, it being understood between Landlord and Tenant that it shall be reasonable for Landlord to withhold its consent for the new use if such is (1) in violation of any exclusive rights of any other tenant open and operating in the Shopping Center at the time the consent is requested, and approved, or (2) a Tenant Prohibited Use (as defined by Section 4 hereof), (ii) no such subletting or assignment shall relieve Tenant of any of its obligations hereunder, and (iii) any such Assignee or Sublessee agrees to abide by and assume all of the terms and conditions of this Lease, including exclusives, restrictions, and /or covenants affecting the Demised Premises. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

## 23.   SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and heating, ventilating, and air conditioning equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at 125% of the Rent and otherwise subject to all the terms and provisions hereof.

## 24.   NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) hand, (ii) a nationally recognized overnight express courier, (iii) registered or certified mail return receipt requested, or (iv) via facsimile, provided a copy of said notice is sent in accordance with (i), (ii), or (iii) within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day in the case of delivery by overnight courier, or (iii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.   LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the laws of the State of North Carolina.

## 26.   BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.   NO RECORDATION:

Neither party shall record this Lease.

## 28.   REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29.   NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.   HAZARDOUS MATERIAL:

Landlord represents and warrants to the best of Landlord's knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord during the Original Term of this Lease or any options or extensions, Landlord shall promptly, if required by law, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all governmental laws and regulations and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials Rent due under this lease shall abate in proportion to such portion of the Demised Premises from which Tenant determines in its reasonable judgment that it can not operate in the manner contemplated by this Lease during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any options or extensions, Tenant, or its contractors shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders, and with notice to the Landlord. Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises caused by Tenant or Tenant's contractors while in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

## 31.   TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

## 32.   WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; or (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amounts owed within twelve (12) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said twelve (12) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

Boone, NC.final

**33.  REASONABLE CONSENT:**

A.     Unless otherwise expressly provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission.  In the event that either party fails to respond to any request for consent, approval or permission within twenty (20) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other party may proceed without further action, approval or permission.  In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

B.     If Tenant claims or asserts that Landlord has violated or failed to perform its covenant not to unreasonably or arbitrarily withhold or delay Landlord's consent, approval or permission, Tenant's sole remedy shall be an action for specific performance, declaratory judgment or injunction and in no event shall Tenant be entitled to any money damages for a breach of said covenant and in no event shall Tenant claim or assert any claim for money damages in any action or by way of offset, defense or counterclaim; provided, however, Tenant shall be entitled to escrow all Rent and Additional Rent until final resolution of Tenant's claim, whereupon all sums escrowed shall be paid in full.

**34.  CO-TENANCY:**

Intentionally omitted.

**35.  NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.  SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

**37.  INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken out, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken out which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.  TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.  LENDER APPROVAL OF LEASE:**

Notwithstanding anything in this Lease to the contrary, Landlord shall have the right to terminate this Lease within 15 days of full execution should it's lender ("Lender") not approve this Lease.  Landlord covenants and agrees to immediately submit this Lease to

Boone, NC.final

Lender and diligently seek its approval. Landlord further covenants and agrees to immediately commence Landlord's work hereunder and to diligently prosecute the same.

**40.   LIMITATION OF LANDLORD LIABILITY:**

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center (which consideration shall be deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition), and Landlord shall not be liable for any deficiency. The provisions of this Section are not intended to relive Landlord from the performance of its obligations under the Lease, but only to limit the personal liability of Landlord in case of a recovery of judgment against Landlord, nor shall the shall provisions hereof be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by law or under the terms of this Lease by reason of Landlord's failure to perform its obligations hereunder.

