# TABLE OF CONTENTS

**Section**

1. Definitions
   - A. Common Areas
   - B. Dates
   - C. Exhibits
   - D. Demised Premises
   - E. Shopping Center
   - F. Gross Sales

2. Demise

3. Term
   - A. Original Term
   - B. Option to Extend Term

4. Use and Operation

5. Rent
   - A. Fixed Minimum Rent
   - B. Utilities Charges
   - C. Intentionally Deleted
   - D. Common Area Charges and Fixed CAM
   - E. Real Estate Taxes
   - F. Rent Abatement
   - G. Late Fees
   - H. Declaration

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    - A. Tenant
    - B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23.    Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

42.    Landlord Liability

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 21st day of March, 2013 (the "Effective Date"), by and between HH-Laveen, LLC, an Arizona limited liability company ("Landlord") whose mailing address is c/o Hinkson Company, 15455 N. Greenway Hayden Loop Road, Suite C-2, Scottsdale, AZ 85260 and PNS Stores, Inc., a California corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

1.  **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.  <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

    Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.  Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

    B.  <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

        1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by

Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord notifies Tenant of Landlord's completion of any construction that may be required pursuant to Exhibit C, or (ii) the date on which Tenant receives all permits for its construction and signage ("Permits"). Tenant will submit its plans for Permits within ninety (90) days of the Effective Date and thereafter, diligently pursue obtaining such Permits. Landlord will reasonably, at no cost to Landlord, cooperate with Tenant in obtaining said Permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    If Landlord fails to return properly executed Leases to Tenant by March 30, 2013, then Tenant may terminate this Lease by written notice to Landlord. If Landlord fails to complete Landlord's Work in the Demised Premises by September 1, 2013, Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to May 1, 2013. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by August 5, 2013, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon August 6, 2013 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to August 20, 2013, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day. Commencing August 21, 2013 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) 

annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction and/or signage in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)    Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by August 1, 2013, Tenant will not be required to accept possession until February 3, 2014. The period of time between August 1, 2013 and February 3, 2014 will be the "Optional Blackout Period". In the event Landlord completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not completed Landlord's Work by February 3, 2014, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 3, 2014, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 3, 2014. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit A – 1 Tenant's Plans and Specifications

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    Landlord's Work

5)    Exhibit D -    Tenant Building Sign Specifications

6)    Exhibit D – 1 Tenant Pylon Sign Location

7)    Exhibit E -    Completion of Landlord's Work Letter

8)    Exhibit F -    Exclusive Use Provisions

9)    Exhibit G -    Remeasurement Rider

10)    Exhibit H-    SNDA

D.    Demised Premises: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 30,595 square feet of ground floor area

with a minimum width of 130 feet for the Demised Premises. Tenant's Plans and Specifications are attached hereto as Exhibit A-1 and deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Any dispute as to the actual square footage of the Demised Premises shall be resolved by an independent architect to be mutually agreeable to Landlord and Tenant, the cost of whose service shall be shared equally by Landlord and Tenant. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 31,000 square feet nor accept possession of any space under 28,000 square feet in size, and may terminate this Lease in such an event.

E.   Shopping Center:   The "Shopping Center" means the real property and improvements owned by Landlord which is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, which is a portion of the Laveen Village Shopping Center, 3630 W. Baseline Rd., Phoenix, AZ 85041. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 101,369 square feet.

F.   Gross Sales: The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year whether for cash or on credit (each sale upon installments or credit shall be treated as a sale for the full cash price at the time of sale) and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees, subtenants, licensees and concessionaires. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

## 2.   **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.    **TERM:**

    A.    <u>Original Term</u>: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2021 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

    B.    <u>Options to Extend Term</u>: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

4.    **USE AND OPERATION:**

    A.    <u>Permitted Uses</u>: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including frozen food, beer and wine) and all similar or related merchandise and any lawful retail use. Except as set forth on Exhibit F, Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties. Tenant agrees that it will not use the Demised Premises in a manner such as to violate any of the exclusives or use restrictions set forth on Exhibit F.

        Except for tenants open and operating for business in the Shopping Center as of the date of this Lease and 99¢ ONLY STORES and except for the sporting goods permitted use of Big 5 Sporting Goods (upon the execution and delivery of a lease in the Shopping Center), and provided that Tenant is open and operating for business in the Demised Premises for its permitted use (excluding closures for

repairs, renovations or restorations), no other general merchandise, discount, liquidator, closeout store, discount furniture store or any dollar store operation over 10,000 square feet in floor area ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. The foregoing exclusive use right shall not apply to any retailer whose primary business is the sale of "soft goods" or "sporting goods" as the same is defined in the retail industry. In addition to the foregoing, but subject to the foregoing limitations, a "Competing Business" shall include, without limitation the following business operations in the Shopping Center if such business operations are in premises over 10,000 square feet in floor area: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Christmas Tree Shops, Five Below and Ollie's Bargain Outlet. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise.

B.   Prohibited Uses: Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter; provided, however, that this restriction shall not prohibit first-class regional or national chain operations selling second hand products, such as Plato's Closet, Once Upon a Child and Rent-A-Center, (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 5,000 square feet; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers within 400 linear feet of the Demised Premises (provided, however, that this restriction shall not prohibit a first-class regional or national tire retailer and installation center); (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant) provided, however, that this restriction shall not prohibit restaurants that sell alcoholic beverages and/or that have a bar included therein and/or prepackage items for the sale of alcoholic beverages for offsite consumption as incidental sales or a first-class regional or national beverage retailer such as BevMo! Or Total Wine ; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; provided, however, one (1) health spa, health club, gymnasium or other similar operation located as shown on the site plan attached as Exhibit A-1 in the

9

approved "Health Area" which is located at least 400 linear feet from the Demised Premises shall be permitted (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat except for nominal support facilities for on-site service oriented to pickup and delivery by the ultimate consumer; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation or otherwise in operation as of the Effective Date or any replacement thereof); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; provided, however, pet store operators, such as "Petco", "Pet Club", and "Petsmart" shall be permitted; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

5.    **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"), without notice or demand and unless otherwise expressly set forth herein, without abatement, deduction or set-off. The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent: During the Original Term of this Lease, the sum of $198,867.50 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $16,572.29.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $218,754.25 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $18,229.52. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $240,629.68 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $20,052.47. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $264,692.67 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,057.72. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $294,161.92 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $24,263.49.

