Exhibit "1"

# LEASE

This Lease, made effective this _5th_ day of ____April____, 1995, by and between____ _____B & B Cash Grocery Stores, Inc., a Florida corporation_____ with its business address at _____9330 Adamo Drive, Tampa, Florida 33619_____, LANDLORD, and Consolidated Stores Corporation, an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 80061, Columbus, Ohio 43228-0512.

## WITNESSETH:

**1. DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A. <u>Common Areas</u>: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan or otherwise leased to tenants from time to time, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center sign, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.

Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Such Common Areas shall be subject to the reasonable rules and regulations as are prescribed by Landlord from time to time. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas. Landlord shall not alter the parking area outlined in green on Exhibit A in a manner that would materially and adversely affect Tenant's business.

B. <u>Dates</u>:

1) The Tenant Possession Date shall be the date Landlord, after having substantially completed all construction required of him pursuant to Exhibit C, tenders possession of the Demised Premises to Tenant by written notice. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless construction pursuant to Exhibit C is substantially complete. Upon substantial completion of Landlord's Work, Tenant shall accept possession of the Demised Premises in "as is, where is" condition with all faults subject only to Landlord's obligations set forth in Paragraph 7 hereof and without warranty of any nature whatsoever. From and after the Tenant Possession Date, Tenant shall diligently pursue all improvements to the Demised Premises necessary for Tenant to open and operate its business, fully stocked and in a first-class manner in accordance with the terms and provisions of this Lease ("Tenant's Work"). Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person or any property as a result of any of the Tenant's Work or installations made in the Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk and prior to any early entry by Tenant, provide Landlord with proof of insurance coverages described in this Lease. As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Term Commencement Date.

2)    The Term Commencement Date shall be the earlier of (i) the date Tenant opens for business; or (ii) the 120th day after the date of this Lease or such extended period of time caused by a delay in Landlord delivering possession in accordance with Section 1(B)(3) below.

3)    If Landlord fails to deliver possession of the Demised Premises to Tenant by the sixtieth (60th) day after the date of this Lease, then Tenant as Tenant's exclusive remedy, may cancel this Lease by written notice to Landlord at any time thereafter until Landlord tenders possession of the Demised Premises to Tenant.

C.    <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1)    Exhibit A    -    Site Plan of Shopping Center

2)    Exhibit B    -    Legal Description of Shopping Center

3)    Exhibit C    -    Landlord Work

4)    Exhibit D    -    Tenant Sign Specification

5)    Exhibit E    -    Notice of Commencement

6)    Exhibit F    -    Sketch showing proposed widening of Florida Avenue

D.    <u>Demised Premises</u>: Being the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately _____27,907_____ square feet.

E.    <u>Shopping Center</u>: Landlord's Shopping Center is known as ____Bearss Plaza____ at the address _____14948 North Florida Avenue_____ in the State of_____ Florida_____, County of _Hillsborough_, and _33613-1626_ zip code.

## 2.    DEMISE:

Landlord, in consideration of the rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the term and for the use hereinafter provided. Landlord further grants to Tenant a non-exclusive license to use the Common Areas to be shared with the other Tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.    TERM:

A.    <u>Original Term</u>: The Original Term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, ____2001____. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be the "First Partial Lease Year." Tenant's obligations to pay rent shall commence on the Term Commencement Date.

B.    <u>Option to Extend Term</u>: So long as the Tenant is not in default under the terms of this Lease, Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term" and "Second Option Term". The First Option Term shall commence at the end of the Original Term of this Lease and the Second Option Term shall commence at the end of the First Option Term, each upon the same

terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the Original Term or the previous option term.

**4. USE AND OPERATION:**

Tenant covenants and agrees that the Demised Premises shall be used and occupied for the purpose of the retail sale of general merchandise. After the date of this Lease and thereafter during the term hereof so long as (i) Tenant is not in default hereunder, (ii) Tenant is open for business on an on-going basis (subject to temporary periods during which Tenant is closed due to remodeling or repairs after a casualty), and (iii) Tenant is conducting its business on the Demised Premises as a liquidator, close out store or dollar store, Landlord shall not enter into any lease for space in the Shopping Center with any other liquidator, close out store or dollar store operation ("Competing Business"). In the event of a breach of the foregoing covenant, Tenant, as Tenant's sole and exclusive remedy, shall pay in lieu of Guaranteed Minimum Rent, Percentage Rent and other charges payable hereunder (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Guaranteed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees to, operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and 1:30 P.M. to 5:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section 4 Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all liability hereunder accruing on or after the termination date, but Tenant shall remain fully liable for all obligations accruing prior to the termination date.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, or refuse (except that reasonable amounts may be kept temporarily in closed containers in the places directed by Landlord) from vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances. Tenant shall operate its business in compliance with all applicable laws, codes and governmental rules and regulations (collectively, the "Laws") and shall cause the Demised Premises (interior non-structural) at all times during the term hereof to comply with all Laws. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair; permit Tenant's agents, employees, customers or invitees to break the law or reasonable rules and regulations adopted by Landlord; do anything to damage, injure or interfere with Landlord, other tenants or occupants of the shopping center or their customers or invitees.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance

3

over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

**5.    RENT:**

From the Term Commencement Date and throughout the term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at,    B & B Cash Grocery Stores, a Florida corporation, P.O. Box 1808, Tampa, FL    33601 , or at such other place as Landlord may from time to time direct in writing, the following which are collectively referred to hereinafter as "Rent", all without setoff, demand, counter claim or abatement, except as specifically set forth herein, each installment of which Rent shall be supplemented to include all applicable sales and use taxes:

A.    Guaranteed Minimum Rent:  During the Original Term of this Lease, the sum of    $97,674.50  per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of    $8,139.54  .  The Guaranteed Minimum Rent for any partial month shall be prorated on the basis of a thirty (30) day month.

All the terms and conditions of this Lease shall apply during the option terms except that (1) each option to extend the term shall terminate unless timely and properly exercised; (2) the Guaranteed Minimum Rent applicable for the First Option Term shall be the sum of    $111,628.00  per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of    $9,302.33  .  The Guaranteed Minimum Rent applicable for the Second Option Term shall be the sum of    $125,581.50  per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each of every month in the amount of    $10,465.12  .

B.    Utilities Charge and Exterior Lighting:  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities.  In the event Landlord supplies any utility to Tenant, the rate charged for such service shall not exceed the applicable consumer rate which Tenant would otherwise pay as a direct customer of the public or municipal utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than forty-eight (48) consecutive hours as a result of the acts or gross negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs, Guaranteed Minimum Rent shall abate upon the expiration of such forty-eight (48) hour period until such services are fully restored.  All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof, or among Landlord's other remedies, such services may be discontinued.

C.    Percentage Rent:  In addition to the "Guaranteed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual gross sales and income, as hereinafter defined, which exceeds the annual base sum of_____    $3,906,980.00  during the Original Term;  $4,465,119.00  during the First Option Term; and  $5,023,260.00  during the Second Option Term.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of gross sales and income for the previous month. Tenant shall furnish to Landlord within sixty (60) days immediately following the end of each Lease Year, an accurate statement of the gross sales and income for such period, certified to by Tenant, and shall therewith pay to Landlord, any percentage rental then due at the percentage above stated.  Percentage rental

payments required to be made by Tenant under the terms of this Lease shall be made promptly when due. The term "gross sales and income" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises and (2) charges for all services rendered in or from the Demised Premises, and (3) all other income and receipts whatsoever of all business conducted at, on or from the Demised Premises including without limitation mail, telephone, facsimile and other orders received or filled at the Demised Premises, including all catalogue sales, deposits not refunded the purchasers, orders taken at the Demised Premises although filled elsewhere, gross receipts from vending and game machines, sale price of gift and merchandise certificates, and all other gross income or receipts from any business or operation at, on or from the Demised Premises. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees, licensees and concessionaires. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned for cash, (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks not to exceed two percent (2%) of gross sales; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; and (8) proceeds from vending machines located in the Demised Premises.

For the First Partial Lease Year, percentage rent shall be calculated using a formula with the numerator being the number of days in the Partial Lease Year and the denominator being 365 multiplied by the annual base sum during the term in which it falls. Tenant shall pay the amount by which two and one-half percent (2-1/2%) of Tenant's gross sales exceeds the product.

Should Tenant have opened for business during the month preceding the Term Commencement Date, the gross sales and income for the fractional month shall be added to the gross sales and income for the first month of this term, and the annual base sum shall be proportionately increased and the Percentage Rent paid thereon. Should this Lease expire or be sooner terminated leaving a fractional Lease Year, for purpose of computation of Percentage Rent payable hereunder, the annual base sum shall be proportionately reduced and Percentage Rent shall be paid thereon.

Tenant agrees to keep at its corporate offices books of account, in accordance with good accounting practice of the business conducted on said Demised Premises, accurately showing all gross sales and income. Landlord or its authorized agents may audit in accordance with generally accepted accounting principles the same at any reasonable time upon ten (10) days prior written notice, provided such right to audit shall be limited to one (1) time per Lease Year. Should Landlord's audit of Tenant's books and records disclose gross sales and income which are three percent (3%) or more greater than that reported by Tenant, then Tenant shall pay to Landlord on demand the reasonable cost of such audit and any Percentage Rent found to be due by such audit, plus interest at the rate of eighteen percent (18%) per annum from the date payment was due. Further, in the event Landlord's audit discloses gross sales and income of less than three percent (3%) than reported by Tenant, then Tenant shall pay to Landlord said amount plus interest at the rate of eighteen percent (18%) per annum from the date payment was due.

