# **EXHIBIT 1**

# TABLE OF CONTENTS

**Section**

1. Definitions
   - A. Common Areas
   - B. Dates
   - C. Exhibits
   - D. Demised Premises
   - E. Shopping Center
   - F. Gross Sales

2. Demise

3. Term
   - A. Original Term
   - B. Option to Extend Term

4. Use and Operation

5. Rent
   - A. Fixed Minimum Rent
   - B. Utilities Charge and Exterior Lighting
   - C. Intentionally Deleted
   - D. Common Area Charges and Cap
   - E. Real Estate Taxes
   - F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    - A. Tenant
    - B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the _31_ day of July, 2011, by and between South Plaza Investments, LLC, a Delaware limited liability company, whose mailing address is c/o Madison Partners, LLC, 2622 Commerce Street, Dallas, TX 75226 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

**WITNESSETH:**

1. **DEFINITIONS:**

   For purposes of this Lease, these terms are defined as follows:

   A. <u>Common Areas</u>: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, pylon signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

   B. <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

      1) Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord s Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)   The "Tenant Possession Date" shall be the date that both of the following have occurred: (i) Landlord has delivered the Demised Premised to Tenant with all construction that may be required pursuant to Exhibit C completed, and (ii) Tenant has received all permits for its construction and signage. As of the date of this Lease, Tenant received all permits for its construction and signage. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord has delivered the Demised Premises in accordance with Exhibit C. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)   The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)   The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)   If Landlord fails to return properly executed Leases to Tenant by August 1, 2011, or if Landlord fails to complete Landlord's Work in the Demised Premises by July 31, 2011, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to July 31, 2011. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by July 31, 2011, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon August 1, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work and such delay materially interferes with Tenant's work on Demised Premises or operation of Demised Premises prior to August 15, 2011, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day. Commencing August 16, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work and such delay materially interferes with Tenant's work on Demised Premises or operation of Demised Premises, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction

4

and/or signage in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)     Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by July 31, 2011, Tenant will not be required to accept possession until February 4, 2012. The period of time between August 1, 2011 and February 4, 2012 will be the "Optional Blackout Period".   In the event Landlord completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election.  In addition, in the event Landlord has not completed Landlord's Work by February 4, 2012, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 4, 2012, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)     In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 4, 2012.  Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.     <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)     Exhibit A -  Site Plan of Shopping Center

2)     Exhibit B -  Legal Description of Shopping Center

3)     Exhibit C -  Landlord Work

4)     Exhibit D -  Tenant Building Sign Specifications

5)     Exhibit D – 1 Tenant Pylon Sign Location

6)     Exhibit E -  Completion of Landlord's Work Letter

7)     Exhibit F -  Exclusive Use Provisions

8)     Exhibit G -  Remeasurement Rider

9)     Exhibit H -  Prohibited Uses Area

D.     <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 31,920 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises.  Within sixty (60) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof

differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 32,500 square feet nor accept possession of any space under 28,728 square feet in size.

E.  Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the South Plaza Shopping Center, 5702 Nolensville Road, Nashville, TN 37211. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 165,568 square feet.

F.  Gross Sales: The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises provided that the merchandise is returned or exchange in accordance with established Tenant policies and the value of the exchanged merchandise is included in Gross Sales; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) only the discounted value of sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

2.  **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.  **TERM:**

A.  Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2019 (the "Original Term"). Upon the expiration or earlier termination of this Lease (if terminated pursuant to a right of termination provided herein), Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately

preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period. Notwithstanding anything to the contrary contained herein, Landlord will be allowed to use a traditional calendar year (January 1st through December 31st) for any or all calculations relating to the Tenant's proportionate share of Common Area Charges, Real Estate Taxes and Insurance Costs.

B.  Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable, provided Tenant is not in monetary default of this Lease beyond any applicable notice and cure periods at the time of exercise of the respective option.

## 4.  **USE AND OPERATION:**

A.  Permitted Uses: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furnishings, furniture accessories, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including frozen food, beer and wine), and for any other lawful retail purpose; provided, however, that such "other lawful retail purpose" shall not violate any then existing exclusive use right in the Shopping Center and shall be subject to Tenant's receipt of Landlords' written approval, such approval not to be unreasonably withheld, conditioned or delayed. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises except as reflected in Exhibit F. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease and new tenants that occupy 2,000 square feet of floor area or less, no other discount general merchandise store, liquidator, closeout store, or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Christmas Tree Shops, and Ollie's Bargain Outlet. Tenant acknowledges that Landlord has executed a lease with Dollar Tree for approximately 10,500 square feet adjacent to the Demised Premises for the operation of a Deal$ store in the Shopping Center, that such Deal$ lease does not constitute a Competing

Business as defined herein, and Tenant's exclusive use rights shall also not preclude or apply to a successor of Deal$ provided that such a tenant does not occupy more than the 10,500 square feet of floor area.

