**Exhibit A**

**Approved Budget**

| Week # | Ref | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Weeks 1 - 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Date | | 10/6/2024 | 10/13/2024 | 10/20/2024 | 10/27/2024 | 11/3/2024 | 11/10/2024 | 11/17/2024 | 11/24/2024 | 12/1/2024 | 10/6/2024 |
| End Date | | 10/12/2024 | 10/19/2024 | 10/26/2024 | 11/2/2024 | 11/9/2024 | 11/16/2024 | 11/23/2024 | 11/30/2024 | 12/7/2024 | 11/30/2024 |
| Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Memo: Total Sales | | 64,644 | 72,020 | 70,683 | 73,967 | 88,290 | 89,936 | 103,098 | 125,200 | – | 687,839 |
| **Operating Receipts** | | | | | | | | | | | |
| Credit Card Receipts | | 57,708 | 58,308 | 58,821 | 59,263 | 68,815 | 76,771 | 76,413 | 106,325 | – | 562,413 |
| Cash Deposits | | 11,667 | 11,094 | 11,600 | 10,748 | 12,188 | 14,038 | 14,000 | 17,530 | – | 101,267 |
| Other Sales | | 4,175 | 4,123 | 4,246 | 4,232 | 4,921 | 5,487 | 5,391 | 7,608 | – | 40,183 |
| Miscellaneous | | 2,235 | 229 | 2,293 | 8,482 | 896 | 1,105 | 3,158 | 1,359 | – | 19,756 |
| **Total Receipts** | | 75,185 | 72,754 | 76,960 | 82,715 | 86,821 | 97,400 | 98,961 | 132,823 | – | 723,619 |
| **Operating Disbursements** | | | | | | | | | | | |
| Accounts Payable | | 52,677 | 34,033 | 60,896 | 66,075 | 61,632 | 61,963 | 50,616 | 74,317 | – | 462,208 |
| Payroll | | 11,986 | 22,730 | 9,891 | 17,014 | 8,946 | 16,014 | 8,885 | 16,014 | – | 111,279 |
| Rent | | 436 | 436 | 422 | 366 | 31,459 | 366 | 366 | 366 | – | 34,217 |
| Sales Tax | | 4,943 | 9,983 | 6,397 | – | 3,770 | 3,770 | 4,138 | 943 | – | 40,174 |
| Other | | 1,000 | – | – | – | 1,000 | – | – | 4,000 | – | 6,000 |
| **Total Operating Disbursements** | | 70,042 | 67,182 | 77,605 | 83,454 | 102,037 | 82,113 | 73,005 | 91,639 | – | 647,878 |
| **Total Net Operating Cash Flow** | | 5,143 | 5,572 | (645) | (739) | (15,217) | 15,287 | 25,156 | 41,183 | – | 75,741 |
| **Non-Operational Disbursements** | | | | | | | | | | | |
| Professional Fees | | 4,094 | 2,155 | 1,705 | 3,455 | 1,455 | 3,455 | – | 9,006 | – | 25,325 |
| UST Fees | | – | – | 400 | – | – | – | – | – | – | 400 |
| Stub and Other Rent [1] | | – | – | – | – | 7,913 | – | – | – | – | 7,913 |
| 503(b)(9) Payments [3] | | 1,054 | 4,468 | 548 | 2,478 | 3,300 | 9,300 | 14,121 | 16,619 | – | 51,888 |
| Other | | 1,000 | – | – | – | 1,000 | – | – | 4,000 | – | 6,000 |
| **Total Non-Operational Disbursements** | | 6,148 | 6,623 | 2,653 | 5,933 | 13,668 | 12,755 | 14,121 | 29,625 | – | 91,526 |
| **Unlevered Free Cash Flow** | | (1,005) | (1,051) | (3,298) | (6,673) | (28,885) | 2,532 | 11,036 | 11,559 | – | (15,784) |
| **Financing** | | | | | | | | | | | |
| ABL Borrowings / (Payments) | | 2,381 | 5,100 | 3,700 | 8,600 | 19,800 | (1,400) | (5,600) | 31,296 | (30,110) | 63,876 |
| FLO Borrowings / (Payments) | | – | – | – | – | 10,000 | – | – | – | – | 10,000 |
| FLO FF&E Paydown | | (1,235) | (3,896) | (293) | (2,082) | (896) | (1,105) | (1,158) | (14,359) | – | (25,024) |
| Interest, Amort and Bank Fees | | – | (229) | – | – | – | – | (4,320) | (8,216) | – | (12,765) |
| Other | | – | – | – | – | – | – | – | (1,785) | – | (1,785) |
| **Total Financing Cash Flow** | | 1,146 | 976 | 3,407 | 6,518 | 28,904 | (2,505) | (11,078) | 6,936 | (30,110) | 34,305 |
| **Total Net Cash Flow** | | 142 | (75) | 109 | (155) | 19 | 27 | (42) | 18,495 | (30,110) | 18,520 |
| (+/-) Net Cash Flow | | 142 | (75) | 109 | (155) | 19 | 27 | (42) | 18,495 | (30,110) | 18,520 |
| Beginning Bank Balance | | 11,589 | 11,731 | 11,656 | 11,765 | 11,610 | 11,629 | 11,657 | 11,615 | 30,110 | 11,589 |
| **Ending Bank Balance** | | 11,731 | 11,656 | 11,765 | 11,610 | 11,629 | 11,657 | 11,615 | 30,110 | – | 30,110 |
| **Availability** | | | | | | | | | | | |
| ABL Borrowing Base | a | 447,383 | 447,601 | 454,748 | 465,732 | 488,220 | 500,926 | 502,583 | 516,501 | – | 516,501 |
| FLO Borrowing Base | b | 143,953 | 143,725 | 143,432 | 141,350 | 150,454 | 149,349 | 148,191 | 133,832 | – | 133,832 |
| (-) ABL Balance | c | (291,562) | (296,662) | (300,362) | (308,962) | (330,762) | (327,362) | (321,762) | (353,058) | – | (353,058) |
| (-) FLO Balance | d | (143,953) | (143,725) | (143,432) | (141,350) | (150,454) | (149,349) | (148,191) | (133,832) | – | (133,832) |
| (-) LCs | e | (61,209) | (61,209) | (58,749) | (58,749) | (58,749) | (58,749) | (58,749) | (58,749) | – | (58,749) |
| MEA Covenant | f | (80,000) | (80,000) | (80,000) | (80,000) | (80,000) | (80,000) | (80,000) | (80,000) | – | (80,000) |
| ABL Availability (excl. MEA) | g=a+c+e | 94,612 | 89,730 | 95,637 | 98,021 | 98,709 | 114,815 | 122,072 | 104,694 | – | 104,694 |
| ABL Availability (incl. MEA) | h=g+f | 14,612 | 9,730 | 15,637 | 18,021 | 18,709 | 34,815 | 42,072 | 24,694 | – | 24,694 |
| FILO Availability | i=b+d | – | – | – | – | – | – | – | – | – | – |
| **Total Availability (incl. MEA)** | j=h+i | 14,612 | 9,730 | 15,637 | 18,021 | 18,709 | 34,815 | 42,072 | 24,694 | – | 24,694 |

1. Budget assumes transaction closes on 11/30/2024, budget will be updated accordingly if delayed.
2. Other Rent consisted of estimated amount of ~$7m that relates to balances owed through September 8th.
3. $33.2m of 503(b)(9) claims are assumed by the buyer and paid post transaction.

**Exhibit B**

**October 21, 2024 Hearing Transcript**

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                          .  Chapter 11
                                     .  Case No. 24-11967 (JKS)
 4   BIG LOTS, INC., et al.,    .
                                     .  (Jointly Administered)
 5                                   .
                                     .  Courtroom No. 6
 6                                   .  824 Market Street
              Debtors.              .  Wilmington, Delaware 19801
 7                                   .
                                     .  Monday, October 21, 2024
 8   . . . . . . . . . . . . . . .   1:30 p.m.

 9                        TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE J. KATE STICKLES
10                    UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Sophie Rogers Churchill, Esquire
                               Daniel Butz, Esquire
13                             Casey Sawyer, Esquire
                               Andrew Remming, Esquire
14                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
15                             Wilmington, Delaware 19801

16

17
     (APPEARANCES CONTINUED)
18
     Audio Operator:   Mandy Bartkowski, ECRO
19
     Transcription Company:    Reliable
20                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
21                             (302)654-8080
                               gmatthews@reliable-co.com
22

23   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
24

25
```

APPEARANCES (CONTINUED):

| | |
|---|---|
| For the Debtors: | Brian Resnick, Esquire |
| | Jonah Peppiatt, Esquire |
| | Adam Shpeen, Esquire |
| | Stephen Piraino, Esquire |
| | James McClammy, Esquire |
| | DAVIS POLK & WARDWELL LLP |
| | 450 Lexington Avenue |
| | New York, New York 10017 |
| | |
| For the U.S. Trustee: | Linda Casey, Esquire |
| | OFFICE OF THE UNITED STATES TRUSTEE |
| | 844 King Street, Suite 2207 |
| | Lockbox 35 |
| | Wilmington, Delaware 19801 |
| | |
| For the Committee: | Justin Alberto, Esquire |
| | COLE SCHOTZ, P.C. |
| | 500 Delaware Avenue |
| | Suite 1410 |
| | Wilmington, Delaware 19801 |
| | |
| For Fifth Grand Holdings LLC, et al.: | Scott Leonhardt, Esquire |
| | ESBROOK P.C. |
| | 1000 N. West Street, Suite 1200 |
| | Wilmington, Delaware 19801 |
| | |
| For Milelli Realty-Lehigh Street, LLC: | Shannon Humiston, Esquire |
| | MCCARTER & ENGLISH |
| | 405 N. King Street, Eighth Floor |
| | Wilmington, Delaware 19801 |
| | |
| For Gordon Brothers: | Steven Fox, Esquire |
| | RIEMER & BRAUNSTEIN |
| | Times Square Tower, Suite 2506 |
| | Seven Times Square |
| | New York, New York 10036 |
| | |
| For Various Landlords: | Leslie Heilman, Esquire |
| | BALLARD SPAHR |
| | 919 N. Market Street, 11th Floor |
| | Wilmington, Delaware 19801 |

1    <u>APPEARANCES (CONTINUED)</u>:

2    For WPG Management:        Susan Kaufman, Esquire
                                LAW OFFICE OF SUSAN KAUFMAN
3                               919 N. Market Street
                                Wilmington, Delaware 19801
4
                                -and-
5
                                Ronald Gold, Esquire
6                               FROST, BROWN & TODD
                                Great American Tower
7                               301 East Fourth Street, Suite 3300
                                Cincinnati, Ohio 45202
8
     For Mideb Interests:       Ivan Gold, Esquire
9                               ALLEN MATKINS LECK GAMBLE
                                    MALLORY & NATSIS LLP
10                              3 Embarcadero Center
                                12th Floor
11                              San Francisco, California 94111

12   For Various Landlords:     Robert LeHane, Esquire
                                KELLEY DRYE & WARREN, LLP
13                              3 World Trade Center
                                175 Greenwich Street
14                              New York, New York 10007

15

16

17

18

19

20

21

22

23

24

25

4

1

INDEX

2    MOTIONS:                                                         PAGE

3    Motion of Debtors for Entry of Interim and Final                  8
     Orders (I) Prohibiting Utilities from Altering,
4    Refusing, or Discontinuing Service, (II) Deeming
     Utilities Adequately Assured of Future Performance,
5    and (III) Establishing Procedures for Determining
     Requests for Additional Adequate Assurance
6
     Application of Debtors for Authority to Employ and                9
7    Retain Davis Polk & Wardwell LLP as Attorneys for
     the Debtors *Nunc Pro Tunc* to the Petition Date
8
     Motion of Debtors for Entry of Interim and Final                  9
9    Orders Establishing Notification and Hearing
     Procedures for, and Approving Restrictions on,
10   Certain Transfers of, and Declarations of
     Worthlessness with Respect to, Interests in the
11   Debtors Estates

12   Motion of Debtors for Leave To File the Omnibus                  11
     Reply in Support of the Store Closing Motion, Bidding
13   Procedures Motion and DIP Motion

14   Motion of Debtors for Entry of Interim and Final                 11
     Orders (I) Authorizing Debtors to Assume the Services
15   Agreement, (II) Authorizing Store Closing Sales
     and Approving Related Procedures, and (III) Granting
16   Related Relief

17   Motion of Debtors for Entry of Orders (I) (A)Approving           56
     Bidding Procedures for Sale of Debtors' Assets, (B)
18   Approving the Stalking Horse Bid Protections, (C)
     Scheduling Auction for, and Hearing to Approve, Sale
19   of Debtors' Assets, (D) Approving Form and Manner of
     Notices of Sale, Auction, and Sale Hearing, and (E)
20   Approving Assumption and Assignment Procedures, (II) (A)
     Approving Sale of Debtors' Assets Free and Clear
21   of Liens, Claims, Interests, and Encumbrances and (B)
     Authorizing Assumption and Assignment of Executory
22   Contracts and Unexpired Leases, and (III) Granting Related
     Relief

23

24

25

MOTIONS:                                                          PAGE

Motion of Debtors for Entry of Interim and Final Orders     99
    (I)     Authorizing (A) Debtors to Continue to Maintain
Existing Cash Management System, Bank Accounts, and
Business Forms, (B) Debtors to Open and Close Bank
Accounts, and (C) Financial Institutions to Administer
the Bank Accounts and Honor and Process Related Checks
and Transfers, (II) Waiving Deposit and Investment
Requirements, and (III) Allowing Intercompany Transactions
and Affording Administrative Expense Priority to Post-
Petition Intercompany Claims


WITNESSES CALLED
BY THE DEBTORS:                                                  PAGE

     JONATHAN EDWARD RAMSDEN
     Direct examination by Mr. McClammy              17
     Cross-examination by Ms. Casey                  28
     Redirect examination by Mr. McClammy            40

     ADAM RIFKIN
     Direct examination by Mr. McClammy              62
     Cross-examination by Ms. Casey                  70
     Redirect examination by Mr. McClammy            71



                         EXHIBITS
                                              REC'D
                                              UNDER
DEBTORS' EXHIBITS:                       ID          PAGE

D-1                                                  17

D-2                                                  62




Transcriptionist's Certificate                      118

1    (Proceedings commenced at 1:38 p.m.)

2    THE COURT:  Good afternoon.  Please be seated,

3 everyone.  This is Judge Stickles.  We are on the record in

4 Big Lots, Case No. 24-11967.  Can you bear with me one

5 second?  I feel like I'm in the dark, but I'd rather not be.

6    MR. RESNICK:  Good afternoon, Your Honor.

7    THE COURT:  Good afternoon.

8    MR. RESNICK:  Brian Resnick of Davis Polk &

9 Wardwell that on behalf of the debtors.  I am joined by

10 several of my colleagues as well as our co-counsel from

11 Morris Nichols.

12    From the company, we have Mr. Jonathan Ramsden,

13 the chief financial and administrative officer as well as

14 Rocky Robins, the executive vice-president, chief legal

15 officer and governance officer for the Big Lots management

16 team.  I'm also joined today by Adam Rifkin and Stuart

17 Erickson from Guggenheim and Ken Kersey from Alix Partners.

18    Your Honor, before we start with the agenda, I

19 just wanted to give a very brief update of where things stand

20 since our last hearing.

21    As Your Honor is aware, we were able to

22 potentially resolve many of the issues on the other first

23 days, and Your Honor hopefully entered that relief.  That was

24 not without a ton of work and back-and-forth with the various

25 parties.  So we certainly want to thank you, the Trustee's

1  office as well as the committee and the banks and the

2  landlord groups for working with us on those various motions

3  to achieve consensus.

4          We worked very hard to narrow the issues that are

5  before Your Honor today, and there are a few discrete issues,

6  but I think we worked very hard to really narrow those.

7          Also, in terms of what's been going on, the

8  initial 341 meeting was conducted by Ms. Casey last

9  Wednesday.  That was October 16th.  And we understand that

10  Ms. Casey will be scheduling a second meeting following the

11  filing of the schedules and the SOFAs, and we're expecting to

12  file those on -- by October 31st at the latest.

13          Otherwise, Your Honor, we continue with the

14  debtor's vendors and other stakeholders to continue to

15  operate smoothly in these Chapter 11 cases as we pursue the

16  sale process.

17          In terms of what's next, Your Honor, this will be

18  up in the bid procedures, but just high level.  Our bid

19  deadline is scheduled for this Wednesday, a few days from

20  now.  And then, assuming we have more than one qualified bid,

21  the auction is scheduled for October 28th, one week from now.

22  And then, we have a sale hearing scheduled for November 8th.

23          We have worked constructively with our stalking

24  horse bidder, Nexus, to make some changes to the APA, to the

25  bid procedures, and worked with the landlord group, as well.

1   My colleague, Mr. Peppiatt, is going to address that motion

2   and some of the changes that were made.

3          Your Honor, I think that brings us to the six

4   items that are on the agenda today.  I think three of which

5   are fully consensual.  And to start with, the utilities

6   motion that was filed at Docket No. 9, we filed a -- we were

7   able to resolve an objection that was filed, and -- by the

8   utility company that filed the withdrawal of the objection,

9   and so we submitted a proposed final order under

10  certification under Docket No. 563.

11         THE COURT:  I had an opportunity to look at that.

12  I was curious.  Paragraph 2 of that order refers to paragraph

13  14(a) and 15 with respect to service.  And I don't think

14  that's the correct reference paragraphs.  It looks to me like

15  that should be paragraphs 16 and 17 address service.

16         MR. RESNICK:  Okay.  I'm sorry, Your Honor.  I

17  have it out, but which page are you looking -- reviewing?

18         THE COURT:  I was looking at paragraph 2.  In line

19  3 of paragraph 2 it refers to paragraphs 14(a) and 15.  I

20  don't think they're the correct paragraphs unless I don't

21  understand the order.

22         MR. RESNICK:  Got it.  Why don't we have our team

23  take a look at that in the interim.

24         THE COURT:  Got it.  If you'll just let me know by

25  the end of the hearing.

1          MR. RESNICK:  We'll do that.  Thank you, Your

2   Honor.

3          Second is the Davis Polk retention application,

4   which was filled at Docket No. 205.  Ms. Casey requested that

5   we file a supplemental declaration, which we did a few hours

6   ago at Docket 565.  And with that, we also filed a

7   certification of counsel at 567.

8          THE COURT:  And I have not had an opportunity to

9   look at that, but I will look at it promptly at the

10  conclusion of the hearing.

11         MR. RESNICK:  Thank you, Your Honor.  And then,

12  lastly, for the -- what's uncontested is the NOL motion that

13  was filed at Docket No. 8.

14         We did not file a certificate of counsel because

15  we had received an email from an individual shareholder and

16  Mr. Kurzon and that the shareholder -- we responded but never

17  heard back, so we assumed that they -- they didn't file an

18  objection, we assumed that they're not prosecuting anything

19  but because there was an interaction with the shareholder

20  that sort of trailed off, we did file a certificate of

21  counsel.  But that letter was -- and again, we filed a letter

22  that was docketed at 438.

23         THE COURT:  That was -- I had it down as Betty

24  Burns; is that correct?  Or you -- I think you sent a

25  different --

1          MR. RESNICK:  I'm sorry.  The letter was in

2    addition.  Yes, I apologize.  The letter was by Ms. Brens at

3    Docket 438.  And Mr. Kurzon was the one who reached out by

4    email.  I apologize.

5          THE COURT:  Okay, well, let me ask.  Is Ms. Brens,

6    B-R-E-N-S, or Mr. Kurzon on the line?  Or anyone else who

7    wishes to be heard regarding Docket No. 8?  Okay, I hear no

8    one with respect to an objection.

