**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 13 & 1198** |

**DECLARATION OF EMILIO AMENDOLA OF A&G REAL ESTATE PARTNERS, IN SUPPORT OF ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, ENCUMBRANCES, AND OTHER ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, (II) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Emilio Amendola, declare under penalty of perjury:

1. I am Co-President of A&G Realty Partners, LLC ("**A&G**"), real estate consultant and advisor to the above captioned debtors and debtors in possession (collectively, the "**Debtors**"). I submit this declaration (this "**Declaration**") in support of the *Motions of Debtors for Entry of Interim and Final Orders (I) Establishing Procedures To Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [D.I. 13] (the "**Sale Motion**")[2].

---

[1] The Debtors in these cases, together with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Sale Motion.

1

2.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, real estate portfolio, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

### Professional Background and Qualifications

3.      I co-founded A&G in 2012 and currently serve as co-president. I have over 25 years of experience in the commercial real estate industry.  My responsibilities at A&G primarily involve managing the company and overseeing and executing many of the in- and out-of-court real estate transactions with which we are involved.  In this capacity, I have assisted more than 150 distressed retailers with the disposition or restructuring of their real estate assets. Prior to co-founding A&G, I worked in finance for over a decade.  I began my career as a certified public accountant and continued in investment banking at Thomson McKinnon Securities, where I eventually served as Senior Vice President and Managing Director of Real Estate Investment Banking.

4.      A&G has been advising the Debtors since June 2024 with respect to optimizing their real estate portfolio. As a result, I am generally familiar with the Debtors' real estate portfolio and related marketing efforts. Members of the A&G team and I have assisted the Debtors with their ongoing efforts to right-size their retail footprint, among other things.

**The Real Estate Portfolio**

5. The Debtors historically maintained a leased real estate portfolio that consisted of approximately 1,300 properties spanning 48 states. In the lead up to the filing of these cases, A&G assisted the Debtors in a portfolio review. As a result of this analysis, A&G advised the Debtors that certain of these leases represented value.

6. Following that review, the Debtors commenced a comprehensive marketing process (the "**Marketing Process**") for those various leases including the properties listed in the Sale Motion (the "**Lease Assets**").

**The Marketing Process**

7. To initiate the Marketing Process, shortly after the Petition Date, the Debtors, with the assistance of A&G, circulated a flyer marketing hundreds of the Debtors' leases, to approximately two hundred (200) potential purchasers. The Debtors, with the assistance of A&G, took additional steps to broadly market the Debtors' valuable leases, including publishing press releases, ultimately expanding the population of interested parties to over four hundred (400).

8. These marketing efforts culminated in the successful sale of over 60 leases in 3 waves of sales from September through November of 2024. Building off the success of Waves 1 through 3, the Debtors sought, and received, Court authorization to run a similar process for December 2024, the "Wave 4" auction. A&G continued their Wave 1 marketing practices for the Wave 4 Lease Assets and ultimately marketed 151 of the Debtors leases to approximately 850 potentially interested buyers.

9. In order to maximize the value of the Debtors' estate and to avoid incurring additional lease costs, the Debtors pursued an accelerated lease sale process for the month of

December. Through this accelerated timeline, by the Bid Deadline, the Debtors had received a total of 42 bids across 36 "Wave Four" properties.

10. In light of competing bids multiple of the Lease Assets, the Debtors held a competitive live auction on December 4, 2024, for Store #4686 located in Montebello, CA, Store #4761 located in Paris, TX, Store #5216 located in Nashville, TN (defined in the Motion as the "**Nolensville Lease**"), and Store #5230 located in Vero Beach, FL (defined in the Motion as the "**Vero Beach Lease**").

### The Auction

11. On December 4, 2024, Debtors' counsel, Davis Polk & Wardwell LLP ("**Davis Polk**"), moderated the Auction for the Lease Assets. At the beginning of the Auction, Davis Polk recited the list of stores receiving multiple bids. Davis Polk and A&G also confirmed that (i) each potential purchaser had not had communications with any other bidder with the goal of either controlling the price for the assets being auctioned or discouraging such other bidder's participation in this auction, (ii) each potential purchaser's bid was a good faith bona fide offer, and (iii) the potential purchaser intended to consummate the proposed transaction if selected as the successful bidder.

