# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*,[1] | Case No. 24-11967 (JKS) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 511 |

### AFFIDAVIT OF B. V. BELK, JR.

B. V. Belk, Jr. (hereinafter "Affiant"), after having been duly sworn accordingly to law, deposes and states as follows:

1.      Affiant is a citizen and resident of Mecklenburg County, North Carolina. Furthermore, this Affidavit is based upon the personal knowledge of Affiant who avers his competency to testify as a sworn witness to the matters contained herein.  At all times mentioned, Affiant was the Managing Member of BVB-NC, LLC, a North Carolina limited liability company

2.      Affiant is familiar with the books and records of BVB-NC, LLC, which books and records were kept in the ordinary course of business of BVB-NC, LLC at all times mentioned herein. Also to the personal knowledge of Affiant, all events and transactions noted therein were recorded at or near the time of that particular event or transaction.

3.      On June 2, 2020, BVB-NC, LLC and the Debtor entered into a certain Lease Agreement.    This Lease Agreement was subsequently amended by a Lease Modification

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores – PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores – CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081

\\hsb-FILE\ushare\Bankruptcy\B. V. Belk\Big Lots\Affidavit - B.V. Belk.docx

Agreement and Second Lease Modification Agreement on February 15, 2021 and June 6, 2024, respectively. True copies of the Lease Agreement, Lease Modification Agreement and Second Lease Modification Agreement are appended hereto, identified as "Exhibits 1, 2 and 3," and the same are incorporated herein by reference.

4.    On September 9, 2024, the Debtor filed a Chapter 11 proceeding under Title 11 of the U.S. Code.

5.    As of the petition date, the Debtor was delinquent for the following payments:

| | |
|---|---|
| September 1, 2024 rent: | $18,490.56 |
| Common Area Maintenance Charges: | $ 3,036.35 |
| Unpaid pro-rata ad valorem taxes for 2023: | $ 9,510.68 |
| Total: | $31,037.59 |

6.    The Lease Agreement provides that the common area maintenance charges are affixed at the rate of $0.78 per square foot (see paragraph 5.D. of the Lease Agreement).

7.    The Lease Agreement requires that the Debtor pay its pro rata share of the ad valorem taxes paid by BVB-NC, LLC (see paragraph 5.E. of the Lease Agreement). BVB-NC, LLC paid the sum of $84,413.00 for 2023 ad valorem or Real Estate Taxes.

8.    This amount was determined by taking the total amount of square feet for the center or 197,983 and apportioning the taxes to the square feet leased by the Debtor. The Debtor utilized 46,713 square feet or 23.59% of the property. After multiplying the total amount of taxes by 23.59% (the percentage of the space utilized by the Debtor), this equates to $19,913.03 due for 2023 real estate taxes or $9,510.68 after giving credit for the prior payment of $10,402.35 by the Debtor.

9.    Based on the foregoing, the cure amount for BVB-NC, LLC as of the petition date was $31,037.59.

10.    The foregoing is the substance of this Affiant's testimony which would be offered at any trial of the above-captioned action.

This the 12th day of December, 2024.

_____
AFFIANT

Sworn to and subscribed before me
this 12th day of December, 2024.

_____
NOTARY PUBLIC
My Commission Expires: 6-6-28

TAMARA B WOODIN
Union County
My Commission Expires
June 6, 2028

\\hsb-FILE\ushare\Bankruptcy\B. V. Belk\Big Lots\Affidavit - B.V. Belk.docx

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

# TABLE OF CONTENTS



EXHIBIT
tabbies 1

Section

1.    Definitions
      A.    Common Areas
      B.    Dates
      C.    Exhibits
      D.    Demised Premises
      E.    Shopping Center

2.    Demise

3.    Term
      A.    Original Term
      B.    Option to Extend Term

4.    Use and Operation

5.    Rent
      A.    Fixed Minimum Rent
      B.    Utilities Charges
      C.    Intentionally Deleted
      D.    Common Area Charges and Fixed CAM
      E.    Real Estate Taxes
      F.    Taxes

6.    Buildout and Other Alterations

7.    Maintenance and Repairs

8.    Signs

9.    Trade Fixtures

10.   Governmental Regulations

11.   Indemnification

12.   Insurance
      A.    Tenant
      B.    Landlord

13.   Fire Rebuilding and Altering

14.   Force Majeure

15.   Injunction

16.   Warranty of Title by Landlord; Representations

17.   Quiet Enjoyment

18.   Mortgage and Estoppel Certificates

19.   Default

20.   Condemnation

21.   Mutual Waiver of Subrogation

22.   Assignment and Subletting

23.   Surrender and Holdover

24.   Notices

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Intentionally Deleted

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the ___ day of _____, 2020 (the "Effective Date"), by and between BVB-NC, LLC, a North Carolina limited liability company, whose mailing address is c/o BV Belk Properties, 204-C West Woodlawn Road, Charlotte, NC 28217 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"); whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081-7651, Attention: Lease Administration.

### WITNESSETH:

### 1.   DEFINITIONS:

For purposes of this Lease, these terms are defined as follows:

A.   Common Areas:   The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center except for roof repair and maintenance.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) near the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

B.   Dates:  Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

3

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

2)    The "Tenant Possession Date" shall be February 2, 2021 or the date Tenant accepts possession following Landlord's notice to Tenant that Landlord has completed any construction that may be required pursuant to Exhibit C pursuant to plans approved by Tenant, has furnished Tenant with a certificate of occupancy and the Demised Premises meets all code requirements for Tenant's Permitted Use, whichever is later. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    The estimated delivery date (as herein defined) shall be February 2, 2021 ("Estimated Delivery Date"), conditioned on Tenant agreeing to Landlord's Plans for Landlord's work. Upon receipt of such notice of acceptance, the Estimated Delivery Date shall become February 2, 2021, then commencing upon February 16, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to March 1, 2021, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $250.00 per day. Commencing April 1, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installment(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)    INTENTIONALLY DELETED

4

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

7)  In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.  Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

    1)   Exhibit A -    Site Plan of Shopping Center

    2)   Exhibit A – 1 Landlord's Plans and Specifications

    3)   Exhibit A-2  Permitted Area

    4)   Exhibit A-3  Aerial Antenna

    5)   Exhibit B -   Legal Description of Shopping Center

    6)   Exhibit C -   Landlord's Work

    7)   Exhibit D -   Tenant Building Sign Specifications

    8)   Exhibit D – 1 Tenant Pylon Sign Location

    9)   Exhibit E -   Completion of Landlord's Work Letter

    10)  Exhibit F -   Exclusive Use Provisions

    11)  Exhibit G -   Remeasurement Rider

    12)  Exhibit H-   Rules

D.  Demised Premises:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 46,713 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises.  Landlord's Plans and Specifications for the Demised Premises are attached hereto as Exhibit A-1 and deemed approved by the parties hereto.

