# Exhibit "A"

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charges
   C. Intentionally Deleted
   D. Common Area Charges and Cap
   E. Real Estate Taxes

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24. Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the **1** day of **March**, 2019 (the "Effective Date"), by and between Edgewater Park Urban Renewal, LLC, a New Jersey limited liability company, whose mailing address is 670 Myrtle Ave. # 166, Brooklyn, NY 11205 ("Landlord"), and PNS Stores, Inc., a California corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

1. ## DEFINITIONS:

   For purposes of this Lease, these terms are defined as follows:

   A. <u>Common Areas</u>: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not erect any structure or otherwise materially alter the area crosshatched on Exhibit A ("No Change Area") without the prior written consent of Tenant.

   B. <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

   1) Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

3

2) The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession to Tenant with all Landlord Work complete, or (ii) the date on which Tenant receives all permits for its construction and signage (the "Permits"), provided that Tenant shall promptly and diligently pursue obtaining such permits following the Submission Date. Tenant will submit its plans for the Permits within ninety (90) days of the Effective Date (the "Submission Date") and thereafter, diligently pursue obtaining such Permits. Landlord will cooperate fully with Tenant in obtaining said Permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Expansion Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date   In the event Tenant fails to receive approval for its permits within 120 days after submission for such permits, the Landlord may in its sole discretion 1) assist Tenant with obtaining such permits or 2) assume the responsibility for and pursue obtaining such permits.

3) The "Rent Commencement Date" shall be the earlier of 1) 180 days from the Possession Date or 2) When Tenant opens for business in the Expansion Premises or 3) September 1, 2020. Notwithstanding anything to the contrary herein, Tenant shall continue to pay Rent and all other charges pursuant to the Existing Lease (as hereinafter defined) as such amounts come due, prior to the Rent Commencement Date of this Lease.

4) The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5) In no event shall Tenant be obligated to accept possession of the Demised Premises prior to April 1, 2019. Landlord and Tenant agree that if Landlord fails to substantially complete Landlord's Work in the Expansion Premises by May 1, 2019, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon May 1, 2019 and continuing for each and every day Landlord is delayed in substantially completing Landlord's Work prior to May 1, 2019, excepting delays caused by force majeure or delays caused by the acts or omissions of Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $ $1,000 per day until Landlord's Work is substantially complete. Tenant shall have the right to deduct such amount from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)     Notwithstanding anything to the contrary, in the event Landlord has not substantially completed Landlord's Work in the Expansion Premises by July 31, 2019, Tenant will not be required to accept possession until February 2, 2020. The period of time between August 1, 2019 and February 2, 2020 will be the "Optional Blackout Period". In the event Landlord substantially completes Landlord's Work during the Optional Blackout Period, no liquidated damages shall be due or incurred by Landlord for after such substantial completion of Landlord's Work. In addition, in the event Landlord has not substantially completed Landlord's Work by February 2, 2020, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 2, 2020, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)     In the event Landlord substantially completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 2, 2020. In the event Tenant opens for business in the Expansion Premises, the Rent Commencement Date will begin on the date the Tenant opens for business. Upon the Rent Commencement Date the Existing Lease between Landlord and Tenant for the Existing Premises shall automatically terminate. Notwithstanding anything in the contrary, if Tenant determines in Tenant's reasonable discretion that Tenant cannot continue to operate during the construction process, Tenant may close until Landlord has substantially completed all of Landlord's Work, or until Landlord stops construction and all Rent and Additional Rent shall abate until Tenant reopens the Existing Premises or the Demised Premises. The Rent abatement described here shall be capped at the earlier of 1) the date Tenant re-opens the Existing Premises or opens the Demised Premises or 2) 90-days after Tenant closes. In the event Tenant re-opens the Existing Premises, Tenant shall only be required to pay the rent for the Existing Premises until the Rent Commencement Date.

Anything to the contrary in this Lease notwithstanding, in no event shall the Existing Lease terminate or become void or invalid pursuant to anything contained in this Lease, until the Rent Commencement Date.

C.    <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -   Site Plan of Shopping Center

2)    Exhibit B -   Legal Description of Shopping Center

3)    Exhibit C -   Landlord's Work

4)    Exhibit D -   Tenant Building Sign Specifications

5)    Exhibit D – 1 Tenant Pylon Sign Location

6)    Exhibit E -   Completion of Landlord's Work Letter

7)    Exhibit F -   Exclusive Use Provisions

8)    Exhibit G -   Remeasurement Rider

9)      Exhibit H – Proposed Site Plan

D.      Demised Premises:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 55,051 square feet in the aggregate of ground floor area with a minimum width of 130 feet for the Demised Premises.  The "Demised Premises" are comprised of the Existing Premises and the Expansion Premises as hereinafter defined.  Tenant's Plans and Specifications are attached hereto as Exhibit A-1 and deemed approved by the parties hereto.

