# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
|  | **<u>Hearing Date</u>: December 30, 2024 at 11:00 a.m. (ET) (proposed)** |
|  | **<u>Objection Deadline</u>: Subject to Motion to Shorten[2]** |

### MOTION OF DEBTORS FOR ENTRY OF AN ORDER
### (I) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE GBRP APA, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each

of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the

"**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of an Order (I) Approving Sale*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Contemporaneously herewith, the Debtors filed the *Motion to Shorten Notice of Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "**Motion to Shorten**"), which requests a Sale Hearing date of December 30, 2024, at 11:00 a.m. (prevailing Eastern Time), and an objection deadline of December 30, 2024, at 9:00 a.m. (prevailing Eastern Time). Additionally, and contemporaneously herewith, the Debtors intend to file a Notice of Sale Hearing setting forth the Sale Hearing information as well the proposed objection deadline.

*of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (this "**Motion**").  This Motion is supported by the *Declaration of Kent Percy in Support of Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "**Percy Declaration**"), which is attached hereto as **Exhibit A** and incorporated by reference herein.[3]  In further support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1.      In the days following last Thursday's announcement that the Debtors' long-planned, Court-approved going-concern sale to an affiliate of Nexus Capital Management, LP ("**Nexus**") was not going to close and that the Debtors were immediately commencing Store Closing Sales (as defined below) at each of their Stores, the Debtors worked around the clock to pursue a potential alternative transaction.  The Debtors' advisors and management team exhausted all conceivable options and engaged in multiple conversations with potential financing parties, strategic bidders, operators, key vendors, and business partners in an attempt to attract a full or partial going-concern bid.  Gordon Brothers Retail Partners, LLC ("**GBRP**"), who was the only

---

[3] Certain factual background about the Debtors' sale process can be found in the *Declaration of Adam Rifkin in Support of Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. 197] (the "**Rifkin Declaration**"), which was previously submitted by the Debtors in support of the Nexus Sale (as defined below).

party other than Nexus to have submitted an actionable bid to the Debtors prior to the Auction, stood out as the most promising candidate to support a sale and had expressed interest in executing a transaction with the Debtors.  When it became clear that GBRP was perhaps the only party that had the financial wherewithal and desire to get to the finish line and execute a transaction within the very limited time available to the Debtors, and had not only the support of the DIP Lenders but also the Committee's encouragement, the Debtors' pursued a pathway forward with GBRP assiduously.

2.    Following days of intense, arms'-length negotiation, the Debtors have now, in record time, reached an agreed-upon asset purchase agreement (the "**GBRP APA**") with GBRP. The GBRP APA, among other things, contemplates, in exchange for purchasing substantially all of the Debtors' remaining assets:

- Upfront payment in full in cash of all outstanding loans under DIP ABL Facility and DIP Term Facility;

- GBRP coordinating with an operational counterparty—Variety Wholesalers ("**Variety**")—to preserve at least 200 Stores, with the option to expand that number to approximately 400 Stores;

- Variety providing potential continued employment opportunities to the thousands of employees employed at the Stores it would assume, including store-level personnel, regional management personnel and select corporate-level employees;

- Realization of several pools of value to directly compensate pre-closing Accrued Administrative Expenses (as defined in the GBRP APA), including certain proceeds from the sale of the Debtors' corporate headquarters, 60% of proceeds which arise from certain retained litigation actions, state tax refunds, and certain other assets;

- Payment of all anticipated go-forward administrative expenses through the week-ending March 3, 2025; and

- Payment of "stub rent" and the provision of available funds to provide recoveries to other accrued administrative expenses.

3. Importantly, the Debtors believe that the value conferred upon their estates by the sale to GBRP (the "**Sale**") contemplated by the GBRP APA exceeds the likely value recoverable in a liquidation, and the Sale is supported by the DIP Lenders. The Committee is currently evaluating the Sale, and the Debtors hope to have their support as well in advance of the Sale Hearing. What's more, the Sale preserves a significant portion of the Debtors' Stores (at least 200 locations across the country), and with it provides the potential for continued employment of thousands of the Debtors' dedicated employees. The Sale also provides the Debtors will sufficient time (nine weeks) to confer with all relevant case parties to determine the best path forward to resolve these cases – whether through a chapter 11 plan, conversion, or dismissal. There is no alternative to the Sale other than a liquidation, and the Debtors' estates and their creditors are better off if the Sale were to close.

4. Time is of the essence, and the GBRP Bid is predicated on the Sale closing next week. Concurrent with the filing of this Motion, the Debtors are filing a motion that requests to have this Motion heard on December 30, 2024, which is when the Court had scheduled a case status conference. As this Court rightly observed last week, the Debtors can now be fairly "categoriz[ed] as a melting ice cube." *See* Dec. 19 Hr'g Tr. 44:5–6. The Debtors have ceased all go-forward purchase orders thereby cutting off all future inventory for their stores, and with each passing day the value of these estates decreases, to the detriment of creditors. *Id.* at 47:25–48:2. The Debtors have heeded this Court's own words that "we need to move expeditiously." *Id.* at 44:9–11. Indeed, there is no reason for delay, and it is in these estates' best interest for the Sale to be approved forthwith.

## **Relief Requested**

5. By this Motion, and pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, 9007, and 9008 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1, 6004-1, and 9006-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Proposed Sale Order**")[4] (a) authorizing and approving the Sale of the Assets (as defined below) free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as set forth and pursuant to the Asset Purchase Agreement, dated December 27, 2024 (the "**Effective Date**"), by and among Big Lots, Inc. (the "**Seller**"), each of the subsidiaries of the Seller listed on the signature pages of the GBRP APA (together with the Seller, the "**Selling Entities**"), and GBRP (the "**Buyer**"), a copy of which is attached to the Proposed Sale Order as Exhibit 1 thereto, (b) authorizing the Debtors to enter into and perform under the GBRP APA, (c) subject to the Designation Rights (as set forth in the GBRP APA), authorizing the assumption and assignment of the proposed Assumed Contracts and Assumed Leases (each as defined below and collectively, the "**Proposed Assumed Contracts**") in connection with the proposed Sale; and (d) granting related relief.

### Jurisdiction, Venue, and Authority

6.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

7.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a

---

[4] For illustrative purposes, the Debtors have attached hereto as **Exhibit C** a redline of the Proposed Sale Order marked against the Nexus Sale Order (as defined below).

final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

8.    Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.    General Background

9.    On September 9, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.  Additional information about the Debtors' business and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the *Declaration of Jonathan Ramsden as Chief Financial and Administrative Officer of the Debtors in Support of the Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 77] (the "**First Day Declaration**").

