<u>**Exhibit A**</u>

**Percy Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF KENT PERCY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE GBRP APA, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

I, Kent Percy, declare as follows:

1.     I am a Partner and Managing Director at AlixPartners, LLP ("**AlixPartners**"), a turnaround consulting firm with principal offices located at 909 Third Avenue, Floor 30, New York, New York 10022.  AlixPartners is the financial advisor of the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").[2]

2.     I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims,*

---

[1]  The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2]  On October 21, 2024, the Court entered the *Order Authorizing Debtors to Employ and Retain AlixPartners, LLP as their Financial Advisor Effective as of the Petition Date* [D.I. 572].

*Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "**Motion**"), filed contemporaneously herewith.

3.      Although AlixPartners is compensated for its work as the Debtors' proposed financial advisor in the Chapter 11 Cases, I am not compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, my review of relevant documents, the information provided to me by the members of the Debtors' management team or the Debtors' professionals in the Chapter 11 Cases, or my opinion based upon my experience. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and am authorized to submit this Declaration.

## Qualifications

4.      AlixPartners is an internationally recognized restructuring and turnaround firm with substantial experience in providing financial advisory services and has an excellent reputation for its work in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. AlixPartners performs critical services that complement the services provided by the Debtors' other professionals.

5.      AlixPartners has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases. Its professionals have provided restructuring or crisis management services in numerous large cases, including recent filings in this district. *See, e.g.*, *American Tire Distributors, Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Oct. 22, 2024); *LL Flooring Holdings Inc.*, No. 24-11680 (BLS) (Bankr. D. Del. July 15, 2024); *In re DermTech Inc.*, No. 24-11378 (JTD) (Bankr. D. Del. July 15, 2024); *In re NanoString Techs., Inc.*, No. 24-10160 (CTG)

(Bankr. D. Del. Mar. 13, 2024); *In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 5, 2024); *In re Mallinckrodt plc*, No. 23-11258 (JTD) (Bankr. D. Del. Oct. 2, 2023); *In re KDC Agribusiness LLC*, No. 23-10786 (CTG) (Bankr. D. Del. Jul. 18, 2023); *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Bankr. D. Del. Jan. 20, 2023); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023); *In re Phoenix Services Topco, LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Oct. 25, 2022); *In re Kabbage Inc. d/b/a KServicing*, No. 22- 10951 (CTG) (Bankr. D. Del. Oct. 21, 2022); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Oct. 7, 2022); *In re MD Helicopters, Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. Apr. 25, 2022); *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 16, 2021); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 8, 2021); *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021); *In re Nine Point Energy, LLC*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 20, 2021); *In re HighPoint Res. Corp.*, No. 21- 10565 (CSS) (Bankr. D. Del. Apr. 13, 2021); *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 19, 2020); *In re RGN-Grp. Holdings, LLC*, No. 20-11961 (BLS) (Bankr. D. Del. Sept. 15, 2020); *In re Skillsoft Corp.*, No. 20-11532 (MFW) (Bankr. D. Del. July 23, 2020); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 3, 2020).

6.      I have over 25 years of corporate restructuring experience, including over 20 years in the AlixPartners restructuring practice and have served at AlixPartners as a Partner & Managing Director since January 2018. Prior to joining AlixPartners, I was a Vice President of the venture capital firm MC Capital, where I managed the investment of early-stage capital of startup companies. Before that, I spent three years in the Business Recovery Services group at PricewaterhouseCoopers LLP.

7.      Over the past 25 years, I have specialized in the retail and consumer products industries, advising senior management and directors of major companies to devise and implement turnaround and restructuring strategies in out-of-court transactions, chapter 11 restructurings, and foreign insolvency proceedings. I have been involved in numerous large and complex restructurings, including the following: Careismatic Brands, LLC, Bed Bath & Beyond; CTI Foods; Caesars Entertainment Operating Company; Borden Dairy; Eastman Kodak Company; Advantage Rent A Car; Toys "R" Us; Comverse Technology, Inc.; Dana Incorporated; Gymboree Group, Inc.; FairPoint Communications, Inc.; Milacron, Inc.; think3, Inc.; and Nebraska Book Company. I am a Certified Insolvency & Restructuring Advisor and a Certified Public Accountant. I received a Bachelor of Arts in Economics from the University of Texas at Austin and earned a Master of Business Administration from the Goizueta Business School at Emory University.

