# Exhibit A

DocuSign Envelope ID: EA72CB85-1B67-40E0-A883-ADA6GBD3EC66

# TABLE OF CONTENTS

**Section**

1.     Definitions
       A.     Common Areas
       B.     Dates
       C.     Exhibits
       D.     Demised Premises
       E.     Shopping Center

2.     Demise

3.     Term
       A.     Original Term
       B.     Option to Extend Term

4.     Use and Operation

5.     Rent and Construction Allowance
       A.     Fixed Minimum Rent
       B.     Utilities Charges
       C.     Intentionally Deleted
       D.     Common Area Charges and Fixed CAM
       E.     Real Estate Taxes
       F.     Taxes
       G.     Construction Allowance
       H.     Declarations

6.     Buildout and Other Alterations

7.     Maintenance and Repairs

8.     Signs

9.     Trade Fixtures

10.     Governmental Regulations

11.     Indemnification

12.     Insurance
       A.     Tenant
       B.     Landlord

13.     Fire Rebuilding and Altering

14.     Force Majeure

15.     Injunction

16.     Warranty of Title by Landlord; Representations

17.     Quiet Enjoyment

18.     Mortgage and Estoppel Certificates

19.     Default

20.     Condemnation

21.     Mutual Waiver of Subrogation

22.     Assignment and Subletting

23.     Surrender and Holdover

24.  Notices

25.  Legality

26.  Binding Obligations

27.  No Recordation

28.  Real Estate Broker's Commission

29.  No Waiver, Laches or Accord and Satisfaction

30.  Hazardous Materials

31.  Titles and Entire Agreement

32.  Waiver of Claims

33.  Reasonable Consent

34.  Intentionally Deleted

35.  No Presumption against Drafter

36.  Submission of Lease

37.  Interlineation

38.  Time of the Essence

39.  Tenant's Audit Rights

40.  Attorney Fees

41.  Waiver of Jury Trial

42.  OFAC Compliance

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the 3 day of June_____, 2021 (the "Effective Date"), by and between Steger Towne Crossing II, LP, a Texas limited partnership, whose mailing address is 580 Decker Drive, Suite 203 Irving, Texas 75062 ("Landlord"), and PNS Stores, Inc., a California corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081-7651, Attention: Lease Administration.

## WITNESSETH:

1. **DEFINITIONS:**

   For purposes of this Lease, these terms are defined as follows:

   A.  <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) near the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").  Landlord shall not construct additional buildings nor alter any of the Common Areas within the existing Shopping Center per Tenant's No Change Area, as depicted in Exhibit A, without Tenant's consent.

   B.  <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

   1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

3

2)      The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession to Tenant with all Landlord Work complete, or (ii) the date on which Tenant receives all necessary building permits for its construction, fixturing, merchandising and/or signage (the "Permits"). Tenant will submit its plans for the Permits within one hundred twenty (120) days of  full Lease Execution and thereafter, diligently pursue obtaining such Permits. If Tenant has not submitted plans for permits within six (6) months of full Lease Execution, either Landlord or Tenant shall have the right to terminate the Lease, with no further obligations. Landlord will cooperate fully with Tenant in obtaining said Permits.  Landlord shall use the form shown on Exhibit E with all the documentation, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed.  Tenant agrees to schedule an on-site walk through within two (2) weeks of receipt of Exhibit E and all documentation to acknowledge completion of Landlord's Work. Notwithstanding the foregoing, acknowledgement of Landlord's Work shall not constitute possession of the Demised Premises.    Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work").  Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)      The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred fifty (150) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises. **Notwithstanding anything to the contrary, the Rent Commencement Date will be no later than twelve (12) months from full Lease Execution.**

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      The Estimated Delivery Date (as hereinafter defined) shall be July 8, 2021 ("Estimated Delivery Date"). In the event Landlord does not deliver possession of the Demised Premises to Tenant by the Estimated Delivery Date, commencing upon July 9, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to July 23, 2021, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day.  Commencing July 23, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day.  If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease.  Notwithstanding anything to

4

the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)    Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises and/or Tenant has not received the Permits by August 1, 2021, Tenant will not be required to accept possession until January 3, 2022. The period of time between August 1, 2021 and January 3, 2022 will be the "Optional Blackout Period". In addition, in the event Landlord has not completed Landlord's Work by January 3, 2022, then Tenant may terminate this Lease by delivery of a termination notice at any time after January 3, 2022, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) January 3, 2022. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    Landlord's Work

5)    Exhibit D -    Tenant Building Sign Specifications

6)    Exhibit D – 1 Tenant Pylon Sign Location

7)    Exhibit E -    Completion of Landlord's Work Letter

8)    Exhibit F -    Exclusive Use Provisions

9)    Exhibit G -    Remeasurement Rider

10)   Exhibit H -    Roof Report

D.    <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 36,878 square feet of ground floor area with a minimum width of 150 feet for the Demised Premises. Tenant shall provide Landlord with any plans submitted to a permitting authority. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached

5

hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 40,565 square feet nor accept possession of any space under 33,191 square feet in size, and may terminate this Lease in such an event.

E.    <u>Shopping Center</u>:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is Steger Towne Crossing, 2855 Ridge Road Rockwall, TX 75032.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 36,878 square feet. For clarity, it understood that the Shopping Center consists only of the Demised Premises and No Change Area as set forth in Exhibit A. Landlord agrees that it will not add any additional parcels into the Shopping Center, whether currently owned or purchased in the future.

## 2.    <u>DEMISE:</u>

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees, except reserved parking spots.

## 3.    <u>TERM:</u>

A.    <u>Original Term</u>:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2032 (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except for any environmental issues resulting from tenants use and as otherwise provided herein.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any exercised Option Terms (as defined below), and any other extended period.

