## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: January 21, 2025 at 1:00 p.m. (ET)**<br>**Obj. Deadline: January 14, 2025 at 4:00 p.m. (ET)** |

### GATEWAY'S MOTION TO ENFORCE THE SALE ORDER AND COMPEL PERFORMANCE BY DEBTORS UNDER ASSET PURCHASE AGREEMENT

1.    In exchange for cash and the assumption of significant liabilities, Gateway BL Acquisition, LLC ("Gateway") agreed to buy substantially all of the Debtors' assets in a going-concern transaction.  Key constituents, including the DIP lenders and ultimately the Committee, supported the sale.  On November 22, 2024, the Court approved the sale and bound the Debtors "in all respects" to the asset purchase agreement they negotiated.  *See* D.I. 1232 ("Sale Order") ¶ 8.

2.    To induce Gateway to pursue a going-concern transaction, the Debtors had agreed that—if the transaction did not close—the Debtors would repay certain of Gateway's expenses and return a $2.5 million deposit.  Those provisions were subject to creditor objection and Court approval.  To ensure priority of the re-payment, the parties agreed that some funds would be held in escrow—at a third-party bank—outside the property of the estate.  Based on the Debtors'

---

[1]    The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin Granville Road, Columbus, OH 43081.

promises, Gateway invested thousands of hours of principal and advisor time and incurred significantly more than $5 million to diligence, negotiate, and take steps to close the transaction; Gateway also incurred the opportunity cost of not looking at other transactions during this period.

3.      Unfortunately, through no fault of Gateway, the sale to Gateway did not close. Updated business forecasts—provided by the Debtors and shared with Gateway after the sale hearing—showed a collateral shortfall of approximately $103 million for the week ending November 30, 2024, and approximately $85 million for the week ending December 7, 2024. Although the collateral shortfall triggered the failure of a closing condition—permitting Gateway to terminate the transaction—Gateway did not immediately terminate the transaction. Instead, Gateway continued to work with stakeholders and third parties to fill that hole and make the going-concern sale viable. Those efforts were impeded by challenges getting timely and accurate information from the Debtors. Ultimately, many parties were uninterested in contributing to a solution; those that showed some interest required terms or a timeline that would not be feasible without delaying the closing and deepening the shortfall.

4.      The 11th-hour effort to raise additional capital was unsuccessful. In addition, the Debtors sought and received approval to liquidate approximately 850 stores that Gateway intended to acquire. There was no longer any realistic possibility to close the transaction. On December 21, 2024, Gateway served a termination notice that complied with the requirements in the APA. Gateway's termination was valid; it has not been challenged by the Debtors or any party.

5.      Upon termination, the following were due to Gateway:

- The release of a $2.5 million deposit held in escrow ("Deposit Amount");

- The release of $1.5 million of the Expense Reimbursement (as defined in the APA) held in escrow; and

- The remaining $500,000 balance of the Expense Reimbursement.

2

6.      The amounts were due to Gateway by December 30, 2024.  The amounts remain unsatisfied, despite multiple follow-ups from Gateway and its advisors.  The Debtors have refused to countersign the escrow release letter and wire the Expense Reimbursement, leaving Gateway with no choice but to bring this motion.  While Gateway appreciates the difficult situation faced by many of the Debtors' creditors, the Court must enforce its Sale Order and hold the Debtors to their bargain.  The Court should compel the Debtors—within one (1) business day of entering the requested order—to (i) countersign the letter releasing the Deposit Amount and $1.5 million of Expense Reimbursement and (ii) wire Gateway the remaining $500,000 balance of the Expense Reimbursement.

**Jurisdiction and Venue**

7.      The United States Bankruptcy Court for the District of Delaware ("Court") has jurisdiction over this matter pursuant to (1) 28 U.S.C. §§ 157 and 1334 and the February 29, 2012 *Amended Standing Order of Reference*; (2) paragraph 81 of the Sale Order ("[T]he Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA"); (3) section 13.09(b) of the APA ("the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby"); and (4) the Court's jurisdiction to interpret and enforce its own orders, *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).  Gateway confirms its consent to the Court entering a final order in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3

9.      The statutory bases for the relief requested herein are sections 105, 363, 503, and

507 of title 11 of the Bankruptcy Code; the Court's inherent authority to enforce its own orders;

and Bankruptcy Rules 2002, 6004, and 9013.

