**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF EVAN GLUCOFT IN SUPPORT OF
GATEWAY'S MOTION TO ENFORCE THE SALE ORDER AND
COMPEL PERFORMANCE BY DEBTORS UNDER ASSET PURCHASE AGREEMENT**

I, Evan P. Glucoft, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Nexus Capital Management LP, the parent of Gateway BL Acquisition, LLC ("Gateway"). Nexus is a Los Angeles-based private equity firm that makes debt and equity investments in a broad range of companies and industries.

2. I am the day-to-day lead for Gateway's engagements with Big Lots. I joined Nexus in 2017 after working in distressed investing and restructuring at Alden Global Capital and Moelis & Company. I serve on the board of directors of Savvas Learning, ACT, Inc., Careismatic, and HDT Global. I hold an M.B.A. from the University of Chicago and a B.A. from the University of California, Los Angeles.

3. I submit this declaration in support of the *Gateway's Motion to Enforce the Sale Order and Compel Performance by Debtors Under Asset Purchase Agreement*. I am over the age

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin Granville Road, Columbus, OH 43081.

of 18 and authorized to submit this declaration on behalf of Gateway. This declaration is based upon my personal knowledge, my day-to-day work on the Big Lots matter, my discussions with Big Lots and its advisors, and my review of relevant documents and information. If called as a witness, I would testify as follows.

### The Sale Process and Gateway's Effort to Close the Transaction

4. On September 8, 2024, Gateway and the Debtors executed a stalking horse asset purchase agreement. Gateway worked tirelessly over many months to develop, fund raise, and close the transaction. For example:

- ***Debt Commitment Letters***.  On the eve of the hearing to approve the Bidding Procedures Order, Gateway executed debt commitment letters that contemplated (a) an equity contribution of at least $90 million from Nexus, (b) a $232.5 million FILO asset-based term loan credit facility, and (c) an approximately $443 million senior secured asset-based revolving credit facility. These letters gave the Debtors a path to reach a workable transaction on a timely basis.

- ***Assuming Additional Liabilities***.  In the lead up to and during the auction, Gateway made meaningful concessions to assume additional liabilities, including obligations under the assumed leases; taxes attributable to the pre-closing period to the extent not paid in the ordinary course of business prior to Closing; gift cards, customer credits and rebates, and similar liabilities; and 401K Match for Q3 2024 and any other amounts through termination of the match, which occurred on October 26, 2024—all providing the estate further value.

- ***Preparation to Own Business***.  Following the auction, Gateway continued to progress the transaction and prepare to own the go-forward business. Gateway met with the Debtors' management team in Columbus and interacted regularly with the Debtors' advisors on operational matters, including the go-forward lease portfolio and trade contract counterparties. Gateway coordinated to set up the infrastructure required to operate the business after closing, including bank accounts, insurance, employee benefit plans and payroll for the Debtors' workforce. Gateway also spent substantial resources negotiating the long form credit agreements and related ancillary documents with its lenders.

5. Meanwhile, Gateway facilitated consensus with respect to the sale transaction and the overall exit from chapter 11. To smooth a path to approval and closing—often at the Debtors' or Committee's request—Gateway extended sale order milestones, agreed to adjourn the sale

hearing by almost two weeks, and agreed to further modifications in the Sale Order and APA. Gateway knew time was of the essence for the Debtors to close the sale transaction before the holidays, but Gateway also appreciated the need to allow the parties time to reach consensus to minimize disputes.

6.    Gateway pushed to close as quickly as possible to minimize the administrative burn. Gateway wanted to close quickly because additional administrative claims would reduce the value of the post-reorganized assets that Gateway would own. While there were delays, they were not attributable to Nexus. On November 26, 2024, the Debtors provided financials that showed a deterioration to the Debtors' business. Gateway initially believed the shortfall was manageable and continued to work in good faith to close. Gateway organized an effort to identify solutions to fill the capital need to consummate the acquisition. Gateway was open-minded to the form that capital and savings could be realized, whether it be in the form of payment holidays and/or reduction of claims in exchange for equity in Gateway, or capital infusion through additional financing or equity from existing stakeholders or strategic parties interested in the investment. Those efforts were impeded by challenges getting timely and accurate information from the Debtors. Ultimately, many parties were uninterested in contributing to a solution; those that showed some interest required terms or a timeline that would not be feasible without delaying the closing and deepening the shortfall.

7.    Further, as Gateway received more information, it became increasingly clear that the financials provided by the Debtors did not fully reflect the depth of the business underperformance and shortfalls. The Debtors continued to miss their revised, lowered forecast for November; revised their December projections lower; and increased exit costs (including fees, expenses, and cure costs). Updated business forecasts showed a collateral shortfall of

approximately $103 million for the week ending November 30, 2024, and approximately $85 million for the week ending December 7, 2024.

8. Meanwhile, while Gateway was working to salvage the deal instead of exercising its termination right, Gateway learned of two significant developments: *first*, an imminent breach of the DIP that had not been disclosed on the disclosure schedule, and *second*, to avoid the DIP lenders exercising remedies due to DIP defaults, the Debtors were entering into contracts and taking steps to liquidate the business (including the purchase of millions of dollars' worth of GOB signage), which worsened the financial situation, hurt employee morale, and breached the APA. Finally, after the Debtors received Court approval to liquidate approximately 850 stores that Gateway intended to acquire, Gateway terminated the APA as there was no longer any realistic possibility to close.

9. Overall, Gateway invested thousands of hours of principal and advisor time and incurred significantly more than $5 million to diligence, negotiate, and take steps to close the transaction, excluding the cost of Gateway and Nexus' internal time and the opportunity cost to Gateway of not looking at other transactions during this period.

**The Debtors Refuse to Honor Their Expense Reimbursement Obligations**

10. On December 21, 2024, Gateway sent its termination notice. Gateway's termination notice included joint instructions to return the Deposit Amount and release from escrow $1.5 million of the Expense Reimbursement. A true and correct copy of Gateway's termination notice is attached as **Exhibit A** (omitting two pages that included account information).

11. I understand that on December 23, 2024, counsel for the Debtors responded that the Debtors would not countersign the joint instructions or pay the incremental Expense Reimbursement at that time.

12. On December 31, 2024, Gateway sent the Debtors a breach notice in light of the Debtors' failure to agree to release the escrowed funds and wire the $500,000. A true and correct copy of Gateway's breach notice is attached as **Exhibit B**.

*       *       *       *       *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 3, 2025

/s/ *Evan P. Glucoft*
Evan P. Glucoft
Managing Director
Nexus Capital Management LP
On behalf of Gateway BL Acquisition, LLC