# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>Hearing Date: January 21, 2025 at 1:00 p.m. (ET)<br>Obj. Deadline: January 14, 2025 at 4:00 p.m. (ET) |

### GATEWAY'S SECOND MOTION TO
### ENFORCE THE SALE ORDER AND COMPEL
### PERFORMANCE BY DEBTORS UNDER ASSET PURCHASE AGREEMENT

1.  Gateway BL Acquisition, LLC ("Gateway") moves to compel the Debtors to pay a $7.5 million termination fee ("Break-Up Fee") owed to Gateway.[2] This motion is related to but separate from Gateway's First Motion to Enforce, which concerns the repayment of certain expenses incurred by Gateway and the return of Gateway's deposit. While Gateway continues to appreciate the difficult situation faced by many of the Debtors' creditors, the Debtors made Court-approved promises to induce Gateway to diligence, negotiate, and take steps to close a going-concern transaction. One promise was the payment of the Break-Up Fee if Gateway

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin Granville Road, Columbus, OH 43081.

[2] On January 3, 2025, Gateway filed a *Motion to Enforce the Sale Order and Compel Performance by Debtors Under Asset Purchase Agreement* (D.I. 1559) ("First Motion to Enforce") and *Declaration of Evan Glucoft in Support of Gateway's Motion to Enforce the Sale Order and Compel Performance by Debtors Under Asset Purchase Agreement* (D.I. 1560) ("Glucoft Declaration"). There is overlap between this motion and the factual bases of the First Motion to Enforce, which Gateway incorporates but does not repeat in full here; Gateway incorporates certain defined terms from it.

terminated the transaction and an alternative transaction closed. The GBRP Sale Transaction qualifies as an alternative transaction, and it has closed. The Debtors therefore owe Gateway the Break-Up Fee but have refused to pay it. Gateway therefore asks the Court to enforce its Sale Order and hold the Debtors to their agreement by compelling them—within one (1) business day of entering the requested order—to wire the $7.5 million Break-Up Fee to Gateway.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of Delaware ("Court") has jurisdiction over this matter pursuant to (1) 28 U.S.C. §§ 157 and 1334 and the February 29, 2012 *Amended Standing Order of Reference*; (2) paragraph 81 of the Sale Order ("[T]he Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA"); (3) section 13.09(b) of the APA ("the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby"); and (4) the Court's jurisdiction to interpret and enforce its own orders, *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Gateway confirms its consent to the Court entering a final order in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105, 363, 503, and 507 of title 11 of the Bankruptcy Code; the Court's inherent authority to enforce its own orders; and Bankruptcy Rules 2002, 6004, and 9013.

**Background**

A.   **The Gateway Sale Process.**

5.   In exchange for cash, the assumption of significant liabilities, and pay down of all of the Debtors' secured debt, Gateway agreed to buy substantially all of the Debtors' assets in a going-concern transaction. On September 8, 2024, Gateway and the Debtors executed a stalking horse asset purchase agreement. See D.I. 1232-1 ("APA"). On October 25, 2024, the Court entered the Bidding Procedures Order, which approved bidding procedures and certain bid protections for Gateway, including the $7.5 million Break-Up Fee. See D.I. 612 ("Bidding Procedures Order").

6.   Following a further marketing process, the Debtors ultimately sought and received Court approval of the APA. See D.I. 1232 ("Sale Order"). Key constituents—including the DIP lenders, trade vendors, many landlords, other contract counterparties, and ultimately the Committee—supported the sale to Gateway.

7.   The APA, Bidding Procedures Order, and Sale Order contained several provisions relevant here:

- APA section 9.06 created a closing condition that required the Debtors to maintain a minimum contributed asset value based on the Debtors' projected contributed asset value as of the signing of the APA. The projected amount varied depending on the timing of the closing.

- APA section 12.01(c)(i) allowed Gateway to terminate the APA upon certain breaches by the Debtors, including if such breach would lead to the failure of the conditions set forth in section 9 of the APA.

- APA section 13.07(b)(ii)(A) required the Debtors to deliver the Break-Up Fee to Gateway upon closing of a Tail Transaction if (a) Gateway terminated the APA pursuant to section 12.01(c)(i) due to a material breach by the Debtors and (b) if the Debtors closed a Tail Transaction within 120 days of such termination.

- The APA defines a "*Tail Transaction*" as "(a) an Alternative Transaction pursuant to which the holders of Repaid Indebtedness receive payment in full for the Repaid Indebtedness or (b) in the case of termination of this Agreement for any reason

- other than pursuant to Section 12.01(d) (*Material Buyer Breach*), a transaction pursuant to a Superior Proposal."

