# Exhibit A

## LEASE AGREEMENT

This Lease, made effective this ⌐1⌐ day of _May_, 2003, (the "Effective Date") by and between **Bayshore Mall Acquisition**, LLC, a New Jersey limited liability company, with its business address at c/o Wharton Realty Group, Inc., 2100 Highway 35, Suite A, Sea Girt, New Jersey, 08750, (the "Landlord"), and **Big Lots Stores, Inc.**, an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, (the "Tenant"), whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

## WITNESSETH:

1.  **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.  Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan attached hereto as Exhibit A, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs and pylon signs (excluding Tenant's particular sign panel), and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

        Landlord shall maintain the Common Areas, as provided in Section 6D, which shall remain under Landlord's control and Landlord agrees not to change such Common Areas except as provided herein. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not unreasonably adversely affect Tenant's business operation, and such are applied uniformly to all tenants. Neither Tenant, nor any of Tenant's employees, contractors or agents shall fence, block, or allow property to remain in or upon or otherwise obstruct the Common Areas, except as may be provided herein. Landlord shall not alter the parking area crosshatched in green on Exhibit A, (the "No Build Area") without Tenant's prior written consent, such consent not to be unreasonably withheld or delayed.

        So long as Landlord does not materially adversely affect the character of the Shopping Center, the visibility or accessibility of the Demised Premises, or reduce the number of parking spaces serving the Shopping Center below the number required by applicable law, Landlord, from time to time, shall have the right to perform the following: (a) change or modify, and add to or subtract from the Common Areas, including without limitation, changing or modifying the size, location, shape and/or arrangement of parking areas, entrances, exits, and parking aisle alignments, and to charge for parking; (b) restrict parking by Tenant's employees to designated areas on-site; (c) construct surface, subsurface or elevated parking areas and facilities; (d) change the level or grade of parking surfaces; (e) add to or subtract from the Shopping Center, including, without limitation, the right to build additional stores or buildings or demolish buildings.

    B.  Tender, Possession and Commencement: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

        1)  The "Tenant Possession Date" shall be the date Tenant accepts possession of the Demised Premises following Landlord's written notice that it is tendering delivery of the Demised Premises with all its construction work pursuant to Exhibit C, substantially completed, except for such punchlist items which although incomplete, do not interfere with the progression of

Tenant's work or operations (the "Landlord Delivery Date"), such Tenant Possession Date not to be later than 10 days following the Landlord Delivery Date. Notwithstanding anything to the contrary stated herein, Tenant shall not be obligated to accept possession of the Demised Premises prior to the 90th day following execution of this Lease.

Within 45 days following the Tenant Possession Date, Tenant shall submit in writing to Landlord a punchlist of such unfinished items which Landlord shall complete without interfering with the progression of Tenant's Work within 30 days after Landlord's written receipt of Tenant's punchlist. In the event of any unreasonable disruption in the progression of Tenant's Work due to Landlord's efforts to complete such punchlist items, the Rent Commencement Date, defined hereinafter, shall be extended one day for each day Tenant is delayed in performing its work. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant, construction pursuant to Exhibit C is substantially complete, and the Demised Premises is in compliance with all laws, ordinances, regulations and building restrictions. As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments of Fixed Minimum Rent due hereunder which shall take effect as of the Rent Commencement Date.

2)      The "Rent Commencement Date" shall be the earlier of (i) the date occurring ninety (90) days after the Tenant Possession Date or (ii) the date Tenant opens for business.

3)      The "Term Commencement Date" shall be the Rent Commencement Date.

4)      Landlord and Tenant agree that if Landlord fails to tender possession of the Demised Premises to Tenant with Landlord's Work pursuant to Exhibit C substantially complete by the ninetieth (90th) day following execution of this Lease, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, in the event Landlord has not delivered the Demised Premises with its construction work complete within the time frame provided herein, then for each and every day Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day, up to a maximum damages amount of $25,000.00. If Landlord is delayed in delivering possession by more than 50 days, Tenant in its sole discretion may terminate this Lease (and collect $25,000.00) at any time following the 50th day until Landlord tenders possession of the Demised Premises with its work complete. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installments(s) of Rent due under this Lease.

C.     <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by reference hereto:

    1)     Exhibit A -    Site Plan of Shopping Center

    2)     Exhibit B -    Legal Description of Shopping Center

    3)     Exhibit C -    Landlord Work

    4)     Exhibit D -    Tenant Sign Specification

    5)     Exhibit E -    Delivery of Possession Letter

    6)     Exhibit F -    Existing Exclusives

D.     <u>Demised Premises</u>: The "Demised Premises" shall be storeroom unit #27, shown outlined in yellow on Exhibit A, such storeroom shall have 43,020 square feet.

E.     <u>Shopping Center</u>: The "Shopping Center" is described in Exhibit B attached hereto and made a part hereof and is known as Bay Shore Mall, at the address 845 Bayshore Road, North Cape May, New Jersey, 08204. The Gross Leaseable Area of the Shopping Center is 161,088 square feet.

## 2.   DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.   TERM:

A.     <u>Original Term</u>: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2009 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability under this Lease thereafter accruing unless such early termination is the result of a Default on the part of either Landlord or Tenant. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and the following January 31st shall be a "Partial Lease Year". If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any exercised Option Terms, and any other extended periods.

B.     <u>Option to Extend Term</u>: Landlord hereby grants to Tenant and to any of its successors or assigns permitted pursuant to Section 23 of this Lease, the option to extend the Term of this Lease for four (4) consecutive five (5) year option terms, respectively referred to as "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". Each option (upon exercise) shall become a part of the Term, shall commence following the conclusion of the immediately preceding term, and shall terminate once concluded. Each exercised Option shall be upon the same terms and conditions as contained in this Lease except as otherwise provided herein. If Tenant is then in possession of the

Demised Premises, and is not in default of this Lease beyond any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred eighty (180) days prior to the expiration of the Original Term or the immediately preceding Option Term as applicable.

4. **USE :**

A. <u>Tenant's Use:</u> Subject to the Exclusive Uses listed in Exhibit F, attached hereto, in favor of other tenants of the Shopping Center as of the Effective Date of this Lease, Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale of general merchandise and furnishings, including but not limited to furniture, furniture accessories, appliances, toys, seasonal merchandise, food (including frozen food), health and beauty aids, and for any other items sold in Tenant's stores from time to time, herein referred to as ("Permitted Use"), and shall not operate in any manner so as to violate the exclusive uses listed in Exhibit F. Tenant warrants that no single item or category of merchandise will become the primary line of merchandise sold from the Demised Premises. Landlord represents and warrants to Tenant, as of the Effective Date of this Lease, that aside from those exclusives listed in Exhibit F attached hereto, no exclusive covenants or item / category restrictions granted to, or for the benefit of existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises for the Permitted Use, or the sale of any specific item typically sold in Tenant's stores. Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with Landlord's failure to disclose all exclusives.

B. <u>Prohibited Uses:</u> Tenant shall not use the Demised Premises or Common Areas, or any part thereof, in violation of rules and regulations which are promulgated by Landlord and delivered to Tenant from time to time governing the Common Areas and the Demised Premises, provided that they are not inconsistent with any express provisions of this Lease, and are applied in a non-discriminatory manner as to all tenants. Landlord shall not lease any space in the Shopping Center, for the below enumerated Prohibited Uses, unless such Prohibited Use exists as of the Effective Date of this Lease, but in such case said Prohibited Use shall not be expanded, but may be replaced by Landlord with a new tenant and lease for the same existing Prohibited Use, and Tenant shall not use any portion of the Demised Premises or Shopping Center: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii)   to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) auditorium, activity facility, or meeting hall; (iv)   any self storage facilities; (v) any medical or health-oriented facilities or offices of more than 3,000 square feet in the aggregate in the Shopping Center; (vi) any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or unreasonably increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) automotive, tire, gasoline, or oil service centers, excluding such primarily automotive retail operations as a Pep Boys or an Auto Zone; (ix) for any governmental use or office or any social service functions or facilities of more than 3,000 square feet in the aggregate in the Shopping Center; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment or the sale of alcoholic beverages, excluding any family style sit down restaurant which may serve alcohol; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard

parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat, except for a non-plant (or off-site plant) dry cleaning service operation of more than 3,000 square feet in the aggregate in the Shopping Center; (xx) deleted; (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; or (xxvi) for any astrology, palm reading, tarot card or other like service or facility. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

C.    Tenant's Exclusive Use: Except for tenants open and operating for business in the Shopping Center as of the Effective Date of this Lease, and such other leases for premises in the Shopping Center executed prior to the Effective Date over which Landlord has no control regarding that tenant's rights to sublet or assign the lease, no other discount general merchandise operation, liquidator, closeout store, furniture, or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof as exercised pursuant to the terms of this Lease. Landlord may replace any Competing Business in operation the Shopping Center as of the Effective Date of this Lease, but may not expand such operation. In the event Landlord leases to a Competing Business, in violation of this Lease, in this Shopping Center, or in the event some other person or entity, without the knowledge of, or consent from Landlord engages in a Competing Business in this Shopping Center, and Landlord fails to enjoin and prohibit such Competing Business within 60 days from Tenant's written notice that such person or entity is in violation of Tenant's exclusive, Tenant shall have the right to pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Rent equal to the lesser of two percent (2.0%) of Gross Sales for such month or 50% of the regular monthly Fixed Minimum Rent ("Substitute Rent"), such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

5.    **OPERATION:**

Tenant agrees, subject to its Go Dark right set forth hereinafter, it will operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or

when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees ("Go Dark"); provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, so long as Tenant remains closed, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the sidewalks immediately in front of the Demised Premises for the periodic sale and display of merchandise, so long as such actions do not impair the free flow or safety of pedestrian or vehicular traffic. During any single Lease Year, Tenant shall conduct no more than 6 outdoor sales events each of a duration of no longer than 10 days.

6.    **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date, and continuing through the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month. Landlord shall be obligated to apply all monies received from Tenant in strict accordance with, and in such a manner as Tenant may designate on a check stub, or as Tenant may otherwise advise in writing.

