**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

– – – – – – – – – – – – – – – – – – – – – – – – –

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| BIG LOTS, INC., *et al.*, [1] | : | Case No. 24-11967 (JKS) |
|  | : | (Jointly Administered) |
| Debtors. | : | **Related to D.I. 13, 1337, 1717** |
|  | : |  |
|  | : |  |

– – – – – – – – – – – – – – – – – – – – – – – –

**EXHIBITS A-J TO ALDI INC.'S REPLY IN SUPPORT OF THE MOTION OF DEBTORS
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) ESTABLISHING
PROCEDURES TO SELL CERTAIN LEASES, (II) APPROVING THE
SALE OF CERTAIN LEASES, AND (III) GRANTING RELATED RELIEF**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

# <u>EXHIBIT A</u>

## Lease

# LEASE AGREEMENT

**By and Between**

**BIG VEFL Owner LLC**, a Delaware limited liability company

(**Landlord**)

**and**

**BLBO Tenant, LLC**, an Ohio limited liability company

**(Tenant)**

# TABLE OF CONTENTS

**Page**

1.   BASIC TERMS ............................................................................................................. 1
2.   DEFINITIONS AND BASE PROVISIONS ............................................................... 2
3.   GRANTING CLAUSE ............................................................................................... 10
4.   USE ............................................................................................................................ 12
5.   RENT ......................................................................................................................... 13
6.   TRUE LEASE; NET LEASE ..................................................................................... 15
7.   REAL ESTATE TAXES ............................................................................................ 17
8.   PERSONAL PROPERTY TAXES............................................................................ 20
9.   OPERATING EXPENSES ........................................................................................ 20
10.  TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES ...................... 21
11.  COMPLIANCE WITH LAWS .................................................................................. 24
12.  SURRENDER OF PREMISES .................................................................................. 24
13.  ALTERATIONS ........................................................................................................ 25
14.  ENTRY BY LANDLORD ......................................................................................... 27
15.  TENANT'S INSURANCE OBLIGATIONS .............................................................. 27
16.  OFAC ........................................................................................................................ 32
17.  WAIVER OF SUBROGATION ................................................................................ 33
18.  FIRE OR OTHER CASUALTY ................................................................................ 33
19.  CONDEMNATION ................................................................................................... 35
20.  INDEMNIFICATION................................................................................................ 37
21.  ASSIGNMENT AND SUBLETTING ....................................................................... 39
22.  LIENS ........................................................................................................................ 46
23.  TENANT'S DEFAULT ............................................................................................. 46
24.  REMEDIES OF LANDLORD ................................................................................... 47
25.  SUBORDINATION/ATTORNMENT ....................................................................... 49
26.  ESTOPPEL CERTIFICATE...................................................................................... 50
27.  HAZARDOUS MATERIALS ................................................................................... 51
28.  PRESS RELEASES ................................................................................................... 54
29.  HOLDING OVER ...................................................................................................... 54
30.  FINANCIAL STATEMENTS ................................................................................... 54
31.  QUIET ENJOYMENT ............................................................................................... 55
32.  NOTICES ................................................................................................................... 55
33.  PERSONAL LIABILITY .......................................................................................... 55
34.  ENTIRE AGREEMENT............................................................................................ 56
35.  AMENDMENTS ....................................................................................................... 56
36.  LEGAL INTERPRETATION .................................................................................... 56
37.  OPTION TO RENEW ............................................................................................... 57
38.  AUTHORITY TO ENTER INTO LEASE ................................................................. 57
39.  PARTIES BOUND .................................................................................................... 60
40.  COUNTERPARTS; ELECTRONIC SIGNATURES ................................................ 60
41.  SEVERABILITY ....................................................................................................... 60
42.  WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES ................................ 60
43.  MEMORANDUM OF LEASE................................................................................... 61

44.    BROKERS ................................................................................................................. 61
45.    RIGHT OF FIRST REFUSAL TO PURCHASE ........................................................... 61
46.    GUARANTY ............................................................................................................... 63
47.    REIT PROTECTION ................................................................................................... 63
48.    LOCAL LAW PROVISIONS ...................................................................................... 65

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "<u>Lease</u>") is entered into as of the 25th day of August, 2023 (the "<u>Effective Date</u>"), by and between **BIG VEFL Owner LLC**, a Delaware limited liability company (individually and/or collectively, as the context may require, "<u>Landlord</u>"), and **BLBO Tenant, LLC**, a, Ohio limited liability company ("<u>Tenant</u>").

## RECITALS

A.  Big Lots Stores, LLC ("<u>Seller</u>"), an affiliate of Tenant, was the fee simple owner of the Premises immediately prior to the Effective Date.

B.  Landlord purchased the Premises from Seller pursuant to an Agreement for Purchase and Sale of Real Property dated as of June 30, 2023 (as amended by that certain First Amendment to Agreement for Purchase and Sale of Real Property dated as of July 31, 2023, that certain Second Amendment to Agreement for Purchase and Sale of Real Property dated as of August 4, 2023, and that certain Third Amendment to Agreement for Purchase and Sale of Real Property dated as of August 15, 2023, collectively, the "<u>Purchase Agreement</u>").

C.  In connection with the closing of the transactions contemplated under the Purchase Agreement, Landlord and Tenant are executing this Lease, pursuant to which Landlord shall lease the Premises back to Tenant, on the terms and conditions set forth below.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.  **BASIC TERMS**.

   A.  "<u>Base Rent</u>":  Base Rent shall be paid in accordance with and in the amounts set forth on **Exhibit "A"** attached hereto and made a part hereof, subject to increases as set forth herein.

   B.  "<u>Building</u>":  The building or buildings located on the Property in the approximate square footages set forth on **Exhibit "B-1"** attached hereto and made a part hereof.

   C.  "<u>Commencement Date</u>":  The Effective Date.

   D.  "<u>Expiration Date</u>":  The last day of the calendar month in which the twenty (20) year anniversary of the Commencement Date shall occur, or as otherwise extended pursuant to the terms of <u>Section 37</u> of this Lease.

   E.  "<u>Option to Renew</u>":  Ten (10) additional periods of five (5) years each, under the terms and conditions set forth in <u>Section 37</u> of this Lease.

   F.  "<u>Premises</u>":  Collectively, the Building and the Property.

1

G.    "<u>Property</u>":  Collectively, those certain tracts or parcels of land, more particularly described on **Exhibit "B-1"** attached hereto and made a part hereof.

H.    "<u>Term</u>":  A period of twenty (20) years (plus the number of days, if any, to have this Lease expire on the last day of a calendar month), commencing on the Commencement Date and expiring on the Expiration Date, unless extended pursuant to the terms of <u>Section 37</u> of this Lease.

2.    **<u>DEFINITIONS AND BASE PROVISIONS</u>**.

For purposes of this Lease, the following terms shall have the meanings indicated below:

A.    "<u>ADA</u>":  The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

B.    "<u>Affiliate</u>":  With respect to Landlord or Tenant, shall mean a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such person or entity.  The term "control" as used in the immediately preceding sentence, means, with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or effective control, with respect to any publicly traded company.

C.    "<u>Alterations</u>":  Defined in <u>Section 13.A</u> hereof.

D.    "<u>Anti-Money Laundering Laws</u>":  The BSA and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (commonly referred to as the USA Patriot Act), P.L. 107-56, as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

E.    "<u>Architect</u>":  A duly licensed architect selected by Tenant to complete any applicable Tenant's Work, who is reasonably acceptable to Landlord.

F.    "<u>Base Rent</u>":  Defined in <u>Section 1.A</u> hereof.

G.    "<u>BSA</u>":  The Bank Secrecy Act (otherwise known as the Currency and Foreign Transactions Reporting Act), 31 U.S.C. §§ 310 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

2

H.    "Building":  Defined in Section 1.B hereof.

I.    "Code":  The Internal Revenue Code of 1986 and, to the extent applicable, the Treasury Regulations promulgated thereunder, each as amended from time to time.

J.    "Commencement Date":  Defined in Section 1.C hereof.

K.    "Comparable Buildings":  Buildings in the market in which the Building is located that are comparable in size, design, use, age, location, class and quality to such Building.

L.    "Control": With respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than twenty five percent (25%) of the voting rights attributable to the ownership interests of the entity, with respect to a publicly traded company.

M.    "Default Rate":  The lesser of (i) the Prime Rate plus five and one-half percent (5.5%) per annum, compounding monthly, or (ii) the highest rate allowed by applicable Law.

N.    "EBITDA":  For any Test Period and any Person, the consolidated net income or loss of such Person on a consolidated basis for such period, determined in accordance with GAAP, adjusted by excluding (1) income tax expense, (2) consolidated interest expense (net of interest income), (3) depreciation and amortization expense, (4) any income, gains or losses attributable to the early extinguishment or conversion of indebtedness or cancellation of indebtedness, (5) gains or losses on discontinued operations and asset sales, disposals or abandonments, (6) impairment charges or asset write-offs including, without limitation, those related to goodwill or intangible assets, long-lived assets, and investments in debt and equity securities, in each case, in accordance with GAAP, (7) any non-cash items of expense (other than to the extent such non-cash items of expense require or result in an accrual or reserve for future cash expenses), (8) extraordinary gains or losses, and (9) unusual or non-recurring gains or items of income or loss.

O.    "Effective Date":  Defined in the Preamble hereof.

P.    "Encumbrance":  Any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, lease, sublease, attachment, conditional sales agreement, encumbrance, preemptive right, right of first refusal, right of first offer, covenant, condition, restriction, reciprocal easement agreement, declaration or other right of third parties, whether voluntarily

3

incurred or arising by operation of Law, and includes any agreement to give or enter into any of the foregoing.

Q.   "Environmental Laws":  All Laws, Permits, orders and other legally-binding declarations of any Governmental Authority pertaining to environmental, health or safety matters or Hazardous Materials, including but not limited to the (1) Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), (2) Hazardous Substances Transportation Act (49 U.S.C. §1802 et seq.), (3) Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), as amended by the Hazardous and Solid Wastes Amendments of 1984, (4) Water Pollution Control Act (33 U.S.C. §1251 et seq.), (5) Safe Drinking Water Act (42 U.S.C. §300f et seq.), (6) Clean Water Act (33 U.S.C. §1321 et seq.), (7) Clean Air Act (42 U.S.C. §7401 et seq.), (8) Solid Waste Disposal Act (42 U.S.C. §6901 et seq.), (9) Toxic Substances Control Act (15 U.S.C. §2601 et seq.), (10) Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. §11001 et seq.), (11) Radon Gas and Indoor Air Quality Research Act of 1986 (42 U.S.C. §7401 et seq.), (12) National Environmental Policy Act (42 U.S.C. §4321 et seq.), (13) Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. §9601 et seq.), (14) Occupational Safety and Health Act (29 U.S.C. §651 et seq.), (15) Refuse Act of 1999 (33 U.S.C. § 407 et seq.), (16) Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), (17) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401 et seq.), (18) Noise Control Act (42 U.S.C. §  4902 et seq.), (19) Atomic Energy Act (42 U.S.C. §  2011 et seq.), (20) Nuclear Waste Policy Act of 1982 (42 U.S.C. § 10101 et seq.), and any similar state or local Laws and any and all rules and regulations in effect under such Laws.

R.   "Event of Default":  Defined in Section 23 hereof.

S.   "Exercise Period":  Defined in Section 45.B hereof.

T.   "Expiration Date":  Defined in Section 1.D hereof.

U.   "Final Completion": With respect to any Tenant's Work (a) the completion of construction of such Tenant's Work, including all "punch list" items, in accordance with the applicable Plans as certified by the applicable General Contractor, and (b) all permits and licenses required for the legal occupancy of such Tenant's Work, if any, have been obtained.

V.   "Final Completion Date": The date that Final Completion of the applicable Tenant's Work occurs.

W.   "GAAP": Generally accepted accounting principles consistently applied in the preparation of financial statements, as in effect from time to time (except with respect to any financial ratio defined or described herein or the

4

components thereof, for which purposes GAAP shall refer to such principles as in effect as of the Commencement Date).

X.    "General Construction Contract": With respect to any Tenant's Work, the applicable construction contract by and between the applicable General Contractor and Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

Y.    "General Contractor": With respect to any Tenant's Work, a contractor selected by Tenant to complete such Tenant's Work and reasonably acceptable to Landlord.

Z.    "Guarantor": Big Lots, Inc., an Ohio corporation.

AA.    "Guaranty":  Defined in Section 46 hereof.

BB.    "Hazardous Materials": (a) any toxic substance or hazardous waste, substance, solid waste or related material, or any pollutant or contaminant; (b) radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, radiation, mold or other microbial matter, odors, noise, per- and poly-fluoroalkyl substances, or any petroleum product or additive; (c) any substance, gas, material or chemical which is now or hereafter defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes," "regulated substances" or words of similar import under any Environmental Laws; and (d) any other chemical, material, gas, or substance, the exposure to or release of which is or may be prohibited, limited or regulated by any governmental authority, or any chemical, material, gas or substance that does or is reasonably likely to pose a hazard to human health or safety or to the environment.

CC.    "Indebtedness": As to any Person, (a) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments, (b) all obligations of such Person as lessee under capital leases, together with the obligations of such Person under this Lease, which have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts and operating liabilities payable in the ordinary course of business), (d) all indebtedness secured by a lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person, (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of such Person, (f) all net obligations (after taking into account any legally enforceable netting arrangement) under any agreement with respect to any swap, forward, future or derivative transaction or option or similar arrangement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities or

5

economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of transactions, and (g) all guarantees by such Person of any of the foregoing.

DD.    "Indemnified Party": With respect to any indemnification obligation contained in this Lease, the individual or entity so indemnified by the indemnifying party.

EE.    "Landlord Indemnified Parties": Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives.

FF.    "Landlord": Defined in the Preamble hereto.

GG.    "Landlord Claim": Defined in Section 20.A hereof.

HH.    "Landlord Mortgage": Defined in Section 25.B hereof.

II.    "Landlord Mortgagee": Defined in Section 25.B hereof.

JJ.    "Landlord Notice Address":

   c/o Blue Owl Real Estate Capital LLC
   30 North LaSalle, Suite 4140
   Chicago, IL 60602
   Attention:  Asset Management
   Email:  RealEstateAM@blueowl.com

   With a copy to

   Kirkland & Ellis LLP
   300 North LaSalle
   Chicago, Illinois 60654
   Attention: David A. Rosenberg, P.C. & David P. Stanek
   Email:  david.rosenberg@kirkland.com &
   david.stanek@kirkland.com

KK.    "Landlord's Representatives": Landlord's agents, attorneys, representatives, members, directors, officers and employees.

LL.    "Late Charge": Defined in Section 5.D hereof.

MM.    "Law": All applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, common law, rulings, and decrees of all local, municipal, state and

federal governments, departments, agencies, commissions, boards or political subdivisions.

NN.    "LC Issuer Requirements":  Defined in Section 21.B hereof.

OO.    "Lease":  Defined in the Preamble hereof.

PP.    "Letter of Credit": Defined in Section 21.B hereof.

QQ.    "Loss(es)":  Defined in Section 20 hereof.

RR.    "Monthly Base Rent Commencement Date":  Defined in Section 5.B hereof.

SS.    "Negotiation Period":  Defined in Section 45.C hereof.

TT.    "OFAC Laws and Regulations":  All Laws administered by the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury, codified at 31 C.F.R. Part 500 (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), interpretive guidance or other governmental action regarding persons or entities with whom U.S. persons or entities are restricted from doing business (including persons or entities who have violated the U.S. Foreign Corrupt Practices Act 15 U.S.C. §§78dd-1, 78dd-2 and 78dd-3), as same may be amended from time to time.

UU.    "Option to Renew":  Defined in Section 1.E hereof.

VV.    "OSREC":  Blue Owl Real Estate Capital LLC, Blue Owl Capital, Inc., any other entity under common control with the foregoing, and/or any direct or indirect owner of Landlord that is a "real estate investment trust" within the meaning of Section 856(a) of the Code.

WW.    "Permits":  All permits, licenses, approvals, authorizations, consents, waivers, exemptions, registrations, and certificates obtained from any governmental authority or required by any Law.

XX.    "Permitted Encumbrances":  Any and all Encumbrances (i) affecting any portion of the Premises as of the Commencement Date, including, but not limited to, those Encumbrances shown on Landlord's title policy obtained on the Effective Date, (ii) consisting of any and all leases, subleases, licenses and other occupancy agreements in place with respect to the Premises as of the Effective Date (collectively, the "**Existing Leases**"), (iii) consisting of current taxes and assessments with respect to the Premises, not yet due or payable, (iv) arising or created by municipal and zoning ordinances and (v) arising after the Commencement Date that are approved in writing by Landlord in its sole and absolute discretion.

7

YY.   "<u>Permitted Guarantor Change of Control</u>":  Defined in <u>Section 21.B</u> hereof.

ZZ.   "<u>Person</u>":  Any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

AAA.  "<u>Personal Property</u>":  All personal property on the Premises, which shall include, without limitation, all business machinery and equipment, including, but not limited to, specialized equipment unique to the nature of Tenant's business, business records, furniture, furnishings, communications equipment, office equipment, computer equipment, computer software, computer tapes, computer program tapes, computer program disks, computer program documentation and manuals, computer program codes, customer accounts, customer lists, customer information, inventory and proprietary information which may belong to Tenant or be in the possession of Tenant, which is located or used upon, in or about the Premises during the Term, or any renewal or extension thereof.  Any generator and associated equipment located at the Premises, if any, shall constitute a fixture and shall not constitute Personal Property.

BBB.  "<u>Plans</u>":  With respect to any Tenant's Work, the plans and specifications prepared by the Architect and approved by Landlord.

CCC.  "<u>Premises</u>":  Defined in <u>Section 1.F</u> hereof.

DDD.  "<u>Prime Rate</u>":  The interest rate per annum as published, from time to time, in The Wall Street Journal as the "Prime Rate" in its column entitled "Money Rate."  The Prime Rate may not be the lowest rate of interest charged by any "large U.S. money center commercial banks" and Landlord makes no representations or warranties to that effect.  In the event The Wall Street Journal ceases publication or ceases to publish the "Prime Rate" as described above, the Prime Rate shall be the average per annum discount rate (the "<u>Discount Rate</u>") on ninety-one (91) day bills ("<u>Treasury Bills</u>") issued from time to time by the United States Treasury at its most recent auction, plus three hundred (300) basis points.  If no such 91-day Treasury Bills are then being issued, the Discount Rate shall be the discount rate on Treasury Bills then being issued for the period of time closest to ninety-one (91) days.

EEE.  "<u>Prohibited Persons</u>":  Defined in <u>Section 16.B</u> hereof.

FFF.  "<u>Property</u>":  Defined in <u>Section 1.G</u> hereof.

GGG.  "<u>Purchase Agreement</u>":  Defined in Recital B hereto.

HHH.  "<u>Real Estate Taxes</u>":  Defined in <u>Section 7.A</u> hereof.

III.   "<u>Release</u>":  Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, presence of,

exposure to or disposing into the environment of any Hazardous Materials, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials.

JJJ.    "Renewal Amendment":  Defined in Section 37.C hereof.

KKK.    "Renewal Notice":  Defined in Section 37.A.1 hereof.

LLL.    "Renewal Option":  Defined in Section 37.A hereof.

MMM. "Renewal Term":  Defined in Section 37.A hereof.

NNN.    "Rent":  Defined in Section 5.C hereof.

OOO.    "Repossessed Premises":  Defined in Section 24.C hereof.

PPP.    "Restoration Standards": Defined in Section 18.A hereof.

QQQ.    "Security Deposit":  Defined in Section 21.B hereof.

RRR.    "Seller":  Defined in the Recitals hereto.

SSS.    "SNDA":  Defined in Section 25.A hereof.

TTT.    "Substitute Tenant":  Defined in Section 24.C hereof.

UUU.    "Taxes":  Defined in Section 7.D hereof.

VVV.    "Tenant":  Defined in the Preamble hereto.

WWW. "Tenant Notice Address":

> Big Lots, Inc.
> 4900 East Dublin Granville Road
> Columbus, OH 43081
> Attn:  Steve Hutkai
> VP of Tax & Treasurer
> Email:  shutkai@biglots.com
>
> Big Lots, Inc.
> 4900 East Dublin Granville Road
> Columbus, OH 43081
> Attn:  Ronald A. Robins, Jr. (Rocky)
> EVP, Chief Legal Officer, General Counsel & Corporate Secretary
> Email:  rrobins@biglots.com
>
> Big Lots, Inc.
> 4900 East Dublin Granville Road

Columbus, OH 43081
Attn:  Chris Macke
Director, Real Estate Counsel
Email:  cmacke@biglots.com
With a copy to:

Vorys, Sater, Seymour and Pease LLP
50 S. Main Street, Suite 1200
Akron, OH  44224
Attn:  Jacinto A. Núñez
Email:  janunez@vorys.com

XXX.    "Tenant's Personal Property":  Defined in Section 12 hereof.

YYY.    "Tenant's Representatives":  Tenant's agents, attorneys, representatives, directors, officers and employees and any mortgagee of Tenant's interest in this Lease or in the Premises.

ZZZ.    "Tenant's Work": Defined in **Exhibit "C"** hereof.

AAAA.  "Term":  Defined in Section 1.H hereof.

BBBB.  "Test Period":  At any date of determination, the trailing twelve (12) full calendar months for which financial statements have been delivered to Landlord.

CCCC.  "Total Indebtedness Leverage Ratio":  With respect to any Person, at any date of determination, the ratio of (i) total Indebtedness of such Person and its subsidiaries to (ii) EBITDA of such Person.

DDDD.  "Transfer":  Defined in Section 21.B hereof.

EEEE.   "U.S. Publicly-Traded Entity":  Defined in Section 16.A hereof.

FFFF.   "Utility Charges":  Defined in Section 9.A hereof.

3.     **GRANTING CLAUSE**.

A.     Landlord, in consideration of the covenants and agreements to be performed by Tenant, and upon the terms and conditions contained in this Lease, does hereby lease, demise, let and deliver to Tenant, and Tenant, in consideration of the covenants and agreements to be performed by Landlord and upon the terms and conditions contained in this Lease, does hereby lease from Landlord, the Premises, to have and to hold for the Term.   Tenant acknowledges receipt and delivery of complete and exclusive possession of the Premises, subject to the Permitted Encumbrances. Tenant acknowledges and confirms that for a substantial period prior to and up to and including the execution of this Lease, Seller has been in continuous ownership and

possession of the Premises, and, accordingly, Tenant is fully familiar therewith, and Tenant has examined and otherwise has knowledge of the condition of the Premises prior to the execution and delivery of this Lease and has found the same to be satisfactory for its purposes hereunder. Regardless, however, of any knowledge, examination or inspection made by Tenant and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Premises "as is," "where is" and "with all faults" in its present condition.  Tenant hereby irrevocably, unconditionally and absolutely waives and relinquishes any claim or action against Landlord whatsoever in respect of the condition of the Premises as of the Commencement Date, including any patent or latent defects or adverse conditions not discovered or discoverable or otherwise known or unknown by Tenant as of the Commencement Date.

LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN FACT OR IN LAW, IN RESPECT OF THE PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS MATERIALS, IT BEING AGREED THAT ALL SUCH RISKS, KNOWN AND UNKNOWN, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY  AND LIABILITY FOR ANY ENVIRONMENTAL CONDITION OF THE PREMISES, ENVIRONMENTAL REMEDIATION AND COMPLIANCE WITH ALL ENVIRONMENTAL LAWS.

Without limiting the foregoing, Tenant realizes and acknowledges that factual matters existing as of the Commencement Date now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses that are presently unknown, unanticipated and unsuspected, and Tenant further agrees that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Tenant nevertheless hereby intends to release, discharge and acquit Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives, from any and all such unknown losses, damages, liabilities, costs and expenses.

B.    Tenant acknowledges that fee simple title (both legal and equitable) to the Premises is vested in Landlord and that Tenant has only the leasehold right of possession and use of the Premises as provided herein.

4.    **USE**.

    A.    Tenant may use the Premises for the applicable permitted use as set forth on **Exhibit "B-2"** attached hereto and all ancillary uses associated therewith, in all cases subject to and in compliance with all Laws and Permitted Encumbrances.  Tenant shall use the Premises only as provided by and in accordance with all Permitted Encumbrances, subject to Landlord's reservation of rights herein.  Tenant shall not use or occupy the Premises, or any part thereof, nor permit or allow the Premises or any part thereof to be used or occupied, for (i) any purpose or in any manner which is in violation of any Law or a violation of the provisions set forth in <u>Section 27</u> or any other provision of this Lease or (ii) in any manner which violates any certificates of occupancy for the Premises or makes void or voidable any insurance then in force with respect thereto as is required pursuant to <u>Section 15</u> hereof.  Tenant's occupancy of the Premises will be in compliance with all Laws and insurance requirements, and as otherwise provided in this Lease.  Tenant shall neither suffer nor permit the Premises or any portion thereof to be used, or otherwise act or fail to act, in such a manner as (I) might impair Landlord's title thereto or to any portion thereof, (II) may make possible a claim of adverse use or possession or an implied dedication of the Premises or any portion of the Premises, or (III) may subject the Premises or this Lease to any Encumbrances, other than Permitted Encumbrances.  Notwithstanding anything herein to the contrary, Tenant shall not (a) permit any unlawful or immoral practice to be carried on or committed in the Premises; (b) make any use of or allow the Premises to be used for any purpose that might invalidate or increase the rate of insurance thereof; (c) deface or injure the Premises; (d) overload the floors, walls or ceilings of the Premises; (e) sell or consume, or allow the sale or consumption of, alcoholic beverages in the Premises; (f) commit or suffer any material waste in or about the Premises; (g) use the Premises in any manner that may diminish the value of the Premises in any material respect; or (h) use the Premises for any of the following purposes without the Landlord's prior consent (in its sole and absolute discretion): (i) bar, nightclub, adult bookstore or video shop or other adult entertainment establishment; (ii) incineration or reduction of garbage or any garbage dumps on the Premises; (iii) mortuary; (iv) fire sale, bankruptcy sale or auction house operation; (v) gas station; (vi) laundry or dry cleaning plant or laundromat; (vii) automobile, truck, trailer or RV repairs on-site; (viii) "flea market," secondhand, surplus or other "off-price" or deep discount store (provided this language shall not be construed to limit Tenant's use of a portion of the Premises for a Big Lots retail store); (ix) massage parlor; (x) carnival; or (xi) gambling or off-track betting operation.

    B.    At all times during the first eight (8) years of the Term, (i) Tenant shall occupy the Premises and (ii) except during periods when the Premises may be untenantable by reason of fire or other casualty or condemnation (provided, however, during all such periods while the Premises are

untenantable, Tenant shall strictly comply with the terms and conditions of <u>Section 18</u> and <u>Section 19</u> of this Lease), Tenant shall operate its business on the Premises in the ordinary course.

C.      Tenant will not enter into any agreements or consent to any transaction or instruments that will create an Encumbrance on the Premises without Landlord's prior written consent, which may be granted or withheld in its sole discretion.  Tenant shall be responsible for complying with the terms and conditions of, and paying the costs and expenses under, all Encumbrances on the Premises (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant shall not, without Landlord's prior written consent (in Landlord's sole discretion), apply for or otherwise seek or obtain any zoning changes or variances with respect to the Property.  If Landlord desires to seek or obtain any zoning changes or variances with respect to the Property, Tenant shall cooperate in all respects therewith, at Landlord's request, provided that such zoning change or variance will not prohibit, restrict or otherwise limit Tenant's use of the Property for its then-current use.  Tenant shall use commercially reasonable efforts, at Landlord's request, to endeavor to secure any estoppels related to an Encumbrance.

D.      Tenant shall have the right to access and use the Premises twenty-four (24) hours per day, seven (7) days per week.

E.      To the extent that there are any leases, subleases, licenses, occupancy agreements, or similar agreements affecting the Premises as of the date hereof, such agreements shall be treated as if they were subleases, sublicenses, or similar agreements; Tenant shall remain the landlord, licensor, or similar party under such agreements; Tenant shall timely perform all obligations under such agreements; and Tenant shall protect, indemnify, defend and hold harmless all Landlord Indemnified Parties from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, losses, costs, fees and expenses, including without limitation reasonable counsel fees and court costs, to the maximum extent permitted by Law, imposed upon, asserted against or suffered or incurred by any Indemnified Party directly or indirectly which arise out of, are occasioned by, or are in any way attributable to or related to such agreements.

5.      **<u>RENT</u>**.

A.      On the Commencement Date, in connection with Landlord's acquisition of the Premises pursuant to the Purchase Agreement, Tenant shall pay to Landlord (1) the sum set forth in the "Commencement Date Payment" column on **Exhibit "B-2"** attached hereto, which is an amount equal to the Base Rent for the first (1st) three full months of the Term, and (2) prorated base rent for the month of August 2023 (based on the number of days remaining in August 2023 after and including the Commencement Date,

divided by the total number days in August 2023, and the base rent amount attributable to such month).  From and after September 1, 2023, Base Rent shall be due quarterly, in advance of each subsequent three-month period of the Term, on the first calendar day of each subsequent three-month period of the Term (i.e., on or before the date that is three (3) months after September 1, 2023 (such payment being attributable to the months of December 2023, January 2024, and February 2024), on or before the date that is six (6) months after September 1, 2023 (such payment being attributable to the months of March 2024, April 2024, and May 2024), etc.), in an amount equal to the Base Rent that would be due for such three-month period pursuant to the terms of this Lease (including increases thereof), until the date that is September 1, 2026.

B.    From and after September 1, 2026 (the "Monthly Base Rent Commencement Date"), Tenant shall commence to pay Base Rent to Landlord in the manner provided in Section 5.C in equal consecutive monthly installments in advance on or before the first (1st) day of each calendar month commencing as of such date and continuing through the Term.  If the Monthly Base Rent Commencement Date is a day other than the first day of a calendar month, or if the Term ends on a day other than the last day of a calendar month, the Base Rent for such month shall be prorated by multiplying such Base Rent by a fraction, the numerator of which is the number of days of the Term within such calendar month and the denominator of which is the total number of days within such calendar month.  Tenant shall pay its first monthly installment of Base Rent, which may be prorated pursuant to this Section 5.B, on or before the Monthly Base Rent Commencement Date.

C.    For purposes of this Lease, the Base Rent, the Real Estate Taxes, the Utility Charges and any and all other amounts, sums, charges, liabilities and obligations which Tenant assumes or agrees to pay or may become liable for under this Lease at any time and from time to time are sometimes collectively referred to as "Rent"; and, in the event of any failure on the part of Tenant to pay any portion of the Rent, every fine, penalty, interest and cost which may be added for nonpayment or late payment of such items, including, without limitation, all amounts for which Tenant is or may become liable to indemnify Landlord and the Landlord Indemnified Parties under this Lease (including reasonable attorneys' fees and court costs) shall be deemed to be Rent.  All Rent is payable in lawful money of the United States of America and legal tender for the payment of public and private debts without notice, demand, abatement, deduction, or setoff under any circumstances, in accordance with the wire or ACH information as Landlord designates to Tenant in writing from time to time.

D.    Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent will cause Landlord to incur costs and administrative complications not contemplated hereunder, the exact amount and scope of which are presently anticipated to be extremely difficult to ascertain.  Accordingly, if any

14

installment of Rent due to Landlord is not paid on the date it is due for any reason, Tenant shall pay Landlord upon demand a late charge equal to the lesser of (i) five and one-half percent (5.5%) of the delinquent installment of Rent and (ii) the highest amount allowed by applicable Law (each a "Late Charge").  The parties agree that this Late Charge represents a fair and reasonable estimate of the costs and expenses (including economic losses) that Landlord will incur by reason of late payment by Tenant.  The parties further agree that such Late Charge is Rent and not interest and such assessment does not constitute a lender or borrower/creditor relationship between Landlord and Tenant.  In addition, any amount of delinquent Rent (including the amount of any Late Charge) due to Landlord shall accrue interest at the Default Rate from the date on which such Rent was due up to the date that such Rent is paid.  The payment of such Late Charge or such interest shall not constitute waiver of, nor excuse or cure, any default under this Lease, nor prevent Landlord from exercising any other rights and remedies available to Landlord.  Without limitation of the foregoing, Tenant shall be responsible for payment of all interest, late charges, and other costs and fees imposed by third parties with respect to late payments of Utilities or other third party charges that are the responsibility of Tenant hereunder.

E.   For any non-scheduled payment of Rent hereunder that is payable by Tenant on demand by Landlord, such shall be due ten (10) days following written demand therefor by Landlord, without abatement, deduction, or setoff under any circumstances.

6.   **TRUE LEASE; NET LEASE.**

A.   Landlord and Tenant covenant and agree that, except to the extent otherwise required by applicable Law:  (i) each will treat this Lease in accordance with U.S. generally accepted accounting principles, consistently applied, and as a true lease for state law reporting purposes and for federal, state and local income tax purposes; and (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to any governmental authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 6.A; provided, however, that nothing in this Agreement shall prevent a party from settling or offsetting any proposed deficiency or adjustment by any governmental authority challenging such intended income tax treatment, and no party will be required to litigate any proposed adjustment by any governmental authority challenging such intended income tax treatment.  In the event that the income tax treatment described in this Section 6.A is disputed by any governmental authority, the party receiving the notice of the contest shall provide the other party with prompt written notice thereof (which, in any event, shall be within 30 days of receiving notice of such contest from the governmental authority).

15

B.    It is the intent of Landlord and Tenant that this Lease establish a "true lease" and an "operating lease" of all parcels constituting the Premises for all purposes under the United States Bankruptcy Code, applicable state law, and for federal, state and local income tax purposes. The Rent for the Term is intended to be "fixed rent" within the meaning of Treasury Regulation Section 1.467-1(h)(3) for each annual period. This Lease is intended to be a "true lease" and does not represent a financing statement, financing lease, financing agreement, device or arrangement, security interest, security agreement, capital lease, mortgage, equitable mortgage, deed of trust, deed to secure debt, trust agreement, or other financing or trust arrangement or any other non-lease transaction, and the economic realities of this Lease are those of a true lease. Each of the parties (1) waives any claim or defense based upon the characterization of the Lease as anything other than a "true lease," (2) stipulates and agrees not to challenge, and is estopped from challenging, the validity, enforceability or characterization of the lease of the Premises under the Lease as a "true lease," (3) stipulates and agrees, and is estopped from challenging, that nothing contained in the Lease creates or is intended to create a joint venture, partnership (de facto or de jure), equitable mortgage, trust, financing device or arrangement, security interest or the like, (4) stipulates and agrees, and is estopped from challenging, that none of the agreements contained herein is intended, or shall be deemed or construed, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, or to make Landlord in any way responsible for the debts, obligations or losses of Tenant, and (5) shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a "true lease" and does not create a joint venture, partnership (de facto or de jure), equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs. Landlord does not intend to convey any fee interest in any of the Premises to Tenant. Tenant does not intend to obtain an interest in the Premises other than a leasehold interest pursuant to the Lease. The Lease may not be construed in any manner to create any relationship between the parties other than a landlord-tenant relationship.

C.    Landlord and Tenant acknowledge and agree that (i) this Lease is, and is intended to be, what is commonly referred to as a "net, net, net" or "triple net" lease, and (ii) the Rent shall be paid absolutely net to Landlord, so that this Lease shall yield to Landlord the full amount or benefit of the installments of Base Rent, Real Estate Taxes and all other Rent throughout the Term with respect to the entire Premises, all as more fully set forth in <u>Section 5</u>. All of the costs, expenses, including Landlord's expenses, responsibilities and obligations of every kind and nature whatsoever foreseen and unforeseen relating to the condition, use, operation, management, maintenance, repair, restoration and replacement of the Premises and all improvements and appurtenances related thereto or any part thereof shall be performed and paid by Tenant, and Landlord shall have no responsibility or liability therefor. Landlord's expenses include the reimbursement of

Landlord's property and casualty insurance premiums on the Building.  The covenants to pay Base Rent, Real Estate Taxes and all other Rent hereunder are independent covenants, and Tenant shall have no right to hold back, offset, deduct, credit against or fail to pay in full any such amounts for claimed or actual default or breach by Landlord of whatsoever nature, for force majeure or for any other reason whatsoever.  For the avoidance of doubt, Tenant shall not have, and hereby expressly and absolutely waives, relinquishes, and covenants not to assert, accept or take advantage of, any right to deposit or pay with or into any court or other third-party escrow, depository account or tenant account with respect to any disputed Rent, or any Rent pending resolution of any other dispute or controversy with Landlord.  Tenant hereby expressly waives any and all defenses it may have at law or in equity to payment of Rent, including, without limitation, based on any theories of frustration of purpose, impossibility, or otherwise.

D.      Intentionally Omitted.

E.      In furtherance of the foregoing, Landlord and Tenant intend that:

1.      Landlord and Tenant acknowledge and agree that the Term with respect to the Premises, including any term extensions provided for in this Lease, is less than the remaining economic life of the Premises.

2.      Intentionally Omitted.

3.      The expressions of intent, the waivers, the representations and warranties, the covenants, the agreements and the stipulations set forth in this <u>Section 6</u> are a material inducement to each of Landlord and Tenant in entering into this Lease.

7.      **<u>REAL ESTATE TAXES</u>**.

A.      During the Term, Tenant shall promptly pay, or cause to be paid, on a cash basis when due to the applicable taxing authority one hundred percent (100%) of all taxes, other than those specifically excluded in <u>Section 7.F</u>, including ad valorem, sales, use, rent, commercial activity, and similar taxes imposed upon the Rent or other payments due under this Lease, including tax increases and re-assessments; payments in lieu of taxes pursuant to any statutory service agreement, payment-in-lieu-of-taxes agreement or the like; transfer taxes; assessments, including assessments for supplemental assessments and public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term, and including assessments under Encumbrances; water, sewer and other utility levies and charges; excise tax levies imposed upon the Rent or other payments due under this Lease; fees, including license, permit, inspection, authorization and similar fees; and, all other

governmental and other charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character and any kind and nature whatsoever in respect of the Premises (including, without limitation, any Building and/or the Property) and/or the Rent and all interest and penalties thereon attributable to any failure in payment by Tenant which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon (i) the Premises or any part thereof or any appurtenance thereto, (ii) any Rent reserved or payable hereunder or any other sums payable by Tenant hereunder, (iii) this Lease or the leasehold estate hereby created or the operation, possession, occupancy or use of the Premises or any part thereof, (iv) any occupancy, operation, use or possession of, or sales from or activity conducted on or in connection with the Premises or the Property or the leasing or use of the Premises or the Property or any part thereof, or (v) any document to which Tenant is a party creating or transferring an interest or estate in the Premises, together with any interest or penalties thereon (all of which are hereinafter called "Real Estate Taxes").  Tenant shall make such payments directly to the taxing authorities and shall promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such direct payments.  Tenant's obligation to pay Real Estate Taxes due and payable during under this Lease during the Term shall be absolutely fixed upon the date such Real Estate Taxes become a lien upon the Premises or any part thereof, subject to Section 7.C.  Tenant shall also be responsible for all Real Estate Taxes which, on the Commencement Date, are a lien upon the Premises or any part thereof.

B.     If Landlord receives a bill for Real Estate Taxes, Landlord shall provide the bill for each installment of Real Estate Taxes to Tenant promptly upon Landlord's receipt of such bill.  Tenant shall pay the Real Estate Taxes set forth on such bill prior to when due.  Tenant shall provide Landlord with reasonable evidence that such Real Estate Taxes have been paid.  If Tenant shall default in the payment of any Real Estate Taxes, Landlord shall have the right (but not the obligation) to pay the same together with any penalties and interest, in which event the amount so paid by Landlord shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate.  Tenant may pay any Real Estate Taxes in installments, if payment may be so made without penalty, fine, premium or interest, except that on the termination of this Lease any Real Estate Taxes which Tenant has elected to pay in installments shall be apportioned between Landlord and Tenant based on the time remaining in the Term.  All Real Estate Taxes for the tax year in which this Lease shall terminate shall be apportioned between Landlord and Tenant on a cash basis.

C.     Tenant shall have the right of protesting, contesting, objecting to or opposing, formally or informally, at Tenant's sole cost and expense, by appropriate administrative and legal proceedings conducted in good faith and with due diligence, the legality or amount of any such Real Estate

18

Taxes, assessments or assessed valuations in its own or in Landlord's name as the case may be, and upon Tenant's written request, Landlord will, at no cost or expense to Landlord, reasonably cooperate with Tenant; provided, however, that (i) in the case of any unpaid Real Estate Taxes, lien, attachment, levy, encumbrance, charge or claim pursuant to any Law, the commencement and continuation of such proceedings shall suspend the collection or enforcement thereof from or against Landlord and the Premises, which suspension may be caused by the payment by Tenant of a bond or some other form of security for payment; (ii) neither the Premises, the Rent therefrom nor any part or interest in either thereof would be in any danger of being sold, forfeited, attached or lost pending the outcome of such proceedings solely based on the outcome of the proceeding and not if Tenant has the right to make a curative payment following the outcome of the proceeding to avoid any of the foregoing consequences; (iii) in the case of any requirement of Law, neither Landlord nor Tenant would be in any danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings; (iv) the insurance coverage required by <u>Section 15</u> shall be maintained; (v) Tenant shall keep Landlord reasonably informed as to the status of and with copies of all documents in the proceedings, upon request by Landlord; and (vi) if such contest shall be finally resolved against Landlord or Tenant, Tenant shall promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable requirement of law.  Landlord shall execute and deliver to Tenant such authorizations and other documents as may reasonably be required in any such contest, provided Tenant shall reimburse Landlord for its actual out-of-pocket costs associated with such execution, and, if reasonably requested by Tenant, Landlord shall join as a party therein (and at no cost or expense to Landlord).  The provisions of this <u>Section 7.C</u> shall not be construed to permit Tenant to contest the payment of Rent or any other amount payable by Tenant to Landlord hereunder other than Real Estate Taxes.  Without limiting any other provision of this Lease, Tenant shall indemnify, defend, protect and save harmless Landlord and all Landlord Indemnified Parties and the Premises from and against any and all liability, costs, fees, damages, expenses, penalties, fines and charges of any kind (including reasonable  attorneys' fees, including those incurred in the enforcement of this indemnity) that may be imposed upon Landlord or the Premises (or any portion thereof) in connection with any such contest and any loss resulting therefrom.  Any refund due from any taxing authority in respect of any Real Estate Taxes paid by or on behalf of Tenant shall be paid over to or retained by Tenant.

D.    Tenant will indemnify Landlord and/or any Landlord Indemnified Parties, on an after-tax basis, against any fees or taxes, including, but not limited to, Real Estate Taxes and any fees or taxes directly attributable to the Premises on a site level basis ("<u>Taxes</u>"), imposed by the United States or any taxing jurisdiction or authority of or in the United States or any state in connection with this Lease, Landlord's ownership of the Premises and/or Tenant's use

19

of the Premises, including, without limitation, reimbursing Landlord for any such Taxes that are paid directly by Landlord.

E.  Landlord and Tenant shall, upon request of the other, promptly provide such data as is maintained by the party to whom the request is made with respect to the Premises as may be necessary to prepare any required tax returns and reports required by a governmental authority.

F.  Notwithstanding anything to the contrary in Section 7.A through 7.C hereof, in no event will Tenant be required to pay any taxes of Landlord that are (i) imposed on or measured by net income, net profits, net worth or capital stock (however denominated, including any minimum tax), (ii) franchise taxes, (iii) branch profits taxes, (iv) gross receipts taxes (other than excise taxes on rental income), or (v) transfer taxes or any taxes imposed with respect to the sale, exchange or other disposition by Landlord, in whole or in part, of the Premises or the Property or Landlord's interest in this Lease (other than transfer or recordation taxes imposed in connection with the transfer of the Premises or the Property to Landlord, or the leaseback of the Premises or the Property from Landlord to Tenant, or the termination of this Lease pursuant to the express provisions of the Purchase Agreement and the Lease); provided, however that taxes in the nature of rental or property taxes shall not be excluded.  In the event that Tenant is required by Law to withhold any amount payable to Landlord under this Lease in respect of a tax excluded under this Section 7.F, the amount so withheld shall be treated for all purposes of this Lease as having been paid to Landlord.

8.  **PERSONAL PROPERTY TAXES**.

Tenant shall be liable for and shall promptly pay when due all personal property taxes related to Personal Property and Tenant's Personal Property placed in the Premises.  Tenant may, without Landlord's consent, before delinquency occurs, contest any such taxes related to the Personal Property.

9.  **OPERATING EXPENSES**.

A.  Utilities.  During the Term, Tenant agrees to pay all fees, costs, expenses and charges for electricity, power, gas, oil, water, sanitary and storm sewer, septic system refuse collection, landscaping, telephone, internet, trash removal, security, and other utilities and services consumed, rendered or used on or about the Premises (or any portion thereof) and such utility franchises as may be appurtenant to the use of the Premises (or any portion thereof) (collectively, "Utility Charges").  Landlord acknowledges and agrees that Tenant may enter into contracts for any of the foregoing services or the like without Landlord's prior consent during the Term; provided, that any such contract shall be terminable by Tenant (or Landlord following termination of this Lease in accordance with its terms) at or prior to the expiration or sooner termination of the Lease or upon no more than thirty

(30) days' prior notice to the third-party servicer.  Any resulting termination premium, fee or penalty shall be the sole responsibility of Tenant.

B.    <u>Third Party Management</u>.  Tenant shall have the right to manage and operate the Premises (or any portion thereof) utilizing third parties for the management and operation thereof, without obtaining Landlord's prior written consent of such third party.  Notwithstanding the appointment of any third party manager, Tenant shall remain fully responsible for the Premises in accordance with the terms hereof.

C.    <u>Landlord's Insurance</u>. Tenant agrees to reimburse Landlord for all property and casualty insurance premiums maintained by Landlord on the Building as required by this Lease and/or by Landlord's mortgagees; provided, however, that the insurance limits maintained by Landlord shall not be higher than the amounts required of Tenant under this Lease unless higher limits that are commercially reasonable for like-kind properties in the areas in which the Premises are located are required by Landlord's mortgagee.  If Landlord's mortgagee requires lower property deductibles that are commercially reasonable for like-kind properties in the areas in which the Premises are located than those required under this Lease, then, notwithstanding the other provisions of this Lease, it shall be Tenant's obligation to maintain the maximum property deductible as required by Landlord's mortgagee.

10.    **TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES**.

A.    Throughout the Term, Tenant, at its sole cost and expense, will keep the Premises in a substantially similar condition as existed on the Commencement Date (reasonable wear and tear, damage from fire or other casualty excepted), whether or not the need for such repairs occurs as a result of Tenant's use, the elements, or the age of the Building, the Property or Tenant's Personal Property, or otherwise, and will commit or allow no physical waste with respect thereto, and with reasonable promptness, will make all necessary and appropriate repairs and replacements thereto of every kind and nature, including without limitation those necessary to ensure continuing compliance with all Laws and insurance requirements, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen.  Tenant's maintenance, repair and replacement obligations shall extend to and include, without limitation, all systems serving the Premises and, subject to any Permitted Encumbrances, any parking areas and landscaping on the Property.  The necessity for and adequacy of repairs to any Building or other improvements forming a part of the Premises shall be measured by the standard which is appropriate for and equivalent in quality to such Building's Comparable Buildings.  Tenant's obligations under this <u>Section 10</u> shall, without limitation, include the maintenance, repair and replacement (a) at all times, of any and all building systems, machinery and equipment which exclusively serve the Premises, and (b) of the bearing walls, floors, foundations, roofs and all structural

21

elements of the Premises.  Tenant will not take or omit to take any action the taking or omission of which would reasonably be expected to (i) create (or permit to continue) any dangerous condition, or (ii) create (or permit to continue) any condition which might reasonably be expected to involve any loss, damage or injury to any person or property.  All repairs and replacements shall be in quality and class at least equal to the original work and shall be made promptly as and when necessary.  Repairs and replacements called for as a result of fire and/or other casualty and condemnation shall be made pursuant to the provisions of <u>Sections 18</u> and <u>19</u> hereof, respectively.  In connection with the foregoing, Tenant's obligations shall include without limitation with respect to the Premises, to the extent applicable:

1.    Maintaining, repairing, and replacing, as necessary, the roof of the Building on the Premises;

2.    Maintaining and repairing the bearing walls, floors, foundations, and all structural elements of the Building on the Premises;

3.    Maintaining (including periodic window washing and periodic painting) and repairing the facade and exterior walls of the Building on the Premises;

4.    Repairing and replacing, as necessary, the doors (including, without limitation, any overhead doors) and windows of the Building on the Premises, and the mechanisms therefor;

5.    Causing the regular removal of garbage and refuse from the Premises;

6.    Causing the regular spraying for and control of insect, rodent, animal and pest infestation, and maintaining in good working order and condition all doors (both swinging and roll-up doors), including, without limitation, all weather seals;

7.    Servicing, maintaining, repairing and replacing all systems and equipment serving the Premises, including, without limitation, heating, ventilation, and air-conditioning equipment, and generators;

8.    Regular sweeping, cleaning and removal of trash, debris, other materials and stains from the Premises and from the immediately adjacent sidewalks, service drives and loading or delivery areas, if any, of the Premises, as necessary to keep the same clean and in good order and condition;

9.      Regular sweeping, cleaning and washing of the interior of the Building, including, without limitation, floors, windows and fixtures, and periodic washing and painting of interior walls;

10.    Repairing broken, damaged or leaking walls, bathrooms, ceilings, or fixtures and equipment in the interior of the Building, including, without limitation, plate glass windows, windows, floors and lighting fixtures;

11.    Irrigating and performing all gardening and landscaping of all lawns, trees, shrubs and plantings comprising part of the Premises; and

12.    Tenant shall maintain a contract on at least an annual basis for regular servicing and maintenance (at least once annually) of the heating, ventilating, air conditioning and vertical transportation systems serving the Building, unless Landlord shall otherwise direct. Upon written request of Landlord, Tenant shall submit to Landlord a copy of such fully paid contract and any extensions, renewals or replacements thereof. At a minimum, each maintenance contract for any such equipment shall include a provision that such contractor shall be required to coordinate any activities performed on the roof of the Building by a roofing contractor, so as to not void any roof or related warranties.

B.    Landlord shall not be required to furnish any services or facilities or make any repairs or alterations in or to the Premises, and Landlord shall not under any circumstances be required to (i) build or rebuild any improvements on the Premises; (ii) make any repairs, replacements, alterations, restorations or renewals of any nature to the Premises, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto; or (iii) maintain the Premises (including any parking or common areas which comprise part of the Premises or the Property) in any way. Tenant hereby expressly and unconditionally waives, to the fullest extent now or hereafter permitted by Law, the right to make repairs or perform any maintenance at the expense of Landlord which right may be provided for in any Law in effect at the time of the execution and delivery of this Lease or which may hereafter be enacted. Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises. However, on default of Tenant beyond the expiration of any applicable notice and cure periods in making such repairs or replacements, Landlord may, but shall not be required to, make such repairs and replacements for Tenant's account and the expense thereof shall be paid by Tenant to Landlord upon demand with interest at the Default Rate.

C.    Except as expressly set forth herein, nothing contained in this Lease and no action or inaction by Landlord shall be construed as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition or maintenance of or to the Premises or any part thereof or any improvements thereto; or (ii) giving Tenant any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord in respect thereof.

11.    **COMPLIANCE WITH LAWS**.

Tenant shall, at its sole cost and expense, use and maintain the Premises in compliance with all Laws, and Tenant shall, at its sole cost and expense, comply with all Laws applicable to or having jurisdiction over the use, occupancy, operation, and maintenance of the Premises, including without limitation, all Environmental Laws, the ADA and other access laws and those which require the making of any structural, unforeseen or extraordinary changes and including those which involve a change of policy on the part of the governmental body enacting the same. Tenant shall, at its sole cost and expense, comply with all Encumbrances affecting the Premises or any portion thereof (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant, at its sole expense, shall comply with the requirements of policies of special form insurance coverage at any time in force with respect to the Premises as required pursuant to Section 15 hereof and with the provisions of all contracts, agreements and restrictions affecting the Premises or any part thereof in effect as of the date hereof or the ownership, occupancy or use thereof. Without diminishing the obligations of Tenant, if Tenant shall at any time fail to comply as promptly as reasonably practicable with any Law applicable to the Premises, or the use and occupation thereof, Landlord may cause the Premises to so comply and the reasonable costs and expenses of Landlord in such compliance shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate.

12.    **SURRENDER OF PREMISES**.

Upon the expiration of this Lease pursuant to its terms (or, in the event of a termination of this Lease on a date other than the scheduled Expiration Date of this Lease, as promptly as commercially practicable thereafter (but in any event within ten (10) days thereafter, during which 10-day period Tenant shall be liable for the holdover rent pursuant to Section 29 hereof)), Tenant shall surrender to Landlord the Premises, including all Alterations constructed by Tenant therein that Landlord has not requested that Tenant remove in accordance with Section 13 below, with all fixtures appurtenant thereto (but not including furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other Personal Property installed or placed on the Premises by Tenant (collectively, "Tenant's Personal Property")), free and clear of any occupants or tenancies (including subtenancies) (other than subtenants under subleases as in effect on the date hereof) and in compliance with Laws (including, without limitation, Environmental Laws) and in as good (or better) condition and repair as existed as of the Commencement Date, reasonable wear and tear and damage from fire or other casualty excepted, and any new buildings, alterations,

improvements, replacements or additions constructed by Tenant and remaining at the Premises, in the same or better condition as when completed, reasonable wear and tear and damage from fire or other casualty excepted. Any of Tenant's Personal Property installed or placed on the Premises by Tenant or any subtenant or assignee of Tenant, if not removed within ten (10) days after termination or expiration of this Lease shall be deemed abandoned and become the property of Landlord without any payment or offset therefor if Landlord so elects. If Landlord shall not so elect, Landlord may remove such property from the Premises and have it stored at Tenant's risk and expense. Tenant shall repair and restore and save Landlord harmless from all damage to the Premises caused by such removal by Landlord.

13. **<u>ALTERATIONS</u>**.

A. Tenant shall not make any alterations, additions or improvements to the Premises or any portion thereof ("<u>Alterations</u>") without first obtaining the prior written consent of Landlord, provided, however, that so long as no Event of Default has occurred, Landlord's prior written consent shall not be required, but prior written notice shall be delivered to Landlord accompanied with full and complete drawings and Plans prepared by a licensed Architect or engineer, if applicable, for any Alterations to the Premises that are: (i) installations of Tenant's Personal Property, (ii) installations of HVAC systems and equipment, or (iii) other Alterations that satisfy all of the following conditions: (a) such Alterations will not change the use of the Premises (i.e., Alterations that will not change the Premises from being used for the use in effect on the Effective Date and ancillary uses), and (b) such Alterations will not (x) materially affect the structural elements or roof of the Building, including the structural exterior, unless such Alterations are reasonable "like-kind" replacements of previous improvements or installations, (y) materially and adversely affect the proper functioning of the Building's systems, or (z) materially and adversely affect the value of the Building. In seeking approval from Landlord of any Alterations, if required, Tenant shall provide Landlord with (1) full and complete drawings and Plans for the proposed Alterations prepared by a licensed Architect or engineer; and (2) notice of whether the Alteration will involve or affect Hazardous Materials. Tenant shall not have the right to seek any zoning changes or variances in connection with any Alterations without Landlord's approval. Tenant shall reimburse Landlord upon demand for any reasonable out-of-pocket costs, including, without limitation, attorney's fees and engineering advisor's fees, related to Landlord's review of any Alterations request by Tenant.

B. All Alterations shall be constructed by Tenant, without expense to Landlord, in a good, first-class, professional and workmanlike manner so as not to void or make voidable any roof or other warranties, employing materials of first-class quality free of material defects, and in compliance with all Law, all applicable Encumbrances and all regulations and orders, rules and regulations of the Board of Fire Insurance Underwriters or any other body

exercising similar functions, and in compliance with the terms and conditions of this Lease.

C.  Prior to the commencement of any Alteration, any party, including Tenant, performing work shall deliver to Landlord certificates evidencing the existence of:  (i) statutory worker's compensation insurance and $1,000,000 employers liability limits covering all employees of the party, and all worker's compensation policies will include a waiver of subrogation in favor of Landlord; (ii) commercial general liability insurance, including completed operations coverage, naming Landlord and its designees as Additional Insureds with minimum limits of $1,000,000 per occurrence and $2,000,000 general aggregate; (iii) for any party other than Tenant, minimum umbrella limits of $5,000,000 each occurrence and general aggregate, naming Landlord and its designees as Additional Insureds; and (iv) regardless of the party performing the Alterations, Tenant shall maintain all risk property coverage, either under its own property policy or a separate builder's risk policy for the full replacement value of the Alterations and existing Building. All parties with an insurable interest, including Landlord and its lenders, must be insureds under this property or builder's risk coverage during the duration of the Alterations.

D.  Promptly upon the completion of construction of any Alteration that is permanently affixed to the Premises and alters the existing footprint or elevation of a Building, Tenant shall deliver to Landlord one complete set of "as built" drawings thereof (and if the Alterations involve any change to the footprint of the applicable Building or the erection of a new Building, an ALTA survey for the Premises certified to Landlord and any Landlord Mortgagee), proof of payment for all labor and materials, and if and to the extent commercially obtainable, copies of guarantees, if any, from all major contractors (including, without limitation, the General Contractor) in favor of Landlord and Tenant (jointly and separately) against defects and deficiencies in materials and workmanship, and requiring the correction of the same upon demand of Landlord and Tenant at the expense of such contractor.

E.  All Alterations, whether temporary or permanent in character, made in or upon the Premises either by Landlord or Tenant (other than Tenant's Personal Property installed or placed on the Premises by or on behalf of Tenant) shall be Landlord's property, and will remain with the Premises without compensation to Tenant.  Notwithstanding the foregoing, in the case of any Alteration requiring Landlord's prior written approval, Landlord may condition such approval on Tenant's agreement to remove all or a portion of such Alteration at the end of the Term.  Landlord shall provide Tenant with notice, prior to the Expiration Date, of Tenant's obligation to remove any Alteration approved by Landlord at the end of the Term.  If Landlord does not notify Tenant that Tenant is obligated to remove such Alteration, such Alteration may be removed at Tenant's option.  Upon the expiration or

26

sooner termination of this Lease, all Alterations on the Premises required by Landlord to be removed as aforesaid, or any part or parts thereof so designated by Landlord, shall be removed from the Premises by Tenant and the Premises restored to the same or better condition than existed immediately prior to the construction of the Alteration, reasonable wear and tear, and damage from fire or other casualty excepted.

14. **ENTRY BY LANDLORD**.

Landlord or Landlord's Representatives shall have the right to enter, from time to time, the Premises or any portion thereof with reasonable advance notice during normal business hours (or at such other times as approved by Tenant in advance, which approval shall not be unreasonably withheld or delayed, or as may be reasonably necessary in emergency situations) to (i) inspect the Premises, (ii) exercise its rights and/or obligations under this Lease, or (iii) show the Premises to prospective purchasers, lenders or prospective tenants; and Tenant shall not be entitled to any abatement or reduction of Base Rent by reason thereof, nor shall such entry or action by Landlord constitute an actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing. No such entry shall be deemed an eviction of Tenant. At any time during which Landlord or Landlord's Representatives are on the Premises, they shall use commercially reasonable efforts to not unreasonably interrupt or interfere with Tenant's use of the Premises and shall not cause any damage or injury to persons or property on the Premises.

15. **TENANT'S INSURANCE OBLIGATIONS**.

A. During the Term, Tenant shall provide and maintain property insurance on the Building and other improvements on the Property on an all-risk basis against physical loss or damage by fire and all other risks and perils, including, without limitation, flood, earthquake, windstorm and terrorism, in amounts no less than the full replacement cost, excluding excavations, footings and foundations, and with a deductible no greater than One Million and No/100 Dollars ($1,000,000.00), which deductible may be adjusted from time to time to reflect commercially reasonable, marketplace increases in the deductibles (subject to Landlord's prior consent, which shall not be unreasonably withheld, conditioned, or delayed). Tenant's property insurance shall also include coverage for the perils of flood, earthquake, windstorm, including named windstorm, tornado, hail, and terrorism in amounts of the full insurable value, unless commercially unavailable. The coverage for the perils of flood, earthquake, windstorm, including named windstorm, tornado and hail may have deductibles not to exceed five percent (5%) of the total insurable value of the property per occurrence. Such insurance shall be on terms (i) that have an agreed amount endorsement or with no co-insurance provisions; and (ii) with no exclusions for vandalism, malicious mischief or sprinkler leakage. Boiler and Machinery Coverage shall be procured either by endorsement to the property policy or under a separate placement in an amount no less than 100% of the replacement cost or as otherwise approved in writing by Landlord. The property insurance required hereunder shall, subject to applicable sublimits, (a) cover loss

sustained when access to all or a portion of a Building is prevented due to an insured peril at a location in the vicinity of the Premises; (b) cover loss sustained due to the action of a public authority preventing access to a Building provided such order is the direct result of physical damage of the type insured against at such Building or within 1,000 feet of it; (c) insure loss caused by damage or mechanical breakdown; (d) provide an ordinance or law extension; (e) cover loss sustained due to the accidental interruption or failure of supplies of electricity, gas, water or telecommunication up to the terminal point of the utility supplier with the Premises; (f) name Landlord as an Additional Insured and Loss Payee, its lender(s) and other designees as the Mortgagees and contain a loss payee endorsement; and (g) contain an endorsement providing coverage for cleanup of sudden and accidental pollution releases, with a sub-limit of at least One Hundred Thousand and No/100 Dollars ($100,000.00).  In addition to the foregoing coverages on the Building and other improvements upon the Property, Tenant shall maintain property insurance covering Tenant's machinery, equipment, furniture, fixtures, and all other Tenant's Personal Property at a limit of liability determined by Tenant in its sole discretion.   During the period of any restoration and repair of the Premises, Tenant shall maintain an "all-risk" property policy of an "all risk" Builder's Risk policy on a completed value basis for the full replacement cost of the property being repaired and restored, if and when there is a structural restoration and/or major repair required at the Building.  All parties with an insurable interest, including Landlord and its designees, must be insureds under this property or builder's risk policy.  To the extent any portion of the Premises is located within a Special Flood Hazard Area, Tenant shall maintain NFIP flood insurance.

If any property coverage is provided by a stand-alone or blanket policy, the earthquake limit must be in amount not less than the per occurrence and annual aggregate limit must be equal to or greater than the annual aggregate gross loss estimates, including 24 months of business income, for a 475-year event as indicated in a seismic risk analysis for the Premises and all other high risk locations sharing the limit, including any locations not owned by Landlord, utilizing the most current RMS software or its equivalent including loss amplification and fire-following, unless fire-following is included in the all risk property coverage. With respect to windstorm, including named storm, the windstorm, including named windstorm, policy limit must be in an amount not less than the annual occurrence exceedance probability (not aggregate) gross loss estimates for a 10,000 year event as indicated in a risk analysis for catastrophic wind perils as modeled utilizing the most current RMS software or its equivalent for the Premises, including 24 months of business income, and all other high risk policy locations sharing the respective limit. With respect to terrorism, the policy limit must be at least equal to the Full Replacement Cost, including 24 months of business income, of the largest location covered by the policy. If such terrorism policy covers any property located within a 1,000 foot radius, the

policy limit must be adequate to cover all locations within the 1,000 foot radius.

B.    During the Term, Tenant shall also provide and maintain the following insurance at the terms and in the limits specified below:

1.    Commercial General Liability Insurance against claims for third party Bodily Injury, Personal/Advertising Injury, Property Damage, and Products/Completed Operations Liability. Such insurance shall be written on an occurrence basis and such coverage shall include, but not be limited to, assumed contractual liability for the performance by Tenant of the indemnity agreements set forth in this Lease to which this insurance applies, cross liability, and/or severability of interests. Limits shall be no less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) general aggregate with a deductible no greater than One Million and No/100 Dollars ($1,000,000.00), which deductible may be adjusted from time to time to reflect commercially reasonable, marketplace increases in the deductibles (subject to Landlord's prior consent, which shall not be unreasonably withheld, conditioned, or delayed). Tenant shall cause Landlord and its lender or other designees to be named as additional insureds under such insurance.

2.    Workers' Compensation and Employer's Liability Insurance insuring against and satisfying Tenant's obligations and liabilities under the workers' compensation laws of the jurisdiction in which the Premises are located, with Employer's Liability minimum limits per insured of Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury each accident; Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease, each employee; and Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease policy limit. Policies shall include Voluntary Coverage. Tenant's Worker's Compensation policy shall include a waiver of subrogation in favor of Landlord and its lenders or other designees.

3.    Automobile Liability Insurance for liability arising out of claims for bodily injury and property damage arising from owned (if any), leased (if any), non-owned and hired vehicles used in the performance of the business upon the Premises, with a combined single limit of One Million and No/100 Dollars ($1,000,000.00) per accident for bodily injury and property damage and containing appropriate no-fault insurance provisions wherever applicable.

4.    Umbrella or Excess Liability Insurance written on an occurrence basis and covering claims in excess of the underlying insurance

29

described in the foregoing subsections (1), (2) and (3) above, with a Twenty-Five Million and No/100 Dollars ($25,000,000.00) minimum limit per occurrence. Such insurance shall contain a provision that it will drop down as primary and noncontributory insurance in the event that the underlying insurance policy aggregate is exhausted.

5.     Business interruption or equivalent insurance insuring that the Base Rent will be paid to Landlord for a minimum of twelve (12) months if the Premises are destroyed or rendered untenantable by any cause insured against (it being understood that the existence of such insurance does not reduce Tenant's obligation to pay Base Rent without diminution).

C.     The required limits and coverages of all insurance set forth in Sections 15.A and 15.B above may be reasonably adjusted by Landlord, with agreement from Tenant, such agreement not to be unreasonably withheld, from time to time (but not more frequently than once every five (5) years) in conformity with the then prevailing custom of insuring liability in Comparable Buildings.

D.     Tenant shall cause all such property policies to permit Tenant's waiver of claims against Landlord under Section 17 for matters covered thereby. Tenant shall cause Landlord, Landlord Mortgagee and any superior lessor or fee owner to be named as Additional Insureds and loss payees and/or mortgagees, as their interests may appear, under all property insurance policies and shall cause the coverage to continue for Landlord's benefit notwithstanding any act or omission on Tenant's part. By this Section 15, Tenant intends that the risk of loss or damage to the Premises and all property thereon, including Personal Property and Tenant's Personal Property described above, be borne by responsible property insurance carriers and Tenant hereby agrees to look solely to, and to seek recovery only from, its respective property insurance carriers, in the event of a loss of a type described above to the extent that such coverage is agreed to be provided hereunder. For this purpose, any applicable deductible shall be treated as though it were recoverable under such policies.

E.     All insurance required to be maintained by Tenant pursuant to Section 15.A and 15.B must be maintained with insurers authorized to do business in the jurisdiction in which the Premises are located and which have an A.M. Best Company Rating of at least A/VIII or Standard and Poor's Rating of at least A. Tenant shall provide to Landlord, and at each renewal of expiring policies, such certificates as may be reasonably required to establish that the insurance coverage required by this Section 15 is in effect from time to time and that, to the extent commercially available, the insurer(s) have agreed to give Landlord and Landlord Mortgagee at least thirty (30) days' notice prior to any non-renewal or cancellation of, or material modification to, the

30

required coverage. Landlord and Tenant shall cooperate with each other in the collection of any insurance proceeds which may be payable in the event of any loss, including the execution and delivery of any proof of loss or other actions required to effect recovery. Tenant shall cause all liability and property policies maintained by Tenant to be written as primary policies, not contributing with and not supplemental or excess to any coverage that Landlord or Landlord Mortgagee may carry.

F.    Tenant may provide the insurance required by virtue of the terms of this Lease by means of a combination of primary and excess or umbrella coverage and by means of a policy or policies of blanket property insurance so long as (i) the amount of the total insurance allocated to the Premises under the terms of the blanket policy or policies furnishes protection equivalent to that of separate policies in the amounts required by the terms of this Lease, and (ii) the blanket policy or policies comply in all other respects with the other requirements of this Lease.

G.    If Tenant fails to obtain the insurance coverage, as set forth in this <u>Section 15</u> and does not cure its failure within ten (10) days after written notice from Landlord, Landlord may, at its option, obtain such insurance for Tenant, and Tenant shall, upon demand, pay, as additional Rent, the cost thereof.

H.    All policies of insurance required to be maintained pursuant to this Lease shall be endorsed, if commercially available, so that if at any time should they be not renewed, canceled, coverage be reduced (by any party including the insured) which affects the interests of the Landlord or Landlord Mortgagee, such non-renewal cancellation or reduction shall not be effective as to Landlord and Landlord Mortgagee for thirty (30) days, except for non-payment of premium which shall be for ten (10) days after receipt by Landlord of written notice from such insurer of such cancellation or reduction. In addition to the foregoing, all policies of insurance required to be maintained pursuant to this Lease shall contain terms in accordance with Tenant's normal business practice and reasonably acceptable to Landlord and shall (i) contain a severability of interest and a cross-liability clause; (ii) name Landlord, Landlord Mortgagee, any ground lessor of the Property and other entities as additional insureds or loss payees, as required by contract; and (iii) be endorsed to waive any rights of subrogation against Landlord, its lenders, and their respective officers, directors, employees, agents, partners, and assigns. If commercially available, all policies of insurance required to be maintained pursuant to this Lease (other than in respect to automobile liability or workers compensation insurance) shall insure the interests of Landlord and Tenant regardless of any breach or violation by Tenant or any other party of warranties, declarations or conditions contained in such policies, any action or inaction of Tenant or others.

31

I.      Prior to the Commencement Date and on each policy anniversary, Tenant shall furnish Landlord with certificates of insurance, in a form reasonably acceptable to Landlord, evidencing all of the insurance required by the provisions of this Lease for the benefit of Landlord and required to be in force by the provisions of this Lease.  Such certificates of insurance shall be executed by each insurer or by an authorized representative of each insurer where it is not practical for such insurer to execute the certificate itself.  Such certificates of insurance/binders shall identify underwriters, the type of insurance, the insurance limits and deductibles and the policy term.

16.     **OFAC**.

A.      Tenant has taken and will take all reasonable measures, in accordance with all applicable Anti-Money Laundering Laws, with respect to each holder of a direct or indirect ownership interest in the Tenant, to assure that funds invested by such holders in the Tenant are derived from legal sources; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest in Tenant is in or through an entity whose stock or shares are listed and traded on any recognized stock exchange located in the United States (a "U.S. Publicly-Traded Entity").

B.      Tenant hereby represents and warrants that neither Tenant, nor, to the actual knowledge of Tenant, any persons or entities holding any legal or beneficial ownership interest (direct or indirect) whatsoever in Tenant (1) has been designated by the President of the United States or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or otherwise a person with whom U.S. Persons are prohibited from dealing pursuant to OFAC Laws and Regulations (including without limitation Persons identified on the "List of Specially Designated Nationals and Blocked Persons") (any of the foregoing, and any person owned or controlled by any of the foregoing, "Prohibited Persons"), (2) is under investigation by any governmental authority for, or has been charged with, or convicted of, any violation of any Anti-Money Laundering Laws, or drug trafficking, terrorist-related activities or other money laundering predicated crimes or a violation of the BSA, (3) has been assessed civil penalties under these or related laws, or (4) has had any of its funds seized or forfeited in an action under these or related laws; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest is in or through a U.S. Publicly-Traded Entity.  If the foregoing representations are, or become untrue at any time during the Term, and Landlord suffers actual damages as a result thereof, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

32

C. Tenant has taken and will take reasonable steps, consistent with industry practice for comparable organizations and in any event as required by Law, to ensure that Tenant is and shall be in compliance with all (1) Anti-Money Laundering Laws and (2) OFAC Laws and Regulations. Tenant will not during the Term knowingly engage in any transactions or dealings, or knowingly be otherwise associated, with any Prohibited Persons in connection with the use or occupancy of the Premises. A breach of the representations and/or covenants contained in this Section 16 by Tenant as a result of which Landlord suffers actual damages shall constitute an Event of Default and shall entitle Landlord to any and all remedies available hereunder, or at law or in equity.

17. **WAIVER OF SUBROGATION**.

Notwithstanding anything to the contrary set forth in this Lease, to the fullest extent permitted by Law, neither Landlord nor Tenant shall be liable (by way of subrogation or otherwise) to the other party (or to any insurance company insuring the other party) for any loss or damage to the property of the releasing party to the extent the loss or damage is covered by property insurance carried or required by this Lease to be carried by the releasing party **EVEN THOUGH SUCH LOSS MIGHT HAVE BEEN OCCASIONED BY THE NEGLIGENCE OR WILLFUL ACTS OR OMISSIONS OF LANDLORD OR TENANT OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONTRACTORS OR INVITEES**. Landlord and Tenant shall give each insurance company which issues policies of insurance, with respect to the items covered by this waiver, written notice of the terms of this mutual waiver, and shall have such insurance policies properly endorsed, if necessary, to prevent the invalidation of any of the coverage provided by such insurance policies by reason of such mutual waiver. For the purpose of the foregoing waiver, the amount of any deductible or self-insured retention applicable to any loss or damage shall be deemed covered by, and recoverable by the insured under the insurance policy to which such deductible or self-insured retention relates. Each party shall pay any additional expense, if any, for obtaining such waiver.

18. **FIRE OR OTHER CASUALTY**.

A. All proceeds (except business interruption insurance proceeds) payable by reason of any property loss, damage, or destruction of or to the Premises or portion thereof by fire or other casualty, under any property policy of insurance required to be carried hereunder, where the cost of repair and/or restoration does not exceed Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (each of the foregoing, respectively, a "Minor Casualty"), shall be paid to Tenant (except business interruption proceeds not allocated to Rent expenses) and shall be used first for the repair of any damage to the Premises to substantially the same condition as existed immediately before the damage or destruction and with materials and workmanship of like kind and quality and to Landlord's reasonable satisfaction, and in accordance with the general terms and conditions of **Exhibit "C"** attached hereto, as applicable (collectively, "Restoration Standards"). Tenant shall have the right to reasonably prosecute and settle

33

insurance claims relating to any Minor Casualty, provided that Tenant shall consult with Landlord in the process of adjusting any insurance claims under this <u>Section 18</u>.

B.    All proceeds (except business interruption insurance proceeds) payable by reason of any property loss, damage, or destruction of or to the Premises or portion thereof by fire or other casualty, under any property policy of insurance required to be carried hereunder where the cost of repair and/or restoration exceeds Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (each of the foregoing, respectively, a "<u>Major Casualty</u>"), shall be paid to Landlord, to be held by Landlord or Landlord Mortgagee for purpose of restoration of the Premises and made available to Tenant upon request without unreasonable delay, pursuant to the procedures set forth in this <u>Section 18</u> for the reasonable costs of preservation, stabilization, emergency restoration, business interruption, reconstruction and repair, as the case may be, of any damage to or destruction of the Premises, or any portion thereof; provided, however, that the portion of such proceeds that are attributable to Tenant's obligation to pay Rent shall be applied against Rent due by Tenant hereunder.  All proceeds paid to Tenant shall be used first for the repair of any damage to the Premises.  Any excess proceeds of insurance remaining after the completion of the restoration or reconstruction of the Premises to substantially the same condition as existed immediately before the damage or destruction and with materials and workmanship of like kind and quality and to Landlord's reasonable satisfaction, and in accordance with the Restoration Standards, shall be retained by Landlord.  Tenant shall have the right to reasonably prosecute and settle insurance claims for any Major Casualty, provided that Tenant shall consult with Landlord in the process of adjusting any insurance claims under this <u>Section 18</u>.

C.    Subject to the terms of this <u>Section 18</u>, Landlord shall make available to Tenant the insurance proceeds (net of all reasonable administrative and collection costs, including reasonable attorneys' fees, if any) paid to Landlord for such repair and rebuilding of the Premises following a Major Casualty as it progresses.  Payments shall be made against certification of the Architect responsible for the supervision of the repairs and rebuilding that the work had been performed substantially in conformance with the approved plans and specifications therefor and the value of the work in place is equal to not less than one hundred ten percent (110%) of the aggregate amount advanced by Landlord for the payment of such work.  Prior to commencing the repairing and rebuilding, Tenant shall deliver to Landlord for Landlord's approval a schedule setting forth the estimated monthly draws for such work.  Landlord shall contribute to such payments, out of the insurance proceeds being held by Landlord, an amount equal to the proportion that the total net amount so held by Landlord bears to the total estimated cost of repairing and rebuilding, multiplied by the payment by Tenant on account of such work.  Landlord may, however, withhold ten percent (10%) from each payment until the work has been completed and

34

unconditional lien releases and/or other proof has been furnished to Landlord that no lien or liability has attached, or will attach, to the applicable Building or the Property or to Landlord in connection with repairing, reconstructing and rebuilding, which retention shall be promptly released to Tenant upon the satisfaction of the conditions described in this sentence. In addition, disbursement of such proceeds to Tenant are subject to any customary conditions of a Landlord Mortgagee.

D.    If the Premises or any portion thereof is damaged by fire or other casualty, whether or not from a risk covered by insurance, Tenant shall give Landlord prompt written notice thereof and Rent shall continue unabated notwithstanding any casualty. Tenant waives any statutory rights of termination which may arise by reason of any damage or destruction of the Premises or any portion thereof.

E.    In the event of a fire or other casualty, Tenant shall, at its expense regardless of the amount of any such damage or destruction and whether or not the insurance proceeds attributable such damage or destruction made available to Tenant, if any, shall be sufficient for the purpose, cause the Premises to be repaired, restored and replaced in accordance with all Law, this Section 18.D and the Restoration Standards, as expeditiously as practicable using reasonable diligence to a condition as nearly as practicable to that which existed immediately prior to occurrence of the fire or other casualty and otherwise in a good workmanlike manner, using new materials of like quality.

F.    No damage or destruction of the Premises or any portion thereof as a result of fire or any other hazard, risk or casualty whatsoever shall relieve Tenant from Tenant's liability and obligation to timely pay the full Rent payable under this Lease and Rent shall continue unabated notwithstanding any casualty.

G.    The provisions of this Lease, including this Section 18 constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, and any Law with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any similar or successor Laws now or hereinafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises.

19.    **CONDEMNATION**.

A.    Tenant and Landlord shall promptly give the other written notice upon knowledge of the actual or threatened commencement of any condemnation or eminent domain proceeding or other governmental taking affecting the Premises or any portion thereof, and, to the extent not otherwise received, shall deliver to the other copies of any and all papers served in connection

35

therewith.  Subject to the remainder of this Section 19, if during the Term all or any part of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, all compensation awarded or paid as a result thereof shall belong to and be the property of Landlord without any participation by Tenant and without any deduction therefrom for any estate hereby vested in or owned by Tenant and Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant may be or become entitled by reason of any taking of the Premises or any part thereof, subject to the other provisions of this Section 19.  Landlord shall have the exclusive power to collect, receive and retain any such award proceeds and to make any compromise or settlement in connection with such award.  Nothing herein shall be deemed to preclude Tenant from prosecuting any claim directly against the condemning authority in such condemnation proceeding for loss of business or depreciation to, damage to or cost of removal of, or for value of, stock, trade fixtures, furniture, machinery, equipment and other personal property belonging to Tenant (including, without limitation, Tenant's Personal Property), provided that no such claim shall diminish or otherwise adversely affect Landlord's award.  Tenant agrees to execute any and all further documents that may be reasonably required in order to facilitate collection by Landlord of any and all awards.  Tenant, in cooperation with Landlord, shall have the right to participate in any condemnation proceedings for the purpose of protecting Tenant's interest hereunder.

B.    If during the Term all or substantially all of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, then Tenant may, not later than thirty (30) days after any such taking, give notice to Landlord of its intention to terminate this Lease on any business day specified in such notice which occurs not less than thirty (30) nor more than one hundred eighty (180) days after such taking.  In such event, this Lease shall terminate on the date set forth in the notice provided by Tenant and upon such termination neither party shall have any obligation to the other under this Lease.  A taking of substantially all of the Premises under this Section 19.B shall be deemed to have occurred if (i) twenty percent (20%) or more of the square footage of the Building(s) shall have been subject to a taking, or (ii) there shall have been a permanent loss of access, ingress or egress, parking capacity or any other appurtenance necessary for the operation of the Premises substantially in the manner in which it had previously been operated and there is no reasonably equivalent replacement therefor.

C.    If during the Term all or any part of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof and if the Lease is not terminated pursuant to Section 19.B as expressly provided in Section 19.B, then this Lease shall continue in full effect without abatement or reduction of Rent or other sums payable by Tenant under this Lease, notwithstanding such taking or private

purchase.  Tenant shall, promptly after any such taking and at its expense (regardless of whether any awards are available as a result of such taking), repair any damage caused by any such taking in accordance with this Section 19 and the Restoration Standards and so that, after the completion of such repair, the Premises shall be, as nearly as possible, in a condition as good as the condition thereof immediately prior to such taking, except for ordinary wear and tear.  In the event of any taking for which this Lease is not terminated pursuant to the express terms and conditions hereof, all of the net award collected by Landlord pursuant to Section 19.A shall be held by Landlord (or Landlord Mortgagee), and such proceeds shall be incrementally disbursed to Tenant from time to time to reimburse Tenant for the costs actually incurred by Tenant to repair the damage due to such taking, and such disbursements shall be made promptly after Landlord's receipt of certificates signed by an authorized officer of Tenant, delivered to Landlord from time to time as such repair progresses or is completed, describing such repair for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith and stating that Tenant has not theretofore received payment for such repair.  If the cost of repairs shall exceed the net award collected by Landlord, Tenant shall pay the deficiency.  Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration shall be allocated between Landlord and Tenant based on the fair market value of the respective estates of Landlord and Tenant in the Property.

D.  If the use or occupancy of the Premises or any portion thereof shall be temporarily requisitioned by any governmental authority, civil or military, then this Lease shall continue in full effect notwithstanding such requisition, without abatement or reduction of Rent or other sums payable by Tenant hereunder, and Tenant shall be entitled to receive the entire net award payable by reason of such temporary requisition.  Any requisition  of sixty (60) months or longer shall be considered a taking of substantially all of the Premises under Section 19.B, and Tenant shall be afforded the termination rights as and to the extent set forth in said Section 19.B.

20.  **INDEMNIFICATION**.

A.  Notwithstanding the existence of any insurance required to be provided hereunder (but not in duplication thereof), and without regard to the policy limits of any such insurance, and in addition to and not in limitation of any other indemnity provided in this Lease, Tenant shall protect, indemnify, defend and hold harmless all Landlord Indemnified Parties from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, losses, costs, fees and expenses, including without limitation reasonable counsel fees and court costs, to the maximum extent permitted by Law, imposed upon, asserted against or suffered or incurred by any Indemnified Party directly or indirectly by reason of any claim, suit or judgment obtained or brought by or on behalf of any person or persons

against any Landlord Indemnified Party, for damage, loss or expense, which arise out of, are occasioned by, or are in any way attributable to or related to the following: (i) Tenant's use or occupancy of the Premises; (ii) the conduct of Tenant's business at the Premises; (iii) any activity, work or thing done or permitted by or on behalf of Tenant or its agents, contractors or subtenants in or about the Premises; (iv) the condition of the Premises; (v) the Lease or any breach or default in the performance of any obligation to be performed by Tenant under the terms of this Lease or arising from any act, neglect, fault or omission of Tenant or Tenant's Representatives; (vi) any sublease or similar agreement entered into by Tenant with respect to the Premises or any portion thereof; or (vii) the Premises or any accident, injury to or death of any person or damage to any property howsoever caused in or on the Premises, except to the extent that any of the foregoing are directly caused by the gross negligence or willful misconduct of Landlord and/or any Landlord Indemnified Parties. Tenant, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against any Landlord Indemnified Party ("Landlord Claim"). If at any time a Landlord Indemnified Party shall have received written notice of or shall otherwise be aware of any Landlord Claim which is subject to indemnity under this Section 20.A, such Landlord Indemnified Party shall give reasonably prompt written notice of such Landlord Claim to Tenant; provided, that, except to the extent Tenant is materially prejudiced in its defense of such Landlord Claim, (I) such Landlord Indemnified Party shall have no liability for a failure to give notice of any Landlord Claim, and (II) the failure of such Landlord Indemnified Party to give such a notice to Tenant shall not limit the rights of such Landlord Indemnified Party or the obligations of Tenant with respect to such Landlord Claim. Tenant's liability under this Section 20 shall survive the expiration or earlier termination of this Lease.

B.      Except to the extent prohibited by Law or caused by the gross negligence or willful misconduct of Landlord or any Landlord Indemnified Parties, Tenant hereby expressly releases Landlord and Landlord Mortgagee and all other Landlord Indemnified Parties from, and waives all claims for, damage or injury to person, theft, loss of use of or damage to property and loss of business sustained by Tenant and resulting from the Premises, including the Building, Property, Personal Property or Tenant's Personal Property or any part thereof or any equipment therein or appurtenances thereto becoming in disrepair, or resulting from any damage, accident or event in or about the Premises. Without limiting the generality of the foregoing, this Section 20.B shall apply particularly, but not exclusively, to flooding, damage caused by Building equipment and apparatuses, water, snow, frost, steam, excessive heat or cold, broken glass, sewage, gas, odors, excessive noise or vibration, death, loss, conversion, theft, robbery, or the bursting or leaking of pipes, plumbing fixtures or sprinkler devices.

38

21.  **ASSIGNMENT AND SUBLETTING**.

    A.    Landlord shall have the right to sell or convey the Premises subject to this Lease or to assign its right, title and interest as Landlord under this Lease in whole or in part.  In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee and Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.  In addition, Tenant agrees to cooperate reasonably with Landlord in connection with any such sale or assignment at no cost or expense of or additional liability or adverse effect to, Tenant.

    B.    Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Premises in entering into this Lease. Without the prior written consent of Landlord, which consent may not be unreasonably withheld or delayed: (i) Tenant shall not assign, transfer, convey, sublease, pledge or mortgage this Lease or any interest therein, whether by operation of law or otherwise (except as expressly permitted otherwise in this Section 21); (ii) no direct or indirect transfer of fifty percent (50%) or more of an interest in Tenant (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur except for any such transfer to an Affiliate or in connection with a Permitted Guarantor Change of Control; (iii) no direct interest in Tenant shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Tenant (it being understood, however, that nothing herein shall restrict or prohibit the pledge of any direct or indirect interest in Tenant in connection with any corporate financing obligations of Guarantor or its Affiliates (other than Tenant) provided that the interests in the Tenant do not constitute more than fifty percent (50%) of the value of the collateral for such obligations (as reasonably determined by the corporate lender) or the loan is otherwise fully recourse to an entity of which the value of the interests in the Tenant constitute no more than fifty percent (50%) of the assets of such entity); and (iv) no change of Control of Guarantor shall occur, provided that Landlord consent shall not be required (but prior written notice to Landlord shall be required) under the foregoing clause (ii) or this clause (iv) for any Permitted Guarantor Change of Control (each of items (i) through (iv) are hereinafter referred to as a "<u>Transfer</u>"). For purposes of this Agreement, the term "<u>Permitted Guarantor Change of Control</u>" shall mean any change of Control of Guarantor with respect to which one or more of the following conditions is satisfied (the "Guarantor Transaction Conditions"): (1) immediately following such change of Control of Guarantor, Guarantor (or the successor to Guarantor or a replacement of Guarantor, as applicable) has an investment grade rating (public or private) pursuant to ratings established by at least two (2) of the following Nationally Recognized Statistical Ratings Organizations (NRSRO): Standard & Poor's, Moody's, Fitch, Morningstar, Kroll, and

Egan-Jones; (2) following such change of Control of Guarantor, Guarantor (or the successor to Guarantor or a replacement of Guarantor, as applicable), shall have EBITDA of at least Four Hundred Million and No/100 Dollars ($400,000,000.00) and shall have a Total Indebtedness Leverage Ratio of less than 1.5 to 1, as evidenced by financial statements of Guarantor (or the successor to Guarantor or replacement of Guarantor, as applicable) delivered to Landlord prior to such change of Control of Guarantor, or (3) both of the following conditions are satisfied: (x) effective upon such change of Control of Guarantor, this Lease shall be deemed amended to increase the then-applicable Base Rent by five percent (5%) (and which Base Rent, as so increased, shall continue to increase by two percent (2%) each year during the Term and each Renewal Term) (and Landlord and Tenant shall promptly and reasonably cooperate to evidence such deemed amendment in a written instrument reasonably acceptable to Landlord and Tenant), and (y) as a condition precedent to such change of Control of Guarantor, Tenant delivers to Landlord an irrevocable standby letter of credit in form and substance reasonably acceptable to Landlord ("Letter of Credit") in an amount equal to the aggregate Base Rent scheduled to be paid by Tenant to Landlord hereunder from the date of delivery of such Letter of Credit until the date that is twenty-four (24) months thereafter (the "Security Deposit"), to be held by Landlord for the balance of the Term. Upon the end of the Term, provided no default hereunder exists, Landlord shall return the Security Deposit to Tenant within thirty (30) days after the end of the Term. Upon Tenant's failure to timely pay Rent or any other sums due under this Lease, Landlord may, without limiting any other rights Landlord may have herein, draw on such Letter of Credit to satisfy any such unpaid monetary obligation of Tenant, and Tenant shall, immediately upon written notice from Landlord thereof, deposit with Landlord an amount in cash sufficient to replenish the Security Deposit to its original amount. The Letter of Credit shall be issued (the following collectively, the "LC Issuer Requirements"): by a commercial bank (a) with net assets or market capitalization of at least Ten Billion Dollars ($10,000,000,000) at the time of issuance of the Letter of Credit, (b) that is chartered under the laws of the United States, any State thereof or the District of Columbia, and which is insured by the Federal Deposit Insurance Corporation, (c) whose long-term, unsecured and unsubordinated debt obligations are rated in the following categories by at least two of Fitch Ratings Ltd. (Fitch), Moody's Investor Services, Inc. (Moody's) and Standard & Poor's Rating Services (S&P) (the "Rating Agencies") or their respective successors: (1) not less than A from Fitch, (2) not less than A2 from Moody's and (3) not less than A from S&P, (d) which has a short term deposit rating in the highest category from at least two Rating Agencies (which shall mean F1 from Fitch, P-1 from Moody's and A-1 from S&P), and (e) which is not insolvent and is not placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, and for which no trustee, receiver or liquidator is appointed. If at any time following the delivery of the Letter of Credit by

Tenant pursuant to this Section 21.B the LC Issuer Requirements are not satisfied, then Tenant shall, no later than fifteen (15) business days thereafter, deliver to Landlord either a replacement Letter of Credit which meets the LC Issuer Requirements or cash in the amount of the Security Deposit. If Tenant fails to deliver a replacement Letter of Credit from an institution that satisfies the LC Issuer Requirements or such cash Security Deposit to Landlord within such fifteen (15) business day period, Landlord, at its option, upon the delivery of written notice to Tenant may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit. It is Tenant's responsibility to maintain and renew the Letter of Credit such that it is in effect at all times until the return of the Letter of Credit to Tenant in accordance herewith. Tenant shall renew such Letter of Credit no later than thirty (30) days prior to any expiration date thereof or replace such Letter of Credit with a replacement Letter of Credit which otherwise meets the LC Issuer Requirements or with a cash Security Deposit. If Tenant has not renewed the Letter of Credit (and delivered the original of such renewal documentation to Landlord) or delivered a satisfactory replacement Letter of Credit or cash Security Deposit to Landlord at least thirty (30) days prior to the expiration date of the Letter of Credit, Landlord, at its option, may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit. In lieu of the Letter of Credit, Tenant may at any time elect to deliver to Landlord (i) a cash Security Deposit or (ii) a rental insurance product, issued by an investment-grade insurer, which will "credit wrap" all of the Tenant's obligations under this Lease for the entire Term. Notwithstanding anything to the contrary in this Lease (including, without limitation, this Section 21), no interest in Tenant, or in any individual or person owning directly or indirectly any interest in Tenant, shall be transferred, assigned or conveyed to any individual or person whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations and/or who is in violation of any of the OFAC Laws and Regulations, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Tenant and Landlord that (A) the transferee or any person who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations, and (B) the transferee has taken reasonable measures to assure that any individual or entity who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations; provided, however, the covenant contained in this sentence shall not apply to any person to the extent that such person's interest is in or through a U.S. Publicly-Traded Entity.

C.      To the extent Landlord's consent is required hereunder, Landlord's consent to a Transfer shall be subject to the satisfaction of such conditions as Landlord shall determine in its reasonable judgment, including, without limitation, the proposed transferee (or a successor or replacement guarantor, as applicable)  having satisfactory creditworthiness as determined by Landlord.  In addition, any such consent shall be conditioned upon the payment by Tenant to Landlord of all out-of-pocket costs and expenses incurred by Landlord in connection with such consent, including, without limitation, reasonable attorneys' fees.  The provisions of this Section 21 shall apply to every Transfer regardless of whether voluntary or not, or whether or not Landlord has consented to any previous Transfer.  Except as expressly hereinafter provided, no Transfer shall relieve Tenant of its obligations under this Lease or any guarantor of this Lease of any of its obligations under the Guaranty, it being understood that, following any Transfer, the initial Tenant under this Lease and the Guarantor always shall remain liable and responsible for the obligations of the tenant hereunder. Any Transfer in violation of this Section 21 shall be voidable at the sole option of Landlord.

D.      Notwithstanding anything in this Section 21 to the contrary, Tenant shall be permitted to cause, suffer, or permit, without Landlord's consent, any Transfer that satisfies all of the terms and conditions set forth in this <u>Section 21.D</u> applicable to such Transfer, all of which must be satisfied on or before the effective date (or earlier closing) of such proposed Transfer (each a "<u>Permitted Transfer</u>"):

(1)      Tenant shall be permitted to sublet all or any part of the Premises so long as, in each instance, the following conditions precedent have all been satisfied: (i) no Event of Default has occurred and is continuing as of the date such proposed sublease becomes effective; (ii) the proposed sublease is not reasonably expected to result in a violation of a material term or condition of this Lease; and (iii) the proposed sublease does not relieve Tenant of its obligations under this Lease or the Guarantor of any of its obligations under the Guaranty, it being understood that the initial Tenant under this Lease and the Guarantor always remain primarily liable and responsible for the obligations of the Tenant hereunder.

(2)      Tenant shall be permitted to assign its entire interest under this Lease to an entity which has expressly assumed all the obligations and liabilities of Tenant under this Lease, actual, contingent and accrued, in a manner reasonably acceptable to Landlord and otherwise in accordance with the terms and conditions of this Lease (and/or an assignment of more than fifty percent of the interests in the Tenant shall be permitted) so long as the following conditions precedent have all been satisfied: (i) no Event of Default has occurred and is continuing as of the date such proposed assignment becomes effective; (ii) the proposed assignment is not reasonably expected to result in a violation of a material term or condition of this Lease; (iii) the proposed assignee is experienced in management and operation of

42

facilities similar to the Premises and has a favorable business and operational reputation and character (or such proposed assignee has engaged a third party who is experienced in management and operation of facilities similar to the Premises and has a favorable business and operational reputation and character); and (iv) the proposed assignment does not relieve Tenant of its obligations under this Lease or the Guarantor of its obligations under the Guaranty, it being understood that the initial Tenant under this Lease and the Guarantor remain primarily liable and responsible for the obligations of the Tenant hereunder.

(3)     Tenant shall be permitted to assign its entire interest under this Lease to an entity which has expressly assumed all the obligations and liabilities of Tenant under this Lease, actual, contingent and accrued, in a manner reasonably acceptable to Landlord and otherwise in accordance with the terms and conditions of this Lease so long as the following conditions precedent have all been satisfied: (i) no Event of Default has occurred and is continuing as of the date such proposed assignment becomes effective; (ii) the proposed assignment is not reasonably expected to result in a violation of a material term or condition of this Lease; (iii) the proposed assignee is experienced in management and operation of facilities similar to the Premises and has a favorable business and operational reputation and character (or such proposed assignee has engaged a third party who is experienced in management and operation of facilities similar to the Premises and has a favorable business and operational reputation and character); and (iv) immediately after the proposed assignment, the assignee or a replacement guarantor either (1) has an investment grade rating (public or private) pursuant to ratings established by either (x) Standard & Poor's; (y) Moody's; or (z) at least two (2) of the following Nationally Recognized Statistical Ratings Organizations (NRSRO): Fitch, Morningstar, Kroll, and Egan-Jones, or (2) shall have EBITDA of at least Four Hundred Million and No/100 Dollars ($400,000,000.00) and shall have a Total Indebtedness Leverage Ratio of less than 1.5 to 1, as evidenced by financial statements of assignee (or a replacement guarantor, as applicable) delivered to Landlord prior to such assignment, in which case the Tenant and the Guarantor will be released from liability under this Lease and the Guaranty to the extent accruing from and after such assignment.

(4)     Tenant shall be permitted to assign its entire interest under this Lease to an Affiliate of Tenant which has expressly assumed all the obligations and liabilities of Tenant under this Lease, actual, contingent and accrued, in a manner reasonably acceptable to Landlord and otherwise in accordance with the terms and conditions of this Lease so long as no Event of Default has occurred and is continuing as of the date such proposed assignment becomes effective and provided that Guarantor shall not be released from any of its obligations under the Guaranty, in which case the assigning Tenant will thereafter be released from any of its obligations under this Lease.

Tenant shall, at Tenant's sole cost and expense, execute and deliver to Landlord any reasonable instruments and documents requested by Landlord in connection with any Permitted Transfer and pay to Landlord all out-of-pocket costs and expenses incurred by Landlord in connection with such Permitted Transfer, including, without limitation, reasonable attorneys' fees.

E.    Any Transfer shall not relieve Tenant, or any person claiming by, through or under Tenant, of the obligation to obtain the consent of Landlord, pursuant to this Section 21, to any further Transfer. In the event of a sublease, if there exists an Event of Default, Landlord may collect rent from the subtenant without waiving any rights under this Lease while such Event of Default is continuing. Any rent Landlord may collect from any such subtenant will be first applied to the Rent due and payable under this Lease and any other amounts then due and payable and then applied to the Rent as it becomes due and payable under this Lease. The collection of the Rent and any other sums due and payable under this Lease, from a person other than Tenant shall not be a waiver of any of Landlord's rights under this Section 21.E, an acceptance of assignee or subtenant as Tenant, or a release of Tenant from the performance of Tenant's obligations under this Lease. No Transfer shall affect the liability of Guarantor under the Guaranty.

F.    No Transfer shall impose any additional obligations on Landlord under this Lease. Tenant shall reimburse Landlord (and Landlord's Mortgagee, if applicable) for Landlord's reasonable costs and expenses (including reasonable attorneys' fees) incurred in conjunction with the reviewing and processing and documentation of any Transfer requiring Landlord's consent regardless of whether such Transfer is actually consummated.

G.    Intentionally Omitted.

H.    At any time and from time to time, Landlord shall have the right to sell and convey all or any portion of the Premises to a third party or Affiliate of Landlord (such party, the "Superior Landlord"), and enter into a lease back (including, without limitation, a master lease, prime lease and/or ground lease) from Superior Landlord for such Premises or portion thereof (a "Landlord Master Lease"); provided, however, that the Landlord Master Lease shall provide that in the event of default under any such Landlord Master Lease, such Superior Landlord and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of this Lease so long as no Event of Default exists hereunder.  In such event, this Lease will automatically be deemed to be a sublease between Landlord, as sublandlord, and Tenant, as subtenant.  Tenant shall promptly execute and deliver to Landlord and Superior Landlord such other instruments and documents reasonably requested by Landlord or Superior Landlord with respect to such Landlord Master Lease.  Further, at the request of Landlord, the Superior Landlord, Tenant or, if applicable, any subtenant of Tenant, Tenant, any applicable subtenant of Tenant, Landlord, and the Superior

Landlord shall promptly enter into a recognition agreement concerning this Lease and the Sale/Leaseback in form and substance reasonably acceptable to Landlord, the Superior Landlord, Tenant and, if applicable, the subtenant of Tenant.

I.   Subject to the prior written approval of Tenant, which approval shall not be unreasonably withheld, conditioned, or delayed, Landlord shall have the right, from time to time, to identify outparcel portions of the Premises (each, an "Outparcel"; collectively, "Outparcels") that Landlord desires to either (1) subdivide into one or more separate tax parcel(s), or (2) create a condominium in lieu of a subdivision, each in accordance with applicable Laws from the balance of such Site and sell such Outparcel parcel or condominium unit to a third party (each such transaction, an "Outparcel Sale"). Prior to creating any Outparcel and Outparcel Sale, Landlord shall provide Tenant with (X) a boundary survey, and draft subdivision plat or condominium plat or declaration, as applicable, of the proposed Outparcel prepared by a surveyor licensed in the state where the Premises is located, (Y) written detail on the proposed use of the Outparcel, and (Z) renderings of the improvements, if any, proposed to be constructed at the Outparcel (collectively, the "Proposed Plans"). Upon Tenant's approval of an Outparcel and Outparcel Sale, Landlord may proceed with creating the Outparcel and closing on the Outparcel Sale in material conformity with the approved Proposed Plans. Without limitation as to other reasonable grounds for withholding consent, Landlord hereby agrees that it shall be reasonable under this Lease for Tenant to withhold consent to any proposed Outparcel or Outparcel Sale where one or more of the following apply: (a) the size, configuration, or location of the Outparcel or the improvements proposed to be construct at the Outparcel may unreasonably impair access to, use of, visibility of or frontage of the Building or parking areas serving the Building; (b) the proposed use or development of the Outparcel may unreasonably affect the conduct of Tenant's business at the Premises; or (c) the development of the Outparcel may detract from Tenant's signage at the Premises.

Tenant shall reasonably cooperate, at no out-of-pocket cost to Tenant, in connection with any Outparcel Sale approved by Tenant pursuant to the terms of the preceding paragraph, including, without limitation, executing appropriate documentation to reflect the partial termination of this Lease with respect to any such Outparcel concurrent with the consummation of an Outparcel Sale (including, without limitation, assignments of Tenant's and, if applicable, Tenant's affiliates' interests in any lease affecting any such Outparcel). Landlord shall reimburse Tenant within ten (10) days' demand for any reasonable, actual, out-of-pocket costs, including, without limitation, attorney's fees, impact study fees, traffic study fees, and advisor's fees, related to Tenant's review of any Outparcel request by Landlord, up to a maximum of Five Thousand and No/100 Dollars ($5,000.00). All proceeds of an Outparcel Sale shall be retained by Landlord, and Tenant shall not be

entitled to receive any such proceeds.   There shall be no reduction of rent due under this Lease as a result of an Outparcel Sale or the development of an Outparcel.

22.    **LIENS**.

Tenant will not, directly or indirectly, create or permit to be created or to remain, and will promptly discharge, at its expense, any mechanic's, supplier's or vendor's lien, encumbrance or charge on the Premises or any part hereof.  The existence of any mechanic's, supplier's or vendor's lien, or any right in respect thereof, shall not constitute a violation of this Section 22 if payment is not yet due upon the contract or for the goods or services in respect of which any such lien has arisen or, if Tenant is protesting or challenging such lien in good faith and has, within thirty (30) days after Tenant receives actual notice of such lien, bonded over such lien.  Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, expressed or implied, of any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof, and any such contractor, subcontractor, laborer, materialman or vendor shall look solely to Tenant and Tenant's interest in the Premises to secure the payment of any bills for any labor, services, or materials furnished.  Notice is hereby given that Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding the Premises or any part thereof through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises.  If Tenant has not removed any such lien or other encumbrance described above within thirty (30) days after written notice thereof to Tenant, Landlord may, but shall not be obligated to, pay the amount of such lien or other encumbrance or discharge the same by deposit, and the amount so paid or deposited shall constitute additional Rent and be collectible upon demand with interest at the Default Rate.  Landlord hereby consents to the granting of a lien or security interest on the fixtures, furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other of Tenant's Personal Property installed or placed on the Premises by Tenant in connection with any customary credit facility that Tenant has or may have during the Term hereof, and Tenant shall give Landlord written notice of any such lien.

23.    **TENANT'S DEFAULT**.

Each of the following events shall be deemed to be an "Event of Default" under this Lease: (i) failure to pay Rent or any other monetary obligation as and when due, and such failure continues for three (3) business days after Tenant's receipt of Landlord's written notice thereof; (ii) Tenant abandons the Premises; (iii) Guarantor or Tenant becomes insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under state or federal bankruptcy laws (or successor laws) or Guarantor or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Guarantor or Tenant; (iv) a writ of attachment or execution is levied on this Lease, or a receiver is appointed with authority to take possession of the Premises, which attachment, execution and receiver is not removed within thirty (30) days of filing or appointment of a receiver; (v) Guarantor or Tenant shall be liquidated or dissolved; (vi) Tenant shall violate Section 22 hereof; (vii) the estate or interest of Tenant in the Premises or any part thereof shall be levied upon or attached in any proceeding relating to more than One Hundred Thousand and No/100 Dollars ($100,000.00),

46

and the same shall not be vacated, discharged or stayed pending appeal (or bonded or otherwise similarly secured payment) within the earlier of sixty (60) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord or any earlier period provided by Law for obtaining any stay pending appeal or to prevent foreclosure or sale; provided, however, that such notice shall be in lieu of and not in addition to any notice required under applicable Law; (viii) Tenant fails to maintain any insurance required by this Lease; (ix) failure by Tenant to perform any other covenant, agreement or undertaking of the Tenant contained in this Lease if the failure to perform is not cured within thirty (30) days after Tenant's receipt of Landlord's written notice thereof; provided, however, if the breach cannot reasonably be cured within thirty (30) days, the same shall not result in an Event of Default if Tenant commences to cure the breach within thirty (30) days of receipt of Landlord's written notice and diligently and in good faith continues to prosecute the cure of said breach to completion, provided such breach is cured within sixty (60) days after Tenant's receipt of Landlord's written notice thereof; (x) to the extent required under the Guaranty, Guarantor fails to deliver the financial statements required to be delivered by Guarantor to Landlord if such failure is not cured within ten (10) days after Tenant's receipt of Landlord's written notice thereof; and (xi) an event of default beyond all applicable notice and cure periods by Guarantor under the Guaranty.

24. **REMEDIES OF LANDLORD**.

A. From and after the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies as well as any other remedy available at law or in equity for such Event of Default: (i) terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord; (ii) using lawful means, enter upon and take possession of the Premises without terminating this Lease and without being liable for prosecution or claim for damages, and relet, upon reasonable terms, all or a portion of the Premises (if Landlord elects to enter and relet the Premises, Landlord may at any time thereafter elect to terminate this Lease); (iii) sue periodically to recover damages during the period corresponding to the portion of the Term for which suit is instituted, and if Landlord elects to sue and is successful in such suit, Landlord shall be entitled to recover all costs and expenses of such suit, including reasonable attorneys' fees, together with interest at the Default Rate; (iv) re-enter the Premises or any portion thereof and attempt to cure any default of Tenant, or make any such payment or perform such act for the account of and at the expense of Tenant, in which event Tenant shall, upon demand, reimburse Landlord as additional Rent for all reasonable costs and expenses which Landlord incurs to cure such default, together with interest at the Default Rate accruing from the date such costs and expenses were incurred, and Tenant agrees that no such entry or action by Landlord shall constitute an actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing, and no such entry shall be deemed an eviction of Tenant; (v) institute summary proceeding for recovery of possession at the Premises pursuant to applicable Law; (vi) to the extent permitted by applicable Law, accelerate and recover from Tenant all Rent and other monetary sums scheduled to become due and owing under this Lease after the date of such breach for the

entire Term and any Renewal Term that has been exercised, discounted to present value at an assumed per annum interest rate equal to the then-applicable "Prime Rate" published in The Wall Street Journal (or, if such rate is no longer published in The Wall Street Journal, the average discount rate on 3-month treasury bills issued by the United States Treasury at its most recent auction; and (vii) enforce the provisions of this Lease by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy.  Tenant shall reimburse Landlord for any out-of-pocket expenses which Landlord actually incurs in complying with the terms of this Lease on behalf of Tenant, together with interest at the Default Rate.

B.    If Landlord elects to terminate this Lease, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional Rent payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord, which may be then owing and unpaid, and all costs and expenses, including court costs and reasonable attorneys' fees, incurred by Landlord in the enforcement of its rights and remedies hereunder, together with interest at the Default Rate.  In addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty the lesser of (i) the sum of (1) the aggregate sum which at the time of such termination represents the present value of the aggregate Rent which would have been payable after the termination date had this Lease not been terminated for the remainder of the Term or Renewal Term, as applicable, during which such termination occurred, such present value to be computed on the basis of the rate of U.S. Treasury Bills with the closest maturity date correlating with the amount of time left in the Term or Renewal Term, as applicable, had this Lease not been terminated, and (2) any damages in addition thereto, including without limitation reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent, and interest at the Default Rate or (ii) the greatest amount permitted by applicable Law.

C.    Unless required by applicable Law, Landlord shall have no obligation to mitigate damages upon the occurrence of an Event of Default.  However, if Landlord is required by applicable Law to mitigate Tenant's damages, Landlord's obligation shall be satisfied in full if Landlord undertakes to lease the Premises (the "Repossessed Premises") to another tenant (a "Substitute Tenant") in accordance with the following criteria: (1) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for such Repossessed Premises until Landlord obtains full and complete possession of such Repossessed Premises including, without limitation, the final and unappealable legal right to relet such Repossessed Premises free of any claim of Tenant; (2) Landlord shall not be obligated to lease or show such Repossessed Premises, on a priority basis, or offer such Repossessed Premises to a prospective tenant when other premises in the

48

applicable Building or any other building owned by Landlord suitable for that prospective tenant's use are (or will be) available; (3) Landlord shall not be obligated to lease such Repossessed Premises to a Substitute Tenant for a rent less than the current fair market rent then prevailing for similar uses in Comparable Buildings for such Repossessed Premises, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the applicable Building or for a building belonging to Landlord in the vicinity; (4) Landlord shall not be obligated to enter into a lease with a Substitute Tenant whose use would: (i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the applicable Building; or (ii) adversely affect the reputation of the applicable Building; and (5) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources to operate such Repossessed Premises in a first-class manner and to fulfill all of the obligations in connection with the lease thereof as and when the same become due.  No reletting shall be construed as an election on the part of Landlord to terminate this Lease unless a written notice of such intention is given to Tenant by Landlord.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous default and/or exercise its rights under Section 24.A and Section 24.B.

D.     Pursuit of any of the above stated remedies by Landlord after an Event of Default shall not preclude pursuit of any other remedy provided in this Lease or at law or in equity, nor shall pursuit of any remedy constitute forfeiture or waiver of any remedy of Landlord or payment due to Landlord.  No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of any other violation or default.  Once an Event of Default occurs, Landlord shall not be obligated to accept any cure of such Event of Default, and such Event of Default shall continue unless and until Landlord states in writing, in its sole and absolute discretion, that no Event of Default exists under this Lease.

25.     **SUBORDINATION/ATTORNMENT**.

A.     Landlord Mortgage.  Landlord may mortgage its fee interest in the Premises or any portion thereof, at any time, and from time to time, in accordance with the terms hereof.  Notwithstanding anything to the contrary contained herein, Landlord and Tenant agree that this Lease shall be subordinate to any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage,

or conveyance or assignment in lieu of foreclosure or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of this Lease so long as no Event of Default exists hereunder.   Tenant shall recognize and attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, or otherwise, upon such party's request, as Tenant's direct landlord under the Lease.   Such subordination, attornment and recognition shall be self-operative without the need for further documentation; provided that Tenant shall execute such agreements and/or instruments as such successor landlord shall reasonably request to evidence such attornment and recognition.   If requested by Landlord, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, enter into a reasonable and customary subordination, non-disturbance and attornment agreement ("SNDA") with Landlord Mortgagee to effectuate the subordination, non-disturbance and attornment rights contemplated by this Section 25.A.

     B.     For the purposes of this Lease, the following definitions shall apply:

"Landlord Mortgage": shall mean any financing obtained by Landlord, as evidenced by any mortgage, deed of trust, assignment of leases and rents, financing statement or other instruments, and secured by the interest of Landlord in the Premises or any portion thereof, including any extensions, modifications, amendments, replacements, supplements, renewals, refinancings and consolidations thereof.

"Landlord Mortgagee": shall mean the mortgagee (and its successors and assigns) under any Landlord Mortgage.

     26.     **ESTOPPEL CERTIFICATE**.

     A.     At any time, and from time to time, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, execute, acknowledge and deliver to Landlord a certificate in the form attached hereto as **Exhibit "D"** or such other form as may be supplied by Landlord certifying: (i) that Tenant has accepted the Premises; (ii) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications); (iii) the commencement and expiration dates of the Term, including the terms of any extension options of Tenant; (iv) the date to which the rentals have been paid under this Lease and the amount thereof then payable; (v) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (vi) that Tenant is not in default under this Lease beyond any grace or cure periods, except as to defaults specified in the certificate; (vii) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Tenant; (viii) that Landlord has no actual involvement in the

management or control of decision making related to the operational aspects or the day-to-day operations of the Premises; and (ix) any other information reasonably requested by Landlord.

B.      At any time, and from time to time, Tenant shall, at Landlord's request, use commercially reasonable efforts to obtain estoppel certificates, in a form requested by Landlord or any Landlord Mortgagee, from any applicable counterparties under any applicable declarations, covenants, conditions and restrictions, reciprocal easement agreements or other encumbrances.

27.     **HAZARDOUS MATERIALS**.

Notwithstanding anything contained herein to the contrary:

A.      Tenant covenants and agrees that it shall not cause, conduct, authorize or allow (i) the presence, generation, transportation, storage, treatment, or usage at the Premises, or any portion thereof, of any Hazardous Material in violation of or as would give rise to liability under Environmental Laws; (ii) a Release or threat of Release of any Hazardous Material on, under, about or in the Premises; or (iii) any violation of or liability under any Environmental Law at or with respect to the Premises or activities conducted thereon. For avoidance of doubt, nothing in this Section 27.A shall prohibit Tenant from using at the Premises (I) cleaning materials, pesticides, and other common household and office products, and/or (II) materials in connection with any fuel tanks, generators or the like on the Premises, solely to the extent, with respect to each of the preceding clauses (I) and (II), that any such use thereof is in compliance with Environmental Laws. Further, nothing in this Section 27.A shall prohibit Tenant from storing and distributing products which contain or are Hazardous Materials, to the extent, with respect to the preceding clause, that any such storage and distribution are in compliance with Environmental Laws and are in the ordinary course of Tenant's business.

B.      Tenant shall, at its own cost, comply and ensure that the Premises and all operations and activities at the Premises comply with all Environmental Laws and the terms of this Lease with respect to Hazardous Materials. Tenant shall, at its own cost, obtain all Permits, licenses and authorizations required under Environmental Laws for the operations and activities conducted at the Premises.

C.      Tenant shall promptly provide Landlord with notice of any actual or potential violation of Environmental Laws, any Release of Hazardous Materials in or around the Premises that could impact the Premises or require any investigation, remediation or other response action under Environmental Law, and any claim or threat of a claim asserting any liability under Environmental Laws relating to the Premises, and copies of all reports, site assessments, and material communications, permits or

agreements to, from or with any governmental authority or other third party relating to such violation, Release or claim.

D.     Landlord and Landlord's Representatives, including such environmental consultants as Landlord may designate, shall have the right upon reasonable prior notice, and subject to <u>Section 14</u> hereof, to enter the Premises and/or conduct appropriate tests and investigations for the purpose of assessing the condition of the Premises or ascertaining that Tenant complies with the terms of this Lease and with all applicable Environmental Laws that relate in any way to the Premises.

E.     If the presence, Release, threat of Release, presence or placement on, in or around the Premises, or the generation, transportation, storage, use, treatment, or disposal at or around the Premises of any Hazardous Material by Tenant, Tenant's Representatives, or by any third party other than Landlord or Landlord's Representatives: (i) gives rise to any liability or obligation (including, but not limited to, any investigatory, remedial, removal, reporting, or other response action) under any Environmental Law, (ii) causes or threatens to cause a material and adverse effect on public health or occupational safety and health, (iii) pollutes or threatens to pollute the environment, or endanger human health, or (iv) otherwise violates Environmental Law, Tenant shall promptly take any and all remedial and removal actions required by Environmental Laws or otherwise necessary to clean up the Premises to comply with all environmental standards applicable to the Premises given its use at the time of the remediation and mitigate exposure to liability arising from the Hazardous Material.

F.     Tenant shall promptly notify Landlord upon Tenant becoming aware of: (i) any enforcement action, investigation, cleanup, notice of violation, or other regulatory action taken or threatened against either party or otherwise related to the Premises by any governmental authority with respect to the presence of any Hazardous Material at the Premises, or the migration thereof from or to other property, (ii) any demands or claims made or threatened by any governmental authority or other person against either party hereto or otherwise relating to any actual or alleged violation of or liability under Environmental Laws or relating to any loss or injury resulting from any Hazardous Material or based on Environmental Laws, (iii) any Release of Hazardous Materials, unlawful discharge, or non-routine, improper or unlawful disposal or transportation of any Hazardous Material on or from the Premises or any other location that may affect the Premises, and (iv) any matters where Tenant is required by Environmental Law to give a notice to any governmental authority respecting any Hazardous Materials in, at, on, under or about the Premises, and Tenant shall thereafter keep Landlord reasonably apprised with respect to the status and Tenant's actions to resolve such matters, and shall furnish Landlord with such other documents and information as Landlord may reasonably request with respect thereto. At such times as Landlord may reasonably request, Tenant

52

shall provide Landlord with a written list identifying any Hazardous Material then actually known by Tenant to be used, stored, or maintained in, on or upon the Premises.  In such case, Tenant shall if requested by Landlord provide Landlord with information with respect to the use and approximate quantity of each such material, a copy of any Material Safety Data Sheet issued by the manufacturer therefor, written information concerning the removal, transportation, and disposal of the same, and such other information as the Landlord may reasonably require or as may be required by Environmental Laws.

G.      Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnified Parties harmless, without limitation to and in the manner specified in <u>Section 20</u>, from and against any and all liability, claim, expense, cause of action, fines, judgments, settlements, investigation, monitoring and remediation and corrective costs, fines and penalties, losses and damages (including reasonable attorney's, consultant's and contractor's fees) resulting or arising from (i) the breach by Tenant of its covenants and agreements set forth in this <u>Section 27,</u> (ii) the presence, Release, placement on, in or around the Premises, or the generation, transportation, storage, use, treatment or disposal at or around the Premises of any Hazardous Materials before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, (iii) any violation of or obligation under Environmental Law before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, and (iv) claims by governmental authorities or other third parties associated with Hazardous Materials or violations of or obligations under Environmental Laws by Tenant or any third party other than Landlord or Landlord's Representatives, or Hazardous Materials present at, on, under or about the Premises before or during the Term and any Renewal Term, as applicable, including, without limitation those that were discovered during the Term and any Renewal Term, as applicable, which were caused prior to the Term by Tenant or its agents, representatives, employees, contractors, subcontractors, licensees or invitees or any third party other than Landlord or Landlord's Representatives.  The foregoing indemnity obligations shall survive the expiration or earlier termination of this Lease.

H.      At Landlord's request, at any time (1) during the last year of the Term (or any Renewal Term, as applicable), (2) in connection with any future sale, financing or other transaction by Landlord related to the Premises, or (3) Landlord receives information indicating the presence of an environmental condition at the Premises requiring investigation, Tenant shall commission and provide to Landlord, or Landlord may commission, in each event, at Tenant's sole cost and expense, a Phase I site assessment and, if warranted in Landlord's sole discretion, a Phase II site assessment of the Premises at Tenant's sole cost and expense, for purposes of confirming

53

the environmental condition of the Premises and Tenant's compliance with the terms of the Lease with respect to environmental matters.

28.    **PRESS RELEASES**.

Except for any announcement intended solely for internal distribution by Landlord or Tenant or any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the disclosing party, all media releases or public announcements (including, but not limited to, promotional or marketing material) by Landlord or Tenant or either party's employees or agents relating to this Lease or its subject matter, or including the name, trade name, trademark, or symbol of Tenant or an Affiliate of Tenant, or Landlord or an Affiliate of Landlord, shall be coordinated with and approved in writing by the other party prior to the release thereof; provided, that nothing herein is intended to require Tenant's consent to the identification of Tenant or the particulars of this Lease in connection with any marketing of the Premises or any portion thereof by Landlord.

29.    **HOLDING OVER**.

Except as set forth below, if Tenant continues to occupy the Premises or any portion thereof after the expiration or other termination of this Lease or the termination of Tenant's right of possession with respect to the Premises or any portion thereof, such occupancy shall be that of a tenancy at sufferance.  Tenant shall, throughout the entire holdover period, be subject to all the terms and provisions of this Lease (other than provisions relating to length of the Term) and shall pay for its use and occupancy an amount (on a per month basis without reduction for any partial months during any such holdover) equal to (i) one hundred percent (100%) of the additional Rent due under this Lease for the holdover period, and (ii) two hundred percent (150%) of the monthly Base Rent due in the month immediately prior to the expiration or earlier termination of the Term. Except as set forth below, no holding over by Tenant or payments of money by Tenant to Landlord after the expiration of the Term shall be construed to extend the Term or prevent Landlord from recovery of immediate possession of the Premises by summary proceedings or otherwise.  In the event that Tenant continues to occupy the Premises or any portion thereof after the expiration or termination of this Lease, such occupancy shall be that of a tenancy at sufferance and Tenant shall be liable to Landlord for all direct and consequential damages which Landlord may suffer by reason of any holding over by Tenant.

30.    **FINANCIAL STATEMENTS**.

A.    Within ninety (90) days after the end of each fiscal year of Guarantor, Tenant shall deliver to Landlord complete audited financial statements of the Guarantor, including, without limitation, a balance sheet (together with all notes thereto), profit and loss statement, statement of annual cash flows, all in reasonable detail, prepared in accordance with GAAP and audited by a "Big Four" accounting firm.  So long as all such financial statements of Guarantor and other information required by this Section 30.A is publicly available via EDGAR or Guarantor's website, Tenant shall not be required to separately deliver such information to Landlord pursuant to this Section 30.A.

B.      Within thirty (30) days after the end of each fiscal quarter of Tenant and within ninety (90) days after the end of each fiscal year of Tenant, Tenant shall deliver to Landlord income statements for the business at the Premises reflecting the business operations at the Premises, which shall include information regarding sales and EBITDA at the Premises.  Landlord shall not disclose to any third party such income statements; provided, however, that (i) Landlord may disclose such information if Tenant or its affiliates previously disclosed such information to such third party, or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Laws or to its accountants, attorneys, advisors, affiliates, investors, potential investors, partners, bona fide prospective purchasers, or current or prospective lenders, if any, of all or any portion of Landlord's interest in the Property (or the interests in Landlord), provided that Landlord shall instruct each of such recipients that they must adhere to the same non-disclosure provisions as are imposed upon Landlord under this <u>Section 30.B</u>.

31.      **QUIET ENJOYMENT**.

So long as Tenant is not in default under this Lease, Landlord shall not take any action to disturb in any material respect Tenant's quiet enjoyment of the Premises (subject, however, to the exceptions, reservations and conditions of this Lease).  Except to the extent expressly set forth in this <u>Section 31</u>, Tenant hereby waives any right or defense it may have at law or in equity relating to Tenant's quiet enjoyment of the premises.

32.      **NOTICES**.

Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) business days after mailing; (c) if by Federal Express or other nationally recognized overnight courier service, on the next business day after delivered to such courier service for delivery on the next business day; or (d) if by facsimile or e-mail transmission, on the day of transmission so long as a copy is sent on the same day (or prior thereto) by Federal Express or other nationally recognized overnight courier service for delivery on the next business day, to the addresses set forth in <u>Section 2</u> hereof, or at such other address as the party to be served with notice has furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.  Attorneys for either party hereto may provide notice of behalf of such party, provided that all other requirements of this <u>Section 32</u> are satisfied.

33.      **PERSONAL LIABILITY**.

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that (i) there shall be absolutely no personal liability on the part of the direct and indirect members, partners, shareholders, officers, directors, employees and agents of Landlord and its successors or assigns, to Tenant with respect to any of the terms, covenants and conditions of this Lease, (ii) Tenant waives all claims, demands and causes of action against the direct and indirect members, partners, shareholders, officers, directors, employees and agents of Landlord and its successors or assigns in the event of any breach by Landlord of any of the terms,

covenants and conditions of this Lease to be performed by Landlord, and (iii) Tenant shall look solely to Landlord's interest in the Premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, or any other matter in connection with this Lease or the Premises, such exculpation of liability to be absolute and without any exception whatsoever.  No breach by Landlord of any provision of this Lease shall give rise to a right of Tenant to terminate this Lease, it being understood and agreed that Tenant's sole remedy for any such breach shall be a claim for actual damages (if any).  Furthermore, Tenant hereby knowingly, voluntarily and intentionally waives any right it may have to seek punitive, consequential, special and indirect damages from Landlord and any of such Landlord's direct and indirect members, partners, shareholders, officers, directors, employees and agents of Landlord and its successors or assigns with respect to any matter arising out of or in connection with this lease or any document contemplated herein or related hereto.  The waiver by Tenant of any right it may have to seek punitive, consequential, special and indirect damages has been negotiated by the parties hereto and is an essential aspect of their bargain.

34.  **ENTIRE AGREEMENT**.

This Lease represents the entire agreement and understanding between Landlord and Tenant with respect to the subject matter herein, and there are no representations, understandings, stipulations, agreements or promises not incorporated in writing herein.

35.  **AMENDMENTS**.

No amendments or modifications of this Lease shall be effective unless such amendment or modification is in writing and executed and delivered by and between Tenant and Landlord, nor shall any custom, practice or course of dealing between the parties be construed to waive the right to require specific performance by the other party in compliance with this Lease.

36.  **LEGAL INTERPRETATION**.

Each of Landlord and Tenant hereby agree that the State of Illinois has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects (including, without limiting the foregoing, matters of construction, validity and performance), this Lease and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Illinois applicable to contracts made and performed therein and all applicable law of the United States of America; except that, at all times, the provisions for the creation of the leasehold estate created by this Lease, enforcement of Landlord's rights and remedies with respect to right of re-entry and repossession, surrender, delivery, ejectment, dispossession, eviction or other in-rem proceeding or action regarding the Premises pursuant to Section 24 hereunder shall be governed by and construed according to the Laws of the State in which the Premises is located, it being understood that, to the fullest extent permitted by law of such State where the Premises is located, the law of the State of Illinois shall govern the validity and enforceability of this Lease, and the obligations arising hereunder.  To the fullest extent permitted by law, Tenant and Landlord hereby unconditionally and irrevocably waive any claim to assert that the law of any other jurisdiction governs this Lease.  Words of any gender shall be construed to include any other gender, and words in the singular number shall be construed to

include the plural, unless the context otherwise requires.  The headings of the sections have been inserted for convenience only and are not to be considered in any way in the construction or interpretation of this Lease.  Except as otherwise herein expressly provided, the terms of this Lease shall apply to, inure to the benefit of, and be binding upon, the parties and their respective assigns, successors and legal representatives.  Any legal suit, action or proceeding against Tenant arising out of or relating to this Lease may be instituted in any federal court in the Northern District of Illinois or state court sitting in Cook County, State of Illinois, and Landlord and Tenant each waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in such federal district or county and state, and Landlord and Tenant each hereby expressly and irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  In this Lease, the words "include," "includes" or "including" mean "include without limitation," "includes without limitation" and "including without limitation," respectively, and the words following "include," "includes" or "including" shall not be considered to set forth an exhaustive list.

37.     **OPTION TO RENEW**.

A.     Tenant shall have the right, at its election made in its sole discretion, to extend the Term (the "Renewal Option") for the consecutive, additional periods set forth in Section 1.E (each, a "Renewal Term"), provided that each of the following occurs:

1.     Landlord receives irrevocable written notice of exercise of the Renewal Option (the "Renewal Notice"), not less than twelve (12) full months prior to the expiration of the then existing Term (or Renewal Term, as case may be); and

2.     There is no uncured Event of Default beyond any applicable notice and cure period at the time that Tenant delivers the Renewal Notice or at the time the applicable Renewal Term will commence.

B.     The Renewal Term shall be upon the same terms and conditions as in this Lease except Base Rent for the first lease year of the applicable Renewal Term shall be equal to the greater of (i) one hundred two percent (102%) of the Base Rent for the lease year immediately preceding the first lease year of the applicable Renewal Term, and (ii) the then-current Market Rate (as hereinafter defined) for the Premises. The Base Rent shall increase by two percent (2%) annually during each Renewal Term.  "Market Rate" for the Premises shall mean the base rent rate for the first lease year of the applicable Renewal Term that the Premises would be expected to be leased for, for a term commencing on the applicable commencement date of the Renewal Term in question and ending on the applicable expiration date of the Renewal Term in question, in its then-existing condition, in an arms-length transaction between a willing landlord and tenant in the commercial space market existing in the vicinity of the Premises at the time such rate is established. Such determination shall take into account all relevant factors, including consideration of (1) the size and location of the Premises, and the quality of,

57

condition of, and the nature of the improvements in, the Building, including without limitation, the necessity to remove such improvements, but shall exclude the value of improvements installed by Tenant in the Premises that are to be removed by Tenant at the expiration of the Term; (2) other Comparable Buildings to the Building; (3) other comparable leasing transactions in comparable locations in the vicinity of the Premises for new leases (with appropriate adjustments for different size premises and different length terms), and the rents and concessions, allowances and commissions granted along with the other terms of such transactions; (4) the financial condition of Tenant; and (5) the fact that there shall not be any Landlord work, inducement allowances, or rent abatements for the Renewal Term. Notwithstanding the foregoing, in no event shall the Market Rate be less than one hundred two percent (102%) of the Base Rent in effect at the expiration of the then current Term (or Renewal Term, as case may be).

C.   Within forty-five (45) days after receipt of the Renewal Notice, Landlord shall advise Tenant of Landlord's determination of the Market Rate for the first lease year of the applicable Renewal Term.  Tenant, within twenty (20) days after the date on which Landlord advises Tenant of the Market Rate for the first lease year of the applicable Renewal Term, shall either (i) give Landlord final binding written notice (the "<u>Binding Notice</u>") of Tenant's exercise of the Renewal Option, or (ii) if Tenant disagrees with Landlord's determination, provide Landlord with written notice of rejection (the "<u>Rejection Notice</u>").  If Tenant fails to provide Landlord with either a Binding Notice or Rejection Notice within such twenty-day period, Tenant's Renewal Option shall be null and void and of no further force and effect.  If Tenant provides Landlord with a Binding Notice, Landlord and Tenant shall enter into the Renewal Amendment upon completion of the process set forth in <u>Sections</u> **Error! Reference source not found.** and **Error! Reference source not found.** in accordance with the terms and conditions hereof.  If Tenant provides Landlord with a Rejection Notice, Landlord and Tenant shall reasonably negotiate to agree upon the Market Rate.  If Landlord and Tenant agree on the Market Rate, Tenant shall provide Landlord with a Binding Notice and Landlord and Tenant shall enter into the Renewal Amendment upon completion of the process set forth in these <u>Sections</u> **Error! Reference source not found.** and **Error! Reference source not found.** in accordance with the terms and conditions hereof.  If Landlord and Tenant are unable to agree upon the Market Rate within twenty (20) days after the date Tenant provides Landlord with the Rejection Notice, Tenant, by written notice to Landlord (the "<u>Arbitration Notice</u>") within ten (10) days after the expiration of such twenty-day period, shall have the right to have the Market Rate determined in accordance with the arbitration procedures described in <u>Section 37.D</u> below.  If Landlord and Tenant are unable to agree upon the Market Rate within the aforementioned twenty-day period and Tenant fails to timely exercise its right to arbitrate, then the Renewal Option in question (along with all remaining Renewal Options) shall be deemed to be null and void and of no further force and effect.

D.      If Tenant provides Landlord with an Arbitration Notice, Landlord and Tenant, within ten (10) days after the date of the Arbitration Notice, shall each simultaneously submit to the other, in a sealed envelope, its good faith estimate of the Market Rate for the Premises for the first lease year of the applicable Renewal Term (together referred to as the "Estimates") and shall each select an appraiser (each, an "appraiser") to determine which of the two Estimates most closely reflects the Market Rate for the first lease year of the applicable Renewal Term.  Each appraiser so selected shall be a member of the Appraisal Institute and have not less than ten (10) years' experience in the field of commercial real estate appraisal and/or brokerage and shall be experienced in the geographical jurisdiction of the Premises subject to such Arbitration Notice.  If either Landlord or Tenant fails to appoint an appraiser within the ten (10) day period referred to above, the appraiser appointed by the other party shall be the sole appraiser for the purposes hereof, and such appraiser shall in good faith select which of the two Estimates most closely reflects the Market Rate, and the Estimate so chosen shall be deemed to be the Market Rate for the first lease year of the applicable Renewal Term.

Upon selection of the two appraisers, Landlord's and Tenant's appraisers shall work together in good faith to agree, on or before thirty (30) days after the expiration of the ten-day appointment period, upon which of the two Estimates most closely reflects the Market Rate.  If such two appraisers are able to agree on or before the expiration of such thirty-day discussion period, then the Estimate so chosen by such appraisers shall be deemed to be the Market Rate for the first lease year of the applicable Renewal Term.  If the two appraisers cannot agree upon which of the two Estimates most closely reflects the Market Rate prior to the expiration of such thirty-day discussion period, then, within ten (10) days after the expiration of such thirty-day discussion period, the two appraisers shall select a third appraiser meeting the aforementioned criteria, the cost of which third appraiser shall be borne equally by Landlord and Tenant.  Once the third appraiser has been selected as provided for above, then, as soon thereafter as practicable but in any case within fifteen (15) days after such selection, the third arbitrator shall make its independent determination of which of the two Estimates most closely reflects the Market Rate for the Premises, or the arbitrator may determine a Market Rate which is not equal to either Estimate, provided, however, that the arbitrator's Market Rate may not be higher than the higher of the Estimates nor lower than the lower of the Estimates.  The determination by such third appraiser shall be deemed to be the Market Rate for the first lease year of the applicable Renewal Term.

E.      If Tenant is entitled to and validly exercises its Renewal Option in accordance with the terms and conditions of this Section 37, then upon completion of the process of determination of Market Rent set forth in Sections 37.B and 37.C, Landlord and Tenant shall execute an amendment (the "**Renewal Amendment**") to reflect changes in the Base Rent, the Term, the Expiration Date and other appropriate terms; provided that an otherwise

59

valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed.  During any validly exercised Renewal Term, references to the Term in this Lease shall mean and refer to the Term as extended by the Renewal Term.

38.    **AUTHORITY TO ENTER INTO LEASE**.

Each of Tenant and Landlord represents and warrants (a) that the individual executing this Lease on its behalf is duly authorized to execute and deliver this Lease on behalf of the corporation, limited liability company or partnership, as the case may be, and (b) that this Lease is binding on the corporation, limited liability company and the partnership in accordance with its terms.

39.    **PARTIES BOUND**.

The preparation and submission of a draft of this Lease by either party to the other party shall not constitute an offer, nor shall either party be bound to any terms of this Lease or the entirety of this Lease, until both parties have fully executed a final document.  Until such time as described in the previous sentence, either party is free to terminate negotiations without penalty or any further obligation to the other party.

40.    **COUNTERPARTS; ELECTRONIC SIGNATURES**.

This Lease may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each of the parties and delivered to the other party.  Signatures to this Lease, any amendment hereof and any notice given hereunder, delivered electronically via .pdf, .jpeg, .TIF, .TIFF or similar electronic format shall be deemed an original signature and fully effective as such for all purposes.  Each party agrees to deliver promptly an executed original of this Lease (and any amendment hereto) with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Lease (or any amendment hereto), it being expressly agreed that each party to this Lease shall be bound by its own electronically transmitted signature and shall accept the electronically transmitted signature of the other party to this Lease.

41.    **SEVERABILITY**.

If any term or other provision of this Lease is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all of the other conditions and provisions of this Lease will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Lease so as to reflect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

42.    **WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES**.

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING,

CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.  IN ADDITION, LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THE TERMS OF THIS AGREEMENT, OTHER THAN WITH RESPECT TO A BREACH BY TENANT OF THE PROVISIONS OF <u>SECTION 29</u> HEREIN.

43. **<u>MEMORANDUM OF LEASE</u>**.

This Lease shall not be recorded, either independently or as an exhibit, schedule, annex, or addendum to any other document.  However, at Tenant's or Landlord's election, a Memorandum of Lease in the form annexed hereto as **Exhibit "E,"** shall be executed, acknowledged and delivered for recording in the county in which the Premises are located by both parties with the costs of recording the Memorandum of Lease to be borne by Tenant.  Tenant shall execute, acknowledge and deliver to Landlord a release of the Memorandum of Lease in recordable form within five (5) days following the expiration or earlier termination of this Lease in accordance with its terms.  If Tenant fails to so execute, acknowledge and deliver the release within such five (5) day period, Landlord shall hereby be deemed to be Tenant's attorney-in-fact for the sole purpose of executing and recording the release on behalf of Tenant.  Tenant shall pay any and all recording and other costs, fees and taxes in connection with the execution and recordation of the Memorandum of Lease.

44. **<u>BROKERS</u>**.

Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease.  Tenant covenants and agrees to pay, hold harmless and indemnify Landlord and Landlord Mortgagee for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease, based on Tenant's actions.  Landlord warrants that it has had no dealings with any other broker or agent in connection with this Lease.  Landlord covenants and agrees to pay, hold harmless and indemnify Tenant for any compensation, commissions and charges claimed by any broker or agent with respect to this Lease, based on Landlord's actions.

45. **<u>RIGHT OF FIRST REFUSAL TO PURCHASE</u>**.

Provided that no Event of Default has occurred under this Lease, commencing and effective from and after the date that is five (5) years after the Effective Date, Tenant shall have a right of first refusal ("<u>Right of First Refusal</u>") to purchase the Property from Landlord pursuant to the terms of this <u>Section 45</u>.  The Right of First Refusal is subject to the following terms and conditions:

    A.    If Landlord receives a bona fide written offer from a third party to purchase the Property (the "<u>Offer Property</u>"), and Landlord desires to accept such

offer, Landlord shall give Tenant written notice thereof, including the stated purchase price and other material economic terms (if any), which notice may include the applicable letter of intent, purchase and sale agreement or a similar document reflecting the material terms of such offer from such third party ("Landlord's Notice").

F.      Tenant may then deliver to Landlord written notice of its election ("Tenant's Purchase Election") to purchase the Offer Property on the terms described in Landlord's Notice on or before the date that is fifteen (15) business days after delivery by Landlord to Tenant of Landlord's Notice (the "Exercise Period").

G.      Upon Landlord's receipt of Tenant's Purchase Election, the parties shall negotiate reasonably and in good faith for a period of fifteen (15) days (the "Negotiation Period") in order to finalize and execute a mutually acceptable purchase and sale agreement setting forth such terms (the "Contract"), it being agreed that, if Landlord's Notice included a purchase and sale agreement negotiated by Landlord with the applicable third party, then Tenant shall be required to accept such purchase and sale agreement (with solely ministerial changes to reflect Tenant (or its designee) as purchaser) as the Contract.  In the event a Contract is not executed by the parties prior to the expiration of the Negotiation Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Offer Property under the terms of Landlord's Notice and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Offer Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 45.E, and consummate the sale of the Offer Property pursuant thereto.

H.      If Tenant does not deliver a Tenant's Purchase Election prior to the expiration of the Exercise Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Offer Property under the terms of Landlord's Notice as to the Offer Property, and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Offer Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 45.E, and consummate the sale of the Offer Property pursuant thereto.

I.      In the event that Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Offer Property pursuant to this Section 45, Landlord shall have the right to sell the Offer Property and Tenant shall not have a further Right of First Refusal only as to the Offer Property unless (i) there shall be a material decrease in the purchase price from the purchase price provided in the initial Landlord's Notice or (ii) the other material economic terms of such sale (taken as a whole) are materially more favorable to the third-party purchaser as compared to those set forth in the initial Landlord's Notice.  For the purposes of this Section 45.E, a "material decrease" shall mean a decrease of ten percent (10%) or more of

the purchase price for the Offer Property in the Landlord's Notice. Notwithstanding the foregoing, Landlord shall re-institute the procedure set forth in this <u>Article 45</u> if Landlord fails to (x) execute and deliver a bona fide contract with a third party for the proposed sale within one hundred eighty (180) days after Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Offer Property or (y) consummate the proposed sale pursuant to such contract.

J.     Tenant's Right of First Refusal pursuant to this <u>Article 45</u> shall be a one-time right as to the Offer Property, and, accordingly, if Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Offer Property pursuant to this <u>Article 45</u> and the sale of the Property by Landlord is subsequently consummated pursuant to this <u>Article 45</u>, then, thereafter, the terms and conditions of this <u>Article 45</u> shall automatically be of no further force or effect.

K.     **<u>Notwithstanding anything herein to the contrary, Tenant's right to purchase the Property or any portion thereof pursuant to this Article 45 is and shall be subject and subordinate to any Landlord Mortgage and shall not be applicable to any foreclosure sale, transfer by deed-in-lieu of foreclosure or similar transfer of the Property or to any subsequent transfer or sale of the Property by any Landlord Mortgagee or its nominee, in each case, whether such transfer or sale affects the Property or the ownership interests in Landlord.</u>**

46.    **<u>GUARANTY</u>**.

Simultaneously with the execution of this Lease, Tenant shall deliver to Landlord a fully executed copy of the Unconditional Guaranty of Payment and Performance attached hereto as **Exhibit "F"** (the "<u>Guaranty</u>") signed by the Guarantor named in Section 2 hereof.

47.    **<u>REIT PROTECTION</u>**.

The parties hereto intend that Rent and other amounts paid by Tenant hereunder will qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto and this Lease shall be interpreted consistent with this intent.

A.     Anything contained in this Lease to the contrary notwithstanding, Tenant shall not, without Landlord's advance written consent (which consent shall not be unreasonably withheld) (i) sublet, assign or enter into a management arrangement for the Premises to any Person (other than a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code) of OSREC) in which Landlord or OSREC owns an interest, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Code); or (ii) sublet, assign or enter into a management arrangement for the Premises in any other manner if Tenant reasonably expects (acting in good faith) that such action could cause any portion of the amounts received by

Landlord pursuant to this Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto, or which could cause any other income of Landlord to fail to qualify as income described in Section 856(c)(2) of the Code.  The requirements of this <u>Section 47.A</u> shall likewise apply to any further subleasing by any subtenant.

B.    Anything contained in this Lease to the contrary notwithstanding, the parties acknowledge and agree that Landlord, in its sole discretion, may assign this Lease or any interest herein to another Person (including without limitation, a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)) in order to maintain Landlord's status as a "real estate investment trust" (within the meaning of Section 856(a) of the Code); provided, however, Landlord shall be required to (i) comply with any applicable legal requirements related to such transfer and (ii) give Tenant notice of any such assignment; and provided, further, that any such assignment shall be subject to all of the rights of Tenant hereunder.

C.    Anything contained in this Lease to the contrary notwithstanding, upon request of Landlord, Tenant shall cooperate with Landlord in good faith and at no cost or expense to Tenant, and provide such documentation and/or information as may be in Tenant's possession or under Tenant's control and otherwise readily available to Tenant as shall be reasonably requested by Landlord in connection with verification of OSREC's "real estate investment trust" (within the meaning of Section 856(a) of the Code) compliance requirements.   Anything contained in this Lease to the contrary notwithstanding, Tenant shall take such reasonable action as may be requested by Landlord from time to time in order to ensure compliance with the Internal Revenue Service requirement that Rent allocable for purposes of Section 856 of the Code to personal property, if any, at the beginning and end of a calendar year does not exceed fifteen percent (15%) of the total Rent due hereunder as long as such compliance does not (i) increase Tenant's monetary obligations under this Lease or (ii) materially and adversely increase Tenant's nonmonetary obligations under this Lease or (iii) diminish Tenant's rights under this Lease (except to a de minimis extent).

D.    Tenant acknowledges that Landlord's direct or indirect parent intends to qualify as a "real estate investment trust" (within the meaning of Section 856(a) of the Code) (a "<u>REIT</u>").   Tenant agrees that it will not knowingly or intentionally take or omit to take any action, or permit any status or condition to exist at the Premises, which Tenant actually knows (acting in good faith) would or could result in the Rent payable under this Lease not qualifying as "rents from real property" within the meaning of Section 856(d) of the Code.  Tenant shall have no responsibility under this <u>Section 47</u> for any REIT-related aspects of any action (i) approved of in writing by Landlord or (ii) required under this Agreement or by applicable Law.

64

48.     **LOCAL LAW PROVISIONS**.

A.      <u>Radon Gas</u>.    The following notification is provided under Section 404.056(5), Florida Statutes:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

B.      <u>Lien Prohibition</u>.  The interest of Landlord in the Premises shall not be subject in any way to any liens, including construction liens, for alterations or improvements made by or on behalf of Tenant. This exculpation is made with express reference to Section 713.10, Florida Statutes. Nothing contained in this Lease shall be deemed or construed in any way as constituting Landlord's consent, express or implied, for any contractor or subcontractor to perform any labor or furnish any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof. Furthermore, nothing contained in this Lease shall give Tenant any right, power, or authority to contract for, or permit the rendering of, any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises. Tenant represents to Landlord that any improvements that might be made by Tenant to the Premises are not required to be made under the terms of this Lease and that any improvements that may be made by Tenant do not constitute the "pith of the lease" under applicable Florida case law. Tenant shall provide notice of the restriction set forth herein in advance to any and all contractors, subcontractors, or other entities that may furnish any such material, service or labor to the Premises on Tenant's behalf.

**[Signatures on following page]**

**IN WITNESS WHEREOF,** the undersigned have executed this Lease Agreement effective as of the date first written above.

LANDLORD:

**BIG VEFL Owner LLC**, a Delaware limited liability company

By: _____

Name:  Michael Reiter

Title:  Authorized Representative

STATE OF ___IL_____ )
COUNTY OF ___Cook_____ )

    I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Michael Reiter, whose name as Authorized Representative of **BIG VEFL Owner LLC**, a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Authorized Representative and with full authority, executed the same voluntarily for and as the act of said limited liability company, acting in its capacity as Authorized Representative of said limited liability company as aforesaid.

Given under my hand and official seal, this __23__ day of August, 2023.

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 2024

_____
Notary Public

AFFIX SEAL

My commission expires: _____

(Vero Beach, FL)

TENANT:

**BLBO Tenant, LLC**, an Ohio limited liability company

By:_____

      Jonathan Ramsden, Executive Vice President
      and Chief Financial and Administrative Officer

STATE OF OHIO              )
COUNTY OF FRANKLIN      )

      I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Jonathan Ramsden , whose name as Executive Vice President and Chief Financial and Administrative Officer of **BLBO Tenant, LLC**, an Ohio limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Executive Vice President and Chief Financial and Administrative Officer  and with full authority, executed the same voluntarily for and as the act of said limited liability company, acting in its capacity as Executive Vice President and Chief Financial and Administrative Officer  of said limited liability company as aforesaid.

Given under my hand and official seal, this 22nd  day of August, 2023.

PAULA JONES
Notary Public, State of Ohio
My Commission Expires
January 22, 2024

AFFIX SEAL

_____
Notary Public

My commission expires: _1 - 22 - 2024_____

(Vero Beach, FL)

**EXHIBIT "A"**
**TO**
**LEASE AGREEMENT**

**BASE RENT SCHEDULE**[1]

**6420 20th St., Vero Beach, FL**

| Lease Year | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| **Initial Term** | | |
| 1 | $308,776.53 | $25,731.38 |
| 2 | $314,952.06 | $26,246.00 |
| 3 | $321,251.10 | $26,770.93 |
| 4 | $327,676.12 | $27,306.34 |
| 5 | $334,229.64 | $27,852.47 |
| 6 | $340,914.24 | $28,409.52 |
| 7 | $347,732.52 | $28,977.71 |
| 8 | $354,687.17 | $29,557.26 |
| 9 | $361,780.92 | $30,148.41 |
| 10 | $369,016.53 | $30,751.38 |
| 11 | $376,396.87 | $31,366.41 |
| 12 | $383,924.80 | $31,993.73 |
| 13 | $391,603.30 | $32,633.61 |
| 14 | $399,435.36 | $33,286.28 |
| 15 | $407,424.07 | $33,952.01 |
| 16 | $415,572.55 | $34,631.05 |
| 17 | $423,884.00 | $35,323.67 |
| 18 | $432,361.68 | $36,030.14 |
| 19 | $441,008.92 | $36,750.74 |
| 20 | $449,829.10 | $37,485.76 |

---

[1]    Note:  This is a base rent schedule that does not include reimbursements required under the Lease, including, without limitation, state sales tax and county surtax on rent.

**EXHIBIT "B-1"**
**TO**
**LEASE AGREEMENT**

**PREMISES**

Address: 6420 20th St., Vero Beach, FL 32966

Square Footage of Buildings: 32,595 SF

Legal Description:

Parcel I:

Indian River Mall Fee Parcel situated in the Northwest 1/4 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida and being more particularly described as follows:

Lots 13, 14 and 15, INDIAN RIVER MALL - THE WEST PERIPHERAL SUBDIVISION as recorded in Plat Book 14, Pages 61, 61 A and 61 B, of the Public Records of Indian River County, Florida, said parcels being further described as beginning at the Southwest corner of said Lot 13, thence run the following courses:

Run North a distance of 489.40 feet to a point; thence run North 45°00'00" East, a distance of 40.90 feet to a point; thence run East, a distance of 309.60 feet to a point; thence run South 00°30'13" West, a distance of 517.60 feet to the Southeast corner of Lot 15, thence run South 89°52'25" West, a distance of 333.97 feet to the said Southwest corner of Lot 13 and the Point of Beginning.

ALSO DESCRIBED AS: Situated in the North 1/2 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida and more particularly described as follows:

Commencing at a point of intersect of the North right-of-way line of State Road 60 Highway, with the West line of Wallace Acres Subdivision, as recorded in Plat Book 7, Page 12, Public Records of Indian River County, Florida; thence South 89°52'37" West along said North right-of-way, a distance of 175.00 feet to the principal point and place of beginning of the following description:

Continuing along said North right-of-way South 89°52'25" West, a distance of 333.97 feet to a point; departing said North right-of-way line, thence North, a distance of 489.40 feet to a point; thence North 45°00'00" East, a distance of 40.90 feet to a point; thence East, a distance of 309.60 feet to a point; thence South 00°30'13" West, a distance of 517.60 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PARCEL:

A fee parcel situated in part of Lots 13, 14 and 15, INDIAN RIVER MALL - THE WEST PERIPHERAL as recorded in Plat Book 14, Page 61, 61A and 61 B, the Public Records of Indian River County, Florida, said parcels being more particularly described as follows:

Commencing at the Southwest corner of said Lot 13, thence run North 89°52'25" East along the South boundary line of said Lot 13 also being the North right-of-way line of State Road 60 Highway, a distance of 37.61 feet to the principal point and place of beginning of the following description: thence run North and parallel to the West boundary of said Lot 13, a distance of 227.85 feet; thence run East, a distance of 114.00 feet; thence run South, a distance of 227.60 feet to the aforementioned South boundary line of Lot 13 and North right-of-way line of State Road 60 Highway; thence run South 89°52'25" West along said South boundary line of Lot 13, a distance of 114.00 feet to the Point of Beginning.

Parcel II:

Together with that certain Stormwater Drainage Easement recorded in Official Records Book 1085, Page 2364, as amended by Amendment recorded in Official Records Book 1375, Page 654; and together with that certain Access Easement recorded in Official Records Book 1085, Page 2359.

**EXHIBIT "B-2"**
**TO**
**LEASE AGREEMENT**

| Property Address | Permitted Use | Annual Year 1 Base Rent | Commencement Date Payment |
|---|---|---|---|
| 6420 20th St., Vero Beach, FL 32966 | Retail | $308,776.53 | $77,194.13 |

**EXHIBIT "C"**
**TO**
**LEASE AGREEMENT**

**GENERAL REQUIREMENTS AND CONDITIONS**

All provisions of this Exhibit are expressly subject to the provisions in the Lease above governing any work performed by Tenant (or an Affiliate of Tenant, as the case may be) on its own behalf, including Alterations or any casualty or condemnation restoration ("Tenant's Work"). In the event of any conflict between the Lease and this Exhibit, the Lease shall control.

Tenant's Work will be performed by Tenant in substantial accordance with final Plans approved by Landlord (where such approval is provided for in the Lease). Tenant's General Contractor(s) shall secure and pay for all necessary permits, inspections, certificates, legal approvals, certificates of occupancy and/or fees required by Law and/or utility companies with respect to Tenant's Work.

A.    General Requirements

1.    All Tenant's Work shall be completed in a good and workmanlike manner and in accordance with the Plans as approved by Landlord, the terms of the General Construction Contract and the budget applicable to such Tenant's Work.

2.    Tenant and Tenant's General Contractor shall provide all insurance required by Landlord as set forth in this Lease, or as is otherwise maintained in the ordinary course by prudent and reputable contractors and/or property owners, prior to the start of any construction work within the Premises. Landlord and Landlord Mortgagee shall each be named as an additional insured in all such insurance.

3.    Tenant shall, at all times, keep or cause to be kept the Premises and the surrounding area free from accumulations of waste materials and/or rubbish caused by it or its contractors' employees or workers. Tenant and/or its contractors shall provide dumpsters and maintenance of said dumpsters during the construction period in a secure, neat and orderly condition and shall remove and empty the same on a regular basis to avoid unsightly, obstructive or hazardous accumulations or conditions.

B.    Construction Procedures

1.    When submitting construction Plans and specifications (preliminary, completed or final), Tenant or Tenant's appointed representative shall issue Tenant's Plans, specifications and supporting documents electronically via emails to Landlord's construction coordinator.

2.    Once the applicable Plans are approved by Landlord, except for (A) changes required by governmental authorities having jurisdiction over the Premises or (B) interior changes requested by Tenant, and in each case which would not lessen the value of the Premises, Tenant shall not amend, modify or supplement the applicable General Construction Contract in any respect, except pursuant to change

orders approved by Landlord, and shall not attempt to terminate, whether by legal proceedings or otherwise, the applicable General Construction Contract without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed.

3.    Not later than ninety (90) days after the Final Completion of the applicable Tenant's Work, Tenant shall deliver or cause to be delivered to Landlord (with a copy to Landlord's consultant) each of the following (1) a certificate addressed to Landlord, signed by a duly authorized officer of Tenant and the applicable Architect or General Contractor (but only if such General Contractor is a design-builder for the applicable Tenant's Work), stating that the Tenant's Work (and any equipment therein) including all "punch list" items have been completed and installed in accordance with the applicable Plans therefor; (2) a complete release of liens for the Premises signed by the General Contractor and all subcontractors of the Tenant's Work and Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises; (3) evidence of receipt of a certificate of occupancy, if available, or comparable instruments, by all governmental authorities whose approval is required of the applicable completed Tenant's Work for the occupancy thereof and the intended uses thereof; (4) if applicable, a volume containing all warranties and indemnities from the applicable General Contractor or manufacturer for the applicable Tenant's Work or equipment therein (excepting therefrom any of Tenant's Personal Property), each of which shall be enforceable by Landlord and all in customary form for the jurisdiction in which the Premises is situated; (5) final as-built Plans and, in the event that the Tenant's Work has modified the footprint of the Building, an as-built ALTA-ACSM Land Title Survey for the Premises indicating the applicable Tenant's Work thereon, together with a surveyor's certification in a customary form as reasonably satisfactory to Landlord; and (6) a title commitment dated no earlier than the date that is thirty (30) days after Final Completion and which title commitment shall not disclose any mechanics' liens affecting the Property, except that with respect to any bona fide dispute with the applicable General Contractor or any such subcontractor that has resulted in a lien, Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises.

4.    Tenant hereby agrees to indemnify, save harmless, pay, protect and defend Landlord from and against any and all liabilities, losses, damages, penalties, costs, expenses (including Landlord's reasonable counsel fees and costs of suit), causes of action, suits, claims, demands or judgments of any nature whatsoever under this Lease or Landlord's ownership of the Premises arising from or in connection with (a) any General Construction Contract, if any, and any and all construction contracts or architect's agreement or resulting from the failure of Tenant to discharge Tenant's obligations thereunder or resulting from the failure of Tenant to perform its obligations under this Lease with respect to any instance of Tenant's Work, and (b) construction and completion of Tenant's Work, whether by reason of any act or omission of Tenant, the General Contractor, Architect or by any other

contractor, subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable.

5.   Tenant's Work shall comply in all respects with applicable Law.

**EXHIBIT "D"**
**TO**
**LEASE AGREEMENT**

**FORM ESTOPPEL CERTIFICATE**
**ESTOPPEL CERTIFICATE**

This ESTOPPEL CERTIFICATE (this "Estoppel") is made as of _____, by [_____ _____], a [_____] ("Tenant"), based upon the following facts and understandings of Tenant:

**RECITALS**

A.     Tenant is the tenant under that certain Lease Agreement (the "Lease"), dated as of _____, 2023, between Tenant and [_____], a [_____], as landlord ("Landlord") of certain real property commonly known as _____, and as more particularly described in the Lease (the "Property").

B.     Big Lots, Inc., an Ohio corporation ("Guarantor") is the guarantor under that certain Unconditional Guaranty of Payment and Performance, dated as of _____, 2023, by Guarantor in favor of Landlord (the "Guaranty", and together with the Lease, collectively, the "Agreements").

C.     Landlord has requested that Tenant provide this Estoppel pursuant to Section 26 of the Lease and Section XX of the Guaranty.

D.     [IF APPLICABLE] Landlord has agreed to convey the Property to _____, a _____ ("Purchaser").  As a condition to Purchaser purchasing the Property, Purchaser has required that Tenant furnish certain assurances to, and make certain agreements with, Purchaser, as set forth below.

E.     [IF APPLICABLE] [Landlord] [Purchaser], as borrower or as co-borrower with one or more other co-borrower(s), has applied to _____, a _____ (together with its successors and assigns, "Lender") for a loan ("Loan"), which will be secured by, among other things, a mortgage, encumbering the Property.  As a condition to making the Loan, Lender has required that Tenant furnish certain assurances to, and make certain agreements with, Lender, as set forth below.

F.     Capitalized terms used but not otherwise defined herein shall have the definitions given such terms pursuant to the terms of the Lease.

THEREFORE, [as a material inducement to Lender to make the Loan and Purchaser to purchase the Property], Tenant warrants and represents to, and agrees with, Landlord [Lender] and [Purchaser] as follows:

1.    **ESTOPPEL**.

Tenant and Guarantor each warrants and represents to Landlord [Lender] and [Purchaser], as of the date hereof, that:

1.1    Agreements Effective.  Attached hereto as Exhibit A-1 is a true, complete and accurate copy of the Lease.  Attached hereto as Exhibit A-2 is a true, complete and accurate copy of the Guaranty.  The Agreements have been duly executed and delivered by Tenant and are in full force and effect, the obligations of Tenant thereunder are valid and binding, and there have been no modifications or additions to the Agreements, written or oral, other than those, if any, which are attached on Exhibit A-1 and Exhibit A-2 attached hereto and made a part hereof.  There are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Property, and Tenant has not given Landlord any notice of termination under the Lease.

1.2    Possession.  Except as set forth in Exhibit B attached hereto and made a part hereof, Tenant is in full and complete possession of the Property and has accepted the Property, including any tenant improvements or other work of Landlord performed thereon pursuant to the terms and provisions of the Lease, and the Property is in compliance with the Lease.  There are no contributions, credits, free rent, rent abatements, deductions, concessions, rebates, unpaid or unreimbursed construction allowances, offsets or other sums due to Tenant from Landlord under the Lease, except _____.

1.3    Minimum Rent.  The current *monthly* Base Rent under the Lease is $_____, subject to any escalation and/or additional Rent charges provided in the Lease, and such Base Rent is current as of the date hereof.

1.4    Additional Rent.  The current *monthly* additional Rent under the Lease is $_____, and such additional Rent is current within thirty (30) days as of the date hereof.

1.5    Rental Payment Commencement Date.  The Base Rent stated in Section 1.3 above began on _____, 2023.

1.6    Rentable Area.  The rentable area of the Building located upon the Premises is _____ square feet.

1.7    Commencement Date.  The Term of the Lease commenced on _____, 2023.

1.8    Expiration Date.  The Term of the Lease will expire on _____ (unless sooner terminated or extended in accordance with the Lease).

1.9    Options to Renew or Extend.  Tenant has no option to renew or extend the Term of the Lease, except as follows: _____ (if none, write "None").

1.10    <u>No Default</u>.  There exists no breach, default, or event or condition which, with the giving of notice or the passage of time or both, would constitute a breach or default under the Agreements by Tenant or, to Tenant's knowledge, Landlord, except as follows: _____(if none, write "None").  Tenant has no existing claims, defenses or offsets against Rent due or to become due under the Lease, except as follows: _____(if none, write "None").

1.11    <u>Entire Agreement</u>.  The Agreements constitute the entire agreement between Landlord and Tenant with respect to the Property, and Tenant claims no rights of any kind whatsoever with respect to the Property, other than as set forth in the Lease, except as follows: _____(if none, write "None").

1.12    <u>No Deposits or Prepaid Rent</u>.  No deposits, including security deposits, or prepayments of Rent have been made in connection with the Lease, except: _____ (if none, write "None").  None of the Rent has been paid more than one (1) month in advance.

1.13    <u>No Purchase Option or Preferential Right to Purchase</u>.  Tenant does not have any option or preferential right to purchase all or any part of the Property other than pursuant to Section 45 of the Lease.

1.14    <u>Authority</u>.  The undersigned representatives of Tenant are each duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

1.15    <u>Financial Condition; Bankruptcy</u>.  There are no voluntary or involuntary actions pending against Tenant under the bankruptcy laws of the United States or any state thereof.

2.      **<u>HEIRS, SUCCESSORS AND ASSIGNS</u>**.  The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto.  Whenever necessary or appropriate to give logical meaning to a provision of this Estoppel, the term "Landlord" shall be deemed to mean the then current owner of the Property and the landlord's interest in the Lease.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, Tenant has executed this instrument as of the date first listed above.

**TENANT:**

[_____],
a [_____]

By: _____
Name: _____
Title: _____


STATE OF _____    )
COUNTY OF _____    )

     I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of [_____],a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said limited liability company, acting in its capacity as _____ of said limited liability company as aforesaid.

Given under my hand and official seal, this _____ day of _____, 2023.


_____
Notary Public

AFFIX SEAL

My commission expires: _____

**GUARANTOR:**

[_____],
a [_____]

By: _____
Name: _____
Title: _____


STATE OF _____    )
COUNTY OF _____    )

       I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of [_____],a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said limited liability company, acting in its capacity as _____ of said limited liability company as aforesaid.

Given under my hand and official seal, this _____ day of _____, 2023.


_____
Notary Public

AFFIX SEAL

My commission expires: _____

**Exhibit A-1**

**LEASE AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit A-2**

**GUARANTY AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit B**

**SUBLEASES (IF ANY)**

**[Attached]**

**EXHIBIT "E"**
**TO**
**LEASE AGREEMENT**

**FORM OF MEMORANDUM OF LEASE**

PREPARED BY AND, UPON RECORDATION,
RETURN TO:

_____

_____

_____

[INSERT NAME OF NATURAL PERSON]

TAX PARCEL INDENTIFICATION
NUMBER:  [_____]

**MEMORANDUM OF LEASE AGREEMENT**

THIS MEMORANDUM OF LEASE AGREEMENT (this "Memorandum") is made as of this _____ day of _____, 20__, by and between [_____], a [_____] ("Landlord"), having and address of [_____], and [_____], a [_____] ("Tenant"), having an address of [_____].

1.      Memorandum of Lease of Premises.  This Memorandum is recorded in connection with, and as evidence of, that certain Lease Agreement (the "Lease") dated as of _____ _____, 2023, as may be amended from time to time, by and between Landlord and Tenant for that certain real property and the improvements thereon described on Exhibit A attached hereto and made a part hereof (the "Premises").  The Lease is incorporated by reference into this Memorandum.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Lease.

2.      Intentionally Omitted.

3.      Lease Term and Certain Other Provisions.  The initial Term of the Lease commenced on _____, 20__ and expires on _____, 20__. Tenant has [_____] options to extend the initial Term of the Lease pursuant to the applicable provisions thereof for an additional term of [ ] years each.

4.      Subordination.  The Lease shall be subordinate at all times to any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage, or conveyance or assignment in lieu of foreclosure

or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of the Lease so long as no Event of Default exists thereunder.

     5     <u>Intentionally Omitted</u>.

     6.     <u>Right of First Refusal</u>.  Provided that no Event of Default has occurred under this Lease, commencing and effective from and after the date that is five (5) years after the date hereof, Tenant has a right of first refusal to purchase the Premises or portions thereof from Landlord pursuant to the terms and conditions of <u>Section 45</u> of the Lease.

     7.     <u>Purpose of Memorandum; Conflicting Provisions</u>.    The purpose of this Memorandum is to make the Lease a matter of public record.  If a provision of this Memorandum conflicts with a provision in the Lease, the provision in the Lease will control.

     8.     <u>Lien Prohibition</u>.  The Lease contains the following provision:  "The interest of Landlord in the Premises shall not be subject in any way to any liens, including construction liens, for alterations or improvements made by or on behalf of Tenant. This exculpation is made with express reference to Section 713.10, Florida Statutes. Nothing contained in this Lease shall be deemed or construed in any way as constituting Landlord's consent, express or implied, for any contractor or subcontractor to perform any labor or furnish any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof. Furthermore, nothing contained in this Lease shall give Tenant any right, power, or authority to contract for, or permit the rendering of, any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises. Tenant represents to Landlord that any improvements that might be made by Tenant to the Premises are not required to be made under the terms of this Lease and that any improvements that may be made by Tenant do not constitute the "pith of the lease" under applicable Florida case law. Tenant shall provide notice of the restriction set forth herein in advance to any and all contractors, subcontractors, or other entities that may furnish any such material, service or labor to the Premises on Tenant's behalf."

     9.     <u>Counterparts</u>.  This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which, taken together, shall constitute one and the same instrument.  The signature of a party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof

**[Signature Pages Follow]**

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Memorandum of Lease Agreement as of the day and year first above written.

LANDLORD:

_____,
a _____

By: _____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

      The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this _____ day of _____, 202__, by _____, as _____ of _____, a _____, on behalf of the _____. He/She is personally known to me or has produced _____ as identification.


_____
Notary Public, State of _____
Print Name:_____
Commission No.:_____
My Commission Expires:_____

TENANT:

[_____], a(n) [_____]
[_____]

By:_____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

      The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this _____ day of _____, 202__, by _____, as _____ of _____, a _____, on behalf of the _____. He/She is personally known to me or has produced _____ as identification.


_____
Notary Public, State of _____
Print Name:_____
Commission No.:_____
My Commission Expires:_____

**EXHIBIT "A"**
**Legal Description of Premises**

**EXHIBIT "F"**
**TO**
**LEASE AGREEMENT**

**FORM OF GUARANTY**

**UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE**

      **THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of August 25, 2023, by **BIG LOTS, INC.**, an Ohio corporation ("Guarantor"), to **BIG VEFL Owner LLC**, a Delaware limited liability company ("Landlord").

**R E C I T A L S**

      A.     Landlord has been requested by **BLBO Tenant, LLC**, an Ohio limited liability company ("Tenant"), to enter into that certain Lease Agreement, dated as of the date hereof (the "Lease"), for the Premises (as defined in the Lease).

      B.     Tenant is a direct or indirect subsidiary of Guarantor and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

      C.     Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

      D.     Guarantor hereby acknowledges receipt of a copy of the Lease.

      **NOW, THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

      1.     **DEFINITIONS**.  Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

      2.     **COVENANTS OF GUARANTOR**.

      A.     Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent, additional Rent and all other sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise, including out of pocket costs and expenses of collection (collectively, the "Monetary Obligations"), and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii) are collectively referred to herein as the "Obligations").  If Tenant defaults under the Lease (subject to any applicable grace periods set forth in the Lease), Guarantor will promptly pay and perform all of the Obligations and pay to Landlord, when and as due, all Monetary Obligations

payable by Tenant then due under the Lease, together with all damages and out of pocket costs and expenses to which Landlord is entitled pursuant to any or all of the Lease and this Guaranty.

B.    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "Action") commenced by Landlord against Guarantor to collect Base Rent, additional Rent and any other sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Lease Term in any subsequent Action, (ii) Landlord may, at its option, without prior notice or demand, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations, (iii) Landlord may seek and obtain recovery against Guarantor in an Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Tenant or in any independent Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease, (iv) Landlord may (but shall not be required to) exercise its rights against each of Guarantor and Tenant concurrently, and (v) Guarantor will be conclusively bound by a final non-appealable judgment by a court of competent jurisdiction in any Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) in favor of Landlord against Tenant, as if Guarantor were a party to such Action, irrespective of whether or not Guarantor is entered as a party or participates in such Action.

C.    Guarantor agrees that, in the event of the rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy, pursuant to bankruptcy law or any other law affecting creditors' rights, Guarantor will, if Landlord so requests, assume all obligations and liabilities of Tenant under the Lease, to the same extent as if Guarantor was a party to such document and there had been no such rejection or disaffirmance, and Guarantor will confirm such assumption, in writing, at the request of Landlord upon or after such rejection or disaffirmance. Guarantor, upon such assumption, shall have all rights of Tenant under the Lease to the fullest extent permitted by law.

3.    **GUARANTOR'S OBLIGATIONS UNCONDITIONAL**.

A.    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

B.    This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

C.    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant; (iv) any extension of time that may be granted by Landlord to Tenant; (v) any assignment or transfer of all or any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Premises or any portion thereof; (vii) any changed or different use of the Premises (or any portion thereof); (viii) any other dealings or matters occurring between Landlord and Tenant; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from Tenant or any other persons or entities; (x) the release by Landlord of any other guarantor; (xi) Landlord's release of any security provided under the Lease; (xii) Landlord's failure to perfect any Landlord's lien or other lien or security interest available under any applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, rulings, and decrees of all local, municipal, state and federal governments, departments, agencies, commissions, boards or political subdivisions ("Laws"); (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease, or Tenant's assignment of any or all of its rights and interests under the Lease; (xiv) the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease; (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership, business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of either or both of this Guaranty and the Lease (including, but not limited to, any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant at any time or from time to time; or (xviii) any other cause, whether similar or dissimilar to any of the foregoing, that might constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof) other than the full release and complete discharge of all of the Obligations. Without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.

D.      Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding.  This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

4.      **WAIVERS**.

A.      Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law or equity, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Base Rent, additional Rent or any other charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving Guarantor of its obligations hereunder, and (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any other person or entity (including any additional guarantor or Guarantor) or against any collateral=.

B.      GUARANTOR AND LANDLORD HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: (A) THIS GUARANTY; (B) THE LEASE; (C) ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES OR ANY PORTION THEREOF; (D) ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE AND/OR THE PREMISES (OR ANY PORTION THEREOF); (E) ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS,

CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR (F) ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES (OR ANY PORTION THEREOF). GUARANTOR SHALL NOT IMPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY, EXCEPT TO THE EXTENT ANY SUCH COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION ARE MANDATORY PURSUANT TO APPLICABLE LAWS. GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.    IN ADDITION, EXCEPT AS OTHERWISE PROVIDED IN THE LEASE, LANDLORD AND GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THE TERMS OF THIS GUARANTY, EXCEPT AS TO ANY LIABILITY OF GUARANTOR WITH RESPECT TO SECTION 29 OF THE LEASE (WHICH SUCH RIGHT IS NOT WAIVED).

C.    Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING, WITHOUT LIMITATION, ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution, or other defense of Tenant (other than the full release and complete discharge of all of the Obligations), of any other guarantor other than the full release and complete discharge of all of the Obligations (or any other Guarantor), or of any other person or entity other than the full release and complete discharge of all of the Obligations, or by reason of the cessation of Tenant's liability from any cause whatsoever; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any termination of such relationship; (vi) any irregularity, defect or unauthorized action by any or all of Tenant, any other guarantor (or Guarantor) or surety, or any of their respective officers, directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer, in whole or in part, of the Obligations, whether made with or without notice to or

consent of Guarantor; (viii) the recovery from Tenant or any other Person (including without limitation any other guarantor) becoming barred by any statute of limitations or being otherwise prevented (ix) the benefits of any and all applicable statutes, laws, rules or regulations which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x)  any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Premises or any portion thereof; or (xi) any neglect, delay, omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor.  Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

5.     **SUBORDINATION AND SUBROGATION**.  Until the full release and complete discharge of all of the Obligations, Guarantor hereby subordinates and postpones any claim or right against Tenant by way of subrogation or otherwise to any of the rights of Landlord under the Lease or otherwise, or in the Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder.  Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

6.     **REPRESENTATIONS AND WARRANTIES OF GUARANTOR**.  Guarantor represents and warrants that:

A.     Guarantor is a company incorporated under the laws of the State of Ohio; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, without the requirement of further action or condition.

B.     The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, nor (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

C.      No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

D.      There is no action, suit or proceeding pending or, to Guarantor's knowledge, threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

E.      Guarantor's principal place of business is Columbus, Ohio.

F.      Tenant is directly or indirectly owned and controlled by Guarantor.

G.      Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

7.      **FINANCIAL STATEMENTS**.

A.      Guarantor shall deliver to Landlord the following financial information:  (a) on or before forty-five (45) days after the end of each of Guarantor's first three (3) fiscal quarters in each fiscal year during the term of the Lease, unaudited financial statements for such fiscal quarter including a balance sheet, income statement, profit and loss statement, statement of cash flows and all other related schedules, prepared in accordance with GAAP and certified to be accurate and complete by Guarantor (or the Treasurer or other appropriate officer of Guarantor), and (b) on or before one hundred twenty (120) days after the end of each of Guarantor's fiscal years during the term of the Lease, audited financial statements for such fiscal year including, without limitation, a balance sheet (together with all notes thereto), income statement, profit and loss statement, statement of annual cash flows, all in reasonable detail, prepared in accordance with GAAP and audited by any "Big Four" accounting firm.  Notwithstanding the foregoing, so long as all such financial statements of Guarantor and other information required by this Section 7.A is publicly available via EDGAR or Guarantor's website, Guarantor's obligations to deliver financial reports pursuant to this Section 7.A shall be deemed to be satisfied.

B.      Guarantor shall also deliver or cause to be delivered to Landlord the reporting required under Section 30.B of the Lease in accordance with the terms thereof.

8.      **NOTICES.**   Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor (as applicable) may designate by notice given to the other in accordance with the provisions of this Section 8:

If to Guarantor:

Big Lots, Inc.
4900 East Dublin Granville Road
Columbus, OH 43081
Attn: General Counsel

With a copy to:

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
Attn:  Jacinto A. Núñez
Email:  janunez@vorys.com

If to Landlord:

c/o Blue Owl Real Estate Capital LLC
30 North LaSalle, Suite 4140
Chicago, IL 60602
Attention:  Asset Management
Email: RealEstateAM@blueowl.com

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: David A. Rosenberg, P.C. & David P. Stanek
E-mail: david.rosenberg@kirkland.com & david.stanek@kirkland.com

9.    **GOVERNING LAW; CONSENT TO JURISDICTION**.    Guarantor and Landlord hereby agree that this Guaranty and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Illinois applicable to contracts made and performed therein.  Any legal suit, action or proceeding arising out of or relating to this Guaranty may be instituted in any federal court in the Northern District of Illinois or state court sitting in Cook County, State of Illinois, and Landlord and Guarantor each waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in such federal district or county and state, and Landlord and Guarantor each hereby expressly and irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

10.    **ESTOPPEL CERTIFICATE**.  Guarantor shall, from time to time within fifteen (15) days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord an estoppel certificate in the form attached to the Lease as Exhibit "D".  Such certificate may be relied upon by Landlord and any prospective purchaser, landlord or lender of all or a portion of the Premises (or any portion thereof).

12.    **MISCELLANEOUS**.

A.    Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part to the extent permitted by the Lease.  If Landlord disposes of its interest in the Lease in accordance with the Lease, "Landlord," as used in this Guaranty, shall mean Landlord's successors and assigns.

B.    Guarantor promises to pay all out of pocket costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity.

C.    If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance

of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

D.     The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its, successors, and assigns (it being understood that, except as expressly provided otherwise in the Lease, Guarantor shall not have the right to assign its obligations under this Guaranty without the prior written consent of Landlord in Landlord's sole and absolute discretion), and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

E.     Whenever the words "include," "includes," or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation," and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

F.     Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

G.     The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty.

SIGNATURE PAGE TO FOLLOW

IN WITNESS WHEREOF, the parties hereto have executed this Unconditional Guaranty of Payment and Performance effective as of the date first written above.

**GUARANTOR:**

BIG LOTS, INC., an Ohio corporation

By: _____

      Jonathan Ramsden, Executive Vice President
      and Chief Financial and Administrative Officer

STATE OF OHIO           )
COUNTY OF FRANKLIN    )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Jonathan Ramsden, whose name as Executive Vice President and Chief Financial and Administrative Officer of Big Lots, Inc., an Ohio corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Executive Vice President and Chief Financial and Administrative Officer and with full authority, executed the same voluntarily for and as the act of said corporation, acting in its capacity as Executive Vice President and Chief Financial and Administrative Officer of said corporation as aforesaid.

Given under my hand and official seal, this _____ day of _____, 2023.

_____
Notary Public

AFFIX SEAL

My commission expires: _____

(Vero Beach, FL)

ACKNOWLEDGED AND AGREED:

**LANDLORD:**

**BIG VEFL Owner LLC**, a Delaware limited
liability company

By:_____
Name:  Michael Reiter
Its:  Authorized Representative


STATE OF _____  )
COUNTY OF _____  )

      I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Michael Reiter, whose name as Authorized Representative of **BIG VEFL Owner LLC**, a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Authorized Representative and with full authority, executed the same voluntarily for and as the act of said limited liability company, acting in its capacity as Authorized Representative of said limited liability company as aforesaid.

Given under my hand and official seal, this _____ day of August, 2023.


_____
Notary Public

AFFIX SEAL

My commission expires: _____


(Vero Beach, FL)

# **EXHIBIT B**

## **Assumption and Assignment Agreement**

## ASSUMPTION AND ASSIGNMENT AGREEMENT

This ASSUMPTION AND ASSIGNMENT AGREEMENT (the "**Agreement**"), dated as of December 2, 2024, is by and between Big Lots Stores, Inc. ("**Debtors**" or "**Assignor**") and Aldi Inc., an Illinois corporation, or its designee ("**Assignee**"). For the avoidance of doubt, all provisions of the applicable assigned contracts, including any provision limiting future assignment, shall be binding on the applicable Assignee after consummation of the assignment of such contract by the Debtors to the Assignee.

## RECITALS

WHEREAS, Assignor, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 §§ 101 et seq. (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), jointly administered under case *In re Big Lots, Inc.*, Case No. 24-11967 (JKS) (Bankr. D. Del. 2024) (the "**Chapter 11 Cases**");

WHEREAS, Assignor has agreed to assign and Assignee has agreed to assume the unexpired leases listed on Schedule A attached hereto (the "**Leases**") with respect to the premises set forth on Schedule A (the "**Premises**"), pursuant to the terms and conditions of the *FOURTH INTERIM ORDER (I) ESTABLISHING PROCEDURES TO SELL CERTAIN LEASES, (II) APPROVING THE SALE OF CERTAIN LEASES AND (III) GRANTING RELATED RELIEF* [Doc 1198] (the "**Lease Sale Procedures**") subject to approval by the Court in the Chapter 11 Cases; and

WHEREAS, Assignee intends to occupy and use the Premises for operation of the Assignee's prototypical "Aldi Food Market" retail grocery store and other uses as are incidental to the operation of a retail grocery store (including, without limitation, the sale of beer, wine, and spirits) or for any other lawful retail purposes allowed by the Leases (the "**Intended Use**");

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## AGREEMENT

1.      Assignment and Assumption.  Effective as of the date the Bankruptcy Court enters an order of record pursuant to 11 U.S.C. 363(b) and 356 (the "**Sale Order**") approving the assumption and assignment contemplated by this Agreement (the "**Closing Date**"), and upon payment of the Purchase Price as set forth below,

(a)      Assignor hereby sells, transfers, conveys, assigns and sets over to Assignee, its successors and assigns, all of Assignor's right, title, and interest in and to the Leases free and clear (subject to this Agreement's express terms regarding the assumption/cure of certain liabilities) of leasehold mortgages (if any), subleases, licenses, holdover rights under applicable bankruptcy and non-bankruptcy law and rules, claims, liens, mechanics liens, bills, interests, any rights under Section 365(h) of the Bankruptcy Code, and other rights and encumbrances.

(b)      Except as may be agreed in writing by the landlord or as provided in the Sale Order, Assignee hereby assumes and undertakes to pay, perform, and discharge all of Assignor's obligations and duties with respect to the Leases; provided, however, the Assignee shall not be responsible for and does not assume any responsibility for any personal injury or property damage claims that accrued or arose before the Closing Date.

(c)    No later than the Closing Date, Assignor shall surrender the Premises to Assignee, deliver possession thereof to Assignee and deliver all access codes and keys (or written confirmation that Assignee is authorized to change the locks), key codes and alarm codes for the Premises (if practically available) to Assignee.

2.    <u>Payment of Purchase Price</u>.  Assignee shall, on the Closing Date, deliver the purchase price for the Leases in the amount of $400,000.00 (net of any previously paid deposit amounts) (the "**Purchase Price**") in immediately available funds wired to the account specified by Assignor. The Purchase Price is inclusive of any cure amounts that may be owed as a result of the assumption of the Lease in connection with this Agreement. Assignee's obligation to deliver the Purchase Price is conditioned upon Assignor first surrendering and delivering possession of the Premises to Assignee in accordance with section 1 of this Agreement. To the extent Assignor has already paid rent and/or other charges due and owing under the respective Leases for the month in which the Closing Date occurs or for subsequent months, Assignee and Assignor shall adjust on a per diem basis for the same upon the Closing Date. Except as otherwise agreed by Assignee in writing, Assignee shall not be responsible for payment of rent and other charges that first come due pursuant to the respective Leases prior to the Closing Date.

3.    <u>Assumption of Liabilities</u>. Assignee shall assume responsibility for any accrued but unbilled adjustments for common area maintenance, real estate taxes, and insurance; provided, however, Assignee shall not be responsible for and does not assume any liability or responsibility whatsoever for any personal injury or property damages claim that accrued or arose before the Closing Date. Assignor (and not Assignee) shall be obligated to pay all cure costs in connection with the assumption of the Leases.

4.    <u>Sale Order Conditions</u>.  The obligations of Assignee to consummate the closing of the transaction hereunder is expressly subject to and conditioned upon the entry of the Sale Order by the Bankruptcy Court under sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Assignee.

5.    <u>No Further Liability of Assignor</u>.  From and after the Closing Date, except as provided herein or in the Sale Order, Assignor shall have no further obligations and duties with respect to the Leases.

6.    <u>Further Assurances</u>.  At any time and from time to time after the Closing Date, at the request of Assignee, and without further consideration, Assignor shall execute and deliver such other instruments of sale, transfer, conveyance, assignment, and confirmation or consents and take such other action as Assignee may reasonably request as necessary or desirable in order to more effectively transfer, convey, and assign to Assignee Assignor's rights to the Leases.

7.    <u>"As Is Where Is" Transaction</u>.  Assignee hereby acknowledges and agrees that Assignor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Leases.  Without limiting the foregoing, Assignor hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Leases.  Assignee further acknowledges that the Assignee has conducted an independent inspection and investigation of the physical condition of the Premises and all such other matters relating to or affecting the Leases as Assignee deemed necessary or appropriate and that in proceeding with its acquisition of the Leases, Assignee is doing so based upon such independent inspections and investigations.  Accordingly, Assignee will accept the Premises "AS IS" and "WHERE IS."

8.    <u>Compliance With Law</u>.  Assignee hereby agrees to comply with all applicable laws. Assignee agrees to indemnify and hold Assignor harmless for any violation or alleged violation of this section with respect to the Leases being conveyed by Assignor.

9.      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

10.     Jurisdiction.    The Parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to all matters arising under or relating to this Agreement. The Parties hereby irrevocably waive any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law. The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

11.     No Reliance.  Except as specifically set forth in this Agreement, each Party represents and warrants that in entering into this Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

12.     Construction.  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the Parties.

13.     Execution in Counterparts.  This Agreement may be executed electronically and delivered in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties to this Agreement may be transmitted by facsimile or by electronic mail, and such transmission will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.

14.     Going Dark. In order to facilitate  Assignee's Intended Use, Assignee shall be permitted to delay reestablishing retail operations for a period of time of at least 180 days (the "**Going Dark Period**").

15.     Assignment Free and Clear of Alcohol Sale Restrictions. It is a condition precedent to the assignment of the Leases contemplated herein that the assignment of the Leases must be made free and clear of any restrictions on the sale of alcoholic beverages contained in any of the Leases.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**ASSIGNOR:**
**Big Lots Stores, Inc.**

By_____
Name_____
Its_____


**ASSIGNEE:**
**Aldi Inc.**

By_____
Name_____Robert Sitter_____
Its Group Director Finance and Administration

**Schedule A**

**Description of Leases**

| LEASE | BID/PURCHASE PRICE |
|---|---|
| 1.   #4741 - 4919 North St., Nacogdoches, TX | $125,000.00 |
| 2.   #5230 - 6420 20th St., Vero Beach, FL | $150,000.00 |
| 3.   #5271 - 23351 Eureka Rd., Taylor, MI | $125,000.00 |
| **Aggregate Purchase Price:** | $400,000.00 |

# <u>EXHIBIT C</u>

**Diagram and Aerial Map of the Big Lots Parcel, the Indian River Mall Parcels, and the Mattress Firm Parcel**



**\* \* \* Big Lots Parcel**

**# # # Mattress Firm Parcel**



# **<u>EXHIBIT D</u>**

## **1995 Deed**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:21 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-JBJBBF-ECIGAD-G |
| **Instrument Number:** | 919115 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



ingmrsw2

. LSZ/wp6–4/2/93;4/12/93;6/7/93/1;12/15/93/6;10/20/95/1/6;11/20/95/1;11/22/95

IN THE RECORDS OF
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO., FLA.

123 00
10,945 90

09 | 9 | 1 | 5

## SPECIAL WARRANTY DEED

**THIS INDENTURE** is made this _28_ day of _December_, 199_5_, by **DeBARTOLO REALTY PARTNERSHIP, L.P.**, a Delaware limited partnership, 7655 Market Street, Youngstown, Ohio 44513 (**"Grantor"**) in favor of **GMRI, INC.**, a Florida corporation, 1751 Directors Row, Orlando, Florida 32809 (**"Grantee"**);

## WITNESSETH THAT:

Grantor, for valuable consideration, does hereby grant, with special warranty covenants, unto Grantee, its successors and assigns, all of that certain parcel of real property situated and lying in Indian River County, Florida, consisting of approximately 3.9885 acres, as more fully described in **Exhibit "A"** attached hereto and made a part hereof (the **"Property"**);

95 DEC 29 AM 10: 59

ALL interests conveyed by Grantor to Grantee hereunder are SUBJECT TO:

(i)   all streets and public rights-of-way;

(ii)   all laws, rules and/or regulations (federal, state and/or local) now in effect;

(iii)   restrictions, encumbrances, reservations, limitations, conditions, easements, agreements and/or other matters affecting the Property, if of public record; and

(iv)   all real estate taxes and assessments not due and payable as of the date hereof.

SUBJECT FURTHER TO AND RESERVED THEREFROM, by Grantor, on behalf of itself, its successors and assigns, for the benefit of the **"Complete Site"** (as that term is defined in the instrument referenced in the initial section of Paragraph (a) below) and such other parcels of real property owned or acquired by Grantor proximate to the Complete Site, a perpetual, nonexclusive right, privilege and easement (the **"Reserved**

This Instrument Prepared Outside
the State of Florida By:
Leon S. Zionts, Esq.
7655 Market Street
Youngstown, Ohio 44513

Record and Return to:
**Interstate Title Services, Inc.**
1897 Palm Beach Lakes Blvd.
Suite 125
West Palm Beach, FL 33409
File No. _____

DOCUMENTARY STAMPS
DEED $ 10,945 90
NOTE $
JEFFREY K. BARTON, CLERK
INDIAN RIVER COUNTY

1

OR 1085 PG 2332

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 1 of 27

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED IN OUT THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER. THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT

THE HONORABLE RYAN L. BUTLER,

INDIAN RIVER CLERK OF THE COURTS & COMPTROLLER

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 2 of 27

**Utility Easement"**) to construct, install, operate, inspect, maintain, repair and/or replace general utility facilities over, under, in and through that area described in **Exhibit "B-1"** attached hereto and made a part hereof, together with the right to enter thereon to fully enjoy the rights reserved herein (the **"Reserved Utility Easement Area"**). Grantee, its successors and assigns, may landscape or pave the surface of the Reserved Utility Easement, but shall not construct any permanent structure(s) or improvements which would or might restrict Grantor's access to or use of the utility facilities located therein. Grantor, on behalf of itself, its successors and assigns, covenants and agrees to undertake all activities permitted hereunder diligently to completion and shall use commercially reasonable efforts to minimize interference with Grantee's operation of the Project (as hereinafter defined). Grantor, on behalf of itself, its successors and assigns, further covenants and agrees that if the surface and/or subsurface of the Reserved Utility Easement Area are disturbed by Grantor's activities hereunder, Grantor, at its sole cost and expense, will restore the surface and/or subsurface thereof to the same general condition in which it existed immediately prior to such disturbance;

SUBJECT FURTHER TO AND RESERVED THEREFROM, by Grantor, on behalf of itself, its successors and assigns, for the benefit of the **"Developer Site"** (as that term is defined in the instrument referenced in the initial section of Paragraph (a) below), a perpetual, exclusive right, privilege and easement in and upon that portion of the Property described in **Exhibit "B-2"** attached hereto and made a part hereof (the **"Reserved Landscape/Signage Easement Area"**), for the limited purpose of landscaping and signage, together with such rights of access thereto, thereon and therein as are reasonably necessary to fully enjoy the easement rights reserved herein, and for no other purpose (the **"Reserved Landscape and Sign Easement"**).

**IN CONSIDERATION** of Grantor's execution and delivery of this Indenture, Grantee hereby covenants and agrees, on behalf of itself, its successors and assigns, as evidenced by its acceptance of this Indenture and use of the Property, (i) to execute any document(s) hereafter deemed reasonably necessary by Grantor to further confirm (x) the reservation and existence of the hereinabove described easement reservations, and (y) the terms, covenants, limitations, restrictions and agreements hereinafter set forth, and (ii) to own, hold and use the Property and all portions thereof on and subject to the following terms, covenants, limitations, restrictions and agreements, which terms, covenants, limitations, restrictions and agreements are imposed upon the Property as part of a general plan for the uniform and orderly development thereof and the Benefited Parcel (as hereinafter defined):

(a)    **Covenants**. For a period of forty (40) consecutive years from and after the date of recordation hereof, the Property shall be subject to the following restrictions which shall be real covenants running with the land and shall be binding upon and enforceable against the Property and the fee simple owner thereof, its successors and assigns (**"Obligor"**), and shall inure to the benefit of and be enforceable by Grantor and/or the

OR 1085 PG 2333

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 3 of 27

party (the **"Beneficiary"**), or its nominee, which holds title from time to time to the **"Developer Site"**, as that term is defined in that certain **"Reciprocal Easement and Operating Agreement"** dated _____, 199___ and recorded _____, 199___ in the Public Records of Indian River County, Florida in O.R. Book _____, Page _____ (as said Reciprocal Easement and Operating Agreement may be amended, modified, supplemented and/or restated from time to time; the **"REA"**) (the **"Benefited Parcel"**). All references to the REA herein are for definitional purposes only. If title to portions of the Benefited Parcel become vested in parties other than the Beneficiary (or affiliates of the Beneficiary), the then owner of the largest portion of the Benefited Parcel shall be or continue to be, as the case may be, the Beneficiary, and the other portions of the original Benefited Parcel shall be deleted from the Benefited Parcel. No party holding any interest in any such deleted portion of the Benefited Parcel shall thereafter have any right to enforce the Covenants, nor shall such party be required to join in the execution of any amendments thereof.

Notwithstanding the foregoing, Grantee and Grantor acknowledge that, as of the date hereof of recordation hereof, the REA has not been finalized by the parties thereto or recorded. Until such time as the REA is recorded, references made elsewhere in this Indenture to the **"Developer Site"/"Benefited Parcel"** and to the **"Complete Site"** shall be deemed to refer to those parcels of real property described in **Exhibits "B-3"** and **"B-4"**, respectively. Following recordation of the REA, the descriptions of the Developer Site and Complete Site set forth therein shall control.

        (i)    Maintenance/Failure to Maintain.

        (A)    Maintenance Standard/Obligor's Failure. Obligor shall maintain the Property in good order, condition and repair in a manner comparable to that used in the maintenance of the Indian River Mall, including, but not limited to, keeping all landscaping, parking areas, paved areas and building and other structural exteriors in good order and repair and in a neat and clean condition, free of accumulation of trash and debris, including, without limitation, repair of pot-holes in parking lot and other paved areas, regular and periodic restriping of parking areas, regular and periodic mowing of grass, prompt removal and replacement of defective and/or dead landscaping and shrubbery and prompt repair, as needed, of all buildings or other structures located thereon, both interior and exterior. Should Obligor fail to maintain the Property in the manner prescribed herein within fifteen (15) days following notice from Beneficiary (or, if such maintenance activities cannot reasonably be performed within the fifteen (15) day period, then if Obligor fails to commence said maintenance activities within fifteen (15) days and diligently pursue the same to completion), then Beneficiary may perform all such required maintenance activities and Obligor shall promptly reimburse Beneficiary for Beneficiary's costs incurred, plus an administrative fee equal to fifteen percent (15%) of such costs. Beneficiary has the absolute right of entry upon the Property to perform all such maintenance activities and shall in no event be held to be a trespasser upon the Property. All notices given under this

OR 1085 PG 2334

Paragraph (a)(i)(A) shall be sent via nationally recognized overnight courier to the address set forth on Page 1 hereof, or to such other address as may be specified from time to time in writing.

(B)    Claim of Lien.  If Obligor fails to reimburse Beneficiary for Beneficiary's costs incurred and the administrative fee as aforesaid within ten (10) days after written demand therefor, then Beneficiary is hereby granted a lien on the Property, which lien shall secure  said monies due, together with interest thereon at the highest rate permitted under the laws of the State of Florida, and the costs of enforcing said lien, including, without limitation, reasonable attorneys' fees and costs of tribunals at all levels. The lien herein granted shall be effective from and after the date of recording Beneficiary's claim of lien in the Public Records of Indian River County, Florida.  Said claim of lien shall include, at a minimum, a description of the Property, the name of the record owner, the amount due and the date when due.  Any such lien shall continue in effect until all sums secured by said lien, as herein provided, shall have been paid.  Obligor may, at its option, obtain a surety bond in form and substance acceptable to Beneficiary for such liens as may arise pursuant to the foregoing.  Beneficiary agrees to release of record any such lien bonded or paid within ten (10) days of Obligor's bonding or payment thereof.

(ii)    Use.

(A)    Prohibitions on Use.  The Property shall not be used, in whole or in part, for any or all of the following uses or purposes:

(1)    Tire, battery and automobile accessories stores;

(2)    Automobile or truck facility used for paint shop or garages, whether for body or mechanical repair, or for the dispensing of petroleum products;

(3)    Storage, use, or disposal, whether temporary or permanent, by Obligor, its agents, representatives, employees, licensees, tenants, subtenants or business invitees, or by any other person, of "Hazardous Substances".  For the purposes of this subparagraph, **"Hazardous Substances"** shall mean and include, without limitation, hazardous materials or substances as defined in all applicable provisions of any federal regulations, amendments, updates or superseding legislation to or for the Environmental Protection Act, the Resource Conservation and Recovery Act, the Comprehensive    Environmental    Response, Compensation  and  Liability  Act,  the  Superfund

4

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 5 of 27

Amendments and Reauthorization Act, or the regulations promulgated thereunder, or any other federal, state, local or other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous substances, hydrocarbons, hazardous materials, toxic substances or hazardous wastes as defined from time to time in any other federal, state and local laws or the regulations promulgated thereunder applicable to the Property including, but not limited to, any asbestos insulation or other materials composed of or containing asbestos;

(4) Automobile or truck washing facility;

(5) Amusement or game rooms or similar establishments, including without limitation the use of pinball machines, electronic games and similar apparatus, except as an ancillary use;

(6) Funeral home;

(7) Laundromat;

(8) Movie theatre; or

(9) "Adult" bookstores or cinemas or establishments for the sale of drug-related paraphernalia. For the purposes of this subparagraph, **"Adult"** bookstores or cinemas shall mean and include any establishments which sell or offer for sale any merchandise which is distinguished or characterized by emphasis on matters depicting, describing or related to (i) specified sexual activities {i.e., human genitals in a state of sexual stimulation or arousal; acts of human masturbation, sexual intercourse or sodomy); or (ii) fondling or other erotic touching of human genitals, pubic regions, buttocks or female breasts; or (iii) specified anatomical areas (i.e., less than completely and opaquely covered human genitals, pubic regions, buttocks or female breasts below a point immediately above the top of the areola; or human male genitals, even if completely and opaquely covered, if in a discernibly turgid state). Further, for the purposes of

5

OR 1085 PG 2336

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 6 of 27

this subparagraph, establishments for the sale of drug-related paraphernalia shall mean and include establishments which sell or offer for sale any merchandise which is commonly used or intended for use with or in the consumption of any narcotic, dangerous drug or other controlled substance, including, without limitation, any hashish pipe, waterpipe, bong, chillum, pipe screen, rolling papers, rolling devices, coke spoons or roach clips.

(B)    Initial Intended Use.  The initial intended use of the Property shall be for a typical "Red Lobster" restaurant to be constructed and operated on a portion of the Property, and shall also mean, at Grantee's election and subject to the provisions of this Indenture, the "Agreement" (as defined in subparagraph (b)(i)(A) hereinbelow), the "Development Criteria" (as defined in subparagraph (a)(iii)(A) hereinbelow), matters of public record and all applicable governmental laws, ordinances, regulations and requirements, a second GMRI, Inc. (or affiliate)  concept restaurant to be constructed and operated on the balance of the Property (the **"Project"**).

(iii)    Plans and Specifications.

(A)    Plan Approval.  Obligor's construction of any and all buildings or other improvements on the Property shall not be commenced without first receiving Beneficiary's written approval of all plans and specifications therefor, including, without limitation, site, grading, landscaping, utility, sign, trash storage and screening plans and exterior elevations.  Obligor agrees that such plans and specifications shall conform to the Development Criteria for Peripheral Property Surrounding the Indian River Mall, Vero Beach, Florida (the **"Development Criteria"**), receipt of a copy of which Obligor, by its acceptance of this Indenture, acknowledges; provided, however, that satisfaction of the Development Criteria shall in no way diminish Beneficiary's approval rights as provided herein.  Notwithstanding the foregoing, (i) Beneficiary's approval of Obligor's plans and specifications shall control in the event of a discrepancy with the Development Criteria and shall operate to waive any inconsistencies therewith, and (ii) provided the same are for a prototypical "Red Lobster" restaurant (and, as to the balance of the Property, another prototypical GMRI, Inc. (or affiliate) concept restaurant), Beneficiary shall not unreasonably withhold its approval of Obligor's plans and specifications therefor.  Obligor shall provide Beneficiary with a sepia, mylar or other reproducible copy, or triplicate prints, of said plans and specifications.  Following Beneficiary's receipt of all such plans and specifications, Beneficiary shall have fifteen (15) working days to review, comment on, and either approve or disapprove the same, in its sole discretion.  If said plans and specifications are not approved, Beneficiary shall return the same to Obligor for such changes as are indicated. Further, construction shall be prosecuted only in accordance with the plans and specifications so approved.

OR 1 0 8 5 PG 2 3 3 7

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 7 of 27

(B)    <u>No Warranty</u>.  Neither Beneficiary's approval of the plans and specifications, nor any subsequent inspections or approvals of the Project during construction or thereafter shall constitute a warranty or representation by Beneficiary or any of its agents, representatives or designees, as to the technical sufficiency or adequacy or safety of the structures or any of their component parts or of any physical condition or feature pertaining to the Property.

(iv)    <u>Beneficiary's Nominee</u>.  As used in this Paragraph (a), the term **"Beneficiary"** shall include Beneficiary's nominee.  For the purposes hereof, Beneficiary's nominee shall be DeBartolo Properties Management, Inc.    All notices, plans, correspondence or other communications required or desired to be given to Beneficiary hereunder shall, except as otherwise directed by Beneficiary to the contrary, be sent to Beneficiary's nominee at the address set forth for the Grantor on Page 1 hereof (to the attention of Land Development).  Beneficiary may designate replacement nominees from time to time by providing notice thereof to Obligor at the address set forth on Page 1 of this Indenture, or at such other address as Grantee (or any successor Grantee) shall specify from time to time.

(v)    <u>Third Party Beneficiary</u>.  Grantor and, by its acceptance of this Indenture, Grantee, on behalf of themselves, their respective successors and assigns, intend that the Beneficiary shall be a "third party beneficiary" of the agreements, covenants and restrictions set forth in this Paragraph (a), and that the same may be enjoyed and enforceable by Beneficiary.

(vi)    <u>Grantor/Beneficiary Disclaimer</u>.  Grantor and Beneficiary, on behalf of themselves, their successors and assigns (subject to the provisions of the initial section of this Paragraph (a) relative to the Beneficiary), make no representation and give no assurance to Obligor that, as to other parcels of real property owned by Grantor proximate to the Property, the terms, covenants, conditions, restrictions and agreements set forth in this Paragraph (a) will be imposed in their present form, if at all.

(b)    **Grantor's Right of Repurchase/Sale of Property by Grantee**.

(i)    "<u>Red Lobster Site</u>".  In the event Grantee has not commenced construction of a "Red Lobster" restaurant on the "Red Lobster" portion of the Property in a bona fide and substantial manner in accordance with the plans and specifications approved by Beneficiary within eighteen (18) months after the grand opening date of the Indian River Mall, Grantor, its nominee or assignee, may repurchase the Property, together with any and all buildings and other improvements located thereon and all rights, privileges and easements appurtenant thereto, in the manner set forth hereinbelow.

(A)    <u>Exercise</u>.  In the event Grantor, its nominee or assignee, desires to exercise the right of repurchase set forth hereinabove, it shall do so by delivering

OR 1085 PG 2338

written notice to Grantee within thirty (30) days following the expiration of said eighteen (18) month period.  Within ninety (90) days following delivery of such notice, Grantor, its nominee or assignee, shall deposit into escrow with the Title Company (as such term is defined in the Purchase and Sale Agreement pursuant to which this Indenture is delivered; the **"Agreement"**) (or such other escrow agent mutually acceptable to Grantee and Grantor, its nominee or assignee), a sum equal to the Purchase Price (as such term is defined in the Agreement) and Grantee shall deliver into escrow with the Title Company a special warranty deed, duly executed and acknowledged in recordable form by Grantee, so as to convey to Grantor, its nominee or assignee, fee simple title to the Property and all buildings and other improvements constructed thereon, free and clear of all liens, restrictions, encumbrances and other matters (other than those subject to which Grantor conveyed the Property to Grantee).  Said special warranty deed from Grantee shall contain the following language: "This special warranty deed is given to the Grantee herein for the purpose of reconveying the Property pursuant to the "Grantor's Right of Repurchase" as contained in that certain Special Warranty Deed from DeBartolo Realty Partnership, L.P. to GMRI, Inc., recorded in O.R. Book _____, Page _____ in the Public Records of Indian River County, Florida."  Grantee shall also transfer, reconvey or terminate any easement rights acquired herein in a manner satisfactory to Grantor, its nominee or assignee, and deposit sufficient funds to pay any and all transfer taxes including, without limitation, any documentary stamps, state gross income tax and county surtax applicable to the deed.  Upon receipt of all documents and funds, the Title Company shall deliver the deed and funds for payment of such transfer taxes to Grantor, its nominee or assignee, and the funds equal to the Purchase Price to Grantee.  Grantor hereby reserves the right to assign the repurchase rights granted herein to DeBartolo Properties Management, Inc., its affiliates, successors or assigns.

(B)    Release of Restrictions.  Grantee and Grantor agree that in the event Grantee is required to reconvey the Property as set forth in this subparagraph (b)(i), each of the covenants, restrictions and requirements contained in this Indenture shall, upon execution and delivery of the special warranty deed (as provided in subparagraph (b)(i)(A) above), automatically terminate and be of no further force or effect.  No further action by Grantor, its nominee or assignee shall be required to effect said termination.

(ii)    Balance of Property.  In the event Grantee has not commenced construction of another GMRI, Inc. (or affiliate) concept restaurant on the balance of the Property in a bona fide and substantial manner in accordance with the plans and specifications therefor approved by Beneficiary within twenty-four (24) months after the grand opening date of the Red Lobster restaurant on the Red Lobster "portion" of the Property, Grantor, its nominee or assignee, may repurchase said portion of the Property, together with any and all buildings and other improvements located thereon and all rights, privileges and easements appurtenant thereto, in the manner set forth hereinbelow.

8

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G  Page 9 of 27

(A)    Exercise.  In the event Grantor, its nominee or assignee, desires to exercise the right of repurchase set forth hereinabove, it shall do so by delivering written notice to Grantee within thirty (30) days following the expiration of said twenty-four (24) month period.  Within ninety (90) days following delivery of such notice, Grantor, its nominee or assignee, shall deposit into escrow with the Title Company (or such other escrow agent mutually acceptable to Grantee and Grantor, its nominee or assignee), a sum equal to that portion of the Purchase Price attributable to the balance of the Property being repurchased and an amount equal to Grantee's reasonable site improvement costs, if any, incurred by Grantee in preparing said portion of the Property for construction (e.g., utility infrastructure improvements, paving and the like), and Grantee shall deliver into escrow with the Title Company a special warranty deed, duly executed and acknowledged in recordable form by Grantee, so as to convey to Grantor, its nominee or assignee, fee simple title to said portion of Property and all buildings and other improvements constructed thereon, free and clear of all liens, restrictions, encumbrances and other matters (other than those subject to which Grantor conveyed said portion of the Property to Grantee).  Said special warranty deed from Grantee shall contain the following language:  "This special warranty deed is given to the Grantee herein for the purpose of reconveying the Property pursuant to the "Grantor's Right of Repurchase" as contained in that certain Special Warranty Deed from DeBartolo Realty Partnership, L.P. to GMRI, Inc., recorded in O.R. Book _____, Page _____ in the Public Records of Indian River County, Florida."  Grantee shall also transfer, reconvey or terminate any easement rights acquired herein pertaining to said portion of the Property in a manner satisfactory to Grantor, its nominee or assignee, and deposit sufficient funds to pay any and all transfer taxes including, without limitation, any documentary stamps, state gross income tax and county surtax applicable to the deed.  Upon receipt of all documents and funds, the Title Company shall deliver the deed and funds for payment of such transfer taxes to Grantor, its nominee or assignee, and the funds equal to the Purchase Price to Grantee.  Grantor hereby reserves the right to assign the repurchase rights granted herein to DeBartolo Properties Management, Inc., its affiliates, successors or assigns.

(B)    Release of Restrictions.  Grantee and Grantor agree that in the event Grantee is required to reconvey said portion of the Property as set forth in this subparagraph (b)(ii), each of the covenants, restrictions and requirements contained in this Indenture shall, upon execution and delivery of the special warranty deed (as provided in subparagraph (b)(ii)(A) above), automatically terminate and be of no further force or effect.  No further action by Grantor, its nominee or assignee shall be required to effect said termination.

(iii)    Grantor's "Option" to Repurchase/Sale of Property by Grantee.  Should Grantee elect not to construct any portion of the Project on the Property prior to the expiration of the Grantor's right of repurchase period set forth in subparagraph (b)(i) hereinabove, or, having commenced construction of a Red Lobster restaurant on the Red Lobster portion of the Property within the required time period, elects not to construct

OR 1085 PG 2340

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 10 of 27

another GMRI, Inc. (or affiliate) concept restaurant on the balance of the Property prior to the expiration of the Grantor's right of repurchase period set forth in subparagraph (b)(ii) hereinabove, Grantee shall first offer Grantor the right to repurchase the Property (or balance of the Property, as the case may be) prior to offering the same to a third party, for an amount equal to the Purchase Price (as to the entire Property) or, as to the balance of the Property, a sum equal to that portion of the Purchase Price attributable to the balance of the Property being offered for sale plus an amount equal to Grantee's reasonable site improvement costs, if any, incurred by Grantee in preparing said portion of the Property for construction (e.g., utility infrastructure improvements, paving and the like). Grantor shall have thirty (30) days following receipt of Grantee's offer to elect whether to accept same. Closing on such sale by Grantee shall occur within ninety (90) days after Grantor's acceptance of said offer, in the same general manner and subject to the same general provisions of subparagraph (b)(i)(A) hereinabove.

Notwithstanding the foregoing, should Grantor elect not to accept Grantee's offer to purchase the Property or balance of the Property, as provided hereinabove, and should Grantee elect to sell the Property or balance of the Property, as the case may be, to a third party prior to the expiration of the repurchase periods set forth in subparagraphs (b)(i) and/or (b)(ii) hereinabove or, provided Grantee has not commenced construction of the Project within the time period(s) provided and Grantor has not elected to exercise its right of repurchase, Grantee and Grantor shall share equally in the net profits of any such third party sale. As used in this subparagraph (b)(iii), **"net profits"** shall be defined as being the gross purchase price for such sale parcel, reduced by (A) the per square foot purchase price of the parcel (or portion thereof) being sold, (B) Grantee's reasonable infrastructure costs (determined on a proportionate share basis if only the balance of the Property is sold), and (C) usual and customary costs and expenses incurred by or charged to Grantee (and Grantor, as applicable) in connection with the documentation and closing of such sale. The sharing of net profits as described above shall expire upon the expiration of the twenty-four (24) month repurchase period described in Paragraph (b)(ii).

(c)    **Additional Site/Building Restrictions**. In addition to the covenants and restrictions set forth in Paragraph (a) hereinabove, the following site and building restrictions shall be additional covenants running with the land, and the Property shall be subject to same for a period of fifty (50) years following recordation of the REA or such shorter period of time as is permitted or provided therein. Nothing set forth hereinbelow shall be deemed to supersede any more restrictive provisions of Paragraph (a) hereinabove (including the provisions of the Development Criteria):

(i) No buildings or other improvements may be constructed on the Property within twenty-five feet (25') of the Indian River Mall ring road or the lateral access drives thereto (except directional signs, subject to the provisions of (ii) herein).

OR I 085 PG 234 I

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 11 of 27

(ii)  Freestanding signs on the Property may not unduly restrict visibility of any portion of the Indian River Mall, and shall be no greater than ten feet (10') in height; ground mounted monument signs may have a face no greater than forty (40) square feet on each side.

(iii)  The parking area on the Property shall contain not less than the following number of parking spaces:

(A)  five (5) space for each 1,000 square feet of service or retail gross floor area;

(B)  ten (10) spaces for each 1,000 square feet of restaurant gross floor area;

(C)  one (1) space per hotel room, plus five (5) spaces per 1,000 square feet of gross floor area used for meeting rooms and retail service areas in such hotel, plus two (2) spaces for every three (3) employees scheduled to work the largest shift of such hotel;

(D)  three (3) spaces for each 1,000 square feet of office gross floor area;

(E)  one (1) space for every three (3) theater seats; and

(F)  the minimum number of spaces required by city code for all other uses.

(iv)  Grantor shall maintain or cause to be maintained or require in a written agreement with the occupant or owner of the Property the maintenance of the Property and all improvements thereon in a clean and orderly condition, consistent with the standards of maintenance of the Indian River Mall, and, until improved with buildings, the Property shall be seeded with grass.

(v)  Unless otherwise shown on the plan attached hereto as **Exhibit "C"**, the permissible building area on the Property shall be the entire Property, subject to the foregoing requirements regarding parking and building lines.

(vi)  Access to the Property shall be confined to the curb cuts depicted on the plan attached hereto as **Exhibit "C"** or within the permitted location(s) and number(s) of curb cuts depicted thereon.

(vii)  No building erected on the Property shall exceed two (2) stories above natural grade level in height (exclusive of basement and rooftop mechanical

11

OR 1085 PG 2342

equipment) or a maximum height of thirty feet (30'), including parapet and architectural features such as cupolas and clock towers.

(viii)  Landscaping on the Property shall be compatible with the landscaping of the Indian River Mall.

(ix)  Exterior architectural compatibility (e.g., shape, general design, color and materials) between the Indian River Mall and those improvements to be constructed on the Property is deemed highly desirable and, therefore, no building shall be constructed on the Property which is architecturally incompatible with the improvements constructed on the Complete Site.  Prototypical exterior design and materials of nationally recognized freestanding building operators (such as Red Lobster, Wendy's, Pizza Hut and the like) will not be deemed incompatible.

(x)  The Property may be developed, improved and used for any lawful use or purpose, with the exception that the Property may not be used for:

(A)    any heavy industrial use or for a purpose which may cause objectionable odors and/or untidiness (including, without limiting the generality of the foregoing, stand-up or drive-in food facilities or other litter-creating operations; provided, however, that a sit-down or drive-through type restaurant is not precluded hereby);

(B)    any use which involves any unusual firing, explosives or other damaging or dangerous hazards (including, without limiting the generality of the foregoing, the storage, display or sale of explosives or fireworks);

(C)    except for the storage, assembly or manufacture of goods for sale from the Property incidental to a retail use, any warehouse operation or any assembly, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation;

(D)    any trailer court, mobile home park, lot for sale of new and/or used motor vehicles, labor camp, junk yard, stock yard or animal raising (other than pet shops and veterinarian clinics or hospitals, provided such facilities have no provision for keeping animals overnight and otherwise comply with the provisions hereof);

(E)    any dumping, disposal, incineration or reduction of garbage or refuse, other than handling or reducing such waste if produced

12

on the Property from otherwise authorized uses and, in such latter event, only if handled in a reasonably clean and sanitary manner;

        (F)    any commercial laundry or dry cleaning plant (other than shops serving as a drop-off and pick-up cleaning establishment with minimal cleaning and/or pressing done on-site), bowling alley, mortuary or similar service;

        (G)    the performance of any automobile body and fender repair work; and

        (H)    any use not compatible with the operation of a first-class regional enclosed mall shopping center.

    **(d)**    **Equitable Remedies**. Grantor, Beneficiary and, by its acceptance of this Indenture, Grantee agree, on behalf of themselves, their respective successors and assigns, that as no measure of damages can be set for a violation of any of the provisions set forth herein, the same may be enforced by injunction or other equitable relief including, without limitation, specific performance.

    **(e)**    **Waiver**.  No waiver by Beneficiary or Grantor, their respective nominees, successors or assigns, of any term, covenant, condition, restriction or agreement set forth in this Indenture, or a breach of any of the foregoing, shall be deemed to imply or constitute a further waiver of same or of any other term, covenant, condition, restriction or agreement set forth herein.

    **TO HAVE AND TO HOLD** the same, together with all the hereditaments and appurtenances thereunto belonging or in anywise appertaining, to Grantee, its successors and assigns, forever.

    And Grantor will **WARRANT AND DEFEND** title to the Property against all parties lawfully claiming the same from, through or under it, but against no others.

    And Grantor hereby covenants and warrants that it is fully authorized to convey the Property as set forth herein.

13

**IN WITNESS WHEREOF**, Grantor has caused these presents to be duly executed the day and year first above written.

Signed in the Presence of:

DeBARTOLO REALTY PARTNERSHIP, L.P., a Delaware limited partnership

By:   DeBartolo Realty Corporation, an Ohio corporation, its Managing General Partner

Sign Name: _William J. Reardon_
Print Name: _WILLIAM J. REARDON_

Sign Name: _Marlo Gillett_
Print Name: _Marlo Gillett_

By: _____
Kim A. Rieck
Senior Vice President

Sign Name: _William J. Reardon_
Print Name: _WILLIAM J. REARDON_

Sign Name: _Marlo Gillett_
Print Name: _Marlo Gillett_

By: _Jane Walsh_
Jane Walsh
Assistant Secretary

OR 1085 PG 2345

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 14 of 27

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 15 of 27

STATE OF OHIO              )
                          )SS
COUNTY OF MAHONING )

   The foregoing instrument was acknowledged before me this *2nd* day of December, 1995, by Kim A. Rieck, a Senior Vice President of DeBartolo Realty Corporation, an Ohio corporation, managing general partner of **DeBARTOLO REALTY PARTNERSHIP, L.P.**, a Delaware limited partnership, in the capacity aforestated; such person is personally known to me or has produced (strike all but one) ~~(i) a driver's license, (ii) a state issued identification card, (iii) a passport,~~ (iv) nothing (as such person is personally known to me) as identification and ~~did~~/did not do so under oath.

Sign Name: *Marie E. Thomas*
Print Name: Marie E. Thomas

My Commission Expires:                    Notary Public

Serial No. (none if blank):_____

[NOTARIAL SEAL]

NOTARIAL SEAL
STATE OF OHIO

MARIE E. THOMAS,
Notary Public, State of Ohio
My Commission Expires 8/18/2000

STATE OF OHIO              )
                          )SS
COUNTY OF MAHONING )

   The foregoing instrument was acknowledged before me this *3rd* day of December, 1995, by Jane Walsh, an Assistant Secretary of DeBartolo Realty Corporation, an Ohio corporation, managing general partner of **DeBARTOLO REALTY PARTNERSHIP, L.P.**, a Delaware limited partnership, in the capacity aforestated; such person is personally known to me or has produced (strike all but one) ~~(i) a driver's license, (ii) a state issued identification card, (iii) a passport,~~ (iv) nothing (as such person is personally known to me) as identification and ~~did~~/did not do so under oath.

Sign Name:_____
Print Name:   Marie E. Thomas

My Commission Expires:                    Notary Public

Serial No. (none if blank):_____

[NOTARIAL SEAL]



NOTARIAL SEAL

MARIE E. THOMAS,
Notary Public, State of Ohio
My Commission Expires 8/18/2000

15

OR 1085 PG 2346

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 16 of 27

#144
10-25-95
REF. DWG
GCP-1A
Rev 12/22/95

INDIAN RIVER MALL
FEE PARCEL
3.9885 ACRES

Situated in the Northwest ¼ of Section 5, Township 33 South, Range
39 East, Indian River County, Florida and being more particularly
described as follows:

Lots 13, 14, and 15, Indian River Mall, The West Peripheral as
recorded in Plat Book 14, pages 61, 61A, and 61B, Public Records of
Indian River County, Florida, said parcels being further described
as beginning at the Southwest corner of said Lot 13, thence run the
following courses:

(1)  Run North a distance of 489.40 feet to a point, thence

(2)  Run N 45° 00' 00" E, a distance of 40.90 feet to a point;
     thence

(3)  Run East, a distance of 309.60 feet to a point, thence

(4)  Run S 00° 30' 13" W, a distance of 517.60 feet to the
     Southeast corner of Lot 15; thence

(5)  Run S 89° 52' 25" W, a distance of 333.97 feet to said
     Southwest corner of Lot 13 and the Point of Beginning.

Containing 3.9885 Acres, more or less (173,741 Sq. Ft.)

OR 1085 PG 2347



EXHIBIT "A"

12/22/95  FRI 10:54 FAX 407 562 7180      CARTER & ASSOC                               @001

**INDIAN RIVER MALL**
**20-FT. WIDE RESERVED UTILITY EASEMENT AREA**

Situated partly in the North 1/2 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida and more particularly described as follows:

Beginning at the Southeast corner of Lot 15, Indian River Mall, The West Peripheral as recorded in Plat Book 14, pages 61, 61A and 61B, Public Records of Indian River County, Florida as the principal point and place of beginning of the following easement description:

Said easement being normal to and 20.0 feet to the right of the following five (5) described lines: thence

(1)      Run S 89° 52' 25" W, a distance of 333.97 feet to a point; thence

(2)      North, a distance of 489.40 feet to a point; thence

(3)      N 45° 00' 00" E, a distance of 40.90 feet to a point, thence

(4)      East, a distance of 309.60 feet to a point, thence

(5)      S 00° 30' 13" W, a distance of 517.60 feet to the Point of Beginning.

Note:

All opposite sidelines are to be extended or shortened and to terminate at the point of intersect with the sideline of the next or previous described line.

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 17 of 27

EXHIBIT "B-1"

Darden exh

OR 1085 PG 2348

12/22/95  FRI 10:55 FAX 407 562 7180       CARTER & ASSOC                    @003

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 18 of 27

## INDIAN RIVER MALL
### RESERVED LANDSCAPE AND SIGNAGE EASEMENT AREA

Situated in the Northwest 1/4 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida being a part of Lot 13, Indian River Mall, The West Peripheral as recorded in Plat Book 14, pages 61, 61A AND 61B, Public Records of Indian River County, Florida and being more particularly described as follows:

Commencing at the Southwest corner of said Lot 13, run North 10.00 feet to the Point of Beginning;

(1)    Thence, run North, a distance of 37.00 feet to a point;

(2)    Thence, run N 89° 52' 25" E, a distance of 17.96 feet to a point;

(3)    Thence, run S 45° 07' 35" E, a distance of 24.00 feet to a point;

(4)    Thence, run South a distance of 20.00 feet to a point;

(5)    Thence, run S 89° 52' 25" W, a distance of 35.00 feet to the Point of Beginning.

EXHIBIT "B-2"

Darden exh

OR 1085 PG 2349

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 19 of 27

#136
REF DWG X2
4-19-95
REV. 9-26-95
REV. 10-6-95
REV. 10-25-95
REV. 11-15-95
REV. 11-17-95

"Developer Site"/"Benefited Parcel"

INDIAN RIVER MALL
DEVELOPER'S PARCEL
83.471 ACRES

Commencing at a point being 50.0 feet east and 30.0 feet South of
the Northwest corner of the Northwest 1/4 of Section 5, Township 33
South, Range 39 East, run parallel to the North line of said
Section 5, S 89° 52' 28" E a distance of 614.00 feet to a point,
said point being the principal point and place of beginning of the
following description:

Thence continuing S 89° 52' 28" E a distance of 72.00 feet to a
point; thence S 00° 07' 32" W a distance of 425.00 feet to a point;
thence S 44° 52' 28" E a distance of 35.36 feet to a point; thence
S 89° 52' 28" E a distance of 250.00 feet to a point; thence N 00°
07' 32" E, 230.00 feet to a point; thence S 89° 52' 28" E, 770.02
feet to a point; thence S 00° 07' 32" W, 143.38 feet to a point;
thence N 87° 01' 21" E, 550.00 feet to a point; thence S 57° 58'
39" E, 556.50 feet to a point; thence S 32° 01' 21" W, 122.35 feet
to a point; thence S 57° 58' 39" E, 330.00 feet to a point; thence
S 47° 13' 39" E, 69.27 feet to a point; thence S 89° 51' 57" E,
917.49 feet to a point; thence S 00° 08' 03" W, 339.44 feet to a
point; thence S 00° 07' 12" W, 210.00 feet to a point; thence N 89°
52' 48" W a distance of 590.00 feet to a point; thence S 51° 10'
06" W a distance of 127.09 feet to a point; thence N 89° 53' 54" W
a distance of 290.00 feet to a point; thence N 66° 53' 54" W a
distance of 45.00 feet to a point; thence N 49° 43' 56" W a
distance of 365.00 feet to a point; thence South a distance of
126.78 feet to a point; thence 208.13 feet along a curve to the
right with a radius of 265.00 feet and a chord length of 202.82
feet, having a bearing of S 22° 30' 00" W to a point; thence S 45°
00' 00" W a distance of 262.00 feet to a point; thence South a
distance of 35.00 feet to a point; thence S 47° 00' 00" E a
distance of 150.00 feet to a point; thence S 55° 53' 54" E a
distance of 270.00 feet to a point; thence 258.23 feet along a
curve to the right with a radius of 264.21 feet and a chord length
of 248.08 feet, having a bearing of S 27° 53' 54" E to a point;

Exhibit "B-3"

(sub)
(6pg.)

OR 1085 PG 2350

thence S 00° 06' 06" W a distance of 110.00 feet to a point on the
North right-of-way line of State Road 60 Highway; thence along said
North line, N 89° 53' 54" W a distance of 84.00 feet to a point;
thence departing said North right-of-way line, N 00° 06' 06" E a
distance of 110.00 feet to a point; thence 176.13 feet along a
curve to the left with a radius of 180.21 feet and a chord length
of 169.21 feet having a bearing of N 27° 53' 54" W to a point;
thence N 55° 53' 54" W a distance of 427.46 feet to a point; thence
West a distance of 225.00 feet to a point; thence South a distance
of 85.00 feet to a point; thence S 45° 00' 00" E a distance of
65.64 feet to a point; thence South a distance of 132.33 feet to a
point; thence West a distance of 227.22 to a point on the East line
of land now owned or formerly owned by Wallace Acres Sub-division
per Plat Book 7, Page 12, Public Records of Indian River County,
Florida; thence N 00° 33' 07" E along said East line a distance of
256.79 feet to the Northeast corner of said sub-division; thence
along the North line of said sub-division, N 89° 53' 07" W a
distance of 619.05 feet to the Northwest corner of said
sub-division; thence N 00° 30' 13" E a distance of 21.49 feet to a
point; thence West a distance of 309.50 feet to a point; thence S
45° 00' 00" W a distance of 40.90 feet to a point; thence South a
distance of 439.40 feet to a point on the aforementioned North
right-of-way line of State Road 60 Highway; thence along said North
line, S 89° 52' 25" W a distance of 96.00 feet to a point; thence
departing said North line, North a distance of 492.44 feet to a
point; thence N 45° 00' 00" W a distance of 36.89 feet to a point;
thence West a distance of 423.69 feet to a point; thence 241.23
feet along a curve to the right with a radius of 310.00 feet and a
chord length of 235.24 feet, having a bearing of N 67° 42' 10" W to
a point; thence West a distance of 30.32 feet to a point; thence
153.63 feet along a curve to the right with a radius of 190.00 feet
and a chord length of 149.53 feet, having a bearing of S 66° 51'
02" W to a point; thence N 89° 53' 39" W a distance of 12.55 feet
to a point on the west line of Tract 5 of said Section 5; thence
run N 00° 01' 21" E and parallel to the West line of said Section
5 a distance of 1079.13 feet to a point; thence N 45° 00' 00" E a
distance of 465.00 feet to a point; thence N 67° 00' 00" E a
distance of 123.49 feet to a point; thence S 89° 52' 23" E a
distance of 145.85 feet to a point; thence N 45° 07' 32" E a
distance of 35.36 feet to a point; thence N 00° 07' 32" E a
distance of 425.00 feet to the point of beginning.

Containing 119.633 acres of land more or less.

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 20 of 27

Save and except five parcels of land -

1.  Dillard's Parcel (10.151 Ac.)
2.  J. C. Penney Parcel (6.480 Ac.)
3.  Sears Parcel (8.763 Ac.)
4.  Burdines Parcel (9.501 Ac.)
5.  Parcel 'C' (1.317 Ac.)

Described as follows:

DILLARD'S PARCEL

Commencing at a point being 50.0 feet East and 30.0 feet South of
the northwest corner of the northwest 1/4 of Section 5, Township 33
South, Range 39 East; thence run S 00° 01' 21" W and parallel to
the west line of said Section 5, a distance of 1294.28 feet to a
point; thence East a distance of 579.74 feet to the principal point
and place of beginning of the following description:

Thence South a distance of 275.07 feet to a point; thence S 45° 00'
00" W a distance of 408.61 feet to a point; thence 110.89 feet
along a curve to the right with a radius of 266.00 feet and a chord
length of 110.08 feet, having a bearing of N 52° 50' 29" W to a
point; thence N 40° 53' 57" W a distance of 134.18 feet to a point;
thence 147.05 feet along a curve to the right with a radius of
205.00 feet and a chord length of 143.95 feet, having a bearing of
N 20° 26' 59" W to a point; thence north a distance of 666.24 feet
to a point; thence East a distance of 526.65 feet to a point;
thence South a distance of 131.94 feet to a point; thence East a
distance of 43.65 feet to a point; thence South a distance of
124.08 feet to a point; thence West a distance of 55.50 feet to a
point; thence South a distance of 149.00 feet to the point of
beginning.

Containing 10.151 acres of land more or less.

J. C. PENNEY PARCEL

Commencing at a point being 50.0 feet east and 30.0 feet south of
the northwest corner of the northwest 1/4 of Section 5, Township 33
South, Range 39 East; thence run S 00° 01' 21" W and parallel to
the west line of said Section 5, a distance of 1294.28 feet to a

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 21 of 27

OR 1085 PG 2352

point; thence East a distance of 579.74 feet to a point, said point is also the beginning of a East-West mall concourse centerline; thence along said east-west centerline, east a distance of 215.08 feet to a point of intersect with a north-south concourse centerline; thence along the north-south centerline, south 91.41 feet to the principal point and place of beginning of the following description:

Thence East a distance of 247.00 feet to a point; thence South a distance of 25.00 feet to a point; thence S 28° 14' 33" E a distance of 131.20 feet to a point; thence South a distance of 286.43 feet to a point; thence West a distance of 55.00 feet to a point; thence South a distance of 70.92 feet to a point; thence West a distance of 644.77 feet to a point; thence 97.12 feet along a curve to the right with a radius of 266.00 feet and a chord length of 96.58 feet, having a bearing of N 79° 32' 25" W to a point; thence N 45° 00' 00" E a distance of 423.79 feet to a point; thence North a distance of 100.73 feet to a point; thence East a distance of 60.00 feet to a point; thence North a distance of 80.00 feet to a point; thence East a distance of 126.00 feet to the point of beginning.

Containing 6.460 acres of land more or less.

SEARS PARCEL

Commencing at a point being 60.0 feet east and 30.0 feet south of the northwest corner of the northwest 1/4 of Section 5, Township 33 South, Range 39 East; thence run S 00° 01' 21" W and parallel to the west line of said Section 5, a distance of 1394.23 feet to a point; thence East a distance of 579.74 feet to a point, said point is also the beginning of a East-West mall concourse centerline; thence along said east-west centerline, east a distance of 215.08 feet to a point of intersect with a north-south concourse centerline; thence along the north-south centerline, south a distance of 4.33 feet to a point of intersect with an east-west concourse centerline; thence along said east-west concourse centerline, east a distance of 330.50 feet to a point of intersect with a north-south concourse centerline; thence along said north-south concourse centerline south, a distance of 113.75 feet to the principal point and place of beginning of the following description:

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 22 of 27

OR 1085 PG 2353

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 23 of 27

**Thence East a distance of 205.50 feet to a point; thence South a distance of 65.58 feet to a point; thence east a distance of 100.83 feet to a point; thence S 45° 00' 00" E a distance of 360.13 feet to a point; thence N 45° 00' 00" E a distance of 75.59 feet to a point; thence S 45° 00' 00" E a distance of 149.96 feet to a point; thence S 45° 00' 00" W a distance of 51.82 feet to a point; thence 165.72 feet along a curve to the right with a radius of 211.00 feet and a chord length of 161.49 feet, having a bearing S 67° 30' 00" W to a point; thence West a distance of 954.54 feet to a point; thence North a distance of 333.26 feet to a point; thence East a distance of 250.42 feet to a point; thence North a distance of 178.00 feet to a point; thence East a distance of 169.50 feet to the point of beginning.**

Containing 8.763 acres of land more or less.

<u>BURDINES PARCEL</u>

Commencing at a point being 50.0 feet east and 30.0 feet south of the northwest corner of the northwest 1/4 of Section 5, Township 33 South, Range 39 East; thence run S 00° 01' 21" W and parallel to the west line of said Section 5, a distance of 1294.23 feet to a point; thence East a distance of 579.74 feet to a point, said point is also the beginning of a East-West mall concourse centerline; thence along said east-west centerline, east a distance of 215.05 feet to a point of intersect with a north-south concourse centerline; thence along the north-south centerline, south a distance of 4.33 feet to a point of intersect with an east-west concourse centerline; thence along said east-west concourse centerline, east a distance of 930.00 feet to a point of intersect with a north-south concourse centerline; thence along said north-south concourse centerline south, a distance of 4.33 feet to point of intersect with an east-west concourse centerline; thence along the said east-west centerline, east 260.08 feet to the point of beginning of the following description:

Thence North a distance of 127.00 feet to a point; thence West a distance of 24.33 feet to a point; thence North a distance of 225.63 feet to a point; thence East a distance of 368.53 feet to a point; thence S 40° 30' 00" E a distance of 499.38 feet to a point; thence 35.34 feet along a curve to the right with a radius of 50.00 feet and a chord length of 34.61 feet, having a bearing of S 20°

OR 1085 PG 2354

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 24 of 27

#136                    Indian River Mall                    Page 6

15' 00" E to a point; thence South a distance of 94.36 feet to a
point; thence 167.29 feet along a curve to the right with a radius
of 213.00 feet and a chord length of 163.02 feet, having a bearing
S 22° 30' 00" W to a point; thence S 45° 00' 00" W a distance of
251.35 feet to a point; thence N 45° 00' 00" W a distance of 149.96
feet to a point; thence S 45° 00' 00" W a distance of 75.59 feet to
a point; thence N 45° 00' 00" W a distance of 350.13 feet to a
point; thence West a distance of 26.24 feet to a point; thence
North a distance of 175.00 feet to the point of beginning.

Containing 9.501 acres of land more or less.

PARCEL C

The net acreage for the Developer's Parcel being 83.366 acres of
land more or less.

Situated in the north ¼ of Section 5, Township 33 South, Range 39
East, Indian River, Florida and more particularly described as
follows:

Commencing at the southwest corner of Rivera Estates Sub-division
per Plat Book 1, Page 12, Public Records of Indian River County,
Florida; said point also being on the north right-of-way line of
State Road 60 Highway; thence along said north line N 89° 53' 54"
W, a distance of 1325.63 feet to a point; thence continuing along
said north line S 89° 52' 37" W a distance of 480.49 feet to a
point; thence north a distance of 236.26 feet to the principal
point and place of beginning of the following description:

Thence west a distance of 227.22 feet to a point; thence N 00° 33'
07" E a distance of 255.78 feet to a point; thence N 00° 02' 44" E
a distance of 22.73 feet to a point; thence east a distance of
178.31 feet to a point; thence south a distance of 100.76 feet to
a point; thence S 45° 00' 00" E a distance of 65.64 feet to a
point; thence south a distance of 132.33 feet to the point of
beginning.

Containing 1.317 acres of land more or less.

The net acreage for the Developer's Parcel being 83.471 acres of
land more or less.

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 25 of 27

#135
REF DWG X2
4-12-95
REV. 8-10-95
REV. 10-6-95

*"Complete Site"*

INDIAN RIVER MALL
SHOPPING CENTER PARCEL
119.683 ACRES

Commencing at a point being 50.0 feet east and 30.0 feet South of the
Northwest corner of the Northwest 1/4 of Section 5, Township 33 South,
Range 39 East, run parallel to the North line of said Section 5, S 89°
52' 28" E a distance of 614.00 feet to a point, said point being the
principal point and place of beginning of the following description:

Thence continuing S 89° 52' 28" E a distance of 72.00 feet to a point;
thence S 00° 07' 32" W a distance of 425.00 feet to a point; thence S 44°
52' 28" E a distance of 35.36 feet to a point; thence S 89° 52' 28" E a
distance of 250.00 feet to a point; thence N 00° 07' 32" E, 230.00 feet
to a point; thence S 89° 52' 28" E, 770.02 feet to a point; thence S 00°
07' 32" W, 141.38 feet to a point; thence N 87° 01' 21" E, 550.00 feet to
a point; thence S 57° 58' 39" E, 556.50 feet to a point; thence S 32° 01'
21" W, 122.35 feet to a point; thence S 57° 58' 39" E, 330.00 feet to a
point; thence S 47° 13' 39" E, 69.27 feet to a point; thence S 89° 51' 57"
E, 917.49 feet to a point; thence S 00° 08' 03" W, 339.44 feet to a
point; thence S 00° 07' 12" W, 210.00 feet to a point; thence N 39° 52'
48" W a distance of 590.00 feet to a point; thence S 51° 10' 06" W a
distance of 127.09 feet to a point; thence N 89° 53' 54" W a distance of
290.00 feet to a point; thence N 66° 53' 54" W a distance of 45.00 feet
to a point; thence N 49° 43' 56" W a distance of 365.00 feet to a point;
thence South a distance of 125.78 feet to a point; thence 208.13 feet
along a curve to the right with a radius of 265.00 feet and a chord
length of 202.83 feet, having a bearing of S 22° 30' 00" W to a point;
thence S 45° 00' 00" W a distance of 262.00 feet to a point; thence South
a distance of 35.00 feet to a point; thence S 47° 00' 00" E a distance of
150.00 feet to a point; thence S 55° 53' 54" E a distance of 270.00 feet
to a point; thence 258.23 feet along a curve to the right with a radius
of 264.21 feet and a chord length of 248.08 feet, having a bearing of S
27° 53' 54" E to a point; thence S 00° 06' 06" W a distance of 110.00 feet
to a point on the North right-of-way line of State Road 60 Highway;
thence along said North line, N 89° 53' 54" W a distance of 84.00 feet to
a point; thence departing said North right-of-way line, N 00° 06' 06" E
a distance of 110.00 feet to a point; thence 176.13 feet along a curve
to the left with a radius of 180.21 feet and a chord length of 169.21
feet having a bearing of N 27° 53' 54" W to a point; thence N 55° 53' 54"
W a distance of 427.45 feet to a point; thence West a distance of 225.00

*Exhibit "B-4"*

(SUD)
(2 pgs)

OR 1085 PG 2356

Unique Code : BAA-BAA-BCAGB-JBJBBF-ECIGAD-G Page 26 of 27

feet to a point; thence South a distance of 85.00 feet to a point; thence S 45° 00' 00' E a distance of 65.64 feet to a point; thence South a distance of 132.33 feet to a point; thence West a distance of 227.22 to a point on the East line of land now owned or formerly owned by Wallace Acres Sub-division per Plat Book 7, Page 12, Public Records of Indian River County, Florida; thence N 00° 33' 07" E along said East line a distance of 256.73 feet to the Northeast corner of said sub-division; thence along the North line of said sub-division, N 89° 53' 07" W a distance of 613.05 feet to the Northwest corner of said sub-division; thence N 00° 30' 13" E a distance of 21.49 feet to a point; thence West a distance of 309.50 feet to a point; thence S 45° 00' 00" W a distance of 40.90 feet to a point; thence South a distance of 489.40 feet to a point on the aforementioned North right-of-way line of State Road 60 Highway; thence along said North line, S 89° 52' 25" W a distance of 96.00 feet to a point; thence departing said North line, North a distance of 492.44 feet to a point; thence N 45° 00' 00" W a distance of 35.89 feet to a point; thence West a distance of 423.69 feet to a point; thence 241.28 feet along a curve to the right with a radius of 310.00 feet and a chord length of 235.24 feet, having a bearing of N 67° 42' 10" W to a point; thence West a distance of 30.32 feet to a point; thence 153.68 feet along a curve to the right with a radius of 190.00 feet and a chord length of 149.53 feet, having a bearing of S 66° 51' 02" W to a point; thence N 89° 58' 39" W a distance of 12.55 feet to a point on the west line of Tract 5 of said Section 5; thence run N 00° 01' 21" E and parallel to the West line of said Section 5 a distance of 1079.13 feet to a point; thence N 45° 00' 00" E a distance of 465.00 feet to a point; thence N 67° 00' 00" E a distance of 123.49 feet to a point; thence S 89° 52' 28" E a distance of 145.85 feet to a point; thence N 45° 07' 32" E a distance of 35.36 feet to a point; thence N 00° 07' 32" E a distance of 425.00 feet to the point of beginning.

Containing 119.683 acres of land more or less.



FEE PARCEL
(±144)

PARCEL "B"
3.988 ACRES

20-FT WIDE RESERVED UTILITY
EASEMENT AREA
(±143)

RESERVED LANDSCAPE AND
SIGNAGE EASEMENT AREA
(±147) SEE DETAIL

EXHIBIT "C"

# **EXHIBIT E**

## **Mall Subdivision Plat**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 1/14/2025 9:44:30 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-JBFHBC-EDJFHJ-D |
| **Instrument Number:** | 915712 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13671079 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

\*\*The web address shown above contains an embedded link to the verification page for this particular document.



# INDIAN RIVER MALL — THE MALL SUBDIVISION

### BEING A RESUBDIVISION OF PART OF SECTION 5, TOWNSHIP 33 SOUTH, RANGE 39 EAST, INDIAN RIVER COUNTY, FLORIDA.

PLAT BOOK ___14___

PAGE ___59___

DOCKET NO. __915712__

## LEGAL DESCRIPTION

COMMENCING AT A POINT BEING 50.0 FEET EAST AND 30.0 FEET SOUTH OF THE NORTHWEST CORNER OF THE NORTHWEST ONE-QUARTER OF SECTION 5, TOWNSHIP 33 SOUTH, RANGE 39 EAST, SAID POINT OF COMMENCEMENT BEING ON THE EAST SOUTH RIGHT-OF-WAY LINE OF THE 30.00 FEET WIDE R.O.W. OF SUB-LATERAL "A-3" CANAL (INDIAN RIVER FARMS WATER CONTROL DISTRICT); RUN PARALLEL TO THE NORTH LINE OF SAID SECTION 5, SOUTH 89°52'28" EAST, A DISTANCE OF 614.00 FEET TO THE PRINCIPAL POINT AND PLACE OF BEGINNING OF THE FOLLOWING DESCRIPTION:

THENCE SOUTH 89°52'28" EAST, 72.00 FEET TO A POINT; THENCE SOUTH 00°37'32" WEST, 425.00 FEET TO A POINT; THENCE SOUTH 44°52'28" EAST, 35.36 FEET TO A POINT; THENCE SOUTH 89°52'28" EAST, 250.00 FEET TO A POINT; THENCE NORTH 00°07'32" EAST, 230.00 FEET TO A POINT; THENCE SOUTH 89°52'28" EAST, 770.02 FEET TO A POINT; THENCE SOUTH 00°07'32" WEST, 143.38 FEET TO A POINT; THENCE NORTH 87°01'21" EAST, 550.00 FEET TO A POINT; THENCE SOUTH 57°58'59" EAST, 556.50 FEET TO A POINT; THENCE SOUTH 32°01'21" WEST, 122.35 FEET TO A POINT; THENCE SOUTH 57°58'59" EAST, 330.00 FEET TO A POINT; THENCE SOUTH 47°13'39 EAST, 69.27 FEET TO A POINT; THENCE SOUTH 09°51'57" EAST, 917.49 FEET TO THE WEST BOUNDARY LINE OF "PLAT OF RIVERA ESTATES" AS RECORDED IN PLAT BOOK 1, PAGE 12 OF THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA, SAID LINE ALSO BEING THE WEST LINE OF TRACT B OF THE AFOREMENTIONED SECTION 5; ACCORDING TO THE LAST GENERAL PLAT OF LANDS OF INDIAN RIVER FARMS COMPANY AS RECORDED IN PLAT BOOK 2, PAGE 25, PUBLIC RECORDS OF ST. LUCIE COUNTY, FLORIDA; THENCE SOUTH 00°08'03" WEST ALONG SAID WEST BOUNDARY LINE, 339.44 FEET TO THE SOUTHWEST CORNER OF SAID SUBDIVISION; THENCE SOUTH 00°07'12" WEST ALONG SAID WEST LINE OF TRACT B, 210.00 FEET; THENCE NORTH 89°52'48" WEST, 590.00 FEET TO A POINT; THENCE SOUTH 00°10'50" WEST, 127.09 FEET TO A POINT; THENCE NORTH 89°53'54" WEST, 290.00 FEET TO A POINT; THENCE NORTH 68°53'54" WEST, 45.00 FEET TO A POINT; THENCE NORTH 49°43'56" WEST, 355.00 FEET TO A POINT; THENCE SOUTH 00°09'00" EAST, 126.78 FEET TO A POINT OF CURVATURE; THENCE RUN SOUTHWESTERLY ALONG A CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 265.00 FEET, A CENTRAL ANGLE OF 45°00'00", SUBTENDED BY A CHORD BEARING AND DISTANCE OF SOUTH 22°30'00" WEST 202.82 FEET AND AN ARC DISTANCE OF 208.13 FEET TO A POINT OF TANGENCY; THENCE SOUTH 45°00'00" WEST, 262.00 FEET TO A POINT; THENCE SOUTH 00 00°00' EAST, 35.00 FEET TO A POINT; THENCE SOUTH 47°00'00" EAST, 150.00 FEET TO A POINT; THENCE SOUTH 55°53'54" EAST, 270.00 FEET TO A POINT OF CURVATURE; THENCE RUN SOUTHEASTERLY ALONG A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 284.21 FEET, A CENTRAL ANGLE OF 56°00'00", SUBTENDED BY A CHORD BEARING AND DISTANCE OF SOUTH 27°53'54" EAST 248.08 FEET AND AN ARC DISTANCE OF 258.23 FEET TO A POINT OF TANGENCY; THENCE SOUTH 00°06'06" WEST, 10.00 FEET TO THE NORTH RIGHT OF WAY LINE OF STATE ROAD 60 ( 20TH. STREET); THENCE NORTH 89°53'54" WEST, 84.00 FEET TO A POINT; THENCE NORTH 00°06'06" EAST, 110.00 FEET TO A POINT OF CURVATURE; THENCE RUN NORTHWESTERLY ALONG A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 180.21 FEET, A CENTRAL ANGLE OF 56°00'00", SUBTENDED BY A CHORD BEARING AND DISTANCE OF NORTH 27°53'54" WEST 169.21 FEET AND AN ARC DISTANCE OF 176.13 FEET TO A POINT OF TANGENCY; THENCE RUN NORTH 55°53'54" WEST, 00.19 FEET TO A POINT; THENCE SOUTH 00°00'00" EAST, 35.55 FEET TO THE SAID NORTH RIGHT OF WAY LINE OF STATE ROAD 60 ( 20TH. STREET ); THENCE SOUTH 89° 52'37" WEST ALONG SAID R.O.W. LINE, 449.58 FEET TO A POINT; THENCE NORTH 00°00'00" WEST, 236.00 FEET TO A POINT; THENCE NORTH 00°00'00" WEST, 227.22 FEET TO THE EAST BOUNDARY LINE OF "WALLACE ACRES" SUBDIVISION AS RECORDED IN PLAT BOOK 7, PAGE 12 OF THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA; THENCE NORTH 00°33'07" EAST ALONG SAID EAST BOUNDARY LINE, 256.78 FEET TO THE NORTHEAST CORNER OF SAID PLAT OF "WALLACE ACRES" SUBDIVISION; THENCE NORTH 89°53'07" WEST ALONG THE NORTH BOUNDARY LINE OF SAID PLAT 609.05 FEET; THENCE NORTH 00°30'13" EAST, 21.44 FEET TO A POINT; THENCE NORTH 90°00'00" WEST, 369.60 FEET TO A POINT; THENCE NORTH 90°00'00" WEST, 150.00 FEET TO A POINT; THENCE NORTH 00°00'00" EAST, 55.50 FEET TO A POINT OF CURVATURE; THENCE NORTH 90°00'00" WEST, 482.44 FEET TO A POINT; THENCE NORTH 00°00'00" EAST, 423.69 FEET TO A POINT OF CURVATURE, CONCAVE TO THE NORTHEAST HAVING A RADIUS OF 310.00 FEET, A CENTRAL ANGLE OF 44°35'40", SUBTENDED BY A CHORD BEARING AND DISTANCE OF NORTH 67°42'10" WEST 235.37 AND AN ARC DISTANCE OF 241.28 FEET TO A POINT; THENCE NORTH 00°00'00" WEST, 30.32 FEET TO A POINT ON CURVE; THENCE RUN WESTERLY ALONG A CURVE CONCAVE TO THE NORTH HAVING A RADIUS OF 190.00 FEET, A CENTRAL ANGLE OF 46°00'39", SUBTENDED BY A CHORD BEARING AND DISTANCE OF SOUTH 66°51'02" WEST 149.53' AND AN ARC DISTANCE OF 153.68 FEET TO A POINT OF TANGENCY; THENCE NORTH 89° 58'39" WEST, 12.55 FEET TO THE WEST LINE OF TRACT 5 OF THE AFOREMENTIONED SECTION 5, SAID LINE ALSO BEING THE EAST RIGHT OF WAY LINE OF "LATERAL 'A' CANAL" ( INDIAN RIVER FARMS WATER CONTROL DISTRICT); THENCE NORTH 00°02'21" EAST ALONG SAID EAST RIGHT OF WAY LINE, 1079.13 FEET TO A POINT; THENCE NORTH 45°00'00" EAST, 35.36 FEET TO A POINT; THENCE NORTH 00°07'32" EAST, 425.00 FEET TO THE SOUTH LINE OF "SUB-LATERAL 'A-3' CANAL" 30.00 FEET WIDE RIGHT OF WAY (INDIAN RIVER FARMS WATER CONTROL DISTRICT AND POINT OF BEGINNING.

## LINE DATA

| LINE | DIRECTION | DISTANCE |
|------|-----------|----------|
| L1 | S44°52'28"E | 35.36 |
| L2 | S89°52'28"E | 72.00 |
| L3 | S00°07'32"W | 143.38 |
| L4 | S32°01'21"W | 122.35 |
| L5 | S47°13'39"E | 69.27 |
| L6 | N00°06'06"E | 110.00 |
| L7 | N00°00'00"E | 35.00 |
| L8 | N47°00'00"E | 150.00 |
| L9 | S00°08'03"W | 126.78 |
| L10 | S66°53'54"E | 45.00 |
| L11 | N51°10'08"E | 127.09 |
| L12 | S00°06'06"W | 110.00 |
| L13 | S55°53'54"E | 100.19 |
| L14 | S89°53'54"E | 131.03 |
| L15 | N89°57'37"E | 30.91 |
| L16 | S89°53'54"E | 84.00 |
| L17 | N00°30'13"E | 21.49 |
| L18 | N45°00'00"E | 45.90 |
| L19 | N89°52'25"E | 96.00 |
| L20 | S45°00'00"E | 36.89 |
| L21 | S90°00'00"E | 35.32 |
| L22 | S89°58'39"E | 12.55 |
| L23 | S89°52'28"E | 145.85 |
| L24 | N67°00'00"E | 123.49 |
| L25 | N45°07'32"E | 35.36 |
| L26 | N90°00'00"W | 227.22 |
| L27 | S00°00'00"E | 85.00 |
| L28 | S45°00'00"E | 65.64 |
| L29 | S00°00'00"W | 132.33 |
| L30 | S00°00'00"E | 15.76 |
| L31 | N90°00'00"E | 178.31 |
| L32 | N90°00'00"W | 225.00 |
| L33 | N55°53'54"W | 327.27 |
| L34 | N89°52'28"W | 60.00 |
| L35 | N78°00'00"W | 100.00 |
| L36 | N45°00'00"W | 165.00 |
| L37 | N49°43'56"W | 51.48 |
| L38 | S40°53'57"W | 134.18 |
| L39 | N00°00'00"W | 424.07 |
| L40 | N90°00'00"W | 35.50 |
| L41 | N00°00'00"E | 24.08 |
| L42 | N90°00'00"W | 43.66 |
| L43 | N00°00'00"E | 131.94 |
| L44 | N45°00'00"E | 408.61 |
| L45 | N45°00'00"E | 423.79 |

| LINE | DIRECTION | DISTANCE |
|------|-----------|----------|
| L46 | S28°14'33"E | 131.20 |
| L47 | S00°00'00"E | 25.00 |
| L48 | S00°00'00"E | 373.00 |
| L49 | N00°00'00"E | 80.00 |
| L50 | S90°00'00"E | 50.00 |
| L51 | N00°00'00"E | 100.71 |
| L52 | S00°00'00"E | 70.92 |
| L53 | N90°00'00"W | 55.00 |
| L54 | S00°00'00"E | 286.40 |
| L55 | N90°00'00"W | 220.00 |
| L56 | N00°00'00"E | 258.36 |
| L57 | N90°00'00"E | 220.00 |
| L58 | N00°00'00"E | 240.93 |
| L59 | N00°00'00"E | 240.93 |
| L60 | N00°00'00"E | 240.00 |
| L61 | S00°00'00"W | 240.93 |
| L62 | N90°00'00"E | 240.00 |
| L63 | N90°00'00"E | 243.26 |
| L64 | S00°00'00"E | 65.58 |
| L65 | N90°00'00"E | 375.00 |
| L66 | N00°00'00"E | 178.67 |
| L67 | S90°00'00"E | 230.42 |
| L68 | S00°00'00"E | 103.83 |
| L69 | N45°00'00"E | 360.13 |
| L70 | S45°00'00"E | 149.96 |
| L71 | N45°00'00"E | 15.59 |
| L72 | S45°00'00"E | 51.82 |
| L73 | N00°00'00"E | 84.36 |
| L74 | S45°00'00"W | 251.35 |
| L75 | N45°00'00"W | 159.15 |
| L76 | S00°04'48"W | 172.11 |
| L77 | S00°03'19"W | 171.27 |
| L78 | S37°01'19"W | 171.05 |
| L79 | S89°52'54"E | 184.35 |
| L80 | S89°59'54"E | 88.24 |
| L81 | S89°52'28"E | 60.70 |
| L82 | S90°00'00"W | 89.08 |
| L83 | N00°00'00"E | 22.73 |
| L84 | N00°00'00"W | 54.00 |
| L85 | N90°00'00"W | 34.00 |
| L86 | N00°00'00"W | 258.50 |
| L87 | N40°20'00"W | 74.01 |
| L88 | S00°00'00"E | 579.74 |
| L89 | N90°03'02"E | 215.08 |
| L90 | S00°00'00"E | 280.08 |
| L91 | N00°00'00"E | 101.67 |
| L92 | S00°00'00"E | 87.08 |
| L93 | N00°00'00"E | 109.42 |

## CURVE DATA

| CURVE | RADIUS | LENGTH | CHORD | BEARING | DELTA |
|-------|--------|--------|-------|---------|-------|
| C1 | 284.21' | 86.49' | 86.11' | N46°31'12"W | 18°45'24" |
| C2 | 284.21' | 171.74' | 168.73' | N18°31'12"W | 37°14'36" |
| C3 | 265.00' | 208.13' | 202.82' | N22°30'00"E | 45°00'00" |
| C4 | 180.21' | 176.13' | 169.21' | N27°53'54"W | 56°00'00" |
| C5 | 190.00' | 153.68' | 149.53' | N66°51'02"E | 46°20'39" |
| C6 | 310.00' | 241.28' | 235.23' | S67°42'10"E | 44°35'40" |
| C7 | 284.00' | 47.05' | 47.04' | S38°57'36"E | 09°29'33" |
| C8 | 284.00' | 110.89' | 110.08' | S52°50'23"E | 22°22'30" |
| C9 | 266.00' | 97.12' | 96.56' | S79°37'25"E | 20°55'10" |
| C10 | 211.00' | 165.72' | 161.46' | N67°30'00"W | 45°00'00" |
| C11 | 213.00' | 167.23' | 163.02' | N22°30'00"E | 45°00'00" |
| C12 | 50.00' | 35.34' | 34.61' | N20°15'00"W | 40°30'00" |

## CERTIFICATE OF TITLE

I CERTIFY THAT AS OF THIS _____ DAY OF _____ 19____, THE LANDS AS DESCRIBED AND SHOWN ON THE PLAT ARE IN THE NAME OF, AND APPARENT RECORD TITLE IS HELD BY THE PERSONS, OR ORGANIZATIONS EXECUTING THE DEDICATION; THAT ALL TAXES HAVE BEEN PAID ON SAID PROPERTY AS REQUIRED BY CHAPTER 197.192, FLORIDA STATUTES AS AMENDED; AND THAT NO MORTGAGES, LIENS OR OTHER ENCUMBRANCES WHICH WOULD REQUIRE EXECUTION OF THE PLAT BY OTHER PARTIES THAN APPEAR HEREON ARE AGAINST THE LAND.

ROGER C. GAMBLIN, VICE PRESIDENT
INTERSTATE TITLE SERVICES, INC.

## CERTIFICATE OF SURVEYOR

KNOW ALL MEN BY THESE PRESENTS, THAT THE UNDERSIGNED, BEING A LICENSED AND REGISTERED LAND SURVEYOR, DOES HEREBY CERTIFY THAT ON _____ 19____, HE COMPLETED THE SURVEY OF THE LANDS AS SHOWN IN THE FOREGOING PLAT, THAT SAID PLAT IS A CORRECT PRESENTATION OF THE LANDS THEREIN DESCRIBED AND PLATTED OR SUBDIVIDED; THAT PERMANENT REFERENCE MONUMENTS AND PERMANENT CONTROL POINTS HAVE BEEN PLACED AS SHOWN THEREON AS REQUIRED BY CHAPTER 177, FLORIDA STATUTES AND SUBDIVISIONS AND PLATTING, CHAPTER 913; AND THAT SAID LAND IS LOCATED IN INDIAN RIVER COUNTY, FLORIDA.

DANA HOWARD (P.S.M.) NO. 2805
SURVEYOR'S SEAL                DATED __Nov. 30, 1995__

## CERTIFICATE OF OWNERSHIP AND DEDICATION

KNOW ALL MEN BY THESE PRESENTS, THAT DEBARTOLO REALTY PARTNERSHIP, L.P., A DELAWARE LIMITED PARTNERSHIP, AUTHORIZED TO DO BUSINESS IN THE STATE OF FLORIDA UNDER THE NAME DEBARTOLO REALTY PARTNERSHIP, LTD., FEE SIMPLE OWNER OF THE LANDS SHOWN AND PLATTED HEREON, AS "INDIAN RIVER MALL — THE MALL SUBDIVISION", BEING IN INDIAN RIVER COUNTY, FLORIDA, HAVING CAUSED SAID LANDS TO BE SURVEYED AND PLATTED AS SHOWN HEREON STATES THAT NO LANDS OR USES THERE'IN' ARE DEDICATED BY IT TO THE PUBLIC OR ANYONE ELSE BY THIS PLAT.

1. SUBSEQUENT TO THE RECORDING OF THIS PLAT ON THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA, THE OWNERS OF LOTS WITHIN THE SUBDIVISION WILL EXECUTE A RECIPROCAL EASEMENT AND OPERATING AGREEMENT WHICH WILL BE RECORDED ON THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA. THE RECIPROCAL EASEMENT AND OPERATING AGREEMENT, AMONG OTHER THINGS, WILL DEFINE THE LOT OWNERS' RIGHTS AND RESPONSIBILITIES WITH RESPECT TO THE USE OF THE PROPERTY TO INCLUDE, BUT NOT BE LIMITED TO, COMMON AREA EASEMENTS, PERMANENT ACCESS EASEMENTS, UTILITY EASEMENTS, EASEMENTS FOR ENCROACHMENTS, CONSTRUCTION EASEMENTS, MAINTENANCE AND PARKING.

2. EASEMENTS FOR UTILITIES WILL BE GRANTED TO INDIAN RIVER COUNTY OR UTILITY PROVIDERS INCLUDING CABLE TELEVISION BY WRITTEN EASEMENTS RECORDED ON THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA.

3. CONSERVATION EASEMENTS AND LIMITED ACCESS EASEMENTS AND BIKEWAY AND SIDEWALK EASEMENTS WHICH HAVE BEEN PREVIOUSLY GRANTED BY THE FEE SIMPLE OWNER OF THE PLATTED PROPERTY ARE IDENTIFIED ON THIS PLAT BY DESIGNATION OF THE OFFICIAL RECORD BOOK AND PAGE WHERE SUCH EASEMENT IS RECORDED ON THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA.

ALL PUBLIC AUTHORITIES, INCLUDING BUT NOT LIMITED TO POLICE, FIRE AND AMBULANCE, SHALL HAVE THE RIGHT TO USE THE INTERNAL DRIVEWAYS AND PARKING AREAS CONSTRUCTED WITHIN THE SUBDIVISION IN THE COURSE OF PERFORMING THEIR RESPECTIVE DUTIES.

IN WITNESS WHEREOF, THE ABOVE NAMED LIMITED PARTNERSHIP HAS CAUSED THESE PRESENTS TO BE SIGNED BY ITS GENERAL PARTNER, THIS ____ DAY OF ___November___, 1995.

DEBARTOLO REALTY PARTNERSHIP, L.P., A DELAWARE LIMITED PARTNERSHIP, AUTHORIZED TO DO BUSINESS IN THE STATE OF FLORIDA UNDER THE NAME DEBARTOLO REALTY PARTNERSHIP, LTD.

BY: DEBARTOLO REALTY CORPORATION, AN OHIO CORPORATION

BY: _____   WITNESS: _____
ITS: _____

## ACKNOWLEDGMENT

STATE OF OHIO
COUNTY OF MAHONING

THE FOREGOING INSTRUMENT WAS ACKNOWLEDGED BEFORE ME THIS ____ DAY OF ___November___, 1995, BY _____ OF DEBARTOLO REALTY CORPORATION, AN OHIO CORPORATION, ON BEHALF OF AND AS GENERAL PARTNER OF DEBARTOLO REALTY PARTNERSHIP, L.P., A DELAWARE LIMITED PARTNERSHIP, AUTHORIZED TO DO BUSINESS IN THE STATE OF FLORIDA UNDER THE NAME DEBARTOLO REALTY PARTNERSHIP, LTD., ON BEHALF OF THE LIMITED PARTNERSHIP, WHO IS PERSONALLY KNOWN TO ME OR WHO HAS PRODUCED _____ AS IDENTIFICATION.

PRINTED SIGNATURE
NOTARY PUBLIC, STATE OF OHIO AT LARGE
MY COMMISSION
EXPIRES: _____

THIS INSTRUMENT WAS PREPARED BY: DANA HOWARD
DATED: OCTOBER 'OTH., 1995.

## CERTIFICATE OF APPROVAL BY BOARD OF COUNTY COMMISSIONERS

THIS IS TO CERTIFY THAT ON __November 28, 1995__ THE FOREGOING PLAT WAS APPROVED BY THE BOARD OF COUNTY COMMISSIONERS OF INDIAN RIVER COUNTY, FLORIDA, AND IS HEREBY ACCEPTED.

CHAIRMAN OF THE BOARD _____

ATTEST: _____ CLERK

APPROVED AS TO FORM AND LEGAL SUFFICIENCY

_____
COUNTY ATTORNEY

## CERTIFICATE OF APPROVAL BY COUNTY ADMINISTRATOR

EXAMINED AND APPROVED _____ DATE: 11-30-95

## CERTIFICATION OF THE CLERK OF THE CIRCUIT COURT

STATE OF FLORIDA
COUNTY OF INDIAN RIVER

I, CLERK OF THE CIRCUIT COURT OF INDIAN RIVER COUNTY, FLORIDA, DO HEREBY CERTIFY THAT I HAVE EXAMINED THIS PLAT OF "INDIAN RIVER MALL—THE MALL SUBDIVISION" AND THAT IT COMPLIES WITH ALL THE REQUIREMENTS OF CHAPTER 177 OF THE LAWS OF FLORIDA. THIS PLAT FILED FOR RECORD THIS ____ DAY OF __December__ A.D., 1995, AND RECORDED ON PAGE __59__ OF THIS PLAT BOOK __14__ IN THE OFFICE OF THE CLERK OF THE CIRCUIT COURT OF INDIAN RIVER COUNTY, FLORIDA.

BY: _____
JEFFERY K. BARTON
CLERK OF THE CIRCUIT COURT OF INDIAN RIVER COUNTY, FLORIDA.

RICHARD WOODARD, DEPUTY CLERK

NOTICE: THERE MAY BE ADDITIONAL RESTRICTIONS THAT ARE NOT RECORDED ON THIS PLAT THAT MAY BE FOUND IN THE PUBLIC RECORDS OF THIS COUNTY.

NOTICE: NO CONSTRUCTION, TREES OR SHRUBS WILL BE PLACED IN EASEMENTS WITHOUT COUNTY APPROVAL.

CARTER ASSOCIATES, INC.
CONSULTING ENGINEERS AND LAND SURVEYORS
1708 21ST. STREET, VERO BEACH, FLORIDA 32960
TEL (407) 562-4191    FAX (407) 562-7180

SHEET 1 OF 2



### INDIAN RIVER MALL — THE MALL SUBDIVISION

BEING A RESUBDIVISION OF PART OF SECTION 5, TOWNSHIP 33 SOUTH, RANGE 39 EAST,
INDIAN RIVER COUNTY, FLORIDA.

PLAT BOOK ___14___

PAGE ___59 A___

DOCKET NO.___915712___

THIS INSTRUMENT WAS PREPARED BY: DANA HOWARD
DATED: OCTOBER 10TH, 1995.

CARTER ASSOCIATES, INC.
CONSULTING ENGINEERS AND LAND SURVEYORS
1708 21ST. STREET, VERO BEACH, FLORIDA. 32960
TEL.(407) 562-4191    FAX.(407) 562-7180

SHEET 2 OF 2

# **EXHIBIT F**

**Reciprocal Easement and Operating Agreement**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:29 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-BACCBIA-ECIGAF-A |
| **Instrument Number:** | 1022180 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



GAS/wp3-5/15/95;4/4/96/1/3;RBM9/30/96;11/06/96; 12/5/96; 2/27/97; 4/22/97; 5/13/97;
6/11/97; 6/19/97; 8/6/97
F:\STAFF\BRUCE\DOCUMENT\INDIAN.GS\RREOA17.CMP

# $ 388.50

1022180

97 OCT 10 PH 3:19

IN THE RECORDS OF
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO., FLA.

## INDIAN RIVER MALL

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

### BY AND AMONG

### DILLARD'S, INC.

### AND

### BURDINES, INC.

### AND

### SEARS, ROEBUCK AND CO.

### AND

### J. C. PENNEY COMPANY, INC.

### AND

### I R MALL ASSOCIATES, LTD.

OR 1174 PG 2945

Record and return to
Interstate Title Services, Inc.
1807 Palm Beach Lakes Blvd
Suite 125
West Palm Beach FL 33409
File No _T-517_

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR
DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN
THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER.
THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT

THE HONORABLE RYAN L. BUTLER,

12/17/2024 10:24:31 AM
INDIAN RIVER CLERK OF THE COURTS & COMPTROLLER
12/17/2024 10:24:31 AM

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 1 of 86

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 2 of 86

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
|  | DEFINITIONS | 2 |
| ARTICLE I | DESIGNING THE SHOPPING CENTER | |
| 1.1 | The Shopping Center | 7 |
| 1.2 | Developer Buildings | 7 |
| 1.3 | Preliminary Plans and Specifications for Common Area Site Work | 9 |
| 1.4 | Final Plans and Specifications by Developer | 10 |
| 1.5 | Approval of Final Plans and Specifications | 11 |
| 1.6 | Preliminary Plans of Department Stores | 11 |
| 1.7 | Parking Requirements | 12 |
| 1.8 | Compliance with Laws | 12 |
| 1.9 | Preparation of Plans and Document Approval | 12 |
| 1.10 | Effect of Approval | 13 |
| ARTICLE II | CONSTRUCTION OF SHOPPING CENTER | |
| 2.1 | Construction Contract | 13 |
| 2.2 | Common Area Site Work | 13 |
| 2.3 | Construction by Developer | 13 |
| 2.4 | Construction by Dillard | 13 |
| 2.5 | Construction by Burdines | 13 |
| 2.6 | Construction by Sears | 14 |
| 2.7 | Construction by Penney | 14 |
| 2.8 | Changes in Buildings/Expansion | 14 |
| 2.9 | Compliance with Laws and Plot Plan | 15 |
| 2.10 | Reasonable Diligence to Meet Dates | 15 |
| 2.11 | Certification of Floor Area | 15 |
| ARTICLE III | LEASING | |
| 3.1 | Leasing Requirements | 15 |
| 3.2 | Kiosks, Pushcarts and Retail Merchandising Units | 16 |
| ARTICLE IV | OPENING FOR BUSINESS | |
| 4.1 | Opening by Developer | 16 |
| 4.2 | Opening by Dillard | 17 |
| 4.3 | Opening by Burdines | 17 |
| 4.4 | Opening by Sears | 17 |
| 4.5 | Opening by Penney | 17 |
| 4.6 | Extension of Opening Date | 17 |

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 3 of 86

| | | PAGE |
|---|---|---|
| **ARTICLE V** | **SHOPPING CENTER OPERATION** | |
| 5.1 | Shopping Center Operation | 18 |
| 5.2 | Location of Selling Activities | 20 |
| 5.3 | Signs | 20 |
| 5.4 | Name | 20 |
| 5.5 | Employee Parking | 20 |
| 5.6 | Transfers by Developer | 20 |
| 5.7 | Transfers by Department Store Operators | 21 |
| 5.8 | Sale and Leaseback, Mortgages | 21 |
| 5.9 | Resident Manager | 23 |
| | | |
| **ARTICLE VI** | **EASEMENTS** | |
| 6.1 | Common Area Easements | 23 |
| 6.2 | Permanent Access Easements | 24 |
| 6.3 | Utility Easements | 25 |
| 6.4 | Footing and Foundation Easements | 25 |
| 6.5 | Encroachments | 26 |
| 6.6 | Termination of Perpetual Easements | 26 |
| 6.7 | Easement to Perform Self-Help | 27 |
| 6.8 | Easement for Signage, Alarms, Accent Lights, Etc. | 27 |
| 6.9 | Non-Dedication | 28 |
| 6.10 | Construction Easement | 28 |
| | | |
| **ARTICLE VII** | **MAINTENANCE** | |
| 7.1 | Building and Utility Maintenance | 29 |
| 7.2 | Maintenance and Operation of Common Areas | 29 |
| 7.3 | Parking Regulations | 30 |
| | | |
| **ARTICLE VIII** | **CONDEMNATION** | |
| 8.1 | Condemnation on Developer Site | 31 |
| 8.2 | Condemnation on Department Store Sites | 32 |
| 8.3 | Proceeds | 33 |
| 8.4 | Rebuilding | 33 |
| | | |
| **ARTICLE IX** | **INSURANCE** | |
| 9.1 | Property Insurance | 34 |
| 9.2 | Liability Insurance | 34 |
| 9.3 | Workers' Compensation Insurance | 34 |
| 9.4 | Motor Vehicle Liability Insurance | 34 |
| 9.5 | Indemnities | 35 |
| 9.6 | Form of Policies | 35 |

OR 1174 PG 2947

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 4 of 86

|  |  | PAGE |
|---|---|---|
| ARTICLE X | DAMAGE AND DESTRUCTION | |
| 10.1 | Rebuilding by Developer | 37 |
| 10.2 | Rebuilding by the Department Store Operators | 38 |
| 10.3 | Restoration of Site | 38 |
| | | |
| ARTICLE XI | UNAVOIDABLE DELAY | |
| 11.1 | Unavoidable Delay | 38 |
| | | |
| ARTICLE XII | TERM | |
| 12.1 | Term | 39 |
| | | |
| ARTICLE XIII | REAL ESTATE TAXES | |
| 13.1 | Payment of Taxes | 39 |
| 13.2 | Contesting Taxes | 39 |
| | | |
| ARTICLE XIV | OPERATING COVENANTS | |
| 14.1 | Operating Covenant of Developer | 39 |
| 14.2 | Operating Covenant of Dillard | 40 |
| 14.3 | Operating Covenant of Burdines | 41 |
| 14.4 | Operating Covenant of Sears | 43 |
| 14.5 | Operating Covenant of Penney | 44 |
| | | |
| ARTICLE XV | MISCELLANEOUS | |
| 15.1 | Recording; Publicity | 44 |
| 15.2 | Covenants Running with the Land | 44 |
| 15.3 | Not Partners | 45 |
| 15.4 | Waiver | 45 |
| 15.5 | Governing Law | 45 |
| 15.6 | Modifications | 45 |
| 15.7 | Notices | 45 |
| 15.8 | Headings | 47 |
| 15.9 | Exhibits | 47 |
| 15.10 | Counterparts | 47 |
| 15.11 | Remedies Not Exclusive | 47 |
| 15.12 | Successors and Assigns | 48 |
| 15.13 | Estoppel Certificates | 48 |
| 15.14 | Performance Under Protest | 48 |
| 15.15 | Cost and Expense | 48 |
| 15.16 | Injunctive and Declaratory Relief | 48 |
| 15.17 | Temporary Cessation of Business | 49 |
| 15.18 | Agreement for Benefit of Parties | 49 |
| 15.19 | Default | 49 |
| 15.20 | Right to Cure Default of Another Party | 49 |
| 15.21 | Liens | 50 |
| 15.22 | Severability | 51 |

OR 17; PG 2948

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 5 of 86

|        |                  | **PAGE** |
|--------|------------------|------|
| 15.23  | Exculpation      | 51   |
| 15.24  | Time of Essence  | 52   |

## EXHIBITS

EXHIBIT "A"    PARCEL DESCRIPTIONS
    A-1 - Developer Site
    A-2 - Dillard Site
    A-3 - Burdines Site
    A-4 - Sears Site
    A-5 - Penney Site
    A-6 - Complete Site
    A-7 - Flora Preservation Area

EXHIBIT "B"    PLOT PLAN

EXHIBIT "C"    SIGN CRITERIA

CR 1174 PG 2949

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 6 of 86

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

THIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT (hereinafter called the "Agreement") is made as of the _____7_____ day of _OCTOBER_ _____, 1997, by and among:

DILLARD'S, INC. (hereinafter called "Dillard"), a Delaware corporation, having its principal office at 1600 Cantrell Road, Little Rock, Arkansas 72201;

BURDINES, INC. (hereinafter called "Burdines"), an Ohio corporation, having its principal office at 7 West Seventh Street, Cincinnati, Ohio 45202;

SEARS, ROEBUCK AND CO. (hereinafter called "Sears"), a New York corporation, having its principal office at 3333 Beverly Road, Hoffman Estates, Illinois 60179; and

J. C. PENNEY COMPANY, INC. (hereinafter called "Penney"), a Delaware corporation, having its principal office at 6501 Legacy Drive, Plano, Texas 75024;

I R MALL ASSOCIATES, LTD. (hereinafter called "Developer"), a Florida limited partnership, having its principal office at % Simon DeBartolo Group, National City Center, 115 W. Washington Street, Indianapolis, Indiana 46204.

### W I T N E S S E T H :

WHEREAS, Developer is the fee owner of a parcel of land situated in the County of Indian River, State of Florida, containing approximately 83.471 acres upon which it shall cause to be constructed an Enclosed Mall and other Developer Buildings (as both terms are hereafter defined), said parcel being more particularly described as the "Developer Site" in Exhibit "A-1" annexed hereto and hereby made a part hereof and being the area so designated on the plot plan last revised on May 21, 1997, annexed hereto as Exhibit "B" and hereby made a part hereof (said plot plan being hereinafter referred to as the "Plot Plan"); and

WHEREAS, Dillard is the owner of a parcel of land contiguous to the Developer Site containing approximately 10.151 acres, upon which Dillard shall construct and operate, pursuant to the terms of Section 14.2 hereof, a Department Store, said parcel being more particularly described as the "Dillard Site" in Exhibit "A-2" annexed hereto and hereby made a part hereof and being the area so designated on the Plot Plan; and

WHEREAS, Burdines is the owner of a parcel of land contiguous to the Developer Site containing approximately 9.501 acres, upon which it shall construct (or cause to be constructed) and operate (or cause to be operated) a Department Store, said

1

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 7 of 86

parcel being more particularly described as the "Burdines Site" in Exhibit "A-3" annexed hereto and hereby made a part hereof and being the area so designated on the Plot Plan; and

WHEREAS, Sears is the owner of two parcels of land contiguous to the Developer Site containing approximately 8.763 acres and 1.317 acres, respectively, upon which it shall construct (or cause to be constructed) and operate (or cause to be operated) a Department Store and Auto Service Center, said parcels being more particularly described as the "Sears Site" in Exhibit "A-4" annexed hereto and hereby made a part hereof and being the area so designated on the Plot Plan; and

WHEREAS, Penney is the owner of a parcel of land contiguous to the Developer Site containing approximately 6.48 acres, upon which it shall construct (or cause to be constructed) and operate (or cause to be operated) a Department Store, said parcel being more particularly described as the "Penney Site" in Exhibit "A-5" annexed hereto and hereby made a part hereof and being the area so designated on the Plot Plan; and

WHEREAS, It is the mutual desire of the parties hereto that their respective Sites (hereinafter collectively referred to as the "Complete Site" and more particularly described in Exhibit "A-6" annexed hereto and hereby made a part hereof) be developed in accordance with the Plot Plan and thereafter the Complete Site shall be operated as a first-class enclosed regional mall type shopping center for the mutual benefit of the parties hereto; and

WHEREAS, It is the intention of this Agreement to set forth the rights, obligations, duties and responsibilities of each of the parties hereto in connection with the development and use of the buildings and operations on the Complete Site.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereby covenant and agree to and with each other, as follows:

## DEFINITIONS

The following terms, where used in this Agreement, shall have the meanings set forth hereinbelow:

The term "best efforts" shall mean commercially reasonable efforts such as would be used by a prudent businessman in the ordinary course of business .

The term "Burdines Building" shall mean the Department Store Building to be constructed on the Burdines Site initially containing approximately 105,055 square feet of Gross Floor Area.

OR 11171:PG 2951

2

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 8 of 86

The term "Burdines Building Expansion" shall mean the expansion of the Burdines Building which may be constructed on the Burdines Site containing approximately 21,306 square feet of Gross Floor Area.

The term "Burdines Site" shall mean that parcel of land owned by Burdines upon which the Burdines Building will be located and which is more particularly described on Exhibit "A-3".

The term "Common Area" shall refer to and include all portions of the Complete Site which are designed and/or available for the general use, convenience and benefit of all the parties hereto and their respective employees, agents, contractors, customers, visitors, licensees, invitees and tenants, excepting, however, from the foregoing definition:

(a)    those portions of the Complete Site occupied at any time and from time to time by buildings, excluding the Enclosed Mall;

(b)    truck facilities shown on the Plot Plan, including truck ramps, truck tunnels, truck loading, truck parking and truck turn-around facilities and truck docks and delivery concourses; and

(c)    those portions of the Complete Site which may from time to time be occupied by any duly dedicated public street or highway.

The Common Area shall include, without limiting the generality of the foregoing:  (i) parking areas and individual parking stalls and parking structures for passenger vehicles, including curbs, lighting standards, and directional signs; (ii) roadways which have not been dedicated as a highway, public street or right of way (including the ring road located within the "Permanent Access Easement" (as described in Section 6.2 hereof) and all access roads) which provide vehicular access to and ingress and egress to and from and in and out of such individual parking stalls and parking structures and to streets, highways and alleys adjacent to and abutting the Complete Site; (iii) sidewalks and walkways to provide pedestrian access to and ingress and egress to and from such individual parking stalls and parking structures; (iv) malls (including the Enclosed Mall), whether covered or uncovered or open or enclosed, which provide pedestrian access to and ingress and egress to and from the Sites of the respective parties hereto, but not including kiosks located within the Enclosed Mall; (v) common utility facilities; (vi) perimeter sidewalks; (vii) restrooms and stairways within and being part of the Enclosed Mall; (viii) wetlands areas, drainage detention ponds, and the Flora Preservation Area; (ix) landscaping (excluding landscaping between buildings and building sidewalks); and (x) mall offices, storage rooms and the like.

The term "Common Area Site Work" shall mean that work which Developer shall perform or cause to be performed pursuant to the plans and specifications approved in accordance with Article I hereof.

3

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 9 of 86

The term "Complete Site" shall refer to the tract of land which is comprised of the Developer Site, Dillard Site, Burdines Site, Sears Site, and Penney Site which is more particularly described on Exhibit "A-6".

The term "Condemnation" or "Condemned" means the taking or appropriation of any portion of the Complete Site pursuant to an exercise of the power of eminent domain or any conveyance in lieu of condemnation under threat thereof to a grantee having the power of condemnation.

The term "Department Store" shall mean a retail store located in the Shopping Center outside the Developer Buildings and containing at least eighty thousand (80,000) square feet of Gross Floor Area and multiple departments for the sale of hard and/or soft goods, miscellaneous other merchandise, and such services as are customarily sold and performed by department stores from time to time and carrying general lines of apparel, which may include suits, coats, dresses, cosmetics and housewares, whether or not each type or category of merchandise or a full line of each category of merchandise is carried and whether or not all of such services are offered.

The term "Department Store Building" shall mean a building located on a Department Store Site in which a Department Store is operated.

The term "Department Store Operator" shall mean the Owner of any Department Store Site. Dillard, Burdines, Sears and Penney are the Department Store Operators as of the date hereof.

The term "Department Store Site" shall mean the Dillard Site, Burdines Site, Sears Site, and Penney Site.

The term "Developer Buildings" shall mean all buildings which Developer shall construct or cause to be constructed on the Developer Site pursuant to the preliminary plans and specifications referenced in Section 1.2 hereof and more particularly described therein, containing approximately 411,000 square feet of Gross Floor Area.

The term "Developer Site" shall mean that parcel of land owned by Developer on which Developer has constructed or shall construct the Developer Buildings and which is more particularly described on Exhibit "A-1".

The term "Dillard Building" shall mean the Department Store Building to be constructed on the Dillard Site containing approximately 131,000 square feet of Gross Floor Area.

The term "Dillard Site" shall mean that parcel of land owned by Dillard upon which the Dillard Building will be located and which is more particularly described on Exhibit "A-2".

The term "Enclosed Mall" shall mean that enclosed one (1) level, sprinklered, heated, air conditioned and ventilated area of the Developer Buildings which is Common Area and is designated "Enclosed Mall" on the Plot Plan, together with the heating, air conditioning, lighting and ventilating equipment required to operate the Enclosed Mall in accordance with the standards provided in Section 1.2 hereof.

The term "Flora Preservation Area" shall mean that parcel of land designated "Cabbage Palm Hammock Preserve" on the Plot Plan and which is more particularly described in Exhibit "A-7" on which no building or other improvements will be constructed and over which Developer has granted an easement to the Indian River County pursuant to that certain "Conservation Easement" dated September 18, 1995, recorded in Official Record Book 1072, Page 2576, and rerecorded in Official Record Book 1072, Page 2581, Public Records of Indian River County, Florida.

The term "Gross Floor Area" shall mean, with respect to each building or structure on each Owner's Site, the number of square feet of floor area at each level or story (including mezzanines and basements) lying within the exterior faces of exterior walls (except party walls as to which the centerline, not the exterior faces, shall be used).

The term "maintenance" (and its grammatical variations) whenever used in this Agreement shall mean any and all of the following to the extent applicable to the buildings or other improvements located on each Owner's Site: (a) inspecting, servicing and otherwise taking care of all structures, buildings, building equipment and other improvements; (b) putting and keeping same in first class condition, state of repair and working order in accordance with then existing standards for a first-class regional enclosed mall type shopping center, and performing any repairs, replacements and/or other work for such purposes; (c) keeping same well-painted, clean and clear of rubbish, debris, unlawful obstructions and water as well as removing such; (d) keeping same lighted and heated, cooled and ventilated in accordance with the standards therefor set forth in this Agreement; (e) making such additions, alterations, repairs, replacements and doing such other construction as is permitted under this Agreement to render any building and other improvements, including without limitation, machinery, equipment and equipment systems and fixtures in compliance in all respects with every applicable requirement of law or duly constituted authority, (f) doing all work necessary to cure any defect in construction or other work done by an Owner or for which such other Owner is responsible pursuant to the provisions relating thereto as set forth in this Agreement; and (g) performing such other acts or work as is reasonably incident to any of the foregoing.

The term "Mall Opening" shall mean the date defined in Section 4.1 hereof.

The term "Mall Stores" shall mean the small shop stores to be leased by Developer to tenants, located along the Enclosed Mall in the Developer Buildings.

The term "Merchants' Association" shall mean an association formed by tenants of the Shopping Center for the purpose of carrying out an ongoing program for the

5

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 10 of 86

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 11 of 86

promotion of the Shopping Center which may include, without limitation, special events, shows, displays, signs, marquees and advertising for the Shopping Center. The term "Merchants' Association" shall also include any Promotional Fund established pursuant to this Agreement.

The term "Net Floor Area" shall mean, with respect to each building or other structure on each Owner's Site, the number of square feet of floor area on all levels or stories (including mezzanines and basements and kiosks, pushcarts and/or retail merchandising units located within the Enclosed Mall) lying within the exterior faces of exterior walls (except party walls as to which the centerline, not the exterior faces, shall be used), excluding, however, (i) rooms used exclusively for mechanical, electrical, telephone or computer equipment (including penthouses and bulkheads), (ii) the Enclosed Mall and delivery corridors (but not including within this exclusion any area(s) occupied by kiosks, pushcarts and/or retail merchandising units), (iii) open truck loading areas, (iv) outdoor sales areas which are neither heated nor air conditioned, (v) paved or concrete aprons (whether or not covered by canopies), (vi) decked storage areas above floor level, and (vii) public service corridors required by safety fire codes or similar public regulations or laws.

The term "Owner" shall mean the owner of record of the fee simple interest in the Developer Site, Dillard Site, the Burdines Site, the Sears Site, and the Penney Site. Developer, Dillard, Burdines, Sears and Penney are the Owners as of the date hereof.

The term "Penney Building" shall mean the Department Store Building to be constructed on the Penney Site containing approximately 82,027 square feet of Gross Floor Area.

The term "Penney Site" shall mean that parcel of land owned by Penney upon which the Penney Building will be located and which is more particularly described on Exhibit "A-5".

The term "Permissible Building Area" shall mean the area so designated on the Plot Plan and referenced in Article II hereof for the construction of buildings on each Owner's Site. Notwithstanding the foregoing, the Permissible Building Area shall not constitute an expansion area.

The term "Sears Building" shall mean the Department Store Building and the Auto Service Center, to be constructed on the Sears Site, containing approximately 120,615 square feet and 10,048 square feet, respectively, of Gross Floor Area.

The term "Sears Site" shall mean those parcels of land owned by Sears upon which the Sears Building will be located and which is more particularly described on Exhibit "A-4".

The term "Shopping Center" shall mean the Complete Site and the regional enclosed mall shopping center operation located thereon, including the real estate and all

OR 1 1 7 4 PG 2 9 5 5

6

buildings and improvements located thereon used for the sale of goods, wares and merchandise at retail, together with such facilities as are incident thereto.

The term "Site" shall mean the Developer Site or any Department Store Site, as the context requires.

The term "Taxes" shall have the meaning set forth in Section 13.1 hereof.

The term "Unavoidable Delay" shall have the meaning set forth in Section 11.1 hereof.

The term "Utilities" shall mean and include all utility lines, facilities and like improvements (whether on or off the Complete Site) necessary for the occupants of the Complete Site, including: water, water hydrants, storm and sanitary sewer lines, electric power lines, telephone lines and gas mains and the underground conduits for same.

ARTICLE I
DESIGNING THE SHOPPING CENTER

Section 1.1 - The Shopping Center. To the extent herein provided, Developer has planned, as depicted on the Plot Plan, and shall develop an enclosed mall type shopping center on the Developer Site substantially in accordance with the elevations, design studies and plans and specifications referred to in Section 1.2 below. Developer represents that it has engaged Edward J. DeBartolo and Associates Company for the preparation of the elevations, design studies, plans and specifications for the Developer Buildings.

Section 1.2 - Developer Buildings.

(a)      Developer, at its expense, shall complete and deliver to each Owner, for such Owner's informational purposes only, the exterior elevations, design studies and preliminary plans and specifications hereinafter provided for in this Section 1.2 for the Developer Buildings. The preliminary plans and specifications shall be consistent with the Plot Plan. The Developer Buildings shall be one (1) story in height, contain not less than 400,000 square feet of Gross Floor Area, be located completely within that portion of the Developer Site designated 'Permissible Building Area' on the Plot Plan, and be otherwise in accordance with the provisions of this Agreement.

(b)      The Developer Buildings shall include an enclosed one (1) level (except as otherwise shown on the Plot Plan), air conditioned, heated and sprinklered mall, which shall conform to this Agreement, and shall be built as shown on the Plot Plan, together with decorative elements and amenities contained thereon, and all components and equipment necessary for the operation thereof, including, without limitation, the

7

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 12 of 86

OR I I 7LPG 2956

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 13 of 86

heating, air conditioning and ventilating equipment required to operate the Enclosed Mall in accordance with the following heating, cooling and ventilation standards:

      (i)    <u>Heating System</u> - a prevailing minimum indoor temperature of approximately 72°F with outside temperatures of 38°F. The system shall be automatically controlled.

      (ii)    <u>Cooling System</u> - a prevailing maximum indoor temperature of 78°F and a relative humidity of 50% with an outside dry bulb temperature of 90°F coincident with a wet bulb temperature of 77°F. The system shall be automatically controlled.

      (iii)    <u>Ventilation</u> - The Enclosed Mall and the Department Store Buildings shall maintain a balanced air conditioning pressure at all times so as to insure compatible operation of each of the air conditioning systems for said buildings and the Enclosed Mall with a minimum of four (4) air changes per hour in the Enclosed Mall.

      (c)    Developer Buildings shall at all times be separated structurally from the Department Store Buildings and shall meet all fire code and other code requirements without relying on the Department Store Buildings. To the extent physically possible at the time of construction of the Developer Buildings, unless otherwise requested by a Department Store Operator, the Developer Buildings will share, along common building lines, common foundations with the Department Store Buildings to be constructed. Unless otherwise requested by a Department Store Operator, Developer will engineer and construct such common foundations based on the Department Store Operator's loading requirements and anchor bolt spacing (to be furnished to Developer upon request). Costs will be shared on a pro rata basis of the Developer Building's total loading versus a particular Department Store Building's total loading on the common foundation.

      (d)    Subject to the provisions of Section 6.4 hereof, if a Department Store Building's exterior wall along a common building line is higher than a Developer Building's wall, Developer will provide flashing and counterflashing into a reglet in such Department Store Building's wall furnished and installed by the Owner of such Department Store Site at a height specified by Developer. Subject to the provisions of Section 6.4 hereof, if the Developer Building's wall is higher than a Department Store Building's wall along the common building line, such Department Store Operator will furnish and install flashing and counterflashing into a reglet provided by Developer at a height and location specified by such Department Store Operator. All details of connection of Developer Buildings and the Department Store Buildings shall be mutually agreed upon and approved by Developer and such Department Store Operator before commencement of construction of any such work.

      (e)    Each Owner shall promptly repair, at its sole expense, any damage to any other building caused by it in making or maintaining the attachment specified in subsection (d) hereinabove and shall indemnify, defend and hold the other Owner(s)

8

OR 11744 PG 2957

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 14 of 86

harmless against and from any and all claims, liabilities, costs and expenses, whether in connection with death, personal injury or property damage, which may result or arise out of the making or maintenance of the attachment specified in subsection (d) hereinabove by such party.    During the course of any such construction permitted or required hereunder, each Owner will cooperate and cause their respective contractors, agents and employees to cooperate with each other in the coordination of construction schedules so as to facilitate the construction of the improvements on their respective Sites and the connection of the Enclosed Mall to the Department Store Buildings. The Department Store Buildings shall not be used for bearing the load of any portion of the Developer Buildings.

The final plans and specifications for the Developer Buildings shall be consistent with the preliminary plans and specifications and the exterior elevations and design studies and shall provide for first-class structure, workmanship and material.

Section 1.3 - Preliminary Plans and Specifications for Common Area Site Work.

Developer, at its sole expense, shall prepare and  submit to each Owner, for each such Owner's approval, preliminary plans and specifications (hereinafter in this Section 1.3 collectively referred to as the "preliminary plans and specifications") for all off-site and on-site facilities and improvements on and off the Complete Site necessary for the proper operation, in accordance with the then existing reasonable standards for a first-class regional enclosed mall type shopping center, of the Complete Site, including, but not limited to:

(a)    parking areas on the Complete Site as shown on the Plot Plan and of the capacity referred to in Section 1.7 hereof, which Developer represents is not less than the parking area required by any applicable state, county or municipal law, ordinance or regulation, and showing the lighting plan (which provides for a lighting intensity of one (1) foot candle minimum maintained at grade level) for such parking area, drainage and the markings and directional signs for such parking areas;

(b)    driveways with exits and entrances, truck and delivery passages, truckways, truck loading areas (but not docks), ramps, access and egress roads, retaining walls (but not building foundation walls or combination retaining-building foundation walls), walkways (but not curbs and walkways on Department Store Sites and adjoining Department Store Buildings), exterior landscaped and planted areas (but not landscaped and planted areas between building sidewalks and the Department Store Buildings), and utility and other service buildings on the Complete Site (including, without limitation, those shown on the Plot Plan) necessary for the proper operation of the buildings on the Complete Site in accordance with then existing reasonable standards of good shopping center operation; and

9

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 15 of 86

(c)    all other facilities and improvements, other than buildings on the Complete Site, as well as off-site improvements necessary for the operation of the Shopping Center on the Complete Site in accordance with the then existing reasonable standards for a first-class regional mall type shopping center operation, including, without limitation, fire hydrants, water mains and taps on each Site adequately sized to deliver a water supply at the maximum that can be supplied by the serving water authority for sprinkler protection (but in any event affording a water supply complying with the minimum requirements of Factory Mutual Engineering Association) gas lines, storm sewers and sanitary sewers, detention areas, power lines and telephone lines, all of which shall be underground (except as otherwise shown on the Plot Plan) to the extent consistent with usage.

All such work shall hereinafter be referred to as the "Common Area Site Work".

The preliminary plans and specifications for the Common Area Site Work shall provide for a first-class facility and conform to the Plot Plan and this Agreement and all applicable governmental rules and regulations.

Each Department Store Operator shall, within thirty (30) days of the date of receipt of the preliminary plans and specifications, give Developer written notice of its approval or disapproval of the preliminary plans and specifications for the facilities and improvements comprising the Common Area Site Work, and shall specify, in the latter event, the reason(s) therefor.  Each Department Store Operator's right to disapprove the preliminary plans and specifications shall be limited to the objection that such preliminary plans and/or specifications do not (i) provide for a first-class facility and/or (ii) conform to the Plot Plan, this Agreement, and all applicable governmental rules and regulations.

Developer will make all appropriate changes, modifications and corrections requested by the Department Store Operators to said preliminary plans and specifications as shall be necessary to comply with construction of a first-class facility and to conform to the Plot Plan, this Agreement, and all applicable governmental rules and regulations.  Upon completion thereof and acceptance by the Department Store Operators, the preliminary plans and specifications shall be delivered to each Department Store Operator with the changes highlighted and shall be deemed to be approved by all Department Store Operators.

Section 1.4 - Final Plans and Specifications by Developer.  As used herein, the phrase "final plans and specifications" shall mean definitive architectural and engineering plans and specifications, including all necessary working drawings in detail sufficient to permit construction in full of the facilities and improvements comprising the Common Area Site Work described in Section 1.3 hereof.

GR1174PG2959

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 16 of 86

Developer will prepare final plans and specifications for the facilities and improvements comprising the Common Area Site Work and will submit same to each Department Store Operator for approval.

Section 1.5 - Approval of Final Plans and Specifications. Each Department Store Operator shall, within thirty (30) days of the date of receipt of the final plans and specifications, give Developer written notice of its approval or disapproval of Developer's final plans and specifications for the facilities and improvements comprising the Common Area Site Work, and shall specify, in the latter event, the reason(s) therefor. Each Department Store Operator's right to disapprove said final plans and specifications shall be limited to the objection that such final plans and specifications do not provide for construction consistent with the approved preliminary plans and specifications, the Plot Plan or this Agreement.

Developer, within thirty (30) days following the expiration of the aforementioned thirty (30) day time period, will make all appropriate changes, modifications and corrections to said final plans and specifications as requested by each Department Store Operator. Upon completion thereof, Developer will resubmit to each Department Store Operator the final plans and specifications as changed, modified or corrected, which each Department Store Operator shall then approve, subject to such Department Store Operator's reasonable satisfaction. Failure by any Department Store Operator to give written notice of its approval or disapproval within twenty (20) days after receipt of said changed, modified or corrected final plans and specifications shall be deemed to constitute approval given therefore by such Department Store Operator.

Developer shall not thereafter modify or change said final plans and specifications in any material way without the Department Store Operators' prior written consent.

Section 1.6 - Preliminary Plans of Department Stores.

(a)    Each Department Store Operator shall complete and deliver to Developer, for informational purposes only, five (5) sets of preliminary plans and outline specifications relating to the exterior treatment of their respective Department Store Buildings and showing such treatment. Developer will provide each other Department Store Operator, for informational purposes only, one (1) set of each of said Department Store Operator's plans and outline specifications. At all times, the exterior appearance of each Department Store Building shall be architecturally harmonious with the exterior treatment of all Developer Buildings as shown on the preliminary plans referred to in Section 1.2 hereof.

(b)    At all times, each Department Store Operator shall provide exits within its Department Store Building to comply with code requirements. The exiting of Department Store Buildings through the Enclosed Mall or mall fire exit corridors will be

11

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 17 of 86

permitted only to the extent local building and safety codes and regulations so permit with no penalty in size or capacity being required for the Enclosed Mall.

Section 1.7 - Parking Requirements.   Developer's final plans and specifications (as set forth in Section 1.4 hereof) shall provide on the Developer Site and each Department Store Site, parking areas having a minimum capacity of no less than five (5) car spaces of the minimum dimensions shown on the Plot Plan for each one thousand (1,000) square feet of Net Floor Area contained in the Department Store Buildings and the Developer Buildings.   On its opening date and at all times thereafter, subject to the provisions of Article VIII hereof, each Owner shall, at its sole cost and expense, maintain on its Site at least said ratio of parking spaces to Net Floor Area.   Should any Owner increase the Net Floor Area on its Site after its opening date (provided that there is no increase in the Gross Floor Area of its building unless otherwise permitted herein) such Owner shall proportionally increase its parking area on its Site, if such increase is required to maintain at least said ratio.   No expansion rights shall be  attributed to any Owner by reason of the provisions of this Section 1.7.

Notwithstanding the foregoing, Developer shall be permitted to satisfy its parking obligations with respect to the Developer Buildings by counting those car spaces on the Sites of the other Owners which are in excess of the required minimum car spaces for such Sites, if any (the "Excess Spaces"); provided, however, that at any time that any Owner of such Excess Spaces shall require all or a portion of its Excess Spaces to satisfy such Owner's minimum parking requirements due to an actual expansion of the Net Floor Area on its Site as may be permitted in accordance with this Agreement, then upon such Owner's providing written notice to Developer of its intent to promptly undertake such an expansion and itemizing the number of Excess Spaces thereby required, Developer shall be obligated to provide, within one hundred eighty (180) days of its receipt of such written notice, replacement car spaces for the Excess Spaces such Owner shall require.   Such replacement car spaces shall be located on Developer's Site and within any portion of the area shown on the Plot Plan as Future Developer Parking.

Section 1.8 - Compliance with Laws.   All plans and specifications referred to in this Article I shall comply with the building and zoning laws of the municipality or other governmental subdivision wherein the Complete Site is situated and with all laws, ordinances, orders, rules, regulations and requirements of federal, county, state and municipal governments and the appropriate departments, commissions, boards and officers thereof, including environmental protection agencies.

Section 1.9 - Preparation of Plans and Document Approval.  The documents required by this Article I shall be prepared and sealed by an engineer or architect licensed to practice such profession(s) in the State of Florida and shall be delivered in duplicate to each party entitled to receive such documents.  Furthermore, all documents submitted under this Article I shall be sent to the parties entitled to receive same at the address specified by such party.

12

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 18 of 86

Section 1.10 - Effect of Approval. Notwithstanding the approval of the plans and specifications by the Department Store Operators in this Article I, Developer shall be solely responsible for the design, supervision and inspection of the work to be performed pursuant to the approved plans and specifications provided for in Section 1.4 and neither the reservation of such rights nor the granting by any Department Store Operator of any such approvals shall be deemed to relieve Developer from such responsibility or to constitute a waiver by any Department Store Operator of any claim arising out of Developer's failure to meet such responsibility.

## ARTICLE II
## CONSTRUCTION OF SHOPPING CENTER

Section 2.1 - Construction Contract. Developer hereby represents to each Department Store Operator that it has entered into a construction contract with DeBartolo Properties Management, Inc., as general contractor, for the construction of the Developer Buildings and the Common Area Site work.

Section 2.2 - Common Area Site Work. Upon approval of the final plans and specifications, Developer will commence and will proceed diligently with construction of the Common Area Site Work. Each Department Store Site and building pad shall be delivered in accordance with the provisions of separate Supplemental Agreements entered into between Developer and each Department Store Operator.

Section 2.3 - Construction by Developer. Developer has commenced and will proceed diligently to complete construction of the Developer Buildings and improvements on the Developer's Site referred to in Section 1.2 hereof. Developer shall substantially complete construction of the Developer Buildings and the Common Area Site Work provided for under Sections 1.3 and 2.2 hereof not later than November 1, 1996 in accordance with the final plans and specifications approved pursuant to Section 1.5. Said construction activities shall be deemed substantially complete on the date completed in accordance with the terms and conditions contained herein and when a Certificate of Substantial Completion is issued by Developer's architect, with the exception of minor items of work which shall be completed within a reasonable period of time thereafter. Developer shall not be relieved of its obligations hereunder to fully complete any construction not fully completed on the date of substantial completion.

Section 2.4 - Construction by Dillard. Dillard has commenced, and by November 1, 1996, will substantially complete, construction of the Dillard Building. Said Building shall be within the lines of the area designated "Dillard Permissible Building Area" on the Plot Plan; shall have a major entrance abutting and fronting on the Enclosed Mall; shall conform to this Agreement; and shall be substantially as shown on the Plot Plan.

Section 2.5 - Construction by Burdines. Burdines has commenced, and by November 1, 1996, will substantially complete, construction of the Burdines Building. Said

13

OR 1174 PG 2962

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 19 of 86

Building shall be within the lines of the area designated "Burdines Permissible Building Area" on the Plot Plan; shall have a major entrance abutting and fronting on the Enclosed Mall; shall conform to this Agreement; and shall be substantially as shown on the Plot Plan.

   **Section 2.6 - <u>Construction by Sears</u>**.  Sears has commenced, and by November 1, 1996, will substantially complete, construction of the Sears Building.  Said Building, including the Auto Service Center, shall be within the lines of the area designated "Sears Permissible Building Area" on the Plot Plan; shall conform to this Agreement; and shall be substantially as shown on the Plot Plan.  The Sears Department Store Building shall have a major entrance abutting and fronting on the Enclosed Mall.

   **Section 2.7 - <u>Construction by Penney</u>**.  Penney has commenced, and by November 1, 1996, will substantially complete, construction of the Penney Building.  Said Building shall be within the lines of the area designated "Penney Permissible Building Area" on the Plot Plan; shall have a major entrance abutting and fronting on the Enclosed Mall; shall conform to this Agreement; and shall be substantially as shown on the Plot Plan.

   **Section 2.8 - <u>Changes in Buildings/Expansion</u>**.

   (a) Any building on any Owner's Site may at any time be altered, provided that as so altered its exterior appearance shall remain architecturally harmonious with the other buildings in the Shopping Center prior to such alteration and provided that such altered building shall continue to comply with the respective requirements of Sections 1.2, 1.4, 1.7, 1.8, 2.3, 2.4, 2.5, 2.6, 2.7 and 2.9 hereof, and remain within the respective "Permissible Building Area" shown therefor on the Plot Plan and shall have a major entrance onto the Enclosed Mall.  Except for the Burdines Building Expansion as shown on the Plot Plan, Dillard, Burdines, Sears, Penney and Developer shall have no rights to increase the number of floors or to otherwise expand their respective Buildings at any time. Other than as expressly provided in this Section 2.8(a), no other expansion rights shall be attributed to any Owner by reason of the provisions of this Section 2.8.  During the term of any covenant to operate applicable to an Owner's Site, and subject to the condemnation provisions of Sections 8.1 and 8.2 hereof, and subject to the damage and destruction provisions of Sections 10.1 and 10.2 hereof, no building on such Owner's Site may be demolished.

   (b) Notwithstanding the foregoing provisions of this Section 2.8, during the period Developer is required to operate the Shopping Center pursuant to Section 14.1 hereof, Developer will not, without obtaining the prior consent of the Department Store Operators then operating Department Stores on their Department Store Sites, given in their sole and absolute discretion, change the number of floors of the Developer Buildings, or materially change the location or arrangement of the Enclosed Mall or the Common Area on the Developer Site shown on the Plot Plan.  In addition, no Owner may construct any multi-level above or below grade parking facility except as permitted under Article VIII.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 20 of 86

Section 2.9 - Compliance with Laws and Plot Plan. All buildings and other improvements referred to in this Agreement shall comply with the building and zoning laws of the municipal or other governmental subdivisions in which the Complete Site is situated and with all laws, ordinances, orders, rules, regulations and requirements of all federal, state, county and municipal governments and the appropriate departments, commissions, boards and officers thereof, and be in accordance with reasonable orders, rules and regulations of the National Board of Fire Underwriters or any other body now or hereafter constituted performing similar functions and the minimum requirements of Industrial Risk Insurers, Factory Mutual Engineering Association or other high quality Department Store insurance carriers. All buildings and other improvements shall comply with and be constructed in conformance with the Plot Plan; furthermore, there shall be no expansions of such buildings except for the Burdines Building Expansion.

Section 2.10 - Reasonable Diligence to Meet Dates. No Owner shall incur any financial or other liability to any other Owner arising out of the failure of such Owner to meet a particular date or particular dates as set forth herein, provided such Owner has acted in good faith and has used reasonable diligence to meet said date or dates, it being understood that "reasonable diligence" shall not require any Owner to expend funds for overtime work.

Section 2.11 - Certification of Floor Area. Upon the completion of construction of the Dillard Building, Burdines Building, Sears Building and Penney Building on their respective Sites as provided in Sections 2.4, 2.5, 2.6 and 2.7 hereof, Dillard, Burdines, Sears and Penney shall provide to Developer and each other Department Store Operator, and each of Developer and the other Department Store Operators shall provide to Dillard, Burdines, Sears and Penney, an architect's or engineer's certification of the Net Floor Area and Gross Floor Area contained in their respective Buildings. Upon completion of the permitted expansion pursuant to the provisions of Section 2.8 hereof, or other substantial alteration of a Department Store Building and/or the Developer Buildings whereby the Net Floor Area and/or Gross Floor Area change, the Owner of such Department Store Building and/or the Developer Buildings shall provide an architect's or engineer's certification of the Net Floor Area and the Gross Floor Area to each of the other Owners.

## ARTICLE III
## LEASING

### Section 3.1 - Leasing Requirements.

(a)     Developer has undertaken and will continue to use best efforts to negotiate with prospective tenants for the leasing of Mall Stores within the Developer Buildings.

3R 1174 PG 2964

15

(b)    Each Owner agrees that it is in their mutual best interest that the Developer Buildings contain a combination of merchants which, (i) represent a sound and balanced diversification of merchandise and services as are found in a first-class regional shopping center in the State of Florida, (ii) are well qualified and willing to direct an intensive and continuous merchandising and promotional program, (iii) will be of strong financial condition and good repute, and (iv) will fixture, decorate and maintain their respective store premises in a tasteful and decorous manner, having regard for the general standards of appearance prevailing in the Shopping Center. Developer will continue to use best efforts to provide such a balanced tenant mix throughout the Developer Buildings in accordance with the foregoing standards, to promote an even distribution of the various types of retail stores along the Enclosed Mall.

Section 3.2 - Kiosks, Pushcarts and Retail Merchandising Units. Kiosks may be erected in the Enclosed Mall only in the areas specifically shown therefor on the Plot Plan, provided that such kiosks do not exceed nine feet (9') in height and twelve feet (12') in the horizontal dimension perpendicular to the direction of the mall concourse in which it is located, do not occupy in excess of one hundred eighty (180) square feet of Gross Floor Area (provided, however, that the aforesaid square footage restriction shall not apply to the kiosks located in the food court area shown on the Plot Plan or to two (2) of the other kiosks which may occupy up to two hundred ten (210) square feet of Gross Floor Area) and that no such kiosks will be so wide as not to permit an unobstructed passage of at least ten feet (10') on all sides of such kiosk. Automated teller machines may be installed in the Enclosed Mall only within the areas specifically shown therefor (described as "ATM" on the legend on the Plot Plan) on the Plot Plan. Pushcarts and Retail Merchandising Units ("RMUs") may be located throughout the Enclosed Mall, but shall not be located within one hundred feet (100') of the main Enclosed Mall opening(s) of any Department Store Operator, except for any pushcart or RMU which a Department Store Operator places within one hundred feet (100') of its own Department Store entrance with the consent of Developer.

## ARTICLE IV
## OPENING FOR BUSINESS

Section 4.1 - Opening by Developer. Developer shall open the buildings and improvements on the Developer Site for business on or before November 14, 1996, provided that Dillard, Burdines, Sears and Penney are then open or are prepared to then open in their respective Buildings, or such later date as Dillard, Burdines, Sears and Penney are then open or are prepared to then open in their respective Buildings (the "Mall Opening"). Should Developer not be obligated to open as aforesaid because only one (1) of Dillard, Burdines, Sears, or Penney is not ready to open, Developer agrees to open the Common Area when the other three Department Stores open, but in no event prior to November 15, 1996.

16

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 22 of 86

Section 4.2 - Opening by Dillard.  Provided Developer has substantially completed construction of that portion of the Developer Buildings and Common Area adjacent to the Dillard Building and the conditions to Dillard's covenant to operate (as set forth in Section 14.2 hereof) are satisfied, Dillard covenants and agrees to open for business in the Dillard Building on or before November  15, 1996.

Section 4.3 - Opening by Burdines.  Provided Developer has substantially completed construction of that portion of the Developer Buildings and Common Area adjacent to the Burdines Building ; the conditions to Burdines' covenant to operate (as set forth in Section 14.3 hereof) are satisfied; Dillard, Penney and Sears are either prepared to open or have opened and commenced operating a Department Store in their respective Department Store Buildings under their respective trade names as provided herein; and tenants occupying at least fifty-five percent (55%) of the Net Floor Area of the Mall Stores, exclusive of the space shown on the Plot Plan to be occupied by a cinema, are either prepared to open or have opened and commenced operating; Burdines covenants and agrees to open for business in the Burdines Building on or before November  15, 1996. In the event that any of the foregoing conditions shall not be satisfied on or before November 15, 1996, Burdines shall have the right to delay opening for business until any such condition is satisfied, and provided that Burdines shall not be required to open except as provided in Section 4.6.

Section 4.4 - Opening by Sears.  Provided Developer has substantially completed construction of that portion of the Developer Buildings and Common Area adjacent to the Sears Building and the conditions to Sears' covenant to operate (as set forth in Section 14.4 hereof) are satisfied, Sears covenants and agrees to open for business in the Sears Building on or before November  15, 1996.

Section 4.5 - Opening by Penney.  Provided Developer has substantially completed construction of that portion of the Developer Buildings and Common Area adjacent to the Penney Building and the conditions to Penney's covenant to operate (as set forth in Section 14.5 hereof) are satisfied, Penney covenants and agrees to open for business in the Penney Building on or before November  15, 1996.

Section 4.6 - Extension of Opening Date.  The opening date of Developer, Dillard, Burdines, Sears and/or Penney shall be extended by the period of Unavoidable Delay as to the performance by such Owner as provided in Article XI hereof, and any other extension provision provided for herein related to completion of construction and, provided further, if such opening date as so extended falls between November 16 of any year and February 15 of the following year, such opening date may be deferred to the first business day following said February 15 or, if the opening date as so extended falls between March 7 and July 25 of any year, such opening date may be deferred to the first business day following said July 25 or, if the opening date as so extended falls between August 10 and October 15 of any year, such opening date may be deferred to the first business day following said October 15, or, if such opening date as so extended falls within the six (6)

OR 1174 PG 2966

week period prior to Easter Sunday in any year, such opening date, in the latter event, may be deferred to the first Wednesday following Easter Sunday.

## ARTICLE V
## SHOPPING CENTER OPERATION

### Section 5.1 - Shopping Center Operation.

(a)     Each Owner shall take all reasonable means to  prevent any manner of operation or use of its Site not in accordance with first-class regional mall type shopping center standards, including, but without limitation, the use of any Owner's site for solicitations, demonstrations, or any other activity inconsistent with such standards or with the private ownership of its Site or any operation or use thereof or activity therein which would interfere with the performance or observance of this Agreement or the rights and easements referred to herein.

(b)     Developer shall operate or cause to be operated the Developer Site in accordance with the then current reasonable standards of first-class regional mall type shopping center operations, and the Enclosed Mall HVAC system shall be operated so as to maintain the temperature and humidity conditions set forth in Section 1.2 hereof. Each Owner shall operate the buildings on its Site so as to maintain a static pressure to prevent the flow of heated or air conditioned air from one building to another.  To the extent Developer may do so under applicable law or rules of court, Developer shall not, without the prior consent of all Department Store Operators, at any time permit any occupant of the Developer Buildings to: (i) conduct or permit any auction, going out of business, fire or bankruptcy sale within the Developer Site (but this provision shall not restrict the absolute freedom of such occupant to determine its own selling prices nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); or (ii) use, or permit to be used, the Common Area, including the Enclosed Mall or sidewalks adjacent to such occupant's space, or any other premises outside such space, for the sale or display of any merchandise or for any other business, occupation or undertaking (except as provided in Section 3.2 hereof).

(c)     For so long as Developer is operating or obligated to operate the Shopping Center, the Developer Buildings will be used only by businesses meeting the requirements of Section 3.1 hereof and selling goods, wares, merchandise and services of the type customarily sold in first class regional mall type shopping centers and by service tenants as are customarily located in such shopping centers and are an incidental part thereof such as, but not limited to, banks, savings and loan associations, professional offices, restaurants, coin-operated amusement rooms, theatres, or travel agents.

(d)     No Owner shall (i) use or permit the use on its Site of any advertising medium which might constitute a nuisance, such as loudspeakers, sound amplifiers, phonographs or radios or television broadcasts in a manner which can be heard outside

18

of their respective premises or stores; (ii) so long as the Shopping Center is being operated as a first-class regional mall type shopping center, use or permit the use of any portion of their respective Buildings for any activity of a type which is not generally considered appropriate for a first-class regional mall type shopping center conducted in accordance with first-class and generally accepted standards of operation; (iii) release in a fashion which would contaminate either directly or indirectly the Complete Site, any hazardous materials or substances or toxic wastes as defined by all applicable provisions of any federal regulations, amendments, updates or superseding legislation to or for the Environmental Protection Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act and all other federal, state and local laws relating in any way to the protection of the environment in violation of any environmental laws or regulations and fail to perform any remediation required under said laws or regulations as a result of such release, excluding the use of those materials or substances normally used and those wastes typically generated (in such amounts as are typically generated) in any Owner's retail operation; provided, however, the foregoing exclusion shall not relieve any Owner of the obligation to perform any remediation required under federal, state, and local laws or regulations in connection with the use of the aforedescribed materials or substances; (iv) burn trash or permit the burning of trash, or store or permit the storage of any trash or garbage in any area other than inside such Owner's Building within appropriate enclosed receptacles; (v) except to the extent authorized pursuant to Section 6.10 hereof, park or permit to be parked trucks and delivery vehicles on its Site or any other Owner's Site so as to unreasonably interfere with, or suffer or permit any other use thereon to interfere with, the use of any driveways, walks, roadways, highways, streets, malls or parking areas or other Common Areas; (vi) use or permit the use of any portion of the Common Area on its Site for the sale or display of any merchandise or for any other business (except as provided in Section 3.2 hereof); (vii) use, or permit the use of, on its Site any firing, explosive or other damaging or dangerous hazard; (viii) use, or permit the use of, on its Site any warehouse operation or any assembling, manufacturing, distilling, refining, smelting, industrial or agricultural operation or (ix) use, or permit the use of, on its Site dry cleaning, laundromats, veterinary hospitals, car washes or mortuaries. If any Owner shall violate the provisions of this Section 5.1, the Owner on whose Site the violation occurred shall not be deemed to be in violation of the provisions hereof if such Owner shall use all reasonable means, including such legal action(s) as may be necessary, to compel compliance with the provisions hereof. Notwithstanding the foregoing, there may be extraordinary, special events of the Merchants' Association or sponsored by the Promotional Fund, provided such activities shall not be located on the Site of any Department Store Operator or within one hundred feet (100') of any Department Store Building without the consent of the affected Department Store Operator, and provided such activities shall not interfere with the flow of pedestrian or vehicular traffic.

19

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 25 of 86

Section 5.2 - <u>Location of Selling Activities</u>.

(a)    There shall be no selling or other commercial activities outside of the buildings on the Complete Site, except as a part of extraordinary, special events of the Merchants' Association or sponsored by the Promotional Fund (not to exceed two times in any twelve month period and not in excess of two days each) provided such activities shall not be located on the Site of any Department Store Operator or within one hundred feet (100') of any Department Store Building without the consent of the affected Department Store Operator, and provided such activities shall not unreasonably impede the flow of pedestrian or vehicular traffic, give rise to loud noises or obnoxious odors or otherwise violate the provisions of Section 5.1 hereof.

(b)    During the term of this Agreement, there shall be no commercial office buildings, hotels, motor inns, new or used automobile, truck or recreational vehicle dealers, funeral parlors or drive-in fast food stores on the Complete Site.

Section 5.3 - <u>Signs</u>.  All outdoor and Enclosed Mall signs installed or maintained within the Complete Site shall conform to the Sign Criteria annexed hereto and hereby made a part hereof as Exhibit "C".  Pylon signs shall be located only as shown on the Plot Plan.

Section 5.4 - <u>Name</u>.  Developer shall continue to operate the Shopping Center under the name "Indian River Mall" during the term of this Agreement (as provided in Section 12.1 hereof).  The name of the Shopping Center shall not be changed during the term of this Agreement unless consented to by each Owner.

Section 5.5 - <u>Employee Parking</u>.  Each Owner shall use its best efforts to require its agents, employees, tenants or concessionaires and their agents and employees not to park their vehicles in or on any of the parking areas on such Owner's Site other than such as may from time to time by agreement among the Owners be designated as areas for employee parking.  Each Owner shall use its best efforts to reach agreement regarding the location or locations of bus stops, if any, on its Site; provided, however, that in all events all parts, if any, of the Complete Site shall be equally serviced.

Section 5.6 - <u>Transfers by Developer</u>.  Developer may assign, sell or otherwise transfer its interest in this Agreement provided (i) Developer has completed its construction obligations contained in Article II, (ii) Developer shall simultaneously transfer title to the fee of the Developer Site to the same transferee, or Developer shall simultaneously transfer its leasehold interest in the Developer Site to the same transferee, if Developer is then lessee of the Developer Site or any portions of the Developer Site, and (iii) said transferee shall expressly assume and covenant with the other Owners, or their respective successors in title, to perform and be bound by all of the terms, covenants and conditions of this Agreement and all amendments and supplemental agreements thereto to be performed or kept on the part of Developer.  From and after the date of any such transfer, Developer shall be relieved of all liabilities and obligations on its part thereafter

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 26 of 86

arising or to be performed or kept by it under this Agreement and all such amendments and supplemental agreements.

**Section 5.7 - Transfers by Department Store Operators.** Except as otherwise provided herein, nothing contained in this Agreement shall in any way restrict any Department Store Operator's right to conduct its Department Store or other business, if any, on its Site in such a manner as it, in its sole discretion, may determine; provided that such conduct of business shall be, at all times, consistent with the then-existing use of the Shopping Center. Nothing contained in this Agreement shall in any way restrict any Department Store Operator's right to sell, mortgage or otherwise convey its Site or to assign, sell, or otherwise transfer its interest in this Agreement, and from and after the date of such transfer such Department Store Operator shall be relieved of all liabilities and obligations hereunder (except, as between Developer and such Department Store Operator, any obligation to operate as contained in Article XIV hereof) on its part thereafter arising or to be performed or kept by it under this Agreement, provided the transferee shall expressly assume and covenant with Developer and the other Owners to perform and be bound by all of the terms, covenants and conditions in this Agreement to be performed by the transferor, including, as to Developer only, any obligation to operate as contained in Article XIV hereof, and provided further that any operations by such transferee shall be, at all times, consistent with the then-existing use of the Shopping Center.

**Section 5.8 - Sale and Leaseback, Mortgages.**

(a)    Anything in this Agreement to the contrary notwithstanding, if (i) any Owner shall assign its interest in this Agreement in connection with a sale and leaseback or lease and subleaseback, and it or an affiliated corporation [which affiliated corporation shall have a net worth equal to at least that of the assignor corporation or One Hundred Million Dollars, whichever is greater] which shall fully assume the assignor's obligations hereunder (or shall become a party hereto), shall simultaneously become vested with a leasehold estate or similar possessory interest in its Site by virtue of a lease made by the assignee, or lessee, as the case may be, or (ii) if, in order to secure an indebtedness, any Owner shall convey its Site by way of a deed to secure debt or mortgage and it or an affiliated corporation (as described above) shall retain a possessory interest in its Site, then in no such event shall the assignee of this Agreement under any such sale and leaseback or lease and subleaseback or any subsequent owner of its Site, or the trustee, beneficiary or mortgagee under any such deed to secure debt or mortgage, be deemed to have assumed or be bound by any of such Owner's obligations hereunder for so long as such Owner or its affiliated corporation shall retain such possessory interest, and all obligations shall continue to remain those of such Owner or affiliated corporation alone, so long as such Owner retains such possessory interest, and performance by such Owner or such affiliated corporation of any act required to be performed under this Agreement by it or fulfillment of any condition of this Agreement by such Owner or such affiliated corporation shall be deemed the performance of such act or the fulfillment of such condition by such assignee, lessee, subsequent owner, trustee, beneficiary or mortgagee, as the case may be, and shall be acceptable to the other Owners with the same force and effect as if

21

performed or fulfilled by such assignee, lessee, trustee, subsequent owner, beneficiary or mortgagee. Anything in this Agreement to the contrary notwithstanding, if any such mortgage on any Department Store Site is foreclosed or a deed delivered in lieu of foreclosure, or if any Department Store Operator, having entered into a sale and leaseback or a lease and subleaseback transaction involving its Site, shall be deprived of possession of such Site by reason of its failure to comply with the terms of such leaseback or subleaseback, anyone who has acquired, or shall thereafter acquire, title to such Site or a leasehold estate therein shall hold the same free of any requirement of this Agreement that a Department Store be operated on such Site, but such Department Store Operator shall not, in such a case, be deemed released from liability for damages resulting from the breach of its covenant to operate as contained in Article XIV hereof; provided, however, such Department Store Site may be used only for a retail Department Store that is consistent with a first-class regional mall type shopping center and for no other purpose for so long as the Owner of such Department Store Site would otherwise be obligated to operate a Department Store thereunder and thereafter such Department Store Site may be used only for a purpose which is consistent with the uses then being conducted in the remainder of the Shopping Center.

(b) Anything in this Agreement to the contrary notwithstanding, if a mortgage on the Developer Site is foreclosed or a deed delivered in lieu of foreclosure, or if Developer, having entered into a sale and leaseback or a lease and subleaseback transaction with an Institutional Lender (as hereinafter defined) involving the Developer Site shall be deprived of possession of the Developer Site by reason of its failure to comply with the terms of such leaseback or subleaseback, any mortgagee or lessor (or their respective affiliates or wholly owned subsidiaries), as the case may be, acquiring title as a result thereof shall not be obligated to pay any money damages for or cure any defaults occurring prior to the date such mortgagee or lessor (or their respective affiliates or wholly owned subsidiaries), as the case may be, acquired title, except for obligations to maintain or repair that are continuing in nature. Any such mortgagee or lessor (or their respective affiliates or wholly owned subsidiaries), as the case may be, shall be bound by and shall have the benefit of all and any provisions in this Agreement creating easements of any kind, including without limitation, easements for access, footings and foundations, structures, parking, Common Area, lighting and utilities. Except as otherwise provided in this Section 5.8, any other party acquiring title to a Site through a foreclosure of a mortgage or otherwise as provided herein shall not be relieved of an Owner's duties, obligations and responsibilities, except such successor shall have no obligation to pay money damages for defaults as may be provided for in this Agreement or amendments or supplemental agreements thereto which occurred prior to acquisition of title, unless such defaults arise out of a failure to perform obligations for repair or maintenance and are continuing in nature.

"Institutional Lender" means a savings bank, a savings and loan association, a commercial bank or trust company, an insurance company, a private four-year college or university, a welfare, pension or retirement fund or system of a state or municipality or of a corporation, the shares of which are listed on the New York Stock Exchange, a real

estate investment trust which is not affiliated with Developer, the shares of which are listed on the New York Stock Exchange, or any real estate development entity whose experience and financial standing are reasonably satisfactory to the parties hereto; provided, however, in each case, such entity is authorized to do business in the state where the Shopping Center is located, is subject to the jurisdiction of the courts of such state in any action and is not affiliated with any Owner.

Section 5.9 - Resident Manager. Developer will continuously maintain on the Developer Site an office and a resident manager who, as Developer's representative, will diligently enforce the standards of operation prescribed in this Agreement and the reasonable general rules governing the conduct of tenants and other occupants thereon, and supervise the performance of Developer's maintenance obligations under this Agreement.

ARTICLE VI
EASEMENTS

Section 6.1 - Common Area Easements.

(a)    During the term of this Agreement, each Owner hereby grants to each of the other Owners, their respective successors and assigns, for the benefit of each such grantee's Site as herein described, the nonexclusive right, privilege and easement to use the Common Areas, which include, but are not limited to, parking areas, sidewalks, walkways, roadways, the Enclosed Mall (and as to Developer Buildings, the Enclosed Mall fire exit corridors to the extent a Department Store is permitted to use the same under the provisions of Section 1.6 hereof) and all common facilities and improvements on each such grantor's Site for the purposes for which they are provided, including, without in any way limiting the generality of the foregoing, for adequate and unobstructed pedestrian and vehicular traffic and to permit their respective officers, employees, agents, customers, business visitors, business guests, licensees and invitees and those of their tenants to use the same, in common with all of the parties hereto, their respective successors and assigns, and all persons claiming by or through them, for parking purposes and for the purposes of access, ingress and egress to, from and between its Site and the other Sites and the streets and highways abutting and adjacent to the Complete Site, without payment of any fee or other charge being made therefor, except for the purpose of preventing or discouraging abuse of parking privileges by others than those hereinbefore specified as being entitled to the use of same. If a fee or other charge is established for the reasons set forth above, said fee or other charge shall, prior to the implementation thereof, require the unanimous consent of the Owners. Each Owner reserves the right, from time to time, without obtaining the consent or approval of the other Owners, to make any reasonable changes, modifications or alterations in or to those portions of its Site which are subject to the foregoing easements, provided that the accessibility of the respective Sites to pedestrian and vehicular traffic is not unreasonably restricted thereby and the flow of vehicular traffic thereon is not materially affected, the parking ratio is not reduced below

23

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 28 of 86

GR1174PG2972

the required ratio, the parking dimensions remain the same and the access roads and driveways on its Site are not changed, and the size of the Common Area on its Site is not changed.

(b)    Developer reserves the right to delete the Flora Preservation Area from the Developer Site and Common Areas in the event that the Conservation Easement, as described in the definition of the term "Flora Preservation Area", shall be terminated or released in accordance with the terms thereof, in which event, the Flora Preservation Area shall thereafter be deemed to be a portion of the "Not Included" property as described in Section 6.2(d) and Section 6.3(b) hereof.

Section 6.2 - Permanent Access Easements.

(a)    Each Owner hereby grants to each of the other Owners, their respective successors and assigns, for the benefit of each such grantee's Site as herein described, a perpetual, nonexclusive right, privilege and easement for pedestrian and vehicular access only, along, over and across a strip of land located on its Site and identified on the Plot Plan as the "Permanent Access Easement", for the purpose of providing access to and from each such grantee's Site to the other Sites, to adjoining public streets and highways and to the entrances shown on the Plot Plan.

(b)    The Permanent Access Easement may be used by each grantee thereof, its tenants, officers, employees, agents, customers, business visitors, business guests, licensees and invitees and those of its tenants, such use to be in common with each grantor, its successors and assigns, and all other persons claiming by or through such grantor. Each grantee shall have the right to construct, maintain, inspect, repair and replace roadways, without cost to the grantor of the Permanent Access Easement, its successors and assigns, over those portions of the lands of the grantor over which the Permanent Access Easement is granted and, further, shall have the right to use any roadways which may be constructed thereon by such grantor. The grantor of the Permanent Access Easement agrees not to obstruct or interfere in any way with the free flow of pedestrian and vehicular traffic over the roadways located within the Permanent Access Easement, except to the extent legally necessary to prevent a dedication thereof or the accrual of any rights to the public therein. Nothing contained in this paragraph shall be deemed to release Developer from its obligations contained in this Agreement.

(c)    Nothing contained in this Section 6.2 shall lessen in any way the rights granted to Developer and the Department Store Operators as set forth in Section 6.1 hereof.

(d)    Developer reserves the right to grant, for the benefit of the property, identified as "Not Included" and shown on the Plot Plan, perpetual (subject to Section 6.6), nonexclusive rights and easements for pedestrian and vehicular access only along, over and across the Permanent Access Easement for the purpose of providing access from such property to the Complete Site and public streets and highways, except that there shall

24

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 30 of 86

be no curb cuts or access rights to such Permanent Access Easement other than in the number and at points as shown on the Plot Plan. The foregoing access easement may be used by the owners or tenants, as the case may be, of the aforesaid property, their respective officers, employees, agents, customers, business visitors, business guests, licensees, invitees and those of their tenants, such use to be in common with the grantor thereof, its successors and assigns, and all other persons claiming by or through such grantor.

Section 6.3 - Utility Easements.

(a)    Each Owner hereby grants to each of the other Owners, their successors and assigns, for the benefit of each such grantee's Site, such perpetual (subject to the provisions of Section 6.6 hereof), nonexclusive rights and easements across, through, under and on its Site, other than any Permissible Building Area shown on the Plot Plan and other than the areas occupied prior thereto at any time by the Enclosed Mall or by buildings, as are reasonably necessary, without interfering with the use of the grantor's Site as provided in this Agreement, to provide rights-of-way for public or private underground utility services for the benefit of each such grantee's Site, and access to and use of the water, storm and sanitary sewer systems. Any such installed utility system may, however, be relocated by the Owner of the grantor's Site, subject to the provisions of Section 2.9 hereof, at any time or from time to time at the expense of such Owner, provided that any such relocation shall not interfere with, or increase the cost of, or diminish such grantee's utility services, or adversely interfere with the business of the other Owners, or occur between November 15 of any year and February 15 of the following year, and such relocated utility system may also be used by such grantees. Developer grants to the Department Store Operators, for the benefit of their respective Sites, the nonexclusive right and easement, as necessary, to drain storm water across the Developer Site and into the detention areas on the Developer Site.

(b)    Developer reserves the right to grant for the benefit of the property, identified as "Not Included" and shown on the Plot Plan, nonexclusive rights and easements for access to and use of the utility systems, including and not limited to water, gas, storm (including the right to drain storm water into the detention areas on the Developer Site) and sanitary sewer systems, provided same do not overburden or diminish the quality of the service afforded or interrupt or otherwise interfere with the service to each Site.

Section 6.4 - Footing and Foundation Easements. Developer hereby grants to each of the other Owners, their respective successors and assigns, and each of the other Owners hereby grant to Developer, its successors and assigns, such perpetual easements (subject to the provisions of Section 6.6 hereof) in, on, over and to their respective Sites (excluding Gross Floor Area) for the construction and maintenance of foundations and footings reasonably necessary in connection with the construction of their respective improvements on their respective Sites, provided same does not affect existing construction on such other Site; and, provided same does not affect the separate

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 31 of 86

insurance rating of any Owner's building, for a roof projection allowing the grantee to tie its building into the adjoining building by flashing and reglets. No such foundation or footing attachment shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the Owner of the building to which the attachment is to be made. A grantee shall repair, at its sole expense, any damage to any building caused in making or maintaining said attachment and shall indemnify and hold the grantor harmless from any and all claims, liability, cost and expense, whether in connection with death, personal injury, or property damage, which result or arise out of the making or maintenance of such attachment. The Owners will cooperate and cause their respective contractors to cooperate with each other in the coordination of construction schedules so as to facilitate the construction of improvements on their respective Sites and the connection of the Enclosed Mall to Department Store Buildings. No Owner's building shall be used for load-bearing purposes by another Owner, unless the Owner whose building is being used for load-bearing purposes shall have given the other Owner its prior approval to use its building for load-bearing purposes. The easements set forth in this Section 6.4 shall apply only to initial construction and any reconstruction as provided for in this Agreement.

Section 6.5 - Encroachments. While it is the intention of the Owners to confine their improvements to the limits of their respective Sites, it is recognized that this result is not always achieved in multi-ownership shopping center developments. Accordingly, each Owner, on behalf of itself, its successors and assigns, hereby grants to each of the other Owners, their successors and assigns, an easement permitting the maintenance of canopies, decorative facia, roofs and other overhangs, awnings, utility vaults, staircases, signs, pillars and other like projections and encroachments over and across the grantor's Site which exist after completion of all construction or reconstruction (if any part is damaged or destroyed and then rebuilt); provided, however, that any such projections and encroachments shall not exceed two feet (2'), or such greater distance as shown on the plans of the grantee if previously approved by grantor. The provisions of this Section 6.5 shall survive the termination of this Agreement and shall continue thereafter for so long as any Owner's building (or any replacement thereof constructed during the term of this Agreement) stands.

Section 6.6 - Termination of Perpetual Easements. Any perpetual easement provided for in this Agreement, except those granted pursuant to Section 6.2(a) hereof, shall terminate (as to the abandoning benefited real estate only) if the use of such easement shall have been abandoned and continue to be abandoned for a period of one (1) year after written notice of such abandonment shall have been actually received by the Owner of the Site benefited by such easement (and the then record owner, if any, of a leasehold interest in said Site) from the Owner of the Site burdened with such easement; provided, however, if the easement is for a nonregular use (for example, an easement to maintain, repair or replace), it shall not be considered to be abandoned during said one (1) year period even if not used during that period if, during the period following actual receipt of said written notice, the Owner of the Site or the owner of any leasehold interest in the Site benefited by such easement gives written notice to the Owner of the Site burdened with such easement that it has not been abandoned. The aforesaid notice from the Owner

OR 1174 PG 2975

26

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 32 of 86

of the Site burdened with an easement shall not be valid unless it states the address to which notices to that Owner may be mailed and sets forth, pursuant to this Section 6.6, that an easement benefiting the recipient of said notice may terminate. Any notice provided in this Section 6.6 to be given to the Owner of a Site shall be deemed as having been given when mailed by U.S. registered or certified mail (return receipt requested) to said Owner at the address provided in Section 16.7 hereof.

Section 6.7 - Easement to Perform Self-Help. For so long as any easement granted under this Article VI shall be in full force and effect, each Owner grants to the other Owners, their employees, agents and contractors, easements to enter upon the Site of the grantor, and into all improvements thereof (excluding any improvements constituting Gross Floor Area), for the purpose of performing any obligation which the grantor is required to perform under this Agreement, but, after receipt of notice from grantee, fails or refuses to do so within a reasonable time, and which any such grantee has the right to then so perform under this Agreement. In exercising any such right in said easements, such grantee shall minimize, to the extent possible, any interference or interruption of any business being conducted on the Site(s) constituting the subservient tenement. Each Owner's exercise of its rights contained in this Section 6.7 is subject to the terms and conditions contained in Section 15.20 hereof.

Section 6.8 - Easement for Signage, Alarms, Accent Lights, Etc.

(a)    Developer, as grantor, hereby grants to the  Department Store Operators, as grantees, for the benefit of their respective Sites, an easement for (i) the construction and maintenance of entrance signs located at or about their entrances onto the Enclosed Mall, and (ii) the installation, maintenance, repair and replacement, at the sole cost and expense of each Department Store Operator, of accent lights, sprinkler systems and alarm and security systems for the entrances to their buildings from the Enclosed Mall, to be located in close proximity to those entrances, together with such rights of ingress and egress on, to and from the Enclosed Mall as is reasonably necessary to accomplish such purposes. Each of the Department Store Operators shall prepare plans and specifications showing the precise locations of such entrance signs, accent lights, sprinkler systems and alarm and security systems and detailing all other specific information with respect thereto, which plans and specifications shall be subject to Developer's approval, such approval not to be unreasonably withheld or delayed, and shall be approved unless, in Developer's discretion, the position, type or character of such entrance signs, accent lights, sprinkler systems and alarm and security systems are not architecturally harmonious with the treatment of the Enclosed Mall immediately adjacent to that portion of the Enclosed Mall where such entrance signs, accent lights, sprinkler systems and alarm and security systems are to be placed. Each Department Store Operator agrees (i) to pay for the electricity required for, and the replacement of bulbs of, the entrance signs, if applicable, and accent lights, (ii) to use due care in the exercise of the rights granted hereunder and to obtain Developer's consent as to the method and timing in its exercise of such rights, (iii) at its expense, to promptly repair, replace and/or restore any and all improvements of Developer which have been or are, from time to time,

OR I I 7 4 PG 2 9 7 6

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 33 of 86

damaged or destroyed by any Department Store Operator in the exercise of the rights granted hereunder, (iv) to hold Developer harmless from all loss, liability, cost or expense incurred in connection with the exercise of such rights, including, without limitation, any mechanic's or laborer's liens, and (v) to keep and maintain all such facilities in a first-class and sightly condition in accordance with standards for a first-class regional enclosed mall type shopping center.

        (b)    The easements provided in this Section 6.8 shall not terminate until either:

        (i)    the Enclosed Mall is demolished or destroyed and not replaced or required to be replaced; or

        (ii)    a Department Store Building is demolished or destroyed and the Department Store Operator thereof does not, within a reasonable time following such demolition or destruction, not to exceed twenty-four (24) months (subject to Unavoidable Delay), restore said Department Store Building.

Section 6.9 - Non-Dedication.  The easements granted by and among the parties hereto in this Article VI are not intended and shall not be construed as a dedication of any such parties' respective Sites for public use, and the parties will refrain from taking any action which would cause such a dedication and shall take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by all of the Owners or their respective successors or assigns.

Section 6.10 - Construction Easement.  For the term of this Agreement, each Owner grants to each other Owner, their respective successors and assigns, a nonexclusive easement in, to, over, under and across its Site (excluding areas occupied by Gross Floor Area) for the purpose of the development, construction and reconstruction of each other Owner's Site; provided, however, that this easement shall not be available to any Owner for any expansion not otherwise permitted by the terms of this Agreement or, if not so permitted, consented to by all of the Owners.  The use of such easement by any Owner shall not unreasonably interfere with the business operation conducted by any other Owner, and said easements shall be subject to such other reasonable conditions as the grantor thereof shall from time to time require.  Each such grantee hereunder will indemnify, defend and hold harmless the grantor from such damage or injury to the grantor's employees, invitees, licensees, and to the buildings or other improvements of the grantor and from unreasonable interference with the business operations conducted by the grantor arising from the exercise and use of the construction easement provided for herein. If reasonable alternatives are available on its Site, a grantee shall not avail itself of this easement.

OR 1174 PG 2977

28

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 34 of 86

## ARTICLE VII
## MAINTENANCE

Section 7.1 - Building and Utility Maintenance.  During  the term of this Agreement, each Owner shall, subject to the provisions of Article VIII and Article X hereof, keep and maintain or cause to be kept and maintained, at no expense to the other Owners, all buildings and other improvements located on its Site in accordance with first-class regional enclosed mall shopping center standards.  The Enclosed Mall, including the attachments to the Department Store Buildings, shall be kept and maintained by Developer all in good order and condition and state of repair and maintenance in accordance with first-class regional enclosed mall shopping center standards.  Insofar as there are any facilities installed on any Owner's Site to provide utility services or water or sanitary or storm sewers or storm water detention ponds to serve, in addition to that Owner's Site, the Site of any other Owner, the same shall be kept and maintained in good order, condition and state of repair by the Owner on whose Site the portion of said facilities or systems are located (except to the extent that such services or systems may be operated and maintained by public agencies or utilities), and the costs attendant thereto shall be borne by each Owner serviced thereby in the proportion to which the Net Floor Area on each such Owner's Site bears to the total Net Floor Area of all Sites served thereby.  Should any party fail to discharge its obligations under this Article VII, except as it relates to any buildings (excluding, however, the Enclosed Mall) on the Complete Site, within a reasonable time after receiving written notice thereof from any other Owner, or such other form of notice as shall be reasonable under the circumstances in case of an emergency, the Owner giving the notice shall have the right to perform such repairs or maintenance and a license to enter upon the land of the defaulting Owner (excluding Gross Floor Area) and charge the defaulting Owner the proportionate share of the costs    thereof if the Site of the defaulting Owner is served by such utility; said action may be taken by any Owner immediately after the giving of notice whenever such failure causes interference with the operation or use of its Site.  At the election of the performing Owner, any amounts so expended for repairs or maintenance under this self-help provision (i) may be withheld from amounts, if any, otherwise payable to the defaulting Owner under this Agreement or any supplemental agreement, without prejudice, however, to the right of the defaulting Owner to contest the right of the other Owner to make such repairs or perform such maintenance and to withhold such amounts, or (ii) shall be payable on demand by the defaulting Owner to the performing Owner, along with interest at a rate per annum equal to the "base" or prime rate being charged by Citibank, N.A. plus three percent (3%) from the date of such expenditure by the performing Owner to the date of full payment thereof by the defaulting Owner.

Section 7.2 - Maintenance and Operation of Common Areas.

(a)    Developer will keep and perform or cause to be  kept and performed all maintenance of the Common Area on the Developer Site.  Developer also will keep all parking areas, malls and walkways, including the Enclosed Mall, on the Developer Site open and well lighted with a minimum maintained intensity of not less than one (1) foot

29

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 35 of 86

candle measured at ground level during all periods that any Department Store Building is open for business and for one-half (½) hour before and one (1) hour after such business hours, and will keep the Enclosed Mall adequately heated and air conditioned during the aforementioned times in accordance with the standards set forth in Section 1.2 hereof; provided, however, that Developer shall not be required to light the Common Areas or keep the Enclosed Mall open after 11:00 p.m.

(b)     Each other Owner shall keep and perform or cause to be kept and performed all maintenance of the Common Area on its Site and will, during any period when one other Department Store Building and fifty percent (50%) or more of the Net Floor Area of the Mall Stores are open for business and for one-half (½) hour before and one (1) hour after such business hour*p-1Xs, but in no event later than 11:00 p.m., at its own expense, keep or cause to be kept the Common Areas on its Site open and well lighted.

Section 7.3 - Parking Regulations.  Unless expressly agreed to by each of the Owners, no charge of any type shall be made to or collected by any Owner for the use of the parking areas as set forth on the Plot Plan provided however that Developer may collect Common Area maintenance costs as may be provided in any lease agreement or supplemental agreement entered into regarding the Shopping Center.  All tenants, officers, employees, agents, customers, business visitors, business guests, licensees and   invitees of the Owners (hereinafter referred to as "Permittees") shall not be prohibited or prevented from parking in the parking areas as long as space is available thereon and such Permittees do not violate the reasonable rules and regulations covering the use of the parking area as may be promulgated from time to time by Developer.  All rules and regulations regarding the parking areas promulgated by Developer shall be consistent with sound shopping center operation.  The Owners may by mutual agreement, prescribe certain sections within the parking area located on their respective Sites for use as parking space by the employees, tenants, agents, contractors, licensees and concessionaires of such Owner and of such Owner's tenants.  In the absence of such mutual agreement, each Owner shall provide parking on its Site for the employees, agents, contractors, licensees and concessionaires of such Owner and of such Owner's tenants.  Each Owner shall require the employees, agents, contractors, licensees and concessionaires of such Owner and of such tenants to use only such sections as are so prescribed for parking.  No such employee parking shall be provided within two hundred feet (200') of any store fronting on the Enclosed Mall without the consent of the Owner upon whose Site such store is located. Sears shall be permitted to locate on the Sears Site, as shown on the Plot Plan, a Budget Rent A Car operation, together with the right to designate twenty (20) parking spaces, and erect a kiosk andportable signs in connection with such operation.  No Owner shall use or permit the use of parking area for any purpose other than parking and passage of pedestrians and motor vehicles unless specifically provided otherwise in this Agreement.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 36 of 86

## ARTICLE VIII
## CONDEMNATION

### Section 8.1 - Condemnation on Developer Site.

(a)    If (i) as a result of Condemnation, the parking ratio (as defined in Section 1.7 hereof) on the Developer Site is reduced below four (4) car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Developer Buildings and Developer fails to provide, within six (6) months thereafter, substitute parking (including the construction of multi-level parking facility/ies) reasonably satisfactory to the other Owners, (ii) the Developer Buildings are Condemned, thereby reducing the existing total square feet of Net Floor Area contained in the Developer Buildings below 100,000 square feet, or (iii) any part of the Enclosed Mall is Condemned so as to render it substantially unusable for the uses customarily inherent in the operation of an enclosed mall, then and in any of such events any Owner may elect to withdraw from this Agreement, subject to the survival of Sections 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8 and 9.5 hereof, and exclude its Site from the operation and effect of this Agreement as of the date of the Condemnation of such property by the condemning authorities, by notice in writing given to the other Owners within thirty (30) days following such taking.

(b)    If (i) any Condemnation results (A) in a reduction of the parking ratio on the Developer Site to between four (4) and four and one-half (4.5), inclusive, car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Developer Buildings and (B) does not result in reducing the existing Net Floor Area of the Developer Buildings below 100,000 square feet or making the Enclosed Mall substantially unusable (as set forth above), or (ii) Developer, having the right to withdraw from this Agreement, elects not to do so, then this Agreement shall continue in full force and effect, but in such event the proceeds of any award received by Developer by reason of such Condemnation in excess of one million dollars ($1,000,000) shall be payable to a holder reasonably satisfactory to the Department Store Operators (an institutional holder with a then net worth of at least $50,000,000 or the holder of any first mortgage on the Developer Site shall be deemed conclusively to be satisfactory), as trustee, to be applied toward (x) the repair and/or reconstruction of any building or other improvements on the Developer Site condemned so as to continue to provide an integrated shopping center, including the Enclosed Mall, and (y) the repair and/or reconstruction of the parking areas on the Developer Site, including the construction of a multi-level parking facility/ies, if necessary, at Developer's sole cost and expense, to the extent necessary to maintain the ratio of parking spaces on the Developer Site as required by Section 1.7 hereof.

(c)    If any Condemnation results in the reduction of the parking ratio on the Developer Site to between five (5) and four and one-half (4.5) car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Developer Buildings, Developer shall have no obligation to provide additional substitute parking.

31

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 37 of 86

(d)    All work of repair and/or reconstruction under this Section 8.1, including the design thereof, shall be undertaken pursuant to the applicable provisions of this Agreement.  Any excess Condemnation proceeds held by the trustee upon completion of the aforesaid repair and/or reconstruction activities shall be paid to Developer.  The type, design, location and construction of any substitute parking referred to in this Section 8.1 shall be subject to the mutual agreement of the Owners.

### Section 8.2 - Condemnation on Department Store Sites.

(a)    If, as a result of Condemnation, the parking ratio  on a Department Store Site is reduced below four (4) car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Department Store Building located on such Department Store Site, or if any part of a Department Store Operator's main building (excluding freestanding auto service center or gasoline island facilities or any seasonal or garden area, if any) is taken by Condemnation so that, in such Department Store Operator's reasonable judgment, such main building is rendered unfit for use as a Department Store, then in either of such events the Department Store Operator whose Site shall be so taken shall have the option of excluding its Site from the operation and effect of this Agreement and to withdraw from this Agreement as to it, subject to the survival of Sections 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8 and 9.5 hereof, by giving notice to such effect in writing to the other Owners within sixty (60) days following such Condemnation.   Notwithstanding the foregoing, during the six (6) month period following such Condemnation,  Developer shall have the right, but not the obligation, to provide, at its sole cost (provided that Developer receives any and all proceeds of condemnation received by such Department Store Operator to the extent that such proceeds relate to the parking areas), substitute parking at a location or locations reasonably satisfactory to the Department Store Operator whose Site shall be so taken and the other Department Store Operators so as to maintain the ratio of parking spaces on such Department Store Operator's Site as required by Section 1.7 hereof.  In the event Developer provides such substitute parking, the Department Store Operator whose Site shall be so taken shall no longer have the option of withdrawing from this Agreement.

(b)    If (i) any Condemnation (A) results in the reduction of the parking ratio on a Department Store Site to between four (4) and four and one-half (4.5), inclusive, car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Department Store Building located on such Department Store Site, and (B) does not render such Department Store Operator's main building unfit for use as a Department Store or (ii) if the option to withdraw described in subparagraph (a) hereinabove is not exercised, then this Agreement shall continue in full force and effect, but in such an event the Department Store Operator so affected shall use the proceeds of any award received by it by reason of such Condemnation to repair and/or reconstruct its Building and the parking areas on its Site, including the construction of a multi-level parking facility, if necessary, to the extent necessary to maintain the amount of automobile parking spaces required by Section 1.7 hereof.  Any necessary multi-level parking facility shall be constructed at such location reasonably approved by all of the Owners.

OR | | 7 4 PG 2 9 8 |

32

(c)     If any Condemnation results in the reduction of the parking ratio on a Department Store Site to between five (5) and four and one-half (4.5) car spaces for each one thousand (1,000) square feet of Net Floor Area contained in the Department Store Building located on such Department Store Site, the Department Store Operator so affected shall have no obligation to provide additional substitute parking.

(d)     All work of repair and/or reconstruction under this Section 8.2, including the design thereof, shall be undertaken pursuant to the applicable provisions of this Agreement.  The type, design, location and construction of any substitute parking referred to in this Section 8.2 shall be subject to the mutual agreement of the Owners.

Section 8.3 - Proceeds.

(a)     In the event of a Condemnation of any portion of an Owner's Site, the Owner whose Site is Condemned shall be entitled, as between the Owners, to the entire award proceeds resulting from the Condemnation of its Site, and the other Owners, subject to each other Owner's right to claim severance damages, waive any and all claims or rights to such award proceeds.  The obligation of any Owner to repair and/or reconstruct under this Article VIII shall be limited to the extent of the proceeds received by such Owner by reason of such Condemnation.

(b)     If required pursuant to Section 9.6(b) hereof, all Condemnation proceeds shall be paid over to the trustee or mortgagee (referred to in Section 9.6(b) hereof) and shall be disbursed or paid over and shall be used, all as set forth therein.

Section 8.4 - Rebuilding.  Any repairs and/or reconstruction under this Article VIII shall be completed and any building or other improvement shall be ready for occupancy within eighteen (18) months, or such other time period as is specified in this Article VIII, from the date such Condemnation occurs, which, for the purposes of this Article VIII, shall be deemed to be the date on which possession of the condemned property is surrendered to the condemning authority.  Once commenced, work of repair and/or reconstruction shall be carried through to completion with due dispatch, but Unavoidable Delay shall not be deemed such an interruption as would constitute the particular party in default in the obligation to cause such work to be done continuously or to complete such repair and/or reconstruction activities within said eighteen (18) month period.  In the event any Owner elects to withdraw from this Agreement and exclude its Site from the operation and effect of this Agreement by reason of Condemnation as herein permitted, then the excluding Owner shall cause its Site to be maintained in a clean, orderly, safe and sightly condition and, so long as the Site of any other Owner still bound by this Agreement is being utilized for retail purposes, at its option, (i) either pave and stripe its Site so that it is suitable for use as a parking area for the Shopping Center or landscape the same, or (ii) use its Site for a use which is compatible and consistent with the operation of a first-class regional enclosed mall type shopping center.

33

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 39 of 86

## ARTICLE IX
## INSURANCE

### Section 9.1 - Property Insurance.

(a)     At all times during the period during which such Owner is required to operate pursuant to Article XIV, or during which such Owner is operating, whether or not such Owner is required to operate, each Owner shall keep all buildings and other improvements on its Site insured, at its expense, against loss or damage by fire, extended coverage, sprinkler leakage, vandalism, malicious mischief, water damage, accidental collapse, flood and earthquake, and such other risks as are from time to time included in "all risk coverage" endorsements available in Indian River County, Florida, and in an amount of not less than ninety percent (90%) of the actual full replacement cost of the building or buildings and improvements on its Site (excluding foundation and excavation costs and cost of underground flues, pipes and drains).  Any such policy or policies may provide for a deductible amount of $350,000.00 for base perils and 5% for flood, earthquake and windstorm, or such higher amounts as an Owner may determine, so long as such Owner is entitled to self-insure under the provisions of Section 9.6(a) hereof.

(b)     No Owner shall be liable to any other Owner or to any insurance company (by way of subrogation or otherwise) insuring such other Owner for any loss or damage to any building or its contents or fixtures or other structure which was or, pursuant to the terms of this Agreement was required to have been covered by such insurance even though such loss or damage might have been occasioned by the negligence of such Owner, its agent or employees.

### Section 9.2 - Liability Insurance.  During the term of this Agreement, each Owner will, at its expense, maintain commercial general and umbrella liability insurance including, but not limited to, coverage for premises/operations, products/completed operations, personal/advertising injury and contractual liabilities, with limits of not less than Ten Million Dollars ($10,000,000) combined single limits, which may provide for deductible amounts of no more than $350,000.00, or such higher amounts as an Owner may determine, so long as such owner is entitled to self-insure under the provisions of Section 9.6(a) hereof.

### Section 9.3 - Workers' Compensation Insurance.  During the term of this Agreement, each Owner will, at its expense, maintain a policy of Workers' Compensation Insurance for its employees, covering all costs, benefits and liabilities under State Workers' Compensation and similar laws with limits in compliance with Florida law, and Employers' Liability Insurance with limits of at least $1,000,000 per accident or disease.  Such insurance shall contain a waiver of subrogation in favor of each other Owner.

### Section 9.4 - Motor Vehicle Liability Insurance.  During the term of this Agreement, each Owner will, at its expense, maintain a policy of Motor Vehicle Liability Insurance covering all owned, non-owned and hired vehicles with combined single limits

34

OR 1 174 PG 2983

of liability of One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage.

Section 9.5 - Indemnities. Each Owner covenants and agrees to defend, indemnify and save the other Owners harmless from and against any and all claims, actions, damages, liabilities and expense including, but not limited to, reasonable attorney fees and costs of tribunals at all levels, arising out of or incurred in connection with loss of life, personal injury or damage to property, or any of them, arising from an incident on the indemnitor's Site or occasioned in whole or in part by any act or omission of such Owner, its subtenants (or tenants), agents, contractors or employees except to the extent that any such claim is due to the negligent act, omission or willful misconduct of the Owner or its subtenants (tenants), agents, contractors or employees seeking to be indemnified and held harmless by another Owner.

Section 9.6 - Form of Policies.

(a)     All insurance provided for in this Article IX shall be effected under valid and enforceable policies issued by insurers of recognized responsibility authorized to do business in the State of Florida and rated "A-/VII" or better by Best's Insurance Reports. Any insurance required to be maintained by an Owner may be in whole or in part by self-insurance provided any such Owner shall individually have a net worth (or the entity, if any, guaranteeing its obligations under Articles VIII, IX and X has a net worth) according to its last published report or audited financial statement of at least One Hundred Million Dollars ($100,000,000). Any insurance required to be maintained by an Owner may be taken out under a blanket insurance policy or policies or a combination of such blanket policy or policies and self-insurance covering other premises, property or insureds in addition to such Owner's Site. The immediately preceding sentence shall not be construed to permit any of the Owners to carry less than the insurance (except for permitted self-insurance) otherwise required hereunder. The original of the initial policies or renewal policies, if any, as the case may be, shall be delivered to the primary named insured, and, if requested, certificates or memoranda thereof shall be delivered to the other Owners upon issuance thereof and thereafter within thirty (30) days of the expiration dates of the expiring policies. Any policy required by this Article IX shall provide that such policy shall not be canceled or materially changed without at least thirty (30) days prior written notice to the other Owners. Any Owner intending to self-insure shall deliver to the other Owners, upon written request, written notice of its intent to self-insure, together with evidence of its qualification to self-insure, and shall supply evidence of its continuing qualification to so insure upon written request therefor. In the event an Owner fails to maintain insurance in accordance with the provisions of this Article IX and if such Owner fails to correct such default after reasonable notice from any one of the other Owners, such other Owner may purchase such insurance for such defaulting Owner and the defaulting Owner shall promptly repay the cost thereof.

(b)     Unless the Owner (or lessee in possession of the Site in question) or the corporation, if any, which is then guaranteeing performance of the insured's obligations

35

hereunder has a net worth according to its last published report or audited financial statement of at least One Hundred Million Dollars ($100,000,000), the policy or policies of insurance required pursuant to Section 9.1 hereof shall contain a clause providing that any loss under same shall be payable in trust to (i) a trustee, which trustee shall be a bank or trust company approved by the other Owners (an institutional mortgagee with a net worth of at least One Hundred Million Dollars ($100,000,000) shall be deemed satisfactory to the other Owners), or (ii) in the case of Developer, if applicable, the institutional mortgagee of any first mortgage loan made for the purpose of financing the construction of improvements on the Developer Site or providing permanent financing for the improvements on the Developer Site (hereinafter called "Mortgagee"), and certificates or memoranda of policies covering said insurance shall, from time to time, as issued, be deposited with said trustee or Mortgagee; provided, however, that all amounts collected on any such policy or policies shall be made available to the insured thereunder for the reconstruction and/or repair of any building or buildings and other improvements damaged or destroyed, and shall be paid out by the said trustee or Mortgagee from time to time as the work of rebuilding, reconstruction and/or repair shall progress, upon delivery of architects' certificates by architects licensed to do business in the State of Florida, showing the application of the amount paid for such repairs, rebuilding and/or reconstruction. If the damage is so slight that the insurance award is less than Five Hundred Thousand Dollars ($500,000), then the insurance award shall be paid directly to the insured without the necessity of payment to the trustee or Mortgagee as provided in this Article IX. The provisions of the immediately preceding sentence shall not be construed as relieving such Owner from the necessity of repairing such damage promptly in accordance with the terms of Article X hereof. The insured shall pay any and all fees of the trustee or Mortgagee for its services in connection with such insured's rebuilding, reconstruction and/or repair obligations as provided by this Article IX. Any excess of moneys received from insurance remaining with the trustee or Mortgagee after the rebuilding, reconstruction and/or repair of such building or buildings or other improvements shall be paid directly to the insured, provided the insured is not in default in its performance of the covenants contained in this Agreement. If an Owner does not commence reconstruction or repair of its building or buildings or other improvements on its Site promptly after the date of payment of loss, after damage or loss occasioned by fire or other casualty for which insurance moneys shall be payable, and prosecute the same thereafter with such dispatch as may be necessary to complete the same within eighteen (18) months after the occurrence of such damage or loss, occasioned as aforesaid, or if such Owner is otherwise in default, then the amount so collected or the balance thereof remaining with the trustee or Mortgagee, as the case may be, may, at the option of any nondefaulting Owner, be paid in trust to the electing nondefaulting Owner for the purpose of performing the required rebuilding, reconstruction and/or restoration.

(c)    Any mortgage placed on the Developer Site by Developer, or any renewals or replacements thereof, or any agreement otherwise extending or modifying the same, shall contain a provision that any Condemnation awards or insurance proceeds resulting from Condemnation of or a loss on the Developer Site received by Developer's Mortgagee shall be held by it in trust for the purpose of paying for the cost of repairing,

36

restoring and/or replacing the buildings and improvements in accordance with the provisions of this Agreement.  Any party meeting the self-insurance requirements hereof and having elected to self-insure shall not be obligated to deposit funds for restoration in trust.

## ARTICLE X
## DAMAGE AND DESTRUCTION

Section 10.1 - Rebuilding by Developer.  In the event of the destruction of or damage to the buildings or improvements located on the Developer Site, or any part thereof, during the period commencing as of the date hereof and continuing through the period ending thirteen and one-half (13-1/2) years following the Mall Opening and as often as any buildings or improvements or any part or parts thereof on the Developer Site shall, during such period, be destroyed or damaged by fire or other casualty required to be insured under the provisions of Section 9.1 hereof, Developer shall diligently rebuild and repair or replace same within eighteen (18) months following the damage or destruction to as good a condition and to the same general appearance as existed prior to the damage or destruction and to the extent necessary so that there shall be on the Developer Site, Mall Stores and Enclosed Mall at least equal in size and quality to the original construction. Developer agrees that any building or other improvements, including the Enclosed Mall, shall be rebuilt in accordance with plans and specifications which provide for first-class structures, workmanship and materials and are otherwise in accordance with the provisions of Section 1.2 of this Agreement and which provide for the Enclosed Mall to abut and connect to the Department Store Buildings in which a Department Store Operator is operating so that each such Department Store Building has as many entrances onto the Enclosed Mall as it did immediately before such damage or destruction.  Developer also agrees to rebuild and repair or replace the buildings or improvements described above if such destruction or damage occurs after the thirteen and one-half (13-1/2) year period set forth above if, within ninety (90) days of the occurrence of such damage or destruction, two (2) or more Department Store Operators shall agree in writing to extend their respective obligations to operate as provided in Article XIV hereof for a period to expire not less than ten (10) years after completion of such rebuilding, repair or replacement.  In no event, however, shall Developer be required to so rebuild, repair or replace during the last ten (10) years of the term of this Agreement.  Notwithstanding the foregoing, (i) if only Dillard and Penney so extend their respective obligations to operate as provided in Article XIV hereof, Developer shall only be obligated to rebuild and repair or replace and operate those portions of the Enclosed Mall and other buildings and improvements on the Developer Site located west of the easterly side of the center food court area as shown on the Plot Plan; and/or (ii) if only Burdines and Sears so extend their respective obligations to operate as provided in Article XIV hereof, Developer shall only be obligated to rebuild and replace and operate those portions of the Enclosed Mall and other buildings and improvements on the Developer Site located east of the westerly side of the center food court area as shown on the Plot Plan.

37

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 43 of 86

**Section 10.2 - Rebuilding by the Department Store Operators.** In the event of the destruction of or damage to the buildings and improvements on a Department Store Site or any part thereof during the period prior to the final eighteen (18) months of a Department Store Operator's covenant to operate as provided in Article XIV hereof and as often as any buildings or improvements or any part or parts thereof on any such Department Store Site shall, during such period, be destroyed or damaged by fire or other casualty required to be insured under the provisions of Section 9.1 hereof, such Department Store Operator shall, provided it is then obligated to operate pursuant to the applicable provisions of Article XIV hereof, promptly rebuild and replace or repair same to as good a condition and to the same general appearance as existed prior to the damage or destruction and, to the extent necessary, so that within eighteen (18) months from the date of such destruction or damage, subject to Unavoidable Delay, there shall be on said Department Store Operator's Site a Department Store Building at least equal in size, utility and quality to that originally constructed.

**Section 10.3 - Restoration of Site.** If buildings and improvements on an Owner's Site are damaged or destroyed at a time when such Owner is not obligated to rebuild or repair as required by this Article X and such Owner elects not to rebuild or repair, then such Owner shall, at its option, either (i) restore its Site to a neat and orderly condition and maintain its Site in a clean, safe and sightly condition and either pave and stripe same so that it is suitable for use as a parking area for the Shopping Center or landscape the same, or (ii) use its Site for a use which is compatible and consistent with the operation of a first class regional enclosed mall type shopping center.

## ARTICLE XI
## UNAVOIDABLE DELAY

**Section 11.1 - Unavoidable Delay.** The time for performance of any term, covenant, condition or agreement contained in this Agreement, except the obligation to pay any sum of money, shall be extended by any period of "Unavoidable Delay". Notwithstanding the foregoing, this Section 11.1 shall not be applied so as to extend the term of this Agreement as set forth in Article XII hereof. "Unavoidable Delay" means delay reasonably beyond the control of the party obligated to perform the applicable term, covenant, condition or agreement under this Agreement and shall include, without limiting the generality of the foregoing, delays attributable to acts of God, strikes, labor disputes, casualty, damage or destruction to property; inability to procure labor, equipment, facilities or materials; governmental restrictions, actions or failure to take action; riot, civil commotion, and acts of a public enemy or casualty, but shall not include any delay attributable to financial difficulties of such Owner or such Owner's inability or unwillingness to obtain financing or lease space in its buildings.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 44 of 86

## ARTICLE XII
## TERM

Section 12.1 - Term.  Unless otherwise specifically provided to the contrary elsewhere in this Agreement, or unless sooner terminated by mutual agreement of the Owners, this Agreement shall continue and the obligations hereunder shall remain binding on each of the parties hereto, their successors and assigns, until the fiftieth (50th) anniversary of the Mall Opening.  Notwithstanding such expiration (or earlier termination) of this Agreement, it is agreed that:  (i) the easements granted pursuant to Sections 6.2, 6.3, 6.4, 6.5 and 6.8 hereof shall not expire (or terminate); (ii) any easements granted to public utility companies for a term or terms beyond said expiration (or termination) date shall not so expire (or terminate); and (iii) such expiration (or termination) shall not limit or affect any remedy at law, in equity or under this Agreement of any Owner against any other Owner with respect to any liability and obligation on the part of such other Owner arising or to be performed under this Agreement prior to the date of such expiration (or termination).

## ARTICLE XIII
## REAL ESTATE TAXES

Section 13.1 - Payment of Taxes.  Each Owner shall pay  (or cause to be paid) before delinquency, all real estate taxes and assessments (herein collectively called "Taxes") levied on its Site and the improvements situated thereon.

Section 13.2 - Contesting Taxes.  Each Owner may, at its own cost by appropriate proceedings, contest the validity, applicability and/or the amount of any Taxes.  Nothing in this Article XIII requires an Owner to pay Taxes so long as it contests the validity, applicability or amount thereof in good faith and so long as it does not allow the affected Site to be in imminent danger of being forfeited to the imposer of such Taxes as a result of nonpayment of such Taxes.

## ARTICLE XIV
## OPERATING COVENANTS

Section 14.1 - Operating Covenant of Developer.  Developer shall, for a period of fifteen (15) years following the Mall Opening and for so long thereafter as any two (2) Department Stores shall continue to operate pursuant to the standards (but not time periods) as provided in Sections 14.2 through 14.5 hereof, continuously operate the Enclosed Mall under the name "Indian River Mall", in a manner consistent with the operation of a first class regional mall shopping center, and shall use its reasonable and good faith, diligent efforts to keep all store space leased to the end that the Shopping Center will be utilized to the maximum extent possible for retail and related purposes; provided, however, that if none of said Department Stores are operating at locations

39

OR 1174 PG 2986

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 45 of 86

fronting on the Enclosed Mall east of the center food court as shown on the Plot Plan, then Developer shall not be obligated to keep open or operate that portion of the Enclosed Mall and Developer Buildings located east of the center food court; or if none of said Department Stores are operating at locations fronting on the Enclosed Mall west of said center food court, then Developer shall not be obligated to keep open or operate that portion of the Enclosed Mall and Developer Buildings located west of the center food court. Following the expiration of Developer's covenant to operate pursuant to the provisions of this Section 14.1 and during the remainder of the term of this Agreement, and provided a Department Store Operator is operating a Department Store in its Department Store Building, Developer will not use or permit the use of the Developer Site for any purpose which is not consistent with the operation of a Department Store or which use would constitute a nuisance.

### Section 14.2 - Operating Covenant of Dillard.

(a)     Dillard hereby covenants with and for the benefit of Developer and Developer's Mortgagee only (as the term "Mortgagee" is defined in Section 15.19 of this Agreement) to continuously operate a Department Store in the Dillard Building under a trade name that includes the name "Dillard's" or such other name as Dillard or its permitted transferee may be operating the majority of its then-existing Department Stores in the State of Florida for a period commencing on the date Dillard opens the Dillard Building for business to the public and ending on the earlier of (i) the date which is fifteen (15) years thereafter or (ii) the date on which any other Department Store's operating covenant would expire by its terms. Thereafter, or after the earlier release of the foregoing covenants pursuant to Section 14.2(b), Dillard shall have no obligation to operate in the Dillard Building a retail or other facility or to use the Dillard Building at all; provided, however, if Dillard elects to operate at all after such time, the Dillard Site will be used in a manner consistent with the then-existing use of the Complete Site.

(b)     Dillard shall be released from the performance of Dillard's covenant to operate set forth in Section 14.2(a), and such operating covenant shall be deemed of no further force and effect, upon the earliest to occur of any one or more of the following dates:

(1)     the date of Developer's default under Section 14.1 beyond the expiration of any applicable notice and cure period;

(2)     the date on which Burdines, or such other direct or indirect subsidiary of Federated Department Stores, Inc. as may be operating a majority of the then existing Department Stores operated by any direct or indirect subsidiary of Federated Department Stores, Inc. in the State of Florida, is both:  (i) not obligated to operate pursuant to its operating covenant (as same is represented to Dillard in Section 14.3), and (ii) in fact, not operating a retail department store under the trade name "Burdines" (or such other name as is permitted pursuant to Section 14.3 or such other

40

OR 1 1 7 4 PG 2 9 8 9

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 46 of 86

name as any direct or indirect subsidiary of Federated Department Stores, Inc. may be operating a majority of the then existing Department Stores operated by any direct or indirect subsidiary of Federated Department Stores, Inc. in the State of Florida) in the Burdines Building in accordance with its operating covenant;

(3)    the date on which both Penney and Sears are both: (i) not obligated to operate pursuant to their respective operating covenants (as same are represented to Dillard in Section 14.4 and Section 14.5, respectively), and (ii) in fact, not operating retail department stores under the trade names "Penney" or "Sears" (or such other names as are permitted, respectively, pursuant to Section 14.4 and 14.5), in the Penney Building and the Sears Building, respectively, in accordance with their respective operating covenants;

(4)    the date on which the Mall Stores contain less than 200,000 square feet of Net Floor Area other than in the event of a casualty or condemnation that is to be repaired and/or restored such that the Mall Stores will again contain at least 200,000 square feet;

(5)    subject to the provisions of the Supplemental Agreement of even date herewith between Dillard and Developer, the date (the "Cotenancy Default Date") on which less than sixty-five percent (65%) of the Net Floor Area of the Mall Stores is occupied by tenants operating their respective facilities pursuant to leases and representing a tenant mix traditionally found in first-class regional enclosed mall shopping centers (the "Cotenancy Default");

(6)    the date on which less than three (3) Department Store Buildings (inclusive of the Dillard Building) are connected by the Enclosed Mall; or

(7)    the date on which any of the operating covenants of the other Department Store Operators shall have been terminated, canceled or released by agreement of Developer.

Nothing contained in Section 14.2(b) shall diminish or constitute a waiver of any other rights of Dillard resulting from a failure of Developer to perform its covenants set forth in this Agreement.

Section 14.3 - Operating Covenant of Burdines.

(a)    Provided that all conditions precedent to the obligation of Burdines to open for business in the Burdines Building as contained in Section 4.3 hereof have been satisfied, Burdines covenants and agrees with and for the benefit of Developer and

OR 1174 PG 2990

Developer's Mortgagee only (as the term "Mortgagee" is defined in Section 15.19 of this Agreement) to operate or cause to be operated in the Burdines Building, a Department Store under the trade name that includes the name "Burdines" or such other name as Burdines or its permitted transferee may be operating the majority of its then existing Department Stores in the State of Florida for a period commencing on the date Burdines initially opens the Burdines Building for business to the public and ending on the earlier of (i) the date which is fifteen (15) years thereafter, or (ii) the date on which any other Department Store's operating covenant would expire by its terms. Thereafter, or after the earlier release of the foregoing covenant pursuant to Section 14.3(b), Burdines shall have no obligation to operate in the Burdines Building a retail or other facility or to use the Burdines Building at all; provided, however, if Burdines elects to operate at all after such time, the Burdines Site will be used either for retail uses or otherwise in a manner consistent with the then existing use of the Complete Site. The covenant of Burdines to operate as set forth in this Section 14.3(a) is sometimes hereinafter referred to as the "Burdines Operating Covenant."

(b)    Burdines shall be released from the performance of the Burdines Operating Covenant, and the Burdines Operating Covenant shall be deemed of no further force or effect, upon the earliest to occur of any one or more of the following dates (which dates shall not, except as set forth in that certain Supplement to Reciprocal Easement and Operating Agreement between Developer and Burdines (the "Burdines Supplemental Agreement") be extended or affected by any Unavoidable Delay):

(1)    the date of Developer's default under Section 14.1 beyond the expiration of any applicable notice and cure period;

(2)    the date on which Dillard is both: (i) not obligated to operate pursuant to its operating covenant (as the same is represented to Burdines in Section 14.2) and (ii) in fact, not operating a Department Store under the trade name "Dillard" (or such other name as is permitted pursuant to Section 14.2) in the Dillard Building in accordance with its operating covenant;

(3)    the date on which both Penney and Sears are both: (i) not obligated to operate pursuant to their respective operating covenants, and (ii) in fact, not operating a Department Store under the trade name "Sears" (or such other name as is permitted pursuant to Section 14.4) in the Sears Building, or under the trade name "Penney" (or such other name as is permitted pursuant to Section 14.5) in the Penney Building, in accordance with their respective operating covenants;

(4)    the date on which the Mall Stores contain less than 200,000 square feet of Net Floor Area, other than in the event of a casualty or condemnation that is to be repaired and/or restored such that the Mall Stores will again contain at least 200,000 square feet of Net Floor Area;

42

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 48 of 86

(5)    subject to the provisions of the Burdines Supplemental Agreement, the date (the "Cotenancy Default Date") on which less than sixty-five percent (65%) of the Net Floor Area of the Mall Stores is occupied by tenants operating their respective facilities pursuant to leases and representing a tenant mix traditionally found in first-class regional enclosed mall shopping centers (the "Cotenancy Default");

(6)    the date on which fewer than three (3) Department Store Buildings (inclusive of the Burdines Building) are connected by the Enclosed Mall; or

(7)    the date on which any of the operating covenants of the other Department Store Operators shall have been terminated, canceled or released by agreement of Developer.

Nothing contained in Section 14.3(b) shall diminish or constitute a waiver of any other rights of Burdines resulting from a failure of Developer to perform its covenants set forth in this Agreement.

Section 14.4 - Operating Covenant of Sears.  Sears covenants and agrees with and for the benefit of Developer and Developer's Mortgagee (as the term "Mortgagee" is defined in Section 15.19 of this Agreement) that Sears shall, after the Sears Opening Date and for a period of years then coexistent with the first to expire of the operating covenants of Dillard, Burdines, and Penney (but in no event beyond fifteen years from the Sears Opening Date), continuously operate or cause to be operated a Department Store only in the Sears Building (not including the Auto Service Center) containing at least Sears Gross Floor Area as originally constructed under the name "Sears" or such other name as Sears shall be operating a majority of its like Department Stores in the State of Florida, provided that (i) Developer is not in default of its Operating Covenant set forth in Section 14.1, (ii) tenants occupying a minimum of sixty percent (60%) of the Net Floor Area of the Mall Stores are open and operating (however, in the event such occupancy rate falls below sixty percent (60%) as required hereunder, Developer shall have a period of up to one (1) year after notice thereof from Sears to regain said required occupancy rate) and (iii) at least two (2) other Department Stores are open and operating as provided in this Agreement (however, in the event there are fewer Department Stores open than required hereunder, Developer shall have a period of up to one (1) year after notice thereof from Sears to replace the Department Store(s) with one(s) that has(have) at least one store in the State of Florida, each such replacement Department Store having nine (9) months to open from the date it takes possession of the Site in question).  Thereafter, during the remainder of the term of this Agreement and provided the Shopping Center is being operated by the Developer, Sears will not use or permit the use of its Site for a purpose which is inconsistent with the operation of the Shopping Center (as long as Developer shall not have allowed any other Site to be so operated) or which would constitute a nuisance.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 49 of 86

Section 14.5 - Operating Covenant of Penney.  Penney covenants and agrees with and for the benefit of Developer and Developer's Mortgagee (as the term "Mortgagee" is defined in Section 15.19 of this Agreement) that Penney shall, after the Penney Opening Date and for a period of years then coexistent with the first to expire of the operating covenants of Dillard, Burdines and Sears (but in no event beyond fifteen (15) years from the Penney Opening Date), continuously operate or cause to be operated a Department Store in the Penney Building containing at least Penney's Gross Floor Area as originally constructed under the name "J.C. Penney" or such other name as Penney shall be operating a majority of its like Department Stores in the State of Florida, provided that (i) Developer is not in default of its operating covenant set forth in Section 14.1, (ii) tenants occupying a minimum of seventy-five percent (75%) of the Net Floor Area of the Mall Stores are open and operating (however, in the event such occupancy rate falls below seventy-five percent (75%) as required hereunder, Developer shall have a period of up to one (1) year after notice thereof from Penney to regain said required occupancy rate) and (iii) at least two (2) other Department Stores are open and operating as provided in this Agreement under the names "Dillard", "Burdines" and "Sears" respectively or such other names as is permitted pursuant to Sections 14.2, 14.3 and 14.4, as part of an integrated department store operation.  Thereafter, during the remainder of the term of this Agreement and provided the Shopping Center is being operated by the Developer, Penney will not use or permit the use of its Site for a purpose which is inconsistent with the operation of the Shopping Center (as long as Developer shall not have allowed any other Site to be so operated) or which would constitute a nuisance.

## ARTICLE XV
## MISCELLANEOUS

Section 15.1 - Recording; Publicity.

(a)    Developer will cause a counterpart original of this Agreement to be recorded promptly following its execution, with the cost of recording to be paid by Developer.

(b)    The Owners shall execute a written instrument or instruments in recordable form for the purpose of evidencing the dates when the Developer Buildings, Dillard Building, Burdines Building, Sears Building, and Penney Building shall have opened for business, and Developer shall cause such instrument(s) to be filed for record at its expense.

(c)    The Owners will not release any publicity, or make any statements for release to the public, relating to the other Owners or the stores to be operated by such other Owners, without the prior written consent of such other Owners.

Section 15.2 - Covenants Running with the Land.  All covenants, agreements, conditions and restrictions set forth in this Agreement and any supplemental agreements

OR 1174 PG 2993

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 50 of 86

hereto are intended to be and shall be construed as covenants running with the land, binding upon, inuring to the benefit of and enforceable by the parties hereto and all subsequent owners of their respective Sites. Nothing contained herein shall be construed as creating a reversion or right of reversion in the respective Sites of the Owners.

Section 15.3 - Not Partners. Nothing contained in this Agreement shall be construed to make the Owners partners or joint venturers or to render any of the Owners liable for the debts or obligations of the others, except as expressly provided in this Agreement.

Section 15.4 - Waiver. No delay or omission by any of the Owners to exercise any right or power accruing upon any noncompliance or failure of performance by any of the other Owners pursuant to the provisions of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by any of the Owners of any of the covenants, conditions or agreements hereof to be performed by any other Owner shall not be construed to be a waiver of any subsequent breach thereof or of any other covenant, condition or agreement herein contained.

Section 15.5 - Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

Section 15.6 - Modifications. No agreement shall be effective to add to, change, modify, waive or discharge this Agreement or any of the Exhibits hereto, including the Plot Plan, in whole or in part, unless such agreement is in writing and signed by each Owner.

Section 15.7 - Notices. Any notice, request, demand, approval or consent given or required to be given under this Agreement shall be in writing and mailed by United States registered or certified mail (return receipt requested), postage prepaid, or delivered by nationally recognized air courier service (against signed receipt) to the other Owners or to such other Owner or such of the other Owners as shall be entitled to receive such notice, request, demand, approval or consent at the addresses stated below or at the last changed address given by the Owner to be notified as hereinafter specified:

DILLARD:         DILLARD'S, INC.
                           Attention: President
                           1600 Cantrell Road
                           Little Rock, Arkansas 72201

and

45

OR 1174 PG 2994

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 51 of 86

Copy to:

DILLARD'S, INC.
Attention:  General Counsel
1600 Cantrell Road
Little Rock, Arkansas  72201

BURDINES:          FEDERATED DEPARTMENT STORES, INC.
                   7 West Seventh Street
                   Cincinnati, Ohio  45202
                   Attn:  Real Estate Department

                            and

                   Copy to:

                   BURDINES
                   22 East Flagler Street
                   Miami, Florida 33131
                   Attn:  President

SEARS:             SEARS, ROEBUCK AND CO.
                   3333 Beverly Road
                   Hoffman Estates, IL  60179
                   Attn:  Vice President Real Estate

                   with a copy to:

                   SEARS, ROEBUCK AND CO.
                   3333 Beverly Road
                   Hoffman Estates, IL  60179
                   Attn:  Assistant General Counsel, Real Estate

PENNEY:            J.C. PENNEY PROPERTIES, INC.
                   Real Estate Department
                   P. O. Box 10001
                   Dallas, TX  75301-2105
                   Attn:  Real Estate Counsel

OR I I 74 PG 2995

46

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 52 of 86

or (only for overnight courier service)

J. C. PENNEY PROPERTIES, INC.
Real Estate Counsel
Real Estate Department (2105)
6501 Legacy Drive
Dallas, TX  75024-3698


DEVELOPER:    IR MALL ASSOCIATES, LTD.
% Simon DeBartolo Group
National City Center
115 W. Washington Street
Indianapolis, IN 46204
Attn: Executive Vice President-Development


with a copy to:

IR MALL ASSOCIATES, LTD.
% Simon DeBartolo Group
National City Center
115 W. Washington Street
Indianapolis, IN 46204
Attn: General Counsel

Any such notice shall be deemed given on the date that it is received or refused by the addressee as indicated by the return receipt or on the date of personal delivery.  Any Owner may, at any time, change its address for the above purpose by delivering, as aforesaid, a notice stating the change and setting forth the new address.

Section 15.8 - Headings.  The article and section headings contained herein are for convenience and reference only, and in no way define and/or limit the scope and content of this Agreement or in any way affect its provisions.

Section 15.9 - Exhibits.  Each of Exhibits "A-1" through "A-7", "B" and "C" is hereby incorporated herein by reference and made a part hereof as fully as if set forth in full herein.

Section 15.10 - Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all such counterparts shall constitute one and the same instrument.

Section 15.11 - Remedies Not Exclusive.  The remedies provided in this Agreement are not the sole remedies of an Owner and shall not be construed to be, by way

OR 1 1 74 PG 2996

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 53 of 86

of limitation, the only remedy available to it, but in addition each Owner shall be    entitled to all remedies available in law or in equity for a breach or anticipated breach by any other Owner.

Section 15.12 - Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

Section 15.13 - Estoppel Certificates. Each Owner shall, from time to time (but not more than once in any twelve (12) month period and no earlier than thirty (30) days after the Mall Opening) and upon not less than thirty (30) days notice from any other Owner, execute and deliver to such other Owner a certificate addressed to a third party stating (i) that this Agreement is unmodified and in full force and effect, or if modified, stating the modifications; and (ii) whether or not to the best of its actual knowledge, any other party is in default in any respect under this Agreement, and if in default, specifying the nature of such default.

Section 15.14 - Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other pursuant to the provisions of this Agreement, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said party to institute suit for the recovery of such sum, and if it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay pursuant to the provisions of this Agreement. If at any time a dispute shall arise between the parties as to any work to be performed by any of them under the provisions of this Agreement, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest" and the performance of such work shall in no event be regarded as a voluntary performance and there shall survive the right on the part of said party to institute suit for the recovery of the cost of such work, and if it shall be adjudged that there was no legal obligation on the part of said party to perform the same or any part thereof, said party shall be entitled to recover the cost of such work or the cost of so much thereof as said party was not legally required to perform under the provisions of this Agreement.

Section 15.15 - Cost and Expense. Wherever it is provided in this Agreement that a party is to perform certain obligations, those obligations shall be performed by said party at its sole cost and expense, except where otherwise expressly provided.

Section 15.16 - Injunctive and Declaratory Relief. In the event of any violation or threatened violation by any person of any of the terms, restrictions, covenants and conditions of this Agreement, any of the parties shall have the right to enjoin such violation or threatened violation or bring an action for specific performance in a court of competent jurisdiction. Any of the parties shall also have the right to bring an action for

OR 1174 PG 2997

declaratory relief to prevent any threatened breach or default hereunder or to obtain such interpretation of the provisions hereof as such party shall desire.

Section 15.17 - Temporary Cessation of Business. Any temporary cessation of business by any party shall not constitute a breach of the covenant to operate on the part of the party so ceasing business if such cessation is (i) occasioned by the making of repairs, alterations and/or renovations not in excess of six (6) months or interruptions pursuant to the provisions of Articles VIII, X or XI hereof, so long as such party is using due diligence in making its repairs, alterations and/or renovations, or (ii) not longer than three (3) months in duration.

Section 15.18 - Agreement for Benefit of Parties. This Agreement is made for the exclusive benefit of the parties hereto and their successors and assigns herein permitted and not for any third person. Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties hereto and their successors and assigns herein permitted, any rights or remedies under or by reason of this Agreement.

Section 15.19 - Default. Unless otherwise provided in this Agreement, no Owner shall be deemed to be in default under this Agreement until such Owner shall have been given written notice describing the nature of such default, and within thirty (30) days after the receipt of such notice, shall have failed to cure such default or, in the case of a default which by its nature cannot be cured within thirty (30) days, shall have failed to commence and diligently proceed to complete the curing of such default, utilizing all reasonable means to effectuate and expedite the curing of such default. Notwithstanding any default by an Owner, this Agreement shall not terminate but shall continue in full force and effect. In the event of a default on the part of Developer, which Developer fails to cure or commence to cure within the prescribed time period, the parties agree that such failure to cure will not be deemed a default until any first mortgagee of the Developer Site ("Mortgagee") is given notice of the default and a period of thirty (30) days after receipt of such written notice to cure such default; provided, however, that in the case of any default which cannot with diligence be cured within said thirty (30) day period, if Mortgagee shall proceed promptly to cure such default and thereafter prosecute the curing of such default with diligence and continuity, the time within which such default may be cured shall be extended for such period as may be necessary to complete the curing of such default with diligence and continuity, not to exceed ninety (90) business days. Developer agrees to provide the Department Store Operators with the names and addresses (and any address changes) of any Mortgagee and the Department Store Operators agree to provide Developer with the names and addresses of their first mortgagees, if any.

Section 15.20 - Right to Cure Default of Another Party. Subject to the provisions of Section 15.19 above, in the event any Owner shall be in default under this Agreement, by reason of its failure to perform any of the provisions, covenants and conditions of this Agreement (other than default in preparing plans and specifications for, or constructing, the Developer Buildings, the Enclosed Mall, or Department Store Buildings;

49

or operating as provided in Article XIV) then, in such event, in addition to any other remedies provided at law or in equity:

(a)    Any Owner or Mortgagee shall have the right (unless, within the thirty (30) day period provided in Section 15.19 hereof, the defaulting Owner shall have cured such default, or unless, in the case of a default which, by its nature, cannot be cured within such thirty (30) day period, the defaulting Owner shall have taken action to begin and shall thereafter diligently prosecute the curing thereof), but not the obligation, to proceed to take such action as shall be necessary to cure such default, in the name of and for the account of the defaulting Owner.

(b)    The defaulting Owner shall, on demand, reimburse any Owner or Mortgagee for its expenses in curing said default, including all monies actually expended by it and its reasonable out-of-pocket expenses, together with all penalties, if any, and interest thereon at the lower of Citibank, N.A. prime rate plus three percent (3%) or the highest legal rate chargeable under the law of Florida.

(c)    In the event that a curing Owner or Mortgagee shall, in good faith, believe that a default has created an emergency, then, notwithstanding Section 15.19, no notice shall be required to permit the curing Owner or Mortgagee to act immediately to take such action as is necessary to cure said default, provided it gives the defaulting Owner such notice as is reasonable in the circumstances and, in any event, immediately upon commencing the curing action.

Section 15.21 - Liens. Each Owner agrees that in the event any mechanic's lien or other statutory lien shall be filed during the term of this Agreement against its Site or the Site of any other Owner by reason of work, labor, services, or materials supplied to or at the request of it pursuant to construction or expansion or repair or replacement of improvements on its Site, it shall pay and discharge the same of record within thirty (30) days (i) after the filing thereof, or (ii) after receipt of statutory notice of the filing thereof (if provided for), subject to the provisions of the following sentence. Each Owner shall have the right to contest the validity, amount and/or applicability of any such respective liens by appropriate legal proceedings, and so long as it shall furnish a bond or indemnity as hereinafter provided, and be prosecuting such contest in good faith, the requirement that it pay and discharge such liens within said thirty (30) day period shall not be applicable; provided, however, that in any event such Owner, within thirty (30) days after the filing of such lien or receipt of statutory notice of the filing thereof, shall (i) at such Owner's sole expense, bond off such lien or indemnify against such liens in amounts and form satisfactory to induce the title insurance company which insures title of the respective Site of each of the Owners to insure each Owner against loss or damage by reason of such liens or to reissue or update its existing policy, binder or commitment without showing any title exception by reason of such lien, and (ii) indemnify and save harmless the other Owners from all loss, damage, liability, expense or claim whatsoever (including reasonable attorneys' fees and costs of tribunals at all levels and other costs of defending against the foregoing) resulting from the assertion of any such lien. In the event such legal

50

proceedings shall be finally concluded (so that no further appeal may be taken) adversely to the Owner contesting such liens, such Owner shall, within ten (10) days thereafter, cause the lien(s) to be discharged of record.

Section 15.22 - Severability. If any clause or provision of this Agreement is held to be illegal, invalid or unenforceable, or the application thereof to any person or circumstance shall to any extent be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, then and in any such event, it is the express intention of the parties hereto that the remainder of this Agreement, or the application of such clause or provision other than to those as to which it is held illegal, invalid or unenforceable, shall not be affected thereby, and each clause or provision of this Agreement and the application thereof shall be legal, valid and enforceable to the fullest extent permitted by law.

Section 15.23 - Exculpation.

(a)    The Department Store Operators agree that they will look solely to the estate and property of Developer in the land and buildings comprising the Developer Site for the collection of any judgment (or other judicial process) requiring the payment of money by Developer in the event of any default by Developer with respect to any of the terms, covenants and conditions of this Agreement to be observed and/or performed by Developer, and no other property or assets of Developer shall be subject to levy, execution or other procedures for the satisfaction of the Department Store Operator's remedies. The Department Store Operators agree that they will not satisfy or attempt to satisfy any judgment or other obtained remedy out of the separate assets of any partner of the limited partnership comprising Developer, and that simultaneously with the entry by any court of any judgment, decrees or other remedy against the Developer, the Department Store Operators will enter in the Court proceeding its statement in a form conforming to the procedures of said Court, acknowledging and agreeing that said judgment, decree or other remedy is neither a lien upon any of the assets of, collectible from or otherwise enforceable against any member of the limited partnership and/or its assets (other than its interest in the limited partnership comprising Developer). Nothing herein contained shall act as a limitation on the right of the Department Store Operator's to: (i) seek and secure injunctive relief for the violation by Developer of any of the terms of this Agreement; or (ii) make a deduction from any sums due Developer as provided in this Agreement or any supplemental agreement hereto.

(b)    Notwithstanding the foregoing provisions of this Section 15.23, Developer (or a general partner of Developer, as applicable) shall be fully liable to the Department Store Operators to the same extent that it would be liable absent the foregoing provisions for: (i) fraud or willful misrepresentations by Developer (or such general partner, as applicable); or (ii) the misapplication by Developer (or such general partner, as applicable) of (x) any proceeds paid under any insurance policies by reason of damage, loss or destruction to any portion of the Shopping Center, or (y) any proceeds or awards

51

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 57 of 86

resulting from the Condemnation, prior to any such foreclosure, of all or any part of the Shopping Center.

➤    Section 15.24 - Time of Essence.  Time is of the essence in the performance of the terms and conditions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed by their respective duly authorized officers or representatives, and their corporate seals, where applicable, to be affixed hereto, as of the day, month and year first above stated.

Signed in the presence of
the following witnesses:

DILLARD'S, INC..
a Delaware corporation

Name: _JAMES W. CHERRY, JR_

By: _____
     James E. Darr, Jr., Senior Vice President

STATE OF ARKANSAS    )
                     )  SS:
COUNTY OF PULASKI    )

BEFORE ME, a Notary Public in and for said County and State, personally appeared the above-named DILLARD'S, INC., a Delaware corporation, by James E. Darr, Jr., its Senior Vice President, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said corporation, by authority of its Board of Directors, and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal, at _Little Rock, AK_, this _3rd_ day of _July_ , 1997.

_Deborah K. Agee_
Notary Public

Deborah K. Agee
Notary Public
Pulaski County, Arkansas
My Commission Expires 3/10/2005

OR 1174 PG 3001

52

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 58 of 86

Signed in the presence of
the following witnesses
(as to both signatories):

Name: Joan E. Bartlett

Name: Dorothy M. Oliver

BURDINES, INC.,
an Ohio corporation

By: _____
Name: Gary J. Nay
Vice President

By: _____
Name: KLAUS M. OBERMAIER
Assistant Secretary

STATE OF OHIO          )
                       ) SS
COUNTY OF HAMILTON  )

BEFORE ME, a Notary Public in and for said County and State, personally
appeared the above-named BURDINES, INC., an Ohio corporation, by GARY J. NAY and
KLAUS M. ZIERMAIER its Vice President and (Assistant) Secretary, respectively, both personally
known to me, who being first duly sworn, did upon oath acknowledge that they did sign the
foregoing instrument as such officers on behalf of said corporation and are duly authorized
to do so, and that the same is the free act and deed of said corporation, and their free act
and deed individually and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal
this __3rd__ day of __OCTOBER__, 1997.



Richard E. Winkler
Notary Public

RICHARD E. WINKLER
Notary Public, State of Ohio
My Commission Expires June 18, 2002

OR 1174 PG 3002

53

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 59 of 86

| Signed in the presence of the following witnesses (as to both signatories): | J. C. PENNEY COMPANY, INC., a Delaware corporation |
|---|---|

Name: JACQUELYN STE MARIE

By: _____
Name: MICHAEL LOWENKRON
Vice President

APPROVED
PBS
ATTORNEY

Name: CAROLE D CHANDESS

By: _____
Name: FRANK J. BONET
(Assistant) Secretary

STATE OF TEXAS     )
                      ) SS
COUNTY OF COLLIN   )

        BEFORE ME, a Notary Public in and for said County and State, personally appeared the above-named J. C. PENNEY COMPANY, INC., a Delaware corporation, by _____Michael Lowenkron_____ and _____Frank J. Bonet_____, its Vice President and Assistant Secretary, respectively, both personally known to me, who being first duly sworn, did upon oath acknowledge that they did sign the foregoing instrument as such officers on behalf of said corporation and are duly authorized to do so, and that the same is the free act and deed of said corporation, and their free act and deed individually and as such officers.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this ___23___ day of _____September_____, 1997.

BETTY SUE WICKWARE
Notary Public, State of Texas
My Commission Expires 02-05-00

_____
Notary Public

OR1174PG3003

55

Signed in the presence of
the following witnesses
(as to both signatories):

Name: _Ella Noetzel_

Name: _TERESA GRABOWSKI_

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
    Barry D. Kaufman
    Its Vice President Real Estate

By: _____
    Victoria S. Berghel
    Its Assistant Secretary

R. E. DIRECTOR
LEGAL
5NA

STATE OF ILLINOIS     )
                      )  SS:
COUNTY OF COOK        )

        BEFORE ME, a Notary Public in and for said County and State, personally
appeared the above-named SEARS, ROEBUCK AND CO., by Barry D. Kaufman, its Vice
President Real Estate and Victoria S. Berghel, its Assistant Secretary, who acknowledged
that they did sign and seal the foregoing instrument for and on behalf of said corporation,
by authority of its Board of Directors, and that the same is the free act and deed of said
corporation, and the free act and deed of each of them personally and as such officers.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal,
at Hoffman Estates, Illinois, this ___30TH___ day of _____June_____, 1997.

"OFFICIAL SEAL"
S. NASEEM ANJUM
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 04 26 99

_____
Notary Public

56

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 61 of 86

Signed in the presence
of the following witnesses
(as to both signatories):

I R MALL ASSOCIATES, LTD.,
a Florida limited partnership
By:  I R Mall Company, L.C., a Florida limited liability
company, general partner

By:  Simon DeBartolo Group, L.P., a Delaware
limited partnership, formerly known as
DeBartolo Realty Partnership, L.P., a
Delaware limited partnership, general
manager

By:  SD Property Group, Inc., an Ohio
corporation, formerly known as
DeBartolo Realty Corporation, its
managing general partner

Name: _____

Name: _____

By:_____
Name:____David Simon____
     Chief Executive Officer

STATE OF INDIANA        )
                        ) SS
COUNTY OF MARION        )

The undersigned, a Notary Public in and for said County and State, does hereby
certify that I R MALL ASSOCIATES, LTD., a Florida limited partnership, by I R Mall
Company, L.C., a Florida limited liability company, by Simon DeBartolo Group, L.P., a
Delaware limited partnership, by SD Property Group, Inc., an Ohio corporation, its duly
authorized general partner, by _____, its duly authorized _____
personally known to me to be the same person whose name is subscribed to the foregoing
instrument, appeared before me in person on the date set forth below and being first duly
sworn, did upon oath acknowledge that he did sign the foregoing instrument as such officer
on behalf of said corporation as the general partner of said partnership as general
manager of said limited liability company as general partner of said partnership in the
capacity indicated therein and is duly authorized to do so, and that the same is the free act
and deed of said partnerships in the capacities indicated therein, of said corporation as
general partner, and his free act and deed individually and as such officer, for the uses and
purposes therein set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at office
in _____, _____ this _____ day of _____, 1997.

_____
Notary Public

56

## EXHIBIT "A-1"

## DEVELOPER SITE

#197
REF DWG #1011 P-11
6-12-97

INDIAN RIVER MALL
DEVELOPER'S PARCEL
83.471 ACRES

Lots 5, 7, 8, 9, and 10 per "Indian River Mall - The Mall Subdivision", as filed for Record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 62 of 86

OR 1174 PG 3006

EXHIBIT "A-1"
Page 1 of 1

## EXHIBIT "A-2"

## DILLARD SITE

#198
6-12-97
REF. DWG. #1011 P-11

INDIAN RIVER MALL
DILLARD'S PARCEL
10.151 ACRES

Lot 1 per "Indian River Mall - The Mall Subdivision" as filed for record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 63 of 86

OR 1174 PG 3007

EXHIBIT "A-2"
Page 1 of 1

## EXHIBIT "A-3"

## BURDINES SITE

#201
6-12-97
REF. DWG #1011 P-11

INDIAN RIVER MALL
BURDINES PARCEL
9.501 ACRES

Lot 6 per "Indian River Mall - The Mall Subdivision" as filed for Record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 64 of 86

OR 1174 PG 3008

**EXHIBIT "A-3"**
Page 1 of 1

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 65 of 86

## EXHIBIT "A-4"

#200
6-12-97
Rev. 9-23-97
REF. DWG #1011 P-11

### INDIAN RIVER MALL
### SEARS PARCEL
### 8.763 ACRES

Lot 3 per "Indian River Mall - The Mall Subdivision" as filed for record in Plat Book 14, Pages 59, and 59A, public records of Indian River County, Florida.

### SEARS T.B.A. PARCEL
### 1.317 ACRES

Lot 4 per "Indian River Mall - The Mall Subdivision" as filed for record in Plat Book 14, Pages 59 and 59A, Public Records of Indian River County, Florida.

OR 1174 PG 3009

### EXHIBIT "A-4"
Page 1 of 1

## EXHIBIT "A-5"

## PENNEY SITE

#199
6-12-97
REF. DWG. #1011 P-11

INDIAN RIVER MALL
J.C. PENNEY PARCEL
6.480 ACRES

Lot 2 per "Indian River Mall - The Mall Subdivision" as filed for Record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 66 of 86

OR 1174 PG 3010

EXHIBIT "A-5"
Page 1 of 1

**EXHIBIT "A-6"**

**COMPLETE SITE**

#203
REF DWG #1011 P-11
6/18/97

INDIAN RIVER MALL
SHOPPING CENTER PARCEL
119.683 ACRES

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 per "Indian River Mall - The Mall Subdivision," as filed for Record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 67 of 86

OR 1174 PG 3011

**EXHIBIT "A-6"**
Page 1 of 1

## EXHIBIT "A-7"

## FLORA PRESERVATION AREA

#202
REF DWG #1011 P-11
6/18/97

INDIAN RIVER MALL
PRESERVE PARCEL
4.700 ACRES

Lot 5 per "Indian River Mall - The Mall Subdivision" as filed for record in Plat Book 14, Pages 59, and 59A, Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 68 of 86

OR 1174 PG 3012

EXHIBIT "A-7"
Page 1 of 1

wpgas;indiansc
GAS/wp3-11/22/95/2

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 69 of 86

<u>SIGN CRITERIA</u>

I.    <u>AS TO THE DEVELOPER'S SITE AND ANY IMPROVEMENTS THEREON:</u>

A.    There shall be no flashing, rotating or moving signs or markers of any type.

B.    There shall be no signs painted on the exterior masonry surface of any building.

C.    There shall be no signs which are constructed of or made up on cloth material, paper or cardboard.

D.    There shall be no freestanding signs without the prior consent of the Department Store Owners, except:

1.    one (1) initial Shopping Center identification pylon sign, and one (1) movie pylon sign, which signs may contain:

(i)    one (l) theatre attraction panel on each face;

(ii)    one (1) or more restaurant identification panels; and

(iii)    one (1) mall attraction panel with electronic or changeable copy readerboard on each face;

provided, that the location(s) thereof shall be as shown on the Plot Plan, and the size and design of the sign(s) referred to in this clause D.1 shall be subject to the prior reasonable consent of the Department Store Owners.

2.    six (6) identification signs (without changeable copy capacity) of not more than fifteen (15) feet in height, located at each access drive to the Complete Site.

E.    All signs which front on the Enclosed Mall shall be:

1.    not more than twenty-four inches (24") in height, with the exception that the first letters of a tenant's name in an extended script type sign may be, subject to the strict approval of Developer, a maximum of two feet six inches (2' 6") in height.  This exception will not apply to box or plaque type signs;

2.    flush mounted on the wall of the building to which such sign is affixed; and

<u>EXHIBIT "C"</u>

1

OR 1174 PG 3013

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 70 of 86

      3.     of a length defined as being the leased frontage less a distance of two feet six inches (2' 6") from each end of said frontage of the store upon which it fronts or of the rear of such store in the case of permitted signs at the rear.

F.    There shall be no roof-top signs.

G.    No signs will be permitted at or on the rear of any building(s), except in the case of stores, including, without limitation, a theatre, a drug store, restaurants and lending institutions, with customer entrances opening directly onto parking areas, which will be permitted exterior identification signs.

II.    <u>AS TO THE DEPARTMENT STORE SITES AND ANY IMPROVEMENTS THEREON:</u>

The Department Store Owners may erect their typical signs for a store located in an enclosed first class regional mall type shopping center, EXCEPT:

A.    There shall be no flashing, rotating or moving signs or markers of any type or pylon signs.

B.    There shall be no signs painted on the exterior surface of any building.

C.    There shall be no roof-top signs, but the Department Store Owners may mount their typical store identification sign on parapet walls constructed on building columns extended through the roof penthouses formed by the enclosure of heating or air conditioning equipment, or parapet walls formed by the extension of the Department Store Building walls.

D.    There shall be no freestanding signs without the prior consent of the Department Store Owners and Developer.

OR 1174 PG 3014

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 71 of 86



CANAL

EASEMENT

NOT A PART

425.00'
N 07'32.00" E

S 07'32.00" W
425.00'

LANDSCAPE
EASEMENT

SEC.
SIGN

OR 1174 PG 3015

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 72 of 86



FUTURE
DEVELOPER
PARKING

DOCK
70'

184

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 73 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 74 of 86



## PARKING EVALUATION

### PROJECT @ 5.0 RATIO OVERALL

| PARCEL | ESTIMATED NET FLOOR AREA | SPACES REQD. | SPACES PROV'D. | EVALUATION |
|---|---|---|---|---|
| BUILDINGS | 106,055 sf | 525 | 725 | 200 |
| SEARS (INC. A/S) | 130,663 sf | 653 | 654 | 1 |
| J.C.PENNEY | 82,027 sf | 410 | 413 | 3 |
| BULLARDS | 131,000 sf | 655 | 672 | 17 |
| DEVELOPER (INC. MALL/OPD) | 303,804 sf | 1,519 | 1,441 | (78) |
| TOTAL SITE | 753,549 sf | 3,762 | 3,905 | 143 |

NOT INCLUDED

4' SIDEWALK

SIDEWALK

10' LANDSCAPE BUFFER

10' BIKE PATH & SIDEWALK EASEMENT (TYPICAL

LANDSCAPE/SIGNAGE
EASEMENT AREAS (T

OR TT 74 PG 3018

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 75 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 76 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 77 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 78 of 86



LEGEND:

———— EXISTING TRAFFIC SIGNAL

———— PERMISSIBLE BUILDING LINE

———— PERMANENT ACCESS EASEMENT

———— PARKING FIELD COUNTS

———— FLORIDA POWER PRIMARY DISTRIBUTION LINES

FUTURE TRAFFIC SIGNAL SUBJECT
TO ALL GOVERNMENTAL APPROVALS.

PYLON SIGN

NOT INCLUDED

SUB – LATERAL A-2 CANAL — 20 TH STREET (S.R. 60)

NORTH

OR 1174 PG 3022

WALLACE
ACRES
SUBDIVISION

30
FEET

EXHIBIT

SCALE 1" =

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 79 of 86

NOT A PART

LATERAL A-3 CANAL

N

OR 1174 PG 3023

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 80 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 81 of 86

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 82 of 86



Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 83 of 86



OR 1174 PG 3027

SIMON
DEBARTOLO
GROUP
NATIONAL CITY CENTER
PO BOX 7033
INDIANAPOLIS, IN 46207

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 84 of 86



ION DETAIL

OR II74PG3028

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 85 of 86



PRIMARY DISTRIBUTION LINES

NOT INCLUDED

OR I 174 PG 3029

S 07°13' W
210.00'

Unique Code : BAA-BAA-BCAGB-BACCBIA-ECIGAF-A Page 86 of 86

EXHIBIT "B"

RECIPROCAL EASEMENT AND OPERATING AGREEMENT

INDIAN RIVER MALL

6200 20th STREET (S.R.60)
VERO BEACH, FLORIDA 32966

DATE: MAY 21, 1997 P.B
MAR. 11, 1997 P.B.

R.E.O.A.

EX-01

10' BIKE PATH & SIDEWALK EASEMENT (TYPICAL)

10' LANDSCAPE BUFFER

NAGE
(S (TYP.)

OR 1174 PG 3030

# EXHIBIT G

## Deed Amendment



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:13 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I |
| **Instrument Number:** | 1246740 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



Recvid and Return to:

m HAROLD L. LEWIS, ESQ.
PATHMAN LEWIS, LLP
ONE BISCAYNE TOWER, SUITE 2400
2 SOUTH BISCAYNE BLVD.
MIAMI, FL 33131

44.°° X
13,300.°° 

IN THE RECORDS OF
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO., FLA.

**AGREEMENT AMENDING DEED**

DOCUMENTARY STAMPS
DEED $ /3,300.00

NOTES

JEFFREY K. BARTON, CLERK
INDIAN RIVER COUNTY

1246740

01 JAN 10 PM 2: 32

OR 1375 PG 0640

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 1 of 9

This Agreement is made this 4th. day of January, 2001, among Simon Property Group, L.P., a Delaware limited partnership, successor in interest to Simon DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to Simon-DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to DeBartolo Realty Partnership, L.P., a Delaware limited partnership, GMRI, Inc., a Florida corporation, and VLM Associates, LLC, a Florida limited liability company.

## W I T N E S S E T H:

WHEREAS, by Special Warranty Deed dated December 28, 1995, and recorded December 29, 1995, in Official Records Book 1085, Page 2332, of the Public Records of Indian River County, Florida (the "Deed"), Simon Property Group, L.P., a Delaware limited partnership, successor in interest to Simon DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to Simon–DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to DeBartolo Realty Partnership, L.P., a Delaware limited partnership ("Simon"), conveyed to GMRI, Inc., a Florida corporation ("GMRI"), the real property legally described on Exhibit "A" attached hereto and made a part hereof (the "Property"); and

WHEREAS, the Deed contains various covenants and agreements pertaining to the Property; and

WHEREAS, VLM Associates, LLC, a Florida limited liability company ("VLM") is purchasing the Property from GMRI; and

WHEREAS, as a precondition to its purchase of the Property, VLM is requiring that certain of the terms of the Deed be modified or deleted.

**NOW, THEREFORE**, in consideration of the sum of Ten ($10.00) Dollars, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Recitals of Facts</u>. The foregoing recitals of facts are true and correct and are hereby incorporated into this Agreement.

2.    <u>Defined Terms</u>. Capitalized terms as used herein shall have the same meaning as in the Deed unless otherwise defined herein.

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER. THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT

THE HONORABLE RYAN L. BUTLER,



CLERK OF THE COURTS & COMPTROLLER

3.    Reciprocal Easement and Operating Agreement.

(a)    Paragraph (a) of the Deed (commencing on page 2) makes reference to a Reciprocal Easement and Operating Agreement (the "REA") not recorded as of the date of the Deed. The Deed is amended to reflect that the REA has been recorded on October 10,1997, in Official Records Book 1174,  Page 2945, of the Public Records of Indian River County, Florida.

(b)    Notwithstanding paragraph 3(a) above, Simon and GMRI represent and warrant to VLM that: (i) the REA does not affect the Property, and (ii) no portion of the legal description of the Property is included within the REA.

(c)    Simon hereby waives its right to record the REA against the Property.

4.    Initial Intended Use. Paragraph (a)(ii)(B) of the Deed (on page 6) is hereby deleted in its entirety.

5.    Right of Repurchase/Sale of Property. Paragraph (b) of the Deed (commencing on page 7 and ending on page 10) is hereby deleted in its entirety.

6.    Beneficiary and Beneficiary's Nominee. Simon represents and warrants that: (a) it has the power and authority to execute this Agreement, (b) it is the proper party to execute this Agreement under the provisions of the Deed, and (c) no party, other than the parties hereto, is required to join into this Agreement for it to be effective.

7.    Binding Effect. All the terms of this Agreement shall be binding upon the respective personal representatives, successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by the parties hereto, and their respective personal representatives, successors and assigns, including any future fee simple owner of the Property.

8.    Remainder of Deed. Except as amended hereby, the Deed shall otherwise remain in full force and effect.

9.    Miscellaneous. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Florida. This Agreement and the terms and provisions hereof may only be changed, waived or discharged by an instrument in writing signed by Simon and VLM (or such other party or parties that may then be the fee simple owner(s) of the Property). In the event of litigation concerning this Agreement, the prevailing party shall be entitled to receive its costs and reasonable attorneys' fees, through and including all appeals, from the non-prevailing party. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one agreement. If, for any reason, any provision of this Agreement is held invalid, such invalidity shall not affect any other provision of this Agreement, and the Agreement shall otherwise remain in full force and effect.

2

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

Simon Property Group, L.P., a Delaware
limited partnership, successor in interest to
Simon DeBartolo Group, L.P., a Delaware
limited partnership, successor in interest to
Simon–DeBartolo Group, L.P., a Delaware
limited partnership, successor in interest to
DeBartolo Realty Partnership, L.P., a
Delaware limited partnership

By:   Simon Property Group Inc., Delaware
corporation, Managing General Partner

Print Name: Kenn L. Chumlea

Print Name: Kathy L. Nelson

By:
Name:
Title: William J Bir

GMRI, Inc., a Florida corporation

Print Name:

By:
Print Name: William S. Hemmerly
Print Name:
Title: Controller/Real Estate

VLM ASSOCIATES, LLC,
a Florida limited liability company

Print Name: Laura Scale

By:
Steven T. Siegel, Managing Member

Print Name: Harold Lewis

3

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 3 of 9

OR 1375 PG 0642

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

Simon Property Group, L.P., a Delaware limited partnership, successor in interest to Simon DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to Simon–DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to DeBartolo Realty Partnership, L.P., a Delaware limited partnership

By: Simon Property Group Inc., Delaware corporation, Managing General Partner

Print Name:

Print Name:

By:_____
   Name:
   Title:

GMRI, Inc., a Florida corporation

Print Name: Theresa Trulongo

Print Name: ~~Seuivincerkcit~~

By: _____
Print Name: William S. Hemmerly
Title: Controller/Real Estate

VLM ASSOCIATES, LLC,
a Florida limited liability company

Print Name:

Print Name:

By:_____
   Steven T. Siegel, Managing Member

3

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 4 of 9

OR1375PG0643

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 5 of 9

STATE OF INDIANA        )
                        ) SS:
COUNTY OF _MARION_      )

The foregoing instrument was acknowledged before me this 3rd day of January, 2001, by _Melvin Simon_, as _Co-Chairman of Board_ of Simon Property Group Inc., a Delaware corporation, Managing General Partner of Simon Property Group, L.P., a Delaware limited partnership, successor in interest to Simon DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to  Simon–DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to DeBartolo Realty Partnership, L.P., a Delaware limited partnership, on behalf of the partnership. He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.



DARLENE E. GARVEY.
Res. of Johnson Co.
Comm. Exp. 1-18-2008

_Darlene E Garvey_
NOTARY PUBLIC

Print Name
My Commission Expires:

STATE OF FLORIDA       )
                       ) SS:
COUNTY OF ORANGE       )

The foregoing instrument was acknowledged before me this __ day of January, 2001, by William S. Hemmerly, as Controller/Real Estate of GMRI, Inc., a Florida corporation on behalf of the corporation. He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.

NOTARY PUBLIC

Print Name
My Commission Expires:

**\*\* ACKNOWLEDGMENTS CONTINUE ON NEXT PAGE \*\***

4

OR1375PG0644

STATE OF INDIANA )
) SS:
COUNTY OF_____)

     The foregoing instrument was acknowledged before me this __ day of January, 2001, by _____, as _____ of Simon Property Group Inc., a Delaware corporation, Managing General Partner of Simon Property Group, L.P., a Delaware limited partnership, successor in interest to Simon DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to Simon–DeBartolo Group, L.P., a Delaware limited partnership, successor in interest to DeBartolo Realty Partnership, L.P., a Delaware limited partnership, on behalf of the partnership.  He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.


_____
NOTARY PUBLIC

_____
Print Name
My Commission Expires:


STATE OF FLORIDA )
) SS:
COUNTY OF ORANGE )

     The foregoing instrument was acknowledged before me this 4 day of January, 2001, by William S. Hemmerly, as Controller/Real Estate of GMRI, Inc., a Florida corporation on behalf of the corporation.  He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.


*Anne Pinson*
NOTARY PUBLIC

ANNE PINSON
My Comm Exp. 6/21/2001
No. CC 795172
[ ] Personally Known  [ ] Other I.D.

_____
Print Name  *ANNE PINSON*
My Commission Expires:


**\*\* ACKNOWLEDGMENTS CONTINUE ON NEXT PAGE \*\***

4

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 6 of 9

OR 1375 PG 0645

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 7 of 9

STATE OF FLORIDA       )
                         ) SS:

COUNTY OF MIAMI-DADE   )

The foregoing instrument was acknowledged before me this _4th_ day of January, 2001, by Steven T. Siegel, as Managing Member of VLM ASSOCIATES, LLC., a Florida limited liability company on behalf of the company. He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.



_____
NOTARY PUBLIC

LAURA SCALA
Print Name
My Commission Expires:

OFFICIAL NOTARY SEAL
LAURA SCALA
COMMISSION NUMBER
CC648474
MY COMMISSION EXPIRES
MAY 19, 2001

### JOINDER

The undersigned does hereby join into and consent to this Agreement.

I R Mall Associates, Ltd., a Florida limited partnership

By: I R Mall Company, L.C., a Florida limited liability company, General Partner

By:   Simon Property Group, L.P., a Delaware limited partnership, Managing Member

By: Simon Property Group Inc., a Delaware corporation, Managing General Partner

By: _____

Name: MELVIN SIMON

Title: CO-CHAIRMAN OF THE BOARD

Print Name: KENO L. CRANER

Print Name: Kathy L. Nelson

## ** ACKNOWLEDGMENT CONTAINED ON NEXT PAGE **

5

OR 1375 PG 0646

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 8 of 9

STATE OF INDIANA        )
                        ) SS:
COUNTY OF _MARION____   )

The foregoing instrument was acknowledged before me this 3ʳᵈ day of January, 2001, by _Melvin Simon_, as _Co-Chairman of Board_ of Simon Property Group Inc., a Delaware corporation, as Managing General Partner of Simon Property Group, L.P., a Delaware limited partnership, as Managing Member of I R Mall Company, L.C., a Florida limited liability company, as General Partner of I R Mall Associates, Ltd., a Florida limited partnership.  He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath.



DARLENE E. GARVEY.
Res. of Johnson Co.
Comm. Exp. 1-18-2008

NOTARY PUBLIC

Print Name
My Commission Expires:

m:\clients2\argate\gmri\docs\deedamendmentrev2.doc

6

OR 1375 PG 0647

Unique Code : BAA-BAA-BCAGB-BCEGHEA-ECIGAC-I Page 9 of 9

## EXHIBIT "A"

### LEGAL DESCRIPTION

Parcel I, Indian River Mall Fee Parcel, situated in the Northwest 1/4 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida, and being more particularly described as follows:

Lots 13, 14 and 15, Indian River Mall, The West Peripheral, as recorded in Plat Book 14, pages 61, 61A, and 61B, the Public Records of Indian River County, Florida; said parcels being further described as beginning at the Southwest corner of said Lot 13, thence run the following courses:

1. Run North a distance of 489.40 feet to a point; thence
2. Run N 45° 00' 00" E, a distance of 40.90 feet to a point; thence
3. Run East, a distance of 309.60 feet to a point; thence
4. Run S. 00° 30' 13" W, a distance of 517.60 feet to the Southeast corner of Lot 15; thence
5. Run S. 89° 52' 25" W, a distance of 333.97 feet to the said Southwest corner of Lot 13 and the Point of Beginning.

## ALSO DESCRIBED AS:

Situated in the North ½ of Section 5, Township 33 South, Range 39 East, Indian River, Florida, and more particularly described as follows:

Commencing at a point of intersect on the North Right-of-Way line of State Road 60 Highway, with the West Line of Wallace Acres Subdivision, as recorded in Plat Book 7, Page 12, Public Records of Indian River County, Florida; thence South 89°52'37" West along said North Right-of-Way a distance of 175.00 feet to the principal point and place of beginning of the following description:

Continuing along said North Right-of-Way South 89°52'25" West a distance of 333.97 feet to a point; departing said north Right-of-Way line, thence North a distance of 489.40 feet to a point; thence North 45°00'00" East a distance of 40.90 feet to a point; thence East a distance of 309.60 feet to a Point; thence South 00°30'13" West a distance of 517.60 feet to the Point of Beginning.

m:\clients2\argate\gmn\docs\legal description - 2 descriptions.doc

OR I 375 PG 0648

# EXHIBIT H

**Declaration of Covenants, Restrictions and Easements**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:22 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G |
| **Instrument Number:** | 1246744 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



Recud and Return to:
**HAROLD L. LEWIS, ESQ.** ᴍ
**PATHMAN LEWIS, LLP**
**ONE BISCAYNE TOWER, SUITE 2400**
**2 SOUTH BISCAYNE BLVD.**
**MIAMI, FL 33131**

IN THE RECORDS OF
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO., FLA.

## DECLARATION OF COVENANTS, RESTRICTIONS AND EASEMENTS

87.⁰⁰ doc
.70

THIS DECLARATION OF COVENANTS, RESTRICTIONS AND EASEMENTS ("Declaration") is made as of this 31 day of December , 2000, by VLM Associates, LLC, a Florida limited liability company, having an office at 1401 Brickell Avenue, Suite 520, Miami, Florida 33131 (hereinafter referred to as the "Declarant").

<u>Preliminary Statement</u>

Declarant is the owner in fee simple of certain real property located in Indian River County, Florida, consisting of approximately 3.988 acres more or less, more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof (the "Parcel").

Declarant intends to subdivide the Parcel into two (2) parcels and to make certain improvements . Attached hereto and made a part hereof as <u>Exhibit B</u> is a Site Plan showing the respective location of the Parcels. The Parcels are together referred to herein as the "Center". Declarant intends to construct a retail building consisting of approximately 32,870 square feet upon that portion of the Parcel designated on the Site Plan as Parcel "A" (consisting of 3.393 acres, more or less) and to construct a retail building consisting of approximately 5,510 square feet upon that portion of the Parcel designated on the Site Plan as Parcel "B" (consisting of .595 acres, more or less). Parcel A and Parcel B are collectively referred to herein as the "Parcels."

Declarant recognizes that for the most favorable use and development of the Center, it is necessary, for the benefit of parties that may from time to time own the Parcels (referred to herein as "Owners") that an agreement exist whereby the Owners agree and cooperate with respect to the operation and maintenance of their Parcels and the curb cuts, roadways, driveways, aisles, walkways, sidewalks and other common areas and facilities existing, or to be erected thereon as indicated in the Site Plan or as otherwise constructed from time to time on the Parcels (collectively, the "Common Areas"). Declarant therefore intends herein to declare certain reciprocal easements for pedestrian and vehicular ingress and egress over the curb cuts, roadways, driveways, aisles, walkways and sidewalks for access and for delivery and to grant certain rights to install and maintain utility lines and site facilities within the Common Areas. Declarant also intends herein to provide for certain obligations and restrictions with respect to the operation and maintenance of the Parcels and the Common Areas and facilities constructed and to be constructed thereon. Such easements, obligations and restrictions shall run to the benefit of, and bind the respective Parcels, and the Owners from time to time of the Center or any portion thereof. Any reference to Declarant or Owners shall be deemed to refer to such parties and the respective heirs, successors, grantees and assigns of such parties, and any net lessee of any Parcel or part thereof who has assumed all of the obligations of the owning party.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties hereby grant, covenant and agree as follows:

**DOCUMENTARY STAMPS
DEED $ .70**

**NOTES
JEFFREY K. BARTON, CLERK
INDIAN RIVER COUNTY**

1246744

01 JAN 10 PM 2:32

OR 1375 PG 0661

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR
DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN
THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER.
THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT

THE HONORABLE RYAN L. BUTLER,
12/11/2024 10:24:25 AM

OF THE COURTS & COMPTROLLER

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 1 of 19

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 2 of 19

## ARTICLE I - GRANT OF EASEMENTS

Section 1.01. Access Easements.

(a)    Declarant hereby declares, grants and convey, for the benefit of the Parcels and the Owners thereof from time to time, a non-exclusive easement and right to the use during the term of this Agreement, of the curb cuts, roadways, driveways, aisles, walkways and sidewalks located on the Parcels as indicated on the Site Plan or as otherwise may exist from time to time for purposes of ingress, egress, passage and delivery, by vehicles and pedestrians; provided, however, at no time shall an owner develop, modify or design the access to such Owner's Parcel in such a way as to adversely affect access to the other Owners' Parcels in a material manner, without the prior written consent of such other Owners.

The easements granted hereby and granted in Section 1.02 shall be for the benefit of, but not restricted solely to, the Owners of the Parcels and each such Owner may grant the benefit of such easement to the tenants and other occupants of the Parcels for the duration of such occupancy, and to the customers, employees, agents and business invitees thereof, but same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public nor shall it affect any real property outside of the Center. Such easement areas are reserved for said use for the term of this Agreement.

Section 1.02. Utility Easement. The Owners of the Parcels hereby grant and convey, each to the other, for the benefit of the Parcels, a non-exclusive easement in, to, over, under and across the Common Areas of the Parcels for the purpose of surface drainage and for the purpose of installation, operation, maintenance, repair, replacement, removal and relocation of underground storm sewer lines, sanitary sewer pipes, irrigation lines, septic systems, water and gas lines, electric power lines, telephone lines, and other underground utility lines (collectively, the "Utility Lines") to serve the facilities located on the Parcels. The installation of any Utility Lines shall be subject, as to location, to the approval of the granting Owner which approval shall not be unreasonably withheld, conditioned or delayed.

The Owners of the Parcels or any designee served by such Utility Lines may operate, maintain and repair (and, if it does not interfere with the use of the granting Owner's Parcel, relocate) such Utility Lines, provided such repair and maintenance is performed expeditiously, during reasonable hours, and only after five (5) business days' written notice to the granting Owner utilizing or serviced by said Utility Lines or the parking area to be affected by any construction work, accompanied by a certificate of insurance naming the Owner(s) affected by the work as additional insured(s). The party performing the repair shall, at its cost and expense, immediately repair any damage to any improvements resulting from such work. Each Owner shall indemnify, defend and hold the granting Owner and any occupant of the granting Owner's Parcel harmless from and against any claims, damages or losses (including reasonable attorneys' fees actually incurred) which may result from the activities in making such repairs or relocating such facilities.

Section 1.03. Temporary Construction Easement. In connection with any construction work to be performed in the development of the Center, each Owner hereby grants the other

OR1375PG0662

temporary easements for incidental encroachments upon the other Owner's Parcel which may occur as a result of construction, so long as such encroachments are kept within the reasonable requirements of construction work expeditiously pursued and so long as customary insurance is maintained protecting the other Owner from the risks involved.

Section 1.04.  Monument Sign Easement. Declarant hereby grants to the Owners an easement to use and maintain a sign, advertising the business located on the Parcel only, on the monument structure located on Parcel A fronting on State Road 60 in the area delineated on the Site Plan. Each Owner shall be permitted to use one-half (1/2) of the approved signage on the monument signed. The Owner of Parcel A shall always have the top position on such monument structure. Each Owner shall be maintain its signage in good repair at the sole expense of the respective Owner. The monument signs shall be under a single meter in the name of the Owner of Parcel A.  The Owner of Parcel B shall be required to reimburse the Owner of Parcel A for one half (1/2) of the metered charges within fifteen (15) days after receipt of billing from the Owner of Parcel A for such charges. The Owner of Parcel A may make changes to and/or replace such monument structure and/or sign, so long as all necessary governmental approvals are obtained therefor and so long as the easement granted hereby shall continue on such replacement or revised monument structure and/or sign. Notwithstanding the foregoing, the Owner of Parcel A shall not make changes to such monument structure and/or sign that will adversely affect Parcel B's sign in a material manner without the Owner of Parcel B's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. If the Owner of Parcel A shall remove such monument structure without replacement, the Owner of Parcel B shall have the right to construct its own sign in such location, so long as all necessary governmental approvals are obtained therefor and the Owner of Parcel B shall have reasonable access to Parcel A for such purpose. In addition, the Owner of Parcel B shall have reasonable access to Parcel A for purposes of maintaining, repairing and/or replacing its sign thereon.

Section 1.05. Restrictions.  The easements granted by this Article I shall be subject to the covenants and restrictions set forth in Article III.

## ARTICLE II - MAINTENANCE AND OPERATION

Section 2.01.  Maintenance and Repair.

(a)    Each Owner shall maintain, repair and replace all portions of the Common Areas located on its Parcel, so as to keep such areas at all times in a safe, sightly, good and functional condition of comparable community shopping centers in the market area.

(b)    Each Owner shall be responsible for keeping its own Parcel clear and free from refuse and rubbish. Any landscaped areas on a Parcel outside the boundaries of the Common Areas shall be mowed and otherwise tended to by the Owner of such Parcel, and any landscaped areas on the respective Common Areas shall be mowed and otherwise tended to by each Owner.

(c)    Each Owner shall seal coat, repave, re-stripe and replace markings on the surface of the parking areas and driveways in its Parcels from time to time as and when necessary so as to provide for the orderly parking of automobiles and shall place and maintain adequate exit and

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 3 of 19

OR 1375 PG 0663

3

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 4 of 19

entrance and other traffic control signs to direct traffic in and out of said parking areas. Any striping and other markings shall be consistent with the Site Plan, and the lighting, seal coating, paving and striping materials shall be consistent with that used in the Center.

(d)    Each Owner shall service, maintain, repair and replace, and pay the cost of any fees or charges in connection with the Utility Lines located on its Parcel to the extent that such Utility Lines service the improvements on that Parcel. To the extent that any Utility Line exclusively servicing any Parcel crosses another Owner's Parcel, such Utility Line shall be so maintained by the party served by the Utility Lines, subject to the provisions of Section 1.02. Maintenance of any portion of any Utility Lines serving more than one Parcel shall be performed by the Owner of the Parcel crossed by the Utility Line, but the cost thereof shall be shared on an equitable basis based upon the relative consumption or usage of the utility furnished from such Utility Line. The Owners of the Parcels shall use the existing metering established by Declarant for purposes of lighting unless otherwise agreed to in writing by the Owners.  To the extent that the lighting is under a single meter, the Owner of Parcel B shall be required to reimburse the Owner of Parcel A for its respective pro rata share of usage of the foregoing lighting (said pro rata share being 85% as to Parcel A and 15% as to Parcel B) within fifteen (15) days of billing from the Owner of Parcel A for such charges. Further, the Owners of the Parcels shall use the existing metering established by Declarant for purposes of irrigation unless otherwise agreed to in writing by the Owners.  To the extent that the irrigation is under a single meter, the Owner of Parcel B shall be required to reimburse the Owner of Parcel A for its respective pro rata share of usage (said pro rata share being 85% as to Parcel A and 15% as to Parcel B) within fifteen (15) days of billing from the Owner of Parcel A for such charges.

(e)    Each Owner shall pay, prior to any penalty attaching thereto, all real estate taxes, personal property taxes, if any, charges for storm water detention facilities, and other assessments, costs and charges imposed upon the land and improvements and equipment located on its respective Parcel. Each Owner shall have the right to contest any such taxes, charges and assessments, provided that such Owner complies with all requirements of law regarding such contest and that such contest does not in any way impair the other Owner's Parcel.

(f)    Each Owner shall cause the buildings and improvements located on its Parcel to comply with all applicable requirements of law and governmental regulations applicable thereto; provided however, that an Owner may contest any such law or regulation so long as such contest would not create any material danger of a loss of title to, or impairment in any way of the use of all or any portion of, the Common Areas for their intended purposes.

OR1375PG0664

Section 2.02. Access and Lighting.

(a)    Each Owner shall keep the roadways and parking areas of its respective Parcel open to the customers of the Center seven (7) days a week at all times and lighted after dusk until 11:00 p.m. on Monday through Saturday and from dusk until 7:00 p.m. on Sunday ("Normal Lighting Hours"). Any Owner or occupant of a Parcel may require the lights on any other Parcel to be kept lighted after Normal Lighting Hours if such Owner or occupant reimburses the requested Owner for the additional electrical costs incurred thereby, which cost shall be shared on a pro rata square footage basis with any other occupant which remains open during such additional hours.

## ARTICLE III - COVENANTS AND RESTRICTIONS

Section 3.01.    Restrictions on Parcel A. Parcel A shall be subject to the following restrictions which shall be binding upon the Owner of Parcel A and each of its tenants, occupants, employees, agents or invitees:

(a)    Restrictions, easements, prohibitions and limitations of record, including the matters set forth in that certain Special Warranty Deed from DeBartolo Realty Partnership, L.P., and GMRI, INC., a Florida corporation, dated December 28, 1995, and recorded December 29, 1995, in Official Records Book 1085, Page 2332, of the Public Records of Indian River County, Florida.

(b)    Any construction on Parcel A shall be conducted in a manner that will limit, to the extent reasonably practicable, any interference with the operation of the Parcel B.

(c)    Parking sufficient to comply with applicable rules and regulations of applicable governmental authorities for the use intended for Parcel A shall be provided within the limits of Parcel A.

(d)    No portion of Parcel A shall be used for a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; or create unusual fire, explosive or other hazards.

(e)    No portion of Parcel A may be leased, used or occupied as a funeral parlor; flea market; discotheque; skating rink; bar (a bar being defined for purposes of this Agreement as an establishment offering the sale of alcoholic beverages for consumption on the premises where such sales are not incidental to the sale of food for on-premises consumption in a bona fide restaurant); unsupervised game room or amusement arcade; movie theater; automobile dealership or repair shop; billiard parlor; flea market; bowling alley; industrial manufacturing; truckstop; adult bookstore or establishment selling, exhibiting or distributing pornographic or obscene materials; massage parlor; so-called "head shop"; body and fender shop; off-track betting parlor; health spa; or "social encounter" type restaurant.

(f)     For so long as a Mattress Giant or other similar retail store shall be operated on Parcel B, no portion of Parcel A shall be used for the sale of those items listed on Exhibit "C" attached hereto and made a part hereof, except where the sale of such items is incidental to the business being conducted on Parcel A.

(g)     No obstruction to the free flow of traffic and use of the parking and delivery facilities on the parcels shall be permitted, except to the extent, if any, indicated on the Site Plan or herein expressly provided for.

Section 3.02.   Restrictions on Parcel B. Parcel B shall be subject to the following restrictions which shall be binding upon the Owner of Parcel B and each of its tenants, occupants, employees, agents or invitees:

(a)     Restrictions, easements, prohibitions and limitations of record, including the matters set forth in that certain Special Warranty Deed from DeBartolo Realty Partnership, L.P., and GMRI, INC., a Florida corporation, dated December 28, 1995, and recorded December 29, 1995, in Official Records Book 1085, Page 2332, of the Public Records of Indian River County, Florida.

(b)     Any construction on Parcel B shall be conducted in a manner that will limit, to the extent reasonably practicable, any interference with the operation of the Parcel A.

(c)     Parking sufficient to comply with applicable rules and regulations of applicable governmental authorities for the use intended for Parcel B shall be provided within the limits of Parcel B.

(d)     No portion of Parcel B shall be used for a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; or create unusual fire, explosive or other hazards.

(e)     No portion of Parcel B may be leased, used or occupied as a funeral parlor; flea market; discotheque; skating rink; bar (a bar being defined for purposes of this Agreement as an establishment offering the sale of alcoholic beverages for consumption on the premises where such sales are not incidental to the sale of food for on-premises consumption in a bona fide restaurant); unsupervised game room or amusement arcade; movie theater; automobile dealership or repair shop; billiard parlor; flea market; bowling alley; industrial manufacturing; truckstop; adult bookstore or establishment selling, exhibiting or distributing pornographic or obscene materials; massage parlor; so-called "head shop"; body and fender shop; off-track betting parlor; health spa; or "social encounter" type restaurant.

(f)     For so long as a Linens N' Things or other similar retail store shall be operated on Parcel A, no portion of Parcel B shall be used for the sale of those items of those items listed on Exhibit "D" attached hereto and made a part hereof except where the sale of such items is incidental to the business being conducted on Parcel B.

6

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 6 of 19

OR 1375 PG 0666

(g)    No obstruction to the free flow of traffic and use of the parking and delivery facilities on the Parcels shall be permitted, except to the extent, if any, indicated on the Site Plan or herein expressly provided for.

## ARTICLE IV – LIABILITY AND INDEMNIFICATION

Section 4.01.  Liability and Indemnification.  Each Owner shall indemnify, defend, save and hold every, other Owner, tenant, and occupant of the Center harmless (except for loss or damage resulting from the tortious acts of such other parties) from and against any damages, liability, actions, claims, and expenses (including attorneys' fees in a reasonable amount) in connection with the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon such Owner's Parcel, or occasioned wholly or in part by any act or omission of said Owner, its tenants, agents, contractors, employees, or licensees.

Section 4.02.  Liability Insurance.  Each Owner shall maintain or cause to be maintained public liability insurance insuring against claims on account of loss of life, bodily injury or property damage that may arise from, or be occasioned by the condition, use or occupancy of the Common Areas by the Owner and its tenants, agents, contractors, employees, licensees, customers and invitees, of such Owner or the occupants of its Parcel except as herein provided. Said insurance shall be carried by a reputable insurance company or companies qualified to do business in the State in which the Center is located and having limits for loss of life or bodily injury in the amounts of not less than $3,000,000 for each person and $3,000,000 for each occurrence and $500,000 for property damage for each occurrence. Each Owner shall maintain or cause to be maintained contractual liability insurance specifically endorsed to cover said Owner's agreement to indemnify as set out in Section 4.01. Notwithstanding the foregoing, any Owner or party responsible to maintain such insurance who has a net worth of at least One Hundred Million Dollars ($100,000,000.00) may "self insure", or provide for a deductible from said coverage related to the Parcel, to the extent of one percent (1%) of the net worth of said Owner or party in its last annual or fiscal year as certified by an independent certified public accountant and computed in accordance with generally accepted accounting principles consistently applied.  Such insurance may be carried under a "blanket" policy or policies covering other properties of the party and its subsidiaries, controlling or affiliated corporations. Each Owner shall, upon written request from the other Owner, furnish to the party making such request certificates of insurance evidencing the existence of the insurance required to be carried pursuant to this Section or evidence of a self-insurance capacity as hereinabove provided, as the case may be. All such insurance shall include provisions denying to the insurer subrogation rights against the other parties to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Notwithstanding anything in Section 4.01 to the contrary, each Owner hereby waives any rights of recovery against any other Owner, its directors, officers, employees, agents and tenants and occupants for any damage or consequential loss covered by said policies, against which such Owner is protected by insurance, to the extent of the proceeds payable under such policies, whether or not the damage or loss shall have been caused by any acts or omissions of the other Owner or its directors, officers, employees, agents, tenants or occupants.

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 8 of 19

## ARTICLE V - CASUALTY AND EMINENT DOMAIN

Section 5.01.  Casualty.

(a)    If any of the buildings located on any Parcel is damaged or destroyed by fire or other cause, the Owner of such building will promptly cause either: (i) the repair, restoration, or rebuilding of the building so damaged or destroyed, or (ii) the razing of any damaged building, the filling of any excavation, and performance of any other work necessary to put such portion of the Center in a clean, sightly and safe condition.

(b)    In the event any Common Area improvements are damaged or destroyed, the Owner of the Parcel to which such damage has occurred shall promptly cause the repair, restoration or rebuilding of the Common Area improvements to the extent necessary to restore such area to its previously improved condition and restore such other areas to the extent necessary to avoid interference with the remaining Common Areas of the Center and to adhere to any required parking ratios required by law and as set forth herein.

Section 5.02.  Casualty Insurance.  In order to assure performance of their respective obligations under Section 5.01, the Owners of the respective Parcels shall cause to be carried fire and extended coverage insurance on all buildings and improvements on their respective Parcels in the amount of the replacement cost of such improvements, and in amounts at least sufficient to avoid the effect of any co-insurance provisions of such policies, except if the Owner of said Parcel, or party responsible for any required restoration, is permitted to "self insure" pursuant to Section 4.02. Any such insurance shall otherwise conform to the provisions with respect to insurance contained in Section 4.02.

Section 5.03.  Eminent Domain.  In the event the whole or any part of the Center shall be taken by right of eminent domain or any similar authority of law (a "Taking"), the entire award for the value of the land and improvements so taken shall belong to the Owner of the property so taken or to such Owner's mortgagees or tenants, as their interest may appear, and no other Owner shall have a right to claim any portion of such award by virtue of any interest created by this Agreement.  Any Owner of a Parcel which is not the subject of a taking may, however, file a collateral claim with the condemning authority over and above the value of the land being so taken to the extent of any damage suffered by such Owner resulting from the severance of the land or improvements so taken if such claim shall not operate to reduce the award allocable to the Parcel taken. In the event of a partial Taking, the Owner of the portion of the Center so taken shall restore the improvements located on the Common Areas of the Owner's Parcel as nearly as possible to the condition existing prior to the Taking without contribution from any other Owner and any portion of any condemnation award necessary therefor shall be held in trust and applied for such purpose.

## ARTICLE VI – REMEDIES

Section 6.01.  Self Help: Lien Rights Disputes.

OR I 375 PG 0668

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 9 of 19

(a)     If any Owner shall default in the performance of an obligation required of such Owner (such Owner being herein called a "Defaulting Owner"), which default affects the Owner of another Parcel or any occupant thereof (an "Affected Party'), such Affected Party, in addition to all other remedies it may have at law or in equity, after ten (10) days' prior written notice to the Defaulting Owner and any first Mortgagee or SL Lessor as herein defined (or in the event of an emergency after such notice as is practical under the circumstances), shall have the right to perform such obligation on behalf of the Defaulting Owner; provided, however, if such default is not an emergency situation and cannot be reasonably cured within such ten (10) day period, the Defaulting Owner shall have a longer period of time to cure such default, so long as the Defaulting Owner commences to cure such default within such ten (10) day period and diligently and continuously proceeds to final cure of such default.  In such event, the Defaulting Owner shall promptly reimburse the Affected Party the cost thereof, together with interest thereon from the date of outlay at a rate equal to the lesser of (i) two percent (2%) in excess of the prime lending rate as published in the Wall Street Journal or similar publication from time to time, (ii) the highest rate permitted by applicable law (the "Interest Rate").

(b)     Any claim for reimbursement not paid when due or during any applicable cure period, together with interest thereon as aforesaid, shall be secured by a lien on the Parcel of the Defaulting Owner and improvements thereon, which lien shall be effective upon the recording of a notice thereof in the Office of the Clerk or Registrar of the County in which the Center is located.  The lien shall be subordinate to any first mortgage or deed of trust now or hereafter affecting the subject Parcel (a "First Mortgage") and to the interest of any party who has purchased the Parcel and leased it back to the preceding Owner ("SL Lessor"), or its subsidiary or affiliate, on a net basis with the lessee assuming all obligations thereunder in what is commonly referred to as a "sale leaseback" transaction (an "SL Lease"); and any purchaser at any foreclosure or trustee's sale (as well as any grantee by deed in lieu of foreclosure or trustee's sale) under any such First Mortgage or assignee of such SL Lease shall take title subject only to this Agreement and liens thereafter accruing pursuant to this Section 6.01.

Section 6.02.  Injunctive and Other Remedies.  In the event of a breach by any Owner of any obligation of this Agreement, the other Owners shall be entitled to obtain an order specifically enforcing the performance of such obligation or an injunction prohibiting any such breach; the Owners hereby acknowledge the inadequacy of legal remedies and the irreparable harm which would be caused by any such breach, and/or to relief by other available legal and equitable remedies from the consequences of such breach.  Any action taken or document executed in violation of this Agreement shall be void and may be set aside upon the petition of the other Owners of portions of the Center.  Any costs and expenses of any such proceeding, including attorney's fees in a reasonable amount, shall be paid by Defaulting Owner and, subject to the notice and cure provisions of Section 6.01 hereof, shall constitute a lien against the land, and improvements thereof, or the interests therein, until paid.

Section 6.03.  Nonwaiver.  No delay or omission of any Owner in the exercise of any right accruing upon any default of any other Owner shall impair such right or be construed to be a waiver thereof, and every such right may be exercised at any time during the continuance of such default.  A waiver by any Owner of a breach of, or a default in, any of the terms and conditions of this Agreement by any other Owner shall not be construed to be a waiver of any

OR 1375 PG 0669

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 10 of 19

subsequent breach of or default in the same or any other provision of this Agreement. Except as otherwise specifically provided in this Agreement, (i) no remedy provided in this Agreement shall be exclusive but each shall be cumulative with all other remedies provided in this Agreement and (ii) all remedies at law or in equity shall be available.

Section 6.04. Nonterminable Agreement. No breach of the provisions of this Agreement shall entitle any Owner or party to cancel, rescind or otherwise terminate this Agreement, but such limitation shall not affect, in any manner, any other rights or remedies which any party may have hereunder by reason of any breach of the provisions of this Agreement. No breach of the provisions of this Agreement shall defeat or render invalid the lien of any mortgage or deed of trust made in good faith for value covering any part of the Center, and any improvements thereon.

Section 6.05. Force Majeure. In the event any Owner or any other party shall be delayed or hindered in or prevented from the performance of any act required to be performed by such party by reason of Act of God, strikes, lockouts, unavailability of materials, failure of power, prohibitive governmental laws or regulations, riots, insurrections, the act or failure to act of the other party, adverse weather conditions preventing the performance of work as certified to by an architect, war or other reason beyond such party's control, then the time for performance of such act shall be extended for a period equivalent to the period of such delay. Lack of adequate funds or financial inability to perform shall not be deemed to be a cause beyond the control of such party.

## ARTICLE VII - TERM

Section 7.01. Term. This Agreement and the easements, rights, obligations and liabilities created hereby shall be perpetual to the extent permitted by law.

## ARTICLE VIII - EFFECT OF INSTRUMENT

Section 8.01. Mortgage Subordination. Any mortgage or deed of trust affecting any portion of the Center shall at all times be subject and subordinate to the terms of this Agreement, except to the extent expressly otherwise provided herein, and any party foreclosing any such mortgage or deed of trust, or acquiring title by deed in lieu of foreclosure or trustee's sale shall acquire title subject to all of the terms and provisions of this Agreement, subject to Section 6.01 hereof. Each party hereto represents and warrants to the other parties that there is no presently existing mortgage or deed of trust lien on its Parcel, other than mortgage or deed of trust liens that are expressly subordinate to the lien of this Agreement and set forth on Exhibit "E" attached hereto and made a part hereof.

Section 8.02. Binding Effect. Every agreement, covenant, promise, undertaking, condition, easement, right, privilege, option and restriction made, granted or assumed, as the case may be, by either party to this Agreement is made by such party not only personally for the benefit of the other party hereto but also as Owner of a portion of the Center and shall constitute

OR 1375 PG 0670

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 11 of 19

equitable servitude on the portion of the Center owned by such party appurtenant to and for the benefit of the other portions of the Center. Any transferee of any part of the Center shall automatically be deemed, by acceptance of the title to any portion of the Center, to have assumed all obligations of this Agreement relating thereto to the extent of its interest in its Parcel and to have agreed with the then Owner or Owners of all other portions of the Center to execute any and all instruments and to do any and all things reasonably required to carry out the intention of this Agreement and the transferor shall upon the completion of such transfer be relieved of all further liability under this Agreement except liability with respect to matters that may have arisen during its period or ownership of the portion of the Center so conveyed that remain unsatisfied.

Section 8.03.  Non-Dedication.  Nothing contained in this Agreement shall be deemed to be a gift or dedication of any portion of the Center to the general public or for any public use or purpose whatsoever, it being the intention or the parties hereto and their successors and assigns that nothing in this Agreement, expressed or implied, shall confer upon any person, other than the parties hereto and their successors and assigns, any rights or remedies under or by reason of this Agreement.

Section 8.04.  Responsibility.  Notwithstanding, anything to the contrary contained in this instrument, each party to this Agreement shall be liable and responsible for the obligations, covenants, agreements and responsibilities created by this Agreement and for any judgment rendered hereon only to the extent of its respective interest in the land and improvements on its Parcel. Each party shall be relieved from any duty or obligation which accrues after such party ceases to be an Owner of any Parcel with respect to which such duty has arisen.

## ARTICLE IX - NOTICES

Section 9.01.  Notices.  Any notice, report or demand required, permitted or desired to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes upon the earlier to occur of (1) receipt or refusal of receipt or (ii) three (3) business days after deposit in the United States Mail, registered or certified mail, return receipt requested or (iii) one (1) business day after deposit with the courier for personal hand delivery or (iv) one (1) business day after deposit with a nationally recognized overnight courier service. The address for the Declarant is shown on page 1 hereof. The address for other Owners shall be the address set forth in a recorded Deed to the other Owners. Owners shall have the right to change their addresses from time to time by notifying other Owners pursuant to the notice provisions hereof.

## ARTICLE X - MISCELLANEOUS

Section 10.01. Miscellaneous.

(a)     If any provision of this Agreement, or portion thereof, or the application thereof to any person or circumstances, shall, to any extent be held invalid, inoperative or unenforceable, the remainder of this Agreement, or the application of such provision or portion thereof to any other persons or circumstances, shall not be affected thereby; it shall not be deemed that any such invalid provision affects the consideration for this Agreement; and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

(b)     This Agreement shall be construed in accordance with the laws of the State of Florida.

(c)     The Article headings in this Agreement are for convenience only, shall in no way define or limit the scope or content of this Agreement, and shall not be considered in any construction or interpretation of this Agreement or any part hereof.

(d)     Nothing in this Agreement shall be construed to make the parties hereto partners or joint venturers or render any of said parties liable for the debts or obligations of the other.

(e)     This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

(f)     This Agreement may be amended, modified, or terminated at any time by a declaration in writing, executed and acknowledged by the parties to the Agreement or their successors or assigns;  this Agreement shall not be otherwise amended, modified or terminated during the term hereof.

(g)     Upon the request of another party hereto, each of the parties hereto agrees to execute (not more than twice in any twelve (12) month period) a reasonable estoppel certificate requesting information about the subject matter of this Agreement, within twenty (20) days after request therefor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

DECLARANT

Signed, sealed and delivered
in the presence of:

VLM ASSOCIATES, LLC, a Florida
limited liability company

Print Name: _____

By: _____
Steven T. Siegel, Managing Member

Print Name: Jonathan D. Belop

12

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 13 of 19

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me this 31 day of ___Dec~ber___, 2000 by Steven T. Siegel, as Managing Member of VLM Associates, LLC, a Florida limited liability company, on behalf of the company. He is personally known to me and has produced a Driver's license issued by the Department of Highway Safety and Motor Vehicles as identification and did not take an oath



NOTARY PUBLIC

Print Name
My Commission Expires:

JONATHAN D. BELOFF
MY COMMISSION # CC 795703
EXPIRES: January 19, 2003
Bonded Thru Notary Public Underwriters

Exhibits
A – Legal Description of Parcel
B – Site Plan of Center
C – Parcel A Restricted Uses
D – Parcel B Restricted Uses
E - Mortgages
Consent and Joinder of Mortgagee – To be added

m:\clients2\argate\gmri\docs\reoa1rev4.doc

13

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

Parcel I, Indian River Mall Fee Parcel, situated in the Northwest 1/4 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida, and being more particularly described as follows:

Lots 13, 14 and 15, Indian River Mall, The West Peripheral, as recorded in Plat Book 14, pages 61, 61A, and 61B, the Public Records of Indian River County, Florida; said parcels being further described as beginning at the Southwest corner of said Lot 13, thence run the following courses:

1.  Run North a distance of 489.40 feet to a point; thence
2.  Run N 45° 00' 00" E, a distance of 40.90 feet to a point; thence
3.  Run East, a distance of 309.60 feet to a point; thence
4.  Run S. 00° 30' 13" W, a distance of 517.60 feet to the Southeast corner of Lot 15; thence
5.  Run S. 89° 52' 25" W, a distance of 333.97 feet to the said Southwest corner of Lot 13 and the Point of Beginning.

**ALSO DESCRIBED AS:**

Situated in the North ½ of Section 5, Township 33 South, Range 39 East, Indian River, Florida, and more particularly described as follows:

Commencing at a point of intersect on the North Right-of-Way line of State Road 60 Highway, with the West Line of Wallace Acres Subdivision, as recorded in Plat Book 7, Page 12, Public Records of Indian River County, Florida; thence South 89°52' 37" West along said North Right-of-Way a distance of 175.00 feet to the principal point and place of beginning of the following description:

Continuing along said North Right-of-Way South 89°52'25" West a distance of 333.97 feet to a point; departing said north Right-of-Way line, thence North a distance of 489.40 feet to a point; thence North 45°00'00" East a distance of 40.90 feet to a point; thence East a distance of 309.60 feet to a Point; thence South 00°30'13" West a distance of 517.60 feet to the Point of Beginning.

m:\clients2\argate\gmn\docs\legal description - 2 descriptions.doc

EXHIBIT "B"

SITE PLAN

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 15 of 19



OR I 375 PG 0675

Exhibit C

## Parcel A Use Restrictions

Parcel A shall not be used for the following other than where the use is incidental to the business being conducted on Parcel A:

Retail sale of mattresses, box springs, bed frame, bed headboards, brass bed pieces.

r:\argate\gmri\docs\veoa-exc-parcel a use restrictions.doc

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 17 of 19

Exhibit D

Parcel B Use Restrictions

Parcel B shall not be used for the following other than where the use is incidental to the business being conducted on Parcel B:

1. Bed linens and related items: sheets, comforters, comforter covers, bedspreads, drapes, blinds, decorative pillows, blankets, bed pillows and mattress pads.

2. Bath accessories: towels, shower curtains, waste baskets, hampers, and bathroom rugs.

3. Kitchen and tabletop items: cookware, cutlery, kitchen gadgets, dinnerware, flatware and glassware.

4. Small electric appliances: (such as blenders, coffeemakers and toaster ovens).

5. Basic housewares: storage items, closet-related items (such as hangers, organizers, shoe racks), general housewares (such as brooms, garbage pails and ironing boards) and lifestyle accessories (such as lamps, chairs, wicker, silk and dried flowers).

6. Wall décor: pictures, frames, posters, clocks and mirrors.

m:\clients2\argate\gmri\docs\reoa-exd-parcel b use restricts doc

## EXHIBIT E

### MORTGAGES

SouthTrust Bank, National Association, pursuant to that certain Mortgage, dated December 31____, 2000, to be recorded in the Public Records of Indian River County, Florida.

Unique Code : BAA-BAA-BCAGB-BCEGHEE-ECIGAE-G Page 18 of 19

OR 1375 PG 0678

## JOINDER AND CONSENT OF MORTGAGEE

SOUTHTRUST BANK, NATIONAL ASSOCIATION, being the holder of that certain Mortgage, dated the __31__ day of __December__, 200_0_, to be recorded in the Public Records of Indian River County, Florida, hereby consents to the filing of the foregoing Declaration of Covenants, Restrictions and Easements by VLM Associates, LLC, a Florida limited liability company.

Signed, sealed and delivered
in the presence of:

Print Name: _Paul L. Lewis_

Print Name: _Jonathan D. Beloff_

SOUTHTRUST BANK, NATIONAL
ASSOCIATION

By: _____
Name: _____
Title: _____ (SEAL)

_Glenn Parish_
_SVP_

STATE OF FLORIDA )
                 )SS:
COUNTY OF _Miami-Dade_ )

The foregoing instrument was acknowledged before me this __31st__ day of __Dec__, 2000, by __Glenn Parish__, as __SVP__ of SouthTrust Bank, National Association, who is personally known to me or who produced a Florida Driver's license as identification, and who executed the foregoing on behalf of said bank.

_____
NOTARY PUBLIC - State of Florida

My Commission Expires:

m:\clients2\argate\gmri\docs\exhibit e and f to declaration doc

JONATHAN D. BELOFF
MY COMMISSION # CC 795703
EXPIRES: January 19, 2003
Bonded Thru Notary Public Underwriters

OR 1375 PG 0679

# **EXHIBIT I**

## **Special Warranty Deed (Big Lots Parcel)**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:11 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-DBCACEAABEBIH-ECIGAB-H |
| **Instrument Number:** | 3120240014187 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



**Execution Copy**

PREPARED BY:

David J. Arbus, Esq.
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004

AFTER RECORDING, RETURN TO:

DTS Properties VI LLC
c/o DTS Properties Management Inc.
1111 N. Plaza Dr., Ste. 200
Schaumburg, IL 60173
Attention: Daniel Shoffet

Property Appraiser's Parcel Identification
No.: 33-3905-00009000000013.0

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED, made as of the 21st day of March 2024, by BIG
VEFL Owner LLC, a Delaware limited liability company, whose address is 30 N. LaSalle St.,
Chicago, IL 60654, hereinafter called Grantor, and DTS Properties VI LLC, an Illinois limited
liability company whose address is 1111 N. Plaza Dr., Ste. 200, Schaumburg, IL 60173,
hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs,
successors and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of Ten and No/100
Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, does hereby grant, bargain, sell, alien, remise, release, convey and
confirm unto Grantee, all of Grantor's right, title and interest in and to those tracts or parcels of
land being more particularly described on Exhibit A attached hereto and incorporated herein by
this reference (the "Property").

TOGETHER WITH all the improvements, tenements, hereditaments and appurtenances
thereto belonging or in anywise appertaining.

SUBJECT TO all of the matters described on Exhibit B attached hereto and incorporated
herein by this reference (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the same in fee simple forever.

AND GRANTOR hereby covenants with Grantee that Grantor is lawfully seized of the
Property in fee simple; that Grantor has good right and lawful authority to sell and convey the
Property, and hereby warrants the title to the Property and will defend the same against the

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR
DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN
THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER.
THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT



THE HONORABLE RYAN L. BUTLER,
CLERK OF THE COURTS & COMPTROLLER

lawful claims of all persons claiming by, through or under said Grantor, but against none other; and that the Property is free of all encumbrances except the Permitted Exceptions.

[SIGNATURE PAGE FOLLOWS]

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBIH-ECIGAB-H Page 2 of 7

2

IN WITNESS WHEREOF, Grantor has signed and sealed these presents as of the day and year above written.

WITNESS:

GRANTOR:

**BIG VEFL OWNER LLC**, a Delaware limited liability company

Printed Name: Kennedy Silverakin
30 N. LaSalle St, Ste. 4140
Chicago, IL 60602

By: _____
Name: Michael Reiter
Title: Authorized Representative

WITNESS:

Printed Name: Dana Barr
30 N. LaSalle St., Ste. 4140
Chicago, IL 60602

STATE OF ILLINOIS

COUNTY OF COOK

The foregoing instrument was acknowledged before me by means of ☒/physical presence or ☐ online notarization this 18th day of March, 2024, by Michael Reiter as authorized representative of BIG VEFL OWNER LLC, a Delaware limited liability company. He is personally known to me or has produced _____ as identification.

_____
Notary Public, State of Illinois
Print Name: Heather Patricia Bear
Commission No.: 908267
My Commission Expires: 2/16/2028

Official Seal
HEATHER PATRICIA BEAR
Notary Public, State of Illinois
Commission No. 908267
My Commission Expires February 16, 2028

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBH-ECIGAB-H Page 3 of 7

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBH-ECIGAB-H Page 4 of 7

## EXHIBIT A

### LEGAL DESCRIPTION

Parcel I:

Indian River Mall Fee Parcel situated in the Northwest 1/4 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida and being more particularly described as follows:

Lots 13, 14 and 15, INDIAN RIVER MALL - THE WEST PERIPHERAL SUBDIVISION as recorded in Plat Book 14, Pages 61, 61A and 61B, of the Public Records of Indian River County, Florida, said parcels being further described as beginning at the Southwest corner of said Lot 13, thence run the following courses:

Run North a distance of 489.40 feet to a point; thence run North 45°00'00" East, a distance of 40.90 feet to a point; thence run East, a distance of 309.60 feet to a point; thence run South 00°30'13" West, a distance of 517.60 feet to the Southeast corner of Lot 15, thence run South 89°52'25" West, a distance of 333.97 feet to the said Southwest corner of Lot 13 and the Point of Beginning.

ALSO DESCRIBED AS: Situated in the North 1/2 of Section 5, Township 33 South, Range 39 East, Indian River County, Florida and more particularly described as follows:

Commencing at a point of intersect of the North right-of-way line of State Road 60 Highway, with the West line of Wallace Acres Subdivision, as recorded in Plat Book 7, Page 12, Public Records of Indian River County, Florida; thence South 89°52'37" West along said North right-of-way, a distance of 175.00 feet to the principal point and place of beginning of the following description:

Continuing along said North right-of-way South 89°52'25" West, a distance of 333.97 feet to a point; departing said North right-of-way line, thence North, a distance of 489.40 feet to a point; thence North 45°00'00" East, a distance of 40.90 feet to a point; thence East, a distance of 309.60 feet to a point; thence South 00°30'13" West, a distance of 517.60 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PARCEL:

A fee parcel situated in part of Lots 13, 14 and 15, INDIAN RIVER MALL - THE WEST PERIPHERAL as recorded in Plat Book 14, Page 61, 61A and 61B, the Public Records of Indian River County, Florida, said parcels being more particularly described as follows:

Commencing at the Southwest corner of said lot 13, thence run North 89°52'25" East along the South boundary line of said Lot 13 also being the North right-of-way line of State Road 60 Highway, a distance of 37.61 feet to the principal point and place of beginning of the following description: thence run North and parallel to the West boundary of said Lot 13, a distance of 227.85 feet; thence run East, a distance of 114.00 feet; thence run South, a distance of 227.60

BK: 3686 PG: 1224

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBIH-ECIGAB-H Page 5 of 7

feet to the aforementioned South boundary line of Lot 13 and North right-of-way line of State Road 60 Highway; thence run South 89°52'25" West along said South boundary line of Lot 13, a distance of 114.00 feet to the Point of Beginning.

Parcel II:

Together with that certain Stormwater Drainage Easement recorded in Official Records Book 1085, Page 2364, as amended by Amendment recorded in Official Records Book 1375, Page 654; and together with that certain Access Easement recorded in Official Records Book 1085, Page 2359.

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBH-ECIGAB-H Page 6 of 7

## EXHIBIT B

### PERMITTED EXCEPTIONS

1. All matters contained on the Plat as recorded in Plat Book 10, Page 33, Public Records of Indian River County, Florida. as to Parcel II.

2. All matters contained on the Plat of Indian River Mall The Mall Subdivision, as recorded in Plat Book 14, Page 59, Public Records of Indian River County, Florida. As to Parcel II

3. All matters contained on the Plat of Indian River Mall The East Peripheral Subdivision, as recorded in Plat Book 14, Page 60, Public Records of Indian River County, Florida. As to Parcel II

4. All matters contained on the Plat of Indian River Mall-The West Peripheral Subdivision, as recorded in Plat Book 14, Page 61, Public Records of Indian River County, Florida.

5. Notice of Adoption of Development Orders recorded in O.R. Book 1039, Page 2453, O.R. Book 1041, Page 1076, and O.R. Book 1063, Page 208, Public Records of Indian River County, Florida

6. Easement granted to Indian River County by instrument recorded in O.R. Book 1072, Page 2576, Public Records of Indian River County, Florida. As to Parcel II

7. Limited Access Easement granted to Indian River County, a Political Subdivision of the State of Florida recorded in O.R. Book 1082, Page 1840, Public Records of Indian River County, Florida.

8. Sidewalk and Bikeway Easement granted to Indian River County, a Political Subdivision of the State of Florida recorded in O.R. Book 1082, Page 1845, Public Records of Indian River County, Florida.

9. Terms and conditions of the Access Easement between DeBartolo Realty Partnership, L.P., a Delaware limited partnership and GMRI, Inc., a Florida corporation recorded in O.R. Book 1085, Page 2359, Public Records of Indian River County, Florida.

10. Restrictive covenants, provisions, conditions, easements and other matters as set forth in Special Warranty Deed recorded in O.R. Book 1085, Page 2332, as amended by Agreement Amending Deed recorded in Book 1375, Page 640, Public Records of Indian River County, Florida.

11. Terms and conditions of the Stormwater Drainage Easement between DeBartolo Realty Partnership, L.P., a Delaware limited partnership and GMRI, Inc., a Florida corporation recorded in O.R. Book 1085, Page 2364 as amended in O.R. Book 1375, Page 654, Public Records of Indian River County, Florida.

12. Pipeline Easement granted to NUI Corporation, a New Jersey Corporation d/b/a City Gas Company of Florida of Vero Beach, Florida recorded in O.R. Book 1172, Page 1016, Public Records of Indian River County, Florida.

13. Easement granted to City of Vero Beach by instrument recorded in O.R. Book 1172, Page 1028, Public Records of Indian River County, Florida.

BK: 3686 PG: 1226

Unique Code : BAA-BAA-BCAGB-DBCACEAABEBIH-ECIGAB-H Page 7 of 7

14. Declaration of Covenants, Conditions, Restrictions and Easements, including any amendments or modifications thereto, recorded in O.R. Book 1375, Page 661, Public Records of Indian River County, Florida.

15. Utility Easement granted to City of Vero Beach, a municipal corporation of the State of Florida recorded in O.R. Book 1402, Page 1400, Public Records of Indian River County, Florida.

16. Memorandum of Lease Agreement recorded in O.R. Book 3646, Page 1393, Public Records of Indian River County, Florida.

17. All matters shown on survey (the "Survey") prepared by Peter G. Johnson, Professional Surveyor and Mapper LS5913, Blew & Associates, P.A., 3825 North Shiloh Drive, Fayetteville, Arkansas, 72703, dated April 3, 2023, Job No.: 23-1940 including, but not limited to, the following: All utility and drainage lines with poles, meters, valves, and other appurtenances; and Fence encroachment.

7

# **EXHIBIT J**

## **Special Warranty Deed (Mattress Firm Parcel)**



# Electronically Certified Official Record

| | |
|---|---|
| **Agency Name:** | Indian River County Clerk of the Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable Ryan L. Butler |
| **Date Issued:** | 12/17/2024 10:24:29 AM |
| **Unique Reference Number:** | BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F |
| **Instrument Number:** | 3120220045454 |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 13414084 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Ryan L. Butler, Indian River County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Indian River Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



Unique Code : BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F Page 1 of 5

Prepared By and Return to:
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Attn: Matthew Weinstein, Esq.

Tax Parcel I.D. No: 33-39-05-00009-0000-00013/1

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED** is made and executed as of this ⊗ day of July, 2022 by **6040-20ᵗʰ ST. LLC**, a Florida limited liability company ("**Grantor**"), whose address is 75-909 Hiona Street, Holualoa, Hawaii 96725, to **6040 VERO BEACH LLC**, a Delaware limited liability company ("**Grantee**"), whose address is 2950 SW 27ᵗʰ Avenue, Suite 300, Miami, Florida 33133, Attn: Eric Gordon or James Leach.

(Wherever used herein the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

**WITNESSETH:** That Grantor, for and in consideration of the sum of Ten and No/100 Dollars and other good and valuable considerations in hand paid by Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold to Grantee, and Grantee's successors and assigns forever, all right, title and interest Grantor has in and to the following described lot, piece or parcel of land, situate, lying and being in the County of Indian River, State of Florida ("**Property**"):

## SEE **EXHIBIT A** ATTACHED HERETO AND INCORPORATED HEREIN

**TO HAVE AND TO HOLD** the Property in fee simple forever, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and Grantor hereby covenants with Grantee that it is lawfully seized of the Property in fee simple, that it has good right and lawful authority to sell and convey the Property, that it hereby fully warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor but not otherwise, and that the Property is free of all encumbrances except as set forth on Exhibit B attached hereto.

The Property is not homestead realty as to Grantor or Grantee.

*[Signature and Notary Page Follows]*

LEGAL\58355674\2

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN THE OFFICE OF THE INDIAN RIVER COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER. THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT WWW.CLERK.INDIAN-RIVER.ORG TO VALIDATE THIS DOCUMENT



THE HONORABLE RYAN L. BUTLER,
CLERK OF THE COURTS & COMPTROLLER

Unique Code : BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F Page 2 of 5

**IN WITNESS WHEREOF**, Grantor has signed and sealed these presents the day and year first above written.

6040-20TH ST. LLC,
a Florida limited liability company

By: _____
Lynda Tansey, Manager

**Signed, sealed and delivered in presence of:**

(Two witness signatures required)

_____
(Signature of first witness)

_____
(Signature of second witness)

MEAGAN HONEA
(Printed name of first witness)

KICK SWING
(Printed name of second witness)


STATE OF HAWAII            )
                           ) SS:
COUNTY OF  HAWAII          )

I, the undersigned, a notary public in and for said county and state aforesaid, do hereby certify that Lynda Tansey, as manager of Grantor as aforesaid, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as her own free and voluntary act, in such capacity, for the uses and purposes therein set forth.

Given under my hand and official seal this 28th day of ____June____, 2022.

_____

Print Name:  Sandra K. Mock Chew
             Expiration Date: May 18, 2023

NOTARY PUBLIC, State of Hawaii
My commission expires:  See Attached Notary Certification

**SEND SUBSEQUENT TAX BILLS TO:**

6040 Vero Beach LLC
2950 SW 27th Avenue, Suite 300
Miami, FL 33133
Attn: Eric Gordon or James Leach

Unique Code : BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F Page 3 of 5

## EXHIBIT A

### Legal Description

A FEE PARCEL SITUATED IN PART OF LOTS 13, 14 AND 15, INDIAN RIVER MALL, THE WEST PERIPHERAL AS RECORDED IN PLAT BOOK 14, PAGE 61, 61A AND 61B, THE PUBLIC RECORDS OF INDIAN RIVER COUNTY, FLORIDA, SAID PARCELS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 13, THENCE RUN NORTH 89°52'25" EAST ALONG THE SOUTH BOUNDARY LINE OF SAID LOT 13 ALSO BEING THE NORTH RIGHT-OF-WAY LINE OF STATE ROAD 60 HIGHWAY, A DISTANCE OF 37.61 FEET TO THE PRINCIPAL POINT AND PLACE OF BEGINNING OF THE FOLLOWING DESCRIPTION: THENCE RUN NORTH AND PARALLEL TO THE WEST BOUNDARY LINE OF SAID LOT 13, A DISTANCE OF 227.85 FEET; THENCE RUN EAST, A DISTANCE OF 114.00 FEET; THENCE RUN SOUTH, A DISTANCE OF 227.60 FEET TO THE AFOREMENTIONED SOUTH BOUNDARY LINE OF LOT 13 AND NORTH RIGHT-OF-WAY LINE OF STATE ROAD 60 HIGHWAY; THENCE RUN SOUTH 89°52'25" WEST ALONG SAID SOUTH BOUNDARY LINE OF LOT 13, A DISTANCE OF 114.00 FEET TO THE POINT OF BEGINNING.

Common Address: 6440 20th Street, Vero Beach, Florida
Parcel ID No.: 33390500009000000013.1

LEGAL\58355674\2

**EXHIBIT B**

Permitted Exceptions to Deed

1.     Real estate taxes and assessments for the year 2022 and subsequent years, not yet due and payable.

2.     Lease in favor of Mattress Firm, Inc., dated as of December 19, 2000, as amended.

3.     Provisions of the Plat of Indian River Mall - The West Peripheral Subdivision, recorded in Plat Book 14, Page 61 of the Public Records of Indian River County, Florida.

4.     The terms, provisions, and conditions contained in that certain Notice of Adoption of Development Order, recorded in Book 1039, Page 2453.

5.     The terms, provisions, and conditions contained in that certain Notice of Adoption of Development Order, recorded in Book 1041, Page 1076.

6.     The terms, provisions, and conditions contained in that certain Notice of Adoption of Development Order, recorded in Book 1063, Page 208.

7.     The terms, provisions, and conditions contained in that certain Limited Access Easement, recorded in Book 1082, Page 1840.

8.     The terms, provisions, and conditions contained in that certain Sidewalk and Bikeway Easement, recorded in Book 1082, Page 1845.

9.     Restrictions and Easements set out in Special Warranty Deed recorded in Official Records Book 1085, Page 2332, as affected by Official Records Book 1375, Page 640.

10.    The terms, provisions, and conditions contained in that certain Access Easement, recorded in Book 1085, Page 2359.

11.    The terms, provisions, and conditions contained in that certain Stormwater Drainage Easement, recorded in Book 1085, Page 2364, as affected by Book 1375, Page 654.

12.    The terms, provisions, and conditions contained in that certain Declaration of Covenants, Restrictions and Easements, recorded in Book 1375, Page 661.

13.    Easement recorded in Book 1402, Page 1400.

14.    Zoning restrictions imposed by applicable governmental authorities.

CH2:26053637.3

Unique Code : BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F Page 4 of 5

Unique Code : BAA-BAA-BCAGB-DBCACCAAEFEFE-ECIGAG-F Page 5 of 5

STATE OF HAWAII       )

                               ) SS.

COUNTY OF HAWAII    )

On this 28th day of _June_ , _2022_ , before me personally appeared _Lynda Tansey_ ☐ personally known to me, or ☑ proved to me on the basis of satisfactory evidence, who, being by me duly sworn or affirmed, did say that such person executed the foregoing instrument, and acknowledged that such person executed the same as the person's free act and deed.

Signature: _____

Notary Public, State of Hawaii

Name: Sandra K. Mock Chew

My Commission _____ Expiration Date: May 18, 2023

Document Date: _6/28/2022_    No. of Pages: _5_

Notary Name: Sandra K MockChew    THIRD Circuit

Document Description: _Special Warranty Deed_

_____

_____

X _____    _6/28/2022_

Notary Signature                    Date