**Exhibit A**

**In re Number Holdings, Inc., Case No. 24-10719 (JKS)
(Bankr. D. Del. 2024), 5/23/2024 Hr'g Tr., Docket No. 734**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 24-10719 (JKS)
 4   NUMBER HOLDINGS, INC.,        .
     et al.,                       .  (Jointly Administered)
 5                                 .
                                   .  Courtroom No. 3
 6                                 .  824 North Market Street
                                   .  Wilmington, Delaware 19801
 7             Debtors.            .
                                   .  Thursday, May 23, 2024
 8   . . . . . . . . . . . . . . . 10:00 a.m.

 9                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE J. KATE STICKLES
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Andrew Leblanc, Esquire
                               MILBANK LLP
13                             1850 K Street, NW
                               Suite 1100
14                             Washington, DC 20006

15                             Brian Kinney, Esquire
                               MILBANK LLP
16                             55 Hudson Yards
                               New York, New York 10001

17

18
     (APPEARANCES CONTINUED)
19
     Audio Operator:           Madaline Dungey, ECRO
20

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24

     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:      Rosa Sierra-Fox, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3                             844 King Street, Suite 2207
                              Lockbox 35
4                             Wilmington, Delaware 19801

5  For Ollie's Bargain
   Outlet:                    Josef Mintz, Esquire
6                             BLANK ROME LLP
                              1201 North Market Street
7                             Suite 800
                              Wilmington, Delaware 19801
8
                              John Lucian, Esquire
9                             BLANK ROME LLP
                              One Logan Square
10                            130 North 18th Street
                              Philadelphia, Pennsylvania 19103
11
   For Landlords:             Laurel D. Roglen, Esquire
12                            BALLARD SPAHR LLP
                              919 North Market Street
13                            11th Floor
                              Wilmington, Delaware 19801
14
                              Ivan Gold, Esquire
15                            ALLEN MATKINS LECK GAMBLE
                                MALLORY & NATSIS LLP
16                            TCW Tower
                              865 S Figuero Street
17                            Suite 2800
                              Los Angeles, California 90017
18
   For Red Hill Village:      Aaron Applebaum, Esquire
19                            DLA PIPER LLP (US)
                              1201 North Market Street
20                            Suite 2100
                              Wilmington, Delaware 19801
21
   For Mira Mesa
22 Shopping Center West
   LLC:                       William Hazeltine, Esquire
23                            SULLIVAN HAZELTINE ALLINSON LLC
                              919 North Market Street
24                            Wilmington, Delaware 19801

25

```
1   APPEARANCES (CONTINUED):

2   For the Committee:          Steven Golden, Esquire
                                PACHULSKI STANG ZIEHL & JONES LLP
3                               780 Third Avenue
                                34th Floor
4                               New York, New York 10017

5   For KRG Houston New
    Forest, LLC:               Lucian Murley, Esquire
6                               SAUL EWING LLP
                                1201 North Market Street
7                               Suite 2300
                                Wilmington, Delaware 19801
8
    For Oracle Limberlost
9   Shopping Center, LLC:      Benjamin Keenan, Esquire
                                ASHBY & GEDDES, P.A.
10                              500 Delaware Avenue
                                8th Floor
11                              Wilmington, Delaware 19801

12  For Burlington:            Matthew Ward, Esquire
                                WOMBLE BOND DICKINSON (US) LLP
13                              1313 North Market Street
                                Suite 1200
14                              Wilmington, Delaware 19801

15  For ALDI, Inc.:            James Rossow, Jr., Esquire
                                RUBIN & LEVIN, P.C.
16                              135 North Pennsylvania Street
                                Suite 1400
17                              Indianapolis, Indiana 46204

18  For Kimco:                 Rachel Mersky, Esquire
                                MONZACK MERSKY & BROWDER, P.A.
19                              1201 North Orange Street
                                Suite 400
20                              Wilmington, Delaware 19801

21  For Unexpired Lease
    Counterparty:              Alexandra Thomas, Esquire
22                              CHOATE, HALL & STEWART LLP
                                Two International Place
23                              Boston, Massachusetts 02110

24

25
```

<u>APPEARANCES (CONTINUED)</u>:

For American National
Insurance Company:             Simon Fraser, Esquire
                               COZEN O'CONNOR
                               1201 North Market Street
                               Suite 1001
                               Wilmington, Delaware 19801

                               Marc Young, Esquire
                               GREER, HERZ & ADAMS, LLP
                               One Moody Plaza
                               18th Floor
                               Galveston, Texas 77550

For CSIM/Franklin
Family Partnership:            Paige Topper, Esquire
                               SAUL EWING LLP
                               1201 North Market Street
                               Suite 2300
                               Wilmington, Delaware 19801

For the DIP Lender:            Megan Volin, Esquire
                               PROSKAUER ROSE LLP
                               Eleven Times Square
                               Eighth Avenue & 41st Street
                               New York, New York 10036

For Navins Fund:               Jeffrey Waxman, Esquire
                               MORRIS JAMES LLP
                               500 Delaware Avenue
                               Suite 1500
                               Wilmington, Delaware 19801

INDEX

MOTIONS:                                                              PAGE


Agenda
Item 5:  Debtors' Motion for Entry of an Order                          6
         Approving (I)(A) Bidding Procedures in
         Connection with the Sale of Substantially
         All of the Debtors' Remaining Assets, (B)
         Assumption and Assignment Procedures, (C)
         Form and Manner of Notice of Sale Hearing,
         Assumption Procedures, and Auction
         Results; (II) Auction and Sale Hearing
         Dates; (III)(A) Debtors' Entry into One or
         Multiple Asset Purchase Agreements, (B)
         Sales(s) Free and Clear of All Encumbrances,
         and (C) Assumption and Assignment of
         Certain Executory Contracts and Unexpired
         Leases; and (IV) Granting Related Relief
         (D.I. 171, filed 4/16/24)

         Court's Ruling:                                              104


EXAMINATION:                                                         PAGE

     WILLIAM SCOTT WEBB
     Direct examination by Mr. Young                                   32
     Cross-examination by Mr. Lucian                                   47
     Redirect examination by Mr. Young                                 58


DECLARATIONS:                                                        PAGE

1) Matt Tabloff                                                       11

2) Paul Shin                                                          12


EXHIBITS:                                                           PAGE

American National - Exhibits 1 through 3                              32

1        (Proceedings commenced at 10:09 a.m.)

2                THE COURTROOM DEPUTY:  All rise.

3                THE COURT:  Good morning. Please be seated.

4                This is Judge Stickles.  We are on the record in

5    Number Holdings, Case No. 24-10719.

6                I will hear from debtors' counsel.

7                MR. LEBLANC:  Good morning, Your Honor.

8                THE COURT:  Good morning.

9                MR. LEBLANC:  Andrew Leblanc of Milbank on behalf

10   of 99 Cents and its affiliated debtors-in-possession.

11               Your Honor, today marks the culmination of the

12   efforts of the company and its advisors that began well

13   before the petition date. On April 16th 99 Cents filed a bid

14   procedures and sale motion seeking approval of the bidding

15   procedures for the sale of substantially all of the company's

16   assets that were not being sold pursuant to the store closing

17   procedures previously authorized by Your Honor.

18               On May 9th the Court entered the bidding

19   procedures order at Docket No. 463.  Pursuant to the process

20   set forth in the bidding procedures, 99 Cents received 150

21   indications of interest for various portions of the assets

22   which included 44 owned properties, hundreds of leases and

23   the company's intellectual property.

24               We subsequently received over 75 bids for the

25   assets.  One of those bids, Your Honor, was the stalking

1  horse bid of Ollie's, which Your Honor approved our

2  designation of Ollie's as the stalking horse bidder on May

3  15th, that docket entry was at No. 562.  The company and its

4  advisors conducted an auction on May 21st. The auction was

5  entirely done virtually with the first portions taking place

6  on Hilco's online platform and then the process concluding in

7  a Zoom environment.

8          The company and its advisors worked closely with

9  the advisors to our consultation parties to evaluate the bids

10  that were received and determine the highest and best bid for

11  each asset.  The end result is the process that are the

12  proposed sales for which we are seeking approval today, Your

13  Honor, which in the aggregate represent over $170 million of

14  value to the company.

15          So, Your Honor, we are here today seeking approval

16  of that sale and that is the purpose for the hearing.  We

17  submitted an agenda and I think, Your Honor, there is some

18  contested issues and we will take that in the order in a

19  moment, but that is the purpose for which we are here today

20  simply to get approval that sale order.  As I mentioned, our

21  view is that this was a very successful auction.  We raised,

22  as I said, $170 million which compares very favorably to the

23  initial indications of interest and --

24          THE COURT:  What is the breakdown of the $170

25  million for the multiple sales?  You have four transactions,

1  proposed transactions, what is the breakdown?

2           MR. LEBLANC:  Your Honor, I know -- I am not sure

3  that I have the breakdown for each of them, but one of my

4  colleagues may be able to give that to me.  I know that the

5  Ollie's one is the stalking horse bid, the $14.6 million.

6           THE COURT:  I know those two. I was curious the

7  breakdown for the multiple -- not Ollie's, not the

8  designation.  The other two, what is the breakdown?

9           MR. LEBLANC:  Your Honor, there is -- I think

10 there's 44 different purchasers; supporting two, minus

11 Ollie's and the Dollar Tree acquisition. So, 42 different

12 purchasers, but I am looking at my colleagues to get that for

13 you.

14      (Pause)

15          MR. LEBLANC:  I apologize for the delay, Your

16 Honor.  So, the Dollar Tree designation rights constitute $13

17 million; that is one of the two that Your Honor said you were

18 familiar with.  The 21 lease assignments that are not part of

19 the stalking horse bid constitute $2,464,863.  The Ollie's

20 stalking horse bid is $14.6 million.  Then the sale of the 41

21 owned properties is $137,334,320.

22          THE COURT:  Thank you.

23          MR. LEBLANC:  So, Your Honor, those are the sales,

24 obviously, that occurred on the auction date.  We had the

25 prior transactions that Your Honor had approved in connection

1   with the Dollar Tree designation rights and the grocery

2   outlet April leases were an additional $2.75 million which

3   brings the grand total in the sales process, not just from

4   the auction, to just over $170 million in the aggregate.

5              One note, Your Honor, as contemplated by the

6   bidding procedures with respect to all transactions involving

7   leases other then the stalking horse bid, resolution of cure

8   objections and the filing resolution of adequate assurance

9   information will occur after this hearing.  We will bring any

10  unresolved issues and we will work to resolve them all, Your

11  Honor, but any unresolved issues we will bring back to Your

12  Honor and have provided that we might not close those lease

13  assignments until those issues are resolved.  So, that is not

14  a today issue.

15              THE COURT:  That is June 4th, correct?

16              MR. LEBLANC:  Yes, Your Honor.  Exactly.

17              Your Honor, what I would propose to do is there

18  are four different forms of order.  What I propose to do is

19  offer our evidence in connection with the proceedings and

20  then I will yield the podium to Mr. Kinney who is going to

21  handle the first of the forms of order, the Dollar Tree one,

22  so we can resolve that and get them on their way.  Then we

23  will turn to the one with respect to the Ollie's lease

24  assignment and American National.

25              THE COURT:  Is that the only pending objection

1   today?

2          MR. LEBLANC:  The only pending objection today,

3   Your Honor, I think -- my colleagues will go over the forms

4   of order.  There is the American National one and then Mr.

5   Kinney is going to raise -- there is a landlord.

6          MR. KINNEY:  Yes, Your Honor.  We're also have

7   received an informal -- sorry, Brian Kinney from Milbank.  We

8   also received an informal objection from one of our

9   landlords.  We believe that is still live.  So, that will be

10  heard in connection with the proposed form of relief sale

11  order.

12         THE COURT:  Okay.

13         MR. LEBLANC:  Your Honor, we have two declarations

14  that we filed on the docket.  The first is a declaration by

15  Matt Tabloff in support of the debtors' motion.  That was

16  filed at Docket No. 669.

17         THE COURT:  That is in support of designation

18  rights only, is that correct?

19         MR. LEBLANC:  That is -- I believe that is

20  correct, Your Honor.

21         THE COURT:  Okay.

22         MR. LEBLANC:  Yes, Your Honor.  That is just in

23  connection with the (indiscernible).  So, Your Honor, we

24  would offer that declaration as Mr. Tabloff's direct

25  testimony and he's available for cross-examination if anyone

1   wishes.

2          THE COURT:  Does anyone object to the admission

3   into evidence of the Tabloff declaration at Docket 669 in

4   support of sale of the designation rights?

5       (No verbal response)

6          THE COURT:  Okay.  I hear no one. I see no hands

7   on Zoom.

8          Does anybody wish to cross-examine the declarant

9   regarding the content of his declaration?

10      (No verbal response)

11         THE COURT:  I hear no one. I see no hands on Zoom.

12  The declaration is admitted uncontroverted.

13      (Tabloff declaration received into evidence)

14         MR. LEBLANC:  Thank you, Your Honor.

15         The next declaration is Exhibit No. 671 and this

16  is the declaration of Paul Shin, of Jefferies, in connection

17  with the remainder of the sales, Your Honor.  Mr. Shin is

18  available for cross-examination. He is here in the courtroom.

19  We would offer Document No. 671 as Mr. Shin's direct

20  testimony in this case.

21         THE COURT:  Does anyone object to entry into

22  evidence of the Shin declaration at Docket 671 in support of

23  multiple asset purchase agreements?

24      (No verbal response)

25         THE COURT:  I hear no one. I see no hands on Zoom.

1          Does anyone wish to cross-examine the declarant

2   regarding the content of his declaration?

3          (No verbal response)

4          THE COURT:  Okay.  Hearing no one or seeing no

5   hands on Zoom, that declaration is admitted uncontroverted.

6          (Shin declaration received into evidence)

7          MR. LEBLANC:  That concludes our evidentiary

8   presentation, Your Honor.  What I would propose to do is we

9   were going to -- if it would please the Court, we would

10  handle the Dollar Tree order first and then we will turn next

11  to the --

12         THE COURT:  Before we get there, I just want to

13  confirm that some of these orders were just filed and, in

14  fact, one of them I was handed before I came on the bench.  I

15  haven't even looked at it yet, a blackline.  I just want to

16  make sure that parties in interest have had an opportunity to

17  review these orders.

18         MR. LEBLANC:  We believe they have, Your Honor.

19  We have been coordinating with the parties throughout. I know

20  just as we walked in the courtroom there is, what I believe

21  to be, knits that were raised to us.  So, I have no doubt

22  that there will be some changes.  When we talk about the

23  Ollie's transaction, Your Honor, we are going to work

24  subsequent to -- assuming Your Honor enters an order --

25  agrees to enter the order, we are going to separate out the

1  Ollie's transaction with respect to the one piece of property

2  -- the one lease that is objected to, we are going to treat

3  that in a separate order and then have the other seven leases

4  and three owned properties that Ollie's is transacting for

5  treated in one order. It won't require a separate APA.  We

6  just want to have a clean separation between those.

7         THE COURT:  Understood.

8         MR. LEBLANC:  So, we will do that subsequent to

9  the proceeding and we will do it under certification of

10 counsel and submit that to the Court.  We have been trying to

11 keep everybody updated, Your Honor, and, obviously, if people

12 have comments we are happy to take them and then provide it

13 to Your Honor under certificate of counsel at some point

14 subsequent to today.

15         THE COURT:  I think Ms. Sierra-Fox wants to be

16 heard.

17         MS. SIERRA-FOX:  Yes, Your Honor.  May I be heard?

18         THE COURT:  Yes, please.

19         MS. SIERRA-FOX:  Your Honor, I did -- on behalf of

20 the U.S. Trustee Rosa Sierra-Fox.  I did begin reviewing the

21 orders and in particular started with the Dollar Tree order

22 yesterday afternoon. I am still working through the orders on

23 behalf of the U.S. Trustee.  So, throughout the hearing I

24 will be -- I have a couple of comments.

25         THE COURT:  I have comments too and certainly feel

1  free to raise any issues you have as we work through them or

2  if we need to take a break for someone to look at an order we

3  will.

4          MS. SIERRA-FOX:  Yes, Your Honor.  Thank you.

5          THE COURT:  Mr. Kinney.

6          MR. KINNEY:  Thank you, Your Honor.  For the

7  record Brian Kinney of Milbank on behalf of 99 Cents and its

8  affiliated debtors.

9          Your Honor, yesterday we filed at Docket No. 663 a

10  proposed order including the purchase agreement amongst

11  debtors and buyer authorizing the sale of designation rights,

12  determining leases free and clear of liens, claims, and

13  encumbrances, and approving assignment and assumption

14  procedures of the designated leases and granting related

15  relief.

16          Your Honor, this is the Dollar Tree order that we

17  have been referring to.  Your Honor, in connection with the

18  sale process, prior to the auction, the debtors received a

19  bid from Dollar Tree as evidenced in Mr. Tabloff's

20  declaration.  In consultation with our consultation parties -

21  -- in extensive consultation with our consultation parties

22  the debtors determined that the proposal which Dollar Tree

23  made was an extremely beneficial offer to the estates.  The

24  debtors commenced the process, basically, to value check that

25  proposal.

1          Your Honor, the Dollar Tree proposal provides for

2   the purchase of designation rights for 112 of our lease

3   locations and the consideration for that as well as for the

4   debtors' intellectual property is $13 million.  There is an

5   agreement also to purchase the fixtures, furniture and

6   equipment related to those locations for an amount in excess

7   of $1.7 million.

8          THE COURT:  Is that the debtors' FF&E?

9          MR. KINNEY:  It is, Your Honor.  It is the

10  debtors' FF&E.  There is no landlord FF&E.  That is the

11  debtors.

12         THE COURT:  Or no third-party FF&E?

13         MR. KINNEY:  It's not third-party FF&E.  We

14  returned the third-party FF&E the debtors are in possession

15  of and the (indiscernible) in those stores.

16         UNIDENTIFIED SPEAKER:  Your Honor, may I ask

17  counsel to speak into the mic.  We can't hear him back here.

18  Sorry to interrupt.

19         MR. KINNEY:  Is this better?  First time I have

20  ever been told that I was inaudible.

21         THE COURT:  Actually, no offense, I don't think

22  its you.  I think it's the vent above their heads back there

23  that makes it very difficult to hear. I have one behind me

24  too, so, yes.  Give me a thumb's up if you can't hear him.

25         MR. KINNEY:  Your Honor, the Dollar Tree proposal

1   also included an additional benefit to the estate. It

2   included an agreement to pay June rent for the locations and

3   it also provided that if fewer than 95 of the locations were,

4   in fact, designated for assumption additional payment of

5   $25,000 per location to the debtors.

6           This bid, however, was conditioned on the debtors

7   designating them the successful bidder prior to the auction

8   and removing the assets from the auction. The debtors

9   commenced an extensive process of reaching out to all parties

10  that have expressed an interest in those lease locations

11  prior to as part of the process to see if they were willing

12  to increase their bids. The net result of that, Your Honor,

13  is that while we did get some interest to increase those

14  bids, which (indiscernible) for all the individual bids still

15  paled in comparison with what Dollar Tree was offering on

16  this designation rights bid.

17          THE COURT:  And that was in consultation with your

18  consultation parties?

19          MR. KINNEY:  It was, Your Honor.  There was

20  extensive consultation with both the committee and with our

21  DIP lenders.  So, after those discussions we determined

22  Dollar Tree the successful bidder for those assets, removed

23  them from the auction, and we are here today to proceed with

24  an order approving those designation rights.

25          As Your Honor may remember, we had entered a

1  designation rights order with respect to a set of our April

2  leases in Dollar Tree earlier in this process and the order

3  that we filed is redlined against that earlier order.  So,

4  the order that we have at 663 also attached a redline of the

5  initial Dollar Tree designation rights order for the ease of

6  the parties.  They kept largely to that same form.

7  Obviously, there was some amendments to not only reflect the

8  passage of time, but also the inclusion of the intellectual

9  property at this time and the specifics of the bid.

10  Otherwise, we kept to the earlier form.

11           Your Honor, as Ms. Sierra-Fox noted, she has

12  provided informal comments. They are not reflected in the

13  form of order that we submitted.

14           THE COURT:  I just want to make sure I'm on the

15  right page.  The latest order is 663, correct?

16           MR. KINNEY:  Correct.

17           THE COURT:  Okay.

18           MR. KINNEY:  6631 is the current order, 6632 was

19  the blackline.

