**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 1437** |

**ORDER (I) APPROVING THE ASSET PURCHASE
AGREEMENT, (II) AUTHORIZING AND APPROVING THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS,
LIENS, RIGHTS, INTERESTS, ENCUMBRANCES, AND OTHER ASSUMED
LIABILITIES AND PERMITTED ENCUMBRANCES, (III) AUTHORIZING
APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Big Lots, Inc. and certain of its affiliates, each of

which is a debtor and debtor in possession (collectively, the "Debtors"), pursuant to sections

105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

(the "Bankruptcy Code"), rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of

---

[1]     The Debtors in these cases, together with the last four digits of their respective employer identification numbers, are as follows:  Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the APA, or as applicable, the *Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 503, 506, 507 and 552, and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Parties, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 584] (the "Final DIP Order").  For the avoidance of doubt, the "Motion" as referred to herein refers to the *Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1437].

Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an order (this "Sale Order") (a) authorizing and approving entry into that certain Asset Purchase Agreement, dated as of January 2, 2025 (as amended or supplemented, and including all exhibits, schedules, and annexes attached thereto, including, without limitation, the Agency Agreement, the "APA"), attached hereto as **Exhibit 1**, by and among Big Lots, Inc. (the "Seller"), each of the subsidiaries of the Seller listed in Schedule 1 of the APA (together with the Seller, the "Selling Entities"), and Gordon Brothers Retail Partners, LLC, a Delaware limited liability company (the "Buyer"); (b) except as otherwise provided in this Sale Order, approving the sale of the Assets free and clear of any property or asset, any legal or equitable, specific or floating, lien (statutory or otherwise and including any "Lien" as defined in the Bankruptcy Code), pledge, mortgage, deed of trust, security interest, charge, debenture, lease, license, occupancy agreement, option, easement, Claim, restriction, preference, priority, right of first refusal, right of first offer, servitude, right of way, right of set off, preemptive right, conditional sale or other title retention agreement or installment Contract or finance lease with substantially the same effect, or other encumbrances affecting any right or title to the Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown (together, the "Encumbrances") pursuant to the APA (the "Sale"); (c) subject to exercise of the Designation Rights as set forth in the APA, approving the assumption and assignment of certain executory contracts and unexpired leases identified in the APA (collectively, and as may be consensually modified or amended with written agreement of the applicable counterparty, the "Assigned Contracts") pursuant to section

2

365 of the Bankruptcy Code in connection with the Sale and assignment of the Assigned Contracts to the Buyer or any Designated Buyer, as applicable; (d) authorizing the Debtors to consummate the Sale and all other transactions related to the APA, including, but not limited to, conduct of the Store Closing Sale under the terms of the Agency Agreement; and (e) granting related relief, all as more fully set forth in the Motion; and upon the record at the Sale Hearing (as defined below), including the testimony of Kent Percy (the "Percy Testimony"); and the Debtors having determined, in a sound exercise of their business judgment, that the entry into the APA represents the highest or otherwise best available offer for the Assets; and the Court having conducted a hearing on December 30–31, 2024 (collectively, the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sale, to consider the approval of the Sale pursuant to the terms and conditions set forth in the APA, and the Court having considered (1) the Motion and all objections related thereto, (2) the Sale, (3) the arguments of counsel made, and evidence adduced related thereto, and (4) the full record in these chapter 11 cases, including the record of the Sale Hearing held before the Court; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the Sale, the transactions contemplated under the APA or in connection therewith; and due and sufficient notice of the Sale Hearing and the relief sought in the Motion having been given under the particular circumstances of these chapter 11 cases; and no other or further notice needing to be provided; and the relief requested provided for herein being in the best interests of the Debtors, their estates, their creditors, and other parties in interest in these chapter 11 cases; it is hereby

**FOUND, CONCLUDED, AND DETERMINED THAT**:[3]

---

[3] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

A.      <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Jurisdiction</u>.  The Court has jurisdiction over the Motion and over the Debtors' property, including the Assets to be sold, transferred, and conveyed pursuant to the APA, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable to these chapter 11 cases through Bankruptcy Rule 7054, the Court finds that there is no just reason for delay in the implementation of this Sale Order and that the terms and conditions of this Sale Order shall be immediately effective and enforceable upon its entry.  The Court hereby directs entry of judgment as set forth herein.

D.      <u>Power and Authority</u>.  The Debtors (a) have full corporate power and authority to execute the APA and all other documents contemplated related thereto, (b) the Debtors' sale of the Assets has been duly and validly authorized by all necessary corporate action; (c) have all of the corporate power and authority necessary to consummate the transactions contemplated under the APA; and (d) have taken all corporate action necessary to authorize and approve the APA and

the consummation of the transactions contemplated thereunder.  No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate such transactions, subject to the waiver of such consents or approvals to the extent provided for in the APA and as may be permitted under applicable law.

E.        Binding Agreement.   The APA is a valid and binding contract between the Selling Entities and the Buyer and shall be enforceable pursuant to its terms.  The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance, fraudulent transfer claims, or otherwise.  This Sale Order, the APA, the Sale, and the consummation thereof, shall (i) be, to the extent provided in the APA, specifically enforceable against and binding upon (without posting any bond) the Buyer and all successors and assigns of the Buyer and each of its respective affiliates, successors, and assigns, the Debtors and their estates, and any chapter 7 or chapter 11 trustee or receiver or trustee in bankruptcy appointed with respect to any of the Debtors, and, solely with respect to this Sale Order, their creditors (whether known or unknown) and holders of equity interests in any Debtor, any holders of Claims against or on all or any portion of the applicable Assets, all counterparties to the applicable Assigned Contracts, and any affected third-parties, (collectively, the "Bound Parties") and (ii) not be subject to rejection or avoidance. Notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties.  The terms and provisions of the APA shall survive

the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7. The rights and interests granted pursuant to this Sale Order and the APA shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the APA and this Sale Order without the need for further order of the Court.

F.        *Property of the Estate*. The Debtors are the sole and lawful owner(s) of, and have clear and marketable title to, the Assets. The Debtors' right, title, and interest in and to the Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Subject to sections 363(f) and 365(a) of the Bankruptcy Code, and except as otherwise set forth in this Sale Order, the transfer of each of the Assets to the Buyer or its designee (collectively the "Designated Buyer"), in accordance with the APA shall be, as of the applicable Closing Date, a legal, valid, and effective transfer of the Assets, which transfer vests or shall vest the Buyer or such Designated Buyer(s), as applicable, with all right, title, and interest of the Debtors to the Assets free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances or as otherwise set forth in this Sale Order). For the avoidance of doubt, this Sale Order does not authorize the assumption or assumption and assignment of any nonresidential real property lease, which shall be assumed and assigned pursuant to the Designation Rights Procedures, and no such leases will

6

be assumed or assumed and assigned on the Initial Closing Date. Notwithstanding anything to the contrary in this Sale Order or the APA, the transfer of any nonresidential real property lease shall be (i) solely effective following entry of a further order of this Court (a) authorizing the assumption or assumption and assignment of such nonresidential real property lease pursuant to the terms of this Sale Order and (b) following the payment of the applicable cure costs (if any) on the applicable Closing Date or as soon thereafter as reasonably practicable; (ii) subject to the Designation Rights Procedures set forth in this Sale Order; and (iii) subject to any easements, reciprocal easement agreements, operating or redevelopment agreements, licenses, permits, dedications, covenants, or other rights applicable to such real estate that run with the land or limit or condition the permitted use of the property (the "**Lease Encumbrances**") and shall not be free and clear of any such Lease Encumbrances, except to the extent provided in any order approving the assumption and assignment of any such Lease.

G.      Statutory Bases for Relief.  The statutory bases for the relief requested in the Motion and provided for herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008, and Local Rules 2002-1 and 6004-1.

H.      Petition Date.  On September 9, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to maintain their businesses and manage their property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

I.      Notice.  Due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale and the Designation Rights and Designation Rights Procedures (each as defined below), has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008, and 9014, to each party entitled

to receive such notice.  The notices described herein constitute good and sufficient notice, and were appropriate under the circumstances, and no other or further notice of the Motion, the Sale, this Sale Order and the Sale Hearing is, or shall be, required.

J.       The notices provided all interested parties with timely and proper notice under the circumstances of the Motion, this Sale Order, the Sale, the Sale Hearing, the Designation Rights Procedures, and the other relief granted herein and related to the transactions contemplated under the APA.

K.       <u>Disclosures</u>.   The disclosures the Debtors made in the Motion and related documents filed with the Court concerning the APA, the Sale, and the Sale Hearing were good, complete, and adequate.

L.       <u>Best Interests of the Estates, Creditors, and Parties in Interest</u>.  Given all the facts and circumstances of these chapter 11 cases and the adequacy and fair value of the consideration the Buyer shall provide to the Selling Entities under the APA, the Sale constitutes a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and should be approved.

M.       <u>Sound Business Purpose</u>.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code and pursuant to the APA because, among other reasons, (a) the APA constitutes the highest or otherwise best offer for the Assets, (b) the APA and the closing of the Sale thereunder present the best available opportunity to realize the value of the Assets, and (c) any other transaction would not have yielded as favorable an economic result given the circumstances.  The Debtors have therefore determined, in a sound exercise of their business judgment, that the Buyer's offer as

contained in the APA represents the highest or otherwise best offer for the Assets given the circumstances presently facing these Debtors.

N.        Good Faith and No Collusion.  The APA, including the Agency Agreement, was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and as the result of arm's-length bargaining positions and is substantively and procedurally fair to all parties.  Neither the Buyer nor any of the Buyer's affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and no common identity of incorporators, directors, managers, or controlling stockholders existed between the Debtors and the Buyer.  The Buyer has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders. The Debtors and the Buyer have not engaged in any conduct that would cause or permit the APA to be avoided or damages to be assessed against the Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law. The Buyer is purchasing the Assets, in accordance with the APA, in good faith, and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all the protections afforded by such provision and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases.  As demonstrated by (a) any testimony and other evidence proffered or adduced at the Sale Hearing, including the Percy Testimony, and (b) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted and, among other things:  (i) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing and ultimately acquiring the Assets; (ii) the Buyer in no way induced or caused the Debtors' chapter

11 filing; (iii) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been fully and properly disclosed; (iv) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (v) the negotiation and execution of the APA and Agency Agreement, including the Sale contemplated thereby, were at arms'-length and in good faith. There was and is no evidence of insider influence or improper conduct in any manner by the Buyer or any of its affiliates in connection with the negotiation, and ultimate execution, of the APA (including the Agency Agreement) with the Debtors.

O.      <u>Highest and Best Bid and Fair Consideration</u>. The consideration the Buyer shall provide to the Selling Entities pursuant to the APA (including the Agency Agreement) (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Voidable Transactions Act (formally the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, and other similar laws), and (iv) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative. Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Assets for greater economic value to the Debtors or their estates. The Debtors' determination that the APA (including the Agency Agreement) constitutes the highest and otherwise best offer for the Assets and the Debtors' determination to seek approval of the APA (including the Agency Agreement) and the sale transactions embodied therein each constitute a valid and sound exercise of the Debtors' business judgment and the Debtors' decision to enter into the APA (including the Agency Agreement) and consummate the transactions contemplated

thereunder constitutes a proper exercise of the fiduciary duties of the Debtors and their officers and directors.

      P.        <u>Buyer Not a Successor</u>.  The transactions contemplated under the APA do not amount to a consolidation, merger, or *de facto* merger of the Buyer, any Designated Buyer, and the Debtors and/or the Debtors' estates; there is not substantial continuity between the Buyer any Designated Buyer, and the Debtors; there is no continuity of enterprise between the Debtors and the Buyer or any Designated Buyer; neither the Buyer nor any Designated Buyer is a mere continuation of the Debtors or their estates; and neither the Buyer nor any Designated Buyer is a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any federal, state, or local statute or common law, or revenue, pension, ERISA, COBRA, tax, labor, employment, environmental (including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act, as amended), escheat, or unclaimed property laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine.  Except for the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in the APA or this Sale Order, neither the Buyer and its affiliates, nor any Designated Buyer, shall have any liability or obligation under the Workers Adjustment and Retraining Act (the "<u>WARN Act</u>"), 929 U.S.C. §§ 210 *et seq.* or the Comprehensive Environmental Response Compensation and Liability Act, as amended or analogous foreign, state, or local laws and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as

amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act.  Except for the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in the APA or this Sale Order, the (a) transfer of the Assets to Buyer or any Designated Buyer, as applicable, and (b) assumption and assignment to the Buyer or any Designated Buyer, as applicable, of the Assigned Contracts do not and shall not subject the Buyer or any Designated Buyer, as applicable, to any liability whatsoever with respect to the operation of the Debtors' business before the applicable Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, either directly, or based on, in whole or in part, directly or indirectly, any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability, in each case regardless of whether such law or theory purports to apply any liability directly to the Buyer or any Designated Buyer, as applicable, rather than in a successor or transferee capacity.

Q.      No *Sub Rosa* Plan.  The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a plan of reorganization of the Debtors. The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation.

R.      Valid Transfer.  The transfer of the Assets to the Buyer (or any Designated Buyer, as applicable), including the consummation of the transactions contemplated by the Agency Agreement, shall be as of the applicable Closing Date a legal, valid, and effective transfer of such

assets, and vests or shall vest the Buyer (or any Designated Buyer, as applicable) with all right, title, and interest to the Assets free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances.

S.     Free and Clear Sale.  The Debtors may sell the Assets free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances (as may be modified by this Sale Order), as contemplated under the APA (including the Agency Agreement), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Holders of Encumbrances that affirmatively consented to the Sale and the entry of this Sale Order (on the record or otherwise), or did not object, or who withdrew their objections to the Motion or the Sale, are deemed, subject to the terms of this Sale Order, to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code and shall be forever barred and estopped from pursuing or asserting any right, title, claim, or interest against the Buyer, or any of its, or their, respective assets, property, affiliates, successors, assigns, or the Assets.  All holders of Encumbrances are adequately protected by having their Encumbrances, if any, attach to the net cash proceeds the Debtors shall receive in connection with the Sale that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such Encumbrances now have against the Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

T.     If the Sale were not free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances (as may be modified by this Sale Order), if the Buyer (or any Designated Buyer, as applicable) would, or in the future could, be liable for any Encumbrances other than Assumed Liabilities and Permitted Encumbrances, or if the Buyer (or any Designated

13

Buyer, as applicable) could be liable for any liabilities related to the Debtors' business under any law or statute that purports to apply to the Buyer (or any Designated Buyer, as applicable) in the first instance rather than as successor or transferee, the Buyer would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors, their estates, their creditors, and all other parties in interest.  A sale of the Assets other than one free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances would yield substantially less value for the Debtors' estates, with less certainty, than the Sale.  Therefore, the Sale contemplated under the APA is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

U.      Designation Rights Procedures.  The Debtors have demonstrated that the Designation Rights and the Designation Rights procedures contained in the APA (the "Designation Rights Procedures") are an exercise of the Debtors' sound business judgment, and are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  The Designation Rights are an integral part of the APA and the Sale, and accordingly the Designation Rights are reasonable and fair under applicable law or rules, and enhance the value of the Debtors' estates.

V.      The Debtors and the Buyer, or any Designated Buyer, as applicable  will, to the extent necessary, satisfy the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, prior to the assumption and assignment of the Assigned Contracts pursuant to the Designation Rights Procedures and the APA and will:  (a) cure any default existing prior to the effective date of any assumption and assignment of any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; (b) provide compensation or adequate assurance of compensation to any party

for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and (c) provide adequate assurance of future performance with respect to the Assigned Contracts, within the meaning of sections 365(b)(1), 365(b)(3) (to the extent applicable), and 365(f)(2) of the Bankruptcy Code.  The Assigned Contracts are assignable pursuant to the Designation Rights Procedures notwithstanding any anti-assignment provisions contained therein that are unenforceable solely in connection with this Sale, including, provisions that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract.

     W.     <u>Single, Integrated Transaction</u>.  The APA (including the conduct of the Store Closing Sale under the Agency Agreement) and Sale must be approved and the Initial Closing must occur promptly to preserve the value of the Assets and the Debtors' estates.  The provisions of this Sale Order and the APA (including the Agency Agreement) and the transactions contemplated under this Sale Order and the APA (including the Agency Agreement) and the Sale to the Buyer, and any Designated Buyer, are inextricably linked and technically and collectively constitute a single, integrated transaction.

     X.     <u>Consummation is Legal, Valid and Authorized</u>.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all the applicable requirements of such sections have been complied with in respect of the Sale.

Y.        Waiver of Stay.  Time is of the essence in effectuating the APA and proceeding

with the transactions contemplated therein without interruption.  Accordingly, cause exists to

waive the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a), 6004(h),

and 6006(d) to permit the immediate effectiveness of this Sale Order.

Z.        Legal and Factual Bases.  The legal and factual bases set forth in the Motion and

at the Sale Hearing establish just cause for the relief granted herein.

## NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.        The relief requested in the Motion is granted as set forth herein.

2.        Any and all objections and responses to the Motion that have not been withdrawn,

waived, settled, adjourned, or resolved, and all reservations of rights included therein, are hereby

overruled and denied on the merits with prejudice; *provided* that the foregoing shall not prejudice

any applicable Counterparty's rights with respect to, and as provided under the Designation Rights

and the Designation Rights Procedures (each as defined herein).

3.        Notice of the Motion, the Sale Hearing, and the Sale was fair and equitable under

the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008, the Local Rules, and applicable law.

### Approval of the Sale of the Assets

4.        Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, the Debtors' sale

of the Assets to the Buyer is hereby approved in all respects unless otherwise set forth in this Sale

Order, and the Debtors are each hereby authorized to enter into the APA, including all other

ancillary documents, agreements, instruments, notices, and papers related thereto or contemplated

thereunder, including, but not limited to, the Agency Agreement, and all the terms and conditions

thereof, and the Sale and related transactions contemplated thereunder.

5.     Pursuant to sections 363 and 365 of the Bankruptcy Code, the Selling Entities' entry into the APA (including the Agency Agreement), and any other ancillary documents required in connection with Sale, is hereby authorized and approved as a valid exercise of their business judgment.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to continue performance under and make all payments required by the APA and Agency Agreement (on the terms and conditions set forth herein) and all other ancillary documents as and when due thereunder without further order of the Court.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their agents, representatives, directors, and officers, are authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of this Sale Order and the APA (including the Agency Agreement); (b) transfer and assign all right, title, and interest to all property, licenses, and rights to be conveyed in accordance with the terms and conditions of this Sale Order and the APA; and (c) execute and deliver, perform under, consummate, and implement this Sale Order and the APA (including the Agency Agreement) and all additional instruments and documents that may be reasonably necessary or desirable to implement this Sale Order, the APA, the Agency Agreement, and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated under this Sale Order, the APA, and any other ancillary documents. The Debtors are further authorized to pay, without further order of the Court, whether before, at or after the Closing, any amounts that become payable by the Debtors pursuant to the APA, the Agency Agreement, or ancillary documents (on the terms and conditions set forth herein), together with other fees and expenses approved by the Court. Such amounts shall:  (a) constitute allowed administrative expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(2) of the

Bankruptcy Code (provided that the priority of such administrative claims shall in no circumstance so long as the DIP Obligations or the Prepetition Secured Obligations remain outstanding, be *pari passu* with or senior to the claims granted to the DIP Credit Parties or the Prepetition Secured Creditors, respectively); (b) be treated with such priority if the chapter 11 cases convert to cases under chapter 7 of the Bankruptcy Code; and (c) not be discharged, modified, or otherwise affected by any reorganization or liquidation plan for any of the Debtors, except by written agreement with the Buyer (such agreement to be provided in the Buyer's sole discretion). Neither the Buyer nor the Selling Entities shall have any obligation to proceed with the Closing under the APA until all conditions precedent to their respective obligations to do so have been met, satisfied, or waived in accordance with the terms of the APA.

6.      The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units (as defined in section 101(27) of the Bankruptcy Code), any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the APA, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and bylaws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors or Buyer (or any Designated Buyer, as applicable), as the case may be, may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

7.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all their creditors, all holders of equity interests in the Debtors, all holders of any Encumbrances

against the Debtors, any holders of Encumbrances against or on all or any portion of the Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' bankruptcy cases.  The terms and provisions of the APA and this Sale Order shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer (including any Designated Buyer, as applicable), and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer (and any Designated Buyer, as applicable), and any other affected third parties, including all persons asserting any Encumbrances in the Assets to be sold to the Buyer (including any Designated Buyer, as applicable) pursuant to the APA and Agency Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  This Sale Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.  Nothing contained in any chapter 11 plan of reorganization or liquidation confirmed in any of these chapter 11 cases, any order confirming any such chapter 11 plan of reorganization or liquidation or any order approving the wind-down or dismissal of any of these chapter 11 cases or any subsequent chapter 7 cases (including any discharge of Claims thereunder) or otherwise shall alter, conflict with, or derogate from the provisions of this Sale Order or the APA (including the Agency Agreement), and to the extent of any conflict or derogation between this Sale Order or the APA (including the Agency Agreement) and such future plan or order, the terms of this Sale Order and the APA (including the Agency Agreement) shall

control. To the extent of any conflict between the terms of this Sale Order, the APA, or the Agency Agreement, except as otherwise set forth in this Sale Order, the terms of this Sale Order shall control.

### Sale and Transfer of the Assets

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Assets to the Buyer (or a Designated Buyer, as applicable) in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall vest the Buyer (or a Designated Buyer, as applicable) with title in and to the Assets and, other than the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in this Sale Order, the Buyer (or a Designated Buyer, as applicable) shall take title to and possession of the Assets free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) and other interests of any kind or nature whatsoever, including, but not limited to, "bulk sale" rules (or similar laws) and theories of successor or successor-in-interest liability regardless of whether such theory, rule, or law would purport to provide for the Buyer's (or a Designated Buyer's, as applicable) direct liability rather than merely as a successor of the Selling Entities and claims in respect of the Excluded Liabilities, with all such Encumbrances and other interests to attach to the net cash proceeds the Debtors receive in connection with the Sale that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such Encumbrances now have against the Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.  Those holders of such Encumbrances and other parties in interest that did not object (or that ultimately withdrew their objections, if any) to the Sale are deemed to have consented to such Sale being free and clear of all Encumbrances (other

than Assumed Liabilities and Permitted Encumbrances or as otherwise set forth in this Sale Order) pursuant to sections 363(f)(2) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Encumbrance, claim, right, interests, or otherwise that constitute interests in the Assets, if any, attach solely to the proceeds of the Sale ultimately attributable to the property in which they have an interest, in each case with the same validity, force and effect that such holders had prior to the entry of this Sale Order, and subject to any claims and defenses of the Debtors; *provided* that the foregoing shall not prejudice any applicable Counterparty's rights with respect to, and as provided under the Designation Rights and the Designation Rights Procedures.  Neither the process by which any of the Assets were sold, nor the results of such Sale in the APA (as opposed to selling the Assets to any other party), create claims of any kind against either the Buyer (or a Designated Buyer, as applicable) or the Debtors, and no claims arising out of the sale process or the Sale shall be brought against the Buyer (or any Designated Buyer, as applicable) or the Debtors.

9.      Pursuant to the APA, the sale of the Avoidance Actions described in Section 2.01(b)(xviii) of the APA  (excluding the right to assert setoff rights that may arise from Avoidance Actions in relation to any Liability that is not an Assumed Liability, which right shall be retained by the Debtors), and all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of setoff, rights of subrogation, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or Applicable Laws (the "Purchased Avoidance Actions") is hereby approved.

10.     Unless otherwise expressly included in the definition of "Assumed Liabilities" or "Permitted Encumbrances" in the APA or as otherwise set forth in this Sale Order, neither the

Buyer nor any Designated Buyer shall be responsible for any Encumbrances, including, for the avoidance of doubt, any Claims (as defined in section 101(5) of the Bankruptcy Code).

11.     As set forth in Section 2.02(h) and (m) of the APA, Excluded Proceedings and the proceeds thereof, as well as D&O Insurance Policies, the proceeds thereof, and all rights and benefits of any nature relating to the D&O Insurance Policies (including any claims arising under such policies and all credits, proceeds, causes of action or rights thereunder) shall constitute Excluded Assets.

12.     Notwithstanding anything to the contrary in this Sale Order or the APA, with respect to each Assigned Contract, upon assumption and assignment of such Assigned Contract to the Buyer (or a Designated Buyer, as applicable) pursuant to the Designation Rights Procedures, the Buyer (or a Designated Buyer, as applicable) shall be responsible for all obligations under such Assigned Contract, *cum onere*, including, without limitation, liabilities for any default under such Assigned Contract, in each case arising or occurring after such assumption, assignment and sale, and for payment or performance of any and all obligations under such Assigned Contract arising or occurring after such assumption, assignment and sale when due in accordance with the terms of such Assigned Contract (irrespective of whether such obligations accrued before, on, or after assumption and assignment of the Assigned Contract), including with respect to (a) claims for indemnification, and (b) year-end adjustment and reconciliation amounts that become due or accrue after the entry of this Sale Order, including for royalties, rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent, in each case subject to the terms and conditions of the Assigned Contract, and subject to any defenses provided by such Assigned Contract and applicable non-bankruptcy law and unless otherwise agreed with the counterparty to the Assigned Contract. To the extent the Buyer (or any Designated

22

Buyer, as applicable) relies on the Debtors' existing insurance coverage to satisfy any such assumed indemnification obligations under any Assigned Contracts, any deductibles or self-insured retention amount shall be the responsibility of the Buyer (or any Designated Buyer, as applicable), except to the extent the applicable Selling Entity has already satisfied any such insurance deductibles or self-insured retention amount. Notwithstanding the definition of Pre-Closing Liabilities in the APA, in the event the Initial Closing does not close by January 1, 2025, Buyer shall nevertheless be responsible for Occupancy Expenses (as defined in the Agency Agreement) for the month of January 2025 in accordance with the APA, which amount shall be paid to the Debtors upon the Initial Closing Date and the Debtors shall promptly pay to applicable landlords. Consistent with the Agency Agreement, the Buyer shall pay Occupancy Expenses for each subsequent month the Debtors continue to occupy the leased premises by funding the applicable Occupancy Expenses to the Debtors on or prior to the first Business Day of each month, and the Debtors shall promptly pay such amounts to applicable landlords in accordance with the terms of the nonresidential real property leases.

13.     On the applicable Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Assets or a bill of sale transferring the Debtors' good and marketable title in such Assets to the Buyer (or any Designated Buyer, as applicable) pursuant to the terms set forth in this Sale Order and the APA. This Sale Order is and shall be effective as a determination that, on the Initial Closing Date, all Encumbrances or other interests of any kind or nature whatsoever existing as to the Assets prior to the Initial Closing Date, other than the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein

have been affected.  This Sale Order shall be binding upon and govern the acts of all persons and

entities, including, without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or contract,

to accept, file, register, or otherwise record or release any documents or instruments, or who may

be required to report or insure any title or state of title in or to any lease, and each of the foregoing

persons and entities is hereby authorized to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the APA

and the Agency Agreement.  A certified copy of this Sale Order may be filed with the appropriate

clerk and/or recorded with the recorder to act to cancel any Encumbrances and other interests of

record except those assumed as Assumed Liabilities or Permitted Encumbrances.

      14.    Subject to the terms and conditions of this Sale Order, the transfer of the Assets to

the Buyer (or any Designated Buyer, as applicable) pursuant to the APA (including the Agency

Agreement) and the consummation of the Sale and any related actions contemplated thereby do

not require any consents other than as specifically provided for in this Sale Order and the APA and

the Agency Agreement, constitute a legal, valid, and effective transfer of the Assets, and shall vest

the Buyer (or any Designated Buyer, as applicable) with right, title, and interest in and to the Assets

as set forth in this Sale Order and the APA and Agency Agreement, as applicable, free and clear

of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances.

      15.    All entities that are presently, or on the applicable Closing Date may be, in

possession of some or all of the Assets to be sold, transferred, or conveyed (wherever located) to

the Buyer (or any Designated Buyer, as applicable) pursuant to this Sale Order, the APA and the

Agency Agreement are hereby directed to surrender possession of the Assets to the Buyer (or any Designated Buyer, as applicable) on the applicable Closing Date.

16.    Upon Closing, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) that the person or entity has with respect to the Assets, then (a) the Debtors may request that the applicable person or entity execute and file such termination statements, releases, instruments of satisfaction, or other documents with respect to the Assets, and, to the extent such person or entity fails to do so, may execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets, and (b) the Buyer (or any Designated Buyer, as applicable) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against or in the Assets of any kind or nature (other than Assumed Liabilities and Permitted Encumbrances).  For the avoidance of doubt, upon Closing, the Buyer (or any Designated Buyer, as applicable) is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any Encumbrances that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.  Notwithstanding the foregoing, the provisions of this Sale Order shall be self-executing and neither the Debtors nor the Buyer (or its designee,

including any Designated Buyer) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

17.     Except for the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in this Sale Order, neither the Buyer nor any of its designees (including any Designated Buyer) shall have any liability or other obligation of the Debtors arising under or related to any of the Assets, including, but not limited to, any liability for any Encumbrances, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the applicable Closing Date.

18.     Except to the extent included in Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in this Sale Order, or as necessary to enforce the APA and Agency Agreement, all persons and entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, contract counterparties, customers, licensors, litigation claimants, employees and former employees, dealers and sale representatives, and trade or other creditors holding Encumbrances against or in the Debtors and their estates or the Assets arising under or out of, in connection with, or in any way relating to, the transfer of the Assets to the Buyer (or any Designated Buyer, as applicable), or any entities or individuals asserting any interests in the Assets, hereby are forever barred, estopped, and permanently enjoined from asserting any Encumbrances against the Buyer (or any Designated Buyer, as applicable), the permitted successors and assigns of the Buyer the Buyer (or any Designated Buyer, as applicable), the property of the Buyer the Buyer (or any

Designated Buyer, as applicable) or its permitted successors and assigns, or the Assets including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Buyer, any Designated Buyer, its successors and assigns, assets, or properties; (b) enforcing, attaching, collecting, or recovering, in any manner, any judgment, award, decree, or order against the Buyer, any Designated Buyer, its successors and assigns, or their assets or properties; (c) creating, perfecting, or enforcing any Encumbrance, lien, claim, or interest against the Buyer, any Designated Buyer, its successors and assigns, their assets, or their properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Buyer, any Designated Buyer, or its successors and assigns (except in connection with Assigned Contracts consistent with paragraph 12 of this Sale Order); (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

19. As of and after the Initial Closing and any subsequent Closing, as applicable, any and all valid and perfected liens or interests in the Assets (other than the Permitted Encumbrances and the Assumed Liabilities) shall attach to any proceeds of the Sale immediately upon receipt of such proceeds by the Debtors in the order of priority, and with the same validity, force and effect which they now have against such Assets, subject to any rights, claims, and defenses of the Debtors, the Debtors' estates or any trustee for any Debtor, or any statutory committee or any party (to the extent any such rights, claims, and defenses exist), as applicable, may possess with respect thereto; *provided*, *however*, that setoff rights shall be extinguished to the extent there is no longer

mutuality after the consummation of the Sale. At the Initial Closing, the Debtors (or the Buyer at the Debtors' direction) shall transfer, or cause to be transferred, proceeds generated from the sale of the Assets contemplated herein to the DIP Agents and the Prepetition Agents, as applicable; free and clear of any and all liens, claims and encumbrances, which shall be in an amount not less than necessary to fully fund and shall be applied for permanent application against the DIP Obligations and the Prepetition Secured Obligations in accordance with the terms and conditions of the Final DIP Order and the DIP Loan Documents until the DIP Obligations and the Prepetition Secured Obligations have been Paid in Full.   For the avoidance of doubt, any cash collateral delivered in connection with the DIP ABL Facility and the Prepetition ABL Facility being "Paid in Full" pursuant to the payoff letter entered into in connection therewith shall be held in a "Big Lots For Benefit Of" account (the "<u>ABL FBA Account</u>") at PNC Bank, N.A. for the benefit of the DIP ABL Lenders and the Prepetition ABL Lenders. The DIP ABL Lenders and the Prepetition ABL Lenders shall have a first priority, perfected security interest in the ABL FBA Account, and the Debtors and Buyer (and any Designated Buyer) shall have no control of, or ability to withdraw from, the ABL FBA Account in any respect. Similarly, any cash collateral delivered in connection with the DIP Term Facility and the Prepetition Term Facility being "Paid in Full" pursuant to the payoff letter entered into in connection therewith shall be held in an account to be identified by the DIP Term Agent (the "<u>Term FBA Account</u>") for the benefit of the DIP Term Lenders and the Prepetition Term Lenders. The DIP Term Lenders and the Prepetition Term Lenders shall have a first priority, perfected security interest in the Term FBA Account, and the Debtors and Buyer (and any Designated Buyer) shall have no control of, or ability to withdraw from, the Term FBA Account in any respect.   Prior to the occurrence of the foregoing and the payment in full of the DIP Obligations and the Prepetition Secured Obligations in accordance with the Carve Out

provisions (including paragraph 29) of the Final DIP Order, the Debtors shall transfer all funds held in the Professional Fee Account to an escrow account held by an escrow agent reasonably acceptable to the Debtors (such transfer, the "Professional Fee Escrow Transfer" and such escrow account, the "Professional Fee Escrow Account").  For the avoidance of doubt, following the occurrence of the Professional Fee Escrow Transfer, all Professional Persons shall continue to have a first-priority claim over the funds held in the Professional Fee Escrow Account, with priority over all administrative expense claims and unsecured claims against the Debtors and their estates of any kind or nature whatsoever, including, without limitation, (x) any remaining obligations of the DIP Credit Parties or the Prepetition Secured Parties that survive termination of the DIP Obligations, including any contingent indemnification claims, (y) administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, and (z) any DIP Liens or Adequate Protection Liens (each as defined in the Final DIP Order).  The Debtors shall continue to pay Professional Persons as and when the same may become due and payable, the Allowed Professional Fees of Professional Persons, from the funds held in the Professional Fee Escrow Account.  Upon the Initial Closing, in accordance with the terms of the APA, Buyer shall deposit $7,500,000 in cash to fund the Professional Fee Escrow Amount, and shall fund $1,500,000 beginning February 7, 2025 and each Friday thereafter through February 28, 2025, which all such amounts shall be deposited by Buyer into the Professional Fee Escrow Account.  Such Payments shall be an advance on the Buyer's assumption of the Professional Fees Amount in accordance with the APA. For the avoidance of doubt, at and after the Initial Closing, upon payment in full of the DIP Obligations and the Prepetition Secured Obligations, the DIP Credit Parties and Prepetition Secured Creditors shall have no further obligation to fund the Carve-

Out or the Carve Out Reserves or otherwise to fund any amount owing by the Debtors to Professional Persons. For the further avoidance of doubt, the Debtors' reversionary interest, if any, in any funds held in the ABL FBA Account and the Term FBA Account, and the proceeds thereof, shall constitute an Acquired Asset in accordance with Section 2.01(a)(xxiv) of the APA.

20. Consistent with the Final DIP Order, not later than 6:00 p.m. New York time on Tuesday of each week beginning with the week ending January 10, 2025, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of the fees and expenses incurred during the preceding week (through the Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement").

21. If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, then the estimated aggregate unpaid amount of professional fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period (if any) shall be the aggregate unpaid amount of professional fees included in the budget prepared by the Debtors as of the Initial Closing Date (and which may be updated from time to time by the Debtors) for such period for such Professional Person. If at any time the cumulative aggregate amounts reported in the Weekly Statements, or estimated pursuant to the foregoing sentence, exceed the total amount Buyer is obligated to fund into the Professional Fee Escrow Account (after adding the amount of the Professional Fee Escrow Transfer), then the Debtors shall immediately notify the Buyer and, within one (1) Business Day of receipt of such notice, such additional amount shall be funded by the Buyer into the Professional

Fee Escrow Account to cover the shortfall.  Buyer's obligation to fund the foregoing shortfall shall be capped by the amount of payments Buyer is required to make under the APA Administrative Budget and the Winddown Budget, and any payments to be made by the Buyer to the Debtors' estates in accordance with the APA Administrative Budget and the Winddown Budget shall be reduced by the amount of such shortfall.  If following any payments made by the Buyer, the funds in the Professional Fee Escrow Account are insufficient to pay all Allowed Professional Fee claims (the "Professional Fee Shortfall"), then the Professional Persons shall continue to have a superpriority administrative expense claim, senior to all other claims, against, and a superpriority lien, senior to all other liens, on, all remaining assets in the Debtors' estates for such Professional Fee Shortfall.  Any amounts remaining in the Professional Fee Escrow Account after the payment in full of all Professional Fees Amount of Professional Persons pursuant through the final Closing shall be returned to the Debtors.

22.    Upon the Initial Closing Date, the Buyer shall pay the Debtors the portion of the Purchase Price allocated to outstanding stub rent (as set forth in section 3.01(a)(ii) of the APA), and the Debtors shall promptly pay such outstanding stub rent to the applicable landlords, unless otherwise agreed between the Debtors and the applicable landlord.

23.    Neither the Buyer, any Designated Buyer, nor its affiliates, successors, and assigns, shall have nor incur any liability to, or be subject to, any action by any Debtor or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA, the Agency Agreement, the Transaction Documents, and the entry into and consummation of the Sale, except as expressly provided in the APA, the Agency Agreement, and this Sale Order.

24.     To the greatest extent available under applicable law, the Buyer (or any Designated Buyer, as applicable), shall be authorized, as of the applicable Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets to the extent transferred in the APA or Agency Agreement, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Buyer (or any Designated Buyer, as applicable), as of the Closing Date.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APA and Agency Agreement, including the Sale and the assumption and assignment of the Assigned Contracts.  To the extent any license or permit necessary for the operation of the business of the Debtors is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code or otherwise transferable to the Buyer (or any Designated Buyer, as applicable), the Buyer (or any Designated Buyer, as applicable), may apply for and obtain any necessary license or permit promptly and the Debtors are hereby authorized to cooperate with the Buyer (or any Designated Buyer, as applicable) in connection with any such application as the Buyer (or any Designated Buyer, as applicable) deems reasonably necessary or desirable, pursuant to the provisions of the APA.

25.     Subject to the terms of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the Debtors' ability to sell and transfer the Assets to the Buyer (or any Designated Buyer, as applicable) in accordance with the terms of the APA and this Sale Order; *provided, however,* the foregoing shall not prejudice the rights of any Utility (as defined in the *Final Order (I) Prohibiting*

*Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* [D.I. 579]) under section 366 of the Bankruptcy Code and applicable state laws, regulations and/or tariffs under 28 U.S.C. Section 959(b).

