# EXHIBIT A

# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement') is entered effective as of July 9, 2024 ("Effective Date"), by and between Horizon Media LLC, a New York limited liability company with an address at 75 Varick Street, New York, NY 10013 ("Contractor"), and Big Lots Stores, LLC, an Ohio limited liability company with an address at 4900 E. Dublin Granville Road, Columbus, OH 43081 ("Big Lots").

In consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

**1.     Definitions.**  Capitalized terms used in this Agreement will have the meanings ascribed to such terms in this Section 1 or elsewhere in this Agreement.

1.1     "Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a party.  "Control," including the terms "controlling," "controlled by" and "under common control with," for purposes of this definition, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, through membership, by contract or otherwise.

1.2     "Applicable Law" means any applicable international, federal, state or local law, rule, regulation, or guideline, including, without limitation those related to labor, employment, data security, privacy, consumer engagement, marketing, advertising, e-mail, telecommunications, consumer protection, anti-bribery, and anti-corruption.

1.3     "Authorized Person(s)" means a party's employees, contractors, agents, legal counsel and auditors who: (a) have a need to know or otherwise access the other party's Confidential Information in order to enable the receiving party to perform its obligations or exercise its rights under this Agreement; and (b) are bound by confidentiality obligations sufficient to protect the disclosing party's Confidential Information in accordance with the terms of this Agreement.  In cases where the Big Lots' Confidential Information being provided or accessed includes PII, Contractor's employees, contractors, agents, legal counsel and auditors, including, without limitation, Contractor Personnel, will not be considered Authorized Persons, unless the provisions of Sections 1.3(a) and (b) are satisfied and an officer of Big Lots has consented in writing and in advance to such disclosure or access and the list of Authorized Persons.  The list of Authorized Persons will be reviewed by the parties for appropriateness at least once per quarter.

1.4     "Background Policy" means Big Lots' then current contractor background screening policy.

1.5     "Big Lots Indemnified Party(ies)" means Big Lots, its Affiliates, and their respective officers, directors, contractors, employees and agents.

1.6     "Big Lots Marks" means all names, trademarks, trade names, logos and service marks of Big Lots and its Affiliates.

1.7     "Big Lots Systems" means all hardware, software, service subscriptions, systems, applications, networks and communication services and devices, including, but not limited to desktop computers, laptop computers, mobile computing devices, storage devices, servers, network switches, network routers, e-mail, data, voicemail, telephone, and Internet, owned, leased, licensed or controlled by Big Lots or operated by a third-party on behalf of Big Lots.

1.8     "Cardholder Information" means any PII that includes: (a) with respect to a payment card, the account holder's name, account number, service code, card validation code/value, PIN or PIN block, valid to and from dates and magnetic stripe data; and (b) information relating to a payment card transaction that is identifiable with a specific account.

1.9     "Confidential Information" means records, documents, information and data, whether oral, written or demonstrative, concerning the other party's business, including, without limitation, information regarding the other party's technology, customers, products, employees, vendors, financials, and/or strategy,

together with analyses, compilations, studies, summaries, extracts or other documents or records prepared by or on behalf of the receiving party that contain or otherwise reflect or are generated therefrom.  Without limiting the generality of the immediately preceding sentence, any PII: (a) provided to Contractor, or to which Contractor was granted access, by or on behalf of Big Lots; or (b) otherwise Processed by Contractor on behalf of Big Lots, in connection with Services provided under this Agreement, will be considered Big Lots' Confidential Information.  Confidential Information does not include information that: (i) was generally available to the public at the time of disclosure; (ii) became generally available to the public after disclosure to the receiving party other than as a result of the receiving party's breach of this Agreement; (iii) was, at the time of disclosure, already lawfully in the receiving party's possession without restriction from a third party that was under no obligation to maintain such information in confidence; or (iv) was independently developed by the receiving party without access to or use of the disclosing party's Confidential Information and the receiving party has documentation evidencing same.

1.10    "Contractor Materials" means code, software programs, processes, methodologies, algorithms, documentation, materials, and related know-how and residual knowledge, that: (a) Contractor owned or licensed prior to the Effective Date; or (b) Contractor independently developed outside of the scope of this Agreement and any SOW; and (c) do not include or use, directly or indirectly, Big Lots Property or Work Product.

1.11    "Contractor Personnel" means all employees, consultants, agents, contractors and representatives of Contractor, its Affiliates or any subcontractor of Contractor or its Affiliates.

1.12    "Contractor Facilities & Systems" means any facility, physical storage system, or other system, including, without limitation, desktop computers, laptop computers, software, computer networks, servers, storage devices, or mobile computing devices, owned, leased, licensed or controlled by Contractor or operated by a third party on behalf of Contractor, in, on or through which Contractor or Contractor Personnel Process Big Lots' Confidential Information, whether in electronic or hard copy.

1.13    "DSA" means Data Security Addendum as agreed in Exhibit B.

1.14    "Excluded Tax(es)" means any Tax other than a Transaction Tax.

1.15    "Fees" means the compensation due to Contractor in connection with the Services as determined in accordance with this Agreement and the relevant Scope(s) of Work. For the avoidance of doubt, the Fees do not include Expenses or Third Party Costs.

1.16    "Intellectual Property Rights" means all of the following:  (a) patents, patent applications and related patent rights, including but not limited to divisional, continuations, continuations-in-part, and continued prosecution applications, and reissues thereof; (b) rights associated with works of authorship including moral rights, copyrights, and registrations therefor; (c) rights relating to trade secrets and Confidential Information; (d) rights relating to the protection of trademarks, service marks, design marks (including logos), trade names and World Wide Web addresses (including URLs, directory names included in or read by browser technology, or their successors); and (e) any other intellectual and industrial property and proprietary rights, in the United States or elsewhere.

1.17    "Losses" means any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, and fees, costs and expenses of whatever kind, including, without limitation, reasonable attorneys' fees, court costs and expert witness fees.

1.18    "Malicious Software and Code" means any software, or code in any part of a software system or script, that is intended to cause undesired effects, security breaches or damage to Big Lots Systems, including without limitation, any worm, virus, trojan horse, spyware, adware, self-destruct or other device, as such terms are understood in the computer industry.

1.19    "Media" means all platforms upon which Media Placements are placed that now exist or may hereinafter be invented, including television, radio, print, outdoor, Internet, and mobile.

1.20 "Media Vendor" means any Person, including its Affiliate who owns or controls the point of display for any Media Placement.

1.21 "Media Placement" means advertising, sponsorship or promotional Media purchased or provided in connection with the provision of Services. Payments for Media Placements may take any form, including cash, credits, or the transfer of funds by digital means.

1.22 "Person" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, governmental authority or other entity.

1.23 "PII" means personally identifiable information as defined under applicable US state privacy laws, such as the California Consumer Privacy Act ("CCPA") or as amended, and includes any information that, either individually or when combined with other information, identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with an identifiable individual.

1.24 "Process" (including "Processes" and "Processed") means collect, receive, access, store, maintain, use, transmit, disclose, dispose, and otherwise process.

1.25 "Rebates and Incentives" means any money, credit note, inventory, promotional space or opportunities or other product, service or benefit that has value which is provided, conferred by or earned from a Media Vendor which arises directly or indirectly as a result of or in connection with a Contractor's arrangements or negotiations in connection with (a) Big Lot's spend or (b) spend of all or a portion of Contractor clients (which include Big Lots or which do not specify by name which clients receive such benefit), including agreements for volume or share of market commitments. Following formula will be used for calculating Big Lot's share:  the pro-rated share of the total rebates and incentives in a given Big Lots' fiscal year, the numerator of which is Big Lots' total spending placed via the Contractor with each Vendor and the denominator of which is the total aggregate spending by Contractor with such Vendor. Where a Rebate and Incentive is free or discounted inventory, Rebates and Incentives shall mean the pro-rated share of such inventory at a day part/quality mix consistent with the average mix with the same Media Vendor, or if the Contractor consents, the revenue generated by the Contractor Affiliate from the sale of such inventory to a third party.

1.26 "Security Breach" means: (a) any actual or reasonably suspected unauthorized use, acquisition, or disclosure of, or unauthorized access to, Big Lots' Confidential Information when on or in Contractor Facilities & Systems or otherwise in the possession, care, custody or control of Contractor, Contractor Personnel, or any Authorized Person; (b) any act or omission that compromises the security, confidentiality, or integrity of Big Lots' Confidential Information or any Contractor Facilities & Systems; (c) a breach or alleged breach of this Agreement relating to the data security or privacy practices of Contractor or any Authorized Person; or (d) receipt of a complaint regarding the privacy practices of Contractor or any Authorized Person.

1.27 "Specifications" means the technical and functional descriptions, specifications and requirements describing Work Product and its operation as set forth in the applicable SOW or otherwise in documentation provided by Contractor to Big Lots.

1.28 "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

1.29    "Third Party Costs" means all Media Vendor costs and reasonable expenses incurred in connection with the Services which are authorized by Big Lots in accordance with this Agreement. All Third Party Costs shall be passed through without any mark-up or margin.

