## Exhibit B

**Purchase Agreement**

Execution Version

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made this 31st day of January 2025 (the "**Effective Date**"), by and between Big Lots Management, LLC f/k/a BLHQ LLC, an Ohio limited liability company ("**Seller**"), and OhioHealth Corporation, an Ohio nonprofit corporation ("**Purchaser**", and together with Seller, sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties**.")

### RECITALS

WHEREAS, Seller and certain of its affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "**Bankruptcy Code**") and, on September 9, 2024, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under Case No. 24-11967 (JKS) (the "**Bankruptcy Cases**").

WHEREAS, Seller is the fee simple owner of the real property located in Franklin County, Ohio, being tax parcel number 010-296247-00, as more particularly described on **Exhibit A** attached hereto and made a part hereof (the "**Land**"). The Land, together with all improvements located on the Land, and all rights and appurtenances pertaining to the Land (collectively, the "**Improvements**"), are sometimes collectively called the "**Property**".

WHEREAS, in exchange for payment of the Purchase Price (as hereinafter defined) and subject to the terms and conditions hereinafter set forth, on the Closing Date (as hereinafter defined), Seller has agreed to sell to Purchaser, and Purchaser has agreed to acquire from Seller, Seller's interest in the Property and the Purchased Assets (as hereinafter defined), subject, in all respects, to such matters as are described or provided herein.

WHEREAS, Purchaser acknowledges that the Property and the Purchased Assets are being sold on an "as is" "where is" and "with all faults" basis, subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the representations, warranties, covenants, and agreements set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### Purchase and Sale

1.1     <u>Purchase and Sale</u>.  Upon the terms and conditions of this Agreement, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase, accept and assume from Seller, the following (the "**Purchased Assets**"), free and clear of any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrances of any kind ("**Encumbrances**"), except, solely in the case of the Property, for Permitted Title Exceptions (and deemed Permitted Title Exceptions), and in accordance with the terms of this Agreement:

1.1.1    All right, title and interest of Seller in and to (i) the Property, (ii) all fixtures thereto; (iii) all plans, specifications and studies pertaining to the Land in Seller's possession or control; (iv) all the coal, oil and gas and other mineral rights in and under the Land; (iv) all beneficial easements, water rights, licenses, leases, privileges and other property interests belonging or appurtenant to the Land; and (v) all personal property (other than furniture belonging to Seller, which shall be excluded from the Purchased Assets) located on the Real Property and otherwise used in connection with the operation of the Real Property which shall be described by the Parties with particularity in the Bill of Sale (as defined herein) (the "**Personal Property**").

1.1.2    To the maximum extent permitted by the Bankruptcy Code and applicable laws, all right, title, interest and obligations of Seller in and to the leases described in **Exhibit B-1** attached hereto and made a part hereof (the "**Leases**") which, as of the Closing, have not expired or terminated pursuant to a right exercised by Seller in accordance with this Agreement or pursuant to a right exercised by any tenant thereunder; provided that (i) Purchaser shall be solely responsible for the performance of the obligations of Seller under the Leases from and after the Closing, solely to the extent relating to facts, occurrences or other circumstances first arising after Closing, (ii) Purchaser shall not purchase, accept or assume from Seller any (a) claims or obligations of Seller under the Leases relating to facts, occurrences or other circumstances first arising prior to Closing or (b) any rights to revoke or obligations with respect to the Initial Termination Fee (as defined in the WPG Lease (as defined in **Exhibit B-1** hereto) payable by WPG (as defined in **Exhibit B-1** hereto) as a result of the delivery by Seller to WPG of a Termination Notice (as defined herein).

1.1.3    To the maximum extent permitted by the Bankruptcy Code and applicable laws, and if, at or prior to Closing, Purchaser elects to assume the City Agreement (as herein defined) at Closing, all right, title, interest and obligations of Seller in and to the agreement described in **Exhibit B-2** attached hereto and made a part hereof (the "**City Agreement**"); provided that (i) Purchaser shall be solely responsible for the performance of the obligations of Seller under the City Agreement from and after the Closing, solely to the extent relating to facts, occurrences or other circumstances first arising after Closing and (ii) Purchaser shall not purchase, accept or assume from Seller any claims or obligations of Seller under the City Agreement relating to facts, occurrences or other circumstances first arising prior to Closing and (iii) Purchaser shall be solely responsible for the payment of any and all Cure Costs in connection with the assumption of the City Agreement.  As used herein, "**Cure Costs**" means, with respect to the City Agreement, any and all monetary amounts, costs or expenses that must be paid or satisfied pursuant to Section 365(b)(1) of the Bankruptcy Code to effectuate the assumption and assignment to Purchaser of the City Agreement, as determined by a final order of the Bankruptcy Court or agreed to by Purchaser and the applicable counterparty to the City Agreement.

1.2    Bankruptcy Court Filings.  Seller and Purchaser acknowledge that this Agreement and the transactions contemplated by this Agreement (the "**Transactions**") are subject to the approval of the Bankruptcy Court.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Order (as hereinafter defined) and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the Transactions pursuant to and in accordance with the terms of this Agreement.

**PURCHASER EXPRESSLY ACKNOWLEDGES AND AGREES THAT ALL OBLIGATIONS OF SELLER SET FORTH IN THIS AGREEMENT ARE SUBJECT TO THE ENTRY OF THE SALE ORDER AND THE TERMS CONTAINED THEREIN**.

#99679845v19

## ARTICLE II
## Purchase Price and Deposit

2.1    <u>Purchase Price</u>.  The purchase price (the "**Purchase Price**") to be paid by the Purchaser to Seller for the Purchased Assets shall be Thirty-Six Million Dollars ($36,000,000.00), subject to adjustments as set forth in this Agreement.  The Purchase Price shall be paid by Purchaser by wire transfer of immediately available funds as follows:

2.1.1    <u>Earnest Money</u>.  (a) Within three (3) business days following the Effective Date, Purchaser shall deposit the amount of One Million Dollars ($1,000,000.00) (the "**Deposit**") by wire transfer of immediately available funds with Stewart Title Guaranty Company ("**Escrow Agent**") in an account designated by Escrow Agent, which Deposit shall be held by Escrow Agent pursuant to this Agreement. The Deposit shall be non-refundable except as expressly provided in this Agreement.

(b)    The Deposit shall be disbursed as follows: (i) if the transaction proceeds to Closing, the Deposit will be paid to Seller and credited against the Purchase Price; (ii) if Purchaser exercises its right to terminate this Agreement pursuant to and in accordance with <u>Section 3.2</u>, <u>Section 4.6</u>, <u>Section 5.1</u>, Section <u>8.1</u> or <u>Section 8.2</u>, or either Party exercises its right to terminate this Agreement pursuant to and in accordance with <u>Section 7.2</u>, the Deposit will be returned to Purchaser; and (iii) if Purchaser defaults on its obligations under this Agreement, the Deposit will be delivered to Seller.

(c)    The Deposit shall be refundable to Purchaser until the expiration (or deemed expiration pursuant to <u>Section 3.4</u>) of the Inspection Period (as defined below).  If Purchaser fails to deliver notice to Seller and Escrow Agent to terminate this Agreement prior to the expiration of the Inspection Period pursuant to <u>Section 3.2</u>, the Deposit shall become non-refundable at the expiration of the Inspection Period.

(d)    Notwithstanding the foregoing clauses (b)-(c), if Purchaser timely exercises the Lease Termination Option (as defined below) pursuant to Section 5.1, and has not, as of the date Purchaser exercises the Lease Termination Option, delivered an Acceleration Notice (as defined below), then Fifty Thousand Dollars ($50,000) of the Deposit shall, immediately upon Purchaser's exercise of the Lease Termination Option, become non-refundable to Purchaser except in the event that (i) Purchaser exercises its right to terminate this Agreement pursuant to and in accordance with <u>Section 5.1</u>, Section <u>8.1</u> or <u>Section 8.2</u>, or (ii) either Party exercises its right to terminate this Agreement pursuant to and in accordance with <u>Section 7.2</u>.

(e)    In the event that Purchaser, in default of its obligations, fails to close as required under this Agreement, Seller's sole remedy shall be retention of the Deposit as liquidated damages.

2.1.2    <u>Closing Payment</u>.  The Purchase Price, less the Deposit, as adjusted pursuant to this Agreement shall be paid by Purchaser on the Closing Date, by wire transfer of immediately available funds to an account or accounts designated in writing by Seller (the amount being paid under this <u>Section 2.1.2</u> being the "**Closing Payment**").

## ARTICLE III
## Inspections; Seller Information; Acceleration Option

3.1    <u>Inspection Period; Inspection Rights and Obligations</u>.  Purchaser shall have a period of time commencing on the Effective Date and terminating at 5:00 pm (EST) on the date that is ninety (90) days thereafter (the "**Inspection Period**") to conduct examinations, tests, studies and inspections of the physical condition or legal status of the Property as may be necessary or desirable in Purchaser's discretion

#99679845v19

to evaluate the Property for Purchaser's intended use, evaluate necessary government and local approvals, analyze the Property's ability to be converted to other uses, and coordinate the internal approvals required to authorize Purchaser to fund and consummate the Transactions; provided, however, that Purchaser shall not conduct any environmental studies (other than a Phase I Environmental Site Assessment) or reports or any invasive tests (including a Phase II Environmental Site Assessment) without first obtaining Seller's written (or email) consent thereto ("**Inspections**"). All Inspections conducted by Purchaser or at Purchaser's direction shall be at Purchaser's sole cost and expense and shall be conducted only during regular business hours, which access shall be supervised by Seller, and in such a manner so as not to unreasonably interfere with Seller's operations upon the Property or the rights of tenants or other parties in possession.  Purchaser shall notify Seller no less than forty-eight (48) hours prior to entering upon the Property to conduct any Inspections (including locations and times at which the activities will take place), and Seller shall reasonably cooperate to make the Property available to Purchaser, subject to the rights of tenants or other parties in possession, provided, that Seller shall have the right to impose reasonably conditions on the performance of the Inspections (including, without limitation, reasonable schedule modifications) so as to minimize disturbances at the Property. Purchaser agrees that entry upon the Property shall be limited to the extent necessary for the performance of the Inspections.  Purchaser agrees to maintain equipment and other materials in an orderly manner while they are located on the Property and to maintain them in locations specified by Owner.  Purchaser agrees to remove all debris and trash resulting from the Inspections on a daily basis and to remove all equipment and other materials used by Purchaser or Purchaser's consultants, and its and their contractors, subcontractors, employees and agents (collectively, "**Purchaser's Consultants**") as soon as the activity for which such equipment and other materials are used is completed.  Purchaser shall take all appropriate measures for the safety of persons and property on the Property and shall comply with all legal requirements.  Purchaser shall restore any damage to the Property resulting from the Inspections including but not limited to repair of surface openings resulting from tests. Any and all samples, sample residues, by-products from the sampling process, extracts, well purgings, core borings and hazardous and other wastes (collectively, "**Wastes**") derived from the Inspections (including, without limitation, any contaminated protective clothing or other materials used in performing the Inspections) when removed from the Property shall be deemed the property of Purchaser and shall be transported and disposed of by Purchaser in accordance with applicable law.  Purchaser shall, during the term of this Agreement and at all times during which access is available to maintain and comply with the insurance requirements described on **Exhibit C** attached hereto and made a part hereof.  Purchaser shall promptly provide Seller with a copy of any reports produced by third parties in furtherance of Purchaser's Inspections.  During the course of the performance of the Inspections and receipt and review of the Seller Information (as hereinafter defined), Purchaser may acquire knowledge concerning environmental problems that exist at the Property, other knowledge concerning the Property or Seller, or knowledge of other matters of a sensitive business nature (collectively, "**Privileged Information**").  Except as described below, neither Purchaser nor Purchaser's Consultants shall disclose to any third party, publicize or suffer or permit any of its employees to so disclose or publicize any such Privileged Information.  Purchaser shall indemnify and hold Seller and Seller's officers, agents, employees, directors, trustees, invites, successors, and assigns (collectively, "**Indemnitees**") harmless from and against any and all liabilities, costs, losses, claims, litigation, demands, proceedings, damages and expenses, including without limitation damage to the Property or the death or injury of any persons arising out of or resulting from the Inspections or Purchaser's exercise of the rights granted hereunder; provided, however, that Purchaser shall have no liability to Seller for any liability, cost or expense incurred by Seller, including without limitation the diminution in value of the Property, resulting from Purchaser's mere discovery (and required reporting, as applicable) of the environmental or other conditions of the Property. Purchaser waives any claims against Seller arising out of the Inspections or Purchaser's exercise of the rights granted hereunder.  Purchaser hereby assumes all responsibility for claims against Seller by Purchaser's Consultants.  The obligations of Purchaser under this Section 3.1 shall survive any termination of this Agreement.

