**Exhibit 1**

# TABLE OF CONTENTS

**Section**

1.    Definitions
    A.    Common Areas
    B.    Dates
    C.    Exhibits
    D.    Demised Premises
    E.    Shopping Center
2.    Demise
3.    Term
    A.    Original Term
    B.    Option to Extend Term
4.    Use and Operation
5.    Rent and Construction Allowance
    A.    Fixed Minimum Rent
    B.    Utilities Charges
    C.    Intentionally Deleted
    D.    Common Area Charges and Cap
    E.    Real Estate Taxes
    F.    Taxes
    G.    Intentionally Deleted
    H.    Intentionally Deleted
6.    Initial Buildout and Subsequent Alterations
7.    Maintenance and Repairs
8.    Signs
9.    Trade Fixtures
10.    Governmental Regulations
11.    Indemnification
12.    Insurance
    A.    Tenant
    B.    Landlord

13.    Fire Rebuilding and Altering
14.    Force Majeure
15.    Injunction
16.    Warranty of Title by Landlord; Representations
17.    Quiet Enjoyment
18.    Mortgage and Estoppel Certificates
19.    Default
20.    Condemnation
21.    Mutual Waiver of Subrogation
22.    Assignment and Subletting
23.    Surrender and Holdover
24.    Notices
25.    Legality
26.    Binding Obligations
27.    No Recordation
28.    Real Estate Broker's Commission
29.    No Waiver, Laches or Accord and Satisfaction
30.    Hazardous Materials
31.    Titles and Entire Agreement
32.    Waiver of Claims
33.    Reasonable Consent
34.    Intentionally Deleted
35.    No Presumption against Drafter
36.    Submission of Lease
37.    Interlineation
38.    Time of the Essence
39.    Tenant's Audit Rights
40.    Attorney Fees
41.    Waiver of Jury Trial

<center>**LEASE AGREEMENT**</center>

This Lease Agreement ("Lease") shall be made effective the ___ day of _____, 2022 (the "Effective Date"), by and between Avenue 12 Holdings, LP, a Florida limited partnership, whose mailing address is c/o NAI Talcor, 1018 Thomasville Road Suite 200A Tallahassee, FL 32303 ("Landlord"), and Big Lots Stores, LLC., an Ohio limited liability company, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081-7651, Attention: Lease Administration.

**WITNESSETH:**

1. **DEFINITIONS:**

   For purposes of this Lease, these terms are defined as follows:

   A.   1)   Common Areas:  The improved portion of the Shopping Center not occupied by building area as shown in Exhibit A, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Pylons, and parking lot lighting poles and light fixtures of the Shopping Center (collectively the "**Common Areas**").  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

   Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s)/container(s) in the receiving area of the Demised Premises so long as said trailer(s)/container(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.  Landlord shall not alter the area crosshatched on Exhibit A ("**No Change Area**").  Landlord shall not construct additional buildings nor alter any of the Common Areas within the existing Shopping Center per Tenant's No Change Area, as depicted in Exhibit A, without Tenant's consent.  Notwithstanding anything to the contrary, Landlord shall be permitted to construct one (1) new outparcel building not to exceed 6,500 square feet  and twenty (20) ft in height, exclusive of any parapet or similar architectural feature, with a maximum frontage of along U.S. 98 as indicated on the Exhibit A attached hereto (the "Outparcel").  Landlord may also, add or subtract up to 25% of the in line portion of the Shopping Center's Common Area, and/or modify Common Area, and add or subtract building area within the Shopping Center outside of the No Change Area in Landlord's discretion.

   2)   Applicable Laws.  The terms "applicable laws" and "applicable law" as used herein mean any and all applicable governmental requirements whether pursuant to federal, state or local statute, law, ordinance, regulation or the like promulgated by any governmental entity or an instrumentality thereof, or by an agency or department of any of the foregoing. Applicable laws also include orders issued by any court of competent jurisdiction.

B.    Dates:

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work, to be done simultaneously with Landlord's Work, as set forth in Exhibit C and defined below. Upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "**Tenant Entrance Date**" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work.    Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "**Tenant Possession Date**" shall be the date on which Tenant receives all necessary building permits for its construction, fixturing, merchandising and/or signage (the "**Permits**"). Tenant will submit its plans for the Permits within ninety (90) days of full Lease execution and thereafter, diligently pursue obtaining such Permits. Landlord and Tenant will cooperate for Tenant to receive its necessary signage permits. If Tenant is unable to secure its Permits within one hundred twenty (120) days of submittal, Landlord may assist Tenant with obtaining such Permits. Landlord shall execute and submit the form shown on Exhibit E, which may be sent via email, to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Construction pursuant to Exhibit C shall be completed, except for minor punch list items and the Demised Premises shall comply with all laws, ordinances, regulations and building restrictions ("**Landlord's Work**"). Landlord and Tenant agree that Landlord's Work and completion of Exhibit C will run concurrently with Tenant's Work. Notwithstanding anything to the contrary, any punch List Items identified by Tenant shall be completed by Landlord within thirty (30) days of the Tenant Possession Date. Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("**Exterior Improvements**") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete Landlord's Work or any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "**Term Commencement Date**" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

4)   The "**Rent Commencement Date**" shall be the earlier of (i) the date which is one hundred eighty (180) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

5)   The Estimated Delivery Date (as hereinafter defined) shall be and Tenant shall not be required to accept Delivery prior to, March 6, 2023 ("**Estimated Delivery Date**"). In the event Landlord does not deliver possession of the Demised Premises to Tenant by the Estimated Delivery Date, subject to extension due to force majeure, and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to completion of Tenant's Work (the "Late Delivery Date"), Landlord shall provide to Tenant, as liquidated damages and not a penalty, one day of rent abatement for each day of delay.   Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work unless and until Tenant has received its Permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its Permits due to circumstances within Landlord's control.

6)   Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises and/or Permits have not been received by Tenant or Landlord by June 1, 2023, Tenant will not be required to accept possession until February 1, 2024.  The period of time between June 1, 2023 and February 1, 2024 will be the "**Optional Blackout Period**".  In addition, in the event Landlord has not completed Landlord's Work by February 1, 2024, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 1, 2024, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)   In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) of one hundred eighty (180) days after delivery of possession of the Demised Premises by Landlord or (ii) ninety (90) days after Tenant has received all its construction permits and approvals; or (iii) February 1, 2024.  Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.   Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)   Exhibit A -    Site Plan of Shopping Center
2)   Exhibit A – 1 Tenant's Plans and Specifications
3)   Exhibit B -    Legal Description of Shopping Center
4)   Exhibit C -    Landlord's Work
5)   Exhibit D -    Tenant Building Sign Specifications

4

6)    Exhibit D – 1 Tenant Pylon Sign Location

7)    Exhibit E -  Completion of Landlord's Work Letter

8)    Exhibit F -  Exclusive Use Provisions

9)    Exhibit G -  Remeasurement Rider

D.    Demised Premises: The "**Demised Premises**" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 43,500 square feet of ground floor area with a minimum width of 150 feet for the Demised Premises.  Tenant's plans and specifications for the Demised Premises are attached hereto as Exhibit A-1 and deemed approved by the parties hereto ("Tenant's Plans and Specifications").  Within ninety (90) days after the Tenant Possession  Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the Landlord with written notice of its findings based on BOMA 1998 measurement standards.  Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 250 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 250 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.  Notwithstanding the foregoing, Tenant shall not be obligated to accept possession of any space under 39,150 square feet in size and may terminate this Lease in such an event.

E.    Shopping Center:  Landlord's "**Shopping Center**" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Beacon Plaza, 225 South Tyndall Parkway Panama City, FL 32404.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 155,051 square feet.

## 2.    DEMISED PREMISES:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas as they exist from time to time, to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.    TERM:

A.    Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending on the January 31st a full ten (10) years thereafter (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.  The "**Lease Year**"

shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "**Partial Lease Year**." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "**Term**" shall mean the Original Term, any exercised Option Terms (as defined below), and any other extended period.

