# EXHIBIT A

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term

4. Use and Operation

5. Rent and Construction Allowance
   A. Fixed Minimum Rent
   B. Utilities Charges
   C. Late Fees
   D. Common Area Charges and CAM Cap
   E. Real Estate Taxes
   F. Intentionally Deleted
   G. Construction Allowance
   H. Declarations

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Consequential Damages

35.    Intentionally Deleted

36.    No Presumption against Drafter

37.    Submission of Lease

38.    Interlineation

39.    Time of the Essence

40.    Tenant's Audit Rights

41.    Attorney Fees

42.    Waiver of Jury Trial

## LEASE AGREEMENT

This Lease Agreement ("Lease") shall be made effective the 22 day of December____, 2020 ("Effective Date"), by and between USPG Portfolio Eight, LLC, a Delaware limited liability company, whose mailing address is 3665 Fishinger Blvd., Hilliard, OH 43026 ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 4900 East Dublin Granville Road, Columbus, OH 43081.

**WITNESSETH:**

1.  **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.  <u>Common Areas</u>: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the Site Plan attached as Exhibit A or as may exist from time to time, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

    Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area (in an area designated on the Site Plan) of the Demised Premises so long as said trailer(s) do not interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not construct additional buildings nor alter the area crosshatched on Exhibit A ("No Change Area") without Tenant's written consent.

    B.  <u>Dates</u>: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

        1)  Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined herein below, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. In the event Tenant, its agents, employees, and/or contractors interfere with or delay Landlord's Work, all associated dates shall be extended by the amount of time Landlord is delayed by said interference or delay. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession to Tenant with all Landlord Work's complete (the "Landlord Delivery Date"), or (ii) the date on which Tenant receives all necessary building permits for its construction and/or signage (the "Permits"), provided, however, in any event the Tenant Possession Date shall occur no later than one hundred eighty (180) days after full Lease execution. Tenant will submit its plans for the Permits within one hundred twenty (120) days of the full execution of the Lease and thereafter, diligently pursue obtaining such Permits. If Tenant has not received the Permits within one hundred twenty (120) days after it submits for permits, Landlord may pursue the Permits on Tenant's behalf provided that Landlord does not alter Tenant's plans and specifications. Landlord will cooperate fully, at Tenant's sole cost, with Tenant in obtaining said Permits. Landlord shall use the form shown on Exhibit E, which may be sent via email to a designated (ghanson@biglots.com), to notify Tenant when it has completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred eighty (180) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    If Landlord fails to return a fully executed Leases to Tenant by January 11 , 2021, then any Tenant executed version of the Agreement becomes null and void and of no force or effect. Landlord shall deliver to Tenant the Demised Premises with Landlord's Work completed on March 1, 2021 and Tenant shall not be required to accept possession prior to March 1, 2021. If Landlord fails to deliver the Demised Premises with the Landlord's Work completed by July 1, 2021, then Tenant may terminate this Lease by written notice to Landlord provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by March 1, 2021, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon March 2, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to March 31, 2021, and as Tenant's sole remedy except as otherwise provided under this Lease, including the rights provided in Paragraph 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,000.00 per day delivery is delayed. Commencing April, 1, 2021 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,000.00 per day delivery is delayed. If Landlord

shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its Permits due to circumstances within Landlord's control.

6)    Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by July 1, 2021 despite commercially reasonable efforts to obtain the Approvals, as defined below, Tenant will not be required to accept possession until February 2, 2022. The period of time between July 1, 2021 and February 2, 2022 will be the "Optional Blackout Period". In the event Landlord completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. Notwithstanding anything to the contrary, upon Landlord completion of Landlord's Work in the Demised Premises, the liquidated damages shall cease accruing regardless of whether Tenant accepts possession of the Demised Premises. In addition, in the event Landlord has not completed Landlord's Work by February 2, 2022, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 2, 2022, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until one hundred eighty (180) days after the Landlord Delivery Date. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit B -    Legal Description of Shopping Center

3)    Exhibit C -    Landlord's Work

4)    Exhibit D -    Tenant Building Sign Specifications

5)    Exhibit D – 1 Tenant Pylon Sign Location

6)    Exhibit E -    Completion of Landlord's Work Letter

7)    Exhibit F -    Exclusive Use Provisions

8)    Exhibit G -    Remeasurement Rider

9)    Exhibit H -    SNDA

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

D.  <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom is 33,796 square feet of ground floor area with a minimum width of 140 feet for the Demised Premises.  Within sixty (60) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises, in accordance with BOMA standards, for a determination of its exact square footage and provide the Landlord with written notice of its findings.  Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.  Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 37,175 square feet nor accept possession of any space under 30,471 square feet in size, and may terminate this Lease in such an event.

E.  <u>Shopping Center</u>:  Landlord's "Shopping Center", designated as Cross Creek Plaza or any other name as Landlord or Landlord's successor may, from time to time, is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Cross Creek Plaza, 328 Robert Smalls Parkway Beaufort, SC 29906.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 243,863 square feet.  Notwithstanding anything herein to the contrary, the Shopping Center may exclude in Landlord's sole and exclusive determination, those portions of the Shopping Center (i) that are not owned or ground leased by Landlord from time to time, and (ii) any portions of the Shopping Center to the extent any charges for the occupants of said areas are accounted for and the costs of which are recovered separately by Landlord; provided, however, that ingress and egress for Tenant and the parking field identified on Exhibit A are maintained at all times.

## 2.  <u>DEMISE:</u>

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.  <u>TERM:</u>

A.  <u>Original Term</u>:  The original term of this Lease shall be for an approximate period of ten (10) Lease Years, commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending on January 31, 2031, provided, however, the term of the lease shall not be for less than ten (10) full calendar years ending on the January 31st after the 10th full calendar year (the "Original Term"), which shall be adjusted and all references to the date shall be adjusted based on the provisions in the Lease.  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the

termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.  Options to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. The options provided above are personal to Tenant and are not available to any subtenant or assignee of Tenant (excluding any "Related Party Assignment" as defined in Section 22 of this Lease).

4.  **USE AND OPERATION:**

A.  Permitted Uses: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the retail sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), all similar and related merchandise ("Initial Permitted Uses") and for any other lawful retail purpose, subject to Existing Restrictions, as defined below. In the event Tenant changes it use from the Initial Permitted Uses provided under this paragraph, the change of use will be subject to all then existing exclusive rights of other tenants of the Shopping Center or any then existing rights on recorded documents. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises, except those listed on Exhibit F (collectively the "Existing Restrictions"). Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants having a signed lease at the Shopping Center for business in the Shopping Center, as of the date of this Lease, or their assigns, successors, or replacements, no other general merchandise discount store, liquidator, close-out store, stores selling, leasing or renting furniture (including rent-to-own stores, home accessories or mattresses) discount stores, or dollar store operations ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof; provided, however, another tenant of the Shopping Center shall not be deemed a Competing Business if the prohibited items sold occupy the greater of five percent (5%) or 500 square feet of the tenant's gross leasable area. The parties acknowledge and agree that a discount tool or equipment retailer such as Harbor Freight Tools shall not be considered a Competing Business. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's,

Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Dirt Cheap, Bargain Hunt, Rose's, Christmas Tree Shops, Encore and Ollie's Bargain Outlet, Aaron's, Rent A Center, Rent Way, Color Tyme, Show Place, Buddy's. In the event a Competing Business, as defined herein, is operated in the Shopping Center (an "Exclusive Violation"), Tenant shall so notify Landlord in writing, and if the Exclusive Violation is not cured within sixty (60) days after such notice, Tenant shall be entitled to any and all of the following remedies, provided Tenant is open and operating from the Demised Premises, except for closures due to condemnation, casualty, force majeure, repairs and renovations: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; or (ii) Tenant may pay, commencing on the 61st day after notice of the Exclusive Violation, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

Tenant agrees to open for business for at least one (1) day within one hundred and eight (180) days of the Landlord Delivery Date, thereafter it is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in up to 6 parking spots in Cart Corral Area as designated on the Exhibit A Site Plan; and (ii) use the Common

Areas, immediately adjacent to the Demised Premises for the sale and display of merchandise as designated on the Exhibit A Site Plan.

