**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BIG LOTS, INC., *et al.*,[1] | ) Case No. 24-11967 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) Obj. Deadline: Feb. 20, 2025 at 11:59 p.m. (ET)[2] |
| | ) Re: Docket No. 1556 & 1923 |

**LIMITED OBJECTION OF R.L. WITTBOLD-NEW PHILADELPHIA, LLC TO NOTICE OF FILING FIFTH POST-CLOSING DESIGNATION NOTICE**

R.L. Wittbold-New Philadelphia, LLC (the "Landlord"), by and through their undersigned counsel, hereby files this limited objection (the "Objection") to the Debtors' *Notice of Filing of Fifth Post-Closing Designation Notice* [D.I. 1923] (the "Fifth Notice"), and respectfully state as follows:

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

1.     On September 9, 2024 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "Court"), which cases have been jointly consolidated for administrative purposes only (the "Chapter 11 Cases"). The Debtors continue to

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Deadline extended by agreement of the parties. At the time the extension was granted, Landlord had not yet retained counsel, but was working informally with the Debtors, Gordon Brothers and Variety Stores and their counsel. A further extension was requested by the Landlord, but Landlord received no response to that latest request. Landlord did not retain undersigned counsel after the close of business on February 21, 2025, and counsel worked diligently to file this Objection as quickly as possible.

operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.³ No trustee or examiner has been appointed in the Chapter 11 Cases.

2. The Debtor, Big Lots Stores-CSR, LLC, and the Landlord are parties to that certain unexpired lease of nonresidential real property dated February 15, 2001 (as amended and modified from time to time, the "Lease"), whereby the Debtors lease approximately 34,019 square feet of retail space from the Landlord for the premises located at 408 Bluebell Drive, Northwest, New Philadelphia, Ohio 44663 (the "Premises"), in that certain shopping center known as New Philadelphia Center (the "Center").

3. The Lease is a lease "of real property in a shopping center" as that term is used in Section 365(b)(3). See In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990)/

4. Pursuant to Section 4 of Lease, the Premises may only be used for:

> [O]f the sale of general merchandise, furniture, furniture accessories, toys, seasonal merchandise, furnishings, food and groceries, and for any other lawful purpose. . . . **Tenant agrees it shall not.** . . operate any business for the purpose of advancing or loaning money using a personal check, the sale, installation and servicing of mobile cellular telephone equipment, ***or a retail/rental purchase store similar to stores operated under the name and style of Rent-A-Vision in the State of Ohio***.

Lease, § 4 (emphasis added). A true and correct copy of the relevant excerpts of the Lease are attached hereto as **Exhibit 1**.

5. Upon information and belief, the Debtor has been operating a rent-to-own program at the Premises in violation of Section 4 of the Lease and has been offering a retail/rental purchase option to customers similar to the stores operated in the style of Rent-A-Vision.

---

³ Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

6.     In addition, Landlord is a counterparty to a lease with Rent-A-Center East, Inc., formerly Rent-A-Vision ("Rent-A-Center"), dated August 10, 2001 (the "Rent-A-Center Lease"), another tenant in the Center, which "leases, markets, provides, rents with the option to own and occasionally sells consumer durable goods . . . an related item" (a "rent to own business"), whose use Debtors expressly acknowledged and agreed it would not compete with pursuant to Section 4 of the Lease. *Id. See also* Rent-A-Center Lease (as amended), § 6.A.  A true and correct copy of the relevant excerpts of the Rent-A-Center Lease are attached hereto as **Exhibit 2**.

7.     Further, the Rent-A-Center Lease also contains an exclusive use provision that prohibits the Landlord from leasing any other space in the Center which would permit such tenant to engage in or operate a lease/rent-to-own business.  Rent-A-Center Lease, § 6.B., as amended pursuant to that certain Lease Extension and Modification Agreement, dated August 10, 2001.

