# Exhibit A

VOL    PAGE

1136    176     163772

STEGER TOWNE CROSSING
ROCKWALL, TEXAS

OPERATION AND EASEMENT AGREEMENT

BETWEEN

DAYTON HUDSON CORPORATION,

ALBERTSON'S, INC.

AND

STEGER TOWNE CROSSING, L.P.

WHEN RECORDED, RETURN TO:
Safeco Land Title of Rockwall
P.O. Box 66
Rockwall, TX  75087

VOL      PAGE

1136     177

## OPERATION AND EASEMENT AGREEMENT

ARTICLE I -- DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1    Approving Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2    Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.3    Building Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.4    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.5    Constant Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.6    Floor Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.7    Occupant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.8    Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.9    Outparcel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.10   Outside Sales Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.11   Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.12   Permittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.13   Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.14   Primary Building Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.15   Restaurant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.16   Site Development Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.17   Tract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.18   Utility Lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE II -- EASEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.1    Ingress, Egress and Parking . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.2    Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.3    Construction, Maintenance and Reconstruction . . . . . . . . . . . . . . . 8
    2.4    Sign Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.5    Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE III -- CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3.1    General Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3.2    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    3.3    Building Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE IV -- MAINTENANCE AND REPAIR . . . . . . . . . . . . . . . . . . . . . 16
    4.1    Utility Lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.2    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    4.3    Building Improvements and Outside Sales Area . . . . . . . . . . . . . . . 23

ARTICLE V -- OPERATION OF THE SHOPPING CENTER . . . . . . . . . . . . . . . 24
    5.1    Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    5.2    Lighting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    5.3    Occupant Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    5.4    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    5.5    Taxes and Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    5.6    Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VOL    PAGE

1136    178

ARTICLE VI -- MISCELLANEOUS ............................... 36
    6.1    Default ............................................. 36
    6.2    Interest ............................................. 37
    6.3    Estoppel Certificate ................................. 37
    6.4    Notices ............................................. 38
    6.5    Approval Rights ..................................... 39
    6.6    Condemnation ....................................... 40
    6.7    Binding Effect ...................................... 40
    6.8    Construction and Interpretation ...................... 40
    6.9    Negation of Partnership ............................. 41
    6.10   Not a Public Dedication ............................. 42
    6.11   Excusable Delays .................................... 42
    6.12   Mitigation of Damages ............................... 42
    6.13   OEA Shall Continue Notwithstanding Breach ........... 42
    6.14   Time ............................................... 42
    6.15   No Waiver .......................................... 42
    6.16   Limitation of Liability ............................. 43
    6.17   Sale & Sale-Leaseback Purchaser ..................... 44

ARTICLE VII -- TERM ...................................... 44
    7.1    Term of this OEA .................................... 44

ARTICLE VIII -- EXCULPATION .............................. 44
    8.1    Certain Limitations on Remedies ..................... 44

**EXHIBITS**

Exhibit A  Legal Description of Target Tract
Exhibit B  Legal Description of Albertson's Tract
Exhibit C  Legal Description of Developer Tract
Exhibit D  Submission Guidelines
Exhibit E  Shared Pylon Sign Schematics
Exhibit X  Site Plan

- ii -

VOL       PAGE

1136     179

## OPERATION AND EASEMENT AGREEMENT

THIS OPERATION AND EASEMENT AGREEMENT ("OEA") is made and entered into as of the 15th day of July, 1996, between DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target"), Albertson's, Inc., a Delaware corporation ("Albertson's"), and STEGER TOWNE CROSSING L.P., a Texas limited partnership ("Developer").

### WITNESSETH

WHEREAS, Target is the owner of a certain tract of land described in Exhibit A attached hereto and identified as the "Target Tract" on Exhibit X (the "Site Plan") attached hereto; and

WHEREAS, Albertson's is the owner of a certain tract of land described in Exhibit B and identified as the "Albertson's Tract" on the Site Plan; and

WHEREAS, Developer is the owner of eight (8) certain tracts of land described in Exhibit C attached hereto and identified as "Developer Tract 1", "Developer Tract 2", "Developer Tract 3", "Developer Tract 4", "Developer Tract 5", "Developer Tract 6", "Developer Tract 7" and "Developer Tract 8" on the Site Plan (said Developer Tract 1, Developer Tract 2, Developer Tract 3, Developer Tract 4, Developer Tract 5, Developer Tract 6, Developer Tract 7 and Developer Tract 8 are sometimes referred to collectively as the "Developer Tract"); and

WHEREAS, the Target Tract, the Albertson's Tract and the Developer Tract (collectively the "Shopping Center") are contiguous and adjacent as shown on the Site Plan; and

WHEREAS, the signatories hereto intend to develop and operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex, but not a planned or common interest development, and in order to effectuate the common use and operation thereof they desire to enter into certain covenants and agreements, and to grant to each other certain reciprocal easements, in, to, over, and across their respective Tracts.

NOW, THEREFORE, in consideration of the premises, the covenants and agreements hereinafter set forth and in furtherance of the parties' understanding, it is agreed as follows:

### ARTICLE I
### DEFINITIONS

1.1   <u>Approving Party</u>. "Approving Party" shall mean the Party designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of this OEA. There shall be one Approving Party representing the Developer Tract, one Approving Party representing the Target Tract and one Approving Party representing the Albertson's Tract. Each Approving Party shall have absolute discretion to make the decisions and/or give the approvals expressly designated to be made and/or given on behalf of the real estate represented by such position regardless of whether the Approving Party then owns all or less than all of the Developer Tract, the Target Tract or the Albertson's Tract, as the case may

VOL      PAGE
1136      180

be. The holder of the Approving Party position shall have the right to assign such position to any other Party owning a Tract within the Developer Tract, the Target Tract or the Albertson's Tract, as the case may be, but if an assignment is not made, then such Approving Party position shall automatically be deemed assigned to the Party acquiring the last Tract owned by the transferring Approving Party. Developer shall be the initial Approving Party for the Developer Tract; Target shall be the initial Approving Party for the Target Tract; and Albertson's shall be the initial Approving Party for the Albertson's Tract.

1.2    Building. "Building" shall mean any enclosed structure placed, constructed or located on a Tract, which for the purpose of this OEA shall include any appurtenant canopies, supports, loading docks, truck ramps and other outward extensions.

1.3    Building Area. "Building Area" shall mean the limited areas of the Shopping Center within which Buildings and Outside Sales Areas may be constructed, placed or located; Building Areas are designated on the Site Plan and will not be amended or reconfigured solely by reason of the construction of one or more buildings thereon. One or more Buildings may be constructed within a Building Area; provided, however, no Building may be built in any Outside Sales Area shown on the Site Plan.

1.4    Common Area. "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of (i) Buildings and (ii) any Outside Sales Area.

1.5    Constant Dollars. "Constant Dollars" means the present value of the dollars to which such phrase refers. An adjustment shall occur on January 1 of the sixth calendar year following the date of this OEA, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which the OEA is dated; the "Current Index Number" shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average, All items published by the United States Department of Commerce (base year 1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then the Approving Parties shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

1.6    Floor Area. "Floor Area" shall mean the actual number of square feet of space contained on each floor within a Building, including any mezzanine or basement space, as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls; provided, however, that the following areas shall not be included in such calculations: space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise which is located vertically above ground floor; any space used for Building utilities or mechanical equipment; and, notwithstanding anything in this OEA to the contrary, any Outside Sales Area not included within a Building. Within thirty (30) days of a request, a Party shall certify to the requesting Party the amount of Floor Area

- 2 -

VOL        PAGE

1136        181

applicable to each Building on its Tract. If any Party causes an as-built survey to be prepared with respect to any portion of the Shopping Center, such Party shall furnish a copy of the survey to the other Parties for informational purposes only.

During any period of rebuilding, repairing, replacement or reconstruction of a Building, the Floor Area of that Building shall be deemed to be the same as existed immediately prior to that period. Upon completion of such rebuilding, repairing, replacement or reconstruction, the Party upon whose Tract such Building is located, shall cause a new determination of Floor Area for such Building to be made in the manner described above, and such determination shall be sent to any Party requesting the same.

1.7    Occupant. "Occupant" shall mean any Person from time to time entitled to the use and occupancy of any portion of a Building in the Shopping Center under an ownership right or any lease, sublease, license, concession, or other similar agreement.

1.8    Operator. "Operator" shall mean the Person designated from time to time by the Approving Parties to maintain and operate the Common Area of the Shopping Center. The Person designated as Operator shall serve in such capacity until he resigns or is removed by the Approving Parties. The Approving Parties hereby designate Developer as the initial Operator, and Developer accepts such appointment.

1.9    Outparcel. "Outparcel" shall mean the portions of the Developer Tract designated as Developer Tract 2, Developer Tract 3, Developer Tract 4, Developer Tract 5, Developer Tract 6 and Developer Tract 7 on the Site Plan. There are six (6) Outparcels constituting a part of the Developer Tract and the Shopping Center.

1.10    Outside Sales Area. "Outside Sales Area" shall mean those areas, if any, designated on the Site Plan which from time to time may be used for sales, display and/or storage purposes. During the period an Outside Sales Area is: (i) used, such space shall be enclosed by a fence or other security barrier appropriate for the nature of the merchandise being displayed, but shall not be heated nor air-conditioned, and (ii) not used, the surrounding barrier, if any, shall be removed by the Occupant and the surface of such area shall be used for Common Area purposes or, if the area is located within a Building Area, for the location of Buildings.

1.11    Party. "Party" shall mean each signatory hereto and, after compliance with the notice requirements set forth below, their respective successors and assigns who become owners of any portion of the Shopping Center. Each Party shall be liable for the performance of all covenants, obligations and undertakings herein set forth with respect to the portion of the Shopping Center owned by it which accrue during the period of such ownership, and such liability shall continue with respect to any portion transferred until the notice of transfer set forth below is given, at which time the transferring Party shall be released from the obligations of this OEA arising subsequent to the effective date on the transfer notice. A Party transferring all or any portion of its interest in the Shopping Center shall give notice to all other Parties and the Operator of such transfer and shall include therein at least the following information:

(i)    the name and address of the new Party;

- 3 -

VOL     PAGE
1136    182

    (ii)   a copy of the legal description of the portion of the Shopping Center transferred; and

    (iii)  if the transferee is the designated Approving Party.

If a Tract is owned by more than one Person, the Person or Persons holding at least 51% of the ownership interest in the Tract shall designate one of their number to represent all owners of the Tract and such designated Person shall be deemed the Party for such Tract. Until the notice of transfer is given, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder which is placed upon the transferred portion of the Shopping Center prior to receipt of the notice.

    1.12   <u>Permittee</u>.  "Permittee" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants, and concessionaires of Occupants insofar as their activities relate to the intended development, use and occupancy of the Shopping Center.  Persons engaged in civic, public or political activities within the Shopping Center, including but not limited to the activities set forth below shall not be considered Permittees:

    (i)    Exhibiting any placard, sign, or notice;

    (ii)   Distributing any circular, handbill, placard, or booklet;

    (iii)  Soliciting memberships or contributions for private, civic, public or charitable purposes;

    (iv)  Parading, picketing, or demonstrating; and

    (v)   Failing to follow regulations established by the Parties relating to the use of the Shopping Center.

    1.13   <u>Person</u>.  "Person" shall mean any individual, partnership, firm, association, corporation, trust, or any other form of business or government entity.

    1.14   <u>Primary Building Area</u>.  "Primary Building Area" shall mean collectively the Building Areas designated as such on the Site Plan.

    1.15   <u>Restaurant.</u>  "Restaurant" shall mean any operation or business which requires a governmental permit, license and/or authorization to prepare and/or serve food for either on or off site consumption; provided, however, notwithstanding anything herein to the contrary, a supermarket, grocery store or similar operation shall not be deemed a Restaurant.

    1.16   <u>Site Development Agreement</u>.  "Site Development Agreement" shall mean that certain Site Development Agreement, of even date herewith, between Target, Albertson's and Developer, concerning the initial site improvement work on the Shopping Center.

    1.17   <u>Tract</u>.  "Tract" shall mean that portion of the Shopping Center owned by a Party.

- 4 -

VOL        PAGE

1136      183

1.18 <u>Utility Lines.</u> "Utility Lines" shall mean those facilities and systems for the transmission of utility services, including drainage and storage of surface water including, without limitation, the detention pond to be constructed on Developer Tract 8 (the "Detention Pond"). "Common Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to two (2) or more Tracts. "Separate Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to only one (1) Tract. For the purpose of this OEA, the portion of a Utility Line extending between a Common Utility Line and a Building shall be considered a Separate Utility Line.

