IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*,[1] | Case No. 24-11967 (JKS) |
| Debtors. | (Jointly Administered) |
| | Related D.I. 1964 |

### OBJECTION OF STEGER TOWNE CROSSING, LP TO NOTICE OF FILING OF EIGHTH POST-CLOSING DESIGNATION NOTICE WITH RESPECT TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE AND PROPOSED CURE

Steger Towne Crossing, LP ("**Landlord**") hereby files this objection ("**Objection**") to the *Notice of Filing of Eighth Post-Closing Designation Noice* [D.I. 1964] (the "**Designation Notice**") filed by the above-captioned debtors and debtors in possession (together, "**Debtors**"). As set forth below, Landlord specifically objects to: (i) the ability of the Lease to be transferred free and clear of certain use restrictions, which are covenants running with the land contained in an operation and easement agreement; (ii) the lack of adequate assurance of future performance based upon the ability of the proposed assignee, Goodwill Industries of Dallas, Inc. ("**Goodwill**"), to comply with certain use restrictions related to the Lease (as defined below) in accordance with 11 U.S.C. §§ 365(f)(2)(B) and 365(b)(3); and (iii) the proposed Cure Amount (defined below). In support of the Objection, Landlord would respectfully show as follows:

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin- Granville Road, Columbus, OH 43081.

55159903.1

**BACKGROUND**

A.      **The OEA and the Lease**

1.      Landlord is the owner of the majority of that certain retail shopping center known and referred to as Steger Towne Crossing, located at 2855 Ridge Road, Rockwall, Texas 75032 (the "**Shopping Center**").  The Shopping Center is owned in three parts: by Landlord, and two other owners of the tracts of land containing the original anchor stores, Target and Albertson's (now Academy Sports and Outdoors).

2.      At the time of the Shopping Center's development, the three landowner parties -- Landlord, Dayton Hudson Corporation ("**Target**") and Albertson's, Inc. ("**Albertson's**" and together with Landlord and Target, the "**Landowner Parties**") -- entered into an Operation and Easement Agreement ("**OEA**") for the purpose of effectuating the common use and operation of their respective tracts of the Shopping Center by making certain covenants and granting one another certain reciprocal easements to permit the Shopping Center to operate as an integrated retail shopping complex.  A true and correct copy of the OEA is attached hereto as **Exhibit A**. The OEA was recorded in the real property records of Rockwall County, Texas on July 16, 1996.

3.      The terms of the OEA constitute covenants running with the land and are binding upon the Landowner Parties and upon each of their respective successors and assigns:

> 6.7    Binding Effect. The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the real estate described herein and inure to the benefit of and be binding upon the signatories hereto and their respective successors and assigns who become Parties hereunder. This OEA is not intended to supersede, modify, amend, or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

*See* Exhibit A at p. 40, ¶ 6.7.

4.      The OEA further contains certain use restrictions that are mutually binding upon the Landowner Parties and their successors and assigns.  Specifically, at section 5.1(B), the OEA

contains a list of uses that are expressly <u>not</u> permitted at the Shopping Center. Among those prohibited uses is "[a]ny 'second hand' or 'surplus' store":

> (B) No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:
>
> (i) Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any Building in the Shopping Center;
>
> (ii) Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;
>
> (iii) Any "second hand" store or "surplus" store;
>
> (iv) Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);
>
> (v) Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any Building);
>
> (vi) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;
>
> (vii) Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate
>
> - 24 -

*See* Exhibit A at p. 24, ¶ 5.1(B)(iii).

5. Effective June 3, 2021, Landlord and Debtor PNS Stores, Inc. (now Big Lots PNS, LLC) ("**Big Lots**") entered into a lease (the "**Lease**") for premises consisting of approximately 36,878 square feet at the Shopping Center (the "**Premises**"). A true and correct copy of the Lease is attached hereto as **Exhibit B**.

