# EXHIBIT A

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center
   F. Gross Sales

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Intentionally Deleted
   D. Common Area Charges and Cap
   E. Real Estate Taxes
   F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Intentionally Deleted

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

42.    Sales Tax

43.    Radon

44.    Prohibited Persons and Transactions

# LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 28th day of February, 2011, by and between WDC/HLP Cortez LLC, a Wisconsin limited liability company ("Landlord") whose mailing address is c/o MLG Management, LLC, 13400 Bishops Lane, Suite 100, Brookfield, WI 53005 and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

**1.    DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.    Common Areas:    The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.    Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord reserves the right to change such Common Areas provided that any such change will not substantially impair the visibility of or accessibility to the Demised Premises.    Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.    Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.    Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

B.    Dates:    Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.    The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.    Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord pursuant to Exhibit C.    Tenant hereby agrees to indemnify and hold Landlord harmless against any injury and loss or

insurance coverages described in this Lease.

2) The "Tenant Possession Date" shall be the later of (i) the date Tenant accepts possession of the Demised Premises following Landlord's notice to Tenant that it has substantially completed any construction that may be required pursuant to Exhibit C, or (ii) the date on which Tenant receives all permits for its construction and signage. For purposes of this Lease, "substantially completed" shall means all of Landlord's Work is completed other than minor exceptions or variations from the Landlord's Work shown in Exhibit C of a nature commonly found on a "punch list" (as that term is used in the construction industry), Tenant will submit its plans for permits within sixty (60) days of the full execution of this Lease and thereafter, diligently pursue obtaining such permits. Landlord will cooperate fully with Tenant in obtaining said permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has substantially completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord when Landlord's Work has been substantially completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event the cost of the Exterior Improvements is in excess of $25,000.00, Landlord may terminate this Lease upon providing written notice of termination to Tenant; provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to pay the Exterior Improvements cost in excess of $25,000.00. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed; provided however, the Rent Commencement Date shall not be delayed if the delay in obtaining the certificate of occupancy was a result of Tenant's actions or inactions. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3) The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred eighty (180) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4) The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5) If Landlord fails to return properly executed Leases to Tenant by February 11, 2011, or if Landlord fails to substantially complete Landlord's Work in the Demised Premises by April 1, 2011, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to April 1, 2011. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by May 1, 2011, the damages suffered by

remedy available to Tenant under this Lease, at law, or in equity, including the landlord's production action, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $500.00 per day. Commencing May 16, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no penalties will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction and/or signage in the Demised Premises or if the delay in substantially completing Landlord Work was a result of Tenant's actions or inactions.

6) Notwithstanding anything to the contrary, in the event Landlord has not substantially completed Landlord's Work in the Demised Premises by June 30, 2011, Tenant will not be required to accept possession until February 4, 2012. The period of time between July 1, 2011 and February 4, 2012 will be the "Optional Blackout Period". In the event Landlord substantially completes Landlord's Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not substantially completed Landlord's Work by February 4, 2012, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 4, 2012, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice. If Tenant fails to deliver said termination notice to Landlord as provided, then Tenant's right to so terminate is waived.

7) In the event Landlord substantially completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 4, 2012. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C. Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1) Exhibit A -   Site Plan of Shopping Center

2) Exhibit B -   Legal Description of Shopping Center

3) Exhibit C -   Landlord Work

8)   Exhibit F-1 -  Covenants and Restrictions of Record

9)   Exhibit F-2 -  Covenants and Restrictions to be recorded prior to Tenant Possession Date

10)   Exhibit G -   Re-measurement Rider

11)   Exhibit H -   Area 1, 2 and 3

12)   Exhibit I -   Pre-Existing Permitted Uses

D.   <u>Demised Premises</u>:  The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 39,795 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises.  Within ninety (90) days after the Tenant Possession Date, Tenant, at its sole cost and expense, shall have the opportunity to measure the dimensions of the Demised Premises, by a registered architect, for a determination of its exact square footage and provide the Landlord with written notice of its findings.  The space will be measured from the exterior of the exterior walls and from the midpoint of demising or interior walls.  Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.  Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 39,795 square feet nor accept possession of any space under 35,816 square feet in size, and may terminate this Lease in such an event.

E.   <u>Shopping Center</u>:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, including the land, building(s), improvements and appurtenants, the address of which is the Cortez Commons Shopping Center, 5502-5726 Cortez Road, West, Bradenton, FL 34210.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 119,924 square feet.

F.   <u>Gross Sales</u>:  The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees.  The following shall be deducted from Gross Sales to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another

Premises.

2. **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3. **TERM:**

   A.   Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2018 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

   B.   Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term" and "Fourth Option Term". The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default under this Lease beyond applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

4. **USE AND OPERATION:**

   A.   Permitted Uses: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including frozen food, beer and wine), and all similar or related merchandise and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the Tenant Possession Date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises.

Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties. Further, Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) arising out of or associated with any allegation that Tenant's use of the Demised Premises is a breach of any exclusive use provision or rights or use restriction afforded Walgreen Co. ("Walgreens") with respect to its occupancy of the retail premises located at the northeast corner of Cortez Road West and 59th Street West, Bradenton, Florida.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease and provided that Tenant is operating its business as a "Big Lots" store in the Demised Premises, no other general merchandise store, discount store, liquidator, closeout store, furniture store or dollar store operation ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Goodwill, Bed Bath & Beyond, Christmas Trees, Five & Below, Encore and Ollies Bargain Outlet. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) place cart corrals in the parking field in front of the Demised Premises and store shopping carts and baskets in the Common Areas immediately in front of the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise. Notwithstanding anything to the contrary, the use by Tenant of the Common Areas for said purposes shall be a reasonable nonexclusive use in common with Landlord and all others to whom Landlord has or may hereafter grant rights to use the same, said uses shall be subject to such reasonable rules and regulations as Landlord may from time to time adopt governing the same and access to the Shopping Center is not materially impaired.

B.    <u>Prohibited Uses</u>:  Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; provided, however, that this restriction shall not prohibit a tenant such as "Once Upon a Child" or "Play it Again Sports" or other reputable local/regional merchant with a similar type use; (iii) for an auditorium or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 6,000 square feet of floor area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities in excess of 6,000 square feet of floor area; (x) for the operation of a massage parlor (provided, however, that this restriction shall not prohibit a tenant such as "Massage Envy" or other reputable local/regional merchant with a similar type use as a Massage Envy) or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which creates undue noise, sound, vibration, litter or odor within 200 linear feet of the Demised Premises; (xii) for a night club or

provided, however, that this restriction shall not prohibit a full service restaurant; (xiii) for a pool hall or billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; provided, however, that this restriction shall not prohibit an exercise club or a health club to operate in the Shopping Center in Area 1, 2 and/or 3, as depicted on **Exhibit "H"**, attached hereto and incorporated herein; provided, however if the exercise club or a health club/spa is located in Area 3 it may occupy a maximum of 2,000 square feet of floor area; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; provided, however, that this restriction shall not prohibit a retail drop-off location for a dry cleaner; (xx) intentionally deleted (xxi) for any veterinary hospital, animal boarding, training or raising facilities; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxvi) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use; (xxiiiv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxivi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" provided, however, that this restriction shall not prohibit a call center, of 3,000 square feet or less of floor area, to operate in the Shopping Center only if located in Area 1 as depicted on Exhibit H; or (xxviii) for the use as a "head shop" selling drug paraphernalia.  All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

Notwithstanding the foregoing, the above restrictions shall not apply to the operation of a business in the Shopping Center operating under a lease in existence prior to the date of full execution of this Lease (such existing tenants being listed on **Exhibit "I"** attached hereto and incorporated herein, the **"Pre-Existing Permitted Uses"**).

