Exhibit "1"

# LEASE

This Lease, made effective this 3rd day of *August*, 2001, by and between B & B Cash Grocery Stores, Inc., a Florida corporation with its business address at 9330 Adamo Drive, Tampa, Florida 33619, LANDLORD, and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

## WITNESSETH:

1. **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.  <u>Common Areas</u>:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan or otherwise leased to tenants from time to time, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center sign, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.

Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  Such Common Areas shall be subject to the reasonable rules and regulations as are prescribed by Landlord from time to time.  Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas.  Landlord shall not alter the parking area outlined in green on Exhibit A in a manner that would materially and adversely affect Tenant's business.

B.  <u>Dates</u>:

1)  The ("Tenant Possession Date") shall be the date Tenant takes actual possession of the Demised Premises, such date to be no latter than 10 days after Landlord has  substantially completed all construction as required pursuant to Exhibit C, and tenders possession of the Demised Premises to Tenant by written notice.  Possession of the Demised Premises shall not be deemed to have been tendered  to Tenant unless construction pursuant to Exhibit C is substantially complete.  Upon substantial completion of Landlord's Work, Tenant shall accept possession of the Demised Premises in "as is, where is" condition with all faults subject only to Landlord's obligations set forth in Paragraph 7 hereof and without warranty of any nature whatsoever.  From and after the Tenant Possession Date, Tenant shall diligently pursue all improvements to the Demised Premises necessary for Tenant to open and operate its business, fully stocked and in a first-class manner in accordance with the terms and provisions of this Lease ("Tenant's Work").  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person or any property as a result of any of the Tenant's Work or installations made in the Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk and prior to any early entry by Tenant, provide Landlord with proof of insurance coverages described in this Lease.  As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Term Commencement Date.

1

2)   The Term Commencement Date shall be the earlier of (i) the date Tenant opens for business; or (ii) the 90th day after the Tenant Possession Date.

3)   Landlord agrees to tender possession of the Demised Premises to Tenant (the "Landlord Delivery Date") no later than September 24, 2001 . If Landlord does not tender possession of the Demised Premises to Tenant by such date, then Tenant, as Tenant's exclusive remedy, may cancel this Lease upon written notice to Landlord, given at any time prior thereafter until Landlord tenders possession of the Demised Premises to Tenant. In the event Landlord tenders possession of the Demised Premises to Tenant between October 16, 2001 and February 2, 2002, Tenant shall have the sole and absolute right to accept possession immediately or elect to postpone acceptance of possession until February 2, 2002.

C.   <u>Exhibits</u>:  The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1)   Exhibit A   -   Site Plan of Shopping Center

2)   Exhibit B   -   Legal Description of Shopping Center

3)   Exhibit C   -   Landlord Work

4)   Exhibit D   -   Tenant Sign Specification

5)   Exhibit E   -   Shopping Center Exclusives

6)   Exhibit F   -   HVAC Maintenance Items

D.   <u>Demised Premises</u>:  Being the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately <u>41,028</u> square feet.

E.   <u>Shopping Center</u>:  Landlord's Shopping Center is at the address <u>2414 Land O'Lakes Blvd.</u> in the State of <u>Florida</u>, City of <u>Land O' Lakes</u>, County of <u>Pasco</u>, and <u>34639</u> zip code.

## 2.   DEMISE:

Landlord, in consideration of the rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the term and for the use hereinafter provided. Landlord further grants to Tenant a non-exclusive license to use the Common Areas to be shared with the other Tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.   TERM:

A.   <u>Original Term</u>:  The Original Term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(2) above and ending January 31, <u>2007</u>.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be the "First Partial Lease Year." Tenant's obligations to pay rent shall commence on the Term Commencement Date.

B.   <u>Option to Extend Term</u>:  So long as the Tenant is not in default under the terms of this Lease, Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term" and "Second Option Term". The First Option Term shall commence at the end of the Original Term of this Lease and the Second Option Term shall commence at the end of the First Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least one hundred

eighty (180) days prior to the expiration of the Original Term or the previous option term.

4.   **USE AND OPERATION:**

Tenant covenants and agrees that the Demised Premises shall be used and occupied ("Tenant's Use") for the purpose of the retail sale of general merchandise, furniture and related furnishings, and food. Landlord warrants that, except for those exclusives identified in Exhibit F, and attached hereto, no other exclusive covenants granted on behalf of any other tenants in the Shopping Center shall restrict Tenant's Use. After the date of this Lease and thereafter during the term hereof so long as (i) Tenant is not in default hereunder, (ii) Tenant is open for business on an on-going basis (subject to temporary periods during which Tenant is closed due to remodeling or repairs after a casualty), and (iii) Tenant is conducting its business on the Demised Premises as a liquidator, close out store or dollar store, Landlord shall not enter into any lease for space in the Shopping Center with any other liquidator, close out store or dollar store operation ("Competing Business"). In the event of a breach of the foregoing covenant, Tenant, as Tenant's sole and exclusive remedy, shall pay in lieu of Guaranteed Minimum Rent, Percentage Rent and other charges payable hereunder (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly rent equal to the lesser of two and one-half percent (2.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Guaranteed Minimum Rent, such amount to be payable within thirty (30) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder. Tenant acknowledges and agrees that the Shopping Center, as depicted on Exhibit A and legally described on Exhibit B is part of a larger retail development over which Landlord has no control and that the foregoing exclusive right applies only to the Shopping Center, as so depicted and described.

Tenant agrees to, operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and 1:30 P.M. to 5:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section 4 Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all liability hereunder accruing on or after the termination date, but Tenant shall remain fully liable for all obligations accruing prior to the termination date.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, or refuse (except that reasonable amounts may be kept temporarily in closed containers in the places directed by Landlord) from vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances. Tenant shall operate its business in compliance with all applicable laws, codes and governmental rules and regulations (collectively, the "Laws") and shall cause the Demised Premises (interior non-structural) at all times during the term hereof to comply with all Laws. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair; permit Tenant's agents, employees, customers or invitees to break the law or reasonable rules and regulations adopted by Landlord; do anything to damage, injure or interfere with Landlord, other tenants or occupants of the shopping center or their customers or invitees.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over

the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

5.    **RENT:**

From the Term Commencement Date and throughout the term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at, B & B Cash Grocery Stores Inc. P.O. Box 1808, Tampa, FL 33601, or at such other place as Landlord may from time to time direct in writing, the following which are collectively referred to hereinafter as "Rent", all without setoff, demand, counter claim or abatement, except as specifically set forth herein, each installment of which Rent shall be supplemented to include all applicable sales and use taxes:

A.    Guaranteed Minimum Rent:  During the Original Term of this Lease, the sum of $153,855.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $12,821.25. The Guaranteed Minimum Rent for any partial month shall be prorated on the basis of a thirty (30) day month.

All the terms and conditions of this Lease shall apply during the option terms except that (1) each option to extend the term shall terminate unless timely and properly exercised; (2) the Guaranteed Minimum Rent applicable for the First Option Term shall be the sum of $174,369.00 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $14,530.75.  The Guaranteed Minimum Rent applicable for the Second Option Term shall be the sum of $194,883.00 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each of every month in the amount of $16,240.25.

B.    Utilities Charge and Exterior Lighting:  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities.  In the event Landlord supplies any utility to Tenant, the rate charged for such service shall not exceed the applicable consumer rate which Tenant would otherwise pay as a direct customer of the public or municipal utility company providing such service.  In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than forty-eight (48) consecutive hours as a result of the acts or gross negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs as herein provided, Guaranteed Minimum Rent shall abate upon the expiration of such forty-eight (48) hour period until such services are fully restored.  All billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof, or among Landlord's other remedies, such services may be discontinued.

C.    Percentage Rent:  In addition to the "Guaranteed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional rent for each Lease Year and the First Partial Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual gross sales and income, as hereinafter defined, which exceeds the annual base sum of $6,154,200.00 during the Original Term; $6,974,760.00 during the First Option Term; and $7,795,320.00 during the Second Option Term.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of gross sales and income for the previous month. Tenant shall furnish to Landlord within sixty (60) days immediately following the end of each Lease Year, an accurate statement of the gross sales and income for such period, certified to by Tenant, and shall therewith pay to Landlord, any percentage rental then due at the percentage above stated.  Percentage rental payments required to be made by Tenant under the terms of this Lease shall be made promptly when due.  The term "gross sales and income" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises and (2) charges for all services rendered in or from the Demised Premises, and (3) all other income and receipts whatsoever of all business conducted at, on or from the Demised Premises including without limitation mail, telephone, facsimile and other orders received or filled at the

Demised Premises, including all catalogue sales, deposits not refunded to the purchasers, orders taken at the Demised Premises although filled elsewhere, gross receipts from vending and game machines, sale price of gift and merchandise certificates, and all other gross income or receipts from any business or operation at, on or from the Demised Premises. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees, licensees and concessionaires. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned for cash, (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks not to exceed two percent (2%) of gross sales; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; and (8) proceeds from vending machines located in the Demised Premises.

