**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BIG LOTS, INC., *et al.*,<br><br>               Debtors.[1] | Chapter 11<br><br>Case No. 24-11967 (JKS)<br>(Jointly Administered)<br><br>**Objection Deadline:  March 12, 2025 at 4:00 pm (ET)**<br><br>**Re:  Docket Nos. 1556, 2084** |

**OBJECTION AND RESERVATION OF RIGHTS**
**OF KIN PROPERTIES INC. AND ITS AFFILIATED LANDLORDS TO**
**DEBTORS' PROPOSED ASSUMPTION AND ASSIGNMENT OF LEASE**

Kin Properties, Inc., as managing agent, and Esan LLC and Alisan LLC, as landlords (collectively, the "Kin Landlords"), by and through undersigned counsel, hereby file this objection (the "Objection") to the Debtors' *Notice of Filing of Twelfth Post-Closing Designation Notice* [D.I. 2084] (the "Notice"), and in support hereof respectfully states as follows.

**BACKGROUND**

1.      The Kin Landlords and Debtor Big Lots Stores – PNS, LLC are parties, by assignment, to that certain Lease, dated November 13, 1978 (as amended and assigned, the "Auburn Lease") for the demised premises located at 416 South Bridge Street, Auburn

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

Massachusetts (the "<u>Premises</u>").  A true and correct copy of the November 13, 1978 Lease is attached hereto as **<u>Exhibit A</u>**.

2.      On September 9, 2024 (the "<u>Petition Date</u>"), the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") commenced the above-captioned chapter 11 cases (collectively, the "<u>Bankruptcy Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") in this Court. No trustee or examiner has been appointed and the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.      On January 2, 2025, the Court entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1556] (the "<u>Sale Order</u>").

4.      On February 25, 2025, the Debtors filed the Notice, which states that Gordon Brothers Retail Partners, LLC ("<u>Gordon Brothers</u>" or "<u>Buyer</u>") notified Debtors of its determination to designate the Auburn Lease for assumption and assignment to an entity called TT&L Realty ("<u>TT&L</u> or "<u>Proposed Assignee</u>").  The Notice lists a cure amount for the Auburn Lease of $2,419.95.

5.      According to the limited information provided to the Kin Landlords to date in the form of a pitch deck regarding the Proposed Assignee and its business plans,[2] TT&L intends to

---

[2] On February 27, 2025, the Kin Landlords, by counsel, sent a letter to counsel for the Debtors and Gordon Brothers requesting certain documents and information regarding the Proposed Assignee's ability to provide adequate assurance of future performance under the Auburn Lease.  A true and

operate the Premises as "The Zone Arcade and Family Entertainment Center" (the "Zone Arcade").  A true and correct copy of the pitch deck is attached hereto as **Exhibit C**. It does not appear that the Zone Arcade is to be operated as a franchise, but rather will be operated as a stand-alone, independent business.  There is no indication that either TT&L or its principals have any experience whatsoever in the ownership, operation or management of an arcade and family entertainment center.

6.      Other than limited information regarding the three individuals identified as the owners and managers of TT&L, no information has been provided regarding TT&L's business. According to a Limited Liability Company Annual Report dated May 26, 2023 and filed with the Secretary of the Commonwealth of Massachusetts, TT&L's business is described as the "ownership, operation and management of commercial and residential real estate."  According to the Secretary of the Commonwealth's website, TT&L has not filed an annual report for 2024, and it appears many of the company's annual reports for prior years have not been timely filed.[3]

7.      The limited information provided to date about the three individuals identified as the owners and managers of TT&L generally describes them as developers, owners and operators of commercial and residential properties.  One of the principals of TT&L is described as an

---

correct copy of the February 27, 2025 letter is attached hereto as **Exhibit B**.  As of the date hereof, the Kin Landlords have not received any of the documents and information requested.  The Kin Landlords reserve all rights, including without limitation the right to supplement this Objection in the event documents and information regarding the Proposed Assignee, the business that is proposed to be operated at the Premises, and other information pertinent to the Proposed Assignee's ability to provide adequate assurance of future performance, are eventually provided to the Kin Landlords.

