**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BIG LOTS, INC.,[1] | : | Case No. 24-11967 (JKS) |
| | : | |
| Debtor. | : | **Obj. Deadline: March 17, 2025 at 4:00 p.m. (ET)** |
| | : | **Hearing Date:  March 25, 2025 at 10:00 a.m. (ET)** |
| | : | **Related to Docket Nos. 2159 & 2199** |

-----------------------------------------------------x

**OBJECTION OF UE REVERE LLC TO NOTICE OF FILING
OF SEVENTEENTH POST-CLOSING DESIGNATION NOTICE AND
NOTICE OF AMENDED CURE AMOUNTS FOR SEVENTEENTH
POST-CLOSING DESIGNATION NOTICE**

UE Revere LLC the "<u>Landlord</u>"), by and through its undersigned counsel, hereby files this objection (the "<u>Objection</u>") to the *Notice of Seventeenth Post-Closing Designation Notice* [Docket No. 2159] and the *Notice of Amended Cure Amounts for Seventeenth Post-Closing Seventeenth Notice* [Docket No. 2199] (collectively, the "<u>Assignment Notice</u>"),[2] and the proposed assumption and assignment of the Lease (defined below) to Burlington Coat Factory of Texas, Inc., a designee of Burlington Coat Factory Warehouse Corporation ("<u>Burlington</u>") and respectfully represents as follows:

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin Granville Road, Columbus, OH 43081.

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Cure Notice and accompanying sale documents.

## I.    <u>PRELIMINARY STATEMENT</u>

The proposed assumption and assignment of the Lease to Burlington – a major retailer of brand-name apparel at discount prices – should not be approved as such use is not only prohibited under the current permitted use clause of the Lease, but it will result in a violation of an exclusive granted to another tenant in the Center (defined below), which in turn if allowed will result in significant pecuniary harm and losses to the Landlord, contrary to the express provisions of the Lease as well as 11 U.S.C. § 365(b)(3).  Specifically, another brand-name retailer of apparel at discount prices (Marshalls), currently operating in the Center has a competing business restriction that prohibits any other tenant of the Center to use more than 10,000 square feet of sales and display area for the sale or display at discount prices of brand-name apparel.  Upon information and belief, Burlington uses a majority of its floor area to sell brand-name apparel at discount prices.

Under no circumstances can Landlord consent to the Debtors' proposed assumption and assignment of the Lease to Burlington.  If approved as the assignee of the Lease, not only is Burlington's use expressly prohibited by the Lease itself, it also conflicts with another tenant's exclusive expressly set forth in its lease and will subject the Landlord to pecuniary harm and loss, as well as disrupt the tenant mix and balance of an otherwise balanced and diversified shopping center.  Such an assignment may also cause any percentage rent due under the Lease and/or the Marshalls' Lease to decline substantially as a result of the addition of a competing discount apparel retailer.  Because the Debtors will be unable to overcome these issues, they cannot meet their burden of showing that adequate assurance of future performance can be provided under 11 U.S.C. § 365(b)(3)(B), (C) and (D). Accordingly, this Court must deny the Debtors' proposed assumption and assignment of the Lease to Burlington.

To the extent the Court is inclined to grant the assumption and assignment of the Lease to Burlington, as a condition to any assumption and assignment of the Lease, the Debtors and/or Burlington, as applicable, must cure or provide adequate assurance of prompt cure of all defaults under the Lease, including amounts to compensate the Landlord for any actual pecuniary losses incurred by the Landlord resulting from such defaults, such as its reasonable attorneys' fees, as well as any losses and damages incurred by the Landlord as a result of the valuation of the use and exclusives in the Lease and another tenant's lease arising from the assumption and assignment of the Lease to a direct competitor, and the disruption of the tenant mix and balance.

In addition, any assignment of the Lease must not be free and clear of (a) all applicable reciprocal easement agreements (or similar agreements) and other restrictive covenants applicable to the Center, (b) any liability and responsibility for all obligations to pay all accruing or accrued, but unbilled charges or obligations due under the Lease, including un-billed year-end adjustments and reconciliations, which may come due in the future in accordance with the terms of the Lease, regardless of when they arose, or (c) any contractual indemnification obligations to indemnify and hold the Landlord harmless with regard to claims for personal injuries at the Premises and/or damage to the Premises or Center arising from the Debtors' use and occupancy of the Premises prior to the assumption and assignment, but which may not be known to the Landlord as of the time of the assumption and assignment.  The proposed form of order approving the assumption and assignment of the Lease (the "Assignment Order") must be modified to ensure that the assumption and assignment of the Lease is pursuant to the terms of the Lease and does not cut-off obligations arising thereunder and the Landlord's rights to enforce those obligations or any related agreements. Absent sufficient assurances, including modification of the Assignment Order, an assignment of the Lease must be denied.

Landlord is engaging in discussions with Burlington regarding each of the issues raised by this Objection, but unless resolved by a withdrawal of the Assignment Notice from Burlington, the Landlord will be required to prosecute its Objection and reserves all rights to argue these and other issues at the hearing.

