# EXHIBIT A

# LEASE AGREEMENT

## BETWEEN

## MADEIRA PLAZA POWER LLC

## AND

## BURLINGTON COAT FACTORY WAREHOUSE CORPORATION

5425472v2

ARTICLE 1      CERTAIN DEFINITIONS ....................................................1
ARTICLE 2      DEMISED PREMISES AND USE .......................................3
ARTICLE 3      TERM ..................................................................................3
ARTICLE 4      POSSESSION .......................................................................3
ARTICLE 5      RENTAL ...............................................................................4
ARTICLE 6      TITLE ...................................................................................5
ARTICLE 7      TITLE INSURANCE..............................................................6
ARTICLE 8      TENANT'S RIGHT TO MAKE ALTERATIONS ...............6
ARTICLE 9      FIXTURES AND PERSONAL PROPERTY........................8
ARTICLE 10     COMPLIANCE WITH LAWS...............................................8
ARTICLE 11     QUIET POSSESSION ..........................................................8
ARTICLE 12     TENANT'S RIGHT TO CURE LANDLORD'S DEFAULTS....................9
ARTICLE 13     LANDLORD COOPERATION ...........................................10
ARTICLE 14     UTILITIES..........................................................................10
ARTICLE 15     ASSIGNING; SUBLETTING; MORTGAGING....................11
ARTICLE 16     REPAIRS .............................................................................13
ARTICLE 17     DAMAGE TO DEMISED PREMISES .................................15
ARTICLE 18     INSURANCE; MUTUAL RELEASE; WAIVER OF SUBROGATION AND
               INDEMNITY.......................................................................17
ARTICLE 19     INTENTIONALLY DELETED. ...........................................22
ARTICLE 20     EMINENT DOMAIN ...........................................................23
ARTICLE 21     TENANT'S DEFAULT IN MINIMUM RENT ....................24
ARTICLE 22     OTHER DEFAULTS BY TENANT ......................................24
ARTICLE 23     TRANSFER OF TITLE.........................................................26
ARTICLE 24     WAIVER................................................................................27
ARTICLE 25     NOTICES...............................................................................27
ARTICLE 26     ENTIRE AGREEMENT........................................................28
ARTICLE 27     GENERAL PROVISIONS ....................................................28
ARTICLE 28     LANDLORD'S PRE-OPENING CONSTRUCTION OBLIGATIONS AND
               CONSTRUCTION ALLOWANCE ....................................31
ARTICLE 29     OPTION FOR EXTENDED TERMS ...................................39
ARTICLE 30     CERTAIN CONDITIONS.....................................................39
ARTICLE 31     SUBORDINATION AND NONDISTURBANCE ...................40
ARTICLE 32     USE OF COMMON FACILITIES ........................................41
ARTICLE 33     RESTRICTIVE COVENANT ...............................................43
ARTICLE 34     TENANT'S RIGHT TO OPERATE .....................................45
ARTICLE 35     REAL PROPERTY TAXES...................................................46
ARTICLE 36     COST OF COMMON FACILITIES ......................................48
ARTICLE 37     ENVIRONMENTAL COMPLIANCE ...................................52
ARTICLE 38     USE OF COMMON AREAS .................................................57
ARTICLE 39     CONSENT NOT TO BE UNREASONABLY WITHHELD....................57
ARTICLE 40     TENANT SOLELY LIABLE; LANDLORD'S EXCULPATION .............57
ARTICLE 41     OTHER TENANCIES ...........................................................58
ARTICLE 42     SIGNAGE ..............................................................................60

5425472v2

ARTICLE 43    SATELLITE DISH AND ROOF RIGHTS ...................................................60
ARTICLE 44    ESTOPPEL CERTIFICATES ....................................................................61
ARTICLE 45    ACCESS TO DEMISED PREMISES .........................................................61
ARTICLE 46    HOLDING OVER ....................................................................................61
ARTICLE 47    COMPLETE AGREEMENT/SHORT FORM ...........................................62
ARTICLE 48    BIG LOTS WAIVER.................................................................................62
ARTICLE 49    AFFIRMATION OF LEASE TERMS .......................................................62

**Exhibits:**

A.      Site Plan of Shopping Center with Demised Premises Cross-Hatched and
        Protected Parking Area; Building Area, Future Building Area; Critical Areas and
        Critical Building Facilities Identified

A-1.    Legal Description of Shopping Center

B.      Permitted Encumbrances

C.      Plans and Specifications

D.      Deleted

E.      Prohibited Uses

F.      Tenant's Signs

5425472v2

# LEASE AGREEMENT

This Lease ("Lease") is made on November  15, 2021 by and between **MADEIRA PLAZA POWER, LLC**, a Pennsylvania limited liability company, ("Landlord") and **BURLINGTON COAT FACTORY WAREHOUSE CORPORATION**, a Florida corporation ("Tenant.").

## ARTICLE 1
## CERTAIN DEFINITIONS

A. "Demised Premises" means the premises comprising the Estimated Square Feet (as defined in this Article) of ground floor space, with a frontage of approximately 141 lineal feet, located in the Building, as defined in Article 27, with a street address of 315 N 5th Street Highway, Reading, PA  19605, which premises are identified on Exhibit "A" annexed hereto and made a part hereof.

B. "Estimated Square Feet" means twenty-five thousand and twenty two (25,022) square feet of ground floor space.

C. "Shopping Center" means the shopping center known as Madeira Plaza in Reading, Pennsylvania, as such shopping center is depicted on Exhibit "A," which shopping center is located on the land more particularly described in Exhibit "A-1" annexed hereto and made a part hereof.

D. "Commencement Date" means the date of delivery to Tenant of exclusive physical possession of the Demised Premises in accordance with the terms and conditions of this Lease, including satisfaction of all requirements set forth in Article 28.E of this Lease.

E. "Rent Commencement Date" means the date which shall be the earlier of: (i) the date Tenant shall "grand open" (as defined below) in the Demised Premises for business; or (ii) a date which is the earlier of the next October 1st or April 1st, which is at least sixty (60) days after the Commencement Date. For the purposes of this Lease, the term "grand open" shall mean the date Tenant shall advertise as its grand opening date, which shall be not more than ten (10) days after Tenant initially opens its store for business.

F. "Delivery Notice" means a written notice from Landlord to Tenant of the date it intends to deliver possession of the Demised Premises to Tenant, which notice to be valid must specify a date that is not more than thirty (30) days prior to the Delivery Date (defined below) and not later than the Termination Date, unless Tenant agrees to accept possession of the Demised Premises after the Termination Date.

G. "Delivery Date" means August 1, 2022.
H. "Termination Date" means February 6, 2023.
I. "Outside Approvals Date" means June 1, 2022.
J. "Outside Landlord's Work Commencement Date" means July 1, 2022.

1

DocuSign Envelope ID: D1726786-5D10-4C74-9AE9-D74E4AFFB5A7

    K.  "Minimum Rent" means:

| | Lease Years | Minimum Rent PSF | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|---|---|
| Initial Term: | 1-10 | $14.75 | $369,074.50 | $30,756.21 |
| Extended Term(s) if exercised: | 11-15 | $15.75 | $394.096.50 | $32,841.38 |
| | 16-20 | $16.75 | $419,118.50 | $34,926.55 |
| | 21-25 | $17.75 | $444,140.50 | $37.011.71 |
| | 26-30 | $18.75 | $469,162.50 | $39,096.88 |

    L. Intentionally Omitted.
    M. Intentionally Omitted.

    N. "Initial Term" means that period commencing on the Commencement Date and ending at the very end of the day on February 28th (or February 29th during a leap year) next following the tenth (10th) anniversary of the Rent Commencement Date.

    O. "Extension Option(s)" means four (4) successive options to extend the Term of this Lease, the first three (3) of which for five (5) years on each such option, and the fourth (4th) of which for four (4) years and six (6) months for such option (each, an "Extended Term" and collectively the "Extended Terms"), such Extended Terms to begin, respectively, upon the expiration of the Initial Term or previous Extended Term of this Lease, as applicable.

    P. "Landlord's Notice Address" means:
        Madeira Plaza Power LLC
        1195 Route 70, Suite 2000
        Lakewood, New Jersey  08701

    Q. "Landlord's Emergency Contact Information" means:
        Name: Lee Zekaria
        Phone Number: 732-961-8132
        Email:  lz@paramountrealty.com

    R.  "Tenant's Notice Address" means:

        BURLINGTON COAT FACTORY WAREHOUSE CORPORATION
        1830 Route 130 North
        Burlington, NJ 08016

2

Attention:  Lease Administration

With a copy to:
BURLINGTON COAT FACTORY WAREHOUSE CORPORATION
1830 Route 130 North
Burlington, NJ 08016
Attention:  Legal Department

S. "Broker" means Goldfine Broker LLC d/b/a Goldfine & Company.

T. "Total Allowance" intentionally omitted.

## ARTICLE 2
## DEMISED PREMISES AND USE

Landlord does demise and let unto Tenant, and Tenant does Lease and take from Landlord, for the term and upon the terms and conditions set forth in this Lease, the Demised Premises together with the exclusive right to the use of any loading dock adjoining the Demised Premises and any dumpster pads, outside storage areas or cart corrals associated with the Demised Premises and installed by Tenant pursuant to this Lease and all alley rights, if any, easements, and rights, privileges and appurtenances in connection therewith or thereunto belonging or herein granted. Tenant may use the Demised Premises for any lawful retail purpose; provided, however, that in no event shall Tenant use the Demised Premises in violation of any of the exclusive or prohibited uses set forth in Exhibit "B".

## ARTICLE 3
## TERM

The "Effective Date" of this Lease is the day that the later of Landlord or Tenant (or their attorneys at law, respectively) receives a fully executed copy of this Lease.  Tenant shall have and hold the Demised Premises for the Initial Term, unless sooner terminated herein or renewed or extended as provided herein.  The Initial Term together with any extensions or renewals thereof shall be hereinafter referred to as the "Term."  All optional or extended terms provided for in this Lease shall run from March 1st following the expiration of the Initial Term as hereinabove determined.  The term "Lease Year" shall mean: (a) for the first Lease Year, the period commencing on the Rent Commencement Date and ending on the last day of the February next following the anniversary of the Rent Commencement Date; and (b) for each Lease Year thereafter (including during Extended Terms), the twelve month period commencing on March 1st and ending on the last day of the next February thereafter.  Any period less than a full Lease Year shall be a partial Lease Year.

## ARTICLE 4
## POSSESSION

5425472v2

DocuSign Envelope ID: D1726786-5D10-4C74-9459-D74E4AFFB5A7

Landlord agrees to deliver to Tenant physical possession of the Demised Premises free and clear of all tenants and occupants and the rights of others and in accordance with the provisions of Article 28 below.  Tenant agrees to deliver to Landlord physical possession of the Demised Premises upon the termination of the Term in broom clean condition, ordinary wear and tear, damage by fire or other casualty or damages from any other cause (not directly attributable to the negligence of Tenant unless covered by Landlord's insurance) excepted, with all of Tenant's furniture, trade fixtures and personal property removed and all damage caused by such removal repaired.

## ARTICLE 5
## RENTAL

A. Tenant agrees to pay to Landlord the Minimum Rent for the period commencing on the Rent Commencement Date, and ending on the last day of the Term, (in each instance unless such rent shall be abated or diminished as in this Lease elsewhere provided) in equal monthly installments on the first (1st) day of each and every month hereof.  Payments of Minimum Rent and Additional Rent (as defined in Article 27) are to be made to Landlord, or such other person or entity and at such other place, as shall be designated by Landlord in writing and delivered to Tenant at least thirty (30) days prior to the next ensuing rent payment date.  Minimum Rent for the calendar month during which it shall begin to accrue or change in amount and for the last calendar month of the Term shall be apportioned if less than a full calendar month.

B.  Since Minimum Rent is based upon the Estimated Square Feet, Tenant, at its option, may re-measure the Demised Premises within thirty (30) days after delivery of the Demised Premises to Tenant with Landlord's Work substantially complete and certify to Landlord the correct dimensions of the Demised Premises.  In the event the square footage of the Demised Premises is more or less than the Estimated Square Feet, Minimum Rent and all items of proration based upon the size of the Demised Premises shall be increased or decreased accordingly. Notwithstanding the foregoing, if Landlord disputes Tenant's measurement, Landlord may so notify Tenant in writing.  In such event, Landlord's architect and Tenant's architect shall meet within five (5) business days after Landlord's notice and select a third (3rd) neutral architect with substantial experience in designing retail buildings (the "Neutral Architect"), and the Neutral Architect shall be engaged to measure the premises in accordance with the standard of measurement set forth herein.  The determination of the Neutral Architect shall be binding.  The fees of the Neutral Architect shall be shared by the parties.  It is Landlord's responsibility to deliver the Demised Premises with the correct dimensions and nothing in this Article shall be construed to authorize Landlord to deliver or require Tenant to accept delivery of a Demised Premises that deviates from the floor plan or Estimated Square Feet in any more than a de minimis respect.  In no event shall Tenant's Minimum Rent or items of proration based upon the size of the Demised Premises be increased as a result of any such measurement or Landlord's delivery of a Demised Premises in excess of the Estimated Square Feet. Notwithstanding any certification of the area of the Demised Premises or the acceptance of the same by Tenant or any other provision herein to the contrary, it is specifically understood and agreed that should the Demised Premises contain any mezzanine space, basement space, patio or outside selling areas, unenclosed loading areas, fire

4

egress corridors (whether or not mandated by local law or regulation), or space used by or in common with others including, without limitation, utility rooms, stairs, stairwells, escalators, elevators and access easements of any type affecting the floor area of the Demised Premises, then such space or spaces shall be excluded from all computation of Minimum Rent and the floor area of the Demised Premises for the purpose of calculating Tenant's pro rata share of taxes, insurance and common area maintenance charges and all items of pro-ration based upon the size of the Demised Premises under this Lease, and Minimum Rent and the floor area of the Demised Premises for the purpose of calculating Tenant's pro rata share of taxes, insurance and common area maintenance charges and other pro-rated charges shall be reduced by the area of such space or spaces.  The Demised Premises shall be measured from the exterior faces of exterior walls and from the center line of demising walls between premises.

## ARTICLE 6
## TITLE

A. Landlord represents, warrants and covenants that it has full right and authority to enter into this Lease and that Landlord holds fee simple title to the Shopping Center free and clear of liens and encumbrances other than those set forth in Exhibit "B" hereof (collectively, the "Permitted Encumbrances").  No covenant or agreement made by Landlord or any predecessor in title with any other person or entity restricting the use or occupancy of all or part of the Shopping Center shall be of any force or effect against Tenant except as set forth in Exhibit "B" and whenever an agreement underlying a Permitted Encumbrance or any term therein shall lapse, Tenant shall thereafter be free of such restriction.  Landlord further represents, warrants and covenants that: (i) the zoning for the Shopping Center permits retail uses (including the retail sale of apparel) as a right and not based on conditional use or variance, (ii) the Permitted Encumbrances, (a) subject to Landlord obtaining the Use Waiver, to Landlord's knowledge, do not contravene, hinder or impair any right or privilege granted to Tenant in this Lease, (b) will not result in the imposition of any cost or expense which shall be the responsibility of Tenant under this Lease, or (c) do not prohibit the operation of a typical Burlington store, except an exclusive or restriction in favor of a third party as set forth on Exhibit "B" may have the effect of limiting Tenant's ability to sell one or more products or deliver one or more services.

B. Landlord represents, warrants and covenants that, to the best of Landlord's knowledge, there is no existing, pending or contemplated, threatened or anticipated: (a) condemnation of any part of the Shopping Center or any part thereof; (b) repaving, widening, change of grade or limitation on use of streets, roads or highways abutting the Shopping Center; (c) special tax or assessment to be levied against the Shopping Center or any part thereof; (d) change in the zoning classification of the Shopping Center or any part thereof; or (e) change in the tax assessment of the Shopping Center, except for any change in the tax assessment that may result from Landlord's construction of additional retail space in the Shopping Center.

C. Landlord further covenants that all access roads within the Shopping Center afford actual and legal access to N. 5th Street Highway.  Notwithstanding the generality of foregoing, Landlord agrees at Landlord's expense to always provide Tenant with: (i) reasonable and lit access

5

for Tenant's delivery trucks (WB- 65) to the loading facilities at the rear of the Demised Premises by and through a public street adjacent to the Shopping Center ("Truck Access") and (ii) reasonable and lit vehicular access to and from the Protected Parking Area designated on Exhibit A ("Protected Parking Area") and the Demised Premises by and through a public street adjacent to the Shopping Center ("Vehicular Access").

**ARTICLE 7**
**TITLE INSURANCE**

The condition of title to the Shopping Center and Tenant's leasehold estate consistent with this Article may be insured by Tenant, at Tenant's cost, by an ALTA leasehold title insurance policy in the amount of Three Million Dollars ($3,000,000.00) insuring Tenant's leasehold estate and rights to the Common Facilities hereunder from First American Title Insurance Company or such other national title insurance company acceptable to Tenant. The receipt of the leasehold title insurance policy by Tenant shall not waive or relieve Landlord of any of its obligations, representations or warranties set forth above. Tenant shall pay the cost of the policy directly to the title company within twenty (20) days after receipt or refusal of the title company's invoice.

**ARTICLE 8**
**TENANT'S RIGHT TO MAKE ALTERATIONS**

A. Landlord agrees that Tenant may at its own expense, from time to time during the Term, make such interior, non-structural alterations, additions and changes in and to the Demised Premises as it finds necessary or convenient for its purposes. Tenant shall not make (a) a structural alteration or (b) an alteration to the exterior of the Demised Premises without first obtaining Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the preceding, or anything herein to the contrary, Tenant may at any time and from time to time alter its exterior store front and/or equipment without consent of Landlord provided that with respect to the storefront such alterations shall conform to the then current exterior store front adopted for use generally for all new stores within Tenant's chain in the region in which the Demised Premises are located and the changes are architecturally harmonious with the balance of the Shopping Center; provided that if Tenant has assigned this Lease or sublet any part of the Demised Premises to a party unaffiliated with the named Tenant who is not a national or regional tenant (as defined in Article 41 below), or who is a national or regional tenant that occupies less than 20,000 square feet of the Premises, any changes to the exterior storefront of the sublet premises (or entire storefront if assigned) shall require Landlord's prior consent, which shall not be unreasonably withheld, conditioned or delayed. In the case of a sublease of less than the entire Demised Premises and Landlord's consent is not required for storefront modifications by the sublessee, any changes to the remainder of the storefront not included in the subtenant's premises shall be subject to Landlord's approval. In addition, if Tenant subleases a portion of the Demised Premises and the subleased area is not a "front to back" area as described in Article 15.1, Landlord shall have the right to approve all storefront changes in connection with such sublease. Tenant agrees that all the alterations, additions and changes made by it will be erected or made in a first-class workerlike manner, and anything in this Lease to the

6

contrary notwithstanding, Landlord and Tenant agree that Tenant shall have neither the right nor the obligation at the end of the Term to remove the same or to change such structure or restore the Demised Premises to the condition in which they were originally delivered.  Tenant shall have the right to temporarily close any other entrance to the Demised Premises while making permitted alterations, subject to applicable municipal code.  Notwithstanding anything in this Lease to the contrary, Tenant may not increase the height of the building (including architectural features) in which the Demised Premises is located or extend or move all or any part of the front or side wall of the Demised Premises any further (i.e. "bump out") that it will exist on the Commencement Date or construct any alteration or addition (such as a canopy) that will project out further beyond the front and side walls.

B. All alterations, additions improvements and fixtures (other than trade fixtures) which may be installed or made upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become property of the Landlord at the termination or expiration of this Lease, and Tenant shall not be required to remove the same or repair damage caused by removal thereof not conducted by Tenant; provided, that Tenant may de-identify the interior of the space and its exterior signage removing all logos, trade names, marks or intellectual property therefrom, without causing damage, and in no event shall Landlord ever acquire any rights in Tenant's intellectual property located at, on or in the Demised Premises or the Common Facilities.

C. Tenant agrees not to suffer any mechanic's lien to be filed against the Demised Premises or any other portion of the Shopping Center by reason of any work, labor, services or materials performed at or furnished to the Demised Premises by Tenant or by anyone holding the Demised Premises through or under Tenant.  If any such mechanic's lien shall at any time be filed, Tenant shall cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction, or otherwise within twenty (20) days after Tenant is notified of the lien, and shall indemnify, defend and save Landlord from and against any and all claims, demands, loss, damages and expenses, including legal fees, costs and charges arising out of such liens, but Tenant shall have the right to contest any and all such liens, provided Tenant bonds or otherwise causes the lien to be removed of record.  Nothing in this Lease contained shall be construed as consent on the part of Landlord to subject Landlord's estate in the Demised Premises to any such lien or liability.

D. Landlord agrees not to suffer any mechanic's lien to be filed against the Demised Premises or any other property of Tenant by reason of any work, labor, services or materials performed at or furnished to the Shopping Center by Landlord or by anyone claiming through or under Landlord.  If any such mechanic's lien shall at any time be filed, Landlord shall forthwith cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction, or otherwise and shall indemnify, defend and save Tenant from and against any and all claims, demands, loss, damages and expenses, including legal fees, costs and charges arising out of such liens, but Landlord shall have the right to contest any and all such liens, provided Landlord bonds or discharges any such lien so as to prevent the foreclosure portion of any such action.  Nothing in this Lease contained shall be construed as consent on the part of Tenant to subject Tenant's estate in the Demised Premises to any such lien or liability.

5425472v2

# ARTICLE 9
## FIXTURES AND PERSONAL PROPERTY

All trade fixtures, equipment, and other property owned by Tenant shall remain the property of Tenant without regard to the means by which, or the person by whom the same are installed in or attached to the Demised Premises, and Landlord agrees that Tenant shall have the right at any time, and from time to time to remove any and all of its trade fixtures, equipment and other property, including but not limited to, counters, shelving, showcases, mirrors, slides, and signs.  Tenant agrees to make all necessary repairs to the Demised Premises caused by such removal.  Landlord agrees not to mortgage or pledge Tenant's trade fixtures, equipment or other property and hereby waives and releases any lien or claim thereon and agrees to deliver confirming lien waivers to Tenant upon request in a form reasonably acceptable to Landlord.  All trade fixtures, equipment and other personal property shall be removed from the Demised Premises on or before the termination or expiration of this Lease and vacating of the Demised Premises by Tenant, failing which such property shall be deemed abandoned by Tenant and shall become property of Landlord and may be disposed of by Landlord in its discretion and Tenant shall reimburse Landlord upon demand for the costs of removal and disposal; provided, that in no event shall Landlord ever acquire any rights in Tenant's intellectual property located at, on or in the Demised Premises or the Common Facilities.

# ARTICLE 10
## COMPLIANCE WITH LAWS

Landlord and Tenant agree to comply with and to require Landlord's and Tenant's contractors to comply with all Federal, State and local laws, ordinances, regulations and directions relating to the employment, conditions of employment and hours of labor in connection with any demolition, construction, alteration or repair work done by or for Landlord and Tenant in or about the Demised Premises.

# ARTICLE 11
## QUIET POSSESSION

Landlord agrees that Tenant, upon paying the Minimum Rent and other charges payable hereunder and performing its covenants under this Lease, may quietly have, hold and enjoy the Demised Premises and all rights granted Tenant in this Lease during the Term free from interference by anyone claiming by, through or under Landlord, subject to the conditions of <u>Article 31</u> hereof.  If at any time through Landlord's act or omission Tenant shall be materially deprived of or impaired in the use and enjoyment of, or access to, the Demised Premises and/or Common Facilities as herein provided and, as a result, Tenant is forced to close for business in the affected area of the Demised Premises, and Landlord fails to cure such act or omission within three (3) business days after written notice of the same from Tenant (or such longer period as may be necessary so long as Landlord has commenced the cure within such three (3) business day period

8

and is working diligently to complete the same): (a) Minimum Rent to be paid by Tenant shall be equitably abated to the extent of interference with Tenant's business during any such period extending beyond twenty-four (24) hours; and (b) at the option of Tenant, to be exercised by notice to Landlord, the running of the Term shall be suspended during any such period extending beyond twenty-four (24) hours, and the expiration date of the Term (and any extension Terms as applicable) shall be extended for an amount of time equal to such period.  If such period continues for more than one hundred eighty (180) days after notice from Tenant, in addition to all other remedies available to Tenant at law or in equity, Tenant, at its option, may terminate this Lease by notice to Landlord given prior to Landlord's cure of the condition, while reserving all rights which Tenant may have for Landlord's default under this Lease.  The rights granted to Tenant in this Article shall not apply in the case of casualty, which shall be governed by Article 17of this Lease. If Landlord disputes Tenant's right to abate rent as provided in this Article and a court of competent jurisdiction determines that Tenant was not permitted to abate rent, then Tenant shall repay all abated rents to Landlord with interest at the Interest Rate.

## ARTICLE 12
## TENANT'S RIGHT TO CURE LANDLORD'S DEFAULTS

If Landlord fails to pay any installment of taxes or assessments and the Demised Premises is subject to imminent tax sale, or any interest, principal, costs or other charges upon any mortgage or mortgages or other liens and encumbrances affecting the Demised Premises and to which this Lease may be subordinate when any of the same become due (not including any mortgage for which Tenant has received a non-disturbance agreement), and the Demised Premises is subject to imminent foreclosure sale, or fails to defend Tenant as required by this Lease, or if Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease within the applicable time period required to complete such repair or work, or in any other respect fails to perform any covenant or agreement in this Lease contained on the part of Landlord to be performed, or, if any such repair, work, covenant or agreement cannot be completed or performed within such period, if Landlord shall not have promptly commenced such repair, work or covenant within such period and at all times shall have diligently and continuously pursued the completion and performance thereof, then and in any such event or events, in addition to all other remedies available to Tenant at law or in equity, Tenant, after the continuance of any such failure or default for twenty (20) days after notice in writing thereof is given by Tenant to Landlord (or such longer period as may be necessary so long as Landlord has commenced and is working diligently to cure such failure or default), or immediately in the event the failure constitutes an imminent danger to life or property or will result in a store closure or materially and adversely affect Critical Building Facilities, may, but shall not be obligated to, pay any or all of the taxes, assessments, interest, principal, costs and other expenses of Landlord, and may, but shall not be obligated to, make or perform all reasonable or any necessary repair, work or covenant and make all reasonable and necessary payments in connection therewith including but not limited to hiring counsel and the payment of reasonable counsel fees, costs and charges of or in connection with any legal action which may have been brought, and Landlord agrees to pay to Tenant forthwith the amount so paid by Tenant, together with interest thereon at seven percent (7%) above the prime rate of Citibank,

9

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D74E5AFFBEA7

N.A. in the City of New York or such successor bank selected by Tenant (but in no event higher than the lawful maximum rate then in force in the state or territory in which the Demised Premises are situated) ["Interest Rate"], and agrees that Tenant may withhold up to fifty percent (50%) of the Minimum Rent each month thereafter becoming due to Landlord pursuant to the provisions of this Lease, and may apply the same to the payment of such indebtedness of Landlord to Tenant until such indebtedness is fully paid with interest thereon as herein provided.  Nothing herein contained shall preclude Tenant from proceeding to collect the amount so paid by it as aforesaid without waiting for rental offsets to accrue, and if at the expiration of the Term, there shall be any sum owing by Landlord to Tenant, this Lease may be, at the election of Tenant, extended and continued in full force and effect until January 31st of the year following the date when indebtedness of Landlord to Tenant shall have been fully paid or Tenant may require full payment of the remainder of the rental offsets from Landlord.  If Landlord disputes Tenant's right to exercise the self-help remedy in this Article and a court of competent jurisdiction determines that Tenant was not permitted to exercise self-help or withhold Minimum Rent, then Tenant shall reimburse Landlord for all amounts withheld with interest at the Interest Rate.

## ARTICLE 13
## LANDLORD COOPERATION

Landlord agrees, upon Tenant's request and at Tenant's sole cost and expense, to reasonably cooperate with Tenant, in Landlord's name (if necessary), to secure from any Authority (defined in Article 28.C hereof) having or asserting jurisdiction over the Demised Premises or the Shopping Center such permits and licenses, which may be necessary in connection with any alterations, additions, changes, and repairs that Tenant is required or permitted to make hereunder. Landlord agrees upon request by Tenant to execute or join in the execution of any application for such permits and licenses so long as the same imposed no liability on Landlord.

## ARTICLE 14
## UTILITIES

A. Landlord agrees at Landlord's own cost and expense to provide to the Demised Premises throughout the Term such sewer facilities and such utilities (including, but not limited to, water, electric current and gas) as required in the Final Plans and to supply, install and maintain separate meters for the purpose of measuring all such utilities consumed by Tenant in the Demised Premises.  Tenant agrees to pay directly to the utility companies for all such utilities indicated by such meters to have been consumed by Tenant during the Term beginning with the delivery of possession of the Demised Premises to Tenant.  From and after the Commencement Date, Tenant, at Tenant's sole cost and expense, shall be responsible for maintaining sewer facilities and utilities within and exclusively serving the Demised Premises; provided, however, that Landlord shall maintain such facilities and utilities which are under floor slab, but Tenant is responsible for maintenance caused by the acts or omissions of Tenant.

B. Landlord agrees that from the date of delivery of possession of the Demised Premises to Tenant until the expiration of the Term: all water, electricity, gas, and sewage disposal facilities provided for the benefit of the Demised Premises shall be in such amounts and capacities as shall

10

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D7454AFFBEA7

be required by the Final Plans (including, without limitation, sufficient water pressure to maintain fire suppression systems and domestic water use throughout the Term); provided, however, Landlord shall not be responsible for the failure or unavailability of utilities if such failure is not due to a circumstance under the direct or indirect control of Landlord.  Landlord shall not take, nor permit or suffer any tenant or occupant of the Shopping Center or any person claiming under Landlord or any such tenant or occupant to take, any action which shall interrupt or interfere with, any electric, gas, water, sewage or telephone service to the Demised Premises, except for temporary interruptions as a result of required repairs or maintenance, which Landlord shall use reasonable efforts to complete during times that Tenant is not open for business.  If any meters, controls or conduits for the utilities systems serving the Demised Premises are located outside the Demised Premises, then Tenant shall have reasonable access to such meters, controls or conduits and any room or rooms within which they are located.  Landlord shall be responsible for paying any and all tap-in, hook-up, connection, impact or similar fees associated with the supply or connection of water, sewer and/or drainage services to the Demised Premises and Shopping Center.

