**Exhibit A**

*5331*

## EXHIBIT E

### COMPLETION OF LANDLORD'S WORK LETTER

Date:       June 3, 2015

To:         Big Lots Stores, Inc. dba Big Lots                                        *16*

From:       Plaza At Speedway LLC
            Contact Persons:      Abraham Farahan
                                  Maurice Refoua
            EIN #      20-5385438

RE:         6121 Crawfordsville Road, Indianapolis, IN 46224
            Speedway Plaza

You are hereby notified that all work required of Landlord pursuant to the Lease dated February 18, 2015 has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

|   |   |
|---|---|
| X | Roof Survey with evidence that the required repairs have been made. |
| X | HVAC Survey with evidence that all required repairs have been made *REPAIRS COMP. 5/15* |
| X | Asbestos Survey (with evidence of required remediation, if necessary) – *REMOVAL COMP. 3/31* |
| X | Pest Survey certifying the premises |
| X | Sprinkler Certification – *FROM 1/15. WHEN WERE CORRECTIONS MADE? IALUDER* |
| X | Completion of Exhibit C     *SAW TOPS UNTIL NOW. ASKED FOR IT IS MARCH. WE MADE CORRECTIONS.* |

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant on March 15, 2015.     *LANDLORD WORK SUB. COMPLETE (4/15/15)*

You may pick up the keys at:      the site; and was picked up on or about March 11, 2015

If you have any questions, please feel free to contact:
            Abraham Farahan          317 848 7847          abrahamfar@hotmail.com
            Liz Mijares              310 229 9850 ext. 107  Liz@hrpropertygroup.com

Thank you.

LANDLORD:  PLAZA AT SPEEDWAY LLC

By:

Signature:
Printed Name: Maurice Refoua
Title: Manager

Tenant:  BIG LOTS STORES, INC.
an Ohio corporation
By:

Signature:
Printed Name:  *JEFF Halley*
Title:  *DIRECTOR, CONSTRUCTION*

# TABLE OF CONTENTS

**Section**

1. Definitions
   - A. Common Areas
   - B. Dates
   - C. Exhibits
   - D. Demised Premises
   - E. Shopping Center

2. Demise

3. Term
   - A. Original Term
   - B. Option to Extend Term

4. Use and Operation
   - A. Permitted Uses
   - B. Prohibited Uses

5. Rent
   - A. Gross Rent
   - B. Utilities Charges
   - C. Intentionally Deleted
   - D. Common Area Maintenance
   - E. Real Estate Taxes
   - F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    - A. Tenant
    - B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Intentionally Deleted

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

42.    Exculpation

43.    Mechanic's Liens

44.    Inspections

45.    Limit On Offset

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 18 th day of February , 2015 (the "Effective Date"), by and between Plaza at Speedway, LLC, an Indiana limited liability company ("Landlord") whose mailing address is 410 S. Beverly Drive * and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

*  Beverly Hills, CA 90212

**WITNESSETH:**

1.  **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.   Common Areas:   The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as the same may exist from time to time, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.   The current Common Areas are shown on Exhibit A.

    Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises from Crawfordsville Road. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place no more than two (2) drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances.   Tenant shall repair any damage caused by such trailers. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

    Except for the No Change Area, Landlord reserves the right to change the Common Areas and the Shopping Center, including but not limited to, adding land and/or buildings thereto, changing the number and location of buildings, building dimensions, the exterior façade of buildings, the number of floors in any building, the Common Areas and the type and identity of other tenants in the Shopping Center; provided that the location and size of the Demised Premises shall not be changed nor shall the visibility or accessibility of the Demised Premises be impaired.

    B.   Dates:   Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

        1)   Landlord shall notify Tenant if and when (in Landlord's sole discretion) construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, as defined

3

hereinbelow, and upon such notice, Tenant shall have the right, at its sole risk, to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work. Tenant hereby agrees to indemnify, defend and hold Landlord harmless from and against any injury, loss or damage which may occur to any person or property as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)      The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers possession to Tenant with all of Landlord Work substantially complete; or (ii) the date on which Tenant receives all permits for its construction and signage (the "Permits"). Tenant will submit its plans for the Permits within sixty (60) days of the Effective Date. Tenant shall apply for the Permits in compliance with all code requirements, in the format required by the governmental entity and in compliance with all customary practices thereof and will pay all fees required therefor. Tenant shall use its commercially reasonable best efforts to obtain the Permits. Landlord will cooperate fully with Tenant in obtaining said Permits, at no cost or expense to Landlord. Tenant shall promptly notify Landlord when Tenant has received its Permits. If Tenant has not obtained its Permits within one hundred twenty (120) days after the Effective Date, either party may terminate this Lease by written notice to the other party. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has substantially completed Landlord's Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been substantially completed. Tenant shall notify Landlord, in writing and in reasonable detail, of any items of Landlord's Work which is not substantially complete within ten (10) days following Tenant's receipt of Landlord's notice that Landlord's Work has been substantially completed. Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is substantially complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work"). Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of completion and compliance is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of completion and compliance is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)      The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)  If Landlord fails to return properly executed Leases to Tenant by February 15, 2015 or if Landlord fails to substantially complete Landlord's Work in the Demised Premises by March 15, 2015, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to January 1, 2015. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by March 15, 2015, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon March 16, 2015 and continuing for each and every day Landlord is delayed in completing Landlord's Work, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, as set forth above, Landlord shall pay to Tenant, as liquidated damages and not a penalty, an amount equal to 1 day's rent for each day after March 15, 2015 that Landlord is delayed in completing Landlord's Work. If Landlord shall fail to pay such liquidated damages within thirty (30) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Work until Tenant has received its permits for its construction in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)  Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises and/or Tenant has not received the Permits by July 31, 2015, Tenant may terminate this Lease by written notice to Landlord.

C.  <u>Exhibits</u>: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)  Exhibit A -  Site Plan of Shopping Center

2)  Exhibit B -  Legal Description of Shopping Center

3)  Exhibit C -  Landlord's Work

4)  Exhibit D -  Tenant Building Sign Specifications

5)  Exhibit D – 1 Tenant Pylon Sign Location

6)  Exhibit E -  Completion of Landlord's Work Letter

7)  Exhibit F -  Exclusive Use Provisions

D.  <u>Demised Premises</u>: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 48,000 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises.

E.  <u>Shopping Center</u>: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is Speedway Plaza, 6121 Crawfordsville Rd., Speedway, IN 46224. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 82,882 square feet.

