**EXHIBIT 3**

Brandon Lease

## LEASE AGREEMENT

This Lease, made effective this_____ day of February, 1997, by and between Charles J. Bickimer, and Raymond A. Bichimer, with their business address at c/o Bruce Stumpf, Inc., 314 South Missouri Avenue, Suite 305, Clearwater, Florida 34616 , LANDLORD, and Consolidated Stores Corporation, an Ohio corporation, doing business as Odd Lots or Big Lots, of the City of Columbus, County of Franklin, and State of Ohio, Tenant, whose mailing address is 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, Ohio 43228-0512.

## WITNESSETH:

1. **DEFINITIONS:**

    For purposes of this Lease, these terms are defined as follows:

    A.    Common Areas:    The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center sign, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.

    Landlord shall maintain the Common Areas which shall remain under Landlord's control and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises. Such Common Areas shall be subject to the reasonable rules and regulations as are prescribed by Landlord from time to time. Tenant, any employees or agents shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas. Landlord shall not alter the parking area outlined in green on Exhibit A.

    B.    Dates:

    1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person or any property as a result of any of the Tenant's Work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk and prior to any early entry by Tenant, provide Landlord with proof of insurance coverages described in this Lease.

    2)    The Tenant Possession Date shall be ten (10) days after written notice from Landlord that it has completed all construction as required pursuant to Exhibit C. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant; construction pursuant to Exhibit C is complete, except for punchlist type items and finish work which will not interfere with Tenant's work; and the Demised Premises complies, if required by authority having jurisdiction, with all

applicable laws, ordinances, regulations and building restrictions. As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)      The Rent Commencement Date shall be the earlier of (i) the date sixty (60) days after the Tenant Possession Date, or (ii) the date Tenant shall open for business.

4)      The Term Commencement Date shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      If Landlord fails to return properly executed Leases to Tenant by February 11, 1997, or if Landlord fails to tender possession of the Demised Premises to Tenant by March 10, 1997, then Tenant may cancel this Lease by written notice to Landlord.  For every day after March 10, 1997, Landlord is delayed in delivering possession (as described in Article 1.B.2. of this Lease) to Tenant there shall be a $1,000.00 penalty per day paid to Tenant by Landlord (subject to Article 14 of this Lease).

C.      Exhibits:  The following Exhibits are attached to and made a part of this Lease by this reference hereto:

1)      Exhibit A -    Site Plan of Shopping Center

2)      Exhibit B -    Legal Description of Shopping Center

3)      Exhibit C -    Landlord Work

4)      Exhibit D -    Tenant Sign Specification

D.      Demised Premises:  Being the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 29,246 square feet with dimensions of approximately 200 feet by 142 feet, plus a vestibule with approximate dimensions of 12 feet by 68 feet.

E.      Shopping Center:  Landlord's Shopping Center is known as Kings Row Shopping Center at the address 843 West Bloomingdale Avenue at Kings Avenue in the City of Brandon, State of Florida, County of Hillsborough, and 33511 zip code.

2.      **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant a non-exclusive license to use the Common Areas to be shared with the other Tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.      **TERM:**

A.      Original Term:  The Original Term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2002.  The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be the

2



"First Partial Lease Year." Tenant's obligations to pay Rent shall commence on the Rent Commencement Date.

B.    Option to Extend Term: So long as the Tenant is not in default under the terms of this Lease, Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term" and "Second Option Term". The First Option Term shall commence at the end of the Original Term of this Lease and the Second Option Term shall commence at the end of the First Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written notice at least ninety (90) days prior to the expiration of the Original Term or the previous Option Term.

## 4.    USE AND OPERATION:

Tenant covenants and agrees that the Demised Premises shall be used and occupied for the purpose of the retail sale of general merchandise and furnishings. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that Tenant's aforementioned use is not in violation of any exclusive covenants granted to existing tenants in the Shopping Center. Landlord agrees to indemnify Tenant for any and all costs associated with violation of this provision.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise  liquidator, closeout store or dollar store operation larger than 3,000 square feet of leasable floor area ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any option terms exercised by Tenant. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant  may, at its sole and absolute discretion, (i) reduce the Guaranteed Minimum Rent, Percentage Rent and other charges payable hereunder , in proportion to the "effect" such Competing Business has on Tenant's business operation, or (ii) terminate this Lease by written notice to Landlord, in which case Tenant shall have no further obligations hereunder. The term "effect" shall mean (a) if the Competing Business opens for business after the end of the first Lease Year, the amount by which Tenant's Gross Sales during the twelve (12) month period immediately after the Competing Business opens for business are less than Tenant's Gross Sales during the twelve (12) month period immediately preceding the date the Competing Business opens for business, or (b) if the Competing Business opens for business before the end of the first Lease Year, the amount by which Tenant's Gross Sales are less than Two Million Four Hundred Thousand and 00/100 Dollars ($2,400,000.00).   At such time that the Competing Business ceases to operate in the Shopping Center, all reductions in Rent hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees to, when possible, operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and 11:00 A.M. TO 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section 4 and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this

Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in the places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, excessive vibrations, loud or constant noises, dangerous materials and all other nuisances. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair; permit Tenant's agents, employees, customers or invitees to repeatedly or routinely break the law or reasonable rules and regulations adopted by Landlord; do anything to damage, injure or interfere with Landlord, other tenants or occupants of the Shopping Center or their customers or invitees.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

5.    **RENT:**

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at, c/o Bruce Stumpf, Inc., 314 South Missouri Avenue, Suite 305, Clearwater, Florida 34616, or at such other place as Landlord may from time to time direct in writing, the following which are collectively referred to hereinafter as "Rent":   *See below



A.    Guaranteed Minimum Rent: During the Original Term of this Lease, the sum of $110,000.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $9,166.67. The Guaranteed Minimum Rent for any partial month shall be prorated on the basis of a thirty (30) day month.

All the terms and conditions of this Lease shall apply during the option terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Guaranteed Minimum Rent applicable for the First Option Term shall be the sum of $120,000.00 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $10,000.00. The Guaranteed Minimum Rent applicable for the Second Option Term shall be the sum of $130,000.00 per Lease Year which shall be paid in equal monthly installments, in advance of the first day of each and every month in the amount of $10,833.33.

B.    Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities. Landlord shall provide separate utility meters which shall accurately reflect Tenant's usage. Landlord shall be permitted to submeter the water service provided to the Demised Premises, provided that such submeter shall accurately reflect Tenant's water usage. The rate charged for such water service shall not exceed the lesser of (i) the bulk rate paid by Landlord, or (ii) the applicable consumer rate which Tenant would otherwise pay as a direct customer of the public or municipal utility company providing such service. In the event



4

*Tenant shall pay any tax assessed by the State, or any governmental authority, in which the premises are located, which is applicable to rentals or charges specified in this lease. Said tax payment shall be paid to Landlord with and when the applicable rental or charge is due.

any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure to make repairs, Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. All billings by Landlord for any such water service shall be paid within thirty (30) days of receipt thereof, or among Landlord's other remedies, such services may be discontinued.

C.  Percentage Rent:  In addition to the "Guaranteed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's annual Gross Sales and income, as hereinafter defined, which exceeds the annual base sum of $4,400,000.00 during the Original Term; $4,800,000.00 during the First Option Term; and $5,200,000.00 during the Second Option Term.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales and income ("Gross Sales") for the previous month. Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, an accurate statement of the Gross Sales for such period, certified to by Tenant, and shall therewith pay to Landlord, any Percentage Rent then due at the percentage above stated. Percentage Rent payments required to be made by Tenant under the terms of this Lease shall be made promptly when due. The term "Gross Sales" as used herein, shall be deemed to mean (1) the aggregate gross amount of all sales made in or from the Demised Premises and (2) charges for all services rendered in or from the Demised Premises. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted therefrom to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned for cash; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; (8) credit card company finance or service charges; and (9) proceeds from vending machines located in the Demised Premises.

For the First Partial Lease Year, Percentage Rent shall be calculated using a formula with the numerator being the number of days in the Partial Lease Year and the denominator being 365 multiplied by the annual base sum during the Term in which it falls. Tenant shall pay the amount by which two and one-half percent (2-1/2%) of Tenant's Gross Sales exceeds the product.

Should Tenant have opened for business during the month preceding the Rent Commencement Date, the Gross Sales for the fractional month shall be added to the Gross Sales for the first month of the Term, and the annual base sum shall be proportionately increased and the Percentage Rent paid thereon. Should this Lease expire or be sooner terminated leaving a fractional Lease Year, for purpose of computation of Percentage Rent payable hereunder, the annual base sum shall be proportionately reduced and Percentage Rent shall be paid thereon.

Tenant agrees to keep books of account, in accordance with good accounting practice of the business conducted on said Demised Premises, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting

olblrata - 1/10/97

principles at any reasonable time upon ten (10) days prior written notice, provided such right to audit shall be limited to one (1) time per Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales and income which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit.

