<u>**Exhibit 1**</u>

**Redacted Reply**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 2292 & 2293** |

**DEBTORS' OMNIBUS REPLY TO THE OBJECTIONS TO
DEBTORS' ASSUMPTION AND ASSIGNMENT OF
<u>NON-RESIDENTIAL REAL PROPERTY LEASES TO FORMAN MILLS</u>**

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), file this omnibus reply (this "**Reply**") to certain objections to the Debtors' *Eighteenth Notice of Filing of Post-Closing Designation Notice* [D.I. 2178] (the "**Notice**")[2] proposing to assume and assign certain leases of non-residential real property to Forman Mills Inc. ("**Forman Mills**"). In support of this Reply, and in further support of the Notice, the Debtors respectfully state as follows:

<u>**REPLY**</u>

1.      Two objections have been filed by landlords with respect to the proposed assignments of their leases to Forman Mills pursuant to the Notice. First, 1255 Sunrise Realty,

---

[1]      The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Notice.

LLC ("**Sunrise**") filed the *Objection of 1255 Sunrise Realty, LLC to Debtors' Proposed Assumption and Assignment of its Unexpired Lease in Eighteenth Post-Closing Designation Notice* [D.I. 2293] alleging that (i) Forman Mills has not provided adequate assurance of future performance and (ii) the noticed cure amounts are inaccurate. Second, Madeira Plaza Power, LLC ("**Madeira**") filed the *Objection of Madeira Plaza Power, LLC to Eighteenth Post-Closing Designation Notice* [D.I. 2292] alleging that (i) the assignment of their lease to Forman Mills would violate the certain exclusivity provisions in a co-tenant's lease in the shopping center and (ii) the noticed cure amount is incorrect.

### A.    Sunrise Objection

2.    The Sunrise objection seeks to paint Forman Mills as a non-creditworthy tenant by (i) referencing a media report from 2023 concerning a possible bankruptcy filing, (ii) speculating broadly about certain pending litigation without cause, and (iii) criticizing the "unaudited" nature of Forman Mills' finances.  None of these superficial criticisms amount to anything more than the landlord's attempt to recoup a below-market lease in contravention of the Debtors' rights to assign their leases in these Cases.

3.    The rumored bankruptcy filing never occurred, and the retailer was acquired by the current owner in 2023, who has been operating the chain profitably and growing its footprint as evidenced by the portfolio of leases it now seeks to acquire from Debtors to open additional Forman Mills stores. Forman Mills is one of the leading discount fashion and general merchandise retailers in the U.S.  Its ability to pay a mere $50,000 per month to Sunrise is beyond dispute and amply demonstrated by Forman Mills' financials ██████████████████████ ██████████████████████ (together with all other adequate assurance materials provided, the "**Forman Mills Adequate Assurance Package**"), which evidence Forman Mills'

strong financial position. The Forman Mills Adequate Assurance Package is attached as **Exhibit A** hereto.

4.      More importantly, the question of the day is adequate assurance of *future performance*. "[T]he concept of 'adequate assurance' is a flexible one, mainly requiring evidence satisfactory to the Court that the proposed assignee possesses the financial wherewithal to perform all of the obligations under the agreement at issue." *In re RS Legacy Corp.*, Nos. 15-10197 (BLS), 1947, 2414, 2015 Bankr. LEXIS 2206, at *2 (Bankr. D. Del. June 25, 2015). The Sunrise objection makes no serious attempt to show that Forman Mills' current financial structure cannot support this lease – instead relying on old rumors and bankruptcies of unaffiliated clothing retailers. The landlord's attempt to discredit Forman Mills based on rumors of *past* performance is misleading and inappropriate.

5.      A simple review of the December 2024 financial statement provided to the Sunrise landlord as proof of adequate assurance of future performance ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

6.      Likewise, Forman Mills' operational performance is also strong. The financial statement reveals that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████

7.     The Sunrise objection further alludes to use restrictions in the lease.  However, those provisions restrict the operation of a fast-food restaurant or grocery store within the premises.  Forman Mills operates neither, so the restrictions are not relevant.

8.     The Sunrise lease is a below market lease and thus has value to the estates.  It is obvious that Sunrise's manufactured objection is an attempt to delay and ultimately block any assignment whatsoever, so that the landlord can regain possession and relet the premises at higher rates.  In an effort to avoid delay, Forman Mills agreed to produce additional information concerning insurance, financial projections, access to financing, and the proposed layout of the store.  Moreover, Forman Mills offered its principal for a deposition on Monday, March 24, but the landlord refused repeatedly – further evidence of its intent to delay.

9.     Further delay here would needlessly prejudice the assignee. The landlord is unwilling to abate future rent during the pendency of this dispute and Forman Mills would be responsible for paying April rent without any confirmation of assignment of the lease. The Debtors submit that Forman Mills has met their burden of adequately assuring future performance under the lease and this Court should approve the assignment to Forman Mills.

**B.     Madeira Objection**

10.     The Madeira objection correctly notes all the facts. The shopping center where the Debtors' lease sits is shared with a Burlington Coat Factory Warehouse Corporation location ("**Burlington**"). Burlington's lease provides that the shopping center cannot house an off-price retailer. Whether Forman Mills is an off-price retailer is of no matter, though, because Madeira is wrong on the resulting law – as this Court has already held in these very Cases.

11.     The legal crux of the Madera objection is essentially the same as an objection this Court overruled recently – that the Debtors and Forman Mills should be bound to provide adequate assurance of future performance of provisions in a co-tenant's lease that the Debtors are not subject

to under applicable state law. The Debtors' lease with Madeira predates the Burlington lease[3] and nothing in the Debtors' lease requires that they comply with subsequent agreements that Madeira may enter into with third parties that purport to govern the Debtors' behavior. As such, adequate assurance of *the Debtors' lease* cannot possibly require assurance that Burlington's use exclusives will be honored.

12.    Congress intended that § 365(b)(3)(C) only serve to "assure a landlord of his bargained for exchange," and not offer additional benefits at the expense of a bankrupt debtor or allow the enforcement of use provisions absent from the debtor-tenant's lease.  *See In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990); *see also Trak Auto Corp. v. West Town Center LLC (In re Trak Auto Corp.)*, 367 F.3d 237, 244 (4th Cir. 2004)) ("Congress's purpose in § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out in the lease with the debtor-tenant.").  Since it is clear that the Burlington lease does not restrict this assignment under applicable non-bankruptcy law, the inquiry into adequate assurance under § 365(b)(3)(C) should end.

13.    This Court faced this exact issue just a few months ago with Burlington and Ross Dress for Less ("**Ross**"). There, Burlington sought assignment of one of the Debtors' leases that the landlord and Ross argued that the Ross lease exclusives prohibited Burlington's proposed usage. However, the Debtors' lease predated the Ross lease and was not subject to the Ross lease provisions under applicable state law. This Court approved the prior assignment to Burlington and should approve this assignment to Forman Mills for the same reasons.

