**United States Bankruptcy Court, District of Delaware**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|

**Debtor:** BLBO Tenant, LLC

**Case Number:** 24-11972

## Modified Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | Cottonwood Meadow Properties, LP |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| 2. | Has this claim been acquired from someone else? | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? |

| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Address1: Attention: Jeffrey I. Golden | Address1: |
| | | Address2: 3070 Bristol Street, Suite 640 | Address2: |
| | | Address3: | Address3: |
| | | Address4: | Address4: |
| | | City: Costa Mesa | City: |
| | | State: CA | State: |
| | | Postal Code: 92626 | Postal Code: |
| | | Country: | Country: |
| | | Contact phone 714-966-1000 | Contact phone |
| | | Contact email jgolden@go2.law | Contact email |

| 4. | Does this claim amend one already filed? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known)_____ | Filed on ___/___/____ | MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _540,533.79_ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease arrearage, stub rent, county taxes

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _14,935.00_

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:*               **Amount entitled to priority**<br><br>  ☐ Domestic support obligations (including alimony and child support) under<br>     11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).       $_____<br><br>  ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for<br>     personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____<br><br>  ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the<br>     bankruptcy petition is filed or the debtor's business ends, whichever is earlier.<br>     11 U.S.C. § 507(a)(4).     $_____<br><br>  ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____<br><br>  ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____<br><br>  ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies.   $_____<br><br>     * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received**   $_____<br>    **by the Debtor within 20 days before the date of commencement of the above case, in**<br>    **which the goods have been sold to the Debtor in the ordinary course of such**<br>    **Debtor's business. Attach documentation supporting such claim.** |

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Jeffrey Ian Golden*    01/31/2025<br>  Electronic Signature          Date<br><br>**Name of the person who is completing and signing this claim**<br><br>Name   Jeffrey Ian Golden<br>     First name      Middle name      Last name<br><br>Title/Company   Golden Goodrich LLP<br>     Identify the corporate servicer as the company if the authorized agent is a servicer.<br>     3070 Bristol Street, Suite 640<br><br>Address<br>     Number     Street<br>     Costa Mesa     CA     92626<br>     City     State     ZIP Code    Country<br><br>Contact phone   714-966-1000    Email  jgolden@go2.law |

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:

City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

--------------------------------------------------------------------------------------------------------------------

Attachment Filename:

POC- Cottonwood- Final-Reduce.pdf

**KROLL**

**Fill in this information to identify the case:**

Debtor 1 — BLBO Tenant, Inc.

Debtor 2
(Spouse, if filing) — _____

United States Bankruptcy Court for the: Central District of California

Case number — 24-11972

## Official Form 410

# Proof of Claim

12/24

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Cottonwood Meadow Properties, LP
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Jeffrey I. Golden, Esq.
Name

3070 Bristol Street, Suite 640
Number        Street

Costa Mesa            CA            92626
City                State          ZIP Code

Contact phone  7149661000

Contact email  _____

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number        Street

_____
City            State          ZIP Code

Contact phone  _____

Contact email  _____

Uniform claim identifier (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

---

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

---

7. **How much is the claim?**    $_____540,533.79    **Does this amount include interest or other charges?**

*Plus additional fees and damages in an amount to be determined

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease arrearage, stub rent, county taxes

---

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

10. **Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____14,935.00

---

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/31/2025
                   MM / DD / YYYY

/s/ Jeffrey I. Golden
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Jeffrey I Golden | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Golden Goodrich LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3070 Bristol Street, Suite 640 | | |
| | Number        Street | | |
| | Costa Mesa | CA | 92626 |
| | City | State | ZIP Code |
| Contact phone | 7149661000 | Email | |

## Attachment to Cottonwood Meadow Properties, LP Proof of Claim

On or about May 11, 1993, Stater Bros. Markets ("Stater Bros") and PNS Stores ("PNS Stores" or "Debtor") entered into a Lease Agreement (the "Lease") whereby PNS Stores agreed to lease the Premises (as defined therein) located at 155 East Baseline Avenue, Rialto, CA (the "Property") for use as a retail store. A true and accurate copy of the Lease is attached hereto as **Exhibit A**. On November 21, 2012, Stater Bros assigned the Lease to Cottonwood Meadow Properties, LP (the "Landlord" or "Cottonwood") by way of an Assignment of Lease.  Thereafter, the term of the Lease was extended through the exercise of various options through July 31, 2025 (the "Lease Term").

In connection with the Lease, the Tenant agreed to pay minimum rent as set forth in Section 4 of the Lease as well as real property taxes for the Premises.

## Itemization of Damages

| Category | Amount |
|---|---|
| Rent Arrearage at Petition Date | $14,935.00 |
| Prorated/Stub Rent from 9/9/24-9/30/24 | $10,952.33 |
| Potential Rejection Damages | $498,829.00 |
| San Bernardino County Taxes | $15,817.46 |
|  |  |
| **TOTAL DAMAGES** | **$ 540,533.79** |

## **RESERVATION OF RIGHTS**

The filing of this Proof of Claim is made without waiver or limitation of any rights, claims, defenses, or remedies that Landlord may have against the Debtor(s) or any other party. Landlord expressly reserves the right to:

1. **Amend, Supplement, or Modify** this Proof of Claim at any time, including to reflect additional amounts due, new facts, or legal arguments.
2. **Assert Additional Claims** against the Debtor(s) or any third party, including administrative, secured, priority, or unsecured claims.
3. **Challenge the Debtor's Treatment** of this Claim in any plan of reorganization, liquidation, or any other proceeding.
4. **Enforce Setoff or Recoupment Rights** against any amounts owed to the Debtor(s).
5. **Object to the Treatment of this Claim** in any capacity, including under any proposed plan of reorganization or settlement.
6. **Participate in Proceedings** related to this bankruptcy case, including adversary proceedings, contested matters, or any hearings affecting its rights.
7. **Seek Relief from the Automatic Stay** or other relief as appropriate.

Nothing in this Proof of Claim shall be deemed a waiver of any rights, claims, or defenses of Landlord in any jurisdiction, nor shall it constitute an election of remedies or consent to the jurisdiction of any court other than as required by applicable bankruptcy law.

Specifically, Landlord reserves the right to amend this Proof of Claim to assert additional damages with respect to any liens or claims asserted by any contractor, subcontractor or representatives or agents thereof with whom the Debtor or anyone on its behalf contracted to perform work on the Premises. This work was undertaken without providing the required advance disclosures and notices to the Landlord. As the Landlord is continuing its investigation into such claims and liens, it is anticipated that the amount of such claims and liens will increase, thereby increasing the Landlord's claim against the Debtor. Moreover, the Landlord reserves the right to assert all available causes of action against the Debtor, including those sounding in fraud, for such conduct. Accordingly, the Landlord expressly reserves the right to amend this Proof of Claim to reflect such increases and additional damages.

# EXHIBIT A

04/28/93/RIALTO/LEASE6.W51

LEASE
TABLE OF CONTENTS

Date:            May 11, 1993
Landlord:        Stater Bros. Markets, a California corporation
Tenant:          PNS Stores, Inc., a California corporation
Location:        155 East Baseline Avenue
City of:         Rialto
County of:       San Bernardino
State of:        California
Store No.:       274

1.   PREMISES . . . . . . . . . . . . . . . . . . . . . . . .   1
2.   TERM . . . . . . . . . . . . . . . . . . . . . . . . . .   2
3.   IMPROVEMENTS TO THE PREMISES . . . . . . . . . . . . . .   4
4.   RENT AND RENT COMMENCEMENT DATE . . . . . . . . . . . .    6
5.   REAL PROPERTY TAXES . . . . . . . . . . . . . . . . . .   10
6.   INSURANCE . . . . . . . . . . . . . . . . . . . . . . .   13
7.   USE . . . . . . . . . . . . . . . . . . . . . . . . . .   16
8.   UTILITIES . . . . . . . . . . . . . . . . . . . . . . .   19
9.   MAINTENANCE, REPAIRS AND ALTERATIONS . . . . . . . . . .  19
10.  SIGNS . . . . . . . . . . . . . . . . . . . . . . . . .   37
11.  DAMAGE TO THE PREMISES . . . . . . . . . . . . . . . . .  38
12.  LIENS . . . . . . . . . . . . . . . . . . . . . . . . .   44
13.  RIGHTS OF ACCESS . . . . . . . . . . . . . . . . . . . .  44
14.  ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . .   45
15.  EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . .  46
16.  TENANT'S DEFAULT . . . . . . . . . . . . . . . . . . . .  50
17.  LANDLORD'S DEFAULT . . . . . . . . . . . . . . . . . . .  53
18.  ESTOPPEL CERTIFICATES . . . . . . . . . . . . . . . . .   55
19.  SUBORDINATION AND NONDISTURBANCE . . . . . . . . . . . .  55
20.  END OF TERM . . . . . . . . . . . . . . . . . . . . . .   56
21.  LANDLORD'S WARRANTY OF TITLE; QUIET POSSESSION . . . . .  57
22.  BROKERAGE . . . . . . . . . . . . . . . . . . . . . . .   58
23.  FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . .   58
24.  LEASE MEMORANDUM . . . . . . . . . . . . . . . . . . . .  59
25.  ATTORNEYS' FEES . . . . . . . . . . . . . . . . . . . .   59
26.  NOTICES . . . . . . . . . . . . . . . . . . . . . . . .   59
27.  SUCCESSORS . . . . . . . . . . . . . . . . . . . . . . .  60
28.  INTERPRETATION . . . . . . . . . . . . . . . . . . . . .  61
29.  RELATIONSHIP OF PARTIES . . . . . . . . . . . . . . . .   61
30.  ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . .  62
31.  OFFER TO LEASE . . . . . . . . . . . . . . . . . . . . .  62
32.  AUTHORITY . . . . . . . . . . . . . . . . . . . . . . .   62
33.  HOLDING OVER . . . . . . . . . . . . . . . . . . . . . .  62
34.  ANNOUNCEMENTS . . . . . . . . . . . . . . . . . . . . .   64

EXHIBIT A      LEGAL DESCRIPTION OF THE PREMISES
EXHIBIT B      SITE PLAN
EXHIBIT C      LANDLORD'S WORK
EXHIBIT D      MINIMUM RENT CREDIT SCHEDULE
EXHIBIT E      TENANT'S SCOPE OF WORK FOR VANDALISM DAMAGE;
               LANDLORD'S REIMBURSEMENT

04/28/93/RIALTO/LEASE6.WS1

## LEASE

THIS LEASE, dated for reference purposes on the 11 th day of _____ May _____, 1993, is entered into by and between Stater Bros. Markets, a California corporation, hereinafter referred to as "Landlord", and PNS Stores, Inc., a California corporation, hereinafter referred to as "Tenant".

## W I T N E S S E T H:

In consideration of the mutual covenants and agreements herein contained and of the due and faithful performance of each and all of the terms, covenants and conditions hereof to be performed, the parties agree as follows:

1.    PREMISES.

Landlord, as owner in fee simple, hereby leases to Tenant and Tenant hereby leases from Landlord, for the term and at the rental and upon the covenants and conditions set forth herein, the real property legally described on Exhibit A attached hereto and made a part hereof, all easements, rights and appurtenances belonging to said real property, and all improvements situated thereon including, without limitation, the existing store building (the "Building") located at 155 East Baseline Avenue in the City of Rialto, County of San Bernardino, State of California, consisting of approximately twenty five thousand seven hundred fifty (25,750) square feet of ground floor area.  Said real property, easements, appurtences, Building and

04/28/93/RIALTO/LEASE6.WS1

improvements are hereinafter collectively referred to as the "Premises". The Premises are located substantially as shown on the site plan (the "Site Plan") attached hereto as Exhibit B and made a part hereof.

2.   TERM.

2.1   <u>Lease Term</u>. The primary term of this Lease shall be for a period of ten (10) years commencing on the Rent Commencement Date (as defined in Paragraph 4.1) and continuing until the expiration of ten (10) years after the Rent Commencement Date ("Primary Term").

2.2   <u>Options to Extend Term</u>. Provided that Tenant is not in default under this Lease at the time any option period provided for below is deemed exercised or scheduled to commence, Tenant is hereby granted four (4) separate options to extend the Primary Term for additional consecutive periods of five (5) years each with the first such option period following the expiration of the Primary Term and subsequent option periods following the expiration of the immediately preceding option period, subject to all the provisions of this Lease. Each option shall be deemed to have been automatically exercised by Tenant unless Tenant shall have given written notice to Landlord of Tenant's election not to exercise the option at least one hundred twenty (120) days prior to the commencement of the period of years to which such option applies. Upon the exercise of any option to extend, all references in this Lease to the "Lease Term" and to the

- 2 -



04/28/93/RIALTO/LEASE6.W51

termination or end of the Lease Term shall mean the Primary Term as extended by any option periods.

2.3  <u>Conditions Precedent to Commencement of Lease Term; Tenant's Termination Rights</u>.  The satisfaction of the condition hereinbelow shall constitute a condition precedent to the commencement of the Lease Term and to Tenant's obligations under this Lease.  In the event such condition specified below is not satisfied within the time period set forth herein, Tenant shall have the right to terminate this Lease by written notice delivered to Landlord within thirty (30) days after the date specified for the satisfaction of such condition.

Not later than thirty (30) days after the date hereof, Landlord shall have delivered vacant possession of the Premises with Landlord's Work fully completed (as more fully described in Paragraph 3.1 hereto), but otherwise in an "as is" condition subject to Landlord's representations and warranties set forth below in Paragraphs 9.2 and 9.7.2.

The entry of Tenant into the Premises for any of the purposes described in Paragraph 13.1 below shall not constitute a waiver of the condition precedent of this Paragraph 2.3.  If Tenant elects to terminate this Lease under the provisions of this Paragraph 2.3, neither party shall have any rights or obligations under this Lease after the effective date of such termination.

2.4  <u>Early Termination for Lack of Certificate of Occupancy</u>.  Notwithstanding anything contained in this Lease to the contrary, in the event Tenant is unable to procure, after use

- 3 -



04/28/93/RIALTO/LEASE6.W51

of reasonable efforts, on terms and conditions acceptable to Tenant in its sole discretion, a final certificate of occupancy for the Premises within one hundred twenty (120) days after Landlord has substantially completed Landlord's Work and delivered to Tenant vacant possession of the Premises in compliance with Paragraph 2.3 above, then Tenant shall have the right and option, exercisable for a period of thirty (30) days, to terminate this Lease upon written notice to Landlord.  If Tenant elects to terminate this Lease pursuant to this Paragraph 2.4, neither party shall have any rights or obligations under this Lease from and after the effective date of such termination.

3.    IMPROVEMENTS TO THE PREMISES.

3.1  <u>Landlord's Improvements</u>.  Landlord shall substantially complete, the work described generally on Exhibit C attached hereto and made a part hereof ("Landlord's Work") in the manner set forth in said Exhibit C.  During Landlord's performance of Landlord's Work, Tenant shall have access to the Premises in accordance with and for the purposes set forth in Paragraph 13.1.  Landlord's Work shall be deemed substantially completed when the roof membrane has been removed and the Hazardous Materials contained therein have been remediated (pursuant to Exhibit C), the Hazardous Materials located in or at the Premises have been satisfactorily remeditated (pursuant to Exhibit C), and Landlord has removed the recycling center from the Premises.  Landlord shall notify Tenant when Landlord

- 4 -

04/28/93/RIALTO/LEASE6.W51

considers Landlord's Work to be substantially complete.  Upon
Tenant's approval of Landlord's Work as set forth in Exhibit C,
and subject to Landlord's warranties contained herein and to
Landlord's maintenance obligations contained in Section 9, Tenant
shall be deemed to have accepted and approved the Premises and
Landlord's Work.

