# DEBTORS' EXHIBIT 1

| | Wind Down Budget As of 12/21 | Downside Wind Down Budget As of 12/21 | APA Schedule |
|---|---|---|---|
| **GOB Sale Proceeds** | | | |
| Inventory[1] | 501,197 | 501,197 | |
| GOLV | 125.0% | 120.0% | |
| **Net Proceeds** | $    626,497 | $    601,437 | |
| | | | |
| Ending Cash Balance (12/21/24) | 15,198 | 15,198 | |
| | | | |
| **Inflows** | | | |
| GOB Retail Proceeds | 626,497 | 601,437 | |
| Net Proceeds - Ongoing GOB Waves | 9,419 | 9,419 | |
| Net Proceeds - In Transit Inventory | 18,667 | 18,667 | |
| Lease Sale Proceeds | 40,250 | 40,250 | |
| Sales Tax Proceeds | 40,584 | 39,030 | |
| Building Sale Proceeds | 34,500 | 34,500 | 24,500 |
| Outstanding Credit Card Receivables | 7,109 | 7,109 | |
| FF&E/M&E Receipts | 7,345 | 7,345 | |
| Real Property Sale Proceeds | 9,494 | 9,494 | |
| Intellectual Property Sale Proceeds | 6,500 | 6,500 | |
| Worldpay Reserve | 6,000 | 6,000 | |
| Outstanding Litigation | 5,000 | 5,000 | 3,000 |
| Sublease Receipts | 1,200 | 1,200 | |
| APA Admin Budget | | | 42,391 |
| APA Wind Down Budget | | | 125,000 |
| State Income Tax Refund | 6,000 | 6,000 | 6,000 |
| Variety Severance Mitigation | | | 5,712 |
| Stub Rent | | | 17,000 |
| Pro Fee Escrow | | | 7,500 |
| Other Proceeds | 818,566 | 791,952 | 231,103 |
| | | | |
| **Total Inflows and Opening Cash** | $    833,763 | $    807,150 | $    231,103 |
| | | | |
| **Outflows** | | | |
| *Payroll* | | | |
| HQ | 8,457 | 8,457 | 4,240 |
| HQ Severance | 6,600 | 6,600 | 6,600 |
| DCs | 11,917 | 11,917 | 9,534 |
| Stores | 89,345 | 89,345 | |
| Store Severance | 28,559 | 28,559 | 28,559 |
| *Rent and Occupancy Costs* | | | |
| DC & Store Rent | 64,050 | 64,050 | |
| Stub Rent | 17,000 | 17,000 | 17,000 |
| IT Disbursements | 8,859 | 8,859 | 3,813 |
| Outbound Freight Disbursements | 8,871 | 8,871 | 2,773 |
| Utilities Disbursements | 19,840 | 19,840 | 17,142 |
| Store Operating Expense Disbursements | 13,434 | 13,434 | – |
| Insurance Disbursements | 4,900 | 4,900 | 2,400 |
| 401(k) Employee Contributions | 1,800 | 1,800 | 1,800 |
| Credit Card Fees | 8,017 | 8,017 | |
| Bank Fees | 461 | 461 | |
| Other Expenses | 3,788 | 3,788 | 2,488 |
| **Less: Winddown Expenses** | $    295,898 | $    295,898 | $    96,349 |
| | | | |
| **VARIABLE OPERATING EXPENSES** | | | |
| HQ Severance | 3,493 | 3,493 | 3,493 |
| DC Severance | 4,767 | 4,767 | 4,767 |
| PTO | 5,895 | 5,895 | 5,895 |
| 401(k) Match | 2,695 | 2,695 | 2,695 |
| Q3 Bonus | 2,799 | 2,799 | 2,799 |
| Q4 Bonus | 3,500 | 3,500 | 3,500 |
| IBNR | 11,730 | 11,730 | 10,000 |
| Corporate Winddown | – | | 5,828 |
| Worker's Comp Disbursements | 2,173 | 2,173 | 1,778 |
| Benefits Disbursements | 8,050 | 8,050 | 6,037 |
| Sales Tax Payable | 53,759 | 53,759 | 25,000 |
| Other Tax Payable | 30,528 | 30,528 | 27,793 |
| **Less: Total of Expenses to be Discussed** | $    129,389 | $    129,389 | $    99,586 |
| | | | |
| Other Costs | | | |
| Professional Fees | 28,858 | 28,858 | 13,838 |
| Liquidator Fees | 45,522 | 45,522 | |
| UST Fee | 2,000 | 2,000 | 2,000 |
| Interest | 6,143 | 6,143 | |
| **Less: Other Costs** | $    82,522 | $    82,522 | $    15,838 |
| | | | |
| **Net Cash Available for Distribution** | $    325,954 | $    299,340 | $    19,330 |
| | | | |
| **DIP ABL, DIP FILO and LC Claims** | | | |
| DIP ABL (as of 12/21/24) | 120,749 | 120,749 | |
| DIP FILO (as of 12/21/24) | 134,245 | 134,245 | |
| Cash Collateralization of LCs (as of 12/21/24) | 60,151 | 60,151 | |
| **Total DIP ABL, DIP FILO and LC Claims** | $    315,146 | $    315,146 | |
| | | | |
| **Net Cash Available for Administrative Claims** | $    10,808 | $    (15,805) | |

# META PLATFORM'S EXHIBIT 1

1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE
 2                   Chapter 11
                Case No. 24-11967 (JKS)
 3
        - - - - - - - - - - - - - - - -x
 4    IN RE:  BIG LOTS, INC., et al,

 5            Debtors.
        - - - - - - - - - - - - - - - -x
 6

 7
                 REMOTE DEPOSITION OF:
 8                    KENT PERCY
                 December 30, 2024
 9                   7:00 p.m. ET

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
24    Reported by:  Karen Friedlander, CCR-NJ, NYRCR,
      RDR, CRR
25    Job No.: 8484
```

                                                    2

```
 1    APPEARANCES:

 2   Davis Polk & Wardwell LLP
     BY:  James I. McClammy, Esquire
 3        Matthew R. Brock, Esquire
          Adam Shpeen, Esquire
 4   450 Lexington Avenue
     New York, NY  10017
 5   +1 212 450 4584
     James.mcclammy@davispolk.com
 6   Counsel for the Debtors

 7   McDermott Will & Emery LLP
     BY:  Joel C. Haims, Esquire
 8        Natalie Rowles, Esquire
          Darren Azman, Esquire
 9   One Vanderbilt Avenue
     New York, NY 10017-3852
10   +1 212 547 5829
     Jhaims@mwe.com
11   Counsel to the Official Committee of
     Unsecured Creditors
12
     Office of the U.S. Trustee
13   BY:  Linda Casey, Esquire
     Caleb Boggs Federal Building
14   844 King Street, Suite 2207
     Wilmington, DE 19801
15   +1 302 573 6539
     Linda.casey@usdoj.gov
16   Counsel for the Trustee

17   Rogers Law Offices
     BY:  Beth Rogers, Esquire
18   River Ridge
     9040 Roswell Road, Suite 205
19   Atlanta, GA 30350
     +1 770 685 6320
20   Brogers@berlawoffice.com
     Counsel for Simmons Bedding Company
21
```

```
       Phelps Dunbar LLP
22     BY:  Danielle Mashburn-Myrick, Esquire
       101 Dauphin Street, Suite 1000
23     Mobile, AL 36602
       +1 251 441 8202
24     Danielle.mashburn-myrick@phelps.com
       Counsel for Peak Living, Delta Furniture
25     Manufacturing, Infinite Furniture Supply and Hello
       Sofa
```

3

```
 1     APPEARANCES CONTINUED:

 2     Maynard Nexsen
       BY:  Evan N. Parrott, Esquire
 3     11 North Water Street
       RSA Battle House Tower, Suite 24290
 4     Mobile, AL  36602
       +1 251 206 7449
 5     Eparrott@MaynardNexsen.com
       Counsel for Fusion Furniture
 6
       Polsinelli PC
 7     BY:  Shanti M. Katona, Esquire
            Elisa Hyder, Esquire
 8     222 Delaware Avenue, Suite 1101
       Wilmington, DE 19801
 9     +1 302 252 0924
       Skatona@polsinelli.com
10     Counsel for Hogan Transport

11     Covington & Burling LLP
       BY: Jorge A. Garcia, Esquire
12     The New York Times Building
       620 Eighth Avenue
13     New York, NY 10018-1405
       +1 212 841 1034
14     Jagarcia@cov.com

15     Otterbourg P.C.
       BY:  James V. Drew, Esquire
16     230 Park Avenue
       New York, NY  10169-0075
17     +1 212 905 3665
       Jdrew@otterbourg.com
18     Counsel for 1903P Loan Agent
```

```
19  Choate Hall & Stewart LLP
    BY:  Mark Edgarton, Esquire
20  Two International Place
    Boston, MA  02110
21  +1 617 248 5101
    Medgarton@choate.com
22  Counsel for PNC Bank, N.A.

23

24

25
```

4

```
 1  APPEARANCES CONTINUED:

 2  Blank Rome
    BY:  Stanley B. Tarr, Esquire
 3  1201 N. Market Street
    Suite 800
 4  Wilmington, DE 19801
    +1 302 425 6400
 5  Counsel for Ollie's Bargain Outlet

 6  Arentfox Schiff
    BY:  George A. Angelich, Esquire
 7  1301 Avenue of the Americas
    42nd Floor
 8  New York, NJ  10019
    +1 212 457 5423
 9  George.angelich@afslaw.com
    Counsel for Meta Platforms
10
    Gibbons Law
11  BY:  Mark Conlan, Esquire
    One Gateway
12  Newark, NJ 07102
    +1 212 613 2000
13  Mconlan@gibbonslaw.com
    Counsel for Round Tripping Limited
14
    McCarter & English
15  BY:  Shannon Dougherty Humiston, Esquire
    Wilmington, DE
16  +1 302 984 6344
    Shumiston@mccarter.com
```

17   Counsel for Mielli

18   Morris Nichols
     BY:  Casey Sawyer, Esquire
19   1201 North Market Street
     Wilmington, DE 19899-1347
20   +1 302 351 9182
     Csawyer@morrisnichols.com
21

22

23

24

25

                                                        5

1                        I N D E X

2    Examinations                              Page

3

4    KENT PERCY                                  6

5    BY MS. MASHBURN-MYRICK:                     8

6    BY MS. ROGERS:                             37

7    BY MR. ANGELICH:                           72

8    BY MR. PARROTT:                            95

9    BY MS. CASEY:                              97

10   BY MR. CONLAN:                            115

11   BY MS. KATONA:                            117

12   BY MS. HUMISTON                           119

13

14

```
15                    E X H I B I T S

16   No.      Description                    Page

17

18              - No exhibits marked -

19

20

21

22

23

24

25
```

6

```
 1                    (KENT PERCY, having been duly

 2   sworn as a witness, testified as follows:)

 3                    MR. McCLAMMY:  Before we start,

 4   this is Jim McClammy from Davis Polk on behalf

 5   of the debtors and the witness, just for the

 6   record.  In the room with Mr. Percy is also Adam

 7   Shpeen, S-H-P-E-E-N.  There's no one else in the

 8   room with us.

 9                    (Audio distortion.)

