UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> BIG LOTS, INC., *et al.*, <br><br> Debtor(s). | Chapter 11 <br><br> Case No. 24-11967 (JKS) <br> Jointly Administered <br><br> **Re: D.I. 2207, 2557** |

### HOMEVIEW DESIGN INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF THE ALLOWANCE AND IMMEDIATE PAYMENT OF ITS POST-CLOSING ADMINISTRATIVE EXPENSE CLAIM

Post-closing administrative priority creditor, HomeView Design Inc. (hereinafter, "**HomeView**"), by and through undersigned counsel, hereby submits *HomeView Design Inc.'s Supplemental Brief in Support of the Allowance and Immediate Payment of its Post-Closing Administrative Expense Claim*, and states as follows:

### FACTS

1. The relevant facts and dates here are indisputable.

2. HomeView is a home furnishing distributor based in California.

3. Prior to and following the petition date, the Debtors engaged HomeView to supply goods in the ordinary course of business.

**I.    Procedural History**

4. On September 9, 2024 (the "**Petition Date**"), the above-captioned debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

5. The Debtor(s) are operating as debtors-in-possession. No trustee or examiner has been appointed.

6. On September 10, 2024, the Court entered an Order authorizing the procedural joint administration of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b). [Bankr. D.I. 95].

7. On January 3, 2025, the Debtors closed a going concern sale to Gordon Brothers.

8. On February 7, 2025, the Debtors filed a Motion [D.I. 1962] asking this Court to create two distinct classes of administrative priority creditors – those with pre-closing claims, and those with post-closing claims.

9. On February 27, 2025, the Court granted that request – over the objection of a number of administrative priority creditors. *See* D.I. 2110.

10. Notably, paragraph 8 of the Motion [D.I. 1962] defines "Post-Closing Administrative Expense Claims" as "administrative claims incurred after January 3, 2025".

11. Paragraph 8 of the Motion [D.I. 1962] also goes on to say that that "[]Post-Closing Administrative Expense Claims[] would not be subject to the procedures set forth herein"; and that "[t]he Debtors intend to pay Post-Closing Administrative Expense Claims in the ordinary course…"

12. Upon information and belief, the Debtors' estate professionals have been paid 100% of their pre-closing administrative priority claims (a total of over $44 million), and also intend to be paid 100% of their post-closing administrative priority claims. *See* D.I. 519, D.I. 2257, and D.I. 2271.

II. **HomeView's Post-Closing Administrative Priority Claim**

13. HomeView has a claim for breach of contract damages against the Debtors relating to over a half a million dollars worth of post-petition orders that the Debtors wrongfully repudiated post-closing – on January 15, 2025.

14. These orders were placed, and later repudiated, incident to the operations of the debtors' business.

15. In the months leading up to the January 15, 2025 repudiation, the Debtors misrepresented, repeatedly, in November and December of 2024 that they wanted the orders fulfilled, and that they "do not want to cancel".

16. HomeView relied on those misrepresentations – to their detriment.

17. HomeView arranged for the goods to be specially manufactured for the Debtors, in accordance with the Debtors' specifications - specially tagged, packaged and labelled – all with the Debtors' name.

18. At all relevant times, HomeView was ready, willing and able to ship the goods to the Debtors.

19. However, as noted above, on January 15, 2025 - the Debtors wrongfully repudiated the contract.

20. Specifically, the Debtors' January 15, 2025 repudiation email says: "all current PO's that were issued were cancelled off if not already shipped" and that they "will not be re-instated."

21. January 15, 2025 was the very first time that the Debtors indicated to HomeView, unequivocally, that they would not perform under the contract.

22. In reliance on the Debtors' January 15, 2025 repudiation, HomeView did not ship the goods.

23. The goods are sitting in manufacturer warehouses in China.

24. The goods are not able to be resold to others.

25. In a good faith effort to mitigate its damages, HomeView has communicated with both its manufacturers and a closeout sale provider.

26. The closeout sale provider was not interested in providing closeout services, because of the fact that all of the goods are specially tagged, packaged and labelled – all with the Debtors' name – and because the duty for home décor products made with metal materials (which was 0% at the time these goods were originally scheduled to ship) is now presently 145%.

