# EXHIBIT A

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 20th day of July , 2009, by and between Norman P. Bertke, Managing Director of CB Richard Ellis, Inc., as Receiver for Rushmore Roberts, LLC ("Landlord"), whose mailing address is CB Richard Ellis, Inc., 280 North High Street, Suite 1700, Columbus, Ohio 43215, and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10051, Columbus, Ohio 43228-0512.

## WITNESSETH:

**1.   DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.   Common Areas: The term "Common Areas" as used herein shall mean all improved portions not occupied by buildings of the Shopping Center from time to time designated by Landlord for the common use or benefit of the occupants of the Shopping Center, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center, all of which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would materially and adversely impair the visibility of or accessibility to the Demised Premises. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not materially and adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Tenant, or any employees or agents of Tenant or anyone else acting by, through or under Tenant, shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any applicable "Laws" (as hereinafter defined). Unless required by applicable Laws, Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area"). For purposes of the preceding sentence, "alter" shall not mean customary or typical maintenance, repair, replacement, including landscaping and other Common Areas components.

B.   Dates: Landlord and Tenant agree, upon the occurrence of the dates contained in this Section and at the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall deliver the Demised Premises in their current as-is, where-is condition with all faults and without representation or warranty by Landlord of any kind including, the suitability thereof for Tenant's intended use, except as expressly set forth herein. Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises, except to the extent caused by the negligence of Landlord, its employees, agents, or contractors. Prior to any

3

early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.    Notwithstanding the foregoing, Landlord covenants and agrees as follows:

(a)    As of the Tenant Possession Date, the plumbing and the sewer line serving the Demised Premises shall be in good working condition.

(b)    Within thirty (30) days after the effective date of this Lease, the roof of the Demised Premises shall be professionally inspected and certified to be in good condition and free of leaks. Within 30 days after the effective date of this Lease, Landlord shall also provide an inspection report to Tenant and make the necessary repairs to the roof to ensure it has a minimum life expectancy over the Original Term of this Lease.

(c)    Within sixty (60) days after the effective date of this Lease, all exterior lighting shall be operational and working, including pole lights, entrance/exit lighting and building lights, with a minimum average of two foot candles of exterior lighting throughout the parking lot. All exterior lighting will be separately metered.

(d)    Within sixty (60) days after the effective date of this Lease, the parking lot shall be paved, patched, sealed and striped, with potholes, severe cracks and uneven areas resurfaced in a manner that is adequate for customer parking.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord delivers and Tenant accepts possession the Demised Premises to Tenant, or (ii) the date on which Tenant receives all permits for its construction and signage. Tenant will submit its plans for permits in compliance with Laws within ninety (90) days of the full execution of this Lease and thereafter, diligently and continuously pursue obtaining such permits in good faith. Landlord will cooperate fully with Tenant in obtaining said permits, at no cost to Landlord. Within five (5) business days after Tenant's receipt of all such permits, Tenant shall provide Landlord with written notice of the same. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if possession has been given. Any exterior improvements to the Shopping Center, parking lot, landscaping or façade required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises shall be the responsibility of Landlord. As of the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The "Term Commencement Date" shall be the Rent Commencement Date.

5)    If Landlord fails to tender possession of the Demised Premises to Tenant by July 17, 2009, then Tenant may terminate this Lease by written notice to Landlord delivered within thirty (30) days thereafter. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to July 17, 2009; provided, however, that in the event Landlord

attempts to deliver possession of the Demised Premises prior to July 17, 2009, then Tenant may elect to either accept possession or defer acceptance until July 17 2009.

6)    August 1, 2009 until February 8, 2010 shall be the Optional Black Out Period. Notwithstanding anything to the contrary, in the event Landlord attempts to deliver possession of the Demised Premises between August 1, 2009, and February 8, 2010 (the "Optional Blackout Period"), then Tenant may elect to either accept possession or defer acceptance until the expiration of the Optional Blackout Period. In addition, in the event Landlord has not offered delivery of possession to Tenant by February 8, 2010, then Tenant may terminate this Lease by delivery of a termination notice within thirty (30) days thereafter, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7) In the event Landlord offers possession of the Demises Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 8, 2010. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit A-1  Tenant's Drawing of Demised Premises

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    [Intentionally Deleted]

5)    Exhibit D -    Tenant Building Sign Specifications

6)    Exhibit D-1  Tenant Pylon Sign Location

7)    Exhibit E -    Delivery of Possession Letter

8)    Exhibit F -    Exclusive Use Provisions

9)    Exhibit G -    Remeasurement Rider

10)   Exhibit H -    Construction Procedures for Tenant's Work

D.    Demised Premises: The "Demised Premises" shall be the premises indicated on Exhibit A, which premises shall have approximately 29,667 square feet of ground floor area with a minimum width of 120 feet for the Demised Premises. "Tenant's Drawing" of the Demised Premises is attached hereto as Exhibit A-1 and is deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, either party shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage and provide the other party with written notice of its findings, in which case the other party agrees to review the results of such remeasurement. If both parties re-measure the Demised Premises and such remeasurements differ,

the parties will use good faith efforts to resolve such difference. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Gross Rent shall be adjusted accordingly. Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other.

E.    Shopping Center: Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, commonly known as the Roberts Crossing Shopping Center, 5419 Roberts Rd., Hilliard, Ohio 43026. Landlord represents that, to Landlord's actual knowledge, the gross leasable area of the Shopping Center as of the date of this Lease is 78,275 square feet; provided that any variance in the foregoing representation shall not be deemed a default by Landlord hereunder.

F.    Tenant's Work: Between the Tenant Possession Date and the date Tenant opens the Demised Premises for business, Tenant will construct and install all interior improvements to the Demised Premises, subject to and in accordance with the conditions and limitations set forth on Exhibit H attached hereto and in accordance with Tenant's Drawing set forth on Exhibit A-1 (such construction and installation are sometimes hereinafter referred to as "Tenant's Work").

G.    Laws: The term "Laws" as used herein shall mean any and all present or future federal, state or local laws, statutes, ordinances, rules, requirements, regulations or orders of any and all governmental or quasi-governmental authorities having jurisdiction.

## 2.    DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

Landlord reserves (i) the use of the exterior rear and side walls and roof of the Demised Premises and the exclusive use of any space between the ceiling of the Demised Premises and the floor above or the roof of the building in which the Demised Premises is located, provided that in no event shall such use interfere with Tenant's storefront or include the placement of any billboards on the roof of the Demised Premises; (ii) the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading into or running through the Demised Premises (in locations which will not materially interfere with Tenant's use of the Demised Premises); and (iii) the right to cause or permit the building in which the Demised Premises is located and/or the other buildings within the Shopping Center to be expanded, enlarged (by adding additional stories or other additions), deleted or altered, and to cause or permit additional buildings or other improvements to be built on the Common Areas, subject to terms of the No Change Area, provided that any such addition or expansion to the building in which the Demised Premises is located shall not unreasonably interfere with Tenant's use of the loading dock serving the Demised Premises.

## 3.    TERM:

A.  Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2017 (the "Original Term").  Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability under this Lease thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year."  Tenant's obligations to pay Rent and any additional rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.  Option to Extend Term:  Subject to the terms and conditions of this Section 3.B., Landlord hereby grants to Tenant the option to extend the Term of this Lease for four (4), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", "Third Option Term", and "Fourth Option Term" (each, an "Option Term").  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, the Third Option Term shall commence at the end of the Second Option Term, and the Fourth Option Term shall commence at the end of the Third Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  To exercise its option as to each Option Term, Tenant must give Landlord written notice (the "Renewal Notice") at least one hundred eighty (180) days prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. Subject to the conditions set forth in the preceding sentences and as set forth below, Landlord and Tenant agree that once Tenant has delivered such Renewal Notice, both parties will be responsible for their respective obligations under this Lease for the applicable Option Term as described below.  Tenant will have no right to extend the Term hereunder, and any attempted exercise of such rights will, at Landlord's option, be null and void, if a monetary default by Tenant beyond any applicable notice and cure period exists, at the time Tenant delivers its Renewal Notice with respect to the applicable Option Term.  Any termination of this Lease prior to the end of the Original Term of this Lease (or during any previous Option Term with respect to the Second Option Term, the Third Option Term and the Fourth Option Term) will serve to immediately and automatically terminate all of Tenant's rights to further extend the Term of this Lease under this Section. During each Option Term, all of the terms and provisions of this Lease will apply, except that, (i) upon the expiration or earlier termination of the Fourth Option Term, Tenant will have no further rights to renew or extend the Term of this Lease; (ii) Tenant will not be entitled to any allowance to be applied against the costs and expenses of any additional Tenant's Work for each Option Term; and (iii) Landlord will not perform any construction work in or for the Demised Premises other than those repairs required pursuant to the terms and provisions of this Lease.  Subject to the following, Rent will continue to be paid during each Option Term in accordance with the provisions of this Lease, except that the amount of Rent for each Lease Year during the applicable Option Term is set forth in Section 5.A.

## 4.  USE AND OPERATION:

A.  Permitted Uses.  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, closeouts, furnishings, furniture, furniture accessories, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food

(including frozen food) (collectively, the "Permitted Use"), and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants shall restrict Tenant's Permitted Use in the Demised Premises. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center are attached hereto and incorporated herein as Exhibit F. The Demised Premises will not be used or occupied for any purpose or use which would violate any of the exclusive or restricted uses described on Exhibit F. It is understood that Landlord has granted such exclusive uses and imposed such prohibitions for the benefit of certain tenant(s) of the Shopping Center.

Except for tenants open and operating for business, Landlord will not grant any other tenant or occupant of premises in the Shopping Center the right to use such premises for the operation of a general merchandise discount store, liquidator, closeout store or dollar store operation ("Competing Business") during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall (a) include the following business operations: Dollar General, Dollar General Market, Dollar Tree, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams and Ollies Bargain Outlet; and (b) not be deemed to include a shoe store, book store, full-service grocery store, clothing store, pet store, Aaron Rents & Sells, and/or office supply store. In the event a Competing Business, as defined herein, begins operating in the Shopping Center in violation of this Section, Tenant will promptly provide Landlord with written notice thereof specifying in reasonably sufficient detail the identity and activities of the tenant or occupant using its premises in the Shopping Center for a Competing Business and Landlord shall thereafter use commercially reasonable efforts and diligently pursue an action using all legal remedies to cause such tenant or occupant to terminate such use. If such tenant or occupant is making such use of its premises in violation of its lease or occupancy agreement (a "Rogue Tenant"), and if Landlord is unable to cause such use to be terminated within twelve (12) months after Tenant's notice to Landlord requesting commencement of such action by Landlord, then Tenant will have the right to either (a) pay in lieu of Rent, and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), reduce its monthly rent by fifty percent (50%), such amount to be payable on the first day that the Rent is due for so long as such Competing Business continues by such tenant or occupant; or (b) terminate this Lease by notice given to Landlord within sixty (60) days after such twelve (12)-month period. However, if Landlord failed to include a provision in such tenant's or occupant's lease or occupancy agreement restricting such tenant or occupant from using its premises for a Competing Business, then Tenant shall be entitled to any and all of the following remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; (ii) Tenant may pay in lieu of Rent, and other charges payable hereunder including Additional Rent (all of which shall abate during the period that any such Competing Business is operated in the Shopping Center), a monthly Rent equal to one-half of (1/2) of the Rent, such amount to be payable on the first day of the month that the Rent is due; or (iii) Tenant may seek injunctive relief to enjoin or restrain such Competing Business from engaging in a competing use at Landlord's sole cost and expense. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating. All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable. If Tenant has not terminated the Lease as provided above, at such time that the Competing Business (including any Rogue Tenant) ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder, including, without limitation, the obligation to pay Rent. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event both parties shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations, all in compliance with Laws. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, and subject to Laws, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately in front of the Demised Premises; and (ii) use the Common Areas immediately in front of the Demised Premises for the periodic sale and display of merchandise.

**B.**    **Prohibited Uses.**    Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices (1) in excess of 5,000 square feet per premises, and (2) in excess of 10% of the square footage of the Shopping Center in the aggregate; (vi) industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or social service functions or facilities; (x) for the operation of a massage parlor (meaning for purposes hereof, an establishment of a prurient nature, as opposed to spas, salons, and other retail establishments providing massage in accordance with Laws) or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue and noise, sound, vibration, litter or odor; (xii) for a night club or discotheque; (xiii) for a roller or skating rink,

skateboard or other rink or area, bowling alley (unless such use is incidental to an entertainment facility); (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant (but a retail dry cleaner or laundry is not so prohibited); (xx) for any veterinary hospital, animal boarding, training or raising facilities (unless part of a national chain pet store); (xxi) for any separately demised newsstand; (xxii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility (excluding the incidental sale of lottery tickets); (xxiii) for any astrology, palm reading, tarot card or other like service or facility; (xxiv) for the use of a call center; (xxv) for the use as a "head shop" selling drug paraphernalia; (xxvi) the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure is a permitted use under this subsection, however such billboard or large advertisement display shall not be placed upon the roof of the Demised Premises. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

## 5.  RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date and during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Rent under this Lease, without notice or demand and without right of deduction, abatement or setoff, except as otherwise expressly provided in this Lease. The Rent for any partial month shall be pro rated based on the actual number of days in such month. "Rent" means the rent payable according to this Section, and in the amount per month and per year during the Term as follows:

A.  Gross Rent: During the Original Term of this Lease, the sum of One Hundred Ninety-two Thousand Five Hundred and 00/100 Dollars ($192,500.00) per annum ($7.00 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Sixteen Thousand Forty One and 67/100 Dollars ($16,041.67).

