# EXHIBIT A

## **LEASE AGREEMENT**

This Lease Agreement ("Lease"), shall be made effective the ___ day of July, 2012 (the "Effective Date"), by and between Midwest Centers, LTD, an Ohio limited liability company ("Landlord") whose mailing address is 2nd Floor, 3307 Clifton Avenue, Cincinnati, Ohio 45220 and Big Lots Stores, Inc., an Ohio corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

### **WITNESSETH:**

**1.   DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.   Common Areas: The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas. Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises; provided, however, Landlord shall be entitled to construct a new building, structure or improvement on the outparcel as shown on the site plan attached hereto as Exhibit A (the "Outparcel") as long as the height of such new building, structure or improvement does not exceed the lesser of (i) eighteen (18) feet or (ii) the height of Tenant's façade plus the height of any HVAC equipment. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease. Neither Tenant, nor any employees or agents of Tenant, shall fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises as shown on the Site Plan attached hereto as Exhibit A so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not alter the area crosshatched on Exhibit A ("No Change Area").

B.   Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's work to be done simultaneously with Landlord's Pre-Delivery Work and Landlord's Post-Delivery Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C. Tenant hereby agrees to indemnify Landlord

3

against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Tenant accepts possession following Landlord's notice to Tenant that it has completed any construction that may be required pursuant to Exhibit C, or (ii) the date on which Tenant receives all permits for its construction and signage. Tenant will submit its plans for permits within ninety (90) days of the Effective Date and thereafter, diligently pursue obtaining such permits. Landlord will cooperate fully with Tenant in obtaining said permits. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has completed Landlord's Pre-Delivery Work in the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if Landlord's Pre-Delivery Work has been completed. Delivery of the Demised Premises shall not be deemed to have been made unless Landlord's Pre-Delivery Work pursuant to Exhibit C is complete, and the Demised Premises (excluding alterations or improvements related to Landlord's Post-Delivery Work) complies with all laws, ordinances, regulations and building restrictions ("Landlord's Pre-Delivery Work"). Landlord's Post-Delivery Work (as set forth on Exhibit C-1) must be completed October 22, 2012. Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises ("Exterior Improvements") shall be the responsibility of Landlord. In the event Tenant's certificate of occupancy is delayed due to Landlord's failure to complete any Exterior Improvements, the Rent Commencement Date shall be delayed one (1) day for each day the certificate of occupancy is delayed. As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is ninety (90) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    If Landlord fails to complete Landlord's Pre-Delivery Work in the Demised Premises by August 15, 2012, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to August 1, 2012. Landlord and Tenant agree that if Landlord fails to complete Landlord's Pre-Delivery Work in the Demised Premises by August 15, 2012, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon August 16, 2012 and continuing for each and every day Landlord is delayed in completing Landlord's Pre-Delivery Work, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $200.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefor, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent

due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no liquidated damages will be assessed for late completion of Landlord's Pre-Delivery Work until Tenant has received its permits for its construction and/or signage in the Demised Premises unless Tenant has been delayed in obtaining its permits due to circumstances within Landlord's control.

6)    Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Pre-Delivery Work in the Demised Premises by September 1, 2012, Tenant will not be required to accept possession until February 4, 2013. The period of time between September 1, 2012 and February 4, 2013 will be the "Optional Blackout Period". In the event Landlord completes Landlord's Pre-Delivery Work during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, no liquidated damages shall be due or incurred by Landlord for periods subsequent to the date Tenant makes such election. In addition, in the event Landlord has not completed Landlord's Pre-Delivery Work by February 4, 2013, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 4, 2013, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord completes Landlord's Pre-Delivery Work and Landlord's Post-Delivery Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 4, 2013. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit A – 1 Tenant's Plans and Specifications

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    Landlord's Work

5)    Exhibit D -    Tenant Building Sign Specifications

6)    Exhibit D – 1 Tenant Pylon Sign Location

7)    Exhibit E -    Completion of Landlord's Work Letter

8)    Exhibit F -    Exclusive Use Provisions

9)    Exhibit G -    Remeasurement Rider

D.    Demised Premises: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 29,640 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises. Tenant's Plans and Specifications are attached hereto as Exhibit A-1 and deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, Tenant

shall have the opportunity to measure the dimensions of the Demised Premises (measured to the exterior of the outside walls and to the center of the interior walls) for a determination of its exact square footage and provide the Landlord with written notice of its findings. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.   Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 30,114 square feet nor accept possession of any space under 27,103 square feet in size, and may terminate this Lease in such an event.

E.   Shopping Center:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Fairfield Crossing Shopping Center, 4507 Dixie Highway, Fairfield, Oho 45014.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 109,750 square feet.

## 2.   DEMISE:

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided.  Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.   TERM:

A.   Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2019 (the "Original Term").   Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.  If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."  If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".  Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.  As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.   Options to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises, Tenant may elect to exercise each option by giving the Landlord written

6

notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.

**4.    USE AND OPERATION:**

A.    Permitted Uses:  Tenant shall have the right to use and occupy the Demised Premises for the primary use for the retail sale of general merchandise and the secondary use for the retail sale of closeouts, new furnishings, new furniture, furniture accessories, furnishings, mattresses, appliances, electronics, toys, seasonal merchandise, plastics, crafts, home goods, party goods, greeting cards, health and beauty products, food (including frozen food, beer and wine), and all similar or related merchandise and for any other lawful retail use, provided, that, such "other lawful retail use" shall not conflict with any then-existing exclusive rights in the Shopping Center.  Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises.  Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, no other general merchandise store, discount store, liquidator, closeout store, new furniture store or dollar store operation ("Competing Business") as a primary business may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Roses, Encore, Family Dollar, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Bed Bath & Beyond, Christmas Tree Shops, Five Below, Encore and Ollie's Bargain Outlet.  In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall be entitled to any and all of the following  remedies: (i) Tenant may terminate the Lease, which termination shall be effective upon the date specified in a written notice to Landlord; or (ii) Tenant may pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease. Failure to exercise (i) above shall not waive Tenant's continuing right to do so as long as said Competing Business is open and operating.  All of Tenant's remedies herein are cumulative, and the exercise of one or more rights or remedies herein shall not preclude or waive the right of the Tenant to exercise any of the other remedies available to it herein.  All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.  If Tenant has not terminated the Lease as provided above, at such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

7

It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall contract, and pay directly, for its own trash receptacle and trash removal.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise.

B.    Prohibited Uses:  Except for tenants open and operating for business in the Shopping Center as of the date of this Lease, Landlord shall not lease any space, or permit any use in the Shopping Center, and Tenant shall not use the Demised Premises: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter, or a store selling used apparel; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices in excess of 3,000 square feet of floor area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; provided, however, first class retail vehicle parts stores that do not provide on site repair of vehicles shall be permitted such as Auto Zone and Advanced Auto; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages (excluding any incidental beer or wine sales by Tenant), provided, however, restaurants that sell alcoholic beverages and/or that have a bar included therein shall be permitted;

(xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations, provided, however, a health spa, health club, gymnasium or other similar operation which is located within the location identified as "Sears Hardware" shown on Exhibit A shall be permitted ; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales (excluding incidental sales of lottery tickets) or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use (which Tenant may install on the Demised Premises); (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

## 5.    RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent:  During the Original Term of this Lease, the sum of $154,128.00 per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of $12,844.00.

