EXHIBIT A

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the _2ᴺᴰ_ day of ___Mar___ , 2011, by and between LBUBS 2007-C2 GARFIELD STREET, LLC., a Texas limited liability company, whose mailing address is 1601 Washington Avenue, Suite 700, Miami Beach, FL 33139 ("Landlord"), and PNS Stores, Inc., a California corporation, doing business as Big Lots, of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-5311.

## WITNESSETH:

**1.    DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.  Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan for the common use of all tenants and occupants in the Shopping Center, their employees, agents, customers, licensees and invitees, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas, as the same may be enlarged, reduced, removed or otherwise altered by Landlord, subject to the provisions of the next paragraph of this Section 1.A. . Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would substantially impair the visibility of or accessibility to the Demised Premises.  No enlargements, reductions, removal or alterations by Landlord to the Common Areas shall (i) modify the parking ratio of the Shopping Center, (ii) substantially impair the visibility or accessibility to the Demised Premises, (iii) alter the dimensions, location, exterior appearance or storefront of the Demised Premises, (iv) adversely affect Tenant's signage or storefront, or (v) materially diminish in quality or quantity the services provided at the Shopping Center for the Demises Premises or other tenants similar to Tenant. Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.  Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place drop/storage trailer(s) in the receiving area of the Demised Premises so long as said trailer(s) do not materially interfere with the business operations of the other tenants of the Shopping Center and do not violate any local codes/ordinances. Landlord shall not construct any buildings in the area crosshatched on Exhibit A ("No Change Area").  Further, Landlord shall not alter the No Change Area without the consent of Tenant; provided, however, Landlord shall be permitted to alter or erect customary Common Area improvements within the No Change Area, such as light poles, planters and landscaping, so long as the same do not unreasonably interrupt or disturb access to and from the Demised Premises or reduce the number of parking spaces within the No Change Area, without obtaining the prior written consent of Tenant.  Notwithstanding the foregoing, Tenant's approval shall not be required for alterations within the No Change Area that are required by law, statute, ordinance, order or regulation of any governmental authority having jurisdiction.

B.    Dates:  Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

3

1)    Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work, as defined hereinbelow, to be done simultaneously with Landlord's Work, as defined hereinbelow, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay the work to be completed by Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises, except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord notifies Tenant in writing that it has Substantially Completed, as defined hereinbelow, Landlord's Work, or (ii) the date on which Tenant receives all permits for its construction in accordance with the Tenant's Plans, as defined hereinbelow ("Tenant's Work") and signage; provided that Tenant has submitted Tenant's Plans for permits within ninety (90) days of the full execution of this Lease and thereafter, diligently pursues obtaining such permits. Landlord will cooperate fully with Tenant in obtaining said permits; provided, however, Landlord shall not be required to expend any monies in connection with such cooperation.  Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to notify Tenant when it has Substantially Completed Landlord's Work in the Demised Premises.  Said form shall be executed by Tenant and returned to Landlord if Landlord's Work has been Substantially Completed.  Delivery of the Demised Premises shall not be deemed to have been made unless construction pursuant to Exhibit C is Substantially Complete, and the Demised Premises complies with all laws, ordinances, regulations and building restrictions ("Landlord's Work").  Any exterior improvements to the Shopping Center, parking lot, landscaping or façade, and/or any impact fees or systems development charges, required by the local authority having jurisdiction as a condition for issuing Tenant's building permits or a certificate of occupancy for the Demised Premises shall be the responsibility of Landlord and included in Landlord's Work. Substantial Completion of Landlord's Work shall mean construction of Landlord's Work is complete except for Punch-List Items, as defined hereinbelow. Punch-List Items shall mean minor items requiring minor adjustment. Within a reasonable time after Substantial Completion, Landlord and Tenant shall agree on the Punch-List Items.  Landlord shall use due diligence to complete such Punch-List Items to the end that final completion of Landlord's Work is achieved within thirty (30) days after Substantial Completion and shall cause the least possible interference with Tenant its employees and contractors.  As of the earlier of the Tenant Entrance Date, or the Tenant Possession Date, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

3)    The "Rent Commencement Date" shall be the earlier of (i) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (ii) the date on which Tenant opens for business in the Demised Premises.

4)    The    "Term    Commencement    Date"    shall    be    the    Rent

4

Commencement Date.

5)    If Landlord fails to return properly executed Leases to Tenant by April 29, 2011, or if Landlord fails to complete Landlord's Work in the Demised Premises by May 31, 2011, then Tenant may terminate this Lease by written notice to Landlord on or before the expiration of fifteen (15) days following such date, respectively.   In no event shall Tenant be obligated to accept possession of the Demised Premises prior to May 31, 2011. Landlord and Tenant agree that if Landlord fails to complete Landlord's Work in the Demised Premises by May 31, 2011, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore, commencing upon June 1, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work prior to June 16, 2011, subject to Force Majeure delays attributable to acts of God only, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $1,500.00 per day. Commencing June 16, 2011 and continuing for each and every day Landlord is delayed in completing Landlord's Work, subject to delays attributable to acts of God as provided in Section 14, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,000.00 per day; provided that Landlord's obligation to pay such liquidated damages shall not exceed the sum of Fifty Thousand Dollars ($50,000.00).   If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Bank (or any successor thereto) annually (the "Lease Interest Rate"), from the next installments(s) of Rent due under this Lease. Notwithstanding anything to the contrary contained hereinabove, no penalties will be assessed for late completion of Landlord's Work until Tenant has received its permits for Tenant's Work and/or signage in the Demised Premises.

6)    Notwithstanding anything to the contrary, in the event Landlord has not completed Landlord's Work in the Demised Premises by June 30, 2011, Tenant will not be required to accept possession until February 4, 2012. The period of time between July 1, 2011 and February 4, 2012 will be the "Optional Blackout Period".  In the event Landlord has not completed Landlord's Work by February 4, 2012, then Tenant may terminate this Lease by delivery of a termination notice within fifteen (15) days thereafter, whereupon this Lease will terminate as of the date of such termination notice, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord completes Landlord's Work and offers possession of the Demised Premises to Tenant during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of one hundred twenty (120) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals for Tenant's Work and signage; or (ii) February 4, 2012. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

5

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit A – 1 Tenant's Plans

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    Landlord's Work

5)    Exhibit D -    Tenant Building Sign Specifications

6)    Exhibit D – 1 Tenant Pylon Sign Location

7)    Exhibit E -    Completion of Landlord's Work Letter

8)    Exhibit F -    Exclusive and Prohibited Use Provisions

9)    Exhibit G -    Remeasurement Rider

10)   Exhibit H -    Shopping Center Sign Criteria

11)   Exhibit I -    Existing Leases

12)   Exhibit J -    Shopping Center Rules and Regulations

13)   Exhibit K -    Title Exceptions

D.    Demised Premises: The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have 25,050 square feet of ground floor area with a minimum width of 130 feet for the Demised Premises. Tenant's plans and specifications of the Demised Premises ("Tenant's Plans") are attached hereto as Exhibit A-1 and are deemed approved by the parties hereto. Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity to measure the dimensions of the Demised Premises for a determination of its exact square footage of ground floor area ("Certified Area") and provide the Landlord with written notice of its findings. If there is a disagreement between Landlord and Tenant, the Certified Area will be remeasured by an independent, professional, licensed architect mutually selected by Landlord and Tenant and the calculation of such architect shall thereafter be the "Certified Area". Landlord and Tenant shall split said architect's fee. Except as otherwise provided herein, should the Certified Area differ from the square footage of the Demised Premises set forth in this Section 1.D. by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent based upon the square footage of the Demised Premises shall be adjusted accordingly based upon the Certified Area. Upon performing such remeasurement, should the Certified Area differ from the square footage of the Demised Premises set forth in this Section 1.D. by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, (a) if the Certified Area is in excess of 25,050 square feet, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 25,050 square feet; and (b) if the Certified Area is under 23,800 square feet, Tenant shall not be obligated to accept possession of any space under 23,800 square feet in size, and Tenant may, as its sole and exclusive remedy, terminate this Lease in the event the Certified Area is less than 23,800 by written notice to Landlord within fifteen (15) business days following determination of the Certified Area, whereupon this Lease shall terminate, and, thereafter, neither Landlord nor Tenant shall have any liability hereunder, except for those liabilities expressly surviving the expiration or earlier termination of this Lease.

E.    Shopping Center: Landlord's "Shopping Center" is described in Exhibit B

6

attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the University Plaza Shopping Center, 2133 West Washington Street, Stephenville, Texas. Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is 98,022 square feet.

F.    Gross Sales:    The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year. Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation: (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks; (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges; (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises.

G.    Landlord Related Persons:    The term "Landlord-Related Persons" shall mean the officers, directors and members of Landlord.

2.    **DEMISE:**

Landlord, in consideration of the Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive license to use the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

3.    **TERM:**

A. Original Term:    The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Section 1.B(4) above and ending January 31, 2017 (the "Original Term").    Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein.    The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof.    If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year."    If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".    Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date.    As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

7

B. Option to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for two (2), five (5) year option terms, consecutively referred to as "First Option Term", and "Second Option Term".  The First Option Term shall commence at the end of the Original Term of this Lease, and the Second Option Term shall commence at the end of the First Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein.  If Tenant is then in possession of the Demised Premises and not in monetary default beyond the expiration of any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least four (4) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.  Written notice shall be the only permissible mode of notice to exercise said options.

4.    **USE AND OPERATION:**

A. **Permitted Uses.**  Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, mattresses, appliances, toys, seasonal merchandise, furnishings, health and beauty products, food (including frozen food), and for any other lawful retail purpose. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants granted to existing Shopping Center tenants, or any covenants or restrictions of record, shall restrict Tenant's use of the Demised Premises. Landlord represents and warrants to Tenant that all exclusive and/or prohibited use provisions granted by Landlord, or any predecessor of Landlord, to existing tenants in the Shopping Center, and any covenants or restrictions of record affecting Tenant's use are attached hereto and incorporated herein as Exhibit F.  Tenant shall not use the Demised Premises in violation of any of the exclusive and/or prohibited uses set forth on Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) associated with a breach of the foregoing representations and warranties.