**41.   LANDLORD'S PROHIBITED USES:**

Landlord represents that, except for those tenants open and operating from the Shopping Center as of the Effective Date, in no event shall the Shopping Center or any portion thereof be used as or for a movie theater (within 200 feet of either side of the Demised Premises); auditorium; meeting hall; church; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles (within 200 feet of either side of the Demised Premises); bar serving alcoholic beverages except as incidental to a restaurant; funeral parlor (within 200 feet of either side of the Demised Premises); massage parlor; animal clinic or veterinary hospital; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate studio or gymnasium (within 100 feet of either side of the Demised Premises); skating rink; car wash (within 200 feet of either side of the Demised Premises); off-track betting establishment; game room; amusement arcade, gallery or store; pinball arcade; so-called "flea market"; second hand or used goods store or store selling primarily distressed or damaged merchandise (within 100 feet of either side of the Demised Premises); pool room; bowling alley; health club or spa (within 100 feet of either side of the Demised Premises); so-called "head shop"; night club; school; gun range or gun shop; or any business or use which emits offensive odors, fumes, dust or vapors; is a public or private nuisance; emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; dry cleaning plant; auction house; living quarters; government offices (within 100 feet of either side of the Demised Premises); for the operation involving assembly, manufacturing, distilling, refining, smelting, agricultural, or mining operations; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit materials; for use as a massage parlor or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials (all of the foregoing collectively referred to as the "Landlord Prohibited Uses").

END OF LEASE
Signature page and Exhibits follow

Boone, NC.final

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD: EIG Boone LLP, a Delaware Limited Liability Company**

By: _____

Robert L. Sutton, Executive Vice President

Title: _____

Witnesses As To Tenant:

**TENANT:    Big Lots Stores, Inc., an Ohio corporation**

By: _____

Albert J. Bell

Title: _____

Vice Chairman

**STATE OF ATLANTA**
**COUNTY OF**

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **EIG Boone LLP** by, Robert L. Sutton, its Executive Vice President who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

    IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Atlanta, GA, this 31st day of October, 2001.

_____
Notary Public

Notary Public, Cobb County, Georgia
My Commission Expires August 2, 2002

**STATE OF OHIO**
**COUNTY OF FRANKLIN**

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by Albert J. Bell, its **Vice Chairman** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

    IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, OH, this 24 day of October, 2001.

_____
Notary Public

**PENNY** J. SAVAGE
NOTARY PUBLIC  STATE OF OHIO
MY COMMISSION EXPIRES 5-10-03

EXHIBIT A

SITE PLAN

# NEW MARKET CENTRE
115 - 267 New Market Boulevard • Boone, North Carolina  28607



Gross Leasable Area: 134,229 S.F.

NORTH

| # | | S.F. |
|---|---|---|
| 1 | THE BISTRO | 1,440 S.F. |
| 2 | RETAIL | 1,800 S.F. |
| 3 | RETAIL | 1,470 S.F. |
| 4 | RACK ROOM SHOES | 4,980 S.F. |
| 5 | RACK ROOM CLEARANCE | 4,200 S.F. |
| 6 | DOS AMIGOS | 6,200 S.F. |
| 7 | RETAIL | 2,000 S.F. |
| 8 | PARCEL PLUS | 1,760 S.F. |
| 9 | RETAIL | 1,440 S.F. |
| 10 | ANGEL NAILS | 1,600 S.F. |
| 11 | H & R BLOCK | 2,000 S.F. |
| 12 | CHINA PALACE | 5,000 S.F. |
| 13 | EXPRESSIONS | 3,580 S.F. |
| 14 | RETAIL | 31,759 S.F. |
| 15 | BOONE DRUG | 6,309 S.F. |
| 16 | MOVIE GALLERY | 4,691 S.F. |
| 17 | LOWE'S FOOD | 54,000 S.F. |
| A | STATE EMPLOYEES ATM | 0 S.F. |

This Exhibit is solely for the purpose of showing the approximate location of the Leased Premises within the Shopping Center and for no other reason whatsoever.  Landlord reserves the right to relocate, change, expand or delete parking spaces or parking areas, curb cuts, entrances, service areas, total building area, frontage, etc., including expansion or demolition of existing or new buildings.