B.   <u>Utilities Charges</u>: ' Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord shall provide Tenant with access to all such utilities necessary to conduct business in the Demised Premises, and Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than forty-eight (48) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such forty-eight (48) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.   <u>Intentionally Deleted</u>.

D.   <u>Common Area Charges and Fixed CAM</u>: Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

   (i)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies ("Common Area Charges").

Fixed Common Area Charges:     Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of costs for Common Area Maintenance ("Common Area Charges") shall be fixed at $1.35 per square foot of the Demised Premises for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any. Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. After the first Lease Year, as well as any Partial Lease Year, if any, Tenant's pro-rata share of Common Area Charges shall increase by three percent (3%) per Lease Year above that amount of Common Area Charges payable by Tenant for the previous Lease Year. For the avoidance of doubt, and merely as an example, in the first full Lease Year, and Partial Lease Year, if any, Tenant's the Common Area Charges shall be equal to $1.35 per square foot of the Demised Premises. In the second Lease Year, Tenant's Common Area Charges shall increase by 3% so that Tenant's pro rata share shall be $1.39 per square foot of the Demised Premises. In the third Lease Year, Tenant's pro rata share of Common Area Charges shall increase by 3% over the amount paid in the second Lease Year so that Tenant's pro rata share shall be $1.43 per square foot of the Demised Premises.

The $1.35 per square foot Fixed Common Area Charges for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any, and the three percent (3%) fixed annual increase in Common Area Charges shall be collectively known as the "Fixed CAM". In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the Fixed CAM set forth herein.

E.  Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord estimates in good faith that the Real Estate Taxes for the 2013 tax year shall be approximately $2.00 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest

thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor-in-interest.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Rent Abatement:  Notwithstanding anything to the contrary contained in this Lease, commencing upon the Rent Commencement Date and continuing through January 31, 2015, Tenant shall not be obligated to pay $10,426.28 of each monthly installment of Fixed Minimum Rent, as an incentive for Tenant's lease of the Demised Premises (hereinafter referred to as "Rent Abatement").

Tenant shall be solely responsible to comply with any and all requirements of the Internal Revenue Code to use the Rent Abatement as a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Tenant shall be solely responsible to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.    Late Fees.  If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year.

H.    Declaration:  Subject to Article 16 below, Landlord and Tenant acknowledge that Shopping Center is subject to certain covenants, conditions and restrictions of

record, including but not limited to a Declaration of Covenants, Conditions and Restrictions for Laveen Village Center, by Mountain Vista Village Center, L.L.C., and dated October 17, 2007 (the "Declaration"). To the extent that the Declaration allocates Real Estate Taxes, utility expenses, insurance expenses, Common Area Charges and any other expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the Center (as defined in the Declaration) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant. In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the Declaration, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant. Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) arising out of any violation by Tenant of the Declaration to the extent it conflicts with the Lease as stated above. Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the Declaration, and Landlord agrees not to consent to any uses prohibited by the Declaration or this Lease in the Shopping Center; provided, however, Tenant hereby acknowledges and agrees that this Lease shall control as between Landlord and Tenant and that Landlord has limited or no control over the acts of the other landlords and tenants within the shopping center.

6.   **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

7.   **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following:

(i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use per Exhibit C. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any

such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, then effective upon the date of Tenant enters the Demised Premises to complete Landlord's Work no liquidated damages shall be due or incurred by Landlord for periods subsequent to such date and Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.  **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and

Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill

18

Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.   **INSURANCE:**

A.   <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord (and any mortgagees provided Landlord has provided Tenant notice of the identity and address of such mortgagees) as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.   <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by

19

multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord estimates in good faith that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B shall be approximately $0.15 per square foot per annum for the 2013 calendar year.

If Tenant is able to secure an insurance policy or policies with the same coverages as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.   **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.   In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.   If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

14.   **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any

delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises except for delays attributable to acts of God or to the respective obligations of Landlord or Tenant to pay Rent, Additional Rent or any other sums of money due and payable under the terms of this Lease.

**15.   INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.   WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, and the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease.  If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all

liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

**17.   QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

**18.   MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord. Tenant agrees, within thirty (30) days after request, to execute a non-disturbance and attornment agreement in the form attached hereto as Exhibit H. Within thirty (30) days following request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

**19.   DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment

for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. Upon Landlord's termination of this Lease following an uncured default by Tenant, Landlord shall be entitled to recover from Tenant, as additional rent, all reasonable costs incurred by Landlord in (i) obtaining possession of the Demised Premises, (ii) removing and storing Tenant's property, (iii) collecting Rent from Tenant and (iv) the costs of reletting including reasonable brokerage fees. All remedies available to Landlord are declared to be cumulative and concurrent. No termination of this Lease nor any taking or recovering of possession of the Demised Premises shall deprive Landlord of any of its remedies or actions against Tenant for all damages resulting from Tenant's default, and Landlord shall have the right to seek either damages payable by Tenant hereunder and/or possession of the Demised Premises either concurrently with, or separately from, such other remedy and/or either concurrently with, or separately from, all of the rights and remedies provided to Landlord under this Lease and/or otherwise at law or in equity.

B.   If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease upon thirty (30) days additional notice and Landlord's failure to complete the cure within such additional thirty (30) days without penalty or default on the part of Tenant , if such default materially and adversely affects Tenant's ability to operate Tenant's business in the Demised Premises; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be

exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20.   **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises.  In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises.  In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith.  Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate.  Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority.  For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings.  Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21.   **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers. It is the intent of the parties that the parties shall look solely to their respective insurance company for recovery.

The provisions of this Section 21 will survive termination of this Lease.

22.   **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder.  Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.  Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center or any use restrictions

24

set forth on Exhibit F, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

23.  **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition (with existing floor tile, if any, as-is), ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred twenty-five percent (125%) of the Rent that was in effect immediately prior to the expiration of the applicable Term and otherwise subject to all the terms and provisions hereof.

24.   **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.   **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Arizona. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26.   **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.   **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.   **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease other than the Hinkson Company which shall be paid by Landlord pursuant to a separate agreement. If any other individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.   **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest

stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

**30.   HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

**31.   TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**32.   WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If

Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33.   **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34.   **CO-TENANCY:**

**Opening Co-tenancy Requirement:**

So long as Tenant is open and operating as a "Big Lots" store in the Demised Premises, if, as of the Rent Commencement Date, one Junior Tenant (defined as a regional retailer occupying at least 10,000 square feet of floor area) shall fail to be continuously open for business in the Shopping Center (the "Opening Co-tenancy Requirement"), then Tenant may pay a reduced rent equal to fifty percent (50%) of the Fixed Minimum Rent payable under this Lease (the "Alternate Rent") commencing on the Rent Commencement Date and continuing until the Opening Co-tenancy Requirement is satisfied.