D.    Common Area Charges: Throughout the term of this Lease, Landlord shall be responsible for the following:

    (i)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by

occupants of the Shopping Center and/or their customers and invitees in the manner and condition that exist on the date of this Lease;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center in the manner and condition that exist on the date of this Lease;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs in the manner and condition that exist on the date of this Lease;

(iv) maintaining all paved surfaces in a reasonably level and smooth condition, reasonably free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(v) cleaning and sweeping as needed.

Such expenses shall include, but shall not be limited to, costs of management and supervision not to exceed ten percent (10%) of all other such expenses, refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, resurfacing, landscaping, providing security, providing public liability, property damage, fire and extended coverage on the common facilities and such other insurance as Landlord deems appropriate (including without limitation rental loss coverage), total compensation and benefits (including premiums for worker's compensation and other insurance) paid to on behalf of employees; personal property, supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, and parking area surcharges or levies.

Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges as set forth herein. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the ground leasable floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. Notwithstanding anything to the contrary contained herein, there shall be excluded from Common Area Charges the original capital costs of the Shopping Center and the original equipment serving the same. There shall also be excluded from the Common Area Charges the capital costs of improvements, replacements, additions, and alterations of the Common Areas, but such costs and expenses may be depreciated according to generally accepted accounting principles over the applicable useful lives, and such annual depreciation may be included in the Common Area Charges.

On the first day of each calendar month during the Original Term hereof, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to one-twelfth (1/12th) of the sum obtained by multiplying the leasable floor area of the Demised Premises by the sum of $.40. If the Term Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of Common Area Charges for the fractional month between the Term Commencement Date and the last day of the calendar month in which the Term Commencement Date occurs shall be prorated on a per diem basis (calculated on a thirty (30) day month) and shall be paid together with the first payment of Guaranteed Minimum Rent.

After the first Full Lease Year, Tenant shall continue to pay such estimated amount of Tenant's pro rata share of such Common Area Charges on the first day

of each month in advance without demand and without any setoff or deduction (except as specifically set forth herein) by the aforesaid estimated amount of Tenant's pro rata share of such Common Area Charges. Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, Landlord shall furnish to Tenant a written statement in reasonable detail covering the Common Area Charges just expired showing the total Common Area Charges for such Lease Year, the amount of Tenant's pro rata share thereof and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual invoices limited to items in excess of Five Thousand Dollars ($5,000.00) paid for such Common Area Charges as stated herein.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord ten (10) days' notice of its dissatisfaction, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books to be made by Tenant's accountants. If any such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next rental payments due from Tenant to Landlord hereunder.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder or otherwise indebted to Landlord, Landlord shall credit such excess against the next payments due for Common Area Charges; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, is not indebted to Landlord and has vacated in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Notwithstanding anything to the contrary contained herein, Tenant's contribution to Common Area Charges shall not exceed _____ $.40 ∧ per Lease Year during [per square foot] the Original Term; __$.50 Υ__ per Lease Year during the First Option Term; and ____$.60 Υ____ per Lease Year during the Second Option Term. [or pro rata portion thereof] [per square foot]

E.     Taxes and Assessments: Tenant shall pay its pro rata share of all real property taxes and assessments which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center. Tenant's pro rata share of real estate taxes and assessments shall be the product obtained by multiplying said taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. If the term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said real

estate taxes for the year shall be made to cover the fraction of a year included within the terms of this Lease.

The real estate taxes and assessments on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and expense of obtaining the same) to be payable with respect to the Shopping Center for such period. For any Partial Lease Year, the amount of real estate taxes and assessments shall be pro rated on a per diem basis.

Interest and/or penalties for late payment shall not be included in determining tax and assessment increases. Further, if a discount of said tax bills is available by prompt payment, Tenant's pro rata share of real estate taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

If Tenant deems any taxes, assessments, or charges payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, at no cost to Landlord, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all taxes, assessments, and charges, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay to Landlord on the first day of each calendar month during the term, its estimated monthly pro rata share of the taxes and assessments against the land and improvements in the Shopping Center, or against Landlord in respect thereof, based upon the actual amount of the last taxes and assessments which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. If the Term Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its prorata share of taxes and assessments for the fractional month between the Term Commencement Date and the last day of the calendar month in which the Term Commencement Date occurs shall be prorated on a per diem basis (calculated on a thirty (30) day month) and shall be paid together with the first payment of Guaranteed Minimum Rent. Tenant's pro rata share of such taxes shall be determined as provided in this Section 5(E). Landlord shall furnish Tenant with copies of actual tax bills when same are issued. An adjustment shall be made as soon as the actual taxes for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall pay for any deficiency within fifteen (15) days of receipt of Landlord's notice, and Landlord shall within thirty (30) days of receipt of the actual tax bill give credit for any overage.

Tenant shall pay when due and payable all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.     Tenant shall be entitled to an abatement of Guaranteed Minimum Rent, but not Percentage Rent, utilities charges, Common Areas charges or any other amounts provided for hereunder, for a period commencing on the Term Commencement Date and continuing for the number of days or fractional portion thereof equal to the amount (the "Guaranteed Minimum Rent Credit Amount") of the actual expenses incurred by Tenant in performing its renovation and fixturing of the

Demised Premises in accordance with the terms and provisions of this Lease as substantiated by invoices and receipts evidencing full payment thereof up to the maximum total amount of One Hundred Twelve Thousand Seven Hundred Dollars ($112,700.00), divided by the amount of Two Hundred Sixty-Seven and 50/100 Dollars ($267.50). The foregoing shall not be construed to relieve Tenant of any duties and obligations under this Lease, including without limitation the obligation to pay all Percentage Rent, Tenant's pro rata share of Common Area Charges, and Tenant's pro rata share of taxes and assessments throughout the entire Original Term, the First Option Term and the Second Option Term.

**6.    ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises, provided that such work shall not affect any the structural systems of the building of which they are a part, including without limitation electrical, plumbing, HVAC and structural support; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

If any construction or other liens shall be filed against the Demised Premises or any improvement thereon by reason of or arising out of any labor or material furnished or alleged to have been furnished or to be furnished to, or for Tenant at the property or for or by reason of any charges, alternations, or additions or the cost or expense thereof, or any contract relating hereto, or against Landlord as the owner thereof, Tenant shall within thirty (30) days after written notice from Landlord, either pay or bond the same or procure the discharge thereof in such manner as may be provided by law.

Notice is hereby given that Landlord shall not be liable for liens for any labor or materials or other liens incurred by Tenant, and no such liens shall attach to the reversionary or other estate or interest of Landlord in the Demised Premises. Tenant shall also defend on behalf of Landlord at Tenant's sole cost and expense, any action, suit or proceedings which may be brought thereon or for the enforcement of such lien or liens, and Tenant shall pay any damage and discharge any judgment entered thereon and save harmless Landlord from any claim or damage resulting therefrom.

**7.    MAINTENANCE AND REPAIRS:**

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost, damage or claim resulting from such breakage or the replacement thereof unless such damage is due to the negligence of Landlord.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the date of possession under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Tenant also agrees to keep the entrance to the Demised Premises in a clean and safe condition by removing snow and ice from the doorways. Tenant further agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary. Tenant, at Tenant's sole cost and expense, shall maintain a full service and parts maintenance contract for the air conditioning system with terms reasonably acceptable to Landlord.

Landlord agrees to keep or cause to be kept, repaired, replaced and maintained, at Landlord's sole cost and expense the roof, roof drains, exterior utility lines, and exterior

walls, exclusive of doors and windows during the term and will make required structural repairs to the building of which the Demised Premises are a part. Notwithstanding the foregoing, Tenant agrees to make and pay for all repairs of damage to the same caused by the act, omission, fault or negligence of Tenant, its agents, employees, contractors and invitees. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or to make repairs to Common Areas or those facilities required to be maintained by Landlord or to otherwise inspect the Demised Premises, provided the same does not substantially interfere with Tenant's operation.

Tenant shall provide written notice to Landlord of the need for repairs to the Demised Premises pursuant to the terms of this Lease. If Landlord fails to commence any necessary repairs within thirty (30) days after such notice and thereafter diligently complete such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency and if Landlord after receiving confirmation from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. In performing any such repairs pursuant to this Section 7, Tenant shall use reputable contractors and perform all such work in a first class and workmanlike manner in accordance with all applicable governmental codes, rules and regulations. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days after receiving a full accounting from Tenant, together with copies of invoices, receipts, and lien waivers, Tenant shall have the right to deduct such cost from the next monthly rent payment(s) owing.