In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) unless Landlord has already done so, Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, further, if said violation does not cease within 365 days after its occurrence, Tenant shall have the right to terminate this Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise, and provided that such activities do not interfere with the rights of any other tenants or unreasonably block the sidewalk of other pathways in the Shopping Center.

B.  Prohibited Uses:  Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) intentionally deleted; (ii) intentionally deleted; (iii) intentionally deleted; (iv) intentionally deleted; (v) intentionally deleted; (vi) assembling, manufacturing, industrial, distilling, refining or smelting facility; (vii) intentionally deleted; (viii) intentionally deleted; (ix) intentionally deleted; (x) for the operation of an illicit massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; and provided that such recognized and legitimate massage or spa establishments such as the Massage Company and the like are not prohibited by this language (xi)   intentionally deleted (xii) intentionally deleted; (xiii) intentionally deleted; (xiv) intentionally deleted; (xv) ) intentionally deleted; (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home park or trailer court; (xviii) land fill, garbage dump or for the dumping, disposing, incineration or reduction of garbage (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) intentionally deleted; (xx) intentionally deleted; (xxi) intentionally deleted; (xxii) intentionally deleted; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxv) intentionally deleted; (xxvii) intentionally deleted; or (xxviii) intentionally deleted.  All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses" and none of the activities currently being engaged in by tenants of the Shopping Center as of the execution of this Lease shall be considered Prohibited Uses for the entire Shopping Center.**

Landlord shall not lease any space, or permit any use in the red-outlined area on the site plan in Exhibit H of this Lease ("Big Lots Prohibited Uses Area"), and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" store, as that term is generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall in excess of 5,000 square feet of floor area; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 5,000 square feet of floor area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) intentionally deleted; (viii) for any automotive, tire, gasoline, or oil service centers (excluding an automobile parts retailer such as "Advance Auto"); (ix) for any governmental use or office or any social service functions or facilities in excess of 5,000 square feet of floor area; (x) for the operation of a massage parlor (other than massage services in connection with a day spa or facility similar to Massage Envy) or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for

9

pornographic or "adult" material; (xi) intentionally deleted; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant); provided, however, that this restriction shall not prohibit the operation of a full-service restaurant with alcohol sales; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; provided, however, that a fitness club of up to 10,000 square feet of floor area is permitted so long as it is located at least 200 linear feet away from the Demised Premises; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated Laundromat; provided, however, that a retail drop-off location for a dry cleaner shall not be prohibited; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities ; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the "Big Lots **Prohibited Uses**".

5.    <u>**RENT AND CONSTRUCTION ALLOWANCE:**</u>

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:   During the Original Term of this Lease, the sum of $223,440.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $18,620.00.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $255,360.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,280.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $271,320.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,610.00. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $287,280.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,940.00.

B.  Utilities Charges:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Landlord shall provide separate utility meters from local distribution companies.  Tenant shall be solely responsible for and shall promptly pay for all direct public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

In the event Landlord is providing any utilities under a master meter account in Landlord's name, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities.  Landlord shall provide and maintain separate utility submeters for any such water/sewer, electricity or gas, which shall accurately reflect Tenant's usage.  All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision.  Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant.  If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense.  Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use.  The schedule for reading the submeter, if any, shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice.  In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service.  In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored.  Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use.  Installation shall be the cost and responsibility of the Tenant.  The monitoring equipment can be installed at any time during the lease Term.  Tenant reserves the right to leave monitoring equipment in place indefinitely.  Landlord agrees to recalculate utilities provided by Landlord, if any, and services based on findings by Tenant's monitoring data.  Landlord shall provide Tenant written notice of such adjustment.  In no event shall Tenant be charged an amount greater than the rate that would be charged by the applicable utility company, if service were furnished directly to the Demised Premises.