9          This motion seeks to implement procedures intended

10   to protect the debtor's estate against the possible loss of

11   tax assets.  The proposed order didn't deem stock worthless,

12   as I believe one of the objectors asserted, so I'll enter

13   that form of order.

14         MR. RESNICK:  Thank you, Your Honor.  That brings

15   us to the three contested motions.  Mr. Piraino will be

16   handling the store closing relief and argument.  And then my

17   colleague, Mr. Peppiatt, will be handling the bid procedures

18   motion argument.  And that will include testimony from Mr.

19   Adam Rifkin of Guggenheim, who had previously filed a

20   declaration at Docket No. 197.

21         And then last, we'll do the DIP motion, which will

22   be handled by my colleague, Adam Shpeen.

23         THE COURT:  Okay, thank you.

24         MR. RESNICK:  Thank you, Your Honor.

25         MR. PIRAINO:  Good afternoon, Your Honor.

1             THE COURT:  Good afternoon.

2             MR. PIRAINO:  For the record, Stephen Piraino of

3   Davis Polk & Wardwell on behalf of the debtors.  Your Honor,

4   just one housekeeping point before we start.

5             We filed a motion at Docket No. 559 to file a late

6   reply.  As set forth in the motion, given that we were

7   continuing to resolve objections, we believe there is cause

8   to grant the motion.  I just wanted to make sure we got that

9   out of the way before we begin today's hearing.

10            THE COURT:  Does anyone oppose the motion to file

11  late reply?  Okay, I hear no one.  I'll grant that motion.  I

12  will note I had meetings this morning, so if you have

13  something in that reply, I looked at it briefly, but if

14  there's anything you want to focus on in the reply, you

15  should.

16            MR. PIRAINO:  Thank you, Your Honor.  We will do

17  so.  So moving on to the first item on the agenda today is

18  Docket No. 16, which is the store closing motion.  This Court

19  granted the motion on an interim basis, and the interim order

20  can be found at Docket No. 134.

21            Today, the debtors are seeking entry of a final

22  order, and a proposed final order was filed at Docket No.

23  557.  Since the first day hearing, the debtors have worked

24  constructively with various counterparties, including the

25  committee, landlords, state taxing authorities, insurance

1  companies, and state attorneys general.  And the final order

2  that consensually resolves various objections or obviated the

3  need for parties to file an objection includes, for example,

4  requesting a committee for periodic reporting, language

5  addressing personal property tax liabilities, and from the

6  National Association of Attorney's General, language to

7  address concerns about customer privacy and protection.

8          We've also made sure to include in the final order

9  Your Honor's comment from the first day hearing about

10 disposal of abandoned property without liability to third

11 parties.

12         And Your Honor, importantly, the creditors'

13 committee is not objecting to the relief sought today.

14 However, as noted in the reply and as noted on the agenda,

15 the U.S. Trustee and certain landlords continue to pursue

16 objections.  For the reasons in our reply that we'll discuss

17 today, those objections should be overruled on the merits.

18         If Your Honor would allow, I'd like to provide a

19 short opening addressing the U.S. Trustee's objection, which

20 was filed at Docket No. 503, at which point I'll cede the

21 podium to my colleague, James McClammy, for a brief direct

22 examination of Jonathan Ramsden, and then after the witness

23 testimony, I will address the additional objections and, of

24 course, any questions Your Honor may have.

25         THE COURT:  Okay.

1          MR. PIRAINO:  Your Honor, the U.S. Trustee seeks

2     to overturn years of established practice and precedent in

3     this district by arguing that store liquidators like Gordon

4     Brothers Retail Partners, or GBRP, are professionals under

5     Section 327(a) of the Bankruptcy code.

6          While there is no doubt that GBRP has expertise in

7     store liquidations, indeed, that's why the debtors engaged

8     them more than two years ago, that fact does not make them a

9     professional under Section 327(a).

10          Judge Shannon in In Re Brookstone, 592 BR 27 came

11     to the same conclusion, and I quote literally all business

12     and service activities require specialized knowledge or skill

13     on the part of the service provider.

14          At the October 9th hearing, Your Honor stated that

15     the test in this district for whether someone is a

16     professional under Section 327 is the six-factor test

17     articulated by the District Court In Re First Merchants

18     Acceptance Corp.

19          And as set forth in our reply papers and as will

20     be discussed today, when applying those factors here, GBRP is

21     simply not a professional under Section 327.  Importantly,

22     GBRP does not control the debtors, is not an agent of the

23     debtors, and does not have discretion to exercise its own

24     judgment over the debtor's reorganization.

25          For example, Section 4.1 of the consulting

1  agreement provides that neither party is an agent of the

2  other or is authorized to enter into or make commitments on

3  behalf of the other party.  GDRP is not directing the

4  administration of the estate.  Again, they simply cannot

5  speak on behalf of the estate or the debtors in possession.

6          Just like the liquidator of Brookstone, GBRP is

7  not determining that store closures are warranted or which

8  stores will be closed.  Moreover, store closing sales with

9  the liquidator or consultant routinely occurred pre-petition

10 for Big Lots.

11         And while GBRP certainly has knowledge or skill,

12 Judge Shannon and Brookstone concluded that that factor of

13 the First Merchants' test is ultimately unhelpful.

14         The U.S. Trustee's alternative argument also

15 fails.  Assumption of a contract with a third party like this

16 consulting agreement is governed by the business judgment

17 standard.  Simply because affiliates of GDRP and syndication

18 partners, Tiger and Hilco, have other roles in this case,

19 such as administrative agent or lender, such connections do

20 not indicate a disqualifying conflict.

21         Bankruptcy courts, including in this district,

22 have continued to approve assumption of consulting agreements

23 just like this when affiliates of the consultant or

24 liquidator are involved in other roles such as lender.  For

25 example, in Christmas Tree Shops, Judge Horan approved a very

1    similar motion that included assumption of an agreement with

2    Hilco.

3              THE COURT:  Was that approved on a final basis?

4              MR. PIRAINO:  That was, Your Honor.  And in

5    Brookstone, Judge Shannon expressly acknowledged that Hilco,

6    the liquidator there, might be called upon or invited to play

7    other roles in the case as circumstances may require.

8              THE COURT:  But when he approved it, there were no

9    other roles of Hilco; is that correct?

10             MR. PIRAINO:  In Brookstone, that's correct.  And

11   other courts in this circuit, in the District of New Jersey,

12   have similarly acknowledged that affiliates of liquidators

13   are short-closing consultants may have other roles, such as a

14   lender.

15             On two recent cases, Sam Ash Music Corp and

16   Christopher and Banks, the Bankruptcy Court for the District

17   of New Jersey overruled similar objections by the U.S.

18   Trustee.

19             So Your Honor, at bottom, the Court is being asked

20   to approve today the standard relief in a retail Chapter 11

21   case.  I'll now cede the podium to Mr. McClammy for a brief

22   direct examination of Mr. Ramsden.

23             MR. MCCLAMMY:  Thank you.  Good afternoon, Your

24   Honor.

25             THE COURT:  Good afternoon.

1           MR. MCCLAMMY:  For the record, Jim McClammy of

2   Davis Polk on behalf of the debtors.  At this time, we'd like

3   to call Mr. Jonathan Ramsden, the executive vice president,

4   chief financial administrative officer of the debtors to the

5   stand.

6           THE COURT:  Okay, thank you.  And I'm going to ask

7   the ECRO to employ the broadcasting protocol and then swear

8   in the witness, please.  Thank you.  Wait one second.

9           THE COURT REPORTER:  Please raise your right hand

10  do you affirm that you will tell the truth, the whole truth

11  and nothing but the truth, to the best of your knowledge and

12  ability?

13          THE WITNESS:  I do.

14          THE COURT REPORTER:  Please state your full name

15  and spell your last name for the record.

16          THE WITNESS:  Jonathan Edward Ramsden,

17  R-A-M-S-D-E-N.

18          THE COURT REPORTER:  Thank you.

19          MR. MCCLAMMY:  Thank you.  As Your Honor may

20  recall, as part of the first-day proceedings, Mr. Ramsden

21  offered a declaration which is found in Docket No. 3, which

22  was accepted as evidence at that time, and which also serves

23  as part of the evidentiary record for this motion.

24          At this time, I'd like to provide a copy of the

25  declaration to the witness.

1          THE COURT:  Okay.

2          MR. MCCLAMMY:  Does Your Honor need a copy?

3          THE COURT:  Are you seeking to admit the

4   declaration to evidence?

5          MR. MCCLAMMY:  I believe it's already admitted,

6   but I'd also like to have it as part of the evidentiary

7   record here, so yes.

8          THE COURT:  Does anyone object to the admission of

9   the Ramsden's declaration in support of first-day motions at

10  Docket No. 3?  I hear no one.  Thank you.

11         MR. MCCLAMMY:  Thank you, Your Honor.

12         THE COURT:  The declaration is admitted.

13         (Debtor's 1 entered into evidence.)

14         MR. MCCLAMMY:  Does Your Honor need a copy?

15         THE COURT:  Yes.  Can I?  It's easier than working

16  through a binder.  Thank you, Mr. McClammy.

17  DIRECT EXAMINATION

18  By MR. MCCLAMMY:

19     Q.   And Mr. Ramsden, I placed in front of you what was

20  previously filed at Docket No. 3.  Can you identify that

21  document, please?

22     A.   Yes.  Thank you.  I can yes.

23     Q.   And what is this document?

24     A.   This is my declaration in connection with the

25  initial filing.

1      Q.   And is there anything that you would like to

2 change or modify in that document?

3      A.   There is not.

4      Q.   And just briefly, Mr. Ramsden, can you explain

5 your role with the debtors, please?

6      A.   Sure.  I'm the executive vice president, chief

7 financial and administrative officer of the company.  I've

8 been with the company for a little over five years.  I

9 oversee finance, real estate, merchandise planning, corporate

10 strategy primarily.

11     Q.   And in that role, are you familiar with the

12 debtors going-out-of-business sales process?  And can you

13 provide us a general overview of what that means, what a

14 going-out-of-business sales processes?

15     A.   Yes, it's a process that occurred for a long

16 period of time.  Routinely, in any given year, we would have

17 a number of stores that we would close because we were unable

18 or unwilling to renew the leases.

19          So we'd have a process where, towards the end of the

20 lease, we would go through going-out-of-business sale in

21 those particular stores, which would entail essentially

22 liquidating all of the inventory in those stores, all of the

23 merchandise, as well as the fixtures and fittings in those

24 stores until the stores are completely run down of inventory

25 and fittings.

1        Q.    And the merchandise and the furniture and the

2   fixtures that are being sold, they're primarily being sold

3   directly out of the particular store that's going out of

4   business; is that correct?

5        A.    Yeah, for the most part, yeah.  They can be sold

6   directly to retail consumers in those stores.

7        Q.    Okay.  And was there time when the debtors, or Big

8   Lots, I guess, at the time, pre-petition, did they manage

9   that process themselves?

10       A.    We did until a couple of years ago.  We mostly ran

11  those processes ourselves.  There were relatively few stores

12  going through the GOB processes at that time.

13       Q.    And then what did you do after that?

14       A.    We started to bring in third parties to help us

15  with that process, primarily in 2023, but to some degree in

16  2022.

17       Q.    Okay.  And why was that?

18       A.    Well, we had reason to believe they might be able

19  to secure better recoveries for the merchandise than we

20  could.  So that was the primary reason we go down that path.

21       Q.    Were you able to achieve that?

22       A.    Absolutely.  The results we got from using third

23  parties were significantly better than running the GOBs

24  ourselves.

25       Q.    And are you familiar with Gordon Brothers Retail

1  Partners?

2       A.    I am.

3       Q.    And when did the debtors first begin working with

4  Gordon Brothers Retail Partners?

5       A.    Last year.  We had them handle a number of the

6  routine GOBs for the company in 2023.

7       Q.    And in general, can you describe for me what

8  services Gordon Brothers Retail Partners provide?

9       A.    Yeah, so they provide consulting services,

10  advising our teams on how to execute various aspects of the

11  store closing process.  They work very collaboratively with

12  our teams on things like marketing, markdown, cadence,

13  condensing inventory in certain areas of the store to promote

14  the faster sales of those items and to sell through the

15  remaining inventory as quickly and efficiently as possible.

16       Q.    And those services, those are similar services

17  that were provided both pre-petition and post-petition?

18       A.    That's correct, yes.

19       Q.    Okay.  And what was the process for bringing

20  Gordon Brothers on board?

21       A.    So we first engaged them in 2023, again with a

22  relatively smaller number of stores.  We also engaged a

23  number of -- two other firms in 2023 to do the same thing.

24  We were interested to see how the different firms performed

25  relative to each other, so we brought those three firms on.

1  We did consider some other alternatives, but they were -- we

2  chose to go forward with those three firms.

3       Q.   Okay.  And among those three firms, how did they

4  perform?

5       A.   Gordon Brothers had the strongest performance in

6  2023.

7            THE COURT:  I'm sorry, could you repeat that, sir?

8            THE WITNESS:  My answer?  Yes.

9            THE COURT:  Yes.

10           THE WITNESS:  Gordon Brothers had the strongest

11 performance of the firms we worked with in 2023.

12 BY MR. MCCLAMMY:

13      Q.   And is that why the debtors selected Gordon

14 Brothers?

15      A.   That was a significant part of the reason.  The

16 appointment was also made in connection with the execution of

17 the final term loan with Gordon Brothers, which required us

18 to use them for the store liquidations going forward.  But we

19 were very comfortable with that decision because we've seen

20 very good results from the liquidations they've executed in

21 2023.

22      Q.   And compared to the debtors doing this work

23 themselves and having Gordon Brothers on board, can you tell

24 us, was there a benefit to having Gordon Brothers involved?

25      A.   Yeah, it's a significantly higher recovery.  We

1   saw probably 25 percent higher than we were able to achieve

2   by managing the GOB processes on our own.

3        Q.   Do you have a view as to what would happen if

4   Gordon Brothers were disqualified from being able to serve in

5   this role for the debtors going forward?

6        A.   Yeah, at this point it would be very disruptive.

7   We have about 550 stores that have either gone through GOB,

8   there are about 150 that have already completed and have

9   closed, but there are still close to 400 stores going through

10  GOB processes.  Gordon Brothers is intimately involved with

11  that process, and those GOBs represent the vast majority of

12  the stores we expect to close.

13       So at this point, to go with another provider of those

14  services would be very disruptive and potentially worse.  We

15  would have a very short period of time in which to engage an

16  alternative advisor and that would likely be very challenging

17  and would likely impair the recoveries we would expect from

18  the process.

19       Q.   Thank you.  And in this role, is Gordon Brothers

20  Retail Partners focus exclusively on consulting with the

21  debtors in connection with the store closings?

22       A.   That's correct, yes.

23       Q.   And I say store closing, but I mean, with respect

24  to the going-out-of-business sales?

25       A.   Yes.

1      Q.    And is Gordon Brothers Retail Partners advising

2   the debtors generally with respect to Chapter 11 strategy?

3      A.    It is not.

4      Q.    Who is advising the debtors with respect to

5   general corporate -- general Chapter 11 restructuring

6   strategy?

7      A.    So Davis Polk, Guggenheim, Alex Partners.  We've

8   also engaged some other advisors.

9      Q.    And is Gordon Brothers helping to devise strategy

10  for maximizing the estate's value?

11     A.    Not in general, only with regard to the store

12  closures.

13     Q.    To your knowledge, would Gordon Brothers be

14  involved in negotiating the plan of reorganization?

15     A.    No.

16     Q.    And you mentioned that there were store closings

17  both prior to the Chapter 11 filing and afterwards.  In your

18  experience, have store closings been a typical part of the

19  retail businesses?

20     A.    Yeah.  So routinely in any given year there would

21  be a number of stores that we would close.  So yes, it's been

22  part of our normal operations for a number of years.

23     Q.    And here, with respect to Gordon Brothers'

24  involvement, do they have any authority to make any final

25  decisions with respect to which assets are sold?

1      A.    They do not, no.  The primary authority rests with

2    the company.  We work closely with Gordon Brothers in a

3    consultative capacity, but they do not have the unilateral

4    right to make any final decisions on disposition of assets.

5      Q.    And do they have any authority to make any final

6    decisions with respect to which stores should be closed?

7      A.    They do not.

8      Q.    Does Gordon Brothers have authority to make any

9    decisions with respect to staffing levels at the Big Lots

10   stores?

11     A.    They would be involved in consultation on that.

12   And the staffing model in the stores gets adjusted as we go

13   through the GOB process.  But again, the company would retain

14   the ultimate decision-making authority on that.

15     Q.    So is it your testimony that basically across the

16   board, with respect to the going-out-of-business sales

17   process, that it's the debtors that retain the ultimate

18   decision-making authority?

19     A.    That's correct, yes.

20     Q.    Are you familiar with an entity called 1903P Loan

21   Agent?

22     A.    Yes, I am.

23     Q.    And what role do they play?

24     A.    They were the agent or are the agent for our term

25   loan facility that we entered into April of this year.

1          Q.   And do you know when they started in that role?

2          A.   We executed the term loan on April the 18th this

3   year, so that's when they assumed that role.

4          Q.   And at that point was Gordon Brothers already Big

5   Lots' liquidation partner in connection with the going-out-

6   of-business sales?

7          A.   They were one of our partners.

8          Q.   And are you familiar with Tiger Capital Group?

9          A.   I am, yes.

10          Q.   Can you explain for us what role Tiger Capital

11   Group is playing?

12          A.   So Tiger Capital Group was also a participant in

13   the term loan facility and they also -- the Tiger Group has

14   other relationships with us too.

15          Q.   Would one of the entities within the Tiger Group

16   be Tiger Finance, LLC?

17          A.   I believe so, yes.

18          Q.   And do you recall what role they play?

19          A.   I believe Tiger Finance, LLC is the participant in

20   the term loan facility.

21          Q.   And to your knowledge, do any of the Tiger

22   entities play a direct role with respect to the going-out-of-

23   business sales process?

24          A.   So we have also engaged in the past with Tiger to

25   execute some of the stalled GOBs.  And I believe that Gordon

1  Brothers has also subcontracted some of the current GOBs to

2  Tiger.

3      Q.   And is there any overlap of the teams at Tiger

4  between those that are dealing with the loans and those that

5  are dealing with the going-out-of-business sales?

6      A.   Not to the best of my knowledge.

7      Q.   Are you familiar with Hilco Merchant Resources?

8      A.   Yes.

9      Q.   And what's your understanding of their role in

10 these procedures?

11     A.   Very similar to Tiger.  They're a participant in

12 the term loan, and they're also a firm we've worked with in

13 the past with regards to going-out-of-business sales.

14     Q.   To your knowledge, does Gordon Brothers Retail

15 Partners have any input into exercising rights under the

16 credit facilities?

17     A.   Not to the best of my knowledge.

18     Q.   I think you've answered this already with respect

19 to Tiger, but with respect to Hilco, do you have any

20 understanding as to whether or not there's any overlap in the

21 team at Hilco that they'd be working in connection with the

22 going-out-of-business sales as opposed to the term loans or

23 the credit facility?

24     A.   I don't have any direct knowledge of that.

25     Q.   And then I think you've answered this already, but

1   my understanding is that the entities that you've worked for

2   or that you've worked with in the past, like Gordon Brothers,

3   include Tiger and Hilco; is that correct?