12. For the Montebello, California property, A&G announced the Baseline Bid and minimum overbid increment. After numerous rounds of active bidding, Hobby Lobby Stores made the highest or otherwise best bid of $550,000, which bid the Debtors selected as the winning bid at the Auction for that property.

13. For the Paris, Texas property, A&G announced the Baseline Bid and minimum overbid increment. After numerous rounds of active bidding, Ivan Smith Furniture Co.,

LLC made the highest or otherwise best bid of $205,000, which bid the Debtors selected as the winning bid at the Auction for that property.

14. For the Nolensville Lease, A&G announced the Baseline Bid and minimum overbid increment. After numerous rounds of active bidding, Burlington Coat Factory Warehouse Corporation made the highest or otherwise best bid of $300,000, which bid the Debtors selected as the winning bid at the Auction for that property.

15. For the Vero Beach Lease, A&G announced the Baseline Bid and minimum overbid increment. After numerous rounds of active bidding, Aldi Inc. made the highest or otherwise best bid of $800,000, which bid the Debtors selected as the winning bid at the Auction for that property.

16. The Debtors, in consultation with their advisors the Consultation Parties (as defined in the *Interim Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving The Sale of Certain Leases and (III) Granting Related Relief* [D.I. 1198] (the "**Bidding Procedures Order**"), engaged in dialogue with the remaining solitary bidders (including bidders where a second bidder had declined to increase their bid and pursue an auction) and decided to pursue sales with certain of those bidders on the terms set forth in the Sale Motion, for each respective property therein.

17. The Debtors, with the assistance of A&G and in consultation with the Consultation Parties, selected each purchaser as the winning bidder for each respective Property after careful review and consideration of all competing offers submitted at the Auction. I believe that each Purchase Price represents the highest or otherwise best offer for each Lease Asset.

18. Furthermore, I believe that each sale agreement related to a sale of one of the Lease Assets (each, a "**Sale Agreement**," and together, the "**Sale Agreements**") was

negotiated at arm's-length and in good faith. To my knowledge, no purchaser acted in a collusive or fraudulent manner with any person, and each Purchaser's prospective performance and payment of amounts owing under the applicable Sale Agreement is in good faith and for a valid business purpose.

### The Lease Go-Dark Provision

19. When a lease is assigned to a new tenant, it is necessary for the new tenant to "go-dark" for a period of time in order to remodel the premises, outfit and stock the store, secure the necessary permits required to operate and generally prepare for ordinary business.

20. I believe that 90-days is generally insufficient time to allow for new tenants to complete the necessary logistical activities required before opening for business. In my experience, new tenants are fully incentivized to end the "go-dark" period as quickly as possible considering that they continue paying rent while dark. Nonetheless, I believe that in most circumstances, 90-days would an unreasonable timeframe to hold a new tenant. This is especially true in the context of a bankruptcy assignment where the winning bidder may have to clear out items abandoned by the previous tenant in additional to typical conforming work. If the 90-day provision of the Nolensville Lease were upheld, I believe the lease would be rendered largely unalienable due to the very real risk of "go-dark" default by most potential purchasers.

### Conclusion

21. For the foregoing reasons, I believe that the sale of each of the Lease Assets should be approved. The robust Marketing Process undertaken by the Debtors, with the assistance of A&G, has resulted in each Lease Asset receiving a winning bid that represents the highest and best value that the Debtors can reasonably expect to receive for the Lease Assets. Accordingly, for the reasons stated herein and in the Sale Motion, I believe that entering into the Sale Agreements

and consummating the sale of each of the Lease Assets is fair, reasonable, and represents a sound exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 17, 2024

*/s/ Emilio Amendola*
Name: Emilio Amendola
Title: Co-President