E.  Shopping Center:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Shelby Market Place Shopping Center, 1730 A&B East Dixon Blvd., Shelby, NC 28152.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 197,787 square feet.

## 2.  DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

3.   **TERM:**

   A.   <u>Original Term</u>:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2031 (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any exercised Option Terms (as defined below), and any other extended period.

   B.   <u>Options to Extend Term</u>:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

4.   **USE AND OPERATION:**

   A.   <u>Permitted Uses</u>:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale (including financing and/or leasing) of general merchandise, furnishings, furniture, furniture accessories, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), all similar or related merchandise and for any other lawful retail purpose.  Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises.  Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

      Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise discount store, liquidator, close-out store, stores selling, leasing or renting furniture (including home furnishings and mattresses), craft stores or dollar store operations ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's. Fred's, Super 10, Maxway, Mazel, Odd Job,

DocuSign Envelope ID: 699C0196-2BEE-4194-83BD-B0935817507A

Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Dirt Cheap, Rose's, Christmas Tree Shops, Encore and Ollie's Bargain Outlet, Aaron's, Rent A Center, Rent Way, Color Tyme, Show Place, Buddy's. In the event a Competing Business, as defined herein, is operated in the Shopping Center (an" Exclusive Violation"), Tenant shall give Landlord written notice of the Exclusive Violation, and if Landlord has not cured the Exclusive Violation within sixty (60) days of receipt of Tenant's notice, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease, at Landlord's sole discretion, upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises so long as Tenant installs a shopping cart corral (to be located in the area depicted as the "Cart Corral Area"

DocuSign Envelope ID: 699C0195-29EE-4194-83BD-B0935817507A

on Exhibit A). Tenant shall keep the Cart Corral Area in a clean and neat condition. Tenant may also use the Common Areas, including up to six (6) parking spaces that do not obstruct or interfere with other tenants use or business or prohibitions under current leases immediately adjacent to the Demised Premises for the sale and display of merchandise.

B.    Prohibited Uses: Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea market" type of operation except that high-end consignment shops such as Plato's closet, My Sister's Closet, Once Upon a Child or 2nd and Charles shall be allowed; (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self-storage facilities; (v) for any medical or health oriented facilities or offices, including for any medical or health-oriented facilities or offices, including but not limited to plasma centers in excess of an aggregate of 5,000 square feet except medical or health oriented facilities located in the Permitted Area shown on Exhibit A-2 shall be allowed any size square footage (but not to exceed an aggregate of 30,000 square feet, including governmental or social services offices)(vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any government use or office or social services functions or medical facilities in excess of an aggregate of 5,000 square feet except any governmental use or office or social services functions or medical facilities located within the Permitted Area shown on Exhibit A-2 shall be allowed any size; (x) for the operation of a massage parlor or bath house (not including any national massage salons such as Massage Envy or Massage Heights), adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, except a restaurant or establishment having alcohol sales of less than 35% of gross sales shall not be considered a tavern, bar or cocktail lounge or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 150 linear feet away from the Demised Premises); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations in excess of an aggregate of 10,000 square feet; except a health club, exercise club, gymnasium or for medical and governmental services use, located in the area indicated on Exhibit A-2, shall be allowed any size square footage; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat except for a drop off commercial laundry or dry cleaning location; (xx) for any day care center or school (other than in conjunction with a retail or.

8

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop except national chain pet supply stores such as Petsmart or Petco shall not be prohibited; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, excepting the cell tower to be placed in the rear of the center as further described in Exhibit A-3, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure except for tenant signage; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia excluding retail sales of CBD products and associated merchandise. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

5.   **RENT:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). Tenant will not make any payment to Landlord until Landlord provides Tenant with a duly executed federal Form W-9. Landlord will indemnify Tenant as a result of its failure to timely execute any withholding exemption requirements (e.g. Tenant is assessed unwithheld Tax (see below) related to its payments to Landlord). The Rent and Additional Rent for any partial month shall be prorated based on the actual number of days in such month.

A.   Fixed Minimum Rent:  From the Rent Commencement Date of this Lease and continuing through January 31, 2026, the sum of $217,215.45 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $18,101.29. From February 1, 2026 and continuing through the remainder of the Original Term, the sum of $221,886.75 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $18,490.56.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $233,565.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $19,463.75. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $245,243.25 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $20,436.94. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $256,921.50 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,410.13.

B.   Utilities Charges:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

DocuSign Envelope ID: 699C0196-29EE-4194-83BD-B0935817507A

If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade; with ANSI standard; and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test; Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored so long as Landlord is not making a good faith effort to correct such interruption. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Late Fees.  If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due after ten (10) days. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year.

D.    Common Area Charges and Fixed CAM:  Throughout the Term of this Lease, Landlord shall be responsible for the following:

    (i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

    (ii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

    (iii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to affect the site plan;

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

(iv) Lighting and, policing if necessary, in Landlord's reasonable judgment and on-site and off-site traffic control;

(v) Landlord shall maintain all paved surfaces in a level and smooth condition, as reasonably determined by Landlord and Tenant, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked;

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas;

(vii) repairing and maintaining the roof of the Building in a good and watertight condition;

(viii) management fees in the amount of five percent (5%); and

(vii) roof maintenance and repair

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, improving and insuring the Shopping Center pursuant to Section 12.B. of this Lease (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees, , all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies ("Common Area Charges").

<u>Fixed Common Area Charges:</u>   Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be fixed at $0.78 per square foot of the Demised Premises for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any. Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. After the first Lease Year, as well as any Partial Lease Year, if any, Tenant's pro-rata share of Common Area Charges shall increase by three percent (3%) per year above that amount of Common Area Charges payable by Tenant for the previous Lease Year.

The $0.78 per square foot Fixed Common Area Charges for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any, and the fixed annual three percent (3%) increase in Common Area Charges shall be collectively known as the "Fixed CAM". In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the Fixed CAM set forth herein.