The "Existing Premises" is the portion of the Demised Premises indicated on Exhibit A-1, containing approximately 28,660 square feet of ground floor area, and are currently occupied by Tenant pursuant to separate Store Lease dated October 17, 2002 (the "Existing Lease").  Tenant shall continue to use and occupy the Existing Premises pursuant to the terms and conditions of the Existing Lease until the Rent Commencement Date.  Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Expansion Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings.  Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 500 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 500 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.

The "Expansion Premises" is the portion of the Demised Premises as indicated on Exhibit A-1 containing approximately 26,391 square feet of ground floor area.  Landlord shall perform Landlord's Work with respect to the Expansion Premises and deliver possession of the Expansion Space to Tenant on the Tenant Possession Date.  .

E.      Shopping Center:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the 4355 Route 130, Beverly, NJ 08010.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 122,000 square feet, subject to change during the Term of Lease. The Shopping Center may be expanded as further set forth herein.

## 2.  DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees, subject to any changes to the Common Areas as permitted pursuant to the terms of this Lease.

## 3.  TERM:

A.      Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2030 (the "Original Term").  Upon the expiration or earlier termination of this Lease, except for an instance of default by either party, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If

6

the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.  Options to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term" and "Second Option Term". The First Option Term shall commence at the end of the Original Term of this Lease and the Second Option Term shall commence at the end of the First Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default on the Lease beyond any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

4.  **USE AND OPERATION**:

A.  Permitted Uses:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), and similar or related merchandise. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise discount store, liquidator, close-out store, stores selling furniture (including furniture and home accessories or mattresses) or dollar store operations ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Dirt Cheap, Bargain Hunt, Rose's, Christmas Tree Shops, Five Below, Encore and Ollie's Bargain Outlet, Aaron's, Rent A Center, Rent Way, Color Tyme, Show Place, Buddy's. Notwithstanding the foregoing, (i) Landlord shall be permitted to lease to not more than one, single price point dollar store operation not to exceed 12,000 square feet and not expressly listed above, (ii) Landlord shall be permitted to lease to 'single category discounters' such as TJX Stores, Burlington Stores, and any other single category operator, including without limitation sporting goods, hardware, soft goods, footwear, apparel, or other single category of retail, and (iii) Landlord shall be permitted to lease to 'full-line' furniture

7

operators such as Raymour and Flanigan, Thomasville, and Ethan Allen (,collectively, "Permitted Competitors"). Landlord shall specifically be permitted to enter into a lease with a full-line supermarket or farmers market.

In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; or (ii) Tenant may pay, in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease ; (ii)All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease, excepting any closures relating to force majeure events, renovations to the Premises or other events outside of Tenant's control.

It is expressly understood that, notwithstanding anything to the contrary contained herein Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder including the payment of Rent and Additional Rent. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may in its sole discretion terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and

pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas, including up to six (6) parking spaces, immediately adjacent to the Demised Premises for the sale and display of merchandise.

B.   Prohibited Uses: Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea market" type of operation; (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 10,000 square feet in the aggregate, including but not limited to plasma centers; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities in excess of 5,000 square feet in the aggregate; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material (except Massage Envy or other similar national tenant shall not be prohibited); (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 150 linear feet away from the Demised Premises); (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia.  All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**". Landlord may only operate one of the following at the Shopping Center (provided that such shall not exceed 25,000 square feet and shall not have an

entrance located within 75 feet of Tenant's demising wall): a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations.

**5.**     **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.     Fixed Minimum Rent:  From the Rent Commencement Date through January 31, 2025, the sum of $357,832.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $29,819.33.  From February 1, 2025 through January 31, 2030, the sum of $379,852.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $31,654.33.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $412,883.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $34,406.92.  The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $454,171.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $37,847.58.

B.     Late Fees.  If Tenant fails to make payments of Rent, Additional Rent or any component thereof within five (5) days after such payment is past due, then upon the second (2nd) or more of such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due.  Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year. The provisions herein for the late fee shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the time or times herein stipulated.

C.     Utilities Charges:  Landlord and Tenant acknowledge and agree that Tenant has access to all utilities necessary to conduct its business with respect to the Existing Premises.  Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord shall provide Tenant with access to all such utilities necessary to conduct business in the Demised Premises, and Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility

10

submeters for any such water, which submeters shall accurately reflect Tenant's usage. All such meters/submeters shall be as existing for the Existing Premises. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

      <u>Common Area Charges and Fixed CAM</u>: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, shared garbage and refuse disposal facilities (if any), Shopping Center maintenance and storage room, shared loading area and all other shared areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center (if any) ;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) providing security, lighting and policing if necessary in Landlord's reasonable discretion, and on-site and off-site traffic control;

(v) maintaining all paved surfaces in a level and smooth condition, reasonably free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as reasonably required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in

11

the Common Areas, licenses and permit fees, and parking area surcharges or levies ("Common Area Charges").