10.    The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 95] entered by the Court on September 10, 2024, in each of the Chapter 11 Cases.[5]

---

[5]  *See In re Great Basin, LLC*, No. 24-11966 (JKS); *In re Big Lots, Inc.*, No. 24-11967 (JKS); *In re Big Lots Management, LLC*, No. 24-11969 (JKS); *In re Consolidated Property Holdings, LLC.*, No. 24-11968 (JKS); *In re Broyhill LLC*, No. 24-11971 (JKS); *In re Big Lots Stores – PNS, LLC*, No. 24-11970 (JKS); *In re Big Lots Stores, LLC*, No. 24-11973 (JKS); *In re BLBO Tenant, LLC*, No. 24-11972 (JKS); *In re Big Lots Stores – CSR, LLC*, No. 24-11976 (JKS) *In re CSC Distribution LLC*, No. 24-11974 (JKS); *In re Closeout Distribution, LLC*, No. 24-11978 (JKS); *In re Durant DC, LLC*, No. 24-11975 (JKS); *In re AVDC, LLC*, No. 24-11981 (JKS); *In re GAFDC LLC*, No. 24-11977 (JKS); *In re PAFDC LLC*, No. 24-11982 (JKS); *In re WAFDC, LLC*, No. 24-11979 (JKS); *In re INFDC, LLC*,

11. On September 23, 2024, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code. *See Not. of Appointment of Comm. of Unsecured Creditors* [D.I. 248].

12. On October 21, 2024, the Court entered the *Final Order (I) Authorizing Debtors to Assume the Consulting Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 576] (the "**Store Closing Order**").

13. On October 25, 2024, the Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [D.I. 612] (the "**Bidding Procedures Order**").

**B.    The Sale Process**

14. Since the outset of these Chapter 11 Cases, the Debtors and their advisors have worked tirelessly to identify, negotiate and consummate a going-concern sale for substantially all of the Debtors' assets. *See* First Day Decl. ¶¶ 48–51. The Debtors commenced these Chapter 11 Cases after having executed a stalking horse asset purchase agreement, dated as of September 8, 2024 (as amended or supplemented, and including all exhibits, schedules, and annexes attached thereto, the "**Nexus APA**"), by and among the Seller, the Selling Entities, and Gateway BL

---

No. 24-11983 (JKS); *In re Big Lots Ecommerce LLC*, No. 24-11980 (JKS); *In re Big Lots F&S, LLC*, No. 24-11984 (JKS).

Acquisition, LLC, a Delaware limited liability company (together with its affiliates, including

Nexus Capital Management LP, "**Nexus**") (the "**Nexus Bid**").[6]

15.     Consistent with the Bidding Procedures, the Debtors and their advisors continued

to solicit and negotiate competing bids during the post-petition period.  On October 30, 2024, the

Debtors conducted the Auction pursuant to the Bidding Procedures Order.  Prior to the Auction,

the Debtors received an additional bid from GBRP, but determined, in consultation with the

Consultation Parties, that such bid was not a Qualified Bid (each as defined in the Bidding

Procedures Order).  Accordingly, the transaction described on the record at the Auction (the

"**Nexus Sale**") was identified as the Successful Bid in the *Notice of Successful Bidder for the Sale*

*of the Debtors' Assets* filed and served on October 30, 2024 [D.I. 661] pursuant to the Bidding

Procedures Order.

16.     At the hearings on November 21 and 22, 2024 (collectively the "**Nexus Sale**

**Hearing**"),[7] the Debtors sought and received Court approval to consummate the Nexus Sale.  *See*

*Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of*

---

[6] *See Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II) (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. 18] (the "**Bidding Procedures Motion**") (describing the Nexus APA and the Debtors' pre-petition marketing efforts).

[7] The Nexus Sale Hearing was adjourned multiple times based on requested extensions of the Challenge Deadline (as defined in the Final DIP Order) by various case parties.  Specifically, on November 6, 2024, the Debtors agreed, at the request of the Committee, to adjourn the Nexus Sale Hearing (as defined below) from November 12, 2024 to November 21, 2024.  The purpose of those extensions was to give the Committee additional time to conduct discovery regarding potential claims.  As set forth on the record at the November 5, 2024 hearing, the Court also granted an extension of the Challenge Deadline "for cause" from November 11, 2024 to November 15, 2024.  Finally, as set forth on the record at the Nexus Sale Hearing, the Committee and one of its members (Blue Owl Real Estate Capital, LLC) filed additional emergency requests to extend the Challenge Deadline, which the Court denied.  *See Order Denying (I) Emergency Motion of the Official Committee of Unsecured Creditors for an Order Further Extending the Challenge Deadline and (II) Blue Owl Capital LLC's Second Motion to Extend Challenge Period* [D.I. 1243]; Nov. 22 Hr'g Tr. 79:13–80:11.  A timely challenge was never filed by any party.

*Certain of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1232] (the "**Nexus Sale Order**").

17.    As the Debtors' counsel stated repeatedly on the record at Nexus Sale Hearing, it was imperative to swiftly close the Nexus Sale to avoid business deterioration resulting from a prolonged stay in bankruptcy and weakening confidence from the Debtors' commercial counterparties regarding the Debtors' financial capacity to continue operating as a going-concern. *See* Nov. 21 Hr'g Tr. 18:3–7; Nov. 22 Hr'g Tr. 38:11–21. The Debtors and their advisors worked around the clock to ensure that the Debtors would be positioned to close the Nexus Sale on or around December 2, 2024. *See* Dec. 19 Hr'g Tr. 8:4–9:16.

18.    Despite the Herculean efforts to prepare the estates for the sale transaction, on December 1, 2024, Nexus informed the Debtors that it would need more time to close and identified a new target closing of December 10 or 11, 2024—which dates would still permit the Debtors to satisfy the sale closing milestone of December 13, 2024 contemplated by the Debtors' DIP Facilities[8] (the "**Sale Closing Milestone**"). *See* Dec. 19 Hr'g Tr. 8:7–12. However, on December 5, 2024, the Debtors received a letter from Nexus (the "**December 5 Letter**") notifying the Debtors that the minimum asset value closing condition set forth in Section 9.06 of the Nexus APA would not be satisfied. *See* Dec. 19 Hr'g Tr. 8:13–17. While the December 5 Letter informed the Debtors that Nexus was still "exploring whether there is a path to close," it cautioned that

---

[8] As defined in the *Final Order Under Bankruptcy Code Sections 105, 105, 361, 362, 363, 364, 503, 506, 507, and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [D.I. 584] (the "**Final DIP Order**").

"there [was] a significant capital need" in order to close the Nexus Sale and that Nexus sought

"additional sources of equity financing" and required "$20 million in additional savings" from the

Debtors.  *See* Percy Decl. ¶ 10.  The Debtors' advisors were subsequently informed by Nexus's

advisors that this "significant capital need" was approximately $75 million.  *See id.*

19.     After receiving the December 5 Letter, the Debtors' management team and advisors

immediately committed their full efforts to assist Nexus in identifying and engaging with potential

additional sources of financing, as the Debtors believed that there was interest from third parties

in jointly investing capital with Nexus to preserve the go-forward Big Lots business.  *See id.* ¶ 11.