## The Nexus Sale

8.      Since the outset of these Chapter 11 Cases, the Debtors and their advisors have worked tirelessly to realize a going-concern sale for substantially all of the Debtors' assets, as such a sale was understood to be the most value-maximizing outcome for the Debtors' estates and stakeholders. As set forth in various filings and on the record in these Chapter 11 Cases, the Debtors filed these Chapter 11 Cases after having executed a stalking horse asset purchase agreement with Gateway BL Acquisition, LLC (together with its affiliates, including Nexus Capital Management LP, "**Nexus**"). During the initial weeks and months of the Chapter 11 Cases, the Debtors and their advisors took the requisite steps to obtain the Bankruptcy Court's approval of a going-concern sale while simultaneously continuing the Debtors' marketing process to test whether more accretive offers would come forward. At the time of the Debtors' Auction, the Debtors and their advisors determined that the bid submitted by Nexus was the only Qualified Bid,

4

and the Debtors sought and received the Bankruptcy Court's approval of the sale transaction contemplated thereby (the "**Nexus Sale**").

9.      As the Debtors repeatedly made clear in their conversations with Nexus, the DIP Lenders, the Court and other parties in interest, the Debtors recognized that it was imperative to swiftly close the Nexus Sale to avoid the business deterioration that inevitably results from a protracted chapter 11 process. Accordingly, the Debtors and their advisors worked around the clock to set the stage to close the Nexus Sale on or around December 2, 2024.

10.     Despite these tireless efforts, on December 1, 2024, Nexus informed the Debtors that it required additional time to close the transaction. Nexus identified a new target closing of December 10 or 11, 2024.  However, on December 5, 2024, the Debtors received a letter from Nexus (the "**December 5 Letter**") notifying the Debtors that the minimum asset value closing condition set forth in Section 9.06 of the Nexus APA would not be satisfied. While the December 5 Letter informed the Debtors that Nexus was still "exploring whether there is a path to close," it cautioned that "there is now a significant capital need" in order to close the Nexus Sale and that Nexus was seeking "additional sources of equity financing" and required "additional savings of nearly $20 million" from the Debtors. I understand from conversations with Nexus's advisors that this "significant capital need" was approximately $75 million.

11.     In the days immediately following receipt of the December 5 Letter, the Debtors' management team and the Debtors' advisors directed their full efforts to assist Nexus in identifying and negotiating with additional sources of financing, as the Debtors strongly believed that there would be significant interest among third parties in jointly invest capital with Nexus in the go-forward business. The Debtors, in their business judgment and with assurances from Nexus that it was working to close the Nexus Sale, continued to pursue consummation of the Nexus Sale. At

the same time, however, the DIP Lenders and their advisors were advising that the Debtors should seriously consider the alternate path of commencing Store Closing Sales at all of the Debtors' remaining stores.

12.     In order to reassure the DIP Lenders that the Nexus Sale remained viable, the Debtors repeatedly requested Nexus's cooperation to communicate directly with the DIP Lenders and explain the steps being taken to fill the identified funding gap. Nexus, however, repeatedly declined to engage in such communications with the DIP Lenders, and the lack of information from Nexus heightened the DIP Lenders' credible concerns that the Nexus Sale would not close.

13.     Under both DIP Credit Agreements, the Debtors had agreed to an accelerated sale closing milestone of December 13, 2024, even though the APA provided for a December 31, 2024 outside date to close (the "**Outside Date**"). The Debtors failed to satisfy this sale closing milestone and, on December 14, 2024, I understand that the Debtors received notices of default and reservations of rights from the DIP Lenders.

14.     From my understanding, the Debtors continued to believe that if there were a viable pathway to close the Nexus Sale prior to the Outside Date, that continuing to pursue such a pathway was the most value-maximizing course of action available to the Debtors and their stakeholders. However, on the evening of December 14, 2024, Nexus informed the Debtors that closing the Nexus Sale prior to the Outside Date was very unlikely. On December 21, 2024, the Debtors received a formal notice from Nexus that it was terminating the Nexus APA.

## The GBRP Sale

15.     During the period in which it was becoming increasingly evident that Nexus would not close the Nexus Sale, the Debtors and their advisors acted proactively to identify alternative pathways that would best preserve the value of the Debtors' estates. The Debtors recognized that,

in the absence of the Nexus Sale and in the face of impending, material business deterioration, the estates were at risk of becoming a "melting ice cube" unless immediate action was taken. Therefore, the Debtors, including the Debtors' management team and Board of Directors, determined that the most value-maximizing alternative path would be to commence Store Closing Sales at all or a significant portion of the Debtors' stores while, on a parallel track, continuing to pursue and negotiate actionable going-concern and/or other asset sale transactions.