B.    <u>Options to Extend Term</u>:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and "Third Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice via certified letter or a nationally recognized overnight express courier at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

## 4.    <u>USE AND OPERATION:</u>

A.   Permitted Uses:   Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), and for similar or related merchandise.  Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises.  Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties that Landlord has actual knowledge or should have had knowledge of such.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder.  In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations.  Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.  Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the approved cart corral's in the Common Areas as set forth in Exhibit A  (ii) use the Common Areas and sidewalks immediately adjacent to the Demised Premises for the sale and display of merchandise, .

B.   Prohibited Uses:  Intentionally Deleted.

## 5.   RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first

listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). Tenant will not make any payment to Landlord until Landlord provides Tenant with a duly executed federal Form W-9. Landlord will indemnify Tenant as a result of its failure to timely execute any withholding exemption requirements (e.g. Tenant is assessed unwithheld Tax (see below) related to its payments to Landlord). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:  Commencing from the Rent Commencement Date thru the Original Term, the sum of $313,463.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $26,121.92.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $331,902.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $27,658.50. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $350,341.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $29,195.08. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $368,780.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $30,731.67. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $387,219.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $32,268.25.

B.    <u>Utilities Charges</u>:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Notwithstanding anything to the contrary, Landlord shall provide utilities as set forth in Exhibit C. .  In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. In the event of such interruption, Tenant shall contact Landlord via email at: tritter@ritterdallas.com and advise of such interruption. Tenant shall provide Landlord with reasonable access to the Demised Premises to make any necessary repairs. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate

that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    <u>Intentionally Deleted</u>

D.    <u>Common Area Charges and Fixed CAM</u>:   Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

(i)    operating, maintaining, refurbishing, repairing, replacing, the Common parking lot to include lighting the Common Areas which are available for use in common by occupants of the Shopping Center and/or their customers and invitees.

(ii)    operating, maintaining, refurbishing, repairing, replacing, and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces).

(iii)    operating, maintaining, refurbishing, repairing, replacing, and lighting appropriate parking area entrances, exit and directional markers , Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing , lighting and policing if necessary;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)    cleaning, and  sweeping, and snow and ice removal as needed.  Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, , and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas,  licenses and permit fees, and parking area surcharges or levies ("Common Area Charges").

<u>Fixed Common Area Charges</u>: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be fixed at $1.20 per square foot of the Demised Premises for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any.  Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. After the first Lease Year, as well as any Partial Lease Year, if any, Tenant's pro-rata share of Common Area Charges shall increase by three percent (3%) per year above that amount of Common Area Charges payable by Tenant for the previous Lease Year.

The $1.20 per square foot Fixed Common Area Charges for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any and the fixed annual 3% increase in Common Area Charges shall be collectively known as the "Fixed CAM".  In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the Fixed CAM set forth herein.

E.<u>Real Estate Taxes:</u>  In the event Tenant's Parcel is a separate and distinct tax parcel (Property ID #33605) (in such event, the "<u>Tax Parcel</u>"), Tenant shall pay prior to the due date, directly to the local taxing authority all real property taxes and assessments which may be levied or assessed by any lawful authority against the

9

Tax Parcel and any improvements thereon (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments, impositions, penalties or interest. Tenant shall pay to Landlord 100% of Real Estate Taxes paid by Landlord. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant agrees and acknowledges that Real Estate Taxes shall be calculated on a cash basis based on the taxes actually due and payable in a given calendar year. Therefore, despite the fact that Real Estate Taxes may be assessed against the Tax Parcel six (6) months or more in arrears, the current tax bill shall be used to calculate Real Estate Taxes. Landlord represents that the Real Estate Taxes for the 2020 tax year are $1.45 per square foot per annum. This amount is for 2020 only and not binding for the following years. Tennant will cover all (if any) Real Estate Tax increases.

Tenant shall pay the Real Estate Taxes upon Tenant's receipt of the Real Estate Tax bill issued by the taxing authority specifically showing the amount of Real Estate Taxes levied or assessed against the Tax Parcel. In the event Landlord receives the Real Estate Tax bill, Landlord shall forward the same to Tenant promptly upon receipt of such tax bill from taxing authorities.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes unless such interest or penalty arose due to Tenant's action or inaction (including Tenant's failure to pay the Real Estate Taxes by the date due, provided Landlord has promptly delivered the tax bill to Tenant). Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's payment of Real Estate Taxes shall be based upon the discounted amount, if Tenant timely makes such payment. Tenant's payment of Real Estate Taxes shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's Real Estate Taxes shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including property card requests, and the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real

property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time in any five (5) year period. ~~This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.~~



Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.   Taxes:

1.  "Excluded Tax(es)" means any Tax other than a Transaction Tax.

2.  "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

3.  "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale or rent transaction; (b) levied upon the purchaser/Tenant; (c) can be legally collected from the purchaser/Tenant; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser/Tenant.

4.  The rent payments do not include any amount for Transaction Taxes. Tenant will pay, reimburse or indemnify (as the facts and circumstances dictate) Landlord for any applicable Transaction Taxes with respect to the rents, unless the particular rent is nontaxable.  For purposes of clarity, currently, only rents for locations in Florida and certain locations in Arizona are subject to Transaction Taxes.

5.  Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement.  For purposes of clarity but without limiting the foregoing, Landlord acknowledges that it may have gross receipts, license and/or income Tax obligations where the rent receipt may be assigned under applicable Tax law.  Any Taxes or license fees imposed on Landlord's rents or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes are not and, will not be construed as, Transaction Taxes and are Excluded Taxes and also will not be an itemized charge on any invoice. Landlord and Tenant will, and will cause their respective affiliates and subcontractors, to reasonably cooperate in good faith on all Tax matters.