## Background

### A.      The Sale Process.

10.      On September 8, 2024, Gateway and the Debtors executed a stalking horse asset

purchase agreement ("APA").  On October 25, 2024, the Court approved bidding procedures and

certain bid protections for Gateway, including the Expense Reimbursement.  *See* D.I. 612

("Bidding Procedures Order").

11.      Following a further marketing of the Debtors' assets and an auction, the Debtors

identified Gateway as the successful bidder.  *See* D.I. 661 (Notice of Successful Bidder for the

Sale of the Debtors' Assets).  At hearings on November 21 and 22, 2024, the Debtors sought and

received Court approval of the APA.  *See* D.I. 1218, 1227.  Key constituents—including the DIP

lenders, trade vendors, many landlords, other contract counterparties, and ultimately the

Committee—supported the sale to Gateway.

12.      The APA and Sale Order contained several provisions relevant here:

- APA section 9.06 created a closing condition that required the Debtors to maintain a minimum contributed asset value based on the Debtors' projected contributed asset value as of the signing of the APA.  The projected amount varied depending on the timing of the closing.

- APA section 12.01(c)(i) allowed Gateway to terminate the APA upon certain breaches by the Debtors, including if such breach would lead to the failure of the conditions set forth in section 9 of the APA.

- APA section 3.02(c) required the Debtors to return the Deposit Amount to Gateway within 2 business days of the APA being terminated for circumstances other than a breach by Gateway.

- APA section 13.07(b)(ii)(B) required the Debtors to deliver the Expense Reimbursement to Gateway within 5 business days of the APA being terminated for circumstances other than a breach by Gateway.

- Paragraph 16 of the Bidding Procedures Order authorized the Expense Reimbursement, approved its amount, and authorized its payment to the extent it became due.

- Paragraph 17 of the Bidding Procedures Order provided that the Expense Reimbursement constituted an allowed administrative expense claim under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

- Paragraph 6 of the Sale Order authorized the Debtors to pay, without further order of the Court, any amounts that become payable by the Debtors pursuant to the APA.[2]

**B.    Gateway's Efforts to Close the Transaction.**

13.    Gateway worked tirelessly over many months to develop, fund raise, and close the transaction.  For example:

- ***Debt Commitment Letters***.   On the eve of the hearing to approve the Bidding Procedures Order, Gateway executed debt commitment letters that contemplated (a) an equity contribution of at least $90 million from Nexus Capital Management, Gateway's parent, (b) a $232.5 million FILO asset-based term loan credit facility, and (c) an approximately $443 million senior secured asset-based revolving credit facility.  These letters gave the Debtors a path to reach a workable transaction on a timely basis.  *See Declaration of Evan Glucoft* ("Glucoft Decl.") ¶ 4.

- ***Assuming Additional Liabilities***.  In the lead up to and during the auction, Gateway made meaningful concessions to assume additional liabilities, including obligations under the assumed leases; taxes attributable to the pre-closing period to the extent not paid in the ordinary course of business prior to Closing; gift cards, customer credits and rebates, and similar liabilities; and 401K Match for Q3 2024 and any other amounts through termination of the match, which occurred on October 26, 2024—all providing the estate further value.  *See* D.I. 661; *see also* Glucoft Decl. ¶ 4.

---

[2]    **Exhibit 2** to this motion includes a chart with the key provisions from the APA, Bidding Procedures Order, and Sale Order.

The APA also provided for a break-up fee that is payable in certain circumstances.  The payment of that break-up fee is not at issue in this motion, but Gateway reserves its rights to raise issues related to the amount and priority of that break-up fee at the appropriate time.

- ***Preparation to Own Business***.  Following the auction, Gateway continued to progress the transaction and prepare to own the go-forward business.  Gateway met with the Debtors' management team in Columbus and interacted regularly with the Debtors' advisors on operational matters, including the go-forward lease portfolio and trade contract counterparties.  Gateway coordinated to set up the infrastructure required to operate the business after closing, including bank accounts, insurance, employee benefit plans and payroll for the Debtors' workforce.  Gateway also spent substantial resources negotiating the long form credit agreements and related ancillary documents with its lenders.  *See* Glucoft Decl. ¶ 4.