- The APA defines an "*Alternative Transaction*" as "a sale, transfer, or other disposition, whether direct or indirect, whether by means of an asset sale (other than a liquidation or other sale of assets where the Business is not continuing as a going-concern), merger, sale of stock, amalgamation, reorganization, or otherwise (including through a standalone plan of reorganization), of (a) beneficial ownership of a majority of the equity interests of the Selling Entities or (b) any material portion of the Assets, in a transaction or a series of transactions with one or more Persons, other than the Buyer and/or its Affiliates."

- The APA defines "*Repaid Indebtedness*" as "collectively, the ABL DIP Obligations, the Pre-Petition ABL Obligations, the Term DIP Obligations and the Pre-Petition Term Obligations."

- Paragraph 16 of the Bidding Procedures Order authorized the Break-Up Fee, approved its amount, and authorized its payment to the extent it became due.

- Paragraph 17 of the Bidding Procedures Order provided that the Break-Up Fee constituted an allowed administrative expense claim under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

- Paragraph 6 of the Sale Order authorized the Debtors to pay, without further order of the Court, any amounts that become payable by the Debtors pursuant to the APA.[3]

8. Based on the Debtors' promises, Gateway invested thousands of hours of principal and advisor time and incurred significant costs to diligence, negotiate, and take steps to close the transaction—and that does not include the cost of internal time and effort or the opportunity cost of not pursuing other transactions during this period. *See* D.I. 1560 ¶ 9.

**B. Gateway's Efforts to Close the Gateway Transaction and the Debtors' Subsequent Entry into GBRP Sale Transaction.**

9. As discussed in the First Motion to Enforce, Gateway worked tirelessly over many months to develop, fund raise, and close the transaction. *See, e.g.*, D.I. 1559 ¶ 13. Prior to the

---

[3] **Exhibit 2** to this motion includes a chart with key provisions from the APA, Bidding Procedures Order, and Sale Order.

anticipated closing, the Debtors' finances deteriorated: They missed their revised, lowered forecast for November; revised their December projections lower; and increased exit costs (including fees, expenses, and cure costs)—creating a significant collateral shortfall. *Id.* ¶ 17. The collateral shortfall resulted in an express failure to satisfy a closing condition which triggered a termination right. Rather than terminate the APA, however, Gateway first attempted to salvage the transaction. *Id.* ¶ 18. After an 11th-hour capital raise to fill the capital need was unsuccessful—and after the Debtors received Court approval to liquidate approximately 850 stores that Gateway intended to acquire—Gateway terminated the APA on December 21, 2024, as there was no longer any realistic possibility to close. *Id.* ¶ 20.

10. After Gateway terminated the APA, the Debtors quickly pivoted to the GBRP Sale Transaction. On December 27, 2024, the Debtors filed a motion to approve the GBRP Sale, which contemplated (a) a sale of substantially all of the Debtors' assets to Gordon Brothers Retail Partners, LLC and (b) payment in full in cash of the Debtors' outstanding DIP obligations and prepetition secured obligations. D.I. 1556 ¶ 19. The Court approved the GBRP Sale Transaction, D.I. 1556, and it closed on January 3, 2025, D.I. 1588.

11. The GBRP Sale Transaction constitutes an Alternative Transaction (as defined in the APA). Further, the GBRP Sale Transaction provides for full payment of the Repaid Indebtedness (as defined in the APA). Given that the GBRP Sale Transaction is an Alternative Transaction providing for the payment in full of the Repaid Indebtedness, the GBRP Sale Transaction is a Tail Transaction under the APA—making the Break-Up Fee due upon closing of the GBRP Sale.

12. On January 2, 2025, Gateway sent the Debtors a notice regarding their obligation to pay the Break-Up Fee upon closing of the GBRP Sale Transaction. The Debtors have not paid.

5

**Argument**

13. The Court should enforce its Sale Order and compel the Debtors to comply with their obligation to pay the Break-Up Fee, which was previously approved in the Bidding Procedures Order.

14. In the Third Circuit, termination fees, such as the Break-Up Fee, are subject to the standard used for administrative expenses under section 503 of the Bankruptcy Code. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999)). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (quoting *O'Brien*, 181 F.3d at 535). Bid protections, such as break-up fees, are a normal and often necessary component of sales under the Bankruptcy Code. *See Integrated Resources, Inc.*, 147 B.R. 650, 659–60 (Bankr. S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. … In fact, because the … corporation ha[s] a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize value."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales because they provide a benefit to the estate.

15. Gateway provided significant benefits to the Debtors in its role as Stalking Horse Bidder. As the Debtors told the Court in September:

> [T]he Debtors only offered the Bid Protections to the extent that they believe, in the exercise of their business judgment and consistent with their fiduciary duties, that offering these protections would enhance and incentivize bidding. ***The Bid Protections have enabled the Debtors to secure an adequate floor for the Bid Assets and ensure that competing bids be materially higher or otherwise better than the Stalking Horse Bid, benefiting the Debtors' estates and stakeholders.*** Moreover, the Stalking Horse Bidder

would not agree to hold out its bid and act as a stalking horse without Court approval of the Bid Protections; thus, the Debtors could risk losing out on the opportunity to obtain the highest or otherwise best offer for the Bid Assets and would certainly lose out on the downside protection the Stalking Horse Bid would provide.