A.    Fixed Minimum Rent: During the Original Term of this Lease, Tenant shall pay the sum of **$129,060.00** per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of **$10,755.00**.

All the terms and conditions of this Lease shall apply during the Option Terms except that the Fixed Minimum Rent applicable for the First Option Term shall be the sum of **$150,570.00** per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of **$12,547.50**. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of **$172,080.00** per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of **$14,340.00**. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of **$193,590.00** per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of **$16,132.50.00**. The Fixed Minimum Rent applicable for the Fourth Option Term shall be in the sum of **$215,100.00** per Lease Year which

shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of **$17,925.00.**

B.   Utilities Charges:   Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer, together with all taxes, levies, or other charges based on the use of such utilities.  Tenant, a its sole cost and expense, shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises. In the event any utility service to the Demised Premises shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs,  Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored.

In the event Landlord supplies any utility to Tenant, the rate charged to Tenant for such service shall not exceed the bulk rate paid by Landlord.  All billings by Landlord for any such service shall be paid by Tenant within thirty (30) days of receipt thereof.  Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use.  Installation shall be the cost and responsibility of the Tenant.  The monitoring equipment can be installed at any time during the lease Term.  Tenant reserves the right to leave monitoring equipment in place indefinitely.  In the event Landlord is supplying any utilities, Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data.  Landlord shall provide Tenant written notice of such adjustment.

C.   Percentage Rent:  In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the amount by which Tenant's Gross Sales (as hereinafter defined and if achieved) during each Lease Year exceeds the annual base sum of  **$5,162,400.00** during the Original Term; **$6,022,800.00** during the First Option Term; **$6,883,200.00** during the Second Option Term; **$7,743,600.00** during the Third Option Term; and **$8,600,000.00** during the Fourth Option Term,  (the "Breakpoint(s)").  The Parties hereby agree and understand that this is not a representation nor warranty that Tenant may or will actually achieve the stated base sums in sales.

The term "Gross Sales"  shall  mean the aggregate gross amount of (1) all sales made by Tenant or Tenant's Sublessees in or from the Demised Premises  during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  The following shall be deducted from Gross Sales to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks;  (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated on the internet and fulfilled at the Demised Premises; (8) credit card company finance or service charges;  (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month.  Tenant shall furnish to Landlord within ninety (90) days immediately following the end

of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by an officer of Tenant as being true and correct. Tenant shall include payment for any Percentage Rent owed, along with the year end statement.

For any Partial Lease Year, Percentage Rent shall be calculated using a formula with the numerator being the number of days in the Partial Lease Year and the denominator being 365 with such quotient multiplied by the particular Breakpoint during the Original Term or Option Term in which said Partial Lease Year occurs. Tenant shall pay the amount by which two and one-half percent (2 1/2%) of Tenant's Gross Sales for the Partial Lease Year exceeds the Partial Lease Year Breakpoint.

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, consistently applied, and accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year for the immediately preceding 3 Lease Years. Should Landlord's audit of Tenant's books and records disclose any discrepancy in Tenant's statement of Gross Sales resulting in a deficiency in Tenant's payment of Percentage Rent, Tenant shall pay such deficiency, which shall be immediately due and payable, and if such discrepancy in Tenant's statement of Gross Sales exceeds five percent (5%) of that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit.  In the event Tenant shall fail to pay any Percentage Rent deficiency and audit costs (should such be assessable) within 30 days of Landlord's written notice that such sums are due, then such sums shall bear interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto).  Any information obtained from such an audit shall remain confidential and shall be used only by Landlord for the purpose for which the audit is being conducted. Landlord shall be liable for any direct and consequential damages resulting from the intentional violation of this Lease provision and/or from the intentional dissemination of such information, except when mandated by court order, subpoena or other applicable law.

D.   Common Area Maintenance:  Throughout the Term of this Lease, Landlord shall maintain the Common Areas in such a manner as is reasonably in keeping with a first class shopping center, and shall be responsible for performing such customary services for the Common Areas, which shall include, without limitation, the following:

   (i)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities and equipment located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

   (ii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

   (iii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs and pylons signs (excluding Tenant's specific sign panel), and other traffic control signs as would be commercially reasonable for similarly situated shopping centers;

(iv)   providing security, lighting and policing as would be commercially reasonable for similarly situated shopping centers, and on-site and off-site traffic control;

(v)   maintaining and repairing all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)   cleaning, sweeping, and snow and ice removal as needed.  Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

E.   <u>Common Area Charges</u>:  Landlord's costs ("Common Area Maintenance Costs") shall be the expenses Landlord incurs in performing, but not limited to, the above enumerated items, as well all other costs in refurbishing, repairing, maintaining, replacing, and improving the Common Areas (but less the amount of any insurance proceeds, or condemnation awards received by Landlord for the performance thereof, whether or not so used), including lighting, line painting, landscaping, providing security, and public liability, property damage, and fire and extended coverage for the Shopping Center and the Common Areas, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas,  licenses and permit fees, and parking area surcharges or levies.

Tenant shall pay to Landlord a pro rata share of Landlord's Common Area Maintenance Costs.  Tenant's pro rata share shall be herein referred to as ("Common Area Charges").  Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable ground floor area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable ground floor area of the Shopping Center.  In no event shall there be any duplication of expenses.

Excluded from Tenant's Common Area Charges shall be Landlord's costs in maintaining any portion of the Shopping Center not defined herein as Common Areas, including Landlord's costs in maintaining or replacing the roof and all structural portions of the Demised Premises and the Shopping Center, any depreciation of the Shopping Center, any administrative, management or related fees, or capital expenditures except for such capital expenditures for (i) equipment used in maintaining the Common Areas of the Shopping Center, (ii) designed to decrease Common Area Maintenance expenses, or (iii) made in order to comply with any laws, statutes, regulations or ordinances enacted following the date of execution of this Lease, provided that such capital expenditures shall be amortized over the useful life of such items and only that portion of such amortized amount attributable to the calendar year in question shall be included in Common Area Maintenance Expenses. Expressly excluded from this inclusion in Common Area Charges shall be any costs or any amortization associated with the development or construction of the Shopping Center or any additions thereto, or any cost associated with Landlord's renovation of other premises for other tenants.

On the first day of each calendar month commencing on the Rent Commencement Date, Tenant shall pay without demand and without setoff or deduction (except as set forth herein) to Landlord, a payment on account of Tenant's Common Area Charges, equal to its estimated monthly pro rata share of Landlord's Common Area Maintenance costs as reasonably determined by Landlord based on Tenant's pro rata share of Landlord's Common Area Maintenance Costs in the Shopping Center during the prior year.

Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Maintenance Costs for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within one hundred twenty(120) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Maintenance Costs for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request.

If Tenant's Common Area Charges exceed Tenant's payment with respect thereto for any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment shall occur during the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, Tenant upon 30 days prior written notice shall be entitled to an audit of Landlord's books and records of its Common Area Maintenance Costs for the previous 3 Lease Years. Tenant shall not conduct any such audit more than once in any given Lease Year, and such audit shall be performed by Tenant's accountants in accordance with generally accepted accounting principles. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually against the next Rent payments due from Tenant to Landlord hereunder.

F.   Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's Common Area Charges shall be capped at ($0.40) per square foot for each Lease Year of the Original Term. Should Tenant elect to exercise any available option periods, such charges shall be capped at ($0.50) per square foot for each Lease Year of the First Option Term, ($0.60) per square foot for each Lease Year of the Second Option Term, ($0.70) per square foot for each Lease Year of the Third Option Term, and ($0.80) per square foot for each Lease Year of the Fourth Option Term.

G.   Real Estate Taxes: Landlord shall pay all real property taxes and special assessments which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). The amount of Real Estate Taxes for any year shall mean

such amount as shall be finally determined after deducting all applicable abatements, refunds or rebates. If any governmental taxing authority acting under any present or future law, ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than an income or franchise tax) upon or against or in any way related to the land and buildings comprising the Shopping Center, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, such tax, excise and/or assessment shall be included in the definition of Real Estate Taxes.

Tenant shall pay to Landlord, Tenant's pro rata share of Real Estate Taxes paid by Landlord for tax years or portions there of which occur during the Term. It is expressly understood and agreed that Tenant shall not be required to pay, or reimburse Landlord for (i) any local, state or federal capital levy, franchise tax, revenue tax, income tax or profits tax of Landlord or (ii) any estate, inheritance, devolution, succession or transfer tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Demised Premises.

Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable ground floor area of all buildings in the Shopping Center, except that excluded from the denominator shall be the Gross Leasable Area of any portion of the Shopping Center which is separately assessed, and for which the Real Estate Taxes are the sole responsibility of the tenant of such area.

If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of Tenant's Pro rata share of Real Estate Taxes for the year shall be made.

Commencing on the Rent Commencement Date, Tenant shall pay monthly to Landlord an estimation of Tenant's pro rata share of Real Estate Taxes based upon the prior year's tax bill. Landlord, within 30 days of its receipt, will submit to Tenant any copies of actual statements of tax bills from any taxing authorities specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center, and a statement of Tenant's pro rata share thereof. Within 10 days of Tenant's receipt of copies of Landlord's Real Estate Tax bills, and the statement of Tenant's pro rata share thereof, Tenant shall pay to Landlord the amount by which Tenant's actual pro rata share exceeds Tenant's estimated payments thereof. If Tenant has not paid such outstanding amount of Real Estate Taxes within the 10 day period provided herein, such amount shall bear interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually. If Tenant's actual pro rata share of Real Estate Taxes is less than Tenant's estimated payments therefor, Landlord shall credit any such overage against the next ensuing installment of Minimum Rent, or if after the expiration or termination of the Term, refund such excess, subject to Landlord's right to offset against any indebtedness owed by Tenant to Landlord.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Taxes is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of any abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of any increase in the assessed value of the land and/or buildings or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be

filed with the applicable taxing authority.  If Tenant shall deem any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant shall first request Landlord to contest such taxes.  If Landlord refuses to contest taxes and the Real Estate Taxes have increased by at least 13% over any three year period or less, then Tenant may contest the same by proper proceedings commenced at its own expense and in good faith.  Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. Tenant shall continue to pay Tenant's Pro Rata Share of Real Estate Taxes during the pendency of such proceedings.  Any refund received as a result of such proceedings shall be applied first to reimburse Tenant for its expenses of prosecuting such proceedings, including reasonable attorney's fees, second to Tenant as proportional reimbursement for Real Estate Taxes paid by Tenant to Landlord for the tax year or years which are the subject of such proceedings, and the balance shall become the property of Landlord.  If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing.  Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights of Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

H.    Construction Allowance:

Landlord, in consideration of Tenant's construction to and improvement of the Demised Premises, shall pay Tenant $43,750.00 (hereinafter referred to as "Construction Allowance"), due upon Tenant providing to Landlord all lien waivers for any work performed or materials supplied to Tenant in the performance of its work which were in excess of $3000.00, and Tenant's commencement of operations.