20           THE COURT:  The blackline which is what I was

21  working off of.

22           MR. KINNEY:  We are working to incorporate Ms.

23  Sierra-Fox's comments and we will, under COC after the

24  hearing, submit a blackline reflecting those changes that we

25  have agreed to with the Office of the United States Trustee.

1     THE COURT:  Okay.  Let me ask: Does anyone want to

2  be heard with respect to the proposed sale or Docket No. 663,

3  the proposed order?

4     MR. GOLDEN:  Good morning, Your Honor.  Steve

5  Golden of Pachulski Stang Ziehl & Jones, proposed counsel to

6  the committee.

7     I just wanted to confirm further to Your Honor's

8  question that we were consulted as part of this and we agree

9  and think it's a good result of the estate.

10     Thank you, Your Honor.

11     THE COURT:  Thank you.  I appreciate your comment.

12     MR. KEENAN:  Good morning, Your Honor.  May I

13  please the Court Ben Keenan, Ashby & Geddes, for Oracle

14  Limberlost Shopping Center LLC, which is a landlord with

15  leases subject to the proposed order at 663.

16     The proposed order was filed under -- the notice

17  of successful bidder was filed at No. 638.  I just wanted to

18  make a clarification, Your Honor and just explain to the

19  Court the issue I have. In reviewing this last night and this

20  morning the proposed sale order is pursuant to the general

21  sale procedures under (indiscernible) entered at 463, but it

22  also references the designation rights. Those are two

23  separate tracks and that is what gave me a concern.

24     THE COURT:  Understood.

25     MR. KEENAN:  I did have a chance to thank debtors'

1 counsel and Dollar Tree's counsel was kind enough to explain

2 this before the hearing. I think just filing an amended

3 clarification to --

4          THE COURT:  Where are you referring to

5 specifically?

6          MR. KEENAN:  What the different procedures are?

7          THE COURT:  No.  I understand the different

8 procedures. I actually see them as two bifurcated events.

9 So, I guess I am asking more specifically what is your

10 concern vis-à-vis the order.

11          MR. KEENAN:  What I have done is I will tell you

12 my understanding and Dollar Tree's counsel can correct me if

13 I'm wrong.  Dollar Tree is under the -- under this proposed

14 sale order is purchasing a new set of designation rights for

15 these (indiscernible) Oracle.  Its similar, but its not

16 identical.  That is why I wanted (indiscernible) procedures

17 for the designation right period.

18          Dollar Tree will have a chance to inform the

19 debtors of leases they wish to potentially assume and assign.

20 Notice will be issued.  Counterparties will have a chance to

21 respond just as they have under the existing designation

22 rights procedures.  Dollar Tree's counsel explained to me

23 that one section of that is the core objection deadline,

24 which ran on May 14th, will continue to uphold. So, other

25 than that the --

1          THE COURT:  Okay.  What does that mean?

2          MR. KEENAN:  That means there -- that under the

3  sale procedures, under Docket 463, there is what's called a

4  contract objection deadline which is, essentially, a cure

5  objection deadline that was on May 14th.  That will continue

6  to hold and parties that didn't respond before that will not

7  have a chance at a cure objection.

8          THE COURT:  Will have a new chance?

9          MR. KEENAN:  Will not.

10          THE COURT:  Oh, okay.  So, those cure objections

11  were due and many were filed. I have looked at every one of

12  them.  They will be heard on June 4th unless otherwise

13  resolved in advance, which we are hopeful that many will be

14  resolved.

15          MR. KEENAN:  Right, but, otherwise, the

16  designation rights procedures will hold under the previous

17  designation order. That will be the procedures that will

18  govern counterparties rights.  Subject to that clarification,

19  Oracle does not object and (indiscernible).

20          THE COURT:  Mr. Kinney.

21          MR. KINNEY:  Your Honor, again, for the record,

22  Brian Kinney of Milbank.

23          That is correct, the order at 663 is not approving

24  the assumption and assignment of any individual lease.  It is

25  approving the sale of the intellectual property, but with

1   respect to the leases it's just approving a sale of the

2   designation rights and implementation of the designation

3   rights procedures which provide for subsequent notice and an

4   opportunity to object to the assumption and assignment based

5   on adequate assurance grounds.  Again, as noted, since we did

6   notice all of these locations with their cure amounts there

7   is not an additional chance to object to the cure amount, but

8   there is to the adequate assurance and (indiscernible).

9          MR. KEENAN:  Thank you, Your Honor.

10         THE COURT:  Mr. Applebaum.

11         MR. APPLEBAUM:  Good morning, Your Honor.  Aaron

12  Applebaum, DLA Piper, on behalf of Red Hill Village LLC,

13  which is also a minority.

14         I think this is mostly a tag along to the prior

15  comments which we did file an objection which is Docket No.

16  609.  Our lease does appear to be listed as part of the

17  Dollar Tree sale.  My clients want to make sure that our

18  rights are preserved on the record with respect to the cure

19  amounts that is not being addressed today.  Assumption and

20  assignment is conditioned on resolution of the cure amount

21  and any adequate assurance objection that we might file by

22  the May 30th deadline.

23         Thank you, Your Honor.

24         THE COURT:  Mr. Kinney.

25         MR. KINNEY:  That is confirmed.

1           THE COURT:  Thank you.

2           Mr. Murley.

3           MR. MURLEY:  Good morning, Your Honor.  Luke

4   Murley of Saul Ewing for KRG Houston New Forest.

5           I rise to confirm that our cure objection can be

6   heard on June 4th and that is not prejudiced.  I also want to

7   point out practical issues that we don't yet have adequate

8   assurance information. I believe the deadline was yesterday.

9   We will continue to coordinate with the other side, but our

10  ability to respond on adequate assurance is contingent on

11  actually getting information.

12          THE COURT:  Could you, Mr. Kinney, address the

13  status of adequate assurance?

14          MR. KINNEY:  Your Honor, to the extent that

15  adequate assurance information did not get served yet we will

16  make sure that it gets served today.  When our first batch

17  went out yesterday, I just need to verify (indiscernible) but

18  also for this process the adequate assurance information will

19  occur after the designation.

20          Again, this is not being assumed today so its not

21  subject to the adequate assurance deadline to the sale order.

22  Its subject to the adequate assurance deadlines in the

23  designation procedures.  So, that information would be

24  transmitted when the lease is designated and the objection is

25  not due until after that designation occurs.

1          THE COURT:  Maybe you should insert a footnote in

2   this order stating that.

3          MR. MURLEY:  I'm sorry, Your Honor.

4          THE COURT:  I'm suggesting to the debtor that

5   perhaps they insert a footnote in the order clarifying that

6   because I am not certain, having read the order, that that is

7   abundantly clear.  Of course, I'm not living it like you're

8   living it, but --

9          MR. KINNEY:  Your Honor, that is perfectly fine.

10  We will insert an express clarification with respect to the

11  adequate assurance for the designation of properties.

12         THE COURT:  Okay.  Does anyone else wish to be

13  heard with respect to the sale of designation rights?

14         MR. GOLD:  A quick clarification, please, Your

15  Honor.

16         THE COURT:  Yes.  Mr. Kinney, he is asking for a

17  clarification. I just want to make sure -- I'm sorry, I

18  didn't mean to interrupt you, but I am putting you on the

19  spot.

20         Go ahead, Mr. Gold.

21         MR. GOLD:  Yes.  Good morning, Your Honor. Ivan

22  Gold of Allen Matkins for a member of the debtors' landlords.

23         We have 11 leases that are part of the designation

24  rights transaction.  Just a clarification, Your Honor, it's

25  my understanding, as we talk about June 4th, that is for the

1 | other tranches of leases because, otherwise, we would be

2 | adjudicating cures prior to the designation rights.  So,

3 | while we're adding footnotes that might not be another bad

4 | one for us to add so you are not issuing advisory rulings on

5 | cures that are being negotiated.

6 |         THE COURT:  Yeah, I misspoke. They are not

7 | necessarily ripe at that point.

8 |         MR. KINNEY:  Your Honor, we can further adjourn

9 | for any leases that are not part of one of the other -- that

10 | is not part of the other transaction today we will either

11 | further adjourn those cure objections or in some cases those

12 | cure objections had become moot because the debtors are in

13 | the process of rejecting those leases.  So, we will update

14 | and work with the landlords to adjourn those cure objections

15 | till after the designation --

16 |         THE COURT:  Thank you.  And utilizing charts with

17 | respect to your cure objections is very efficient.

18 |         MR. KINNEY:  Thank you, Your Honor.

19 |         THE COURT:  Does anyone else wish to be heard with

20 | respect to the designation rights sale or the proposed form

21 | of order?

22 |     (No verbal response)

23 |         THE COURT:  So, I don't know -- did the U.S.

24 | Trustee want to put their comments on the record?  Are these

25 | comments that --

1          MS. SIERRA-FOX:  Rosa Sierra-Fox on behalf of the

2    U.S. Trustee.

3          Your Honor, with the Dollar Tree order our

4    comments were relatively minor.

5          THE COURT:  Okay.

6          MS. SIERRA-FOX:  So, I don't think that is

7    necessary.  We have already agreed on those changes.  So, we

8    are fine with our resolution.

9          THE COURT:  Thank you.

10         Okay.  So, having heard no one -- no further

11   objection, based on the record that's been made and the

12   resolution of all objections I'm prepared to approve the

13   uncontested sale of the designation right to Dollar Tree. I

14   am satisfied that the proposed sale constitutes a reasonable

15   exercised of the debtors' business judgment, yields maximum

16   value for the debtors' estate and is in the best interest of

17   the debtors or creditors.

18         Based on the Shin declaration at Docket 671 in

19   support of the multiple asset purchase agreements as well as

20   the Tabloff declaration at 669 in support of the sale of the

21   designation rights, the debtors and their advisors, in

22   consultation with consultation parties, engaged in a robust

23   auction process. The sale process provided a full, fair and

24   reasonable opportunity for any person or entity to make a

25   higher or, otherwise, better offer to purchase the assets.

1  The proposed sale does represent the highest and best offer.

2  The purchaser is entitled to all the protections afforded

3  under the bankruptcy code.

4          So, I will approve the proposed sale order with a

5  few modifications to the form of order.  You are going to

6  have to bear with me because I kind of scribbled comments on

7  here.  So, I'm sure you are familiar, in the introductory

8  paragraph, there needs to be a couple of conforming edits

9  about dates and docket number for the Tabloff declaration and

10 that type of thing.

11         MR. KINNEY:  Yes, Your Honor.

12         THE COURT:  I had a lot of comments on the

13 evidence, but I note that the declarations were very helpful

14 and tracked very nicely to the form of order.

15         MR. KINNEY:  Thank you, Your Honor.

16         THE COURT:  On Paragraph 22 these trade fixtures

17 these are debtors. I don't have to -- what I am concerned

18 about here is any lienholders that were, you know, banning

19 free and clear of property that is not the debtors.

20         MR. KINNEY:  Correct, Your Honor. This is only

21 debtor property and it is subject to the lien of the

22 prepetition notes.  That is the only lien on these.

23         THE COURT:  So, they're consenting lienholders.

24         MR. KINNEY:  They're consenting.

25         THE COURT:  So, why don't you just tack onto the

1  end of that sentence something to the effect of consenting

2  lienholders.

3           MR. KINNEY:  We will make that change, Your Honor.

4           THE COURT:  Just out of an abundance of caution.

5           I think that is the only comment -- oh, I know,

6  Paragraph 29, the last sentence, what is this language about

7  a plan?  Why is it in here, the language about a plan?

8           MR. KINNEY:  Your Honor, its just to clarify that

9  a plan cannot affect this order and the relief granted in the

10  order. Its solely -- again, the sale will occur under this

11  order and the plan can't affect the rights of the purchaser

12  that are granted under the sale order.

13           THE COURT:  I understand what's being done.  I

14  don't love it, I will be honest, because to me orders speak

15  for themselves and then I will enter a confirmation order

16  that says this supersedes everything else.  If there is a

17  conflict between the plan and confirmation order the

18  confirmation order will stand.  So, I understand why its in

19  here, but I recommend to parties that they be vigilant when

20  they're looking at a plan.  If they have an issue with it,

21  they should raise it.

22           With that modification and the comments of the

23  United States Trustee if you will upload a clean and

24  blackline under certification of counsel, we can get it

25  entered.

1        MR. KINNEY:  Thank you, Your Honor.  We will do

2   that after the hearing.

3        MR. LEBLANC:  Your Honor, Andrew Leblanc again for

4   99 Cents.

5        What I would propose to do next, Your Honor, is to

6   cover the Ollie's transaction.  So, the objection there --

7   the one remaining objection is the American National

8   objection. My understanding is the others have been resolved.

9   My colleagues can talk to that if necessary.  And I know we

10  have submitted our evidence, Your Honor, and I know Ollie's

11  had submitted a declaration -- I'm sorry, not Ollie's.

12  American National had submitted a declaration. I know Ollie's

13  they are going to take the lead on responding to the

14  evidentiary submission and I will jump up as necessary at the

15  end and I will certainly take the lead on arguing our

16  position with respect to their objection.

17        THE COURT:  Can you all just give me a minute, I

18  want to pull up the correct papers.

19      (Pause)

20        THE COURT:  Okay.  Let me ask before we proceed

21  any further, is there any other party, other then American

22  National Insurance, who objects to the proposed sale of the

23  leases to Ollie's Bargain Outlet which is Docket 637?

24      (No verbal response)

25        THE COURT:  I hear no one. I am ready to proceed.

1         MR. LEBLANC:  Your Honor, happy to proceed however

2    you would propose.  What I think would make logical sense is

3    to the extent that American National wants to submit evidence

4    I would propose that that happen and then we can just do --

5    rather then doing openings, evidence, closing in an issue

6    like this I would propose we just deal with the evidence and

7    then we will turn to legal argument.

8         THE COURT:  Well, since it's their objection I

9    will let them proceed first and then they can proceed if you

10   want to make an opening statement or not it's your choice.

11        MR. FRASER:  Good morning, Your Honor. Simon

12   Fraser from Cozen O'Connor for American National.

13        My co-counsel, Marc Young, is here remotely. I

14   know also our declarant, Scott Webb, is available remotely

15   with permission from Chambers.  I will turn the podium over -

16   - virtually over to Mr. Young.

17        THE COURT:  All right.  Thank you.

18        Mr. Young.

19        MR. YOUNG:  Good morning, Your Honor.  Marc Young

20   on behalf of American National.

21        First let me thank you for allowing us to attend

22   remotely as well as Mr. Scott Webb.  I will represent to you

23   that Mr. Webb is in a separate office and apart in the

24   offices of American National.  He is alone.  In front of him

25   is a copy of his declaration and portions of the excerpted

1  lease that were attached to that declaration.

2         I would ask that, if we could, I have no objection

3  to proceeding as reflected by counsel with respect to putting

4  on evidence and then going into legal argument.

5         THE COURT:  Okay.

6         MR. YOUNG:  I would ask that, fi we could, since

7  the declarant is here, I do plan to present him and ask that

8  we stipulate to the admittance of his declaration and he laid

9  the underlying business records exception predicate for those

10 attachments. I would ask that as they are reflected in our

11 exhibit list, American Nationals exhibit list, that those two

12 be admitted into evidence by stipulation.

13        THE COURT:  Is there any objection to that

14 proposal?

15        MR. LUCIAN:  Good morning, Your Honor.  John

16 Lucian of Blank Rome for Ollie's.

17        Your Honor, their request is to admit the

18 declaration.  We would object to admission of the declaration

19 other then to authenticate Exhibits 1, 2, and 3 which I think

20 are the first six paragraphs of the declaration. I think that

21 may be what counsel is asking for and I need him to proceed

22 with direct exam of his witness for the balance.

23        THE COURT:  Mr. Young.

24        MR. YOUNG:  I was actually trying to economize

25 everyone's time and allow for the entire entry of the

1  declaration given that on the record counsel will be able to

2  cross-examine he can have an opportunity to examine the

3  particular statements made by the witness; otherwise, we are

4  going to go through the entirety of the declaration on the

5  record and I don't think that is an efficient use of our time

6  this morning.

7          MR. LUCIAN:  Your Honor, I think the problem is

8  the second half of the declaration is the declarant

9  interpreting the lease and offering an opinion about

10  (indiscernible) term.  Those may not get in on direct examine

11  either.  We can't (indiscernible) efficiency, but we can

12  stipulate to what we believe are improper inclusions in the

13  declaration, Your Honor.

14          THE COURT:  Mr. Young, let's proceed with your

15  witness.

16          MR. YOUNG:  All right.  Mr. Webb.

17          MR. WEBB:  Yes.

18          MR. YOUNG:  Can you please state, and you will be

19  sworn in here in a moment -- in fact, Your Honor, do you want

20  to swear him in first.

21          THE COURT:  Wait a minute, Mr. Young.  I'm sorry,

22  we need to take a minute.  Can you make sure we're in

23  compliance with the broadcast protocol with the exception of

24  Mr. Webb and Mr. Young.

25          UNIDENTIFIED SPEAKER:  For those on Zoom, anyone

1   who is audio only will now be moved to the waiting room.

2          UNIDENTIFEID SPEKAER:  I do have copies of the

3   exhibits for anyone who would like them passed out or if you

4   would like me to pass them out.

5          THE COURT:  I have Mr. Webb's declaration.  Thank

6   you.

7            WILLIAM SCOTT WEBB, WITNESS, SWORN

8          THE CLERK:  Please state your full name and spell

9   your last name for the record.

10          THE WITNESS:  William Scott Webb, W-E-B-B.

11          THE CLERK:  Thank you.

12          MR. YOUNG:  Apologies, Your Honor.  Marc Young for

13   American National.

14          We did get a stipulation with respect to the

15   exhibits being admitted.  We can lay the foundation for

16   those.

17          MR. LUCIAN:  That's correct, Your Honor. No

18   objection to Exhibits 1 through 3, which I believe are the

19   (indiscernible).

20          THE COURT:  Okay.  Exhibits 1 through 3 are

21   admitted.

22       (Exhibits 1 through 3 received into evidence)

23          MR. YOUNG:  Thank you.

24                  DIRECT EXAMINATION

25   BY MR. YOUNG:

1   Q    Mr. Webb, please state your name for the record?

2   A    William Scott Webb.

3   Q    For the record, where are you testifying from today?

4   A    Galveston, Texas in the American National office

5 building.

6   Q    Who are you testifying on behalf of today?

7   A    American National Insurance Company.

8   Q    And if I say American National you understand that I am

9 referring to American National Insurance Company?

10  A    Yes.

11  Q    Okay.  Are you generally familiar with the substance

12 and nature of the proceeding today?

13  A    I am.

14  Q    What is your general understanding of this proceeding

15 with respect to American National?

16  A    Well, 99 Cents, through bankruptcy, has requested to

17 sell a portion of its assets and included in that is the

18 assets and the lease of our property that we own in Conroe,

19 Texas.

20  Q    We will talk a little bit more about that property in a

21 moment. I want to go over some of your background. Is

22 American National your employer?

23  A    Yes.

24  Q    And what is your job title?

25  A    Assistant vice president real estate.

1   Q    And what are your duties and responsibilities as

2 assistance vice president real estate?

3   A    Oversee a portion of the company's real estate holdings

4 and investments including mortgage loans and numerous

5 property types. Also, I assist and/or direct junior analysts

6 through their job and I am an authorized signator for

7 documents for American National.

8   Q    How long have you been in real estate management in the

9 course of your career?

10   A    Over 25 years.

11   Q    And how -- during that time have you reviewed leases?

12   A    Yes.

13   Q    Have you negotiated leases?

14   A    I have.

15   Q    How many leases have you reviewed and negotiated over

16 the course of that 25 years?

17   A    I would have to say its hundreds.

18   Q    And you mentioned earlier property owned by American

19 National. Are you referring to the non-residential real

20 property located at 1406 East Loop 336 West Conroe,

21 Montgomery County, Texas?

22   A    Yes.

23   Q    Now does that property have a common name that you

24 refer to it as?

25   A    Its Montgomery Plaza Shopping Center.

1    Q      And how would you generally describe that property?

2    A      It's a large shopping center with multiple anchors and

3    junior anchors.

4    Q      Is American National the sole owner of that property?

5    A      Yes.

6    Q      Is American National the only landlord?

7    A      Yes.

8    Q      Are there multiple tenants?

9    A      Yes, there are.

10   Q      Is there a common parking lot?

11   A      Yes.

12   Q      What are some of the tenants that are located at the

13   Montgomery Plaza Shopping Center?

14   A      There's (indiscernible) Academy, Big Lots, Spec's,

15   Petco.

16   Q      Are you aware if American National has attempted to

17   maintain the particular mix of tenants in its management of

18   the Montgomery Plaza Shopping Center?