26.     The Buyer has given substantial and fair consideration under the APA and the Agency Agreement for the benefit of the Debtors, their estates, and their creditors.  The Buyer's consideration for the Assets under the APA and the Agency Agreement shall constitute valid and valuable consideration for the releases of any potential Encumbrances pursuant to this Sale Order, which releases, to the extent applicable under section 363(f) of the Bankruptcy Code, shall be deemed to have been given in favor of the Buyer (and any Designated Buyer, as applicable) by all holders of Encumbrances or liens against or interests in, or claims against, any of the Debtors or any of the Assets, other than with respect to the Assumed Liabilities or Permitted Encumbrances or as otherwise set forth in this Sale Order.  The Buyer's consideration for the Assets under the APA and Agency Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

**Executory Contracts and Unexpired Leases to be Assumed and Assigned**

27.     Upon exercise of the Designation Rights pursuant to the Designation Rights Procedures and the occurrence of the applicable Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer (or any Designated Buyer, as applicable) shall be fully and irrevocably vested in all right, title, and interest in and of each Assigned Contract, subject to the Designation Rights and the Designation Rights Procedures.  The Buyer (or any Designated Buyer, as applicable) shall cooperate with the Debtors and all counterparties to the Assigned Contracts to effectuate the foregoing pursuant to the APA and the Designation Rights Procedures.

28.    Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer or any applicable Designated Buyer, subject to the other applicable terms of the Assigned Contract.  Any extension or renewal options in connection with all Assigned Contracts that the Debtors validly exercised prior to the entry of this Sale Order, and all terms of the Assigned Contracts are in full force and effect and have not been previously rejected, and, as of the date of entry of this Sale Order, the Debtors' time to assume or reject the Assigned Contracts has not otherwise expired.

29.    Pursuant to sections 365(b)(1)(A)–(B) of the Bankruptcy Code and in accordance with the APA and the Designation Rights Procedures, at the applicable Closing, the Buyer or the applicable Designated Buyer shall pay to the respective counterparty the Cure Costs relating to any Assigned Contract.

30.    All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the applicable Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the applicable Closing Date or as soon thereafter as reasonably practicable through the Buyer's or applicable Designated Buyer's payment of the Cure Costs.

31.    Upon the Debtors' assignment of the Assigned Contracts to the Buyer (or any Designated Buyer, as applicable) under the Designation Rights Procedures set forth in this Sale Order and any additional orders of the Court and payment of any Cure Costs by the Buyer or applicable Designated Buyer, no counterparty to any Assigned Contract shall be permitted (a) to declare a pre-assignment default by the Buyer (or any Designated Buyer, as applicable) under such

Assigned Contract or (b) otherwise take action against the Buyer (or any Designated Buyer, as applicable) as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Assigned Contract. Each non-Debtor party to an Assigned Contract, subject to and following the Buyer's exercise of the Designation Rights consistent with the Designation Rights Procedures, hereby is also forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the Buyer (or any Designated Buyer, as applicable), or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or, against the Buyer (or any Designated Buyer, as applicable), any counterclaim, defense, setoff, recoupment, or any other Claim asserted or assertable against the Debtors, in each case, except as provided in paragraph 12 of this Sale Order and (b) imposing or charging against the Buyer (or any Designated Buyer, as applicable) any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to the Buyer (or any Designated Buyer, as applicable) of any Assigned Contract in accordance with the APA. The validity of such assumption and assignment of each Assigned Contract shall not be affected by any dispute between the Debtors and any non-Debtor party to an Assigned Contract relating to such contract's respective Cure Costs.

32.     Subject to the Designation Rights Procedures, and as further set forth in this Sale Order, pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized to assume all Assigned Contracts, and assign such Assigned Contracts to the Buyer (or any Designated Buyer, as applicable) or transfer such Assigned Contracts to the Buyer (or any Designated Buyer, as applicable), as applicable.

33. The payment of the applicable Cure Costs (if any) and cure of any non-monetary defaults (if any) subject to the Designation Rights Procedures, shall effect a cure of all defaults existing as of the date that such Assigned Contracts are assumed and compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and the non-Debtor parties to such Assigned Contracts are forever bound by such Cure Costs and, upon payment of such Cure Costs, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, the Buyer (or any Designated Buyer, as applicable) and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer (or any Designated Buyer, as applicable), or the Assets with respect to any claim for cure under any Assigned Contract.

34. Subject to the Designation Rights Procedures, and as further set forth in this Sale Order, the Debtors shall have assumed the Assigned Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned Contracts to the (or any Designated Buyer, as applicable) shall not be a default thereunder. After the payment of the relevant Cure Costs by Buyer or any Designated Buyer, as applicable, neither the Debtors and their bankruptcy estates nor the Buyer (or any Designated Buyer, as applicable) shall have any further liabilities to the non-Debtor counterparties to the Assigned Contracts, other than the Buyer's (or any Designated Buyer's, as applicable) obligations under the Assigned Contracts as set forth in paragraph 12 of this Sale Order.

35. Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract constitute anti-assignment provisions that are unenforceable

36

solely in connection with this Sale, subject to exercise of the Designation Rights pursuant to the Designation Rights Procedures).

36.     Nothing in this Sale Order, the Motion, or any notice relating to the assumption and assignment of the Assigned Contracts, is or shall be deemed an admission by the Debtors that any contract is an executory contract or must be assumed and assigned pursuant to the APA or in order to consummate the Sale.

37.     Upon entry of an order approving the assignment of the Assigned Contracts and payment of the applicable Cure Costs, the Buyer (or any Designated Buyer, as applicable) shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts, and the Debtors and their bankruptcy estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability for a breach under the Assigned Contracts.

38.     The failure of the Debtors or the Buyer (or any Designated Buyer, as applicable) to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's (or any Designated Buyer's, as applicable) rights to enforce every term and condition of the Assigned Contracts.

39.     The Buyer (or any Designated Buyer, as applicable) will provide prior to the effective date of any assumption and assignment of any Assigned Contract, and in accordance with the Designation Rights Procedures, adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code.

40.     Neither the Buyer (or any Designated Buyer, as applicable) nor any permitted successor or assign of the Buyer (or any Designated Buyer, as applicable) shall be responsible for

or have any Encumbrances or obligations arising out of any of the Excluded Contracts (except as specifically provided by the APA or this Sale Order).

41.    <u>Designation Rights</u>. During the Designation Rights Period, the Buyer may designate any 365 Contract for assumption and assignment in accordance with the terms of the APA and this Sale Order (in such instance, a "<u>Designated 365 Contract</u>").   In such event, the Debtors shall file with the Court and serve on the applicable Counterparty a Designated 365 Contract Notice (as defined below).  The Debtors shall also deliver to the applicable Counterparty (and deliver by email to counsel for the applicable Counterparty, if such counsel has filed a notice of appearance or request for service of notices) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designated 365 Contract that is proposed to be assumed and assigned to the applicable assignee.

42.    Notwithstanding anything to the contrary in the APA, during the Designation Rights Period, Buyer may deliver a written notice to Seller of Buyer's entry into an agreement with a 365 Counterparty to any Post-Closing Desired 365 Contract pursuant to which such 365 Counterparty consents to the assumption by the applicable Selling Entity and assignment to Buyer or its designee of such Post-Closing Desired 365 Contract on the terms set forth in such agreement (each, an "<u>Agreed Assignment Notice</u>"). Each Agreed Assignment Notice shall be filed with the Bankruptcy Court no later than the expiration of the Designation Rights Period.  The assumption and assignment of any Post-Closing Desired 365 Contract pursuant to Section 2.05(d) of the APA shall be effective on the date set forth in the notice (with the agreement of the applicable 365 Counterparty), provided that such date is no later than the expiration of the Designation Rights Period.

43.     At any time after Closing but in no event later than the expiration of the Designation Rights Period, Buyer may notify (a "Post-Closing Designation Notice") Seller from time to time of its determination to designate a 365 Lease (the "Post-Closing Designated Leases") or 365 Contract (the "Post-Closing Designated Contracts", and together with the Post-Closing Designated Leases, the  "Desired 365 Contracts") that has not previously been (x) rejected by the Selling Entities or (y) designated as an Assigned Asset pursuant to Disclosure Schedule 2.05(a) or Sections 2.05(b)or 2.05(c) of the APA, for assumption by the applicable Selling Entity and assignment to Buyer (or its designee).   Within five Business Days of Seller's receipt of a Post-Closing Designation Notice, the applicable Selling Entity shall provide written notice to the counterparty of such Post-Closing Desired 365 Contract (such counterparty, the "365 Counterparty") of Seller's intent to assume and assign such Post-Closing Desired 365 Contract (each, a "Designated 365 Contract Notice"). Each Designated 365 Contract Notice will set forth the following information: (a) the street address of the real property that is the subject of such 365 Contract; (b) the name and address of the Counterparty (and their counsel, if known); (c) a description of the deadline and procedures for filing objections to the Designated 365 Contract Notice; (d) the identity of the proposed assignee; (e) information intended to provide the Counterparty to the Designated 365 Contract with adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code; (f) the proposed Cure Costs associated with such Designated 365 Contract; and (g) a proposed form of order authorizing the assumption and assignment; *provided, however,* that if adequate assurance information is provided pursuant to this paragraph 43, such adequate assurance information shall be kept strictly confidential and not be used for any purpose other than to (a) evaluate whether adequate assurance requirements under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code have been

satisfied, and (b) to support any objection to adequate assurance provided by any party including the Buyer (or any Designated Buyer, as applicable) and its affiliates.

44.     Any party seeking to object to the assumption and assignment of any Designated 365 Contract on any basis (including, but not limited to, Cure Costs or objections to adequate assurance of future performance if such Designated 365 Contract is designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer (or any Designated Buyer, as applicable) must (a) file a written objection in compliance with the Bankruptcy Rules and Local Rules (a "Designated Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later than fourteen (14) days after the date on which (and if not the same day, the later of) (i) the applicable Designated 365 Contract Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the terms hereof is served on the applicable Counterparty (the "Designated Contract Assumption and Assignment Objection Deadline"); and (b) serve the Designated Contract Assumption and Assignment Objection (by email) so that it is actually received by counsel for the Debtors, the Buyer and applicable designated assignee on or before the Designated Contract Assumption and Assignment Deadline.

45.     If no Designated Contract Assumption and Assignment Objection has been filed by the Designated Contract Assumption and Assignment Objection Deadline, the Debtors, the Buyer, and the applicable assignee shall submit for evaluation and entry by this Court, under certificate of no objection, an order approving assignment of the Designated 365 Contract (such order, a "Designated Contract Assignment Order").  Each Designated Contract Assignment Order shall provide that the assumption and assignment of a Designated 365 Contract shall be effective as of the date of entry of the Designated Contract Assignment Order, unless the applicable 365

Counterparty, the Debtors, and the Designated Buyer have agreed to a different date, or as otherwise set forth in this Sale Order.  The Designated Contract Assignment Order may seek, among other things, that upon the applicable Designated Assignment Date, except as otherwise expressly agreed by the applicable assignee and the applicable Counterparty, notwithstanding any provision in any Designated 365 Contract that purports to prohibit, restrict, or condition such action, upon the assumption and assignment of such Designated 365 Contract to an assignee in accordance with the terms of the APA and any related assignment agreements, (x) the applicable assignee shall be authorized to:  (i) use the leased premises subject to the Designated 365 Contract (such premises, the "Leased Premises") as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designated 365 Contract to such assignee in accordance with the terms of the APA and any related assignment agreements; (ii) operate its business at the Leased Premises under its tradename; (iii) make such alterations and modifications to the interior and exterior of the Leased Premises (including signage, together with appropriate changes to existing tenant signage in the respective shopping center, including signage affixed to the building panels on all directional and other ground and off-premises signs where the Debtors are presently represented) as are determined by the applicable assignee to be necessary to conform such Leased Premises to the applicable assignee's typical retail store; (iv) remain "dark" with respect to such Leased Premises after such assumption and assignment until the date that is necessary to permit, but no more than 270 consecutive days, such assignee to remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above; and (v) exercise, utilize, or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Designated 365 Contract (including all of the same which may be described or designated as, or purport to be,

"personal" to the Debtors or to a named entity in such Designated 365 Contract or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name) and (y) neither the Buyer nor the applicable assignee shall have any responsibility or liability for any Excluded Liabilities.  All parties' rights are reserved with respect to objections to these provisions that may be sought in any subsequent Designated Contract Assignment Order, and objections to these terms and provisions may be filed by the applicable Designated Contract Assumption and Assignment Objection Deadline.

46.     If a Designated Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the applicable assignee, and the objecting 365 Counterparty shall have authority to compromise, settle, or otherwise resolve any objections and submit an agreed form of order under certification of counsel.  If the Debtors, the applicable assignee, and the objecting 365 Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designated 365 Contract will be determined by the Court on a date to be scheduled by any of the Debtors or the applicable assignee in consultation with the, Buyer, any Designated Buyer (where applicable), and the objecting Counterparty (which hearing date shall be no sooner than ten business days following the date of filing of the Designated 365 Contract Notice Objection, unless the Debtors, the Buyer, the applicable assignee, and the applicable 365 Counterparty agree otherwise).

47.     Unless a Designated Contract Assumption and Assignment Objection with respect to the Buyer was filed and served before the applicable Designated Contract Assumption and Assignment Objection Deadline, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignment of its respective Designated 365 Contract(s) to the Buyer (or

any Designated Buyer, as applicable) in accordance with the APA, and the applicable Counterparty is forever barred from objecting to (i) the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Designated 365 Contract in the event it is assumed and/or assigned, except to the extent such Cure Costs further accrue (being subject to further credits, debits, and adjustments in accordance with the terms of the applicable underlying Designated 365 Contract) following the Debtors' filing of the applicable assumption and assignment notice or (ii) adequate assurance of future performance by the Buyer (or any Designated Buyer, as applicable).

48.     Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer (or Designated Buyer, if applicable) shall, on the applicable assumption effective date for a 365 Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code, and pay to the applicable 365 Counterparty all Cure Costs. Upon assumption and assignment of any 365 Contract and payment of the applicable Cure Costs, the Debtors and the estates shall be relieved of any liability for breach of such 365 Contract pursuant to section 365(k) of the Bankruptcy Code, except as expressly provided herein or in the APA or related agreements. For the avoidance of doubt, during the Designation Rights Period, nothing in this Sale Order or the APA shall modify the obligations of the Debtors pursuant to Section 365(d)(3) of the Bankruptcy Code with respect to unexpired real property leases that are 365 Contracts until such time as the applicable 365 Contract is assumed, assumed and assigned, or rejected. Nothing in this Sale Order shall be considered an extension of the Debtors' time to assume or reject nonresidential real property leases pursuant to Section 365(d)(4).

49.     The Debtors may seek that upon the applicable assignment effective date, any provision in any 365 Contract that purports to declare a breach or default as a result of a change or

transfer of control of any interest in respect of the Debtors is unenforceable (solely in connection with this Sale) and all assigned 365 Contracts that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such 365 Contract (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such 365 Contract); (ii) provide for the cancellation, or modification of the terms of the 365 Contract based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such 365 Contract upon assignment thereof; or (iv) provide for any rights of first refusal on a Counterparty's part, or any recapture or termination rights in favor of a Counterparty, or any right of a landlord to take an assignment or sub lease from a tenant, shall have any force or effect with respect to the grant and honoring of the Buyer's 365 Contract designation rights or in accordance with this Sale Order and the APA and assignments of 365 Contracts by the Debtors in accordance therewith or in accordance with any Designated Contract Assignment Order.

## **Provisions Related to the Agency Agreement**

50.     The Debtors are each hereby authorized to enter into Agency Agreement, a copy of which is attached hereto as **Exhibit 2**, and each of the transactions contemplated therein, including, but not limited to, conducting the Sale (as defined in the Agency Agreement) pursuant to the Agency Agreement, which shall be binding on all parties thereto and incorporated herein by reference. Following the Initial Closing, the Agent shall be deemed to be the Debtors' and Buyer's exclusive agent for the purpose of conducting the Store Closing Sale and selling the Assets constituting Designated Assets, and any other assets to be sold pursuant to the Agency Agreement free and clear of all Claims, Liens, Interests or other Encumbrances thereon.

51.     Subject to the provisions of this Sale Order, as same may be modified by any Side Letter (as defined below), the Debtors, Buyer and Agent are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Store Closing Sale in accordance with the Agency Agreement and the Store Closing Procedures[4] as may be modified by any Side Letter, which Store Closing Procedures are hereby approved in their entirety.

52.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, Buyer, Agent and each of their respective officers, employees and agents are hereby authorized to (i) execute such documents and to do such acts as are necessary or desirable to carry out the transactions contemplated by the Agency Agreement, including the conduct of the Store Closing Sale in accordance with the Agency Agreement and Store Closing Procedures, (ii) effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein, and any actions taken by the Debtors, Buyer and/or the Agent necessary or desirable to implement said transactions prior to the date of this Sale Order, are hereby are approved and ratified. Any officer of the Debtors is authorized to act on behalf of the Debtors in connection with the Store Closing Sale and no other consents or approvals are necessary or required for the Debtors to carry out the Store Closing Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

53.     The Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions

---

[4]     For purposes of this Sale Order, Store Closing Procedures shall have the meaning ascribed thereto in the Court's Final Order (I) Authorizing Debtors To Assume The Consulting Agreement, (II) Authorizing Store Closing Sales And Approving Related Procedures, And (III) Granting Related Relief" [ECF No. 576].

imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than

all applicable laws, rules and regulations in respect of "going out of business", "store closing" or

similar-themed sales and permitting, including laws restricting safe, professional and

nondeceptive, customary advertising such as signs, banners, posting of signage, and use of sign-

walkers solely in connection with the Store Closing Sale and including ordinances establishing

license or permit requirements, waiting periods, time limits or bulk sale restrictions that would

otherwise apply solely to the Store Closing Sale (collectively, the "Liquidation Sale Laws"),

*provided* that the Store Closing Sale are conducted in accordance with the terms of the Agency

Agreement, the Store Closing Procedures and this Sale Order (as may be modified by any Side

Letter). To the extent the Store Closing Sale are subject to any Liquidation Sale Laws, the

following provisions shall apply:

a. Within two (2) business days after entry of this Sale Order, the Debtors shall serve copies of this Sale Order, the Agency Agreement, and the Store Closing Procedures via email, facsimile, or regular mail, on the following: (i) the United States Trustee; (ii) the state attorney general's office for each state where the Store Closing Sale are being conducted; (iii) the county consumer protection agency or similar agency for each county where the Store Closing Sale will be held; (iv) the division of consumer protection for each state where the Store Closing Sale will be held; (v) the chief legal counsel for the local jurisdiction; and (vi) the landlords for the Stores.

b. To the extent there is a dispute arising from or relating to the Store Closing Sale, this Sale Order, the Agency Agreement, or the Store Closing Procedures, which dispute relates to any Applicable General Laws (a "Reserved Dispute"), this Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten (10) days following entry of this Sale Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (which may be by e-mail) to Any Governmental Unit may assert a Reserved Dispute by sending a written notice (which may be by e-mail) explaining the nature of the dispute to: (a) the Debtors, Davis Polk & Wardwell LLP, Attn: Brian M. Resnick, Esq., Adam L. Shpeen, Esq., Stephen D. Piraino, Esq., and Ethan Stern Esq. (notice.biglots@davispolk.com); (b) co-counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP; Attn: Robert J. Dehney, Sr., Esq., Andrew R. Remming, Esq., Daniel B. Butz, Esq., Tamara K. Mann, Esq., and Casey B. Sawyer, Esq. (biglots.mnat@morrisnichols.com); (c) the United States Trustee for the District of Delaware, Attn.: Linda J. Casey (linda.casey@usdoj.gov), Attn:

Robert J. Dehney, Sr., Esq., Andrew R. Remming, Esq., Daniel B. Butz, Esq., Tamara K. Mann, Esq., and Casey B. Sawyer, Esq. (biglots.mnat@morrisnichols.com); (d) counsel to the Official Committee of Unsecured Creditors, (i) McDermott Will & Emery LLP, Attn: Darren Azman, Esq., Kristin K. Going, Esq., and Stacy A. Lutkus, Esq. (BigLotsMWETeam@mwe.com) and (ii) Cole Schotz P.C., Attn: Justin R. Alberto, Esq., Stacy L. Newman, Esq., and Sarah Carnes, Esq. (CS-BigLots@coleschotz.com); (e) counsel to the Agent, Riemer & Braunstein LLP, Attn: Steven E. Fox, Esq. (sfox@riemerlaw.com); and (f) any affected landlord and their counsel of record (if known), so as to ensure delivery thereof within one (1) business day thereafter. If the Debtors, Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days after service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

c.  In the event a Dispute Resolution Motion is filed, nothing in this Sale Order shall preclude the Debtors, a landlord, or other interested party from asserting (i) that the provisions of any Applicable General Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Sale Order nor the conduct of the Debtors pursuant to this Sale Order, violates such Applicable General Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Store Closing Sale pursuant to this Sale Order, absent further order of this Court. This Court grants authority for the Debtors and the Agent to conduct the Store Closing Sale pursuant to the terms of this Sale Order, the Agency Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Applicable General Laws or the lack of any preemption of such Applicable General Laws by the Bankruptcy Code.  Nothing in this Sale Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

d.  If, at any time, a dispute arises between the Debtors and/or the Agent and a Governmental Unit as to whether a particular law is an Applicable General Law, and subject to any provisions contained in this Sale Order related to the Applicable General Laws, then any party to that dispute may utilize the provisions hereunder by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is an Applicable General Law shall be made *de novo*.

e.  Nothing in this Sale Order shall constitute a ruling with respect to any issues to be raised with respect to a Reserved Dispute.

54.  Except as expressly provided in this Sale Order, the Agency Agreement, and/or any Side Letter, the Store Closing Sale shall be conducted by the Debtors and the Agent

notwithstanding any restrictive provision or covenant in any lease, sublease, license or other agreement relative to occupancy, abandonment of assets or "going dark" provisions or other provisions or covenants that purport to prohibit, restrict or otherwise interfere with the conduct of the Store Closing Sale. Without further order of this Court, the Debtors, the Agent and landlords of the Stores are authorized to enter into agreements (each a "Side Letter") between themselves modifying the Store Closing Procedures and the Agency Agreement, to the extent such modifications do not have an adverse economic effect on the Debtors or the Buyer, and such Side Letters shall be binding on the Debtors, the Agent and any such landlords. In the event of any conflict between the Store Closing Procedures, the Agency Agreement, and any Side Letter, the terms of such Side Letter shall control. In the event of any conflict between any Side Letter and this Sale Order, the terms of this Sale Order shall control, except with respect to paragraphs 50–52 and 54–70 of this Sale Order, over which the terms of the Side Letter will control.

55. For purposes of conducting the Store Closing Sale, the Agent shall have (a) the right to the unencumbered use and occupancy of, and peaceful and quiet possession of each Store and the assets currently located at such Stores (as defined in the Agency Agreement), and (b) the exclusive right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors or Buyer, as the context makes applicable, as designated under the Agency Agreement and/or hereunder for the purpose of conducting the Store Closing Sale, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures as modified by any Side Letter and this Sale Order. The Agent, as the exclusive agent for the Debtors and Buyer, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the Store Closing Sale, and otherwise in accordance with this Sale Order and the Store Closing Procedures (as the same may be modified by any Side Letters).

56.     Except as otherwise consented to by the Agent and Buyer, which consent may be withheld, delayed, conditioned or denied in the exercise of the Buyer's and Agent's respective discretion, the Debtors shall not assign, reject or otherwise terminate any lease or other occupancy agreement relating to any Store, or vacate any Store, until the applicable Sale Termination Date or Vacate Date, as the case may be.

57.     In connection with a motion or notice by the Debtors to reject any lease, pursuant to section 554(a) of the Bankruptcy Code the Debtors, Buyer and the Agent are permitted to abandon property of the Debtors' estates in accordance with the terms and provisions of the Agency Agreement, without notice or liability to any consenting person or entity; *provided* that to the extent prohibited by applicable law, the Agent and Debtors are not authorized to abandon, and the Debtors are directed to remove and properly dispose of, any "hazardous materials" (as may be defined under applicable law of the jurisdiction in which the materials are located) from any leased premises as and to the extent required by applicable law of the jurisdiction in which the lease premises lies.

58.     Notwithstanding anything to the contrary in this Sale Order, the APA, the Agency Agreement or Store Closing Procedures, the Debtors shall not sell or abandon any property that the Debtors know is not owned by the Debtors; *provided* that the Debtors will either (a) provide for the return of such property to the Headquarters (as defined below) or (b) return such property to the applicable lessor, or other owner of the property; *provided, however,* that the Debtors may abandon property owned by the landlord at the applicable Store.  In the event of any such abandonment of property owned by the landlord at the applicable Store, such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtors or any other party in interest to object thereto.

59.     All sales of Inventory, FF&E, and Additional Agent Merchandise pursuant to the Agency Agreement will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same. However, as to the sale of Inventory in the Store Closing Sale, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  The Agent shall accept return of any goods that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, *provided* that the consumer must return the merchandise within the time period proscribed by the Debtors' return policy that was in effect when the merchandise was purchased, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect, which goods shall not be resold by the Debtors, Buyer and/or Agent.

60.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Inventory, F&E, and Additional Agent Merchandise, to the extent that disputes arise during the course of such Store Closing Sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Agent are unable to resolve the matter consensually, this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Sale Order, the Agency Agreement and Store Closing Procedures (as may be modified by a Side Letter), including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Store Closing Sale, (c)

any other disputes related to the Store Closing Sale, and (d) protection of the Debtors, Buyer and/or the Agent against any assertions of any Liens, Claims, Encumbrances, and other Interests. No such parties or person shall take any action against the Debtors, Buyer, Agent, the landlords, or the Store Closing Sale until this Court has resolved such dispute. Any party may request an emergency telephonic hearing with this Court pursuant to these provisions.

61. Except as expressly provided for herein, in the Agency Agreement, or in the Store Closing Procedures (as may be modified by a Side Letter), no person or entity, including but not limited to any landlord, licensor, or creditor shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such Store Closing Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors, utility companies, parties in interest, and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the conduct of the Store Closing Sale and/or (ii) instituting any action or proceeding in any court (other than in the Court) or administrative body with respect to Inventory, or the F&E, or seeking an order or judgment against, among others, the Debtors, Buyer, the Agent, or the landlords at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sale or other liquidation sales at the Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

62. Unless otherwise ordered by this Court, all newspapers and other advertising media in which the Store Closing Sale may be advertised and all landlords shall be directed to accept this Sale Order as binding and to allow the Debtors, Buyer, and Agent to consummate the transactions

provided for in the Agency Agreement, including, without limitation, the conducting and advertising of the Store Closing Sale in the manner contemplated by the Agency Agreement.

63.     The Additional Agent Merchandise shall be consigned to Debtors and/or Buyer, as applicable, as a true consignment under Article 9 of the Uniform Commercial Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the Proceeds (as defined in the Agency Agreement), which security interest shall be deemed perfected pursuant to this Sale Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; *provided* that Agent is hereby authorized, but shall not be required, to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise as consigned goods thereunder and Debtors as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Merchandise and related Proceeds.

64.     Upon the Closing, the Debtors shall hold the Proceeds that may be in the Debtors' possession and/or control from time to time, in trust for the benefit of the Agent as required under the Agency Agreement. To the extent that any Proceeds are ever determined to constitute property of the Debtors' estates, the Agent shall have, pursuant to section 364(d) of the Bankruptcy Code, a senior lien on such Proceeds. The Designated Deposit Accounts (as defined in the Agency Agreement) and all funds on deposit therein from time to time after the Initial Closing shall be held in trust for the benefit of the Agent, and to the extent any Designated Deposit Account or any funds on deposit therein is deemed to be property of the Debtors' estates, the Agent shall have a first priority senior security interest in each Designated Deposit Account and all funds on deposit in such accounts from and after the Closing. The liens granted pursuant to this paragraph 64 shall

be automatically perfected pursuant to this Sale Order and the Agent is expressly authorized to take any action the Agent deems appropriate to perfect and enforce such liens, without further order of this Court.

65.     Subject to the terms of paragraph 19 in this Sale Order, any amounts owed by Debtors to Agent under the Agency Agreement shall be granted the status of superpriority claims pursuant to section 364(c) of the Bankruptcy Code. Agent shall have a superpriority administrative expense claim against the Debtors to the extent of any amounts owing from the Debtors to Agent in connection with the Agency Agreement until all such amounts have been indefeasibly paid in full, subject to the right of any party in interest to object to the allowance of such claim if asserted.

66.     The Agent is hereby granted a first priority, senior security interest in and lien upon: (i) the Inventory (to the extent constituting Designated Assets); (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, processor receivables and credit card Proceeds); (iv) the FF&E; and (v) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"). Subject to the preceding sentence, and only upon entry of this Sale Order, and subject to and upon the Initial Closing, the security interests and liens granted to Agent herein shall be deemed valid, binding, enforceable, and properly perfected as provided for in Section 15.11 of the Agency Agreement (without the necessity of filing UCC-1 financing statements or any other documentation). Subject to entry of this Sale Order, neither Debtors nor Buyer shall sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of Agent Collateral other than in favor of Agent. In the event of an occurrence of an Event of Default under the Agency Agreement, other than by Agent, in any jurisdiction where the enforcement of

its rights under the Agency Agreement is sought Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

67.     Subject to the terms of the Agency Agreement, to the extent that there is Inventory remaining as of the Sale Termination Date (as such term is defined in the Agency Agreement, the "Remaining Merchandise"), Agent may, at its election and without further order of this Court, take title to such Remaining Merchandise in its own name or designate a party to take title to such Remaining Merchandise, without further consideration to the Debtors, free and clear of all liens, claims, and encumbrances. The Agent and its affiliates or designees shall be authorized to sell or cause to be sold or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.  The proceeds received by Agent upon the sale or other disposition of any Remaining Merchandise shall constitute Proceeds under the Agency Agreement and shall be for the sole account and benefit of Agent.

68.     The sales and other transactions contemplated in the Agency Agreement may not be avoided, and no damages may be assessed against the Agent under section 363(n) of the Bankruptcy Code.

69.     The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Store Closing Sale to the applicable Governmental Units as and when due, *provided* that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other

party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agency Agreement.  This Sale Order does not enjoin, suspend, or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

70.    Neither the Store Closing Procedures, Agency Agreement, nor this Sale Order authorize the Debtors to transfer or sell to the Agent the personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number ("PII") of any customers or employees unless such sale or transfer is permitted by the Debtors' privacy policy and state or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws"), or the APA.  The foregoing shall not limit the Agent's use of the Debtors' customer lists and mailing lists in accordance with the Agency Agreement solely for purposes of advertising and promoting the Store Closing Sale.  To the extent that the Debtors, Buyer or Agent propose to sell or abandon FF&E which may contain PII or confidential information about the Debtors' employees and/or customers, the Debtors shall utilize commercially reasonable efforts to remove or cause to be removed the PII from such items of FF&E before such sale or abandonment.  At the conclusion of the Store Closing Sale, and other than as provided under the APA, the Agent shall provide the Debtors with written verification that the Agent has not removed, copied, or sold any customer PII  and that any records containing PII were shredded, erased or otherwise modified to render the PII unreadable or undecipherable prior to any sales.

## **Additional Provisions**

71.     Buyer Releases.  Except to the extent expressly preserved pursuant to the APA or this Sale Order, upon the Closing Date, each of the Debtors and the Buyer  (each a "Releasing Party"), to the fullest extent permissible under applicable law, mutually releases and discharges each other Releasing Party and such Releasing Parties' respective current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, current, and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals, each in their capacity as such (collectively, in such capacity, the "Released Parties" and each a "Released Party"), from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities of every kind, nature and description whatsoever, which such Releasing Party ever had, now has or may have on or by reason of any matter, cause or thing whatsoever to the Closing Date, including any derivative claims that such Releasing Party (or someone on its behalf) would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of a holder of any claim against a Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Sale, entry into the APA, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Sale, the APA, or any restructuring transaction, contract, instrument, release, or other agreement

or document created or entered into in connection with the Sale, the APA, the filing of these chapter 11 cases, the pursuit of the Sale, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the applicable Closing Date related or relating to the foregoing; *provided* that this paragraph 74 shall not affect the liability of any Releasing Party for claims or liabilities arising out of or relating to any act or omission of a Releasing Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a final order of a court of competent jurisdiction.

72.    Lender Releases.  At (and immediately prior to) the Closing, the Debtors, on behalf of themselves their estates, and on behalf of their past, present, and future successors and assigns (solely to the extent permitted under applicable law) (collectively, the "Debtor Releasors"), hereby, forever release, discharge and acquit the DIP Credit Parties, the Prepetition Secured Parties and their respective successors and assigns, and their current and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, partners, members, managers, attorneys, employees, consultants, advisors and other representatives in their respective capacities as such (collectively, the "DIP Credit Party Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Debtor Releasors had, have or hereafter can or may have against any DIP Credit Party Releasees as of the Closing, in respect of events that occurred on or prior to the Closing relating to any Debtor or any subsidiary thereof, the APA, the Final DIP Order, the DIP Obligations or DIP Loan Documents, the Prepetition Secured Obligations, the Prepetition Secured Parties, and the Prepetition Credit Documents**.**

73.    Purchase of Avoidance Actions. Pursuant to this Sale Order and the APA, the Buyer is acquiring certain causes of action and claims pursuant to sections 2.01 (a)(xxv) and (xxvi) of

57

the APA, and upon occurrence of the Initial Closing, the Buyer shall be deemed to have released and be forever barred from enforcing and prosecuting all such claims, rights and causes of action arising under Chapter 5 of the Bankruptcy Code.

74.     <u>Consumer Privacy Provisions</u>.  The Buyer or Designated Buyer, as applicable, shall be bound by and meet the material standards established by the Seller's privacy policies solely with respect to the personally identifiable information transferred to the Buyer pursuant to the APA; *provided*, *however*, that nothing in this Sale Order shall affect, limit, restrict, prohibit, or impair any right to amend or replace such privacy policies on a going forward basis with respect to the personally identifiable information transferred to the Buyer, in accordance with the terms thereof and applicable law.

75.     <u>Automatic Stay Relief</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of the Court, to (a) allow the Buyer to deliver any notice provided for in the APA and any ancillary documents and (b) allow the Buyer, the Agent and any Designated Buyer, as applicable, to take any and all actions permitted under this Sale Order, the APA, the Agency Agreement, and any ancillary documents in accordance with the terms and conditions thereof.

76.     <u>Buyer Not a Successor</u>.  The transactions contemplated under the APA and Agency Agreement do not amount to a consolidation, merger, or *de facto* merger of the Buyer, Agent, any Designated Buyer, and the Debtors and/or the Debtors' estates; there is not substantial continuity between Buyer, Agent, any Designated Buyer, and the Debtors; there is no continuity of enterprise between the Debtors and the Buyer, Agent, or any Designated Buyer; neither the Buyer, Agent, nor any Designated Buyer is a mere continuation of the Debtors or their estates; and neither the Buyer, Agent, any Designated Buyer is a successor or assignee of the Debtors or their estates for

any purpose including, but not limited to, under any federal, state, or local statute or common law, or revenue, pension, ERISA, COBRA, tax, labor, employment, environmental (including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act, as amended), escheat, or unclaimed property laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine.  Neither the Buyer, Agent, nor any Designated Buyer,  or their respective affiliates shall have any liability or obligation under the WARN Act, 929 U.S.C. §§ 210 *et seq.,* or the Comprehensive Environmental Response Compensation and Liability Act, as amended or analogous foreign, state, or local laws and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act.  Except for the Assumed Liabilities or Permitted Encumbrances, or as otherwise set forth in this Sale Order, the (a) transfer of the Assets to Buyer (or any Designated Buyer, as applicable), or the sale of the Designated Assets by Agent pursuant to the Agency Agreement, and (b) assumption and assignment to Buyer (or any Designated Buyer, as applicable) of the Assigned Contracts do not and shall not subject Buyer, Agent, or any Designated Buyer to any liability whatsoever with respect to the operation of the Debtors' business

before the applicable Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, either directly, or based on, in whole or in part, directly or indirectly, any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability, in each case regardless of whether such law or theory purports to apply any liability directly to Buyer, Agent or any Designated Buyer rather than in a successor or transferee capacity.

77. <u>Bulk Transfer Laws</u>. The Debtors and the Buyer hereby waive, and shall be deemed to waive, any requirement of compliance with, and any Claims including, without limitation, any Claims related to non-compliance with the provisions of any bulk sales rules, bulk transfer rules, or similar law of any jurisdiction that may be applicable regardless of whether such non-compliance would purport to result in Buyer being liability in its own capacity.

78. <u>No Interference</u>. Following the Closing, no holder of an Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) in or against the Debtors and their estates or the Assets shall interfere with the Buyer's (or any Designated Buyer's, as applicable) title to or use and enjoyment of the Assets based on or related to such Encumbrance or any actions that the Debtors and their bankruptcy estates may take in these chapter 11 cases or any successor bankruptcy cases.

79. <u>Authorization</u>. The Debtors, including their respective directors, managers, officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA, the Agency Agreement, and this Sale Order. The Debtors shall be, and they hereby

are, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Order and the relief granted pursuant to this Sale Order.

80.    <u>Good Faith</u>.  The Sale as contemplated by the APA is undertaken by the Buyer (and where applicable, the Agent) without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts to the Buyer (or any Designated Buyer, as applicable) and the sale free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances) unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Buyer, Agent and any Designated Buyer, as applicable, is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and as such is entitled to the full benefits and protections of such section.  As a good-faith purchaser of the Assets, neither the Buyer, the Agent, nor or any Designated Buyer, as applicable, has colluded with any of the other bidders, potential bidders, or any other parties interested in the Assets, and therefore the sale of the Assets shall not be avoided pursuant to section 363(n) of the Bankruptcy Code.

81.    <u>Failure of Approval</u>.  The failure specifically to include any particular provision of the APA or the Agency Agreement, including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order, shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of the Court that the APA and each document, agreement or instrument be authorized and approved in its entirety.

82.    <u>Post-Closing Claims Administration</u>.  After the applicable Closing:  (a) neither the Debtors nor any successor in interest, including any chapter 11 or chapter 7 trustee in these chapter

11 cases or any successor chapter 7 cases, shall consent or agree to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Encumbrance without the prior written consent of the Buyer (or applicable Designated Buyer); and (b) the Buyer shall have standing to object to any claim against the Debtors and their estates to the extent that, if allowed, it would constitute an Assumed Liability or Permitted Encumbrance, and the Court shall retain jurisdiction to hear and determine any such objections.

83.    <u>Liberty Mutual Insurance Company</u>.  Liberty Mutual Insurance Company (the "<u>Surety</u>") executed certain surety bonds on behalf of certain of the Debtors (collectively, the "<u>Existing Surety Bonds</u>").  These Existing Surety Bonds are issued pursuant to certain existing indemnity agreements and/or related agreements by and between the Surety, on the one hand, and the Debtors, on the other hand (collectively, the "<u>Existing Indemnity Agreements</u>" and, together with any Existing Surety Bond, the "<u>Surety Agreements</u>").

84.    Nothing in this Sale Order, the APA, or any document related to any of the foregoing shall be (a) construed to authorize or permit the Debtors' assumption and/or assignment of any Surety Agreement or to obligate the Surety to replace any Existing Surety Bond in connection with the Sale, or (b) deemed to (i) provide the Surety's consent to the substitution of any principal under any Existing Surety Bond or Existing Indemnity Agreement, and the Buyer shall not be deemed a substitute principal under any Existing Surety Bond or an indemnitor under any Existing Indemnity Agreement or (ii) alter, limit, expand, modify, release, waive or prejudice any rights, remedies and/or defenses of the Surety under the Surety Agreements or in connection with the Chapter 11 Cases.