1.30    "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale transaction; (b) levied upon the seller or purchaser; (c) can be legally collected from the purchaser; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser.

1.31    "Work Product(s)" means all deliverables, materials and results, whether tangible or intangible, complete or partially complete, including, without limitation code, software, programs, designs, processes, methodologies, algorithms, documentation, materials, products, development, testing, maintenance, training, discoveries, ideas, inventions (whether or not patentable), reports, technologies, concepts, formulas, and know-how, conceived, created, provided or reduced to practice by or on behalf of Contractor, whether alone or with others, in connection with the Services, this Agreement or any SOW.

**2.    Services.**

2.1    <u>Statements of Work</u>.  Contractor will provide Big Lots with certain services (the "Services") and Work Product specified in one or more Statements of Work referencing this Agreement, which, upon execution by both parties, will be automatically incorporated into this Agreement (each a "SOW" and collectively the "SOWs").  A sample SOW form is attached hereto as Exhibit A.  Big Lots and Contractor agree that any Big Lots' Affiliate may enter into a SOW with Contractor pursuant to this Agreement and, by executing any such SOW, the subject Affiliate will have all of the rights and obligations of Big Lots under this Agreement as if it were an original party hereto.  Contractor will secure Big Lots' approval before making any expenditures or commitments on Big Lots' behalf or before releasing any material created or prepared by Contractor to the Media, it being agreed that approval of final produced materials shall constitute approval to release such materials to media.  Written approval of production and/or media cost estimates by Big Lots will constitute approval of the costs and charges included therein.

2.2    <u>Change Orders</u>.   Any change to or modification of a SOW, including, without limitation, the scope of services or fees, will not become effective unless and until both parties have executed a written amendment to the subject SOW, which sets forth the agreed upon change or modification ("Change Order").

2.3    <u>Order of Precedence</u>. In the event of a conflict between the terms of this Agreement or the terms of a SOW, the terms of this Agreement will prevail, except as otherwise provided herein.

2.4    <u>Timetable</u>. Contractor will provide Services according to the timetable set forth in the applicable SOW.  In the event Contractor anticipates, at any time, that it will not reach one or more milestones or make deliveries according to the scheduled timetable, Contractor will immediately so inform Big Lots by written notice, submitting proposed revisions to the timetable and milestones that reflect Contractor's best estimate of what can be achieved, and continue to work under the original timetable and milestones until the parties execute a Change Order.

2.5    <u>Testing & Acceptance</u>.  Unless otherwise specified in the applicable SOW, testing and acceptance criteria for Services and Work Product will be as provided herein.  Big Lots may test, or request Contractor to test, each Work Product and the Work Products together as an entire system, to ensure conformance with the acceptance criteria in the applicable SOW and the Specifications.  Big Lots will accept Work Product, except in the event of non-conformance as described in this Section 2.5.  In the event testing reveals that a Work Product does not meet the applicable acceptance criteria and/or Specifications, Big Lots agrees to identify in writing to Contractor (email will suffice), with reasonable specificity, the nature and events surrounding the non-conformance (the "Non-Acceptance Notice").  Upon receipt of the Non-Acceptance Notice, Contractor will correct the identified non-conformance as soon as commercially practicable, but in no event more than thirty (30) days' after the date of the Non-Acceptance Notice ("Cure Period").  If Contractor fails to correct the non-conformance within the Cure Period, Contractor will be deemed to be in material breach of this Agreement and the applicable SOW.

2.6     Facilities & Supplies.  If a SOW provides that Contractor Personnel will perform Services on-site at Big Lots' Premises (defined below), then, to the extent reasonably requested by Contractor, Big Lots will supply such Contractor Personnel with office space, desks, storage, furniture and other normal office equipment, including computer workstation, printer, telephone service, and general office supplies.  Big Lots will not be responsible or liable for any theft of or loss to the personal property of any Contractor Personnel while on-site at Big Lots' Premises.  Except as provided in this Section 2.6 or in a SOW, Contractor, at its own cost, will furnish all facilities, tools, equipment and materials necessary for the performance of Services.

2.7 Reporting. Contractor shall prepare and submit written reports as part of Services, at no additional costs, to Big Lots on a monthly basis as agreed in the in the format agreed in the SOW. In addition, Big Lots has the right to request additional reports as it may deem fit, from time to time from Contractor, at no additional cost, in order to establish the Contractor's compliance (or otherwise) with its obligations under this Agreement. Any reporting requirement may only be waived by approval given by Big Lots.

## 3.     Fees & Payment.

3.1     Fees. Big Lots agrees to compensate Contractor for Services and Work Product provided under this Agreement as specified in the applicable SOW.

3.2     Expenses. Big Lots will reimburse Contractor for reasonable out-of-pocket expenses actually incurred by Contractor and necessary to complete Services under the applicable SOW (the "Expenses"), provided that: (a) with regard to travel Expenses, Big Lots will reimburse Contractor for coach class airfare, hotel accommodations and per diem meal expenses; (b) Expenses must be detailed as separate line items on the invoice therefor; and (c) any Expense that is greater than $500 must be preapproved in writing by Big Lots. If applicable, the SOW must include an estimate of Expenses.

3.3     Sequential Liability, Invoicing and Payment. All Media approved in writing by Big Lots that Contractor places directly on behalf of Big Lots will be placed in liability of Big Lots and all contracts and affidavits from Media Vendors will state "in care of Horizon Media". Prior to Contractor placing such media, Contractor will require Big Lots to execute a sequential liability letter with the Media Vendor that acknowledges that Big Lots is solely liable to pay for the media until such time as Big Lots has paid Contractor, at which time Contractor becomes solely liable for payment to such Media Vendor.  Only if agreed in the applicable SOW, should any Media Vendor require cash in advance or require that Media be placed in sole liability of an advertiser, prior to placing the Media Vendor will either require Big Lots to pay in advance or have Big Lots execute the appropriate liability document requested by the Media Vendor. Notwithstanding the foregoing, the principle of sequential liability applies to all media Contractor places on behalf of Big Lots with any Media Vendor, whereby Big Lots is solely liable to pay for the media until such time as Big Lots has paid Contractor, at which time Contractor becomes solely liable for payment to such Media Vendor. Unless otherwise specified in a SOW, on a monthly basis Contractor will invoice Big Lots monthly for Services performed and Expenses incurred at the end of the month for  preceding month of service.  Each invoice will separately itemize: (a) charges by location for each Service rendered; (b) any Services that are training Services (by location); and (c) any lawfully imposed Transaction Taxes.  Contractor's invoices will contain the content and be in the format requested by Big Lots to support Big Lots' business practices and facilitate efficient integration into Big Lots' enterprise business systems. Upon Big Lots' request, Contractor will provide backup materials and documentation supporting charges in the subject invoice. Contractor will bill Big Lots, or an Affiliate on its behalf, for media costs on estimate at the end of the month in which the Media is scheduled to run and Big Lots, or an Affiliate on its behalf, will pay undisputed amounts reflected in Contractor invoices issued in accordance with the terms of this Section 3.3 and the applicable SOW within thirty (30) days after the date Big Lots receives the subject invoice.  Within approximately ninety (90) days following the completion of the month in which the media appears, Contractor shall furnish Big Lots with a statement reconciling actual net costs and any applicable Contractor fees with the estimated payments made. If the reconciliation statement shows a balance due to Contractor, Big Lots shall remit payment of such amount to Contractor within 30 days of the receipt of the reconciliation statement. Any balance due to Big Lots can be applied to subsequent estimated billing payments due to Contractor from Big Lots. Big Lots will not make any payment to Contractor until Contractor provides Big Lots with a duly executed federal Form W-9.  If, at any time during the term of this Agreement, Contractor's Services may be provided in or attributed, assigned, or otherwise sourced to, California, or any other state or jurisdiction where Big Lots may be deemed a withholding agent related to

payments to Contractor hereunder, Contractor must timely notify Big Lots of same and provide Big Lots with a duly executed California Form 590, or its successor or progeny, and/or other subject states' or jurisdictions' withholding exemption form, as applicable, and no payment will be made to Contractor until such duly executed forms are provided. Big Lots will have no obligation to pay Contractor any fees for Services invoiced later than sixty (60) days after: (i) invoice date(s) provided for in the applicable SOW and, if none, the date of termination or expiration of the applicable SOW, for Services rendered on a fixed fee basis; and (ii) the date on which the Services being invoiced were provided, for Services rendered on a time and materials basis. Big Lots will have no obligation to pay Contractor for Expenses invoiced later than one-hundred and eighty  (180) days after the date such Expenses were incurred.

3.4    Taxes.  The fees for Services do not include any amount for Transaction Taxes.  Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement. For purposes of clarity but without limiting the foregoing, Contractor acknowledges that it may have gross receipts, license and/or income Tax obligations where the fees receipt or revenue for Services, or the benefit thereof, may be assigned under applicable Tax law.  Any Taxes or license fees imposed on Contractor's fees or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes will not be construed as Transaction Taxes and are Excluded Taxes and will not be an itemized charge on any invoice.  The titleholder of any property shall be responsible for any applicable property Tax that may be imposed.  Contractor and Big Lots will, and will cause their respective Affiliates and subcontractors to, reasonably cooperate in good faith on all Tax matters including, without limitation, configuration and format of invoices.