#99679845v19

3.2     <u>Purchaser Termination Right</u>.  Purchaser may terminate this Agreement at any time prior to the expiration of the Inspection Period by delivering written notice thereof to Seller and Escrow Agent prior to the expiration of the Inspection Period, in which case (i) the Deposit shall be disbursed to Purchaser in accordance with <u>Section 2.1.1</u> and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement. If Purchaser fails to deliver notice to Seller and Escrow Agent to terminate this Agreement prior to the expiration of the Inspection Period, Purchaser shall be deemed to be satisfied with the Property and shall have waived any right to terminate the Agreement pursuant to this <u>Section 3.2</u>.

3.3     <u>Seller Deliverables</u>.  Seller shall, at no cost to Seller, provide to Purchaser or its designees, all of the following to the extent the same are within the possession or reasonable control of Seller: (a) copies of all permits, governmental approvals necessary for the operation of the Property; (b) copies of any plans for development of the Property; (c) copies of all existing environmental audits or reports, soils reports and engineered foundation reports of the Property; (d) copies of existing surveys; (e) access to comprehensive financial statements for the Property detailing all incomes and expenses related thereto; (f) copies of existing property condition reports; (g) copies of the Leases and the City Agreement; (h) a list of all capital improvements to the Property currently under construction as of the Effective Date and scheduled to begin construction after the Effective Date; (i) a list of all outstanding tenant allowances, and the outstanding balances thereof, for any tenant under a Lease; (j) a list of all unpaid security deposits, and the balances thereof, paid by any tenant under a Lease to Seller; and (k) any and all other information reasonably requested by Purchaser related to the possession, maintenance, control or operation of the Property ("**Seller Information**").

3.4     <u>Acceleration Option</u>.  At any time prior to the expiration of the Inspection Period, Purchaser shall have the right to waive the remainder of the Inspection Period and accelerate the Closing by sending written notice thereof to Seller and Escrow Agent (the "**Acceleration Notice**").   Any Acceleration Notice delivered by Purchaser on or prior to February 13, 2025 shall be deemed to also be a Lease Termination Option (as defined herein) delivered pursuant to <u>Section 5.1</u>. In the event Purchaser delivers an Acceleration Notice, the Inspection Period shall be deemed expired and the Deposit shall become non-refundable to Purchaser as of the date the Acceleration Notice is delivered to Seller.

**ARTICLE IV**
**Title and Survey**

4.1     <u>Deed</u>.  Seller shall convey to Purchaser at Closing fee simple title to the Property by recordable limited warranty deed in the form attached hereto as **Exhibit D** ("**Deed**").

4.2     <u>Evidence of Title</u>.  Within ten (10) business days after the Effective Date, Purchaser shall, at Purchaser's sole cost and expense, obtain a title insurance commitment ("**Title Commitment**") for an owner title insurance policy ("**Title Policy**") from Coventry Title Agency, Inc. as agent for Stewart Title Guaranty Company ("**Title Company**") committing the Title Company to insure in Purchaser title to the Property.   Purchaser may cause Title Company to deliver to Purchaser legible copies of all recorded documents referred to in the Title Commitment.

4.3     <u>Survey</u>.  Purchaser may, at Purchaser's option and sole cost and expense, obtain a survey of the Property (the "**Survey**"), certified to Purchaser, Seller and the Title Company and made in accordance with the most recent Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, which survey shall include a flood plain designation, the location of all easements affecting the Property, any encroachments onto or from the Property, the location of all buildings and improvements on the Property, if any, and contain a calculation of the acreage of the Property to the nearest one-thousandth (1/1000th) of an acre, excluding all right-of-ways, streets, alleys, roadways, and railroad tracks (the "**Survey**").   If

Purchaser does obtain a Survey, the legal description shown on the Survey will be used to convey the Property to Purchaser at the Closing.

4.4     Permitted Title Exceptions.  The following (and any exception thereof contained in any Title Commitment, update to the Title Commitment, or Title Policy) shall be deemed Permitted Title Exceptions: (1) exceptions, covenants, conditions, restrictions and other matters of record common to the platted subdivision in which the Property is located;  (2) general real estate taxes and assessments not yet due and payable; (3) utility easements, or any other easements, rights of way, servitudes, encroachments, apparent servitudes, permits, surface leases and similar rights, (4) exception as to waters, tidelands, beaches, streams and related matters, (5) discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions or overlapping improvements, (6) all matters set forth on the Title Commitment (as hereinafter defined) or any update to the Title Commitment (as hereinafter defined), in each case, approved by Purchaser or deemed approved by Purchaser as herein provided, (7) any title exception or encumbrance created directly by Purchaser, Purchaser's Contractors or any party acting on behalf of Purchaser or Purchaser's Contractors, (8) all matters set forth on the Survey (as hereinafter defined) or any update to the Survey, in each case, approved by Purchaser or deemed approved by Purchaser as herein provided (or, if no Survey is obtained, any matter as would be disclosed by a current and accurate survey or an inspection of the Property), (9) all Encumbrances approved in writing by Purchaser, (10) all applicable laws, rules, zoning laws, ordinances and government regulations affecting the development, use, occupancy and/or enjoyment of the Property, or any portion thereof, (11) the Leases, (12) Encumbrances that will be removed by operation of the Sale Order and (13) any Title Objections waived or deemed waived by Purchaser in accordance with the terms and conditions of this Article IV  (collectively, "**Permitted Exceptions**").  On the Closing Date, Purchaser may cause the Title Company to issue, at Purchaser's sole cost and expense, the Title Policy in the amount of the Purchase Price insuring fee simple title to the Property in Purchaser as of the Closing Date, subject to the Permitted Title Exceptions (and deemed Permitted Title Exceptions). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before the Closing Date. A failure by Purchaser to satisfy any condition to, or undertake any action necessary to, obtain any endorsement or the issuance of a requested endorsement, shall not excuse Purchaser from its obligations hereunder.  Nothing in this Section 4.4 shall diminish or limit Purchaser's ability to terminate this Agreement for any reason or no reason at any time prior to the expiration (or deemed expiration pursuant to Section 3.4) of the Inspection Period.

4.5     Acceptance of Title.  Purchaser acknowledges and agrees that upon the expiration (or deemed expiration pursuant to Section 3.4) of the Inspection Period, Purchaser shall be deemed to have approved the state of title to the Property as reflected in the Title Commitment and Survey, together with any subsequent updates thereto, which Purchaser has received as of the expiration (or deemed expiration pursuant to Section 3.4) of the Inspection Period.

4.6     Title Objections.  If the Title Commitment or the Survey or any subsequent update to the Title Commitment or the Survey disclose any defect in title or any other exception, covenant, condition, encroachment or restriction which is unacceptable to Purchaser in its sole discretion, and such new title or survey matter is not a Permitted Title Exception (or deemed Permitted Title Exception) (collectively, "**Title Objections**"), Purchaser shall promptly notify Seller in writing, and provide a copy, of such Title Objections ("**Title Objection Notice**").  If Purchaser fails to give written notice to Seller within ten (10) business days after Purchaser first receives the Title Commitment, Survey or update thereto that initially discloses the Title Objection, Purchaser shall be deemed to have approved such Title Objection and such matters shall be deemed to be Permitted Exceptions.  If Purchaser has given the required written notice described above identifying Title Objections together with Purchaser's written basis for Purchaser's belief that such Title Objections are not otherwise Permitted Title Exceptions (or deemed Permitted Title Exceptions), Seller may, at its option, within fifteen (15) business days after receipt of such Title Objection Notice, notify Purchaser ("**Seller Response**") that Seller has elected to cure such Title Objection by (i)

6

having the Title Objection removed from the Title Commitment or the Survey, (ii) committing to having such Title Objection removed from the Survey or Title Policy when issued, (iii) having Title Company commit to insure over such Title Objection and provide evidence thereof acceptable to Purchaser, or (iv) if such Title Objection is not reasonably likely to materially and adversely affect the Property, declining to take any action with respect to such Title Objection, in which case, Purchaser shall accept title to the Property subject to such Title Objection and remain obligated to close the Transactions in accordance with the terms hereof without any credit, setoff or abatement.  Failure of Seller to timely provide a Seller Response shall be deemed confirmation that Seller has elected not to cure such Title Objections.  If Seller elects not to cure any or all of the Title Objections set forth in a Title Objection Notice, Purchaser shall have until the later of (x) the expiration (or deemed expiration pursuant to Section 3.4) of the Inspection Period and (y) three (3) business days after such election to (a) terminate this Agreement pursuant to Section 3.2, in which case the Deposit shall be disbursed to Purchaser in accordance with Section 2.1.1, and neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement, or (b) waive the uncured Title Objections and proceed to Closing without any credit, setoff or abatement of the Purchase Price, in which case any uncured Title Objections shall become Permitted Exceptions; provided that if Purchaser does not timely make such election, Purchaser shall be deemed to have elected clause (b).  If Seller elects to cure any or all of the Title Objections in the Title Objection Notice(s), Seller shall use commercially reasonable efforts to cause the same to be cured prior to Closing; provided, however that if Seller is unable to effectuate the cure prior to Closing, it shall not be a default on the part of Seller, but Purchaser shall have three (3) business days to elect to (a) terminate this Agreement in which case (i) the Deposit shall be disbursed to Purchaser in accordance with Section 2.1.1 and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement, or (b) waive the uncured Title Objections and proceed to Closing without any credit, setoff or abatement of the Purchase Price, in which case any uncured Title Objections shall become Permitted Exceptions; provided that if Purchaser does not timely make such election, Purchaser shall be deemed to have elected clause (b).

If, at any time prior to Closing, Purchaser is made aware of any new condition of title (whether created during the pendency of this Agreement or resulting from omissions in the original Title Commitment or the original Survey) (collectively a "**New Encumbrance**"), Purchaser shall have a right to deliver a supplemental Title Objection Notice to Seller for such New Encumbrance(s), in which case Purchaser and Seller shall promptly address the same in the manner otherwise provided in this Section 4.6.