B. <u>Options to Extend Term</u>: Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "**First Option Term**", "**Second Option Term**", and "**Third Option Term**". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default beyond any applicable notice and cure period, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Term, time being of the essence.

**4.** **USE AND OPERATION**:

A. <u>Permitted Uses</u>: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine not to exceed 3,000 square feet), all similar or related merchandise, and for any other lawful retail use not otherwise restricted herein. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are set forth in Exhibit F, and Tenant's shall not use or permit the use of the Demises Premises in violation of any such covenants or restrictions. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants (and their respective successor and assigns) open and operating for business in the Shopping Center as of the Effective Date of this Lease, and any permitted

6

assignee or subtenant under the applicable lease, and Family Dollar (or its successors and assigns) (collectively the "Existing Tenant Rights"), no other general variety merchandise discount store, liquidator, close-out store, or stores primarily selling, leasing or renting furniture (not to exceed 5,000 square feet of space or 10% of the total gross leasable area of the premises) (including furniture and home accessories or mattresses) or not more than one dollar store operations in excess of 15,000 square feet ("Competing Business") may be permitted in the Shopping Center during the Term of this Lease. A Competing Business does not include any grocery store or discount grocery store, , a discount retailer selling a limited category of merchandise such as Petco and TJ Maxx and Harbor Freight. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) if the violation is not cured within ninety (90) days following notice to Landlord, Tenant may terminate the Lease any time prior to the date the violation is cured, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease as liquidated damages; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Notwithstanding the foregoing, in the event Competing Business restriction is violated by a tenant that does not have the right in its lease to operate in violation of the Competing Business restriction (a "Rogue Tenant") Landlord shall use commercially reasonable means to stop such Rogue Tenant's violation of the Use Protections and shall commence curing the violation within thirty (30) days of Landlord's receipt of written notice from Tenant of such violation. So long as Landlord diligently pursues enforcement of the Competing Business restriction through the trial court level against a Rogue Tenant (the "Trial Court Proceedings"), Landlord shall not be in violation of the Lease provided Landlord commercially reasonable efforts to enforce injunctive relief, and Tenant may not pay reduced Fixed Minimum Rent or pursue any other remedies against Landlord during such time that Landlord is pursuing such Rogue Tenant. Notwithstanding anything to the contrary, if said violation does not cease within 365 days after its occurrence and Landlord is not actively pursuing the Rogue Tenant, Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees subject to force majeure, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days

on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant and Landlord shall be released from all further liability hereunder other that liability which is expressly intended to survive the termination or expiration of the Term. Landlord and Tenant acknowledge and agree that there shall not be a "surrender by operation of law" as determined under applicable Florida law, and that any surrender of the Demised Premises and termination of this Lease as a result of a default by Tenant must be in writing and signed by Landlord. A vacation or abandonment of their premises by any other tenant in the Shopping Center shall not in any way release Tenant from its obligations under this Lease.

Tenant agrees to keep the Demised Premises in a good, clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises, (ii) use the Common Areas, including up to six (6) parking spaces, and sidewalks immediately adjacent to the Demised Premises for the sale and display of merchandise, and (iii) use four (4) parking spaces in the Common Areas immediately adjacent to the Demised Premises for "curbside" pickup of orders.

B.   Prohibited Uses:  Subject to the Existing Tenant Rights, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises:

   1)   to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises;
   2)   to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea

8

market" type of operation (excluding national or regional stores such as Play It Again Sports, Once Upon a Child, Goodwill and Tuesday Morning);

3) for an auditorium, activity facility, meeting hall, church or other place of worship;

4) for any self-storage facilities;

5) for any plasma centers, or for any medical or health-oriented facilities or offices in excess of 3,000 square feet; for any medical or health-oriented facilities or offices, including but not limited to plasma centers;

6) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating) other than will-call supplies such as Grainger, Fastenal and Johnstone Supply;

7) to conduct any activity which may make void or voidable or substantially increase the premium on any insurance coverage on the Shopping Center or parts thereof;

8) other than on the Outparcel, for any inline automotive, tire, gasoline, or oil service centers, provided however, open bay automotive uses will not be permitted;

9) for any governmental use or office or any social service functions or facilities;

10) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material;

11) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor;

12) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment unless ancillary to a full service restaurant, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine liquor sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 150 linear feet away from the Demised Premises), and excluding a liquor store or wine shop;

13) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines bowling alley, health spa, health club, exercise club, gymnasium or other similar operations in excess of 5,000 square feet other than a national or regional chain such as Planet Fitness or LA Fitness; bowling alley, health spa, health club, exercise club, gymnasium or other similar operations;

14) for lodging, including a hotel, motor inn, apartments or condominiums;

15) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations);

16) for a funeral parlor or mortuary;

17) for a mobile home or trailer court;

18) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time);

19) for any commercial laundry or dry-cleaning plant or coin operated laundromat;

9

20)     for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation);

21)     for any veterinary hospital, animal boarding, training or raising facilities or pet shop;

22)     for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets, lottery sales from retail establishments) or facility;

23)     for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises subject to Landlord's approval not be unreasonably withheld so long as the exterior visual aesthetics of the Demised Premises are not adversely impacted);

24)     for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; for any astrology, palm reading, tarot card or other like service or facility;

25)     for the use of a "call center" or for the use as a "head shop" selling drug paraphernalia, or marijuana dispensary (even if permitted under applicable state law).

All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses"**.

## 5.     **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, without notice, demand, abatement or right of setoff except as otherwise expressly provided herein, Fixed Minimum Rent (sometimes referred to as "**Rent**") along with all other charges due from Tenant to Landlord under this Lease ("**Additional Rent**") and all applicable sale tax thereon. Tenant may defer payment to Landlord until Landlord provides Tenant with a duly executed federal Form W-9. Landlord will indemnify Tenant as a result of its failure to timely execute any withholding exemption requirements (e.g. Tenant is assessed unwithheld Tax (see below) related to its payments to Landlord). The Rent and Additional Rent for any partial month shall be pro-rated based on the actual number of days in such month.

A.     Fixed Minimum Rent:  Commencing from the Rent Commencement Date thru January 31, 2028 the sum of $250,125.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $20,843.75. From February 1, 2028 and continuing through January 31, 2033, the sum of $271,875.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $22,656.25.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $282,750.00 per

Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of \$23,562.50. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of \$293,625.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of \$24,468.75. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of \$304,500.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of \$25,375.00.

B.   Utilities Charges: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged

11

an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Intentionally Deleted.

D.    <u>Common Area Charges and Cap</u>: Landlord shall maintain the Common Areas and agrees not to change, use or allow the use of such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises, subject only to Landlord's right to construct the Outparcel as set forth in Section 1.A.1. Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

1)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Common Areas of the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees, including keeping the parking lot lights on during periods of darkness during normal Shopping Center hours and also, for the period commencing November 20th through December 31st each year, until midnight.

2)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

3)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to affect the site plan;

4)    providing lighting and on-site traffic control, if necessary;

5)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

6)    cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation

12

awards), lighting, line painting, pressure washing, slurry seal of the paved areas, landscaping, providing security, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies and any and all other similar charges and costs in connection with the maintenance, and operation of the Common Area ("**Common Area Charges**"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be, costs associated with fire sprinkler system, for buildings within the Shopping Center, all capital or roof expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, marketing or related fees. Notwithstanding the inclusion of security related charges, if any, in the Common Area Charges, Landlord makes no representation or warranty regarding the security of the Shopping Center and in no event shall landlord be liable for any personal injury, wrongful death, or property damage suffered by Tenant, or its employees, agents or contractors or invitees at the hands of a third party (specifically including any damage or injury resulting from a criminal or terrorist attack).