B.  Prohibited Uses:  Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel or a "flea market" type of operation; (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self storage facilities; (v) for any plasma centers or medical or health-oriented facilities or offices in excess of an aggregate of 10,000 square feet of floor area ; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers (excluding out parcels as designated on the Site Plan); (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor (excluding national chains such as "Massage Envy" or similar type of spa) or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 100 linear feet away from the Demised Premises, measured from entrance to entrance); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines (excluding incidental use and Dave and Busters and Top Golf type concepts), bowling alley, health spa, health club, exercise club, gymnasium or other similar operations (provided, however, that a fitness club or health club is excluded provided it is located at least 100 linear feet away from the Demised Premises, measured from entrance to entrance); (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop located adjacent to the Demised Premises (excluding pet supply companies such as Pet Supply Plus, PetSmart or Petco); (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia.  All of the foregoing uses are sometimes collectively referred to herein as the "**Prohibited Uses**". This provision shall not apply to those current

Tenants of the Shopping Center who may be allowed to operate such use without the consent of Landlord.

**5.     RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.      Fixed Minimum Rent:  From the Rent Commencement Date of this Lease through January 31, 2026, the sum of $253,470.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $21,122.50. From February 1, 2026 through January 31, 2031, the sum of $270,368.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $22,530.67.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $287,266.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $23,938.83. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $304,164.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $25,347,00. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $321,062.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $26,755.17.

B.      Utilities Charges:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises from the Tenant Possession Date and during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure

or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.   Late Fees. If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of seven (7%) percent ( per annum of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year.

D.   Common Area Charges and CAM Cap:   Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

   (i)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Common Areas of the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

   (ii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

   (iii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to affect the Site Plan;

   (iv)   providing security, lighting and policing if necessary, and on-site and off-site traffic control;

   (v)   maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

   (vi)   cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied) i) to repair, resurface or reseal the parking lot and ii) of improvements intended to reduce CAM costs such as converting existing lights to LED lights, or roof expenditures; but such exclusion of capital expenditures shall not include any major repairs which Landlord elects to amortize over the useful life thereof (and all such major repairs are subject to CAM Cap, as defined below), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management, marketing or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first calendar year, or partial calendar year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first calendar year, or partial calendar year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised after the end of each calendar year or partial calendar year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding calendar year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each calendar year or partial calendar year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such calendar year or partial calendar year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein. In the event Landlord fails to provide such a reconciliation statement within six (6) months following the end of a calendar year, or partial calendar year, as the case may be, Tenant may reduce its payments of estimated Common Area Charges by fifty percent (50%), commencing with the seventh (7th) month and continuing until such time as Landlord provides the reconciliation statement ("Reduced CAM"). At such time as Tenant has been paying Reduced CAM for a period of twelve (12) months, if Landlord has not yet provided the reconciliation statement, Tenant may further reduce its monthly payments of estimated Common Area Charges to zero until Landlord provides to Tenant the required reconciliation statement.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any calendar year, or partial calendar year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last calendar year or partial calendar year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap:  Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at $1.00 per square foot of the Demised Premises for the first  partial calendar year of the Original Term.  Commencing on the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. After the first partial calendar year, if any, Tenant's Common Area Charges shall increase by five percent (5%) per year above that amount of Common Area Charges payable by Tenant for the previous calendar year.

The Common Area Charges Cap and the fixed annual increase in Common Area Charges shall be collectively known as the "CAM Cap".  In no event shall Tenant be required to pay any amount under this Section 5.D. in excess of the CAM Cap set forth herein

E.    Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center, including stormwater fees that are assessed as part of the Real Estate Taxes invoice (hereinafter referred to as "Real Estate Taxes"). Real Estate Taxes shall also include all costs reasonably incurred in employing tax consultants to attempt to manage or lower such taxes or defend against a reassessment and all costs reasonably incurred in any proceeding brought by Landlord to reduce said Taxes. Tenant shall contribute up to the amount of any reduced taxes toward the cost of appealing the Real Estate Taxes during any calendar year or partial calendar year during the Original Term or Option Term.  Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions unless pro rated over the useful life of the improvement subjected to the special assessment or imposition.  Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord.  Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees, including, without limitation, the South Carolina commercial activity tax, imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any calendar year or partial calendar year. Landlord represents that the Real Estate Taxes for the 2020 tax year are approximately $1.65 per square foot per annum. Tenant may deduct from tax invoices submitted by Landlord during the Term the amount of any discrepancy of more than five percent (5%) per square foot between the amount represented by Landlord and the actual Real Estate Taxes per square foot for the 2020 tax year unless Landlord can provide documentation to justify the discrepancy as resulting from a newly imposed tax or from a reassessment or other change in assessment by the taxing authority.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted, to the extent Landlord can reasonably determine the amount, from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time every five (5) years during the Term. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Intentionally Deleted:

G.    Construction Allowance Abatement:
Landlord shall pay to Tenant an amount equal to Five Hundred Six Thousand Nine Hundred Forty Dollars ($506,940.00) within thirty (30) days of Tenant's opening for business, which amount represents fifty percent (50%) of the Total Construction Allowance ($1,013,880.00) owed to Tenant. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Construction Rent Abatement
Additionally, for a period of 24 months commencing upon the Rent Commencement Date ("Rent Abatement Period"), Tenant shall not be obligated to pay Fixed Minimum Rent, as consideration for Tenant's construction to and improvement of the Demised Premises (hereinafter referred to as "Rent Abatement") which represents the remaining fifty percent (50%) of the Total Construction Allowance owed to Tenant. The total amount of the Rent Abatement shall be equal to $506,940.00. Notwithstanding anything to the contrary, Rent Abatement shall be preserved in the event of a Force Majeure event.

Tenant agrees that during the Rent Abatement Period, Tenant shall be continuously open and operating from the Premises. In the event Tenant ceases operating from the Premises for a period of more than ninety (90) days for reasons other than casualty, condemnation or force majeure, Tenant shall immediate commence paying Fixed Minimum Rent. Notwithstanding anything to the contrary, should such an event occur, Landlord shall pay Tenant 50% of the remaining Rent Abatement as Construction Allowance.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent and Rent Abatement is used for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance and Rent Abatement shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

H.    Declaration: Landlord and Tenant acknowledge that Shopping Center is subject to certain covenants, conditions and restrictions of record, including but not limited to a Partial and Limited Waiver of Covenants and Restrictions, dated March 3, 1989, recorded in Official Book 524, Page 1183, a Declaration of Restrictions, dated August 31, 1989, recorded in Official Book 539, Page 2129, an Agreement Regarding Outparcels, dated December 13, 1990, recorded in Official Record Book 567, Page 46, a Declaration Regarding Store Pads, dated December 13, 1990, recorded in Official Book 567, Page 92, an Easement with Covenants and Restrictions Affecting Land, dated February 25. 1999, recorded in Official Record Book 1145, Page 610, a Declaration of Commercial Covenants and Restrictions, as amended dated February 9, 2001, recorded February 22, 2001, in Official Record Book 01386, Page 0736, of Beaufort County, South Carolina, (collectively, the "Declaration"). To the extent that the Declaration allocates Real Estate Taxes, utility expenses, insurance expenses, Common Area Charges and any other expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the Declaration) differently than in this Lease, or to the extent Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and

Tenant.  In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the Declaration, or Charges in excess of what Tenant has agreed to pay under this Lease, are to be made by Landlord without reimbursement from Tenant.  Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) arising out of any alleged violation by Tenant of the Declaration to the extent such violation conflicts with the Lease as stated above.  Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the Declaration, and Landlord agrees not to consent to any uses prohibited by the Declaration or this Lease in the Shopping Center.

6.    **ALTERATIONS:**

During the Term of this Lease, following completion of Tenant's initial improvements in the Demised Premises, Tenant shall have the right to make subsequent non-structural changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any such alterations.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease.  The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.  The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises; provided, however, that Tenant shall be responsible for any damage to the floor slab caused solely by the negligence of Tenant's or its contractors. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date except for the 2003 6-ton Carrier unit and the 2004 30-ton Trane unit. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition as specified in Exhibit C except for the 2003 6-ton Carrier unit and the 2004 30-ton Trane unit. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense except as applied to the 2003 6-ton Carrier unit and the 2004 30-ton Trane unit. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within sixty (60) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence, and then subsequently, diligently complete, the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs (unless more than fifteen (15) days are required for such repairs, in which case, this period shall be extended for so long as reasonably required, which shall not be longer than ninety (90) days for completion of such repairs), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within thirty (30) days after the date specified for delivery of possession as provided in Section 1.B.5, then in Tenant's discretion, Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%)

administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense and in compliance with all applicable laws, regulations and ordinances, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease.

Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-third (1/3) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Notwithstanding the foregoing, Landlord shall ensure that no other tenant of the Shopping Center shall have a panel larger than Tenant's panel(s). Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s). In the event Tenant removes its panel sign(s), Tenant shall responsible for all costs associated with the removal and shall replace any panel with a blank panel.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs. Tenant shall be responsible for the removal and any damage caused by said removal of all of its signage within fifteen (15) days of the termination or expiration of the Lease.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove such trade fixtures or equipment, and shall repair any damage to the Demised Premises caused by or resulting

from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premise. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord agrees to make all structural and/or exterior repairs, alterations, additions, or replacements to the Demised Premises required by any governmental agency to be in compliance with any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, and sprinkler system; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future ; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

A.    Tenant:  Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total

combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, and trade fixtures.

B.    <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance(but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B are $0.25 per square foot per annum for the 2021 calendar year. For the first calendar year of the Original Term, Tenant shall not be required to reimburse Landlord for any discrepancy of more than five percent (5%) per square foot between the amount represented by Landlord herein and the amount per square foot of the insurance invoices actually submitted by Landlord to Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.    <u>**FIRE REBUILDING AND ALTERING**</u>:

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping

Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration.   During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease   on the date on which the Demised Premises are restored to tenantable condition and the expiration of a period equal in duration to double the fixturing period. Tenant shall repair or replace its merchandise, trade fixtures, furnishings and equipment in a manner and to a condition equal to that immediately prior to the damage or destruction.

B.      In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within three hundred sixty-five (365) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.      If the Demised Premises are damaged or destroyed during the last two (2) years of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option, if any, to extend the Term of the Lease.

**14.    FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to the financial obligations of either party under this Lease.

**15.    INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant or are recorded as of the execution of this Lease as those recorded documents may be amended from time to time; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and

power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) to Landlord's knowledge, Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, and such failure impedes Tenant in its operation of its business in the Demised Premises, or breaches the aforesaid representations, and such breach impedes Tenant in its operation of its business in the Demised Premises, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, which may expand Tenant's obligations or limit its rights under this Lease, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17.   **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18.   **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory, acting reasonably, subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. The Parties acknowledge and agree that a mutually agreeable SNDA is attached hereto as Exhibit H. Tenant agrees to work in good faith with Landlord's lender on any changes to the SNDA attached as Exhibit I. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so

provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Within thirty (30) days of a request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19. **DEFAULT:**

A. If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof or any other amounts due and owing to Landlord for more than fifteen (15) days after receipt by Tenant of written notice, which Landlord shall not be required to provide more than two (2) such written notices in a twelve (12) month period, of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, without terminating this Lease, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B. If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option (i) in the event of a continuing default that has a material adverse impact on Tenant's operations in the Demised Premises, to terminate this Lease without penalty or default on the part of Tenant; or (ii) to cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until

such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same at a reasonable cost and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20.  **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, either party may terminate this Lease by providing written notice of termination to the other party no more than sixty (60) days after the date on which title shall vest in the condemning authority. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises upon providing written notice of its election to Landlord within sixty (60) days after such taking. If the parking facilities are reduced as a result of such a taking below the minimum parking requirements imposed by the applicable authorities, Landlord may elect to terminate this Lease by giving Tenant notice within one hundred twenty (120) days after such taking. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. In the case of any taking or condemnation, whether or not the term of this Lease shall cease and terminate, the entire award shall be the property of Landlord; provided, however, Tenant shall be entitled to any award as may be allowed for fixtures and other equipment which under the terms of this Lease would not have become the property of Landlord; further provided, that any such award to Tenant shall not be in diminution of any award to Landlord.

21.  **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant

relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean, as-is condition. Tenant may remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred twenty-five percent (125%) of the Fixed Minimum Rent payable under this Lease at the expiration of the immediately preceding Term, and otherwise subject to all the terms and provisions hereof.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.    **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Ohio. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense.  Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease other than Tim Brennan of The Navigator Group. The Navigator Group has a separate agreement for payment with Landlord.  If any individual or entity other than Broker shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials and shall provide to governmental authorities having jurisdiction, all the necessary documentation as is required or may be required by applicable law, to include without limitation, an asbestos survey or certification as required.  "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority.  Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's (other than Tenant) during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and restore the contaminated area into good condition acceptable to Tenant. Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related

to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises and/or the Shopping Center other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly or indirectly caused by Tenant, its agents, contractors, employees or licensees while in possession, or elsewhere if directly or indirectly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.  **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.  **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33.  **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

34.  **CONSEQUENTIAL DAMAGES**

In no event shall either party be liable to the other party for indirect, special, consequential or punitive damages.

35.  **INTENTIONALLY DELETED**

36.  **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or

conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

37.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

38.    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

39.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

40.    **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of CAM, Real Estate Taxes, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein or if Tenant is not satisfied with Landlord's written statement(s) with respect to CAM, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. Tenant may audit only one year at a time, and no one year may be audited more than once. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit reveals an underpayment by Tenant, Tenant shall promptly pay the amount of such underpayment to Landlord. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit not to exceed $1,500.00 (but only if audit is conducted by an independent third party). If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such CAM, Real Estate Taxes, Insurance Costs charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding calendar year.

41.    **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

42.    **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

43.    **CONTINGENCIES:**

The effectiveness of this lease is contingent on i) Landlord securing a waiver from both Hibbett's for Tenant's Use as set forth herein, and ii) the execution of the lease between Tenant and Landlord for space at Petoskey Towne Center in Petoskey, Michigan. In the event both contingencies have been not been satisfied within thirty (30) days of the full execution of this Lease, either party may terminate this lease on thirty (30) days' notice to the other party (the "Termination Notice"). In the event the contingencies are met within the thirty (30) day notice period, the Termination Notice shall become null and void and the Lease shall become of full force and effect. Upon the satisfaction or waiver of the contingencies, the termination right contained in this Section shall become null and void.

[Signatures Appear on Immediately Subsequent Page.]

DocuSign Envelope ID: A6F30705-9481-4570-B2EB-818290A34EDD

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:    USPG PORTFOLIO EIGHT, LLC, a Delaware limited liability company**

By: *Darin Hobson*

Title: Manager

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, USPG Portfolio Eight, LLC by, Darin Hobson its Manager who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said company, and the free act and deed of him/her personally. The notarial act certified hereby is an acknowledgement. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, OH this 22nd day of December, 2020.

Notary Public

ALICIA RENEE' ROBERTS
Notary Public, State of Ohio
My Commission Expires
December 9, 2022

Witnesses as to Tenant:

**TENANT:    BIG LOTS STORES, INC., an Ohio corporation**

By: *Jonathan E. Ramsden*

Jonathan E. Ramsden

Title:    Executive Vice President, Chief Financial & Administrative Officer

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Jonathan E. Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer. The notarial act certified hereby is an acknowledgement. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 21st day of December, 2020.

Notary Public

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

CCP Lease

30

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:     **LANDLORD:   USPG PORTFOLIO EIGHT, LLC**, a **Delaware limited liability company**

_____     By: _____

_____     Title: _____

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, USPG Portfolio Eight, LLC by, _____ its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said company, and the free act and deed of him/her personally. The notarial act certified hereby is an acknowledgement. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this _____ day of _____, 2020.

_____
Notary Public

Witnesses as to Tenant:     **TENANT:   BIG LOTS STORES, INC., an Ohio corporation**

By: Jonathan E. Ramsden
Jonathan E. Ramsden
Title: Executive Vice President, Chief Financial & Administrative Officer

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Jonathan E. Ramsden, its Executive Vice President, Chief Financial & Administrative Officer, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer. The notarial act certified hereby is an acknowledgement. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 21 day of December, 2020.