8.     In the event of a violation of Rent-A-Center's exclusive use, Rent-A-Center shall be entitled to terminate the Lease on thirty (30) days notice to Landlord at any time prior to Landlord's curing such violation, or abate 100% of all sums due to Landlord under the Rent-A-Center Lease so long as the violation remains uncured, among other remedies. *Id.*

9.     On or about July 18, 2024, Rent-A-Center notified the Landlord of the Debtors' violation of its exclusive rent-to-own rights at the Center, and reserved all rights to enforce its rights under its lease if the violation was not cured within 30 days (the "Violation Notice").  A true and correct copy of the Violation Notice is attached hereto as **Exhibit 3**.  Upon information and belief, the violation continues today.

10.    To date, notwithstanding the uncured violation, upon information and belief, Rent-A-Center has not yet elected to enforce its remedies for the violation of its exclusive, but retains the right to do so at any time.

11. On February 20, 2025, the Landlord issued a formal notice to the Debtors, Gordon Brothers, and Variety of the Debtors' default of the Rent-A-Center exclusive use restriction pursuant to Section 4 of the Lease, among other defaults (the "<u>Default Notice</u>").  A true and correct copy of the Default Notice is attached hereto as **Exhibit 4**.

12. On January 2, 2025, the Court entered an *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances (III) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "<u>Sale Order</u>") [D.I. 1556].  The Sale Order approved Golden Brothers Retail Partners, LLC as the buyer (the "<u>Gordon Brothers</u>") of designation rights to the Leases.

13. Pursuant to paragraph 43 of the Sale Order, the Gordon Brothers notified the Debtors on January 27, 2025 of its determination to designate the Lease for assumption and assignment to Variety Stores, LLC, as assignee ("<u>Variety</u>").

14. On February 3, 2025, the Debtors filed the Fifth Notice, which identifies those executory contracts and unexpired leases that may be assigned to Variety, together with the Debtors' proposed cure amounts to be paid in connection with any assumption and assignment of such contracts and leases, including the Lease, which is listed with a proposed Cure of $5,281.00.

15. The Landlord is also in receipt of certain adequate assurance information for Variety consisting of certain consolidated financial statements for Variety Wholesalers, Inc. and its subsidiaries, which includes its wholly owned subsidiary, Variety.  Landlord continues to review this information, however, none of the information identifies whether Variety Stores, LLC intends to comply with the use and restrictive use provisions of the Lease and the exclusives of other

tenant's in the Center. Upon information and belief, Landlord understands that Variety intends to use the Premises to operate a Big Lots-branded store, but goes back to its roots of bargain shopping of a variety of merchandise without mattresses, furniture and appliances, so the intended use of the Premises should not change. Notwithstanding, Para. 9 of the proposed assignment order (the "<u>Assignment Order</u>") seeks to render unenforceable "a provision prohibiting Variety's intended use of the premises," among other provisions of the Lease, effectively seeking to re-write the Lease. *See* proposed Assignment Order, ¶ 9.

16. The Landlord initially did not retain counsel and reached out to the Debtors and Variety and received an extension of time from the Debtors and Variety to respond to the Fifth Notice to February 20, 2025. During that time, the Landlord informally provided the Debtors, Gordon Brothers, and Variety with a list of the issues with the Fifth Notice and the proposed assignment of the Lease to Variety.

17. On February 20, 2025, the Landlord sought a further extension of time from counsel for the Debtors, Gordon Brothers, and Variety, but received no response.

18. Landlord files this Objection to assert the appropriate cure, including both monetary and non-monetary defaults under the Lease. Notwithstanding the filing of this Objection, however, Landlord remains willing to continue to work with the Debtors and Variety on the issues raised herein.

### II. <u>OBJECTION</u>

19. While Landlord does not necessarily object to the assignment of its Lease to Variety, Landlord does object to any proposed assumption and assignment of the Lease unless and until the Debtors, Gordon Brothers, and/or Variety complies with all of the requirements of Sections 365 of the Bankruptcy Code. Absent the ability, or willingness, of the Debtors and Variety to satisfy said

requirements, the Court should deny the proposed assumption and assignment of the Lease. In addition, the amounts set forth in the Fifth Notice for the Lease do not reflect all outstanding balances due and owing to Landlord under the Lease, or account for accruing or accrued, but unbilled charges or obligations under the Leases which may come due in the future. In addition, the Landlord must receive adequate assurance from the Debtors and Variety that will promptly cure the existing use violation by ceasing all rent-to-own business operations in the Premises.