## ARTICLE II
## EASEMENTS

2.1 <u>Ingress, Egress and Parking.</u> During the term of this OEA each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use, and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use. In exercising these easement rights, each Party and Occupant shall use diligent efforts to assure that (a) all employees of a business on such Owner's or Occupant's Tract park only on such Tract and not within 200 feet of the front door of any building on the Target Tract or the Albertson's Tract and (b) service vehicles serving such Owner's or Occupant's Tract use only the Permanent Service Drives designated on the Site Plan. Additionally, each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a perpetual, non-exclusive easement for the passage of vehicles over and across those driveway areas of the grantor's Tract which are designated as "Permanent Access Drive" and "Permanent Service Drive" on the Site Plan, and any relocation thereof from the locations shown on the Site Plan shall require the prior written approval of the Approving Parties. Such easement rights shall be subject to the following reservations as well as other provisions contained in this OEA:

    (i)    Each Party further reserves the right to close off its portion of the Common Area for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Common Area, as herein provided, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing with each other Party so that no unreasonable interference in the passage of pedestrians or vehicles shall occur, and

    (ii)    Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using the Common Area on its Tract.

- 5 -

VOL          PAGE

1136          184

2.2    Utilities.

(A)    Each Party hereby grants and conveys to each other Party non-exclusive perpetual easements in, to, over, under, along and across those portions of the Common Area (exclusive of any portion located within Building Areas) located on the grantor's Tract necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of Utility Lines serving the grantee's Tract, including but not limited to, sanitary sewers, storm drains, water (fire and domestic), gas, electrical, telephone and communication lines. The easements granted in this subparagraph 2.2(A) shall be perpetual (subject, however, to relocation as hereinafter set forth in this paragraph 2.2) and shall survive the termination of this OEA for the benefit of the Shopping Center for as long as buildings are open and operating on the Target Tract, the Albertson's Tract and/or the Developer Tract. The initial location of any Utility Line shall be subject to the prior written approval of the Party whose Common Area is to be burdened thereby, such approval not to be unreasonably withheld or delayed. The easement area shall be no wider than necessary to reasonably satisfy the requirements of a private or public utility, or five feet (5') on each side of the centerline if the easement is granted to a Party. Upon request, the grantee shall provide to the grantor a copy of an as-built survey showing the location of such Utility Line. All Utility Lines shall be underground except:

(i)    ground mounted electrical transformers;

(ii)    as may be necessary during periods of construction, reconstruction, repair, or temporary service;

(iii)    as may be required by governmental agencies having jurisdiction;

(iv)    as may be required by the provider of such service; and

(v)    fire hydrants.

Except for those lines approved and constructed pursuant to the Site Development Agreement, at least thirty (30) days prior to exercising the right granted herein, the grantee shall first provide the grantor with a written statement describing the need for such easement, shall identify the proposed location of the Utility Line, the nature of the service to be provided, the anticipated commencement and completion dates for the work and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by 5.4(C). Except as otherwise agreed to by the grantor and the grantee, any Party installing Separate Utility Lines pursuant to the provisions of this subparagraph shall pay all costs and expenses with respect thereto and shall cause all work in connection therewith (including general clean-up and proper surface and/or subsurface restoration) to be completed as quickly as possible and in a manner so as to minimize interference with the use of the Common Area. In addition, the grantee of any Separate Utility Line agrees to indemnify, protect, hold harmless and defend the grantor from all losses, claims, costs, liabilities and/or expenses (including reasonable attorneys fees and court costs) arising out of or resulting from the exercise of the right to install, maintain and operate the Utility Line as herein provided. If the Parties elect to install Common Utility Lines, all repair, maintenance, replacement and other work thereon shall be performed by the Operator as part of Common Area maintenance.

- 6 -

VOL       PAGE

1136      185

(B)    The grantor shall have the right to relocate a Utility Line upon thirty (30) days' prior written notice, provided that such relocation:

(i)    shall not be commenced during the months of November, December or January;

(ii)   shall not interfere with or diminish the utility service to the grantee during the grantee's business hours; and if an electrical line/computer line is being relocated, then the grantor and grantee shall coordinate such interruption to eliminate any detrimental effects;

(iii)  shall not reduce or unreasonably impair the usefulness or function of such Utility Line;

(iv)   shall be performed without cost or expense to grantee;

(v)    shall be completed using materials and design standards which equal or exceed those originally used; and

(vi)   shall have been approved by the provider of such service and the appropriate governmental or quasi-governmental agencies having jurisdiction thereover.

Documentation of the relocated easement area, including the furnishing of an "as-built" survey, shall be the grantor's expense and shall be accomplished as soon as possible following completion of such relocation.

(C)    Each Party hereby grants and conveys to each Party owning an adjacent Tract the perpetual right and easement to discharge surface storm drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract, upon the following conditions and terms:

(i)    The Common Area grades and the surface water drainage/retention system for the Shopping Center (including, without limitation, the Detention Pond) shall be initially constructed in strict conformance with the details approved by the Approving Parties; and

(ii)   No Party shall alter or permit to be altered the surface of the Common Area or the drainage/retention system constructed on its Tract (including, without limitation, if applicable, the Detention Pond) if such alteration would materially increase the flow of surface water onto an adjacent Tract either in the aggregate or by directing the flow of surface water to a limited area.

The surface water collection, retention and distribution facilities shall be deemed a Common Utility Line.

- 7 -

VOL        PAGE
1136      186

(D)    Developer acknowledges that the Detention Pond is of critical importance to and an integral part of the Shopping Center; therefore, Developer hereby agrees that Developer Tract 1 and Developer Tract 8 shall, during the term of this OEA, be owned by the same Party, and that the ownership of Developer Tract 1 and Developer Tract 8 shall not be severed without the prior written consent of the Approving Parties, which consent shall not be unreasonably withheld.

2.3    Construction, Maintenance and Reconstruction.

(A)    In order to accommodate any Building improvements which may inadvertently be constructed beyond a Tract's boundary line, each Party grants to each Party owning an adjacent Tract an easement, not to exceed a maximum lateral distance of six inches (6") on the Target Tract and two feet (2') on all other Tracts, in, to, over, under, and across that portion of the grantor's Tract adjacent to such common boundary line for the maintenance and replacement of such encroaching Building improvements.

(B)    In the event a constructing Party (the "Constructing Party") determines that it is necessary to place underground piers, footings and/or foundations ("Subsurface Construction Elements") across the boundary line of its Tract, the Constructing Party shall advise the Party owning the adjacent Tract (the "Adjacent Party") of its construction requirement and shall provide plans and specifications relating thereto, including proposed construction techniques for the Subsurface Construction Elements. The Adjacent Party hereby grants and conveys to the Constructing Party for the benefit of its Tract an easement, not to exceed a maximum lateral distance of five feet (5'), in, to, under, and across that portion of the Adjacent Party's Tract not theretofore occupied by any then existing structure, for the installation, maintenance and replacement of such Subsurface Construction Elements;  provided, however, that the Constructing Party shall have no right to use such easement if the Adjacent Party is able to provide the Constructing Party a reasonable alternative construction method for the placement of the Subsurface Construction Elements entirely on the Constructing Party's Tract.

The Adjacent Party reserves the right to require the Constructing Party to modify the design specifications for the Subsurface Construction Elements in order to permit the Adjacent Party the opportunity to utilize the same in connection with the construction of its Building improvements to the end that each Party shall be able to place its Building immediately adjacent to the common boundary line. If a common Subsurface Construction Element is used by the Parties, each shall assume and pay its reasonable share of the cost and expense of the design and construction thereof. In the event any Building utilizing a common Subsurface Construction Element is destroyed and not replaced or is removed, the common Subsurface Construction Element shall remain in place for the benefit of the other Building utilizing the same.

(C) The foregoing easement grants shall not diminish or waive any right of a Party to recover damages resulting from the constructing Party's failure to construct its Building within its Tract in the case of (A) above, or within the easement area limits in the case of (B) above. The easements in each instance shall:

- 8 -

VOL        PAGE

1136      187

(i)    continue in effect for the term of this OEA and thereafter for so long as the Building utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such Building if the same shall be destroyed, damaged, or demolished); and

(ii)    include the reasonable right of access necessary to exercise and enjoy such grant upon terms and with the limitations described in 3.1(E) below.

(D)    With respect to Buildings constructed along the common boundary line between Tracts, nothing herein shall be deemed to create or establish:

(i)    a "common" or "party" wall to be shared with the adjacent Building, or

(ii)    the right for a Building to receive support from or apply pressure to the adjacent Building.

2.4    <u>Sign Easement</u>. Developer hereby grants and conveys to Target and Albertson's for their use and for the use of designated Occupants of the Target Tract and Albertson's Tract, a perpetual easement for the construction, reconstruction, replacement, operation, maintenance and repair of a sign structure, including the right and privilege to place thereon or affix thereto sign panels, over, under, upon and across each of those portions of the Developer Tract identified on the Site Plan as Shared Pylon Sign #1 and Shared Pylon Sign #2, together with reasonable access over, under, upon, through and across the Developer Tract to install, replace, maintain, repair and operate a Separate Utility Line pursuant to the terms and conditions set forth in 2.2 above in order to provide such sign structures and panels with power to illuminate the same. Except as otherwise provided in 5.3 of this OEA, Target, Albertson's and Developer shall each pay their respective costs and expenses with respect to the construction, maintenance and operation of the sign structure and panels. The foregoing easement, together with the rights included therewith, shall be for the benefit of and appurtenant to the Target Tract and Albertson's Tract and shall be binding on and burden the Developer Tract.

2.5    <u>Restriction</u>. No Party shall grant any easement for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of easements by a Party on its Tract to governmental or quasi-governmental authorities or to public utilities.

### ARTICLE III
### CONSTRUCTION

3.1    <u>General Requirements</u>.

(A)    Each Party agrees that all construction activities performed by it within the Shopping Center shall be performed in compliance with all applicable laws, rules, regulations, orders, and ordinances of the city, county, state, and federal government, or any department or agency thereof. All construction shall utilize new materials, and shall be performed in a good, safe, workmanlike manner.

- 9 -

VOL          PAGE

1136        188

(B)    Each Party further agrees that its construction activities shall not:

    (i)    cause any unreasonable increase in the cost of constructing improvements upon another Party's Tract;

    (ii)    unreasonably interfere with construction work being performed on any other part of the Shopping Center;

    (iii)    unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees;

    (iv)    cause any Building located on another Tract to be in violation of any law, rule, regulation, order or ordinance authorized by any city, county, state, federal government, or any department or agency thereof.

(C)    Each Party agrees to defend, indemnify and hold harmless each other Party from all claims, losses, liabilities, actions, proceedings and costs (including reasonable attorneys' fees and costs of suit), including liens, and any accident, injury or loss or damage whatsoever occurring to any Person or to the property of any Person arising out of or resulting from any construction activities performed or authorized by such indemnifying Party; provided however, that the foregoing shall not be applicable to either events or circumstances caused by the negligence or willful act or omission of such indemnified Party, its licensees, concessionaires, agents, servants, employees, or anyone claiming by, through, or under any of them, or claims covered by the release set forth in 5.4(D).

(D)    In connection with any construction, reconstruction, repair or maintenance on its Tract, each Party reserves the right to create a temporary staging and/or storage area in the Common Area or in the Building Area on its Tract at such location as will not unreasonably interfere with access between such Tract and the other areas of the Shopping Center. Prior to the commencement of any work which requires the establishment of a staging and/or storage area on its Tract, a Party shall give at least 30 days prior notice to the Approving Parties, for their approval, of the proposed location, provided, however, that if a business is operating on the Target Tract or Albertson's Tract, then no other Party's staging area shall be located within 100 feet of the Target Tract or Albertson's Tract, unless located within a Building Area, and if substantial work is to be performed, the constructing Party shall, at the request of any Approving Party, fence off the staging and storage area. If the Approving Parties do not approve the proposed location of the staging and/or storage area, the Party shall modify the proposed location to satisfy the reasonable requirements of the Approving Parties. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Tract, and all laborers, suppliers, contractors and others connected with such construction activities shall use only the access points located upon the constructing Party's Tract. Upon completion of such work, the constructing Party shall restore the affected Common Area to a condition equal to or better than that existing prior to commencement of such work.

- 10 -

VOL      PAGE

1136     189

(E)     Each Party hereby grants and conveys to each other Party and to its respective contractors, materialmen and laborers a temporary license for access and passage over and across the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during periods when actual construction and/or maintenance is being performed and provided further that the use of such license shall not unreasonably interfere with the use and operation of the Common Area by others. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by 5.4(C). Any Party availing itself of the temporary license shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area, and restore and/or repair the affected portion of the Common Area to a condition which is equal to or better than the condition which existed prior to the commencement of such work. Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers, suppliers and/or others connected with construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Tract.