6. As set forth below, the Debtors, via the sale of their designation rights to Gordon Brother Retail Partners ("**GBRP**") and its designated buyers ("**Buyers**"), have proposed to assign

the Lease to Goodwill.  Goodwill, by common knowledge, and by its own description on its website, is a "secondhand store."[2]

**B.    The Bankruptcy Cases**

7.    On September 9, 2024 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

8.    On January 2, 2025, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV)  Granting Related Relief* [D.I.. 1556] (the "**Sale Order**").  Pursuant to the Sale Order, the Court approved, among other things, certain procedures by which GBRP might designate certain of the Debtors' unexpired nonresidential real property leases for assumption and assignment to new tenants ("**Designation Rights Procedures**").

9.    On February 10, 2025, the Debtors filed Designation Notice.  The Designation Notice lists the Lease to be assigned to Goodwill and lists the applicable cure amount as $0.00.

10.    As set forth below, the proposed assignment to Goodwill is improper and the Court should not approve it for the following reasons: (i) the Sale Order expressly makes all transfers of real property leases subject to any applicable reciprocal easement agreements, operating agreements or redevelopment agreements, such as the OEA and its use restrictions; (ii) the Debtors

---

[2] *See* https://goodwilldallas.org/about-us/ ("Our Donated Goods program provides employment by offering work through the recycling and reselling of material donations in our stores throughout the community, while keeping millions of pounds of reusable items out of our landfills.")

55159903.1

and Goodwill, as the proposed assignee, cannot demonstrate adequate assurance of future performance in the Shopping Cetner as required under sections 365(f)(2)(B) and 365(b)(3) because it is a "secondhand store" in violation of the use restriction in the OEA; and (iii) the cure amount is inaccurately stated in the Designation Notice as being $0.00, and the Debtors cannot assign the Lease to Goodwill or to any other potential tenant without curing the Lease in full.

## **OBJECTION**

A.  **The Sale Order Expressly Makes the Use Restrictions in the OEA Applicable**

    11.    The Sale Order expressly provides as follows:

> Notwithstanding anything to the contrary in this Sale Order or the APA, the transfer of any nonresidential real property lease shall be (i) solely effective following entry of a further order of this Court (a) authorizing the assumption or assumption and assignment of such nonresidential real property lease pursuant to the terms of this Sale Order and (b) following the payment of the applicable cure costs (if any) on the applicable Closing Date or as soon thereafter as reasonably practicable; (ii) subject to the Designation Rights Procedures set forth in this Sale Order; **and (iii) subject to any easements, reciprocal easement agreements, operating or redevelopment agreements, licenses, permits, dedications, covenants, or other rights applicable to such real estate that run with the land or limit or condition the permitted use of the property (the "Lease Encumbrances") and shall not be free and clear of any such Lease Encumbrances, except to the extent provided in any order approving the assumption and assignment of any such Lease.**

Sale Order at p. 7, ¶ H (emphasis added).  The OEA is specifically the type of "operating or redevelopment agreement" referred to in the Sale Order whose covenants run with the land, and which the transfer of any leasehold property interests cannot be free of, pursuant to the Sale Order. As such, the use restriction prohibiting Landlord (or any of the other Landowner Parties) from allowing the Shopping Center to be used as a secondhand store is not an encumbrance that is removed by the Sale Order, and the Debtors (and Buyers) cannot assign the Lease to a tenant in violation of the OEA's use restriction.

**B.    The Debtors and Goodwill Cannot Demonstrate Adequate Assurance of Future Performance**

12. Even in the absence of the Sale Order's express language, Landlord must be provided with adequate assurance of future performance by the Debtors and Goodwill, as the proposed assignee, under the Lease. 11 U.S.C. § 365(f)(2)(B). Because the Premises is part of a shopping center,[3] Landlord must be provided with adequate assurance of the following:

> A. of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
> B. that any percentage rent due under such lease will not decline substantially;
> C. **that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as** a radius, location, **use**, or exclusivity **provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center**; and
> D. **that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center**.