5.    **RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent").  The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    <u>Fixed Minimum Rent</u>:  During the Original Term of this Lease, the sum of $173,108.25 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $14,425.69.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and

of $200,964.75 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $16,747.06. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $214,893.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $17,907.75. The Fixed Minimum Rent applicable for the Fourth Option Term shall be the sum of $228,821.25 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $19,068.44.

B.   <u>Utilities Charges</u>:   Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies. Tenant shall be solely responsible for and shall promptly pay for all direct public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing any utilities under a master meter account in Landlord's name, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility submeters for any such utilities (water/sewer, electricity, and gas) which shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than thirty-six (36) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs (other than for reasons or causes beyond the reasonable control of Landlord), Rent and Additional Rent shall abate upon the expiration of such thirty-six (36) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if

shall be respusible for the following with respect to the Common Areas:

(i) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) providing security, lighting and policing if necessary, and on-site and off-site traffic control, if necessary;

(v) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards actually received by Landlord, if any), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), commencing on the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of the Common Area Charges reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at eighty cents (**$0.80**) per square foot of the Demised Premises for the first Lease Year of the Original Term, as well as the initial Partial Lease Year, if any. Thereafter, in no event shall Tenant's pro-rata share of Common Area Charges increase by more than three percent (3%) per year (on a non-cumulative basis) above that amount of Common Area Charges payable by Tenant for the previous Lease Year (the Common Area Charges Cap described herein shall be known as the "CAM Cap").

E.    Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real

buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage) of such space leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord estimates that the Real Estate Taxes for the 2011 tax year shall be approximately $0.82 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes; provided, however interest and/or penalties for late payment shall be included in determining Real Estate Taxes if Tenant fails to pay to Landlord Tenant's pro rata share of Real Estate Taxes on a timely basis as provided for herein. Further, if a discount of said Real Estate Tax bills is available by prompt payment and Tenant has paid to Landlord Tenant's pro rata share of Real Estate Taxes on a timely basis as provided for herein, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made by Landlord. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord as soon as possible after Landlord receives such notice from the applicable taxing authority and prior to the date on which an appeal regarding such increase must be filed.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Notwithstanding the foregoing, if Tenant elects to contest the Real Estate Taxes payable by Tenant, Tenant shall in any event pay its pro rata share of all Real Estate Taxes to Landlord as provided for above within thirty (30) days after Tenant's receipt of an invoice therefor as provided for above. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved in favor of Tenant, Landlord shall reimburse Tenant for any excess of the pro rata share of all Real Estate Taxes Tenant paid. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes of the Shopping Center and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time every five (5) years during the Term. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.   Construction Allowance: Provided Tenant is not in Default, beyond applicable notice and cure periods, of the payment of Fixed Minimum Rent under the terms of the Lease, Landlord shall pay to Tenant an amount equal to Two Hundred Seventy-five Thousand and no/00 Dollars ($275,000.00) within thirty (30) days of Landlord's receipt of (i) final lien waivers from contractors and subcontractors providing in excess of $5000.00 of labor or materials in the construction of Tenant's improvements in the Demised Premises; and (ii) a copy of Tenant's certificate of occupancy. If said amount is not paid by Landlord to Tenant when due, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

6.   **ALTERATIONS:**

Tenant, at its sole cost and expense, shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner and in compliance with all governmental

agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting from any act of Tenant, and agrees not to create or permit any lien against the Demised Premises or Shopping Center by reason of any improvement, and Tenant agrees to indemnify and hold Landlord harmless from and against any such lien claim.

7.   **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall, upon notice from Tenant, reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to both Landlord and Tenant, and Landlord shall confirm that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 200-300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the

the Original Term; and the cost thereof exceeds Two Thousand and no/00 Dollars ($2,000.00), Tenant shall be solely responsible for such costs over and above Two Thousand and no/00 Dollars ($2,000.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly represents to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's reasonable cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of a paid invoice and lien waiver therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises in compliance with any applicable governmental regulations. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense

signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the state in which the Demised Premises is located, and Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons as long as all such signs comply with all applicable governmental requirements. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylons on the space as indicated on Exhibit D-1 attached hereto at Tenant's sole cost and expense. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. In the event Tenant elects not to occupy the Pylon space or fails to respond to Landlord's notification after said thirty (30) days this right of first refusal is deemed waived and null and void. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels in a location mutually agreed to by Landlord and Tenant at the Shopping Center as long as such Pylon complies with all applicable governmental requirements and any covenants or restrictions affecting the Shopping Center. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Other than as provided for above, once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9. **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

cause its changes, alterations, and additions to so conform. Landlord shall provide Tenant with such as built drawings filed with any and all local, state or federal code, or otherwise required pursuant to this Lease, if any in Landlord's possession. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority unless such is necessitated by changes, alterations or additions made by Tenant; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

A.    Tenant:  Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment,

all improvements located therein (except for Tenant's trade fixtures, furnishings and inventory) against loss under a standard form of "All Risk" insurance in an amount not less than the full replacement value of all the improvements located in the Demised Premises, and shall name Landlord as an additional insured as its interest may appear. Tenant shall provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

B. <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, excluding the Demised Premises, against perils normally covered under special form "All Risk" insurance against fire, vandalism, malicious mischief and such other perils as are from time to time included in a standard extended coverage endorsement, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, excluding the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

13. **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part (excluding Tenant's inventory, fixtures and equipment), by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B. In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, subject to delays which may arise by reason of adjustment of loss under insurance policies and delays beyond the reasonable control of Landlord, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided however, that if Landlord has commenced repair or restoration but cannot complete because of a delay caused by Tenant,

C.     If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.   **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.  This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.   **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.   **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that:  (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease except for the consent of Landlord's mortgagee (in accordance with the terms of the applicable mortgage) which consent Landlord shall obtain prior to full execution of this Lease; (e) to the best of Landlord's knowledge, as of the date of this Lease, the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, and Landlord has no actual knowledge of any pending or planned change to the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.  In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents

from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record, other than the Memorandum of Termination of Lease and Restrictive Covenant attached hereto and incorporated herein as Exhibit F-2 which Landlord shall record on or before the Tenant Possession Date, affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant, absent Tenant's written consent, any such amendment, modification, termination or new agreement shall be of no effect and deemed invalid. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17. **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18. **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and Landlord shall use its best efforts to obtain from the holder of any mortgage lien a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall request that any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees, within thirty (30) days after receipt of written request therefore, to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and

property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary, not to exceed ninety (90) days), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B. If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) in the event Landlord's default has a materially adverse impact on Tenant's business operations in the Demised Premises, terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or

as Tenant shall deem desirable.