For the First Partial Lease Year, percentage rent shall be calculated using a formula with the numerator being the number of days in the Partial Lease Year and the denominator being 365 multiplied by the annual base sum during the term in which it falls. Tenant shall pay the amount by which two and one-half percent (2-1/2%) of Tenant's gross sales exceeds the product.

Should Tenant have opened for business during the month preceding the Term Commencement Date, the gross sales and income for the fractional month shall be added to the gross sales and income for the first month of this term, and the annual base sum shall be proportionately increased and the Percentage Rent paid thereon. Should this Lease expire or be sooner terminated leaving a fractional Lease Year, for purpose of computation of Percentage Rent payable hereunder, the annual base sum shall be proportionately reduced and Percentage Rent shall be paid thereon.

Tenant agrees to keep at its corporate offices books of account, in accordance with good accounting practice of the business conducted on said Demised Premises, accurately showing all gross sales and income. Landlord or its authorized agents may audit in accordance with generally accepted accounting principles the same at any reasonable time upon ten (10) days prior written notice, provided such right to audit shall be limited to one (1) time per Lease Year. Should Landlord's audit of Tenant's books and records disclose gross sales and income which are three percent (3%) or more greater than that reported by Tenant, then Tenant shall pay to Landlord on demand the reasonable cost of such audit and any Percentage Rent found to be due by such audit, plus interest at the rate of eighteen percent (18%) per annum from the date payment was due. Further, in the event Landlord's audit discloses gross sales and income of less than three percent (3%) than reported by Tenant, then Tenant shall pay to Landlord said amount plus interest at the rate of eighteen percent (18%) per annum from the date payment was due.

D.    Common Area Charges: Throughout the term of this Lease, Landlord shall be responsible for the following:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees in the manner and condition that exist on the date of this Lease;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities (except Tenant shall be solely responsible to contract for and maintain such sized disposal containers as it may deem appropriate), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center in the manner and condition that exist on the date of this Lease;

(iii) operating, maintaining, refurbishing, repairing, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs in the manner and condition that exist on the date of this Lease;

(iv) maintaining all paved surfaces in a reasonably level and smooth condition, reasonably free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(v) cleaning and sweeping as needed.

Such expenses shall include, but shall not be limited to, costs of management and supervision not to exceed ten percent (10%) of all other such expenses, refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, resurfacing, landscaping, providing security, providing public liability, property damage, fire and extended coverage on the common facilities and such other insurance as Landlord deems appropriate, including without limitation rental loss coverage, (except that all expenses associated with any policies of insurance carried by Landlord shall be excluded from the Common Area Charges cap stated herein, and Tenant shall be responsible to pay a pro rata share of Landlord's insurance premiums as provided in Section 12 of this Lease) total compensation and benefits (including premiums for worker's compensation and other insurance) paid to on behalf of employees; personal property, supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, and parking area surcharges or levies. Such expenses are collectively referred to herein as "Common Area Charges".

Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges as set forth herein. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the ground leasable floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. Notwithstanding anything to the contrary contained herein, there shall be excluded from Common Area Charges the original capital costs of the Shopping Center and the original equipment serving the same. There shall also be excluded from the Common Area Charges the capital costs of improvements, replacements, additions, and alterations of the Common Areas, but such costs and expenses may be depreciated according to generally accepted accounting principles over the applicable useful lives, and such annual depreciation may be included in the Common Area Charges.

On the first day of each calendar month during the Original Term hereof, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to one-twelfth (1/12th) of the sum obtained by multiplying the leasable floor area of the Demised Premises by fifty cents ($0.50). If the Term Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its pro rata share of Common Area Charges for the fractional month between the Term Commencement Date and the last day of the calendar month in which the Term Commencement Date occurs shall be prorated on a per diem basis (calculated on a thirty (30) day month) and shall be paid together with the first payment of Guaranteed Minimum Rent.

After the first Full Lease Year, Tenant shall continue to pay such estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as specifically set forth herein) by the aforesaid estimated amount of Tenant's pro rata share of such Common Area Charges. Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, Landlord shall furnish to Tenant a written statement in reasonable detail covering the Common Area Charges just expired showing the total Common Area Charges for such Lease Year, the amount of Tenant's pro rata share thereof and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual invoices limited to items in excess of Five Thousand Dollars ($5,000.00) paid for such Common Area Charges as stated herein.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord ten (10) days' notice of its dissatisfaction, and Tenant shall be entitled to an audit in accordance with generally accepted accounting principles of Landlord's books to be made by Tenant's accountants. If any such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next rental payments due from Tenant to Landlord hereunder.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder or otherwise indebted to Landlord, Landlord shall credit such excess against the next payments due for Common Area Charges; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, is not indebted to Landlord and has vacated in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Notwithstanding anything to the contrary contained herein, Tenant's contribution to Common Area Charges shall not exceed fifty cents ($0.50)per square foot per Lease Year or pro rata portion thereof during the Original Term; sixty cents ($0.60) per square foot per Lease Year or pro rata portion thereof during the First Option Term; and seventy cents ($0.70) per square foot per Lease Year or pro rata portion thereof during the Second Option Term.

E.     Taxes and Assessments: Tenant shall pay its pro rata share of all real property taxes and assessments which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center. Tenant's pro rata share of real estate taxes and assessments shall be the product obtained by multiplying said taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. If the term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said real estate taxes for the year shall be made to cover the fraction of a year included within the terms of this Lease.

The real estate taxes and assessments on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and expense of obtaining the same) to be payable with respect to the Shopping Center for such period. For any Partial Lease Year, the amount of real estate taxes and assessments shall be pro rated on a per diem basis.

Interest and/or penalties for late payment shall not be included in determining tax and assessment increases. Further, if a discount of said tax bills is available by prompt payment, Tenant's pro rata share of real estate taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

If Tenant deems any taxes, assessments, or charges payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, at no cost to Landlord, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all taxes, assessments, and charges, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay to Landlord on the first day of each calendar month during the term, its estimated monthly pro rata share of the taxes and assessments against the land and improvements in the Shopping Center, or against Landlord in respect thereof, based upon the actual amount of the last taxes and assessments which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. If the Term Commencement Date hereof shall not be the first day of a calendar month, Tenant's payment of its prorata share of taxes and assessments for the fractional month between the Term Commencement Date and the last day of the calendar month in which the Term Commencement Date occurs shall be prorated on a per diem basis (calculated on a thirty (30) day month) and shall be paid together with the first payment of Guaranteed Minimum Rent. Tenant's pro rata share of such taxes shall be determined as provided in this Section 5(E). Landlord shall furnish Tenant with copies of actual tax bills when same are issued. An adjustment shall be made as soon as the actual taxes for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall pay for any deficiency within fifteen (15) days of receipt of Landlord's notice, and Landlord shall within thirty (30) days of receipt of the actual tax bill give credit for any overage.

Tenant shall pay when due and payable all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

## 6. ALTERATIONS:

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises, provided that such work shall not result in any penetrations of the roof without Landlord's written consent; affect any the structural systems of the building of which they are a part, including without limitation electrical, plumbing, HVAC and structural support; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

If any construction or other liens shall be filed against the Demised Premises or any improvement thereon by reason of or arising out of any labor or material furnished or alleged to have been furnished or to be furnished to, or for Tenant at the property or for or by reason of any charges, alternations, or additions or the cost or expense thereof, or any contract relating hereto, or against Landlord as the owner thereof, Tenant shall within thirty (30) days after written notice from Landlord, either pay or bond the same or procure the discharge thereof in such manner as may be provided by law.

Notice is hereby given that Landlord shall not be liable for liens for any labor or materials or other liens incurred by Tenant, and no such liens shall attach to the reversionary or other estate or interest of Landlord in the Demised Premises. Tenant shall also defend on behalf of Landlord at Tenant's sole cost and expense, any action, suit or proceedings which may be brought thereon or for the enforcement of such lien or liens, and Tenant

shall pay any damage and discharge any judgment entered thereon and save harmless Landlord from any claim or damage resulting therefrom.