[3] *See* Secretary of the Commonwealth of Massachusetts, Corporations Division, Business Entity Summary for TT&L Realty LLC, *https*://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=WBdKahGjjvp N17Zm4JkluUvUgDxYYzphnIUIc52Pn.I- (last visited March 25, 2025).

"[e]xperienced contractor with over 50 years of family history in residential property building in Auburn [sic] Owner of multiple commercial properties and involved in large-scale development projects throughout Worcester County." *See* **Exhibit C**. Another principal of TT&L is described as the "[o]wner of multiple commercial properties in the area" that is "currently renovating" a 30,000 square foot industrial warehouse in Leicester, Massachusetts "for mixed use including GYM and Pickleball spaces." *Id.* Another principal of TT&L is identified as an "Accomplished Sales Manager" with a record of "identifying and creating profitable business opportunities and cultivating strong partnerships," with experience "working for the leading financial advisor marketing firms, building and refining sales strategies, managing sales operations, and leading both SDRs and full-cycle sales teams." *Id.* There is no suggestion that any of the principals of TT&L have any experience with the ownership, management or operation of an arcade and family entertainment business.

8.       The meager financial information provided in the pitch deck in support of the proposed assignment casts significant doubts about the economics and feasibility of TT&L's proposed business operations at the Premises. Unsupported by any analysis, business plan or other support of any kind, TT&L states that its "business objectives" are to "achieve $4.5M in gross revenue in the first year, and expand offerings by year 3," and to "[h]ost 80+ birthday parties and group events per month within the first 12 months." *See* **Exhibit C**. This statement is not accompanied by any corresponding analysis of margin or profit based on the hoped-for revenues and aggressive business operational goals.[4] No information is provided about cash flows,

---

[4] Even companies that operate similar family entertainment businesses that are supported by national franchises average less annual revenue than the $4.5 million that TT&L projects in year one. For example, according to the franchise disclosure document of Urban Air Adventure Park, the average annual revenue of its franchised businesses is $3,797,000. *See* Urban Air Adventure Park Franchise FDD, Profits & Costs (2025) https://sharpsheets.io/blog/urban-air-adventure-park-

capitalization, liquidity, operating expenses, debt, profitability ratios or for that matter any meaningful financial information about the proposed business. TT&L further represents that it is "[e]xpecting an initial investment of $5.5M" but offers no details about the proposed investment, including whether it will take the form of equity, debt financing, equipment financing, or some combination thereof. *Id*.

9.      Moreover, on its face, the business proposal provided by the Proposed Assignee is not economically rational given the remaining term of the Auburn Lease. The original term of the Auburn Lease ended on January 31, 2012, subject to the tenant's option to renew the Auburn Lease for four (4) consecutive five (5) year renewal periods, with no right to renew the Auburn Lease beyond the expiration of the fourth renewal term. *See* **Exhibit A**, Lease at Section 2.03. The third renewal term ends on January 31, 2027, subject to one additional five (5) year renewal option, if timely exercised per the terms of the Auburn Lease. Moreover, while the original terms of the Auburn Lease included a tenant option to purchase the Premises, a 2003 amendment to the Auburn Lease deleted the purchase option and replaced it with a right of first refusal in the event the Kin Landlords receive from a third party an arms-length, bona fide written to purchase the Premises that the Kin Landlords desire to accept. A true and correct copy of the January 29, 2003 amendment is attached hereto as **Exhibit D**. Accordingly, the term of the Auburn Lease will end on January 31, 2032, with no further tenant options to renew or purchase the Premises. While the Proposed Assignee has not provided a business plan or any meaningful financial information, even if it is assumed (solely for the sake of argument) that TT&L could achieve a net profit of $500,000 per year for the remaining seven (7) years of the lease term (a conclusion not supported by any information provided by the Proposed Assignee to date), that would amount to a net profit of $3.5

---

franchise-fdd-profits-costs/ (last visited March 12, 2025).

million, resulting in a $2 million dollar loss based on the expected $5.5 million investment proposed by TT&L.