## II.    BACKGROUND FACTS

1.      Big Lots, Inc., and their affiliated debtor entities (the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on September 9, 2024 (the "Petition Date") with the United States Bankruptcy Court for the District of Delaware (the "Court").   The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3]

2.      The Debtor, Big Lots Stores–PNS, LLC (the "Debtor"), and the Landlord are parties to that certain unexpired lease of nonresidential real property dated May 14, 2014 (as amended from time to time, the "Lease"), whereby the Debtor leases approximately 31,000 square feet of retail space from the Landlord located at 151 VFW Parkway, Revere, Massachusetts (the "Premises"), in that certain shopping center more commonly known as Wonderland Marketplace (the "Center").

3.      The Lease is a lease "of real property in a shopping center" as that term is used in Section 365(b)(3).  See In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

4.      Pursuant to the Lease, the Premises, may only be used and occupied for:

[T]he sale of general merchandise, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and

---

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

> frozen food, beer and wine).... and for any other lawful retail
> purpose; *provided, however, that such "other lawful retail purpose"*
> *shall not violate the use exclusives and restrictions set forth on*
> *Exhibit F.*

Lease, § 4(A) (emphasis added).  A true and correct copy of the relevant excerpts of the Lease are

attached hereto as **Exhibit 1**.

   5. Accordingly, while the tenant under the Lease has the right to use the

Premises for any other lawful retail purpose, it cannot do so if it would violate the use exclusives

and restrictions as described in Exhibit F to the Lease.  Id.

   6. Exhibhit F of the Lease states in relevant part that:

Marshalls:

  . . .

> C. Landlord acknowledges that [Marshalls] is paying a rent in
> excess of that which Tenant would otherwise pay by reason of
> Landlord having agreed that [Marshalls] is entitled to be the sole
> major retailer of brand-name apparel at discount prices in the
> Shopping Center.  Accordingly, if Landlord permits any one
> occupant of the Shopping Center (or any affiliate of such
> occupant), other than [Marshalls] or any occupant of the
> building(s) initially leased to Stop & Shop (but only so long as
> Stop & Shop Lease is in affect), to use more than ten thousand
> (10,0000) square feet of sales and display area for the sale or
> display at discount prices of brand-name apparel, the minimum
> rent and percentage rent payable pursuant hereto shall be reduced
> to fifty percent (50%) of the amount otherwise payment under this
> lease.

Id., at Exhibit F.

   7. In addition, Landlord is a counterparty to a lease with Marshalls, Inc., a

Massachusetts corporation ("Marshalls"), who also leases space in the Center.  Landlord and

Marshalls entered into the lease on August 3, 1994 (the "Marshalls' Lease"), prior in time to the

Lease with the Debtor.  The Marshalls' Lease contains an exclusive use provision that tracks the

language in Exhibit F of the Lease almost verbatim (the "Marshalls' Exclusive").  Specifically, the

Marshalls' Lease provides in pertinent part:

> "Tenant is entitled to be the sole major retailer of brand-name apparel at discount prices in the Shopping Center…[If] Landlord permits any one occupant of the Shopping Center (or such affiliate of such occupant), other than Tenant or any occupant of the building(s) initially leased to Stop & Shop (but only so long as the Stop & Shop Lease is in effect), to use more than ten thousand (10,000) square feet of sales and display area for the sale or display at discount prices of brand-name apparel. Then minimum rent and percentage rent payable pursuant hereto shall be reduced to fifty (50%) of the amount otherwise payable under this lease, and such reduction in rent shall remain effective for so long as any such use by another tenant of the Shopping Center continues."

See Article IX, Section 2(C) to Marshalls' Lease.  True and correct copies of the relevant excerpts

of the Marshalls' Lease is attached hereto as **Exhibit 2**.

8.    In the event of a violation of the Marshalls' Exclusive, Marshalls may elect

to reduce "the minimum rent and percentage rent payable [to Landlord]" by "fifty (50%) of the

amount otherwise payable under [its] lease, and [the] reduction in rent shall remain effective for

so long as any such use by another tenant of the Shopping Center continues." Lease at Exhibit F;

Marshalls' Lease, Article IX, Section 2(C).

9.    Upon information and belief, based on a review of Burlington's website, it

sells brand-name apparel at discount prices, which implicates the Marshalls; Exclusive.

Specifically, upon information and belief, Burlington uses the majority of its floor area for the sale

or display of brand-name apparel at discount prices.  Accordingly, not only would Burlington's

use violate the use exclusives and restrictions set forth in Exhibit F of the Lease itself and,

therefore, would not be permitted under the Lease, but it would also be a violation of the express

exclusive granted in favor of Marshalls in its Lease.

10.     On December 27, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1437] (the "Sale Motion"), pursuant to which the Debtors sought the Court's approval to authorize certain designation rights procedures for the sale and assignment of certain of the Debtors' unexpired leases of nonresidential real property (the "Designation Rights Procedures").