## ARTICLE 15
## ASSIGNING; SUBLETTING; MORTGAGING

A. Tenant may assign, sublet, grant concessions, license, mortgage, pledge or encumber this Lease without first obtaining the written consent of Landlord; provided that (a) any assignment of this Lease to an entity that is not a national tenant or a regional tenant (as those terms are defined in Article 41) with the same or better net worth as Tenant on the date of this Lease shall require Landlord's prior written consent, and (b) any sublease, concession or license of all or any part of the Demised Premises to an entity that is not a national tenant or a regional tenant shall require Landlord's prior written consent.  Notwithstanding such assignment, subletting or licensing, Tenant shall continue to be liable for the performance of the terms, conditions and covenants of this Lease.

B. Upon request of Tenant, Landlord agrees to execute and deliver to any permitted sublessee of the entire Demised Premises or a portion thereof consisting of "front to back" space of at least 15,000 square feet, an agreement confirming that, in the event this Lease is terminated for any reason, if such sublessee shall observe and perform all of the obligations of such sublessee to be performed pursuant to such sublease, then and in that event such sublease and the rights of the sublessee thereunder shall not be disturbed by Landlord but shall continue in full force and effect so long as such sublessee shall continue to observe and perform all of its obligations under such sublease.  Such sublessee shall attorn to Landlord, including the payment to Landlord of minimum or base rent and additional rent in the amounts provided for in such sublease.  Such sublease shall become a direct lease between Landlord and such sublessee and those parties will execute and deliver any further reasonable documents at such time to more fully effectuate the foregoing.  Notwithstanding the foregoing, in the event of any such attornment, Landlord shall not be: (i) liable for any previous act or omission by Tenant under any such sublease (unless a default of a continuing nature which is curable by Landlord); (ii) subject to any offset of rent that shall

11

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D745FAFFBEA7

thereunto have accrued to any such sublessee against Tenant; (iii) bound by any previous prepayment of rent made by any such sublessee to Tenant for more than the current month; or (iv) liable to any such sublessee for any security deposit made by any such sublessee to Tenant unless Tenant pays such security deposit over to Landlord. The foregoing provisions of this Article shall apply only to those subleases that: (a) obligate the sublessee to pay base or minimum rent in an amount not less than a proportionate share of the Minimum Rent payable under this Lease (which proportionate share shall be based upon the square footage of the premises sublet by any sublessee as compared with the total square footage of the Demised Premises); and (b) to the extent that Tenant is obligated by the provisions of this Lease to pay same, obligate such sublessee to pay taxes, insurance, common area maintenance, utilities and all other charges with respect to the premises covered by the sublease on a proportionate share basis as described above; and (c) the sublease does not grant the sublessee any more rights or impose any more obligations on Landlord, than are what is provided for in this Lease. In addition, Landlord shall not be obligated to grant the rights in this paragraph to any sublessee that (i) does not have both a tangible net worth of at least $50,000,000 and a Moody's credit rating of at least Ba2, or (ii) is not a national or regional tenant (as defined in Article 41 below). For the purpose of the first sentence of this Article 15.B, "front to back" space means that the front wall that faces the main parking lot is the same length as the rear wall so that the subleased space is a complete rectangle (although there may be allowance for a rear corridor to access loading, utilities and similar items).

C. Following any assignment of Tenant's interest in this Lease in which the original Tenant named herein is not released from liability hereunder, Landlord shall not exercise any rights or remedies under this <u>Article</u> on account of any default by the then tenant in possession unless Landlord shall give: (i) notice to Tenant named herein, as well as the tenant in possession, of such default if Landlord was provided the name and contact information for such tenant; and (ii) the opportunity to both Tenant named herein as well as the tenant in possession to cure each such default within the applicable period of time provided in this Lease. In the case of a bankruptcy by the tenant in possession or other incurable default, Landlord will, upon request of Tenant given within thirty (30) days after such default, execute a new lease with Tenant for the balance of the Term and any remaining unexercised optional, renewal or extended terms on the same terms and conditions provided for herein so long as Tenant cures all monetary defaults and other defaults capable of being cured. It is the intention of the Parties hereto that such new lease shall have the same priority relative to other rights or interests in or to the Demised Premises as this Lease. The provisions of this <u>Article</u> and the applicable provisions of this Lease shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this paragraph were a separate and independent contract between Landlord and the original Tenant.

D. Tenant may grant a mortgage, deed of trust or other financing instrument that constitutes or creates a lien on Tenant's interest in this Lease or the leasehold estate created hereby to an institutional lender (such as, but not limited to, a life insurance company, bank or savings association) [such mortgage, deed of trust or other financing instrument hereinafter referred to as a "<u>Leasehold Mortgage</u>"]. Provided Landlord receives written notice of a Leasehold Mortgage, Landlord will promptly provide to the holder of the Leasehold Mortgage ("<u>Leasehold Lender</u>")

12

copies of any notice of default or breach under this Lease. Landlord hereby grants Leasehold Lender the right to cure any default or breach under this Lease, the exercise of which shall be at the sole option of Leasehold Lender. Leasehold Lender shall have the right to enter upon the Demised Premises at any time to cure any such default.

E. Notwithstanding any contrary provisions of this Lease, provided Landlord receives notice of a Leasehold Lender, Landlord agrees not to terminate this Lease or Tenant's right of possession of the Demised Premises, or to interfere with Tenant's occupancy, use or enjoyment of the Demised Premises for any default under this Lease unless: (x) Landlord has given to Leasehold Lender notice of such default, which notice shall specify in reasonable detail the nature of such default; and (y) such default shall not have been cured by Tenant or Leasehold Lender within the greater of the cure period provided therefor under the terms of this Lease or a period of thirty (30) days (ten (10) days in the case of a monetary default) following Leasehold Lender's receipt of such notice. If any non-monetary default that is curable by Leasehold Lender is of such nature that it reasonably cannot be cured within thirty (30) days, Leasehold Lender shall be entitled to such additional period of time as may be reasonably necessary to cure such default provided Leasehold Lender commences within thirty (30) days to remedy the same and thereafter proceeds with due diligence. In the event of the bankruptcy of Tenant, or a general assignment by Tenant for the benefit of its creditors, Landlord will not terminate this Lease or exercise its other remedies under this Lease so long as Leasehold Lender continues to pay all rent and other sums payable by Tenant under the Lease and performs or causes to be performed all other obligations of Tenant under this Lease reasonably capable of being performed by Leasehold Lender. If any default (other than a monetary default) cannot be cured by Leasehold Lender because such cure requires possession of the Demised Premises, Landlord agrees that it will not exercise its rights and remedies under this Lease as a result thereof, so long as Leasehold Lender acts with due diligence to cure all other curable defaults reasonably capable of being cured by Leasehold Lender, including payment of past due rent and additional rent within the cure periods provided in this paragraph and is diligently pursuing its right to possession of the Demised Premises, whether through foreclosure or otherwise. It is expressly understood and agreed by Landlord that Leasehold Lender has the right to cure Tenant's defaults under this Lease, but shall not have the obligation to do so. Upon cure by Leasehold Lender of such Tenant defaults, any notice of breach or default given by Landlord, or any action of Landlord to terminate or exercise any remedies under this Lease or to otherwise interfere with the occupancy, use or enjoyment of the Demised Premises by reason thereof, shall be deemed rescinded without any further action by Landlord, Tenant or Leasehold Lender.

## ARTICLE 16
## REPAIRS

A. Until the end of the first Lease Year, Landlord, at its sole cost and expense, shall make and pay for all repairs and replacements necessary to cure defects in all mechanical, electrical and plumbing systems servicing the Demised Premises and Landlord's Work, whether structural or nonstructural, including all utility lines and areas within or under the floor slab, excluding, however, work performed by Tenant or damage caused by Tenant or its agents, employees or

13

contractors.  Thereafter, Landlord shall assign to Tenant all assignable warranties relating to the Demised Premises and the equipment located therein, except such warranties as may be used to cover any of Landlord's obligations stated herein.  Landlord, at its sole cost and expense, throughout the Term of this Lease, shall make and pay for: (a) all maintenance and repairs, structural or otherwise, to the exterior of the Building (subject to Section 16.D below), including but not limiting such repairs to the streets, access drives, service drives, curbs, sidewalks and alleys (subject to Tenant's obligation in Article 36); and (b) all repairs to the interior of the Building which are of a structural nature and which are not made necessary by any unusual use or alteration of the Demised Premises by Tenant including, without limitation, all repairs to the sprinkler or fire safety system servicing the Demised Premises); and (c) all maintenance and repairs to the structure and roof (including, without limitation, the structure and roof over Tenant's basement space, if any), the roof skin, unexposed utility lines and utility lines that are exterior, under slab or that do not exclusively serve the Demised Premises, flashings, gutters and downspouts, floor slab, exterior walls (subject to Section 16.D below), columns, beams, foundations, and footings; and (d) all repairs, remediations and other actions involving any Hazardous Material (as hereinafter defined) as required by Article 37 below; and (e) all repairs, structural or otherwise, to the interior of the Demised Premises made necessary by structural failures, leakage or flowing of water and steam into the Demised Premises; and (f) all repairs, structural or otherwise, occasioned by losses which are covered by either Landlord's casualty policy or by a standard fire and extended coverage policy.  Notwithstanding the foregoing, Tenant, and not Landlord, shall be responsible for any of the cost of repairs and/or maintenance required above to the extent the same is made necessary by the negligence or willful misconduct of Tenant or its agents, contractors or employees, or any alterations or improvements made by Tenant.  In addition, Landlord shall not be obligated to maintain or repair any work or improvements made by Tenant.

B. At delivery of the Demised Premises to Tenant, the heating, ventilating and the air-conditioning system ("HVAC System") shall be new and in compliance with regulations governing fluorinated hydrocarbons and shall be delivered with refrigerants in compliance with all regulations applicable to the HVAC System.  Landlord shall be responsible for all necessary repairs and replacements to the HVAC System to maintain same in good operating condition through the first forty-five (45) days following the Rent Commencement Date (unless the need for the same is caused by the negligence or willful misconduct of Tenant or its agents, contractors and employees) and Tenant shall be responsible to maintain, repair and replace the HVAC units and system thereafter.  All HVAC units shall come with a ten (10) year warranty for the heat exchanger, a five (5) year warranty for the compressor and a one (1) year warranty for all remaining parts.  Landlord shall assign to Tenant all guarantees or warranties for the HVAC System that extend beyond the first forty-five (45) days following the Rent Commencement Date.  Tenant shall keep at all times during the term of this Lease, and shall provide a copy to Landlord upon request, an industry standard HVAC service contract.

C. Anything in this Lease to the contrary notwithstanding, Landlord agrees that if in an emergency it shall become necessary to promptly make any repairs hereby required to be made by Landlord, Tenant shall give such notice to Landlord as is practical under the circumstances and an

14

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74F5AFFBEA7

opportunity to commence and complete the repairs and if Landlord does not timely commence such repairs then Tenant, at its option, may proceed forthwith to have such repairs made and pay the cost thereof.  Landlord agrees to pay Tenant the reasonable cost of such repairs on demand, and that if not so paid within thirty (30) days after written notice of such demand; Tenant may deduct the amount from up to 50% of the Monthly Minimum Rent so due or to become due each month.  In the event Tenant shall elect not to make such repairs, it will promptly notify Landlord in writing of the need for such repairs.  Landlord agrees to keep Landlord's Emergency Contact Information up to date with Tenant and advise Tenant in writing of any changes in the same.  If Landlord disputes Tenant's right to exercise the self-help remedy in this Article and a court of competent jurisdiction determines that Tenant was not permitted to exercise such right or withhold Minimum Rent, then Tenant shall reimburse Landlord for all amounts withheld with interest at the Interest Rate.

D. Tenant agrees to make and pay for all maintenance, repairs and replacements to the plate glass, exterior doors, its signage, all utility lines that are not Landlord's responsibility, fixtures and facilities exclusively serving the Demised Premises, all work performed by Tenant, after completion of Landlord's Work, to ready the Demised Premises for Tenant's use ("Tenant's Work") and other alterations or improvements, and all other nonstructural repairs to the interior of the Demised Premises which are reasonably necessary to keep the same in a good state of repair except such repairs as are herein provided to be made by Landlord.  Notwithstanding the foregoing, Landlord, and not Tenant, shall be responsible for any of the cost of repairs and/or maintenance required above to the extent the same is made necessary by the negligence or willful misconduct of Landlord or its agents, contractors or employees, or any alterations or improvements made by Landlord.

## ARTICLE 17
## DAMAGE TO DEMISED PREMISES

A. If the Demised Premises or any building or Common Facilities in the Shopping Center are damaged or destroyed by fire or through any other casualty at any time after the date of this Lease, Landlord will proceed with due diligence to repair or restore the same to the same condition as existed before such damage or destruction, but Landlord is not obligated to restore outparcel buildings and in the event Landlord elects not to restore same it shall appropriately demo any such building and leave such parcels in a good and orderly condition.  If the Demised Premises are so damaged or destroyed, Landlord as soon as possible after such repair or restoration will give possession to Tenant (but not prior to the beginning of the Term of this Lease, unless acceptable to Tenant) of the same space in the same condition as existed immediately prior to such damage or destruction, without diminution or change of location.

B. If the Demised Premises is damaged, Tenant shall have the right to require Landlord to make changes to the Demised Premises in the course of such restoration, subject to Landlord's reasonable approval of such changes.  If the cost and expense of restoration of the Demised Premises is increased by any change or changes made by Tenant, then Tenant, within thirty (30)

15

days after demand therefore, shall reimburse Landlord for the aggregate amount by which the cost or expense of restoration of the Demised Premises was thereby increased.

C. If Tenant determines, in Tenant's sole opinion, that, by reason of such damage, Tenant cannot operate its business as a viable financial unit within the unaffected portion of the Demised Premises, the Term of this Lease shall be tolled during the period from the date of the occurrence of the damage until the first to occur of: (i) Tenant's reopening of the Demised Premises to the retail public for business, or (ii) the earlier of the next October 1st or April 1st, which is at least sixty (60) days after delivery of exclusive possession of the restored Demised Premises to Tenant in accordance with the provisions of this Lease.

D. If the Building is damaged by fire or through any other casualty or in the event of damage or destruction to, or loss of, any portion of the Critical Areas (designated on Exhibit "A" ("Critical Area")), Critical Building Facilities or Protected Parking Area and in Tenant's reasonable opinion, Tenant cannot operate its business as a viable financial unit within the unaffected portion of the Demised Premises and such damage: (i) occurs within the last year of this Lease, or (ii) is of such a nature or to such an extent that rebuilding thereof cannot reasonably be completed within one year after such casualty, Tenant shall have the right to terminate this Lease upon notice to Landlord given within ninety (90) days after the damage. Landlord shall cause its architect to render an estimate, within sixty (60) days after the date of the fire or casualty, of the time necessary to fully restore the affected areas (the "Restoration Estimate").

E. If Tenant does not terminate this Lease and: (a) Landlord shall fail to commence repair or restoration of such building, the Demised Premises, Critical Areas, Critical Building Facilities or Protected Parking Area within one hundred twenty (120) days after such damage or destruction or thereafter fail to diligently prosecute the repair or restoration to completion, or (b) should Landlord not restore any such building, the Demised Premises, Critical Areas, Critical Building Facilities or Protected Parking Area to the condition required pursuant to the provisions of this Article by the date in the Restoration Estimate, TIME BEING OF THE ESSENCE WITH RESPECT TO ALL SUCH TIME PERIODS, Tenant, in addition to and not in lieu of any other right available under law or equity may terminate this Lease at any time prior to restoration. If this Lease shall terminate as aforesaid, Tenant shall have: (1) the right to recover from Landlord the unamortized value of Tenant's leasehold improvements; and (2) any other rights or remedies available to Tenant at law or in equity, including injunctive relief, and if any rent shall have been paid in advance, Landlord agrees to refund to Tenant all rent so paid applicable to the period subsequent to such damage or destruction. Notwithstanding the foregoing, if Landlord's failure to commence or complete restoration is due to events or conditions outside of Landlord's reasonable control, termination of this Lease will be Tenant's only remedy.

F. If within the last year of this Lease the Building (including a portion of the Demised Premises) is damaged by fire or through any other cause that would take more than sixty (60) days to repair, then Landlord may terminate this Lease. Landlord's termination must be exercised by notice in writing to Tenant within thirty (30) days after occurrence of such damage or destruction

16

and upon such termination this Lease shall terminate and no rent shall be paid by Tenant for the period subsequent to the date of such damage or destruction; provided, however, that if at the time Tenant receives Landlord's notice of termination, Tenant shall have an option to extend the current Term of this Lease for a period of at least five (5) years and if Tenant so exercises its option to extend within sixty (60) days after receipt of Landlord's notice of termination, this Lease shall not terminate and Landlord shall be obligated to repair or restore as aforesaid. If this Lease shall terminate and any rent shall have been paid in advance, Landlord shall refund to Tenant all rent so paid applicable to the period subsequent to such damage or destruction.

G. In the event of damage or destruction of the Demised Premises, or in the event of damage or destruction to any portion of the Shopping Center which interferes with the operation of Tenant's business (damage or destruction to, or loss of, any portion of the Critical Areas, Critical Building Facilities or Protected Parking Area (as shown on Exhibit "A") shall, ipso facto, be deemed to interfere with the operation of Tenant's business), rent shall be equitably abated from the date of such damage, destruction or interference, until: (i) in the event Tenant is not operating in the Demised Premises as a result of such damage, destruction or interference, the earlier of the date Tenant re-opens for business to the public or the next April 1st or October 1st which is at least sixty (60) days after (x) delivery of exclusive possession of the restored Demised Premises to Tenant in accordance with this Lease or (y) the date Landlord has repaired or restored the Shopping Center so as to allow the operation of Tenant's business without adverse interference, as applicable; or (ii) in the event Tenant is operating in the unaffected portion of the Demised Premises, thirty (30) days after the date Landlord has repaired or restored the affected portion of the Demised Premises in accordance with the terms of this Lease and delivered exclusive possession of same to Tenant and/or repaired or restored the Shopping Center so as to allow the operation of Tenant's business without adverse interference. The abatement, with respect to damage or destruction to the Demised Premises, shall be inversely proportional to the amount of the Demised Premises, if any, in which Tenant, at its sole discretion, continues to operate after such event.

## ARTICLE 18
## INSURANCE; MUTUAL RELEASE; WAIVER OF SUBROGATION AND INDEMNITY

A. LANDLORD'S OBLIGATION TO INSURE PROPERTY AT THE SHOPPING CENTER.

(i) From and after the Effective Date and throughout the Term, Landlord shall maintain a policy of insurance covering the Shopping Center (including any of leasehold improvements installed by Tenant that become permanently affixed to the building and not including buildings insured by the occupants thereof) against loss, damage or destruction caused by any peril covered by a Causes of Loss - Special Form coverage part (or the then industry replacement to such coverage part) to a policy of property insurance, including coverage for or endorsements for: (a) water damage; (b) Business Income; (c) Extra Expense; (d) Service Interruption; (e) Ordinance or Law; (f) Boiler and Machinery, if applicable; (g) demolition costs;

17

and (h) rent loss.  Such coverage shall be written for replacement value.  Such policy shall provide for no deductible in excess of Fifty Thousand Dollars ($50,000.00), subject to commercially reasonable increases for similar shopping centers and owners in the geographic area of the Shopping Center.  In addition, Landlord shall maintain: (y) if any portion of the Shopping Center is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of: (1) the replacement value of the improvements at the Shopping Center; or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (z) earthquake insurance in amounts and in form and substance satisfactory to Landlord's first mortgagee (or, if there is no first mortgagee, Tenant) in the event the Shopping Center is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the Causes of Loss - Special Form coverage part required above.

(ii) If Landlord is required by the operation of this Lease to repair all or any part of the Demised Premises, the proceeds (after deduction of Landlord's costs to collect same) which are payable under policies of insurance carried by Landlord shall first be made available for repair of the Demised Premises to the extent required by this Lease before such proceeds are applied in any other manner, including the satisfaction of debts secured by a mortgage or other lien instrument, or interest or penalties imposed thereon.

## B. LANDLORD'S OBLIGATION TO MAINTAIN LIABILITY INSURANCE

(i) From and after the Effective Date and throughout the Term, Landlord shall maintain commercial general liability insurance (in the broadest form then available in the State or territory where the Shopping Center is located) against claims for bodily injury, personal injury, death or property damage occurring on, in or about the Shopping Center or as a result of ownership of facilities located on the Shopping Center.  Any blanket insurance Policy shall specifically allocate to the Shopping Center the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate insurance policy insuring only the Shopping Center in compliance with the provisions of this Article.

(ii) The commercial general liability coverage must be on the so-called "occurrence" form with a combined single limit, excluding umbrella coverage, of not less than One Million Dollars ($1,000,000.00).

(iii) Landlord shall also maintain umbrella liability insurance in addition to primary coverage in an amount not less than Twenty Million Dollars ($20,000,000.00) per occurrence on terms consistent with the required commercial general liability insurance policy.

(iv) Landlord shall also maintain motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of Three Million Dollars ($3,000,000.00).

18

(v) The specified limits of Landlord's insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.

(vi) All policies of insurance provided for or contemplated by this Article to be carried by Landlord shall be primary, non-contributory coverage with respect to the Common Areas. No act or negligence of Landlord, or anyone acting for or at the direction of Landlord, or of any other owner, tenant or occupant of the Shopping Center, or failure to comply with the provisions of any insurance policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Tenant or Tenant's leasehold mortgagee (if any, and if named as an additional insured) is concerned.

C. GENERAL INSURANCE PROVISIONS PERTAINING TO LANDLORD'S INSURANCE

(i) Landlord represents and warrants that all such insurance coverage required by this Lease to be carried by Landlord is now, and during the Term will continue to be in full force and effect. The premiums for such policy or policies shall be part of Operating Costs. All policy or policies required to be carried by Landlord shall be issued only by admitted insurers authorized to do business in the State or territory where the Shopping Center is located and which are rated "A-/VIII" or equivalent in Best's Key Rating Guide, or any successor thereto (or if there is none, a rating organization having a national reputation).

(ii) Within fifteen (15) days after the Effective Date, Landlord shall deliver to Tenant original or duplicate policies or certificates of the insurers evidencing all the insurance which is required to be maintained hereunder by Landlord and evidencing that an endorsement to the commercial general liability policy naming Tenant and any leasehold mortgagee of Tenant of whom Tenant has notified Landlord as an additional insureds (including, without limitation, that within Landlord's property insurance policy, there is a waiver of each insurer's rights of subrogation, the naming of the insureds required hereunder, and the obligation of each insurer to give the notice required hereunder).

(iii) If available from the insurance provider, each policy required to be maintained by Landlord hereunder shall provide that Tenant and each additional insured under a liability insurance policy shall receive prior written notice (a) in the case of non-payment of premium, at least ten (10) days before such action shall take effect of; and (b) in case of suspension, modification, non-renewal or lapse or material change of coverage the insurer shall endeavor to provide at least thirty (30) days before such action shall take effect shall be given to all insured parties. Landlord, at least ten (10) days prior to the expiration of any insurance this Lease requires Landlord to carry, shall furnish Tenant with an original or duplicate policy or certificates evidencing the renewal of such insurance.

### D. <u>TENANT'S OBLIGATION TO CARRY LIABILITY INSURANCE</u>

(i) From and after the date Tenant first enters the Demised Premises and throughout the Term, Tenant, at its own expense shall maintain with admitted insurers authorized to do business in the State or territory where the Shopping Center is located and which are rated "<u>A-/VIII</u>" or equivalent in Best's Key Rating Guide, or any successor thereto (or if there is none, a rating organization having a national reputation) commercial general liability (in the broadest form then available in the State or territory where the Shopping Center is located) against claims for bodily injury, personal injury, death or property damage occurring on, in or about the Demised Premises or as a result of ownership of facilities located in the Demised Premises. Any blanket insurance policy shall specifically allocate to the Demised Premises the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate insurance policy insuring only the Demised Premises in compliance with the provisions of this <u>Article</u>.

(ii) The commercial general liability coverage must be on the so-called "<u>occurrence</u>" form with a combined single limit, excluding umbrella coverage, of not less than Five Million Dollars ($5,000,000.00) per occurrence. Tenant's insurance shall be primary and non-contributory with respect to the Demised Premises.

(iii) Tenant shall also maintain motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of Three Million Dollars ($3,000,000.00).

(iv) The policies of insurance required to be maintained by Tenant pursuant to this <u>Article</u> shall name as additional insured: Landlord, Landlord's managing agent of whom Landlord has notified Tenant, and any mortgagee of Landlord of whom Landlord has notified Tenant, and, if available from the insurance provider, shall provide for the benefit of such holder or holders, that each shall receive prior written notice (a) in the case of non-payment of premium, at least ten (10) days before such action shall take effect of; and (b) in case of suspension, modification, non-renewal or lapse or material change of coverage the insurer shall endeavor to provide at least thirty (30) days before such action shall take effect shall be given to all insured parties.

(v) Within fifteen (15) days after the date Tenant first enters the Demised Premises, Tenant shall deliver to Landlord original or duplicate policies or certificates of the insurers evidencing all the insurance which is required to be maintained hereunder by Tenant certifying that all requirements set forth herein have been complied with, the naming of the insureds required hereunder and the obligation of each insurer to give the notice required hereunder and, within ten (10) days prior to the expiration of any such insurance, other original or duplicate policies or certificates evidencing the renewal of such insurance.

(vi) The specified limits of Tenant's insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.

(vii)  Tenant shall have the right to self-insure for the insurance required above on the following terms and conditions:

(a)  "Self-insure" shall mean that Tenant is itself acting as though it were the insurance company providing the insurance required under the provisions hereof and Tenant shall pay any amounts due in lieu of insurance proceeds which would have been payable if the insurance policies had been carried, which amounts shall be treated as insurance proceeds for all purposes under this Lease.

(b)  All amounts which Tenant pays or is required to pay and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation provisions of this Article and shall not limit Tenant's indemnification obligations set forth in this Article.

(c)  Tenant's right to self-insure and to continue to self-insure is conditioned upon and subject to Tenant, or any guarantor of Tenant's obligation under this Lease or combination thereof, having a tangible net worth or, if a reporting company under the Securities Exchange Act of 1934, a shareholder's equity, of at least One Hundred Million Dollars ($100,000,000.00).

(d) In the event that Tenant elects to self-insure and an event or claim occurs for which a defense and/or coverage would have been available from the insurance company, Tenant shall:

(1)  undertake the defense of any such claim, including a defense of Landlord, at Tenant's sole cost and expense, with counsel selected by Tenant and reasonably acceptable to Landlord; and

(2)  use its own funds to pay any claim or replace property or otherwise provide the funding which would have been available from insurance proceeds but for such election by Tenant to self-insure.

E. MUTUAL RELEASE AND WAIVER OF SUBROGATION

(i) Landlord and Tenant shall each secure an appropriate clause, or an endorsement upon any policy of property insurance in force, covering the Shopping Center or any part thereof, including the Demised Premises, or any personal property, fixtures and equipment or leasehold improvements located therein or thereon, pursuant to which the respective insurance companies waive subrogation or permit the insured, prior to any loss, to agree with a third party to waive any claim it might have against that third party.  The waiver of subrogation or permission for waiver of any claim hereinbefore referred to shall extend to the agents of each party and also extends to all other persons and entities holding under this Lease.  In the event that either Landlord or Tenant

21

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D7AF5AFFBFA7

shall be unable at any time to obtain one of the provisions referred to above in any of its insurance policies, Landlord or Tenant, as the case may be, shall promptly notify the other.

(ii) Notwithstanding any provision of this Lease to the contrary, each party hereby releases the other and its members, shareholders, partners, agents, employees, and person and entities of like character (and in the case of Tenant, all other persons and entities occupying or using the Demised Premises in accordance with the terms of this Lease) with respect to any claim other than claims for gross negligence or willful or intentional misconduct which it might otherwise have against the other party for loss, damages or destruction with respect to its property by fire or other casualty (including rental value or business interruption, as the case may be) occurring during the Term.

F. TENANT'S INDEMNITY OF LANDLORD. Tenant during the Term hereof shall indemnify, defend, and save Landlord harmless from and against any and all claims, demands, loss, damages and expenses, including legal fees, costs and charges whether for injuries to persons or loss of life, or damage to property, occurring within the Demised Premises, excepting, however, such claims and demands whether for injuries to persons or loss of life, or damage to property, arising out of the negligence or willful misconduct of Landlord, its agents, employees or contractors. Tenant, at its own expense, shall defend all actions brought against Landlord, its agents or employees for which Tenant is responsible for indemnification hereunder, and if Tenant fails to do so, Landlord (at its option, but without being obligated to do so), at the cost and expense of Tenant, may defend such actions, and Tenant shall pay and discharge any and all judgments that arise therefrom.

G. LANDLORD'S INDEMNITY OF TENANT. Landlord shall indemnify, defend, and save Tenant harmless from and against any and all claims, demands, losses, damages and expenses, including legal fees, costs and charges, whether for failure to comply with laws or for injuries to persons or loss of life, or damage to property or otherwise, (i) occurring at the Demised Premises prior to delivery of full possession thereof with Landlord's Work substantially completed (except if caused by any act or omission of Tenant, its agents, employees or contractors); or (ii) occurring in the Shopping Center (including in the Common Facilities), but outside the Demised Premises (except if caused by act or omission of Tenant, its agents, employees or contractors). Landlord, at its own expense, shall retain counsel satisfactory to Tenant, and defend all actions brought against Tenant, its agents or employees for which Landlord is responsible for indemnification hereunder, and if Landlord fails to do so, Tenant (at its option, but without being obligated to do so) may, at the cost and expense of Landlord, defend such actions, and Landlord shall pay and discharge any and all judgments that arise therefrom.