2.    **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant, and Tenant hereby rents from Landlord, the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

Landlord shall ensure that Tenant shall have continued cross access with the adjacent parcel owners to the traffic light on Crawfordsville Road.

3.    **TERM:**

A.    Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2022 (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.    Options to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and "Fourth Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises and not in monetary default under this Lease beyond any applicable notice or cure period, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.  The failure to properly exercise any Option Term automatically voids all subsequent Option Terms.

4.    **USE AND OPERATION:**

A.    Permitted Uses:  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale (including financing and/or leasing) of general merchandise, closeouts, furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including refrigerated and frozen food, beer and wine), and for any other lawful retail purpose.  Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's

6

use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs, but excluding any punitive, incidental or consequential damages) incurred by Tenant as a result of the breach of the foregoing representation and warranty. Notwithstanding anything to the contrary contained in this Lease, Tenant covenants and agrees that its use of the Demised Premises will not violate any covenants or restrictions set forth in Exhibit F.

Except for tenants open and operating for business in the Shopping Center as of the Effective Date, no other general merchandise store, discount store, liquidator, closeout store, furniture store or dollar store operating in more than 10,000 square feet ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Roses, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Building 19, National Wholesale Liquidators, Bed Bath & Beyond, Christmas Tree Shops, Five Below, and Ollie's Bargain Outlet. Notwithstanding the foregoing, the following shall not be considered to be a Competing Business: stores whose primary business is the sale of apparel, home improvement or hardware stores, a specialty retail store or store that primarily sells a specific category of merchandise, such as an electronics store, a book store, a sporting goods store, an office supply store, a craft store, a pet store, a fabric store, a card store, etc. In the event a Competing Business, as defined herein, is operated in the Shopping Center at any time Tenant is open and operating in the Shopping Center and not in default (beyond applicable notice and cure periods) under this Lease (an "Exclusive Violation"), Tenant shall give Landlord written notice of the Exclusive Violation, and in the event Landlord does not cure such Exclusive Violation within ninety (90) days after receipt of Tenant's notice, Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay, in lieu of Gross Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Gross Rent then effective under this Lease; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to

cease; provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall vacate the Demised Premises in accordance with this Lease and both parties shall be released from all liability thereafter accruing, except as otherwise provided herein.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal. Tenant shall lock the doors of the Demised Premises whenever Tenant is not open for business, however, Tenant shall not be responsible for providing or maintaining security in the Common Areas of the Shopping Center.

Tenant shall use the Demised Premises in accordance with all laws, ordinances, statutes, codes and governmental rules and regulations.
Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises as shown on Exhibit A; and (ii) use the Common Areas immediately adjacent to the Demised Premises as shown on Exhibit A for the periodic sale and display of merchandise.

B.    Prohibited Uses: Except as permitted under leases in effect as of the Effective Date, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, a store selling used apparel (except for (A) a national or regional store such as Play it Again Sports or Once Upon a Child or (B) Goodwill or a similar national or regional operation) or a "flea market" type of operation; (iii) for an auditorium, activity facility, meeting hall, church or other place of worship; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or

8

parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any alcoholic beverage sales by Tenant and a full-service restaurant; provided, however, that any restaurant must be located at least 150 linear feet away from the Demised Premises); (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities, except for incidental uses in connection with a pet store; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises provided that such installation does not involve any roof penetrations); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

**5.      RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date and continuing on the first day of each calendar month during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Gross Rent (sometimes referred to as "Rent"). The Rent shall be paid without notice or demand and without offset or deduction, except as specifically permitted under this Lease. The Rent for any partial month shall be pro rated based on the actual number of days in such month. The parties agree that the Rent paid by Tenant to Landlord shall be a "gross rent", and Tenant shall not pay Landlord any additional rent or any other amounts including, but not limited to, costs, expenses and charges related to real estate taxes, common area maintenance and insurance, except as otherwise specifically set forth herein, it being the intent of the parties that the Rent paid by Tenant pursuant to Section 5.A. be the only payments made by Tenant to Landlord, except Tenant's pro rata share of Taxes over Base Year 2016.

A.    <u>Gross Rent</u>:  During the Original Term of this Lease, the sum of $200,000.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $16,666.67.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Gross Rent applicable for the First Option Term shall be the sum of $225,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $18,750.00. The Gross Rent applicable for the Second Option Term shall be the sum of $250,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $20,833.33. The Gross Rent applicable for the Third Option Term shall be the sum of $275,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $22,916.67. The Gross Rent applicable for the Fourth Option Term shall be the sum of $300,000.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $25,000.00.

B.    <u>Utilities Charges</u>:  Landlord shall provide Tenant with access to water, sewer, gas, electricity and telephone services. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises with no cost to Landlord.

Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs which are Landlord's obligation hereunder, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring

equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Late Fees: If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more of such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year. The provisions herein for the late fee shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the time or times herein stipulated.

D.    Common Area Maintenance: Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

(i)    operating, maintaining, refurbishing, repairing, replacing and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)   operating, maintaining, refurbishing, repairing, replacing and lighting the service areas, garbage and refuse disposal facilities (but excluding service areas and garbage and refuse disposal facilities for individual tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)  operating, maintaining, refurbishing, repairing, replacing and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are in place from time to time;

(iv)   providing lighting and on-site and off-site traffic control, if necessary;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)   cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not unreasonably interfere with Tenant's store entrance and designated parking areas.

In addition to the above enumerated items, Landlord shall be responsible for refurbishing, repairing, maintaining, and, when required, replacing, lighting, line painting, and landscaping, and paying compensation and benefits (including premiums for worker's compensation and other insurance) for on-site employees and paying all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies. Tenant shall not pay or reimburse Landlord for the costs or expenses arising with respect to the Common Area maintenance. Tenant shall not pay or reimburse Landlord for any capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping

Center, insurance deductibles, and uninsured retentions, and any administrative, management or related fees. All Common Area maintenance shall be performed by Landlord at its sole cost and expense.