D.    Common Area Charges: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)     operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)   operating, maintaining, refurbishing, repairing, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, if mutually agreed to by Landlord and Tenant, lighting and policing if necessary, and on-site and off-site traffic control striping;

(v)     maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)    cleaning, sweeping, snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Such expenses are limited to refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, providing public liability, property damage, and fire and extended coverage on the common facilities, the insurance required to be carried by Landlord pursuant to Article 12 of this Lease, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to on behalf of employees; personal property, supplies, fire protection, and fire hydrant charges, water and sewer charges, utility charges, licenses and permit fees, and parking area surcharges or levies.

On the first day of each and every calendar month during the Original Term of this Lease or any Option Term(s) exercised by Tenant, Tenant shall pay to Landlord, in advance, without any setoff or deduction (except as set forth herein), a Common Area Charge in an amount equal to one-twelfth (1/12th) of the sum obtained by multiplying the leasable floor area of the Demised Premises by the Annual Fee. The Annual Fee shall be $.63 throughout the first Partial Lease Year; $.66 throughout the first Lease Year; $.69 throughout the second Lease Year; $.72 throughout the third Lease Year; $.76 throughout the fourth Lease Year; $.80 throughout the fifth Lease Year; $.84 throughout the sixth Lease Year; $.88 throughout the seventh Lease Year; $.93 throughout the eighth Lease Year; $.97

olblrata -1/10/97

throughout the ninth Lease Year; $1.02 throughout the tenth Lease Year; $1.07 throughout the eleventh Lease Year; $1.13 throughout the twelfth Lease Year; $1.18 throughout the thirteenth Lease Year; $1.24 throughout the fourteenth Lease Year; and $1.30 throughout the fifteenth Lease Year. Tenant's payment of Common Area Charges for any fractional month shall be prorated on a per diem basis (calculated on a thirty (30) day month).

E.    Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Tenant shall pay to Landlord its pro rata share of such Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. That amount is currently $.36 per square foot. If the Term of this Lease shall begin on and/or terminate at a time other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made to cover the fraction of a year included within the terms of this Lease.

The Real Estate Taxes on the Shopping Center for any Lease Year or Partial Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds or rebates, if any, (less the reasonable cost and expense of obtaining the same) to be payable with respect to the Shopping Center for such period. For any Partial Lease Year, the amount of Real Estate Taxes shall be pro rated on a per diem basis.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term Commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings or additions shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

Tenant shall pay its estimated monthly pro rata share of the Real Estate Taxes, based upon the actual amount of the last Real Estate Taxes which have been assessed or based upon an estimate, projection or other statement in writing by the taxing authority, or if unavailable then as estimated reasonably by Landlord. Tenant's pro rata share of Real Estate Taxes shall be determined as provided in this Section. Landlord shall furnish Tenant with copies of actual Real Estate Tax bills when same are issued. An adjustment shall be made as soon as the actual Real Estate Taxes for the period, and Tenant's pro rata share thereof, can be determined; and Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.    Construction Allowance:  Tenant shall be entitled to payment of <u>Ten Thousand and 00/100</u> Dollars (<u>$10,000.00</u>) upon completion of the following conditions:

1.    Tenant shall provide fully executed lien waivers for each contractor, subcontractor and/or materialman which performed Tenant's work. (In the event that Landlord's contractor or other representatives finish Tenant's work instead of Tenant's contractor, this requirement shall be inapplicable);

2.    Landlord's receipt of a letter from an officer of Tenant's Real Estate Department stating that Tenant's work has been performed per this Lease;

3.    Tenant's opening for business in the Demised Premises.

Upon completion of the above requirements, Landlord shall pay to Tenant an amount equal to <u>Ten Thousand and 00/100</u> Dollars (<u>$10,000.00</u>) within thirty (30) days of Tenant's completion of the above requirements. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's completion of the above requirements, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Manhattan Bank of New York from the due date of the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

## 6.    ALTERATIONS:

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

## 7.    MAINTENANCE AND REPAIRS:

Tenant agrees to maintain and replace all plate glass and other glass which is part of the Demised Premises, promptly replacing any such damaged or broken glass with tempered or safety plate glass (as required) and to save Landlord harmless from any loss, cost,

8

damage or claim resulting from such breakage or the replacement thereof unless such damage is due to the negligence of Landlord.