---

[3] The Burlington lease, attached as Exhibit A to the Madeira Objection, was entered into in 2021, while the Debtors' lease, attached as **Exhibit B** hereto, was entered into in 2003.

**CONCLUSION**

14.     For the reasons set forth herein, the Debtors respectfully request that the Court overrule the objections and approve the assignment of the leases set forth in the Notices and any such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank]*

Dated:   March 24, 2025
         Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

*/s/ Sophie Rogers Churchill*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4277)
Tamara K. Mann (No. 5643)
Sophie Rogers Churchill (No. 6905)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com
srchurchill@morrisnichols.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
Stephen D. Piraino (admitted *pro hac vice*)
Ethan Stern (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com

*Counsel to the Debtors and Debtors in
Possession*

**EXHIBIT A**

Adequate Assurance Information

**REDACTED IN FULL**

**EXHIBIT B**

Big Lots Madeira Lease

# TABLE OF CONTENTS

**Section**

| | | |
|---|---|---|
| 1. | | Definitions |
| | A. | Common Areas |
| | B. | Dates |
| | C. | Exhibits |
| | D. | Demised Premises |
| | E. | Shopping Center |
| 2. | | Demise |
| 3. | | Term |
| | A. | Original Term |
| | B. | Option to Extend Term |
| 4. | | Use and Operation |
| | A. | Use |
| | B. | Exclusive |
| | C. | Operation |
| | D. | Prohibited Uses |
| 5. | | Rent and Additional Rent |
| | A. | Fixed Minimum Rent |
| | B. | Percentage Rent |
| | C. | Common Area Charges |
| | D. | Cap on Common Area Charges |
| | E. | Real Estate Taxes |
| | F. | Utilities and Exterior Lighting |
| 6. | | Alterations |
| 7. | | Maintenance, Repairs and Initial Build Out |
| 8. | | Signs |
| 9. | | Fixtures |
| 10. | | Governmental Regulations |
| 11. | | Indemnification |
| 12. | | Insurance |
| | A. | Tenant |
| | B. | Landlord |
| 13. | | Fire Rebuilding and Altering |
| 14. | | Force Majeure |
| 15. | | Injunction |
| 16. | | Warranty of Title by Landlord |
| 17. | | Quiet Enjoyment |
| 18. | | Mortgage and Estoppel Certificates |
| 19. | | Default |
| 20. | | Condemnation |
| 21. | | Mutual Waiver of Subrogation |
| 22. | | Assignment and Subletting |
| 23. | | Surrender and Holdover |
| 24. | | Notices |
| 25. | | Legality |
| 26. | | Binding Obligations |
| 27. | | No Recordation |
| 28. | | Real Estate Broker's Commission |
| 29. | | No Waiver, Laches or Accord and Satisfaction |
| 30. | | Hazardous Materials |
| 31. | | Titles and Entire Agreement |
| 32. | | Waiver of Claims |
| 33. | | Reasonable Consent |
| 34. | | Co-Tenancy |
| 35. | | No Presumption against Drafter |
| 36. | | Submission of Lease |
| 37. | | Interlineation |
| 38. | | Time of the Essence |
| 39. | | Limitation of Landlord Liability |
| 40. | | Attorneys Fees |
| 41. | | Waiver of Jury Trial and Counterclaim |

## LEASE AGREEMENT

This Lease, made effective this _5th_ day of February, 2003 (the "Effective Date"), by and between **MADEIRA PLAZA ASSOCIATES** , a Pennsylvania general partnership, with its business address c/o Becker Associates, 111 Presidential Blvd., Suite 140, Bala Cynwyd, PA 19004-1086 ("Landlord"), and **BIG LOTS STORES, INC.,** an Ohio corporation, whose mailing address is 300 Phillipi Road, Columbus, Ohio 43228-5311("Tenant").

### WITNESSETH:

1. **DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.     Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

B.     Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)     Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors, the same being at Tenant's sole risk. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)     The "Tenant Possession Date" shall be the earlier of (i) the date Tenant accepts possession following Landlord's notice that it has completed all construction required pursuant to Exhibit C, or (ii) ten (10) days after written notice from Landlord that it has completed all construction as required pursuant to Exhibit C. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless the Demised Premises are ready for the installation of Tenant's fixtures and finishing work by Tenant, construction pursuant to Exhibit C is complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions. Unless otherwise agreed to in writing, in no event shall the Tenant Possession Date occur during the period from September 1 to December 31. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable

1

Reading, PA.final

except as to Tenant's obligations with regard to payments due hereunder, which shall take effect as of the Rent Commencement Date.

3)     The "Rent Commencement Date" shall be the earlier of (i) the later of the date which is ninety (90) days after the Tenant Possession Date, or ninety (90) days from the date on which Tenant receives all permits and approvals for its construction, or (ii) the date Tenant opens for business. Tenant warrants that it shall pursue such permits and approvals with all due diligence.

4)     The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)     If Landlord fails to tender possession of the Demised Premises to Tenant by March 31, 2003 (the "Delivery Date"), then Tenant may cancel this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to the Delivery Date. Landlord and Tenant agree that if Landlord fails to deliver possession of the Demised Premises to Tenant by the Delivery Date, the damages suffered by Tenant, through great and irreparable, are difficult or impossible to accurately ascertain. Therefore, for each and every day beyond the Delivery Date that Landlord is delayed in delivering possession to Tenant, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the Interest Rate, as hereinafter defined, from the next installments(s) of Rent and Additional Rent due under this Lease.

C.     Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

| | | |
|---|---|---|
| 1) | Exhibit A - | Site Plan of Shopping Center |
| 2) | Exhibit B - | Legal Description of Shopping Center |
| 3) | Exhibit C - | Landlord's Work |
| 4) | Exhibit D - | Tenant's Sign Specification |
| 5) | Exhibit D-1- | Pylon Sign |
| 5) | Exhibit E - | Delivery of Possession Letter |
| 6) | Exhibit F - | Exclusive Uses and Use Restrictions of Record |
| 7) | Exhibit G - | Tenant's Floor Plan |

D.     Demised Premises: The "Demised Premises" shall be the storeroom, as outlined in yellow on Exhibit A, which storeroom shall have approximately 43,000 square feet of leasable ground floor area, at the address 5th Street Highway, Reading, PA  19606.

E.     Interest Rate: The "Interest Rate" shall be interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually.

2

F.    Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof and is known as **MADEIRA PLAZA** in the Township of Muhlenberg, State of Pennsylvania, County of Berks, 19606. As of the Effective Date, the gross leasable area of the Shopping Center is 140,593 square feet.

## 2.    DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. The ground floor area of the Demised Premises shall be the actual completed ground floor area, excluding any mezzanines, basements or balconies, as the same exists from time to time. The dimensions and the ground floor area of the Demised Premises shall be adjusted, if necessary, by Tenant to conform with actual field measurements, and the Rent and Additional Rent under this Lease shall be proportionately adjusted on the basis of the actual field measurements; except that if the actual ground floor area of the Demised Premises exceeds that amount set forth above by more than 250 square feet, then Tenant shall occupy such excess space without having any obligation to pay rent on such excess space. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.    TERM:

A.    Original Term: The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2009 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." The first Lease Year shall include the first Partial Lease Year, if any. If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extension or holdover period.