     3.2  <u>Tenant's Improvements</u>.  Landlord acknowledges
receiving a preliminary set of plans and specifications from
Tenant ("Tenant's Preliminary Plans") for the design of Tenant's
improvements ("Tenant's Improvements") to the Premises under
cover letter dated March 24, 1993.  Landlord hereby approves
Tenant's Preliminary Plans.  Landlord shall assist and cooperate
with Tenant (at no cost to Landlord) in Tenant's efforts to
obtain approval of Tenant's Preliminary Plans by all appropriate
governmental agencies.  As soon as practicable after Tenant's
Preliminary Plans have been approved by Landlord and by the
appropriate governmental agencies and Tenant has accepted
possession of the Premises from Landlord, Tenant shall commence
construction of Tenant's Improvements, which construction shall
be completed in substantial conformity with Tenant's Preliminary
Plans.

     Following completion of Tenant's Improvements, Tenant
shall provide Landlord with final plans and specifications used
in the construction of Tenant's Improvements upon Landlord's
written request therefor.  All of Tenant's Improvements shall
become part of the Premises, and Tenant shall have no obligation

- 5 -

04/28/93/RIALTO/LEASE6.W51

to remove the same upon the expiration or termination of this
Lease.

3.3   Tenant's Installation of Roof Membrane.   Tenant,
at Tenant's initial cost, but subject to the partial
reimbursement described in Paragraph 4.4 below, shall install a
new roof membrane on the Building following Landlord's removal
and remediation of the roof membrane attached to the Building as
of the date of this Lease.

3.4   Tenant's Repair of Vandalism Damage; Landlord's
Reimbursement.   Tenant shall, subject to reimbursement by
Landlord, repair the damage to the Building caused by vandals
prior to the date Tenant accepts possession of the Building.  The
scope of work for such repairs is set forth in Exhibit E attached
hereto and made a part hereof.  Upon the completion of the work
performed by Tenant pursuant to Exhibit E, Tenant shall give
written notice thereof to Landlord together with copies of paid
invoices documenting the full payment of all contractors and
subcontractors performing work or supplying materials in
connection therewith.  Landlord shall then reimburse Tenant the
cost for said work within fifteen (15) days after receipt of such
notice, copies of paid invoices therefor and conditional lien
releases from all applicable contractors and subcontractors.


4.   RENT AND RENT COMMENCEMENT DATE.

4.1   Rent Commencement Date.   Tenant's obligation to
pay Minimum Rent (defined in Paragraph 4.2) and Taxes (defined in
Paragraph 5.1) shall not commence until the date which is the

- 6 -

04/28/93/RIALTO/LEASE6.W51

earlier of (i) the date upon which Tenant opens for business to customers in the Premises, or (ii) the date occurring one hundred twenty (120) days after the satisfaction or waiver of the condition set forth in Paragraph 2.3 above (the "Rent Commencement Date" or "RCD"); provided, however, that in the event the Rent Commencement Date has not occurred within one (1) year after the date of execution of this Lease by both parties, then either party may terminate this Lease upon written notice to the other party.  Tenant shall provide written notice to Landlord of the occurrence of the Rent Commencement Date not later than fifteen (15) days after such occurrence.  Notwithstanding the foregoing, if the Rent Commencement Date has not occurred prior to November 15 of any given calendar year, then the Rent Commencement Date shall not occur until February 1 of the next succeeding calendar year unless Tenant opens the Premises for business prior to such February 1.  Tenant shall procure the insurance set forth in Section 6 (and pay the cost therefor) and shall commence to maintain the Premises other than the Building upon Tenant's acceptance of delivery of possession of the Premises.

    4.2  <u>Minimum Rent</u>.  Commencing with the Rent Commencement Date, Tenant shall pay to Landlord without demand, deduction or offset, except as expressly provided otherwise herein, at such place or places as Landlord shall designate from time to time in writing, a fixed minimum monthly rent ("Minimum Rent"), payable in advance on the first day of each and every



04/28/93/RIALTO/LEASE6.W51

calendar month during the Primary Term and all extensions
thereof, as follows:

     (a)   for each month commencing on the RCD and
continuing through the sixtieth (60th) full calendar month of the
Primary Term, the sum of Ten Thousand Three Hundred Dollars
($10,300.00);

     (b)   for each month commencing with the sixty
first (61st) full calendar month following the RCD and continuing
through the one hundred twentieth (120th) month of the Primary
Term, the sum of Eleven Thousand Three Hundred Thirty Dollars
($11,330.00);

     (c)   for each month of the first five-year option
period immediately following the expiration of the Primary Term,
the sum of Twelve Thousand Three Hundred Sixty Dollars
($12,360.00);

     (d)   for each month of the second five-year option
period, the sum of Thirteen Thousand Six Hundred Forty Seven
Dollars ($13,647.00);

     (e)   for each month of the third five-year option
period, the sum of Fourteen Thousand Nine Hundred Thirty Five
Dollars ($14,935.00); and

     (f)   for each month of the fourth five-year option
period, the sum of Sixteen Thousand Four Hundred Eighty Dollars
($16,480.00).

     If the Rent Commencement Date occurs on a day other
than the first day of a calendar month, then Minimum Rent and all
other monetary obligations of Tenant under this Lease shall be

- 8 -

04/28/93/RIALTO/LEASE6.W51

prorated on a per diem basis for the partial month extending from
(and including) the Rent Commencement Date to the beginning of
the next full calendar month and shall be payable on the first
day of such next calendar month or when otherwise due and payable
in accordance with the terms hereof.  As of the date of this
Lease, Tenant shall send all rent payments to the following
address:

> Stater Bros. Markets
> Property Management Accounting
> Post Office Box 150
> Colton, California  92324-0150.

4.3   Rent Credit for Landlord's Allowance for Tenant's
Improvements.  Notwithstanding anything contained in this Lease
to the contrary, Tenant shall be entitled to a credit against
Minimum Rent of Twenty Three Thousand Five Hundred Dollars
($23,500) for Tenant's Improvements pursuant to Paragraph 3.2.
Subject to Tenant's rights pursuant to Section 17, Landlord shall
apply such Tenant's Improvements credit by reducing Tenant's
obligation to pay Minimum Rent in the manner set forth in
Exhibit D, attached hereto and made a part hereof.

4.4   Rent Credit for Roof Replacement by Tenant.
Notwithstanding anything contained in this Lease to the contrary,
Tenant shall be entitled to a rent credit of Thirty Seven
Thousand Dollars ($37,000.00) plus interest at eight percent (8%)
per annum for the installation of a new roof membrane by Tenant.
Subject to Tenant's rights pursuant to Section 17, Landlord shall
apply such credit by reducing Tenant's obligation to pay Minimum
Rent in the manner set forth in Exhibit D.  After the rent

- 9 -

04/28/93/RIALTO/LEASE6.W51

credits set forth in Paragraph 4.3 and 4.4 (as detailed in
Exhibit D) have been applied in full, and subject to Tenant's
rights pursuant to Section 17 and Landlord's reimbursement of the
sum set forth in Paragraph 3.4, Tenant shall commence paying
Minimum Rent in the amount set forth in Paragraph 4.2.

5.   REAL PROPERTY TAXES.

5.1   <u>Taxes Defined</u>.   Tenant shall pay all real property
taxes and assessments, general and special, which shall be
assessed or imposed upon and which shall become due and payable
during the Lease Term with respect to the Premises or any part
thereof or any improvements thereon (collectively, "Taxes").

5.2   <u>Payment of Taxes</u>.   Landlord shall cause the County
Assessor or Tax Collector for San Bernardino County to send
copies of the tax bill for the Premises directly to Tenant.   In
the event the County Assessor or Tax Collector sends the bill for
Taxes to Landlord, Landlord shall forward to Tenant any pertinent
bill, invoice or statement of the governmental authority imposing
or assessing Taxes within ten (10) days after receipt thereof by
Landlord but in no event later than thirty (30) days prior to the
initial date for payment thereof.   Tenant shall pay the Taxes
directly to the governmental agency imposing or assessing the
same, in full before delinquency, provided that Tenant shall have
received any such bill, invoice or statement not later than
thirty (30) days prior to the initial date for payment of the
Taxes.   In no event, however, shall Tenant be responsible or
obligated to pay any fee or penalty charged for payment of Taxes



- 10 -

04/28/93/RIALTO/LEASE6.W51

after the delinquency date for payment thereof in the event
Tenant does not timely receive from Landlord the bill, invoice or
statement referred to in the preceding sentence. Taxes shall be
prorated between Landlord and Tenant as of the RCD or the date of
termination, as the case may be.

     5.3  <u>Bonded Assessments</u>. If any general or special
assessment is levied and assessed against the Premises which by
law is payable at the option of the taxpayer in installments,
Tenant may pay its share of such assessment in installments as
the same become due together with any interest due thereon.

     5.4  <u>Right to Contest</u>. Tenant shall have the right at
its expense to contest the rate, legality or validity of any tax
or assessment provided herein to be paid by Tenant, but no such
contest shall be carried on or maintained by Tenant after such
taxes or assessments become delinquent unless Tenant shall
(i) pay its share of the amount involved under protest, or
(ii) procure and maintain a stay of all proceedings to enforce
collection, forfeiture and sale and provide for payment thereof
together with all penalties, interest, costs and expenses by the
deposit of a sufficient sum of money or by a good and sufficient
undertaking or other means required or permitted by law to
accomplish such stay. At the request of Tenant, Landlord will
execute or join in the execution of any instrument or documents
reasonably required by Tenant in connection with any such
contest. In the event Tenant prevails in any such contest,
Tenant shall retain or be entitled to receive any refund of Taxes
previously paid by Tenant.

- 11 -

04/28/93/RIALTO/LEASE6.W51

    5.5  <u>Limitation</u>.  Nothing in this Lease shall require
Tenant to pay any business tax, personal property tax, rent tax,
franchise tax, income tax, excess profits tax, estate tax,
inheritance tax, succession tax, capital levy, transfer tax or
any other tax assessed or levied against the Landlord except as
provided in this Section 5.  Notwithstanding anything contained
in this Lease to the contrary, Tenant shall not reimburse
Landlord for any increase in Taxes occurring after the date of
execution of this Lease which is caused by a reassessment of the
Premises resulting from a sale or other transfer of the Premises
by Landlord except that Tenant shall be obligated to pay an
increase in Taxes resulting from (a) one (1) bona fide sale of
the Premises during the Primary Term; (b) the first two (2) bona
fide sales of the Premises arising during the Lease Term after
the expiration of the Primary Term; and (c) a reassessment, if
any, caused by Landlord and Tenant's execution of this lease (as
opposed to their actions after the date of this Lease).  Except
as expressly provided herein, Tenant shall not be responsible for
the payment of any increase in Taxes resulting from the sale or
transfer of the Premises including any increases resulting from
reassessments other than those for which Tenant is expressly
obligated hereunder.  As used herein "bona fide sale" shall be
deemed to mean an arms-length sale to an unrelated party; a party
is not unrelated if that party is an entity which is (i)
controlled by, controlling, under common control with or
otherwise an affiliate of Landlord or (ii) an entity which is



- 12 -

04/28/93/RIALTO/LEASE6.W51

controlled by or otherwise affiliated with any current or former officer, director or shareholder of Landlord.

   6.   **INSURANCE**.

      6.1   _Property Insurance_.   Commencing on the date Tenant accepts possession of the Premises and at all times during the Lease Term, Tenant at its expense shall maintain an "all risk" (as such term is customarily used and accepted in the insurance industry) form policy of insurance covering the Premises against physical loss or damage (excluding earthquake and flood) in an amount not less than the full replacement value thereof.   Said policy shall be issued in the names of Landlord, Tenant and Landlord's lender, as their interest appear.   A certificate of insurance evidencing the insurance coverage required hereunder shall be delivered to Landlord within ten (10) days after the Rent Commencement Date and shall provide that the policy may not be cancelled or modified without at least thirty (30) days prior written notice to Landlord.

      If Landlord receives notice that the insurance required to be obtained by Tenant pursuant to this Paragraph 6.1 is to be cancelled or will expire, and if prior to twenty (20) days before the effective date of cancellation or expiration Landlord has not received written notice from the insurance carrier or agent that the policy will be extended or a new policy substituted in its place, then Landlord shall have the right without notice, but shall have no obligation, to procure such substitute insurance insuring the Premises which shall meet the requirements of this

- 13 -

04/28/93/RIALTO/LEASE6.W51

Paragraph 6.1.  In such event, Tenant shall reimburse Landlord for the amount of the premium for such substitute insurance upon demand.

6.2  <u>Liability Insurance</u>.  Prior to the date Tenant first enters the Premises to commence Tenant's Improvements hereunder and at all times during the Lease Term, Tenant shall maintain at its expense general public liability insurance against claims for bodily injury, death or property damage occurring in or upon the Premises.  The limitation of liability of such insurance shall be not less than Two Million Dollars ($2,000,000) combined single limit in respect to any one occurrence for bodily injury and property damage.  Such insurance policy shall be issued in the name of Tenant and shall name Landlord as an additional insured.  A certificate of insurance evidencing the policy required hereunder shall be delivered to Landlord by the earlier date to occur of the date which is (i) thirty (30) days after Tenant takes possession of the Premises or (ii) ten (10) days after Tenant's receipt of written request therefor from Landlord (once this Lease is fully executed).  Such certificate shall reflect that the policy may not be cancelled or modified without at least thirty (30) days prior written notice to Landlord.

6.3  <u>Rating</u>.  All policies of insurance required under Paragraphs 6.1 and 6.2 shall be written by companies of generally accepted responsibility and credit, licensed to do business in the State in which the Premises are located and at all times having a policyholder's rating of "B+" or better and financial

- 14 -

04/28/93/RIALTO/LEASE6.WS1

rating of Class X or better as reflected in the most recent
edition of "Best's Insurance Guide".

*6.4  Self-Insurance.  If Tenant, either alone or in
conjunction with any of its affiliated companies, adopts a
program of self-insurance against claims for bodily injury, death
or property damage, then Tenant may substitute such
self-insurance program in lieu of providing the insurance
described in Paragraphs 6.1 and 6.2, provided that (i) Landlord
is protected by such program for no less coverage than provided
for in such Paragraphs and (ii) Tenant maintains a net worth of
at least Twenty Five Million Dollars ($25,000,000).  Tenant
agrees to provide Landlord a copy of an unaudited financial
statement documenting Tenant's net worth from time to time during
the Lease Term, but not more often than one (1) time per year,
upon Landlord's written request therefor.

6.5  Waiver of Subrogation.  To the extent permitted by
law, Landlord and Tenant each hereby release each other and their
respective officers, employees and agents from any claims for
bodily injury to or death of any person and from property damage
to the Premises, and to the fixtures and personal property of
either Landlord or Tenant located on the Premises that are caused
by or result from risks insured against under any insurance
policy which is required by this Lease to be maintained by
Landlord or Tenant.  This release shall not be effective if the
releasing party's loss was uninsured due to a breach by the other
party of its obligation to maintain an insurance policy required
by this Lease to be maintained by such other party.  Each party

- 15 -

*This Section 6.4 only applies so long as PNS is primarily liable under this Lease.

04/28/93/RIALTO/LEASE6.W51

shall cause each insurance policy obtained by such party pursuant to this Lease to provide that the insurance carrier waives all right of recovery by way of subrogation against both parties and their respective officers, employees and agents in connection with any injury or damage covered by such policy.

6.6  Blanket Policies.  In lieu of providing individual policies of insurance, the insurance protection required under this Section 6 may be provided in the form of blanket policies of insurance covering the Premises and other properties.  In such event, however, certificates of insurance evidencing the coverage required hereunder shall be provided as herein required and any such blanket policy shall provide that the amount of insurance required under this Lease shall not be prejudiced in any manner by other losses covered by the policy.