10                    MR. McCLAMMY:  I was saying --

11   all right.  I was just saying, for the record,

12   in the room with the witness, in addition to
```

13      myself, is Adam Shpeen, also with Davis Polk.

14      Last name is S-H-P-E-E-N.

15                      And then prior to the deposition

16      starting, I was asked if I might be able to

17      provide the witness with a copy of his

18      declaration, the Exhibit F and G to the sale

19      motion, and the 12-26-24 notice of filing of

20      budget, that were referenced in some of the

21      emails earlier.

22                      I do have completely clean copies

23      here with me in the room.  I can represent that

24      they are completely clean copies and they are

25      the as-filed versions that have the docket

7

1      numbers requested on them from the ECF filing.

2                      Unless anyone has any objection,

3      I'm happy to have these placed in front of the

4      witness to make it a little bit easier for him

5      to see those documents, as we go forward this

6      evening.

7                      MS. ROGERS:  We're going to put

8      it on the screen, too.  We can't see the witness

9      or anybody, currently.

10                      MR. AZMAN:  Yeah.  It's Darren, I

11     think that you'll need to pin the Zoom link that

12     you have open there.  Somehow, whoever is

13     hosting, will have to post that because

14     otherwise it won't pick up the audio since you

15     are using the cell phone.

16                         MR. McCLAMMY:  So I can see us on

17     the screen, so I think that's right.  So I think

18     if you, if you pin the box for Morris Nichols,

19     where the witness and I are.

20                         MS. ROGERS:  Okay.  I see you

21     now.

22                         MR. McCLAMMY:  Okay.  With that,

23     we're ready to proceed.

24                         MS. MASHBURN-MYRICK:  Well, this

25     is Danielle Mashburn-Myrick.  D-A-N-I-E-L-L-E,

8

1      M-A-S-H-B-U-R-N, hyphen, Myrick, M-Y-R-I-C-K.

2                          I represent Peak Living, Delta

3      Furniture Manufacturing, Infinite Furniture

4      Supply and Hello Sofa in these cases.

5                          All four of our clients are

6      postpetition administrative plaintiffs, and if

7      others are -- if it's acceptable to others, I

8      would like to ask some questions.

9    EXAMINATION

10   BY MS. MASHBURN-MYRICK:

11           Q.      Okay.  Mr. Percy, I've reviewed

12   your declaration and my questions generally

13   pertain to your declaration statements made

14   there.  You might find it helpful to have that

15   in front of you.

16                   I'm going to ask my colleague,

17   Jorge Garcia, to put your declaration on the

18   screen, too, so that others who are

19   participating can view it.

20                   MR. GARCIA:  Is my screen

21   sharing, can everybody see it?

22                   MS. MASHBURN-MYRICK:  I'm able to

23   see it.

24   BY MS. MASHBURN-MYRICK:

25           Q.      So, Mr. Percy, would you state

9

1    your name for the record?

2            A.      Kent Percy.

3            Q.      Okay.  And, Mr. Percy, can you

4    tell us generally what your role has been in the

5    case's prepetition during the case and then now?

6            A.      We were retained by Big Lots to

7      help -- prior to the Chapter 11 process, we were

8      originally brought in to help with cash flow

9      forecasting and then we migrated to the

10     preparation for Chapter 11, including the

11     first-day motions, and we have been advising the

12     company as a financial advisor through today.

13              Q.      Thank you.

14                      Did the debtors, and I'm thinking

15     now early in the case, from the petition date,

16     those first couple weeks, did the debtors

17     perform administrative solvency analyses during

18     that time?

19                      MS. ROGERS:  Danielle, was the

20     witness sworn?

21                      MS. MASHBURN-MYRICK:  I thought

22     so.

23                      MS. ROGERS:  I don't think so.

24                      THE REPORTER:  Yes, the witness

25     was sworn.

                                                       10

1                       MR. McCLAMMY:  The court reporter

2      can confirm.

3                       (Off the record.)

4      BY MS. MASHBURN-MYRICK:

5          Q.      Mr. Percy, early in cases, from

6   the petition date and those first couple weeks,

7   did the debtor perform administrative solvency

8   analyses?

9          A.      We did not.

10          Q.      When did the debtor first perform

11   an administrative solvency analysis?

12          A.      We had not done an administrative

13   solvency analysis.

14          Q.      Why not?

15          A.      We were operating under a

16   stalking horse purchase agreement.  We were

17   continuing to pay our obligations in full, for

18   all postpetition activities, and we were

19   pursuing a transaction with Nexus as the outcome

20   there, and we did not deem it necessary.

21          Q.      I see.

22                  About the sale to Nexus, were you

23   and your team responsible for conducting

24   diligence from the seller side on that

25   transaction prepetition?

                                                    11

1          A.      We assisted with a significant

2   amount of due diligence, yes.

3        Q.       Okay.  And what did the debtors

4    do to satisfy themselves that Nexus had the

5    financial wherewithal to close the sale of this

6    proposed?

7        A.       Nexus is a buyer that has a

8    private equity fund that has participated in

9    many acquisitions.

10                 The investment bank that was

11   retained by the debtor is thoroughly --

12   thoroughly vetted them and did their own

13   analysis to their financial wherewithal.

14       Q.       Okay.  And what were the results

15   of that?

16       A.       That they had sufficient capital

17   and were in the process of securing capital to

18   close the transaction and they were comfortable

19   that they had the financial wherewithal to

20   proceed and complete the sale.

21       Q.       Thank you.

22                 From your declaration, I

23   understand that the Nexus APA had, in section

24   9.06, a minimum asset value condition to

25   closing.

1                    Are you familiar with that?

2          A.        I am.

3          Q.        Okay.  And did the debtors

4    analyze whether that condition could be met

5    before the petition was filed?

6          A.        We did.

7          Q.        And what was the --

8          A.        And it was -- it was our opinion

9    that based upon the inventory and assets that

10   were needed to run the business and a buildup of

11   inventory on a postpetition basis, that the

12   company could be in position to satisfy the

13   minimum assets test.

14         Q.        What changed?

15         A.        The debtor was not able to get

16   inventory in certain categories, most notably

17   consumables, which would be things like food,

18   paper plates, groc- -- garbage bags, things that

19   turn over relatively quickly, they were not able

20   to get terms with those vendors so they were not

21   able to get the level of inventory that was

22   necessary.

23                   We discussed this with Nexus and

24   the determination was made that we were not

25   going to just buy alternative inventory to meet

1   the numerical test.  That we informed Nexus that

2   the inventory levels were not going to meet the

3   tests, and they were comfortable with that,

4   however, they determined that they were not

5   going to change the level of detached or the

6   covenants.

7            Q.     Tell us about the efforts the

8   debtors made to secure the inventory you're

9   telling us the debtors ultimately were unable to

10  secure?

11           A.     There were significant

12  negotiations with vendors to procure this type

13  of inventory.  A certain level of the inventory

14  was achieved, however, it was not in full

15  satisfaction of the level of fulfilment that the

16  stores would have preferred, and so there was a

17  deficiency in the total inventory and a fully

18  and stocked store and distribution centers.

19           Q.     How many vendors were you unable

20  to reach terms with?  What's the universe of

21  people you're talking about that the debtor was

22  unable to buy product from?

23           A.     It's probably in excess of a

24    hundred.

25              Q.       Did you reach out to any of those

1    vendors prepetition to talk to them about the

2    debtors' plans and the sale transaction that

3    might be proposed to secure some of that

4    cooperation before launching into this case?

5              A.       No.  We did not have any

6    conversations with our vendors about our plans

7    to file for bankruptcy prior to the Chapter 11

8    file.

9              Q.       So did -- so the debtors, the

10    stalking horse bid, as I understand you to be

11    saying, was premised on the idea that these

12    vendors would continue doing business with the

13    debtor postpetition, and that premise turned out

14    to be faulty.  Is that correct?

15              A.       These vendors did continue to do

16    business, however, they did not provide terms.

17    So we were not able to procure as much inventory

18    as we wanted to based upon the liquidity

19    position of the debtor.

20              Q.       Okay.  Okay.  So let me restate

21    that then.

22                      The stalking horse agreement and

23    the cases generally were premised on the idea

24    that the debtor would be able to reach specific

25    terms with vendors that it hadn't prenegotiated

                                                                15

1    or arranged; is that correct?

2            A.       That is correct.

3            Q.       Okay.  And what did the debtor

4    base its confidence that it would be able to

5    reach terms with those hundred-plus vendors that

6    would be satisfactory to the debtor and allow

7    the debtor to meet the minimum asset covenant in

8    the stalking horse agreement?

9            A.       The level of terms was actually

10    relatively low, however, most of the vendors

11    required cash in advance.  So instead of being

12    able to get even two week or four-week terms,

13    which were relatively modest, most of these

14    vendors required cash in advance for this

15    inventory.

16                      So it was a significant

17    difference even just based upon a couple of the

18    weeks.

19            Q.       How early in the cases did the

20    debtor know that it was not getting the terms it

21    needed from a significant number of its vendors

22    in order to meet the minimum asset covenant in

23    the sales agreement?

24         A.    I mean, probably, I would say,

25    about a month in, we became aware that there was

16

1    a significant hill to climb to achieve this

2    level of inventory.

3         Q.    Thank you.

4              How much inventory did the

5    debtors order from other vendors who were

6    selling to the debtors after it knew it wasn't

7    getting the terms it needed from a significant

8    number of vendors in order to meet the minimum

9    asset required and close the sale?

10         A.    I don't recall the exact dollar

11    figure, but I will tell you that we did not

12    order excess inventory from vendors just to fill

13    the numerical.

14              We ordered the level of inventory

15    by category that we felt was in alignment with

16    what these stores would sell.

17              So we didn't, for instance, buy

18    twice as much furniture as we needed because we

19    could get terms with our furniture vendors.  We

20    bought the applicable amount of furniture and

21    were deficient in areas such as consumables.

22          Q.      Thank you.

23                  In your declaration, I believe,

24    at paragraph 10, you mentioned that that Nexus

25    informed the debtors on December 1st that it was

17

1    going to require additional time to close the

2    transaction.

3                  Were you familiar with those

4    statements that you made?

5          A.      Yes.

6                  MR. McCLAMMY:  Actually, hold on,

7    before we -- before you answer, I think someone

8    on the line are experiencing feedback.  I don't

9    know if everybody has their computers on and

10    their phones on mute, but if you're -- if you're

11    not actively speaking, if you could be on mute,

12    please.

13                  MS. MASHBURN-MYRICK:  Thank you

14    for that.

15    BY MS. MASHBURN-MYRICK:

16          Q.      Going back to the December 1st

17   date in paragraph 10 of your declaration, after

18   the debtors received notice that Nexus was

19   wanting to push the closing date back, did the

20   debtors continue ordering product from vendors

21   who were selling to it?

22          A.      We were anticipating that the

23   closing, which was originally anticipated for

24   December 2nd or 3rd, was going to close on

25   November -- I'm sorry, December 9th or 10th.  So

18

1    we were interested in only a one-week delay.  So

2    we continued business as usual.

3           Q.      And then you go on to say that on

4    December 5th, you received the letter from Nexus

5    saying that the debtors minimum asset value

6    closing condition was not going to be satisfied.

7    And that they were exploring other paths but at

8    that point you had significant -- they had

9    significant capital needs and were indicating

10   that the sale was not likely to close.

11               Is that correct?

12          A.      That is not my interpretation.

13   My interpretation is that they felt like between

14    our -- between the debtors identification of

15    additional savings, and the discussion with

16    other --

17                    (Interruption.)

18                    (Court reporter seeks

19    clarification.)

20                    THE WITNESS:  I'm sorry, can you

21    repeat the question again?  I'm sorry.

22                    MS. MASHBURN-MYRICK:  Yes.  All

23    right.  Let me also point out, there's a phone

24    number (302)351-9577, is that the conference

25    room number?

                                                    19

1                     MR. SHPEEN:  Yes.

2                     MS. MASHBURN-MYRICK:  Okay.

3                     A VOICE:  (978) 273-5662 also in

4    that conference room?  Because it seems to be

5    connected to that feedback loop, that phone

6    number.

7                     (Discussion off the record.)

8    BY MS. MASHBURN-MYRICK:

9         Q.      Sorry.  Mr. Percy, going back to

10    paragraph 10 of your declaration, I understand

11    you to be saying that in the December 5th letter

12    sent by Nexus to the debtor, that Nexus

13    expressed to the debtor that they were still

14    put, "exploring whether there is a path to

15    close," and they you cautioned that there was

16    now significant capital need.

17              So at this point, on

18    December 5th, the debtor was aware that the

19    transaction with Nexus was in serious doubt,

20    correct?

21        A.      It was in doubt.  I don't know

22    that I would use the word "serious."

23        Q.      Okay.  Did the debtors continue

24    ordering the product after receiving this

25    December 5th letter?

                                              20

1         A.      We did.

2         Q.      And in dollar figures, how

3    many -- how much product was ordered after the

4    December 5th letter was received?

5         A.      I don't have that information

6    available.

7         Q.      Thank you.

8              Upon receipt of the December 5th

9    letter, did the debtors conduct a solvency -- an

10      administrative solvency analysis at that point?

11           A.      We did not.

12           Q.      Why not?

13           A.      We anticipated that the

14      transaction was still going to close.  We were

15      -- we were proceeding with the request that

16      Nexus had in the December 5th letter, which was

17      to identify additional savings.

18                   We also worked with their

19      prospective lenders, as well as other parties

20      that were looking to provide additional

21      liquidity to close the transaction and still

22      anticipated that the transaction would close.

23                        (Court reporter seeks

24      clarification.)

25                        THE WITNESS:  And still

                                                          21

1      anticipated that the transaction would close.

2                        (Interruption.)

3                        MR. McCLAMMY:  Listen, I

4      understand that we are on Zoom and we are doing

5      this all remotely, but people have to know that

6      your chat can be seen by everyone and it is not

7      a private conversation.  It's inappropriate for

8    those kinds of things to be happening during the

9    course of this deposition.  I don't understand

10   why that's happening.

11                      I think most people here know