27. HomeView has not been able to pay its manufacturers for their production and packaging services.

28. Also, HomeView's manufacturers are now seeking monthly storage payments from HomeView in the amount of $3,884.35/mo. beginning in February, 2025 (a total of $15,537.40 as of May, 2025).

29. Damages continue to accrue each month.

30. Under the circumstances, the goods will likely need to be destroyed to stop further damage to HomeView.

31. HomeView has discussed destruction of these goods with its manufacturers. It will cost approximately $20,500 to destroy and dispose of these goods.

32. HomeView's damages, to date, total at least $552,146.68, calculated as follows:

|   | | |
|---|---|---|
|   | $554,109.28 | Purchase orders price |
| + | $15,537.40 | Storage fees incurred to date |
| + | $20,500.00 | Estimated Destruction and disposal costs |
|   | $590,146.68 | Sub-Total Damages (before cost savings) |
| - | $36,000.00 | Estimated ocean freight savings |
| - | $2,000 | Estimated bookage fee savings |
| - | $0.00 | Duties savings[1] |
|   | $552,146.68 | Total Damages as of May, 2025 |

---

[1] As noted above, these shipments would have been duty free had they shipped out as originally scheduled.

4

### III. HomeView's Motion for Allowance and Immediate Payment, and the Debtors' Opposition Thereto

33. On March 11, 2025, HomeView filed a motion [D.I. 2207] seeking, among other things, a Court Order allowing and requiring immediate payment of its post-closing administrative expense claim.

34. On April 11, 2025, the Debtors filed a letter brief in opposition to the motion.

35. The Debtors' opposition is four-fold.

36. First, the Debtors argue that there was no *actual* benefit to the estate since the goods were never delivered. And, without citation to any on point authority, the Debtors also argue that "a predicate for an administrative expense claim relating to a sale of goods is that the goods must actually be delivered."

37. Second, the Debtors argue that the Reading Doctrine is inapplicable to breach of contract claims in general. And, the Debtors also argue, and mischaracterize certain case law as holding that, the Reading Doctrine may apply to breach of contract claims – but only if the contract was a *pre-petition* contract.

38. Third, the Debtors argue that HomeView's claim accrued pre-closing. Specifically, and without citing to *any* legal authority, the Debtors argue that HomeView's claim for breach of contract accrued when the contract was first entered into. And alternatively, the Debtors argue that HomeView's claim for breach of contract accrued on December 19, 2024, when Debtors' counsel made vague statements in court, and outside of HomeView's presence, that the debtors would not place any new orders with vendors, and are not expecting vendors to ship new items.

39. Forth, the Debtors argue that it would be inequitable for HomeView to get paid 100% when the pre-closing admin claims are getting pennies on the dollar.

5

**DISCUSSION**

40. As detailed below, the arguments made by the Debtors in their opposition brief are legally and factually incorrect.

**I.     HomeView's Claim Accrued Post-Closing – on January 15, 2025**

41. "[R]epudiation gives rise to an ordinary claim for breach of contract." *McCarron v. FDIC*, 111 F.3d 1089, 1095 (3rd Cir. 1997); *see also e.g., Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 500 (D.N.J. 2006) ("[A]n anticipatory repudiation is a breach of contract."); 23 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 63:28 (4th ed. 1994) ("[A]n anticipatory repudiation is a breach of contract.").