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Rent applicable for the First Option Term shall be the sum of Two Hundred Thirteen Thousand One Hundred Twenty-Five and 00/100 Dollars ($213,125.00) per Lease Year ($7.75 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Seventeen Thousand Seven Hundred Sixty and 42/100 Dollars ($17,760.42). The Rent applicable for the Second Option Term shall be the sum of Two Hundred Thirty Three Thousand Seven Hundred Fifty and 00/100 Dollars ($233,750.00) per Lease Year ($8.50 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Nineteen Thousand Four Hundred Seventy Nine and 17/100 Dollars ($19,479.17). The Gross Minimum Rent applicable for the Third Option Term shall be the sum of Two Hundred Fifty Four Thousand Three Hundred Seventy- Five and 00/100 Dollars ($254,375.00) per Lease Year ($9.25 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty One Thousand One Hundred Ninety Seven and 92/100 Dollars ($21,197.92). The Rent applicable for the Fourth Option Term shall be the sum of Two Hundred Seventy Five Thousand 00/100 Dollars ($275,000.00) per Lease Year ($10.00 per square foot of floor area per annum) which shall be

paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty Two Thousand Nine Hundred Sixteen and 67/100 Dollars ($22,916.67).

Landlord and Tenant agree that this Lease shall be a gross Lease. With the exception of Rent, as provided hereinabove, Tenant shall be under no obligation to pay any additional rent or other charges except as expressly set forth herein, it being the intent of the parties that Rent shall be a gross payment to Landlord and shall include Tenant's share of any Common Area Charges, Real Estate Taxes and Insurance. Landlord shall be responsible for the payment of all Common Area Charges, Real Estate Taxes and Insurance.

B.   Utilities Charge and Exterior Lighting: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution company, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all direct  public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing any utilities, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility meters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage. All such meters shall be a type that is utility billing grade, with ANSI standard, and the water meter type shall comply with ANSI/AWWA Standard C700, latest revision. Each meter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such meter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the meter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. Landlord will not be liable in damages or otherwise, nor will there be an abatement of Rent, if the furnishing by any supplier of any utility service or other service to the Demised Premises is interrupted or impaired by fire, accident, riot, strike, act of God, the making of necessary repairs or improvements, or by any causes beyond Landlord's reasonable control. However, in the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs required to be made by Landlord under this Lease, and if such unavailability causes the Demised Premises to become untenantable for the Permitted Use, then Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, and at Tenant's sole cost and expense, to install and operate devices for check metering (monitoring) for utility supply and use, provided that any such devices do not interfere directly or indirectly with any

utility services which do not exclusively serve the Demised Premises. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C. Late Payments. Any payment of Rent which is not received within 15 days after it is due will be subject to a late charge equal to five percent (5%) of the unpaid payment, or Two Hundred Fifty Dollars ($250.00), whichever is greater. This amount is in compensation of Landlord's additional cost of processing late payments. Notwithstanding anything contained herein to the contrary, Landlord shall waive the late charge set forth above for the first time the late charge is assessed in any Lease Year. In addition, any Rent which is not paid when due will accrue interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually (the "Interest Rate") from the date on which it was due until the date on which it is paid in full with accrued interest.

D.    Common Area Maintenance:  Subject to the terms of this Section 5.D., throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)  operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)   providing lighting and policing if necessary, and on-site and off-site traffic control;

(v)    maintaining all paved surfaces in a level and smooth condition, free of potholes; with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)   cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, providing security, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common

12

Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). The Common Area maintenance set forth in this Section shall be consistent with practices and customs used by other landlords and/or operators of similarly situated shopping centers in the state in which the Shopping Center is located, in Landlord's commercially reasonable discretion. All Common Area Maintenance shall be performed by Landlord at its sole cost and expense, except if additional maintenance is required beyond the usual course of business as a result of Tenant's negligence.

E.    Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). All such Real Estate Taxes shall be paid by Landlord, and Tenant shall not be obligated to pay or reimburse Landlord for the Real Estate Taxes.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. .

F.    Construction Allowance:  Subject to the terms and provisions hereof, Landlord shall pay to Tenant an amount equal to Four Hundred Twenty-five Thousand and 00/100 Dollars ($425,000.00) (the "Allowance") within thirty (30) days after Tenant has submitted to Landlord a written invoice requesting such payment for the Allowance, provided at the time of such requested payment: (a) there is no monetary default of this Lease by Tenant beyond any applicable notice and cure periods; (b) to Tenant's knowledge, no liens have been filed or notices of liens received and the appropriate lien waiver from all of Tenant's general contractors and any subcontractors providing labor and/or materials in excess of $5,000.00, for all work completed at the Demised Premises has been received by Landlord; (c) the certificate of occupancy for the Demised Premises has been issued; and (d) the Demised Premises are open for business. Subject to the foregoing, if said amount is not paid by Landlord to Tenant within such thirty (30) day period, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by Chase Manhattan Bank of New York (or any successor thereto) from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance  is used for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal

G.    Easements, Restrictions & Covenants:  Landlord and Tenant acknowledge that Shopping Center is subject to certain easements, restrictions and covenants of record recorded in volume 27259, page B13, Recorder's Office, Franklin County, Ohio and volume 32961, page A01, Recorder's office, Franklin County, Ohio. To the extent that such easements, restrictions & covenants  allocate Real Estate Taxes, utility expenses, insurance expenses, Common Area Charges and any other expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the easements, restrictions and covenants) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the

13

Lease shall control as between Landlord and Tenant. In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the easements, restrictions and covenants, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant. Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the easements, restrictions and covenants.

6.    **ALTERATIONS:**

Tenant shall have the right to make non-structural changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the building systems or the exterior or structural parts of the building of which they are a part; that such are done in good and workmanlike manner and in compliance with Laws; that permits therefor from all public authorities, as required, are obtained and paid for by Tenant; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise requests in writing. Tenant agrees to indemnify, defend and hold Landlord harmless from any and all claims and liabilities of any kind and description which may arise out of or be connected in any way with such work. Tenant will not make any other modifications, improvements, alterations, additions or installations in or to the Demised Premises without Landlord's prior written consent, which consent will not be unreasonably withheld, except that Landlord may withhold consent in its sole discretion for any work affecting the structural, electrical or mechanical systems of the Demised Premises or the building in which the Demised Premises is located or affecting the exterior of the Demised Premises or the building in which the Demised Premises is located.

Tenant will not permit any mechanic's lien or other lien to be filed against the Shopping Center, or any portion thereof including the Demised Premises, by reason of any Tenant's Work or other work performed by or for, or material furnished to, Tenant (including, without limitation, any work undertaken by Tenant pursuant to Section 1.F. or this Section). If any such lien is filed at any time against the Shopping Center, or any portion thereof including the Demised Premises, Tenant will cause the same to be discharged of record within thirty (30) days after the date of filing the same. If Tenant fails to discharge any such lien within such period, then, in addition to any other right or remedy of Landlord, after five days prior written notice to Tenant, Landlord may, but will not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the Shopping Center by deposit in the court having jurisdiction of such lien, the foreclosure thereof or other proceedings with respect thereto, of a cash sum sufficient to secure the discharge of the same, or by the deposit of a bond or other security with such court sufficient in form, content and amount to procure the discharge of such lien, or in such other manner as is now or may in the future be provided by present or future Laws for the discharge of such lien as a lien against the Shopping Center, or any portion thereof, including the Demised Premises. Any amount paid by Landlord, or the value of any deposit so made by Landlord, together with all costs, fees and expenses in connection therewith (including reasonable attorney's fees of Landlord) will be repaid by Tenant to Landlord on demand by Landlord and if unpaid may be treated as additional rent. Notwithstanding the foregoing, if Tenant desires to contest any such lien, Tenant may do so provided that, within thirty (30) days after the filing thereof, Tenant notifies Landlord of Tenant's intention to do so and, until such time as Tenant causes such lien to be removed by the payment thereof or by bonding over such lien in the manner provided by applicable Laws, posting with Landlord such security as Landlord may reasonably request to provide funds with which Landlord may discharge such lien in the event Tenant is unsuccessful in its contest and then fails to discharge such lien. Tenant will indemnify and defend Landlord against and save

14

Landlord and the Shopping Center, or any portion thereof, including the Demised Premises, harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorney's fees resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises, unless any such repairs or replacements are caused by the acts or omissions of Tenant or anyone acting by, through or under Tenant.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; and (vi) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, (excluding the HVAC units which Tenant is installing) will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefore, Tenant shall have the right to deduct such costs with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, form the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs which are the obligation of Landlord hereunder within fifteen (15) days after receipt of written notice by Tenant of the need for such repairs (or in the event of a repair which cannot with due diligence be completed within a period of fifteen (15) days, if Landlord fails to

proceed promptly after the receipt of such notice and with all due diligence to commence to complete the same and thereafter to prosecute the completion of such repair with all due diligence to completion as soon as reasonably possible), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage to the extent caused by the negligence or willful misconduct of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York annually, from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to this Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in this Lease.

For purposes of performing Landlord's obligations under this Section, or performing any of Tenant's obligations under this Section that Tenant fails to perform within the cure period provided in Section 19.A., or to inspect the Demised Premises, Landlord may enter the Demised Premises upon at least ten (10) days' prior written notice to Tenant (except in cases of actual or suspected emergency, in which case no prior notice will be required) without liability to Tenant for any loss or damage incurred as a result of such entry, provided that Landlord will take reasonable steps in connection with such entry to minimize any disruption to Tenant's business or its use of the Demised Premises.

8.    **SIGNS:**

Subject to applicable Laws Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the front exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord hereby approves Tenant's Sign Specifications attached hereto as Exhibit D and incorporated herein. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable Laws for Tenant's signs.

Landlord shall ensure that, as of the Tenant Possession Date, the Shopping Center pylons and/or monument signs (the "Pylon(s)") conform to all Laws. Tenant shall have the right to place suitable sign panels upon the top two (2) positions on any existing Pylon(s) (which such position shall not exceed one-third (1/3) of any Pylon). Landlord agrees that Tenant shall have the right to install and maintain its sign panels on the existing Pylon(s) on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy a position, within the top one-half (1/2) portion of any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Tenant shall, at its own expense, obtain the necessary permits and

comply with applicable Laws for Tenant's signs. Once Tenant's sign panels on the Pylon(s) are installed, unless required by Laws, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon(s). Notwithstanding anything to the contrary contained herein, the parties agree that the Pylon currently located near Hilliard Rome Road is scheduled to be removed, and accordingly, Landlord shall rebuild said pylon, in the same or similar design, at a different location along Hilliard Rome Rd within the Shopping Center within ninety (90) days after completion of the road construction. Once the said pylon has been replaced, then the terms of this Section, including Tenant's right to place suitable sign panels upon the top one-third (1/3) position of the Pylon, shall apply to such new Pylon.

During the Original Term, Option Terms or extensions of this Lease, except to the extent required by Laws, Landlord shall not install any structure, sign or landscaping or take any other action which will materially and adversely obstruct or interfere with the visibility of Tenant's signs.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit and use of only Tenant and Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10.    **GOVERNMENTAL REGULATIONS:**

Landlord agrees that, to Landlord's actual knowledge, as of the Tenant Possession Date the Demised Premises conforms to all requirements by authority having jurisdiction, if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by interior changes, interior alterations or interior additions made by Tenant, then Tenant will, at Tenant's expense, cause the interior of the Demised Premises to comply with all Laws. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to those portions of the Demised Premises which are the obligation of Landlord to maintain as required by any Law, statute, ordinance, order or regulation of any governmental authority; and to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and approved fire extinguishers of the type and number recommended.

11.    **MUTUAL INDEMNIFICATION:**

Subject to Section 21, and except to the extent caused by the negligence or willful misconduct of Landlord, or anyone acting by, through or under Landlord, Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises or Common Areas caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant

17

and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Subject to Section 21 and except to the extent caused by the negligence or willful misconduct of Tenant, or anyone acting by, through or under Tenant, Landlord, its successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.    **INSURANCE:**

A.    Tenant shall at all times carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

B.    Tenant's Right to Self Insure:  To the extent permitted by Laws and subject to the requirements of this Section, Tenant shall have the option to self-insure for all plate glass, inventory, equipment and fixtures and improvements pursuant to this Section 12.B.

For purposes of this Section 12.B., to "self insure" and "self-insurance" or "self-insuring" will mean that Tenant is itself acting as though it were the insurance company providing the insurance for the plate glass and/or store fixtures, furnishings and contents required under this Lease and Tenant will pay any amounts due in lieu of insurance proceeds as required under the provisions of this Lease, which amounts will be treated as insurance proceeds for all purposes under this Lease.

All amounts that Tenant pays or is required to pay and all losses or damages resulting from risks for which Tenant has elected to self-insure will be subject to the waiver of subrogation provisions in Section 21 and will not limit Tenant's indemnification obligations set forth in Section 11.