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; and (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $171,912.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $14,326.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $189,696.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $15,808.00. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $207,480.00 per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of $17,290.00.

B.    Utilities Charges:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution companies, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the

Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord shall provide Tenant with access to all such utilities necessary to conduct business in the Demised Premises, and Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished directly to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. If Landlord is providing water and/or sewer under a master meter account in Landlord's name, Landlord shall provide and maintain separate utility submeters for any such water/sewer, which submeters shall accurately reflect Tenant's usage. All such submeters shall be a type that is utility billing grade, with ANSI standard, and the water submeter type shall comply with ANSI/AWWA Standard C700, latest revision. Each submeter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such submeter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the submeter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Intentionally Deleted

D.    Common Area Charges and Cap: Throughout the Term of this Lease, Landlord shall be responsible for the following with respect to the Common Areas:

    (i) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

    (ii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities (but specifically excluding any garbage and refuses disposal facilities for tenant spaces), Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

    (iii) operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers,

Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv) maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(v) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord has advised Tenant that it does not provide any security to or for the entire Shopping Center.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, and total compensation and benefits (including premiums for workers' compensation and other insurance) paid to or on behalf of on site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies ("Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of the Shopping Center. In calculating Tenant's pro rata share, the area leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within sixty (60) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at (**$0.76**) per square foot of the Demised Premises for the first Lease Year during the Original Term, as well as the initial Partial Lease Year, if any. Thereafter, throughout the remainder of the Original Term, and any extensions or renewals thereof, in no event shall Tenant's pro-rata share of Common Area Charges increase by more than four and one-half percent (4.5%) per Lease Year (on a non-cumulative basis) above the Common Area Charges paid by Tenant for the previous calendar year. The initial $0.76 Common Area Charges Cap and the four and one-half percent (4.5%) non-cumulative annual increase in the Common Area Charges shall be collectively known as the "CAM Cap". The charges for excessive snow shall be excluded from the CAM Cap. The typical snow fall in the Cincinnati metro area is 11 inches. Tenant shall pay Landlord its pro rata share of the cost for additional snow removal above the CAM Cap if the seasonal snow fall exceeds 11 inches.

E.    Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees imposed on or computed with

reference to any payments required to be made by Tenant to Landlord under this Lease including, without limitation, the Ohio commercial activity tax

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2012 tax year shall be approximately $0.79 per square foot per annum. Tenant's pro rata share of Real Estate Taxes shall be capped at $.81 per square foot (annualized) of the Demised Premises for calendar year 2012.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord within thirty (30) days after Landlord's receipt of any such notice from the taxing authority

If Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than one (1) time in any five (5) year period . This

provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer.

Tenant shall pay directly to the applicable taxing authority all taxes assessed against Tenant for its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes and other governmental charges imposed upon Tenant in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

F.     Construction Allowance: Landlord shall pay to Tenant an amount equal to Five Hundred Three Thousand Five Hundred Dollars ($503,500.00) within thirty (30) days of Tenant's opening for business, provided that simultaneously with or prior to Tenant's request for disbursement of the Construction Allowance Tenant has delivered to Landlord (i) lien waivers executed by each contractor and subcontractor supplying labor and/or materials in excess of Five Thousand and 00/100 Dollars ($5,000.00) and (ii) a copy of Tenant's plans for permits for its construction as submitted to and approved by the local authority having jurisdiction. If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business and delivery of the lien waivers required above, Landlord shall, in addition, pay to Tenant interest on said amount at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid. Landlord further acknowledges that Tenant is altering the existing receiving area's loading docks in accordance with Tenant's plans attached as Exhibit A-1. Tenant's costs and expenses in performing such work shall be included as part of the Construction Allowance.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.     Late Fees. If Tenant fails to make payments of Rent, Additional Rent or any component thereof within ten (10) days after Tenant's receipt of written notice that such amount is past due, then upon the second (2nd) or more such occurrence in any calendar year, Tenant shall pay to the Landlord a late fee of five percent (5%) of such past due amount, to the extent permitted by law, for each month or portion thereof that said payment shall remain past due. Landlord shall only be required to provide written notice of such failure to pay the amount due by the date due, one time per calendar year.

## 6.   ALTERATIONS:

Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises resulting therefrom.

## 7.   MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in

good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises. In addition to the foregoing maintenance obligations, Tenant shall repair, maintain and replace any of the items that are included as part of Tenant's initial construction of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire suppression systems (but excluding the fire alarm system) as may be required by applicable law for Tenant's Permitted Use, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within twenty (20) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such twenty (20) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Further, if Tenant performs any repairs related to the roof of the Demised Premises, Tenant shall use Landlord's then-approved roofing contractor. Should

Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's work at the Demised Premises ("Landlord's Work") within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

## 8.    SIGNS:

Subject to the approval and requirements of all governmental authorities having jurisdiction, Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening and grand opening signs and banners, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located. Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylon ( "Pylon") (i) is fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conforms to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylon. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon on the space as indicated on Exhibit D-1 attached hereto. Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which Tenant is not currently on, which may become available, or which is subsequently constructed during the Term of this Lease. Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space. Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels. Additionally, in the event Landlord constructs, or causes to be constructed, any new building, structure or improvement on the Outparcel, Landlord shall construct a new pylon for Tenant's use, which new pylon shall be consistent with the pylon configuration set forth on Exhibit D-2. Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace,

change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s). Tenant shall be solely responsible for all costs of repairs and maintenance of Tenant's panel on the Pylon sign.

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 9.    FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the interior of the Demised Premises. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

## 10.    GOVERNMENTAL REGULATIONS:

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future ("ADA") ; and to place all HVAC equipment in compliance with the Clean Air Act of 1992. In addition to Tenant's maintenance obligations under Section 7, Tenant shall be responsible for compliance with the ADA with respect to the interior non-structural portions of the Demised Premises.

## 11.    INDEMNIFICATION:

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions

to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12. **INSURANCE:**

A. <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord as an additional insured, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to provide Landlord with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements. Landlord shall have no liability for any damage, theft or otherwise relating to drop/storage trailers or any contents thereof which Tenant may place in the receiving area of the Demised Premises and such shall be the sole liability and risk of Tenant.

B. <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord.

Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B shall be approximately $0.11 per square foot per annum for the 2012 calendar year. Tenant's pro rata share of Insurance Costs shall be capped at $0.11 per square foot (annualized) of the Demised Premises for calendar year 2012.

If Tenant is able to secure an insurance policy or policies with the same coverages as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.    **FIRE REBUILDING AND ALTERING:**

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement shall cease when the Demised Premises are restored to tenantable condition.

B.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one hundred eighty (180) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease.

C.    If the Demised Premises are damaged or destroyed during the last twelve (12) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

14.    **FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any

delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed. This provision shall not apply to initial delivery of possession of the Demised Premises.