Except for tenants  in the Shopping Center as of the date of this Lease under existing leases in the Shopping Center as set forth on Exhibit I attached hereto ("Existing Leases") and any renewals, extensions or permitted assignments or subleases thereof, no other discount general merchandise store, discount store, liquidator, dollar store operation, closeout store, or discount furniture store ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof.  Notwithstanding the foregoing, (i) a discount department store whose primary business is the sale of apparel and/or footwear and (ii) a full line furniture store such as, but not limited to,  Kittles, Ashley's, Haverty's, Rooms to Go, Ethan Allen, Broyhill and Thomasville shall not be deemed a Competing Business.  Primary business for the purposes of the discount department store described in the immediately preceding sentence shall mean fifty percent (50%) or more of the tenant's space is devoted to the sale of apparel and/or footwear.  In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Dollar General, Dollar General Market, Dollar Tree, Encore, 99 Cent Only (and any store with the word 99 Cent in its name), Deals, Save-A-Lot, Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, Dollar Dreams, Goodwill, Christmas Tree Shops, Five & Below, Encore and Ollies Bargain Outlet.  Family Dollar and its successors and permitted assigns shall not be deemed a Competing Business.  In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant may, as its sole and exclusive remedy, pay, in lieu of Fixed Minimum Rent and other charges payable hereunder including Additional Rent, an amount equal to fifty percent (50%) of the Fixed Minimum Rent then effective under this Lease.  At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying all monetary charges due hereunder.  Notwithstanding the foregoing provisions of this Section 4, the above

8

restriction shall not apply if the Demised Premises are not open for business for a period of more than ninety (90) consecutive days, except for periods of closure for remodeling, repair or restoration.

Notwithstanding the foregoing terms of this Section 4, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises, which said lease or license agreement prohibits the uses set forth in this paragraph; provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such violation, uses good faith efforts to enforce its rights under such lease or license agreement in order to cause such violation to cease; provided, further, if said violation does not cease within 365 days after its occurrence Tenant shall have the right to terminate the Lease at any time thereafter while such violation continues.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

Tenant agrees to open for business in the Demised Premises fully stocked and staffed as a typical Big Lots retail store for one (1) day within six (6) months of the Tenant Possession Date. Thereafter, it is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant may close the Demised Premises in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair. Tenant shall comply with the Shopping Center rules and regulations promulgated by Landlord attached hereto as Exhibit J, provided such rules and regulations do not conflict with the terms of this Lease.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) place up to two (2) cart corrals in the parking field in front of the Demised Premises in the area designated as "Cart Corrals" on Exhibit A and to store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises; and (ii) use the Common Areas immediately adjacent to the Demised Premises for the periodic sale and display of merchandise, provided Tenant maintains such display areas in a clean, neat and orderly condition.

**B. Prohibited Uses.** Except for tenants in the Shopping Center as of the date of this

9

Lease under Existing Leases and any renewals, extensions or permitted assignments or subleases thereof, Landlord shall not lease any space, or permit (where Landlord has a right to withhold permission) any use in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises; (ii) to operate a so-called "Army and Navy" surplus store, as that term is generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities; (v) for any medical or health-oriented facilities or offices; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers; (ix) for any governmental use or office or any social service functions or facilities; (x) for the operation of a massage parlor or bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (xi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar, cocktail lounge or similar establishment, or any establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment, or any establishment which permits the sale of alcoholic beverages; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor, amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa, health club, exercise club, gymnasium or other similar operations; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations); (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant or coin operated laundromat; (xx) for any day care center or school (other than in conjunction with a retail or, in the case of day care, office operation); (xxi) for any veterinary hospital, animal boarding, training or raising facilities or pet shop; (xxii) for any separately demised newsstand; (xxiii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility; (xxiv) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial, satellite dish or antenna for Tenant's own use; (xxv) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxvi) for any astrology, palm reading, tarot card or other like service or facility; (xxvii) for the use of a "call center" or (xxviii) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

## 5. RENT; CONSTRUCTION ALLOWANCE AND INCENTIVE RENT ABATEMENT:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord first listed above, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro-rated based on the actual number of days in such month.

    A.    Fixed Minimum Rent:  During the Original Term of this Lease, the sum of One Hundred Eighteen Thousand Nine Hundred Eighty-seven and 50/100 Dollars

($118,987.50) per annum ($4.75 per square foot of ground floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Nine Thousand Nine Hundred Fifteen and 63/100 Dollars ($9,915.63).

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of One Hundred Twenty-Seven Thousand Seven Hundred Fifty-Five and 00/100 Dollars ($127,755.00) per Lease Year ($5.10 per annum per square foot of ground floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Ten Thousand Six Hundred Forty-Six and 25/100 Dollars ($10,646.25). The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of One Hundred Thirty-Six Thousand Five Hundred Twenty-Two and 50/100 Dollars ($136,522.50) per Lease Year ($5.45 per annum per square foot of ground floor area) which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Eleven Thousand Three Hundred Seventy-Six and 88/100 Dollars ($11,376.88).

B.    Utilities Charges:  Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Landlord shall provide separate utility meters from local distribution company, which shall accurately reflect Tenant's usage.  Tenant shall be solely responsible for and shall promptly pay for all direct   public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities.  Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

If Landlord is providing any utilities, Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises.  Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility meters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage. All such meters shall be a type that is utility billing grade, with ANSI standard, and the water meter type shall comply with ANSI/AWWA Standard C700, latest revision. Each meter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such meter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the meter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than forty-eight (48) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, Rent and Additional Rent shall abate upon the expiration of such forty-eight (48) hour period until such services are fully restored.   Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use.  Installation shall be the cost and

11

responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.    Intentionally Deleted

D.    Common Area Charges and Fixed CAM: Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)maintaining all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies (collectively, "Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, advertising, management or related fees.

Fixed Common Area Charges: Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be fixed at, and Tenant shall pay, the sum of sixty cents (**$0.92**) per square foot of the Demised Premises for each Lease Year for the Original Term, as well as the initial

Partial Lease Year, if any. From and after the Rent Commencement Date, such amount shall be paid to Landlord in equal monthly installments on the first day of each calendar month. Should Tenant elect to exercise any available option periods, Tenant's pro rata share of such Common Area Charges for the First Option Term shall be fixed at one dollar and seven cents (**$1.07**) per square foot of the Demised Premises for each Lease Year during the First Option Term and one dollar twenty-two cents (**$1.22**) per square foot of the Demised Premises for each Lease Year during the Second Option Term. The Fixed Common Area Charges for the Original Term and the Fixed Common Area Charges for the Option Terms shall be collectively known as the "Fixed CAM". In no event shall Tenant be required to pay an amount under this Section 5.D. other than the Fixed CAM set forth herein.

E.      Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, work papers evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2011 tax year is estimated to be approximately $0.67 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is available by prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount, regardless of whether in fact such prompt payment is made. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord, net of Tenant's pro rata share of expenses, if any, incurred by Landlord to secure such abatement, refund or rebates in connection with Landlord's proceedings to appeal or contest the Real Estate Taxes; but only to the extent of any savings actually realized by Tenant.

Landlord shall notify Tenant of increase in the value of the land and/or improvements comprising the Shopping Center which will result in an increase in the amount of Real Estate Taxes payable by Tenant hereunder. Notice of such increase shall be provided by Landlord at least sixty (60) days prior to the date on which an appeal regarding such increase must be filed with the applicable taxing authority.

13

From time to time during the Term, Landlord may appeal or contest the Real Estate Taxes if the same, in Landlord's reasonable determination, are in excess of the amount of Real Estates Taxes that are appropriate given the then current value of the Shopping Center. If at any time Landlord does not appeal or contest the Real Estate Taxes, and if Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use its best efforts to cause any such new construction to be separately assessed.

Landlord shall promptly notify Tenant, in writing, of any sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements in the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom more than two (2) times in any five (5) year period. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer more than two (2) times in any five (5) year period.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to pay or reimburse Landlord for any income taxes or sales, use, gross receipts-based or other excises taxes or fees, including, without limitation, the Texas franchise tax, imposed on or computed with reference to any payments required to be made by Tenant to Landlord under this Lease.

F.    Construction Allowance: Landlord shall pay to Tenant an amount equal to Two Hundred Fifty Thousand Five Hundred and 00/100 Dollars ($250,500.00) as a contribution for the cost of Tenant's Work ("Construction Allowance") within thirty (30) days of Tenant's opening for business in the Demised Premises, provided that simultaneously with or prior to Tenant's request for disbursement of the Construction Allowance Tenant (i) has paid the first month's Rent for the Demised Premises and all other Additional Rent that is due and payable pursuant to the terms of this Lease as of the date of disbursement of the Construction Allowance, and (ii) has delivered to Landlord (a) a copy of the certificate of occupancy for the Demised

14

Premises,  (b) lien waivers for all contractors supplying labor and/or materials for Tenant's Work in excess of Five Thousand and 00/100 Dollars ($5,000.00) and (c) a copy of Tenant's plans as approved for Tenant's permits.

If said amount is not paid by Landlord to Tenant within thirty (30) days after Tenant's opening for business and satisfaction of the requirements set forth above for disbursement of such Construction Allowance, Landlord shall, in addition, pay to Tenant on said amount interest at the Lease Interest Rate from the due date to the date of payment, and Tenant may deduct such sum from one hundred percent (100%) of the subsequent installments of Fixed Minimum Rent hereunder until such sum is fully paid.

Landlord and Tenant recognize and agree that to the extent that the Construction Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Construction Allowance shall be a "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.    Incentive Rent Abatement:  Notwithstanding anything to the contrary contained in this Lease, for a period of three (3) months commencing upon the Rent Commencement Date, Tenant shall not be obligated to pay Fixed Minimum Rent, as an incentive to enter into this Lease (hereinafter referred to as "Rent Abatement").   The total amount of the Rent Abatement shall be equal to $29,746.89.

## 6.    ALTERATIONS:

Excluding Tenant's Work, Tenant shall have the right to make changes, additions, and alterations inside the Demised Premises up to the amount of One Hundred Thousand Dollars ($100,000.00) per single change, addition or alteration without consent from Landlord, provided that such work shall not affect the structural or exterior parts (including the storefront and roof) of the building of which they are a part; that such are done in good and workmanlike manner and in compliance with all applicable governmental laws, regulations and ordinances; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any Mechanic's Lien placed on the Demised Premises and/or the Shopping Center resulting therefrom.  Tenant agrees to indemnify, defend and hold Landlord harmless from any costs, expenses and liabilities which Landlord may suffer or occur arising from any alterations made to the Demised Premises by Tenant.