Revised: 10/22/01

## EXHIBIT B
## LEGAL DESCRIPTION

A parcel of land lying on the north side of North Carolina Highway No. 221/421 ad on the west side of North Carolina Highway No. 194 and being the lands described in deed recorded in Book of Records 132 at page 234 of the Watauga County Public Registry and bounded on the north by the Watauga County Board of Education, on the east by R. Thurman Johnson, Joseph C. Lemyre, N.C. Hwy. 194, High Country Bank and James C. Hastings, on the south by U.S. Hwy. No. 221/421, K. B. Boone, Inc., and KB Realty Investments, LLC, and on the west by New Market Blvd. and Suzanne S. Miller and Herbert P. Miller as surveyed by Donald H. McNeil, P.L.S., L-2809, dated April 26, 2001 as BEGINNING on an existing 5/8 inch rebar found in the southern line of the lands conveyed to Watauga County Board of Education by deed recorded in Deed Book 109 at page 553 and located South 27 degrees 28 minutes 42 seconds West 2,382.21 feet from Monument No. 6, a corner of the Town of Boone City Limits and also located South 44 degrees 42 minutes 30 seconds East 217.39 feet from an existing iron pipe; thence with the southern line of the Watauga County Board of Education lands, the following four (4) courses and distances: (1) South 44 degrees 42 minutes 30 seconds East 44.71 feet to an existing ½ inch conduit pipe; (2) South 35 degrees 32 minutes 24 seconds East 46.63 feet to an existing 5/8 inch rebar; (3) South 72 degrees 55 minutes 24 seconds East 307.41 feet to an existing 5/8 inch rebar; (4) South 85 degrees 06 minutes 24 seconds East 340.34 feet to an existing 5/8 inch rebar in a fence corner and in the western line of the lands conveyed to R. Thurman Johnson by deed recorded in Book of Records 546 at page 869; thence with the western line of said lands South 07 degrees 47 minutes 12 seconds East 38.93 feet to an existing 5/8 inch rebar, a corner to the lands conveyed to Joseph C. Lemyre by deed recorded in Book of Records 400 at page 598; thence with the western line of said lands, North 87 degrees 28 minutes 54 seconds West 9.16 feet to an existing 5/8 inch rebar at the back of the concrete curb; thence continuing with the western line of said lands and with the back of the curb, South 02 degrees 31 minutes 06 seconds West 188.96 feet to a 5/8 inch rebar set; thence continuing said line and with the curb, a curve to the left having a radius of 26.00 feet, an arc length of 42.39 feet (chord: South 44 degrees 11 minutes 36 seconds East 37.85 feet) to a 5/8 inch rebar set; thence with the southern line of said lands and with the back of the curb, North 89 degrees 05 minutes 42 seconds East 191.05 feet to an existing 5/8 inch rebar; thence North 59 degrees 09 minutes 12 seconds East 16.18 feet to an existing 5/8 inch rebar; thence North 56 degrees 01 minutes 12 seconds East 4.79 feet to a chiseled "X" on the concrete curb and in the western right of way of N.C. Hwy No. 194; thence with the western right of way of said highway, South 08 degrees 36 minutes 12 seconds East 49.05 feet to an existing railroad spike, said spike being the northeast corner of the lands as conveyed to High Country Bank by deed recorded in Book of Records 485 at page 220; thence with the northern line of said lands, North 67 degrees 19 minutes 48 seconds West 5.33 feet to an existing railroad spike; thence continuing said line, South 87 degrees 41 minutes 48 seconds West 192.54 feet to an existing 5/8 inch rebar; thence continuing with the line of said lands with a curve to the left having a radius of 24.00 feet, an arc length of 37.59 feet (chord:  South 42 degrees 49 minutes 24 seconds West 33.87 feet) to a 5/8 inch rebar set; thence with the western line of said lands, South 02 degrees 03 minutes 00 seconds East 143.27 feet to an existing 5/8 inch rebar in the western line of the lands conveyed to James C. Hastings by deed recorded in Book of Records 452 at page 633; thence with the western line of said lands, South 15 degrees 20 minutes 00 seconds East 126.48 feet to an existing 5/8 inch rebar; thence continuing said line, South 68 degrees 20 minutes 00 seconds East 58.00 feet to an existing railroad spike in the asphalt of US Hwy. No. 221/421; thence with the northern right of way line of said highway, South 71 degrees 45 minutes 54 seconds West 461.94 feet to an existing railroad spike, said spike being the southeast corner of the lands conveyed to K.B. Boone, Inc. by deed recorded in Book of Records 071 at page 939; thence with the eastern line of said lands, North 18 degrees 44 minutes 18 seconds West 207.00 feet to a Mag-nail set; thence with the northern line of said lands, South 81 degrees 15 minutes 42 seconds West 170.00 feet to a Mag-nail set; thence continuing said line, South 38 degrees 13 minutes 48 seconds West 39.67 feet to a Mag-nail set, said nail being the northeast corner of the lands conveyed to KB Realty Investments, LLC by deed recorded in Book of Records 313 at page 848; thence with the northern line of said lands, South 72 degrees 34 minutes 12 seconds West 319.31 feet to an existing 5/8 inch rebar found in the eastern right of way of New Market Blvd.; thence with the eastern right of way of said street, with a curve to the left having a radius of 278.27 feet, an arc length of 260.33 feet (chord:  North 02 degrees 57 minutes 30 seconds West 250.94 feet) to a railroad spike set in the asphalt of said street; thence leaving the street and with the eastern line of the lands conveyed to Suzanne S. Miller and Herbert P. Miller by deed recorded in Book of Records 514 at page 435, North 18 degrees 55 minutes 54 seconds East 682.18 feet to the BEGINNING and containing 14.076 acres as calculated by the coordinate geometry method and having bearings relative to the North Carolina Geodetic Survey (NAD 27) and all distances being horizontal measurements.