**Continuing Co-tenancy Requirement:**

Following the first twelve (12) months of the Term, if at any time during the Original Term, or any options or extensions, the occupancy level of the Shopping Center should fall below sixty percent (60%) of the gross leasable area of the Shopping Center (except where any closing is due to restoration following a casualty or taking or for the purpose of remodeling) being occupied by retail tenants with uses not prohibited under this Lease, which said tenants are open and operating for business at the Shopping Center (the "Continuing Co-tenancy Requirement") and the Continuing Co-tenancy Requirement is not met within twelve (12) consecutive months (which twelve-month period shall initially include the first twelve months of Opening Co-tenancy Requirement), then Tenant may reduce by fifty percent (50%) its Fixed Minimum Rent payable under this Lease (the "Alternate Rent") commencing with the thirteenth (13th) month. Further, if thereafter during the remainder of the Term, and any renewals or extensions thereof, the occupancy level of the Shopping Center should fall below sixty percent (60%), and remain below sixty percent (60%) for twelve (12) consecutive months, then Tenant shall have the right to pay Alternate Rent until the Continuing Co-tenancy Requirement is again satisfied. In each instance where Tenant is paying Alternate Rent, due to a failure of the Continuing Co-tenancy Requirement, and payment of Alternate Rent has continued for twelve consecutive (12) months, Tenant shall then either: (i) terminate this Lease by giving Landlord ninety (90) days written notice of its intention to so terminate, whereupon, this Lease shall then terminate with the same effect as if such date were the scheduled expiration date of this Lease and Landlord and Tenant shall thereafter be released from all obligations hereunder, except any thereof which shall have accrued prior to the date of termination; or (ii) resume the payment of full Fixed Minimum Rent under this Lease.

Failure of Tenant to give Landlord the 90-day notice of termination, within thirty (30) days of the expiration of the Alternate Rent Period, shall constitute a waiver of the termination right provided herein.  Tenant's remedies provided herein for Landlord's violation of this provisions of this Article 34 shall constitute Tenant's sole and exclusive remedies against Landlord for such violation, shall be personal to PNS Stores, Inc. a California corporation or any assignee in connection with a Related Party Assignment., and shall not be assigned to nor inure to the benefit of any other party.

28

35. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37. **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38. **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39. **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. Tenant shall have the right to conduct such audit not more than once in any calendar year. In no event shall any such audit be performed by an entity which is paid on a contingency basis. The request to conduct such audit shall be made within twenty-four (24) months after the applicable reconciliation statement is provided to Tenant. A copy of the audit report shall be provided to Landlord promptly after the audit is completed. Tenant shall hold in confidence all information obtained from Landlord's records. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit, but no event to exceed $2,500.00. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord

only Fifty Percent (50%) of such Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party.  This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.    WAIVER OF JURY TRIAL AND CONSEQUENTIAL DAMAGES:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

Notwithstanding any other provision of this Lease to the contrary, in no event shall either Landlord or Tenant be liable or responsible for any consequential, special or exemplary damages, including lost profits.

**42.    LANDLORD'S LIABILITY**

Notwithstanding anything to the contrary set forth in this Lease, Landlord shall not be personally liable for any obligation under this Lease.  Any judgment recovered by Tenant against Landlord shall be satisfied solely out of Landlord's right, title and interest in and to the Demised Premises, including the rents and income received therefrom, and any sales, insurance or condemnation proceeds received therefor.  Tenant shall not look whatsoever against Landlord's members, partners, managing agent, or their respective successors and assigns personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder, or to keep, preserve or sequester any property of Landlord other than the Demised Premises, and that all personal liability of Landlord's members, partners, or managing agent of every sort, if any, is hereby expressly waived by Tenant.  If Landlord's interest in the Demised Premises is insufficient for the payment of any judgment requiring the payment of money by Landlord, Tenant shall not institute any further action, suit, claim or demand, in law or in equity, against Landlord for or on account of such deficiency. Tenant hereby waives, to the fullest extent permitted by law, any right to satisfy a money judgment against Landlord except from Landlord's interest in the Demised Premises.

[Signatures Appear on Immediately Subsequent Page.]

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:      **LANDLORD:    HH-Laveen, LLC, an Arizona limited liability company**

By: _____

Title: _____ MANAGER _____

Witnesses as to Tenant:      **TENANT:    PNS STORES, INC., a California corporation**

By: _____
     Charles W. Haubiel II
Title:   Executive Vice President,
          Chief Administrative Officer

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, HH-Laveen, LLC  by, Chris Hinkson  its MANAGER  who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said company, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Scottsdale, Arizona this 21st day of March , 2013.

LAURA J. DE RITO
Notary Public, State of Arizona
Maricopa County
My Commission Expires
September 20, 2016

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President, Chief Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 20th day of March , 2013.

_____
Notary Public

Courteney Robertson
Notary Public, State of Ohio
My Commission Expires 08/22/2016

31



EXHIBIT A

SITE PLAN OF SHOPPING CENTER





Laveen Village



HINKSON COMPANY, LLC

January 15, 2013

No Change Area =

# EXHIBIT A- 1

## TENANT'S PLANS AND SPECIFICATIONS

Sixteen (16) pages attached.



# BIG LOTS!

**BIG LOTS STORES, INC.**
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

## MATERIALS AND EQUIPMENT SCHEDULE

| Product | Supplied by | Installed by | Vendor and Contact Information | Manufacturer & Model Number |
|---|---|---|---|---|

## CODE INFORMATION

**1. APPLICABLE CODES:**
- BUILDING
- LIFE/HEALTH
- ELECTRICAL
- PLUMBING
- FIRE
- ACCESSIBILITY

**2. BUILDING DESCRIPTION:**

**3. BUILDING AREA:**

**4. OCCUPANT LOAD:**

**5. PLUMBING FIXTURES:**

## STORE ADDRESS:

BIG LOTS STORE #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

## BUILDING AREA:

| | | |
|---|---|---|
| TOTAL SALES | | 22,185 |
| (FURNITURE SALES 3,196 | | |
| OTHER | | 1,739 |
| STOCKROOM | | 6,637 |
| GROSS TOTAL AREA | | 30,561 |

## SITE PLAN

## DEVELOPMENT CONTACTS

CITY BUILDING DEPT.