## 8. SIGNS:

Tenant shall at its sole cost and expense  have the right to place, suffer or erect the signs, awnings, canopies or decorations on the exterior walls of the Demised Premises depicted on Exhibit D attached hereto and made a part hereof. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

Subject to applicable codes and ordinances, Tenant shall have the right to place suitable panels upon the existing Shopping Center pylon in the location of the existing U Save panels on such pylon sign. Tenant shall, at its own expense, obtain all necessary permits and comply with applicable local codes and ordinances. Once the pylon sign is installed Landlord shall not require Tenant to remove, replace change, or alter it and Landlord shall not remove, replace or diminish the size of Tenant's pylon sign.

During the Original Term, options or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 9. FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At all times while Tenant is not in default under the terms and conditions of this Lease, Tenant may replace such trade fixtures or equipment. Prior to the end of the term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or air conditioning, plumbing or electrical equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.

**10. GOVERNMENTAL REGULATIONS:**

If mandated by the appropriate governmental authority, Landlord agrees to bring the roof, structure and exterior portions of the Demised Premises into conformance with applicable code; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such mandate is the result of changes, alterations or additions made by Tenant.

**11. INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act of Landlord, or Landlord's servants and agents, or by failure of Landlord, or Landlord's servants and agents, to fulfill Landlord's obligations hereunder. Excluded from such indemnification shall be any consequential damages.

Landlord and Tenant agree to notify their respective fire and extended coverage insurance carrier of the indemnity and hold harmless agreement contained in this Section.

**12. INSURANCE:**

A.  <u>Liability</u>:  Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, including a contractual liability endorsement covering Tenant's indemnity obligations under this Lease, which insurance, shall include Landlord as an additional insured, as its interest may appear, in companies and in a form reasonably satisfactory to Landlord, with minimums of the following: (i) Five Hundred Thousand Dollars ($500,000.00) on account of bodily injuries to, or death of one person; (ii) One Million Dollars ($1,000,000.00) on account of bodily injuries to or death of more than one person as a result of any one accident or disaster; and (iii) with Two Hundred Fifty Thousand Dollars ($250,000.00) coverage for property damaged in an accident, and to deposit said certificates of coverage thereof with Landlord prior to the Tenant Possession Date.

Tenant also agrees to carry at its own expense, throughout this Lease workers' compensation insurance as required by statue, Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements, provided Tenant has a minimum net worth of Twenty Million Dollars ($20,000,000.00).

B.  <u>Insurance Premiums</u>:  Landlord has insured all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against loss or damage by fire and such other risks as are normally insurable under the standard form of fire insurance with broad form extended coverage endorsement, including malicious mischief and vandalism, in an amount not less than the full insurable value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.  All policies of insurance required hereunder shall require thirty (30) days' prior written notice of cancellation or modification.

Tenant will pay to Landlord on the first day of each calendar month during the term, its estimated pro rata share of premiums for all insurance with respect to the Shopping Center carried by Landlord to the extent not otherwise included in Common Area Charges.  Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the

Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center with the resulting percentage being Tenant's pro rata share. If the Term Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of insurance for the fractional month between the Term Commencement Date and the last day of the calendar month in which the Term Commencement Date occurs shall be prorated on a per diem basis (calculated on a thirty (30) day month) and shall be paid together with the first payment of Guaranteed Minimum Rent.

Upon request, Landlord shall furnish Tenant with copies of insurance premium bills. An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall pay for any deficiency within fifteen (15) days of receipt of an invoice therefore, and Landlord shall within thirty (30) days receipt of the actual premiums for the period give credit for any overage.

Tenant acknowledges that the Shopping Center is insured, together with additional properties owned by Landlord, under blanket insurance policies and that a portion of the premiums for such policies shall be allocated to the Shopping Center for purposes of determining Tenant's pro rata share thereof. Such allocation shall be made in a commercially reasonable manner such that the portion of such premiums allocated to the Shopping Center shall be competitive with premiums for insurance policies covering only the Shopping Center and no other properties.

13. **FIRE REBUILDING AND ALTERING:**

A.  Landlord shall at all times during the term of this Lease and in accordance with all provisions herein, carry fire, casualty, and extended coverage insurance on all the buildings and permanent improvements on the building.

B.  If the Demised Premises shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the term hereof, Landlord shall repair and restore the same to a good tenantable condition within a reasonable time. During such period of repair, the rent herein provided for in this Lease shall abate in proportion to the area of the Demised Premises rendered untenantable. Said abatement shall cease when Landlord has restored the Demised Premises to the condition in which Landlord is required to deliver same to Tenant. Notwithstanding anything in this Lease to the contrary, (i) Landlord shall have no responsibility for the repair or replacement of any furnishings, fixtures or other leasehold improvements belonging to or placed in or affixed to the Demised Premises by Tenant and no damage to or destruction of any such furnishings, fixtures or other leasehold improvements shall entitle Tenant to an abatement of rent; (ii) Tenant shall not be entitled to an abatement of rent for any damage or destruction of the Demised Premises resulting from the negligent acts or omissions or wilful misconduct of Tenant or Tenant's agents, employees or contractors.

C.  In the event the Demised Premises are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

D.  If the Demised Premises are damaged or destroyed during the last twelve (12) months of the Original Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, or in the event that the Demised Premises are substantially damaged or destroyed or rendered wholly untenantable at any time during the term Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days following such casualty. In the event this Lease is terminated, Landlord shall be entitled to its insurance proceeds.

**14.    FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing other than Tenant's obligation to pay all rent and other amounts to be paid by Tenant hereunder, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

**15.    INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.    WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; and (b) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the term provided in this Lease.

Tenant may obtain, at his own expense, a title insurance policy issued by a title insurance company acceptable to Tenant.  Landlord agrees to cooperate with Tenant in obtaining said policy by delivering, within seven (7) days after notification by Tenant or Tenant's title insurance company all title information in Landlord's possession relating to the Demised Premises.  Said title insurance policy shall insure Tenant in the amount of Five Hundred Thousand ($500,000.00) that good and marketable title to the Demised Premises is vested in the Landlord.  In the event said title insurance policy is not obtainable, then Tenant as its sole option may as Tenant's sole and exclusive remedy, by notice delivered to Landlord within ten (10) days of the date of this Lease, terminate this Lease, in which event this Lease shall be null and void and of no further force and effect.

**17.    QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that if Tenant shall not be in default beyond any period for the cure thereof, Tenant shall, at all times during the Original Term of this Lease and any options or extensions properly and timely exercised by Tenant, have peaceable and quiet enjoyment and possession of the Demised Premises.

**18.    MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien which shall be placed on the Demised Premises prior to the Tenant possession date shall enter into a subordination, non-disturbance and attornment agreement on terms mutually satisfactory within fifteen (15) days of the date of the execution of the mortgage by Landlord, which agreement shall provide, inter alia, that the mortgagee shall not disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.  Tenant agrees to subordinate Tenant's interest under this Lease to any mortgage lien placed on the Demised Premises after the Tenant possession date, provided that as a condition to such subordination Tenant and such mortgagee shall enter into a mutually satisfactory non-disturbance, subordination and attornment agreement on a commercially reasonable form which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.  If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the term remaining,

including any options or extensions, renewals, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement in writing satisfactory to Landlord or the holder of the mortgage, certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Guaranteed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the date that the Demised Premises were ready for occupancy and all conditions precedent to the Lease taking effect were satisfied or waived by Tenant; (iv) the dates on which Tenant accepted possession and Tenant's store opened for business; (v) the Tenant is occupying the Demised Premises; and (vi) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

19. **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the rent or other charges reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Landlord (provided that Landlord shall be obligated to deliver such notice no more than two times in any Lease Year and after two written notices in any Lease Year, Tenant shall be in default hereunder if any rent or other charges reserved herein or any installment thereof is not paid within ten (10) days of the applicable due date), or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord, then in any such event Landlord shall name the right to elect any one or more of the following remedies:

   A.   Landlord shall have the right, at its election, to cancel and terminate this Lease and to remove all persons and property therefrom by summary proceedings; provided, however, that any such termination of this Lease shall be at the option or election of the Landlord only, and such termination and cancellation shall not take effect unless the Landlord elects in writing that it shall. No such termination of this Lease shall relieve Tenant of any liability hereunder accruing prior to the date of termination.

   B.   Landlord shall have the right to collect each installment of Rent and all other charges hereunder as and when the same become due and payable.

   C.   Landlord shall have the right without termination of this Lease, upon written notice to Tenant, to terminate Tenant's right to possession and to enter upon the Demised Premises and dispossess the Tenant and to re-let the Demised Premises, or portions thereof, for the Tenant's account, for such periods of time and at such rentals, for such use and upon such covenants and conditions as Landlord may elect, applying the net rentals or avails of such letting first to the payment of Landlord's expenses in dispossessing the Tenant and the costs or expenses of making such repairs in the Demised Premises as may be necessary in order to enable the Landlord to re-let the same, and to the payment of any brokerage commissions or other necessary expenses of the Landlord in connection with such re-letting; and the balance, if any, shall be applied by the Landlord from time to time, on account of the payment due or payable by the Tenant hereunder, if any, with the right reserved to the Landlord to

bring such action or proceedings for the recovery of any deficits remaining unpaid as it may deem advisable from time to time, without being obliged to wait until the end of the term for a final determination of the Tenant's account. The commencement or maintenance of any one or more actions shall not bar the Landlord from bringing other or subsequent actions for further accruals pursuant to the provisions of this paragraph. Any balance remaining, however, after full payment and liquidation of the Landlord's accounts as aforesaid, shall be paid to the Tenant from time to time with the right reserved to the Landlord at any time to give notice in writing to the Tenant of Landlord's election to cancel and terminate this Lease and all of the Tenant's obligations under the Lease, and upon the giving of such notice and the simultaneous payment by Landlord to Tenant of any credit balance in Tenant's favor that may at the time be owing, it shall constitute a final and effective cancellation and termination of this Lease and the obligations under this Lease on the part of either party to the other. Notwithstanding the foregoing, Landlord shall have all remedies available to it by law or equity and choosing one remedy shall not preclude Landlord from other remedies.