C.  Intentionally Deleted.

D.  Common Area Charges and Cap:  Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

    (i)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, pylon signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees; provided, however, that Landlord may include in Common Area Charges each Lease Year an administrative fee in an amount equal to five percent (5%) of the Common Area Charges for that Lease Year.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at one and no/00 dollars (**$1.00**) per square foot of the Demised Premises for the initial Partial Lease Year and the first full calendar Lease Year. Thereafter, The Common Area Charges Cap on controllable CAM expenses shall increase by ten percent (10%) per year calculated on a cumulative basis (collectively, the cap on Common Area Charges as described herein shall be known as the "CAM Cap").

E.  Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord, including the reasonable cost of any third party tax specialist employed by Landlord to contest the appraised values applied to the Shopping Center by the taxing authorities. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the

13

Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority.  Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities.  Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.  Landlord represents that the Real Estate Taxes for the 2012 tax year shall be approximately $1.31 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes.  Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.  Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder.  Notice of such increase shall be provided by Landlord at least thirty (30) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith.  Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file.  If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing.  Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder.  Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center.  Notwithstanding anything to the contrary contained herein, Tenant shall only be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer

14

of real property, buildings or other improvements or a reassessment resulting therefrom once in any five (5) year consecutive period. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from more than one transaction in any five (5) year consecutive period which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.   Construction Allowance:  Landlord shall pay to Tenant an amount equal to Four Hundred Thousand and no/00 Dollars ($400,000.00) within thirty (30) days of Tenant's opening for business.  Tenant shall provide to Landlord a copy of its certificate of occupancy, copy of "as-built" CAD files available to Tenant after Tenant's construction and copies of lien waivers from all contractors and subcontractors supplying in excess of $5,000.00 of labor and/or materials.  If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code.   Tenant acknowledges that the Construction Allowance will not be used on expenditures such as furniture, fixtures and equipment or inventory.  Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.   ECR:  Landlord and Tenant acknowledge that Shopping Center  is subject to certain covenants, conditions and restrictions of record, including but not limited to an Reciprocal Access and Cross Parking Easement and Property Maintenance Agreement, dated June 13, 1994, as heretofore amended, of record in Book 6490, page 204, as re-recorded in Book 6538, page 731, Register's Office for Davidson County, Tennessee, and a Reciprocal Easement and Restrictive Covenant Agreement, dated June 13, 1994, as heretofore amended, of record in Book 6644, page 397, Register's Office for Davidson County, Tennessee (collectively, the "ECR").  To the extent that the ECR allocate any expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the ECR) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant.  In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease.  Landlord agrees that any payments required be made under the ECR, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant.  Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) arising out of any violation by Tenant of the ECR to the extent it conflicts with the Lease as stated above.

15

Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the ECR, and Landlord agrees not to consent to any uses prohibited by the ECR or this Lease in the Shopping Center.

H.     It is understood Fixed Minimum Rent is payable on or before the first day of each calendar month and with only the offset or deduction rights specifically outlined in this Lease. If any rental is not received by the tenth (10th) day after its due date for any reason whatsoever, or if any rental payment by check is returned due to insufficient funds, then in addition to the past due amount, Tenant shall pay to Landlord one of the following (the choice to be at the sole option of Landlord unless one of the choices is improper under applicable law, in which event the other alternative will automatically be deemed to have been selected): (a) a late charge equal to ten percent (10%) of the rental then due, in order to compensate Landlord for its administrative and other overhead expenses; or (b) interest on the rental then due at the maximum contractual rate which could legally be charged in the event of a loan of such rental to Tenant (but not to exceed 1½% per month), such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the rental due date and terminating on the date Tenant makes full payment of all amounts owing to Landlord at the time of said payment (the selected alternative is referred to herein as the "Late Fee"). Tenant will be allowed to waive one Late Fee per twelve (12) month period provided that Landlord receives the payment that the Late Fee relates to by the end of the month in which it is due. All such late charge or interest payments shall be payable as additional rental under this Lease and shall be payable immediately on demand. If any rent or other payment due Landlord hereunder paid by check is returned due to insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, Tenant shall also pay Landlord the amounts specified above, plus an additional fee of $50.00 to compensate Landlord for its expenses and effort in connection with the dishonored check.

## 6.     ALTERATIONS:

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that Tenant furnishes Landlord a copy of all the plans and specifications pertaining to such work including CAD files; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall remove any Mechanic's Lien placed on the Demised Premises resulting therefrom within thirty (30) days of receiving notice of the existence of such lien from Landlord.