4        A.   That's correct, yes.

5        Q.   And if the disqualification of Gordon Brothers

6   were to be upheld, they would face a similar

7   disqualification; is that correct?

8        A.   I would assume, yes.

9        Q.   And again, can you just sum up, what difficulties

10  would the debtors face if they weren't able to partner with

11  someone in connection with these going-out-of-business sales?

12       A.   So if that were to occur, we'd have to engage a

13  firm that we haven't worked with in the past, who wouldn't

14  have any familiarity with that business to pick up in the

15  middle of GOBs that are already now, you know, wholly in

16  process, you know, pretty much.  I mean, there may be some

17  additional GOBs, but for the most part, the vast majority of

18  stores we expect to close are now in a GOB process.

19       So a new firm would have to come in in the middle of

20  that transition from Gordon Brothers to take that over, which

21  would likely be difficult on a number of levels.

22  Alternatively, we could pick up that work ourselves, but we

23  know from past experience, that would likely result in a

24  significantly lower recovery on the merchandise and fixtures

25  that we're selling in those stores.

1    Q.   Thank you.

2         MR. MCCLAMMY:  I have no further questions at this

3    time, Your Honor.

4         THE COURT:  Okay, thank you.  Cross examination,

5    Ms. Casey.

6    CROSS-EXAMINATION

7    BY MS. CASEY:

8    Q.   Good afternoon.  Linda Casey, on behalf of the

9    U.S. Trustee, I'd like to start with how many stores did the

10   debtors have as of the petition date?

11   A.   We had a little under 1,400 stores that were open

12   as of that date.

13   Q.   And how many stores have already started and/or

14   concluded the going-out-of-business sales post-petition?

15   A.   So in total, today, we have about 550 stores that

16   are in or have concluded their GOB.  Around 150 have fully

17   concluded their GOB and are essentially closed, and there are

18   another 400 at various stages in that process.  And as of the

19   filing date, approximately 300 of the 550 had begun the

20   process.

21   Q.   Do the debtors anticipate additional stores to

22   start the going-out-of-business sales during the post-

23   petition period?

24   A.   There's potential for a small number of stores,

25   but the 550 that are already in that process is going to

1 account for the vast majority of stores we expect to close.

2     Q.   Prior to April of 2024, that's the date that the

3 loan, the term loan, was entered into, correct?

4     A.   Yes.

5     Q.   Prior to April of 2023, let's say the year prior,

6 from April 2023 to April 2024, sorry, I have my dates wrong,

7 how many stores did the debtor close through these

8 liquidating --

9     A.   I believe it was approximately 50.

10         THE COURT:  Did you say 50?

11         THE WITNESS:  50, yes.

12         THE COURT:   Okay.

13 BY MS. CASEY:

14     Q.   Prior to the Bankruptcy Court entering the interim

15 order approving the store closing motion, the store closing

16 sales had to comply with existing law; is that correct?

17     A.   That is correct, yes.

18     Q.   And the interim order that was signed by the judge

19 permitted the store closing sales to be conducted in manners

20 that alter that existing law; is that correct?

21     A.   That's my understanding, yes.

22     Q.   And that includes the consultant being allowed to

23 put additional goods that they own into those store selling

24 sales; is that correct?

25     A.   That is something they are permitted to do, yes.

1    Q.    So you said that the services that the consulting

2    -- consultant has provided, including the cadence of prices,

3    can you explain what that means?

4    A.    So as we go through the GOB process, we take

5    various tiers of markdowns and typically start off with a

6    relatively shallow markdown, and then the markdowns will get

7    progressively deeper relative to the original retail price as

8    we go through the GOB, with the goal being to realize as much

9    as we can at the higher margins, but progressively having to

10   increase the markdowns to sell through the entire inventory.

11   Q.    Is that cadence decided on a store-by-store basis,

12   or is that cadence uniform across all of the stores?

13   A.    So there are some general parameters where they

14   are adjusted on the store-by-store basis based on the selling

15   in those stores.

16   Q.    And you said that all they do is advise on the

17   cadence of the prices and that the debtor maintains the

18   authority to approve that.  Who at the debtor approves the

19   markdown of inventory on the store basis?

20   A.    So at the merge planning team, all of the proposed

21   adjustments to the markdown cadence roll up to the merge

22   planning team, and they ultimately have the ability to

23   approve or not approve those markets.

24   Q.    I'm sorry.  I don't understand that.  There's a

25   cadence team?

1       A.   I'm sorry.  The merchandise planning team oversees

2  that.  So all of the proposed markdowns at each store level

3  are rolled up to the merchandise planning team, who have the

4  ability to override that, but typically don't.  Typically

5  would accept those recommendations.

6       Q.   So before -- at each store level, before the

7  consultant can mark down the price, they have to move that up

8  to the debtors for approval every time the prices are marked

9  down?

10      A.   I wouldn't say every, but there is a weekly

11 reporting of all of the markdowns that have been applied at

12 the store level, or are going to be applied, that has to be

13 reviewed by the merchandise plan.

14      Q.   And you said that the consultant has been able to

15 provide a 25 percent higher recovery than the debtors have

16 been able to on their own; is that correct?

17      A.   That's correct, yes.

18      Q.   Does their recommended cadence of prices -- is

19 their expertise in recommending the cadence of price part of

20 the reason why that 25 percent increase in the value of the

21 sales has occurred?

22      A.   Yes, I believe so, yes.

23      Q.   And as you stated, it's unlikely that the debtors

24 would overrule the recommendation on the cadence of prices;

25 is that correct?

1      A.   We certainly recognize that they have expertise

2  with regard to pricing cadence, and so we attach significant

3  weight to that, but we do reserve the right to take a

4  different point of view.

5      Q.   And you said the other thing that they handle is

6  condensing inventory.  Can you explain what that means?

7      A.   So for example, as a store starts to sell through

8  and certain areas of the store are sold out, there's no

9  longer any merchandise there, sort of reconfiguring the store

10  to optimize the selling of the remaining inventory is what I

11  was referring to.

12      Q.   And they're not allowed to move the inventory of

13  the store until they get approval from the debtor; is that

14  your testimony?

15      A.   So they work closely with our local team, so we

16  maintain our teams in the stores throughout the GOB process.

17  So there is still a store manager who's there.  Typically

18  through the end of the process, there's a district manager

19  who's involved.  So they work collaboratively in the store on

20  those types of things to make sure that the solutions

21  optimize their input from terms of their expertise, but also

22  are done in a way that the company is comfortable with.

23      Q.   You also said that one of the services they

24  provide is advising on advertising.  Can you explain what

25  they do with that?

1    A.    Yeah.  So they typically come up with the original

2    advertising.  Again, our marketing team has input to that,

3    but the signage around the markdowns and going-out-of-

4    business sale itself, again, we look to them for their

5    expertise in those areas, but we retain the discretion to

6    accept or not accept any particular recommendation.

7    Q.    Have you not accepted any of their recommendations

8    on advertising in the Big Lots sales?

9    A.    I'm not aware I was not agreeing with their

10   recommendation.

11   Q.    Have you not accepted any of their cadence of

12   prices in the Big Lots sales?

13   A.    I'm not sure of the answer to that.

14   Q.    Have you not accepted their recommendations in the

15   condensing of inventory?

16   A.    I would say with regard to condensing inventory,

17   that's a very collaborative approach.  So they have

18   expertise, but they work very closely with our teams at the

19   store level to execute that.

20   Q.    You stated that the consultant does not have the

21   final decision on which assets are to be sold.  You've also

22   retained Guggenheim in this case; is that correct?

23   A.    That's correct, yes.

24   Q.    And they are your investment banker to help sell

25   the assets on a going concern basis.

1        A.    That's correct, yes.

2        Q.    Do the debtors retain the final decision as to

3    what assets to be sold in the going concern sale?

4        A.    Do the debtors retain final decision?  I'm not

5    sure I can answer that.  It's probably a legal question.

6        Q.    Can Guggenheim (inaudible) the debtors to sell

7    without the debtor's approval?

8        A.    I don't believe so.  I don't think Guggenheim can

9    bind the company.  I think -- ultimately I think the court

10   has to approve whatever we do in terms of the asset

11   disposition.

12       Q.    You also stated that the consultant does not have

13   the final decision on which doors are to be closed.  Does

14   Guggenheim have the final decision on which stores are to

15   remain open?

16       A.    They do not.  Typically, neither would have any

17   input into the specific decisions about store closures.

18       Q.    You also suggested that the consultant has the

19   ability to make recommendations on staffing.  Can you explain

20   what the consultant's role is on staffing?

21       A.    So again, as a store starts to sell through its

22   remaining inventory and fixtures, a certain point in time,

23   the staffing needs of that store will evolve to reflect the

24   lower level of inventory in the store and so on.  So Gordon

25   Brothers will have input into that, and they'll work closely

1  with our store management team, our district management team,

2  to make any adjustments to the store payroll that are

3  appropriate to the current situation at the store.

4      Q.    Are you familiar with the terms of the -- are you

5  familiar with the terms of the agreements with the

6  consultants?

7      A.    Yes, I am.

8      Q.    So the agreement gives the consultant the right to

9  be repaid its expenses in negotiating any side letters with

10 the lenders and the store closing sales also gives the

11 debtors and/or the consultant the ability to negotiate side

12 letters with the lenders.  Do the consultants have to the

13 ability to enter -- to negotiate and enter into side letters

14 with the debtors?

15     A.    I don't recall that particular provision, but I'm

16 not aware of any such side letters.

17     Q.    The agreement also provides, and this is the

18 Amendment Number 1, that was effective as of April 18th,

19 2024, and I'm quoting, "If applicable, any auctioneer may be

20 paid as additional compensation by means of an industry

21 standard buyer's premium added to the gavel price of any sold

22 off FF&E via online auction and collected from the buyers

23 thereof."

24     Is it your understanding that the consultant has the

25 right to retain an auctioneer to auction off some of the

1  (inaudible) FF&E?

2      A.    Yes, again, that would only be a applicable to the

3  FF&E.   To the best of my knowledge, there hasn't been any

4  auctioning off of any of that FF&E.

5      My expectation would be any decision on that would be

6  made in conjunction with the company because I think there is

7  also a provision in the agreement that says the decision on

8  which FF&E should be transferred out of the store versus

9  retained in the store and liquidated there is a matter of

10  consultation between Gordon Brothers and the company.

11      Q.    And is it your understanding that the agreement

12  requires mutual agreement between the parties as to what is

13  offered FF&E and what's retained FF&E?

14      A.    That's my understanding, yes.

15      Q.    What happens to inventory at a store that --

16  debtor-owned inventory at a store that has not been sold at

17  the time that the store closing sale has included?

18      A.    Our goal and intention is to liquidate the entire

19  inventory of the store prior to closing.   If there's anything

20  that was left at the end, it would be de minimis and would be

21  abandoned would be my expectation.

22      Q.    Would the consultant be permitted to take

23  ownership of that abandoned merchandise?

24      A.    Not to my knowledge, no.

25      Q.    Would the consultant be authorized to purchase any

1  of that merchandise?

2       A.   I don't think they would be automatically

3  authorized to do that, but they could potentially make an

4  offer for it.  Although, again, the value of that inventory

5  would be de minimis.

6       Q.   You had testified that the consultant and its two

7  syndicated partners are both participants in the secured

8  (inaudible); is that correct?

9       A.   Affiliates of that, yes.

10      Q.   Thank you for that correction.  Do you know the

11  percentage or the approximate percentage that those three

12  entities hold -- those three affiliates hold in that secured

13  debt?

14      A.   I don't have that -- those numbers at hand.  I am

15  broadly aware of it, but I don't have the specific

16  percentages.

17      Q.   Do you know if collectively they have a majority

18  of the debt?

19      A.   I believe so, yes.

20           THE COURT:  Excuse me, I'm sorry, I distracted

21  myself.  Did you say that collectively the three consultants

22  hold a majority of the debt?

23           THE WITNESS:  They're affiliates who --

24  participants in the term loan, I believe, have a majority of

25  the term loan, yes.

1            THE COURT:  Okay.  Collectively.  Okay.

2  BY MS. CASEY:

3       Q.   And the consultants, a term of the -- condition of

4  closing on that FILO loan was that the Gordon Brothers became

5  the exclusive consultant to conduct these going-out-of-

6  business sales; is that correct?

7       A.   That was a provision of the updated MSA, yes.

8       Q.   Are any of the -- let me just ask it individually.

9  Does an affiliate of Gordon Brothers also act as a vendor for

10 the debtors?

11      A.   Yes.

12      Q.   Do they hold a pre-petition unsecured claim as a

13 result of that relationship?

14      A.   They do have a pre-petition claim, which I believe

15 is 503(b)(9).

16      Q.   100 percent of it is 503(b)(9)?

17      A.   I believe the outstanding amount is, yes.

18      Q.   Does Tiger act as a vendor of the debtors and sell

19 inventory to the debtors?

20      A.   I'm not aware of any specific purchases made from

21 Tiger, but it's possible.

22      Q.   Is Hilco a vendor to the debtors?

23      A.   I believe so, yes.

24      Q.   And is it correct that they hold approximately a

25 $900,000 pre-petition claim as a result of being a vendor for

1   the debtors?

2        A.   I'm not familiar with that specific number, but

3   that is possible.

4        Q.   And do you know if any part of that is entitled to

5   administrative expense claim priority?

6        A.   I do not.

7        Q.   The debtors are seeking authority for bid

8   procedures to sell certain of their assets as a going

9   concern; is that correct?

10       A.   Yes.

11       Q.   And are you aware that that order provides that

12  secured lenders, and it's probably subject to the challenge

13  period, have the right to credit bid for those assets?

14       A.   Sorry.  Could you just say that one more time?

15       Q.   That the proposed bidding procedures grant the

16  secured lenders the ability to credit bid for the assets,

17  perhaps subject to the challenge period, I would assume.

18       A.   Yeah.  I'm not familiar with that particular

19  aspect of the bidding procedures.

20       Q.   Are there any other services that the consultant

21  provides to the debtors that we have not addressed?

22       A.   Not that I'm aware of.

23       Q.   Do they advise as to potential bonuses to store-

24  level employees?

25       A.   I don't believe so.

1          MS. CASEY:  I don't think I have any further

2  questions, Your Honor.  Thank you.

3          THE COURT:  Okay.  Any redirect?

4          MR. MCCLAMMY:  Thank you, Your Honor.  Just a

5  couple of clarifying questions.  Again for the record, Jim

6  McClammy, Davis Polk on behalf of the debtors.

7  REDIRECT EXAMINATION

8  BY MR. MCCLAMMY:

9      Q.   Mr. Ramsden, I believe you testified to this in

10 your direct testimony earlier, when I was asking you some

11 questions.  But just to confirm, Gordon Brothers Retail

12 Partners that's consulting with respect to the going-out-of-

13 business sale, are they playing a role with respect to the

14 debtor's strategy and the overall Chapter 11 restructuring

15 process?

16     A.   They are not.

17     Q.   And Guggenheim Partners, are they one of your main

18 advisors with respect to the Chapter 11 restructuring?

19     A.   Yes.

20          MR. MCCLAMMY:  Thank you Your Honor.  No further

21 questions.

22          THE COURT:  Okay.  Could I ask a question, sir?

23 Does Gordon Brothers, Tiger, Hilco, or any of its affiliates

24 have -- serve as a member of the board?

25          THE WITNESS:  They do not.

1                   THE COURT:  Okay.  Or the merchandise planning

2     committee, are any of them on the planning committee itself?

3                   THE WITNESS:  They do not, no.

4                   THE COURT:  Okay, thank you.

5                   MR. MCCLAMMY:  Thank you, Your Honor.

6                   THE COURT:  You're excused.  Thank you sir, for

7     your testimony.

8                   MR. PIRAINO:  Your Honor, at this point, happy to

9     take direction from you.  If you'd like to hear from other

10    parties or if we should proceed with --

11                  THE COURT:  Well, let me -- I don't know if the

12    United States Trustee wants to be heard with respect to its

13    objection.

14                  MS. CASEY:  Your Honor, I don't have any

15    additional evidence, so we can go on.

16                  THE COURT:  Okay.  You can present your argument.

17    Go ahead.

18                  MR. PIRAINO:  Thank you, Your Honor.  So just

19    before turning to the U.S. Trustee's objection, I do just

20    want to address the non-U.S. Trustee objections briefly.

21                  THE COURT:  Certainly.

22                  MR. PIRAINO:  I think just importantly as relevant

23    to the instant motion, nothing is cutting off the objecting

24    landlords' right to payment, but -- or their legal rights to

25    payment, but those legal rights, they need to be established.

1   And that's not before Your Honor with this motion.

2           As Mr. Shpeen will discuss in his presentation of

3   the DIP financing, the debtors have budgeted for stub rent,

4   and the provision in the budget for payment of stub rent has

5   already resolved the same objection from numerous landlords

6   and should resolve the remaining objections which essentially

7   are reservations of rights.

8           So turning back to the U.S. Trustee's objection,

9   Your Honor, rationalizing Big Lots real estate footprint is,

10  of course, an important part of the restructuring.  But I

11  want to be crystal clear on this.  The decision to close the

12  stores is the debtors and the debtors alone.

13          As you heard from Mr. Ramsden, Gordon Brothers

14  Retail Partners does not advise generally on the

15  restructuring.  The primary authority rests with the company.

16  The debtors selected Gordon Brothers Retail Partners for its

17  experience, and they've been working with them to close

18  stores for some time.

19          As you heard from Mr. Ramsden, they got strong

20  results, 25 percent higher, and they continue to have a good

21  working relationship based on those results.  Mr. Ramsden's

22  testimony also shows that entry into the MSA was in good

23  faith, and that the roles of the affiliates are not

24  influencing the liquidation at the closing of stores.

25                  To upend the established practice in this

1  district, that store liquidators are not professionals, would

2  be incredibly harmful to the estate.  As you heard from Mr.

3  Ramsden, it would be disruptive.  And frankly, they would

4  have no viable options, given that those Tiger and Hilco,

5  affiliates of Tiger and Hilco, are also lenders.

6          So for those reasons, the reasons set forth in our

7  reply, we believe the objection should be overruled and

8  consistent with precedent that a store liquidator is not a

9  professional for purposes of Section 327.  And we submit that

10 the record adequately reflects that this is a sound exercise,

11 the debtor's business judgment to assume the consultant

12 agreement with GBRP.

13          THE COURT:  Good afternoon, Mr. Alberto.

14          MR. ALBERTO:  Good afternoon, Your Honor.  Justin

15 Alberto, Cole Schotz, proposed co-counsel to the official

16 committee of unsecured creditors.  I have a couple points,

17 Your Honor.

18          First, as Mr. Piraino noted at the outset, the

19 committee is resolved on this motion.  We thank the debtors

20 and their advisors for working constructively with us.  We

21 have no outstanding issues, but I do rise on a substantive

22 basis, as well.  First, to clean up something on the record,

23 I believe Your Honor asked earlier whether or not Hilco

24 played any other roles in Brookstone.