E.     <u>Real Estate Taxes:</u>   Landlord shall timely pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments, impositions, penalties or interest. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real

11

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority.  Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities.  Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year.  Landlord represents that the Real Estate Taxes for the 2018 tax year are $0.30 per square foot per annum.  Tenant may deduct from tax invoices submitted by Landlord during the Term the amount of any discrepancy of more than five percent (5%) per square foot between the amount represented by Landlord and the actual Real Estate Taxes per square foot for the 2018 tax year unless Landlord can provide documentation to justify the discrepancy as resulting from a newly imposed tax or from a reassessment or other change in assessment by the taxing authority.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes.  Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.  Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder.  Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith.  Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including property card requests, and the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file.  If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing.  Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder.  Landlord shall use its best efforts to cause any such new construction to be separately assessed.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time every five (5) years during the Term. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Taxes:

1. "Excluded Tax(es)" means any Tax other than a Transaction Tax.

2. "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

3. "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale or rent transaction; (b) levied upon the purchaser/Tenant; (c) can be legally collected from the purchaser/Tenant; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser/Tenant.

4. The rent payments do not include any amount for Transaction Taxes. Tenant will pay, reimburse or indemnify (as the facts and circumstances dictate) Landlord for any applicable Transaction Taxes with respect to the rents, unless the particular rent is nontaxable.   For purposes of clarity, currently, only rents for locations in Florida and certain locations in Arizona are subject to Transaction Taxes.

5. Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement.   For purposes of clarity but without limiting the foregoing, Landlord acknowledges that it may have gross receipts, license and/or income Tax obligations where the rent receipt may be assigned under applicable Tax law. Any Taxes or license fees imposed on Landlord's rents or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes are not and, will not be construed as, Transaction Taxes and are Excluded Taxes and also will not be an itemized charge on any invoice. Landlord and Tenant will, and will cause their respective affiliates and subcontractors, to reasonably cooperate in good faith on all Tax matters.

DocuSign Envelope ID: 699C0196-28EE-4194-838D-B0935817507A

6. **INTITIAL BUILDOUT AND OTHER ALTERATIONS:**

If Landlord fails to complete Landlord's Work at the Demised Premises within fourteen (14) days after the date specified for delivery of possession as provided in Section 1.B.5, then at Tenant's discretion. (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

During the Term of this Lease, following completion of initial buildout/alterations to the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which the Demised Premises are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term continue to remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any such alterations.

7. **MAINTENANCE AND REPAIRS:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. Tenant shall use a licensed contractor and abide by any warranties in place. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and Tenant shall have a HVAC maintenance agreement with maintenance performed not less than semi-annually (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises. Tenant also agrees to make repairs or replacement to its loading dock bumpers, seals, plates and doors.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) roof replacement, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall

DocuSign Envelope ID: 699C0196-28EE-4194-838D-B0935817507A

guarantee that the HVAC system is in good working condition pursuant to Exhibit C. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 400 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor. Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

For new HVAC units, Landlord shall transfer to Tenant all warranties on such units. Should Tenant discover that any existing units of the HVAC system requires repair and/or replacement during the first 12 months of the Original Term, Landlord shall be solely responsible for the costs for such repair and/or replacement. Tenant shall notify Landlord in writing of any HVAC repair and or replacement needed prior to any repair or replacement being made. Landlord shall have the option of making any repair or replacement required. Should Landlord fail to make any such repair or replacement, Tenant may do so at Landlord's expense. Tenant shall invoice Landlord for any amounts due under this provision within ninety (90) days of the end of each Lease Year. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within thirty (30) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition; and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible. Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.   **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s). It shall be the Tenant's responsibility for removal of Tenant's main signs if the tenant leaves. This shall be done before vacating the leased space. Any holes left behind shall be filled with siliconized paintable caulk. Any electrical wires left behind shall not remain exposed but shall be taped and installed within a UL listed watertight box. If a banner or other temporary sign is removed the holes left behind shall be filled with siliconized paintable caulk.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.   **TRADE FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or

DocuSign Envelope ID: 609C0196-28EE-4194-83BD-B0935817507A

equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees at Tenant's Date of Possession the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform after Tenant Date of Possession, Landlord shall promptly cause it to conform at all times, unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the exterior and/or structural portions of the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992. Tenant agrees to make all repairs, alterations, additions or replacements to the interior, non-structural portions of the Demised Premises necessary to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

   A.    Tenant:   Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.  Tenant shall name Landlord as an additional insured.

   Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

   B.    Landlord:   Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

   Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.   Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

   The cost of premiums paid by Landlord for the insurance coverage required under this Section 12.B. shall be included in Common Area Charges under Section 5.D., above. Tenant's share of Landlord's insurance costs of the Shopping Center shall be determined for each year by multiplying such taxes by a fraction, the numerator of which shall be the square footage of the Demised Premises, and the denominator of which shall be the aggregate of the square footage of all rentable space comprising the Shopping Center.

13. **FIRE REBUILDING AND ALTERING:**

   A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease when the Demised Premises are restored to tenantable condition.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

B.     In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within ninety (90) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.     If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.   FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, national emergencies, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

## 15.   INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.   WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney' fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will

19

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17. **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18. **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant; so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect) and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19. **DEFAULT:**

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than five (5) business days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, then Tenant shall be in Default; provided however, that Tenant shall be permitted such additional time to cure the default as is reasonably necessary), and if Tenant fails to cure the default, then this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. All rights and remedies of Landlord herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

B.  If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

20. **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate, Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21. **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty-five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty-five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with, or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition. Tenant may remove all of its trade fixtures from the Demised Premises. Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at a monthly rent equal to the then current monthly Fixed Minimum Rent under this Lease and otherwise subject to all the terms and provisions hereof. If Landlord gives Tenant written notice to vacate, and Tenant fails to surrender the Demised Premises within 90 days thereafter, the holdover rent shall increase to 125% of the then current monthly Fixed Minimum Rent.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii). within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company, duly organized, validly existing and in good standing under the laws of North Carolina. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease other than Navigator Group ("Broker") and Atlantic Retail (Co Broker) both of which shall be paid by Landlord pursuant to separate agreement. If any other individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the