The foregoing notwithstanding, Tenant shall maintain its own dumpster area, which it will use for the disposal of all of its garbage and waste.

<u>Fixed Common Area Charges</u> :   Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be fixed at $1.15 per square foot of the Demised Premises for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any. Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. After the first Lease Year, as well as any Partial Lease Year, if any, Tenant's pro-rata share of Common Area Charges shall increase by five percent (5%) per year above that amount of Common Area Charges payable by Tenant for the previous Lease Year.

The $1.15 per square foot Fixed Common Area Charges for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any, and any Option Term or other extension of the Term of Lease, if any, and the fixed annual 5% increase in Common Area Charges shall be collectively known as the "Fixed CAM".  In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the Fixed CAM set forth herein.

E.    <u>Real Estate Taxes:</u>  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes").  Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions.  Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord within 30 days of demand for such payment from the Landlord. In the event the taxes are collected from the Landlord each half year or quarter year, Landlord may bill Tenant when such half year or quarterly payments are due and Tenant will pay Tenant's pro rata share of the Real Estate Taxes within 30-days of such demand.  Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes. Within thirty (30) days after Tenant's receipt of an invoice therefor At the end of each calendar year, Landlord shall provide Tenant with a receipt invoice specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority.  Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real

Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. The parties shall reconcile such amount with the estimated monthly amounts paid by Tenant during the year, and (i) Landlord shall promptly credit to Tenant any overage of Real Estate Taxes for any given calendar and (ii) Tenant shall promptly pay within thirty (30) days any shortfall in the estimated Real Estate Tax charges paid in given any calendar year. Tenant shall not be required to make more than four (4) such payments in any Lease Year or Partial Lease Year. Landlord estimates that the Real Estate Taxes for the 2018 tax year are $1.22 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord, net of any legal expenses and other expenses in connection therewith.

Landlord shall use best efforts to promptly notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed. Nevertheless, Tenant must pay what would be the normal tax increases had no such additional structures been built.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one time every five years. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Nevertheless, Tenant must pay what would be the normal tax increases had such a sale or transfer not taken place.

13

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.     <u>Construction Allowance</u>: Landlord shall pay to Tenant an amount equal to $200,000.00 within thirty (30) days of the latest to occur of the following: (i) Tenant substantial completion of Tenant's Work and delivery to Landlord of all lien waivers and lien releases from contractors, subcontractors and materialmen performing work in excess of $5,000.00; (ii) Tenant obtaining a certificate of occupancy for the Demised Premises (if necessary) and (iii) Tenant's opening for business in the entire Demised Premises (including the Expansion Premises). If said amount is not paid by Landlord to Tenant within thirty (30) days after , satisfaction of the foregoing conditions, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

<u>Construction Rent Abatement</u>: Notwithstanding anything to the contrary contained in this Lease, as consideration for Tenant's construction to and improvement of the Demised Premises, Tenant shall not be obligated to pay Fixed Minimum Rent until Tenant has received an additional fixed amount equal to $200,000.00 as a credit against Fixed Minimum Rent (hereinafter referred to as "Rent Abatement") which abatement shall commence on the Rent Commencement Date and shall fully offset against monthly installments of Fixed Minimum Rent only credited in full.

Landlord and Tenant recognize and agree that to the extent that the Rent Abatement is used for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Rent Abatement shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.     <u>ACM Remediation Credit</u>. Landlord and Tenant acknowledge and agree that certain asbestos containing materials ("ACMs") may be present and encapsulated in the Existing Premises. In connection with the Lease, Tenant shall perform all required removal of ACM and any other environmental remediation of the Existing Premises prior to the Lease Commencement Date. Landlord shall reimburse Tenant for the cost of such ACM remediation up to an amount equal to $2.25 per square foot of floor area, such amount to be reimbursed within 30 days after Tenant delivering notice of completion of such work along with lien releases to Landlord.

**6.**     <u>**ALTERATIONS:**</u>

During the Term of this Lease, following completion of Tenant's initial improvements in the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the exterior or structural parts of the

14

building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant;  Any exterior or structural changes shall require Landlord's prior consent, such consent not to be unreasonably withheld conditioned or delayed.