The Debtors, in their business judgment and with repeated assurances from Nexus that it was

working to close the Nexus Sale, continued to pursue consummation of the Nexus Sale.  At the

same time, however, the DIP Lenders and their advisors were advising that the Debtors should

seriously consider the parallel alternative path of commencing Store Closing Sales[9] at all of the

Debtors' stores.  *See id.*

20.     Under both DIP Credit Agreements (each as defined in the Final DIP Order), the

Debtors had agreed to an accelerated Sale Closing Milestone, even though the Nexus APA

provided for a December 31, 2024 outside date to close (the "**Nexus APA Outside Date**").  The

Debtors were unable to satisfy the Sale Closing Milestone and, on December 14, 2024, received

notices of default and reservations of rights from the DIP Lenders.  The DIP Lenders did not,

however, deliver a DIP Termination Declaration (as defined in the Final DIP Order), and the

Debtors continued to have access to and use of cash collateral.

---

[9] As defined in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors To Assume the Services Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, and (III) Granting Related Relief* [D.I. 16] (the "**Store Closing Motion**").

21.     The Debtors remained steadfast in their belief that, if there were a viable pathway to close the Nexus Sale prior to the Outside Date, the Debtors' estates would be better off pursuing such a pathway.  *See* Percy Decl. ¶ 14.  However, on the evening of December 14, 2024, counsel to Nexus informed counsel to the Debtors that closing the Nexus Sale prior to the Nexus APA Outside Date was very unlikely and that Nexus did not see a realistic path to doing so.   On December 21, 2024, the Debtors received a formal Termination Notice from Nexus pursuant to Section 13.02 of the Nexus APA.  *See id.*

22.     Following the Debtors' conversation with Nexus's advisors on December 14, 2024 (in which the Debtors learned that Nexus no longer believed it was possible to close the Nexus Sale), and after conferring amongst the Debtors' management team and advisors as well as the DIP Lenders and the Committee, and with the support of the Debtors' board of directors, the Debtors determined that, because Nexus had stated that it was highly unlikely to close the Sale before the Nexus APA Outside Date, the most value-maximizing path forward for the Debtors' estates was to commence Store Closing Sales at all of the Debtors' stores while, on a parallel track, continuing to pursue alternative going-concern transactions and/or other asset sales in an effort to preserve the Debtors' businesses.  *See id.* ¶ 15.

**C.     The GBRP Bid and Store Closing Process**

23.     On December 15, 2024, the Debtors received a letter from GBRP (the "**GBRP Bid Letter**") setting forth GBRP's bid (the "**GBRP Bid**") for a transaction for certain of the Debtors' assets (as further detailed below).  Percy Decl. ¶ 16.  The GBRP Bid Letter attached a draft APA and set forth the consideration that GBRP, along with Variety (together with GBRP, the "**Purchasers**"), were willing to offer in exchange for the Debtors' assets that remained following the Debtors' Store Closing Sales.  *Id.*

24.     Given that the Nexus Sale was no longer actionable, the GBRP Bid Letter came as welcome news to the Debtors and their advisors because it would (a) provide greater certainty with respect to the Debtors' ability to satisfy administrative and other go-forward "freight" expenses in the Chapter 11 Cases, (b) preserve at least some of the Debtors' stores and provide employment opportunities to certain employees, and (c)  maximize the remaining value of the Debtors' estates in conjunction with the Store Closing Sales.  *Id.*  Put simply, the Sale represents the best alternative to a complete chain-wide liquidation.   *Id.*   Moreover, and importantly, the GBRP Bid Letter represented that the Sale could be consummated quickly.

25.     The structure of the GBRP APA generally tracks to the Nexus APA and contemplates the purchase of substantially all of the Debtors' Assets:[10]

- *First*, the GBRP APA contains four primary categories of going-concern Assets to be transferred to the Purchasers upon closing: (1) not fewer than 200 retail store locations to be operated as a going concern, with the option to expand that number to approximately 400 locations (subject to the completion of due diligence); (2) certain intellectual property, including the Big Lots trademark, copyrights, and other proprietary rights critical to brand operations and recognition; (3) with the option to take one (and perhaps a second) distribution facility, subject to further diligence; and (4) the continued employment of (a) certain store-level personnel employed in the go-forward locations, (b) regional management personnel integral to market-level oversight, and (c) select corporate-level employees critical to ensuring continuity and support functions.  *See* Percy Decl. ¶ 19.

- *Second*, as set forth in greater detail below, if consummated, the Sale would provide weekly payments to the estates in accordance with two budgets through the week ending March 3, 2025 that provide payment for (1) all estimated go-forward administrative expenses necessary for the Debtors to conduct the Store Closing Sales process (the "**APA Administration Budget**" (a copy of which is attached to the GBRP APA as Exhibit F)), (2)  all outstanding "Stub Rent," and (3) a "Wind-Down Budget" consisting of, among other things, (a) severance for Store and corporate employees, (b) certain tax liabilities, (c) workers' compensation liabilities, and (d) certain professional and U.S. Trustee fees (the "**Wind-Down Budget**" (a copy of which is attached to the GBRP APA as Exhibit G), and, together with the APA Administration Budget, the "**Budgets**").  *See id.* ¶ 18.

---

[10] The assets and operations described in this section are referred to herein, collectively, as the "**Assets**."

- *Third*, unlike the Nexus APA, where the entirety of the purchase price would be transferred to the Debtors and the DIP Lenders on the closing date, the GBRP APA provides for an initial payment on the "Initial Closing Date" consisting of (a) the Debt Payoff Amount (i.e., payment in full of the DIP Facilities) and (b) payment to satisfy a portion of the Professional Fee Escrow Amount.  Following the Initial Closing Date, the GBRP APA contemplates weekly payments each Friday to satisfy accrued administrative expenses in accordance with the Budgets.  *See id.*

- *Fourth*, and finally, the GBRP APA would provide for a designation rights period, similar to that set forth in the Nexus APA, wherein GBRP would have the right to designate certain of the Debtors' leases for assumption and assignment on a go-forward basis.  *See id.* ¶ 20.

26.     As further detailed in the Percy Declaration, the APA Administration Budget in particular was a critical piece of why the Debtors determined that entering into the GBRP APA was in the best interests of all stakeholders in these Chapter 11 Cases.  *See id.* ¶ 21. Indeed, both the Court and other parties in interests expressed concerns about the growing administrative claims pool at the December 19 Status Conference.  *See, e.g.*, Dec. 19 Hr'g Tr. 20:4–6 ("[MR. GOLD] So the stub rent number -- and that's separate and apart from other admins, that's separate and apart from 503(b)(9) -- that number is going to grow."); 42:12–16 ("[THE COURT] So, while it's good to talk about this, and I don't disagree that, generally, maximizing value is where we want to be, but at the same time, I can't hold the door open for three weeks and let money go out of this estate and run an administratively insolvent estate.").