16.     On December 15, 2024, the Debtors' received a statement of interest from GBRP setting forth the terms of a proposed going-concern transaction (the "**GBRP Bid**"). The GBRP Bid was credible and actionable, setting forth a transaction framework in which GBRP and Variety (together, the "**Purchasers**") would purchase certain of the Debtors' assets at the conclusion of the Debtors' Store Closing Sales (the "**GBRP Sale**"). I understand that the GBRP Sale was viewed favorably by the Debtors and their advisors because it (a) provides greater certainty with respect to the Debtors' ability to satisfy administrative and other go-forward "freight" expenses in the Chapter 11 Cases, assurances which were critical to the Debtors' understanding that the GBRP Bid would be value-maximizing for their stakeholders as compared to an immediate liquidation of their businesses, (b) preserves at least some of the Debtors' stores and provide employment opportunities to certain employees, and (c) maximizes the remaining value of the Debtors' estates in conjunction with the Store Closing Sales. Accordingly, the Debtors have now reached an agreed-upon asset purchase agreement (the "**GBRP APA**") with GBRP. For the reasons described above, and because the GBRP Sale is projected to result in greater recoveries to administrative claimants than a complete chain-wide liquidation, it is my view that the GBRP Sale is the value-maximizing path forward for the Debtors' estates at this juncture. If the GBRP Sale does not receive the Bankruptcy Court's approval, I understand that the Debtors will be forced to turn to a

complete liquidation of the Debtors' going concern business, as no other actionable bids are available to the Debtors.

**Terms of the GBRP Sale**

17.     If consummated, the purchase price contemplated by the GBRP Sale would involve a series of go-forward budgets to provide for (i) all estimated go-forward administrative expenses necessary for the Debtors to conduct the Store Closing Sales process (the "**APA Administration Budget**"), (ii) the full payoff of the DIP Facilities, (iii) payment in full of outstanding "Stub Rent," and (iv) a "Wind-Down Budget" consisting of (a) severance for Store and corporate employees, (b) certain tax liabilities, (c) workers' compensation liabilities, and (d) certain professional and U.S. Trustee fees (the "**Wind-Down Budget**" and, together with the APA Administration Budget, the "**Budgets**").

18.     Unlike the Nexus APA, where the entire purchase price was contemplated to be transferred to the Debtors and the DIP Lenders on the closing date of the Nexus Sale, the GBRP APA provides for an initial payment on the "Initial Closing Date" consisting of (i) the Debt Payoff Amount (i.e., payment in full of the DIP Facilities) and (ii) payment to satisfy a portion of the Professional Fee Escrow Amount. Following the Initial Closing Date, the GBRP APA contemplates weekly payments each Friday to satisfy administrative expenses accrued in accordance with the Budgets.

19.     In exchange, the GBRP APA contains four primary categories of going concern assets to be transferred to the Purchasers upon closing of the GBRP Sale: (i) not fewer than 200 retail store locations to be operated as a going concern, with the option to expand that number to approximately 400 locations (subject to the completion of due diligence); (ii) certain intellectual property, including the Big Lots trademark, copyrights, and other proprietary rights critical to

brand operations and recognition; (iii) one (and perhaps a second) distribution facility, subject to further diligence by the Purchasers; and (iv) the continued employment of (a) certain store-level personnel employed in the go-forward locations, (b) regional management personnel integral to market-level oversight, and (c) select corporate-level employees critical to ensuring continuity and support functions.

20.    The GBRP APA also contemplates a Designation Rights Period, comparable to the construct set forth in the Nexus APA and approved by the Bankruptcy Court pursuant to the Sale Order [D.I. 1232], during which GBRP will have the right to designate certain of the Debtors' leases for assumption and assignment on a go-forward basis.

### Conclusion

21.    Based on my knowledge and experience, the GBRP Sale is the most value-maximizing path forward for the Debtors at this stage of the Chapter 11 Cases. If the GBRP Sale is not approved, the Debtors will be forced to pivot to a chain-wide liquidation and the certain termination of the going-concern business.

22.    An additional marketing period would not yield a higher purchase price for the Debtors' assets than the purchase price contemplated by the GBRP Sale, especially given that (i) interested parties have had nearly half a year to indicate interest in purchasing the Debtor's assets, (ii) the time-sensitive nature of the terms of the GBRP Sale, and (iii) the acute deterioration in the value of the Debtors' businesses and assets which will likely result from the Debtors' continued operation in chapter 11 without an immediate sale transaction.

23.    I understand that the Designation Rights Period was an integral and bargained-for provision in the GBRP APA, as it will permit GBRP to maximize the value of the Debtors' estates by assuming and assigning certain of the Debtors' highest-performing stores.

24.     Based on the discussions I participated in during the course of these negotiations and my experience negotiating other asset purchase agreements, the negotiations with GBRP were conducted at arm's length.

25.     Accordingly, in light of the foregoing, I believe that the Debtors' entry into the GBRP APA and the subsequent GBRP Sale is the most value-maximizing course of action available to the Debtors and represents a sound exercise of the Debtors' business judgment.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 27, 2024

By:    */s/ Kent Percy*
       Kent Percy
       Partner and Managing Director
       AlixPartners, LLP