G.   Construction Allowance: Landlord shall pay to Tenant an amount equal to Seven Hundred Thirty Seven Thousand Five Hundred Sixty Dollars ($737,560.00) within thirty (30) days of Tenant's opening for business and receipt of lien waivers in excess of $5000.00 from contractor(s)  If said amount is not paid by Landlord to Tenant within thirty (30) days and receipt of lien waivers after Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may

deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

H.    Declarations:  Landlord and Tenant acknowledge that Shopping Center  is subject to certain covenants, conditions and restrictions of record, including but not limited to Operating and Easement Agreement, dated July 15, 1996, , of record as Vol. 1136, Page 176; Operation and Easement Agreement dated July 15, 1996, as heretofore amended, of record as Vol. 1303, Page 137; Declaration of Covenants, Conditions and Restrictions, dated August 29, 1997, as heretofore amended of record as Vol. 1303, Page 218, Private Sign Easement, as heretofore amended, dated November 19, 1997 of record as Vol 1303, Page 155;  in the Official Records of Rockwall County, Texas (collectively, the "Declaration").  To the extent that the Declaration allocates any expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the Declaration) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant.  In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the Declaration, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant.  Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) arising out of any violation by Tenant of the Declaration to the extent it conflicts with the Lease as stated above.  Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the Declaration, and Landlord agrees not to consent to any uses prohibited by the Declaration or this Lease in the Shopping Center.

## 6.    **INITIAL BUILDOUT AND OTHER ALTERATIONS:**

If Landlord fails to complete Landlord's Work at the Demised Premises within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, then at Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work.  In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full.  In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

During the Term of this Lease, following completion of initial buildout/alterations to the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which the Demised Premises are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term continue to remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any such alterations.

7.    **MAINTENANCE AND REPAIRS:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and also located within the floor slab of the Demised Premises but only to the extent Tenant has made changes or alterations to the floor slab.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.   The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, , (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) electrical, plumbing, sprinkler and other mechanical systems and equipment (exclusively serving the Demised Premises), located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises but only to the extent Tenant has not made changes or alterations to the floor slab.   Notwithstanding anything to the contrary contained in this Section 7, Landlord will replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Subject to Exhibit C, Landlord has supplied Tenant with an HVAC inspection report. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use with a load of 335 square feet per ton (calculation based on 36,878sf.). Tenant shall the right to inspect the HVAC equipment installation within sixty (60) days of the Tenant Possession Date. Tenant shall advise Landlord of any necessary repairs to the HVAC equipment. Should any such repairs be necessary, Landlord will complete same within thirty (30) days of receipt of such notice from Tenant.

Should Tenant discover that the HVAC system requires repair  during the Original Lease Termand the cost thereof exceeds Five Thousand Dollars ($5,000.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Five Thousand Dollars ($5,000.00).  Tenant shall invoice Landlord for any amounts due under this provision within ninety (90) days of the end of each Lease Year and provide copy of paid invoice to contractor  In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full. Notwithstanding anything to the contrary, Landlord's obligation hereunder shall not exceed a total of $15,000 in any given Lease Year.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date.  Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within fifteen (15) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate.  If Landlord fails to perform such work within such fifteen (15) day period, Tenant shall have the right to perform such work and charge the Landlord the

13

reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency Tenant shall inform Landlord immediately in writing. If Landlord, after receiving such information from Tenant, fails to commence repair within 24 hours, Tenant shall have the right to perform such repairs at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8. **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein). Afterward Tenant is solely responsible for repair and maintenance of its sign panels.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons in the previous Stein Mart sign locations. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently

constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **TRADE FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.  At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition.  Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of Landlord when affixed.  For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises .  Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees to the best of it's knowledge the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.  Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.  Landlord shall provide to governmental authorities having jurisdiction all the necessary documentation as is required or may be required by applicable law including, without limitation, an asbestos survey or certification as required.  In the event hazard materials are found on Premises, Landlord shall promptly remove per code requirements and restore the contaminated area, i.e. walls, floor, ceiling, etc. into good condition acceptable to Tenant prior to delivery of Premises.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, , officers, directors, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder.  When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.  Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.  When a claim is caused by the joint negligence or willful misconduct of

15

Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

A.    Tenant:    Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

B.    Landlord:    Landlord shall at all times carry insurance covering all leasehold improvements affixed to the building, the building and the structure of the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, , in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises .  Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Tenant shall provide Landlord with any plans submitted to a permitting authority for insurance purposes.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.  Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay 100% of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs").  Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation").  Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, the Insurance Costs paid by Landlord.  Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B are $0.45 per square foot per annum for the 2020 calendar year.  Tenant will cover all (if any) increases in the insurance premiums in the following years. The current insurance for 2021 is $25,118.59 per annum, which is $0.68 per square foot per annum.

If Tenant is able to secure an insurance policy or policies with the same coverages as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

13.    **FIRE REBUILDING AND ALTERING:**

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration.   During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty  (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.    If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

14.    **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

15.    **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.    **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will

defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, and such failure or breach results in a material impact on Tenant, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, that would limit Tenant's rights or expand Tenant's obligations as set forth in the Lease, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease.  If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder.  Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

**17.**    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions.  Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

**18.**    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.  Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and

18

restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19. **DEFAULT:**

A.    (i) If Tenant shall be adjudicated as bankrupt, or (ii) if a trustee or receiver of Tenant's property be appointed, or (iii) if Tenant shall make an assignment for the benefit of creditors, or (iv) if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof, or any other payment required herein when due, for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord; provided that, Landlord shall not be required to provide written notice more than two (2) time per twelve (12) month period (in which event tenant shall have no additional notice and cure or grace period), or (v) if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary provided Tenant is diligently pursuing such cure, or (vi) any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease, or (vi) subject to Section 4.A herein, Tenant shall fail to occupy or shall abandon or vacate the Demised Premises or shall fail to continuously operate its business at the Demised Premises for the Permitted Uses set forth herein, whether or not Tenant is in monetary or other default under this Lease, Landlord may at any time thereafter at its election: (1) terminate this Lease, (2) perform Tenant's obligations and Tenant shall pay to Landlord, Landlord's costs incurred to perform the same, and/or (4) pursue any other remedies available to Landlord at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter

to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

C.    The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or equity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Demised Premises shall be limited to Tenant's interest of Landlord in the Demised Premises, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency.