14.    Meanwhile, Gateway facilitated consensus with respect to the sale transaction and the overall exit from chapter 11.  To smooth a path to approval and closing—often at the Debtors' or Committee's request—Gateway extended sale order milestones, agreed to adjourn the sale hearing by almost two weeks, and agreed to further modifications in the Sale Order and APA.  Gateway knew time was of the essence for the Debtors to close the sale transaction before the holidays, but Gateway also appreciated the need to allow the parties time to reach consensus to minimize disputes.  *Id.* ¶ 5.  Ultimately, the fee burn and operational impact of an extended stay in chapter 11 proved devastating.

15.    In recent papers, the Debtors suggested that Gateway delayed closing.  *See* D.I. 1437 ("GB Sale Motion"), ¶ 18.  Although that suggestion has no basis, it has been adopted by other case participants.  *See, e.g.*, D.I. 1504 ¶ 12.  In fact, Gateway pushed to close as quickly as possible to minimize the administrative burden.  Gateway wanted to close quickly because additional administrative claims would reduce the value of the post-reorganized assets that Gateway would own.  Glucoft Decl. ¶ 6.

16.    While there were delays, they were not attributable to Nexus.  On November 26, 2024, the Debtors provided the financials that showed a deterioration to the Debtors' business.  Gateway initially believed the shortfall was manageable and continued to work in good faith to close.  *Id.*  Gateway organized an effort to identify solutions to fill the capital need to consummate

the acquisition.  *Id.*  Gateway was open-minded to the form that capital and savings could be realized, whether it be in the form of payment holidays and/or reduction of claims in exchange for equity in Gateway, or capital infusion through additional financing or equity from existing stakeholders or strategic parties interested in the investment.  Ultimately, many parties were uninterested in contributing to a solution; those that showed some interest required terms or a timeline that would not be feasible without delaying the closing and deepening the shortfall.  *Id.*

17.     Further, as Gateway received more information, it became increasingly clear that the financials provided by the Debtors did not fully reflect the depth of the business underperformance and shortfalls.  The Debtors continued to miss their revised, lowered forecast for November; revised their December projections lower; and increased exit costs (including fees, expenses, and cure costs).  As noted above, updated business forecasts showed a collateral shortfall of approximately $103 million for the week ending November 30, 2024, and approximately $85 million for the week ending December 7, 2024.  *Id.* ¶ 7.

18.     Meanwhile, while Gateway was working to salvage the deal instead of exercising its termination right, Gateway learned of two significant developments: *first*, an imminent breach of the DIP that had not been disclosed on the disclosure schedule, and *second*, to avoid the DIP lenders exercising remedies due to DIP defaults, the Debtors were entering into contracts and taking steps to liquidate the business (including the purchase of millions of dollars' worth of GOB signage), which worsened the financial situation, hurt employee morale, and breached the APA. Finally, after the Debtors received Court approval to liquidate approximately 850 stores that Gateway intended to acquire, Gateway terminated the APA as there was no longer any realistic possibility to close.  *See id.* ¶ 8.

19.     Overall, Gateway invested thousands of hours of principal and advisor time and incurred significantly more than $5 million to diligence, negotiate, and take steps to close the transaction, excluding the cost of Gateway and Nexus' internal time and the opportunity cost to Gateway of not looking at other transactions during this period. *Id.* ¶ 9.

**C.      The Debtors Refuse to Honor their Expense-Reimbursement Obligations.**

20.     On December 21, 2024, Gateway sent its termination notice. Gateway's termination notice included joint instructions to return the Deposit Amount and release from escrow $1.5 million of the Expense Reimbursement. *Id.* ¶ 10.

21.     On December 23, 2024, counsel for the Debtors responded that the Debtors would not countersign the joint instructions or pay the incremental Expense Reimbursement at that time. *Id.* ¶ 11.

22.     On December 31, 2024, Gateway sent the Debtors a breach notice in light of the Debtors' failure to agree to release the escrowed funds and wire the $500,000. *Id.* ¶ 12.