D.I. 18 ¶ 40 (emphasis added).

16. Gateway's Stalking Horse Bid served as a valuable benchmark for other parties to analyze the value of the Debtors' assets and allowed the Debtors to determine that an initial bid from GBRP was not qualified. Additionally, statements at recent hearings concerning the GBRP Sale confirmed that Gateway's transaction—which Gateway spent months negotiating, drafting, and analyzing diligence to finalize—provided a roadmap and blueprint for the Debtors and GBRP to transact. *See, e.g.*, *In re Big Lots, Inc.*, No. 24-11967 (JKS) Hr'g Tr. at 58 (Bankr. D. Del. Dec. 30, 2024) ("It's a cut and paste of the Nexus APA."); *id.* at 33 ("Your Honor, we included a . . . blackline of our sale order, the proposed sale order against the Nexus sale order as an attachment to the sale motion in order to show that the order we're proposing hues very closely to the Nexus order. . . . [N]ot many substantive changes have been made.").

17. Gateway's involvement in these cases, the marketing process, and its own Sale Transaction allowed the Debtors to advance their processes so that they could quickly pivot to the GBRP Sale Transaction to maximize the value of their estates. As such, not only has the Court already approved the bid protections, *see* D.I. 612 ¶ 17,[4] but this case also proved to be a classic example of the value provided by bid protections.

---

[4] "[O]rders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). "If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." *Id.*; *Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*, 2023 WL 1478999, at *7, n. 13 (3d Cir. Feb. 2, 2023) ("[A]bsent a stay … a party is required to comply 'promptly' with 'all orders and judgments of courts.'" (quoting *United States v. Stine*, 646 F.2d 839, 845 (3d Cir. 1981)).

18. Gateway's termination of the APA was valid, and no party has suggested otherwise. The Debtors have not provided any argument or basis for why the Debtors need not wire the Break-Up Fee. There would be no basis: the obligations are plain, clear, and enforceable. The Sale Order has not been appealed or stayed, nor did Debtors (or any other party) seek to stay it. The Debtors must promptly comply with their obligations under the Sale Order and the APA. And at the December 31, 2024 hearing, the Debtors and their advisors made clear that the Debtors are positioned to satisfy go-forward administrative claims as they come due. *See* Hr'g Tr. 26: 4-18 (Bankr. D. Del. Dec. 31, 2024). This administrative expense came due when the GBRP sale closed on January 3, 2025, and it is now past due.

## Conclusion

19. The Court should therefore enter an order enforcing the Sale Order and compelling the Debtors to wire to Gateway—within one (1) business day of entering the requested order—the $7.5 million Break-Up Fee.

## Notice

20. Gateway will provide notice of this motion to the following: (a) the U.S. Trustee; (b) Davis Polk & Wardwell LLP, as counsel to the Debtors; (c) (i) McDermott Will & Emery LLP and (ii) Cole Schotz, P.C., as counsel to the Committee; (d) Choate, Hall & Stewart LLP, as counsel to the DIP ABL Agent; (e) Otterbourg P.C., as counsel to the DIP Term Agent; (f) the United States Attorney's Office for the District of Delaware; and (g) any party that requested notice pursuant to Bankruptcy Rule 2002. Gateway submits that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

Dated: January 7, 2025
Wilmington, Delaware

*/s/ Joseph Barry*

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **KIRKLAND & ELLIS LLP** |
| Joseph Barry (Del. Bar No. 4221) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Kenneth J. Enos (Del. Bar No. 4544) | Christopher Marcus, P.C. (admitted *pro hac vice*) |
| Jared W. Kochenash (Del. Bar. No. 6557) | Nicholas Adzima (admitted *pro hac vice*) |
| Rodney Square | 601 Lexington Avenue |
| 1000 North King Street | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone:  (212) 446-4800 |
| Telephone:    (302) 571-6600 | Email:    christopher.marcus@kirkland.com |
| Facsimile:    (302) 571-1253 |             nicholas.adzima@kirkland.com |
| Email:         jbarry@ycst.com | |
|                  kenos@ycst.com | -and- |
|                  jkochenash@ycst.com | |
| | Judson Brown, P.C. (admitted *pro hac vice*) |
| | McClain Thompson (admitted *pro hac vice*) |
| | 1301 Pennsylvania Avenue, N.W. |
| | Washington, D.C. 20004 |
| | Telephone: (212) 446-4800 |
| | Email:    judson.brown@kirkland.com |
| |             mcclain.thompson@kirkland.com |
| *Co-Counsel for Gateway BL Acquisition, LLC* | *Co-Counsel for Gateway BL Acquisition, LLC* |