If the Construction Allowance is due and not paid by Landlord to Tenant within 30 days of the last to occur above specified events, Landlord shall in addition pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York from the due date of the date of payment, and Tenant may deduct such sum from the subsequent monthly installments of Fixed Minimum Rent and Additional Rent until such sum is paid in full.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

Tenant's EIN: 31-1186811

Landlord's EIN:

7.    **TENANT'S BUILD-OUT AND ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work is performed in compliance with all laws, codes and regulations of any governmental authority having

jurisdiction over the Demised Premises; shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; and that all such changes shall at the end of this Term remain the property of Landlord unless Landlord otherwise agrees in writing. Landlord shall provide Tenant with a complete set of "as built" drawings, if available, or shall prepare such in the event such plans must be submitted to any governmental authority for the purpose of obtaining construction permits or certificates of occupancy.

Tenant shall not permit any mechanic's liens to remain filed against the Demised Premises for any work performed or materials furnished in connection with Tenant's work. If such a lien is filed, Tenant, within thirty days of its receipt of such notice of the lien filing, shall either pay the amount of the lien or bond off and diligently contest such lien.

## 8.   MAINTENANCE:

Tenant, at its sole cost and expense, agrees to maintain and make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior, non-structural portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 8 or Sections 11, 14 and 21 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames, signage and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior (whether or not structural or non-structural) and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 8. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition as of the Tenant Possession Date. Further, Landlord shall provide HVAC equipment to the Demised Premises to Tenant's specifications as such may be provided herein or under separate cover. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense, and may deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such

amount with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from its next Rent payment(s) owing.

Should Tenant discover that the HVAC system (which includes all units and all portions thereof, ducting, diffusers, thermostats and any other HVAC related equipment) requires repair and/or replacement during the first twenty four (24) months of the Original Term, and the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate during either the 1st through the 12th months of the Original Term or the 13th through the 24th months of the Original Term, Tenant shall perform such necessary work, and Landlord shall be responsible for reimbursing Tenant for all such reasonable costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant, or its agents, employees or contractors, in which case such cost shall be solely borne by Tenant. In the event Landlord fails to reimburse Tenant for the costs for which Landlord is responsible within 30 days after Landlord's receipt of an invoice therefor, Tenant may deduct such amount, with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually from its next Rent payments owing. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Tenant shall notify Landlord of any defects in the Demised Premises or with Landlord's Work within fifteen (15) days after the date Tenant opens for business by providing Landlord with written notice that such items are not in operating condition. Landlord shall, within ten (10) days from such notice, commence to put such inoperative items in operating condition, and shall complete such work with reasonable diligence. Upon Landlord's completion of such work, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installment of Rent.

If either Landlord or Tenant fails to make any repairs for which it is obligated pursuant to this Lease (the "Non-Repairing Party"), within thirty (30) days after notice by from the other (the "Noticing Party") of the need for such repairs, or within such time as is reasonably necessary so long as the Non-Repairing Party commences its repair work within 15 days of the Noticing Party's notice and is diligently pursuing to completion such repair, then the Noticing Party shall have the right to perform such repairs and to charge the Non-Repairing Party the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Non-Repairing Party, after receiving notice from the Noticing Party of such necessity, fails to commence such repair as soon as reasonably possible, the Noticing Party shall have the right to make such repairs at the Non-Repairing Party's cost, without waiting fifteen (15) days. Should the Noticing Party perform repairs pursuant to this Section, the Non-Repairing Party shall and does hereby indemnify and hold harmless the Noticing Party from all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of the Noticing Party or the Noticing Party's authorized representatives. In performing any such repairs pursuant to this Section, the Noticing Party shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Upon the completion of the Non-Repairing Party repair work by the Noticing Party, the Noticing Party shall provide the Non-Repairing Party with a detailed statement of the work completed, together with copies of paid invoices for such work, and the Non-Repairing Party shall reimburse the Noticing Party for such work within 30 days after its receipt of such statement. Should the Non-Repairing Party fail or refuse to reimburse the Noticing Party the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, the Noticing Party (where such is the Tenant) shall have the right to deduct such cost with interest at the annual rate of two

percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

## 9.   SIGNS:

Tenant shall at its sole cost and expense, and in compliance with all applicable governmental codes have the right to place, install or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Landlord shall have consent rights (not to be unreasonably withheld, conditioned or delayed) over the manner and location of installation of Tenant's exterior signage, but shall have no such rights regarding the materials used or the design scheme. Tenant warrants that it shall install an exterior sign in substantial conformance with the sign depicted in Exhibit D, but shall have the right from time to time to change such sign in keeping with its local, regional or national advertising and marketing campaign. Tenant agrees to maintain such sign(s) in good condition and repair, and to save, defend and hold harmless Landlord of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

Landlord shall ensure that Shopping Center pylons (i) are properly wired and constructed; (ii) conform to all requirements of any authorities having jurisdiction; and (iii) are maintained in proper working order throughout the Lease Term, and any extensions thereto. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof as provided in Section 8 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon both existing Shopping Center pylons, in the locations formerly occupied by the Ames panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances with regard to its exterior sign and pylon sign panels. Once Tenant's signs and panels are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action, unless so directed by any authority having jurisdiction over the property, which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 10.   FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove such trade fixtures and equipment, and shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted. Should Tenant install permanent lighting fixtures, and/or HVAC equipment, the parties agree that such are not trade fixtures or equipment and shall not be removed upon Tenant vacating the Demised Premises. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

11.    **GOVERNMENTAL REGULATIONS:**

Upon Landlord's delivery of the Demised Premises, and thereafter, Landlord shall promptly cause all common areas, the sprinkler system and the structural and exterior portions of the Demised Premises to conform at all times to all requirements by governmental authority having jurisdiction over the Demised Premises, unless such modifications are necessitated by changes, alterations or additions made by Tenant, or due to Tenant's specific use of the Demised Premises (as opposed to any requirements regarding the general use and occupancy of the Demised Premises). Landlord agrees to make all repairs, alterations, additions, or replacements to the structural and exterior portions of the Demised Premises and to the sprinkler system required by any law, statute, ordinance, order or regulation of any governmental authority.

Tenant shall be responsible to make all repairs, alterations, additions, or replacements required by any governmental law, code or regulation to the interior, non-structural portions of the Demised Premises (excluding the sprinkler system if any should exist) and to any Tenant improvements.

12.    **INDEMNIFICATION:**

Tenant, its administrators, successor and assigns hereby agrees to indemnify, defend and hold harmless Landlord, its administrators, agents, contractors, employees, managers, successors and assigns, from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with (i) any occurrence in the Demised Premises, except to the extent caused by the negligence or willful misconduct of Landlord, its agents, contractors, employees, managers, successors or assigns, or any third parties unrelated to Tenant; (ii) Tenant's or its agents', contractors', employees', managers', successors' or assigns' negligence or willful misconduct in the Common Areas, or (iii) the failure of Tenant, its administrators, agents, employees, managers, successors or assigns to fulfill Tenant's obligations hereunder. Landlord, its administrators, successors and assigns, hereby agrees to indemnify, defend and hold harmless Tenant, its administrators, agents, contractors, employees, managers, successors and assigns, from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with (i) any occurrence in the Shopping Center and its Common Areas, except to the extent caused by the negligence or willful misconduct of Tenant, its agents, contractors, employees, managers, successors or assigns (ii) Landlord's or its agents', contractors', employees', managers', successors' or assigns' negligence or willful misconduct in the Demised Premises, or (iii) the failure of Landlord, its administrators, agents, employees, managers, successors or assigns to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord, each party's obligation to indemnify the other as set forth herein shall be in proportion to such party's allocable share of such joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 12 shall survive termination of this Lease.

13.    **INSURANCE:**

Tenant: During the Term, Tenant shall maintain with respect to the Demised Premises, and the Common Areas (with regard to liability for Tenant's acts or omissions in such defined area) the following insurance (collectively, "Tenant's Insurance"):

(a)    Commercial general liability insurance with a minimum combined limit of $3,000,000 for bodily injury or death in any one accident and for property damage in any one accident and which insurance shall name Landlord as an additional insured as its interests may appear.

(b)    Plate glass insurance covering all plate glass located in the Demised Premises.

(c)     At all times that Tenant shall be performing Tenant's Work and until such time as such Tenant's Work shall be completed, builders risk insurance on Tenant's Work in the minimum amount of the total budget for Tenant's Work.

(d)     Fire and extended coverage insurance on (i) Tenant's Work and (ii) Tenant's inventory, equipment, furniture, trade fixtures, signs, and all other property kept on the Demised Premises (collectively, "Tenant's Property").

(e)     Policies of Workers Compensation insurance in such statutory amounts as dictated by the particular jurisdiction in which the Shopping Center is located

Each policy of Tenant's Insurance shall be issued by an insurance company that is licensed to do business in the state in which the Shopping Center is located and shall contain a provision that said policy shall not be canceled or changed in scope or amount of coverage without 30 days' prior written notice to Landlord. Prior to the Term Commencement Date, Tenant shall provide Landlord with certificates or other evidence of Tenant's Insurance reasonably acceptable to Landlord. Notwithstanding the foregoing, Tenant shall have the option to self-insure for all plate glass, inventory, equipment and trade fixtures.