19   A      Yes.  I mean we attempt to maintain a variety mix of

20   tenants and merchandisers that will hopefully, you know,

21   maximize the foot traffic to the center.

22   Q      Was there a purposeful selection in the tenants that

23   American National has selected or your predecessor in

24   interest selected in the Montgomery Plaza Shopping Center?

25   A      Well, I would say yes, it --

1          MR. LUCIAN:  Objection.

2          THE COURT:  I'm sorry, I didn't hear your

3 objection.

4          MR. LUCIAN:  Objection, foundation.

5          THE COURT:  Mr. Young.

6          MR. YOUNG: I mean I don't really know how to

7 respond to an objection on foundation. I am asking him

8 specifically his opinion as working in realty management as

9 he understands it. If counsel is suggesting that we're

10 construing that as an expert opinion I don't think that is

11 the case.  As has been testified, he's spent 25 years making

12 these decisions on behalf of American National. I think its

13 within his personal knowledge to state whether or not they

14 have maintained a particular mix of tenants.

15          MR. LUCIAN:  He can offer a lay opinion, Your

16 Honor, but (indiscernible) I want to be clear he's not being

17 offered as an expert.

18          THE COURT:  He's established a foundation to

19 answer the question.

20          Go ahead, Mr. Young.

21          MR. LEBLANC:  Your Honor, I apologize.  I think

22 the question that was asked was did you or the predecessor to

23 your ownership purposefully select -- I don't think he can

24 talk about the intention of his predecessor, of the people

25 that owned it prior to American National. That would be the

1  objection that I would make, Your Honor.

2         THE COURT:  All right.  Well, he can answer as to

3  him.

4         MR. LEBLANC:  As to American National, but not as

5  to the predecessor.

6  BY MR. YOUNG:

7  Q    Mr. Webb, do you understand the question?

8  A    Yes.

9  Q    And can you answer the question?

10  A    Yes.  We typically, in retail and shopping center

11  environments, try to purposefully place tenants in a mix that

12  will optimize, again, the foot traffic of the center and

13  also, obviously, income.

14  Q    In the course of your 25 years are you familiar with

15  restrictive use provisions?

16  A    Yes.

17  Q    And are there any restrictive use provisions that you

18  are aware of with respect to the Montgomery Plaza Shopping

19  Center?

20  A    Yes, there are.

21  Q    Is there joint participation by the tenants, and trash

22  removal and other maintenance on that property?

23  A    Yes.  That is part of the CAM charges.

24  Q    And would you describe this property, the Montgomery

25  Plaza Shopping Center, as your understanding in retail as a

1  shopping center?

2  A     Yes.

3  Q     Are you familiar with the lease between American

4  National and the 99 Cents store?

5  A     Yes.

6  Q     And as you heard, you know, virtually in the courtroom,

7  that was admitted into evidence as Exhibit 2.  How are you

8  familiar with the lease between American National and 99

9  Cents store?

10  A     I have reviewed it recently.

11  Q     Is that something that you would be responsible for in

12  the course of your title or your job with American National

13  in managing that lease?

14  A     Yes.

15  Q     You also testified earlier that there is a Big Lots

16  store that is also a tenant in the shopping center, is that

17  correct?

18  A     Yes.

19  Q     Now, are you familiar with the lease between American

20  National and Big Lots?

21  A     I am.

22  Q     And what has been tendered and pre-admitted as Exhibit

23  1 is that the lease between American National and Big Lots?

24  A     Yes.

25  Q     And how are you familiar with this lease?

1          MR. LEBLANC:  Your Honor, just a point -- I

2    apologize, point of clarification I believe the Big Lots

3    lease is Exhibit 3.

4          THE COURT:  Exhibit 1 is the tenant estoppel

5    certificate.

6          MR. LEBLANC:  Yes.  Thank you, Your Honor.

7          MR. YOUNG:  I was going off of our tendered

8    exhibit list and not how it was framed in the declaration.

9          MR. LUCIAN:  I apologize. I'm using the

10   declaration and that is Exhibit 3 in the declaration.

11         THE COURT:  Let's -- Mr. Young, let's all get on

12   the same page. Are you referring to your exhibit list?

13         MR. YOUNG:  Yes, Your Honor.  American National

14   filed an exhibit list --

15         THE COURT:  Yeah, I understand.

16         MR. YOUNG:  Let me --

17         THE COURT:  Its Docket 627.

18         MR. LUCIAN:  Your Honor, the confusion is we

19   admitted under the declarations that we were going off of.

20   They were 1, 2 and 3. I don't think matters the number as

21   long as we're on the same page.

22         THE COURT:  Right.  Could you bear with me a

23   second, I want to pull up your exhibit list so I have it in

24   front of me.

25         MR. YOUNG:  Your Honor?

1          THE COURT:  Yes.

2          MR. YOUNG:  I'm fine to use the declaration if

3  everything that was appended there was admitted.

4          THE COURT:  I don't think -- Exhibits 1, 2 and 3

5  were admitted, right?  So, I guess we should specify for the

6  record then Exhibit 1 is the tenant estoppel certificate.

7  Exhibit 2 is the lease.  Exhibit 3 is --

8          MR. LUCIAN:  2 is the 99 Cents lease and 3 is the

9  Big Lots.

10          MR. YOUNG:  All right. So, to clarify, I was

11  asking just a moment ago I was referring to Exhibit 1, but,

12  in fact, Exhibit 2 for the record is the 99 Cents lease.  Now

13  Exhibit 3 is the Big Lots lease.

14          You understand that change, Mr. Webb?

15          THE WITNESS:  Yes.

16          MR. YOUNG:  Can I proceed, Your Honor?

17          THE COURT:  Yes, please.

18  BY MR. YOUNG:

19  Q    Again, just to get back to what we were talking about

20  how are you familiar with the Big Lots lease between American

21  National and Big Lots?

22  A    I have reviewed it.

23  Q    Okay. Is this something -- is this lease something in

24  the course of your duties and responsibilities that you are

25  responsible for administering and managing on behalf of

1  American National?

2  A      Yes.

3  Q      And do you have signatory authority for American

4  National to enter into leases, amendments, and other legal

5  documents related to that?

6  A      Yes.

7  Q      And you said earlier you had reviewed this, are you

8  aware of any exclusive use provisions, as you understand them

9  in 25 years, as to what those are?

10           MR. LEBLANC:  Objection, Your Honor.  The document

11  speaks for itself and I think this is the point of the prior

12  objection which is everything that now follows in the

13  declaration is just the witness reading what is in the

14  document. I don't think Your Honor or any of the parties here

15  need that. I don't think there is any space for anything

16  beyond.

17           The documents are admitted.  They have the

18  provisions they have. I don't think we need this witness's

19  opinions about those provisions. I think this question gets

20  exactly to that.  He is defining it as a restrictive use

21  provision.  We will make an argument about what it is and

22  what it says.  That is what is relevant to the Court, not

23  this witness's testimony as to that issue.  So, I would

24  object, Your Honor.

25           THE COURT:  Mr. Young.

1          MR. YOUNG:  I fundamentally disagree.  This may be

2     the only opportunity for my client to offer evidence about

3     their understanding.  If this contract is ultimately

4     determined to be ambiguous this is our only opportunity to

5     offer that evidence; otherwise, that assignment, when my

6     client is in breach, we are going to be dealing and wrestling

7     with this issue.

8          So, while it may not be the best opportunity and

9     there hasn't been a determination of ambiguity when else will

10    my client have an opportunity to provide into the record, you

11    know, its evidence as to what it understands the contract it

12    has been longstanding with means.

13          MR. LEBLANC:  Two points, Your Honor.  The

14    contract with 99 Cents was signed initially in 1984.  The

15    contract with Big Lots was signed in 2009.  My recollection,

16    I have to just look, but I think American National --

17          MR. YOUNG:  I am going to object that is facts not

18    in evidence.  That is not when that lease was entered.  I

19    think, you know, Your Honor --

20          THE COURT:  All right.  I am going to allow him

21    some latitude.  There is no jury here. I can give this the

22    weight it deserves.

23          So, Mr. Young, you may proceed because we're

24    spending more time on objections then we are on actually

25    dealing with the issue. So, you may proceed.

1        MR. YOUNG:  Thank you, Your Honor.

2   BY MR. YOUNG:

3   Q     Getting back to exclusive use provisions, are you aware

4   of any exclusive use provisions in this lease, Mr. Webb?

5   A     Yes.  Again, we're on Exhibit 3?

6   Q     Exhibit 3, the Big Lots lease.

7   A     Yes. Its Section 4.

8   Q     Do you know if the lease distinguishes between what it

9   refers to as dollar stores and closeout stores?

10  A     Yes, it does.

11  Q     Does this lease, as you understand it specifically,

12  reference Ollie's?

13  A     Yes, it does.

14  Q     Was Ollie's open and operating for business in the

15  Montgomery Plaza Shopping Center on September 4th, 2009?

16  A     No, it was not.

17  Q     Was Ollie's open and operating for business in the

18  Montgomery Plaza Shopping Center as the successor of assign

19  of the 99 Cents store on September 4th, 2009?

20  A     No.

21  Q     In your 25 years of experience releases do you

22  understand Ollie's to be a dollar store?

23  A     No, I do not.

24        MR. LEBLANC:  Your Honor, I will just lodge an

25  objection for the record.

1          THE COURT:  Understood.

2    BY MR. YOUNG:

3    Q      Have you heard the term "closeout store?"

4    A      Yes.

5    Q      And based on your personal understanding what is a

6    closeout store?

7              MR. LEBLANC:  Same objection, Your Honor.

8              MR. LUCIAN:  Same objection, Your Honor.

9              THE COURT:  Understood.

10             THE WITNESS:  Usually, its synonymous to some

11   degree with liquidation of merchandise. It can largely be

12   name brands, bulk items, larger items typically would be sold

13   in a dollar store.

14   BY MR. YOUNG:

15   Q      Have you personally been into an Ollie's before?

16   A      I have.

17   Q      And would you consider Ollie's -- how would you

18   characterize Ollie's based on your 25 years of management?

19   A      As a closeout or liquidation store.

20   Q      And I want to actually turn back to Exhibit 3.  If you

21   would turn to page 8, please.

22   A      Okay

23   Q      If you would look at the second paragraph that begins

24   "So long as tenant is open and operating," do you see that?

25   A      I do.

1 | Q    Can you please -- are you familiar with this sentence?

2 | A    I am.

3 | Q    Okay. Now, are you aware that debtors have contended

4 | that they are accepted from any restriction on making this

5 | assignment because they were a tenant in September of 2009?

6 | A    Yes.

7 | Q    What is your understanding of the terms of this lease

8 | with respect to that?

9 |        MR. LEBLANC:  Objection, Your Honor.  He's now

10 | asking him for a legal conclusion as to the ultimate issue.

11 | I know you said you would give him latitude, but I don't know

12 | how far that latitude goes.  This is a question for Your

13 | Honor to decide.

14 |        MR. LUCIAN:  Same.

15 |        MR. YOUNG:  Again, Your Honor, if you ultimately

16 | deem this contract to be ambiguous by virtue of our argument

17 | what other forum are we going to have to enter this into

18 | evidence.  If you deem it to be clear then you can disregard

19 | this testimony.  I don't know when we are going to have

20 | another opportunity and forum to put this into evidence.

21 |        MR. LUCIAN:  Your Honor, the witness did not

22 | negotiate the lease. It's with a different entity that he

23 | wasn't at, at the time it was entered into. This is just his

24 | lay opinion of the interpretation of a lease.

25 |        THE COURT:  Yeah, I'm struggling, Mr. Young, to

1  see how this isn't an interpretation of the language here.

2          MR. YOUNG:  Again, Your Honor, I would -- we can

3  move forward, but, again, my client has come to an

4  understanding that they will be in breach if this is reached.

5  If this contract is deemed to be ambiguous then, again, when

6  will there be evidence offered as to the meaning of the

7  intention of the parties.

8          With regard to the argument about negotiated my

9  clients managed this lease for the -- the 99 Cents lease for

10  20 years and has managed this particular lease since they

11  took ownership of the property.

12          MR. LEBLANC:  Your Honor, Mr. Young has said a few

13  times if not now than when will I offer this. I presume, like

14  us, they will argue that they are not in breach of the Big

15  Lots lease and they will make their arguments there. I am

16  just confused as to that.  He is talking about the meaning of

17  a provision that this person didn't negotiate in respect of a

18  breach that is not before Your Honor.

19          So, where will he put that evidence in if and when

20  there's an allegation of a breach and their litigating that

21  issue there is what I would submit.  Your Honor, to be

22  responsive to the question that counsel has asked a few times

23  here if not here when, when that issue is actually before a

24  Court.

25          MR. YOUNG:  I am going to withdraw the question,

1  Your Honor.  I am going to withdraw the question. We are

2  spending more time on this then getting through this.

3  BY MR. YOUNG:

4  Q    I will ask you this, to counsel's point, Mr. Webb, is

5  it American Nationals position that if this lease is assigned

6  will it be in breach of the Big Lots lease?

7  A    Yes, it will.

8         MR. YOUNG:  I will pass the witness.

9                    CROSS-EXAMINATION

10 BY MR. LUCIAN:

11 Q    Good morning, Mr. Webb.  Can you hear me okay?

12 A    I can.  Good morning.

13 Q    My name is John Lucian. I am with Blank Rome. I

14 represent Ollie's. I have two questions for you, sir.

15      First, I want to be clear, your 25 years of experience

16 are in real estate management, not in retail operations,

17 correct?

18 A    That is correct.

19 Q    You have never worked for Ollie's, correct?

20 A    I have not.

21 Q    You never worked for Big Lots, Dollar General or Dollar

22 Tree, correct?

23 A    That is correct.

24 Q    And your testimony about having been in an Ollie's

25 store is just as a shopper, a consumer, correct?

1  A      That's correct.

2  Q      No specialized experience in Ollie's business

3  operations, correct?

4  A      Correct.

5  Q      You testified to your understanding of the Big Lots

6  lease here. I just want to clarify a couple of points that

7  you made.

8         You talked about dollar store versus closeout store.

9  Do you remember your testimony on that a few minutes ago?

10 A      Yes.

11 Q      Dollar General -- is Dollar General a dollar store in

12 your opinion?

13 A      Yes.

14 Q      And they're identified as such in the Big Lots lease as

15 a dollar store, correct?

16 A      Correct.

17 Q      Dollar Tree is also a dollar store?

18 A      Yes.

19 Q      You've been to Ollie's -- have you ever been to Dollar

20 General?

21 A      I have.

22          MR. LUCIAN:  I would like to mark, Your Honor, as

23 Ollie's Exhibit 1.  We're going to have a little bit of a

24 logistics issue here, but I have a solution on it because the

25 witness is not in the courtroom.  He may or may not need

1  this.  I will hand one to counsel who is here for the witness

2  and Your Honor.

3        MR. YOUNG:  I have not received this exhibit, Your

4  Honor.

5        MR. LUCIAN:  His co-counsel has it in the

6  courtroom, Your Honor.

7        MR. FRASER:  This is the first time I've seen it

8  also.

9        MR. YOUNG:  I didn't see this 24 hours in advance.

10        MR. LUCIAN:  Its for cross-examine.  I'm not

11  seeking admission of the document. Its based on his

12  testimony.

13        THE COURT:  Wait a minute. I don't even know what

14  it is.

15        MR. LUCIAN:  May -- I have a few questions, Your

16  Honor.

17  BY MR. LUCIAN:

18  Q    Have you ever been to Dollar Genera's website, Mr.

19  Webb?

20        MR. YOUNG:  I'm going to object.

21        THE COURT:  What is this exhibit?  I don't know

22  what this is.

23        MR. LUCIAN:  Your Honor, this exhibit is three

24  pages of a printout of Dollar General's website.  Three items

25  on the website I want to ask about.

1          MR. YOUNG:  Your Honor, I would like to see a copy

2    of that.

3          MR. LUCIAN:  His counsel has it here in the

4    courtroom.  Your Honor --

5          MR. FRASER:  This is the first time I have seen

6    it.  I have no idea what it is.

7          THE COURT:  First of all, let's get a copy of this

8    to Mr. Young.  We are going to have to take a break and Mr.

9    Young has got to get a copy of this.

10          MR. LUCIAN:  Your Honor, if we take a short

11    recess, we can email it to Mr. Young and (indiscernible).

12          MR. YOUNG:  Do you have any other exhibits? I

13    would suggest you go ahead and send them as well.

14          MR. LUCIAN:  I have one copy to -- we can email

15    those quickly, Your Honor.

16          THE COURT:  Okay.  Why don't we take a five-minute

17    break so that he can get this exhibit and we will come back

18    in the courtroom at 11:15.  We stand in recess.

19       (Recess taken at 11:09 a.m.)

20       (Proceedings resumed at 11:23 a.m.)

21          THE COURTROOM DEPUTY:  All rise.

22          THE COURT:  Okay. Please be seated.

23          Bear with me for a second, I'm logged out of my

24    computer.

25          Mr. Young, were you able to receive the document?

1       MR. YOUNG:  Yes, Your Honor. I am in receipt of

2    the documents.  I don't know how you would like to proceed on

3    my objections or I also -- since I'm not there I couldn't

4    approach counsel during the break and seek a stipulation with

5    respect to 1. I don't know if you would like us to do that or

6    just go straight to -- however, you would like to proceed,

7    Your Honor.

8       MR. LUCIAN:  Your Honor, I did speak with Mr.

9    Fraser is stipulating there was an exhibit you have from the

10   Ollie's website. My understanding was we could stipulate to

11   the -- counsel can represent -- you can represent that your

12   document was printed off of the Ollie's website.  I can

13   represent that the exhibit I handed before the break was

14   printed off of the Dollar General website.  That was my

15   understanding of the stipulation of Mr. Fraser on

16   (indiscernible)

17      MR. YOUNG:  Yeah, I would only add I'm agreeable

18   to that stipulation, and that is what I was going to suggest,

19   with the one caveat since I don't know where this document

20   came from with respect to Dollar General, this is the first

21   time I've seen it, and we haven't proffered anybody who has

22   laid a foundation for it. I am still willing to do that

23   stipulation if you will acknowledge that this document, when

24   it was produced, and that it was not produced or created in

25   or around September of 2009 when this lease was negotiated.

1    MR. LUCIAN:  They are print offs of Dollar
2  General's website this morning within the last hour.
3        THE COURT:  Okay.
4        MR. YOUNG:  Okay.  Then I am agreeable to the
5  Dollar General printouts and I object to the news articles
6  under 801.
7        THE COURT:  I don't have any news articles.
8        MR. LUCIAN:  We haven't gotten to anything else
9  yet. I sent him the other two.
10       MR. YOUNG:  Can we go ahead and have that -- can
11 you go ahead and present those to the Judge so we can have
12 that conversation?  I don't want to interrupt you if I can
13 avoid it.
14       MR. LUCIAN:  If I need them, I will use them.  I
15 don't know if I need them yet.
16       THE COURT:  Okay.
17       MR. LUCIAN:  (Inaudible).
18 BY MR. LUCIAN:
19 Q    Mr. Webb, did you speak with your counsel during the
20 recess?
21 A    I did not.
22 Q    Two quick questions before I get to the exhibit from
23 your declaration, so I'm clear on the lease.  The 99 Cents
24 store lease is Exhibit 2, it was entered into March 16th,
25 2004, on or about that date, correct?

1  A    Yes.

2  Q    In that lease the landlord was Weingarten, not American

3  National, correct?

4  A    That is correct.

5  Q    And you were never an employee of Weingarten, correct?

6  A    Correct.

7  Q    Same with the Big Lots lease.  That was entered into on

8  or about September 4th, 2009, approximately 15 years ago,

9  correct?

10 A    Correct.

11 Q    Also Weingarten, not American National correct?

12 A    Yes, that's correct.

13 Q    And you're not a lawyer, correct?

14 A    Correct.

15 Q    So I'm going to ask you -- back to Dollar General now.

16 You've been a Dollar General -- a Dollar General store

17 before, correct?

18 A    I have.

19 Q    And you're aware they sell items that cost more than a

20 dollar, correct?