85.    Nothing in this Sale Order, the APA, or any document related to any of the foregoing shall be deemed to limit, impair, or prime Surety's rights or interests, if any, in any

letters of credit, or any other collateral or the proceeds of such collateral, securing existing surety bonds and existing indemnity agreements.

86.     <u>Chubb Companies</u>.  Notwithstanding anything to the contrary in the Motion, the APA (including the Agency Agreement), any cure notice or assumption notice, any lists of executory contracts to be assumed and assigned, this Sale Order, or any documents relating to any of the foregoing: (a) nothing shall permit or otherwise effect a sale, an assignment or any other transfer, without the express written consent of the Chubb Companies (as defined herein), of (i) any insurance policies that have been issued by ACE American Insurance Company, Federal Insurance Company, ACE Property & Casualty Insurance Company, Westchester Surplus Lines Insurance Company, Indemnity Insurance Company of North America, Executive Risk Indemnity Inc., Chubb Atlantic Indemnity, Ltd., Great Northern Insurance Company, Chubb Custom Insurance Company, and/or any of their U.S.-based affiliates and predecessors (collectively, the "<u>Chubb Companies</u>") to or that provide coverage to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto (collectively, the "<u>Chubb Insurance Contracts</u>"), and/or (ii) any rights, proceeds, benefits, claims, interests, rights to payments and/or recoveries under such Chubb Insurance Contracts to the Buyer or any Designated Buyer; *provided, however*, that to the extent any claim with respect to the Assets arises that is covered by the Chubb Insurance Contracts, the Debtors may pursue such claim in accordance with the terms of the Chubb Insurance Contracts, and, if applicable, turn over to the Buyer or any Designated Buyer any such insurance proceeds (each, a "<u>Proceed Turnover</u>") and, further, Chubb Companies shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover.

87.     <u>Tempur Sealy International, Inc</u>. Notwithstanding any other provision of this Sale Order or the APA to the contrary, to the extent the Assets include any assets related to Tempur

Sealy International, Inc. or its affiliates, such transfer shall not be free and clear of, and shall not impair in any respect, but are expressly subject to, any and all affirmative defenses to payment, including but not limited to rights of setoff and recoupment, held by Tempur Sealy International, Inc. or its affiliates.

88.     Notwithstanding anything in this Sale Order or the APA to the contrary: (i) no rights under that certain (a) Sealy Retailer Agreement, entered into May 15, 2019, as amended by the First Amendment to Sealy Retailer Agreement, entered into February 1, 2021 and Second Amendment to Sealy Retailer Agreement, entered into August 11, 2021, (b) Statement of Work, entered into September 16, 2019, as amended by the First Amendment to Statement of Work, entered into January 20, 2020, (c) Dealer Agreement, signed September 28, 2004, (d) Trailer Interchange Agreement, entered into March 30, 2020, and (e) Trademark Sublicense Agreement, effective August 1, 2021 (collectively, as amended, the "Tempur Sealy Agreements") are being transferred to Buyer pursuant to this Sale Order or the APA; (ii) Buyer shall not be permitted to utilize, without the express permission of Tempur Sealy International, Inc. ("Tempur Sealy"), any intellectual property assets of Tempur Sealy including, but not limited to, Tempur-Pedic®, Sealy® and Stearns & Foster® trade names and trademarks (the "Tempur Sealy Marks"); *provided, however,* that the foregoing shall not (x) in any way limit or otherwise restrict Buyer's sale or other disposition pursuant to the APA and/or Agency Agreement of any Tempur Sealy products that are included in Debtors' inventory that are the subject of the APA in Buyer's capacity as Agent under the Agency Agreement and in the course of the Store Closing Sale; (y)  in any way preclude Buyer from selling any Assets purchased by Buyer that include the Tempur Sealy Marks, or (z) obligate Buyer to remove any Tempur Sealy Marks from the Assets purchased by Buyer in connection with such sales or otherwise; *provided, further*, however, with respect to any Assets purchased by Buyer

that include the Tempur Sealy Marks (as distinguished from Inventory that is subject to disposition under the Agency Agreement), that Buyer shall not be permitted to include Tempur Sealy Marks in advertising or other promotions; (iii) Buyer shall not be entitled to assert a claim against Tempur Sealy for indemnification, warranties, rebates, or incentives that may otherwise be due and owing to the Debtors pursuant to the Tempur Sealy Agreements; and (iv) Tempur Sealy reserves all of its rights and remedies under the Tempur Sealy Agreements against the Debtors and nothing in this Sale Order or the APA shall abrogate Tempur Sealy's rights under the Tempur Sealy Agreements against the Debtors.

89.     <u>WPG Management Associates, Inc</u>. Notwithstanding anything to the contrary in this Sale Order or the APA, the real property located at 4900 E Dublin Granville Rd., Westerville OH 43081 (the "<u>Headquarters</u>") shall not be transferred to the Buyer, any Designated Buyer, or any other buyer free and clear under Section 363(f) of the Bankruptcy Code of that certain leasehold interest (the "<u>Lease</u>") of WPG Management Associates, Inc. ("<u>WPG</u>") at the Headquarters until either (a) this Court on notice and a hearing has entered a further order approving such transfer of the Headquarters free and clear of any interest in the Lease or (b) a settlement is reached, and notice of which is filed on the Bankruptcy Court's docket, among WPG, the applicable buyer and Seller pursuant to which each agree to such transfer free and clear.  If the Buyer or a Designated Buyer purchases the Headquarters, the Buyer or Designated Buyer, as applicable shall provide WPG with ten (10) days' notice of such sale.  For the avoidance of doubt, a motion filed by the Debtors seeking approval of the HQ Sale shall satisfy the notice requirement of the foregoing sentence.  All rights of WPG, Buyer, any Designated Buyer, or any other buyer and Seller are reserved notwithstanding entry of this Sale Order.

90.  <u>Comenity Capital Bank</u>.  Comenity Capital Bank ("<u>Comenity</u>") and the Debtors agree that the Private Label Credit Card Program Agreement by and between Comenity and Big Lots Stores, Inc. dated as of May 17, 2016 (as amended or modified from time to time, the "Program Agreement") and the accompanying credit cards (the "<u>Big Lots Cards</u>") offered to customers of the Debtors pursuant to the Program Agreement will cease utility (including being accepted for the purchase or return of any inventory or merchandise of the Debtors) upon the later of: (i) the Closing Date of any sale that transfers ownership of the Debtors' inventory, merchandise, or sales channels to any third-party; or (ii) February 15, 2025 only in the event that the Buyer has executed a letter agreement temporarily binding the Buyer to the terms of the Program Agreement prior to the Closing Date referenced in "(i)" above. All parties reserve any and all rights regarding the Program Agreement should an assumption or assumption and assignment be contemplated or attempted at any time in the future.

91.  Notwithstanding anything to the contrary in the foregoing, in the event that the Program Agreement is ultimately rejected or utility is eliminated as described above, Comenity shall be permitted to continue its use of the Debtors' stylized trademarks and service marks for nine (9) months after the last date on which Comenity is required to operate under the existing Program Agreement for: (i) business purposes in the ordinary course and (ii) throughout liquidation of the accounts portfolio, as necessary to service the private label credit card accounts and collect the balances due on any accounts pursuant to the Program Agreement. This is in addition to Comenity's rights to use the un-stylized Big Lots name for as long as needed to service the private label credit card accounts (including processing, customer care, and collecting any remaining balances), including, but not limited to, through liquidation of the portfolio.

92. <u>Texas Taxing Authorities</u>. The 2025 Post-Closing Taxes shall be payable by the Selling Entities or the Buyer, as applicable, and as provided for in the APA. The Texas Taxing Authorities' ad valorem tax liens (the "<u>Texas Taxing Authorities Tax Liens</u>"), if any, shall be retained against the Assets until the 2025 taxes are paid in full. Nothing in this Sale Order shall amend, alter, or otherwise modify the terms of the Final DIP Order as it relates to the Texas Tax Reserve. The Texas Taxing Authorities Tax Liens shall neither be primed by nor made subordinate to any liens granted to any party hereby to the extent the Texas Taxing Authorities Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

93. <u>AGS Matter</u>. Subject to the terms of this Sale Order, the Acquired Proceedings includes all rights, claims, accounts, and causes of action (including warranty and similar claims) of the Selling Entities against any persons (other than another Selling Entity) (regardless of whether such claims and causes of action have been asserted) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement, and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities (regardless of whether such rights are currently exercisable). For the avoidance of doubt, the AGS Matter is an asset of the Sellers and is property of the Debtors' estates, and that is an Acquired Proceeding subject to the terms of this Sale Order and the APA. *provided, however,* that if Buyer determines not to pursue the AGS Matter, Buyer shall promptly inform Seller in writing and such claims shall be deemed to be Excluded Assets and be deemed property of the Debtors' Estates. Within five (5) business days of Closing, Seller shall file a motion to substitute Buyer as a party in the AGS Matter.

94. <u>Notice of Sale Closing</u>.  Within one Business Day of the occurrence of the Initial Closing, the Debtors shall file and serve a notice of the closing of the Sale.

95. <u>Computation of Time Periods</u>.  All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

96. <u>Order Governs in Event of Inconsistencies</u>.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies between the terms of this Sale Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

97. <u>Modification</u>.  The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court. Notwithstanding the foregoing, no such modifications, amendments or supplements shall be permitted that impair the rights of the DIP Credit Parties or Prepetition Secured Creditors under this Sale Order without their prior written consent or further order of the Court.

98. <u>Buyer Entities</u>.  The term "Buyer" as used in this Sale Order shall include any affiliate the Buyer designates to acquire particular assets in accordance with the terms of the APA.

99. <u>Waiver of Stay</u>.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), or 7062 or any applicable provisions of the Local Rules, this Sale Order (which, for the avoidance of doubt, does not include any future order approving the assumption and assignment of any Designated 365 Contract) shall not be stayed following the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

100.    <u>Non-Severability</u>.  The provisions of this Sale Order as applied to the Buyer for the APA are non-severable and mutually dependent.

101.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the APA and the Agency Agreement, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer (or any Designated Buyer, as applicable), and failure to pay any go-forward administrative expenses, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

**Dated: January 2nd, 2025**
**Wilmington, Delaware**

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

## **EXHIBIT 1**

APA

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

DATED AS OF JANUARY 2, 2025

BY AND AMONG

BIG LOTS, INC.,

EACH OF THE SUBSIDIARIES OF

BIG LOTS, INC.

LISTED ON THE SIGNATURE PAGES HERETO,

GORDON BROTHERS RETAIL PARTNERS, LLC

# TABLE OF CONTENTS

## ARTICLE 1
## DEFINITIONS

Section 1.01. *Definitions* ..................................................................................2
Section 1.02. *Other Definitions and Interpretive Matters* ...............................18

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01. *Purchase and Sale* .....................................................................20
Section 2.02. *Excluded Assets* ........................................................................24
Section 2.03. *Assumed Liabilities* ...................................................................25
Section 2.04. *Excluded Liabilities* ..................................................................26
Section 2.05. *Cure Costs; Desired 365 Contracts* ..........................................27
Section 2.06. *Additional Excluded Assets* ......................................................28
Section 2.07. *Assignment of Assets Subject to Consent Requirements* ...........28
Section 2.08. *Misallocated Assets* ..................................................................29
Section 2.09. *Further Assurances* ...................................................................29
Section 2.10. *Withholding* ...............................................................................30

## ARTICLE 3
## PURCHASE PRICE

Section 3.01. *Purchase Price* ..........................................................................30

## ARTICLE 4
## CLOSINGS

Section 4.01. *Closing Date* ..............................................................................32
Section 4.02. *Payments on the Closing Date* ...................................................32
Section 4.03. *Buyer's Deliveries* .....................................................................33
Section 4.04. *The Selling Entities' Deliveries* .................................................33

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Section 5.01. *Organization and Good Standing* ..............................................34
Section 5.02. *Authority; Validity* .....................................................................34
Section 5.03. *Governmental Approvals; No Conflict* ......................................35
Section 5.04. *Financial Statements; Liquidity and Asset Calculations* ...........36
Section 5.05. *Seller SEC Documents* ..............................................................36
Section 5.06. *No Undisclosed Material Liabilities* ..........................................36
Section 5.07. *Absence of Certain Changes* .....................................................36
Section 5.08. *Legal Proceedings* .....................................................................37

i

Section 5.09. *Compliance with Laws; Permits* ................................................................37
Section 5.10. *Material Contracts* ..................................................................................37
Section 5.11. *Intellectual Property* ...............................................................................39
Section 5.12. *Environmental Compliance* ......................................................................40
Section 5.13. *Title* ........................................................................................................41
Section 5.14. *Matters Related to Assets; Casualty Losses* ..............................................42
Section 5.15. *Insurance* ...............................................................................................42
Section 5.16. *Security Arrangements* ...........................................................................42
Section 5.17. *Certain Business Practices* .....................................................................43
Section 5.18. *Brokers or Finders* .................................................................................43
Section 5.19. *Employee Benefit Plans; Labor and Employment Matters* ........................43
Section 5.20. *Taxes* .....................................................................................................46
Section 5.21. *Inventory* ...............................................................................................47

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Section 6.01. *Organization and Good Standing* ...........................................................47
Section 6.02. *Authority; Validity; Consents* .................................................................47
Section 6.03. *No Conflict* ............................................................................................48
Section 6.04. *Legal Proceedings* .................................................................................48
Section 6.05. *Bankruptcy* ...........................................................................................48
Section 6.06. *Brokers or Finders* .................................................................................48
Section 6.07. *Financial Capability* ..............................................................................48
Section 6.08. *Independent Evaluation* .........................................................................49
Section 6.09. *Solvency* ................................................................................................49

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01. *Access and Reports* ................................................................................50
Section 7.02. *Operations Prior to the Initial Closing Date* ...........................................51
Section 7.03. *Reasonable Best Efforts* .........................................................................54
Section 7.04. *Reserved* ...............................................................................................54
Section 7.05. *Bankruptcy Court Matters* .....................................................................54
Section 7.06. *Alternative Proposals; Post-Auction No-Shop* .........................................55
Section 7.07. *Public Announcements; Filings* ..............................................................56
Section 7.08. *Transition Services* .................................................................................56
Section 7.09. *Reserved* ...............................................................................................57
Section 7.10. *Bankruptcy Court Milestones* .................................................................57
Section 7.11. *Legal Entity Names* ................................................................................57
Section 7.12. *Notification of Certain Matters* ..............................................................57
Section 7.13. *Proceedings* ...........................................................................................57

## ARTICLE 8
## ADDITIONAL AGREEMENTS

Section 8.01. *Taxes* ..................................................................................... 57
Section 8.02. *Allocation of Purchase Price* ................................................... 58
Section 8.03. *Assigned Contracts; Adequate Assurance and Performance* ...... 59
Section 8.04. *Employee Matters* .................................................................. 59
Section 8.05. *Post-Closing Books and Records* ............................................. 63
Section 8.06. *Title Matters* .......................................................................... 63
Section 8.07. *Insurance Access* .................................................................... 64
Section 8.08. *Disclaimers* ............................................................................ 65
Section 8.09. *Collection of Accounts Receivable* .......................................... 68
Section 8.10. *Bulk Transfer Laws* ................................................................ 68

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

Section 9.01. *Accuracy of Representations* .................................................... 69
Section 9.02. *Selling Entities' Performance* .................................................. 69
Section 9.03. *Certificate* .............................................................................. 69
Section 9.04. *Seller's Deliveries* .................................................................. 69
Section 9.05. *Conversion Motions* ................................................................ 69

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER
## AND THE SELLING ENTITIES

Section 10.01. *No Order* .............................................................................. 69
Section 10.02. *Sale Order* ............................................................................. 69

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF
## THE SELLING ENTITIES TO CLOSE

Section 11.01. *Accuracy of Representations* .................................................. 70
Section 11.02. *Buyer's Performance* ............................................................. 70
Section 11.03. *Certificate* ............................................................................ 70
Section 11.04. *Buyer's Deliveries* ................................................................ 70

## ARTICLE 12
## TERMINATION

Section 12.01. *Termination Events* ............................................................... 70
Section 12.02. *Effect of Termination* ............................................................ 72
Section 12.03. *Procedure Upon Termination* ................................................. 72

ARTICLE 13
GENERAL PROVISIONS

Section 13.01. *No Survival of Representations and Warranties* ......................................72
Section 13.02. *Notices* .................................................................................................73
Section 13.03. *Waiver* .................................................................................................74
Section 13.04. *Entire Agreement; Amendment* ...........................................................74
Section 13.05. *Assignment* ..........................................................................................74
Section 13.06. *Severability* .........................................................................................75
Section 13.07. *Expenses* .............................................................................................75
Section 13.08. *Specific Performance* ..........................................................................75
Section 13.09. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver* ....................................................................................................75
Section 13.10. *Counterparts* .......................................................................................76
Section 13.11. *Parties in Interest; No Third Party Beneficiaries* .................................76
Section 13.12. *No Recourse* ........................................................................................77
Section 13.13. *Disclosure Schedules; Materiality* .......................................................78
Section 13.14. *Liquidating Trustee* .............................................................................78
Section 13.15. *Conflicts; Privileges* ............................................................................78

**Exhibits:**

| | |
|---|---|
| Exhibit A | Intentionally Omitted |
| Exhibit B | Intentionally Omitted |
| Exhibit C | Form of IP Assignment Agreement |
| Exhibit D | Form of Master Assignment |
| Exhibit E | Form of Sale Order |
| Exhibit F | APA Administrative Budget |
| Exhibit G | Winddown Budget |
| Exhibit H | Form of Agency Agreement |

**Schedules**:
Disclosure Schedules

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of January 2, 2025, is by and among Big Lots, Inc., a company organized under the laws of the State of Ohio whose address is 4900 E. Dublin-Granville Road, Columbus, Ohio 43081 ("**Seller**"), each of the Subsidiaries of Seller (together with Seller and its other Subsidiaries, the "**Selling Entities**"), as sellers, GORDON BROTHERS RETAIL PARTNERS, LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business;

WHEREAS, the Selling Entities filed voluntary petitions and commenced cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on September 9, 2024 (the "**Petition Date**");

WHEREAS, the Selling Entities desire to sell, convey, assign, and transfer to Buyer (and one or more entities designated by Buyer (each a "**Designated Buyer**" and collectively, "**Designated Buyers**"), as applicable), all of the Assets, and Buyer (and Designated Buyers, as applicable), desire to (i) purchase, acquire and assume, or designate one or more Designated Buyers to purchase, acquire and assume all of the Assets and all of the Assumed Liabilities (and no other Liabilities), (ii) designate for sale by Agent the Designated Assets pursuant to the Agency Agreement pursuant to a store closing sale initiated by the Selling Entities (the "**Store Closing Sale**"), and (iii) consummate such other transactions as are contemplated by this Agreement and the other Transaction Documents, in each case, upon the terms and conditions hereinafter set forth (with all such transactions described in (i)-(iii) referred to as the "**Transaction**");

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order; and

WHEREAS, the Selling Entities' ability, and Buyer's (and Designated Buyers', as applicable) willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# DEFINITIONS

Section 1.01.  *Definitions*.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**1060 Allocation**" has the meaning set forth in Section 8.02(a).

"**365 Contracts**" means all of the Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of Section 365 of the Bankruptcy Code.

"**ABL DIP Obligations**" means all "Secured Obligations" under and as defined in that certain Senior Secured Superpriority Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated on or around September 10, 2024, by and among the Selling Entities, PNC Bank, National Association, as administrative agent and as collateral agent and each lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Accounts Receivable**" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to Seller or any of its Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts payable, or that may become payable, to Seller or any of its Subsidiaries; (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries); (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables; (vi) other amounts due to Seller or any of its Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of Seller; and (vii) any claim, cause of action, remedy, or other right related to any of the foregoing.

"**Accrued Administrative Claims**" means those allowed administrative claims under Section 503 of the Bankruptcy Code that have accrued but remain unpaid as of the Initial Closing Date; provided, that solely for purposes of this Agreement in no event shall the aggregate amount of Accrued Administrative Claims exceed $100,000,000.

"**Actual Fraud**" means, with respect to any Person, actual and intentional common law fraud in the making of the representations and warranties set forth in this Agreement as interpreted by Delaware courts applying Delaware common law and as determined by the Bankruptcy Court. "Fraud" expressly excludes any theory of fraud premised upon constructive fraud, including any theory of fraud based upon constructive knowledge or negligent misrepresentation or omission.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that (a) none of the equity holders of Seller or creditors of the Selling Entities (other than any equity holder of Seller or creditor who is a Subsidiary of any Selling Entity) will be considered an Affiliate of a Selling Entity for purposes of this Agreement,

2

and (b) all investment funds, separately managed accounts, and other investment vehicles managed or advised by Buyer or its Affiliates and their respective portfolio companies shall be deemed not to be Affiliates of Buyer.

"**Agency Agreement**" means the agency agreement substantially in the form of <u>Exhibit H</u>.

"**Agent**" means Gordon Brothers Retail Partners, LLC, together with any Person to which it syndicates its rights and obligations under the Agency Agreement.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means a sale, transfer, or other disposition, whether direct or indirect, whether by means of an asset sale (other than a liquidation or other sale of assets where the Business is not continuing as a going-concern), merger, sale of stock, amalgamation, reorganization, or otherwise (including through a standalone plan of reorganization), of (a) beneficial ownership of a majority of the equity interests of the Selling Entities or (b) any material portion of the Assets, in a transaction or a series of transactions with one or more Persons, other than the Buyer and/or its Affiliates; *provided*, that nothing in this Agreement shall be deemed to prohibit or limit in any manner (and "**Alternative Transaction**" shall not include) sales of inventory and product sales or other dispositions of immaterial or obsolete assets in the ordinary course of business or sales of assets that would not require Buyer's consent pursuant to Section 7.02.

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.17(a).

"**Anti-Money Laundering Laws**" has the meaning set forth in Section 5.17(b).

"**APA Administrative Budget**" means that certain agreed budget providing for certain costs and expenses to be incurred by the Selling Entities from the Initial Closing until the end of the Store Closing Sale in order to provide central administrative and other services to be provided by Seller (or as may otherwise be agreed by Buyer and/or Agent, with the prior written consent of Seller). The agreed form of APA Administrative Budget as of the Effective Time is annexed hereto as <u>Exhibit F</u>.

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise, and including international conventions, protocols and treaties), act, statute, constitution, treaty, convention, ordinance, code, policy, rule, regulation, Order, or other similar requirement enacted, adopted, promulgated, enforced or applied by any Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Assets**" means all tangible and intangible rights, properties and assets of every nature, kind and description, used or useful in the Business, wheresoever located, whether arising by contract, Applicable Law or otherwise, and whether or not carried or reflected on the Books and Records, in each case as the same may exist at the Effective Time, including such rights, properties and assets hereafter acquired by the Selling Entities prior to the Initial Closing, but in each case excluding the Excluded Assets.

3

"**Assigned Contracts**" has the meaning set forth in Section 2.01(a)(v).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Audited Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Available Insurance Policy**" has the meaning set forth in Section 8.07(b).

"**Avoidance Actions**" has the meaning set forth in Section 2.01(a)(xviii).

"**Balance Sheet Date**" has the meaning set forth in Section 5.04(a).

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Court Milestones**" has the meaning set forth in Section 7.10.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**Big Lots Marks**" has the meaning set forth in Section 7.11.

"**Business**" means, collectively, all of the businesses of the Selling Entities conducted prior to the Initial Closing, including discount retailing of food, consumables, soft home products, hard home products, furniture, seasonal merchandise, and other general merchandise to customers utilizing "brick and mortar" and online direct-to-customer sales channels.

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer 401(k) Plan**" has the meaning set forth in Section 8.04(h).

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.01(b).

"**Closing Date**" has the meaning set forth in Section 4.01(b).

"**Code**" means the United States Internal Revenue Code of 1986.

4

"**Company Employees**" means, as of any relevant date of determination, the employees of the Selling Entities.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b).

"**Continuation Period**" has the meaning set forth in Section 8.04(b).

"**Contract**" means any agreement, contract, lease, deed, license, instrument, indenture, note, bond, guarantee, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases.

"**Control**" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise.

"**Copyrights**" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing.

"**Corporate/HQ Facility**" means that certain Owned Real Property located at 4900 E. Dublin-Granville Road, Columbus, OH 43081.

"**Cure Costs**" means all monetary Liabilities, including pre-petition monetary Liabilities, of the Selling Entities that must be paid or otherwise satisfied to cure all of the Selling Entities' monetary and other defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assigned Contracts to Buyer (or one or more Designated Buyers, as applicable) as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the Assignment and Assumption Procedures as defined and provided for in the Bidding Procedures Order.

"**Current Representation**" has the meaning set forth in Section 13.15(a).

"**D&O Insurance Policies**" shall have the meaning set forth in **Error! Reference source not found.**.

"**Davis Polk**" has the meaning set forth in Section 13.15(a).

"**Deal Communications**" has the meaning set forth in Section 13.15(b).

"**Debt Payoff Amount**" means the amount of cash necessary to pay in full the Repaid Indebtedness.

"**Definitive Documents**" means (a) this Agreement; (b) the Agency Agreement (c) the Sale Order; (d) intentionally omitted; (e) intentionally omitted; (f) the other Transaction Documents; (g) any and all other material documents, deeds, agreements, filings, notifications, letters, or

instruments reasonably necessary to consummate the transactions contemplated by this Agreement, which shall exclude, for the avoidance of doubt, any affidavits, statements of financial affairs and schedules of assets and Liabilities, monthly operating reports or other periodic reports, retention applications or fee applications, fee statements or other notices, declarations, or other documents filed by the Selling Entities in the Bankruptcy Cases with respect thereto, and other similar ministerial documents filed with the Bankruptcy Court; and (h) any amendments, modifications or supplements to such documents. To the extent such form has not been agreed to as of the date hereof, the Definitive Documents shall all be in form and substance reasonably acceptable to Buyer (and, where applicable, any Designated Buyer) and Seller.

"**Designated Assets**" has the meaning set forth in Section 2.01(b).

"**Designated Buyer**" or "**Designated Buyers**" each have the meaning set forth in the recitals.

"**Designated Person**" has the meaning set forth in Section 13.15(a).

"**Designation Rights Period**" means the period commencing on the Initial Closing Date and ending at 11:59 pm Eastern time on February 28, 2025, or such earlier date as Buyer may determine, in its sole discretion; *provided* that such period may be extended until March 31, 2025 at the election of Buyer so long as Buyer agrees in writing to bear all Liabilities, costs and expenses to be incurred by the Selling Entities during such extension set forth in an updated APA Administration Budget and Winddown Budget prepared in good faith by Seller.

"**Dollars**" or "**$**" has the meaning set forth in Section 1.02(a)(ii).

"**Effective Time**" has the meaning set forth in Section 4.01.

"**Encumbrance**" means with respect to any property or asset, any legal or equitable, specific or floating, lien (statutory or otherwise and including any "Lien" as defined in the Bankruptcy Code), pledge, mortgage, deed of trust, security interest, charge, debenture, lease, license, occupancy agreement, option, easement, Claim, restriction, preference, priority, right of first refusal, right of first offer, servitude, right of way, right of set off, preemptive right, conditional sale or other title retention agreement or installment Contract or finance lease with substantially the same effect, or other encumbrances affecting any right or title to the Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown.

"**Environmental Laws**" means any Applicable Laws relating to the protection of the environment, pollution, public health or safety (regarding toxic or hazardous materials, substances or wastes), or any spill, release, or discharge of, or exposure to, any pollutant or contaminant or ignitable, corrosive, reactive or otherwise toxic or hazardous material, substance or waste.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Event**" has the meaning set forth in the definition of Material Adverse Effect.

"**Ex-Im Laws**" means all Applicable Laws relating to export, re-export, transfer or import controls (including the Export Administration Regulations administered by the U.S. Department of Commerce, and customs and import Applicable Laws administered by U.S. Customs and Border Protection).

"**Exchange Act**" has the meaning set forth in Section 5.05(a).

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Contracts**" means all Contracts of the Selling Entities other than the Assigned Contracts.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Proceedings**" means any and all Proceedings and causes of action against any current or former director or officer of any of the Selling Entities.

"**Excluded Records**" means (a) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (b) each Selling Entity's respective federal, state, local or non-U.S. income, franchise or margin tax files and records and all other tax files and records except those described in Section 2.01(a)(vii), (c) employee files (other than files of Transferred Employees that are permitted to be transferred pursuant to Applicable Law), (d) records solely to the extent relating to the sale of the Assets (other than sales by the Selling Entities in the ordinary course of business), including competing bids, (e) proprietary data (including any engineering studies and forecasts and economic studies) solely to the extent relating to Excluded Assets, (f) information and data that is subject to Third Party contractual restrictions on assignment or disclosure solely to the extent relating to Excluded Assets, or any privileged information to the extent the transfer pursuant hereto would jeopardize such privilege, (g) copies of records stored for archival and/or back up purposes solely to the extent relating to Excluded Assets or Excluded Liabilities, and (h) any other files or records solely to the extent relating to any Excluded Assets or Excluded Liabilities; *provided* that Buyer will have the right to make copies of any portions of Excluded Records to the extent related to the Business, the Assets or the Assumed Liabilities to the extent permitted by Applicable Law.

"**Facilities**" has the meaning set forth in Section 2.01(a)(i).

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such Order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such

order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, will not cause such Order not to be a Final Order as long as such motion has not been filed.

"**Financial Statements**" has the meaning set forth in Section 5.04(a).

"**GAAP**" means generally accepted accounting principles in the United States.

"**Gateway BL Agreement**" means that certain Asset Purchase Agreement dated as of September 8, 2024 between the Selling entities and Gateway BL Acquisition, LLC, as the same may be amended, modified or supplemented.

"**Governmental Authority**" means (a) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (b) any federal, state, local, municipal, or other government of the foregoing, (c) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, administrative or regulatory body, agency, authority, department, board, commission, official, or other entity and any court or other tribunal), or (d) any Person (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or Taxing authority or power of any nature, including any arbitrator or arbitral body (public or private).

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Hazardous Substance**" means any pollutant or contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous or toxic substance, waste or material, including petroleum, its derivatives, by-products and other hydrocarbons, asbestos, per- or polyfluoroalkyl substances and any other substance, waste or material regulated as a pollutant or contaminant or otherwise as "hazardous" or "toxic" under any Environmental Laws.

"**HQ Sale**" has the meaning set forth in Section 3.01(b).

"**HQ Sale Deductions**" has the meaning set forth in the definition of "Net Proceeds."

"**Initial Closing**" has the meaning set forth in Section 4.01(a).

"**Initial Closing Date**" has the meaning set forth in Section 4.01.

"**Insurance Policies**" has the meaning set forth in Section 5.15.

"**Insurance Rights**" has the meaning set forth in Section 2.01(a)(xvii).

"**Intellectual Property**" means any Copyright, Patent, Trademark, trade secret, know-how, Software, rights in data and databases, inventions (whether patentable or not), right of

publicity, or any other proprietary right or intellectual property right arising under Applicable Laws.

"**Inventory**" means all inventory held by the Selling Entities, including all inventory in-process, in transit to or from the Selling Entities and whether in the Selling Entities' warehouses, distribution facilities, rejected inventory, customer inventory returns, held by any Third Parties or otherwise and all open purchase orders with suppliers.

"**IP Assignment Agreement**" means the IP Assignment Agreement in the form attached hereto as Exhibit C.

"**IRS**" has the meaning set forth in Section 5.19(a)(v).

"**Knowledge**" means, with respect to any matter in question, (a) in the case of each Selling Entity, the knowledge, after reasonable inquiry, of any of the individuals listed on Disclosure Schedule 1.01(a)(1), and (b) in the case of Buyer, the knowledge, after reasonable inquiry, of any of the individuals listed on Disclosure Schedule 1.01(a)(2) with respect to such matter.

"**Labor Agreement**" has the meaning set forth in Section 5.10(a)(vii).

"**Leased Real Property**" has the meaning set forth in Section 5.13(b).

"**Leases**" has the meaning set forth in Section 5.13(b).

"**Liability**" means any and all Claims, debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, Taxes, responsibilities, commitments, costs, deficiencies, assessments, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any nature, kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, choate or inchoate, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due, regardless of whether or not any of the foregoing is required to be accrued on any financial statements.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance in the form attached hereto as Exhibit D.

"**Material Adverse Effect**" means any event, occurrence, condition, circumstance, development, or change or effect (each, an "**Event**") that, individually or in the aggregate with all other Events, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or financial condition of the Business or the Assets or Assumed Liabilities, considered as a whole or (b) would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated hereby; *provided* that, no effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect under the foregoing clause (a): (i) any change in the United States or foreign economies, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the

business or areas in which the Business operates, including changes in the prices or industry margins of the products sold, and the raw materials used by, the Business or any increase in operating costs or capital expenses; (iii) any Proceeding by any Person by reason of, based upon, attributable to, resulting from or arising in connection with, the negotiation, entry into or consummation of the transactions contemplated by this Agreement, any other Transaction Document or the Confidentiality Agreement, (iv) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action; (v) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic (including COVID-19), other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (vi) any change or proposed change in Applicable Law or accounting rules (or the interpretation or enforcement thereof); (vii) any action taken or proposed to be taken by Buyer or any of its Affiliates; (viii) any effect resulting from the public announcement of this Agreement, the negotiation, execution, performance of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of the Business, including the effect of any of the foregoing on the relationships, contractual or otherwise, of the Business with clients, customers, employees, suppliers, vendors, service providers or Governmental Authorities (including the failure to obtain any consents in connection with the transactions contemplated hereby); (ix) any effect resulting from the filing or continuation of the Bankruptcy Cases, including the Selling Entities' inability to pay its obligations as a result of the filing of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Proceeding); (x) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (xi) any action taken (or omitted to be taken) at the written request or with the written consent of Buyer or any of its Affiliates; (xii) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is required or expressly contemplated or permitted to be taken (or not taken) pursuant to this Agreement; (xiii) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is related to the Gateway BL Agreement or any effect resulting from the Gateway BL Agreement; and (xiv) any matter to the extent disclosed on the Disclosure Schedules or in any filings by Seller or any of its Subsidiaries with the Bankruptcy Court or the Securities and Exchange Commission prior to the date of this Agreement; *provided*, *however*, that, in the case of clauses (i), (ii) and (vi), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on the Business, the Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"**Material Contract**" and "**Material Contracts**" each have the meaning set forth in Section 5.10(a).

"**Most Recent Balance Sheet**" has the meaning set forth in Section 5.04(a).

"**MSA**" means that certain Master Services Agreement entered effective as of November 30, 2022 (as the same may be amended, modified or supplemented) between Seller and Buyer.

"**Necessary Consent**" has the meaning set forth in Section 2.07.

"**Net Proceeds**" means an amount, if any, equal to (i) the sum of cash and cash equivalents received in connection with the HQ Sale (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise (including release of any escrowed funds), but only as and when so received) *less* (ii) the sum of (A) the principal amount of any indebtedness that is secured by a lien on the Corporate HQ / Facility and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with the HQ Sale; (B) the reasonable and customary out-of-pocket expenses incurred in connection with the HQ Sale (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Selling Entity to third parties (other than any affiliate of any Selling Entity); (C) the amount of all taxes required to be paid by the Selling Entities as a result of such transaction; and (D) any funded escrow established pursuant to the documents evidencing any such transaction to secure any indemnification obligations or adjustments to the purchase price or other similar obligations associated with any such transaction (the items in this clause (ii), collectively, the "**HQ Sale Deductions**"); *provided*, that with respect to any funds escrowed per clause (D) above, such funds shall constitute Net Proceeds immediately upon their release from escrow unless applied to satisfy such obligations.

"**Order**" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree, ruling, subpoena, verdict, decision or other restraint promulgated, entered, issued, made or rendered by any Governmental Authority, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"**Outside Date**" has the meaning set forth in Section 12.01(a)(ii)(A).

"**Owned Intellectual Property**" means all Intellectual Property to the extent owned or purported to be owned by any Selling Entity and used or held for use in connection with the operation of the Business.

"**Owned Real Property**" has the meaning set forth in Section 5.13.

"**Parties**" and "**Party**" each have the meaning set forth in the preamble.

"**Party Affiliate**" has the meaning set forth in Section 13.12(a).

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisionals, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"**Payoff Letter**" means a customary payoff letter in form and substance reasonably satisfactory to the Parties, setting forth (a) the aggregate principal amount outstanding and all

accrued but unpaid interest constituting the Repaid Indebtedness, (b) any prepayment penalties, breakage fees and other fees or amounts payable in connection with the payment of such Repaid Indebtedness (other than contingent indemnification obligations for which no claim has been made as of the date of such payment), and (c) payment instructions for the payment thereof, in each case, on the Initial Closing Date.  Each such Payoff Letter will also include a customary statement that, if the aggregate amount set forth therein is paid to such lender or other applicable payee on the Initial Closing Date, (i) such Repaid Indebtedness shall be repaid in full and all Encumbrances securing such Repaid Indebtedness and guarantees in connection therewith will thereafter be terminated and released and (ii) such lender or lenders (or agent or other designee on such lender's or lenders' behalf) will execute and file (or have filed or permit Buyer or the applicable Seller to file) Uniform Commercial Code termination statements and such other documents, discharges, terminations, releases or endorsements reasonably necessary (if any) to release and terminate such Encumbrances and guarantees.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, registrations, certificates, variances, plans, exemptions or other similar documents and authorizations issued by or obtained from any Governmental Authority.