3.5    Records.  Contractor will maintain books, records, documents and other evidence detailing and supporting fees and Expenses charged, including, without limitation, time spent by each individual Contractor Personnel who performed Services under this Agreement (the "Records").  Contractor will make the Records available to Big Lots, either remotely or at Contractor's offices, during standard business hours upon at least ten (10) calendar days' prior written notice, no more than once a year during each calendar year during the term of this Agreement and when there is Security Breach, and for a period of one (1) year thereafter, for inspection, audit or reproduction by Big Lots or its representative. Should Big Lots engage an independent third-party auditor to conduct an audit under this Section 3.5 the parties agree that the auditor's compensation will not be on a contingency basis (*i.e.*, dependent on the audit findings).. For clarity, the reconciliation process described in Section 3.3 shall not be considered as inspection for the purposes of this Section 3.5.

3.6. Markups. Marking up of Third-Party Costs and Expenses (either when invoicing Big Lots direct or when invoicing the Contractor for onward invoicing to Big Lots or in respect of transactions, dealings or arrangements between Contractor or Media Vendor which are ultimately the subject of an invoice presented to Big Lots) is not permitted.

3.7 Rebates and Incentives. i)    Contractor shall always disclose and pass on such Rebates and Incentives received or receivable by it on any Big Lots' spending for Media Placements in accordance with this Agreement.

ii)    Big Lots shall receive the Rebates and Incentives in the same form as they are earned or received, however Big Lots reserves the right to receive the Rebates and Incentives in any other manner including credit note issued against old invoices, credit note against future Media Placements, or invoiced for payment by Contractor).

iii)    Except to the extent prohibited by any mandatory laws in the United States prohibiting the passing on of Rebates and Incentives to Big Lots, Contractor shall report to Big Lots no later than 30 calendar days following the end of each Big Lots' fiscal year (FY) all Rebates and Incentives entitled to be received by Big Lots. Such report shall be in a format mutually agreed by Big Lots and Contractor, and shall include, among other information, in the event any Contractor aggregates Big Lots' spending with other Contractor Group clients, the portion of such Rebates and Incentives allocated to Big Lots and the basis upon which such allocation is made. Where Rebates and Incentives are to be paid back to Big Lots from the prior calendar year, Contractor shall pay such sums to Big Lots by no later than 30 days from the end of fiscal year. Any subsequent

Rebates and Incentives from the prior FY which are not paid to Big Lots by the foregoing date shall be paid within thirty (30) days of receipt.

iv)    Where Rebates and Incentives are free or discounted inventory, Contractor shall provide written details in a timely manner to Big Lots of such inventory and timing for when such inventory must be used.

v)    Contractor shall provide Big Lots on a quarterly basis (during the Term and for at least twelve (12) months thereafter) with a full and accurate report, in a format mutually agreed upon, of:
a.    any circumstances where an Contractor is able to receive or benefit from Rebates and Incentives;
b.    the gross amounts of actual or forecasted Rebates and Incentives due to Big Lots; and
c.    any actions by any Contractor or Media Vendor or Big Lots that are required in order for the Rebates and Incentives to accrue.

vi)    Contractor shall take all reasonable steps to pursue third parties for any Rebates and Incentives owed.

vii)    Contractor shall keep Big Lots fully informed of any relevant discounted Media space available to Big Lots on account of Contractor's dealings with Media Vendor together with any dates by which such discounted Media space must be used by Big Lots in order to take advantage of the discount.

**4.    Relationship of the Parties & Contractor Personnel**.

4.1    <u>Independent Contractors</u>.  Except with respect to Contractor's role as express agent for Big Lots for purposes of media buying, the parties agree that nothing in this Agreement is intended to, or shall be deemed to, establish any partnership or joint venture between them, constitute any party as the agent of the other party, or authorize any party to make or enter into any commitments for or on behalf of the other party. The parties are acting as independent contractors in making and performing under this Agreement. Contractor and Big Lots acknowledge and agree that all Contractor Personnel providing Services under the Agreement are employees of Contractor or a Contractor subcontractor approved in accordance with Section 4.5 hereof and are not, and shall not be deemed to be, employees of Big Lots, whether jointly with Contractor or otherwise. With respect to Contractor Personnel, Contractor will: (a) comply with all applicable national, federal, state and local employment and labor laws, including, without limitation, the Affordable Care Act, Fair Labor Standards Act, Occupational Safety & Health Act, and Employee Retirement Income Security Act and will accept all liability for the breach of same; and (b) be solely responsible for, and Big Lots will have no responsibility for, without limitation: (i) paying all wages and other employment related benefits; (ii) making all appropriate tax, social security, Medicare and other withholding deductions and payments; (iii) providing workers' compensation insurance coverage as required; (iv) making all appropriate unemployment tax payments; (v) hiring; skill testing; orientation and training; performance monitoring, evaluation, counseling, discipline and resolution; and employment termination; and (vi) control, management and supervision of assigned work. Contractor and Big Lots agree and acknowledge that nothing in this Agreement is meant to create an employment relationship, joint or otherwise, between Big Lots and any Contractor Personnel and Contractor Personnel will not be eligible for, nor may they participate in, any Big Lots' retirement, bonus, incentive, health or other fringe benefit plan.

4.2    <u>Assignment of Contractor Personnel</u>.  Contractor shall assign Contractor Personnel to provide Services under each SOW, and such Contractor Personnel will have the appropriate qualifications, skill and experience to perform the Services.  If any Contractor Personnel are designated in a SOW as "Key Personnel," such individuals will not be removed from Services under the subject SOW without the written consent of Big Lots.  If any Key Personnel leave the employ of Contractor during the term of the applicable SOW, Contractor will immediately replace such Key Personnel with an individual of equal or greater experience, skill and qualifications.

4.3    <u>Background Screening</u>.  All Contractor Personnel are required to undergo successful background screening in accordance with the Background Policy prior to assignment to Big Lots' Premises or projects. The term "Premises" is used in its broadest sense and includes, but is not limited to, the general office, distribution centers, and all jobsites, facilities, stores and property owned, leased, operated or otherwise under the control of Big Lots.  In furtherance of the foregoing, Contractor agrees to: (a) obtain Big Lots' current

Background Policy by contacting Big Lots' Asset Protection or Human Resources departments at 614-278-6800; and (b) screen all Contractor Personnel to be assigned to Big Lots in accordance with the Background Policy prior to their arrival at Big Lots' Premises or start on a Big Lots project. Contractor will be solely responsible, at its own expense, for pre-assignment and recurring background screening, in accordance with the Background Policy, for all persons planned or scheduled for assignment on Big Lots' Premises or on a Big Lots project. By assigning Contractor Personnel to Big Lots' Premises or projects, Contractor attests that Contractor has completed a satisfactory background check on the Contractor Personnel being assigned. Big Lots reserves the right, in its sole discretion, to require Contractor to be available, and to make Contractor Personnel available, at any time, for re-screening or for internal or external investigation purposes ("Investigations"). Contractor agrees to make good faith, commercially reasonable efforts to cooperate with Big Lots and to make Contractor Personnel available for Investigations. Big Lots agrees, where reasonably practical, without jeopardy to an Investigation, to provide Contractor with notice of Investigation activities.

      4.4    <u>Exclusion & Removal</u>. Big Lots reserves the right to exclude or remove any Contractor Personnel from Big Lots' Premises by denial of access, by suspension or revocation of access authorization, by expulsion or by any other reasonable means, if, in Big Lots' reasonable and good faith opinion, such exclusion or removal is deemed advisable in the interest of Services completion, employee safety, or security at any Big Lots Premises.

      4.5    <u>Subcontractors</u>. Contractor will not subcontract or delegate its duties and/or obligations under this Agreement or any SOW without obtaining Big Lots' prior written consent in each instance and for each specific subcontractor. Prior to each instance where a subcontractor will provide Services, Contractor will enter into a written agreement with the subcontractor containing provisions consistent with and no less restrictive than those in Sections 4.6, 5, 6 and 9 of this Agreement and will, upon request, certify to Big Lots compliance with this Section 4.5. Contractor will be responsible and liable for the acts and omissions of, and breach of this Agreement by, any Contractor Personnel or Contractor subcontractor, as if the same were Contractor's acts, omissions and breach. For the avoidance of doubt, Media Vendors shall not be considered to be subcontractors or Contractor Personnel under this Agreement.