Nothing in this Section 4.6 shall diminish or limit Purchaser's ability to terminate this Agreement for any reason or no reason at any time prior to the expiration (or deemed expiration pursuant to Section 3.4) of the Inspection Period.

4.7     No Obligation of Seller to Remove Exceptions.  An order or orders of the Bankruptcy Court approving this Agreement and the Transaction and authorizing Seller to consummate the Transaction, which may be the Sale Order, shall provide that, to the fullest extent permitted under Section 363(f) of the Bankruptcy Code, this sale is free and clear of all Encumbrances other than, solely in the case of the Property, Permitted Title Exceptions (or deemed Permitted Title Exceptions). Notwithstanding anything to the contrary contained in this Agreement, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Company.

4.8     Financing.  Purchaser expressly agrees and acknowledges that Purchaser's obligations to consummate the Transactions are not in any way conditioned on or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing, equity investment or otherwise).

## ARTICLE V
## Leases

5.1     <u>Leases; Lease Termination Option</u>. Purchaser acknowledges that the Property is currently subject to the Leases and the City Agreement. On or prior to February 12, 2025, Purchaser shall have the option (the "**Lease Termination Option**") to elect to cause Seller to exercise Seller's termination option under the WPG Lease (as defined in **Exhibit B-1** hereto) pursuant to Section 3(b) of the WPG Lease Amendment . If Purchaser timely exercises the Lease Termination Option, Seller shall, on or prior to February 14, 2025, deliver to WPG a termination notice in the form attached hereto as **Exhibit K** (the "**Termination Notice**") in accordance with the provisions governing delivery of notices under the WPG Lease; <u>provided</u> that if Seller fails to timely deliver the Termination Notice, then Purchaser shall have the right to terminate this Agreement within ten (10) days of becoming aware of such failure by delivering written notice thereof to Seller and Escrow Agent, in which case (i) the Deposit shall be disbursed to Purchaser in accordance with <u>Section 2.1.1</u> and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement.  If Purchaser does not timely exercise the Termination Notice (including by delivery of an Acceleration Notice on or prior to February 12, 2025), Seller shall have the right in its sole discretion whether or not to exercise the termination right under the WPG Lease in accordance with the terms thereof.

5.2     <u>Leaseback</u>.  It is the intent of Purchaser and Seller that, at Closing, Seller and Purchaser shall enter into a new lease agreement (the "**New Lease**") pursuant to which Purchaser shall lease to Seller the premises in the Property that Seller is then using for its operations.  Seller and Purchaser shall use commercially reasonable efforts to negotiate and agree upon a form of New Lease prior to the expiration of the Inspection Period, which shall be on the form of a customary arms-length commercial lease agreement form and reflect the terms set forth on **Exhibit E** hereto. Notwithstanding anything to the contrary contained in this Agreement, Seller may assign the New Lease or designate the right to enter into the New Lease to Gordon Brothers Retail Partners, LLC or any purchaser of all, substantially all or a material portion of the assets of Seller in connection with the Bankruptcy Cases.

## ARTICLE VI
## Representations and Warranties

6.1     <u>Seller Representations and Warranties</u>.  Seller represents and warrants to Purchaser as of the Effective Date:

6.1.1     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the Leases and the City Agreement in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases, Seller holds good title to, the right to use, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all Encumbrances, other than (i) Encumbrances as of the date hereof that will be removed by operation of the Sale Order and (ii) solely in the case of the Property, the Permitted Title Exceptions.

6.1.2     Subject to the Sale Order, and the Sale Order not being subject to any stay, (a) Seller has full power and authority to enter into and fully perform and comply with the terms of this Agreement and consummate the Transactions without the need to obtain any approvals or satisfy any contingencies of any nature whatsoever, (b) the person signing this Agreement on behalf of Seller is authorized to do so, (c) this Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms, and (d) neither the execution and delivery by Seller of this Agreement or the other documents contemplated hereby, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will conflict

with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable.

6.1.3    Seller is not a "foreign person" as such term is defined in Section 1445(f) of the Internal Revenue Code of 1954, as amended.

6.1.4    Seller is duly incorporated, validly existing and in good standing under the laws of the State of Ohio.

6.1.5    Seller is not on the list of "Specially Designated Nationals and Blocked Persons" maintained by the United States Treasury under the provisions of Executive Order 13224.

6.1.6    Seller has not engaged any broker or other representative that may be due a commission or other payment as a result of the conveyance of the Property to Purchaser as contemplated by this Agreement.

6.1.7    To Seller's actual knowledge and without taking into account the ownership of any shares that are publicly held, Seller is not directly wholly-owned by a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry or a chiropractor, or a person who is an immediate family member of any of the foregoing (collectively a "**Physician Ownership Party**").   For purpose of this Section 6.1.7, an "immediate family member" is defined as a husband or wife, birth or adoptive parent, child or sibling; stepparent, stepchild, stepbrother or stepsister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law; grandparent or grandchild; or spouse of a grandparent or grandchild.

6.1.8    To Seller's knowledge, Exhibit B-1 is a true and complete list of the Leases (including all amendments, modifications, and supplements thereto and guaranties thereof) in effect as of the Effective Date.   Seller has delivered and made available to Purchaser true and correct copies of the Leases and the City Agreement.   Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the Leases and the City Agreement in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Cases, (a) as of the Effective Date, each Lease and the City Agreement is in full force and effect in accordance with its respective terms, (b) to Seller's knowledge, no tenant under a Lease or counterparty under the City Agreement has given or received a written notice of default (except for defaults as to such matters as will be resolved or cured by Seller in connection with the assumption of such Lease or the City Agreement) and (c) there have been no amendments, modifications of supplements to the Leases or the City Agreement, written or otherwise, except as set forth on **Exhibit B-1** and **Exhibit B-2** hereto.

6.1.9    Purchaser Representations and Warranties.   Purchaser represents and warrants to Seller as of the Effective Date:

6.1.10    Purchaser is duly incorporated, validly existing and in good standing under the laws of the State of Ohio.

6.1.11    Purchaser has full power and authority to enter into and fully perform and comply with the terms of this Agreement and consummate the Transactions without the need to obtain any approvals or satisfy any contingencies of any nature whatsoever, and the person signing this Agreement on behalf of Purchaser is authorized to do so qualified and empowered to conduct its business.

9

6.1.12    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Agreement.

6.1.13    This Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

6.1.14    Prior to the Closing, Purchaser will not create any Encumbrances with respect to the Purchased Assets.

6.1.15    Purchaser has, and will have at Closing, (A) sufficient immediately available funds and the financial ability to pay the Purchase Price and any costs and expenses incurred by Purchaser pursuant to, or in connection with the negotiation, execution or performance of this Agreement and (b) the resources and capabilities (financial and otherwise) to perform its obligations under this Agreement and consummate the Transactions.

6.1.16    Purchaser has not made a general assignment for the benefit of its creditors, (b) admitted in writing its inability to pay its debts as they mature, (c) had an attachment, execution, or other judicial seizure of any property interest which remains in effect or (d) taken, failed to take or submitted to any action indicating a general inability to meet its financial obligations as they accrue. There is not pending any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or recomposition of Purchaser, or any of its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking appointment of a receiver, trustee, custodian or other similar official for it or any members for all or any substantial part of its or their property.

6.1.17    Neither the execution and delivery by Purchaser of this Agreement or the other documents contemplated hereby, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will conflict with or violate any provision of a Purchaser's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable.

6.1.18    Neither Purchaser as an entity nor any member of Purchaser or any party who has loaned any money to Purchaser is on the list of "Specially Designated Nationals and Blocked Persons" maintained by the United States Treasury under the provisions of Executive Order 13224.

6.1.19    Purchaser has not engaged any broker or other representative that may be due a commission or other payment as a result of the conveyance of the Property to Purchaser as contemplated by this Agreement.

6.2    Scope.  The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder.  All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time.  Further, all representations and warranties of Seller set forth in this Article VI shall merge with the transfer of title and shall not survive Closing.  If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any representation or warranty, whether such breach is known or unknown.

6.3     <u>As-Is Purchase</u>.  Except for the express representations and warranties contained in this Agreement, Seller has not made and does not make any representation or warranty as to the physical condition of the Property, the state of legal title to the Property or the suitability of the Property for Purchaser's intended use. Purchaser hereby expressly acknowledges and agrees that Purchaser will have, as of the Closing, thoroughly inspected and examined the status of title to the Property and the physical condition of the Property to the extent deemed necessary by Purchaser in order to enable Purchaser to evaluate the purchase of the Property. Purchaser hereby further acknowledges and agrees that, subject to Seller's express representations, warranties and covenants set forth in this agreement, and except as otherwise provided in this Agreement, Purchaser is relying solely upon the inspection, examination, and evaluation of the physical condition of the Property by Purchaser and that Purchaser is purchasing, and at Closing will accept, the property on an "as is," "where is" and "with all faults" basis, without representations, warranties and/or covenants, express or implied, of any kind or nature; except for Seller's express representations, warranties and covenants set forth in this Agreement. Purchaser acknowledges that Seller has made no agreement to alter, repair or improve the Property. Without limiting the foregoing, Purchaser further acknowledges that Seller has not made and will not make, nor shall Seller be deemed to have made, any warranty or representation, express or implied, as to (i) the fitness, design or condition of the Property for any particular use or purpose, (ii) the quality of the material or workmanship therein, (iii) the existence of any defect, latent or patent, (iv) Seller's title thereto which is being conveyed as is, with all defects and objections, (v) value, (vi) compliance with specifications, (vii) location, (viii) use, (ix) condition, (x) merchantability, (xi) quality, (xii) description, (xiii) durability, (xiv) operation, or (xv) the existence of any hazardous substance and all risks incident thereto which are to be borne by Purchaser. Purchaser further acknowledges that the property has been (or will be, subject to the terms of this Agreement) inspected by Purchaser and is (or will be, subject to the terms of this Agreement) satisfactory to it. In the event of any defect or deficiency in any portion of the Property of any nature, whether latent or patent, Seller shall not have any responsibility or liability with respect thereto or for any incidental or consequential damages (including strict liability in tort). The provisions of this Section 6.4 have been negotiated with the advice of counsel and are intended to be a complete exclusion and negation of any warranties by Seller, express or implied, with respect to the Property, arising pursuant to the Uniform Commercial Code or any other law now or hereafter in effect or arising otherwise. The provisions of this Section 6.4 shall survive the closing or the termination of this Agreement.

**ARTICLE VII**
**Closing**

7.1     <u>Closing</u>.  Provided neither party exercises an express right to terminate this Agreement and all conditions and/or contingencies to Closing described in this Agreement have been fulfilled or waived, the closing of the Transactions (the "**Closing**") shall occur in escrow with the Title Company and Escrow Agent on the later to occur of (a) the date that is three (3) business days following the date on which the Sale Order has been entered and any stay relating thereto has been lifted or expired and (b) the earlier to occur of (i) the date that is thirty (30) days after the expiration (or deemed expiration pursuant to <u>Section 3.4</u>) of the Inspection Period and (ii) such earlier date, if any, as may be mutually agreed upon by Seller and Purchaser (such date, the "**Closing Date**").  On or before Closing Date, the Parties shall deliver to the Title Company in escrow the Seller Deliverables and the Purchaser Deliverables, respectively, and Purchaser will deliver to Escrow Agent in escrow the Closing Payment and, to the extent Purchaser elects, at or prior to the Closing, to assume the City Agreement and Cure Costs are payable thereunder, all Cure Costs.