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised after the end of each Lease Year or Partial Lease Year, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common

13

Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within ninety (90) days following each Lease Year or Partial Lease Year,, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto.  Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.  In the event Landlord fails to provide such a reconciliation statement within six (6) months following the end of a Lease Year, or Partial Lease Year, Tenant may defer fifty percent (50%) of its payments of estimated Common Area Charges, commencing with the seventh (7th) month and continuing until such time as Landlord provides the reconciliation statement ("**Reduced CAM**").  At such time as Tenant has been paying Reduced CAM for a period of twelve (12) months, if Landlord has not yet provided the reconciliation statement, Tenant may further defer its monthly payments of estimated Common Area Charges to zero until Landlord provides to Tenant the required reconciliation statement.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the receipt of the statement from Landlord. If Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year of the Term, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease.  In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap:  Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at one dollar **($1.00)** per square foot of the Demised Premises for each Lease Year during the Original Term, as well as the initial Partial Lease Year, if any.  Should Tenant elect to exercise any available option periods, such charges shall be capped at one dollar and fifteen cents **($1.15)** per square foot of the Demised Premises for each Lease Year during the First Option Term, one dollar and twenty cents **($1.20)** per square foot of the Demised Premises for each Lease Year during the Second Option Term, and one dollar and twenty five cents **($1.25)** per square foot for each year during the Third Option Term (collectively, the Common Area Charges Cap described herein shall be known as the "**CAM Cap**").

E.    Real Estate Taxes:  Landlord shall timely pay all ad valorem and non ad valorem taxes real property taxes and assessments which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "**Real Estate Taxes**").  Excluded from such Real Estate Taxes for Tenant shall be the amount of

14


DocuSign Envelope ID: F3334431-0875-4079-8ADB-6C68D4A98BE3

any one-time special assessments, or one-time impositions, penalties or interest. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2020 tax year are $0.35 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, and Landlord has elected not to contest such Real Estate Taxes, then Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including property card requests, and the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. Under no circumstances shall Tenant have the right to withhold any payments to Landlord pursuant to this Lease in the event of such contest, nor shall Landlord have any obligation to withhold the payment of any Real Estate Taxes levied or assessed by any lawful authority against the Shopping Center.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by

15

fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder.  Landlord shall use its commercially best efforts to cause any such new construction to be separately assessed, provided in no event will Landlord be required to replat the Shopping Center.       .

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center.  Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one time in any consecutive five (5) year period.  This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer resulting from the second such sale, conveyance, change in ownership or other transfer in any consecutive five (5) year period.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Taxes:

1)    "Excluded Tax(es)" means any Tax other than a Transaction Tax.

2)    "Tax(es)" means any income, net income, alternative or add-on minimum tax, business and occupation ("B&O") (e.g., Washington B&O), business privilege, gross income, adjusted gross income, gross receipts, commercial activity (e.g., Ohio Commercial Activity Tax or "Ohio CAT"), sales, use, consumer, transfer, documentary, registration, ad valorem, value added, franchise (including, but not limited to, the Texas franchise tax on taxable margin), privilege, profits, license, permits, withholding, payroll, employment, or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority responsible for the imposition of any such tax.

3)    "Transaction Tax(es)" means Taxes similar in characteristics and nature to sales and use Taxes and (a) directly imposed with respect to a retail sale or rent transaction; (b) levied upon the purchaser/Tenant; (c) can be legally collected from the purchaser/Tenant; and (d) must be remitted to the applicable jurisdiction when collected from the purchaser/Tenant.

16

4) The rent payments do not include any amount for Transaction Taxes. Tenant will pay, reimburse or indemnify (as the facts and circumstances dictate) Landlord for any applicable Transaction Taxes with respect to the rents, unless the particular rent is nontaxable. For purposes of clarity, currently, only rents for locations in Florida and certain locations in Arizona are subject to Transaction Taxes.

5) Each party shall remain responsible for its Excluded Taxes resulting from the transactions covered by this Agreement. For purposes of clarity but without limiting the foregoing, Landlord acknowledges that it may have gross receipts, license and/or income Tax obligations where the rent receipt may be assigned under applicable Tax law. Any Taxes or license fees imposed on Landlord's rents or gross receipts, including without limitation the Washington B&O tax, the West Virginia B&O tax, Ohio CAT, Oregon CAT, the Nevada Commerce tax, the Delaware Gross Receipts tax, the Kentucky Limited Liability Entity Tax, the San Francisco gross receipts tax and Tennessee state or municipal Business Tax and similar type Taxes are not and, will not be construed as, Transaction Taxes and are Excluded Taxes and also will not be an itemized charge on any invoice. Landlord and Tenant will, and will cause their respective affiliates and subcontractors, to reasonably cooperate in good faith on all Tax matters.

G. Construction Allowance: Landlord shall pay to Tenant an amount equal to One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) within thirty (30) days of Tenant's opening for business and Tenant providing lien waivers in excess of $5,000.00. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to source construction materials and will not be required to provide lien waivers for the cost of such materials. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the rate of five percent (5%) per annum ("Lease Interest Rate") from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

H. Intentionally Deleted

## 6. INITIAL BUILDOUT AND SUBSEQUENT ALTERATIONS:

If Landlord fails to complete Landlord's Work at the Demised Premises within thirty (30) days after the date specified for delivery of possession as provided in Section 1.B.5, subject to force majeure, then at Tenant's discretion, Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments

17

of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

During the Term of this Lease, following completion of initial buildout to the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises as Tenant deems necessary or desirable for its use of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which the Demised Premises are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term continue to remain the property of Landlord, and such work is done in compliance with all applicable laws. Tenant shall promptly remove any mechanic's lien placed on the Demised Premises resulting from any such alterations.

## 7.   **MAINTENANCE AND REPAIRS:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in compliance with all applicable laws, and in good order, repair and operation, except those which the Landlord is required to make pursuant to this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises, provided however, Tenant shall be responsible for the cost of any and all maintenance and repair to the under slab plumbing arising from misuse by Tenant or its employees or customers.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) canopy lights, (viii) building lights to include side and rear floodlights, (ix) electrical, plumbing, sprinkler and other mechanical systems and equipment including backflow preventor valves for the domestic water and for the sprinkler riser (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to

replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted one hundred twenty (120) days from Tenant Possession Date to test the air conditioning system.

Should Tenant discover that the HVAC system requires repair and/or replacement during the first Lease Year or any Partial Lease Year, if any, and the cost thereof exceeds Three Thousand Dollars ($3,000.00) in the aggregate in such Lease Year, Landlord shall be solely responsible for such costs over and above Three Thousand Dollars ($3,000.00) during the Original Term only. Tenant shall invoice Landlord for any amounts due under this provision within ninety (90) days of the end of such Lease Year. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full. Commencing as of the Tenant Possession Date, Tenant shall maintain a quarterly HVAC maintenance service agreement with a reputable HVAC service company to provide routine maintenance and service of the HVAC system as a condition to Landlord's obligation to pay for repairs in excess of $3,000 set forth above.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence making of any necessary repairs within thirty (30) days after notice by Tenant of the need for such repairs, and diligently pursue such repair to completion, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof,. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to diligently commence repair within twenty-four hours, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives or contractors. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from up to 75% of the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

## 8. **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises subject to Landlord's reasonable review and approval of any signage that is not consistent with Exhibit D attached hereto (the "**Building Signs**"). Tenant agrees to maintain such Building Signs in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence and removal and repair of damage caused by removal of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located subject to compliance with applicable laws. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to

perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons in the top or second from top position as indicated on Exhibit D-1. Tenant shall receive the top position, if the current tenant occupying the top position is no longer a tenant of the Shopping Center. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon on the space as indicated on Exhibit D-1 attached hereto, and the too-be-constructed pylon indicated on Exhibit D-1. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion of any multi-tenant shared Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the additional available Pylon space. Once Tenant's Business Signs and/or Tenant's Pylon signs are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Term, and subject to Landlord's right to construct the Outparcel as set forth in Section 1.A.1, Landlord shall not install any structure, sign or landscaping (excluding any landscaping required by applicable laws) or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 9.    TRADE FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove such trade fixtures or equipment. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of Landlord when affixed (the "**Leasehold Improvements**"). For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment in the Demised Premises and adjacent areas thereto (provided same are not in violation of any Declaration or Prohibitive Use affecting the Shopping Center). Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

## 10.    GOVERNMENTAL REGULATIONS:

Landlord agrees the Demised Premises as of the Tenant Possession Date will conform to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform. After the Tenant Possession Date, as to any Tenant shall be responsible for all changes to the interior to comply with any changes to applicable laws and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future, and all changes necessary to comply with applicable laws necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required

21

pursuant to this Lease. As to the portion of the Demised Premises that Landlord is required to maintain only, Landlord agrees to make all repairs, alterations, additions, or replacements required by any applicable law; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms and sprinkler system of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future. Landlord shall provide to governmental authorities having jurisdiction all the necessary documentation as is required or may be required by applicable law.