Notary Public

Janelle N. Lopez
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

CCP_Big Lots Lease     30



DocuSign Envelope ID: F53E5F05-536C-4E55-BDEC-D1023AC12C50

## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

### EXHIBIT "A"
### LEGAL DESCRIPTION

LEGAL DESCRIPTION FOR CROSS CREEK

All that tract, lot, parcel, or piece of land located, in Port Royal Island, Beaufort County, South Carolina, known as Cross Creek Shopping Center, and Out Parcel F, save and except Out Parcel A, Out Parcel D, Out Parcel C, Out Parcel D and Out Parcel E, having the following metes and bounds courses and destinations as follows, to wit:

Commencing at a concrete monument at the Southeastern corner of Beaufort County School District property, as recorded in the Office of the Clerk of Court for Beaufort County, South Carolina, in Judgment Roll Number 43414, being the Point of Beginning; thence running North 61° 24' 42" East a distance of 1406.64 feet measured along the Northern right-of-way of South Carolina Highway 170 to a property corner; the true point of beginning; thence turning and running North 37 degrees 54' 11" West a distance of 158.73 feet measured along a property line bounded on the West by Cecile F. and John W. Gray to a property corner; thence turning and running North 41° 51' 03" West a distance of 664.43 feet along the property line bounded to the West of the line by Cecile F. and John W. Gray to a property corner; thence turning and running North 48° 05' 57" East a distance of 150.00 feet measured along a property line bounded to the Northwest by Cecile F. and John W. Gray to a property corner; thence turning and running North 33° 23' 38" East a distance of 64.94 feet measured along a property line bounded in the Northwest by Cecile F. and John W. Gray to a property corner; thence turning and running North 48° 08' 57" East a distance of 983.63 feet measured along a property line bounded to the Northwest by Cecile F. and John W. Gray to a property corner; thence turning and running North 84° 38' 42" East a distance of 470.53 feet measured along a property line bounded by Cecile F. and John W. Gray to a property corner; thence turning and running South 76° 20' 19" East a distance of 207.64 feet measured along a property line bounded to the North by Cecile F. and John W. Gray to a property corner; thence turning and running North 51°00'03" East a distance of 377.38 feet measured along a property line bounded to the Northeast by Cecile F. and John W. Gray to a property corner located on the Northwest right-of-way of S.C. Highway 280; thence turning and running South 29° 22' 42" West a distance of 98.26 feet measured along the Northwest right-of-way of S.C. Highway 280 to a property corner; thence turning and running North 60°37'18" West a distance of 17.00 feet measured along the right-of-way of S.C. Highway 280 to a property corner; thence turning and running South 29°22'42" West a distance of 460.50 feet measured along the Northwest right of way of S.C. Highway 280 to a property corner; thence turning and running South 29° 22' 42" West a distance of 92.08 feet measured along the Northwest right-of way of S.C. Highway 280 to a property corner; thence turning and running South 45° 90' 33" West a distance of 327.50 feet measured along the Northwest right-of-way of S.C. Highways 280 and 170 to a property corner; thence turning and running South 61° 24' 42" West a distance of 241.60 feet measured along the Northern right-of-way of S.C. Highway 170 to a property corner; thence turning and running South 61° 24' 42" West a distance of 123.30 feet measured along the Northern right-of-way of S.C. Highway 170 to a property corner; thence turning and running South 61° 24' 42" West a distance of 176.64 feet measured along the Northern right-of-way of S.C. Highway 170 to a property corner; the True Point of Beginning. Being shown on that certain survey entitled "As-built Survey of Cross Creek Shopping Center" dated March 2, 1990, and last revised December 20, 1990 prepared by Johnston-Trogdon Surveyors (Job No.2909), recorded in Plat Book 40 page 43, Beaufort County records.

#### SAVE AND EXCEPT OUTPARCELS A, B, C, D & E

#### OUTPARCEL "A"

All that certain place, parcel or tract of land, situate, lying and being in the City of Beaufort, Port Royal Island, Beaufort County, South Carolina, and being more particularly described as follows:

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

The Point of Beginning, being a concrete monument at the Southeastern most corner of Beaufort County School District property, as recorded in the Office of the Clerk of Court for Beaufort County, South Carolina, in Judgment Roll Number 43414; thence running along the Northern right-of-way of S.C. Highway 170, North 61° 24' 42" East for a distance of 1585.28 feet to an iron pipe; thence leaving said right-of-way and running North 41° 51' 03" West for a distance of 121.23 feet to an iron pipe, the True Point of Beginning; thence running South 61° 38' 57" West for a distance of 125.00 feet to an iron pipe; thence running North 37° 54' 11" West for a distance of 51.51 feet to an iron pipe, thence running North 41° 51' 03" West for a distance of 104.43 feet to an iron pipe; thence running North 48° 08' 57" East for a distance of 148.00 feet to an iron pipe; thence running South 41° 51' 03" East for a distance of 185.00 feet to the True Point of Beginning, and containing 0.465 acre. Being shown as "Outparcel A" on that certain survey entitled "As built Survey of Cross Creek Shopping Center", dated May 2, 1990, and last revised December 10, 1990, prepared by JOHNSON-TROGDON SURVEYORS (Job No.2909).

OUTPARCEL "B"

All that certain piece, parcel or tract of land, situated, lying and being in the City of Beaufort, Port Royal Island, Beaufort County, South Carolina, and being more particularly described as follows:

The Point of Beginning, being a concrete monument at the Southeastern most corner of Beaufort County School District property, as recorded in the Office of the Clerk of Court for Beaufort County, South Carolina, in Judgment Roll Number 43414; thence running along the Northern right-of-way of S.C. Highway 170 North 61° 24' 42" East for a distance of 2248.18 feet to a concrete monument placed by the S.C. Highway Department to mark the right-of-way of S.C. Highway 170; thence leaving said right-of-way and running North 40° 12' 58" West for a distance of 64.79 feet to an iron pipe, to the True Point of Beginning; thence running South 51° 42' 02" West for a distance of 200.58 feet to an iron pipe; thence running North 41° 51' 03" West for a distance of 98.00 feet to an iron pipe; thence running North 48° 08' 57" East for a distance of 195.00 feet to an iron pipe; thence running South 41° 51' 03" East for a distance of 145.00 feet to the True Point of Beginning, and containing 0.544 acre. Being shown as "Outparcel B" on that certain survey entitled "As built Survey of Cross Creek Shopping Center", dated May 2, 1990, and last revised December 10, 1990, prepared by JOHNSON-TROGDON SURVEYORS (Job. No.2909).

OUTPARCEL "C"

All that certain piece, parcel or tract of land, situated, lying and being in the City of Beaufort, Port Royal Island, Beaufort County, South Carolina, and being more particularly described as follows:

The Point of Beginning being a concrete monument at the Southeastern most corner of Beaufort County School District property, as recorded in the Office of the Clerk for Beaufort County, South Carolina, in Judgment Roll Number 43414; thence running along the Northern right-of-way of S.C. Highway 170, North 61° 24' 42" East for a distance of 2248.18 feet to a concrete monument placed by the S.C. Highway Department to mark the right-of-way of S.C. Highway 170; thence leaving said right-of-way and running North 39° 48' 49" West for a distance of 54.99 feet to an iron pipe, thence running North 41° 51' 03" West for a distance of 71.9 feet to a 1/2" rod, the True Point of Beginning; thence running North 41° 51' 03" West for a distance of 145.00 feet to 1/2" rod, said rod being one (1) foot behind the concrete curb; thence turning and running parallel and one (1) foot behind the concrete curb North 48° 08' 57" East for a distance of 160.00 feet to a 1/2" iron rod; thence turning and running South 41° 51' 03" East for a distance of 145.00 feet to 1/2" rod; thence turning and running South 48° 08' 57" West for a distance of 160.00 feet, said rod being the True Point of Beginning, and containing 0.533 acres. Being shown as "Outparcel C" on that certain survey entitled "Topographic Survey prepared for B&S showing Outparcels B & C, dated January 31, 1997, revised April 22, 1997 and recorded in the Office of the Clerk for Beaufort County in Plat Book 61, Page 46.

OUTPARCEL "D"

ALL that certain piece, parcel or tract of land, situate, lying and being in the City of Beaufort, Port Royal Island, Beaufort County, South Carolina, and being more particularly described as follows:

The Point of Beginning being a concrete monument at the Southeastern most corner of Beaufort County School District property, as recorded in the Office of the Clerk for Beaufort County, South Carolina, in Judgment Roll Number 43414; thence running along the Northern right-of-way of S.C. Highway 170 North 61° 24' 42" East for a distance of 2248.18 feet to a concrete monument placed by the S.C. Highway Department to mark the right-of-way of S.C. Highway 170; thence running with the Northern right-of-way of S.C. Highway 280 North 45° 30' 33" East for a distance of 327.50 feet to a concrete monument; thence running along the Northern right-of-way of S.C. Highway 280 North 29° 22' 42" East for a distance of 92.08 feet to a point located in the Northern right-of-way of S.C. Highway 280; thence leaving such right-of-way and running Northerly North 41° 51' 03" West for a distance of 53.06 feet to a point, the True Point of Beginning; thence running South 29° 22' 16" West for a distance of 105.62 feet to an iron pipe; thence running South 48° 08' 57" West, for a distance of 55.00 feet to an iron pipe; thence running North 41° 51' 03" West for a distance of 106.00 feet to an iron pipe; thence running North 48° 08' 57" East for a distance of 135.00 feet to an iron pipe; thence running South 41° 51' 03" East for a distance of 106.00 feet to the True Point of Beginning, and containing 0.395 acre. Being shown as "Outparcel D" on that certain survey entitled "As built Survey of Cross Creek Shopping Center", dated May 2, 1990, and last revised December 10, 1990, prepared by JOHNSON TROGDON SURVEYORS (Job. No. 2909).