    **A.    The Debtors must demonstrate adequate assurance of future performance to assume and assign the Lease to the Variety.**

20.    The Debtors may not assume and assign the Lease unless they demonstrate adequate assurance of future performance. 11 U.S.C. § 365(b)(1)(C); see also 11 U.S.C. § 365(f)(2). The provision of adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365. See In re Rachels Indus., Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985). The obligation to comply with Section 365(b) and Section 365(f) is unaffected by the assumption and assignment process taking place through a sale under Section 363. Courts require a specific factual showing through competent evidence to determine whether adequate assurance of future performance has been provided. See, e.g., Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, the court found that insufficient documentary evidence had been presented).

21.    In this case, the Lease is a shopping center lease and, as such, the Bankruptcy Code requires more than the basic adequate assurance of future performance of the Lease under Section 365(b)(1)(C). In re Sun TV and Appliances, Inc., 234 B.R. 356, 359 (Bankr. D. Del. 1999). In order to assume and assign shopping center leases, the Debtors must satisfy the heightened

requirements set forth in 11 U.S.C. § 365(b)(3)(A) - (D).  See Joshua Slocum, 922 F.2d at 1086; see also L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 299 (3d Cir. 2000).  The heightened adequate assurance requirements that Debtors must satisfy under Section 365(b)(3) include the following:

- the source of rent and that the financial condition and operating performance of the proposed assignee and its guarantors, if any, must be similar to the financial condition and operating performance of the debtor and its guarantor(s), if any, as of the time the debtor became the lessee.  See 11 U.S.C. § 365(b)(3)(A);

- that any percentage rent due under the lease will not decline substantially.  See 11 U.S.C. § 365(b)(3)(B) (emphasis added);

- that assumption and assignment of the lease is subject to all provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision, and will not breach of any such provision in any other lease**, financing agreement, or master agreement relating to such shopping center.  See 11 U.S.C. § 365(b)(3)(C) (emphasis added); and

- that assumption and assignment of the lease will not disrupt the tenant mix or balance in the shopping center.  See 11 U.S.C. § 365(b)(3)(D) (emphasis added).

22. A heightened adequate assurance of future performance determination must be satisfied in connection with an assumption and assignment under Section 365(f)(2)(B).  Sun TV and Appliances, Inc., 234 B.R. at 370.  In connection with the heightened adequate assurance requirement for shopping center leases, courts also require a specific factual showing through competent evidence to determine whether the Debtors have provided adequate assurance of future performance.  Matter of Haute Cuisine, Inc., 58 B.R. at 394.  The Debtors have not met their burden for the reasons more fully set forth herein.

**B.  Any Assumption and Assignment Must Comply with All Terms of the Lease, and Not Breach Another Lease at the Center, or Violate the Existing Use.**

23. Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amendments, "Section 365(f)(1) was amended to make sure that all of the provisions of Section 365(b) are adhered to and that 365(f) of the Code does not override Section 365(b)."

7

Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005). In explaining the change to Section 365(f)(1), Senator Hatch stated:

> The bill helps clarify that an owner should be able to retain control over the mix of retail uses in a shopping center. When an owner enters into a use clause with a retail tenant forbidding assignments of the lease for a use different than that specified in the lease, that clause should be honored. Congress has so intended already, but bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 2461 (daily ed. March 10, 2005).