3.2     <u>Common Area</u>. The Parties have agreed that the Common Area of the Shopping Center shall be initially constructed as shown on the Site Plan and in accordance with the provisions of the Site Development Agreement, provided, however, no fence or other barrier which would prevent or unreasonably obstruct the passage of pedestrian or vehicular travel shall be erected or permitted within or across the Common Area, exclusive of the limited curbing and other forms of traffic control depicted on the Site Plan, or permitted staging and/or storage areas. Contemporaneously with the construction of a Building upon its Tract, the constructing Party shall cause the Common Area on its Tract to be substantially completed no later than the day the first Occupant of such Tract opens for business with the public. Such work shall be done in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be complied with throughout the term of this Agreement:

(A)     The lighting system shall be designed to produce a minimum maintained lighting intensity measured at grade at all points in the Common Area of two (2) foot candles; provided however, that the extreme edge of the parking or drive areas may have not less than a minimum maintained lighting intensity measured at grade of one (1) foot candle, and provided further that the drive areas immediately in front of the entrance to any Building shall have not less than a minimum maintained lighting intensity measured at grade of five (5) foot candles. Each Party may elect to control the lighting system located on its Tract. The type and design of the Common Area light standards shall be approved by the Approving Parties.

(B)     The slope in the parking area shall not exceed a maximum of four percent (4%), nor be less than a minimum of one percent (1%).

(C)     All sidewalks and pedestrian aisles shall be concrete or other materials approved by the Approving Parties; the automobile parking areas, drives, and access roads shall be designed in conformity with the recommendations of a registered soils engineer approved by the

- 11 -

VOL     PAGE
1136     190

Approving Parties which shall require the installation of a suitable base and the surfacing with concrete or concrete wearing material.

(D)    Utility Lines that are placed underground shall be at depths designated by consultants approved by the Approving Parties. If surface water retention and/or detention areas are located outside of the general parking lots, such areas shall be fenced or otherwise secured to impede public access thereto.

(E)    The parking area on the Target Tract, Albertson's Tract and on each separate Tract comprising the Developer Tract shall contain sufficient ground level, parking spaces in order to comply with the following minimum requirements:

(i)    five (5.0) parking spaces for each one thousand (1,000) square feet of Floor Area; provided, however, that compact car parking spaces shall be located only in the areas, if any, designated on the Site Plan;

(ii)    if a business use contains a drive-up unit (such as remote banking teller or food ordering/dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles for each drive-up unit;

(iii)    for each single Restaurant which has less than five thousand (5,000) square feet of Floor Area, then five (5) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use; provided, however, if any such Restaurant is located on Developer Tract 2 and has annual gross revenues from the sale of alcoholic beverages in excess of twenty percent (20%) of the gross revenues of such Restaurant, then the above requirement for five (5) additional parking spaces shall be increased to ten (10) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such Restaurant;

(iv)    for each single Restaurant which has at least five thousand (5,000) square feet of Floor Area, but less than seven thousand (7,000) square feet of Floor Area, then ten (10) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use;

(v)    for each single Restaurant which has seven thousand (7,000) square feet of Floor Area or more, then fifteen (15) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use.

If an Occupant operates a Restaurant incidental to its primary business purpose, then so long as such incidental operation continues, the portion of the Floor Area occupied by such Restaurant shall be excluded from the application of (iii), (iv) and (v) above. For the purpose of this clause only, a Restaurant shall be an "incidental operation" if it occupies less than seven percent (7%) of the Occupant's Floor Area and does not have a separate customer entry/exit door to the outside of the Building. In the event an Occupant utilizes Floor Area for Restaurant and other purposes, only the portion of Floor Area allocated for Restaurant purposes shall be subject to the increased parking requirements.

- 12 -

VOL          PAGE

1136          191

In the event of a condemnation of part of a Tract or sale or transfer in lieu thereof that reduces the number of usable parking spaces below that which is required herein, the Party whose Tract is so affected shall use its best efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute ground level parking spaces in order to comply with the parking requirements set forth in this OEA. If such compliance is not possible, such Party shall not be deemed in default hereunder, but such Party shall not be permitted to expand the amount of Floor Area located upon its Tract. If such Floor Area is thereafter reduced other than by casualty, then the Floor Area on such Tract may not subsequently be increased unless the parking requirement is satisfied.

(F)     No Party shall make changes to the improved Common Area on its Tract without the approval of the Approving Parties, except that each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in its portion of the Common Area, including the installation of convenience facilities such as mailboxes, public telephones and benches, provided that:

(i)     the accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan;

(ii)    there shall be maintained at all times within such Common Area, a sufficient number of vehicular parking spaces to meet the parking requirements set forth in 3.2(E), as well as all governmental rules, regulations, and/or ordinances relating to parking requirements, but without reliance on parking spaces that may be available on another Tract; provided, however, that no more than two percent (2%) of the parking spaces depicted on the Site Plan for such Tract shall be eliminated;

(iii)   no governmental rule, ordinance or regulation shall be violated as a result of such action; any and all governmental conditions applicable to such modifications shall be satisfied by the Party performing the same; and such action shall not result in any other Party being in violation of any governmental rule, ordinance or regulation;

(iv)    no change shall be made in the access points between the Common Area and the public streets; provided, however, that additional access points may be created with the approval of the Approving Parties, such approval not to be unreasonably withheld; and

(v)     at least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each other Party copies of the plans therefor, and provided further that such work shall not occur during the months of October, November, December or January;

- 13 -

VOL   PAGE
1136   192

The provisions of this paragraph (F) do not apply to any changes, modifications or alterations of Common Area located within Building Areas which result from or arise out of the construction, expansion or maintenance of Buildings or Outside Sales Areas.

3.3   Building Improvements.

(A)   While it is acknowledged and agreed that no Party shall have an obligation to commence construction of any Building on its Tract, the Parties hereby agree once construction has been commenced, such Building shall be completed.  If a Building Area has a maximum Floor Area designation, such amount shall not be exceeded.

(B)   The Approving Parties shall agree upon an architecturally compatible theme for the exterior of all Buildings to be constructed, placed or located within the Shopping Center.  Once the Approving Parties have agreed upon such theme, each Party shall submit to the Approving Parties detailed plans ("Plans") as required by Exhibit D attached hereto, including signs, covering the initial construction of each Building and any additions, remodeling, reconstruction or other alteration thereto which changes the exterior thereof for approval at least thirty (30) days prior to the commencement of any such work.  If an Approving Party should reject the Plans for not complying with the architectural theme established by the Approving Parties, the submitting Party and the Approving Parties shall mutually consult to establish approved Plans for the proposed work.  The Approving Parties shall not arbitrarily or unreasonably withhold approval of the Plans or recommend changes in the Plans which otherwise conform with the requirements hereof, nor shall they withhold approval of exterior remodeling or exterior reconstruction which does not either substantially enlarge an existing structure, or substantially change an existing structure.  In no event shall an Approving Party require any other Party to utilize design standards superior to those utilized by the Approving Party in the construction of Buildings on its Tract.  Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency, or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with applicable laws.  No material deviation shall be made from the approved Plans.  Notwithstanding anything contained herein, the Approving Parties (i) agree that the above-described architectural theme shall be the prototype "Target" retail store and (ii) waive the requirement for the submission of Plans for the initial Buildings, including signs thereon, to be constructed on the Target Tract and the Albertson's Tract if such Buildings reflect a prototype "Target" retail store and a prototype "Albertson's" retail store, respectively, provided such prototypes (including signage) conform to the architectural theme (i.e., are harmonious and compatible with the colors and materials of the prototype "Target" retail store).  Target and Albertson's may each use their standard signs and logos (including, without limitation, the standard sign and logo identifying banking and/or financial services within the Albertson's on the Albertson's Tract) as they may exist from time to time without prior approval.

(C)   The Parties hereby specifically consent to the placement of Buildings along their respective common boundary lines, and each agrees to support any request by another Party for a side-yard or setback variance if the same is required in order to accommodate such construction.

- 14 -

VOL        PAGE

1136      193

(D)    The Parties acknowledge that each of Target and Albertson's initially proposes to construct on their respective Tracts a Building which is classified as an "unlimited area" building under certain building codes. (By way of explanation, but not limitation, an "unlimited area" building is designated II-N or V-N under the Uniform Building Code.) The Parties agree that all Buildings constructed within the Primary Building Area shall comply with the following requirements:

    (i)    no Building shall be constructed within sixty feet (60') of the Building Area on an adjoining Tract unless such Building, hereinafter referred to as the "Adjacent Building," shall be located immediately adjacent to the common boundary line and is attached to the Building, if any, on the adjacent Tract in accordance with 3.3(E);

    (ii)    if an Adjacent Building exists, then no Building shall be located within sixty feet (60') of the Adjacent Building unless such Building is attached to the Adjacent Building in accordance with 3.3(E); the Adjacent Building and all other Buildings on the Tract that are attached to the Adjacent Building and to each other are hereinafter referred to as the "Building Group";

    (iii)    any Building that is not part of the Building Group, shall be located at least sixty feet (60') distant from the Building Group;

    (iv)    the Adjacent Building or the Building Group, as the case may be, shall comply with the building code requirements applicable to an "unlimited area" building, including without limitation the installation of an approved sprinkler system for fire protection.

In addition to the requirements set forth above, the Parties agree that no Building shall initially be placed or constructed on their respective Tracts in a manner which will, based on then existing governmental regulations, either preclude the construction on the Primary Building Areas of an "unlimited area" building, or cause an existing "unlimited area" building thereon to no longer be in conformance with applicable building code requirements, it being understood and agreed, however, that subsequent changes in governmental regulations shall not obligate a Party to modify or alter its existing Building.

If required by any governmental authority, each Party agrees to join in a recordable declaration which confirms the existence of a sixty foot (60') clear area around the Primary Building Areas.

(E)    The second Party to construct a Building adjacent to a common boundary line shall do so in a manner that does not result in damage to the improvements in place on the adjoining Tract, and such Party shall undertake and assume at its sole cost the obligation of completing and maintaining the nominal attachment (flashing and seal) of its Building to that of the existing Building on the other Tract, it being the intent of the Parties to establish and maintain the appearance of one continuous Building complex. In performing such attachment,

- 15 -

VOL      PAGE

1136     194

the wall of one Building shall not receive support from nor apply pressure to the wall of the other Building.

(F)    No Building shall exceed one story, nor the following height restrictions:

(i)    On the Target Tract - The top elevation of the parapet of the main body of the Building shall be no higher than twenty-four (24) feet, and the top elevation of any entrance element of the Building shall be no higher than twenty-eight (28) feet.

(ii)    On the Albertson's Tract - The top elevation of the parapet of the main body of the Building shall be no higher than twenty-seven (27) feet, and the top elevation of any entrance element of the Building shall be no higher than thirty-five (35) feet.

(iii)    On the Developer Tract - The top elevation of the parapet of the main body of each Building shall be no higher than twenty-two (22) feet, and the top elevation of any entrance element of each Building shall be no higher than twenty-six (26) feet. In the event of any connection with the Building on the Target Tract or on the Albertson's Tract, the connecting Building on the Developer Tract shall be no higher than the Building on the Target Tract or on the Albertson's Tract (as appropriate) at the point of connection and for a distance of fifty (50) feet from the Building on the Target Tract or on the Albertson's Tract (as appropriate).

The height of any Building shall be measured perpendicular from the finished floor elevation to the top of the roof structure, including any screening, parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such Building. Any Party shall have the right to install, maintain, repair, replace and remove Communications Equipment used in connection with the business being conducted by an Occupant on the top of the Building on its Tract which may extend above the height limits established above; provided, however, such Communications Equipment shall be set back from the front of the Building to reduce visibility thereof by customers. As used herein, the phrase "Communications Equipment" means such things as satellite and microwave dishes, antennas and laser heads, together with associated equipment and cable.

## ARTICLE IV
## MAINTENANCE AND REPAIR

4.1    <u>Utility Lines.</u>

(A)    Each Party shall maintain and repair, or cause to be maintained and repaired, in a good state of repair and safe condition, all Separate Utility Lines utilized by it regardless of where located. Any maintenance, replacement and/or repair of nondedicated Utility Lines located on another Party's Tract shall be performed: after two (2) weeks' notice to the grantor (except in an emergency the work may be initiated with reasonable notice); after normal business hours whenever possible; and in such a manner as to cause as little disturbance in the use of the

- 16 -

VOL    PAGE
1136    195

grantor's Tract as is practicable under the circumstances. Any Party performing or causing to be performed maintenance or repair work agrees: to promptly pay all costs and expenses associated therewith; to diligently complete such work as quickly as possible; and to promptly clean the area and restore the affected portion of the Common Area to a condition equal to or better than the condition which existed prior to the commencement of such work.

(B)    Common Utility Lines shall be maintained, repaired and/or replaced as part of the Common Area pursuant to 4.2 below.

4.2    <u>Common Area</u>.

(A)    Until the Operator commences maintenance of the Common Area pursuant to the provisions in (B) below, each Party shall maintain, or cause to be maintained, the Common Area on its Tract in a sightly, safe condition and good state of repair. The unimproved Common Area shall be mowed and kept litter-free. The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other first class retail developments of comparable size in the Dallas/Fort Worth Metropolitan Area; notwithstanding the foregoing, however, the Common Area shall be operated and maintained in compliance with all applicable governmental laws, rules, regulations, orders and ordinances, and the provisions of this OEA. All Common Area improvements shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole. The maintenance and repair obligation shall include but not be limited to the following:

(i)    Drive and Parking Areas. Maintaining all paved surfaces and curbs in a smooth and evenly covered condition including, without limitation, replacement of base, resealing, and cutting and patching, with the type of surfacing material originally installed.