11 U.S.C. § 365(b)(3) (emphasis added).

13. As noted above, the OEA contains use restrictions that prohibit Landlord from permitting the Premises from being used as, among other things, a secondhand store. The OEA is an agreement "relating to the shopping center" as identified in section 365(b)(3)(C). Because Goodwill is plainly a "secondhand store" that sells donated used goods, Goodwill cannot comply with the use restriction in the OEA, and an assignment to Goodwill will cause the Landlord to be

---

[3] Steger Towne Crossing (where the Premises is located) falls clearly within the classic conception of a shopping center under the Bankruptcy Code. *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1087 (3d Cir. 1990) (describing factors, such as combination of leases held by a single landlord, with tenants engaged in retail operations, the presence of common parking area, existence of a tenant mix, purposeful development as shopping center, sharing costs of maintenance).

6

in breach of the OEA with respect to the other Landowner Parties.[4]  The Landlord should not be forced to accept an assignment that will leave it open to liability.

14. An assignment to Goodwill would also disrupt the tenant mix at the Shopping Center, as the OEA specifies that the use restriction is intended to prohibit uses that are "inconsistent with the operation of a first-class retail shopping center." There being no other secondhand or flea-market-type retailers operating in the Shopping Center, and the OEA's use restriction being intended expressly to prevent such uses, the proposed use of the Premises by Goodwill as secondhand store would inevitably upset the tenant mix at the shopping center. *See* Exhibit A at p. 24, ¶ 5.1(b)(iii).

15. Landlord is aware that this Court recently ruled on January 21, 2025 in this bankruptcy case in favor of a proposed assignment to Burlington Coat Factory Warehouse Corporation ("**Burlington**"), overruling the objections of the landlord and its tenant Ross Stores ("**Ross**") where the landlord and Ross had argued that certain use restriction in the Ross lease should prevent an assignment to Burlington.  *See* **Exhibit C**, Transcript of Hearing before the Honorable J. Kate Stickles, United States Bankruptcy Judge, Tuesday, Jan. 21, 2025, 11:00 a.m. However, the Landlord here believes that its Objection differs in a number of respects:

- The use restriction in the lease at issue in the January 21 hearing (the "**Nolensville Lease**") was just that – a use restriction in a lease.  The OEA is different, and the use restriction against secondhand stores is a covenant running with the land that the leasehold cannot be transferred free of, pursuant to the express language of the Sale Order.

---

[4] It is worth noting that neither Landlord nor any of the other Landowner Parties have waived or violated any of the use restrictions in section 5.1 of the OEA.  A review Landlord's rent roll shows that all tenants are operating businesses that comply with the use restrictions in the OEA.

55159903.1

- The Nolensville Lease was entered into <u>before</u> the Ross lease. The Ross lease was, in the Court's words, a "subsequent lease between a landlord and a third party to which the debtor was not a party." *See* Exhibit C, p. 61, lines 11-13. By contrast, here, the OEA and its use restrictions predate the Lease by nearly 30 years. It was not a subsequent agreement, but an agreement whose restrictions were already in place when Big Lots took possession of the Premises. Indeed, the OEA and its use restrictions had been on file in the real property records since 1996.

- The Court points out that the Nolensville Lease was "freely assignable pursuant to its terms." *See* Exhibit C, p. 59, lines 13-14. This is contrasted with the Lease, which only permits assignment to a "parent, subsidiary or other affiliate of Tenant" or in connection with a merger or sale, which would generally prevent an assignment that violated the use restrictions of the OEA. *See* Exhibit B, p. 21.

- The underlying premise of the Objection is different here. Ross and its landlord wanted to enforce the protections Ross had bargained for to prevent another off-price retailer (Burlington) from operating in the same shopping center. Here, the Landlord is not trying to protect a tenant from perceived competition; rather it is trying to protect itself from becoming the subject of litigation when an assignment to a secondhand store at its Premises places Landlord in direct violation of the OEA's use restriction.