20.    **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. Notwithstanding the foregoing, in the event twenty (20) feet or less of any of the rights-of-way adjoining, or approaches to the Shopping Center or Common Area, are taken in condemnation proceedings and such taking does not obstruct any access points to the Shopping Center or materially affects Tenant's visibility or signage in the Shopping Center, Tenant may not terminate the Lease. By way of examples and without limitation, a moving of the monument/pylon sign as a result of a condemnation that does not reduce the size of Tenant's signage or its visibility from the adjacent road is considered a non-material event and Tenant may not terminate this Lease; whereas a permanent removal of the monument/pylon sign or a moving of the monument/pylon sign resulting in a decrease in the size of Tenant's signage by more than 25% of its surface occurs as a result of a condemnation would be considered a material event for which Tenant may terminate this Lease. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith so long as this Lease has not been terminated. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages. In any event, all damages awarded by or amounts paid by the acquiring authority for any such taking, whether for the whole or a part of the Demised Premises or the Shopping Center, shall belong to and be the sole property of Landlord whether such damages are awarded as compensation for loss of, or diminution in value to, the leasehold or the fee thereof, provided, however, Tenant shall have the right to pursue such claim or claims as Tenant may have legally for relocation expenses, interruption of business and such other compensation as may be awarded separately to Tenant which does not reduce the award or proceeds of sale payable to Landlord. In the event that this Lease is terminated as hereinabove provided, Tenant shall not have any claim against Landlord for the value of the unexpired term hereof. The provisions of this Paragraph are subject to the rights of Landlord's mortgagees, if any.

21.    **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and

coverages by reason of these waivers, if required by the respective insurers. Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder nor violates any restriction, covenant or agreement of record. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen business (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen business (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange.

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

Tenant shall pay Landlord One Hundred Twenty-five percent (125%) of the Fixed Minimum Rent then applicable for each month or partial month during which Tenant retains possession of the Demised Premises, or any part of the Demised Premises, after the expiration or termination of this Lease. The provisions of this Paragraph shall not constitute a waiver by Landlord of any re-entry rights of Landlord available under this Lease or by law.

Such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.    **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Wisconsin. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26.    **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.    **NO RECORDATION:**

Tenant and Landlord covenant and represent to each other that no parties, other than LandQwest Commercial ("Broker"), are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. Broker will be paid a fee or commission by Landlord pursuant to a separate agreement. If any individual or entity other than Broker, shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.    **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.    **HAZARDOUS MATERIAL:**

Landlord represents that, to the best of Landlord's knowledge and except as may be set forth in the Phase I Environmental Site Assessment dated January 12, 2005 prepared by ECS, project No. 16-5108 (the "Environmental Report"), the Demised Premises do not presently contain any Hazardous Materials. In making this representation on Hazardous Materials, Landlord is relying solely upon the information contained in the Environmental Reports and has no other actual knowledge, other than that contained in the Environmental Reports, concerning any current or previous use of the Demised Premises which would lead a reasonable person to suspect that Hazardous Substances were deposited, stored, released, disposed of or placed upon, about or under the Demised Premises. As used in this Lease, "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remediate or remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials. If Landlord shall be required to remediate or remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional

shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of Hazardous Materials in, on, under or around the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been placed thereon by Tenant, Tenant's agents, contractors, or employees, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Tenant's sole cost and expense, remediate or remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. If Landlord shall be required to remediate or remove and dispose of any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials placed thereon by Tenant, Tenant's agents, contractors, or employees there shall be no abatement of Rent or Additional Rent during the period of time necessary to complete such work The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31. **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

34. **INTENTIONALLY DELETED**

Landlord and Tenant acknowledge (i) that this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37. **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38. **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39. **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction with any of Landlord's reconciliation statements within one (1) year of Tenant's receipt of any such statement, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

41. **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

42. **SALES TAX:**

Along with and in addition to each monthly Rental payment or Additional Rent Payment under this Lease, Tenant shall pay to Landlord the sales or privilege tax required by Florida Statutes 212.031 and any amendments or replacements thereof or any other sales, use or other tax that may be imposed by the State of Florida or any local or county governmental entity.

43. **RADON:**

Pursuant to Chapter 88-285 of the Laws of Florida, Florida Statute 404056(8), or any successor thereto, Landlord makes the following notification to Tenant. RADON GAS: Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit

44. **PROHIBITED PERSONS AND TRANSACTIONS:**

1. <u>Tenant Representations</u>:  Tenant and each person or entity owning an interest in Tenant is (a) (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (b) none of the funds or other assets of Tenant constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined), (c) no Embargoed Person has any interest of any nature whatsoever in Tenant (whether directly or indirectly), (d) Tenant has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated there under with the result that the investment in Tenant is prohibited by law or Tenant is in violation of law.

Tenant also shall require, and shall take reasonable measures to ensure compliance

Publicly-Traded Entity" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

2.  <u>Landlord Representations</u>:  Landlord and each person or entity owning an interest in Landlord represents and warrants that (a) they are not a U.S. Publicly Traded Entity, (b) (i) is not currently identified on the List, and (ii) is not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (c) none of the funds or other assets of Landlord or any person or entity owning an interest in Landlord constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and (d) has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

Landlord also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Landlord is or shall be listed on any of the Lists or is or shall be an Embargoed Person.  This Section shall not apply to any person to the extent that such person's interest in the Landlord is through a U.S. Publicly-Traded Entity.

**[Signatures Appear on Immediately Subsequent Page.]**

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:**    **WDC/HLP Cortez LLC, a Wisconsin limited liability company**

          **By:  Wisconsin Development, LLC, its Managing Member**

By: _____

Title: _____

Witnesses as to Tenant:

**TENANT:**    **BIG LOTS STORES, INC., an Ohio corporation**

By: _____

      Charles W. Haubiel II

Title: Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary



**Acknowledgements appear on immediately following page.**

STATE OF

COUNTY OF

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _WDC/HLP Cortez LLC_ by, _Timothy J. Wallen_ its _President_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _10:33am_ this _28th_ day of _February_, 2011.

_Beverly J. Adams_
Notary Public

NOTARY PUBLIC
BEVERLY
J.
ADAMS
STATE OF WISCONSIN

**Tenant's Acknowledgement**

STATE OF OHIO

COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _8th_ day of _February_, 2011.

Notary Public

NOTARIAL SEAL
STATE OF OHIO

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES _5/12/15_



(Fourteen pages attached)



# BIG LOTS!

**BIG LOTS STORES, INC.**
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

## STORE ADDRESS:

BIG LOTS STORE #
CORTEZ COMMONS
5584 CORTEZ ROAD WEST
BRADENTON, FL. 34210

## BUILDING AREA:

| | |
|---|---|
| TOTAL SALES | 28,644 |
| (FURNITURE SALES 4,118) | |
| OTHER | 2,040 |
| STOCKROOM & RECEIVING | 10,236 |
| GROSS TOTAL AREA | 40,920 |

## DRAWING PAGE AND TITLE

- T-1    TITLE PAGE

**ARCHITECTURAL**

- D-1    DEMO PLAN
- A-1    CONSTRUCTION PLAN
- A-1.1  CONSTRUCTION NOTES
- A-2    FIXTURE PLAN
- A-3    LIGHTING PLAN
- FP-1   FIRE ALARM PLAN

**ELECTRICAL**

- E-1    ELECTRICAL PLAN
- E-2    ELECTRICAL NOTES
- E-3    EMS NOTES
- E-4    EMS SPECIFICATION

**MECHANICAL (LANDLORDS WORK)**

- M-1    MECHANICAL PLAN
- M-2    MECHANICAL NOTES
- M-3    MECHANICAL DEMO

## ISSUE DATES

PERMIT
BID
CONSTRUCTION

## SITE PLAN

Proposed BIG LOTS!