7.    **MAINTENANCE AND REPAIRS:**

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost, damage or claim resulting from such breakage or the replacement thereof unless such damage is due to the negligence of Landlord.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the date of possession under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Tenant also agrees to keep the entrance to the Demised Premises in a clean and safe condition by removing snow and ice from the doorways. Tenant further agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary. Tenant, at Tenant's sole cost and expense, shall maintain an annual HVAC service contract which shall provide for the regular maintenance and performance of the items listed in Exhibit G. F

Landlord agrees to keep or cause to be kept, repaired, replaced and maintained, at Landlord's sole cost and expense the roof, roof drains, exterior utility lines, and exterior walls, exclusive of doors and windows during the term and will make required structural repairs to the building of which the Demised Premises are a part. Notwithstanding the foregoing, Tenant agrees to make and pay for all repairs of damage to the same caused by the act, omission, fault or negligence of Tenant, its agents, employees, contractors and invitees. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or to make repairs to Common Areas or those facilities required to be maintained by Landlord or to otherwise inspect the Demised Premises, provided the same does not substantially interfere with Tenant's operation.

Tenant shall provide written notice to Landlord of the need for repairs to the Demised Premises pursuant to the terms of this Lease. If Landlord fails to commence any necessary repairs within thirty (30) days after such notice and thereafter diligently complete such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency and if Landlord after receiving confirmation from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. In performing any such repairs pursuant to this Section 7, Tenant shall use reputable contractors and perform all such work in a first class and workmanlike manner in accordance with all applicable governmental codes, rules and regulations. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days after receiving a full accounting from Tenant, together with copies of invoices, receipts, and lien waivers, Tenant shall have the right to deduct such cost from the next monthly rent payment(s) owing.

8.    **SIGNS:**

Subject to applicable codes and ordinances and declarations, covenants and restrictions of record, Tenant shall at its sole cost and expense have the right to place, suffer or erect the signs, awnings, canopies or decorations on the exterior walls of the Demised Premises depicted on Exhibit D attached hereto and made a part hereof. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Subject to applicable codes and ordinances and declarations, covenants and restrictions of record, Tenant shall also be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

Subject to applicable codes and ordinances and declarations, covenants and restrictions of record, Tenant shall have the right to place suitable panels upon the existing Shopping Center pylon in the location of the existing panels on such pylon sign. Tenant shall, at its own expense, obtain all necessary permits and comply with applicable local codes and ordinances. Once the panels are installed Landlord shall not require Tenant to remove,

replace change, or alter them and Landlord shall not remove, replace or diminish the size of Tenant's panels.

During the Original Term, options or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At all times while Tenant is not in default under the terms and conditions of this Lease, Tenant may replace such trade fixtures or equipment. Prior to the end of the term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or air conditioning, plumbing or electrical equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.

10.    **GOVERNMENTAL REGULATIONS:**

If mandated by the appropriate governmental authority, Landlord agrees to bring the roof, structure and exterior portions of the Demised Premises into conformance with applicable code; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such mandate is the result of changes, alterations or additions made by Tenant.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property or real property of every kind and nature arising from or in connection with Tenant's use and occupancy of the Demised Premises, the Common Areas and the Shopping Center. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to, or death of any person or damage to personal property or real property of every kind and nature arising from or in connection with the use and occupancy of the Common Areas, the Shopping Center and the Demised Premises caused by the negligent acts or omissions to act of Landlord, or Landlord's servants and agents, or by failure of Landlord, or Landlord's servants and agents, to fulfill Landlord's obligations hereunder. Excluded from such indemnification shall be any consequential damages.

Landlord and Tenant agree to notify their respective fire and extended coverage insurance carrier of the indemnity and hold harmless agreement contained in this Section.

12.    **INSURANCE:**

A.    Liability: Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, including a contractual liability endorsement covering Tenant's indemnity obligations under this Lease, which insurance, shall include Landlord as an additional insured, as its interest may appear, in companies and in a form reasonably satisfactory to Landlord, with minimums of the following: (i) Five Hundred Thousand Dollars ($500,000.00) on account of bodily injuries to, or death of one person; (ii) One Million Dollars ($1,000,000.00) on account of bodily injuries to or death of more than one person as a result of any one accident or disaster; and (iii) with Two Hundred Fifty Thousand Dollars ($250,000.00) coverage for property damaged in an accident, and to deposit said certificates of coverage thereof with Landlord prior to the Tenant Possession Date.

Tenant also agrees to carry at its own expense, throughout this Lease workers' compensation insurance as required by statue, Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements, provided Tenant has a minimum net worth of Twenty Million Dollars ($20,000,000.00).

B.   Insurance Premiums:  Landlord has insured all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against loss or damage by fire and such other risks as are normally insurable under the standard form of fire insurance with broad form extended coverage endorsement, including malicious mischief and vandalism, in an amount not less than the full insurable value of all the improvements located in the Shopping Center, including the Demised Premises. All policies of insurance required hereunder shall require thirty (30) days' prior written notice of cancellation or modification.

Tenant acknowledges that the Shopping Center is insured, together with additional properties owned by Landlord, under blanket insurance policies.

Tenant will pay to Landlord monthly Tenant's estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center.

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium within ten (10) days of when the same are issued.  An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

13.   **FIRE REBUILDING AND ALTERING:**

A.   Landlord shall at all times during the term of this Lease and in accordance with all provisions herein, carry fire, casualty, and extended coverage insurance on all the buildings and permanent improvements on the building.

B.   If the Demised Premises shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the term hereof, Landlord shall repair and restore the same to a good tenantable condition within a reasonable time.  During such period of repair, the rent herein provided for in this Lease shall abate in proportion to the area of the Demised Premises rendered untenantable.  Said abatement shall cease when Landlord has restored the Demised Premises to the condition in which Landlord is required to deliver same to Tenant.  Notwithstanding anything in this Lease to the contrary, (i) Landlord shall have no responsibility for the repair or replacement of any furnishings, fixtures or other leasehold improvements belonging to or placed in or affixed to the Demised Premises by Tenant and no damage to or destruction of any such furnishings, fixtures or other leasehold improvements shall entitle Tenant to an abatement of rent; (ii) Tenant shall not be entitled to an abatement of rent for any damage or destruction of the Demised Premises resulting from the negligent acts or omissions or willful misconduct of Tenant or Tenant's agents, employees or contractors.

C.   In the event the Demised Premises are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

D.   If the Demised Premises are damaged or destroyed during the last twelve (12) months of the Original Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, or in the event that the Demised Premises are substantially damaged or destroyed or rendered wholly untenantable at any time during the term Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days following such casualty.  In the event this Lease is terminated, Landlord shall be entitled to its insurance proceeds.

14.    **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing other than Tenant's obligation to pay all rent and other amounts to be paid by Tenant hereunder, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

15.    **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.    **WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; and (b) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the term provided in this Lease.

Tenant may obtain, at his own expense, a title insurance policy issued by a title insurance company acceptable to Tenant. Landlord agrees to cooperate with Tenant in obtaining said policy by delivering, within seven (7) days after notification by Tenant or Tenant's title insurance company all title information in Landlord's possession relating to the Demised Premises. Said title insurance policy shall insure Tenant in the amount of Five Hundred Thousand ($500,000.00) that good and marketable title to the Demised Premises is vested in the Landlord.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that if Tenant shall not be in default beyond any period for the cure thereof, Tenant shall, at all times during the Original Term of this Lease and any options or extensions properly and timely exercised by Tenant, have peaceable and quiet enjoyment and possession of the Demised Premises.

18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien which shall be placed on the Demised Premises prior to the Tenant possession date shall enter into a subordination, non-disturbance and attornment agreement on terms mutually satisfactory within fifteen (15) days of the date of the execution of the mortgage by Landlord, which agreement shall provide, inter alia, that the mortgagee shall not disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Tenant agrees to subordinate Tenant's interest under this Lease to any mortgage lien placed on the Demised Premises after the Tenant possession date, provided that as a condition to such subordination Tenant and such mortgagee shall enter into a mutually satisfactory non-disturbance, subordination and attornment agreement on a commercially reasonable form which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the term remaining, including any options or extensions, renewals, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement in writing satisfactory to Landlord or the holder of the mortgage, certifying the

facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Guaranteed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the date that the Demised Premises were ready for occupancy and all conditions precedent to the Lease taking effect were satisfied or waived by Tenant; (iv) the dates on which Tenant accepted possession and Tenant's store opened for business; (v) the Tenant is occupying the Demised Premises; and (vi) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

## 19. DEFAULT:

A.  If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the rent or other charges reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Landlord (provided that Landlord shall be obligated to deliver such notice no more than two times in any Lease Year and after two written notices in any Lease Year, Tenant shall be in default hereunder if any rent or other charges reserved herein or any installment thereof is not paid within ten (10) days of the applicable due date), or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord, then in any such event Landlord shall name the right to elect any one or more of the following remedies:

   A.  Landlord shall have the right, at its election, to cancel and terminate this Lease and to remove all persons and property therefrom by summary proceedings; provided, however, that any such termination of this Lease shall be at the option or election of the Landlord only, and such termination and cancellation shall not take effect unless the Landlord elects in writing that it shall. No such termination of this Lease shall relieve Tenant of any liability hereunder accruing prior to the date of termination.