10.     In addition, it appears that pursuant to the Auburn, Massachusetts zoning regulations, the Proposed Assignee will be required, at a minimum, to obtain special use permit and site plan approvals in order to operate an arcade and family entertainment center at the Premises, which upon information and belief is situated within the Limited Business District and the Aquifer Zone II protection district.[5]  TT&L's proposed use of the Premises may also require further site upgrades, and additional corresponding permits and approvals related to stormwater treatment, landscaping, open space, parking and loading, signage, and other potential alterations. Obtaining the necessary permits and approvals will involve significant work, including a public hearing and notice to abutting landowners, and will undoubtedly be a costly and lengthy process that, at a minimum, will eat into most if not all of the first of the remaining seven years left on the term of the Auburn Lease.

11.     Moreover, pursuant to the terms of the Auburn Lease, the Proposed Assignee would be alone responsible, at its sole costs and expense, to obtain the required permits and approvals and otherwise comply with all laws and regulations.  *See* **Exhibit A**, Lease at Art. VIII.  And, given that TT&L has no apparent track record of operating a business like the one it proposes to operate at the Premises, the ability of TT&L to obtain the required permits and other governmental approvals is far from certain.[6]  Assuming the necessary permits and approvals necessary to comply

---

[5] The zoning map and zoning by-laws for the Town of Auburn, Massachusetts are available on the Town's website at https://www.auburnma.gov/166/Planning-Division?utm_source=chatgpt.com (last visited March 12, 2025).

[6] The proposed order approving the requested assumption and assignment of the Auburn Lease impermissibly seeks to modify the terms of the Auburn Lease in certain respects, including the inclusion of language requiring the landlord's cooperation with the Proposed Assignee's efforts to

with the zoning regulations and other laws are obtained, the Proposed Assignee would thereafter be required to perform alterations to the Premises (which would have to be done in accordance with the terms of the Auburn Lease) in order to operate the proposed arcade and family entertainment center, a process that will further erode the limited available term of Auburn Lease.

12.    Moreover, the documentation submitted by TT&L in connection with its proposal to Buyer further misapprehends the tenant's replacement, repair and maintenance obligations under the Auburn Lease.  In its pitch deck, TT&L indicated it intended to "assume proposed CAM rates." *See* **Exhibit C**.  The Auburn Premises is not, however, a "CAM" property.  Rather, the Auburn Lease is a triple net lease under which the tenant is solely responsible for taxes, insurance, and all replacements, repair and maintenance of the Premises, in addition to the payment of rent. *See generally* **Exhibit A**, Lease at Art. III, VII, XI & section 14.02.

13.    As set forth in the property inspection report obtained by the Kin Landlords, significant repairs and replacements are required to bring the Premises into compliance with the terms of the Auburn Lease at an estimated cost of no less than approximately $350,000.  A true and correct copy of the property inspection report for the Premises is attached hereto as **Exhibit E**.  Moreover, as reflected in the property inspection report, certain of the replacements and repairs, including the installation of a new roof, require immediate attention to secure and protect the Premises, and cannot be put on hold while the Proposed Assignee undertakes the lengthy process of attempting to obtain the special use and other required permits and approvals to operate the Premises as an arcade and family entertainment center.

---

obtain permits and approvals for "opening and operating the properties as contemplated under the Assignment Agreements." *See* Proposed Order [D.I. 2084-3] at ¶ 14.  The Kin Landlords object to this provision and any other provision of the proposed order to the extent inconsistent with the Kin Landlords' rights, interests and obligations under the terms of the Auburn Lease.