11.     On January 2, 2025, the Court entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1556] (the "Sale Order"), by which the Court approved, among other things, the Designation Rights Procedures in favor of Gordon Brothers Retail Partners, LLC (the "Buyer").

12.     On January 6, 2025, the Debtors filed the *Notice of Closing of Sale of Debtors' Assets to Gordon Brothers Retail Partners, LLC* [Docket No. 1588] (the "Sale Closing Notice").

13.     On March 2, 2025, pursuant to the Designation Rights Procedures, the Debtors filed the *Notice of Filing of Seventeenth Post-Closing Designation Notice* [Docket No. 2159] (the "Original Notice").

14.     The Original Notice identifies, *inter alia*, certain unexpired leases that may be assumed and assigned to Burlington Coat Factory Warehouse Corporation or its designee Burlington Coat Factory of Texas, L.P. ("Burlington"), as the proposed assignee, including the Lease, along with the amounts, according to the Debtors' books and records, which must be paid to cure any defaults existing under such unexpired leases, including the Lease.

15.     On March 10, 2025, the Debtors filed the Assignment Notice.  Among other things, the Assignment Notice scheduled the Debtors' proposed Cure for Landlord's Lease at $7,993.00.  Landlord objects to the Debtors' Cure and insofar as the Cure does not take into account the Landlord's pecuniary losses, including their reasonable attorney's fees and any harm or prejudice to the Landlord for the violation of the permitted use and exclusives at the Center arising from the assignment of the Lease to Burlington and its changed use.

16.     The hearing to consider approval of the assumption and assignment of the Lease to Burlington is scheduled to be heard on March 25, 2025 at 10:00 a.m. (ET) (the "Hearing").

17.     Landlord is also in receipt of certain confidential adequate assurance information for Burlington in the form of public SEC filings.  Landlord continues to review this information.  Notably, none of the information identifies whether Burlington intends to comply with the current use and restrictive use provisions of the Lease, including the exclusives granted to other tenants in the Center as more fully set forth in Exhibit F of the Lease.  In addition, the information also does not identify whether a financially capable parent of Burlington will guaranty the obligations of the assignee under the Lease should an assignment be approved by this Court as further adequate assurance of future performance.

18.     Accordingly, Landlord files this Objection in order to preserve all of its rights under the Lease, including with respect to any defaults under its Lease to be cured at the

time of any assumption and assignment of its Lease to Burlington, and reserve their rights to raise further and other objections to the assumption and assignment of their Lease and cure amount as designated.

## III.   ARGUMENT

19.     The Landlord opposes any assumption and assignment of the Lease to Burlington in violation of the restrictive use and exclusive provision of the Lease and the exclusive contained in the Marshalls' Lease.  To the extent the Court is inclined to approve the assumption and assignment of the Lease over the Landlord's Objection, Landlord further objects to any assumption and assignment of the Lease absent strict compliance with all of the requirements of Sections 365 of the Bankruptcy Code and the provisions of the Lease, including as to cure and adequate assurance of future performance, and the recognition of liability for accruing but not yet due obligations under the Lease, as well as any indemnification obligations, as more fully set forth herein, and the Assignment Order must be modified to address the Landlord's objections raised herein.

### B.     The Debtors must demonstrate adequate assurance of future performance to assume and assign the Lease to Burlington.

19.     The Debtors may not assume and assign the Lease unless they demonstrate adequate assurance of future performance. 11 U.S.C. § 365(b)(1)(C); see also 11 U.S.C. § 365(f)(2).  The provision of adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365. See In re Rachels Indus., Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).  The obligation to comply with Section 365(b) and Section 365(f) is unaffected by the assumption and assignment process taking place through a sale under Section 363.  Courts require a specific factual showing through

competent evidence to determine whether adequate assurance of future performance has been provided.  See, e.g., Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, the court found that insufficient documentary evidence had been presented).

20.    In this case, the Lease is a shopping center lease and, as such, the Bankruptcy Code requires more than the basic adequate assurance of future performance of the Lease under Section 365(b)(1)(C).  In re Sun TV and Appliances, Inc., 234 B.R. 356, 359 (Bankr. D. Del. 1999).  In order to assume and assign shopping center leases, the Debtors must satisfy the heightened requirements set forth in 11 U.S.C. § 365(b)(3)(A) - (D).  See Joshua Slocum, 922 F.2d at 1086; see also L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 299 (3d Cir. 2000).  The heightened adequate assurance requirements that Debtors must satisfy under Section 365(b)(3) include the following:

- the source of rent and that the financial condition and operating performance of the proposed assignee and its guarantors, if any, must be similar to the financial condition and operating performance of the debtor and its guarantor(s), if any, as of the time the debtor became the lessee.  See 11 U.S.C. § 365(b)(3)(A);

- that **any percentage rent due under the lease will not decline substantially**.  See 11 U.S.C. § 365(b)(3)(B) (emphasis added);

- that assumption and assignment of the lease is subject to all provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision, and will not breach of any such provision in any other lease**, financing agreement, or master agreement relating to such shopping center.  See 11 U.S.C. § 365(b)(3)(C) (emphasis added); and

- that assumption and assignment of the lease **will not disrupt the tenant mix or balance in the shopping center**.  See 11 U.S.C. § 365(b)(3)(D) (emphasis added).