H. SURVIVAL. The provisions of this Article shall survive the expiration or earlier termination of this Lease.

## ARTICLE 19
## INTENTIONALLY DELETED

## ARTICLE 20
## EMINENT DOMAIN

A. In the event all of the Demised Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority or by deed in lieu thereof, then, except as provided otherwise below, this Lease shall terminate and expire as of the date of such taking.

B. In the event ten percent (10%) or more of the Demised Premises or any part of the Critical Areas, Critical Building Facilities or Protected Parking Areas, is appropriated or taken under the power of eminent domain or by deed in lieu thereof, or if access to the Demised Premises or the Common Facilities through the Critical Areas shall be appropriated or taken under the power of eminent domain, Tenant shall have the right to cancel and terminate this Lease as of the date of such taking upon giving Landlord written notice of such election within thirty (30) days after receiving notice of the same. Landlord, immediately after having knowledge or notice of any such appropriation or taking, shall give written notice to Tenant thereof.

C. In the event of a temporary taking (meaning in excess of sixty (60) consecutive days) of the Demised Premises or a portion thereof, or of any of the Critical Areas or the Protected Parking Area by any public or quasi-public authority, Tenant shall be entitled to an equitable abatement of rent hereunder. If any temporary taking with respect to the aforementioned areas lasts in excess of six (6) consecutive months, Tenant shall have the right to terminate this Lease.

D. If this Lease is terminated in either manner hereinabove provided, the Minimum Rent and Additional Rent otherwise payable for the last month of Tenant's occupancy shall be prorated and Landlord agrees to refund to Tenant any rent paid in advance, and if at the time of such appropriation or taking, Tenant shall not have fully amortized expenditures which it may have made or erected on the Demised Premises, Landlord shall and hereby does assign to Tenant so much of any award payable as a result of such appropriation or taking as equals the unamortized portion of Tenant's expenditures.

E. The unamortized portion of Tenant's expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of years of the Term of this Lease which shall not have expired at the time of such appropriation or taking and the denominator of which shall be the number of years of the Term of this Lease which shall not have expired at the time Tenant's expenditures are made.

F. In addition, Landlord hereby grants to Tenant the right to any award or compensation for moving expenses.

G. If a portion of the Demised Premises or of the Common Facilities or Critical Building Facilities shall have been appropriated or taken and if this Lease shall continue, then in that event, Landlord agrees, at Landlord's cost and expense, to immediately restore the Building on the land remaining to a complete unit of like quality and character as existed prior to such appropriation or

23

5425472v2

taking and to restore the remaining portion of the Common Facilities or the Building Facilities, as the case may be, so as to provide access and services to the Demised Premises in a manner as nearly as possible to the condition thereof prior to such taking, rent shall abate proportionately, based upon the proportion of the Demised Premises not occupied by Tenant during the period of demolition and restoration, and thereafter the rent shall be reduced by the ratio that the floor area of the Demised Premises prior to the taking or deed in lieu thereof bears to the floor area of the Demised Premises after such taking or deed in lieu thereof, or in the case of taking of Common Facilities or Building Facilities, Minimum Rent and Additional Rent shall be abated in an equitable manner.

H. In no event shall Landlord voluntarily surrender the Demised Premises or Critical Areas by way of deed in lieu of condemnation, settlement or compromise without Tenant's consent, which may be withheld in its sole discretion.

**ARTICLE 21**
**TENANT'S DEFAULT IN MINIMUM RENT**

In the event Tenant shall default in the payment of Minimum Rent herein reserved when due, Landlord shall forward notice in writing of such default to Tenant, and failure of Tenant to cure such default within ten (10) days after the date of receipt of such notice, shall constitute an event of default by Tenant hereunder and entitle Landlord to all of its rights and remedies set forth in Article 22 below.

**ARTICLE 22**
**OTHER DEFAULTS BY TENANT**

A. If Tenant shall be in default in performing any of the terms or provisions of this Lease other than the provision requiring the payment of Minimum Rent, Landlord shall forward notice in writing of such default to Tenant, and the failure of Tenant to cure such default within thirty (30) days after the receipt of such notice (or if the default is of such a character as to require more than thirty (30) days, then if Tenant shall fail to commence to cure such default within such thirty (30) days and to use reasonable diligence in curing such default within a reasonable period of time thereafter taking into account the applicable circumstances), shall constitute an event of default by Tenant hereunder and entitle Landlord to exercise any of the remedies set forth in this Article 22.

B. After the occurrence of an event of default beyond any applicable notice and/or cure period set forth in Article 21 or Article 22 above, as applicable, Landlord may, without further notice or demand (i) cure such default for the account of and at the cost and expense of Tenant, and the reasonable sum so expended by Landlord, with interest at the Interest Rate, shall be deemed to be Additional Rent and shall be paid by Tenant within twenty (20) days of receipt of written demand (which demand shall include reasonable documentation of the costs incurred), or (ii) commence an action in any court of competent jurisdiction to terminate this Lease and re-enter and take possession of the Demised Premises, or (iii) commence an action in any court of competent jurisdiction to re-enter and take possession of the Demised Premises without

24

terminating this Lease; or (iv) pursue any other action or remedy to which Landlord may be entitled to take under applicable law or equity (except as expressly limited herein). All rights and remedies of Landlord hereunder shall be cumulative, and exercise of any one or more rights hereunder shall not constitute a waiver of Landlord's rights to exercise such other remedies as it may have or as otherwise allowed by law or in equity. Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Demised Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

C. In the event Landlord re-enters and takes possession of the Demised Premises in accordance with the terms of this Lease following an event of default and attempts to re-let the Demised Premises, Tenant shall pay Landlord within twenty (20) days of demand for (a) the cost of retaking possession of the Demised Premises, including reasonable attorneys' fees therefor, (b) the reasonable costs of preparing the Demised Premises for reletting to such new tenant, including reasonably necessary repairs or alterations to the Demised Premises, and (c) any reasonable leasing commission. The rent collected under the new lease of the Demised Premises shall be applied toward the amounts owing from Tenant to Landlord.

D. Notwithstanding anything to the contrary contained herein: (i) Landlord shall not be entitled to recover from Tenant or from any guarantor of Tenant any consequential damages nor shall Landlord be entitled to accelerate rents payable under this Lease (whether permitted by statute or otherwise); (ii) should a bona fide dispute arise between the parties with respect to any sum payable hereunder (other than Minimum Rent unless the dispute involves an offset taken by Tenant pursuant to the terms of this Lease, in which case such dispute will be submitted to arbitration as hereinafter provided but Tenant shall remain responsible for the payment of the portion of Minimum Rent not in dispute), and the dispute cannot be resolved within thirty (30) days by agreement of the parties, the dispute shall be resolved by expedited arbitration initiated by either party before the American Arbitration Association at its offices in New Jersey, and this Lease shall not be terminated by either party nor possession disturbed except upon failure to pay a final award rendered in such arbitration, with interest at the Interest Rate, within thirty (30) days after receipt by the liable party of notice of such rendering; and (iii) neither this Lease nor Tenant's right to possession shall be terminated for any non-monetary default unless and until Landlord obtains a final court order terminating this Lease or Tenant's right to possession hereunder and Tenant fails to cure same within thirty (30) days after the entry of such court order (or if the default is of such a character as to require more than thirty (30) days, then if Tenant shall fail to commence to cure such default within such thirty (30) days and to use reasonable diligence in curing such default within a reasonable period of time thereafter taking into account the applicable circumstances). The foregoing provisions of sub-section (iii) shall not apply to an event of default by Tenant in the payment of Minimum Rent.

E. All rental amounts and any other charges and expenses to be paid by Tenant to Landlord hereunder which are not paid within ten (10) days of the date due shall bear interest at the lesser

of (a) the maximum interest rate permitted by then applicable law, or (b) the Interest Rate, per annum, and such interest charge shall accrue from the date payment is due until the date paid.

F.  Landlord shall use commercially reasonable efforts to mitigate damages following an event of default by Tenant hereunder.  In satisfying Landlord's responsibility to mitigate its damages, Landlord shall not be obligated to (1) solicit or entertain negotiations with any other prospective tenants for the Demised Premises until Landlord obtains full and complete possession of the Demised Premises including the final and unappealable legal right to re-let the Demised Premises free of any claim of Tenant for possession, (2) offer the Demised Premises to a prospective tenant when other premises in the Shopping Center suitable for that prospective tenant's use are available; (3) lease the Demised Premises to a substitute tenant for a rental substantially less than the then current fair market rental then prevailing for similar retail uses in comparable shopping centers in the same market area as the Shopping Center; (4) lease the Demised Premises to a proposed substitute tenant whose use would violate any restriction, covenant or requirement contained in the lease of another tenant of the Shopping Center; or (5) lease to a proposed substitute tenant who does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Demised Premises in a first-class manner.

## ARTICLE 23
## TRANSFER OF TITLE

A.  It is understood and agreed that in the event of any change in or transfer of title of Landlord in or to the Demised Premises or any part thereof, whether voluntary or involuntary, or by the act of Landlord or by the operation of law, Tenant shall be under no obligation to pay to the transferee Minimum Rent, Additional Rent or any other amount thereafter accruing until: (x) thirty (30) days after being notified in writing of such change in title; (y) the transferee, in a written instrument, assumes performance of all obligations of Landlord under this Lease; and (z) Tenant is given satisfactory proof of the foregoing.  The withholding of such Rent, Additional rent or other amounts in the meantime shall not be deemed a default on the part of Tenant; provided, however, that all amounts withheld on account of the preceding sentence shall be paid to such transferee after the satisfaction of the conditions set forth in said sentence.  In the alternative, Tenant may, at its option, continue the payment of Minimum Rent, Additional Rent and other amounts accruing under this Lease to the Landlord known to Tenant immediately prior to such transfer; all amounts thus paid shall be credited to Tenant against obligations accruing under this Lease; and it shall be the transferor Landlord's responsibility to pay over any amounts due to its transferee.

B.  Landlord may convey portions of the Shopping Center provided such conveyance does not interfere with the use of, access to, or visibility of the Demised Premises or Protected Parking Area or Critical Areas or result in any more than a de minimis increase in Operating Costs to Tenant, and such conveyance shall be subject to the provisions of this Lease.  In all events, the transferred part of the Shopping Center shall remain subject to the terms of this Lease and Landlord shall protect and preserve Tenant's rights under this Lease for the entire Term (including any Extended Term) including, without limitation, rights of ingress, egress, access, parking, exclusive

5425472v2

rights and consent rights.  In connection therewith, Landlord shall enter into appropriate reciprocal easement agreements, restrictive covenants and/or other agreements for the benefit of Tenant and other tenants and occupants of the Shopping Center, as the Shopping Center is constituted on the date of this Lease, and their respective successors, assigns, officers, directors, principals, employees, invitees, customers, contractors and agents. All such reciprocal easement agreements, restrictive covenants and/or other agreements shall be subject to the prior written approval of Tenant, which shall not be unreasonably withheld.

C. The term "Landlord" as used in this Lease means only the owner for the time being of the Landlord's interest in this Lease and in the event of any transfer of Landlord's interest in this Lease and assumption of all responsibilities hereunder, the transferor shall cease to be liable hereunder.  Anything to the contrary in this Lease notwithstanding, the covenants contained in this Lease to be performed by the Landlord shall not be binding personally, but rather, said covenants are made only for the purpose of binding only the Landlord's estate in the Shopping Center, and no liability for deficiency judgment shall attach to Landlord as a result of the breach of any of the covenants herein contained, and in no event shall Landlord or any partner of Landlord have any personal liability under or on account of this Lease.

## ARTICLE 24
## WAIVER

Landlord agrees that any rental payments or other payments becoming due to Landlord pursuant to the provisions of this Lease or any extensions thereof, which remain unpaid and for which no claim has been made in writing by Landlord to Tenant within three (3) years after the date when such payment is due, shall be deemed and hereby are waived by Landlord.

## ARTICLE 25
## NOTICES

A. Wherever in this Lease it shall be required or permitted that notice or demand be given or served by either party to this Lease to or on the other, such notice or demand shall be given or served and shall not be deemed to have been duly given or served unless in writing and forwarded: (a) by certified or registered mail, return receipt requested; or (b) by nationally recognized overnight courier against signed receipt addressed to the party being noticed at the address first set forth above.  Notices to Tenant shall be addressed to Tenant's Notice Address to the attention of the Lease Administration Department with a copy to Legal Department at Tenant's Notice Address. Notices to Landlord shall be addressed to Landlord's Notice Address or Landlord's Managing Agent. Such addresses may be changed from time to time by either party by serving notices as above provided.  Notices shall be deemed given on the date received or delivery refused. Notices of change of address shall not be effective until twenty (20) days following receipt.

27

B. Landlord shall give to Tenant written notice ("Designation Notice") designating its managing agent to which notices are to be sent and rents paid if Landlord elects to have notices sent to a managing agent and not Landlord. If Tenant receives any notice ("New Notice") including any direction where to deliver: (i) payments of rent; or (ii) notices to Landlord, from any party purporting to be Landlord's managing agent, which is not accompanied by a Designation Notice signed by Landlord, Tenant may deliver to Landlord a copy of the New Notice requesting that Landlord confirm in a Designation Notice Landlord's managing agent. If Landlord does not send to Tenant a Designation Notice within ten (10) days of receipt of Tenant's request, Tenant shall disregard the New Notice as if such notice had not been delivered by Landlord. Until Tenant receives the Designation Notice with respect to the New Notice, Tenant may continue to pay rent and deliver notices to Landlord or Landlord's prior managing agent, as the case may be, any payments made to Landlord or the prior agent will be credited against any payments due under the Lease. After Landlord has confirmed Landlord's managing agent in the Designation Notice, all rents, commencing twenty (20) days following Tenant's receipt of the Designation Notice, will be sent to the address of the agent in the New Notice. In addition, Tenant is entitled to rely on any signed or unsigned written communication purporting to come from Landlord or a managing agent as if duly signed by Landlord so long as Tenant does not have actual notice that the communication is fraudulent.

## ARTICLE 26
## ENTIRE AGREEMENT

This Lease constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, between or among the parties with respect to such subject matter. This Lease cannot be amended or modified except by a writing signed by the parties. The submission of this Lease for examination, approval or execution does not constitute a definitive agreement, and no agreement is made or is effective until execution and delivery of the Lease by proper officers of both Landlord and Tenant.

## ARTICLE 27
## GENERAL PROVISIONS

A. Landlord agrees to pay all fees and commissions to Broker for bringing the execution and delivery of this Lease pursuant to a separate agreement, and agrees to indemnify, defend and save Tenant harmless of and from any and all claims for such fees and commissions. Each of Tenant and Landlord represents and warrants to each other that it has not dealt with any broker in connection with this Lease other than Broker. Landlord shall pay any fee or commission or consulting fee due Broker pursuant to separate agreement between Landlord and Broker.

B. The captions of this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

28

5425472v2

C. The term "Additional Rent" shall refer to all sums of money which shall become due from and be payable by Tenant to Landlord under this Lease other than Minimum Rent and Alternate Rent.

D. Whenever it is provided that the Demised Premises or the Shopping Center, or any portion thereof, is delivered or accepted in "As Is" condition, the same shall exclude conditions that are concealed or not readily discoverable upon a reasonable inspection or any condition that constitutes an environmental condition (unless Tenant specifically accepts the risk of a specified environmental condition).  In no event shall acceptance of the Demised Premises or the Shopping Center in "As Is" condition be deemed to relieve Landlord of any obligation of construction, maintenance or repair which would normally arise pursuant to the provisions of this Lease, but the same is only intended to mean Landlord shall not be obligated to perform any work with respect thereto as a condition of the delivery thereof.

E. Wherever the word "Building" is used in this Lease it is intended that the same shall include any building, buildings, structure, and structures which are now on or which may hereafter be erected on the Demised Premises or a structure of which the Demised Premises is a part.

F. If more than one person, corporation or other entity is named as Landlord in this Lease and executes the same as such, then and in such event, the word "Landlord" wherever used in this Lease, is intended to refer to all such persons, corporations or other entities, and the liability of such persons, corporations or other entities for compliance with and performance of all the terms, covenants, and provisions of this Lease shall be joint and several.  In addition, the terms "Landlord" and "Tenant" shall include their respective successors and assigns who at the time of reference shall be the landlord or tenant, as the case may be, under this Lease.

G. All provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof, and that all of the provisions hereof shall bind and inure to the benefit of the parties hereto, and their respective heirs, legal representatives, successors, and assigns.  Landlord's and Tenant's respective indemnity obligations and any other provision of this Lease which by its express terms applies after termination (including, without limitation, this sentence) shall survive in accordance with its terms any termination of this Lease.

H. If any provision(s) or portion thereof of this Lease held to be void or unenforceable by a court of competent jurisdiction, the remaining provisions hereof (and the remaining portion(s) of any provision held void or unenforceable in part) shall remain in full force and effect, and, in such case, the provisions hereof shall be interpreted or reformed by the court so as to nearly as possible effectuate the intent of the parties.

I. The marginal notes used as headings for the various provisions of this Lease are used only as a matter of convenience for reference and are not to be considered a part of this Lease or used in determining the intent of the parties to this Lease.

J. Nothing contained in this Lease shall be deemed or construed by Landlord or Tenant, nor by any third party, as creating a relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained in this Lease, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than that of landlord and tenant.

K. This Lease may be executed in any number of original counterparts, all of which evidence only one agreement and only one full and complete copy of which need be produced for any purpose. A facsimile or scan of a signature will have the same legal effect as an originally drawn signature.

L. This Lease shall not be interpreted or construed more strictly against one party or the other merely by virtue of the fact that it was drafted by counsel to Landlord or Tenant; it being hereby acknowledged and agreed that Landlord and Tenant have both contributed materially and substantially to the negotiations and drafting leading to this Lease. The time for the performance of any act required to be done by either Landlord or Tenant, other than payment of Minimum Rent or Additional Rent, shall be extended by a period equal to any delay caused by or resulting from act of God, war, terrorism, civil commotion, fire, casualty, labor difficulties, shortages of labor or materials or equipment, governmental regulation, a restraint of law (e.g., injunctions, court or administrative orders or a legal moratorium imposed by a governmental authority), act or default of the other party or other causes beyond such party's reasonable control (which shall not, however, include the availability of funds), whether such time be designated by a fixed date, a fixed time or otherwise ("Unavoidable Delay".) For Landlord to claim an Unavoidable Delay or Tenant Delay for Landlord's Work the delay must cause an actual delay in the construction schedule that cannot be reasonably made up; and in such event, the time for the performance of any act required to be done by Landlord shall be extended by a period equal to any such delay. In order to make a valid Unavoidable Delay or Tenant Delay claim, the party claiming the delay must give the other notice of same in accordance with the provisions of this Lease within ten (10) days after the occurrence of the Unavoidable Delay or Tenant Delay. After a Delivery Notice is given, no Unavoidable Delay claim for Landlord's Work may be made for periods prior to the giving of the Delivery Notice. Notwithstanding the foregoing, the following dates are considered "hard" dates for purposes of Tenant's termination rights and shall not be extended on account of the foregoing by more than ninety (90) days: the Termination Date.

M. Tenant shall have the right to use compactors and dumpsters at the location shown on Exhibit "A" and if no location is designated then a location to be designated in the Final Plans reasonably close to the Demised Premises. The compactor and dumpster pads and loading docks serving the Demised Premises shall be constructed by Landlord to meet all Legal Requirements and shall be in conformity with the specifications contained in Final Plans.

N. Intentionally Omitted.

30

O. In this Lease, "<u>Legal Requirements</u>" shall mean any and all applicable governmental requirements whether pursuant to statute, law, ordinance, regulation or the like promulgated by any governmental entity or an instrumentality thereof, or by an agency or department of any of the foregoing.  Legal Requirements also include orders issued by any court of competent jurisdiction.

**ARTICLE 28**
**LANDLORD'S PRE-OPENING CONSTRUCTION OBLIGATIONS AND**
**CONSTRUCTION ALLOWANCE**

A. <u>LANDLORD'S WORK</u>.

(i) Landlord, at its sole cost and expense and prior to delivery of the Demised Premises to Tenant, shall substantially complete all of the work described or depicted in <u>Exhibit "C"</u> ("<u>Landlord's Work</u>") and pursuant to the Final Plans developed in accordance with this Article.

(ii) In addition to the above, "<u>Landlord's Work</u>" shall include performing all work in the Shopping Center, other than Tenant's Work, which may be necessary in order to obtain a temporary or permanent certificate of occupancy for the Demised Premises (or jurisdictional equivalent) and for Tenant to operate its business in the Demised Premises, such work to include, but not be limited to, completing all grading, surfacing, striping, landscaping and installation of all Common Facilities in the Critical Areas and Protected Parking Field, and construction of all pylon and monument signs on which Tenant may install panels so that they are properly illuminated and ready to accept Tenant's signs; provided, however, Landlord may delay completion of final landscaping and final course paving and striping (the "<u>Delay Work</u>") if, based on weather conditions, it would not be prudent to do such work, so long as Landlord promptly completes such work as soon as reasonably practical and the incompletion of such work shall not prevent or interfere with Tenant from opening for business in the Demised Premises.

B. <u>PLANS</u>.

(i) Tenant has previously provided Landlord with its prototype plans and specifications described in <u>Exhibit "C"</u> hereof ("<u>Tenant's Prototype Plans</u>") and Landlord acknowledges receipt of same.  On or before the tenth (10th) day after the Effective Date, Landlord shall provide Tenant with a shell plan of the Demised Premises showing, at a minimum, all walls, columns, entrances and exits as well as the location of the loading dock. On or before the tenth (10th) day after the Effective Date, Landlord shall provide Tenant with plans accurately reflecting the current physical condition of the Demised Premises including, without limitation, the location of all walls, columns, entrances and exits, the loading dock, all utilities, bathrooms, janitors closet and offices.  All plans shall be in CAD unless otherwise approved by Tenant.  Thereafter, Tenant's architects and engineers shall have access to the Building to inspect the Demised Premises and conduct a site survey.  Tenant shall provide Landlord with at least three (3) business days prior notice of such visit, and Landlord will ensure access to the Demised Premises at such time.  Upon completion of the site survey, Tenant shall deliver to Landlord a floor/fixture plan specific to the

31

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D7454AFFBEA7

Demised Premises ("Floor Plan"). Thereafter, Tenant shall deliver to Landlord a floor/fixture plan specific to the Demised Premises ("Floor Plan"). Tenant shall not be required to deliver the Floor Plan until after the site survey is conducted. After receipt of the Floor Plan, Landlord, at its sole cost and expense, shall engage an architect to prepare a draft construction permit set of plans adapting Tenant's Prototype Plans to the Floor Plan. The draft construction permit set of plans shall be accompanied by an architect's deviation report (the "Deviation Report") specifying all deviations from Tenant's Prototype Plans and no changes or deviations from Tenant's Prototype Plans shall be binding on Tenant unless contained in the Deviation Report and approved by Tenant. The draft construction permit set of plans are subject to review and approval by Tenant, which approval shall not be unreasonably withheld. If Tenant fails to respond to Landlord's submission of plans within ten (10) days after receipt of the same, Landlord may send Tenant a second notice in accordance with the notice provisions hereof notifying Tenant that "Tenant's approval shall be deemed granted if Tenant fails to approve Landlord's plans or provide reasonable, specific comments to the plans submitted by Landlord within ten (10) days after receipt of the second notice," and if Tenant fails to so respond within such ten (10) day time period, its approval shall be deemed granted. All of Landlord's Work shall be set forth on final construction plans based on Tenant's Prototype Plans and the Floor Plan (subject to deviations noted in the Deviation Report) and prepared by Landlord, at Landlord's sole cost and expense, and approved by Tenant, to Tenant's reasonable satisfaction ("Final Plans"). Landlord shall make no material changes to the Final Plans without Tenant's approval, which approval shall not be unreasonably withheld.

(ii) Once Landlord and Tenant agree on the Final Plans, Tenant shall have the right to require Landlord to make changes thereto which are nonstructural, which do not require Landlord to obtain new permits or approvals or modify existing permits or approvals and which will not delay completion of Landlord's Work by more than thirty (30) days ("Changes"). The Changes shall be incorporated in Landlord's Work in a timely manner to avoid any unnecessary costs, expenses or delays. Thereafter, such Changes shall be incorporated into and then be deemed to be part of the Final Plans for Landlord's Work. Tenant shall pay to Landlord the net reasonable additional out-of-pocket third-party costs of Landlord's Work, if any, resulting directly and solely from the aggregate Changes [exclusive of any charges for overhead and profit, other than fees for general contractor overhead and profit, not to exceed ten percent (10%) thereon], including any costs associated with delays in Landlord's Work caused by the Changes, taking into account any and all actual costs and savings resulting from all Changes. Such payment shall be due and payable within thirty (30) days after Tenant's receipt of supporting information reasonably substantiating all such costs, including, without limitation, invoices, receipts and lien waivers from subcontractors and material suppliers. Any delays in completing Landlord's Work caused by Changes shall constitute a Tenant Delay.

C. APPROVALS.

(i) Landlord, at its sole cost and expense, shall diligently and continuously attempt to obtain and, in connection therewith, shall take all action, furnish all information and execute all documents reasonably necessary, desirable or requested by any Authority (as hereinafter defined)

32

to obtain, all required permits, consents, certificates, zoning and other variances, and changes and approvals (collectively, the "Approvals") of any court, agency, authority, board (including, without limitation, any environmental protection, planning or zoning board), bureau, commission, department, office or instrumentality of any nature whatsoever of any governmental or quasi-governmental unit of the United States, the State or territory in which the Demised Premises are located, and any local governmental body or agency, whether now or hereafter in existence, having jurisdiction over either or both the Shopping Center or the Demised Premises (collectively, "Governmental Authorities"), and all third party or other approvals, including quasi-public entities such as public utility companies and any applicable association or review boards applicable to the Shopping Center or other parties having the ability to approve improvements or alterations at the Shopping Center ("Other Authorities"; and together with Governmental Authorities, "Authorities"), necessary or desirable for the construction of Landlord's Work.  "Approvals" do not include permits for Tenant's signs.  Landlord shall notify Tenant promptly after receiving each of the Approvals or if any of the Approvals shall be denied.  Notwithstanding anything to the contrary, Landlord shall not be considered to have obtained an Approval until the period shall have expired during which any third party may appeal or otherwise challenge such Approval without such an appeal or challenge having been filed, or if any such appeal or challenge shall be filed, until such appeal or challenge shall have been dismissed or otherwise adjudicated (beyond right of further appeal) so that the Approval in question shall be valid and in full force and effect without conditions unsatisfactory to Tenant in Tenant's reasonable discretion.  If any of the Approvals shall be denied (which shall be deemed to include the invalidation or revocation of an Approval as the result of an appeal or challenge by a third party as aforesaid), Landlord or Tenant shall have the right to terminate this Lease by sending a notice to that effect to the other, whereupon this Lease shall terminate and Landlord and Tenant shall have no further rights or obligations hereunder.  If Landlord shall not obtain all of the Approvals on or prior to the Outside Approvals Date for reasons other than delays caused by Tenant (TIME BEING OF THE ESSENCE), then at any time thereafter and prior to Landlord having obtained all of the Approvals, Landlord or Tenant shall have the right to terminate this Lease by sending a notice to that effect to Landlord.

The term "Approvals" includes Landlord having obtained and delivered to Tenant upon the execution hereof a use waiver from Big Lots, in form and substance reasonably acceptable to Tenant, allowing Tenant to conduct its intended uses within the Demised Premises (the "Use Waiver").

(ii) No Approval shall be deemed to have been "obtained" unless it has been granted and is not subject to conditions or terms which, in the reasonable discretion of Tenant would: (a) materially interfere with the construction of Landlord's Work or any work to be performed by Tenant to prepare for opening; (b) materially interfere with the operation of the Demised Premises for the retail sale of apparel; (c) impose upon Tenant any excess construction or operating costs; (d) require any modification to the site plan in a manner which materially affects access to the Protected Parking Area or access to or visibility of the Building; or (e) otherwise would have a material and adverse impact on Tenant's use or operation of the Demised Premises.

33

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74F5AFFBEA7

D. <u>COMMENCEMENT OF AND PROGRESS OF WORK</u>.

(i) Landlord shall use all due diligence to deliver the Demised Premises in the condition required by this Lease no later than the Delivery Date. Landlord shall commence Landlord's Work within ten (10) business days following the last to occur of: (i) execution of this Lease by Landlord and Tenant; (ii) the approval of Final Plans for the construction of Landlord's Work; and (iii) receipt of the Approvals. In no event shall Landlord commence Landlord's Work later than the Outside Landlord's Work Commencement Date unless Landlord is delayed in commencing Landlord's Work by reason of Tenant Delay or Unavoidable Delay. Landlord shall be deemed to have commenced Landlord's Work upon commencing demolition inside the Demised Premises.

(ii) Together with the execution of this Lease, Landlord shall provide Tenant with a projected construction schedule detailing all major milestones of permitting and construction (the "Construction Schedule") which will enable Landlord to deliver the Demised Premises to Tenant in accordance with the terms of this Lease on or before the Delivery Date. The Construction Schedule is estimated dates only and Tenant shall have no remedies or rights if Landlord fails to meet the dates in the Construction Schedule, it being agreed that Tenant's rights and remedies for delays in completing Landlord's Work as set forth entirely in this Lease.

(iii) Within five (5) days after Landlord commences Landlord's Work, Landlord shall provide Tenant written notice of the commencement thereof.