E.   Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center and all reasonable costs and expenses incurred in connection with any appeal of such real property taxes, but only to the extent that such costs and expenses do not exceed the amount of any tax savings actually realized (hereinafter referred to as "Real Estate Taxes"). Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord for tax parcel # 9027760, as provided herein. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Commencing with calendar year 2017 and continuing for each calendar year thereafter during the Term, Tenant's only obligation with respect to Real Estate Taxes shall be to pay to Landlord its pro rata share of any increase in Real Estate Taxes paid by Landlord in excess of those Real Estate Taxes paid by Landlord during calendar year 2016 (the "Base Year for Taxes"). Landlord shall provide to Tenant a copy of the tax bills paid by Landlord during the Base Year for Taxes. Thereafter, Landlord shall deliver to Tenant a statement of Real Estate Taxes within one hundred twenty (120) days after the end of each calendar year. If, in calendar year 2017, the Real Estate Taxes paid by Landlord during such calendar year exceed the Real Estate Taxes paid by Landlord during the Base Year for Taxes, Tenant shall pay its pro rata share of such increase to Landlord within thirty (30) days of its receipt of such statement. If, in any subsequent calendar year, the amount of Real Estate Taxes paid by Landlord during such calendar year exceeds the amount of the Real Estate Taxes paid by Landlord during the Base Year for Taxes, Tenant shall pay its pro rata share of such increase to Landlord within thirty (30) days of its receipt of such statement. Landlord shall deliver to Tenant a statement of Real Estate Taxes up to two (2) times per calendar year and, in any event, within one hundred twenty (120) days after the end of each calendar year.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord for any applicable year.

Landlord shall notify Tenant of any notice it receives from the applicable taxing authority increasing the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided to Tenant by the later of (i) ten (10) business days after Landlord receives such notice, or (ii) sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file, at no cost or expense to Landlord. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the Base Year for Taxes which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time during the Original Term and one (1) time during each Option Term.

Tenant shall pay all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.    Construction Allowance: Landlord shall pay to Tenant an amount equal to Three Hundred Thousand Dollars ($300,000.00) within thirty (30) days of the later of: (i) Tenant's opening for business, and (ii) Landlord's receipt of lien waivers from all contractors, subcontractors and suppliers providing more than Five Thousand Dollars ($5,000.00) in labor and/or materials in connection with Tenant's work in the Demised Premises (the "Payment Conditions"). If said amount is not paid by Landlord to Tenant when due, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully recovered by Tenant.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

Construction Rent Abatement:    Notwithstanding anything to the contrary contained in this Lease, once the Payment Conditions have been satisfied, Tenant shall not be obligated to pay Gross Rent, as consideration for Tenant's construction to and improvement of the Demised Premises (hereinafter referred to as "Rent Abatement") until the full amount of Three Hundred Thousand Dollars ($300,000.00) is recouped by Tenant.

Landlord and Tenant recognize and agree that to the extent that the Rent Abatement is used for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Rent Abatement shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code.   Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

## 6.    ALTERATIONS:

During the Term of this Lease, following completion of Tenant's initial improvements in the Demised Premises, Tenant shall have the right to make subsequent changes, additions, and alterations to the interior of the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner in accordance with all applicable building codes and standards; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord. Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises or the Shopping Center resulting from any such alterations.  Tenant shall not make any structural or exterior alteration of the Demised Premises without Landlord's prior written consent.

## 7.    MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non-structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises (even if located outside the Demised Premises), (vi) any canopy, awning or signs installed by Tenant and (vii) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises or were installed by Tenant. .

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7.   The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) intentionally omitted, (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not

14

exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report no later than two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall warrant that the HVAC system is in good working condition. Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall notify Landlord of any work required to place the HVAC system in good working condition. If Landlord does not have this work performed within 10 business days, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Tenant shall notify Landlord of any defects within ninety (90) days after the Tenant Possession Date by providing Landlord with written notice of such defects. Landlord shall, within thirty (30) days from such notice, put such defective items listed in Tenant's notice in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Should Tenant discover that the HVAC system requires repair and/or replacement during the Original Term, Landlord shall be solely responsible for the reasonable amount of such costs over and above $2,500.00 per Lease Year. In the event Landlord fails to reimburse Tenant for such costs within thirty (30) days of receipt of invoice therefor, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full. Provided, however, in the event one or more HVAC units are replaced during the Term of this Lease, Tenant shall be solely responsible for the cost of maintaining, repairing and replacing such unit(s).

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within sixty (60) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, or if more than thirty (30) days is reasonably required to put such items in operating condition, Landlord shall have such additional time as is reasonably required provided Landlord diligently pursues the cure, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period or longer period if reasonably required, Tenant shall have the right to perform such work and charge the Landlord the actual and reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently pursue to completion the making of any repairs required to be made by Landlord to the Demised Premises hereunder within thirty (30) days after notice by Tenant of the need for such repairs, Tenant shall have the right

15

to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the actual and reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's Work at the Demised Premises within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such reasonable and necessary expenses incurred by Tenant from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Subject to Tenant obtaining all required governmental permits and approvals and compliance with all governmental laws and rules, Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, or canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, subject to Tenant obtaining all required governmental permits and approvals, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners (until forty-five (45) days after Tenant opening), building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs (collectively "Pylon") (i) are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right, after 15 days prior written notice to Landlord, to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylon. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant

16

shall have thirty (30) days to accept the available Pylon space. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign. Tenant shall maintain such sign panels in good condition and repair and shall remove such sign panels at the expiration or earlier termination of this Lease.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment. This indemnification obligation shall survive the termination of this Lease.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant or because of any governmental permit or approval requested by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, sprinkler system; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992, in each case unless necessitated (i) by Tenant's specific use of the Demised Premises (as opposed to general retail use), (ii) by changes, alterations or additions made by Tenant or (iii) because of any governmental permit or approval requested by Tenant.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint

negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.   **INSURANCE:**

A.   Tenant: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date and any policy renewal date, so that Tenant shall have provided Landlord certificates of insurance evidencing the continuous existence during the Lease Term of all insurance required to be carried by Tenant hereunder.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.   Landlord: Landlord shall, at its sole cost and expense, at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall, at its sole cost and expense, at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions and Tenant shall not pay or reimburse Landlord for any costs or expenses arising from the insurance costs herein.

13.   **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof,

18

Landlord shall, except as otherwise provided herein, repair and restore the Demised Premises to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration and either restore or remove all other portions of the Shopping Center so damaged or destroyed. Landlord shall have no responsibility to repair, restore or replace Tenant's inventory, trade fixtures or equipment. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which in Tenant's reasonable judgment, is not useable by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to the condition required by this Lease within two hundred seventy (270) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all liability and obligations thereafter accruing under this Lease.

C.    If the Demised Premises are damaged or destroyed during the last one (1) year of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease within thirty (30) days after receipt of Landlord's notice.

## 14.    FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises or to the financial obligations of either Landlord or Tenant under this Lease.