Tenant acknowledges that the Demised Premises, including marquee lights, rear or side floodlight, heating system, electrical system, fixtures, equipment, air conditioning, if any, plumbing, hot water tank, floor covering, doors, windows, and the interior of the Demised Premises, will be, as of the Tenant Possession Date under the possession and control of Tenant and Tenant agrees to keep same in good order, repair, maintenance, and operation. Tenant also agrees to keep the area adjoining the entrance to the Demised Premises in a clean and safe condition by removing debris and trash from the doorways. Tenant further agrees, except for the negligence of Landlord, its agents, contractors or employees, to free all stopped or clogged interior waste or interior sewer lines and to exterminate pests when necessary.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report when the HVAC work Landlord will perform pursuant to Exhibit C has been completed. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and shall guarantee that the HVAC system is in good working condition.

Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefore, Tenant shall have the right to deduct such amount from its next Rent payment(s) owing.

Should the HVAC system require repair and/or replacement, not including normal maintenance, cleaning, filter changes, lubricating, and preventative maintenance during the first two (2) Lease Years, which the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition as of the Tenant Possession Date. Landlord further agrees that Tenant shall have no obligation to repair or maintain any such item as is not in operating condition until put in operating condition by Landlord at its expense. Tenant shall notify Landlord of any defects within thirty (30) days after the Tenant Possession Date by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs, Tenant shall have the right to deduct such cost from the next installment of Rent.

Landlord agrees to keep or cause to be kept, repaired, replaced and maintained, at Landlord's sole cost and expense the roof, roof drains, exterior utility lines, and exterior walls, exclusive of doors and windows during the Term and will make required structural repairs to the building of which the Demised Premises are a part. Landlord's performance of each of its covenants contained in this Lease shall be a condition precedent to its right to collect rents and to enforce this Lease. Landlord, its agents and employees, may freely enter the Demised Premises at all reasonable times to inspect or to make repairs to Common Areas or, upon written notice, to those facilities required to be maintained by Landlord, provided the same does not substantially interfere with Tenant's operation.

9

Tenant shall provide written notice to Landlord of the need for repairs pursuant to the terms of this Lease. If Landlord fails to commence and diligently complete the making of repairs within fifteen (15) days after such notice, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end or avert an emergency, and it is a repair Landlord is responsible for making pursuant to the terms of this Lease, and if Landlord after receiving confirmation from Tenant of such necessity fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work, provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord refuse to reimburse Tenant the reasonable cost of any such repair work, Tenant shall have the right to deduct such cost from the next Rent payment(s) owing.

8.  **SIGNS:**

Tenant shall at its sole cost and expense have the right to place, suffer or erect a sign on the exterior wall of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs and its pre-opening signs as are used in a majority of Tenant's stores.

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center pylons, if there are pylons existing. Landlord agrees that Tenant shall have the right to install and maintain its sign on a space within the top one-half (1/2) portion of the existing pylons. Absent an existing pylon, Tenant shall have the right to erect a pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once the pylon signs are installed Tenant shall not be required to remove, replace, change, or alter it and Landlord shall not remove, replace or diminish the size of Tenant's sign.

During the Original Term, options or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs, unless required to do so by authority having jurisdiction.

9.  **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or air conditioning equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees that as of the Tenant Possession Date the Demised Premises conform to all requirements by authority having jurisdiction. Thereafter, if the Demised Premises do not conform to all requirements by authority having jurisdiction and such nonconformity is related to the exterior, foundation, structure (including the smoke and fire alarms) and

any other portion of the Demised Premises for which Landlord is responsible to maintain pursuant to the terms of this Lease, Landlord will promptly have them conform unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall, if required by authority with jurisdiction, comply with all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and, if required by authority with jurisdiction, place all HVAC equipment in compliance with the Clean Air Act of 1992. Tenant agrees to keep all portions of the Demised Premises for which Tenant is responsible to maintain pursuant to the terms of this Lease in compliance with all requirements by authority having jurisdiction.

**11.    INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act of Tenant or Tenant's servants and agents. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant, from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by structural defects in the Demised Premises, the negligent acts or omissions to act of Landlord, or Landlord's servants and agents, or by failure of Landlord, or Landlord's servants and agents, to fulfill Landlord's obligations hereunder.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section.

**12.    INSURANCE:**

A.    Liability:  Tenant agrees to carry at its own expense, throughout this Lease, public liability insurance covering the Demised Premises and Tenant's use thereof, which insurance, shall include Landlord as an additional insured, as its interest may appear with minimums of the following:  One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    Insurance Premiums:  Landlord has insured all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under broad form "All Risk" insurance, including the perils of earthquake and flood,  in an amount not less than the full insurable value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.