B.    Option to Extend Term: Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term" and "Third Option Term", commencing upon the expiration of the Original Term or such prior Option Term, as the case may be. Each Option Term shall be upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises, and Tenant is not in default beyond any applicable notice and cure period at the time it elects to exercise an option, Tenant may elect to exercise each option by giving the Landlord written notice at least two hundred seventy (270) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

3

Reading, PA.final

**4.**    **USE AND OPERATION:**

A.    Use: Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, including, but not limited to, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, food and for the sale of any other merchandise typically sold in Tenant's stores. Landlord represents and warrants to Tenant, as of the Effective Date, that no exclusive covenants granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises. All exclusive use provisions granted by Landlord to tenants in the Shopping Center and all use restrictions of record are attached hereto and incorporated herein as Exhibit F. At such time as an exclusive use is no longer applicable for the benefit of another tenant, the Demised Premises shall not be subject to such exclusive use under this Lease and such use shall no longer be an exclusive use. Landlord agrees to indemnify Tenant for any and all costs, damages, and losses associated with Landlord's violation of this provision.

B.    Exclusive: Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise, discount, liquidator, closeout store, furniture or dollar store operation (individually and collectively referred to herein as a "Competing Business") may be permitted in the Shopping Center during the Term of this Lease. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall have the right either to (i) pay in lieu of Fixed Minimum Rent, Percentage Rent and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly rent equal to the lesser of one and one-half percent (1.5%) of Gross Sales for such month or one-twelfth (1/12th) of the annual Fixed Minimum Rent ("Alternate Rent"), such Alternate Rent to be payable within thirty (30) days after the month for which it is due, or (ii) to terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate. Tenant's failure to exercise its right to terminate shall not waive Tenant's continuing right to do so as long as such Competing Business is operating in the Shopping Center. Provided Tenant has not elected to terminate this Lease as herein provided, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

C.    Operation: Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises when in Tenant's reasonable judgment the operation of the Demised Premises as provided herein cannot be economically justified or when the operation of the Demised Premises would expose Tenant's employees to any condition or event which threatens the safety of such employees; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section 4 and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.

4

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise so long as such actions do not impair the free flow or safety of pedestrians.

D.    Prohibited Uses: Except for tenants open and operating in the Shopping Center as of the Effective Date, in no event shall the Shopping Center or any portion thereof be used as or for a movie theater; auditorium; meeting hall; church; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles (excepting the Sears TBA existing as of the Effective Date); bar serving alcoholic beverages except as incidental to a restaurant; funeral parlor; massage parlor; animal clinic; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate; gymnasium; skating rink; car wash; off-track betting establishment; game room; amusement arcade, gallery or store; pinball arcade; so-called "flea market"; second hand or used goods store or store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa (within either side of the Demised Premises); so-called "head shop"; night club; school; gun range or gun shop; or any business or use which emits offensive odors, fumes, dust or vapors; is a public or private nuisance; emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit materials (all of the foregoing collectively referred to as the "Prohibited Uses").

5.    **RENT, ADDITIONAL RENT AND CONSTRUCTION ALLOWANCE:**

From the Rent Commencement Date and throughout the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent and Percentage Rent (sometimes referred to collectively as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent: During the Original Term, the sum of $161,250.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $13,437.50.

5

Reading, PA.final

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $182,750.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $15,229.17. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $204,250.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $17,020.83.  The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $225,750.00 per Lease Year which shall be paid in equal monthly installments in advance of the first day of each and every month in the amount of $18,812.50.

B.    Percentage Rent:  In addition to the "Fixed Minimum Rent" hereinbefore expressly reserved, Tenant further agrees to pay to Landlord as additional Rent for each Lease Year, in the manner following, a "Percentage Rent" equal to two and one-half percent (2-1/2%) of the excess of Tenant's Gross Sales (as hereinafter defined) which exceeds the annual base sum of $6,450,000.00 during the Original Term; $7,310,000.00 during the First Option Term; $8,170,000.00 during the Second Option Term; and $9,030,000.00 during the Third Option Term.

The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) credit card company finance or service charges;  (8) proceeds from vending machines located in the Demised Premises; (9) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises; and (10) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet.

Within thirty (30) days following the end of each month, Tenant shall furnish to Landlord an accurate statement of Gross Sales for the previous month.  Tenant shall furnish to Landlord within ninety (90) days immediately following the end of each Lease Year, or Partial Lease Year, as the case may be, an accurate statement of the Gross Sales for such period, certified by Tenant.  Tenant shall pay any Percentage Rent due within thirty (30) days of receipt of an invoice for Percentage Rent from Landlord.

Solely for the purpose of calculating Percentage Rent due during any Partial Lease Year, the Gross Sales during a Partial Lease Year shall be added to either: (i) Gross Sales for the period of time immediately preceding the Partial Lease Year (in the case of a Partial Lease Year at the end of the Term), or (ii) Gross Sales for the period of time immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Term), so that 365 days are calculated. In the event the Gross Sales during the 365 day period of time exceed the applicable annual base sum, a proportionate share of the Percentage Rent payment, calculated on a per diem basis to include only those days falling within the Partial Lease Year, shall be paid thereon in accordance with the payment procedures set forth above.

6

Tenant agrees to keep books of account, in accordance with generally accepted accounting principles, accurately showing all Gross Sales. Landlord or its authorized agents may, at Tenant's corporate offices, audit the same in accordance with generally accepted accounting principles consistently applied at any reasonable time upon ten (10) days prior written notice to Tenant, provided such right to audit shall be limited to one (1) time per Lease Year or Partial Lease Year. Should Landlord's audit of Tenant's books and records disclose Gross Sales which are five percent (5%) or more greater than that reported by Tenant, then Tenant shall promptly pay to Landlord the reasonable cost of such audit and any Percentage Rent found to be due by such audit, which additional Percentage Rent found to be due shall be payable in any event. Any information obtained from such an audit shall remain confidential and shall be used only for the purpose for which the audit is being conducted. Landlord shall be liable for any direct and consequential damages resulting from violation of this Lease provision and/or from the illegal dissemination of such information.

C.    Common Area Operation and Maintenance: Landlord shall maintain the Common Areas, which shall remain under Landlord's control, and Landlord agrees not to change such Common Areas in a manner that would substantially impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided such rules and regulations do not adversely affect Tenant's business operation, are uniformly applied to all tenants, and do not limit the rights or expand the obligations of Tenant under this Lease. Landlord shall not alter the parking area outlined in green on Exhibit A (the "No Build Area").

Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)    cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

7

Reading, PA.final

Landlord's costs ("Common Area Charges") shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred in refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, the insurance required to be carried by Landlord pursuant to Section 12.B. hereof, including public liability, property damage, and fire and extended coverage on the Shopping Center and/or Common Areas, total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area surcharges or levies.