7.  USE.

7.1  Use of Premises.  The Premises may be used for the operation of a retail store for the sale of general merchandise including, without limitation, bargain and close-out merchandise, or for any other lawful use; provided, however, in no event shall Tenant operate or permit to be operated a supermarket, food market, grocery store, meat, fish, or poultry store, a fruit or vegetable store, or for any business selling fresh or frozen meat, fish, poultry, produce or fresh dairy products.  Landlord warrants and represents that no covenant of exclusive use currently in effect restricts the use of the Premises except as set forth above.  Tenant shall have the right, exercisable at its

- 16 -

04/28/93/RIALTO/LEASE6.W51

sole option from time to time during the Lease Term, to change

its trade name without first obtaining Landlord's written

consent.  Nothing contained in this Lease shall be deemed or

construed to impose any affirmative obligation on Tenant to make

any particular use of the Premises, or any use thereof at all;

and nothing contained in this Lease shall be deemed or construed

to require Tenant to keep the Premises open for the conduct of

any business during any particular hours, or on any particular

days, or at all.

     7.2  <u>Compliance with Laws</u>.

     (a)  Tenant agrees promptly at its expense to

comply with all laws, rules and orders of federal, state and

municipal authorities applicable to its particular and specific

use of the Premises, except that Tenant shall not be required to

make structural repairs or improvements to the Premises nor to

make any other repairs or replacements which are the

responsibility of Landlord under any other provision of this

Lease.  Tenant shall have the right at its expense to contest or

review by legal proceedings the validity or legality of any such

law, rule or order with which it is required to comply hereunder,

and during such contest Tenant may refrain from complying

therewith.  Tenant shall give notice to Landlord prior to any

such contest or review by legal proceedings, and Tenant shall

include within such notice whether or not Tenant intends to

refrain from complying with the law or regulation in question.

If requested by Landlord, Tenant shall post an appropriate bond

or other security in a reasonable amount or in the statutory

- 17 -

04/28/93/RIALTO/LEASE6.W51

amount, if regulated by law, in order to protect Landlord from
any financial loss which may potentially be incurred as a result
of Tenant's non-compliance. Tenant shall indemnify and hold
Landlord harmless from any loss or damage suffered by Landlord as
a result of any such contest or delay in compliance.

(b)    Notwithstanding the foregoing, Tenant agrees
to contribute the first Ten Thousand Dollars ($10,000) towards
the cost of any improvement to the Premises necessary to make the
Premises comply with all laws, rules and orders of federal, state
and municipal authorities applicable to the general use of the
Premises ("Required Improvement"). If the reasonable cost of any
Required Improvement exceeds Ten Thousand Dollars ($10,000), then
Landlord shall have the right either to terminate this Lease or
to pay the reasonable cost of the Required Improvement in excess
of Ten Thousand Dollars ($10,000). Landlord shall notify Tenant
in writing, within thirty (30) days after the date Landlord
becomes aware of the Required Improvement of Landlord's election
to terminate or to contribute the excess cost. Any such notice
shall be accompanied by a statement showing the estimated cost of
the Required Improvement (which cost shall be competitively bid).
If Landlord elects to terminate this Lease, Tenant shall have the
right, exercisable by written notice delivered to Landlord within
thirty (30) days after receipt by Tenant of Landlord's notice, to
agree to bear all reasonable costs of the Required Improvement.
If both Landlord and Tenant contribute to the cost of the
Required Improvement, the parties shall mutually agree upon the
contractor and upon the terms of the contract. If Tenant only is

- 18 -

04/28/93/RIALTO/LEASE6.W51

paying the reasonable cost of the Required Improvement, Tenant

shall select the contractor to perform such work and such

selection shall be made in Tenant's sole and absolute discretion.


8.   UTILITIES.

Tenant shall pay or cause to be paid all charges for

gas, water, electricity, light, heat or power, telephone or other

communication services used or supplied upon or in connection

with the Premises from and after the date on which Tenant accepts

possession of the Premises and throughout the Lease Term.

However, PNS Stores, Inc. or any entity which controls PNS

Stores, Inc. or which is controlled by or under common control

with PNS Stores, Inc. shall not be required to pay for the cost

of maintaining or repairing utility lines and installations which

serve the Building but which are located outside of the Building,

all of which shall be the responsibility of Landlord as set forth

in Paragraph 9.3(a)(4).


9.   MAINTENANCE, REPAIRS AND ALTERATIONS.

9.1  <u>Obligations of Tenant</u>.

(a)   Subject to Landlord's obligations under

Paragraphs 3.1, 9.2 and 9.3 and provided that the following items

are not damaged as a result of structural failure, Tenant at its

expense shall maintain: (i) the interior of the Building and all

fixtures, mechanical systems, equipment, improvements, exterior

doors,  plate glass and glazing material located in and serving

the Building, (ii) the floor slab, (iii) the wiring, plumbing,



- 19 -

04/28/93/RIALTO/LEASE6.W51

pipes, conduits and other water, sewage, utility and sprinkler
fixtures and equipment which are located within the slab of the
Building or beneath the Building or which service any portion of
the Premises (such as the parking lot) other than the Building,
(iv) the gutters, downspouts and roof drain system, (v) the roof
membrane (once Tenant has installed a new roof membrane on the
store building), (vi) the landscaping, driveways, parking lots
and signs located at the Premises and (vii) the exterior surfaces
of the exterior walls including painting and waterproofing [but
excluding structural elements thereof which shall be Landlord's
obligation pursuant to subparagraph 9.3(a)(1)], in good condition
and repair throughout the Lease Term, ordinary wear and tear and
damage from casualty governed by the provisions of Section 11
hereof excepted.

      (b)  Tenant shall also perform all maintenance and
make all repairs and replacements which become necessary because
of the negligence or default under this Lease of Tenant, its
agents, employees contractors or invitees.

      9.2  Warranty of Landlord.  Landlord warrants that as
of the RCD, the heating, ventilating and air conditioning system
("HVAC") located in the Building shall be in good working order
and condition.  Following Tenant's completion of all work in the
Premises affecting the roof or HVAC, Tenant shall permit Landlord
to enter the Building for purposes of inspecting the HVAC and
performing any work to the HVAC which is necessary in order to
place the HVAC in good working order and condition prior to the
RCD.  Landlord agrees not to materially interfere with Tenant

- 20 -

04/28/93/RIALTO/LEASE6.W51

during any such entry.  Provided that Tenant does not make any changes to the HVAC which are not approved by Landlord and further provided that Tenant maintains the HVAC as set forth in Paragraph 9.1, Landlord, at Landlord's sole cost and expense, shall effect all repairs and make any necessary replacements to the heating, ventilating and air conditioning system which are required within one (1) year following the Rent Commencement Date.  In addition, and without reducing Landlord's obligations under the preceding sentence, Landlord hereby assigns to Tenant all assignable warranties of materialmen, subcontractors and equipment manufacturers in effect, if any, applicable to work performed upon or materials and equipment incorporated in or installed upon the Premises.

    9.3  <u>Obligations of Landlord</u>.  In addition to Landlord's obligations under Paragraph 9.2 above, <u>Landlord shall, at its sole expense</u>:

        (a)  Perform all maintenance and make all repairs, replacements and alterations necessary or appropriate to keep the structure of the Building in good order, condition and repair, including, without limitation, each of the following:

        (1)  The exterior walls (as to structure, but not as to painting which shall be Tenant's maintenance obligation), interior load bearing walls, and interior roof structural columns;

        (2)  The roof structure and supports (but not the roof membrane);

        (3)  The foundations and structural supports;

- 21 -

04/28/93/RIALTO/LEASE6.W51

(4)   All wiring, plumbing, pipes, conduits and other water, sewage, utility fixtures and equipment which serve the Building and which are located up to five (5) feet from the Building (but, which are not beneath the Building or within the slab of the Building).

(b)   Landlord shall also perform all maintenance and make all repairs and replacements which result from any structural failure of the Premises or which become necessary or appropriate at any time because of any act, negligence or default under this Lease of Landlord, its agents, employees, licensees or contractors; and

(c)   Notwithstanding anything contained in this Lease to the contrary, if the reasonable cost to Landlord of performing maintenance or repair pursuant to Subparagraph 9.3(a)(4) exceeds Fifteen Thousand Dollars ($15,000), then Landlord shall have the right either to terminate this Lease or to pay the reasonable cost of such repair and maintenance. Landlord shall notify Tenant, in writing, within ten (10) days after the date of the occurrence necessitating such repair or maintenance of Landlord's election to terminate or to perform such repair or maintenance. Any such notice from Landlord shall be accompanied by a statement documenting the cost of repair and maintenance (which cost shall be competitively bid). If Landlord elects to terminate this Lease, Tenant shall have the right, exercisable by written notice delivered to Landlord within fifteen (15) days after receipt by Tenant of Landlord's notice, to agree to bear all costs of repair or maintenance exceeding

- 22 -



04/28/93/RIALTO/LEASE6.W51

Fifteen Thousand Dollars ($15,000) whereupon Tenant and Landlord
shall mutually agree upon a contractor to perform such work and
Landlord shall promptly perform the necessary repair or
maintenance.

    9.4  <u>Landlord's Repairs; Minimum Rent Abatement</u>.
Landlord shall notify Tenant in writing at least five (5)
business days prior to beginning any maintenance or repairs to
the Premises required under this Lease to be made by Landlord
except in the case of an emergency, in which event Landlord shall
be entitled to commence such emergency work immediately provided
Landlord shall use reasonable efforts to notify Tenant.  Landlord
shall perform all such work in a manner which shall cause the
least interference reasonably possible with the operation by
Tenant of its business in the Premises.  Tenant shall be entitled
to an equitable abatement of Minimum Rent and all other amounts
payable hereunder to the extent any such maintenance or repair
work makes the Premises or any portion thereof unusable.

    9.5  <u>Installations</u>.  Tenant at its expense may install
in the store building portion of the Premises such fixtures and
equipment as Tenant may desire, and Tenant may from time to time
remove, replace, alter or add to such fixtures and equipment.
All fixtures and equipment installed by Tenant shall remain the
property of Tenant and may be removed by Tenant at any time
during or at the expiration of the Lease Term.

    9.6  <u>Alterations</u>.  Tenant at its expense may alter or
remodel the Building at any time or times during the Lease Term.
However, after the initial construction of the Tenant

- 23 -



04/28/93/RIALTO/LEASE6.W51

Improvements by Tenant pursuant to the Preliminary Plans approved by Landlord pursuant to Paragraph 3.2, no changes shall be made which affect the structural elements of the Building without the prior written approval of Landlord, which approval shall not be unreasonably withheld, delayed or conditioned.   Notwithstanding the foregoing, Landlord may condition its approval of any future alterations to the Premises, at the time such approval is sought, by requiring Tenant to restore the Premises (at the expiration of the Lease Term) to the same structural condition which existed at the completion of the Tenant Improvements.   In the event Landlord does not so condition its approval, Tenant shall have no obligation to restore the structure of the Premises at the expiration of the Lease Term.   All such alterations or remodeling shall be performed in accordance with all applicable legal requirements and shall become the property of Landlord upon termination of this Lease.

    9.7   <u>Hazardous Materials</u>.

       9.7.1      <u>Definitions</u>.

          (a) The term "Environmental Law" shall mean any federal, state or local law, statute, ordinance, regulation, policy, or common law pertaining to health, safety, industrial hygiene or the environmental conditions on, under or about the Premises, including the land, surface water, ground water and air including, without limitation: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. Sections 9601 et seq.; (ii) the Resource Conservation and  Recovery Act of 1976 ("RCRA"), 42 U.S.C.

- 24 -

04/28/93/RIALTO/LEASE6.W51

Sections 6901 et seq.; (iii) the Federal Water Pollution Control
Act, 33 U.S.C. Sections 1251 et seq.; (iv) the Toxic Substances
Control Act of 1976 ("TSCA"), 15 U.S.C. Sections 2601 et seq.;
(v) the Federal Insecticide, Fungicide and Rodenticide Act of
1982 ("FIFRA"), 7 U.S.C. Sections 136 et seq.; (v) the Federal
Clean Air Act, 40 U.S.C. Section 7401 et seq. (including but not
limited to refrigerant recycling regulations promulgated
thereunder); (vii) California Health and Safety Code Sections
25100 et seq. (hazardous waste) and Sections 25915 et seq.
(asbestos); (viii) the Porter-Cologne Water Quality Control Act,
California Water Code Sections 13000 et seq.; (ix) California
Civil Code Sections 3479 et seq. (regarding insurance); (x) the
Safe Drinking Water and Toxic Enforcement Act of 1986, California
Health and Safety Code Sections 25249.5 et seq.; (xi) the
California Underground and Aboveground Storage Tank Acts, Health
and Safety Code Sections 25270 and 25280 et seq.; (xii) Federal
and California OSHA requirements; and (xiii) any similar federal,
state, or local law enacted after the date of this Lease which
pertains to hazardous waste, hazardous material or hazardous
substances; as the above laws are amended, and all regulations
promulgated thereunder or applicable thereto.

          (b)   The term "Hazardous Materials" includes,
without limitation, any material or substance which is (i)
defined or listed as a "hazardous waste", "extremely hazardous
waste", "restrictive hazardous waste", "hazardous substance" or
"hazardous material" or considered a waste, condition of
pollution or nuisance under an Environmental Law; (ii) gasoline,

- 25 -

04/28/93/RIALTO/LEASE6.W51

diesel fuel, oil, used oil, petroleum, or a petroleum product or
fraction thereof; (iii) asbestos and asbestos-containing
construction materials which contain more than 0.1 percent, by
weight, of asbestos; (iv) substances known by the State of
California, or the United States, to cause cancer and/or
reproductive toxicity; (v) toxic, corrosive, flammable,
infectious, radioactive, mutagenic, explosive or otherwise
hazardous substances which are or become regulated by any
governmental agency or instrumentally of the United States, or
any state or any political subdivision thereof;
(vi) polychlorinated biphenyls (PCBs); (vii) urea formaldehyde
foam insulation: (vii) all hazardous air pollutants or materials
known to cause serious health effects (including, without
limitation, volatile hydrocarbons, and industrial solvents)
and/or (ix) substances which constitute a material health, safety
or environmental risk to any person or property.  It is the
intent of the parties hereto to construe the terms "Hazardous
Materials" and Environmental Law" in their broadest sense.

     9.7.2  <u>Landlord's Representations and Warranties;
Indemnification by Landlord.</u>

     (a)  Landlord represents and warrants that as
of the date hereof (i) to the best of Landlord's knowledge, the
Premises and the soil and ground water on or under the Premises
are free of Hazardous Materials except for any Hazardous
Materials identified in the Environmental Audit which remain in
the Premises after the completion of the Landlord's Work and
Tenant's approval thereof; ( ii) to the best of Landlord's

- 26 -

04/28/93/RIALTO/LEASE6.W51

knowledge the Premises is in compliance with all Environmental Law regulating the manufacturing, generation, handling, transportation, storage, treatment, use and disposition of Hazardous Materials; (iii) to the best of Landlord's knowledge there are no underground storage tanks at the Premises; (iv) there are no Hazardous Materials used, handled or stored at the Premises except in compliance with Environmental Law; (v) to the best of Landlord's knowledge there are no governmental investigations regarding possible Hazardous Materials at the Premises; and (vi) Landlord has received no notices of an anticipated investigation regarding possible Hazardous Materials at the Premises.

(b)  Landlord shall indemnify, defend and hold harmless Tenant and Tenant's directors, officers, employees, agents, attorneys, successors, and assigns against any claims, demands, liabilities, costs, expenses, liens, fines, penalties, judgments, damages and losses (whether or not litigation has commenced) which arise on or after the date possession of the Premises is accepted by Tenant (including at any time after the expiration of the Lease Term) resulting from or related to (A) any breach or alleged breach of Landlord's representations or warranties hereinabove or (B) any violation of any Environmental Law by Landlord or Landlord's agents, employees or contractors, to the extent such violation by Landlord or Landlord's agents, employees or contractors causes Hazardous Materials to be present in, on or under the Premises, or to be released from the Premises including, without limitation: (i) attorney's fees as incurred

- 27 -

(payable quarterly upon written demand); (ii) contractor and consultant fees; (iii) any claim or liability for personal injury or death, property or natural resource damage asserted by Landlord's employees, third parties or governmental agencies against Landlord; (iv) any liabilities to third parties or governmental agencies incurred by Tenant for the containment, removal, remedy, clean-up or abatement of any contamination arising from any violation by Landlord, or its agents, employees or contractors of any Environmental Law, or arising from the possession or use by Landlord or Landlord's agents, employees or contractors of any Hazardous Materials, including, but not limited to, liability for, settlements, consequential damages, investigation, remediation and monitoring work.