12   what deposition protocol is and it's no

13   different because this is happening over Zoom

14   than if we were all in person.  You wouldn't be

15   saying these things aloud on the record.

16                      But to the extent that these

17   things are in the chat, I would ask that the

18   court reporter make the chat part of the public

19   record, and that everyone who has put these

20   things in has their name attached to the

21   statements that are being made in the chat room

22   during this deposition, as if they were being

23   said aloud in the deposition room.

24                      I'm sorry for the interruption.

25   If you wouldn't mind either asking again or

                                                    22

1    asking the court reporter to restate your

2    question.

3                      MS. MASHBURN-MYRICK:  Yes,

4    actually, could you read back where we were.

5                      (Pertinent portion of the record

6        is read back.)

7    BY MS. MASHBURN-MYRICK:

8            Q.        Okay.  Does the estate have

9    claims against Nexus for the failure of Nexus to

10   close the sale?

11           A.        I have not been party to those

12   conversations.  I'm not sure.

13           Q.        How were potential estate claims

14   against Nexus being handled pursuant to the

15   sale?

16           A.        I do not -- I'm not aware of any

17   claims against Nexus that are being pursued at

18   this point pursuant to the sale.

19           Q.        So the -- any potential claims

20   against Nexus are not part of the consideration

21   being paid in connection with the proposed sale

22   to Gordon Brothers; is that correct?

23                     MR. McCLAMMY:  Objection to form.

24   BY MS. MASHBURN-MYRICK:

25           Q.        Did you understand the question?

                                                    23


1                     MR. McCLAMMY:  You can answer to

2    the extent that you know.

3                     THE WITNESS:  Not to my

 4      knowledge.

 5      BY MS. MASHBURN-MYRICK:

 6              Q.      Okay.  In paragraph 16, of your

 7      deposition -- or apologies -- in paragraph 16 of

 8      your declaration, you say that Gordon Brothers

 9      did provide, quote, provides, greater certainty

10      with respect to the debtors' ability to satisfy

11      administrative and other go-forward freight

12      expense in the Chapter 11 cases.

13                      What exactly does that mean?

14              A.      So GBRP as part of this

15      transaction is paying a specific amount and has

16      specific consideration, including in the asset

17      purchase agreement.

18                      The assets that are identified

19      and that are a part of the estate have some

20      variability in their recovery.  Most notably,

21      the inventory.

22                      So the inventory is now being

23      sold in January post the holiday season.  There

24      are multiple store -- other retailers that are

25      liquidating at this time and there is, for lack

                                                        24

 1      of a better word, not as much confidence in

2      achieving a recovery on this inventory at the

3      level that would have been achieved in November

4      and December when people were buying for the

5      holiday season.

6              Q.      Thank you.

7                      Does the debtor have -- sorry.

8                      MS. ROGERS:  What month did you

9      say the inventory will now be sold?

10                     MR. McCLAMMY:  I'm sorry, I don't

11     know, I don't know who that was, but there's

12     really only one questioner at a time.  So if you

13     are going to ask additional questions, that's

14     great, but otherwise --

15                     MS. ROGERS:  We're taking a

16     deposition with little notice.  I think we can

17     have some leeway here.

18                     Are you instructing the witness

19     not to answer the question?

20                     MR. McCLAMMY:  I'm not

21     instructing the witness not to answer a question

22     that's coming from a questioner.

23                     MS. ROGERS:  This is Beth Rogers

24     for Simmons Bedding.  I did not get what month

25     he said.  He said two different months.  It was

1   confusing.  I'm asking for clarity.

2                   MR. McCLAMMY:  Okay.  To the

3   extent that we can do that this time, that's

4   great, but there's over 40 folks on the Zoom and

5   it would be unworkable to have people

6   interjecting throughout other people's

7   questioning and it's going to interrupt the flow

8   of the questioner.

9                   But, Mr. Percy, to the extent you

10  remember, can you restate those months or do we

11  need to have the court reporter read the answer

12  back?

13                  THE WITNESS:  No, I can restate

14  it.

15                  The recovery that was achieved in

16  November and December would have been higher

17  than what is being achieved and what we're

18  anticipating to be achieved in January or to go

19  forward liquidation of the stores.

20                  Because it is the holiday season,

21  people are out buying, people are out looking

22  for more product, gifts, et cetera, and there

23  are more purchases in the November/December time

24  period for this retailer.

25   BY MS. MASHBURN-MYRICK:

26

1            Q.      Mr. Percy, I understand that Big

2     Lots is deliberate in how it receives inventory

3     it has ordered, and over the last two months,

4     Big Lots has allowed inventory to sit on trucks

5     until it was ready to receive that inventory and

6     trigger the timeline for paying for that

7     inventory.

8                    Can you testify that Big Lots has

9     actually received all of the inventory shipped

10    to it by my clients, Peak Living, Delta

11    Furniture Manufacturing, Independent Furniture

12    Supply, and Hello Sofa, and that the debtors

13    actually have title to all of that inventory

14    now?

15                   MR. McCLAMMY:  Objection to form.

16                   THE WITNESS:  I am not aware,

17    specifically, of the disposition or the receipt

18    for those specific vendors that you discussed.

19    BY MS. MASHBURN-MYRICK:

20           Q.      Thank you.  Going back to

21    paragraph 16 of the deposition, the statement I

22    read to you earlier, what does the greater

23    certainty you mention with respect to the

24    debtors' ability to satisfy administrative and

25    other go-forward claims, what does that mean for

27

1    trade vendors specifically?

2        A.    The higher the recovery during

3    this process achieves a greater amount available

4    to pay admin claims.  And so the greater

5    certainty, the higher recovery, the greater

6    recovery that we're anticipating to be able to

7    payout to admin claims.

8        Q.    How much are you projecting for

9    landlord recoveries under this proposed sale?

10        A.    For stub rent, we're anticipating

11    full recovery.  For rents that will be accrued

12    in January and February where I anticipate

13    paying that in full.

14        Q.    Does that include leases that are

15    rejected?

16        A.    We will pay January and February

17    rent, if we are utilizing the store.  If the

18    lease has been rejected previously, then there

19    will not be any rent payments made to them.

20        Q.    How much are you projecting for

21   professional fee claim recoveries?

22          A.        We are anticipating full recovery

23   for professional fees.

24          Q.        How is the stub rent being

25   funded?

                                                          28

1           A.        The buyer is paying the stub

2    rent.

3           Q.        Is the buyer paying the stub rent

4    in cash at closing?

5           A.        To my knowledge, yes.

6           Q.        Has AlixPartners completed a

7    conversion analysis?

8                     MR. McCLAMMY:  Objection to form.

9    BY MS. MASHBURN-MYRICK:

10          Q.        Mr. Percy, do you understand what

11   I mean when I say "a conversion analysis"?

12          A.        Are you talking about a

13   conversion from a Chapter 11 to a Chapter 7?

14          Q.        Correct.

15          A.        We have not done a formal

16   analysis, no.

17          Q.        But you cannot tell the Court

18   with any certainty that trade creditors are

19   better off under this claim?

20            MR. McCLAMMY:  Objection to form.

21   BY MS. MASHBURN-MYRICK:

22        Q.       Under the sale proposed?

23        A.       Based upon my experience, a

24   conversion to a Chapter 7 would yield

25   significantly less value to the estate, and

29

1    there would not be sufficient funds to pay

2    administrative claims probably anything at all.

3    And so I am anticipating that the recovery --

4    and it is my business knowledge and based upon

5    my experience that the recovery would be

6    significantly less in a Chapter 7 than it would

7    be in a Chapter 11.

8    BY MS. MASHBURN-MYRICK:

9         Q.       Why haven't the debtors performed

10   an actual financial analysis of what recoveries

11   would look like if the case were converted to

12   Chapter 7?

13        A.       We did not deem it necessary.

14            Based upon our experience and the

15   debtor advisors, as well as the lenders, that we

16   all cumulatively, in our conversation, nobody

17      proposed that there would be a greater recovery

18      in Chapter 7.  And in all conversations that I

19      have had personally, there was no anticipation

20      that a Chapter 7 would yield greater value.

21                      So we determined not -- there was

22      no need to do that analysis.

23              Q.      What would -- what is required to

24      perform that analysis?

25              A.      Just the general financial

                                                        30

1       analysis, and we need to do the modeling

2       appropriate.

3               Q.      How long would that take?

4               A.      To do it to the extent that we

5       would want it filed in court?  Probably at least

6       a week.

7               Q.      When did Gordon Brothers first

8       propose this sale transaction again?

9               A.      They proposed a similar

10      transaction very early on in the case, as a

11      competitive bid against Nexus.  They presented a

12      bid somewhat similar to this at the auction, but

13      it was deemed that it was of lower value than

14      the Nexus transaction, so we moved forward with

15    the Nexus transaction.

16         Q.      And did Gordon Brothers again

17    bring this proposal to the debtors around

18    December 15th?

19         A.      It was a little bit earlier than

20    that.  Maybe a week earlier than that when there

21    was some concern about the Nexus deal closing.

22         Q.      December 15th was a Sunday.  A

23    week earlier than that would have been around

24    December 8th.  So on or about -- and I won't

25    hold you to it exactly.

31

1                 On or about December 8th, do I

2     understand you correctly that Gordon Brothers

3     proposed this sale transaction that does not

4     guarantee any payment to trade vendors on post

5     position --

6          A.      It was not a formal proposal, but

7     they started mentioning it and saying that they

8     were available to do this.  So a transaction

9     similar to this.

10         Q.      Okay.  So the debtors have had

11    over three weeks since this transaction, since

12    they started discussing this transaction with

13    Gordon Brothers again, and that's been ample

14    time for the debtors to perform a conversion

15    analysis, correct?

16              MR. McCLAMMY:  Objection to form.

17              THE WITNESS:  We did not

18    determine that a conversion analysis was

19    required.

20    BY MS. MASHBURN-MYRICK:

21         Q.      The debtors are now telling the

22    Court and want the Court to find that trade

23    vendors and others would not do as well in a

24    Chapter 7 liquidation without giving the Court

25    the benefit of an actual financial analysis of

                                                    32

1    what a Chapter 7 liquidation would look like for

2    those constituencies, correct?

3         A.      We had not performed a Chapter 7

4    liquidation analysis.

5         Q.      Why do landlords get special

6    treatment over other administrative claimants in

7    the budget proposed?

8              MR. McCLAMMY:  Objection to form,

9    and objection to the extent it's asking for a

10    legal conclusion.

11                     But to the extent you have an

12      understanding, you could answer.

13                     THE WITNESS:  We are prepared to

14      budget in connection with the -- with GBRP, the

15      expenses that are paid in this budget, according

16      to this transaction, were mutually agreed upon

17      between the debtors and GBRP.

18                     The landlord's expenses were

19      deemed to be recovered or were deemed to be paid

20      for January and February, as well as the stub

21      rents in their asset purchase agreement.

22      BY MS. MASHBURN-MYRICK:

23           Q.       How much is Gordon Brothers

24      paying for the claims it's acquiring, Chapter 5

25      causes of action and other claims?

33

1                      MR. McCLAMMY:  The -- objection

2       to form.  And -- yeah, just objection to form.

3                      THE WITNESS:  The consideration

4       is not detailed on a line-by-line basis.  It is

5       essentially done cumulatively.

6       BY MS. MASHBURN-MYRICK:

7            Q.       Has the debtor valued the

8       preference and other Chapter 5 causes of action

9        the estate has?

10              A.        We have not.

11              Q.        So the debtor cannot tell the

12       Court that it is getting their consideration for

13       transferring those claims, correct?

14                        MR. McCLAMMY:  Objection to form

15       and to the extent it calls for a legal

16       conclusion.

17       BY MS. MASHBURN-MYRICK:

18              Q.        What is your basis for telling

19       the Court that their consideration is being paid

20       for the transfer of those claims if there's been

21       no financial analysis of what those claims might

22       be worth?

23              A.        There is only one viable offer

24       that has been made; that is this offer, so there

25       are no competing bids.  So this is the best and

                                                        34

1        only offer that has been provided.

2               Q.        Do you understand that in a

3        Chapter 7 liquidation, claims might be pursued?

4               A.        I do.

5               Q.        And you are not able to tell the

6        Court what, if any, recovery could be

7       anticipated from those claims, are you?

8             A.       I am not.

9             Q.       Have you considered holding on to

10      the professional fee escrow and the stub rent

11      payments, the cash received under the sale

12      transaction pending further order of the Court?

13            A.       The transaction testified that

14      those would be funded up front, and that is the

15      way that we have presented them, pursued them as

16      part of this transaction.

17            Q.       But has the debtor considered

18      holding those funds for a later time so that the

19      Court can consider a pro rata distribution to

20      all administrative claimants?

21            A.       We have not.

22            Q.       Why not?

23                     MR. McCLAMMY:  Objection to form.

24      And we'll object to the extent that -- we'll

25      just direct you not to disclose privileged

                                                        35

1       communications in connection with your response.

2                      If you have any other basis for

3       answering, you can answer.

4                      THE WITNESS:  The GBRP proposed

5    to pay those up front, and that is the -- that

6    is the way that we instructed the transaction.

7    BY MS. MASHBURN-MYRICK:

8        Q.        Was there a counteroffer made by

9    the debtors?  Did anyone go back to Gordon

10    Brothers and say, this consideration isn't going

11    to you?  We want this money held for a later

12    order of the Court so that other administrative

13    claimants have time to be heard?

14        A.        No one made that counteroffer.

15        Q.        Why didn't the debtors consider

16    that?

17        A.        Because we, as general advisors,

18    determined that this was the best use of funds

19    to administer the estate and pursue the

20    liquidation of the source.

21        Q.        Who prepared the December 26

22    budget that was filed?

23        A.        AlixPartners did it in

24    conjunction with other debtor advisors and

25    managements, as well as in collaboration with

                                                          36

1    the -- the purchaser and their advisor.

2        Q.        Thank you.