42. The claim accrues "immediately" upon repudiation. *See e.g., James Cable, LLC v. Millenium Digital Media Sys., L.L.C. (In re Broadstripe, LLC)*, 435 B.R. 245, 261 (Bankr. D. Del. 2010) ("The law generally has acknowledged for more than one hundred years that [repudiation] gives the injured party an immediate claim to damages for total breach, in addition to discharging the remaining duties of performance."); *Clymer v. DeGirolano*, C.A. No. 2021-0004-SEM, 2023 Del. Ch. LEXIS 165 at *33 (Del. Ch. July 5, 2023) ("[Repudiation], gives the injured party an immediate claim to damages for total breach."); *AMG Vanadium LLC v. Global Advanced Metals U.S.A., Inc.*, C.A. No. N17C-03-1637 MMJ [CCLD], 2020 Del. Super. LEXIS 159 at *16 (Del. Ch. Feb. 6, 2020) (Describing repudiation as "giving rise to an immediate cause of action for breach of [contract]"); *Brasby v. Morris*, C.A. No. 05C-10-022-RFS, 2007 Del. Super. LEXIS 73, *12 (Del. Super. Ct. March 29, 2007) (Describing repudiation as "giving rise to an immediate cause of action for breach of [contract]"); *Global Advanced Metals U.S.A., Inc.*, C.A. No. N17C-03-1637 MMJ [CCLD], 2020 Del. Super. LEXIS 159 at *16 (Del. Ch. Feb. 6, 2020) (Describing

repudiation as "giving rise to an immediate cause of action for breach of [contract]"); *Veloric v. J.G. Wentworth, Inc.*, C.A. No. 9051-CB, 2014 Del. Ch. LEXIS 178 at *46 (Del. Ch. Sept. 18, 2014) (*internal quotations and citations omitted*) ("[A] promisor must give an unequivocal statement that is positive and unconditional about its intent to not perform its contractual obligation before a promisee may assert a claim for anticipatory repudiation.").

43. Repudiation requires "an unequivocal statement by a promisor that he will not perform his promise[.]" *James Cable, LLC v. Millenium Digital Media Sys., L.L.C. (In re Broadstripe, LLC)*, 435 B.R. 245, 261 (Bankr. D. Del. 2010); *see also Neurvana Med., LLC v. Balt USA, LLC*, C.A. No. 2019-0034-KSJM, 2020 Del. Ch. LEXIS 77, *50, (Del. Ch. February 27, 2020) (*internal citations and quotations omitted*) ("[U]nder Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions requiring an unequivocal statement of an intent not to perform.")

44. The statement must be "unequivocal". *See e.g., Frontier Oil Corp. v. Holly Corp.*, 2005 Del. Ch. LEXIS 57, 2005 WL 1039027, at *27 (Del. Ch. Apr. 29, 2005) ("An '*unequivocal* statement by a promisor that he will not perform his promise' is the essential underpinning for a repudiation claim."); *Cornell Glasgow, LLC v. La Grange Props., LLC*, C.A. No. N11C-05-016-JRS CCLD, C.A. No. N11C-07-160-JRS CCLD, 2012 Del. Super. LEXIS 546 at *48-49 (Del. Super. Ct. Dec. 7, 2012); *Edwards v. Wyatt*, 335 F.3d 261, 273 (3rd Cir. 2003) (*internal citations omitted*) ("[R]epudiation must be apparent in an objective sense.... that the party will not or cannot perform."); *AMG Vanadium LLC v. Global Advanced Metals U.S.A., Inc.*, C.A. No. N17C-03-1637 MMJ [CCLD], 2020 Del. Super. LEXIS 159 at *16 (Del. Ch. Feb. 6, 2020) (Describing repudiation as "an unequivocal statement ... that [the breaching party would] not perform [its] promise."); *Clymer v. DeGirolano*, C.A. No. 2021-0004-SEM, 2023 Del. Ch. LEXIS

165 at *33 (Del. Ch. July 5, 2023) (Describing repudiation as "an unequivocal statement by a promisor that he will not perform his promise[.]") *Veloric v. J.G. Wentworth, Inc.*, C.A. No. 9051-CB, 2014 Del. Ch. LEXIS 178 at *46 (Del. Ch. Sept. 18, 2014) (*internal quotations and citations omitted*) (Describing repudiation as "an unequivocal statement that is positive and unconditional about its intent to not perform its contractual obligation[.]"); *Bioveris Corp. v. Meso Scale Diagnostics, LLC*, C.A. No. 8692-VCMR, 2017 Del. Ch. LEXIS 780 at *23 (Del. Ch. Nov. 2, 2017) (Describing repudiation as an "unequivocal statement that is positive and unconditional.") (*internal quotations and citations omitted*); *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, C.A. No. 2020-0249-JRS, 2022 Del. Ch. LEXIS 49, at *38 ("[T]o constitute an anticipatory repudiation, the acts or statements of the alleged repudiator must amount[] to an unequivocal statement . . . that the breaching party would not perform its promise.") (*internal quotations and citations omitted*); *Am. Messaging Servs., LLC v. DocHalo, LLC*, C.A. No. 10761-VCN, 2015 Del. Ch. LEXIS 105 at *8, (Del. Ch. April 9, 2015) ("[R]epudiation requires a clear and unequivocal statement of intent not to perform contractual duties[.]").