C.    Landlord:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises (except for Tenant's trade fixtures, furnishings and inventory), against perils normally covered under "Causes of Loss – Special Form" (formerly known as "All Risk") insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center including the Demised Premises (except for Tenant's trade fixtures, furnishings and inventory and any leasehold improvements or other alterations to the Demised Premises installed by Tenant) and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

13. **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, and the same can be repaired or restored within two hundred seventy (270) days from the occurrence of such damage, then Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, (excluding Tenant's fixtures, furnishings and inventory) but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent shall abate entirely in case the whole Demised Premises are untenantable. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B. In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within two hundred seventy (270) days from the date of such casualty, then Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to the Landlord and thereupon the Tenant shall be released from all future liability and obligations under this Lease.

C. If the Demised Premises are damaged or destroyed during the last six (6) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty and thereupon the parties shall be released from all future liability and obligations under this Lease.

14. **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant (which each such event of delay may be referred to as "Force Majeure"), and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. A lack of funds, however, will never be deemed beyond a party's reasonable control. This provision shall not apply to initial delivery of possession of the Demised Premises.

15. **INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

16.   **WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant, to Landlord's actual knowledge and belief, without inquiry and without duty to inquire, that: (a) By virtue of that certain Agreement Concerning Appointment of Receiver dated June 22, 2009 ("Receivership Agreement"), by and among Orix Capital Markets, LLC, for itself and ORIX Real Estate Capital, Inc. as an affiliate thereof (collectively, "Lender"), RUSHMORE ROBERTS, LLC ("Rushmore Roberts"), RUSHMORE WINDSOR, LLC ("Rushmore Windsor," and together with Rushmore Roberts, the "Borrowers"), MARC REINISCH, in his individual capacity as a guarantor ("Reinisch"), and JENNY HALL, in her individual capacity as a guarantor ("Hall," and together with Reinisch, the "Guarantors"), Landlord has full right, power and authority to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (b) at the time of the execution by Landlord of this Lease, Rushmore Roberts is the sole owner in fee simple absolute of the Demised Premises; (c) at the time of the execution by Landlord of this Lease, Rushmore Roberts has good and marketable fee simple title to the Demised Premises; (d) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (e) neither Rushmore Roberts nor Landlord is in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by either Rushmore Roberts or Landlord or given by either of them of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Rushmore Roberts does not have title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent, or the breach of the aforesaid representations is cured.

The parties hereto recognize that Lender may take title to the Demised Premises by way of a deed in lieu of foreclosure, and, upon execution by and delivery of such deed in lieu of foreclosure by Rushmore Roberts to Lender and further upon recording of same in the Official Records, Recorder's Office, Franklin County, Ohio, Tenant covenants and agrees to acknowledge and accept Lender as Landlord hereunder, and Lender agrees to assume and undertake all of Landlord's obligations, duties and responsibilities hereunder and Landlord shall be unconditionally relieved of its obligations hereunder.  So long as the Tenant is not in default under the Lease beyond any applicable grace or cure periods (an *"Event of Default"*), Lender (i) shall not terminate or disturb Tenant's possession of the Demised Premises under the Lease, and the Lease shall remain in full force and effect (ii) shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies.

The parties hereto recognize that upon termination or expiration of the Receivership Agreement, the party holding title to the Demised Premises at the time of such termination or expiration shall assume and undertake all of Landlord's obligations, duties and responsibilities hereunder, and Landlord shall be unconditionally relieved of its obligations hereunder subject to this Agreement.

The parties hereto acknowledge and agree that so long as the Receivership Agreement is in full force and effect, the scope of Landlord's obligations and liability hereunder shall be subject to and limited by the terms of the Receivership Agreement, including, but not limited to, the terms of paragraph 32 of Exhibit A. In the event of a conflict between the terms of the Receivership Agreement and the terms of this Lease, the terms of the Receivership Agreement shall govern and control.

17.     **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and any additional rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.     **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to the lien of any mortgage, deed of trust, ground lease or sale-leaseback presently existing or hereafter created upon the Demised Premises or Shopping Center and to amendments, replacements, renewals and extensions thereof, provided however that, with respect to any mortgage, deed of trust, ground lease or sale-leaseback first placed upon the Demised Premises or Shopping Center after the execution of this Lease, as long as Tenant is not in default in the payment of Rent and the payment of other charges to be paid by Tenant under this Lease, and the performance of all covenants, agreements and conditions to be performed by Tenant under this Lease after receipt of any applicable notice and the expiration of any applicable cure period, and provided that Tenant attorns to the party acquiring title to the Demised Premises or Shopping Center, as the case may be, as a result of the foreclosure, termination or transfer in lieu thereof of any such mortgage, deed of trust, ground lease or sale-leaseback, then neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Demised Premises and to conduct its business thereon, in accordance with the terms of this Lease, will be interfered with by the holder of any such mortgage, deed of trust, ground lease or sale-leaseback, by any successor thereto or any successor to Landlord as a result of the foreclosure or termination thereof or transfer in lieu thereof, or by virtue of any such foreclosure, termination or transfer. Such subordination will be effective without the necessity of the execution and delivery of any further instruments on the part of Tenant to effectuate such subordination. However, Tenant agrees at any time hereafter, upon demand, to execute and deliver any instruments, releases or other documents in a form provided by Landlord or Landlord's lender that may be reasonably required for the purpose of subjecting and subordinating this Lease, as above provided, to the lien of any such mortgage, deed of trust, ground lease or sale-leaseback, provided that such instruments include a covenant by the party acquiring title to the Demised Premises or Shopping Center, as the case may be, not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Rent and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised

Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19.    **DEFAULT:**

A.      Each of the following events will constitute a material breach by Tenant and an event of default by Tenant under this Lease: (i) if Tenant files a petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or insolvency Laws, or voluntarily takes advantage of any such Laws by answer or otherwise, or dissolves or makes an assignment for the benefit of creditors, or involuntary proceedings under any such Laws or for the dissolution of Tenant are instituted against Tenant, or a receiver or trustee is appointed for the Demised Premises or for all or substantially all of Tenant's property, and such proceedings are not dismissed or such receivership or trusteeship vacated within sixty (60) days after such institution or appointment; or (ii) Tenant's interest under this Lease or in the Demised Premises is taken upon execution or by other process of law directed against Tenant, or is subject to any attachment by any creditor or claimant against Tenant and such attachment is not discharged or disposed of within thirty (30) days after levy; or (iii) if Tenant fails to pay the Rent or other charges reserved herein, or any installment thereof, for more than five (5) days after receipt by Tenant of written notice of such default from the Landlord; or (iv) if Tenant shall fail to perform any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (or if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonable necessary, provided that Tenant does in good faith commence to cure such breach or noncompliance within such thirty (30)-day period and thereafter diligently pursue such cure to completion), then, in any of such events, Landlord shall be entitled to exercise all rights and remedies available under this Lease and/or at law or in equity, including, without limitation, this Lease, if the Landlord so elects, shall thereupon become null and void, and/or Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Upon a repossession of the Demised Premises or a termination of this Lease pursuant to this Section, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.

B.      If Landlord shall fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall be entitled to all rights and remedies at law or in equity, including, without limitation, Tenant shall have the right, at its option, (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) to cure such default and the amount expended by it therefor, with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of

all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not limited to, defects and failure in the sprinkler system, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency than Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.    CONDEMNATION:

In the event the whole or any substantial part of the Demised Premises hereby leased is taken in condemnation proceedings, or taken in any manner for any public or quasi-public use, so as to render the remaining portion of the Demised Premises unsuitable for the purposes intended hereunder, then the Term will cease as of the day possession is taken by such public authority and Landlord will make a pro rata refund of any prepaid Rent. In the event any part of the Demised Premises, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the commercially reasonable judgment of Tenant, the Demised Premises remaining would be unsuitable for Tenant's business operation, then Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will promptly restore, at Landlord's sole cost and expense, the Demised Premises, if applicable, affected by the taking to a condition substantially comparable to their condition immediately preceding the taking, less the portion lost in the taking. In such event, this Lease will continue in full force and effect, except that from and after the taking (a) Fixed Minimum Rent will be reduced in proportion to the reduction, if any, in the square footage of gross leaseable area in the Demised Premises as a result of the taking, and (b) Common Area Charges, Real Estate Taxes and Insurance will be adjusted to reflect the change in size, if any, of the Demised Premises, the Shopping Center and the improvements on the Shopping Center as a result of the taking.

All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold estate, whether as damages or as compensation, shall be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, for loss of the leasehold interest by reason of such taking. Any amounts specifically awarded or agreed upon by Tenant and the condemning authority for the taking of Tenant's removable trade fixtures, furnishings, inventory shall be the property of Tenant.

Further, Tenant shall have the right to pursue in Tenant's own name any separate remedy Tenant may have against the condemning authority for relocation expenses, loss of business, or other non-real estate related awards; provided, however, that Landlord shall not be liable to Tenant for any such amounts in connection with such takings and no amount shall decrease the amount of the award otherwise due Landlord for the taking of the fee simple interest in the Shopping Center. Landlord shall not be liable to Tenant for any such amounts in connection with such taking.

## 21.    MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.   **ASSIGNMENT AND SUBLETTING:**

Subject to the terms and conditions of this Section 22, Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee.

Anything to the contrary set forth herein notwithstanding, if Tenant desires to assign this Lease or sublet the whole or any part of the Premises, Tenant shall give Landlord thirty (30) days written notice of the same as provided herein. During such thirty (30) day period, Landlord shall have the right to advise Tenant in writing of Landlord's request to recapture the Premises and terminate this Lease by delivering notice of the same (the "Recapture Notice") to Tenant at any time during such thirty (30) day period, which Recapture Notice shall contain the proposed effective date of such termination. The effective date of such proposed termination shall be no earlier than thirty (30) days after the date Tenant receives the Recapture Notice from Landlord. Tenant shall have thirty (30) days from the date of receipt of such Recapture Notice to rescind its request for assignment and sub-lease by written notice to Landlord (the "Recapture Rejection Notice"), in which event this Lease shall continue in full force and effect between Landlord and Tenant notwithstanding Landlord's rejection of Tenant's prior request(s) for approval of assignment or subletting.   Should Tenant fail to deliver the Recapture Rejection Notice within thirty (30) days after receipt of the Recapture Rejection Notice, Landlord shall be deemed to have exercised its right of recapture upon the following terms and conditions:

(i)This Lease shall terminate upon the date specified in the Recapture Notice and;

(ii)All rents accrued as of the date of such termination shall be promptly paid by Tenant.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without Landlord's consent so long as (i) the intended use does not differ from the Permitted Use, and (ii) such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant;  provided that in

case of any such assignment referred to above, such assignee shall assume all of Tenant's obligations hereunder in writing, and Tenant shall not be relieved of its obligations hereunder. The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as (i) the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange, or (ii) such transfer is otherwise a permitted transfer without Landlord's consent as provided for above.

### 23.    SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its unattached and moveable property, trade fixtures and equipment from the Demised Premises that can be removed from the Demised Premises without causing any damage to the Demised Premises (excluding lighting fixtures and HVAC equipment whether or not attached to the Demised Premises). All such unattached and moveable property not removed will be deemed abandoned. Tenant will promptly surrender all keys for the Demised Premises to Landlord at the place then fixed for the payment of Rent...

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at a Rent equal to the Rent paid for the last month of the last term, plus twenty – five percent (25%) of such Rent.

### 24.    NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

### 25.    LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Illinois. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

### 26.    BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease except CB Richard Ellis, representing Landlord, and Equity Inc., representing Tenant (collectively, the "Brokers"). If any individual or entity other than the Brokers shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29. **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

30. **HAZARDOUS MATERIAL:**

Landlord represents and warrants, to Landlord's actual knowledge, without inquiry and without duty to inquire, that the Demised Premises do not contain any Hazardous Materials in violation of environmental Laws as of the effective date of this Lease. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. If and to the extent required by Laws, Landlord will promptly, at Landlord's sole cost and expense, take any and all remedial and removal action in compliance with all EPA, governmental laws and regulations necessary to clean up the Shopping Center and mitigate exposure to liability arising from the presence of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees. Except to the extent caused by the negligence or willful misconduct of Tenant, or anyone acting by, through or under Tenant, Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials in, on, under or around the Demised Premises existing prior to the Tenant Possession Date, or placed thereon by Landlord, Landlord's agents, contractors, or employees. If Landlord shall be required by Laws to remove any Hazardous Materials from the Demised Premises or perform work in the Demised

Premises related to any Hazardous Materials, and such removal or work renders the Demised Premises untenantable, then all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable Laws. Except to the extent caused by the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, Tenant shall indemnify, defend and hold harmless Landlord with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to the existence of Hazardous Materials at the Demised Premises and/or the Shopping Center as a result of the acts of Tenant or its agents, employees or contractors. The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

31.    **TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

32.    **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within twelve (12) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said twelve (12) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33.    **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34.    **INTENTIONALLY DELETED:**

35.    **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36.    **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any

rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

37. **INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

38. **TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

39. **INTENTIONALLY DELETED:**

40. **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

41. **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

42. **TRANSFERS OF LANDLORD'S INTEREST:**

The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, will be limited to mean and include only the owner or owners of the Shopping Center at the time in question, and in the event of any transfer or conveyance, the then grantor will be automatically freed and released from all personal liability accruing from and after the date of such transfer or conveyance as respects the performance of any covenant or obligation on the part of Landlord contained in this Lease to be performed, it being intended hereby that the covenants and obligations contained in this Lease on the part of Landlord will be binding on the then Landlord only during and in respect to its period of ownership. In the event of a sale or conveyance by Landlord of any portion of the Shopping Center that contains the Demised Premises, the same will operate to release Landlord from any future liability upon any of the covenants or conditions herein contained with respect to the portion of the Shopping Center sold or conveyed and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord in and to this Lease. This Lease will not be affected by any such sale or conveyance, and Tenant agrees to attorn to the purchaser or grantee, which will be personally obligated on this Lease only so long as it is the owner of Landlord's interest in and to this Lease.