## 15.    INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that: (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record. In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and

expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17.    **QUIET ENJOYMENT:**

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.    **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall require any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

19.    **DEFAULT:**

A.    If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than fifteen (15) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, at its option, relet the Demised Premises

or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. All rights and remedies of Landlord herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

## 20.    CONDEMNATION:

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the buildings of the Shopping Center, or Common Area, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost. For the purpose of this paragraph, the term "condemnation

proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

## 21. MUTUAL WAIVER OF SUBROGATION:

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

## 22. ASSIGNMENT AND SUBLETTING:

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by a mortgagee. Any subletting or assignment shall be subject the Exclusive Use Provisions set forth on Exhibit F, and shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business., and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within thirty (30) days after written request of Tenant. If Landlord fails to provide said exclusives within thirty (30) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

## 23. SURRENDER AND HOLDOVER:

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition (with existing floor tile, if any, as-is), ordinary wear and tear and damage by fire and other casualty excepted. Tenant may remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month at the same Rent and otherwise subject to all the terms and provisions hereof.

**24.    NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii),    within two (2) business days following facsimile transmission. The date of actual receipt shall be deemed the date of service of notice. In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

**25.    LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Ohio. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

**26.    BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

**27.    NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

**28.    REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

**29.    NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or

24

prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.    HAZARDOUS MATERIAL:

Landlord represents and warrants to the best of its knowledge the Demised Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority.  Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and  Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials.  If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.  Tenant shall indemnify Landlord, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31.    TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

## 32.    WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within nine (9) months after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said nine (9) month period, Landlord's claim to such amount owed shall be deemed waived and discharged.

**33.    REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented. Landlord hereby consents pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (as may be amended from time to time) to any and all extensions pursuant thereto.

**34.    CO-TENANCY:**

If at any time during the Original Term, or any options or extensions, the occupancy of the Shopping Center is below seventy percent (70%) of the ground floor area of the Shopping Center for a period of six (6) consecutive months or more, except where any closing is due to restoration following a casualty or taking or for the purpose of remodeling, excluding the Demised Premises, being occupied by retail tenants with uses permitted under this Lease, which said tenants are open and operating for business at the Shopping Center (collectively, the "Threshold Requirement"), Landlord shall promptly so notify Tenant, and as long as the Threshold Requirement remains unfulfilled, Tenant may, at its option, terminate this Lease by giving Landlord ninety (90) days notice of its intention to so terminate together with reasonable proof that since the date the Threshold Requirement was unfulfilled , whereupon, this Lease shall then terminate with the same effect as if such date were the scheduled expiration date of this Lease and Tenant shall have no further liability hereunder.

**35.    NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

**36.    SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.**   **TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction within twelve (12) months following receipt of the reconciliation statement, and Tenant shall be entitled to an audit of Landlord's books and records at Landlord's office in accordance with generally accepted accounting principles to be made by Tenant's representatives. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

**40.**   **ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefor.

**41.**   **WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

[Signatures Appear on Immediately Subsequent Page.]

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses as to Landlord:

**LANDLORD:   MIDWEST CENTERS, LTD,
an Ohio limited liability company**

By: _alvin upman_

Title: _____

Witnesses as to Tenant:

**TENANT:     BIG LOTS STORES, INC., an Ohio
corporation**

By: _____

Charles W. Haubiel II

Title: Executive Vice President – Legal & Real Estate,
General Counsel and Corporate Secretary

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Midwest Centers Ltd. by, Alvin Lipson its Managing Member who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Midwest Centers Ltd this 27th day of July, 2012.

_____
Notary Public

**TARI J. FAHRNBACH**
Notary Public, State of Ohio
My Commission Expires 02-01-2015

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **Big Lots Stores, Inc.**, by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 26th day of July, 20___.

_____
Notary Public

**Andrea L. Turner**
Notary Public, State of Ohio
My Commission Expires 05-12-2015

**EXHIBIT A**

**SITE PLAN OF SHOPPING CENTER**



## EXHIBIT A-1

### TENANT'S PLANS AND SPECIFICATIONS

Sixteen (16) pages attached.



# BIG LOTS STORES, INC.
# STORE PLANNING DEPT.
# 300 PHILLIPI ROAD
# COLUMBUS, OHIO 43228
## PHONE: (614) 278-6800

### STORE ADDRESS:

BIG LOTS STORE #
FAIRFIELD CROSSING S/C
4507 DIXIE HIGHWAY
FAIRFIELD, OHIO 45014

### BUILDING AREA:

| | |
|---|---|
| TOTAL SALES | 21,072 |
| (FURNITURE SALES 3,270) | |
| OTHER | 3,104 |
| STOCKROOM | 5,464 |
| GROSS TOTAL AREA | 29,640 |

## MATERIALS AND EQUIPMENT SCHEDULE

| Product | Supplied by | Installed by | Manufacturer & Model Number | Vendor and Contact Information |
|---|---|---|---|---|
| Floor Tile (Sales, Offices, Lavatory, Vestibule) | BIG LOTS | BIG LOTS GC | Armstrong V4003 | Terra Kelly Flooring  856-596-0208 |
| Floor Tile (Stockroom, Restroom Entry) | BIG LOTS | BIG LOTS GC | Armstrong BR-103 | Terra Kelly Flooring  856-596-0208 |
| Ceiling Tile | BIG LOTS | BIG LOTS GC | Certainteed 87277 | Terra Kelly Flooring  856-596-0208 |
| Storefront Doors | LANDLORD GC | LANDLORD GC | | |
| Exclusive Doors | BIG LOTS | BIG LOTS GC | Ceco - DEP 800 or FWF Jamb Curtis (Wall) | Pease - Division South  513-860-2901 |
| Entry Charging Table | BIG LOTS | BIG LOTS GC | STAYING DEPOT HOODINGNING - DUAL BABY CHANGING STATIONS | Safe Step Co - Jennifer Rigsby  800-356-2735 |
| Total Sales Grout Dispenser | BIG LOTS | BIG LOTS GC | Krystal KD-904 or mounting box | Rockford - Mike Knapple 877-290-8908 |
| Air Curtain Dispenser | BIG LOTS | BIG LOTS GC | Tsunami TD-42H | Rockford - Mike Knapple 877-290-8908 |
| Paper Towel Dispenser (Air mount) | BIG LOTS | BIG LOTS GC | Rubbermaid | Rockford - Mike Knapple 877-290-8908 |
| Soap Dispenser | BIG LOTS | BIG LOTS GC | Sani - Fresh BR-Rack | Rockford - Mike Knapple 877-290-8908 |
| Toilet Paper Dispenser | BIG LOTS | BIG LOTS GC | Bobrick B-2888 | Rockford - Mike Knapple 877-290-8908 |
| Electric Hand Dryers | BIG LOTS | BIG LOTS GC | Bobrick XL-HT | Georgia Fixit & Assoc  336-841-9751 |
| Restroom Partitions | BIG LOTS | BIG LOTS GC | Toytron - Toy Bar - mounted wood - 1 grey grey to solid | National |
| Carpet/Anagerfort System | BIG LOTS | BIG LOTS GC | | Dur Carbolic  513-336-6108 |
| Cash Resign or Tophile to Items | BIG LOTS | BIG LOTS GC | Warrior 7900 | John Phillips  704-634-6819 |
| Lamp Wall Payment | BIG LOTS | BIG LOTS GC | Dry-Less KL - Available Four Leaf Checkr/1 | FR-456 Max  Linda Garcia  614-431-3308 |
| Other Weapons Light Bunk two | BIG LOTS | BIG LOTS GC | Lentor 0007A - DIV | Linda Garcia  513-266-7000 |
| Back Light (Emergent) | BIG LOTS | BIG LOTS GC | Technical Consumers Products Steel - Deck Light, FULM,SLICH/MTVTS TE P Lamp - 06LT, Not Warm Type, FWL4,BEN LIS Non - Deck Light Non Park4,Div/31,SW/0 | Short Stock-Lend Electra  614-431-3308 |
| Two-Light (if fixture) | BIG LOTS | BIG LOTS GC | Handy MST-LP RST-ODS-COM-CM46 WD 9064 | Linda Gifford  513-266-7000 |
| Two-Light (if fixture) | BIG LOTS | BIG LOTS GC | Handy WHT 520-08 8nd GST 4 x D58/3 G 4 | Linda Gifford  513-266-7000 |
| Two-Light (Emergency) | BIG LOTS | BIG LOTS GC | Handy WH7 69 FCW CD5 - COM4's FFF 9470 D/8.0QC NF5V-MV WE MAD/09036 or | Linda Gifford  513-266-7000 |
| Wall Link (Lamp) | BIG LOTS | BIG LOTS GC | Apt com-FCX FCXW RW 04-D58/32 | Linda Gifford  513-266-7000 |
| Secrecent/Pub/Mod (102 Gms) | BIG LOTS | BIG LOTS GC | Technical Consumers Products  TCP 069466 | Linda Gifford  513-266-7000 |
| Mandis Head Lamp spot o Light | BIG LOTS | BIG LOTS GC | Natural Consumers Products  TCP 20446 | Linda Gifford  513-266-7000 |