In connection with Tenant's Work, (i) Tenant shall secure all permits and licenses necessary for Tenant's Work and shall comply with all laws and regulations applicable to Tenant's Work, (ii) Tenant shall pay for all water, sewer, electricity, heat and any other utility used by Tenant or its agents for such work, (iii) neither Tenant nor any of Tenant's contractor's shall be required to post any payment or performance bond or any other security to insure the proper completion of Tenant's Work; and (iv) only Tenant's general contractor and any major contractors providing labor, services or materials in excess of Five Thousand Dollars ($5,000.00) shall be required to supply Landlord a waiver of lien. Notwithstanding Tenant's construction of Tenant's Work, nothing in this Lease shall be deemed or construed in any way to make Tenant to be Landlord's partner, joint venturer or agent, nor shall it be deemed or construed to authorize Tenant or its contractor, subcontractor, laborer or materialman to act as agent for Landlord for the performance of any labor or the furnishing of any materials or equipment for any improvement, alteration to or repair of the Demised Premises or any part thereof. If any mechanic's or materialmen's lien is filed against any part of the Demised Premises or Shopping Center for

15

labor or material furnished for Tenant or those acting for Tenant in connection with Tenant's Work, Tenant shall cause the same to be discharged by payment or bonding with thirty (30) days after its receipt of notice thereof, failing which Landlord may, at its option, bond or discharge such lien or claim, in which event Tenant shall pay Landlord the amount of the lien or claim thus discharged by Landlord plus all reasonable expenses (including reasonable attorneys fees and costs) in connection with said lien or claim; provided, however, that Tenant shall have the right at all times at its own expense to contest and defend on behalf of Tenant and Landlord any action involving the collection, validity or removal of any lien or liens upon giving adequate security to Landlord for payment of such lien and provided such contest does not subject Landlord to any liability under any document to which it is a party.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises.

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 7, Landlord shall reimburse Tenant for the cost of labor and materials to replace any ceiling tiles in the Demised Premises that are damaged or stained as a result of roof leaks.

Landlord shall be responsible for supplying Tenant with an HVAC inspection report two (2) weeks prior to the Tenant Possession Date. Such report shall be prepared by a commercially licensed reputable HVAC company. Landlord shall deliver the Demised Premises to Tenant with the HVAC system in the condition set forth in Exhibit C. Further, Landlord shall provide HVAC equipment to the Demised Premises fit for Tenant's intended use as outlined in American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) Standard 90.1-1989 (Typical building and Air Conditioning load 200-300 square feet per ton). Should Landlord not provide Tenant with such report by the Tenant Possession Date, Tenant shall have the right to have such report prepared at Landlord's sole cost and expense. Tenant shall have the right to deduct such expense from the next Rent payments owing. After receipt of said inspection report, Tenant shall have the right to perform any and all work required to place the HVAC system in good working condition and adequate for Tenant's intended use as stated above, at Landlord's sole cost and expense. Should Landlord fail to reimburse Tenant for all costs and expenses incurred as provided for above, within thirty (30) days of receipt of invoice therefor, Tenant shall have the right to deduct such amount, with interest at the Lease

16

Interest Rate, from its next Rent payment(s) owing until such amount is recaptured in full. Notwithstanding the foregoing, if the Tenant Possession Date occurs during the months of October through May, Tenant shall be granted until June 15th to test the air conditioning system.

Should Tenant discover that the HVAC system requires repair and/or replacement during the Original Term; and the cost thereof exceeds Two Thousand and 00/100 Dollars ($2,000.00) in the aggregate in any one (1) Lease Year, Landlord shall be solely responsible for such costs over and above Two Thousand and 00/100 Dollars ($2,000.00), unless the need for such repair or replacement is occasioned by the negligent or willful act of Tenant. In the event Landlord fails to reimburse Tenant for such costs, Tenant may deduct such amount, with interest at the Lease Interest Rate, from its next Rent payments owing until such amount is recaptured in full.

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within ten (10) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such ten (10) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs which are Landlord's obligations under this Section 7 within fifteen (15) days after notice by Tenant of the need for such repairs, Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting fifteen (15) days. Should Tenant perform repairs pursuant to this Section, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury or damage caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this Section, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost, with interest at the Lease Interest Rate, from the next Rent payment(s) owing until such amount is recaptured in full.

If Landlord fails to complete Landlord's Work within ten (10) days after the date specified for delivery of possession as provided in Section 1.B.5, in Tenant's discretion, (i) Tenant may refuse to accept possession of the Demised Premises, or (ii) Tenant shall be permitted to enter the Demised Premises and complete Landlord's Work. In the event Tenant completes Landlord's Work as aforesaid, Tenant may off-set such expenses plus a ten percent (10%) administrative fee from the next installments of Rent due and owing until such amount is recaptured in full. In such event, the Tenant Possession Date shall be deemed to be the date Tenant completes all of Landlord's Work. Tenant shall complete such work in a timely manner.

17

Any reservation of a right by Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the Landlord's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Tenant to do so; (ii) render Tenant liable to Landlord or any third party for failure to do so; or (iii) relieve Landlord from any obligation to indemnify Tenant as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises in compliance with applicable laws, codes and ordinances. Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located.  Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.  Any future modification or change to Tenant's Sign Specifications as set forth in Exhibit D shall comply with all applicable laws and Landlord's sign criteria set forth in Exhibit H attached hereto.

Landlord shall ensure that Shopping Center pylon ( "Pylon") (i) is fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction. If Landlord fails to complete repairs, installation, or otherwise fails to deliver a fully operational Pylon sign to Tenant on or before the Tenant Possession Date, Tenant shall have the right to perform such repairs and/or installation and to charge Landlord the reasonable cost thereof as provided in Section 7 of this Lease (without reference to the notice provision therein).

Tenant shall have the right to place suitable sign panels upon the existing Shopping Center Pylons located in the position designated on the Site Plan attached as Exhibit A as set forth in the succeeding sentence. Landlord agrees that Tenant shall have the right to install and maintain its sign panels on both sides of the existing Pylon on the space as indicated on Exhibit D-1 attached hereto.  Landlord grants Tenant a right of first refusal to occupy, within the top one-half (1/2) portion, any Pylon at the Shopping Center which is subsequently constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space.  Absent an existing Pylon, Tenant shall have the right to erect a Pylon for its sign panels.  Tenant shall, at its own expense, obtain the necessary permits and comply with applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping or take any other action which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

The Shopping Center Sign Criteria attached hereto as Exhibit H shall be applicable Tenant's assignees and sublessees only (excluding assignees and sublessees in connection with a Related Party Assignment as defined in Section 22 and shall not apply to Tenant or Tenant's assignees or sublessees in connection with a Related Party Assignment.

9.    **FIXTURES:**

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.  At the end of the Term, Tenant may remove such trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting

18

from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

10. **GOVERNMENTAL REGULATIONS:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises and the Common Areas required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms and sprinkler system; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act as said Act now exists or may be amended in the future ("ADA") ; and to place all HVAC equipment in compliance with the Clean Air Act of 1992. Notwithstanding the foregoing, Landlord's obligation to comply with laws, statutes, ordinances, orders and regulations of governmental authorities and the requirements of the ADA with respect to the Demised Premises shall only apply to structural and exterior components thereof and Tenant shall comply with such laws, statutes, ordinances, orders, regulations and requirements for the Demised Premises except for the structural and exterior components thereof.

11. **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord and Landlord Related Persons from any liability for injury to or death of any person or damage to personal property of every kind and nature arising (including reasonable attorneys' fees) from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its heirs, executors, administrators, successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

19

The provisions of this Section 11 shall survive expiration or termination of this Lease.

12.   **INSURANCE:**

A. Tenant:   Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include Landlord and Landlord's mortgagee, if any, as additional insureds, with minimums of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of coverage with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements provided that Tenant is PNS Stores, Inc. or one of its affiliates.

The insurance required above shall name Landlord and its designee(s) as additional insureds. A certificate of insurance or a certificate of coverage evidencing insurance coverage required and confirming the Landlord as additional insured shall be provided to Landlord prior to the Tenant Possession Date and without demand throughout the Term. Unless the Tenant self insures in accordance herewith, such coverage shall be issued by one or more responsible insurance companies satisfactory to Landlord with a minimum Best Rating of A-X. All such insurance may be carried under a blanket policy covering the Premises and any other of Tenant's stores and shall contain provisions that Tenant shall be solely responsible for payment of premiums for such insurance. Should any of Tenant's insurance be cancelled, Tenant shall provide prompt written notice to Landlord.

Tenant also agrees to provide evidence of worker's compensation coverage in accordance with State of Texas requirements.

B. Landlord:   Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than one hundred percent (100%) of the replacement cost of all the improvements located in the Shopping Center, including the Demised Premises. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date. Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Landlord may maintain any of its required insurance under blanket policies of insurance covering the Demised Premises and any other premises of Landlord or companies affiliated with Landlord, provided that the coverage afforded and required hereunder will not be reduced or diminished by reason of the use of any such blanket policy of insurance.

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability

20

insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area of the Demised Premises and the denominator of which is the gross leasable area of all buildings in the Shopping Center. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease. Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B shall be approximately $0.20 per square foot per annum for the 2011 calendar year.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.     **FIRE REBUILDING AND ALTERING:**

A. If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration.   During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Demised Premises.  In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant.  Said abatement shall cease when the Demised Premises are restored to tenantable condition.  Notwithstanding the foregoing, Landlord's repair and restoration obligations shall not include Tenant's fixtures, furnishings, equipment or inventory, all of which shall be repaired and replaced by Tenant at its sole expense.  In the event Tenant closes its business during any period of repair, Tenant shall open for business for one (1) day within one hundred twenty (120) after the date Landlord completes restoration of the Demised Premises in accordance with this provision.

B. In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within two hundred seventy (270) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving written notice to Landlord within sixty (60) days after said two hundred seventy (270) day period and prior to completion of the repair and restoration and thereupon Landlord and Tenant shall be released from all future liability and obligations under this Lease, except those obligations expressly surviving the termination

21

of this Lease.

C. If the Demised Premises are damaged or destroyed during the last twelve (12) months of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty, provided, however, that Tenant may vitiate a termination by Landlord if Tenant elects to exercise its next option to extend the Term of the Lease.

## 14.    FORCE MAJEURE:

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant, and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed.    This provision shall not apply to initial delivery of possession of the Demised Premises, except for delays attributable to acts of God, or to the respective obligations of Landlord or Tenant to pay Rent, Additional Rent or any other sums of money due and payable under the terms of this Lease.