## EXHIBIT C

## LANDLORD WORK

1.  HVAC equipment to be in good working condition and adequate for Tenant's intended use, including but not limited to all duct work, diffusers and any other air distribution equipment commonly used and required by Tenant. Tonnage requirements to meet Tenant's specifications of one ton per 400 square feet throughout the demised premises, sales floor and stock room. If the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to have the HVAC system inspected to determine the needed repairs by the Landlord. Landlord shall also warrant the HVAC system for a period of two years for any repairs over $2,500 during a single lease year.

2.  All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification.

3.  Existing exterior lighting to be in good working condition.

4.  All doors and door systems to be sound and secure and in good working condition, and in compliance with A.D.A. requirements.

5.  Roof to be in good condition and free of leaks.

6.  Existing loading docks to be in good working condition.

7.  Tenant to have the right to erect its own pylon per all local codes and ordinances.

8.  Landlord will provide tenant with "as built" drawings or a floor plan of the demised premises adequate for tenant to draw its floor and fixture plan.

9.  Landlord agrees premises conforms to all requirements by authority having jurisdiction, if said premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations or additions made by tenant.

10.  All above work to be completed before the Tenant Possession Date.

# EXHIBIT D

## TENANT SIGN SPECIFICATIONS



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

<u>SIGN SPECIFICATIONS: BIG LOTS</u>
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING
POWERED BY 30MA SELF CONTAINED TRANSFORMERS
(NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

<u>SIGN SPECIFICATIONS: EXCLAMATION</u>
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING
POWERED BY 30MA SELF CONTAINED TRANSFORMERS

| | STANDARD SIZE CHARACTERISTICS | | | | |
|---|---|---|---|---|---|
| A | B | C | D | E |
| 2'-0" | 12'-3" | 2'-10" | 9" | 4 1/2" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5 1/2" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-8" | 17 1/2" | 8 1/2" |
| 4'-6" | 26'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 28'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS
INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE
EQUIPT WITH DISCONNECT SWITCHES