## ISSUE DATES

PERMIT
BID
CONSTRUCTION

## NOTES

## DRAWING PAGE AND TITLE

- T-1    TITLE PAGE

**ARCHITECTURAL**
- D-1    DEMO PLAN
- A-1    CONSTRUCTION PLAN
- A-1.1  CONSTRUCTION NOTES
- A-2    FIXTURE PLAN
- A-3    REFLECTED CEILING PLAN
- FP-1   FIRE ALARM PLAN

**ELECTRICAL**
- E-1    ELECTRICAL PLAN
- E-2    ELECTRICAL NOTES
- E-3    EMS NOTES
- E-4    EMS SPECIFICATIONS
- E-5    EMS LIGHTING CONTROL PANEL
- E-6    LIGHTING PLAN

**MECHANICAL**
- M-1    MECHANICAL PLAN
- M-2    MECHANICAL NOTES
- M-3    MECHANICAL DEMO

## TITLE PAGE



| | |
|---|---|
| **BIG LOTS STORES, INC.** STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6800 | **DATE DRAWN:** 3-4-13 **DRAWN BY:** bns **SCALE:** 3/32"=1'-0" |
| **SQUARE FOOTAGE** SALES: 22,185 (INCLUDES FURNITURE DEPT.) TOTAL: 30,561 | **BIG LOTS #** BASELINE VILLAGE CENTER 3630 WEST BASELINE RD. PHOENIX, AZ 85040 |

| DATE | REVISIONS |
|---|---|

**SHEET:** T-1



DEMOLITION PLAN

DEMOLITION LEGEND

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

SQUARE FOOTAGE
SALES: 22,165
TOTAL: 30,561

D-1





CONSTRUCTION NOTES

DOOR SCHEDULE

ROOM FINISH SCHEDULE

INTERIOR FINISH LEGEND

EXTERIOR FINISH SCHEDULE

SHEET:
A-1.1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN:
3-4-13
DRAWN BY:
bwg
SCALE:
3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 22,185
(INCLUDES FURNITURE DEPT.)
TOTAL: 30,561

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

DATE    REVISION

ATTENTION FIXTURE INSTALLER

FIXTURE NOTES:

1.) 12' GONDOLA RUN AT THE SERVICE COUNTER TO HAVE (7) 22" DEEP BASE DECKS, (3) SHEETS OF 46"-6" PEGBOARD ONE ON EACH SIDE PER 4' SECTION.

2.) 72' GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (3) SHEETS OF PEGBOARD OF 46"-6", ONE ON EACH SIDE PER 4' SECTION.

3.) 48" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (3) SHEETS OF PEGBOARD, (2) 46"-6" & (1) 46"-6", ONE ON EACH SIDE PER 4' SECTION, (2) BASE END TRIMS & (2) UPRITE END TRIMS.

4.) 48" GONDOLA RUNS TO HAVE 22" BASE DECKS, 51" UPRITES, (3) SHEETS OF PEGBOARD OF 46"-6", ONE ON EACH SIDE PER 4' SECTION (2) BASE END TRIMS & (2) UPRITE END TRIMS.

5.) 54" WALLCASE RUNS HAVE 15" DEEP BASE DECKS, (3) SHEETS OF 46" x 48" PEGBOARD, ONE ON EACH SIDE PER 4' SECTION.





FIXTURE PLAN



BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN: 2-6-13
DRAWN BY: 3rd
SCALE: 3/32" = 1'-0"

SQUARE FOOTAGE
SALES: 22,185
TOTAL: 30,561

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

DATE | REVISION

SHEET A-2



REFLECTED CEILING PLAN

SHEET A-3



| BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIP ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6800 | DATE DRAWN 3-4-13 DRAWN BY: bnd SCALE: 3/32" = 1'-0" | SQUARE FOOTAGE SALES: 22,185 (INCLUDES FURNITURE DEPT.) TOTAL: 30,561 | BIG LOTS # BASELINE VILLAGE CENTER 3630 WEST BASELINE RD. PHOENIX, AZ 85040 | DATE: | REVISION |



## Big Lots New Store FA System Requirements

FA System Information Contact:
Michael Post (614) 278-6465, mpost@biglots.com

### Fire Alarm Statement

**FIRE ALARM PLAN**

**SHEET FP-1**



| | | | |
|---|---|---|---|
| BIG LOTS STORES, INC. | DATE DRAWN | SQUARE FOOTAGE | BIG LOTS # |
| STORE PLANNING DEPT. | | | BASELINE VILLAGE CENTER |
| 300 PHILLIPI ROAD | DRAWN BY: | SALES: 22,185 | 3630 WEST BASELINE RD. |
| COLUMBUS, OHIO 43228 | | | PHOENIX, AZ 85040 |
| PHONE: (614) 278-6800 | SCALE: | TOTAL: 30,661 | |

| DATE | REVISION |
|---|---|
| | |

















ELECTRIC NOTES

SHEET
E-2

| BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIP ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6600 | DATE DRAWN: 3-4-13 | SQUARE FOOTAGE | BIG LOTS # | DATE | REVISION |
|---|---|---|---|---|---|
| | DRAWN BY: | SALES: 22,185 | BASELINE VILLAGE CENTER | | |
| | SCALE: 3/32" = 1'-0" | TOTAL: 30,661 | 3650 WEST BASELINE RD. PHOENIX, AZ 85040 | | |

## DEVICE SCHEDULE

## INSTALLATION RESPONSIBILITIES

## NOTES

## CABLE SCHEDULE

## GENERAL EMS CONSTRUCTION NOTES:

## GENERAL LV CABLE INSTALLATION INSTRUCTIONS

## INSTALLATION SUMMARY

## GENERAL NON-EMS CONTROLS NOTES:

## MULTIPLE SEGMENT EXAMPLE





EMS NOTES

E-3

BIG LOTS STORES, INC
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

SQUARE FOOTAGE
SALES: 22,185
(INCLUDES FURNITURE DEPT.)
TOTAL: 30,561

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

DATE DRAWN:
DRAWN BY:
SCALE:



EMS SPECIFICATIONS

| | | | | | |
|---|---|---|---|---|---|
| **BIG LOTS!** | BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6800 | DATE DRAWN: 3-4-13 | SQUARE FOOTAGE | BIG LOTS # BASELINE VILLAGE CENTER 3630 WEST BASELINE RD. PHOENIX, AZ 85040 | DATE | REVISION |
| | | DRAWN BY: SHB | SALES: 22,185 | | | |
| SHEET: E-4 | | SCALE: | TOTAL: 30,561 | | | |





EMS LIGHTING CONTROL PANEL PLAN

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

| DATE DRAWN: 3-4-13 |
| DRAWN BY: tmf |
| SCALE: |

SQUARE FOOTAGE
SALES: 22,185
(includes Furniture Dept.)
TOTAL: 30,561

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

SHEET:
E-5





MECHANICAL PLANS TO BE
COMPLETED BY LANDLORDS
ENGINEERS AND TO BE
APPROVED BY TENANT

MECHANICAL PLAN

M-1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

| DATE DRAWN: | SQUARE FOOTAGE | BIG LOTS # |
|---|---|---|
| 3-4-15 | | BASELINE VILLAGE CENTER |
| DRAWN BY: | SALES: 22,185 | 3630 WEST BASELINE RD. |
| bmd | INCLUDES FURNITURE DEPT | PHOENIX, AZ 85040 |
| SCALE: | | |
| 3/32" = 1'-0" | TOTAL: 30,561 | |





MECHANICAL PLANS TO BE
COMPLETED BY LANDLORDS
ENGINEERS AND TO BE
APPROVED BY TENANT

MECHANICAL DEMOLITION PLAN

SHEET
M-D

BIG
LOTS!

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN:
3-4-13
DRAWN BY:
kmd
SCALE:
3/32" = 1'-0"

SQUARE FOOTAGE

SALES: 22,185
(INCLUDING FURNITURE DEPT.)

TOTAL: 30,561

BIG LOTS #
BASELINE VILLAGE CENTER
3630 WEST BASELINE RD.
PHOENIX, AZ 85040

DATE   REVISION

# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MARICOPA, STATE OF ARIZONA AND IS DESCRIBED AS FOLLOWS:

Lots 1 through 5, inclusive, Laveen Village Center, according to Book 954 of Maps, Page 23, records of Maricopa County, Arizona.

# EXHIBIT C

## LANDLORD'S WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative. As clarification to this Exhibit C, Tenant's plans are attached to the Lease as Exhibit A-1 and any discrepancies between the Exhibit C and Tenant's Plans shall be resolved by Tenant's Plans controlling.**

**STOREFRONT:**  The exterior storefront will have an "ANCHOR" type façade and canopy acceptable to Tenant. The canopy and building fascia shall be repaired and painted (Sherwin Williams #SW6350 Intricate Ivory for the building, fascia, canopies, etc. (if allowed by governing authority) & existing color for the trim, columns, copings, etc.) per Tenant's specifications. The landlord will provide a vestibule entrance with a minimum of 48' feet of glass storefront including four (4) sets of bi-part, fully automatic, sliding doors (NABCO GT-1175) that meet ADA, ANSI and AHJ requirements. The vestibule will have new commercial grade floor tile (AZROCK #SR190 slip retardant) per Tenant's specifications and adequate HVAC. The landlord will ensure that there are curb cuts within reasonable proximity to the storefront.

**DOORS:**  All doors and door systems (exterior and overhead included) to be sound, secure, in good working condition adequate for Tenant's use and in compliance with ADA, ANSI and AHJ requirements. All doors are to have weather stripping, thresholds, and be sealed to prevent outside elements from entering the building.

**WALLS:**  All interior walls will be smooth, spackled, sanded and painted per Tenant's specifications (side walls to be painted with Sherwin Williams #SW6385 Dover White gloss, front and rear walls to be painted with Sherwin Williams #SW6 Tricom Black).

**GLASS:**  The landlord will replace all broken or damaged glass, and storefront mullions (mullions to be clear aluminum or dark bronze finish). Remove all materials blocking or covering windows and glass doors.

**UTILITIES:**  The Landlord will provide separate utilities and provide separate meters adequate for Tenant's intended use. The Tenant will have a minimum of 800 amps for 208v service or 600 amps for 480v service and will include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. Landlord shall install Tenant's Energy Management System (EMS) that will be supplied by Tenant. The Landlord will also provide Tenant with assurance that utilities adequate for Tenant's use are available and include legal access across other properties if necessary to serve the Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage.

**HVAC & EQUIPMENT:** The Landlord will provide a minimum of one ton per 300 square feet of new HVAC throughout the sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. All mechanicals will meet ASHREA standard and comply with all state and local codes. All mechanical designs shall be submitted to Tenant's engineering and construction departments for review and approval two weeks prior to applying for permits. All HVAC units will be replaced with new concentric units (unless otherwise specified by a Big Lots HVAC/Energy representative) if the existing are ten (10) years or older. New units shall be either Carrier or Trane and no larger than 10-20 tons each. Landlord is required to either install new or modify existing ducting from units in order to serve sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. Big Lots will inherit all manufacturers warranties.

**PLUMBING, ELECTRICAL, SPRINKLER &: FIRE SYSTEMS:**  All plumbing, electrical, mechanical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other Tenants throughout the Original Term and Options, Terms or Extensions. The Landlord shall install any device(s) or system(s) for the suppression, detection or reporting of fire as required by Authority Having Jurisdiction (AHJ). All devices and systems installed for the suppression, detection or reporting of fire shall be in compliance with all applicable National, State and Local codes including backflow preventer devices. The fire alarm system will meet the requirements for monitoring by Tenant's contractor and Tenant to approve the fire alarm plans prior to installation of equipment to verify panel compatibility and coordinate monitoring.

If a sprinkler system does not exist, the Landlord will install a sprinkler system at its sole cost and expense if required by code. If code does not require a sprinkler system, the Landlord will install, at its sole cost and expense, a smoke detection system that is to be monitored by the Tenant and any other device required by code.

**INTERIOR LIGHTING:** Landlord to install and new energy efficient 8' florescent strip lighting and circuits per Tenant's specifications. Lighting fixtures to be used are 8' strip - 4 lamp tandem 4' T8 with electronic ballasts. Lighting fixtures are to run side-to-side in continuous rows with 10' spacing including a perimeter row of lighting. The perimeter lighting is to be installed within 4'-6' off the front, back and side walls running parallel to the walls and within 2'-3' of the end of the fixture runs. The back row of the perimeter lighting is to extend past the rows of lighting on each side wall.   Lighting in the stockroom should be a maximum height of 16' and a minimum height of 12'. Stockroom lighting fixtures to be 12' on center. Lamp color for the lighting fixtures is to be #841 with 30 watt capacity.