## 20.  CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, both Landlord and Tenant shall have the right to cancel this Lease. In the event any part of the parking area of the Shopping Center is taken in condemnation proceedings so that the number of parking spaces in the Shopping Center is reduced below the requirements of the applicable building and zoning code(s), both Landlord and Tenant may shall have the right to cancel this Lease. In the event of a condemnation that does not result in the termination of this Lease, Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith; provided, however, that Landlord shall not be obligated to expend any amounts in excess of condemnation proceeds paid to Landlord. Rental shall abate in proportion to the extent that the Demised Premises are rendered untenantable during the restoration process. Thereafter, rental shall be reduced in proportion to the amount of space within the Demised Premises taken. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Tenant shall be entitled to pursue compensation for damages in separate actions brought by Tenant for Tenant's business losses and moving expenses only but not for losses of fixtures or Tenant improvements or the value of Tenant's leasehold estate or any other asset or interest.

Notwithstanding the foregoing, Tenant acknowledges and agrees that a portion of the Shopping Center depicted on Exhibit F attached hereto and made a part hereof is subject to a threatened condemnation action in connection with the proposed widening of State Road 685 (Florida Avenue). In the event of a taking of that portion of the Shopping Center shown on Exhibit F or in the event of a conveyance in lieu of condemnation of such portion of the Shopping Center, Tenant shall have no claim or rights whatsoever, including without limitation, any claim for damages or any rights to rent abatement or rent reduction.

## 21.  MUTUAL WAIVER OF SUBROGATION:

Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by and casualty or hazard, or in connection with property on or activities conducted on the Demised Premises or the Shopping Center and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof.

## 22.  ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease with Landlord's prior written consent which shall not unreasonably be withheld or delayed provided that the proposed subtenant or assignee

shall demonstrate financial strength equivalent to that of Tenant on the date of this Lease; No such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Any sublease shall provide that it is subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof.

**23.    SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, loss by fire, wind and ordinary wear and tear excepted.  Tenant agrees to remove all of its trade fixtures with the exception of lighting and other electrical fixtures, plumbing fixtures and heating, ventilating, and air conditioning equipment whether or not attached to the Demised Premises.

Should Tenant thereafter remain in possession or occupancy of any part of the Demised Premises or hold the keys, a tenancy shall be deemed to continue from month to month on the terms herein expressed, where applicable, but should the same occur without Landlord's consent, no tenancy of any duration shall be created and Tenant's use and occupancy fee while in possession of the Demised Premises shall be the Guaranteed Minimum Rent, plus all other charges due under this Lease, and percentage rent based on the twelve (12) months (or fraction thereof, if less than twelve (12) months of the lease term has elapsed) prior to the breach.

**24.    NOTICES:**

Whenever any demand, request, approval, consent or notice ("Notice") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) hand, (ii) a nationally recognized overnight express courier, or (iii) registered or certified mail return receipt requested.  The date of actual receipt shall be deemed the date of service of Notice.  In the event an addressee refuses to accept delivery, however, then Notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day in the case of delivery by overnight courier, or (iii) three (3) business days after mailing the Notice in the case of registered or certified mail.  Either party may, at any time, change its Notice address by giving the other party Notice, in accordance with the above, stating the change and setting forth the new address.

**25.    LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the laws of the State of _Florida_ .

**26.    BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

**27.    NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease in form and content reasonably acceptable to Landlord, which Tenant may record at its expense.  Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

**28.    REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled be paid a fee or commission in connection with the transaction contemplated by this Lease

16

other than Retail Realty Group, Inc. (the "Broker"). Landlord shall be solely responsible for paying the Broker's commission in accordance with the terms of a separate agreement by and between Landlord and Broker. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder other than the Broker, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29.    NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the rental herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.    HAZARDOUS MATERIAL:

Landlord represents and warrants that, to Landlord's present actual knowledge without any investigation whatsoever and except as disclosed in that certain Ground Water Investigation Report Number 91-03, North Florida Avenue PCE Contamination-Hillsborough County, prepared by the State of Florida Department of Environmental Regulation, Division of Waste Management, Bureau of Waste Cleanup, Site Investigation Section, by George E. Wiegand, P.G. and Shekhar R. Melkote, dated July, 1991 (the "Report"), the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which has been determined by state, federal or local governmental authority to pose a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. In the event that any remediation of the contamination described in the Report has a material, adverse effect on Tenant's business or the conduct thereof, Tenant shall be entitled to an abatement of Guaranteed Minimum Rent in proportion to the extent of such material, adverse effect; provided, however, in no event shall Tenant be entitled to any remedy or claim whatsoever based on the presence of such contamination in or about the Demised Premises or on the conduct thereof, except to the extent that the remediation of such contamination has a material, adverse effect on Tenant's business or the conduct thereof as provided above.

Throughout the Original Term of this Lease or any options or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. In all events, Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any release of hazardous materials from on or about the Demised Premises directly caused by Tenant or Tenant's agents, employees, or contractors while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

## 31.    TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord

or Tenant unless reduced to writing and signed by them. This Lease is not binding upon Tenant until it has been signed by Landlord's authorized officers and delivered to the Tenant.

32.    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is a year-end adjustment or an adjustment resulting from an error in the calculation of any additional rents payable by Tenant under the Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, tax charges or any charges to Tenant for electrical and heating and air conditioning service, which results in a deficiency owned by Tenant, Landlord shall notify Tenant of any deficiency within six (6) months after the expiration of the Lease Year in which such adjustments are applicable. If Landlord does not notify Tenant of such deficiency within said six (6) month period, Landlord's claim to such deficiency shall be deemed waived and discharged.

33.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and the delivery of an executed original copy thereof to Tenant.

34.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

35.    **EXCULPATION:**

Tenant agrees that it shall look solely to the estate and property of the Landlord in the land and buildings comprising the Shopping Center of which the Demised Premises are a part for the collection of any judgment (or any other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and performed by Landlord and no other property or estates of Landlord shall be subject levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies.

36.    **RADON DISCLOSURE:**

Section 404.056(8), Florida Statutes, requires the following disclosure statement:

"RADON GAS: Is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**IN TESTIMONY WHEREOF,** the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgement dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:          **LANDLORD:  B & B CASH GROCERY STORES, INC.**
                                    **a Florida corporation**

By: _Andrew Bever_

Title: _Executive Vice President_

18

Witnesses As To Tenant:

**TENANT: CONSOLIDATED STORES CORPORATION,**
    **an Ohio corporation**

By: _____
                Albert J. Bell

Title: _____ Senior Vice President _____

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, B+B Cash Grocery Stores, Inc. _____, by J. Andrew Bever _____, its Executive Vice President _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Tampa, Florida _____, this 5th _____ day of April _____, 19 95 .

_____
                Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

GARY W. JOHNSON
MY COMMISSION # CC314468 EXPIRES
October 4, 1997
BONDED THRU TROY FAIN INSURANCE, INC.

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation**, by **Albert J. Bell**, its **Senior Vice President** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at_____ Columbus, Ohio _____, this 4th _____ day of April _____, 19 95 .

_____
                Notary Public

JANET L. BLANKENSHIP
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES DEC. 7, 1998

19

**EXHIBIT A**

## SITE PLAN OF SHOPPING CENTER



## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

The Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida, LESS that part (East 40.00 feet) in right-of-way of Florida Avenue (State Road No. 685), and LESS the North 210.00 feet of the East 132.50 feet of that part of said Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36 lying West of Florida Avenue, AND LESS right-of-way for Bearss Avenue.

Together with:

The East 72.00 feet of the Northwest 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida, LESS right-of-way for Bearss Avenue.

LESS that portion for Bearss Avenue right-of-way, Project 85-17-R, Parcel 170(R) described as follows:

(Exhibit A)

That part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East; LESS right-of-way for Bearss Avenue; and LESS the North 210 feet of the East 132.50 feet of that part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 lying West of Florida Avenue, all lying and being in Hillsborough County, Florida, and the East 72.00 feet of the Northwest 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida.