## 7.     MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks. Landlord further agrees that in the event Tenant exercises its right to extend the term of this Lease through the First Option Term pursuant to paragraph 3.B above, Landlord will replace, overlay, provide an additional roof coating or apply another product to the roof that has a warranty period of at least the length of the First Option Term prior to the commencement of the First Option Term unless Landlord can demonstrate to Tenant's commercially reasonable satisfaction that it is reasonable to expect that the roof will last longer than the length of the First Option Term without major issues. Nothing contained herein shall reduce or diminish Landlord's obligation to maintain the roof of the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall ensure that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 200-300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Should Tenant discover that the HVAC system requires repair and/or replacement during the first Partial Lease Year, if any, and the first three (3) Lease Years; and the cost thereof exceeds Two Thousand and no/00 Dollars ($2,000.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand and no/00 Dollars ($2,000.00) unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten

17

(10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.   **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to

deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Notwithstanding anything to the contrary contained herein, Tenant does not have any rights to the topmost Pylon space (e.g. the Pylon spaces currently occupied by Lowe's in exhibit D-1) at any time whether they become available or are part of a newly constructed Pylon. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs, except that Tenant shall at all times keep such signs in good condition and shall replace any faded letters or panels and repair any burned out wiring or bulbs, and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in

the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

## 11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.    Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.    When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

## 12.    **INSURANCE:**

A.    <u>Tenant</u>:    Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:    One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    <u>Landlord</u>:    Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.    Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance

evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles, unless the loss is attributable to the actions or inactions of the Tenant or its agents provided that Tenant's financial responsibility under this sentence is capped at $5,000.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not excess insurance and only the portion of the umbrella policy allocated to the Shopping Center specifically) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B shall be approximately $0.26 per square foot per annum for the 2012 calendar year.

If Tenant is able to secure an insurance policy or policies with the same coverages and for the entire Shopping Center (not just the Demised Premises) as provided by Landlord at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13. **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.    In the event Landlord has not begun repairs within ninety (90) days from the date of such casualty and been diligently working to complete such repairs to restore the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, to tenantable condition, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.    If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.    **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.    **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations and such breaches adversely affect Tenant's ability to conduct business in the Demised Premises or results in parties other than Landlord or successors in interest making a claim for rent of the Demised Premises against Tenant, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional

Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17. **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18. **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall request any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

23

19. **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary, provided Tenant commence the cure within said thirty (30) day period and continue to prosecute such cure to completion), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. Tenant acknowledges and agrees that the cost of obtaining the new tenant, including without limitation ordinary brokerage fees and tenant improvement allowances, shall be deducted from the mitigated rents received by Landlord in calculating the net amount Tenant remains liable to Landlord for following any such mitigation.

B.   If Landlord shall fail to pay any taxes, assessments, insurance premiums, or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant if such default materially interferes with the normal conduct of Tenant's business in the Demised Premises; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed

24

such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.   CONDEMNATION:

In the event a material portion of the Demised Premises hereby leased which adversely affects Tenant's ability to conduct business in the Demised Premises, are permanently taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are permanently taken in condemnation proceedings so that in the commercially reasonable judgment of Tenant the Demised Premises remaining would materially impair Tenant's business operation, Tenant may terminate this Lease. Should Tenant elect to remain, thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land area lost if and to the extent the land area lost reduces the parking available in the Shopping Center or reduces the access to the Shopping Center   For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21.   MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

## 22.   ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

## 23.   SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the

exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at 125% of the Rent due under this Lease for the immediately preceding term and otherwise subject to all the terms and provisions hereof.

## 24. NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25. LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26. BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27. NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28. REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim

26

and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

27

32.   **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable.  If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33.   **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission.  In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.  Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

34.   **INTENTIONALLY DELETED.**

35.   **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36.   **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37.   **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38.   **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39.    **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit, not to exceed $2,000.00. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

40.    **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

41.    **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:   South Plaza Investments, LLC, a Delaware limited liability company**

By: _____

Title: _____

Witnesses as to Tenant:

**TENANT:   BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Charles W. Haubiel II

Title: Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary

**STATE OF**

**COUNTY OF** Dallas, TX

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, South Plaza Investments, LLC by, Larry Vineyard  its Manager who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Dallas, TX this 1st day of August, 2011.

_____
Notary Public

CHLOE ESTHER JONES
My Commission Expires
March 24, 2015

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 27th day of July, 2011.