25          At my prior firm, I was counsel to the Brookstone

1  committee.  Hilco was selling FF&E there, much like Gordon

2  Brothers is doing so here.  So there was some overlap.  I

3  would encourage Your Honor to read Judge Shannon's opinion

4  there.  I think it is spot on.  He found four of the six

5  First Merchant factors favored that Hilco is not a

6  professional under 327A.  I believe that the same calculus

7  applies here.

8        Also, practically, Your Honor, I think any benefit

9  to overturning Brookstone is already captured by what I

10  consider a safety valve here of the UCC's challenge period.

11  Gordon Brothers is an affiliate of 1903P, which you have

12  heard today, and the DIP order that you're going to be asked

13  to approve later today, paragraph 42, and specifically,

14  footnote 6 defines a challenge as "asserting or prosecuting

15  any avoidance, action or any other claims, counterclaims or

16  causes of actions, objections, contests or defenses against

17  any creditors or" importantly, "their respective

18  subsidiaries, affiliates, officers, directors", and the list

19  goes on.

20        I do believe that there is a built in safety valve

21  here, notwithstanding what this order may or may not say.

22  The committee retains its challenge rights.  If we were to

23  find something nefarious, not to suggest that there is, but

24  again, any benefit of overturning Brookstone at this

25  juncture, which I think is inappropriate anyways --

1          THE COURT:  I don't think I have the authority to

2    overrule Brookstone.  Brookstone is Brookstone.

3          MR. ALBERTO:  Judge Shannon, you're right

4          THE COURT:  I don't have any authority to do so.

5          MR. ALBERTO:  (Inaudible) Your Honor.  It's a fair

6    point.  I will say, my last point, Your Honor, the downsides

7    here to not finding -- not approving this would be immense.

8    The disruption to the GOB process is one thing, but to get in

9    the new liquidator.  But in the alternative, if the debtors

10   were to run this process at the 500 stores themselves, you

11   heard Mr. Ramsden testify that they were receiving 25 percent

12   less in proceeds, which I think is significant and is a

13   downside the committee is not willing to risk it.

14         THE COURT:  Thank you.  And I should add, my

15   making that statement didn't mean I was ruling.  I was just

16   saying that Judge Shannon's ruling is not precedent on this

17   court.  Ms. Casey?

18         MS. CASEY:  Again, for the record, Linda Casey on

19   behalf of the United States Trustee.  Your Honor, to start

20   with, we certainly understand Brookstone and Brookstone's

21   ruling.  One of the first things I was going to say is,

22   unlike what the debtor's brief says, we're not asking you to

23   overrule it because it is not binding precedent on this

24   Court.  It is just a ruling (inaudible).

25              On the facts, it is true that the Court in that

1   case noted that they could become a lender or a purchaser,

2   not that they were.  And my understanding of the facts of

3   that case, at least as of the time that it was approved, that

4   they were neither a lender nor a potential purchaser.

5           Your Honor, the United States Trustee disagrees

6   with that ruling, and we disagree with the argument made by

7   the debtors today that to be a professional, you have to be

8   specifically on the restructuring, and only the

9   restructuring, and the main person on the restructuring.

10          I don't think if they had Guggenheim helping to

11  sell as a going concern the live stores and had a different

12  investment banker selling the online store, that they could

13  carve it up that neatly and say, well, one's helping with the

14  restructuring and the other one's not helping with the

15  restructuring.  One's helping with the reorganization and

16  one's not helping with the reorganization.

17          In Brookstone, the facts were the same, that the

18  judge found that this is not ordinary course, that the store

19  closing sales are a function of bankruptcy.  They are

20  different than the store closing sales that occurred pre-

21  petition.

22          Your Honor is entering an order that allows

23  different rules and regulations to govern them instead of

24  having about 50 in a year, they're having about 550 in a

25  compressed time period.  To quote Judge Sanchez, a

1   liquidation is a reorganization and it is, in fact,

2   necessary.  They are selling the underperformed stores,

3   underperforming stores, specifically to maximize the value of

4   the performing stores in the going concern business.

5          So it is part of their strategy.  Their strategy

6   to reorganize is to sell the underperforming stores, excuse

7   me, to close the underperforming stores and sell the

8   overperforming stores.

9          You also heard testimony that they clearly have

10  the expertise and that they have maximized the value of the

11  debtor's assets, which is clearly a Trustee duty here, by

12  providing a 25 percent premium over the debtors doing it

13  themselves.

14         You've heard that while the debtors maintain the

15  ultimate authority on the services to be provided, the

16  consultation regarding condensing inventory, the consultation

17  regarding the cadence of prices, the consultation regarding

18  advertising, that because of their expertise, it is, at least

19  as to two of them, I believe the testimony was they have not

20  overruled the (inaudible) cadence of pricing or the

21  advertising, and that the condensing of the inventory is a

22  collaborative basis with store-level employees.

23         So we do think that that shows that they are a

24  professional, that they are helping the debtors in the

25  organization, that they are working on a Trustee duty of

1   maximizing the value of the assets, that they are using their

2   expertise, and they are doing work that is not within the

3   ordinary course of the debtor's business.

4         It is also important that a professional be acting

5   in a fiduciary capacity for the benefit of all creditors.

6   And when you have a professional, assuming they find in our

7   favor that they are a professional, who has secured claims,

8   administrative priority claims, and general unsecured claims,

9   and are in control of the sale of the assets and the

10  maximizing of the value of the assets, and potentially could

11  come in and purchase the assets through a credit bid or

12  otherwise, there's just too many roles to say that they are

13  being -- that they are capable of acting in the best interest

14  of the creditors.

15        If Your Honor were to disagree with us that they

16  are professionals, we also, as stated in our brief, that it

17  is not an exercise of their business judgment to have a

18  consultant in charge of the sales of assets that may also

19  purchase the assets and that may also have conflicting agenda

20  with being a secured creditor and administrative creditor and

21  a priority and an unsecured creditor.

22        And in any event, our last request is even if Your

23  Honor were to overrule the two of those, at a minimum, they

24  should not be allowed to be a purchaser of the assets when

25  they are in control of the sale of the assets and that just

1  prevents that from being the two hat, where the one hat might

2  be working for the benefit of their other role rather than

3  the benefit of the estates.

4         THE COURT:  Are you talking about a purchase of

5  assets that are assets remaining as a result of GOB sales, or

6  are you talking about a purchaser in the context of the

7  proposed sale process run by Guggenheim?

8         MS. CASEY:  I think my client's position would be

9  all of it.  Their role in consulting on store closings, how

10  to close the stores, you know, infects everything.  At a

11  minimum, I think, clearly the assets that are left over, they

12  have so much control over the sale process at the stores.

13  But in general, they are part of the team who is getting

14  these debtors to the organization finish line by closing the

15  sales, the stores that cannot be sold as a going concern, and

16  we don't think they should be allowed to be a purchaser.

17         I would like to point out that they are authorized

18  to negotiate side letters with landlords and they're getting

19  their expenses, including their attorney's fees, paid for

20  that negotiation with side letters.  And that certainly seems

21  like something a professional would do.  And they are

22  authorized to retain an auctioneer, which is, of course,

23  expressly (inaudible) the Bankruptcy Code as a professional

24  that needs to be retained.

25         So we do think, again, that Brookstone was wrongly

1  decided and that they are a professional and that the motion

2  should be denied.

3            THE COURT:  Thank you.

4            MS. CASEY:  Unless Your Honor has any further

5  questions.

6            THE COURT:  No, thank you.  Not right now.

7            MR. FOX:  Good afternoon, Your Honor.  Steven Fox,

8  Riemer & Braunstein on behalf of Gordon Brothers Retail

9  Partners, the proposed consultant subject to this motion.

10            I rise only to speak as to the last point raised

11  by the U.S. Trustee with respect to the ability of Gordon

12  Brothers Retail Partners, as distinct from any other entity,

13  to participate in the debtor's sale process.

14            Your Honor, as you will hear, I'm sure, from the

15  debtor's presentation on the bidding procedures motion being

16  conducted by the debtors in consultation with Guggenheim,

17  Gordon Brothers Retail Partners plays no role whatsoever in

18  either the marketing, negotiation, or sale of any of the

19  assets that are not subject to the store closing sales.  That

20  process is being run entirely separately by different

21  advisors to the debtors, and we play no role in governing,

22  directing, or consulting in connection with that process.

23            To the extent the U.S. Trustee suggests that any

24  Gordon Brothers-affiliated entity, including GBRP, should be

25  restricted from participating in a process not affecting the

1  store closing sales simply is inconsistent with the ultimate

2  goals of the estate, and that is maximizing value of all of

3  the assets.

4          That sale process will be conducted in a

5  competitive manner under the direction of the debtors and its

6  other advisors and to the extent that GBRP or any of its

7  affiliates wish to participate in that process, it would do

8  so openly, notoriously, with full transparency and full

9  disclosures to all parties in interest in the estate,

10  including the debtors, the committee, and the U.S. Trustee,

11  and the lenders.

12          If we are participants in that process, don't know

13  today if we will or won't be, but if we were to be a

14  participant in that process, it is ultimately the debtor's

15  determination as to who is or is not determined to be the

16  successful bidder.  I don't see any circumstance where it

17  would be fair to conclude today that we should be precluded

18  from participating in that process where all parties and

19  interests are preserved until a final hearing on the ultimate

20  successful bidder, which will come at a later date at a

21  hearing to be held before this Court.

22          And if any party has an objection at that time as

23  to our participation, if we were to be determined to be a

24  successful bidder, that would be the appropriate time to

25  raise it, not today, in connection with the store closing

1  motion, which has nothing whatsoever to do with the other

2  part of the estate, and that is the efforts by the debtors to

3  achieve a going concern sale.

4          THE COURT:  And what is GBRP's position with

5  respect to store closing sale assets?

6          MR. FOX:  I'm sorry, Your Honor, I didn't hear

7  that part.

8          THE COURT:  What is your client's position, GBRP's

9  position, with respect to the ability to purchase assets as a

10 result of the store closing sales?

11         MR. FOX:  There, too, Your Honor, while it is

12 atypical that there would be any inventory left at the end of

13 the store closing process, that would be (inaudible) by any

14 third party, typically that process involves either a bulk

15 sale or an abandonment of inventory.  As the witness

16 testified, it would be of highly de minimis value at that

17 point.  It will have gone through a multi week process of

18 being marketed to your average consumer who found no interest

19 in it.

20         So it would be unlikely and atypical for a

21 consultant such as GBRP to purchase, for lack of a better

22 term, without intending to disrespect the debtors the

23 (inaudible) left in the stores.  No different than we

24 wouldn't be -- it would be atypical for Gordon Brothers or

25 any other liquidator in its position to purchase any

1 | remaining fixtures in those stores.

2 |       And you have heard at the interim hearing, and you

3 | see in the proposed order all the abandonment procedures with

4 | respect to fixtures because it's not cost effective or value

5 | additive to remove those to another location and trying to

6 | resell them elsewhere.

7 |       So as I said, it would be very atypical for that

8 | to happen.  But here, too, Your Honor, if it ultimately is

9 | determined by the debtors, after a presentation of an offer

10 | by GBRP to buy those assets, it's the debtors business

11 | judgment at the end of the day as to whether that's a

12 | reasonable proposal to accept or not.

13 |       And I would assume, at the risk of assuming

14 | anything, that that would -- determination by the debtors

15 | would be in consultation with its other advisors, its

16 | counsel, the committee, and the lenders as to what's the most

17 | value maximizing disposition of those assets at the end of

18 | the day.

19 |       So we don't think it would be in the interest of

20 | the estate to preclude us from doing that.  And it certainly

21 | is, I think, inappropriate at this stage from the

22 | anticipatory perspective to limit the estate's options at

23 | this stage of the day.  I'm happy to respond to any

24 | additional questions, Your Honor.

25 |       THE COURT:  I don't have any.  Thank you.

1      MR. FOX:  Thank you, Your Honor, for the

2   opportunity to be heard.

3      THE COURT:  Does anyone else wish to be heard?

4      MR. PIRAINO:  Your Honor, seeing no additional

5   parties, debtors just had a couple of additional points to

6   make.

7      THE COURT:  Okay.

8      MR. PIRAINO:  First, obviously, the debtors

9   believe that Brookstone was correctly decided, but ultimately

10  the test is First Merchant, which Your Honor has applied in

11  this very Court a little over a week ago.  And we believe

12  that those factors strongly weigh in favor that GBRP is not a

13  professional.

14      Importantly, all of the restructuring strategy, as

15  Mr. Ramsden testified, it comes from the debtors.  GBRP is

16  not dictating these cases by any means.

17      Also, the continuation of the going concern sale.

18  Sorry, the going of the business sales.  Sure, they were on a

19  smaller scale before the petition date, but it's one of the

20  factors.  And that's why the First Merchant test.  It's not a

21  -- it's a scale.  And you think ultimately it does weigh in

22  favor that there were stores that were sold pre-petition --

23  or sorry, stores that were liquidated pre-petition.

24      And just to touch on something that Ms. Casey

25  raised, the fact that Gordon Brothers has had such good

1  results, frankly, should be a good thing and something that

2  in the debtor's business judgment, any service provider or

3  contractor or third party that we're working with should be

4  adding value to the estate.

5         So frankly, we continue to believe that just

6  underscores why it's within the debtor's business judgment to

7  assume the consulting agreement.  So happy to answer any

8  questions Your Honor may have.

9         THE COURT:  I don't have any other questions.

10         MR. PIRAINO:  Thank you, Your Honor.

11         THE COURT:  Okay.  I'm going to take this matter

12  under advisement.  And I will either rule later today or

13  tomorrow morning.

14         MR. PIRAINO:  Thank you, Your Honor.

15         THE COURT:  Not -- or tomorrow.  I don't want to

16  say the morning.  I have a calendar tomorrow, but sometime

17  tomorrow.

18         MR. PIRAINO:  Understood.  Thank you, Your Honor.

19         MR. PEPPIATT:  Good afternoon, Your Honor.  Jonah

20  Peppiatt of Davis, Polk & Wardwell on behalf of the debtors.

21         Before we dive into the bidding procedures motion,

22  I did want to briefly return to Docket No. 563, which is a

23  certification of counsel with respect to the utilities order.

24         THE COURT:  Yeah.

25         MR. PEPPIATT:  Your Honor was, of course, correct

1  in reading those section references, and the correct

2  references are Sections 16(a) and 17, not 14(a) and 15.  So

3  we'll correct that and submit a revised order.

4          THE COURT:  Okay, perfect.  Thank you, and we'll

5  get that entered.

6          MR. PEPPIATT:  So with that, Your Honor, we'll

7  turn to Docket No. 18, the bidding procedures motion, which

8  is Item No. 14 on the most recent amended agenda, which is

9  filed at Docket No. 562.

10          If Your Honor is okay, I would just like to take a

11  brief moment to give an overview of where we are with respect

12  to the order generally and the resolutions --

13          THE COURT:  That would be fantastic.  Thank you.

14          MR. PEPPIATT:  -- before we get to evidence and

15  argument.

16          So as reflected in the agenda, there were a number

17  of objections received by the debtors, both informally and

18  filed on the docket.  And I'm pleased to report that over the

19  last several weeks, the debtors have been able to

20  consensually resolve all of those objections, save one, which

21  is the objection of the United States Trustee filed at Docket

22  No. 494.

23          A number of the resolutions that we reached were

24  through changes to the order, a revised version of which was

25  filed last night at Docket No. 558, along with a black line

1  to the previous revised proposed form of order that was filed

2  at Docket No. 495 on October 15th.

3           Your Honor, I have both an incremental and a

4  cumulative black line here, if you would like one, or if you

5  have your own.

6           THE COURT:  I have 558 in front of me, so --

7           MR. PEPPIATT:  Okay, 558 should be good.  I was

8  not planning on going through sort of every single change in

9  the order.  I'm just going to highlight a few things --

10           THE COURT:  Okay.

11           MR. PEPPIATT:  -- and then, of course, if Your

12  Honor has any questions.

13           With respect to two objections that were filed on

14  the docket, one was filed by 1600 East Chase Parkway Leasing

15  at Docket No. 237.  Your Honor may have seen that was

16  withdrawn at Docket No. 536.  Another was filed by American

17  National at Docket No. 246.  And counsel for American

18  National has told us that that objection is likewise

19  resolved, and then I'll come back to the resolution with

20  respect to the committee's objection in just a moment.

21           Before doing that, I did want to note that,

22  importantly, there have been a number of changes to the sale

23  timeline for the debtor's bidding procedures as is set forth

24  in the revised proposed order.  I won't go through every

25  single date and deadline, but I will note four key dates for

1  Your Honor for the record.

2              THE COURT:  Okay.

3              MR. PEPPIATT:  As Mr. Resnick mentioned, the bid

4  deadline is now this Wednesday, October 23rd, at 5:00 p.m.

5  Eastern.  The auction will be held a week from today.  That's

6  Monday, October 28th, starting at 10:00 a.m. Eastern.  The

7  deadline to object to the sale transaction, along with

8  assumption assignments and cure objections, is Monday,

9  November 4th at 12:00 Eastern, and the sale hearing is

10  scheduled for Friday, November 8th, at 10:30 Eastern.

11              In addition to changes to the timeline, Your

12  Honor, there have also been various modifications to

13  increased notice periods, provide some more specificity

14  around adequate assurance, and how and when it will be

15  provided, and certain other changes, all of which were

16  negotiated and agreed to with the committee, the U.S.

17  Trustee, and various other stakeholders, including a

18  substantial number of the debtor's landlords.

19              So with that, Your Honor, I'll briefly turn to the

20  resolution with the committee that was reflected in the

21  revised proposed order filed last night.

22              The revised proposed order reflects a key change,

23  which is with respect to the bid protections.  And that

24  change is that those bid protections will only spring into

25  effect and become payable if the stalking horse bidder

1  obtains commitment letters for the financing of their

2  purchase by Wednesday's bid deadline.

3            So if that does not happen, the bid protections

4  are not payable.  We've been in close contact with the

5  stalking horse bidder.  We understand that it and its

6  financing parties are extremely close on the financing and

7  that they're sort of at the stage of minor issues being

8  closed out.

9            THE COURT:  When is -- it's due by Wednesday?

10           MR. PEPPIATT:  By Wednesday at 5:00 p.m.

11           THE COURT:  This week, correct?

12           MR. PEPPIATT:  Yes.  Correct.  So that resolved

13  the committee's remaining objection.

14           I'll also note, just for the record, there was an

15  amendment to the APA that was filed at Docket No. 495.  There

16  were three changes there.  One was to extend the deadline for

17  the entry of the bidding procedures order under the APA to

18  tomorrow, October 22nd.  The second was certain

19  clarifications with respect to the designation of contracts.

20  And the third was an increase to the expense reimbursement

21  provided for in the APA from 1.5 million to 2 million, which

22  is reflective of the additional time that's been built into

23  the milestones and the additional work that the stalking

24  horse has had to do.

25           So all of that is to say, Your Honor, that we've

1 resolved the committee's issues and many other parties'

2 issues, and we're here before you with just a single

3 unresolved objection.

4          And with that for evidence and for the direct

5 examination of Mr. Rifkin, I would cede the podium to Mr.

6 McClammy, once again, to take his testimony.  Unless Your

7 Honor has questions on the order or the other matters I just

8 covered.