DocuSign Envelope ID: 999C0196-28EE-4194-83BD-B0935817507A

Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

34. **INTENTIONALLY DELETED.**

35. **NO PRESUMPTION AGAINST DRAFTER:**

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the

construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.    TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Real Estate Taxes or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Real Estate Taxes or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees

26

DocuSign Envelope ID: 689C8196-28EE-4194-83BD-B0935817507A

from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.    WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**42.    ENTRY OF LANDLORD.** Landlord may, at all reasonable times, upon no less than 24 hours prior written notice to Tenant, enter the Demised Premises:

(A)    To inspect or protect the Demised Premises or any of its equipment thereon;

(B)    To effect compliance with any law, order or regulation of any lawful authority;

(C)    To make or supervise repairs, alterations or additions;

(D)    To exhibit the Demised Premises to prospective tenants, purchasers or other persons; and,

No entry by Landlord shall constitute an eviction of Tenant or a deprivation of Tenant's rights, alter the obligations of Tenant, or create any right in Tenant adverse to Landlord's interests hereunder and the rent reserved shall in no way abate, by reason of loss or interruption of business of Tenant, or otherwise, while any repairs, alterations, improvements or additions are being made except as otherwise provided in this Lease.

IN TESTIMONY WHEREOF, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:          LANDLORD:    **BVB-NC, LLC, a North Carolina limited liability company**

By: _____

R. Keith Neel

Title: Managing Member

Witnesses as to Tenant:          TENANT:    **BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Jonathan E. Ramsden
Title:    Executive Vice President,
Chief Financial & Administrative Officer

Acknowledgements appear on following page.

27

DocuSign Envelope ID: 699C0195-28EE-4194-83DD-B0935817507A

**Landlord's Acknowledgement**

STATE OF N C

COUNTY OF Mecklenburg

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, BVB-NC, LLC by, BVBell, Jr its Managing Member who acknowledged, that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this 2nd day of June , ~~2019~~. 2020



_____
Tamara B. Woodin
Notary Public

**Tenant's Acknowledgement**

STATE OF OHIO

COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by Jonathan E. Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 2ᵗʰ day of June , ~~2019~~ 2020

_____
Notary Public

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

28

DocuSign Envelope ID: 099C0190-28EE-4194-83BD-B0535817507A

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

EXHIBIT A- 1

LANDLORD'S PLANS AND SPECIFICATIONS

(to be attached and approved by Tenant)

DocuSign Envelope ID: 699C0196-28EE-4194-839D-60935817507A

Exhibit A-2
Permitted Area



31

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

## Exhibit A-3
### Aerial Antenna



DocuSign Envelope ID: 699C0196-28EE-4194-838D-B0935817507A

EXHIBIT B

LEGAL DESCRIPTION OF SHOPPING CENTER

All that certain tract or parcel of land situate, lying and being located East of the City of Shelby, North Carolina, containing 23.26 acres and being more particularly described as follows:

BEGINNING at the intersection of the Southerly right of way of U.S. Highway No. 74 and the Westerly right of way of N.C. Highway No. 180; thence in a Southerly direction along the Westerly right of way of N.C. Highway No. 180 a distance of 294.86 feet to a P.K. nail found being the POINT OF BEGINNING; thence along the Westerly right of way of N.C. Highway No. 180; South 07 degrees 15' 45 ' West a distance of 243.26 feet to a #4 rebar set; thence along the Westerly right of way of N.C. Highway No. 180 South 87 degrees 30' 00" East a distance of 22.27 feet to a P.K. nail set thence along the Westerly right of way of N.C. Highway No. 180 South 04 degrees 55' 52" West a distance of 187.09 feet to a P.K. nail set; thence leaving the Westerly right of way of N.C. Highway No. 180 North 87 degrees 09' 32" West a distance of 32.43 feet to a #5 rebar found; thence North 44 degrees 17' 59" West a distance of 33.11 feet to a crimp top pipe found; thence North 85 degrees 10' 16" West a distance of 129.33 feet to a crimp top pipe found; thence along a curve a length of 40.94 feet having a radius of 23.14 feet with a chord of South 53 degrees 20' 39" West a distance of 35.81 feet to a P.K. nail set; thence South 04 degrees 55' 04" West a distance of 160.00 feet to a #4 rebar set; thence South 85 degrees 04' 56" East a distance of 10.00 feet to a #4 rebar set; thence South 04 degrees 55' 03" West a distance of 57.90 feet to a P.K. nail set; thence North 85 degrees 04' 56" West a distance of 10.00 feet to a P.K. nail set; thence along a curve a length of 56.40 feet having a radius of 58.32 feet with a chord of South 48 degrees 09' 27" East a distance of 54.23 feet to a #4 rebar set; thence South 80 degrees 48' 20" East a distance of 140.38 feet to a crimp top pipe found; thence South 85 degrees 09' 40" East a distance of 29.97 feet to a P.K. nail set on the Westerly right of way of N.C. Highway No. 180; thence along the Westerly right of way of N.C. Highway No. 180 South 04 degrees 58' 52" West a distance of 48.54 feet to a P.K. nail set; thence leaving the Westerly right of way of N.C. Highway No. 180 North 80 degrees 49' 11" West a distance of 29.81 feet to a #5 rebar found; thence North 81 degrees 02' 02" West a distance of 265.03 feet to a #5 rebar found; thence North 13 degrees 30' 24" West a distance of 21.63 feet to a #5 rebar found; thence South 55 degrees 00' 06" West a distance of 39.81 feet to a #4 rebar found; thence South 85 degrees 50' 01" West a length of 534.12 feet to an open top pipe found; thence North 46 degrees 09' 11" West a distance of 361.44 feet to an open top pipe found; thence North 56 degrees 48' 18" East a distance of 247.29 feet to an open top pipe found; thence North 08 degrees 34' 17" West a distance of 226.89 feet to an axle found; thence North 86 degrees 43' 05" West a distance of 12.70 feet to an axle found; thence North 07 degrees 32' 36" East a distance of 325.52 feet to a #5 rebar found; thence

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

North 09 degrees 46' 04" East a distance of 349.52 feet to a #5 rebar found on the Southerly right of way of U.S. Highway No. 74; thence along the Southerly right of way of U.S. Highway No. 74 South 78 degrees 33' 40" East a distance of 250.01 feet to a #4 rebar set; thence along the Southerly right of way of U.S. Highway No. 74 South 75 degrees 33' 59" East a distance of 239.64 feet to a #5 rebar found; thence along the Southerly right of way of U.S. Highway No. 74 South 74 degrees 18' 41" East a distance of 125.17 feet to a P.K. nail found; thence leaving the Southerly right of way of U.S. Highway No. 74 South 05 degrees 00' 06" West a distance of 226.89 feet to a #5 rebar found; thence South 85 degrees 12' 47" East a distance of 180.28 feet to a #5 rebar found; thence South 09 degrees 57' 57" West a distance of 112.05 feet to a #5 rebar found; thence South 74 degrees 27' 02" East a distance of 199.52 feet to the point of BEGINNING.