If any mechanic's, laborer's or materialman's lien, notice of intention, or notice of refusal, shall at any time be filed against the Shopping Center or Leased Premises or any part thereof, or against Landlord, Tenant, within thirty (30) days after notice of the filing thereof, will cause it to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise.  If Tenant shall fail to cause such lien or notice to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien or notice by deposit or by bonding proceedings. Any amount so paid by Landlord and all costs and expenses incurred by Landlord in connection therewith, together with interest thereon at the Lease Interest Rate from the respective dates of Landlord's making of the payments and incurring of the costs and expenses, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises., but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Tenant agrees to procure and maintain throughout the Lease term, at Tenant's sole cost and expense, comprehensive quarterly preventative  maintenance contracts for all heating, ventilating and air conditioning systems with respect to the Premises with reputable contractors, and provide copies of such contracts to Landlord upon request. .
Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.   The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

If Landlord fails to commence and diligently pursue completion the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs (or such additional time as may be reasonable given the circumstances of the repair), Tenant shall provide Landlord with a second written notice expressing Tenant's intent to perform such repair at Landlord's expense if Landlord fails to commence such repair within fifteen (15) days thereafter. If Landlord fails to commence the referenced repair within

15

fifteen (15) days following the second notice, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days, subject to delays caused by force majeure or such longer period as may be reasonable under the circumstances.. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, except in the event of a good faith dispute, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

## 8.   SIGNS:

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, the exterior walls of the Demised Premises, subject to municipal ordinances and Landlord's Sign Criteria attached hereto as Exhibit __.   Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located.  Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction.  If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).  The parties acknowledge and agree that Tenant shall maintain Tenant's existing sign panel on the Shopping Center Pylon Sign.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons.  Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto.  Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space.  Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels.  Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs.  Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove such trade fixtures or equipment, and repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.  Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.    **INSURANCE:**

A.    <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease:

17

commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: Three Million Dollars ($3,000,000.00) each event combined single limit with a Five Million Dollar ($5,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date, and name Landlord and Landlord's managing agent as additional insured on all such certificates.

In addition, Tenant shall provide Worker's Compensation, employer's liability insurance and unemployment compensation covering all Tenant's employees working in the Leased Premises in such amounts as are required by law;

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

B.    Landlord:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings, inventory and all other property owned by Tenant and located in the Premises against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.  Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Notwithstanding anything to the contrary contained herein, Tenant shall have no obligation to reimburse Landlord for insurance related costs as such costs shall be included within Tenant's Fixed CAM payments.

## 13.   FIRE REBUILDING AND ALTERING:

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within ninety (90) days from the date of such casualty,

18

Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.  If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

**14.   FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.  This provision shall not apply to Tenant's obligation to pay Rent and Additional Rent.

**15.   INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.   WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other normal exceptions of title which have been approved in writing by Tenant.  The exceptions attached hereto as Exhibit H are approved by the Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation

19

attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center which would have a material adverse affect on Tenant's use, visibility or access to the Premises or expands Tenant's obligations set forth in the Lease, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed;

Landlord shall be able to expand the Shopping Center as shown on the Site Plan annexed hereto as Exhibit A.

### 17.  QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

### 18.  MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. In the event Landlord requests that Tenant execute an SNDA, Tenant shall have thirty (30) days to return to Landlord a signed SNDA. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, or other third party identified by Landlord, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord, and (v) other reasonable information pertaining to the lease contained on a Tenant's standard estoppel certificate form. In the event Landlord requests that Tenant execute an Estoppel, Tenant shall have thirty (30) days to return to Landlord a signed Estoppel without.

### 19.  DEFAULT:

A.    TENANT'S DEFAULT

19.1 Each of the following shall be deemed an "Event of Default":

(a) Any failure by Tenant to pay any Rent or other sum of money within 10 days after receipt of written notice of such default;

(b) Any failure by Tenant *to* perform any of the other terms, conditions or covenants of this Lease to be observed or performed by Tenant for more than thirty (30) days (or any shorter time specifically provided for in this Lease) after notice of such default shall have been given to Tenant, unless such default cannot be cured with reasonable diligence within such thirty (30) day period, in which event Tenant shall not be deemed to be in default if it shall have commenced curing the default within such thirty (30) day period and shall diligently prosecute same to completion;

(c) A rejection of this Lease by Tenant or a trustee in Bankruptcy;

(d) *An* Event of Default provided for under any other Section of this Lease.

**19.2 (a)(1)**    The provisions of this Subsection 19.2(a)(1) are subject to the provisions of Subsection 19.2 (a)(2). If (i) the estate created hereby shall be taken by execution, attachment, or any other process of law, (ii) Tenant shall be adjudged a bankrupt or insolvent, or any receiver or trustee shall be appointed for the business or property of Tenant and not be discharged within ninety days, (iii) Tenant shall make any assignment of its property for the benefit of creditors, or (iv) Tenant shall file a voluntary petition in bankruptcy or apply for reorganization, under any federal or state law now or hereafter enacted, and any such process, assignment, action or proceeding is not vacated or set aside within ninety days thereafter, then each of the foregoing shall be deemed an Event of Default. For the purpose of this Subsection 19.2(a)(1) and Subsection 19.2(a)(2) the term "Tenant" shall be deemed to include any guarantor of this Lease, but shall not include a predecessor of Tenant as the holder of the tenant's interest in this Lease.