27.     In response to such concerns, the APA Administration Budget is structured such that it ensures that all anticipated administrative expenses incurred during the operation and wind-down of the Debtors' Stores will be covered by GBRP.  Under the transaction contemplated by the GBRP APA, there are several pools of presently unrealized value which are scheduled to directly compensate Accrued Administrative Expenses (as defined in the GBRP APA), including certain proceeds from the sale of the Debtors' corporate headquarters, 60% of proceeds which arise from certain litigation actions, state tax refunds, and certain other assets.  The Debtors thus

maintain that, given (a) the substantial consideration to be paid to the Debtors' estates via the APA Administration Budget and other components of the purchase price and (b) the fact that at least 200 of the Debtors' Stores are contemplated to continue (thereby preserving jobs), entry into the GBRP APA is in the best interests of the Debtors' estates.  Additionally, as set forth herein and in the Percy Declaration, the Debtors submit that entry into the GBRP APA is a superior outcome to a chain-wide liquidation, which would almost certain be the alternative absent the Sale.  Percy Decl. ¶¶ 21, 25.

28.     Finally, in conjunction with the GBRP APA, the Debtors also seek authorization to enter into that certain Agency Agreement (the "**Agency Agreement**"), dated as of December 27, 2024, by and between Big Lots Stores, LLC and GBRP, a copy of which is attached to the GBRP APA as Exhibit H.  Under the Agency Agreement, the Debtors propose to grant GBRP, as Agent, exclusive authority to (a) sell all Inventory (as defined therein) from the Debtors' Stores and certain Inventory located at the Debtors' distribution centers, and (b) dispose of Owned FF&E (as defined therein) in the Debtors' Stores as well as the Debtors' corporate headquarters.  The Debtors submit that entry into the Agency Agreement is a critical part of the overall transaction contemplated by the GBRP APA.  Indeed, under Sections 5.02 and 9.01 of the GBRP APA, execution of the Agency Agreement is a condition precedent to closing of the Sale.  See GBRP APA §§ 5.02, 9.01.  The Agency Agreement, once approved, will permit GBRP to continue the Store Closing Sales and maximize the value of the goods held in the Debtors' Stores and thus, the Debtors view the Agency Agreement as a natural extension of relief the Court has permitted through assumption of the MSA (as defined in the Store Closing Order).  Entry into the Agency Agreement was also necessary to induce GBRP to enter into the GBRP APA, and thus, like the Debtors maintain that its execution was a sound exercise of the Debtors' business judgment.

**D.      The GBRP APA**

29.      The GBRP APA includes various customary representations, warranties and covenants by and from the parties thereto.  In addition, the GBRP APA includes certain conditions to closing the contemplated Sale and rights of termination related to the Chapter 11 Cases.

30.      As the GBRP APA is attached to this Motion, it is not restated herein in its entirety. In accordance with Local Rule 6004-1, certain of the key terms of the GBRP APA are highlighted in the chart below.

| MATERIAL TERMS OF THE GBRP APA[11] | |
|---|---|
| **Purchase Price** | The Purchase Price consists of:<br><br>i.  the Debt Payoff Amount; provided, that in the event the Debt Payoff Amount is less than $304,000,000, the Purchase Price shall be reduced on a dollar for dollar basis by the amount by which the Debt Payoff Amount is less than $304,000,000; *plus*<br>ii.  an amount in cash to satisfy the Selling Entities' obligations in respect of unpaid "stub" rent, not to exceed $17,000,000 in the aggregate; *plus*<br>iii.  an amount not to exceed $42,391,000 in the aggregate as set forth in, and limited to (determined on both a line-item and aggregate basis), the amounts set forth in the APA Administration Budget (including any such Seller obligations arising under the Agency Agreement); *plus*<br>iv.  an amount not to exceed $125,000,000 in the aggregate as set forth in, and limited to (determined on both a line-item and aggregate basis), the amounts set forth in the Winddown Budget; *plus*<br>v.  $7,500,000 to fund the Professional Fee Escrow Amount.<br><br>*See* GBRP APA § 3.01. |
| **Transferred Assets** | The Assets to be transferred include all right, title, and interest of the Selling Entities in, to, or under all of their respective assets, rights, and properties, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of the Selling Entities, in each case, as of the Closing, including in, to, or under the following (and excluding the Excluded Assets) (i) all offices and other facilities (ii) all tangible personal property and intangible property of the Selling Entities wherever located, including all such property in transit or in the possession of any Person, including all equipment, machinery, vehicles, fixtures, supplies, furniture, furnishings, leasehold improvements, signage, industry memorabilia, tools, vehicles, hardware, peripherals, Systems, telephone systems, and other personal, movable and fixed property, (iii) all inventory, (iv) subject to Section 5.13 of the GBRP APA, all owned and leased real property, (v) all 365 contracts as of the applicable Closing (to the |

---

[11] The summary set forth herein is qualified in its entirety by the express terms and conditions of the GBRP APA.  In the event of any conflict between the below summary and the GBRP APA, the GBRP APA governs.

| **MATERIAL TERMS OF THE GBRP APA[11]** | |
|---|---|
| | extent such contracts are designated for purchase under the GBRP APA), (vi) all transferable and assignable permits and orders (except those that would impose a liability after Closing), (vii) all books, databases, files, documents, instruments and other similar items, including telephone numbers, email addresses and accounts, customer and supplier lists and contact information, mailing lists, sales and promotional literature and other sales related materials and records, (viii) all rights, claims, accounts, and causes of action and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, (ix) all rights to any proceeds with respect to (A) any loss, destruction or condemnation of any Asset or (B) any Assumed Liabilities (other than with respect to Taxes) or the operation of such Assets, (x) all warranty, indemnity, or other claims made under any assign contract, (xi) all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, all rights to any Tax Refunds of any of the Seller Entities, prepaid Property Taxes, and, in each case to the extent relating to Taxes that are Assumed Liabilities, other Tax assets, security and other deposits or the like, (xii) all owned intellectual property, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to assert, defend, sue, and recover damages for any infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in such intellectual property and any and all corresponding rights secured with respect to any owned intellectual property, (xiii) all goodwill, (xiv) any rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements, (xv) other than with respect to taxes, all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, or rights of recoupment, recovery or set off, (xvi) all rights, claims, or causes of action relating to or arising against suppliers, vendors, merchants, manufacturers, license counterparties, license counterparties and any other counterparty to any assigned contract or real property interest, (xvii) all rights and benefits with respect to insurance policies (to the extent transferable), insurance recoveries under any insurance policies that relate to the assets or assumed liabilities, (xviii) all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state applicable law, and all other claims, causes of action, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or applicable laws, (xix) all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding, for the avoidance of doubt, any items related to income Taxes); (excluding any items related to income taxes), (xx) all Tax Returns that relate to the assets; provided that, the Debtors may retain copies of such Tax Returns, (xxi) all acquired proceedings, (xxii) all cash and cash equivalents (other than any cash and cash equivalents held in the Professional Fee Escrow Account in respect of the HQ Sale Deductions or paid to Seller pursuant to the GBRP APA), (xxiii) all accounts receivable (and proceeds therefrom), (xxiv) all of the Selling Entities to receive (a) any refund or return of any cash collateral or other monies deposited with any issuer of any letter of credit upon the expiration and/or return of such letter(s) of credit undrawn, and (b) following any draw under a letter(s) of credit, any refund or return by the beneficiary thereof or any exceeds proceeds of such letter(s) of credit, and (xxv) all outside of the ordinary course of business deposits to the extent made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Chapter 11 Cases. <br><br> *See* GBRP APA § 2.01(a). |
| **Designated Assets** | Upon the terms and subject to the conditions of the GBRP APA and the Sale Order, at and as of the Effective Time, the Buyer and the Selling Entities hereby designate GBRP (as Agent under the Agency Agreement) to serve as their exclusive Agent for purposes of conducting the Store Closing Sale and selling, transferring, pursuing or otherwise disposing of certain of the Assets, free and clear of all Encumbrances (other |