**20.    <u>CONDEMNATION:</u>**

In the event the Demised Premises hereby leased, or any part thereof, or any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings, and (a) the taking would prevent or materially interfere with Tenant's use of the Demised Premises, in Tenant's reasonable determination, (b) in Landlord's judgment would materially interfere with or impair its ownership or operation of the Demised Premises, or (c) as a result of such taking, Landlord's mortgagee accelerates the payment of any indebtedness securing all or a portion of the Demised Premises, then upon written notice Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center or Common Area, or rights of way adjoining or approaches to the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operations, Tenant may terminate this Lease, or at its option retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceeding, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith; provided, however, Landlord's obligation to so restore the Demised Premises shall be exclusive of any internal alterations, additions, improvements, fixtures and equipment installed by Tenant, and limited to the award Landlord receives in respect of such taking that is not required to be applied to the indebtedness secured by a mortgage. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. In the event of any such taking, Landlord shall be entitled to receive the entire price or award from any such taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's trade fixtures, if a separate award for such items is made to Tenant.

21.    **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured;; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent with the same permitted use; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder nor violate any Declaration.  Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.  The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice").  Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right").  If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein.  Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment.  Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment").  The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the

21

meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

## 23.  SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition.  Tenant may remove all of its trade fixtures from the Demised Premises.  Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof.

## 24.  NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i)  a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii),  within two (2) business days following facsimile transmission.  The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery.  Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.  LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State and County where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited partnership duly organized, validly existing and in good standing under the laws of Texas.  Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California.  Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26.  BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.  NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense.  Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28.  REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker

or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

**29.**   **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

**30.**   **HAZARDOUS MATERIAL:**

Landlord represents and warrants to the best of its knowledge the Demised Premises do not presently contain any Hazardous Materials.  "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority.  Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and  Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials.  If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.  Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

**31.**   **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**32.**    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable.  If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.**    **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission.  In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

**34.**    **INTENTIONALLY DELETED.**

**35.**    **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.**    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.**    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.**    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.**    **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit

of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

## 40.    <u>ATTORNEYS FEES:</u>

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

## 41.    <u>WAIVER OF JURY TRIAL:</u>

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

## 42.    <u>OFAC COMPLIANCE:</u>

Landlord and Tenant each represents and warrants that (a) Landlord or Tenant, as the case may be or entity owning an interest in Landlord or Tenant, as the case may be, is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (ii) not an entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (b) none of the funds or other assets of Landlord or Tenant, as the case may be, constitute property of, or are beneficially owned, directly or indirectly, by any "Embargoed Person" (as hereinafter defined), (c) no Embargoed Person has any interest of any nature whatsoever in Landlord or Tenant, as the case may be, (whether directly or indirectly), and (d) none of the funds of Landlord or Tenant, as the case may be, have been derived from any unlawful activity with the result that the investment in Landlord or Tenant, as the case may be, is prohibited by Law or that the Lease is in violation of Law. The term "Embargoed Person" means any entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Landlord or Tenant, as the case may be, is prohibited by Law or Tenant is in violation of Law. Landlord and Tenant, as the case may be, each covenants and agrees (A) to comply with all Applicable Laws relating to money laundering, anti-terrorism, trade embargos and economic sanctions, and (B) to immediately notify the other in writing if any of the representations, warranties or covenants set forth in this section are no longer true or have been breached or if Landlord or Tenant, as the case may be, has a reasonable basis to believe that they may no longer be true or have been breached. Tenant covenants not to use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit,

or Support Terrorism) to make any payment due to the Landlord under the Lease. Landlord and Tenant acknowledges that either Landlord's or Tenant's inclusion on the List during the Term, or any renewal thereof, as the case may be, of the Lease shall be an Event of Default (without the need for any notice and with no opportunity to cure), thereby entitling either Landlord or Tenant to the exercise of any and all rights and remedies provided for under this Lease, under Applicable Law and in equity. Tenant covenants that Tenant shall not permit the Demised Premises or any portion thereof to be used or occupied by any entity on the List or by any Embargoed Person (on a permanent, temporary or transient basis), and any such use or occupancy of the Demised Premises by any such entity shall be an Event of Default (without the need for any notice and with no opportunity to cure), thereby entitling Landlord to the exercise of any and all rights and remedies provided for under this Lease, under law and in equity.

**[Signatures Appear on Immediately Subsequent Page.]**

26

IN TESTIMONY WHEREOF, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:       **LANDLORD: STEGER TOWNE CROSSING , LP, a Texas limited partnership**

_____    By: *S. Susan Self* _____

_____    Title: Vice President _____

Witnesses as to Tenant:       **TENANT:    PNS STORES, INC., a California corporation**

_____    By: Jonathan E. Ramsden _____
FF2E51620539412

_____       Jonathan E. Ramsden

     Title:    Executive Vice President,
              Chief Financial & Administrative Officer,

DocuSign Envelope ID: EA72CB05-1B67-4DE0-A8B2-ADA6CBD35C66

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD: STEGER TOWNE CROSSING , LP, a Texas limited partnership**

By: _S. Susan Seef_

Title: _Vice President_

Witnesses as to Tenant:

**TENANT:**     **PNS STORES, INC., a California corporation**

By: _Jonathan E. Ramsden_

Jonathan E. Ramsden

Title:     Executive Vice President,
Chief Financial & Administrative Officer,

27

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Steger Towne Crossing, LP** by, __S. Susan Self_____ its _____Vice President____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this _____ day of _____, 2021.

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the abovenamed Tenant, **PNS Stores, Inc.**, by Jonathan E. Ramsden, its Executive Vice President, Chief Financial and Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _1st_ day of _June_____, 2021.

_____
Notary Public

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

DocuSign Envelope ID: EA72CB05-1B67-40E0-A8B2-ADA6CBD35C66

STATE OF Texas

COUNTY OF Dallas

    Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **Steger Towne Crossing, LP** by Sandra S. Sett its Sandra S. Sett Vice President who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

    IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Dallas Texas this 3 day of June, 2021.