<u>**Argument**</u>

23.     The Court should enforce its Sale Order and compel the Debtors to comply with their escrow-release and expense-reimbursement obligations under the APA and Sale Order.

24.     Parties must comply with court orders—particularly ones they sought and supported—in their entirety. "[O]rders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). "If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." *Id.*; *Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*, 2023 WL 1478999, at *7, n. 13 (3d Cir. Feb. 2, 2023) ("[A]bsent a stay … a party is required to comply 'promptly' with 'all orders and judgments of courts.'" (quoting *United States v. Stine*, 646 F.2d 839, 845 (3d Cir. 1981)).

25.     The Sale Order bound the Debtors in all respects to their obligations under the APA. *See* D.I. 1232 ¶ 8.  Those obligations included the escrow release and expense reimbursement obligations, which are core to the Court-approved bargain struck between the Debtors and Gateway.  Key creditor constituencies supported the deal and its terms.

26.     Gateway's termination of the APA was valid, and no party has suggested otherwise. There is no basis for the Debtors to not release the funds:  the obligations are plain, clear, and enforceable.  The Sale Order has not been appealed or stayed, nor did Debtors (or any other party) seek to stay it.  The Debtors must promptly comply with it.  *See In re Bouchard Transp. Co.*, 74 F.4th 743, 751 (5th Cir. 2023) (stalking horse bidder's expense reimbursement and breakup fee were payable under both sections 503(b) and 363(b) of the Bankruptcy Code, respectively); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 521 (Bankr. N.D. Tex. 2019) (expense reimbursement was payable even when trustee's plan was unconfirmable), *aff'd*, 850 F. App'x 302 (5th Cir. 2021); *NBR Shoppes, LLC v. SB Cap. Gp., LLC* (*In re Antaramian Props., LLC*), 564 B.R. 762, 766 (Bankr. M.D. Fla. 2016) ("[Bid protections are] intended to compensate the bidder for the time, effort, and risk of being the stalking horse, and to encourage the bidder to do the necessary due diligence with the assurance that its efforts will be compensated if it is unsuccessful.") (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 535 (3d Cir. 1999)).

27.     By refusing to honor their post-termination obligations, the Debtors attempt to change the economics of the deal they struck.  If the Debtors were excused from honoring their post-termination obligations, it would not only violate the contract and the Court's order, but it could also chill buyer interest in debtor assets.  Potential buyers may be less willing to commit the time and resources needed to develop transactions and tie up capital in anticipation of closing

them—all reducing the value of assets in chapter 11 and impairing the prospects for going-concern transactions.

## Conclusion

28.    The Court should enter an order enforcing the Sale Order and compelling the Debtors to immediately perform all of their outstanding obligations under the Sale Order and APA. The Court should compel the Debtors—within one (1) business day of entering the requested order—to (i) countersign the letters releasing the Deposit Amount and $1.5 million of Expense Reimbursement and (ii) wire Gateway the remaining $500,000 balance.

## Notice

29.    Gateway will provide notice of this motion to the following:  (a) the office of the United States Trustee for the District of Delaware; (b) Davis Polk & Wardwell LLP, as counsel to the Debtors; (c) (i) McDermott Will & Emery LLP and (ii) Cole Schotz, P.C., as counsel to the Committee; (d) Choate, Hall & Stewart LLP, as counsel to the DIP ABL Agent; (e) Otterbourg P.C., as counsel to the DIP Term Agent; and (f) the United States Attorney's Office for the District of Delaware.  Gateway submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

Dated: January 3, 2025
Wilmington, Delaware

/s/ Jared Kochenash
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar. No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:          jbarry@ycst.com
                kenos@ycst.com
                jkochenash@ycst.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (*PHV* forthcoming)
Nicholas Adzima (*PHV* forthcoming)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Email:      christopher.marcus@kirkland.com
            nicholas.adzima@kirkland.com

-and-

Judson Brown, P.C. (*PHV* forthcoming)
McClain Thompson (*PHV* forthcoming)
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (212) 446-4800
Email:      judson.brown@kirkland.com
            mcclain.thompson@kirkland.com

*Co-Counsel for Gateway BL Acquisition, LLC*

*Co-Counsel for Gateway BL Acquisition, LLC*