Landlord:  Landlord shall at all times during the Term of this Lease, carry insurance covering  all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under "Special Form coverage ISO form CF 10-20" insurance, including the perils of earthquake and flood,  in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.  Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord may also carry policies of Rent Loss and Terrorism insurance, for which Tenant shall be responsible for a pro rata share of such policies.  All insurance policies carried by Landlord may be a part of "umbrella policies" insuring multiple properties in Landlord's portfolio.  Landlord shall be responsible to properly allocate the costs of such umbrella policies to each individual property covered by the umbrella policies.

Landlord will be in compliance with the requirements of this section should such coverages be a part of any blanket insurance policies which Landlord may carry for this and other shopping centers in its portfolio.

Tenant will pay to Landlord monthly Tenant's estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges.  Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable ground floor area of all buildings in the Shopping Center.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium within ten (10) days of when the same are issued.  An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to another tenant's use or operation in the Shopping Center which is inconsistent with those standard uses typically found in such similarly situated retail shopping centers, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

14.   **CASUALTY DAMAGE OR DESTRUCTION:**

A.   If the Demised Premises, or any permanent additions or leasehold improvements thereto, and/or less than 35% of any buildings or other improvements comprising the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term, except as otherwise provided herein, Landlord shall, promptly at its own expense, cause the Demised Premises or such applicable portions of the Shopping Center to be restored (exclusive of Tenant's Work and Tenant's Property) to such condition substantially similar to that as existed prior to the casualty ("Landlord's Restoration Work"), and Tenant shall, promptly at its own expense, restore Tenant's Work and Tenant's Property to such condition substantially similar to that as existed prior to the casualty ("Tenant's Restoration Work"). If a casualty occurs during the last eighteen (18) months of the Term, or the last eighteen (18) months of any Option Term, Landlord shall not be required to rebuild unless Tenant agrees to exercise any then existing option to renew and if no such option remains, Landlord shall have no obligation to rebuild and may elect to terminate this Lease by notice to Tenant.

In the event Landlord, as provided above, is obligated to restore such damaged portions of the Demised Premises and/or the Shopping Center, and fails to complete Landlord's Restoration Work, within one hundred eighty (180) days from the date of any such casualty, Tenant may, at its option, terminate this Lease by giving thirty (30) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided that if Landlord tenders delivery of the Demised Premises to Tenant, or reopens the damaged portions of the Common Areas to the public with its repair and restoration fully completed within said 30 day period, and if such event does not occur within the final Lease Year of the Term, Tenant's termination notice shall be void, and this Lease shall continue in full force and effect upon Tenant taking possession of the Demised Premises. After written notice to Tenant that Landlord has completed Landlord's Restoration Work, Tenant shall proceed with Tenant's Restoration Work with reasonable diligence.

During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced in proportion to the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored, and Tenant has taken possession of such in tenantable condition.

B.   If (a) any buildings or other improvements comprising the Shopping Center shall be damaged or destroyed by fire or any other casualty to the extent that (a-i) the cost of replacement is or exceeds thirty-five percent (35%) of the cost or value of the building or improvement, or (a-ii) thirty-five percent (35%) or more of the gross leasable area contained therein shall be rendered untenantable, or (b) the Demised Premises or the buildings comprising the Shopping Center shall be damaged or destroyed by any casualty other than those covered by Landlord's Insurance, or (c) the holder of any indebtedness secured by a mortgage covering the Demised Premises or Shopping Center shall require that any insurance proceeds be applied to such indebtedness, Landlord may, within sixty (60) days following the date of such casualty, at its option, either (a) terminate this Lease or (b) promptly

proceed with Landlord's Restoration Work as provided by Section 13A. In either such event Landlord shall give Tenant written notice of its intention within said sixty (60) day period.

## 15. FORCE MAJUERE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant ("Force Majuere"), and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises.

## 16. INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against the other when either party believes in good faith that the other is in violation, whether actual, attempted or threatened, of any covenant, condition, or provision of this Lease.

## 17. WARRANTY OF TITLE BY LANDLORD:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple absolute of the Demised Premises, free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (b) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises which adversely impacts Tenant's use and operation of the Demised Premises in the manner contemplated by this Lease; and (c) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by Landlord to Tenant, or Tenant may withhold Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent, and Landlord will defend, indemnify, and protect Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

## 18. QUIET ENJOYMENT:

So long as Tenant is not in default beyond any applicable notice and cure periods provided herein, of any of the terms, covenants, and conditions of this Lease, Landlord covenants, warrants, and agrees that Tenant's quiet use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease or during any Option Terms or extensions thereof. Tenant's covenant to pay Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 19. MORTGAGE AND ESTOPPEL CERTIFICATES:

This Lease shall be subject and subordinate to any recorded mortgage lien presently existing or hereafter encumbering the Demised Premises or Shopping Center; provided, that as a condition to Tenant's subordination under any such mortgage lien, Tenant and any current or future holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall request any such mortgagee to agree that insurance proceeds and

condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

**20.    DEFAULT AND REMEDIES:**

A.    Each of the following events shall be a "Default" by Tenant under this Lease:

1)    If Tenant shall fail to pay any Rent, Additional Rent, or any other sums due herein, and such failure continues for ten (10) days after Landlord gives Tenant written demand of such;

2)    If Tenant shall fail to observe or perform any other covenants and/or agreements for which it is responsible hereunder, and such failure continues for thirty (30) days from the date Tenant receives written notice from Landlord advising of such failure (provided that if Tenant commences to cure the default within the initial 30-day period and diligently prosecutes the same to completion, Tenant shall be afforded such additional time as is reasonably necessary to effect such cure if such failure cannot reasonably be cured within the initial 30-day period);

3)    If any petition is filed by or against Tenant (a) in any bankruptcy or other insolvency proceeding, or (b) seeking any relief under any state or federal debtor relief law, or (c) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease, and any such action is not dismissed within 30 days of said filing or appointment;

4)    If Tenant makes an assignment for the benefit of its creditors;

B.    Upon the occurrence of any such Default, Landlord shall have the option to pursue any one or more of the following remedies without further notice or demand, in addition to all other rights and remedies available to Landlord at law or in equity, all of such rights and remedies being cumulative. However in no event shall Landlord be entitled to accelerate any amount due under this Lease following a Default by Tenant.

1)    Terminate this Lease by giving written notice thereof to Tenant, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so Landlord may, without prejudice to any other remedy which Landlord may have, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying the Demised Premises without being liable for any claim of damages.

If Landlord terminates this Lease under this provision, then Tenant shall pay to Landlord the sum of (i) all Rent accrued through the date of termination, and (ii) all amounts due under Section 20C below.

2)   Terminate Tenant's right to possess the Demised Premises and re-enter the Demised Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (i) all Rent and other amounts accrued hereunder to the date of termination, (ii) all amounts due from time to time under Section 20C below, and (iii) such Rent, Additional Rent and other net sums on a monthly basis required to be paid by Tenant according to the terms of the Lease for the remainder of the term, diminished by any net sums thereafter received by Landlord through reletting the Demised Premises on commercially reasonable terms during such period; Landlord having an obligation to use commercially reasonable efforts to mitigate its damages. Landlord shall not be obligated to re-let the Demised Premises before leasing other portions of the Shopping Center.

3)   Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Demised Premises in connection therewith if necessary) without being liable for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in performing Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the maximum rate permitted by applicable law.

C.   Upon any event of default, Tenant shall pay to Landlord, as additional rent, all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (i) obtaining possession of the Demised Premises, (ii) removing and storing Tenant's or any other occupant's property, (iii) repairing, restoring, altering, remodeling, or otherwise putting the Demised Premises into condition substantially similar to that at the time of Landlord's initial delivery to Tenant, (iv) the costs of reletting all or any part of the Demised Premises, including brokerage commissions, and (v) performing Tenant's obligations which Tenant failed to perform.

D.   Tenant's liability following an event of default for Percentage Rent shall be the average annual Percentage Rent paid for all previous Lease Years prior to such termination (or, if shorter, the period from the Rent Commencement Date to termination).

E.   Landlord's Default: If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant shall give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot reasonably be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant where Landlord's default materially affects Tenant's ability to conduct its operation as contemplated by this Lease, (ii) abate an amount in Rent reasonably necessary to correct such default without any obligation on the part of Tenant to exercise it s rights stated in 20(E)(iii); or (iii) cure such default, and upon the completion of such work by Tenant, Tenant shall provide Landlord with a detailed statement of the work completed, together with copies of paid invoices for such work, and Landlord shall reimburse Tenant for such work within 30 days after its receipt of such statement. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the annual rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing.

In the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repairs, all Rent due hereunder shall equitably abate in proportion to the square footage of the Demised Premises rendered untenantable until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

F.    Remedies Cumulative: All rights and remedies of Landlord and Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Parties to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem desirable. The failure of Landlord or Tenant to insist upon strict performance by the other party of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any of said rights and remedies concerning any subsequent or continuing breach or default by the breaching party of any of the covenants, conditions, or agreements of this Lease.

## 21.   CONDEMNATION:

A.    Taking. If there is any taking of, or damage to all or any portion of the Shopping Center or the Demised Premises because of the exercise of the power of eminent domain or inverse condemnation, whether by condemnation proceedings, or any transfer made in avoidance of, or because of a threat or imminence of such taking (all of the foregoing being hereinafter referred to as "Taken" or "Taking") before or during the term of this Lease, as the same may be extended, the rights and obligations of the parties with respect to such Taking shall be as provided in this Section 21. For purposes of such Sections, the "Date of Taking" means the earlier of the date of entry into possession by, or the vesting of title in, the condemning authority or third-party transferee.

B.    Total Condemnation. If there is a Taking of all of the Demised Premises, this Lease shall terminate as of the Date of Taking.