21 A    Yes.

22 Q    Some items substantially more than a dollar, correct?

23 A    I have not personally seen or bought anything

24 substantially more from a Dollar General.

25 Q    Well, I can't show you because you're -- on the computer

 1  screen, but if you can't see it, I'm holding up what I've

 2  marked as Exhibit 1 for Ollie's I'll represent to you it's a

 3  printout from Dollar General's website of (indiscernible) and

 4  I have 3 items.

 5          MR. YOUNG:  Can I -- I'm sorry to interrupt you,

 6  Counsel.

 7          But Your Honor, if I can drop this into the chat

 8  feature, so he can --

 9          MR. LUCIAN:  That would be great.

10          MR. YOUNG:  -- Mr. Webb can pull this up.  I don't

11  know if I can do that or the clerk can.

12          THE COURT:  Can you share screen?

13      (Court and court personnel confer)

14          MR. YOUNG:  I'm happy to share screen for opposing

15  --

16          THE COURT:  Okay.  That's very kind of you, Mr.

17  Young.  Okay.  You should be able to share screen now, sir.

18          MR. LUCIAN:  Those in attendance are waiting with

19  bated breath Your Honor (indiscernible)

20  BY MR. LUCIAN:

21  Q    Mr. Webb, can you see what is on the screen?

22  A    I can.

23  Q    This is an Air Flex all black, pedestal, oscillating

24  fan.  Do you see that?

25  A    I do.

1  Q    Does it surprise you that Dollar General sells an

2  oscillating fan?

3  Q    No, not completely.  No.

4          MR. LUCIAN:  Does it -- counsel could maybe --

5  Q    Does it surprise you that they sell an item that's

6  reflected on here for $27?

7          MR. YOUNG:  I'm going to -- I'm going to object to

8  relevance.  I don't know if the surprise -- to counsel's

9  earlier point, this is -- we've stipulated to its admittance,

10  it's speaks for itself.  I don't, you know --

11          MR. LUCIAN:  Well, Your Honor, he's testified that

12  -- his understanding of the distinction between a close-out

13  store and a dollar store, and so I think this is relevant to

14  examine briefly about his understanding and what facts he

15  considered in his of opinion distinction between the – I just

16  have like two more questions.

17          THE COURT:  I'll allow it, but yeah, keep it --

18  BY MR. LUCIAN:

19  Q    So does it surprise you, sir, that they sell an item

20  that costs $27?

21  A    Somewhat, yeah.

22          MR. LUCIAN:  Okay.  Could you -- Counsel, could

23  you kindly scroll down to the next one?  Thank you.

24  BY MR. LUCIAN:

25  Q    Here we have the second of three items:

1        A Bestway OGO steel pro pool, nine foot, for $75.  Do

2   you see that?

3   A    I do.

4   Q    Does it surprise you that Dollar General, a dollar

5   store, you testified to, sells an item, a pool, for $75?

6   A    Again, yes, it does.

7            MR. LUCIAN:  And please scroll down one more page.

8   Q    The third and final item is an electronics item, a blue

9   tooth powered speaker system for $40.  Do you see that?

10  A    Yes.

11  Q    Does it surprise you that a dollar store sells

12  electronics that cost $40?

13  A    Again, yes, a little bit.

14  Q    Thank you.  Counsel thank you for doing that I

15  appreciate that.

16       Just a few more questions for you, Mr. Webb.

17       Are you -- do you have any knowledge of how the

18  industry, the dollar discount, closeout industry groups

19  stores together?

20  A    I -- I can't say that -- that I do specifically, no.

21  Q    Would it surprise you if Ollie's was grouped with Dollar

22  General by industry analyst?

23  A    Yes, it would.

24            MR. LUCIAN:  Your Honor, may I approach with what

25  I'll mark as Exhibit 2?

1          MR. YOUNG:  Your --

2          MR. LUCIAN:  He can raise the objection

3    (indiscernible)

4          MR. YOUNG:  Well --

5          MR. LUCIAN:  Counsel, for the record, this is the

6    Bloomberg article (indiscernible) --

7          MR. YOUNG:  Yeah, I'm going to --

8          MR. LUCIAN:  -- (indiscernible)

9          MR. YOUNG:  I'm going to object to this, Your

10   Honor, as hearsay.  It's being offered by a declarant for the

11   matter -- truth of the matter asserted, who's not even here.

12          Moreover, it wasn't provided in advance.  I've had

13   no opportunity to really digest this, nor has the witness.

14   And he just conceded the point that he didn't have an

15   understanding.  So I'm going to object to allowing either of

16   these news articles in.

17          The declarant is not here to talk about it and we

18   haven't presented Mr. Webb as an expert in these matters on

19   dollar stores.  We've talked about as they were used in a

20   lease created more than ten years ago.

21          MR. LUCIAN:  Your Honor, first, I'm not moving

22   their admission I haven't done yet.  That objection is

23   premature. Second -- he's testified that his lay opinion

24   understanding of the distinction between the two and I'm

25   entitled to impeach him on that by asking him questions about

1 | documents that are in front of them. Your Honor determines
2 | the weight of that.  But I have not asked to move this into
3 | evidence.  I can hand him my pen and ask him a question about
4 | (indiscernible) for impeachment purposes.  And it goes to his
5 | understanding, which is the opinion that he's (indiscernible)
6 | MR. YOUNG:  This is an unauthenticated printout
7 | from who knows where without the authors present.  I'm going
8 | to maintain my objection, Your Honor.
9 | THE COURT:  Yeah, I'm going to sustain the
10 | objection.
11 | MR. LUCIAN:  All right.  Then I'll move on.
12 | BY MR. LUCIAN:
13 | Q    Mr. Webb, then, to be clear, if industry analysts group
14 | Ollie's with Dollar General, would you agree or disagree that
15 | that's an appropriate grouping?
16 | A    In certain aspects, possibly.
17 | MR. LUCIAN:  Nothing further, Your Honor.
18 | THE COURT:  Thank you.
19 | Any redirect, Mr. Young?
20 | MR. YOUNG:  Yeah, just very briefly, Your Honor,
21 | since the questions that were asked regarded my witness'
22 | understanding, Mr. Webb's understanding of what a "dollar
23 | store" means.
24 | REDIRECT EXAMINATION
25 | BY MR. YOUNG:

1  Q    I would just ask you this:  You've -- you were familiar

2  with "dollar stores" in or around 2009, as the term is used

3  in your experience with the lease.  Were you familiar with

4  how that term was used in 2009?

5  A    Yes.

6  Q    And what's your understanding of what has happened with

7  respect to dollar stores over the course of, you know, the

8  last ten or more years, in terms of pricing, if I need to be

9  more specific?

10 A    Well, I -- I think the overall economy and so forth has

11 expanded and -- and grown and gotten more expensive, to where

12 they cannot necessarily sell their items for a dollar anymore

13 and make a profit.

14         MR. LUCIAN:  Your Honor --

15 Q    And the --

16         MR. LUCIAN:  -- move to strike that testimony for

17 lack of foundation. He's a real estate management executive,

18 he's not a financial analyst and couldn't answer questions

19 about the industry when I crossed him.

20         MR. YOUNG:  Your Honor, I just asked what his

21 personal understanding was.  You can give it the weight that

22 you desire to.

23         THE COURT:  I'm going to sustain.

24         MR. YOUNG:  Fair enough.  Thank you, Your Honor.

25         THE COURT:  Thank you.

1          THE WITNESS:  Am I able to say anything more?

2          MR. LUCIAN:  No questions asked your honor

3 (Indiscernible)

4          THE COURT:  No.

5          MR. YOUNG:  Well, I haven't passed the witness, so

6 ...

7 BY MR. YOUNG:

8 Q    Based -- did you personally go into a Dollar General

9 store or a similar store in or around 2009?

10 A    I -- I most likely did, yeah, but I can't remember

11 specifically.

12 Q    And in or around that time, were, generally, items

13 priced at around a dollar or a couple of bucks?

14         MR. LUCIAN:  Objection.  He's testified he can't

15 remember.  This is most likely (indiscernible) speculation,

16 Your Honor (indiscernible)

17         MR. YOUNG:  If he can remember, he remembers; if

18 he can't, he can't.

19         THE WITNESS:  That's what dollar stores were known

20 for, as to be priced -- have prices on a majority of their

21 merchandise at a buck or -- or a little over.

22         MR. YOUNG:  Pass the witness, Your Honor.

23         THE COURT:  Okay.  No --

24         MR. LUCIAN:  (Indiscernible)

25         THE COURT:  Okay.  Okay.

1     (Witness excused)

2          THE COURT:  I'll hear argument.

3          MR. YOUNG:  Well, I would like to call --

4          THE COURT:  Oh, I'm sorry, Mr. Young.

5          MR. YOUNG:  I would like to call -- and I guess,

6   with respect to Ollie's witness list, they didn't proffer a

7   witness with respect to the statement of assurances.  I can

8   speak to those as they stand, since they've already been

9   entered.  I don't need to lay any foundation.

10          Well, I'm sorry.  I was looking at the witness

11  list and there's no one here to really speak to the statement

12  of assurances.  But I'll just speak to that in the record, as

13  it's stated in the record.

14          THE COURT:  Okay.

15          MR. YOUNG:  So now we're moving to argument.

16  Would you like me to proceed, Your Honor?

17          THE COURT:  Yes.  Bear with me one second.  Okay.

18          MR. YOUNG:  American National's objection before

19  the Court today embodies the very reason that Congress

20  created the shopping center exception under Section 365(b)(3)

21  and under 365(b)(4) of the Bankruptcy Code.

22          An assignment of the 99 Cent Store lease in the

23  Montgomery Plaza shopping center is in direct violation to

24  the Big Lots lease, another tenant in the shopping center;

25  and should, therefore, be foreclosed as a matter of law under

1 | 365(b)(3) of the Bankruptcy Code.

2 | American National, as owner and landlord, as was

3 | testified today, has worked to build a very specific tenant

4 | mix and maintain that mix of commercial businesses.  The

5 | leases in the Montgomery Shopping Center Plaza were

6 | negotiated, agreed upon, the specific terms of those leases,

7 | to include competing business restriction.  And consideration

8 | agreed were based, among other things, on those terms.

9 | To allow this assignment essentially allows a

10 | competing store to come in an existing shopping center and

11 | oust another tenant to the detriment of my client.  This is

12 | precisely why 365(b)(3) was enacted.

13 | As this Court, in In Re Three A's Holdings, LLC,

14 | 2007 WL 831662 (Bankr. D. Del.) stated, citing a Third

15 | Circuit holding:

16 | "The legislative intent behind the so-called

17 | 'Shopping Center Amendments' is clear:  to protect the rights

18 | of lessors and the center's other tenants.  Congress

19 | recognized that unlike the usual situation where a lease

20 | assignment affects only the lessor, an assignment of a

21 | shopping center lease to an outside party can have a

22 | significant detrimental impact on others, in particular the

23 | center's other tenants."

24 | That's exactly, Your Honor, what's happening here.

25 | Certainly, American National understands the

1  import of the sale to the estate.  But the legislative

2  history here is quite clear that -- and again, this is citing

3  another Delaware decision in the third -- or actually, a

4  Third Circuit, In Re Joshua Slocum Ltd., that recognizes that

5  the tenant mix a shopping center may be as important to the

6  lessor as the actual promised rental payments because certain

7  mixes will attract higher patronage of the stores in the

8  center and, thus, a higher rental for the landlord from those

9  stores that are subject to a percentage of gross receipts

10 rental agreement.

11      It is undisputed that Montgomery Plaza Shopping

12 Center is, indeed, under 365(b)(3) and (4), a shopping

13 center.  The question then becomes whether or not it violates

14 the Big Lots lease tenant and, frankly, the 99 Cent lease

15 tenant.

16      That takes us to a question of contractual

17 interpretation.  The contract provides that Texas substantive

18 law applies in this instance, Your Honor.

19      And I would ask that my co-counsel Simon Fraser

20 proffer to you and to debtors' counsel and, I guess, counsel

21 for Ollie's, as well, the case Coker v. Coker from the Texas

22 Supreme Court, dated 1983.  And I'd give him an opportunity

23 to do that before proceeding, Your Honor.

24      THE COURT:  Okay.

25      (Pause in proceedings)

1          MR. FRASER:  Would Your Honor like a copy?

2          THE COURT:  Yes, please.  Thank you.  Thank you.

3          MR. YOUNG:  Your Honor, and I would direct counsel

4   and yourself to Page 3 of Coker v. Coker, as reflected on the

5   document.  And I'll proceed at your -- when you're ready for

6   me to.

7          THE COURT:  Okay.

8          MR. YOUNG:  All right.  I'm in the first --

9          THE COURT:  Well, excuse me --

10          MR. YOUNG:  -- keynote section.

11          THE COURT:  -- one second.  Do you have any extra

12   copies of this opinion?

13          MR. FRASER:  I had, I think, seven copies, and I

14   handed them all out.

15          THE COURT:  Could you -- I was going to say, could

16   you share -- thank you.

17          UNIDENTIFIED:  Is one okay, Your Honor?

18          THE COURT:  Thank you.

19       (Participants confer)

20          THE COURT:  Thank you.

21          Okay, Mr. Young.

22          MR. YOUNG:  All right.  Thank you, Your Honor.

23          On Page 3, in the keynotes one, two, three, Texas

24   Supreme Court law is clear:

25          "In construing a written contract, the primary

1  concern of the court is to ascertain the true intentions of

2  the parties as expressed in the instrument."

3          To achieve -- moving on to Page 4:

4          "To achieve this objective, courts should examine

5  and consider the entire writing" --

6          Emphasis added.

7          "-- in an effort to harmonize and give effect to

8  all the provisions of the contract so that none will be

9  rendered meaningless."

10         It then proceeds:

11         "No single provision taken alone will be given

12 controlling effect; rather, all the provisions must be

13 considered with reference to the whole instrument."

14         So, if we take the argument of debtors, we would

15 render superfluous and meaningless an entire section of the

16 Big Lots lease, the 99 Cent exception.  If we take their

17 reading as stated, there is no need for a 99 Cent lease

18 exception because it would have already been provided for by

19 existing tenants.

20         It's very clear -- and before I proceed, I want to

21 -- I want to direct the Court's attention to Exhibit 3, Page

22 8.  That's the Big Lots lease.

23     (Pause in proceedings)

24         MR. YOUNG:  And this is where the language comes

25 in, Your Honor.  It states -- and this is the contention of

1  debtors with respect to this language, "So long as tenant is"

2  -- "as provided above" --

3        THE COURT:  But Mr. Young --

4        MR. YOUNG:  "-- except for tenants" --

5        THE COURT:  Mr. Young, you were cut off while you

6  were speaking. It froze. So, you need to start at so you need

7  to start at "so long again."

8        MR. YOUNG:  Okay.  Did you hear --

9        THE COURT:  I heard so long and then you froze.

10       MR. YOUNG:  Okay.  Yes, Your Honor.  I will

11 continue.  So, I am reading from page 8 of the Big Lots lease

12 which is admitted as Exhibit 3:

13       "So long as tenant is open and operating its

14 business on the premise for the initial permitted use, as

15 provided above, except for tenants and their successors and

16 assigns open and operating for business in the shopping

17 center as of the effective date of this lease no dollar store

18 operation in excess of 10,000 square feet of floor area or

19 closeout store competing business may be permitted in the

20 shopping center during the original term of its lease or any

21 option terms or extensions thereof."

22       The debtors would contend that this provision

23 except of tenants and their successors and assigns will

24 permit the assignment of anyone from 99 Cents store because

25 they were open and operating as of the date in 2009 when this

1  lease was formed; however, that would render meaningless the

2  entire reason to have a 99 Cents exception.  Moreover, it

3  doesn't matter because this next succeeding sentence trumps

4  this sentence.

5        I will continue: In addition to the foregoing, in

6  addition to, so no matter what is stated before, whether it's

7  a closeout store or a dollar store in excess of 10,000 square

8  feet in addition to the foregoing whether or not its except

9  for tenants a competing business shall include without

10 limitation.  In other words, without any limitations provided

11 by the proceeding section, the foregoing, the following

12 business operations. Then it enumerates a number of those

13 which includes expressly Ollie's Bargain Outlet.

14       So, you have, one, its undisputed that Ollie's was

15 not a tenant in September of 2009. Ollie's was not a

16 successor and assign of a tenant in 2009 and mind you, during

17 that time there were other assignees of other tenants that

18 that language is seeking to capture.  So, in addition to

19 without limitation Ollie's Bargain Outlet.  It is expressly

20 there.

21       Then we continue: "Notwithstanding the foregoing

22 there is a 99 Cents exception."  So, they do acknowledge that

23 you have a closeout operation and you have a dollar store

24 operation.  If I might, if you turn to page 9 of this

25 agreement, and I will come back to this and you will see why

1   I am going in this order, I hope, at the top of page 9 of the

2   Big Lots lease, the very first paragraph that starts

3   "Therefore, purposes of clarification."

4          "For purposes of clarification a dollar store

5   shall include by way of illustrative example without

6   limitation the following business operations, 99 Cents only,

7   Dollar Tree, and Dollar General."

8          Then it goes onto describe: "Dollar store shall

9   not be deemed a competing business unless that dollar store

10  occupies more then 10,000 square feet of floor area of the

11  shopping except for the 99 Cents exception."

12         Then it goes on later in that paragraph and it

13  states: "Further, a closeout store shall not include any

14  branded or private label fashion apparel" and then it goes on

15  to talk further about closeout stores.  So, clearly going

16  back to page 8, the lease was intended to describe two

17  distinct types of stores, dollar stores and closeout stores.

18  Then there was a second distinction of dollar stores in

19  excess of 10,000 square feet which takes us to the 99 Cents

20  exception which follows that same paragraph on page 8.

21         If 99 Cents is premised to a dollar store or

22  vacates its premises and landlord subsequently leases such

23  premises to a dollar store, replacement dollar store tenant

24  that any such event, such assignee, sublease, or replacement

25  dollar store tenant shall not be deemed a competing business

1  notwithstanding the fact that such premises are being

2  operated for the purpose of a dollar store and occupy more

3  then 10,000 square feet of floor are of the shopping center,

4  the 99 Cents exception.

5          There would be no point for a 99 Cents exception

6  fi we read this document the way debtor suggests.  In fact,

7  the controlling language here and the dispositive language is

8  the express not permitted, Ollie's Bargain Outlet. That is

9  the controlling. In addition to the foregoing its very clear,

10 its saying no matter what we just said this is included

11 without limitation.

12         Your Honor, as you heard testimony, my client

13 views that they will be in breach of this lease if this

14 assignment is, indeed, made.  They have testified that it

15 will disrupt the mix of tenants that are currently there

16 under 3643(d) and if you look further into this same Section

17 4 under use and operations of the Big Lots lease, what

18 happens when they are in breach is that Big Lots can remain

19 in place for up to a year paying half of the rent.

20         So, if the Court ultimately is inclined to say

21 that we have misinterpreted this contract we would ask for a

22 finding of fact and a conclusion of law from this Court that

23 my client is not in breach under these terms. Now we are not

24 conceding because we do believe that, as I have stated, that

25 in addition to is quite clear, but we would ask that the

1  Court make that rendering because, otherwise, American

2  National is going to bear the brunt of this assignment

3  effectively without recourse.

4       Sorry, Your Honor, I'm just looking through my

5  notes real quickly.

6       THE COURT:  Take your time.

7       MR. YOUNG:  I would also offer, under Texas -- and

8  I apologize, I don't have a copy of this, but I know that

9  debtors have filed a request for leave. If that is granted we

10 would ask that we have an opportunity -- we will be filing a

11 request for leave to either amend our objection to address

12 those issues or to file a response because we didn't have an

13 opportunity that was, obviously, before the hearing to

14 respond.

15      Under O'Connor v. O'Connor, 694 S.W. 2d 152 (1985)

16 Texas Appellate Court, generally where there are general

17 special provisions in a contract relating to the same thing

18 the special provisions control.  Here, you have express

19 language saying in addition to whatever else Ollie's is not

20 permitted.  So, therefore, American National believes its in

21 breach and, therefore, is opposed to the assignment of this

22 lease to Ollie's under 365(b)(3) and 365(b)(4).

23      Thank you, Your Honor.

24      THE COURT:  Mr. Young, if this

25      UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor. I

1 think the phone might still be turned off if I am not

2 mistaken.  I think Zoom is (indiscernible).

3          THE COURT:  My question is assume that the Court

4 interprets the Big Lots lease to contradict Section 365,

5 tenant mix provision.  Which controls, the statute or the

6 contractual language?