"**Permitted Encumbrances**" means any of the following:

(a) exceptions, restrictions, charges, and other encumbrances that are set forth in any Permit;

(b) statutory or common law liens in favor of carriers, warehousemen, mechanics and materialmen arising or incurred in the ordinary course of business to secure claims for labor, materials or supplies that are not (i) past due or in default, and (ii) individually or in the aggregate, impairing or interfering with, in a manner material to, the continued use, value or operation of the Assets to which they relate in the conduct of the Business as it is currently conducted,

(c) statutory liens or other Encumbrances for Taxes not yet delinquent or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP;

(d) materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar Encumbrances (i) arising in the ordinary course of business, (ii) existing prior to the commencement of the Bankruptcy Case or (iii) perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code;

(e) Assumed Liabilities;

(f) any other imperfections in title, charges, easements, restrictions, licenses and Encumbrances that do not materially affect the value or use of the Assets subject thereto;

(g) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, if any;

(h) all Necessary Consents;

12

(i) non-exclusive licenses of Intellectual Property granted in the ordinary course of business; and

(j) with respect to any Real Property Interest, all matters of public record, to the extent valid and subsisting, except mortgages or deeds of trust.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means, as applicable, (a) all information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual, device or household and (b) "personal information," "personally identifiable information," "personal data," and any terms of similar import, in each case as defined under applicable data protection and privacy laws.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required (whether expressly or implicitly by the nature of such covenant) to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"**Pre-Closing Liabilities**" means all Liabilities of the Selling Entities to the extent resulting from, arising out of or attributable to Events that existed or occurred on or prior to the Initial Closing, whether known or unknown; *provided*, *however*, that with respect to Liabilities for Taxes, Pre-Closing Liabilities shall (1) only include Taxes for the Pre-Closing Tax Period and (2) exclude (a) Transfer Taxes which are expressly addressed by Section 8.01 hereof, (b) Taxes imposed on the Selling Entities to the extent resulting from any election made by the Buyer on the Initial Closing Date after the Initial Closing with respect to the Assets or the Business that is applicable to a taxable period ending on or before the Initial Closing Date and (c) Specified Pre-Closing Taxes. Pre-Closing Liabilities will include all Liabilities arising from any product defects, product warranties and other Contractual claims, regardless of the legal theory on which such claim is based (whether in contract or tort) relating to products that the Selling Entities have sold, licensed, leased or otherwise provided (directly or indirectly) to customers or other users, including any breach of Contract, implied warranty, or other claim relating to such matters, in each case, with respect to products that were sold, leased or otherwise furnished or made available (directly or indirectly) to customers or other Persons prior to the Initial Closing.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Initial Closing Date and that portion of any Straddle Period ending on and including the Initial Closing Date.

"**Pre-Petition ABL Obligations**" means all "Secured Obligations" under and as defined in that certain Credit Agreement, dated as of September 21, 2022, by and among the Selling Entities, PNC Bank, National Association, as administrative agent and as collateral agent and each

lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Pre-Petition Term Obligations**" means all "Secured Obligations" under and as defined in that certain Credit Agreement, dated as of April 18, 2024, by and among the Selling Entities, 1903P Loan Agent, LLC, as administrative agent and as collateral agent and each lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Privacy Requirements**" means, collectively, all of the following to the extent relating to the collection, processing, disclosure, privacy, or security of Personal Information, as well as security breach notification requirements, and applicable to the Business, to the conduct of the Business, or to any of the Systems: (a) each Selling Entity's own written rules, policies and procedures (whether physical or technical in nature, or otherwise), (b) all Applicable Laws and (c) binding industry standards applicable to the industry in which the Business operates (including the Payment Card Industry Data Security Standard (PCI DSS)) and (d) Contracts to which any Selling Entity is party and by which any Selling Entity or its assets are otherwise bound (including the terms and conditions of all applicable social media platforms).

"**Proceeding**" or "**Proceedings**" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, charge, proceeding or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority.

"**Professional Fee Escrow Amount**" means the amount of cash held in the Professional Fee Escrow Account (as defined in the Final DIP Order), including any amount deposited therein in connection with the Initial Closing.

"**Professional Fees Amount**" means an amount equal to all fees and expenses incurred from the Initial Closing through and including the end of the Designation Rights Period (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the end of the Designation Rights Period) by any Professional Persons (as defined in the Final DIP Order).

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts.

"**Purchase Price**" has the meaning set forth in **Error! Reference source not found.**.

"**Purchase Price Allocation**" has the meaning set forth in Section 8.02(a).

"**R&W Insurance Policy**" has the meaning set forth in Section 13.12(c).

"**Real Property Interests**" has the meaning set forth in Section 2.01(a)(iv).

"**Records**" has the meaning set forth in Section 2.01(a)(vii).

"**Related Party Agreement**" means any Contract among any Selling Entity, on the one hand, and any of its Affiliates (other than any other Selling Entity), on the other hand.

14

"**Release**" means any presence, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the environment.

"**Released Parties**" and "**Released Party**" each have the meaning set forth in Section 13.12(b).

"**Releasing Party**" has the meaning set forth in Section 13.12(b).

"**Repaid Indebtedness**" means, collectively, the ABL DIP Obligations, the Pre-Petition ABL Obligations, the Term DIP Obligations and the Pre-Petition Term Obligations (inclusive of outstanding letters of credit).

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants, investment bankers and financial advisors.

"**Retained Cash**" has the meaning set forth in Section 2.01(a)(xxi).

"**Sale Order**" means an Order of the Bankruptcy Court, which Order is substantially in the form attached hereto as Exhibit E, with such changes as are required by the Bankruptcy Court to which Seller and Buyer have consented (such consent not to be unreasonably withheld, delayed, or conditioned).

"**Sanctioned Person**" means any Person who is the target of Sanctions, including by virtue of being (a) listed on any Sanctions-related list of designated or blocked persons; (b) a Governmental Authority of, resident in, or organized under the Applicable Laws of a country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, and the Crimea region and so-called Donetsk People's Republic and Luhansk People's Republic in Ukraine); or (c) 50% or more owned or controlled by any of the foregoing.

"**Sanctions**" means trade, economic and financial sanctions Applicable Laws, regulations, embargoes, and restrictive measures, including those administered, enacted or enforced by (a) the United States (including the Department of Treasury, Office of Foreign Assets Control), (b) the European Union and enforced by its member states, (c) the United Nations or (d) His Majesty's Treasury.

"**Securities Act**" has the meaning set forth in Section 5.05(a).

"**Security Incident**" means any (a) security incident, breach of security, phishing incident, network intrusion, ransomware or malware attack affecting any Systems, or (b) incident in which confidential information or Personal Information was or may have been accessed, disclosed, destroyed, processed, used, or exfiltrated in an unauthorized manner (whether any of the foregoing was transmitted, possessed or controlled by the Selling Entities or by another Person on behalf of the Selling Entities).

"**Seller**" has the meaning set forth in the preamble.

"**Seller 401(k) Plan**" has the meaning set forth in Section 8.04(h)(i).

"**Seller Benefit Plans**" any (i) "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (ii) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, arrangement or agreement or (iii) other plan, agreement, arrangement, policy or program, providing for compensation, bonuses, profit-sharing, equity or equity-based incentives or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by any Selling Entity, including for the benefit of any current or former Company Employee, or under or with respect to which any Selling Entity has any Liability.

"**Seller Credit Obligations**" has the meaning set forth in Section 8.03(b).

"**Seller SEC Document**" means, collectively, any form, report, statement, certification or other document (including all exhibits, amendments and supplements thereto) filed or furnished by any Selling Entity with the Securities and Exchange Commission since January 1, 2022.

"**Selling Entities**" has the meaning set forth in the preamble.

"**Software**" means any and all software and all related source code, object code, application programming interfaces, data files, databases, protocols, specifications, and all documentation thereof.

"**Solvent**" shall have the meaning given to such term in Section 6.09.

"**Specified Pre-Closing Taxes**" means any Taxes included on Exhibit G, to the extent such Taxes are related or attributable to the Pre-Closing Tax Period.

"**Specified Proceedings**" means those Proceedings set forth on Disclosure Schedule 1.01(b); *provided* that, for the avoidance of doubt, no Excluded Proceeding may be deemed a Specified Proceeding.

"**Specified Tax Refund**" means any Tax refunds or credits of the Selling Entities or any of its Subsidiaries or with respect to the Business for the taxable periods, tax type and jurisdictions set forth in Disclosure Schedule 1.01(c).

"**Store Closing Sale**" has the meaning ascribed thereto in the recitals.

"**Straddle Period**" means any Tax period beginning before and ending on or after the Initial Closing Date.

"**Subsidiary**" means any entity with respect to which a specified Person directly, or indirectly through one or more Subsidiaries, (a) has the power, through the ownership of securities

16

or otherwise, to elect a majority of the directors or similar managing body of such entity or (b) holds a majority of the equity interests in such entity.

"**Superior Proposal**" means any bona fide proposal or offer to or from a Person other than Buyer or its Representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (b) any other direct or indirect acquisition involving the Assets, that, in each case, the Selling Entities have determined in their business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.

"**Systems**" means all Software, computers, computer equipment, hardware, firmware, networks, databases, electronics, platforms, servers, interfaces, applications, websites and related information technology systems, infrastructure, and services that are owned, used or held for use by the Selling Entities.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxation**" or "**Taxing**") means all U.S. federal, state, local or foreign taxes, including all taxes on net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, escheat, severance, stamp, occupation, real property and personal property or other tax of any kind whatsoever, including any interest, penalties and additions thereto.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"**Term DIP Obligations**" means all "Secured Obligations" under and as defined in that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated on or around September 10, 2024, by and among the Selling Entities, 1903P Loan Agent, LLC, as administrative agent and as collateral agent and each lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, IP address, trade style, trade dress, service mark, logo, social media identifier or account, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction**" has the meaning set forth in the recitals.

"**Transaction Documents**" means this Agreement, the Master Assignment, the IP Assignment Agreement, the Agency Agreement, and any other agreements, instruments, certificates or documents entered into pursuant to this Agreement.  To the extent such form has not been agreed to as of the date hereof, the Transaction Documents shall all be in form and substance reasonably acceptable to Buyer and Seller.

"**Transfer Taxes**" has the meaning set forth in Section 8.01(a).

"**Transferred Employees**" means any Company Employee who accepts (or is deemed to accept) an offer of employment with Buyer or any Designated Buyer pursuant to Section 8.04 and actually commences employment with Buyer or any Designated Buyer.

"**Trustee**" has the meaning set forth in Section 13.14.

"**TSA**" has the meaning set forth in Section 7.08(a).

"**WARN**" has the meaning set forth in Section 8.04(e).

"**Willful Breach**" means a material breach that is a consequence of an act undertaken or a failure to act by the breaching Party with knowledge that the taking of such act or such failure to act would, or would reasonably be expected to, constitute or result in a material breach of this Agreement.

"**Winddown Budget**" means that certain agreed budget providing for the costs, taxes and expenses to be incurred by the Selling Entities in furtherance of winding down the Selling Entities' estates, and other considerations. The agreed form of Winddown Budget as of the Effective Time is annexed hereto as <u>Exhibit G</u>.

Section 1.02.   *Other Definitions and Interpretive Matters*.  (a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)   *Calculation of Time Period*.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.  All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(ii)   *Dollars*.  Any reference in this Agreement to "**Dollars**" or "**$**" means United States dollars.

(iii)   *Exhibits; Schedules; Disclosure Schedules*.  All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)     *Gender and Number*.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

(v)     *Headings*.   The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement.   All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)     *Accounting Terms*.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.  To the extent that any definition of an accounting term defined herein is inconsistent with the meaning of such term under GAAP, the definition set forth herein will control.

(vii)     *Herein*.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)     *Or.*  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)     *Including*.  The word "including" or any variation thereof means "including, without limitation," and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)     *Statute*.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi)     *Contract*.  References to a Contract mean such Contract as amended from time to time.

(xii)     *Ordinary Course of Business*.   References to the "ordinary course of business" and similar standards mean the ordinary course of business as conducted by the Selling Entities consistent with past practices.

(xiii)     *Shall*.  For purposes of this Agreement, the words "will" and "shall" have the same meaning.

(xiv)     *Made Available*.  Any document or item will be deemed "made available" by the Selling Entities within the meaning of this Agreement if such document or item is included in (i) the "Project Boxer" data room hosted by Intralinks or (ii) the "Big Lots"

leases folder hosted by Dropbox, at least one Business Day prior to the date of this Agreement.

(b)    *No Strict Construction*.  Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

ARTICLE 2
PURCHASE AND SALE

Section 2.01.   *Purchase and Sale*.  (a) *Purchase of the Assets*.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, at and as of the Effective Time, (i) on the Initial Closing Date and throughout the Designation Rights Period, Buyer (or Agent, at Buyer's election in accordance with the terms of the Agency Agreement) shall have the right to designate one or more Designated Buyers to purchase, acquire and accept one or more Assets and (ii) to the extent such rights are exercised, the Selling Entities shall sell, transfer, convey, assign and deliver to Buyer or such Designated Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances), and Buyer or each Designated Buyer, as applicable, shall purchase and accept from the Selling Entities, all right, title and interest of the Selling Entities in and to the Assets so designated by Buyer or Agent (as applicable) and all related Assumed Liabilities; *provided* that, notwithstanding anything to the contrary in this Agreement, in no event shall Buyer (or Agent, at Buyer's election in accordance with the terms of the Agency Agreement) have the right to designate one or more Designated Buyers to purchase, acquire and accept one or more Assets if such transaction (x) would require any notices, filings, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws or (y) would be reasonably likely to impair, impede or delay the transactions contemplated hereby.  Without limiting the generality of the foregoing and except for the Excluded Assets, the Assets shall include all right, title and interest of the Selling Entities in and to the following as the same may exist at the Effective Time:

(i)    all offices, and processing, distribution, storage, warehousing, and other facilities used (or held for use) by the Selling Entities (collectively, the "**Facilities**");

(ii)    all tangible personal property and intangible property of the Selling Entities wherever located, including all such property in transit or in the possession of any Person, including all equipment, machinery, vehicles, fixtures, supplies, furniture, furnishings, leasehold improvements, signage, industry memorabilia, tools, vehicles, hardware, peripherals, Systems, telephone systems, and other personal, movable and fixed property;

(iii)    all Inventory;

20

(iv)    subject to Section 5.13 below, all Owned Real Property and Leased Real Property and all other rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits, and privileges owned or held for use by Seller or any of its Subsidiaries or hereinafter acquired by Seller or any such Subsidiary prior to the Initial Closing constituting real property or a real property interest, together with the rights, tenements, appurtenant rights and privileges relating thereto (in each case, excluding unexpired Leases that are 365 Contracts) (collectively, the "**Real Property Interests**");

(v)    all Contracts that constitute 365 Contracts in respect of the applicable Closing (to the extent such 365 Contracts are designated for purchase hereunder, the "**Assigned Contracts**");

(vi)    all Permits and Orders (whether preliminary or final), including, but not limited to, those set forth on Disclosure Schedule 2.01(a)(vi), in each case, to the extent transferrable and assignable and excluding any such Order that would impose a Liability on Buyer or its Affiliates after the Closing;

(vii)    all books, databases, files, documents, instruments, papers, studies, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, advertising and promotional materials, information, data, employee files, ledgers, journals, title policies, regulatory filings, operating data and plans, research material, technical documentation (including design specifications, engineering information, test results, logic manuals, processes and flow charts), user documentation (including installation guides, user manuals, training materials, release notes and working papers), bills of material, equipment logs, service books and records, operating guides and manuals, creative materials and other similar items (other than the Excluded Records) owned by, or otherwise in the possession or control of, the Selling Entities or held by a Third Party on behalf of the Selling Entities, whether in written or electronic or any other format, including telephone numbers, email addresses and accounts, customer and supplier lists and contact information, mailing lists, sales and promotional literature, other sales related materials, marketing plans, reports or data, forecasts, drawings, schematics, technical plans, reports, trade secrets, user data, and customer Personal Information (collectively, the "**Records**");

(viii)    all Proceedings, accounts, and causes of action (including warranty and similar claims) of any Seller or any of its Subsidiaries against any Persons (other than another Selling Entity) (regardless of whether such claims and causes of action have been asserted) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement, and other rights of recovery, including rights to insurance proceeds, other than proceeds related to D&O Insurance Policies, possessed by Seller or any of its Subsidiaries (regardless of whether such rights are currently exercisable), in each case, other than the Excluded Proceedings;

(ix)    all rights to any proceeds to which Seller or any of its Subsidiaries is entitled in respect of (x) any loss, destruction or condemnation of any Asset or (y) any Assumed Liabilities (other than with respect to Taxes) or the operation of such Assets;

21

(x)     all warranty, indemnity or other claims that have been, or may be, made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract;

(xi)     all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, prepaid Property Taxes and, in each case to the extent relating to Taxes that are Assumed Liabilities, other Tax assets that are not Specified Tax Refunds, security and other deposits or the like, except to the extent taken into account in the APA Administration Budget or the Winddown Budget;

(xii)     all Owned Intellectual Property, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to assert, defend, sue, and recover damages for any past, present, and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Owned Intellectual Property and any and all corresponding rights that have been, now, or hereafter may be secured throughout the world with respect to any Owned Intellectual Property, together with, to the extent in Seller's or any of its Subsidiaries' possession or control, all tangible embodiments and copies of any of the foregoing and all books and records pertaining to any of the foregoing;

(xiii)     all goodwill, including all customer relationships, all rights under any confidentiality agreements executed by any third party for the benefit of Seller or any of its Subsidiaries, and all information and documents related thereto (other than the Excluded Records);

(xiv)     all rights of Seller or any of its Subsidiaries under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any current or former employees, or current or former directors, consultants, independent contractors and agents of Seller or any of its Subsidiaries or any of their Affiliates, or with third parties, in each case, solely to the extent related to the Transferred Employees or the Designated Assets;

(xv)     other than with respect to Taxes, all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, or rights of recoupment, recovery or set off;

(xvi)     all rights, claims, or causes of action relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interests;

(xvii)     to the extent provided in Section 8.07, all rights and benefits of the Selling Entities with respect to all insurance policies (to the extent transferable), insurance recoveries under any insurance policies of the Selling Entities that relate to the Assets or Assumed Liabilities, including any and all claims, rights to assert claims and rights to proceeds on any such insurance policies, binders and interests for all periods before, through and after the Closing (collectively, "**Insurance Rights**").  The Insurance Rights shall exclude any of the foregoing with respect to any Excluded Assets and Excluded Proceedings and, for the avoidance of doubt, shall not include any proceeds, rights or benefits under or related in any way to any D&O Insurance Policies. For the avoidance of

doubt, this Section 2.01(a)(xvii) shall not result in any insurance policies being treated as Assigned Contracts;

(xviii)    all claims or causes of action arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state Applicable Law (the "**Avoidance Actions**"), and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of setoff, rights of subrogation, and all other rights of any kind in each case under any other provision of the Bankruptcy Code or Applicable Laws;

(xix)    all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals, prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding, for the avoidance of doubt, any items related to income Taxes), except to the extent taken into account in the APA Administration Budget or the Winddown Budget;

(xx)    all Tax Returns that relate to the Assets; *provided* that, Seller or any of its Subsidiaries may retain copies of such Tax Returns;

(xxi)    all cash and cash equivalents (other than any cash and cash equivalents held in the Professional Fee Escrow Account, in respect of the HQ Sale Deductions or paid to Seller pursuant to this Agreement (collectively, "**Retained Cash**"));

(xxii)    all Accounts Receivable (and proceeds therefrom) to the extent related to Designated Assets;

(xxiii)    all rights of the Selling Entities to receive (a) any refund or return of any cash collateral or other monies deposited with any issuer of any letter of credit upon the expiration and/or return of such letter(s) of credit undrawn, and (b) following any draw under a letter(s) of credit, any refund or return by the beneficiary thereof or any exceeds proceeds of such letter(s) of credit;

(xxiv)    all outside of the ordinary course of business deposits to the extent made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases;

(xxv)    all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, creditors, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refund or Tax attributes or refunds that constitute Excluded Assets), causes of action, rights of setoff, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Selling Entity); *provided*, *however*, that Buyer shall not enforce or prosecute any of the foregoing claims or causes of action arising under Chapter 5 of the Bankruptcy Code, against such third parties; *provided further*, *however*, that, for the avoidance of doubt, the foregoing shall not result in any Excluded Proceedings constituting

Assets that may be designated, sold, transferred, conveyed, assigned, or delivered to Buyer or any Designated Buyer; and

(xxvi)    with respect to third parties (including any counterparties to any Assigned Contract or Real Property Interests and customers, suppliers, vendors, and merchants), all claims, rights or causes of action of any Selling Entity, including but not limited to claims, rights or causes of action arising under Chapter 5 of the Bankruptcy Code; *provided*, *however*, that Buyer shall not enforce or prosecute any of the foregoing claims or causes of action arising under Chapter 5 of the Bankruptcy Code against such third parties; *provided further*, *however*, that, for the avoidance of doubt, the foregoing shall not result in any Excluded Proceedings constituting Assets that may be designated, sold, transferred, conveyed, assigned, or delivered to Buyer or any Designated Buyer.

(b)    *Designated Assets*.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, at and as of the Effective Time, Buyer and the Selling Entities hereby designate Agent to serve as their exclusive Agent for purposes of conducting the Store Closing Sale and selling, transferring, pursuing or otherwise disposing of certain of the Assets (the "**Designated Assets**"), free and clear of all Encumbrances (other than Permitted Encumbrances), together with the related Assumed Liabilities, subject to and in accordance with the terms and conditions of this Agreement and the Agency Agreement.  Buyer shall have the right to designate any Assets as Designated Assets at any time during the Designation Rights Period.  If Buyer designates any Asset as a Designated Asset, Buyer shall acquire all related Assets and assume all related Assumed Liabilities.  To the extent any Assets are not designated as Designated Assets on or prior to the end of the Designation Rights Period, such Assets shall be deemed Excluded Assets and shall remain the properties of the Selling Entities.  For the avoidance of doubt, in no event shall any Excluded Assets constitute Assets that may be designated, sold, transferred, conveyed, assigned, or delivered to Buyer or any Designated Buyer.

Section 2.02.  *Excluded Assets*.  Notwithstanding anything to the contrary in this Agreement, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer or any Designated Buyer, and the Selling Entities will retain all right, title, and interest to, in, and under the Excluded Assets.  The term "**Excluded Assets**" means only the following assets, rights, and properties of the Selling Entities:

(a)    any amounts (including the Purchase Price) paid or payable to Seller or any of its Subsidiaries pursuant to this Agreement or any other Transaction Document;

(b)    any shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(c)    all minute books and other corporate books solely to the extent relating to a Selling Entity's organization or existence, and all stock ledgers, corporate seals, and stock certificates of the Selling Entities (other than Tax Returns described in Section 2.01(a)(xx));

(d)    all Excluded Records;

(e)    all Excluded Contracts;

24

(f)     sponsorship of all Seller Benefit Plans and all rights, title and interest in the assets held with respect to or otherwise relating to the same;

(g)     all rights to any Specified Tax Refund;

(h)     (i) except as set forth in Section 2.01(a)(xviii), all insurance policies and rights to proceeds thereof and (ii) the assets set forth on Disclosure Schedule 2.02(g); *provided, however*, that any and all director and officer insurance policies (including, for the avoidance of doubt, all current and prior director and officer insurance policies) of the Selling Entities with respect thereto ("**D&O Insurance Policies**"), the proceeds thereof, and all rights and benefits of any nature relating thereto (including any claims arising under such policies and all credits, proceeds, causes of action or rights thereunder) shall constitute Excluded Assets;

(i)     all bank accounts and securities accounts of Seller or any of its Subsidiaries, but not the contents thereof;

(j)     the Professional Fee Escrow Account (including, for the avoidance of doubt, all cash held in the Professional Fee Escrow Account, including any amount deposited therein in connection with the Initial Closing) and any other Retained Cash;

(k)     all Assets that have not been designated as Designated Assets on or prior to the end of the Designation Rights Period;

(l)     any rights, claims, or causes of action of Seller or any of its Subsidiaries under this Agreement, any other Transaction Document or the Confidentiality Agreement;

(m)     any and all Excluded Proceedings and the proceeds thereof;

(n)     the proceeds of the sale of any Excluded Assets; and

(o)     those other properties and assets described on Disclosure Schedule 2.02(o).

Section 2.03.  *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, at and as of the Effective Time, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (and no other Liabilities) (collectively, the "**Assumed Liabilities**"):

(a)     *Generally*.  All Liabilities solely to the extent arising from the ownership, operation or right to dispose of the Business or the Assets after the Effective Time;

(b)     *Assigned Contract*s.  All of the Selling Entities' obligations to perform under the Assigned Contracts in accordance with their terms, solely to the extent such performance is required after the Effective Time (and not arising from any pre-Effective Time breach or other failure to perform or satisfy such obligations prior to the Effective Time by the Selling Entities);

(c)     *Real Property Interests*.  All of Seller's and its Subsidiaries' Liabilities under the Real Property Interests, to the extent arising or attributable to any period after the Initial Closing;

(d)     *Post-Closing Taxes*.  (i) All Taxes solely to the extent resulting from the use or operation of the Assets and the Business attributable to the Post-Closing Tax Period, (ii) Taxes of Seller or a Selling Entity for a Pre-Closing Tax Period that would not have been incurred but for an election by Buyer on the Closing Date that is retroactive to the Pre-Closing Tax Period and not expressly contemplated by this Agreement or otherwise agreed upon by Seller and (iii) all Transfer Taxes; *provided*, that in no case will Assumed Liabilities include Taxes or other Liabilities with respect to the Assets or the Business with respect to which "responsible person" or similar claims may be made against any Selling Entity's or any Affiliate of a Selling Entity's employees, managers, officers, directors or similar persons with respect to any action or refusal to take action of such Selling Entity or Affiliate of a Selling Entity, including pursuant to any wage payment statute;

(e)     *WARN Act.*  All Liabilities that are the responsibility of Buyer or any Designated Buyer(s) pursuant to Section 8.04(e);

(f)     *Cure Costs.* All Cure Costs;

(g)     *Professional Fees*.  All Liabilities giving rise to the Professional Fees Amount; *provided* that such amount shall be capped at the amounts Buyer is required to pay into the Professional Fee Escrow Account (as defined in the Sale Order) pursuant to the Sale Order; and

Notwithstanding the foregoing, Buyer shall not be required to assume any Liability in respect of the Designation Rights Period that is expressly provided for in the APA Administrative Budget and/or the Winddown Budget.

Notwithstanding anything to the contrary herein, the Assumed Liabilities will not include any Excluded Liabilities.

Section 2.04.  *Excluded Liabilities*.  Notwithstanding anything herein to the contrary, Buyer and any Designated Buyers will not assume and will not be obligated to assume or be obliged to pay, perform, or otherwise discharge or in any other way be liable or responsible for any Liability of the Selling Entities (with respect to the Business, the Assets or otherwise) other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include any Liability of the Selling Entities relating to the following:

(a)     *Excluded Assets & Liabilities*.  All Liabilities to the extent related to, arising from or in connection with any Excluded Assets or not included in the Assumed Liabilities;

(b)     *Pre-Closing Taxes.* Other than Specified Pre-Closing Taxes, all Taxes with respect to the Assets and the Business attributable to the Pre-Closing Tax Period;

(c)     *Company Employees; Seller Benefit Plans*.  All Liabilities (i) arising out of, or relating to, the employment, or the termination of employment, of any current or former Company Employees (including any severance or other termination-related payments), in each case, other than Liabilities to the extent arising entirely after the Initial Closing or (ii) arising out of, or relating to any Seller Benefit Plan, in each case, whether arising before, on or following the Initial Closing;

26

(d)    *WARN Act*.  All Liabilities under WARN that are the responsibility of any Seller pursuant to Section 8.04(e);

(e)    *Brokerage Fees*.  All Liabilities relating to any brokerage, finder's or other similar fee or commission incurred in connection with the transactions contemplated hereby;

(f)    *Product Liabilities*.  All Liabilities arising out of or relating to services, products or product or service warranties of the Selling Entities or any predecessors or Affiliates of the Selling Entities provided, developed, designed, manufactured, marketed, sold or distributed on or prior to the Initial Closing Date;

(g)    *Environmental*.  All Liabilities arising from or relating to any Environmental Laws or the presence or Release of any Hazardous Substance, except to the extent attributable to any period at or after the Initial Closing;

(h)    *Proceedings*.  All Liabilities relating to (i) Excluded Proceedings or (ii) Proceedings in existence or resulting from, arising out of or attributable to Events on or prior to the Initial Closing (including those set forth on Disclosure Schedule 5.08);

(i)    *Successor Liability*.  All Liabilities based on successor liability theories, including product liability claims; and

(j)    *Pre-Closing Liabilities*.  Other than Cure Costs, Liabilities that are the responsibility of Buyer or any Designated Buyer(s) pursuant to Section 8.04(e) or as set forth in Section 2.03(b), all Pre-Closing Liabilities.

Section 2.05.  *Cure Costs; Desired 365 Contracts*.  (a) Seller shall use commercially reasonable efforts to provide timely and proper written notice of the motion seeking entry of the Sale Order to all known parties to any executory Contracts or unexpired Leases to which the Selling Entities are a party that are 365 Contracts.  Upon receipt of notice from the Buyer or its Agent that a 365 Contract has been designated as an Assigned Contract, Seller shall take all other reasonable actions reasonably necessary to cause the Assigned Contracts to be assumed by the applicable Selling Entity and assigned to Buyer or the applicable Designated Buyer pursuant to Section 365 of the Bankruptcy Code at the Effective Time or, for 365 Contracts designated after the Effective Time but during the Designation Rights Period, promptly following such designation; *provided* that no Selling Entity shall be required to make any payment or grant any accommodation in connection therewith and Buyer or the applicable Designated Buyer shall pay all Cure Costs relating thereto in accordance with this Section 2.05(a). At the applicable Closing, subject to the terms and conditions hereof, (i) Seller or its Subsidiaries, as applicable, will assign each Assigned Contract to Buyer or the applicable Designated Buyer, (ii) Buyer or the applicable Designated Buyer will assume Liabilities under each Assigned Contract in accordance with Section 2.03(b) and pursuant to Section 365 of the Bankruptcy Code and the Sale Order, and (iii) Buyer or the applicable Designated Buyer shall pay all Cure Costs relating thereto as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order.

(b)    At any time during the Designation Rights Period, Buyer, or where applicable Agent, will have the right to provide written notice to Seller of Buyer's (or Agent's) election to:

(i)      designate a 365 Contract as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)      designate a 365 Contract as an Assigned Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer or a Designated Buyer under this Agreement at the subsequent Closing Date (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such 365 Contract is added to the Assigned Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract, and (B) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order). In connection with the foregoing, Buyer covenants that not fewer than 200 non-residential real property leaseholds for Seller's retail store locations will be designated for assumption and assignment as Assigned Contracts (subject to entry of an order of the Bankruptcy Court approving such assumption and assignment under Sections 363 and 365 of the Bankruptcy Code, as applicable); *provided* that to the extent the Buyer commits to use commercially reasonable best efforts to address the concerns of, and obtain an approval order from, the Bankruptcy Court.

(c)      To the extent that Buyer (or Agent, as applicable) makes a valid designation with respect to any 365 Contracts pursuant to Section 2.05(b), the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(d)      If Buyer (or Agent, as applicable) exercises its rights in Section 2.05(b) to designate a 365 Contract as an Assigned Contract or as an Excluded Contract (as the case may be), then the Parties acknowledge and agree that there will be no increase or reduction in (and such designation shall not otherwise affect) the Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing.

Section 2.06.  *Additional Excluded Assets*.  Notwithstanding any other provision of this Agreement or any other Transaction Document to the contrary, at any time during the Designation Rights Period, Buyer (or Agent, as applicable) will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's (or Agent's, as applicable) election to designate any Asset (or portion thereof) or any 365 Contract, which is addressed in Section 2.05) as an Excluded Asset, and upon such designation such Asset will constitute an Excluded Asset for all purpose of this Agreement.  If Buyer (or Agent, as applicable) exercises its rights in this Section 2.06 to designate any such Asset (or portion thereof) as an Excluded Asset, then the Parties acknowledge and agree that there will be no increase or reduction in (and such designation shall not otherwise affect) the Purchase Price as a result of such designation or change in designation, nor will there be any delay of the Closing.  To the extent that Buyer (or Agent, as applicable) makes a valid designation with respect to any Asset pursuant to this Section 2.06, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

Section 2.07.  *Assignment of Assets Subject to Consent Requirements*.  The Selling Entities will use reasonable best efforts to assign or transfer and implement the assignment or transfer of

any Asset requiring the approval, authorization or consent of, or granting or issuance of any license or Permit by, any Third Party thereto (each such action, a "**Necessary Consent**"), and to avoid a breach thereof or of any Applicable Law or Order or in any way adversely affect the rights of Buyer thereunder. In the event that, (a) such Necessary Consent has not been obtained and (b) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required, subject to the terms and conditions hereof, the Closing will proceed with respect to the remaining Assets (but not the Asset(s) with respect to which any such Necessary Consent has not been obtained), and there will be no reduction in the Purchase Price as a result thereof, and, for a period of one year after the Closing Date, (i) the Selling Entities shall use their reasonable best efforts to obtain the Necessary Consents with respect to any such Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer (or its designated Affiliate) as Buyer may reasonably request; *provided* that neither Seller nor Buyer will be obligated to pay any consideration or grant any accommodation therefor to any Third Party from whom consent or approval is requested or to initiate any Proceedings to obtain any such consent or approval; and (ii) the Selling Entities will hold such Assets in trust for the benefit of Buyer, and the Selling Entities and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and without the need for any Necessary Consent, under which Buyer would obtain the benefits and assume the obligations under such purchased Assets in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which the Selling Entities would enforce their rights thereunder for the benefit of Buyer with Buyer assuming each applicable Selling Entities' obligations thereunder. Notwithstanding anything to the contrary herein, in no event shall Buyer or any Designated Buyer acquire beneficial ownership of any of the Assets if such acquisition would require a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

Section 2.08. *Misallocated Assets*. If after the end of the Designation Rights Period, (a) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (b) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities, Buyer and the applicable Selling Entity will promptly execute such documents as may be reasonably necessary to cause the transfer of and thereafter transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party for no additional consideration. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party. If, following a Closing, the Selling Entities receive any payments in respect of the Assets acquired by Buyer (or a Designated Buyer) at such Closing, such Selling Entities shall promptly remit such payments to Buyer or other entity designated by Buyer. If, following the Initial Closing, Buyer receives any payments in respect of the Excluded Assets, Buyer shall promptly remit such payments to Seller or any other entity designated by Seller.

Section 2.09. *Further Assurances*. Subject to the terms and conditions hereof, from time to time following the Closing, the Parties will execute, acknowledge, and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions (including provision of materials and information), as may be reasonably necessary or appropriate or as Buyer or any Designated Buyer may reasonably request to transfer, convey or assign to Buyer or any Designated Buyer the relevant Assets, to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully

to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.09 will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the Closing.

Section 2.10. *Withholding*. Notwithstanding any other provision in this Agreement, Buyer (or any Designated Buyer) and any other applicable withholding agent shall be entitled to deduct and withhold from the payments to be made pursuant to this Agreement any Taxes required to be deducted and withheld with respect to the making of such payments under Applicable Law; *provided* that (a) other than with respect to any withholding resulting from any Person's failure to deliver the documents described in Section 4.04(e), the Person making any payment shall use commercially reasonable efforts to notify the Person entitled to receive such payment at least five (5) business days before any such payment is made of any deduction or withholding requirement applicable to such payment of which the withholding Person becomes aware and (b) the Parties hereto shall use commercially reasonable efforts to cooperate prior to the payment date to reduce or eliminate any such deduction and withholding. To the extent that amounts are so withheld and deducted and remitted to the applicable Tax Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction or withholding was made.

## ARTICLE 3
## PURCHASE PRICE

Section 3.01. *Purchase Price*. (a) The aggregate all-cash purchase price for the purchase, sale, assignment, and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets as follows (collectively, the "**Purchase Price**"):

(i) *First*, an amount equal to the Debt Payoff Amount; *provided*, that in the event the Debt Payoff Amount is less than $304,000,000, the Purchase Price shall be reduced on a dollar for dollar basis by the amount by which the Debt Payoff Amount is less than $304,000,000; *plus*

(ii) *Second*, an amount in cash required to satisfy Selling Entities' obligations in respect of unpaid "stub" rent, not to exceed $17,000,000 in the aggregate; *plus*

(iii) *Third*, an amount not to exceed $42,391,000 in the aggregate as set forth in, and limited to (determined on both a line-item and aggregate basis), the amounts set forth in the APA Administration Budget (including for any such Seller obligations arising under the Agency Agreement); *plus*

(iv) *Fourth*, an amount not to exceed $125,000,000 in the aggregate as set forth in, and limited to (determined on both a line-item and aggregate basis), the amounts set forth in the Winddown Budget; *plus*

(v) $7,500,000 to fund the Professional Fee Escrow Amount.

provided, that Seller covenants that a condition to Buyer's funding of the APA Administrative Budget is Seller's agreement to use a portion of such funds to pay those items denominated under Section 6 on Schedule 3.01 attached hereto and incorporated herein; provided, further, that in the event the actual dollar amount of funds necessary to satisfy the items covered by the APA Administration Budget or the Winddown Budget are greater than the aggregate amount set forth in such budget, any such excess shall be satisfied from (x) funds derived from the Seller's allocable share of the Net Proceeds provided for under Section 3.01(b) below and/or (y) funds available under the Winddown Budget or the APA Administration Budget, as applicable; provided, further, that in the event the actual dollar amount of funds necessary to satisfy items covered by either the APA Administration Budget or the Winddown Budget are less than the aggregate amount set forth in such budget(s), any such savings shall be available to the Selling Entities to satisfy Accrued Administrative Claims; provided, further, that upon Seller's satisfaction of Accrued Administrative Claims in the aggregate amount of $100,000,000, any such budget savings shall be retained by Buyer for its own account.

(b)    In addition to the amounts set forth in Section 3.01(a) above, upon the sale of the Corporate/HQ Facility (the "**HQ Sale**"), if any, the Net Proceeds of any such sale shall be allocated as between Buyer and Seller as follows:

      i.    First, the HQ Sale Deductions shall be paid to the applicable third party (or reimbursed to Seller to the extent Seller has paid any such amounts to any such third parties) or escrowed as required to consummate the subject transaction;

      ii.    Next, $10,000,000 in Net Proceeds shall be paid to Buyer for its own account upon a closing of any such sale;

      iii.    All remaining Net Proceeds above $10,000,000 shall be for the account of Seller; provided, that the Seller's portion of any such sale proceeds shall be held by Buyer until Seller and Buyer perform a final reconciliation of the APA Administration Budget or the Winddown Budget.

Buyer and Seller shall cooperate with each other and undertake commercially reasonable best efforts to market promptly the Corporate/HQ Facility with a view to realizing maximum recoverable value upon a HQ Sale; provided, that any such sale shall require the prior written consent of Seller (which consent shall not be unreasonably withheld, delayed, denied or conditioned).

(c)    In addition to the amounts set forth in Section 3.01(a) and Section 3.01(b) above, and without duplication of any amount included in either the APA Administrative Budget or Winddown Budget, an amount equal to those "Expenses" listed under Section 4.1 of the Agency Agreement.

(d)    The assumption of the Assumed Liabilities.

The Purchase Price will be delivered by Buyer as set forth in Section 4.02.

ARTICLE 4

CLOSINGS

Section 4.01.  *Closing Date*.  The (a) initial consummation of the Transaction (the "**Initial Closing**") shall take place on the date that is two Business Days after the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 (or the waiver thereof by each Party entitled to waive that condition) (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Initial Closing), and (b) each subsequent consummation of the Transaction (each, together with the Initial Closing, a "**Closing**") with respect to one or more Assets shall take place on a date to be agreed in writing by Seller and Buyer pursuant to an assignment agreement in form and substance reasonably acceptable to Seller and Buyer (each such date of a Closing, together with the Initial Closing Date, a "**Closing Date**").   Each Closing will take place remotely via the exchange of electronic documents and signatures by electronic mail at the on the dates set forth in the foregoing sentence, unless another place, date, or time is agreed to in writing by Seller and Buyer.  The date on which the Initial Closing actually occurs is referred to as the "**Initial Closing Date**" and the date of any such Closing is referred to as a "**Closing Date**."  For purposes of this Agreement, the Initial Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Initial Closing Date (the "**Effective Time**"). Each subsequent Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the applicable Closing Date. In connection with each subsequent Closing, the Selling Entities, Buyer, Agent and each Designated Buyer shall deliver the appropriate and customary assignment documents in form and substance reasonably acceptable to Seller and Buyer for the applicable Assets and Contracts and Leases.