      4.6    <u>Big Lots Systems Security Policies</u>. Contactor agrees to comply with, and will cause all Contractor Personnel to comply with, Big Lots' policies and procedures designed to protect the security and integrity of Big Lots Systems and maintain an environment free of Malicious Software and Code. Contractor acknowledges and agrees, on its own behalf and on the behalf of all Contractor Personnel, that such policies and procedures require Contractor Personnel to provide to Big Lots, before accessing or connecting to Big Lots Systems, all equipment that Contractor Personnel will use to access or connect to Big Lots Systems for the purpose of: (a) testing the security profile of such equipment; (b) installing or updating any security or anti-virus software that Big Lots deems necessary; and (c) performing any other test or actions as Big Lots deems necessary to protect the security and integrity of Big Lots Systems and keep them free from Malicious Software and Code. If Contractor or Contractor Personnel fail to strictly adhere to the terms of this Section 4.6, Contractor Personnel will refrain from accessing or connecting to Big Lots Systems and Big Lots will have the right to immediately terminate this Agreement, and any SOW upon written notice to Contractor.

      4.7    <u>Reporting</u>. At Big Lots' request, Contractor will provide Big Lots with requested information and reporting regarding the Services performed under this Agreement.

**5.**    **Ownership.**

      5.1    <u>Contractor Materials</u>. Prior to incorporating any Contractor Materials into any Work Product, Contractor will notify Big Lots of same in writing, either by inclusion in the applicable SOW or otherwise. To the extent that any Contractor Materials are contained in or incorporated into any Work Product, Contractor hereby grants Big Lots a perpetual, irrevocable, royalty-free, non-exclusive, worldwide license to transmit, perform, display, reproduce, modify, distribute, adapt, sell, sublicense, create derivative works from, and otherwise use such Contractor Materials to facilitate full and unhindered use of such Work Product. Except for the rights granted to Big Lots in this Section 5.1, Contractor reserves all right, title, and interest to the Contractor Materials.

5.2     Big Lots Property.  Big Lots reserves all rights, title and interest in and to: (a) any programs, information, data, software, systems, processes, and other materials provided by or on behalf of Big Lots to Contractor or accessed by or on behalf of Contractor, in connection with this Agreement, and all associated Intellectual Property Rights; (b) Big Lots Marks; and (c) Big Lots' Confidential Information (collectively, "Big Lots Property").  Additionally, Big Lots reserves all right, title and interest in and to any changes, enhancements, modifications and updates to Big Lots Property, whether made by or on behalf of Big Lots, Contractor or any third party, and all Intellectual Property Rights therein.  Contractor has and acquires no interest in any Big Lots Property by virtue of this Agreement or otherwise.

5.3     Work Product.  Contractor, on its own behalf and on behalf of all Contractor Personnel, hereby irrevocably assigns and transfers to Big Lots, without further consideration and free and clear of all liens and encumbrances, Contractor's and any Contractor Personnel's entire right, title and interest in and to all Work Product, including, without limitation, all associated Intellectual Property Rights.  Big Lots will own the Work Product, and all associated Intellectual Property Rights, and Contractor, on its own behalf and on behalf of all Contractor Personnel, disclaims any ownership interests.  Contractor will execute, and will cause Contractor Personnel to execute, all applications for patents and copyrights, domestic and foreign, assignments, and other papers reasonably necessary to secure and enforce Big Lots' rights related to any Work Product.

## 6.     Confidentiality, Data Processing, & Data Security.

6.1     Confidentiality Obligations.  The parties acknowledge and agree that each may learn, obtain and/or have access to Confidential Information of the other in connection with its performance under this Agreement.  Each receiving party agrees to: (a) hold the disclosing party's Confidential Information in confidence and to take reasonable precautions to protect such Confidential Information from unauthorized access, use or disclosure (including, without limitation, all precautions the receiving party employs with respect to its own similar confidential information as long as those precautions rise to the level of reasonable care); (b) not to divulge any such Confidential Information to any third person, other than Authorized Persons, or use, sell, rent, transfer, distribute or otherwise disclose or make available such Confidential Information for its own benefit or for the benefit of any other person; (c) restrict access of the disclosing party's Confidential Information to Authorized Persons; (d) use the disclosing party's Confidential Information for the sole purpose of, and only to the extent necessary to, perform its obligations hereunder. For clarity, Contractor will not retain, use, disclose, or otherwise Process Big Lots' Confidential Information for any purpose other than to perform its obligations under this Agreement.  In no event may Contractor sell or otherwise disclose Big Lots' Confidential Information to any third party for the commercial benefit of Contractor or any third party.  Contractor certifies that it understands and will comply with all restrictions placed on its Processing of Big Lots' Confidential Information under this Agreement. The receiving party will be responsible and liable for the acts, omissions and breach of any Authorized Person in connection with this Section 6 as if the same were the acts, omissions and breach of the receiving party.

6.2     Required Disclosures.  In the event that the receiving party is required by law or court order to disclose any of the disclosing party's Confidential Information, the receiving party will: (a) unless prohibited by law or court order, promptly notify the disclosing party in writing prior to disclosure to permit the disclosing party to seek appropriate protective measures; (b) reasonably cooperate with the disclosing party to preserve the confidentiality of such Confidential Information consistent with Applicable Law; and (c) use commercially reasonable efforts to limit any such disclosure to the minimum disclosure necessary to comply with such law or court order. Contractor will promptly notify Big Lots in writing, unless specifically prohibited by laws applicable to Contractor, if Contractor receives: (i) any requests from an individual with respect to Big Lots' Confidential Information Processed by Contractor; or (ii) any complaint relating to the Processing of Big Lots' Confidential Information.  Contractor will not respond to any such request or complaint unless expressly authorized to do so by Big Lots, will cooperate with Big Lots with respect to any action taken relating to such request or complaint, and will seek to implement appropriate processes to assist Big Lots in responding to complaints or requests from individuals, including, without limitation, deletion requests.

6.3     Return of Confidential Information.  All Confidential Information supplied by a party to the other party in connection with this Agreement, and all copies, reprints, reproductions or translations thereof made and retained by a receiving party or an Authorized Person, will, at any time upon written request of the disclosing party, and at the termination or expiration of this Agreement or the applicable SOW, be returned by

the receiving party to the disclosing party or, in accordance with the disclosing party's express written direction, Applicable Law, and accepted industry standard, destroyed with certification of destruction in compliance with this Section 6.3.

6.4    <u>Contractor Safeguards & Controls</u>.  If Contractor Process PII, Contractor shall comply with Exhibit B – Data Security Addendum in addition to compliance of this Agreement. Contractor agrees to establish and maintain a comprehensive data privacy and information security program, including physical, technical, administrative, organizational and procedural safeguards (the "Safeguards"), that is designed to: (a) protect and ensure the security, confidentiality, integrity and availability of PII and Big Lots' Confidential Information; (b) protect against and prevent the unauthorized disclosure, use or Processing of, or access to, PII and Big Lots' Confidential Information; (c) protect against and prevent the unauthorized use of, or access to, Contractor's Facilities & Systems; (d) ensure the disposal of Big Lots' Confidential Information in compliance with this Agreement, Applicable Law, and accepted industry standard; (e) ensure the disposal of PII in compliance with Applicable Law and accepted industry standard; (f) prevent a Security Breach or infection of Big Lots' Systems by Malicious Software and Code; and (g) ensure the compliance of all Authorized Persons with the applicable terms of this Agreement and Contractor's data privacy and information security program. The Safeguards must be no less rigorous than accepted industry practices and Big Lots' practices for securing Big Lots Systems.  Contractor represents, warrants and agrees that: (i) Contractor's and all Authorized Persons' Processing of Big Lots' Confidential Information will comply with this Agreement and Applicable Law, and will occur only in the continental United States; and (ii) Contractor's Processing of PII will comply with Applicable Law.

6.5    <u>Minimum Safeguards</u>.   In no way limiting the generality of Section 6.4, at a minimum, the Safeguards must include: (a) limiting access to Authorized Persons; (b) implementing network, device application, database and platform security, including network firewall provisioning and intrusion detection, the timely application of patches, fixes and updates to operating systems and applications; (c) securing information transmission, storage and disposal; (d) implementing authentication and access controls within media, applications, operating systems and equipment; (e) strictly segregating Big Lots' Confidential Information from Contractor's own information and that of third parties so that Big Lots' Confidential Information is not commingled with any other types of information; (f) implementing appropriate security and integrity procedures and practices for Authorized Persons, including, but not limited to, conducting background checks consistent with Applicable Law; and (g) encrypting PII at rest and in transit: (i) using recognized industry standards and a commercially supported encryption solution; (ii) changing the data encryption keys at minimum once per calendar year; (iii) storing the encryption keys in a secure location with limited access; and (iv) maintaining a list of which Authorized Persons are encryption key holders, restricting access to only those indicated Authorized Persons, and reviewing the appropriateness of the indicated Authorized Persons at least once per quarter; and (h) ensuring that Big Lots' Confidential Information, other than PII, is transmitted in a mutually agreed upon secure manner. Contractor further agrees that Big Lots' Confidential Information will not be Processed on any portable or laptop computing devices or any portable storage medium, unless the Big Lots' Confidential Information Processed thereon is encrypted at rest and in transit, using a commercially supported encryption solution.   To the extent Contractor receives or accesses any information in a deidentified or aggregated form, Contractor will make no attempt to identify any individual to whom such information relates and will take commercially reasonable measures to prevent such reidentification of the information. Contractor will immediately notify Big Lots if any Contractor Facilities & Systems do not conform to the standards set forth in Sections 6.4 and 6.5 of this Agreement.