7.2     <u>Bankruptcy Matters</u>.

7.2.1     As soon as practicable after the Effective Date, Seller shall file with the Bankruptcy Court a motion (the "**Approval Motion**") seeking approval and entry of an order authorizing

11

the sale of the Purchased Assets in accordance with the terms of this Agreement in the form attached hereto as **Exhibit F** with only such changes as reasonably consented to by Purchaser (the "**Sale Order**"). Purchaser acknowledges that the Approval Motion will include a copy of this Agreement as an exhibit thereto.

7.2.2    Seller shall provide timely and proper written notice of the Approval Motion to all parties to the Leases and the City Agreement and take all other actions necessary or otherwise required to cause such Leases and the City Agreement to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that, with respect to the Leases, such Leases have not been terminated prior to the Closing in accordance with this Agreement or by any tenant thereunder. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser the Leases (which, prior to Closing, have not expired or terminated pursuant to a right exercised by Seller in accordance with this Agreement or pursuant to a right exercised by any tenant thereunder) and the City Agreement (if Purchaser elects to assume the same at Closing).

7.2.3    Seller shall use commercially reasonable efforts to obtain entry of the Sale Order on or prior to the expiration of the Inspection Period. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court, and making such advisors and representatives of Purchaser available to testify before the Bankruptcy Court, for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Leases and, if Purchaser elects to assume the same at Closing, the City Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Each Party shall appear formally or informally in the Bankruptcy Court, as applicable, if reasonably requested by the other Party or required by such the Bankruptcy Court in connection with the Transactions. Upon the Bankruptcy Court's entry of the Sale Order, Seller shall promptly provide Purchaser, Title Company and Escrow Agent with notice thereof.

7.2.4    Either Party may terminate this Agreement by written notice to the other if: (i) the Bankruptcy Court enters an order denying the Approval Motion; or (ii) the Bankruptcy Court fails to issue the Sale Order within thirty days after the expiration of the Inspection Period; provided, however, that if the Bankruptcy Court fails to issue the Sale Order within such thirty (30) day period and Purchaser and Seller are using good faith efforts to obtain entry of the Sale Order, the thirty (30) day period shall be extended for an additional thirty (30) days. In the event of a termination under this Section 7.2.4, (i) the Deposit shall be disbursed to Purchaser in accordance with Section 2.1.1 and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement.

7.3    Seller Deliverables. No later than 12:00 pm New York time on the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following (the "**Seller Deliverables**"):

7.3.1    the Deed, in recordable form (and, if Purchaser obtains a Survey prior to Closing, containing the legal description of the Property as set forth on the Survey), duly executed by Seller and acknowledged in the presence of a notary public, subject only to the Permitted Exceptions;

7.3.2    if any Leases have not, prior to Closing, expired or terminated pursuant to a right exercised by Seller in accordance with this Agreement or pursuant to a right exercised by any tenant thereunder, an assignment and assumption of Leases in the form attached hereto as **Exhibit G** (the "**Assignment of Leases**"), duly executed by Seller;

7.3.3    a bill of sale in the form attached hereto as **Exhibit H**, describing the Personal Property being transferred pursuant thereto with particularity on a schedule thereto (the "**Bill of Sale**"), duly executed by Seller;

7.3.4    if, on or prior to the Closing, Seller (or Seller's assignee or designee pursuant to Section 5.2) elects to accept the New Lease, the New Lease, in form and substance reasonably acceptable to Seller, duly executed by Seller (or Seller's assignee or designee pursuant to Section 5.2 hereof);

7.3.5    if Purchaser elects to purchase a Title Policy, an owner's affidavit of title for the benefit of the Title Company in the form attached hereto as **Exhibit I** (or such other form as reasonably approved by Seller and the Title Company), duly executed by Seller;

7.3.6    if Purchaser elects, on or prior to the Closing, to assume the City Agreement and pay Cure Costs thereunder, an assignment and assumption of the City Agreement in the form attached hereto as **Exhibit J** (the "**Assignment of City Agreement**"), duly executed by Seller;

7.3.7    a properly completed and duly executed IRS From W-9 of Seller or a certificate of Non-Foreign Status (Internal Revenue Code Section 1445 and the Regulations issued thereunder);

7.3.8    evidence of Seller's authority and due authorization of Seller to consummate the Transactions, as reasonably requested by the Title Company;

7.3.9    a closing statement (the "**Closing Statement**"), approved by Seller, duly executed by Seller;

7.3.10   a certificate of Seller acknowledging that all of the representations and warranties of Seller contained in Section 6.1 are true and correct as of the date of Closing in all material respects other than as a result of any change in facts or circumstances which do not otherwise constitute a default of Seller pursuant to the express terms of this Agreement;

7.3.11   such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the City, County and State of the Property; and

7.3.12   a file-stamped copy of the Sale Order.

7.4    Purchaser Deliverables.  No later than 12:00 pm New York time on the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following (the "**Purchaser Deliverables**"):

7.4.1    the Closing Payment and all amounts payable by Purchaser pursuant to this Agreement (including Cure Costs, if any, under the City Agreement if Purchaser elects to assume the City Agreement) in immediately available federal funds wire transferred to Escrow Agent's account, together with instructions to Escrow Agent to immediately release the full amount of the Closing Payment to Seller and any Transfer Taxes to the applicable authority at Closing;

7.4.2    Purchaser's duly executed signature page to the Assignment of Leases;

7.4.3    Purchaser's duly executed signature page to the Bill of Sale;

7.4.4    if Seller (or Seller's assignee or designee pursuant to Section 5.2) elects to accept the New Lease, Purchaser's duly executed signature page to the New Lease;

7.4.5    if Purchaser elects to assume the City Agreement and pay Cure Costs thereunder, Purchaser's duly executed signature page to the Assignment of City Agreement;

7.4.6    a properly completed and duly executed IRS From W-9 of Purchaser;

7.4.7    evidence of Purchaser's authority and due authorization of Seller to consummate the Transactions, as reasonably requested by the Title Company;

7.4.8    Purchaser's duly executed signature page to the Closing Statement;

7.4.9    a certificate of Purchaser acknowledging that all of the representations and warranties of Purchaser contained in <u>Section 6.2</u> are true and correct as of the date of Closing; and

7.4.10    such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the City, County and State of the Property.

7.5    <u>Credits and Prorations</u>.  All income and expenses of the Property shall be apportioned as of 12:01 a.m. on the Closing Date, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs.  Seller shall cause a statement of such prorations to be completed and delivered to Purchaser no less than two (2) business days prior to Closing, complete with evidence reasonably satisfactory to Purchaser, and the net result of such prorations shall be set forth in the Closing Statement, taking into account the Party that is responsible for making the actual payment of amounts that are pro rated pursuant to this <u>Section 7.5</u>, shall be applied to reduce or increase the Purchase Price and the Closing Payment, without duplication.  All prorations established pursuant to this <u>Section 7.5</u> shall be final. Such prorated items shall include without limitation the following:

7.5.1    all general real estate taxes, personal property taxes, *ad valorem* taxes, assessments and special assessments of every kind and nature attributable to the Property ("**Taxes**") shall be prorated as of the Closing Date based on the most recently available tax information attributable to the Purchased Assets.

7.5.2    For those utilities, water and sewer charges for which the applicable utility company does not directly bill tenants or other occupants of the Property, prior to the Closing date Seller shall notify each of the utility companies which provide services to the Property of the scheduled transfer of the Property on the Closing Date, and make appropriate arrangements with the utility companies to bill Seller for services provided before the Closing Date, and to Purchaser for services provided on and after the Closing date.  To the extent any such invoices are not available or paid prior to Closing, the same shall be prorated as of the Closing Date.

7.5.3    All Rents (as defined below) shall be allocated on an accrual basis, with respect to their period of ownership.  "**Rents**" shall mean all rents, percentage rents, license fees, and all other sums and charges excluding CAM Contributions (as defined below) payable under the Leases. All Rents attributable to the period prior to the Closing Date (the "**Seller Ownership Period**") will be retained by Seller to the extent that such rents have been collected before the Closing Date. All Rents attributable to the period beginning on the Closing Date and continuing thereafter (the "**Purchaser Ownership Period**") will be paid to Purchaser by the Tenants (or credited to Purchaser at Closing if such Rents are received prior to or after the Closing Date). The Parties agree to prepare a final reconciliation and accounting of all Rents no later than sixty (60) days (or such longer time as may be required for final adjustment for real estate taxes) after the Closing Date (the "**Rent Reconciliation Period**").  After the Rent Reconciliation Period, all Rents shall be deemed final. Seller shall promptly pay to Purchaser any Rents received by Seller after the Proration Time and attributable to the Purchaser Ownership period. Purchaser shall promptly pay to

14

Seller any Rents received by Purchaser and attributable to the Seller Ownership period, provided however, Purchaser shall have no obligation to pay the same to Seller until Seller has repaid or Purchaser has been credited for any Delinquents (as defined below). "**Delinquents**" shall mean charges attributable to the Seller Ownership Period which are (i) owed by Seller to any Tenant under any Lease, and (ii) owed by any tenant under a Lease to Seller under any Lease that is due and payable during the Seller Ownership Period (collectively, "**Delinquents**"). In the event any tenant under a Lease is owing any Rents to Seller which are attributable to the Seller Ownership Period, Seller shall have the right to recover such amounts directly from the tenants under Leases, but no action shall be taken to dispossess any such tenant under a Lease or any of its subtenants, nor shall Purchaser be required to condition any amendment, consent, or other modification of a Lease upon the tenant under such Lease paying all amounts due Seller in full.

7.5.4    Payments by the tenants under the Leases for utility costs, operating expenses, insurance costs and other escalation charges (collectively, "**CAM Contributions**") shall be prorated as of the Closing Date by allocating each such deposit and payment ratably based on the number of days in the period to which the same apply. Purchaser and Seller hereby acknowledge and agree that CAM Contributions are billed to, and paid by, the tenants under Leases on the basis of estimates of the expenses with respect to which CAM Contributions are payable. At Closing, Purchaser shall be credited, and Seller shall be charged, for any overpayment of CAM Contributions made by any tenant under a Lease ("**Tenant Overpayment**").

7.6    <u>Transaction Taxes</u>.

7.6.1    <u>Transfer Taxes</u>. Purchaser shall bear any and all stamp, sales or transfer tax or other similar fees and amounts (including any interest, penalties or additions thereto) imposed in connection with the purchase and sale by Seller to Purchaser of the Purchased Assets hereunder (collectively, "**Transfer Taxes**"), whether payable at the Closing or upon a subsequent Transfer Tax audit or examination by a governmental authority, including those imposed by any municipality, any county ordinance in Franklin County, Ohio or the state of Ohio, and the Party required by applicable law to file any related tax returns and pay such amounts to the applicable taxing authority will timely do so and provide the other Party with evidence satisfactory to such other Party that all such Transfer Taxes have been paid.

7.7    <u>Closing Costs</u>.

7.7.1    At Closing, Seller shall be responsible for, and pay, the costs of Seller's counsel and other professionals engaged by Seller.