## 11.    INDEMNIFICATION:

Subject to Section 21 herein, Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.

Subject to Section 21 herein, Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use of the Common Areas or Demised Premises caused by defects therein the acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

## 12.    INSURANCE:

A.    Tenant: From and after the Tenant Possession Date and throughout the Term, Tenant, at its own expense, shall maintain with insurers authorized to do business in the State or territory where the Shopping Center is located and which are rated "A-/VIII" or equivalent in Best's Key Rating Guide, or any successor thereto (or if there is none, a rating organization having a national reputation) the following coverages:

1)     commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: three Million Dollars ($3,000,000.00) each occurrence and Three Million Dollars ($3,000,000.00) general aggregate, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. The commercial general liability coverage must be on the so-called "occurrence" form. The limits of the commercial general liability insurance policy will not, however, limit the liability of Tenant under this Lease, and if Tenant's liability insurance coverage has limits higher than the limits required in this Lease, the full amount of the insurance coverage actually carried by Tenant will be available to respond to a covered loss or occurrence, and the coverage afforded to Landlord as additional insured under this policy or these policies will not be limited by the minimum coverage limits specified in this Lease but will be deemed increased to the amounts actually carried by Tenant. Such insurance shall cover at least the following hazards: (1) premises, operations, conduct, assumed liabilities, and use or occupancy of the Premises; (2) products and completed operations; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; (5) automobiles; and (6) contractual liability covering the indemnities contained herein, and shall not contain an exclusion for assault.

2)     Causes of Loss – Special Form property insurance (or the then industry replacement to such coverage part), covering all Tenant's furniture, trade fixtures, equipment and inventory.

3)     Workers' compensation insurance in accordance with the statutory requirements of the State of Florida, and employers' liability insurance with a limit of not less than $1,000,000 with respect to all persons that work on the Demised Premises.

4)     Prior to the commencement of any construction activities within the Demised Premises, Tenant or its general contractor shall obtain commercial general liability insurance, all risk builder's risk insurance and workmen's compensation insurance to cover every contractor to be employed and shall deliver duplicate originals of all certificates of such to Landlord naming Landlord and Landlord's mortgagee as additional insured on the liability and builder's risk insurance coverages, with a deductible in each event, not to exceed $10,000 per occurrence.

5)     The policies of insurance required to be maintained by Tenant pursuant to this Article shall name as additional insured Landlord, Landlord's managing agent of whom Landlord has notified Tenant, and any mortgagee of Landlord of whom Landlord has notified Tenant and shall require that the insurer endeavor to provide at least thirty (30) days' prior written notice to Landlord before any cancellation or non-renewal of coverage.

6) Prior to the Commencement Date, Tenant shall deliver to Landlord certificates of the insurers evidencing all the insurance which is required to be maintained hereunder by Tenant and copies of all endorsements evidencing the additional insureds, the naming of the insureds required hereunder and the obligation of each insurer to give the notice required hereunder) and, within ten (10) days following the renewal of such insurance.

7) Tenant shall have the right to self-insure for all plate glass, inventory, equipment, and trade fixtures for the insurance required above on the following terms and conditions:

(a) "Self-insure" means that Tenant is itself acting as though it were the insurance company providing the insurance required under this Lease and Tenant shall pay any amounts due in lieu of insurance proceeds which would have been payable if the insurance policies had been carried, which amounts, including all deductibles and self-insured retention, shall be treated as insurance proceeds for all purposes under this Lease.

(b) All amounts which Tenant pays or is required to pay and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation/waiver of claims provisions herein.

(c) If Tenant elects to self-insure and an event or claim occurs for which coverage would have been available from the insurance company, Tenant shall use its own funds to pay any claim or replace property or otherwise provide the funding which would have been available from insurance proceeds but for such election to self-insure.

B. Landlord: Landlord shall at all times carry insurance covering the Shopping Center, all improvements (including Leasehold Improvements) located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" property insurance, including the perils of earthquake, windstorm ("**Casualty**"), in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each occurrence and Two Million Dollars ($2,000,000.00) general aggregate, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums

24

paid by Landlord for maintaining the commercial general liability insurance and casualty insurance policies referred to herein, for the Term hereof (the "**Insurance Costs**"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("**Insurance Documentation**"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B are $0.35 per square foot per annum for the 2020 calendar year.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to a high risk use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

## 13.   FIRE REBUILDING AND ALTERING:

A.   If the Demised Premises, any permanent additions or Leasehold Improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other Casualty during the Term hereof, Landlord shall repair and restore the Demised Premises and the to a condition substantially similar to the condition existing immediately prior to such Casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration, and Landlord shall restore the Common Area, subject to Landlord's right to add, subtract and/or modify Common Area, and add or subtract building area within the Shopping Center outside of the No Change Area in Landlord's discretion. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a Casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when Landlord substantially completes Landlord's restoration obligations.

B.  In the event as a result of such damage or destruction, the Demised Premises or a substantial portion of the Shopping Center, are not repaired and restored to tenantable condition within one year (1) year from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord, unless Landlord completes such restoration prior to the expiration of such sixty (60) days period, and thereupon Tenant and Landlord shall each be released from all future liability and obligations under this Lease except for such liability which by the terms of this Lease are intended to survive the termination or expiration of this Lease..

C.  If more than one-third (1/3) of the ground floor area of the Demised Premises are damaged or destroyed during the last year of the Term Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party within sixty (60) days following the date of such Casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.  FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or obligation, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, labor or material shortages, supply chain disruptions, acts of God, war, temporary governmental order, pandemic or epidemic, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. In no event shall an event of force majeure excuse any payment due to either Landlord or Tenant.

## 15.  INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to seek to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.  WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of any unrecorded liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant, or disclosed herein,; (c) Landlord does warrant and will defend the title of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) to Landlord's knowledge as of the Effective Date, the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, and as of the Effective Date, Landlord is not aware of any intent to change the current zoning, and to Landlord's knowledge of the Tenant Possession Date, construction of the Demised Premises shall comply with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or

26

agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and to Landlord's actual knowledge as of the Effective Date, there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. If it is determined that Landlord does not have the title and rights aforesaid, or breaches the representations as set forth herein, and such failure has a materially and negative impact on Tenant's ability to operate, then in addition to any other rights of Tenant's, this Lease shall in addition to all other rights available to Tenant, at the option of Tenant, (a) terminate the Lease and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or (b) Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Once Tenant is furnished proof satisfactory, Tenant shall pay to Landlord any of the Rent or Additional Rent previously withheld as a result of Landlord's breach herein. Landlord will indemnify, defend, hold harmless, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any breach by Landlord of any of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, in any manner that would limit Tenant's rights or expand Tenant's obligations as set forth in the Lease, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld, conditioned, or delayed. Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant and such breach materially and negatively impacts Tenant's ability to operate, Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will indemnify, defend, hold harmless, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17.    QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Term of this Lease from any party claiming by through or under Landlord. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants; provided however, in the event Tenant is able to operate from the Demised Premises in connection with a breach of the covenant of quiet enjoyment, Tenant shall continue to pay Rent and Additional Rent, but shall be entitled to a retroactive credit against Rent and Additional Rent in proportion to the impact on Gross Sales which shall be calculated in arrears based upon the percentage by which Gross Sales made by

Tenant at the Demised Premises during the period in which the breach exists are less than gross sales during the applicable period during the immediately preceding year.