OUTPARCEL "E"

ALL that certain piece, parcel or tract of land, situate, lying and being in the City of Beaufort, Port Royal Island, Beaufort County, South Carolina, and being more particularly described as follows:

The Point of Beginning being a concrete monument at the Southeastern most corner of Beaufort County School District property, as recorded in the Office of the Clerk of the Court for Beaufort County, South Carolina, in Judgment Roll Number 43414; thence running along the Northern right-of-way of S.C. Highway 170 North 61° 24' 42" East for a distance of 2248.18 feet to a concrete monument placed by the S.C. Highway Department to mark the right-of-way of S.C. Highway 170; thence running with the Northern right-of-way of S.C. Highway 280 North 45° 30' 33" East for a distance of 327.50 feet to a concrete monument; thence running along the Northern right-of-way of S.C. Highway 280 North 29° 22' 42" East for a distance of 92.08 feet to a point located in the Northern right-of-way of S.C. Highway 280; thence leaving such right-of-way and running Northerly North 41° 51' 03" West for a distance of 53.06 feet to a point, the True Point of Beginning; thence running North 41° 51' 03" West for a distance of 106.00 feet to an iron pipe; thence running North 48° 08' 57" East for a distance of 150.00 feet to an iron pipe; thence running South 41° 51' 03" East for a distance of 55.00 feet to an iron pipe; thence running South 29° 22' 16" West for a distance of 158.43 feet to the True Point of Beginning, and containing 0.227 acre. Being shown as "Outparcel E" on that certain survey entitled "As built Survey of Cross Creek Shopping Center", dated May 2, 1990, and last revised December 10, 1990, prepared by JOHNSON-TROGDON SURVEYORS (Job No.2909).

ALSO SAVING AND EXCEPTING THEREFROM THE FOLLOWING:

ALL those certain pieces, parcels or tracts of land, situate, lying and being in Cross Creek Shopping Center, City of Beaufort, Beaufort County, South Carolina, shown and described as "PARCEL B2", containing 0.06 acres, more or less, and as "PARCEL C2", containing 0.02 acres, more or less, on that certain plat entitled "Topographic Survey Prepared for B.E.S. Showing Outparcels B & C" prepared by Gasque & Associates, Inc., David E. Gasque, SCRLS 10506, dated January 31, 1997, last revised April 22, 1997, and recorded in the RMC Office for Beaufort County, South Carolina in Plat Book 61 at Page 46.

TOGETHER WITH THE FOLLOWING:

EASEMENT PARCELS:

Together with easement for ingress, egress and access, and easements for drainage and utility facilities, as set forth and described in instrument entitled "Agreement Regarding Outparcels" recorded in Book 567, Page 46 , over Outparcel "A", "B", "C", "D" and "E" shown on Plat entitled "As-built Survey of Cross Creek Shopping Center", dated May 2, 1990, last revised December 10, 1990, and recorded in Plat Book 40, Page 43, in the Office of the RMC for Beaufort County.

Also together with easements for ingress, egress and access, and an easement for drainage and utility facilities, as set forth and described in instrument entitled "Declaration Regarding Store Pad" recorded in Book 567, Page 92 , over Outparcel "F" shown on Plat entitled "As-built Survey of Cross Creek Shopping Center", dated May 2, 1990, last revised December 10, 1990, and recorded in Plat Book 40, Page 43, in the Office of the RMC for Beaufort County.

Also together with easements for drainage set forth and described in "Declaration of Commercial Covenants and Restrictions" recorded in Book 524, Page 1165, said easement being shown and described on Plat of approximately 81.996 acres, by David S. Youmans, RLS, recorded in Plat Book 35, Page 359, in the Office of the RMC for Beaufort County.

(Note: Any and all reference to acreage or square footage under Exhibit "A", Legal Descriptions is for informational purposes only)

FOR INFORMATIONAL AND RECORDING REQUIREMENT PURPOSES ONLY:

This being the same property conveyed to USPG Portfolio Two, LLC by deed of Glimcher Properties Limited Partnership dated 12/5/2002 and recorded in Book 1690 page 1706.

TMS # R122 029 000 182A 0000

## EXHIBIT C
### CONDITION OF PREMISES:

**STOREFRONT:** The exterior storefront façade shall be in good condition and repaired from previous tenant's signage

**GLASS:** All store front glass to be in good condition.

**UTILITIES:** Tenant to utilize the existing utilities to be in good working condition and to include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. If the existing electrical service is not in Tenant's Premises, Landlord is to set a new transformer providing a basic service to Tenant's Demised premises with a minimum of 1600 amps for 120/208v service or 800 amps for 277/480v service. Tenant will be responsible to distribute the service throughout the space including any additional circuit panels, step down transformers etc. from the initial supply delivered by Landlord on the inside of the rear wall.

**HVAC EQUIPMENT & MECHANICALS:** All HVAC and HVAC equipment, duct work, diffusers etc. to be in good working condition. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. This provision shall not apply to the 2003 and 2004 HVAC units.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with a sprinkler certification and ensure the existing sprinkler system meets the requirements that are adequate for Tenant's use (Class A Plastics with Pallet Racking 12' AFF in Stock Room).

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc, throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. Canopy lighting and wall packs servicing Tenant's Demised Premises are to be on Tenant's meter.

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks with a minimum life expectancy equal to or greater than Tenant's initial Lease term. Landlord shall have all roof vents, stacks or openings not being utilized by Tenant, removed and roof repaired. All unused equipment from previous tenants such as satellite dishes and cabling shall be removed from roof. All gutters and downspouts shall be in good working condition. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports. To ensure the repairs have been made and the roof is free of leaks, Landlord shall conduct a roof flood test with a Tenant representative present prior to turn over of possession. Landlord shall coordinate with Tenant shall have access to the roof above its Demised Premises at all times throughout the term of the Lease, either via a roof hatch (existing or newly installed in a mutually agreeable location of the stock room) OR via a ladder existing/installed on the exterior wall in the rear.

**RECEIVING AREA:** Landlord to provide adequate receiving area with loading docks to accommodate over-the road tractor-trailers (53' trailers). Loading docks are to be 48" inches high and in good working order (including all seals, bumpers, bollards, doors, etc.). The truck/trailer area to be level. Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**REMOVAL OF FIXTURES & EQUIPMENT:** Landlord to remove all previous tenant's fixtures and equipment and deliver the space in broom clean condition. Landlord shall remove any existing or abandoned HVAC units or equipment not utilized by Tenant and patch the roof as necessary.

**PARKING LOT:** Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises shall be re-sealed and re-striped prior to delivery of Demised Premises to Tenant. Fire lanes, curbs and pole bases shall be freshly painted as well.

| | |
|---|---|
| **PESTS:** | Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free. |
| **CART CORRALS:** | Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto. |
| **SIGNAGE:** | Tenant to have the right to use its color and logo on building signs at the maximum size per code and on pylons. Tenant to have the Top position on the pylons. Landlord shall provide a rendering of the existing pylon signs highlighting Tenant's panel position. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position. (If no pylon is available, Tenant shall have the right to erect its own pylon per all city codes and ordinances.) |
| **DRAWINGS:** | Landlord is to provide Tenant with "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. |
| **HAZARDOUS MATERIALS:** | Landlord is responsible for remediation of any and all hazardous material. Landlord shall provide to Tenant a Phase I and asbestos survey or, in the alternative, necessary certification. |
| **GENERAL CONDITIONS:** | Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Furthermore, the building structure shall meet governmental and local codes including current seismic requirements if applicable. |

All above work to be completed before the Tenant Possession Date.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**





## HORIZONTAL LOGO

### INDIVIDUAL LED ILLUMINATED
### CHANNEL LETTER SET

| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60



## STACKED LOGO
### INDIVIDUAL LED ILLUMINATED
### CHANNEL LETTER SET

| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

# SECTION DETAILS









# PYLON PANELS

## RECTANGULAR PANELS

PREFERRED: 

2ND OPTION: 

## SQUARE PANELS

PREFERRED:                          2ND OPTION:

                

### COLORS:

BACKGROUND OR LETTERS (DEPENDING ON OPTION)
100% BLACK

EXCLAMATION POINT
MATCH PMS 021c ORANGE (3M COLOR 44)



DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60



## EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

**Date:** _____

**To:** _____ (insert Tenant)
   via facsimile: (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs.  Landlord shall deliver to Tenant with this notice, the required surveys and initial  completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

_____ Utility Information:  Meter numbers for electric, gas and water.

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You**.**

**LANDLORD:**

_____
a _____



By: _____
Title: _____


**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**



By: _____
Title: _____

## EXHIBIT F

## EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use except as set forth below:**

### Cross Creek Plaza
### Exclusive Uses

**Cato:** Exclusive prohibits any national or regional women's apparel chain stores classified as popular priced and carrying competitive merchandise, or any store specializing in large-sized women's apparel. Exclusive will allow one other national or regional popular priced ladies' apparel operation, not to exceed 3,200 square feet, and occupying no more than forty (40) front feet in the Shopping Center.