24. The changes embodied in the BAPCPA specifically preserve a landlord's right to enforce use and other lease provisions. Again, Senator Hatch's remarks in the Congressional Record clarify the intent behind Section 365(b) and 365(f):

> A shopping center operator . . . must be given broad leeway to determine the mix of retail tenants it leases to. Congress decided that use or similar restrictions in a retail lease, which the retailer cannot evade under nonbankruptcy law, should not be evaded in bankruptcy. It is my understanding that some bankruptcy judges have not followed this mandate. Under another provisions of the Code, Section 365(f), a number of bankruptcy judges have misconstrued the Code and allowed the assignment of a lease even though terms of the lease are not being followed. (emphasis added).

151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).

25. BAPCPA clarified Section 365 to reflect the Congressional intent that a Debtor cannot use Section 365(f)(1) to void lease provisions, and to overrule those prior court decisions that did not strictly enforce lease terms. The predicate to the limited ability to assign a lease over a landlord's objection under Section 365(f) is that such assignment must be subject to the protections of Section 365(b)(1) and (3).

26. Section 365(f)(1) does not modify or override Section 365(b). <u>Trak Auto Corp. v. West Town Ctr. LLC (In re Trak Auto Corp.)</u>, 367 F.3d 237, 243-44 (4th Cir. 2004) (bankruptcy courts could not use the general anti-assignment provision of Section 365(f)(1) to trump the specific

protections granted to landlords in Section 365(b)(3)(C)); Three A's Holdings, 364 B.R. 550, 559-61 (Bankr. D. Del. 2007) ("Although the Court has broad authority under section 365(f)(1) to authorize the assumption or assignment of leases in violation of their terms, *this discretion is severely constrained if the assumption or assignment involves a lease of real property in a shopping center.* In 1984, Congress provided for heightened restrictions in section 365(b)(3) to provide a framework for enforcing common provisions found in shopping center leases.") (emphasis added). Any assignment must remain subject to all provisions of the Lease, including those provisions concerning use and exclusivity.

27. To the extent that Variety intends to use the Premises to continue to operate a Big Lots-branded store or similar store under another name, and offer a rent-to-own program similar to stores operated under the name and style of Rent-A-Center, formerly Rent-A-Vision, in violation of Section 4 of the Lease, the Debtors and Variety are unable to satisfy the requirements under § 365(b)(3)(C), as such use does not comply with the current permitted use and prohibited uses under the Lease and violates the exclusive set forth in Rent-A-Center's Lease. See, Sun TV and Appliances, Inc., 234 B.R. at 370 (court denied a motion for approval of the assumption and assignment of a lease in a shopping center which contained a restrictive use condition.). To rectify, the Debtors and/or Variety must not only cure the defaults existing under the Lease, but also provide the Landlord with adequate assurance of Variety's intent to take the Lease subject to the use restrictions contained in the Lease.

28. In order to assume and assign a shopping center lease, the Debtors must provide adequate assurance that the assignment of the lease "is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision, and will not breach any such provision contained in any other lease**, financing agreement, or

9

master agreement relating to such shopping center." 11 U.S.C. § 365(b)(3)(C). The first clause of § 365(b)(3)(C) calls for examining the lease between the landlord and the debtor tenant, while the second clause calls for evaluating other leases with other tenants in the same shopping center. See In re Heilig-Meyers Co., 294 B.R. 660, 662 (Bankr. E.D. Va. 2001) (concluding that debtor's proposed assignment of lease to Hancock Fabrics could not satisfy § 365(b)(3)(C) as lease conflicted with another lease executed by the landlord after the bankruptcy filing that (1) gave another fabric retailer "exclusive rights in the center for a fabric shop" and (2) prohibited the landlord from "leas[ing] to any other tenant who would be in direct competition with [such retailer].").

29.  Here, both the Lease and Rent-A-Center's Lease contain a prohibition against the Debtors or Variety from operating a lease/rent-to-own business from the Premises. Debtors are currently in default of these provisions, which can subject the Landlord to pecuniary harm, and must be cured. Further, Variety must take the Lease subject to the use restrictions contained in the Lease, but the proposed Assignment Order fails to articulate Variety's intended use of the Premises, thus giving Variety free range to use the Premises in any manner whatsoever, including to continue operating a rent-to-own business in violation of the Lease. The proposed Assumption Order must be modified to strike Paragraph 9.a. from the order, or otherwise clearly articulate that Variety's uses of the Premises will be consistent with the terms of the Lease and not violate other tenant's exclusive uses in the Center.