(ii)    Debris and Refuse. Periodic removal of all papers, debris, filth, refuse, ice and snow (2" on surface), including daily vacuuming and broom sweeping to the extent necessary to keep the Common Area in a first-class, clean and orderly condition; provided, however, that Occupant trash and/or garbage removal shall not be a Common Area Maintenance Cost (as hereinafter defined) since such removal obligation is covered by 4.3(A). All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by Permittees.

(iii)    Non-Occupant Signs and Markers. Maintaining, cleaning and replacing any appropriate directional, stop or handicapped parking signs or markers; restripe parking lots and drive lanes as necessary to maintain parking space designation and traffic direction; and keep clearly marked fire lanes, loading zones, no parking areas and pedestrian cross-walks.

- 17 -

VOL
1136

PAGE
196

(iv) Lighting. Maintaining, cleaning and replacing Common Area lighting facilities, including light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers.

(v) Landscaping. Maintaining and replacing of all landscape plantings, trees and shrubs in an attractive and thriving condition, trimmed and weed free. Maintain and replace landscape planters, including those adjacent to exterior walls of Buildings. Modify irrigation system to satisfy governmental water allocation or emergency requirements. If any Occupant requires "special" landscaping (i.e. beyond the standard landscaping requirements for the remainder of the Shopping Center), or if landscaping additions/modifications are required as a result of a Building addition, expansion or remodel, the cost of installation, replacement and maintenance of such special or required landscaping shall be borne solely by such Occupant and shall not be included in Common Area Maintenance Costs.

(vi) Common Utility Lines. Maintaining, cleaning, replacing, and repairing any and all Common Utility Lines including, without limitation, the Detention Pond.

(vii) Obstructions. Keeping the Common Area free from any obstructions including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA.

(viii) Sidewalks. Maintaining, cleaning and replacing of all sidewalks, including those adjacent and contiguous to Buildings located within the Shopping Center. Sidewalks shall be steam cleaned at least monthly and shall be swept at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Area.

(ix) Supervisory Personnel. Providing of professional supervisory personnel for the Common Area, if reasonably required and agreed to by the Approving Parties.

(x) Traffic. Supervision of traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow.

(y) Maintenance and replacement of the structure (but not the individual sign cans or sign panels) of Shared Pylon Sign #1 and Shared Pylon Sign #2; provided, however, the cost and expense of such maintenance and replacement shall be shared amongst the Parties in accordance with 2.4 and 5.3 of this OEA.

- 18 -

VOL     PAGE

1136    197

Notwithstanding anything to the contrary, each Party shall maintain and repair, at its sole cost, any exterior shipping/receiving dock area, any truck ramp or truck parking area, and any refuse, compactor or dumpster area located on its Tract.

(B)    Commencing on the date the Approving Parties designate in writing, the Operator shall operate and maintain the Common Area of the Shopping Center in accordance with the requirements of (A) above. Within 30 days following the commencement of such maintenance and operation, Operator shall provide the Approving Parties an estimated budget for the balance of the current calendar year containing the information required by (C) below, and each Party agrees to pay its share thereof in accordance with (D) below. Operator may hire companies affiliated with it to perform the maintenance and operation of the Common Area, but only if the rates charged by such companies are competitive with those of other companies furnishing similar services in the metropolitan area in or about the Shopping Center, it being agreed that this provision shall be construed strictly against Operator. Each Party hereby grants to Operator, its agents and employees a license to enter upon its Tract to discharge the duties to operate, maintain and repair the Common Area. Operator shall operate on a nonprofit basis, expending only such funds as are reasonably necessary for the operation, maintenance and insurance of the Common Area and shall promptly pay such costs ("Common Area Maintenance Costs") when incurred. For the purpose of this OEA, Common Area Maintenance Costs shall not include:

(i)    any late charges or fees;

(ii)    any charge for electricity to a Party that separately pays the electrical costs for lighting the Common Area on its Tract;

(iii)    any costs to clean up or repair the Common Area resulting from promotional activities or from construction, maintenance or replacement of Buildings;

(iv)    real property taxes and assessments; provided, however, real property taxes and assessments levied against Developer Tract 8 shall be a Common Area Maintenance Cost so long as the Detention Pond is located thereon;

(v)    Operator's profit, administrative and overhead costs (including but not limited to: office space, equipment and utilities; legal, accounting or administrative services; Operator's personnel who are not permanently located at the Shopping Center); and

(vi)    entertainment, transportation, meals and lodging of anyone.

In lieu of Operator's profit, administrative and overhead costs, Operator shall be permitted to charge an amount ("Administration Fee") computed by multiplying the Common Area Maintenance Costs (exclusive of insurance premiums, fees paid to third Persons who perform the Common Area operation and maintenance on Operator's behalf, real property taxes and assessments on Developer Tract 8 and utility charges) by three percent (3%). In the event

- 19 -

VOL     PAGE

1136     198

the Operator contracts all or a substantial part of the maintenance of the Common Area to a commercial property management company, Operator shall not receive the Administration Fee. If any of Operator's personnel at the Shopping Center perform services, functions or tasks in addition to Common Area duties, then the cost of such personnel shall be equitably allocated according to time spent performing such duties.

(C)    Operator shall, at least 90 days prior to the beginning of each calendar year, submit to the Approving Parties an estimated budget ("Budget") for the Common Area Maintenance Costs and the Administration Fee for operating and maintaining the Common Area of the Shopping Center for the ensuing calendar year. The Budget shall be in a form and content reasonably acceptable to the Approving Parties and shall identify separate cost estimates for at least the categories specified under 4.2(A), plus:

> (i)     premium for public liability insurance covering the Common Area as required by 5.4(A) below;
>
> (ii)    rental or purchase of equipment and supplies;
>
> (iii)   depreciation or trade-in allowance applicable to items purchased for Common Area purposes; and
>
> (iv)    Administration Fee.

If an item of maintenance or replacement is to be accomplished in phases over a period of calendar years, such as resurfacing of the drive and/or parking areas, then the Budget shall separately identify the cost attributable to such year (including the area of the Common Area affected), and shall note the anticipated cost and timing (indicating the area of the Common Area affected) of such phased work during succeeding calendar years. The cost of approved "phased" work shall be paid by the Parties approving the same, or their successors or assigns, as the case may be, notwithstanding that when such work is performed a Party may not then be participating in the joint maintenance of the Shopping Center.

If an Approving Party disapproves the proposed Budget, it shall consult with the other Approving Parties and the Operator to establish a final approved Budget. If a Budget for the following calendar year is not approved by December 1st of any calendar year, Operator shall have the right to terminate its maintenance obligation with respect to the Common Area located on the Tract of the disapproving Approving Party by written notice prior to December 10th. If the notice is given, then such Approving Party shall maintain and operate the Common Area on its Tract and the Operator shall maintain and operate the balance of the Common Area, commencing on the following January 1st. If the notice is not given, and the Party that owns such Tract does not give notice under 4.2(G) of its intent to become a Self-Maintenance Party (as hereinafter defined), then Operator shall continue to maintain and operate the Common Area for the next calendar year.

Operator shall use its diligent, good faith efforts to operate and maintain the Common Area of the Shopping Center in accordance with the Budget. Notwithstanding the foregoing, Operator shall have the right to make emergency repairs to the Common Area to

- 20 -

VOL     PAGE

1136    199

prevent injury or damage to person or property, it being understood that Operator shall nevertheless advise each Party of such emergency condition as soon as reasonably possible, including the corrective measures taken and the cost thereof. If the cost of the emergency action exceeds $10,000.00 (per emergency) in Constant Dollars then Operator may submit a supplemental billing to each Party, together with evidence supporting such payment, and each Party shall pay its share thereof within thirty (30) days; if the cost limitation set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs at the year end.

(D)      Common Area Maintenance Costs and the Administration Fee shall be allocated as follows:

         (a)     To the Developer Tract     21%

         (b)     To the Target Tract     51%

         (c)     To the Albertson's Tract     28%

         In the event an existing Tract is divided, the Party causing such division shall prorate the allocation attributable to the existing Tract between the newly created Tracts, file a recorded declaration confirming such allocation and deliver a copy of such declaration to the Operator and each other Party. Each Party shall pay to the Operator in equal monthly payments, in advance, its share of the Common Area Maintenance Costs and the Administrative Fee based either upon the amount set forth in the approved Budget, or if a Budget is not approved, then the lesser of the amount set forth in the unapproved Budget or the monthly payment established for the prior year. The Operator shall reasonably estimate such costs for the partial year during which its maintenance obligations commence and each Party shall make its first payment in the month following Operator's undertaking of such maintenance and repair of the Common Area. Within 45 days after the end of each calendar year, Operator shall provide each Party with a statement certified by an authorized Person, together with supporting invoices and other materials setting forth the actual Common Area Maintenance Costs paid by it for the operation and maintenance of such Common Area, the Administration Fee, and such Party's share of the aggregate thereof. If the amount paid by a Party for such calendar year shall have exceeded its share, Operator shall refund the excess to such Party at the time such certified statement is delivered, or if the amount paid by a Party for such calendar year shall be less than its share, such Party shall pay the balance of its share to Operator within 30 days after receipt of such certified statement; provided, however, that the balance of a Party's share shall not exceed five percent (5%) of its budgeted share without its prior written approval except for emergency expenses.

         Within two years after receipt of any such certified statement, each Party shall have the right to audit Operator's books and records pertaining to the operation and maintenance of the Common Area for the calendar year covered by such certified statement; the Party shall notify Operator of its intent to audit at least fifteen (15) days prior to the designated audit date. In the event that such audit shall disclose any error in the determination of the Common Area Maintenance Costs, the Administration Fee or in the allocation thereof to a Tract, an appropriate adjustment shall be made forthwith. The cost of any audit shall be assumed by the auditing

- 21 -

VOL      PAGE

1136      200

Party unless such Party shall be entitled to a refund in excess of three percent (3%) of the amount calculated by Operator as its share for the calendar year, in which case Operator shall pay the cost of such audit.

(E)    Operator agrees to defend, indemnify and hold each Party harmless from and against any mechanic's, materialmen's and/or laborer's liens, and all costs, expenses and liabilities in connection therewith, including reasonable attorney's fees and court costs, arising out of the maintenance and operation by Operator of the Common Area, and in the event that any Tract shall become subject to any such lien, Operator shall promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting such bond or other security as shall be required by law to obtain such release and discharge.

(F)    In the event any of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided that no Party shall be required to expend more than $250,000 in Constant Dollars in excess of insurance proceeds which may be available (or which would have been available except for elections relating to deductibles or self-insurance for which the Party shall be responsible to contribute) for such repair or restoration. Notwithstanding the limitation set forth in the preceding sentence, a Party may require another Party to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of such sum. Except to the extent limited by 5.4(D), in the event such damage or destruction of Common Area is caused in whole or in part by another Party or a third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution or damages.

(G)    Target, Developer, Albertson's and each Party that is the owner of an Outparcel (each a "Self-Maintenance Party") shall each have the right, upon giving not less than sixty (60) days' written notice to Operator, to take over and assume the maintenance of the Common Area upon the Tract or Outparcel owned by such Self-Maintenance Party. Following the effective date of such assumption, such Self-Maintenance Party shall maintain the Common Area on its Tract or Outparcel, and shall pay all costs and expenses incurred in connection therewith; provided, however, Operator shall continue to maintain the Common Utility Lines of the Shopping Center (including, without limitation, the Detention Pond) regardless of location, shall continue to maintain the Common Area security program, if any, and shall continue to insure the Common Area on the Tract or Outparcel of such Self-Maintenance Party under the Operator's Common Area public liability insurance program if such Self-Maintenance Party elects to participate therein by written notice to the Operator. Upon such assumption, such Self-Maintenance Party shall be released from the obligation to contribute towards Operator's maintenance and operation of the balance of the Common Area, except with respect to those functions identified above for which continued participation is mandatory or elected including, without limitation, any "phased" work which was approved by the Self-Maintenance Party or its predecessor in title; such Self-Maintenance Party's share of such costs shall be paid in accordance with the allocation set forth in 4.2 (D)(i) above. Operator shall continue to maintain the balance of the Common Area in accordance with the standards set forth herein.