16. Landlord did, in fact, represent and warrant to Big Lots that, "as of the effective date of this Lease, no exclusive covenants granted to existing Shopping Center tenants, or any

covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises." *See* Exhibit B, p.7. However, this representation was specifically based on <u>Big Lots' own use</u>[5] of the Premises – not the use of a future assignee whose use of the Premises the Landlord could not reasonably anticipate. Landlord would have made no such representation to Goodwill, or any other party who proposed to use the Premises in violation of the OEA.[6] Indeed, Big Lots was well aware of the use restrictions in the OEA, having been provided a copy in conjunction with negotiations regarding conforming use of the pylon for its signage at the Shopping Center. *See* **Exhibit D**.

C. **Cure Amount**

17. Section 365(b)(1) of the Bankruptcy Code requires that "[i]f there has been a default in an executory contract . . . of the debtor, the trustee may not assume such contract . . . unless, at the time of assumption of such contract . . ., the trustee . . . cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ." 11 U.S.C. § 365(b)(1).

18. Here, the Designation Notice incorrectly lists the amount necessary to cure the Lease as $0.00. Rather, the correct Cure Amount should be not less than the amount of outstanding unpaid prepetition rent ($8,009.09) plus costs under the Lease that are still being finalized related to the Debtor's failure to maintain utility services and secure the Premises during an adverse weather event ("**Cure Amount**"), as both pre- and post-petition amounts are currently outstanding under the Lease.

---

[5] Big Lots' approved use of the Premises is defined in the Lease as follows: "Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale (including financing and/or leasing) of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), and for similar or related merchandise." *See* Exhibit B, p.7.

[6] The language of the Sale Order, described above, addresses this issue by expressly providing that the Debtors' leases are not transferred free and clear of "Lease Encumbrances" such as those found in the OEA.

19. First, as reflected in claim number 7267 filed by the Landlord on January 31, 2025, there is $8,009.09 in unpaid prepetition rent outstanding under the Lease.

20. There are also post-petition costs arising under the Lease that are related to utilities. Specifically, during the weekend of February 14-16, 2025, the Debtors (or the Buyers) shut off all utilities at the Premises, including the exterior lights and the heat. The following week was predicted to be the coldest of the year in the area, with temperatures reaching a low of 12 degrees by February 20, 2025. For the safety of other tenants, and to protect the plumbing at the Premises, including the fire suppression system, Landlord was forced to scramble to put all of the utilities at the Premises into its own name. Big Lots, as tenant, is obligated to both pay for utility services and to protect the Premises from being "ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair." *See* Exhibit B at p. 7-8. Costs incurred by Landlord with respect to these issues that are still being finalized and are to be borne by the Debtors pursuant to the Lease include the following:

- Locksmith charges to enter the Premises;
- Charges to engage a fire sprinkler specialist to inspect the fire suppression system following the freeze;
- Monthly costs for electricity services now in Landlord's name;
- Use of a temporary pole light to illuminate the parking lot;
- Overtime pay for property management staff; and
- All other costs associated with transitioning the utility services to the Landlord.

21. Any proposed assumption and assignment of the Lease must also account for (i) amounts that come due after the Designation Notice but before the Lease is assumed, and (ii) amounts that accrue *prior* to the assumption and assignment of the Lease but do not come due until *after* assumption and assignment of the Lease, including reconciliations for taxes and CAM, indemnification obligations, expenses incurred as a result of the attempted imposition of a mechanics' lien and attorneys' fees incurred in vindicating the Landlord's rights under the Lease.

10

22. As set forth above, the Landlord strongly disagrees that the Lease may be assigned to Goodwill; however, if the Lease were to be assigned to anyone at all, the Debtors or their designee must cure the Lease in an amount that includes all of the foregoing costs.