## DEVELOPMENT CONTACTS

CITY BUILDING DEPT.:

FIRE:

## MATERIALS AND EQUIPMENT SCHEDULE

| Object | Supplied by | Installed by | Manufacturer & Model Number | Vendor and Contact Information |
|---|---|---|---|---|

## CODE INFORMATION

APPLICABLE CODES:

DEMOLITION PLAN



DEMOLITION LEGEND

EXISTING WALL

ITEM TO DEMOLITION



CONSTRUCTION PLAN



CONSTRUCTION NOTES



MEZZANINE PLAN

FIXTURE PLAN

## ATTENTION FIXTURE INSTALLER

### FIXTURE NOTES:

1) 48" GONDOLA RUN AT THE SERVICE COUNTER TO HAVE 22" DEEP BASE DECKS, (3) SHEETS OF 48"x 48" PEGBOARD, ONE ON EACH SIDE PER 4' SECTION

2) 72" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (3) SHEETS OF PEGBOARD OF 48"x 96", ONE ON EACH SIDE, EACH SIDE PER 4' SECTION

72" END CAPS TO HAVE 48"x 22" BASE DECKS, 72" UPRITES, (3) SHEETS OF PEGBOARD OF 48"x 96", ONE ON EACH SIDE PER 4' SECTION, (2) BASE END TRIMS & (1) UPRITE END TRIMS

3) 84" GONDOLA RUNS TO HAVE 22" DEEP BASE DECKS, (4) SHEETS OF PEGBOARD, (2) 48"x VEF & (2) 48"x 36", ONE SIDE OF EACH ON EITHER SIDE PER 4' SECTION

84" END CAPS TO HAVE 48"x 22" BASE DECKS, 84" UPRITES, (4) SHEETS OF PEGBOARD, (2) 48"x 48" & (2) 48"x 36", ONE SIDE OF EACH ON EITHER SIDE PER 4' SECTION, (2) BASE END TRIMS & (1) UPRITE END TRIMS

4) 54" WALL CASE RUNS HAVE 25" DEEP BASE DECKS, (3) SHEETS OF 48"x 48" PEGBOARD, ONE ON EACH SIDE PER 4' SECTION

5) 84" WALL CASE RUNS HAVE 25" DEEP BASE DECKS, (2) SHEETS OF PEGBOARD, (1) 48"x 48 (1) 48"x 36" PER 4' SECTION. MULTI FUNCTION COMPONENTS TO BE INSTALLED W/ 84" MULTI FUNCTION UPRITES AS INDICATED ON FIXTURE PLAN. TOP SHELF TO USE WIRE GRID W/ CROSSBARS AND SUPPORTS



MEZZANINE PLAN

LIGHTING PLAN

## LIGHTING NOTES

## LIGHTING LEGEND

REMOTE HEAD TECHNICAL CONSUMER PRODUCTS PART# TCP 20784

EMERGENCY/EXIT RED LED EXIT SIGN
TECHNICAL CONSUMER PRODUCTS PART# TCP 22743

## LIGHTING TAKE-OFF

| Count | Name |
|---|---|
| 7 | TCP REMOTE HEAD |
|  | TCP#2743 RED LED EXIT SIGN |
| 14 | 2 LAMP 4' STRIP |
| 23 | 8' STRIP(EMERGENCY RIGHT) |
| 24 | 8' STRIP(EMERGENCY LEFT) |
| 415 | 4 LAMP 8' STRIP |



FIRE ALARM PLAN



MEZZANINE PLAN

ELECTRIC PLAN

ELECTRICAL LEGEND

COMMON GROUND CONVENIENCE DUPLEX RECEPTACLE TO BE
NEMA 5-20R (HUBBLE MODEL #HBL5352)

COMMON GROUND CONVENIENCE DOUBLE DUPLEX RECEPTACLE TO BE
NEMA(2)5-20R (HUBBLE MODEL #HBL5352Q)

ISOLATED GROUND TWIST LOCK DUPLEX RECEPTACLE
TO BE NEMA L5-20R HUBBELL IG5210

MOTION ACTIVATED SWITCH LEVITON PART#
ODS10-IDW (SEE NOTE #20 SHEET E-2)

J-BOX FOR SIGN

TELECOM. ROUGH-IN

CAT-5 ROUGH-IN

DOORBELL

DISCONNECT SWITCH

CORD REEL
(SEE NOTE #9 SHEET E-2)

ELECTRIC PANEL

LEGEND

NEW WALL

EXISTING WALL

DETAIL/NOTE
SHEET MARKER

ELECTRIC NOTES

## BASIC WIRING REQUIREMENTS

PLEASE REVIEW SPECIFICATIONS BELOW AND REFER TO SHEET E-1.

ALL ADDITIONS OR CHANGES TO THIS SCOPE OF WORK CAN BE MADE WITHOUT PRE-APPROVAL BY AUTHORIZED BIG LOTS REPRESENTATIVE.

ALL WORK IS TO BE DONE IN A WORKMANLIKE MANNER, AND THE CONTRACTOR IS RESPONSIBLE FOR ALL PERMITS, INSPECTIONS, AND COMPLIANCE TO ALL NATIONAL AND LOCAL CODES AND ORDINANCES. IN THE EVENT OF A CONFLICT BETWEEN THE DRAWING(S) AND LOCAL CODES OR ORDINANCES, PLEASE CONTACT THE BIG LOTS REPRESENTATIVE.

IF ANY QUESTION ARISE DUE TO ANY ITEM IN THIS SCOPE OF WORK, PLEASE CONTACT BIG LOTS REPRESENTATIVE.

THANK YOU FOR YOUR ATTENTION IN THIS MATTER.

### TABLE OF CONTENTS

1. CASHWRAP / CASH REGISTERS / FURNITURE CABINETS
2. EXTERIOR SIGNS
3. AUTOMATIC DOORS
4. CONVENIENCE RECEPTACLE
5. CONDENSER
6. COUNTDOWN ROOM
7. CASHWRAP
8. EMPLOYEE LOUNGE
9. MANAGER OFFICE
10. BALER
11. DOCK LIFT
12. HOLD AREA / LAYAWAY / BLACKWELL
13. FIRE ALARM / FIRE ALARM DIALER
14. EMP/NELL PLUG MOLD
15. STOCK ROOM
16. DOCK LIGHT
17. WATER COOLER
18. HVAC UNITS
19. DOOR KIT

### 17 STANDARD CABINET & FURNITURE CABINETS

CASHWRAP CABINETS

FURNITURE CABINET



### POS/CASH REGISTER NOTES



FRONT END CHECKOUT WIRING
SCALE: NTS





### 21 EXTERIOR SIGNS

### 31 AUTOMATIC DOOR OPERATORS

### 4) CONVENIENCE RECEPTACLE

### 5) CONDENSER

### 6) COUNTDOWN ROOM

### 7) CASHWRAP

### 8) EMPLOYEE LOUNGE

### 9) MANAGER OFFICE

### 10) BALER

### 11) DOCK LIFT & HARDWARE

### 12) FIRE ALARM SYSTEM & ALARM

### 13) PHONE SYSTEM & ALARM

### 14) LAMP/WALL PLUG MOLD

### 15) EXTERIOR LIGHTING

### 16) DOCK LIGHT

### 17) WATER COOLER

### 18) HVAC UNITS

### 19) DOOR KIT DISPLAY

# EMS SCHEDULES

## DEVICE SCHEDULE

## EMS NOTES

## INSTALLATION RESPONSIBILITIES

## GENERAL EMS CONSTRUCTION NOTES:

## INSTALLATION SUMMARY

## GENERAL LV CABLE INSTALLATION INSTRUCTIONS

## NON-EMS CONTROLS

## GENERAL NON-EMS CONTROLS NOTES:

## EXAMPLES FOR 3-PHASE EQUIPMENT INTERLOCKING

## CABLE SCHEDULE



NOTE:
MECHANICAL PLANS TO BE
COMPLETED BY LANDLORDS
ENGINEERS AND TO BE
APPROVED BY TENANT.