   B.  Landlord shall have the right to collect each installment of Rent and all other charges hereunder as and when the same become due and payable.

   C.  Landlord shall have the right without termination of this Lease, upon written notice to Tenant, to terminate Tenant's right to possession and to enter upon the Demised Premises and dispossess the Tenant and to re-let the Demised Premises, or portions thereof, for the Tenant's account, for such periods of time and at such rentals, for such use and upon such covenants and conditions as Landlord may elect, applying the net rentals or avails of such letting first to the payment of Landlord's expenses in dispossessing the Tenant and the costs or expenses of making such repairs in the Demised Premises as may be necessary in order to enable the Landlord to re-let the same, and to the payment of any brokerage commissions or other necessary expenses of the Landlord in connection with such re-letting; and the balance, if any, shall be applied by the Landlord from time to time, on account of the payment due or payable by the Tenant hereunder, if any, with the right reserved to the Landlord to bring such action or proceedings for the recovery of any deficits remaining unpaid as it may deem advisable from time to time, without being obliged to wait until the end of the term for a final determination of the Tenant's account. The commencement or maintenance of any one or more actions shall not bar the Landlord from bringing other or subsequent actions for further accruals pursuant to the provisions of this paragraph. Any balance remaining, however, after full payment and liquidation of the Landlord's accounts as aforesaid, shall be paid to the Tenant from time to time with the right reserved to the Landlord at any time to give notice in writing to the Tenant of Landlord's election to cancel and terminate this Lease and all of the Tenant's obligations under the Lease, and upon the giving of such notice and the simultaneous payment by Landlord to Tenant of any credit

balance in Tenant's favor that may at the time be owing, it shall constitute a final and effective cancellation and termination of this Lease and the obligations under this Lease on the part of either party to the other. Notwithstanding the foregoing, Landlord shall have all remedies available to it by law or equity and choosing one remedy shall not preclude Landlord from other remedies.

**20.    CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, both Landlord and Tenant shall have the right to cancel this Lease.  In the event any part of the parking area of the Shopping Center is taken in condemnation proceedings so that the number of parking spaces in the Shopping Center is reduced below the requirements of the applicable building and zoning code(s), both Landlord and Tenant may shall have the right to cancel this Lease.  In the event of a condemnation that does not result in the termination of this Lease, Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith; provided, however, that Landlord shall not be obligated to expend any amounts in excess of condemnation proceeds paid to Landlord.  Rental shall abate in proportion to the extent that the Demised Premises are rendered untenantable during the restoration process. Thereafter, rental shall be reduced in proportion to the amount of space within the Demised Premises taken.  For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings.  Tenant shall be entitled to pursue compensation for damages in separate actions brought by Tenant for Tenant's business losses and moving expenses only but not for losses of fixtures or Tenant improvements or the value of Tenant's leasehold estate or any other asset or interest.

**21.    MUTUAL WAIVER OF SUBROGATION:**

Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by and casualty or hazard, or in connection with property on or activities conducted on the Demised Premises or the Shopping Center and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof.

**22.    ASSIGNMENT AND SUBLETTING:**

Except as otherwise provided herein, Tenant shall not assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein, and shall not sublet the Demised Premises or any part thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld.  Tenant's Request shall (a) specify the name and address of the proposed assignee or subtenant (the "Proposed Transferee") and the proposed use of the Demised Premises by the Proposed Transferee and (b) include a copy of the Proposed Transferee's most recent financial statements, certified by a certified public accountant.  In no event shall the Demised Premises be used for purposes that shall be (a) in violation of then existing exclusives uses granted by Landlord to any other tenant in the Shopping Center or (b) otherwise prohibited by this Lease.

Upon notice from Tenant to Landlord requesting Landlord's consent to an assignment or subletting of this Lease ("Tenant's Request"), Landlord shall have the option, which shall be exercisable by notice given to Tenant within 20 days after Tenant's Request, to cancel this Lease.  If Landlord shall elect to cancel this Lease, the Lease shall terminate 90 days from the date on which Tenant receives written notice of Landlord's termination election, and this Lease shall so terminate without penalty or default on the part of either Party.

No consent by Landlord to any assignment or subletting by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether occurring before or after such consent, assignment or subletting.  If at the time of a default beyond any applicable notice and cure periods under this Lease, all or a part of the Demised Premises shall be assigned or sublet, Landlord, in addition to any other remedies provided by law, may at its option collect Rent and Additional Rent directly from the assignee or subtenant without in any way waiving any claims Landlord may have against Tenant under this Lease.  Any collection directly by Landlord from the assignee or subtenant shall not be construed as a novation or a release of Tenant hereunder.  The acceptance by Landlord of Rent or Additional Rent from any other person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any assignment, subletting

or other transfer. Consent to one assignment, subletting or other transfer shall not be deemed to constitute consent to any subsequent assignment, subletting or other transfer.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without Landlord's consent, and without Landlord's right to terminate this Lease so long as (i) the intended use does not substantially differ from the use of Tenant herein, <u>and</u> (ii) such assignment or subletting is to a parent, subsidiary, succeeding entity, or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant; provided that in case of any such assignment or sublet referred to above, such assignee or sublessee shall assume all of Tenant's obligations hereunder in writing, and Tenant shall not be relieved of its obligations hereunder. The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as (i) the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange, or (ii) such transfer is otherwise a permitted transfer without Landlord's consent as provided for above.

Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, loss by fire, wind and ordinary wear and tear excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting and other electrical fixtures, plumbing fixtures and heating, ventilating, and air conditioning equipment whether or not attached to the Demised Premises.

Should Tenant thereafter remain in possession or occupancy of any part of the Demised Premises or hold the keys, a tenancy shall be deemed to continue from month to month on the terms herein expressed, where applicable, but should the same occur without Landlord's consent, no tenancy of any duration shall be created and Tenant's use and occupancy fee while in possession of the Demised Premises shall be the Guaranteed Minimum Rent, plus all other charges due under this Lease, and percentage rent based on the twelve (12) months (or fraction thereof, if less than twelve (12) months of the lease term has elapsed) prior to the breach.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("Notice") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) hand, (ii) a nationally recognized overnight express courier, or (iii) registered or certified mail return receipt requested. The date of actual receipt shall be deemed the date of service of Notice. In the event an addressee refuses to accept delivery, however, then Notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day in the case of delivery by overnight courier, or (iii) three (3) business days after mailing the Notice in the case of registered or certified mail. Either party may, at any time, change its Notice address by giving the other party Notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the laws of the State of <u>Florida</u>.

26.    **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.    **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease in the form attached hereto as Exhibit F, which Tenant may record at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.    **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder other than the Broker, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.    **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the rental herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.    **HAZARDOUS MATERIAL:**

Landlord represents and warrants that, to Landlord's present actual knowledge without any investigation whatsoever the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which has been determined by state, federal or local governmental authority to pose a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises and within the Shopping Center at any time during the Term of this Lease or any options or extensions thereof, which Hazardous Material is determined (i) to have been in existence on the Demised Premises prior to the Tenant Possession Date, or (ii) is determined to have been placed thereon by Landlord during the Term of this Lease or any options or extensions thereof, Landlord shall comply with all applicable governmental laws and regulations concerning such Hazardous Material including those concerning the removal and disposal of such Hazardous Material; provided, however, that Tenant shall be solely responsible for the removal and disposal of any and all asbestos in or about the Demised Premises in accordance with all applicable governmental requirements to the extent that such removal and disposal is required in conjunction with any alterations, modifications or improvements to the Demised Premises performed by or on behalf of Tenant other than Landlord's obligations described on Exhibit C attached hereto and made a part hereof.

Throughout the Original Term of this Lease or any options or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. In all events, Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any

release of hazardous materials from on or about the Demised Premises directly caused by Tenant or Tenant's agents, employees, or contractors while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

31.    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them. This Lease is not binding upon Tenant until it has been signed by Landlord's authorized officers and delivered to the Tenant.