**OBJECTION**

14.     The Kin Landlords object to the proposed assumption and assignment of the Auburn Lease on the grounds that neither the Debtors, the Buyer, nor the Proposed Assignee have satisfied the burden of proving that the Proposed Assignee is willing and able to provide adequate assurance of future performance under the Auburn Lease.  While the Kin Landlords deny that the Auburn Lease may be assumed and assigned to the Proposed Assignee based on the failure to demonstrate adequate assurance of future performance, the Kin Landlords further object because (i) the Debtors propose to assume and assign the Auburn Lease without curing, or providing adequate assurance of the prompt cure of, existing defaults under the Auburn Lease, and (ii) the proposed order submitted in connection with the proposed assumption and assignment is inconsistent with law requiring that unexpired leases be assumed *cum onere*, subject to all benefits and burdens of such leases, and because the proposed order includes language that would rewrite the terms of the Auburn Lease and impose burdens and obligations on the Kin Landlords that go beyond the terms of the Auburn Lease.  Accordingly, the Kin Landlords respectfully request that the motion to assume and assign the Auburn Lease to the Proposed Assignee be denied.

I.      **The Debtors and the Proposed Assignee Have Not Satisfied Their Burden of Demonstrating Adequate Assurance of Future Performance of the Proposed Assignee Under the Auburn Lease**

15.     Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code require that adequate assurance of future performance be provided in connection with the assumption or assignment of an unexpired lease.  The Debtors and the Proposed Assignee have the burden of proving adequate assurance of future performance with respect to the potential assumption and assignment of the Auburn Lease.  *See In re Res. Tech. Corp.*, 624 F.3d 376, 385 (7th Cir. 2010); *In re C.W. Mining Co.*, Adv No. 09-2248, 2010 WL 458914, at *9 (Bankr. D. Utah Feb. 10, 2010);

8

*In re F.W. Restaurant Assoc., Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995); *In re Rachels Indus. Inc.*, 109 B. R. 797, 802 - 03 (Bankr. W.D. Tenn. 1990); *In re Lafayette Radio Electronics Corp.*, 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1981).

16.     A determination of whether the burden of demonstrating adequate assurance of future performance has been satisfied is a fact-based inquiry based on the circumstances of the proposed assumption and assignment. *In re Filene's Basement, LLC*, Case No. 11-13511 (KJC), 2014 WL 1713416, at *11 (Bankr. D. Del. Apr. 29, 2014); *see also In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("Congress intended that the words "adequate assurance" be given a practical, pragmatic construction, and is to be determined under the facts of each particular case."). The policy underlying adequate assurance of future performance seeks to balance the ability of debtors to assume and assign leases as a means of realizing value for the estate with the protection of landlords' interests under unexpired leases. *In re Bygaph*, 56 B.R. at 605. Importantly, "Congress equated 'adequate assurance' with that which will give the landlord the full benefit of its bargain." *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983). The primary focus of the adequate assurance of future performance requirement "centers on the assignee's ability to satisfy the financial obligations imposed by the lease." *Id*. 829. While an absolute guarantee of performance is not required, and while the adequate assurance process is not designed to provide a landlord with rights or benefits not bargained for under the lease, a landlord is entitled to protection "from having to take on the burden of a tenant who may be likely to default on his lease obligations after the assumption and assignment have occurred." *In re Bygaph*, 56 B.R. at 605.

17.     Although the Kin Landlords have not yet received any of the adequate assurance information requested from the Debtors and the Proposed Assignee, the limited information

provided to date, when considered in light of the facts and circumstances relating to the Proposed

Assignee, the Auburn Lease and the Premises, demonstrates that the Debtors and the Proposed

Assignee are unable to provide adequate assurance of future performance as required to authorize

the assumption and assignment of the Auburn Lease.