21.    A heightened adequate assurance of future performance determination must be satisfied in connection with an assumption and assignment under Section 365(f)(2)(B).  Sun TV and Appliances, Inc., 234 B.R. at 370.  In connection with the heightened adequate assurance

requirement for shopping center leases, courts also require a specific factual showing through competent evidence to determine whether the Debtors have provided adequate assurance of future performance.  Matter of Haute Cuisine, Inc., 58 B.R. at 394.  The Debtors have not met their burden for the reasons more fully set forth herein.

> **C.      Any Assumption and Assignment Must Comply with Terms of the Lease, and Not Breach Another Lease at the Center, Violate the Existing Use, or Disrupt the Tenant Mix or Balance.**

22.     Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amendments, "Section 365(f)(1) was amended to make sure that all of the provisions of Section 365(b) are adhered to and that 365(f) of the Code does not override Section 365(b)."  Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).  In explaining the change to Section 365(f)(1), Senator Hatch stated:

> The bill helps clarify that an owner should be able to retain control over the mix of retail uses in a shopping center.  When an owner enters into a use clause with a retail tenant forbidding assignments of the lease for a use different than that specified in the lease, that clause should be honored. Congress has so intended already, but bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 2461 (daily ed. March 10, 2005).

23.     The changes embodied in the BAPCPA specifically preserve a landlord's right to enforce use and other lease provisions.   Again, Senator Hatch's remarks in the Congressional Record clarify the intent behind Section 365(b) and 365(f):

> A shopping center operator . . . must be given broad leeway to determine the mix of retail tenants it leases to.  Congress decided that use or similar restrictions in a retail lease, which the retailer cannot evade under nonbankruptcy law, should not be evaded in bankruptcy.  It is my understanding that some bankruptcy judges have not followed this mandate. Under another provisions of the Code, Section 365(f), a number of bankruptcy judges have misconstrued the Code and allowed the assignment of a lease even though terms of the lease are not being followed. (Emphasis added).

11

151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).

24.    BAPCPA clarified Section 365 to reflect the Congressional intent that a Debtor cannot use Section 365(f)(1) to void lease provisions, and to overrule those prior court decisions that did not strictly enforce lease terms.  The predicate to the limited ability to assign a lease over a landlord's objection under Section 365(f) is that such assignment must be subject to the protections of Section 365(b)(1) and (3).

25.    Section 365(f)(1) does not modify or override Section 365(b).  Trak Auto Corp. v. West Town Ctr. LLC (In re Trak Auto Corp.), 367 F.3d 237, 243-44 (4th Cir. 2004) (bankruptcy courts could not use the general anti-assignment provision of Section 365(f)(1) to trump the specific protections granted to landlords in Section 365(b)(3)(C)); Three A's Holdings, 364 B.R. 550, 559-61 (Bankr. D. Del. 2007) ("Although the Court has broad authority under section 365(f)(1) to authorize the assumption or assignment of leases in violation of their terms, *this discretion is severely constrained if the assumption or assignment involves a lease of real property in a shopping center.*  In 1984, Congress provided for heightened restrictions in section 365(b)(3) to provide a framework for enforcing common provisions found in shopping center leases.") (emphasis added).  Any assignment must remain subject to all provisions of the Lease, including those provisions concerning use, radius, exclusivity, tenant mix and balance and must ensure that percentage rents will not decline substantially.

20.    To the extent that Burlington intends to use the Premises as a Burlington Coat Factory store, selling brand-name apparel at discount prices, the Debtors are unable to satisfy the requirements under § 365(b)(3)(C) as such use does not comply with the current permitted use under the Lease and will violate another tenant's exclusive use.

26.    As a threshold matter, the Debtors must provide adequate assurance that the assignment of the lease "is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision, and will not breach any such provision contained in any other lease**, financing agreement, or master agreement relating to such shopping center." 11 U.S.C. § 365(b)(3)(C).  <u>See also</u> Lease, § 4(A).  <u>Sun TV and Appliances, Inc.</u>, 234 B.R. at 370 (court denied a motion for approval of the assumption and assignment of a lease in a shopping center which contained a restrictive use condition.).  The first clause of § 365(b)(3)(C) calls for examining the lease between the landlord and the debtor tenant, while the second clause calls for evaluating other leases with other tenants in the same shopping center.  <u>See In re Heilig-Meyers Co.</u>, 294 B.R. 660, 662 (Bankr. E.D. Va. 2001) (concluding that debtor's proposed assignment of lease to Hancock Fabrics could not satisfy § 365(b)(3)(C) as lease conflicted with another lease executed by the landlord after the bankruptcy filing that (1) gave another fabric retailer "exclusive rights in the center for a fabric shop" and (2) prohibited the landlord from "leas[ing] to any other tenant who would be in direct competition with [such retailer].").