(iv) Landlord shall prosecute Landlord's Work to completion with all due diligence, speed and dispatch, in a good and workerlike manner, using only new first class materials and in accordance with all applicable governmental requirements.

(v) After the commencement of Landlord's Work and prior to the delivery of the Demised Premises, Tenant, without being required to pay any Minimum Rent or Additional Rent to Landlord, whenever Tenant shall deem it reasonably appropriate, shall have the right to enter the Demised Premises to inspect the same, at Tenant's sole risk. Tenant shall coordinate such entry with Landlord and its contractor. Tenant may not delay Landlord's Work or require that Landlord uncover any portion of Landlord's Work. No such entry by Tenant shall be deemed an acceptance of delivery of the Demised Premises or the condition thereof. Until Landlord's delivery of possession of the Demised Premises to Tenant and until such time as Tenant shall have the exclusive right to use the Demised Premises, Landlord shall pay the cost of water, sewer, gas, electricity, heat, air-conditioning, and other utilities used in and upon the Demised Premises.

(vi) If Landlord shall not have commenced Landlord's Work on or before the Outside Landlord's Work Commencement Date, subject to delays in commencing Landlord's Work by reason of Tenant Delay or Unavoidable Delay, then at any time thereafter, but prior to the actual commencement of significant and sustained construction activity in connection

34

therewith, Tenant, at its election, shall have the right to terminate this Lease by giving Landlord written notice thereof.

E. <u>DELIVERY OF POSSESSION</u>.

(i) In order for Landlord to have delivered possession of the Demised Premises to Tenant and the Commencement Date to occur, all of the following conditions precedent must either be satisfied or be waived, in writing, by Tenant:

(a)  Exclusive physical possession of the Demised Premises shall have been delivered to Tenant and all of Landlord's Work shall have been performed in conformity with the applicable requirements set forth in this Lease and in the relevant exhibits thereto and Landlord's Work shall be substantially complete, including the installation of permanent power, loading docks, compactor pads, Common Facilities (other than Delay Work) and any other delivery requirements of this Lease;

(b)  Landlord shall have delivered the Demised Premises and all Landlord's Work in compliance with all Legal Requirements (including, without limitation, being free of all applicable building code violations that would prevent issuance of a certificate of occupancy or otherwise adversely affect Tenant's ability to operate, and being in compliance with the Americans with Disabilities Act);

(c)  The Demised Premises shall be free of all Hazardous Materials, including asbestos-containing material regardless if they require removal or remediation under applicable law;

(d)  The Demised Premises shall be free of all other tenants or occupants;

(e)  Landlord shall have delivered to Tenant such non-disturbance agreements as may be required by <u>Article 31</u> hereof;

(f)  Landlord shall have provided Tenant with a proper Delivery Notice; and

(g)  Delivery of a temporary or permanent certificate of occupancy for the Demised Premises, unless Landlord is not able to obtain a temporary or permanent certificate of occupancy until Tenant completes Tenant's Work, in which case receipt of the temporary or final certificate of occupancy shall not be a condition of delivery, but Landlord shall be required to obtain all permitting sign-offs or approvals, if any, necessary for Tenant to occupy the Demised Premises and commence its work (other than permits for Tenant's Work) and Landlord shall obtain a certificate of occupancy or its equivalent after Tenant completes such work.

(ii)  Delivery of possession of the Demised Premises in accordance with the provisions hereof shall occur on or before the date set forth in the Delivery Notice. Notwithstanding anything contained in this Lease, without Tenant's prior written consent granted

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D745EAFFBEA7

in Tenant's sole discretion, in no event shall Tenant be required to accept possession of the Demised Premises on any date other than the Delivery Date or the Termination Date. Occupancy of the Demised Premises or acceptance of physical possession shall in no way be deemed a waiver of any of the delivery conditions.

(iii) For purposes of defining "<u>substantially complete</u>" or "<u>substantial completion</u>" in connection with Landlord's Work, such terms shall mean that: (a) Landlord's Work is complete except for minor punchlist items, (b) all pylon and monument signs serving the Shopping Center on which Tenant is permitted to install panels are properly illuminated and in good working order and all power to the signs to be erected on the Demised Premises is in good working order, (c) that there are no items of Landlord's Work remaining that would unreasonably restrict Tenant from grand opening or commencing any and all of its pre-opening activities or fit-up work; and (d) such elements of Landlord's Work required to be completed as a condition precedent to the issuance of an occupancy permit for the Demised Premises have been properly completed, subject to punch-list items and, if applicable, Delay Work.

F. <u>FAILURE TO DELIVER ON TIME.</u>

(i) If Landlord shall fail to timely satisfy the requirements for delivery of possession of the Demised Premises on or prior to the Delivery Date, Tenant will sustain substantial additional costs and expenses, including, without limitation, storage costs for Tenant's personal property, loss of value affecting inventory, costs associated with employees during such period of delay, additional advertising and promotional costs and other store opening opportunities, and delays in expansion plans in affiliated markets. Landlord and Tenant agree that Tenant will certainly incur such additional costs and expenses, but that it would be impracticable or extremely difficult to ascertain their actual amount. Consequently, Landlord and Tenant agree that a reasonable estimate of such additional costs and expenses is Four Thousand Dollars ($4,000.00) multiplied by the number of days which accrue, beginning with the Delivery Date and ending on the Commencement Date or the date Tenant terminates this Lease, whichever is earlier; provided, however, notwithstanding anything herein to the contrary set forth herein, such liquidated damages shall not exceed Four Hundred Thousand and 00/100 Dollars ($400,000.00). That amount shall be payable by Landlord to Tenant as agreed-upon liquidated damages (and not as a penalty) and Tenant, at its election, shall be entitled to offset such liquidated damages against any amounts then owing or in the future owing to Landlord by Tenant, including, *inter alia*, against future installments of Minimum Rent and Additional Rent becoming due hereunder until Tenant offsets the entire amount of liquidated damages. If Landlord has not satisfied the requirements for delivery of possession of the Demised Premises on or before the Termination Date, then at any time thereafter, but prior to the actual satisfaction of the requirements for delivery of possession of the Demised Premises, Tenant, at its election, shall have the right to terminate this Lease by giving Landlord notice thereof. Tenant's rights to the liquidated damages and Landlord's obligations to pay such liquidated damages hereunder to Tenant shall survive the termination of this Lease. Notwithstanding anything herein to the contrary, the date in the Delivery Notice, the

36

Delivery Date and the Termination Date shall each be extended by one (1) day for each day that completion of Landlord's Work is delayed by Unavoidable Delay or Tenant Delay.

(ii) Notwithstanding anything to the contrary contained in this Lease, in addition to the above, if the Rent Commencement Date has occurred but delivery of possession requirements remain outstanding or elements of Landlord's Work remain outstanding that are not substantially complete such as: (i) any sign on which Tenant is permitted to install a panel not being constructed, powered or illuminated, (ii) Critical Areas or Protected Parking Areas not being substantially complete, or (iii) other buildings or Common Facilities that are required to be constructed as a part of Landlord's Work not being substantially complete, fifty percent (50%) of Minimum Rent shall abate until all delivery of possession requirements are satisfied and Landlord's Work is substantially complete.

(iii) "Tenant Delay" shall mean delays in completing Landlord's Work caused by (i) Tenant's failure to timely deliver plans necessary for Landlord to design or construct Landlord's Work, or Tenant's failure to respond to requests or provide information in a timely manner when requested by Landlord, (ii) Tenant's revision of any plans for work that Landlord is responsible to construct, or any Changes, (iv) Tenant's failure to perform work or services that are integral or necessary for Landlord to complete its work, or (v) Tenant's entry upon the Demised Premises by Tenant or any of its contractors or consultants. The Commencement Date shall be accelerated by the number of days that Landlord is delayed in completing Landlord's Work as a result of a Tenant Delay.

G.    PUNCHLIST AND COMMISSIONING.

(i) Landlord and Tenant shall conduct a punch list inspection of Landlord's Work on a mutually agreed upon date approximately fifteen (15) days prior to the date set forth in the Delivery Notice for delivery of the Demised Premises in order to inspect Landlord's Work together and to produce a punch list of remaining items to be completed by Landlord. If the punch list(s) generated at the time of the inspections reflect(s) that any element of Landlord's Work is not substantially complete, Landlord shall diligently and promptly pursue substantial completion of its obligations, and Landlord and Tenant will again together inspect Landlord's Work, upon reasonable notice from Landlord, and together they shall produce the final punch list(s). Tenant will not be required to finally accept the Demised Premises until Landlord's Work, as required pursuant to this Lease, is substantially complete. Landlord shall act diligently and promptly to complete all final punch list items.

(ii) In the event that Landlord fails to diligently complete the punch list items within ten (10) days after the creation of the punch list, or such longer period as is necessary so long as Landlord is working diligently to complete the items on the punch list, Tenant may immediately, upon written notice to Landlord, cause such punch list items to be corrected ("Punch List Correction"). In the event Landlord fails to pay Tenant for reasonable expenses incurred due to the Punch List Correction within thirty (30) days following Tenant's written demand therefor,

37

which shall be accompanied by reasonable documentation substantiating such expenses, Tenant shall be entitled to offset such expenses, together with interest thereon at the Interest Rate, against any amounts then owing or in the future owing to Landlord by Tenant, including, *inter alia*, future installments of Minimum Rent and Additional Rent becoming due hereunder.

(iii) Notwithstanding the acceptance of delivery of the Demised Premises by Tenant, Landlord agrees to correct any defect in Landlord's Work of which Tenant notifies Landlord within one (1) year after the Commencement Date. In addition to the punch list inspection provided in the Lease, Tenant may contract with a third party commissioning agent to perform a fundamental commissioning of the HVAC System, lighting, mechanical, vertical transportation (if any), plumbing, electrical, energy and other equipment delivered or installed as part of Landlord's Work ("MEP Equipment"). The commissioning agent may inspect and validate the operations of all MEP Equipment within forty-five (45) days after the Commencement Date and complete a comprehensive commissioning report and deficiency log ("Commissioning Report Correction List"). The Commissioning Report Correction List will be provided to the Landlord within forty-five (45) days after the Commencement Date and all issues identified in the Commissioning Report Correction List will be repaired and addressed by the Landlord. In the event that Landlord fails to diligently complete the items in the Commissioning Report Correction List within thirty (30) days after the delivery of the report to Landlord, Tenant may immediately, upon written notice to Landlord, cause such items to be corrected. In the event Landlord fails to pay Tenant for reasonable expenses incurred due to the Commissioning Report Correction List within thirty (30) days following Tenant's written demand therefor, which shall be accompanied by reasonable documentation substantiating such expenses, Tenant shall be entitled to offset such expenses, together with interest thereon at the Interest Rate, against any amounts then owing or in the future owing to Landlord by Tenant, including, inter alia, future installments of Minimum Rent and Additional Rent becoming due hereunder.

H. Intentionally omitted.

I. CONSTRUCTION. All construction activities performed or authorized by it within the Shopping Center by Landlord shall be performed in compliance with all Legal Requirements, and in such a manner so as to not in any more than a minor respect interfere with Tenant's business, use of the Demised Premises, access or visibility to the Demised Premises or use of the Common Facilities or signs. Except in the case of emergency, before commencing any significant construction within the Critical Areas or Protected Parking Area, Landlord shall identify approved construction access routes so as to not unreasonably interfere with the use and operation of the Common Facilities and Demised Premises by Tenant. Landlord shall use all reasonable efforts and due diligence to cause all such construction traffic to not materially or adversely affect customer or delivery traffic via the Critical Areas. In no event shall construction vehicles (and the vehicles of construction workers) be allowed to park in the Protected Parking Area, and Landlord shall immediately tow any vehicles which park in the Protected Parking Area. If a building is not constructed concurrently with the construction of the Demised Premises, the building area shall be left in a finish-graded condition, seeded with appropriate grasses, pending the construction of a

38

DocuSign Envelope ID: D1726786-5D19-4C71-81F9-D74F5AFFBFA7

building thereon, or shall be Common Facilities. The staging areas for any such building shall either be on a building pad or in an area outside of the Critical Areas and Protected Parking Areas. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only in such areas. In constructing improvements, Landlord shall not cause or allow construction debris, water or soils to migrate or be deposited onto the Critical Areas or Protected Parking Areas or into the Demised Premises, or otherwise damage the Demised Premises, and Landlord, at its sole cost and expense, shall immediately (and consistently, to the extent the problem becomes a chronic issue) cause such debris, water or soils to be cleaned up or removed and any damage to be repaired. All building sites shall be appropriately fenced and screened. Landlord may only erect scaffolding adjacent to the Demised Premises in connection with repairs to the Demised Premises which are required by applicable law or this Lease and Landlord shall not erect any scaffolding on the Demised Premises or perform any alterations on Tenant's storefront (not including routine repairs and maintenance), without Tenant's coordination, including consideration as to temporary signage, manner of scaffolding erection and time of year and length and scope of work.

## ARTICLE 29
## OPTION FOR EXTENDED TERMS

A. Landlord agrees that Tenant shall have and is hereby granted successive Extension Options to extend the Term of this Lease for the Extended Term(s) set forth in Article 1 of this Lease. Each Extended Term shall begin, respectively, upon the expiration of the Initial Term or applicable Extended Term of this Lease and, except as in this Article otherwise provided, all the terms, covenants and provisions of this Lease shall apply to each such Extended Term. Each such option shall automatically become exercised and effective as the same shall accrue unless Tenant is in default hereunder for failure to pay Minimum Rent or Tenant gives Landlord notice in writing of its intention not to exercise such option at least nine (9) months prior to the expiration of the Initial Term or any Extended Term of this Lease.

B. If an option to extend the Term of this Lease is exercised as provided herein, the Minimum Rent for each Lease Year of the Extended Term shall be as set forth in Article 1, and, except as otherwise herein provided, all of the terms and provisions of this Lease shall apply to the optional Extended Terms.

## ARTICLE 30
## CERTAIN CONDITIONS

A. Landlord agrees at Landlord's expense: (a) to maintain within the Shopping Center certain parking areas (exclusive of basement or underground parking areas) to accommodate not less than four (4.0) automobiles for each one thousand (1,000) square feet of leasable floor area in the buildings on the Shopping Center and entrances and exits within the Critical Areas from and to public streets or highways, all to be located in the areas designated for such purpose on Exhibit "A"; (b) to maintain the lighting as required by local Code, and (c) to remove all restrictions on both ingress to, and egress from, the Shopping Center affecting all current and proposed curb cuts and access roads designated as Critical Areas on Exhibit "A," unless such restrictions shall be

required by applicable law or regulation and notice thereof is submitted by Landlord to Tenant and approved by Tenant prior to execution of this Lease.  All mall areas, service courts, service drives, sidewalks, exterior asphalt and landscaping, loading and delivery areas, access roads, curb cuts, parking areas, sign pylons and monuments, open space areas, common utility systems, common sanitary and other waste handling systems, holding tanks, force mains, common fire detection and/or suppression systems, common life safety systems, common security systems, lighting (excluding any tenant specific lighting), pylon signage (excluding individual tenant sign faces), traffic signals and traffic control devices and all other improvements benefiting the Shopping Center are herein sometimes called the "Common Facilities" or "Common Areas."  All of the Common Facilities shall be constructed and maintained in a good workerlike manner using first quality materials, so that the same will be adequate and serviceable in all respects for the non-exclusive use by Tenant (subject to Landlord's rights in Article 32) for the purposes designated in Exhibit "A" and elsewhere in this Lease.

B.  At any time, and from time to time before or during the Term, Landlord, at no cost to Tenant, and upon written request from Tenant, shall furnish Tenant with a then up-to-date copy of a site plan for the Shopping Center, showing, in reasonable detail, at least the following features: curb cuts, drive lanes, parking spaces, islands, loading areas, building locations, light stanchions, and items and features of similar character.

## ARTICLE 31
## SUBORDINATION AND NONDISTURBANCE

A.  This Lease shall not be subordinate to any mortgages, deeds of trust, or underlying leases now or hereafter affecting the real property of which the Demised Premises are part unless Landlord delivers to Tenant a written agreement (an "SNDA") of the holder of such mortgage, deed of trust or underlying lease, in form and substance reasonably satisfactory to Tenant and otherwise in proper form for recording, providing that so long as this Lease shall be in full force and effect, Tenant's rights, use and occupancy shall not be disturbed, Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the mortgage or the termination of the underlying lease or to enforce any rights under the underlying lease or the mortgage or the bond or note or other obligation secured thereby (unless required by law) and that the holder thereof or lessor thereunder, as the case may be, shall apply all insurance and condemnation proceeds to the restoration of the Demised Premises as set forth in Articles 17 and 20.

B.  Landlord covenants and agrees to procure and deliver to Tenant such SNDA from existing mortgagees, deed of trust holders, and/or underlying lessors upon the execution of this Lease.  In the event that Landlord fails to deliver to Tenant any SNDA required under the provisions of this Article from any existing holder of a mortgage, deed of trust or underlying lease, Tenant shall have the right in addition to and not in lieu of, any other right or remedy available under law or equity, to terminate this Lease upon notice given to Landlord at any time prior to delivery of such non-disturbance agreement.  Upon any such termination, Tenant shall be released

40

from any further liability and obligations under this Lease. In addition all rents payable under this Lease shall abate from the date any such non-disturbance was to have been delivered to Tenant through the date of delivery of any such instrument, which abated rents shall not be recoverable by Landlord. Tenant agrees that it will execute an SNDA within thirty (30) days after request of Landlord or the holder or prospective holder of a mortgage recorded or to be recorded after the date of this Lease.

C. In the event Tenant executes and delivers an SNDA to the holder of any mortgage or underlying lease which requires the payment of Tenant's rents to any such holder upon notice to Tenant, then following receipt of such notice, Tenant shall be released from any liability for any such rents paid to such holder or other person pursuant to written direction from such holder, and all payments shall be credited to Tenant under the Lease as if Tenant had made such payments directly to Landlord.

## ARTICLE 32
## USE OF COMMON FACILITIES

Landlord hereby grants to Tenant, its customers, employees, and visitors the right throughout the Term hereof to use, in common with other tenants of the Shopping Center, their customers, employees and visitors, all of the Common Facilities for their intended purposes and in addition thereto any similar future facilities provided by Landlord, including but not limiting the same to the use of all the mall areas, streets, service courts, service drives and sidewalks, if any, for ingress and egress to and from the Demised Premises and the public streets or highways shown on Exhibit "A" and the use thereof for parking and deliveries; all of the Common Facilities being situated as shown in Exhibit "A" and upon land described in Exhibit "A-1" attached hereto. Tenant may not use any of the sidewalks or Common Facilities for the sale or storage of merchandise or other property or for conducting any sales, promotions or other events, nor may Tenant install or place any property improvements on the sidewalks or on the Common Facilities. Tenant shall not use the parking areas for parking of vans, trucks, delivery vehicles or other commercial vehicles. Landlord agrees at Landlord's expense to adequately maintain throughout the Term hereof, all of the Common Facilities in good, safe, clean, useable, unobstructed first class condition, adequately lighted, free and clear of ice, snow and debris, and without any charge or cost for such use by Tenant except as expressly provided herein, to include, without limitation, the following:

(i)  Maintaining, repairing, resurfacing and restriping, when necessary, all paved surfaces in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal or superior in quality, use and durability;

(ii)  Removing all snow, papers, gum, debris, graffiti, filth and refuse and thoroughly sweeping the area to the extent reasonably necessary to keep the area in a clean and orderly condition;

5425472v2

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D7AF5AFFBEA7

(iii)    Maintaining, repairing and replacing, when necessary, all traffic directional signs, markers and lines;

(iv)    Operating, maintaining, repairing and replacing, when necessary, such artificial lighting facilities as shall be reasonably required;

(v)    Maintaining and watering all landscaped areas (including, without limitation, those on the perimeter of the Shopping Center); maintaining, repairing and replacing, when necessary, automatic sprinkler systems and water lines; and replacing shrubs and other landscaping as is necessary;

(vi)    Maintaining, repairing and replacing, when necessary, all Common Area walls and fences;

(viii)    Maintaining, repairing and replacing, when necessary, all storm drains, sewers and other utility lines and facilities not dedicated to the public or conveyed to any public or private utility which are necessary for the operation of the buildings and improvements located in the Shopping Center;

(ix)    Maintaining security in the Common Areas when reasonable to do so and keeping the Shopping Center Pylon Sign and any directional signs lighted during periods of darkness from dusk to dawn or during such other times mutually agreed in writing by the businesses designated thereon; and

(x)    Maintaining, repairing and replacing, when necessary, the Shopping Center Pylon Sign pylon structure (except for the sign fascia and cans which shall be supplied and maintained by the businesses designated thereon).  Notwithstanding the other provisions of this Article 32, the non-capital costs of maintaining, repairing and replacing the non-structural portions of the Shopping Center pylon signs shall be paid by Landlord and Tenant in the proportion that the total square footage of each party's designation or designations bears to the total square footage of all tenant designations entitled to be displayed thereon.

Notwithstanding the foregoing, Landlord shall have the following rights: (i) the right to designate a reasonable number of parking spaces not within the Protected Parking Area or Critical Areas, as "short term" parking, exclusive parking, expectant mother parking, pick-up parking, "green" vehicle, electric vehicle or other similar vehicle parking only, or any other similar designations, along with the right to permit other tenants and occupants to install small signs, cameras, speakers, canopies and other improvements that are supportive of pick-up facilities, (ii) the right to permit temporary and/or seasonal sales of merchandise, outdoor seating, festivals, food trucks and other activities in the Common Areas, but not within the Protected Parking Area or Critical Areas, that Landlord deems to be in the best interests of the Shopping Center, (iii) the right to permit a reasonable number of cart corrals in the parking areas but not within the Protected Parking Area and (iv) the right to permit other tenants and occupants of the Shopping Center to install temporary

42

tenants, canopies and other similar structures in the Common Areas, not within the Protected Parking Area or Critical Areas if and during such time as any government restriction is imposed on indoor sales or dining.

## ARTICLE 33
## RESTRICTIVE COVENANTS

A. So long as Tenant, its successors, assigns or subtenants lease, use or occupy any space in the Shopping Center, Landlord covenants that notwithstanding the amendment, cancellation, termination or expiration of the herein Lease: (a) no covenant or agreement made by Landlord or any predecessor in title with any other person or entity restricting the use or occupancy of all or part of the Shopping Center shall be of any force or effect against Tenant except as set forth in Exhibit "B" hereof; (b) Intentionally Omitted; (c) no building or other structure shall exceed one (1) story (which may include a mezzanine) nor shall any building (including architectural features or facade) exceed the height of the Demised Premises (except for architectural features such as, without limitation, the raised storefront used by Best Buy, in which event Landlord shall request Tenant's approval, only in event such building or structure shall be adjacent to the Premises) and no building on an outparcel shall exceed the higher of the existing height of the building or thirty feet (30') in height, including architectural features (the height of the buildings shall be measured perpendicular from the finished floor elevation to the top of the highest point of the building, including any screening, parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such building) nor shall any building that is in-line with the Demised Premises and located within four hundred feet (400') of the Demised Premises "bump out" further than the Demised Premises; (d) except as required by applicable law, no portion of any Protected Parking Area, the Critical Areas or Critical Building Facilities may be materially modified (including by way of example any material change in the configuration of the parking stalls or access to the Protected Parking Areas) without Tenant's consent, which consent Tenant may not unreasonably withhold; (e) no places of public assembly (e.g., movie theaters and bowling alleys) shall be erected or maintained in any part of the Shopping Center, except as shown on Exhibit "A"; (f) no restaurant may be erected or maintained within 150 feet of any part of the Demised Premises; (g) no building in the Shopping Center shall be leased, used or occupied by an "infant furniture and accessories store" (as defined below) (such as buy buy Baby or Babies R Us); (h) no building in the Shopping Center shall be leased, used or occupied by a "bath and linen store" (as defined below); (i) no store shall be leased, used or occupied by an off-price retailer (defined below); and (j) no building in the Shopping Center shall be leased, used or occupied for the sale of any of the items set forth on Exhibit E. An "off-price retailer" shall mean a retailer who engages in the sale of brand name and style apparel similar to department stores, but at everyday prices that are substantially discounted from the everyday regular prices of department stores (but Marshalls, and TJMaxx and any other concept operated by the TJX Companies are expressly permitted). The foregoing restrictions and exclusives shall be deemed covenants running with the land of the Shopping Center for the Term of this Lease. The restrictive covenants described in subsections (g), (h) and (i) above are collectively referred to as the "Exclusives". Notwithstanding the

43

foregoing, (i) Landlord shall be permitted to install benches, planters, small signs and other small structures or minor improvements in the Protected Parking Area so long as the same are commonly found in shopping centers in the area of the Shopping Center, do not reduce the parking available in the Protected Parking Area or adversely affect access to or visibility of the Demised Premises, and (ii) except as expressly set forth in this Lease, Landlord shall have the right to make such changes, modifications, additions and subtractions to the buildings and Common Facilities in the Shopping Center (other than those in the Protected Parking Area or within Critical Areas) as Landlord deems necessary and in the best interests of the Shopping Center.  The restrictions in this Article 33 shall not be binding upon any tenant of the Shopping Center that has executed a lease as of the date hereof, provided that to the extent Landlord has a right of consent or approval over any such existing tenant's change in operation or use that would violate these restrictions Landlord shall not grant such consent or approval or otherwise amend or modify any such leases so as to permit a violation of these restrictions.

B.  An "infant furniture and accessories store" is a store that engages, as its primary use, in the sale of cribs, changing tables, toy boxes, children's and adult rocking chairs, glider/rockers, juvenile furniture, tables, chairs, chests, dressers, bean bags, crib comforters, dust ruffles, bumpers, sheets and mattress pads, diaper stackers and diaper bags, strollers, high chairs, car seats, play pens, walkers and entertainers, infant swings, infant and layette clothing, infant toys, children's books, diapers or such additional items that are typically sold in an infant and children toys, furnishings and furniture store.  A "bath and linen store" is store that engages, as its primary use, in the sale of bedding, towels, aprons, potholders, oven mitts, robes and body wraps, decorative pillows or chair pads, tabletop items, rugs, bathroom accessories, curtains or draperies or drapery hardware, wall art or picture frames, housewares, closet or storage items, luggage or candles or candleholders.  The term "Critical Building Facilities" means (i) those areas that may be designated as such on Exhibit "A," (ii) any and all parking decks or enclosed garages in the Shopping Center; (iii) any and all elevators, escalators, stairways and common, exterior or limited common entrances, foyers or hallways providing access to the Demised Premises; and (iv) any and all risers, sewer mains, chillers, power main feeds and other exterior utility, water and sewer feeds serving the Demised Premises.

C. Notwithstanding the foregoing, the following uses shall be excluded from the Exclusives and are permitted in the Shopping Center:  (i) any of the TJX Brands, including, but not limited to, TJ Maxx, Marshalls, HomeGoods, Sierra Trading Post, HomeSense, TK Maxx, and Winners; (ii) electronics stores such as, but not limited to, Best Buy; (iii) craft stores such as, but not limited to A.C. Moore, Jo-Ann, Michaels, and Hobby Lobby; (iv) dollar stores such as, but not limited to, Dollar Tree, Dollar General, Deal$, Big Lots; (v) full-line furniture stores such as, but not limited to, IKEA, Ashley Furniture, Bassett, Blinds to Go, Crate and Barrel, La-Z-Boy, Pottery Barn, Thomasville, Container Store, and Restoration Hardware; (vi) supermarkets; (vii) home improvement stores such as, but not limited to, Home Depot, Lowes, Ace Hardware, True Value, Tractor Supply, Sherwin Williams, Restoration Hardware; (viii) a pet supplies store such as, but not limited to, Petco, PetSmart, and Pet Goods; (ix) sporting good stores such as, but not limited

to, Dick's, Champs, Eastern Mountain Sports, Golf Galaxy, Golfsmith, Modell's, and REI; and (x) wholesale clubs such as, but not limited to BJ's Wholesale, Costco and Sam's Club.

D. If there is a violation of the covenants above or the covenants in Article 42.B below, and such violation continues for a period of three (3) business days following written notice from Tenant to Landlord, Tenant shall have the right to seek all remedies available at law or in equity, and Tenant shall have the right to pay Alternate Rent in lieu of (but not to exceed) Minimum Rent from the date of the expiration of such three (3) business day period, in addition to Tenant's right to seek other remedies available at law or in equity (it being understood that any amount which Tenant may realize thereby shall constitute a partial reimbursement to Tenant for costs incurred and sales lost by Tenant in connection with the interference with Tenant's business). Landlord and Tenant agree that Tenant would certainly be damaged by reason of Landlord's violation of the above-referenced covenants, but that it would be impractical or extremely difficult to ascertain the exact amount by which Tenant would be damaged. Consequently, Landlord and Tenant agree that the amount above is a reasonable estimate of the amount of Tenant's damages and shall constitute partial liquidated damages and is not a penalty. If the violation of any restriction is caused by another tenant or occupant of the Shopping Center using its premises in violation of such tenant's or occupant's lease, Tenant shall forebear exercising any remedies, other than the right to seek injunctive relief against the violating tenant, as long as Landlord is using its good faith, diligent efforts to enjoin or cause such tenant or occupant to cease the use that violates the restriction, which shall include declaring a default under such tenant's or occupant's lease and commencing legal action against such tenant or occupant within sixty (60) days of first being noticed of the violation. Tenant shall not be required to continue to forebear its remedies through any appeal of any legal action and such forbearance shall end upon any adverse ruling against Landlord (or in favor of the alleged violating tenant permitting it to use its premises in violation of the restrictions herein) or any settlement, termination or dismissal of any such legal action without affirmative relief declaring such tenant to be in violation of its Lease and precluding it from violating these restrictions, in which case Tenant may immediately commence payment of Alternate Rent in lieu of Minimum Rent with a credit against such future payments for the difference between Minimum Rent paid and Alternate Rent that Tenant forbear during such period.