## 15.    INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which are set forth on Exhibit H; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments,

damages and expenses (including without limitation attorney fees and court costs but excluding any punitive, incidental or consequential damages) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises not set forth on Exhibit H; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and to the best of Landlord's actual knowledge construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions by any party claiming by, through or under Landlord, but not otherwise. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other

proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises or a prospective purchaser of the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Gross Rent, and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

## 19.    DEFAULT:

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10)) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary provided that Tenant commences such cure within thirty (30) days and thereafter diligently pursues such cure to completion), then (a) this Lease, if the Landlord so elects in writing, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor, and Tenant shall pay to Landlord the reasonable damages resulting therefrom; or (b) Landlord, if the Landlord so elects in writing, may terminate Tenant's right to possess the Demised Premises without terminating this Lease, and Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor, and Tenant shall pay to Landlord the reasonable actual damages resulting therefrom, including, but not limited to, any payments required to be made by Tenant under this Lease as the same become due, less any net sums received by Landlord from renting the Demised Premises for the same period; or (c) Landlord may pursue any other right or remedy available at law, in equity or under this Lease. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises; provided, however, Landlord may lease other space in the Shopping Center first in the reasonable exercise of its judgment. All rights and remedies of Landlord herein created or otherwise

available at law or in equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of Landlord to exercise any other right or remedy available to Landlord. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord deems advisable. Any sums due from Tenant to Landlord under this Lease which are not paid when due shall bear interest at the Lease Interest Rate from the date due until paid.

B.  If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently pursue such cure to completion), then Tenant shall have the right, at its option, to (i) in the event of a continuing default that has a materially adverse impact on Tenant's ability to conduct business from the Demised Premises, terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount reasonably expended by it therefor, with interest at the Lease Interest Rate, may be collected from Landlord. Should Landlord refuse to reimburse Tenant for the reasonable costs incurred by Tenant in curing such default within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

**20.  CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the reasonable judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith to the extent of the available condemnation proceeds. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall equitably abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of the Demised Premises taken by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

22

21.    **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee, but shall be provided if requested. Tenant shall give Landlord prompt written notice of any assignment or subletting and the assignee or subtenant shall assume all of the obligations of Tenant under this Lease. The use of the Demised Premises by any assignee or subtenant shall be subject to all then-existing exclusives in the Shopping Center, provided that Landlord shall give Tenant notice of exclusive use rights granted by Landlord upon the written request of Tenant.

23.    **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition (with existing floor tile, if any, as-is), ordinary wear and tear and damage by fire and other casualty excepted. Tenant shall remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at one hundred twenty five percent (125%) of the Rent payable at the expiration of the immediately preceding Term and otherwise subject to all the terms and provisions hereof.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Indiana. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease. If Tenant records a memorandum of lease, upon the expiration of this Lease, Tenant shall execute and record a release of such memorandum.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Except for Linder Partners LLC d/b/a Sitehawk Retail Real Estate (which shall be paid by Landlord pursuant to a separate written agreement), Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon, including reasonable attorneys' fees.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than

24

the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30.   **HAZARDOUS MATERIAL:**

Landlord represents and warrants that to the best of Landlord's actual knowledge, the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material to the extent required by law in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs but excluding any punitive, incidental or consequential damages) related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall be solely responsible for the cost of the identification, containment, treatment, remediation and removal of all Hazardous Materials brought to, created on and/or disposed of from the Demised Premises or Shopping Center by Tenant, its agents, employees, or contractors. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant or persons acting under Tenant, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.   **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.   **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent

25

payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within twelve (12) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said twelve (12) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

Notwithstanding anything to the contrary contained herein, in the event there is any sum owed by Landlord to Tenant under this Lease, Tenant shall notify Landlord of any amount owed within twelve (12) months after the expiration of the Lease Year in which such sum is applicable. If Tenant does not notify Landlord of such amount owed within said twelve (12) month period, Tenant's claim to such amount owed shall be deemed waived and discharged.

33.    **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold, condition or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34.    **INTENTIONALLY DELETED.**

35.    **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine or electronic mail, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine or printer to be its original signature.

37.    **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38.    **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39. **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Real Estate Taxes payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction within twelve (12) months of receipt of Landlord's statement which it is challenging, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives. Tenant shall not audit Landlord's books and records more than one time per year and may audit each year only one time. Such audit shall be conducted at the location of the books and records of Landlord upon no less than fifteen (15) days advance written notice. Tenant will provide Landlord a copy of the audit report, and if such audit reveals any overpayment by Tenant, which is confirmed by Landlord acting in good faith, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit, not to exceed $3,000. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against up to fifty percent (50%) of the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. In the event Tenant's audit reveals any underpayment by Tenant, Tenant shall pay the amount of the underpayment to Landlord within thirty (30) days after receipt of the audit report. If Landlord refuses to allow any audit permitted hereunder, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Real Estate Taxes payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year, provided that all unpaid Real Estate Taxes shall be paid upon Landlord allowing such audit.

40. **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

41. **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

42. **EXCULPATION:**

Tenant acknowledges that Landlord's liability under this Lease shall be limited to Landlord's equity interest in the Shopping Center, and any judgment against Landlord shall be satisfied solely out of the proceeds of the sale of Landlord's equity interest in the Shopping Center. No judgment rendered against Landlord shall give rise to any right of execution or levy against Landlord's other assets. No individual who is Landlord or any member or partner of any entity that is Landlord, or their heirs, personal representatives, successors or assigns, shall have any personal liability to Tenant, or to any person claiming by, through or under Tenant, for any amount or in any capacity. Notwithstanding anything to the contrary herein, neither Landlord, nor any officer, director, member, or direct or indirect beneficial owner of Landlord or of any parent or other affiliate of Landlord shall have any personal liability with respect to any provision of this Lease, or

any obligation or liability arising hereunder or in connection herewith and none of their assets (other than the Shopping Center) shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claims. Tenant shall look solely to the equity of the then owner of the Shopping Center in the Shopping Center for the satisfaction of any remedies of Tenant in the event of a breach by Landlord of any of its obligations. Such exculpation is absolute and without any exception whatsoever.

43. **MECHANIC'S LIENS:**

Tenant will, at all times during the Term of this Lease take all steps necessary to prevent the filing of mechanic's liens against the Demised Premises or Shopping Center. If any mechanic's or other liens shall be filed against the Demised Premises or the Shopping Center or any part thereof, by reason of work performed or materials delivered to or for the benefit of Tenant, Tenant shall cause the same to be discharged and released of record within thirty (30) days after notice of filing, by bond or otherwise, at the expense of Tenant. In the event Tenant fails to remove any such lien within thirty (30) days of Tenant's receipt of notice of such filing, Landlord may have such lien discharged and released, and Tenant shall reimburse Landlord the amount paid by Landlord to remove such lien together with the reasonable attorneys' fees incurred by Landlord in removing such lien and interest at the Lease Interest Rate.