Tenant will pay to Landlord monthly, as a part of Common Area Charges (as defined in Article 5.D of this Lease), its  share of premiums for such insurance.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from  Tenant's share of such insurance.  Tenant shall not be responsible for any increase in the payments toward such insurance cost.

olblrata - 1/10/97

13. **FIRE REBUILDING AND ALTERING:**

A.  Landlord shall at all times during the Term of this Lease and in accordance with all provisions herein, carry broad form "All Risk" insurance including the perils of earthquake and flood on all the buildings and permanent improvements on the buildings.

B.  If the Demised Premises or any permanent additions or leasehold improvements thereto shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a good tenantable condition within a reasonable time.  During any period of repair or casualty, the Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  Said abatement shall cease when the Demised Premises are restored to tenantable condition.

C.  In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within ninety (90) days from the date of receipt of insurance proceeds, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

D.  If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days following such casualty, unless Tenant shall, within thirty (30) days following receipt of such notice, offer to extend the Term of this Lease for an additional period of five (5) years from the date such damage or destruction is repaired and restored.  If the Tenant makes said offer to extend, Landlord and Tenant shall determine the terms and conditions of said extension within thirty (30) days thereafter or Tenant's offer shall not be deemed to stop Landlord from cancelling this Lease.  If the terms and conditions have been mutually agreed to by the parties, then Landlord shall accept Tenant's offer and shall repair and restore the premises within the time and in the manner set forth above.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16. **WARRANTY OF TITLE BY LANDLORD:**

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free

12

olblrata -1/10/97

and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises; and (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any options or extensions.

18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien  shall enter into a mutually satisfactory non-disturbance, subordination and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement in writing reasonably satisfactory to Landlord or the holder of the mortgage, certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information:  (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Guaranteed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the date that the Demised Premises were ready for occupancy and all conditions precedent to the Lease taking effect were satisfied or waived by Tenant; (iv) the dates on which Tenant accepted possession and Tenant's store opened for business; (v) the Tenant is occupying the Demised Premises; and (vi) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

olblrata - 1/10/97

19.    **DEFAULT:**

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after written notice of such default by the Landlord, or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after written notice of such default by the Landlord, this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. Notwithstanding the foregoing, Landlord shall have all remedies available to it in law or equity and choosing one remedy shall not preclude Landlord from other remedies.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, may be deducted by Tenant from Rent thereafter to become due. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and/or failures of any structure, system, item, or thing which Landlord is responsible to maintain pursuant to the terms of this Lease, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

20.    **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may cancel this Lease. In the event any part of the buildings of the Shopping Center, or common area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the

14

judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may cancel this Lease, or at its option, retain the Demised Premises, in which event Landlord will restore the entire remaining Shopping Center to proper tenantable condition forthwith. Throughout the time Landlord is restoring the Shopping Center to proper tenantable condition, (i) Rent shall abate entirely if Tenant is unable to conduct business operations from the Demised Premises, or (ii) Rent shall abate in proportion to the amount of leasable floor area of the Demised Premises from which Tenant is unable to conduct business operations. Thereafter, Rent shall be reduced in proportion to the amount of land and/or area of the Demised Premises lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21.  **MUTUAL WAIVER OF SUBROGATION:**

Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same. Tenant shall not be liable for any damage to the Demised Premises or building of which it is a part and Landlord hereby releases Tenant from the same.

22.  **ASSIGNMENT AND SUBLETTING:**

If Tenant is not in default and subject to any exclusive covenants granted by Landlord to other tenants in the Shopping Center, Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall provide that it is subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

23.  **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and heating, ventilating, and air conditioning equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof.

24.  **NOTICES:**

Whenever any demand, request, approval, consent or notice ("Notice") shall or may be given by one party to the other, Notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) hand, (ii) a nationally recognized overnight express courier, or (iii) registered or certified mail return receipt requested. The date of actual receipt shall be deemed the date of service of Notice. In the

event an addressee refuses to accept delivery, however, then Notice shall be deemed to have been served on either (i) the date hand delivery is refused, (ii) the next business day in the case of delivery by overnight courier, or (iii) three (3) business days after mailing the Notice in the case of registered or certified mail. Either party may, at any time, change its Notice address by giving the other party Notice, in accordance with the above, stating the change and setting forth the new address.