Subject to the provisions of Section 5.D. hereof, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant that is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses. Notwithstanding anything contained herein to the contrary, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), reserves for replacements, any insurance deductible and/or self-insured retentions, any depreciation of the Shopping Center, and any administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of name, related to the management or operation of the Shopping Center.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior Lease Year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

8

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent and Additional Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

If Tenant is not satisfied with Landlord's written statement or wishes to challenge the accuracy or validity of any items therein, Tenant shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's accountants. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof, with interest at the Interest Rate, against the next Rent and Additional Rent payments due from Tenant to Landlord hereunder.

D.     Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's Common Area Charges shall be capped at $0.50 per square foot for each year during the Original Term. Should Tenant elect to exercise any available option periods, such charges shall be capped at $0.60 per square foot for each year during the First Option Term, $0.70 per square foot for each year during the Second Option Term, $0.80 per square foot for each year during the Third Option Term.

E.     Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land (tax parcel number(s) _____) and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center. If any governmental taxing authority acting under any present or future law, ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than an income or franchise tax) upon or against or in any way related to the land and buildings comprising the Shopping Center, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, such tax, excise and/or assessment shall be included in the definition of Real Estate Taxes, as hereinafter defined.

Tenant shall pay to Landlord its pro rata share of the taxes (hereinafter referred to as "Real Estate Taxes") assessed against the land and improvements in the Shopping Center and paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the gross leasable area leased to any Shopping Center tenant which is solely responsible for payment of real estate taxes for its separately assessed parcel shall be deducted from the gross leasable area of the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

9

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes and work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 1/1/02 – 12/31/02 tax year were $1.10 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Tax increases. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord. Tenant shall pay to Landlord, Tenant's pro rata share of Real Estate Taxes paid by Landlord for tax years or portions there of which occur during the Term. In no event shall Tenant pay for Real Estate Taxes for a time period longer than the Term. For example, if the Term is for five (5) Lease Years, then notwithstanding if the Real Estate Taxes are paid in advance, contemporaneously, or in arrears to the taxing authority, Tenant shall reimburse Landlord for Real Estate Taxes paid during the five (5) Lease Years of the Term regardless of when such Real Estate Taxes are levied or the time period for when such Real Estate Taxes are placed on the Shopping Center and/or the Demised Premises. It is expressly understood and agreed that Tenant shall not be required to pay, or reimburse Landlord for (i) any local, state or federal capital levy, franchise tax, revenue tax, income tax or profits tax of Landlord or (ii) any estate, inheritance, devolution, succession or transfer tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Demised Premises.

Landlord shall notify Tenant of any increase in the value of the land and/or improvements comprising the Shopping Center that will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Landlord shall provide notice of such increase at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. Any refund received as a result of such proceedings shall be applied first to reimburse Tenant for its expenses of prosecuting such proceedings, including reasonable attorney's fees, second to Tenant as proportional reimbursement for Real Estate Taxes paid by Tenant to Landlord for the tax year or years which are the subject of such proceedings, and the balance shall become the property of Landlord. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises. If anyone other than Tenant (including Landlord) successfully contests such Real Estate Taxes, the resulting refund, if

10

any, after deduction of expenses for conducting such proceedings, shall be prorated and Tenant's pro rata share shall be paid to Tenant.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder.  Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom.  This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.  Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.      Utilities Charge and Exterior Lighting:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including heat, water, gas, electricity, and sewer rental, together with all taxes, levies, or other charges based on the use of such utilities.  Landlord shall provide separate utility meters that shall accurately reflect Tenant's usage. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises.  Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use.  Installation shall be the cost and responsibility of the Tenant.  The monitoring equipment can be installed at any time during the Term.  Tenant reserves the right to leave monitoring equipment in place indefinitely.  Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data.  Landlord shall provide Tenant written notice of such adjustment.  In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.  In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service.  In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored.  All

11

billings by Landlord for any such service shall be paid within thirty (30) days of receipt thereof.

6.    **ALTERATIONS:**

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing. Tenant shall not permit any mechanic's liens to remain filed against the Demised Premises for any work performed or materials furnished in connection with Tenant's work. If, because of any act or omission of Tenant, a mechanic's or other lien or order for the payment of money shall be filed against the Premises or upon the Shopping Center or lands of which the Premises is a part, Tenant shall, at Tenant's own cost and expense, within thirty (30) days after notice of the filing thereof, cause the same to be canceled and discharged of record, or furnish Landlord with a surety bond issued by a surety company, protecting Landlord from any loss because of non-payment of such lien claim. In the event Tenant does post bond, Tenant shall be entitled to contest any such lien claims by appropriate judicial proceedings.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

A.    _Tenant's Repairs:_ Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment (except with respect to the HVAC system exclusively serving the Demised Premises) are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Should Tenant discover that the HVAC system requires repair and/or replacement during the first Partial Lease Year, if any, and the first two (2) Lease Years; and the cost thereof exceeds Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate in any one (1) Lease Year or Partial Lease Year, as the case may be, Landlord shall be solely responsible for such costs over and above Two Thousand Five Hundred Dollars ($2,500.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Interest Rate, from its next Rent and Additional payments owing. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do

12

so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

B.    <u>Landlord's Repairs</u>. Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify and hold harmless Tenant for all claims, demands, liabilities, warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Interest Rate, from the next Rent and Additional Rent payment(s) owing.

C.    <u>Initial Build Out</u>. Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a reputable HVAC company, reasonably acceptable to Tenant, and Landlord shall guarantee that the HVAC system is in good working condition. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Interest Rate, from its next Rent and Additional Rent payment(s) owing.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within thirty (30) days after the Tenant

13

Reading, PA.final

Possession Date by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch-list in operating condition, and thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Interest Rate, from the next installment of Rent and Additional Rent.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days after the Delivery Date, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may offset such expenses plus a ten percent (10%) administrative fee from the next installments of Rent and Additional Rent due and owing. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

8.   **SIGNS:**

Tenant shall have the right, at its sole cost and expense, to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. All of Tenant's signs shall comply with all requirements of the applicable governmental authorities and all necessary permits or licenses shall be obtained by Tenant. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the state in which the Demised Premises are located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Tenant shall have the right, at its sole cost and expense, to place suitable sign panels upon the existing Shopping Center pylons, if pylons exist in the Shopping Center. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on the space(s) indicated on Exhibit D-1. In the event space is unavailable on any existing pylon, Landlord grants Tenant a right of first refusal to occupy, in accordance with the provisions herein, any pylon space which may become available during the Term of this Lease, any extensions thereof, or during any holdover period. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the vacated pylon space. Absent an existing pylon, Tenant shall have the right to erect a pylon for its sign panels. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances. Once Tenant's sign panels and/or Tenant's pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs.

Landlord shall ensure that Shopping Center pylons, if pylons exist in the Shopping Center, (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

14

During the Term of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

If Landlord renovates all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord shall first notify Tenant at least forty-five (45) days prior to the removal of such sign(s) and the cost of such removal and reinstallation together with the cost of any damage to said sign(s) as a result of such removal and/or reinstallation shall be borne solely by Landlord. Further, Landlord agrees to provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) shall be approved by Tenant prior to such installation.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.   **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. In the event Tenant is required by local, state or federal code, Landlord shall provide Tenant with a complete set of "as built" drawings. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future; and to place all HVAC equipment in compliance with the Clean Air Act of 1992.