9.7.3  <u>Use by Tenant; Indemnification by Tenant</u>.

(a)  Tenant shall not bring onto, create, manufacture, generate, store, treat or dispose of, in or about the Premises, including but not limited to, the Premises' sewage or storm drain systems, any Hazardous Materials.  Notwithstanding the foregoing, Tenant shall have the right to store, use and handle Hazardous Materials on the Premises in the usual operation of Tenant's retail business on the Premises provided that such Hazardous Materials are stored, used, handled and disposed of in compliance with all Environmental Law.  In no event shall Tenant use the Premises as a warehouse for Hazardous Materials.

(b)  Tenant shall not engage in any activity on or about the Premises that violates in any way any Environmental Law and shall promptly, at Tenant's sole cost and

- 28 -



04/28/93/RIALTO/LEASE6.WS1

expense, take all investigatory and/or remedial action ordered or required by any governmental agency or Environmental Law for clean-up, restoration and/or removal of any contamination involving any violation of any Environmental Law involving any Hazardous Materials released, stored or created, to the extent caused by Tenant or Tenant's agents or independent contractors. Tenant shall maintain and operate the Premises at all times in compliance with all applicable local, state and federal laws relating to Hazardous Materials.  Unless otherwise provided in this Lease, Tenant shall comply with all orders issued by any governmental authority having jurisdiction over the Premises and take all action required by such governmental authorities to bring the Premises into compliance with all laws relating to Hazardous Materials to the extent caused by Tenant.

(c)  Tenant shall indemnify, defend and hold harmless Landlord and Landlord's directors, officers, employees, agents, attorneys, successors, and assigns against any claims, demands, liabilities, costs, expenses, liens, fines, penalties, judgments, damages and losses (whether or not litigation has commenced) which arise after the date of possession of the Premises is accepted by Tenant but prior to the expiration of the Lease Term, resulting from or related to any violation of any Environmental Law by Tenant or Tenant's agents, employees or contractors, or to the extent such violation by Tenant or Tenant's agents, employees or contractors, causes Hazardous Materials to be present in, on or under the Premises, or to be released from the Premises, including, without limitation:

- 29 -



04/28/93/RIALTO/LEASE6.W51

(i) attorney's fees as incurred (payable quarterly upon written demand) (ii) contractor and consultant fees; (iii) any claim or liability for personal injury or death, property or natural resource damage asserted by Landlord's employees, third parties or governmental agencies against Landlord; (iv) any liabilities to third parties or governmental agencies incurred by Landlord for the containment, removal, remedy, clean-up or abatement of any contamination arising from any violation by Tenant, or its agents, employees or contractors of any Environmental Law, or arising from the possession or use by Tenant or Tenant's agents, contractors or employees of any Hazardous Materials, including, but not limited to, liability for, settlements, consequential damages, investigation, remediation and monitoring work.

      9.7.4 <u>Notices</u>. Tenant shall provide all notices required pursuant to the Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code Sections 25249.5 et seq. Tenant and Landlord shall also provide immediate written notice to the other party: (i) of asbestos-containing construction materials which come to Landlord's or Tenant's attention, as such notices are defined in state and federal asbestos notification provisions, e.g., California Health and Safety Code Sections 25915 et seq, this asbestos notice shall also be given to Tenant's employees; (ii) of the existence of Hazardous Materials on the Premises and all notices of violation of any Environmental Law received by Landlord or Tenant; (iii) upon Landlord's or Tenant's obtaining knowledge of, or notice by any governmental agency of, any

- 30 -



04/28/93/RIALTO/LEASE6.W51

potential or known release or threat of release, of any Hazardous
Materials at, on, under or from the Premises or which release may
result in a lien on the Premises; (iv) upon Landlord's or
Tenant's obtaining knowledge of any governmental assessment,
enforcement, cleanup, containment, removal or other action
instituted, completed or threatened pursuant to any Environmental
Law, or any expense or loss associated therewith, for which
Landlord or Tenant may be liable or for which a lien may impose
on the Premises; (v) any claim made or threatened by any person
against Landlord, Tenant or the Premises, resulting from any
Hazardous Materials; and (vi) any reports made by Landlord or
Tenant to any local, state or federal environmental agency
arising out of or in connection with any Hazardous Materials.

     9.7.5  <u>Removal of Hazardous Materials from
Premises During Lease Term</u>.

     (a)  Notwithstanding anything contained in
this Lease to the contrary, if it is determined at any time in
connection with any construction work or maintenance of the
Premises or otherwise that the Premises contain Hazardous
Materials which were present at the time possession of the
Premises was accepted by Tenant, and if such Hazardous Materials
must be removed, contained or neutralized in order to comply with
Environmental Law, then Landlord shall cause the same to be
removed, contained or neutralized by a licensed, certified and
qualified abatement contractor in accordance with Environmental
Law and in accordance with the following provisions:

- 31 -



04/28/93/RIALTO/LEASE6.W51

(i)   If the Hazardous Materials must be
removed, contained or neutralized solely in order to accommodate
any request of, or action proposed to be taken by, Tenant, then
Tenant shall reimburse Landlord for the cost of such removal,
containment or neutralization, which reimbursement shall be made
in the manner as set forth in Exhibit C.   Prior to any such
removal, containment or neutralization, Tenant shall approve the
abatement contractor and all terms of the abatement contract,
which approval shall be in Tenant's sole and absolute discretion.
Tenant shall notify Landlord of the method of removal,
containment or neutralization which Tenant prefers and Landlord
agrees to implement such method.

(ii)  If the Hazardous Materials must be
removed, contained or neutralized for any reason other than
solely to accommodate any request of, or action proposed to be
taken by, Tenant and the reasonable cost thereof does not exceed
Ten Thousand Dollars ($10,000), then Tenant shall reimburse
Landlord for the reasonable cost thereof not to exceed Ten
Thousand Dollars ($10,000) provided that prior to any such
removal, containment or neutralization, Tenant shall approve the
abatement contractor and all terms of the abatement contract,
which approval shall be in Tenant's sole and absolute discretion.
Tenant shall notify Landlord of the method of removal,
containment or neutralization which Tenant prefers and Landlord
agrees to cause such method to be implemented.   Such
reimbursement shall be made in the same manner as set forth in
Exhibit C.

- 32 -

04/28/93/RIALTO/LEASE6.W51

        (iii)   If the Hazardous Materials must
be removed, contained or neutralized for any reason other than
solely to accommodate any request of, or any proposed action to
be taken by, Tenant and if the reasonable cost of removal,
containment or neutralization exceeds Ten Thousand Dollars
($10,000) then Landlord shall have the right either to terminate
this Lease or to pay the reasonable cost of removal, containment
or neutralization in excess of Ten Thousand Dollars ($10,000).
Landlord shall notify Tenant in writing, within thirty (30) days
after the discovery of the Hazardous Materials which require
abatement, of Landlord's election to terminate or to contribute
the excess cost.  Any such notice shall be accompanied by a
statement showing the estimated cost of remediation (which cost
shall be competitively bid).  If Landlord elects to terminate
this Lease, Tenant shall have the right, exercisable by written
notice delivered to Landlord within thirty (30) days after
receipt by Tenant of Landlord's notice, to agree to bear all
reasonable costs of the Hazardous Materials removal, containment
or neutralization.  If both Landlord and Tenant contribute to the
cost of the removal, containment or neutralization, the parties
shall mutually agree upon an abatement contractor, the terms of
the contract and the method of abatement.  If Tenant only is
paying the reasonable cost of the removal, containment or
neutralization, Tenant shall approve the abatement contractor and
all terms of the abatement contract, which approval shall be made
in Tenant's sole and absolute discretion.  In such case, Tenant
shall notify Landlord of the method of removal, containment or



04/28/93/RIALTO/LEASE6.WS1

neutralization which Tenant prefers and Landlord agrees to cause such method to be implemented.

(b)   If it is determined at any time that the Premises contain Hazardous Materials which were not present at the time possession of the Premises was accepted by Tenant and the existence of such Hazardous Materials is not the result of the actions of Landlord or Tenant, or either of their respective agents, employees, contractors or invitees, then Landlord shall cause the same to be removed, contained or neutralized by a licensed, certified and qualified abatement contractor in accordance with Environmental Law.

In such event, Tenant shall reimburse Landlord up to Ten Thousand Dollars ($10,000) per occurrence provided such occurrence is a discrete and noncontinuous incident or event, as opposed to a continuous action or event such as an underground migration of Hazardous Materials.  Prior to any such removal, containment or neutralization, Tenant shall approve the abatement contractor and the abatement contract in Tenant's sole and absolute discretion.  Tenant shall notify Landlord of the method of removal, containment or neutralization which Tenant prefers and Landlord agrees to cause such method to be implemented.  If the cost of removal, containment or neutralization exceeds Ten Thousand Dollars ($10,000) then Landlord shall have the right either to terminate this Lease or to pay the reasonable cost of removal, containment or neutralization in excess of Ten Thousand Dollars ($10,000).  Landlord shall notify Tenant in writing, within thirty (30) days after the discovery of the Hazardous

- 34 -

04/28/93/RIALTO/LEASE6.W51

Materials which require abatement, of Landlord's election to terminate or to contribute the excess cost.  Any such notice shall be accompanied by a statement showing the estimated cost of remediation (which cost shall be competitively bid).  If Landlord elects to terminate this Lease, Tenant shall have the right, exercisable by written notice delivered to Landlord within thirty (30) days after receipt by Tenant of Landlord's notice, to agree to bear all reasonable costs of the removal, containment or neutralization of the Hazardous Materials.  If both Landlord and Tenant contribute to the cost of the renewal, containment or neutralization, the parties shall mutually agree upon an abatement contractor, the terms of the contract and the method of abatement.  If Tenant only is paying the reasonable cost of the removal, containment or neutralization, Tenant shall approve the abatement contractor and all terms of the abatement contract, which approval shall be made in Tenant's sole and absolute discretion.  In such case, Tenant shall notify Landlord of the method of removal, containment or neutralization which Tenant prefers and Landlord agrees to cause such method to be implemented.

In the event of a continuous incident or occurrence of Hazardous Materials (such as a migration of Hazardous Materials), not caused by Landlord or Tenant or either of their respective agents, employees, contractors or invitees, Tenant may cancel this Lease upon written notice to Landlord within thirty (30) days after Tenant's discovery or notification of such event.  In the event Tenant does not cancel this Lease, Tenant shall not be

- 35 -

04/28/93/RIALTO/LEASE6.W51

entitled to a Minimum Rent abatement for any interference with
Tenant's use of the Premises caused by the remediation of such
Hazardous Materials and Tenant, to the extent permitted by law,
shall release Landlord and Landlord's directors, officers,
employees, agents, attorneys, successors and assigns from any
claims, demands, liabilities, costs, expenses, liens, fines and
penalties, judgments, damages and losses which arise after the
expiration of the thirty (30) day period for Tenant's
cancellation and which result from or are related to any action
or legal proceeding brought by Tenant, or Tenant's agents,
employees or contractors.

      (c)  Except as otherwise set forth herein,
Tenant shall be entitled to an equitable abatement of Minimum
Rent and all other amounts payable hereunder, to the extent any
Hazardous Materials remediation interferes with Tenant's use of
the Premises. As between Landlord and Tenant, Landlord shall be
solely responsible for the disposal of all Hazardous Materials
removed from the Premises or any portion thereof, which disposal
shall be in accordance with Environmental Law.

      9.7.6  <u>Interpretation</u>. The provisions of this
Paragraph 9.7 shall supersede any other provisions in this Lease
regarding the use, maintenance, repair, construction, remodel or
reconstruction of the Premises or any part thereof, to the extent
inconsistent with the provisions hereof. The representations,
warranties and agreements of the parties set forth herein shall
survive the expiration of the Lease Term or the termination of
this Lease for any reason whatsoever.

- 36 -

04/28/93/RIALTO/LEASE6.W51

    10.  SIGNS.

        Tenant may install and maintain upon the Premises,
including the front and west exterior parapet walls, such
building identification signs advertising the business conducted
on the Premises by Tenant as are permitted by applicable law.
Tenant, at Tenant's cost, shall be allowed to erect a monument
sign at the Premises if permitted by applicable law.  Landlord
agrees to cooperate with and assist Tenant in acquiring any
governmental approvals in connection with such sign at no cost to
Landlord.  All building signs and the monument sign (if installed
by Tenant) (i) shall be of the size, type and logo which Tenant
customarily uses from time to time in its business, (ii) shall
comply with all applicable laws, rules and ordinances of state or
local governmental authorities, and (iii) shall remain the
property of Tenant and shall be removed by Tenant at the
termination of this Lease.  In the event Tenant does not remove
any building signs or the sign panel from the monument sign
within thirty (30) days after the expiration of the Lease Term,
Landlord may remove any such signs at Tenant's expense, provided
any such removal is performed at a competitive cost.  The
monument shall become the property of Landlord at the expiration
of the Lease Term.

        If permitted by applicable law, Tenant may construct a
hardboard sign on the Premises immediately after the execution of
this Lease and continuing through installation of Tenant's
building identification sign(s) to announce Tenant's store
opening.  Immediately after execution of this Lease and

                          - 37 -

04/28/93/RIALTO/LEASE6.W51

continuing until fourteen (14) days after Tenant's store opening
at the Premises, if permitted by applicable law, Tenant shall
also be permitted to hang such banners and other temporary
signage outside the Premises as Tenant deems desirable to
announce Tenant's store opening.

11.   DAMAGE TO THE PREMISES.

   11.1 Repair and Restoration.

      (a)   Subject to Paragraph 11.2, in the event the
building or other improvements located on the Premises are
damaged or destroyed by any cause required to be insured against
pursuant to Paragraph 6.1, this Lease shall remain in full force
and effect except as otherwise provided herein and Landlord
shall, at its sole expense, repair, restore and rebuild the same
with all reasonable dispatch and diligence, so far as practicable
and lawful, to a complete unit of like quality, nature and
condition, with the same layout and parking to floor area ratio
as that which existed immediately prior to the damage.  Tenant
shall cause all available insurance proceeds from the insurance
policy maintained pursuant to Paragraph 6.1 to be made available
to Landlord for purposes of Landlord's restoration and/or repair
of the Premises.  In the event of a casualty which is required to
be insured against by Tenant pursuant to Paragraph 6.1 and
Tenant's failure to so insure, Landlord may cancel this Lease
upon thirty (30) days written notice to Tenant unless Tenant
agrees to pay the cost of restoration or repair to the Premises
to the extent insurance proceeds for the same are insufficient

- 38 -

due to inadequate coverage. Landlord's obligation to repair, restore and rebuild as set forth in this Paragraph 11.1(a) shall supercede any provision of applicable law to the contrary, which provisions the parties hereby waive. Said repair, restoration and rebuilding shall be performed so as to restore the Premises to their condition immediately prior to the occurrence of the damage or destruction. During such repair, restoration and rebuilding Tenant shall at all times have access to the Premises for the purpose of inspecting the work in progress and for the purpose of installing trade fixtures, equipment, merchandise, advertising and signs.