```
  3          A.        Advisors.

  4          Q.        Thank you.

  5                    How was it determined how much in

  6    professional fees would be needed?

  7          A.        We did an analysis of

  8    professional fees that have been accrued

  9    throughout the case.  We had conversations with

 10    the professional that will be -- will continue

 11    to provide services, determine the appropriate

 12    amounts, and confirm those with the applicable

 13    professionals.

 14          Q.        Under the -- under the proposed

 15    sale transaction, how much is being paid in --

 16    how much is guaranteed to be paid on

 17    administrative expense claims, including the

 18    professional fees, stub rent, and other

 19    administrative expense claims?

 20          A.        I have not calculated the total

 21    post transaction administrative claims.

 22                    MS. MASHBURN-MYRICK:  Okay.

 23    Those are my questions, and I'll tender the

 24    witness.

 25                    MS. ROGERS:  This is Beth Rogers
```

1    for Simmons Bedding Company.  I'd like to go

2    next, if that's okay.

3                    MR. McCLAMMY:  That's fine from

4    our perspective.  I don't know if anyone else

5    has views on that.

6    EXAMINATION

7    BY MS. ROGERS:

8            Q.      Why didn't the debtor list

9    their -- I think you referred to it as

10   consumable creditors, in its schedules who were

11   getting paid cash in advance prior to the

12   bankruptcy?

13           A.      I'm sorry, can you repeat the

14   question?

15           Q.      Why didn't the debtor list their

16   creditors who provided consumable product or

17   inventory in their schedules?  It's my

18   understanding they were getting paid cash in

19   advance prepetition, and you kind of testified

20   to that.

21           A.      We -- we absolutely requested

22   additional terms.  They were not provided by

23   those vendors.  And so instead of not having the

24   product at all, we paid them in cash in advance

25   because much of this product drives traffic

1   which consumers come into the store for, and

2   without them, the consumers stop coming to the

3   stores altogether.

4           Q.      That wasn't my question.  My

5   question is:  Those consumable

6   vendors/creditors, were not listed in the

7   debtor's schedules.  Why?

8           A.      So what schedule are you talking

9   about specifically?

10          Q.      The list of unsecured creditors,

11  potential preference creditors.  Any part of the

12  debtors' schedules that would be applicable to

13  creditors who were paid within 90 days of the

14  petition date.

15          A.      So there were definitely

16  consumable creditors that were listed in our

17  schedules.

18          Q.      Can you tell me which schedule

19  those are on?

20          A.      I do not have that information in

21  front of me.  No, I cannot.

22          Q.      What is the total amount of

23  payments made to consumable creditors in the 90

24      days before the petition date?

25              A.      I do not have that information

39

1      available.

2              Q.      Were those potential preference

3      claims included in any type of analysis that was

4      done of the total avoidance/preference claims

5      that are out there?

6              A.      We have not done a preference

7      analysis.  To the extent that there were

8      payments, those are listed as applicable.

9              Q.      So if -- if the sales

10     transaction, it's my understanding it's proposed

11     that avoidance/preference claims will be sold to

12     Gordon Brothers, but Gordon Brothers will agree

13     not to pursue them.

14                      Doesn't that again result in one

15     a group of creditors being preferred over

16     another?

17                      MR. McCLAMMY:  Objection to form.

18                      If you have an answer, you can

19     answer.

20                      THE WITNESS:  This was the offer

21     from GBRP that is included in the asset purchase

22    agreement.  We did not pursue an alternative

23    course.

24    BY MS. ROGERS:

25            Q.        You didn't answer my question.  I

                                                            40

1    know what you're saying was done, what was not

2    done.  But I'm saying, doesn't it result in one

3    group of creditors being preferred over another?

4            A.        I have not made a determination

5    of that and have not done that analysis.

6            Q.        Well, based on your vast

7    experience, wouldn't that be the result?

8                    MR. McCLAMMY:  Objection to form.

9                    THE WITNESS:  I would not make

10    any statement that I have not done an analysis

11    on.

12    BY MS. ROGERS:

13            Q.        But in the declaration, you make

14    numerous conclusions that the sale, the proposed

15    sale is better for creditors than a Chapter 7

16    liquidation.  But you just testified that you

17    haven't done a liquidation analysis, you haven't

18    done a preference analysis, you haven't done a

19    claims analysis.

20                  So how did you --

21                  (Cross talk.)

22                  (Court reporter seeks

23      clarification.)

24      BY MS. JACOBS:

25          Q.      How can you make those statements

                                                              41

1       when you haven't done an analysis?

2                  MR. McCLAMMY:  Objection to form.

3                  THE WITNESS:  My statement of the

4       declaration was in regards to the cumulative

5       value that's available to all creditors.  I have

6       not made a determination based upon specific

7       creditors at this time.

8       BY MS. ROGERS:

9          Q.      When you say it's based on a

10      cumulative analysis, what are you referring to?

11          A.      The cumulative value that was

12      achieved through the asset purchase agreement

13      versus a company-led wind down or any other

14      alternatives that were available to the debtor.

15          Q.      So what is the cumulative value

16      for the APA versus a company-led wind down?

17          A.      As been detailed in our budget

18          that was filed under Docket 1434, there is $328

19          million of value that is coming to the estate

20          from this transaction.

21               Q.     I'm sorry, you said 328 million?

22               A.     $328 million.

23               Q.     And what is -- what is in a

24          company-led wind down?

25               A.     The company-led wind down would

42

1           be very different because it would actually --

2           to be honest with you would be actually higher

3           because the full value of all of the assets

4           would all come into the estate.  The difference

5           here is the certainty of the assets that are

6           coming in and the applicable expenses that are

7           covered by GBRP.

8                       So the expenses, when netted

9           against the recovery, yield greater value in the

10          asset purchase agreement as compared to assuming

11          all expenses with a -- with a company-led wind

12          down.

13               Q.     I'm not understanding your

14          answer.

15                      So you just said that --

16          A.      You asked me a question about

17   gross recovery, now I'm answering you in a net

18   recovery basis, because that is what is

19   applicable here.

20          Q.      Okay.  So what you're saying is

21   on a gross basis, a company-led wind down would

22   result in more value than the proposed sale?

23          A.      It would --

24          MR. McCLAMMY:  Objection -- hold

25   on.

                                                    43

1               Objection to form and misstates

2    the testimony.

3               But you can answer.

4               THE WITNESS:  It results in more

5    inflows.  It would also result in more outflows.

6    So on a net basis, the recovery would be less.

7    BY MS. ROGERS:

8          Q.      And the reason there's less

9    outflow in the proposed sale is because certain

10   groups of creditors are not getting paid, right?

11              MR. McCLAMMY:  Objection to form.

12              THE WITNESS:  It primarily has to

13   do with the costs that are covered by GBRP.  For

14    example, most of the store -- the cost to run

15    the stores, including store rents, store

16    payroll, DC rent, store operating expenses are

17    all covered by GBRP.

18    BY MS. ROGERS:

19            Q.        So when you say they are covered

20    by GB, aren't they being covered by GB -- GB

21    from the operation of the stores and the

22    going-out-of-business sales?

23            A.        They are covered by the value

24    that is achieved by selling the inventory and

25    other assets of the estate.

44

1            Q.        So the answer is yes.

2                      So on a net basis, what is the

3    cumulative value through the proposed sale

4    versus a company-led wind down?

5            A.        We estimated that the recovery

6    would be approximately $20 million under the

7    asset purchase agreement.  It would be a

8    approximately 10 million for a company-led;

9    however, that does not include all of the risk

10   that is associated with recovering at the same

11   level that the company did earlier in this year

12   when there may have been higher demand for this

13   product.

14          Q.      Well, isn't it true that you said

15   earlier that the value in the inventory has

16   basically been lost because the sales were not

17   completed before the end of the holiday season?

18          A.      No, that is not correct.  I had

19   stated that the recovery or the sales of the

20   type of product that Big Lots sells does better

21   in November and December than it does in

22   January.

23                  And so their ability to sell

24   through this product in what amounts to the

25   month of January and February is more difficult

                                                    45

1   than it would be for the two months of November

2   and December, for example.

3          Q.      Okay.  So whether it's a

4   company-led wind down or through the sale,

5   proposed sale, the prospect of sales of the

6   inventory in January and February is the same

7   under either of those scenarios, right?

8          A.      That is correct.

9          Q.      By company-led wind down, what

10   does that mean?

11           A.      It means that under the APA,

12   Gordon Brothers, GBRP is purchasing all of the

13   inventory and certain assets outright.  In a

14   company-led wind down, the company would

15   administer all of the sales of the assets,

16   instead of having a fixed number, such as what

17   is anticipated in the APA coming into the

18   estate.

19                   And so they would collect

20   whatever value they can from those assets,

21   wherein it is a fixed known number under the

22   asset purchase agreement.

23                   MS. ROGERS:  Okay.  I'd like to

24   go to the document that we were sent just prior

25   to the deposition, which is the APA comparison

                                                        46

1   schedule.

2                    Danielle, can someone with your

3   office put that on the screen?

4                    MS. MASHBURN-MYRICK:  I'm going

5   to text about that.  Be easier to print.

6                    MR. GARCIA:  This is it, right,

7   Beth?

8                    MS. ROGERS:  Yes, that is it,

9      thank you.  Hang on.  I have to get back to my

10     notes here.

11                    Okay.  So --

12                    THE WITNESS:  I'm sorry, could

13     you put it back -- that's way too small.  Can

14     you put it back to the level it was earlier?

15     That's great.  Thank you.

16     BY MS. ROGERS:

17          Q.      Okay.  So this is not -- this

18     document that is on the screen, which is the APA

19     comparison schedule 12-30-24, this is not been

20     filed in the bankruptcy case, correct?

21          A.      Correct.

22          Q.      Is there a reason why?

23          A.      It was an analysis that was done

24     internally, to determine whether a company-led

25     wind down or pursuit of the asset purchase

                                                        47

1      agreement was the best pursuit.  It was only

2      shared internally within the company at the

3      direction of the company's advisors, including

4      Davis Polk.

5          Q.      And do you think it's important

6      for creditors to understand the actual numbers

7      and the various scenarios?

8             A.      We have provided the document to

9      you, so I'm happy to answer any questions you

10     have.

11            Q.      That's not an answer.  There's

12     been no notice.  There is -- you know, I think

13     we got the document about 7 o'clock tonight.

14     We've already had, you know, a full day of the

15     sale hearing.

16                    Anyway, so when you were talking

17     about the company-led wind down, which column

18     does that follow on the --

19            A.      The far left column.

20            Q.      The far left.  So the wind-down

21     budget as of 12-21?

22            A.      That is correct.

23            Q.      Okay.  And when you say on this

24     document -- and who prepared this document?

25            A.      The debtors' advisors in

                                                              48


1      coordination with the company.

2             Q.      The company is who?

3             A.      Big Lots.

4          Q.      Oh, okay.  Big Lots.

5                  So the "downtime wind-down

6     budget," what does that mean?

7          A.      The only difference in that

8     column is that we used a GOLV of 120 percent

9     versus the 125 percent in the wind-down budget.

10    And the rational for that was, we wanted to

11    demonstrate the risk if the inventory did not

12    recover at levels that were commensurate with

13    what they had achieved in prior store closings

14    because of the timing, because of the situation

15    that the company is in, and competitive

16    pressures on the store closings sales.

17         Q.      I thought that at the sale, at

18    the hearing today, the debtor stated that no

19    more inventory would be purchased?

20         A.      That is correct.  We have

21    terminated all POs and have not been purchasing

22    inventory.

23         Q.      So then why would you need to

24    make a comparison at -- to show a risk if the

25    inventory does not recovery on this achievement

                                                    49

1     prior to store closings?

2          A.        Well, for example, this inventory

3     includes inventories in the stores in GCs

4     currently, but it is just the -- based upon the

5     discounting schedule that occurs in a store

6     liquidation.  The faster inventory sells, the

7     lower the discount on the inventory is.

8                    The discount is what drives

9     customers into the store.  So if you're not

10    selling as much, then more is sold at a higher

11    discount, and so the value of that inventory is

12    less to the estate.

13         Q.        Okay.  And then the column that

14    says, "AKA Schedule," what does that refer to?

15         A.        That refers to the GBRP offer and

16    all the terms that are in the asset purchase

17    agreement and the agency agreement.

18         Q.        Okay.  So if we go down -- and

19    these numbers are stated in millions?

20         A.        Thousands.

21         Q.        Thousands?

22         A.        Yes.

23         Q.        So when it says at the top, "Net

24    proceeds 626,497," that's 626,497,000?

25         A.        Or said differently $626 million.

50

1          Q.      I just asked you, are the numbers

2    stated in millions or thousands?  You said,

3    "thousands."

4          A.      And I answered you accurately, if

5    you put three zeros at the end, that is

6    thousands.  If you put six zeros at the end,

7    that's millions.  That would be $626 billion.

8                  (Court reporter seeks

9    clarification.)

10                 THE WITNESS:  Billions with a

11   "B."

12   BY MS. ROGERS:

13         Q.      Okay.  So the number in the first

14   column next to net proceeds, it says 626,497,

15   that's 626,497 million?

16         A.      Correct.

17         Q.      Okay.  So if we go down to the

18   bottom of the budget or I guess comparison, it

19   says, "Net net cash available for distribution."

20                 Do you see that?

21         A.      Yes.

22         Q.      Okay.  So in the first column,

23   under wind-down budget, it states 325,954

24   million.  Correct?

25          A.      Correct.

1           Q.      And so that is the projection

2    based on the debtors' wind-down budget using the

3    GOLV of 125 percent, correct?

4           A.      Correct.

5           Q.      And then if we go to the next

6    column, the downside, downside wind-down budget

7    under the net cash available for distribution,

8    it states 299,340 million, correct?

9           A.      Correct.

10          Q.      And then if we go to the last

11   column, the APA schedule, it shows 19,330,000,

12   correct?

13          A.      Correct.

14          Q.      So the comparison that we are

15   looking at shows that under the proposed sale,

16   there will be less money available for

17   distribution to creditors under the proposed

18   sale versus a wind down.  Is that right?

19          A.      That is not correct.  The

20   proposed sale includes a payoff of all of the

21   DIP ABL, the DIP FILO, and a letter of credit

22   claims --

23                    (Court reporter seeks

24     clarification.)

25                    THE WITNESS:  Sure.

52

1                    The APA schedule column

2      contemplates a payoff of the ABL, the

3      asset-based loans, the FILO loan, and cash

4      collateralization of the LCs at close, so those

5      obligations are not outstanding.

6                    So said slightly differently, I

7      would compare the 19,330 million to the 10

8      million and the minus 15 million in the other

9      two columns.

10     BY MS. ROGERS:

11          Q.        I am not following you at all

12     there, so --

13          A.        Well, can you scroll -- can

14     whoever has it on the screen, can you scroll

15     down to the bottom of the page, please?  Keep

16     going.

17                    So the 19,330 that's on the far

18     right, that is comparable to the 10,808 and the

19     15 -- and the negative 15,805 because the debt

20     has been paid in full.  So that is a way that I

21    would compare the three alternatives.

22          Q.      Okay.

23          A.      There is no debt outstanding

24    under the APA because it is paid out in full as

25    part of this transition.

                                                          53

1           Q.      No debt to secured lenders,

2     right?

3           A.      The debt is paid off in full upon

4     finalization of the transaction.  So if it

5     finalizes this Friday, the debt will be paid in

6     full to those parties.

7           Q.      All right.  Now I'm not

8     understanding what you're saying.

9                   So under the APA column, where

10    does it show the payoff of the secured debt

11    upon --

12          A.      It is not, it is not -- it is not

13    in that column.

14                  MR. McCLAMMY:  For the sake of

15    the court reporter, please let her finish her

16    question first, please.

17                  THE WITNESS:  It is not in that

18    column because the terms of the transaction are

19    that it is paid off right away.

20                     So it is not a obligation that

21    needs to be paid off because GBRP pays off those

22    obligations at the beginning -- as of the

23    transaction date.

24    BY MS. ROGERS:

25          Q.      Okay.  So down below, "net cash

                                                          54

1     available for distribution," it lists DIP ABL

2     DIP FILO and LLC claims, right?

3           A.      Correct.

4           Q.      Okay.  And so is that showing the

5     total amount of secured debt that the debtor

6     owes?

7           A.      As of December 21st, yes.

8           Q.      So above, the line that says,

9     "net cash available for distribution," none of

10    the columns contemplate paying the secured debt,

11    right?  There's no expense listed for the

12    secured debt in any of these columns above the

13    net cash line?

14                     MR. McCLAMMY:  Objection to form.

15    BY MS. ROGERS:

16          Q.      Let me restate it.

17          MR. McCLAMMY:  If you understand