45. The statement must be made directly to the contract counterparty. *See e.g., Tenneco Auto., Inc. v. El Paso Corp.*, C.A. No. 18810-NC, 2007 Del. Ch. LEXIS 4 at *29 (Del. Ch. Jan. 8, 2007) ("The [statement] must be made to an obligee under the contract."); *Restat 2d of Contracts*, § 250 (defines repudiation as "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach[.]")

8

**II.     HomeView Conferred a Benefit to the Debtors**

46.     The Third Circuit has explained that:

> The word benefit does not itself appear in the text of Section 503(b)(1)(A). Instead, it functions as merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no benefit, it cannot have been 'necessary' within the meaning of § 503(b)(1)(A). The benefit does not, however, have to be substantial to qualify.
> ...
> Although the amount to be allowed as an administrative expense must be measured in dollars and cents . . . the question whether the estate has been benefited cannot be so narrowly confined. That is because the concept of necessary costs in the 503(b)(1)(A) context is broader than one of absolute requirement, and less readily calculable benefits, such as the ability to conduct business as usual, can qualify.

*In re Energy Future Holdings Corp.*, 990 F.3d 728, 741-42 (3rd Cir. 2021).

47.     Here, HomeView unquestionably conferred an actual benefit to the Debtors. As detailed above, HomeView accepted and fulfilled the Debtors' post-petition orders. More specifically, HomeView contracted with the Debtors post-petition, and arranged for the goods to be specially manufactured for the Debtors, in accordance with the Debtors' specifications - specially tagged, packaged and labelled – all with the Debtors' name. And, at all relevant times, HomeView was ready, willing and able to ship the goods to the Debtors. The goods are sitting in manufacturer warehouses in China.

48.     The post-petition contract and services provided by HomeView allowed the Debtors to continue ordinary course operations post-petition, which in turn allowed the Debtors to maintain a going concern value, and allowed the Debtors to pursue a going concern sale – for which they were ultimately successful with their going concern sale to Gordon Brothers.

### III. The Debtors are Barred from Arguing that HomeView Failed to Confer a Benefit to the Debtors

49. Equitable doctrines—unclean hands, estoppel, quasi-estoppel, and waiver—bar the Debtors from denying that HomeView provided value.

50. Indeed, the *only* reason that the goods were never delivered to the Debtors is because the Debtors wrongfully repudiated the contract.

51. Again, as noted above, HomeView contracted with the Debtors post-petition, and arranged for the goods to be specially manufactured for the Debtors, in accordance with the Debtors' specifications - specially tagged, packaged and labelled – all with the Debtors' name.

52. And, at all relevant times, HomeView has been ready, willing and able to ship the goods to the Debtors. But, on January 15, 2025, the Debtors wrongfully repudiated the contract. The goods are sitting in manufacturer warehouses in China.

53. In the months leading up to the January 15, 2025 repudiation, the Debtors misrepresented, repeatedly, in November and December of 2024 that they wanted the orders fulfilled, and that they "do not want to cancel".

54. HomeView relied on those misrepresentations – to their detriment.

55. It is a "fundamental rule of equity that a party should not be permitted to profit from its own wrongdoing." *See Miklavic v. USAir Inc.,* 21 F.3d 551, 557 (3d Cir. 1994).

56. The unclean hands doctrine "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with the inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co,* 324 U.S. 806, 814-15 (1945)*; see also Sportsman's Warehouse, Inc. v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372 at 401 (Bankr. D. Del. 2011) (Same).