43. **OTHER TENANTS:**

Landlord reserves the absolute right to effect other tenancies in the Shopping Center as Landlord determines in the exercise of its sole business judgment. Tenant does not rely

on the fact, nor does Landlord represent, that any specific stores or occupants, or any particular number of stores or occupants, will occupy any space in the Shopping Center during the Term of this Lease. A vacation of premises or cessation of operations by any other tenant(s) or occupant(s) in the Shopping Center will not in any way release Tenant from its obligations under this Lease.

## 44.    LIMITATION ON LANDLORD'S LIABILITY:

Tenant agrees to look solely to Landlord's interest in the Shopping Center for the recovery of any judgment from Landlord, it being agreed that Landlord, and if Landlord is a partnership, its partners whether general or limited, and if Landlord is a corporation, its directors, officers or shareholders, and if Landlord is a limited liability company, its managers or members, will never be personally liable for any such judgment. In no event will Landlord be liable to Tenant or any other person for consequential, special or punitive damages, including, without limitation, lost profits.

## 45.    MISCELLANEOUS:

In the event the Receivership Agreement is terminated prior to either (i) execution and recording of a deed in lieu of foreclosure or (ii) a foreclosure sale and transfer of the Property, and Rushmore Roberts regains possession and control of the Property and assumes the responsibilities of Landlord hereunder, then Lender agrees to guarantee payment and performance of all of Landlord's financial obligations to Tenant hereunder.

[Signatures Appear on Immediately Subsequent Page.]

IN TESTIMONY WHEREOF, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as To Landlord:  **LANDLORD:**

By: _____

Norman P. Bertke, Managing Director of CB Richard Ellis, Inc., as Receiver for Rushmore Roberts, LLC

STATE OF Ohio

COUNTY OF Franklin

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, CB Richard Ellis by, Norman P Bertke its Managing Director who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, OH this 17th day of July, 2009.

JUDY CHAPMON
Notary Public, State of Ohio
My Commission Expires 01-10-2012

Notary Public

Witnesses As To Tenant:  **TENANT:**  **BIG LOTS STORES, INC., an Ohio corporation**

By: _____
Charles W. Haubiel II
Title: Senior Vice President- Legal and Real Estate, General Counsel and Corporate Secretary

STATE OF OHIO

COUNTY OF FRANKLIN

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Senior Vice President- Legal and Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 20 day of July, 2009.

KARLENE YAMAMOTO
Notary Public, State of Ohio
My Commission Expires 2/26/2012

Notary Public

[Consent Signatures Appear on Immediately Subsequent Page.]

30

Jul 17 09 01:54p        Mike and Jean Moran

**ORIX Capital Markets, LLC for itself and ORIX Real Estate Capital, Inc. as an affiliate, intending to be legally bound, all parties hereby consent to the Lease between Norman P. Bertke, Managing Director of CB Richard Ellis, Inc., as Receiver for Rushmore Roberts, LLC (Landlord) and Big Lots Stores, Inc., (Tenant).**

Witness:                           **ORIX Capital Markets, LLC for itself and ORIX Real Estate Capital, Inc., as an affiliate**

_Jean M. Moran_             By: _____

                                   Title: COO + GC

31

## EXHIBIT A

## SITE PLAN OF SHOPPING CENTER



**EXHIBIT A-1**

**TENANT'S DRAWING OF DEMISED PREMISES**
Five Pages Attached





CONSTRUCTION PLAN

A-1

BIG LOTS

BIG LOTS STORE #
3406 MAIN ST
HILLIARD, OH 43026

SQUARE
FOOTAGE:
SALES:22,156
TOTAL:29,649

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS , OHIO 43228
PHONE: (614) 278-6800







**EXHIBIT B**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

**Legal Description**

**Roberts Road**

**PARCEL 1:**

SITUATED IN THE STATE OF OHIO, COUNTY OF FRANKLIN, CITY OF COLUMBUS, BEING IN VIRGINIA MILITARY SURVEY NO.S 7029 AND 6554 AND CONTAINING 9.875 ACRES OF LAND, MORE OR LESS, PART OF SAID 9.875 ACRES BEING PARTS OF LOTS 3 AND 4 AS THE SAME ARE NUMBERED AND DELINEATED UPON THE RECORDED PLAT OF KATHERINE DURBAN SUBDIVISION, OF RECORD IN PLAT BOOK 23, PAGE 35, PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.667 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27416115, PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.861 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27259B10, PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.861 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27353J02, PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.861 RESIDUE OF THAT 0.976 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27393C01, PART OF SAID 9.875 ACRES BEING ALL OF THAT 1.076 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27353J05, PART OF SAID 9.875 ACRES BEING ALL OF THAT 2.223 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27373A15, PART OF SAID 9.875 ACRES BEING ALL OF THAT 2.907 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27259B13, PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.361 ACRE RESIDUE OF THAT TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27353118 AND PART OF SAID 9.875 ACRES BEING ALL OF THAT 0.059 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO PUMA LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 27373A04, ALL BEING OF RECORD IN THE RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, SAID 9.875 ACRES BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, FOR REFERENCE, AT A RAILROAD SPIKE IN THE CENTERLINE OF ROBERTS ROAD AT THE NORTHWESTERLY CORNER OF THAT 0.115 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN OFFICIAL RECORD 24615A07, SAID RAILROAD SPIKE BEING THE NORTHEASTERLY CORNER OF THAT 0.663 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN OFFICIAL RECORD 23508H12, BOTH BEING OF RECORD IN THE RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, SAID RAILROAD SPIKE ALSO BEING LOCATED S 87°30'00" E, A DISTANCE OF 34 0.3 5 FEET FROM AN ALUMINUM CAP SET IN CONCRETE AT THE CENTERLINE INTERSECTION OF HILLIARD-ROME ROAD AND SAID ROBERTS ROAD (FRANKLIN COUNTY MONUMENT FCGS-6665); THENCE S 6°19'00" E, WITH THE WESTERLY LINE OF SAID 0.115 ACRE TRACT AND WITH THE EASTERNMOST LINE OF SAID 0.663 ACRE TRACT, A DISTANCE OF 50.60 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE TRUE POINT OF BEGINNING AT THE

## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

SOUTHWESTERLY CORNER OF SAID 0.115 ACRE TRACT, THE SAME BEING THE NORTHWESTERLY CORNER OF SAID 0.861 ACRE TRACT;

THENCE, FROM SAID TRUE POINT OF BEGINNING, S 87°30'00" E, WITH THE NORTHERLY LINES OF SAID 0.861 ACRE TRACTS AND 1.076 ACRE TRACT WITH THE SOUTHERLY LINES OF THOSE 0.115 ACRE TRACTS OF LAND DESCRIBED IN THE DEEDS TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN OFFICIAL RECORD 24615A07, OFFICIAL RECORD 24615A11, OFFICIAL RECORD 27412D03, AND WITH THE SOUTHERLY LINE OF THAT 0.143 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN OFFICIAL RECORD 26815G07, ALL BEING OF RECORD IN THE RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, THE SAME BEING PARALLEL WITH AND 500 FEET SOUTHERLY FROM, AS MEASURED AT RIGHT ANGLES, THE CENTERLINE OF SAID ROBERTS ROAD, A DISTANCE OF 425.00 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE NORTHEASTERLY CORNER OF SAID 1.076 ACRE TRACT IN THE WESTERLY LINE OF SID 2.223 ACRE TRACT, THE SAME BEING THE SOUTHEASTERLY CORNER OF SAID 0.143 ACRE TRACT;

THENCE N 6°19'00" W, WITH A WESTERLY LINE OF SAID 2.223 ACRE TRACT AND WITH THE EASTERLY LINE OF SAID 0.143 ACRE TRACT, A DISTANCE OF 50.60 FEET TO A RAILROAD SPIKE
AT A NORTHWESTERLY CORNER OF SAID 2.223 ACRE TRACT IN THE CENTERLINE OF SAID ROBERTS ROAD, THE SAME BEING THE NORTHEASTERLY CORNER OF SAID 0.143 ACRE TRACT;

THENCE S 87°30'00" E, WITH THE CENTERLINE OF SAID ROBERTS ROAD AND WITH THE NORTHERLY LINE OF SAID 2.223 ACRE TRACT, A DISTANCE OF 180.11 FEET TO A RAILROAD SPIKE AT THE NORTHEASTERLY CORNER OF SAID 2.223 ACRE TRACT;

THENCE SOUTHWESTERLY, WITH THE EASTERLY BOUNDARY OF SAID 2.223 ACRE TRACT, THE FOLLOWING SIX (6) COURSES AND DISTANCES:

1.) S 2°30'00" W, A DISTANCE OF 50.00 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT A POINT OF CURVATURE;

2.) SOUTHWESTWARDLY, WITH THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 97°45'59" AND A CHORD THAT BEARS S 43°37'01" W, A CHORD DISTANCE OF 37.67 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT A POINT OF COMPOUND CURVATURE;

3.) SOUTHWARDLY, WITH THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 210.00 FEET, A CENTRAL ANGLE OF 17°54'23" AND A CHORD THAT BEARS S 14°13'11" E, A CHORD DISTANCE OF 65.3 6 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT A POINT OF TANGENCY;

4.) S 23°10'22" E, A DISTANCE OF 129.03 FEET TO A 3/4 INCH (I.D.) IRON

PIPE; 5.) S 66°49'38" W, A DISTANCE OF 60.00 FEET TO A 3/4 INCH (I.D.)

IRON PIPE;

6.) S 6°19'00" E, A DISTANCE OF 337.13 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE SOUTHEASTERLY CORNER OF SAID 2.223 ACRE TRACT;

## EXHIBIT B

### LEGAL DESCRIPTION OF SHOPPING CENTER

THENCE S 83° 35'59" W, WITH THE SOUTHERLY LINE OF SAID 2.223 ACRE TRACT, WITH THE SOUTHERLY LINE OF SAID 2.907 ACRE TRACT AND WITH THE NORTHERLY LINE OF THAT 8.122 ACRE RESIDUE OF THAT 11.029 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO BAYSIDE COMMONS II LIMITED PARTNERSHIP, OF RECORD IN OFFICIAL RECORD 21462J11, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, PASSING A 5/8 INCH SOLID IRON PIN AT BOTH THE SOUTHWESTERLY CORNER OF SAID 2.223 ACRE TRACT AND THE SOUTHEASTERLY CORNER OF SAID 2.907 ACRE TRACT AT A DISTANCE OF 154.00 FEET, A TOTAL DISTANCE OF 647.92 FEET TO A 5/8 INCH SOLID IRON PIN AT THE SOUTHWESTERLY CORNER OF SAID 2.907 ACRE TRACT, THE SAME BEING THE NORTHWESTERLY CORNER OF SAID 8.122 ACRE RESIDUE TRACT, SAID IRON PIPE ALSO BEING IN THE EASTERLY LINE OF SAID 0.059 ACRE TRACT;

THENCE S 6°24'06" E, WITH THE EASTERLY LINE OF SAID 0.059 ACRE TRACT, WITH THE EASTERLY LINE OF SAID 0.361 ACRE RESIDUE TRACT AND WITH THE WESTERLY LINE OF SAID 11.029 ACRE TRACT, A DISTANCE OF 105.29 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE SOUTHEASTERLY CORNER OF SAID 0.361 ACRE RESIDUE TRACT, THE SAME BEING THE NORTHEASTERLY CORNER OF THE LAND CONVEYED TO KERMIT L. FRISCHE BY CERTIFICATE OF TRANSFER, OF RECORD IN OFFICIAL RECORD 08486D06, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO;

THENCE N 87°21'47" W, WITH THE SOUTHERLY LINE OF SAID 0.361 ACRE RESIDUE TRACT, WITH THE NORTHERLY LINE OF SAID FRISCHE LAND, WITH THE SOUTHERLY LINE OF SAID LOT 4 AND WITH THE NORTHERLY LINE OF LOT 5 OF SAID KATHERINE DURBAN.SUBDIVISION, A DISTANCE OF 180.29 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE SOUTHWESTERLY CORNER OF SAID 0.361 ACRE RESIDUE TRACT, THE SAME BEING THE SOUTHEASTERLY CORNER OF THAT 0.046 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN OFFICIAL RECORD 26815G12, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO;

THENCE N 6°22'47" W, WITH THE WESTERLY LINE OF SAID 0.361 ACRE RESIDUE TRACT AND WITH THE EASTERLY LINE OF SAID 0.046 ACRE TRACT, THE SAME BEING PARALLEL WITH AND 60.00 FEET EASTERLY FROM, AS MEASURED AT RIGHT ANGLES, THE CENTERLINE OF HILLIARD-ROME ROAD, A DISTANCE OF 70.98 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE NORTHEASTERLY CORNER OF SAID 0.361 ACRE RESIDUE TRACT, THE SAME BEING THE SOUTHWESTERLY CORNER OF THAT 0.048 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO MICHAEL T. MCCLASKIE AND
TERESA D. MCCLASKIE, OF RECORD IN OFFICIAL RECORD 27373A08, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO;