## SITE PLAN



## DRAWING PAGE AND TITLE

- T-1    TITLE PAGE

### ARCHITECTURAL

- D-1    DEMO PLAN
- A-1    CONSTRUCTION PLAN
- A-1.1  CONSTRUCTION NOTES
- A-2    FIXTURE PLAN
- A-3    REFLECTED CEILING PLAN
- FP-1   FIRE ALARM PLAN

### ELECTRICAL

- E-1    ELECTRICAL PLAN
- E-2    ELECTRICAL NOTES
- E-3    EMS NOTES
- E-4    EMS SPECIFICATIONS
- E-5    EMS LIGHTING CONTROL PANEL
- E-6    LIGHTING PLAN

### MECHANICAL

- M-1    MECHANICAL PLAN
- M-2    MECHANICAL NOTES
- M-3    MECHANICAL DEMO

## CODE INFORMATION

PROJECT NARRATIVE

1. APPLICABLE CODES:
   - BUILDING -
   - MECHANICAL -
   - PLUMBING -
   - ELECTRICAL -
   - FIRE -
   - ACCESSIBILITY -

2. BUILDING DESCRIPTION
   - OCCUPANCY TYPE
   - CONSTRUCTION TYPE
   - USE GROUP
   - DATA PROVIDED
   - EXISTING HEIGHT
   - one sprinklered provided -

3. BUILDING AREA:
   - SALES -
   - FURNITURE SALES -
   - OTHER -
   - STORAGE/STOCKROOM -
   - RESTROOMS -
   - GROSS TOTAL AREA -

4. OCCUPANT LOAD
   - Mercantile -
   - SALES - SP/OCCUPANCY -
   - SUBTOTAL -
   - OFFICES/ SP/ PER PERSON -
   - STORAGE AREAS -
   - SP/- SP/OCCUPANCY -
   - TOTAL CALCULATED OCCUPANCY -
   - MINIMUM NUMBER OF EXITS -
   - ( = 1 )/ ( OCCU ) -
   - PROVIDED NUMBER OF EXITS -
   - DOOR A -
   - DOOR B -
   - DOOR C -
   - DOOR D -
   - TOTAL CALCULATED EXITS -

5. PLUMBING FIXTURES
   - OCCUPANT LOAD PER PLUMBING -
   - PLUMBING FIXTURE REQUIRED -
   - TOILETS -
   - LAVATORIES -
   - DRINKING FOUNTAIN -
   - PLUMBING FIXTURES PROVIDED -
   - TOILETS -
   - LAVATORIES -
   - URINALS -
   - DRINKING FOUNTAINS -
   - TOILETS -
   - LAVATORIES -
   - DRINKING FOUNTAIN -
   - URINAL EFA

## DEVELOPMENT CONTACTS

CITY BUILDING DEPT:

## ISSUE DATES

FIRST

FOR CONSTRUCTION

## NOTES



BIG LOTS STORES, INC.
STORES PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

**TITLE PAGE**

SHEET:
T-1



DEMOLITION PLAN



CONSTRUCTION PLAN

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

BIG LOTS #
FAIRFIELD CROSSING SHOPPING CENTER
4507 DIXIE HIGHWAY
FAIRFIELD, OHIO  45014

SHEET
A-1



CONSTRUCTION NOTES

A-1.1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

BIG LOTS #
FAIRFIELD CROSSING SHOPPING CENTER
4607 DIXIE HIGHWAY
FAIRFIELD, OHIO  45014



FIXTURE PLAN

ATTENTION FIXTURE INSTALLER

FIXTURE NOTES:

| A-2 | BIG LOTS! | BIG LOTS STORES, INC.<br>STORE PLANNING DEPT.<br>300 PHILLIPI ROAD<br>COLUMBUS, OHIO 43228<br>PHONE: (614) 278-6800 | DATE DRAWN | SQUARE FOOTAGE | BIG LOTS #<br>FAIRFIELD CROSSING SHOPPING CENTER<br>4507 DIXIE HIGHWAY<br>FAIRFIELD, OHIO 45014 | DATE | Revision |
|---|---|---|---|---|---|---|---|
| | | | DRAWN BY: | SALES: 21,072 | | | |
| | | | SCALE | TOTAL: 29,640 | | | |





FIRE ALARM PLAN

TRUCK WELL

SEASONAL DECK

| FP-1 | BIG LOTS STORES, INC.<br>STORE PLANNING DEPT.<br>300 PHILLIPI ROAD<br>COLUMBUS, OHIO 43228<br>PHONE: (614) 278-6800 | DATE DRAWN<br>DRAWN BY:<br>SCALE | SQUARE FOOTAGE<br>SALES: 21,972<br>TOTAL: 26,543 | BIG LOTS #<br>FAIRFIELD CROSSING SHOPPING CENTER<br>4507 DIXIE HIGHWAY<br>FAIRFIELD, OHIO  45014 | DATE | REVISION |