## 15.    INJUNCTION:

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

## 16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:

Landlord hereby warrants, represents, and covenants to Tenant that:    (a) at the time of the execution by Landlord of this Lease, Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and indefeasible fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and exceptions of title attached hereto as Exhibit K which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.    In case Landlord does not have the title and rights aforesaid, or breaches the aforesaid representations, then in such event, in addition to any other rights of Tenant's, this Lease shall, at the option of Tenant, become null and void, and no Rent or Additional Rent for the remainder of the Term shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant, or Tenant may withhold Rent and Additional Rent thereafter accruing until Tenant is furnished proof satisfactory to Tenant as to the parties entitled to receive Rent and Additional Rent, or the breach of the aforesaid representations is cured. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and

22

expenses (including without limitation attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, which said consent shall not be unreasonably withheld or delayed; provided, however, Landlord agrees it shall not be unreasonable for Tenant to withhold consent if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. If Tenant does not respond in writing to Landlord's request for Tenant's consent of any such amendment, modification, termination or new agreement within thirty (30) days from Tenant's receipt of such request, then Tenant shall be deemed to consent to same. If Landlord breaches the foregoing covenant Tenant may, without waiving any other remedy available to Tenant under this Lease, at law, or in equity, terminate the Lease, in which event Tenant shall be released from any and all liability hereunder. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

## 17.    QUIET ENJOYMENT:

Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

## 18.    MORTGAGE AND ESTOPPEL CERTIFICATES:

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall request any such mortgagee to agree that insurance proceeds and condemnation awards shall be used for the repair and restoration of the Demised Premises when so provided in this Lease. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a statement certifying the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Fixed Minimum Rent, Common Area Charges and other charges hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; and (iv) Tenant knows of no default under the Lease by the Landlord and there is no offset which Tenant has against Landlord.

23

19.    **DEFAULT:**

A. If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten (10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor.    Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant.    In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due.    In no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant.    Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises.    All rights and remedies of Landlord herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity.    All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to (i) terminate this Lease without penalty or default on the part of Tenant; or (ii) cure such default and the amount expended by it therefor, with interest at the Lease Interest Rate, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items.    It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided.    In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided.    All rights and remedies of Tenant herein created, or remedies otherwise existing at law or equity are cumulative, and the exercise of one

24

or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20.    **CONDEMNATION:**

In the event the Demised Premises hereby leased, or any part thereof, are taken in condemnation proceedings, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event any part of the Demised Premises, No Change Area or ingress and egress to the Shopping Center via rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of Tenant the Demised Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease, or at its option, retain the Demised Premises. In the event Tenant shall retain the Demised Premises subsequent to any condemnation proceedings, Landlord will restore the entire remaining Demised Premises and/or Shopping Center to proper tenantable condition forthwith. Until the Demised Premises and/or Shopping Center is restored to proper tenantable condition, Rent and Additional Rent shall abate. Thereafter, Rent and Additional Rent shall be reduced in proportion to the amount of land and/or building area lost, or if Tenant shall elect, in proportion to the effect of the loss of such are on Tenant's business, which shall be calculated by the percentage by which Gross Sales made by Tenant at the Demised Premises during the one year following the date on which the condemning authority takes possession of part of the Demised Premises are less than gross sales during the one (1) year immediately preceding the date of possession by the condemning authority. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's rights to compensation for damages.

21.    **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same and Tenant waives any and all rights of recovery against Landlord relating to property damage whether or not such loss or damage is insured; and (ii) Tenant shall not be liable for any damage to the Demised Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same and Landlord waives any and all rights of recovery against Tenant relating to property damage whether or not such loss or damage is insured. Landlord and Tenant agree promptly to provide notice, if necessary, to their respective, appropriate, insurers of the terms of the aforementioned mutual waivers; and, if necessary, to obtain appropriate insurance policy endorsements to prevent the invalidation of the insurance coverages by reason of these waivers, if required by the respective insurers.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.    **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall be to a regional or national retailer with at least ten (10) stores and shall not violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a

Competing Business, and Landlord agrees to provide Tenant with actual copies of all tenant exclusives at the Shopping Center within fifteen (15) days after written request of Tenant. If Landlord fails to provide said exclusives within fifteen (15) days, Tenant may proceed with said assignment or subletting regardless of any exclusives granted to other tenants of the Shopping Center.

In the event Tenant desires to assign this Lease or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord at least thirty (30) days in advance of its intent to assign or sublet ("Notice") which shall contain the name and contact information of all relevant parties, the intended use and trade name, and the retail experience and reasonably detailed financial information for the proposed assignee or subtenant. The date that Landlord is deemed to have received the Notice shall be the date that Landlord has received all of the foregoing information. Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which Termination Notice must be received by Tenant within forty five (45) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within forty five (45) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived and null and void with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting, but shall be under no obligation to do so. If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date") and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without prior written notice to, or consent of, Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or is in connection with the sale of all or substantially all of the assets or stock of Tenant (collectively "Related Party Assignment"); provided that any transfer of the ownership (other than a Related Party Assignment) of any subsidiary or other affiliate of Tenant to which this Lease is assigned or the Demised Premises is sublet shall be deemed an assignment or subletting for which Landlord's consent is required under the first paragraph of this Section 22. The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange. Tenant agrees that the intention of a Related Party Assignment is to permit Tenant to structure its business affairs in an efficient manner, and the same shall not be used as a subterfuge to avoid the requirement for Landlord's consent to assignments and sublettings and Landlord's Recapture Right.

No subletting or assignment, whether with or without Landlord's consent, shall relieve Tenant of any of its obligations hereunder.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises. Thirty (30) days prior to the expiration or termination of this Lease, Landlord and Tenant shall schedule an inspection of the Demised Premises to determine the condition, and Landlord will have ten (10) days after the date of such inspection to notify Tenant, in writing, of any damage for which repair is sought by Landlord.

If Tenant shall remain in possession of the Demised Premises after expiration or earlier

26

termination of the Original Term or any Option Term, such occupancy shall be a tenancy from month to month subject to all the terms and provisions hereof, except that Tenant shall pay one and one-half (1 ½) times the Fixed Minimum Rent payable in the last month of the Original Term or then applicable Option Term, as applicable.

24.    **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission.    The date of actual receipt shall be deemed the date of service of notice.    In the event an addressee refuses to accept delivery, however, then notice shall be deemed to have been served on the date of said refusal of delivery.    Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25.    **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.    The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is a limited liability company duly organized, validly existing and in good standing under the laws of Texas. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26.    **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27.    **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease. Tenant may record such memorandum at its expense.    Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28.    **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

29.    **NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken

27

to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

## 30.    HAZARDOUS MATERIAL:

Landlord represents and warrants that to the best of Landlord's knowledge,  the Demised Premises do not presently contain any Hazardous Materials in violation of applicable laws. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all EPA, governmental laws and regulations, and  Landlord shall indemnify, defend and hold harmless Tenant with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation attorney fees and court costs) related to such Hazardous Materials.  If Landlord shall be required to remove any Hazardous Materials from the Demised Premises or perform work in the Demised Premises related to any Hazardous Materials all Rent and Additional Rent due under this Lease shall abate entirely during the period of time necessary to complete such work in case the whole Demised Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the Demised Premises.  In the event Tenant continues to operate during the period of time necessary to complete such work, Rent and Additional Rent shall be equitably abated.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify, defend and hold harmless Landlord and Landlord Related Persons, except for the negligence or reckless acts of Landlord, Landlord's agents, contractors, or employees, from any cost, liability or expense (including without limitation reasonable attorney fees and court costs) arising from any release of Hazardous Materials from the Demised Premises directly caused by Tenant, Tenant's agents, contractors or employees while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Lease Term or any extensions thereof.

## 31.    TITLES AND ENTIRE AGREEMENT:

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

28

32. **WAIVER OF CLAIMS:**

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Percentage Rent, Common Area Charges, insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within one (1) year after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said one (1) year period, Landlord's claim to such amount owed shall be deemed waived and discharged.

33. **REASONABLE CONSENT:**

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay such consent, approval or permission. In the event that any such consent, approval or permission is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

34. **CO-TENANCY:**

The "Threshold Requirement" shall be defined as: tenants occupying at least sixty percent (60%) of the gross leasable area of the Shopping Center, excluding the Demised Premises, are open and operating for business from the Shopping Center for uses not prohibited under the Lease. If at any time during the Term, the Threshold Requirement is not met for six (6) consecutive months, Tenant shall have the right to reduce the Fixed Minimum Rent payable under the Lease by fifty percent (50%) ("Alternate Rent") until the Threshold Requirement is met. If after twelve (12) months of paying Alternate Rent, the Threshold Requirement is not met, then Tenant shall either (i) terminate this Lease by giving Landlord ninety (90) written notice of termination, and this Lease shall then terminate with the same effect as if such date were the scheduled expiration date of this Lease and Landlord and Tenant shall have no further liability hereunder, except as otherwise specifically provided in this Lease, or (ii) Tenant shall resume paying one hundred percent (100%) of the Fixed Minimum Rent due under the terms of the Lease. The rights set forth in this Section 34 are personal to the initial named Tenant herein and any of its Related Party Assignees. Notwithstanding the foregoing provisions of this Section 34, the Threshold Requirement shall not apply if the Demised Premises are not open for business for a period of more than ninety (90) consecutive days, except for periods of closure for remodeling, repair or restoration.

35. **NO PRESUMPTION AGAINST DRAFTER:**

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

36. **SUBMISSION OF LEASE:**

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this

29

authorized signature printed by the receiving facsimile machine to be its original signature.

**37.    INTERLINEATION:**

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**38.    TIME OF THE ESSENCE:**

Time is of the essence of all conditions of this Lease in which time is an element.

**39.    TENANT'S AUDIT RIGHTS:**

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums of Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's authorized representatives who shall not be compensated by Tenant on a contingent fee basis.    If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%), Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit.    If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof with interest at the Lease Interest Rate, against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to Tenant in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter.    If Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year.

**40.    ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party.    This provision applies to court costs and attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore.

**41.    WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**42.    ANTI-TERRORISM PROVISIONS:**

Tenant is not, and shall not during the term of this Lease become, a person or entity with whom Landlord is restricted from doing business under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism

30

Act of 2001, H. R. 3162, Public Law 107-56 (commonly known as the "USA Patriot Act") and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto (collectively, "Anti-Terrorism Laws"), including without limitation persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List (collectively, "Prohibited Persons").