ALL STAR SIGNS

112 SOUTH GLENWOOD AVENUE
COLUMBUS, OHIO 43222

PHONE (614) 461-9052
FAX (614) 461-0620

**EXHIBIT E**

**DELIVERY OF POSSESSION LETTER**

**Date:** _____

**To:** _____(insert Tenant)
           via facsimile: (614) 278-6546

**From:** _____ (insert Landlord & name of contact person)

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)


You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed.  Accordingly, possession of the Demised Premises is hereby delivered to Tenant.  You may pick up the keys at _____
_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

# EXHIBIT F

## SHOPPING CENTER EXCLUSIVES

Tenant acknowledges that Landlord has extended certain "exclusive use" rights to existing tenants of the Shopping Center. Tenant agrees not to use the Premises in a manner that would violate the following restrictions:

1. Lowe's Supermarket: Landlord covenants and agrees not to lease, rent, occupy or suffer or permit to be occupied, any part of the Center (other than the Demised Premises) for the purpose of conducting therein or for use as a food store or a food department, or for the sale for off-premises consumption of groceries, produce, dairy products, meats or bakery products, or any of the foregoing; provided, however, that nothing contained herein shall prevent any tenant in the center from selling such products as an incidental part of its other and principal business so long as (a) the total number of square feet devoted by such tenant to the display for sale of such products does not exceed 5% of the total number of square feet of building area leased by such tenant in the Center, or 500 square feet (including, in either such case, one-half (1/2) of the aisle space adjacent to any display area), whichever is smaller; or (b) the tenant is primarily a restaurant selling freshly prepared food for contemporaneous consumption on or off the tenant's premises, including, but not limited to, such stores as a pizza store, ice cream store, "Subway" type sandwich store, and a "Dunkin Donuts" type donut store.

2. Boone Drugs: Landlord covenants and agrees that it will not hereafter enter into any lease of space in the Shopping Center which gives the lessee thereof the right to use such space for the sale of prescription drugs.

3. H & R Block: During the term of tenant's lease and option period, Landlord will not enter into another lease for the Shopping Center with a tenant whose primary purpose is tax preparation, bookkeeping and accounting services.

4. Little Caesars Pizza: Landlord covenants and agrees that, subsequent to the date hereof, Landlord shall not enter into any lease of any space in the Shopping Center which permits such space to be used primarily for the sale of prepared pizzas for off-premises consumption.

5. Parcel Plus: Parcel Plus shall have the exclusive right in the center to offer retail packaging and shipping services and Internet-related services. Landlord agrees from the date of this Lease forward not to enter into a lease agreement with another tenant with the same primary use.

6. Angel Nails: During the term of the Angel Nails lease, no other premises in the Shopping Center shall be used for the primary purpose of operating a nail salon.

7. China Palace: During the term of the China Palace lease, no other premises in the Shopping Center shall be used for the primary business of operating a Chinese restaurant.

## **FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT**

This First Lease Extension and Modification Agreement (the "Agreement") is made as of the 13th day of September_____, 2021, (the "Effective Date") by and between **Boone Investment Group, LLC** having an address P.O. Box 1036, Charleston, SC 29401 (the "Landlord"), and **Big Lots Stores, Inc.,** an Ohio corporation, having an address at 4900 East Dublin Granville Road, Columbus, Ohio 43081 (the "Tenant").

## RECITALS:

A.      Landlord and Tenant have entered into that certain Lease Agreement, dated October 31, 2001, as amended (collectively, the "Lease") for approximately 31,750 square feet of storeroom ("Demised Premises") located at New Market Centre, 223 New market Ctr., Boone, NC 28607 (the "Shopping Center"), as more particularly described in the Lease.