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot.  All exterior lighting is to be on a separately metered house panel in the Landlord's name.

**FLOORING:** The Landlord will remove the existing floor covering, fill channels in floors and install new commercial grade VCT AZROCK #V-862 floor tile throughout the sales floor, offices, restrooms and vestibule. The Landlord will remove any hazardous materials from tiles, mastic, and any other flooring materials. The stockroom floor will be smooth, level and at the same elevation throughout entire area and will be sealed concrete.

**ROOF:** The roof will be professionally inspected and certified to be in good condition and free of leaks. Repairs per inspection shall be made prior to possession.

**CEILING:** Open deck to be insulated and painted per Big Lots specs. The Landlord will paint the interior open deck including but not limited to all roof decking, bar joists and duck work per Tenant's specifications.

**OFFICES, RESTROOMS & LOUNGE:** The Landlord will provide Tenant with three offices, one lounge, and a minimum of two restrooms to Tenant's specifications and in compliance with all applicable local and state codes and ADA requirements. Restrooms fixtures will be new and will have a minimum of three commodes in the women's and two commodes and a urinal in the men's. Rest rooms shall include baby changing stations, and electric hand dryers. Additionally, drinking fountains, mop sink and utility closet will be located per Tenant's plans. Offices, lounge and restrooms will have adequate HVAC, new ceiling, floor tiles, electrical, plumbing, lighting, sinks, fixtures, partitions, FRP board, etc. Restrooms to have floor covering that meet code requirements for premises with the sale of food. The cash office and count room will have a solid plywood ceiling of a minimum 1/2" thickness.

**STOCKROOM WALL:** The Landlord will install a new stockroom wall with two pairs of 3'0 x 7'0 doors to stockroom wall which are to be located and constructed per Tenant's specifications.

**RECEIVING AREA:** The loading docks will be 48" high and in good working order (including all seals, bumpers, bollards, doors, etc.).  The truck/trailer area will be level. If a loading dock does not exist, the Landlord will install, per Tenant's specifications, new weather protected receiving area which shall include new receiving doors, 3 walls, adequately lighted, a roof canopy (minimum height 14') that extends 4' feet beyond the installed concrete pad with steel bollards. The width of the covered receiving area will be no less than 10' feet. The Tenant will have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**STRUCTURE & BUILDING:** The Landlord will make any and all repairs/replacement to the building structure as necessary. This will include all existing brick/masonry block and mortar. The exterior walls will also be treated as necessary to ensure the Demised Premises is free of leaks. The Landlord will also install new gutters and downspouts on the building as necessary.

**PARKING LOT:** Parking lot shall be good condition - paved, patched, sealed and striped with potholes, cracks and uneven areas resurfaced – adequate for customer parking and Tenant's use.

**PESTS:** Premises to be professionally inspected for pestilence and termites. The Tenant is to be provided with a certified report that the Demised Premises is pest free. Otherwise, the Landlord will make the space pest free.

**CART CORRAL:**    Landlord to install cart corral in the parking lot area in front of the Demised Premises or in reasonable proximity thereto.

**SIGNAGE:**    The Tenant will have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the future pylon(s). The Landlord will ensure any future pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. The Landlord will provide a rendering of the future pylon sign(s) highlighting Tenant's panel position. Landlord to ensure that the pylon(s) is properly wired maintained and constructed. Landlord will deliver pylon(s) fully operational. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position. The Tenant will have marquee signage on the pylon. If no pylon is available, the Landlord will erect a pylon per all city/county codes and ordinances.

**DRAWINGS:**    The Landlord will provide the Tenant with a complete set of "as-built" and AutoCAD drawings of the Demised Premises adequate for Tenant to prepare Tenant's Plans and Specifications. The Tenant will approve all construction drawings prepared by Landlord prior to Landlord's submission for permits and the commencement of Landlord's Work. Upon fully executing a lease document, the Landlord will also supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress.

**HAZ MATS:**    The Landlord is responsible for remediation of any and all hazardous material. The Landlord will provide the Tenant with an asbestos inspection report of the Demised Premises including roof, prior to lease execution. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:**    The Landlord agrees that the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Furthermore, the building structure shall meet governmental and local codes including current seismic requirements if applicable. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to, sprinkler certification completed within the last 60 days, roof report and HVAC report evidencing all repairs have been completed, and pest inspection report, prior to Tenant's possession.

**POSSESSION DATE:**    All above work will be completed before the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**



# BIGLOTS!

## EXTERIOR SIGNING

## SPECIFICATIONS

If you need additional information that
is not contained in this packet contact:

**BIGLOTS!** Store Planning Department:

Michael Neu - 614-278-6868
Mike Stiles - 614-278-6805

## HORIZONTAL LOGO

## INDIVIDUAL LED ILLUMINATED
## REVERSE CHANNEL LETTER SET



| A | B | C | D | E | Area |
|---|---|---|---|---|---|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

## STACKED LOGO
## INDIVIDUAL LED ILLUMINATED
## REVERSE CHANNEL LETTER SET



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|---|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |





# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet



 **BIG LOTS AND TRADE MARK**
100% BLACK

 **EXCLAMATION**
PANTONE 021 ORANGE

11/2000

# EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



**Signs to be substantially similar in size and nature

# EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



## EXHIBIT E

## COMPLETION OF LANDLORD'S WORK LETTER

**Date**: _____

**To**:  _____ (insert Tenant)
      via facsimile:  (614) 278-6546

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE**: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You.