Lying within the following Metes and Bounds description:

Commence at the Southwest corner of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida; said corner lying on the centerline of North Boulevard; thence North 00°01'57" West along the West line of said Section 36, and along said centerline of North Boulevard for 1328.15 feet to the Southwest corner of the North 1/2 of the Southwest 1/4 of said Section 36; thence South 89°42'07" East along the South line of said North 1/2 of the Southwest 1/4 of Section 36 for 1908.81 feet to the POINT OF BEGINNING; thence continue South 89°12'07" East for 199.32 feet; thence South 00°18'47" West for 77.71 feet; thence South 89°41'13" West for 19.12 feet; thence South 73°26'35" West for 8.25 feet; thence South 89°27'25" West for 16.39 feet to the beginning of a curve concave Southeasterly, having a radius of 35.50 feet, thence Southwesterly along the arc of said curve a distance of 32.22 feet, through a central angle of 52°00'00" (chord bearing South 63°27'25" West and chord distance of 31.12 feet) to a point of reverse curvature, said curve being concave Northwesterly, having a radius of 74.50 feet, thence Southwesterly along the arc of said curve, through a central angle of 25°57'44", a distance of 33.76 feet (chord bearing South 50°26'17" West and chord distance of 33.47 feet) to a point of compound curvature, said curve being concave Northwesterly, having a radius of 14.50 feet, thence Southwesterly along the arc of said curve, through a central angle of 28°14'34" a distance of 7.15 feet (chord bearing South 77°32'26" West and chord distance of 7.08 feet) to end said curve; thence North 75°44'34" West a distance of 9.15 feet; thence North 33°16'30" West, a distance of 4.43 feet; thence South 62°58'15" West, for 8.01 feet; thence South 54°58'57" West for 25.00 feet; thence South 66°19'56" West for 25.40 feet; thence South 60°38'57" West for 36.64 feet; thence North 00°29'44" West for 158.30 feet to the POINT OF BEGINNING.

LESS existing maintained right-of-way, and also less that part lying Southerly of the existing maintained right-of-way line of Bearss Avenue.

Also LESS additional right-of-way for Florida Avenue, described as follows:

That portion of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida.

Being described as follows:

Commence at a 3/4" iron pipe marking the Northwest corner of Lot 2, PLEASANT ESTATES, in said Section, as per plat thereof recorded in Plat Book 34, Page 7, of the Public Records of Hillsborough County, Florida; thence South 89°40'37" East 275.67 feet along the North boundary of said PLEASANT ESTATES to the West existing right-of-way line of SR 685 (Florida Avenue - CC Book R, Pages 516 and 517); thence North 00°14'26" West 112.09 feet along said existing right-of-way line for a POINT OF BEGINNING; continue thence North 00°14'26" West 324.30 feet along said existing right-of-way line; thence North 89°15'07" West 13.92 feet; thence South 02°41'45" East 324.84 feet to the POINT OF BEGINNING.

Being subject to that portion of Bearss Avenue right-of-way, Project 85-17-R, Parcels 870 for perpetual easements for right-of-way and drainage, described as follows:

(Exhibit B)

That part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East; LESS right-of-way for Florida Avenue (State Road 685); LESS right-of-way for Bearss Avenue; and LESS the North 210.00 feet of the East 132.50 feet of that part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 lying West of Florida Avenue, all lying and being in Hillsborough County, Florida, and the East 72.00 feet of the Northwest 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida.

Lying within the following Metes and Bounds description:

Commence at the Southwest corner of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida, said corner lying on the centerline of North Boulevard; thence North 00°01'57" West along the West line of said Section 36, and along said centerline of North Boulevard for 1328.15 feet to the Southwest corner of the North 1/2 of the Southwest 1/4 of said Section 36; thence South 89°42'07" East along the South line of said North 1/2 of the Southwest 1/4 of Section 36 for 2132.95 feet; to the POINT OF BEGINNING; thence continue South 89°42'07" East for 10.36 feet; thence South 11°53'29" East for 48.25 feet; thence South 75°06'32" West for 10.00 feet; thence North 14°53'29" West for 50.96 feet to the POINT OF BEGINNING.

LESS existing maintained right-of-way.

Together with:

(Exhibit B)

That part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East; LESS right-of-way for Florida Avenue (State Road 685); LESS right-of-way for Bearss Avenue; and LESS the North 210 feet of the East 132.50 feet of that part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 lying West of Florida Avenue, all lying and being in Hillsborough County, Florida.

AND:

The East 72.00 feet of the Northwest 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida.

Lying within the following Metes and Bounds description:

Commence at the Southwest corner of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida; said corner lying on the centerline of North Boulevard; thence North 00°01'57" West along the West line of said Section 36, and along said centerline of North Boulevard for 1328.15 feet to the Southwest corner of the North 1/2 of the Southwest 1/4 of said Section 36; thence South 89°42'07" East along the South line of said North 1/2 of the Southwest 1/4 of Section 36 for 1908.81 feet to the POINT OF BEGINNING; thence continue South 89°42'07" East for 199.32 feet; thence South 00°18'17" West for 77.71 feet; thence South 89°41'13" West for 19.12 feet; thence South 73°26'35" West for 8.25 feet; thence South 89°27'25" West for 16.39 feet to the beginning of a curve concave Southeasterly, having a radius of 35.50 feet, thence Southwesterly along the arc of said curve a distance of 32.22 feet, through a central angle of 52°00'00" (chord bearing South 63°27'25" West and chord distance of 31.12 feet) to a point of reverse curvature, said curve being concave Northwesterly, having a radius of 74.50 feet, thence Southwesterly along the arc of said curve, through a central angle of 25°57'44', a distance of 33.76 feet (chord bearing South 50°26'17" West and chord distance of 33.47 feet) to a point of compound curvature, said curve being concave Northwesterly, having a radius of 14.50 feet; thence Southwesterly along the arc of said curve, through a central angle of 28°14'34" a distance of 7.15 feet (chord bearing South 77°32'26" West and chord distance of 7.08 feet) to end said curve; thence North 75°44'34" West a distance of 9.15 feet; thence North 33°16'30" West, a distance of 4.43 feet; thence South 62°58'15" West, for 8.01 feet; thence South 54°58'57" West for 25.00 feet; thence South 66°19'56" West for 25.40 feet; thence South 60°38'57" West for 36.64 feet; thence North 00°29'44" West for 158.30 feet to the POINT OF BEGINNING.

LESS existing maintained right-of-way, and also LESS that part lying Northerly of the existing maintained right-of-way line of Bearss Avenue.

Also subject to the following described parcel for perpetual easement for right-of-way and drainage described as follows:

(Exhibit C)

Commence at the Southwest corner of Section 36, Township 27 South, Range 18 East, Hillsborough County, Florida; thence on the West boundary thereof North 00°01'57" West, a distance of 1328.15 feet to the Southwest corner of the North 1/2 of the Southwest 1/4 of said Section 36; thence on the South boundary thereof South 89°42'07" East, a distance of 1980.81 feet to the West boundary of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of said Section 36; thence on said West boundary South 00°29'41" East, a distance of 100.00 feet to the POINT OF BEGINNING. Said POINT OF BEGINNING being the point of curvature of a curve concave Southeasterly having a radius of 278.54 feet and a central angle of 34°10'39"; thence on the arc of said curve a distance of 166.15 feet, said arc subtended by a chord which bears North 69°00'25" East, a distance of 163.70 feet to the curves end and a point on the Southerly maintained right-of-way line of Bearss Avenue as shown on Map 85-13R, dated 9/27/81 prepared by the County of Hillsborough Surveying and Mapping Department; thence on said maintained right-of-way South 65°13'07" West, a distance of 40.20 feet; thence South 62°58'16" West, a distance of 25.18 feet; thence South 65°13'07" West, a distance of 25.52 feet; thence South 62°58'16" West, a distance of 25.18 feet; thence South 60°42'08" West, a distance of 25.08 feet; thence South 62°58'16" West, a distance of 19.35 feet; thence North 36°18'17" West, a distance of 15.84 feet to the POINT OF BEGINNING.

1003-002-265945

**EXHIBIT C**

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease.

Landlord covenants and agrees to deliver the Demised Premises to Tenant as follows:

All air conditioning compressors, refrigerant piping, and shelving to be removed from the Demised Premises.

Landlord shall complete such work on or before the _____60th_____ day after full execution and delivery of this Lease.

**EXHIBIT D**

## TENANT SIGN SPECIFICATION



**EXHIBIT E**

## NOTICE OF COMMENCEMENT

State of Florida
County of _____

The undersigned hereby informs all concerned that improvements will be made to certain real property, and in accordance with section 713.13 of the FLORIDA STATUTES, the following information is stated in this NOTICE OF COMMENCEMENT. This notice shall be void and of no force and effect if construction is not commenced within 30 days of recordation.

Description of property _____

_____

Owner _____

Address _____

Owner's interest in site of improvement _____

Fee Simple Title holder (if other than owner)

Name _____

Address _____

Contractor _____

Address _____

Surety (if any) _____

Address _____ Amount of Bond $_____

Name of person within the State of Florida designated by owner upon whom notices or other documents may be served:

Name _____

Address _____

In addition to himself, owner designates the following person to receive a copy of the Lienor's Notice as provided in Section 713.06 (2) (b), Florida Statutes. (Fill in at Owner's option)

Name _____

Address _____

_____
OWNER

It is suggested that in order to maximize your protection, consult your private attorney.

Sworn to and subscribed before me this_____day of_____, 19_____.