_____
Notary Public

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 5/12/15

30

## EXHIBIT A

## SITE PLAN OF SHOPPING CENTER

*Shoppes at South Plaza*
*Nashville, TN*



# EXHIBIT B

# LEGAL DESCRIPTION OF SHOPPING CENTER

Parcel 1

Beginning at a point in the proposed north margin of State Route 254 described above said point being 66 feet left of State Route 254 proposed centerline station 412+37.68; thence with the existing northeast margin of said road northwesterly 3 feet, more or less to a point; thence with the meander of the slope easterly 150 feet, more or less to a point; thence with said proposed north margin south 83 degrees 29 minutes 07 seconds west 147 feet, more or less to the point of beginning.

Parcel 2

Beginning at a point in the proposed north margin of State Route 254 described above said point being 60 feet, more or less left of State Route 254 proposed center line station 1421+54, more or less; thence with the meander of the slope easterly 182 feet, more or less; thence with said proposed north margin south 85 degrees 04 minutes 56 seconds west 181 feet, more or less to the point of beginning.

Parcel 3

Beginning at the point of intersection of the west boundary of the said Hickory Valley property and the proposed north margin of State Route 254 described above said point also being 50.87 feet left of State Route 254 proposed centerline station 1424+52.60; thence with said proposed north margin (1) north 88 degrees 27 minutes 35 seconds west 33.24 feet, (2) south 85 degrees 31 minutes 25 seconds west 44 feet, more or less to a point; thence with the meander of the slope (1) northerly 3 feet, more or less, (2) easterly 77 feet, more or less to a point; thence with said west boundary south 04 degrees 06 minutes 36 seconds west 7 feet, more or less the point of beginning.

Parcels 1, 2 and 3 combined contain 1,530 square feet.

(B) Easements for the constructions of a working area over the following two (2) parcels:

Parcel A

Being a strip of land parallel to and at all points no greater than 5.0 feet from the slope easements described in Parcels 1, 2 and 3 above.

(B) Easements for the constructions of a working area over the following two (2) parcels:

Parcel A

Being a strip of land parallel to and at all points no greater than 5.0 feet from the slope easements described in Parcels 1, 2 and 3 above.

Parcel B

Beginning at the point of intersection of the existing east margin of State Route 11 and the north boundary of the 37-37 Corporation property thence with said existing east margin northerly 513 feet, more or less to a point said point being 60 feet, more or less right of State Route 11 proposed centerline station 37+50, more or less; thence with the east margin of this proposed working area southerly 513 feet, more or less to a point; thence with said north boundary westerly 5 feet, more or less to the point of beginning.

Parcels A and B combined contain 4,070 square feet.

# EXHIBIT C

## LANDLORD WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative:**

**DOORS:**   All doors and door systems to be sound and secure, in good working condition, adequate for Tenant's use and in compliance with ADA requirements. Tenant is to verify prior to Lease execution that the current doors and door systems are acceptable to the Tenant.

**HVAC & EQUIPMENT:**   All existing HVAC equipment, duct work, diffusers etc. in good working condition and adequate for Tenant's intended use. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. If the Tenant Possession Date occurs during the months of October through May, the Landlord shall grant Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. Landlord shall also warrant the HVAC system for a period of three years for any repairs over $2,000 during a single lease year.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:**   All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term and Options, Terms or Extensions. Currently one sprinkler riser (which is contained in a room located adjacent to the Demised Premise and accessible from an exterior door) services all the building that includes the Demised Premise, Deal$, Office Max, and the two vacancies remaining in that building and no changes are anticipated to this situation.

**UTILITIES:**   Landlord shall provide Tenant with assurance that utilities are adequate for Tenant's use, are available and include legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. Tenant is to verify prior to Lease execution that the current utility service is acceptable to the Tenant.

**LIGHTING:**   All existing interior lighting to be in good working condition.

**EXTERIOR LIGHTING:**   All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Tenant is to verify prior to Lease execution that the current exterior lighting is acceptable to the Tenant.

**ROOF:**   Roof shall be professionally inspected and certified to be in good condition and free of leaks. Landlord shall provide an inspection report to tenant and make the necessary repairs to the roof to ensure it has a minimum life expectancy over Tenant's initial lease term. Tenant may also have the roof inspected and landlord shall make the necessary repairs/replacement per its inspection report.

**RESTROOMS:**   Existing restrooms to be in good working condition.

**RECEIVING AREA:**   Existing loading dock to be in good working condition (including all seals, bumpers, bollards, doors, etc.). Tenant shall have exclusive use of the dock area, which shall remain unobstructed

**PARKING LOT:**   Parking lot shall be in good condition (paved, patched, sealed and striped) - with potholes, severe cracks and uneven areas resurfaced – adequate for customer parking and Tenant's use. Tenant is to verify prior to Lease execution that the current parking lot is acceptable to the Tenant.