9          THE COURT:  No, I will tell you, I am struggling

10 very much in this case with a stalking horse who has,

11 essentially, got a contingent commitment as to why this isn't

12 being heard with respect to bid protections at a later

13 hearing.  And that later hearing, there's a hearing in this

14 case virtually every week for a month.

15          And so I'm finding the relief that you're seeking,

16 while I, as a fundamental principal, have no issue with

17 stalking horses and bid protections, and I very much

18 appreciate when parties collaborate and resolve issues.  What

19 I'm struggling with here is how this fits into O'Brien, when

20 I don't have a firm commitment from a stalking horse bidder

21 that if I had this hearing on Wednesday with a firm

22 commitment, it would be very different factually.

23          MR. PIRAINO:  Understood, Your Honor.  And that is

24 why -- one of the reasons why we got to the resolution we got

25 to with the stalking horse, which is that if there is no

1   committed financing on Wednesday by the bid deadline, the

2   stalking horse protections do not spring into being at all.

3   But understood, and we'll revisit that, of course.

4            THE COURT:  So I just want to -- I want to be --

5            MR. PEPPIATT:  Understood, Your Honor.

6            THE COURT:  -- candid so you know where my head is

7   going into this.

8            MR. PEPPIATT:  Thank you, Your Honor.  And with

9   that, I'll cede the podium for Mr. McClammy.

10           MR. MCCLAMMY:  Thank you.  For the record, Jim

11  McClammy of Davis Polk on behalf of the debtors.  At this

12  time, Your Honor, we would like to call Mr. Adam Rifkin to

13  the stand.

14           THE COURT:  Okay, certainly.  Again, could we re-

15  employ the broadcasting policy?  Thank you.

16           THE WITNESS:  Hello.

17           THE COURT:  Hold on one second, sir.

18           THE COURT REPORTER:  Please raise your right hand.

19  Do you affirm that you will tell the truth, the whole truth,

20  and nothing but the truth to the best of your knowledge and

21  ability?

22           THE WITNESS:  I do.

23           THE COURT REPORTER:  Please state your full name

24  and spell your last name for the record.

25           THE WITNESS:  Adam Rifkin.  R-I-F-K-I-N.

1          THE COURT REPORTER:  All right, thank you.

2          THE WITNESS:  Yep.

3          MR. MCCLAMMY:  Thank you.  Your Honor, also, as

4   part of Mr. Rifkin's direct testimony, so we don't have to

5   rehash everything, Mr. Rifkin did submit a declaration.  It's

6   found at Docket No. 197 in connection with this motion.  And

7   I would like to move to have that declaration admitted into

8   evidence.

9          THE COURT:  Okay.  Does anyone object to the

10  admission into evidence of the Rifkin declaration in support

11  of bid procedures at Docket 197?  Okay.  It is admitted.

12          (Debtor's 2 entered into evidence.)

13          MR. MCCLAMMY:  Thank you, Your Honor.  May I

14  approach the witness with a copy of the declaration?

15          THE COURT:  Yes.

16          MR. MCCLAMMY:  And would Your Honor like a copy as

17  well?

18          THE COURT:  Certainly.

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you.

21          MR. MCCLAMMY:  Thank you.

22  DIRECT EXAMINATION

23  BY MR. MCCLAMMY:

24     Q.  And, Mr. Rifkin, are you familiar with the

25  document I placed in front of you?

1      A.   Yes, I am.

2      Q.   And can you tell us, please, what that document

3 is?

4      A.   It is my declaration.

5      Q.   Okay.  And have you reviewed that declaration

6 since it was submitted?

7      A.   I have.

8      Q.   And is there anything in that declaration that you

9 would wish to change or modify?

10     A.   Not at this moment, no.

11     Q.   One thing I will point out to you, if you take a

12 look at, please, paragraph 11.

13     A.   Yes.

14     Q.   Okay.  Those are some dates and some schedules.

15 Have any of those deadlines changed?

16     A.   I believe they have.  As we stated before, I

17 apologize.  Yes.  I didn't -- I thought we were not

18 rehashing.  So, as you said, so, yes, those dates have

19 changed per your colleague that just spoke.

20     Q.   And other than that, is there anything in your

21 declaration that you wish to change or modify?

22     A.   I don't believe so.

23     Q.   Okay.  Thank you.  And just so we can hear it, as

24 part of this process today, you work with Guggenheim

25 Securities, correct?

1          A.     I am.  I'm a senior managing director of the firm.
2    I've been there since 2013.

3          Q.     And can you just give a general description of
4    what your role is at Guggenheim?

5          A.     Yes, as I said, I'm a senior managing director.  I
6    am in our retail consumer investment banking.  I work on
7    mergers and acquisitions, capital raising, and strategic
8    matters for clients in the retail sector.

9          Q.     And as part of your job and your firm's role, have
10   you been involved in the negotiation of bidding procedures?

11         A.     Yes, we're involved in the negotiation of bidding
12   procedures, and our firm and my colleagues and partners have
13   been involved in the sale process that has been ongoing for
14   Big Lots.

15         Q.     And how often would you say that there's a
16   stalking horse bid that's part of the bidding procedures
17   process on the matters that you and your firm work on?

18         A.     The goal is all the time to have a stalking horse
19   bidder, given some of the strategic benefits it brings to the
20   estate.  So that was a goal as part of our process and our
21   objectives.

22         Q.     And before we talk about specifics in this case,
23   you mentioned that there's a benefit to having a stalking
24   horse bidder in general.  Can you explain that, please?

25         A.     Sure.  The benefit of the stalking horse, it

1  provides clarity to the estate and the stakeholders, it

2  provides a floor, sort of valuation and certainty, just

3  overall, of a continuing entity for Big Lots, for vendors,

4  other constituents, and other stakeholders.

5       Q.   And you, specifically, have you been involved with

6  the Big Lots restructure?

7       A.   Yes, I have been involved, yes.  From the very

8  beginning.

9       Q.   And what's your role with respect to Big Lots?

10      A.   I'm one of the senior partners at the firm that

11 have been responsible for advising and running the process,

12 interacting with the company, interacting with potential

13 third parties interested in the process, the diligence

14 process, the negotiation process, and also to be the related

15 activities.

16      Q.   Okay.  So are you familiar with the bidding

17 procedures that have been agreed to here?

18      A.   I am familiar with them.

19      Q.   And are you familiar with the stalking horse APA

20 (inaudible) agreement?

21      A.   Yes, I am.

22      Q.   Were you involved in the negotiation of that

23 stalking horse APA?

24      A.   Me and my colleagues and obviously legal counsel

25 of the debtors and so on.

1      Q.   And specific to this case, in your view, was it

2   important to have a stalking horse bidder for these

3   proceedings?

4      A.   Yes, it was very important.  Obviously, the retail

5   sector, there's always volatility, there's lots of noise out

6   in the retail sector.  So it was very helpful in the process

7   and to get, as I said before, provide certainty and to

8   provide some clarity on that.

9       This company, you know, there's an opportunity to sell

10   this company, and it actually has been helpful to driving

11   additional interest once we had a stalking horse announced at

12   the time of filing for bankruptcy.

13      Q.   And you mentioned that a stalking horse was

14   announced.  Who was announced as a stalking horse?

15      A.   Nexus and its affiliates.  I don't have the

16   official name, but the Nexus private equity firm.

17      Q.   And what does it mean for Nexus to be the stalking

18   horse bidder?

19      A.   It means they've made a commitment to try to

20   consummate the transaction that has a real interest, they've

21   committed interest, and dedicating tremendous resources to

22   getting to the finish line, putting financing together for --

23   to close on a transaction of the company.

24      Q.   And are you familiar with the concept of bid

25   protections?

1        A.    I am.

2        Q.    And what are they?  Bid protections are a way to

3    keep people -- or keep a party focused on getting to the

4    finish line in a transaction.  And I'll stop there.  So

5    keeping people focused and shows high desire to get to the

6    finish line at the agreed upon terms.

7        Q.    And were there certain bid protections provided to

8    Nexus here?

9        A.    There were certain bid protections.  Those were in

10    negotiation.

11        Q.    Okay.  And do you recall what they were?

12        A.    There was all -- in terms of their specifics?  Or

13    there were lots of conversations, negotiations throughout.

14        Q.    Ultimately, what was agreed to?

15        A.    In terms of?

16        Q.    Of the bid protections.

17        A.    Oh, I'm sorry.  Of expense reimbursement and

18    specific -- there was expense reimbursement.  There was a

19    breakup fee, and there were certain protections associated

20    with if there was a breach of reps and warranties.

21        Q.    And being someone who was familiar with the

22    negotiation process, did Nexus require those bid protections

23    in order to serve as the stalking horse here?

24        A.    Yes, there was lots of conversations, and Nexus

25    has been clear from the very beginning that if they were

1  going to serve as -- they wanted to serve as the stalking
2  horse, but along with that came -- they were not going to go
3  forward with any -- without these big protections.  There was
4  a robust negotiation process with them on this.
5      Q.   Are you aware of anyone else who would have
6  stepped forward to serve as the stalking horse here without
7  any bid protection?
8      A.   No.  I mean, there was no one else who submitted
9  or expressed an interest in serving as the stalking horse at
10 the time, despite repeated conversations with -- I think -- I
11 forget how many parties are outlined in here that we went to
12 on a pre-petition basis, but none of them were interested in
13 becoming a stalking horse.  None of them told us, or none of
14 them delivered a draft of an APA or anything expressing
15 interest in being a stalking horse.
16     Q.   And I believe you may have mentioned this already,
17 but are bid protections common as far as you --
18     A.   They're customary and usual in transactions of
19 this nature.  Absolutely.
20     Q.   And do you believe that the bid protections that
21 are provided here are customary?
22     A.   I believe that they are customary and usual, yes.
23     Q.   Okay.  The stalking horse bid that Nexus has
24 provided, do you have any sense yet as to whether or not
25 that's been helpful to the process here for Big Lots?

1        A.   Has -- yes, it has absolutely been helpful.  There

2   has been increasing amount of interest once we filed with

3   stalking horse, and that information was made to the public,

4   and there's been increased, you know, increased amount of

5   interest by various strategic and financial parties that

6   became increasingly more serious about digging in, spending

7   time diligencing and so on to see if they could move forward

8   themselves with an acquisition of the company.

9        So, yes, it provided the competition that we were

10  looking for in our process.

11       Q.   There's been mention of the fact that this

12  stalking horse bid has been contingent on obtaining

13  financing.  Do you recall that?

14       A.   The stalking horse -- yes.

15       Q.   Are the bid protections payable to Nexus, even if

16  it were unable to obtain finances?

17       A.   No, I think that was a change that was just made

18  that was spoken about a few minutes ago.  If Nexus does not

19  deliver the financing, then Nexus does not get any of those

20  big protections.

21            MR. MCCLAMMY:  Thank you, Your Honor, I have no

22  further questions at this time.

23            THE COURT:  Okay, thank you.  Any cross

24  examination?  Ms. Casey?

25            MS. CASEY:  For the record, Linda Casey on behalf

1  of the United States Trustee.

2  CROSS EXAMINATION

3  BY MS. CASEY:

4      Q.   I just want to make sure.  I'm not sure I heard

5  all of the benefits of having a stalking horse.

6      A.   Sure.

7      Q.   Am I correct, one of the benefits is it provides a

8  floor to the purchase price by having conducted depreciation

9  valuation?

10      A.   It provides certainty and floor, yes.

11      Q.   And it provides certainty to stakeholders that the

12  debtors are going to be selling their assets and the

13  enterprise will continue to operate.

14      A.   I think it provides a floor that they're somewhat

15  interested in buying the whole business to create a certain

16  level of competition at the next stage in the process.

17      Q.   Was there anything else?  I thought that was the

18  two that you had stated?  Was there --

19      A.   I think those are the primary benefits.

20      Q.   Okay.  The purchase price is -- are you familiar

21  with the purchase price?

22      A.   Yeah.  Generally, yes.

23      Q.   The purchase price, according to your declaration,

24  is two and a half million in cash plus a defined term debt

25  payoff amount.

1      A.   Yeah.

2      Q.   What is that debt payoff amount?  Is that 100

3  percent or is that a number that is negotiated between the

4  purchaser and the lender?

5      A.   I believe it's 100 percent payoff, but I believe

6  it's a negotiation between -- it is 100 percent payoff and a

7  negotiation between Nexus and exit financing and so on.  If

8  that's your question.

9      Q.   So could that number fluctuate?

10      A.   If there's a negotiation on exit between the Nexus

11  and the creditors, they could negotiate such a thing, I

12  guess.

13      Q.   And by exit, are you talking about that credit

14  facility that they're --

15      A.   All their -- all their -- yes, the credit

16  facility, the outstanding debt and so on, sure.

17          MS. CASEY:  I have no further questions, Your

18  Honor.

19          THE COURT:  Anyone else?  Any redirect?

20          MR. MCCLAMMY:  Briefly, Your Honor, just maybe one

21  or two questions.  For the record, Jim McClammy of Davis Polk

22  for the debtors.

23  REDIRECT EXAMINATION

24  BY MR. MCCLAMMY:

25      Q.   Mr. Rifkin you were talking about some of the

1  benefits of having a stalking horse bidder and how that might

2  set the floor with respect to bidders in the bidding process.

3  Do you know whether or not there were benefits, for example,

4  with respect to other constituents in these cases of having

5  the stalking horse bidder online, for example, with respect

6  to vendors?

7       A.   In this situation?

8       Q.   Yes.

9       A.   Oh yes.  I'm sorry.  When I talk about -- I said,

10  I think, in what I said before, constituents, clarity,

11  certainty of a transaction that benefits the vendors,

12  stakeholders, and other sort of various sort of parties

13  around the estate.  So, yes.

14      Q.   And are you aware of any particular benefits with

15  respect to the vendors here, or discussions with vendors with

16  respect to the stalking horse bid here?

17      A.   I think you have -- I don't interact directly with

18  the vendor, so I think it is.  I think vendors, in general,

19  like the fact that there is an acquisition of the company by

20  another party to provide longevity for a business and so on.

21  So I think that's probably -- that is a benefit here to the

22  vendors, but you have to ask vendors directly on that.

23          MR. MCCLAMMY:  Thank you.  No further questions,

24  Your Honor.

25          THE COURT:  Thank you.  You're excused, sir.

1    THE WITNESS:  Thank you, Your Honor.

2    MR. PEPPIATT:  Your Honor, once again, for the

3 record, John Peppiatt of Davis Polk on behalf of the debtors.

4 I just wanted to note that there's a sort of dichotomy here

5 between the argument around the issues Ms. Casey raised that

6 we'll get to, but also there's a separate issue of the

7 conditionality of the financing and when the bid protections

8 come into being.  So I propose to address the argument first,

9 and then we can come back to that point if that's okay with

10 Your Honor.

11    THE COURT:  Okay.

12    MR. PEPPIATT:  So as Your Honor noted, we filed

13 our reply last night rather late at Docket No. 559.  I won't

14 repeat every argument laid out in that reply, but I'll go

15 into maybe a bit more detail than I otherwise would have.

16    Fundamentally, in our view, the question of

17 whether bid protections constitute actual and necessary

18 expenses of the estate is a question of weighing benefit and

19 risk.  The debtors in the exercise of their business judgment

20 determined that the benefits of entering Chapter 11 with the

21 stalking horse bid, including the bid protections as they

22 were drafted and the conditions in which they are payable,

23 provided a substantial benefit to the debtors estates that

24 outweighed the attending costs.

25    The benefits provided by the stalking horse bid,

1  inclusive of the bid protections, in our view, fall squarely

2  within the parameters set forth by the Third Circuit in

3  O'Brien -- in the O'Brien Environmental Energy.  As that

4  court said, such inquiry stems directly from Section

5  503(b)(1)(A), which requires that an expense provides some

6  benefit to the debtor's estate.

7          The Third Circuit has also made clear that there

8  are three primary ways to satisfy that 503(b) standard.  The

9  first is found if assurance of a breakup fee -- well, if

10  assurance of a breakup fee promoted more competitive bidding,

11  such as by inducing a bid that would otherwise not have been

12  made and without which bidding would have been limited.

13  That's Energy Future 904 F.3d. 288 at 537.

14          Second, if the availability of breakup fees and

15  expenses were to induce a bidder to research the value of the

16  bidder and convert that value to a dollar figure on which

17  other bidders can rely, that's another pathway to a rate fee

18  being an administrative expense, and the third --

19          THE COURT:  Do we have a dollar figure here that

20  other bidders can rely upon?  Do we have a dollar figure with

21  certainty?

22          MR. PEPPIATT:  Yes, Your Honor, the dollar figure

23  is.

24          THE COURT:  We have a number, right?  But that

25  number is subject to financing, is it not?

1          MR. PEPPIATT:  That number is subject to the Nexus

2   obtaining financing commitments, but they are committed --

3   Nexus is committed to getting the financing at that number,

4   and they lose the bid protections if they don't hit that

5   number.

6          THE COURT:  How do other bidders know what the

7   number is?  The bids are due the same day that Nexus is

8   supposed to get a commitment, correct?

9          MR. PEPPIATT:  Correct.

10          THE COURT:  So how does this play to other

11   bidders?

12          MR. PEPPIATT:  So there is a total dollar figure

13   that is associated with the Nexus bid, and another bidder

14   coming into the process has to beat that bid by the minimum

15   overbid that's set forth in the bid procedures.  So that

16   number is known, and the minimum overbid is what the next

17   bidder has to hit.  The Nexus bid is the floor.

18          There's a question of whether Nexus has obtained

19   that financing, but that financing has to be committed by the

20   bid deadline, and then the next bidder coming in will have to

21   satisfy the minimum over bid.  So that's where the floor is

22   set.

23          THE COURT:  So they have to meet a minimum overbid

24   even if the financing isn't available for Nexus.  So Nexus

25   says it's going to get $750 million, right?  The next bidder

1 has to overbid the 750 plus two five, plus the minimum bid

2 increment.  Not knowing whether or not Nexus has the

3 finances, whether it's -- is it even a qualified bidder

4 absent knowing whether they have the money?

5          MR. PEPPIATT:  So the debtors (inaudible).  So the

6 debtors -- if the Nexus bid did not come with that committed

7 financing, the debtors could have the flexibility to reassess

8 that question.  And similarly, if the debtors are receiving

9 other bids from bidders at the bid deadline, the debtors can

10 determine whether to qualify those bids, for example, if

11 there are issues with the financing or if it's a bid that

12 comes in at a different price.  But everybody is expecting

13 that financing to come in.

14          THE COURT:  Let me just ask the fundamental

15 question.  Why is this being pushed today when in 48 hours

16 you're going to know whether or not they have financing?  Why

17 wasn't the whole schedule modified to coincide with the

18 ability to have financing so that people know truly what the

19 floor is?

20          And I understand milestones, but this -- I'm

21 struggling very much with this process.  Or why aren't they

22 coming back later and seeking the bid protection?

23          MR. PEPPIATT:  We could speak to the stalking

24 horse about moving the deadline to Wednesday at 5:00 p.m. for

25 entry of the bid procedures order and then come back to the

1  Court.  We retain flexibility --

2       THE COURT:  Well, I think I'd like it if you all

3  took a break and talked about that, because to me, I mean,

4  I'm not adverse to bid protections.  That's not what the

5  issue is here.  But my concern here is very much the timing

6  and actually having a commitment before awarding someone bid

7  protections.