Together with that certain 10 foot sanitary sewer easement located along the Eastern boundary line of the tract conveyed to Dayton & Associates X to Branch Banking and Trust Company, said easement having been created by reservation in the general warranty deed from Dayton & Associates X to Branch Banking and Trust Company recorded in Deed Book 994, Page 61.

Together with that certain Cross Easement between Dayton & Associates X, a South Carolina general partnership and Branch Banking and Trust Company, a North Carolina corporation, dated May 28, 1997, recorded in Book 999, Page 207, Cleveland County Registry.

DocuSign Envelope ID: 899C0196-28EE-4194-83BD-B0935817507A

## EXHIBIT C

## LANDLORD'S WORK

The following work is to be completed per Landlord's Plans and is subject to the review and approval from the Big Lots Director of Construction or designated Representative. As clarification to this Exhibit C, Tenant's plans will be attached to the lease agreement and any discrepancies between the Exhibit C and Landlord's Plans shall be resolved by "Landlord's Plans" controlling. Landlord shall submit for Tenant's final review and approval all Landlords' Construction and Architectural Drawings prior to the submission for permits and the commencement of Landlord's work.

**STOREFRONT FACADE:**

The exterior storefront shall have an "ANCHOR" type façade and canopy, it is to be centered within the frontage of the demised premises, and to be acceptable to Tenant. The canopy and building facade shall be new, or repaired to like new condition, and finished per Tenant's specifications.
Sign Façade Area:
-Corrugated Metal – Manufacture: ATAS Model: Corra-Lok Color: 02-Black
Other Façade/Building Areas:
If new EFIS finishes are required apply:
-Trim areas, Cornices and CopingsDryvit - 101 Super White
-Building areas Dryvit - 455A Pearl

**STOREFRONT GLASS:** Landlord is to provide a minimum of 48' feet of glass storefront including a vestibule entrance with four (4) sets of bi-part, fully automatic, sliding doors (STANLEY Dura-Glide Series 3000). The vestibule is to have new commercial grade walk-off carpet tiles (SHAW 5T034-LAVA34549) and adequate HVAC per Tenant's specification. Landlord to provide curb cut ramps directly aligned with entry and exit doors. Ramps to be flush with parking lot and meet ADA Requirements. Any and all broken or damaged glass, and storefront mullions to be replaced (mullions to be clear aluminum or dark bronze finish). Remove all materials blocking or covering windows and glass doors.

**DOORS:** All doors and door systems (exterior and overhead included) to be sound, secure, in good working condition, and adequate for Tenant's use. All doors are to have locking hardware, closers, weather stripping, thresholds, and be sealed to prevent outside elements from entering the building.

**DEMISING WALL:** Landlord to erect demising wall(s) separating the demised premises per Tenant's specifications. Landlord to re-tie the ceiling to demising wall(s) and finish floor to include cove base.

**STOCKROOM & INTERIOR WALLS:** Landlord to erect all new interior walls including doors per Tenant specifications. All walls to be smooth, spackled, sanded and painted per Tenant's specifications.

**OFFICES, LOUNGE, REST ROOMS, ETC.:** Landlord is to provide Tenant with two offices, one lounge, one utility closet, and a minimum of two restrooms to Tenant's specifications and finishes. Restroom fixtures and finishes shall be new and to have a minimum of three commodes in the women's and two commodes and one urinal in the men's. Rest rooms shall include baby changing stations, partitions, and electric hand dryers. Additionally, drinking fountains and utility sink to be provided per Tenant's specifications. All offices, lounge and restrooms shall have adequate HVAC, new ceilings and new floor tile (restrooms to have floor covering that meet code requirements for premises with the sale of food), electrical, plumbing, lighting, sinks, fixtures, partitions, FRP, Marlite panels, etc per Tenant's specifications.

**PAINTING:** Landlord shall paint all interior areas per Tenant drawings and specifications.

**FLOORING:** Landlord is to remove the existing floor covering, ensure that all floors are smooth, level and at same elevation throughout entire premises. Landlord to install new commercial grade luxury vinyl floor tile throughout the sales floor, offices, rest rooms (sheet vinyl if applicable), vestibule, and lounge areas per Tenant's specifications. Stockroom floor to be sealed concrete.

35

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-BC935817507A

Page -2-

**CEILINGS:**

Due to extensive cost of converting sprinkler system, Landlord shall install new ceiling tiles in current drop ceiling. Existing mezzanine area shall remain "as-is". Tenant is not responsible to pay rent on upper floor mezzanine square footage. LOD attached showing mezzanine location within Premises. Roof deck insulation must have adequate and compliant R-factor ratings.

Offices, Restrooms, Lounge, Utility Closet, and Vestibule:
Acoustical Ceiling Tile systems per Tenant specifications.

**INTERIOR
LIGHTING:**

Landlord to install all new energy efficient strip lighting with LED lamps and circuits, per Tenant's specifications. Lighting fixtures to be used are 8' and 4' strip-type T5  T8 with electronic ballasts (minimum type Sylvania model QHE instant start low ballast factor), and with 4' tandem LED lamps. Lamp color to be 841 with 15.5 watt rating, lamp type minimum or equivalent, Sylvania LED15T8L48FP841SUBG8, (TITLE 24 JURISDICTION ONLY... Landlord to install all new energy efficient dimmable strip lighting with led lamps and circuit per Tenant's specifications. Standard lighting fixtures to be used are 8' and 4' strip-type with 0-10V dimmable T8 LED lamp. Inverter ready emergency strip fixtures shall be line voltage with an emergency circuit fed from inverter ISC022-120/277-120/277-B2004. Lamp type to be equivalent to KEYSTONE TECHNOLOGIES SBDIM18L840 (KT-LED18T8-48P-840-DVDIM-CP)

Lighting fixtures are to run side – to – side in continuous rows with 10' spacing including a perimeter row of lighting. The perimeter lighting is to be installed within 4'-6" feet off the front, back and side walls running parallel to the walls and within 2'-3" feet of the end of the fixture runs. The back row of the perimeter lighting is to extend past the rows of lighting on each side wall. Lighting in the stockroom should be a maximum height of 16' feet and a minimum height of 12' feet. Stockroom lighting fixtures to be 12' feet on center.