**19.2 (a)(2)**    Landlord may, at its sole discretion and without notice, invoke the following provisions:

(i) On a Tenant's Bankruptcy, this Lease and all rights of Tenant hereunder shall automatically terminate with the same force and effect as if the date of any such event were the date stated herein for the expiration of the Lease Tenn., and Tenant shall vacate and surrender the Demised Premises, but shall remain liable as herein provided. This provision shall not apply in the event a petition is filed by or against Tenant pursuant to the provisions of the Bankruptcy Code. Landlord reserves any and all remedies provided herein, at law or in equity.

(ii) On the filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, **as debtor**
and as debtor in possession, and any trustee who may be appointed, **agree:**

    (A)to perform each **and** every obligation of Tenant under this Lease, including the obligations set forth in Articles **4** and *6* of this Lease, until such time as this Lease is rejected by order of the United States Bankruptcy Court.

    (B)To pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Demised Premises an amount equal to one-twelfth of all annual Minimum Rent and all additional rent.

    (C)To reject or assume this Lease within such period of time deemed reasonable by the Bankruptcy Court or the trustee.

    (D)To give Landlord notice as ordered by the United States Bankruptcy Court of any proceeding
relating to any assumption or rejection of this Lease.

    (E)To give Landlord at least thirty *(30)* days prior notice of any abandonment of the Demised Premises, any such abandonment *to* **be deemed** conclusively **a** rejection of this lease.

(iii) Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on
behalf of Landlord hereunder, whether or not expressly denominated as Rent, shall constitute "rent" for the purposes of Section 502(b)(7) of the Bankruptcy Code.

(iv) Landlord and Tenant agree that this is a "lease of real property in **a** shopping center" as such term is **used in** Section36S(b)(3) of the Bankruptcy Code.

(v) Included within and in addition to any other conditions or obligations imposed on Tenant in the
event of assumption or assignment, or both, are the following:
(A) In the event of assignment pursuant to the provisions of the Bankruptcy Code, the execution and

21

delivery to Landlord of an instrument by which the assignee assumes all of the obligations arising under this Lease from and after the date of assignment.

(B) The cure of any monetary defaults and the reimbursement of pecuniary loss resulting &om any such default within thirty (30) days of assumption or assignment or both, if ordered by the Bankruptcy Court.

(C) The use of the Demised Premises not in violation of any existing exclusive grated to any other tenant in the Shopping Center.

(D) The prior written consent *of any* Mortgagee to which this lease has been assigned as collateral

security, if ordered by the Bankruptcy Court.

(E) No physical changes of any kind are to be made to the Demised Premises unless in compliance· with the applicable provisions of this Lease.

(vi) Nothing in this Section 29.2 shall be deemed in any manner to limit Landlord's rights and remedies under the Bankruptcy Code, as it presently *exists* or as it may hereafter be amended. If the Bankruptcy Code is interpreted or amended during the Lease Term to so permit, or is superseded by an act so permitting, the Provisions of this Section 29.2 shall apply.

**19.2(a)(3)** Any one or more of the following events shall constitute a "Tenant's Bankruptcy": (A) the interest or estate created in Tenant hereby shall be taken in execution or by process of law; or (B) Tenant is adjudicated insolvent by a final order of a c:ourt of competent jurisdiction other than the United States Bankruptcy Court; or (C) a receiver, trustee, or custodian of the property of Tenant shall be appointed by reason of the insolvency or inability of Tenant to pay its debts, and such appointments shall not be vacated within sixty days: or (D) a petition is filed by or against Tenant under any insolvency law except the Bankruptcy Code. 11 U.S.C. Section 101 et. seq. (herein called Bankruptcy Code") and such petition is not vacated within sixty days: or (E) any assignment shall be made of the property of Tenant for the benefit of creditors, or (F) the rejection of the tenant' s interest in this Lease in any proceeding under the Bankruptcy Code.