| MATERIAL TERMS OF THE GBRP APA[11] | |
|---|---|
| | than Permitted Encumbrances), subject to and in accordance with the terms and conditions of the GBRP APA and the Agency Agreement.<br><br>*See* GBRP APA § 2.01(b). |
| **Assumed Liabilities** | The Assumed Liabilities include (a) all Liabilities solely to the extent arising from the ownership, operation, or right to dispose of the Business or Assets by the Buyer or such Designated Buyer after the Effective Time, (b) all of the Selling Entities' obligations to perform under the Assigned Contracts in accordance with their terms, solely to the extent such performance is required after the Effective Time (and not arising from any pre-Effective Time breach or other failure to perform or satisfy such obligations prior to the Effective Time by the Selling Entities), (c) all of Sellers' and its Subsidiaries' Liabilities under the Real Property Interests, to the extent arising or attributable to any period after the Closing, (d)(i) all Taxes solely to the extent resulting from the use or operation of the Assets and the Business attributable to the Post-Closing Tax Period, (ii) Taxes of Seller or a Selling Entity for a Pre-Closing Tax Period that would not have been incurred but for an election by Buyer on the Closing Date that is retroactive to the Pre-Closing Tax Period and not expressly contemplated by the GBRP APA or otherwise agreed upon by Seller and (iii) and all Transfer Taxes; provided, that in no case will Assumed Liabilities include Taxes or other Liabilities with respect to the Assets or the Business with respect to which "responsible person" or similar claims may be made against any Selling Entity's or any Affiliate of a Selling Entity's employees, managers, officers, directors or similar persons with respect to any action or refusal to take action of such Selling Entity or Affiliate of Selling Entity, including pursuant to any wage payment statute, (e) all Liabilities that are the responsibility of Buyer or any Designated Buyer(s) pursuant to Section 8.04(e) of the GBRP APA, (f) all Cure Costs and (g) All Liabilities giving rise to the Professional Fees Amount; provided that such amount shall be capped at the amounts Buyer is required to pay into the Professional Fee Escrow Account (as defined in the Sale Order) pursuant to the Sale Order.<br><br>*See* GBRP APA § 2.03. |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | GBRP is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code, of any of the Debtors. |
| **Agreements with Management or Key Employees**<br>Local Rule 6004-1(b)(iv)(B) | Prior to the Initial Closing, the Selling Entities shall reasonably cooperate with Buyer and any Designated Buyer(s), (i) to discuss the functions of the Company Employees, and (ii) the post-Closing needs of the Business.  For a period of twelve (12) months following the Closing Date (or until the date of termination of employment of the relevant Transferred Employee, if sooner), Buyer or any Designated Buyer, where applicable, shall provide, or shall cause its applicable Subsidiary to provide, each Transferred Employee with compensation and other employee and fringe benefits (excluding any deferred compensation, severance, retention, change in control, transaction, defined benefit pension, stock purchase plans or post-employment welfare benefits) that are no less favorable in the aggregate than the compensation and other employee and fringe benefits (subject to the same exclusions) provided to such Transferred Employee immediately prior to the Closing.<br><br>*See* GBRP APA § 8.04(a)-(b). |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | As of Closing, each of the Selling Entities and Buyer (each a "Releasing Party"), mutually releases and discharges each other Releasing Party, and each other Releasing Parties' affiliated parties, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities of every kind, nature and description, except for any rights or obligations under the GBRP APA, the other Transaction Documents and the Confidentiality Agreement. |

| MATERIAL TERMS OF THE GBRP APA[11] | |
|---|---|
| | *See* GBRP APA § 13.12(b). |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | For the reasons discussed herein, the Debtors have not conducted (and do not intend to conduct) a supplemental auction for the Assets, as the Debtors have already conducted a substantial pre- and post-petition marketing process and held an auction in connection with the Bidding Procedures and the Nexus Sale. |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The (a) initial consummation of the Transaction (the "Initial Closing") shall take place on the date that is two Business Days after the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 (or the waiver thereof by each Party entitled to waive that condition) (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Initial Closing), and (b) each subsequent consummation of the Transaction (each, together with the Initial Closing, a "Closing") with respect to one or more Assets shall take place on a date to be agreed in writing by Seller and Buyer pursuant to an assignment agreement in form and substance reasonably acceptable to Seller and Buyer (each such date of a Closing, together with the Initial Closing Date, a "Closing Date"). Each Closing will take place remotely via the exchange of electronic documents and signatures by electronic mail at the on the dates set forth in the foregoing sentence, unless another place, date, or time is agreed to in writing by Seller and Buyer.  The date on which the Initial Closing actually occurs is referred to as the "Initial Closing Date" and the date of any such Closing is referred to as a "Closing Date."  For purposes of the GBRP APA, the Initial Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Initial Closing Date (the "Effective Time"). Each subsequent Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the applicable Closing Date. In connection with each subsequent Closing, the Selling Entities, Buyer, Agent and each Designated Buyer shall deliver the appropriate and customary assignment documents in form and substance reasonably acceptable to Seller and Buyer for the applicable Assets and Contracts and Leases. <br><br>*See* GBRP APA § 4.01. |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | None. |
| **Interim Arrangements with Purchasers** Local Rule 6004-1(b)(iv)(G) | The Debtors and GBRP are not entering into any interim agreements or arrangements in connection with the GBRP Bid or pursuant to the GBRP APA. |
| **Use of Proceeds** Local Rule 6004-1(b)(iv)(H) | Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of the GBRP APA, the other Transaction Documents and the transactions contemplated thereby. <br><br>*See* GBRP APA § 13.07. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Debtors do not seek to have the sale of the Assets in the GBRP Bid declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | Until the earlier of the closure of the Bankruptcy Cases and seven years after the Closing Date, Buyer will use reasonable best efforts to not dispose or destroy any of the Records received by Buyer as Assets and will allow the Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notices, to any Records included in the Assets for the purposes relating to the Bankruptcy Cases and the wind-down of the operations. |

| MATERIAL TERMS OF THE GBRP APA[11] | |
|---|---|
| | *See* GBRP APA § 8.05. |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | GBRP will purchase all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state applicable law, and all other claims, causes of action, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or applicable laws.<br><br>See GBRP APA §§ 2.01(a)(xviii). |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The assets sold in the Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale Transaction.<br><br>*See* GBRP APA §§ 2.03, 2.04. |
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | The transferred Assets do not include any unexpired Leases that are 365 Contracts. *See* GBRP APA § 2.01(a)(iv). |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The Debtors do not seek to allow, disallow, or affect in any manner credit bidding pursuant to section 363(k) of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | See paragraph 64 below. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | None. |