                         Notary Public

KELVIN HESTER
My Notary ID # 130858865
Expires October 11, 2024

STATE OF OHIO

COUNTY OF FRANKLIN

    Before me, a Notary Public, in and for said State and County, personally appeared the abovenamed Tenant, **PNS Stores, Inc.,** by Jonathan E. Ramsden, its Executive Vice President, Chief Financial and Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

    IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 1st day of June, 2021.

                         Notary Public

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

28

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



# EXHIBIT B

# LEGAL DESCRIPTION OF SHOPPING CENTER

EXHIBIT "A"

TRACT I:

BEING Lot 1 (4.4013 Acres), Lot 3 (4.2183 Acres), and Lot 7 (0.8812 Acres) of Block A of STEGER TOWNE CROSSING PHASE I SUBDIVISION, an addition to the City of Rockwall, out of the James Smith Survey, Abstract No. 200, Rockwall County, Texas, according to the Plat thereof recorded in Cabinet C, Slide 345, of the Plat Records of Rockwall County, Texas and Containing 9.5008 Acres of Land, more or less.

TRACT II:

BEING Lot 5R of Block A of STEGER TOWNE CROSSING PHASE I SUBDIVISION, an addition to the City of Rockwall, out of the James Smith Survey, Abstract No. 200, Rockwall County, Texas, according to the Revised Plat thereof recorded in Cabinet D, Slide 15 of the Plat Records of Rockwall County, Texas and Containing 1.3512 Acres of Land, more or less.

TRACT III:

BEING all that certain lot, tract or parcel of land situated in the James Smith Survey, Abstract No. 200, City of Rockwall, Rockwall County, Texas, same being Lot 2 of Block 1 of STEGER RETAIL ADDITION, an addition to the City of Rockwall according to the plat thereof recorded in Cabinet "C", Slide 115 of the Plat Records of Rockwall County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING at a concrete highway monument found for corner at the Northwest corner of said Lot 2, same being on the East line of F.M. Highway No. 740, a variable width right-of-way, as dedicated by plat of said STEGER RETAIL ADDITION, and being on the East line of that certain City of Rockwall 15 foot water line easement of record in Volume 64, Page 308 of the Deed Records of Rockwall County, Texas;

THENCE leaving said F.M. Highway No. 740 along the North line of said Lot 2, Block 1 the following courses and distances numbered (1) through (5);

(1) SOUTH 81 degrees 48 minutes 28 seconds EAST (S 81 degrees 49 minutes 02 seconds Record), a distance of 328.29 feet (328.00 feet Record) to an "x" set in concrete for corner;

(2) SOUTH 08 degrees 13 minutes 21 seconds WEST (S 08 degrees 10 minutes 58 seconds W Record), a distance of 45.97 feet (46.00 feet Record) to a p.k. nail found for corner;

(3) SOUTH 81 degrees 48 minutes 31 seconds EAST (S 81 degrees 49 minutes 02 seconds E Record), a distance of 160.00 feet (Record) to an "x" found in concrete for corner;

(4) NORTH 08 degrees 06 minutes 33 seconds EAST (N 08 degrees 10 minutes 58 seconds E Record), a distance of 20.01 feet (20.00 feet Record) to an "x"

EXHIBIT "A" - Page 1 of 2

found in concrete for corner;

(5) SOUTH 81 degrees 49 minutes 41 seconds EAST (S 81 degrees 49 minutes 02 seconds E Record), a distance of 147.03 feet (147.00 feet Record) to a 5/8" iron rod found for corner at the Northeast corner of said Lot 2;

THENCE SOUTH 08 degrees 12 minutes 31 seconds WEST (S 08 degrees 10 minutes 58 seconds W Record), a distance of 227.10 feet (227.00 feet Record) to a 5/8" iron rod found for corner at the Southeast corner of said Lot 2;

THENCE along the South line of said Lot 2, the following courses and distances numbered (7) through (11);

(7) NORTH 81 degrees 46 minutes 00 seconds WEST (N 81 degrees 49 minutes 02 seconds W Record), a distance of 146.97 feet (147.00 feet Record) to an "x" found in concrete for corner;

(8) NORTH 08 degrees 12 minutes 24 seconds EAST (N 08 degrees 10 minutes 58 seconds E Record), a distance of 29.00 feet (Record) to an "x" found in concrete for corner;

(9) NORTH 81 degrees 47 minutes 35 seconds WEST (N 81 degrees 47 minutes 35 seconds WEST (N 81 degrees 49 minutes 02 seconds W Record), a distance of 159.98 feet (160.00 feet Record) to an "x" found in concrete for corner;

(10) SOUTH 08 degrees 20 minutes 23 seconds WEST (S 08 degrees 10 minutes 58 seconds W Record), a distance of 30.07 feet (30.00 feet Record) to an "x" found in concrete for corner;

(11) NORTH 81 degrees 48 minutes 38 seconds WEST (N 81 degrees 49 minutes 02 seconds W Record), a distance of 328.34 feet (328.00 feet Record) to a 5/8" iron rod found for corner on the East line of aforesaid F.M. Highway No. 740 (Ridge Road);

THENCE along the East line of said F.M. Highway No. 740 (Ridge Road), NORTH 08 degrees 13 minutes 37 seconds EAST (N 08 degrees 10 minutes 58 seconds E Record), a distance of 263.02 feet (263.00 feet Record) to the PLACE OR POINT OF BEGINNING and CONTAINING 3.4356 ACRES OF LAND, more or less.

EXHIBIT "A" – Page 2 of 2

# EXHIBIT C

## LANDLORD'S WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative.**

**DOORS:** All doors and door systems (exterior and overhead included) to be sound, secure, in good working condition

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc, in the area of the shopping center owned by the Landlord. All parking lot lighting and exterior building lighting is controlled from a panel located inside the Demised Premises and will be Tenant's responsibility after accepting possession.