C.    Partial Condemnation.

(i)    Right To Terminate. If thirty five percent (35%) or more of the Demised Premises is Taken, or such amount of the customer parking area of the Shopping Center shall be Taken to the extent the number of remaining spaces are not in conformance with applicable parking codes, or if fifty percent (50%) or more of the Floor Area of the Shopping Center is Taken, except as otherwise provided in Section 21C(ii) below, either Landlord or Tenant shall be entitled to terminate this Lease so long as either Party in good faith determines that it can not operate its own business in the manner contemplated by this Lease. The terminating party shall give the other party written notice of such election not later than sixty (60) days after the date the condemning authority actually takes the property. In the event these contingencies are not met, this Lease shall remain in full force and effect and Fixed Minimum Rent, Additional Rent, and all other charges due under this Lease shall be adjusted, if at all, as provided in Section 21E below.

(ii)    Repair And Restoration. If this Lease is not terminated as provided in Section 21C, Landlord shall, at its sole cost, restore, the Shopping Center and the Demised Premises to a complete architectural unit of like quality,

character and condition as that which existed immediately prior to the Taking, except for such leasehold improvements made by Tenant.

E.   Rent Adjustment. If this Lease is not terminated as provided in Section 20C, the Fixed Minimum Rent, Additional Rent, and all other charges due under this Lease shall be reduced in proportion to the amount by which the Demised Premises Taken bears to the total floor area of the Demised Premises immediately prior to the Taking.

F.   Award. Except as otherwise herein provided as between Landlord and Tenant, the entire award or compensation paid on account of any partial or total condemnation or Taking under power of eminent domain, or threat of exercise thereof, of the Demised Premises, Shopping Center or Common Area shall be the property of Landlord, provided that Tenant shall be entitled to claim and recover from the condemning authority or third-party transferee such compensation as may be separately awarded for any loss to which Tenant may be entitled for Tenant's moving expenses or other relocation costs, loss of profits, loss of leasehold estate, the unamortized value of leasehold improvements or injury to Tenant's good will, trade fixtures or equipment, and retain any such award applicable thereto, but only to the extent that such compensation is in addition to and shall not diminish the compensation provided to Landlord.   In no event shall Tenant have any claim against Landlord or the condemning authority for loss or diminution in value of leasehold improvements paid for by Landlord, whether installed as part of Landlord's Work or Tenant's work, and Tenant hereby assigns to Landlord the amounts representing such value.

## 22.   MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights or recovery against Landlord relating to property damage insured or required to be insured pursuant to the terms of this Lease;  and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage insured or required to be insured pursuant to the terms of this Lease;  Such waiver shall mutually apply to the extent of any deductables maintained by either party under its policies of insurance.

Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

## 23.   ASSIGNMENT AND SUBLETTING:

Except as otherwise provided herein, Tenant shall not assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein, and shall not sublet the Demised Premises or any part thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Tenant's Request shall (a) specify the name and address of the proposed assignee or subtenant (the "Proposed Transferee") and the proposed use of the Demised Premises by the Proposed Transferee and (b) include a copy of the Proposed Transferee's most recent financial statements, certified by a certified public accountant. In no event shall the Demised Premises be used for purposes that shall be (a) in violation of the then existing exclusive uses granted by Landlord to any other tenant in the Shopping Center or (b) otherwise prohibited by this Lease.

Upon notice from Tenant to Landlord requesting Landlord's consent to an assignment or subletting of this Lease ("Tenant's Request"), Landlord shall have the option, which shall be exercisable by notice given to Tenant within 20 days after Tenant's Request, to cancel this Lease. If Landlord shall elect to cancel this Lease, the Lease shall terminate 90 days from the date on which Tenant receives written notice of Landlord's termination election, and this Lease shall so terminate without penalty or default on the part of either Party.

Any consent granted by Landlord to an assignment or subletting by Tenant shall not relieve Tenant of any obligation to be performed by Tenant under this Lease, whether occurring before or after such consent, assignment or subletting. If at the time of a default beyond any applicable notice and cure periods under this Lease, all or a part of the Demised Premises shall be assigned or sublet, Landlord, in addition to any other remedies provided by law, may at its option collect Rent and Additional Rent directly from the assignee or subtenant without in any way waiving any claims Landlord may have against Tenant under this Lease. Any collection directly by Landlord from the assignee or subtenant shall not be construed as a novation or a release of Tenant hereunder. The acceptance by Landlord of Rent or Additional Rent from any other person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any assignment, subletting or other transfer. Consent to one assignment, subletting or other transfer shall not be deemed to constitute consent to any subsequent assignment, subletting or other transfer.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without Landlord's consent, and without Landlord's right to terminate this Lease so long as (i) the intended use does not substantially differ from the Permitted Use of Tenant herein, and (ii) such assignment or subletting is to a parent, subsidiary, succeeding entity, or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant; provided that in case of any such assignment or sublet referred to above, such assignee or sublessee shall assume all of Tenant's obligations hereunder in writing, and Tenant shall not be relieved of its obligations hereunder. The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as (i) the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange, or (ii) such transfer is otherwise a permitted transfer without Landlord's consent as provided for above.

Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.

24.     **SURRENDER AND HOLDOVER:**

Upon the expiration or earlier termination of this Lease, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. On, or prior to such date, Tenant agrees to remove except for lighting fixtures and HVAC equipment, all of its trade fixtures whether or not attached to the Demised Premises, and upon failure by Tenant to do so, such remaining property shall become the property of Landlord, who may at Tenant's expense dispose of, or store such property without liability to Landlord.

If Tenant holds over after expiration or termination of this Lease, and any extension or renewal thereof, without the written consent of Landlord, Tenant shall pay as Annual Rent one hundred fifty percent (150%) of the Annual Rent in effect immediately prior to the commencement of the holdover period. No holding over by Tenant after the Term shall operate to extend the Lease. In the event of any unauthorized holding over, Tenant shall indemnify Landlord against all claims for damages by any other lessee to whom Landlord may have leased the Premises, or a portion thereof, effective upon the termination of this Lease. Any holding over with the consent of Landlord in writing shall thereafter convert

this Lease into a Lease from month to month at the Annual Rent in effect immediately prior to the commencement of the holdover period.

## 25. NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i)or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the next business day in the case of delivery by overnight courier, or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 26. LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the state in which the Shopping Center is located, without regard to choice of law rules of that state. Any action brought regarding the terms of this Lease and the actions by the parties thereunder shall be shall be the jurisdiction of the state in which the Shopping Center is located.

## 27. BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 28. NO RECORDATION:

Neither party shall record this Lease.

## 29. REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 30. NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

31. **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any materials currently deemed Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, etc.) which is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. In the event of the discovery of any Hazardous Material (as such may be defined and identified in the future) in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent due under this Lease shall abate in proportion to the square footage of the Demised Premises not occupied by Tenant during the period of time necessary to complete such work. Landlord shall indemnify and hold harmless Tenant from and against any and all claims, causes of action, damages, liabilities, costs and expenses in connection with the presence of such Hazardous Materials and Landlord's removal of such, and with respect to all direct costs and expenses which Tenant may reasonably incur in the preparation of the Demised Premises for Landlord's abatement work, including but not limited to the breaking down and resetting of fixtures and equipment, and the storing, transporting, and restocking of merchandise, and any overtime paid to Tenant's employees in the performance of such work. Such indemnification shall exclude claims for loss of income due to Tenant's inability to operate its business.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not directly cause the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises or the Shopping Center, other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall remove any Hazardous Materials from the Demised Premises and shall indemnify Landlord, and Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

32. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

33. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Percentage Rent, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6)

month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**34.    REASONABLE CONSENT:**

Intentionally deleted.

**35.    CO-TENANCY:**

Intentionally deleted.

**36.    NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**37.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**38.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**39.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**40.    WAIVER OF JURY TRIAL:**

LANDLORD AND TENANT FOREVER WAIVE ANY RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE ARISING OUT OF OR PURSUANT TO THIS LEASE AND AGREE THAT ANY SUCH DISPUTE SHALL BE RESOLVED BY COURT PROCEEDING WITHOUT THE BENEFIT OF JURY TRIAL. LANDLORD AND TENANT BOTH ACKNOWLEDGE THAT THIS WAIVER HAS BEEN WILLINGLY ACKNOWLEDGED, GRANTED AND AGREED TO AFTER EACH PARTY HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE WITH RESPECT TO THE RAMIFICATIONS THEREOF.

**41.    LANDLORD'S LIABILITY:**

In no event shall Landlord have any personal liability for its obligations hereunder and in any enforcement action with respect to any of Landlord's obligations, Tenant shall look solely to Landlord's interest in the Shopping Center, including the rent stream or any other of Landlord's income derived from the operation of the Shopping Center, and all

improvements, fixture, and equipment servicing the Shopping Center, for satisfaction of any judgment which may, at any time, be rendered against Landlord.

**42.**  **ATTORNEY'S FEES:**

If either party shall employ an attorney to enforce or defend any of its rights or remedies hereunder in a court of law on account of any failure by either party to perform any covenant herein, or due to any violation or default in the performance of any obligation, term, provision, or condition hereof, then in such event, the non-prevailing party shall be responsible for the prevailing party's reasonable attorney's fees, and for such other reasonable costs and expenses incurred in connection with such litigation, which shall be paid on demand.

**43.**  **CORPORATE AUTHORITY:**

Tenant, a corporation, and Landlord (if a corporation) represents and warrants to the other that it has all necessary authority as bestowed by its Board of Directors to execute this Lease.

END
Signature block and Exhibits follow

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:          **LANDLORD:  Bayshore Mall Acquisitions, LLC**
                                                          **a New Jersey limited liability company**

_Eddie Rive_                       By: _Daram_

_Eddie Silvera_                    Title: _Managing Member_


Witnesses As To Tenant:            **TENANT:  Big Lots Stores, Inc., an Ohio corporation**

                                   By: _Kathleen Hupper_
                                                    Kathleen Hupper
                                   Title: _____Vice President_____

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Bayshore Mall Acq_ by, _Daniel Massry_ its _Managing Member_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Sea Girt, NJ_, this _7th_ day of _May_, 2003.