7          MR. YOUNG:  I don't have case law or authority to

8 provide you, Your Honor, on this particular question. I am

9 happy to provide additional briefing, but I would say that

10 its an equitable remedy and so if you were to find under

11 365(b)(4) that it would supersede the contractual language,

12 because that is what its intended to do, its irrespective of

13 the contract if this is upsetting this balance.

14          Now, obviously, there is limits to that, I would

15 imagine, but I would think it would control.  We also, and I

16 know you didn't ask this question, Your Honor, but clearly we

17 view it to violate 365(b)(3) as well. So, we don't -- you

18 know, we think they are both hand in glove.

19          THE COURT:  Thank you.

20          MR. LEBLANC:  Good morning, Your Honor.  Andrew

21 Leblanc again on behalf of 99 Cents store.

22          Your Honor, I think, and I will concede that this

23 is a first for me, but I fundamentally disagree with the

24 party that they are breaching the contract. I think they are

25 just misreading the very contractual language that they just

1    walked you through. I will try to do so as well, Your Honor.

2            I will -- let me just begin, I haven't seen the

3    O'Connor v. O'Connor.  It wasn't among the note cases cited

4    in their objection, but O'Connor v. O'Connor itself, if you

5    just read on in the very case that he handed to you it says

6    after the -- it's the very next passage that says no single

7    provision taken alone will be giving controlling effect. The

8    next sentence says in harmonizing these provisions, terms

9    stated earlier in agreement must be favored over subsequent

10   terms.

11           So, let me use that as the jumping off point to

12   make the point, Your Honor, that I think the analysis here

13   begins and ends with the first sentence of the provision that

14   we have all been looking at. I am going to -- its -- this is

15   on page 8 of their Exhibit 3, the Big Lots lease.  Just to

16   reinforce, Your Honor, what I had said before, I think

17   counsel's right, it wasn't from 1984.  There is a reference

18   to 1984 in the 99 Cents only lease.  The lease looks like its

19   from 2005, but whenever it was it predates the Big Lots. So,

20   99 Cents store was a tenant in this -- operating under their

21   lease prior to Big Lots ever coming into existence as a

22   tenant.

23           What it says is, and this is the part that I

24   struggle with even understanding argument.  It says so long

25   as tenant is open and operating that is Big Lots and --

1         THE COURT:  I'm sorry.  Let me find the right

2 spot.

3         MR. LEBLANC:  Sure.  Your Honor, this is the

4 second paragraph that's on their Exhibit 3, second paragraph

5 on page 8 under use and operation.  Page 9 of the PDF, page 8

6 internally.  And, Your Honor, I will just tell you that I'm

7 actually using from our reply brief because the print is a

8 little bit bigger and my eyes are a little bit older.

9         So, what it says is as long as tenant is open and

10 operating its business in the devised premise for the initial

11 permitted use, as provided above, except for tenants and

12 their successors and assigns.  I am going to pause there but

13 it goes on to say open and operating for business in the

14 shopping center as of the effective date of this lease.  Then

15 it goes on from there.

16         To me, Your Honor, I think what he elided over was

17 the notion of successors and assigns. The suggestion is that

18 successors and assigns, as using that parenthetical, has to

19 be a successor and assign open and operating for business in

20 the shopping center as of the effective date of this lease. I

21 just think that is fundamentally wrong.  And I would

22 encourage them, if there is a litigation with Big Lots over

23 it, I would encourage them to adopt this argument to make the

24 point that if you read it the way that they are then you are

25 rendering surplusage, the parenthetical, that says and their

1  successors and assigns. Why is that? Because if we were

2  sitting here and -- if we had assigned the lease to Ollie's

3  in 2008 the tenant operating in the space in 2009, when the

4  Big Lots lease was executed, would be Ollie's. So, Ollie's

5  would be the tenant in that sentence.

6           So, the and their successors and assigns would be

7  rendered surplusage. Had Ollie's become a successor to 99

8  Cents prior to the entry into the Big Lots lease and Ollie's

9  would be the successor -- would be the tenant and, therefore,

10 would be captured by this language. Your Honor, I think

11 they're misreading it and I think the way you harmonize this

12 and the 99 Cents exception is the following. What the

13 counterparties to this agreement -- and the counterparties to

14 this lease do not include 99 Cents to be clear and do not

15 include Ollie's. The counterparties to the lease that we are

16 looking at are Big Lots and the predecessor interest to

17 American National.

18          What they agreed is that if the lease is turned

19 back to the landlord the landlord will not go out and lease

20 it to another similar party. That's the point, Your Honor.

21 They didn't put any limitation and I think the better reading

22 of this agreement is that they didn't put any limitation on

23 the ability of 99 Cents to assign it and particularly didn't

24 do so in a bankruptcy as we're trying to do here. Instead,

25 they made clear that if this particular lease is turned back

1    to the landlord, the landlord is constrained.

2            So, in other words, the counterparty to that

3    contract is constrained.  And, Your Honor, I think that is

4    what -- I think -- to me, that is the better reading of this

5    language and this is the proceeding to use the

6    (indiscernible) language.  This comes earlier in the

7    contract.  Therefore, Your Honor, they are not in breach of

8    the Big Lots lease because the assignment that we are talking

9    about is by 99 Cents store to Ollie's. 99 Cents store is the

10   tenant and if you go through the language, Your Honor, what

11   it says is its -- there's a timing component of it but the 99

12   Cents lease has been extended through 2035.  So, as long as

13   its provided for through the term of the lease or any

14   extensions then they are not in breach of that agreement.

15           I think that is the answer to the question. The

16   focus on -- I am struggling to understand the focus on the

17   phrase in addition to the foregoing, which comes in the next

18   sentence because clearly in addition to the foregoing a

19   convening business challenge without limitation is an effort

20   to add words or more definition to what constitutes a

21   competing business.  It doesn't add to the prohibition. It

22   doesn't trump the language that comes before it.  So, I just

23   think, Your Honor, that they're misreading the contract.

24           THE COURT:  What do you think is the purpose for

25   the addition sentence?

1          MR. LEBLANC:  Your Honor, it adds definition to

2    what constitutes a competing business.  That the landlord --

3    again, this is what I think is critical, that the landlord

4    could not lease the space to subsequent to 99 Cents returning

5    its lease. It doesn't affect what 99 Cents can do because 99

6    Cents is free to assign its lease. This doesn't prohibit 99

7    Cents from assigning its lease because 99 Cents was a tenant

8    at the time that the Big Lots lease was entered into.  What

9    it precludes is the landlord, its counterparty, from if it

10   gets back the space from using that space in a way that is

11   inconsistent with this. It adds definition to what would

12   constitute a non-permitted use meaning who put a least to it.

13   That is a definition to what constitutes a competing

14   business.

15          I am going to leave to Ollie's counsel the

16   argument with respect to whether or not they constitute a

17   dollar store. I will leave that argument entirely to them

18   because I don't think that from our purposes, Your Honor, I

19   don't think you get past the first sentence.  The first

20   sentence is the one that makes clear that the tenants, we,

21   the 99 Cents store, can assign this lease and as long as we

22   are the ones assigning the lease then it doesn't implicate

23   the Big Lots lease in any respect; therefore, there is no

24   breach of the Big Lots lease.

25          Again, I would suggest that they make this

1 argument if and when Big Lots contends there is a breach of

2 this agreement. Obviously, Your Honor, the answer to the

3 Court's question we believe the statutory language trumps the

4 contractual language and we think this lease is critical for

5 us to assume -- to assign, rather, Your Honor, under the

6 terms of the stalking horse bid that is before the Court and

7 we simply think that they are misreading the contract and

8 arguing that it's a breach. We think if Your Honor simply

9 orders it and says your read of the contract is that it's in

10 compliance because you complied with the terms of the

11 contract, I don't know where -- I don't know what the issue

12 that they could possibly contend with.

13 They will have -- I'm sorry, if Big Lots wants to

14 come back and make that argument they can, but, Your Honor,

15 we don't think that is any issue for this Court and we

16 should, both Ollie's and we, should be able to move on with

17 Ollie's having paid us the (indiscernible) and with us

18 assigning them the lease.

19 Your Honor, I do -- I will repeat what I said at

20 the outset. We are, just for the sake of good order, because

21 this is the only one that is objected to, going to ask the

22 Court at the end to enter a separate order with respect to

23 this lease. We have talked with counsel to Ollie's and we

24 have agree that we are going to allocate a portion of the

25 purchase price to this particular lease. So, this lease will

1  have a $600,000 purchase price.

2          The rest of them will have the balance of the

3  purchase price, so the $14 million for the rest of them.  I

4  just wanted to put that on the record so Your Honor is aware

5  because we just want to make sure that for the sake of good

6  order that this lease is not tied up with -- that the

7  assumption and assignment and the sale of the other

8  properties are not tied up with this lease.

9          Your Honor, I am happy to answer any questions,

10  but I know Ollie's counsel is going to make their argument

11  with respect to their characterization, but happy to answer

12  any questions the Court may have.

13          MR. YOUNG:  Your Honor, I would like to respond to

14  counsel prior to Ollie's, just to keep these arguments if

15  possible.

16          MR. LEBLANC:  Your Honor, I suspect that Ollie's

17  is also going to argue --

18          THE COURT:  Yeah, I was going to say, Mr. Young,

19  you obviously will get the last word.  I'd like to hear what

20  Ollie's has to say, as well, so that you can address all of

21  it at once.

22          MR. LEBLANC:  And, Your Honor, with respect to it

23  being the last word, it is our motion.  I know it's their

24  objection, and I understood why Your Honor wanted to hear

25  from them first, but I do think it's our motion.

1          THE COURT:  Well, we'll see.  I may not want to

2     hear from any of you --

3          MR. LEBLANC:  Understood, Your Honor.

4          THE COURT:  -- so I appreciate that, but let's see

5     where we go.

6          MR. LUCIAN:  Thank you, John Lucian with Blank

7     Rome, for Ollie's.  For the sake of efficiency, I thought Mr.

8     LeBlanc made most of the points that we would make, so we'll

9     just adopt and join in his argument.

10          But I will address then solely, Your Honor, that

11     the issue of replacement dollar store tenant.  And of course,

12     that only comes up if Your Honor disagrees with the analysis

13     of the first sentence of the second paragraph before and

14     about what that parenthetical means.

15          But even if you were to, for argument purposes,

16     accept the landlord's interpretation of that, Your Honor,

17     there's still no breach here because Ollie's would meet the

18     definition.  There is an exception to the competing business,

19     Your Honor, I don't know a dozen lines down where it's says

20     notwithstanding -- so we have the first sentence that's so

21     long as, and the second sentence, which counsel focused on

22     the in addition to.

23          But then we have to look at the third sentence,

24     notwithstanding the foregoing.  And that sentence allows,

25     right, the assignment of a lease or sublease "to a dollar

1   store", to a Dollar or (inaudible) vacate its premises and

2   landlord subsequently leases such premises to a dollar store,

3   parens and quote, the replacement dollar store tenant.

4           So this is really talking about the landlord's

5   rights in the event that the debtor were to go dark and

6   leave, which is not the case here, Your Honor.

7           But again, even if somehow you agree with their

8   contorted interpretation of that, you still have this

9   exception for the replacement dollar store tenant.  It

10   doesn't define what a dollar store is.

11           So if we go to the next page, internal page nine,

12   PDF page ten, first full paragraph says, for purposes of

13   clarification, a dollar store shall include, by way of

14   illustrative example, without limitation -- important -- the

15   following business operations: one, 99 Cents only; two,

16   Dollar Tree; and three, Dollar General.

17           Doesn't provide any definition.  It doesn't say

18   dollar amount of sale, their items, what they are or what

19   they're not.  (Inaudible) counsel goes on and really

20   highlights the second half of that paragraph about the

21   closeout store definition.

22           But Your Honor, that's completely unrelated.

23   We'll look at that now.  It says further, "a closeout store"

24   shall not include any branded or private label fashion

25   apparel, including footwear, outlet closeout stores, such

1  stores to include, by way of illustrative example, without

2  limitation the following business operations:  Talbot's

3  Outlet, Nine West outlet, Nordstrom Rack, TJ Maxx, and Ross

4  Dress For Less.

5          This is a completely unrelated issue to a discount

6  dollar type store, Your Honor.  That's about outlet selling

7  clothes.  It then ends the paragraph with the parties

8  acknowledge and agree that branded or private label fashion

9  apparel, including footwear, outlet closeout stores, shall

10 not be deemed a competing business.

11         So that second half of that paragraph is talking

12 about clothing outlet stores not being a violation if a

13 Talbot's were to move in.  Importantly, Your Honor, nowhere

14 in there does it say a closeout store is prohibited or what

15 the definition of a closeout store even is.

16         So the landlord is drawing a distinction without a

17 difference in this paragraph because it doesn't say thou

18 shalt not lease to this type of entity.  Further, Your Honor,

19 the limited evidence we were able to get in today shows that

20 with Dollar General is not a store that sells things for

21 $0.99.  They sell things for $70.  They sell electronics,

22 they sell outdoor tools, they sell appliances, fans, those

23 sorts of things.  No wonder the industry groups them

24 together.  Thanks, Your Honor.

25             THE COURT:  Mr. Young.

1          MR. YOUNG:  Your Honor, I'll try to be quite

2    brief.  I'm going to address Ollie's points first.  It's a

3    fundamental misreading.  It also seeks to displace the entire

4    use provisions and the argument under 365 part D if we read

5    it his way.

6          There's clearly a distinction between closeout

7    stores, and as was admitted, Exhibit 4, Ollie's own website

8    holds itself out as a closeout store.  That's why it's

9    competing business with Big Lots.  That's why it was

10   expressly put in there.

11         In fact, it states here, Ollie's -- quoting from

12   this exhibit -- Ollie's is America's largest retailer of

13   closeout merchandise and excess inventory.  Moreover, Your

14   Honor, the statement of assurances reference closed out

15   store, used that language in those terms more than 37 times.

16   Not once did it describe itself as a dollar store.

17         I think we can dance around about the lack of

18   clarity as to dollar store and closeout, but there's clearly

19   a distinction.  There's clearly a distinction between

20   closeout store and dollar store and dollar store over 10,000

21   square feet.  But I'm shifting now to debtor's argument.

22         Debtor's argument wants us -- first of all, it's a

23   misreading of Coker v. Coker.  Coker v. Coker was talking

24   about a display section and earlier in the document of

25   paragraph five followed by paragraph eight later down.

1        That language comes into play whenever you've

2   already made a determination.  And I can provide an

3   additional briefing on canons of construction in Texas with

4   respect to when things are determined ambiguous or not and

5   when would use that doctrine.

6        But the point is, you don't need to here, because

7   on its plain terms, it says in addition to -- Meriam

8   Dictionary describes addition, a part added to the foregoing,

9   foregoing, the listed mention without limitation.  Without

10  any limitation.  We don't care if it's a closeout store, a

11  dollar store, whatever.  Ollie's will not be permitted here.

12  That's unequivocal.

13       And the misreading of -- the fundamental

14  misreading of debtor's counsel on this is they want you to

15  focus on that -- say that it renders superfluous except for

16  tenants.  Well, there were other tenants besides the 99 Cents

17  Store.  That language is not superfluous.

18       We have specific prevailing over general because

19  otherwise you're reading out the entire 99 Cents exception.

20  Why would we need a 99 Cents exception?  Big Lots came in,

21  they knew 99 Cents was there.  They saw this language.  Hey,

22  99 Cents can assign to everybody.

23       Well, that's not the case.  Otherwise you wouldn't

24  need a 99 Cents exception.  It was understood that you could

25  have a dollar store.  You could even have a dollar store over

1   10,000 square feet.  But you couldn't have more than one.

2   And you couldn't have a closeout store.  And that's secondary

3   to the fact that without limitation, Ollie's Bargain Outlet

4   is in that mix.

5           So, Your Honor, while they repeatedly told us that

6   American National is misreading the contract, at best, we've

7   got an ambiguity here because their reading would simply

8   negate the need for a 99 Cents exception.

9           THE COURT:  What do you make of the debtor's

10  counsel's argument with respect to the first sentence, the so

11  long as sentence and the effective date of the lease?

12          MR. YOUNG:  You know, Your Honor, there --

13  frequently tenants sublet or assign and make assignments.  Is

14  that the argument you're referring to, Your Honor?

15          THE COURT:  Yes.

16          MR. YOUNG:  Frequently assignments are made where

17  the tenant, by matter of law, is the paramount or holder of

18  that leasehold interest and the successors and assigns that

19  were present at that time, maybe somebody other than who

20  still holds that tenancy.

21          So I think it was clear that that language is

22  referring to tenants and their successors and assigns at that

23  time.  You know, by analogy, not perfect, but, for example,

24  Weingarten, you know, was the party here.  But American

25  National now holds that interest.

1          Our thought would be there may be an existing

2     tenant that, we'll just use Super Ten here -- well, it

3     obviously wouldn't be Super Ten.  That's expressly excluded.

4     I'll use Dollar General.

5          Dollar General may have been present.  They

6     already knew they were there, but they had assigned it to,

7     let's say, another dollar store.  You know, dollar store.

8     I'll just call it Dollar Store.  They were there instead, but

9     it's still the tenant holder.  Maybe they had sublet.  And

10    the tenant holder was still Dollar Store.

11         So I don't think it -- I don't think it renders

12    that language superfluous.  And again, to read it that way

13    would render the 99 Cents exception entirely superfluous.

14    There'd be no need for that language.  And to read it the way

15    Ollie's counsel suggests would require no distinction between

16    closeout stores and dollar stores.

17              THE COURT:  Thank you, Mr. Young.

18              MR. LEBLANC:  Your Honor, I think where counsel is

19    struggling is because the argument is just wrong.  If you

20    look at this language, except for tenants and their

21    successors and assigns, he even said it.  If you see there's

22    a Dollar General there, that's the tenant.  The tenant is not

23    a defined term.  There's a defined term tenant that begins so

24    long as tenant defined term.  That is Big Lots.

25         When you get subsequent to the except for tenants,

1  that is an undefined term.  And to be clear, a sublease is

2  not an assignment.  That's a sublease.  That's something

3  different.  So what does this permit?  So tenants and their

4  successors and assigns.

5          And Your Honor, we were a tenant at the time -- we

6  were open and operating for business in the shopping center

7  as of the effective date of this lease.  That means that it

8  covers us, and it covers our successors, and it covers our

9  assigns and Ollie's, if Your Honor allows the order to be

10  entered, will be our assignee of that lease.  I think that's

11  crystal clear, Your Honor.

12          Now, let's talk -- the 99 Cents exception.  He

13  says we're rendering that surplusage.  Well, I disagree with

14  that, Your Honor.  The first provision A does deal with a

15  assignments -- assignment leases or subleases of its premises

16  to a dollar store.  That does deal with 99 Cents.  That may

17  be -- that may be something that is unnecessary because you

18  already can assign pursuant to the first paragraph.

19          But that doesn't matter because if you look at the

20  next provision, B, this is what I was talking about, Your

21  Honor.  This is a contract between the landlord and the

22  tenant.  If 99 Cents Only store vacates its premises and the

23  landlord subsequently leases such premises to a dollar store,

24  a replacement dollar store, then in any event.

25          So what it means, Your Honor, what the 99 Cents

1  exception means is there was a tenancy in this building.  I

2  think it's 25,000 square feet, although that's -- I'm not

3  sure that's in the record, but it was an amount that the

4  landlord always had the ability to put a dollar store into,

5  even if we left, and it was the one leasing it.  That doesn't

6  say anything about our ability or any limitation on our

7  ability to lease this to Ollie's in this instance, Your

8  Honor.

9          So I just think it's a misreading of the

10  agreement.  There's no rational reason -- because if you

11  accept the premise that only -- that successors had to be

12  operating -- open and operating the business, and assignees

13  had to be operating the business, then you've rendered that

14  surplusage because they would be tenants at the time.  And

15  that's not the limitation.  That's just a misreading of it.

16          I think the good news for Big Lots -- or I'm sorry

17  for American National, is that we don't believe, and I think

18  Your Honor can find that they're not going to be in breach.

19  That is not violative.  The assignment of this lease does not

20  violate the Big Lots lease.  And I think Your Honor should so

21  find.  Thank you, Your Honor.

22          MR. YOUNG:  Just one quick note.  Counsel still

23  hasn't addressed in addition to.  And you know, you render

24  that superfluous too.  In addition to -- and then it

25  expressly provides.  It doesn't matter what preceded.