Section 4.02.  *Payments on the Closing Date*.  (a) At the Initial Closing, Buyer will pay, or cause to be paid (A) to the Persons identified in each Payoff Letter the respective portion of the Debt Payoff Amount set forth therein by wire transfer of immediately available funds to the account(s) designated in such Payoff Letter and (B) $7,500,000 into the Professional Fee Escrow Account.  In order to facilitate the foregoing, Seller shall deliver to Buyer draft Payoff Letters at least two (2) Business Days prior to the Initial Closing; and

(b)     On each Friday beginning February 7, 2025 through and including February 28, 2025, the Buyer will fund by wire transfer of immediately available funds to the Professional Fee Escrow Account $1,500,000 such that the aggregate of such weekly fundings shall be equal to $6,000,000. Such amount actually funded shall reduce payments Buyer is required to pay to Seller under the Winddown Budget (or, in Seller's discretion, the APA Administration Budget) on a dollar for dollar basis for such Friday; *provided*, *further*, that Buyer's obligation to make any weekly funding to the Professional Fee Escrow Account shall terminate upon any valid termination of this Agreement under Article 12 hereof;

(c)     (i) On the Initial Closing Date, Buyer will fund by wire transfer of immediately available funds to an account designated in writing by Seller such amounts as are projected to be incurred by the Selling Entities and provided for in the APA Administration Budget for the period starting on the Initial Closing Date and ending on the following Friday (or if a Friday is not a Business Day, then on the next succeeding Business Day) and (ii) on each Friday (or if a Friday is not a Business Day, then on the next succeeding Business Day) following the Initial Closing Date, Buyer will fund by wire transfer of immediately available funds to an account designated in writing

by Seller such amounts as are projected to be incurred by the Selling Entities and provided for in the APA Administration Budget for the following calendar week (or portion thereof);

(d)     (i) On the Initial Closing Date, Buyer will fund by wire transfer of immediately available funds to an account designated in writing by Seller such amounts as are projected to be incurred by the Selling Entities and provided for in the Winddown Budget for the period starting on the Initial Closing Date and ending on the following Friday (or if a Friday is not a Business Day, then on the next succeeding Business Day) and (ii) on each Friday (or if a Friday is not a Business Day, then on the next succeeding Business Day) following the Initial Closing Date, Buyer will fund by wire transfer of immediately available funds to an account designated in writing by Seller such amounts as are incurred by the Selling Entities and provided for in the Winddown Budget for the immediately following calendar week (or portion thereof); and

(e)     Agent shall be responsible for the payment of all Expenses out of Proceeds (each as defined in the Agency Agreement) or from Agent's own accounts if and to the extent there are insufficient Proceeds.  All Expenses incurred during each week of the Store Closing Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of the Selling Entities, or paid by the Selling Entities and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation provided for in Section 8.7(a) of the Agency Agreement; *provided*, *however*, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), the Selling Entities, Buyer and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available; *provided*, *further*, in no event shall Agent be obligated to fund any amount that is otherwise provided for in with the APA Administrative Budget or Winddown Budget and that would constitute double counting of any Expense that is required to be funded under the Agency Agreement.

Section 4.03.  *Buyer's Deliveries*.  At the Initial Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)     the payments required to be made at the Initial Closing pursuant to Section 4.02;

(b)     a counterpart to the Master Assignment and each other Transaction Document to which Buyer (and any Designated Buyer and/or Agent) is a party, duly executed (and acknowledged, where applicable) by Buyer (and any Designated Buyer and/or Agent) and Agent, as applicable; and

(c)     the certificate of Buyer to be received by Seller pursuant to Section 11.03.

Section 4.04.  *The Selling Entities' Deliveries*.  At the Initial Closing, the Selling Entities will deliver to Buyer:

(a)     a counterpart to the Master Assignment and each other Transaction Document to which a Selling Entity is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by such Selling Entity;

(b)     the certificate of the Selling Entities to be received by Buyer pursuant to Section 9.03;

(c)     a certified copy of the Sale Order as approved by the Bankruptcy Court;

(d)     possession of (i) each Owned Real Property included in the Designated Assets, together with duly executed special warranty deeds for each such Owned Real Property conveying fee simple title in such Owned Real Property to Buyer and (ii) each other Asset in any Selling Entity's possession and capable of passing by delivery, in each case subject only to Permitted Encumbrances;

(e)     a certificate of non-foreign status of each Selling Entity (or, if such Selling Entity is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), a certificate of non-foreign status from the entity that is treated as the transferor of property for U.S. federal income tax purposes) meeting the requirements of Treasury Regulation Section 1.1445-2(b)(2); and

(f)     executed Payoff Letters.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Except as (i) disclosed in any Seller SEC Document filed and publicly available at least 24 hours prior to the date hereof (but excluding any such disclosure set forth in any section thereof entitled "Risk Factors" (other than any specific historical factual information contained therein, which will not be excluded) or in any "forward-looking statements" that are cautionary, forward-looking, or predictive in nature set forth therein), (ii) disclosed in connection with the Bankruptcy Cases or (iii) set forth in the corresponding section of the Disclosure Schedules, each Selling Entity jointly and severally represents and warrants to Buyer, as of September 8, 2024, as follows:

Section 5.01.   *Organization and Good Standing*.   Seller and each Subsidiary of Seller is an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization. Subject to the limitations imposed on Seller or any such Subsidiary as a result of having filed a petition for relief under the Bankruptcy Code, Seller and each such Subsidiary has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Seller and each Subsidiary of Seller is duly qualified, licensed, or otherwise authorized to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification, licensing, or authorization necessary, except for such failures to be so qualified, licensed, authorized, or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02.   *Authority; Validity*.   Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery, and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling

Entity and no other corporate (or equivalent) proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at each Closing will be duly and validly executed and delivered by such Selling Entity at such Closing.  Subject to entry of the Sale Order and assuming the due authorization, execution, and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates, or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid, and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing, regardless of whether such principles are considered in a Proceeding at law or in equity.

Section 5.03.  *Governmental Approvals; No Conflict*.  Except for (a) entry of the Sale Order, and (b) notices, filings and consents required in connection with the Bankruptcy Cases and (c) any applicable notices, filings, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, none of the Selling Entities is required to give any notice to, make any filing with, or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  When the consents and other actions described in the preceding sentence, including entry of the Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Selling Entity under (i) the certificate of incorporation, bylaws, or other governing documents of such Selling Entity, (ii) any Order applicable to such Selling Entity or any of the Assets owned or held by it or on its behalf, (iii) any Applicable Law, or (iv) require any consent under, or give any Third Party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise, or other instrument or arrangement to which any of the Selling Entities is a party as of the Initial Closing and which constitutes an Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Initial Closing on any of the Assets, except in the case of clauses (ii) through (iv), to the extent that any such rights of termination, amendment, acceleration, suspension, revocation, or cancellation as a result of such Encumbrance will not be (x) reasonably expected to be material to the Business, the Assets or the Assumed Liabilities, taken

as a whole, or (y) enforceable against such Asset or Assumed Liability following the Initial Closing in accordance with the Sale Order.

Section 5.04.  *Financial Statements; Liquidity and Asset Calculations*.  (a) The audited consolidated balance sheet as of January 29, 2022, January 28, 2023 and February 3, 2024 and the related audited consolidated statements of operations and cash flows for the fiscal years then ended (collectively, the "**Audited Financial Statements**") and the unaudited interim condensed consolidated balance sheet as of May 4, 2024 (the "**Most Recent Balance Sheet**"), and the related unaudited interim condensed consolidated statements of operations and cash flows (collectively with the Audited Financial Statements and the Most Recent Balance Sheet, the "**Financial Statements**") for the 3 months ended May 4, 2024 (May, 4 2024 shall be referred to herein as the "**Balance Sheet Date**"), of Seller and its Subsidiaries (i) have been prepared in all material respects in accordance with GAAP applied on a consistent basis (except as may be indicated in the notes thereto), and (ii) fairly present, in all material respects, the consolidated financial position of Seller and its Subsidiaries as of the dates thereof and their consolidated results of operations, stockholder's equity and cash flows for the periods then ended (subject, in each case, to normal year-end adjustments in the case of any unaudited interim financial statements, none of which will be, individually or in the aggregate, material).

Section 5.05.  *Seller SEC Documents*.  All of the Seller SEC Documents (a) as of its date, complied as to form in all material respects with the applicable requirements of the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**"), or the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "**Exchange Act**"), as the case may be, as in effect on the date so filed, (b) did not, at the time it was filed (or, if subsequently amended or supplemented, at the time of such amendment or supplement), contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, and (c) to the extent they contained consolidated financial statements of Seller, such financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act).

Section 5.06.  *No Undisclosed Material Liabilities*.  As of September 8, 2024, there are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business, other than (a) Liabilities provided for in the Most Recent Balance Sheet or disclosed in the notes thereto; (b) Liabilities incurred in the ordinary course of business since the Balance Sheet Date; (c) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.06; and (d) Liabilities that will constitute Excluded Liabilities.

Section 5.07.  *Absence of Certain Changes*.  From the Balance Sheet Date, (a) the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course of business and consistent in all material respects with past practices, (b) the Selling Entities have not taken any action that, if taken during the period from the date hereof to the Initial Closing would constitute a breach of Sections 7.02(e)(ii)(A), 7.02(e)(ii)(B), 7.02(e)(ii)(D), 7.02(e)(ii)(E), 7.02(e)(ii)(G), 7.02(e)(ii)(I), 7.02(e)(ii)(K) and 7.02(e)(ii)(M) and (c) there has not been any Event

that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08. *Legal Proceedings*. Except (a) for the Bankruptcy Cases and any adversary Proceedings or contested motions commenced in connection therewith or (b) as disclosed in Disclosure Schedule 5.08, after giving effect to the Sale Order, there is no, and since January 1, 2022 there has not been any, Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person, relating to the Business, the Assets or Assumed Liabilities, (i) that is material to the Business, Assets or Assumed Liabilities or that would reasonably be expected to give rise to any material Liability of Buyer or be materially adverse to the ownership or use by Buyer of the Assets after the Initial Closing, as such Assets are presently owned and used (or held for use) by Seller and/or its Subsidiaries, as applicable, (ii) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party or (iii) that is against any Selling Entity and seeks to prevent, restrain, materially delay, prohibit, or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents. There is no Order enjoining any Selling Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity to take any material action, in connection with the ownership, lease, possession, use or operation of the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities other than, in each case, Orders of general applicability.

Section 5.09. *Compliance with Laws; Permits*. (a) The ownership and operation of the Business or the Assets by the Selling Entities is and since January 1, 2022, has been, in material compliance with all Applicable Laws.

(b)     (i) The Selling Entities have obtained and maintained all necessary material Permits with regard to the ownership or operation of the Assets and the conduct of the Business, (ii) no Selling Entity has received written notice of any material default under any such Permit, and (iii) there are no, and since January 1, 2022 there have not been any, material violations in respect of Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been finally resolved.

Section 5.10. *Material Contracts*. (a) Disclosure Schedule 5.10 sets forth a complete list as of September 8, 2024 of Contracts and 365 Contracts to which the Selling Entities is party or is bound and that fall within the following categories (each Contract set forth or required to be set forth on Disclosure Schedule 5.10, a "**Material Contract**", and collectively, the "**Material Contracts**"):

(i)     any material lease or sublease of real property included as an Asset (whether a Selling Entity is lessor, sublessor, lessee, or sublessee);

(ii)     other than purchase orders or purchases of close-out inventory in the ordinary course of business, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $2,500,000 or more; or (B) annual receipts by the Business of more than $10,000,000 in any calendar year;

(iii)    any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement;

(iv)    any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets, or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Business or the Assets following the date of this Agreement;

(v)    any Contract where the Business is, and Buyer would be required to become, obligor or guarantor relating to indebtedness;

(vi)    any material Contract (A) containing covenants limiting, individually or in the aggregate, in any material respect the freedom of the Business or Assets to engage in any business, compete with any Person in a product or line of business or operate in any jurisdiction, (B) granting an option to acquire any material Asset or (C) granting any right of first offer, right of first refusal or right of first negotiation in respect of any material Asset;

(vii)    any collective bargaining agreement or other labor-related Contract with a union, works council, or other employee representative (each, a "**Labor Agreement**");

(viii)    any Contract, except for any lease that is not material, containing "most favored nation" provisions or granting any exclusivity right to any Third Party, in each case, applicable to the Business or the Assets;

(ix)    any Contract relating to the licensing of any material Intellectual Property (whether granted by or to any Selling Entity), in each case, other than (A) non-exclusive licenses of Intellectual Property granted by any Selling Entity in the ordinary course of business, (B) non-exclusive licenses of Intellectual Property granted by suppliers or vendors to any Selling Entity that are incidental to a services or other agreement or arrangement, the primary purpose of which is something other than the grant of rights under Intellectual Property, (C) licenses of commercially available off-the-shelf software entered into in the ordinary course of business with an aggregate fee of less than $500,000, or (D) employee invention assignment agreements executed on the applicable Selling Entity's standard form of agreement; or

(x)    any Related Party Agreement.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to materially affect value ascribed to the Material Contracts, (i) each Material Contract is in full force and effect and is a legal, valid, and binding obligation of the Selling Entity party thereto and, to the Knowledge of each Selling Entity, the other parties thereto in accordance with its terms and conditions, and is enforceable against such Selling Entity except as such legality, validity, and enforceability may be limited by (A) bankruptcy, insolvency, fraudulent conveyance, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (B) equitable principles of general applicability (whether considered in a Proceeding at law or in equity), and (C) the obligation to pay Cure Costs, (ii) the applicable Selling Entity and, to the Knowledge of each Selling Entity, the other parties thereto have performed all obligations

required to be performed by them under each Material Contract in all material respects and (iii) except for payment defaults, as of September 8, 2024, the Selling Entities have not received any written notice of the existence of any material breach or material default on the part of any Selling Entity under any Material Contract or that the counterparty thereto intends to terminate such Material Contract.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a material default under or a material violation of any Material Contract or would cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of an Encumbrance upon any Asset.

Section 5.11.  *Intellectual Property*.  (a) Disclosure Schedule 5.11(a) sets forth a list of all material registrations and applications for registration of the Owned Intellectual Property, setting forth for each item (1) the record owner of such item; (2) the jurisdiction in which such item is issued, registered, or pending; and (3) the issuance, registration, filing, or application date and serial or identification number of such item.

(b)     The Selling Entities are the sole and exclusive owner of all right, title, and interest in and to the Owned Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances). The Owned Intellectual Property is subsisting, valid and, to the Knowledge of each Selling Entity, enforceable.  Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code, the Selling Entities own or have a right to use, all Owned Intellectual Property and all other material Intellectual Property used in or necessary for the operation of the Business as currently conducted by the Selling Entities, free and clear of all Encumbrances (other than Permitted Encumbrances) (it being understood that the foregoing is not a representation or warranty regarding infringement, misappropriation or other violation of any Intellectual Property of any Person).

(c)     To the Knowledge of each Selling Entity, the operation of the Business by the Selling Entities does not infringe, misappropriate, or otherwise violate, and, since January 1, 2022, has not infringed, misappropriated, or otherwise violated, any Intellectual Property of any Person in any material respect.  None of the Selling Entities has received any written notice since January 1, 2022 that it is infringing, misappropriating, or otherwise violating the Intellectual Property of any other Person which notice remains unresolved. To the Knowledge of each Selling Entity, no Person is infringing, misappropriating, or otherwise violating any Owned Intellectual Property and no such Proceedings are currently being asserted or threatened in writing against any Person by any Selling Entity.

(d)     The Selling Entities have taken reasonable steps to protect and maintain any material trade secrets and know-how included in the Owned Intellectual Property, and, to the Knowledge of each Selling Entity, there are no unauthorized uses or disclosures of any such trade secrets or know-how. All Persons (i) who have contributed to the creation or development of any material Intellectual Property for or on behalf of any of the Selling Entities have executed and delivered to a Selling Entity an agreement (A) providing for the present tense assignment by such Person to such Selling Entity of all right, title and interest in and to such Intellectual Property, and (B) prohibiting such Person from using or disclosing trade secrets or confidential information of the Selling Entities and (ii) who have had or currently have access to any material trade secrets or material source code owned or used by a Selling Entity are subject to confidentiality obligations

regarding the non-disclosure and protection of such trade secrets and source code. To the Knowledge of each Selling Entity, no Person is in violation of any such agreement in any material respect.

(e) Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code, the Selling Entities own or have a license or other valid right to use all of the Systems used in the operation of the Business. The Systems (i) operate in all material respects in accordance with their functional specifications, (ii) are sufficient for the operation of the Business as currently conducted and (iii) to the Knowledge of each Selling Entity, are free from any virus, malware or material programming, design or documentation error or corruption of material defect. The Selling Entities have implemented and maintain (A) commercially reasonable technical, physical and organizational measures to protect the confidentiality, integrity and security of the Systems and data and identify and address internal and external risks to the privacy and security of Personal Information and the Systems and data in their possession or control, and (B) commercially reasonable data backup, data storage, system redundancy and disaster avoidance and recovery procedures. To the Knowledge of each Selling Entity, since January 1, 2022, there have been no material unauthorized intrusions, failures, breakdowns, continued substandard performance, or other adverse events affecting any such Systems that have caused any substantial disruption of or interruption in or to the use of such Systems by the Selling Entities.

(f) The Selling Entities are in compliance with, and since January 1, 2022, have been in compliance with, all Privacy Requirements in all material respects. Since January 1, 2022, to the Knowledge of each Selling Entity, there has been no material Security Incident or other material unauthorized access, loss, damage use, sharing, modification, or other misuse of any Personal Information by any Selling Entity. No written notices have been sent or received by, and no Proceeding relating to any Security Incident, violation of any Privacy Requirement or otherwise material improper use, unauthorized access or disclosure of, or a material breach in the security of, any Personal Information has been made against any Selling Entity since January 1, 2022, and no Selling Entity has notified, or been required to notify, any Person in connection with any of the foregoing or under any applicable Privacy Requirement.

Section 5.12. *Environmental Compliance*. Except for facts, circumstances or conditions that would not, individually or in the aggregate, reasonably be expected to be material to the Business or be materially adverse to the ownership or use by Buyer of the Assets:

(a) The Assets owned or held by the Selling Entities and their operations are, and since January 1, 2022, have been in all material respects, in compliance with applicable Environmental Laws and all Permits required thereunder;

(b) Since January 1, 2022, (x) no written notice, Order, request for information, complaint, or penalty has been received by the Selling Entities, and (y) there has been no Proceeding pending or, to the Knowledge of each Selling Entity, threatened, in the case of each of clauses (x) and (y), which (A) alleges a violation of or Liability under any Environmental Law, (B) relates to the Assets and (C) has not been settled, dismissed, paid, or otherwise resolved;

(c) To the Knowledge of each Selling Entity, each Selling Entity's services and operations in connection with the Assets and Business have not given rise to exposure of persons

to, and no Selling Entity has Released or owned or operated any property or facility contaminated by, Hazardous Substances in a manner that would reasonably be expected to give rise to liability under any Environmental Laws;

(d)     The Selling Entities have made available to Buyer all material environmental reports, audits and assessments in their possession as of September 8, 2024 regarding the Business, the Owned Real Property and Leased Real Property; and

(e)     The representations and warranties in Sections 5.03, 5.04, 5.07, 5.08, 5.09, and this Section 5.12 are the exclusive representations or warranties made by Seller with respect to Environmental Laws, Hazardous Substances or any other environmental matters.

Section 5.13.    *Title*.  (a) Disclosure Schedule 5.13(a)(i) sets forth a complete and accurate list of all of the real property interests owned in fee by Seller or any of its Subsidiaries as of September 8, 2024, that are used, or held for use, by the Business (the Real Property Interests listed or required to be listed on Disclosure Schedule 5.13(a)(i), the "**Owned Real Property**"), specifying the street address and the current owner of each parcel of Owned Real Property.  Each Selling Entity has good and valid fee simple title to all Owned Real Property owned by it, free and clear of all Encumbrances, except for Permitted Encumbrances and Encumbrances listed on Disclosure Schedule 5.13(a)(ii). Other than the right of Buyer pursuant to this Agreement and as disclosed in Disclosure Schedule 5.13(a)(iii), there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein. No Selling Entity is a party to any agreement or option to purchase any real property or interest therein.

(b)     Disclosure Schedule 5.13(b)(i) sets forth a list of all real property interests that are leased by Seller or any of its Subsidiaries as of September 8, 2024, that are used, or held for use, by the Business (the Real Property interests listed or required to be listed on Disclosure Schedule 5.13(b)(i), the "**Leased Real Property**" and the associated leases, the "**Leases**"). Each of the Leases constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity and is in full force and effect in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Applicable Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in a Proceeding in equity or at law).  The applicable Selling Entity has good and valid leasehold title to all of the material Leased Real Property free and clear of all Encumbrances, except for Permitted Encumbrances and Encumbrances listed on Disclosure Schedule 5.13(b)(ii). The Selling Entities have made available to Buyer true and complete copies of each material Lease.  With respect to any material Lease, no Selling Entity (i) is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease, except to the extent that the filing of Bankruptcy Cases is considered an event of default under any such Lease, (ii) except as disclosed in Disclosure Schedule 5.13(b)(iii), has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof, and (iii) has collaterally assigned or granted any other security interest in such Lease or any interest therein.

(c)     The Owned Real Property and Leased Real Property constitute all of the real property rights necessary to own and conduct the Business in all material respects as currently owned, operated, and conducted by the Selling Entities.

Section 5.14.  *Matters Related to Assets; Casualty Losses*.  (a) All of the rights, personal properties, interests, equipment, and other tangible and intangible assets that constitute Assets are owned, leased, or used (or held for use) by the Selling Entities and are free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     All of the equipment, machinery, vehicles, and other tangible assets that constitute Assets (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and usage, (ii) not in need of any repairs, which, if not made, would materially and adversely affect the integrity or safety of such Assets, and (iii) suitable for use by the Selling Entities to conduct the Business as currently conducted by the Selling Entities with respect to such Assets, in each case in all material respects.

(c)     The Assets owned or used (or held for use) by the Selling Entities constitute all assets, properties, rights, privileges and interests of whatever kind or nature, real or personal or mixed, tangible or intangible, used or necessary, and such Assets are sufficient, to conduct the Business as currently conducted by the Selling Entities, in all material respects, other than the operations and business conducted with respect to the Excluded Assets.

(d)     There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

Section 5.15.  *Insurance*.  A true, correct and complete list of the material insurance policies related to the Business currently conducted by Seller and its Subsidiaries with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) as of September 8, 2024 is attached hereto as Disclosure Schedule 5.15 (collectively, the "**Insurance Policies**").  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Insurance Policies are in full force and effect.  All premiums on the Insurance Policies have been paid to the extent due.  To the Knowledge of each Selling Entity, no event has occurred, including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies.  Except as set forth in Disclosure Schedule 5.15, no material claim is outstanding under any of the Insurance Policies, and no carrier of any Insurance Policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim.

Section 5.16.  *Security Arrangements*.  All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries with Governmental Authorities or Third Parties and relating to the Assets owned or held by Seller or any such Subsidiary as of September 8, 2024 are described on Disclosure Schedule 5.16.

Section 5.17.  *Certain Business Practices*.  (a) No Selling Entity, nor any of their respective Representatives or other Persons that act for or on behalf of any Selling Entity has in the past three years, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act or any other applicable anti-bribery law (collectively, the "**Anti-Corruption Laws**"). The Selling Entities have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or, to the Knowledge of each Selling Entity, threatened allegation, voluntary disclosure, investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws. To the Knowledge of each Selling Entity, none of the current officers, directors, or employees of any Selling Entity is an employee of any Governmental Authority or of any instrumentality of a Governmental Authority.

(b)     The Business has been conducted and the Assets have been operated in material compliance with all applicable anti-money laundering and financial record-keeping and reporting laws (collectively, the "**Anti-Money Laundering Laws**"). The Selling Entities have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization.  There is no pending or, to the Knowledge of each Selling Entity, threatened allegation, voluntary disclosure, investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of applicable Anti-Money Laundering Laws or Sanctions, and in the past three years there has been no such Proceeding.

(c)     No Selling Entity, nor to the Knowledge of any Selling Entity any of their respective Representatives or other Persons that act for or on behalf of any Selling Entity, (i) is or has been a Sanctioned Person, (ii) in the past three years, with respect to the Business or the Assets, has engaged in, or is now engaged in, any dealings or transactions with, or for the benefit of, any Sanctioned Person, or has otherwise violated Sanctions or, (iii) in the past three years, with respect to the Business or the Assets, has violated applicable Ex-Im Laws.

Section 5.18.  *Brokers or Finders*.  Except for fees and expenses payable to Guggenheim Securities, LLC, no Selling Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby, and Selling Entities shall remain solely liable for payment of any such fees, commissions or other similar payments, other than as set forth in Liabilities giving rise to the Professional Fees Amount.

Section 5.19.  *Employee Benefit Plans; Labor and Employment Matters*.  (a) Disclosure Schedule 5.19 contains a complete and accurate list of each material Seller Benefit Plan as of September 8, 2024.  Seller has made available to Buyer with respect to each material Seller Benefit Plan as of September 8, 2024: (i) the current plan document (or a summary description of the material terms of any unwritten Seller Benefit Plan), (ii) each trust agreement, insurance contract

or other funding arrangement related thereto, (iii) the most recent annual report, financial statements and actuarial or other valuation reports prepared with respect thereto, (iv) the most recent summary plan description and any material modification with respect thereto, (v) the most recent determination or opinion letter received from the Internal Revenue Service (the "**IRS**") with respect to each Seller Benefit Plan intended to qualify under Section 401 of the Code, and (vi) all nonroutine correspondence with any Governmental Authority within the last three years.

(b)     Each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, funded, operated, and administered in all material respects in compliance with Applicable Laws (including ERISA and the Code) and with the terms of such Seller Benefit Plan. There are no pending or, to the Knowledge of each Selling Entity, threatened claims, suits or Proceedings (except routine claims for benefits payable in the ordinary course of business) against or relating to any Seller Benefit Plan (or the assets thereof), including by or before any Governmental Authority.

(c)     Except as listed on Disclosure Schedule 5.19(c), none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event) would reasonably be expected to (i) entitle any current or former Company Employee or other individual service provider to any material compensation or benefit under any Seller Benefit Plan or otherwise, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any current or former Company Employee or other individual services provider or trigger any other material obligation under any Seller Benefit Plan or otherwise, or (iii) result in any loss of tax deduction under Section 280G of the Code or the imposition of an excise tax under Section 4999 of the Code.

(d)     No Seller Benefit Plan is, and none of the Selling Entities sponsors, maintains, contributes to, has an obligation to contribute to or otherwise has any Liability under or with respect to: (i) a plan that is or was subject to Section 302 or Title IV of ERISA or Section 412 or 430 of the Code, (ii) a "multiemployer plan" (as defined in Section 3(37) of ERISA) or (iii) a plan, program or arrangement that provides (or could be required to provide) any retiree or post-employment medical, dental or life insurance or other welfare benefits to any Person (other than coverage mandated by Applicable Law, including COBRA).

(e)     Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired, and nothing has occurred that could adversely affect the qualification of any such Seller Benefit Plan.

(f)     Each Seller Benefit Plan that constitutes in any part a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) subject to Section 409A of the Code has been operated and administered in all material respects in operational compliance with, and is in all respects in documentary compliance with, Section 409A of the Code, and no amount under any such Seller Benefit Plan has been or is expected to be subject to any interest or additional Taxes imposed under Section 409A of the Code.

44

(g)    No Selling Entity is party to any contract, agreement, plan or arrangement to which such Selling Entity is required to provide a gross-up or otherwise reimburse any current or former employee, director, service provider or other person for Taxes, including pursuant to Sections 409A or 4999 of the Code.

(h)    The Selling Entities are neither party to, nor bound by, any Labor Agreement, and no Company Employees are represented by any labor union, labor organization, works council, employee representative or group of employees with respect to their employment with a Selling Entity. To the Knowledge of each Selling Entity, in the past three years there have been no labor organizing activities with respect to any Company Employees. There are no material strikes, slowdowns, work stoppages, unfair labor practice charges, labor grievances, labor arbitrations, lockouts, picketing, hand billing, or any other material labor disputes involving any Company Employee pending or, to the Knowledge of each Selling Entity, threatened in writing nor have there been any such controversies in the past three years. There are no material unfair labor practice complaints pending against any of the Selling Entities before the National Labor Relations Board or any other Governmental Authority with respect to any Company Employee.

(i)    The Selling Entities are in material compliance with all Applicable Laws relating to employment or labor, including Applicable Laws related to hiring, background checks, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), pay equity and transparency, hours and labor relations, health and safety, immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), child labor, discrimination, harassment, retaliation, disability rights or benefits, affirmative action, workers' compensation, restrictive covenants, equal opportunity, plant closures and layoffs (including WARN), employee leave issues, employee trainings and notices, COVID-19, and unemployment insurance. Except as would not result in material Liability, each Selling Entity has fully and timely paid all wages, salaries, wage premiums, commissions, bonuses, severance and termination payments, fees and other compensation that have come due and payable to their current or former employees and independent contractors under Applicable Laws, Contract or Seller policy.

(j)    Disclosure Schedule 5.19(j) sets forth a true and accurate list by job title, termination date and primary work location, of any current or former employee of any Selling Entity who has experienced or is expected to experience an "employment loss" under WARN on or within ninety (90) days prior to September 8, 2024, at any site of employment where a Company Employee is located.

(k)    Each Selling Entity has investigated all sexual harassment, or other harassment, discrimination, retaliation or policy violation allegations against officers, directors, partners, and Company Employees that have been reported to the applicable Selling Entity or of which the Selling Entity is otherwise aware. With respect to each such allegation (except those the Selling Entities reasonably deemed to not have merit), each Selling Entity has taken prompt corrective action reasonably calculated to prevent further improper action in the discretion of the Selling Entity. To the Knowledge of the Selling Entities, there are no such allegations of harassment or discrimination that, if known to the public, would bring the Selling Entities into material disrepute.

(l)    To the Knowledge of the Selling Entities, no current or former Company Employee is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement or restrictive covenant obligation (i) owed to a Selling Entity or (ii) owed to any Third Party with respect to such person's right to be employed or engaged by a Selling Entity.

(m)    Disclosure Schedule 5.19(m) sets forth a complete and correct list of all Company Employees as of September 8, 2024, and includes the following information: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; accrued unused paid time off; current target bonus (if any); and an indication of whether or not such employee is on leave of absence.

Section 5.20.    *Taxes*.  (a) Each Selling Entity and its Affiliates has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed with respect to the Assets and the Business except where failure to file would not have a Material Adverse Effect.  All such Tax Returns are true, complete and accurate except as would not have a Material Adverse Effect.  All material Taxes owed by any Selling Entity or its Affiliates in respect of the Assets or the Business (whether or not shown on any such Tax Returns) have been timely paid except (i) where failure to pay such taxes would not have a Material Adverse Effect and (ii) income taxes with respect to a Tax period ending after the Closing Date.  Each Selling Entity and its Affiliates (with respect to the Business and the Assets) has complied in all material respects with all applicable withholding obligations for Taxes required to have been withheld in connection with amounts paid to any employee.

(b)    There are no pending audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for any material Taxes of any Selling Entity or its Affiliates with respect to the Assets or the Business.  All deficiencies for material Taxes asserted or assessed in writing against any Selling Entity or its Affiliates (with respect to the Business or the Assets) have been fully and timely (within any applicable extension periods) paid, or settled. No Selling Entity or its Affiliates has waived any statute of limitations in respect of Taxes with respect to the Assets or the Business that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)    The Selling Entities do not have Liability for Taxes of another Person as successor, transferee, or by contract other than customary commercial contracts not primarily related to Taxes.

(d)    There are no Encumbrances for Taxes on the Assets other than Permitted Encumbrances.

(e)    No Selling Entity or its Affiliates (with respect to the Business or the Assets) has been a party to a "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2) (or similar provisions of state, local, or non-U.S. Applicable Law).

(f)    No claim in writing has been made by any Tax Authority in a jurisdiction where a Selling Entity or its Affiliates (with respect to the Business and the Assets) does not file Tax Returns that it is or may be subject to Taxation by that jurisdiction.

(g)     No Selling Entity nor any of their Affiliates has or has ever had a direct or indirect interest in Buyer or any of its beneficial owners or Affiliates.

Section 5.21.  *Inventory*.  The Inventory of the Selling Entities shown on the Most Recent Balance Sheet, net of the reserves applicable thereto as shown on the Most Recent Balance Sheet, is (a) of a quantity and quality useable and saleable in the ordinary course of business, (b) adequate in order to conduct the Business as currently conducted and (c) merchantable and fit for its intended use, subject to allowances reflected on the Most Recent Balance Sheet, except as would not be material to the Business.

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01.  *Organization and Good Standing*.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Buyer is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and Buyer or Buyer's Affiliates will be duly qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s) where the Assets are located other than where failure to be so qualified would not, individually or in the aggregate, reasonably be expected to materially affect Buyer's ability to perform its material obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.02.  *Authority; Validity; Consents*.  Buyer has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and such other Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated herein and therein have been duly, validly authorized and approved and approved by the board of directors (or similar governing body) of Buyer and no other corporate proceedings on the part of Buyer or vote of Buyer's equityholders are necessary to authorize the execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party that is required to be executed and delivered by Buyer at the Closing will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  No other action on the part of Buyer, its Affiliates, or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which Buyer is a party and this Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by

47

general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 6.03. *No Conflict*.   Except for any applicable notices, filings, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, Buyer is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.   When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer under (a) any agreement, indenture, bond, debenture, note, mortgage or other instrument to which it or its assets is bound, (b) the certificate of incorporation, bylaws or other governing documents of Buyer, (c) any Order applicable to Buyer or its assets or (d) any Applicable Law, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.04. *Legal Proceedings*.   There are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit, or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to materially affect Buyer's ability to perform its material obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.05. *Bankruptcy*.   There are no bankruptcy, reorganization, or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against Buyer.

Section 6.06. *Brokers or Finders*.   Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent, or intermediary for or on account of the transactions contemplated by this Agreement for which Seller or any of its Subsidiaries are or will become liable.

Section 6.07. *Financial Capability*.   Buyer will have at the Initial Closing and at any time payments are required to be made by Buyer hereunder or under the other Transaction Documents sufficient funds available in cash to pay the Purchase Price and any fees and expenses incurred by or otherwise required to be paid by Buyer in connection with the acquisition of the Assets and the

assumption of the Assumed Liabilities pursuant to this Agreement and the transactions contemplated by this Agreement.

Section 6.08. *Independent Evaluation*. Buyer acknowledges and affirms for the benefit of the Selling Entities and their respective Affiliates and Representatives (a) that it (i) is experienced in the evaluation, purchase, ownership, and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and is aware of the risks associated with the purchase, ownership, and operation of such assets and interests related thereto, (ii) is capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (iii) is able to bear the economic risks associated with the Assets, ownership, and operation thereof and its obligations hereunder, (b) that, in entering into this Agreement and except for the representations and warranties expressly set forth in Article 5 of this Agreement and the other Transaction Documents, none of Seller, Seller's Subsidiaries, their respective Affiliates, Seller's, its Subsidiaries or its or their respective Representatives or any Person acting on Seller's, its Subsidiaries or its or their Affiliates' behalf is making or has made any other express or any implied representations or warranties, and Buyer disclaims reliance upon any other representations and warranties (including as to the accuracy and completeness thereof), with respect to Seller, its Subsidiaries or any of its or their respective Affiliates, any of their respective business, operations, assets, Liabilities, condition (financial or otherwise), or prospects or any other matter relating to Seller, its Subsidiaries or any of its or their respective Affiliates and (c) that it has relied and will rely solely on the terms of this Agreement and the Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax, or other consequences of the transactions contemplated by this Agreement.

Section 6.09. *Solvency*. Assuming (a) the satisfaction or waiver of the conditions set forth in Article 9 and Article 10, (b) the accuracy of the representations and warranties of the Selling Entities (without regard to any knowledge, materiality or Material Adverse Effect qualifications contained therein), and (c) the Business to the extent acquired by Buyer at the Closing hereunder (taking into account all of the Assets and Assumed Liabilities) is Solvent, after giving effect to the transactions contemplated by this Agreement (including any financing in connection with the Closing), Buyer and its Subsidiaries will be Solvent. Buyer is not entering into the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer, Seller or their respective Subsidiaries. For purposes of this Agreement, "**Solvent**" when used with respect to any Person, means that such Person (i) will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) has property with fair value greater than the total amount of their debts and Liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent Liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured Liability), (iii) has assets with present fair salable value not less than the amount that will be required to pay their Liability on their debts as they become absolute and matured, (iv) will be able to pay its debts and Liabilities, subordinated, contingent or otherwise, as they become absolute and matured and (v) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

# ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01.  *Access and Reports*.  (a) From the date hereof through the end of the Designation Rights Period, subject to Applicable Laws, upon reasonable advance notice, each Selling Entity will afford Buyer's and Agent's officers and other authorized Representatives reasonable access, during normal business hours, (i) to those of its officers, consultants, and applicable authorized Representatives (including its legal advisors and accountants) possessing information relating to the Assets, the Assumed Liabilities or the Business (other than the Excluded Assets and the Excluded Liabilities), (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Business, the Assets or the Assumed Liabilities (excluding, for the avoidance of doubt all income Tax Returns), (iii) to any reasonably available financial and operating data and other information in connection with the Assets, the Assumed Liabilities or the Business (other than the Excluded Assets and the Excluded Liabilities) and (iv) to all stores, distribution centers, offices, plants, buildings, facilities and other physical locations and properties that are (or could be if Buyer so elects) included in the Assets, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's and Agent's authorized Representatives will (A) abide by any reasonable safety rules, regulations, and operating policies provided in writing by Seller or its Representatives and (B) at Seller's option, be accompanied by at least one (1) Representative of Seller.  Without limiting the foregoing, each Selling Entity will make available its officers, consultants, and applicable authorized Representatives during meetings with Buyer and Agent and its respective officers and other Representatives no less than once per week (upon at least 48 hours' prior notice from Buyer and/or Agent) to discuss the transactions contemplated by this Agreement, the Business's progress with respect to Seller's existing operating and restructuring plan and other initiatives, or any other reasonable business purpose. Notwithstanding anything herein to the contrary, (1) no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the business of the Selling Entities or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities or any confidentiality obligations owed to any Person; *provided* that the Selling Entities use their reasonable best efforts to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation); and (2) the foregoing should not be construed to create any obligation on any of the Selling Entities' professional advisors to take or refrain from taking any action or to participate in any communications or provide any information, absent an express contractual requirement to do so under their respective engagement agreements with the relevant Selling Entities.