6.6    <u>Security Breach Response</u>.  Contractor shall notify Big Lots of a Security Breach as soon as practicable, but no later than 24 hours after Contractor becomes aware of it, by telephone at 614-395-2821, and leaving a voicemail if there is no response.   Contractor shall also send notification via email to privacy@biglots.com, or such other addresses as provided by Big Lots from time-to-time.  Contractor shall remedy any Security Breach and prevent any further Security Breach, including the recurrence of any such Security Breach, in accordance with Applicable Law and accepted industry standards. Immediately following Contractor's notification to Big Lots of a Security Breach, the parties will coordinate with each other to investigate the Security Breach.  Contractor agrees to fully cooperate with Big Lots and its designees, including, without limitation: (a) assisting with any investigation; (b) providing Big Lots' designees with physical access to affected Contractor Facilities & Systems; (c) facilitating interviews with Contractor's employees and others involved in the matter; and (d) making available summary reports and such other documents required to comply

with Applicable Law and industry standards, or as otherwise required by Big Lots.  In order to facilitate the investigation of a Security Breach, Contractor shall retain all authentication and other relevant system logs for a minimum of sixty (60) days from the creation of such logs, and provide such logs to a Big Lots identified third party auditor, who shall not be a competitor to Contractor, in connection with the investigation of a Security Breach.  Except as otherwise expressly required by Applicable Law, Contractor agrees not to inform any third party of any Security Breach without first obtaining Big Lots' prior written consent, other than to inform a complainant that the matter has been forwarded to Big Lots' legal counsel.  Contractor agrees that Big Lots shall have the sole right to determine: (i) whether notice of the Security Breach is to be provided to any individuals, regulators, law enforcement agencies, consumer reporting agencies or others as required by Applicable Law, or otherwise in Big Lots' discretion; and (ii) the contents of such notice, whether any type of remediation may be offered to affected persons, and the nature and extent of any such remediation.  In the event of a Security Breach, Contractor will, at Big Lots' option, pay or reimburse Big Lots for: (1) all costs and expenses incurred by Big Lots in providing notices and/or credit monitoring to parties whose information may have been subject to unauthorized use, access or disclosure; and (2) all fines, penalties and assessments paid by Big Lots to its governmental regulators in connection with the Security Breach.

6.7    Data Security Audit.  On an annual basis upon thirty (30) days' written notice to Contractor, Contractor grants Big Lots' third party auditor, permission to perform an on-site assessment, audit, and/or examination, including, without limitation, review of all controls in Contractor's physical and/or technical environment involved in the processing of Big Lots' Confidential Information, and the right to review Contractor's data privacy and information security program ("Security Audit"), during normal business hours at such time that will not interrupt or negatively impact Contractor's day-to-day operations.  Contractor will fully cooperate with each Security Audit by providing access to knowledgeable personnel, physical premises, documentation, infrastructure and application software involved in the Processing of Big Lots' Confidential Information.  Any and all Security Audits will be conducted at Big Lots' own expense.  In lieu of an on-site audit, upon Big Lots' request, Contractor agrees to complete and return to Big Lots, within forty-five (45) days of receipt, an audit questionnaire provided by Big Lots regarding Contractor's data privacy and information security program.  Additionally, no less than once annually, Contractor shall conduct a comprehensive, independent third-party audit, by a reputable audit firm, of its data privacy and information security program and will provide summary findings of such audit to Big Lots for review.

6.8    Cardholder Information.  If Contractor has access to Cardholder Information, Contractor must at all times comply with the security standards for the protection of Cardholder Information, with which payment card companies require merchants to comply, including, but not limited to, the Payment Card Industry Data Security Standards currently in effect and as may be updated from time to time ("PCI Standards").  Contractor will promptly provide, at Big Lots' request, current certification of compliance with the PCI Standards by an authority recognized by the payment card industry for that purpose.  If, during the term of this Agreement or any SOW, Contractor undergoes, or has reason to believe that it will undergo, an adverse change in its certification or compliance status with the PCI Standards, Contractor will promptly notify Big Lots of such circumstances.  Contractor will not take any actions that will compromise Big Lots' ability to comply with the PCI Standards.

6.9    Irreparable Harm.  Contractor agrees that any actual or threatened breach of the provisions of this Section 6 would cause Big Lots irreparable harm for which monetary damages would not be adequate compensation.  In each such case, Contractor agrees that Big Lots is entitled to seek equitable relief, including, without limitation, a restraining order, injunctive relief, or specific performance, with respect to any such actual or threatened breach.  Contractor further agrees that Big Lots will have the right to seek a remedy at law, as well as, or in lieu of, equitable relief in the event of any such actual or threatened breach.

**7.    Representations & Warranties.**

7.1    General.  Contractor represents and warrants that: (a) Contractor has the right and full authority to enter into this Agreement and to perform its obligations hereunder; (b) Contractor has the right to disclose to Big Lots and to grant Big Lots access to any information disclosed to Big Lots; (c) Services and Work Product, and performance and use thereof, do not and will not violate, infringe upon, or misappropriate the rights of any third party, including, without limitation, Intellectual Property Rights or non-disclosure or contractual rights; (d) Contractor has all rights, title and interest necessary to convey to Big Lots the rights and licenses granted herein and in any SOW; (e) Services and Work Product will not contain, and will not introduce

into Big Lots Systems any Malicious Software and Code; and (f) all Services and Work Product will be provided in accordance with Applicable Law.

7.2    Services Warranty.  Contractor warrants that all Services provided under this Agreement will be performed in a professional and workman like manner by individuals with appropriate qualifications, skill and experience and in accordance with generally accepted industry standards.

7.3    Performance Warranty.    Contractor warrants that all Work Product will conform with the applicable Specifications for a period of one hundred eighty (180) days' after the date Big Lots accepted the subject Work Product, or such other period of time as set forth in the applicable SOW (the "Warranty Period"). If, during the Warranty Period, Big Lots notifies Contractor, in writing (email will suffice) and with reasonable specificity, of any breach of this warranty, Contractor will, at no cost to Big Lots, replace or repair the non-conforming Work Product so that it conforms to the applicable Specifications as soon as commercially practicable, but in no event more than thirty (30) days' after the date of Big Lots' notice.  Any replacement or repaired Work Product will be warranted for the same period of time as the original Warranty Period.  If Contractor fails to replace or repair Work Product as required by this Section 7.3, Big Lots may, at its option, (a) replace or repair the Work Product itself, or through use of a third party, in which case Contractor will reimburse Big Lots for all associated costs incurred by Big Lots, or (b) request a refund of all fees Big Lots paid for the Work Product, in which case, Contractor will provide Big Lots with such refund within thirty (30) days' after Big Lots' request.

7.4    Disclaimer.  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, NEITHER PARTY MAKES ANY OTHER WARRANTY, WHETHER EXPRESS, IMPLIED, ORAL OR WRITTEN AND, TO THE EXTENT APPLICABLE, SPECIFICALLY DISCLAIMS THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**8.    Indemnification.**

8.1    General.  Contractor will be responsible for, and will defend (at Big Lots option), indemnify and hold harmless the Big Lots Indemnified Parties from and against, any and all Losses arising from or related to: (a) personal injury to or death of persons or damage to property caused by Contractor, its Affiliates, or their respective employees, agents or contractors, including any Contractor Personnel; (b) violation of Applicable Law by, or the willful misconduct or criminal, fraudulent or negligent act or omission of, Contractor, its Affiliates, or their respective employees, agents or contractors, including any Contractor Personnel; (c) Contractor's breach of this Agreement; (d) a Security Breach; (e) an employment related claim brought against a Big Lots Indemnified Party by any Contractor Personnel except to the extent that such claims arise out of Big Lots Indemnified Party's gross negligence or willful misconduct; or (f) any unwithheld Tax from Contractor where a Big Lots Indemnified Party was deemed a withholding agent related to payments to Contractor.

8.2    Intellectual Property.  Contractor agrees, at its own expense, to defend, or at its option, to settle, any demand, claim, suit or action brought against a Big Lots Indemnified Party arising from, related to or alleging that the Services, Contractor Materials or Work Product, or any part thereof, violate, infringe or misappropriate any third party's Intellectual Property Rights ("Infringement Claim"), and to indemnify and hold harmless the Big Lots Indemnified Parties against all Losses that may be assessed against or incurred by a Big Lots Indemnified Party as a result of an Infringement Claim.  Big Lots agrees to provide Contractor with: (a) written notice of any Infringement Claim promptly after obtaining knowledge of same, provided that Big Lots' failure to timely provide such notice will not reduce or eliminate Contractor's indemnification obligation; (b) sole control of the defense or settlement of any Infringement Claim, subject to Section 8.3 and except that Big Lots may, at its own expense, employ separate counsel in any Infringement Claim; and (c) reasonable assistance, at Contractor's expense and request, to settle and/or defend any Infringement Claim.