7.7.2    At Closing, Purchaser shall be responsible for, and pay: (i) all conveyance fees, Transfer Taxes and similar governmental transaction fees payable upon the conveyance of the Property to Purchaser; (ii) the premium for the Title Policy; (iii) the cost of any endorsements to the Title Policy; (iv) the closing or escrow fees charged by the Title Company; (v) all recording charges for the Deed and all documents pertaining to any Purchaser financing; (vi) any commission due any broker of Purchaser; and (vii) the costs of counsel and other professionals engaged by Purchaser, including without limitation those engaged in connection with the Inspections.

7.7.3    All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Agreement, will be payable by the Party that incurred such costs.

7.8    <u>Conditions to Seller's Obligation to Close</u>. In addition to any other conditions and/or contingencies set forth in this Agreement, Seller's obligation to sell the Purchased Assets to Purchaser is subject to each and all of the following conditions precedent (or express written waiver thereof by Seller):

15

7.8.1    All representations and warranties of Purchaser contained in <u>Section 6.2</u> are true and correct as of the Closing Date;

7.8.2    All obligations of Purchaser in this Agreement that were to have been performed on or prior to the Closing Date have been timely and duly performed in all material respects;

7.8.3    Purchaser shall have delivered or caused to be delivered to Escrow Agent the Closing Payment; and

7.8.4    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to any stay and shall not have been vacated or modified.

7.9    <u>Conditions to Purchaser's Obligation to Close</u>.  In addition to any other conditions and/or contingencies set forth in this Agreement, Purchaser's obligation to close the acquisition of the Purchased Assets is subject to each and all of the following conditions precedent (or express written waiver thereof by Purchaser):

7.9.1    All representations and warranties of Seller contained in <u>Section 6.1</u> are true and correct as of the date of Closing in all material respects other than as a result of any change in facts or circumstances which do not otherwise constitute a default of Seller pursuant to the express terms of this Agreement;

7.9.2    All obligations of Seller in this Agreement that were to have been performed on or prior to the Closing Date have been timely and duly performed in all material respects; and

7.9.3    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to any stay and shall not have been vacated or modified.

## ARTICLE VIII
## Casualty and Condemnation

8.1    <u>Condemnation</u>.  If, prior to Closing, the Property or any part thereof shall be condemned by any legally constituted authority for any public use or purpose, or if Seller receives notification that a condemnation is being contemplated by any legally constituted authority, Seller shall give Purchaser prompt notice of same and Purchaser shall have the option either to terminate this Agreement or to consummate the transaction contemplated by this Agreement notwithstanding such condemnation.  If Purchaser elects to consummate the transaction contemplated by this Agreement, Purchaser shall be entitled to receive the condemnation proceeds with no credit, setoff or abatement of the Purchase Price, and Seller shall, at Closing and thereafter, execute and deliver to Purchaser all required assignments of the condemnation proceeds and other similar items.  If Purchaser elects to terminate this Agreement, Purchaser shall send a written notice of such termination to Escrow Agent and Seller pursuant to the notice provisions of this Agreement within five (5) business days after receiving the written notice from Seller under this Section 8.1 and (i) the Deposit shall be disbursed to Purchaser in accordance with <u>Section 2.1.1</u> and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement.

8.2    <u>Casualty</u>.  If prior to Closing the Property or the Purchased Assets are completely or partially damaged by fire or other casualty and the cost of repair or restoration would reasonably be expected to equal or exceed Ten Million and No/100 Dollars ($10,000,000.00) ("**Material Casualty**"), then Seller shall promptly notify Purchaser thereof in writing.  Purchaser shall have five (5) business days from the receipt of such notice of Material Casualty to notify Seller that Purchaser will (i) subject to all of the

16

other terms and conditions hereof, proceed with the Closing with no credit, setoff or abatement of the Purchase Price and Purchaser will be entitled to receive all insurance proceeds payable as a result thereof, less expenses incurred by Seller prior to the Closing Date for the direct cost of the repair of any of the damage undertaken by Seller with respect to such loss or damage, or (ii) terminate this Agreement in which case (i) the Deposit shall be disbursed to Purchaser in accordance with Section 2.1.1 and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement.  In the event of other loss or damage to the Property or Purchased Assets that is not a Material Casualty, the Parties shall proceed with the Closing and no credit, setoff or abatement of the Purchase Price, and Seller shall assign to Purchaser at Closing all interest of Seller in and to any insurance proceeds or claims on account of such casualty, less expenses incurred by Seller prior to the Closing Date for the direct cost of the repair of any of the damage undertaken by Seller with respect to such loss or damage.

## ARTICLE IX
## Default

9.1     <u>Default by Purchaser</u>.  Any material breach of the representations of Purchaser under Section 6.2 or any other failure to perform any obligation of Purchaser hereunder shall constitute an event of default.  Purchaser and Seller each acknowledge that it would be difficult to ascertain the actual damages which would be suffered by Seller if Purchaser defaults in consummating the Transactions.  Upon the occurrence of any such event of default, then Seller's sole remedy shall be to terminate the Agreement upon notice to Seller and Escrow Agent, in which case (i) the Deposit shall be disbursed to Seller in accordance with <u>Section 2.1.1</u> and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement.  Upon such payment of the Deposit as liquidated damages to Seller, as the actual amount of damages are impractical or extremely difficult to fix and liquidated damages in the amount of the Deposit are and will be reasonable, neither party to this Agreement shall have any further liability to the other and this Agreement shall terminate and the parties shall have no further obligations hereunder, except for those which expressly survive any such termination.

9.2     <u>Default by Seller</u>.  Any material breach of the representations of Seller under Section 6.1 or any other failure to perform any obligation of Seller hereunder (including without limitation Seller's refusal or inability to convey the Property at Closing) shall constitute an event of default.  Upon the occurrence of any such event of default, Purchaser shall be entitled to exercise any or all of the following remedies:  (a) terminate this Agreement by giving written notice to Seller, with a copy thereof to Escrow Agent, in which case (i) the Deposit shall be disbursed to Purchaser in accordance with <u>Section 2.1.1</u> and (ii) neither Party shall have any obligations hereunder except those expressly stated to survive the termination of this Agreement; or (b) seek specific performance of Seller's obligations hereunder.

9.3     <u>Escrow Agent Provisions</u>.  Escrow Agent shall hold the Deposit in an account which shall not be commingled with any other funds.  Escrow Agent shall pay the Deposit to the Party entitled to it solely when Escrow Agent receives (a) a notice signed by both Parties directing disposition of the Deposit or (b) a final, non-appealable judgment or order of a court of competent jurisdiction.  In the event of any dispute as to who is entitled to receive the Deposit and interest earned thereon, the Title Company shall have the right to retain the funds and disburse them in accordance with the final order of a court of competent jurisdiction, or to deposit the Deposit with the Bankruptcy Court, pending a final decision of the controversy.  The parties hereto further agree that Escrow Agent shall not be liable for failure of the depository.

#99679845v19

# ARTICLE X
# Other Provisions

10.1   <u>Brokers</u>.  Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.

10.2   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between Seller and Purchaser with respect to the Purchased Assets and shall not be modified or amended except in a written document signed by Seller and Purchaser.  Any prior agreement or understanding between Seller and Purchaser concerning the Purchased Assets is hereby rendered null and void.

10.3   <u>Notices</u>.  All notices, requests, demands or other communications required or permitted under this Agreement shall be in writing and delivered personally, by overnight mail by a national courier service, by certified mail, or return-receipt requested, postage prepaid, or by e-mail, in each case so long as such notice is addressed as follows:

If to Seller:

Big Lots Management, LLC
4900 East Dublin Granville Road
Columbus, Ohio 43081
Attn: Chris Macke
Vice President, Legal – Real Estate
Email: cmacke@biglots.com

and

Big Lots Management, LLC and Big Lots Stores, LLC
4900 East Dublin Granville Road
Columbus, Ohio 43081
Attn: Ronald A. Robins, Jr. (Rocky)
EVP, Chief Legal and Governance Officer
Email: rrobins@biglots.com

With a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:  Adam Shpeen; Avelina Burbridge
Telephone: 212-450-4169; 212-450-4306
Email: adam.shpeen@davispolk.com;
avelina.burbridge@davispolk.com

18

If to Purchaser:

OhioHealth Corporation
3430 OhioHealth Parkway
Columbus, Ohio 43202
Attn: System VP, Real Estate, Construction &
Facilities

With a copy to:

OhioHealth Corporation
3430 OhioHealth Parkway
Columbus, Ohio 43202
Attn: System Vice President & Deputy
General Counsel

Additional copy to:

Matthew E. Moberg
Porter Wright Morris & Arthur
41 S. High Street, Suites 2800-3200
Columbus, Ohio 43215
mmoberg@porterwright.com

If to Escrow Agent:

Stewart Title Guaranty Company
1360 Post Oak Blvd., Ste. 100, MC#11-15
Houston, TX 77056
Email: STGescrowservices@stewart.com
Tel: (1) 713-625-8126

All notices given in accordance with the terms hereof shall be deemed received (i) on the same day when delivered personally; (ii) one (1) business day after being deposited with a national overnight courier service; (iii) three (3) business days after posting for delivery by certified mail, or return-receipt requested, postage prepaid; or (iv) on the same day when delivered via the email addresses noted above, provided a hard copy of same is also deposited with a national overnight courier service to be delivered the following business day. Either Party hereto may change the address for receiving notices, requests, demands or other communication by notice sent in accordance with the terms of this Section 10.3.

10.4    Business Day. For purposes of this Agreement, (i) "days" shall mean calendar days and (ii) "business day" shall mean any day of the year, other than (a) a Saturday or a Sunday, and (b) any day on which national banks located in New York or Ohio are required or authorized by law to remain closed. Any time period provided for herein which shall end on a non-business day shall extend to 5:00 P.M., Columbus, Ohio time, of the next business day.

10.5    Assignment. This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and assigns including any trustee or estate representative appointed by the Bankruptcy Court or pursuant to any successor Chapter 7 cases of Seller. Purchaser may not assign or transfer its rights or obligations under this Agreement without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller. An assignment or transfer of this Agreement shall not relieve the Purchaser named herein of any of Purchaser's obligations under this Agreement (whether the same accrued prior to the date of such assignment or accrues on or after such date). No transfer or assignment in violation of the provisions hereof shall be valid or enforceable. References to Purchaser in this Agreement shall be deemed to include any such permitted assignee or transferee, but only to the extent of such assignment and only to the extent such assignment is in accordance with such provisions.

19

10.6    <u>Waiver of Jury Trial</u>.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY AND COVENANT THAT NEITHER PARTY NOT THEIR AFFILIATES WILL ASSERT ANY RIGHT TO SUCH TRIAL BY JURY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS TRANSACTION. Each Party may file an original counterpart or a copy of this <u>Section 10.6</u> with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury. The provisions of this Section 10.6 shall survive the Closing or termination of this Agreement.