**18.   MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, and upon payment to Tenant of a $1,500 review fee Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment ("**SNDA**") agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Notwithstanding anything to the contrary, the SNDA review fee shall only be due for the second or any subsequent SNDA requests made by Landlord. Landlord shall use its commercially reasonable efforts to ensure any such mortgagee agrees that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease Tenant agrees that the SNDA may specify that the lender shall not be (a) liable for any act or omission of any previous landlord under the Lease; (b)  subject to any offsets or defenses which Tenant may have against any previous landlord under the Lease except for those matters that are continuing in nature; (c) bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any previous landlord; (d) obligated to make any payment to Tenant which any previous landlord was required to make  before Lender succeeded to the landlord's interest; (e) accountable for any monies deposited with any previous landlord (including security deposits), except to the extent such monies are actually received by Lender; (f) bound by any amendment or modification of the Lease or any waiver of any term of the Lease made without Lender's written consent; (g) bound by any surrender or termination of the Lease made without Lender's written consent (unless effected unilaterally by Tenant pursuant to the express terms of the Lease); (h) obligated to complete any improvement or construction or to pay or reimburse Tenant for any tenant improvement allowance, construction allowance or leasing commissions; (i) liable for any default of any previous landlord under the Lease except for those matters that are continuing in nature. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon the receipt of a written request from Landlord and payment to Tenant of a $1500 review fee, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the amount of Rent payable and the dates to which the Rent, Common Area Charges, Additional Rent and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

Notwithstanding anything to the contrary, the Estoppel review fee shall only be due for the second or any subsequent Estoppel requests made by Landlord.

19.    **DEFAULT:**

A.    If (i) Tenant shall fail to make any payment of the Rent reserved herein, or any installment thereof when due and such failure continues for (a) " more than ten (10) days after receipt by Tenant of a written notice of late payment (provided Landlord shall not be required to provided more two (2) written notices of such default from within any twelve (12) month period, and upon the third such late payment, Tenant shall be in default if payment is not received within five (5) days of the due date) or (ii) if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary provided Tenant is diligently pursuing such cure and cures same no later than one hundred eighty (180) days following the notice of default), or (iii) If Tenant shall become bankrupt or insolvent, or petitions for or enters into an arrangement, or suffers this Lease to be taken under any writ of execution without dismissal within sixty (60) days of filing, or (iv) if there is the appointment of a receiver, not including receivership pursuant to any leasehold mortgage, to take possession of Tenant's interest in the leasehold estate or of Tenant's operations on the Premises for any reason, if such receivership is not terminated, dismissed or vacated within thirty (30) days after the appointment of the receiver; or (v) if Tenant seeks to modify the terms of this Lease in any bankruptcy proceeding, including but not limited to, an assignment in contravention of any use restrictions set forth herein; or (vi) if Tenant shall make an assignment for the benefit of creditors; or (vii) Tenant shall use the Premises in breach of any restricted uses/exclusives set forth in this Lease, then Tenant shall be in default.

B.    After the occurrence of an event of default beyond any specified applicable notice and/or cure periods above, Landlord may, without further notice or demand (i) cure such default for the account of and at the cost and expense of Tenant, and the reasonable sum so expended by Landlord shall be Additional Rent, or (ii) terminate the Lease and commence an action in any court of competent jurisdiction to evict Tenant and re-enter and take possession of the Premises, or (iii) terminate Tenant's right of possession and commence an action in any court of competent jurisdiction to re-enter and take possession of the Demised Premises without terminating this Lease; or (iv) pursue any other action or remedy under applicable law or equity.  If Landlord re-enters and takes possession of the Demised Premises in accordance with this Lease following an event of default and re-lets the Premises, Tenant shall pay Landlord within twenty (20) days of demand for (a) the cost of retaking possession of the Premises, including but not limited to reasonable attorney fees and costs, (b) the reasonable costs of preparing the Demised Premises for reletting to such new tenant, including reasonably necessary repairs to the Demised Premises, and (c) any reasonable leasing commission and transactional legal fees.  The rent collected under the new lease of the Demised Premises shall be applied toward the amounts owing from

29

Tenant to Landlord. Without waiving any other rights and remedies hereunder or at law or equity, all Rent not paid within ten (10) days of the date due shall bear interest at the lesser of (a) the maximum interest rate permitted by then applicable law, or (b) the Lease Interest Rate, and such interest charge shall accrue from the date payment is due until the date paid.

In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. If Landlord elects to terminate this Lease or Tenant's right of possession, Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises which Landlord determines in Landlord's reasonable discretion to be compatible with the nature and character of the Shopping Center. All rights and remedies of Landlord herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be entitled to recover from Tenant any consequential, incidental or punitive type damages.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), Tenant shall provide Landlord with an additional notice of such default to Landlord and if Landlord shall not within fifteen (15) days thereafter cure such default (or if the default cannot be cured within fifteen (15) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same, and if such default is a chronic, recurring issue, then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant, but only if such default materially and adversely impacts Tenant's ability to operate from the Demises Premises; or (ii) cure such default and the amount expended by it therefore, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Notwithstanding anything to the contrary contained herein, Landlord and Tenant agree to work reasonably in conjunction with the other in order to cure such default prior to Tenant executing its self-help rights. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by email, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure

to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be entitled to recover from Landlord any consequential, incidental or punitive type damages.

## 20.    CONDEMNATION:

In the event the Demised Premises hereby leased, or any material part thereof or any material part of the buildings of the Shopping Center, or Common Area, or rights of way adjoining, or approaches to  the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant, the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises by delivery of notice to Landlord on or before thirty (30) days following notice of such taking. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith to the extent of Landlord's receipt of condemnation proceeds allocated for such purpose. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion  to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority.

For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for business damages; provided however, in no event shall Tenant be entitled to any portion of the award attributable to the value of the land or buildings, or damage thereto.

For the purpose of this paragraph, the term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6)

31

insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

**21.   MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is actually insured, but only to the extent such loss is or would have been covered under a standard Special Form property insurance policy. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.        .

The provisions of this Section 21 will survive termination of this Lease.

**22.   ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's  consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder nor violate any then existing exclusives or Prohibited Uses.  In the event of assignment, to include a Related Party Assignment, Tenant will provide Landlord notice of the assignment or sublet and upon request of Landlord, with a copy of the Assignment documents. Tenant's assignment agreement shall require the assignee to be bound by all of the terms and conditions of this lease and to assume all the obligations under this Lease. .Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.  The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of

Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below). Tenant shall give Landlord Notice of a Related Party Assignment within thirty (30) days following any such assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without advance notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

**23.    SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition reasonable wear and tear or damage by fire or other Casualty excepted. Tenant may remove all of its trade fixtures from the Demised Premises and repair any damages caused by such removal. Lighting fixtures and HVAC equipment are the property of Landlord and may not be removed.

If Tenant retains possession of the Demised Premises or any part thereof after the expiration or earlier termination of the Original Term or any Option Terms, as the case may be, without prior written approval of Landlord, such holding over shall constitute an extension of this Lease on a month to month basis. Upon receipt of a notice to vacate received by Tenant from Landlord

("Notice to Vacate"), Tenant shall have sixty (60) days in which to return possession of the Demised Premises back to Landlord. Should Tenant continue to holdover past the sixty (60) day period, then Tenant shall pay Landlord Fixed Rent at one hundred fifty (150%) percent of the rate which was payable for the last month prior to the expiration or earlier termination of the Term, together with any Additional Rent as provided herein, for the time Tenant thus remains in possession, plus any damages incurred by Landlord arising out of any such holdover.