**Sterling, Inc.:** Landlord shall not lease space in the Shopping Center to any tenant whose Primary Use is the sale of fine jewelry. Primary Use is defined as more than 10% of sales floor devoted to the sale of fine jewelry (precious metals, diamonds, colored gem stones or timepieces).

**Shoe Show, Inc.:** Tenant has exclusive for the sale of family footwear. Does not apply to any tenant or occupant open for business in the Shopping Center on the date of this Lease who by the terms of its lease or occupancy agreement is not prohibited or restricted from engaging in the Exclusive Use from its premises, any tenant that occupies less than 1,000 square feet in the Shopping Center, any tenant that is permitted to use its premises for the Exclusive Use by operation of law, court order, bankruptcy, or similar action, any store owned or operated by Tenant, or Tenant's parent, affiliate, subsidiary, franchisee, franchisor, or franchisee of Tenant's franchisor, any space not owned and operated by Landlord; a replacement of any existing tenant or occupant, provided the area used by such replacement tenant for the sale of family footwear shall not exceed the area used by the former tenant or occupant.

**General Nutrition, Inc.:** Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for the retail display and sale of vitamins and/or mineral supplements.

**Rue21, Inc.:** Landlord covenants and agrees that Landlord shall not permit any portion of the Shopping Center (other than the Premises) to be used for the display or sale of teen clothing, junior apparel or accessories. Exclusive does not apply to any tenant occupying 10,000 square feet or more of space at the Shopping Center.

**Glamour:** Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for the retail sale of beauty supplies. Exclusive does not apply to any Tenant that occupies at least 7,000 square feet.

**Feel Good, LLC (Massage Envy):** Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for a massage therapist, massage therapy, or muscle therapy.

**Sandra J. Campeau and Raine Campeau (Great Clips):** No other space in the Shopping Center shall be used by any tenant for the purpose of operating a haircutting salon, including barber shops and beauty or cosmetology schools.

**Beaufort Pizza (Little Caesar's):** Landlord shall ensure that the Shopping Center is not used for the sale (including, without limitation, so called carry-out, delivery, or sit-down service) of pizza, Crazy Bread (or similar products) and related sauces and Italian cheese-bread.

**Maria's Mexican Kitchen:** Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for sit-down casual Mexican Restaurant.

**Rent-A-Center, Inc.:** Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for the principal purpose of carrying on the business of a rent to own operation for superior quality electronic equipment, electronic appliances, and electronics related furniture and accessories. Exclusive does not apply to any tenant that occupies at least 20,000 square feet in the Shopping Center.

**Gamestop:** No other tenant shall lease, rent, occupy or permit to be occupied or used for the sale, resale, trading-in and renting of any one or more of the following as Tenant's principal business: (a) video games, (b) hand-held entertainment software, (c) personal computer games, (d) hardware, accessories and other products related to categories (a)-(c), and (e) any substitutes, new formats or technological evolutions therefore (unless not more than two hundred (200) square feet of surface display area of such other occupant's space is devoted to the retail display of such Exclusive Items.

**Hibbett Sporting Goods, Inc:** Landlord shall not permit any other tenant or other user in the Center as the retail sale of sporting goods, athletic apparel, athletic shoes or sports fan licensed

products. Exclusive shall not apply to discount department stores containing 20,000 square feet or more, provided such Tenant is not a Big Box Competitor.

**Petsmart:** Tenant has the exclusive right for the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, (iii) services related to pets and animals, such as grooming, boarding, pet day care, pet training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educations products and services related to any of the foregoing, and office and storage uses incidental to the foregoing. Incidental shall mean that the use occupies the lesser of (a) 500 square feet of Gross Floor Area, or 5% of the sales area in the subject premises.

**TJ Maxx:** Landlord agrees that no other premises in the Shopping Center shall at any time contain more than (i) fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel and related accessories, and/or (ii) seven thousand five hundred (7,500) square feet of floor area therein used or occupied for, or devoted to the sale or display of shoes, footwear and related accessories, and/or (iii) fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of furnishings for the home including the following categories of items: linens and domestics, window treatments, floor coverings, bathroom items (not including health and beauty aids, such as might be carried by a store operating under the tradename Ulta), bedding, furniture, wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, giftware and/or closet, home shelving and home storage items and home accessories.

**Aspen Grove, LLC d/b/a Bruster's:** the retail sale of ice cream, cakes, pies, shakes and related items, and a Nathan's Hotdog Franchise.

**Planet Fitness:** to operate a health/physical fitness club.

### Restrictions

**Belk, Inc.:** Landlord agrees not to hereafter lease (nor otherwise permit the occupancy of) any Floor Area within 100 lineal feet of the main entrance to the Demised Premises to any restaurant (i) which is typically referred to as a "fast food" restaurant or (ii) which does not have restroom facilities which are open to such restaurant's Occupants and Permittees, nor to lease (or otherwise permit the occupancy of) within such restricted area to or for any ice cream or amusement center. No kiosks shall be constructed within 100 feet of the main entrance to the Belk Store, except in the locations (if any) shown therefor on the Site Plan.

Landlord shall prohibit any Occupant on the Shopping Center Site from displaying, warehousing or selling its merchandise outside its premises, and that it will use all commercially reasonable efforts to enforce such regulations. Nothing hereinabove contained shall be deemed to prohibit temporary promotional events which do not unreasonably diminish the number of parking spaces in the Shopping Center nor unreasonably hinder the orderly flow of vehicular and pedestrian traffic in the Shopping Center and which are not located in the Belk Primary Parking Area; provided, however, that, except to the extent now (i.e., at the time of the date of this Lease) permitted under existing leases and other agreements by which Landlord and/or the Shopping Center are bound, no carnivals nor circuses shall be permitted in the exterior Common Area on the Shopping Center Site at any time.

**Cato:** Landlord agrees that it will not construct or permit construction of any building or structure, including, but not limited to, ramps (for handicapped or otherwise), railings, kiosks, planters or any other obstruction to the view and exposure of the Premises, or changes to existing buildings within the Shopping Center, which in the judgment of Tenant obscures the public view of Tenant's store. Construction of single story free-standing buildings on the out-parcels as shown on Exhibit A are not construed to be obstructing to public view of Tenant's store.

Landlord agrees that, during the term of this Lease, or any extension thereof, no space contiguous or adjacent to the Premises shall be occupied by a pet shop or game room or business in which either is a part thereof, no shall space within one hundred feet (100') of the Premises be occupied by non-retail establishments requiring extensive parking including, without limitation, a disco, night club, amusement arcade, theatre, health spa, bowling alley, or any other non-retail operation or a store featuring sexually explicit materials or products, or drug paraphernalia.

**Hibbett Sporting Goods, Inc:** The Landlord shall not use or permit the use of any portion of the Center as a massage parlor, "adult book or video store" or similar business catering to pornographic interests, amusement center or game room (featuring, without limitation, pinball, electric and video game machines), bowling alley, a tire, battery or auto parts retail location (where repairs are made on site), skating rink, head shop, off-track betting facility, billiard parlor, automobile leasing facility or a business operation generally referred to as a "flea market", night club or comedy club,

country and western bar, teenage facility, dance hall, bingo parlor or a close-out, thrift, good will or similar store such as "Big Lots", Bud's" or "Odd Lots".