30.  Further, other provisions of Paragraph 9 of the proposed Assignment Order should be stricken as well. As discussed above, sections 365(a) and (f) of the Bankruptcy Code do not authorize the Court to rewrite the terms of the Lease. While the Court can proscribe the enforcement of provisions that would have the effect of preventing assignment under Sections 365(f)(1) and (f)(3) of the Bankruptcy Code, that authority does not extend to eviscerating provisions in the Lease

that are merely inconvenient to Variety. Rather, the lease terms deemed unenforceable must directly or effectively serve as an anti-assignment clause. See In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 50 (Bankr. M.D.N.C. 2003). To make that determination, a "court must examine the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment to the non-debtor party." Id. (citations omitted).

31. Among other things, Paragraphs 9.b and 9.g. of the proposed Assignment Order seek to render unenforceable "a provision unreasonably prohibiting necessary alternations to the premises or signage" and "a provision restricting Variety's ability to place reasonable signage on the premises; provided, that such signage is deemed necessary to conform such store with Variety's intended use of the premises." The Lease contains provisions regarding internal alterations and signage. See Lease, §§ 6 and 8. Any modifications to the Premises and to the existing Big Lots signage must be done in the manner and consistent with the terms of the Lease. Therefore, any use of signs, as well as any size, placement, and permitting requirements for such signage, as well as any provisions governing alterations to the interior of the Premises, of the Lease must remain in effect and be done in a manner as required under the Lease.

32. Further, Paragraph 9.c of the proposed Assignment Order purports to render any "go dark" provision in the Lease unenforceable for the later of 120 days after the assignment of the Lease or some uncertain period of time depending on vague factors that defy definition or certainty, such as "the demographics of the shopping center's location." The Lease has a 90 day "go dark" provision. See Lease § 4 ("In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate the Lease upon thirty (30) days' notice to Tenant…."). As discussed, Landlord understands that Variety intends to operate the store as a Big Lots branded store and may close the store for restocking. But if it continues as a Big Lots, there will be no need to rebrand. Therefore, even if Variety closes the store for restocking, rebranding or other actions, the 90 day provision in

11

the Lease is more than adequate to allow it time to perform those tasks. Landlord objects to any provision that would allow Variety to delay reopening the store indefinitely based on nebulous criteria not included in the Lease, and should be required to comply with the 90-days provided under the Lease.

      **C.    Any Assignment of Leased Real Property Must be Subject to all Applicable Restrictive Covenants.**

33.    The *cum onere* principle and requirements of section 365 (including section 365(b)(3)) of the Bankruptcy Code also mandate that restrictive covenants be respected in connection with any lease assignment. See 11 U.S.C. § 365(b)(3)(C) (requiring that "assumption or assignment of such lease is subject to all the provisions thereof"); Bildisco, 465 U.S. 513, 531-32 (1984); In re MF Glob. Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012). As is typical, shopping center leases are part of an integrated and complex commercial relationship between the shopping center owner and tenants that arise under both leases as well as reciprocal easement agreements (or similar agreements) and other restrictive covenants applicable to the properties. Accordingly, assumption and assignment of any leases in accordance with section 365 of the Bankruptcy Code and applicable law requires compliance with, and is subject to, any agreements containing restrictive covenants or other obligations related to the properties.

34.    Accordingly, Landlord objects to the assumption and/or assignment of the Lease or any Premises to the extent such transfer is not subject to all applicable reciprocal easement agreements, other similar agreements, and other restrictive covenants or obligations set forth therein.

**D.  The Debtors' proposed cure amount as set forth in the Assignment Notice fails to provide for the payment of all obligations due and owing under the Lease.**

35. In order to assume and assign the Lease, the Debtors must also comply with Section 365(b)(1) of the Bankruptcy Code which provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;. . .