- 22 -

VOL      PAGE

1136      201

Such Self-Maintenance Party shall have the right to cause the Operator to resume the operation and maintenance of its Common Area upon the satisfaction of the following conditions:

(i)     It shall give the Operator at least sixty (60) days' prior notice of its intention to have the Operator reassume the operation and maintenance of its Common Area; provided however, such date for reassumption shall always be the first day of a calendar quarter; and

(ii)    Prior to the date established for Operator to reassume the maintenance and operation thereof, such Self-Maintenance Party shall, at its sole cost and expense, cause the Common Area on its Tract or Outparcel to be at least equal to the same condition of maintenance then existing on the other portions of the Common Area then being maintained by the Operator.

Provided the above conditions are satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area located on such Self-Maintenance Party's Tract or Outparcel and such Self-Maintenance Party shall be responsible for its share of the costs and expenses of Operator's performance as set forth in (D) above.

4.3     Building Improvements and Outside Sales Area.

(A)     After completion of construction, each Party covenants and agrees to maintain and keep the exterior portion of the Buildings and Outside Sales Area, if any, located on its Tract in first-class condition and state of repair, in compliance with all governmental laws, rules, regulations, orders, and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this OEA. Each Party further agrees to store all trash and garbage in adequate containers, to locate such containers so that they are not readily visible from the parking area, and to arrange for regular removal of such trash or garbage.

(B)     In the event any of the Buildings are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such Building is located shall, subject to governmental regulations and/or insurance adjustment delays, immediately remove the debris resulting from such event and provide a slightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the Building so damaged to a complete unit, such repair or restoration to be performed in accordance with all provisions of this OEA, or (ii) erect another Building in such location, such construction to be performed in accordance with all provisions of this OEA, or (iii) demolish the damaged portion and/or the balance of such Building and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement Building is erected. Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one of such alternatives. Such Party shall give notice to each other Party within ninety (90) days from the date of such casualty of which alternative it elects.

- 23 -

VOL      PAGE

1136     202

## ARTICLE V
### OPERATION OF THE SHOPPING CENTER

5.1    Uses.

(A)    The Shopping Center shall be used only for retail sales, offices, Restaurants or other commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerages, title company and escrow offices, travel and insurance agencies, and medical, dental and legal clinics. All Retail Office and/or Business Office uses on the Developer Tract shall be located in Developer Tract 2 and Developer Tract 6, and not more than twelve thousand (12,000) square feet of the total Floor Area thereof shall be used for Retail Office and/or Business Office purposes; provided, however, that (i) no more than two (2) such office uses shall be located on Developer Tract 2 (each of which shall be limited to three thousand (3,000) square feet of Floor Area) and (ii) office space used by an Occupant for administrative purposes, and which is not open to the general public shall not be considered office space for the purpose of this limitation.

(B)    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

(i)     Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any Building in the Shopping Center;

(ii)    Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(iii)   Any "second hand" store or "surplus" store;

(iv)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(v)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any Building);

(vi)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(vii)   Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate

- 24 -

VOL     PAGE
1136    203

consumer as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(viii)  Any automobile, truck, trailer or recreational vehicles sales, leasing, display or body shop repair operation;

(ix)    Any bowling alley or skating rink;

(x)     Any movie theater or live performance theater;

(xi)    Any living quarters, sleeping apartments, or lodging rooms;

(xii)   Any veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

(xiii)  Any mortuary or funeral home;

(xiv)   Any establishment selling or exhibiting pornographic materials or drug-related paraphernalia or which exhibits either live or by other means, to any degree, nude or partially clothed dancers or wait staff and/or any massage parlors or similar establishments;

(xv)    Any bar, tavern, Restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business;

(xvi)   Any health spa, fitness center or workout facility;

(xvii)  As to Developer Tract 1, Developer Tract 2 and Developer Tract 8, any automotive maintenance or repair facility and any self-service or unenclosed car wash;

(xviii) Any flea market, amusement or video arcade, game parlor, pool or billiard hall, car wash, or dance hall;

(xix)   Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(xx)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines, video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply

- 25 -

to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant.

(C)    No Party shall use, or permit the use of Hazardous Materials on, about, under or in its Tract, or the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. Each Party shall indemnify, protect, defend and hold harmless the other Parties from and against all claims, suits, actions, demands, costs, damages and losses of any kind, including but not limited to costs of investigation, litigation and remedial response, arising out of any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

For the purpose of this paragraph (C), the term (i) "Hazardous Materials" shall mean: petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean: all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

(D)    No merchandise, equipment or services, including but not limited to vending machines, promotional devises and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided however, that the foregoing prohibition shall not be applicable to (i) the storage of shopping carts on the Target Tract and Albertson's Tract; (ii) the seasonal display and sale of bedding plants on the sidewalk in front of any Building located on the Target Tract and Albertson's Tract, (iii) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties which may be withheld in their sole and absolute discretion, (iv) any recycling center required by law, the location of which shall be subject to the approval of the Approving Parties, (v) the sale (including sales by vending machines) by Target on the sidewalk in front of the Building on the Target Tract of merchandise typically sold on sidewalks by similar Target stores in Texas, (vi) the sale (including sales by vending machines) by Albertson's on the sidewalk in front of the Building on the Albertson's Tract of merchandise typically sold on sidewalks by similar Albertson's stores in Texas or (vii) any designated Outside Sales Area (provided, however, sales of merchandise from any designated Outside Sales Area shall be limited to not more than four (4) occasions per calendar year per Tract for a cumulative total of not more than sixty (60) days duration per calendar year per Tract).

(E)    The following use and occupancy restrictions shall be applicable to the Developer Tract:

(i)    No Restaurant shall be located on Developer Tract 1 or Developer Tract 8;

(ii)    No toy store exceeding ten thousand (10,000) square feet of Floor Area shall be permitted;

- 26 -

(iii)   No drug store (which shall be defined as any store which sells or offers for sale any ethical pharmaceutical products requiring the services of a registered pharmacist) shall be permitted;

(iv)   No supermarket (which shall be defined as a store or department containing at least 5,000 square feet of floor area, including aisle space and storage, primarily devoted to the sale of food for off-premises consumption) shall be permitted; and no part of the Developer Tract, except for Developer Tract 6 and/or Developer Tract 7, shall be used as a bakery or delicatessen, or for the sale of fresh or frozen meat, fish, poultry or produce for off-premises consumption; provided, however, the incidental sale of bakery and/or delicatessen items by a sit-down restaurant on Developer Tract 5 shall be permitted; and

(v)   No Restaurant shall be located on Developer Tract 2 which (a) contains more than 8,000 square feet of floor area, or (b) contains more than 6,500 square feet of floor area if its projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds ten percent (10%) of the gross revenues of such Restaurant or (c) contains more than 5,000 square feet of floor area if its projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds twenty percent (20%) of the gross revenues of such Restaurant.   In addition, no customer entrance to such a Restaurant located on Developer Tract 2 may be located on the south wall of such Restaurant but this provision shall not prohibit a diagonal corner door on the southwest corner of such Restaurant.

(F)   The names "Target" and "Albertson's" shall not be used to identify the Shopping Center or any business or trade conducted on the Developer Tract. Until the Approving Parties agree upon a name change, the Shopping Center shall be called "Steger Towne Crossing."

(G)   Except to the extent required by law, no Permittee shall be charged for the right to use the Common Area; for the purpose of this provision, a tax assessment or other form of charge applicable to parking spaces or parking lots may be deemed by the Approving Parties an imposition required by law.

(H)   Each Party shall use its best efforts to cause the employees of the Occupants of its Tract to park their vehicles only on such Tract.

(I)   This OEA is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate, or cause to be operated a business or any particular business at the Shopping Center or on any Tract.

(J)   Target, Albertson's and Developer each covenant with respect to the land depicted on the Site Plan as "Phase II" and located between Steger Towne Drive on the north, F.M. 740 Ridge Road on the west, F.M. 3097 Horizon Road on the south and "New Road In 110' Row" on the east ("Phase II") that should either Developer, Target, Albertson's or their respective

- 27 -

successors or assigns, or an affiliate of Developer, Target, Albertson's or their respective successors or assigns, acquire all or a portion of Phase II (each such party being an "Acquiring Party"), then (i) the portion of Phase II acquired by the Acquiring Party shall thereafter be restricted from being used as a "general merchandise store", and as a "supermarket" and "drug store" as defined in (E) above, and (ii) the Acquiring Party shall record a memorandum of this restriction against such portion of Phase II in the Real Property Records of Rockwall County, Texas.

5.2    Lighting.

(A)    After completion of the Common Area lighting system on its Tract, each Party hereby covenants and agrees to keep its Tract fully illuminated each day from dusk to at least 11:00 p.m. unless the Approving Parties agree upon a different time. Each Party further agrees to keep any exterior Building security lights, plus each of the lights located on the light standards located adjacent to any main access drive or entry into the Shopping Center, on from dusk until dawn. During the term of this OEA, each Party grants an irrevocable license to each other Party for the purpose of permitting the lighting from one Tract to incidentally shine on the adjoining Tract.

(B)    It is recognized that Occupants within the Shopping Center may be open for business at different hours, and that a Party may wish to have the Common Area lights on another Tract to be illuminated before or after the required period. Accordingly, a Party ("Requesting Party") shall have the right, at any time to require another Party ("Requested Party") to keep its Common Area lights operating as stipulated by the Requesting Party; provided that the Requesting Party notifies the Requested Party of such request not less than fifteen (15) days in advance. The Requesting Party shall state the period during which it wishes the lights to be kept operating and shall pay to the Requested Party a prepayment as follows:

(i)    If the period is less than thirty (30) days, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower), as estimated by the Requested Party; or

(ii)    If the period is greater than or equal to thirty (30) days, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower) for thirty (30) days, as estimated by the Requested Party. If the period is greater than thirty (30) days, then the Requesting Party shall renew such prepayment at the end of each thirty (30) day period.

The Requesting Party agrees to pay one hundred ten percent (110%) of the cost to the Requested Party of electrical power to provide such extra-hours illumination, and the prepayment shall be applied to such obligation as incurred. If the Requested Party is of the opinion that the prepayment made by the Requesting Party does not cover one hundred ten percent (110%) of such costs, then the Requesting Party and Requested Party shall attempt to agree to the cost of such electrical power and if they cannot do so, then the amount the Requesting Party is obligated to pay shall be determined from the power costs as estimated by

- 28 -

VOL        PAGE

1136       207

the electrical utility company furnishing such power, or if the utility fails to do so, by a reputable engineer. Upon the failure of a Requesting Party to pay the aforesaid amount or renew a prepayment as required hereby, the Requesting Party shall have the right to discontinue such additional lighting and to exercise other remedies herein provided. Any such request for additional lighting may be withdrawn or terminated at any time by written notice from the Requesting Party, and a new request or requests for changed hours may be made from time to time.

(C)   As an alternative to the process of lighting another's Tract as set forth in (B) above, a Party ("Constructing Party") may install, with the consent of the affected Party ("Consenting Party"), a secondary wiring system, from the Constructing Party's Tract to the light standards on the Consenting Party's Tract, which would permit a portion or all of the lighting on the Consenting Party's Tract to be operated contemporaneously with the lighting on the Constructing Party's Tract. All costs and expenses associated with the installation, maintenance, replacement, and operation of such secondary wiring, including the cost of energy to light any portion of the Consenting Party's Tract, shall be assumed and promptly paid by the Constructing Party. The Constructing Party shall submit to the Consenting Party appropriate plans and specifications for the installation of such secondary wiring systems. The Consenting Party shall have thirty (30) days to approve or disapprove of such submission, such approval not to be unreasonably withheld. If the Consenting Party does not disapprove of the submission within the 30-day period, approval shall be deemed given; if disapproval is given, the Constructing Party shall revise the submission to accommodate the reasonable objections of the Consenting Party and then may resubmit such plans and specifications to the Consenting Party for its approval.

5.3   Occupant Signs.

(A)   No freestanding sign shall be permitted within the Shopping Center unless constructed in areas designated on the Site Plan, and only one such sign may be located in each designated area. The freestanding signs at the Shopping Center shall be constructed substantially as shown on the pylon sign schematic drawings attached hereto as Exhibit E and shall be utilized as follows:

(i)    "Shared Pylon Sign #1" may be used to identify Target and Albertson's and no more than two (2) Occupants of the Developer Tract or, if acquired by Developer, Phase II; and

(ii)   "Shared Pylon Sign 2" may be used to identify Target and Albertson's and no more than one (1) Occupant of the Developer Tract or, if acquired by Developer, Phase II. In addition, Shared Pylon Sign 2 may contain a "reader board" which may be used to identify up to four (4) Occupants of the Developer Tract or, if acquired by Developer, Phase II.