## RESERVATION OF RIGHTS

Landlord hereby reserves the right to amend or supplement this Objection to revise the Cure Amount to reflect additional amounts due and owing under the Lease as of the date of any such assumption of the Lease, including but not limited to operating costs, real estate taxes, and insurance.

Landlord hereby reserves any further Objection to the assumption and assignment of the Lease, including with respect to adequate assurance of future performance.

[remainder of page left intentionally blank]

WHEREFORE, Landlord respectfully requests that the Court: (i) refuse to permit the Debtors (or Buyers) from assigning the lease to Goodwill in contravention of the express language of the Sale Order and the OEA; (ii) require the payment of the amounts owed and amounts that will accrue under the Lease as set forth herein as part of the cure of defaults under 11 U.S.C. § 365(b) upon any assumption and assignment of the Lease, and (iii) grant Landlord all such further relief as the Court deems appropriate.

Dated: February 24, 2025
Wilmington, Delaware

**SAUL EWING LLP**

*/s/ Monique B. DiSabatino*
Monique B. DiSabatino (DE Bar No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email: monique.disabatino@saul.com

-and-

**FERGUSON BRASWELL FRASER KUBASTA P.C.**
Rachael L. Smiley (admitted *pro hac vice*)
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Telephone: (972) 826-4457
Email: rsmiley@fbfk.law

*Attorneys for Steger Town Crossing, LP*

55159903.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **BIG LOTS, INC.,** *et al.*, | **Case No. 24-11967 (JKS)** |
| **Debtors.** | **(Jointly Administered)** |

**CERTIFICATE OF SERVICE**

I, Monique B. DiSabatino, hereby certify that on February 24, 2025, I caused a copy of *Objection of Steger Towne Crossing, LP to Notice of Filing of Eighth Post-Closing Designation Notice with Respect to Adequate Assurance of Future Performance and Proposed Cure* to be served electronically with the Court and served through the Court's CM/ECF system upon all registered electronic filers appearing in this case and via Electronic Mail on the parties on the attached service list.

        **SAUL EWING LLP**

    By: */s/ Monique B. DiSabatino*
        Monique B. DiSabatino (DE Bar No. 6027)
        1201 North Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE 19899
        (302) 421-6806

Dated: February 24, 2025

55159903.1

**Service List**

Robert J. Dehney, Sr., Esquire
Andrew R. Remming, Esquire
Daniel B. Butz, Esquire
Tamara K. Mann, Esquire
Casey B. Sawyer, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
rdehney@morrisnichols.com
aremming@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

Brian M. Resnick, Esquire
Adam L. Shpeen, Esquire
Stephen D. Piraino, Esquire
Jonah A. Peppiatt , Esquire
Ethan Stern, Esquire
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
jonah.peppiatt@davispolk.com
ethan.stern@davispolk.com

*Counsel to the Debtors and
Debtors in Possession*


Linda Casey, Esquire
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street
Wilmington, DE 19801
linda.casey@usdoj.gov

Justin R. Alberto, Esquire
Stacy L. Newman, Esquire
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
jalberto@coleschotz.com
snewman@coleschotz.com

Darren Azman, Esquire
Kristin K. Going, Esquire
McDermott Will & Emery
One Vanderbilt Avenue
New York, NY, 10017
dazman@mwe.com
kgoing@mwe.com

*Co-Counsel to the Official Committee of
Unsecured Creditors*


Steven E. Fox, Esq.
Times Square Tower, Suite 2506
Seven Times Square
New York, New York 10036
sfox@riemerlaw.com

*Counsel to Gordon Brothers Retail Partners*


Goodwill Industries of Dallas, Inc.
c/o Marcus Neupert, Esq.
Sutton, Pakfar & Courtney, LLP
132 S. Rodeo Drive, 4th Floor
Beverly Hills, CA 90212
mneupert@spcllp.com

2