MECHANICAL PLAN

# MECHANICAL NOTES

## DIVISION 15: MECHANICAL

## HEATING, VENTILATION, AND AIR CONDITIONING

## EXHAUST FAN SCHEDULE

## VENTILATION SCHEDULE

## AIR BALANCE

## AIR DISTRIBUTION DEVICE SCHEDULE

## MECHANICAL EQUIPMENT SCHEDULE



MECHANICAL PLANS TO BE COMPLETED BY LANDLORDS ENGINEERS AND TO BE APPROVED BY TENANT



MECHANICAL DEMOLITION

# LEGAL DESCRIPTION OF SHOPPING CENTER

FROM THE N.W. CORNER OF THE S.W. 1/4 OF THE S.E. 1/4 OF SECTION 5, TOWNSHIP 35 SOUTH, RANGE 17 EAST, RUN THENCE N 89°58'47" E, ALONG THE NORTH LINE OF SAID S.W. 1/4 OF THE S.E. 1/4, A DISTANCE OF 72.00 FEET TO THE EAST RIGHT OF WAY LINE OF 59TH STREET WEST; THENCE S 00°00'02" E, ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 946.87 FEET FOR A POINT OF BEGINNING; THENCE N 89°46'40" E, A DISTANCE OF 214.00 FEET; THENCE N 00°00'02" W, A DISTANCE OF 262.00 FEET; THENCE N 89°46'40" E, A DISTANCE OF 630.00 FEET TO A POINT WHICH LIES 404.07 FEET WESTERLY OF THE EAST LINE OF AFORESAID S.W. 1/4 OF THE S.E. 1/4; THENCE S 00°00'43" W, PARALLEL WITH SAID EAST LINE, A DISTANCE OF 297.00 FEET; THENCE S 89°46'40" W, A DISTANCE OF 40.93 FEET; THENCE S 00°00'43" W, A DISTANCE OF 303.00 FEET TO THE NORTH RIGHT OF WAY LINE OF CORTEZ ROAD (S.R. 684), SAME BEING THE EASTERLY RIGHT OF WAY LINE OF 59TH STREET WEST; THENCE S 89°46'40" W, ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 318.38 FEET; THENCE N 86°57'06" W, ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 210.34 FEET; THENCE S 89°46'40" W, ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 44.51 FEET; THENCE N 00°00'02" W, A DISTANCE OF 286.00 FEET; THENCE S 89°46'40" W, A DISTANCE OF 230.00 FEET TO THE EAST RIGHT OF WAY LINE OF 59TH STREET WEST; THENCE N 00°00'02" W, A DISTANCE OF 40.00 FEET TO THE POINT OF BEGINNING.  LYING AND BEING IN SECTION 5, TOWNSHIP 35 SOUTH, RANGE 17 EAST, MANATEE COUNTY, FLORIDA.

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative.**

**HVAC EQUIPMENT & MECHANICALS:**  Landlord shall provide a minimum of one ton per 300 square feet of HVAC throughout the sales floor and stockroom to Tenant's specifications. All mechanicals to meet ASHREA standard and comply with all state and local code. All mechanical designs shall be submitted to Tenant's engineering and construction departments for review and approval two weeks prior to applying for permits. All HVAC units to be replaced with new concentric units (unless otherwise specified by a Big Lots HVAC/Energy representative) if the existing are 10 years and older. New concentric units shall be either Carrier or Trane and no larger than 10-20 tons each. All HVAC and HVAC equipment, duct work, diffusers etc. to be in good working condition and adequate for Tenant's intended use. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. If the Tenant Possession Date occurs during the months of October through May, Landlord shall grant Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. Landlord shall also warrant the HVAC system for the initial lease term for any repairs over $2,000 during a single lease year.

**STOREFRONT:**  The exterior storefront façade shall be in good condition, freshly painted and repaired from previous tenant's signage. Property was painted in early 2010.

**DOORS:**  All doors to be sound and secure in good working condition.

**GLASS:**  All store front glass to be in good condition.

**UTILITIES:**  Tenant to utilize the existing utilities to be in good working condition and to include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems.

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:**  All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions.

**EXTERIOR LIGHTING:**  All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, adequate for Tenant's use. All exterior lighting is to be on a separately metered house panel in the Landlord's name.

**ROOF:**  Landlord to install new roof to be in good condition and free of leaks.

**RECEIVING AREA:**  The existing loading docks are to be in good working order (including all seals, bumpers, bollards, doors, etc.). Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use.

**REMOVAL OF FIXTURES & EQUIPMENT:**  Landlord to remove all previous tenant's fixtures and equipment and deliver the space in broom clean condition.

PESTS: Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free.

CART CORRAL: Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

SIGNAGE: Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on the pylon. Tenant to receive the former Publix position on the pylon per the attached pylon exhibit. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position.

DRAWINGS: Landlord is to provide Tenant with "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan.

HAZARDOUS
MATERIALS: Landlord is responsible for remediation of any and all hazardous material. Landlord shall provide to Tenant a Phase I and asbestos survey or, in the alternative, necessary certification. Landlord will share Phase I issued in 2005.

GENERAL
CONDITIONS: Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Furthermore, the building structure shall meet governmental and local codes including current seismic requirements if applicable.


All above work to be completed before the Tenant Possession Date.

TENANT SIGN SPECIFICATION

# BIG LOTS!

## LOGOS
### WITH
## SPECIFICATIONS
### for exterior signage

**If you need additional information that is not contained in this packet contact:**

Store Planning:
Mike Stiles - 614-278-6805
Michael Neu - 614-278-6868

11/2009

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

Stacked Logo



## STANDARD SIZE STACKED LAYOUTS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ | Ⓗ* |
|---|---|---|---|---|---|---|---|
| 5' 0" | 3' 11" | 7' 0" | 13' 7" | 9' 8" | 22" | 7 ½" | 131 SF |
| 4' 6" | 3' 6" | 6' 4" | 12' 3" | 8' 8 ½" | 19 ½" | 6 ½" | 107 SF |
| 4' 0" | 3' 1 ½" | 5' 7 ½" | 10' 10 ½" | 7' 9" | 17 ½" | 6" | 84 SF |
| 3' 0" | 2' 4" | 4' 2 ½" | 8' 2" | 5' 9 ½" | 13" | 4 ½" | 47 SF |
| 2' 6" | 1' 11 ½" | 3' 6" | 6' 9 ½" | 4' 10" | 11" | 3 ½" | 33 SF |

*SF = SQ. FEET TOTALS

## SIGN SPECIFICATIONS FOR BIG LOTS!

5" .063 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS
LETTER FACES .150 ACRYSTEEL #2119 ORANGE W/1" ORANGE JEWELITE TRIM CAP
INTERNALLY ILLUMINATED W/SLOAN V SERIES - ORANGE L.E.D.s AS PER SLOAN LAYOUTS

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C..
All signage equipped with disconnect switches.