32.    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is a year-end adjustment or an adjustment resulting from an error in the calculation of any additional rents payable by Tenant under the Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, tax charges or any charges to Tenant for electrical and heating and air conditioning service, which results in a deficiency owned by Tenant, Landlord shall notify Tenant of any deficiency within six (6) months after the expiration of the Lease Year in which such adjustments are applicable. If Landlord does not notify Tenant of such deficiency within said six (6) month period, Landlord's claim to such deficiency shall be deemed waived and discharged.

33.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and the delivery of an executed original copy thereof to Tenant.

34.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

35.    **EXCULPATION:**

Tenant agrees that it shall look solely to the estate and property of the Landlord in the land and buildings comprising the Shopping Center of which the Demised Premises are a part for the collection of any judgment (or any other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and performed by Landlord and no other property or estates of Landlord shall be subject levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies.

36.    **RADON DISCLOSURE:**

Section 404.056(8), <u>Florida Statutes</u>, requires the following disclosure statement:

"RADON GAS: Is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD:  B & B Corporate Holdings**

By: _Andrew Berg_

Title: _President_

Witnesses As To Tenant:

**TENANT:      Big Lots Stores, Inc., an Ohio corporation**

By:

Title: _Kathleen Hupper_

KATHLEEN HUPPER
VICE PRESIDENT

**STATE OF** _Florida_

**COUNTY OF** _Hillsborough_

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _J. Andrew Berg, Jr._, by _President_, its who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Tampa, Florida_, this _3rd_ day of _August_, 19 ~~~~ _2001_

_Patricia L. Toth_
Notary Public

Patricia L. Toth
MY COMMISSION # CC923049  EXPIRES
June 6, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.,** by, its who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Columbus, Ohio_, this _1_ day of _August_, 19 ~~~~ _2001_.

_Candice S. Hendry_
Notary Public



CANDICE S. HENDRY
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES APRIL 25, 2005



PASCO PLAZA - Site Plan
Land O'Lakes - Lutz, FL
Exhibit "A"

Folio No. 25-26-18-0000-07900-0010

## EXHIBIT



Folio # 25-26-18-0000-07900-0010

Pasco Plaza: Commence at the Southwest corner of the Northeast 1/4 of the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, thence run North 00° 05' 38" East along the West boundary of said Northeast 1/4 of Southwest 1/4 587.82 feet to the centerline of State Road 54, thence run South 75° 40' 42" East along said centerline 157.57 feet; thence run North 02° 01' 10" East, 51.18 feet to the northern boundary of the right of way of State Road 54 for a point of beginning; thence Continue North 02° 01' 10" East, 127.82 feet; thence South 75° 40' 42" East, 280.0 feet; thence South 02° 01' 10" West 127.82 feet to said northerly right of way; thence South 75° 40' 42" East, along said right of way 51.19 feet; thence North 02° 01' 10" East, 127.82 feet' thence North 13° 07' 42" West, 132.0 feet; thence North 20° 09' 45" West 27.77 feet; thence North 10° 40' 28" East, 564.01 feet to the northerly boundary of the Southwest 1/4 of said Section 25, thence South 89° 51' 52" West along said northerly boundary of said Southwest 1/4 860.86 feet to the easterly boundary of the right of way of U.S. Highway 41 (State Road 45); thence run South 10° 47' 58" West along said easterly right of way 587.90 feet; thence South 32° 26' 22" East, 43.71 feet to the northerly boundary of aforesaid State Road 54; thence run South 75° 40' 42" East along said northerly right of way 575.39 feet to the point of beginning; all lying and being in Pasco County, Florida.

Less and except: A Parcel of land located in the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, Pasco County, Florida, said parcel of land being more particularly described as follows: Commence at the Southwest corner of the Northeast 1/4 of the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, thence run North 00° 05' 38" East, along the West boundary of said Northeast 1/4 of the Southwest 1/4, 587.82 feet to the centerline of State Road No. 54, thence run South 75° 40' 42" East along said centerline, 157.57 feet; thence run North 02° 01' 10" East, 51.18 feet to the northerly boundary of the right of way line of said State Road No. 54; thence North 75° 40' 42" West, 575.39 feet on said northerly right of way line, thence North 32° 26' 22" West, 43.71 feet to the easterly boundary of the right of way line of U.S. Highway No. 41 (State Road 45); thence North 10° 47' 58" East, 587.90 feet on said easterly right of way line to the northerly boundary of the Southwest 1/4 of said Section 25; thence South 89° 51' 52" East, 810.86 feet to the Point of Beginning. Thence South 89° 51' 52" East, 50.00 feet on said northerly boundary; thence South 10°

40' 28" West, 95.34 feet; thence North 89° 51' 52" West 50.00 feet; thence North 10° 40' 29" East, 95.34 feet to the Point of Beginning. Less the northerly 20.34 feet thereof as measured along the East boundary of said parcel for Carson Road.

Less and except Parcel 129: That part of the Northwest 1/4 of the Southwest 1/4 of the Northeast 1/4 of the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, Pasco County, Florida, being described as follows: Commence at a 1 inch iron pipe being the Northwest corner of the Northwest 1/4 of the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, Pasco County, Florida, thence South 89° 10' 36" East along the North line of said Northwest 1/4 of the Southwest 1/4 of Section 25, for 1,328.89 feet to the Northeast corner of the Northwest 1/4 of the Southwest 1/4 of Section 25, Township 26 South, Range 18 East, Pasco County, Florida, thence South 00° 27' 43" West along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section 25, for 21.50 feet to a point on the southerly maintained right of way line of Carson Road; said point also being the point of beginning; thence South 88° 09' 07" West, along said southerly maintained right of way for 75.23 feet; thence North 89° 10' 36" West along said southerly maintained right of way line for 53.70 feet to a point on the existing easterly right of way line of State Road 45 (U.S. Highway 41); thence South 11° 01' 40" West along said easterly right of way line for 570.62 feet; thence continue along said easterly right of way line South 31° 48' 33" East for 43.71 feet to a point on the existing northerly right of way line of State Road 54, thence South 75° 27' 39" East along said northerly right of way for 403.20 feet; thence North 14° 22' 21" East for 10.00 feet; thence North 75° 27' 39" West for 346.42 feet; thence North 30° 56' 24" West for 71.79 feet; thence North 11° 01' 40" East for 233.31 feet; thence North 09° 45' 22" East for 292.88 feet; thence North 57° 30' 11" East for 25.11 feet' thence South 88° 32' 40" East for 122.98 feet; thence North 01° 27' 26" East for 14.54 feet to a point on the aforesaid southerly maintained right of way of Carson Road; thence South 86° 58' 04" West along said southerly maintained right of way line for 19.45 feet; thence North 89° 18' 02" West along said southerly maintained right of way line for 24.85 feet to the point of beginning.

EXHIBIT "A" (continued)

Less and except the parcel described in Exhibit "B" of this Easement.

## EXHIBIT B - 1

## LEGAL DESCRIPTION

DESCRIPTION: THAT PART OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 25, TOWNSHIP 26 SOUTH, RANGE 18 EAST, PASCO COUNTY, FLORIDA;

BEING MORE DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHWEST CORNER OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 25, TOWNSHIP 26 SOUTH, RANGE 18 EAST, PASCO COUNTY, FLORIDA; THENCE SOUTH 89°10'36" EAST ALONG THE NORTH LINE OF SAID NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 25 FOR 1328.89 FEET TO THE NORTHEAST CORNER OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 25, TOWNSHIP 26 SOUTH, RANGE 18 EAST, PASCO COUNTY, FLORIDA; THENCE SOUTH 00°27'43" WEST ALONG THE EAST LINE OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SAID SECTION 25 FOR 21.50 FEET TO A POINT ON THE SOUTHERLY MAINTAINED RIGHT-OF-WAY LINE OF CARSON ROAD; THENCE SOUTH 89°18'02" EAST ALONG THE SAID SOUTHERLY MAINTAINED RIGHT-OF-WAY LINE FOR 24.66 FEET; THENCE NORTH 86°58'04" EAST ALONG SAID MAINTAINED RIGHT-OF-WAY LINE FOR 19.45 FEET; THENCE SOUTH 01°27'20" WEST FOR 14.54 FEET; THENCE NORTH 88°32'40" WEST FOR 122.98 FEET TO A POINT ON THE EXISTING EASTERLY RIGHT-OF-WAY LINE OF STATE ROAD NO. 45 (U.S. HIGHWAY 41); THENCE ALONG SAID EASTERLY RIGHT-OF-WAY LINE THE FOLLOWING THREE (3) COURSES; (1) SOUTH 57°20'11" WEST FOR 25.12 FEET; (2) SOUTH 09°45'22" WEST FOR 292.88 FEET; (3) SOUTH 11°01'40" WEST FOR 145.12 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 82°34'20" EAST, FOR 136.54 FEET; THENCE SOUTH 79°13'07" EAST FOR 57.89 FEET; THENCE SOUTH 67°50'18" EAST FOR 16.67 FEET TO A POINT OF CURVATURE; THENCE 21.66 FEET ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 82°43'05" (CHORD BEARING SOUTH 26°28'45" EAST, 19.82 FEET) TO A POINT OF TANGENCY; THENCE SOUTH 14°52'47" WEST FOR 141.83 FEET TO A POINT ON THE EXISTING NORTHERLY RIGHT-OF-WAY LINE OF STATE ROAD NO. 54; THENCE NORTH 75°28'19" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE FOR 165.36 FEET TO A POINT ON THE EXISTING EASTERLY RIGHT-OF-WAY LINE OF STATE ROAD NO. 45 (U.S. HIGHWAY 41); THENCE ALONG SAID EASTERLY RIGHT-OF-WAY LINE THE FOLLOWING TWO (2) COURSES; (1) NORTH 30°57'18" WEST FOR 71.77 FEET; (2) NORTH 11°01'40" EAST, FOR 88.19 FEET TO THE POINT OF BEGINNING.