18.     Critically, the information provided to date indicates that the business transaction

contemplated by TT&L is not viable, particularly in light of the remaining term of the Auburn

Lease, which ends in less than seven (7) years.   In addition to performing the significant

outstanding replacement, repair and maintenance obligations necessary to bring the Premises into

good order and condition as required under the Auburn Lease (as described below), the Proposed

Assignee would need to perform substantial alterations to the Premises, which has historically

been operated as a retail store, in order to operate an arcade and family entertainment center.[7]

Furthermore, in order to operate the Premises as an arcade and family entertainment center, the

Proposed Assignee will also need to obtain special use permits and approvals to comply with

applicable zoning laws, a process that, if ultimately successful, will take a significant amount of

time.   While the Proposed Assignee has represented (without any detail or support) that it is

"[e]xpecting an initial investment of $5.5M," and anticipates it will achieve $4.5M in revenue in

the first year (without providing any information about operating expenses or any other financial

information), given the limited number of years remaining on the Auburn Lease, the economics of

the proposed transaction indicate that the proposed business will ultimately operate at a loss.

---

[7] Pursuant to the Auburn Lease, any Alterations (as defined in the Auburn Lease) that would reduce the size of the building, materially and adversely affect the structural integrity of the building, or reduce the market value of the Premises, are not permitted absent the Kin Landlords' prior written approval.  Any such Alterations must also be made at the tenant's sole cost and expense and in accordance with the terms and requirements of the Auburn Lease. *See* **Exhibit A**, Lease at Art. VI.

Adding in the fact that neither the Proposed Assignee nor any of its principals appear to have any experience owning, operating or managing an arcade and family entertainment center, it is evident that the Kin Landlords are being asked to take on the "burden of a tenant who may be likely to default on [its] lease obligations after the assumption and assignment have occurred." *In re Bygaph*, 56 B.R. at 605.

19.    The Auburn Lease is a triple net lease that requires the tenant to pay not only rent, but all real estate taxes, insurance and the costs of maintaining the Premises by performing repairs and replacements.  The Kin Landlords have a protectable interest in ensuring that any proposed assignee will be able to satisfy all of the tenant's obligations under the Auburn Lease, including without limitation the tenant's obligations to pay taxes, insurance, and maintain the Premises in good order and condition as required under the Auburn Lease.  The mere assurance that Fixed Rent (as defined in the Auburn Lease) might be paid on an ongoing basis would not be sufficient to provide adequate assurance of future performance under the Auburn Lease.  The Kin Landlords are entitled to adequate assurance that any proposed assignee will be able to operate a business at the Premises that is viable and will enable the assignee to perform the obligations required of the tenant throughout the term of the Auburn Lease.

20.    The concern over the ability of the Proposed Assignee to perform its obligations under the Auburn Lease is heightened under the circumstances here, where neither the Proposed Assignee nor its principals appear to have any experience operating an arcade and family entertainment center, a business that by its very nature involves greater potential exposure to liability that the operation of a retail store.  Under these circumstances, the protection of the Kin Landlords' financial interests under the Auburn Lease would further require the Proposed Assignee to procure sufficient liability insurance and to otherwise demonstrate adequate assurance

of its ability to satisfy the tenant's obligations to indemnify the Kin Landlords as required under the terms of the Auburn Lease.  No such adequate assurance of the Proposed Assignee's performance under the Auburn Lease has been provided.

21.    The Kin Landlords have not yet received the adequate assurance and related information it has requested from the Debtors, the Buyer and the Proposed Assignee, and expressly reserve all of their rights in connection with such requests, including without limitation the right to amend or supplement this Objection as necessary or appropriate to the extent that such information is provided, and to seek formal discovery in connection with the proposed assumption and assignment of the Auburn Lease.