21.    Here, both the Lease and the Marshalls' Lease contain a prohibition against the Debtor or Burlington from operating as a "retailer of brand-name apparel at discount prices in the Shopping Center" in "more than ten thousand (10,000) square feet of sales and display area…."  <u>See</u> Lease, Exhibit F; Marshalls Lease, Article IX, Section 2(C).

22.    Further, pursuant to 11 U.S.C. § 365(b)(3)(B), an assignment must ensure that any percentage rent due under the lease will not decline substantially.  If the Court approves the assignment to Burlington, there will be two direct competitors for the sale of name-brand apparel at discount prices and, therefore, Landlord may suffer a substantial decline in the

percentage rents due under the Marshalls' Lease.  See In re Ames Dep't Stores, Inc., 348 B.R. 91, 96 (Bankr. S.D.N.Y. 2006) (analyzing that percentage rent is "intended to limit internal or external competition or to create synergies.").

23.     The Debtors must also provide adequate assurance that the assignment of the Lease to Burlington "will not disrupt any tenant mix or balance in [the] shopping center." 11 U.S.C. § 365(b)(3)(D).  The "tenant mix" issue "focus[es] on the inclusion or exclusion of a store in the array or mix of mall stores," while the "tenant balance" issue "focus[es] on the location and relationship of tenants in the mix of mall stores."  In re Federated Dep't Stores, Inc., 135 B.R. 941, 943 (Bankr. S.D. Ohio 1991).  On the importance of protecting a shopping center's tenant mix or balance, Congress has indicated,

> A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center.

H.R. Rep. No. 95-595, at 348 (1977), reprinted in 1977 U.S.C.C.A.N. 5963, 6305. Accordingly, § 365(b)(3)(D) "guarantees to the landlord and remaining tenants that the tenant mix will not be . . . disrupted." Joshua Slocum, 922 F.2d at 1088.  And on this issue, "[t]he level of competition between stores in a shopping center must be considered, especially in connection with the fact that the success or failure of individual tenants may affect the landlord and the other tenants in the center."  Rockland Ctr. Assocs. v. TSW Stores of Nanuet, Inc. (In re TSW Stores of Nanuet, Inc.), 34 B.R. 299, 307 (Bankr. S.D.N.Y. 1983).

27.     Here, the Debtors will be unable to provide adequate assurance that the assignment of the Lease to Burlington will not disrupt the Center's existing tenant mix or balance. Burlington is a discount retailer and direct competitor of Marshalls, an existing tenant in the

Center.  Accordingly, unless Burlington intends to comply with the square footage restriction and limit the sale of any name-brand apparel at discount prices to 10,000 square feet of its sales and display area in an otherwise 31,000 square foot store, Burlington's presence in the Shopping Center poses a direct threat to Marshalls' success and will disrupt the tenant mix and balance of the Center.

28.    The Center's comprehensive presence of use clauses in the leases that govern the exclusive and prohibited uses of the premises exemplify the need for a balanced and diversified mix of tenants.  Cf. Trak Auto, 367 F.3d at 242 ("To maintain proper tenant mix, that is, store variety, shopping center landlords have routinely placed use restrictions in leases."); TSW Stores of Nanuet, 34 B.R. at 307 (rejecting debtor's proposed modification of restrictive-use clause in lease in connection with proposed assumption and assignment to assignee who directly competed with another tenant after finding that "the landlord has inserted restrictive use clauses in the tenants' leases to avoid a head to head confrontation between two stores selling the exact same categories of merchandise").

**C.    Any Assignment of Leased Real Property Must be Subject to all Applicable Restrictive Covenants.**

29.    The *cum onere* principle and requirements of section 365 (including section 365(b)(3)) of the Bankruptcy Code also mandate that restrictive covenants be respected in connection with any lease assignment.  See 11 U.S.C. § 365(b)(3)(C) (requiring that "assumption or assignment of such lease is subject to all the provisions thereof"); Bildisco, 465 U.S. 513, 531-32 (1984); In re MF Glob. Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012).  As is typical, shopping center leases are part of an integrated and complex commercial relationship between the shopping center owner and tenants that arise under both leases as well as reciprocal easement agreements (or similar agreements) and other restrictive covenants applicable to the properties.

Accordingly, assumption and assignment of any lease in accordance with section 365 of the Bankruptcy Code and applicable law requires compliance with, and is subject to, any agreements containing restrictive covenants or other obligations related to the property.

30.      Accordingly, Landlord objects to the assumption and/or assignment of the Lease or any use of the Premises to the extent such transfer is not subject to all applicable reciprocal easement agreements, other similar agreements, and other restrictive covenants or obligations set forth therein or the Lease.