E. Notwithstanding anything herein to the contrary, if Tenant ceases operation of the Burlington store in the Demised Premises for more than ninety (90) days, for reasons other than repairs being diligently pursued, casualty, condemnation or Landlord default, then the Exclusives shall no longer bind Landlord or the Shopping Center.

## ARTICLE 34
## TENANT'S RIGHT TO OPERATE

A. Landlord recognizes that Tenant's parent operates a chain of stores on a national basis in a highly competitive business and acknowledges that the amount of sales which Tenant may make in the Demised Premises is not predictable and will necessarily depend not only on business

5425472v2

conditions, but upon many other factors and unforeseeable decisions which Tenant's parent reserves the right to make in the best interest of its entire business.

B. Tenant reserves the right to lawfully operate its business in the Demised Premises as it sees fit, but subject to any express limitations in this Lease, including Article 2. Landlord shall have no express or implied right to interfere in the operation of Tenant's business or to complain about or hold Tenant liable for the manner in which Tenant's business is operated. Without limiting the generality of the foregoing, Tenant shall have the right to determine how and during what hours, if any, its store in the Demised Premises is to be operated and what merchandise and services are to be offered for sale therein, and the further right to operate stores in other locations which are in competition with such store. Tenant may place and operate vending machines at such locations as it may desire within the Demised Premises. Tenant may install for its exclusive use cart corrals and similar items in the parking lot adjacent to the Demised Premises in a location approved by Landlord. Tenant shall not be obligated to join any merchants association or promotional fund. Further, Landlord acknowledges that notwithstanding anything contained in this Lease to the contrary, Tenant has not and shall not make any representation or covenant, express or implied, that it will achieve any amount of sales from the Demised Premises, or that it will continuously operate its or any business in the Demised Premises. Landlord acknowledges that Tenant was unwilling to enter into the Lease except for the provisions of this Article and Landlord is willing to accept the business risks involved. The relationship of the parties hereto shall be that of Landlord and Tenant only, and not partners or joint venturers.

C. Tenant shall, within one hundred eighty (180) days after the Rent Commencement Date, open for business in the Demised Premises as a fully stocked and staffed Burlington store. After the Rent Commencement Date and after initially opening for business, in the event Tenant ceases operations at the Demised Premises for more than one hundred eighty (180) consecutive days for any reason other than repairs being diligently pursued, casualty, condemnation, remodeling being diligently pursued or force majeure, Landlord may as its sole and exclusive remedy elect at any time thereafter to terminate this Lease and recover possession of the Demised Premises on ninety (90) days' prior notice to Tenant and this Lease shall so terminate as if such date of termination were the date originally fixed for the expiration of the Term on the ninetieth (90th) day. If this Lease is so terminated, Minimum Rent and Additional Rent for the last month of Tenant's occupancy shall be prorated and Landlord agrees to refund to Tenant any Minimum Rent and Additional Rent paid in advance, within thirty (30) days after such termination.

## ARTICLE 35
## REAL PROPERTY TAXES

A. Throughout the Term, Landlord shall pay before delinquency all real property taxes upon the Shopping Center. From and after the Rent Commencement Date, Tenant shall pay Landlord, as Additional Rent, its pro rata share of Taxes paid by Landlord for each calendar year (or portion thereof) which occurs after the Rent Commencement Date and within the Term. Tenant's pro rata share of Taxes shall be determined by multiplying Taxes by a fraction, the numerator of which shall be the total floor area of the Premises and the denominator of which shall

46

be the total floor area of all the buildings in the Shopping Center or, at Landlord's option, the floor area of the buildings in the tax parcel of which the Demised Premises is a part.  The "floor area" of the Premises and other premises in the Shopping Center shall be measured from the exterior faces of exterior walls and from the center line of demising walls and shall not include any exterior loading areas or mezzanine space. "Taxes" means all real property taxes and assessments, general or special, upon the Shopping Center, but not estate, income, inheritance, succession, transfer, gift or franchise taxes nor shall the Taxes include any penalties or interest resulting from delinquent payment of Taxes or any levies for public improvements, assessments or special assessments, but shall be strictly limited to taxes now generally known as *ad valorem* real property taxes and assessments, general or special, and Taxes shall reflect any discount available to Landlord by prompt or early payment of such tax regardless of whether such prompt or early payment is actually made by Landlord.  Notwithstanding the foregoing, if any increase in Taxes assessed against the Shopping Center is due to an alteration or improvement (specifically excepting, such alterations or improvements pursuant to Landlord's general business and maintenance obligations or routine tenant improvements at the Shopping Center), benefitting exclusively a building in the Shopping Center other than the building in where the Premises resides, the entire increase shall be borne by the premises so benefitting by the improvement or alteration and no portion thereof shall be payable by Tenant. In addition, real estate taxes shall include any tax or imposition on the value of this Lease or upon the rents, if the same is imposed in lieu of or in addition to real estate taxes. Real estate taxes shall also include Landlord's cost (provided such cost shall not exceed any savings ascertained) to contest any taxes or assessments upon the Demised Premises or Shopping Center, or the land upon which the same is located.

B. On or before April 30 following each calendar year during the Term, Landlord shall deliver to Tenant a statement certified by one of its accountants or officers showing the amount of Taxes on the Shopping Center paid by Landlord and allocable to such full or partial calendar year and the amount to be paid by Tenant along with a copy of the tax bill.  In addition, said statement shall show in reasonable detail the information relevant or necessary to the exact computation and determination of Tenant's pro rata share of Landlord's actual Taxes for such calendar year.  Tenant shall pay its pro rata share of Taxes within thirty (30) days after receipt of the above-mentioned statement. If Landlord receives a refund of all or part of such Taxes paid by Tenant, Landlord shall promptly repay Tenant its pro rata share of any such refund net of Landlord's reasonable costs to obtain such refund.  If there shall be more than one taxing authority, the Taxes for any period shall be the sum of the Taxes for such period attributable to each such taxing authority.

C. Landlord agrees that Tenant has the right, subject to Landlord's approval, not to be unreasonably conditioned or withheld (i.e., it would be unreasonable if the tax assessment for the Shopping Center is materially higher than the market value) to contest the amount or legality of the Taxes on the Shopping Center and make applications for the reduction thereof or of any assessment upon which the same may be based and shall prosecute such contest or application with due diligence until the same shall have been fully determined.  In connection therewith, Landlord shall make available to Tenant such information in its files as Tenant may reasonably

47

request.  If any abatement, refund or rebate shall be obtained, then the expenses of obtaining the same shall be a first charge thereon.

D. If Landlord receives notification of a change in assessment of the Premises or Shopping Center, Landlord shall provide a copy of such notice to Tenant within fifteen (15) days after Landlord's receipt of such notification to allow Tenant the right to protest any increase in assessment to the extent permitted in Article 35.C above.  If Landlord fails to provide a copy of such notification, and the assessed value is increased, resulting in an increase in Taxes, Landlord shall pay such increase in Taxes for each and every bill received reflective of such increase, until the next time that such assessment can be appealed.  Tenant agrees to cooperate with Landlord in filing any protest of such increase in assessment at the next opportunity.

E. Landlord represents and warrants to Tenant that the Shopping Center is not subject to, affected by, or involved in any tax rebate, abatement, tax incentive, tax financing program or other similar programs of any kind, whether the tax in question be termed a real property tax, sales tax or any other kind of tax or assessment.

F. Notwithstanding anything to the contrary, Tenant's pro rata share of Taxes on an annualized basis shall not exceed $1.72 per square foot of floor area of the Demised Premises through the first full calendar year following the Rent Commencement Date (prorated for any partial calendar year within such period).

## ARTICLE 36
## COST OF COMMON FACILITIES

A. From and after the Rent Commencement Date, Tenant shall pay Landlord, as Additional Rent due hereunder for each full or partial calendar year during the Term, a monthly charge equal to one-twelfth (1/12) of Tenant's pro rata share of Operating Costs as reasonably estimated by Landlord for such calendar year (or portion thereof). Tenant's pro rata share of Operating Costs shall be determined by multiplying Operating Costs by a fraction, the numerator of which shall be the total floor area of the Premises and the denominator of which shall be the total floor area of all the buildings in the Shopping Center.  The "floor area" of the Premises and other premises in the Shopping Center shall be measured from the exterior faces of exterior walls and from the center line of demising walls and shall not include any exterior loading areas, or mezzanine space. However, If any tenant of any part of the Shopping Center, in lieu of paying a share of the Operating Expenses, shall undertake to maintain any designated part of the Common Areas of the Shopping Center, incur any cost otherwise included in the Operating Expenses or provide any insurance the cost of which would be included in Operating Expenses, then the floor area of such tenant's leased premises shall not be included in the denominator of the Tenant's pro rata share for the applicable purposes of this Section.

B. Within one hundred eighty (180) days after the end of each calendar year, Landlord shall furnish to Tenant a statement certified by Landlord showing in reasonable detail the information

48

relevant or necessary to the exact computation and determination of the above-described fraction, a certification by a registered architect or engineer of the denominator figure referred to in the first paragraph of this <u>Article</u> if there is a material  change to the denominator, and Landlord's actual Operating Costs for such calendar year.  Simultaneously with the sending of the aforementioned statement, Landlord will send the back-up for Operating Costs in electronic format.  If the aggregate monthly charges paid by Tenant and allocable to such calendar year shall be less or greater than Landlord's actual Operating Costs; Tenant shall pay to Landlord or Landlord shall pay to Tenant within thirty (30) days after receipt of such statement, an amount equal to the deficiency or excess, as the case may be.  If Landlord fails to timely pay to Tenant any amount owed, Tenant may offset such amounts from rent due hereunder.  Should Landlord fail to furnish the above documentation when due, Tenant shall be relieved of its obligation to make estimated monthly payments for Operating Costs until the documentation has been delivered. Landlord shall supply Tenant with estimated Operating Costs budget for the current calendar year with the annual reconciliation for the prior year and agrees to cooperate with Tenant and respond to reasonable inquiries concerning anticipated expenditures for each upcoming new calendar year of the Term.

C. "<u>Operating Costs</u>" means the total cost and expense incurred in operating and maintaining the Common Areas consistent with reasonable economical operation including, without limitation, performing Landlord's obligations under <u>Article 32</u>, repairing, lighting, cleaning, painting, striping, removing of snow and ice, removing of trash and debris whether dumped or otherwise present on the Common Areas, policing, inspection of equipment to be used in the operation of the facilities, regulating traffic, maintenance of machinery and equipment used in the operation of the facilities (but not acquisition cost or depreciation); cost and expenses of repair of paving, sealing and striping (other than those costs properly chargeable to capital accounts), curbs, walkways, landscaping, drainage and parking lot lighting facilities; costs of operating, maintaining and repairing common utility lines and facilities, including sprinkler systems and storm water management facilities; repairing, maintaining and operating traffic controls; cost and expense of planting, re-planting and replacing flowers and shrubbery, premiums for the liability insurance (with endorsements) on the Common Areas and the casualty insurance on the buildings and structures constructed in the Shopping Center which are required to be maintained by Landlord hereunder, but exclusive of overhead, administrative or management fees or charges of any nature or other similar charges.  Common Area Costs may include an administrative fee in the amount of ten percent (10%) of all Common Area Costs.

D. Notwithstanding the above, the following items shall be specifically excluded from Operating Costs:  (i)   costs of original construction, replacement or expansion (as distinguished from operation and maintenance) or costs otherwise properly chargeable to capital accounts under generally accepted accounting principles; (ii) costs of correcting defects; (iii) costs of any portion of the Shopping Center that is not part of the Common Areas; (iv) costs of repair or restoration of any portion of the Shopping Center that is: (a) damaged or destroyed by a fire or other casualty, except for deductible payments; or (b) taken by eminent domain or conveyance of title in lieu thereof; (v) principal, interest or ground rent payments on any financing, refinancing or ground lease for all or any portion of the Shopping Center;  (vi) costs incurred as a result of any act,

49

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D74F5AFFBEA7

omission, default or negligence of Landlord, its agents, servants or employees; (vii) costs of Landlord's compliance with its repair and maintenance obligations as set forth in this Lease, other than with respect to the Common Areas; (viii) costs, expenses, liabilities, fines, penalties, and losses in connection with or related to hazardous materials testing, abatement, remediation, clean-up or removal programs in the Shopping Center; (ix) legal and other fees, leasing commissions, advertising expenses, and other costs incurred in connection with the original development or original leasing of the Shopping Center or any re-leasing of all or any part of the Shopping Center; (x) the cost of items for which Landlord is entitled to reimbursement by any tenant or occupant of the Shopping Center or by any insurance (or would be entitled if such insurance was required by this Lease or by Landlord's mortgagee had been in effect) or otherwise compensated, including direct reimbursement by any tenant or occupant of the Shopping Center; (xi) costs and expenses of putting all or any portion of the Shopping Center into compliance with the requirements of the Americans with Disabilities Act in effect on the Rent Commencement Date;  (xii) interest or penalties incurred as a result of Landlord's late payment of any bill, invoice or other cost or expense as the same became due or increased costs as a result of Landlord's failure to take advantage of any early payment discounts unless, and to the extent, incurred solely by reason of Tenant's default on payment of its portion of such expense; (xiii)    costs of renting or leasing any item if the purchase price (or depreciation thereon) would not properly be included as a reimbursable expense hereunder; (xiv) Landlord's income, excise, franchise, and other taxes of similar nature;  (xv) entertainment, transportation, meals, and lodging expenses of anyone; (xvi) promotional and similar fees; and (xvii) costs and expenses payable to Landlord or to a Landlord Affiliate to the extent that such costs and expenses exceed competitive costs and expenses for materials and services furnished by unrelated persons or entities of similar skill and experience; (xvii) payments of judgments or liens against Landlord.

E. Tenant or its representative may, on no less than twenty (20) days' notice to Landlord, audit Landlord's records (including any management company or similar entity retained by Landlord) involving Operating Costs for the three year period preceding the last annual statement. Should such audit reveal an overcharge exceeding three percent (3%) for any year, Landlord shall pay Tenant the reasonable cost of the audit.  Any overcharge shall be promptly remitted together with interest at the Interest Rate.

F. Notwithstanding anything else to the contrary, in no event shall the annualized amounts payable by Tenant pursuant to this Article for all Operating Costs for the calendar year in which the Rent Commencement Date occurs (and the following calendar year if the Rent Commencement Date is after June 30) exceed $1.30 per square foot of floor area of the Demised Premises per year, pro-rated for any partial year.  Thereafter, increases in the annualized amounts payable by Tenant pursuant to this Article for controllable Operating Costs shall not exceed three percent (3%) of the amount required to be paid by Tenant in the prior calendar year for controllable Operating Costs. For purposes of this Lease, the term "Controllable Operating Costs" shall mean all Operating Costs other than Operating Costs for insurance, snow and ice removal and utilities for the Common Areas.

5425472v2

## ARTICLE 37
## ENVIRONMENTAL COMPLIANCE

A.     For the purposes of this <u>Article</u>, the following terms shall have the meanings set forth below:

(i) "<u>CERCLA</u>" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9601 *et seq.,* and any other amendments now or hereafter enacted.

(ii) "<u>Damages</u>" shall mean all damages, and includes, without limitation, punitive damages, liabilities, costs, losses, diminutions in value, fines, penalties, demands, claims, cost recovery actions, lawsuits, administrative proceedings, orders, response action costs, compliance costs, investigation expenses, consultant fees, attorneys' and paralegals' fees and expenses and litigation expenses.

(iii) "<u>Environmental Claim</u>" shall mean any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim, (whether administrative, judicial or private in nature) arising: (a) pursuant to, or in connection with, an actual or alleged violation of, any Environmental Law; (b) in connection with any Hazardous Material or actual or alleged Hazardous Material Activity; (c) from any abatement, removal, remedial, corrective, or other response action in connection with an Environmental Law; or (d) from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources or the environment.

(iv) "<u>Environmental Law</u>" shall mean any current or future Legal Requirement pertaining to: (a) the protection of health, safety and the indoor or outdoor environment from contamination by Hazardous Material; (b) the conservation, management, or use of natural resources or wildlife; (c) the protection or use of surface water and groundwater from contamination by Hazardous Material; (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to any Hazardous Material; or (e) pollution (including any Release to air, land, surface water and groundwater), and includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 U.S.C. 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 U.S.C. 2601, *et seq.*, Hazardous Materials Transportation Act, 49 U.S.C. 1801 *et seq.*, Occupational Safety and Health Act of 1970, as amended 29 U.S.C. 651 *et seq.*, Oil Pollution Act of 1990, 33 U.S.C. 2701 *et seq.*, Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. 11001 *et seq.*, National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.*, Safe

51

Drinking Water Act of 1974, as amended, 42 U.S.C. 300(f) *et seq.*, any similar, implementing or successor law, and any amendment, rule, regulation, order or directive issued thereunder.

(v) "Environmental Record" shall mean any document, correspondence, pleading, report, assessment, analytical result, Governmental Approval, or other record concerning a Hazardous Material, compliance with an Environmental Law, an Environmental Claim, or other environmental subject.

(vi) "Governmental Approval" shall mean any permit, license, variance, certificate, consent, letter, clearance, closure, exemption, decision or action or approval of a Governmental Authority.

(vii) "Governmental Authority" shall mean any international, foreign, federal, state, regional, county, or local person or body having or asserting governmental or quasi-governmental authority or jurisdiction or any department or sub-division thereof.

(viii) "Hazardous Material" shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, or material which is hazardous or toxic, and includes, without limitation: (a) asbestos, polychlorinated biphenyls, and petroleum (including crude oil or any fraction thereof); and (b) any such material classified or regulated as "hazardous" or "toxic" pursuant to an Environmental Law.

(ix) "Hazardous Material Activity" shall mean any activity, event, or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

(x) "Legal Requirement" shall mean any treaty, convention, statute, law, regulation, ordinance, Governmental Approval, injunction, judgment, order, consent, decree, or other requirement of any Governmental Authority.

(xi) "Material Adverse Effect" shall mean any changes or effects that individually or in the aggregate are or are reasonably likely to be materially adverse to: (a) the assets, business, operations, income or condition (financial or otherwise) of Landlord or Tenant; (b) transactions contemplated by this agreement; or (c) the ability of Landlord or Tenant to perform their respective obligations under this Lease; or (d) the condition or fair market value of the Shopping Center or the Demised Premises.

(xii) "Pre-Existing Conditions" shall mean the conditions of the Demised Premises and the Shopping Center as of the date Landlord delivers the Demised Premises to Tenant, including without limitation the presence of any Hazardous Material, whether in compliance with Legal Requirements or not.

5425472v2

(xiii) "<u>Post-Existing Conditions</u>" shall mean the conditions of the Demised Premises and the Shopping Center which are not Pre-Existing Conditions and which arise after the date Landlord delivers the Demised Premises to Tenant.

(xiv) "<u>RCRA</u>" shall mean the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. 6901 *et seq*., and any amendments now or hereafter enacted.

(xv) "<u>Release</u>" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the indoor or outdoor environment, including, without limitation, the abandonment or discarding of barrels, drums, containers, tanks, and other receptacles containing or previously containing any Hazardous Material.

B.    Landlord represents and warrants as of the Commencement Date that, to Landlord's actual knowledge, which is based solely upon the environmental reports provided to Tenant (the "<u>Existing Reports</u>"), and except as disclosed in the Existing Reports:

(i)    the Shopping Center complies in all material respects with any applicable Environmental Law;

(ii)    Landlord has obtained all Governmental Approvals required for the Shopping Center by any applicable Environmental Law;

(iii)    Landlord has not, and has no knowledge of any other person who has, caused any Release, threatened Release, or disposal of any Hazardous Material at the Shopping Center in violation of Environmental Law; the Shopping Center is not adversely affected by any Release, threatened Release, or disposal of a Hazardous Material originating or emanating from any other property;

(iv)    the Shopping Center does not contain and has not contained any: (a) underground storage tank; (b) asbestos-containing building material; (c) any landfills or dumps; (d) hazardous waste management facility as defined pursuant to RCRA or any other comparable state law; or (e) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(v)    Landlord has used no Hazardous Material in violation of any Environmental Law and has conducted no Hazardous Material Activity at the Shopping Center that violates Environmental Law;

(vi)    Landlord is not subject to, has no notice or knowledge of, and is not required to give any notice of any Environmental Claim involving the Shopping Center; there are no

53

conditions or occurrences at the Shopping Center which could form the basis for an Environmental Claim against Landlord or the Shopping Center;

(vii)    the Shopping Center is not subject to any, and Landlord has no knowledge of any imminent, restriction on the ownership, occupancy, use or transferability of the Shopping Center in connection with any: (a) Environmental Law; or (b) Release, threatened Release, or disposal of a Hazardous Material; and

(viii)    there are no conditions or circumstances at the Shopping Center which pose a material risk to the environment or the health or safety of persons.

C.    Tenant represents and warrants as of the Commencement Date that Tenant intends to use no Hazardous Material in violation of any Environmental Law.

D.    Landlord shall:

(i)    within ten (10) business days notify Tenant in writing of and provide any reasonably requested documents upon learning of any of the following which arise in connection with the Shopping Center, if the same will have a Material Adverse Effect for Tenant:

(a)    any liability for response or corrective action, natural resource damage, or other harm pursuant to CERCLA, RCRA, or any comparable state law;

(b)    any Environmental Claim;

(c)    any violation of an Environmental Law or Release, threatened Release, or disposal of a Hazardous Material;

(d)    any restriction on the ownership, occupancy, use or transferability arising pursuant to any: (i) Release, threatened Release, or disposal of a Hazardous Material; or (ii) Environmental Law; or,

(e)    any environmental natural resource, health or safety condition which could materially impair the condition of the Shopping Center or could have a Material Adverse Effect;

(ii)    cure any violation of applicable Environmental Laws at the Shopping Center at the expense of Landlord which are Pre-Existing Conditions or Post Existing Conditions (except Post-Existing Conditions which are violations caused by the acts, omissions, negligence or willful misconduct of Tenant, or its employees, agents or contractors); and,

(iii)    conduct, if required by and in accordance with any applicable Environmental Law, any investigation, study, sampling, testing, abatement, clean-up, removal, remediation, or other response action ("Response Action") necessary to remove, remediate, clean up, or abate any Release, threatened Release, or disposal of a Hazardous Material at Landlord's expense to the extent such Response Action is attributable to events or conditions which are Pre-Existing Conditions or Post-Existing Conditions (except Post-Existing Conditions caused by the acts, omissions, negligence or willful misconduct of Tenant, or its employees, agents or contractors).

54

E.      Tenant shall:

(i)      maintain the Demised Premises in compliance in all respects with any applicable Environmental Law and be responsible for making any notification or report concerning the Demised Premises to a Governmental Authority required to be made by any applicable Environmental Law;

(ii)      if Landlord fails to cure legal violations of Environmental Law within the time required by Environmental Law, have the right to cure to the reasonable satisfaction of Tenant any violation of applicable Environmental Laws at the Demised Premises: (a) at the expense of Landlord to the extent such violation is attributable to events or conditions which are Pre-Existing Conditions; and (b) at its own expense to the extent such violation is attributable to Post-Existing Conditions caused by the acts, omissions, negligence or willful misconduct of Tenant or its employees, agents or contractors;

(iii)      not create or operate at the Demised Premises any: (a) landfill or dump; or (b) hazardous waste management facility or solid waste disposal facility as defined pursuant to RCRA or any comparable state law;

(iv)      not manufacture, use, generate, transport, treat, store, Release, dispose, or handle any Hazardous Material at the Demised Premises except in the ordinary course of its business as of the Rent Commencement Date and in all events in compliance with Environmental Law;

(v)      if Landlord fails to conduct Response Actions within the time required by Environmental Law, have the right to conduct to the reasonable satisfaction of Tenant and in accordance with any applicable Environmental Law any Response Action necessary to remove, remediate, clean up, or abate any Release, threatened Release, or disposal of a Hazardous Material from the Demised Premises: (a) at Landlord's expense to the extent such Response Action is attributable to events or conditions which are Pre-Existing Condition or a Post-Existing Condition (except a Post-Existing Condition caused by the negligence or willful misconduct of Tenant or its employees, agents or contractors); and (b) at Tenant's expense to the extent such Response Action is attributable to events or conditions which are a Post-Existing Condition caused by the acts, omissions, negligence or willful misconduct of Tenant or its employees, agents or contractors;

(vi)      allow Landlord or its representatives from time to time upon reasonable notice and at Landlord's expense to inspect the Demised Premises and conduct an environmental assessment (including invasive soil or groundwater sampling), including without limitation, to facilitate any other sale or lease of the Shopping Center; and

(vii)      remove from the Demised Premises at its expense by the termination date any Hazardous Materials or equipment to manufacture, generate, transport treat, store, Release, dispose, or handle any Hazardous Material used by Tenant or in the course of Tenant's business.

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74E5AFFBFA7

F.    (i)    Landlord shall indemnify, defend, and hold Tenant harmless, and hereby waives any claim for contribution against Tenant for any Damages to the extent they arise from:

(a)    Pre-Existing Conditions or Post-Existing Conditions not caused by the acts, omissions, negligence or willful misconduct of Tenant or its employees, agents or contractors, and which relate to:

(1)    any Release, threatened Release, or disposal of any Hazardous Material at the Shopping Center;

(2)    the operation or violation of any Environmental Law at the Shopping Center; or,

(3)    any Environmental Claim in connection with the Shopping Center;

(b)    the inaccuracy or breach of any representation or warranty by Landlord in this Article of this Lease.

(ii)    Tenant shall indemnify, defend, and hold Landlord harmless, and hereby waives any claim for contribution against Landlord for any Damages to the extent they arise from:

(a)    Post-Existing Conditions caused by the acts, omissions, negligence or willful misconduct of Tenant or its employees, agents or contractors, and relate to:

(1)    any Release, threatened Release, or disposal of any Hazardous Material at the Demised Premises;

(2)    the operation or violation of any Environmental Law at the Demised Premises;

(3)    any Environmental Claim in connection with the Demised Premises; or,

(b)    the inaccuracy or breach of any representation or warranty by Tenant in this Article of this Lease.

(iii)    These indemnifications and waivers shall be binding upon successors and assigns of Landlord and Tenant and inure to the benefit of Landlord, Tenant, their respective directors, officers, employees and agents, and their successors and assigns and shall survive the expiration or sooner termination of the Term of this Lease.

(iv)    Landlord has supplied to Tenant an environmental report certified to Tenant, prepared by an environmental consultant licensed in the state or territory where the Demised Premises are located disclosing any and all Hazardous Materials in the Demised

5425472v2

Premises, including items listed in <u>Exhibit "D"</u> attached hereto and prior to the execution of this Lease.

## ARTICLE 38
## USE OF COMMON FACILITIES

A. Landlord agrees during Tenant's normal business hours and for one hour thereafter to:

(i)      Keep all Common Facilities open to the public with the entrances and exits shown on <u>Exhibit "A."</u>

(ii)      Keep all Common Facilities adequately lighted, safe, and maintained in a clean, uniform and orderly condition.

B.  Landlord covenants and agrees it will not erect and maintain, or permit the erection and maintenance of any shops, stalls, stands or kiosks in the Common Facilities (or in the enclosed Common Facilities, if any), not including cart corrals, within fifty (50) feet of any part of the Demised Premises or any Protected Parking Area and will not permit any selling in the Common Facilities (or in the enclosed Common Facilities, if any) within fifty (50) feet of any part of the Demised Premises or any Protected Parking Area. Landlord further covenants and agrees: (i) to prevent commuter parking in the parking areas, (ii) that no portions of the Common Facilities may be leased or licensed in any way to third parties who are not occupants or tenants of the Shopping Center, (iii) not to charge a fee for use of the parking areas; and (iv) to the extent permitted under applicable law, to maintain a no solicitation policy within the Shopping Center.  The foregoing shall not limit the rights of other tenants to conduct sidewalk sales and displays on the sidewalks immediately in front of their premises.

## ARTICLE 39
## CONSENT NOT TO BE UNREASONABLY WITHHELD

Whenever Landlord's consent or Tenant's consent shall be required by the terms of this Lease and no standard for consent shall be otherwise specified, such consent shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE 40
## TENANT SOLELY LIABLE; LANDLORD'S EXCULPATION

A.      Landlord agrees to look solely to Tenant for the fulfillment of Tenant's obligations hereunder and shall not, under any theory, seek any recovery against Tenant's parent or affiliates (unless any such parties become an assignee of Tenant) or its or their officers, directors, stockholders, partners or members except pursuant to a written agreement executed by the party against whom such recovery is sought and in furtherance of the foregoing Landlord expressly waives any claims against any such individuals or entities whether it be in contract, tort or equity including without limitation claims for piercing the corporate veil, promise to pay, alter ego or similar claims.

57

5425472v2

B.      Tenant agrees to look solely to Landlord's estate in the Shopping Center and the rents and profits therefrom and the proceeds from any sale or financing or refinancing of Landlord's interest in any portion or interest in the Shopping Center and the proceeds realized from insurance or upon a taking as the sole assets for collection of any claim, judgment or damages or enforcement of any other judicial process requiring payment of money.  Tenant agrees that no other assets of Landlord (other than such interest, and the rents and profits therefrom and the sale, financing, refinancing, insurance or taking proceeds thereof) shall be subject to levy, execution or other procedures to satisfy Tenant's rights or remedies.  Tenant shall not, under any theory, seek any recovery against Landlord's parent or affiliates or its or their officers, directors, stockholders, partners or members except pursuant to a written agreement executed by the party against whom such recovery is sought.