44. **INSPECTION:**

Tenant agrees to allow Landlord or its representatives or prospective purchasers or Mortgagees, during normal business hours and upon 24 hours notice, to enter the Demised Premises for the purpose of inspecting the same, for making any repairs deemed necessary or advisable, or for showing the Demised Premises to any party.

45. **LIMIT ON OFFSET:**

Notwithstanding anything to the contrary set forth in this Lease, in the event Tenant is permitted to deduct any sum from the next Rent payments owing under this Lease, such deduction shall be limited to fifty percent (50%) of the Rent payment otherwise required from Tenant.

[Signatures Appear on Immediately Subsequent Page.]

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_

On _Jan. 22, 2015_ before me, _Daniel Puno Candeloza, Notary Public_,
<span style="font-size:smaller">Date</span>   <span style="font-size:smaller">Here Insert Name and Title of the Officer</span>

personally appeared _Maurice Kepoua_
<span style="font-size:smaller">Name(s) of Signer(s)</span>

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
<span style="font-size:smaller">Signature of Notary Public</span>

DANIEL PUNO CANDELOZA
Commission # 2053465
Notary Public - California
Los Angeles County
My Comm. Expires Jan 13, 2018

Place Notary Seal Above

—————— OPTIONAL ——————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



# EXHIBIT B

# LEGAL DESCRIPTION OF SHOPPING CENTER

A part of the Southwest Quarter of Section 25, Township 16 North, Range 2 East, Marion County, Indiana, described as follows:

Commencing at the Northwest corner of said quarter Section; thence South 00 degrees 16 minutes 20 seconds West along the West line of said Quarter Section 231.23 feet to a point on a curve on the Southwesterly right of way of Crawfordsville Road; thence Southeasterly along said right of way 166.66 feet along an arc to the right and having a radius of 828.97 feet and subtended by a long chord having a bearing of South 64 degrees 07 minutes 25 seconds East, and a length of 165.88 feet; thence South 58 degrees 32 minutes 03 seconds East, along said right of way 274.00 feet to the point of beginning of this description; thence continuing South 58 degrees 32 minutes 03 seconds East along said right of way 50.00 feet; thence South 31 degrees 27 minutes 57 seconds West, 217.50 feet; thence South 58 degrees 32 minutes 03 seconds East, 200.00 feet; thence North 31 degrees 27 minutes 57 seconds East 217.50 feet to the Southwesterly right of way of Crawfordsville Road; thence South 58 degrees 32 minutes 03 seconds East, along said right of way 70.00 feet; thence South 31 degrees 27 minutes 57 seconds West, 40.00 feet; thence North 58 degrees 32 minutes 03 seconds West, 10.00 feet; thence South 31 degrees 27 minutes 57 seconds West 177.50 feet; thence South 57 degrees 19 minutes 50 seconds East 200.00 feet; thence North 31 degrees 27 minutes 25 seconds East, 217.50 feet to a point on a curve on the South line of the right of way taken by Cause No. C-6128 in the Marion Superior Court Room 3; thence Southeasterly right of way line taken by Cause No. C- 6128) along an arc to the right and having a radius of 2794.79 feet and subtended by a long chord having a bearing of South 52 degrees 27 minutes 53 seconds East, and a length of 285.03 feet; thence South 49 degrees 32 minutes 30 seconds East, 43.90 feet; thence South 40 degrees 27 minutes 30 seconds West 35.00 feet; thence South 69 degrees 20 minutes 25 seconds East, 23.91 feet to a point on the West property line of the Wardlow Property extended South as established by deed in Land Record 81, page 6 and in Deed Record 1274, page 126; thence South 24 degrees 27 minutes 00 seconds West along Wardlow's said West line and West line extended a distance of 45.46 feet to a point on a curve on the Southwesterly right of way of Cunningham Road; thence Southeasterly along said right of way 7.86 feet along an arc to the right and having a radius of 489.64 feet and subtended by a long chord having a bearing of South 54 degrees 11 minutes 56 seconds East and length of 7.86 feet to a point on the Westerly line of a 40 foot drainage easement to the Town of Speedway recorded December 14, 1965, as Instrument #65-66213, the next two calls being along said Westerly line; thence South 30 degrees 46 minutes 00 seconds West, 137.57 feet; thence South 38 degrees 16 minutes 00 seconds West, 332.76 feet to the right of way of the C.C.C. and St. Louis Railroad; thence North 63 degrees 14 minutes 00 seconds West, along said right of way 783.02 feet; thence North 31 degrees 27 minutes 57 seconds East, 401.62 feet; thence North 58 degrees 32 minutes 03 seconds West, 30.00 feet; thence North 31 degrees 27 minutes 57 seconds East, 222.50 feet; thence North 07 degrees 11 minutes 38 seconds West, 32.02 feet to the point of beginning, containing 9.608 acres, more or less.

Also a non-exclusive easement for utilities and sewer as set out in a grant recorded December 22, 1976 as Instrument #76-77225 over the following:

A part of the Southwest Quarter of Section 25, Township 16 North, Range 2 East in Marion County, Indiana, described as follows:

Commencing at the Northwest corner of said Quarter Section; thence South 00 degrees 16 minutes 20 seconds West, along the West line of said Quarter Section 980.85 feet to the Northeasterly right of way of the C.C.C. and St. Louis Railroad; thence South 63 degrees 14 minutes 00 seconds East, along said right of way 884.19 feet to the West line of a 40 foot drainage easement to the Town of Speedway recorded December 14, 1965, as Instrument #65-66213; thence North 38 degrees 16 minutes 00 seconds East, along the West line of said easement 332.76 feet; thence North 30 degrees 46 minutes 00 seconds East, along the West line of said easement 59.04 feet to the point of beginning of this easement; thence continuing North 30 degrees 46 minutes 00 seconds East, along the West line of said drainage easement 24.29 feet; thence North 86 degrees 10 minutes 56 seconds East, 77.29 feet to a point on a curve of the Southwesterly right of way of Cunningham Road; thence Southeasterly along said right of way 26.44 feet along an arc to the right and having a radius of 489.64 feet and subtended by a long chord having a bearing of South 44 degrees 39 minutes 45 seconds East a length of 26.44 feet; thence South 86 degrees 10 minutes 56 seconds West, 108.37 feet to the point of beginning.