## 25.    LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the laws of the State of Florida.

## 26.    BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

## 27.    NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease which Tenant may record at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

## 28.    REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29.    NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.    HAZARDOUS MATERIAL:

Landlord represents that to the best of Landlord's knowledge the Demised Premises do not presently contain any hazardous materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery

16

of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date of the Demised Premises was delivered to Tenant or is determined to have been placed thereon by Landlord during the Original Term of this Lease or any options or extensions, Landlord shall promptly, if required by authority having jurisdiction, and at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all governmental laws and regulations.

Throughout the Original Term of this Lease or any options or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. In all events, Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any release of hazardous materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

In accordance with Florida law, the following disclosure is hereby made:

**RADON GAS:**    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present a health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

## 31.    TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them. This Lease is not binding upon Tenant until it has been signed by Landlord's authorized officers and delivered to the Tenant.

## 32.    WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is a year-end adjustment or an adjustment resulting from an error in the calculation of any additional rents payable by Tenant under the Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, tax charges or any charges to Tenant for electrical and heating and air conditioning service, which results in a deficiency owed by Tenant, Landlord shall notify Tenant of any deficiency within six (6) months after the expiration of the Lease Year in which such adjustments are applicable. If Landlord does not notify Tenant of such deficiency within said six (6) month period, Landlord's claim to such deficiency shall be deemed waived and discharged.

## 33.    REASONABLE CONSENT:

If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that either party fails to respond to any request for consent, approval or permission within fifteen (15) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other

17

party may proceed without further action, approval or permission, so long as the request for consent, approval, or permission is sent via certified mail and contains in the heading of such request the words "FAILURE TO RESPOND IS DEEMED AUTOMATIC APPROVAL". In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

35. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and the delivery of an executed original copy thereof to Tenant.

36. **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:        LANDLORD: CHARLES J. BICKIMER, AND
                                                    RAYMOND A. BICKIMER

By: _____

                                                    Charles J. Bickimer
Title: Owner

By: _____

                                                    Raymond A. Bichimer
Title: Owner

Witnesses As To Tenant:        TENANT:    CONSOLIDATED STORES
                                                    CORPORATION, an Ohio corporation

By: _____

                                                    Albert J. Bell
Title: Senior Vice President

18

**STATE OF** FLORIDA

**COUNTY OF** PINELLAS

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Charles J. Bickimer and Raymond A. Bichimer who acknowledged that they did sign the foregoing instrument and that the same is the free act and deed of them personally.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _Clear - water, Florida_, this _29th_ day of _January_, 1997.

_Lois D. Hawkins_
Notary Public

**STATE OF OHIO**

> LOIS D. HAWKINS
> MY COMMISSION # CC 503924
> EXPIRES: December 27, 1999
> Bonded Thru Notary Public Underwriters

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation**, by **Albert J. Bell**, its **Senior Vice President** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this _1st_ day of _February_, 1997.

_Mark E. Florak_
Notary Public

> **MARK E. FLORAK, Attorney At Law**
> NOTARY PUBLIC, STATE OF OHIO
> My commission has no expiration date.
> Section 147.03 R.C.

19

# EXHIBIT A

## SITE PLAN OF SHOPPING CENTER

NOV-15-1996  09:52        BRUCE W. RAFF, INC.              813 449 2212   P.04/06



# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

JAN-20-1997  11:53          BRUCE STRUMPF, INC.                813 449 2212   P.02/02

A parcel of land lying in the NW 1/4 of Section 10, Township 30 South, Range 20 East, Hillsborough County, Florida, being more particularly described as follows:

Commence at the NE corner of the NW 1/4 of said Section 10, thence south 00 degrees 27 minutes 42 seconds east along the centerline of King Avenue, said centerline being along the East Boundary of the NW 1/4 of said Section 10 a distance of 50.00 feet; thence south 89 degrees 45 minutes 00 seconds west a distance of 60.00 feet to a point, said point being the intersection of the West Right-of-Way Boundary of King Avenue and the South Right-of-Way Boundary of Bloomingdale Avenue; thence continue south 89 degrees 45 minutes 00 seconds west along said South Right-of-Way Boundary and being 50 feet from and parallel to the centerline of Bloomingdale Avenue a distance of 116.00 feet to the POINT OF BEGINNING; thence south 00 degrees 27 minutes 42 seconds east a distance of 163.00 feet; thence north 89 degrees 45 minutes 00 seconds east a distance of 116.00 feet to a point on the aforesaid West Right-of-Way Boundary of King Avenue; thence south 00 degrees 27 minutes 42 seconds east along said West Right-of-Way Boundary of King Avenue and being 50 feet from and parallel to the centerline of King Avenue a distance of 147.00 feet; thence south 89 degrees 45 minutes 00 second west a distance of 100.00 feet; thence south 00 degrees 27 minutes 42 seconds east a distance of 100.00 feet; thence south 89 degrees 45 minutes 00 seconds west a distance of 750.00 feet; thence north 00 degrees 27 minutes 42 seconds west a distance of 247.00 feet; thence north 89 degrees 45 minutes 00 seconds east a distance of 100.00 feet; thence north 00 degrees 27 minutes 42 seconds west a distance of 163.00 feet to a point on the aforesaid South Right-of-Way Boundary of Bloomingdale. Avenue; thence north 89 degrees 45 minutes 00 seconds east along said Boundary and being 50 feet from and parallel to the centerline of said Bloomingdale Avenue, said centerline being along the North Boundary of the aforesaid Section 10 a distance of 634.00 feet to the Point of Beginning.