11.   **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of

15

Reading, PA.final

every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective property insurance carrier of the indemnity and hold harmless agreement contained in this Section. The provisions of this Section 11 shall survive the expiration or earlier termination of this Lease.

## 12.    INSURANCE:

A.    Tenant: Tenant agrees to carry at its own expense, throughout the Term of this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    Landlord: Landlord shall, throughout the Term of this Lease, carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under "Special Form Coverage ISO Form CF 10-20" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Tenant will pay to Landlord monthly Tenant's estimated pro rata share of premiums for such insurance based on Landlord's premiums for the previous Lease Year to the extent not otherwise included in Common Area Charges. Tenant's pro rata share shall be determined by the use of a formula, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the gross leasable area leased to any Shopping Center tenant which is solely responsible for payment of insurance for its building shall be deducted from the gross leasable area of the Shopping Center.

16

Reading, PA.final

Landlord shall furnish Tenant with copies of insurance premium bills, the type of insurance plan used, and documentation regarding the method of computing said premium within ten (10) days of when the same are issued. An adjustment shall be made as soon as the actual premiums for the period, and Tenant's pro rata share thereof, can be determined. Tenant shall promptly pay for any deficiency, and Landlord shall promptly give credit for any overage.

In the event that the premiums on policies required to be carried by Landlord pursuant to this Section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

## 13.    FIRE REBUILDING AND ALTERING:

A.    If the Demised Premises, or any permanent additions or leasehold improvements thereto, and/or less than 35% of any buildings or other improvements comprising the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term, except as otherwise provided herein, Landlord shall, promptly at its own expense, caused the Demised Premises or such applicable portions of the Shopping Center to be restored (exclusive of Tenant's Work and Tenant's Property) to such condition substantially similar to that as existed prior to the casualty ("Landlord's Restoration Work"), and Tenant shall, promptly at its own expense, restore Tenant's Work and Tenant's Property to such condition substantially similar to that as existed prior to the casualty ("Tenant's Restoration Work").

In the event Landlord, as provided above, is obligated to restore such damaged portions of the Demised Premises and/or the Shopping Center, and fails to complete Landlord's Restoration Work within one hundred eighty (180) days from the date of any such casualty, Tenant may, at its option, terminate this Lease by giving thirty (30) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided that if Landlord tenders delivery of the Demised Premises to Tenant, or reopens the damaged portions of the Common Areas to the public with its repair and restoration fully completed within said 30 day period, and if such event does not occur within the final Lease Year of the Term, Tenant's termination notice shall be void, and this Lease shall continue in full force and effect upon Tenant taking possession of the Demised Premises. After written notice to Tenant that Landlord has completed Landlord's Restoration Work, Tenant shall proceed with Tenant's Restoration Work with reasonable diligence.

During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced in proportion to the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored, and Tenant has taken possession of such in tenantable condition.

B.    If (a) any of any buildings or other improvements comprising the Shopping Center shall be damaged or destroyed by fire or any other casualty to the extent that (1) thirty-five percent (35%) or more of the cost of replacement thereof, or (2) thirty-five percent (35%) or more of the gross leasable area contained therein shall be rendered untenantable, or (b) the Demised Premises or the buildings

17

comprising the Shopping Center shall be damaged or destroyed by any casualty other than those covered by Landlord's Insurance, or (c) the holder of any indebtedness secured by a mortgage covering the Demised Premises or Shopping Center shall require that any insurance proceeds be applied to such indebtedness, Landlord may, within sixty (60) days following the date of such casualty, at its option, either (a) terminate this Lease or (b) promptly proceed with Landlord's Restoration Work as provided by Section 13A. In either such event Landlord shall give Tenant written notice of its intention within said sixty (60) day period.

## 14.    FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to the initial delivery of possession of the Demised Premises.

## 15.    INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    WARRANTY OF TITLE BY LANDLORD:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify Tenant against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Demised Premises; and (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease.

## 17.    QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Term of this Lease. Tenant's covenant to pay Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18.    MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and

18

Reading, PA.final

attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the facts stated therein which may include, but shall not be limited to, all or any part of the following information: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by Landlord and there is no offset which Tenant has against Landlord; provided that such facts are true and ascertainable.

## 19.    DEFAULT:

A.    Each of the following events shall be a "Default" by Tenant under this Lease:

1)    If Tenant shall fail to pay any Rent, Additional Rent, or any other sums due herein, and such failure continues for fifteen (15) days after Landlord gives Tenant written demand of such;

2)    If Tenant shall fail to observe or perform any other covenants and/or agreements for which it is responsible hereunder, and such failure continues for thirty (30) days from the date Tenant receives written notice from Landlord advising of such failure (provided that if Tenant commences to cure the default within the initial 30-day period and diligently prosecutes the same to completion, Tenant shall be afforded such additional time as is reasonably necessary to effect such cure if such failure cannot reasonably be cured within the initial 30-day period);

3)    If any petition is filed by or against Tenant (a) in any bankruptcy or other insolvency proceeding, or (b) seeking any relief under any state or federal debtor relief law, or (c) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease, and any such action is not dismissed within 30 days of said filing or appointment;

4)    If Tenant makes an assignment for the benefit of its creditors;

B.    Upon the occurrence of any such Default, Landlord shall have the option to pursue any one or more of the following remedies without further notice or demand, in addition to all other rights and remedies available to Landlord at law or in equity, all of such rights and remedies being cumulative; provided, however, in no event shall Landlord be entitled to accelerate any amount due under this Lease following a Default by Tenant.

1)    Terminate this Lease by giving written notice thereof to Tenant, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so Landlord may, without prejudice to

Reading, PA.final

any other remedy which Landlord may have, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying the Demised Premises without being liable for any claim of damages.

If Landlord terminates this Lease under this provision, then Tenant shall pay to Landlord the sum of (i) all Rent and Additional Rent accrued through the date of termination, and (ii) all amounts due under Section 19.C. below.

2)      Terminate Tenant's right to possess the Demised Premises and re-enter the Demised Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (i) all Rent, Additional Rent and other amounts accrued hereunder to the date of termination, (ii) all amounts due from time to time under Section 19.C. below, and (iii) such Rent, Additional Rent and other net sums on a monthly basis required to be paid by Tenant according to the terms of the Lease for the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Demised Premises on commercially reasonable terms during such period; Landlord having an obligation to use commercially reasonable efforts to mitigate its damages. Landlord shall not be obligated to re-let the Demised Premises before leasing other portions of the Shopping Center.

3)      Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Demised Premises in connection therewith if necessary) without being liable for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in performing Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the Interest Rate.