      (b)  <u>Uninsured Losses</u>

          (1)  <u>Insubstantial</u>. Subject to Paragraph 11.2 hereof, in the event the Building and/or other improvements located on the Premises are damaged or destroyed by any cause other than a peril for which insurance is required to be maintained under Paragraph 6.1 to the extent that the direct cost of restoration to Landlord (i.e., hard construction costs, and architectural, engineering, permits and other direct costs of construction) does not exceed Two Hundred Thousand Dollars ($200,000), then Landlord shall repair and restore the Premises at Landlord's sole expense as soon as practicable after the damage or destruction in the same manner as provided for in Paragraph 11.1(a) above. Landlord's obligation to repair, restore and rebuild as set forth in this paragraph 11.1(b) shall supercede any provision of applicable law to the contrary, which provisions the parties hereby waive.

- 39 -

04/28/93/RIALTO/LEASE6.W51

(2) <u>Substantial Losses</u>.  Subject to
Paragraph 11.2 hereof, if the Building and/or other improvements
located upon the Premises are damaged or destroyed by any cause
other than a peril for which insurance is required to be
maintained under Paragraph 6.1 to the extent that the direct cost
of restoration to Landlord (i.e, hard construction costs, and
architectural, engineering, permits and other direct costs of
construction) exceeds Two Hundred Thousand Dollars ($200,000),
then Landlord shall have the right, at Landlord's election,
either to terminate this Lease or to repair or restore the
Building and/or other improvements at Landlord's sole cost.
Landlord shall notify Tenant in writing within thirty (30) days
after the damage or destruction of Landlord's election to either
terminate this Lease or to repair or restore the Premises.  Any
such notice, if Landlord elects to cancel, shall be accompanied
by a statement showing the estimated cost for the restoration of
the Premises (which cost shall be competitively bid.)  In the
event Landlord elects to repair or rebuild, Landlord shall do so
promptly at Landlord's sole expense.  If Landlord elects to
terminate this Lease, Tenant shall have the right, exercisable by
written notice delivered to Landlord within thirty (30) days
after receipt by Tenant of Landlord's notice or the expiration of
Landlord's notice period (if Landlord is deemed to have elected
to terminate this Lease), to agree to bear all such direct costs
of repair or restoration in excess of Two Hundred Thousand
Dollars ($200,000), in which event this Lease shall not be
terminated and Landlord shall repair and restore the Premises as

- 40 -

04/28/93/RIALTO/LEASE6.W51

soon as possible after the damage or destruction in the same
manner provided for in Paragraph 11.1(a) above.  Landlord's
obligation to repair, restore and rebuild as set forth in this
Paragraph 11.1(b) shall supercede any provision of applicable law
to the contrary, which provisions the parties hereby waive.
During such repair, restoration and rebuilding Tenant shall at
all times have access to the Premises for the purpose of
inspecting the work in progress and for the purpose of installing
trade fixtures, equipment, merchandise, advertising and signs.

          (c)  In the event that the Building or other
improvements located on the Premises are damaged to the extent
that the Premises are not suitable in Tenant's opinion, subject
to reasonable standards, for the normal conduct of Tenant's
business as carried on prior to said damage, and Landlord is
obligated to repair or restore said Building and improvements
pursuant to this Paragraph 11.1, Tenant may nevertheless elect to
continue occupancy of the Building during the period of repair,
restoration and rebuilding or discontinue occupancy until
satisfaction of the conditions set forth below.  In the event
Tenant elects to continue occupancy of the Building, then from
the date of such damage until completion of repair, restoration
and rebuilding, there shall be an equitable adjustment in Minimum
Rent and all other amounts payable hereunder, taking into account
the interference with Tenant's normal conduct of business.  In
the event Tenant elects to discontinue occupancy, then Minimum
Rent and all other amounts payable hereunder shall completely
abate from the date of damage for the duration of the period of

- 41 -

04/28/93/RIALTO/LEASE6.W51

repair, restoration and rebuilding.  Tenant shall not be required
to accept delivery of possession of the Premises and to commence
paying Minimum Rent and other charges payable by Tenant to
Landlord hereunder until the earlier of (i) the date on which
Tenant recommences to conduct business on the entire Premises, or
(ii) sixty (60) days after the last to occur of all of the
following events:

(1)   The architect in charge of the
construction certifies in writing to Tenant that said
construction has been completed in strict accordance with the
approved plans and specifications and that the Premises is in
compliance with all laws, ordinances, regulations and
requirements of governmental authorities having jurisdiction
thereof;

(2)   A certificate of occupancy or an
equivalent use permit and all other requisite permits and
approvals necessary for Tenant to conduct business on the
Premises and for the public to have access to the Premises are
issued by the appropriate legal authorities and Tenant shall have
received certified or photostatic copies of the same; and

(3)   If the location of the foundations or
exterior walls has been changed, Landlord delivers to Tenant an
as-built drawing of the restored Premises.

(d)   Tenant may cancel and terminate this Lease
upon thirty (30) days written notice to Landlord in the event
Landlord fails or is unable to (1) obtain a building permit for
any repairs, rebuilding or restoration required under this

- 42 -

04/28/93/RIALTO/LEASE6.W51

Section 11 within three (3) months from the date of damage to the Premises; or (2) complete such repairs, rebuilding and restoration and comply with the conditions in this Paragraph 11.1(c) for the resumption of Minimum Rent and other charges payable by Tenant hereunder with all reasonable dispatch and diligence.

11.2 <u>Last Twelve Months Exception</u>. If more than twenty percent (20%) of the Building and/or other improvements located on the Premises are destroyed within the last twelve months of the Primary Term or the last twelve months of any extension of the Lease Term, Landlord or Tenant shall have the option, exercisable by written notice to the other party within sixty (60) days after the date of the occurrence of such damage, to terminate this Lease, provided that Tenant releases to Landlord all of Tenant's claim or interest in and to insurance proceeds otherwise allowable for the repair and restoration of said improvements. Notwithstanding the foregoing, Tenant may vitiate Landlord's election to terminate this Lease if Tenant affirms its obligations under this Lease by waiving Tenant's rights pursuant to Paragraph 2.2 above to elect not to exercise the next succeeding option to extend the Lease Term, and in such event, Landlord shall immediately undertake the repair, restoration and rebuilding of the Premises in accordance with Paragraph 11.1 above.

- 43 -



04/28/93/RIALTO/LEASE6.W51

## 12.  LIENS.

Tenant shall do all things reasonably necessary to
prevent the filing of any mechanic's liens or other liens against
the Premises or any part thereof by reason of work, labor,
services or materials supplied or claimed to have been supplied
to Tenant.  If any such lien shall at any time be filed against
the Premises, Tenant shall either cause the same to be discharged
of record within thirty (30) days after the date of filing the
same or, if Tenant in its discretion and in good faith determines
that such lien should be contested, furnish such security or bond
as may be reasonably necessary to prevent any foreclosure
proceedings against the Premises during the pendency of such
contest.

## 13.  RIGHTS OF ACCESS.

13.1 <u>By Tenant</u>.  Provided that Tenant has procured the
insurance it is required to obtain pursuant to Paragraph 6.2,
Tenant may enter the Premises prior to the RCD for the purposes
of inspecting the Premises and constructing Tenant's Improvements
and installing its trade fixtures, equipment, merchandise,
advertising and signs.  Pursuant to any such entry, Tenant agrees
not to enter the Premises at any time when applicable law
prohibits such entry (i.e. during any time when Landlord is
remediating the Hazardous Materials located in the building
materials of the interior of the Building as opposed to the roof
membrane) and Tenant agrees not to materially interfere with
Landlord while Landlord is performing Landlord's Work.

- 44 -

04/28/93/RIALTO/LEASE6.W51

13.2 <u>By Landlord</u>.  Provided that Tenant's business is not materially interfered with, Landlord and its authorized agents and representatives shall be entitled to enter the Premises at reasonable times, upon at least five (5) business days prior notice, for the purpose of inspecting the same and showing the Premises to prospective purchasers and lenders or performing any necessary maintenance or repairs.  Landlord agrees that Landlord shall make no forcible entry of the Premises except to prevent injury to persons or substantial damage to property.

14.  ASSIGNMENT AND SUBLETTING.

Tenant shall have the right to assign this Lease or sublet the Premises or any portion thereof with the prior written consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned; provided, however, that in the event Tenant assigns this Lease or sublets the entire Premises, Landlord shall be entitled to receive twenty percent (20%) of any excess Minimum Rent paid to Tenant by any assignor or subtenant once Tenant has recaptured from any excess Minimum Rent (i) all reasonable leasing expenses related to an assignment of this Lease or sublet of the Premises, and (ii) all depreciation for Tenant's Improvements, such depreciation to be calculated using a straight-line basis over a ten (10) year period.  Any assignment shall not relieve Tenant from liability under this Lease. Notwithstanding the foregoing, the consent of Landlord shall not be required nor shall Landlord be entitled to any consideration for the assignment of this Lease or the sublet of any portion of

- 45 -

04/28/93/RIALTO/LEASE6.W51

the Premises to any entity which controls Tenant or which is controlled by or under common control with, Tenant.

15.   EMINENT DOMAIN.

15.1 <u>Taking Defined</u>.  If there is any taking of all or any part of the Premises or the access roads to the Premises because of the exercise of the power of eminent domain, whether by condemnation proceedings or otherwise, or any transfer of any part of the Premises or access roads to the Premises made in avoidance of the exercise of the power of eminent domain (all of the foregoing being hereinafter referred to as a "taking") during the Lease Term, the rights and obligations of the parties with respect to such taking shall be as provided in this Section 15.

15.2 <u>Substantial Taking</u>.  If title to all of the store building comprising the Premises is taken, or if title to so much of any other portion of the Premises is taken so that a reasonable amount of reconstruction thereof will not, in Tenant's reasonable judgment, result in the Premises being viable for Tenant's continued occupancy, then this Lease shall terminate on the date that possession of the store building of the Premises, or such other part of the Premises, is taken.  In such event, neither party shall have any further rights or obligations hereunder except that Tenant shall have the right to participate in any condemnation award or in the purchase price paid, in accordance with Paragraph 15.5 below.

15.3 <u>Partial Taking</u>.  If title to any part of the store building comprising the Premises or any other part of the

- 46 -

04/28/93/RIALTO/LEASE6.WS1

Premises is taken and the remaining part of the Premises, after reconstruction of the Premises, is suited in Tenant's reasonable judgment for Tenant's continued occupancy, this Lease shall terminate only as to the part of the store building of the Premises or such other part of the Premises so taken as of the date that possession of such part is taken and shall continue in effect as to the part of the Premises remaining.  In such event, neither party shall have any further right or obligation with respect to the portion of the Premises so taken except that Tenant shall have the right to participate in any condemnation award or in the purchase price paid in accordance with Paragraph 15.5 below.  In the event that the Premises, following reconstruction thereof, is not suited in Tenant's reasonable business judgment for Tenant's continued occupancy, this Lease shall terminate pursuant to the terms of Paragraph 15.2.

15.4 <u>Temporary Taking</u>.  If the whole or any part of the Premises is taken for ninety (90) days or less, this Lease shall not terminate and Tenant shall continue to pay the full amount of Minimum Rent and other charges payable by Tenant hereunder (except to the extent to which Minimum Rent exceeds the amount of the award) and to perform and observe all of the other terms and conditions hereof as though the taking had not occurred (except to the extent to which Tenant is prevented from so doing by the terms of the order of the taking authority).  Tenant shall be entitled to receive the entire award made for the temporary taking of the Premises.  If the taking extends beyond the

- 47 -

04/28/93/RIALTO/LEASE6.W51

expiration of the Lease Term the award shall be apportioned

between Landlord and Tenant.

15.5 Repair, Restoration, Rebuilding.

(a)   In the event of a taking, unless this Lease

is terminated as provided in Paragraphs 15.2 or 15.3, Landlord

shall, at Landlord's expense, but only to the extent of any

compensation or award Landlord receives pursuant to this Section

15, promptly repair, restore and rebuild the remainder of the

Premises so far as practicable to a complete unit of like

quality, nature and condition as that which existed immediately

prior to the taking.  Such repair, restoration and rebuilding

shall be conducted in the same manner, with the same approvals

and the same rights of Tenant as provided for in

Paragraph 11.1(a) above.  Tenant may cancel and terminate this

Lease upon thirty (30) days written notice to Landlord in the

event Landlord fails to:  (1) obtain a building permit for any

repair, rebuilding or restoration required under this Section 15

within three (3) months from the date of taking; or (2) complete

such repairs, rebuilding and restoration with all reasonable

dispatch and diligence.

(b)   During the period between the effective date

of taking and the completion of repair, restoration and

rebuilding of the Premises, Minimum Rent shall be equitably

abated to the extent that the Premises are not then suitable in

Tenant's reasonable discretion for the conduct of Tenant's

business.  Upon the completion of repair, restoration and

rebuilding of the Premises, and access necessary for the fullest

- 48 -

04/28/93/RIALTO/LEASE6.W51

possible use of the Premises or the remaining portion thereof,
Minimum Rent shall thereafter and throughout the balance of the
Lease Term be reduced in that proportion which the area of the
Premises taken bears to the area of the Premises existing
immediately prior to such taking.  The repair, restoration and
rebuilding of the Premises will not be deemed complete until the
earlier of the dates referred to in Paragraph 11.1(c).

    15.6 <u>Notices; Compensable Interests</u>.

       (a)   In the event Landlord or Tenant receives any
notice of any kind specified below, Landlord or Tenant shall
promptly give the other party a photocopy of the notice received:

       (1)   Notice of intended taking;

       (2)   Service of any legal process relating to
condemnation of any portion of the Premises or any improvement
located thereon, or any easement appurtenant thereto;

       (3)   Notice in connection with any
proceedings or negotiations with respect to such a condemnation;
or

       (4)   Notice of intent or willingness to make
or negotiate a private purchase, sale or transfer in lieu of
condemnation.

       (b)   Landlord and Tenant shall be entitled to
compensation for the appropriation of their respective rights and
interests by the condemning authority, severance damages and
interest on the award in accordance with the law of the State in
which the Premises are located.  Landlord, Tenant and all persons
and entities holding under Tenant shall have the right to

- 49 -

04/28/93/RIALTO/LEASE6.W51

represent his or its respective interest in each proceeding or negotiation with respect to a taking or intended taking and to make full proof of his or its claims. No agreement, settlement, sale or transfer to or with the condemning authority shall be made without the written consent of Landlord and Tenant. Landlord and Tenant each agree to execute and deliver to the other any instruments that may be necessary or appropriate to effectuate or facilitate the provisions of this Lease relating to condemnation.

16.   TENANT'S DEFAULT.

(a)   Tenant shall be in default under this Lease if:

(i)   Tenant fails to pay any installment of Minimum Rent or any other amount payable by Tenant under the terms of this Lease, when and as the same shall become due and payable under the terms hereof, and any such failure continues for a period of more than fifteen (15) days after notice thereof in writing is given to Tenant by Landlord (provided, however, that any such notice shall be in lieu of, and not in addition to, the notice described in Section 1161 of the California Code of Civil Procedure relating to unlawful detainer actions), or

(ii)   Tenant fails to keep and perform any of the other covenants, conditions or agreements set forth in this Lease and agreed to be kept and performed by it, and any such failure continues for a period of more than thirty (30) days after notice thereof in writing stating the nature of said failure is given to Tenant by Landlord; provided, however, that

- 50 -

04/28/93/RIALTO/LEASE6.W51

if the cause for giving such notice involves making repairs or taking other acts reasonably requiring a longer period of time than thirty (30) days to complete or remedy, then Tenant shall not be in default hereunder so long as Tenant has commenced to cure the failure referred to in said notice within said thirty (30) day period and thereafter continues diligently until completion to cure such failure.  Any such notice shall be in lieu of, and not in addition to, the notice described in Section 1161 of the California Code of Civil Procedure relating to unlawful detainer actions.