18   the question, you can answer it.

19          THE WITNESS:  Actually, is there

20   a question there or is that just a statement?

21          So the debt is paid off in full

22   in all three circumstances.  It is --

23   BY MS. ROGERS:

24      Q.      That's not the question, sir.

25   Sir, that's not my question.  I'm asking you to

                                                        55

1    tell me what the document says.

2           In the -- above the line, the row

3    that says, "Net cash available for

4    distribution," none of the columns list as an

5    expense being paid from gross proceeds, the

6    secured debt; right or wrong?

7           MR. McCLAMMY:  I think he's

8    answered your question by telling you that it's

9    appearing below that line, but --

10   BY MS. ROGERS,

11      Q.      Well, that wasn't my question.

12   My question is:  Does it or does it not -- is

13   the secure debt listed as an expense above the

14   net cash row in any of the columns?

15              MR. McCLAMMY:  So are you

16      essentially asking:  Is it only appearing on

17      this document once where it's listed below and

18      not twice all the way above?  He's telling you

19      that it's listed there and it's listed below.

20              MS. ROGERS:  I'd like to the

21      witness to answer, not the attorney.

22              MR. McCLAMMY:  I'm not answering,

23      I'm just trying to understand what the question

24      is.

25              MS. ROGERS:  Well, let me

                                                        56

1       rephrase it for the third time or fourth time.

2       BY MS. ROGERS:

3           Q.      Yes or no, does this comparison

4       list, as an expense, in any column above the row

5       that says net cash, the payoff of the secured

6       debt?

7           A.      So there are two rows that say

8       net cash.  So can you be -- can you read the

9       entire column that you're asking -- or row that

10      you're asking about?

11          Q.      Yes.  It says:  "Net cash

12      available for distribution."  And then it has

13    325,954 under the first column, 299,340, under

14    the second column, and 19,330 under the third

15    column.

16              A.        So under the third column, the

17    debt is paid off in full as of the transaction

18    date, which is anticipated to be this week.

19                        So it is already taken out.  It

20    is not listed in that column, but it is already

21    paid off to zero in the APA schedule.

22                        So it is not listed on there, but

23    it is assumed to have been paid in full in the

24    APA column at the row that you're asking about.

25              Q.        So when the document shows

                                                         57

1    outflows and variable operating expenses, it

2    isn't accounting for above that row, "net cash

3    available for distribution," it's not accounting

4    for it in the APA column.  You're saying it's

5    just assumed.

6                        So the number --

7              A.        That is correct.

8              Q.        -- if I conducted -- in the AKA

9    -- APA column, if I go through it and I deduct

10    from 231,103, which is the total influx of the

11    opening cash and I deduct all these other

12    numbers that are below that, but before the net

13    cash available for distribution row, I'm not

14    going to come up with 19,330 million.

15                    Is that what you're telling me?

16         A.        No.  That is incorrect.

17         Q.        Okay.  Then how is it incorrect?

18         A.        Well, just doing simple math, 231

19    minus 96, minus 99, is -- that's about $36

20    million, minus 15 is roughly $20 million.

21                    So without -- with rounding, it

22    comes to roughly $20 million just based upon the

23    millions in the context column.

24         Q.        Okay.  So the 19,330 million, is

25    the net amount after payment of only the

58

1    expenses that are listed above the net cash

2    available for distribution row?

3                    MR. McCLAMMY:  Objection to form

4    and misstates his testimony.  It may make sense

5    to take a quick break to allow you --

6                    MS. ROGERS:  I want to finish my

7    line of questioning.

8                    MR. McCLAMMY:  Okay.

9                    MS. ROGERS:  I'm trying to

10    understand why the net cash available for

11    distribution is not apples to apples.  The three

12    columns show 325 -- 299 to 40 --

13                    (Court reporter seeks

14    clarification.)

15                    MS. ROGERS:  I'm sorry.  It is

16    8:18 at night and I have been working since 7:00

17    a.m.

18                    MR. McCLAMMY:  The court reporter

19    doesn't deserve that, like, she's helping us out

20    on short notice.

21                    MS. ROGERS:  The numbers are on

22    the screen.

23                    (Court reporter seeks

24    clarification.)

25                    MR. McCLAMMY:  I'm not trying to

                                                        59

1    interrupt your flow but --

2                    MS. ROGERS:  Yes, you are.  Yes,

3    you are.  Yes, you are.

4                    MR. McCLAMMY:  Just let me

5    finish.  I would say, it may be helpful --

6                    MS. ROGERS:  Let me finish.

7    BY MS. ROGERS:

8             Q.      My question is:  These numbers,

9    under "net cash available for distribution"

10   represent what is available after the expenses

11   are deducted, other than the secured claims.

12                   All three columns represent that,

13   right?

14                   MR. McCLAMMY:  Objection to form.

15   Misstates the testimony.

16                   But to the extent you can answer,

17   you could answer.

18                   THE WITNESS:  Ma'am, maybe it

19   would make more sense if you add $315 million to

20   the 19,330.  That is what would be available if

21   the debt had not been paid off.

22                   The debt is paid off as part of

23   this transaction.  So it is not part of the

24   equation.

25                   The -- if you pull the $19

60

1    million down to the bottom row, it would -- all

2    of those would be the cash that is available to

3    pay administration -- administrative claims.

4    BY MS. ROGERS:

5          Q.     Why don't you just deduct -- it

6   doesn't make any sense.  It's a

7   misrepresentation.  It makes it look like it's

8   more cash available under the other two columns

9   than the APA schedule.

10                 So why don't you just take the

11  19,30 and put it in the net cash available for

12  administrative claims column?

13         A.     This was not prepared for filing

14  within the Court.  We provided this for

15  information because we assumed that you would be

16  asking questions.  This was not prepared as an

17  exhibit.  It was an analysis that was presented

18  to management and the board of directors.

19                 They had no problem following it,

20  so it worked for that audience.  So it's not

21  meant to be filed as an exhibit or in court.  So

22  it was not done as such.

23         Q.     Isn't the estimated accrued

24  administrative claims 300 million?

25         A.     I do not believe that much.

61

1          Q.     What is it, then?

2          A.     I believe it is about 216 million

3     of open AP, about 38 million of 503(b)(9) claims

4     and approximately 17 million of stub rent.

5              Q.       What about professional fees?

6              A.       We escrow professional fees on a

7     weekly basis and those are reflected in our

8     budget as such, and, therefore, we do not have

9     those as an outstanding admin claim in our

10    calculation.

11             Q.       How much is in the escrow for

12    professional fees currently?

13             A.       It's approximately $40 million.

14             Q.       How much has been paid for

15    professional fees so far?

16             A.       Approximately $15 million.

17             Q.       And Alix -- Alix's professionals

18    fees are in that pool, correct?

19             A.       They are.

20             Q.       How much is Alix owed?

21                      (Court reporter seeks

22    clarification.)

23    BY MS. ROGERS:

24             Q.       How much is Alix owed?

25             A.       I have not looked at the number

1     recently.  I'm not sure.

2          Q.      How much is the debtors' counsel

3     owed?

4          A.      I haven't looked at specific

5     professionals.

6          Q.      I thought you said earlier that

7     this all went into your analysis in your

8     declaration, how much the professional fees were

9     owed and that they were -- analysis done of what

10    was owed to professionals and what is projected

11    future amount of professional fees.

12                 So is that not true?

13         A.      We have a schedule of all of

14    this.  I have not familiar with what each row

15    is.  I know that -- what the cumulative number

16    is, and that's what is reflected here.

17         Q.      Reflected on this comparison.

18                 So is that what you're saying?

19         A.      No.  There is no escrow -- there

20    is no escrow for professional fees to date on

21    this comparison.  This is for future

22    professional fees that will accrue over the next

23    couple of months.

24         Q.      So you're saying on the

25    comparison, where it says "other costs," those

1    are future professional liquidator and U.S.

2    Trustee fees?

3             A.       That's correct.

4             Q.       So then when you're looking at

5    the 19,330 million under the APA column, you

6    would have to deduct the already accrued

7    professional --

8                      (Court reporter seeks

9    clarification.)

10                     MS. ROGERS:  Fees.

11                     THE WITNESS:  That is not

12   correct.

13   BY MS. ROGERS:

14            Q.       Why?

15            A.       The $19 million number is net of

16   all the costs above.  So I would not take that

17   out twice.  It's already been taken out once.

18            Q.       Okay.  So then where does it show

19   on here already accrued professional fees?

20            A.       It does not, because they are in

21   a separate account.  So there are no

22   disbursements to that escrow account that are

23   necessary.  Those funds have already been set

24      aside.

25              Q.      Okay.  So if there's 40 million

1    in the escrow for professional fees, but it's

2    not accounted for in this comparison, there

3    could be in excess of $40 million, then, right?

4              A.      No.  That is not correct.  Based

5    upon our estimate and our conversations with

6    professionals as well as the applications that

7    have been filed, the professional fees to date,

8    the estimated professional fees to date have

9    been set aside in the escrow accounts.

10              Q.      Okay.  But you just told me you

11    don't know what the accrued professional fees

12    are, so --

13              A.      I don't know.

14              Q.      -- so the 40 million is less or

15    more than what the accrued professional fees

16    are?

17                      MR. McCLAMMY:  Objection to the

18    form.  Misstates his testimony and the questions

19    that you've asked.

20                      If you understand her question,

21    you can answer.

22          THE WITNESS:  You asked me about

23    specific professionals.  I do not recall what is

24    in each specific professional's row I view.

25          You also asked me about

65

1    cumulative, and I looked at cumulative recently,

2    and those are the numbers that I provided to

3    you.

4          MR. McCLAMMY:  And we've been

5    going for a while.  Why don't we take a break.

6    Let's come back in 15 minutes.  Make it even,

7    come back at 8:45.

8          MS. ROGERS:  Sure.

9          (RECESS TAKEN 8:27 p.m.)

10          (RECESS ENDED AT 8:46 p.m.)

11    BY MS. ROGERS:

12          Q.     In the comparison schedule, if --

13    so that I could put that back on the screen,

14    what does the APA admin budget and APA wind-down

15    budget under inflows.  What do those mean?

16          A.     Those are the value that is their

17    transaction.  So there are certain assets that

18    are set aside for the estate, which includes the

19    value of the building over 10 million.

20                    So 10 million is the collateral

21    that is in the FILO.  So the FILO -- so that has

22    been set aside, and then our estimated proceeds

23    on the building of 34.5 minus 10, is 24.5.

24                    The outstanding litigation is

25    split 60/40 between the estate and the buyer.

                                                          66

1    So 60 percent of the 5 million for outstanding

2    litigation is in that column.

3                    The numbers that are included in

4    Exhibit F and G are 49,8, which is a combination

5    of the 42,391, and the professional fee escrow.

6    Those are the 49,891 that are in the admin

7    budget, which is schedule -- or, I'm sorry,

8    Exhibit F.

9                    The 125 is Exhibit G.

10                    Then the additional value is part

11    of the asset purchase agreement, the income tax

12    refunds go to the estate.  So that is estimated

13    at $6 million.  That is listed in here.

14                    And then there are certain

15    mitigation items, such as the Variety severance.

16    So under a circumstance where 200 stores are

17    transferred from Big Lots to Variety, those

18      employees would continue to have ongoing

19      employment, and that would mitigate their

20      severance.

21                  So that is allocated here at 200

22      stores.  And then the stub rent of $17 million

23      that is also covered by the asset purchase

24      agreement is included here, all of that combined

25      totals to $231 million.

67

1           Q.      Well, isn't that an outflow

2       rather than an inflow from severance -- isn't

3       that an --

4                   (Court reporter seeks

5       clarification.)

6       BY MS. ROGERS:

7           Q.      My question is -- so the 17

8       million for stub rent, it's in the -- under the

9       heading called "inflows," as in inflows, income

10      proceeds?

11          A.      As part of the asset purchase

12      agreement, the buyer is recovering stub rent.

13      So it is an inflow to show the value coming in.

14      As you can see from the outflows below, it is

15      also listed as an outflow.  So net to the estate

16    is zero, whereas in a company-led wind down,

17    those obligations would be exclusively the

18    obligation of the company.

19                    So there would be no inflow, but

20    there still is an outflow in a company-led wind

21    down.  So they're listed as an outflow under

22    both, but only an inflow under the asset

23    purchase agreement.

24    BY MS. ROGERS:

25            Q.      So under the APA schedule, or the

                                                                68

1    proposed sale, wouldn't there also be GOB retail

2    proceeds?

3            A.      I'm sorry, I couldn't understand

4    you.

5            Q.      I said in the proposed sale, or

6    under the APA schedule column, won't there also

7    be GOB retail proceeds?

8            A.      From the -- are you asking about

9    from the sale of inventory?

10           Q.      Well, you have got GOP -- GOB

11   retail proceeds under inflows in the two columns

12   for wind-down budget, but you don't have

13   anything for APA schedule.  But in the proposal,

14    aren't there going to be GOB sales, right?

15          A.       The consideration that as part of

16    the asset purchase agreement is these numbers

17    that are included here.

18                   The sale of the inventory goes to

19    the buyer.  So there are no proceeds for

20    specifically relayed exactly to the inventory

21    sales.

22                   It is covered as a net inflow,

23    and these numbers, plus the outflow of expenses

24    that the buyer is covering.

25                   So it is not an inflow as part of

69

1    the asset purchase agreement.

2          Q.       Okay.  So that was going to be my

3    next question.  In the outflows, like under the

4    heading for stores, there's 89 -- I guess it's

5    89,345 in both wind-down columns but nothing

6    under the APA schedule.  So that's because the

7    buyer would be assuming those costs?

8          A.       Correct.

9          Q.       And how much is Variety paying

10   for 200 stores?

11         A.       There is an agreement between

12   GBRP and Variety.  We do not have access to that

13   agreement, so I do not know the answer to that

14   question.

15          Q.      So the purchase price that the

16   APA proposes GB is paying, that does not include

17   the sale of the 200 stores to Variety?

18          A.      That is the side agreement

19   between GBRP and Variety and is not part of the

20   consideration included in this agreement.

21          Q.      Okay.  So I just want to be

22   clear.  The purchase price that is being paid

23   under the proposed sale is only what GB is

24   proposing to pay.  Is that right?

25          A.      It is what GBRP is planning the

                                                         70

1   estate, correct.

2          Q.      Other than Variety, are there any

3   other potential buyers of the debtors' assets?

4   So my understanding is that the agency agreed

5   that the APA proposer, GB, to sell the debtors'

6   assets to other buyers.

7                   Have there been any discussions

8   with the other parties other than GB -- I mean,

9   Variety?

10          A.       There have been no discussions

11     between GBRP and the estate on whom those

12     parties would be.

13          Q.       If the trade vendors have not

14     provided those petition product, would Big Lots

15     have been able to keep operating during the

16     bankruptcy case?

17          A.       They would not.

18          Q.       If the trade vendors had not

19     provided post-petition product, would Big Lots

20     have been able to attract any potential buyers?

21          A.       I think it is highly doubtful

22     that they would.

23          Q.       Would Nexus have been willing to

24     make a bid and potentially buy the debtor if the

25     inventory levels had not been replenished during

                                                        71

1     the bankruptcy case?

2                    MR. McCLAMMY:  Objection to form.

3                    THE WITNESS:  I would expect that

4     Nexus would not have been willing to purchase

5     Big Lots if they were not able to replenish

6     their inventory stock.

7     BY MS. JACOBS:

8          Q.      How much total post-petition

9     product was provided by vendors?

10         A.      I don't know the answer to that.

11         Q.      Do you know how much of the total

12    post-petition product that was provided by

13    vendors was not paid for?

14         A.      Approximately $216 million.

15         Q.      Why in the proposed sale are

16    trade creditors not treated as go-forward

17    administrative claims so that they don't pay for

18    the post-petition product, which is being used

19    to fund the sale and the other go-forward

20    expenses?

21         A.      This budget was prepared in

22    conjunction with GBRP, and at their direction,

23    we are not paying any merchandise vendors in

24    this budget during this period of time.

25         Q.      And GB doesn't have an interest

72

1     in paying the vendor creditors because it's not

2     going to operate any of the stores, right?

3               MR. McCLAMMY:  Objection to form.

4               THE WITNESS:  I don't know what

5     GB's incentives are.

6                    MS. JACOBS:  That's all the

7      questions I have for now.  I reserve my right to

8      go back after other parties have a chance.

9                    MS. CASEY:  This is Linda Casey.

10     Would this be an appropriate tame for me to go

11     forward?

12                    MR. ANGELICH:  Hi, Linda.  It's

13     George Angelich.  I just had a couple of

14     questions.

15                    MS. CASEY:  Go for it.

16                    MR. ANGELICH:  Thank you.  All

17     right.

18     EXAMINATION

19     BY MR. ANGELICH:

20          Q.      Nice to meet you, sir.  My name

21     is George Angelich, and I'm an attorney with the

22     law firm ArentFox Schiff, and we are counsel to

23     Meta Platforms.  If I -- if I ask any questions

24     and you need me to repeat myself, you know,

25     please say so.

73

1                    So what I wanted to start with is

2      your declaration in support of the sale.

3                    In paragraph 5 --