57. "[T]he primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, i.e., have a relationship, to the matters before the court for resolution." *New Valley Corp. v. Corp. Prop. Assocs.(In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir. 1999) *(internal citations omitted)*; *see also Sportsman's Warehouse, Inc. v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372 at 401 (Bankr. D. Del. 2011) (Same).

58. "Equitable estoppel is most often invoked and frequently applied when a denial of estoppel under the facts of the case would permit a defendant to take advantage of his wrong." *Pirinate Consulting Group, LLC v. Cascades Sonoco Inc. (In re NewPage Corp.)*, Case No. 11-12804(KG), Adv. Proc. No. 13-52430(KG), 2014 Bankr. LEXIS 4563 at *48-49 (Bankr. D. Del. Aug. 22, 2014).

59. "Parties claiming equitable estoppel must establish that (1) a representation of fact was made to them, (2) upon which they had a right to rely and did so rely, and (3) that the denial of the represented fact by the party making the representation would result in injury to the relying party." *Wheeling-Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 162-63 (3d Cir. 1987) *(internal citations omitted)*; *See also In re Maxus Energy Corp.*, 639 B.R. 51, 66 (Bankr. D. Del. 2022) (same).

60. "[Q]uasi-estoppel differs from garden-variety equitable estoppel in that there is no requirement of a change in position in reliance upon another's prior conduct... The doctrine applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or where he accepted a benefit... In common parlance, quasi-estoppel translates into the maxim that one cannot blow both hot and cold." *Forman v. Amboy Nat'l Bank (In re Price)*, 361 B.R. 68, 79 (Bankr. D.N.J. 2007) *(internal citations omitted)*.

61. Waiver is the "intentional relinquishment of a known right." *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 (3d Cir. 1996); *see also Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 51 (3d Cir.1988); *Sportsman's Warehouse, Inc. v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372 at 400 (Bankr. D. Del. 2011) (Same).

**IV. The Reading Doctrine is Not Limited to Tort Claims – It Applies to Breach of Contract Claims Where the Contract at Issue is a Post-Petition Contract**

62. Under the Reading Doctrine, "[p]ersons injured by a debtor-in-possession in its continued operation of the debtor's business are entitled to administrative priority." *Oil, Chem. & Atomic Workers v. Hanlin Group (In re Hanlin Group)*, 176 B.R. 329, 334 (Bankr. D.N.J. 1995).

63. Notably, under the Reading Doctrine, there need not be a benefit to the estate. *See e.g. In re Energy Future Holdings Corp.*, 990 F.3d 728, 728 (3rd Cir. 2021) (*internal citations omitted*) (Describing the Reading Doctrine as an "exception to the requirement that an application must show a benefit to the estate in order to recover administrative fees.").

64. Also, notably, "the Reading [Doctrine] is not limited to tort claims. Rather it applies to all costs ordinarily incident to operations of a business, including damages for any injuries caused by the debtor-in-possession." *Oil, Chem. & Atomic Workers v. Hanlin Group (In re Hanlin Group)*, 176 B.R. 329, 334-35 (Bankr. D.N.J. 1995) (*internal citations and quotations omitted*).

65. Indeed, Courts across the country, as well as other legal authorities, have repeatedly acknowledged that the Reading Doctrine may be applied in a variety of contexts – including breach of contract claims. *See e.g., Exec. Sounding Bd. Assocs. v. Moshannon Valley Citizens, Inc. (In re Moshannon Valley Citizens, Inc.)*, 2012 Bankr. LEXIS 1803 at *15 (Bankr. M.D. Pa. April 24, 2012) (*internal citations omitted*) ("The [Reading Doctrine] has been applied in the context of a