THENCE N 84°10'07" E, WITH THE NORTHERLY LINE OF SAID 0.361 ACRE RESIDUE TRACT AND WITH THE SOUTHERLY LINE OF SAID 0.048 ACRE TRACT, A DISTANCE OF 84.49 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT AN ANGLE POINT IN THE NORTHERLY BOUNDARY OF SAID 0.361 ACRE RESIDUE TRACT, THE SAME BEING AN ANGLE POINT IN THE SOUTHERLY BOUNDARY OF SAID 0.048 ACRE TRACT;

THENCE N 51°07'14" E, WITH THE NORTHWESTERLY LINE OF SAID 0.361 ACRE RESIDUE TRACT, WITH A NORTHWESTERLY LINE OF SAID 0.59 ACRE TRACT, WITH THE SOUTHEASTERLY LINE OF SAID 0.048 ACRE TRACT AND WITH A SOUTHEASTERLY LINE OF THAT 0.3 50 ACRE RESIDUE OF THE LAND DESCRIBED IN THE DEED TO MICHAEL T. MCCLASKIE AND TERESA D. MCCLASKIE, OF RECORD IN OFFICIAL RECORD 24510F12, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, A DISTANCE OF 52.21 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT AN ANGLE POINT IN THE NORTHWESTERLY BOUNDARY OF SAID 0.059 ACRE TRACT,

**EXHIBIT B**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

THE SAME BEING AN ANGLE POINT IN THE SOUTHEASTERLY BOUNDARY OF SAID 0.350 ACRE RESIDUE TRACT;

THENCE N 38°35'54" E, WITH A NORTHWESTERLY LINE OF SAID 0.059 ACRE TRACT AND WITH A SOUTHEASTERLY LINE OF SAID 0.350 ACRE RESIDUE TRACT, A DISTANCE OF 70.00 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE NORTHERLY CORNER OF SAID 0.059 ACRE TRACT IN THE WESTERLY LINE OF SAID 2.907 ACRE TRACT, THE SAME BEING AN ANGLE POINT IN THE EASTERLY BOUNDARY OF SAID 0.350 ACRE RESIDUE TRACT;

THENCE N 6°24'06" W, WITH THE WESTERLY LINE OF SAID 2.907 ACRE TRACT, WITH THE EASTERLY LINE OF SAID 0.350 ACRE RESIDUE TRACT, WITH THE WESTERLY LINE OF THOSE TRACTS OF LAND DESIGNATED AS PARCEL II AND PARCEL III IN THE DEED TO GREGORY C. LANDIS, OF RECORD IN OFFICIAL RECORD 15476E03, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, A DISTANCE OF 224.79 FEET TO A 5/8 INCH SOLID IRON PIN AT THE NORTHWESTERLY CORNER OF SAID 2.907 ACRE TRACT IN THE SOUTHERLY LINE OF SAID 0.667 ACRE TRACT, THE SAME BEING THE NORTHEASTERLY CORNER OF SAID PARCEL III;

THENCE N 87°28'37" W, WITH THE SOUTHERLY LINE OF SAID 0.667 ACRE TRACT AND WITH THE NORTHERLY LINE OF SAID PARCEL III, A DISTANCE OF 9.89 FEET TO A 1/2 INCH SOLID IRON PIN AT THE SOUTHWESTERLY CORNER OF SAID 0.667 ACRE TRACT, THE SAME BEING THE NORTHWESTERLY CORNER OF SAID PARCEL III, SAID IRON PIPE ALSO BEING THE NORTHEASTERLY CORNER OF LOT 1 OF SAID KATHERINE DURBAN SUBDIVISION AND AT THE SOUTHEASTERLY CORNER OF THAT 0.603 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT 'A" IN THE DEED TO CAMERAS, INC. OF RECORD IN OFFICIAL RECORD 25024B09, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO;

THENCE N 6°20'04" W, WITH THE WESTERLY LINE OF SAID 0.667 ACRE TRACT, WITH THE EASTERLY LINE OF SAID 0.603 ACRE TRACT AND WITH THE EASTERLY LINE OF THAT 0.603 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT A IN THE DEED TO CORD CAMERA CENTERS, INC., OF RECORD IN OFFICIAL RECORD 23456H20, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, A DISTANCE OF 22 9.97 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE NORTHWESTERLY CORNER OF SAID 0.667 ACRE TRACT, THE SAME BEING THE NORTHEASTERLY CORNER OF SAID CORD CAMERA CENTERS, INC., 0.603 ACRE TRACT, THE SAME BEING AN ANGLE POINT IN THE SOUTHERLY BOUNDARY OF THAT 0.761 ACRE TRACT OF LAND DESCRIBED IN EXHIBIT "A" IN THE DEED TO SMITH-TANDY REALTY (7-ELEVEN), OF RECORD IN OFFICIAL RECORD 26734C14, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO;

THENCE N 53°35'15" E, WITH THE NORTHWESTERLY LINE OF SAID 0.667 ACRE TRACT AND WITH THE SOUTHEASTERLY LINE OF SAID 0.761 ACRE TRACT, A DISTANCE OF 124.54 FEET TO A 3/4 INCH (I.D.) IRON PIPE AT THE NORTHWESTERLY CORNER OF SAID 0.667 ACRE TRACT IN THE WESTERLY LINE OF SAID 0.861 ACRE TRACT, THE SAME BEING AN ANGLE POINT IN THE EASTERLY BOUNDARY OF SAID 0.761 ACRE TRACT;

THENCE N 6°19'00" W, WITH THE WESTERLY LINE OF SAID 0.861 ACRE TRACT AND WITH THE EASTERLY LINE OF SAID 0.761 ACRE TRACT, A DISTANCE OF 70.12 FEET TO THE TRUE POINT OF BEGINNING AND CONTAINING 9.875 ACRES OF LAND, MORE OR LESS.

THE FOREGOING DESCRIPTION WAS PREPARED FROM INFORMATION OBTAINED FROM VARIOUS FIELD SURVEYS CONDUCTED BY BAUER,

**EXHIBIT B**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

DAVIDSON & MERCHANT, INC. BEGINNING IN FEBRUARY OF 1994 AND
EXTENDING THROUGH SEPTEMBER OF 1994.

ALL OF THE SURVEY MARKERS NOTED IN THE FOREGOING
DESCRIPTION WERE IN PLACE IN SEPTEMBER OF 1994.

THE BEARINGS GIVEN IN THE FOREGOING DESCRIPTION ARE BASED ON THE
BEARING OF S 87°30'00" E, AS GIVEN FOR THE CENTERLINE OF ROBERTS ROAD IN
THE DEED OF DEDICATION TO THE CITY OF COLUMBUS, OHIO, OF RECORD IN
OFFICIAL RECORD 23508H12, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO.

EXCEPTING THEREFROM A CERTAIN 0.535 ACRES PLATTED AS "DEDICATION
OF POTTS PLACE AND EASEMENTS" OF RECORD IN PLAT BOOK 81, PAGE 82,
RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO.

SAVE AND EXCEPT THE FOLLOWING:

SITUATED IN THE STATE OF OHIO, COUNTY OF FRANKLIN, CITY OF COLUMBUS,
VIRGINIA MILITARY SURVEY NO. 6544 AND 7029 AND BEING 0.0133 HECTARES
(0.033 ACRES) OUT OF A 3.7741 HECTARES (9.326 ACRE) TRACT CONVEYED TO SUN
LIFE ASSURANCE COMPANY OF CANADA BY DEED OF RECORD IN OFFICIAL
RECORD 31027, PAGE C12, RECORDER'S OFFICE, FRANKLIN COUNTY, OHIO, SAID
0.033 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING FOR REFERENCE AT FCGS MONUMENT #6665 LOCATED IN THE
CENTERLINE OF RIGHT-OF-WAY OF HILLIARD-ROME ROAD AND ROBERTS ROAD;
THENCE SOUTH 87° 32'50" EAST A DISTANCE OF 106.079 M (348.03 FEET) ALONG
THE CENTERLINE OF SURVEY OF SAID ROBERTS ROAD TO A POINT ON
CENTERLINE OF ROBERTS ROAD STATION 14+106.057; THENCE SOUTH 02° 27'10"
WEST A DISTANCE OF 15.240 M (50.00 FEET) TO A POINT ON THE EXISTING
SOUTHERLY RIGHT-OF-WAY LINE (EAST) OF SAID ROBERTS ROAD BEING THE
NORTHWESTERLY CORNER OF THE SAID 9.326 ACRE TRACT, 15.240 M (50.00 FEET)
RIGHT OF CENTERLINE OF ROBERTS ROAD STATION 14+106.057, SAID POINT
ALSO BEING THE TRUE PLACE OF BEGINNING OF THE HEREIN DESCRIBED 0.033
ACRE TRACT;

THENCE SOUTH 87° 32'50" EAST A DISTANCE OF 43.943 M (144.17 FEET) ALONG THE
NORTHERLY LINE OF SAID 9.326 ACRE TRACT AND THE SOUTHERLY EXISTING
RIGHT-OF-WAY LINE OF SAID ROBERTS ROAD, TO A POINT BEING 15.240 M (50.00
FEET) RIGHT OF CENTERLINE OF ROBERTS ROAD STATION 14+150.000;

THENCE SOUTH 02° 27'10" WEST A DISTANCE OF 3.048 M (10.00 FEET) ACROSS A
PART OF SAID 9.326 ACRE TRACT TO A SET IRON PIPE BEING 18.288 M (60.00 FEET)
RIGHT OF CENTERLINE STATION 14+150.000;

THENCE NORTH 87° 32'50" WEST A DISTANCE OF 43.469 M (142.62 FEET) ACROSS
PART OF SAID 9.326 ACRE TRACT AND ALONG THE PROPOSED SOUTHERLY
RIGHT-OF-WAY LINE OF SAID ROBERTS ROAD TO A SET IRON PIPE IN A
WESTERLY LINE OF THE SAID 9.326 ACRE TRACT AND BEING A NORTHEASTERLY
CORNER OF A 0.781 ACRE TRACT CONVEYED TO 2550 HILLIARD ROME ROAD, LLC
BY DEED OF RECORD IN INSTRUMENT 199901110007248; RECORDER'S OFFICE,
FRANKLIN COUNTY, OHIO, SAID SET IRON PIPE BEING 18.288 M (60.00 FEET)
RIGHT OF CENTERLINE STATION 14+106.531;

## EXHIBIT B

### LEGAL DESCRIPTION OF SHOPPING CENTER

THENCE NORTH 06° 22'29" WEST A DISTANCE OF 3.085 M (10.12 FEET) ALONG A WESTERLY LINE OF THE SAID 9.326 ACRE TRACT TO THE POINT OF BEGINNING, CONTAINING 0.0133 HECTARES (0.033 ACRES).

**PARCEL 2:**

NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND UTILITIES IN FAVOR OF A 0.667 ACRE PARCEL AS RESERVED IN OFFICIAL RECORDS VOLUME 243 91, PAGE 116 AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

60' PERMANENT INGRESS-EGRESS/UTILITY EASEMENT:

BEING A 60 FOOT WIDE STREET OF LAND LYING ON THE WEST SIDE PARALLEL AND ADJACENT TO THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A (SET) IRON PIN AT THE TRUE PLACE OF BEGINNING OF THE ABOVE DESCRIBED 0.781 ACRE LOT SPLIT,

THENCE SOUTH 06°19'00" EAST, A DISTANCE OF 60.00 FEET TO A (SET) IRON PIN BEING THE TERMINATION POINT OF THIS PERMANENT 60 FOOT WIDE INGRESS-EGRESS/UTILITY EASEMENT.

THE ABOVE DESCRIBED EASEMENT SHALL EXTEND TO INTERSECT THE PROPERTY LINE AT ITS BEGINNING POINT AND ITS TERMINATION POINT.

## EXHIBIT C

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**The following work is subject to the review of a Big Lots' Construction Director:**
Landlord covenants and agrees to deliver the premises to Tenant as follows:

### HILLIARD, OH

**PLUMBING, ELECTRICAL, SPRINKLER & FIRE SYSTEMS:** All plumbing, electrical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other tenants throughout the Original Term and Options, Terms or Extensions. Landlord shall install any device(s) or system(s) for the suppression, detection or reporting of fire as required by Authority Having Jurisdiction (AHJ). All devices and systems installed for the suppression, detection or reporting of fire shall be in compliance with all applicable National, State and Local codes.

**EXTERIOR LIGHTING:** All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot. All exterior lighting is to be on a separately metered house panel in the Landlord's name. (Landlord to check foot candles )

**ROOF:** Roof shall be professionally inspected and certified to be in good condition and free of leaks. Landlord shall provide an inspection report to tenant and make the necessary repairs to the roof to ensure it has a minimum life expectancy over Tenant's initial lease term. Tenant may also have the roof inspected and landlord shall make the necessary repairs/replacement per its inspection report on or before the Rent Commencement Date.