ELECTRIC PLAN

SHEET
E-1

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

DATE DRAWN
DRAWN BY:
SCALE

SQUARE FOOTAGE
SALES: 21,073
TOTAL: 29,842

BIG LOTS #
FAIRFIELD CROSSING SHOPPING CENTER
4507 DIXIE HIGHWAY
FAIRFIELD, OHIO  45014



ELECTRIC NOTES

SHEET E-2

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIP ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

BIG LOTS #
FAIRFIELD CROSSING SHOPPING CENTER
4007 DIXIE HIGHWAY
FAIRFIELD, OHIO 45014



EMS NOTES




| | | | | DATE DRAWN | SQUARE FOOTAGE | | DATE | REVISION |
|---|---|---|---|---|---|---|---|---|
| SHEET E-3 | BIG LOTS! | BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6800 | | DRAWN BY: | SALES: 21,672 | BIG LOTS # FAIRFIELD CROSSING SHOPPING CENTER 4537 DIXIE HIGHWAY FAIRFIELD, OHIO 45014 | | |
| | | | | SCALE | TOTAL: 26,640 | | | |



EMS SPECIFICATIONS

| | | BIG LOTS STORES, INC. STORE PLANNING DEPT. 300 PHILLIPI ROAD COLUMBUS, OHIO 43228 PHONE: (614) 278-6800 | DATE DRAWN: | SQUARE FOOTAGE | BIG LOTS # FAIRFIELD CROSSING SHOPPING CENTER 4537 DIXIE HIGHWAY FAIRFIELD, OHIO 45014 | DATE | REVISION |
|---|---|---|---|---|---|---|---|
| SHEET E-4 | BIG LOTS! | | DRAWN BY: | SALES: 31,072 | | | |
| | | | SCALE: | TOTAL: 39,540 | | | |



EMS LIGHTING CONTROL PANEL PLAN





MECHANICAL PLAN

M-1



MECHANICAL NOTES

AIR BALANCE

MECHANICAL EQUIPMENT SCHEDULE

EXHAUST FAN SCHEDULE

VENTILATION SCHEDULE

| SHEET | M-2 |

BIG LOTS!

BIG LOTS STORES, INC.
STORE PLANNING DEPT.
300 PHILLIPI ROAD
COLUMBUS, OHIO 43228
PHONE: (614) 278-6800

| DATE DRAWN: | 4-26-12 |
| DRAWN BY: | BGM |
| SCALE: | NMF = 1'-0" |

SQUARE FOOTAGE
SALES: 21,072
TOTAL: 29,543

BIG LOTS #
FAIRFIELD CROSSING SHOPPING CENTER
4507 DIXIE HIGHWAY
FAIRFIELD, OHIO   45014

| DATE | REVISION |



**EXHIBIT B**

### LEGAL DESCRIPTION OF SHOPPING CENTER

**PARCEL 1A**

Situated and being in Section 34, Town 2, Range 2, City of Fairfield, Butler County, Ohio, and being part of Lot #172 as listed on the Auditor's Plat for said City and is further described as follows:

Begin at a point found by measuring from the Northeast corner of Symmes Meadow Subdivision, said corner being in the centerline of Symmes Road, South 02° 38' 31" West, 20.01 feet to the Southerly right of way of Symmes Road and the true point of beginning;

thence    from the point of beginning thus found, along the Southerly right-of-way, South 85° 43' 15" East, 536.81 feet;

thence    South 82° 57' 43" East, 100.16 feet;

thence    South 85° 36' 50" East, 95.49 feet;

thence    departing said South right-of-way, South 0° 55' 09" West, 136.65 feet to an iron pin;

thence    South 89° 04' 51" East, 100.92 feet to an iron pin in the Westerly right-of-way of S.R. #4 (Dixie Highway);

thence    along said right-of-way on a curve to the left, having a radius of 2346.83 feet, 195.65 feet, (chord = South 3° 11' 13" East, 195.60 feet) to an iron pin the North line of lot #802;

thence    along said North line and departing the West right-of-way of S.R. #4, North 85° 27' 22" West, 156.41 feet to an iron pin at the Northwest corner of lot #803;

thence    along the West line of said lot #802, South 01° 02' 36" West, 227.00 feet to an iron pin at the Southwest corner of lot #802;

thence    along the South line of lot #802, South 85° 27' 22" East, 164.19 feet to an iron pin at the Westerly right-of-way of S.R. #4 (Dixie Highway);

**PARCEL 1B**

Situated and being in Section 34, Town 2, Range 2, City of Fairfield, Butler County, Ohio and being part of Lot #172 as listed in the Auditor's Plat for said City and is further described as follows: Begin at a point found by measuring from the Northeast corner of Symmes Meadow Subdivision, said corner being in the centerline of Symmes Road, South 85° 43' 15" East, 732.49 feet along the centerline of Symmes Road; thence departing said centerline South 00° 55' 09" West, 22.89 feet to the point of beginning, said point being in the South right-of-way line of Symmes Road;

thence    along the said South right-of-way, South 85° 43' 15" East, 78.99 feet;

thence    along a curve to the right, having a radius of 40.00 feet, 48.12 feet (chord = South 51° 15' 28" East, 45.27 feet) to a point in the West right-of-way of State Route #4;

thence    along said West right-of-way, South 00° 31' 13" West, 37.06 feet;

thence    along a curve to the left, having a radius of 2331.83 feet, 69.35 feet (chord = South 00° 02' 43" West, 69.38 feet);

thence    North 89° 04' 51" West, 115.93 feet to an iron pin (passing an iron pin at 15.01 feet and leaving the West right-of-way of S.R. #4 at said iron pin);

thence    North 00° 55' 09" East, 136.80 feet to the point of beginning; containing 0.352 acres of land.

**PARCEL 2**

Situated and being in Section 34, Town 2, Range 2, City of Fairfield, Butler County, Ohio, and being part of Lot Number 802 as listed on the Auditor's Plat for said City and is further described as follows:

Beginning at an iron pin at the Southwest corner of said lot number 802; thence along the West line of said lot, North 1° 02' 36" East, 117.00 feet; thence South 85° 27' 22" East, 163.81 feet to a point in the Westerly right-of-way of State Route 4; thence along said right-of-way, South 0° 51' 28" West, 117.03 feet to a point in the South line of said lot number 802; thence along said South line, North 85° 27' 22" West, 164.19 feet to the point of beginning; containing 0.440 acres of land.

**PARCEL 3**

Easement for the benefit of the above Parcels as created by Easement Agreement by and among BHN Ventures, Inc., Sara L. Curry and Second National Bank of Hamilton, Ohio, Trustee, dated May 11, 1988 and recorded May 13, 1988 in Deed Book 1631, page 10 of the Butler County, Ohio Records, for drainage and retention pond purposes as described in that easement.