To the best of its knowledge, Tenant is not currently engaged in any transactions or dealings, or otherwise associated with, any Prohibited Persons in connection with the use or occupancy of the Demised Premises or the Shopping Center. Tenant will not, during the Term of this Lease, engage in any transactions or dealings, or be otherwise associated with, any Prohibited Persons in connection with the use or occupancy of the Demised Premises or the Shopping Center.

**47.    LIMITATION ON LANDLORD'S LIABILITY:**

It is specifically understood and agreed that neither Landlord nor any principal, beneficiary, partner, officer, director, agent, employee or mortgagee of Landlord shall be personally liable for any of the terms and conditions of the Lease.    Notwithstanding anything to the contrary contained in this Lease, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed, honored or performed by Landlord, Tenant shall look solely to the proceeds of sale on execution of the interest of Landlord in the Demised Premises for the collection of any judgment (or any other judicial procedures requiring the payment of money by Landlord) and no other property or assets of Landlord shall be subject to levy, execution, or other procedures for satisfaction of Tenant's remedies.

**48.    SALE OF PREMISES BY LANDLORD:**

In the event of any sale or exchange of the Demised Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Demised Premises or this Lease occurring after the consummation of such sale or exchange and assignment, provided said grantee, transferee or other successor in interest expressly assumes all the terms, covenants and conditions of this Lease to be performed on the part of Landlord, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations.

[Signatures Appear on Immediately Subsequent Page.]

31

IN TESTIMONY WHEREOF, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:

**LANDLORD:**
**LBUBS 2007-C2 GARFIELD STREET, LLC, a Texas**
**limited liability company**

By: LNR Texas Partners, LLC, a Texas limited liability
company, successor by statutory conversion to LNR
Texas Partners, Inc., a Texas corporation, its manager

By: _____
STEVEN D. FERREIRA , Vice President

Witnesses As To Tenant:

**TENANT:  PNS STORES, INC., a California**
**corporation**

By: _____
Charles W. Haubiel II
Title: Executive Vice President – Legal & Real Estate,
General Counsel and Corporate Secretary

**STATE OF**

**COUNTY OF**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, LBUBS 2007-C2 Garfield Street, LLC by Steven D. Ferreira its Vice-President who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said limited liability company, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at _____ this 28th day of April , 2011.

JENNIFER S. REYES
Notary Public - State of Florida
My Comm. Expires May 23, 2014
Commission

_____
Notary Public

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, PNS Stores, Inc., by Charles W. Haubiel II, its Executive Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 2ND day of May , 2011.

ANDREA L. TURNER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 5/12/15

_____
Notary Public

EXHIBIT A

SITE PLAN OF SHOPPING CENTER



## EXHIBIT A-1

### TENANT'S PLANS AND SPECIFICATION

Landlord approves Tenant's plans and specifications to construct a typical "Big Lots" in the Demised Premises.

## EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

STEPHENVILLE LEGAL DESCRIPTION

LOT 36, BLOCK 139, CITY OF STEPHENVILLE CITY ADDITION, AN ADDITION TO THECITY OF STEPHENVILLE, ERATH COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET B, SLIDE 36A, PLAT RECORDS, ERATH COUNTY, TEXAS.

LOT 32, BLOCK 139, CITY OF STEPHENVILLE CITY ADDITION, AN ADDITION TO THE CITY OF STEPHENVILLE, ERATH COUNTY, TEXAS, ACCORDING TO THE PLAT THEROF RECORDED IN CABINET A; SLIDE 283A, PLAT RECORDS, ERATH COUNTY, TEXAS.

## EXHIBIT C

## LANDLORD WORK

**The following work is to be completed and is subject to the review and approval from the Big Lots Director of Construction or it's Representative.   Landlord covenants and agrees to deliver the Demised Premises to Tenant as follows:**

| | |
|---|---|
| STOREFRONT: | The canopy and building fascia shall be repaired and painted per Tenant's specifications. The Landlord will ensure that there are curb cuts within reasonable proximity to the store front. |
| DOORS: | All doors and door systems to be sound and secure, in good working condition adequate for Tenant's use and in compliance with ADA requirements. |
| GLASS: | The Landlord will replace all broken and damaged glass and remove all materials blocking or covering windows and glass doors. |
| UTILITIES: | The Landlord will provide separate utilities and provide separate meters adequate for Tenant's intended use.   The Tenant will have a minimum of 800 amps for 208v service or 600 amps for 480v service and will include all circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems. The Landlord will also provide Tenant with assurance that utilities adequate for Tenant's use are available and include legal access across other properties if necessary to serve the Premises including water, gas, electricity, telephone, sanitary sewers and storm drainage. |
| PLUMBING, ELECTRICAL, SPRINKLER &: FIRE SYSTEMS: | All plumbing, electrical, mechanical, and sprinkler equipment to be in good working condition.   Landlord to provide Tenant with sprinkler certification and a separate room with an exterior access door in which it shall maintain the sprinkler riser to any sprinkler system used in common with other Tenants throughout the Original Term and Options, Terms or Extensions.   The Landlord will install any other type of fire suppression or alarm system as required by local codes and ordinances. |
| | If a sprinkler system does not exist, the Landlord will install a sprinkler system at its sole cost and expense if required by code.   If code does not require a sprinkler system, the Landlord will install, at its sole cost and expense, a smoke detection system that is to be monitored by the Tenant and any other device required by code. |
| HVAC & EQUIPMENT: | All existing HVAC equipment, duct work, diffusers, and other air distribution equipment commonly used and required by Tenant will be clean, in good working condition, and adequate for Tenant's intended use. All existing HVAC units are to be inspected and cleaned by Landlord prior to Tenant's possession date and Landlord will provide to Tenant a copy of the inspection report. |
| | If the Tenant Possession Date occurs during the months of October through May, the Landlord will grant the Tenant until June 15th to have the HVAC system inspected to determine the needed repairs. The Landlord shall also warrant the HVAC system for the initial lease term for any repairs over $2,000 during a single lease year. |
| INTERIOR LIGHTING: | Existing lighting will be in good working condition |
| EXTERIOR | All exterior lighting shall be operational and working including pole lights, entrance/exiting |
| LIGHTING: | lighting, building lights, etc, with a minimum average of two (2) foot-candles of exterior lighting throughout the parking lot.    All exterior lighting is to be on a separately metered house panel in the Landlord's name. |
| FLOORING: | The Landlord will remove any hazardous materials from tiles, mastic, and any other flooring materials. |
| ROOF: | New roof installed. |
| RESTROOMS: | The existing restrooms will be in good working condition. |
| RECEIVING AREA: | The loading dock is to be 48" high and in good working order (including all seals, bumpers, ballards, doors, etc.).   The Tenant shall have exclusive use of the dock area, which shall remain unobstructed. |

**PARKING LOT:** Parking lot shall be good condition - paved, patched, sealed and striped with potholes, cracks and uneven areas resurfaced – adequate for customer parking and Tenant's use.

**PESTS:** Premises to be professionally inspected for pestilence and termites. The Tenant is to be provided with a certified report that the Demised Premises is pest free. Otherwise, the Landlord will make the space pest free.

**SIGNAGE:** The Tenant will have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the pylon(s). The Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. Tenant to have marquee signage on the pylon-the entire Dunlap's panel.

**DRAWINGS:** The Landlord will provide the Tenant with "as built" CAD drawings or a floor plan of the Demised Premises adequate for Tenant to draw its floor and fixture plan. The Tenant will approve all drawings prior to submission for permits and prior to work commencement. The Landlord will deliver a construction timeline schedule within one week of the permits being issued or the commencement of Landlord's Work.

**HAZ MATS:** The Landlord will be responsible for the removal of any and all hazardous materials.

**POSSESSION DATE:** All above work will be completed before the Tenant Possession Date.

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant. Tenant to approve all drawings prior to the commencement of work.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS!

## LOGOS
### WITH
## SPECIFICATIONS
### for exterior signage

If you need additional information that
is not contained in this packet contact:

Store Planning:
Mike Stiles – 614-278-6805
Michael Neu – 614-278-6868

**Stacked Logo**
# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS



### STANDARD SIZE STACKED LAYOUTS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ | Ⓗ |
|---|---|---|---|---|---|---|---|
| 5'0" | 3'11" | 7'0" | 13'7" | 9'8" | 22" | 7½" | 131 SF. |
| 4'6" | 3'6" | 8'4" | 12'3" | 8'8½" | 19½" | 6½" | 107 SF. |
| 4'0" | 3'1½" | 8'7½" | 10'10½" | 7'9" | 17½" | 6" | 84 SF. |
| 3'0" | 2'4" | 4'2½" | 8'2" | 5'9½" | 13" | 4½" | 47 SF. |
| 2'6" | 1'11½" | 3'6" | 6'9½" | 4'10" | 11" | 3½" | 33 SF. |

*SF = SQ. FEET TOTALS

### SIGN SPECIFICATIONS FOR BIG LOTS!

5" .063 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS
LETTER FACES .150 ACRY STEEL #2119 ORANGE W/1" ORANGE JEWELITE TRIM CAP
INTERNALLY ILLUMINATED W/SLOAN V SERIES – ORANGE L.E.D.s AS PER SLOAN LAYOUTS

NOTE: Fabrication and installation per UL specifications,
installed in accordance with N.E.C.
All signage equipped with disconnect switches.

### Horizontal Logo
## INDIVIDUAL LED ILLUMINATED
## CHANNELED LETTERS



| | STANDARD SIZE HORIZONTAL LAYOUTS | | | | |
|---|---|---|---|---|---|
| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ |
| 2'0" | 11'7½" | 2'4" | 8½" | 3½" | 24 SF |
| 2'6" | 14'6½" | 2'11½" | 11" | 4½" | 38 SF |
| 3'0" | 17'5½" | 3'6½" | 13" | 5½" | 62 SF |
| 3'6" | 20'4½" | 4'1½" | 15½" | 6½" | 77 SF |
| 4'0" | 23'3½" | 4'8½" | 17½" | 7½" | 92 SF |
| 4'6" | 26'2½" | 5'3½" | 19½" | 8½" | 110 SF |
| 5'0" | 29'1½" | 5'10½" | 22" | 9½" | 145 SF |
| 6'0" | 34'11" | 7'½" | 2'2" | 11" | 207 SF |

*SF = SQ. FEET TOTALS

#### SIGN SPECIFICATIONS FOR BIG LOTS!

5" .083 ALUMINUM CHANNEL LETTERS W/BLACK RETURNS
LETTER FACES .150 ACRYSTEEL #2119 ORANGE W/1° ORANGE JEWELITE TRIM CAP
INTERNALLY ILLUMINATED W/SLOAN V SERIES – ORANGE L.E.D.s AS PER SLOAN LAYOUTS

NOTE: Fabrication and installation per UL specifications.
Installation according to this N.E.C.
All signage equipped with disconnect switches.