B.      The Term of the Lease currently expires on **January 31, 2023**.

C.      The parties desire to extend the Term of the Lease for seven (7) years and further amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.      Extension of Term.  Effective as of the Effective Date, the Term of the Lease is hereby extended for a seven (7) year period which commences on **February 1, 2023** and expires on **January 31, 2030** (the "First Extended Term"). For purposes of this Agreement, all references to the term "Extended Term" shall be deemed to refer to the First Extended Term as defined in this Agreement.  In addition, from and after the Effective Date, all references to the term "Term" or "Lease Term" contained in the Lease shall be deemed to mean the term of the Lease as extended by the Extended Term.

2.      Fixed Minimum Rent During the Extended Term.  During the Extended Term, the Fixed Minimum Rent payable by Tenant to Landlord for the Demised Premises shall be as follows:

| Period | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
|---|---|---|
| February 1, 2023 – January 31, 2030 | $222,250.00 ($7.00/sf) | $18,520.83 |

Fixed Minimum Rent during the Extended Term shall continue to be due and payable by Tenant to Landlord in equal monthly installments (in the monthly amounts set forth above for the corresponding period), in advance, without offset or deduction and without prior demand, on or before the first day of each calendar month during the Extended Term and otherwise in accordance with the terms of the Lease.

3.      Percentage Rent.  During the Extended Term, Tenant further agrees to pay Landlord a Percentage Rent equal to two and one-half percent (2-1/2%) of the excess of

DocuSign Envelope ID: 4C1D3982-522G-4A15-A2F4-578A8A8C951B

BL #1684

Tenant's Annual Gross sales and income which exceeds, the annual base sum of $8,890,000.000.

4.    CAM cap.  The CAM cap during the Extended Term shall be $0.90.

5.    Option to Renew.  Provided that Tenant is not in monetary default of the terms and provision of this Lease beyond any applicable notice and cure period set forth in the Lease, if any, Tenant shall have the option to extend the Term of this Lease for one (1) successive period, consisting of seven (7) years the ("Fourth Option Term") from the expiration of the Extended Term.

In order to exercise the option herein granted, Tenant shall give written notice to Landlord of Tenant's exercise of such option at least one hundred eighty (180) days prior to the expiration of the immediately preceding Term as to which notice time is of the essence. All of the terms, covenants and conditions set forth in this Amendment shall apply during an Option Term. Notwithstanding anything herein to the contrary the Fixed Minimum Rent for each lease year of the Option Term shall accrue as follows:

| Term | Annual Fixed Minimum Rent | Monthly Fixed Minimum Rent |
|------|---------------------------|----------------------------|
| Fourth Option Term | $238,125.00 ($7.50/sf) | $19,843.75 |

6.    Percentage Rent.  During the Fourth Option Term, Tenant further agrees to pay Landlord a Percentage Rent equal to two and one-half percent (2-1/2%) of the excess of Tenant's Annual Gross sales and income which exceeds, the annual base sum of $9,525,000.00.

7.    CAM cap.  The CAM cap during the Fourth Option Term shall be $1.00.

8.    Full Force and Effect; Successors and Assigns.  Except as modified herein, all other terms and conditions of the Leases shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

9.    Counterpart Execution.  This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such

DocuSign Envelope ID: 4C1D3082-522C-4A15-A2E4-573A8A8C951B

individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed this Agreement as of the date first hereinabove set forth.

**LANDLORD:**
**BOONE INVESTMENT GROUP, LLC,**
a/an ___North Carolina___ **limited liability company**

By: _____

By: _____

**TENANT:**
**BIG LOTS STORES, INC.**
**an Ohio corporation**

By: _____
Name:  Jonathan Ramsden
Title:   Executive Vice President, Chief Financial and Administrative Officer

Signature Page – First Lease Extension and Modification Agreement