**LANDLORD:**

_____
a _____


By: _____
Title: _____


**TENANT:**

**PNS STORES, INC., a California corporation**


By: _____
Title: _____

## EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use except as set forth below:**

### Boston Nails

**USE:** Solely for Nail Salon and for no other purpose

**EXCLUSIVES:** Accordingly, Tenant shall use the entire Premises continuously and without interruption solely for the Permitted use of the Premises under the Trade Name. (Article 7)

### Federicos Mexican Restaurant

**USE:** Solely for a Quick Serve Mexican Restaurant (hereinafter defined) and for no other purpose. A "Quick Service Mexican Restaurant" is a non-waiter/waitress served restaurant, that includes a drive through window, specializing in servicing Mexican cuisine such as tacos, burritos, enchiladas and the like, where more than fifty percent (50%) of the sales are related to Mexican cuisine, and where customers order their meals at a counter either for consumption within the restaurant or "to go" to be consumed off-Premises. No alcoholic beverages may be served on the Premises, either for the consumption on or off-Premises. (Section 1.6)

**EXCLUSIVE USE:** So long as (i) Tenant is operating a Quick Service Mexican Restaurant at the Premises under the trade name "Federico's Mexican Restaurant" in accordance with the terms of this Lease, and (ii) Tenant is not in default under this Lease, Landlord shall not enter into any other leases of the Shopping Center (excluding outparcels) for the operation of a Quick Service Mexican Restaurant (the "Restrictive Covenant" and such restaurants which are restricted pursuant to the foregoing Restricted Covenant being referred to herin as "Restricted Restaurants"). (Section 23.21)

### Kelly Adams Photography

**USE:**  The operation of a retail photography studio

**EXCLUSIVE USE:** Landlord will include a provision in each lease entered into by Landlord after the date of this Lease that will restrict each tenant from conducting as its primary business at the Shopping Center a retail photography studio. (Article 4.7)

### Kumon Math and Reading Center

**USE:**  Kumon Math & Reading Center and all uses incidental thereto

**EXCLUSIVE USE:**  No Exclusive Use. Nothing contained in this Lease shall be deemed to give Tenant an express or implied exclusive right to operate any particular type of business in the Shopping Center. (Section 23.21)

### Lee's Black Belt Academy

**USE:**  Martial Arts Instruction

**EXCLUSIVE USE:** No Exclusive Use. Landlord hereby agrees that it shall not, after the date of this Lease, and until Tenant is no longer operating in the Premises as a martial arts studio as permitted under this Lease, enter into a new lease with another tenant in the Shopping Center which permits such other tenant to engage in martial arts instruction as its primary business. (Section 23.21)

**99¢ Only Stores**

**EXCLUSIVE USE:** TENANT shall have the exclusive right to operate a general merchandise retail store that offers substantially all (i.e., more than 80%) of its merchandise for sale at price points of Five Dollars ($5.00) (the "UPPER EXCLUSIVITY PRICE POINT") (which amount, for purposes of TENANT'S exclusivity, shall be adjusted as provided hereinbelow) or less within the SHOPPING CENTER, provided that the foregoing exclusive shall not apply to (i) any merchandise discount stores being operated within the SHOPPING CENTER upon the EFFECTIVE DATE, but if any existing tenant desires to change its use to a use which violates the foregoing exclusive and LANDLORD'S consent thereto is required, LANDLORD shall withhold consent, (ii) Big Lots or any affiliate of Big Lots that controls (as defined in Article 9 below), is controlled by, or is under common control with Big Lots, or (iii) the sales of "soft goods" (i.e., clothing or linens); provided, further, however, that TENANT'S exclusive rights set forth in this Section 5.07(a) shall not be diminished as a result of TENANT'S failure to operate a general merchandise retail store that offers at least 80% of its merchandise for sale at price points below the UPPER EXCLUSIVITY PRICE POINT.

**Big 5 Sporting Goods:**

EXCLUSIVE USE: Landlord hereby grants to Tenant the exclusive right to sell sporting goods items (including athletic apparel and footwear) in the Shopping Center ("Tenant's Sporting Goods Exclusive"). Notwithstanding the foregoing, Tenant's Sporting Goods Exclusive shall not apply to (a) the operation of one (1) (but no more than one [1]) specialty bicycle store of up to two thousand (2,000) square feet selling only bicycles, bicycle equipment and bicycle accessories, (b) a store operating under the tradename "Payless Shoe Source" of up to five thousand (5,000) square feet, and (c) the Incidental Sales of sporting goods items by other tenants in the Shopping Center. Tenant acknowledges and agrees that neither, a toy store nor a pool supply store, are prohibited by this Section 5.6.1, provided that the sale of sporting goods items is limited to Incidental Sale. "Incidental Sales" shall mean sales of items otherwise subject to Tenant's Sporting Goods Exclusive which are incidental (defined as not more than 10% of the gross sales from such tenant's premises) to a tenant's primary use.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and PNS STORES, INC., a California corporation, ("Tenant").

        Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.      Demised Premises: (Section 1.D.) = _____.

2.      A.     Fixed Minimum Rent – Original Term (Section 5.A.):
            _____ annually; _____ per month.

3.      A.     Fixed Minimum Rent – First Option (Section 5.A.):
            _____ annually; _____ per month.

4.      A.     Fixed Minimum Rent – Second Option (Section 5.A.):
            _____ annually; _____ per month.

5.      A.     Fixed Minimum Rent – Third Option (Section 5.A.):
            _____ annually; _____ per month.

6.      A.     Fixed Minimum Rent – Fourth Option (Section 5.A.):
            _____ annually; _____ per month.

**EXHIBIT H**

**SNDA**


Five (5) pages attached.

SNDA FORM

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made and entered into this ____ day of _____, 201_, by and between _____ ("Lender"). _____ ("Landlord") and PNS STORES, INC., a California corporation ("Tenant"). As used in this Agreement, the word "Tenant" shall mean Tenant and any subsequent holder or holders of any interest in the Lease hereinafter described (provided that the interest of such holder is acquired in accordance with the terms and provisions of the Lease), the word "Landlord" shall mean Landlord and any subsequent party acquiring title to the Property hereinafter described from Landlord, and the word "Lender" shall mean Lender or any subsequent holder or holders of the Mortgage hereinafter described or any party acquiring title to the Property by purchase at a foreclosure sale or by deed in lieu of foreclosure.

### WITNESSETH:

(a) Tenant has entered into that certain Lease (the "Lease") dated _____, with Landlord, covering certain premises located within that certain property located at _____ Shopping Center, _____, _____, and more particularly described in Exhibit A hereto (the "Property"); and

(b) Lender has made a loan to Landlord as evidenced and secured by that certain Mortgage or Deed of Trust recorded _____, in Book _____ beginning at Page _____ (the "Mortgage") in the real property records of ___ ___ County, _____, encumbering the Property described in Exhibit A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid Property, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. The Lease now is and shall at all times continue to be, subject and subordinate in each and every respect to the lien of and security interest created by the Mortgage and to any and all renewals, extensions, modifications, substitutions or replacement thereof. Notwithstanding that Landlord has assigned all of its rights under the Lease to Lender as security for a loan, Lender shall not be liable for any of the obligations of Landlord to Tenant under the Lease unless and until Lender has obtained title to the Property by foreclosure or deed in lieu of foreclosure and, then, only to the extent herein provided.