_____
Notary Public

This instrument prepared by:



EXHIBIT F
PAGE 1 OF 3

**EXHIBIT F**
**PAGE 2 OF 3**
PARCEL INFORMATION SHEET

<u>**SECTION 10020-2524    STATE ROAD 685    HILLSBOROUGH COUNTY    DESCRIPTION**</u>

**PARCEL 148**

RIGHT OF WAY

**That portion of:**

The Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 of Section 36, Township 27 South, Range 18 East: LESS right-of-way for Florida Avenue (State Road #685); LESS right-of-way for Bearss Avenue; and LESS the North 210 feet of the East 132.5 feet of that part of the Northeast 1/4 of the Southeast 1/4 of the Southwest 1/4 lying West of Florida Avenue, all lying and being in Hillsborough County, Florida.

**Being described as follows:**

Commence at a railroad spike marking the Northeast corner of the Southwest 1/4 of aforesaid Section 36; thence South 00°08'39" West, along the East line of said Southwest 1/4, a distance of 1,505.66 feet; thence North 88°50'30" West, a distance of 54.01 feet to a point on the Westerly right-of-way line of State Road 685 (Florida Avenue) and the POINT OF BEGINNING; thence South 02°19'32" East, along said Westerly right-of-way line, a distance of 324.88 feet; thence South 00°08'39" West, a distance of 112.05 feet; thence North 89°14'46" West, leaving said Westerly right-of-way line, a distance of 0.03 feet to a point on the arc of a circular curve concave to the West, having a radius of 2830.79 feet and a central angle of 3°53'27"; thence Northerly along the arc of said curve, a distance of 192.23 feet, said arc subtended by a chord which bears North 02°03'26" West, for 192.19 feet to a point of reverse curvature of a circular curve concave to the East, having a radius of 2898.79 feet and a central angle of 4°08'49"; thence Northerly along the arc of said curve, a distance of 209.80 feet, said arc subtended by a chord which bears North 01°55'45" West, for 209.76 feet; thence North 00°08'39" East, a distance of 34.97 feet; thence South 88°50'30" East, a distance of 1.00 feet to the POINT OF BEGINNING.

Containing 1372 square feet, more or less.

Legal Description Approved By: __Dianne M. Collins__

Date: __April 19, 1994__

* * * * * NOT A DEED - FOR INFORMATION PURPOSES ONLY * * * * *

WPI NO. 7113786                                    M.S. NO. 7

BASED UPON TITLE SEARCH THRU: 06/21/93          UPDATE: 04/06/94

GRANTOR: .01    (GWD.02) B & B CASH GROCERY STORES, INC., a Florida corporation (O.R. 1367, Pg. 146 & O.R. 1446, Pg.654 and O.R. 3791, Pg. 353)

PURPOSE OF EASEMENT: N/A              (SEE PARCEL NO. N/A )

SUBJECT TO:

.02    (MLR.02) - MORTGAGE AND SECURITY AGREEMENT (WILD)**- 12/13/83 - FROM OR AGAINST: TRI Venture Developers, a Florida General Partnership; IN FAVOR OF: First National Bank of Florida; O.R. Book 4237, Page 1196.

**PARCEL 148**                                    **PAGE 1**

<u>**EXHIBIT F**</u>
PAGE 2 OF 3

.03  **(UTL.01) - EASEMENT -**  05/03/90 - FROM OR AGAINST: B & B Cash Grocery Stores, Inc.; IN FAVOR OF: GTE Florida Incorporated, a Florida corporation; O.R. Book 6004, Page 1157.

.04  **(UTL.01) - EASEMENT -** 09/17/65 - FROM OR AGAINST: Twelfth Street Corporation of Tampa; IN FAVOR OF: Tampa Electric Company, a Florida corporation; O.R. Book 1548, Page 438.

.05  **(QCD.02) - LEASE -** 08/14/66 - FROM OR AGAINST: Twelfth Street Corporation of Tampa; IN FAVOR OF: Neisner Brothers, Inc., a New York corporation; O.R. Book 1678, Page 245.

.06  **(QCD.02) - LEASE (EASEMENT) -** 03/10/82 - FROM OR AGAINST: B & B Cash Grocery Stores, Inc.; IN FAVOR OF: McDonald's Corporation, d/b/a McDonald's Corporation, a Delaware corporation; O.R. Book 3923, Page 1198.

*** Mortgage Description (paragraph 1) has an error.....Range 18 East should be Range 17 East as indicated in paragraph 2. Agent should notify bank and advise of error...request re-recording of mortgage to correct the legal description and clear the point.*

**N O T E:** TAXES NOT UPDATED

**PARCEL 148**                                                                 PAGE 2

#556

**FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT**

This First Lease Extension and Modification Agreement is made and entered into this _19th_ day of July, 2000, by and between B & B Cash Grocery Stores, Inc., a Florida corporation ("Landlord") with its business address at 9330 Adamo Drive, Tampa, FL 33619 and Consolidated Stores Corporation, an Ohio corporation ("Tenant") with its business address at 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, OH 43228-0512.

      **WHEREAS,** Landlord and Tenant entered into a Lease, as amended, dated April 5,1995 (the "Lease") for the premises located in Tampa, Florida more particularly described in the Lease.

      **WHEREAS,** Landlord and Tenant mutually desire to provide for certain additions and modifications to the terms and provisions of said Lease.

      **NOW THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

      1.      Landlord and Tenant hereby agree to extend the term of the Lease for five (5) years (hereinafter referred to as "the Extended Term"). Commencing February 1, 2001 and continuing through and including January 31, 2006, Tenant shall pay Guaranteed Minimum Rent in the amount of Ninety Seven Thousand Six Hundred Seventy Four and 48/100 Dollars ($97,674.48) per annum, payable in equal monthly installments of Eight Thousand One Hundred Thirty Nine and 54/100 Dollars ($8,139.54);

      2.      Tenant hereby retains its two (2), five (5) year options to renew the Lease pursuant to the terms specified therein; and

      3.      The following clause is hereby added to the Lease:

      <u>Reasonable Consent:</u>   "If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission."

      Except as herein amended and modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

      Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

      In the event there is a conflict between the terms and provision of this First Lease Extension and Modification Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this First Lease Extension and Modification Agreement, the terms and provisions of this First Lease Extension and Modification Agreement shall control.

      This First Lease Extension and Modification Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

      This First Lease Extension and Modification Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

      **IN WITNESS WHEREOF,** Landlord and Tenant have caused this First Lease Extension and Modification Agreement to be executed as of the date first written above.

Signed acknowledged in the presence of:

Witnesses as to Landlord:

_Merilie J Diebold_

_Lottie Spellane_

**LANDLORD: B & B Cash Grocery Stores, Inc., a Florida corporation**

By: _Andrew Berof_

Title: _President_

(signatures continue on the following page)

Witnesses as to Tenant:

**TENANT: Consolidated Stores Corporation, an Ohio corporation**

By _____

      Albert J. Bell

Title:   Vice Chairman 

STATE OF FLORIDA

County of Hillsborough

       Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **B & B Cash Grocery Stores, Inc., a Florida corporation** ,by J.Andrew Bever, Jr. its    President _____, who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

       **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Tampa, Florida _____, this 14th day of July, 2000.

                                    *Patricia L. Toth*

                                  Notary Public

Patricia L. Toth
MY COMMISSION # CC923049  EXPIRES
June 6, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

STATE OF Ohio

                       )

County of Franklin

       Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation, an Ohio corporation**, by Albert J. Bell, its **Vice Chairman**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

       **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this 12th day of July, 2000.

                            *Candice S. Hendry*

                          Notary Public

NOTARIAL SEAL
STATE OF OHIO

CANDICE S. HENDRY
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES APRIL 25, 2005

# SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT

This Second Lease Extension and Modification Agreement (this "Agreement") is made and entered into this 29th day of July, 2010, by and between **B & B Cash Grocery Stores, Inc., a Florida corporation** ("Landlord"), with its business address at c/o B&B Cash Grocery Stores, Inc., 927 US Highway 301S, Tampa, FL 33619, and **Big Lots Stores, Inc., an Ohio corporation,** formerly known as Consolidated Stores Corporation ("Tenant"), with its business address at 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

**WHEREAS**, Landlord and Tenant are parties to a Lease Agreement dated April 5, 1995, as amended (collectively, the "Lease"), for approximately 27,907 square feet of retail space located at Bearss Plaza, 14948 North Florida Avenue, Tampa, Florida 33613, as more particularly described in the Lease; and

**WHEREAS**, Tenant now desires to extend the Term of the Lease as provided herein below;

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Landlord and Tenant agree as follows:

1.  Landlord and Tenant hereby agree that the Term of the Lease is extended for a term commencing February 1, 2011, and expiring on January 31, 2014 (the "Second Extended Term"). During the Second Extended Term, Tenant shall pay Guaranteed Minimum Rent in the amount of One Hundred Three Thousand Two Hundred Fifty-Six and 00/100 Dollars ($103,256.00) per annum, payable in equal monthly installments of Eight Thousand Six Hundred Four and 67/100 Dollars ($8,604.67).

2.  During the Second Extended Term, Tenant shall pay Percentage Rent in an amount equal to two and one-half (2½%) percent of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $4,130,240.00.