**Page -2-**

| | |
|---|---|
| **SIGNAGE:** | Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Tenant to have the pylon positions outlined in Exhibit D. |
| **DRAWINGS:** | Landlord is to provide Tenant with "as built" drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. Tenant's plans will be attached to the Lease and will be deemed approved by Landlord upon execution of the Lease. |
| **MISCELLANEOUS:** | Landlord shall provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, an asbestos survey or, in the alternative, necessary certification. Landlord to be responsible for the removal of any and all Hazardous Materials. |
| **GENERAL CONDITIONS:** | Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. |

All above work to be completed before the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS!

# EXTERIOR SIGNING

# SPECIFICATIONS

**If you need additional information that is not contained in this packet contact:**

**BIG LOTS! Store Planning Department:**

**Michael Neu - 614-278-6868**
**Mike Stiles - 614-278-6805**

## HORIZONTAL LOGO

## INDIVIDUAL LED ILLUMINATED
## REVERSE CHANNEL LETTER SET



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

## STACKED LOGO

## INDIVIDUAL LED ILLUMINATED
## REVERSE CHANNEL LETTER SET



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |



**BIG LOTS**

Returns: .063 aluminum; 5" deep
Paint exterior semi-gloss black;
Paint interior white

Faces: .125 aluminum;
Paint exterior semi-gloss black;
Paint interior white

Backs: 3/16" clear lexan

Halo Illumination: Sloan Apollo series
White L.E.Ds

Pass-thrus: Plastic; UL approved;
Located in lower half of letters

Mounting: Determined by conditions;
2" off wall, spacers painted to
match wall

Remote power supplies located behind wall



Returns: .063 aluminum; 5" deep
Paint exterior semi-gloss black;
Paint interior white

Faces: .150 Acryloid
#2119 Orange

False Back: .063 aluminum; Painted white;
Welded to returns 2" in from letter backs;

Backs: 3/16" clear lexan

Halo Illumination: Sloan Apollo series
White L.E.Ds

Face Illumination: Sloan V-series
Orange L.E.Ds

Pass-thrus: Plastic; UL approved;
Located in lower half of letters

Mounting: Determined by conditions;
2" off wall, spacers painted to
match wall

Trimcap: Jewelite 1" Orange

Remote power supplies located behind wall

# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet





**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE

11/2009

## EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date**: _____

**To**: _____ (insert Tenant)
      via facsimile: (614) 278-6546

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE**: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed. Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant. You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**LANDLORD:**

_____
a _____

By: _____

Title: _____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____

Title: _____

# EXHIBIT F

## EXCLUSIVE USE PROVISIONS

1.  **Shoe Show** During the term of this lease, and any renewal thereof, the Lessor, its successors, assigns, heirs, and executors hereby covenants that it its successors, assigns, heirs, and executors shall not lease, use, permit to be used, or otherwise allow any real property owned or leased by Lessor within the South Plaza Shopping Center to be used for business operations primarily engaged in "rack Type" and/or "Open Display" show retail sales. Lessor and Lessee hereby agree that "Open Display" shoe retail sales are where the shoes are displayed in a manner whereby the customer may make a selection with minimum employee assistance.

2.  **Office Max** During the Lease Term, no portion of the Shopping Center shall be used: (a) for the purposes of, or which is permitted to be, the sale of office, home office, school or business products, computers and computer products, office home office, school or business supplies or equipment; office furniture; mobile or portable telephones or pagers; or electronics; or for use as a business support center, copy center or "Kinko"-type of operation, except to the extent permitted by subparagraphs (b) and (c) immediately below; (b) for any purpose which would permit more than (i) 1,000 sf of space to be used for any Prohibited Uses, or (ii) 5% of such user's floor area to be used for purposes of any Prohibited Uses, whichever is less; or (c) for any purpose which, taken in the aggregate for the entire Shipping Center, would permit more than 5,000 sf of space in the Shopping Center to be used for any of the Prohibited Uses.

3.  **Deal$/Dollar Tree**

    a.  <u>Exclusive Use.</u>  Landlord shall not lease, rent, occupy or permit any other premises in the Shopping Center less than **20,000** square feet to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the operation of **the following uses** ("Exclusive" or "Exclusive Use"):  .