8       And so if the parties want to take a break to talk

9  about this, I think it would behoove them to do so.

10       MR. PEPPIATT:  We'll do that, Your Honor, right

11  now.

12       THE COURT:  Okay, we'll take a break.  And feel

13  free to knock on the door.  Okay.  So we're going to stand in

14  recess.

15            (Off the record at 3:13 p.m.)

16            (On the record at 3:51 p.m.)

17       THE COURT:  Be seated.

18       MR. PEPPIATT:  Your Honor, one again, Jonah

19  Peppiatt of Davis Polk on behalf of the debtors.  Thank you

20  for that opportunity to take a break just there.

21       We've had a chance to confer with the stalking

22  horse and the lenders and the committee and other parties and

23  the U.S. Trustee.  And what we propose to do is we are going

24  to move the bid deadline to Friday, October 25th, at noon.

25  (Inaudible) --

1          THE COURT:  Wait, I'm sorry.  Friday.  This Friday

2   till noon?

3          MR. PEPPIATT:  This Friday, October 25th, at noon.

4          THE COURT:  Okay.

5          MR. PEPPIATT:  We understand that Your Honor has

6   time on the calendar this Thursday at 2:30 p.m.

7          THE COURT:  Okay.

8          MR. PEPPIATT:  And so we would propose to come

9   back and seek approval of the bid procedures and the bid

10  protections at that hearing on Thursday at 2:30.

11         THE COURT:  Okay.  All right.

12         MR. PEPPIATT:  And Guggenheim will go out to all

13  the parties and let them know now that the bid deadline has

14  been changed, and they'll understand the circumstances, and

15  they'll know that they will be able to find out prior to the

16  bid deadline precisely whether the stalking horse has that --

17         THE COURT:  Okay.

18         MR. PEPPIATT:  -- (inaudible).

19         THE COURT:  And the stalking horse will be

20  prepared at that -- by that time.  By Thursday.

21         MR. PEPPIATT:  That's our understanding.

22         THE COURT:  Okay.

23         MR. PEPPIATT:  And the stalking horse and the

24  lenders have agreed to move their respective milestones to

25  accommodate that revised schedule.

1        THE COURT:  Okay.  And do you need a new sale

2    date?  Sale hearing date?

3        MR. PEPPIATT:  We don't believe we do, Your Honor.

4    We think that -- we talked to Guggenheim about this

5    (inaudible) option on Monday, the 28th, and the rest of the

6    key dates in the calendar would remain unchanged.

7        THE COURT:  Okay.

8        MR. PEPPIATT:  The only question, Your Honor, that

9    leaves is whether Your Honor wants to hear arguments on the

10   issues raised by the U.S. Trustee now or to hold that argument

11   for Thursday.  We're happy to go either way.  And we understand

12   the  U.S.  Trustee  is  as  well.   But  of  course,  they've

13   (inaudible).

14       THE COURT:  Okay, I'll hear from Ms. Casey.

15       MS. CASEY:  Thank you, Your Honor, Linda Casey on

16   behalf of the U.S. Trustee.  I do think that the objections,

17   the other objections raised by the U.S. Trustee are different

18   from.  So if Your Honor would like to hear it, it has to do

19   with whether the Court can approve today bid protections

20   where there isn't a higher and better offer that (inaudible).

21       So if we want to hear those arguments today, I'm

22   more than willing to go through it.  I do think it's

23   sufficiently separate from.  But if you'd like to hear it all

24   at once, it's up to Your Honor what Your Honor would prefer.

25       THE COURT:  I don't have a strong preference.  I

1  mean, I have read your pleadings.  I'm happy to have it heard

2  on Thursday, but I don't know if that provides a problem for

3  counsel or I'm happy to hear it today.

4           MR. PEPPIATT:  Your Honor, I think the reason to

5  hear it today is that we do still have witnesses here.

6           THE COURT:  Okay.

7           MR. PEPPIATT:  The witness, Mr. Rifkin.  So it may

8  make sense just to go through the argument now and then if

9  Your Honor has questions or wants to recall the witness, that

10  can be done.

11           THE COURT:  Okay, that's fine.  And I think that

12  will probably then streamline Thursday.

13           MR. PEPPIATT:  Thank you, Your Honor.

14           THE COURT:  Or -- yeah, Thursday.  Thursday at

15  2:30.  Correct?

16           MR. PEPPIATT:  Thursday at 2:30.

17           THE COURT:  Okay.  I wrote Tuesday.  Sorry.

18           MR. PEPPIATT:  So with that, Your Honor, I guess

19  I'll return to the standard that we were going through that

20  was set forth in O'Brien and the three ways that the Court in

21  Energy Future Two laid out --

22           THE COURT:  Um-hum.

23           MR. PEPPIATT:  -- that a stalking horse bid

24  protection or similar break fee may satisfy the actual and

25  necessary test.  So the first, if it is -- if it promotes

1  more competitive bidding, such as by inducing a bid that

2  otherwise would not have been available.

3           The second is that if it induces a bidder to

4  (inaudible) to set a floor to convert value to a dollar

5  figure to set a price.

6           And the third is that incentivizes a stalking

7  horse bidder or similar party to adhere to its bid rather

8  than abandoning its attempts to enter into the purchase.

9           So further, though, as the Third Circuit also

10 stated in Energy Future Two, the Bankruptcy Court must make

11 what is ultimately a judgment call about whether the proposed

12 fees benefits outweigh potential harms.  The U.S. Trustee

13 appears to suggest, in its objection, that the inquiry into

14 the benefit of the bid protections in any circumstance other

15 than a superior proposal, as Ms. Casey just noted, must be

16 done on an ex post facto basis when the protections are set

17 to be paid and seem to also suggest that that was only upon

18 request by the stalking horse bidder itself.

19          We don't believe that that's the right approach or

20 consistent with precedent, even in Energy Future, the case

21 that -- a case was only looking backwards because it was

22 found in the context of a motion for reconsideration in a

23 situation where the Court believed -- that the Trial Court

24 believed that they fundamentally misunderstood the facts in

25 that case.

1          In our view, the question is simple.  Do the

2    benefits of the bid protections outweigh any harms, and you

3    think that they do?  As you've heard, the debtors determined

4    in their business judgment that it was better to have this

5    stalking horse bid, even with those bid protections as

6    negotiated, and to have an auction with no stalking horse.

7          They determined that the sale process would

8    benefit, and they also concluded in arm's-length negotiations

9    that the stalking horse would not provide a bid without those

10   protections.  And they have also -- they also determined that

11   the stalking horse would be committed and remain committed to

12   its bid with those protections.  All of that is consistent

13   with the law in the Third Circuit.

14         As Your Honor heard earlier this afternoon from

15   Mr. Rifkin's testimony, all of those circumstances exist

16   here.  The stalking horse was the only party willing to serve

17   as a stalking horse pre-petition and did condition its entry

18   into the APA on those bid protections.

19         If the bid protections are not approved, the

20   stalking horse could walk away under the terms of the APA.

21   The stalking horse has also remained committed to its bid,

22   and as we're all well aware, is actively and very focused on

23   obtaining the financing that will firm up its bid ahead of

24   what is now Friday's bid deadline.

25         And again, as Mr. Rifkin noted, the stalking horse

1   bid also provided certainty to the debtors of a critical

2   stage in the case and to vendors and other parties, and set

3   forth sort of a roadmap for potential bidders and a floor

4   price for the auction.

5           I do want to speak for a moment about the

6   circumstances in which the break fee and expense

7   reimbursement in this case are payable (inaudible) issue and

8   the objection.  There's two steps before the break fee is

9   payable.

10          The first is that the APA must be validly

11  terminated because either the buyer was not selected, the

12  debtor's entered into a superior proposal, the debtor's

13  elected to pursue an alternative transaction, or the debtor's

14  materially breached the APA.  These are all factors that are

15  within the debtor's control, and that's very important when

16  looking at the case law, because in Energy Future, the Court

17  found that issue important.  There was a clear and present

18  risk that related to a major regulatory approval in that case

19  that no one else involved had anything control over.

20          The Court said that it had previously failed to

21  recognize that this was a potentially significant harm and

22  created a perverse incentive for the buyer, and that the risk

23  of not obtaining that regulatory approval was so great that

24  the fee could not have been seen to preserve the value of the

25  estate.  We haven't heard any evidence today or otherwise,

1 Your Honor, that suggests a similar circumstance exists here.

2          And the second piece of the break fee is that the

3 debtors do actually have to close the tail transaction as not

4 as though, excuse me, the debtor's material breach on its own

5 is sufficient to give rise to payment of the break fee.

6          With respect to payment of the expense

7 reimbursement, there are additional circumstances under the

8 APA which we view as typical, in which the expense

9 reimbursement may be paid and -- but that is because the

10 expense reimbursement is somewhat different in character than

11 break fee, in that it is related contractually and

12 specifically to out-of-pocket, reasonable, and documented

13 costs that are incurred by the stalking horse bidder

14 throughout this process.

15          THE COURT:  And that amount now is two million; is

16 that correct?

17          MR. PEPPIATT:  It is now two million following the

18 amendment that was filed last week, Your Honor.

19          Our reply sets forth a number of recent examples

20 where stalking horse bid protections were approved in similar

21 circumstances.  We have found a couple of additional examples

22 of that as well.  So we have a total of nine that were

23 approved for similar circumstances where bid protections

24 could be paid that were not limited to a superior entry into

25 a superior proposal by the debtors.

1        Those are all cases that are from 2024 or 2023.

2   So there may be additional out there from further back, but

3   we didn't feel a need to go further back when we found those

4   nine.

5        Those are In Re Sunpower Corp., Case No. 24-11649

6   and that's at Docket No. 290.  In Re Express Inc., which is

7   Case No. 24-10831.  And that's at Docket No. 414, 427, and

8   471.  Apologies.  There are three places where it comes up,

9   if you have to trace it through.

10       And I'll note that in the Express case, the

11  specific circumstance of a seller breach of the APA was one

12  of the factors.  In the Sunpower case, it was not --

13  (inaudible) was not specifically enumerated, but other

14  circumstances that were not just a superior proposal, such as

15  the debtors entering into an alternative transaction were

16  present.

17       In In Re Water Gremlin Co. That's Case No. 23-

18  11775, Docket No. 152.  That was also bid protections that

19  were payable on a seller breach.  In Re Zymergen, that's Case

20  No. 23-11661, Docket No. 194, again, payable upon seller

21  breach.  In Re Unconditional Love.  That is Case No. 23-

22  11759.  And that was similar to Sunpower case where it was

23  closing of an alternative transaction, but not necessarily a

24  superior proposal that triggered the break fee.

25       In Re Yellow Corp., Case No. 23-11069 at Docket

1  No. 624, again associated with seller breach.  I'm almost

2  done, Your Honor.

3          THE COURT:  No, it's okay.

4          MR. PEPPIATT:  Just three more.

5          THE COURT:  Take your time.

6          MR. PEPPIATT:  In Re Virgin Orbit Holdings, that's

7  Case No. 23-10405 at Docket No. 326.  And again, that was

8  seller breach.  Slightly more specific, seller breach related

9  specifically to inaccuracy of reps and warranties, but

10  nonetheless seller breach.

11          In Re AD1 Urban Palm Bay.  That's Case No. 23-

12  10074 at Dockets No. 284 and 298, again tied to both seller

13  breach or reps and warranties.  And the last case is In Re

14  Nova Wildcat Shur-Line Holdings, Inc.  That's Case No. 23-

15  10114, again tied to seller breach.

16          I will also note that in each of those nine cases,

17  in some of them there were no objections.  In three of them

18  there were objections, but none of the objections, including

19  in one case where the U.S. Trustee objected, raised this

20  issue.  So we find it somewhat novel that the question of the

21  ability of bid protection to be paid based on a seller breach

22  is now coming up, and we don't think it's consistent with

23  precedent in this court.

24          THE COURT:  The rationale being that a seller

25  breach is -- leads to a contract claim for breach of contract

1  as opposed to a protection under a sale order?  Is that the

2  argument?  I just want to make sure that I -- and it's not

3  your argument, obviously, but I can save that for the United

4  States Trustee.

5          MR. PEPPIATT:  Okay, Your Honor.  So we believe

6  that subject to the points we discussed earlier, which now

7  (inaudible) financing, these are typical reasonable bid

8  protection provisions as they relate to the break fee and

9  (inaudible) payable in the context of, for example, a seller

10  breach or other circumstances that go beyond, as is typical,

11  the sale of the debtors to a -- under a superior proposal.

12          We, again, believe that the debtors have already

13  benefited from the stalking horse bod and that, therefore,

14  these bid protections are actual and necessary.

15          The U.S. Trustee raises two other points in its

16  objection.  The first is with respect to the super priority

17  status being granted to the bid protections.  Consistent with

18  what we said in our reply, super priority status is not

19  limited to funded debt financing.  Section 364(c)(1) permits

20  a claim to be afforded super priority status if such debt is

21  not available on a priority basis.

22          As Judge Sontchi said on the record in the Lucky

23  Brand case, the reality is 364(d) says what it says.  Someone

24  who is doing what a stalking horse is doing in an asset sale

25  agreement certainly meets that criteria.  And that criteria

1  makes it possible to then get a super priority claim if the

2  Court finds it appropriate.  That's, Your Honor, from Case

3  No. 20-11768 at Docket No. 269.

4          And we submit that here, super priority status was

5  an important part of the bargain that was reached with the

6  stalking horse and was a condition of their stalking horse

7  bid, and it should be approved over the U.S. Trustee's

8  objection.

9          The final point, Your Honor, the U.S. Trustee

10  requests that the fees and expenses under the expense

11  reimbursement be subject to a ten-day notice and review

12  period.  We've gone through several precedents.  We have some

13  cited in our reply that sort of show the negative that do not

14  have that as part of the stalking horse order.  I can't say

15  that there is no case where that existed, but we looked, and

16  we were not able to find that limitation.  And we viewed

17  these as if the bid protections are approved, they will be

18  Court-approved and contractually required to be reasonable,

19  actual, out-of-pocket, and documented.  And we don't think

20  that there needs to be a further, separate review function

21  that applies to those expenses here.

22          So in conclusion, looking at the evidence Your

23  Honor heard today regarding the benefits of the stalking

24  horse bid, it is clear to the debtors that the bid

25  protections in this case are actual and necessary under

1   Section 503(b) and should be approved and the U.S. Trustee

2   objection overruled.

3          THE COURT:  Thank you.  Ms. Casey.  Well, did the

4   committee or anyone want to be heard?  I didn't mean to shut

5   you out, Ms. Casey, but --

6          MR. ALBERTO:  Your Honor, I'll keep it brief.

7   Justin Alberto from Cole Schotz on behalf of the committee.

8   The committee wants a stalking horse here.  I realize that is

9   a very generic statement here several days before the bid

10  deadline without committed finance from the proposed stalking

11  horse bidder.

12         I will say that a stalking horse purchaser retail

13  cases sends a message to the vendor and landlord communities

14  that help stabilize an otherwise potentially unstable

15  situation.

16         We support the debtors here in their efforts, and

17  our objection that we filed last week was very targeted with

18  respect to the return of a deposit, not necessarily bid

19  protections, but on balance, after looking at the concessions

20  that have been made with respect to the bid protections and

21  them going away if the financing is not committed between now

22  and the bid deadline, we're satisfied that it resolves our

23  objection.

24         THE COURT:  Okay, thank you.

25         MR. ALBERTO:  Thank Your Honor.

1          THE COURT:  Anyone else?  Oops, Ms. Casey?  Ms.
2  Kaufman?
3          MS. KAUFMAN:  Good afternoon, Your Honor.
4          THE COURT:  Good afternoon.
5          MS. KAUFMAN:  Susan Kaufman for WPG Management.
6  We filed a brief reservation of rights with respect to the
7  bid procedures.  And just very briefly, my co-consul Ronald
8  Gold of Frost, Brown & Todd is on Zoom with us, and he'd like
9  to address the Court just very briefly with respect to our
10  reservation or rights.  He's been admitted pro hac vice.
11          THE COURT:  Thank you.  Mr. Gold.
12          MR. GOLD:  Good afternoon, Your Honor.  Ronald
13  Gold, Frost, Brown & Todd on behalf of WPG Management
14  Associates.  Your Honor, we did file a reservation of rights
15  in response to Docket No. 211.  WPG Management has its
16  corporate headquarters in the debtor's Granville Dublin
17  location.  We filed a reservation of rights and statement
18  with respect to our 365(h) rights to preserve that in the
19  event that the property is sold.
20          We do note, Your Honor, that last week the debtor
21  filed its cure schedule with respect to the proposed going
22  concern sale and did not list the WPG Management Associates
23  lease as a lease designated for assumption and assignment.
24  We intend to obviously pursue our 365(h) right to request
25  adequate protection, and we intend to do that in connection

1  with the sale hearing.  We did want to make sure the Court

2  was aware of that.

3          We've reached out to debtor's counsel as well.

4  They indicated that all matters had been resolved.  While

5  this is technically not a bid procedures matter, it has not

6  yet been resolved, Your Honor.

7          THE COURT:  Okay.  All right.  Thank you, sir.

8          MR. GOLD:  Thank you.

9          THE COURT:  Ms. Casey.

10          MS. CASEY:  Linda Casey on behalf of the United

11  States Trustee.  Your Honor, start by saying what we're not

12  asking for.  We're not asking for Your Honor to say that the

13  bid protections permitted by the APA are disallowed with

14  prejudice.

15          What we are asking is that through the bid

16  protections order, the only time where it is authorized

17  before the auction is under the circumstances where the

18  auction produces a higher and better offer and that higher

19  and better offer closes.

20          Before I get into the legal part, I keep hearing

21  the benefit, it provides a floor.  The benefit, it provides

22  certainty.  The benefit, we know that this is going to sell.

23  It's going to give vendors the understanding.  It's going to

24  give the committee -- they want to get their sale.

25          But the bid protections are being authorized in

1   cases where there's no sale, the expense reimbursement,

2   specifically, where there's no sale, and the bid protections

3   where there could be a sale that is for an amount below the

4   floor, and that's not certainty.  That's not providing the

5   floor.  That's actually providing bid protections when

6   there's a sale that closes that is less good than this one,

7   or that there is no sale at all.

8           I disagree that the reading of the case law is

9   that only under exceptional circumstances is it in hindsight,

10  I think the case law clearly stands, that Your Honor is put

11  in hindsight, and that you need to have an actual and

12  necessary benefit to the estate.

13          So where exactly are these bid protections and

14  expense reimbursements permitted?  The bid protections, which

15  is seven and a half million dollars, requires two

16  occurrences.  I'll go with the second one first.  That within

17  120 days of the failure of the stalking horse to close, that

18  a tail transaction occurs.

19          And a tail transaction is either a superior

20  proposal, which is any transaction that is superior to the

21  stalking horse, or an alternate transaction, which is any

22  alternate transaction, provided that the senior debt, that

23  the secured debt is paid off.  It doesn't require that extra

24  two and a half million dollars.  It's not a better

25  transaction.  It's actually less than.

1    So you do have a circumstance where it does not

2 have to be a better offer procured as a result of the

3 stalking horse, and it doesn't even have to be a superior

4 offer.  It can be a lesser offer.  And those bid protections

5 are available if the seller reaches its warrant -- its

6 warranties or its covenants, if the seller enters into an

7 alternative transaction, if Your Honor approves an

8 alternative transaction, if they're not selected at the

9 auction, and if it doesn't close as of December 31st.