**EXTERIOR
LIGHTING:**

All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Canopy lighting and wall packs servicing Tenant's Demised Premises are to be on Tenant's meter and controlled with storefront signage.

**UTILITIES:**

Landlord to provide separate utilities and separate utility meters with service direct from the local distribution company (including but not limited to, electric, water, etc.) adequate for Tenant's intended use per the following specifications: Tenant to have a minimum electrical service of 1,600 amps for 120/208v service or 800 amps for 277/480v service and include all switch gear, main distribution panels, transformers, and circuit panels. All electrical equipment to be located within the demised premises and connected to all HVAC, lighting, receptacles, other electrical devices, etc. throughout the demised premises.
Landlord to install Tenant supplied Energy Management System (EMS) per Tenant specifications.
Landlord shall also provide Tenant with assurance that utilities per the specifications above are adequate for Tenant's use, are available and include legal access across other properties if necessary to serve the Demised Premises including water, electricity, telephone, sanitary sewers and storm drainage. All existing sanitary lines to be video scoped to ensure they not obstructed or damaged, video to be provided to Tenant.

**HVAC
EQUIPMENT
& MECHANICALS:**

Landlord shall provide a 117.5 ton of New HVAC throughout the sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. All mechanicals to meet ASHREA standard and comply with all state and local code. All mechanical designs shall be submitted to Tenant's engineering and construction departments for review and approval two weeks prior to applying for permits. All HVAC units are to be replaced with new standard RTU units with new/revised diffusers (unless otherwise specified by a Big Lots HVAC/Energy representative). New units shall be either Rheem, Carrier, or Trane and no larger than 10-20 tons each. Landlord is required to either install new or modify existing ducting from units in order to serve sales floor, offices, restrooms, lounge, vestibule and stockroom per Tenant's specifications. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date with Landlord providing Tenant a copy of the inspection report. Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant, and patch the roof as necessary. Landlord shall also warrant any existing HVAC units for the first lease year. All warranties shall be passed on to Tenant.

DocuSign Envelope ID: 699C0196-28EE-4184-83BD-B0935817507A

Page -3-

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system meets the requirements that are adequate for Tenant's use (including Class A Plastics with Pallet Racking 12' AFF in Stock Room) and required by local code.

Where required, Landlord shall also provide a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions.

Landlord shall install any devices or systems for the suppression (including fire extinguishers), detection, reporting of fire, and backflow prevention as required by the AHJ. Any fire alarm systems must meet the requirements for monitoring by Tenant's contractor, and Tenant to approve the fire alarm plans prior to installation of equipment to verify panel compatibility and coordinate monitoring.

**REMOVAL OF FIXTURES & EQUIPMENT:** Landlord to remove all fixtures, equipment, rooms, partitions, walls, and make all repairs to the ceiling, floor, walls, etc. necessitated by such removal. Landlord to remove the electric and plumbing to such equipment and block any openings in exterior walls with matching material.

**RECEIVING AREA:** Landlord to provide an adequate receiving area with one loading dock to accommodate over-the-road tractor-trailers (53' trailers). Loading dock area to be 48" inches high or a recessed truck well and in good working order (including all seals, bumpers, bollards, doors, etc.). The truck/trailer area to be level. Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term. Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports. To ensure the repairs have been made and the roof is free of leaks, Landlord shall conduct a roof flood test with a Tenant representative present prior to possession. Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease, either via a roof hatch (existing or newly installed in a mutually agreeable location of the stock room) OR via a ladder existing/installed on the exterior wall in the rear.

**STRUCTURE & BUILDING:** Landlord shall make any and all repairs/replacement to the building structure as necessary. This shall include all existing brick/masonry block and mortar. The exterior walls shall also be treated as necessary to ensure the Demised Premises is free of leaks. Landlord shall also install new gutters and downspouts on the building as necessary. All conditions and materials must meet or exceed all ADA, ANSI, ASHRE, NFPA, and AHJ codes and requirements.

**PARKING LOT:** Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises shall be re-striped prior to delivery of Demised Premises to Tenant. Fire lanes, curbs and pole bases shall be freshly painted as well. Parking lot repairs are to be made in Landlord and Tenant's commercially reasonable judgment. The number of parking spaces provided for the demised premises must meet the requirements of the AHJ and ADA. A minimum of four, van accessible, handicap parking spaces and related signage required by Tenant.

**CART CORRAL:** Tenant shall have the right to install up to four cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

**SIGNAGE:** Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Landlord to ensure that the pylon(s) is properly wired, maintained, constructed and deliver fully operational. (pursuant to Exhibit D and D-1). Any pylon remodels or newly constructed signs, shall reflect Tenant in a substantially similar position & size. If no pylon exist, Tenant shall have right to erect new pylon or monument sign.

DocuSign Envelope ID: 599C0196-28EE-4194-83BD-B0935817507A

Page -4-

**PESTS:** Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises prior to lease execution if asbestos report is required by governmental authorities upon Landlord obtaining construction permits. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**DRAWINGS:** Landlord is to provide Tenant with a complete set of "as-built" drawings (CAD format) of the Demised Premises adequate for Landlord to produce Landlord's plans and specifications. Tenant shall approve all Landlords' Construction Documents prior to the submission for permits and the commencement of Landlord's work. Upon fully executing a lease document, Landlord shall supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress.

**GENERAL CONDITIONS:** Landlord agrees at the Tenant Possession Date the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable). If said Demised Premises do not conform after the Tenant Possession Date, Landlord will promptly have them conform at all times, unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; HVAC report evidencing all installations and/or repairs have been completed and all HVAC is operating properly; and pest inspection report showing building is pest free, prior to Tenant's possession.

All above work to be completed prior to the Tenant Possession Date.