**19.3** If an Event of Default shall occur, Landlord shall have the immediate right of re-entry and may remove all persons and property from the Demised Premises by summary proceedings, force or otherwise or, at Landlord's election, may store such property in a public warehouse or elsewhere It Tenant's expense *for* Tenant's account without Landlord being deemed guilty of trespass or becoming liable for any *loss* or damage which may result therefrom. Additionally (whether or not Landlord shall elect to re-enter or take possession pursuant to legal proceedings or pursuant to any notice provided for by law and not in limitation of any other right or remedy of Landlord). if an Event of Default shall occur. Landlord *shall* have the right, at its option, *to* terminate this Lease on not less than thirty (30) days' notice to Tenant, and on the date stated in such notice this Lease shall terminate as if such date were the date fixed herein for the expiration of the Lease Term, but Tenant shall continue to remain liable hereunder. Landlord may, from time to time. whether or not this Lease be terminated. make such alterations and repairs as may be necessary in order to relet the Demised Premises. and may relet the Demised Premises or any part thereof for such term for such terms or terms (which may be less than or extend beyond the Lease Term) and at such rents and on such other terms and conditions as Landlord *in* its reasonable judgment may deem advisable. In no event shall Landlord be liable for any failure to relet the Demised Premises provided however Landlord shall use commercially reasonable efforts *to* mitigate its damages. If Landlord relets the Demised Premises then, on each such reletting. all Rent received by Landlord from such reletting shall be applied first to the payment of any indebtedness (other than Rent due hereunder) of Tenant to Landlord. second, to the payment of any costs and expenses of such reletting, including brokerage fees. attorneys' fees and costs of such alterations and repairs. third, to the payment of Rent due and unpaid hereunder, and the balance, if any. shall be held by Landlord and applied in payment of future Rent as it may come due and payable hereunder. Landlord reserves the right to bring actions or proceedings for the recovery of any deficits remaining unpaid without being obliged to await the end of the Lease Term for a final determination of Tenant's account. and the commencement or maintenance of any one or more actions or proceedings shall not bar Landlord from bringing other or subsequent actions or proceedings for further accruals pursuant to the provisions of this Lease. If the Rent received from any such reletting during any month is less than the amount payable during that month by Tenant hereunder (including said indebtedness. costs and expenses), Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. In no event shall Landlord be entitled to accelerate any Rent or additional rent accruing under this Lease. If the Rent received from any such reletting during any month is more than the amount payable during that month by Tenant hereunder. said surplus shall belong solely

to Landlord and Tenant hereby waives all claims to said surplus. No such re-entry or taking possession of the Demised Premises by Landlord shall be construed as an election on its part to terminate this Lease as provided above unless a written notice of such intention be given to Tenant or unless such termination be decreed by a court of competent jurisdiction.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach. Should Landlord at any time so terminate this Lease for any breach, in addition to any other remedies it may have, it may recover from Tenant all actual damages incurred because of such breach as damages for loss of the bargain and not as a penalty, including the cost of recovering the Demised Premises, reasonable attorneys' fees. In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease. Landlord shall also have the right to appropriate injunctive and declaratory relief. The rights and remedies provided in this Lease shall be cumulative. and the exercise of any one or more shall not preclude the exercise, or act as a waiver, of any other right or remedy of Landlord hereunder, or which may exist at law. in equity or by statute. The words "re-enter" and "re-entry' as used herein are not restricted to their technical legal meaning.

19.4  If Tenant shall fail to comply fully with any of its obligations under this Lease (including its
obligations to make repairs, maintain various policies of insurance. comply with Legal Requirements and pay for utilities) after prescribed notice and cure period then Landlord shall have the right, in addition to any and all other remedies which Landlord may have under this Lease or at law or equity. at its option to cure such default at Tenant's expense. Tenant shall reimburse Landlord, as additional rent. for all costs and expenses incurred as a result thereof (including reasonable legal fees) together with interest thereon at the Lease Interest Rate, within thirty (30) days and the substantiation of expenses.

B.   If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to  cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full.  Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items.  It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided.  In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.  Furthermore if 1) Landlord's default under this Lease is material in nature, 2) Tenant sends Landlord the 30 day notice to cure mentioned in the beginning of this paragraph and Landlord fails to cure such default within 30 days (or initiate the cure of such default if such default cannot be cured within the 30-day period and diligently pursues the cure through completion), then Tenant may send Landlord a final 15-day notice to cure such default (or initiate the cure of such default if such default cannot be cured within the 15-day period and diligently pursues the cure through completion) and if the material default is not cured or Landlord has not initiated

23

the cure of such default within the 15-day period and diligently pursues the cure through completion, Tenant shall have the right to deliver to Landlord a Termination notice terminating this Lease on a date not less than 30 days after the date of such notice. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20. **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of building area lost,. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21. **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee. Notwithstanding the foregoing, in the event of a change in use from Tenant's

24

Permitted Use in connection with any such sublease or assignment of the Lease, such assignment shall be subject to all the prohibited uses set forth herein and any existing exclusive benefiting any other tenant of the Shopping Center at the time of such assignment.   Tenant shall send written notice of such proposed assignment of lease and change in use prior to such assignment, and Landlord shall provide Tenant with a list of such tenant exclusive uses and consent to such assignment or sublease, not to be unreasonably withheld, conditioned or delayed, without thirty (30) days following notice from Tenant.