## E.    Necessity for Expedited Sale

31.    As described in further detail in the Percy Declaration, and as recognized by the Court at the December 19 Status Conference, the Debtors estates can be fairly characterized as a "melting ice cube" with respect to their liquidity and the ever-growing administrative claims pool in these Chapter 11 Cases.  *See* Dec. 19 Hr'g Tr. 44:5–6; Percy Decl. ¶ 15.  A prompt consummation of the Sale is critical to ensure that the Debtors can pay for all anticipated go-forward administrative expense claimants.  Moreover, as detailed above, under the terms of the GBRP APA, GBRP is providing funding for all anticipated go-forward administrative claims

incurred in connection with the Store Closing Sales and operation of the remaining Stores. Under these circumstances, the Debtors believe that the expedited Sale to GBRP pursuant to the terms of the GBRP APA is both appropriate and in the best interests of the Debtors, their estates, and their stakeholders. Given the Debtors' liquidity position, the fact they are presently in default under the DIP Facilities, and the extensive pre- and post-petition marketing of the Debtors' businesses and assets, the Debtors submit that conducting the Sale on an expedited timeline is appropriate. Finally, the Debtors understand that Variety requires an expedited Sale in order to begin diligence—including site visits—related to Stores it intends to assume.

**F.   Assumption and Assignment Procedures and Designation Rights**

32.   In connection with the Sale, the Debtors would assume and assign to the Buyer (or a Designated Buyer, as applicable) certain of the Debtors' executory contracts and unexpired leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby also seek approval of the proposed Designation Rights to the Buyer (as further described in the GBRP APA), which is substantially similar to the Designation Rights the Court approved through the Nexus Sale Order. However, unlike with the Nexus APA, no executory contracts or unexpired leases are being assumed and assigned as part of the Initial Closing, and all contract and lease counterparties to contracts or leases proposed to be assumed by the Buyer (or a Designated Buyer) will have notice and an opportunity to be heard prior to such assumption and assignment.

33.   The Designation Rights are designed to, among other things, (a) outline the process by which the Debtors would serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding the Buyer (or Designated Buyer's) adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the executory contracts and unexpired leases.

34.     As set forth in the GBRP APA and the Proposed Sale Order, the assumption and assignment of executory contracts and unexpired leases would be subject to a "Designation Rights Period" commencing on the Initial Closing and ending March 31, 2025, or such earlier date as GBRP may determine, in its sole discretion.  During the Designation Rights Period, the Buyer would have the right to provide written notice to the Debtors of the Buyer's election to either (a) designate a 365 Contract (as defined in the GBRP APA) as an "Excluded Contract" and (b) designate a 365 Contract as an "Assigned Contract," upon which such 365 Contract would be constituted an "Asset" and conveyed to the Buyer or a Designated Buyer at a subsequent Closing Date.[12]

35.     Further, as set forth in the Proposed Sale Order, any Assigned Contract for which there is an unresolved cure objection would not be assumed, assigned, or sold unless (a) all such objections relating to such executory contract or unexpired lease are withdrawn, (b) the counterparty to such executory contract or unexpired lease consents in writing, or (c) the Court subsequently orders otherwise (each, a "**Resolution Event**").  For the avoidance of doubt, if no Resolution Event occurs by the end of the Designation Rights Period with respect to any Assigned Contract(s) that are subject to a pending cure objection in accordance with the Proposed Sale Order, such Assigned Contract(s) shall automatically be deemed an "Excluded Contract."  Accordingly, as set forth herein, the Debtors maintain that the Designation Rights Period ensures that the rights of all contract and lease counterparties, including landlords, are fully preserved.  These procedures are substantially similar to those which the Court already approved in connection with the Nexus Sale.  *Compare* Proposed Sale Order ¶¶ 46–53, *with* Nexus Sale Order ¶¶ 49–55.

---

[12] As contemplated in Section 2.05(b)(ii) of the GBRP APA, GBRP has covenanted that not fewer than 200 non-residential real property leaseholds for the Debtors' Store locations will be designated for assumption and assignment as an Assigned Contract (subject to entry of the Proposed Sale Order).

## Basis for Relief

**A.     The Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code**

36.     Ample authority exists for approval of the Sale contemplated by this Motion. Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business, however, must be based upon a "sound business purpose" of the debtor. *In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015); *see also In re Lionel Corp. ("Lionel")*, 722 F.2d 1063, 1070 (2d Cir. 1983) (holding that the debtor must articulate a "business justification" to satisfy section 363(b) of the Bankruptcy Code). This Court adopted the Second Circuit's *Lionel* decision, such that courts deciding whether a debtor satisfied the business judgment standard must consider "all salient factors pertaining to the proceeding." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–54 (D. Del. 1999) (quoting *Lionel*). The business judgment standard "is not a difficult standard to satisfy," and merely requires a court to find that "a reasonable business person would make a similar decision under similar circumstances." *Cf. In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (applying the business judgment standard in the context of section 365 of the Bankruptcy Code); *see also In re Network Access Sols., Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) ("There is, however, no discernable difference in the . . . standard for approval under section[s] 363 and 365 [of the Bankruptcy Code]." (citation omitted)).

37.     Moreover, section 105(a) of the Bankruptcy Code confers a bankruptcy court with broad equitable powers to confer relief in alignment with bankruptcy policies. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235–36 (3d Cir. 2004) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings" (citing

*United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990))); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) ("It is well settled that the court's power under § 105(a) is broad." (citation omitted)); *In re Nortel Networks, Inc*., 532 B.R. 494, 554 (Bankr. D. Del. 2015) ("The Third Circuit has construed [section 105 of the Bankruptcy Code] to give bankruptcy courts 'broad authority' to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to 'craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.'" (citation omitted)); *Patrick v. Dell Fin. Servs., L.P. (In re Patrick),* 344 B.R. 56, 58 (Bankr. M.D. Pa. 2005) ("There is no doubt that § 105(a) is a 'powerful [and] versatile tool' designed to empower bankruptcy courts to fashion orders in furtherance of the Bankruptcy Code." (quoting *Joubert v. ABN AMRO Mortg. Grp., Inc. (In re Joubert),* 411 F.3d 452, 455 (3d Cir. 2005))).

38.     The sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code where the transaction represents an exercise of the debtors' sound business judgment.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See, e.g.*, *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (D. Del. 1987).

39.     Once a debtor articulates a valid business justification, its decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest or gross negligence," as "[c]ourts are loath to interfere with corporate decisions absent [such] a showing." *See id.* at 656 (citations omitted); *see also In re Promise Healthcare Grp., LLC*, No. 18-12491 (CSS) (Bankr. D. Del. Feb. 28, 2019) [D.I. 770] (order approving the private sale of healthcare facilities upon the debtors showing they properly exercised their business judgment and set forth sound business justifications for pursuing such a sale, having marketed the private sale and showing that the purchaser was the only bidder for the facilities that could close a sale promptly on terms favorable to the debtors); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Dec. 8, 2019) [D.I. 417, 418, 766] (orders approving private sales of the debtors' nonresidential real property upon the debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such private sales, having marketed the private sales and showing that the purchasers were the only bidders that could close a sale promptly on terms favorable to the debtors); *In re Taronis Fuels, Inc.*, No. 22-11121 (BLS) (Bankr. D. Del. Dec. 12, 2022) [D.I. 135] (order approving the private sale of one geographical region of the debtors' retail operations outside of the ordinary course of business).