**UTILITIES:** Landlord to provide separate utilities and separate utility meters with service direct from the local distribution company (including but not limited to electric, water, etc.). Existing electrical service is 2000 amps 120/208 volts and same will be in good working condition. All electrical equipment to be located within the demised premises and connected to all HVAC, lighting, receptacles, other electrical devices, etc. throughout the demised premises. Landlord shall also provide Tenant with assurance that utilities are available and include legal access across other properties if necessary, to serve the Demised Premises including water, electricity, telephone, sanitary sewers and storm drainage. All existing sanitary sewer lines to be video scoped to ensure they not obstructed or damaged, video to be provided to Tenant. Tenant acknowledges that gas is not present.

**HVAC EQUIPMENT & MECHANICALS:** Existing HVAC (6 units totaling 105 tons) to be in good working condition. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date with Landlord providing Tenant a copy of the inspection report. Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant; and patch the roof as necessary. If the Tenant Possession Date occurs during the months of October through May, Landlord shall grant Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. Landlord shall also warrant any existing HVAC units for the initial lease term for any repairs over $5,000 during a single lease year. All warranties for new units shall be passed on to Tenant. HVAC inspection was completed on 12/1/2020 by Affiliated Air, Inc. and all necessary repairs will be completed by Landlord and proof of same will be provided.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to the demised premises to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system meets the requirements that are adequate for Tenant's use (including Class A Plastics with Pallet Racking 12' AFF in Stock Room) and required by local code.
Landlord shall install any devices or systems for backflow prevention as required by the AHJ. Any fire alarm systems must meet the requirements for monitoring by Tenant's contractor and Tenant to approve the fire alarm plans prior to installation of equipment to verify panel compatibility and coordinate monitoring (Landlord has installed a new cellular communication panel, annual cost for monitoring is $456, subject to review and approval by Tenant). We will need an update regarding the fire sprinkler system from the damage caused by the broken pipes last.

**REMOVAL OF FIXTURES & EQUIPMENT:** Landlord to remove all fixtures, equipment, trash & debris and deliver in broom clean condition.

**RECEIVING AREA:** Loading docks are to be 48" inches high and in good working order (including all bollards, doors, etc.). Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term. Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed

and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition.  Both Landlord and Tenant inspected the roof and landlord has made the necessary repairs/replacement  per Landlords inspection report. Landlord will also make the repairs as per Tenant's inspection report and the advisory opinion of Tenant's Construction Project Specialist, Tiffany Lordier (email dated March 29th, 2021) and attached hereto as Exhibit H. Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease, either via a roof hatch (existing  or newly installed in a mutually agreeable location of the stock room) OR via a ladder existing/installed on the exterior wall in the rear.

**STRUCTURE & BUILDING:**

Landlord shall make any and all repairs/replacement to the building structure as necessary. This shall include all existing brick/masonry block and mortar.  The exterior walls shall also be treated as necessary to ensure the Demised Premises is free of leaks.  Landlord shall also install new gutters and downspouts on the building if Landlord & Tenant deem necessary.

**PARKING LOT:**

Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking).  The parking lot serving the Demised Premises shall be re-striped prior to delivery of Demised Premises to Tenant, if necessary. Fire lanes, curbs and pole bases shall be freshly painted as well.  The number of parking spaces provided for the demised premises must meet the City of Rockwall requirements, or other AHJ and ADA. A minimum of four, van accessible, handicap parking spaces and related signage if/as required by ADA guidelines.

**SIGNAGE:**

Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Landlord to ensure that the pylon(s) is properly wired, maintained, constructed and deliver fully operational. Tenant shall have the right to the panel position as illustrated on the attached exhibit at all times.
Tenant shall also have the right to erect an additional building sign as illustrated on the attached exhibit – Tenant is responsible for permit.  Any pylon remodels or newly constructed signs shall reflect Tenant in a substantially similar position & size.

**PESTS:**

Premises to be professionally inspected for pestilence and termites.  Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**HAZARDOUS MATERIALS:**

Landlord has provided Tenant with an asbestos inspection report of the Demised Premises performed by Avanco Environmental, Inc. on 1/29/2021 and proved no asbestos abatement necessary.   Landlord shall provide to governmental authorities having jurisdiction all the necessary documentation as is required or may be required by applicable law including, without limitation, an asbestos survey or certification as required. In the event hazard materials are found on Premises, Landlord shall promptly remove per code requirements and restore the contaminated area, i.e. walls, floor, ceiling, etc into good condition acceptable to Tenant.

**DRAWINGS:**

.  Landlord provided Tenant with "Stein Mart plans"; there is nothing else in Landlord's possession.

**GENERAL CONDITIONS:**

Landlord agrees to the best of its knowledge the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable).  If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant.  Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; HVAC report evidencing all installations and/or repairs have been completed and all HVAC is operating properly; and pest inspection report showing building is pest free, prior to Tenant's possession.  All above work to be completed prior to the Tenant Possession Date.

**MAINTENANCE & REPAIR:**

Landlord: Roof, structure, exterior, parking lots, sidewalks and driveways.

Tenant: All interior (including electrical service, and distribution of the sprinkler system [specifically not the Riser and portions from the Riser to the exterior], fire alarm system)

DocuSign Envelope ID: EA72CB05-1B62-4050-A8B2-ADA9CBD25C56

and HVAC system after same having been delivered to Tenant in good working condition.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**



DocuSign Envelope ID: EA72CB05-1B67-4050-A8B2-ADA9CBD25C66



# HORIZONTAL LOGO

## INDIVIDUAL LED ILLUMINATED
## CHANNEL LETTER SET

| A | B | C | D | E | Area |
|---|---|---|---|---|---|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |



# SECTION DETAILS





**RETURNS:** .063 x 5" DEEP
PAINT OUTSIDE BLACK
PAINT INSIDE WHITE

**BACKS:** .063 ALUMINUM
PAINT OUTSIDE BLACK
PAINT INSIDE WHITE

**FACES:** 3/16" 7328 WHITE ACRYLITE WRT30 ACRYLIC
**ILLUMINATION:** SLOAN GREAT WHITE 4 LED MODULES
701269-WL4-MB

**WIRING AND FIXTURES:** UL LISTED/RECOGNIZED HARDWARE

**POWER SUPPLY:** PHILLIPS ADVANCE LED DRIVER

**MOUNTING HARDWARE:** TBD

**TRIMCAP:** 1" BLACK JEWELITE

**FACADE**

1-1 LETTER SECTION DETAIL
SCALE:  3/4" = 1"