> MARK MASSRY
> NOTARY PUBLIC
> STATE OF NEW JERSEY
> MY COMMISSION EXPIRES SEPT. 5, 2006

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by **Kathleen Hupper,** its **Vice President** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _16_ day of _APRIL_, 2003.

_____
Notary Public

> PENNY J. SAVAGE
> Notary Public, State of Ohio
> My Commission Expires May 10, 2003

# EXHIBIT A
## SITE PLAN OF SHOPPING CENTER



Bay Shore Mall

6845 Bay Shore Road

North Cape May, New Jersey

**EXHIBIT B**
**LEGAL DESCRIPTION OF SHOPPING CENTER**

# EXHIBIT C

## LANDLORD WORK

This Exhibit is attached to and is a part of this Lease.

**Landlord covenants and agrees to deliver the Demised Premises to Tenant as follows:**

1.  HVAC equipment to be in good working condition and adequate for Tenant's intended use, including but not limited to all duct work, diffusers and any other air distribution equipment commonly used and required by Tenant. Tonnage requirements to meet Tenant's specifications of one ton per 300 square feet throughout the demised premises, sales floor and stock room. If the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to have the HVAC system inspected to determine the needed repairs by the Landlord.

2.  All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification.

3.  Landlord to install new energy efficient 8'ft florescent strip lighting. Lighting fixtures to be used are 8'ft strip - 4 lamp tandem 4'ft T8 with electronic ballasts. Lighting to be installed 10'ft on center side-to-side and within 2'ft from all perimeter walls throughout the sales floor. Lighting in the stockroom to be 12'ft on center.

4.  If the existing floor tile or mastic contains any Hazardous Materials, the Landlord is to be responsible for its removal. Stock room floor to be smooth and level throughout entire stockroom area.

5.  Remove existing ceiling tiles and install new 2' x 4' white acoustic ceiling tiles and paint grid to match at the existing ceiling height of 13' above the finished floor.

6.  Provide existing vestibule entrance and doors in good working condition that meets ADA requirements (Exit doors to have automatic openers). Landlord to ensure there are curb cuts within reasonable proximity to the store front and vestibule has adequate HVAC for Tenant's use (vestibule to have slip retardant tile).

7.  All doors and door systems to be sound and secure and in good working condition, and in compliance with A.D.A. requirements.

8.  Landlord to provide Tenant with three (3) offices, one (1) lounge and restrooms to Tenant's specifications, accessible from Tenant's sales floor and in compliance with all applicable local and state codes and A.D.A. requirements. Rest rooms to have a minimum of two (2) commodes and one urinal in the men's and two (2) commodes in the women's. Further, the aforesaid offices, lounge and restrooms shall have adequate HVAC, ceiling and floor tile (rest rooms to have floor covering that meet code requirements for the sale of food), electrical and plumbing, lighting, sinks, fixtures, partitions, FRP board, etc. Cash Office to have solid plywood ceiling (minimum 1/2" thickness).

9.  Roof to be in good condition and free of leaks. Canopy and building fascia to be repaired and painted with Sherwin Williams #2055 Outback Brown exterior gloss.

10.  Loading dock to be in good working condition including all doors, bumpers, ballards, seals, etc and be at the standard truck height of 48''.

11.  Replace all broken glass.

12.  Premises to be professionally inspected for pestilence and termites, and Tenant to be provided with a certified report that the Demised Premises is

pest free, and if not, Landlord will make pest free.

13.     Landlord to install cart corral in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

14.     Landlord will provide tenant with "as built" drawings or a floor plan of the demised premises adequate for tenant to draw its floor and fixture plan.

15.     Landlord agrees premises conforms to all requirements by authority having jurisdiction, if said premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations or additions made by tenant.

16.     Tenant to approve all drawings prior to the commencement of work.

# EXHIBIT D
## TENANT SIGN SPECIFICATION



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

| STANDARD SIZE CHARACTERISTICS | | | | |
|---|---|---|---|---|
| A | B | C | D | E |
| 2'-0" | 12'-3" | 2'-10" | 9" | 4 1/2" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5 1/2" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-8" | 17 1/2" | 8 1/2" |
| 4'-6" | 26'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 28'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS
INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE
EQUIPT WITH DISCONNECT SWITCHES

### SIGN SPECIFICATIONS: BIG LOTS
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SIGMA SELF CONTAINED TRANSFORMERS (NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

### SIGN SPECIFICATIONS: EXCLAMATION
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY SIGMA SELF CONTAINED TRANSFORMERS

## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

**Date:** _____

**To:**        _____(insert Tenant)
                via facsimile:  (614) 278-6546

**From:** _____ (insert Landlord & name of contact person)

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)


You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed.  Accordingly, possession of the Demised Premises is hereby delivered to Tenant.  You may pick up the keys at _____
_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**EXHIBIT F**
**EXCLUSIVES**

JMD
1/26/88

'IC Me /Albertsons

## V. RESTRICTIONS

;5.1  Business.  The types of uses permitted in the Shopping

Center shall be of a retail and/or commercial nature found in Shopping

Centers of a similar size and quality in the metropolitan marketing area

in which the Shopping Center is located; provided, nothing contained

herein shall be construed to require ASDC or any ASDC Affiliate to open

or operate any form of business in the Shopping Center for any period

of time or at all but ASDC does agree to open a 55,000 square foot

store for business, even though it shall have no liability to remain

open.  In the event ASDC (or its assignees or sublessees) fails for a

period of 180 days or longer to conduct its contemplated business on

Parcel 1 (except for such additional periods of time required to

effect repairs and renovations) then Parcel 2 shall not thereafter

be bound or subject to the restrictions contained in Article V hereof.

None of the uses listed below shall be conducted in the Shopping

Center without the prior written consent of either party.  This restric-

tion shall be a servitude upon the entire Shopping Center and shall be

binding upon any person acquiring any interest in any part of the

Shopping Center.  The uses prohibited are:

(a)  Office purposes, except that a dental office is permitted,

and except "retail" offices whose principal purpose is to provide

Page 22

1/26/88

services to members of the public directly from such offices, and as an incidental use to a retail or commercial use.

    (b)   Funeral Homes.

    (c)   Any production, manufacturing, industrial, or storage use of any kind or nature, except for storage of products incidental to the retail sale thereof from the shopping center.

    (d)   Entertainment or recreational facilities.  As used herein, "entertainment or recreational facility" includes, but is not limited to, a bowling alley, skating rink, game room over 1,200 square feet, theater (within 200' of south building wall of ASDC Building), (theaters more than 200' from ASDC's south building wall are permitted), billiard room or pool hall, massage parlor, discotheque, dance hall, night club, bar or tavern, flea market, head shop, pornographic or "adult" store, racquetball courts or gymnasium or other place of public amusement.

    (e)   Training or educational facilities.  As used herein, "training or educational facility" includes, but is not limited to, a beauty school, barber college, library, reading room, schools, place of instruction, or any other operation catering primarily to students or trainees rather than to customers.  It is the intent of this provision that the parking and other common facilities should not be burdened by either large scale or pro-tracted use by persons other than customers or occupants of the Shopping Center.

Page 23

1/26/88 

(f)  Restaurants within 200' radius of ASDC building, unless the prior written consent of ASDC is obtained, which consent shall not be unreasonably withheld nor delayed.  A permitted restaurant which is primarily devoted to the sale of food for on-premises consumption may contain a bar or tavern if operated as an incidental part thereof and/ or an electronic or mechanical game room if operated as an incidental part thereof and which occupies less than five percent (5%) of the Building Area occupied by such restaurant.

(g)  Car washes, gasoline stations, or repair service stations.

(h)  Displaying, repairing, renting, leasing or sale of any motor vehicle, boat or trailer, except where the parking and storage in conjunction therewith is off-site.  This does not apply to use of automobiles and boats as part of a temporary promotional display.

(i)  Any use which creates a nuisance or materially increases noise or the emission of dust, odor, smoke, gases, or materially increases fire, explosion or radioactive hazards on adjacent parcels.

5.2  Common Area Uses.  No persons other than customers, employees, agents and contractors of the occupants of the Shopping Center shall be permitted to park in the Common Area, unless all Owners give prior written approval thereto.  No "trailer" sales shall be conducted from the Common Area, however, this shall not exclude temporary seasonal and promotional sales from the Common Area in the areas designated on Exhibit "A".

Page 24

JMD
1/26/88; rev.

.5.3  Jamesway Business.  Notwithstanding any other provision of
this Article 5, the Jamesway Building may be used for any lawful retail
purpose.  Notwithstanding the foregoing, the Jamesway Building may not be used
in whole or in part, as a restaurant, luncheon counter or the like,
bakery, delicatessen, supermarket, drug store, gourmet food store, meat
store, and/or produce store, except that such uses shall be permitted as
an incidental part of the occupant of the Jamesway Building's business
or as otherwise provided in the Jamesway Lease.  Nothing contained
herein, however, shall prevent the use of the Jamesway Building for the
sale of items traditionally sold in a drug store except for prescription
medications.

5.4  Exclusive Rights.  So long as a discount department store
is being operated within any portion of the Jamesway Building, the
occupant of the Jamesway Building shall have the exclusive right to
operate a discount department store within the Shopping Center.

So long as ASDC or any Affiliate is operating a supermarket
within any portion of the ASDC Commercial Building, ASDC and any
Affiliate shall have the exclusive right to operate a supermarket within
the Shopping Center.  Nothing contained herein shall limit the right of
ASDC and any Affiliate to open a pharmacy and/or drug store in the ASDC
Commercial Building.

Page 25

Eckerd

3.  Landlord agrees that it will not directly or indirectly lease, rent, sell or otherwise permit any property in which it has any interest located within the Shopping Center, or within one thousand (1,000) feet of any exterior boundary of the Shopping Center, to be used as a drug store or a business which sells or dispenses prescription drugs, or for any collateral use in support of a drug store or a business which sells or dispenses prescription drugs (such as, e.g., parking, drainage, or service drives), without the written permission of Tenant, for a period of time ending January 31, 2010.