1  Whatever you've said, as a competing business, it's fine.

2  But on top of that language, Ollie's is a competing business.

3        Now, I don't -- you know, if contracts were so

4  clear as counsel might suggest, I guess we would be out of

5  the job.  But I just -- you're reading out completely in

6  addition to the forego foregoing.  And I don't -- I think

7  it's very clear that the parties never intended an Ollie's --

8  Big Lots and American National never intended an Ollie's

9  Bargain to go in there, whether it was as a result of an

10 assignment from an existing tenant or not.  They expressly

11 put that in there.

12       And this isn't the case of some non-exhaustive

13 list, you know, in addition to what you said.  This is

14 clearly in addition, no matter what, without limitation,

15 these things are competing businesses.  And Ollie's is named.

16 I don't see how you get around that.  Thank you, Your Honor.

17       THE COURT:  Thank you, Mr. Young.  Yes, please.

18       MR. LEBLANC:  Let me try to step through it very,

19 very slowly.  So, in addition to -- so let's just read more.

20 In addition to the foregoing, a competing business shall

21 include.  Okay, pausing there.  So what is that?  What does

22 the in addition to the foregoing mean?

23       Well, what's in the foregoing?  The foregoing says

24 no dollar store operation in excess of 10,000 square feet if

25 floor area or closeout store.  And that is defined as a

1    defined term, competing business.

2          So in addition to the foregoing, a competing

3    business shall include necessarily means that in addition to

4    the general description of no dollar store operation in

5    excess of 10,000 square feet of floor area or closeout store,

6    that these parties to this agreement are adding some specific

7    names to that list of what constitutes a competing business.

8          I don't think there's any lack of clarity.  The

9    problem for counsel is that makes zero difference in the

10   analysis of this because we are not -- that's not a

11   limitation that applies to us.  The limitation that applies

12   to us -- or I should say that limitation doesn't apply to us

13   because we were a tenant open and operating for business in

14   the shopping center as of the effective date of the lease.

15         If Your Honor permits the assignment of the lease

16   to Ollie's, then they are an assignee of a tenant open and

17   operating for business in the shopping center as of the

18   effective date of this lease.  Therefore, the rest of it

19   doesn't matter.

20         To make that point even clearer, if you go down

21   later, the parties agree, and this is what counsel for

22   Ollie's mentioned, that notwithstanding the foregoing, the

23   parties acknowledge that 99 Cents is an existing tenant in

24   the shopping center whose premises operate, I'm sorry, occupy

25   more than 10,000 square feet.

1        So if they are an assignee of us, then the rest of

2    that first sentence is not implicated.  And that's our point,

3    Your Honor.  And if you read it differently, then you are

4    rendering surplusage, and you are ignoring the parenthetical

5    that says and their successors and assigns.  And that's

6    where, Your Honor, we think it's simply wrong.

7        THE COURT:  You would just read out of the

8    agreement in your analysis, in addition to the foregoing?

9        MR. LEBLANC:  We're not reading it out, Your

10   Honor.  The addition -- look -- the question is what does in

11   addition to the foregoing do?  In addition to the foregoing

12   does not add any words to what is prohibited.  What it adds

13   is it adds names to what constitutes competing businesses.

14   But the question is, and so what does that mean?

15       THE COURT:  It identifies your competing

16   businesses, correct?

17       MR. LEBLANC:  I'm sorry, Your Honor.

18       THE COURT:  And so how do you reconcile that with

19   the first sentence?

20       MR. LEBLANC:  Right, Your Honor, what I would say

21   is that means that if the landlord wanted to lease the space

22   to somebody else, it could not do so if that person was

23   defined as a competing business.

24       So if the landlord wanted to lease this space to

25   Ollie's and the 99 Cents exception did not apply, that's the

1  argument that my colleague made, then the landlord could not

2  do that.

3        The problem with their argument, Your Honor, is

4  the first sentence, the provision that I am so focused on, is

5  an exception to the ability -- to the inability of the

6  landlord to lease it to a competing business.  It says, so

7  long as tenant is open and operating its business in the

8  devised premises for the initial permitted use, that is, so

9  long as Big Lots is there except for tenants, and tenants

10 therefore means 99 Cents store.

11       We all acknowledge 99 Cents store is a tenant open

12 and operating for business in the shopping center as of the

13 effective date -- and their successors and assigns.  We are

14 asking the Court to authorize us to assign it to Ollie's.

15       So that means we fall into the exception that

16 permits a competing business.  There is no preclusion for a

17 competing business when it is an assignee of us for that

18 reason.

19       So what you -- you can't alight over the

20 exception.  And that's the point, Your Honor, is the

21 exception.  It doesn't swallow the rule because, critically,

22 the landlord agreed with its tenant that it could not put a

23 competing business in.  And the in addition to the foregoing

24 language makes crystal clear that if the landlord had -- if

25 we handed this space back to them and the landlord wanted to

1 lease it to Ollie's, they agreed they couldn't do that.

2 Unless, again, Ollie's meet -- if Ollie's meets the 99 Cents

3 exception that comes later, then they can.

4 But because Ollie's is specifically defined there,

5 I think that would be a hard argument for the landlord to

6 make. But it does not preclude us from assigning because we

7 were open and in operation there at the time of the 99 -- of

8 the Big Lots lease. That's our point, Your Honor, is you

9 have to read that exception and all of the words of that

10 exception, and we fit squarely into the exception.

11 MR. YOUNG: Just very briefly, Your Honor.

12 THE COURT: Yes, go ahead, Mr. Young.

13 MR. YOUNG: Counsel -- or debtor's missed the

14 salient point. They're asking you to read out of this

15 essentially three things, and they say this exception

16 excludes them and precludes the enforcement of the second

17 sentence.

18 And I will be the first to say that I don't find

19 most leases crystal clear on anything. But I'll say this.

20 What is clear here is that the parties intended that Ollie's

21 would never be in that shopping center. And that's made

22 clear by this point. Here's the first language they want to

23 read out: in addition to the forgot.

24 The second language they want to read out is

25 without limitation. So in other words, without no dollar

1  store in excess of 10,000 square feet, without closeout

2  store, without the exception provided for tenants, without

3  limitation, the parties understood, hey, Ollie's is not

4  coming in here.  That's express language, and you're

5  rendering -- counsel is seeking or rather debtors are seeking

6  to render that language a nullity if it's determined

7  otherwise.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. LEBLANC:  Your Honor, without limitation is

10  the grammatical equivalent of including but not limited to.

11  The second sentence is not an operative sentence.  It doesn't

12  preclude anything.  It clarifies the definition that is

13  created in the preceding sentence.

14          So in addition to the foregoing, competing

15  business shall include without limitation the following

16  business operations.  What I suspect the parties intended,

17  although in fairness, no one, including their witness knows,

18  is that including but not limited to the following specific

19  entities, those are competing businesses.  To which I say,

20  fine.  I'm not ignoring that in the least bit.

21          What does it matter if it's a competing business?

22  It matters so long as the tenant, capital T, is open and

23  operating its business in the demised premises.  No dollar

24  store operation -- well, let me just use the defined term.

25          So long as the tenant is operating, no competing

1 business might be permitted in the shopping center except for

2 tenants and their successors and assigns open and operating

3 for business in the shopping center as of the effective date

4 of this lease.

5      THE COURT: Tenants with a small T.

6      MR. LEBLANC: Tenants with a small T. And

7 successors -- and their successors and assignments. And if

8 you grant the motion, Ollie's will be our successor. We were

9 and continue to be a tenant operating in the business,

10 operating for business in the shopping center as the

11 effective date of this lease.

12      So the paragraph -- sentence two of this paragraph

13 is not operative. I'm not ignoring it. Without limitation

14 has no special purpose. It just means including but not

15 limited to these specific ones. And in addition to the

16 foregoing just says, in addition to that very limited

17 definition that precedes this, these are also competing

18 businesses.

19      And I say I don't care what the definition of

20 competing businesses is because if we fit in the exception,

21 then it doesn't matter. Because -- and we fit in the

22 exception because except for tenants and their successors and

23 assigns. That's what Ollie's would be if Your Honor grants

24 the motion.

25      MR. YOUNG: I'm not ignoring it. It's not

1  operative.

2           THE COURT:  I'm going to allow you gentlemen to

3  agree to disagree.  I don't think that -- I don't expect

4  we'll take a lunch break and you'll resolve this.

5           So with that said -- well, let me ask.  So parties

6  finish their arguments?

7           MR. LUCIAN:  With respect to this issue I think

8  you're asking me, Your Honor?

9           THE COURT:  Yeah.

10          MR. LEBLANC:  I certainly have.

11          THE COURT:  Mr. Young, you're complete?

12          MR. YOUNG:  Yeah, I think we've --

13          THE COURT:  I understand your arguments.  Why

14  don't we --

15          MALE VOICE:  (Inaudible).

16          THE COURT:  Why don't we take a break and resume

17  this after lunch?  So why don't we take a break until quarter

18  till 2:00?  Okay.  So we'll resume back at 1:45 and proceed

19  onward.  Okay, thank you.  We stand in recess.

20      (Recess taken at 12:26 p.m.)

21      (Proceedings resumed at 1:50 p.m.)

22          THE COURT:  Thank you, everyone.  Please be

23  seated.  We're back on the record in Number Holdings.

24          First of all, Counsel, let me thank you for your

25  thoughtful arguments this afternoon.  I also want to thank

1  you for giving me some time to digest your presentations from

2  this morning.

3         The current dispute is between the debtor and the

4  landlord American National Insurance regarding a shopping

5  center lease in Conroe, Texas.  The landlord asserts that the

6  assignment of the lease to Ollie's will disrupt the tenant

7  mix of the shopping center, and would cause a breach of the

8  landlord's lease with Big Lots under Section 365(b)(3) and

9  (b)(4).

10        The Third Circuit has held in Joshua Slocum, even

11 under the tightly-drawn definition of adequate assurance, in

12 the shopping center context, Congress did not envision

13 literal compliance with all lease provisions; however,

14 insubstantial disruptions in tenant mix, and other

15 insubstantial breaches in other leases and agreements, are

16 contemplated and allowed.

17        With that being said, here the lease between the

18 landlord and Big Lots states, so long as the tenant, Big

19 Lots, is open and operating its business in the demised

20 premise for the initial permitted use, except for tenants,

21 which would here include 99 Cents, and their successors and

22 assigns open and operating for business in a shopping center

23 as of the effective date of this lease, meaning the Big Lots

24 lease, no Dollar Store operation in excess of 10,000 square

25 feet of floor area or closeout store, a competing business,

1  may be permitted in the shopping center during the original

2  term of this lease, or any operation terms or extension

3  thereof.

4          The lease then specifically names Ollie's as a

5  competing business.

6          Here, 99 Cents was open and operating at the time

7  Big Lots entered into the lease with the landlord.

8  Additionally, the proposed sale to Ollie's would result in

9  Ollie's being a successor and assignee of 99 Cents.

10 Consequently, this proposed assignment to Ollie's does not

11 violate the use restriction in the Big Lots lease.

12         Although the Court agrees, if the leased premise

13 was returned to the landlord, the landlord could not lease

14 the premise to Ollie's without violating the use restriction,

15 here the debtors fall under the exception of successors and

16 assigns in the first sentence of the paragraph.  The lease

17 specifically permits 99 cents to have successors and assigns,

18 and there's no limiting language on who 99 Cents can assign

19 to, despite other provisions within the lease applicable in

20 other circumstances imposing restrictions on tenant mix.

21 Whether Ollie's is a dollar store akin to Dollar Tree or

22 Dollar General is an issue the Court does not need to address

23 because of this Court's interpretation of Section 4(a) of the

24 Big Lots lease.  Additionally, the Court is without

25 sufficient evidence to make that finding.

1        So I would ask the parties to please confer and

2   submit a form of order under certification of counsel.  I

3   would ask that you please circulate the proposed order to Mr.

4   Young, Ms. Sierra-Fox, the committee, and the lenders prior

5   to its submission.

6

7        MR. LEBLANC:  Your Honor, we -- Andrew LeBlanc of

8   Milbank -- we will absolutely do so.

9        THE COURT:  Okay.  So, with that, could we move on

10  to the other sale --

11       MR. LEBLANC:  Yes.

12       THE COURT:  -- on the --

13       MR. LEBLANC:  And, with that, you get the pleasure

14  of not having to hear from me anymore, and I'll turn the

15  podium over to Mr. Kinney, Your Honor.

16       THE COURT:  Okay.  Thank you.

17       MR. MINTZ:  Apologies, Your Honor, Joe Mintz,

18  counsel for Ollie's.

19       THE COURT:  Yes.

20       MR. MINTZ:  I wanted to read into the record the

21  terms of a settlement reached with the North Oaks landlord --

22       THE COURT:  Okay.

23       MR. MINTZ:  -- who had objected to the Ollie's

24  sale.

25       THE COURT:  Okay, I assumed we were going back to

1  the actual Ollie's order.  So you're going to do a separate

2  order with respect to American National, right?

3          MR. LEBLANC:  That's correct, Your Honor.  And

4  what we'll do is we're going to submit a separate order with

5  respect to American National and an order that covers the

6  other, I think it will be ten properties, three owned and

7  seven leased.

8          THE COURT:  Okay.

9          MR. LEBLANC:  And we'll have an APA -- I think

10  what we've agreed is, we'll have an APA separate for the

11  American National lease and a separate one for the others.

12          THE COURT:  Okay.

13          MR. LEBLANC:  And so that's -- we'll do that and

14  we'll do that under --

15          THE COURT:  Okay.

16          MR. LEBLANC:  -- certification of counsel, but

17  what Counsel is talking about is this is the -- this relates

18  to the other side.

19          THE COURT:  Right, and so we are going to hear

20  anyone who wants to be heard with respect to this before I

21  make a ruling as to the other leases.

22          MR. LEBLANC:  Thank you, Your Honor.  And what

23  Ollie's' counsel here is doing is just talking about an

24  agreement to resolve one of the objections that was filed, so

25  that -- that they've reached with them that withdraws --

```
1              THE COURT:  Mr. Meloro's objection?

2              MR. LEBLANC:  Yes.

3              THE COURT:  Yes.  Okay.

4              MR. YOUNG:  Your Honor, Mr. Young for American

5  National.

6              THE COURT:  Yes.

7              MR. YOUNG:  Might Mr. Webb be released at this

8  point then --

9              THE COURT:  Yes, certainly --

10             MR. YOUNG:  -- since you've made your --

11             THE COURT:  -- he is released, and, Mr. Young, you

12 also may be released, if you like.

13             MR. YOUNG:  All right.  Thank you, Your Honor.

14             THE COURT:  Thank you.  And, Mr. Webb --

15             MR. YOUNG:  And thank you for allowing us --

16             THE COURT:  -- thank you for your time today, I

17 appreciate it.

18             MR. YOUNG:  Yes.  Thank you for allowing us to

19 appear remotely.

20             MR. WEBB:  Thank you, Your Honor.

21             THE COURT:  Okay.

22             MR. MINTZ:  Good afternoon, Your Honor, again, Joe

23 Mintz on behalf of Ollie's, and I just wanted to read into

24 the record the terms of a settlement that was reached with

25 the North Oaks landlord.
```

1       North Oaks objected on adequate assurance grounds,

2  and the parties agreed to resolve the objection as follows.

3  The objection was obviously withdrawn, Your Honor.  No

4  security deposit or guarantee will be required from Ollie's,

5  and the landlord will not enforce its right of first refusal.

6  The parties have agreed in principle to certain modifications

7  of the applicable lease addendum and will work to enter into

8  a modification of the addendum within 30 days of closing.

9  And, if you'll permit me, Your Honor, the addendum shall be

10  modified as follows.

11       Paragraph 11-1 of the addendum will be amended and

12  restated as follows to read, "whose primary business will be

13  a general merchandise closeout retail store."

14       Paragraph 15 of the addendum, pursuant to use

15  restrictions, the parties have agreed to delete items 2, 5,

16  6, 7, and 13 of the first part of that paragraph.  Paragraph

17  15, use restrictions, item 11 will remain with the

18  modification that the removal of the words banquet hall and

19  bar --

20       THE COURT:  And what?

21       MR. MINTZ:  Banquet hall and bar.

22       THE COURT:  Oh, bar, b-a-r?

23       MR. MINTZ:  B-a-r.  And the addition of the

24  language, "to the extent that any such businesses share a

25  demising wall with the premises on any side."

1          And paragraph 15, use restrictions, the second

2   part of that paragraph, the parties have agreed to delete

3   paragraphs 4, 5, and 6.

4          THE COURT:  Okay.

5          MR. MINTZ:  Thank you, Your Honor.

6          THE COURT:  Okay.  Did anyone else wish to be

7   heard with respect to the Ollie's lease, or with respect to

8   the proposed form of order?

9          Now, I understand, is there a new order with

10  respect to the Ollie's leases and, if so, do you have a copy

11  of it?

12         MR. KINNEY:  Your Honor, Brian Kinney from

13  Milbank.  We do not currently have a copy of the order.  We

14  have basically to (indiscernible) out the existing order into

15  two --

16         THE COURT:  Okay.

17         MR. KINNEY:  -- and one will cover everything

18  except for the American National lease and one just covering

19  the American National lease.  And we will -- as Mr. LeBlanc

20  said, we will circulate both of those to all the parties and

21  then submit it on COC.

22         THE COURT:  Okay.  So what was the last order you

23  were operating under, was it 667?  That was filed today, so

24  that must be the one.

25         COUNSEL:  Yes.

1           THE COURT:  Okay.

2           MR. KINNEY:  Yes, Your Honor.  Sorry, I left my

3  agenda at the desk, so I didn't have --

4           THE COURT:  No, it's okay.

5           MR. KINNEY:  -- the number in front of me.  Yes,

6  667.

7           THE COURT:  Okay.  Well, I'm going to ask on the

8  record, just in an abundance of caution, is there anyone who

9  wanted to be heard with respect to Ollie's other than

10  American National, or has any comments on the proposed form

11  of order that is intended to be modified?

12           MS. SIERRA-FOX:  Good afternoon, Your Honor, Rosa

13  Sierra-Fox on behalf of the U.S. Trustee.  So while I was

14  sitting, listening to the presentation, I did have to make

15  some comments to all of the orders, and I think some of them

16  carry throughout.  So I don't know what the best way -- I

17  don't think they're necessarily objections, but they could

18  be, I don't know, if the parties have an issue with the

19  comments.  So I don't know what the best way to proceed with

20  that is.

21           MR. KINNEY:  Your Honor, Brian Kinney from

22  Milbank.  If I could suggest, we'll go through those comments

23  immediately after this hearing, Your Honor, and we will

24  obviously circulate the orders to Ms. Sierra-Fox.  If we

25  cannot -- if there's any that we cannot agree on, we would

1    seek to --

2            MS. SIERRA-FOX:  The accompanying (indiscernible)

3    --

4            MR. KINNEY:  Yeah, exactly, we would COC both the

5    competing language for Your Honor, but I can't imagine there

6    would be anything that we'd be unable to resolve, Your Honor.

7            THE COURT:  Okay.

8            MS. SIERRA-FOX:  That sounds good to the U.S.

9    Trustee, Your Honor, if that's good for you.

10           THE COURT:  Okay.  I have some comments on the

11   order, but, first of all, let me ask if there was anyone

12   else.

13       (No verbal response)

14           THE COURT:  Okay.  And let me just note for the

15   record that I'm prepared to approve the Ollie's sale with

16   respect to everyone except American, which will be a separate

17   order.  I'm satisfied that the sale constitutes a reasonable

18   exercise of the debtors' business judgment and yields maximum

19   value for the debtors' estates.

20           And I'm basing that on the Shin declaration at

21   Docket 671 in support of the sale.  That declaration makes

22   clear the debtors and their advisers engaged in a robust

23   auction process; the sale provided a full, fair, and

24   reasonable opportunity for parties to be heard and make

25   higher and better offers; and the debtors, in their business

1  judgment, determined that the stalking horse bid was the

2  highest or otherwise best bid.  The purchaser is a good faith

3  purchaser entitled to the protections of Section 363(m), and

4  the debtors have a sound justification for promptly

5  consummating this sale.

6       So I will approve -- well, let me put it this way,

7  I'll approve the sale and I will review the proposed form of

8  order when I receive it.

9       I had some comments on the order, but I need to

10  find my comments.  I'm working off of too many copies.  Bear

11  with me a second.