(b)     Buyer (and Agent) acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.01, and is subject to the terms of the confidentiality agreement between Seller and Variety Wholesalers, Inc. (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.  Each of Buyer and Agent acknowledges and agrees that it shall be bound by and comply with the Confidentiality Agreement as if it were a signatory thereto as "you" or the "Acquiror" thereunder.  Buyer acknowledges and understands

that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Notwithstanding anything contained in this Agreement or the Confidentiality Agreement to the contrary, (i) until the earlier of the final Closing and the termination of this Agreement, the Selling Entities waive all provisions of the Confidentiality Agreement solely to the extent reasonably necessary to permit the transactions contemplated by this Agreement and the other Definitive Documents, and (ii) the term of the Confidentiality Agreement shall automatically terminate upon the occurrence of the final Closing.

(c)     Seller shall, and shall cause its Affiliates to, and their respective Representatives to, (i) from and after the date hereof, not disclose any information concerning Buyer, Agent, or its respective Affiliates that it learned in connection with the transactions contemplated hereby, and (ii) from and after the Closing, not disclose any information concerning the Business, the Assets or the Assumed Liabilities, except to the extent (A) required to disclose such information by Applicable Law, (B) such information becomes generally available to and known by the public other than as a result of breach of this Section 7.01(c) by Seller or its Affiliates, or (C) such information is lawfully obtained on a non-confidential basis from a source other than Buyer (or where applicable, Agent) or its Affiliates. Buyer (and where applicable, Agent) shall, and shall cause its Affiliates to, and their respective Representatives to, from and after the Closing, not disclose any information concerning the Excluded Assets or the Excluded Liabilities, except to the extent (1) required to disclose such information by Applicable Law, (2) such information becomes generally available to and known by the public other than as a result of breach of this Section 7.01(c) by Buyer (and where applicable, Agent) or its Affiliates, or (3) such information is lawfully obtained on a non-confidential basis from a source other than Seller or its Affiliates. If any of Buyer (and where applicable, Agent), Seller or any of their respective Affiliates or their respective Representatives is compelled to disclose any information by judicial or administrative process or by other requirements of Applicable Law, to the extent permitted by Applicable Law, such Person shall promptly notify the other Party in writing and shall disclose only that portion of such information which such Person is advised by counsel is legally required to be disclosed, and such Person shall reasonably cooperate with such other Party's efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

Section 7.02.  *Operations Prior to the Initial Closing Date*.  Except (a) as otherwise expressly contemplated by this Agreement, (b) as disclosed in Disclosure Schedule 7.02 or as disclosed or contemplated by Disclosure Schedule 1.01, (c) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed), (d) as otherwise required by Applicable Laws or by any Governmental Authority, or (e) as required or prohibited pursuant to a Bankruptcy Court Order or the Bankruptcy Cases or limited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors, including limitations on Seller's or its Subsidiaries' ability to pay amounts relating to the period prior to the Petition Date and the impact of Seller filing for bankruptcy with respect to any Contract to which it or any of its Subsidiaries is a party, from the date hereof until the Initial Closing Date:

(i)     Other than in furtherance of the Store Closing Sale being conducted under the MSA, SOW #16 and SOW #17, the Selling Entities shall (A) use their reasonable best

efforts to (1) operate the Assets operated by Seller and its Subsidiaries in accordance with Seller's operating and restructuring plan conveyed to Buyer prior to the date hereof and otherwise in the ordinary course of business in all material respects, (2) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, and (3) maintain and preserve the Assets in good condition, subject to ordinary wear and tear, and (B) reserved; and

(ii)    Other than in furtherance of the Store Closing Sale being conducted under the MSA, SOW #16 and SOW #17, Seller will not, and will cause its Subsidiaries not to, solely with respect to the Assets or the Assumed Liabilities:

(A)    liquidate, dissolve, recapitalize, or otherwise wind up its operation of the Business;

(B)    terminate, cancel, materially amend or modify (other than by extension or waiver), grant a material waiver or consent with respect to or extend any Assigned Contract or Material Contract, or enter into any Contract that would be a Material Contract, except with respect to any Contract that is or would be a Material Contract under Section 5.10(a)(ii) or Section 5.10(a)(ix);

(C)    sell, lease, transfer, abandon, permit to lapse or expire, fail to maintain, license, assign, convey, surrender, covenant not to sue or assert with respect to, or otherwise dispose of any material Assets, in each case other than (1) sales of Inventory in the ordinary course of business, (2) licenses of Intellectual Property granted on a non-exclusive basis in the ordinary course of business, or (3) the expiration of any Intellectual Property in accordance with its statutory term;

(D)    acquire (by merger, consolidation, acquisition of stock or assets, or otherwise), directly or indirectly, any material assets, securities, properties, interests, or businesses, in each case other than pursuant to existing Contracts or in the ordinary course of business;

(E)    other than as permitted by the foregoing clause (ii)(D), make any material loans, advances, or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller), other than advances to employees in the ordinary course of business;

(F)    voluntarily subject any of the Assets or any portion of the Assets to any Encumbrances, except for Permitted Encumbrances;

(G)    except as required by Applicable Law or GAAP, materially change its accounting methods, policies or practices, in each case as they relate to the Assets;

(H)    commence, settle, or propose to settle any Proceedings (other than any Excluded Proceeding) that could reasonably be expected to materially diminish the value of the Assets or impair title thereto or result in an Assumed Liability;

(I)    other than as required by Applicable Law or by the terms of any Seller Benefit Plan as in effect on the date hereof and set forth on Disclosure Schedule 5.19, (i) increase or accelerate, or commit to increase or accelerate, the funding, vesting or payment of any compensation, bonus, or other benefits of any current or former Company Employee or other individual service provider of the Business, (ii) grant or announce any cash, severance or equity or equity-based incentive awards or other compensation and benefits payable to any current or former Company Employee or other individual service provider of the Business (or any of their respective dependents or beneficiaries), (iii) hire, promote, engage, terminate (other than for cause) or otherwise enter into any employment, consulting or separation agreement or arrangement with (A) any current or former Company Employee or other individual service provider of the Business whose annualized base compensation would exceed $500,000 or (B) any C-suite level employee or (iv) establish, adopt, terminate or amend in any material respect any Seller Benefit Plan;

(J)    cancel or modify any Insurance Policy;

(K)    with respect to Taxes relating to the Assets or the Business, file any material Tax Return inconsistent with past practice, make, revoke or change any material Tax election, settle or compromise any material Tax claim or assessment by any Tax Authority, adopt or change any material accounting method with respect to Taxes, enter into any closing agreement with a Tax Authority or surrender any right to claim a refund of a material amount of Taxes, or consent to any extension or waiver of the limitation period applicable to any material tax claim or assessment; *provided*, that this clause (K) shall only apply with respect to income Taxes if such action would reasonably be expected to have an adverse impact on Buyer or any of its Affiliates;

(L)    modify in any material respect its current practices with respect to receivables, including by accelerating receivables, offering discounts or other incentives to induce payment or changing cash management practices (including any sale of accounts or notes receivable under any "factoring" or similar Contract or arrangement);

(M)    subject to Section 8.06, assume by Final Order any Leases on terms that are materially inconsistent with past practices;

(N)    offer, promote, advertise, or market any (1) storewide promotion or storewide discount or offer or (2) implement or continue any promotion or discount that is greater than what the Seller offered last year during the same time period in a retail location that was not closing; or

(O)    agree or commit to do any of the foregoing.

For the avoidance of doubt, Seller shall be entitled to pay all fees and expenses of Professional Persons incurred prior to the Initial Closing in accordance with the DIP Order.

Section 7.03.  *Reasonable Best Efforts*.  Subject to the terms and conditions of this Agreement, the Selling Entities, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (a) the taking of all reasonable acts necessary to cause the conditions precedent to the other Party's obligations to consummate the Initial Closing set forth in Article 9, Article 10 and Article 11 (or, with respect to a Closing other than the Initial Closing, Article 10) to be satisfied, (b) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any), and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (c) the execution or delivery of any additional instruments, including the Definitive Documents, necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.  Nothing in this Section 7.03 will require Buyer, Seller or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to exercise or waive any right, or provide any consent, under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

Section 7.04.  *Reserved*.

Section 7.05.  *Bankruptcy Court Matters*.  (a) The Selling Entities and Buyer each acknowledges that this Agreement and the sale of the Assets to Buyer (and any Designated Buyer) and the assumption of the Assumed Liabilities by Buyer (and any Designated Buyer) are subject to Bankruptcy Court approval.  Buyer acknowledges that (i) to obtain such approval, the Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

(b)    The applicable Selling Entity may modify the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor, or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest; *provided* that any such modifications to the Sale Order shall be reasonably satisfactory to the Parties.

(c)    Buyer agrees that it will promptly take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer (and any Designated Buyer, where applicable) of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed, the Parties shall use commercially reasonable efforts to defend such appeal(s).

(d)     From the date hereof until the earlier of: (i) the termination of this Agreement and (ii) the final Closing Date, each Selling Entity shall use its respective reasonable best efforts to obtain the Sale Order and any other Orders reasonably necessary to consummate the transactions contemplated under this Agreement.

(e)     Each Selling Entity and Buyer shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated under this Agreement and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any Third Party or any Governmental Authority with respect to the transactions contemplated by this Agreement.  Selling Entities shall use commercially reasonable efforts to give Buyer (and Agent) reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order.

(f)     The Selling Entities will give Buyer (and Agent) reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer (and Agent) and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court unless such advance notice is impossible or impracticable under the circumstances, in which case the Selling Entities will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court.

Section 7.06.  *Alternative Proposals; Post-Auction No-Shop*.  (a) Buyer agrees and acknowledges that the Selling Entities, including through their respective Representatives, are and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Assets, and are and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Bidding Procedures, in each case subject to the remainder of this Section 7.06.

(b)     From and after the execution of this Agreement, Seller shall not, and shall not permit its Affiliates or any of their respective Representatives, to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Buyer, its Affiliates and its and their respective Representatives) with respect to an Alternative Transaction or Superior Proposal, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or Superior Proposal or that could reasonably be expected to lead to an Alternative Transaction or Superior Proposal, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; *provided*, that, notwithstanding anything in this Agreement to the contrary, Seller may take any such action if the board of directors of Seller determines in good faith (after consultation with its outside legal counsel) that the failure of the board of directors of Seller to take such action would reasonably be expected to be inconsistent with its fiduciary duties under Applicable Law.

(c)     From and after the execution of this Agreement, Seller shall promptly (but in any event within 24 hours) give notice to Buyer if (i) any proposals or offers with respect to an

Alternative Transaction are received by Seller or any of its Affiliates or their respective Representatives or (ii) Seller or its Affiliates engage in any activity that would be prohibited by Section 7.06(b), but for the proviso thereto. Such notice shall set forth the name of the applicable Person making such proposal or offer, or with whom Seller and its Affiliates are engaged in such activity with (as applicable), and the material terms and conditions of any proposed Alternative Transaction (as applicable). Seller shall thereafter keep Buyer reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto.

Section 7.07. *Public Announcements; Filings*. No Party nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby, without the prior written approval of each of Buyer and Seller, not to be unreasonably withheld, delayed, or conditioned; *provided*, that the Seller may issue a press release announcing the Initial Closing on the date of (or promptly following) the Initial Closing. Notwithstanding the immediately preceding sentence, in the event any Party reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court or otherwise under Applicable Law or the rules or regulations of any applicable securities exchange, such Party shall give the other Parties advance written notice of, and a meaningful opportunity (as practicable under the circumstances) to review and comment on, the proposed form and substance of any such filing, but prior written approval shall not be required. The Party whose proposed filing is the subject of review shall consider carefully and in good faith all comments timely received from the other Parties. Notwithstanding anything to the contrary in this Agreement, Buyer and its Affiliates may provide on a confidential basis customary information regarding the transactions contemplated by this Agreement in connection with fundraising activities or fund performance reporting to current or prospective investors, lenders or partners, in each case, without the prior written consent of Seller.

Section 7.08. *Transition Services*. (a) To the extent necessary as determined by Buyer and Seller in good faith and subject to the Agency Agreement, as soon as reasonably practicable following the Initial Closing, Seller, Buyer and Agent shall use reasonable best efforts to negotiate the terms of, and at the Closing shall enter into (if agreed by Seller and Buyer), a transition services agreement ("**TSA**") pursuant to which Seller will provide, or cause to be provided, from the entry into the TSA until the end of the Designation Rights Period such transitional services as shall be required by Agent to conduct the Store Closing Sale and as may otherwise be set forth in the TSA. The TSA (if any) will be on customary terms, including that (1) Buyer, or Agent, as applicable, shall advance to Seller an amount equal to the allocable fully loaded cost to provide the services thereunder (with respect to employees, based on the percentage of such employee's time that is dedicated to providing such services), which shall include all (i) out-of-pocket expenses, costs, fees and taxes (including, for the avoidance of doubt, any fees and costs of advisors to the Selling Entities), (ii) base salary and wages, pro-rated bonus, medical benefits, withholding taxes, load charges and all other employee, labor, Systems and service-related and other expenses, costs, fees and taxes, as well as overhead, in each case of (i)-(ii), incurred, paid or payable in connection with the provision of services, without markup, (2) the services will be provided in a manner consistent with the manner in which such services were performed by the Selling Entities immediately prior to the Closing, if applicable, (3) Seller and its Affiliates shall not be liable for any damages arising in connection with the services, other than to the extent caused by Seller's or its Affiliates' fraud,

willful misconduct or gross negligence, and (4) the TSA may be terminated by the Seller if the Buyer fails to timely pay amounts due under such agreement.

Section 7.09.  *Reserved*.

Section 7.10.  *Bankruptcy Court Milestones*.  The Selling Entities shall comply with the following timeline (the "**Bankruptcy Court Milestones**"), subject to further extension with prior written consent from Buyer:

(a)      the Bankruptcy Court shall have entered the Sale Order no later than January 3, 2025.

Section 7.11.  *Legal Entity Names*.  To the extent that any Selling Entities continue to incorporate the Trademarks or words "Big Lots" or any variation of the foregoing ("**Big Lots Marks**") in their corporate or legal names following the Closing, the Selling Entities shall by no later than sixty (60) days after Closing, (a) dissolve such entities or (b) change the corporate and legal names of such entities to no longer incorporate any Big Lots Marks.

Section 7.12.  *Notification of Certain Matters*.  From the date of this Agreement until the end of the Designation Rights Period, each Party shall give prompt written notice to the other Party of any Event that would, or would reasonably be expected to, cause any condition to the other Party's obligation to consummate any Closing set forth in Article 9 or Article 10 not to be satisfied at such Closing.  Such notice shall provide a reasonably detailed description of the relevant circumstances.  A good faith failure to provide any such notice shall not in and of itself be deemed a breach of a covenant hereunder.

Section 7.13.  *Proceedings*.  The Parties shall cooperate in good faith with respect to pursuing any Specified Proceedings and shall use reasonable best efforts to ensure that the value of any Specified Proceeding is not impaired by this Agreement; *provided* that if the Buyer does not use good faith efforts to pursue any Specified Proceeding, such Specified Proceeding shall be deemed automatically to be an Excluded Asset.  60% of any proceeds of any Proceedings (other than the Excluded Proceedings) (net of any costs of pursuing such proceeds, including costs of counsel, which shall be retained by the Party responsible for such costs) shall be paid to or retained by, as applicable, Seller for its own account and 40% of such remaining proceeds shall be paid to or retained by, as applicable, Buyer.

ARTICLE 8
ADDITIONAL AGREEMENTS

Section 8.01.  *Taxes*. (a) *Transfer Taxes*.  Buyer shall be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise, and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes.  To the extent possible based on the due date of such Transfer Taxes, the amount of Transfer Taxes shall be calculated in accordance with the Purchase Price Allocation as set forth in Section 8.02 hereof, and to the extent such Transfer Taxes

are due prior to the date the 1060 Allocation is delivered by Seller under Section 8.02, Seller shall endeavor to assign a value to the assets subject to such Transfer Taxes prior to their due date. Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take reasonable best efforts to obtain any available exemptions from or reductions in such Transfer Taxes. To the extent Buyer or any of its Affiliates is required by Applicable Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Seller will remit an amount equal to such Transfer Taxes to Buyer not less than five Business Days prior to the due date for such payment.

(b)      *Cooperation and Audits*.  Buyer and its Affiliates, and Seller and its Affiliates will cooperate in good faith on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested in good faith all information, records and documents relating to Taxes governed by this Agreement, the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Tax Authority of any Taxes, and the prosecution or defense of any claim, suit or Proceeding relating to any Tax until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.  Buyer and its Affiliates, and Seller and its Affiliates will cooperate with each other in the conduct of any audit or other Proceeding relating to Taxes involving the Assets or the Business.

(c)      *Property, Ad Valorem and Excise Taxes*.  Except for any Assumed Liabilities and Specified Pre-Closing Taxes, Buyer shall not be liable for any unpaid Property Taxes or ad valorem or excise taxes assessed or due with respect to any Pre-Closing Tax Period.

 Section 8.02.   *Allocation of Purchase Price*.  (a) The Purchase Price (plus any Assumed Liabilities and other amounts in each case to the extent properly taken into account as purchase price under the Code) shall be allocated first, among the Selling Entities that are regarded for U.S. federal income tax purposes based on the relative proportion of the fair market value of Assets sold by such Selling Entities pursuant to this Agreement (the "**Purchase Price Allocation**"), and then among the Assets of each such Selling Entity in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "**1060 Allocation**").  The Purchase Price Allocation and the 1060 Allocation shall be delivered by Seller to Buyer within 90 days after the Closing Date (subject to one or more reasonable extensions of time requested by Seller, in each case with Buyer's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed) and Buyer and Seller shall cooperate to resolve any disputes regarding Seller's proposed Purchase Price Allocation and the 1060 Allocation promptly following delivery.

(b)      (i) Seller and Buyer will report, act and file (and will cause their respective Affiliates to report, act and file) Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Purchase Price Allocation and 1060 Allocation (as finally determined) and (ii) neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Purchase Price Allocation or 1060 Allocation, except, in each case, to the extent otherwise required by Applicable Law.

Section 8.03.  *Assigned Contracts; Adequate Assurance and Performance*.  (a) Buyer (and any Designated Buyer, if applicable) will reasonably cooperate with Seller to provide Seller with information sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer (and any Designated Buyer) of each such Assigned Contract as required under Section 365 of the Bankruptcy Code, which information Seller or if applicable, Seller's Subsidiaries, will be permitted to disseminate to any Third Party that is a party to any 365 Contract. In the event Buyer (and Designated Buyer) cannot demonstrate adequate assurance of future performance with respect to an Assigned Contract, at Buyer's election, such Assigned Contract shall become an Excluded Contract.

(b)      Without limiting the provisions of Section 8.03(a), Buyer acknowledges that neither Seller nor any Subsidiary of Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assigned Contracts (including any arrangements set forth in Item #3 of Disclosure Schedule 5.16, collectively, "**Seller Credit Obligations**") after the Closing with respect to the Business.  On or before the Closing, Buyer will use reasonable best efforts to obtain from the creditor or other counterparty (or, in the case of letters of credit, bonds or other similar Seller Credit Obligations, the issuing bank (or similar entity) thereof) a full release as of the Closing of all parties liable, directly or indirectly, for reimbursement to the creditor or issuing bank (or similar entity), as applicable, or fulfillment of other obligations to a counterparty or issuing bank (or similar entity), as applicable, under the Seller Credit Obligations (including any lenders or other financing parties participating in such letters of credit, bonds or similar Seller Credit Obligations). If any Seller Credit Obligation remains outstanding after the Closing, Buyer will indemnify Seller and its Subsidiaries and hold them harmless against any Liabilities that Seller or any such Subsidiary may incur under any such Seller Credit Obligations attributable to periods from and after the Closing.

(c)      Notwithstanding anything to the contrary contained herein, Buyer will not (i) enter into any transactions after the Closing in the name of Seller or any of its Affiliates or that would be covered by Seller Credit Obligations or (ii) amend, modify, extend, or renegotiate any material term of any obligation that is covered by a Seller Credit Obligations in any manner that increases or extends the potential exposure of Seller, any Subsidiary of Seller, or any of its or their respective Affiliates under any Seller Credit Obligations.

Section 8.04.  *Employee Matters*.  (a) *Offers of Employment*.  Prior to the Initial Closing, the Selling Entities shall reasonably cooperate with Buyer and any Designated Buyer(s), (i) to discuss the functions of the Company Employees, and (ii) the post-Closing needs of the Business in performing under the Transaction Documents, winding down the Selling Entities' estates, and other considerations.  During the Designation Rights Period, Buyer or any Designated Buyer may make an offer of employment to certain of the Company Employees, as determined by Buyer or any Designated Buyer in its sole discretion, on such terms as determined by Buyer or any Designated Buyer consistent with Applicable Law.  All such employment offers made by Buyer or any Designated Buyer to any Company Employee will be subject to such Company Employee's satisfaction of any interview, background check, or other processes that Buyer may require in each case in the ordinary course of business.  Any Company Employee who does not become a Transferred Employee will be terminated by the Selling Entities and their respective Affiliates, and the Selling Entities shall be responsible for, and shall indemnify Buyer and all Designated Buyers against, any and all damages and Liabilities associated with the termination of employment

of any such Company Employees, as applicable, whether incurred prior to, on or after the Closing Date, including any employment-related legal claims brought by, and any severance benefits provided to, such Company Employees, and all such Liabilities shall be Excluded Liabilities.

(b)    *Maintenance of Terms and Conditions*.  For a period of twelve (12) months following the Closing Date (or until the date of termination of employment of the relevant Transferred Employee, if sooner) (the "**Continuation Period**"), Buyer or any Designated Buyer, where applicable, shall provide, or shall cause its applicable Subsidiary to provide, each Transferred Employee with compensation and other employee and fringe benefits (excluding any deferred compensation, severance, retention, change in control, transaction, defined benefit pension, stock purchase plans or post-employment welfare benefits) that are no less favorable in the aggregate than the compensation and other employee and fringe benefits (subject to the same exclusions) provided to such Transferred Employee immediately prior to the Closing under the Seller Benefit Plans set forth on Disclosure Schedule 5.19. Notwithstanding anything in this Section 8.04 to the contrary, the terms and conditions provided to Transferred Employees following the Closing shall be subject to the requirements of Applicable Law.

(c)    *Service Credit.*  From and after the Closing, with respect to any "employee benefit plan" (as defined in Section 3(3) of ERISA) or other benefit plan or arrangement maintained by Buyer or its applicable Subsidiary in which any Transferred Employee participates, each Transferred Employee's service with any of the Selling Entities (as well as service with any predecessor employer) prior to the Closing shall be treated as service with Buyer and its applicable Subsidiary from and after the Closing for purposes of determining eligibility to participate, level of benefits, vesting (other than with respect to future equity or equity-based awards) and future vacation benefit plan accruals (other than benefit accrual under a defined benefit pension plan) to the same extent and for the same purpose as such service was recognized under the corresponding Seller Benefit Plan in which such Transferred Employee participated immediately prior to the Closing; *provided* that the foregoing shall not apply to the extent that it would result in any duplication of benefits or compensation for the same period of service.

(d)    *Pre-Existing Conditions and Co-Payments*.  Buyer (or any Designated Buyer, where applicable) shall, or shall cause its applicable Subsidiary to, use commercially reasonable efforts to, cause to be waived, any preexisting conditions, limitations, exclusions, actively at work requirements and waiting periods under any group health plan maintained by Buyer or its applicable Subsidiary in which Transferred Employees (and his or her eligible dependents) participate from and after the Closing, except to the extent that such items would not have been satisfied or waived under the comparable Seller Benefit Plan immediately prior to the Closing. Buyer shall, or shall cause its applicable Subsidiary to, use commercially reasonable efforts to recognize all co-payments, deductibles and similar expenses and out-of-pocket maximums paid by and credited to each Transferred Employee (and his or her eligible dependents) under a Seller Benefit Plan that is a group health plan prior to the Closing during the plan year in which the Closing occurs for purposes of satisfying any comparable deductible and co-payment limitations and out-of-pocket requirements under the relevant group health benefit plans of Buyer (or Designated Buyer, as applicable) or its applicable Subsidiary in which such Transferred Employee (and his or her eligible dependents) participate from and after the Closing during the plan year in which Closing occurs.

(e)    *WARN Act.*  With respect to Transferred Employees, Buyer (or Designated Buyer, as applicable) shall assume all Liabilities and obligations for the provision of notice or payment in lieu of notice and any applicable penalties under WARN arising following the Closing Date. The Selling Entities shall retain (including with respect to any Company Employees who are not Transferred Employees) all Liabilities and obligations for the provision of notice or payment in lieu of notice and any applicable penalties under the Worker Adjustment and Retraining Notification Act (together with any similar foreign, state or local Applicable Law, "**WARN**") arising from the transactions contemplated hereby or any actions by the Selling Entities, in each case whether arising prior to or on the Closing Date.

(f)    *Cooperation; Employee Communications.*

(i)    Each of Buyer (or Designated Buyer, as applicable) and Seller recognize it to be in the best interests of the parties hereto and their respective employees that the transactions contemplated by this Section 8.04 be effected in an orderly manner and agree to devote their respective reasonable best efforts and to cooperate fully in complying with the provisions of this Section 8.04.  Without limiting the generality of the foregoing, each Party agrees to execute, deliver and file all documents and to take all such actions as are deemed necessary or desirable in order to carry out and perform the purpose of this Section 8.04 and to facilitate the transactions referred to in this Section 8.04.

(ii)    Seller and Buyer (and any Designated Buyer, as applicable) shall promptly cooperate in good faith in communications with Company Employees with respect to employee benefit plans maintained by the Selling Entities or Buyer (or Designated Buyer, as applicable) or their respective Affiliates and with respect to other matters arising in connection with the transactions contemplated by this Agreement.

(g)    *Seller Benefit Plans.*  Notwithstanding anything in this Agreement to the contrary, the Selling Entities shall retain sponsorship of, and be solely responsible for and shall indemnify Buyer (and any Designated Buyer, as applicable) and its Affiliates against all Liabilities arising under, pursuant to or in connection with, the Seller Benefit Plans and any other benefit or compensation plan, program, policy, agreement or arrangement at any time sponsored, maintained, contributed to, or required to be contributed to by any Selling Entity or under or with respect to which any Selling Entity has or has had any Liability, including all Liabilities for benefit claims incurred under Seller Benefit Plans prior to the Closing Date, regardless of when such claims are reported, and all Liabilities for compliance with the requirements of Section 4980B of the Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation Section 54.4980B-9.

(h)    *401(k) Plan.*  The Selling Entities shall (i) fully vest each Transferred Employee in his or her accrued benefits under each Seller Benefit Plan (other than an Assumed Benefit Plan) that is intended to be qualified under Section 401(a) of the Code (the "**Seller 401(k) Plan**"), effective as of the Closing Date, and (ii) make or cause to be made to such plan all employee and employer contributions that would have been made on behalf of Transferred Employees had the transactions contemplated by this Agreement not occurred (regardless of any end-of-year employment or other service requirements), but prorated for the portion of the plan year that ends on the Closing Date.  Buyer (or Designated Buyer, as applicable) shall use reasonable best efforts

to permit each Transferred Employee to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code), in the form of cash and notes associated with outstanding plan loans, in an amount equal to the eligible rollover distribution portion of the account balance distributed to such Transferred Employee, from the Seller 401(k) Plan to a defined contribution plan sponsored by Buyer (or Designated Buyer, as applicable) or its applicable Subsidiary (the "**Buyer 401(k) Plan**") if so elected by the applicable Transferred Employee in accordance with the terms of the Seller 401(k) Plan and Applicable Laws. Buyer (or Designated Buyer, as applicable) will, prior to the Closing, undertake all necessary corporate actions to ensure that the Buyer 401(k) Plan is effective as of the Closing Date or as soon as administratively practicable thereafter (but in no event later than 60 days following the Closing Date) and that each eligible Transferred Employee, after giving effect to Section 8.04(c), may participate in the Buyer 401(k) Plan in accordance with the terms thereof.

(i)     *Restrictive Covenants*.  The Selling Entities agree that Buyer (or any Designated Buyer, as applicable) and its Affiliates will be permitted to effect the transactions contemplated by this Section 8.04 notwithstanding any non-disclosure, non-competition, non-solicitation, confidentiality or other restrictive covenant obligation between the Selling Entities and a Company Employee (which will constitute Assets to the extent related to a Transferred Employee). At the Closing (but subject to Section 2.07), the Selling Entities will assign all such restrictive covenants that are applicable to the Transferred Employees to Buyer (or Designated Buyer, as applicable) and the applicable Affiliate that employs such Company Employees, and Buyer and such Affiliate will have the right, but not the obligation, to enforce such restrictive covenants.

(j)     *Visa Employees*. With respect to any Company Employee who is a foreign national who requires a visa in order to work for a Selling Entity in his or her current position, the Selling Entities shall use commercially reasonable efforts to transfer such visa to Buyer (or Designated Buyer, as applicable) or its Affiliate and take any other reasonable actions necessary to ensure that such Company Employee may continue to work in such position for Buyer or its Affiliate as a Transferred Employee from and after the Closing, if Buyer (or Designated Buyer, as applicable) desires to make an offer of employment to such Company Employee.

(k)     *Accrued Vacation and Paid Time Off*.  Effective as of the Closing, Buyer (or Designated Buyer, as applicable) shall, or shall cause one of its Affiliates to, assume all then-accrued, unused vacation and paid time off for Transferred Employees.  To the extent any Transferred Employee is entitled under any Applicable Law to be paid for accrued, unused vacation and/or paid time off, the Selling Entities shall discharge all Liabilities for all such amounts immediately prior to the Closing.

(l)     *Independent Contractors*.  During the period prior to the Closing, the Selling Entities shall use commercially reasonable efforts to make each individual natural person independent contractor engaged by the Selling Entities available to Buyer (or Designated Buyer, as applicable) for the purpose of allowing Buyer (or Designated Buyer, as applicable) to interview each such contractor and determine the nature and extent of each such person's provision of services to Buyer or its Affiliates after the Closing, if any. Each Selling Entity shall provide Buyer (or Designated Buyer, as applicable)  contact information for third-party service providers providing contingent personnel to the Selling Entities and reasonably cooperate in identifying and transferring such contingent work force to the extent requested by Buyer (or Designated Buyer, as applicable).

(m)    *No Third-Party Beneficiaries.*  Nothing in this Section 8.04, express or implied, (i) is intended to or shall confer upon any Person (including any Company Employee) other than the Parties, any right, benefit or remedy (including any third-party beneficiary rights) of any nature whatsoever under or by reason of this Agreement, (ii) shall establish, or constitute an amendment, termination or modification of, or an undertaking to amend, establish, terminate or modify, any benefit plan, program, policy, agreement, or arrangement, or (iii) shall create any obligation on the part of any Selling Entity, Buyer or any of their respective Affiliates to employ (or make any offer to employ) any Company Employee or Transferred Employee for any period following the Closing or (iv) shall prohibit or limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, policy, agreement or arrangement.

Section 8.05.  *Post-Closing Books and Records*.  Until the earlier of the closure of the Bankruptcy Cases and seven (7) years after the Closing Date, (a) Buyer will use reasonable best efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer will allow such Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any Records included in the Assets for purposes relating to the Bankruptcy Cases, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, officers, employees, counsel, Representatives, accountants and auditors will have the right to make copies of any such Records for such purposes. Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records.  In the event any Party desires to destroy any such Records prior to the time during which they must be maintained pursuant to this Section 8.05, such Party will first give 30 days' prior written notice to the other Party and such other Party will have the right at their option and expense, upon prior written notice given within such 30 day period to the Party desiring to destroy such Records or records, to take possession of the Records within 60 days after the date of such notice, or such shorter period as the liquidation and winding up of each applicable Selling Entity's estate will permit.  Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will keep confidential and not use the Records that would have been included in the Records but for the failure to obtain a material Third Party consent or any Records to which it has access under this Section 8.05, except for the use thereof as expressly permissible hereunder. All Records and information contained therein or derived therefrom acquired by the Selling Entities or any of their respective directors, officers, employees, counsel, Representatives, accountants and auditors will be subject to the confidentiality provisions set forth in Section 7.01.  As a condition to any such Person accessing, copying or removing any Records or information, Buyer may require that such Person (or such Person's employer) enter into a customary confidentiality agreement in form and substance similar to the Confidentiality Agreement with reasonable and appropriate modifications.

Section 8.06.  *Title Matters*.  The Selling Entities shall deliver, or cause to be delivered, to Buyer (or Designated Buyer, as applicable), at or prior to the Closing, (a) copies of existing surveys, legal descriptions and title policies relating to the Owned Real Property in each case, in any Selling Entities' possession or control, (b) such deeds, assignments and other customary instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer (or Designated Buyer, as applicable), as Buyer (or Designated Buyer, as applicable) may

reasonably request in order to vest in Buyer (or Designated Buyer, as applicable) all of the applicable Selling Entity's right, title and interests in, to or under any or all Real Property Interests, in each case, in any Selling Entities' possession or control and (c) such ordinary and customary documents (including any factually accurate title affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer (or Designated Buyer, as applicable) to acquire, at Buyer's (or Designated Buyer, as applicable) sole election and sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Owned Real Property. The Selling Entities shall reasonably cooperate with Buyer to facilitate negotiations with the landlords of the Leased Real Property to be assumed under the Sale Order, in order to secure lease terms that are acceptable to Buyer (or Designated Buyer, as applicable) in Buyer's (or Designated Buyer, as applicable) sole and absolute discretion.

Section 8.07.  *Insurance Access*.  (a)  The Selling Entities will use reasonable best efforts to maintain all of their insurance policies in full force and effect at all times up to and including February 28, 2025, and shall pay all premiums, deductibles and retro-adjustment billings, if any, with respect thereto covering all periods up to and including February 28, 2025.  With respect to all events or circumstances affecting the Selling Entities that would reasonably be expected to be the subject of a claim under an insurance policy that provides coverage with respect to the Selling Entities, the Assets or the Business that are known prior to February 28, 2025 to the employees of the Selling Entities who are responsible for making claims under its insurance policies, to the extent consistent with past practices Seller will use reasonable best efforts to submit the applicable claims and to otherwise preserve the value of such claims.

(b)    Following February 28, 2025, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, losses, damages and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets prior to February 28, 2025, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' non-transferable third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to February 28, 2025 (each such policy, an "**Available Insurance Policy**"); *provided*, that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(c)    Buyer may report potentially insured pre-February 28, 2025 claims to Seller so that such claim may be made in accordance with Seller's claim reporting procedures in effect immediately prior to February 28, 2025; *provided*, that if Buyer fails to timely report any such claim, then Seller will not be relieved of its obligations under this Section 8.07 except to the extent that the ability to recover with respect to such claim is prejudiced thereby. Buyer will control the prosecution, defense and administration of any claims that Buyer would be entitled to receive proceeds with respect to, and the Selling Entities will reasonably cooperate with Buyer with respect to such matters;

(d)    Premiums and premium increases, and reasonable and documented out-of-pocket fees and expenses incurred by Seller or any of its Subsidiaries following the Initial Closing to the extent resulting from (and not covered by the Available Insurance Policy) any claims made by Buyer or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives, will, in each case, be promptly reimbursed to Seller by Buyer;

(e)    Any recovery under any Available Insurance Policy shall be net of all uninsured, uncovered, unavailable, or uncollectible amounts of all such claims made by Buyer or any of its Affiliates under the policies as provided for under the Available Insurance Policies (including any deductible, retention or other similar amounts).  The Selling Entities will have any such net recovered amounts paid directly to an account designated by Buyer, or if the Selling Entities receive any such amounts, then such amounts will be promptly remitted to Buyer in accordance with Section 2.08;

(f)    Buyer will not have access to or coverage under any non-transferable insurance policy retained by Seller or any of its Subsidiaries that is not "occurrence based" with respect to claims reported after February 28, 2025; and

(g)    Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.07 after such entity's Bankruptcy Case has been closed.

(h)    Following February 28, 2025, Buyer shall provide to the Selling Entities access to and coverage under any transferable insurance policy included as an Asset, *mutatis mutandis*.

Section 8.08.    *Disclaimers*. (a) To the extent required by Applicable Laws to be operative, the disclaimers of certain warranties contained in this Section 8.08 are "conspicuous disclaimers" for purposes of any Applicable Laws.

(b)    **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE 5 (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) AND THE OTHER TRANSACTION DOCUMENTS, (I) NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED OR OTHERWISE, WITH RESPECT TO, OR IN RELATION TO, ANY OF THE ASSETS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND BUYER EXPRESSLY WAIVES AND ACKNOWLEDGES THAT NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKE ANY SUCH WARRANTY OR REPRESENTATION, AND BUYER IS NOT RELYING ON ANY SUCH WARRANTY OR REPRESENTATION, (II) SELLER, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY, IN WRITING OR OTHERWISE) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR**

REPRESENTATIVES (INCLUDING ANY STATEMENT, OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF EACH SELLER OR ANY OF ITS RESPECTIVE AFFILIATES) AND (III) ALL PROPERTIES INCLUDED IN THE ASSETS WILL BE CONVEYED BY SELLER OR ITS APPLICABLE SUBSIDIARIES AND ACCEPTED BY BUYER PRECISELY AND ONLY AS IS, WHERE IS, AND WITH ALL DEFECTS AND FAULTS WITHOUT RECOURSE AND WITHOUT WARRANTY (INCLUDING WITHOUT ANY WARRANTY OF TITLE).  NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS AGREEMENT WILL LIMIT OR OTHERWISE PREVENT ANY PARTY FROM MAKING ANY CLAIM OR RECOVERING ANY LOSSES OR OTHER AMOUNTS IN THE EVENT OF ACTUAL FRAUD.

(c)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE 5 OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) AND THE OTHER TRANSACTION DOCUMENTS, BUYER ACKNOWLEDGES AND AGREES THAT SELLER AND SELLER'S SUBSIDIARIES ARE CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (III) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (IV) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (V) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE ASSETS (SURFACE AND SUBSURFACE), (VI) COMPLIANCE WITH APPLICABLE LAWS, (VII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (VIII) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IX) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT

STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER OR ANY SUBSIDIARY OF SELLER ASSOCIATED WITH SAME.

(d)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE 5 OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) AND THE OTHER TRANSACTION DOCUMENTS, SELLER AND SELLER'S SUBSIDIARIES HAVE NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, ASSUMED LIABILITIES RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF HAZARDOUS MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE WILL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND BUYER IS DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS" FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION.