8.3    Settlement and Immunity. Contractor may not, without Big Lots' prior written consent, enter into any settlement that would affect any Big Lots Indemnified Party's rights or obligations, exclusive of the payment of any amount for which Contractor will indemnify such Big Lots Indemnified Party.  Contractor specifically and expressly agrees that with respect to any and all claims against a Big Lots Indemnified Party by any Contractor Personnel, any indemnification available hereunder shall not be limited by reason of any immunity to which Contractor may be entitled under any workers compensation and/or industrial insurance

acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Contractor to such Contractor Personnel with respect to any such claim. For the sake of clarity, Contractor's waiver of immunity under this Section 8.3 extends only to indemnification claims against Contractor by or on behalf of a Big Lots Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by any Contractor Personnel directly against Contractor.

8.4    Big Lots shall defend, indemnify, and hold Contractor and its parent company, and their respective directors, officers, employees, , harmless from any and all third-party claims, actions, suits, damages, costs and expenses, including reasonable attorneys' fees and other liabilities, arising out of or in connection with: (1) Big Lots' gross negligence or willful misconduct; or (2) the reproduction, broadcast or publication of any advertising delivered to Contractor by Big Lots or by any third party on behalf of Big Lots, provided the advertising Contractor delivers to the medium, and which is actually performed or published, conforms in all respects with the advertising that was provided to Contractor or otherwise approved by Big Lots.

**9.    Insurance.**    At all times during the term of this Agreement, Contractor will, at its own expense, procure and maintain, at a minimum, the types and amounts of insurance coverage described below. Upon execution and otherwise at Big Lots' request, Contractor will provide Big Lots with certificates of insurance evidencing the required insurance coverages and, with the exceptions of workers' compensation and professional liability, naming "Big Lots, Inc. and all of its direct and indirect subsidiaries" as an additional insured. The policies will provide that the insurance companies issuing the policies shall notify Big Lots at least thirty (30) days prior to any policy cancellation or modification.

| Coverage Type | Coverage Limits |
|---|---|
| Worker's Compensation | Statutory |
| Employer's Liability | $1,000,000 Each Accident<br>$1,000,000 Disease – Policy Limit<br>$1,000,000 Disease – Each Employee |
| Commercial General Liability (including coverage for bodily injury and property damage) | $2,000,000 Each Occurrence<br>$2,000,000 Personal and Advertising Injury<br>$2,000,000 General Aggregate<br>$2,000,000 Products/Completed Operations Aggregate |
| Business Automobile Liability (including coverage for bodily injury and property damage suffered by third persons resulting from any Contractor Personnel's use or operation of automobiles) | $1,000,000 combined single limit for bodily injury and property damage |
| Professional Liability (including coverage for the negligent acts, errors, or omissions of Contractor, its subcontractors and Contractor Personnel) | $1,000,000 Each Occurrence<br>$2,000,000 General Aggregate |
| Cyber Liability (including third party coverage for litigation, regulatory, notification costs, credit monitoring, crisis management, and privacy liability) | $5,000,000 Each Occurrence<br>$5,000,000 General Aggregate |
| Umbrella (policy must be on an occurrence based policy form and coverage to apply excess of Commercial General Liability, Business Automobile Liability, and Employer's Liability coverages) | $5,000,000 Each Occurrence<br>$5,000,000 General Aggregate<br>$5,000,000 Products/Completed Operations Aggregate |

**10.    Term and Termination.**

10.1    <u>Term</u>.  The term of this Agreement will commence on the Effective Date and will be effective until terminated in accordance with applicable provisions hereof.  Unless otherwise stated in a SOW, the term of each SOW will last until performance thereunder is completed or the SOW is terminated in accordance with its provisions or the provisions hereof, whichever is earlier.

10.2    <u>Termination for Cause</u>.  In the event that either party breaches a material term of this Agreement or of a SOW, and said breach is not cured within thirty (30) days following receipt of written notice from the other party describing the breach, the non-breaching party may terminate any SOW impacted by the breach upon written notice to the other party.  Notwithstanding the provisions of this Section 10.2, Big Lots may terminate this Agreement and/or any or all SOWs immediately, and without any cure period, upon written notice to Contractor in the event Contractor breaches the provisions of Section 6 of this Agreement or a Security Breach occurs.

10.3    <u>Termination for Convenience</u>.  Unless a SOW is then outstanding, either party may terminate this Agreement upon written notice to the other party.  Big Lots may terminate any SOW, in whole or in part, by giving Contractor at least thirty (30) days prior written notice of its intent to terminate. Contractor may terminate any SOW, in whole or in part, by giving Big Lots at least sixty (60) days' prior written notice of its intent to terminate.

10.4    <u>Compensation upon Termination</u>. If Big Lots terminates a SOW pursuant to Section 10.3, Big Lots will pay for Services and Work Product actually and properly rendered and delivered prior to the date of termination within sixty (60) days after Big Lots' receipt of a final invoice therefor (the "Final Invoice").  Once Big Lots has paid the amounts reflected in the Final Invoice, no further amounts will be due to Contractor or paid by Big Lots under the subject SOW.  If Big Lots terminates any SOW pursuant to Section 10.2, Contractor will refund to Big Lots, within thirty (30) days of the date of termination, all amounts pre-paid by Big Lots in connection with the subject SOW for unperformed Services and no further amounts will be due to Contractor or paid by Big Lots thereunder. Notwithstanding the foregoing, any media authorized by Big Lots prior to the expiration or termination of this Agreement that is scheduled to run following the expiration or termination of this Agreement shall continue to be governed by this Agreement, inclusive of Big Lot's responsibility for the payment of all buying commission compensation due to Contractor only to the extent of the services rendered by Contractor as had been previously authorized by Big Lots.

10.5    <u>Delivery of Work Product</u>.  Upon termination or expiration of a SOW, Contractor will deliver to Big Lots all completed and uncompleted Work Product in connection with such SOW.

10.6    <u>Transition Services</u>.  If requested by Big Lots, upon termination or expiration of any SOW, Contractor will, for the duration of the Transition Period (defined below), continue to make the Services available and provide reasonable assistance in order to allow Big Lots to effectively transition the Services under the subject SOW to Big Lots or a third party of Big Lots' choosing (the "Transition Services").  Contractor will provide the Transition Services at an agreed upon, commercially reasonable cost, which will not exceed corresponding rates in the subject SOW.  The "Transition Period" will be of a length determined by Big Lots, up to a maximum of 180 days after the date of termination or expiration; provided that the parties can mutually agree on a longer Transition Period.  If Big Lots requests a Transition Period, all provisions of this Agreement and the subject SOW necessary to give effect to the transition shall survive and govern Contractor's performance of the Transition Services until the end of the Transition Period.

10.7    <u>Effect of Termination</u>.   Expiration or termination of this Agreement and any SOW will not affect any right or obligation arising prior thereto and any provision that expressly states that it survives expiration or termination will so survive.  Additionally, Sections 2.3, 3.3, 3.4, 4.1, 5, 6, 7.3 (according to its terms), 7.4, 8, 10.4 through 10.7, 11, and 12 will survive expiration or termination of this Agreement.

**11.    Liability Exclusions.**  EXCEPT WITH RESPECT TO THE INDEMNIFICATION OBLIGATIONS IN SECTION 8, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY, ITS AFFILIATES OR ANY CONTRACTOR PERSONNEL FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, BUSINESS INTERUPTION, AND ANY LOSS OF USE, REVENUE, GOODWILL, OPPORTUNITY OR DATA,

IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OF ANY KIND, AND REGARDLESS OF WHETHER IT WAS ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW OF THE POSSIBILITY OF LIABILITY.

**12.      General.**

     12.1      Assignment.  Contractor will not assign this Agreement, or delegate or otherwise transfer any of Contractor's rights or obligations under this Agreement, without the prior written consent of Big Lots.  Any purported assignment made without such consent is void.  Big Lots may assign this Agreement, or delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, to a Big Lots' Affiliate or to any other party in Big Lots' sole discretion.  The duties and obligations of each party in this Agreement shall be binding upon, and the rights and benefits of each party shall inure to, the successors, successors-in-interest, permitted assigns and permitted transferees of the respective party.

     12.2      Notices**.**  All notices required under this Agreement shall be in writing and shall be deemed given when (a) delivered personally; (b) placed for delivery with a nationally recognized overnight courier; or (c) sent by registered or certified mail, return receipt requested, to the parties at the respective addresses set forth below or such other address notified to the other party according to this Section 12.2:

     **If to Contractor:**

     The address set forth in the first paragraph of this Agreement, Attention: Contract Notices.

     **If to Big Lots:**

     Big Lots Stores, LLC
     4900 E. Dublin Granville Road
     Columbus, OH 43081
     Attn: Office of the General Counsel

     12.3      Force Majeure. The parties will not be liable for any delay or failure to perform if the delay or failure to perform is without the fault or negligence of the party claiming excusable delay or failure and is due to causes beyond the control of such party, including, but not limited to, acts of God, war, acts of government, fires, floods, epidemics, or quarantine restrictions. The party claiming excusable delay or failure will immediately inform the other party in writing.