10.7    <u>Governing Law; Jurisdiction</u>.  THIS AGREEMENT, AND ANY ACTION, CLAIM, SUIT, CHARGE, COMPLAINT, AUDIT, ARBITRATION, INVESTIGATION, INQUIRY OR PROCEEDING THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE OR BE INCIDENTAL TO THE TRANSACTION, THIS AGREEMENT, THE NEGOTIATION, EXECUTION, PERFORMANCE OR CONSUMMATION OF THE FOREGOING OR THE INDUCEMENT OF ANY PARTY TO ENTER INTO THE FOREGOING, WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE, AND WHETHER NOW EXISTING OR HEREAFTER ARISING (EACH, A "**TRANSACTION DISPUTE**"), WILL BE EXCLUSIVELY GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK TO BE APPLIED. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO AND/OR (II) THE PURCHASED ASSETS. THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. The provisions of this Section 10.7 shall survive the Closing or termination of this Agreement.

10.8    <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

10.9    <u>Construction</u>.  This Agreement shall be given a fair and reasonable construction in accordance with the intentions of the parties hereto, and without regard or aid of canons requiring construction against the party drawing this Agreement.

10.10    <u>Captions and Headings</u>.  The caption headings in this Agreement are for convenience only and are not intended to be a part of this Agreement and shall not be construed to modify, explain or alter any of the terms, covenants or conditions herein contained.

10.11    <u>No Waiver</u>.  No failure or delay of either party in the exercise of any right given to such party hereunder or the waiver by any party of any condition hereunder for its benefit shall be deemed to be a waiver of any other provision of this Agreement.

10.12    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument, and any Party hereto may execute this Agreement by signing any such

20

counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

10.13    Operation of the Property through Closing.  From and after the Effective Date and until Closing, Seller shall keep the Property in the same condition and repair as it shall be at the time of inspection by Purchaser, reasonable wear and tear and damage caused by Purchaser's Inspections excepted.  Seller shall from and after the Effective Date and until Closing, keep all insurance in at least such amounts, and with the same deductibles, as are maintained by Seller on the Effective Date in full force and effect and pay all premiums in connection therewith.

10.14    Time of the Essence.  TIME IS OF THE ESSENCE with respect to Purchaser's obligations to close the Transaction.

10.15    Exculpation; Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Agreement. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.  The provisions of this Section 10.15 shall survive the expiration of the term or any earlier termination of this Agreement.

10.16    No Recording.  Purchaser agrees not to record this Agreement or any memorandum or short form of this Agreement.

10.17    Survival.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date.

10.18    Further Assurances.  The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Agreement and to fully consummate and effect the Transactions.

## ARTICLE XI
## Competing Offers

11.1    Competing Offers.  Notwithstanding anything else to the contrary in this Agreement, Purchaser hereby acknowledges and agrees that (a) this Agreement and the transaction contemplated herein are subject to higher or better competing bids for the Purchased Assets that may be made prior to, at or in connection with the Bankruptcy Court hearing on Seller's Approval Motion taking into consideration all of the terms of this Agreement (each, a "**Competing Bid**"), (b) Seller may elect, with approval of the Bankruptcy Court, to sell all or any portion of the Purchased Assets to the maker of a higher or better Competing Bid, and (c) the consummation of any such sale of all or any portion of the Purchased Assets to a competing bidder shall void this Agreement and, other than the obligation to cause the Deposit to be

21

returned to Purchaser, Seller shall have no further obligations to Purchaser or any other party under or in connection with this Agreement.

**[Remainder of page intentionally left blank; signature page follows]**

#99679845v19

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**PURCHASER**

**OhioHealth Corporation**
an Ohio non-profit corporation

By: _____

Name: Roland Tokarski

Title: System Vice President, Real Estate & Construction

Date: January 31, 2025

**SELLER**

**Big Lots Management, LLC** f/k/a BLHQ LLC, an Ohio limited liability company

By: _____

Name: Jonathan Ramsden

Title: Executive Vice President, Chief Financial and Administrative Officer

Date: January 31, 2025

*[Signature Page to Purchase and Sale Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**PURCHASER**

**OhioHealth Corporation**,
an Ohio non-profit corporation

By: _____

Name: Roland Tokarski

Title: System Vice President, Real Estate & Construction

Date: January 31, 2025

**SELLER**

**Big Lots Management, LLC** f/k/a BLHQ LLC,

an Ohio limited liability company

By: *Jonathan Ramsden*
FF2E51629530412...

Name: Jonathan Ramsden

Title: Executive Vice President, Chief Financial and Administrative Officer

Date: January 31, 2025

[*Signature Page to Purchase and Sale Agreement*]

## <u>ACCEPTANCE BY ESCROW AGENT</u>

We are in receipt of the Purchase and Sale Agreement, dated as of January 31, 2025 (the "**Agreement**"), by and between BIG LOTS MANAGEMENT, LLC f/k/a BLHQ LLC, an Ohio corporation, an Ohio limited liability company ("**Seller**"), and OHIOHEALTH CORPORATION, an Ohio nonprofit corporation ("**Purchaser**").  We have received the Deposit in the amount of One Million Dollars and No/100 Dollars ($1,000,000.00) and agree to hold the Initial Deposit and any additional deposits in escrow in accordance with the Agreement and the attached addendum.

**ESCROW AGENT:**

Stewart Title Guaranty Company - Agency
Services, a Texas corporation

By: _McKinney K. Whetstone_

Digitally signed by McKinney K. Whetstone
DN: cn=McKinney K. Whetstone, o, ou, email=mckinney.whetstone@stewart.com, c=US
Date: 2025.02.05 16:18:55 -06'00'

Name: McKinney Whetstone

Date: _02/05/2025_

*[Signature Page to Purchase and Sale Agreement]*

**EXHIBIT A**

**THE LAND**

Situated in the State of Ohio, County of Franklin, City of Columbus, lying in Quarter Township 3, Township 2, Range 16, United States Military Lands, and being all of the remainder of that 25.564 acre tract conveyed to Hamilton Crossing BL LLC by deed of record in Instrument Number 201609130123395 (all references are to the records of the Recorder's Office, Franklin County, Ohio) and being more particularly described as follows:

Beginning, for reference, at Franklin County Geodetic Survey monument number FCGS 8816 found at the centerline intersection of Dublin-Granville Road with Old Hamilton Road (County Road 103), as depicted on Plat Book 122, Page 85, being the southerly common corner of said 25.564 acre tract and that 16.880 acre tract conveyed as Parcel 12-WL to State of Ohio by document of record in Deed Book 3738, Page 298, and being in the line common to said Quarter Township 3 and Quarter Township 4, Township 2, Range 17;

Thence North 03° 50' 37" East, with the line common to said 25.564 and 16.880 acre tracts, said common Quarter Township line, a distance of 45.01 feet to an iron pin set at an angle point in the northerly right-of-way line of Dublin-Granville Road, as dedicated in Plat Book 122, Page 85, the TRUE POINT OF BEGINNING;

Thence North 03° 50' 37" East, continuing with the line common to said 25.564 and 16.880 acre tracts, said common Quarter Township line, a distance of 566.24 feet to an iron pin set in the southerly limited access right-of-way line of Relocated State Route 161, as depicted on State of Ohio Department of Transportation Plan FRA-161-16.75/LIC-161-0.00, being the southwesterly corner of that 31.729 acre tract conveyed as Parcel 13WL to State of Ohio by document of record in Official Record 25998B20;

Thence North 66° 48' 43" East, with said southerly limited access right-of-way line, the line common to said 25.564 and 31.729 acre tracts, a distance of 678.43 feet to an iron pin set; Thence North 67° 17' 20" East, continuing with said southerly limited access right-of-way line, said common line, a distance of 441.03 feet to an iron pin set at the northwesterly corner of the remainder of that 55.460 acre tract conveyed to Hamilton Crossing LLC by deeds of record in Instrument Numbers 201510300154503 and 201602110017560;

Thence South 38° 51' 57" East, with the line common to said 25.564 acre tract and the remainder of said 55.460 acre tract, a distance of 755.64 feet to an iron pin set in the northerly right-of-way line of said Dublin-Granville Road;

Thence with said northerly right-of-way line, the following courses and distances:

South 50° 22' 13" West, a distance of 126.59 feet to an iron pin set;

North 77° 39' 38" West, a distance of 25.35 feet to an iron pin set;
South 43° 02' 58" West, a distance of 35.06 feet to an iron pin set;

South 50° 22' 13" West, a distance of 93.61 feet to an iron pin set;

South 11° 45' 06" West, a distance of 24.83 feet to an iron pin set;

#99679845v19

South 50° 22' 13" West, a distance of 265.99 feet to an iron pin set at a point of curvature;

With the arc of a curve to the right, having a central angle of 42° 31' 31", a radius of 460.50 feet, an arc length of 341.79 feet, a chord bearing of South 71° 37' 59" West and chord distance of 333.99 feet to an iron pin set;

North 87° 06' 16" West, a distance of 705.71 feet to an iron pin set;

North 00° 11' 23" West, a distance of 5.50 feet to an iron pin set; and

North 87° 06' 16" West, a distance of 92.68 feet to the TRUE POINT OF BEGINNING, containing 24.711 acres, more or less.

Subject, however, to all legal rights-of-way and/or easements, if any, of previous record.

Iron pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter, thirty (30) inches long with a plastic plug placed in the top bearing the initials EMHT INC.

The bearings herein are based on the Ohio State Plane Coordinate System as per NAD83, South Zone (2007 Adjustment). Control for bearings was from coordinates of monuments FCGS 8815 & FCGS 8816, having a bearing of North 03° 23' 04" East for a portion of the centerline of Hamilton Road (Relocated), established by the Franklin County Engineering Department, using Global Positioning System procedures and equipment.

This description is based on an actual field survey performed by or under the direct supervision of Heather L. King, Professional Surveyor Number 8307 in September of 2014.

For Informational Purposes Only:
PPN: 010-296247-00
Address: 4860-4900 E Dublin-Granville Road, Columbus, OH

Exhibit A – 2

**EXHIBIT B-1**

**LEASES**

Lease, dated as of April 7, 2023 (the "**Original WPG Lease**"), by and between Seller, as Landlord, and WPG Management Associates, Inc., an Indiana corporation ("**WPG**"), as tenant, as amended by that certain Amendment to Office Lease, dated November 27, 2024 (the "**WPG Lease Amendment**"; the Original WPG Lease, as amended by the WPG Lease Amendment, the "**WPG Lease**"), by and between Seller and WPG.

**EXHIBIT B-2**

**CITY AGREEMENT**

City of Columbus Community Reinvestment Area Agreement, effective as of August 22, 2016 (the "**Initial City Agreement**"), by and among the City of Columbus, Hamilton Crossing BL LLC, a domestic limited liability company ("**Hamilton**"), and Big Lots, Inc., an Ohio Corporation, as (i) partially assigned from Hamilton to Columbus-Franklin County Finance Authority ("**Financing Authority**") pursuant to that certain Assignment and Assumption Agreement, effective as of November 3, 2016, and (ii) assigned from the Financing Authority to Seller pursuant to that certain Second Assignment and Assumption of City of Columbus Community Reinvestment Area Agreement, effective as of October 31, 2019 (the Initial City Agreement, as assigned, collectively, the "**City Agreement**")

**EXHIBIT C**

**INSURANCE REQUIREMENTS**

1. Purchaser and Purchaser's Consultants shall maintain, in form and substance reasonably satisfactory to Owner, with insurance companies acceptable to Owner, the following insurance:

   a. Comprehensive General Liability or Commercial General Liability Insurance, with limits of not less than One Million Dollars ($1,000,000) combined single limit per occurrence and not less than Two Million Dollars ($2,000,000) on a general aggregate basis, for bodily injury, death and property damages, and

   b. Excess (umbrella) liability insurance with liability insurance with limits of not less than Five Million Dollars ($5,000,000) per occurrence.