## 24.  NOTICES:

Whenever any demand, request, approval, consent or notice ("**Notice**") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via electronic mail with such notice attached, which electronic mail must be acknowledged as "received" by the recipient. The parties hereby acknowledge and agree that any electronic notices shall be legal and binding and shall have the same full force and effect as if a paper original of such Notice had been delivered and signed using a handwritten signature  The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

## 25.  LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state. The exclusive venue for any court action taken to enforce any provision of this Lease or to resolve any dispute between Landlord and Tenant pertaining to this Lease, the Demised Premises or the Landlord - Tenant relationship shall be the state and federal courts in and for the county in which the Demised Premises is located.

Landlord represents it is a limited partnership duly organized, validly existing and in good standing under the laws of Florida. Tenant represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Ohio.  Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

## 26.  BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.  NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

**28.    REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

**29.    NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

**30.    HAZARDOUS MATERIAL:**

Landlord represents and warrants that to Landlord's knowledge, as of the Tenant Possession Date, the Demised Premises do not contain any Hazardous Materials in quantities requiring removal or remediation in accordance with applicable law. "Hazardous Material" means: (i) "hazardous substances" or "toxic substances" as those terms are defined by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§9601 et seq., or the Hazardous Materials Transportation Act, 49 U.S.C. §1801, all as amended and amended after this date; (ii) "hazardous wastes," as that term is defined by the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§6901 et seq., as amended and amended after this date; (iii) any pollutant or contaminant or hazardous, dangerous, or toxic chemicals, materials, or substances within the meaning of any other applicable federal, state, or local law, regulation, ordinance, or requirement (including consent decrees and administrative orders) relating to or imposing liability or standards of conduct concerning any hazardous, toxic, or dangerous waste substance or material, all as amended or amended after this date; (iv) crude oil or any fraction thereof; (v) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. §§2011 et seq., as amended and amended after this date; (vi) asbestos; and (vii) polychlorinated biphenyls (PCBs) or substances or compounds containing PCBs. Landlord shall provide to

governmental authorities having jurisdiction all the necessary documentation as is required or may be required by applicable law including, without limitation, an asbestos survey or certification as required. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Term of this Lease, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Term of this Lease, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with and to the extent required by all applicable laws, and restore the contaminated areas; i.e., walls, floor, ceiling, etc. to good condition, reasonably acceptable to Tenant. Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall equitably abate during the period of time necessary to complete such work to the extent such work interferes with Tenant's use of the Demised Premises.

Throughout the Term of this Lease, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises with the exception of (aa) cleaning agents, tools, and equipment of the types and in the quantities and concentrations normally used in retail stores; and (bb) waste of the types and the quantities normally generated by retail stores or used in cleaning the Demised Premises, provided that the foregoing are generally used, stored, transported and disposed of in strict compliance with all applicable laws. Tenant shall indemnify defend and hold harmless Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any and all loss, cost, damage, expense, fine, liability, injury to persons or property, penalty, or judgment arising out of or relating to the acts, omissions, use, handling, discharge, release or disposal of Hazardous Materials from or upon the Demised Premises by Tenant or its agents, employees or contractors while in possession, or elsewhere if caused by Tenant or persons acting under Tenant. Said indemnification shall include all costs incurred by Landlord due to any investigation, clean-up, removal or other remediation predicated as a result of any legal requirement. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31.    TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease, Exhibits, and Rider(s), if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both.

## 32.    WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, Insurance Costs, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.**    **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

**34.**    **INTENTIONALLY DELETED**

**35.**    **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.**    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

The parties hereby acknowledge and agree that electronic signatures may be used in connection with the execution of this Lease and electronic signatures or signatures transmitted by electronic mail in so-called pdf format shall be legal and binding and shall have the same full force and effect as if a paper original of this Lease had been delivered and signed using a handwritten signature.

**37.**    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material

so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

## 38.    TIME OF THE ESSENCE:

Time is of the essence of all conditions of this Lease in which time is an element.

## 39.    TENANT'S AUDIT RIGHTS:

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives, provided however in no event shall Tenant utilized a contingency fee based auditor.  Such audit must be conducted within six (6) months of receipt of the applicable year end reconciliation, or the year end reconciliation shall be deemed final and the right to audit waived.  If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.  If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit.  If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full.  Any overpayments not refunded to Tenant in full prior to the end of the then current Term shall be refunded to Tenant in cash prior to the end of that Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter.  If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall may defer Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

## 40.    ATTORNEYS FEES:

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorneys' fees and costs from the non-prevailing party.  This provision applies to court costs and attorneys' fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

## 41.    WAIVER OF JURY TRIAL:

THE PARTIES HERETO SHALL, AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE.

**42.** **RADON:**

Pursuant to Section 404.056(5) of the Florida Statues, Landlord is required to notify Tenant of the following: "RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**43.** **NO SURRENDER BY OPERATION OF LAW:**

No act or thing done by the Landlord or its agents during the Term hereby granted shall be deemed an acceptance of a surrender of the Demised Premises prior to the expiration of the Term, and no agreement to accept a surrender of said Demised Premises prior to the expiration of the Term shall be valid unless the same be made in writing and subscribed by the Landlord.

**44.** **LANDLORD'S LIABILITY:**

Landlord shall not be liable for any acts or omissions of other tenants of the Shopping Center. Landlord makes no representation or warranty regarding the security of the Shopping Center and in no event shall landlord be liable for any personal injury, wrongful death, or property damage suffered by the tenant at the hands of a third party (specifically including any damage or injury resulting from a criminal or terrorist attack). All property belonging to the Tenant, its agents or any other person which is placed in the Demised Premises is at the sole risk of Tenant or such agents or other person.

**45.** **ACCESS TO PREMISES:**

Tenant shall permit Landlord to enter the Demised Premises at reasonable times approved by Tenant: (i) to make repairs, changes, replacements and restorations to the Demised Premises which are required to be made by Landlord; and (ii) during the six (6) month period preceding the expiration date of the Term to exhibit the Demised Premises to prospective tenants, provided that Landlord shall not unreasonably interfere with the conduct of business therein or contact or solicit or communicate with any of Tenant's employees in the Demised Premises and shall direct all communications concerning the status of the Lease and Tenant's occupancy to the notice address provided in this Lease.

**46.** **ROOF TOP EQUIPMENT:**

In the event Tenant desires to install a satellite dish, antennae and/or other data communications devices in or upon the roof of the Demised Premises (the "Equipment"), such Equipment shall be for Tenant's own use and not for relet nor for sale or license of the transmissions from the Equipment. The Equipment shall be installed and operated in compliance with all city, county or other jurisdiction zoning ordinances. Provided penetration of the roof is required, the location and installation of the Equipment and its installation shall be subject to Landlord's prior written approval which may be granted or denied in Landlord's sole and absolute discretion. Any installation of the Equipment by Tenant shall not penetrate the roof without Landlord's written

consent, and shall not affect or interfere with the structural integrity of the building on which the Equipment is installed. Tenant shall use Landlord's contractor if roof penetrations are necessary to install the Equipment. Tenant shall bear all costs, expenses and liabilities which may arise by reason of the installation, operation or maintenance of any such Equipment and any appurtenant equipment. Tenant shall be solely responsible for the maintenance and repair of the Equipment and appurtenances. Prior to vacating the Demised Premises, Tenant shall remove all the Equipment and restore the Premises to good condition and order, ordinary wear and tear and casualty loss excepted. As to any roof installation/penetration approved in writing by Landlord, the roof related work must be conducted in a manner so as not to void any applicable roof warranty. Likewise, upon Tenant's removal of same, Tenant shall cause all repairs to the roof to be conducted or supervised by Landlord's approved roofer at Tenant's sole cost. Any leaks during the term of the Lease that arise from the installation of such improvements/penetrations shall be repaired by Landlord but at the sole expense of Tenant to be paid to Landlord upon written demand as Additional Rent hereunder.