**Petsmart:** No portion of Tenant's Protected Area may be used for special promotions, sidewalk sales, merchandise displays, seasonal sales, delivery, commercial truck parking, inventory storage, do-it-yourself or demonstration areas, park and ride or car pooling arrangements or for any other purposes, except the common purposes for which such portion of the Common Area was designed. If an in the event Landlord establishes designated areas within the Common Area which permits the use of the Common Area for the purpose of public solicitation, any such area shall be located at least one hundred fifty (150) feet from Tenant's Building.

The following uses (collectively referred to as "Prohibited Uses" and individually as a "Prohibited Use") are prohibited during the Term of this lease in any portion of the Shopping Center: nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility; dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); unless located on the "Outlots" shown on Exhibit A any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet; massage parlor; adult book shop or adult movie house; mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; cinema or theater; health club or spa or exercise facility (except up to seven thousand (7,000) square feet of Gross Floor Area within the spaces between Belk's and JC Penney may be used for these uses); place of recreation (including but not limited to bowling alley, skating rink, carnival or game arcade); church; or any other use inconsistent with the operation of a high quality retail shopping center. No restaurants of any size shall be located within three hundred (300) feet of the Premises. In addition the following uses must be approved in writing by Tenant: drive-throughs; children's recreational, educational or day-care facility; restaurants occupying more than twenty-five hundred (2,500) square feet of Gross floor Area; offices; professional uses; medical uses (excluding the existing orthodontic practice located in space "120" shown on Exhibit A; and schools of any nature except in conjunction with animal training or obedience training classes associated with Tenant's Primary Business. As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers. In addition, the uses listed in Section 5 of this Exhibit D are Prohibited Uses during the Term of this Lease in any portion of the areas marked "Sonic Drive-In", "Outparcel C" and "Outparcel E" on Exhibit A. It is the intent of this Section that the Shopping Center, Sonic Drive-In, Outparcel C and Outparcel E shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protected use. Landlord acknowledges and agrees that to permit any of the Prohibited uses within the Shopping Center, Sonic Drive-In, Outparcel C, and Outparcel E, as applicable, may materially and adversely affect Tenant's business, and, in the event of a material violation of the Prohibited Use, if Landlord is unable or unwilling to stop any material violation of the Prohibited Use within thirty (30) days after written notice thereof, and in addition to any and all other remedies available to Tenant under this lease or at law or in equity, all Base Rent and other charges to tenant under this Lease shall abate (ant not accrue) until such time as the Prohibited use ceases.

Prohibited uses for Sonic drive-In, Outparcel C and Outparcel E. No building, structure or improvement on Sonic Drive-In, Outparcel C or Outparcel E may be used as a theater night club, bowling alley, health spa, billiard parlor, or other place of recreation or amusement, or as a business whose primary use is the sale of alcoholic beverages for off-premises consumption or as a discount department store or a variety, general or "dollar" store.

**TJ Maxx:** - Landlord agrees that the Shopping Center shall not be used (a) for any use inconsistent with the character of the Shopping Center, (b) for any non-retail purposes (repairs, alterations and offices incidental retailing, and banks and small loan offices, not being deemed non-retail), or (c) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar (except as an incidental part of a full-service restaurant (which restaurant shall be subject to the restrictions noted below) and for purposes hereof, "incidental" shall mean no more than forty percent (40%) of the gross revenues of such business shall be from the sale of alcoholic beverages), nightclub, discotheque, amusement gallery, poolroom, health club (except that a single day spa or jazzercise club not to exceed 4,500 square feet may be located in the Shopping Center so long as such health club is not located within one hundred fifty (150) linear feet of the nearest demising wall of the Demised Premises), massage parlor, sporting event, sports or game facility, off-track betting club, or (d) or for any establishment which sells or displays pornographic materials or (e) for any establishment which sells or displays used merchandise or second hand goods (provided, however,

that this restriction shall not apply to a store typically found in a first class shopping center that sells reconditioned merchandise together with new merchandise such as a Computer Renaissance, Play It Again Sports or Terry's Consignment, nor shall it prevent a video/record store from engaging in a CD or video exchange program or the sale or trading of video games by EB Games and/or GameStop). No restaurants or establishments selling food prepared on premises for consumption on or off premises shall be located in the Shopping Center except that (a) a retail store, may, as an incidental use contain a café selling prepared food not to exceed two thousand five hundred (2,500) square feet, (b) restaurants may be located in any area labeled OUTLOT on the Lease Plan, (c) restaurants, not to exceed three thousand five hundred (3,500) square feet of floor area each or up to fifteen thousand (15,000) square feet in the aggregate may be located within the Shopping Center provided that no such restaurant or restaurants shall be located within one hundred fifty (150) linear feet of the nearest demising wall of the Demised Premises. Collectively the uses described herein are referred to as the "Prohibited Uses").

**Planet Fitness:** No Build Zone in Common Area – Landlord shall not be permitted to make any changes, either temporary or permanent, including without limitation the installation, construction, or erection of new structures ,or in any other way limit or specifically assign the available parking within the Protected Area without the express written consent of Tenant, to be granted in Tenant's sole but reasonable discretion.

**One Main Financial:** Landlord shall not lease any premises adjacent to the Premises to a restaurant, hair salon, nail salon, pet shop, or any other enterprise that may emit noxious odors or excessive noise.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC. an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.      Demised Premises: (Section 1.D.) = _____.

2.      A.      Fixed Minimum Rent – Original Term (Section 5.A.):
                _____ annually; _____ per month.

3.      A.      Fixed Minimum Rent – First Option (Section 5.A.):
                _____ annually; _____ per month.

4.      A.      Fixed Minimum Rent – Second Option (Section 5.A.):
                _____ annually; _____ per month.

5.      A.      Fixed Minimum Rent – Third Option (Section 5.A.):
                _____ annually; _____ per month.

**EXHIBIT H**

**SNDA**

SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT AND
ESTOPPEL CERTIFICATE

       This SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT AND ESTOPPEL CERTIFICATE ("Agreement") is made as of December _____, 2020 by and between BIG LOTS STORES, INC., an Ohio corporation with its principal office at 4900 East Dublin Granville Road, Columbus, Ohio 43081 ("Lessee") and FIRST FINANCIAL BANK, an Ohio state chartered bank ("Mortgagee") to induce Mortgagee to offer a mortgage loan to USPG PORTFOLIO EIGHT, LLC, a Delaware limited liability company ("Lessor").

WITNESSETH:

       WHEREAS, Lessor and Lessee have entered into a lease agreement dated [_____, 20___], a copy of which together with all amendments thereof, if any, is attached hereto as Exhibit "B" (collectively, the "Lease"), pursuant to which Lessor has leased to Lessee an approximately 33,796 square foot storeroom ("Premises") to be located on a certain parcel of real property situated in the City of Beaufort, State of South Carolina, as more particularly described in Exhibit "A" attached hereto and made a part hereof;

       WHEREAS, Lessor has obtained from Mortgagee a mortgage loan;

       WHEREAS, Mortgagee requires as a condition of making said loan that said loan be secured by a mortgage on the real estate described in Exhibit "A" attached hereto ("Mortgage"), and that the lien of said Mortgage be superior and prior to the Lease;

       WHEREAS, Lessee is willing to subject and subordinate its right, title, interest and claim in the premises to the lien of the Mortgage provided that Mortgagee makes to Lessee the non-disturbance covenants contained herein; and

       WHEREAS, Mortgagee requires as a condition of making said loan that Lessee make certain representations, and certify thereto, with respect to particular provisions of the Lease and the rights, title, interests and claims thereunder of Lessor and Lessee, respectively.