U.S.C. § 365(b)(1).

36. The amount set forth in the Fifth Notice does not reflect the outstanding balances due and owing to Landlord under the Lease, and the proposed cure amount does not account for accrued but unbilled charges which may come due in the future. The cure amount set forth by the Debtors must be modified to reflect the additional charges owing, as well as recognize the liability for accruing but not yet due charges under the Lease, and to account for the Landlord's pecuniary losses for its reasonable attorneys' fees, and any damages or losses suffered by the Landlord stemming from the violation of the use as more fully set forth herein.

37. Landlord's monetary base cure claim for amounts presently outstanding under the Lease is $12,761.38, as more fully set forth on **Exhibit 5** attached hereto and incorporated into this Objection by reference. The cure amount is the Landlord's base cure claim amount subject to

13

additional qualifications and modifications (such as reimbursement amounts for additional attorney's fees and any indemnification required under the Lease to compensate and hold the Landlord harmless for any pecuniary losses and damages suffered as a result of the use and exclusive violation), which may be in excess of $.

38. In addition to the current outstanding rent and other monthly charges due under the Lease, in determining what must be paid as cure pursuant to Section 365(b), the charges referenced below must also be taken into consideration and paid, either as cure on the effective date of any assumption or assumption and assignment, or when properly billed under the Lease.

i. *Attorneys' Fees, Costs and Interest*

39. The Debtors or Variety takes the Lease *cum onere*—subject to existing burdens. The Debtors cannot assume the favorable portions, and reject the unfavorable provisions, of their leases. In re Wash. Capital Aviation & Leasing, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993). If forced to continue in the performance of the Lease, the Landlord is entitled to the full benefit of the bargain under the Lease with the Debtors. See Matter of Superior Toy and Mfg. Co., Inc., 78 F.3d 1169 (7th Cir. 1996).

40. Here, the Lease contains a provision for recovery of attorneys' fees, costs, and interest in the event the Landlord is required to take legal action to protect its interests. The Debtors are obligated to cure all defaults under the Lease, and compensate the Landlord for its actual pecuniary losses as a result of defaults under the Lease. See 11 U.S.C. § 365(b)(1)(A) and (B). The principle is well-recognized. In re LCO Enterprises, 12 F.3d 938, 941 (9th Cir. 1993); Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989) (debtors allowed to assume lease provided it cured all pre-petition defaults).

41. The "full benefit of the bargain" principle has been held to require payment of interest. "The cure of a default under an unexpired lease pursuant to 11 U.S.C. § 365 is more akin

to a condition precedent to the assumption of a contract obligation than it is to a claim in bankruptcy. One of the purposes of Section 365 is to permit the debtors to continue in a beneficial contract; provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract." In re Entm't, Inc., 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998) (citation omitted; bankruptcy court allowed interest at 18%). Interest on pre-petition lease charges continues to run from the filing of the Debtors' petitions and must be paid as a condition of the assumption of the Lease. See In re Skylark Travel, Inc., 120 B.R. 352, 355 (Bankr. S.D.N.Y. 1990). Interest calculations are, therefore, not cut short by the automatic stay, and payment of such interest is required to fully compensate Landlord for the Debtors' defaults under the Lease, and thus to properly assume (or assume and assign) the Lease. Finally, post-petition interest is allowable where such interest is provided for under the terms of the Lease. Cukierman v. Uecker (In re Cukierman), 265 F.3d 846, 853 (9th Cir. 2001).