The designation of a freestanding sign location on a Tract shall in no way obligate the benefiting Party(ies) to construct such freestanding sign. However, if a freestanding sign is constructed, the benefiting Party(ies) shall be responsible for the sign's operation and maintenance on a first-class basis, and each Party having a sign panel thereon shall maintain

- 29 -

VOL      PAGE

1136      208

such panel at its expense. The cost and expense of maintenance of the sign structure (but not the individual sign cans and sign panels) and the operation of the sign shall be shared prorata (i.e., each Party's prorata share shall equal the quotient obtained by dividing the total square footage of such Party's sign panel(s) by the total square footage of all sign panels on such sign) amongst each of the Parties having a sign panel thereon. The Approving Parties shall have the right to approve the design and size of all freestanding signs, including the panel inserts; provided, however, it is agreed that Target, Albertson's and any Occupant of more than sixty thousand (60,000) square feet of Floor Area shall have the unqualified right to use in the panel or space allocated to it on any freestanding sign its standard prototype identification as the same exists from time to time.

(B)    Any Occupant occupying less than twenty-five thousand (25,000) square feet of Floor Area may have only one (1) identification sign placed on the exterior of the Building it occupies; provided however, that if any such Occupant is located at the corner of a Building, then such Occupant may have an identification sign on each side of such corner. Any Occupant occupying at least twenty-five thousand (25,000) square feet of Floor Area may have more than one identification sign placed on the exterior of the Building it occupies.

No Occupant identification sign attached to the exterior of a Building shall be:

(i)    placed on canopy roofs extending above the Building roof, placed on penthouse walls, or placed so as to project above the parapet, canopy, or top of the wall upon which it is mounted;

(ii)    placed at any angle to the Building; provided, however, the foregoing shall not apply to any sign located under a sidewalk canopy if such sign is at least eight (8) feet above the sidewalk;

(iii)    painted on the surface of any Building;

(iv)    flashing, moving or audible signs;

(v)    signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers; or

(vi)    paper or cardboard signs, temporary signs (exclusive of contractor signs), stickers or decals; provided, however, the foregoing shall not prohibit the placement at the entrance of each Occupant's space a small sticker or decal, indicating hours of business, emergency telephone numbers, acceptance of credit cards, and other similar bits of information.

No Occupant of less than sixty thousand (60,000) square feet of Floor Area other than Albertson's shall have an exterior sign which identifies leased departments, and/or concessionaires operating under the Occupant's business or trade name, nor, shall such sign identify specific brands or products for sale or services offered within a business establishment, unless such identification is used as part of the Occupant's trade name; provided, however, Albertson's and each such Occupant of sixty thousand (60,000) or more square feet of Floor

- 30 -

VOL      PAGE

1136      209

Area shall be limited to a maximum of three (3) such signs unless otherwise approved in writing by the Approving Parties.

(C)    Notwithstanding anything above to the contrary, each Party shall be permitted to place within the Common Area located on its Tract directional signs or informational signs such as "Handicapped Parking", the temporary display of leasing information and the temporary erection of one sign identifying each contractor working on a construction job.

5.4    Insurance.

(A)    During the period the Operator is maintaining the Common Area, Operator shall maintain or cause to be maintained in full force and effect Commercial General Liability Insurance covering the Common Area of the Shopping Center with a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one occurrence; each Party shall be an "additional insured" under such policy.  It is the agreement of the Parties that the insurance maintained by Operator shall be primary insurance and not contributory with the insurance maintained by the Parties pursuant to (B) below, or any other insurance maintained by the Parties.

Operator covenants to defend, protect, indemnify and hold harmless each Party and its respective directors, officers, agents, representatives and employees from and against all claims, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities (including reasonable attorneys' fees and cost of suit) asserted or incurred in connection with or arising as a result of the death of, or any injury, loss or damage whatsoever to any Person, or to the property of any Person, as shall occur due to the performance or failure to perform by Operator of its duties or obligations under this Agreement with respect to the maintenance and operation of the Common Area, except for claims caused by the sole negligence or by the willful act or omission of the indemnified Party or its directors, officers, contractors, licensees, concessionaires, agents, representatives or employees.

If any Party is operating and maintaining the Common Area on its Tract, such Party covenants to defend, indemnify and hold the other Parties harmless in identical fashion to that required of Operator in the immediately preceding paragraph; in addition, if such Party elects not to continue to participate in Operator's insurance program regarding the Common Area, then (a) such Party shall maintain or cause to be maintained at least the insurance coverage required above, and (b) Operator shall be released from its obligation to carry such insurance on such Party's Tract.

(B)    Except to the extent coverage is provided by the insurance required to be maintained under (A) above, each Party (as to its Tract only) shall maintain or cause to be maintained in full force and effect Commercial General Liability Insurance with a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one occurrence; the other Parties shall be "additional insureds" under such policy as it applies to the insuring Party's Tract.

- 31 -

VOL        PAGE
1136       210

Each Party ("Indemnitor") covenants and agrees to defend, protect, indemnify and hold harmless each other Party ("Indemnitee") from and against all claims, including any action or proceedings brought thereon, and all costs, losses, expenses and liability (including reasonable attorney's fees and cost of suit) arising from or as a result of the injury to or death of any Person, or damage to the property of any Person occurring in or arising out of the use of the Tract owned by such Indemnitor, except for claims caused by the negligence or willful act or omission of such Indemnitees, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof.  Each Indemnitee agrees to look first to the insurance coverage provided for in (A) above, and to exhaust all limits thereof before making any claim, other than to preserve rights if coverage under (A) is inadequate, under the insurance carried by a Party hereunder.

(C)    Prior to commencing any construction activities within the Shopping Center, each Party and Operator shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages in Constant Dollars set forth below:

(i)    Workers' compensation and employer's liability insurance:

(a)    Worker's compensation insurance as required by any applicable law or regulation.

(b)    Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(ii)    General liability insurance:    Comprehensive General Liability or Commercial General Liability insurance covering all operations by or on behalf of the Contractor, which shall include the following minimum limits of liability and coverages:

(a)    Required coverages:

(1)    Premises and Operations,
(2)    Products and Completed Operations;
(3)    Contractual Liability, insuring the indemnity obligations assumed by Contractor under the Contract Documents,
(4)    Broad Form Property Damage (including Completed Operations),
(5)    Explosion, Collapse and Underground Hazards, and
(6)    Personal Injury Liability.

- 32 -

| VOL | PAGE |
|-----|------|
| 1136 | 211 |

(b) Minimum limits of liability:

    (1)    If the Contractor carries Comprehensive General Liability, the limits of liability shall not be less than a Combined Single Limit for bodily injury, property damage and Personal Injury Liability of:

        a.    $1,000,000 each occurrence,

        b.    $2,000,000 aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the Work),

    (2)    If the Contractor carries Commercial General Liability, the limits of liability shall not be less than:

        a.    $1,000,000 each occurrence (for bodily injury and property damage)

        b.    $1,000,000 for Personal Injury Liability,

        c.    $2,000,000 aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the Work),

        d.    $2,000,000 general aggregate applying separately to this Project.

(iii)    Automobile Liability Insurance: Any automobile liability insurance (bodily injury and property damage liability) including coverage for owned, hired, and non-owned automobiles. The limits of liability shall not be less than $2,000,000 combined single limit each accident for bodily injury and property damage combined. If the Contractor's general liability insurance is provided by the Commercial General Liability policy, then the Contractor shall require each of his Subcontractors to include in their liability insurance policies coverage for Automobile Contractual Liability.

(iv)    Umbrella/Excess Liability Insurance: The Contractor shall also carry umbrella/excess liability insurance in the amount of $5,000,000. If there is no per project aggregate under the Commercial General Liability policy, the limit shall be $10,000,000.

    If the construction activity involves the use of another Party's Tract, then the owner of such Tract shall be an additional insured and such insurance shall provide that the same shall not be canceled, or reduced in amount or coverage below the requirements of this OEA, without at least thirty (30) days prior written notice to the named insureds and each additional insured. If such insurance is canceled or expires then the constructing Party shall immediately

- 33 -

VOL    PAGE

1136    212

stop all work on or use of the other Party's Tract until either the required insurance is reinstated or replacement insurance obtained.

    (D)    Effective upon the commencement of construction of any Building on its Tract and so long as such Building exists, a Party shall carry, or cause to be carried, property insurance with "extended" or "all-risk" coverage, in the amount of 100% of full replacement cost thereof (excluding footings, foundations or excavations).

    Each Party (the "Releasing Party") hereby releases and waives for itself, and each Person claiming by, through or under it, to the extent it can legally do so, each other Party (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type covered by the insurance required to be maintained under 5.4(D), irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required or actually carried, including any deductible or self insurance reserve. Each Party agrees to use its reasonable efforts to obtain, if needed, appropriate endorsements to its policies of insurance with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given. Each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless each other Party ("Indemnitee") from and against all claims asserted by or through any Permittees of the Indemnitor's Tract for any loss or damage to the property of such Permittee located upon the Indemnitor's Tract, which loss or damage is covered by the insurance required to be maintained under 5.4(D), irrespective of any negligence on the part of the Indemnitee which may have contributed to or caused such loss.

    (E)    All insurance required by 5.4 (other than self-insurance permitted by this paragraph) shall be procured from companies authorized to do business in the state where the Shopping Center is located and shall be rated by Best's Insurance Reports not less than A/X. Exclusive of the insurance referenced in (C) above, all insurance may be provided under (i) an individual policy covering this location, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such Party; provided, however, that if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than $20,000,000 in Constant Dollars, then such insuring Party shall also maintain excess liability coverage necessary to establish a total liability insurance limit of $20,000,000 in Constant Dollars, (iii) a plan of self-insurance, provided that any Party so self-insuring notifies the other Parties of its intent to self-insure and agrees that upon request it shall deliver to such other Parties each calendar year a copy of its annual report that is audited by an independent certified public accountant which discloses that such Party has $100,000,000 in Constant Dollars or more of net current assets, or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with 5.4, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed $50,000.00 in Constant Dollars unless such Party complies with the requirements regarding self-insurance pursuant to (iii) above. Each Party and Operator agrees to furnish to any Party requesting the same, a certificate(s) of insurance, or statement of self-insurance, as the case may be, evidencing that the insurance required to be carried by such Person is in full force and effect.

- 34 -

VOL            PAGE

1136         213

The insurance required pursuant to (A) and (B) above shall include the following provisions:

    (i)    shall provide that the policy may not be canceled or reduced in amount or coverage below the requirements of this OEA, without at least thirty (30) days prior written notice by the insurer to each insured and to each additional insured;

    (ii)    shall provide for severability of interests;

    (iii)    shall provide that an act or omission of one of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other insureds; and

    (iv)    shall provide for contractual liability coverage with respect to the indemnity obligation set forth herein.

    5.5    <u>Taxes and Assessments</u>.  Each Party shall pay, or cause to be paid prior to delinquency, all taxes and assessments with respect to its Tract, the Building, and other improvements located thereon, and any personal property owned or leased by such Party in the Shopping Center; provided, however, that all taxes and assessments levied against Developer Tract 8 shall, so long as the Detention Pond exists thereon for the benefit of the Shopping Center, be a Common Area Maintenance Cost which shall be allocated amongst the Parties as a Common Area Maintenance Cost once same has been paid by the Owner of Developer Tract 8 or, if an Operator currently exists, by the Operator; and, further provided that if the taxes or assessments or any part thereof may be paid in installments, the Party may pay each such installment as and when the same becomes due and payable.  Nothing contained in this subsection shall prevent any Party from contesting at its cost and expense any such taxes and assessments with respect to its Tract in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith.  At the time as such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all such taxes and assessments determined to be owing, together with all interest, penalties and costs thereon.

    5.6    <u>Liens</u>.  In the event any mechanic's lien is filed against the Tract of one Party as a result of services performed or materials furnished for the use of another Party, the Party permitting or causing such lien to be so filed agrees to cause such lien to be discharged within fifteen (15) days after the entry of a final judgment (after all appeals) for the foreclosure of such lien and further agrees to indemnify, defend, and hold harmless the other Party and its Tract against liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees and cost of suit) on account of such claim of lien.  Upon request of the Party whose Tract is subject to such lien, the Party permitting or causing such lien to be filed agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge. Nothing herein shall prevent a Party permitting or causing such lien from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence. In the event such contest is determined adversely (allowing

- 35 -

VOL        PAGE

1136       214

for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs, or other charges necessary to release such lien.

ARTICLE VI
MISCELLANEOUS

6.1    Default.

(A)    The occurrence of any one or more of the following events shall constitute a material default and breach of this OEA by the non-performing Party (the "Defaulting Party"):

(i)    The failure to make any payment required to be made hereunder within ten (10) days of the due date, or

(ii)    The failure to observe or perform any of the covenants, conditions or obligations of this OEA, other than as described in (i) above, within thirty (30) days after the issuance of a notice by another Party (the Non-Defaulting Party") specifying the nature of the default claimed.