11/2009

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS



## STANDARD SIZE HORIZONTAL LAYOUTS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ* |
|---|---|---|---|---|---|
| 2' 0'' | 11' 7 ½'' | 2' 4'' | 8 ½'' | 3 ½'' | 24 SF |
| 2' 6'' | 14' 6 ½'' | 2' 11½'' | 11" | 4 ½'' | 38 SF |
| 3' 0'' | 17' 5 ½'' | 3' 6 ½'' | 13" | 5 ½'' | 52 SF |
| 3' 6'' | 20' 4 ½'' | 4' 1 ½'' | 15 ½'' | 6 ½'' | 77 SF |
| 4' 0'' | 23' 3 ½'' | 4' 8 ½'' | 17 ½'' | 7 ½'' | 92 SF |
| 4' 6'' | 26' 2 ½'' | 5' 3 ½'' | 19 ½'' | 8 ½'' | 119 SF |
| 5' 0'' | 29' 1 ½'' | 5' 10½'' | 22" | 9 ½'' | 145 SF |
| 6' 0'' | 34' 11" | 7' ½'' | 2' 2" | 11" | 207 SF |

*SF = SQ. FEET TOTALS

## SIGN SPECIFICATIONS FOR BIG LOTS!

5" .063 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS
LETTER FACES .150 ACRYSTEEL #2119 ORANGE W/1" ORANGE JEWELITE TRIM CAP
INTERNALLY ILLUMINATED W/SLOAN V SERIES - ORANGE L.E.D.s AS PER SLOAN LAYOUTS

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C..
All signage equipped with disconnect switches.

11/2009

# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet



| | |
|---|---|
| ■ | **BIG LOTS AND TRADE MARK**<br>100% BLACK |
| ■ | **EXCLAMATION**<br>PANTONE 021 ORANGE |

11/2009

PENANT PYLON PANEL LOCATION



Date: _____

To:      _____ (insert Tenant)
         via facsimile:  (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)


RE: _____ (insert Shopping Center, City/State of Demised Premises)


You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed.  Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.   You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.


**LANDLORD:**

_____

a _____


By: _____

Title: _____


**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**


By: _____

Title: _____

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use, except as set forth below:**

Non-Permitted Uses

The following uses are restricted or prohibited under the terms and conditions of the Lease. As such, Tenant warrants and represents it shall not use the Premises for any of the listed uses, and to do so would be considered a default under the provisions of the Lease:

1. Drop off cleaner, drop off wash and fold, and alterations.
2. Mexican restaurant for on and off premises consumption.
3. Chinese restaurant for on and off premises consumption.
4. Digital printing sign company.
5. Sale of medical and restaurant uniforms.
6. Retail sale of medical equipment and medical supplies. (Not including drugs.)
7. Sale of hearing aids and the diagnosis of hearing disorders.
8. Pharmacy.
9. Weight control, exercise or supplements.
10. Telemarketing Call Center.
11. Fitness Center.
12. Provide primary care medical services to patients who are Medicare Advantage members.
13. Family value hair salon with a price point for hair cuts costing less than $32.00.

<u>EXCLUSIVES</u>

8.    (a)    Subject to the existing uses and existing leases set forth on Exhibit "G" attached hereto and made a part hereof (the "Existing Uses"), Landlord covenants and agrees that, during the Term and any extensions or renewals thereof, no additional property which Landlord, directly or indirectly, may now or hereafter own or control, and which is contiguous to, or which is within five hundred (500) feet of any boundary of, the Leased Premises (the "Landlord's Property"), will be used for any one or combination of the following:  (i) the operation of a drug store or a so-called prescription pharmacy or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind; (ii) the operation of a medical diagnostic lab or the provision of treatment services (other than as part of a medical, dental, physician, surgical or chiropractic office[s], which office[s] shall not be restricted by this subsection [ii]); (iii) the sale of so-called health and beauty aids or drug sundries; provided however, nothing herein shall prevent the sale of health, beauty aids or drug sundries by other tenants provided such tenant's business does not devote more than 1,300 square feet to the sale of such items; (iv) Intentionally deleted  ; (v) intentionally deleted ; and (vi) the operation of a business in which prepackaged food items for off premises consumption are offered for sale; provided however, nothing herein shall prevent the sale of take-out food or prepackaged food items from a restaurant or other eating establishment that primarily serves food for consumption on the premises (by example, fast food restaurants shall be exempt from the exclusives as set forth in this paragraph and shall be a permitted use by other tenants) .  In the event that Tenant files suit against any party to enforce the foregoing restrictions, Landlord agrees to cooperate fully with Tenant in the prosecution of any such suit, and reimburse Tenant for all of attorneys' fees and court costs incurred by Tenant in connection with such suit, notwithstanding its resolution. For purposes hereof "contiguous" shall mean property that is either adjoining the Leased Premises or separated from the Leased Premises only by a public or private street, alley or right-of-way.

        (b)    In addition, and subject to the Existing Uses, and their successors and assigns, Landlord shall not permit or suffer any other occupant of Landlord's Property to use any premises or any portion thereof for purposes of a cocktail lounge, bar, disco, bowling alley, pool hall, billiard parlor, skating rink, roller rink, amusement arcade, children's play or party facility, adult book store, adult theatre, adult amusement facility, any facility selling or displaying pornographic materials or having such displays, second hand store, odd lot, closeout or liquidation store, auction house, flea market, educational or training facility, blood bank, sleeping quarters or lodging, the outdoor housing or raising of animals, the sale, leasing or storage of automobiles, boats or other vehicles, any industrial use, a car wash, an assembly hall, off track betting establishment, bingo parlor, any use involving the use, storage, disposal or handling of hazardous materials or underground storage tanks, any office use (except incidental to a retail use), a restaurant, or any use which creates a nuisance.

# CHICAGO TITLE INSURANCE COMPANY
## OWNERS POLICY FORM

### SCHEDULE B

**Policy Number: 7210609-251411**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

**Exceptions:**

Restriction set forth in instrument recorded in Official Record Book 1031, Page 2063, of the Public Records of Manatee County, Florida, that the property described in Exhibit A-1 to the instrument be developed and used for surface water retention only.

Restriction set forth in instrument recorded in Official Record Book 1036, Page 3862 and Official Record Book 1038, Page 1959, of the Public Records of Manatee County, Florida, that the property described in Exhibit A-1 to the instrument be developed and used for surface water retention only.

Reservation of easements for drainage and sewer along with all utility lines contained in instrument recorded in Official Record Book 147, Page 294, and reservation of easement for sewer lines contained in instrument recorded in Official Record Book 972, Page 1739, of the Public Records of Manatee County, Florida.

Easement to Florida Power and Light Company recorded in Official Record Book 194, Page 29, of the Public Records of Manatee County, Florida.

Reciprocal Non-Exclusive Cross Easement Agreement recorded in Official Record Book 1013, Page 3039, of the Public Records of Manatee County, Florida.

Florida Power and Light Company Easement recorded in Official Record Book 1042, Page 3753, of the Public Records of Manatee County, Florida.

Grant of Easement to the City of Bradenton recorded in Official Record Book 1079, Page 1493, of the Public Records of Manatee County, Florida.

Florida Power and Light Company Easement recorded in Official Record Book 1016, Page 2816, of the Public Records of Manatee County, Florida.

Non-Exclusive Easement for ingress, egress, roadway and utilities contained in Warranty Deed recorded in Official Record Book 1033, Page 2004, of the Public Records of Manatee County, Florida.

Easements to Paragon Cable recorded in Official Records Book 1453, Page 4070 and Official Record Book 1531, Page 275, of the Public Records of Manatee County, Florida

Terms, provisions and conditions of Reciprocal Easement Agreement With Covenants And Conditions by and between CORTEZ COMMONS, LTD, a Florida Limited Liability Company, and CORTEZ-59, L.L.C., a Florida Limited Liability Company, recorded in Official Records Book 1787, Page 5462, and First Amendment recorded in Official Records Book 1833, Page 2541, of the Public Records of Manatee County, Florida.

NOTE: This Policy consists of insert pages labeled Schedules A and B. This Policy is Of no force and effect unless both pages are included along with any added pages incorporated By reference.