CONTAINING 0.728 ACRES, MORE OR LESS.
CONTAINING 31,709 SQUARE FEET, MORE OR LESS.

# EXHIBIT C

# LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

## Landlord covenants and agrees to deliver the premises to Tenant as follows:

### LAND O' LAKES, FL

1. HVAC equipment to be in good working condition and adequate for Tenant's intended use, including but not limited to all duct work, diffusers and any other air distribution equipment commonly used and required by Tenant. Tonnage requirements to meet Tenant's specifications of one ton per 400 square feet throughout the demised premises, sales floor and stock room. If the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to have the HVAC system inspected to determine the needed repairs by the Landlord. Landlord shall also warrant the HVAC system for a period of two years for any repairs over $2,500 during a single lease year.

2. All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification. Landlord to provide separate room with an exterior entry access door in which it shall, throughout the Original Term and any Options Terms or extensions, maintain the sprinkler riser to any sprinkler system used in common with other tenants

3. Fill channels in floor and new floor tile to match existing. Stock room floor to be smooth and level throughout entire stockroom area.

4. All damaged or missing ceiling tiles to be replaced with similar tile.

5. Provide existing vestibule entrance in good working condition (Exit doors to have automatic openers). Landlord to ensure there are curb cuts within reasonable proximity to the store front and vestibule has adequate HVAC for Tenant's use (vestibule to have slip retardant tile).

6. All doors and door systems to be sound and secure and in good working condition, and in compliance with A.D.A. requirements.

7. Landlord to provide Tenant with three (3) offices to Tenant's specifications and in compliance with all applicable local and state codes and A.D.A. requirements. The aforesaid offices shall have adequate HVAC, ceiling and floor tile, electrical and plumbing, lighting, sinks, fixtures, partitions, FRP board, etc. Cash Office to have solid plywood ceiling (minimum 1/2" thickness). Provide existing restrooms in good working condition.

8. Roof to be in good condition and free of leaks.

9. Landlord to remove all fixtures, refrigeration equipment, meat prep rooms, coolers and make all repairs necessitated by such removal including repairing the ceiling, floor, walls, etc. and the removal of the electric and plumbing to such equipment. Block in any openings in exterior walls to match existing

10. Landlord to erect demising wall, to existing head wall, separating sales area from stockroom. Existing (3) three pairs of 3'x6' stockroom doors to be in good working condition.

11. Replace all broken glass.

12. Premises to be professionally inspected for pestilence and termites, and Tenant to be provided with a certified report that the Demised Premises is pest free, and if not, Landlord will make pest free.

13. Landlord to ensure existing pylon meets all local and state codes and ordinances in order for tenant to place its panel on the pylon. Tenant to occupy a 2.5' x 14' panel on the pylons. Tenant to have access to both pylons serving the shopping center.

14.  Landlord will provide tenant with a floor plan of the demised premises adequate for tenant to draw its floor and fixture plan.

15.  Landlord agrees premises conforms to all requirements by authority having jurisdiction, if said premises do not conform, Landlord will promptly have them conform unless such is necessitated by changes, alterations or additions made by tenant.

16.  Tenant to approve all drawings prior to the commencement of work.

17.  All above work to be completed before the Tenant Possession Date.

# EXHIBIT D

## TENANT SIGN SPECIFICATION



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

**SIGN SPECIFICATIONS: BIG LOTS**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS (NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

**SIGN SPECIFICATIONS: EXCLAMATION**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS

### STANDARD SIZE CHARACTERISTICS

| A | B | C | D | E |
|---|---|---|---|---|
| 2'-0" | 12'-3" | 2'-10" | 9" | 4 1/2" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5 1/2" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-8" | 17 1/2" | 8 1/2" |
| 4'-6" | 26'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 28'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE EQUIPT WITH DISCONNECT SWITCHES



ALL STAR SIGNS
112 SOUTH GLENWOOD AVENUE
COLUMBUS, OHIO 43222

PHONE (614) 461-9052
FAX (614) 461-0620

## EXHIBIT E

### Shopping Center Exclusives

No exclusive uses granted to existing tenants in the Shopping Center affect Tenant's use.

## EXHIBIT "F"
## Heating and Air Conditioning Preventative Maintenance Items

Contractor's preventative maintenance service shall include, but not be limited to, the following:

> Check refrigerant levels of all equipment, log amounts lost and added to system

> Check oil levels of al equipment, bring up to proper level if low

> Check equipment and piping for vibration and wear, secure as required

> Check belts and pulleys

> Check motors and compressors

> Check oil safety controls

> Check compressor valve plates, oil pumps and oil floats

> Check bearings and shafts

> Check starters and contactors (relays and capacitors)

> Check pressure controls

> Check condenser fan controls

> Check expansion, solenoid and reversing valves

> Check dryers

> Check condensate pumps

> Check evaporator and condenser fan blades and motors

> Check exhaust fans and controls

> Check defrost times and components

> Check sign glasses and thermostats

> ~~Check equipment electrical beyond the point of supply~~

> Replace belts and pulleys as necessary

> Change dryers as required

> Pressure clean all condensers and evaporators ~~annually~~ every three (3) years.

> Supply and install HVAC filters ~~bi-monthly (every 2 months)~~ quarterly.

## AMENDMENT TO LEASE

     **THIS AMENDMENT TO LEASE** (this "*Amendment*") is made effective as of October 1, 2024, (the "*Effective Date*"), by and between **B&B Cash Grocery Stores, Inc.**, a Florida corporation ("*Landlord*"), and **Big Lots Stores, LLC**, an Ohio limited liability company, formerly Big Lots Stores, Inc., an Ohio corporation ("*Tenant*," and together with the Landlord, the "*Parties*" and each, a "*Party*").

## RECITALS

     **WHEREAS**, Landlord and Tenant are the current parties to that certain lease dated August 3, 2001 (the "Original Lease") (as amended from time to time thereafter, the "*Lease*"), with respect to that certain premises located at **2414 LAND O LAKES BLVD, LAND O LAKES, FLORIDA 34639**, which premises is defined and more particularly described in the Lease (the "*Premises*");

     **WHEREAS**, on September 9, 2024, Tenant and certain of its debtor affiliates (collectively, the "*Debtors*") commenced cases (collectively, the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (as amended, the "*Bankruptcy Code*") which are now pending in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). The Chapter 11 Cases are being jointly administered under Case Number 24-11967; and

     **WHEREAS**, Landlord and Tenant desire to modify certain terms and conditions of the Lease, effective as of the Restructuring Effective Date (as hereinafter defined), as amended by this Amendment.

     **NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Landlord and Tenant hereby agree as follows:

## AGREEMENT

     1.     Capitalized Terms.  Capitalized terms used and not otherwise defined herein shall have their respective meaning assigned to such terms in the Lease.