## II.    The Debtors or the Proposed Assignee Have Not Proposed to Cure, or Provide Adequate Assurance of the Prompt Cure, of All Defaults Under the Auburn Lease

22.    Notwithstanding the failure of the Debtors or Proposed Assignee to demonstrate adequate assurance of future performance of the Auburn Lease, the Kin Landlords further object to the proposed assignment on the grounds that the Debtors have failed to cure, or provide adequate assurance of the prompt cure, of all defaults under the Auburn Lease.

23.    In order to assume and assign an unexpired lease, a debtor must first satisfy section 365(b)(1)(A) of the Bankruptcy Code, which requires that a debtor either cure all defaults existing under a lease, or provide the landlord with adequate assurance that it will promptly cure such defaults.  *See* 11 U.S.C. § 365(b)(1)(A).

24.    The proposed cure amount of $2,419.95 under the Auburn Lease as set forth in the Notice is not correct.  The correct cure amount is no less than $366,696.08, which includes (i) the amount of $2,419.95 set forth in the Notice, which is a portion of the rent due under the Auburn Lease for January 2025, (ii) the amount of $15,531.13, for the Fiscal 2025 Third Quarter Real Estate Taxes payable to the Town of Auburn, as set forth in the tax bill attached hereto as **Exhibit**

**F,** and (iii) approximately $348,745 in replacement, repair and maintenance costs, as set forth in the property inspection report attached hereto as **Exhibit E**.

25.     The cure amounts identified herein do not include cure amounts that may become due and owing after the date hereof, or any amounts that are currently unknown or undetermined by the Kin Landlords.  The Kin Landlords reserve the right to amend or supplement this Objection and any statement of cure amount as necessary or appropriate under the circumstances, including without limitation to account for further property inspections, reconciliations or adjustments which have not yet been billed or have not yet become due under the terms of the Auburn Lease, amounts that become due and owing after the date hereof, or amounts that the Kin Landlords become aware of after the date hereof.

**III.     The Auburn Lease Must Be Assumed and Assigned, If At All, *Cum Onere***

26.     While the Kin Landlords strongly disagree that the Auburn Lease may be assumed and assigned as proposed in the Notice, they further object to the proposed assumption and assignment to the extent that the Debtors, in any proposed order approving the assignment or otherwise, seek to modify the rights, claims and interests of the Kin Landlords under the Auburn Lease and applicable law.

27.     In order to assume and assign the Auburn Lease, the Debtors are required, at the time of assumption, to cure or provide adequate assurance of the prompt cure of all monetary and non-monetary defaults under the Auburn Lease, including, without limitation, any and all defaults with respect to insurance requirements under the Auburn Lease, real estate taxes and other charges, amounts payable under reciprocal easement agreements, utilities (including electricity, gas, oil, water, telephone, sanitary sewer services and all other and utilities), attorneys' fees and costs, repair, maintenance, and replacement obligations, and environmental cleanup obligations,

hazardous materials restrictions, the satisfaction of liens, compliance with laws, indemnification obligations, or similar charges owing under the Auburn Lease that remain undetermined as of the date of the proposed assumption (the "Unliquidated Obligations").

28.     Any assumption or assignment of the Auburn Lease must be done, if at all, subject to all of the benefits and burdens of such lease. Section 365 of the Bankruptcy Code provides only for the assumption or assignment of an executory contract or unexpired lease in its entirety, and Debtors may not assume and assign only the favorable parts of a contract or lease and reject parts that they deem unfavorable. *See In re Fleming Cos.,* 499 F.3d 300, 308 (3d Cir. 2007) (agreement must be assumed and assigned *cum onere*, accepting the burdens as well as the benefits); *Cinicola v. Scharffenberger*, 248 F.3d 110, 19-20 (3d Cir. 2001) ("If the trustee meets the assumption requirements under § 365, it must assume the executory contract entirely.") (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)); *In re G-1 Holdings, Inc.*, 568 B.R. 731, 767 (Bankr. D. N.J. 2017) ("A debtor may not "cherry-pick" the provisions of an assumed contract with which it will comply."); *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere,* or reject the entire contract, shedding obligations as well as benefits."); *In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) ("If the debtor decides to assume a lease, however, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. 'The [debtor] may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.'") (quoting *In re Italian Cook Oil Corp.*, 190 F.2d 994, 97 (3d Cir. 1951)); *see also In re Access Beyond Technologies, Inc.*, 237 B.R 32, 47 (Bankr. D. Del. 1999) ("A debtor cannot avoid the requirements of section 365 by saying it is "selling" a lease or executory contract, rather than assuming and assigning it.").