**B.      The Debtors' proposed cure amount as set forth in the Assignment Notice fails to provide for the payment of all obligations due and owing under the Lease.**

31.      In order to assume and assign the Lease, to the extent permitted over the Objection of the Landlord, the Debtors must also comply with Section 365(b)(1) of the Bankruptcy Code which provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)      cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;. . .

11 U.S.C. § 365(b)(1).

32. The amount set forth in the Assignment Notice of $7,993.00 does not reflect the total outstanding balances due and owing to Landlord under the Lease, any pecuniary losses incurred by the Landlord, or account for accrued but unbilled charges which may come due in the future under the Lease. The cure amount set forth by the Debtors, at a minimum, must be modified to reflect the additional charges owing, as well as recognize the liability for accruing but not yet due charges under the Lease, and to account for the Landlord's pecuniary losses for its reasonable attorneys' fees, and any damages or losses suffered by the Landlord stemming from the violation of the use as more fully set forth herein.

33. Landlord's monetary base cure claim for amounts presently outstanding under the Lease, exclusive of any sums which become due after February 25, 2025 (which amounts must be paid when due under the Lease), is $88,548.07, as more fully set forth on **Exhibit 3** attached hereto and incorporated into this Objection by reference. The cure amount is the Landlord's base cure claim amount subject to additional qualifications and modifications (such as reimbursement amounts for attorney's fees and any indemnification required under the Lease to compensate and hold the Landlord harmless for any pecuniary losses and damages suffered as a result of the use and exclusives violations) as more fully set forth below.

34. In addition to the current outstanding rent and other monthly charges due under the Lease, in determining what must be paid as cure pursuant to Section 365(b), the charges referenced below must also be taken into consideration and paid, either as cure on the effective date of any assumption and assignment of, or when properly billed under, the Lease.

i. Attorneys' Fees, Costs and Interest

35. As indicated, the Debtors or Burlington take the Lease *cum onere*—subject to existing burdens. The Debtors cannot assume the favorable portions, and reject the unfavorable provisions, of their leases. In re Wash. Capital Aviation & Leasing, 156 B.R. 167, 172 (Bankr.

E.D. Va. 1993).  If forced to continue in the performance of the Lease, the Landlord is entitled to the full benefit of the bargain under the Lease with the Debtors.  See Matter of Superior Toy and Mfg. Co., Inc., 78 F.3d 1169 (7th Cir. 1996).

36.     Here, the Lease contains a provision for recovery of attorneys' fees, costs, and interest in the event the Landlord is required to take legal action to protect its interests.  The Debtors are obligated to cure all defaults under the Lease, and compensate the Landlord for its actual pecuniary losses as a result of defaults under the Lease.  See 11 U.S.C. § 365(b)(1)(A) and (B).  The principle is well-recognized.  In re LCO Enterprises, 12 F.3d 938, 941 (9th Cir. 1993); Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989) (debtors allowed to assume lease provided it cured all pre-petition defaults).

37.     The "full benefit of the bargain" principle has been held to require payment of interest.  "The cure of a default under an unexpired lease pursuant to 11 U.S.C. § 365 is more akin to a condition precedent to the assumption of a contract obligation than it is to a claim in bankruptcy.  One of the purposes of Section 365 is to permit the debtors to continue in a beneficial contract; provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract."  In re Entm't, Inc., 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998) (citation omitted; bankruptcy court allowed interest at 18%).  Interest on pre-petition lease charges continues to run from the filing of the Debtors' petitions and must be paid as a condition of the assumption of the Lease.  See In re Skylark Travel, Inc., 120 B.R. 352, 355 (Bankr. S.D.N.Y. 1990).  Interest calculations are, therefore, not cut short by the automatic stay, and payment of such interest is required to fully compensate Landlord for the Debtors' defaults under the Lease, and thus to properly assume (or assume and assign) the Lease.  Finally, post-petition interest is

allowable where such interest is provided for under the terms of the Lease.  Cukierman v. Uecker
(In re Cukierman), 265 F.3d 846, 853 (9th Cir. 2001).

      38.    Attorneys' fees and costs incurred in enforcement of the covenants,
obligations, and conditions of a lease are also proper components of a cure claim, and the Debtors
(or successor) must satisfy these lease charges as part of the assumption and assignment of the
Lease if permitted.  Entm't, Inc., 223 B.R. at 152 (citation omitted).  There is no logical distinction
for purposes of Section 365 between attorneys' fees incurred in connection with pre-petition
defaults and fees incurred with post-petition defaults.  Id. at 154.  The fact that a landlord uses
bankruptcy procedures to enforce a lease should not preclude recovery of attorneys' fees and costs
for such enforcement activity (particularly where the Bankruptcy Court is the exclusive forum
where the landlord can obtain any relief, being foreclosed from state court relief by the automatic
stay).  Id., see also In re Crown Books Corp., 269 B.R. 12 (Bankr. D. Del. 2001) (Landlord's fees
and costs are recoverable as a component of cure under 11 U.S.C. § 365(b)(1)); Urban Retail Props.
v. Loews Cineplex Entm't Corp., et al., Case No. 01 Civ.8946, 2002 WL 535479 (S.D.N.Y. Apr.
9, 2002) (where lease "provides for recovery of attorneys' fees and interest, their receipt deserves
the same priority under Section 365(d)(3) as any of the debtors' other obligations that arise
postpetition . . . ."); Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Incorporated), 167
F.3d 843, 850 (4th Cir. 1999).  The Supreme Court has upheld the enforceability of such attorneys'
fees clauses, ruling that pre-petition attorneys' fee clauses were enforceable with respect to issues
peculiar to bankruptcy law.  Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric,
127 S. Ct. 1199, 1206 (2007).