## ARTICLE 41
## OTHER TENANCIES

A. If: (i) Redner's is not open and operating for business in the Shopping Center, such circumstances shall be an "Opening Co-Tenancy Event." If there shall be an Opening Co-Tenancy Event in effect on the date which would otherwise be the Rent Commencement Date under this Lease, Tenant shall not be required to open the Demised Premises and the Rent Commencement Date may be delayed until the earlier of: (i) the date Tenant shall "grand open" (as defined in Article 1.E) its completed store in the Demised Premises for business; or (ii) the next April 1st or October 1st, which is at least sixty (60) days after the Opening Co-Tenancy Event and other requirements of the Rent Commencement Date are satisfied. If there shall be an Opening Co-Tenancy Event in effect on the date which would otherwise be the Rent Commencement Date under this Lease and Tenant elects to open the Demised Premises despite the fact that the Opening Co-tenancy Event is in effect, then Tenant shall pay alternate rent in lieu of Minimum Rent in the amount of 2% of Tenant's gross sales (not to exceed the Minimum Rent which would otherwise be payable under this Lease) ("Alternate Rent"), plus Tenant's share of Taxes and Operating Costs pursuant to Articles 35 and 36 of this Lease until such time that the Opening Co-Tenancy Event is no longer in effect. During such period when Tenant is paying Alternate Rent, such Alternate Rent shall be paid monthly within fifteen (15) days after the end of each calendar month.

B. If, at any time during the Term after the Opening Co-Tenancy is satisfied or waived, Redner's is not open for business and operating in the Shopping Center, such circumstances shall be an "Ongoing Co-Tenancy Event."  If there shall be an Ongoing Co-Tenancy Event in effect for more than ninety (90) days, then, so long as Tenant is open and operating in the Demised Premises at the time of the Ongoing Co-Tenancy event (other than temporary closures in connection with repairs, remodeling, casualty, condemnation, Unavoidable Delay or Landlord Default), Tenant shall pay Alternate Rent in lieu of Minimum Rent, plus Tenant's share of Taxes and Operating Costs pursuant to Articles 35 and 36 of this Lease until such time that the Ongoing Co-Tenancy Event is no longer in effect. During such period when Tenant is paying Alternate Rent, such Alternate Rent shall be paid monthly within fifteen (15) days after the end of each calendar month.

Notwithstanding the foregoing, if Tenant waives an Opening Co-Tenancy Failure by opening for business or not terminating this Lease pursuant to Section 41.C below, Tenant may not later exercise any remedies under Section 41.B as a result of the condition giving rise to the Opening Co-Tenancy Failure.

Landlord may replace Redner's a permanent national or regional replacement credit tenants occupying seventy-five percent (75%), in the aggregate, of the Redner's premises to cure an Ongoing Co-Tenancy Event. A "permanent" tenant means a tenant with an initial lease term in excess of five years operating on a year round basis and specifically excludes seasonal tenants such as Halloween stores, Christmas stores and the like. A "national" tenant means a tenant with stores operating in more than 25 states under a single trade name within the continental United States. A "regional" tenant means a tenant operating at least 15 stores in the Pennsylvania region under a single trade name. For the avoidance of doubt, a franchisee that operates a franchise that operates in 25 or more states under a single trade name or operates at least 15 stores under a single trade name in the State of Pennsylvania shall qualify as a replacement even if that particular franchisee does not, on its own, meet the required threshold.

C. If Tenant has paid Alternate Rent for a period of twelve (12) consecutive months due to an Opening Co-Tenancy Event or Ongoing Co-tenancy Event, then Tenant may terminate this Lease within thirty (30) days after the expiration of the twelfth (12th) such consecutive month of paying Alternate Rent. If Tenant does not terminate this Lease pursuant to the preceding sentence, Tenant shall resume or begin paying regular Minimum Rent as specified in this Lease in lieu of Alternate Rent and the event initially giving rise to the Ongoing Co-Tenancy Event shall be deemed waived. However, subject to the terms above, nothing shall be construed to waive Tenant's rights thereafter to claim an Ongoing Co-Tenancy Event after an Opening Co-Tenancy Event is waived or a new Ongoing Co-Tenancy Event should there be a new Ongoing Co-Tenancy Event or exacerbation of a previously waived Ongoing Co-tenancy Event such as an additional required co-tenant closing, an additional required element of an Ongoing Co-Tenancy Event failing or the Ongoing Co-Tenancy Event previously waived being subsequently satisfied and then a new Ongoing Co-Tenancy Event arises.

D. In computing its sales for the purpose of this Lease, Tenant shall take the total amount realized as the result of sales of merchandise and services made by it and its concessionaires, sub-lessees, and licensees in the Demised Premises (which does not include sales made directly to customers through internet and similar facilities so long as the orders are not filled from the Demised Premises) and deduct therefrom the following to the extent that same are included in the computation of sales: (1) all credits, discounts, adjustments, allowances made to customers, and refunds for merchandise returned; (2) all receipts from weighing machines, lockers, vending machines, public telephones and public toilets; (3) all sums and credits received in settlement of claims for loss or damage to merchandise, (4) delivery, mailing, gift wrap and alteration charges; (5) sales to employees of Tenant or of any subtenants, concessionaires or licensees of Tenant at discount not to exceed two percent (2%) of gross sales; (6) charges of credit/debit card companies

59

and check clearance fees; (7) interest, service and credit charges by customers on credit purchases; (8) uncollected accounts, bad checks and any penalty charged by Tenant for a returned check and any check clearance fees; (9) amounts received from sales of distressed, damaged or obsolescent merchandise sold to other than retail customers and from sales of store fixtures and equipment; (10) transfers of merchandise between the Demised Premises and affiliated stores or warehouses not made to consummate sales made at the Demised Premises; (11) transfers or returns of merchandise to vendors, suppliers or manufacturers; (12) amounts received from concessionaires and licensees of Tenant for occupancy, or for services rendered to such concessionaires or licensees by Tenant or for supplies or equipment furnished to such concessionaires and licensees; and (13) all taxes upon the receipt or purchase of merchandise by Tenant and all occupational sales taxes and other taxes upon or based upon the gross receipts of Tenant or upon the sale or sales price of merchandise and which must be paid by Tenant whether or not collected by Tenant from its customers and whether or not the same may be commonly known as "sales tax." Internet and catalogue sales to the extent recorded as revenues on the books and accounts of related entities are not deemed sales for the purposes of this Article, except to the extent orders may be filled at the Demised Premises. The taxes to which reference is hereinabove made may be deducted regardless of whether imposed under any existing or future orders, regulations, laws or ordinances.

## ARTICLE 42
## SIGNAGE

A. As part of Landlord's Work, the Demised Premises and pylon and/or monument signs shall be constructed and prepared and ready for Tenant's sign panel placement in the positions, size, depiction and locations shown on Exhibit "E".

B. Throughout the Term, Tenant may install or apply facade treatments to the exterior of the Premises and erect signs on the exterior of the Premises. Landlord approves Tenant's façade signs and treatments set forth on Exhibit "E", and any signs not substantially the same as those set forth on Exhibit "E" shall require Landlord's approval, which approval shall not be unreasonably withheld. Tenant shall have the exclusive right to install signs on the exterior of the Premises. Landlord, at its sole cost and expense, shall include Tenant on all directional signs and directories serving the Shopping Center. If Exhibit "E" does not depict Tenant on a particular pylon or monument sign serving the Shopping Center, Tenant's signs not depicted on Exhibit "E" shall require Landlord's approval. Tenant shall be entitled to place a sign panel on such sign when a panel becomes available. If Exhibit "E" does not depict Tenant in the most prominent position on any multi-tenant sign at the time of this Lease (in Tenant's judgment), Tenant shall be entitled to move its sign to a more prominent location when it becomes available. If any new multi-tenant sign serving the in-line tenants at Shopping Center is erected, Tenant shall be entitled to place a sign panel on such sign.

5425472v2

## ARTICLE 43
## SATELLITE DISH AND ROOF RIGHTS

Tenant, at its own expense, may erect and maintain a satellite dish, antennae and/or other data communications devices, HVAC equipment and related wiring or equipment in or upon the roof of the Demised Premises (the "Rooftop Equipment"). If required by Landlord in order to maintain the roof warranty, Tenant shall use a roofing contractor reasonably designated by Landlord. Tenant is solely responsible for obtaining all necessary permits required for installation and Landlord shall cooperate therewith. There shall be no additional charge payable by Tenant to Landlord for the use of such roof area or for the installation or maintenance of such Rooftop Equipment. Landlord shall not impede Tenant's access to Tenant's Rooftop Equipment. Tenant shall, at its own expense, promptly repair any damage or wear to the roof resulting from such use of Tenant's Rooftop Equipment. Tenant shall be liable for damage to the roof caused by the installation, maintenance, repair or operations of the Rooftop Equipment and shall not permit any installation, use or maintenance to void or impair Landlord's roof warranty. All Rooftop Equipment shall be attractively screened from public view. Tenant shall, upon request from Landlord, remove or relocate Tenant's Rooftop Equipment as necessary for Landlord to make repairs or replacements to the roof. If Tenant fails to timely remove or relocate such equipment, Landlord shall have the right to do so, in which case Tenant shall be liable for all costs and expenses incurred by Landlord to remove and/or relocate and/or re-install Tenant's Rooftop Equipment and Landlord shall not be liable for any damage to or interference with Tenant's Rooftop Equipment. Upon the expiration or sooner termination of this Lease, Tenant shall remove the Rooftop Equipment and repair all damage caused by such removal.

## ARTICLE 44
## ESTOPPEL CERTIFICATES

At any time and from time to time, Landlord and Tenant agree, within twenty (20) days after request in writing from the other, to execute, acknowledge, and deliver to: (a) a bona fide proposed purchaser of the Shopping Center or of Tenant's interest in the Lease, or to a proposed subtenant, as the case may be; or (b) to any bona fide proposed or present holder of a deed of trust or mortgage (no more than once every twelve months), a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modification), the dates to which the Minimum Rent and other charges have been paid, and whether or not Landlord or Tenant is in default under the Lease and such other matters of fact as such bona fide purchaser, mortgagee or subtenant may reasonably request.

## ARTICLE 45
## ACCESS TO DEMISED PREMISES

Tenant shall permit Landlord to enter upon the Demised Premises at all reasonable times: (a) to make repairs, changes, replacements and restorations to the Demised Premises and/or the Building in which it is located which are required to be made by Landlord; and (b) during the six

61

(6) month period preceding the expiration date, to exhibit the Demised Premises to prospective tenants, provided that Landlord shall not unreasonably interfere with the conduct of business therein or contact or solicit or communicate with any of Tenant's employees in the Demised Premises and shall direct all communications concerning the status of the Lease and Tenant's occupancy to the notice address provided in this Lease. Landlord's indemnity of Tenant under Article 18 shall apply to any claims against Tenant arising from the presence of Landlord or its contractors, agents, or invitees upon the Demised Premises or from any work undertaken by Landlord.

## ARTICLE 46
## HOLDING OVER

Any holding over after the expiration of the Term shall be construed to create a tenancy from month-to-month at one hundred twenty-five percent (125%) of the Minimum Rent that would have applied had Tenant exercised its respective option to renew (or if no further option exists at the then current Minimum Rent) and shall otherwise be on the terms and conditions specified in this Lease as far as applicable. Landlord and Tenant shall each have the right to terminate any month-to-month tenancy upon thirty (30) days' written notice to the other.

## ARTICLE 47
## SHORT FORM OF LEASE

Simultaneously with the execution of this Lease or upon any amendment of this Lease, Landlord shall execute and deliver to Tenant a memorandum or notice or short form lease in form of and substance satisfactory to Landlord and Tenant in proper form for recording, which Tenant may record, at Tenant's expense. Tenant shall not record this Lease. Upon the expiration or sooner termination of this Lease, Tenant shall remove the memorandum of record, failing which Landlord is appointed Tenant's attorney-in-fact and is authorized to sign such instruments or agreements as may be necessary to remove the memorandum of record.

## ARTICLE 48
## BIG LOTS WAIVER

Landlord shall use commercially reasonable efforts to obtain and deliver to Tenant the Use Waiver, in form and substance reasonably acceptable to Tenant. In the event Landlord is unable to deliver the use Waiver within forty-five (45) days after the Effective Date, either party may terminate this Lease, by notice to the other, at any time prior to the delivery of the Use Waiver, and in such event, neither party shall have any further liability to the other hereunder, except for covenants which expressly survive such termination.

## SIGNATURE PAGE FOLLOWS

5425472v2

IN WITNESS WHEREOF, Landlord and Tenant have duly executed and affixed their respective seals to this Lease on the day and year first above written.

WITNESS:

LANDLORD:

**MADEIRA PLAZA POWER LLC,**
**a** Pennsylvania limited liability company

By: _Ron Stern_
Name:   Ron Stern
Title:   CEO

WITNESS:

TENANT:

**BURLINGTON COAT FACTORY**
**WAREHOUSE CORPORATION**
a Florida corporation

By: _Michael Shanahan_
Name:   Michael Shanahan
Title:   Senior Vice President - Real Estate

63

**EXHIBIT "A"**

<u>Site Plan of Shopping Center with Demised Premises, Protected Parking Area, Critical Areas,</u>
<u>Building Area, Future Building Area (if any) and Critical Building Facilities Identified</u>

[see attached 1 page]

A-1

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74F4AFFBEA7



**MADEIRA PLAZA | READING, PA**

Critical Areas

Protected Parking Area

Compactor Pad & Loading Dock



Pylon



# EXHIBIT "A-1"

## Legal Description of Shopping Center

ALL THAT CERTAIN tract or piece of land known as "Madeira Plaza Shopping Center", lying on the Easterly side of the concrete Pennsylvania State Highway Legislative Route No 157, being U S Route No. 222, known as Fifth Street Highway, situate in the Township of Muhlenberg, County of Berks and State of Pennsylvania, being more fully bounded and described as follows, to wit:

BEGINNING at a point in the curve of the center line of said Fifth Street Highway, being a corner of property belonging to John Hancock Mutual Life Insurance Company (known as William Penn Plaza), and in line of property belonging to the now or late John E. Madeira, THENCE extending along the center line of said Fifth Street Highway, the two following courses and distances, viz:

1. In a Northerly direction along properties belonging to the now or late John E. Madeira, Sibarco Corp., and Muhlenberg Shopping Center Co., respectively, being along the are of a curve deflecting to the right, having a radius of 11,453.19 feet, a central angle of 3 degrees 22 minutes 28.29 seconds, a distance along the are of 674.55 feet, said arc having a chord bearing of North 6 degrees 18 minutes 15.855 seconds East, a distance along the chord of 674.46 feet to a point of tangent, and

2. continuing along property belonging to the now or late Muhlenberg Shopping Center Co. North 7 degrees 59 minutes 30 seconds East a distance of 21.85 feet to a point, THENCE leaving said center line of Fifth Street Highway and extending along property belonging to Colonial Berks Real Estate Co., the following courses and distances, viz;

1. South 82 degrees 00 minutes 30 seconds East a distance of 40.00 feet to a point,
2. North 73 degrees 31 minutes 40 seconds East, a distance of 206.82 feet to a point, and
3. North 16 degrees 28 minutes 20 seconds West a distance of 50.00 feet to a point, a corner of property belonging to Berks County Industrial Development Authority.
THENCE along said property belonging to Berks County Industrial Development Authority, North 73 degrees 31 minutes 40 seconds East a distance of 497.99 feet to a point in the line of property belonging to the now or late Michael Mastidino and Marie R., his wife,

THENCE extending along "Belmont" Plan of Lots, being along properties to the now or late Michael Mastidino and Marie R., his wife, Charles O'Ercole and Mary E., his wife, Keith C. Weitzel and Ruth S., his wife, Curtis H. Moyer and Lillian G., his wife, Nobel R. Moyer and Anna K., his wife, Harold F. Angstadt and Carrie M., his wife, Robert L. Gehring and Shirley M., his wife, Norman S. Dunkelberger and Anna M., his wife, Stamford K. Hutchinson and Mona M., his wife, and Warren W. Skibbe and Ethel M., his wife, respectively, and along the division line between the Township of Muhlenberg and The Borough of Laureldale, South 16 degrees 26 minutes 20 seconds East a distance of 314.63 feet to a point, THENCE continuing along said division line North 73 degrees 32 minutes 40 seconds East, a distance of 0.48 feet, THENCE still continuing along said division line and along property belonging to the now or late Herbert R. Conrath and Vivian M., his wife, crossing the Western terminus of Emerson Avenue, South 16 degrees 45 minutes 20 seconds East a distance of 181.24 feet to a point on the Southern building line at the Western terminus of Emerson Avenue;

THENCE along property belonging to the aforementioned John Hancock Mutual Life Insurance Company (known as William Penn Plaza), the five following courses and distances, viz:

A1-1

1. South 73 degrees 28 minutes 40 seconds West a distance of 124.44 feet to a point,
2. South 4 degrees 24 minutes 30 seconds West a distance of 235.98 feet to a point,
3. North 35 degrees 35 minutes 30 seconds West a distance of 63.00 feet to a point,
4. South 4 degrees 24 minutes 30 seconds West a distance of 248.00 feet to a point, and
5. North 85 degrees 35 minutes 30 seconds West a distance of 702.92 feet to the place of beginning.

EXCEPTING THEREFROM AND THEREOUT the premises covered by Notice of Condemnation for L.R. 157 (Fifth Street Highway) dated 9/8/1981 recorded in Deed Book 1805, page 296.
ABOVE legal also described as follows:

ALL THAT CERTAIN tract or piece of land known as "Madeira Plaza Shopping Center", lying on the Easterly side of the concrete Pennsylvania State Highway Legislative Route No 157, being U S Route No 222, known as Fifth Street Highway, situate in the Township of Muhlenberg, County of Berks and State of Pennsylvania, being more fully bounded and described as follows, to wit:

BEGINNING at a point along the Easterly right of way line of Fifth Street, 80 foot wide (Being also known as State Route 222), also being a Northerly corner of parcel #66530812862670,

THENCE extending along the Easterly line of said Fifth Street, the following two courses;

1. Along the arc of a curve to the right, having a radius of 11413.19 feet, a central angle of 3 degrees 22 minutes 28 seconds, a distance along the arc of 672.19 feet, said arc having a chord bearing of North 6 degrees 18 minutes 16 seconds East, and a distance of 672.10 feet to a point of tangent, thence;

2. N 07° 59' 28" E for a distance of 21.86 feet to a point at the Southwesterly corner of parcel #66530808777619.

THENCE leaving said side line of Fifth Street Highway and extending along the Southerly & Easterly lines of parcel #66530808777619, the following (2) courses;

1. N 73° 31' 40" E for a distance of 206.82 feet to a point, thence;

2. N 16° 28' 20" W for a distance of 50.00 feet to a point at the Southwesterly corner of parcel #66530808880014, thence;

Along the Southerly line of said parcel #66530808880014, N 73° 31' 40" E for a distance of 497.99 feet to an iron pin found at the Northwesterly corner of parcel #57530808873912, thence;

Along the Westerly line of parcel #57530808873912, and others S 16° 26' 20" E for a distance of 314.63 feet to a point in the Westerly line of an unnamed/unimproved alley, thence;

Along the lines of said alley, N 73° 32' 40" E for a distance of 0.48 feet to a point, thence;
Along the Westerly line of said alley and others, S 16° 45' 20" E for a distance of 181.24 feet to an iron pin found at the Northwesterly corner of parcel #66530812862670, thence;
Along the lines of said parcel #66530812862670, the following 5 courses;

1. S 73° 28' 40" W for a distance of 124.44 feet to a point, thence;
2. S 04° 24' 30" W for a distance of 235.98 feet to a point, thence;

A1-2

3. N 85° 36' 10" W for a distance of 63.01 feet to a point, thence;
4. S 04° 24' 30" W for a distance of 248.00 feet to a point, thence;
5. N 85° 36' 15" W a distance of 662.92 feet, through and iron pin found on line at 642.52 feet, to the POINT OF BEGINNING.
BEING 3215 North 5th Street Highway, Reading, Pennsylvania 19605
BEING PARCEL ID. 66-5308-12-87-0341

BEING the same premises which SIN Ventures Madeira, LP, a Delaware limited partnership, by Special Warranty Deed dated 04/20/2016 and recorded 05/10/2016 in Berks County at Instrument No. 2016015330, granted and conveyed unto Madeira Plaza Power LLC, a Pennsylvania limited liability company, in fee.

AND ALSO BEING the same premises which SIN Ventures Madeira, LP, a Delaware limited partnership, by Quit Claim Deed dated 05/03/2016 and recorded 05/10/2016 in Berks County at Instrument No. 2016015331, granted and conveyed unto Madeira Plaza Power LLC, a Pennsylvania limited liability company, in fee.

A1-3

# EXHIBIT "B"

## Permitted Encumbrances

1.    Rights granted to Socony-Vacuum Oil Company, Inc. as set forth in Misc. Book 164 Page 572 and
Misc. Book 165 Page 362.

2.    Agreement as set forth in Misc. Book 250 Page 1103, Misc. Book 253 Page 774 and Misc. Book 256
Page 844.

3.    Ordinance of the Township of Muhlenberg as set forth in Misc. Book 253 Page 840.

4.    Deed of Easement as set forth in Misc. Book 279 Page 1054.

5.    Agreement as set forth in Misc. Book 281 Page 801.

6.    Notice of Condemnation as set forth in Deed Book 1805 Page 296.

7.    Covenants, Conditions, Right, Liberty, Privilege and Easement as set forth in Deed Book 1575 Page 721.

8.    Cross Easement Agreement as set forth in Misc. Book 289 Page 954.

9.    Declaration of Restrictive Covenants as set forth in Record Book 2736 Page 1327 but deleting any  covenant, condition or restriction indicating a preference, limitation, specification or discrimination  based on race, color, religion, sex, handicap, familial status, national origin, age, ancestry, disability or use of guide or support animals to the extent such covenants, conditions or restrictions violate 42  U.S.C. §3604(c) and/or 43 P.S. §951.

10.    Subject to all matters shown on the Plan as recorded in the Recorder's Office of Berks County, Pennsylvania in Plan Book 176 Page 44 and Plan Book 200 Page 54.

11.    Rights granted to Metropolitan Edison Company as set forth in Misc. Book 161 Page 644, Misc. Book 162 Page 86, Misc. Book 221 Page 235, Misc. Book 250 Page 890, Misc. Book 280 Page 819, Misc.  Book 286 Page 169, Misc. Book 293 Page 623, Misc. Book 342 Page 1060, Record Book 2401 Page 540, Record Book 3654 Page 1221 and Record Book 3745 Page 233.

12.    Terms and conditions of Lease to Thrift Drug Company of Pennsylvania as evidenced by
a Memorandum thereof recorded in Misc. Book 273 Page 511.

13.    Terms and conditions of Lease to Tire America, Inc. as evidenced by a Memorandum thereof recorded in Misc. Book 2277 Page 576.

B-1

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74F5AFFBFA7

14.     Terms and conditions of Lease to Officemax, Inc. as evidenced by a Memorandum thereof recorded in Misc. Book 3004 Page 1639.

15.     Terms and conditions of Lease to Taco Bell Corp. as evidenced by a Memorandum thereof recorded in Misc. Book 2736 Page 1315.

16.     Conditional Approval Agreement by and between SIN Ventures Madeira, LP and Muhlenberg Township as set forth in Instrument No. 2015029180.

17.     Permanent Traffic Signal Easement Agreement by and between Madeira Plaza Power LLC and Township of Muhlenberg as set forth in Instrument No. 2019001883.

18.     Title to that portion of the premises lying in the bed of Legislative Route No. 157 a/ka US Route No. 222 a/k/a Fifth Street Highway is subject to public and private rights therein

## Existing Tenant Exclusives and Prohibited Uses

Landlord represents that each of the tenants listed on this Exhibit were occupying leased space at the Shopping Center on the Effective Date pursuant to lease in force on the Effective Date and that the exclusive use rights and prohibited use provisions recited below are true copies of the text from each of those tenant's leases as of the Effective Date and that no part of the text from any tenant's lease has been omitted where such omission would make the following text misleading.

Tenant shall not operate within the Demised Premises where such operation would be violative of the rights granted by Landlord in the text below or would be prohibited by Landlord's covenant not to permit one or more of the activities that are proscribed by the text below.

Notwithstanding the foregoing, Tenant shall not be bound by the restrictions or prohibitions in the text below from and after the first time that Landlord is not bound by such provisions, such as, but not limited to when the respective restriction or prohibition is no longer in effect under the lease within which it was contained.

## Big Lots

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise, discount, liquidator, closeout store, furniture or dollar store operation (individually and collectively referred to herein as a "Competing Business") may be permitted in the Shopping Center during the Term of this Lease.  In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall have the right either to(i) pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly rent equal to the lesser of one and on-half percent (1.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent ("Alternate Rent"), such Alternate Rent to be payable within thirty (30) days after the month for which it is due, or (ii) to terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate.  Tenant's failure to

B-2

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D745AFFBEA7

exercise its right to terminate shall not waive Tenant's continuing right to do so as long as such Competing Business is operating in the Shopping Center.  Provided Tenant has not elected to terminate this Lease as herein provided, at such time that the Competing Business ceases to operate in the shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder

## Dollar General

Lessor covenants and agrees not to lease, rent, occupy, or allow to be occupied, any part of the Shopping Center premises for the purpose of conducting business as or for use as a Family Dollar Store, Bill's Dollar Store, Dred's, or Super Ten.

## Dynamic Physical Therapy

So long as Tenant is continuously and actively operating at the Premises for the Permitted Use, Landlord shall not execute new leases for space in the Project with another tenant whose primary business in the Project is the operation of an out-patient physical therapy center or any other health care provider providing physical therapy services, including medical doctors, chiropractor, and/or health club. Tenant acknowledges that this provision shall not apply to (i) leases previously executed, and Landlord shall have the right to replace any tenant that occupies space in the Project at the time this Lease is executed with a tenant that has substantially the same use as the tenant being replaced without being in violation of this section.

## Redner's

Landlord hereby covenants that it shall not lease to, use, or permit to be used or otherwise allow any portion of the Shopping Center or other remaining lands of Landlord which are adjacent thereto to be used as a food supermarket, butcher shop, seafood shop or "grocery store".  For purposes of interpretation the phrase "grocery store" means a Super Kmart, a Super Walmart, a Super Target or other big box combo.  The term "grocery store" also means any retail operator whose square footage is 15,000 square feet or less, and whose sales of items customarily sold by the Tenant exceeds 25% of such operator's square footage and any retail operator whose square footage is between 15,000 and 30,000 square feet, whose sales of items customarily sold by the Tenant exceeds 20% of such operator's square footage.  The foregoing restrictions shall apply only during such time as Tenant is operating a food supermarket and/or using the Demised Premises for the sale of food or food products and only so long as no Default has occurred and is continuing.  Notwithstanding anything to the contrary contained herein, the foregoing restrictions shall not preclude Landlord from leasing space to others or other occupants of the Shopping Center from using their respective premises, for, among other uses, a  table service delicatessen(s) (i.e., providing at least one-half (2) of its leasable floor space, exclusive of office and stock room for tables and chairs), and which may include a convenience store, candy store, restaurants of any kind, liquor stores, ice cream shops and/or ethnic or specialty food stores.

## Rite Aid

The Lessor covenants and agrees that it will not, during the term of this lease, or any renewal or extension thereof, lease, rent, occupy, or permit to be occupied as a drug store, or for the filling or selling of prescriptions, or for the sale of health and beauty aids or vitamins, or for the publicizing of or reference of or reference to any other store or party which sells drugs, health and beauty aids, or vitamins, any other part of the entire shopping center, or any extension or enlargement thereof, or any of the land embraced in Exhibit "Z".  This covenant shall run with the land, and, in the event of a breach thereof, Tenant shall be entitled to cancel l this lease, and/or to full and adequate relief by injunction or other equitable proceedings and/or to damages for such breach. These provisions, however, shall not be construed to prevent the sale by the key tenant, as an incident to their regular business, of some articles of merchandise customarily sold in drug stores, provided said key tenants do not compound or sell prescriptions, or sell merchandise which is limited by state or federal law or State Board of Pharmacy regulations to sale in licensed pharmacies.

B-3

## Rent A Center

During the Term of this Lease, and all renewals thereof, Landlord agrees not to lease any other space in the Shopping Center, including out parcels, to any other occupant, or consent to modification of any existing lease, of the assignment of subletting by any other tenant within the Shopping Center, which will permit the tenant or subtenant thereunder to engage in a business which leases, markets, provides, rents with the option to own and occasionally sells consumer durable goods, (a "rent to own" business).

B-4

## EXHIBIT "C"

<u>Landlord's Work</u>



**EXHIBIT "C"**
**(Landlord's Work- Turnkey Existing Building - Type II Deal)**

Landlord, at its sole cost and expense and under separate permit, shall complete the following work prior to delivery thereof to Tenant:

(i)       all base building work described on Exhibit "C-1" (the "Base Building Work"); and

(ii)       all work in addition to the Base Building Work needed to adapt the Premises for use as a prototypical Burlington store (other than movable trade fixtures and merchandise) in accordance with and as described in Tenant's prototype plans and specifications referenced in Exhibit C-1 ("Tenant's Prototype Plans"), a copy of which Landlord acknowledges receiving, including without limitation all flooring, lighting fixtures and finishes specified in Tenant's Prototype Plans.

Prior to delivery of the Premises, Landlord shall provide Tenant with a certificate of occupancy (which may be a temporary certificate of occupancy if a permanent certificate cannot be issued until after Tenant installs its fixtures and merchandise in which case Landlord shall remain responsible for obtaining the permanent certificate promptly after Tenant installs its fixtures and merchandise) and all required approvals and certifications from all departments and authorities having jurisdiction over the Premises permitting Tenant to install its fixtures, furniture and equipment and open for business.

5425472v2

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D74E5AFFBEA7



**EXHIBIT C-1**
(Landlord's Work- Type II Deal)

**PROTOTYPE:**

40K - 2019 Prototype Plans 08/01/2019 with F1 Security and Loss Prevention Plan 8/12/2020

25K - 25K Prototype 08/19/2020

Under separate permit, Landlord shall design, construct and deliver to Tenant a turnkey prototypical Burlington store pursuant to Tenant's Prototypical Plans and Specifications referenced above ("Tenant's Prototype Plans").