Subject to and together with a non-exclusive easement for utilities over the following land:

A part of the Southwest Quarter of Section 25, Township 16 North, Range 2 East, Marion County, Indiana described as follows:

Commencing at the Northwest corner of said Quarter Section; thence South 00 degrees 16 minutes 20 seconds West,

Commitment No. 12-006695

along the West line of said Quarter Section 231.23 feet to a point on a curve on the Southwesterly right of way of Crawfordsville Road; thence Southeasterly along said right of way 166.16 feet along an arc to the right and having a radius of 828. 97 feet and subtended by a long chord having a bearing of South 64 degrees 07 minutes 25 seconds East and a length of 165.88 feet; thence South 58 degrees 32 minutes 03 seconds East, along said right of way 72.00 feet; thence South 25 degrees 57 minutes 39 seconds West, 218.51 feet to the point of beginning of this easement; thence South 58 degrees 32 minutes 03 seconds East, 491.04 feet; thence South 57 degrees 19 minutes 50 seconds East 200.34 feet; thence South 53 degrees 27 minutes 26 seconds East 256 feet; thence North 86 degrees 10 minutes 56 seconds East, 126.64 feet to the West line of a 40 foot drainage easement to, the Town of Speedway, recorded December 14, 1965 as Instrument #65-66213; thence South 30 degrees 46 minutes 00 seconds West, along the West line of said easement 24.29 feet; thence South 86 degrees 10 minutes 56 seconds West, 120.20 feet; thence North 53 degrees 27 minutes 26 seconds West, 262.78 feet; thence North 57 degrees 19 minutes 50 seconds West 199.45 feet; thence North 58 degrees 32 minutes 03 seconds West, 488.90 feet; thence North 25 degrees 57 minutes 39 seconds East, 20.09 feet to the point of beginning.

Together with a non-exclusive easement for utilities over the following land:

A part of the Southwest Quarter of Section 25, Township 16 North, Range 2 East, Marion County, Indiana, described as follows:

Commencing at the Northwest corner of said Quarter Section; thence South 00 degrees 16 minutes 20 seconds West, along the West line of said Quarter Section 231.23 feet to a point on a curve on the Southwesterly right of way of Crawfordsville Road; thence Southeasterly along said right of way 166.16 feet along an arc to the right and having a radius of 828.97 feet and subtended by a long chord having a bearing of South 64 degrees 07 minutes 25 seconds East and a length of 165.88 feet; thence South 58 degrees 32 minutes 03 seconds East, along said right of way 56.93 feet to the point of beginning of this easement; thence continuing South 58 degrees 32 minutes 03 seconds East along said right of way 30.14 feet; thence South 25 degrees 57 minutes 39 seconds West, 248.65 feet; thence North 58 degrees 32 minutes 03 seconds West, 30.14 feet; thence North 25 degrees 57 minutes 39 seconds East, 248.65 feet to the point of beginning.

Also, together with a non-exclusive easement for ingress and egress over the following land:

Part of the Southwest Quarter of Section 25, Township 16 North, Range 2 East in Marion County, State of Indiana, more particularly described as follows:

Commencing at the Northwest corner, of the aforementioned Quarter Section; thence South 00 degrees 16 minutes 20 seconds West on and along the West line thereof a distance of 980.854 feet to a point on the Northerly right of way of the C.C.C. and St. Louis Railroad, said point being 33.00 feet perpendicular to and Northeast of the centerline of said railroad track; running thence South 63 degrees 14 minutes 00 seconds East on and along said right of way line and parallel to said centerline a distance of 884.188 feet to a point, said point being on the West line of a 40 foot drainage easement to the Town of Speedway recorded December 14, 1965 as Instrument #65-66213 running thence North 38 degrees 16 minutes 00 seconds East along the West line of said easement a distance of 140.086 feet to the point of beginning of the easement described herein; continuing thence North 38 degrees 16 minutes 00 seconds East a distance of 40.065 feet; running thence South 55 degrees 00 minutes 00 seconds East a distance of 385.218 feet to the point of curvature of a curve concave North having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 38.000 feet; running thence on and along said curve an arc distance of 59.690 feet (said arc being subtended by a cord having a bearing of North 80 degrees 00 minutes 00 seconds East and a length of 53,740 feet) to the point of tangency; running thence North 35 degrees 00 minutes 00 seconds East tangent to said curve a distance of 119.327 feet to a point on the, Southwest right of way line for Cunningham Road (per Instrument #73-10488); running thence South 35 degrees 00 minutes 00 seconds East on and along Southwest right of way line a distance of 42.557 feet; running thence South 35 degrees 00 minutes 00 seconds West a distance of 104.768 feet to the point of curvature of a curve concave North having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 78.00 feet running thence on and along said curve an arc distance of 122.522 feet (said arc being subtended by a chord having a bearing of South 80 degrees 00 minutes 00 seconds West and a length of 110.309 feet) to the point of tangency; running thence North 55 degrees 00 minutes 00 seconds West tangent to said curve a distance of 387.501 feet to the point of beginning.

NOTE: Acreage contained in the legal description of the subject real estate is shown solely for the purpose of identifying and describing the insured land and this search should not be construed as insuring the quantity of land as set forth in said description.

## EXHIBIT C

## LANDLORD'S WORK

**The following work is to be substantially completed prior to the Tenant Possession Date and is subject to the review and approval from the Big Lots Director of Construction or its Representative.**