olblrata -1 10 97

**EXHIBIT C**

**LANDLORD WORK**

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**Landlord covenants and agrees to deliver the premises to Tenant as follows:**

1.  Landlord to install new HVAC system for the sales floor area with a capacity of sixty (60) tons. The HVAC system shall adequately cool the sales floor area and if not Landlord shall install additional HVAC capacity at it's sole cost and expense.

2.  All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide sprinkler certification.

3.  All lighting inside and out to be in good working condition.

4.  All damaged or missing ceiling tiles to be replaced with similar tile. Ceiling system and lighting to be level and consistent with main ceiling throughout sales floor area.

5.  All doors and door systems to be sound and secure and in good working condition.

6.  Roof to be in good condition and free of leaks. Canopy and building facia to be repaired and painted as needed.

7.  Replace all broken glass.

8.  Premises to be professionally inspected for pestilents and termites, and Tenant to be provided with a certified report that the Demised Premises is pest free, and if not, Landlord will make pest free.

9.  Tenant shall have the right to install a cart corral in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

10. Tenant must approve all drawings prior to commencement of work by Landlord.

11. Landlord agrees that the work Landlord will perform pursuant to this Exhibit C shall conform to all requirements by authority having jurisdiction; if said work does not conform, Landlord shall promptly have it conform unless such is necessitated by changes, alterations or additions made by Tenant.

12. All above work to be completed before Tenant Possession Date.

Landlord shall complete such work on or before the 10th day of March, 1997.



## EXHIBIT D

## TENANT SIGN SPECIFICATION



## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** made this 6th day of February, 1997, between Charles J. Bickimer and Raymond A. Bichimer, having their principal place of business at c/o Bruce Stumpf, Inc., 314 South Missouri Avenue, Suite 305, Clearwater, Florida 34616, as the Landlord, and Consolidated Stores Corporation, an Ohio corporation, having its principal place of business at 300 Phillipi Road, Department 10051, P.O. Box 28512, Columbus, Ohio, 43228-0512 as the Tenant.

**WHEREAS,** On the 6th day of February, 1997, Landlord and Tenant entered into a lease ("Lease") of the following described premises: A storeroom consisting of approximately 29,246 square feet of building space (the "Demised Premises"), being a portion of the following described property located in the City of Brandon, County of Hillsborough, and State of Florida, described on Exhibit "B" attached hereto and depicted on Exhibit "A" attached hereto and incorporated herein by reference (such land, together with the buildings and improvements thereon, including the Demised Premises, are hereinafter collectively referred to as the "Shopping Center").

**WHEREAS,** Landlord and Tenant desire to record a memorandum of the Lease to notify third parties. All terms herein shall have the same meaning as set forth in the Lease.

**NOW THEREFORE,** in consideration of the Lease and the rents reserved and the covenants and conditions set forth in the Lease, Landlord and Tenant do hereby state as follows:

1.  The term of the Lease is for a period of years commencing on the Term Commencement Date provided in the Lease and continuing from said date up until the end of the initial term on January 31, 2002 except as otherwise provided in the Lease. The Lease provides for two (2), five (5) year options as set forth in the said Lease.

2.  The Lease provides that the Demised Premises may be used for the retail sale of general merchandise and furnishings.

3.  The Lease grants Tenant an exclusive right, within the Shopping Center to the extent that, except for tenants open and operating for business in the Shopping Center as of the date of the Lease, no other general merchandise liquidator, closeout store or dollar store operation larger than 3,000 square feet of leasable floor area, may be permitted in the Shopping Center during the initial term or any option terms exercised by Tenant.