C.      Upon any event of Default, Tenant shall pay to Landlord, as additional rent, all reasonable costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (i) obtaining possession of the Demised Premises, (ii) removing and storing Tenant's or any other occupant's property, (iii) repairing, restoring, altering, remodeling, or otherwise putting the Demised Premises into condition substantially similar to that at the time of Landlord's initial delivery to Tenant, (iv) the costs of reletting all or any part of the Demised Premises, including brokerage commissions, and (v) performing Tenant's obligations which Tenant failed to perform.

D.      Tenant's liability following an event of default for Percentage Rent shall be the average annual Percentage Rent paid for all previous Lease Years prior to such termination (or, if shorter, the period from the Rent Commencement Date to termination).

E.      <u>Landlord's Default:</u> If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant shall give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant, (ii) abate all Rent until such time as Landlord has adequately cured its default; or (iii) cure such default, and upon the completion of such work by Tenant, Tenant shall provide Landlord with a detailed statement of the work completed, together with copies of paid invoices for such work, and Landlord shall reimburse Tenant for such work within thirty (30) days after its receipt of such statement. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair

20

work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the Interest Rate from the next Rent and Additional Rent payment(s) owing.

In the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repairs, all Rent due hereunder shall equitably abate in proportion to the square footage of the Demised Premises rendered untenantable until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.

F.    Remedies Cumulative: All rights and remedies of Landlord and Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Parties to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem desirable. The failure of Landlord or Tenant to insist upon strict performance by the other party of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any of said rights and remedies concerning any subsequent or continuing breach or default by the breaching party of any of the covenants, conditions, or agreements of this Lease.

## 20.    CONDEMNATION:

A.    Taking. If there is any taking of, or damage to, all or any portion of the Shopping Center or the Demised Premises because of the exercise of the power of eminent domain or inverse condemnation, whether by condemnation proceedings, or any transfer made in avoidance of, or because of a threat or imminence of such taking (all of the foregoing being hereinafter referred to as "Taken" or "Taking") before or during the term of this Lease, as the same may be extended, the rights and obligations of the parties with respect to such Taking shall be as provided in this Section 20. For purposes of these Sections, the "Date of Taking" means the earlier of the date of entry into possession by, or the vesting of title in, the condemning authority or third-party transferee.

B.    Total Condemnation. If there is a Taking of all of the Demised Premises, this Lease shall terminate as of the Date of Taking.

C.    Partial Condemnation:

(i)    Right to Terminate. If thirty five percent (35%) or more of the Demised Premises is Taken, or such amount of the customer parking area of the Shopping Center shall be Taken to the extent the number of remaining spaces are not in conformance with applicable parking codes, or if fifty percent (50%) or more of the gross leasable ground floor area of the Shopping Center is Taken, except as otherwise provided in Section 20.C.(ii) below, either Landlord or Tenant shall be entitled to terminate this Lease so long as either Party in good faith determines that it can not operate its own business in the manner contemplated by this Lease. The terminating party shall give the other party written notice of such election not later than sixty (60) days after the date the condemning authority actually takes the property. In the event these contingencies are not met, this Lease shall remain in full force and effect and Fixed Minimum Rent,

21

Additional Rent, and all other charges due under this Lease shall be adjusted, if at all, as provided in Section 21E below.

(ii)     Repair and Restoration.  If this Lease is not terminated as provided in Section 20.C., Landlord shall restore, at its sole cost and expense, the Shopping Center and the Demised Premises to a complete architectural unit of like quality, character and condition as that which existed immediately prior to the Taking, except for such leasehold improvements made by Tenant.

D.     Rent Adjustment.  If this Lease is not terminated as provided in Section 20.C., the Rent, Additional Rent, and all other charges due under this Lease shall be reduced in proportion to the amount by which the Demised Premises Taken bears to the total floor area of the Demised Premises immediately prior to the Taking.

E.     Award.  Except as otherwise herein provided as between Landlord and Tenant, the entire award or compensation paid on account of any partial or total condemnation or Taking under power of eminent domain, or threat of exercise thereof, of the Demised Premises, Shopping Center or Common Area shall be the property of Landlord, provided that Tenant shall be entitled to claim and recover from the condemning authority or third-party transferee such compensation as may be separately awarded for any loss to which Tenant may be entitled for Tenant's moving expenses or other relocation costs, loss of profits, loss of leasehold estate, the unamortized value of leasehold improvements or injury to Tenant's good will, trade fixtures or equipment, and retain any such award applicable thereto, but only to the extent that such compensation is in addition to and shall not diminish the compensation provided to Landlord.  In no event shall Tenant have any claim against Landlord or the condemning authority for loss or diminution in value of leasehold improvements paid for by Landlord, whether installed as part of Landlord's Work or Tenant's work, and Tenant hereby assigns to Landlord the amounts representing such value.

## 21.     MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights or recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured.

Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.  The provisions of this Section 21 shall survive the expiration or earlier termination of this Lease.

## 22.     ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease; provided that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder.  Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal,

22

Reading, PA.final

amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that a mortgagee need require no further instrument of subordination.

**23.    SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Term, such occupancy shall be a tenancy from month to month at the Fixed Minimum Rent then in effect and otherwise subject to all the terms and provisions hereof.

**24.    NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified on Page 1 of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on either (i) the next business day in the case of delivery by overnight courier, or (ii) three (3) business days after mailing the notice in the case of registered or certified mail. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

**25.    LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the state of in which the Demised Premises are located without regard to choice of law rules of that state.

**26.    BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

**27.    NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

**28.    REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity

23

Reading, PA.final

shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

## 29. NO WAIVER, LACHES OR ACCORD AND SATISFACTION:

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30. HAZARDOUS MATERIAL:

Landlord represents and warrants the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Landlord shall, at its sole cost and expense, promptly remove and dispose of any Hazardous Material in, on, under or around the Demised Premises at any time during the Term of this Lease, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date or is determined to have been placed thereon by Landlord during the Term of this Lease. The removal and disposal of such Hazardous Material shall be performed in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials. If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Term of this Lease, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of this Lease.

## 31. TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

Reading, PA.final

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent or Additional Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Percentage Rent or Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within six (6) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said six (6) month period, then Landlord's claim to such amount owed shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

If the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that either party fails to respond to any request for consent, approval or permission within fifteen (15) days (or such longer or shorter period as is herein specified) after receipt of such request, then said consent, approval, or permission shall be conclusively deemed to have been granted and the other party may proceed without further action, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34. **CO-TENANCY:**

Intentionally Omitted.

35. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of the authorized signature printed by the receiving facsimile machine to be its original signature.

37. **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

25

Reading, PA.final

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.    LIMITATION OF LANDLORD LIABILITY**

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from such property receivable by Landlord, or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, and neither Landlord nor the general partner or any of the other partners comprising the partnership which is the Landlord herein, nor any shareholder, officer, employee or agent thereof, shall be liable for any deficiency.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

**41.    WAIVER OF JURY TRIAL AND COUNTERCLAIM:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with the payment or nonpayment of Rent or Additional Rent. In the event Landlord commences any proceedings for nonpayment of Rent or Additional Rent, Tenant shall not interpose any counterclaim of whatever nature or description in any such proceeding, unless the failure to raise the same would constitute a waiver thereof. This shall not, however, be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.