(b)   In the event of a default by Tenant, Landlord may, so long as such default continues, either terminate this Lease by written notice to Tenant, which written  notice shall specify a date for such termination at least thirty (30) days after the date of such notice, or not terminate this Lease as a result of the default.

(c)   In the event Landlord terminates this Lease pursuant to the provisions of Paragraph 16(b) hereof, Landlord may then, or at any time thereafter, re-enter the Premises or any part thereof and expel or remove therefrom Tenant and any other persons occupying the same and again repossess and enjoy the Premises.  In the event of such termination by Landlord, Landlord shall be entitled to recover in one or more awards of judgment from Tenant:

(1)   the worth at the time of the award of the unpaid Minimum Rent which had been earned at the time of termination;

- 51 -



04/28/93/RIALTO/LEASE6.W51

(2)   the worth at the time of the award of the amount by which the unpaid Minimum Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(3)   the worth at the time of the award of the amount by which the unpaid Minimum Rent for the balance of the Lease Term after the time of the award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(4)   any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

The "worth at the time of the award", as used in (1) and (2) of this Paragraph 16(c) is to be computed by allowing interest at a rate equal to the lesser of (i) twelve percent (12%) per annum or (ii) the maximum rate of interest permitted by law.  The "worth at the time of the award" referred to in (3) of this Paragraph 16(c) is to be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus two percent (2%).

(d)   In the event Landlord does not terminate this Lease as permitted by Paragraph 16(b) above, and without barring Landlord's later election to terminate pursuant to Paragraph 16(b), Landlord shall be entitled to the remedy



04/28/93/RIALTO/LEASE6.W51

described in California Civil Code Section 1951.4 to enforce all
of Landlord's rights hereunder to collect Minimum Rent and other
charges payable by Tenant hereunder as the same become due, and
Tenant  shall remain and continue liable to Landlord under all of
the terms of this Lease.

(e)   The remedies of Landlord in the event of the
default of Tenant as provided in this Section 16 are not intended
to be exclusive of any other remedies which may be permitted by
law.


17.   LANDLORD'S DEFAULT.

(a)   Landlord shall be in default under this Lease
if:

(i)   Landlord fails to make a repair or
perform any maintenance required to be made or performed by it
under the terms of this Lease, and such failure continues for a
period of thirty (30) days after delivery of written notice to
Landlord of the necessity for such repairs or maintenance;
provided, however, that if the cause for giving such notice
involves taking acts reasonably requiring a longer period of time
to complete or remedy, then Landlord shall not be in default
hereunder so long as Landlord has commenced to cure the failure
within said thirty (30) day period and thereafter continues
diligently until completion to cure such failure, or, in the case
of an emergency, if Landlord fails to make a repair or perform
any maintenance required by it under the terms of this Lease

- 53 -



04/28/93/RIALTO/LEASE6.W51

within such shorter period after delivery of such notice as shall
be reasonable under the circumstances; or

(ii)   Landlord fails to keep and perform any
of the other covenants, conditions or agreements set forth in
this Lease and agreed to be kept and performed by Landlord, or if
Landlord fails to timely pay any tax or other charge which is a
lien upon the Premises or any installment of principal or
interest upon any mortgage or deed of trust which is prior in
lien to this Lease, and any such failure continues for a period
of more than thirty (30) days after notice thereof in writing
stating the nature of said failure is given to Landlord by
Tenant; provided, however, that if the cause for giving such
notice involves taking acts reasonably requiring a longer period
of time than thirty (30) days to complete or remedy, then
Landlord shall not be in default hereunder so long as Landlord
has commenced to cure the failure referred to in said notice
within said thirty (30) day period and thereafter continues
diligently until completion to cure such failure.

(b)   In the event of a default by Landlord, Tenant
may without waiving any claim for damages or other remedy
available to it, at any time thereafter cure such default for the
account of Landlord.  Any amount paid or any contractual
liability incurred by Tenant in curing such default shall be
deemed paid or incurred for the account of Landlord, and Landlord
agrees to hold Tenant harmless therefrom and reimburse Tenant
upon demand therefor plus interest thereon at a rate equal to the
lesser of (i) twelve percent (12%) per annum, or (ii) the maximum

- 54 -

04/28/93/RIALTO/LEASE6.W51

rate of interest permitted by law.  If Landlord fails to
reimburse Tenant upon demand for any amount paid for the account
of Landlord hereunder or otherwise due Tenant from Landlord, said
amount may be offset by Tenant against Minimum Rent or other
charges payable hereunder.  Notwithstanding the foregoing, Tenant
may cure any default described in Paragraph 17(a)(i) prior to the
expiration of the thirty (30) day period set forth therein in the
case of an emergency.


    18.   ESTOPPEL CERTIFICATES.

         At any time and from time to time either party, within
thirty (30) days after delivery of a request in writing from the
other, shall execute and deliver a statement in writing
certifying that this Lease is unmodified and in full force and
effect (or if there have been modifications, that the same is in
full force and effect as modified and stating the modifications),
the dates to which Minimum Rent and other charges payable
hereunder have been paid and any other factual information a
purchaser, lender or assignee may reasonably request.


    19.   SUBORDINATION AND NONDISTURBANCE.

         This Lease is and shall be prior to any deed of trust
recorded after the date of this Lease affecting all or any part
of the Premises.  If, however, the holder of any deed of trust
requires that this Lease be subordinated to such deed of trust,
Tenant agrees to subordinate this Lease to that deed of trust if
Landlord first obtains from such holder a written nondisturbance

- 55 -



04/28/93/RIALTO/LEASE6.W51

agreement in form and substance reasonably satisfactory to
Tenant.  In no event shall Tenant's obligations be increased or
Tenant's rights decreased by such nondisturbance agreement.
Furthermore, such nondisturbance agreement shall provide that any
insurance proceeds or condemnation awards shall be allocated or
distributed as provided in this Lease.  Such nondisturbance
agreement shall be recorded in the office of the county recorder
of the county in which the Premises are located.  The term "deed
of trust" as used herein includes mortgages, deeds of trust,
other monetary liens or encumbrances, all modifications,
extensions, renewals and replacements thereof, given as
collateral security for any obligation affecting the Premises.


    20.   END OF TERM.

        At the expiration or earlier termination of the Lease
Term, Tenant shall: (i) surrender the Premises in the same
condition as they were upon delivery of possession thereof at the
commencement of the Lease Term, subject to normal wear and tear,
damage by the elements, alterations, additions and improvements
permitted under Paragraph 9.6 (except those alterations which
Landlord elected to have removed by Tenant at the time such
alterations were approved by Landlord, provided such approval was
necessary), damage that pursuant to Sections 11 and 15 does not
have to be repaired and repairs that are the Landlord's
responsibility to make; (ii) deliver all keys to the Premises to
Landlord; and (iii) have the right to remove from the Premises
all of its signs, sign supports and monuments, trade fixtures,

- 56 -

04/28/93/RIALTO/LEASE6.WS1

equipment and other personal property.  In the event Tenant removes its signs, sign supports and monuments, trade fixtures, equipment and other personal property, Tenant shall repair, at Tenant's expense, any damage caused to the Premises, by such removal.

21.  LANDLORD'S WARRANTY OF TITLE; QUIET POSSESSION.

(a)  Landlord represents and warrants that it has good title to the Premises including without limitation, the real property legally described on Exhibit A and all improvements situated thereon, subject only to Permitted Liens (as defined below), that it has full right and authority to make this Lease and to perform as required under this Lease, and that this Lease does not conflict with any other agreement to which Landlord is bound.  Landlord will furnish to Tenant upon request evidence reasonably satisfactory to Tenant of its title and authorization. "Permitted Liens" means (a) current taxes not past due, (b) utility easements and leases not conflicting with Tenant's rights under this Lease, ~~and~~ (c) those priority mortgages, deeds of trust or leases for which Tenant has received a nondisturbance agreement as contemplated by Section 19, & (d) Landlord represents and warrants that Tenant's use of the Premises for the sale of general merchandise including bargain and close-out merchandise shall not be prevented or materially impaired at any time during the Lease Term, by any restriction, covenant, lease or other agreement voluntarily entered into by Landlord, whether of record or not.  That certain access agreement recorded December 29, 1970, Book 7582, Page 245 of Official Records.

- 57 -

04/28/93/RIALTO/LEASE6.W51

(b)   Landlord covenants that upon payment of the rental herein reserved and the due performance by Tenant of the covenants and agreements herein contained on its part to be performed, Tenant shall at all times peaceably and quietly hold and enjoy the Premises and all of the rights granted it under this Lease during the Lease Term and any and all extensions thereof.

22.   BROKERAGE.

Each party represents and warrants that it has caused or incurred no claims for brokerage commissions or finders' fees in connection with the execution of this Lease, other than to CB Commercial Real Estate Group and its agent Marianne Waggoner, the payment of which shall be the sole responsibility of Landlord. Each party shall indemnify and hold the other harmless from and against any other claims for commissions or finder's fee caused by the party whose actions or alleged commitments form the basis of such claim.

23.   FORCE MAJEURE.

Whenever a period of time is provided for in this Lease for Landlord or Tenant to perform or do any act or thing, there shall be excluded from the computation of such period of time any period during which performance is delayed due to strikes, riots, acts of God, shortages of labor, governmental laws, rules or regulations, or from any other cause or causes beyond the reasonable control of the party required to perform such act or

- 58 -

04/28/93/RIALTO/LEASE6.W51

do such thing, or that of its agents, servants, employees or contractors.

24.   LEASE MEMORANDUM.

Landlord shall execute, acknowledge and deliver to Tenant a memorandum of this Lease.  Tenant may cause said memorandum to be recorded in the office of the county recorder of the county in which the Premises are located.  Tenant agrees that upon the expiration of the Lease Term, Tenant will reasonably cooperate with Landlord in the preparation and execution of a recordable instrument evidencing the expiration of the Lease Term.

25.   ATTORNEYS' FEES.

The prevailing party in any arbitration, action or proceeding instituted by either party against the other to enforce or for the breach or the construction of this Lease shall be entitled to reasonable attorneys' fees and costs incurred in such action in addition to all other relief to which such party may be entitled.

26.   NOTICES.

Any and all notices by Landlord to Tenant, or by Tenant to Landlord, shall be in writing and either personally served or sent by registered or certified mail, postage prepaid, or by overnight courier or delivery service, addressed as follows:

- 59 -



04/28/93/RIALTO/LEASE6.W51

Notices to Landlord:    Stater Bros. Markets
                      Attention:  Vice President, Real Estate
                      21700 Barton Road
                      Colton, CA  92324

Notices to Tenant:      PNS Stores, Inc.
                      2430 East Del Amo Boulevard
                      Dominguez, California  90220-6306
                      Attention:  Vice President-
                                  Real Estate & Construction

With a copy to:         PNS Stores, Inc.
                      2430 East Del Amo Boulevard
                      Dominguez, California  90220-6306
                      Attention:  General Counsel

Either party at any time may change its address by notice to the other party in writing given as provided in this Section.  The earlier of the (i) date of receipt or (ii) three (3) days after the date such notice is given in accordance with this Section shall constitute the initial date of notice in computing the elapsed time as specified in any notice requirement in this Lease.  Minimum Rent shall be payable by check sent by ordinary mail to Landlord at the address set forth in Paragraph 4.2 or as set forth in any change of address for which notice is given pursuant to this Section.

27.  SUCCESSORS.

Each of the terms, covenants and conditions of this Lease shall extend to and be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective legal representatives, successors and assigns.  Whenever in this Lease reference is made to either Landlord or Tenant, the reference



- 60 -

04/28/93/RIALTO/LEASE6.W51

shall be deemed to include, wherever applicable, the legal
representatives, successors and assigns of such parties.


    28.  INTERPRETATION.

       This Lease shall be interpreted in accordance with the
laws of the State in which the Premises are located.  The
language in all parts of this Lease shall be construed in all
cases as a whole and according to its fair meaning and not
strictly for or against Landlord or Tenant, nor shall the fact
that any portion of this Lease was drafted by Landlord or by
Tenant be reason for the construction of such portion against or
in favor of either party.  If any clause or provision herein
contained is adjudged invalid, the same shall not affect the
validity of any other clause or provision of this Lease.


    29.  RELATIONSHIP OF PARTIES.

       Nothing contained herein shall be deemed or construed
by the parties hereto, or by any third party, as creating the
relationship of principal and agent or of a partnership or joint
venture between the parties hereto.  It is understood and agreed
that neither the method of computation of rent nor any provision
contained herein, nor any of the acts of the parties hereto,
shall create a relationship other than the relationship of
landlord and tenant.

- 61 -



04/28/93/RIALTO/LEASE6.W51

30.   ENTIRE AGREEMENT.

This Lease constitutes the entire agreement between the
parties hereto and supersedes all previous agreements and
understandings between the parties in any way relating to the
subject matter hereof, including without limitation, any letter
of intent or proposal to lease.  No amendment to or modification
of this Lease shall be binding unless the same is in writing and
signed by both Landlord and Tenant.

31.   OFFER TO LEASE.

Execution and delivery by Landlord of this Lease
constitutes an offer which shall not be deemed accepted by Tenant
until Tenant has executed this Lease and delivered a duplicate
original thereof to Landlord.

32.   AUTHORITY.

Each individual signing on behalf of a party hereto
represents and warrants that he or she is authorized by the Board
of Directors, managing partner or other appropriate body or
individual, as the case may be, to execute this Lease on behalf
of such party.

33.   HOLDING OVER.

Landlord hereby consents to Tenant remaining in
possession of the Premises after expiration or termination of the
Lease Term on a month-to-month basis, terminable upon sixty (60)
days' written notice.  Such month-to-month tenancy shall be upon

- 62 -

04/28/93/RIALTO/LEASE6.W51

the same terms and conditions contained herein so far as
applicable, with Minimum Rent payable monthly equal to the amount
in effect during the period immediately prior to the expiration
or termination of the Lease Term, prorated and payable in advance
at the commencement of each month for the period of such tenancy.



04/28/93/RIALTO/LEASE6.W51

34.  ANNOUNCEMENTS.

Without the prior written consent of Tenant, Landlord will not make any oral or written public announcement of Tenant's execution of this Lease or the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties have executed this Lease as of the date and year first above mentioned.

LANDLORD:              Stater Bros. Markets,
                       a California corporation

              By:      _____
                       Jack H. Brown
                       Chairman of the Board, President
                       and Chief Executive Officer

              By:      _____
                       Walter F. Ford
                       Vice President, Real Estate


                       Landlord's Taxpayer
                       Identification Number:
                       95-2586175


TENANT:                PNS STORES, INC.,
                       a California corporation

              By:      _____
                       Leonard S. Williams
                       President and C.E.O.

              By:      _____
                       Patricia J. Wehner
                       Vice President,
                       Real Estate & Construction

- 64 -

04/28/93/RIALTO/LEASE6.WS1

## LEGAL DESCRIPTION OF THE PREMISES

Landlord:      Stater Bros. Markets

Tenant:        PNS Stores, Inc.

Date of Lease: _____ May 11, 1993

This Exhibit A is attached to the Lease pursuant to Section 1
thereof.


PARCEL NO. 1:

PARCEL 1 OF PARCEL MAP NO. 1556, IN THE CITY OF RIALTO, COUNTY OF
SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK
14 OF PARCEL MAPS, PAGE 81, RECORDS OF SAID COUNTY.

PARCEL NO. 2:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER AND ACROSS
THE MOST SOUTHERLY 25 FEET OF PARCEL NO. 2 OF PARCEL MAP NO.
1556, IN THE CITY OF RIALTO, COUNTY OF SAN BERNARDINO, STATE OF
CALIFORNIA, AS PER PLAT RECORDED IN BOOK 14 OF PARCEL MAPS, PAGE
81, RECORDS OF SAID COUNTY.