```
 4                         MR. ANGELICH:  And we'll go ahead

 5     and put that up now.  If someone could -- there

 6     we go.

 7     BY MR. ANGELICH:

 8             Q.      Paragraph 5 of your declaration.

 9     It contains a long list of cases you've been

10     involved with.  Can you tell me which of those

11     cases converted to Chapter 7, rather than

12     confirmed?

13             A.      None of the cases converted to

14     Chapter 7.

15             Q.      I want to turn to paragraph 12.

16                     It says in paragraph 12 of your

17     declaration that -- if I may.  It refers to the

18     DIP lenders wanted to hear directly from Nexus

19     about the progress.  Is that -- is that correct?

20             A.      That is correct.

21             Q.      Why didn't Nexus provide an

22     update?

23             A.      They did not communicate with me

24     why they did not provide an update.

25             Q.      Do you know who 1903 P Loan
```

74

```
 1     Agent, LLC is?
```

2          A.        I believe based -- but I'm not

3    positive.  But I believe that is the FILO

4    lender, but I'm not positive.  It sounds like

5    close to what the FILO lender's name is.

6          Q.        Is 1903 P Loan Agent an affiliate

7    of Gordon Brothers?

8          A.        It is -- yes, it is.

9          Q.        And 1903 P Loan Agent, if I were

10   to tell you that it was the term loan agent,

11   would you think that that -- does that basically

12   line up with your understanding, or is it close

13   enough?

14         A.        That lines up with my

15   understanding.

16         Q.        In 1903 P Loan Agent, or Gordon

17   Brothers, in addition to being the

18   administrative agent collateral agent for the

19   term loan, also that loan has a second priority

20   lien on the ABL priority collateral.  Is that

21   right?

22                   MR. McCLAMMY:  Objection to form.

23   BY MR. ANGELICH:

24         Q.        Does 1903 P Loan Agent -- strike

25   that.