debtor's negligence, a debtor's intentional misconduct, or injury to an innocent third party with no prior relationship to the debtor."); *Nostas Assocs. v. Costich (In re Klein Sleep Prods.)*, 78 F.3d 18, 26 (2nd Cir. 1996) ("[B]reach of contract committed by the trustee or debtor-in-possession while administering the estate--gives rise to a debt entitled to the same administrative expense priority."); *In re Energy Conversion Devices, Inc.*, 528 B.R. 697, 708 (Bankr. E.D. MI 2015) ("When a Chapter 11 debtor in possession operates its business in bankruptcy, post-petition claims that arise from the debtor's operation of its business, concluding [*sic*] contract and tort claims, generally are given administrative expense priority under § 503(b)(1)(A). This is sometimes referred to as the "Reading" doctrine..."); *Caradon Doors & Windows, Inc. v. Eagle-Picher Industries, Inc. (In re Eagle-Picher Indus.)*, 447 F.3d 461, 464 (6th Cir. 2006) (expressly recognizing that the Reading Doctrine may be applied in the context of breach of contract claims); *Murphy v. Madden*, 532 B.R. 286, 296 (D. E.D. MI 2015) (expressly recognizing that the Reading Doctrine may be applied in the context of breach of contract claims).

66.    The contract at issue must be a post-petition contract for the Reading Doctrine to apply to a breach of contract claim. *See e.g. Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757-59 (9th Cir. 1998) (describing the Reading Doctrine for breach of contract claims as having a "postpetition transaction requirement", and explaining that "Postpetition contracts may qualify for administrative expense priority [under Reading Doctrine], but costs and expenses arising out of prepetition contracts are treated under the Bankruptcy Code as nonprioritized unsecured claims."); *In re Old Carco LLC*, 424 B.R. 650 (Bankr. S.D. N.Y. 2010) (describing the Reading Doctrine as having a postpetition transaction requirement); 4 *Collier on Bankruptcy* ¶ 503.06[6][a] (Richard Levin & Henry J. Sommer, eds.,16th ed. 2021) ("If the trustee enters into a contract or lease after entry of the order for relief and subsequently breaches the contract or lease,

the other party will have a claim for damages. The amount of those damages will be determined under the contract or lease, and the full amount of the damages arising from the trustee's breach will constitute an administrative expense."); *In re Emerald Grande, LLC*, Case No. 1:17-bk-00021, 2021 Bankr. LEXIS 2799 at *11 (Bankr. N.D. W.Va. Oct. 7, 2021) (same) (*internal quotations and citations omitted*).

## V. The Law of the Case Doctrine and General Principles of Equity Support HomeView's Positions

67. The pre-closing/post-closing demarcation was specifically requested by the Debtors, and ordered by this Court - over the objection of a number of administrative priority creditors.

68. That demarcation is now the law of this case. *See e.g.* In re Budd, Case No.: 20-21419-ABA, 2022 Bankr. LEXIS 592 at *15 (Bankr. D.N.J. March 4, 2022) (*internal quotations and citations omitted*) ("[The law of the case] doctrine is one of both fundamental fairness and judicial efficiency....Under the law of the case doctrine, when a court decides upon a rule of law[,] that decision should continue to govern the same issues in subsequent stages of the same case. Law of the case applies equally to legal and factual findings.").

69. It would be wholly inequitable for this Court to ignore that demarcation now, and *only* with respect to HomeView's post-closing administrative priority claim - while at the same time honoring that demarcation for all other post-closing administrative priority creditors – including presumably, but not limited to, post-closing professional fees and expenses.

70. The Debtors should not be permitted to selectively apply the framework they requested when it benefits them, and abandon it when it does not.

14

**CONCLUSION**

WHEREFORE, HomeView respectfully requests that the Court enter an order pursuant to 11 U.S.C. §§ 503(b)(1)(A) allowing and requiring immediate payment of $552,146.68 to HomeView on account of its post-closing administrative priority claim, and granting such other and further relief as this Court deems just and proper.

Dated: May 2, 2025

Respectfully submitted,

KASEN LAW GROUP, P.C.

*/s/ Jenny R. Kasen*
Jenny R. Kasen, Esquire (DE Bar No. 5849)
1213 N. King Street, Suite 2
Wilmington, DE 19801
Telephone: (302) 652-3300
Facsimile: (856) 424-7565
E-Mail: jkasen@kasenlawgroup.com

*Counsel to HomeView Design Inc.*