**PARKING LOT:** Parking lot shall be in good condition (paved, patched, sealed and striped) - with potholes, severe cracks and uneven areas resurfaced – adequate for customer parking and Tenant's use by Rent Commencement Date

**CART CORRAL:** Tenant shall have the right to install cart corrals in the parking lot area in front of the Demised Premises and in reasonable proximity thereto.

**SIGNAGE:** Tenant to have the right to use its color and logo on building signs at the maximum size per code and on pylons. Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylons meets all codes and zoning ordinances in order for Tenant to place its panel on the pylons. Tenant to have the Top marquee positions the pylons to be included at an exhibit to the lease.

**MISCELLANEOUS:** Landlord shall provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, an asbestos survey or, in the alternative, necessary certification. Landlord to be responsible for the removal of any and all Hazardous Materials and provide Tenant a Phase 1 report covering the demised premises. Tenant has received the Phase 1 report.

## EXHIBIT C

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

**GENERAL**
**CONDITIONS:**     Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant

All above work to be completed before the Tenant Possession Date.

## EXHIBIT C

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.



**Roof Survey**

_Client:_

**Big Lots**
300 Phillipi Rd
Columbus, OH 43228

_Site:_

**Potential Big Lots**
5419 Roberts Road
Hilliard, OH 43026

_Prepared by:_

**Nations Roof, LLC**
National Service Center
1633 Blairs Bridge Rd
Lithia Springs, GA 30122

_Proposal Date:_

April 24, 2009

_Inspection Date:_

_Work Order Number:_

   

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Executive Summary

Per Big Lots request, a Nations Roof inspector was dispatched to the Potential Big Lots! located at 5419 Roberts Road in Hilliard, OH to perform a roof survey. Big Lots asked that we provide a roof survey identifying the overall condition of the roof, the location of any deficiencies, and include a proposal for any necessary repairs or replacement.

### Inspection Findings

This roof is broken out into three sections. Area A, the main roof measures approximately 51,886 square feet. This roof is a Carlisle 45 mil EPDM roof system. Overall this roof is in good condition there are minimal deficiencies in this system. There are two areas that have failing pipe boot covers, a few areas that have punctures in the membrane, there are some improper metal covers and debris on the roof. Area B is a lower EPDM roof system that measures approximately 2,240 square feet. There is debris on the roof that could cause damage to the membrane. Area C is the metal roof area over the front entrance. This area measures approximately 1,239 square feet. There is a small dent in the gutters and a broken gutter strap.

### Recommendations

Nations Roof recommends repairing the deficiencies and establishing a preventative maintenance plan, with a plan in place the roof system will last the estimated design life.

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Roof List by Estimated Design Life

**Roof List by Estimated Design Life**

| Roof Area | Roof System | Area (SF) | Install Date | Evaluation | Est. EDL |
|-----------|-------------|-----------|--------------|------------|----------|
| A | EPDM | 51,886 | 2001 | RPM | 20 |
| B | EPDM | 2,240 | 2001 | RPM | 20 |
| C | Metal | 1,239 | 2001 | RPM | 20 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*EDL = Estimated Design Life*
*Roof system manufacturers do not publish the estimated design life of roof systems. This estimate is based on the warranty offered by the manufacturer and industry experience. The design life is offered as a benchmark to determine anticipated replacement and for making restore vs. replace decisions.*

## EXHIBIT C

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.



Nations Roof                    Page 4 of 10                    4/24/2009

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Roof Area Information

**Building:** Potential Big Lots

**Roof Area:** A

**Roof SF:** 51,886

**Roof System:** EPDM

**Building usage:** Retail

**Roof Access:** Hatch

### Roof Evaluation: RPM-Preventive Maintenance
In order for the roof to last its design life, it should be regularly maintained.

### Condition List

**Priority**
A-leaks, very high priority
B-will likely be a leak prior to the next inspection cycle.
C-good preventive maintenance
D-Monitor condition in future inspections
E-To be corrected by others, not in our scope of work

**Type of Deficiency**
MTC- this is a regular preventive maintenance item.
CMI – corrective maintenance installation, it was not installed properly and needs to be reinstalled.
CMD this is corrective maintenance design, it was not properly designed and needs to be corrected.
DMG – this is due to damage
WTY- this is a warranty repair item
PDT- this is a product deficiency or failure

Condition: Failing pipe boot.
Priority: A Type of Deficiency: MTC

Condition: Punctures in membrane
Priority: A Type of Deficiency: MTC

Condition: Debris on roof.
Priority: A Type of Deficiency: MTC

Condition: Improper metal covers.
Priority: C Type of Deficiency: CMI

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Estimated Scope of Work

- Provide and install safety equipment in accordance to OSHA guidelines and Nations Roof's internal safety procedures.
- Thoroughly clean roof areas of any debris.
- Top off all pitch pockets.
- Clean all drains and tighten all drain bolts.
- Clean gutters. Repair broken gutter straps.
- All pipe boots will be inspected and sealant added or replaced as needed.
- All field seams and wall/curb flashings of the roof will be inspected and all deficiencies marked. All marked areas will be repaired as needed.
- Move ballast back in place where applicable. Ballast is heavy in some areas and light in others, but quite possibly not enough ballast altogether. If additional ballast is needed it should be done at replacement time.
- Clean around all exposed fasteners and install polyurethane sealant.
- Tighten loose fasteners. Replace missing fasteners with a new heavy-duty fastener.
- Inspect coping cap seams. Clean and add polyurethane sealant as needed.

### Total Investment:

$5,040.00 Five Thousand Forty Dollars

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Ask about TWIG

Together Working In Green

If you haven't already looked at GREEN, Renewable Energy and Carbon Reductions strategies, talk to your account manager about solutions that make sense for your building.

Nations Roof is the industry expert and account manager is your resource for the following GREEN solutions:

- Daylighting studies have shown that both active and passive daylighting systems improve production, increase retail sales, and improve visibility. When combined with lighting controls, they can drastically reduce the operating costs for your building and leak-free warranties may coincide with your new roof system warranty. Ask us how the return on investment (ROI) from daylighting may be the best of any options available for your new or existing roof system.

- Solar / Photovoltaic assemblies can turn your roof into an energy producing asset and provide a clear sign to passers by that your company is a leader in going Green. Not only can you roll back the meter and save money on future energy costs, but your building can be a symbol of the future and help reduce carbon emissions. Federal and State incentives may be available and your Nations Roof account manager can help guide you toward the right Solar solution and determine the best way to finance your purchase.

- Garden Roofs can help conserve energy, absorb carbon dioxide and pollutants, control storm run-off and improve the efficiency of your building's heating and cooling systems. Green Roofs can more than double the service life of the roof and will improve the aesthetics of your building more than any other roof system selection. Nations Roof is certified to install all of the major manufacturer's systems and our Green Roof experts can lead you through the critical waterproofing and systems selection hurdles to ensure your Green Roof is right for your geography, your building and your wallet!

## EXHIBIT C

### LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Standard Conditions

- Payments from the Owner to the Company shall be made as follows: The first payment of 30% of the total contract value shall be paid upon mobilization and start up, the second payment of 30% of the total contract value shall be made once the project is 50% complete, and the third payment of 30% of the total contract value shall be made once the project is substantially complete, the final payment of the remaining 10% is due upon presentation of the warranty documents.

- Since material prices can change, particularly those that are petroleum based, or metal the price – proposal herein can be held for 45 days.

**Acceptance of Proposal:**

The before mentioned price, specifications, and conditions are satisfactory and are hereby accepted. Nations Roof is authorized to perform the work as specified, and payments will be made as outlined herein.

Authorized Signature: _____

Printed Name: _____

Title: _____

Date Accepted: _____

# EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.

### Terms and Conditions

1. **PAYMENT TERMS.** The Owner agrees to make payments to the Company as outlined under the Standard Conditions of the proposal. The Company will not supply the actual warranty to the Owner until all funds have been received. Interest shall start to accrue 30 days from the date of final invoice on any unpaid balance at 1 ½ % per month (18% per annum) or at the maximum legal rate permitted by law. If legal proceedings are required to collect an unpaid balance, all costs including actual attorney fees shall be added to the unpaid balance. Non-payment in accordance with these terms shall be considered material and cause for termination of performance by Company.

2. **ADDITIONAL CHARGES.** The following shall be an addition to the work order price and charged on a time and material basis, including 30% for overhead and profit: addition or deviation from the specifications herein described; damage to our work by others; temporary protection of the building not originally included in this work order; premature notice to start work causing unnecessary trips; trips back to the job to repair openings created after work is complete; and any labor required to be done outside of normal business hours.

3. **EXCLUSIONS.** The following items are not included in this work order unless otherwise specifically stated in writing; repairs to the roof deck, installation of wood or cant strips, furnishing or installation of sheet metal or roof drains, repairs or attachment to the building other than the roof, identification and/or abatement of Asbestos Containing Materials, or work preparatory or incidental to these items. No interior protection or clean up included. Nations Roof is not be responsible for any damage incurred due to mist or sources penetrating the roof deck or for damage incurred to anything secured or attached to the roof deck, joists or any other roofing structure member which becomes loose, unsecured or falls as a result of the roofing operations of Nations Roof.

4. **MATERIALS.** All materials used shall be as stated in the specifications and/or attached Scope of Work.

5. **OWNER AND/OR CONTRACTOR RESPONSIBILITY.** The Owner and/or Contractor is solely responsible for structural suitability of the building in light of specifications of the roofing system to be applied pursuant to this work order. Including, but not limited to, load bearing capacity, dew point and vapor transmission calculations. Further, the Owner and/or Contractor shall be solely responsible for any damages to any furniture, furnishing, fixtures or contents of the building during the performance of the work, except such damages as may be cause by the sole negligence of Nations Roof.

6. **PERMITS.** Owner and/or Contractor shall secure and pay for necessary approvals, permits, easements, assessments and charge required for construction, use or occupancy of permanent structures or permanent changes in existing facilities.

7. **GUARANTEE AND WARRANTY.** The type of guarantee and extent of coverage shall be as indicated in accordance with written guarantees, if any, offered by manufacturers of materials incorporated into the project. In addition to the manufacturer's guarantees, and upon receipt of final payment, Nations Roof shall guarantee workmanship furnished as part of this work order against defects in such workmanship for a period of one (1) year from the completion of work. Nations Roof's liability is limited to repairs or roofing and waterproofing work and materials installed by Nations Roof EXPRESSLY EXCLUDING CONSEQUENTIAL DAMAGES. THERE ARE NO OTHER GUARANTEES OR WARRANTIES EXPRESS OR IMPLIED.

8. **PONDING WATER.** It is understood by Owner and/or Contractor that a Ponding Water condition is not indicative of a defective roof system. Positive Drainage is a design goal and is not always achievable. Nations Roof will not be held responsible for a Ponding Water condition that results from a roof structure that is not designed to achieve Positive Drainage as defined by the National Roofing Contractors Association (NRCA). Ponding Water is defined as a roof surface that is incompletely drained. Positive Drainage is a drainage condition with additional roof slope provided to ensure drainage of a roof area with 48 hours after a rainfall.

9. **BOND.** A manufacturer's standard term of Surety/Bond will be furnished where payment and performance bonds are specified.

10. **INSURANCE.** Nations Roof agrees to purchase and maintain, as required by law, workers' compensation, liability and property insurance to protect the Owner and/or Contractor from injuries and/or damages which may arise out of or result from Nations Roof's operations under this work order and for which Nations Roof may be legally liable, whether such operations be by Nations Roof or by anyone directly or indirectly employing by Nations Roof, or by anyone for whose acts Nations Roof may be liable. Owner and/or Contractor agree to look solely to Nations Roof's appropriate insurance carrier for any and all damages including those caused by Nations Roof's sole negligence. The Owner and/or Contractor agrees to provide sufficient insurance to protect Nations Roof against loss or materials installed or on the premises due to fire, windstorm, hail or floods. Owner and/or Contractor provided property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, theft, vandalism, malicious mischief, collapse, false work, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements. If the property insurance requires minimum deductibles the Owner and/or Contractor shall be responsible for payment of the additional costs not covered because of such increased or voluntary deductibles. The insurance shall waive rights of subrogation, if any against Nations Roof. The Owner and/or Contractor shall purchase and maintain such insurance as will insure the Owner and/or Contractor against loss of use of the Owner's and/or Contractor's property due to fire or other hazards, however caused. The Owner and/or Contractor waive all rights of action against Nations Roof for loss of use of the Owner's and/or Contractor's property, including consequential damages.

11. **ACTS OF GOD.** Nations Roof shall not be responsible for damage or delay due to strikes, fires, accidents or other caused beyond its reasonable control.

12. **ACCESS.** Nations Roof shall be permitted to use driveways, and paved areas leading to, or adjacent to, the job site for its equipment without liability to Nations Roof occasioned by the negligence of others or by its equipment.

13. **STRUCTURAL SUITABILITY.** Nations Roof assumes full responsibility for furnishing or roofing materials and for providing specifications and recommendations for their proper installation. Nations Roof does not, either itself or through its representatives, practice architecture or engineering and offers no opinion on, and expressly disclaims any responsibility for, the structural soundness of any roof deck on which roofing products may be applied. Opinions of competent structural engineers should be obtained by the Owner and/or Contractor as to the structural soundness of the roof deck and its ability to properly support the contemplated roof installation. Nations Roof accepts no liability for any failure of the roof deck, its ability to support the contemplated roof installation, or resultant damages.