## EXHIBIT C

### LANDLORD'S PRE-DELIVERY WORK

**The following work is to be completed prior to the Tenant Possession Date per Tenant's Plans and is subject to the review and approval from the Big Lots Director of Construction or its Representative. As clarification to this Exhibit C, Tenant's plans are attached to the Lease as Exhibit A-1 and any discrepancies between the Exhibit C and Tenant's Plans shall be resolved by Tenant's Plans controlling.**

| | |
|---|---|
| **HVAC:** | As is. |
| **ELECTRICAL:** | Landlord is to relocate and remove all the electrical panels, conduits, circuits, etc. in the front left corner of the space currently forming a square. |
| **RECEIVING AREA:** | Tenant shall have sole access to and exclusive use of one of the three existing receiving/dock doors. Tenant will to split the docks per the attached plans. Tenant's work shall include removing the existing overhead garage door and the adjacent man door and the wall in which these doors are located will be demolished and removed entirely. New walls (approximately 47 lineal feet) will be constructed with metal studs and drywall, per code, up to the underside of the metal roof deck. The removed man door will be relocated adjacent to the newly enclosed area to access a 5' wide hallway located around the perimeter of the enclosed area. |
| **GENERAL WORK:** | All plumbing, electrical and sprinkler system to be in good working order. Landlord to provide separate utilities and provide separate meters adequate for Tenant's intended use. Water may be tab metered and read by a third party billing service. Landlord shall also provide Tenant with assurances that utilities are adequate for Tenant's intended use, are available and include legal access across other properties if necessary to serve the demised premises including water, gas, electricity, telephone, sanitary sewers and storm drains. Landlord is to remove the existing electrical feeds in the front left of the premises and provide Tenant exterior access to the common area electrical service. |
| **REST ROOMS:** | As is. |
| **DOORS:** | All doors and door systems (exterior and overhead included) to be sound , secure, in good working condition adequate for Tenant's use and in compliance with ADA, ANSI and AHJ requirements. All doors are to have weather stripping, thresholds, and be sealed to prevent outside elements from entering the building. All maintenance and repair of all doors by Tenant. |
| **GLASS:** | Replace all broken or damaged glass, and storefront. Remove all materials blocking or covering windows and glass doors. |
| **EXTERIOR LIGHTING:** | All Exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, exterior wall packs, under canopy lighting, etc. All exterior lighting is to be on a separately metered house panel in the Landlord's name. |
| **CEILING:** | As is. |
| **LIGHTING:** | As is. |
| **FLOORING:** | As is. |
| **INTERIOR PAINTING:** | N/A |
| **REMOVAL OF FIXTURES & EQUIPMENT:** | N/A. |
| **PESTS:** | Premises to be professionally inspected for pestilence and termites. Tenant is to be provided with a certified report that the Demised Premises is pest free otherwise Landlord will make the space pest free. |
| **SIGNAGE:** | Tenant to have the right to use its color and logo on building sign(s) at the maximum size per code and on pylon(s). Landlord shall provide a copy of the sign regulations from the governing body for the city, town, municipality, township, etc. which jurisdiction includes the demised premises within the center. Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. |

Landlord to ensure that the pylon is properly wired, maintained and constructed. Landlord to deliver pylon fully operational. Any pylon remodels or newly constructed pylons shall reflect Big Lots in the marquee position.

**DRAWINGS:** Landlord is to provide Tenant with a complete set of "as-built" and AutoCAD drawings of the Demised Premises adequate for Tenant to prepare construction documents. Tenant shall approve all drawings prior to the submission for permits and the commencement of work. Upon fully executing a lease document, Landlord shall supply Tenant with a detailed construction timeline to use as a guideline for monitoring Landlord's construction progress.

**HAZARDOUS MATERIALS:** Landlord is responsible for remediation of any and all hazardous material. Landlord to provide Tenant with an asbestos inspection report of the Demised Premises including roof, if required as a condition to the issuance of Tenant's permits. Landlord shall also provide to governmental authorities having jurisdiction all necessary documentation as is required or may be required by the Asbestos Health Protection Act including, without limitation, a Phase I asbestos survey or, in the alternative, necessary certification.

**GENERAL CONDITIONS:** Landlord agrees, that to the best of its knowledge, the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Furthermore, the building structure shall meet governmental and local codes. Landlord to supply Tenant with copies of all inspection reports as required under the lease, including but not limited to, sprinkler certification completed within the last 60 days, roof report and HVAC report evidencing all repairs have been completed, and pest inspection report, prior to Tenant's possession.

All above work to be completed prior to the Tenant Possession Date.

## EXHIBIT C-1

### LANDLORD'S POST-DELIVERY WORK

**The following work is to be completed prior to October 22, 2012 and is subject to the review and approval from the Big Lots Director of Construction or its Representative. As clarification to this Exhibit C, Tenant's plans are attached to the Lease as Exhibit A-1 and any discrepancies between the Exhibit C-1 and Tenant's Plans shall be resolved by Tenant's Plans controlling.**

STOREFRONT:     The exterior storefront shall have an "ANCHOR" type façade and canopy acceptable to Tenant. Landlord shall submit detailed plans and renderings for Tenant's approval. The building, fascia, canopies, etc. shall be painted Sherwin Williams #SW6350 Intricate Ivory & Sherwin Williams #SW6258 Tricorn Black for the trim, columns, copings, etc. per Tenant's specifications. Landlord is to add one addition set of bi-part, fully automatic, sliding doors (NABCO GT-1175) per Tenant's plans that meet ADA, ANSI and AHJ requirements. Landlord to ensure that there are curb cuts within reasonable proximity to the storefront.

GENERAL WORK:     Landlord shall remove the landscaping area in front of Tenant's proposed space and shall fill in said area with cement to be level with existing cement.

PARKING
LOT:     Parking lot shall be in good condition (paved and patched with potholes, severe cracks and uneven areas to be resurfaced and adequate for customer parking). The parking lot serving the Demised Premises shall be striped prior to delivery of Demised Premises to Tenant.

ROOF:     Roof shall be professionally inspected and certified to be in good condition and free of leaks. Both Landlord and Tenant shall have the roof inspected and landlord shall make the necessary repairs/replacement per the inspection reports.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**



# EXTERIOR SIGNING

# SPECIFICATIONS

If you need additional information that
is not contained in this packet contact:

**BIG**LOTS! **Store Planning Department:**

Michael Neu - 614-278-6968
Mike Stiles - 614-278-6905

## HORIZONTAL LOGO

### INDIVIDUAL LED ILLUMINATED
### REVERSE CHANNEL LETTER SET



| A | B | C | D | E | Area |
|---|---|---|---|---|------|
| 3'-0" | 17'-5½" | 3'-6½" | 13" | 5½" | 52 SqFt |
| 3'-6" | 20'-4½" | 4'-1½" | 15½" | 6½" | 71 SqFt |
| 4'-0" | 23'-3½" | 4'-8½" | 17½" | 7½" | 92 SqFt |
| 4'-6" | 26'-2½" | 5'-3½" | 19½" | 8½" | 119 SqFt |
| 5'-0" | 29'-1½" | 5'-10½" | 22" | 9½" | 145 SqFt |
| 5'-6" | 32'-½" | 6'-5½" | 2' | 10½" | 177 SqFt |
| 6'-0" | 34'-11" | 7'-½" | 2'-2" | 11" | 207 SqFt |