# PYLON/MONUMENT SIGN LOGO

This logo and color scheme to be used in pylon or monument sign applications.

### Square Cabinet



### Rectangular Cabinet



 **BIG LOTS AND TRADE MARK**
100% BLACK

 **EXCLAMATION**
PANTONE 021 ORANGE

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



**EXHIBIT E**

**COMPLETION OF LANDLORD'S WORK LETTER**

Date: _____

To: _____ (insert Tenant)
    via facsimile:   (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been completed.   Accordingly, delivery of the Demised Premises with Landlord's Work completed is hereby made to Tenant.   You may pick up the keys at _____

_____

If you have any questions, please feel free to contact me at _____.

Thank You.


**LANDLORD:**

LBUBS 2007-C2 GARFIELD STREET, LLC,
a Texas limited liability company


By:_____

Title:_____


**TENANT:**

**PNS STORES, INC., a California
corporation**


By:_____

Title: _____

EXHIBIT F

EXCLUSIVE AND PROHIBITED USE PROVISIONS

*Terms and section/paragraph references used in this Exhibit "F" but not defined shall have the meanings ascribed thereto in the respective lease or agreement. The clauses below have been taken from the respective leases or agreements and the only changes made thereto are shown in italics for the purpose of clarifying such definitions or terms. References made in each paragraph below to "this Lease" or "the Lease" shall refer to the lease or agreement identified in such paragraph. Unless otherwise noted herein, all references to the "Shopping Center" shall mean the approximately 9.98 acre tract of land known as the University Plaza Shopping Center in Stephenville, Erath County, Texas.*

A.    7 DAY DONUTS

Exclusive Use:  None.  (Final, 7 Day Donut Lease, dated September 30, 2010)

Prohibited Uses:  None.  (Final, 7 Day Donut Lease, dated September 30, 2010)


B.    BURKE'S OUTLET

Exclusive Use:  None.  (Final, Burke's Outlet Lease, dated May 3, 2006)

Prohibited Uses:  Except for existing leases, Landlord agrees that unless Tenant consents in writing, not of the property described in **Exhibit "B"** *(the Shopping Center)* shall be occupied by any entertainment facility, recreational facility, non-retail facility, or hazardous or undesirable facility.

A. As used herein, "entertainment facility" or recreational facility' includes but is not limited to, massage parlor, movie theater, a bar unless incidental to a restaurant, a tavern, an amusement arcade, billiards room, pool hall, bowling alley, live entertainment facility, stage production(s), video game room, skating rink, bingo parlor, or other place of public amusement. Provided, however, that Landlord will not allow in the Shopping Center any so-call "theme" type restaurant such as, by means of example but not of limitation, T.G.I. Fridays, Ruby Tuesdays, and Bennigan's with anticipated liquor sales exceeding thirty percent (30%) of sales and being in excess of seven thousand five hundred (7,500) square feet.

B. As used herein, "non-retail facility" includes, but is not limited to, professional space and offices (except as is incidental to a retail operation), warehousing operations, offices, meeting halls, an office building or place for office usage of any nature, and a meeting hall or place for private clubs or organizations.  However, twenty percent (20%) of the gross leasable area of the Shopping Center may be use for retail oriented office space commonly permitted in shopping centers such as realtor, dental, medical, travel agency, and banks.

C. As used herein, "hazardous or undesirable facility" includes but is not limited to, gas stations, motorcycle shops (sales or service), gun shops, pawn shops, flea markets, second hand merchandise operations, consignment operations, massage parlors, adult book or adult video stores, or other businesses which sell or display pornographic material or operates businesses that are unsuitable for children to visit and patronize, industrial or manufacturing uses, automobile, boat or trailer sales, or any use where inventory is stored or displayed in the Parking Areas of the Shopping Center.  It is agreed between the parties that Parking Areas and other Common Facilities should not be burdened by either large scale or protracted use which is often associated with many of the above prohibited uses.  Notwithstanding the foregoing, a first class consignment shop shall be permissible so long as Tenant consents in writing.  **(Final, Section 29, Burke's Outlet Lease, dated May 3, 2006)**

## C.    CASH ZONE

Exclusive Use:

1.    The Restriction.  Subject to the conditions and exceptions mentioned below, Landlord agrees that during the Lease Term Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is **cash advance/payday loan.**

2.    Conditions.  The Restriction described above shall apply only as long as all of the following conditions exist:

    a.    Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

    b.    Tenant has timely paid as due all rentals and other charges prescribed in this lease; and

    c.    No default of Tenant then exists under the Lease.

Upon the failure of one or more of the above conditions, the Restriction on the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3.    Exceptions.  The following exceptions apply to the Restriction described above:

    a.    The Restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or subletting relating to leases which pre-date the date of this Lease.

    b.    The Restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

    c.    If a court of competent jurisdiction or governmental agency should determine the Restriction to be illegal or unenforceable, [or] if Landlord and Tenant should agree that the Restriction is illegal or unenforceable, the Restriction shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

    d.    If Landlord gives written notice to Tenant that a prospective tenant in violation of the Restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the Restriction shall automatically cease and shall thereafter be of no further force and effect unless Tenant, within ten (10) days after delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless for all liability, legal actions (including without limitation, court costs and attorney fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the Restriction.

    e.    The Restriction shall not apply to any land owned by Landlord, even if within the Shopping Center; and in this regard, Tenant is hereby advised to obtain a written confirmation as to what land is owned by Landlord, and not to rely on any verbal representations by the Agent or any other party.

(Final, Exhibit H, Cash Zone Lease, dated December 21, 2006)

Prohibited Uses:  None. (Final, Cash Zone Lease, dated December 21, 2006)


## D.    CENTURY NAILS (Loc Nguyen and Nuong Tran)

Exclusive Use:  None.  (Final, Century Nails Lease, dated August 8, 2006)

Prohibited Uses:  None.  (Final, Century Nails Lease, dated August 8, 2006)


## E.    CHINESE BUFFET (Zhao Y Li and Hui Liu)

Exclusive Use:  None.  (Final, Chinese Buffet Lease, dated July 25, 2007)

Prohibited Uses:  None.  (Final, Chinese Buffet Lease, dated July 25, 2007)

**F.    HABANEROS**

<u>Exclusive Use</u>:  During the Lease Term, Landlord shall not lease space in the Shopping Center to any tenant whose primary use, as set forth in such tenant's respective lease, is the same as Tenant's Primary Use as set forth in Section 1.09 hereof.  In the event that another tenant's primary use is not specifically identified as such in its respective lease, then its primary use shall mean a use from which said tenant derives more than fifty percent (50%) of its gross sales at the Shopping Center. The foregoing primary use protection provisions shall not apply to any existing tenant or occupant of the Shopping Center as of the mutual execution of the Lease.  *[Primary Use is defined in Section 1.09 as Mexican Breakfast and Lunch fast food Restaurant.]*.  **(Section 3.04, Final, Habaneros, dated October 1, 2008)**

<u>Prohibited Uses</u>:  None.  (Final, Habaneros, Lease, dated October 1, 2008)

**G.    INTEGRITY FINANCIAL SERVICES (Cary Stohmeyer)**

<u>Exclusive Use</u>:  None.  (Final, Integrity Financial Services Lease, dated July 1, 2008)

<u>Prohibited Uses</u>:  None.  (Final, Integrity Financial Services Lease, dated July 1, 2008)

**H.    MERLE NORMAN**

<u>Exclusive Use</u>:  None.  (Final, Merle Norman Lease, dated December 31, 1991)

<u>Prohibited Uses</u>:  None.  (Final, Merle Norman Lease, dated December 31, 1991)

**I.    MI FAMILIA**

<u>Exclusive Use</u>:  None.  (Final, Mi Familia Lease, dated March 4, 2006; First Amendment to Lease Agreement, dated June 28, 2006; Second Amendment to Standard Shopping Center Lease, dated January 1, 2009)

<u>Prohibited Uses</u>:  None.  (Final, Mi Familia Lease, dated March 4, 2006; First Amendment to Lease Agreement, dated June 28, 2006; Second Amendment to Standard Shopping Center Lease, dated January 1, 2009)

**J.    MR. JIM'S PIZZA (Pharty Phamily Enterprises)**

<u>Exclusive Use</u>:  None.  (Final, Mr. Jim's Pizza Lease, dated August 7, 2006)

<u>Prohibited Uses</u>:  None.  (Final, Mr. Jim's Pizza Lease, dated August 7, 2006)

**K.    QUIZNO'S (Joshua Dean)**

<u>Exclusive Use</u>:  Exclusive Restriction:  Throughout the lease term or any extension provided Tenant is not then in default of this lease beyond applicable cure periods, Landlord agrees that it shall not lease to Blimpie's, Subway, Schlotzsky's, Jason's Deli or any other restaurateur whose product line consists of sales of submarine, deli or rolled sandwiches, which is greater than 15% of their total revenue.  This shall not apply to any existing tenants currently leasing space in the shopping center as of the date of this lease.  (Final, <u>Section 1.1(s)</u>, Quizno's Lease, dated February 20, 2006)

<u>Prohibited Uses</u>:  None.  (Final, Quizno's Lease, dated February 20, 2006)

**L.    THE SHERWIN WILLIAMS COMPANY**

**Exclusive Use**: ...(ii) Lessor will not hereafter lease any space in the shopping center for principal use as a paint, wall covering or floor covering store; (iii) Lessor will not permit any tenant or occupant in the shopping center to operate principally as a paint, wall covering or floor covering store; and (iv) Lessor will not relet the demised premises to any subsequent tenant for principal use as a paint, wall covering or floor covering store for a period of six (6) months following termination of Sherwin-Williams' tenancy hereunder, which covenant shall survive such termination so as to protect goodwill developed by Sherwin-Williams at such location. **(Final, Article 27, The Sherwin Williams Company Lease, dated August 20, 1985; Lease Amendment Agreement dated April 13, 1996)**

**Prohibited Uses**: None. **(Final, The Sherwin Williams Company Lease, dated August 20, 1985; Lease Amendment Agreement dated April 13, 1996)**


**M.    UNITED CELLULAR/SPRINT**

**Exclusive Use**: None. **(Final, United Cellular/Sprint Lease, dated January 5, 2006)**

**Prohibited Uses**: None. **(Final, United Cellular/Sprint Lease, dated January 5, 2006)**


**N.    WATER BARREL**

**Exclusive Use**: None. **(Final, Water Barrel Lease, dated January 1, 2001; First Amendment to Lease Agreement, dated April 1, 2006)**

**Prohibited Uses**: None. **(Final, Water Barrel Lease, dated January 1, 2001; First Amendment to Lease Agreement, dated April 1, 2006)**

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ _____, 201__ is attached to and made a part of the Lease dated
(the "Lease") by and between LBUBS 2007-C2 GARFIELD STREET, LLC, a Texas limited
liability company ("Landlord"), and PNS STORES, INC., a California corporation, ("Tenant").

    Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    A.    Fixed Minimum Rent—Original Term (Section 5(A)):
        _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent--First Option (Section 5(A)):
        _____ annually; _____ per month.

4.    A.    Fixed Minimum Rent—Second Option (Section 5(A)):
        _____ annually; _____ per month.

EXHIBIT "H"

SHOPPING CENTER SIGN CRITERIA

A.  Type of Sign – Individual letters, each letter to be mounted on a raceway.  Signs must be lighted with internally illuminated formed neon.  All signs shall be controlled by a 24-hour time clock, and signs shall be illuminated from dusk until at least 12:00 midnight.  Tenant shall be solely responsible for maintenance and repairs to the sign.

B.  Size of Sign – Maximum letter size is 24"; minimum letter size is 12".  Multiple rows are not to exceed 28" total height including space.  Depth of lighted letters to be 5".  Overall length cannot exceed 75% of the length of the sign fascia between the columns under which Landlord has designated Tenant's sign is to be placed.

Example:  If space between columns under Tenant's designated sign area is 20', then a sign with a maximum overall length of 15' is allowed.

C.  Style, Colors and Materials – The style and colors of each individual sign must be submitted by Tenant to Landlord for Landlord's written approval as determined by Landlord's sole discretion. Sign approval submittals should offer details and specifics identifying sign style and colors.  All electrical wiring to be insulated in an 8"x8" raceway.

D.  Placement and Installation – Signs shall be centered height wise on the sign fascia and lengthwise on the sign fascia between the columns Landlord has designated as Tenant's sign area unless otherwise approved in writing by Landlord.  Transformers shall be placed in the raceway. Transformers must be ground fault.  All signs shall meet the requirements set by local sign codes and ordinances and be installed by a qualified and locally licensed sign company.  Final electrical hook-up to be performed by licensed electrician, approved and supervised by the Landlord. Landlord has final authority to approve satisfactory installation and disallow unsatisfactory installation and cause removal of poorly installed signs.

E.  Number of Signs & Logos – Generally speaking, one sign per lease space will be permitted on the shopping center fascia.  Logos shall be subject to Landlord's approval, at Landlord's sole discretion.

F.  Tenant shall, at all times, keep the sign face clean and in good working order.  The letter returns and trim cap shall be kept in good condition and replaced or repainted as needed.  The removal of signs and patching of mounting holes remaining in the sign fascia are the responsibility of the Tenant.

G.  Tenant may install its sign at any time after it is constructed following Landlord's approval, but under no circumstances shall sign be installed later than the date Tenant is open for business.

H.  Window and Door Signs – Permanent window signs are not permitted.  No exposed neon shall be permitted inside Tenant's space.  Permanent vinyl stick-on or painted door signs are optional and are permitted as follows:

A.  Business name
1.  Size: 2" maximum height
2.  Style:  Helvetica or Tenant's logo letter style
3.  Color: White
4.  Location: Bottom of letters shall be 54" – 60" above bottom of  door, centered in width of door.

B.  Hours of Operation
1.  Size: 1" maximum height
2.  Style:  Helvetica or Tenant's logo letter style
3.  Color: White
4.  Location: Directly below business name, centered in width of door.

C.  Decals
Any decals shall be located on the front door or window near the door.

D.  Back Door Identification
1.  Size: 2" maximum height

2. Style:  Helvetica or Tenant's logo letter style
3. Color:  White (Vinyl stick-on letters only)
4. Location: Bottom of letters shall be 54" – 60" above bottom  of door, centered in width of door.
5. Other: Delivery hours may be added if desired and shall be  1" maximum height, placed directly below name,  centered in width of door.

I.  Tenant is responsible for damage to the Shopping Center as a result of fire caused by the sign. Tenant should have an understanding with the sign company that constructed the sign about any damage done as a result of such an incident.

J.  Important – Two (2) sets of drawings showing the complete sign with dimensions and details shall be submitted for approval to Landlord in care of:

The Woodmont Company
   2100 West 7th Street
Fort Worth, TX  76107
     817.732.4000
817.735.4738 (fax)

Drawings may be faxed for preliminary review, but original drawings must be  submitted for final approval.
Purpose -- Our purpose in providing Tenants with these required specifications is to create a good business image of quality and professionalism.

EXHIBIT I
EXISTING LEASES

A. 7 DAY DONUTS

B. BURKE'S OUTLET

C. CASH ZONE

D. CENTURY NAILS (Loc Nguyen and Nuong Tran)

E. CHINESE BUFFET (Zhao Y Li and Hui Liu)

F. HABANEROS

G. INTEGRITY FINANCIAL SERVICES (Cary Stohmeyer)

H. MERLE NORMAN

I. MI FAMILIA

J. MR. JIM'S PIZZA (Pharty Phamily Enterprises)

K. QUIZNO'S (Joshua Dean)

L. THE SHERWIN WILLIAMS COMPANY

M. UNITED CELLULAR/SPRINT

N. WATER BARREL

**EXHIBIT J**

**SHOPPING CENTER**

**RULES AND REGULATIONS**

1. Tenant shall not leave, place or dispose of any refuse, garbage or thing outside the Leased/Demised Premises Or elsewhere in the Shopping Center other than garbage or refuse in containers or receptacles expressly designated by Landlord for that purpose as and where so designated.

2. Receiving, shipping, loading and unloading by Tenant shall not be done through the front door of the Leased/Demised Premises, but shall at all times be done through the loading dock area at the rear of the Leased/Demised Premises.

3. Tenant shall not conduct, advertise, or suffer the occurrence of any auction sale, bankruptcy sale, going out of business sale, distress sale or the like at the Leased/Demised Premises or the Shopping Center. 4. Tenant shall keep the Leased/Demised Premises clean and free of refuse at all times.

5. Tenant shall comply with all applicable laws and governmental authorities regarding Sunday openings as said laws may from time to time appear and/or be amended.

6. Tenant shall keep and maintain temperatures at the Leased/Demised Premises sufficiently high to prevent freezing of or interference of any flow in pipes in, at and about the Leased/Demised Premises.

7. Tenant shall not use any sound device which shall reasonably be deemed objectionable to Landlord or other tenants, including but not limited to loud speakers, microphones, transmitters, amplifiers of phonographs.

8. Tenant shall not burn any trash or garbage of any kind in or about the Leased/Demised Premises or the Shopping Center.

9. Tenant shall comply with all reasonable parking rules and regulations promulgated from time to time by Landlord.

EXHIBIT K
TITLE EXCEPTIONS

I. Right of Way Easement dated February 13, 1961, to Texas Power & Light Company from Ted Heffley and Ina Heffley, recorded in Volume 379, Page 266, Deed Records of Erath County, Texas.

II. Right of Way Easement executed by Stephenville Shopping Center, Ltd., to the City of Stephenville, dated August 2, 1967, recorded in Volume 416, Page 500, Deed Records of Erath County, Texas.

III. Terms, conditions and stipulations of Boundary Line Agreement by and between, Paralee Gilley Jones, and Basic, Inc. dated August 8, 1997, filed for record with the County Clerk of Erath County, Texas, on August 22, 1997, recorded in Volume 938, Page 598, Real Records of Erath County, Texas, under Clerk's File No. 974673, and as shown on Replat of Lot 36, Block 139, City of Stephenville, Erath County, Texas, prepared by Conner Stevens, Registered Professional Land Surveyor, dated March 24, 2006, recorded in Cabinet B, Slide 36A, Plat Records of Erath County, Texas.

## ACCEPTANCE OF PREMISES

Whereas, <u>LBUBS 2007-C2 GARFIELD STREET, LLC</u> ("Landlord") and <u>PNS Stores, Inc. dba</u> <u>Big Lots</u> ("Tenant") entered into a Lease Agreement dated <u>May 2, 2011</u> ("Lease") for the premises located at <u>2133 W WASHINGTON STREET, STEPHENVILLE, TX 76401</u> ("Premises").

Whereas, Landlord wishes to confirm the date that the premises are tendered by Landlord to Tenant pursuant to Section 1 B (2):

1. Landlord has completed all required work referenced as "Landlord's Work" pursuant to the Lease and Exhibit C of the Lease.
2. Tenant has inspected all items covered under the Landlord's warranty and found them to meet the standards specified in Exhibit C of the Lease.
3. Tenant acknowledges and agrees, pursuant to the Lease, that it will not commence any construction in or to the Premises until it has provided Landlord with acceptable proof of insurance for itself and its general contractor. It is also expressly *agreed* and understood that pursuant to the Lease, Tenant will not commence any construction in or to the Premises until it has submitted sufficient construction plans to Landlord and has received written approval of said plans by Landlord. Tenant must also provide Landlord with a copy of its construction permit and install a water sub-meter device if one is not currently present.

Now, therefore, Tenant has taken possession of the above referenced premises as of June 28, 2011 (date).

Except as amended and defined above, the Lease and all of its terms and conditions shall remain in full force and effect.

AGREED AND ACCEPTED this ____5____ day of July, 2011.

TENANT:
*PNS Stores, Inc. dba Big Lots*

By: _____
        SIGNATURE

Name: JEFFREY L. ELAM
          PRINTED NAME

Title: WEST COAST CONST. MGR.