2. Nondisturbance. So long as no default exists under the Lease or this Agreement beyond any applicable grace or cure period, the Lease shall not be terminated, nor shall Tenant's possession of the premises demised under the Lease or other rights and options thereunder be disturbed in any foreclosure action or proceeding instituted under or in connection with the Mortgage unless such right would have existed if the Mortgage had not been made.

Lender will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest and estate under the Lease because of any default under the Mortgage: provided, however, that Lender may join Tenant as a party if joinder is necessary under any applicable statute or law to secure the remedies available to Lender under the Mortgage, but joinder shall be for that purpose, only, and not for the purpose of terminating the Lease or affecting Tenant's right to possession of the Property demised by the Lease, and Lender shall reimburse Tenant for Tenant's reasonable attorneys fees and court costs, if any, incurred in connection therewith, on a monthly basis.

3. Attornment. If the interest of Landlord under the Lease shall be transferred to (a) Lender or its nominee or designee, (b) any assignee or transferee from Lender or its nominee or designee, or (c) any other person or entity as may become the owner of Landlord's interest by purchase at foreclosure or by deed in lieu of foreclosure or otherwise (any such party described in clause (a), (b) or (c) above, the "Successor Landlord"), Tenant shall be bound to Successor Landlord under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, with the same force and effect as if Successor Landlord were the Landlord under the Lease, provided that the provisions of the Mortgage shall govern with respect to the disposition of any casualty insurance proceeds or condemnation awards.

No Successor Landlord shall be: (a) liable for any act or omission of any prior Landlord; (b) subject to any offset, or counterclaims which Tenant might have against any prior Landlord, except that Successor Landlord shall be subject to counterclaims, of offsets accruing in and applicable to the period after Successor Landlord obtains possession of the Lease portion of the Property; (c) bound by any amendment, modification or cancellation of the Lease which may result in (i) a reduction in rent or other sums payable under the Lease; (ii) reducing or extending the term of the Lease (iii) modifying the permitted uses; or (iv) reducing a Tenant's obligation s to comply with laws (hereinafter defined as having a "Material Impact")

upon the leasehold obligations made without Lender's prior written consent, which consent the Landlord shall have the sole responsibility to obtain.

4 Landlord, Tenant and Lender agree that after Lender gives notice to Tenant stating that a default has occurred under the Mortgage or under the loan documents delivered in connection with the Mortgage and that rent under the Lease should be paid to lender, Tenant will pay to Lender, or in accordance with the directions of lender, as and when due, all rent, additional rent and other monies due and to become due to Landlord under the Lease, except that Tenant's obligation hereunder to make all payments to Lender shall be conditioned upon Tenant's prior receipt of a written undertaking by Lender to indemnify, defend and hold Tenant harmless against the claim of such other party or parties. The foregoing notwithstanding, Tenant shall have no obligation to pay to Lender the rents or other charges due under the Lease during the pendency of any writ, order or injunction of any court, or the automatic stay of proceedings imposed under federal bankruptcy law in any bankruptcy proceeding in which Landlord is the debtor.

5.This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. If Lender assigns the Mortgage, then, upon delivery to Tenant of written notice thereof accompanied by the assignee's written assumption of all obligations under this Agreement, all liability of the assignor shall terminate.

6.If any party to this Agreement is a corporation or partnership, all individuals executing this Agreement on behalf of a corporation or partnership represent and warrant that they are authorized to execute and deliver this Agreement on behalf of the corporation or partnership, as the case may be, and that this Agreement is binding upon the corporation or partnership.

7.If Lender is a federally-insured depository institution, Lender certifies to Tenant that this Agreement has been approved by the board of directors or the loan committee of Lender, which approval is reflected in the minutes of said board or committee, and further undertakes to continuously maintain this Agreement as part of Lender's official records.

8 All notices required herein shall be delivered to Tenant, Landlord and/or Lender at the following addresses:

If to Tenant:PNS Stores, Inc.
300 Phillipi Road
Columbus, OH 43228-5311
Attention: Manager, Lease Administration Dept. #10051
T (614) 278-6800
F (614) 278-6763

If to Lender: _____
_____
_____
_____
_____

If to Landlord:_____
_____
_____
_____
_____

Notice shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending a written notice by nationally recognized overnight courier service (with proof of receipt available), provided such notice is addressed to the applicable party at its respective address as set forth above.

9.This Agreement shall be null and void if a fully executed original counterpart is not returned to Tenant within thirty (30) days after its execution by Tenant.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

                                        TENANT

WITNESS:                                PNS STORES, INC., a California corporation

_____

By: _____
      Kevin Day
Its: Vice President

**LENDER:**

WITNESS:

_____

_____

_____

By: _____

Its. _____

**LANDLORD:**

WITNESS:

_____

_____

_____

By: _____

Its. _____

## TENANT

**STATE OF OHIO)**
        ) SS
**COUNTY OF FRANKLIN)**

On this _____ day of _____, 201_, before me, a Notary Public in and for said County and State, personally appeared Kevin Day, the Vice President of PNS Stores, Inc., a California corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and on oath acknowledged to me that he/she voluntarily executed the same in his/her authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he/she acted executed this instrument.

**WITNESS** my hand and official seal.

_____
Notary Public
My commission expires: _____
(Seal)

## LENDER

**STATE OF )**
        ) SS
**COUNTY OF )**

On this _____ day of _____, 201_, before me, a Notary Public in and for said County and State, personally appeared _____ , the _____ _____ of _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and on oath acknowledged to me that he/she voluntarily executed the same in his/her authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he/she acted executed this instrument.

**WITNESS** my hand and official seal.

_____
Notary Public
My commission expires: _____
(Seal)

**LANDLORD**

**STATE OF )**
                    ) SS
**COUNTY OF )**

On this _____ day of _____, 201__, before me, a Notary Public in and for said County and State, personally appeared _____, the _____ _____ of _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and on oath acknowledged to me that he/she voluntarily executed the same in his/her authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he/she acted executed this instrument.

**WITNESS** my hand and official seal.

_____
Notary Public
My commission expires: _____
(Seal)

EXHIBIT A

Legal Description