3.  Tenant shall continue to pay its pro rata share of Common Area Charges pursuant to Section 5.D. of the Lease during the Second Extended Term. Notwithstanding anything to the contrary contained in the Lease, Tenant's contribution to Common Area Charges shall not exceed $.50 per square foot per Lease Year during the Second Extended Term.

4.  Tenant shall continue to pay its pro rata share of Taxes and Assessments pursuant to Section 5.E. of the Lease during the Second Extended Term.

5.  Tenant shall continue to pay its pro rata share of Insurance Premiums pursuant to Section 12.B. of the Lease during the Second Option Term.

6.  Tenant shall retain its remaining one (1), five (5) year option to extend the term of the Lease pursuant to the terms specified within the Lease.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

The Submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either

party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

**B & B CASH GROCERY STORES, INC., a Florida corporation**

By: _____
      J. Andrew Bever, Jr.
Its:      President

Witnesses as to Tenant:

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____
      Kevin Day
Its:      Vice President



(Acknowledgements immediately following on next page)

STATE OF   FLORIDA      )
                              )
COUNTY OF HILLSBOROUGH   )

      Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **B & B Cash Grocery Stores, Inc., a Florida corporation**, by J. Andrew Bever, Jr., its President, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said limited liability company, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal at _Tampa_ , _Florida_ , this _19_ day of July, 2010.



GRIZELLE ALDEA
Notary Public - State of Florida
My Commission Expires Jun 19, 2011
Commission # DD 643064
Bonded Through National Notary Assn.

Notary Public

STATE OF OHIO        )
                     )
COUNTY OF FRANKLIN  )

      Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc., an Ohio corporation**, by **Kevin Day**, its **Vice President**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

    **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal at Columbus, Ohio, this _20th_ day of July, 2010.

NOTARIAL SEAL
STATE OF OHIO

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 5/12/15

Notary Public

# THIRD LEASE EXTENSION AND MODIFICATION AGREEMENT

This Third Lease Extension and Modification Agreement (this "Agreement") is made and entered into this 16th day of April, 2013, by and between **B & B Cash Grocery Stores, Inc., a Florida corporation** ("Landlord"), with its business address at c/o B&B Cash Grocery Stores, Inc., 927 US Highway 301S, Tampa, FL 33619, and **Big Lots Stores, Inc., an Ohio corporation,** formerly known as Consolidated Stores Corporation ("Tenant"), with its business address at 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

**WHEREAS**, Landlord and Tenant are parties to a Lease Agreement dated April 5, 1995, as amended (collectively, the "Lease"), for approximately 27,907 square feet of retail space located at Bearss Plaza, 14948 North Florida Avenue, Tampa, Florida 33613, as more particularly described in the Lease; and

**WHEREAS**, Tenant now desires to extend the Term of the Lease as provided for herein below;

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Landlord and Tenant agree as follows:

1. Landlord and Tenant hereby agree that the Term of the Lease is extended for a term commencing February 1, 2014, and expiring on January 31, 2019 (the "Third Extended Term"). During the Third Extended Term, Tenant shall pay Guaranteed Minimum Rent in the amount of One Hundred Seventeen Thousand Two Hundred Nine and 40/100 Dollars ($117,209.40) per annum, payable in equal monthly installments of Nine Thousand Seven Hundred sixty-Seven and 45/100 Dollars ($9,767.45).

2. During the Third Extended Term, Tenant shall pay Percentage Rent in an amount equal to two and one-half (2½%) percent of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $4,694,600.00.

3. Tenant shall continue to pay its pro rata share of Common Area Charges pursuant to Section 5.D. of the Lease during the Third Extended Term. Notwithstanding anything to the contrary contained in the Lease, Tenant's contribution to Common Area Charges shall not exceed $.70 per square foot per Lease Year during the Third Extended Term.

4. Tenant shall continue to pay its pro rata share of Taxes and Assessments pursuant to Section 5.E. of the Lease during the Third Extended Term.

5. Tenant shall continue to pay its pro rata share of Insurance Premiums pursuant to Section 12.B. of the Lease during the Third Extended Term.

6. Tenant shall retain its remaining one (1), five (5) year option to extend the term of the Lease pursuant to the terms specified within the Lease.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

JABjr

The Submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either

party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

**B & B CASH GROCERY STORES, INC., a Florida corporation**

By: _____

    J. Andrew Bever, Jr.

Its:    President

Witnesses as to Tenant:

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____

    Kevin Day

Its:    Vice President

(Acknowledgements immediately following on next page.)

JABJR

# 556

STATE OF    FLORIDA                )
                                   )
COUNTY OF HILLSBOROUGH     )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **B & B Cash Grocery Stores, Inc., a Florida corporation**, by J. Andrew Bever, Jr., its ~~President~~ **President.** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said limited liability company, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal at *Tampa*, *Florida*, this __7__ day of ~~April,~~ *May* 2013.

_____
Notary Public

> Notary Public State of Florida
> Grizelle Aldea
> My Commission EE060221
> Expires 06/19/2015

STATE OF OHIO            )
                         )
COUNTY OF FRANKLIN   )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc., an Ohio corporation**, by Kevin Day, its **Vice President**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal at Columbus, Ohio, this __16th__ day of ~~April,~~ *May* 2013.

_____
Notary Public

> Courteney Robertson
> Notary Public, State of Ohio
> My Commission Expires 08/22/2016

Doc 3064874   Ver 1

JABJR

BL#556

## FOURTH LEASE EXTENSION AND MODIFICATION TO LEASE

THIS FOURTH LEASE EXTENSION AND MODIFICATION TO LEASE (the "Amendment") is made and entered into as of the _14 th_ day of **March 2018**, by and between **B&B CASH GROCERY STORES, INC.,** a Florida corporation ("Landlord"), and **Big Lots Stores, Inc.,** an Ohio corporation, formerly known as Consolidated Stores Corporation, ("Tenant") (collectively Landlord and Tenant shall be the "Parties").

RECITALS

WHEREAS, the Parties entered into that certain Lease dated April 5, 1995, Commencement Letter Agreement dated September 11, 1995, First Lease Extension and Modification Agreement dated July 14, 2000, Option Letter dated June 29, 2005, Second Lease Extension and Modification Agreement dated July 20, 2010 and Third Lease Extension and Modification Agreement dated May 16, 2013 ("collectively the Lease");

WHEREAS, Landlord is the owner of the Premises situated at 14948 N. Florida Avenue, Tampa, FL  33612 in the Bearss Plaza Shopping Center (the "Shopping Center"), in the County of Hillsborough, State of Florida;

WHEREAS, the Parties desire to amend the Lease.

NOW, THEREFORE, for Ten Dollars ($10.00) and in consideration of the mutual covenants and agreements herein contained, the Parties hereby covenant and agree to amend and to modify the Lease as follows:

1. "Section 3. <u>Length of Term:</u>" is hereby amended to exercise Tenant's last remaining five (5) year Option commencing February 1, 2019 and expiring January 31, 2024 (the "Second Option Term"). For all purposes, the Second Option Term shall be included in the definition of the "Term". The Guaranteed Minimum Rent during the Second Option Term shall be **One Hundred Twenty Five Thousand Seven Hundred Forty Eight Dollars and No Cents ($125,748.00)** per annum, payable in equal monthly installments of **Ten Thousand Four Hundred Seventy Nine Dollars and No Cents ($10,479.00)** in advance. All rents are to be paid on the first day of each month and without deduction, set-off, or abatement whatsoever, plus all applicable sales tax.

   Landlord and Tenant acknowledge that there are no further extensions or options for extensions of the Lease provided for in the Lease other than these contained in this Amendment, and this Amendment replaces any previously negotiated extensions or options.

2. <u>Third Option Term:</u>   Provided Tenant is not in monetary default under the Lease beyond any applicable notice and cure period at the time of exercising, Tenant shall, upon written notice delivered to Landlord no less than four (4) months prior to the expiration of the Second Option Term, have the option of extending the term for one (1), additional five (5) year period  (the "Third Option Term") commencing the day immediately following the last day of the Second Option Term (the "First Expiration Date") and terminating at 11:59 p.m. on the day on which the fifth annual anniversary of the Third Option Term occurs (the "Third Option Expiration Date"). If Tenant exercises the Option herein, all other terms and conditions of the Lease will remain in effect, except for the Guaranteed Minimum Rent, which Guaranteed Minimum Rent for the new Third Option Term appears below. In the event Tenant exercises the Third Option Term, all references in the Lease to "Term" will include the Second Option Term and the Third Option Term. The above terms replace any previously negotiated extensions or options that may be contained in the Lease.

   The Guaranteed Minimum Rent during the Third Option Term shall be **One Hundred Thirty Four Thousand One Hundred Thirty One Dollars and Twenty Cents ($134,131.20)** per annum, payable in equal monthly installments of **Eleven Thousand One Hundred Seventy Seven Dollars and Sixty Cents ($11,177.60)** in advance. All rents are to be paid on the first day of each month and without deduction, set-off, or abatement whatsoever, plus all applicable sales tax.