        **(1) Variety retail operations with the word "Dollar" in their trade name; or**

        **(2) A retail store whose "principal business" (hereinafter defined) is:**

        **(a)      Selling variety retail merchandise at a single price point;**

    b.  <u>Restricted Uses.</u>  Landlord will not permit any other occupant in the Shopping Center to operate the following uses (hereinafter, "Restricted Uses") without Tenant's consent and such consent shall be in Tenant's sole and absolute discretion:

        (1) Variety retail operations with the word "Dollar" in their trade name; or

        (2) A retail store whose "principal business" (hereinafter defined) is:

            a. Selling variety retail merchandise at a single price point;

    For the purpose of Sections A.13.a and A.13.b hereof, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half [1/2] of the adjacent aisle space).

    Notwithstanding the foregoing, this Section A.13 shall not apply to any current occupant or tenant of the Shopping Center who is operating under their current use clause or trade name as of the date of this Lease; provided, however, in the event Landlord's consent is required for a change in permitted use or trade name, or Landlord has the ability to challenge a change of permitted use or trade name, then Landlord shall not consent to a change of any tenant's use or trade name which would violate the Exclusive Use or Restricted Uses, and Landlord shall take affirmative action to protect Tenant's Exclusive Use and Restricted Uses so that no violation of the Exclusive Use or Restricted Uses shall occur.

<u>Lowes</u>

**Amendment to Reciprocal Access and Cross-Parking Easement and Property Maintenance Agreement**

This Amendment to Easements with Covenants and Restrictions Affecting Land is made as of the 3rd day of August, 2007, by SOUTH PLAZA INVESTMENTS, LLC, a Delaware limited liability company with an address of 3100 Monticello Avenue, Suite 260, Dallas, Texas 75205 ("Owner"), as successor in interest to South Plaza Joint Ventrue, a Tennessee joint venture composed of W. Gerald Ezell and Barry E. Dotson & Associates, Inc. ("Original Owner").

**RECITALS:**

1. Original Owner previously executed a certain agreement captioned "Reciprocal Access and Cross Parking Easement and Property Maintenance Agreement dated January 18, 1985, as recorded in Davidson County, Tennessee in Book 6490, Page 204, and re-recorded in Book 6538, Page 731 (the "Original ECR").
2. On or before today's date, Lowe's Home Centers, Inc. has entered into a Ground Lease with Owner with respect to Lot 1 of South Plaza Shopping Center as shown on the plan attached to the original ECR as Exhibit B, said Tract being more particularly described in Exhibit 1 attached hereto. Lot 1 is also precently subject to and the beneficiary of the Original ECR.
3. In connection with Lowe's ground lease of Tract 2, Owner desires to amend certain provisions of the Original ECR and to otherwise incorporate the terms set forth in this Amendment.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the premises, easements, covenant, conditions, restrictions and encumbrances contained herein, the sufficiency of which is hereby acknowledged, Owner does hereby agree as follows:

1. **Amendment to Definitions.** Except as otherwise defined in this Amendment, all capitilizaed terms used in this Amendment shall have the meanings ascribed to them in the Original ECR. In the event a capitalized term is defined in both the Original ECR and this Amendment, the definition ascribed to such term in this Amendment shall supercede and replace any previous definition.
2. **Definition of Easement.** The term "Easment" shall mean the Original ECR as amended by this Amendment.
3. **Use Restrictions.** The follow new Paragraph 10 is hereby added to the Original ECR after Paragraph 9:

10. Use Restrictions.

   (a)  During the Term, subject to subparagraph (d) below, no portion of the Shopping Center may be used for any of the following purposes without the written consent of Tenant:

   (i)  A tavern, bar, nightclub, cocktail lounge, discotheque, dance hall, or any other establishment selling alcoholic beverages for on-premises consumption; provided, however, the foregoing shall not prohibit the operation of a restaurant where the sale of alcoholic beverages therein comprises less than forty (40%) percent of the restaurant's gross revenues.

   (ii) A bowling alley or bingo parlor.

(iii) A theater (motion picture or live performance)

(iv) A service station, automotive repair shop or truck stop.

(v) A flea market or pawn shop.

   (vi)  A car wash, except on an outparcel and where the same shall have constructed and shall use sanitary sewer, water and storm water drainage lines entirely separate from those utilized by the Lowe's Parcel.

   (vii) A dry cleaning plant or central laundry

   (viii)  An establishment for sale of automobiles, trucks, mobile homes, recreational motor vehicles.