10    But again, the sale that does have to close is not

11 necessarily one that was procured because of the stalking

12 horse and is not necessarily one that is a superior

13 transaction.

14    The expense reimbursement previously had two

15 requirements, but now it's down to one.  And they get a $2

16 million expense reimbursement if it doesn't close for any

17 reason other than a buyer breach.  Any reason at all other

18 than a buyer breach.  There's no requirement that there be

19 another closing.

20    So what we're saying, Your Honor, is, is it

21 possible that they can come in and establish to Your Honor

22 that they provided an actual and necessary benefit to the

23 estate under any of those circumstances?  It's possible.  I

24 don't know if I would say it's likely, but we'll say it's

25 possible.  Can they establish that record today?  And we

1  would say no.

2          Today, the actual necessary expense is only if

3  there is a floor and only if they, through their due

4  diligence, through their offer of the stalking horse

5  purchase, it induces other bidders, the debtor selects those

6  other bidders, and the debtor closes a better offer.  That's

7  the circumstance today that you can say this stalking horse

8  has provided an actual and necessary benefit to the estate.

9          All the other circumstances are ones where you

10  might actually -- you might not be able to establish that it

11  was the stalking horse that resulted in the alternative

12  transaction.  You might conclude that it wasn't an actual and

13  necessary benefit for the estate.

14          If the benefit here, as stated by everyone, is

15  there's a floor and there's certainty, but we're giving an

16  expense reimbursement if it doesn't close.  So there is no

17  floor, there is no certainty, and we're giving bid

18  protections if it closes, but not for as good of a price,

19  then you're not getting the actual and necessary benefit.

20          So in the forward looking view, it should just be

21  approved if there's an actual, better offer through the

22  auction sale process that closes, not foreclosing the

23  opportunity to come back and say, hey, this agreement has

24  these other terms.  And the way that facts have transpired,

25  these other terms have been triggered, and we think we can

1 now, in hindsight, establish that it is actually necessary.

2 But we don't have a record today that all of those

3 circumstances would result in an actual and necessary cost to

4 the estate.

5         As far as the cases that were cited, Your Honor, I

6 can't really argue against bare legal orders.  I don't know

7 what happened.  I don't know if my colleague didn't see it.

8 I don't know if my colleague saw it, that there were facts

9 and circumstances in the case where they didn't think those

10 were likely to arise.  I don't know what occurred in those

11 cases, and I don't know, you know, the representation from

12 debtor's counsel was that while there may have been

13 objections filed, they weren't on this issue.  So I don't

14 know why that happened.

15        I also know that I have filed objections in this

16 exact same issue.  So it's not the first time, it's not a

17 change in what's happening.  And it is pretty -- in my

18 personal experience as a U.S. Trustee, it is pretty standard

19 that the bid protections are for the closing of a successful

20 -- a different successful bidder.  But again, under the case

21 law, it has to be an actual and necessary cost of the estate.

22 And the record can only establish that today if a better

23 offer actually (inaudible).

24        THE COURT:  Ms. Casey, I had one question about

25 one of your arguments about review of expense reimbursements.

1        MS. CASEY:  Oh, yes.  So, Your Honor, it is a

2   standard ask from my office that we ask to review the expense

3   reimbursements of stalking horse purchaser fees entitled to

4   expense reimbursement.  Similar to when we ask to see a DIP

5   lender's counsel fees.

6        Bankruptcy is about transparency.  Administrative

7   expenses are about actual and necessary.  So we do ask that

8   we be given, quite frankly, the committee and my office be

9   given a ten-day review period so that if we do see something

10  that appears to be unreasonable or otherwise should not be

11  allowed, that we can raise that objection.

12       I also -- the super priority sale, there have been

13  courts in this district who have overruled us on the super

14  priority.  I wish I could remember the case name, but it

15  would just be a bare legal order anyway.  But Judge Owens

16  sustained our objection under the thing that -- under the

17  ruling that they can get paid at the table, they don't need

18  super priority status because they can get paid on the table.

19       Our position is that 364 says that you can get

20  credit or incur debt under certain circumstances.  It's not

21  the same as a claim.  And if 364 is read so broadly as

22  somebody who provides a service or goods to the debtor and

23  not somebody who is providing financing to the debtor, it

24  renders it illogical that every party can come in and say,

25  well, I'm not going to provide goods if I don't get super

1  priority status.  I'm not going to provide services if I

2  don't get super priority status.

3          It's written in the section that has to do with

4  financing.  It talks about credit and debt.  And so it's our

5  position that the only logical reading of this and the only

6  way that it could realistically occur is if it's limited to

7  financing, if it's limited to cash that's loaned to the

8  debtor can be loaned on a super priority basis, and not

9  anybody who creates, through their actions, a post-petition

10  claim can get a super priority status simply by saying, I

11  won't engage in this transaction if you don't give me that.

12  So that's our position on the super priority status.

13          THE COURT:  Okay.  Anything further?

14          MR. PEPPIATT:  Yes, Your Honor.

15          THE COURT:  Okay, certainly.

16          MR. PEPPIATT:  Just again for the record, Jonah

17  Peppiatt for the debtors.  I just wanted to make two points.

18          I believe Ms. Casey said when talking about the

19  circumstances in which the break fee is payable, it's

20  included if the transaction doesn't close as of December

21  31st.  That's only true if one of the other circumstances of

22  the break fee arises is also payable at that time.  In other

23  words, they can sell, say, well, outside date.  That's an

24  easy one to point to is why I'm terminating the APA.  But you

25  also have to satisfy one of the other termination factors if

1   you look at the language of the break fee.  So I just wanted

2   to clarify that.

3           And the second point I wanted to make is that

4   there are three separate factors here by which you can

5   satisfy the actual and necessary test.  We just heard a lot

6   about setting a floor specifically and being able to look

7   back and determine and figure out whether the bid set a floor

8   or not.

9           But I think Your Honor heard substantial testimony

10  today that the stalking horse bid provided certainty, was

11  very helpful in the process, that there was increased

12  interest as a result of Nexus's competition.  Sorry, of Nexus

13  that drove the competition that the investment bankers were

14  looking for.

15          And if you, for example, if you were to buy

16  inventory, right, you bring it into a store, that inventory

17  may not sell.  Similarly here, if you bought the inventory,

18  that can still be an actual and necessary expense even if you

19  don't ultimately sell the inventory.

20          So it's possible to determine there's a benefit

21  today, the first benefit being that the stalking horse was

22  induced to bid, and the second being all of the interest that

23  it drove in the process, and the third being that Nexus

24  stayed committed to its financing (inaudible) evidence on all

25  of that.  That's all I have, Your Honor.

1          THE COURT:  Let me ask one quick question.  I

2   think I read this, but Nexus is not an insider, correct?

3          MR. PEPPIATT:  Correct, Your Honor.

4          THE COURT:  Not related to any GOB consultants or

5   anyone else in the case.

6          MR. PEPPIATT:  That's correct.

7          THE COURT:  Okay.  Thank you.

8          MR. PEPPIATT:  Thank Your Honor.

9          THE COURT:  Okay, well, thank you for those

10  comments.  It's very helpful.  I'll take that into

11  consideration on Thursday when I rule on the issue.

12          MR. SHPEEN:  Good afternoon, Your Honor.  For the

13  record, Adam Shpeen of Davis, Polk & Wardwell, proposed

14  counsel for the debtors.

15          I'll be presenting what I believe is the final

16  motion for today, Agenda Item No. 15.  This is the debtor's

17  motion seeking entry of a final DIP order, which was

18  originally filed at Docket No. 19.

19          Your Honor, for the past week or so, we've been

20  working furiously to try to resolve issues raised by various

21  parties, both informal comments, formal objections.  We're

22  pleased to report that in advance of the hearing, we were

23  able to resolve all but a few limited objections filed by the

24  landlords, and even more pleased report that as of, I think,

25  40 minutes ago, we may have resolved all of the objections.

1          THE COURT:  That's impressive.

2          MR. SHPEEN:  Thank you.  So we know that the UCC

3   is supportive.  The United States Trustee is not objecting

4   here.  And last night, we filed an amended proposed form of

5   final order at Docket No. 556, including an updated approved

6   DIP budget at Exhibit 4 to the DIP order, which I'll discuss

7   in a moment.

8          THE COURT:  Okay.

9          MR. SHPEEN:  With respect to the form of order

10  that we filed last night, we filed a black line against the

11  as-entered interim DIP order to help aid Your Honor's review

12  of the provisions.  We wanted to just take a moment to direct

13  Your Honor's attention to a few of the changes we made to

14  address the (inaudible).

15         THE COURT:  I did receive this last night, and so

16  I appreciate it.

17         MR. SHPEEN:  And Your Honor, we won't page

18  identify specific provisions.  Many of the changes are

19  intended to just reflect that this is now a final order

20  instead of an interim order.

21         THE COURT:  Right.

22         MR. SHPEEN:  So the first change I go to is at

23  paragraph 13 on page 41 of the black line.  Your Honor, here

24  we added the UCC committee as a consultation party regarding

25  amendments to the DIP facilities that materially or adversely

1    impact the constituencies of the committee.  That was part of

2    the resolution with the creditors committee.

3            On page -- also on page 41 of the black line,

4    paragraph 14(a), this is, you know, the linchpin of our deal

5    with the UCC as well as the deal that was acceptable to the

6    DIP lenders.  We have now amended our budget to include 7.9

7    million of September stub rent associated with leases

8    rejected in September and October as being paid in two weeks

9    during the week ending November 9th.  And we increased the

10   committee's professional fee budget by one and a half million

11   dollars.  And the payment of the 7.9 million is expressly

12   authorized in the order, which I'll get to in a moment.

13           The next place I go to, Your Honor, is paragraph

14   23 on page 49.  Your Honor, there were no changes here, but

15   one of the landlord objections made note of the fact that it

16   was uncertain whether the final DIP order would include

17   language that was in the interim DIP order that was related

18   to the fact that the DIP liens are not attaching to the

19   leases and don't (inaudible).  So we've left that language

20   in.  So for the avoidance of doubt, we wanted to draw Your

21   Honor's attention to that as well.

22           Next place I go to is paragraph 30 on page 66,

23   Your Honor.  Here, as part of the committee settlement, we've

24   increased the investigation budget to $100,000.

25           Next place I go to, Your Honor, is the following

1  page, on page 67, paragraph 34.  This is, I think,

2  colloquially referred to as the soft marshaling language.

3  This is language that requires lenders to use reasonable

4  efforts to recover from shared collateral before recovering

5  unencumbered assets.  Again, this was part of the resolution

6  with the creditors' committee.

7          Next place we turn is paragraph 42.  Your Honor,

8  page 72 of the black line.  This is the challenge period.

9  The deadline is now hardwired into this order as November

10  7th, which not coincidentally is the day before our scheduled

11  sale hearing.  And there's a mechanism by which parties can

12  extend that deadline.

13          The following page on page 73, also in paragraph

14  42, we've added language making clear that the UCC won't be

15  prejudiced in connection with their investigation in seeking

16  standing as a result of the debtor being a limited liability

17  corporation and the limited liability corporation operating

18  agreement waiving certain claims.

19          Paragraph 50 is where I go to next, Your Honor.

20  That's on page 77 of the black line.  Here we've added, at

21  the request of our credit card program provider, Comenity,

22  that we've added language making clear that nothing in the

23  DIP order affects their rights or the program generally.

24          Paragraph 51 is the Chubb reservation of rights

25  language that was added as requested.  Our insurance provider

1  Chubb makes clear that the proceeds of an insurance policy is

2  only DIP collateral to the extent it's property of the

3  debtor, payable to the debtors.  And so that language is

4  added, paragraph 51.

5          Paragraph 52 and 53 was added at the request of

6  two counties (inaudible) with pre-petition tax liens.  Those

7  liens are not being primed by the DIP liens.

8          Paragraph 54 --

9          THE COURT:  Excuse me, does that resolve all the

10  taxing objections?

11          MR. SHPEEN:  As far as we're aware --

12          THE COURT:  Okay.

13          MR. SHPEEN:  -- yes.  Paragraph 54, similar vein,

14  we made clear that nothing in the -- the DIP liens don't

15  prime the rights of sureties with respect to their

16  collateral.

17          Paragraph 55, this is the Texas taxing authority

18  language where we made clear that the DIP liens aren't

19  priming their liens to be said valid, and we're reserving

20  amounts as adequate protection for these reported liens.

21          Your Honor, we were notified that there may be a

22  taxing authority that we've left out of footnote 7, so we'll

23  fix that --

24          THE COURT:  Okay.

25          MR. SHPEEN:  -- in a revised form of order.  We'll

1  also update, Your Honor, the milestones at the end, which

2  will have to be updated in light of what's going on with the

3  bidding.

4            THE COURT:  Okay.

5            MR. SHPEEN:  And then, Your Honor, we were able to

6  resolve a few of the landlord objections in the hallway with

7  language that is added.  One moment (inaudible) paragraph 14.

8  Your Honor, this is on page 39 of the black line.

9            THE COURT:  Did you say paragraph 14?

10           MR. SHPEEN:  14(a), yes, Your Honor.

11           THE COURT:  Okay.

12           MR. SHPEEN:  I'll read it.  The second sentence,

13  and this resolves the objections that were filed at Docket

14  No. -- bear with me one moment, Your Honor.  Well, why don't

15  I read the language first?

16           THE COURT:  Okay.

17           MR. SHPEEN:  Your Honor, the second sentence in

18  that paragraph reads or will be changed to read the approved

19  budget shall be -- the approved budget shall provide for,

20  among other things, to follow in (i), funding during the week

21  ending November 9th, 2024, of 7.9 million applicable to

22  unpaid post-petition rent for the month of September 2024

23  with respect to leases for which the effective date of

24  rejection occurs on or before October 31st, 2024, (the stub

25  rent for rejected leases budget).

1          New words -- and funding during the week ending

2    December 7th allocable to the balance of unpaid post-petition

3    rent for the month of September, defined term, remaining stub

4    rent, with the debtors having authority, but not direction,

5    to draw upon any ABL (phonetic) availability to provide for

6    such funding subject to the terms and conditions of the ABL

7    credit agreement.  No other changes to that sentence.  That

8    makes clear that we have in the budget authority to pay the

9    stub rent that's included in the budget.

10          The following sentence, starting with the debtors,

11   the DIP agents that the committee have agreed will be revised

12   as follows.  The debtors, the DIP agents, and the committee

13   have agreed that the debtors shall be authorized, but not

14   directed to pay -- strike everything until the bottom of the

15   page -- any claims for unpaid post-position rent for the

16   month of September, 2024, with respect to leases for which

17   the effective date of rejection is on or before October 31st,

18   2024, up to the amount of the stub rent for rejected leases

19   budget.  New words -- and the debtors shall be authorized,

20   but not directed, to pay the remaining stub rent in

21   accordance with the budget.  Full stop.

22          So what that does, Your Honor, is it removes the

23   conditionality that was included previously within 14(a) with

24   respect to payment of the stub rent.  And now we have

25   budgeted payment of stub rent, which I believe resolves the

1  remaining landlord objections, as far as we're aware.

2           I believe counsel to one of the landlords --

3           THE COURT:  Do any of the landlords want to be

4  heard?

5           MR. SHPEEN:  -- make a statement.

6           THE COURT:  Ms. Heilman, good afternoon.

7           MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

8  Heilman for Ballard Spahr on behalf of the various landlords,

9  who are referencing Docket Item 523 as well as 527, for whom

10 we are also Delaware counsel for the (inaudible)Hopkins firm.

11          Your Honor, I believe collectively that is

12 probably approximately 80-some landlords of the debtor.  And,

13 Your Honor, the resolution that has been read into the record

14 is, I believe, accurate, except I think we were deleting the

15 word "claims" for any unpaid -- it should be any unpaid post-

16 petition rent attributable to the September.  So it's not

17 subject to actually having filed claims, and so we shouldn't

18 have claims.

19          It is also subject to two reservation of rights,

20 Your Honor.  You know, we understand that -- we believe be

21 subject to the ABL language is really the process in which

22 the debtors need to draw the funds in order to fund the stub

23 rent remaining stub rent.  Your Honor, we don't know what

24 that process is or the procedures or the terms of the ABL for

25 that to happen.  So we do reserve all rights to come back

1  before Your Honor, if that makes some loophole in which that

2  they do not have to fund the remaining stub rent.

3          In addition, Your Honor, we will know by the sale

4  objection deadline whether or not what the sale is going to

5  look like and whether or not there's actually going to be

6  sufficient proceeds in this estate in order to fund the stub

7  rent if there is no sale.  So we also reserve the right to

8  raise objections at that time to revisit the budget to the

9  extent what is now budgeted is no longer at the time of the

10  sale.

11          I also rise to -- and I think the debtors will

12  work with us on this, but we are moving some of the sale

13  dates, and so some of those sale dates trigger off when

14  landlords are going to receive information for the stalking

15  horse bidder as well as other bidders.  It's supposed to be

16  triggered off the bid deadline, which now shortens our time

17  by two to three days because now it's on a weekend, and it's

18  not going to be delivered until the next business day.  So we

19  reserve our rights in that regard, Your Honor.

20          We still should have sufficient time to review

21  that information prior to the objection deadline, but it does

22  shorten our days to now seven days when we had ten.  And to

23  the extent that we do not have sufficient time to review the

24  adequate assurance of the bidders, Your Honor, we reserve all

25  rights to raise that at the time (inaudible).  Thank you.

1          THE COURT:  Mr. Gold.

2          MR. GOLD:  Good afternoon Your Honor.  Ivan Gold

3  of Allen Matkins.  Always good to see you.

4          THE COURT:  Good to see you.

5          MR. GOLD:  I represent the -- as co-counsel with

6  Ballard Spahr, the landlords at Docket 527.  I rise briefly

7  just to first thank the debtors and the committee for working

8  with us feverishly over the last few days and hours,

9  including this afternoon, for -- to describe them as arm's-

10 length negotiations.  It's kind of Inspector Gadget arms at

11 times, but we did get there, and I thank the parties for

12 that.  It would have been a fun argument this afternoon, but

13 --

14          THE COURT:  I know I was looking forward to it.

15          MR. GOLD:  I'm sure you were.  It goes without

16 saying, settlements are preferred, and that's what we got.

17 And I simply join in Ms. Heilman's comments and also the

18 reservations of rights with respect to the sale and the

19 sufficiency of the mechanics to achieve what we've bargained

20 for here in paragraph 14, and as well as just to note the

21 shortening of the timeline in the sale process.

22          But hopefully the circumstances allow us to work

23 through that without any assistance from the Court.  So we

24 thank Your Honor for listening this afternoon and happy to

25 have a resolution.

1    THE COURT:  Well, I'm certain that the debtor's

2  professionals will be working with the landlords.  If there

3  are issues, the Court will be available should you need the

4  Court.

5    MR. LEHANE:  Good afternoon, Your Honor, Robert

6  LeHane --

7    THE COURT:  Good afternoon.

8    MR. LEHANE:  -- Kelley, Drye & Warren on behalf of

9  12 or so landlords who filed an objection at Docker 385 and

10  echoing Ms. Heilman's and Mr. Gold's comments.  Tremendous

11  amount of work, Your Honor.  And in the background what has

12  not been mentioned is all the work going on between the

13  debtor's real estate advisors, landlords across the portfolio

14  who are engaged in discussions, right, working as hard as

15  they can to try to save the company and see a go-forward

16  process is successful here.