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

EXHIBIT D

TENANT BUILDING SIGN SPECIFICATION

TENANT SIGN SPECIFICATION



DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A



# HORIZONTAL LOGO
## INDIVIDUAL LED ILLUMINATED
## CHANNEL LETTER SET

| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A



### STACKED LOGO
### INDIVIDUAL LED ILLUMINATED
### CHANNEL LETTER SET

| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|---|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 8" | 190 SqFt |

41

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A



## SECTION DETAILS





DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

## PYLON PANELS

### RECTANGULAR PANELS

PREFERRED:



2ND OPTION:



### SQUARE PANELS

PREFERRED:                                2ND OPTION:

          

### COLORS:

 **BACKGROUND OR LETTERS (DEPENDING ON OPTION)**
**100% BLACK**

 **EXCLAMATION POINT**
**MATCH PMS 021 c ORANGE (3M COLOR 44)**

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

EXHIBIT D - 1

TENANT PYLON PANEL LOCATIONS





DocuSign Envelope ID: 899C0106-28EE-4194-83BD-B0935817507A

EXHIBIT E

## COMPLETION OF LANDLORD'S WORK LETTER

Date: _____

To: _____ (insert Tenant)
  via facsimile: (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary).

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

_____ Utility Information: Meter numbers for electric, and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at _____

_____

If you have any questions, please feel free to contact me at _____

_____

Thank You.

LANDLORD:

_____

a _____

By: _____
Title: _____

TENANT:

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Title: _____

DocuSign Envelope ID: 699C0196-28EE-4194-83BD-B0935817507A

EXHIBIT F

EXCLUSIVE USE PROVISIONS

No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use except as set forth below:

Hobby Lobby Exclusives:

7.3.   Tenant's Exclusive.   Subject only to the Existing Permitted Uses, Tenant shall have the exclusive right within the Shopping Center to sell art supplies, craft supplies, fabrics, photo frames, frames, framed art, wall art, and wall decor (the "**Tenant's Exclusive**").   Notwithstanding the foregoing tenants of the Shopping Center shall be allowed to sell items of Tenant's Exclusive on an incidental basis in amounts not greater than the lesser of (i) ten percent (10%) of gross sales floor area or (ii) two hundred fifty (250) square feet, both measured from the center of the aisle.

DocuSign Envelope ID: 699C0196-26EE-4194-83BD-B0935817507A

EXHIBIT G
RULES AND REGULATIONS

(1) There shall be no "sidewalk sales" except as otherwise provided in this Lease.

(2) The floors, skylights, windows, doors and transoms that reflect or admit light in passageways, or into any place in the Building, shall not be covered or obstructed by any Tenant.

(3) No sign, advertisement or notice shall be inscribed, painted or affixed on any part of the outside of the Demised Premises except as otherwise provided in this Lease.

(4) Each tenant must, upon the termination of its Lease, leave the windows and doors in the Demised Premises in good condition, and must then surrender all keys to the Demised Premises.

(5) Nothing shall be thrown or allowed to drop by the tenants or employees out of the window or doors, or down the passages or skylight of the Building. All waste paper, refuse, and garbage shall be kept by Tenant in metal trash cans, with covers, to be located at the rear of the store, such waste paper, refuse and garbage to be removed at the Tenant's expense (where dumpsters are provided, they shall be used instead of metal trashcans). Tenant shall dispose of any trash and/or garbage in such a manner as to prevent disturbing or offensive odors, fumes, gases, smoke, dust, steam and/or vapors. No grease or other such substances shall be poured into common drains or storm systems. Tenants requiring such disposal shall install grease traps.

(6) No animals or birds, bicycles or other vehicles shall be kept in or about the Demised Premises or permitted therein. Tenants' vehicles shall be parked away from entranceways and in a manner as to least interfere with other tenants' customers and visibility. Such vehicles shall not be stored at the Shopping Center other than during working hours for the tenant and/or employees.

(7) No tenant shall hold any auction, fire or bankruptcy sale in its premises or otherwise in the Shopping Center.

(8) No Tenant or employees of any Tenant shall go upon the roof of said Building without the written consent of Landlord. (This shall not apply to HVAC service contractors or in the event of "self help" for roof leaks.

(9) Except as otherwise provided in this Lease, the common areas of the Shopping Center shall not be obstructed in any way other than for normal use for ingress or egress except by special permission of Landlord or for parking. The parking areas shall not be obstructed nor marked or roped off except for special occasions specifically allowed by Landlord.

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



BL#5432

## LEASE MODIFICATION AGREEMENT

This Lease Extension and Modification Agreement is made and entered into this *15th* day of __February__, 2021 (the "Effective Date"), by and between BVB-NC, LLC, a North Carolina limited liability company with a business address at 204-C West Woodlawn Road Charlotte, NC 28217 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, with a business address at 4900 E. Dublin Granville Road, Columbus, Ohio 43081 ("Tenant").

### RECITALS:

A.     Landlord and Tenant have entered into that certain Lease dated June 2, 2020, (the "Lease") for approximately 46,713 square feet of storeroom ("Demised Premise") in the Shelby Market Place Shopping Center located at 1730 A&B East Dixon Blvd. Shelby, NC 28152 ("Shopping Center"); as more particularly described in the Lease.

B.     The Term of the amended Lease is currently set to expire on January 31, 2031.

C.     The parties desire to amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.     Estimated Delivery Date: Section 1.B.5 of the Lease shall be amended to read in its entirety as follows:

The estimated delivery date (as herein defined) shall be July 1, 2021 ("Estimated Delivery Date"), conditioned on Tenant agreeing to Landlord's Plans for Landlord's work. Upon receipt of such notice of acceptance, the Estimated Delivery Date shall become July 1, 2021, then commencing upon July 16, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to August 1, 2021, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $250.00 per day. Commencing September 1, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease.  Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work, until Tenant has received its permits for its construction in the Demised Premises or if permits are delayed as a result of a city or state delay in the project, change orders or Force Majeure events, unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

Landlord may offer and Tenant may accept, possession of the Demised Premises prior to the Estimated Delivery Date.

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

BL #5432

2.    <u>Early Delivery of Tenant Possession</u>: Section 1.B.7 of the Lease is hereby amended to read in its entirety as follows:

In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant prior to the Estimated Delivery Date, and Tenant elects to accept possession in prior to the Estimated Delivery Date, unless Tenant opens for business, the Rent Commencement Date will not begin until one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

3.    <u>Fixed Minimum Rent</u>: Section 5.A of the Lease shall be amended to read in its entirety as follows:

From the Rent Commencement Date of this Lease and through January 31, 2026, the sum of $233,565.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $19,463.75. From February 1, 2026 and continuing through January 31, 2031, the sum of $245,243.25 per annum which shall be paid in equal monthly installments in advance on the first day or each and every month, in the amount of $20,436.94.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $257,505.41 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $21,458.78. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $270,380.68 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,531.72. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $283,899.71 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,658.31.