## 23.    SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition, subject to ordinary wear and tear and repairs associated with fire or other casualty, but with any damage caused by removal of Tenant's property repaired.   Tenant shall remove all of its trade fixtures from the Demised Premises.  Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof.

## 24.    NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified herein and delivered by (i)  a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii),  within two (2) business days following facsimile transmission.  The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery.  Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

Landlord's Address for Notice:

> Urban Edgewater Renewal LLC
> 670 Myrtle Ave., #166
> Brooklyn, NY 11205

Tenant's Address for Notice:

> PNS Stores, Inc.
> Attention: Lease Administration
> 4900 East Dublin Granville Rd.
> Columbus, OH 43081

## 25.    LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of New Jersey. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26.  **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.  **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.  **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease except for Joseph Dougherty of Metro Commercial Real Estate and Shane Wierks of Jeffrey Realty who will be paid by Landlord pursuant to a separate agreement. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.  **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.  **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Expansion Premises will be delivered to Tenant free of any Hazardous Materials and in compliance with all Environmental Laws. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Existing Premises or Expansion Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Existing Premises prior to the Existing Lease Tenant Possession Date or the Expansion Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such

26

Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials in the Existing Premises or the Expansion Premises.  If Landlord shall be required to remove any Hazardous Materials from the Existing Premises or the Expansion Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.  Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

**31.**    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**32.**    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within one year after the expiration of the Lease Year in which such payments or adjustments are applicable.  If Landlord does not notify Tenant of such amount owed within said one year period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.**    **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

**34.**    **INTENTIONALYL DELETED.**

**35.**    **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or

conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37.    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39.    **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit up to $2,500. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

40.    **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.    WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

42.    REPORTING GROSS SALES

In the event Landlord is refinancing or selling the Shopping Center, within 30 days of a written demand from the Landlord, Tenant shall furnish to Landlord an accurate statement of the gross sales for the previous quarter.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

EDGEWATER PARK URBAN RENEWAL LLC

By: _Leah Waldman_

Title: _Managing Member_

Witnesses as to Tenant:

**TENANT:    PNS STORES, INC., a California corporation**

By: _____

Title:    Timothy A. Johnson
Executive Vice President,
Chief Administrative Officer,
Chief Financial Officer

**STATE OF** NEW YORK

**COUNTY OF** KINGS

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Edgewater Park Urban Renewal LLC by, LEAH WALDMAN its Managing Member who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at BROOKLYN N.Y this 1st day of March, 2018.9

Notary Public

SHIA KOHN
NOTARY PUBLIC STATE OF NEW YOR
NO. 01K06170293
QUALIFIED IN KINGS COUNTY
COMMISION EXPIERS JULY 7 2019

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, PNS Stores, Inc., by Timothy A. Johnson, its Executive Vice President, Chief Administrative Officer, Chief Financial Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _____ day of _____, 2018.

_____
Notary Public

31

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**

**URBAN EDGEWATER RENEWAL, LLC**

_____

By: _____

_____

Title: _____

Witnesses as to Tenant:

**TENANT:**     **PNS STORES, INC., a California corporation**

By: _____
Timothy A. Johnson
Title:    Executive Vice President,
Chief Administrative Officer,
Chief Financial Officer

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _____ by, _____ its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this _____ day of _____, 2018.

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc.**, by Timothy A. Johnson, its Executive Vice President, Chief Administrative Officer, Chief Financial Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _28th_ day of _February_, 2018.

Andrea L. Muhammad
Notary Public
In and For the State of Ohio
My Commission Expires
10 June 2020

_____
Notary Public

30

**Exhibit A-1**
**Existing Premises and Expansion Premises**



Beverly, NJ — Plan

Legend:
- Expansion Space
- Potential Sales Area
- Pot. Additional Stock

Dimensions shown: 45', 206', 86', 110'

BIGLOTS!    9/19/2018    5

**EXHIBIT B**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

# EXHIBIT C

## LANDLORD'S WORK

**The following work is to be completed per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or designated Representative.**