40.    Further, Bankruptcy Rule 6004(f)(1) permits sales which are conducted without an auction. Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold. *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee [ ].");

*In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1988) (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property.") (citing *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)). So long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment regarding how to structure an asset sale. *In re Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). If the Debtors conclude that conducting a sale without a public auction is in the best interests of their estates, the Debtors should be permitted to do so. *See Penn Mut. Life Ins. Co. v. Woodscape, Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

41.    Under the circumstances, and for the reasons set forth below, there are strong business justifications for (a) entry into the Sale and (b) consummation of the Sale without an additional post-petition marketing and/or auction process.

- *First*, the Debtors have already expended substantial resources in running a post-petition marketing process in connection with the Nexus Sale. *See* Rifkin Decl. ¶¶ 7–9 (describing the Debtors' post-petition marketing process). Moreover, the Debtors simply do not have the resources, nor is it likely that financing will be available under the Debtors' current circumstances (notwithstanding the Debtors' efforts in this regard), to finance an additional robust sale process post-petition, especially given that the Debtors are in default under the DIP Facilities. *See* Percy Decl. ¶ 22.

- *Second*, as set forth in the Percy Declaration, the Debtors do not believe that an additional marketing period would yield a higher purchase price for the Assets,

especially given the time-sensitive nature of the Sale and the recent deterioration of the Debtors' businesses that has resulted from a prolonged stay in chapter 11. *Id.*

- *Third*, the GBRP APA, in addition to the cash consideration and Budgets to administer and wind down the Debtors' estates, contemplates that Variety will provide potential continued employment opportunities to the thousands of employees employed at the Stores it would assume, including store-level personnel, regional management personnel and select corporate-level employees. Accordingly, the Debtors submit that, under the circumstances, the GBRP APA is the best opportunity for not only the Debtors to maximize the value of their estates, but also to preserve thousands of jobs and do right by their employees and other stakeholders.

- *Fourth*, as noted above and in the Percy Declaration, the Debtors' management and board of directors determined, in their business judgment, that GBRP and Variety (the latter a sophisticated strategic counterparty with substantial experience in the retail sector) were the only parties with the financial wherewithal and motivation to consummate the Sale quickly, thus providing much-needed stability to these Chapter 11 Cases as well as a go-forward plan for maximizing value. *Id.* ¶¶ 15–16.

- *Fifth*, and finally, the need to consummate the Sale is made all the more important given that, in the Court's words, "time is of the essence" in these Chapter 11 Cases. *See* Dec. 19 Hr'g Tr. 44:5–6.

42.     Accordingly, the Debtors submit that the use of any further time or resources to continue a formal marketing process would not be value accretive.  As set forth in the Percy Declaration, without the Court's approval of the GBRP APA, the Debtors will have no choice but to continue with chain-wide Store Closing Sales and pursue a full-scale liquidation of their stores and businesses.  Percy Decl. ¶ 21.  A sale on the expedited timeline set forth herein and in the Motion to Shorten is necessary to preserve the value of the Debtors' estates, and thus is in the best interests of all the Debtors' stakeholders.

43.     Based on the foregoing, the Debtors submit that (a) entry into and performance under the GBRP APA constitutes an exercise of the Debtors' sound business judgment and (b) approval of the GBRP APA is necessary to preserve and maximize the value of the Debtors' estates and in the best interests of all of the Debtors' stakeholders.  Absent this relief, the Debtors'

estates would suffer, possibly precipitously and irreparably.  Consequently, the interests of the Debtors' estates and stakeholders are best served by entry into the GBRP APA.

**B.      Entry into the Agency Agreement is a Sound Exercise of the Debtors' Business Judgment**

44.      For the reasons set forth herein as well as in the Store Closing Motion, the Debtors respectfully submit that entry into the Agency Agreement in conjunction with the GBRP APA is a sound exercise of the Debtors' business judgment.  As noted in the Store Closing Motion, GBRP "has extensive experience, capabilities, and expertise in conducting going out of business and similar sales and can oversee, and assist in the management and implementation of, the Store Closing Sales and Store Closings in an efficient and cost-effective manner."  Store Closing Mot. ¶ 29.  Although the GBRP APA contemplates that the Purchasers would assume and continue at least 200 Stores following the Initial Closing, the Debtors also expect to continue the Store Closing Sales process to further maximize the value of their estates.  Accordingly, absent entry into the Agency Agreement, the Debtors would lose the benefit of GBRP's preparations and expertise. Moreover, as noted in the Store Closing Motion, "given the number of Store Closings, it is not certain that the Debtors could retain another party able to conduct the process as efficiently and effectively as the Consultant."  Accordingly, given that entry into the Agency Agreement is a critical part of the transaction contemplated by the GBRP APA, the Debtors submit that it is a sound exercise of their business judgment.  *See In re Bakalis*, 220 B.R. at 532 (noting the great deference given to a trustee's business judgment in structuring an asset sale); *In re NEPSCO, Inc.*, 36 B.R. at 26 (same).

**C.      The Buyer Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

45.      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b)

is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) of the Bankruptcy Code furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings").

46.    Although the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147.  A good-faith determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings."  *Id.*; *see also Pursuit Cap. Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Cap. Mgmt., L.L.C.)*, 874 F.3d 124, 135 (3d Cir. 2017); *In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) (citations omitted).  To constitute lack of good faith, a purchaser's conduct in connection with a sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

47.     The Debtors submit that GBRP would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors and GBRP have entered into the GBRP APA in good faith and through extensive arm's-length negotiations. *See* Percy Decl. ¶ 24.  Indeed, GBRP and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the GBRP APA and in the sale process generally.  To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the GBRP APA to be set aside under section 363(m) of the Bankruptcy Code.

48.     Based on the foregoing, the Debtors submit that the Debtors' entry into the Sale pursuant to the GBRP APA is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**D.     The Bid Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

49.     In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens." (citation omitted)); *In re Boy Scouts of Am.*, 642 B.R. 504, 568 (Bankr. D. Del. 2022), *supplemented*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023).

50.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *8 (Bankr. D. Del. 2001) (highlighting the bankruptcy courts' equitable authority to authorize the sale of estate assets free and clear), *aff'd sub nom.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003).

51.     The Debtors submit that the sale of the Assets free and clear of liens, claims, interests, and encumbrances would satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent that a party objects to the Sale on the basis that it allegedly holds a prepetition lien or encumbrance on the subject Assets, the Debtors believe that any party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is bona fide dispute under section 363(f)(4) of the Bankruptcy Code.