**RETURNS:** .063 x 5" DEEP
PAINT OUTSIDE BLACK
PAINT INSIDE WHITE

**BACKS:** .063 ALUMINUM
PAINT OUTSIDE BLACK
PAINT INSIDE WHITE

**FACES:** 3/16" 2119 ORANGE ACRYLITE 2RK20 ACRYLIC
**ILLUMINATION:** SLOAN V-SERIES ORANGE LED MODULE
701269-OLP-MB

**WIRING AND FIXTURES:** UL LISTED/RECOGNIZED HARDWARE

**POWER SUPPLY:** PHILLIPS ADVANCE LED DRIVER

**MOUNTING HARDWARE:** TBD
**TRIMCAP:** 1" BLACK JEWELITE

**SAME AS ABOVE**

**FACADE**

2-2 EXCLAMATION POINT SECTION DETAIL
SCALE:  3/4" = 1"

# PYLON PANELS

## RECTANGULAR PANELS

**PREFERRED:** 

**2ND OPTION:** 

## SQUARE PANELS

**PREFERRED:**                    **2ND OPTION:**

          

## COLORS:

■ **BACKGROUND OR LETTERS (DEPENDING ON OPTION)**
**100% BLACK**

■ **EXCLAMATION POINT**
**MATCH PMS 021c ORANGE (3M COLOR 44)**

39

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



Big Lots Pylon Panel



40





**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date**: _____
**To**: _____ (insert Tenant)
   via facsimile:  (614) 278-6546

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE**: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs.  Landlord shall deliver to Tenant with this notice, the required surveys and initial  completion of each item below prior to possession being accepted by Tenant.

_____  Roof Survey with evidence that the required repairs have been made.

_____  HVAC Survey with evidence that all required repairs have been made.

_____  Asbestos Survey (with evidence of required remediation, if necessary)

_____  Pest Survey certifying the premises.

_____  Sprinkler Certification.

_____  Completion of Exhibit C

_____  Utility Information:  Meter numbers for electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You**.**

**LANDLORD: STEGER TOWNE CROSSING II, LP,** a Texas limited partnership


By: _____
Title: _____


**TENANT:**

**PNS STORES, INC., a California corporation**


By: _____
Title: _____

42

## EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.**

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 20___ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and PNS STORES, INC., a California corporation, ("Tenant").

      Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.     Demised Premises: (Section 1.D.) = _____.

2.     A.     Fixed Minimum Rent – Original Term (Section 5.A.):
        _____ annually; _____ per month.

3.     A.     Fixed Minimum Rent – First Option (Section 5.A.):
        _____ annually; _____ per month.

4.     A.     Fixed Minimum Rent – Second Option (Section 5.A.):
        _____ annually; _____ per month.

5.     A.     Fixed Minimum Rent – Third Option (Section 5.A.):
        _____ annually; _____ per month.

6.     A.     Fixed Minimum Rent – Fourth Option (Section 5.A.):
        _____ annually; _____ per month.

**Signed and Acknowledged:**

**LANDLORD: STEGER TOWNE CROSSING II, LP,** a Texas limited partnership

By: _____
Title: _____

**TENANT:**

**PNS STORES, INC., a California corporation**

By: _____
Title: _____

44

# EXHIBIT H

# ROOF REPORT


**RoofConnect®**
NATIONAL ROOFING SERVICES.

| Roof Composition: | | |
|---|---|---|
| Membrane: | | EPDM Ballasted |
| Deck: | | Metal |

| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Drainage:** | N/A | N/A |
| - Gutters/Downspouts | 260 LF | Gutter, Fair, back of the building. |
| Metal Type | 260LF | Prefinished |
| Attachment | 260LF | Mechanically |
| Condition | 260LF | Fair |

| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Base Flashing (Wall):** | 630LF | EPDM/Good/Perimeter except back side |
| Laps/Seams | N/A | N/A |
| Holes/Splits/Cracks | N/A | N/A |
| Deterioration/Damage | 25LF | Wall Flashing, Delaminated, 3'X25', loading dock roof wall. |
| Misc. | | |

| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Metal Components:** | | |
| - Edge Metal/Gravel Stop | 260LF | Gravel Stop, Fair, back side of the building. |
| Type | 10LF | Gravel stop, |
| Condition | N/A | N/A |
| Strip in Flashing | 260LF | EPDM, good, back of the building |
| - Counter Flashing | 610LF | Metal, good, perimeter, |

| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Penetrations (1 of 2):** | N/A | N/A |
| - Pipes/VTR | 30 | Pipes, fair, 6", roof field. |
| Type | 4 | Support pipe, poor, 4", wind wall. |
| Flashing | 5 | Condensation drainpipe, improper repair, 1", RTUs. |
| Caulk | 1 | Pipe, improper repair, 6". |
| Pipe/VTR Condition | N/A | N/A |
| -HVAC Curbs | 7 | RTU, good, 8.5'X7' |
| Flashing | 7 | good |
| Counter Flashing | 160LF | Metal, good, 3", |
| Unit Condition | 7 | Good |
| Misc. | N/A | N/A |