4.  Except as set forth in this Agreement, the parties release one another from any and all claims accruing after the Effective Date that either may have against the other for any matter or anything arising out of the Lease or possession of the Premises by Tenant.

*Bay Shore Mall Video*

## ADDENDUM TO LEASE
## DATED MARCH 23, 1993

1. This Addendum is incorporated into the original Lease as an integral part thereof.

2. Article 2 of the Lease is hereby amended to read as follows: The term of the Lease shall be for five (5) years commencing on the date of the purchase of Bayshore Mall Video by Tenant.

3. The provisions of Article 3 of the Lease are hereby deleted.

4. The following provisions are hereby added to Article 4 of the Lease: In addition, Tenant shall be permitted to sell posters, figures, clothing, and jewelry related to movies and television shows, and to sell snack items such as popcorn and candy.

5. Paragraph 5 (a) of the Lease is hereby amended to read as follows: The fixed minimum minimum rent during the initial term hereof shall be Eighteen Thousand Dollars ($18,000.00). Said minimum rent shall be paid monthly, in advance, in equal monthly installments of One Thousand Five Hundred Dollars ($1,500.00).

6. All of the words after the word "area" in Paragraph 5 (a) of the Lease are hereby deleted, and in their place shall be the following: "from the first month of the Addendum To Lease through the last month of the Addendum To Lease."

7. As to Paragraph 8 (a) of the Lease the word "10th" in lines 1 and 2 is hereby amended to "20th".

8. As to Paragraph 8 (a) of the Lease, the following provisions are hereby deleted from lines 9 and 10: "which statement shall also be duly certified by an Independent certified public accountant".

9. The provisions of Articles 11, Paragraph 15 (d), Article 19, and Article 20 of the Lease are hereby deleted.

10. The following provisions are hereby added to Article 24 of the Lease: Landlord shall not permit any future tenant to conduct the retail business of renting video tapes including movies and video games in the Shopping Center as long as tenant herein shall rent the demised premises.

11. The provisions of Paragraph 26.04 of the Lease are hereby deleted.

12. New Paragraph 26.08 is hereby added to the Lease as follows: 26.08  Notwithstanding any language to the contrary contained in the Lease, tenant shall have the right to transfer its interest in the Lease and any amendments thereto to a partnership, corporation, limited liability company, or other business entity subject to the execution of personal guarantees as required by Landlord.

13. As to Paragraph 35 (i) of the Lease, the number "Two Million Five Hundred Thousand Dollars" is hereby amended to read as follows: "One Million Dollars".

14. As to lines 1, 2, 3, 6, 7, and 8 of Article 38 of the Lease, the following provisions are hereby deleted: "insurable under the Landlord's insurance policy" and "upon receipt of the insurance proceeds", and "(b) should be damaged as a result of a risk which is not covered by Landlord's insurance or are uninsurable under landlord's policies."

Also in Article 38, the following provisions are hereby added after the word "rent" in line 3: "and all additional payments to Landlord including but not limited to percentage rent, common area maintenance fees, real estate tax fees, and Landlords' insurance premium fees."

amount claimed to be due, and the amount so paid by Landlord including reasonable attorney's fees incurred by Landlord in procuring the discharge of such lien, together with interest thereon at the rate of 15% per annum, shall be due and payable by Tenant to Landlord.

Section 3.04 <u>Tenant's Trade Fixtures</u>.  All trade fixtures (as distinguished from leasehold improvements) and inventory owned by Tenant and installed in the Leased Premises shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the term; provided, that Tenant shall not at such time be in default of any terms or covenants of this Lease; provided, further, that Tenant shall repair any damage to the Leased Premises caused by the removal of said fixtures.

Section 3.05 <u>Changes and Additions to Shopping Center</u>.  Landlord reserves the right at any time to make additions or alterations to and to build additional stores in the building of which the Leased Premises may be a part and to build adjoining the same. Landlord also reserves the right from time to time to construct other buildings or improvements in the Shopping Center, to make alterations thereof or additions thereto or subtractions therefrom, to build additional stories in any building or buildings in the Shopping Center, to build adjoining the same or to construct double-deck or elevated parking facilities, or to acquire additional property or properties which Landlord, at Landlord's sole election, may include within the Shopping Center as common areas (as hereinafter defined) or otherwise.

<u>ARTICLE IV - CONSTRUCTION DISPUTES</u>

Section 4.01    <u>Settlement of Disputes</u>.  It is understood and agreed that any disagreement or dispute which may arise between Landlord and Tenant with reference to the work to be performed by either Landlord or Tenant hereunder shall be submitted to Landlord's registered architect, whose decision shall be final and binding on both Landlord and Tenant.

<u>ARTICLE V - CONDUCT OF BUSINESS BY TENANT</u>

Section 5.01   <u>Use of Premises</u>.  Tenant shall use and occupy the Leased Premises during the term of this Lease solely for the purpose of conducting the business of the sale of dollar store and for no other purpose or purposes without the prior consent of Landlord. Tenant shall not engage in any type of business that may conflict with the primary business of any of the other tenant in the Shopping Center.  Tenant acknowledges that Landlord has leased or may, in Landlord's sole discretion, lease, at any time hereafter, on various terms and conditions, other space(s) in the Shopping Center to businesses, some of which may or will be similar and directly competitive with the business of Tenant. The landlord has agreed not to lease to another dollar store.

Section 5.02    <u>Operation of Business</u>.  Tenant agrees to operate one hundred percent (100%) of the Leased Premises during the entire term of this Lease, unless prevented from doing so because of fire, accident, or acts of God, and to conduct its business at all times in a high class and reputable manner, maintaining at all times a full staff of employees and a full and complete stock of merchandise.  Tenant shall install and maintain at all times a display of merchandise in the display windows of the Leased Premises and shall keep the same well lighted during all Shopping Center business hours. Tenant shall promptly comply with all laws and ordinances and lawful orders and regulations affecting the Leased Premises and the cleanliness, safety, occupancy and use of same.  No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted in the Leased Premises without the prior consent of Landlord.  Tenant agrees that it will conduct its business in the Leased Premises in a lawful manner and in good faith, and will not do any act tending to injure the reputation of the Shopping Center or the name or logo of the Shopping Center in its advertising.

-3-

3

as not to damage the Demised Premises and any damage caused by such removal shall be promptly repaired by Tenant at its sole cost and expense.

Section 4.04.  <u>Liens</u>.  Tenant shall: (i) keep the Demised Premises at all times during the term hereof free from mechanics' liens and other liens of like nature created or claimed by reason of transactions made by Tenant; and (ii) at all times fully protect and indemnify Landlord against all such liens or claims which may ripen into such liens and all expenses arising from such liens or claims. If Tenant shall elect to contest any such claim or lien, it shall furnish Landlord a bond of a responsible corporate surety, in the amount claimed, conditioned on the discharge of said claim or lien.  If a final judgment establishing the validity of said lien or claim for any amount is entered, Tenant shall pay and satisfy same at once.  As to mechanics' liens and other liens of like nature created or claimed by reason of transactions made by Landlord, Landlord shall keep the Demised Premises free of same, indemnify Tenant, furnish Tenant with a like bond and pay and satisfy valid liens all in accordance with the same requirements as are imposed upon Tenant as aforesaid.

ARTICLE 5.00
<u>USE</u>

Section 5.01.  <u>General.</u>  Tenant shall use the Demised Premises for the purpose of conducting therein the business of a full service hair salon for men, women and children and the sale of related retail items and for incidental purposes related thereto, or for any other legally permissible business or commercial venture subject to the operation of Article 12.00 hereof; provided, however, that Tenant shall not use the Demised Premises in such a manner as to violate any applicable law, rule, ordinance or regulation of any governmental body.

Section 5.02.  <u>Closing of Store</u>.  It is expressly understood and agreed that notwithstanding anything to the contrary contained in this Lease, Tenant may close its store when in its judgement, reasonably exercised, the operation of the Demised Premises as provided herein cannot be economically justified.  Such closing shall not release Tenant from any of its obligations provided herein.

Section 5.03.  <u>Restrictive Covenant</u>.  To the extent that Landlord may lawfully do so, Landlord covenants and agrees that it will not directly or indirectly, lease or rent any additional property within the Development for principal use as a hair salon; nor will Landlord, directly or indirectly, permit any tenant or occupant of such property to lease or rent, in any manner, directly or indirectly, any part thereof to a person, firm or corporation for such use. If at any time during the primary or extended terms of this Lease, a person, firm or corporation does so operate a salon within the Development, then Guaranteed Minimum Rent payable hereunder shall be reduced by fifty percent (50%) while such condition continues to exist.  The foregoing shall not be construed to limit Tenant's rights or remedies for any violation of this Section.  This Section shall not be operative if the Development is or is part of a retail development containing more than two hundred thousand (200,000) square feet of gross leasable floor area.

- 7 -

THE HAIR CUTTERY

*LEASE TO COMMENCE*
*Leases 5/1/96 - Rent To ~~commence~~ 5/1/96*

## INDENTURE OF LEASE (Sears)

**THIS INDENTURE** made this _15th_ day of _March_, 19~~96~~ by and between **Cape May Mall Limited Partnership**, a Maryland Limited Partnership, with offices at P.O. Box 685, Owings Mills, Maryland 21117, hereinafter referred to as "Landlord", and Mary E. Sweeney, an individual, whose address is 106 Marlyn Ave., Hammonton, New Jersey, hereinafter referred to as "Tenant".

## WITNESSETH

**1.01.   Leased Premises.** Landlord leases to Tenant and Tenant leases from Landlord those certain premises in Bayshore Mall Shopping Center (hereinafter called "Center" or "Shopping Center") located at Sandman Blvd. and Bayshore Road, Lower Township, Cape May County, New Jersey, a store having a Gross Leasable Area of approximately SIX THOUSAND THREE HUNDRED (6,300) square feet, having a frontage of sixty three (63) feet and a depth of one hundred (100) feet (hereinafter called the "Demised Premises" or "Premises"), designated on the attached plan (Exhibit "A") as store numbers 26, 25 and a part of store 24, together with the non-exclusive right to use and occupy, in common with others entitled to use the same, the Common Areas and Common Facilities, as defined herein and as may be designated by Landlord on Exhibit "A", subject, however, to the terms and conditions of this Lease.