12       (Pause)

13       THE COURT:  One universal comment that I have is

14  -- and I'm looking at paragraph 4 -- all these orders have

15  the Court approving the APAs and some of these sales I don't

16  even have the APAs.  And I can tell you, since they were

17  filed at 5:00 p.m. yesterday, I haven't reviewed every APA.

18  So I would ask that you strike the first sentence and just

19  leave it where the sellers are authorized to execute and

20  deliver.  You're authorized to enter into these transactions,

21  but I'm not going to approve each document as I haven't seen

22  them or studied them.

23       And, again, I would ask the comment about FF&E, so

24  to include that in this, which is also at paragraph 4.

25       Bear with me a second, I don't have the correct

 1 | copy of the Ollie's lease that I wrote on -- I mean order.

 2 | (Pause)

 3 | THE COURT:  My apologies, Mr. Kinney.

 4 | MR. KINNEY:  No problem at all, Your Honor.  We

 5 | understand it's been a lot of paper.

 6 | THE COURT:  Well, and I really try to keep up with

 7 | your paper, but at some point I just start writing on your

 8 | paper, they're in different binders.  I think I had very few

 9 | comments, but I want to make sure I got them all because I

10 | don't want to have to reach back out to parties once you --

11 | so, in 4, you got the striking on the first sentence, and

12 | then --

13 | MR. KINNEY:  (Indiscernible) --

14 | THE COURT:  Right.

15 | (Pause)

16 | THE COURT:  I think that was it.  I think those

17 | were my comments.  Of course, I'll be very interested in

18 | comments the United States Trustee has.  Many of my comments

19 | had to do with the evidence, which you incorporated.

20 | (Pause)

21 | MR. MINTZ:  Your Honor, I just want to clarify one

22 | thing.  Again, for the record, Joe Mintz on behalf of

23 | Ollie's.  I just want to clarify something that was suggested

24 | previously.  The parties signed the Ollie's APA that was

25 | appended to the stalking horse motion and attached as an

1  exhibit to the proposed order.

2          THE COURT:  Right.

3          MR. MINTZ:  Since that agreement has already been

4  signed, it's our preference to use the two orders, like

5  Counsel indicated before, and have each order modify in

6  certain limited respects the existing asset purchase

7  agreement.  So we're not going to sign two separate APAs, one

8  to address the ten properties and another to address the one

9  property with respect to American National.  I just wanted to

10 make that one clarification.

11         THE COURT:  Okay.

12         MR. MINTZ:  Okay?

13         THE COURT:  I understand.

14         MR. MINTZ:  Thank you.

15         THE COURT:  It's probably less confusing.

16         MR. MINTZ:  It is.

17         THE COURT:  Too much paper, you can't find things.

18     (Pause)

19         MR. KINNEY:  Your Honor, I think that brings us to

20 the conclusion of the Ollie's portion of the sale motion,

21 unless -- unless anyone -- you don't?  Okay.  I just wanted

22 to make sure.

23         THE COURT:  I think I asked three times, so -- I

24 try to be cautious about that.

25         MR. KINNEY:  Your Honor, next we would propose

 1 | taking up --

 2 |       THE COURT:  Oh, wait.

 3 |       MR. MINTZ:  May we be excused, Your Honor, for

 4 | Ollie's --

 5 |       THE COURT:  Certainly.  Yes, thank you.

 6 |       MR. MINTZ:  Thank you, Your Honor.

 7 |       THE COURT:  Anyone else who wants to leave, you're

 8 | more than welcome.

 9 |    (Laughter)

10 |       THE COURT:  But you're also welcome to be here.  I

11 | didn't mean it that way.

12 |    (Laughter)

13 |       MR. KINNEY:  Thank you, Your Honor.

14 |       THE COURT:  You're always welcome to our

15 | courtroom, it is always open.

16 |       MR. KINNEY:  The next piece of this sale process

17 | that we'd like to present, Your Honor, is the sale of the

18 | debtors' own real property.  And, Your Honor, this was

19 | pursuant to a notice of successful bidder filed at Docket

20 | Number 641, and the form of order, the proposed form of order

21 | was filed at Docket 649.

22 |      Your Honor, with respect to these assets, again,

23 | these were debtors' own real property that result -- that

24 | were included in the assets, subject to the bidding

25 | procedures.  With respect to the owned real property, the

1 conclusion of the auction, outside of the owned real property

2 that was just approved to be sold to Ollie's pursuant to

3 their stalking horse bid, there were 28 purchasers for the

4 remaining 41 parcels of owned real property.

5         And in the aggregate --

6         THE COURT:  So 28 out of the 41?

7         MR. KINNEY:  So 28 buyers --

8         THE COURT:  Okay.

9         MR. KINNEY:  -- for 41 properties.  Certain buyers

10 wanted multiple properties --

11         THE COURT:  Gotcha.

12         MR. KINNEY:  And, in the aggregate, these netted

13 over $130 million in proceeds to the estates.

14         Your Honor, based on the testimony contained in

15 the Shin declaration, we believe that we've demonstrated that

16 this is -- that these are, by far, in the best interest of

17 the estate, these are the highest and best offers available

18 for these properties, and that the debtors have exercised

19 their sound business judgment in agreeing to sell these

20 assets to the successful bidders on the terms set forth in

21 the proposed order.  As such, we would ask the Court to

22 approve the sales, subject to any comments that Your Honor or

23 anyone else may have with respect to the order.

24         And just to be clear on the record, we are

25 agreeing, again, that we will review the comments from the

1  Office of the U.S. Trustee and, subsequent to this hearing,

2  in the event Your Honor is inclined to approve -- to grant

3  the relief requested, that we would circulate a revised order

4  under COC, assuming that we get to agreement on all the

5  comments and to not submit any disagreement to Your Honor

6  under COC as well.

7         THE COURT:  Okay.  So, I note this motion is

8  uncontested.  Does anyone want to be heard with respect to

9  the motion, Docket 641 -- well, that's the list of successful

10 bidders -- or the proposed form of order?  Ms. Thomas?

11        MS. THOMAS:  Your Honor, may I be heard?

12        THE COURT:  Yes.

13        MS. THOMAS:  Your Honor, for the record, Alexandra

14 Thomas with Choate, Hall & Stewart on behalf of BioLife

15 Plasma, LP.  BioLife is the tenant under Store Lease 137,

16 which is located in Victorville, California.  And, to be

17 clear, BioLife does not object to the proposed sale to RCB

18 Equities; however, to date, our client has not received any

19 written notice of assumption or assignment of their lease.

20 We've reviewed the notices of assumption and assignment filed

21 on the docket and our lease hasn't been included.  So we

22 would just ask that the debtors provide notice of the cure

23 costs and any adequate assurance that RCB Equities plans to

24 provide in connection with the assumption and assignment of

25 Lease 137.

 1          MR. KINNEY:  Thank you.  Your Honor, to the extent

 2  that we -- so --

 3          THE COURT:  Is Lease 137 included?

 4      (Pause)

 5          MS. THOMAS:  And, Your Honor, if it's helpful, I'm

 6  referring to Docket 641 at Schedule 1, and it's the lease

 7  that's listed 12480A Amargosa Road.

 8          THE COURT:  Thank you, Ms. Thomas.

 9      (Pause)

10          THE COURT:  Ms. Thomas, we're just giving debtors'

11  counsel a moment to get the document.

12          MS. THOMAS:  Understood.

13          MR. KINNEY:  Your Honor, so this is a debtor-owned

14  property.  So --

15          MS. THOMAS:  Yes.

16          MR. KINNEY:  -- Ms. Thomas's client is the tenant

17  in this property.  So, if anything, they owe rent to the

18  estate, but we are happy to -- to the extent there is an

19  assumption and assignment of that lease, which I don't

20  believe has been noticed to date, if that is in fact noticed,

21  we will obviously submit any cure information, to the extent

22  applicable, but I don't believe that's ripe for today.

23          THE COURT:  Do you -- has that satisfied your

24  inquiry, Ms. Thomas?

25          MS. THOMAS:  Yes.  We just wanted to confirm that

1   to the extent there are any adequate assurance objections or

2   cure objections that the deadlines haven't run yet and that

3   we would receive notice of the assumption and assignment

4   before those deadlines passed.

5           MR. KINNEY:  To the extent that there's a proposed

6   assumption and assignment, there would be a period to get to

7   vote any proposed cure, as well as any proposed adequate

8   assurances.

9           THE COURT:  And I'm sure, if you have further

10  inquiry, you can reach out to Mr. Kinney.

11          MR. KINNEY:  Yes, yes.

12          THE COURT:  Okay.  Thank you, Ms. Thomas.

13          Is there anyone else who wishes to be heard with

14  respect to the debtor properties, the sale of the debtors'

15  property, or the proposed form of order?

16      (No verbal response)

17          THE COURT:  Okay, I hear no one; I see no hands on

18  Zoom.

19          Again, based on the record that has been made and

20  the resolution of all objections, I'm prepared to approve

21  this sale as well.

22          This is an uncontested sale of debtors'

23  properties, as identified at Docket 641, to the successful

24  bidders, and identified in the schedules attached to the

25  notice of successful bidders.  I'm satisfied, based on the

1  Shin declaration, that there was a robust auction, that the

2  sale provided a full and fair opportunity for parties to make

3  higher or otherwise better offers to purchase the property,

4  and I will enter the order when it's submitted.

5          I do have a couple of comments on the form of

6  order.  I want to make sure I have the right order, sorry.

7      (Pause)

8          THE COURT:  Many of these are just clean-up

9  comments in the introductory paragraph, the declaration

10 relied on docket numbers, that type of thing, but I do have a

11 question, this is more substantive, in (e), paragraph (e),

12 line 1, you need to strike "non-appealable."

13         MR. KINNEY:  Yes.

14         THE COURT:  Obviously, it's appealable, I don't --

15 it's successful, but it's appealable.

16         And (f), you're missing a docket number.

17         On page 8 -- I'm looking at 649-1, the blackline

18 -- or maybe it's not blackline -- it goes from paragraph (p)

19 to paragraph (a), and I think that that paragraph (a) is very

20 similar to paragraph (v).  You could probably modify and

21 strike the (a).

22         MR. KINNEY:  Yes.

23         THE COURT:  And I'd ask that you make the

24 conforming modification to paragraph 4 about approving

25 agreements and consenting lienholders.

1              In paragraph 13, I'm looking at page 20, about

2    eight lines up from the bottom it says "each and every

3    federal, state, and local government agency" --

4              MR. KINNEY:  Yes.

5              THE COURT:  -- change the word directed to

6    authorized, please.

7              MR. KINNEY:  Yes.

8              THE COURT:  And those are my only comments to the

9    order.

10             MR. KINNEY:  Thank you, Your Honor.

11             As discussed, we will make those comments.  We

12   will also review the comments from the United States Trustee,

13   and submit under certificate of counsel.

14             THE COURT:  Thank you.  One thing I did -- I was

15   reminded to ask is to please incorporate the related-to

16   docket number in the caption of the order because a lot of

17   these are titled very similarly and we want to make sure they

18   are linked to the correct documents.

19             MR. KINNEY:  We will, Your Honor, and we'll

20   include both the notice of successful bidder, as well as the

21   original sale motion itself.

22             THE COURT:  Perfect.  Thank you.

23             MR. KINNEY:  Your Honor, that brings us to the

24   last piece of today's puzzle.  Your Honor, our final piece

25   relates to the debtors' remaining leases that were not

1 subject to either the Dollar Tree designation or the Ollie's

2 stalking horse bid.

3        Your Honor, pursuant to the bidding procedures and

4 these leases, the debtor has marketed all the remaining

5 leases to buyers.  At Docket Number 639 -- I'm sorry, at

6 Docket Number 664 and 639 -- I was right, sorry about that --

7 639 and 664 --

8        THE COURT:  Okay.

9        MR. KINNEY:  -- we filed are notice of successful

10 bidders with respect to the leased properties.  The original

11 one was 639 and the amended one was done at 664.

12        And, with respect to the order, we filed a revised

13 form of proposed order at Docket Number 673, and this revised

14 -- the proposed form of order that had been filed earlier at

15 Docket Number 640.

16        Your Honor, this order and the notice of

17 successful bidders covers 13 parties, for an aggregate

18 purchase price of $2.4 million.  Again, as set forth in the

19 Shin declaration, we believe that this represents the highest

20 and best offers for these properties, and is -- the decision

21 to enter into the -- I will use the term APA, but here APA

22 means purchase agreement, assumption and assignment

23 agreement, and/or a lease termination agreement.

24        THE COURT:  Have they all been filed?

25        MR. KINNEY:  I believe so.

1           COUNSEL:  Yes.

2           MR. KINNEY:  Yes, I believe --

3           THE COURT:  Okay.

4           MR. KINNEY:  -- yes, they all in fact have been

5    filed.

6           THE COURT:  Okay.  It's a variety.

7           MR. KINNEY:  It is a variety because some of the

8    (indiscernible) are actually the landlords buying back their

9    leases.  And so, for those parties, we agreed they didn't

10   need to execute a full purchase agreement, we instead agreed

11   they could be based on the lease termination agreement.  And

12   some of the parties, as envisioned in the procedures, chose

13   to use an assumption and assignment agreement rather than a

14   true purchase agreement.

15          So it is a medley of defined terms, as the parties

16   decided to call them, all to have the same result of

17   providing for the assumption and assignment of the lease to

18   the purchaser.

19          Your Honor, under the bidding procedures we had

20   reserved a couple of issues from today's hearing, those are

21   both cure objections and adequate assurance objections.

22          Specifically, with respect to the adequate

23   assurance, we had provided in the bidding procedures that the

24   adequate assurance deadline would not be until next week and

25   parties would have until then to object.  And, obviously, if

1  an objection was lodged, we -- there is then a procedure to

2  resolve those objections.

3          We have received informal comments from counsel to

4  several landlords, including Ms. Roglen, who's here in court

5  today.  On that front, we had made certain edits already to

6  the order, and that was one of the reasons behind the filing

7  of the amended form of order.  We understand that Ms. Roglen

8  does not believe that that's sufficient to address her

9  issues.  We would propose to make one further modification to

10  address her issue, which I believe she still believes is

11  insufficient, but we would propose to add a very clear

12  paragraph to the order that, notwithstanding anything to the

13  contrary, nothing in here -- nothing in the order prejudices

14  the ability of any landlord to make an adequate assurance --

15  timely make an adequate assurance objection in accordance

16  with the bidding procedures, and for the Court to order

17  appropriate relief if such objection is upheld.

18          So we -- because that's always been the intent,

19  Your Honor, and we believed the order did it.  We acknowledge

20  it was not a model of clarity on this point.  And so, in

21  order to erase any doubt as to what effect this order would

22  have on the ability of landlords to raise the appropriate

23  adequate assurance objections, is to make it expressly clear

24  and governing above all else in the order that nothing in

25  here impairs their right to make those objections, nothing in

1 the order impairs Your Honor's right to grant the appropriate

2 relief upon sustaining such an objection.  And we have also

3 provided in the order and I think it's sufficient -- I'm

4 happy to add it again in another paragraph -- that we cannot

5 close any assignments of leases until either that objection

6 deadline has passed without objection or, if an objection is

7 filed, until it's resolved in the debtors' favor.

8            THE COURT:  I'm sure the landlords would like to

9 be heard.

10           MR. KINNEY:  I was going to say, there is one

11 other point that I would like to very quickly raise, Your

12 Honor.  There's also a provision in the order with respect to

13 percentage rent, and there was an objection filed -- an

14 informal objection raised with respect to that.  We're going

15 to work with the landlord there, we have two possible

16 resolutions, I think either of which may be acceptable to

17 both parties --

18           THE COURT:  Are only two objecting to percentage

19 rent?

20           MR. KINNEY:  I believe so.  I think it's just one

21 party, if I --

22           THE COURT:  Oh, okay.  So it's a one-off --

23           MR. KINNEY:  -- yes, but there are two possible --

24           THE COURT:  -- carveout or --

25           MR. KINNEY:  -- language -- that we just need to

1   discuss with the purchaser which -- and the landlord which
2   one of the two, we have two possible paths.  I think, from
3   the estate, either one works, we just need to find one that
4   works for both the landlord and the purchaser.  And, again,
5   we will submit that on certification of counsel once we get
6   to the -- a resolution of the matter.
7               And, with that, I will cede the podium.
8               THE COURT:  Okay.  Thank you.
9               MS. ROGLEN:  Good afternoon, Your Honor --
10              THE COURT:  Good afternoon.
11              MS. ROGLEN:  -- Laura Roglen of Ballard Spahr on
12  behalf of Ramage Enterprises, which is one of the landlords
13  that was listed in the notice of successful bidder filed at
14  Docket Number 639, and it's for Store Number 435, I believe,
15  which the successful bidder for that entity is identified as
16  TBI, Inc.
17              And, Your Honor, primarily, my issue is that these
18  leases that are proposed to be assumed and assigned are in a
19  different procedural posture right now than the other orders
20  Your Honor has agreed to enter today.  For the Dollar Tree
21  designation rights, that was approving the designation
22  rights, not the assumption and assignment of leases --
23              THE COURT:  Right.
24              MS. ROGLEN:  -- as well as the sale of other IP
25  assets to Dollar Tree.  And so there were no outstanding

1 ongoing objection deadlines or anything that would interfere

2 with the assumption and assignment of leases, that's going to

3 be subject to a separate process.

4          With respect to Ollie's, that's also in a

5 different procedural posture because that was a stalking

6 horse bid and adequate assurance information was provided

7 earlier.  The objection deadline had already passed, and Your

8 Honor already heard an objection and ruled on it today.

9          Now, we're here on leases where the successful

10 bidders were just identified last night and the adequate

11 assurance information was only provided last night, and

12 although there is an ongoing ability to object to that

13 adequate assurance information, the debtors are here seeking

14 entry of an order approving the assumption and assignment of

15 those leases today.

16          Now, certainly with respect to TBI, Inc. -- I of

17 course have not looked at all of the other APAs that are

18 subject to this proposed form of order, but the only thing

19 being sold here are the leases, it is only the assumption and

20 assignment of the leases.  So I don't think it's appropriate

21 to enter an order today approving the assumption and

22 assignment of leases, which is the only thing that would be

23 done today, when you've already heard that the sales will not

24 and cannot close until after the further objection period

25 passes.  And while some changes have been made to the order

1  to attempt to clarify that nothing cuts off landlord's

2  ability to object to adequate assurance of future

3  performance, which I think is everybody's intention here,

4  there's a lot of findings of fact and conclusions of law in

5  this order that directly relate to adequate assurance of

6  future performance, specific findings with respect to the

7  tenant's use of -- intended use of the premises, which the

8  Court has no information about that, we have no information

9  about what the intended use is.

10         And for those reasons, among others, I just am not

11  sure that entry of an order approving the assumption and

12  assignment of those leases today is appropriate and would

13  instead propose that we wait until after the expiration of

14  the May 30th objection deadline to then enter a much cleaner

15  order approving the assumption and assignment, to the extent

16  there's no objection, or, of course, if there is an objection

17  to the adequate assurance of future performance of one of the

18  assignees, then after that objection is adjudicated.

19         It's not clear to me what the procedural process

20  would be for, if the Court enters an order today approving

21  the assumption and assignment, then later there's an

22  objection that the Court were to sustain to the assumption

23  and assignment of the lease, is this order then rescinded

24  somehow, is there a subsequent order modifying it?  I'm not

25  really sure how that would work because it's an unusual

1  scenario.  You typically would not approve the assumption and

2  assignment of a lease before all of the objections were ruled

3  upon.

4          So that's our position today.  I can of course go

5  through the order and outline all of the issues and problems

6  that we've identified with the order so far, and I'm sure we

7  could craft language around each of them, but I think the

8  better course of action would be just to hold the entry of

9  the order for today.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. HAZELTINE:  Good afternoon, Your Honor, Bill

13  Hazeltine on behalf of --

14          THE COURT:  Good afternoon.

15          MR. HAZELTINE:  -- Mira Mesa Shopping Center,

16  which is a landlord that is purchasing back its own lease,

17  and I'll be very brief.  I raised a few nits with debtors'

18  counsel last night, mostly the fact that they used

19  "purchaser" throughout the order, rather than "purchasers."

20  They have corrected some, and I've been informed that they're

21  going to go through and make the rest of the changes.