(e)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF BUYER EXPRESSLY SET FORTH IN Article 6 OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) AND THE OTHER TRANSACTION DOCUMENTS, SELLER ACKNOWLEDGES AND AGREES THAT BUYER AND ITS AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH BUYER HEREBY DISCLAIMS), RELATING TO (I) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION PROVIDED BY, OR ON BEHALF OF, BUYER OR SUCH AFFILIATES TO SELLER OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, (II) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS PREPARED BY, OR ON BEHALF OF BUYER, (III) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (IV) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO SELLER OR ITS AFFILIATES, THEIR CONTRACTUAL COUNTERPARTIES, OR ANY OF THEIR RESPECTIVE EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND SELLER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST BUYER OR ANY OF ITS AFFILIATES ASSOCIATED WITH SAME.

Section 8.09.  *Collection of Accounts Receivable*.  (a) As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets acquired by Buyer (or any Designated Buyer, as applicable) pursuant to this Agreement and delivered to the offices of the Business or otherwise to Buyer regardless of whether such mail is received prior to, on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer regardless of whether such amounts are received prior to, on or after the Closing Date with respect to Accounts Receivable acquired by Buyer (or any Designated Buyer, as applicable) pursuant to this Agreement made payable or endorsed to any Selling Entity or Selling Entity's order, for Buyer's own account (*provided*, that to the extent Buyer receives any amounts that constitute Excluded Assets, such amounts shall be transferred to Seller in accordance with Section 2.08).

(b)     Without limiting Section 2.08, from and after the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to Accounts Receivable acquired by Buyer (or any Designated Buyer, as applicable) pursuant to this Agreement shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.  In addition, without limiting Section 2.08, Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to Seller, from time to time as and when received or identified by Buyer or its Affiliates, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that Buyer or its Affiliates may receive or identify on or after the Closing which properly belongs to the Selling Entities as an Excluded Asset.

(c)     From and after the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable acquired by Buyer (or any Designated Buyer, as applicable) pursuant to this Agreement.

Section 8.10.  *Bulk Transfer Laws*.  The Parties (a) intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of all Encumbrances in the Assets, including any liens or claims arising out of bulk sales rules, bulk transfer rules, or similar Applicable Laws other than Permitted Encumbrances, and (b) hereby waive any requirement of compliance with, and any Claims, including any Claims related to non-compliance with the provisions of any bulk sales rules, bulk transfer rules, or similar Applicable Law regardless of whether such non-compliance would purport to result in Buyer being liable in its own capacity.

# ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Initial Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Initial Closing, of each of the following conditions:

Section 9.01. *Accuracy of Representations*. (a) The representations and warranties of the Selling Entities contained in Sections 5.01 (solely the first sentence thereof), 5.02 and 5.18 will be true and correct in all respects (other than *de minimis* inaccuracies) at and as of the Initial Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, (b) the other representations and warranties of Seller (other than Section 5.07(c)) contained in this Agreement (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth therein) will be true and correct at and as of the Initial Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) the representations and warranties of Seller contained in Section 5.07(c) are true and correct in all respects at and as of the Initial Closing.

Section 9.02. *Selling Entities' Performance*. The Selling Entities shall have performed, or complied with, in all material respects all of their respective obligations hereunder required to be performed, or complied with, by them on or prior to the Initial Closing Date (or otherwise cured any breaches).

Section 9.03. *Certificate*. Buyer will have received a certificate from each Selling Entity, dated as of the Initial Closing Date, duly executed by an officer of such Selling Entity certifying that the conditions set forth in Section 9.01, Section 9.02, Section 9.04 and Section 9.05 have been satisfied.

Section 9.04. *Seller's Deliveries*. Each of the deliveries required to be made to Buyer pursuant to Section 4.04 will have been delivered (or the applicable Selling Entity will make such deliveries at the Initial Closing).

Section 9.05. *Conversion Motions*. No motion seeking to have the Chapter 11 Cases converted to cases under chapter 7 of the Bankruptcy Code shall have been granted by the Bankruptcy Court.

ARTICLE 10
CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER
AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate each Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to such Closing, of each of the following conditions:

Section 10.01. *No Order*. There will not be in effect any Order by any Governmental Authority that restrains, enjoins, stays, or prohibits such Closing or the consummation of the transactions contemplated hereby.

Section 10.02. *Sale Order*. The Bankruptcy Court shall have entered the Sale Order, and such Order shall be a Final Order in full force and effect and shall not have been stayed, vacated, reversed, amended, or modified (in the case of amendments or modifications, in a manner

materially adverse to Buyer) without the consent of Buyer; *provided*, that at the sole election and in the exclusive discretion of Buyer, Buyer may waive the requirement that the Sale Order be a Final Order.

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF
## THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Initial Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Initial Closing, of each of the following conditions:

Section 11.01. *Accuracy of Representations*. The representations and warranties of Buyer contained in Article 6 of this Agreement are correct in all material respects at and as of the Initial Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except for any inaccuracies of such representations and warranties that would not individually or in the aggregate prevent Buyer from consummating the transactions contemplated hereby.

Section 11.02. *Buyer's Performance*. Buyer shall have performed, or complied with, in all material respects all of its obligations hereunder required to be performed, or complied with, by it on or prior to the Initial Closing Date (or otherwise cured any such breaches).

Section 11.03. *Certificate*. Seller will have received a certificate from Buyer, dated as of the Initial Closing Date, duly executed by an officer of Buyer certifying that the conditions set forth in Section 11.01 and Section 11.02 have been satisfied.

Section 11.04. *Buyer's Deliveries*. Each of the deliveries required to be made to Seller pursuant to Section 4.03 will have been delivered (or Buyer will make such deliveries at the Initial Closing).

## ARTICLE 12
## TERMINATION

Section 12.01. *Termination Events*.

(a)    Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Initial Closing:

(i)    by mutual written agreement executed by Seller and Buyer;

(ii)    by written notice of either Seller or Buyer to such other Party if:

(A)    the Initial Closing has not occurred by the close of business on January 3, 2025 (the "**Outside Date**");

(B)    there is in effect a final and non-appealable Order of any Governmental Authority that restrains, enjoins, stays, or prohibits the Initial

Closing or the consummation of the transactions contemplated hereby; *provided* that a Party shall not be entitled to terminate this Agreement pursuant to this (B) if such Party's breach is the proximate cause of such Order;

(C)    any of the Selling Entities enter into a definitive agreement providing for a Superior Proposal and the closing of the sale of the relevant Assets to the applicable acquirer pursuant to such Superior Proposal has occurred;

(D)    after its entry, the Sale Order ceases to be in full force and effect;

(iii)    by Buyer by written notice to Seller if:

(A)    (x) any Selling Entity breaches any representation or warranty or any covenant or agreement contained in this Agreement, (y) such breach would result in a failure of a condition set forth in Article 9 or Article 10 and (z) if such breach is capable of being cured, such breach has not been cured by five (5) Business Days after the giving of written notice by Buyer to the Selling Entities of such breach;

(B)    any of the Selling Entities enter into a definitive agreement providing for, or the Bankruptcy Court approves, any Alternative Transaction;

(C)    the Bankruptcy Court enters any Order materially inconsistent with the Sale Order in a manner materially adverse to Buyer without the Buyer's prior consent and cannot be remedied by the Seller in a manner acceptable to Buyer (and such action has not been reversed or vacated within ten (10) calendar days after its occurrence);

(D)    if any creditor of the Selling Entities obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any material portion of the Assets; or

(E)    if any Selling Entity breaches the Bankruptcy Court Milestones (other than by fewer than 5 days solely as a result of Bankruptcy Court availability).

(iv)    by Seller by written notice to Buyer if (A) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition set forth in Article 10 or Article 11 and (C) such breach has not been cured by five (5) Business Days after the giving of written notice by the Selling Entities to Buyer of such breach;

(v)    by Seller by written notice to Buyer if (i) all of the conditions in Article 9 and Article 10 (other than those conditions that by their nature are to be satisfied at the Closing and that would be satisfied if there were a Closing) have been satisfied or waived, (ii) Seller has notified Buyer in writing at least three Business Days prior to such termination that Seller is ready, willing and able to consummate the Closing, and (iii) Buyer fails to consummate the transactions contemplated hereby, including payment of the

Purchase Price, by the third Business Day after the later of (A) the date on which Buyer receives such notice and (B) the date on which the Closing is supposed to have occurred pursuant to Section 4.01; or

(vi)     by Seller by written notice to Buyer if (i) the Bankruptcy Cases are, without Seller's consent, converted into cases under Chapter 7 of the Bankruptcy Code or dismissed, or (ii) without Seller's consent, a Trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Cases.

(b)     Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time after the Initial Closing by Buyer by written notice to Seller if the Bankruptcy Court fails to grant an extension of the deadline set forth in Section 365(d)(4) of the Bankruptcy Code through the then applicable expiration of the Designation Rights Period.

(c)     Notwithstanding anything to the contrary in this Section 12.01, (i) Seller will not be entitled to terminate this Agreement if any Selling Entity has breached in any material respect its obligations under this Agreement in any manner that shall have caused the failure of the Initial Closing to have occurred on or before such date, unless such breach was proximately caused by the breach of this Agreement by Buyer, and (ii) Buyer will not be entitled to terminate this Agreement if Buyer has breached in any material respect its obligations under this Agreement in any manner that shall have caused the failure of the Initial Closing to have occurred on or before such date, unless such breach was proximately caused by the breach of this Agreement by any of the Selling Entities.

Section 12.02. *Effect of Termination*.  In the event of a valid termination of this Agreement by Buyer or Seller pursuant to this Article 12, all rights and obligations under this Agreement shall terminate without any Liability of any Party or Person to any other Party or Person; *provided* that, subject to Section 13.07 (if applicable), nothing herein will relieve any Party from Liability for any Willful Breach of this Agreement prior to such termination; *provided*, *further*, that the provisions of this Section 12.02, Section 7.01(b), Section 12.03 and Section 13.07 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 13) shall survive the termination of this Agreement.

Section 12.03. *Procedure Upon Termination*.  In the event of termination pursuant to Section 12.01, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to Section 12.02) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller.

## ARTICLE 13
## GENERAL PROVISIONS

Section 13.01. *No Survival of Representations and Warranties*.  The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof.  Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants

applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, 90 days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 13.02. *Notices*.   All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email (so long as no failure message is generated), (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

(i)     If to any Selling Entity, then to:

Big Lots, Inc.
4900 E. Dublin-Granville Road,
Columbus, Ohio 43081
Attn:   Rocky Robins
        Jonathan Ramsden
E-mail: rrobins@biglots.com
        jramsden@biglots.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
Attn: H. Oliver Smith
      Brian Wolfe
      Brian Resnick
      Adam L. Shpeen

450 Lexington Avenue
New York, NY 10017
E-mail: oliver.smith@davispolk.com
        brian.wolfe@davispolk.com
        brian.resnick@davispolk.com
        adam.shpeen@davispolk.com

(ii)    If to Buyer:

Gordon Brothers Retail Partners, LLC

73

101 Huntington Avenue, 11th Floor
Boston, MA 02199
Attn:   Richard Edwards; David Braun
E-mail: redwards@gordonbrothers.com
        dbraun@gordonbrothers.com

with a copy (which will not constitute notice) to:

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn:   Steven E. Fox
Email:  sfox@riemerlaw.com

Section 13.03. *Waiver*.  Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Applicable Laws, (a) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party will be deemed to be a waiver of any right of the other Party that gives such notice or demand to take further action without notice or demand.

Section 13.04. *Entire Agreement; Amendment*.  This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents, and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof.  Except as permitted under Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by both Buyer and Seller.

Section 13.05. *Assignment*.  This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided,* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer, without the prior written consent of any Selling Entity, to one or more of Buyer's Subsidiaries, Agent or a Designated Buyer, so long as (x) such Subsidiary is designated in writing by Buyer to Seller prior to the Closing, (y) Buyer continues to remain obligated in full hereunder, and (z) any such assignment would not reasonably be expected to impede or delay the Closing; *provided, further*, that Buyer and/or Agent may syndicate its performance under the Agency Agreement to one or more national liquidation firms so long as Buyer remains liable for all Liabilities under this Agreement and the Agency Agreement; *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court; *provided, further still* that Buyer may assign its rights under this Agreement any lender (or

agent on behalf of lenders) as collateral security for their obligations under any of their secured debt financing arrangements. Notwithstanding the foregoing or anything to the contrary herein, Buyer shall be liable for any obligations of a Designated Buyer hereunder (including, for the avoidance of doubt, with respect to the assumption of any Assumed Liabilities). Buyer's liability with respect to any breach of this Agreement by any such Designated Buyer shall be joint and several. For the avoidance of doubt, Selling Entities may pursue available claims, or initiate Proceedings, against Buyer without, or prior to, pursuing such claims or initiating such Proceedings against any Designated Buyer. Any attempted or purported assignment in violation of this Section 13.05 will be deemed void *ab initio*. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 13.06. *Severability*. The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 13.07. *Expenses*. Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 13.08. *Specific Performance*. The Parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with the terms hereof, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, each Party will be entitled to an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including specific performance of the covenants, promises or agreements contained in this Agreement or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement (including pursuant to Section 13.07), no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity. The right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

Section 13.09. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*.

(a)    Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed

75

and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute.  The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties each consent to service of process by mail (in accordance with Section 13.02) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

Section 13.10. *Counterparts*.  This Agreement and any amendment hereto may be executed in one or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument.  Notwithstanding anything to the contrary in Section 13.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 13.11. *Parties in Interest; No Third Party Beneficiaries*.  This Agreement will inure to the benefit of and be binding upon Buyer, Agent and any Designated Buyer, and the Selling Entities and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and, save to the extent otherwise expressly referred to herein, nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that Section 13.12 is intended for the benefit of and is enforceable by the Party Affiliates and the Released Parties; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement that are expressly applicable to "Party Affiliates" or "Released

Parties," as the case may be.

Section 13.12. *No Recourse*.  (a) Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current, or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner, or equity holder of any Party (or any of their successors or permitted assignees) (each, other than, for the avoidance of doubt, a Party itself a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, Contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal Liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party hereunder or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith, or for any claim (whether in tort, Contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

(b)    Effective as of the Closing (but only if the Initial Closing actually occurs), except for any rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, each of the Selling Entities and Buyer (each a "**Releasing Party**"), to the fullest extent permissible under Applicable Law, mutually releases and discharges each other Releasing Party and such Releasing Parties' respective current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, current, and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals, each in their capacity as such (collectively, in such capacity, the "**Released Parties**" and each a "**Released Party**"), from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities of every kind, nature and description whatsoever, which such Releasing Party ever had, now has or may have on or by reason of any matter, cause or thing whatsoever to the Closing Date, including any derivative claims that such Releasing Party (or someone on its behalf) would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of a holder of any claim against a Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Selling Entities, the purchase, sale, or rescission of the purchase or sale of any security of the Selling Entities, the subject matter of, or the transactions or events giving rise to, any claim, the Selling Entities' in- or out-of-court restructuring efforts, intercompany transactions, the transactions contemplated hereby, entry into this Agreement, the Chapter 11 cases, the formulation,

preparation, dissemination, negotiation, filing, or consummation of the transactions contemplated hereby, this Agreement, or any restructuring transaction, Contract, instrument, release, or other agreement or document created or entered into in connection with the transactions contemplated hereby, this Agreement, the filing of the Chapter 11 cases, the pursuit of the transactions contemplated hereby, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Closing Date related or relating to the foregoing; *provided* that nothing in this Agreement will limit or otherwise prevent any Releasing Party from making any claim or recovering any losses or other amounts in the event of Actual Fraud.

(c)    Buyer agrees that if Buyer or any of its Affiliates obtains or binds a representations and warranties insurance policy with respect to any of the representations or warranties set forth in Article 5 of this Agreement (each, a "**R&W Insurance Policy**"), each such R&W Insurance Policy will at all times provide that: (1) the insurer will have no, and will waive and not pursue any and all, subrogation rights against Seller, any of its Subsidiaries or any of its or their respective Affiliates, (2) Seller is third party beneficiary of such waiver and (3) Buyer will have no obligation to pursue any claim against Seller or any of its Subsidiaries in connection with any Liability.

Section 13.13. *Disclosure Schedules; Materiality*.   The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other Disclosure Schedules is reasonably apparent on its face.  The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."  No disclosure in any Disclosure Schedule relating to any possible breach or violation of any Contract or Applicable Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Section 13.14. *Liquidating Trustee*.  If at any time any Selling Entity liquidates, its estate is converted to Chapter 7, or otherwise has a trustee or other Representative appointed by the Bankruptcy Court (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of such Selling Entity and will be entitled to exercise the rights of such Selling Entity under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, each Selling Entity grants to such Trustee a power of attorney for purposes performing such Selling Entity's obligations under Section 2.07 with respect to such abandoned assets.  Each Selling Entity acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable.  Further, such power of attorney will also be granted to Buyer for purposes of performing such Selling Entity's obligations under Section 2.07 with respect to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 13.15. *Conflicts; Privileges*.  (a) It is acknowledged by each of the Parties that Seller has retained Davis Polk & Wardwell LLP ("**Davis Polk**") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "**Current Representation**"),

and that no other party has the status of a client of Davis Polk for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that after the Closing, Davis Polk may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Davis Polk may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters. Buyer hereby waives and agrees not to assert (i) any claim that Davis Polk has a conflict of interest in any representation described in this Section 13.15 or (ii) any confidentiality obligation with respect to any communication between Davis Polk and any Designated Person occurring during the Current Representation.

(b)    Buyer hereby agrees that all communications (whether before, at or after the Closing) between Davis Polk and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives and Buyer hereby agrees that it will not seek to compel disclosure to Buyer or any of its Representatives of any such communication that is subject to attorney client privilege, or any other evidentiary privilege.

(c)    Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a Third Party other than any Selling Entity, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such Third Party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of the applicable Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed). In the event that Buyer or any of its respective directors, officers, employees, or other Representatives is legally required by governmental Order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (x) reasonably promptly notify the Selling Entities in writing (including by making specific reference to this Section 13.15(c)), (y) agree that the Selling Entities may seek a protective Order and (z) use, at the Selling Entities' sole cost and expense, reasonable best efforts to assist therewith.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**BIG LOTS, INC.**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**SELLING ENTITIES:**

**BIG LOTS F&S, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BIG LOTS STORES, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**CLOSEOUT DISTRIBUTION, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**CONSOLIDATED PROPERTY HOLDINGS, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**CSC DISTRIBUTION, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BIG LOTS STORES - CSR, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**DURANT DC, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**GREAT BASIN, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BIG LOTS STORES – PNS, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BIG LOTS ECOMMERCE LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**AVDC, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BIG LOTS MANAGEMENT, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BROYHILL, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**GAFDC LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**PAFDC LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**WAFDC, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**INFDC, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BLBO TENANT, LLC**

By: _____
Name: Bruce K. Thorn
Title: President and Chief Executive Officer

**BUYER:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

Name: _____

Title: _____

<u>Exhibit A</u>

INTENTIONALLY OMITTED

Exhibit B

INTENTIONALLY OMITTED

Exhibit C

*Agreed Form*
*Confidential*

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Assignment Agreement"), dated as of [●], 2024 (the "Effective Date"), is made by and between Big Lots, Inc., a company organized under the laws of the State of Ohio ("Seller"), Consolidated Property Holdings LLC, a limited liability company organized under the laws of Ohio, CSC Distribution LLC, a limited liability company organized under the laws of Alabama, and Big Lots Stores, LLC, a limited liability company organized under the laws of Ohio (each, including Seller, an "Assignor" and collectively, the "Assignors"), on the one hand, and Gateway BL Acquisition, LLC, a Delaware limited liability company ("Assignee"), on the other hand. Assignors and Assignee may be referred to herein individually as a "Party" and collectively as the "Parties." Terms capitalized but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

W I T N E S S E T H:

WHEREAS, Seller and the Assignee have entered into that certain Asset Purchase Agreement, dated as of [●] (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, each Assignor desires to sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Assignee, and Assignee desires to purchase, acquire, and accept from each Assignor, each Assignor's right, title, and interest in, to, and under all of the Owned Intellectual Property, including all of the registered and applied for Intellectual Property listed on Schedule 1 hereto, together with all goodwill associated therewith (collectively, the "Assigned Intellectual Property"); and

NOW, THEREFORE, in consideration of the premises and covenants set forth herein and in the Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

Section 1.    Assignment.  Each Assignor hereby sells, transfers, assigns, conveys and delivers, and causes to be sold, transferred, assigned, conveyed and delivered, to Assignee, and Assignee hereby purchases, acquires, and accepts from Assignors, all of each Assignor's right, title, and interest in, to and under the Assigned Intellectual Property, together with Assignor's right, title and interest in, to and under the following: (A) all common law rights or other rights in or to any of the foregoing, and all goodwill associated with any of the foregoing, (B) all registrations and applications for registration of any of the foregoing, and all rights to register any of the foregoing, (C) all renewals, extensions, reexaminations and continuations of any of the foregoing, and rights to any other registrations or applications based upon, claiming priority from, or claiming common parentage with, any of the foregoing, and the right to obtain or file for any renewals, extensions, reexaminations and continuations of, and any other registrations or applications based upon, claiming priority from or claiming common parentage with, any of the foregoing, (D) all income, royalties, damages and payments due or payable at the Closing

Date or thereafter (including damages and payments for past or future infringements or misappropriations thereof), (E) the right to sue and recover for past infringements or misappropriations thereof, (F) any and all corresponding rights that, now or hereafter, may be secured throughout the world and (G) all copies and tangible embodiments of any of the foregoing.

Section 2.    Recordation.  Each of the Assignors authorizes and requests that the Commissioner of Patents and Trademarks of the United States Patent and Trademark Office, and any official of any other jurisdiction or organization of the corresponding entities or agencies in any jurisdiction, including any state, foreign country or multinational authority (including whose duty it is to issue any applicable intellectual property or any legal equivalent thereof), record and register this Assignment Agreement and Assignee as the owner of the Assigned Intellectual Property.

Section 3.    Further Assurances.  Each Assignor shall execute and deliver such further documents, instruments and conveyances, and take such further actions, as may be reasonably necessary or reasonably requested by Assignee to effectuate the intent of this Assignment Agreement and to provide Assignee with the intended benefits of this Assignment Agreement, including the execution and delivery of any and all assignments, affidavits, declarations, oaths, powers of attorney or other documentation to effect, evidence or perfect this assignment of the Assigned Intellectual Property to Assignee, in each case, at Assignee's sole cost and expense. Each Assignor hereby irrevocably grants to Assignee power of attorney to execute and deliver any such documents, instruments and conveyances on Assignee's behalf and in its name, and to do and take all other lawfully permitted acts to transfer the Assigned Intellectual Property to Assignee and to further the transfer, issuance, prosecution, and maintenance of all Assigned Intellectual Property, to the full extent permitted by law. The power of attorney is coupled with an interest and shall not be affected by any Assignor's subsequent incapacity.

Section 4.    This Assignment Agreement in no way modifies, replaces, supersedes, defeats, limits, expands, diminishes or otherwise alters any right, obligation, claim or remedy under the Purchase Agreement, including any rights any party may have under the representations, warranties, covenants, agreements and indemnities set forth in the Purchase Agreement.  This Assignment Agreement is expressly made subject to the terms and provisions of the Purchase Agreement, and the Purchase Agreement shall remain in full force and effect on its terms, separate and apart from this Assignment Agreement. Notwithstanding any other provision in this Assignment Agreement to the contrary, in the event and to the extent that there is a conflict, ambiguity or inconsistency between the provisions of this Assignment Agreement and the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall control.

Section 5.    Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

2

Section 6.    <u>General Provisions</u>. Each of Section 1.02 (*Other Definitions and Interpretive Matters*), 13.02 (*Notices*), 13.03 (*Waiver*), 13.04 (*Entire Agreement; Amendment*) 13.05 (*Assignment*), 13.06 (*Severability*), 13.07 (*Expenses*), 13.09 (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*), 13.10 (*Counterparts*), 13.11 (*Parties in Interest; No Third Party Beneficiaries*) and 13.12 (*No Recourse*) of the Purchase Agreement are hereby incorporated by reference into this Assignment Agreement, the terms of which shall apply to this Assignment Agreement, *mutatis mutandis* as though set forth herein.

Section 7.    This Assignment Agreement shall constitute a "Transaction Document" under the Purchase Agreement.

[*Signatures on Next Page*]

IN WITNESS WHEREOF, the Parties have executed this Assignment Agreement as of the date first above written.

<u>ASSIGNORS</u>:

Big Lots, Inc.

By: _____
    Name:
    Title:

Consolidated Property Holdings LLC,

By: _____
    Name:
    Title:

CSC Distribution LLC

By: _____
    Name:
    Title:

Big Lots Stores, LLC

By: _____
    Name:
    Title:

[Signature Page to Intellectual Property Assignment Agreement]

ASSIGNEE:

Gateway BL Acquisition, LLC

By: _____
    Name:
    Title:

## Schedule 1

### Patents and Patent Applications

| Title | Jurisdiction | App. No. | Filing Date | Patent No. | Issue Date | Assignor |
|-------|--------------|----------|-------------|------------|------------|----------|

### Registered Trademarks and Trademark Applications

| Trademark | Jurisdiction | App. No. | Filing Date | Reg. No. | Reg. Date | Assignor |
|-----------|--------------|----------|-------------|----------|-----------|----------|

### Registered Copyrights and Copyright Applications

| Title | Jurisdiction | Reg. No. | Reg. Date | Assignor |
|-------|--------------|----------|-----------|----------|

Exhibit D

**EXHIBIT D**

**FORM OF MASTER ASSIGNMENT, BILL OF SALE, DEED, AND CONVEYANCE**

THIS MASTER ASSIGNMENT, BILL OF SALE, DEED, AND CONVEYANCE (this "Agreement") is entered into as of [●],2024, by and among (a) Gateway BL Acquisition, LLC, a Delaware limited liability company ("Buyer"), and the Affiliates of Buyer that are indicated on the signature pages attached to this Agreement (together with Buyer, each a "Buyer Entity" and collectively, the "Buyer Entities"), and (b) Big Lots, Inc., an Ohio corporation (as in existence on the date hereof, as a debtor-in-possession, and as a reorganized debtor, as applicable, "Seller"), and the Subsidiaries of Seller that are indicated on the signature pages attached to this Agreement (together with Seller, each a "Selling Entity" and collectively, the "Selling Entities", and together with the Buyer Entities, the "Parties").

WHEREAS, reference is hereby made to that certain Asset Purchase Agreement, dated as of September [●], 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "APA"), by and among Buyer and the Selling Entities pursuant to which the Selling Entities have agreed to sell, convey, assign, and transfer to Buyer, and Buyer has agreed to purchase, acquire, and accept from the Selling Entities, the Assets, and to assume the Assumed Liabilities (and no other Liabilities), for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA; and

WHEREAS, the Selling Entities desire to deliver to the Buyer Entities such instruments of sale, transfer, assignment, conveyance, contribution and delivery as are required to vest in the Buyer Entities all of the Selling Entities' right, title and interest in and to the Assets, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances, and the Buyer Entities desire to deliver to the Selling Entities such instruments as are required in order to effectuate and evidence the assumption by the Buyer Entities of the Assumed Liabilities.

NOW, THEREFORE, pursuant to the APA and in consideration of the mutual promises contained in the APA, and for other good and valuable consideration, the receipt and sufficiency of which the Selling Entities and the Buyer Entities acknowledge, the Parties agree as follows:

1.      Each capitalized term used but not otherwise defined in this Agreement shall have the meaning ascribed to such term in the APA.

2.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms, and subject to the conditions set forth in the APA, including in all respects to Section 2.05, Section 2.06 and Section 2.07 of the APA, and in the Sale Order, the Selling Entities hereby sell, convey, assign and transfer to each Buyer Entity, and each Buyer Entity hereby accepts, all of the Selling Entities' right, title and interest in and to the Assets set forth opposite such Buyer Entity's name on Schedule A attached hereto, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances. Each Buyer Entity hereby purchases, acquires, and accepts the Assets set forth opposite such Buyer Entity's name on Schedule A attached hereto.

3.      In accordance with the terms, and subject to the conditions, set forth in the APA, including in all respects to Section 2.05, Section 2.06 and Section 2.07 of the APA, and the Sale Order, each Buyer Entity hereby assumes the Assumed Liabilities (and no other Liabilities) set forth opposite such Buyer Entity's name on Schedule A attached hereto.

4.      This Agreement in no way modifies, replaces, supersedes, defeats, limits, expands, diminishes or otherwise alters any right, obligation, claim or remedy under the APA, including any rights any party may have under the representations, warranties, covenants, agreements and indemnities set forth in the APA and any obligations of Buyer or the Selling Entities set forth in the APA.  For the avoidance of doubt, the Selling Entities shall have no separate or additional obligations or Liabilities under this Agreement.  This Agreement is expressly made subject to the terms and provisions of the APA, and the APA shall remain in full force and effect on its terms, separate and apart from this Agreement.  Notwithstanding any other provision in this Agreement to the contrary, in the event and to the extent that there is a conflict, ambiguity or inconsistency between the provisions of this Agreement and the provisions of the APA, the provisions of the APA shall control.

5.      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

6.      Each of Section 1.02 (*Other Definitions and Interpretive Matters*), 2.09 (*Further Assurances*), 13.02 (*Notices*), 13.03 (*Waiver*), 13.04 (*Entire Agreement; Amendment*) 13.05 (*Assignment*), 13.06 (*Severability*), 13.07 (*Expenses*), 13.09 (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*), 13.10 (*Counterparts*), 13.11 (*Parties in Interest; No Third Party Beneficiaries*) and 13.12 (*No Recourse*) of the APA are hereby incorporated by reference into this Agreement, the terms of which shall apply to this Agreement, *mutatis mutandis* as though set forth herein.

7.      This Agreement shall constitute a "Transaction Document" under the APA.

[*Remainer of this page is intentionally left blank*]

2

IN WITNESS WHEREOF, the Parties have caused this Master Assignment, Bill of Sale, Deed, and Conveyance to be executed and delivered as of the date first above written.

**SELLING ENTITIES:**

**Big Lots, Inc., an Ohio corporation**

By:_____
Name:
Title:


**[●]**

By:_____
Name:
Title:

[Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance]

**BUYER:**


**Gateway BL Acquisition, LLC**, a Delaware limited liability company


By: _____
Name:
Title:


[●]

By:_____
Name:
Title:

[Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance]

**SCHEDULE A**

| Buyer Entity | Assets | Assumed Liabilities |
|:---:|:---:|:---:|
| [●] | [●] | [●] |
| [●] | [●] | [●] |
| [●] | [●] | [●] |

Exhibit E

INTENTIONALLY OMITTED

Exhibit F

**Big Lots, Inc.**
Administration Budget

| Week | Mapping | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Start | | 1/5/2025 | 1/12/2025 | 1/19/2025 | 1/26/2025 | 2/2/2025 | 2/9/2025 | 2/16/2025 | 2/23/2025 | 3/2/2025 | 1/5/2025 |
| Week End | | 1/11/2025 | 1/18/2025 | 1/25/2025 | 2/1/2025 | 2/8/2025 | 2/15/2025 | 2/22/2025 | 3/1/2025 | 3/8/2025 | 5/10/2025 |
| Actuals / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| DC GOB Employee Payroll | Payroll | 1,192 | 1,192 | 1,192 | 1,192 | 1,192 | 1,192 | 1,192 | 1,192 | – | 9,534 |
| Corporate GOB Employee Payrc | Payroll | – | 1,060 | – | 1,060 | – | 1,060 | – | 1,060 | – | 4,240 |
| IT Disbursements | Other Accounts Payable | 519 | 519 | 519 | 519 | 519 | 406 | 406 | 406 | – | 3,813 |
| Outbound Freight | Other Accounts Payable | 370 | 370 | 370 | 370 | 370 | 231 | 231 | 231 | 231 | 2,773 |
| Insurance | Other Accounts Payable | 240 | 240 | 240 | 240 | 240 | 300 | 300 | 300 | 300 | 2,400 |
| Other Expenses | Other | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 7,776 | 9,988 |
| Utility Expenses: Corporate / DC | Other Accounts Payable | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 6,349 | 17,142 |
| Total Aministration Expenses | | 3,946 | 5,006 | 3,946 | 5,006 | 3,946 | 4,814 | 3,754 | 4,814 | 14,657 | 49,891 |

Exhibit G

**Big Lots, Inc.**
Wind Down Budget

| Week | Mapping | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Start | | 1/5/2025 | 1/12/2025 | 1/19/2025 | 1/26/2025 | 2/2/2025 | 2/9/2025 | 2/16/2025 | 2/23/2025 | 3/2/2025 | 1/5/2025 |
| Week End | | 1/11/2025 | 1/18/2025 | 1/25/2025 | 2/1/2025 | 2/8/2025 | 2/15/2025 | 2/22/2025 | 3/1/2025 | 3/8/2025 | 3/8/2025 |
| Actuals / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| HQ Severance | Payroll | – | 1,616 | – | 1,616 | – | 1,616 | – | 1,673 | 73 | 6,595 |
| DC Severance | Payroll | – | – | – | – | – | – | – | – | 1,192 | 1,192 |
| Store Severance | Payroll | 847 | – | – | – | 1,252 | – | – | – | 25,058 | 27,157 |
| PTO | Payroll | 5,895 | – | – | – | – | – | – | – | – | 5,895 |
| 401(k) Match | Payroll | 2,695 | – | – | – | – | – | – | – | – | 2,695 |
| 401(k) Employee Contributions | Payroll | 1,800 | – | – | – | – | – | – | – | – | 1,800 |
| Q3 Bonus | Payroll | 2,799 | – | – | – | – | – | – | – | – | 2,799 |
| Q4 Bonus | Payroll | – | – | – | – | – | – | – | – | 3,500 | 3,500 |
| IBNR | Payroll | 11,730 | – | – | – | – | – | – | – | – | 11,730 |
| Worker's Comp Disbursements | Other Accounts Payable | 198 | 198 | 198 | 198 | 198 | 198 | 198 | 198 | 198 | 1,778 |
| Sales Tax Payable | Sales Tax | – | 25,000 | – | – | – | – | – | – | – | 25,000 |
| Sales Tax - Audits | Other | – | – | – | – | – | – | – | – | – | – |
| State Income Tax | Other | – | – | – | – | – | – | – | – | 2,770 | 2,770 |
| PPT | Other | – | – | – | 1,747 | – | – | – | 97 | – | 1,844 |
| Business License/Permits | Other | – | – | – | 300 | – | – | – | 400 | – | 700 |
| Excise (Bottle Deposits, Mattress Fee, Ewaste, othe | Other | – | – | – | 102 | – | – | – | 156 | – | 258 |
| State CAT and Gross Receipts | Other | – | 40 | – | – | – | 190 | – | – | – | 230 |
| Real Property Tax | Other | 14,619 | – | – | – | – | – | – | – | – | 14,619 |
| Professional Fee Escrow Account Funding | Professional Fees | 7,500 | – | – | – | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 13,438 |
| US Trustee Fees | UST Fees | – | – | 1,000 | – | – | – | – | – | – | 1,000 |
| Corporate Wind Down | Other Accounts Payable | – | – | – | – | – | – | – | – | – | – |
| Total Wind Down Expenses | | 48,082 | 26,854 | 1,198 | 3,963 | 2,637 | 3,191 | 1,385 | 3,711 | 33,979 | 125,000 |

Exhibit H

EXECUTION VERSION

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 28th day of December, 2024 (the "Execution Date"), and is to be effective upon the Initial Closing (as defined in the APA (as defined below)), by and between **BIG LOTS, INC.**, a company organized under the laws of the State of Ohio and **BIG LOTS STORES, LLC** (together, "Big Lots") and each of the Subsidiaries of Big Lots (collectively defined as the "Merchant" or the "Debtors"), and **GORDON BROTHERS RETAIL PARTNERS, LLC**, a Delaware limited liability company (as "Agent" and "Buyer"; and together with Merchant and Agent, each a "Party" and collectively, the "Parties"); provided that this Agreement shall only be effective upon the Initial Closing (as defined in the APA) and shall automatically terminate upon a valid termination of the APA (as defined below).

## R E C I T A L S:

WHEREAS, the Selling Entities filed voluntary petitions and commenced cases (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 9, 2024 (the "Petition Date");

WHEREAS, simultaneously with the execution hereof, Buyer and Merchant entered into an Asset Purchase Agreement (the "APA") pursuant to which (a) Buyer will acquire certain assets and liabilities of Merchant, as set forth more particularly therein, (b) designate certain assets and liabilities to be sold by Agent pursuant to this Agreement, and (c) designate certain other assets to be acquired by Buyer or any Designated Buyers, in each case, in accordance with the terms and conditions of the APA;

WHEREAS, Merchant operates retail stores, and together with Buyer desires that the Agent act as Merchant's and Buyer's exclusive agent for the limited purposes of: (a) selling all of the Inventory from Merchant's retail store locations identified on Exhibit 1 attached hereto (each individually, a "Store," and collectively, the "Stores") and certain Inventory located in Merchant's third party distribution centers (hereinafter, the "Distribution Centers"; in the latter case as allocated by Buyer and Agent) (as further described below, the "Sale"); and (b) disposing of the Owned FF&E (as defined below) in the Stores (and subject to Section 7, certain designated Owned FF&E located in the Corporate HQ).

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA.  Certain additional terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Additional Agent Inventory | Section 8.10(a) |
| Agency Accounts | Section 3.2(b)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Collateral | Section 15.11(a)(iii) |
| Agent Indemnified Party(ies) | Section 13.1 |

| | |
|---|---|
| Agreement | Preamble |
| APA | Recitals |
| Applicable General Laws | Section 2(d) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Buyer | Preamble |
| Control Agreement | Section 3.2(b)(ii) |
| Corporate HQ | Section 8.1(b)(iii) |
| Debtors | Preamble |
| Designated Deposit Accounts | Section 3.2(b)(i) |
| Distribution Centers | Recitals |
| Distribution Center Expenses | Section 4.1 |
| E-Commerce Platform | Section 8.9(a) |
| Events of Default | Section 14 |
| Expenses | Section 4.1 |
| Final Reconciliation | Section 8.7(b)(i) |
| Final Reconciliation Settlement Date | Section 8.7(b)(i) |
| Force Majeure Event | Section 8.8 |
| Hazardous Materials | Section 7.3 |
| Liquidation Sale Laws | Section 2(b) |
| Merchant | Preamble |
| Merchant's Designated Deposit Accounts | Section 3.2(b)(ii) |
| Merchant Sales Taxes Account | Section 8.3 |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 7.1 |
| Party(ies) | Preamble |
| Proceeds | Section 3.2(a) |
| Remaining Inventory | Section 3.2(d) |
| Retained Employee | Section 9.1 |
| Retention Bonuses | Section 9.4 |
| Returned Inventory | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Store(s) | Recitals |
| Store Advertising | Section 2(c) |
| Third-party | Section 4.1 |
| UCC | Section 15.11(a) |
| Vacate Date | Section 6.2 |
| Vacate Notice | Section 6.1(b) |
| WARN Act | Section 9.1 |

1.2    <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| <u>Exhibit</u> | <u>Section Reference</u> | <u>Description</u> |
|---|---|---|

| | | |
|---|---|---|
| Exhibit 1 | Recitals | Stores |
| Exhibit 2(a) | Section 2(a) | Sale Order Terms |
| Exhibit 3.2(b) | Section 3.2(b) | Merchant's Designated Account |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |

Section 2.    <u>Appointment of Agent/Liquidation Sale Laws/Sale Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the Initial Closing Date, but subject to entry of the Sale Order (which shall include those provisions listed in <u>Exhibit 2(a)</u> hereof and otherwise be in form and substance satisfactory to Agent), Merchant and Buyer jointly appoint Agent as Merchant's and Buyer's exclusive agent, pursuant to the terms of this Agreement, for the limited purpose of conducting the Sale and disposing of Additional Agent Inventory and Owned FF&E at the Stores, Distribution Centers and the Corporate HQ.