     12.4      Non-Waiver. No course of dealing, course of performance, or failure of either party to strictly enforce any provision in this Agreement or in a SOW is to be construed as a waiver thereof.

     12.5      Governing Law; Venue & Jury Trial Waiver.  This Agreement is governed by the laws of the State of Ohio, without application of conflicts of law principles. Each party hereby irrevocably agrees that any dispute or action relating to this Agreement will be brought in the state or federal courts located in Franklin County, Ohio, and hereby expressly submits to the personal jurisdiction and venue of such courts for purposes thereof and expressly waives all claims of improper venue and all claims that such courts are an inconvenient forum. The parties hereby agree to waive a trial by jury with respect to disputes in connection with this Agreement.

     12.6      Severability. Provisions of this Agreement will be interpreted to be valid and enforceable under Applicable Law; provided, however, that if any provision is held invalid or unenforceable, such provision will not invalidate this Agreement. This Agreement's remaining provisions will stay in effect and be enforced to the fullest extent permitted by law.

     12.7      Entire Agreement. This Agreement and each SOW constitute the entire agreement between the parties and supersede all previous agreements, written or oral, between the parties with respect to the subject matter hereof. No modification, amendment, supplement to, or waiver of this Agreement is binding

upon the parties unless made in writing and signed by authorized representatives of both parties.  Without limiting the generality of the foregoing, should the parties choose to issue purchase orders, invoices sales acknowledgments, or other similar documents for their administrative convenience, no term or condition of any such document shall constitute a modification of this Agreement.

12.8    Counterparts; Originals.  This Agreement and any SOW may be executed and delivered in counterparts, each of which will be deemed an original, but all of which, taken together, will constitute one and the same instrument.  A signature transmitted via facsimile or electronic mail, or a scanned original, will be deemed an enforceable signature for purposes of demonstrating the signing party's assent to this Agreement or any SOW.  A facsimile, scanned or other copy of this Agreement and any SOW evidencing execution by both parties shall be deemed an original.

12.9    Publicity.  Except with respect to Contractor using Big Lots logo and naming Big Lots as a customer in its materials on new non-public business presentations and not including in its website, Contractor is not permitted to use Big Lots Marks in any advertising or publicity without the prior written consent of Big Lots' Chief Financial Officer or General Counsel, which consent may be given or withheld in Big Lots' sole and absolute discretion. For clarity, any other use of Big Lots Marks other than express permitted requires express permission and preapproval. .

12.10    Cumulative Remedies.  Except as otherwise expressly stated in this Agreement, all rights and remedies specified herein are cumulative with, and are not exclusive of, any other rights or remedies that may be available to the parties at law, in equity or otherwise.

12.11    Compliance with Law.  Contractor will comply with Applicable Law in its performance under this Agreement.

12.12    No Assurances or Exclusivity.  No party to this Agreement is obligated to enter into a SOW. Contractor agrees and acknowledges that its provision of Services to Big Lots under this Agreement is on a non-exclusive basis and that Big Lots may engage other third party service providers to provide, or to provide itself, the same or similar Services.

12.13    Mutual Drafting.  Each party has had the opportunity to be represented by counsel of its choice in the negotiation of this Agreement. This Agreement shall be deemed to have been drafted by each of the parties hereto jointly, and no rule of construction shall be invoked respecting the authorship hereof.

12.14    Headings.     Headings used in this Agreement are for reference purposes only, have no substantive effect, and will not enter into the interpretation hereof.


By signing below, each party represents it has read this Agreement, understands it, and agrees to be bound by it as of the Effective Date.


**BIG LOTS**
**Big Lots Stores, LLC**

By: _Jonathan E. Ramsden_____
FF2E51629539412...

Print Name: _____Jonathan E. Ramsden_____

Title: ____EVP and CFO_____


**CONTRACTOR**
**Horizon Media LLC**

By: _Gene Turner_____
DEB57134F919400...

Print Name: _____Gene Turner_____

Title: ____President_____

**Exhibit A**

**Sample SOW Form**

**[Note:  This form is for example only.  DO NOT COMPLETE AND/OR SIGN.]**

**Statement of Work #___**

Project Title: _____

This Statement of Work #_____ (this "SOW") is made and entered into as of _____, 20__ (the "SOW Effective Date"), by and between Big Lots Stores, LLC ("Big Lots") and _____ ("Contractor") pursuant to the Master Services Agreement between Big Lots and Contractor dated _____, 20__ (the "Agreement").  The parties agree that, upon execution, this SOW will be automatically incorporated into, and governed by the provisions of, the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

**1.    Term**

The term of this SOW shall begin on the SOW Effective Date and will continue until _____.

**2.    Scope of Services & Work Product**

*[Provide a detailed description of services, including a list of deliverables]*

*3.*    **Performance and Delivery Schedule**

*[Provide a detailed timeline for project performance, milestones and delivery of deliverables]*

**4.    Location**

*[Specify location where services will be performed]*

**5.    Fees; Expenses & Invoicing**

*[Provide a detailed description of fees, including any applicable hourly rates and not to exceed amounts; expense estimates, including not to exceed amounts; and invoicing schedule]*

**6.    Project Management**

*[Include any details on project management, such as naming project managers, providing contact information and change management procedures]*

*7.*    ***Additional/Miscellaneous Terms (if applicable)***

        IN WITNESS WHEREOF, the parties have caused this SOW to be executed by their duly authorized representative as of the SOW Effective Date.

**BIG LOTS**                                                    **CONTRACTOR**
**Big Lots Stores, LLC**


By: _____        By: _____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

Rev. 09.2023 – US Service Providers                                                    17

**Exhibit B – Data Security Addendum**

The parties agree that this Data Security Addendum (this "Addendum") is incorporated by reference into, and made a binding part of, the agreement between the parties to which it is attached (the "Agreement").  For purposes of this Addendum "Big Lots" shall be interpreted as Big Lots Stores, LLC or its affiliated entity entering into the Agreement and "Contractor" shall mean the entity entering into the Agreement for the purpose of delivering the product, service, or software to Big Lots as described in the Agreement. All other capitalized terms not defined in this Addendum will have the same meaning as in the Agreement. References to the Agreement will include the Agreement as modified by this Addendum.

The parties acknowledge and agree that Contractor will receive or have access to Big Lots Data (as defined below), which may, at times, include PII.  Contractor will comply with the terms and conditions set forth in this Addendum in its Processing (as defined below) of such Big Lots Data and be responsible for the unauthorized Processing of Big Lots Data when in the possession, care, custody or control of Contractor, its Affiliates or contractors, or any Contractor Personnel or Authorized Person.  Unless otherwise expressly stated herein, Contractor will fulfill all obligations set forth in this Addendum at Contractor's sole cost and expense.

In the event of any conflict or inconsistency among the terms of this Addendum and the Agreement, this Addendum will take precedence and therefore control and govern the parties' obligations with regard to the matters herein addressed.

**13.  Supplemental Definitions.**

    a.  "Big Lots Data" means any and all data and information, including, without limitation PII,  Big Lots customer or Big Lots Personnel PII, system performance data, transaction related data or other data related to the business or operations of Big Lots or its Affiliates: (i) provided to Contractor, or to which Contractor was granted access, by or on behalf of Big Lots or its Affiliates; or (ii) generated or otherwise Processed by Contractor in connection with the Services as defined in the Agreement.

    b.  "Profiling" means any form of automated Processing performed on PII to evaluate, analyze, or predict personal aspects related to an identified or identifiable individual's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

    c.  "Sale" or "Sell" means exchanging, disclosing, making available, transferring or otherwise providing or communicating PII to a third party for monetary or other valuable consideration.

    d.  "Share" or "Sharing" means sharing, releasing, disclosing, making available, transferring or otherwise providing or communicating PII to a third party for cross-context behavioral advertising, as defined in the California Consumer Privacy Act, as amended by the California Privacy Rights Act, and any regulations promulgated thereunder, whether or not for monetary or other valuable consideration, including transactions between a business and a third party for cross-contextual behavioral advertising for the benefit of a business in which no money is exchanged.

    e.   "Targeted Advertising" means displaying to an individual an advertisement selected based on PII obtained or inferred from that individual's activities over time and across nonaffiliated websites, applications, or online services.

**14. Big Lots Systems Security Policies.**

Contactor agrees to comply with, and will cause all Contractor Personnel who have access to Big Lots Data to comply with, Big Lots' policies and procedures designed to protect the security and integrity of Big Lots Systems and maintain an environment free of Malicious Software and Code.  Contractor acknowledges and agrees, on its own behalf and on the behalf of all Contractor Personnel who have access to Big Lots Data, that such policies and procedures require such Contractor Personnel to provide to Big Lots, before accessing or connecting to Big Lots Systems, all equipment that Contractor Personnel will use to access or connect to Big Lots Systems for the

purpose of: (a) testing the security profile of such equipment; (b) installing or updating any security or anti-virus software that Big Lots deems necessary; and (c) performing any other test or actions as Big Lots deems necessary to protect the security and integrity of Big Lots Systems and keep them free from Malicious Software and Code. If Contractor or Contractor Personnel fail to strictly adhere to the terms of Section 3 of this Addendum, Contractor Personnel will refrain from accessing or connecting to Big Lots Systems and Big Lots will have the right to immediately terminate this Agreement, and any associated statement of work or similar document, upon written notice to Contractor.