2. Each policy of insurance shall:

   a. state that such policy is primary and noncontributing with any insurance carried by Owner;

   b. contain a provision that the naming of the additional insured shall not negate any right the additional insured would have had as a claimant under the policy if not so named; and

3. A certificate, together with any endorsements to the policy required to evidence the coverage which is to be obtained hereunder, shall be delivered to Owner prior to any entry on the Property by Purchaser or Purchaser's Consultants.

4. Any policies required by the provisions of this Section may be (i) made a part of a blanket policy of insurance with a "per project, per location endorsement" or (ii) provided by blanket coverage maintained by Purchaser under a program of self-insurance, so long as, in each case, such blanket policy contains all of the provisions required herein and does not reduce the coverage, impair the rights of the other party of this Agreement or negate the requirements of this Agreement.

Exhibit C-1

#99679845v19

## EXHIBIT D

**FORM OF DEED**

LIMITED WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS THAT **BIG LOTS MANAGEMENT, LLC**, an Ohio limited liability company (f/k/a **BLHQ LLC**, an Ohio limited liability company, as a result of the name change attached hereto as EXHIBIT B) ("**Grantor**"), with an address at 4900 E. Dublin-Granville Road, Columbus, Ohio 43081, for valuable consideration paid, grants, with limited warranty covenants, to **OHIOHEALTH CORPORATION**, an Ohio nonprofit corporation ("**Grantee**"), with an address at 3430 OhioHealth Parkway, Columbus, Ohio 43202, for certain real property described on EXHIBIT A, attached hereto and made a part hereof (the "**Property**").

Parcel Number. 010-296247-00

Street Address:   4860-4900 E. Dublin-Granville Road, Columbus, OH
Prior Instrument Number: 201910300144679

Grantor for Ten and No/100 Dollars ($10.00) cash, and other good and valuable consideration paid, the receipt and sufficiency of which are hereby acknowledged, grants, with limited warranty covenants, to Grantee, the Property, free and clear from all encumbrances made by Grantor except the lien of ad valorem real estate taxes and assessments, general and special, not yet due and delinquent or that are being contested in good faith and the covenants, conditions, restrictions, easements and other matters of record as of the date hereof.

This limited warranty deed is expressly made subject to the terms and conditions of that certain Purchase and Sale Agreement, dated as of January 31, 2025 ("**Purchase Agreement**"), by and between Grantor and Grantee. If any provision of this limited warranty deed is construed to conflict with any provision of the Purchase Agreement, the provisions of the Purchase Agreement shall be deemed controlling to the extent of that conflict; provided, however, that this limited warranty deed may be conclusively relied upon by third parties to vest title to the Property in Grantee. Any capitalized terms used but not defined in this limited warranty deed shall have the meaning assigned to such terms in the Purchase Agreement.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, Grantor has executed the Deed this _____ day of
_____, 2025.

<u>**GRANTOR**</u>:

**BIG LOTS MANAGEMENT, LLC**, an
Ohio limited liability company (f/k/a
**BLHQ LLC**, an Ohio limited liability
company)

By: _____
    Name: Jonathan Ramsden
    Title: EVP, CFO & CAO

STATE OF _____    )
                           ) SS
COUNTY OF _____      )


BEFORE ME, a Notary Public in and for said county and state, personally appeared ___Jonathan Ramsden___, as _EVP, CFO & CAO_ of **BIG LOTS MANAGEMENT, LLC**, an Ohio limited liability company (f/k/a **BLHQ LLC**, an Ohio limited liability company), who acknowledged that he/she did execute the foregoing instrument on behalf of said limited liability company, as general partner of such limited partnership and that the same is his/her free act and deed and that no oath or affirmation was administered to the signor.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and seal as of this _____day of _____, 2025.


_____
Notary Public


THIS INSTRUMENT PREPARED BY:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
By: Real Estate Department

**EXHIBIT A**

Description of the Land

Situated in the State of Ohio, County of Franklin, City of Columbus, lying in Quarter Township 3, Township 2, Range 16, United States Military Lands, and being all of the remainder of that 25.564 acre tract conveyed to Hamilton Crossing BL LLC by deed of record in Instrument Number 201609130123395 (all references are to the records of the Recorder's Office, Franklin County, Ohio) and being more particularly described as follows:

Beginning, for reference, at Franklin County Geodetic Survey monument number FCGS 8816 found at the centerline intersection of Dublin-Granville Road with Old Hamilton Road (County Road 103), as depicted on Plat Book 122, Page 85, being the southerly common corner of said 25.564 acre tract and that 16.880 acre tract conveyed as Parcel 12-WL to State of Ohio by document of record in Deed Book 3738, Page 298, and being in the line common to said Quarter Township 3 and Quarter Township 4, Township 2, Range 17;

Thence North 03° 50' 37" East, with the line common to said 25.564 and 16.880 acre tracts, said common Quarter Township line, a distance of 45.01 feet to an iron pin set at an angle point in the northerly right-of-way line of Dublin-Granville Road, as dedicated in Plat Book 122, Page 85, the TRUE POINT OF BEGINNING;

Thence North 03° 50' 37" East, continuing with the line common to said 25.564 and 16.880 acre tracts, said common Quarter Township line, a distance of 566.24 feet to an iron pin set in the southerly limited access right-of-way line of Relocated State Route 161, as depicted on State of Ohio Department of Transportation Plan FRA-161-16.75/LIC-161-0.00, being the southwesterly corner of that 31.729 acre tract conveyed as Parcel 13WL to State of Ohio by document of record in Official Record 25998B20;

Thence North 66° 48' 43" East, with said southerly limited access right-of-way line, the line common to said 25.564 and 31.729 acre tracts, a distance of 678.43 feet to an iron pin set; Thence North 67° 17' 20" East, continuing with said southerly limited access right-of-way line, said common line, a distance of 441.03 feet to an iron pin set at the northwesterly corner of the remainder of that 55.460 acre tract conveyed to Hamilton Crossing LLC by deeds of record in Instrument Numbers 201510300154503 and 201602110017560;

Thence South 38° 51' 57" East, with the line common to said 25.564 acre tract and the remainder of said 55.460 acre tract, a distance of 755.64 feet to an iron pin set in the northerly right-of-way line of said Dublin-Granville Road;

Thence with said northerly right-of-way line, the following courses and distances:

South 50° 22' 13" West, a distance of 126.59 feet to an iron pin set;

North 77° 39' 38" West, a distance of 25.35 feet to an iron pin set;
South 43° 02' 58" West, a distance of 35.06 feet to an iron pin set;

South 50° 22' 13" West, a distance of 93.61 feet to an iron pin set;

South 11° 45' 06" West, a distance of 24.83 feet to an iron pin set;

South 50° 22' 13" West, a distance of 265.99 feet to an iron pin set at a point of curvature;

With the arc of a curve to the right, having a central angle of 42° 31' 31", a radius of 460.50 feet, an arc length of 341.79 feet, a chord bearing of South 71° 37' 59" West and chord distance of 333.99 feet to an iron pin set;

North 87° 06' 16" West, a distance of 705.71 feet to an iron pin set;

North 00° 11' 23" West, a distance of 5.50 feet to an iron pin set; and

North 87° 06' 16" West, a distance of 92.68 feet to the TRUE POINT OF BEGINNING, containing 24.711 acres, more or less.

Subject, however, to all legal rights-of-way and/or easements, if any, of previous record.

Iron pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter, thirty (30) inches long with a plastic plug placed in the top bearing the initials EMHT INC.

The bearings herein are based on the Ohio State Plane Coordinate System as per NAD83, South Zone (2007 Adjustment). Control for bearings was from coordinates of monuments FCGS 8815 & FCGS 8816, having a bearing of North 03° 23' 04" East for a portion of the centerline of Hamilton Road (Relocated), established by the Franklin County Engineering Department, using Global Positioning System procedures and equipment.

This description is based on an actual field survey performed by or under the direct supervision of Heather L. King, Professional Surveyor Number 8307 in September of 2014.

For Informational Purposes Only:
PPN: 010-296247-00
Address: 4860-4900 E Dublin-Granville Road, Columbus, OH

**EXHIBIT B**

Certificate of Name Change

[To be attached]

#99679845v19

**EXHIBIT E**

**LEASEBACK TERMS**

**4900 E. Dublin Granville Road, Columbus, OH**

| Parties | Lessor: OhioHealth Corporation, an Ohio nonprofit corporation ("**Lessor**") |
| --- | --- |
| | Lessee: Big Lots Management, LLC f/k/a BLHQ LLC, an Ohio limited liability company, or its assignee or designee pursuant to Section 5.2 ("**Lessee**") |
| **Term** | Term:  At least 10-month term. |
| | Extension Options:  Two 30-day options to extend. |
| | Termination Option: Freely terminable by Lessee at any time. |
| **Rental** | Base Rent:  $0 |
| | Operating Expenses:  Lessee shall pay Lessee's proportionate share of all operating expenses (i.e., taxes, utilities) based on the space being occupied by Lessee as a percentage of the total building. |
| **Property Management Services** | Lessor shall provide property management services for the entire building throughout the term. |
| **Signage** | Lessee may retain current signage, with the caveat that Lessor shall also pursue and display such branding and signage as Lessor may deem appropriate. |
| **Unused Space** | Lessor shall be entitled to utilize unused space and various common areas as Lessor may deem necessary or desirable, including existing furniture, fixtures and equipment owned by Lessee ("**FF&E**"), subject to the rights and needs of Lessee during the term. |
| **Design and Renovation** | Lessor may begin design and renovation work during the term, and Lessee shall cooperate with those efforts in good faith, provided that the same do not materially or unreasonably interfere with Lessee's use of the leased premises during the term. |
| **Rent from Tenants** | Lessor shall be entitled to retain any rent payable by WPG under the WPG Lease. |

**<u>EXHIBIT F</u>**

**FORM OF SALE ORDER**

**[OMITTED]**

## EXHIBIT G

## FORM OF ASSIGNMENT OF LEASES

### ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "**Assignment**") is made this __ day of _____, 20____ (the "**Assignment Date**"), by and between _____, a(n) __ _____ ("**Assignor**") and OhioHealth Corporation, an Ohio nonprofit corporation ("**Assignee**").

### W I T N E S S E T H :

Assignor and Assignee are parties to that certain Real Estate Purchase Agreement dated as of the ___ day of _____, 20____, (the "**Agreement**"), pertaining to the transfer of certain tracts of land situated in _____ County, Ohio, and more fully described in the Agreement, including all improvements thereon and all rights and appurtenances pertaining thereto (collectively the "**Property**"). The transfer of the Property by Assignor to Assignee pursuant to the Agreement is being closed concurrently with the execution of this Assignment.

Assignee desires to acquire and assume all obligations under, and Assignor is willing to assign to Assignee, all of Assignor's right, title and interest in and to, and all of Assignor's obligations under, the existing tenant leases on the Property shown on the rent roll attached hereto as Exhibit A and incorporated herein, including without limitation all security deposits contemplated by said leases (collectively the "**Leases**").