## 47.    LANDLORD EXCULPATION:

Tenant shall look solely to Landlord's estate in the Shopping Center and the rents and profits therefrom and the proceeds from any sale or financing or refinancing of Landlord's interest in any portion or interest in the Shopping Center and the proceeds realized from insurance or upon a taking as the sole assets for collection of any claim, judgment or damages or enforcement of any other judicial process requiring payment of money. No other assets of Landlord shall be subject to levy, execution or other procedures to satisfy Tenant's rights or remedies. Tenant shall not, under any theory, seek any recovery against Landlord's parent or affiliates or its or their officers, directors, stockholders, partners or members. It is specifically understood and agreed that there shall be no personal liability of an individual officer, director, partner, stockholder, or member of Landlord in respect to any of the covenants, conditions, or provisions of this Lease. The term "Landlord" as used in this Lease for any particular point in time shall mean only the then-current owner of the Demised Premises, so that in the event of a sale of all of Landlord's right, title, and interest in the Demised Premises and an assignment of this Lease, all previous owners shall be and are hereby entirely freed and relieved of all of the obligations of the Landlord hereunder.

## 48.    COMPLIANCE WITH LAWS:

Landlord and Tenant shall each comply with and require their contractors to comply with all applicable laws relating to the employment, conditions of employment and hours of labor in connection with any demolition, construction, alteration or repair work done by or for Landlord or Tenant in or about the Premises. Landlord and Tenant shall also comply with all applicable laws in connection with its business operations and maintenance obligations, including but not limited to the Americans with Disabilities Act.

**[Signatures Appear on Immediately Subsequent Page.]**

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

**LANDLORD: AVENUE 12 HOLDINGS, LP, a Florida limited partnership**

By: _____
      17E5950619D848D
      Gary Bobke

Title: _General Partner_____

Date: 10/14/2022 _____

**TENANT:    BIG LOTS STORES, LLC., an Ohio limited liability company**

By: _____
      0CDC2E2DA35F40D
      Jonathan E. Ramsden

Title: Executive Vice President, Chief Financial & Administrative Officer

Date: 10/14/2022 _____

41

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



# EXHIBIT A- 1

## TENANT'S PLANS AND SPECIFICATIONS









DocuSign Envelope ID: F3334431-0875-4070-9ADB-6CF8B4A98BF3



CONSTRUCTION DETAILS

A-1.1A

47



DocuSign Envelope ID: F3334431-0875-4070-8ADB-6CF6D4A98BF3



DocuSign Envelope ID: F3334431-0875-4979-8ADB-6CF6B24A98E3











DocuSign Envelope ID: F333443 1-0875-4070-8ADB-6C68B4A98BE3



DocuSign Envelope ID: F3334431-0875-4079-8ADB-6CF8B24A98BE3





DocuSign Envelope ID: F3334431-0875-4079-8ADB-CF6BB4A98BE3





EMS SPECIFICATIONS

SHEET E-4







ELECTRICAL PANEL SCHEDULES

SHEET: E-7





DocuSign Envelope ID: F3334431-0875-4070-8ADB-2C6BD4A98BE3



DocuSign Envelope ID: F3334431-0875-4A70-8ADB-5C6B24A98BF3

ELECTRIC HEAT ELECTRIC COOL PACKAGED ROOFTOP UNITS
START-UP CHECKLIST

GAS HEAT ELECTRIC COOL PACKAGED ROOFTOP UNITS
START-UP CHECKLIST

HEATPUMP/HUMIDIFICATION PACKAGED ROOFTOP UNITS
START-UP CHECKLIST TO BE INCLUSIVE WITH EITHER ELECTRIC/GAS HEAT UNITS

MECHANICAL START UP CHECKLIST

BIG LOTS STORES, INC.
225 S. TYNDALL PKWY
PANAMA CITY, FL 32404

SHEET
M-4



## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

Commence at the Northwest Corner of Section 18, Township 4 South, Range 13 West, Bay County, Florida; thence N89°32'30"E along the centerline of Cherry Street for 50.00 feet; thence S00°51'36"E for 33.00 feet to the intersection of the South R/W line of Cherry Street and the East R/W line of U.S. Highway No. 98; thence N89°32'30"E along said South R/W line of Cherry Street for 321.10 feet to the Point of Beginning; thence continue N89°32'30"E along said South R/W line for 92.00 feet; thence S00°39'30"E for 301.93 feet; thence N89°20'30"E for 229.70 feet; thence S00°39'30"E for 473.71 feet; thence S45°37'06"E for 56.50 feet; thence S00°52'23"E for 445.00 feet to the North R/W line of North Lakewood Drive; thence S89°19'59"W along said North R/W line for 530.00 feet to a point 150.00 feet East of the East R/W line of U.S. Highway No. 98; thence N00°51'36"W

parallel with said East R/W line for 150.00 feet; thence S89°19'59"W parallel with said North R/ W line of North Lakewood Drive for 150.00 feet to said East R/W line of U.S.

Highway No. 98; thence N00°51'36"W along said East R/W line for 240.02 feet; thence N89°08'24"E along said R/W line for 10.00 feet; thence N00°51'36"W along said East R/W line for 85.04 feet; thence S78°34'19"E for 24.05 feet; thence N89°19'59"E parallel with the North R/W line of North Lakewood Drive for 136.50 feet; thence N00°51'36"W parallel with said East R/W line of U.S. Highway No. 98 for 178.20 feet; thence S89°05'57"W for 160.00 feet; thence N00°51'36"W along said East R/W line for 242.65 feet; thence S89°08'00"W along said East R/W line for 10.00 feet; thence N00°51'36"W along said East R/W line for 71.96 feet; thence N89°32'30"E parallel with said South R/W line of Cherry Street for 319.83 feet; thence N00°36'26"W for 300.00 feet to the Point of Beginning.

LESS AND EXCEPT: Commence at the centerline of survey of State Road 30-A, Section 46020, at a 5/8 inch iron rod marking the Northwest Corner of Section 18, Township 4 South, Range 13 West, Bay County, Florida, said point being 2643.43 feet North 0°33'46" East of the Southwest corner of the Northwest ¼ of said Section 18, marked by a square head bolt; thence run South 0°33'46" West a distance of 405.29 feet along said survey line (West line of said Section 18); thence departing said survey line, run South 89°26'14" East a distance of 60.00 feet to the POINT OF BEGINNING; thence North 0°33'46" East a distance of 72.19 feet; thence South 88°54'44" East 2.00 feet; thence North 0°33'46" East 144.66 feet; thence North 89°06'07" West a distance of 12.00 feet to the existing Easterly right of way line (right of way varies) of said State Road 30-A; thence South 0°33'46" West a distance of 216.90 feet along said existing Easterly right of way line; thence South 89°26'14" East a distance of 10.00 feet along said existing Easterly right of way line to the Point of Beginning.

ALSO LESS AND EXCEPT: Commence at the Northwest Corner of Section 18, Township 4 South, Range 13 West, City of Callaway, Bay County, Florida; thence N89°32'30"E along the North line of said Section 18 for 357.61 feet; thence S01°04'15"E for 33.00 feet to the South R/W line of Cherry Street; thence N89°32'30"E along said South R/W line for 105.54 feet to the Point of Beginning; thence S00°39'30"E for 301.80 feet; thence S89°32'30"W for 22.44 feet; thence N28°32'00"W for 25.17 feet; thence N23°24'48" W for 21.20 feet; thence N19°20'35"W for 20.19 feet; thence N11°29'13"W for 19.27 feet; thence N08°25'21"W for 25.38 feet; thence N05°03'00"W for 22.61 feet; thence N00°49'06"W for 174.60 feet to the South R/W line of Cherry Street; thence N89°32'30"E for 58.41 feet to the Point of Beginning.

### Exhibit "C"
### CONDITION OF PREMISES

**STOREFRONT:** All previous tenant storefront and building signs to be removed. Walls of the building or storefront façade to be repaired as needed from old sign removals.

**GLASS:** All store front glass to be in good condition.

**DOORS:** All doors and door systems (exterior and overhead included) to be sound, secure, in good working condition.

**UTILITIES:** **(NEED TO UNDERSTAND EXISTING SERVICE MAKE & MODEL)**
Landlord to provide separate utilities and separate utility meters with service direct from the local distribution company (including but not limited to gas, electric, water, etc.) adequate for Tenant's intended use. Tenant to utilize the existing utilities to be in good working condition and to include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems.

Landlord shall also provide Tenant with assurance that utilities are adequate for Tenant's use, are available and include legal access across other properties if necessary, to serve the Demised Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. All existing sanitary lines to be video scoped to ensure they not obstructed or damaged, video to be provided to Tenant.

**HVAC EQUIPMENT & MECHANICALS:** All HVAC and HVAC equipment, excepting duct work, diffusers etc. to be in good working condition. Existing HVAC and HVAC equipment to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. Tenant shall review the inspection report and determine if further repairs are required during installation of Tenant Improvements. Landlord shall also warrant any existing HVAC units for the initial lease term for any repairs over $3,000 during a single lease year, subject to conditions contained in Section 7 of the Lease. All warranties for new units shall be passed on to Tenant.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system meets the requirements that are adequate for Tenant's use (Class A Plastics with Pallet Racking 12' AFF in Stock Room). Landlord is to ensure Tenant has access to the sprinkler riser in order in install and operate its monitoring equipment on the sprinkler riser and provide an emergency shut off in Tenant's premises.

Landlord shall also at all times maintain access to the sprinkler riser from which in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions.

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Canopy lighting and wall packs servicing Tenant's Demised Premises are to be on Tenant's meter and controlled with storefront signage.

**PARKING LOT:** Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised

70

Premises shall be re-sealed and re-striped prior to delivery of Demised Premises to Tenant. Fire lanes, curbs and pole bases shall be freshly painted as well. The number of parking spaces provided for the demised premises must meet the requirements of the AHJ and ADA. A minimum of four, van accessible, handicap parking spaces and related signage required by Tenant.

**CART CORRALS:**  Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

**REMOVAL OF FIXTURES & EQUIPMENT:**  Landlord to remove all fixtures, equipment, deliver free of debris and in broom clean condition. . Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant and patch the roof as necessary.( Landlord to provide details of the existing bailer for Tenant to determine if it will utilize)

**ROOF:**  Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term. Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports. To ensure the repairs have been made and the roof is free of leaks, Landlord shall conduct a roof flood test with a Tenant representative present prior to turn over of possession. Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease, either via a roof hatch (existing or newly installed in a mutually agreeable location of the stock room) OR via a ladder existing/installed on the exterior wall in the rear.

**RECEIVING:**  Landlord to provide a 48" inch receiving dock/ truck well with the top of the platform at stockroom floor elevation. The receiving dock/truck well slope should not to exceed 5% grade and accommodate over-the road tractor-trailers (53' trailers). The loading platform shall be enclosed and under roof, including all seals, bumpers, bollards, doors, etc to be in good working order and adequate for Tenant's use. Tenant shall have exclusive use of the inside loading dock truck well and continuous use of the dock area, which shall remain unobstructed for Tenant's use.

**STRUCTURE & BUILDING:**  Landlord shall make any and all repairs/replacement to the building structure as necessary. This shall include all existing brick/masonry block and mortar. The exterior walls shall also be treated as necessary to ensure the Demised Premises is free of leaks. Landlord shall also install new gutters and downspouts on the building as necessary
All conditions and materials must meet or exceed all ADA, ANSI, ASHRE, NFPA, and AHJ codes and requirements.

**PESTS:**  Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

**SIGNAGE:**  Tenant shall receive the TOP or SECOND FROM TOP POSITION on the South pylon that is to be rebuilt per the Exhibit D-1. Tenant shall also receive the TOP position on the North pylon that is to also to be refurbished per the exhibit D-1. Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylon(s) meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon(s). Landlord to ensure that the pylon(s) is properly wired, maintained, constructed and deliver fully operational. Any Pylon remodels or newly constructed signs shall reflect Tenant in a similar position & size.

**HAZARDOUS**
**MATERIALS:** Landlord to provide Tenant with an asbestos inspection report of the Demised Premises prior to lease execution. Landlord shall provide to governmental authorities having jurisdiction all the necessary documentation as is required or may be required by applicable law including, without limitation, an asbestos survey or certification as required. In the event hazard materials are found on Premises, Landlord shall promptly remove per code requirements and restore the contaminated area, i.e. walls, floor, ceiling, etc into good condition acceptable to Tenant.

**DRAWINGS:** Landlord is to provide Tenant with a complete set of "as-built" drawings (CAD format) of the Demised Premises adequate for Tenant to produce Tenant's plans and specifications.

**GENERAL**
**CONDITIONS:** Landlord agrees the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable). If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to; a sprinkler certification completed within the last 60 days; roof report, prior to Tenant's possession.

All above work to be completed concurrent with installation of Tenant Improvements.

# EXHIBIT D

## TENANT BUILDING SIGN SPECIFICATION AND

## TENANT SIGN SPECIFICATION



## First Option Building Exterior
## Primary Stacked Logo



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|---|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

## Second Option Building Exterior
## Primary Horizontal Logo



| A | B | C | D | E | Area |
|---|---|---|---|---|---|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

# Channel Letters – Section Details





# Pylon / Monument Panels

### Square Panels

**Preferred:**                                   **2nd Option:**

 

### Rectangular Panels

**Preferred:**



**2nd Option:**



**Colors:**

 Orange – Match PMS 021c Orange (3M color 44)

 White

## EXHIBIT D - 1

### TENANT PYLON PANEL LOCATION







## EXHIBIT E

### COMPLETION OF LANDLORD'S WORK LETTER

**Date**: _____

**To**: _____ (insert Tenant)
   via email at: _____

**From**: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

**RE**: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

_____ Utility Information: Meter numbers for electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You**.**

**LANDLORD:**
_____

a _____

**TENANT:**
**BIG LOTS STORES, LLC., an Ohio limited liability company**

By: _____
Title: _____

By: _____
Title: _____

80

# EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**Landlord Restriction**. Landlord shall not grant any other tenant in the Shopping Center, inclusive of the +/-83,000 square foot Callaway Plaza K-Mart Property and adjacent +/-70,000 square foot Callaway Plaza Shopping Center Property the right to derive more than 10% of its gross income from the sale of food products.. Restaurant operations shall be exempt from this restriction. Provided that Landlord restricts such use in all leases entered into after the date hereof, and uses commercially reasonable efforts to enforce such restriction against a breaching tenant, Landlord shall not be in default of the Lease. The above restriction shall not apply to existing tenants operating under existing leases, or any successor or assign or subtenant thereof, or any renewal or extension of any such lease to the extent any such lease does not currently restrict the sale of food items.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 20___ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, LLC., an Ohio limited liability company, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1.D.) = _____.

2.    A.    Fixed Minimum Rent – Original Term (Section 5.A.):
             _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent – First Option (Section 5.A.):
             _____ annually; _____ per month.

4.    A.    Fixed Minimum Rent – Second Option (Section 5.A.):
             _____ annually; _____ per month.

5.    A.    Fixed Minimum Rent – Third Option (Section 5.A.):
             _____ annually; _____ per month.

**Signed and acknowledged:**

**LANDLORD:**                              **TENANT:**
_____            **BIG LOTS STORES, LLC., an Ohio**
                                           **limited liability company**
a _____

By: _____            By: _____
Title: _____           Title: _____