NOW, THEREFORE, Mortgagee and Lessee hereby undertake and agree as follows:

       1.     Lessee, in consideration of the foregoing recitations and with the purpose of inducing Mortgagee to offer said Mortgage to Lessor, does hereby:

           (a)     covenant and agree with Mortgagee, its successors and assigns, that all of the right, title, interest and claim of Lessee (including, but not limited to, its rights, options, interests, title, claim and privileges under the Lease, and all renewals and extensions thereof) is and shall be and remain at all times subject and subordinate to the lien of the Mortgage to Mortgagee for all advances made or to be made under the provisions of the Mortgage or on the note secured thereby and for all other purposes specified therein;

           (b)     covenant and agree with Mortgagee, that Lessee shall execute and deliver such further or other instruments subordinating the Lease, and all renewals and extensions thereof, to the lien of any mortgage which replaces the Mortgage described above and that the right, title, interest and claim of Lessee shall be and remain at all times subject and subordinate to the lien of the mortgage which replaces the above described Mortgage for all advances made and to be made under the provisions of said replacement mortgage or on the note or notes secured thereby for all other purposes specified therein, subject, however, to the holder of the replacement

        mortgage executing a non-disturbance agreement in substantially the same form as hereinafter provided; and

(c)

2.      Mortgagee, in consideration of the foregoing recitations, does hereby:

      (a)     covenant and agree with Lessee that in the event Mortgagee shall file one or more suits to foreclose the Mortgage, Mortgagee will not join Lessee in the foreclosure proceedings so long as Lessee is not in default under any of the terms, covenants or conditions of the Lease and so long as Lessee observes and complies with the provisions set forth in subsection (b) of this Section 2, except as may be necessary to subject the property described in the Mortgage to the indebtedness secured thereby; and

      (b)     covenant and agree with Lessee that in the event Mortgagee shall file foreclosure proceedings, in accordance with the foregoing, and shall succeed to the interest of Lessor, or its successors or assigns, under the Lease, whether through purchase at a sale pursuant to a judgment or decree of foreclosure and sale, by deed and assignment in lieu of foreclosure, or otherwise, and Lessee shall not be in material default under any of the terms, covenants or conditions of the Lease, Mortgagee shall be bound to Lessee under all of the terms, covenants and conditions of the Lease, and Lessee shall, from and after such event, have the same remedies against Mortgagee for Mortgagee's breach of any covenant contained in the Lease that Lessee might have had under the Lease against Lessor if Mortgagee had not succeeded to the interests of Lessor; provided, however, that Mortgagee (and all of its rights, including, but not limited to, the right to collect the rents under the Lease) shall not be (i) liable or responsible for any act or omission of Lessor, its successors and assigns; (ii) subject to, or affected by, any offsets, defenses, causes of action, credits or counterclaims which Lessee might now or may hereafter have against Lessor, its successors and assigns, or any other person or persons; (iii) bound by any prepayment of rent which Lessee may heretofore or may hereafter have paid to Lessor, its successors or assigns, or to any other person or persons, excepting only any prepayment of not more than one month's rent; (iv) bound by any amendment or modification of the Lease made without first obtaining Mortgagee's written consent thereto; or (v) responsible for the return of any security deposit(s) that Mortgagee has not received.

3.      If the interests of Lessor shall be transferred to and owned by Mortgagee by reason of foreclosure proceedings or deed in lieu of foreclosure or by any other manner and Mortgagee succeeds to the interest of Lessor under the Lease, Lessee shall be bound to Mortgagee, its successors and assigns, under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining, and any extensions or renewals thereof which may be effected in accordance with any option thereof in the Lease, with the same changes and effect as if Mortgagee were the lessor under the Lease, and Lessee hereby does attorn to Mortgagee, its successors and assigns, as its lessor, said attornment to be effective and self-operative without the execution of any further instruments on the part of any of the parties hereto immediately upon Mortgagee's succeeding to such interest. Notwithstanding the same, at the request of Mortgagee, its successors and assigns, or any other person acquiring the interest of Lessor, Lessee agrees to execute and deliver at any time and from time to time, upon such request any instrument which in the sole judgment of the party making such request may be necessary or appropriate to evidence such attornment.

4.      Lessee, with respect to the Lease, hereby certifies, warrants, and agrees as follows:

      (a)     The copy of the Lease attached hereto as Exhibit "B" is a true and correct copy of the lease entered into by and between Lessor and Lessee (Mortgagee and Lessee agree that in the event that Mortgagee desires to record this Agreement, Exhibit "B" shall not be attached to the recorded Agreement but shall remain a part of this Agreement);

(b)     The Lease evidences the valid, binding, enforceable obligations of the undersigned and is presently in full force and effect and unmodified except as set forth in the attachments thereto;

(c)     As of this date, neither Lessor nor Lessee is in material default under any of the terms or provisions of the Lease;

(d)     Lessee is not involved in any bankruptcy, reorganization, arrangement or insolvency proceedings; and

(e)     Lessee understands and agrees that Mortgagee will rely on this certificate in providing financing to Lessor.

5.     Except as hereinafter limited, all parties hereto, and their respective legal representatives, heirs, successors and assigns, are bound by all of the covenants, terms, conditions, subordinations and other matters contained herein.

6.     Mortgagee, in the event it succeeds to the interest of Lessor, whether through foreclosure proceedings or otherwise, shall be entitled to convey and/or assign its right, title and interest, or any part thereof, in and to the Premises and/or the Lease to a nominee, agent, independent contractor or any other person.  Upon sale, conveyance and assignment of the Premises and its interest in the Lease, Mortgagee shall be automatically, and without further consent, written agreement or acknowledgment by Lessee, released, discharged and relieved of any and all liabilities and obligations of every kind, nature and type whatsoever accruing or arising under the Lease on and after the date Mortgagee shall have sold, assigned and transferred its interest in and to the Premises and the Lease to the purchaser(s).

7.     The provisions of this agreement are not intended to, and shall not, release Lessor, its successors and assigns, from its obligations under the Lease, but are solely for the benefit of Mortgagee and Lessee.

8.     To the extent that the Lease shall entitle Lessee to notice of any mortgage of the Premises, this Agreement shall constitute such notice to Lessee with respect to the Mortgage and to any or all other mortgages which may be affected by this Agreement.  Lessee shall provide to Mortgagee a copy of any written notice of any default of Lessor when such notice is required to be provided by Lessee to Lessor under the Lease.  All notices required or permitted to be given by either party hereunder shall be in writing and shall be considered properly given if mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, or by delivering such in person to the intended addressee or by prepaid telegram.  Notice so mailed shall be effective upon its deposit.  Notice given in any other manner shall be effective only if and when received by addressee.  For purposes of notice the addresses of Lessee and Mortgagee shall be as set forth hereinabove; provided however that either party shall have the right to change such party's address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other party in the manner set forth hereinabove.

9.     Lessee covenants not to enter into any material amendments or modifications of the Lease without the prior written consent of Mortgagee, which consent may be withheld in Mortgagee's sole discretion except in the case of non-material amendments or modifications for which such consent shall not be unreasonably withheld or delayed.  In addition, Lessee and Lessor agree that the Lease cannot be terminated, except by Lessee pursuant to the express terms of Sections 15 and 16 of the Lease, without the prior written consent of Mortgagee.  Lessor cannot terminate the Lease (pursuant to the terms of the Lease or otherwise) except upon the prior written consent of Mortgagee.  Lessor and Lessee agree that, notwithstanding the provisions of Section 50 (c) (8) of the Lease, any early termination of the Capital Lease (as defined in the Lease) shall not in any way entitle Lessor or Lessee to terminate this Lease, this Lease being a direct lease with Lessor.

IN WITNESS WHEREOF, Lessee and Mortgagee have executed these presents as of the day and year first above written.

LESSEE:

BIG LOTS STORES, INC.,
an Ohio corporation

By:_____

Its:_____

STATE OF OHIO:
: ss
COUNTY OF FRANKLIN:

The foregoing instrument was acknowledged before me this ___ day of _____, 2020, by _____, the _____ of Big Lots Stores, Inc., an Ohio corporation, on behalf of the corporation. The notarial act certified hereby is an acknowledgment. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.


_____
Notary Public



Commission Expiration:

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

LESSOR:

USPG PORTFOLIO EIGHT, LLC,
a Delaware limited liability company


By:_____

Its:_____

STATE OF _____:
: ss
COUNTY OF _____:

The foregoing instrument was acknowledged before me this ____ day of _____, 2020, by
_____, the _____ of USPG Portfolio Eight, LLC, a
Delaware limited liability company, on behalf of the limited liability company. The notarial act
certified hereby is an acknowledgment. No oath or affirmation was administered to the signer
with regard to the notarial act certified to hereby.



_____
Notary Public



Commission Expiration:

DocuSign Envelope ID: F52B5F35-256C-4B55-BCEC-D102CAC12C60

MORTGAGEE:

FIRST FINANCIAL BANK,
an Ohio chartered bank


By:_____
John Wilgus, Senior Vice President



STATE OF OHIO:
: ss
COUNTY OF FRANKLIN:


The foregoing instrument was acknowledged before me this ___ day of _____, 2020, by John Wilgus, Senior Vice President of First Financial Bank, an Ohio chartered bank, on behalf of the bank. The notarial act certified hereby is an acknowledgment. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby.



_____
Notary Public

Commission Expiration:




This instrument was prepared by: Nicholas I. Bass, Esq., Bricker & Eckler LLP, 100 S. Third Street, Columbus, Ohio 43215

## EXHIBIT "A"
## LEGAL DESCRIPTION

[NSERT]