42. Attorneys' fees and costs incurred in enforcement of the covenants, obligations, and conditions of a lease are also proper components of a cure claim, and the Debtors (or successor) must satisfy these lease charges as part of the assumption and assignment of the Lease if permitted. Entm't, Inc., 223 B.R. at 152 (citation omitted). There is no logical distinction for purposes of Section 365 between attorneys' fees incurred in connection with pre-petition defaults and fees incurred with post-petition defaults. Id. at 154. The fact that a landlord uses bankruptcy procedures to enforce a lease should not preclude recovery of attorneys' fees and costs for such enforcement activity (particularly where the Bankruptcy Court is the exclusive forum where the landlord can obtain any relief, being foreclosed from state court relief by the automatic stay). Id., see also In re Crown Books Corp., 269 B.R. 12 (Bankr. D. Del. 2001) (Landlord's fees and costs are recoverable as a component of cure under 11 U.S.C. § 365(b)(1)); Urban Retail Props. v. Loews Cineplex

Entm't Corp., et al., Case No. 01 Civ.8946, 2002 WL 535479 (S.D.N.Y. Apr. 9, 2002) (where lease "provides for recovery of attorneys' fees and interest, their receipt deserves the same priority under Section 365(d)(3) as any of the debtors' other obligations that arise postpetition . . . ."); Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Incorporated), 167 F.3d 843, 850 (4th Cir. 1999). The Supreme Court has upheld the enforceability of such attorneys' fees clauses, ruling that pre-petition attorneys' fee clauses were enforceable with respect to issues peculiar to bankruptcy law. Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric, 127 S. Ct. 1199, 1206 (2007).

43. Accordingly, the Landlord further requests that it be reimbursed for all of its actual pecuniary losses including, but not limited to, attorneys' fees and costs expended with regard to Debtors' defaults in these bankruptcy proceedings, including in connection with this Objection. Landlord estimates that it will incur additional attorney's fees and costs in the amount of $5,000, but reserves the right to supplement this figure with its actual billings at the time any cure is reconciled and paid.

    ii.    *Year-End Adjustments and Reconciliations and Indemnification*

44. In addition to rent and related monthly charges, attorneys' fees, costs and interest, and other losses, some charges for which the Debtors bear responsibility under the Lease have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods. By way of example, the Debtors occupy retail space at the Center pursuant to a triple-net lease, where it pays rent and related lease charges in advance for each month. The Debtors pay fixed minimum rent, along with a pro-rata share of expenses such as real property taxes, insurance, common area maintenance ("CAM") fees, annual percentage rent, and the like. Certain charges, such as CAM and property taxes are estimated prospectively, billed to and paid by the tenant during the year, and then reconciled after year-end. The reconciliation compares the amounts estimated and paid against

actual charges incurred at the Center. To the extent the estimated payments exceed actual charges, the result is a credit to the tenant. To the extent the estimated payments do not cover actual charges incurred under the Lease, the result is an additional amount (or debit) for which the tenant is liable. In some instances, year-end reconciliations and adjustments for previous years for the Premises may not yet be complete (i.e., year-end reconciliations and adjustments that accrued through 2024 may not yet have been billed, and such charges that are accruing for 2025 will not be billed until 2026). In other instances, certain charges may be paid in arrears, and cannot be calculated (in some cases) until a year or more after year-end. Since Section 365(b) only requires debtors to cure defaults under their leases, and since there can be no default for failure to pay an amount that has not as yet been billed, these accrued, but unbilled, charges are not yet due under the Lease, and they do not create a current default that gives rise to a requirement of cure by the Debtors at this time. The obligation to pay the year-end adjustments is, however, certainly a part of the obligation to provide adequate assurance of future performance. As a result, the Court should deny any attempt to assign the Lease "free and clear" of these obligations.

45. Debtors remain responsible for all accrued or accruing charges under the Lease, and must pay such charges when they come due under the Lease. The Debtors assumes and assigns the Lease subject to their terms, and must assume and assign all obligations owing under the Lease, including obligations that have accrued but may not yet have been billed under the Lease. The final assignment order should clearly state that the Debtors or Variety will assume these lease obligations and pay them when due, regardless of whether they relate to the period prior to, or after, the closing of the assignment. In addition, any provision in the proposed assignment order that purports to release the Debtors, Gordon Brothers, or Variety of further liability based upon a payment of cure

amounts, must specify that such release does not apply to obligations to pay accrued or accruing, but unbilled, charges that come due under the Lease.

46. Finally, the Lease requires the Debtors, Gordon Brothers, or Variety to indemnify and hold the Landlord harmless with respect to any existing claims which may not become known until after the assumption and assignment of the Lease, examples of which may include such claims as personal injuries at the Premises and damage to the Premises or Center by the Debtors, Gordon Brothers, Variety or their agents. Any assumption and assignment of the Lease must be subject to the terms of the Lease, including the continuation of all indemnification obligations, regardless of when they arose.[4] In the alternative, the Debtors must provide (by insurance or otherwise) that they can satisfy the indemnification obligations under the Lease for any claims that relate to the period prior to assumption or assumption and assignment of the Lease. Nothing in the proposed assignment order should preclude the Landlord from pursuing the Debtors, their insurance, or any other party that may be liable under the Lease, and the Landlord requests that any order specifically preserves its right to pursue such rights irrespective of any resolution of cure amounts herein.[5]

47. Landlord, therefore, requests that in the event an assumption and assignment of the Lease is approved by the Court, language must be inserted into the proposed assignment order to provide that Variety shall be responsible for all unpaid year-end adjustments, whether accruing prior to or after the effective date of assumption of the Lease, when such charges become due in accordance with the terms of the Lease, including with respect to indemnification and insurance obligations. In default thereof, a suitable escrow for the Lease equal to 150% of the average year-

---

[4] Any ability to assume and assign the Lease is subject to the protections provided by Section 365(b) and (f). Therefore, any assumption (or assumption and assignment) must be in accordance with all provisions of the Lease.

[5] If Debtors are covered under an "occurrence basis" insurance policy, rather than a "claims made" policy, this objection may be satisfied by proof of such insurance by the Debtors for Landlord's locations.

end adjustments for the prior three (3) years must be established to assure that any amounts due will be available to Landlord when the year-end adjustments are actually billed and due pursuant to the terms of the respective Lease.

    iii.    *The Cure Amount Serves Only As An Estimate*

48.    Landlord can only provide the information presently available regarding amounts owing by the Debtors, while reserving the right to amend the Objection as necessary to include any additional or unknown charges that arise, including but not limited to subsequent rent defaults, attorney fees, costs, interest, and year-end adjustments and reconciliations. There is no basis to impose upon the Landlord the equivalent of an administrative bar date, limiting its recourse to recover charges and other amounts to which it is entitled under the Lease.

    iv.    *The Debtors Must Pay Undisputed Cure Amounts Immediately*

49.    Section 365(b)(1)(A) requires that the Debtors promptly cure outstanding balances due under the Lease upon assumption or assumption and assignment. To the extent there is a dispute over the total cure obligation for the Lease, all undisputed cure amounts should be paid immediately. Debtors should escrow disputed amounts, and the Court should set a status conference within thirty (30) days of the assumption and assignment of the Lease to deal with any disputes that remain unresolved after such period.

**III.    <u>JOINDER IN OBJECTIONS RAISED BY OTHER LANDLORDS</u>**

50.    To the extent consistent with the objections expressed herein, Landlord also joins in the objections of other shopping center lessors to the Debtors' proposed relief.

**IV.    <u>CONCLUSION</u>**

WHEREFORE, Landlord respectfully requests that the Court enter an order consistent with the foregoing Objection and for such other and further relief as may be just and proper under all of the circumstances.

| | |
|---|---|
| Dated: February 23, 2025<br>Wilmington, Delaware | */s/ Leslie C. Heilman*<br>Leslie C. Heilman (DE No. 4716)<br>Laurel D. Roglen (DE No. 5759)<br>Margaret A. Vesper (DE No. 6995)<br>BALLARD SPAHR LLP<br>919 N. Market Street, 11th Floor<br>Wilmington, Delaware 19801-3034<br>Telephone: (302) 252-4465<br>Facsimile: (302) 252-4466<br>E-mail: heilmanl@ballardspahr.com<br>        roglenl@ballardspahr.com<br>        vesperm@ballardspahr.com<br><br>*Counsel for R.L. Wittbold-New Philadelphia, LLC* |