(B)    With respect to any default under (A)(ii) above, any Non-Defaulting Party shall have the right, but not the obligation, to cure such default by the payment of money or the performance of some other action for the account of and at the expense of the Defaulting Party; provided, however, that in the event the default shall constitute an emergency condition, the Non-Defaulting Party, acting in good faith, shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter. To effectuate any such cure, the Non-Defaulting Party shall have the right to enter upon the Tract of the Defaulting Party (but not into any Building) to perform any necessary work or furnish any necessary materials or services to cure the default of the Defaulting Party. Each Party shall be responsible for the default of its Occupants. In the event any Non-Defaulting Party shall cure a default, the Defaulting Party shall reimburse the Non-Defaulting Party for all costs and expenses incurred in connection with such curative action, plus interest as provided herein, within ten (10) days of receipt of demand, together with reasonable documentation supporting the expenditures made.

(C)    Costs and expenses accruing and/or assessed pursuant to 6.1(B) above shall constitute a lien against the Defaulting Party's Tract. The lien shall attach and take effect only upon recordation of a claim of lien in the office of the Recorder of the County of the State in which the Shopping Center is located, by the Party making the claim. The claim of lien shall include the following:

(i)    The name of the lien claimant;

(ii)    A statement concerning the basis for the claim of lien and identifying the lien claimant as a curing Party;

- 36 -

VOL       PAGE

1136      215

(iii)  An identification of the owner or reputed owner of the Tract or interest therein against which the lien is claimed;

(iv)  A description of the Tract against which the lien is claimed;

(v)  A description of the work performed which has given rise to the claim of lien and a statement itemizing the amount thereof; and

(vi)  A statement that the lien is claimed pursuant to the provisions of this OEA, reciting the date, book and page of recordation hereof. The notice shall be duly verified, acknowledged and contain a certificate that a copy thereof has been served upon the Party against whom the lien is claimed, by personal service or by mailing pursuant to 6.4 below. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any judicial proceedings allowed by law, including without limitation, suit in the nature of a suit to foreclose a mortgage/deed of trust or mechanic's lien under the applicable provisions of the law of the State in which the Shopping Center is located.

(D)  Each Non-Defaulting Party shall have the right to prosecute any proceedings at law or in equity against any Defaulting Party hereto, or any other Person, violating or attempting to violate or defaulting upon any of the provisions contained in this OEA, and to recover damages for any such violation or default. Such proceeding shall include the right to restrain by injunction any violation or threatened violation by another of any of the terms, covenants, or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants, or conditions, it being agreed that the remedy at law for a breach of any such term, covenant, or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate. All of the remedies permitted or available to a Party under this OEA or at law or in equity shall be cumulative and not alternative, and invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy.

6.2    Interest. Any time a Party or Operator shall not pay any sum payable hereunder to another within five (5) days of the due date, such delinquent Party or Operator shall pay interest on such amount from the due date to and including the date such payment is received by the Person entitled thereto, at the lesser of:

(i)  The highest rate permitted by law to be paid on such type of obligation by the Person obligated to make such payment or the Person to whom such payment is due, whichever is less; or

(ii)  3% per annum in excess of the prime rate from time to time publicly announced by Norwest Bank, Minneapolis National Association or its successor.

6.3    Estoppel Certificate. Each Party and Operator agrees that within thirty (30) days after receipt of a written request (which shall not be more frequent than three (3) times during

- 37 -

VOL     PAGE

1136     216

any calendar year) from any other Party or Operator, it will issue to such Person, or its prospective mortgagee or successor, an estoppel certificate stating to the best of the issuer's knowledge that as of such date:

> (i)   whether it knows of any default under this OEA by the requesting Person, and if there are known defaults, specifying the nature thereof;

> (ii)  whether this OEA has been assigned, modified or amended in any way by it and if so, then stating the nature thereof; and

> (iii) whether this OEA is in full force and effect;

Such statement shall act as a waiver of any claim by the Person furnishing it to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide encumbrancer or purchaser for value without knowledge of facts to the contrary of those contained in the statement, and who has acted in reasonable reliance upon the statement. The issuance of an estoppel certificate shall in no event subject the Person furnishing it to any liability for the negligent or inadvertent failure of such Person to disclose correct and/or relevant information (but it shall estop such Person from making assertions contrary to those set forth in the certificate for the period covered by the certificate), nor shall such issuance be construed to waive any rights of the issuer to either request an audit of the Common Area Maintenance Costs for any year it is entitled to do so, or challenge acts committed by other Parties for which approval by the Approving Parties was required but not sought or obtained.

6.4   Notices. All notices, demands and requests (collectively the "notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been given as of the date such notice is (i) delivered to the Party intended, (ii) delivered to the then designated address of the Party intended, (iii) rejected at the then designated address of the Party intended, provided such notice was sent prepaid, or (iv) sent via facsimile so long as the original copy is also sent via (i) or (ii) above on the same day. The initial addresses of the Parties shall be:

| Target: | Dayton Hudson Corporation<br>Target Stores-Real Estate<br>Attn: Property Administration<br>33 S. Sixth Street<br>Minneapolis, MN 55402<br>Fax: (612) 370-6008 |
|---|---|
| Developer: | Steger Towne Crossing, L.P.<br>c/o Weber & Company<br>5025 Arapaho Rd., Suite 400<br>Dallas, Texas 75248<br>Fax: 214/789-2979 |

- 38 -

VOL        PAGE

1136       217

Copy:          Today Towne Crossing, Inc.
               c/o Mr. Eric Brauss
               17400 Dallas Parkway, Suite 216
               Dallas, Texas 75287
               Fax: 214/407-9068

Copy:          Wayne R. Miller, P.C.
               5025 Arapaho Rd., Suite 400
               Dallas, Texas 75248
               Fax: 214/851-6942

To Albertson's:   Albertson's, Inc.
                  P.O. Box 20
                  250 Parkcenter Blvd.
                  Boise, Idaho 03726
                  Attn: Vice President
                        Architecture and Engineering

Operator:      As from time to time designated.

          Upon at least ten (10) days prior written notice, each Person shall have the right
to change its address to any other address within the United States of America.

     6.5    Approval Rights.

     (A)    Nothing contained in this OEA shall limit the right of a Party to exercise its
business judgment, or act, in a subjective manner, with respect to any matter as to which it has
specifically been granted such right, or the right to act in its sole discretion or sole judgment,
whether "objectively" reasonable under the circumstances, and any such exercise shall not be
deemed inconsistent with any covenant of good faith and fair dealing otherwise implied by law
to be part of this OEA; and the Parties intend by this OEA to set forth their entire understanding
with respect to the terms, covenants, conditions and standards pursuant to which their obligations
are to be judged and their performance measured.

     (B)    Unless provision is made for a specific time period, each response to a request
for an approval or consent required to be considered pursuant to this OEA shall be given by the
Person to whom directed within thirty (30) days of receipt. Each disapproval shall be in writing
and, subject to (A) above, the reasons shall be clearly stated. If a response is not given within
the required time period, the requested Party shall be deemed to have given its approval if the
original notice stated in capitalized letters that failure to respond within the applicable time
period will be deemed an approval.

- 39 -

VOL    PAGE
1136    218

(C)    If the Approving Parties' approval is requested, unanimous approval must be given.

6.6    Condemnation.   In the event any portion of the Shopping Center shall be condemned, or conveyed under threat of condemnation, the award shall be paid to the Party owning the land or the improvements taken, and the other Parties hereby waive and release any right to recover any value attributable to the property interest so taken, except that (i) if the taking includes improvements belonging to more than one Party, such as Utility Lines or signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking includes easement rights which are intended to extend beyond the term of this OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantee thereof.   In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA which does not reduce or diminish the amount paid to the Party owning the land or the improvement taken, then the owner of such other property interest shall have the right to seek an award for the taking thereof.   Except to the extent they burden the land taken, no easement or license set forth in this OEA shall expire or terminate based solely upon such taking.

6.7    Binding Effect.   The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the real estate described herein and inure to the benefit of and be binding upon the signatories hereto and their respective successors and assigns who become Parties hereunder.   This OEA is not intended to supersede, modify, amend, or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

6.8    Construction and Interpretation.

(A)    This OEA and the Exhibits hereto contain all the representations and the entire agreement between the Parties with respect to the subject matter hereof.   Any prior negotiations, correspondence, memoranda or agreements are superseded in total by this OEA and Exhibits hereto.   This OEA has been fully negotiated at arms length between the signatories hereto, and after advice by counsel and other representatives chosen by such signatories, and such signatories are fully informed with respect thereto; no such signatory shall be deemed the scrivener of this OEA; and, based on the foregoing, the provisions of this OEA and the Exhibits hereto shall be construed as a whole according to their common meaning and not strictly for or against any Party.

- 40 -

VOL        PAGE
1136        219

(B)    Whenever required by the context of this OEA, (i) the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, terms or matter.

(C)    The captions preceding the text of each article and section are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of this OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

(D)    Invalidation of any of the provisions contained in this OEA, or of the application thereof to any person by judgment or court order shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

(E)    This OEA may be amended by, and only by, a written agreement signed by all of the then current Approving Parties and shall be effective only when recorded in the county and state where the Shopping Center is located; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of, a Party or its Tract without the consent of such Party. No consent to the amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof. Each Party may consider, approve or disapprove any proposed amendment to this OEA in its sole and absolute discretion without regard to reasonableness or timeliness.

(F)    This OEA may be executed in several counterparts, each of which shall be deemed an original. The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one complete document.

6.9    Negation of Partnership. None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint

- 41 -

VOL      PAGE

1136     220

enterprise. Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.10    Not a Public Dedication. Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.11    Excusable Delays. Whenever performance is required of any Person hereunder, such Person shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, or any cause beyond the reasonable control of such Person, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this section shall not operate to excuse any Person from the prompt payment of any monies required by this OEA.

6.12    Mitigation of Damages. In all situations arising out of this OEA, all Parties shall attempt to avoid and mitigate the damages resulting from the conduct of any other Party. Each Party hereto shall take all reasonable measures to effectuate the provisions of this OEA.

6.13    OEA Shall Continue Notwithstanding Breach. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind, or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value as to any part of the Shopping Center. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

6.14    Time. Time is of the essence of this OEA.

6.15    No Waiver. The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder, at law or in equity and shall not be deemed a waiver of

- 42 -

VOL          PAGE

1136          221

any subsequent breach or default in any of such terms, covenants or conditions. No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party and no such waiver shall be implied from any omission by a Party to take action in respect to such default. No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver. One or more written waivers or any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance or the same provision or any other term or provision contained in this OEA.

    6.16   Limitation of Liability.

    (A)    Except as specifically provided below, there shall be absolutely no corporate or personal liability of persons, firms, corporations or entities who constitute a Party hereto, including, but not limited to, officers, directors, employees or agents of a party hereto with respect to any of the terms, covenants, conditions, and provisions of this OEA. In the event of default by a Defaulting Party hereunder (as defined in 6.1) any Non-Defaulting Party (as defined in 6.1) who seeks recovery from a Defaulting Party hereto shall look solely to the interest of such Defaulting Party, its successors and assigns, in the Shopping Center for the satisfaction of each and every remedy of the Non-Defaulting Party; provided, however, the foregoing shall not in any way impair, limit or prejudice the right of any Party:

    (i)    to pursue equitable relief in connection with any term, covenants or condition of this OEA, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance.

    (ii)    to recover from another Party (or its guarantor) all losses suffered, liabilities incurred or costs imposed arising out of or in connection with, or on account of, such Party's (or its guarantor's) breach of its obligation to carry liability insurance, or fund its self insurance obligation pursuant to 5.4 above.

    (iii)    to recover from a Party all damages and costs arising out of or in connection with, or on account of, a breach by such Party of its obligations under 5.1(C).

- 43 -

VOL      PAGE

1136      222

6.17    Sale & Sale-Leaseback Purchaser.    Notwithstanding anything to the contrary contained in this OEA, it is expressly agreed that in the event a Party sells its Tract to an unaffiliated third party and thereafter enters into a net lease for such Tract with such third party or its lessee or sublessee (hereinafter referred to collectively as the "Prime Lessor"), so long as said Party is in possession of the Tract as a Prime Lessee (herein so called), the Parties shall look solely to said Prime Lessee (and said Prime Lessee shall be liable) for the performance of any obligations either the Prime Lessee or the Prime Lessor shall have under this OEA, and the Prime Lessor shall be relieved of any obligations for the performance of or liability for the restrictions (expressly excluding any monetary obligations) set forth herein relating to either the Prime Lessee or its Tract.

ARTICLE VII
TERM

7.1    Term of this OEA.    This OEA shall be effective as of the date first above written and shall continue in full force and effect until 11:59 p.m. on December 31, 2061; provided, however, that the easements referred to in Article II hereof which are specified as being perpetual or as continuing beyond the term of this OEA shall continue in force and effect as provided therein.  Upon termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

ARTICLE VIII
EXCULPATION

8.1    Certain Limitations on Remedies.    None of the Persons comprising a Party (whether partners, shareholders, officers, directors, trustees, employees, beneficiaries or otherwise) shall ever be personally liable for any such judgment obtained against a Party. Each Party agrees to look solely to the interest in the Shopping Center of a defaulting Party for recovery of damages for any breach of this OEA; provided, however, the foregoing shall not in any way impair, limit or prejudice the right of a Party:

- 44 -

VOL PAGE
1136 223

(i) <u>Casualty Insurance and Condemnation Proceeds</u>. To recover from another Party all damages and costs on account of, or in connection with, casualty insurance or condemnation proceeds which are not applied or used in accordance with the terms of this OEA.

(ii) <u>Hazardous Substances</u>. To recover from a Party all damages and costs arising out of or in connection with, or on account of, breach by a Party of its obligations under 5.1(C).

(iii) <u>Liability Insurance</u>. To recover from a Party all loss or damages, and costs arising out of or in connection with, or on account of, breach by a Party of its obligation to carry liability insurance as specified under 5.4.

(iv) <u>Taxes, Assessments and Liens</u>. To recover from a Party all damages and costs arising out of or in connection with, or on account of, the failure by such Party to pay when due any tax, assessment or lien as specified under 5.5.

(v) <u>Fraud or Misrepresentation</u>. To recover from a Party all damages and costs as a result of any fraud or misrepresentation by such Party in connection with any term, covenants, or condition in this OEA.

(vi) <u>Equitable Relief; Costs</u>. To pursue equitable relief in connection with any term, covenant or condition of this OEA, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance.

- 45 -

VOL      PAGE

1136     224

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

"DEVELOPER"

STEGER TOWNE CROSSING, L.P.

By:   STC Rockwall, Inc., a
      Texas corporation, its
      General Partner

      By_____
         John P. Weber
         President

"TARGET"

DAYTON HUDSON CORPORATION

By_____
   Name _____Edward J. German____
   Title _____Vice President____
         _____Target Stores____

"ALBERTSON'S"

ALBERTSON'S, INC.

By_____
   Name_____
   Title_____

- 46 -

VOL     PAGE

1136    225

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

"DEVELOPER"

STEGER TOWNE CROSSING, L.P.

By:     STC Rockwall, Inc., a
        Texas corporation, its
        General Partner

By _____
        John P. Weber
        President

"TARGET"

DAYTON HUDSON CORPORATION

By_____
   Name_____
   Title_____

"ALBERTSON'S"

ALBERTSON'S, INC.

By_____
   Name   WILLIAM H. ARNOLD
   Title   Vice President, Real Estate Law

- 46 -

VOL        PAGE

1136       226

| THE STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |
| | § |

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared John P. Weber known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of STC Rockwall, Inc., a Texas corporation, in its capacity as general partner of Steger Towne Crossing, L.P., a Texas limited partnership, and that he executed the same as the act of said corporation acting as such general partner for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 12th day of ____July____, 1996.

My commission expires:

Notary Public, State of Texas

> JAMES P. LAZAR
> Notary Public, State of Texas
> My Commission Expires 3-22-00

_____

(printed name)

- 47 -

VOL     PAGE

1136    227

| THE STATE OF MINNESOTA | ) |
| --- | --- |
| | ) |
| COUNTY OF HENNEPIN | ) |

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _Edward J. Bierman_____, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Dayton Hudson Corporation, a Minnesota corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _27th_ day of ___June_____, 1996.

_____
Notary Public, State of Minnesota

My commission expires:

_1 - 31 - 2000_____.

_John A Cornell_____
(printed name)

| THE STATE OF IDAHO | ) |
| --- | --- |
| | ) |
| COUNTY OF ADA | ) |

JOHN A CORNELL
NOTARY PUBLIC - MINNESOTA
My commission Expires Jan 31 2000

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _____, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Albertson's, Inc., a Delaware corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the ____ day of _____, 1996.

_____
Notary Public, State of Idaho

My commission expires:

_____.

80366 03815 REALEST 84625

_____
(printed name)

- 48 -

VOL     PAGE

**1136**    **228**

THE STATE OF MINNESOTA    )
                                   )
COUNTY OF HENNEPIN        )

       BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _____, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Dayton Hudson Corporation, a Minnesota corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the ____ day of _____, 1996.

My commission expires:

                                 Notary Public, State of Minnesota

_____.

                                     (printed name)

THE STATE OF IDAHO        )
                          )
COUNTY OF ADA            )

       BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _WILLIAM H. ARNOLD_, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Albertson's, Inc., a Delaware corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _1st_ day of _____July_____, 1996.

[Notary seal: JOSEPHINE M. McDON... NOTARY PUBLIC STATE OF IDAHO]

                     _Josephine M. McDonald_
My commission expires:       Notary Public, State of Idaho
                         _Residing at Nampa, Idaho_
_2-01-99_

80366 03815 REALEST 84625       _JOSEPHINE M. McDONALD_
                               (printed name)

- 48 -

**EXHIBIT A**

LEGAL DESCRIPTION OF TARGET TRACT

Lot 2, Block A, Steger Towne Crossing Phase I Subdivision, a subdivision to the City of Rockwall, Rockwall County, Texas, according to the plat thereof recorded in Cabinet C , Slide 345-346 of the Plat Records of Rockwall County, Texas.

VOL     PAGE
1136    230

**EXHIBIT B**

LEGAL DESCRIPTION OF ALBERTSON'S TRACT

Lot 4, Block A, Steger Towne Crossing Phase I Subdivision, a subdivision to the City of Rockwall, Rockwall County, Texas, according to the plat thereof recorded in Cabinet __C__, Slide 345-346 of the Plat Records of Rockwall County, Texas.

VOL        PAGE

1136        231

**EXHIBIT C**

LEGAL DESCRIPTION OF DEVELOPER TRACT

    Lot 1, Block A, Lot 3, Block A, Lot 5, Block A, Lot 6, Block A, Lot 7, Block A, Lot 8, Block A, and Lot 1, Block B, Steger Towne Crossing Phase I Subdivision, a subdivision to the City of Rockwall, Rockwall County, Texas, according to the plat thereof recorded in Cabinet ___C___, Slide 395-396 of the Plat Records of Rockwall County, Texas.

VOL   PAGE
1136   232

EXHIBIT D
SUBMISSION GUIDELINES

1.  During the conceptual design phase, the constructing party shall submit to the other parties the following:

   A.  Site Design Documents to Indicate the Following:
       o   Parking configurations and car parking count
       o   Typical bay width and stall dimensions
       o   Drive widths
       o   Setbacks
       o   Curb cuts
       o   Spot elevations or rough contours
       o   Rough landscape scope
       o   Lighting pole locations
       o   Preliminary utility strategies

   B.  Building Design Single Line Plans to Indicate the Following:
       o   Exterior wall configuration
       o   Doors and store front extent
       o   Canopies and overhangs
       o   Probable column locations at exterior and abutting our building on interior

   C.  Exterior Elevation Drawings to Indicate the Following:
       o   Opaque wall areas with doors and store fronts

2.  After approval has been granted of conceptual design phase submitted in accordance with the guidelines specified in 1 above, the constructing party shall submit final design phase plans to the other parties as follows:

   A.  Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:
       o   Refined grading plans
       o   Selected lighting fixtures and resultant lighting levels in foot candles
       o   Landscaping showing generic planting materials and locations
       o   Proposed paving section designs and location

-1-

VOL        PAGE

1136        233

o     Utility layouts including hydrants and sizes proposed

o     Proposed details for curbs, site structures, manholes, etc.

o     Proposed site signage designs and locations

B.    Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:

o     Exterior wall thicknesses

o     Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings

o     Where common footings are to be shared provide wall or column load information for design of that footing

o     Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment

o     References of key flashing details of roof to adjoining building

C.    Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:

o     Proposed building sign standards

o     Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

o     Proposed large scale details of key section conditions to show exterior design intent

o     Major penthouses or rooftop equipment profiles

o     Features such as special masonry patterns, bands or special materials and textures

o     Rain leaders or scuppers

o     Wall sections at various exterior locations including at the demising wall to the adjoining building with key vertical dimensioning

3.    If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

-2-

VOL        PAGE
1136       234

- o   Plans of the pedestrian mall circulation showing any variations in floor elevations
- o   Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions
- o   Proposed ceiling design including special features such as variations in height or skylights
- o   Floor material patterns
- o   Landscaping and mall seating areas
- o   Proposed interior sign guidelines
- o   Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)
- o   Proposed large scale details of key section conditions to show interior design intent

4.   The constructing party shall provide the other parties with a complete set of bid documents for the building and/or improvements to be located upon its Tract.

-3-



## EXHIBIT E

| VOL | PAGE |
|---|---|
| 1136 | 235 |



24"   12'-0"   24"

ALLOW 3" FOR SIGNALS



STEGER TOWNE CROSSING

TARGET

Albertsons

**MAJOR TENANT**

**MAJOR TENANT**

2'-0"   6'-0"   5'-0"   3'-6"   3'-6"   0"

28'-0" OAH

SIGN #1
RIDGE RD.
OPTION A



SHARED PYLON - ROCKWALL TX.   264 SQ.FT.

GENERAL SPECIFICATIONS:
CABINETS ARE CONVENTIONAL STYLE CONSTRUCTION,
GALV. ANGLE IRON FRAMES W/ SHEET ALUM. CLADDING.
GRAPHICS ARE ROUTED OUT, BACKED W/ PLEX. AND
INTERNALLY ILLUMINATED W/ FLUORESCENT LAMPS.
SUPPORT COLUMNS ARE COVERED W/ RADIUS END
SHEET ALUM. ENTIRE STRUCTURE IS STUCCO FINISHED
AND ALL COLORS ARE TO BE DETERMINED.

CLIENT: TARGET
LOCATION: ROCKWALL TX
DATE: 4-25-96
DRAWN BY: M.ELLIS

 HEATH

VOL  PAGE
1136  236



24"    12'-0"    24"

SIGN # 2
FREEWAY PYLON

**SHARED PYLON - ROCKWALL TX.   360 SQ.FT.**

GENERAL SPECIFICATIONS:
CABINETS ARE CONVENTIONAL STYLE CONSTRUCTION
GALV. ANGLE IRON FRAME W/ SHEET ALUM. CLADDING.
GRAPHICS ARE ROUTED OUT, BACKED W/ PLEX AND
INTERNALLY ILLUMINATED W/ FL HO LAMPS. SUPPORT
COLUMNS ARE COVERED W/ RADIUS END SHEET ALUM.
STRUCTURE IS STUCCO FINISHED, COLORS TO BE
DETERMINED.

<u>Exhibit E - Page 2</u>

VOL  PAGE
1136  237





EXHIBIT X

SCALE: 1" = 100'-0"
6/26/96

LAWRENCE A. CATES & ASSOC., INC.
14200 MIDWAY RD., STE. 122
DALLAS, TEXAS 75244
(214) 385-2272

VOL     PAGE
1136    239



FUTURE

F.M. 3097 HORIZON ROAD

# EXHIBIT X

SCALE: 1" = 100'-0"
6/26/96

LAWRENCE A. CATES & ASSOC., INC.
14200 MIDWAY RD., STE. 122
DALLAS, TEXAS 75244
(214) 385-2272

| VOL | PAGE |
|------|------|
| 1136 | 240 |



ROAD IN 110' ROW

FUTURE



VOL    PAGE
1136    242



NEW ROAD IN

FUTURE



BUILDING AREA

RETAIL

TARGET
PRIMARY BUILDING AREA

VOL
1136

PAGE
243

OUTSIDE
SALES
AREA

PERMANENT ACCESS DRIVE

TARGET TRACT

STEGER TOWNE DRIVE

EX. FOOD LION

BUILDING
AREA

ACCESS DRIVE

DEVELOPER TRACT 7

DEVELOPER
TRACT 4

DEVELOPER
TRACT 5

DEVELOPER TRACT 6

BUILDING
AREA

BUILDING
AREA

BUILDING
AREA

BUILDING
AREA

FUTURE

FUTURE

SHARED
PYLON SIGN

15' ROW DED.

F.M. 740 RIDGE ROAD

FUTURE
SIGNAL



VOL PAGE
1136 244

DETENTION POND
DEVELOPER TRACT 8

PERMANENT SERVICE DRIVE

TARGET
PRIMARY BUILDING AREA

OUTSIDE
SALES
AREA



| VOL | PAGE |
|-----|------|
| 1136 | 246 |



PERMANENT SERVICE DRIVE

DEVELOPER
TRACT 1

PRIMARY
BUILDING AREA

PI

RETAIL

60'
MIN.

PRIMARY
BUILDING AREA

RETAIL

ALBERTSON'S
PRIMARY
BUILDING AREA

ENT ACCESS DRIVE

VOL    PAGE
1136    247



R:\DWGS\95057\EXHIBITX  Fri Jul 5 09:59:55 1996

VOL 1136 PAGE 248

FILED FOR RECORD 16th DAY OF July, A.D., 1996 at ____M.
RECORDED 18th DAY OF July, A.D., 1996.
PAULETTE BURKS, COUNTY CLERK, ROCKWALL COUNTY, TEXAS.
BY: Carolyn Domer