SCHEDULE B

::ODMA\PCDOCS\DOCS\171736\1

Page 2 of 9

## CHICAGO TITLE INSURANCE COMPANY
## OWNERS POLICY FORM

### SCHEDULE B

**Policy Number:** 7210609-251411

Terms, covenants, including Use Restrictions, conditions, and other matters contained in the Lease between Cortez Plaza, Ltd., and Publix Super Markets, Inc., dated December 15, 1980 a Memorandum of which was recorded in Official Record Book 997, Page 3137 and First Addendum recorded in Official Record Book 1033, Page 3576, and Subordination, Non-Disturbance and Attornment Agreement recorded in Official Record Book 1354, Page 1200, of the Public Records of Manatee County, Florida.

Terms, covenants, including Use Restrictions, conditions and other matters in the Lease dated October 1, 2002, and made by CORTEZ-59, L.L.C., and WALGREEN CO., a Memorandum of which is recorded in Official Records Book 1787, Page 5492, as amended by Amendment to Memorandum of Lease recorded in Official Records Book 1804, Page 6400, of the Public Records of Manatee County, Florida.

Rights or claims of parties in possession not shown by the Public Records, as tenants only.

Matters contained in that survey of the land prepared by Zoller, Najjar & Shroyer, L.C., dated February 9, 2005, Job No. 00-34523, as follows:

a.   Chain link fence and wood fence run inside the property line and encroach into the easement on the East line.

b.   Curb encroaches into the easement on the East line.

c.   Rights of others to use the sidewalk and curb on the Southwest corner.

d.   Concrete curb runs outside the property line on the North.

e.   Assignment of Leases and Rents given by WDC/HLP Cortez LLC, a Wisconsin limited liability company in favor of New South Federal Savings Bank, its successors and assigns, recorded April 14, 2005, in Official Records Book 2010, Page 6937, Public Records Manatee County, Florida.

FOR INFORMATION: Notice as to Section 713.10 recorded in Official Records Book 1473, Page 2815, of the Public Records of Manatee County, Florida.

NOTE: This Policy consists of insert pages labeled Schedules A and B. This Policy is Of no force and effect unless both pages are included along with any added pages incorporated By reference.

SCHEDULE B

::ODMA\PCDOCS\DOCS\171736\1

This instrument was prepared by
and should be returned to:

Gregory W. Dworzanowski, Esquire
RMC Property Group
1733 W. Fletcher Avenue
Tampa, Florida 33612

*This space reserved for Recorder's use only.*

### NOTICE OF LEASE TERMINATION

THIS NOTICE OF LEASE TERMINATION (this "Notice") is entered into by and between **WALGREEN CO.**, an Illinois corporation ("Walgreens"), effective as of the _16th_ day of _May_, 2008.

### RECITALS:

A. Cortez-59, L.L.C., a Florida limited liability company ("Cortez-59") as "Landlord" and Walgreens as "Tenant" entered into that certain Lease dated August 22, 2002, as amended by that certain First Amendment to Lease dated February 11, 2003, as further amended by that certain Second Amendment to Lease dated April 18, 2003 (collectively, the "Lease"), of which a Memorandum of Lease was recorded December 4, 2002, in Official Records Book 1787, Page 5492, as amended by Amendment to Memorandum of Lease recorded February 19, 2003, in Official Records Book 1804, Page 6400, both of the public records of Manatee County, Florida (the "**Property**"), which Property is more particularly described in the Lease and legally described in **Exhibit "A"** to this Notice.

B. Walgreens has acquired fee simple title to the Property from Cortez-59 and now desires to terminate the Lease.

NOW THEREFORE, in consideration of the premises and the covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Walgreens intending to be legally bound agrees as follows:

1

1.    **Recitals.** The Recitals set forth above are true and correct and are a part of this Notice.

2.    **Termination.** The Lease is hereby terminated effective as of the date first set forth above, and all rights, obligations, liabilities, warranties and covenants arising under or confirmed in the Lease are null and void and of no force or effect.

3.    **Applicable Law.** This Notice shall be governed by and construed and enforced in accordance with the laws of the State of Florida without regard to any conflict of laws principles.

4.    **Successors.** This Notice shall be binding upon and shall inure to the benefit of Walgreens and their respective successors and assigns.

5.    **Headings and Captions.** The headings and captions contained in this Notice are inserted for convenience of reference only, and are not to be deemed part of or to be used in the construction of this Notice or the interpretation of any part hereof.

6.    **Counterparts.** This Notice may be executed in separate counterparts, all of which together shall constitute a single agreement.

[SIGNATURE PAGE TO FOLLOW]

2

SIGNATURE PAGE TO NOTICE OF LEASE TERMINATION

**IN WITNESS WHEREOF,** the Walgreen Co. has executed this Notice in its capacity as the Landlord and Tenant under the Lease on the date set forth above.

Printed Name: LISETTE MORENO

Printed Name: JANIE M. BATES

WALGREEN CO., an Illinois corporation

By: _____

Name: Robert M. Silverman

Title: Div. Vice Pres.

STATE OF _Illinois_

COUNTY OF _Lake_

This instrument was acknowledged before me on the 15th day of May, 2008, by Robert M. Silverman, as Div. Vice Pres. of WALGREEN CO., an Illinois corporation, on behalf of such corporation, who is *[check where applicable]* [ ✓ ] personally known to me or [ ] has produced a _____ (state) driver's license as identification.

"OFFICIAL SEAL"
SHARIAL M. HOWARD
Notary Public, State of Illinois
MY COMMISSION EXPIRES 8/28/2011

Printed Name: Sharial M. Howard

NOTARY PUBLIC

My Commission Expires: 8/28/2011

3

This instrument prepared by
(and after recording return to):
Louise W. Spivey, Esq., c/o
**PUBLIX SUPER MARKETS, INC.**
P. O. Box 407
Lakeland, FL  33802-0407

Property Appraiser's Parcel
Identification Number

## MEMORANDUM OF TERMINATION OF LEASE AND RESTRICTIVE COVENANT

*FOR RECORDER'S USE ONLY*

THIS MEMORANDUM OF TERMINATION OF LEASE AND RESTRICTIVE COVENANT ("Memorandum") is made as of the ____ day of _____, 2010 by **WDC/HLP CORTEZ LLC**, a Wisconsin limited liability company ("Landlord"), with offices at 13400 Bishops Lane, Suite 100, Brookfield, Wisconsin 53005 ("Landlord"), and **PUBLIX SUPER MARKETS, INC.**, a Florida corporation ("Tenant"), with reference to the following facts:

A.  Landlord (as successor in interest to Cortez Commons, Ltd.) and Tenant are parties to that certain Lease Agreement dated December 15, 1980, as amended by that certain First Amendment to Lease Agreement dated April 23, 1981, and by that certain First Addendum to Lease Agreement dated August 16, 1982, and by that certain Second Addendum to Lease Agreement dated May 13, 1994 (with the Lease Agreement, First Amendment, First Addendum and Second Addendum hereinafter collectively referred to as the "Lease"), as evidenced by that certain Memorandum of Lease dated December 15, 1980 and recorded in Official Records Book 997, page 3137, public records of Manatee County, Florida, as amended by that certain unrecorded Amendment to Memorandum of Lease dated April 23, 1981 and by that certain First Addendum to Memorandum of Lease dated August 16, 1982, and recorded in Official Records Book 1033, page 3576, public records of Manatee County, Florida, whereby Landlord leases to Tenant, and Tenant leases from Landlord, certain Premises in the Cortez Commons Shopping Center, Bradenton, Manatee County, Florida (the "Shopping Center"), as legally described on **Exhibit A**, attached hereto and by this reference made a part hereof.

B.  The Lease grants to Tenant the exclusive right to operate a grocery supermarket in the Shopping Center.

C.  Landlord and Tenant have entered into that certain Termination of Lease Agreement dated on or of even date herewith, whereby Landlord and Tenant have agreed to terminate the Lease as of November 30, 2010.

D.  Pursuant to the Termination of Lease Agreement, Landlord has agreed to restrict the use of the Shopping Center for a certain period of years after termination of the Lease.

E.  Landlord and Tenant have agreed to acknowledge in writing and for recording in the public records of Manatee County, Florida, the termination of the Lease.

IN CONSIDERATION OF the foregoing facts, the covenants, conditions and agreements set forth below, ten and no/100 dollars ($10.00) and other good and valuable considerations the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant covenant and agree as follows:

1.  **Termination.**   The term of the Lease has been terminated as of November 30, 2010 (the "Termination Date"), and from and after such date, none of the terms, conditions, and provisions of the Lease shall have any force or effect whatsoever.

2.  **Restrictive Covenant.**  As a prime consideration and inducement for Tenant to enter into the Termination of Lease Agreement and this Memorandum, Landlord covenants and agrees that, until December 2, 2016, no retail grocery supermarket use shall be permitted to operate within the Premises or the Shopping Center, except for (i) tenants under existing leases which were open and operating for

Family Dollar, 99 Cent Stores, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job/Amazing Savings, Big Lots, Building 19, National Wholesale Liquidators, State Line, Job Lot/Spartan's Bargain Outlet and Ollie's Bargain Outlet. The term "grocery component" as used in this section, shall mean the retail sale of groceries and other products typically sold in a grocery supermarket. The term "ancillary", as used in this section, shall mean (i) not a primary use by such tenant of its premises, and (ii) the Leasable Floor Area of such premises devoted to such ancillary use shall not exceed thirty percent (30%) of the Leasable Floor Area of such premises devoted to retail sales area as opposed to office, storage, or other uses.

Landlord hereby further covenants and agrees that in the event Landlord sells, transfers, or conveys all or any portion of the Shopping Center, this restrictive covenant shall be deemed to constitute a covenant running with title to such sold, transferred or conveyed portion of the Shopping Center, which covenant shall remain in full force and effect and be binding upon the successors in title to Landlord until expiration on December 2, 2016.

3. **Enforcement.**  If any tenant in the Shopping Center or successor in title thereto shall violate the restrictive covenant set forth in paragraph 2, above, then upon notice to Landlord of such violation, Landlord shall promptly commence and expeditiously pursue any and all remedies available to Landlord for the enforcement of such restrictive covenant, including, without limitation, injunctive relief against such tenant or successors in title.  Furthermore, if Landlord fails to promptly pursue enforcement of such restrictive covenant, then Tenant shall have the right, but not the obligation, to pursue enforcement of the restrictive covenant against such tenants or successors in title, whether in Tenant's own right or in the name of Landlord, and Landlord hereby agrees to cooperate and, to the extent required, participate with Tenant. Any reasonable expense, including, without limitation, reasonable attorney's fees and court costs, incurred by Tenant in the enforcement of the restrictive covenant shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor on demand and save Tenant harmless therefrom.

4. **Binding Agreement.**  This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, transferees and assigns.

[SIGNATURES ON FOLLOWING PAGE]

**WDC/HLP CORTEZ LLC**, a
Wisconsin limited liability company

        BY:   WISCONSIN DEVELOPMENT LLC, a
                 Wisconsin limited liability company,
                 Managing Member

_____      By:_____
(Print Name)_____         Name:_____
                               As its:_____

_____
(Print Name)_____          [CORPORATE SEAL]
Two Witnesses

STATE OF _____
COUNTY OF _____

The foregoing instrument was signed, sealed, delivered, and acknowledged before me this _____ day of _____, 2010, by _____, as _____, of Wisconsin Development LLC, a Wisconsin limited liability company, as Managing Member of WDC/HLP Cortez, LLC, a Wisconsin limited liability company, on behalf of the companies. Such person is personally known to me or produced _____ as identification.

(NOTARY SEAL)            _____
                            Printed/typed name:_____
                            Notary Public-State of:_____
                            My commission expires:_____
                            Commission number:_____

**PUBLIX SUPER MARKETS, INC.**, a
Florida corporation

_____      By:_____
(Print Name)_____          John Frazier,
                               Vice President Real Estate

_____
(Print Name)_____          [CORPORATE SEAL]
Two Witnesses

STATE OF FLORIDA
COUNTY OF POLK

The foregoing instrument was signed, sealed, delivered, and acknowledged before me this _____ day of _____, 2010, by JOHN FRAZIER, as Vice President Real Estate, of **PUBLIX SUPER MARKETS, INC.**, a Florida corporation, on behalf of the corporation. He is personally known to me.

(NOTARY SEAL)            _____
                            Printed/typed name:_____
                            Notary Public-State of Florida
                            My commission expires:_____
                            Commission number:_____

Mexicali Border Café
New Hong Kong
Zodiac (liquor store)
Fantastic Sams
JSA Medical Group
You Fit
HearX
Scrubs (Uniform store)
Signs Now
Tuesday Morning
Home Marketing Products
Natalie's Fine Jewelry
Peach's Restaurant
Organizational Development
Manatee Top Nails
Bridge Club
The UPS Store
Hairport Salon

The undersigned, being the holder of a mortgage encumbering the Shopping Center and the real property on which it is located, consents to the Grant of Restrictive Covenant and agrees that its interest in said Shopping Center on the real property on which it is located shall be subject to the Restrictive Covenant contained in the foregoing Memorandum.

DATED:_____

_____

A _____

By:_____
Print Name:_____
Title:_____

STATE OF _____
COUNTY OF _____

The foregoing consent was signed, sealed, delivered, and acknowledged before me this _____ day of _____, 2010, by _____, as _____, of _____, a _____, on behalf of the _____. Such person is personally known to me or produced _____ as identification.

(NOTARY SEAL)

_____
Printed/typed name:_____
Notary Public-State of _____
My commission expires:_____
Commission number:_____

This Rider dated _____ ____, 201__ is attached to and made a part of the Lease dated
_____ (the "Lease") by and between _____
("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.      Demised Premises: (Section 1(D)) = _____.

2.      A.      Fixed Minimum Rent – Original Term (Section 5(A)):
                _____ annually; _____ per month.

3.      A.      Fixed Minimum Rent – First Option (Section 5(A)):
                _____ annually; _____ per month.

4.      A.      Fixed Minimum Rent – Second Option (Section 5(A)):
                _____ annually; _____ per month.

5.      A.      Fixed Minimum Rent – Third Option (Section 5(A)):
                _____ annually; _____ per month.

6.      A.      Fixed Minimum Rent – Fourth Option (Section 5(A)):
                _____ annually; _____ per month.



**Pre-Existing Permitted Uses**

(List by tenant trade name space number and section of the Lease)

Mexicali
New Hong Kong
Zodiac Fine Wine and Spirits
Fantastic Sams
JSA Healthcare
Arcade Land
YouFit
Hear X
Scrubs Shoes and Chef Uniforms
Signs Now
Tuesday Morning
HMP Medical
Natalie's Fine Jewelry
Peach's Restaurant
Hairport Styling Studio
Organizational Development
Top Nails
Bridge Center
UPS Store