     2.     Effective Date.  This Amendment, and each of its amendments, modifications, and waivers with respect to the Lease as set forth herein, shall be effective on the date that the Lease is assumed or assigned in the Chapter 11 Cases, whether pursuant to (a) procedures approved by the Bankruptcy Court or (b) entry of an order by the Bankruptcy Court approving the assumption or assignment of the Lease, in each case, that also approve this Amendment, including pursuant to or in connection with a sale of Tenant's assets pursuant to Section 363 of the Bankruptcy Code, confirmation of Tenant's Chapter 11 plan of reorganization in the Chapter 11 Cases, or a stand-alone motion for assumption or assignment of the Lease (in each case, the "*Restructuring Effective Date*"); *provided, however*, that Tenant shall obtain the benefit of this Amendment, and this Amendment shall be binding on Landlord, beginning on the Effective Date hereof.  In the event the Restructuring Effective Date does not occur, or the Lease is rejected in accordance with the Bankruptcy Code, this Amendment shall be null and void in all respects, and nothing in this Amendment shall give rise to any claim, causes of action, or damages (compensatory or consequential) against either Party.  Nothing contained in this Amendment is intended to be or shall be construed as or deemed an assumption or an assignment of the Lease, as amended hereby, or any contract or document related thereto under section 365 of the Bankruptcy Code.  Prior to the Restructuring Effective Date, Tenant expressly reserves its right, in its sole and absolute discretion, to assume, reject, or assign the Lease pursuant to Section 365 of the Bankruptcy Code.  In the event the rejection occurs prior to the assumption (or assumption and assignment) of the Lease, the Landlord shall be permitted to assert an unsecured rejection claim based upon the original rent and charges due and owing under the Lease without regard to this

(FRNTC)

1

*JABJR*

Amendment pursuant to 11 U.S.C. § 502(b)(6).  In the event the rejection occurs after an assumption (or assumption and assignment) of the Lease, the Landlord shall be permitted to assert an administrative expense claim based upon the original rent and charges due under the Lease without regard to this Amendment pursuant to 11 U.S.C. § 503(b)(7).

       3.      Lease Modification.

      (a)     <u>Monthly Fixed Rent</u>.  Notwithstanding anything in the Lease to the contrary, (a) commencing on January 1, 2025 and continuing through December 31, 2027, Guaranteed Minimum Rent shall be **$164,112.00** per annum, payable in monthly installments of **$13,676.00**, (b) commencing on January 1, 2028 and continuing through December 31, 2029, Guaranteed Minimum Rent shall be **$184,626.00** per annum, payable in monthly installments of **$15,385.50**, and (c) beginning on January 1, 2030 and continuing through January 31, 2032, Guaranteed Minimum Rent shall be **$215,397.00** per annum, payable in monthly installments of **$17,949.75**.

      (b)     <u>Percentage Rent</u>. Notwithstanding anything in the Lease to the contrary, (a) commencing on January 1, 2025 and continuing through December 31, 2027, Tenant shall pay Landlord as Percentage Rent an amount equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual gross sales and income (as defined in the Lease) which exceed the annual base sum of **$6,564,480.00**, and (b) commencing on January 1, 2028 and continuing through January 31, 2032, Tenant shall pay Landlord as Percentage Rent an amount equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual gross sales which exceed the annual base sum of **$7,385,040.00**.

      (c)     <u>Common Area Charges</u>.  Notwithstanding anything in the Lease to the contrary, commencing January 1, 2025 and continuing through January 31, 2032, the CAM cap shall be at $0.90.

      (e)     <u>Abatement</u>.  Landlord hereby acknowledges and agrees that Guaranteed Minimum Rent, with respect to the Abatement Period (as defined below) is hereby abated and forgiven (the **"Abated Rent"**) in full.  Landlord hereby waives any remedy under, or with respect to, the Lease or at law and/or equity arising in connection with, or otherwise related to, the Abated Rent.  As used herein, **"Abatement Period"** shall mean the period commencing on November 1, 2024 and continuing through December 31, 2024.

      For the avoidance of doubt, Abated Rent shall not include Additional Rent, nor shall Abated Rent include the applicable sales and use taxes described in the first paragraph of Section 5 of the Original Lease, which Tenant acknowledges and agrees shall at all times be and remain the obligation of Tenant.

      (f)     <u>Waiver of Claims</u>.  Landlord hereby (i) waives, releases, and discharges Tenant and all of its affiliated companies, the Debtors, and their bankruptcy estates, and their respective successors and assigns (together with Tenant, the "Tenant Parties"), from any and all claims, damages, obligations, liabilities, actions, and causes of action of every kind and nature whatsoever ("Claims") it may have for any cure payments or other amounts due and owing under the Lease, through and including August 31, 2024, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, now existing or hereafter arising, including any claims and causes of action for damages, payments, or amounts owing or that may become owing pursuant to Section 365(b) of the Bankruptcy Code, and (ii) waives, releases, and discharges the Tenant Parties from Claims it may have for any cure payments or other amounts due and owing under the Lease for any and all Rent (as defined in the Lease) due and payable by Tenant in September 2024, including but not limited to claims for so-called "stub rent" (whether or not asserted as administrative priority claims pursuant to Section 503(b) of the Bankruptcy Code).

      Landlord hereby (ii) agrees and acknowledges that it will not object to or oppose the assumption of the Lease by Tenant and/or assignment of the Lease to any assignee selected by the Debtors

(FRNTC)

JABJR

in their sole discretion, provided the same complies with the terms of Section 8 below, and (iii) agrees that it shall not seek the provision of any adequate assurance of future performance by the assignee of the Lease selected by the Debtors in their sole discretion, provided such assignment complies with the terms of Section 8 below..

    (g)    <u>Right to Extend Term</u>.

        i.    Any and all options granted to Tenant under the Lease to extend the Term are hereby void and of no force or effect.

        ii.    Landlord hereby grants to Tenant the right, exercisable at Tenant's option, to extend the Term for **two (2)** (each, an "***Extension Option***") consecutive periods of five (5) years each (each an "***Extension Term***"), exercisable separately as to each such Extension Option as hereinafter provided.

        iii.    If properly exercised, the first Extension Term shall commence immediately following the end of the current Term, and each subsequent Extension Term shall commence immediately upon expiration of the preceding Extension Term, and in such event, each such Extension Term shall be part of the original Lease Term. Tenant shall exercise an Extension Option by giving Landlord written notice of the exercise thereof not later than six (6) months, nor earlier than sixteen (16) months, prior to the expiration of the current Term or the Extension Term, as the case may be, then in effect; *provided, however*, if Tenant fails to timely exercise any Extension Option, Tenant's right to exercise such Extension Option shall not be deemed expired until fifteen (15) days after Tenant's receipt of written notice from Landlord of Tenant's failure to exercise same.

        iv.    During each Extension Term, all the terms, conditions, covenants and agreements set forth in the Lease (except as modified by this Amendment) shall continue to apply and be binding upon Landlord and Tenant, except that (y) during the initial Extension Term, Guaranteed Minimum Rent shall be $247,707.00 per annum, payable in monthly installments of $20,642.25, and Percentage Rent shall be an amount equal to two and one-half percent (2.5%) of the excess of Tenant's annual gross sales and income (as defined in the Lease) which exceeds the annual base sum of $9,477,468.00; and (z) during the second Extension Term, Guaranteed Minimum Rent shall be $284,863.00 per annum, payable in monthly installments of $23,738.58, and Percentage Rent shall be an amount equal to two and one-half percent (2.5%) of the excess of Tenant's annual gross sales and income (as defined in the Lease) which exceeds the annual base sum of $9,477,468.00.

        v.    Notwithstanding anything to the contrary contained in the Lease or this Amendment: (1) commencing on the initial Extension Term and continuing through the last day of the initial Extension Term, the per square foot amount Tenant shall be obligated to pay with respect to Common Area Charges shall be an amount equal to an increase of $.30 per s.f. over the amount per s.f. Tenant was obligated to pay on the day

(FRNTC)

JABJR

immediately preceding the initial Extension Term; and (2) commencing on the subsequent Extension Term and continuing through the last day of the subsequent Extension Term, the per square foot amount Tenant shall be obligated to pay with respect to Common Area Charges shall be an amount equal to an increase of $.30 per s.f. over the amount per s.f. Tenant was obligated to pay on the day immediately preceding the subsequent Extension Term.

4.    Attorneys' Fees. Landlord further acknowledges and agrees that, notwithstanding anything to the contrary in the Lease, Landlord shall not be entitled to receive from Tenant or its affiliates (or charge as rent due from Tenant or its affiliates) any attorneys' fees incurred by Landlord in connection with this Amendment.

5.    Prohibited Uses. Tenant acknowledges and agrees that commencing on the Effective and continuing throughout the remainder of the Term, the Premises may not be used for any of the purposes described in **Exhibit A** of this Amendment, which is incorporated herein by reference (the "***Prohibited Uses***"). Tenant further acknowledges and agrees that from and after the Effective Date, no demised premises within the Shopping Center may be used for any of the Prohibited Uses, except as otherwise permitted in leases (including any amendments to such leases) currently in effect for such demised premises.

6.    <u>No Default and Waiver of Charges</u>.  Landlord acknowledges and affirms that as of the Effective Date, Tenant is not in default under any of the terms, conditions, or provisions of the Lease, and that there exist no events or circumstances which, with the passage of time or the giving of notice or both, constitutes a default under the Lease (including, without limitation, any failure of Tenant to meet its obligations to continuously operate in the Premises).  Landlord further acknowledges and agrees that it has no offsets, claims, or defenses against Tenant with respect to any obligation or duty of Tenant arising pursuant to the Lease.  To the extent that any notices of default or non-payment have been delivered to Tenant, all such notices are hereby waived and of no further force or effect.  No default interest, late fees, charges, surcharges, or other fees shall be due, and all such interest, late fees, charges, surcharges, or other fees are waived and shall not apply.

7.    <u>Confidentiality</u>.   Tenant and Landlord will keep confidential (a) the terms of this Amendment, and (b) all negotiations and communications, including each Party's representatives in connection with this Amendment (collectively, "***Confidential Information***").  Tenant and Landlord will not disclose or make available any Confidential Information to any other person or entity, except (i) accountants, brokers, attorneys, and other agents of Landlord and Tenant for the sole purpose of providing advice to Landlord and Tenant in connection with the Confidential Information and who agree to preserve the confidential nature of same, or (ii) as required by law.

8.    Authority.  Each Party represents and warrants that it has the authority and power to enter into this Amendment and that this Amendment constitutes a legal, valid and binding obligation of that Party.

9.    <u>Notices</u>. Notwithstanding anything to the contrary contained in the Lease, whenever any demand, request, approval, consent or notice ("*Notice*") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified below and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via electronic mail with such notice attached.  The parties hereby acknowledge and agree that any electronic notices shall be legal and binding and shall have the same full force and effect as if a paper original of such Notice had been delivered and signed using a handwritten signature.  The date of actual receipt shall be deemed the date of service of notice.  In the event an addressee refuses to accept

(FRNTC)

delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.:

*If to Tenant*:

4900 East Dublin Granville Road
Columbus, OH 43081-7651
Attn: Lease Administration

*If to Landlord*:

927 South U.S. Highway 301
Tampa. Florida 33619
Attn:    Real Estate Department

*With a copy to*:

Jeffrey D. Butt, Senior Partner
Squire Patton Boggs (US) LLP
One Harbour Place
777 S. Harbour Island Blvd., Suite 420
Tampa, FL  33602

10.    Notwithstanding anything in this Amendment or the Lease to the contrary, if Tenant assigns the Lease at any time or from time to time, including without limitation, pursuant to or in connection with a sale of Tenant's assets pursuant to Section 363 of the Bankruptcy Code, confirmation of or assignment of the Lease (i) to a party other than the acquirer of a substantial portion of the assets of Tenant as a going concern, (ii)  to a party other than the acquirer of at least fifty (50) Big Lots stores, or (ii) in a way not as otherwise permitted without Landlord's consent pursuant to the terms and conditions of the Lease or applicable law (including the Bankruptcy Code, 11 U.S.C. § 101 et seq.), then unless Landlord has approved such assignment in writing, from and after the date of assignment, the provisions herein with respect to the amount of Rent (defined in the Lease to include Guaranteed Minimum Rent, Utilities Charge and Exterior Lighting, Percentage Rent, Common Area Charges, Taxes and Assessments and other amounts Tenant is obligated to pay Landlord pursuant to the terms of the Lease) Tenant is obligated to pay Landlord under the Lease, as amended hereby (but not, for the avoidance of doubt, any other provisions of this Amendment), shall automatically be void and of no further effect and Rent that would otherwise be due and payable under the Lease from and after the date of such assignment (but not, for the avoidance of doubt, prior to the date of such assignment) and the expiration date of and options to extend the term of the Lease that would otherwise have been applicable under the Lease will again apply to the Lease.

1.    Miscellaneous.

a.    Landlord and Tenant each hereby represents that it has dealt with no party or broker in connection with this Amendment except for A&G Real Estate Partners ("***Tenant's Broker***").  Any and all fees that may be due to Tenant's Broker shall be paid by Tenant pursuant to a separate agreement. Insofar as each Party knows, no other broker negotiated this Amendment or is entitled to any commission in connection therewith.  Landlord and Tenant each agrees to indemnify, defend, and hold the other

(FRNTC)

harmless from and against any and all claims, loss, cost and damages (including reasonable attorneys' fees and court costs) suffered or incurred by the representing Party as a result of a breach of this representation.

        b.    This Amendment may be executed in counterparts, each of which shall constitute an original, and which together shall constitute one and the same agreement. This Amendment may be executed or delivered by electronic or facsimile means, and copies of executed signature pages stored electronically in portable document format (.pdf) shall be binding as originals. Neither Party shall record this Amendment without the express prior written consent of the other Party.

        c.    Subject to the other terms of this Amendment, each of Landlord and Tenant agree to execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the modifications, waivers and amendments contemplated by this Amendment.

        d.    This Amendment, and all covenants contained herein, shall be binding and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.

        e.    The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provisions, which shall remain in full force and effect.

        f.    Except as modified as set forth in this Amendment, all the terms and provisions of the Lease remain unchanged and in full force and effect and Landlord and Tenant hereby ratify and confirm same. Landlord and Tenant acknowledge and agree that the Lease, as modified by this Amendment, sets forth the entire agreement between Landlord and Tenant and there are no other agreements, understandings, undertakings, representations, or warranties among the Parties with respect to the subject matter hereof except as set forth herein. In case of any conflict between the terms and provisions of the Lease and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

*[signature page follows]*

(FRNTC)

JABJR

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment effective as of the Effective Date.

**LANDLORD:**

**B&B Cash Grocery Stores, Inc.**

By: _[signature]_____

Name:  J. Andrew Bever, Jr.

Title:    President

**TENANT:**

**Big Lots Stores, LLC,**
an Ohio limited liability company

By: _[signature: Joshua H. Nanberg, AB5634F80C07429...]_____

Joshua H. Nanberg, Vice President, Real Estate

7

(FRNTC)

Big Lots Store No. 1649
**Execution Copy**

### EXHIBIT A
### Prohibited Uses

a.    dry cleaning establishment, provided, the foregoing restriction shall not include an establishment for dry cleaning drop-off and pick-up only, with no cleaning services being performed at the subject property;

b.    pet store;

c.    business selling alcoholic beverages for off-premises or on-premises consumption except if specifically set forth as a permitted use in the Lease;

d.    automobile or motorcycle sales and/or repair shop;

e.    gasoline station;

f.    adult book store;

g.    bingo parlor;

h.    school, academy or learning center having more than twenty students at any one time;

i.    video game parlor or amusement center or arcade, virtual reality, laser tag or game room;

j.    business that would emit or produce noxious fumes, vapors, gases or dust, or loud noises;

k.    assembly or manufacturing operation;

l.    distillation, refining, smelting, industrial, agricultural, drilling or mining operation;

m.    junk yard, stock yard or animal raising operation;

n.    dump or disposal, or any operation for the incineration or reduction of garbage or refuse;

o.    mortuary or funeral parlor;

p.    establishment selling or exhibiting pornographic materials or businesses that are unsuitable for children to visit;

q.    nightclub, discotheque or dance hall;

r.    lot for the sale of used motor vehicles;

s.    pool or billiard hall (unless operated as part of a large scale family recreation or entertainment facility), a bowling alley or a skating rink;

t.    use or operation that is generally considered to be an environmental risk to any portion of the Shopping Center or surrounding properties;

u.    store dedicated to the sale of tobacco products;

v.    gym, sports facility or health club facility in excess of 5,000 s.f. such as Gold's Gym, World Gym or Rush Fitness;

w.    gun range;

x.    theater, movie theater, auditorium, meeting hall, library or reading room or other place of assembly;

y.    hotel or lodging facility;

z.    off track betting establishment (except incidental to the sale of state lottery tickets);

aa.    so-called "flea market" or other operation selling used goods (except nothing shall prevent Tenant from operating its normal business in the Premises and excluding antiques, estate merchandise, "upscale merchandise" or consignment merchandise);

bb.    business that constitutes a public or private nuisance or that creates a fire, explosive or other hazard;

cc.    warehouse (except incidental to a retail operation);

dd.    combination restaurant and game center (such as, by way of example, the businesses operated under the names Chuck E Cheese, Dave & Busters and GameWorks);

ee.    offices excepting (i) offices incidental to retail uses, and (ii) offices providing services to the general public and customarily found in similar shopping centers (e.g., banking for finance services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services or travel agencies);

ff.    massage parlor;

gg.    abortion clinic; or

hh.    the sale of any drugs or substances that may not be legally sold, dispensed, offered for sale and/or possessed without doctor's prescription ("Controlled Substances").

(FRNTC)