29.     Any order approving the assumption and assignment of the Auburn Lease to a proposed assignee must make clear that all liquidated cure amounts must be paid at or prior to assumption and assignment and all Unliquidated Obligations under the Auburn Lease shall survive, and that any assignee shall take the Auburn Lease subject to all of respective terms of the Auburn Lease and undertake to satisfy all monetary and other non-monetary obligations under the Auburn Lease, regardless of whether such Unliquidated Obligations could be argued to have existed, occurred, arose, accrued or related to a period prior to the assumption and assignment of the Auburn Lease.   Furthermore, any order approving the assumption and assignment of the Auburn Lease should confirm that the Kin Landlords' setoff, recoupment, subrogation and indemnification rights are preserved, regardless of when such rights accrued.

30.     The Kin Landlords further object to any proposed order approving the assumption and assignment of the Auburn Lease to the extent such order seeks to modify the Kin Landlords' rights under the terms of Auburn Lease in a manner not consistent with the provisions of the Bankruptcy Code.   For example, paragraph 14 of the proposed order submitted with the Notice would require landlords, among other things, to "cooperate and expeditiously execute and deliver . . . any instruments, applications, consents or other documents which may be required by any public or quasi-public authority or other party or entity, for the purpose of obtaining any permits, approvals or other necessary documents required for the alteration, opening and operating of the properties as contemplated under the Assignment Agreements."   The Kin Landlords object to this provision as an impermissible modification of the Kin Landlords' rights and obligations under the Auburn Lease that finds no support in the Bankruptcy Code or other applicable law.

IV.     **Demand for Security**

31.     Section 365(l) of the Bankruptcy Code provides:

15

> If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

32.     The Kin Landlords reserve all rights to require security in connection with any proposed assignment of the Auburn Lease pursuant to section 365(l) of the Bankruptcy Code, including without limitation in the form of parent or personal guaranties.

## RESERVATION OF RIGHTS

33.     The Kin Landlords expressly reserve all of their rights under the Auburn Lease with respect to any and all obligations of the Debtors and/or any proposed assignee as tenant, including without limitation the Kin Landlords' right to claim any amounts of rent, charges to compensate for monetary defaults, such as accrued real estate taxes, utility charges that have been assessed against the Premises, unsatisfied liens on the Premises created by the Debtors and/or any proposed assignee and/or insurance premiums, and charges to compensate for non-monetary defaults, including without limitation all maintenance, indemnification and environmental obligations of the Debtors and/or any proposed assignee.  The Kin Landlords further reserve all rights to raise further objections, as necessary or appropriate under the circumstances, relating to any motion or request to assume or assign the Auburn Lease, including without limitation the right to amend or supplement this Objection for any reason.

**[SIGNATURE PAGE FOLLOWS]**

Dated: March 12, 2025

**BAYARD, P.A.**

By:      */s/ Ericka F. Johnson*
Ericka F. Johnson (No. 5024)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Email: ejohnson@bayardlaw.com

and

**TAYMAN LANE CHAVERRI LLP**
Jeffrey Rhodes (*pro hac vice*)
2001 L Street, NW, Suite 500
Washington, DC 20036
Email: jrhodes@tlclawfirm.com

*Counsel for Kin Properties, Inc., Esan LLC, and Alisan LLC*