      39.    For purposes of this Objection, the Landlord estimates its attorney's fees
and costs incurred will be approximately no less than $25,000 by time of the Hearing, but reserves

the right to supplement this figure with its actual billings at the time any cure is reconciled and paid.

ii.    <u>Violation Damages</u>

40.    In addition, should an assumption and assignment of the Lease be permitted to Burlington, Landlord will suffer additional pecuniary losses arising from the assumption and assignment of the Lease as a result of the violation of the use and exclusive provision in the form of the damages and losses that the Landlord will be subject to, should Marshalls' decide to pursue or elect their remedies as a result of the exclusive violation.

41.    While it is difficult to monetize the complete harm that the Landlord will suffer at this stage in the proceedings, for representative purposes, based on an analysis completed by the Landlord with respect to Marshalls' remedy of paying fifty percent (50%) of the rent otherwise due and payable under the Marshalls' Lease through its natural expiration, including any option terms, the Landlord could incur damages and losses in addition to the cure and its attorney's fees, in an amount up to $3,186,337.21.  <u>See</u> Marshalls' Lease Damage Analysis attached hereto as **<u>Exhibit 4</u>**.

42.    Accordingly, the Landlord further requests that it be reimbursed for all of its actual pecuniary losses including, but not limited to, attorneys' fees and costs expended with regard to Debtors' defaults in these bankruptcy proceedings, including in connection with this Objection to oppose the assumption and assignment of the Lease in violation of the Lease provision for use and other tenant's exclusive.

iii.    <u>Year-End Adjustments and Reconciliations and Indemnification</u>

43.    In addition to rent and related monthly charges, attorneys' fees, costs and interest, and other losses, some charges for which the Debtors bear responsibility under the Lease have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods.  By

way of example, the Debtors occupy retail space at the Center pursuant to a triple-net lease, where it pays rent and related lease charges in advance for each month.  The Debtors pay fixed minimum rent, along with a pro-rata share of expenses such as real property taxes, insurance, common area maintenance ("CAM") fees, annual percentage rent, and the like.  Certain charges, such as CAM and property taxes are estimated prospectively, billed to and paid by the tenant during the year, and then reconciled after year-end.  The reconciliation compares the amounts estimated and paid against actual charges incurred at the Center.  To the extent the estimated payments exceed actual charges, the result is a credit to the tenant.  To the extent the estimated payments do not cover actual charges incurred under the Lease, the result is an additional amount (or debit) for which the tenant is liable.  In some instances, year-end reconciliations and adjustments for previous years for the Premises may not yet be complete (i.e., year-end reconciliations and adjustments that accrued through 2024 may not yet have been billed, and such charges that are accruing for 2025 will not be billed until 2026). In other instances, certain charges may be paid in arrears, and cannot be calculated (in some cases) until a year or more after year-end.  Since Section 365(b) only requires debtors to cure defaults under their leases, and since there can be no default for failure to pay an amount that has not as yet been billed, these accrued, but unbilled, charges are not yet due under the Lease, and they do not create a current default that gives rise to a requirement of cure by the Debtors at this time.  The obligation to pay the year-end adjustments is, however, certainly a part of the obligation to provide adequate assurance of future performance.  As a result, the Court should deny any attempt to assign the Lease "free and clear" of these obligations.

44.     Debtors remain responsible for all accrued or accruing charges under the Lease, and must pay such charges when they come due under the Lease.  The Debtors or Burlington assume and assign the Lease subject to their terms, and must assume and assign all obligations

owing under the Lease, including obligations that have accrued but may not yet have been billed under the Lease.  The final Assignment Order should clearly state that the Debtors or Burlington will assume these lease obligations and pay them when due, regardless of whether they relate to the period prior to, or after, the closing of the assignment.  In addition, any provision in the Assignment Order that purports to release the Debtors or Burlington of further liability based upon a payment of cure amounts, must specify that such release does not apply to obligations to pay accrued or accruing, but unbilled, charges that come due under the Lease.

45.    Finally, the Lease requires the Debtors or Burlington to indemnify and hold the Landlord harmless with respect to any existing claims which may not become known until after the assumption and assignment of the Lease, examples of which may include such claims as personal injuries at the Premises and damage to the Premises or Center by the Debtors, Burlington, or their agents.  Any assumption and assignment of the Lease must be subject to the terms of the Lease, including the continuation of all indemnification obligations, regardless of when they arose.[4]  In the alternative, the Debtors must provide (by insurance or otherwise) that they can satisfy the indemnification obligations under the Lease for any claims that relate to the period prior to assumption or assumption and assignment of the Lease.  Nothing in the Assignment Order should preclude the Landlord from pursuing the Debtors, their insurance, or any other party that may be liable under the Lease, and the Landlord requests that any order specifically preserves its right to pursue such rights irrespective of any resolution of cure amounts herein.[5]

---

[4] Any ability to assume and assign the Lease is subject to the protections provided by Section 365(b) and (f). Therefore, any assumption (or assumption and assignment) must be in accordance with all provisions of the Lease.

[5] If Debtors are covered under an "occurrence basis" insurance policy, rather than a "claims made" policy, this objection may be satisfied by proof of such insurance by the Debtors for Landlord's locations.

46.     Landlord, therefore, requests that in the event an assumption and assignment of the Lease is approved by the Court, language must be inserted into the Assignment Order to provide that the Burlington shall be responsible for all unpaid year-end adjustments, whether accruing prior to or after the effective date of assumption of the Lease, when such charges become due in accordance with the terms of the Lease, including with respect to indemnification and insurance obligations.  In default thereof, a suitable escrow for the Lease equal to 150% of the average year-end adjustments for the prior three (3) years must be established to assure that any amounts due will be available to Landlord when the year-end adjustments are actually billed and due pursuant to the terms of the respective Lease.

iv.     <u>The Cure Amount Serves Only As an Estimate</u>

47.     Landlord can only provide the information presently available regarding amounts owing by the Debtors, while reserving the right to amend the Objection as necessary to include any additional or unknown charges that arise, including but not limited to subsequent rent defaults, attorney fees, costs, interest, and year-end adjustments and reconciliations.  There is no basis to impose upon the Landlord the equivalent of an administrative bar date, limiting its recourse to recover charges and other amounts to which it is entitled under the Lease.

v.     <u>The Debtors Must Pay Undisputed Cure Amounts Immediately</u>

48.     Section 365(b)(1)(A) requires that the Debtors promptly cure outstanding balances due under the Lease upon assumption or assumption and assignment.  To the extent there is a dispute over the total cure obligation for the Lease, all undisputed cure amounts should be paid immediately.  Debtors should escrow disputed amounts, and the Court should set a status conference within thirty (30) days of the assumption and assignment of the Lease to deal with any disputes that remain unresolved after such period.

E.      **Assumption and Amendment Agreement**

49.      Landlord also requests that, as a condition to any order approving assumption and assignment of Landlord's Lease, Burlington shall be required to enter into a short form Assumption and Amendment Agreement whereby Burlington shall become directly obligated to Landlord and the provision of the Lease regarding notice addresses will be modified.

## II.      RESERVATION OF RIGHTS TO RAISE FURTHER OBJECTIONS

41.      Landlord reserves all rights to (i) raise further or other objections as may be necessary, including but not limited to the final form of Assignment Order and/or the final transaction documents once such documents are filed of record with the Court; (ii) to require payment of all accrued but unbilled Lease charges and compliance with all Lease terms; and, (iii) to require any assignment on a form acceptable to Landlord.

## III.      JOINDER IN OBJECTIONS RAISED BY OTHER LANDLORDS

42.      Landlord hereby joins in the objections filed by Debtors' other landlords to the extent that such objections are not inconsistent with the provisions hereof.

## IV.      CONCLUSION

Landlord respectfully requests that: (a) the assumption and assignment of the Lease be denied; or, in the alternative, (b) any Assignment Order approving the assumption and assignment of the Lease expressly provide that it is subject to, and not free from, all of the restrictions contained in the Lease as well as any use and exclusive restrictions contained in other another tenant's lease; (c) any Assignment Order approving the assumption and assignment of the Lease be subject to and conditioned upon the Burlington providing adequate assurance of future performance, including any such guaranty of a financially capable parent; (d) any assumption of the Lease be conditioned upon responsibility of Burlington to pay a cure amount totaling not less than the cure amounts, if any, when due in accordance with the Lease, plus the Landlord's

pecuniary losses; and (e) the Court should grant such other relief that the Court finds just and proper.

Dated:  March 17, 2025                    /s/ Leslie C. Heilman
Wilmington, Delaware                      Leslie C. Heilman (DE No. 4716)
                                          Laurel D. Roglen (DE No. 5759)
                                          Margaret A. Vesper (DE No. 6995)
                                          BALLARD SPAHR LLP
                                          919 N. Market Street, 11th Floor
                                          Wilmington, Delaware 19801-3034
                                          Telephone: (302) 252-4465
                                          Facsimile: (302) 252-4466
                                          E-mail: heilmanl@ballardspahr.com
                                                  roglenl@ballardspahr.com
                                                  vesperm@ballardspahr.com

                                          *Counsel for UE Revere LLC*