All Landlord's Work and all mechanical, electrical, HVAC, vertical transportation, fire suppression, storm, and plumbing systems servicing the Premises shall be new and in good operating order and condition and in compliance with legal requirements and be in accordance with the standards referenced in Tenant's Prototype Plans unless and only to the extent noted in the "Exceptions" below.

**VENDORS AND ARCHITECTS**

Where specified in Tenant's Prototype Plans, Landlord shall utilize the national account vendors specified in Tenant's Prototype Plans in the performance of the work.

Upon request of Landlord, Tenant will supply a list of Tenant's national architects, which Landlord may choose to contract with directly in an effort to speed up the planning process.

**PRE-CONSTRUCTION**

**SHELL PLAN –** Landlord shall provide a shell plan for the space within ten (10) days of Lease execution showing, at a minimum, all walls, columns, chases, entrances and exits as well as the location of the loading dock.

**PLAN PREPARATION -** Landlord shall supply and contract directly for all architectural and engineering and other necessary services for the Landlord's Work. Tenant will not retain duplicate professionals to review Landlord's plans for conformity with Tenant's Prototype Plans, code requirements, construction standards or other matters. Tenant's review, mark-up, comment or approval of any plans is for general store layout purposes only and Tenant accepts no liability express or implied for the plans or work.  Any approval of plans is not an acceptance of liability, endorsement of correctness or completeness or authorization for Landlord to deviate

C1-1

from the specifications contained in Tenant's Prototype Plans. The overall format of Landlord's draft plans shall follow the same format as the Tenant's Prototype Plans, including matching sheet numbers, page layouts, key notes, legends and symbols. The transmission of Landlord's draft plans shall include one (1) electronic copy in both PDF and DWG format to the designated Burlington Planner and Planning Manager for the project.

**PERMITS**-Landlord is responsible for all permits, approvals and fees, including utility fees, for the work described in this document. Landlord shall coordinate plan submittal timing with Tenant's Store Planning team so plans are submitted at the earliest possible time.

## DEMOLITION

Landlord is responsible for all required demolition to prepare the Premises for Tenant work. Required demolition shall include, but not be limited to, the complete removal of all interior non-load bearing and bearing walls, all existing mezzanines, stairs, all floor finishes within the Premises, the ceiling including supporting framing/hardware, ductwork, mechanical equipment, mechanical devices, interior lighting, abandoned electrical equipment, electrical devices, wire, abandoned conduit, existing façade, existing storefront, previous tenant signage, existing plumbing fixtures, fixed or freestanding sales fixtures, millwork, and all previous tenant equipment.

## ENVIRONMENTAL

Landlord shall provide an environmental assessment report and certification stating that the Premises, as well as all existing flooring materials including mastic, are free of asbestos ("ACM") and other hazardous substances or materials dated no sooner than four (4) months prior to commencement of construction. If hazardous materials are found, Landlord shall be responsible for the removal of any hazardous substances or materials and the abatement of any ACM. The remediation shall be conducted prior to and shall be a condition of delivery of the Premises and, if applicable, a new certification or report issued certifying that the Premises is free of ACM.

## FLOOR CONSTRUCTION

**INTERIOR FLOORING REMOVAL AND SLAB REPAIR** -Landlord shall remove all existing floor finishes and repair the interior concrete floor slab as required to properly receive Tenant's prototypical floor finishes in accordance with all manufacturers' specifications and warranty requirements.

**SLAB PREPARATION**- Landlord, in addition to removing all existing floor finishes, as stated above, shall deliver the Premises with a floor slab that is on one single flat surface with proper vapor barriers and otherwise in the condition necessary to obtain all floor covering manufacturer warranties. Proper slab moisture content must be achieved and confirmed using the approved testing methods provided on Tenant's Prototype Plans prior to delivery. All required slab

moisture control measures are the responsibility of the Landlord. Proper moisture contents shall be verified by reports supplied by Landlord prior to delivery. Final condition of slab shall allow installation of Tenant's standard floor covering in accordance with all manufacturer recommendations and warranty requirements.

**FLOOR COVERINGS** - All floor coverings and finishes per Tenant's Prototype Plans shall be installed.

## ROOF CONSTRUCTION

**ROOF CONDITION** - Landlord shall install a new structurally sound and watertight roof including all parapet caps, canopies, skylights, curb caps, and overhangs. The new roof shall come with a minimum 20 year warranty from a national vendor, a copy of which Landlord shall supply to Tenant within ten (10) days of the Commencement Date.

## DEMISING AND PARTITION WALLS

**DEMISING PARTITION**- New demising walls shall be 1 hour fire rated and fully insulated to deck.  Demising walls shall consist of minimum 6" 18GA metal studs with 5/8" type "x" gypsum board on each side with a minimum of 3.5 "of sound attenuation batts (SABs). Demising wall shall conform to all local code requirements. Gypsum board shall be taped, mudded (level 5), sanded and ready for paint on the Tenant's side from 7' to 14' AFF.  Demising wall shall wrap around any overhead structure.  Tenant side of wall shall be flush and smooth with no offsets or "bumpouts".  Adjacent lease space side shall be taped and fire caulked. Landlord shall install deflection track to accommodate anticipated roof deflection. Demising wall shall wrap around/box out any HVAC units set at demising wall location.  Landlord shall ensure that no electrical conduit/wires, hvac ductwork or dampers penetrate new demising wall. Existing demising walls construction must be verified to be constructed of a minimum 18 GA metal studs, 16", o/c. If not, a new 3 5/8" 18 GA wall shall be built in front of the existing demising wall.

**INTERIOR PARTITION WALLS**- Landlord shall construct all interior partition walls as shown on the Approved Plans.

## CEILINGS

**CEILINGS**-Existing ceiling to be removed as described in the demolition section above. Open ceiling with sprinkler heads turned up per local code requirements.  Exposed structure to be prepped and painted per prototype specifications. All equipment, conduit, cable, etc. shall be run in clean straight runs tight to structure.

**CEILINGS FOR MULTI-FLOOR BUILDINGS –** Tenant may require Landlord to deliver a removable acoustical panel ceiling system with recessed LED lighting (the particular acoustical paneled system to be determined by Tenant. The acoustical panel system is called

5425472v2

"Optima Concealed").  All pipes, ductwork, chases, sprinkler mains, etc. shall be minimized in size, located as close to the ceiling, as possible and contained within perimeter soffits in accordance with the Approved Plans.  All ceilings shall be at a maximized height and subject to approval by Tenant. To the extent there are any other tenants above the Premises, Landlord shall install appropriate ceiling barriers or measures to ensure that there is no leaking, dripping, seepage or water infiltration into the Premises ("Water Infiltration Work").   This work may include the installation of an overhead grid system with drip pans and vertical drainage risers. Drainage risers shall be located at all columns designated wall chase locations, in accordance with Approved Plans. All efforts will be made to locate Street Level plumbing fixtures close to columns where drain risers are located, and to run the horizontal drainage piping above the Street Level floor slab, where possible.

## EXTERIOR

**FACADE** - Landlord shall construct a new exterior façade as specified in Tenant's Prototype Plans unless a modified existing façade is attached as Exhibit C-2 hereto. If the Shopping Center has a certain architectural theme or adjacent or other tenants of the Shopping Center have storefront facades or parapets that exceed the height of the Premises, Tenant may adjust its prototype façade to be consistent with such other tenants or architectural theme.

**STOREFRONT** - Landlord shall provide and install a new storefront with wired and operating exterior automatic sliding doors.  Doors shall be full breakout bi-parting entry doors to meet Tenant specifications per Tenant's Prototype Plans, including, but not limited to, a minimum window frame height and insulated tempered glass as required by Tenant's Prototype Plans. The storefront shall include all storefront structural components and voids completed and clad with storefront metal.  Storefront shall be weather tight.

**VESTIBULE**- Landlord shall provide and install a new vestibule with wired and operating interior vestibule automatic sliding doors.  Doors shall be full breakout bi-parting entry doors to meet Tenant specifications per Tenant's Prototype Plans, including, but not limited to, a minimum window frame height and insulated tempered glass as required by Tenant's Prototype Plans.  The vestibule shall include all structural components and voids completed and clad with storefront metal.

**EXTERIOR FAÇADE SIGNS –** Landlord shall provide all structural elements, conduits and electrical facilities to accommodate and power all Tenant's signage and will pull electric to the location where the signs will be installed. Landlord shall coordinate with Tenant's sign provider for access, location of junction boxes and shall make final electrical connection.

**ENCLOSED MALL SIGNS –** Where there are enclosed malls or non-exterior entrances, Landlord shall provide all structural elements, conduits and electrical facilities to accommodate and power all Tenant's signage and will pull electric to the location where the signs will be installed. Landlord shall coordinate with Tenant's sign provider for access, location of junction boxes and shall make final electrical connection.

5425472v2

**ENCLOSED MALL ENTRY** - Mall entries shall include cladding, gates/grilles or other elements as outlined in Tenant's prototype details and approved by Tenant's Architectural team prior to start of construction.

## UTILITIES

**UTILITIES-** Landlord shall provide separately metered utilities to the Premises to a location as designated by Tenant. Such separately metered services shall meet the specifications contained in Tenant's Prototype Plans.

## MECHANICAL

**HVAC-** Landlord shall install an entirely new HVAC system, which includes the supply to all HVAC components (mounted on the roof, duct drops installed, and powered) including but not limited to rooftop units, main concentric drops including diffusers, utility lines, drain lines, power wiring, etc. to make a fully operational system that provides the minimum conditioned air per square feet of the Premises required for the location of the Premises as required by the Tenant's Prototype Plans.  Sales and non-sales zones should not share RTUs, and the fitting room complex, office complex and receiving areas shall each have their own dedicated RTUs. If any rooftop units are located in the area of a demising wall, the Landlord shall box around each such unit with a compliant fire rated construction.  All equipment capacity shall be rated in accordance with the manufacturer's data and ARI compliance for the property geographic location outdoor operating conditions in accordance with Tenant's Prototype Plans. Landlord's mechanical design team shall perform HVAC load calculations to confirm RTU tonnages meet ASHRAE and local jurisdictional design recommendations. Final rooftop equipment layout and sizing requires written approval from Tenant. All HVAC System units shall also come with a ten (10) year manufacturer warranty for the heat exchanger, a five (5) year manufacturer warranty for the compressor and a one (1) year manufacturer warranty for all remaining parts. Landlord shall assign to Tenant all assignable warranties relating to the Premises and the associated equipment and otherwise assist Tenant in enforcing any warranties not assignable.

**VERTICAL TRANSPORTATION –** For multi-floor premises or premises serviced by vertical transportation, Landlord shall install entirely new escalators, freight and passenger elevators and stairs pursuant to vertical transportation plans developed in accordance with the specifications for vertical transportation described in Tenant's Prototypical Plans. All elevators (freight and passenger) must be equipped with card and card readers or keys and key switches within the elevator cab on the control panel next to each floor button to control each floor that the elevator serves, so that each floor shall be controlled individually and prevented (locked out) from going to any floor (and each floor individually) that the elevator serves from inside of the elevator cab.

In addition, all elevators must be equipped with card and card readers or keys and key switches at the control call button panel outside of the elevator on each floor that the elevator serves, so that the elevator can be prevented from being called from any floor and each floor individually.

5425472v2

All operations required, above for each individual elevator, shall be controlled by one key or one card specific to that individual elevator.

## ELECTRICAL

**ELECTRICAL SERVICE-** Landlord shall provide an electrical service which includes but is not limited to: a single dedicated utility meter, a single fusible service disconnect switch, grounding electrode system, feeders and conduit terminated in a main electrical circuit breaker style distribution panel installed in a location designated by the tenant. Minimum service size and panel distribution requirements for both 25K and 40K prototypes per detail below and assumes the following conditions in both cases: 277/480 volts, natural gas available for any required heating, and no vertical transportation required. For any deviations in voltage, electric heat, etc. Landlord shall reference prototype design set for alternate electrical service requirements.  Effort should be taken by Landlord electrical design engineer to not oversize main service provided to the Tenant.  The main distribution panel shall have an AIC rating sized to withstand the available fault current at that point calculated using the utility company's available short circuit current. Confirm AIC rating with local utility.

For 40K Prototype:  Landlord shall provide a 600 amp 277/480v service. Main distribution panel (MDP) @ 480 volts shall have branch breakers as follows: (1) 400 amp 3 pole (HVA|C panel), (2) 200 amp – 3 pole, (1) 110 amp 3 pole, (1) 100 amp – 3 pole, (1) 50 amp – 3 pole and (1) 20 amp – 3 pole breaker for landlord provided panels, transformers, etc.  HVAC units shall be connected to a 600 amp- circuit breaker panel located next to the main distribution panel with breakers rated for each unit.  This panel shall be connected to the main distribution panel via a 600 amp circuit breaker and appropriate sized feeder.

For 25K Prototype:  Landlord shall provide a 400 amp 277/480v service.  Main distribution panel (MDP) @ 480 volts shall have branch breakers as follows: (1) 110A/3P, (1) 100A/3P, (1) 30A/3P, (1) 20A/3P and (7) other appropriately-sized breakers to feed RTUs.

Notwithstanding the foregoing, final electrical service size requirements shall be determined by the Landlord's engineers after hvac system is designed and vertical transportation (if required) is selected but shall not be less than the previously stated minimums.  Existing power and lighting circuits located in tenant's space that serve adjacent tenants shall be removed and rerouted outside of tenant's space. For larger spaces demised into the Premises space and additional adjacent leasable space, landlord shall make necessary provisions to isolate all electrical loads of the common areas and adjacent leasable space from the tenant's power system. The electrical system in Premises and its surroundings shall be individual complete, fully operational and shall comply with all applicable national, state and local codes as well as the power company rules and regulations.

**EXTERIOR LIGHTING-** Landlord shall provide exterior lighting that meets or exceeds current code in new or in good working order per all Legal Requirements to meet illumination and safety standards.

5425472v2

**INTERIOR LIGHTING-** Landlord shall provide a fully functioning code compliant lighting system meeting the specifications contained in Tenant's Prototype Plans.

**TELEPHONE AND DATA-** The Premises shall have an active telephone service terminated within the Premises, all of in accordance with the specifications contained in Tenant's Prototype Plans. Landlord shall provide the telephone demark at a location within the Premises agreed to by Tenant.  The demark shall be installed and functional by week 5 of Landlord's Work build out. For new construction, the Landlord will provide a 4 x 8 x ¾" plywood telephone board with two (2) 4 inch empty conduits and pull strings to phone company's pedestal or right of way for the purposes of Tenant's phone system. For locations with a demark in a common room outside the Premises and where the demark will need to be extended into the Premises, the Landlord will provide a 4 x 8 plywood telephone board and a 4 inch conduit with a pull string to the phone company's primary demark location.  Tenant is responsible for setting up phone services to Tenant's space. In all cases, the Landlord will also provide a 4 outlet electrical outlet with a dedicated circuit mounted on the plywood board and a grounding bar for the phone company's use. Landlord will also provide for the capacity for a data circuit. This shall include pathway, conduit and pull string from Tenant's Equipment Room to common area where the local provider has access.

## PLUMBING

**RESTROOMS-** Landlord shall provide code compliant fully functional and equipped restroom facilities with an adjacent janitor closet equipped with a mop basin and electric water coolers in accordance with Tenants Prototype Plans. Both toilet rooms shall have floor drains with trap primers and properly sloped floor slabs to each drain.

In addition, Landlord will have its plumber scope the sanitary line with a camera and determine if there are any bellies in the line or any structural damage to the line that could be the causing a blockage in the sanitary lines.

Tenant will require a copy of the video from Landlord showing clear sanitary lines once any blockage has been removed and all issues causing any blockage in the sanitary lines have been repaired.

**WATER SERVICE-** Landlord shall provide water service providing sufficient pressure and flow capacity to meet requirements in Tenant's Prototype Plans including service line, meter, valves and backflow preventer with piping stubbed into the Premises and connected to plumbing fixtures where specified by Tenant.  Sufficient pressure means a minimum of 30 PSI and if the pressure supplied is less it is Landlord's responsibility to install necessary pumps to increase the pressure to 30 PSI. Any shared existing water service and piping shall be modified to serve only the remainder of the building.  All abandoned piping shall be removed or properly capped and sealed when sub terrain. Any new water service shall be tapped at the main and shall be

trenched into the building below the freeze line and concrete footer prior to entering the building.

**SEWER**- Landlord shall provide an adequately sized sewer line stubbed into the Premises and connected to plumbing fixtures where specified by Tenant to meet requirements in Tenant's Prototype Plans.  Sanitary sewer serving the Premises shall be exclusive and tapped into the main city sewer directly or tapped into the existing sanitary sewer prior to entering the building such that the Tenant's sanitary service is independent of other tenant spaces.  All sewer lines shall have proper slope and depth.  All new concrete patching from trenching of existing concrete slab floor shall be patched and leveled to match existing materials. The sewer/waste system serving the Premises shall be scoped to the first connection at the city main prior to commencement of construction. All findings must be documented via DVD/CD and should include a written summary. Any blockages to the waste line shall be flushed and/or repaired to ensure a fully functional building sanitary sewer waste system. Upon completion of construction, a second video survey shall be completed to ensure no construction materials are in the sanitary line. All findings must be documented via DVD/CD and should include a written summary.

**GAS SERVICE**- If required by Tenants Prototype Plans, Landlord shall provide gas service adequately sized by Landlord's mechanical engineer for Tenant, including service line, meter, valves and piping connected to all HVAC units that will serve the Premises.  Any existing gas service and piping to remain shall be left complete and accessible.  All gas lines that service adjacent tenant spaces shall be separated from the Tenant's service.

**FIRE PROTECTION**

**SPRINKLER SYSTEM-** Sprinkler system for entire building, as required by code, shall be complete, certified up to date, operational, with heads to accommodate the Burlington Stores approved ceiling system, and in accordance with all applicable codes. (local, state, and NFPA13). The design densities shall be in accordance with the intended use of each area within the Premises.  Final code complaint design is the sole responsibility of the Landlord. The sprinkler system shall be equipped with a functioning backflow preventer, flow and tamper switches, audible/visible alarms, etc., and meet all NFPA-13 requirements including hazard and commodity classes. If combining spaces, Landlord shall modify fire sprinkler system at demising wall as required by applicable local codes including both sides of the demising wall. No fire sprinkler lines can pass below 14'-0" AFF and sprinklers must be at proper height to accommodate Tenant's fixtures.

**FIRE ALARM SYSTEM**- Landlord shall be responsible for purchase and installation of any alarm or fire systems in the Premises specified in Tenant's Prototype Plans. Landlord is responsible for proper connection of any whole shopping center/Mall fire alarm system to Tenant's fire alarm system if required by the authority having jurisdiction.

**SITE**

5425472v2

**LOADING DOCKS**- Landlord shall provide the Tenant with at least one loading bay if following the 25K prototype and two (2) loading bays if following the 40K prototype.  Bay(s) shall be capable of accommodate a WB-65 truck.  Each bay within the loading area shall have dock bumpers, seals, air actuated pit style dock leveler, and an 8' wide x 9' high commercial grade insulated roll-up door (min 24 ga. steel) for access to the loading area or bays.  Door shall be complete and in good working order with chain hoist, vision panels, and suitable for forklift traffic per Tenant Prototype Plans. The site shall allow for deliveries to the dock and accessibility should be demonstrated using a 73'0" tractor and trailer with a 50' turning radius (typically min 140' clear distance from the face of the dock in the direction of the loading vehicle's movement or 190' if declined approach). Landlord shall supply a truck study with site plan demonstrating such access.

**TRASH ENCLOSURE AND/OR COMPACTOR**- Landlord shall install a 12' x 45' concrete compactor pad with a chute door, apron, enclosure and other components as required by applicable local codes, laws, rules or regulations and Tenant's Prototype Plans.  Landlord shall provide an exterior area to accommodate a 40 yard receiver box, which shall be properly fenced or screened if required by the local jurisdiction. The trash area shall be for Tenant's exclusive use and located immediately adjacent to Tenant's loading area suitable to accommodate required trash and recycling dumpsters per Tenant's requirements.

**PARKING, DRIVEWAY AND DELIVERY AREAS**- Landlord to ensure parking and driveway areas shall be hard surfaced with concrete or asphalt and be designed/installed to accommodate usual and customary vehicular traffic per industry standards and local code requirements.  Parking and driveway areas shall be free from cracking, depressions or standing water and shall be clearly striped to meet all local code requirements. All parking lot lighting shall be in good working order and lit with any expended bulbs replaced prior to Tenant's acceptance.  All existing parking lots should be resealed and restriped.

**SIDEWALKS/CURB CUTS AND SITE HANDICAP ACCESSIBILITY:** Landlord to ensure sidewalks, curb cuts and handicap parking /accessible route is in compliance with current ADA, ANSI, and governing authorities standards and all curbs shall be repainted.

**SIGNS.** The Premises shall be prepared and ready for Tenant's storefront or other building sign placement, including the installation and routing of power for same.  All pylon, monument or similar exterior sign structures upon which Tenant is authorized to place a sign panel or sign shall be constructed or refurbished, properly illuminated and in good working order and otherwise prepared and ready to accommodate Tenant's sign panel placement in the designated size and dimensions. To the extent upgrades, improvements or other modifications to the pylon, monument or similar exterior sign structures are required as a pre-condition to Tenant's installation of its signs or sign panels, Landlord shall be responsible for making such modifications.

5425472v2

**LEGAL REQUIREMENTS:** The Premises and Shopping Center common areas shall be in compliance with all legal requirements (including, without limitation, being free of all applicable building code violations and being in compliance with the Americans with Disabilities Act).

**COMMON AREAS:** Landlord shall timely perform all work and cure all violations of legal requirements for the Shopping Center (outside of the Premises), which may be necessary in order to obtain a permanent certificate of occupancy for the Premises allowing Tenant to operate its business in the Premises, including but not limited to the ADA path of travel, ramps, grades and slopes.

**SCHEDULES**: Prior to commencing any work, Landlord shall provide Tenant with a CPM (Critical Path Method) Project Schedule for the Tenant's review and shall provide Tenant with notice of filing and receipt of permits within five days of filing of the permit and five days of receipt of the permit. After commencement of the work and throughout the progress of the work, Landlord shall provide weekly progress updates including two week projections and photos.

**CHANGE ORDERS:** To be valid, all change orders must contain any increased costs and any authorized adjustments to the schedule and be in a writing signed by both Landlord and Tenant prior to the commencement of the work. Neither requests for changes nor the transmission of prototype updates are an authorization to make changes to the schedule, make changes in Landlord's Work or assess costs to Tenant, but are instead a request for proposal which shall not be binding on Tenant in any way unless a change order is signed as set forth in the preceding sentence.

**PUNCHLIST**: Prior to scheduling a punch list inspection of Landlord's Work, Landlord shall cause its contractor to verify that Landlord's Work is substantially complete and ready for a punch list inspection by completing and delivering to Tenant the Punch List Template provided by Tenant's Construction team during project kickoff and in Specifications) verifying that each of the applicable items listed on the Preliminary Checklist is substantially complete. After Landlord has provided the Preliminary Checklist verifying that each of the applicable items on the Preliminary Checklist is substantially complete, Landlord and Tenant shall schedule the punch list meeting at the Premises to review Landlord's Work, including each item listed on the Preliminary Checklist to produce a task report of remaining items to be completed by Landlord. The task report shall be the "Punch List" under the Lease, which the parties shall follow through until completion of all punch list items noted.

**CLEAN CONDITION**: Upon completion of construction, Landlord shall deliver the Premises cleaned in accordance with the following turn-key clean delivery requirements:

*Interior*
1. Full dusting of all store fixturing, cash wraps, furniture and offices.
2. Full detail vacuuming of offices for carpeting and all lvt to be swept, and mopped.

C1-10

5425472v2

3. Full vacuum of porcelain tile, damp mop with clean water and use swing machine with white pad or low speed electric burnisher with white pad.
4. Full detail scrub of all restrooms including floors, walls, partitions, fixtures, mirrors. Stainless steel to be polished.
5. Full glass cleaning of all storefront glass inclusive of transoms and interior vestibule.
6. Cleaning of all interior mirrors throughout the store.
7. All stainless fixtures and sign holders to be polished.
8. Detail cleaning of entire breakroom.
9. Deep scrub of lvt fitting room floors- red pad and neutral cleaner.
10. Burnish and scrub break room.

*Exterior*
1. Powerwash store front concrete, fire lane, columns, and façade.
2. Clean storefront windows.
3. Clean landscaping, mulch.

The terms code compliant or legal requirements are meant to refer to the most up to date statute, law, ordinance, regulation or the like promulgated by any governmental entity or an instrumentality thereof, or by an agency or department of any of the foregoing or orders issued by any court of competent jurisdiction, but without regard to, or application, of any variance or "grandfather" provision. All Landlord's Work, including any existing services, equipment and materials used by Landlord, shall come with a minimum one (1) year warranty from Landlord and its contractor (unless a greater warranty period is otherwise specified in the Lease).

Upon completion of the Landlord's Work, Landlord shall provide Tenant with a closeout package containing: (1) as built plans of the Premises, (2) the Landlord's and general contractor's warranty and any manufacturers warranties specified herein or for the items installed, (3) the sewer scope showing a clear sewer line free of defects, (4) a roof certification from a licensed contractor certifying that the roof is watertight and all repairs completed (if new is not specified and Landlord is permitted above to utilize existing roof), (5) the specified moisture reports for the slab, (6) the ACM certification or report issued certifying that the Premises is free of ACM, and (7) the truck turning radius/access report.

5425472v2

| OFFICE HALLWAY | Punch | Comments | Final |
|---|---|---|---|
| **Interior Finishes** | X or N/A | | X or N/A |
| Ceiling grid & tile installed per plans @ 10'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |
| Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| Corner guards installed to 48" A.F.F. (CG-1 Stainless Steel) | | | |
| Vinyl wall covering (VYL-2) and trim (TRM-2) on walls as indicated on plans | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| All room nameplates and Braille signs installed | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Doors & frames painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| Egress hardware installed per plans | | | |
| Honeywell door contactors installed | | | |
| Cores installed in all locksets | | | |
| Trilogy digital lock installed per plans | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| Lights installed per plan & operational | | | |
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm horn / strobe installed per approved FA plans | | | |
| Motion sensor (ceiling or wall) installed | | | |

C1-12

| | Punch | Comments | Final |
|---|---|---|---|
| LP camera installed in ceiling | | | |
| Ceiling diffusers installed & acceptable | | | |
| Return air grilles installed & acceptable | | | |
| HVAC operational & temperature acceptable | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plate | | | |
| Ceiling tile cutouts around heads acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

| **MANAGER** | Punch | Comments | Final |
|---|---|---|---|
| **Interior Finishes** | X or N/A | | X or N/A |
| Ceiling grid & tile installed per plans @ 9'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |
| Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| Furniture installed per plans | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Door hardware installed (closer, stops, lockset, etc.) | | | |
| Lock set has removable cores | | | |

C1-13

| | Punch | Comments | Final |
|---|---|---|---|
| Door painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| (4) Minimum duplex receptacles w/ cover plates @ 18" A.F.F. | | | |
| (2) Phone wall jack w/ cover plate/jack installed @ 18" A.F.F. | | | |
| (2) Fax wall jack w/ cover plate installed @ 18" A.F.F. | | | |
| (2) Data lines installed w/ cover plate/jack @ 18" A.F.F. | | | |
| Lights installed per plan and operational | | | |
| Occupancy sensor for lighting installed & operational | | | |
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm strobe installed & operational per approved FA plans | | | |
| Ceiling diffusers & return air grilles installed & acceptable | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plate | | | |
| Ceiling tile cutouts around heads acceptable | | | |
| HVAC operational & temperature acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

| **DEPARTMENT MANAGER/L.P.** | Punch | Comments | Final |
|---|---|---|---|
| **Interior Finishes** | **X or N/A** | | **X or N/A** |
| Ceiling grid & tile installed per plans @ 9'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |

C1-14

| | | | |
|---|---|---|---|
| (3) Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| (1) Wall has Level 5 finish & painted (P-3 Burlington Red) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| Countertop w/ required vertical braces installed (PL-1 Winter White) | | | |
| Wall shelving installed (PL-1 Winter White) | | | |
| Vertical standards & brackets installed per plans (white) | | | |
| Grommets installed in countertop | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Door hardware installed (closer, stops, lockset, etc.) | | | |
| Lock set has removable cores | | | |
| Door painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| (4) Duplex receptacles w/ cover plates below counter @ 18" A.F.F. | | | |
| (2) Plugmold installed above counter @ 38" A.F.F. | | | |
| (3) Phone wall jack w/ cover plate/jack installed @ 18" A.F.F. | | | |
| (9) Data lines installed w/ cover plate/jack @ 18" A.F.F | | | |
| Lights installed per plan and operational | | | |
| Occupancy sensor for lighting installed & operational | | | |
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm strobe installed & operational | | | |
| Ceiling diffusers & return air grilles installed & acceptable | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plate | | | |

5425472v2

| | | | |
|---|---|---|---|
| Ceiling tile cutouts around heads acceptable | | | |
| HVAC operational & temperature acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

| **CASH OFFICE** | **Punch** | **Comments** | **Final** |
|---|---|---|---|
| **Interior Finishes** | **X or N/A** | | **X or N/A** |
| Gypsum board ceiling installed per plans @ 9'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |
| Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| Countertop w/ required vertical braces installed (PL-1 Winter White) | | | |
| Wall shelving installed (PL-1 Winter White) | | | |
| Vertical standards & brackets installed per plans (white) | | | |
| Grommets installed in countertop | | | |
| Pass-thru window installed per plan | | | |
| Pass-thru window frame painted (P-1 Silver Satin w/ gloss finish) | | | |
| Pass-thru window sill installed (PL-1 Winter White) | | | |
| Safe installed w/ Honeywell door contact | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Door hardware installed (closer, stops, lockset, etc.) | | | |

5425472v2

| | | | |
|---|---|---|---|
| Lock set has removable cores | | | |
| Door painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| (2) Duplex receptacles w/ cover plates @ 18" A.F.F. | | | |
| (1) Plugmold installed above counter @ 38" A.F.F. | | | |
| (1) Phone wall jack w/ cover plate/jack installed @ 18" A.F.F. | | | |
| Lights installed per plan and operational | | | |
| Occupancy sensor for lighting installed & operational | | | |
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm strobe installed & operational | | | |
| Ceiling diffusers & return air grilles installed & acceptable | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plate | | | |
| Ceiling tile cutouts around heads acceptable | | | |
| Honeywell door contact installed on door / frame | | | |
| Loss prevention camera installed & operational | | | |
| Door release button installed & operational with Count Room door | | | |
| Motion sensor installed in ceiling | | | |
| HVAC operational and temperature acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

| **COUNT ROOM/E-LEARNING** | **Punch** | **Comments** | **Final** |
|---|---|---|---|
| **Interior Finishes** | **X or N/A** | | **X or N/A** |

C1-17

5425472v2

| | | | |
|---|---|---|---|
| Ceiling grid & tile installed per plans @ 9'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |
| (3) Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| (1) Wall has Level 5 finish & painted (P-3 Burlington Red) | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| Countertop w/ required vertical braces installed (PL-1 Winter White) | | | |
| Grommets installed in countertop | | | |
| Pass-thru window frame painted (P-1 Silver Satin w/ gloss finish) | | | |
| (3) Snap-frames installed | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Door hardware installed (closer, stops, lockset, etc.) | | | |
| Lock set has removable cores | | | |
| Trilogy digital lock installed per plans | | | |
| Door painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| Peep hole installed per specs | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| (1) Duplex receptacle w/ cover plate @ 18" A.F.F. | | | |
| (2) Plugmold installed above counter @ 38" A.F.F. | | | |
| (1) Phone wall jack w/ cover plate/jack installed @ 18" A.F.F. | | | |
| (5) Data lines installed w/ cover plate/jack @ 18" A.F.F. | | | |
| Lights installed per plan and operational | | | |
| Occupancy sensor for lighting installed & operational | | | |

5425472v2

DocuSign Envelope ID: D1726786-5D19-4C74-81E9-D7454AFFBEA7

| | Punch | Comments | Final |
|---|---|---|---|
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm strobe installed & operational | | | |
| Ceiling diffusers & return air grilles installed & acceptable | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plate | | | |
| Ceiling tile cutouts around heads acceptable | | | |
| Honeywell door contact installed on door / frame | | | |
| Entrance buzzer installed and operational (if applicable) | | | |
| Loss prevention camera installed & operational | | | |
| Door release button installed & operational with Count Room door (if applicable) | | | |
| Door camera and monitor (if applicable) | | | |
| HVAC operational and temperature acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

| EMPLOYEE LOUNGE | Punch | Comments | Final |
|---|---|---|---|
| **Interior Finishes** | X or N/A | | X or N/A |
| Ceiling grid & tile installed per plans @ 9'-0" A.F.F. | | | |
| Cove base installation complete & acceptable (VB-1 Charcoal) | | | |
| Flooring installation complete & acceptable (LVT-1 12"x24" Urban Gray) | | | |
| (3) Walls have Level 5 finish & painted (P-2 Repose Grey) | | | |
| (1) Wall has Level 5 finish & painted (P-3 Burlington Red) | | | |
| (1) Wall has vinyl wall covering (VYL-1) | | | |
| Chair rail (PCR-1) installed and painted per plans | | | |
| Corner guards installed to 48" A.F.F. (CG-1 Stainless steel) | | | |

C1-19

DocuSign Envelope ID: D1726786-5D19-4C71-81F9-D74F5AFFBFA7

| | | | |
|---|---|---|---|
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Millwork / Specialties / Equipment** | | | |
| Refrigerator(s) & microwave(s) installed & operational | | | |
| Television is wall-mounted & operational | | | |
| All accessories installed: soap dispenser & paper towel dispenser | | | |
| Base & wall cabinets installed per plan (match PL-5 White Ash) | | | |
| Countertop installed per plan (SS-1 Morning Ice) | | | |
| Fabric wrapped panels are installed per plans | | | |
| Employee lockers installed per plans | | | |
| Employee tables and chairs are properly placed (ADA clearances) | | | |
| Vending machines installed per plan | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Doors & Hardware** | | | |
| Door hardware installed (closer, stops, lockset, etc.) | | | |
| Lock set has removable cores | | | |
| Door painted & acceptable (P-1 Silver Satin w/ gloss finish) | | | |
| Trilogy digital lock installed per plans | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Mechanical Electrical Plumbing** | | | |
| (1) Duplex GFI receptacle w/ cover plate @ 42" A.F.F. (counter) | | | |
| (1) Duplex GFI receptacle w/ cover plate @ 38" A.F.F. (microwave) | | | |
| (1) Duplex GFI receptacle w/ cover plate @ 58" A.F.F. (microwave) | | | |
| (2) Duplex GFI receptacles w/ cover plates @ 18" A.F.F. (refrigerators) | | | |
| (2) Duplex GFI receptacles w/ cover plates @ 18" A.F.F. (vending) | | | |
| (1) Duplex receptacle w/ cover plate @ 18" below finished ceiling (TV) | | | |

C1-20

DocuSign Envelope ID: D1726786-5D19-4C71-81E9-D74F5AFFBEA7

| | | | |
|---|---|---|---|
| (1) Data line w/ cover plate @ 18" below finished ceiling (TV) | | | |
| (3) Duplex GFI receptacles w/ cover plates @ 18" A.F.F. | | | |
| (1) Duplex receptacle w/ cover plate @ 40" A.F.F. (timeclock) | | | |
| (1) Data line installed w/ cover plate/jack @ 40" A.F.F. (timeclock) | | | |
| Timeclock installed & operational | | | |
| Water cooler installed w/ 1/4" water line & duplex receptacle (if applicable) | | | |
| Sink / faucet installed & working properly | | | |
| ADA insulation installed under sink | | | |
| Lights installed per plan and operational | | | |
| Occupancy sensor for lighting installed & operational | | | |
| Speaker w/ volume control installed in ceiling & operational | | | |
| Fire alarm strobe installed & operational | | | |
| Ceiling diffusers and return air, transfer, & exhaust grilles installed & acceptable | | | |
| HVAC operational and temperature acceptable | | | |
| Exhaust fan installed and operational | | | |
| Adequate sprinkler coverage provided per approved FS plans | | | |
| Sprinkler heads have trim rings / escutcheons / concealed sprinkler cover plates | | | |
| Ceiling tile cutouts around heads acceptable | | | |
| Thermostats or temperature sensors installed on wall per mechanical plan (if applicable) | | | |
| Duct detectors installed with remote test on RTU, tested & monitored | | | |
| HVAC operational and temperature acceptable | | | |
| **NEW ITEM:** | | | |
| **NEW ITEM:** | | | |
| **Miscellaneous** | | | |
| Overall area is acceptable | | | |

C1-21

**EXHIBIT "C-2"**

**Modified Façade**

[see attached  1  page(s)]





ALUCOBOND CANOPY SYSTEM PER SPECIFIED VENDOR. 4" PROJECTION, FINISH TO BE NATURAL BRUSHED 50

SW7009 BOTH SIDES

PORCELAIN PER PROTO

NICHIHA ILLUMINATION PANELS, CUSTOM BURLINGTON RED. TOP OF FAÇADE AT **30' AFF**

REMAINDER FACACDE TO BE REPAINTED TO MATCH CENTER COLORS

AUTOSLIDER PER PROTOTYPE AND FIXTURE PLAN. FINISH TO BE CLEAR ANODIZED ALUMINUM.

NICHIHA ILLUMINATION PANEL, COLOR BURLINGTON RED BY SPECIFIED VENDOR.
CONTACT ADAM COSSICK
770.805.9466

Adam Cossick
National Brands Manager

Nichiha USA, Inc.
6465 E. Johns Crossing
Suite 250
Johns Creek, GA 30097

T 866.NICHIHA 1 (866.424.4421)
P 770.805.9466
C 770.570.0511
F 770.805.9467

acossick@nichiha.com
nichiha.com

NICHIHA
fiber cement

THE FAÇADE IS TO BE CONSTRUCTED PURSUANT TO ALL SPECIFICATIONS, AND WITH ALL MATERIALS AND FINISHES, SET FORTH IN THE TENANT'S PROTOTYPE PLANS (A5.0 AND A5.1), AND MUST BE COORDINATED DURING CONSTRUCTION DOCUMENT DEVELOPMENT FOR BURLINGTON REVIEW AND APPROVAL, ANY VARIATION ON COLOR OR MATERIAL REQUIRED BY LOCAL JURISTICTION ORDINANCE MUST BE REVIEWED AND APPROVED BY BURLINGTON PRIOR TO CONSTRUCTION COMMENCEMENT



Burlington



READING, PA

2021-06-01

**EXHIBIT "D"**

Deleted

## EXHIBIT "E"

<u>Prohibited Uses</u>

1. A tavern, bar, nightclub, cocktail lounge, discotheque, dance hall or any other establishment selling alcoholic beverages for on-premises consumption; provided, however, the foregoing shall not prohibit the operation of a restaurant where the sale of alcoholic beverages therein comprises less than Fifty (50%) percent of the restaurant's gross revenues, or a restaurant of the type operated on the date hereof under the trade names "Chili's" or "TGI Friday's."

2. A billiards parlor, pool hall, arcade, video or game room not to include retail Gamestop or similar type tenant.

3. Except for the area North of Line "A" as depicted on Exhibit A .A theater (for live performance only), an auditorium, a convention or exhibition hall or the like.

4. A fairground.

5. A service station, automotive repair shop, truck stop or vehicle fueling station. In conjunction with not to include first class operations such as WAWA, Royal Farms, Autozone, Advance Auto, Pep Boys.

6. A flea market or pawnshop.

7. A training or educational facility (including without limitation, a school, college, reading room or other facility catering primarily to students and trainees rather than to customers or employees employed on premises provided that educational or training classes as part of a permitted use shall be permitted) This shall not apply to first class uses like Kumon, Mathnasium/learning centers, Kids first swim Pinot's Palette.

8. A car wash.

9. Except for the area North of Line "A" as depicted on Exhibit A. A medical clinic or office (which shall not preclude an optometrist's office located in a store selling eyeglasses, contact lenses and similar eye ware products or a person who may, by law, write prescriptions in connection with the operation of a pharmacy or a medical or a medically-related activity then being conducted in, and incidental to, retail drug store

10. Except for the area North of Line "A" as depicted on Exhibit A. An office building or any office of any kind not used principally for the purveying of products or services to walk-in consumers at retail (other than back room offices incidental to a retail use).Exception to this will be a South of Line A, a maximum of a 5, 000 sf of Retail Office shall be permitted. (EX. Insurance Office, Real Estate Office) but no closer than 150' to the Demised Premises.

11. Except for the area North of Line "A" as depicted on Exhibit A, any governmental or political operation of any kind, including without limitation post office, welfare office, motor

5425472v2

DocuSign Envelope ID: D1726786-5D40-4674-9450-D7454AFFB5A7

vehicle or other licensing, testing or inspection operation, or any political or candidate office or operation .

12. A dry cleaning plant, central laundry or laundromat (which shall not preclude a "drop off' and "pick up" dry cleaning service where all dry cleaning processes shall be located outside of such premises).

13. Except for the area North of Line "A" as depicted on Exhibit A, an establishment for sale of automobiles, trucks, mobile homes, recreational motor vehicles.

14. A piercing pagoda or tattoo parlor or similar establishment.

15. An adult type bookstore or other establishment selling, renting, displaying or exhibiting pornographic or obscene materials (including without limitation: magazines, books, movies, videos, photographs or so called "sexual toys") or providing adult type entertainment or activities (including, without limitation, any displays of a variety involving, exhibiting or depicting sexual themes, nudity or lewd acts. [This clause shall not prohibit or limit the items typically sold by a business of the type operated on the date hereof under the trade names "Barnes & Noble" or "Books-A-Million"]

16. A massage parlor or any establishment purveying similar services not to include operations like Massage Envy and Hand and Stone.

17. Except for the area North of Line "A" as depicted on Exhibit A, a skating rink of any type.

18. A house of worship, church, reading room, mortuary, crematorium or funeral home. ·

19. A mobile home or trailer court, labor camp, junkyard or stockyard.

20. A motel or hotel or a lodging establishment of any kind, except a first class hotel e.g. Marriot, Hilton North of Line "A".

21. A landfill, garbage dump or for the dumping, disposing, incineration or reduction of garbage.

22. A telephone call center (which shall not preclude a telephone store, cellular and otherwise).

23. A gambling establishment of any kind including, without limitation, a casino, bingo parlor or betting parlor (but lottery tickets may be sold and government sponsored lottery and similar gaming devices may be operated incidental to non-casino and non-hotel primary business at the premises).

24. An assembling, manufacturing, industrial, distilling, refining or smelting facility, but a so called brew-pub is permitted. This prohibition shall not prohibit a Brew- Pub.

5425472v2

25. A storage warehouse or storage facility, except for storage incidental to a permitted use. This prohibition shall not prohibit a wholesale club such as Costco, BJs and Sam's Club are permitted.

26. The conduct of any "fire sale," going out of business sale or bankruptcy sale (except pursuant to a court order) or any auction house operation.

27. Any use which regularly emits a noxious odor, loud noises or sounds which can be heard or smelled outside of the occupant's premises in violation of code.

28. A "so called" head shop or any business selling marijuana or any type of drug rehab clinic or counseling service, including without limitation a methadone clinic. However, a drug store shall not be restricted from selling any prescription drugs, including marijuana if the sale of marijuana by prescription is permitted by law.

30. Operation of a business which performs medical procedures, consulting or activities related to abortion, birth control or euthanasia, drug or alcohol addiction.

5425472v2

DocuSign Envelope ID: D1726786-5D40-4674-9450-D7454AFFB5A7

**EXHIBIT "F"**

<u>Tenant's Signs</u>

[see attached <u>11</u> pages]

F-1

DocuSign Envelope ID: D1726788-5D40-4674-9450-D74E4AFEBEA7

Project No. 3803

**Burlington Signage Package**
3215 N 5th Street Hwy
Reading, PA 19605

ORIGINAL DRAFT - 06/25/2021
This exhibit is for sign scope only
(not exterior elevation scope)

Facade Type: Modified Existing

[ IDENTITI ]

SIGNAGE | BRANDED ENVIRONMENTS | MAINTENANCE



## <u>Property Evaluation Report: Sign Code Research</u>

Code research is done to the best of our ability by confirming with city & obtaining code in writing, nothing is 100% guaranteed until permits are in hand.

**I. Location** Address: 3215 N 5th STREET HWY          City/State/Zip: READING, PA 19605

Former Tenant: OFFICE MAX          Shopping Center: Madeira Plaza

**II. Exterior Signage**

This report is based upon the city/county sign code: Zone/District: Muhlenberg Township

C2

**A. Building Wall Signs**

Total Qty Allowed per tenant: 8

Total Qty Allowed per elevation: No limit

SqFt Allowed for /PrimaryStorefront: 20% of facade NTE 300SF CUMULATIVE    For Sides/Rear: 20% OF FACADE

Transferable: NO

Max Height Allowed: 30'          Max Width:

How is SqFt Measured: Rectangle

Can we box individual elements and total them up – Y/N: Yes; we can contour around letters or box individually

**B: Boxed Heart Logo**

Counted as part of store signage? Yes: yes          No:

If Counted separately what is the max size it can be?:

**C. Pylon Signs & D. Monument Signs**

Qty Allowed:          SqFt Allowed:          Max Height:

**Proposed Qty of Wall Signs :**

**III. Temporary Signage**

Banners: Yes; max of 30 days can have up to 4x a year 32SF

Construction Sign: yes MAX SIZE 32SF

Flag Banners: NO

Step Stakes: NO

Tenant Overlays: YES

**IV. Permit Procedure:**

A. Permit: (Approx Days) 30  Over the Counter Y/N: N          Design Review Y/N N

Requires Engineering

B. Variance- Probability of Variance approval for 84" set:          72" set:

Comments: Only granted 2 variances and they were for pylon signs as far as height since sign was blocked by highway

C. Name of Contact & dept spoken with: Shelly Fizz

D. Form of Landlord Approval needed for Permits

LL consent form

**V. Additional Information Notes:**

**VI. Restrictive Issues:**



3215 N 5th Street Hwy, Reading, PA 19605

**LEGEND**

| | |
|---|---|
| Front Elevation (West) | S1 |
| Front Elevation (West) | S2 |
| Side Elevation (South) | S3 |
| Pylon | P1 |

N

**Site Plan – Overview**

Project No. 3803
Project Signage Package
Location 3215 N 5th Street Hwy Reading, PA 19605

Orig. Draft 06.25.2021
Project Mgr. Doug Franklin
Designer Liz Morgan
Rev. Art N/A
Rev. Date 00.00.00
Page Rev. 000
Rev. Details N/A

This logo design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this logo design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.501.0510
identiti.net

**IDENTITI**

Scale: 1/4" = 12"



SIGN PLACEMENT ADJUSTED TO KEEP TAGLINE TO BE BETWEEN FACADE SCORE LINES

**FIELD VERIFICATION REQUIRED**
**VARIANCE REQUIRED**



44.50 in

10.375 in

517.00 in
(43 ft - 1 in)

140.125 in

312.50 in

84.00 in

84.00 in

12.00 in

112.875 in
(9 ft - 4 7/8 in)

---

**Front (West) Store Elevation**

# S1-1

**Proposed Signage = 224.6 SF**

**Relevant Signage Code**
NTE 20% of façade; NTE 300 SF Cumulative

±34' x 174' x 20% = 1183.2 SF

224.6 SF = 16 SF + 138.7 SF = 379.3 SF Total

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
☐ Face: White Lexan
☐
☐
■ Trim Cap & Returns: Black
☐  N/A
☐  N/A
☐  N/A

| | |
|---|---|
| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of its employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution or use of this design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

**IDENTITI**

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.301.0510
identiti.net

Scale: 3/4" = 12"



FIELD VERIFICATION REQUIRED
VARIANCE REQUIRED



48.00 in
(4 ft - 0 in)

45.375 in

36.00 in

45.375 in  36.00 in

48.00 in
(4 ft - 0 in)

I-5/16"

---

**Front (West) Store Elevation**

## S2-1

### Proposed Signage = 16.0 SF

**Relevant Signage Code**
NTE 20% of façade; NTE 300 SF Cumulative

±34' x 174' x 20% = 1183.2 SF

224.6 SF ÷ 16 SF = 138.7 SF = 379.3 SF Total

**Sign Type**
1/2" Thick Acrylic Lettering Painted
to Match PMS 207

**Mounting**
Stud Mounted Flush w/ Silicone

**Color Palette**
■ PMS 207C
□ N/A
□ N/A
□ N/A
□ N/A

| | |
|---|---|
| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy<br>Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

**IDENTITI**

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.361.0910
identiti.net

Scale: 1/4" = 12"

## Side (South) Store Elevation

## S3-1

**Proposed Signage = 138.7 SF**

**Relevant Signage Code**
NTE 30% of façade; NTE 300 SF Cumulative

±34' x 174' x 20% = 1183.2 SF

224.6 SF - 16 SF = 138.7 SF = 379.3 SF Total

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
Face: White Acrylic
Vinyl Translucent PMS 207 C
Trim Cap & Returns: Black
Tagline Vinyl 3M 3630=222 Day / Night Black
Tagline Trim Cap & Returns: Black

| | |
|---|---|
| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.301.0510
identiti.net

**IDENTITI**





FIELD VERIFICATION REQUIRED
VARIANCE REQUIRED

SIGN PLACEMENT, EXISTING FACADE ELEMENTS, AND ELECTRICAL TO BE VERIFIED

406.25 in
(33 ft - 10 1/4 in)

245.50 in

66.00 in

66.00 in

10.00 in

88.625 in
(7 ft - 4 5/8 in)

35.00 in

8.00 in

109.75 in

Scale: NTS



◄ PROPOSED

FIELD VERIFICATION REQUIRED



◄ EXISTING



TBD

TBD

---

**D/F Pylon - Tenant Panel**

## P1-1

**Proposed Signage = TBD**

**Relevant Signage Code**
Face Replacement

**Sign Type**
Tenant Panel with Applied Vinyl
QTY

**Mounting**
Mounting TBD

**Color Palette**
Face: White Acrylic

Vinyl: Custom Arlon Trans – Burlington Red

Painted Panels: PMS 207 C

N/A

N/A

| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy |
| | Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured in this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.301.0510
identiti.net

**IDENTITI**





UL LABELS ADHERED TO TOPS OF LETTERS



(A3) LETTER SECTION
SCALE: N.T.S.

## "B" LOGO

| 1 | 2" TRIM CAP; (WITH JEWELETE WASHER HEAD PHILLIPS SCREWS) PAINTED BLACK |
| 2 | 3/16" LEXAN PANEL; WHITE |

## "urlington" LETTERS

| 1 | 1" TRIM CAP; (WITH JEWELETE WASHER HEAD PHILLIPS SCREWS) PAINTED BLACK |
| 2 | 3/16" ACRYLIC #7328; WHITE |

## IDENTICAL SPECIFICATIONS

| 3 | 0.063" ALUMINUM RETURNS (5" DEPTH); PAINTED BLACK SATIN FINISH |
| 4 | LED UNITS: SLOAN PRISM WHITE |
| 5 | UL LISTED HOUSING; SECONDARY WIRING SPLICE POINT (WHEN NEEDED) |
| 6 | UL HOUSING W/ PWR SUPPLY (QTY VARIES) DISCONNECT SWITCH FOR DEDICATED PRIMARY POWER CIRCUIT |
| 7 | PRIMARY POWER CIRCUIT (PROVIDED/PERMITTED BY OTHERS) TO BE PLACED WITHIN 5 FEET OF CENTER OF SIGN |
| 8 | CONDUIT: SECONDARY ELECTRICAL RUN (WHEN NEEDED) |
| 9 | 0.063 ALUMINUM BACK; PRECOAT WHITE FINISH |
| 10 | MOUNTING HARDWARE: STEEL KNURLED FLANGED RIVET NUT 0.880" L, 1/4"-18 DIA./THREAD. SIZE W/ NUTS, WASHERS AND THREADED ROD |
| 11 | WEEP HOLES |

**ALL LETTERS TO HAVE 10' WHIPS**

---

Sign Specification

## SPEC (S1 - 84" Letters)

**Proposed Signage = N/A**

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
Face: White Lexan
■ Trim Cap & Returns: Black
□ N/A
□ N/A
□ N/A

Project No.      3803
Project          Signage Package
Location         3215 N 5th Street Hwy
                 Reading, PA 19605

Orig. Draft      06.25.2021
Project Mgr.     Doug Franklin
Designer         Liz Morgan
Rev. Art         N/A
Rev. Date        00.00.00
Page Rev.        000
Rev. Details     N/A

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

**IDENTITI**
425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.301.0510
identiti.net



LADIES ○ MENS ○ KIDS ○ BABY

HOME ○ COATS

UL LABELS ADHERED TO TOPS OF LETTERS



A3 LETTER SECTION
SCALE: N.T.S.

## LETTERSET SPECIFICATIONS

| 1 | 0.063 ALUMINUM RETURNS (3" DEPTH) SECONDARY ELECTRICAL RUN PAINTED BLACK |
|---|---|
| 2 | 1" TRIM CAP (WITH JEWELITE WASHER HEAD PHILLIPS SCREWS) PAINTED BLACK |
| 3 | LEXAN PANEL; WHITE FACES |
| 4 | LED UNITS; WHITE |
| 5 | UL LETTER HOUSING; SECONDARY WIRING SPLICE POINT (WHEN NEEDED) |
| 6 | UL HOUSING W/ PWR SUPPLY (QTY VARIES) DISCONNECT SWITCH FOR DEDICATED PRIMARY POWER CIRCUIT |
| 7 | PRIMARY POWER CIRCUIT (PROVIDED/PERMITTED BY OTHERS) TO BE PLACED WITHIN 5 FEET OF CENTER OF SIGN |
| 8 | CONDUIT: SECONDARY ELECTRICAL RUN (WHEN NEEDED) |
| 9 | 0.063 ALUMINUM BACK; PRECOAT WHITE FINISH |
| 10 | MOUNTING HARDWARE: VARIES ON FACADE TYPE AND SUPPORT STRUCTURE |
| 11 | WEEP HOLES |

**ALL LETTERS TO HAVE 10' WHIPS**

## Sign Specification

# SPEC (S1 Tagline)

**Proposed Signage = N/A**

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
Face: White Lexan
Tagline Trim Cap & Returns: Black
N/A
N/A
N/A

Project No.        3803
Project            Signage Package
Location           3215 N 5th Street Hwy
                   Reading, PA 19605

Orig. Draft        06.25.2021
Project Mgr.        Doug Franklin
Designer           Liz Morgan
Rev. Art           N/A
Rev. Date          00.00.00
Page Rev.          000
Rev. Details       N/A

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD., is prohibited.

IDENTITI

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.381.0910
identiti.net





UL LABELS ADHERED TO TOPS OF LETTERS

LETTER SECTION
A3 SCALE: N.T.S.

**ALL LETTERS TO HAVE 10' WHIPS**

## LETTERSET SPECIFICATIONS

| 1 | 0.063 ALUMINUM RETURNS (5" DEPTH): PAINTED BLACK SATIN FINISH |
|---|---|
| 2 | 1" TRIM CAP (WITH JEWELITE WASHER HEAD PHILLIPS SCREWS) PAINTED BLACK |
| 3 | 3/16" SEAMLESS WHITE ACRYLIC FACE: WHITE W/ APPLIED TRANSLUCENT VINYL PMS 207 C (Arlon 207 C) |
| 4 | LED UNITS: SLOAN PRISM RED |
| 5 | UL LISTED HOUSING: SECONDARY WIRING: SPLICE POINT (WHEN NEEDED) |
| 6 | UL HOUSING W/ PWR SUPPLY (QTY VARIES) DISCONNECT SWITCH FOR DEDICATED PRIMARY POWER CIRCUIT |
| 7 | PRIMARY POWER CIRCUIT (PROVIDED/PERMITTED BY OTHERS) TO BE PLACED WITHIN 5 FEET OF CENTER OF SIGN |
| 8 | CONDUIT: SECONDARY ELECTRICAL RUN (WHEN NEEDED) |
| 9 | 0.063 ALUMINUM BACK: PRECOAT WHITE FINISH |
| 10 | MOUNTING HARDWARE: STEEL KNURLED FLANGED RIVET NUT 0.880" L, 1/4"-18 DIA./THREAD SIZE W/ NUTS, WASHERS AND THREADED ROD |
| 11 | WEEP HOLES |

---

Sign Specification

## SPEC (S3 Main Letters)

**Proposed Signage = N/A**

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
Face: White Acrylic
Vinyl Translucent PMS 207 C
Trim Cap & Returns: Black
N/A
N/A

| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This sign design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of it's employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this sign design by anyone outside of the customer's organization, without expressed, written, authorization by Identiti Resources, LTD., is prohibited.

**IDENTITI**

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.380.0510
identiti.net



# LADIES • MENS • KIDS • BABY

# HOME • COATS

UL LABELS ADHERED TO TOPS OF LETTERS



A3 LETTER SECTION
SCALE: N.T.S.

## LETTERSET SPECIFICATIONS

| 1 | 0.063 ALUMINUM RETURNS (3" DEPTH): PAINTED BLACK |
| 2 | 1" TRIM CAP: (WITH JEWELITE WASHER HEAD PHILLIPS SCREWS): PAINTED BLACK |
| 3 | 3/16" ACRYLIC FACE: WHITE W/ 3M 3630-22J TRANSLUCTION BLACK DAY/NIGHT VINYL |
| 4 | LED UNITS: WHITE |
| 5 | UL LISTED HOUSING: SECONDARY WIRING STRIKE POINT (WHEN NEEDED) |
| 6 | UL HOUSING W/ PWR SUPPLY (QTY VARIES): DISCONNECT SWITCH FOR DEDICATED PRIMARY POWER CIRCUIT |
| 7 | PRIMARY POWER CIRCUIT (PROVIDED/PERMITTED BY OTHERS): TO BE PLACED WITHIN 5 FEET OF CENTER OF SIGN |
| 8 | CONDUIT: SECONDARY ELECTRICAL RUN (WHEN NEEDED) |
| 9 | 0.063 ALUMINUM BACK: PRECOAT WHITE FINISH |
| 10 | MOUNTING HARDWARE: VARIES ON FACADE TYPE AND SUPPORT STRUCTURE |
| 11 | WEEP HOLES |

**ALL LETTERS TO HAVE 10' WHIPS**

---

## Sign Specification

### SPEC (S3 Tagline)

**Proposed Signage = N/A**

**Sign Type**
LED Channel Letters
Front-Lit

**Mounting**
Flush Mounted

**Color Palette**
Face: White Acrylic

Tagline Vinyl: 3M 3630-22J Day/Night Black
Tagline Trim Cap & Returns: Black

N/A

N/A

| Project No. | 3803 |
| Project | Signage Package |
| Location | 3215 N 5th Street Hwy |
| | Reading, PA 19605 |
| Orig. Draft | 06.25.2021 |
| Project Mgr. | Doug Franklin |
| Designer | Liz Morgan |
| Rev. Art | N/A |
| Rev. Date | 00.00.00 |
| Page Rev. | 000 |
| Rev. Details | N/A |

This logo design is exclusive property of Identiti Resources, LTD., and is the result of the original and creative work of its employees. This drawing is submitted to the customer for the sole purpose of purchase of the design or signage manufactured to this design, by Identiti Resources, LTD. Distribution to or use of this logo design by anyone outside of the customer's organization, without expressed, written authorization by Identiti Resources, LTD. is prohibited.

**IDENTITI**

425 N Martingale Rd
18th Floor
Schaumburg, IL 60173
Office 847.380.0510
identiti.net