| | |
|---|---|
| **STOREFRONT:** | The exterior storefront façade shall be in good condition, freshly painted and repaired from previous tenant's signage |
| **DOORS:** | All doors to be sound and secure in good working condition. |
| **GLASS:** | All store front glass to be in good condition. |
| **UTILITIES:** | Tenant to utilize the existing utilities to be in good working condition and to include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. |
| **HVAC EQUIPMENT & MECHANICALS:** | All HVAC and HVAC equipment, duct work, diffusers etc. to be in good working condition. Existing HVAC and HVAC equipment, duct work, diffusers to be inspected and cleaned prior to Tenant's possession date. Landlord to provide Tenant with a copy of the inspection report. If the Tenant Possession Date occurs during the months of October through May, Landlord shall grant Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. Landlord shall also warrant the existing HVAC system for the initial lease term for any repairs over $2,500 during a single lease year (If Landlord installs new equipment, Tenant will maintain). |
| **PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** | All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term, Option Terms or Extensions. Landlord shall install any device(s) or system(s) for the suppression, detection or reporting of fire as required by Authority Having Jurisdiction (AHJ). All devices and systems installed for the suppression, detection or reporting of fire shall be in compliance with all applicable National, State and Local codes. |
| **EXTERIOR LIGHTING:** | All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. |
| **ROOF:** | Landlord shall install a new commercial grade roof by a reputable roofing contractor with a minimum 15 year warranty. |
| **RECEIVING AREA:** | The existing loading docks are to be in good working order (including all seals, bumpers, bollards, doors, etc.). Tenant shall have exclusive use of the dock area, which shall remain unobstructed for Tenant's use |
| **REMOVAL OF FIXTURES & EQUIPMENT:** | Landlord to remove all previous tenant's fixtures and equipment and deliver the space in broom clean condition. |
| **PARKING LOT:** | Parking lot shall be in good condition (paved, patched, sealed and striped) with potholes, severe cracks and uneven areas resurfaced and adequate for customer parking and Tenant's use. |
| **PESTS:** | Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free. |
| **CART CORRAL:** | Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto. |
| **SIGNAGE:** | Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s.) Tenant to have the marquee position on the pylon(s). Landlord |

shall provide a rendering of the existing pylon sign(s) highlighting Tenant's panel position. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position. (If no pylon is available, Tenant shall have the right to erect its own pylon per all city codes and ordinances.)

**DRAWINGS:**  Landlord is to provide Tenant with "as built" CADD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan.

**HAZARDOUS MATERIALS:**  Landlord is responsible for remediation of any and all hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises prior to lease execution. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:**  Landlord agrees the Demised Premises and building structure conforms to all requirements by authority having jurisdiction (including current seismic requirements if applicable). If said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to: a sprinkler certification completed within the last 60 days; roof report; HVAC report evidencing all repairs have been completed; and pest inspection report prior to Tenant's possession. All above work to be completed before the Tenant Possession Date.

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION





## HORIZONTAL LOGO
### INDIVIDUAL LED ILLUMINATED CHANNEL LETTER SET

| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4¼" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3¼" | 4'-8½" | 17¼" | 7½" | 92 SqFt |
| 4'-6" | 26'-2¼" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-¼" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |



## STACKED LOGO
## INDIVIDUAL LED ILLUMINATED
## CHANNEL LETTER SET

| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|------|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 94 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |

# SECTION DETAILS





# PYLON PANELS

## RECTANGULAR PANELS

PREFERRED:



2ND OPTION:



## SQUARE PANELS

PREFERRED:                    2ND OPTION:

          

## COLORS:

■ BACKGROUND OR LETTERS (DEPENDING ON OPTION)
100% BLACK

■ EXCLAMATION POINT
MATCH PMS 021o ORANGE (3M COLOR 44)

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

Date: _____

To:    _____ (insert Tenant)
    via facsimile: (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at

_____

If you have any questions, please feel free to contact me at

_____

Thank You.

**LANDLORD:**

_____
a _____

By: _____
Title: _____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Title: _____

**EXHIBIT F**

**EXCLUSIVE USE PROVISIONS**

No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use, except as set forth below.  Tenant covenants that its use of the Demised Premises will not violate the following exclusives and restrictions.

## Plaza At Speedway - EXCLUSIVES

Buffalo Wild Wings – Landlord agrees not to sell or lease any land or building within the Shopping Center (or any property owned or controlled by Landlord that adjoins the Shopping Center) (the "Restricted Area") to a tenant or user that will operate a combination restaurant/bar (including without limitation any restaurant/bar serving chicken wings or similar fare as Buffalo Wild Wings) with a three-way liquor license from their premises at the Shopping Center.

Best Nails    Lessee will have the exclusive right in the Shopping Center and any adjacent property owned directly or indirectly by Lessor to engage in a nail salon, except for Lessees under existing leases.

T-Mobile    Landlord grants Tenant the sole and exclusive right to sell wireless products and services in the Shopping Center.

UPS Store    Landlord shall not lease space in the Shopping Cneter to tenants whose primary business is postal services, shipping services and mailbox rentals

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ \_\_\_, 201\_\_ is attached to and made a part of the Lease dated _____ (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.      Demised Premises: (Section 1.D.) = _____.

2.      A.      Gross Rent – Original Term (Section 5.A.):
_____ annually; _____ per month.

3.      A.      Gross Rent – First Option (Section 5.A.):
_____ annually; _____ per month.

4.      A.      Gross Rent – Second Option (Section 5.A.):
_____ annually; _____ per month.

5.      A.      Gross Rent – Third Option (Section 5.A.):
_____ annually; _____ per month.

6.      A.      Gross Rent – Fourth Option (Section 5.A.):
_____ annually; _____ per month.

**EXHIBIT H**
**TITLE EXCEPTIONS**

**SCHEDULE B – SECTION 2**
**EXCEPTIONS**

The Policy or Policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

1.    Rights or claims of parties in possession not shown by public records.

2.    Easements, or claims of easements, not shown by public records.

3.    Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the land.

4.    Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5.    Taxes or special assessments which are not shown as existing liens by the public records.

6.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

7.    Taxes for 2011 due and payable in 2012, in the name of Plaza at Speedway LLC
Assessment: Land $1,456,400.00; Improvements $3,163,900.00; Exemptions $0.00
Parcel No. (s): 914-9027760 (49-05-25-105-004.000-914)
Taxing Unit: Town of Speedway City
May Installment: $62,612.00 Paid, November Installment $62,612.00 Unpaid
Taxes for 2012 due and payable 2013, a lien, but not yet due and payable and taxes for all subsequent years, which are not yet a lien.

8.    Rights of the Public and others entitled thereto in and to the use of that portion of the property within the bounds of any road or highways.

9.    Rights of tenants in possession under unrecorded leases.

10.    Easement for pipeline for the transmission of gas and incidental purposes in favor of the City of Indianapolis d/b/a Citizens Gas and Coke Utility as set out in easement dated October 22, 1959 and recorded October 22, 1959, in Deed Record 1777, Instrument No. 78738.

11.    Easements for water mains and incidental purposes in favor of the Town of Speedway recorded May 25, 1977, as Instrument No. 77-30213, No. 77-30214 and No. 77-30215.

12.    Covenant relative to use or development of subject tract as set out in Covenant dated January 22, 1976 and recorded February 17, 1976, as instrument No. 76-7750.

13.    Easement for drainage and incidental purposes in favor of the Town of Speedway recorded December 14, 1965, as Instrument No. 65-66213. (Crosses easement described in Schedule A)

14.    Terms, covenants, restrictions and easements for public utilities, signs and ingress and egress granted to purchasers of adjacent properties, including a covenant not to construct fence or other barriers on the easements granted or along any boundary

thereof, all as set out in Deed, Easements, and Restrictive Covenants dated January 31, 1977 and recorded February 2, 1977, as Instrument No. 77-5363, and amended by Modification at Restrictive Covenants as recorded April 1, 1977, as Instrument No. 77-17025.

15.  Terms, covenants, restrictions and easements for public utilities, signs and ingress and egress granted to purchaser of adjacent properties, including a covenant not to construct fence or other barriers on the easements granted or along any bounder thereof, all as set out in Deed, Easements and Restrictive Covenants, dated May 27, 1977 and recorded June 11, 1977, as Instrument No. 77-31775.

16.  Terms, covenants, restrictions and easements for public utilities, signs and ingress and egress granted to purchasers of adjacent properties, including a covenant not to construct fence or other barriers on the easements granted or along any boundary thereof, all as set out in Deed, Easements and Restrictive Covenants dated January 31, 1977 and recorded February 10, 1977, as Instrument No. 77-6875.

17.  Terms, covenants, restrictions and easements for public utilities, signs end ingress and egress granted to purchasers of adjacent properties, including a covenant not to construct fence or other barriers on the easements granted or along any boundary thereof, all as set out in Deed, Easements and Restrictive Covenants, darted April 22, 1977 and recorded June 11, 1977, as Instrument No. 77-31769.

18.  Terms, covenants, restrictions and easements for public utilities, signs and ingress and egress granted to purchasers of adjacent properties, including a covenant not to construct a fence or other barriers on the easements granted or along any boundary thereof, all as set out in Deed, Easement and Restrictive Covenants, dated January 31, 1977 and recorded February 2, 1977, as Instrument No. 77-5362.

19.  Easement for electric power lines and incidental purposes in favor of Indianapolis Power and Light Company recorded November 14, 1977, as Instrument No. 77-75980 over 15 foot strip in Southerly portion of the premises.

20.  Easement for electric power lines and underground electrical system and incidental purposes in favor of Indianapolis Power and Light Company recorded June 13, 1974, as Instrument No. 74-35572. (Ingress and egress easement parcel)

21.  Rights of tenants as listed in assignment recorded April 24, 1979, as Instrument No. 79-25925 under unrecorded lease, also, rights of Speedway Plaza Associates, as tenant under unrecorded lease. (By the assignment recorded as Instrument No. 79-25925 Speedway Plaza Associates assigned to Aetna Life Insurance Company its interest in the tenant leases listed therein)

22.  Easement for sanitary sewer and incidental purposes in favor of T.O.C., Inc., recorded July 1, 1977, as Instrument No. 77-40359, and re-recorded July 22, 1977, as Instrument No. 77-46244, over 20' foot strip in Northern portion of tract end obligations and duties of owner of subject real estate as set out in said grant.

23.  Easement for electric power lines and incidental purposes in favor of Indianapolis Power and Light Company recorded August 24, 1977, as Instrument No. 77-55159, over a 10 foot strip along the Southerly side of premises.

24.  Easement for communication system and incidental purposes in favor of Indiana Bell Telephone Company, Incorporated, recorded November 10, 1977, as instrument No. 77-75525 over 10 foot strip, strips being 5 feet on each side of a buried cable as depicted on Exhibit "A" attached to the recorded grant.

25. Lease by and between Speedway Plaza Associates, as Lessor, and Marsh Supermarkets, Inc., as Lessee, as evidenced by Memorandum of Lease dated January 20, 1977, and recorded June 3, 1977, as Instrument No. 77-32259, Modification of Lease Agreement dated, August 17, 1977 and recorded September 1, 1977 as Instrument No. 77-57239, Modification of Memorandum of Lease dated August 17, 1977 and recorded September 29, 1977 as Instrument No. 77-64303 and Assignment and Assumption of Recorded Leases, dated March 19, 1985 and recorded March 25, 1985 as Instrument No. 85-21986. Subordination, Non-Disturbance and Attornment Agreement, dated November 25, 2008 and recorded January 6, 2009 as Instrument No. 2009-1018.

26. Terms and provisions in a Declaration of Easement dated November 3, 1989 and recorded November 29, 1989 as Instrument No. 89-119231.

27. Terms and provisions in a Utility Easement and Maintenance Agreement dated November 18, 2002 and recorded December 04, 2002 as Instrument No. 2002-235656 between McDonald's Corporation, a Delaware corporation and Northstar Partners, a Californian general partnership.

28. Terms and provisions in a Non-Disturbance Agreement (Easement-Mortgage), dated January 21, 2003 and recorded March 17, 2003 as Instrument No. 2003-54888.

29. Terms and provisions in a Ground Lease for Installation of Outdoor Sign between Northstar partners, A California general partnership and J & B Outdoor, Inc., an Indiana corporation., dated April 25, 2005 and recorded June 02, 2005 as Instrument No. 2005-85740.

30. Lease by and between Plaza at Speedway, LLC, as Lessor, and Feed the Chicken, Inc., as Lessee, as evidenced by Memorandum of Lease dated May 31, 2008, and recorded June 3, 2008, as Instrument No. 2008-61321, as assigned by lessee to Consolidated Wings Investment, LLC, by Assignment and Assumption Of Lease dated July 29, 2011 and recorded August 1, 2011 as Instrument No. A201100068039.

NOTE: Leasehold Mortgage, Assignment of Rents, Security Agreement and Fixture Filing and, terms and provisions contained therein, from Consolidated Wings Investment, LLC to Regions Financial Corporation, dated July 29, 2011, and recorded August 1, 2011, as Instrument No.A201100068035.

Assignment of Leases and Rents from Consolidated Wings Investment, LLC to Regions Financial Corporation, dated July 29, 2011, and recorded August 1, 2011, as Instrument No.A201100068036.

Leasehold Mortgage, Assignment of Rents, Security Agreement and Fixture Filing and, terms and provisions contained therein, from Consolidated Wings Investment, LLC to GB Merchant Partners, LLC, dated July 29, 2011, and recorded August 1, 2011, as Instrument No.A201100068037.

Assignment of Leases and Rents from Consolidated Wings Investment, LLC to GB Merchant Partners, LLC, dated July 29, 2011, and recorded August 1, 2011, as Instrument No.A201100068038.