4.  Subject to the restrictions in the Lease, all provisions contained in the Lease and this Memorandum shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of Landlord and Tenant to the same extent as if each such successor and assign were named as a party hereto.

5.  The sole purpose of this Memorandum is to give notice of the Lease and all its terms, covenants and conditions to the same extent as if the Lease was fully set forth herein. This Memorandum shall not modify in any manner the terms, conditions or intent of the Lease and the parties agree that this Memorandum is not intended nor shall it be used to interpret the Lease or determine the intent of the parties under the Lease.

**IN WITNESS WHEREOF,** the parties hereto have caused this Memorandum to be executed by the respective officers duly authorized so to do on the day and year first above written, for the purpose of providing an instrument for recording.

Witnesses As to Landlord:

LANDLORD: CHARLES J. BICKIMER
AND RAYMOND A. BICHIMER

By: _____
Charles J. Bickimer
Title: Owner

By: _____
Raymond A. Bichimer
Title: Owner

Witnesses As to Tenant:

TENANT: CONSOLIDATED STORES
CORPORATION, an Ohio corporation

By: _____
James J. Harris
Title: Director of Leasing, Associate General
Counsel and Assistant Secretary

STATE OF _Florida_
COUNTY OF _Pinellas_

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Charles J. Bickimer and Raymond A. Bichimer, who acknowledged that they did sign the foregoing instrument and that the same is the free act and deed of them personally.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ Clearwater, FL, this 6th day of February 1997.

_____
Notary Public

SUSAN A. KAMUDA
COMMISSION # CC581292
EXPIRES SEP 02, 2000
BONDED THROUGH
ATLANTIC BONDING CO., INC.

STATE OF OHIO
COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Consolidated Stores Corporation**, by **James J. Harris**, its **Director of Leasing, Associate General Counsel and Assistant Secretary** who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 4th day of February, 1997.

_____
Notary Public



**MARK E. FLORAK, Attorney At Law**
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

# EXHIBIT A

# LEGAL DESCRIPTION OF THE SHOPPING CENTER

JAN-20-1997  11:53        BRUCE STRUMPF, INC.              813 449 2212    P.02/02

A parcel of land lying in the NW 1/4 of Section 10, Township 30 South, Range 20 East, Hillsborough County, Florida, being more particularly described as follows:

Commence at the NE corner of the NW 1/4 of said Section 10, thence south 00 degrees 27 minutes 42 seconds east along the centerline of King Avenue, said centerline being along the East Boundary of the NW 1/4 of said Section 10 a distance of 50.00 feet; thence south 89 degrees 45 minutes 00 seconds west a distance of 60.00 feet to a point, said point being the intersection of the West Right-of-Way Boundary of King Avenue and the South Right-of-Way Boundary of Bloomingdale Avenue; thence continue south 89 degrees 45 minutes 00 seconds west along said South Right-of-Way Boundary and being 50 feet from and parallel to the centerline of Bloomingdale Avenue a distance of 116.00 feet to the POINT OF BEGINNING; thence south 00 degrees 27 minutes 42 seconds east a distance of 163.00 feet; thence north 89 degrees 45 minutes 00 seconds east a distance of 116.00 feet to a point on the aforesaid West Right-of-Way Boundary of King Avenue; thence south 00 degrees 27 minutes 42 seconds east along said West Right-of-Way Boundary of King Avenue and being 50 feet from and parallel to the centerline of King Avenue a distance of 147.00 feet; thence south 89 degrees 45 minutes 00 second west a distance of 100.00 feet; thence south 00 degrees 27 minutes 42 seconds east a distance of 100.00 feet; thence south 89 degrees 45 minutes 00 seconds west a distance of 750.00 feet; thence north 00 degrees 27 minutes 42 seconds west a distance of 247.00 feet; thence north 89 degrees 45 minutes 00 seconds east a distance of 100.00 feet; thence north 00 degrees 27 minutes 42 seconds west a distance of 163.00 feet to a point on the aforesaid South Right-of-Way Boundary of Bloomingdale Avenue; thence north 89 degrees 45 minutes 00 seconds east along said Boundary and being 50 feet from and parallel to the centerline of said Bloomingdale Avenue, said centerline being along the North Boundary of the aforesaid Section 10 a distance of 634.00 feet to the Point of Beginning.

## EXHIBIT B

## SITE PLAN OF THE SHOPPING CENTER

NOV-15-1996  09:52        BRUCE PARKER, INC           813 449 2212   P.04/06