END OF LEASE
Signature Pages and Exhibits follow.

Reading, PA.final

**IN TESTIMONY WHEREOF,** the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:                    **MADEIRA PLAZA ASSOCIATES**

By:_____

Title:__Partner__

                                             **LANDLORD**

Landlord's EIN: _23-2839483_

Witnesses As To Tenant:                      **BIG LOTS STORES, INC., an Ohio corporation**

By:_____
                Albert J. Bell
Title:__Vice Chairman__

                                             **TENANT**

**STATE OF PENNSYLVANIA**

**COUNTY OF** Delaware

        Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, **MADEIRA PLAZA ASSOCIATES,** by Eric Becker, its Partner, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

        **IN WITNESS WHEREOF,** I have hereunto set my hand and the official seal, at Bala Cynwyd, PA this __5th__ day of __February__, 2003.

                                Notary Public

**STATE OF OHIO**

                    NOTARY
                    PATRICIA M. SMITH Notary Public
                    Haverford Twp
                    My Commission ___, 2003

**COUNTY OF FRANKLIN**

        Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **BIG LOTS STORES, INC.,** by Albert J. Bell, its Vice Chairman, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

        **IN WITNESS WHEREOF,** I have hereunto set my hand and the official seal, at Columbus, Ohio, this __3rd__ day of February, 2003.

                                Notary Public

                    PENNY J. SAVAGE
                    Notary Public, State of Ohio
                    My Commission Expires May 10, 2003

27

Reading, PA.final

**EXHIBIT A**

**SITE PLAN OF SHOPPING CENTER**



# EXHIBIT B

# LEGAL DESCRIPTION OF SHOPPING CENTER

Application No. 17.... – P 616-017 EF
DESCRIPTION AND RECITAL

ALL THAT CERTAIN tract or piece of land known as "Madeira Plaza Shopping Center", lying on the easterly side of the concrete Pennsylvania State Highway Legislative Route No. 157, being U.S. Route No. 222, known as Fifth Street Highway, situate in the Township of Muhlenberg, County of Berks and State of Pennsylvania, being more fully bounded and described as follows, to wit:

BEGINNING at a point in the curve of the center line of said Fifth Street Highway, being a corner of property belonging to John Hancock Mutual Life Insurance Company (known as William Penn Plaza), and in line of property belonging to the now or late John E. Madeira;

THENCE extending along the center line of said Fifth Street Highway, the two following courses and distances, viz:

1.  In a northerly direction along properties belonging to the now or late John E. Madeira, Siberco Corp., and Muhlenberg Shopping Center Co., respectively being along the arc of a curve deflecting to the right, having a radius of 11,453.19 feet, a central angle of 3 degrees 22 minutes 28.29 seconds, a distance along the arc of 674.55 feet, said arc having a chord bearing of North 6 degrees 18 minutes 15.855 seconds East, a distance along the chord of 674.46 feet to a point of tangency, and

2.  continuing along property belonging to the now or late Muhlenberg Shopping Center Co. North 7 degrees 59 minutes 30 seconds East a distance of 21.85 feet to a point;

THENCE leaving said center line of Fifth Street Highway and extending along property belonging to Colonial Berks Real Estate Co., the following courses and distances, viz:

1.  South 82 degrees 00 minutes 30 seconds East a distance of 40.00 feet to a point.

2.  North 73 degrees 31 minutes 40 seconds East a distance of 206.82 feet to a point, and

3.  North 16 degrees 28 minutes 20 seconds West a distance of 50.00 feet to a point, a corner of property belonging to Berks County Industrial Development Authority;

DESCRIPTION AND RECITAL (continued)

THENCE along said property belonging to Berks County Industrial Development Authority, North 73 degrees 31 minutes 40 seconds East a distance of 497.99 feet to a point in line of property belonging to the now or late Michael Mastidino and Marie R., his wife;

THENCE extending along "Belmont" Plan of Lots, being along property belonging to the now or late Michael Mastidino and Marie R., his wife, Charles D'Ercole and Mary E., his wife, Keith C. Waitzel and Ruth S., his wife, Curtis H. Moyer and Lillian G., his wife, Nobel R. Moyer and Anna K., his wife, Harold F. Angstadt and Carrie M., his wife, Robert L. Gehring and Shirley M., his wife, Norman S. Dunkelberger and Anna M., his wife, Stamford K. Hutchinson and Mona M., his wife, and Warren W. Skibbe and Ethel M., his wife, respectively, and along the division line between the Township of Muhlenberg and the Borough of Laureldale, South 16 degrees 26 minutes 20 seconds East a distance of 314.63 feet to a point;

THENCE continuing along said division line North 73 degrees 32 minutes 40 seconds East a distance of 0.48 feet to a point;

THENCE still continuing along said division line and along property belonging to the now or late Herbert R. Cronrath and Vivian M., his wife, crossing the western terminus of Emerson Avenue, South 16 degrees 45 minutes 20 seconds East a distance of 181.24 feet to a point on the southern building line at the western terminus of Emerson Avenue;

THENCE along property belonging to the aforementioned John Hancock Mutual Life Insurance Company (known as William Penn Plaza), the five following courses and distances, viz:

1.  South 73 degrees 28 minutes 40 seconds West a distance of 124.44 feet to a point.

2.  South 4 degrees 24 minutes 30 seconds West a distance of 235.98 feet to a point.

3.  North 85 degrees 35 minutes 30 seconds West a distance of 63.00 feet to a point.

4.  South 4 degrees 24 minutes 30 seconds West a distance of 248.00 feet to a point, and

5.  North 85 degrees 35 minutes 30 seconds West a distance of 702.92 feet to the place of BEGINNING.

TOGETHER WITH easement rights as listed in Deed Book Volume No. 1575, page 721, recorded in Berks County Records, between Muhl., Inc., and A.S.C. Realty of Reading, Inc.

BEING THE SAME PREMISES WHICH Muhl., Inc., a Pa. Corp. by Deed dated September 30, 1982 and recorded in Berks County in Deed Book 1821 page 1387 conveyed unto U.S. Reatly Associates, a New Jersey Limited Partnership, in fee.

**EXHIBIT C**

**LANDLORD WORK**
**MADEIRA PLAZA - READING, PA**

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**Landlord covenants and agrees to deliver the Demised Premises to Tenant as follows:**

1.      HVAC equipment to be in good working condition and adequate for Tenant's intended use, including but not limited to all duct work, diffusers and any other air distribution equipment commonly used and required by Tenant. Tonnage requirements to meet Tenant's specifications of one ton per 300 square feet throughout the Demised Premises, sales floor and stock room. If the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to have the HVAC system inspected to determine the needed repairs by the Landlord. Landlord shall also warrant the HVAC system for a period of two years for any repairs over $2,500 during a single lease year.

2.      All plumbing, electrical and mechanical equipment to be in good working condition, including sprinkler system. Landlord to provide Tenant with sprinkler certification. Landlord to provide separate room with an exterior entry access door in which it shall, throughout the Original Term and any Options Terms or extensions, maintain the sprinkler riser to any sprinkler system used in common with other tenants (If a sprinkler system does not exist, Landlord to install a sprinkler system and it sole cost and expense if required by code. If code does not require a sprinkler system, Landlord to install a smoke detection system to be monitored by Tenant and any other fire detection, protection and prevention equipment required by code).

3.      Landlord to install new energy efficient 8'ft florescent strip lighting. Lighting fixtures to be used are 8'strip - 4 lamp tandem 4' T8 with electronic ballasts. Lighting to be installed 10'on center side-to-side and within 2' from all perimeter walls throughout the sales floor. Lighting in the stockroom to be 12' on center.

4.      Remove existing floor covering and install new commercial grade VCT Armstrong Excelon 1/8'' #51899 "Cool White" floor tile or approved equivalent throughout the sales floor area. Stockroom floor to be smooth and level throughout entire stockroom area.

5.      Remove existing ceiling tiles and install new 2' x 4' white acoustic ceiling tiles and grid 14' above the finished floor.

6.      Provide vestibule entrance with a minimum of 36' of glass store front including four (4) pairs of 3'0" x 7'0" doors that meet ADA requirements (Exit doors to have automatic openers). Landlord to ensure there are curb cuts within reasonable proximity to the store front and vestibule has adequate HVAC for Tenant's use (vestibule to have slip retardant tile).

7.      All doors and door systems to be sound and secure and in good working condition, and in compliance with A.D.A. requirements.

8.      Landlord to provide Tenant with three (3) offices, one (1) lounge and restrooms to Tenant's specifications, accessible from Tenant's sales floor and in compliance with all applicable local and state codes and A.D.A. requirements. Restrooms to have a minimum of two (2) commodes and one urinal in the men's and three (3) commodes in the women's. Further, the aforesaid offices, lounges and restrooms shall have adequate HVAC, ceiling and floor tile (rest rooms to have floor covering that meet code requirements for the sale of food), electrical and plumbing, lighting, sinks, fixtures, partitions, FRP board, etc. Cash Office to have solid plywood ceiling (minimum 1/2" thickness).

9.      Roof to be in good condition and free of leaks.

**EXHIBIT C - LANDLORD WORK (continued)**

10.    Landlord to construct a new Anchor Tenant façade, canopy and building fascia to be similar in size and style to other anchor tenants in the center.  New façade to be approved by both Tenant and Landlord.

11.    Landlord to separate all utilities and provide separate meters adequate for Tenant's intended use (Tenant to have a minimum of 800 amps for 208v service or 600 amps for 480v service).

12.    Landlord to erect demising wall(s), to roof deck, separating the Demised Premises per Tenant's plans. Landlord to re-tie ceiling to demising walls and finish floor to include cove base and walls ready for paint.

13.    Landlord to erect demising wall, to roof deck, separating sales area from stockroom and install (2) two pairs of 3'x7' stockroom doors to Tenant's specifications.

14.    Landlord to construct a loading dock and receiving doors to Tenant's specifications and to include bumpers, ballards, seals and be at the standard truck height of 48''.

15.    Replace all broken glass.

16.    Demised Premises to be professionally inspected for pestilence and termites, and Tenant to be provided with a certified report that the Demised Premises is pest free, and if not, Landlord will make pest free.

17.    Landlord to install cart corral in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

18.    Landlord to ensure existing pylon meets all local and state codes and ordinances  in order for Tenant to place its panel on the pylon.  Tenant to receive the its prorata share of the former Ames position on the pylon.

19.    Landlord will provide tenant with "as built" drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan.

20.    Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction, if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.

21.    Tenant to approve all drawings prior to the commencement of work.

22.    All above work to be completed before the Tenant Possession Date.

# EXHIBIT D

## TENANT SIGN SPECIFICATION



INDIVIDUAL NEON ILLUMINATED CHANNELED LETTERS STANDARD SIZES AND SPECIFICATIONS

**SIGN SPECIFICATIONS: BIG LOTS**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES: .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS (NOTE: 2'-0" AND 2'-6" USE 13MM TUBING)

**SIGN SPECIFICATIONS: EXCLAMATION**
CUSTOM FABRICATED 9" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES: .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH 15MM CLEAR RED NEON TUBING POWERED BY 30MA SELF CONTAINED TRANSFORMERS

| STANDARD SIZE CHARACTERISTICS | | | | |
|---|---|---|---|---|
| A | B | C | D | E |
| 2'-0" | 12'-3" | 2'-10" | 9" | 4 1/2" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5 1/2" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6 1/2" |
| 3'-6" | 20'-7" | 4'-11" | 15 1/2" | 7 1/2" |
| 4'-0" | 23'-3" | 5'-8" | 17 1/2" | 8 1/2" |
| 4'-6" | 25'-1" | 6'-4" | 19 1/2" | 9 1/2" |
| 5'-0" | 28'-10" | 7'-0" | 21 1/2" | 10 1/2" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

NOTE: FABRICATION AND INSTALLATION PER UL SPECIFICATIONS INSTALL IN ACCORDANCE WITH THE N.E.C. ALL SIGNAGE EQUIPT WITH DISCONNECT SWITCHES

**EXHIBIT D-1**

**PYLON SIGN**

MADERIA PLAZA - PYLON -



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

**Date:** _____

**To:**  **Big Lots Stores, Inc.**
        via facsimile:  (614) 278-6546

**From:**

_____
(insert name of Landlord contact person)

**Re:**  _____
        (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated

_____ has been completed.  Accordingly, possession of the Demised Premises is

hereby delivered to Tenant.  You may pick up the keys at _____

_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**EXHIBIT F**

Madeira Plaza Shopping Center
Exclusive Rights Clauses in Existing Leases

Tasty Baking Co.: No bakery thrift or outlet stores

Taco Bell: No Mexican restaurant or burger restaurant

Sears (NTB): N/A

Rent-A-Center: No store renting/leasing/option to own consumer durable goods

Redner's: No supermarket, butcher shop, seafood shop, or "grocery" store – Super Kmart, Super Wal-Mart, Super Target

Radio Shack: No electronic, telecommunications/transmitting equipment, computers, A/V equipment, and all related accessories store

*Office Max: No office, home office, school, and/or business products and/or supplies, computers/products, office furniture, and cell phones/pager stores. Also no bowling alley, arcade, amusement center, fitness center, heal club, spa, game rooms, skating rink, billiard room, massage parlor, adult bookstore, off track betting, flea market, bar, liquor store, tavern, pub, ballroom, dance hall, day care, disco, beauty school, barber shop, place of instruction, or reading room.*

Fleet Bank: No financial institution such as branch bank, or consumer/commercial lending

Eckerd: N/A

*Dollar General: No store such as Family Dollar/Bill's Dollar/Fred's/Super10*

Bojangles: No restaurant featuring chicken sandwiches or dishes

**EXHIBIT G**

**TENANT'S FLOOR PLAN**