PARCEL NO. 3:

EASEMENTS AND RIGHTS OF WAY AS SET FORTH IN THAT CERTAIN
AGREEMENT AND CONVEYANCE BETWEEN PETROLANE INCORPORATED, AS
GRANTOR AND GRANTEE, AND BETA VENTURE, AS GRANTOR AND GRANTEE,
DATED DECEMBER 11, 1970, RECORDED IN THE OFFICE OF THE COUNTY
RECORDER OF SAN BERNARDINO COUNTY, STATE OF CALIFORNIA, ON
DECEMBER 29, 1970, IN BOOK 7582, PAGE 245, OFFICIAL RECORDS.

PARCEL NO. 4:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND DRIVEWAY PURPOSES, OVER
AND ACROSS THE FOLLOWING DESCRIBED PROPERTY:

ALL THAT PORTION OF LOT 5, TOWN OF RIALTO AND ADJOINING
SUBDIVISION, IN THE COUNTY OF SAN BERNARDINO, STATE OF
CALIFORNIA, AS PER PLAT RECORDED IN BOOK 4 OF MAPS, PAGE 11,
RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:


EXHIBIT A
Page 1 of 2

04/28/93/RIALTO/LEASE6.WS1

## LEGAL DESCRIPTION OF THE PREMISES

BEGINNING AT A POINT IN THE EASTERLY LINE OF RIVERSIDE AVENUE, DISTANT SOUTH 150 FEET, AS MEASURED ALONG SAID EASTERLY LINE FROM THE INTERSECTION OF SAID EASTERLY LINE WITH THE SOUTHERLY LINE OF BASELINE ROAD, AS SAID INTERSECTION IS SHOWN ON MAP RECORDED IN BOOK 25 OF RECORD OF SURVEYS, PAGE 75, RECORDS OF SAID COUNTY; THENCE NORTH ALONG THE EASTERLY LINE OF RIVERSIDE AVENUE, 20 FEET; THENCE SOUTHEASTERLY IN A STRAIGHT LINE TO A POINT ON A LINE WHICH IS PARALLEL TO AND 150 FEET SOUTH MEASURED AT RIGHT ANGLES FROM THE SOUTHERLY LINE OF BASELINE ROAD, SAID POINT BEING EAST 50 FEET, MEASURED ALONG SAID PARALLEL LINE FROM THE POINT OF BEGINNING; THENCE WEST 50 FEET TO THE TRUE POINT OF BEGINNING.

SAID EASEMENT IS FOR THE BENEFIT OF AND APPURTENANT TO PARCEL NO. 1 ABOVE DESCRIBED.

EXHIBIT A
Page 2 of 2



04/28/93/RIALTO/LEASE6.W51

LANDLORD'S WORK


Landlord:        Stater Bros. Markets

Tenant:          PNS Stores, Inc.

Date of Lease: _____May 11__, 1993



        Tenant has caused an environmental audit report for

the Premises to be prepared by Diagnostic Engineering, Inc.

("Environmental Audit"), a copy of which Landlord acknowledges

having received.  The Environmental Audit has disclosed the

existence of Hazardous Materials [as defined in Paragraph

9.7.1(b)] in or at the Premises including both in the building

materials of the Building and in the roof membrane attached to

the Building as of the date of this Lease.  Landlord shall cause

the remediation of such Hazardous Materials in accordance with

Environmental Law as defined in Paragraph 9.7.1(a).  Such

remediation shall be performed by a licensed, certified and

qualified abatement contractor acceptable to Tenant in Tenant's

sole and absolute discretion, in a manner acceptable to Tenant in

Tenant's sole and absolute discretion.  Tenant shall notify

Landlord of the method of removal, encapsulation, neutralization

or combination thereof which Tenant prefers, and Landlord agrees

to cause its licensed, certified and qualified abatement

contractor to implement such method.  As between Landlord and

Tenant, Landlord shall be solely responsible for the disposal of

EXHIBIT C
Page 1 of 3

04/28/93/RIALTO/LEASE6.W51          LANDLORD'S WORK

all Hazardous Materials removed from the Premises or any portion
thereof in connection with such remediation, which disposal shall
be in accordance with Environmental Law.

Upon the full and final completion of such remediation
work, Landlord shall give written notice to Tenant.  Tenant shall
have ten (10) days after receipt of such notice to verify that
the remediation work performed by Landlord satisfactorily
conforms to the remediation instructions previously given by
Tenant to Landlord, which instructions shall be based on the
disclosures contained in the Environmental Audit.  In verifying
the satisfactory completion of such remediation work, Tenant
shall have the right to inspect the Premises and conduct such
tests as it may deem necessary.  In the event Tenant notifies
Landlord that Landlord's remediation work does not conform to the
instructions previously provided by Tenant to Landlord, Landlord
shall have ten (10) business days after receipt of Tenant's
notice or such greater period as may be mutually acceptable to
Tenant and Landlord within which Landlord shall remediate the
Premises to the satisfaction of Tenant.

Upon the completion of all Hazardous Materials
remediation, Landlord shall give written notice thereof to Tenant
together with paid invoices documenting the full payment of the
contract.  Landlord and Tenant agree that said contract price is
Thirty Eight Thousand Four Hundred Fifty Dollars ($38,450).
Tenant shall then reimburse Landlord the contract price for the
roof membrane removal and remediation of the Hazardous Materials



EXHIBIT C
Page 2 of 3

04/28/93/RIALTO/LEASE6.W51          LANDLORD'S WORK

contained in the Building and roof membrane within fifteen (15)
days after receipt of such notice, paid invoices therefor and
conditional liens releases from all contractors and
subcontractors performing work or supplying materials in
connection therewith.

In addition, Landlord, at Landlord's sole cost, shall
remove the recycling center from the Premises.

EXHIBIT C
Page 3 of 3

04/28/93/RIALTO/LEASE6.W51

MINIMUM RENT CREDIT SCHEDULE

Landlord:        Stater Bros. Markets

Tenant:          PNS Stores, Inc.

Date of Lease: _____May 11_____, 1993

| Month | Rental Per Month | Credit for $23,500.00 Tenant Imp Allowance Per Sec. 4.3 | Credit for $37,000.00 Roof Repair Allowance Per Sec. 4.4 | 8.00% Interest on Roof Repair | Net Rental Due |
|---|---|---|---|---|---|
| 0 | * | | | | * |
| 1 | $10,300 | | $5,150 | $0 | $5,150 |
| 2 | $12,000 | | $4,938 | $212.33 | $5,150 |
| 3 | $10,300 | | $4,971 | $179.42 | $5,150 |
| 4 | $10,300 | | $5,004 | $146.28 | $5,150 |
| 5 | $10,300 | | $5,037 | $112.92 | $5,150 |
| 6 | $10,300 | | $5,071 | $79.34 | $5,150 |
| 7 | $10,300 | | $5,104 | $45.54 | $5,150 |
| 8 | $10,300 | $3,413 | $1,726 | $11.51 | $5,150 |
| 9 | $10,300 | $5,150 | $0 | $0 | $5,150 |
| 10 | $10,300 | $5,150 | $0 | $0 | $5,150 |
| 11 | $10,300 | $5,150 | $0 | $0 | $5,150 |
| 12 | $10,300 | $4,637 | $0 | $0 | $5,663 |
| 13 | $10,300 | $0 | $0 | $0 | $10,300 |
| 14 | $10,300 | $0 | $0 | $0 | $10,300 |
| 15 | $10,300 | $0 | $0 | $0 | $10,300 |
| 16 | $10,300 | $0 | $0 | $0 | $10,300 |
| 17 | $10,300 | $0 | $0 | $0 | $10,300 |
| 18 | $10,300 | $0 | $0 | $0 | $10,300 |
| 19 | $10,300 | $0 | $0 | $0 | $10,300 |
| 20 thru 60 | $10,300 | $0 | $0 | $0 | $10,300 |
| 61 thru 120 | $11,330 | $0 | $0 | $0 | $11,330 |
| | | $23,500 | $37,000 | $787 | |

* Rental for beginning fractional month paid in arrears with first full
  month without credits or offsets.

EXHIBIT D



04/28/93/RIALTO/LEASE6.W51

### TENANT'S SCOPE OF WORK FOR VANDALISM DAMAGE; LANDLORD'S REIMBURSEMENT

Landlord:        Stater Bros. Markets

Tenant:          PNS Stores, Inc.

Date of Lease: ____May 11__, 1993

Tenant, subject to reimbursement by Landlord pursuant to Paragraph 3.4 of this Lease, shall cause all damage done to the Premises by vandals to be repaired to Tenant's reasonable satisfaction (including any replacements which may be necessary). Landlord and Tenant agree that the following scope of work for such repairs to be performed by Tenant and the cost breakdown for such work shall serve as the basis for Landlord's reimbursement of Tenant pursuant to Paragraph 3.4:

| | |
|---|---|
| HVAC | $40,000 |
| Store Front | 4,500 |
| T-Bar Ceiling | 3,500 |
| Electrical | 12,540 |
| Lighting | 5,500 |
| Rear Entrance Door | 1,500 |
| TOTAL | $67,540 |

EXHIBIT E



05/11/93/RIALTO/MEMOLEAS.W51

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

PNS Stores, Inc.
2430 East Del Amo Boulevard
Dominguez, CA  90220-6306
Attention:  Dan Zuckerman
            General Counsel

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made as of *May 13* , *93*
by and between Stater Bros. Markets, a California corporation
(hereinafter referred to as "Landlord"), and PNS Stores, Inc., a
California corporation (hereinafter referred to as "Tenant").

In consideration of the mutual covenants and agreements
contained herein and in that certain Lease dated May 11, 1993
(the "Lease Agreement") by and between Landlord and Tenant
relating to the Premises described in Paragraph 1 below, the
parties agree as follows:

1.    The Premises and the Shopping Center.

Landlord, as owner in fee simple, hereby leases to
Tenant and Tenant hereby leases from Landlord, for the term set
forth herein and at the rental and upon the covenants and
conditions set forth in the Lease Agreement the real property
legally described on Exhibit A attached hereto and made a part
hereof, all easements, rights and appurtenances belonging to said
real property, and all improvements situated thereon, including,
without limitation, the existing store building located at 155
East Baseline Avenue in the City of Rialto, County of San
Bernardino, State of California, consisting of approximately

05/11/93/RIALTO/MEMOLEAS.W51

twenty five thousand seven hundred fifty (25,750) square feet of
ground floor area.  Said real property, easements, appurtences,
and improvements are hereinafter collectively referred to as the
"Premises".  The Premises are located substantially as shown on
the site plan (the "Site Plan") attached hereto as Exhibit B and
made a part hereof.

    2.   Term and Options.

       The "Primary Term" of this Lease shall be for a period
commencing as set forth in the Lease Agreement and ending ten
(10) years after the Rent Commencement Date (as such term is
defined in the Lease Agreement).  Provided that Tenant is not in
default under the Lease Agreement at the time any option provided
for below is scheduled to commence, Tenant is hereby granted four
(4) separate options to extend the Primary Term of the Lease for
additional consecutive periods of five (5) years each with the
first such option to extend following the expiration of the
Primary Term and subsequent options to extend following the
expiration of the immediately preceding option period.

    3.  Use.

       The Premises may be used for the operation of a retail
store for the sale of general merchandise including, without
limitation, bargain and close-out merchandise, or for any other
lawful use; provided, however, in no event shall Tenant operate
or permit to be operated a super market, food market, grocery
store, meat, fish or poultry store, a fruit or vegetable store,

- 2 -

05/11/93/RIALTO/MEMOLEAS.W51

or for any business selling fresh or frozen meat, fish, poultry, produce or fresh dairy products. Nothing contained in this Lease shall be deemed or construed to impose any affirmative obligation on Tenant to make any particular use of the Premises, or any use thereof at all; and nothing contained in this Lease shall be deemed or construed to require Tenant to keep the Premises open for the conduct of any business during any particular hours, or on any particular days, or at all.

    4.   <u>Subordination and Nondisturbance</u>.

       The Lease Agreement is and shall be prior to any deed of trust recorded after the date hereof affecting all or any part of the Premises. If, however, the holder of any deed of trust requires that the Lease Agreement be subordinated to such deed of trust, Tenant agrees to subordinate the Lease Agreement to that deed of trust if Landlord first obtains from such holder a written nondisturbance agreement in form and substance reasonably satisfactory to Tenant. In no event shall Tenant's obligations be increased or Tenant's rights decreased by such nondisturbance agreement. Furthermore, such nondisturbance agreement shall provide that any insurance proceeds or condemnation awards shall be allocated or distributed as provided in the Lease Agreement. The nondisturbance agreement shall be recorded in the office of the county recorder of the county in which the Premises are located. The term "deed of trust" as used herein includes mortgages, deeds of trust, other monetary liens or encumbrances,

- 3 -

05/11/93/RIALTO/MEMOLEAS.W51

all modifications, extensions, renewals and replacements thereof, given as collateral security for any obligation affecting the Premises.

    5.   <u>Additional Terms and Provisions</u>.

        The rent to be paid by Tenant and all of the obligations and rights of Landlord and Tenant with respect to the Premises are set forth in the Lease Agreement and are incorporated herein with the same force and effect as if fully set forth herein.  This instrument is a memorandum of the Lease Agreement and is subject to all of the terms and conditions thereof.  In the event of any inconsistency between the terms of this instrument and the Lease Agreement, the terms of the Lease Agreement shall prevail.

        IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Lease as of the date first above written.

LANDLORD:        STATER BROS. MARKETS,
                    a California corporation

                    By: _____
                        Jack H. Brown
                        Chairman of the Board,
                        President and Chief Executive Officer

                    By: _____
                        Walter F. Ford
                        Vice President, Real Estate

TENANT:          PNS STORES, INC.,
                      a California corporation

                    By: _____
                        Patricia J. Wehner
                        Vice President,
                        Real Estate & Construction

- 4 -

05/11/93/RIALTO/MEMOLEAS.W51


STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF LOS ANGELES      )

On _May 14, 1993_ before me, _KAY L. DUKEMAN,_ personally
appeared Patricia J. Wehner, Vice President, Real Estate and
Construction, of PNS Stores, Inc., personally known to me ~~(or
proved to me on the basis of satisfactory evidence)~~ to be the
person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.


Signature _Kay L. Dukeman_

```
┌─────────────────────────────┐
│        OFFICIAL SEAL        │
│       KAY L. DUKEMAN        │
│  NOTARY PUBLIC - CALIFORNIA │
│     LOS ANGELES COUNTY      │
│  My Comm. Expires June 11, 1993 │
└─────────────────────────────┘
```

                    (This area for official notarial seal)

05/11/93/RIALTO/MEMOLEAS.W51

LEGAL DESCRIPTION OF THE PREMISES

Landlord:       Stater Bros. Markets

Tenant:         PNS Stores, Inc.

Date of Lease: _____May 13__, 1993

PARCEL NO. 1:

PARCEL 1 OF PARCEL MAP NO. 1556, IN THE CITY OF RIALTO, COUNTY OF
SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK
14 OF PARCEL MAPS, PAGE 81, RECORDS OF SAID COUNTY.

PARCEL NO. 2:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER AND ACROSS
THE MOST SOUTHERLY 25 FEET OF PARCEL NO. 2 OF PARCEL MAP NO.
1556, IN THE CITY OF RIALTO, COUNTY OF SAN BERNARDINO, STATE OF
CALIFORNIA, AS PER PLAT RECORDED IN BOOK 14 OF PARCEL MAPS, PAGE
81, RECORDS OF SAID COUNTY.

PARCEL NO. 3:

EASEMENTS AND RIGHTS OF WAY AS SET FORTH IN THAT CERTAIN
AGREEMENT AND CONVEYANCE BETWEEN PETROLANE INCORPORATED, AS
GRANTOR AND GRANTEE, AND BETA VENTURE, AS GRANTOR AND GRANTEE,
DATED DECEMBER 11, 1970, RECORDED IN THE OFFICE OF THE COUNTY
RECORDER OF SAN BERNARDINO COUNTY, STATE OF CALIFORNIA, ON
DECEMBER 29, 1970, IN BOOK 7582, PAGE 245, OFFICIAL RECORDS.

PARCEL NO. 4:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND DRIVEWAY PURPOSES, OVER
AND ACROSS THE FOLLOWING DESCRIBED PROPERTY:

ALL THAT PORTION OF LOT 5, TOWN OF RIALTO AND ADJOINING
SUBDIVISION, IN THE COUNTY OF SAN BERNARDINO, STATE OF
CALIFORNIA, AS PER PLAT RECORDED IN BOOK 4 OF MAPS, PAGE 11,
RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

EXHIBIT A
Page 1 of 2

05/11/93/RIALTO/MEMOLEAS.W51

## LEGAL DESCRIPTION OF THE PREMISES

BEGINNING AT A POINT IN THE EASTERLY LINE OF RIVERSIDE AVENUE, DISTANT SOUTH 150 FEET, AS MEASURED ALONG SAID EASTERLY LINE FROM THE INTERSECTION OF SAID EASTERLY LINE WITH THE SOUTHERLY LINE OF BASELINE ROAD, AS SAID INTERSECTION IS SHOWN ON MAP RECORDED IN BOOK 25 OF RECORD OF SURVEYS, PAGE 75, RECORDS OF SAID COUNTY; THENCE NORTH ALONG THE EASTERLY LINE OF RIVERSIDE AVENUE, 20 FEET; THENCE SOUTHEASTERLY IN A STRAIGHT LINE TO A POINT ON A LINE WHICH IS PARALLEL TO AND 150 FEET SOUTH MEASURED AT RIGHT ANGLES FROM THE SOUTHERLY LINE OF BASELINE ROAD, SAID POINT BEING EAST 50 FEET, MEASURED ALONG SAID PARALLEL LINE FROM THE POINT OF BEGINNING; THENCE WEST 50 FEET TO THE TRUE POINT OF BEGINNING.

SAID EASEMENT IS FOR THE BENEFIT OF AND APPURTENANT TO PARCEL NO. 1 ABOVE DESCRIBED.

EXHIBIT A
Page 2 of 2



SITE PLAN

Landlord: Stater Bros. Markets
Tenant: PNS Stores, Inc.
Date of Lease: May 13, 1993

EXHIBIT B

NORTH RIALTO MKT. NO. 43

05/11/93/RIALTO/MEMOLEAS.W51


STATE OF _____ )
                              ) ss.
COUNTY OF _____ )


On _____ before me, _____,
personally appeared _____, personally known
to me (or proved to me on the basis of satisfactory evidence) to
be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.


Signature

_____

---

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5193

State of __California__

County of __San Bernardino__

On __5/13/93__ before me, __Susan J. Atkinson, Notary Public__
DATE                         NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared __Jack H. Brown and Walter F. Ford__
                    NAME(S) OF SIGNER(S)

[X] personally known to me - OR - [ ] proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are
subscribed to the within instrument and ac-
knowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s),
or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[Notary seal:
SUSAN J. ATKINSON
COMM. #955661
Notary Public-California
SAN BERNARDINO COUNTY
My comm. expires FEB 09,1996]

_Susan J. Atkinson_
SIGNATURE OF NOTARY

**OPTIONAL SECTION**

**CAPACITY CLAIMED BY SIGNER**
Though statute does not require the Notary to
fill in the data below, doing so may prove
invaluable to persons relying on the document.

[ ] INDIVIDUAL
[X] CORPORATE OFFICER(S)
Chairman, President & CEO
V.P. Real Estate
                    TITLE(S)
[ ] PARTNER(S)  [ ] LIMITED
                [ ] GENERAL
[ ] ATTORNEY-IN-FACT
[ ] TRUSTEE(S)
[ ] GUARDIAN/CONSERVATOR
[ ] OTHER: _____
_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

Stater Bros. Markets
A California Corporation

**OPTIONAL SECTION**

THIS CERTIFICATE MUST BE ATTACHED TO
THE DOCUMENT DESCRIBED AT RIGHT:

Though the data requested here is not required by law,
it could prevent fraudulent reattachment of this form.

TITLE OR TYPE OF DOCUMENT __Lease with Pic "N" Save (Old #43)__

NUMBER OF PAGES __9__ DATE OF DOCUMENT __Undated__

SIGNER(S) OTHER THAN NAMED ABOVE __Patricia Wehner, V.P. PNS__

©1992 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

#4274

## LEASE EXTENSION AND MODIFICATION AGREEMENT

This Lease Extension and Modification Agreement is made and entered into this *13th* day of _March_, 2003, by and between Stater Bros. Markets, a California corporation ("Landlord"), with its business address at 21700 Barton Road, Colton, CA  92324 and PNS Stores, Inc., a California corporation ("Tenant"), with its business address at 300 Phillipi Road, P.O. Box 28512, Department 10051, Columbus, OH 43228-5311.

**WHEREAS**, Landlord and Tenant entered into a Lease dated May 11, 1993, as amended (collectively, the "Lease") for the premises located at 155 E. Baseline Avenue, in the City of Rialto, State of California more particularly described in the Lease.

**WHEREAS**, Landlord and Tenant mutually desire to provide for certain additions and modifications to the terms and provisions of said Lease.

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.   Landlord and Tenant hereby agree to extend the term of the Lease through and including 7/31/2010 pursuant to the terms herein:

| Extended Term: | Monthly Minimum Rent: |
|---|---|
| 7/27/2003 – 7/31/2005 | $10,557.50 |
| 8/1/2005 – 7/31/2010 | $11,330.00 |

2.   Tenant shall retain its remaining four (4), five (5) year options to extend pursuant to the terms herein:

| Option Term: | Monthly Minimum Rent: |
|---|---|
| 8/1/2010 – 7/31/2015 | $12,360.00 |
| 8/1/2015 – 7/31/2020 | $13,647.00 |
| 8/1/2020 – 7/31/2025 | $14,935.00 |
| 8/1/2025 – 7/31/2030 | $16,480.00 |

Except as herein amended and modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Lease Extension and Modification Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Lease Extension and Modification Agreement, the terms and provisions of this Lease Extension and Modification Agreement shall control.

This Lease Extension and Modification Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Lease Extension and Modification Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Lease Extension and Modification Agreement to be executed as of the date first written above.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

_____

_____

_____

_____

**LANDLORD:**
**STATER BROS. MARKETS, a California corporation**

By: _____
Jack H. Brown
Chairman of the Board, President
and Chief Executive Officer

By: _____  3.12.03
Walter F. Ford
Vice President Real Estate

Witnesses as to Tenant:

_____
Andrew J. Turner

_____
Richard St Lowe

**TENANT:**
**PNS STORES, INC., a California corporation**

By: _____
Kathleen Hupper
Its: Vice President

**STATE OF CALIFORNIA**
**COUNTY OF** ___San Bernardino___

On _March 18, 2003_, before me, _Marilyn Ryan_____, Notary Public,
personally appeared ___**Jack H. Brown**___
_____Chairman of the Board, President and Chief Executive Officer_____ personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS** my hand and official seal.

_Marilyn Ryan_____
(Notary)   Marilyn Ryan

```
MARILYN RYAN
Commission # 1240547
Notary Public - California
San Bernardino County
My Comm. Expires Nov 2, 2003
```

**STATE OF CALIFORNIA**
**COUNTY OF** ___San Bernardino___

On _March 13, 2003_, before me, _Marilyn Ryan_____, Notary Public,
personally appeared ___**Walter F. Ford**___
_____Vice President Real Estate_____
_personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS** my hand and official seal.

_Marilyn Ryan_____
(Notary)   Marilyn Ryan

```
MARILYN RYAN
Commission # 1240547
Notary Public - California
San Bernardino County
My Comm. Expires Nov 2, 2003
```

STATE OF _____

County of _____

     Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _____, by _____, its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

     **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at _____, this ____day of _____, 2003.

                                  _____
                                  Notary Public

STATE OF _____

County of _____

     Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _____, by _____, its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

     **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at _____, this ____day of _____, 2003.

                                  _____
                                  Notary Public

STATE OF OHIO        )
                        )
County of  Franklin     )

     Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc., a California corporation,** by Kathleen Hupper, its **Vice President,** who acknowledged that she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of her personally and of said officer.

     **IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this _26th_ day of _FEBRUARY_____, 2003.

                          _____
                          Notary Public
                          ANDREA L. TURNER
                          Notary Public, State of Ohio
                          My Commission Expires _12/10/2006_



300 PHILLIPI ROAD
COLUMBUS, OHIO 43228-5311

March 1, 2010

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
#7008 1830 0003 9688 9143

MAR - 4 2010

STATER BROS. MARKETS
ATTN: CHRISTINA PRICE
P.O. BOX 150
SAN BERNARDINO, CA  92402

Re:     **BL #4274 – Rialto, CA**
        Lease by and between Stater Bros. Markets, a California corporation ("Landlord")
        and PNS Stores, Inc., a California corporation, doing business as Big Lots
        ("Tenant") dated May 11, 1993, as amended (collectively, the "Lease")

Dear Landlord:

Pursuant to the above referenced Lease, Tenant hereby exercises its option to extend the term of the
Lease from August 1, 2010 through July 31, 2015 ("first five-year option period").  Rental will be
One Hundred Forty-Eight Thousand Three Hundred Twenty and 00/100 Dollars ($148,320.00) per
annum, payable in equal monthly installments of Twelve Thousand Three Hundred Sixty and
00/100 Dollars ($12,360.00).

**PNS STORES, INC.**, a California corporation

Kevin Day
Vice President

KD/alt

# TENANT ESTOPPEL CERTIFICATE

October 1, 2012

Stater Bros. Markets, a California corporation

RE:    Big Lots store #4274
       Rialto, California

Ladies and Gentlemen:

The undersigned, as Tenant currently occupying the Demised Premises, under that certain Lease dated May 11, 1993, made with Stater Bros. Markets, a California corporation, as Landlord, hereby ratifies the said Lease, currently in full force and effect, and certifies that:

1.     The term of the Lease commenced on July 27, 1993, and expires on July 31, 2015.

2.     Monthly minimum rent under the Lease in the amount of $12,360.00 has been paid for the month ending October, 2012. All additional rent payable under the terms of the Lease have been paid through October, 2012.

3.     Said Lease is in full force and effect and has not been modified, supplemented or amended in any way, except as noted below, and to Tenant's knowledge and belief as of the date hereof, neither party thereto is in default thereunder beyond any applicable notice and/or cure period and the same represents the entire agreement between the parties as to this leasing.

       Renewal Letter – March 1, 2010
       Lease Extension and Modification Agreement – March 13, 2003
       Consent Letter – October 20, 1998
       Memorandum of Lease – May 13, 1993

4.     To Tenant's knowledge and belief as of the date hereof, any conditions under said Lease to be performed by the Landlord that are conditions precedent to the commencement of the Term thereof have been satisfied.

5.     Any required contribution by Landlord to Tenant on account of Tenant's improvements made at the commencement of the Term have been received.

Tenant Estoppel Certificate
Page 2

6.  To Tenant's knowledge and belief as of the date hereof, there are no known existing defenses or offsets that the Tenant has against the enforcement of the Lease by the Landlord.

7.  No rental has been paid in advance except as provided in the Lease. Tenant has deposited no security with the Landlord.

8.  The operation and use of the premises will not involve the generation, treatment, storage, disposal or release of a hazardous substance or a solid waste into the environment in violation of law and the premises will be operated in accordance with all applicable environmental laws, zoning ordinances and building codes.

Very truly yours,

**PNS STORES, INC.**, a California corporation,
doing business as Big Lots

By:  _____
     Kevin Day
     Vice President

<u>ASSIGNMENT OF LEASE</u>

This Assignment of Lease ("Assignment") is made in San Bernardino County, California on ⎣NOV 21⎦, 2012 by and between Stater Bros. Markets, a California corporation ("Assignor"), and Cottonwood Meadow Properties, L.P., a California limited partnership ("Assignee"), who agree as follows:

1.    This Assignment is made with reference to the following facts:

(A)    Assignor is the landlord under that lease entered into by and between Assignor and PNS Stores, Inc., a California corporation (the "Tenant"), dated May 11, 1993 (the "PNS Lease").

(B)    Pursuant to the PNS Lease, Assignor leased to the Tenant the retail building of approximately 25,700 square feet of ground area located at 155 East Baseline Road, City of Rialto, in the County of San Bernardino, State of California.

(C)    Assignor desires to assign all of its right, title and interest as landlord in the PNS Lease to Assignee.

2.    For value received, Assignor hereby assigns to Assignee all of Assignor's right, title and interest as landlord in the PNS Lease, and Assignee accepts the assignment and assumes and agrees to perform, as a direct obligation to the Tenant, all the obligations of Assignor as landlord under the PNS Lease, which obligations arise after the effective date of this Assignment.

3.    Assignee shall and does indemnify and hold harmless Assignor and all employees, partners, subsidiaries, parents, affiliates, shareholders, officers, directors, attorneys, assignees, transferees and affiliates of Assignor against all liability, claims, actions or demands against them or any of them arising out of or in any way connected with the landlord's obligations under the PNS Lease, which obligations arise after the effective date of this Assignment.

4.    Assignor shall and does indemnify and hold harmless Assignee and all employees, partners, general partners, limited partners, subsidiaries, parents, affiliates, shareholders, officers, directors, members, managers, attorneys, assignees and transferees of Assignee against all liability, claims, actions or demands against them or any of them arising out of or in any way connected with the landlord's obligations under the PNS Lease, which obligations arise before the effective date of this Assignment.

5.    In any action between the parties to enforce any of the terms or provisions of this Assignment, the prevailing party in the action shall be entitled, in addition to damages, to injunctive relief or other relief, to its reasonable costs and expenses, including, without limitation, court costs and reasonable attorneys' fees.

[Signatures on Next Page]

1

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment on the date first written above.

ASSIGNOR:

STATER BROS. MARKETS,
a California corporation

By: _____

Its: James W. Lee
President and Chief Operating
Officer

By: _____

Its: David J. Harris
Senior Vice President – Finance
and Chief Financial Officer

ASSIGNEE:

COTTONWOOD MEADOW PROPERTIES,
L.P., a California limited partnership

By: Chesterfield Commons, LLC,
a California limited liability company
Its: General Partner

By: _____
Jack Nourafshan, Manager

2



4900 EAST DUBLIN GRANVILLE ROAD
COLUMBUS, OHIO  43081-7651

March 9, 2020

**VIA FEDEX**

Cottonwood Meadow Properties, LP
c/o Reliable Properties
6399 Wilshire Blvd.
Suite 604
Los Angeles, CA 90048

> Re:  **BIG LOTS #4274 – Rialto, CA**
> Lease Agreement by and between Cottonwood Meadow Properties, LP, c/o Reliable Properties
> (Landlord), and PNS Stores, Inc., a California corporation ("Tenant") dated May 11, 1993 (the
> "Lease").

Dear Landlord:

Pursuant to the Lease Agreement, Tenant hereby exercises its option to extend the term of the Lease commencing
August 1, 2020 and expiring on July 31, 2025 ("Third Five-Year Option Period"). Minimum Rent will be One
Hundred Seventy-Nine Thousand Two Hundred Twenty and 00/100 Dollars ($179,220.00) per annum, payable in
equal monthly installments of Fourteen Thousand Nine Hundred Thirty-Five and 00/100 Dollars ($14,935.00).

Thank you.


**PNS Stores, Inc., a California corporation**


Jonathan Ramsden
Executive Vice President
Chief Financial & Administrative Officer


JR/smm

Electronic Proof of Claim Confirmation:  3735-1-KTRTD-382174458

Claim Electronically Submitted on (UTC) :  2025-01-31T22:11:16.208Z

Submitted by:  Cottonwood Meadow Properties, LP
jgolden@go2.law

**KROLL**