```
 1                    Does the term loan, was it
 2    granted a second priority lien on the ABL for
 3    priority collateral.
 4            A.      It was.
 5            Q.      Gordon Brothers, as an affiliate
 6    of the term loan agent, actually then is the
 7    agent for the term loan and controls the entity
 8    that has a second priority lien on the ABL
 9    priority collateral.  Is that --
10                    MR. McCLAMMY:  Objection to form.
11    BY MR. ANGELICH:
12            Q.      -- basically a correct statement?
13            A.      To my knowledge, yes.
14            Q.      In -- if you could go up to
15    paragraph, I think, it's 2 of the motion.  So
16    it's all the way up at the beginning of this
17    document.
18                    It says in -- no, actually
19    paragraph 1, yep.  Last line begins with Gordon
20    Brothers Retail Partners, LLC, GBRP, who was the
21    only party other than Nexus to have submitted an
22    actual bid to the debtors prior to the auction.
23                    Did Gordon Brothers submit a bid
24    prior to the auction?
```

25          A.      They did.

1          Q.      Is it the same bid that you're

2   now asking to approve in the sale hearing.

3                  I'm sorry, I spoke over you.  My

4   apologies.  Could you repeat your answer?

5          A.      It is not the same bid.

6          Q.      Can you tell us how it differs?

7          A.      There were numerous negotiations

8   that have happened over the last couple of weeks

9   that have increased the consideration and the

10  value to the estate.  Those -- that incremental

11  value is significantly more than what was

12  offered at the -- prior to the auction.

13         Q.      And is Gordon Brothers actually

14  paying anything to 1903 P Loan Agent?

15                 MR. McCLAMMY:  Object to the

16  form.

17                 MR. ANGELICH:  Are you

18  instructing him not to answer?

19                 MR. McCLAMMY:  Did you hear me

20  instruct him not to answer?

21                 MR. ANGELICH:  I'm sorry.

22  BY MR. ANGELICH:

23          Q.        Okay.  Then, Mr. Percy, do you

24     understand the question?

25          A.        I understand the question.  I

77

1     would assume that 1903 is going to communicate

2     that its facility has been paid in full.  As to

3     the form of the transfer between the parties, I

4     am not aware of how that will take place.

5          Q.        I'm going to skip to another

6     document now.  Your retention application, it's

7     Docket Number 206-4.  And in your disclosures,

8     you mention that you have a prior relationship

9     with Gordon Brothers, and you actually have --

10     they were a client and they provide vendor

11     services to AlixPartners.  I think it's a few

12     more rows down, lines down.  Pages down.

13                    So I'm putting this up just to

14     help maybe speed things along.

15                    Can you tell us whether your firm

16     has any ongoing matters with Gordon Brothers

17     where they are providing services to you or you

18     are providing services to them?

19          A.        We had worked with Gordon

20     Brothers numerous times in the past, and I'm

21      sure we are working with them currently.

22              Q.      Did Gordon Brothers have a

23      relationship with Big Lots prior to the

24      bankruptcy filed?

25              A.      They did.

78

1               Q.      Did they provide a $200 million

2       delayed term loan?

3               A.      They provided a $200 million FILO

4       loan.

5               Q.      Did Gordon Brothers prepare a net

6       liquidation value analysis of the inventory?

7               A.      I have not seen that analysis

8       that they did.

9               Q.      Who at the company would know if

10      they did?

11              A.      I don't remember.

12              Q.      Do you know what a net

13      liquidation value analysis is?

14              A.      I assume it's a valuation of the

15      assets of the company in a liquidation scenario.

16              Q.      Can we turn to the asset purchase

17      agreement, Section 3.01.

18                      Earlier you said that the

19    consideration was $328 million; is that right?

20          A.     As of December 21st -- no, I'm

21    sorry, 300 -- no, I'm not familiar with that

22    number.

23          Q.     Okay.  What is the total

24    consideration being paid for the assets?

25          A.     That's a difficult question to

79

1    answer because they are taking on liabilities as

2    well.  I would value those liabilities that

3    they're undertaking.  So I'd have to add up all

4    of that, plus the payments they're making, which

5    I detailed on the page that was presented, but I

6    don't have that number calculated.

7          Q.     So the purchase price is

8    comprised of these items listed in Section 3.01,

9    Romanettes i through v.  Is that right?

10          A.     According to the definition of

11    purchase price in this document, yes.

12          Q.     And how much of this -- of these

13    items will the estate save?  Can you tell us,

14    does the estate actually receive the $304

15    million?

16          A.     Their liabilities are reduced by

17    $304 million, but the blow of funds goes

18    directly to the lenders.  They are applicable.

19         Q.      And how much of the $304 million

20    will be flowing to 1903 P?

21         A.      I don't know the exact number,

22    but I'm estimating it at about $134 million.

23         Q.      So out of the $304 million being

24    transferred directly to the lenders, 134 million

25    of it is going to Gordon Brothers.  Is that

                                                        80

1     correct?

2          A.      To 1903, yes.

3          Q.      Number -- Romanette Number 2

4     talks about stub rent.

5                  What's your understanding of stub

6     rent?  What is it?

7          A.      Stub rent is rent from the period

8     of the filing date, which is September 9th

9     through September 30th.  The estate did not pay

10    a large percentage of this rent in September,

11    and remains unpaid.  This is an admin claim of

12    the estate, and that is what the $17 million

13    calculation is based upon.

14         Q.      Was that $17 million promised

15     under the DIP budget?

16                    MR. McCLAMMY:  Objection to form.

17     BY MR. ANGELICH:

18          Q.     If you understand my question,

19     you can answer it.

20          A.     I don't recall.  I don't recall.

21          Q.     Why is it being offered now?

22                    MR. McCLAMMY:  Objection to form.

23                    MR. ANGELICH:  I'll restate the

24     question.

25                    MR. McCLAMMY:  You can answer if

                                                        81

1     you know.

2                    MR. ANGELICH:  Thank you.

3                    THE WITNESS:  It is part of the

4     purchase price that GBRP is proposing;

5     therefore, we have included it as part of the

6     liabilities that will be paid down for the

7     estate at the direction of the buyer.

8     BY MR. ANGELICH:

9          Q.     Third -- the third Romanette, it

10     talks about $42 million.  And can you explain to

11     us what Romanette iii says?

12                    THE WITNESS:  These are

13      administrative expenses that are borne by the

14      company to administer the sale of the inventory

15      and other assets after the purchase price.  This

16      is detailed in Exhibit F of the -- of the agency

17      agreement.  That, plus the $7.5 million for

18      professional fees total to the 49,891 in Exhibit

19      F.

20      BY MR. ANGELICH:

21           Q.      So the purchaser is directing how

22      much of the $42 million is going to be paid to

23      specific administrative creditors?

24           A.      These are for expenses --

25      go-forward expenses of the estate that are

82

1      required to sell the assets.  The debtor has

2      worked collaboratively with the buyer to

3      determine these numbers, and we have come to

4      that jointly.

5           Q.      Will there be any service

6      providers or providers of goods who will go

7      unpaid during this period of the sale?

8           A.      We're anticipating that expenses

9      that are necessary to wind down the estate will

10      be covered in full.

11          Q.      Are there any expenses that will

12    be incurred that are -- that you deem are not

13    necessary for the estate?

14          A.      We are not accruing those level

15    of expenses -- those type of expenses or

16    contracting with parties to provide those type

17    of services.

18          Q.      There is, in Romanette iv, 125

19    million.  Can you explain that?

20          A.      These are expenses that are

21    liabilities of the estate that are for things

22    such as taxes or things such as WARN severance,

23    severance for employees, legal obligations for

24    things like paid time off that are being paid by

25    estate.

                                                    83

1           Q.      And Romanette v, the seven and a

2     half million dollars for professional fee

3     escrow, that's going to be paid when, exactly?

4           A.      That is going to be paid the

5     first week after the transaction.

6           Q.      And then there will be additional

7     weekly contributions to the professional fee

8     escrow?

9           A.        There are five weekly

10    contributions at the last five weeks of the

11    projection period ending March 8th, I believe.

12          Q.        Do you know how much in total

13    will be contributed to the professional fee

14    escrow, beginning with the seven and a half

15    million dollar payment?

16          A.        I believe it's approximately

17    $13.8 million.

18          Q.        If we could scroll down a little

19    bit further on that page.  Right at the end of

20    that paragraph, before sub (b), it says,

21    "Provided further that upon seller's

22    satisfaction of accrued administrative claims in

23    the aggregate amount of $100 million, any such

24    budget savings shall be retained by buyer for

25    its own account."

84

1                     Are you estimating that

2     administrative claims were accrued --

3     administrative claims, I should say, is

4     approximately $100 million?

5           A.        I'm not.

6           Q.        How was this number chosen?

7          A.       It was proposed by the buyer.

8          Q.       Did you push back in any way when

9    the buyer proposed a hundred million?  Did you

10   say, that number should be higher?

11         A.       We had discussions on numerous

12   items.  This was one of them.  I don't remember

13   the exact discussion of alternative amounts.

14         Q.       In the sentence preceding the one

15   we just discussed, it talks about, "In the event

16   actual dollar amount funds necessary to satisfy

17   items covered by either the APA administration

18   budget or the wind-down budget are less than the

19   aggregate amount set forth in such budgets, any

20   such savings shall be available to the selling

21   entities to satisfy accrued administrative

22   claims."

23                  Could you explain how that part

24   of this formula works?

25         A.       So in the document that we

85

1    reviewed earlier that showed approximately $19

2    million of recovery for the admin claims, if the

3    expenses associated with that for the cash

4    inflows regarding things such as tax refunds,

5      ongoing litigation accrued to a higher value,

6      then that incremental value over $19 million

7      would go to admin claims.

8              Q.      Does the debtor have a directors

9      and officers liability policy?

10             A.      It does.

11             Q.      Do you know the limits of that

12     policy?

13             A.      I don't recall them exactly, no.

14             Q.      All right.  Do you know what the

15     premiums are?

16             A.      I don't.

17             Q.      Is the D&O policy, are all the

18     premiums paid?  Are those all current?

19             A.      To my knowledge, they are.

20             Q.      Are there any insurance payments

21     that will be due after the sale closes?

22             A.      For D&O insurance or for any type

23     of insurance?

24             Q.      D&O insurance.

25             A.      Not to my knowledge.

                                                        86

1              Q.      Okay.  How much in savings do you

2      anticipate being able to achieve?

3          A.      I have -- the document that we

4    showed earlier was our best estimation of all

5    inflows and outflows.  So there is upside, but

6    that is our best estimation of the recovery

7    that's going to be available for admin claims.

8          Q.      And what will your role be in

9    monitoring spending and savings?

10         A.      Exactly that.  We will monitor

11   spending and savings and try to yield as much

12   value from the sale of assets and curtail

13   expenses as much as possible.

14         Q.      What steps can you take to

15   curtail expenses?

16         A.      We will work with our freight

17   providers to get goods to the distribution

18   centers and to the stores as for as little

19   consideration as possible.

20              We will work with our HR

21   department to make sure that payroll and

22   severance are applicable, but refrained as much

23   as possible.

24              Generally all of the operating

25   expenses of the business that are going to be

1    going on, we will be tracking and working with

2    the company to ensure that the maximum value is

3    available for the administrative claims.

4          Q.      Did the DIP lender fund the $3

5    and a half million dollar default or fund or

6    professional fees?

7          A.      I do not believe so.

8          Q.      Could you repeat your answer?

9    I'm sorry, I didn't hear you.

10         A.      I do not think they have, no.

11         Q.      Are they required to?

12         A.      My knowledge, they are not.

13         Q.      Do you -- I'm going to ask you

14   this question, but I think you already answered

15   it.  So your lawyer will tell you not to answer,

16   if this, in fact, has already been asked of you.

17                 But what are the total amount of

18   fees for the debtors' -- for the estate's

19   professionals to date?

20         A.      I do not remember.  I do not know

21   those line items exactly.

22         Q.      Do you expect that all

23   professional fees will be paid in full?

24         A.      I do.

25         Q.      All right.  I'd like to go

88

1    through the budgets and we'll start with the

2    wind-down budget.  It's page 157 of page 186.

3                    I realize that it's small.  It's

4    tiny numbers.  Can you see them okay?

5         A.        Yeah, I can see them.

6         Q.        All right.  HQ severance total

7    6,595 million.  Who's receiving HQ severance?

8    Any officers?

9         A.        The severance that is applicable

10   under the WARN Act.  So all employees that are

11   eligible under WARN are receiving this pay.

12        Q.        Is this number in any way

13   modified for expected hires by Variety?

14        A.        It is not.

15        Q.        Do you have any reason to believe

16   that some of those people or personnel will be

17   hired by Variety?

18        A.        Variety has asked to speak with,

19   i.e., interview some of the headquarters

20   employees.  I don't have any personal knowledge

21   about who or how many employees they will take.

22   So it is not included in this budget, but that

23   is a potential upside savings if those

24      individuals are offered some employment.

25              Q.        How many people are at HQ that

                                                            89

1       will be let go?

2               A.        There are a total of 600 --

3       roughly 600 employees at the corporate

4       headquarters.  In the end, all of them will be

5       let go.

6               Q.        "DC severance," I guess that's

7       your distribution center?

8               A.        Correct.

9               Q.        How many employees are there?

10              A.        I believe it's approximately

11      about 1200 employees.

12              Q.        Are any of those employees union?

13              A.        Not to my knowledge.

14              Q.        "Store severance," you have total

15      of 27,157 million in this budget.

16                        Do you have any reason to think

17      that some of the store employees will be picked

18      up by Variety?

19              A.        They -- Gordon Brothers has made

20      the assertion that at least 200 stores will be

21      retained by Variety.  The employees associated

22    with those 200 stores are expected to receive

23    employment offers.  That could increase up to

24    400 stores.

25            Q.      And does the $27 million payment

                                                                        90

1     account for potential hires, or is that just all

2     employees at stores right now?

3             A.      That is all store employees.

4             Q.      And so is it reasonable to say

5     that about half store severance would be saved

6     in the event that 400 stores are kept by Variety

7     or Gordon Brothers?

8             A.      There are approximately a

9     thousand stores open right now.  So it would be

10    closer to 40 percent if 400 stores are retained.

11            Q.      Does that translate into 40

12    percent of $27 million, or is that --

13            A.      I have not done an analysis on

14    store-by-store basis and we don't know the exact

15    stores that Variety wants to take.  But I think

16    that, as a rough estimate, is accurate.

17            Q.      Going down to Q3 bonus and Q4

18    bonus.  Why do we have bonuses in this budget?

19            A.      These are store bonuses that are

20   paid to the store employees only.  It is part of

21   their paid forward.  It is a fee that they have

22   function forward throughout the organization,

23   and it continues here.

24        Q.     Is this a policy of the company,

25   to pay these bonuses?

91

1        A.     Yes.

2        Q.     And it's an employee handbook

3   policy?

4        A.     It's an employee policy.  I don't

5   know if it's in the handbook or not.

6        Q.     Where is the policy, then?

7        A.     They communicate it to the

8   employees.  It is input in documentation.  I

9   have not seen that documentation.  I have been

10   told about it, so I don't know what the nature

11   of the communication is, but I know that it's

12   been communicated to employees.

13        Q.     And that's a policy that's been

14   observed historically, that's prior to the

15   bankruptcy, right?

16        A.     Yes.

17        Q.     Can you tell us what "IBNR"

18   means?

19          A.          Incurred, but not received.

20          Q.          Could you explain what that means

21   in this budget?

22          A.          It is for benefit claims, almost

23   exclusively health care claims.  So when

24   somebody goes to the doctor, their claim that is

25   filed by that doctor often does not get paid for

                                                        92

1    several months.

2                       So this is an amount that has

3    been estimated by Anthem, the health care

4    administrator, on how much claims will be

5    outstanding as of roughly February 28th.

6          Q.          Can you explain the worker's comp

7    disbursements, please.

8          A.          These are the company itself

9    insured on worker's contribution -- I'm sorry,

10   worker's comp.  These are the weekly payments to

11   the loss account that are made to handle claims

12   that are paid out in the ordinary course, as

13   well as to maintain ongoing coverage.

14         Q.          In the event that --

15                     MR. McCLAMMY:  Just one quick

16    question.  I think when you asked to go in front

17    of Ms. Casey you indicated you only had a couple

18    of questions --

19                    (Court reporter seeks

20    clarification.)

21                    MR. McCLAMMY:  Yes, I was just

22    indicating to Mr. Angelich, I believe when he

23    asked to go in front of Ms. Casey, he only

24    indicated he had a few questions so I'm just

25    checking to see where we are in the process --

93

1                    MR. ANGELICH:  Almost done.

2    Sorry.  Happy to wrap up very soon.  Almost

3    done.

4    BY MR. ANGELICH:

5            Q.       Can you tell us or can you

6    explain what will happen if the IBNR is not

7    adequately reserved for the worker's comp

8    disbursements will continue beyond March 8th,

9    what will be the net impact to the estate if

10   these estimates turn out to be low?

11           A.       Those are two separate questions.

12                    So the IBNR specifically, if this

13   estimation is low, then the medical

14    professionals that provided the services have

15    the right to go directly to the employee and

16    require payment from them directly.

17                    So employees that thought they

18    had medical coverage will not in actuality ever

19    had medical coverage, and will receive

20    procedures as well as expenses that they thought

21    were taken care of by their medical coverage

22    but, in fact, will not be.

23                    On the worker's comp, the company

24    potentially would not be covered for any type of

25    incident if it is not paying its premiums as

94

1    due.

2            Q.        Have the employees been notified

3    of this possibility or potentiality?

4            A.        We have not communicated anything

5    about this to the employees.

6            Q.        Last question I have on the

7    budget.

8                    The corporate wind down line

9    is -- there's no numbers here, right?  Could you

10    explain why that is?

11           A.        It was a line item that was being

12    funded previously, and should have been taken

13    out of the schedule and was not.  It is not

14    funded as part of the asset purchase agreements.

15         Q.      Okay.  One last question and I'll

16    be done.

17              What could have been done

18    differently to avoid the current situation the

19    estate finds itself in in being unable to pay

20    administrative claims?

21         A.      It could have closed on the sale

22    with Nexus.

23              MR. ANGELICH:  I have no other

24    questions.

25              MR. PARROTT:  Ms. Casey, I

                                                    95

1     represent a trade vendor and I just have one

2     clarification question, if you don't mind.

3              Thank you.

4     EXAMINATION

5     BY MR. PARROTT:

6         Q.      Good evening, Mr. Percy.  My name

7     is Evan Parrott, I represent Fusion Furniture.

8              And as I mentioned, Fusion is a

9     vendor who provided goods to the debtors pre-

10     and postpetition.

11                    The one question I have, or I

12     should say one item I have is, the 19 million

13     that is referenced on the APA comparison

14     schedule, as far as net cash availability for

15     distribution, I believe it was your testimony

16     that that 19 million reflects what would be

17     available for admin claims that aren't otherwise

18     included in the -- the comparison schedule.

19                    Does that 19 million include the

20     items that were discussed at the hearing today

21     meant to fund the admin payments?  In other

22     words, like the sell of the corporate

23     headquarters in excess of $10 million, is that

24     included in that 19 million, or is that a

25     different bucket?

                                                              96

1              A.      No, the $24.5 million that is

2     estimated recovery for the corporate

3     headquarters is included in that number.

4              Q.      Okay.  So that 19 million is

5     intended to be an all-encompassing number as far

6     as what is anticipated to be available for

7     admins?

8          A.        That is an estimate.  There is

9   obviously upside to that, but that is our best

10  estimate at this point.

11         Q.        Okay.  And I believe you

12  testified before that there are $216 million of

13  unpaid trade vendor claims postpetition; is that

14  accurate?

15         A.        That is -- that is the most

16  recent number that I have seen.

17         Q.        Okay.  Is there any other --

18  strike that.

19                   Are there any other admin claims

20  that would be included in that bucket set to

21  share in that estimated $19 million of proceeds?

22         A.        The 503(b)(9) claims would be

23  included in addition to that.

24                   (Court reporter seeks

25  clarification.)

                                                    97

1                   THE WITNESS:  The 5-0, 503(b)(9)

2   claims would be incremental to the 216 million.

3   BY MR. PARROTT:

4          Q.        And what are the -- what is the

5   estimated total of the 503(b)(9) claims?

6          A.        $38 million.

7                    MR. PARROTT:  That is all the

8     questions I have.  Thank you very much for your

9     time.

10                    MS. CASEY:  Has it come the time?

11    EXAMINATION

12    BY MS. CASEY:

13          Q.        Good evening, Mr. Percy.  Linda

14    Casey, I represent the United States Trustee.

15                    I do apologize.  This is not

16    going to be as efficient of questioning that I

17    would like it to be.  I have a whole bunch of

18    notes, and I am going to try to get there.

19                    So am I correct that there is --

20    and if this is too compound, let me know -- that

21    216 million in open AR, 17 million in stub rent,

22    38 million in 503(b)(9) claims and approximately

23    40 million in professional be paid claims

24    incurred to date that have not been paid.

25          A.        The $40 million of professional

                                                    98

1     fees have not been paid to the professionals.

2     They have been escrowed in a bank account.  So

3     the money has been set aside.  The open accounts

4    payable 503(b)(9) and stub rent that you

5    mentioned are correct.

6           Q.      And the 216 million open AR,

7    there was discussion today, it was clearly not

8    testimony, that there is goods in transit to the

9    debtors.

10              Is that 216 include any goods

11   that have not yet been delivered yet?  Could

12   that number actually increase?

13          A.      That number is anticipated to

14   reflect all goods where title has transferred.

15   I can't say absolutely that every invoice is

16   included in there, but to my knowledge, that

17   includes everything including what in transit

18   that has been -- where title has been

19   transferred.

20          Q.      Of that 216 open AR, how much of

21   that is past due by their terms?

22          A.      I don't know the answer to that.

23          Q.      Do you have an a rough percentage

24   of how much is past due?

25          A.      As of a month ago, it was in --

99

1    almost none of it.  I would expect a good

2      portion of it is past due at this point.

3                      So...

4           Q.      Okay.  So as of a month ago, the

5      debtors were fairly current on paying vendor

6      claims, as in, when they were due; is that

7      correct?

8           A.      That's correct.

9           Q.      What is your -- if there is such

10     a thing, what is the general payment terms for

11     vendors?  30 days, 60 days, do you have a

12     general payment term?

13          A.      It is vendor-specific.  So it

14     differs by vendor.

15          Q.      How much of the 260 open AR was

16     purchased after the debtors knew that there were

17     risks with closing the Nexus sale?

18          A.      I don't know the answer to that.

19          Q.      Do you have a rough percentage of

20     how much would have been purchased after the

21     debtors knew that there was a risk of closing of

22     the Nexus sale?

23          A.      I don't.

24          Q.      What was Gordon Brothers role in,

25     if any, in determining what inventory to

1   purchase and when to purchase it?

2          A.      They had no role.

3          Q.      How much -- how many 503(b)(9)

4   claims have been paid under various -- under the

5   first aid court orders?

6          A.      Under -- there have been certain

7   critical vendor agreements that have been signed

8   in order to get goods flowing again that the

9   vendors refused to ship.

10                 I don't know the number of those,

11  but it's not -- I don't know the number of

12  those, to be honest with you.

13         Q.      Not at today's hearing, but at

14  the December 19th hearing, there was discussion

15  that the 17 million in stub rent was only for

16  those leases that were scheduled to be rejected

17  and that the leases that were scheduled to be

18  purchased by the Nexus purchaser, the stub rent

19  was being included in the cure.  Is that

20  accurate?

21         A.      The $17 million is meant to cover

22  all stub rent.

23         Q.      Going to the, I don't know what

24  we've been calling it, the wind-down budget

25    downside, wind-down budget APA schedule, if we

101

1    were to put into the inflow that portion of the

2    purchase price that reflects the pay down of the

3    debt, we would be adding the 315,146 up to the

4    231,103; is that accurate?

5            A.        That is accurate.

6            Q.        So not including the Gordon

7    Brothers assumption of certain liabilities,

8    there -- that price there would be -- that

9    inflow there would be 546,249 compared to the

10   over 800 million for the other two scenarios; is

11   that correct?

12           A.        There are other liabilities that

13   Gordon Brothers is assuming over the 315, such

14   as store rent, store payroll, that would also

15   need to be added to that number.

16           Q.        I understand that and we'll get

17   there.   That's in the outflows.

18                     But in this -- in this total

19   inflows and opening cash, it would be 546

20   compared to the 833 and 807; is that correct?

21                     MR. McCLAMMY:  Objection to the

22   form.

23          THE WITNESS:  I don't think that

24     that's the right -- to be honest with you, I

25     don't think that that's the right way to

                                                        102

1      calculate it, adding those two numbers to total

2      546, but in my opinion, assuming liability is an

3      additional consideration as well.

4      BY MS. CASEY:

5          Q.      Correct.  But you have that

6      assumed liabilities in the outflows portion of

7      this document, correct?  So I'm saying, if we're

8      looking at this document, that would be 547, and

9      then where they have assumed the liability, it

10     shows up in the outflows portion; is that

11     correct?

12         A.      That's correct.

13         Q.      Okay.  So going down to the

14     outflows, the first level is payroll

15     headquarters, and it assumes that the debtors

16     would have paid 8.5 million approximately, but

17     that in the APA schedule, there's only 4.24.

18              Is there -- why is that a lower

19     amount for payroll in the APA scenario?

20         A.      Because the APA is anticipated to

21    be closed on this week, whereas that 8.457 was

22    as of the 21st of December.

23         Q.    So why would payroll be more on

24    the 21st on December than this week?

25         A.    Because we had made two weeks of

103

1    payroll in the periods between the 21st and when

2    this deal is expected to be closed on, the 6th.

3         Q.    And then the same question for

4    the distribution center payroll, 11.9 to 9.5.

5              Is that also reflecting that

6    payments have already been made?

7         A.    Correct.

8         Q.    So as we're sitting here today --

9    let me rephrase that question.

10             Have any of the inflows above

11    need to be reduced or increased based on the

12    fact that two weeks have gone by?

13         A.    They do not.

14         Q.    So if we were to go down to the

15    net cash available for distribution, we could

16    add in that approximately 5 million because of

17    the headquarters and the distribution center

18    payroll having been paid.  Is that correct?

19          A.          Well, the outstanding debt has

20     changed as well.

21                      So what is outstanding -- what

22     will be outstanding later this week is going to

23     be a lower number.

24                      So the way that we have prepared

25     this, because we had our inventory level as of

104

1      December 21st, we measured that date.  So you

2      would have to adjust the outgoing debt as well.

3      So it's not completely like to like.

4          Q.          So just to see if I understand

5      that correctly.  If we go down to the total DIP

6      ABL, DIP FILO and LC claims, that number would

7      increase, it would no longer be 315, so when we

8      add it up to the total inflows and operating

9      cash, that number would be higher; is that

10     correct?

11         A.          That number is lower because we

12     have been selling inventory over the last two

13     weeks and using those proceeds to pay down the

14     ABL.

15         Q.          Let me go back and ask my earlier

16     question that I thought you had answered no.

17              If we go up to the net proceeds,

18    the GOB sale proceeds, net proceeds of 626 and

19    601, would those come down or would those stay

20    the same?

21          A.      Those are as of December 21st.

22    So if they were measured again today, they would

23    be lower.

24          Q.      Thank you.

25              So why are the -- so I take it

                                                    105

1    the DC and store rent, that it is zero there and

2    the 89 million stores' payroll, is because those

3    are actual obligations that the Gordon Brothers

4    is assuming.  Is that correct?

5          A.      The store payroll, correct.

6          Q.      Now, is the difference between

7    what the Gordon Brothers is assuming versus what

8    they're paying for the wind-down budget and the

9    administrative -- the APA admin budget -- in

10    that Gordon Brothers is undertaking to pay

11    whatever the store payrolls are, whereas, if the

12    admin budgets and the wind-down budgets

13    underestimated, that will not be Gordon Brothers

14    liability, that will be the debtors' liability;

15    is that correct?

16            A.        That's correct.

17            Q.        Why is the IBNR listed on this

18    document 1,730,000 less under the APA?

19            A.        Because we have -- we will have

20    terminated a significant -- a number of

21    employees because of previous rounds of store

22    closings will be effectuated.

23                      So many of those employees will

24    have left over the past several weeks.  So the

25    employee count is lower in this example as of

106

1    the end of the store closing process, which

2    would be at the end of February.

3            Q.        When I read the actual agreement,

4    it appeared as though IBNR claims that have a

5    accrued from the petition date to the initial

6    closing date will not be included in the budget

7    and will not be paid.

8                      Am I reading that document

9    correctly?

10            A.        So IBNR claims are calculated --

11    well, let me backup.

12                      The health care claims are

13    paid -- the company is self-insured, so they are

14    paid on an ongoing basis.  So the company has

15    been paying those claims over the last nine

16    months.

17                    To date, there are no significant

18    outstanding claims that have been filed.  This

19    IBNR number is reflected as of what we would

20    anticipate the number to be as of February 28th.

21                    So it was -- so if it takes three

22    months to have a claim come through for payment,

23    it would essentially be the doctor visits from

24    November 30th through February 28th that come

25    due over the next 90 days.

                                                          107

1            Q.       So what in the budget is there to

2    protect the insureds for the stuff that they

3    incur from January through March under the

4    health care plans?

5            A.       This IBNR payment.  So this IBNR

6    payment will be made to Anthem as part of the

7    transactions.

8            Q.       So maybe I didn't understand your

9    testimony.  I thought you said that the $11

10   million was for the claims that you anticipated

11    from the last 90 days that they've incurred from

12    November but hasn't been submitted yet.

13                    Is the number in the budget

14    enough to pay anticipated claims that are

15    incurred all the way through the last day that

16    the last employee is covered through their

17    insurance program, or is it cut off at some

18    particular time that trailing expenses are not

19    included?

20         A.     It is anticipated that the

21    employees will have coverage through

22    February 28th, which is also the targeted last

23    day of employment.  So any doctor visit up until

24    that date are anticipated to be covered.

25         Q.     Going to the wind-down budget.

                                                    108

1     Looking specifically at the U.S. Trustee fees

2     line, U.S. Trustees is paid -- has a budget of a

3     million dollars and is being paid on January --

4     weekending January 25th.

5                    Is it correct to assume that

6     that's the U.S. Trustee fees for the quarter

7     ending December 21st, 2024?

8          A.     That is our estimate, yes.

9          Q.        Where are the fees that would be

10   due for the quarter ending March 31st, 2025, in

11   this budget?

12          A.        They are paid outside of the

13   weeks of this budget and are anticipated to be

14   paid out of value within the estates post

15   March 8th.

16          Q.        Do the debtors anticipate having

17   sufficient funds to pay those fees?

18          A.        We do.

19          Q.        What -- are all -- have all of

20   the bonus and severance payments contained in

21   these budgets approved by the Court?

22          A.        Can you repeat the question?

23                    (Court reporter seeks

24   clarification.)

25                    THE WITNESS:  Sorry, could you --

                                                    109

1    BY MS. CASEY:

2          Q.        Were all of the severance and

3    bonus payments included in these budgets already

4    approved by the Court?

5          A.        I don't believe they have been

6    submitted to the Court for approval.

7        Q.        Is it the debtors' anticipation

8    that they will seek approval of the severance

9    and the bonus payments in these budgets?

10        A.        I'm not aware of that

11   requirement.  I have not had that conversation

12   with counsel.

13        Q.        Reading through the ADPA, one of

14   the assets being transferred are all causes of

15   action owned by the debtors against any parties.

16                  Are you aware of that?

17        A.        Yes.

18        Q.        Did that include claims that the

19   estate may have against estate professionals?

20        A.        Sorry.  You said transferred to

21   the debtor or transferred to the buyer?  I'm

22   sorry.

23        Q.        I misspoke.  That part of the

24   acquired assets to be sold to the buyer are any

25   cause of action owned by the debtors against any

                                                    110

1    third party.  Is that correct?

2         A.        That is my understanding.

3         Q.        And so that would -- and those

4    causes of action are any causes of action that

5    have accrued as of the initial closing date.  Is

6    that correct?

7              A.       That's my understanding.

8              Q.       So that would include any causes

9    of action against any of the debtors -- excuse

10   me -- any of the estate professionals.  Is that

11   correct?

12             A.       I'm not sure of the answer to

13   that, to be honest with you.

14             Q.       Is there any reason to believe

15   that the sale of all causes of action against

16   all parties does not include causes of actions

17   against the estate professionals?

18             A.       I don't know the definition, so

19   I'm not the right person to ask that question,

20   to be honest with you.

21             Q.       Does it include all causes of

22   action against Gordon Brothers?

23             A.       I don't know this passage very

24   well.  I was not involved in writing it.  So I

25   don't know the answer to this question.

                                                   111

1              Q.       Do you know who put the provision

2    in the asset purchase agreement that would sell

3    all causes of action owned by the debtors to

4    Gordon Brothers?

5            A.        I don't.

6            Q.        Have the debtors marketed those

7    causes of action separate and apart from the

8    ongoing business of the debtors?

9            A.        Not to my knowledge.

10            Q.        Has Nexus asserted that they are

11    entitled to either the breakup fee for the

12    expense reimbursement?

13            A.        They have requested the breakup

14    fee, yes.

15            Q.        Has that been included in any of

16    the budgets?

17            A.        It has not.

18            Q.        Will the debtors have funds to

19    pay that?

20            A.        It is not in the budget, and it

21    is not anticipated to be paid in this budget.

22            Q.        Did the debtors take a position

23    as to whether the breakup fee and the expense

24    reimbursement should be an allowed

25    administrative expense claim against the

1   estates?

2           A.      I don't believe we've taken an

3   assertion on that at this point.

4           Q.      Make sure that's all my

5   questions.  I don't want to miss anything.

6                   So am I reading this correctly

7   that as of the initial closing date, the only

8   assets being purchased by Gordon Brothers that

9   don't require Gordon Brothers to designate it is

10  the cash at the stores, and all of the other

11  assets that are being sold require Gordon

12  Brothers to come and designate that they're

13  purchasing those assets?

14          A.      I'm not sure of that -- of that

15  question.  I don't -- I don't know the answer to

16  that question.

17          Q.      Why is there a separate agency

18  agreement having Gordon Brothers act as the

19  agent of the debtors to sell the inventory if

20  Gordon Brothers is purchasing the inventory and

21  the inventory is Gordon Brothers?

22          A.      Gordon Brothers crafted that

23  separation.  They did not justify to me why they

24  separated the two agreements.

25          Q.      The proposed sale order has the

1   debtor releasing Gordon Brothers, but carving

2   out of that release causes of action based on

3   gross negligence, fraud, or willful misconduct.

4                    Is it your understanding that any

5   causes of action against Gordon Brothers, based

6   on fraud, gross negligence, or willful

7   misconduct is being sold to Gordon Brothers?

8        A.       Those are not my area of

9   expertise, and I have not been focused on this.

10  So I really don't have knowledge of how that is

11  crafted.

12       Q.       What is your understanding about

13  the need close the sale this week?

14       A.       The company has not received new

15  inventory from vendors and is the value of the

16  collateral that is in the stores and in -- as

17  part of the company's assets is diminishing

18  daily.  And, therefore, the consideration that

19  Gordon Brothers has proposed, that value of the

20  collateral that they are purchasing diminishes.

21                    So there is the potential that

22  they would want to reconsider or renegotiate all

23  of the consideration that is part of this

24    agreement if this sale does not close in a

25    relatively short timeframe.

114

1            Q.        Costs of the sales that they have

2    undertaken to pay also be reduced because the

3    debtors would have been paying it in that time

4    period?

5            A.        The costs associated with things

6    such as rent and payroll are being paid in the

7    ordinary course.

8                      So the outflow of cash would --

9    is being disbursed.

10           Q.        Gordon Brothers right to

11    designate buyers, is there any limitations as to

12    who they can designated as a buyer of any

13    particular asset?

14           A.        Not to my knowledge.

15           Q.        Could they designate an insider

16    of the debtors as the purchaser of some of the

17    assets?

18           A.        I don't know any restrictions on

19    their sedation rights.

20                      MS. CASEY:  That's all the

21    questions I have.  Thank you.

22                    MR. McCLAMMY:  Okay.

23                    MR. CONLAN:  I don't know how --

24                    MR. McCLAMMY:  Mr. Conlan, maybe

25    before you start, let me just check to see how

                                                          115

1    our court reporter is holding up.  And maybe

2    also I could ask -- I understand you may have

3    mentioned you only have a few questions.

4                    Is there anyone else on that

5    anticipates having any questions for Mr. Percy?

6                    MS. KATONA:  Hi, this is Shanti

7    Katona of Polsinelli on behalf of Hogan.  We may

8    have one clarifying question as well.

9                    MR. McCLAMMY:  Anyone else?

10                    Okay.  Madam Court Reporter,

11    would you be able to marshal through for a few

12    more questions?

13                    THE REPORTER:  Yes, I'm fine.

14    Thank you.

15                    MR. McCLAMMY:  All right.  Great.

16                    No.  Thank you.

17    EXAMINATION

18    BY MR. CONLAN:

19            Q.      All right.  Good evening,

20    Mr. Percy.  My name is Mark Conlan.  I'm an

21    attorney with the Gibbons firm, and I represent

22    a foreign trade vendor, Round Tripping Limited.

23                        I just want to ask you how the

24    503(b)(9) and post-petition claims were

25    calculated.

116

1                        Are you familiar with the term

2    FCR?

3              A.      I am not.

4              Q.      How about are you familiar with a

5    term called forward -- forwarder's cargo

6    receipt?

7              A.      I am not.

8              Q.      So let me ask you this:  Do you

9    know what dates they used when they

10    calculated -- and I assume it's your firm that

11    did it -- when they calculated the 503(b)(9)

12    exposure?

13             A.      It was related to me that the

14    protocol in Delaware, which is different than

15    other jurisdiction, is based upon when inventory

16    is received, not when title is transferred.

17                        So we did our calculation by

18    cross-referencing invoices and shipping

19    documentation of when goods were received,

20    either in the distribution center or where goods

21    were delivered directly to the stores and to the

22    stores.

23                    And so we worked 20 days back

24    from the filing date for when goods were

25    received in either of those locations.

117

1                    Q.      And would that same methodology

2    apply to the post-petition claims?

3                    In other words, did you use the

4    date that the goods were received at the

5    distribution center of the stores when

6    calculating what was a post-petition receipt?

7                    A.      To the best of my knowledge, yes.

8                    MR. CONLAN:  Thank you.  That's

9    all I have.

10                   I told you it was a couple

11   questions.

12                   MR. McCLAMMY:  You're a man of

13   your word.

14   EXAMINATION

15   BY MS. KATONA:

16          Q.      Hi.  Shanti Katona of Polsinelli

17  on behalf of Hogan Transports and Hogan

18  Logistics.  I just have one clarifying question.

19  And please correct me if I am misstating

20  anything.

21              But was I correct that in

22  response to a question about how the debtors

23  planned to curtail expenses and preserve value

24  through the March period, that one of the

25  strategies to be employed was to get concessions

                                                    118

1  from freight carriers such that they would

2  deliver inventory for as little consideration as

3  possible?

4          A.      No.  That is not correct.  We

5  will contract with freight carriers to the

6  extent that they are willing to send goods.  As

7  you can imagine, we're not getting any real

8  concessions from those freight carriers.  Many

9  of them need to be paid ahead of time.  So we

10  are paying essentially standard rates for

11  freight to be delivered to the distribution

12  centers and to the stores.

13              MS. KATONA:  Thank you.  Thank

14   you for clarifying.

15                      That's all I have.

16                      MS. HUMISTON:  Hi.  This a

17   Shannon Humiston and I represent Mielli.  I

18   didn't get off mute quick enough before, but I

19   have a few quick questions, if the court

20   reporter has two more minutes.  If that would be

21   okay.

22                      (Court reporter seeks

23   clarification.)

24                      MS. HUMISTON:  Shannon Humiston

25   of McCarter & English on behalf of Mielli,

                                                    119

1   M-I-E-L-L-I Realty.

2   EXAMINATION

3   BY MS. HUMISTON:

4           Q.      Okay.  Sir, under the proposed

5   sales agreement with Gordon Brothers, who would

6   make the year-end reconciliation payments?

7           A.      The reconciliation payments for

8   rents, CAM, insurance, property taxes -- is that

9   what you're talking about?

10          Q.      Yes.

11          A.      So those -- I guess it kind of

12      depends.  It depends on what timeframe they're

13      applicable to, and what exactly the expenses

14      are.  Some of these are handled separately than

15      others.

16                      So it kind of depends on the

17      nature of those expenses and when the expense is

18      incurred.

19              Q.      So who will be paying real estate

20      taxes under the proposed development agreement

21      with Gordon Brothers?

22              A.      The real estate taxes are, I

23      believe, in the wind-down budget.

24                      So the estate is paying those.

25                      MS. HUMISTON:  Thank you.  I have

                                                        120

1       no further questions.

2                       MR. McCLAMMY:  I've got nothing

3       on redirect for now.

4                       And thank you very much to our

5       court reporter for doing this on short notice

6       this evening.

7                       I know for our end, we would like

8       a copy of the rough as soon as it's available.

9       You have some sense of timing on that?  We're

10      scheduled to go back to court tomorrow at

11      10:00 a.m.

12                          (Discussion off the record.)

13                          (10:08 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                       CERTIFICATE

2

3

4

5                       I, Karen Friedlander, a

6       Certified Court Reporter of the State of New

7       Jersey, do hereby certify that prior to the

8      commencement of the examination, the witness

9      and/or witnesses were sworn by me to testify to

10     the truth and nothing but the truth.

11                      I do further certify that the

12     foregoing is a true and accurate computer-aided

13     transcript of the testimony as taken

14     stenographically by and before me at the time,

15     place and on the date hereinbefore set forth.

16                      I do further certify that I am

17     neither of counsel nor attorney for any party in

18     this action that I am not interested in the

19     event nor outcome of this litigation.

20

21

               S/Karen Friedlander
22             Certified Court Reporter
               License No. XI01282
23

24

25     Dated:   12-31-24