14. **FINAL PAYMENT.** The making of final payment shall constitute a waiver of all claims against Nations Roof by the Owner and/or Contractor except for those arising from (a) unsettled liens claiming from work performed by Nations Roof, (b) terms of any guarantee or warranty issued pursuant to this work order. No guarantee or warranty provided by Nations Roof shall be valid until full and final payment is received.

15. **ARBITRATION.** Any controversy or claim arising out of or relating to this work order, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association in Chicago, IL, and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof. Notwithstanding the foregoing, in Nations Roof's sole discretion, collection of unpaid balances may be sought in any Court having jurisdiction thereof or under this arbitration clause. The prevailing party shall be entitled to recover all costs including but not limited to all attorney fees, costs, and expert witness fees.

16. **MISCELLANEOUS.** These Terms and Conditions together with the cover page providing the Scope of Work, etc. and any attachments constitute the entire agreement (Agreement) of the parties. Modifications to this Agreement can be made only in writing signed by Nations Roof. Owner and/or Contractor permitting performance of work indicates acceptance without exception of this Agreement, even if this Agreement is not executed.

## EXHIBIT C

## LANDLORD WORK

This Exhibit is prepared to be attached to and become part of the foregoing Lease as the Tenant's Demised Premises therein described is to be repaired and remodeled by Landlord prior to the Tenant Possession Date.



**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS

## LOGOS
### WITH
## SPECIFICATIONS
## for exterior signage

If you need additional information that is
not contained in this packet contact:



02/2007

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS - THE LOGO

The logo can be used in either of the shown versions (stacked or horizontal)
with the stacked logo being the preferred version.
The logo proportions cannot be distorted nor colors changed.*

### Stacked Logo
This is the preferred way to present the logo.

### Horizontal Logo



**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE
PROCESS MIX - 50% MAGENTA, 100% YELLOW

*See: Boxed Sign or Awning One Color.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

Stacked Logo

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

This is the preferred way to present the sign.



## STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
|-----|-----|-----|-------|-------|--------|-------|
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4½" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5½" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17½" | 6½" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19½" | 7½" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21½" | 8½" |

**SIGN SPECIFICATIONS:**
**BIG LOTS**

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**SIGN SPECIFICATIONS:**
**EXCLAMATION**

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
OPAQUE WHITE VINYL OUTLINE AND WHITE
TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C.
All signage equipped with disconnect switches.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

Horizontal Logo
# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS



| STANDARD SIZE CHARACTERISTICS | | | | |
|---|---|---|---|---|
| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ |
| 2'-0" | 12'-3" | 2'-10" | 9" | 4½" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5½" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6½" |
| 3'-6" | 20'-7" | 4'-11" | 15½" | 7½" |
| 4'-0" | 23'-3" | 5'-8" | 17½" | 8½" |
| 4'-6" | 26'-1" | 6'-4" | 19½" | 9½" |
| 5'-0" | 28'-10" | 7'-0" | 21½" | 10½" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

### SIGN SPECIFICATIONS: BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

### SIGN SPECIFICATIONS: EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

NOTE: Fabrication and installation per UL specifications.
Install in accordance with N.E.C.
All signage equipped with disconnect switches.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING

To be used as pylon sign or a boxed sign.

**Boxed Stacked**

This is the preferred way to present the logo.



**Boxed Horizontal**

| SIGN SPECIFICATIONS: | SIGN SPECIFICATIONS: |
|---|---|
| **BIG LOTS AND TRADE MARK** | **EXCLAMATION** |
| BLACK | MATCH TO PANTONE 021 ORANGE |

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING WITH ONE COLOR

To be used as pylon sign or a boxed sign, when landlord requires that only one color be used. Color can be changed to the color required by shopping center (otherwise use color shown).

### Boxed Stacked
This is the preferred way to present the logo.

### Boxed Horizontal

**SIGN SPECIFICATIONS:**

**BIG LOTS, TRADE MARK & EXCLAMATION**

MATCH TO PANTONE 021 ORANGE

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# DO NOT STRETCH LOGOS HORIZONTALLY OR VERTICALLY!

# DO NOT RE-TYPESET IN A "SIMILAR" FONT STYLE!

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**





EXHIBIT D - 1
TENANT PYLON PANEL LOCATION



pylon #2

Big Lots panel

## EXHIBIT E

### DELIVERY OF POSSESSION LETTER

Date: _____

**To:** _____(insert Tenant)
    via facsimile: (614) 278-6546

**From:** _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

**RE:** _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed. Accordingly, possession of the Demised Premises is hereby delivered to Tenant. You may pick up the keys at _____.

If you have any questions, please feel free to contact me at _____.

Thank You.

**LANDLORD:**

_____
a _____

By:_____

Title:_____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By:_____

Title: _____

# EXHIBIT F

## EXCLUSIVE USE PROVISIONS

No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use.

## EXHIBIT G

### REMEASUREMENT RIDER

This Rider dated _____ ____, 200__ is attached to and made a part of the Lease dated (the "Lease") by and between _____ ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    A.    Gross Rent—Original Term (Section 5(A)):
        _____ annually; _____ per month.

3.    A.    Gross Rent--First Option (Section 5(A)):
        _____ annually; _____ per month.

4.    A.    Gross Rent—Second Option (Section 5(A)):
        _____ annually; _____ per month.

5.    A.    Gross Rent—Third Option (Section 5(A)):
        _____ annually; _____ per month.

6.    A.    Gross Rent—Fourth Option (Section 5(A)):
        _____ annually; _____ per month.

## EXHIBIT H

## CONSTRUCTION PROCEDURES FOR TENANT'S WORK

### ARTICLE 1

### GENERAL DESIGN AND CONSTRUCTION CRITERIA

1.1     Tenant is responsible for letting contracts relating to the construction and installation of the leasehold improvements, supervision and completion of Tenant's Work and payment therefor, procurement of all permits and permissions related to Tenant's Work, compliance with the requirements of all Laws and authorities having jurisdiction and compliance with conditions contained herein, and payment of all fees and charges incurred in connection therewith

### ARTICLE 2

### REPRESENTATIVES; OTHER WORK OF LANDLORD

2.1     Tenant acknowledges that Landlord may be carrying out certain other work in the Demised Premises and the Shopping Center at the time that Tenant's Work is being carried on and that such work by Landlord can only be undertaken at the same time as or subsequent to work done by Tenant and that certain work (including correction of deficiencies) may be undertaken or completed subsequent to the Tenant Possession Date.

### ARTICLE 3

### [INTENTIONALLY DELETED]

### ARTICLE 4

### TENANT'S WORK

4.1     No construction work will be undertaken or commenced by Tenant until:

(a)     Tenant's Drawing are attached to the Lease as Exhibit A-1

(b)     all necessary building permits have been secured and copies thereof have been delivered to Landlord, and

(c)     all required insurance coverages have been secured and certificates of insurance have been delivered to Landlord.

### ARTICLE 5

### [INTENTIONALLY DELETED]

### ARTICLE 6

### [INTENTIONALLY DELETED]

### ARTICLE 7

### INSURANCE; PAYMENT DOCUMENTATION

7.1     Tenant will cause Tenant's contractor (and, except as provided below, all of Tenant's contractor's subcontractors) to procure and maintain in effect during the entire period of construction of Tenant's Work the following insurance:

(a)     Commercial general liability insurance.

Prior to the commencement of any Tenant's Work, Tenant will cause Tenant's contractor to deliver to Landlord original certificates of insurance evidencing the insurance coverage required above, together with copies of all applicable endorsements naming Landlord and those parties specified above as additional insureds. Tenant will also cause Tenant's contractor to obtain certificates or evidence of similar insurance and such endorsements from each of Tenant's contractor's subcontractors before their work commences and to deliver such certificates or evidence to Landlord. Each subcontractor must be covered by insurance of the same character and in the same amount as specified for Tenant's contractor above, except that (i) so long as Tenant's contractor's builders risk policy covers all of Tenant's Work, no subcontractor will be required to maintain builders risk coverage; and (ii) with regard to other types of insurance specified above, Tenant's contractor and Landlord may agree to lesser limits in writing because of the nature of the particular subcontract work.

7.2     Tenant will furnish Landlord with sworn owner's and contractor's statements, contractor's affidavits and partial and final waivers of lien, in such form and content as Landlord may require, in order to establish that the cost of all labor, services and materials in excess of $5,000.00 furnished in connection with Tenant's Work has been paid in full and to keep the Demised Premises and Shopping Center free from all liens and claims.

# BRETT THOMAS CONSTRUCTION, INC.

14637 East State Highway 76
Rock Comfort, MO  64861

To:  Jeff Hailey Big Lot Inc.

Proposed Hilliard Ohio Scope Of work

1. Build demising wall to separate spaces per plans removing all electrical, water and gas services to the proposed Big Lots space at the demising wall. Leaving the vacant side with the existing electrical service. ..gas service and stub in a new water service into the vacant side and  modify the Fire sprinkler system to keep coverage to the vacant space

2. Split electrical service and install new meter and disconnect and install new 800 amp service to the Big Lots side with all related panels and switch gear...

3. Demo the new Big lots space, removing the Deli and seafood areas, all ceilings, and flooring, remove the 1 existing freezer in the rear of the space, remove the west window section and blocking in to match the existing split face block, remove the glass front for the new entry doors to be installed

4. Remove approx 5600 sqr foot of concrete slab where Deli and Seafood and Freezers were and pour back with 3500 psi concrete to match the existing sales floor and stock area. Cap off old drain line in sales area and pour back for a smooth sales floor slab

5. Build new stock room wall, offices, lounge, restrooms and sales floor walls and Fur down per the plans and specs.

6. Install  ASROCK V862 VCT flooring and cove base per plans

7. Install new sprinkler lines and heads to the rear of the space and raise the sprinkler main to 14'6" AFF to accommodate new ceiling level at 14' and install new sprinkler heads in the new ceiling per code and new drops to offices and modify the existing Anti freeze loop system in the store front area adding new upright heads in the stock area.

8. Install new ceiling grid and tile on sales floor at 14' Aff, new ceiling tile and grid in offices and lounge and restrooms and new vestibule.

9. Construct new ADA restrooms per plans and specs.

10. Install 4 new automatic sliding doors and new glass vestibule per plans

11. Complete Big Lots wiring package per plan, install new T 8 lighting per plan  install new Fire and Burglar alarm per plans hook up new HVAC system and exhaust system  per code

12. Paint interior per specs and paint exterior of the Big Lots space to match the existing center.

13. Install HVAC system per plans 8 new roof top units all electrical and gas lines per plans and new exhaust system for the restrooms using a landlord approved roofing company to insure that roof warranty stays in tact

14  Provide all plans and permits.

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A.    Original Term
   B.    Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Percentage Rent
   D. Common Area Charges and Cap
   E. Real Estate Taxes
   F. Construction Allowance

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24. Notices

1

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

## LEASE MODIFICATION AGREEMENT

This Lease Modification Agreement (the "Agreement") is made and entered into this 10th day of March, 2010, by and between ORIX Roberts Crossing, LLC successor in interest to Norman P. Bertke, Managing Director of CB Richard Ellis, Inc., as Receiver for Rushmore Roberts, LLC ("Landlord") whose mailing address is 1717 Main Street, Suite 1100, Dallas, TX 75201, and **Big Lots Stores, Inc., an Ohio corporation,** ("Tenant") with its business address at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228-0512.

**WHEREAS,** Landlord and Tenant entered into a Lease dated **July 20, 2009,** (the "Lease") for the premises located in the Roberts Crossing Shopping Center, 5419 Roberts Rd., Hillard, Ohio 43026, more particularly described in the Lease.

**WHEREAS,** Landlord and Tenant mutually desire to modify the certain terms of said Lease.

**NOW THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. Section 5.A. of the Lease is hereby deleted in its entirety and replaced with the following:

   "Gross Rent: During the Original Term of this Lease, the sum of Two Hundred Seven Thousand Six Hundred Sixty-nine and 00/100 Dollars ($207,669.00) per annum ($7.00 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Seventeen Thousand Three Hundred Five and 67/100 Dollars ($17,305.75).

   All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Rent applicable for the First Option Term shall be the sum of  Two Hundred Twenty-nine Thousand Nine Hundred Nineteen and 25/100 Dollars ($229,919.25) per Lease Year ($7.75 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Nineteen Thousand One Hundred Fifty-nine and 94/100 Dollars ($19,159.94).   The Rent applicable for the Second Option Term shall be the sum of Two Hundred Fifty Two Thousand One Hundred Sixty-nine and 50/100 Dollars ($252,169.50) per Lease Year ($8.50 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-one Thousand Fourteen and 13/100 Dollars ($21,014.13).   The Gross Minimum Rent applicable for the Third Option Term shall be the sum of Two Hundred Seventy-four Thousand Four Hundred Nineteen and 75/100 Dollars ($274,419.75) per Lease Year ($9.25 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-two Thousand Eight Hundred Sixty-eight and 31/100 Dollars ($22,868.31).   The Rent applicable for the Fourth Option Term shall be the sum of Two Hundred Ninety-six Thousand Six Hundred Seventy and 00/100 Dollars ($296,670.00) per Lease Year

($10.00 per square foot of floor area per annum) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-four Thousand Seven Hundred Twenty-two and 50/100 Dollars ($24,722.50).

Landlord and Tenant agree that this Lease shall be a gross Lease.   With the exception of Rent, as provided hereinabove, Tenant shall be under no obligation to pay any additional rent or other charges except as expressly set forth herein, it being the intent of the parties that Rent shall be a gross payment to Landlord and shall include Tenant's share of any Common Area Charges, Real Estate Taxes and Insurance.   Landlord shall be responsible for the payment of all Common Area Charges, Real Estate Taxes and Insurance."

The submission by Tenant to Landlord of this agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

Except as herein amended and modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern.

Unless defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:     ORIX Roberts Crossing, LLC**

By: _____

Its: _____ M.D. _____

Witnesses as to Tenant:

**TENANT:**

**BIG LOTS STORES, INC., an Ohio corporation**

By: _____
    Kevin Day
Its: _____ Vice President _____

STATE OF Texas

County of Dallas.

Before me, a Notary Public, in and for said State and County, personally appeared the above named Scott Cronister, by QRIX Roberts Crossing LLCits Managing Director who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said limited liability company.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at 12:00 , this 10th day of March, 2010.

Notary Public

**DENISE C MILLER**
**My Commission Expires**
**December 7, 2010**

STATE OF Ohio      )
                   )
County of Franklin )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc., an Ohio corporation,** by **Kevin Day,** its **Vice President,** who acknowledged that she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of her personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at Columbus, Ohio, this 12 day of March , 2010.

Notary Public

**KARLENE YAMAMOTO**
**Notary Public, State of Ohio**
**My Commission Expires 2/20/2012**

## FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT, made and entered into this _25th_ day of _November_, 2014 (this "Agreement") by and between Roberts Crossing, LLC, an Ohio limited liability company, having an office located at c/o Carnegie Companies, Inc., 6190 Cochran Road, Suite A, Solon, OH 44139 ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, having an office located at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228-5311 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated July 20, 2009, as amended (collectively, the "Lease") for approximately 29,667 square feet of retail space located in Roberts Crossing Shopping Center, 5419 Roberts Road, Hilliard, Ohio 43026 as more particularly described in the Lease, and

WHEREAS, Landlord and Tenant now desire to extend the term of the Lease for ~~five (5)~~ three (3) years through January 31, 2020 pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. The term of the Lease is hereby extended for ~~five (5)~~ three (3) years from February 1, ~~2015~~ 2017 through January 31, 2020 (hereinafter referred to as the "First Extended Term"), upon the same terms and conditions as contained in the Lease except as provided herein.

2. During the First Extended Term, Tenant shall pay Rent in the amount of Two Hundred Seven Thousand Six Hundred Sixty-Nine and 00/100 Dollars ($207,669.00) per annum payable in monthly installments of Seventeen Thousand Three Hundred Five and 67/100 Dollars ($17,305.75).

3. Tenant shall retain its four (4), remaining five (5) year option terms under the Lease pursuant to the terms specified within the Lease.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless otherwise defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**WITNESSES**:

LANDLORD:
Roberts Crossing, LLC
by Carnegie Properties, Inc., member,

By:    Peter Meisel
Its:    President

TENANT:
Big Lots Stores, Inc., an Ohio corporation

By:  Timothy A. Johnson
Its:  Executive Vice President, Chief
      Financial Officer



**(Acknowledgements follow immediately on the next page)**

(Landlord's Acknowledgement)

STATE OF Ohio

County of Cuyahoga

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Roberts Crossing LLC_, by _Peter Meisel_, its _President_ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at _Selon, ohio_, this 24th day of _November_, 2014.

DEIRDRE SALOIS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
February 06, 2016
Recorded in
Cuyahoga County

_____
Notary Public

(Tenant's Acknowledgement)

STATE OF OHIO )
)ss
County of Franklin )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Timothy A. Johnson, its **Executive Vice President, Chief Financial Officer**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Columbus, Ohio, this 25th day of _November_, 2014.

_____
Notary Public

Courteney Robertson
Notary Public, State of Ohio
My Commission Expires 06/22/2016

## SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT, made and entered into this 27 day of June , 2019 (this "Agreement") by and between Roberts Crossing, LLC, an Ohio limited liability company, having an office located at c/o Carnegie Companies, Inc., 6190 Cochran Road, Suite A, Solon, OH 44139, successor-in-interest to ORIX Roberts Crossing, LLC ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, having an office located at 4900 E. Dublin Granville Rd., Columbus, OH 43081 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated July 20, 2009, as amended (collectively, the "Lease") for approximately 29,667 square feet of retail space located in Roberts Crossing Shopping Center, 5419 Roberts Road, Hilliard, Ohio 43026 as more particularly described in the Lease, and

WHEREAS, Landlord and Tenant now desire to extend the term of the Lease for five (5) years through January 31, 2025 pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. The term of the Lease is hereby extended for five (5) years from February 1, 2020 through January 31, 2025 (hereinafter referred to as the "Second Extended Term"), upon the same terms and conditions as contained in the Lease except as provided herein.

2. During the Second Extended Term, Tenant shall pay Rent in the amount of ($218,940.00) per annum payable in monthly installments of ($18,245.00).

3. Tenant shall retain its four (4), remaining five (5) year option terms under the Lease pursuant to the terms specified within the Lease.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless otherwise defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**WITNESSES:**

LANDLORD:
ROBERTS CROSSING LLC,
an Ohio limited liability company
By CARNEGIE PROPERTIES, INC., an
Ohio corporation, member

By:    Peter Meisel
Its:    President

TENANT:
Big Lots Stores, Inc., an Ohio corporation

By:  Timothy A. Johnson
    Its:  Executive Vice President, Chief
    Administrative Officer and Chief
    Financial Officer

**(Acknowledgements follow immediately on the next page)**

(Landlord's Acknowledgement)

STATE OF _Ohio_

County of _Cuyahoga_

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _Roberts Crossing, LLC_, by _Carnegie Properties, Inc. its Member by_ its _President_ who acknowledged that he/she did sign the foregoing _Peter Musel_ instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at _Solon_, this _27th_ day of _June_, 2019.

_____
Notary Public

STATE OF _____

County of _____

JENNIFER DIRRMAN
Notary Public, State of Ohio
Recorded in Lake County
My Commission Expires
May 8, 2020

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, _____, by _____, its _____ who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at _____, this _____ day of _____, 2019.

_____
Notary Public

(Tenant's Acknowledgement)

STATE OF OHIO )
 )ss
County of Franklin )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Timothy A. Johnson, its **Executive Vice President, Chief Administrative Officer and Chief Financial Officer**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Columbus, Ohio, this _26_ day of _June_, 2019.

_____
Notary Public



Christopher M. Macke, Attorney At Law
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
Sec. 147.03 R.C.

DocuSign Envelope ID: 38318699-164E-43BB-8C52-187200A40D53

## FOURTH LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS FOURTH LEASE EXTENSION AND MODIFICATION AGREEMENT, made and entered into this 3rd day of December, 2021 (this "Agreement"), by and between Roberts Crossing, LLC, an Ohio limited liability company, having an office located at c/o Carnegie Companies, Inc., 6190 Cochran Road, Suite A, Solon, OH 44139 ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, having an office located at 4900 E Dublin Granville Rd., Columbus, OH 43081 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated July 20, 2009, as amended (collectively, the "Lease") for approximately 29,667 square feet of retail space located in Roberts Crossing Shopping Center, 5419 Roberts Road, Hilliard, Ohio 43026 as more particularly described in the Lease, and

WHEREAS, Landlord and Tenant now desire to extend the term of the Lease for five (5) years through January 31, 2030 pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. The term of the Lease is hereby extended for five (5) years from February 1, 2025 through January 31, 2030 (hereinafter referred to as the "Third Extended Term"), upon the same terms and conditions as contained in the Lease except as provided for herein.

2. During the Third Extended Term, Tenant shall pay Rent in the amount of Two Hundred Twenty Nine Thousand Five Hundred Forty Eight and 00/100 Dollars ($229,554.00) per annum, payable in monthly installments of Nineteen Thousand One Hundred Twenty Nine and 50/100 Dollars ($19,129.50) $18,245.00 #218,940.00 9H four (4) 9H
Pew
$218,245.00

3. Tenant shall retain its three (3), remaining five (5) year option terms under the Lease pursuant to the terms specified within the Lease.

4. Tenant hereby consents to Landlord using the area within the "No Change Area," as such is referenced in the Lease, to erect a 1,600 sq.ft. building for the operation of Tropical Smoothie, or successor use, in the parking lot location shown on the Exhibit A attached hereto and made a part hereof. Notwithstanding anything to the contrary contained herein, Landlord shall ensure such construction shall be separately parceled for tax purposes. Except as hereinabove set forth, Tenant's grant of this consent shall be for this alteration in the No Change Area only and shall not be interpreted as a consent of any other covenant or condition in the Lease and shall not be considered a general consent of any other alterations within the No Change Area. Landlord shall not make any other alterations to the No Change Area without the consent of Tenant.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless otherwise defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

DocuSign Envelope ID: 39318699-164E-43B8-8C52-18720BA40D53

This may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**WITNESSES:**

**LANDLORD:**
Roberts Crossing, LLC
by Carnegie Properties, Inc., member,

By:   Peter Meisel
Its:   President

**TENANT:**
Big Lots Stores, Inc., an Ohio corporation

DocuSigned by:
Jonathan Ramsden

By: Jonathan Ramsden
Its: Executive Vice President,
     Chief Financial Officer &
     Chief Administrative Officer

**(Acknowledgements follow immediately on the next page)**

DocuSign Envelope ID: 39318699-164E-43BB-8C52-18720BA40D53

(Landlord's Acknowledgement)

STATE OF Ohio

County of Cuyahoga       Roberts Crossing LLC, by Carnegie Properties, Inc., Member

Before me, a Notary Public, in and for said State and County, personally appeared
the above named Landlord, _____, by Peter Meisel,
its President _____ who acknowledged that he/she did sign the foregoing
instrument and that the same is the free act and deed of said corporation, and the free act
and deed of him/her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at
Solon, OH _____, this 3rd day of December, 2021.

JENNIFER DIRRMAN
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires 5/8/2025    Notary Public

(Tenant's Acknowledgement)

STATE OF OHIO      )
                   )ss
County of Franklin )

Before me, a Notary Public, in and for said State and County, personally appeared
the above named Tenant, Big Lots Stores, Inc., by Jonathan Ramsden, its **Executive Vice
President, Chief Financial & Administrative Officer**, who acknowledged that he did
sign the foregoing instrument and that the same is the free act and deed of said
corporation, and the free act and deed of him personally and of said officer.

**IN WITNESS WHEREOF,** I hereunto set my hand and the official seal, at
Columbus, Ohio, this _____ day of _____, 2021.

_____
Notary Public

DocuSign Envelope ID: 39318699-164E-43BB-8C52-18720BA40D53



Exhibit "A"



**DocuSign**

## Certificate Of Completion

Envelope Id: 39318699164E43BB8C5218720BA40D53                                 Status: Completed
Subject: Please DocuSign: BL #5092 - 4th LEMA (clean) 12-2-21.doc, 5092_Hilliard,_OH_Waiver.pdf
Source Envelope:
Document Pages: 5                         Signatures: 1                       Envelope Originator:
Certificate Pages: 4                      Initials: 0                         Chris Macke
AutoNav: Enabled                                                              4900 E Dublin Granville Road
EnvelopeId Stamping: Enabled                                                  Columbus, OH 43081
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                             cmacke@biglots.com
                                                                             IP Address: 50.4.237.118

## Record Tracking

Status: Original                          Holder: Chris Macke                 Location: DocuSign
    12/2/2021 5:33:24 AM

## Signer Events | Signature | Timestamp

Jonathan Ramsden

*Jonathan Ramsden*
FF2E61629539412...

Big Lots
Security Level: Email, Account Authentication
(None)

Signature Adoption: Pre-selected Style
Using IP Address: 12.20.122.76

Sent: 12/2/2021 5:33:54 AM
Viewed: 12/2/2021 5:48:44 AM
Signed: 12/2/2021 5:48:49 AM

**Electronic Record and Signature Disclosure:**
    Accepted: 3/20/2020 9:20:44 AM
    ID: 9c88a9b2-60c7-4989-aa3f-ad788b02be36

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/2/2021 5:33:54 AM |
| Certified Delivered | Security Checked | 12/2/2021 5:48:44 AM |
| Signing Complete | Security Checked | 12/2/2021 5:48:49 AM |
| Completed | Security Checked | 12/2/2021 5:48:49 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 3/17/2020 2:08:09 PM
Parties agreed to: Jonathan Ramsden

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Big Lots (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

### How to contact Big Lots:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: cmacke@biglots.com

### To advise Big Lots of your new email address

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at cmacke@biglots.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

### To request paper copies from Big Lots

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to cmacke@biglots.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

### To withdraw your consent with Big Lots

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to cmacke@biglots.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Big Lots as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Big Lots during the course of your relationship with Big Lots.

P.O. Box 23159
San Diego, CA 92193-3159



IMPORTANT INFORMATION
ENCLOSED

(11)  969 0024 8863 5159 2

**Mailed On:** 11/4/2024
**ClientID:**  Weltman_BK  FC

Kroll Restructuring Administration LLC
1 World Trade Center
31st Floor
New York, NY   10007