## STACKED LOGO

### INDIVIDUAL LED ILLUMINATED
### REVERSE CHANNEL LETTER SET



| A | B | C | D | E | F | Area |
|---|---|---|---|---|---|---|
| 3'-0" | 2'-4" | 8'-2" | 5'-9½" | 13" | 4½" | 71 SqFt |
| 4'-0" | 3'-1½" | 10'-10½" | 7'-9" | 17½" | 6" | 84 SqFt |
| 4'-6" | 3'-6" | 12'-3" | 8'-8½" | 19½" | 6½" | 107 SqFt |
| 5'-0" | 3'-11" | 13'-7" | 9'-8" | 22" | 7½" | 131 SqFt |
| 5'-6" | 4'-3½" | 14'-11½" | 10'-7½" | 2' | 8" | 159 SqFt |
| 6'-0" | 4'-8" | 16'-4" | 11'-7½" | 2'-2" | 9" | 190 SqFt |





# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

## Square Cabinet



## Rectangular Cabinet





**BIG LOTS AND TRADE MARK**
100% BLACK

**EXCLAMATION**
PANTONE 021 ORANGE

## EXHIBIT D - 1

### TENANT PYLON PANEL LOCATION



Big Lots to have position under Goodwill

EXHIBIT D-2

NEW PYLON CONFIGURATION



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

Date: _____

To: _____ (insert Tenant)
   via facsimile: (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION**)

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed, including all construction, surveys, inspections and repairs. Landlord shall deliver to Tenant with this notice, the required surveys and initial  completion of each item below prior to possession being accepted by Tenant.

_____ Roof Survey with evidence that the required repairs have been made.

_____ HVAC Survey with evidence that all required repairs have been made.

_____ Asbestos Survey (with evidence of required remediation, if necessary)

_____ Pest Survey certifying the premises.

_____ Sprinkler Certification.

_____ Completion of Exhibit C

Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.

You may pick up the keys at
_____.

If you have any questions, please feel free to contact me at
_____.

Thank You.

**LANDLORD:**

**MIDWEST CENTERS, LTD**
**an Ohio limited liability company**

By: _____
Title: _____

**TENANT:**

**BIG LOTS STORES, INC., an Ohio**
**corporation**

By: _____
Title: _____

## EXHIBIT F

### EXCLUSIVE USE PROVISIONS

**No exclusive uses granted to existing tenants or restrictions or covenants of record in the Shopping Center affect Tenant's use, except as follows:**

1. In favor of Ohio Goodwill Industries Rehabilitation Center, Inc. ("Goodwill Industries") "for the sale of used personal property". Further, Goodwill has the exclusive use of the concrete ramp area, overhead door and dock leveler nearest the rear driveway (loading dock ramp space #1) and the center ramp, overhead door and leveler (loading dock ramp space #2).

2. Sears Roebuck and Co. has the exclusive right primarily for the sale, servicing, and storing of paint and hardware and other items or services normally sold in Sears Hardware Stores.

3. The lease to Beauty Alliance, Inc. dba Saloncentric prohibits the Landlord from leasing any other space to a wholesale beauty supply company.

## EXHIBIT G

### REMEASUREMENT RIDER

This Rider dated _____ ____, 201__ is attached to and made a part of the Lease dated _____ (the "Lease") by and between MIDWEST CENTERS, LTD, a _____ limited partnership ("Landlord"), and BIG LOTS STORES, INC., an Ohio corporation, ("Tenant").

Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    Fixed Minimum Rent – Original Term (Section 5(A)):
      _____ annually; _____ per month.

3.    Fixed Minimum Rent – First Option (Section 5(A)):
      _____ annually; _____ per month.

4.    Fixed Minimum Rent – Second Option (Section 5(A)):
      _____ annually; _____ per month.

5.    Fixed Minimum Rent – Third Option (Section 5(A)):
      _____ annually; _____ per month.

## FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT

THIS FIRST LEASE EXTENSION AND MODIFICATION AGREEMENT, made and entered into this 6ᵗʰ day of January , 2016 (this "Agreement") by and between Samco Properties, Ltd., an Ohio limited liability company, successor-in-interest to Midwest Centers, LTD, having an office located at c/o Carnegie Companies, Inc., 6190 Cochran Road, Suite A, Solon, OH 44139 ("Landlord") and Big Lots Stores, Inc., an Ohio corporation, formerly known as Consolidated Stores Corporation, having an office located at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228-5311 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated July 27, 2012, (the "Lease") for approximately 29,640 square feet of retail space located in Fairfield Crossing Shopping Center, 4507 Dixie Highway, Fairfield, OH 45014, as more particularly described in the Lease (the "Leased Premises"); and

WHEREAS, Landlord and Tenant now desire to extend the term of the Lease for three (3) years commencing February 1, 2019 and expiring on January 31, 2022, and modify Tenant's Fixed Minimum Rent effective February 1, 2016 pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. The current term of the Lease is hereby extended for three (3) additional years from February 1, 2019 through January 31, 2022 (hereinafter referred to as the "First Extended Term"), upon the same terms and conditions as contained in the Lease except as provided herein.

2. Effective and commencing on February 1, 2016 and continuing through the expiration of the First Extended Term, Tenant shall pay Fixed Minimum Rent in the amount of One Hundred Forty Five Thousand Two Hundred Thirty Six and 00/100 Dollars (**$145,236.00**) per annum payable in monthly installments of Twelve Thousand One Hundred Three and 00/100 Dollars (**$12,103.00**).

3. During the First Extended Term, Tenant shall continue to pay its pro rata share of: (i) Common Area Charges pursuant to Section 5.D of the Lease; (ii) Real Estate Taxes pursuant to Section 5.E of the Lease; and (iii) Insurance Costs pursuant to Section 12.B of the Lease.

4. The second paragraph of Section 5.A of the Lease is hereby deleted in its entirety and replaced with the following paragraph:

   "**All of the terms and condition of the Lease shall apply during the Option Terms except that each option to extend the Term shall terminate when exercised and the Fixed Minimum Rent applicable for the First Option Term shall be the sum of $148,200.00 per Lease Year which amount shall be paid in equal monthly installments, in advance, on or before the first day of each month, in the amount of $12,350.00. The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of $163,020.00 per Lease Year which amount shall be paid in equal monthly installments, in advance, on or before the first day of each month, in the amount of $13,585.00. The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of $177,840.00 which amount shall be paid in equal monthly installments, in advance, on or before the first day of each month, in the amount of $14,820.00.**"

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless otherwise defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

This may be executed in one or more counterparts, each of which shall be deemed to be an original.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

**WITNESSES**:

**LANDLORD:**
SAMCO Properties, Ltd.

By:   Peter Meisel
Its:   Manager

**TENANT:**
Big Lots Stores, Inc., an Ohio corporation

By:  Timothy A. Johnson
Its:  Executive Vice President,
       Chief Administrative Officer &
       Chief Financial Officer

**(Acknowledgements follow immediately on the next page)**

(Landlord's Acknowledgement)

STATE OF Ohio

County of Cuyahoga

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Sampco Properties Ltd    , by Peter Meisel    , its Manager    who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Solon, OH    , this 6th day of January, 2016

DEIRDRE SALOIS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
February 06, 2016
Recorded in
Cuyahoga County

Notary Public

(Tenant's Acknowledgement)

STATE OF OHIO    )
                 )ss
County of  Franklin  )

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, Big Lots Stores, Inc., by Timothy A. Johnson, its **Executive Vice President, Chief Administrative Officer & Chief Financial Officer**, who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and of said officer.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal, at Columbus, Ohio, this 22nd day of December

Notary Public

Andrea L. Turner
Notary Public, State of Ohio
My Commission Expires 06-10-2020

DocuSign Envelope ID: 3A7BE4F3-93BA-4130-9F97-9974BA8C7D85

## SECOND LEASE EXTENSION AND MODIFICATION AGREEMENT

This Second Lease Extension and Modification Agreement (the "Agreement") is made as of the 11⁺ʰ day of __May_____, 2021, (the "Effective Date") by and between **Fairfield Property, LLC** having an address at c/o Carnegie Companies, Inc., 6190 Cochran Rd., Suite A, Solon, OH 44139 (the "Landlord"), and **Big Lots Stores, Inc.,** an Ohio corporation, having an address at 4900 East Dublin Granville Road, Columbus, Ohio 43081 (the "Tenant").

RECITALS:

    A.    Landlord and Tenant have heretofore entered that certain Lease Agreement, dated July 27, 2012, as amended (collectively, the "Lease") for approximately 29,640 square feet of storeroom ("Demised Premises") located at Fairfield Crossing, 4613 Dixie Hwy., Fairfield, OH 45014 (the "Shopping Center"), as more particularly described in the Lease.

    B.    The Term of the Lease currently expires on **January 31, 2022**

    C.    The parties desire to extend the Term of the Lease for five (5) years and further amend the Lease as provided for herein.

    NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease shall be amended as follows:


    1.    Extension of Term. Effective as of the Effective Date, the Term of the Lease is hereby extended for a five (5) year period which commences on **February 1, 2022** and expires on **January 31, 2027** (the "Second Extended Term"). For purposes of this Agreement, all references to the term "Extended Term" shall be deemed to refer to the Second Extended Term as defined in this Agreement. In addition, from and after the Effective Date, all references to the term "Term" or "Lease Term" contained in the Lease shall be deemed to mean the term of the Lease as extended by the Extended Term.

    2.    Fixed Minimum Rent During the Extended Term. During the Extended Term, the Fixed Minimum Rent payable by Tenant to Landlord for the Demised Premises shall be as follows:

| Period | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
| --- | --- | --- |
| February 1, 2022 – January 31, 2027 | $145,236.00 ($4.90/sf) | $12,103.00 |

Fixed Minimum Rent during the Extended Term shall continue to be due and payable by Tenant to Landlord in equal monthly installments (in the monthly amounts set forth above for the corresponding period), in advance, without offset or deduction and without prior demand, on or before the first day of each calendar month during the Extended Term and otherwise in accordance with the terms of the Lease.

    3.    Options: Tenant shall retain its remaining three (3) five (5) year options the ("First Option Term") ("Second Option Term") and ("Third Option Term") to extend the Term of the Lease pursuant to the terms specified within the Lease.

4.      Fixed Minimum Rent During the Option Terms, the Fixed Minimum Rent payable by Tenant to Landlord for the Demised Premises shall be as follows:

| Period | Annual Fixed Minimum Rent | Monthly Installments of Fixed Minimum Rent |
| --- | --- | --- |
| First Option Term | $148,200.00 | $12,350.00 |
| Second Option Term | $163,020.00 | $13,585.00 |
| Third Option Term | $177,840.00 | $14,820.00 |

5.      Full Force and Effect; Successors and Assigns. Except as modified herein, all other terms and conditions of the Leases shall continue and remain in full force and effect and are hereby ratified and reaffirmed by both parties hereto. In the event of any conflicts or inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

6.      Counterpart Execution. This Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, all such counterparts together constituting but one and the same instrument. This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto whether in one or more counterparts. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of signature pages by telephone facsimile or portable document format (.pdf). The individual(s) executing this Agreement on behalf of Tenant hereby covenant and warrant that such individual(s) are duly authorized by Tenant to execute and deliver this Agreement on behalf of Tenant.
[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed this Agreement as of the date first hereinabove set forth.

**LANDLORD:**
**FAIRFIELD PROPERTY, LLC,**
a/an __Ohio__ limited liability
company, by Samco Proper hies Ltd.

By: _____

Its: __Manager__

**TENANT:**
**BIG LOTS STORES, INC.**
an Ohio corporation

By: _Jonathan Ramsden_
Name: Jonathan Ramsden
Title: Executive Vice President, Chief Financial and Administrative Officer



## Certificate Of Completion

Envelope Id: 3A7BE4F393BA41309F979974BA8C7D85
Subject: Please DocuSign: BL #5268 - 2nd Amendment (draft).docx, 5268 Fairfield, OH.pdf
Source Envelope:
Document Pages: 5                                    Signatures: 1
Certificate Pages: 4                                 Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
Chris Macke
4900 E Dublin Granville Road
Columbus, OH 43081
cmacke@biglots.com
IP Address: 50.4.237.118

## Record Tracking

Status: Original
    5/5/2021 7:16:47 AM

Holder: Chris Macke

Location: DocuSign

## Signer Events

Jonathan Ramsden

EVP and CFO
Big Lots
Security Level: Email, Account Authentication
(None)

Electronic Record and Signature Disclosure:
    Accepted: 3/20/2020 9:20:44 AM
    ID: 9c88a9b2-60c7-4989-aa3f-ad788b02be36

## Signature

Jonathan Ramsden

Signature Adoption: Pre-selected Style
Using IP Address: 45.24.226.64

## Timestamp

Sent: 5/5/2021 7:17:20 AM
Viewed: 5/5/2021 7:21:13 AM
Signed: 5/5/2021 7:21:18 AM

| In Person Signer Events | Signature | Timestamp |
|---|---|---|
| Editor Delivery Events | Status | Timestamp |
| Agent Delivery Events | Status | Timestamp |
| Intermediary Delivery Events | Status | Timestamp |
| Certified Delivery Events | Status | Timestamp |
| Carbon Copy Events | Status | Timestamp |
| Witness Events | Signature | Timestamp |
| Notary Events | Signature | Timestamp |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/5/2021 7:17:20 AM |
| Certified Delivered | Security Checked | 5/5/2021 7:21:13 AM |
| Signing Complete | Security Checked | 5/5/2021 7:21:18 AM |
| Completed | Security Checked | 5/5/2021 7:21:18 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 3/17/2020 2:08:09 PM
Parties agreed to: Jonathan Ramsden

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Big Lots (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Big Lots:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: cmacke@biglots.com

**To advise Big Lots of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at cmacke@biglots.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Big Lots**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to cmacke@biglots.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Big Lots**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to cmacke@biglots.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Big Lots as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Big Lots during the course of your relationship with Big Lots.