Date: 7/5/11

# TABLE OF CONTENTS

**Section**

1. Definitions
   - A. Common Areas
   - B. Dates
   - C. Exhibits
   - D. Demised Premises
   - E. Shopping Center
   - F. Gross Sales

2. Demise

3. Term
   - A. Original Term
   - B. Option to Extend Term

4. Use and Operation

5. Rent
   - A. Fixed Minimum Rent
   - B. Utilities Charge and Exterior Lighting
   - C. Intentionally Deleted
   - D. Common Area Charges and Cap
   - E. Real Estate Taxes
   - F. Construction Allowance
   - G. Incentive Rent Abatement

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    - A. Tenant
    - B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

1

23.    Surrender and Holdover

24.    Notices

25.    Legality

26.    Binding Obligations

27.    No Recordation

28.    Real Estate Broker's Commission

29.    No Waiver, Laches or Accord and Satisfaction

30.    Hazardous Materials

31.    Titles and Entire Agreement

32.    Waiver of Claims

33.    Reasonable Consent

34.    Co-Tenancy

35.    No Presumption against Drafter

36.    Submission of Lease

37.    Interlineation

38.    Time of the Essence

39.    Tenant's Audit Rights

40.    Attorney Fees

41.    Waiver of Jury Trial

42.    Anti-Terrorism Provisions

43.    Limitation on Landlord's Liability

44.    Sale of Premises By Landlord



300 PHILLIPI ROAD<br>
COLUMBUS, OHIO  43228-5311

August 19, 2016

**VIA FEDERAL EXPRESS DELIVERY**

P.D. STEPHENVILLE RETAIL, LP
C/O BARNETT INTERESTS, INC.
5700 LEGACY DR
SUITE 10
PLANO, TX 75024

         Re:         Stephenville, TX
Lease Agreement by and between P.D. Stephenville Retail, LLC, a Texas limited liability company, successor in interest to LBUBS 2007-C2 GARFIELD STREET, LLC, a Texas limited liability company ("Landlord") and PNS Stores, Inc., a California corporation, doing business as Big Lots ("Tenant") dated May 2, 2011, as amended (collectively, the "Lease")

Dear Landlord:

Pursuant to the Lease, Tenant hereby exercises its option to extend the term of the Lease commencing February 1, 2017, and expiring January 31, 2022 (the "First Option Term").  Fixed Minimum Rent shall be in the amount of One Hundred Twenty Seven Thousand Seven Hundred Fifty Five and 00/100 Dollars ($127,755.00) per annum which shall be paid in equal monthly installments in advance of the first day of each month in the amount of Ten Thousand Six Hundred Forty Six and 25/100 Dollars ($10,646.25). Thank you.

**PNS STORES, INC., a California corporation**

Timothy A. Johnson
Executive Vice President,
Chief Administrative Officer &
Chief Financial Officer



TAJ/clr

DocuSign Envelope ID: 88ACF1F9-A430-4EE6-9F50-06D26FD3399C

## FIRST EXTENSION AND MODIFICATION OF LEASE AGREEMENT

**THIS FIRST EXTENSION AND MODIFICATION OF LEASE AGREEMENT**, made and entered into as of the **3rd** day of **June**       , 2021 (this "Agreement") by and between **University Plaza Stephenville LLC, an Ohio limited liability company**, successor-in-interest to Carnegie Properties, Inc., successor-in-interest to P.D. Stephenville Retail, LP ("Landlord"), whose mailing address is c/o Carnegie Companies, Inc., 6190 Cochran Road, Suite A, Solon, Ohio 44139, and **PNS Stores, Inc., a California corporation**, doing business as Big Lots of the City of Columbus, County of Franklin, and State of Ohio ("Tenant"), whose mailing address is 4900 E. Dublin Granville Road, Columbus OH 43081.

### WITNESSETH

WHEREAS, Landlord and Tenant are parties to a Lease Agreement dated May 2, 2011, as amended (the "Lease"), for approximately 25,050 square feet of retail space (the "Demised Premises") located at University Plaza, 2133 W. Washington Street, Stephenville, TX 76401 ("Shopping Center"), as more particularly described in the Lease;

WHEREAS, Landlord and Tenant desire to extend the current term of the Lease for three (3) years as provided for herein below; and

WHEREAS, Landlord and Tenant mutually desire to modify the Lease in order to grant Tenant's consent for a coffee shop kiosk and a use that is considered a Prohibited Use under the Lease, as provided for herein below.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby amend the Lease as follows:

1. Upon the Effective Date, the Term of the Lease is hereby extended from February 1, 2022 and expiring on January 31, 2025 (the "Extended Term"), upon the same terms and conditions as contained in the Lease, except as provided herein. In addition, from and after the Effective Date, all references to the term "Term" or "Lease Term" contained in the Lease shall be deemed to mean the term of the Lease as extended by the Extended Term.

2. Effective and commencing February 1, 2022 (the "Effective Date") and continuing throughout the Extended Term, Tenant shall continue to pay Fixed Minimum Rent at the rate of Five and 10/100 Dollars ($5.10) per square foot, in the amount of One Hundred Twenty-Seven Thousand Seven Hundred Fifty-Five and 00/100 Dollars ($127,755.00) per annum, payable in monthly installments of Ten Thousand Six Hundred Forty-Six and 25/100 Dollars ($10,646.25).

3. Tenant shall retain its remaining five (5) year option to extend the Term of the Lease pursuant to the terms specified therein.

4. Tenant hereby consents to Landlord leasing at the Shopping Center the "vacant" unit consisting of 6,319 square feet shown hatched on the Exhibit A attached hereto and made a part hereof, for a medical or health-oriented facility. Except as hereinabove set forth, Tenant's grant of this consent shall be for this request only, and shall not be interpreted as a consent of any other covenant or condition in the Lease and shall not be considered a general consent of any of the other Prohibited Uses referred to under the Lease, nor shall Tenant be obligated to grant any additional consent of any of the other Prohibited Uses in the future.

1

DocuSign Envelope ID: 88ACF1F9-A430-4EE6-9F50-06D26FD3399C

5. Tenant hereby consents to Landlord using 550 square feet within the "No Change Area," as such is referenced in the Lease, to erect a kiosk for the operation of Scooter's Coffee in the parking lot location shown hatched on the Exhibit A attached hereto and made a part hereof. Except as hereinabove set forth, Tenant's grant of this consent shall be for this alteration in the No Change Area only and shall not be interpreted as a consent of any other covenant or condition in the Lease and shall not be considered a general consent of any other alterations within the No Change Area. Landlord shall not make any other alterations to the No Change Area without the consent of Tenant.

Except as herein modified, all other terms, conditions, covenants, agreements, and capitalized terms of the Lease are hereby incorporated herein by reference and shall control and govern. Unless otherwise defined herein, all capitalized terms shall have the same meaning as defined in the Lease.

In the event there is a conflict between the terms and provisions of this Agreement and the original Lease or any subsequent extension and/or modification agreement prior to the date of this Agreement, the terms and provisions of this Agreement shall control.

This Agreement shall bind and inure to the benefit of the successors and assigns of Landlord and the successors and assigns of Tenant.

Landlord and Tenant each represent and warrant to the other that the individual executing this Agreement on its behalf is duly authorized to so execute and deliver this Agreement.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

The submission by Tenant to Landlord of this Agreement shall have no binding force or effect, shall not constitute an option for leasing, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Agreement by facsimile machine or other means of electronic transfer (such as email), the signing party intends the copy of this authorized signature printed by the receiving facsimile machine or other means of electronic transfer to be its original signature.

**(signature blocks appear on the following page)**

DocuSign Envelope ID: 88ACF1F9-A430-4EE6-9F50-06D26FD3399C

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed as of the date first written above.

WITNESSES:

LANDLORD:

UNIVERSITY PLAZA
STEPHENVILLE, LLC,
an Ohio limited liability company
by Carnegie Companies, LLC, member
an Ohio limited liability company

By: Peter Meisel
Its:   Manager

UNIVERSITY PLAZA
STEPHENSVILLE LLC,
an Ohio limited liability company
by Carnegie Properties, Inc., member
an Ohio corporation

By:   Peter Meisel
Its:   President

WITNESSES:

TENANT:

PNS STORES, INC.,
a California corporation

Jonathan Ramsden

By: Jonathan Ramsden
Its:  Executive Vice President
       Chief Administrative Officer and
       Chief Financial Officer

DocuSign Envelope ID: 88ACF1F9-A430-4EE6-9F50-06D26FD3399C

**EXHIBIT A**



DocuSign Envelope ID: 9C92DC2E-C01B-4FE2-8023-8CED2840C629



4900 EAST DUBLIN GRANVILLE ROAD
COLUMBUS, OHIO  43081-7651

January 18, 2022

**VIA FEDEX**

University Plaza Stephenville, LLC
6190 Cochran Rd.
Suite A
Solon, OH 44139

      Re:    **BIG LOTS**   **- Stephenville, TX**
                Lease Agreement by and between University Plaza Stephenville, LLC., an Ohio limited liability
                company (Landlord), and PNS Stores, Inc., a California corporation, ("Tenant") dated May 2,
                2011 (the "Lease").

Dear Landlord:

Pursuant to your request, Tenant hereby waives the prohibited use provision in Section 4(B) of the Lease and grants consent to Landlord's to lease certain space highlighted on the attached Exhibit A in the University Plaza Shopping Center to a liquor store, subject to the following conditions:

    1)  Tenant consents for this request only;

    2)  Such space shall not exceed the area shown on Exhibit A which is for approximately 6,159 square
         feet attached hereto and made a part hereof (the "Shopping Center Site Plan);

It is understood and agreed that this waiver and consent shall apply only to the space identified on Exhibit A and for the identified square footage as set forth herein. The Prohibited Use provision set forth in Section 4(B) of the Lease shall not be deemed waived or modified in any way except as provided herein. Further, Tenant's grant of this consent shall not be interpreted as a waiver of any other covenant or condition in the Lease, shall not be considered a general waiver of its exclusive, nor shall Tenant be obligated to grant any additional waiver of its exclusive in the future.

Thank you.

**PNS Stores, Inc., a California corporation**
**California**

 

By: *Jonathan E. Ramsden*
      FF2E81820630412
Name:  Jonathan Ramsden
Its:     Executive Vice President
         Chief Financial & Administrative Officer

**University Plaza Stephenville, LLC., an Ohio**
**limited liability company**
**By Carnegie Properties, Inc., member**

 

By: _____
Name:  Peter Meisel
Its:     President

DocuSign Envelope ID: 9C92DC2E-C01B-4FE2-8023-8CED2840C629

JR/smm

Exhibit A