JABJR

<u>Fourth Option Term:</u>  Provided Tenant is not in monetary default under the Lease beyond any applicable notice and cure period at the time of exercising, Tenant shall, upon written notice delivered to Landlord no less than four (4) months prior to the expiration of the Third Option Term, have the option of extending the Term for one (1), additional five (5) year period  (the "Fourth Option Term") commencing the day immediately following the last day of the Third Expiration Date and terminating at 11:59 p.m. on the day on which the fifth  annual anniversary of the Fourth Option Term occurs (the "Fourth Option Expiration Date").  If Tenant exercises the Fourth Option Term, all other terms and conditions of the Lease will remain in effect, except for the Guaranteed Minimum Rent, which Guaranteed Minimum Rent for the Fourth Option Term appears below.  In the event Tenant exercises the Fourth Option Term, all references in the Lease to **"Term"** will include the Second Option Term, the Third Option Term and the Fourth Option Term.

The Guaranteed Minimum Rent during the Fourth Option Term shall be **One Hundred Forty Two Thousand Five Hundred Fourteen Dollars and Forty Cents ($142,514.40)** per annum, payable in equal monthly installments of **Eleven Thousand Eight Hundred Seventy Six Dollars and Twenty Cents ($11,876.20)** in advance.  All rents are to be paid on the first day of each month and without deduction, set-off, or abatement whatsoever, plus all applicable sales tax.

3.     During the Second Option Term, the Third Option Term (if exercised) and the Fourth Option Term (if exercised), Tenant shall pay Percentage Rent in an amount equal to two and one-half (2 ½%) percent of the excess of Tenant's annual gross sales and income which exceeds the annual base sum of $4,694,600.00.

4.     Tenant shall pay its pro rata share of Common Area Charges pursuant to Section 5.D. of the Lease during the Second Option Term.  Tenant's contribution to Common Area Charges shall not exceed $.80 per square foot excluding utilities and Insurance during the Second Option Term.

If Tenant exercises the Third Option Term, Tenant's contribution to Common Area Charges shall not exceed $.90 per square foot excluding utilities and Insurance during the Third Option Term.

If Tenant exercises the Fourth Option Term, Tenant's contribution to Common Area Charges shall not exceed $1.00 per square foot excluding utilities and Insurance during the Fourth Option Term.

5.     Tenant shall continue to pay its pro rata share of Taxes and Assessments pursuant to Section 5.E. of the Lease during the Second Option Term, the Third Option Term and the Fourth Option Term (if applicable).

6.     Tenant shall continue to pay its pro rata of Insurance premiums pursuant to Section 12.B. of the Lease during the Second Option Term, the Third Option Term and the Fourth Option Term (if applicable).

7.     Unless amended herein, all terms and conditions of the Lease shall remain in full force and effect.

8.     Except as otherwise provided herein, all terms and phrases herein shall have the same meaning as set forth in the Lease.

9.     Each Party hereto represents and warrants that all consents or approvals required of third parties for the execution, delivery and performance of this Amendment have been obtained and each Party has the right and authority to enter into and perform its covenants contained in this Amendment.  Upon request of either Party hereto, the other Party shall provide evidence of such Parties authority to consummate the transactions contemplated hereby and to execute and deliver this Amendment.

JABJR

10.     Each Party hereto represents and covenants that it has dealt with no broker or other person who shall be entitled to a brokerage commission, fee or other payment.

11.     Tenant acknowledges that there are no defaults by Landlord under the Lease and there are no existing circumstances which with the passage of time, or notice, or both would give rise to a default under the Lease.  Tenant has no charge, lien, claim, or set-off or defense against rents or other charges due or to be come due under the Lease or otherwise under any of the terms, conditions or covenants contained therein.

12.     This Amendment represents the final agreement between the Parties regarding the subject matter hereof and may not be contradicted by evidence of prior subsequent or contemporaneous oral agreements of the Parties.  No amendment or modification hereto shall be valid and binding unless expressed in writing and executed by all Parties hereto.

13.     This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall compromise by one and the same instrument.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

JABJR

IN WITNESS WHEREOF, the Landlord hereto has executed this Amendment as of the day and year first above written.

**LANDLORD:**

*B&B CASH GROCERY STORES INC.*

Witness to Landlord:

*Melanie Merrill*
Signature

*Melanie Merrill*
Print Name

By: _____
J. Andrew Bever, Jr., President

*Abigail Morales*
Signature

*Abigail Morales*
Print Name

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this 14th day of March, 2018 by *J. Andrew Bever, Jr.,* **as President** of *B & B CASH GROCERY STORES, INC.,* a Florida corporation. He is personally known to me.

My Commission Expires:

> Notary Public State of Florida
> Linda Toledo
> My Commission FF 975271
> Expires 03/24/2020

_____
NOTARY PUBLIC, State of Florida

IN WITNESS THEREOF, the Tenant hereto has executed this Amendment as of the day and year first above written.

**TENANT:**
Big Lots Stores, Inc., an Ohio
corporation

Witness to Tenant:

*Andrea L. Muhammad*
Signature

*Andrea L. Muhammad*
Print Name

By: _____
Timothy A. Johnson,
Executive Vice President,
Chief Administration
Officer& Chief Financial
Officer

*Stacey McPherson*
Signature

*Stacey McPherson*
Print Name

STATE OF OHIO
COUNTY OF FRANKLIN

The foregoing instrument was acknowledged before me this 9th day of March, 2018, by Timothy A. Johnson, as Executive Vice President, Chief Administrative Officer & Chief Financial Officer, of Big Lots Stores, Inc., an Ohio corporation. He is personally known to me or has produced _____ as identification.

> Andrea L. Muhammad
> Notary Public
> In and For the State of Ohio
> My Commission Expires
> 10 June 2020

My Commission Expires: Andrea L. Muhammad

_____
NOTARY PUBLIC, State of Ohio

4

JABJR

DocuSign Envelope ID: 915520FB-0D4A-4ABF-BD58-679C5F68E6B6

BL #556

## FIFTH LEASE MODIFICATION AGREEMENT

This Fifth Lease Modification Agreement (the "Agreement") is made as of the *20 th* day of *March*, 2023, (the "Effective Date") by and between **B&B Cash Grocery Stores, Inc.** having an address of 927 US Highway 301 South, Tampa, FL 33619 (the "Landlord"), and **Big Lots Stores, LLC an Ohio limited liability company, formerly known as Big Lots Stores, Inc.** having an address of 4900 East Dublin Granville Road, Columbus, Ohio 43081 (the "Tenant").

## RECITALS:

A.    Landlord and Tenant have entered into that certain Lease Agreement dated April 5, 1995 (the "Original Lease"), as amended (collectively the "Lease") for approximately 27,907 square feet of storeroom (the "Demised Premises") located at Bears Plaza Shopping Center, 14948 N. Florida Avenue, Tampa, FL 33613 (the "Shopping Center"), as more particularly described in the Lease. The Lease, together with this Agreement shall be collectively referred to as the "Lease".

B.    The Current Term of the Lease currently expires on **January 31, 2024**.

C.    The parties desire to extend the Term of the Lease by Tenant exercising its Third Option Term and to further amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.    Option Exercise. The Term of the Lease is hereby extended for approximately five (5) years, commencing on February 1, 2024 and expiring on January 31, 2029 ("Third Option Term).

2.    Guaranteed Minimum Rent During Years 1-3 of the Third Option Term. During years 1-3 of the Third Option Term, the Guaranteed Minimum Rent payable by Tenant to Landlord for the Premises shall be as follows:

| Period | Annual Guaranteed Minimum Rent | Monthly Installments of Guaranteed Minimum Rent |
|---|---|---|
| Years 1-3: February 1, 2024 – January 31, 2027 | $125,748.00 ($4.51/sf) | $10,479.00 |

Guaranteed Minimum Rent During Years 4-5 of the Third Option Term. During years 4-5 of the Third Option Term, the Guaranteed Minimum Rent payable by Tenant to Landlord for the Premises shall be as follows:

DocuSign Envelope ID: 915520FB-0D4A-4ABF-BD58-679C5F68E6B6

BL #556

| Period | Annual Guaranteed Minimum Rent | Monthly Installments of Guaranteed Minimum Rent |
|---|---|---|
| Years 4-5: February 1, 2027 – January 31, 2029 | $134,131.20 ($4.81/sf) | $11,177.60 |

3.   Options. Tenant shall retain its remaining one (1), five (5) year option (the "Fourth Option Term) to extend the Term of the Lease pursuant to the terms specified within the Lease, as amended.

4.   Full Force and Effect; Successors and Assigns.  Unless otherwise set forth herein, all capitalized terms shall have the meaning set forth in the Lease.  Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

5.   Counterpart Execution. This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

Landlord and Tenant have respectively signed this Fifth Lease Modification Agreement as of the date first hereinabove set forth.

**LANDLORD:**
**B&B CASH GROCERY STORES, INC.**

By: _J. Andw Bever_
Name: _J. Andrew Bever, Jr._
Title: _President_

**TENANT:**
**BIG LOTS STORES, LLC, an Ohio limited liability company**

By: _Jonathan Ramsden_
Name:   Jonathan Ramsden
Title:   Executive Vice President, Chief Financial & Administrative Officer

DocuSign Envelope ID: 915520FB-0D4A-4ABF-BD58-679C5F68E6B6

BL #556