   (ix) A child day care facility.

   (a)  During the term of this Lease no portion of the Properties may ever be used for any of the following uses whatsoever:

   (i)  An adult type bookstore or other establishment selling, renting, displaying or exhibiting pornographic or obscene materials (including without limitation: magazines, books, movies, videos, photographs or so called "sexual toys") or providing adult type entertainment or activities (including, without limitation, any displays of a variety involving, exhibiting or depicting sexual themes, nudity or lewd acts.

   (ii)  A massage parlor, unless it is a legitimate and recognized massage parlor incident to a legitimate spa operation, or of a type similar to those operated by The Massage Company.

   (iii) A mortuary, crematorium or funeral home.

(iv)     A mobile home or trailer court, labor camp, junkyard or stockyard.

(v)     A land fill, garbage dump or for the dumping, disposing, incineration or reduction of garbage.

(vi) A gambling establishment, bingo parlor or betting parlor.

(vii)     Animal raising or keeping facilities, other than as ancillary to a veterinary use or a retail business.

(viii)     Assembling, manufacturing, industrial, distilling, refining or smelting facility.

(c)     Provided Tenant is not in material default hereunder, Tenant shall have the exclusive right, during the Term, to operate within the Shopping Center a building material supplies or home center or home improvement retail warehouse as such businesses are commonly understood in the shopping center business. Landlord, nor any tenant of Landlord (other than Tenant), shall not sell, lease, or otherwise allow, directly or indirectly, the use or occupancy of any space in the Shopping Center, including the outparcels, controlled by Landlord (or any tenant of Landlord) adjoining the Demised Premises or the Shopping Center for the following uses:

(i)     A hardware store or center containing more than 5,000 square feet of floor area.

(ii)     An appliance, home electronics and/or lighting store or center containing more than 5,000 square feet of floor area.

(iii)     A nursery and/or lawn and garden store or center containing more than 5,000 square feet of floor area.

(iv)     A paint, wall paper, tile, flooring, carpeting and/or home decor store center containing more than 5,000 square feet of floor area.

(v)     A retail and/or warehouse home improvement center, lumber yard, building materials supply center, home improvement service center and/or other stores or centers similar to those operated by or as Lowe's, Home Depot, Home Depot Expo, Villagers Hardware, 84 Lumber, Wickes, Hughes Lumber, McCoys, Menard's, Sears Hardware, Sears Appliance and Hardware, Great Indoors, Sutherlands, Scotty's and Orchard Supply.

Provided however, that the foregoing shall not be construed to prohibit the operation of a prototypical Best Buy, Circuit City, Conn's, HH Greggs, Radio Shack or other similar type retail store as those stores are customarily operated as of the date hereof or a similar nationally or regionally recognized home electronics or audio/video store having at least 20 stores in the continental United States.

These restrictions or exclusive rights shall also apply to prohibit a larger business having space in its store devoted to selling the merchandise described in subparagraphs (c)(i) through (c)(iv) when such space exceeds the limitations of subparagraphs (c)(i) through (c)(iv).

(d)     The current tenants or occupant of the Shopping Center Site as of the date of the Ground Lease, each of whom is listed on Exhibit C of this Easement, or their successors or assigns (the "Permitted Tenants"), may not comply with the restrictions set forth in subparagraph (a). Neither Owner nor any Permitted Tenant shall be deemed to be in breach of its obligations under subparagraph (a) for so long as such Permitted Tenant continues to operate in the Shopping Center (whether pursuant to an existing lease or a renewal or extension thereof). Owner agrees that it will comply with the restrictions set forth in subparagraph (a) with respect to all other current and future tenants or occupants of the Shopping Center other than the Permitted Tenants.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ____, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    A.    Fixed Minimum Rent – Original Term (Section 5(A)):
_____ annually; _____ per month.

3.    A.    Fixed Minimum Rent – First Option (Section 5(A)):
_____ annually; _____ per month.

4.    A.    Fixed Minimum Rent – Second Option (Section 5(A)):
_____ annually; _____ per month.

5.    A.    Fixed Minimum Rent – Third Option (Section 5(A)):
_____ annually; _____ per month.

# EXHIBIT H

## PROHIBITED USES AREA
**(Red Outlined Area – Includes 5694-D, 5700, 5702, 5706 in Site Plan Below)**



SOLICITORS, 009320, 000028, 103881617.1
DRAFT  07/28/11  8:26AM