17    Well, our concerns were is the downside risk,

18  right?  What if that doesn't happen and we've got a $30

19  million hole to fill, right?  And it seems like obviously

20  this is a significant improvement over the former order that

21  was revised.  I echo, you know, Mr. Shpeen.  We appreciate

22  removal of the conditionality.  We're still very concerned

23  about what it means if we actually got to that place and they

24  were subject to the terms of the ABL.  So echo that

25  reservation of rights to object to the sale but appreciate

1 everybody's hard work in getting to this resolution on the

2 final DIP order, Your Honor.  Thank you very much.

3           THE COURT:  Thank you.  Others.

4           MR. LEONHARDT:  Hey good afternoon, Your Honor.

5 Scott Leonhardt from Esbrook, P.C.  Your Honor, I apologize.

6 I represent about ten landlords.  We didn't file an objection

7 but I rise, I guess, a bit of cynicism.  I don't mean to be

8 the sole objector.  I would just like the debtors to confirm

9 that the deal with the objecting landlords doesn't result in

10 them getting paid on their stub rent claims while all the

11 kind of other landlords are left out to dry so to speak.

12           So I would just ask that all 503(b) stub rent

13 landlords be treated the same, and I would just ask for

14 confirmation if that's going to happen.

15           MS. HUMISTON:  Good afternoon Your Honor, Shannon

16 Humiston, on behalf of --

17           THE COURT:  Good afternoon.

18           MS. HUMISTON:  -- on behalf of Milelli Realty,

19 Lehigh Street, LLC.  I want to echo the other landlords'

20 comments and thank everyone for their cooperation.  It was

21 our understanding that the debtor had reserved stub rents and

22 other amounts for our client and even though their lease was

23 not being rejected.

24           So like the colleague that just stood up, I wanted

25 to also reiterate this, even though our lease is not being

1  rejected, it's our understanding that stub rent will be paid

2  for us as well within the budget.

3          MR. SHPEEN:  Your Honor, for the record Adam

4  Shpeen for Davis, Polk & Wardwell.  I just spoke to Alex

5  Burns to confirm what I suspected to be the case which is the

6  7.9 million is all of the stub rent or the leases that were -

7  - for which rejection will be effective as of this docket.

8  So we're not picking and choosing which rejected leases we're

9  going to pay stub rent for.  That's not the case.  They're

10 all being treated equally.

11         Likewise, in the budget for the balance of the

12 stub rent being paid the week ending December 7th, same

13 principle applies, everything being treated really -- with

14 one exception being if the landlord agrees to waive their

15 claim for stub rent or such other treatment that obviously

16 then we wouldn't pay pursuant to whatever --

17         THE COURT:  Agreement.

18         MR. SHPEEN:  -- landlords.

19         THE COURT:  Does anyone else, in terms of a

20 landlord, want to be heard?  Okay.

21         MR. SHPEEN:  And for the record, you know, Your

22 Honor, I had a beautiful argument, as well, that I was eager

23 to prosecute, but maybe we'll save that for another day or

24 another case.

25         THE COURT:  Listen, let me just say, if it's not

1  clear, I do appreciate parties working together, and I do

2  understand that in a case with this many leases, everyone's

3  drinking from a fire hose.  I get that.  And I understand

4  you're working on tight timeframes.  So I very much applaud

5  you for your efforts in resolving these issues.

6          MR. SHPEEN:  So unless Your Honor has any

7  questions, that would conclude our argument on this.

8          THE COURT:  Okay.  Is there any --

9          MR. SHPEEN:  -- (inaudible) proposed form of

10  order, revised proposed form of order to Your Honor's

11  chambers after this hearing, reflecting the two (inaudible).

12          THE COURT:  Is there anyone who wishes to be heard

13  on the financing motion or the proposed form of order?

14          Q.              Yes.

15          MR. ALBERTO:  Yes, thank you.  Good afternoon,

16  Your Honor.  Justin Alberto, Cole Schotz, proposed counsel

17  for the committee.

18          I'm not going to reiterate everything that was

19  said.  There was a tremendous amount of work, like Mr. LeHane

20  said.  Thank you to the debtors and their professionals, the

21  landlords and their professionals and getting to a deal.

22          I want to echo, I want to put one thing on the

23  record.  The committee did agree to a shortened challenge

24  period here.  That, of course, presumes that the company, its

25  advisors, as well as the lenders, will be responsive to

1    various discovery requests, if the committee needs, in an

2    expedited fashion to allow the committee to do this work on

3    an expedited basis.

4           The DIP order provides that the challenge period

5    could be extended with written order of the Court or upon

6    agreement of the parties.  We don't think we're going to have

7    to do that.  Everybody, as recently as this morning and meet-

8    and-confers last night with the debtors and their

9    professionals, and this morning with the lenders and their

10   professionals, seems to be cooperating.

11          So we would hope not to come back to you.  But I

12   did want to put out there that the shortened challenge period

13   does assume that we will get access to information sufficient

14   to allow us to do our diligence between now and that

15   shortened challenge period.

16          THE COURT:  Okay, thank you.

17          MR. ALBERTO:  Thank you, Your Honor.

18          THE COURT:  Does anyone else wish to be heard with

19   respect to the motion or the proposed form of order?  Okay, I

20   hear no one.  I see no hands on Zoom.

21          Based on the record that's been presented and the

22   first day declaration, and with the modifications to the

23   budget to provide for the payment of stub rent, and the

24   resolution of all the objections to the motion, I will

25   approve the financing on a final basis once I see the revised

1   order that's submitted to the Court.

2           The record here does establish that the debtors

3   require financing in these cases for the administration of

4   the Chapter 11 cases, the sale process, and to maximize

5   recovery for stakeholders.  The principal economic terms, as

6   the declarations previously reflected, note that these terms

7   are customary and usual for DIP financing, were negotiated at

8   arm's length, and were the best available option.

9           So I find that the DIP is a sound exercise of the

10  debtor's business judgment and in the best interest of the

11  debtors and their estates.  So I'll enter the revised order

12  once it's been reviewed.

13          Are there any other housekeeping matters?

14          MR. REMMING:  I have just -- Andrew Remming,

15  Morris, Nichols, Arsht & Tunnell.  I just have two

16  housekeeping matters.  As Your Honor probably saw, there were

17  a few retention applications at the end of the agenda.

18          THE COURT:  Yes.

19          MR. REMMING:  First of all, I'd like to thank the

20  United States Trustee for working so closely with us and

21  cooperatively with us on the retention applications.  We've

22  now resolved all the issues, and a couple will be submitted

23  under CoC.  One has already been submitted under CoC.  And

24  then a fourth had no changes to the form of orders that we

25  submit that -- we'll upload that order to Your Honor's

1    chambers this afternoon.

2             THE COURT:  Okay.  All right.  And I will look at

3    those and get them in a --

4             MR. REMMING:  Another housekeeping matter.  Does

5    Your Honor have a preference for Thursday, whether it's Zoom

6    or some other medium?

7             THE COURT:  I appreciate there's a lot of parties

8    here who would prefer to be on Zoom since the argument has

9    been made, but I would ask that at least the objectors, which

10   I believe is just the United States Trustee and the committee

11   and the debtors have someone in person.

12            MR. REMMING:  Very well.  We're happy to proceed

13   however --

14            THE COURT:  Everyone else can be on Zoom unless

15   you want to make a further extensive argument or something,

16   but the evidence is closed.

17            MR. REMMING:  That's all I had, Your Honor.

18            THE COURT:  Okay.  I am prepared to rule on the

19   GOB sales if we could take care of that this afternoon before

20   we leave.

21            So, based on the evidence presented and the

22   Ramsden declaration at Docket No. 3, as well as the testimony

23   of Mr. Ramsden, the Court finds that GBRP is a consultant and

24   not another professional under Section 327(a).

25            The Court will allow the debtors to assume the MSA

1  under Section 363 in accordance with a sound exercise of the

2  debtor's business judgment.  The Court reaches this

3  conclusion based on First Merchants factors, including the

4  debtors maintain their store managers and district managers

5  in the stores subject to GOB sales to oversee the stores and

6  the process.  The debtors make all decisions on which stores

7  to close and what assets to liquidate.  Although the debtors

8  collaborate with GBRP, the debtors, through their

9  merchandising plan team, ultimately decide, excuse me, the

10  cadence of pricing, the movement of inventory, and all other

11  aspects governing the GOB sale.  GBRP is not involved in

12  negotiating the terms of a plan.

13          The debtors historically closed about 50 stores

14  per year through a GOB process, utilizing, in part, the three

15  consultants at issue.  And although the debtors are closing

16  and liquidating more stores post-petition this is related to

17  the debtor's ordinary course of business.

18          Mr. Ramsden testified that the debtors retain

19  ultimate control on which stores to liquidate, the cadence of

20  pricing, movement of inventory, and retention of employees.

21  Although GBRP advises, the debtor ultimately has the decision

22  making power.

23          GBRP has no involvement in the administration of

24  the debtor's estate.  The debtors rely on counsel, financial

25  advisor, and their investment banker with respect to the

1  administration.  And although GBRP has expertise in GOB

2  sales, this factor is not dispositive.  So I will enter the

3  order when it's been uploaded.

4        MR. PEPPIATT:  Thank you, Your Honor.  We'll

5  upload it promptly after the hearing.

6        THE COURT:  Okay, thank you.  Anything further?

7  Okay.  Thank you all very much for your time today.  We stand

8  adjourned.  Safe travels.

9        (End of Proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2            I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of my

5   knowledge and ability.

6

7   /s/ Wendy K. Sawyer                    October 22, 2024

8   Wendy K. Sawyer, CDLT

9   Certified Court Transcriptionist

10  For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit C**

**Relevant Excerpt of *In re NEC Holdings Corp.,* No. 10-11890 (PJW) (Bankr. D. Del.)
July 13, 2010 Hearing Transcript**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    Case No. 10-11890-PJW

4    - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    NEC HOLDINGS CORP, ET AL.,

8

9            Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                 U.S. Bankruptcy Court

14                 824 North Market Street

15                 Wilmington, Delaware

16

17                 July 13, 2010

18                 9:32 AM

19

20   B E F O R E :

21   HON. PETER J. WALSH

22   HON. CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGES

24

25   ECR OPERATOR:  MICHAEL MILLER/LESLIE MURIN

Case 24-11967-JKS   Doc 1362-1   Filed 07/29/24   Page 124 of 134
NEC HOLDINGS CORP, ET AL.

Page 100

1    that needs to be tempered with 503(b)(9) claimants being left

2    out in the lurch.

3          THE COURT:  All right.

4          MR. PALACIO:  Thank you, Your Honor.

5          THE COURT:  Anyone else?  I assume the Term B issues

6    have been resolved?

7          MR. ATHANAS:  They have, Your Honor.

8          THE COURT:  Okay.  Just wanted to make sure.

9          Let me give you some thoughts, maybe, before you

10    reply.

11          MR. ATHANAS:  Certainly, Your Honor.

12          THE COURT:  503(b)(9), the lender is not a guarantor

13    of the 503(b)(9) or any other admin claims, and neither is the

14    debtor.  Mr. Palacio's right in that I generally have held in

15    the past that you can run a case for the benefit of a secured

16    creditor.  It's the crime of having collateral that some people

17    seem to say that they can't.  They've got to pay the freight,

18    and the freight is, at least -- the freight is not necessarily

19    a tip to the unsecureds, but the freight is certainly an

20    administratively solvent estate.  And while there's not a

21    guarantee, there has to be something other than a wing and a

22    prayer on the payment of the admin claims.  And counsel very

23    honestly and appropriately answered the question that at least

24    it's unclear, as we stand here, and it's quite unclear whether

25    503(b)(9) claims would be paid.  It doesn't need to be in the

Case 24-11967-JKS    Doc 352-1    Filed 07/29/24    Page 125 of 134
NEC HOLDINGS CORP, ET AL.

Page 101

1   DIP budget, necessarily, but there has to be something -- and

2   again, not a guarantee, but something, some evidence that

3   there's a possibility -- probability that they'll be paid.

4   Excuse me.  And I don't -- I really don't see that, as we stood

5   here today.  So I don't know how you address it, but that's a

6   thought.

7           Another thought is this is a position I inherited from

8   Judge Walsh years ago, and I agree with it, which is basically

9   you don't give a 506 waiver over an objection by the committee.

10  And if necessary, we'll have a substantial contribution

11  hearing -- not a substantial -- I'm sorry, but we'll have a

12  hearing on 506(c), and in twenty years, he's never had one.  So

13  I would not be inclined to give a 506(c) waiver.

14          I'm okay with the milestones, I think, for the reasons

15  I articulated with the committee, with Mr. Feinstein.  I don't

16  think I'm putting the case on a highway to a sale that's

17  inappropriate.  But Judge Walsh will decide that, and if the

18  secured creditor calls a default based on that, I'll look on it

19  at the merits.  I don't think it's inappropriate, frankly, to

20  give them the "leverage" at this time.  They are lending money.

21  It is their collateral at risk.  It is not inappropriate for

22  them to agree to fund a case based on certain conditions,

23  provided they're reasonable and within the confines of the law.

24  So as we sit here today, I'm okay with sale milestones.

25          The rollup, I really would like to hear more from the

Page 116

                    C E R T I F I C A T I O N

I, Dena Page, certify that the foregoing transcript is a true

and accurate record of the proceedings.


Dena Page   Digitally signed by Dena Page
            DN: cn=Dena Page, c=US
            Reason: I am the author of this
            document
            Date: 2010.07.16 16:38:41 -04'00'
_____

Dena Page


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  July 16, 2010

**Exhibit D**

**Relevant Except of *In re Townsends, Inc.,* No. 10-14092 (CSS) (Bankr. D. Del.)
January 21, 2011 Hearing Transcript**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF DELAWARE

4   Case No. 10-14092(CSS)

5   - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   TOWNSENDS, INC., et al.,

9

10                  Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  824 North Market Street

16                  Wilmington, Delaware

17

18                  January 21, 2011

19                  1:09 PM

20

21  B E F O R E:

22  HON. CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  DANA MOORE

Case 24-11409-LSS  Doc 633  Filed 02/26/24  Page 129 of 134
TOWNSENDS, INC., et al.

Page 23

1   collateral, the same million-eight will be available for the

2   503(b)(9) claimants, given their administrative priority status

3   is protected by the Code.

4         Unless Your Honor has any questions of the committee

5   position, that's why we have come to difficult conclusions, and

6   it's been a lot of conversation by the committee including

7   direct conversation between the committee members and the

8   bankers, yesterday, with no professionals on the phone call to

9   discuss these issues.

10        THE COURT:  Okay.

11        MR. BUECHLER:  Thank you.

12        THE COURT:  Thank you, Mr. Buechler.  Anybody else

13   wish to be heard?

14        Let me see if I understand, Mr. Abbott.  Under no

15   scenario will the 503(b)(9) creditors be paid in full?

16        MR. ABBOTT:  Your Honor, technically, it's possible;

17   practically, impossible.  The range of values, given the amount

18   of debt, here, we just don't see a buyer clearing the secured

19   debt.

20        THE COURT:  But other administrative claims will be

21   paid in full?

22        MR. ABBOTT:  Post-petition administrative claims, we

23   expect to be paid in full under this revised budget, Your

24   Honor.

25        THE COURT:  Well, we've got a problem.  Not going to

Case 24-10949-BLS Doc 663 Filed 02/26/24 Page 130 of 134
TOWNSENDS, INC., et al.

Page 24

1    run an administratively insolvent estate.  There are benefits

2    to the current administrative claims that are accruing.  There

3    are benefits to the unsecured creditors.  But it can't be done

4    on the back of the 503(b)(9) admin claims, which are admin

5    claims.  Congress has made that determination.  So certainly I

6    would have a problem running any case that was administratively

7    insolvent.  But one that is both administratively insolvent and

8    prefers one set of administrative creditors over another is

9    doubly troubling.  So that's -- well, I'm not going to do it.

10          MR. ABBOTT:  To clarify --

11          THE COURT:  I'm not making -- I'm not making the --

12   this came up on Goody's, for example, Goody's I, and it turned

13   out we were all wrong.  But the point there was there had to be

14   a set aside to pay these claims in the plan that the evidence

15   indicated was a reasonable estimate that they would get paid.

16   Turns out, it was wrong.  But the point being, I'm not making

17   anyone guarantors or insurers of the fact that the case is

18   administratively solvent.  But to go in with a path forward

19   that indicates -- and I certainly appreciate your candor to the

20   Court -- that a certain type of administrative expense claim

21   won't get paid in full but yet others will, I just -- I can't

22   run that kind of case.

23          MR. ABBOTT:  I understand that, Your Honor.  Could I

24   ask the -- well, is it --

25          THE COURT:  Need help?  Go ahead.

1

2                          C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Lisa Bar-Leib

Digitally signed by Lisa Bar-Leib
DN: cn=Lisa Bar-Leib, o, ou,
email=digital1@veritext.com,
c=US

8    _____       Date: 2011.02.22 15:56:20 -05'00'

9    LISA BAR-LEIB (CET**D-486)

10   AAERT Certified Electronic Transcriber

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: February 22, 2011

18

19

20

21

22

23

24

25

**Exhibit E**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 24-11967 (JKS) |
| BIG LOTS, INC., *et al.*, | (Jointly Administered) |
| Debtors.[1] | **Re: Docket No. ___** |

## ORDER ENFORCING THE FINAL DIP ORDER AND COMPELLING
## PAYMENT OF STUB RENT AND SECTION 503(b)(9) CLAIMS

Upon the motion (the "<u>Motion</u>")[2] of the Official Committee of Unsecured Creditors (the

"<u>Committee</u>") of Big Lots, Inc. and its affiliated debtors and debtors in possession (collectively,

the "<u>Debtors</u>") seeking entry of an order (this "<u>Order</u>"), pursuant to sections 105, 365, 503, and

1112(b) of the Bankruptcy Code, compelling the payment of Stub Rent and 503(b)(9) Claims or,

in the alternative, converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy

Code, as set forth in the Motion; and the Court having jurisdiction to grant the Motion and the

relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b) and the *Amended

Standing Order of Reference* of the United States District Court for the District of Delaware,

entered February 29, 2012; and consideration of the Motion and the requested relief being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to

---

[1]   The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows:  Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

28 U.S.C. §§ 1408 and 1409; and adequate notice of the Motion having been given and it appearing that no other or further notice need be given; and the Court having found the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the relief is in the best interests of the Debtors' estates and their creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is granted as set forth herein.

2.      The Debtors are hereby immediately authorized to draw on the DIP ABL Facility and/or DIP Term Facility to fund remaining Stub Rent obligations and to pay outstanding 503(b)(9) Claims, to the extent necessary.

3.      The Debtors are authorized and directed to pay outstanding Stub Rent and 503(b)(9) Claims within five (5) business days of entry of this Order (the "Default Date").

4.      The Debtors are authorized and directed to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

5.      The Court retains jurisdiction as to all matters relating to or arising from the implementation, enforcement, or interpretation of this Order.

68457/0001-49004823