4.    <u>Exhibit A-1 and General Contractor</u>. Exhibit A-1 of the Lease is hereby removed and amended by the attached Exhibit A-1. Notwithstanding anything written in the Lease, or elsewhere to the contrary, Marvin Simmons will be the General Contractor for the construction work contemplated herein.

5.    <u>Full Force and Effect; Successors and Assigns</u>. Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

6.    <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

BL #5432

together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Second Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

[Signature page follows]

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

BL#5432

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed this Second Agreement as of the date first hereinabove set forth.

**LANDLORD:**                                      **TENANT:**

BVB-NC, LLC,                                       BIG LOTS STORES, INC.,
a North Carolina limited liability company         an Ohio corporation,

By: _BV Belk_                                      By: _Jonathan E. Ramsden_
Name: B.V. Belk, Jr.                               Name: Jonathan E. Ramsden
Its: Manager                                       Its: Executive Vice President, Chief
                                                   Financial & Administrative Officer

Signature Page – Lease Modification Agreement

DocuSign Envelope ID: 976A4D4A-9328-49DD-80B8-95B0203F278A

BL #5432

(Tenant's Acknowledgement)

STATE OF OHIO                    )
                                 )
County of  Franklin              )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Big Lots Stores, Inc., an Ohio corporation, by Jonathan A. Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Columbus, Ohio, this 15th day of *February*, 2021.

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

_____
Notary Public

(Landlord's Acknowledgement)

STATE OF NC

County of *Mecklenburg*

Before me, a Notary Public, in and for said State and County, personally appeared the above   named   BVB-NC,   LLC,   by   *BV Belk Jr*   its *Manager* who  acknowledged  that  he/she  did  sign  the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

IN  WITNESS  WHEREOF,  I  hereunto  set  my  hand  and  the  official  seal,  at _4:45pm_ this 15th day of *February*, 2021.

TAMARA B WOOD
NOTARY
EXPIRES
6-2-2023
PUBLIC
UNION COUNTY, NC

*Tamara B. Wood*
_____
Notary Public

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

BL #5432

## EXHIBIT A-1

## LANDLORD'S PLANS AND SPECIFICATIONS

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A







**BIG LOTS MATERIAL AND EQUIPMENT SCHEDULE**

Big Lots Stores, Inc. Store Planning Department
4900 East Dublin Granville Road, Columbus, Ohio 43081
614.278.6800

| Product | Supplied By | Installed By | Manufacturer and Model Number | Vendor and Contact Information |
|---|---|---|---|---|

DocuSign Envelope ID: 976A4D4A-9326-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A





DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-80B8-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9329-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-48DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9326-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



FOUNDATION / SLAB PLAN

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9326-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A

DocuSign Envelope ID: 976A4D4A-9328-49DD-8068-95B0203F278A

DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8068-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 976A4D4A-9326-49DD-8088-95B0203F278A






DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A







DocuSign Envelope ID: 976A4D4A-9328-49DD-8088-95B0203F278A



DocuSign Envelope ID: 71C469C2-32CD-4C2A-94DC-8E2D3D7BA329



BL #5432

## SECOND LEASE MODIFICATION AGREEMENT

This Second Lease Modification Agreement (the "Agreement") is made as of the 6 day of June 2024 (the "Effective Date") by and between **BVB-NC, LLC** having a business address of c/o BV Belk Properties, 204-C West Woodlawn Road. Charlotte, NC 28217 ("Landlord"), and **BIG LOTS STORES, LLC, an Ohio limited liability company, formerly known as Big Lots Stores, Inc.** having a mailing address of 4900 East Dublin Granville Road, Columbus, OH 43081 (the "Tenant").

### RECITALS:

Landlord and Tenant are parties to a Lease Agreement dated June 2, 2020 (the "Original Lease") for approximately 46,713 square feet of storeroom ("Demised Premises") located at 1728 E. Dixon Blvd., Shelby, NC 28152 (the "Shopping Center"), as more particularly described in the Lease. The Original Lease together with any amendments thereto shall hereinafter be collectively referred to as the "Lease".

A.    The Term of the Lease is currently set to expire on **January 31, 2031.**

B.    The parties desire to reduce Tenant's rent for a commencing June 1, 2024 through January 31, 2031 and further amend the Lease as provided for herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:

1.    a. Fixed Minimum Rent.  Commencing June 1, 2024 through January 31, 2031 Fixed Minimum Rent payable by Tenant to Landlord for the Demised Premises shall be as follows:

| Period | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
|---|---|---|
| June 1, 2024 – January 31, 2031 | $221,886.75 ($4.75/sf) | $18,490.56 |

b. Other Tenant Fees and Charges.  This Amendment does not change or alter any obligations of Tenant under the Lease relating to CAM, Real Estate Taxes, or any other fees or amounts due to Landlord.

2.    Consent.  In consideration of the above rent reduction Tenant hereby consents to all operations and product mixes of Burlington in the Shopping Center. It is understood and agreed

DocuSign Envelope ID: 71C469C2-32CD-4C2A-94DC-8E2D3D7BA329

BL #5432

that this consent shall apply only to Burlington vis-a-vis the Prohibited Use provision of Section 4.B of the Lease and shall not be deemed waived or modified in any way except as provided herein.

3.   <u>Full Force and Effect; Successors and Assigns</u>.  Unless otherwise set forth herein, all capitalized terms shall have the meaning set forth in the Lease.  Except as modified herein, all other terms and conditions of the Lease shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto.  In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

4.   <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.

Landlord and Tenant have respectively signed this Second Lease Modification Agreement as of the date first hereinabove set forth.

<u>LANDLORD:</u>
BVB-NC, LLC
a North Carolina  limited liability company

By:  _BV Belk Jr._
Name: BV BELK Jr.
Title: Managing Memeber

<u>TENANT:</u>
BIG LOTS STORES, LLC,
an Ohio limited liability company

By: _Jonathan Ramsden_
        EF2E5I028539A12...
Name:   Jonathan Ramsden
Title:    Executive Vice President, Chief
             Financial & Administrative Officer