| | |
|---|---|
| **DOORS**<br>**(Expansion Area):** | All doors and door systems (exterior and overhead included) to be sound and secure. |
| **UTILITIES**<br>**(Expansion Area):** | Landlord shall provide Tenant with assurance that utilities are available and include legal access across other properties if necessary to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. All existing sanitary lines to be video scoped to ensure they not obstructed or damaged, video to be provided to Tenant. |
| **HVAC**<br>**EQUIPMENT**<br>**& MECHANICALS:**<br>**(Expansion Area)** | Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant; and patch the roof as necessary. Any existing warranties for existing units shall be passed on to Tenant. |
| **PLUMBING,**<br>**ELECTRICAL,**<br>**SPRINKLER**<br>**& FIRE SYSTEMS**<br>**(Existing Premises and**<br>**Expansion Area):** | All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system is code compliant for general retail use. Notwithstanding the foregoing, Landlord shall be responsible for the repair and/or replacement of the sewer system/piping from Tenant's restrooms, the scope of which shall be approved by Tenant. |
| **ROOF:**<br>**(Existing Premises &**<br>**Expansion Area):** | Landlord shall replace the roof with a new roof, secure a warranty for at least the length of the initial term, and ensure that such is in watertight condition. Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition. |
| **STRUCTURE &**<br>**BUILDING:**<br>**Existing Premises &**<br>**Expansion Area):** | Landlord shall make any and all repairs/replacement to the building structure as necessary. This shall include all existing brick/masonry block and mortar. The exterior walls shall also be treated as necessary to ensure the Demised Premises is free of leaks. Landlord shall also install new gutters and downspouts on the building as necessary All conditions and materials must meet or exceed all applicable codes and requirements for the jurisdiction in which the property is located. By way of clarification, Landlord will not have any responsibility for making alterations to the Restroom finishes, which will remain as-is, however, any structural alterations which may require accessing plumbing in the floor slab, will be Landlord's responsibility. |
| **REMOVAL OF**<br>**FIXTURES &**<br>**EQUIPMENT**<br>**(Expansion Area):** | Landlord to remove all fixtures, equipment, debris and block any openings in exterior walls with matching material. |
| **PARKING**<br>**LOT**<br>**(Existing Premises &**<br>**Expansion Area):** | Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises shall be re-sealed and re-striped prior to delivery of Demised Premises to Tenant. Fire lanes, curbs and pole bases shall be freshly painted as well. The number of parking spaces provided for the demised premises must meet the |

34

requirements of the AHJ and ADA. A minimum of four, van accessible, handicap parking spaces and related signage required by Tenant.

**SIGNAGE:**
Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord to ensure that the existing pylon(s) is properly wired, maintained, constructed and deliver fully operational. Tenant shall be permitted use of the entire top panel as shown on Exhibit D-1. Any Pylon remodels or newly constructed signs, shall reflect Tenant in a substantially similar position & size.

**PESTS (Expansion Area):**
To be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**HAZARDOUS MATERIALS (Existing Premises & Expansion Area):**
Landlord is responsible for remediation of any and all hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises prior to lease execution. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification. If hazardous material is found to be present in the Existing Premises and it is determined to have been pre-existing, Tenant shall complete any remediation and bill back the Landlord the associated cost. The cost of remediation in the Existing Premises shall be Capped at $2.25 PSF cost.

**GENERAL CONDITIONS (Existing Premises & Expansion Area):**
Landlord agrees the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable), subject to any work being performed by Tenant as part of Tenant's Work. If the Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; and pest inspection report, prior to Tenant's possession.

35

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**





## HORIZONTAL LOGO
### INDIVIDUAL LED ILLUMINATED CHANNEL LETTER SET

| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

37



## STACKED LOGO
### INDIVIDUAL LED ILLUMINATED CHANNEL LETTER SET

| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-1 1½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

38

# SECTION DETAILS





**1-1** LETTER SECTION DETAIL
SCALE:  3/4" = 1'

**2-2** EXCLAMATION POINT SECTION DETAIL
SCALE:  3/4" = 1'

## PYLON PANELS

### RECTANGULAR PANELS

**PREFERRED:**



**2ND OPTION:**



### SQUARE PANELS

**PREFERRED:**                    **2ND OPTION:**

    

### COLORS:

BACKGROUND OR LETTERS (DEPENDING ON OPTION)
100% BLACK

EXCLAMATION POINT
MATCH PMS 021c ORANGE (3M COLOR 44)



40

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



→ New Panel

→ Old Panel

**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date:** _____

**To:** _____ (insert Tenant)
   via facsimile: (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

_____ Utility Information: Meter numbers for electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You.

**LANDLORD:**

_____
a _____


By: _____
Title: _____


**TENANT:**

**PNS STORES, INC., a California corporation**


By: _____
Title: _____

42

**EXHIBIT F**

**EXCLUSIVE USE PROVISIONS**

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.**

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and PNS STORES, INC., a California corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1.D.) = _____.

2.    A.    Fixed Minimum Rent – Original Term (Section 5.A.):
      _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent – First Option (Section 5.A.):
      _____ annually; _____ per month.

4.    A.    Fixed Minimum Rent – Second Option (Section 5.A.):
      _____ annually; _____ per month.

44