52.     Moreover, the Debtors have sent or will send the Motion and Proposed Sale Order to any purported prepetition lienholders.  If such lienholders do not object to the Sale, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a

prepetition lien, claim, interest, or encumbrance on any of the Bid Assets (other than those assumed or permitted, if any, in connection with the Sale) timely and properly objects to this Motion, such party shall be deemed to have consented to the Sale. *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein); *accord In re BSA*, 642 B.R. at 569 (citing *In re Tabone, Inc.*, 175 B.R. at 858).

53.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (including all DIP Liens, Adequate Protection Liens, Prepetition Liens, DIP Obligations, Adequate Protection Payments, Prepetition Secured Obligations, and DIP Superpriority Claims (as each is defined in the Final DIP Order)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

**E.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

> **i.    *The Assumption and Assignment Procedures Should Be Authorized as a Sound Exercise of Business Judgment***

54.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision to assume or reject an unexpired lease is a matter within the "business judgment" of the debtor. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *see also Mission Prod. Holdings, Inc.*

*v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (noting that a bankruptcy court will generally approve a debtor's choice to assume or reject an executory contract under the deferential business judgment rule (citation omitted)).

55.     Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for their Assets.   The assumption and assignment of Proposed Assumed Contracts is a critical element of the value of the Assets.   Given that the ability to consummate the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

56.     The consummation of the Sale involving the assignment of a Proposed Assumed Contract would be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.   Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts and Leases to be assumed be cured and that the Debtors provide adequate assurance that such defaults would be promptly cured.   The Debtors' assumption and assignment of Proposed Assumed Contracts would be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale Transaction or any later applicable effective date.   As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which would set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on the Potential Assumed Contracts Schedule.   As a result, Counterparties would have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the Sale Hearing.

57.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (citation omitted).  "Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."  *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted)).

58.     As set forth above, each affected Counterparty will have an opportunity to object during the Designation Rights Period to the ability of GBRP to provide adequate assurance as provided in the Proposed Sale Order.  Accordingly, given that all parties' rights are reserved, the Debtors respectfully submit that such issues should not delay the Court's consideration of the GBRP Sale.

59.     In addition, to facilitate the assumption and assignment of Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract or Assumed Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[13]

---

[13]  Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

60.     Finally, although the proposed assumption and assignment procedures set forth in the GBRP APA and the Proposed Sale Order differ from those contemplated by the Nexus APA in that no executory contracts or unexpired leases are being assumed and assigned in connection with the Initial Closing, such procedures are substantially similar to those extensively negotiated between the Debtors, Nexus, and various landlords and contract counterparties.  *See* Nexus Sale Order ¶¶ 22–48.  For that reason, as well as the foregoing, the Debtors respectfully submit that the Assumption and Assignment Procedures are a sound exercise of the Debtors' business judgment and provide landlords and other contract counterparties with appropriate notice and an opportunity to object under the circumstances.

### ii.     *The Designation Rights Period is a Permissible Exercise of the Debtors' Business Judgment*

61.     The Designation Rights Period provided for in the GBRP APA is a sound exercise of the Debtors' business judgment and should thus be approved.  Indeed, such a construct is not novel and has been approved as part of a sale transaction by this Court (in particular, pursuant to the Nexus Sale Order) and others.  *See In re BurgerFi International, Inc.*, No. 24-12017 (CTG) (Bankr. D. Del. Nov. 8, 2024) [D.I. 311] (approving the sale of designation rights); *In re MRRC HoldCo*, No. 24-11164 (CTG) (Bankr. D. Del. Sept. 25, 2024) [D.I. 339] (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 14, 2024) [D.I. 471] (same); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 24, 2024) [D.I. 699] (same); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. May 4, 2023) [D.I. 988] (same).  Courts presented with this question have unequivocally held that designation rights are included in property of the estate, and that debtors are permitted to sell these rights.  *See In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 118-25 (Bankr. S.D.N.Y. 2002) (finding that the sale of designation rights is "fully permissible in bankruptcy cases" and merely subject to the satisfaction of the

business judgment rule and other requirements of section 363); *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 985 (Bankr. W.D. Wash. 1997).

62.     Here, the Designation Rights Period was an integral and bargained-for provision in the GBRP APA, as it will permit the Purchasers to maximize the value of the Debtors' estates by assuming and assigning certain well-performing stores.  *See* Percy Decl. ¶ 23.  As the Debtors have previously explained,[14] the sale of designation rights does not prejudice landlords and other parties in interest in these Chapter 11 Cases, as such landlords' rights will be fully preserved if such landlord believes that the Debtors are violating the terms of a designated lease or the Bankruptcy Code.  Given the expedited nature of the Sale, the Designation Rights Period will give landlords and other contract counterparties more time to assess the go-forward structure of the Debtors' businesses, and thus the period adequately preserves such parties' rights to object on any applicable grounds.  Furthermore, because the GBRP APA contemplates that the go-forward budget (to be paid by GBRP) covers all administrative expenses necessary to administer the GBRP APA in the coming months, there is little risk that the Designation Rights Period will increase the administrative claim exposure to the Debtors' estates.  Finally, as set forth above, the Designation Rights provisions in the Proposed Sale Order are substantially similar to those the Court already approved in connection with the Nexus Sale.  *Compare* Proposed Sale Order ¶¶ 46–53, *with* Nexus Sale Order ¶¶ 49–55.

63.     Accordingly, for the reasons set forth above, the Debtors maintain that the Designation Rights Period is a sound exercise of the Debtors' business judgment and should be approved as part of the GBRP APA.

---

[14] *See Debtors' Omnibus Reply to Objections to the Proposed Sale of Substantially All of the Debtors' Assets* [D.I. 1146] (explaining the Debtors' justifications for entering into a "Designation Rights Amendment" in connection with the Nexus Sale).

**Compliance with Bankruptcy Rule 6004(a) and Waiver of**
**Bankruptcy Rules 6004(h) and 6006(d)**

64.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

65.     The Debtors have already completed the marketing and sale process, and have entered into the GBRP APA with GBRP, to maximize value for their estates and stakeholders. Additionally, as set forth above, time is of the essence given the "melting ice cube" nature of the Debtors' financials. Accordingly, the Debtors request that the Proposed Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with the Sale be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

**Notice**

66.     Notice of this Motion will be provided to the following parties: (a) the U.S. Trustee; (b) (i) McDermott Will & Emery LLP and (ii) Cole Schotz, P.C., as counsel to the Committee; (c) the state attorneys general for states in which the Debtors conduct business; (d) each county consumer protection agency or similar agency in which the Debtors conduct business; (e) the

division of consumer protection for each state in which the Debtors conduct business; (f) the United States Attorney's Office for the District of Delaware; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) Choate, Hall & Stewart LLP, as counsel to the DIP ABL Agent; (j) Otterbourg P.C., as counsel to the DIP Term Agent; (k) Riemer & Braunstein LLP, as counsel to GBRP; (l) the landlords of the Stores; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court, after the Sale Hearing, enter the Sale Order, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:    December 27, 2024
          Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Sophie Rogers Churchill*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
Stephen D. Piraino (admitted *pro hac vice*)
Ethan Stern (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
james.mcclammy@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Counsel to the Debtors and Debtors in Possession*