45



| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Penetrations (2 of 2):** | N/A | N/A |
| **-Pitch Pans** | 4 | Electrical conduits, abandoned 5"X5", roof. |
| **- Curbed Vents** | 4 | Exhaust Vents, Good, N/A. |
| Flashing | 4 | EPDM, Good, |
| Vent Condition | 4 | Metal, good, |
| Fasteners | 4 | Good, n/a. |
| **- Misc. Curbs** | 8 | Abandoned curbs |
| **Coping:** | 630LF | Metal clip sealant, deteriorated, perimeter. |

| | Qty | Type, Condition, Size, Location, etc. |
|---|---|---|
| **Roof Surface (Field):** | N/A | EPDM Ballasted, fair |
| Laps/Seams | 1 | Seam, 17" open seam, SW corner. |
| Ponding Water | N/A | N/A |
| Holes/Cuts | 1 | Cut/hole, temp, SE corner |
| Alligatoring | N/A | N/A |
| Membrane Attachment | N/A | N/A |
| Insulation | N/A | N/A |
| Surfacing | N/A | N/A |
| • Other | N/A | N/A |
| **Miscellaneous Equipment:** | | |
| ☐    Gas Lines | N/A | N/A |
| ♦    Electrical Conduit | 1 | Fair, |
| ♦    Satellites | 2 | N/A |
| ☐    Lightening Protection | N/A | N/A |

46



## Recommended Repairs:

- Properly repair twenty-five (25') lineal feet of delaminated wall flashing on loading dock roof.
- Properly flash five (5) condensation pipes penetrations.
- Furnish and install two (2) metal clips then clean prime and reseal seventy (70) coping cap clips with NP1 urethane sealant.
- Properly flash three (3) penetrations supports with improper repairs with new EPDM flashing materials.
- Fasten three (3) areas of detached gravel guard.
- Properly reinstall detached gutter hangers and repair deteriorated gutter seams.
- Properly patch one (1) area of temp repairs with new EPDM roofing materials.
- Properly patch one (1) area of failing seams on roof field on SW corner.

Budget Amount for Repairs:  $9,596.05

## Recommended Replacement:

10+ years

Budget Amount for Replacement: N/A

47



## RECOMMENDED ACTIONS
Call 877-942-5613 for any questions.

**Customer Name:  Big Lots Stores, Inc.**
**Site/Store Number:  Potential Big Lots (Rockwall, TX)**
**Site Address: 2855 Ridge Road**
**Site City/State Rockwall, TX**
**RoofConnect WO#:  254423**
**Customer PO#:  Tiffany Lordier**

**PLEASE COMPLETE THE FOLLOWING:**
**Survey Date:1/12/2021**
**Roof Type: EPDM Ballasted**
**Roof Size (Total sq. ft): 38570 SF**
**Building Section:  main roof and loading dock roof**
**Roof Condition:** ☐ Good   ☒ Fair   ☐ Poor

Class "C" = Corrective – inspection indicates immediate action is necessary
Class "PM" = Preventative Maintenance – inspection indicates action is necessary to extend the useful life of the roof system.
Class "W" = Warranty - potential warranty claim

| # | Roof Defect Description<br>*In detail describe the defect.*<br>*If damaged explain how it appears to have happened.* | Recommended Action<br>*How will repair be made?* | Units<br>/Qty | Class<br>C/PM/W | Cost to Complete | |
|---|---|---|---|---|---|---|
| | | | | | Current Year | Next Year |
| 1 | Twenty-five (25') LF of delaminated wall. | Properly repair twenty-five (25') lineal feet of delaminated wall flashing on loading dock roof. | | C | $ | $ |
| 2 | Five (5) condensation pipes improperly repaired | Properly flash five (5) Condensation pipes penetrations. | | C | $ | $ |
| 3 | Missing clips, deteriorated sealant. | Furnish and install two (2) metal clips then clean prime and reseal seventy (70) coping cap clips with NP1 urethane sealant. | | C | $ | $ |
| 4 | Three (3) improper repairs | Properly flash three (3) penetrations supports with new EPDM flashing materials. | | C | $ | $ |
| 5 | Detached gravel guard | Fasten three (3) areas of detached gravel guard. | | C | | |
| 6 | Two (2) detached gutter hangers and six areas of failing gutter seams. | Properly reinstall detached gutter hangers and patch gutter seams. | | C | | |
| 7 | One (1) temp repair | Properly patch one (1) area of temp repairs with new EPDM roofing materials. | | C | | |
| 8 | One area of open/failing seam. | Properly patch one (1) area of failing seams on roof field on SW corner. | | C | | |
| | **Total All Recommended Actions** | | | | $ | $ |

48



| # | Roof Defect Description *In detail describe the defect. If damaged explain how it appears to have happened.* | Recommended Action *How will repair be made?* | Units /Qty | Class C/PM/W | Cost to Complete Current Year | Next Year |
|---|---|---|---|---|---|---|
| **LABOR** | Labor | | 90 MH | | $7,110.00 | $ |
| **Material** | EPDM Form flash | | 20 LF | | $271.60 | $ |
| **Material** | Quick prime plus | | 3 Gal | | $435.00 | $ |
| **Material** | 3" seam tape | | 1 Roll | | $88.00 | $ |
| **Material** | Lap sealant | | 5 TB | | $34.50 | $ |
| **Material** | EPDM Membrane | | 100 SF | | $244.00 | $ |
| **Material** | Termination bar 10' | | 6 EA | | $ 34.80 | |
| **Material** | NP1 sealant | | 30 TB | | $264.40 | |
| **Material** | Caulking primer | | 1 EA | | $21.21 | |
| **Material** | Water block | | 3 TB | | $12.75 | |
| **Material** | Quick scrubber kits | | 3 KIT | | $52.91 | |
| **Material** | Concrete faster | | 50 EA | | $12.00 | |
| **Material** | EPDM bonding adhesive | | 5 Gal | | $145.08 | |
| **Material** | Trash bag | | 1 Roll | | $31.25 | |
| **Material** | Rags | | 1 Bag | | $5.63 | |
| **Material** | Rollers & frames | | 4 Each | | $20.44 | |
| **Material** | Splice wash | | 4 Gal | | $57.35 | |
| | | | | | $ | |
| **TAX** | TAX AS Applicable | | | | $755.13 | $ |
| **Total All Recommended Actions** | | | | | $9,596.05 | $ |

● Pricing may vary if all recommended actions are not approved. Pricing valid for 30 days from date of survey. ●

49