**1.02.   Term.** The Term of this Lease shall be for three (3) years plus the Stub Period, if any, beginning on the Commencement Date. Notwithstanding the foregoing, Tenant shall be bound by all the terms and conditions of this Lease from the date of the first occupancy of the Demised Premises by Tenant or its agents for any purpose prior to the Commencement Date. The Tenant may, after giving Landlord thirty days notice, cancel and terminate this Lease Agreement if at least one half of the total square footage of the premises adjacent to the Demised Premises previously leased and/or operated by Jamesway, Inc. is not within two years from the commencement date of this lease under lease and being fully utilized in the operation of a business or businesses. Further the lease executed by the Landlord and Tenant for the premises known as Store Numbers 18 and 19 is terminated on the commencement date of the within lease agreement.

**1.03.   Fixed Minimum Rent.** The Fixed Minimum Rent for each Lease Year shall be as follows:

| Lease Year | Yearly Rent | Monthly Rent |
|---|---|---|
| _5/1/96 - 4/30/97_ One plus Stub Period, if any | $63,000.00 | $5,250.00 |
| _5/1/97 - 4/30/98_ Two | $63,000.00 | $5,250.00 |
| _5/1/98 - 4/30/99_ Three | $66,150.00 | $5,512.50 |

**1.04.   Percentage Rent and Percentage Rent Breakpoint.** Intentionally deleted.

**1.05.   Use of Demised Premises.** Tenant shall use the Demised Premises, subject to the terms and conditions of the Lease Agreement, solely for the purposes of conducting the retail business of a "Sears"

Please Initial:   Landlord_____   Tenant _MS_       Page 1

Appliance Store and such other retail uses as may fall within Tenant's franchise agreement with Sears. Tenant shall neither use nor permit the use of the Demised Premises for any business or purpose other than that stated above. In consideration of the forgoing use restriction Landlord agrees and covenants that during the term of this lease landlord will not use or occupy, or permit the use or occupancy of any space not hereby demised to Tenant which is located within the Entire Premises for the operation of any store or business primarily engaged in the sale of refrigerators, ranges, washers and dryers.

**1.06.    Security Deposit.** It is agreed that the Tenant has deposited with the Landlord at the time of the execution of its prior lease at the Center the sum of Six Thousand Six Hundred and Sixty Six Dollars ($6,666.00) in cash, which money shall continue to be held, as security for the faithful performance by the Tenant of all of the terms, conditions and covenants of this Lease.

**1.07.    Initial Monthly CAM Charge.** The Initial CAM Charge shall be an amount equal to one twelfth of the sum obtained by multiplying the square feet of Gross Leased Area within the Demised Premises by One Dollar and Twenty Five Cents ($1.33).

**1.08.    Initial Monthly Utility Charge.** Intentionally deleted.

**1.09.    Initial Monthly Tax Rent.** The Initial Monthly Tax Rent shall be an amount equal to one twelfth of the sum obtained by multiplying the square feet of Gross Leased Area within the Demised Premises by One Dollar and Forty Two Cents ($1.42).

**1.10.    Lease and Lease Documents.** The Indenture of Lease to which the Lease Agreement is attached, General Provisions, Exhibit "A" Site Plan, Exhibit "B" Tenant's and Landlord's Work, Exhibit "C" Sign Design Criteria, and Exhibit "D" Gross Sales Report Form shall collectively form the Lease and/or Lease Documents.

**IN WITNESS WHEREOF**, the parties hereto have caused this Indenture of Lease to be duly executed the day and year first above written.

(Corporate Seal)

**LANDLORD:**
Cape May Mall Limited Partnership

ATTEST: _(signature)_

BY: _(signature)_
        Richard M. Singer, General Partner

**TENANT:**
Mary E. Sweeney

_(signature)_ Mary Sweeney

Please Initial:  Landlord_____    Tenant _M.E._                    Page 2

KFC

assigns, may operate any other lawful business upon the Leased Premises, provided, however, that any other lawful retail business that Tenant or its successors and assigns may elect to operate shall not conflict with any other exclusive use that shall be in effect in the Shopping Center at such time as Tenant, or its successors and assigns elects to make a change to a use other than a Kentucky Fried Chicken and provided further that any such different use shall be limited to such uses as can be conducted within a 4,000 square foot structure; 100 feet by 40 feet as shown on Exhibit H it being understood that Tenant, or its successors or assigns shall not construct a building larger than 4,000 square feet or higher than 24 feet from ground elevation.   Landlord agrees to provide Tenant with a list of exclusives which are in force in the Shopping Center at the time that Tenant, or its successors or assigns, may elect to make a change from a Kentucky Fried Chicken to some other permitted retail use.  Landlord shall provide such list within twenty days from receipt of a written request.  Landlord agrees that during the term of this lease, or any Renewal Period (as hereinafter defined) that it shall not permit any other out parcel within the boundaries of the Shopping Center, as shown on Exhibit A, to be sold or leased for a use the primary business of which is the advertising, preparation and sale of fried chicken, chicken sandwiches, and hamburger products or any combination thereof.  For the purpose of this restriction, a restaurant has as its primary business the advertising, preparation or sale of fried chicken, chicken sandwiches, hamburger products, or any combination thereof, if thirty percent (30%) or more of its gross sales, exclusive of tax and exclusive of beverages and dairy product sales, consist of the sales of fried chicken, chicken sandwiches and hamburger

- 7 -

*HfC*

products or any combination thereof. This restriction on Landlord shall not apply to any lease or sale between Landlord and any tenant operating a restaurant or fast food operation located within the mall building of the Shopping Center. In the event Tenant elects to cease operating a Kentucky Fried Chicken and after a period of six (6) months following such cessation is unable to sublet, after diligent and good faith efforts, to a tenant whose use would not conflict with an exclusive then in effect in the Shopping Center, Tenant, upon the payment of Fifteen Thousand ($15,000.00) Dollars cash to Landlord shall have the right to terminate this lease without further liability.  Tenant shall install a drive-thru facility in the Leased Premises provided such drive-thru facility shall be consistent with the traffic flow as established by Landlord in Exhibits A and B.

4.      MINIMUM RENT

        (a) The fixed annual base rent (hereinafter referred to as the "Minimum Rent") shall be $15,000.00 per annum through the twentieth (20th) Lease Year until the combined gross sales of the Kentucky Fried Chicken restaurant subject to this lease and the Kentucky Fried Chicken restaurant in Wildwood, New Jersey exceed the sum of $1,300,000.00 and independently the gross sales of the Kentucky Fried Chicken restaurant subject to this lease exceed the sum of $650,000.00, the annual minimum rent shall be a maximum of $15,000 per annum during the initial term of this Lease.

        (b) The Minimum Rent shall be payable monthly, in advance, without any prior demand being required thereof, in equal monthly payments commencing as of the Commencement Date.  In the event that the Commencement Date is a date other than the first day of a month the first rental Payment shall be

- 8 -

RIDER    R/L Jewlers

RIDER to be annexed to and made part of the Lease Agreement by and between ROYCE REALTY INC., trading as MONTGOMERY REALTY COMPANY (hereinafter called "Agent"), Agent for CAPE MAY MALL LIMITED PARTNERSHIP, a Maryland limited partnership, (hereinafter called "Landlord"), and RONALD L. DUCA AND DELIA M. DUCA, and LOUIS CIAMPI AND KATHLEEN CIAMPI, trading as "RONALD - LOUIS FINE JEWELERS" (hereinafter called "Tenant") for certain premises known and designated as STORE NUMBER 10-A located in BAYSHORE MALL.

1.    RIDER TO MINIMUM RENT - INDENTURE OF LEASE.
A.    Notwithstanding anything in the Lease to the contrary, it is agreed and understood between the parties that Tenant shall be granted a Thirty (30) Day Fixed Minimum Rent abatement commencing on November 21, 1994, on which date Tenant shall take possession of the Demised Premises, and terminating on December 20, 1994.  Tenant's obligation to begin paying Fixed Minimum Rent, as set forth in the Lease Agreement shall commence on December 21, 1994.  Other than as stated in this Section, Tenant shall have no other right of rental offset or deduction.  The entire amount of Fixed Minimum Rent and additional rent otherwise due any payable during the abatement period shall become immediately due and payable upon the occurrence of an event of default by Tenant under this Lease.

B.    Notwithstanding anything in the Lease to the contrary, it is further agreed and understood between the parties that Tenant shall be granted an additional Three (3) month Fixed Minimum Rent abatement commencing on February 1, 1995, and terminating on April 31, 1995.  Tenant's obligation to resume paying Fixed Minimum Rent, as set forth in the Lease Agreement shall be on May 1, 1995.  Other than as stated in this Rider, Tenant shall have no other right of rental offset or deduction.  The entire amount of Fixed Minimum Rent and additional rent otherwise due any payable during the abatement period shall become immediately due and payable upon the occurrence of an event of default by Tenant under this Lease.

Notwithstanding the foregoing, nothing in the above paragraph A or B shall release Tenant from the obligation to pay additional rent (i.e., Tax Rent, Common Area Maintenance Charges, and any additional rent) during the period of Fixed Minimum Rent abatement, in accordance with the provisions of the Lease Agreement.

2.    EXCLUSIVE TENANCY.
Providing that Tenant is not in default under the terms and conditions of this Lease, and for so long as Tenant is open and operating in the Shopping Center, Landlord shall not directly lease any other space in the Shopping Center to a tenant whose sole principal business is the sale of fine jewelry.

Nothing herein contained shall prohibit any other tenant in the Shopping Center from dealing or displaying merchandise or services which are the same or similar to those sold or displayed by Tenant herein, so long as such sale or display by such other tenant shall be incidental to its primary business.