22          So, with that, we're fine with the order.

23          THE COURT:  Okay.  Thank you.

24          MS. TOPPER:  Good afternoon, Your Honor; for the

25  record, Paige Topper with Saul Ewing on behalf of Franklin

1  Family Partnership.  Franklin Family Partnership is one of

2  the landlords that debtors' counsel mentioned we were

3  discussing language in connection with the order on

4  percentage rent.  Franklin Family did file an objection to

5  the assumption and assignment notice on the cure issue and

6  there is a reservation of rights on potential objection to

7  adequate assurance of future performance, we understand that

8  those are adjourned to a later date.  We also understand from

9  debtors' counsel that the adequate assurance information will

10  go out today.  My client hasn't received it yet, but I

11  understand that that will be coming shortly.

12          As debtors' counsel represented, we have an issue

13  with the percentage rent because we have an obligation under

14  our lease in connection with, in addition to monthly rent

15  payments, a percentage based on the gross sales, and

16  specifically the language in the order, you know, we want to

17  make sure that that obligation is paid pre-closing for 2024.

18          So I think debtors' counsel is correct that we're

19  going to continue discussing and, you know, if the Court

20  enters the order today, we'll submit revised language,

21  subject to my client's approval, under certification of

22  counsel.

23          Thank you.

24          THE COURT:  Mr. Waxman?

25          MR. WAXMAN:  Good afternoon, Your Honor.  May it

1  please the Court, Jeff Waxman of Morris James on behalf of

2  Navins Fund, LLC.  They are a landlord and purchaser of a

3  lease, Your Honor.  With me today on the line is Patrick

4  Huffstickle of the Dykema law firm.

5  Your Honor, we -- first of all, I understand that

6  the lease rejection -- or lease termination agreement was not

7  docketed, but will be, is my understanding from the debtors.

8  So I just wanted to clear that up.

9  We provided certain comments and proposed form of

10  order to the debtors.  I understand that most of those

11  changes that we have proposed are going to be included in the

12  exhibit which specifically identifies the lease, the

13  location, the landlord as the purchaser, as well as some of

14  the other terms in there, the lease termination.  There's no

15  issue with that.

16  I do want to just put one important issue on the

17  record.  As I understand, the lenders are in court today,

18  they do not oppose the proposed sale of the lease or lease

19  termination.  That way, there's no issue with respect to any

20  proposed modification.

21  So, unless somebody has any comments from the

22  lenders, I think we are -- I think we're okay, Your Honor.

23  MS. VOLIN:  And Megan Volin, Proskauer Rose, on

24  behalf of the DIP agent, just confirming that we have no

25  issues there.

1          THE COURT:  Okay.  Thank you.

2          MR. WAXMAN:  Your Honor, that's our add, if I may

3    be excused?

4          THE COURT:  You are excused.  Thank you, Mr.

5    Waxman.

6          MR. WAXMAN:  Thank you, Your Honor.

7          THE COURT:  Mr. Ward?

8          MR. WARD:  Good afternoon, Your Honor, Matthew

9    Ward on behalf of Burlington Coat Factory, which is a

10   purchaser of one location.  Your Honor, my co-counsel from

11   the Jackson Walker firm Kristhy Peguero, is also on the

12   video.

13         Burlington Coat Factory prevailed at the auction

14   with respect to Store Number 279 in Tulare, California.  We

15   have been working with the Milbank team to incorporate our

16   comments to the order.  We're not quite there yet, but I'm

17   confident that we'll be able to get there.  There are a few

18   open items with respect to a cure amount.  We think that the

19   cure amount has been set, but to the extent, since cure

20   objections are due next week, if there's an unresolved cure

21   dispute, the way our bid is structured is we're putting in a

22   certain amount of cures and then on that the onus would be on

23   the debtors in excess of that.  And so we just wanted that to

24   be incorporated.  We have some language regarding use

25   restrictions and which use restrictions will be binding on us

1  in signage and the size of signage.

2          So nothing earth-shattering here that I don't

3  think we can work out, but we just wanted to reserve our

4  rights to do that.  I think what debtors' counsel proposed to

5  do with the U.S. Trustee's comments, which is incorporate the

6  comments and then submit them under a certification of

7  counsel.  And if for whatever reason we can't get to an

8  agreed form with the debtors, I suppose we could do competing

9  forms under certification of counsel, we're amicable to that

10  approach.

11          MR. KINNEY:  Your Honor, Brian Kinney of Milbank,

12  just one correction and then one response.

13          First of all, the cure objection deadline has

14  passed.  So all cure objections have been filed, it's the

15  adequate assurance --

16          MR. WARD:  Okay.

17          MR. KINNEY:  -- objection deadline that is next

18  week.

19          Secondly, obviously, we will work with counsel on

20  comments to the order.  We will also circulate that to the

21  affected landlords to make sure that they are comfortable

22  with the proposed changes as well.

23          MR. WARD:  Thank you for those clarifications.

24  So, unless my co-counsel has comments or Your Honor has

25  questions, I think that's it for Burlington.

1          THE COURT:  Okay.  Thank you.

2          MR. WARD:  Thanks, Your Honor.

3          THE COURT:  Does anyone else wish to be heard?

4     (No verbal response)

5          THE COURT:  So, Mr. Kinney, welcome back.  I am

6    concerned, when I read this, about timing and process, and I

7    was curious if this is one of those orders that should be

8    bifurcated because the way the timing works -- and there are

9    a lot of findings, substantial findings in this form of

10   order, and I was curious why this couldn't be addressed at

11   June 4.

12          MR. KINNEY:  So, Your Honor, there's two pieces.

13   First, we do have a requirement under our DIP milestones to

14   have a form of orders entered by tomorrow and closings by the

15   end of the month.

16          The second piece of it is monetary, is that if we

17   have this heard at the June 4th hearing, that's another

18   month's worth of rent that in the event that we are unable to

19   sell these that the estate would be left holding the burden

20   of.

21          THE COURT:  Well, I guess --

22     (Pause)

23          MR. KINNEY:  I'm sorry, Your Honor.

24          THE COURT:  No, take a minute, please.  I would

25   much rather the parties work this out.

1        (Pause)

2            THE COURT:  Would it be helpful if I left?  No, I

3    mean --

4        (Laughter)

5            COUNSEL:  Your Honor, I think we should keep the

6    momentum going.

7            THE COURT:  Okay.

8            COUNSEL:  Thank you, Your Honor.

9            MR. ROSSOW:  Your Honor, this is Jim Rossow on

10   Zoom.  I'm sorry for interrupting.  Can the Court hear me?

11           THE COURT:  Yes, I can, Mr. Rossow.

12           MR. ROSSOW:  Thank you.  Your Honor, I'm from

13   Rubin & Levin in Indianapolis, and I represent ALDI Inc.

14           And just to provide a little bit more context to

15   debtors' counsel in terms of the timing issues, one thing I

16   would point out is that ALDI is a successful bidder with

17   respect to two owned properties and one leased property, it's

18   all under one APA.  And so while the landlords may consider

19   this sort of separate, from the -- from ALDI's perspective,

20   we have one APA that deals with three transactions.  And as

21   counsel, debtors' counsel indicated, of course delay is an

22   issue because the cure costs might not necessarily be borne

23   by the debtor, it might be the assignee.

24           And so I certainly understand the valid concerns

25   raised by landlords, I know -- I personally don't see a

1  problem if the Court is reserving specific adequate assurance

2  issues.  I am optimistic that, for example, ALDI, that any

3  such issues would be resolved without having to have the

4  Court actually take evidence and have a contested hearing.

5      So while I understand the need for other landlords

6  to be protected, in our circumstance, if possible, we'd like

7  to press forward.  And to the extent the landlord in our

8  case, if they come forward, we'll be happy to address that,

9  but we don't want any additional delays in terms of being

10 able to close this, to keep sight of the economics of the

11 case.

12      THE COURT:  Okay.  Thank you, Mr. Rossow.

13      MS. MERSKY:  Your Honor, Rachel Mersky.  I can't

14 seem to get my video operating.  I think --

15      THE COURT:  We can hear you, Ms. Mersky.

16      MS. MERSKY:  I'm just -- I'm representing Kimco

17 Realty in connection with a Houston, Texas lease, Number

18 2802.  That lease was part of a rejection, but the landlord

19 has worked with the debtor consensually, as well as with the

20 proposed assignee, Burlington, and I note that we need that

21 Burlington property to be included in an order, I don't

22 think, as of right now, it is.  There may be a little

23 confusion because this was added and was not part of the

24 auction, but we want to clarify that Kimco consents to the

25 addition of its lease and the withdrawal of the rejection.

1    MR. KINNEY:  Your Honor, for this, because it was

2 not part of the auctioned assets, we would propose to file --

3 we'll file a separate notice of assignment and assumption

4 with respect to that lease.

5    THE COURT:  Okay.  Ms. Mersky, did you hear that?

6    MS. MERSKY:  Yes, thank you.  No problem, I just

7 wanted to make sure it didn't get overlooked in the larger

8 picture.

9    THE COURT:  Contact Mr. Kinney if you don't see

10 it.

11    MS. MERSKY:  Okay.  Thank you, Your Honor.

12    THE COURT:  Okay.  So did you have an opportunity

13 to confer and perhaps handle -- determine how to handle this?

14    MR. KINNEY:  Yes.  Your Honor, the issue for the

15 estate remains the need to have resolution prior to June 1st.

16 We are agreeable to carving out Ms. Roglen's client.

17    THE COURT:  Okay.  I mean, she is the sole

18 objector here today who is not pressing to go -- who is

19 disputing going forward.  And I am sympathetic to the

20 concerns raised by ALDI's counsel and others.

21    MR. KINNEY:  So, Your Honor, we will carve her

22 client out of the proposed order.  We will, for the avoidance

23 of doubt, add that paragraph anyway --

24    THE COURT:  I was going to say, yes, please.

25    MR. KINNEY:  -- just to clarify exactly what is

1  and what is not happening, that everything is subject to the

2  resolution of any adequate assurance objection that is in

3  fact filed.

4          THE COURT:  Yeah, you certainly want to avoid a

5  future Mr. Kinney issue.

6          MR. KINNEY:  Exactly.

7          THE COURT:  Let me ask, did anyone else wish to be

8  heard with respect to the sale or the proposed form of order?

9      (No verbal response)

10          THE COURT:  So I had comments on your order, but

11  then this morning you filed another order, which could I just

12  have a minute to look at?

13          MR. KINNEY:  Certainly, Your Honor.

14          THE COURT:  And whose comments are reflected on

15  this blackline?  These are partly landlord?

16          MR. KINNEY:  This is partly -- informal comments

17  we received from Ms. Roglen, as well as certain clean-up

18  changes from some of the purchasers as well.

19          THE COURT:  I see, and updated to reflect filings.

20  Okay.

21          MR. KINNEY:  And, Your Honor, I'm also informed

22  that the UCC's comments are also reflected in this -- in the

23  redline.

24      (Pause)

25          THE COURT:  Okay, I'm going to ask -- these are

1   kind of very similar comments because these are all very

2   similar orders --

3           MR. KINNEY:  Yes.

4           THE COURT:  -- but, in (e), I'm going to ask you

5   strike the "non-appealable."

6           MR. KINNEY:  Yes.

7           THE COURT:  When is the adequate assurance

8   deadline, next -- the 30th?

9           MR. KINNEY:  Next Thursday, yes, the 30th, Your

10  Honor.

11          THE COURT:  Okay.

12      (Pause)

13          THE COURT:  In this order, I don't know that this

14  is an issue, but take a look at (q) and (w) for similarity or

15  repetition.  They may be -- in 4, you'll address the two

16  comments that we talked about previously.

17          MR. KINNEY:  Yes, Your Honor.

18          THE COURT:  I appreciate the modifications to 7.

19      (Pause)

20          THE COURT:  Paragraph 13, general assignment,

21  again, change "directed" to "authorized."

22          And I think -- let me just double check -- take a

23  look at paragraph 18, direction to released interest, and I

24  think the end of that paragraph, starting at the bottom of

25  page 25 of the blackline, "each and every federal, state, and

1   local," do you see that?

2          MR. KINNEY:  Yes.

3          THE COURT:  I think that is duplicative of the

4   prior paragraph -- not the prior to this, but --

5          MR. KINNEY:  Correct.

6          THE COURT:  -- formerly paragraph 12, I don't know

7   what it is --

8          MR. KINNEY:  Correct, Your Honor, 12 is now 13.

9          THE COURT:  Yeah.

10          MR. KINNEY:  Yes.  So we'll strike it from the end

11   of --

12          THE COURT:  Yeah, whatever -- I'm sure by the time

13   you make changes, I don't know what's going to happen, but

14   those are my comments.

15          MR. KINNEY:  Thank you, Your Honor.

16          THE COURT:  So and then, obviously, you'll address

17   the issues that were raised on the record today.

18          And let me just note, I'm just going to

19   incorporate my comments from earlier based on the Shin

20   declaration with respect to this sale as well.

21          MR. KINNEY:  Your Honor, the one question that Ms.

22   Doyle (indiscernible) wanted me to ask you --

23          THE COURT:  She made you ask, yes.

24          MR. KINNEY:  -- is whether or not there's a time

25   by which you need the revised form of order.

1          THE COURT:  I was going to tell you.  So I have

2  limited staff tomorrow, and so is there a possibility that

3  you guys can get them to us by like 1:00?

4          MR. KINNEY:  By 1:00?  Certainly, Your Honor.

5          THE COURT:  And in fact I have some people who are

6  already off for holiday, so please let us know if there's a

7  reason you can't.

8          MR. KINNEY:  Your Honor, we'll endeavor to get

9  drafts turned immediately after the hearing.

10          THE COURT:  Okay.  Was there one other matter for

11  today --

12          MR. KINNEY:  There is, Your Honor.

13          THE COURT:  -- a Suri objection?

14          MR. KINNEY:  Yes, Your Honor.

15    (Pause)

16          MR. KINNEY:  So the rejection is going forward

17  with respect to Docket -- the objection of Suri Westover

18  Village, Inc., which was at Docket Number 324, their

19  objection.

20          THE COURT:  Is anyone here today on behalf of Suri

21  Westover Village?

22          MR. SURI:  I am here, ma'am.

23          THE COURT:  Okay.  You filed -- excuse me, sir --

24  you filed an objection and I wanted to give you an

25  opportunity to address that.

1    MR. SURI:  Yes, thank you for your time.  Yeah, I

2 mean, our main kind of issue is that, you know, rejecting

3 that is because we have quite a bit of financial pressure,

4 and this lease and this, you know, tenant was a significant

5 part of the shopping center, it was an anchor tenant when it

6 was first built and stuff, and their significant, I guess,

7 contribution to the financing and the thing of the operation.

8    THE COURT:  Sir, do you have anything further?

9 And, I'm sorry, did you state your name for the record?

10    MR. SURI:  My name is Parkash Suri.

11    THE COURT:  Okay.

12    MR. SURI:  I'm one of the owners.

13    THE COURT:  Okay, all right.  Thank you

14    Was there anything further, Mr. Suri?

15    (No verbal response)

16    THE COURT:  Okay.

17    MR. SURI:  No, that's it.

18    THE COURT:  I don't want to cut you off, sir.

19 Please feel free --

20    MR. SURI:  No, that's about it.  Yeah, it's just

21 the financial pressure.

22    THE COURT:  Okay.  Well, I'm going to let the

23 debtors respond to your objection, and then I'll rule.

24    MR. KINNEY:  Thank you, Your Honor, Brian Kinney

25 of Milbank on behalf of the company.

1          Your Honor, the location at issue here is a

2    location that the debtors closed as part of their initial

3    wave of store closings in April.  The debtors' estates are

4    receiving no benefit from this location at this point.  The

5    debtors have returned the keys and codes to the landlord, and

6    are no longer in occupancy of the location.  As such, under

7    360 -- excuse me, Section 365 of the Bankruptcy Code, the

8    debtors, in their reasonable business judgment, decided to

9    reject this location.  While it is unfortunate that the

10   shopping center's cash flows are going to be negatively

11   impacted by this rejection, however, the estate simply cannot

12   afford to carry the costs for a closed location when it's

13   receiving no benefits from that location.

14          THE COURT:  Mr. Suri, do you agree the debtors are

15   not in that location anymore?

16          MR. SURI:  Yeah, they're no longer there, yes.

17          THE COURT:  And you have access to the premise?

18          MR. SURI:  I do, yes.

19          THE COURT:  Okay.  Do you wish to be heard any

20   more on your objection?

21          MR. SURI:  I would.

22          THE COURT:  Okay.

23          MR. SURI:  I'm happy to, you know -- I know

24   there's a June 4th matter, if we could be -- then I could

25   have my lawyer.  I just kind of presented this at a very

1  short period of time.  I would appreciate that, if that's

2  possible.

3          MR. KINNEY:  Your Honor, we're happy -- if Your

4  Honor wishes to continue, we could; however, again, we do not

5  believe that there is any basis to object -- that there is no

6  valid objection to the rejection at this location.

7          THE COURT:  Yeah, Mr. Suri, I'm very sympathetic

8  to your position and I appreciate you participating in the

9  process; however, there is no basis in law to support your

10 objection.  The debtors, in their business judgment, have

11 determined to reject and they're entitled to do so, and have

12 noted there's no benefit to the bankruptcy estate here.

13         So, sir, I'm inclined to overrule your objection

14 for those reasons, and I would not be inclined to continue

15 this to another hearing.

16         MR. SURI:  If you're not inclined to, I guess so,

17 then I --

18         MR. KINNEY:  And, Your Honor, can I just note one

19 thing for the record?

20         THE COURT:  Yes.

21         MR. KINNEY:  Pursuant to the Bankruptcy Code, upon

22 the rejection, the landlord will have a claim for damages.

23 We have filed our bar date motion, so we expect to have a bar

24 date set in the near future.  The landlord will be mailed

25 notice of that bar date and is free to file a proof of claim

1  setting forth his damages from the rejection.

2          THE COURT:  Did you hear that, Mr. Suri?

3          MR. SURI:  I did, ma'am.  Thank you.

4          THE COURT:  Yes, so that a remedy available to

5  you.

6          MR. SURI:  Okay.

7          THE COURT:  Okay?  All right.

8          MR. SURI:  Yes, thank you.

9          THE COURT:  Thank you very much for your patience

10 today.

11         MR. SURI:  Yes.

12         MR. LEBLANC:  Your Honor, Andrew Leblanc again.

13 Your Honor, I think that concludes our agenda for today.

14         I did want to mention, Your Honor, we had the

15 occasion to bring a number of our summer associates who just

16 -- this is actually their first day of working at the firm.

17         THE COURT:  Oh --

18         MR. LEBLANC:  They've been with us --

19         THE COURT:  -- it's summer.

20         MR. LEBLANC:  -- for three days -- it is --

21 they've been with us for three days for orientation, but

22 started today, so a number of them came down here.  And we

23 appreciate Your Honor's time and it was good that they got to

24 see a hearing start to finish, and also to see the allure of

25 Bankruptcy Court that you can actually have something start,

1  finish, and conclude all in the course of a handful of hours.

2          So we thank you very much, Your Honor, for your

3  time and for your consideration of the matters before you.

4          THE COURT:  Certainly.  And let me, just before we

5  go, I want to make a couple of points.

6          One, I need a rejection order.  And I'll note that

7  the Court asks that you contain in the rejection orders the

8  language about consenting third parties when it includes

9  abandonment.

10         And I welcome the summer clerks, I hope you have a

11 great experience, and you're always welcome to come view

12 things in this court.  And I hope you also got to experience

13 a bit of the auction, if at all possible.

14         But I'd also like to congratulate the debtors on a

15 successful auction.  I know -- I can appreciate the

16 incredible amount of time and attention required to conduct

17 that auction, and to analyze the multiple sale transactions.

18 And so I just want to note, I appreciate that you were

19 drinking from a fire hose when you were submitting orders and

20 agendas and all up until the hearing, so my congratulations

21 to you.

22         And I appreciate the committee and lenders and the

23 landlords and everyone's participation, that's what makes

24 this process so special.

25         And thank you to Ms. Rosa Sierra-Fox for helping

1　us keep our orders in form.  I appreciate everybody's time.

2　　　　　　I hope you all have a great day.  We'll look

3　forward to receiving your orders tomorrow, and hopefully I

4　won't see any of you and that you have a good holiday, and

5　I'll see you on June 4th.

6　　　　　　COUNSEL:  Thank you, Your Honor.

7　　　　　　THE COURT:  We stand adjourned.

8　　　　(Proceedings concluded at 2:57 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    May 24, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    May 24, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     May 24, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25