(b)    Upon the Initial Closing, Agent shall be authorized to use Store Advertising with respect to Stores and the Sale Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all law and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "<u>Applicable General Laws</u>"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar themed sales and permitting (collectively, the "<u>Liquidation Sale Laws</u>").  The Sale Order shall further provide that provided the Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Sale Order, and otherwise in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

(c)    <u>Advertisement</u>.  Agent shall be authorized to advertise the Sale as a "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale ("<u>Store Advertising</u>").  For the avoidance of doubt, Agent agrees with Buyer that during the Sale Term the Sale Advertising shall not include the right to use the sale theme "going out of business".

(d)    <u>Authority</u>.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant or Buyer that would (or reasonably be expected to) have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant or Buyer without Merchant's or Buyer's, as applicable, prior written consent.

Section 3.    <u>Payments</u>

3.1    <u>Use of POS System</u>.  To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales of Inventory and Additional Agent Inventory in the Stores, and Merchant and/or Buyer shall ensure that Agent shall have access and use of such point-of-sale system for the duration of the Sale Term.

3.2    <u>Control of Proceeds</u>

(a)    For purposes of this Agreement, "<u>Proceeds</u>" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Inventory made under this Agreement, in each case during the Sale

Term; (b) all proceeds from the sale or other disposition of Owned FF&E; (c) all proceeds from the sale of Additional Agent Inventory pursuant to Section 8.10 hereof; and (d) all proceeds of Merchant's insurance for loss or damage to Inventory arising from events occurring during the Sale Term, in each case, exclusive of Sales Taxes.  For the avoidance of doubt: (1) all proceeds from the sales at the Stores for periods prior to the Sale Commencement Date; and (2) all proceeds of Merchant's insurance for loss or damage to Inventory arising from events occurring prior to the Sale Commencement Date shall, in each case, not constitute "Proceeds" hereunder.  The Parties hereby agree that, as compensation for Agent's services hereunder, Agent shall receive and retain for its sole and exclusive benefit all Proceeds.

(b)    Upon the Initial Closing, all Proceeds shall be controlled by Agent in the manner provided for below:

(i)    Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card Proceeds) and proceeds of the sale of Additional Agent Inventory and Owned FF&E shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds (including all cash, credit card payments, checks and similar items of payment, deposits and any other amounts contemplated by this Agreement (including proceeds from the sale of Additional Agent Inventory and Owned FF&E), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  The Sale Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Sale Order, as applicable.  If, notwithstanding the provisions of this section, Merchant, Merchant's lender(s) or agent(s) receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent, such party shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent.  Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that are deposited into the Designated Deposit Accounts; and shall, to the extent requested by Agent, enter into deposit control agreement(s) for such accounts.

(ii)    Agent may establish its own accounts (including, without limitation, credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds), and  other amounts contemplated by this Agreement, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's deposit accounts ("Merchant's Designated Deposit Accounts") as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds, then Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts contemplated by this Agreement.  In the event Agent elects to continue to use Merchant's Designated Deposit

Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) and all other amounts contemplated by this Agreement shall be deposited into the Agency Accounts. If requested by Agent, each account shall be subject to an agreement between and among Agent and Merchant or Buyer (as applicable), and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant or Buyer, as applicable (a "Control Agreement"). If, notwithstanding the provisions of this Section 3.2(b), Merchant or Buyer receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent under this Agreement, Merchant or Buyer, as applicable, shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Buyer's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent. "Agency Accounts" shall not include Merchant's Citibank account containing accrued and unpaid professional fees held in escrow.

(iii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Additional Agent Inventory and Owned FF&E. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from the sale of Owned FF&E) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Inventory and Owned FF&E sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(iv)    Commencing on the first Business Day following the Sale Commencement Date, and continuing on each Business Day thereafter, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) that are deposited into the Designated Deposit Accounts for the prior day. Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any shortfall.

(v)    Title to all cash in the Stores on and as of the start of business on the Sale Commencement Date shall be transferred to Agent.

(c)    Bulk Sales. Agent shall be authorized to sell Inventory in bulk to one or more purchasers, in which case Merchant and/or Buyer shall execute any such customary and reasonably necessary documents of transfer prepared by Agent at Agent's sole cost and expense (provided that such

- 5 -

documents shall not expand Merchant and/or Buyer's liabilities or obligations).

(d)    Remaining Inventory.  To the extent that there is unsold Inventory remaining at the Sale Termination Date (the "Remaining Inventory"), such Remaining Inventory shall be deemed transferred to Agent free and clear of all liens, claims, interests and encumbrances of any kind or nature (other than Permitted Encumbrances (as defined in the APA)).  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Inventory with all logos, brand names, and other intellectual property on the Inventory intact, and shall be authorized to advertise the sale of the Remaining Inventory using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

Section 4.    Expenses of the Sale

4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant may review or audit the Expenses at any time.  As used herein, "Expenses" shall mean the Store-level operating expenses required for the Sale or sale of the Remaining Inventory, limited to the following:

(a)    actual Occupancy Expenses for the Stores on a per location basis consistent with those Occupancy Expense categories set forth in Exhibit 4.1(a) until the last day of the calendar month in which the applicable Sale Termination Date occurs;

(b)    actual wages and commissions for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked as well as payroll (including overtime) for any temporary employees/labor engaged for the Sale;

(c)    amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits) for Store-level Retained Employees used in the Sale, in an amount equal to eighteen percent (18%) of base wages for all Store-level Retained Employees (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    all costs and expenses associated with Agent's on-site supervision of the Stores, including, but not limited to, any and all fees, wages, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores, and all out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(f)    all costs and expenses associated with banners, sign-walkers, and interior and exterior signs that are produced for the Sale;

(g)    the promotional costs including, without limitation, email blasts, digital advertising, television, ROP, other advertising and direct mail attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores as may be required by Agent in the conduct of the Sale;

(i)    postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

       (j)      credit card and bank card fees, chargebacks, and discounts relating to the Sale;

       (k)      any and all costs of moving, transferring, or consolidating Inventory between the Stores;

       (l)      a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Inventory and the Stores;

       (m)      third-party payroll processing fees associated with the Sale;

       (n)      armored car service and security personnel;

       (o)      actual costs of the Designated Deposit Accounts (including Agent Accounts) attributable to the Sale Term, including bank fees and wire charges;

       (p)      Store cash thefts and other Store cash shortfalls in registers;

       (q)      all fees and charges incurred by Agent and Merchant to comply with Applicable General Laws in connection with the Sale, if applicable;

       (r)      Agent's costs and expenses associated with this Agreement, the APA, the Sale, or the transactions contemplated by this Agreement, including, without limitation, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

       (s)      Distribution Center Expenses;

       (t)      costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

       (u)      reserved; and

       (v)      the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

"Expenses" shall not include: (i) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Schedule 4.1(a) hereof to the extent actually incurred or (ii) any costs, expenses or liabilities other than the Expenses listed above. All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term. Notwithstanding anything to the contrary herein, to the extent that any Expense listed in Section 4.1 is also an Occupancy Expense, then Section 4.1(a) and Exhibit 4.1(a) shall control and such Expense shall not be double counted. There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense, and *provided*, in no event shall Agent be obligated to fund any amount that is otherwise expressly provided for in the APA Administrative Budget or Winddown Budget (each as defined in the APA) and that would constitute double counting of any Expense that is required to be funded under this Agreement. Notwithstanding anything herein to the contrary, other than in respect of Buyer's obligation to fund the APA Administrative Budget and Winddown Budget, respectively, under the APA, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses) incurred after the earlier of the Sale Termination Date or the applicable Vacate Date for the applicable Store, in each case other than in respect of Remaining Inventory.

As used herein, the following terms have the following meanings:

"<u>Distribution Center Expenses</u>" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including outbound freight) related to the processing, transfer, and consolidation of Inventory, Additional Agent Inventory, and supplies in the Distribution Centers and from the Distribution Centers to the Stores (and the provision of such services shall be referred to as collectively, the "<u>Distribution Center Services</u>").

"<u>Occupancy Expenses</u>" means those categories of expenses at the Stores as set forth on <u>Exhibit 4.1(a)</u> attached hereto, including any percentage rent obligations indicated thereon and incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term. Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Inventory assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on <u>Exhibit 4.1(a)</u> (the "<u>Non-CAM Trash Removal Charges</u>"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in <u>Exhibit 4.1(a)</u> hereof.

"<u>Third-party</u>" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2    <u>Payment of Expenses</u>.  Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds). All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; <u>provided</u>, <u>however</u>, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant, Buyer and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent, Buyer and/or Merchant may review or audit the Expenses at any time.

Section 5.    <u>Reserved</u>.

Section 6.    <u>Sale Term</u>.

6.1    <u>Term</u>.  The Sale shall be deemed to have commenced at each of the Stores on the Initial Closing Date (hereinafter, the "<u>Sale Commencement Date</u>").  Agent shall complete the Sale and vacate the premises of each Store in favor of Merchant or its representative or assignee on or before February 28, 2025 (the "<u>Sale Termination Date</u>").  The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "<u>Sale Term</u>."  The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Agent, Merchant and Buyer, or (b) accelerated by Agent, in which case Agent shall provide Merchant and Buyer with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "<u>Vacate Notice</u>").

6.2    <u>Vacating the Closing Stores</u>.  Subject to the terms of <u>Section 6.1</u> hereof, Agent shall provide Merchant and Buyer with not less than seven (7) days' advance written notice of its intention to vacate any

Store (as to each, as applicable, the "<u>Vacate Date</u>").  On the Vacate Date, Agent shall vacate such Store in favor of Merchant or its representatives or assignee and leave such Store in "broom clean" condition (ordinary wear and tear excepted), subject to Agent's right to abandon in place any unsold Inventory, Additional Agent Inventory, and unsold Owned FF&E).  Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue only until the earlier of the (a) applicable Vacate Date for such Store, or (b) Sale Termination Date.  Any reference in this <u>Section 6</u> to vacating the Stores means vacating the Stores, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean Merchant vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted.

Section 7.    <u>FF&E</u>.

7.1    <u>Disposition of Owned FF&E</u>.  Agent shall sell all FF&E owned by Merchant (collectively, the "<u>Owned FF&E</u>") and located at the Stores or Distribution Centers.  Agent shall be responsible for the payment of all expenses incurred in connection with the disposition of the Owned FF&E, and shall retain all Proceeds realized from the sale of such Owned FF&E.

7.2    <u>Abandonment of FF&E</u>.  Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to Merchant, Buyer or any third party.  For the avoidance of doubt, Agent shall not be authorized to abandon unsold FF&E that Agent or Merchant know is not owned by Merchant, and Merchant shall retain sole responsibility for the ultimate disposition thereof.

7.3    <u>Merchant FF&E Representations</u>.  All Owned FF&E may be sold by Agent on Merchant's and Buyer's behalf free and clear of all claims, liens and encumbrances of any kind (except for Permitted Encumbrances).  Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores or the Distribution Centers.  Agent shall have no liability to any party for any environmental action brought (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores or the Distribution Centers.  Merchant, and not Agent, shall be solely responsible to remove from the Stores all Hazardous Materials. For purposes of this Agreement, the term "<u>Hazardous Materials</u>" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 8.    <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent and Merchant</u>.  Agent shall be permitted to conduct and advertise the Sale consistent with the Sale Advertising throughout the Sale Term.  Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Sale Order, all governing laws and applicable agreements to which Merchant is a party.  Agent shall conduct the Sale in accordance with the Sale Guidelines annexed hereto as <u>Exhibit 8.1</u>, whether by in-store promotion, media advertising, or other promotional materials. Merchant shall have a right of access to the Stores at any time in the event of an emergency situation and

shall promptly notify Agent of such emergency.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a) to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; and will not extend the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant;

(b) to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment and leasehold improvements, (ii) bank accounts, (iii) Store-level, corporate headquarters ("Corporate HQ") and Distribution Center computer hardware and software, (iv) existing supplies located at the Stores, (v) intangible assets (including Merchant's intellectual property), (vi) Stores' and Corporate HQ's keys, case keys, security codes, passwords, and safe and lock combinations required to gain access to and operate the Stores, Corporate HQ and Distribution Centers, (vii) reasonably sized and placed office space at Corporate HQ to coordinate the management of the Sale; and (viii) any other assets of Merchant located at the Stores, Corporate HQ or Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c) to be provided by Merchant or Buyer, as applicable (at no additional cost to Agent) (i) such central services necessary or incident to the conduct of the Sale as provided for under the APA Administrative Budget and/or Winddown Budget, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale and (ii) to use all Intellectual Property Rights (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant and/or Buyer in order for Merchant and/or Buyer to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d) to establish Sale prices and implement advertising, signage (including A-frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Sale Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and signs, use of sign walkers and similar signage);

(e) to transfer Inventory and Additional Agent Inventory between the Stores at Agent's expense;

(f) to transfer and re-allocate Inventory and reserved;

(g) to conduct the Sale in accordance with the Sale Guidelines attached hereto as Exhibit 8.1; and

(h) subject to the provisions of Section 8.10 below, to include Additional Agent Inventory as part of the Sale.

8.2    Terms of Sales to Customers.  All sales of Inventory will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Inventory in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized credit and debit cards.  Agent shall clearly mark

all receipts for the Inventory sold at the Stores during the Sale Term, so as to distinguish such Inventory from the Inventory sold prior to the Sale Commencement Date.  Agent shall not warrant the Inventory in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.

8.3    Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to the Sale, including as indicated on Merchant's and/or Buyer's point of sale equipment (excluding for the avoidance of doubt taxes on net income) payable to any Taxing Authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Inventory, Additional Agent Inventory or other applicable property and collected by Agent, on Merchant's and Buyer's behalf, at the time of sale. All Sales Taxes indicated on Merchant's point of sale equipment or otherwise collected by Agent shall be deposited into a segregated account designated by Merchant solely for the deposit of such Sales Taxes ("Merchant Sales Taxes Account").  For the avoidance of doubt, Merchant will have payment authority on the Merchant Sales Tax Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.  For any Merchant Sales Taxes Accounts that Agent obtains control or payment authority over, Agent agrees to remit any funds in such Merchant Sales Taxes Accounts to Merchant. Merchant shall prepare and file all applicable reports and documents required by the applicable Taxing Authorities with respect to Sales Taxes incurred on transactions processed under Merchant's identification number(s), and Merchant shall promptly pay all such Sales Taxes from the Merchant Sales Taxes Account.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, Buyer, any Taxing Authority, or any other party, and Merchant and Buyer, as applicable, shall each indemnify and hold harmless Agent (severally but not jointly) from and against any and all costs, including, without limitation, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by such party to promptly pay such Sales Taxes to the proper Taxing Authorities and/or the failure by such party to promptly file with such Taxing Authorities all reports and other documents required by applicable law to be filed with or delivered to such Taxing Authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant and/or Buyer, as applicable, comply with their obligations hereunder, Agent shall indemnify and hold harmless Merchant and/or Buyer, as applicable, from and against any and all costs, including, without limitation, reasonable attorneys' fees, assessments, fines or penalties which Merchant and/or Buyer, as applicable, sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant and/or Buyer, as applicable, to file any requisite returns with such Taxing Authorities.

8.4    Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, and twine, but not gift certificates, rain checks, Inventory credits, or the like) located at the Stores at no charge to Agent.  In the event that additional supplies are required in any of the Stores and Agent requests such additional supplies, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies.

8.5    Returns of Inventory.  During the first twenty-one (21) days of the Sale, Agent shall accept returns of Inventory sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Inventory"); provided, that Agent shall not be obligated to accept any return where the purpose behind such return is for the customer to repurchase the same item so as to take advantage of the sale price being offered in connection with the Sale; provided, further, that anything herein to the contrary notwithstanding, Agent shall not be obligated to accept any return of Inventory sold through Merchant's E-Commerce Platform (except for sales of Inventory that are fulfilled by the Stores), regardless of whether such goods were sold before or after the Sale Commencement

Date. For any item of Returned Inventory that is NOT otherwise capable of being resold, Merchant shall reimburse Agent for the refund issued by Agent pursuant to the Weekly Sale Reconciliation for any given week.

8.6    Gift Cards; Inventory Credits; Membership Program.  During the first fourteen (14) days following the Sale Commencement Date, Agent shall accept Merchant's gift cards, gift certificates, Inventory credits and other similar Merchant-issued credits; provided, that Agent shall not accept any such items following such date.

8.7    Sale Reconciliation.

(a)    Weekly Reconciliation.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent, Buyer and Merchant shall cooperate to reconcile Expenses, Proceeds, sales of Additional Agent Inventory, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant and Agent.

(b)    Final Reconciliation.

(i)    Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Agent, Buyer and Merchant shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, proceeds of Owned FF&E, Expenses, and any other accountings required hereunder (the "Final Reconciliation").  Within seven (7) Business Days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "Final Reconciliation Settlement Date").  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the Parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.

(ii)    Once executed by Merchant, Buyer, and Agent, such Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Sale Order).  During the Sale Term, and thereafter until all of Merchant's, Buyer's and Agent's obligations under this Agreement have been satisfied, Merchant, Buyer, and Agent shall have reasonable access to Merchant's, Buyer's and Agent's records with respect to Expenses to review and audit such records.

(iii)    In the event that there is any dispute with respect to (x) the Final Reconciliation and/or (z) any other dispute relating to this Agreement, such dispute shall be promptly (and in no event later than the fifth (5th) Business Day following a request by either Merchant, Buyer or Agent) submitted to the Bankruptcy Court for resolution.

8.8    Force Majeure.  If any casualty, act of war or terrorism, act of God, or epidemic or pandemic) prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and the Inventory located at such Store shall in Agent's reasonable discretion (following consultation with Merchant and Buyer) be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent, Buyer and Merchant shall have no further rights or obligations hereunder with respect thereto and there shall not be any effect on the APA; provided, however, that the proceeds of any insurance attributable to such Inventory shall constitute Proceeds hereunder.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Inventory that is not the subject of insurance proceeds and include such Inventory in the Sale at other Stores.

    8.9    <u>E-Commerce Platform</u>.  (a)  Anything in this Agreement to the contrary notwithstanding, Agent shall not be entitled to conduct any sale of Inventory utilizing Merchant's existing e-commerce platform ("<u>E-Commerce Platform</u>") except for any sale of Inventory that is fulfilled by the Stores; <u>provided</u>, that Buyer agrees that it shall make available the www.biglots.com website and shall prominently display liquidation information requested by the Agent to be used for advertising and. Buyer shall maintain these websites at its own cost and expense at all times during the Sale Term to facilitate Agent's conduct of the Sale.

    (b)    Upon the occurrence of the Initial Closing and continuing to the end of the Sale Term, Buyer shall be deemed to have granted to Agent a temporary, irrevocable, royalty-free and non-exclusive license and right to use all Intellectual Property Rights, solely in connection with Agent's conduct of the Sale.  Without limiting the generality of the foregoing, Agent shall be authorized to use the Intellectual Property Rights to advertise and promote the Sale, including (without limitation) the hanging of customary liquidation sign packages and banners at the Stores and, the use of trade names, logos, trademarks, e-mail lists, customer lists, catalog recipient lists, loyalty card information, social media sites (including Facebook, Instagram, Twitter, Pinterest, TikTok, etc.) and E-Commerce Platform (whether or not the Sale is conducted through the E-Commerce Platform) for purposes of promoting the Sale. Buyer shall provide Agent with access to the E-Commerce Platform, as well as any technical support that is necessary or desirable for Agent to access or modify such platform to promote or conduct the Sale during the Sale Term; <u>provided</u>, that all such promotion utilizing the E-Commerce Platform, social media sites and other non-bricks and mortar retail channels formerly operated by Merchant shall be subject to the prior approval of Buyer.

    8.10    <u>Additional Agent Inventory</u>.

    (a)    Agent shall have the right to supplement the Inventory in the Sale with additional goods procured by Agent which are of like kind to the Inventory in the Sale ("<u>Additional Agent Inventory</u>"). The Additional Agent Inventory shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense) and Agent shall be responsible for all actual and documented costs and expenses incurred in connection with the receipt, shipping, delivery, processing and transfer of any Additional Agent Inventory. Sales of Additional Agent Inventory shall be run through Merchant's cash register systems; <u>provided</u>, <u>however</u>, Agent shall mark the Additional Agent Inventory using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Inventory from the sale of Inventory. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Inventory are marked in such a way that a reasonable consumer could identify the Additional Agent Inventory as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Inventory have been included in the Sale.

    (b)    Agent and Merchant intend that the transactions relating to the Additional Agent Inventory are, and shall be construed as, a true consignment in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Agent Inventory and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Inventory or their proceeds. The Additional Agent Inventory shall at all times remain subject to the exclusive control of Agent.

    (c)    Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Inventory and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Inventory, which amount shall be deemed an Additional Agent Inventory expense.

(d)     Merchant and Buyer acknowledge, and the Sale Order shall provide, that the Additional Agent Inventory shall be consigned to Merchant as a true consignment under Article 9 of the UCC. Merchant and Buyer further acknowledge and agree that Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Inventory and (ii) the Additional Agent Inventory proceeds, which security interest shall be deemed perfected pursuant to the Sale Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Inventory as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Inventory and Additional Agent Inventory proceeds).

Section 9.     <u>Employee Matters</u>.

9.1     <u>Merchant's Employees</u>.  Subject to the applicable provisions of the Sale Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store level employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, after consulting with Merchant, schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date.  Merchant covenants that it will use commercially reasonable efforts to provide a sufficient number of Retained Employees at each Store to conduct the Sale. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant, Buyer and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2     <u>Termination of Employees by Merchant</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant and Buyer at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; <u>provided</u>, <u>however</u>, that Agent shall notify Merchant and Buyer of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's actionable treatment of such Retained Employees as provided for in <u>Section 13.2</u> below.

9.3     <u>Payroll Matters</u>.  Subject to <u>Section 4.1</u> hereof, during the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to

- 14 -

the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount required under Section 4.1(b) and (c).

9.4    Employee Retention Bonuses.  To the extent not specifically provided for in either the APA Administrative Budget and/or Winddown Budget, Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately ten percent (10%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus, including timing of payments and to whom the payments will be made, plan within three (3) Business Days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

9.5    No Liability of Buyer.  All Retained Employees shall remain employees of Merchant and Buyer shall have no liability or responsibility with respect to any such employees, or Merchant and Agent's use of such employees.

Section 10.    Conditions Precedent.

10.1    Conditions to Agent's Obligations.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects (except where the failure of such representations and warranties to be so true would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform  its material obligations hereunder) and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Agent;

(d)    The Initial Closing shall have occurred;

(e)    This Agreement shall have been duly executed and delivered by all Parties; and

(f)    If necessary, Debtors shall have obtained an order approving its motion ("Lease Extension Motion") pursuant to Section 365(d)(4) of the Bankruptcy Code, inter alia, extending the Merchant's time to assume or reject the leases for the Stores to a date not sooner than the Sale Termination Date.

10.2    Conditions to Buyer's Obligations.  The willingness of Buyer to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions, unless specifically waived in writing by Buyer:

(a)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects (except where the failure of such representations and warranties to be so true would not reasonably be expected to have a material adverse effect on the ability of Buyer to execute and deliver this Agreement and perform its material obligations hereunder) and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)     No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement or the APA;

(c)     The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Buyer;

(d)     The Initial Closing shall have occurred; and

(e)     This Agreement shall have been duly executed and delivered by all Parties.

10.3     <u>Conditions to Merchant's Obligations</u>.    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions, unless specifically waived in writing by Merchant:

(a)     All representations and warranties of Agent hereunder shall be true and correct in all material respects (except where the failure of such representations and warranties to be so true would not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform its material obligations hereunder) and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date, in each case solely as a result of Agent's conduct;

(b)     The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Merchant;

(c)     The Initial Closing shall have occurred; and

(d)     This Agreement shall have been duly executed and delivered by all Parties.

Section 11.     <u>Representations, Warranties and Covenants</u>.

11.1     <u>Merchant's Representations, Warranties, and Covenants</u>.    Each entity comprising Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)     Such Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of its formation; (ii) has all corporate requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and to grant the rights intended to be granted herein as provided herein; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which any Store is located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform its material obligations hereunder.

(b)     Subject to the entry of the Sale Order, such Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated

- 16 -

hereby (collectively, together with this Agreement, the "Agency Documents") and to perform its obligations hereunder.  Subject to the entry of the Sale Order, such Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of such Merchant is required for such Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the issuance and entry of the Sale Order, each of the Agency Documents has been duly executed and delivered by such Merchant and constitutes the legal, valid, and binding obligation of such Merchant, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).  Subject to the entry of the Sale Order, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for such Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party that has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of such Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and any contracts or agreements identified by such Merchant to Agent on or prior to the Sale Commencement Date, no contract or other agreement to which such Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Except for the Bankruptcy Case and the matters set forth on Exhibit 11.1(c), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would have a material adverse effect upon the ability of Merchant to perform its obligations under this Agreement.

(d)     Subject to the provisions of the Sale Order, Agent shall have the right for the duration of the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores  and Distribution Centers.

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)     Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Each entity comprising Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of any entity comprising Agent for such entity to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by each entity comprising Agent and constitutes the legal, valid, and binding obligation of such entity enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy,

insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).  No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for each entity comprising Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which any entity comprising Agent is a party or by which any entity comprising Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against any entity comprising Agent, or has been settled or resolved, or to the knowledge of any entity comprising Agent, has been threatened against or affects any such entity, which questions the validity of this Agreement or any action taken or to be taken by any such entity in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the ability of any entity comprising Agent to perform its obligations under this Agreement.

(d)    Agent will have at the Initial Closing and at any time payments are required to be made by Agent hereunder or under the APA sufficient funds available in cash to pay the Expenses and any fees and expenses incurred by or otherwise required to be paid by Agent in connection with the Sale and the disposition of the Owned FF&E in the Stores and Distribution Centers pursuant to this Agreement and the transactions contemplated by this Agreement.

Section 12.    <u>Insurance</u>.

12.1    <u>Worker's Compensation Insurance</u>.  Merchant shall continue until the Sale Termination Date, in such amounts as Merchant currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.2    <u>Agent's Insurance</u>.  As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.3    <u>Other Insurance</u>. Notwithstanding the foregoing, and subject to any restrictions that may be set forth in the APA, Merchant may modify any insurance to the extent that it is not required for the operation of the Stores.

Section 13.    <u>Indemnification</u>.

13.1    <u>Merchant Indemnification</u>.  Merchant and Buyer shall, severally as to themselves only, indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation,

reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's or Buyer's, as applicable, breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant (for which Merchant shall have the indemnity obligations hereunder) or Buyer (for which Buyer shall have the indemnity obligations hereunder), to pay any Sales Taxes to the proper Taxing Authorities or to properly file with any Taxing Authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant or Buyer, as applicable, to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Inventory; (v) any liability or other claims asserted by customers, any of Merchant's or Buyer's, as applicable, employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation, or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or Buyer, as applicable, or any of their respective representatives (other than Agent); (vii) in the case of Buyer, any failure of Buyer to pay to any expenses during the Sale Term to the extent provided for under either the APA Administrative Budget and/or Winddown Budget, as applicable; (viii) reserved; and (ix) the gross negligence (including omissions) or willful misconduct of Merchant or Buyer, as applicable, or their respective officers, directors, employees, agents (other than Agent) or representatives; provided, that, in each case of clauses (i) – (viii), Merchant shall not have any indemnification obligations with respect to any Assumed Liabilities (as defined in the APA).

13.2    Agent Indemnification.    Agent shall indemnify and hold Merchant and Buyer and their officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement (including any failure to pay Expenses as required hereunder); (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant or Buyer, as applicable, by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Inventory; (v) as set forth in Section 8.3 above; (vi) reserved; and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)    Merchant's, Buyer's, or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured ten (10) business days after receipt of written notice thereof to the defaulting party; or

(b)    subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) Business Days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

- 19 -

Section 15.    <u>Miscellaneous</u>.

     15.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

     If to Merchant:

          c/o Big Lots, Inc.
          4900 E. Dublin-Granville Road,
          Columbus, Ohio 43081
          Attn:    Rocky Robins
                 Jonathan Ramsden
          E-mail: rrobins@biglots.com
                 jramsden@biglots.com

          with a copy (which will not constitute notice) to:

          Davis Polk & Wardwell LLP
          450 Lexington Avenue
          New York, NY 10017
          Attn: H. Oliver Smith
               Brian Wolfe
               Brian Resnick
               Adam L. Shpeen

          E-mail: oliver.smith@davispolk.com
                brian.wolfe@davispolk.com
                brian.resnick@davispolk.com
                adam.shpeen@davispolk.com

     If to Agent:

     Gordon Brothers Retail Partners, LLC
     101 Huntington Avenue, 11th Floor
     Boston, MA 02119
     Attn:    Rick Edwards, Head of North America Retail
             David Braun, Senior Transaction Counsel
     Email:  redwards@gordonbrothers.com
             dbraun@gordonbrothers.com

     With a copy to (which shall not constitute notice):

     Riemer & Braunstein LLP
     Times Square Tower
     Seven Times Square, Suite 2506
     New York, NY 10036
     Attn:    Steven E. Fox
     Email:  sfox@riemerlaw.com

If to Buyer:

- 20 -

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Avenue, 11th Floor
Boston, MA 02119
Attn:    Rick Edwards, Head of North America Retail
         David Braun, Senior Transaction Counsel
Email:  redwards@gordonbrothers.com
        dbraun@gordonbrothers.com

With a copy (which will not constitute notice) to:

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn:    Steven E. Fox
Email:  sfox@riemerlaw.com

15.2    <u>Governing Law; Consent to Jurisdiction</u>.

(a)    This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to conflicts of laws principles thereof.

(b)    The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

15.3    <u>Entire Agreement</u>.  This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Sale Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

15.4    <u>Amendments</u>.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of Merchant and Agent.

15.5    <u>No Waiver</u>.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent, Buyer, and Merchant and their respective successors and permitted assigns, including, without limitation, any chapter 11 or chapter 7 trustee; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by Merchant, Buyer, or Agent to any party without the prior written consent of the other; <u>provided</u>, <u>further</u>, <u>however</u>, that Agent shall have the right to syndicate this Agreement upon notice to (but not consent of) Buyer and Merchant, but Agent shall remain liable under this Agreement notwithstanding such syndication.

- 21 -

15.7    Execution in Counterparts.  This Agreement or any of the other Agency Documents may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. This Agreement may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature delivered by electronic method of transmission (including a "pdf" by email). Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement.

15.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9    Survival.  All representations, warranties, covenants and agreements made herein shall terminate as of the Initial Closing.

15.10    Termination.    This Agreement may be terminated at any time before the Sale Commencement Date as set forth below; provided, however, that any payments made to Merchant hereunder prior to termination shall not be refunded or in any way unwound:

(a)    by mutual written consent of the Merchant and the Agent;

(b)    automatically and without any action or notice by either Agent or Merchant, immediately upon the occurrence of any of the following events:

(i)    the issuance of a final and non-appealable order by any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state thereof, any foreign government or state or any municipal or other political subdivision thereof to restrain, enjoin, or otherwise prohibit the transfer of the assets contemplated hereby; or

(ii)    approval by the Bankruptcy Court of, or the filing by or on behalf of Merchant of a motion or other request to approve, any financing, refinancing, acquisition, divestiture, public offering, recapitalization, business combination or reorganization of or involving all or a material portion of, collectively, the Inventory and Owned FF&E (other than any transaction with Agent or an affiliate of Agent) or any standalone plan of reorganization for Merchant involving the retention of all or a material portion of, collectively, the Inventory and the Owned FF&E (an "Alternative Transaction"); or

(iii)    Merchants' Bankruptcy Cases being converted into a case under Chapter 7 of the Bankruptcy Code or dismissed.

(c)    upon written notice by Agent if the condition set forth in Section 10.02 of the APA has not been satisfied.

(d)    upon written notice by Merchant if Merchant is not in material breach of this Agreement and there has been a material violation or breach by Agent of any representation, warranty, covenant or agreement contained in this Agreement that (A) has not been waived by Merchant, and (B) is

- 22 -

not capable of being cured or, if capable of being cured, is not cured in all material respects within ten (10) business days following receipt by Agent of notification thereof.

In the event that this Agreement is validly terminated as provided herein, then each of the Parties to this Agreement shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that nothing in this Section 15.10 shall be deemed to release any party from liability for any breach of its obligations under this Agreement prior to such termination.

15.11    Agent's Security Interest.

(a)    Effective upon payment by Buyer of the Purchase Price at the Initial Closing, Merchant shall be deemed to have granted to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Inventory; (ii) all Proceeds (including, without limitation, credit card Proceeds); and (iii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Sale Order, and payment by the Buyer of the Purchase Price, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing Uniform Commercial Code financing statements or any other documentation. For purposes of this Agreement, "UCC" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

(b)    Without any further act by or on behalf of the Agent or any other party (including (without limitation) any Lender or the Merchant), the Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created; (ii) effective upon entry of the Sale Order, perfected; and (iii) senior to all other liens and security interests.  Merchant and Buyer shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)    Merchant will not grant any security interest in any of the Agent Collateral other than in favor of the Agent.

(d)    In the event of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

15.12    Third Party Beneficiaries.  This Agreement shall not be deemed to confer any rights or remedies upon any person or entity (including any landlord of Merchant) that is not a party hereto.

15.13    Wiring of Funds.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a Business Day, then such payment shall be made by wire transfer on the next Business Day.

15.14    Nature of Remedies.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under Sections 3 and 11 shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in

exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

15.15   <u>Further Assurances</u>.   From time to time, and without further consideration, each of Merchant and Agent covenants and agrees that each such party shall execute and deliver, or shall cause to be executed and delivered, such other instruments of transfer and conveyance and other documents and take such other actions as the other party may reasonably request as necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement (including satisfaction of all closing conditions that are within the control of Merchant or Agent, as applicable, and reasonably cooperating with the Sale), and shall lend all reasonable assistance to the other party in conducting the Sale and otherwise in the carrying out of the intentions and purposes of this Agreement.  Each of Merchant and Agent further covenants and agrees that it shall promptly deliver to the other party all such information and documents as such party shall reasonably request in connection with the Sale.

*[Remainder of Page Intentionally Blank;
Signatures Appear Next Page]*

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

Name: _____

Title: _____

*[Signatures Continued Next Page]*

- 25 -

**BUYER:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
Name: _____
Title: _____

**MERCHANT:**

**BIG LOTS, INC.**

By: _____
Name: _____Bruce K. Thorn_____
Title: __President and Chief Executive Officer__

**BIG LOTS STORES, LLC,**

By: _____
Name: _____Bruce K. Thorn_____
Title: __President and Chief Executive Officer__

**EXECUTION VERSION**

## EXHIBIT 2.1(a)

The Sale Order shall provide, and otherwise be satisfactory to Agent, _inter alia_, that:

(i)      The Agreement (and each of the transactions contemplated thereby, including without limitation the Sale) is approved in its entirety pursuant to Section 363 of the Bankruptcy Code;

(ii)     The Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

(iii)    Merchant's decisions to (a) enter into the Agreement and (b) perform under and make payments required by the Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(iv)    The Agreement was negotiated in good faith and at arm's length between the Buyer, Merchant and Agent, and that Agent is entitled to the protection of Sections 363(m) and 364(e) of the Bankruptcy Code;

(v)     Agent's performance under the Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(vi)    Buyer, Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement the Agreement and each of the transactions contemplated thereby (including, without limitation, the Sale and completing the Final Reconciliation);

(vii)   Agent, as agent for Buyer and Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale consistent with the Sale Advertising;

(viii)  Agent shall be entitled to sell all Inventory and Owned FF&E hereunder free and clear of all liens, claims, interests or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Inventory, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching, as applicable, only to the Purchase Price under the APA;

(ix)    (A) During the Sale Term, and for purposes of conducting the Sale, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each Store, Distribution Center and the Corporate HQ and the assets currently located at the Stores, in each case subject to the extent of Merchant's or Buyer's rights and entitlement to use the same, and the services provided at such Stores to the extent Merchant is entitled to such services, and (B) Merchant shall not assign, reject or otherwise terminate any lease or other occupancy agreement relating to any such Stores or vacate any such Stores until the applicable Sale Termination Date or Vacate Date.

(x)     Agent shall have the right to use the Stores, Distribution Centers and Corporate HQ and all related services, furniture, fixtures, equipment and other assets of Merchant as designated under the Agreement for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Sale Order;

(xi)    All newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Sale Order as binding and to allow Buyer, Merchant and Agent to consummate the transactions provided for in the Agreement, including, without limitation, the conducting, promoting, and advertising of the Sale in the manner contemplated by the Agreement;

(xii)    All utilities, internet service providers, website service or hosting providers, landlords, creditors, governmental authorities, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(xiii)    Agent shall not be the successor to Merchant, or any predecessor or affiliate of Merchant, and Agent will not assume, or in any way be liable or responsible for, any claim or liability, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent or not, whether at law or in equity or otherwise, whether existing on the date hereof or arising thereafter and whether relating to or arising out of Merchant's businesses, the Inventory, the Owned FF&E or otherwise;

(xiv)    Any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims;

(xv)    Agent shall be granted a valid, binding, enforceable and perfected security interest and lien as provided for in the Agreement without the necessity of filing financing statements or other steps to perfect the security interest or lien (other than entry of the Sale Order);

(xvi)    In the event any of the provisions of the Sale Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the Sale or the liens or priority authorized or created under this Agreement or the Sale Order;

(xvii)    (A) The terms of the Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under chapter 7 or chapter 11 of the Bankruptcy Code (a "Trustee"); (B) any such Trustee shall be authorized and directed to operate the business of Merchant to the fullest extent necessary to permit compliance with the terms of the Agreement and to allow for Agent's continued conduct of the Sale; and (C) Agent and any such Trustee shall be authorized to perform under the Agreement without the need for further order of the Bankruptcy Court;

(xviii)    The application of any automatic stay of immediate enforcement of the Sale Order is waived;

(xix)    The Sale Order constitutes an authorization of the conduct of Buyer, Merchant and Agent in connection therewith;

(xx)    The sale by Agent of Additional Agent Inventory in the course of Agent's conduct of the Sale shall be authorized; and

(xxi)    The Bankruptcy Court shall retain jurisdiction over the Parties to enforce this Agreement.

## **EXHIBIT 2**

Agency Agreement

*See* Exhibit H to GBRP APA