### 15. Description of PII Processing.

The following describes the scope of Contractor's Processing of PII:

    a.  Nature and purpose of Processing PII.   As required and necessary to provide the services in an applicable SOW

    b.  Categories of individuals whose PII is Processed.    As required and necessary to provide the services in an applicable SOW which may include
        i.  customers or prospects
       ii.  web visitors

    c.  Types of PII Processed.  As required and necessary to provide the services in an applicable SOW which may include:
        i.  Consumer data
       ii.  Web visitor data
     iii.  system performance data,
     iv.  transaction related data or
      v.  other data related to the business or operations of Big Lots or its Affiliates

    d.  Duration of PII Processing.   As required and necessary to provide the services in an applicable SOW

### 16. Subcontractors.

Contractor will not subcontract or delegate its duties and/or obligations under this Agreement or any SOW without obtaining Big Lots' prior written consent in each instance and for each specific subcontractor.  Prior to each instance where a subcontractor will provide Services, Contractor will enter into a written agreement with the subcontractor containing privacy and data protection provisions consistent with and no less restrictive than those contained in this Addendum and the Agreement.  Contractor will, upon request, certify to Big Lots its compliance with this Section 4.

### 17. Minimum Confidentiality, Data Processing & Security Requirements.

    a.  Contractor will promptly, and in any event within forty-eight (48) hours of receipt, notify Big Lots in writing, unless specifically prohibited by laws applicable to Contractor, if Contractor receives: (i) any requests from an individual with respect to Big Lots Data processed by Contractor, or Contractor Personnel; or (ii) any complaint relating to the processing of Big Lots Data. Contractor will not respond to any such request or complaint unless expressly authorized to do so by Big Lots, will cooperate with Big Lots with respect to any action taken relating to such request or complaint, and will implement appropriate technical and organizational processes to assist Big Lots in responding to complaints or requests from individuals.   At Big Lots' request, Contractor will promptly, and in any event within ten (10) business days of Big Lots' request, assist Big Lots with fulfilling Big Lots' obligations to respond to complaints or requests with respect to Big Lots Data processed by Contractor, including, without limitation, by:  (i) on Big Lots' instructions, accessing, correcting, securely deleting, opting out of Sale, opting out of Sharing, opting out of Targeted Advertising, opting out of Profiling, or providing copies of any Big Lots Data identified by Big Lots; and (ii) as applicable, directing any Contractor Personnel that Processes Big Lots Data to access, correct, securely delete, opt out of Sale, opt out of Sharing, opt out of Targeted Advertising, opt out of Profiling, or provide copies of any Big Lots Data identified by Big Lots.

b.  Contractor agrees to establish and maintain a comprehensive written data privacy and information security program, including physical, technical, administrative, organizational and procedural safeguards (the "Safeguards"), that is designed to: (i) protect and ensure the security, confidentiality, integrity and availability of Big Lots Data; (ii) protect against and prevent the unauthorized disclosure, use or other Processing of, or access to, the Big Lots Data; (iii) protect against and prevent the unauthorized use of, or access to, Contractor's Facilities & Systems; (iv) ensure the disposal of Big Lots Data in compliance with this Agreement, Applicable Law, and accepted industry standard; (v) prevent a Security Breach or infection of Big Lots' Systems by Malicious Software and Code; and (vi) ensure the compliance of all Authorized Persons with the applicable terms of the Agreement, including, without limitation, the terms of this Addendum, and Contractor's data privacy and information security program.  The Safeguards must be no less rigorous than accepted industry practices and Big Lots' practices for securing the Big Lots Systems.  Contractor represents, warrants and agrees that Contractor's and all Authorized Persons' Processing of Big Lots Data will comply with this Addendum and Applicable Law, and will occur only in the continental United States.  Upon the reasonable request of Big Lots, Contractor will promptly make available to Big Lots all information in its possession necessary to demonstrate Contractor's compliance with its obligations under Applicable Law.  Contractor will notify Big Lots in writing if Contractor makes a determination that it can no longer meet its obligations under Applicable Law.  Big Lots has the right, upon providing notice to Contractor, to take reasonable and appropriate steps to stop and remediate unauthorized Processing of Big Lots Data, including where Contractor has notified Big Lots that it can no longer meet its obligations under Applicable Law.

## 18. Security Breach Response.

Contractor will notify Big Lots of a Security Breach as soon as practicable and as agreed in the Agreement.

## 19. Data Security Audit and Privacy Assessment.

Prior to the provision of Services under the Agreement, and on an annual basis upon thirty (30) days' prior written notice to Contractor, Contractor grants Big Lots' third party auditor, permission to perform an on-site assessment, audit, and/or examination, including, without limitation, review of all controls in Contractor's physical and/or technical environment, and the right to review Contractor's data privacy and information security program and compliance with this Addendum and Applicable Law ("Security Audit"), during normal business hours at such time that will not interrupt or negatively impact Contractor's day-to-day operations. Contractor will fully cooperate with each Security Audit by providing access to knowledgeable personnel, physical premises, documentation, infrastructure and application software involved in the Processing of Big Lots Data.  Any and all Security Audits will be conducted at Big Lots' own expense.
In lieu of an on-site audit, upon Big Lots' request, Contractor agrees to complete and return to Big Lots, within forty-five (45) days of receipt, an audit questionnaire provided by Big Lots regarding Contractor's data privacy and information security program.  Additionally, no less than once annually, Contractor will conduct a comprehensive, independent third-party audit, by a reputable audit firm, of its data privacy and information security program and will provide summary findings of such audit to Big Lots for review.  Contractor will provide all necessary information to enable Big Lots to conduct and document data protection and risk assessments.

## 20. Cardholder Information.

If Contractor has access to Cardholder Information, Contractor must at all times comply with the security standards for the protection of Cardholder Information, with which payment card companies require merchants to comply, including, but not limited to, the Payment Card Industry Data Security Standards currently in effect and as may be updated from time to time ("PCI Standards").  Contractor will promptly provide, at Big Lots' request, current certification of compliance with the PCI Standards by an authority recognized by the payment card industry for that purpose.  If, during the term of the Agreement, Contractor undergoes, or has reason to believe that it will undergo, an adverse change in its certification or compliance status with the PCI Standards, Contractor will promptly notify Big Lots of such circumstances.  Contractor will not take any actions that will compromise Big Lots' ability to comply with the PCI Standards.

**21. Return/Destruction of Big Lots Data.**

Upon termination or expiration of the Agreement, or at any time upon Big Lots' request, all Big Lots Data, and all copies, reprints, reproductions or translations thereof, whether written, electronic or in another form or media, in Contractor's or any Authorized Persons' possession, care, custody or control will, at Big Lots' sole election and in accordance with Big Lots' instructions, Applicable Law, and accepted industry standard, either be returned to Big Lots or destroyed, with certification of destruction, except to the extent Contractor is required by Applicable Law to retain such Big Lots Data, Contractor will notify Big Lots in writing of that obligation, and will return or destroy the Big Lots Data in accordance with this Section 9 as soon as possible after such legally required retention period has ended.

**22. Termination.**

Contractor's failure to comply with any of the provisions of this Addendum and/or the occurrence of any Security Brach will be a material breach of the Agreement.  In such event, Big Lots may terminate the Agreement, and any and all associated statements of work or similar documents, effective immediately, upon written notice to Contractor without further liability or obligation to Contractor.

**23. Indemnity.**

In addition to any other indemnity obligations set forth in the Agreement, Contractor will defend (at Big Lots option), indemnify and hold harmless the Big Lots Indemnified Parties from and against any and all liabilities, obligations, penalties, fines, judgments, settlements, damages, losses, deficiencies, interest, fees, costs, expenses, incidents, demands, claims and/or suits, whether actual or alleged, including, without limitation, reasonable attorneys' fees, court costs, and expert witness fees, including those fees, costs and expenses incurred in enforcing Big Lots' rights under this Addendum, arising from or related to a Security Breach.

**24. Remedies.**

Contractor agrees that any actual or threatened breach of the provisions of this Addendum would cause Big Lots irreparable harm for which monetary damages would not be adequate compensation.  In each such case, Contractor agrees that Big Lots is entitled to seek equitable relief, including, without limitation, a restraining order, injunctive relief, or specific performance, with respect to any such actual or threatened breach.  Except as otherwise expressly stated in this Addendum, all rights and remedies specified herein are cumulative with, and are not exclusive of, any other rights or remedies that may be available to Big Lots at law, in equity or otherwise.  Notwithstanding anything to the contrary in the Agreement, any limitation or exclusion of liability set forth in the Agreement does not and will not limit Contractor's liability in connection with the subject matter or provisions of this Addendum, including, without limitation, liability arising from or in connection with breach of any provision of this Addendum, a Security Breach, or Contractor's indemnification obligations hereunder.