### Agreement:

NOW, THEREFORE, in consideration of the above premises, and for the sum of TEN and NO/100 dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by Assignor and Assignee as follows:

1.      All capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement. Effective as of the Closing, Assignor does hereby SELL, TRANSFER, ASSIGN and SET OVER unto Assignee all of Assignor's right, title and interest in, to and under the Leases, including without limitation all rents prorated pursuant to the Agreement and thereafter as well as all security deposits paid by tenants under the Leases which have not been heretofore forfeited by or returned to the tenants under such Leases, and Assignee does hereby assume the Leases as of the Closing date.

2.      Assignee hereby agrees to assume any and all liability, demands, claims, causes of action and loss arising under the Leases and arising from the management and operation of the Property, including liability for costs and attorneys' fees and expenses, which liability arises from, or is based upon, any facts or circumstances which first occur on or after the Closing date.

3.      This Assignment is made without representation or warranty by Assignor or Assignee other than (a) the warranties of Assignor and Assignee expressly set forth in the Agreement; and (b) the warranty that Assignor has not heretofore assigned the Leases.

4.      In the event of any litigation between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained

herein, the losing party shall pay the prevailing party's costs and expenses of such litigation, including without limitation reasonable attorneys' fees and expenses.

5.     This Assignment shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

6.     This Assignment may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same Assignment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be duly executed as of the Assignment Date written above.

**ASSIGNOR:**

_____

a(n) _____

By:_____

Name:_____

Title:_____

**ASSIGNEE:**

OhioHealth Corporation,
an Ohio nonprofit corporation

By:_____

Name:_____

Title:_____

## EXHIBIT A

**THE LEASES**

[Assignor to attach]

**EXHIBIT H**

**FORM OF BILL OF SALE**

**BILL OF SALE**

DATED:                    ___, 2025

**Big Lots Management, LLC**, an Ohio limited liability company (f/k/a BLHQ LLC, an Ohio limited liability company) ("**Seller**"), does hereby sell, assign, transfer, convey and set over to OhioHealth Corporation, an Ohio nonprofit corporation ("**Purchaser**"), all Purchased Assets (as such term is defined in the Purchase and Sale Agreement, dated as of January 31, 2025, by and between Purchaser and Seller ("**Purchase Agreement**"), including the Transferred Personal Property set forth on **EXHIBIT A** attached hereto, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in the Purchase Agreement and in the Sale Order.

Purchaser acknowledges that this Bill of Sale is made in accordance with the terms and provisions of the Purchase Agreement. Other than as expressly set forth in the Purchase Agreement, the sale of the Transferred Personal Property is made "as-is" and "where-is" "with all faults," without any representations or warranties, express or implied, including as to the physical condition or state of repair of the Transferred Personal Property, as to visible or hidden aspects in material, workmanship or capacity, implied warranties of fitness for any particular use or purpose or merchantability, or any other warranties whatsoever.

Capitalized terms used herein, but not defined, shall have the meanings given to such terms in the Purchase Agreement.

This Bill of Sale shall be subject to the provisions of Sections 10.2, 10.5 through 10.12, 10.15 of the Purchase Agreement, which shall apply *mutatis mutandis* to this Bill of Sale as if fully set forth herein. In the event of any conflict or inconsistency between the terms of this Bill of Sale and the Purchase Agreement, the terms of the Agreement shall control.

**[remainder of page intentionally left blank]**

**[signature page(s) follow immediately]**

      **IN WITNESS WHEREOF**, the undersigned has executed this Bill of Sale as of the date first above written.

**SELLER**:

**BIG LOTS MANAGEMENT, LLC**, an Ohio limited liability company (f/k/a BLHQ LLC, an Ohio limited liability company)

By: _____

Name: _____

Title: _____


PURCHASER:

**OHIOHEALTH CORPORATION**, an Ohio nonprofit corporation

By: _____

Name: _____

Title: _____

## EXHIBIT A TO BILL OF SALE

**Transferred Personal Property**

**(1)**     **The following**:

## EXHIBIT I

## FORM OF OWNER'S AFFIDAVIT OF TITLE

## Title Affidavit

dated as of _____, 2025

Re:     **Insured:**

**Title Insurer:**
[_____] ("Title Insurer")

**Title Insurer**

**Master #:**

**Commitment #:**

**Premises:**
as legally described in the Commitments

**Certifications:**
The undersigned owner of the Premises hereby certifies, to the knowledge of the undersigned, the following to Title Insurer (as to its respective estate and/or interest in the Premises):

1.    **Mechanics Liens:**
[No labor, services or materials rendered or furnished from and after [DATE THAT IS 90 DAYS PRIOR TO THE CLOSING] in connection with the Premises or with the construction or repair of any building or improvements on the Premises.][All labor, services or materials rendered or furnished from and after [DATE THAT IS 90 DAYS PRIOR TO THE CLOSING] in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been paid in full by the Closing Date as evidenced by paid invoices therefor.]

2.    **Tenants/Parties in Possession:**
There are no tenants or other parties who are in possession or have the right to be in possession of said Premises owned or leased by the undersigned other than [DESCRIBE]

3.    **Bankruptcy:**
A proceeding in bankruptcy has been instituted by or against the undersigned (or its constituent entities) which is now pending in the Bankruptcy Court for the District of Delaware under Docket No. [_____].

4.    **Broker:**
The undersigned has not entered into any agreement with any real estate broker for the payment of a commission or similar fee relating to the purchase, sale or lease of the Premises in connection with this instant transaction.

5.    **Further Assurances:**
The undersigned hereby undertakes and agrees to fully cooperate with Title Insurer in correcting any errors in the execution and acknowledgment of the Insured Instrument(s).

6.    **Inducement and Indemnification:**
The undersigned provides this document to induce Title Insurer to insure title to said Premises well knowing that it will do so only in complete reliance upon the matters asserted hereinabove and further, will indemnify and hold Title Insurer harmless against any loss or damage sustained as a result of any inaccuracy in the matters asserted hereinabove.

- see annexed signature page -

**Signatory to Title Affidavit:**

By: _____

      Name: _____

      Title: _____

      Solely in his/her capacity as_____of _____, and not individually

Subscribed and sworn to on_____, 2025

_____

Notary Public

## EXHIBIT J

**FORM OF ASSIGNMENT OF CITY AGREEMENT**

<u>ASSIGNMENT AND ASSUMPTION OF CITY AGREEMENT</u>

THIS ASSIGNMENT AND ASSUMPTION OF CITY AGREEMENT (this "**Assignment**") is made this ___ day of _____, 2025 (the "**Assignment Date**"), by and between Big Lots, Inc., an Ohio Corporation ("**BLI**"), Big Lots Management f/k/a BLHQ, LLC, an Ohio limited liability company ("**Seller**" and, together with BLI, collectively, "**Assignor**"), and OhioHealth Corporation, an Ohio nonprofit corporation ("**Assignee**").

W I T N E S S E T H :

WHEREAS, Assignor is party to that certain City of Columbus Community Reinvestment Area Agreement, effective as of August 22, 2016 (the "**Initial City Agreement**"), by and among the City of Columbus (the "**City**"), Hamilton Crossing BL LLC, a domestic limited liability company ("**Hamilton**"), and BLI, as (i) partially assigned from Hamilton to Columbus-Franklin County Finance Authority ("**Financing Authority**") pursuant to that certain Assignment and Assumption Agreement, effective as of November 3, 2016, and (ii) assigned from the Financing Authority to Seller pursuant to that certain Second Assignment and Assumption of City of Columbus Community Reinvestment Area Agreement, effective as of October 31, 2019 (the Initial City Agreement, as assigned, collectively, the "**City Agreement**").

WHEREAS, Seller and Assignee are party to that certain Purchase and Sale Agreement dated as of the ___ day of _____, 2025 (the "**Agreement**"), pertaining to the transfer of certain tracts of land situated in Franklin County, Ohio, and more fully described in the Agreement, including all improvements thereon and all rights and appurtenances pertaining thereto (collectively the "**Property**"). The transfer of the Property by Seller to Assignee pursuant to the Agreement is being closed concurrently with the execution of this Assignment.

WHEREAS, Pursuant to the Agreement, Assignee desires to acquire and assume all obligations under, and Assignor is willing to assign to Assignee, all of Assignor's right, title and interest in and to, and all of Assignor's obligations under the City Agreement.

<u>Agreement:</u>

NOW, THEREFORE, in consideration of the above premises, and for the sum of TEN and NO/100 dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by Assignor and Assignee as follows:

1.      All capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement. Effective as of the Closing, Assignor does hereby SELL, TRANSFER, ASSIGN and SET OVER unto Assignee all of Assignor's right, title and interest in, to and under the City Agreement, and Assignee does hereby assume the City Agreement as of the Closing Date.

2.      Assignee hereby agrees to assume any and all liability, demands, claims, causes of action and loss arising under the City Agreement and arising from the ownership of the Property, including liability for costs and attorneys' fees and expenses, which liability arises from, or is based upon, any facts or circumstances which first occur on or after the Closing Date.

3.      This Assignment is made without representation or warranty by Assignor or Assignee other than (a) the warranties of Seller and Assignee expressly set forth in the Agreement; and (b) the warranty that Assignor has not heretofore assigned the City Agreement.

4.      In the event of any litigation between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation, including without limitation reasonable attorneys' fees and expenses.

5.      This Assignment shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

6.      This Assignment may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same Assignment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be duly executed as of the Assignment Date written above.

**ASSIGNOR:**

BIG LOTS, INC.,
an Ohio Corporation

By:_____

Name:_____

Title:_____

BIG LOTS MANAGEMENT F/K/A BLHQ, LLC,
an Ohio limited liability company

By:_____

Name:_____

Title:_____

**ASSIGNEE:**

OHIOHEALTH CORPORATION,
an Ohio nonprofit corporation

By:_____

Name:_____

Title:_____

## EXHIBIT K

### FORM OF TERMINATION NOTICE

### BIG LOTS MANAGEMENT, LLC (f/k/a BLHQ LLC)
4900 East Dublin Granville Road
Columbus, Ohio 43081-7651

[DATE]

**VIA FEDEX PRIORITY OVERNIGHT**

WPG Management Associates, Inc.
c/o WPG
4900 East Dublin Granville Road, 4th Floor
Columbus, OH 43081
Attn: EVP, Chief Legal Officer

Re:     Lease, dated as of April 7, 2023 (the "**Original Lease**"), by and between Big Lots Management, LLC f/k/a BLHQ LLC, an Ohio limited liability company ("**Landlord**"), and WPG Management Associates, Inc., an Indiana corporation ("**Tenant**"), as amended by that certain Amendment to Office Lease, dated as of November 27, 2024 (the "**Lease Amendment**"; the Original Lease, as amended by the Lease Amendment, and as the same may be or has been further amended, assigned, restated or otherwise modified, the "**Lease**"), by and between Landlord and Tenant.

To Whom It May Concern:

Reference is made to the Lease. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Lease.

Notice is hereby given to Tenant that, in accordance with Section 3(b) of the Lease Amendment, (i) Landlord is exercising the Landlord Termination Option, (ii) the Lease shall terminate on November 30, 2025 and (iii) Tenant shall be obligated to pay to Landlord the Initial Termination Fee no later than March 15, 2025.

Sincerely,

**Big Lots Management, LLC f/k/a BLHQ LLC**, an Ohio limited liability company

By:     _____
        Name:
        Title: