## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **BIG LOTS, INC.,** *et al.,* | **Case No. 24-11967 (JKS)** |
| **Debtors.1** | **(Jointly Administered)** |
| | **Hearing Date: august 3, 2025 @ 10:00 am** |

## REPLY TO DEBTOR'S OBJECTION TO
## PROOF OF CLAIM OF LIPP CDS, INC.

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT JUDGE:

Lipp CDS Inc., a creditor in this case, files its Reply to the Objection of Big

Lots, Inc. to the Proof of Claim of Lipp CDS, Inc. filed on July 5, 2025, and as

grounds therefore will show the Court the following.

### I.    BACKGROUND

Lipp CDS Inc. is a California licensed real estate broker, whose license

at all times relevant to the claims, was active and in good standing in the State of

California. Lipp CDS Inc. entered into a written agreement with the Debtor, Big

Lots Stores—PNS, LLC on February 3, 2023. That agreement, referred as the

Client Registration and Commission Agreement, is attached to the Declaration of

Deron Conway. Exhibit B(i) and B(ii). Lipp CDS Inc. procured the Property in

question, described as 6351 Westminster Blvd. Westminster, California 92683. The

Property was eventually sold to the Buyer identified in the original Purchase and

Sale Agreement, 6351 Westminster Blvd, LLC. (Exhibit B(iii) and B(iv)). The sale,

however, did not close until January 31, 2025, after this bankruptcy case was filed.

(Exhibit B(vi). Lipp CDS Inc. never received notice of the bankruptcy filing;

however, on June 25, 2025, the Court approved a stipulation allowing Lipp CDS,

Inc. to file its Proof of Claim after the Claims Bar deadline. On July 8, 2025, Lipp

CDS, Inc. filed its Proof of Claim and supporting documentation. On July 22,

2025, the Debtor Big Lots, Inc. filed its Objection to the Proof of Claim.

      On November 27, 2024, a Motion to Approve the Sale of the Property at

6351 Westminster Blvd. Westminster, California, was filed by the Debtor. (DOC

1262). In the Motion to Approve the Sale, a Purchase and Sale Agreement was

attached to the Motion. The Purchase and Sale Agreement, approved by the Court,

is attached as Exhibit B(iv).

      In the Purchase and Sale Agreement attached to the Motion, certain

warranties were made at Paragraph 10.3, specifically, that neither the Debtor, nor

the Buyer were aware of the existence of any brokers. That statement is false. An

authorized representative of Big Lots, Inc. executed the Client Registration and

Commission Agreement attached to the Declaration of Deron Conway, Exhibit B(i)

and B(ii), evidencing the Debtor's actual knowledge of and agreement to the Client

Registration and Commission Agreement. The Purchase and Sale Agreement dated

February 2, 2023, Exhibit B(iii), is identical in all respects to the Purchase and Sale Agreement presented to this Court: the terms of the sale, the parties, and the real estate to be sold are all identical. Exhibit B(iv). The only exception is that the original Purchase and Sale Agreement between the Debtor and the Buyer acknowledges that a broker was involved and that broker was identified as Lipp CDS Inc. See Exhibit B(iii), Purchase and Sale Agreement, Sec. 10.3 BROKERS.

Lipp CDS Inc. was not a party to the prior litigation between the Debtor/Seller and the Buyer. No determination was ever made in that litigation of the validity of the Client Registration and Commission Agreement. The Commission Agreement is an independent agreement and is valid and not contingent on performance under the original Purchase and Sale Agreement. There is nothing in either the original Purchase and Sale Agreement or the Client Registration and Commission Agreement that states that either agreement is dependent on the other. The Client Registration and Commission Agreement is not governed by Ohio law, it is governed by California law, as the Property lies in California and the Broker has a California broker's license. In addition, the Client Registration and Commission Agreement was executed in California. *In re Fresh - G Restaurant Intermediate Holdings LLC,* 580 B.R. 103 (Bankr. D. Del. 2017).

## II.    LEGAL ANALYSIS

### A. THE DEBTOR FAILED TO GIVE LIPP CDS, INC. NOTICE OF THE MOTION AUTHORIZING ASSUMPTION AND PERFORMANCE UNDER THE PURCHASE AGREEMENT

The Debtor argues that Lipp CDS, Inc. could have opposed the Motion Authorizing Assumption and Performance Under the Purchase Agreement (Doc. 1262) or appealed the Court's ruling approving the sale free and clear of all liens, and since it did not, it waived its right to object to the Order of Sale. The law is clear that when Lipp CDS, Inc. did not receive Notice of the Motion, that the Debtor deprived it of the opportunity both to object and to appeal the ruling. The Order Authorizing Assumption and Approval of the Sale is void and unenforceable against Lipp CDS, Inc. as it was obtained without providing Lipp CDS Inc. with notice. *In re Prime Core Technologies Inc.* 2025 Bankr. LEXIS 1698 (Bankr. D. Del. 2025).

The Debtor offers no evidence demonstrating that Lipp CDS, Inc. had either actual or constructive notice of the bankruptcy at the time the Motion was filed on November 27, 2024, or when it was heard, or when the Order was entered on December 20, 2024. The Debtor likewise, fails to show that Lipp CDS, Inc. had actual notice of the Motion Authorizing Assumption and Approval of the Sale. It is undisputed, and the Court can take judicial notice of the fact that the Debtor's Proof of Service for the Motion nowhere lists Lipp CDS, Inc. The Debtor is

required to give known creditors notice of the bankruptcy filing. A known creditor is a creditor whose identity is known or reasonably ascertainable by the Debtor. A creditor's identity is "reasonably ascertainable" if that creditor can be identified through reasonably diligent efforts and focuses on the debtor's own books and records, *Chemetron Corp. v. Jones, 72 F. 3d 341 (3d Cir. 1995)*. The Big Lots Store #4107 in Westminster, California, was part of the Debtor's books and records, and the Buyer did not materialize out of nowhere. In addition, it was indisputably signed by Jonathan Ramsden, the Executive Vice President, Chief Financial and Accounting Officer of Big Lots Stores—PNS, LLC, on February 3, 2023. (Exhibit B(ii)).

The Debtor's Motion for Assumption and Approval of the Sale, makes materially false representations, specifically that there are no broker or commission claims. Had Lipp CDS, Inc. been notified of the Motion, it could have objected, but it is undisputed that it had no such notice.

The Court cannot deny the claim of Lipp CDS, Inc. based on waiver, since not only did the Debtor's obligation to give notice of the motion to Lipp CDS, Inc. fail, but the Order entered is based on materially false statements by the Debtor, that are not supported by any evidence. See DOC. 1262—3 at page 15. *EBCO Construction Group LLC v. Garretson (In re Garretson)* 377. B. R. 214 (Bankruptcy E.D. Ark. 2007). It is undisputed that the Debtor signed the Client

Registration and Commission Agreement, and it is undisputed that the Jonathan

Ramsden, the EVP that signed the Client Registration and Commission Agreement,

had authority to sign it to bind the Debtor, and Jonathan Ramsden is the same

person that signed the Purchase Agreement presented to this Court. DOC 1262—3,

p.20.

### B. THE EXPIRATION OF THE COMMISSION AGREEMENT HAS NO BEARING ON LIPP CDS, INC. ENTITLEMENT TO A COMMISSION

The licensing of real estate agents and brokers is a matter of State law, as are

most matters dealing with the regulation of professionals.  There is no dispute that

Lipp CDS, Inc. was a licensed California real estate broker, and there is no dispute

that it therefore had the ability to represent the Seller in this transaction.  In fact,

the Seller was not entitled to bring in an out of State broker, as the real estate was

in California; it had no choice but to use Lipp CDS, Inc.  The Client Registration

and Commission Agreement is governed by California law.  *In re Fleming*

*Companies, Inc.* 347 B. R. 163, 168 (Bankr. D. Del. 2006) (California law governs

as the place where the services were performed and where the real estate exists).

The expiration of the commission agreement is irrelevant to the payment of

a commission under California law, as it is irrelevant when the sale actually closed.

Under California law, the key date is when the property was listed and the

commission agreement signed.  The closing of the sale after the expiration of the

6

Client Registration and Commission Agreement has no effect on the payment of

the commission under California law, as the sale was procured while the Client

Registration and Commission Agreement was in effect. *Baker v. Curtis* (1951) 105

Cal App. 2d 663, 669-70; *Matthews v. Starritt* (1967) 252 Cal App. 2d 884.

### C. LIPP CDS, INC. WAS NOT A PARTY TO THE LITIGATION BETWEEN THE DEBTOR AND 6351 WESTMINSTER BLVD LLC

The litigation between the Debtor and the Buyer has no impact on and, in

fact, had no effect on the Client Registration and Commission Agreement. First,

Lipp CDS, Inc. was not a party to the litigation. *In re JAB Energy Solutions II,*

*LLC* 655 B.R. 76 (Bankruptcy Del. 2023) (one is not bound by a judgment in

litigation in which he has not been made a party). Second, the Client Registration

and Commission Agreement is not part of, nor is it dependent on, the original

Purchase Agreement. Neither the original Purchase Agreement, nor the

Commission Agreement makes reference to the other. The Court cannot assume

these agreements were dependent, and must assume they were independent. Third,

there is no mention of the Commission Agreement in the Court's final ruling in the

litigation between the Debtor and the Buyer. This Court cannot assume a ruling or

finding that was never made.

It should be noted at this point, that the Buyer's portion of the Commission,

i.e. $120,000, was apparently resolved in connection with the litigation between

the Debtor and the Buyer 6351 Westminster Blvd. LLC. (Exhibit B(v)). Lipp CDS, Inc. makes no claim for that portion of the commission, only the net commission that it was indisputably entitled to. Any resolution between the Debtor and the Buyer had no impact on the Commission due to Lipp CDS, Inc., which is $60,000 plus interest.

## D. BENEFIT TO THE ESTATE

It is undisputed that Big Lots, the Debtor, had to sell a number of the real estate parcels it owned in order to successfully re-organize. There is no question that Lipp CDS, Inc. procured the sale; there is no question that the sale to 6351 Westminster Blvd. LLC was the Buyer procured by Lipp CDS, Inc. There is no question but that the sale was instrumental to a successful reorganization. The real estate at 6351 Westminster Blvd. in Westminster California, also known as big Lots Store #4107 was property of this Estate and there is no question the closing occurred post-petition, on January 31, 2025. There is no question the Estate received $6.1 million at the closing and that the net proceeds went to the Estate.

> "…the Court concludes that the correct standard for determination of an administrative claim under [11 U.S.C. §503(b)(1)(A)] is simply whether [Creditor] provided a benefit to the estate post-petition. It does not require that there be a post-petition contract…"

*In re Bluestem Brands, Inc.* 2021 Bankr. LEXIS 1980; 70 Bankr. Ct. Dec. 145 (Bankr. Del. 2021).

It is disingenuous of the Debtor to argue that they did not employ Lipp CDS, Inc. in connection with the sale. The Client Registration and Commission Agreement was fully executed by the Debtor and Lipp CDS, Inc. The property in question and the Buyer was procured by Lipp CDS, Inc. The Buyer was willing and able to, and did close the deal, which resulted in a $6.1 million benefit to this Estate.

## III.    APPEARANCE OF COUNSEL

The undersigned attorney has not been admitted to the bar of this Court; however, this Reply falls within the description of claims litigation as set out in Local Rule 9010—1(e)(3), which indicates that *pro hac* admission is not required to prosecute a proof of claim or a response to the claim. As set forth in the attached Declaration, Counsel has been admitted to and is active and in good standing in the U.S. Bankruptcy Court for the Central District of California, for the U.S. Bankruptcy Court for the Northern District of Texas, and the U.S. Bankruptcy Court for the Southern District of Ohio. See Doc 2808—5.

## IV.    CONCLUSION

Lipp CDS, Inc. a Creditor in this case, requests the Court to overrule The Objection of the Debtor to the claim of Lipp CDS, Inc. and to approve it as a priority administrative claim.

RESPECTFULLY SUBMITTED,

**SUSAN BARILICH, P.C.**

By: Susan Barilich, Esq.
Attorney for Lipp CDS Inc.

### Exhibit A

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:                                    Chapter 11

                                          Case No. 24-11967 (JKS)

BIG LOTS, INC., ET AL.                    (Jointly Administered)

                    Debtors

                                          Hearing Date:  August 13, 2025 @ 10:00am


## [PROPOSED] ORDER

On July 8, 2025 Lipp CDS Inc., a Creditor in this case, filed its Proof of Claim.  On July 22, 2025, the Debtor filed its Objection to the Proof of Claim of Lipp CDS, Inc.  On August 5, 2025, Lipp CDS, Inc. filed its Reply to the Debtor's Objection. After considering the Proof of Claim, the Debtor's Objection, and the Creditor's Reply,  the Court enters the following Order:

IT IS HEREBY ORDERED:

The Debtor's Objection is overruled.   The Claim of Lipp CDS, Inc. is allowed as an administrative expense of this Estate.

#  #  #  #

## Exhibit B

### Attachments

i.    **Declaration of Deron Conway**

ii.   **Client Registration and Commission Agreement**

iii.  **Purchase Agreement 2-2-2023**

iv.   **Order Authorizing and Approving The Debtors Assumption of and Performance Under the Purchase Agreement November 27, 2024**

v.    **Commission Agreement: Lipp CDS, Inc. and Back Bay Realty 3-3-2023**

vi.   **Closing Statement; January 31, 2025**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

In re:

BIG LOTS, INC., et al.

Debtors

Case No.: 24-11967 (JKS)

Chapter 11

Judge: Hon. J. Kate Sickle

## DECLARATION OF DERON CONWAY

I, Deron Conway, declare as follows:

1.   I am one of the Creditors in this case. I am aware of the facts stated herein of my own knowledge and if called to testify, I could and would competently so testify.

2.   I am a licensed real estate Salesperson in the State of California. My license is active and in good standing and has been at all times relevant to the matters in issue here.

3.   I am familiar with the Property known as 6351 Westminster Blvd. Westminster, California 92683. I was the procuring cause of the sale of that Property, which was owned and sold by Big Lots Stores—PNC, LLC, to the Buyer, 6351 Westminster Blvd. LLC.

4.   Attached to my Declaration is a true and correct copy of the Client Registration and Commission Agreement dated February 3, 2023, between Lipp CDS Inc. and Big Lots Stores—PNS, LLC. Lipp CDS Inc. is the brokerage that I worked with at the time.

1

**Signature:** *Deron Conway*
Deron Conway (Aug 4, 2025 20:11:52 GMT-1)

**Email:**  deron@roicre.com

5.    Attached to my Declaration is a true and correct copy of the Purchase Agreement between Big Lots Stores—PNS, LLC, a California limited liability company and 6351 Westminster Blvd. LLC, the effective date of the Agreement being February 2, 2023.

6.    Attached to my Declaration is a true and correct copy of the Commission Agreement between Lipp CDS, Inc. and Back Bay Realty concerning 6351 Westminster Blvd. Westminster California 92683, in which Back Bay Realty was to be assigned $120,000.  Andrew Fielder, and David Lipp were the managing partners of  6351 Westminster Blvd. LLC, and the principals of Back Bay Realty.

7.    Attached to my Declaration is a true and correct copy of the Closing Statement dated January 31, 2025, for the property at 6351 Westminster Blvd.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on the __4__ day of __August__ , 2025, at Los Angeles, California.

Deron Conway
Deron Conway

2

DECLARATION OF DERON CONWAY

# Pleading Wizard

**Final Audit Report** 2025-08-04

| | |
|---|---|
| Created: | 2025-08-04 |
| By: | Susan Barlich (susan@barilichlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAADPZ1LyxcSTNnMlBtqslahgrK0Ge0u2i_ |

## "Pleading Wizard" History

Document created by Susan Barlich (susan@barilichlaw.com)
2025-08-04 - 8:06:35 PM GMT

Document emailed to Deron Conway (deron@roicre.com) for signature
2025-08-04 - 8:06:39 PM GMT

Email viewed by Deron Conway (deron@roicre.com)
2025-08-04 - 8:09:02 PM GMT

Document e-signed by Deron Conway (deron@roicre.com)
Signature Date: 2025-08-04 - 8:11:24 PM GMT - Time Source: server

Agreement completed.
2025-08-04 - 8:11:24 PM GMT

**Adobe Acrobat Sign**

DocuSign Envelope ID: AF85790E-0D60-45FC-A03C-69AFA9BBA62B

***Broker: Lipp CDS Inc.***
***Agent: Deron M. Conway***
***California Salesperson #00997963***

## CLIENT REGISTRATION AND COMMISSION AGREEMENT

The purpose of this Agreement is to set forth a mutual understanding between **Lipp CDS, Inc.** ("**Broker**") and Big Lots Stores – PNS, LLC ("**Seller**") or assignee with regards to the payment of a commission to Broker for broker services rendered, if a sale is consummated between the below listed client of Broker and Seller, for the real property located at:

**Big Lots Store # 4107**
**6351 Westminster Blvd.**
**Westminster, CA 92683**

This Agreement is regarding the below listed Client and/or their Assignees:

**BBIG Holdings, LLC**

In the event that escrow closes between Client (which term shall include any assignee, nominee, affiliate or successor to the party first identified as the Client) and Seller (which term shall include any assignee, nominee, affiliate, representative or successor to the party first identified as the Seller), Seller agrees to pay a fee for service to Broker in an amount equal to One Hundred Eighty Thousand Dollars ($180,000.00). Said fee shall be due and payable to Broker upon close of escrow and paid by the title company from the proceeds of the sale.

In the event that all or any portion of the fee is not paid within seven (7) days of the close of escrow, interest shall accrue thereon from the due date until paid at the rate of five (5) % per annum. In the event of any dispute or breach under the terms hereof, the prevailing party shall be entitled to recover its costs and reasonable attorney's fees incurred in enforcing its rights hereunder.

**The undersigned warrant that they're an officer of Seller and have the authority to execute this Agreement. The terms, provisions, covenants, and conditions contained in this agreement shall apply to, bind and inure to the benefit of the successors and assigns of Broker and Big Lots Stores – PNS, LLC ("Seller").**



9121 W Russell Rd Suite 111 | Las Vegas, NV 89148
(P) 702.363.3100 | (F) 702.363.0450 | www.roicre.com

DocuSign Envelope ID: AF85790E-0D60-45FC-A03C-69AFA9BBA62B

**Disclosure of Agency:**

Pursuant to California Real Estate Division rules, it is disclosed and understood that Broker represents the Client (Buyer) in this transaction and is accepting compensation from the Seller who is representing itself.

This Agreement shall expire on February 1, 2024.

Receipt of copy of this Agreement is hereby acknowledged.

AGREED this ____3____ day of February 2023

Lipp CDS, Inc.                                    Big Lots Stores—PNS, LLC ("Seller")

_Laurence D Lipp_                                _Jonathan Ramsden_

BY: Larry Lipp                                   BY: Jonathan Ramsden

ITS: Broker                                      ITS: EVP, CF&AO

_Deron Conway_

BY: Deron Conway

ITS: Agent/Salesperson

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made by and among Big        Lots Stores – PNS, LLC, a California limited liability company, successor-by-conversion from PNS Stores, Inc. ( the "Seller"), and 6351 WESTMINSTER BLVD, LLC a Wyoming limited liability company ("Buyer"). The Effective Date of this Agreement shall be February 02, 2023 ("Effective Date").

SECTION 1 - THE PROPERTY.

        1.1 - Agreement. Seller is the owner of the real property consisting of the property currently operating as a Big Lots Store located at the address commonly known as 6351 Westminster Blvd, Westminster, CA 92683 as more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all improvements located thereon (the "Real Property). Seller is also the owner or holder of certain appurtenant easements, rights, permits, entitlements, privileges and other intangible property relating to the Real Property (the "Intangibles"). The Real Property and Intangibles are all sometimes referred to collectively as (the "Property"). On the terms and conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Property.

SECTION 2 - PURCHASE PRICE. Buyer agrees to pay Seller, as the purchase price for the Property, the sum of Six Million Eight Hundred Thousand and 00/100 Dollars ($6,800,000) (the "Purchase Price"). The Purchase Price shall be paid as follows:

    (a)    Within three (3) business days following the Effective Date of this Agreement, Buyer shall deposit the sum of Two Hundred Thousand and 00/100 Dollars ($200,000.00) with the Title Company (as hereinafter defined) in escrow as an earnest money deposit (the "Earnest Deposit"). The Earnest Deposit shall be nonrefundable to Buyer upon the expiration of the Due Diligence Period (as hereinafter defined) except as otherwise expressly provided in this Agreement, but shall be applicable to the Purchase Price at Closing (as hereinafter defined).

    (b)    Buyer shall deliver to the Escrow Agent (as hereinafter defined) the Purchase Price, less the Earnest Deposit and the credits authorized to Buyer, in immediately available funds, on or prior to the Closing Date (as hereinafter defined).

    (c)    Concurrently with depositing the Earnest Deposit with Escrow Holder, Buyer shall deposit, for immediate release to Seller, the sum of $100.00 (the "Independent Consideration") as consideration for Buyer's right to purchase the Property and for Seller's execution, delivery and performance of this Agreement. The Independent Consideration (i) is in addition to and independent of any other consideration or payment provided for in this Agreement, (ii) is non-refundable and (iii) shall be retained by Seller notwithstanding any other provision of this Agreement.

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

## SECTION 3 - ESCROW AND TITLE INSURANCE.

3.1 - Escrow Agent. The parties hereto designate Chicago Title Insurance Company - National Commercial Services, 12500 Reed Hartman Highway, Suite 120, Cincinnati, Ohio 45241, Attn: Rebecca Mishner ("Title Company") as the escrow agent ("Escrow Agent") in connection with this transaction. This Agreement shall serve as escrow instructions and shall be subject to the usual conditions of acceptance of Escrow Agent, insofar as the same are not inconsistent with any of the terms hereof. By execution of this Agreement, Title Company agrees that the Earnest Deposit shall be held as a deposit under this Agreement in an interest-bearing account and: (a) applied against the Purchase Price if Closing occurs; or (b) delivered to Seller or Buyer, in accordance with the terms of this Agreement upon the written approval of Seller and Buyer, if Closing does not occur. Interest on the Earnest Deposit shall be paid to the party entitled to receive the Earnest Deposit pursuant to this Agreement.

3.2 - Title/Survey.

(a)    Buyer's obligation to acquire the Property shall be conditioned upon Seller's ability to convey to Buyer fee simple title to the Real Property, and the issuance by Title Company to Buyer of an ALTA Extended Coverage Owner's Policy of Title Insurance with respect to the Real Property ("ALTA Owner's Policy") in the amount of the Purchase Price, subject only to the Permitted Exceptions defined below. Within ten (10) days after the Effective Date, Buyer shall have ordered from the Title Company one or more commitments (individually "Commitment" and collectively "Commitments") to issue one or more ALTA Owner's Policies of Title Insurance for the Real Property in an amount which equals the Purchase Price ( "Title Policy"). Buyer shall have the right to order and obtain, at its expense, one or more surveys of the Real Property ("Survey"). In the event Buyer desires to obtain a Survey, then Buyer shall obtain same no later than fifty (50) days after the Effective Date. The Survey shall be prepared at Buyer's direction and certified to Seller, Buyer and the Title Company. The Survey shall be in form and substance sufficient to delete the standard survey exception from the applicable Title Policy.

(b)    Buyer shall have the right to object to: (i) any matters disclosed by the Commitment ("Title Objections") and (ii) any matters disclosed by the Survey ("Survey Objections"), provided that Buyer delivers written notice of any valid Title Objections or Survey Objections on or before the expiration of the Due Diligence Period; otherwise any such objections shall be deemed to be waived. With respect to new items identified in any supplemental title report or updated survey delivered after the expiration of the Due Diligence Period which materially and adversely affect the Real Property, Buyer shall have three (3) business days after receipt thereof (the "Supplemental Review Period") to disapprove any exceptions contained therein, otherwise such objections shall be deemed waived. If Buyer delivers in a timely manner written notice of any Title Objections and/or Survey Objections (including to any new items which Buyer timely objects to

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

during the Supplemental Review Period), then Seller shall have the right, in Seller's sole discretion, to: (i) cure the Title Objections and/or Survey Objections within ten (10) business days from the date of receipt of Buyer's objection to title and/or the Survey (the "Cure Period"), or (ii) at any time prior to or during the Cure Period, give notice to Buyer that Seller is either unable or unwilling to cure any or all of the Title Objections and/or Survey Objections (the "No Cure Notice"). If Seller does not fully cure the Title Objections and/or Survey Objections within the Cure Period, or if Seller delivers the No Cure Notice, then Buyer shall elect to do one (1) of the following: (x) terminate this Agreement, whereupon Escrow Agent shall promptly deliver the Earnest Deposit to Buyer, or (y) waive the Title Objections and/or Survey Objections and purchase the Property with such condition of title as Seller is able to convey and/or subject to the Title Objections and/or Survey Objections, without a reduction of the Purchase Price therefor, in which event the items objected to which were not cured shall be deemed to be acceptable to Buyer. Buyer shall make the foregoing election within two (2) business days after receiving the No Cure Notice or within two (2) business days after the expiration of the Cure Period, whichever is earlier; provided, however, that if Buyer fails to timely make such election, then Buyer shall be deemed to have elected to purchase the Property pursuant to the foregoing clause (y). All matters shown in the Commitment that are accepted by Buyer and/or are deemed to be accepted by Buyer pursuant to this Section 3.2 are collectively referred to herein as the "Permitted Exceptions."

3.3 - Release of Mortgages. Except for real estate taxes and assessments not yet due and payable as of the Closing and the Permitted Exceptions, it shall be a condition to Buyer's obligation to close that all mortgages, liens and other encumbrances of ascertainable amounts incurred by, for, or on behalf of the Seller shall be paid by Seller at or prior to Closing and removed from record by Title Company.

SECTION 4- CONVEYANCE. On the Closing Date, Seller shall convey title the Real Property by (as the case may be) grant deed or special or limited warranty deed, as applicable in the applicable jurisdiction in which the applicable Real Estate is situated ("Deed"), in form and substance reasonably acceptable to the parties hereto, based on consultations with their respective local counsel(s), as the case may be, and free and clear of all liens and encumbrances, except the Permitted Exceptions.

SECTION 5 - PRORATIONS AND CLOSING COSTS.

5.1 - Property Operating Expenses. Operating Expenses (as hereinafter defined) for the Property shall be prorated as of 12:01 a.m., Pacific Time on the Closing Date. Seller shall pay all utility charges and other operating expenses, if any and excluding Taxes (collectively, the "Operating Expenses"), attributable to the Real Property incurred prior to, but not including, the Closing Date and Buyer shall pay all utility charges and other operating expenses attributable to the Real Property incurred on or after the Closing Date. If Seller is responsible for any public utility

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

expenses with respect to the Real Property, meters for all public utilities (including water) being used on the Real Property shall be ordered read by Seller on the day of giving possession to Buyer and all charges to said date shall be paid by Seller. To the extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, a proration shall be made at Closing based on the last available reading and post-closing adjustments between Buyer and Seller shall be made within twenty (20) days of the date that actual consumption for such pre-Closing period is determined, which obligation shall survive the Closing and shall not be merged therein. Seller shall not assign to Buyer any deposits which Seller has with any of the utility services or companies servicing the Real Property. Buyer shall arrange with such services and companies to have accounts opened in Buyer's name beginning at 12:01 a.m., Eastern Time, on the Closing Date.

### 5.2 - Real Estate Taxes and Assessments.

(a)     All real estate taxes and assessments, both general and special, with respect to the Real Property (collectively, "Taxes") for the current fiscal year of the applicable taxing authority in which the Closing Date occurs shall be prorated on a per diem basis as of 11:59 p.m. on the day prior to the Closing Date. Seller shall pay Taxes attributable to the Property to, but not including, the Closing Date and Buyer shall pay all Taxes attributable to the Property on or after the Closing Date. If the Closing occurs prior to the receipt by Seller of the bill for Taxes for the calendar year in which the Closing occurs, Taxes shall be prorated on the basis of the last officially certified and available tax duplicate. Seller shall be responsible for Taxes payable in respect to periods prior to the Closing, and shall be entitled to any rebates and refunds for such periods. Buyer shall be responsible for Taxes on the Real Property payable in respect to all periods after the Closing and shall be entitled to any rebates and refunds for such periods. Such proration of Taxes will be final.

### 5.3 - Costs to be Paid by Seller.
Seller shall pay or be charged with the following costs and expenses in connection with this transaction:

(a)     All state (and if applicable county and city) documentary transfer, sales, stamp and similar taxes and conveyance fees on the sale and transfer of the Property;

(b)     one-half (1/2) of the escrow fee charged by Escrow Agent;

(c)     the premium for the standard coverage portion of the Title Policy;

(d)     Seller's share of prorations; and

(e)     the fees and expenses of Seller's attorney(s).

### 5.4 - Costs to be Paid by Buyer.
Buyer shall pay the following costs and expenses in connection with this transaction:

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

(a)     the cost of recording the Deed;

(b)     one-half of the escrow fee charged by Escrow Agent;

(c)     the cost of: the title examination, the Commitment, and the portion of the premium for the Title Policy that is in excess of the premium attributable to the standard coverage portion of the Title Policy, including the cost of any endorsements thereto;

(d)     the cost of the Survey, if obtained;

(e)     Buyer's share of prorations;

(f)     all costs incurred by Buyer in connection with its due diligence or other activities related to the Property, including, without limitation, the cost of any environmental report, property condition report or zoning report ordered by Buyer; and

(g)     the fees and expenses of Buyer's attorney(s).

## SECTION 6 – POSSESSION AND CLOSING; CONTINGENCIES AND CONDITIONS.

6.1 - <u>Closing</u>. The transaction contemplated herein shall be closed at the office of Escrow Agent not later than <u>thirty (30) days after the expiration of the Due Diligence Period</u>. The time and date of such closing is referred to herein as the "Closing Date" or the "Closing".

6.2 - The obligations of Seller under this Agreement to sell the Property and consummate the transaction contemplated hereby shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that Seller waives any of such conditions in writing at or prior to Closing:

(a)     Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed and complied with by Buyer on or before the Closing Date.

(b)     Seller shall have received each of the items to be delivered to it or for its benefit under this Agreement (defined below).

(c)     Between the Effective Date and the Closing Date, no written order shall have been entered and be in effect by any court of competent jurisdiction, and no law shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transaction contemplated hereby.

(d)     No suit or other proceeding shall be pending against Seller by any Person before any court or authority seeking to restrain or prohibit or declare illegal the

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

transaction contemplated by this Agreement, or seeking damages against Seller in connection with the transactions contemplated by this Agreement.

If any of the foregoing conditions are not fulfilled by the Closing, then Seller shall have the right, exercisable by delivering written notice to Buyer, to terminate this Agreement, then the Earnest Deposit, including any interest earned thereon, shall be promptly refunded to Buyer; provided, however, that in the event any failure of a condition constitutes a material default by Buyer under Section 10.2 below, then Seller shall be entitled to exercise the remedies set forth in Section 10.2.

6.3 - Buyer's Conditions to Close. Escrow shall not close unless and until the following conditions precedent and contingencies have been satisfied or waived in writing by the Buyer:

(a) All instruments described in Section 6.4 shall have been timely delivered to Escrow Agent;

(b) On the Closing, Seller shall not be in default in the performance of any material covenant or agreement to be performed by Seller under this Agreement;

(c) On the Closing, all representations and warranties made by Seller in Section 9.1 hereof shall be true and correct in all material respects as if made on and as of the Closing;

(d) The Title Company is irrevocably committed to issue to Buyer the Owner's Title Policy;

(e) All of the conditions in favor of Buyer set forth in Section 3 shall have been satisfied or waived by Buyer in the manner set forth therein;

(f) No material adverse change shall have occurred with respect to the of the Real Property or the condition of title between the expiration of the Due Diligence Period and the Closing;

If any of the foregoing conditions are not fulfilled by the Closing, Buyer may elect to terminate this Agreement, in which event the Deposit shall be refunded to Buyer.

6.4 - <u>Closing Deliveries</u>.

(a) <u>Seller's Closing Deliveries</u>. Not later than 12:00 p.m. Eastern Time on the Closing Date, Seller shall deliver to Escrow Agent:

(i) the Deed;

(ii) signed counterparts of Assignment of Intangible Property, if any;

(iii) a certificate and affidavit of non-foreign status;

(iv) a completed 1099-S request for taxpayer identification number and certification and acknowledgment for Seller;

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

(v)    a title affidavit from Seller reasonably required by Escrow Agent that will enable Buyer to obtain the Title Policies free of any general exception for either mechanics' or materialmen's liens or parties in possession;

(vi)    resolution of Seller authorizing the sale of the applicable Property pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Seller;

(vii)    a settlement statement with respect to the Closing;

(viii)    exclusive possession of the Property to Buyer; and

(ix)    such other closing documents as may be reasonably necessary to consummate the transaction contemplated herein.

(b)    <u>Buyer's Closing Deliveries</u>.  Not later than 12:00 p.m. Eastern Time on the Closing Date, Buyer shall deliver to Escrow Agent:

(i)    a settlement statement with respect to the Closing;

(ii)    such other closing documents as may be reasonably necessary to consummate the transactions contemplated herein; and

(iii)    the Purchase Price less the Earnest Deposit and any credits to which Buyer is expressly entitled hereunder.

(c)    <u>Title Company and Escrow Agent Obligations</u>.  At Closing, Title Company or Escrow Agent (as the case may be) shall:

(i)    pay to Seller the Purchase Price less any credits to which Buyer is entitled;

(ii)    deliver the Deed to Buyer by filing the Deed for record in the public records for the jurisdiction in which the Real Property is located;

(iii)    issue the Title Policy or Title Policies; and

(iv)    charge Seller and Buyer for the closing costs as set forth in Section 5 above.

### 6.5 - <u>Covenants of Seller Pending Closing</u>.

(a)    From and after the Effective Date through the Closing Date, Seller shall not modify, cancel, extend or otherwise change in any manner, the terms, covenants or conditions of any insurance policy insuring the Real Property, nor enter into any contracts for services or otherwise that may be binding upon the Property or upon Buyer, nor shall any easements be created or any licenses given on the Property, nor shall any legal action be taken with respect to the Property, without the express prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller intends to cease all operations of the Big Lot Store

DocuSign Envelope ID: 477D1895-2332-4867-B061-ADAF7BF2C117

presently operating from the Real Property at or prior to Closing. Seller shall remove from the Property prior to the Closing any of Seller's goods, trade fixtures, furniture, equipment, signage and other personal property located at the Real Property.

(b)    From the Effective Date through and including the Closing Date, Seller will not, without the prior written consent of Buyer, convey any interest in any license or permit or entitlement affecting any of the Property, and Seller will not subject any Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters which will not be eliminated prior to the Close of Escrow.

## SECTION 7- CONDITION OF PROPERTY.

7.1 - "As-Is" Condition. BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER WILL HAVE, AS OF THE CLOSING, THOROUGHLY INSPECTED AND EXAMINED THE STATUS OF TITLE TO THE PROPERTY AND THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, SUBJECT TO SELLER'S EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT, AND EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PHYSICAL CONDITION OF THE PROPERTY BY BUYER AND THAT BUYER IS PURCHASING, AND AT CLOSING WILL ACCEPT, THE PROPERTY ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND/OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE; EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES THAT SELLER HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE THE PROPERTY, OTHER THAN ANY ALTERATIONS OR REPAIRS WHICH ARE REQUIRED AS PART OF BUYER'S COVENANT IN SECTION 6.5(c).

Except as specifically set forth in this Agreement, Buyer acknowledges and agrees that it has not (and shall not) rely upon any statement and/or information from whomsoever made or given (including, but not limited to, any broker, attorney, agent, employee or other person representing or purporting to represent Seller) directly or indirectly, verbally or in writing, and Seller is not and shall not be liable or bound by any such statement and/or information.

Except as specifically set forth in this Agreement, Seller specifically disclaims any representation, warranty or guaranty with respect to the Property, express or implied, including, but not limited to, any representation or warranty as to the Property's condition, fitness for a particular purpose, quality, freedom from defects or contamination (whether or not detectable by

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

inspection), compliance with zoning or other legal requirements or as to the availability or existence of any utility or other governmental or private services or as to the amount of taxes assessed to the Property.

7.2 - <u>Release of Claims Under Environmental Laws</u>.  Buyer, on behalf of itself and all future owners and occupants of the Real Property, hereby waives and releases Seller from, including, but not limited to, any claims for recovery of costs associated with conduct of any voluntary action or any remedial responses, corrective action or closure under any applicable federal, state or local environmental laws ("<u>Environmental Laws</u>"), including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., as amended from time to time; and any similar federal, state and local laws and ordinances and the regulations and rules implementing such statutes, laws and ordinances.   The foregoing waiver and release of Seller under this Section 7.2 shall be set forth in the Deed and shall be binding upon all future owners and occupants of the Real Property. Notwithstanding the foregoing, the foregoing waiver and release under this Section 7.2 shall not modify, limit or otherwise affect Seller's representations and warranties set forth in Section 9.1 hereof or Seller's liability hereunder for any breach thereof; nor shall Seller be released from, and Buyer shall not waive its claims against Seller with respect to: (a) any breach of Seller's representations, warranties, covenants or other obligations under this Agreement or any documents executed pursuant to this Agreement, (b) any third-party personal injury which arises during Seller's period of ownership, or (c) Seller's fraud or willful misconduct.

<u>SECTION 8</u> – <u>DUE DILIGENCE</u>.  The Close of Escrow is subject to and contingent on Buyer's approval, in its sole and absolute discretion, of all aspects of the Property on or before the expiration of the Due Diligence Period.  Buyer may elect to approve or disapprove the Property (or any aspect thereof) in Buyer's sole and absolute discretion.

8.1 - <u>Seller's Due Diligence Materials</u>.  To the extent not previously delivered, Seller shall, no later than three (3) business days after the Effective Date,  deliver to Buyer's broker, with a copy to Buyer, copies of the following documents for review, if in Seller's actual possession and readily available (and to the extent said documents exist): a copy of an ALTA survey for each Property, copies of environmental reports, property condition reports, license agreements, plans, specifications, surveys, maintenance and repair records, permits and other approvals and licenses and entitlements related to the Real Property, zoning confirmations, drainage, engineering, utilities check, operating statements, operating expense reports, rent rolls related to the Real Property and reconciliations, tax bills, notices received from any governmental authority, any notices, correspondence and other documents relating to any litigation or condemnation affecting the Real Property, soil borings, service contracts,

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

tax receipts, title policies, utility information, tenant correspondence, primary contact information for each Tenant, the Leases and all amendments thereto and guaranties and assignments thereof, and site plans (collectively, the "Due Diligence Material"). Buyer hereby acknowledges that the Due Diligence Material is all the information necessary to facilitate Buyer's due diligence review of the Property and that Seller makes no representation or warranty about the accuracy or completeness of the Due Diligence Material.

8.2 - Inspections and Reports; Review of Title and Survey. Buyer shall have fifteen (15) days, commencing on the Effective Date (the "Due Diligence Period"), to perform any and all due diligence relating to the Property, and Seller shall permit Buyer and Buyer's representatives to enter any of the Real Property at any reasonable time for any purpose in connection with Buyer's proposed purchase, development or operation of the Real Property, including, without limitation, the right make such non-invasive inspections, investigations and tests as Buyer may elect to make or obtain, including without limitation, environmental (Phase I and/or Phase II), soils, seismic, geologic and engineering tests, analyses and studies' (collectively, the "Inspections"), provided Buyer shall provide Seller sufficient information to permit Seller to review and reasonably approve the scope of any invasive Inspections, including, without limitation, Phase II environmental sampling, soils, seismic, geologic and engineering tests, analyses, and studies. During the Due Diligence Period, pursuant to Section 3.2 above, Buyer shall also review the status of title to the Real Property and all matters relating to the Survey. Buyer shall promptly repair any damage to the Real Property attributable to the conduct of the Inspections, and shall promptly return the Real Property to substantially the same condition as existed prior to the conduct thereof. No Inspections shall be conducted without Seller's approval as to the time and manner thereof, which approval shall not be unreasonably withheld, conditioned or delayed and without at least twenty-four (24) hours prior notice from Buyer to Seller. At Seller's request, any such Inspection shall be performed in the presence of a representative of Seller.

If the results of the Inspections or the content of the Commitments, the Survey, and/or any reports or other written materials or information obtained or generated in connection with the conduct of the Inspections (the "Reports") are not acceptable to Buyer, then Buyer, in its sole discretion, may terminate this Agreement by written notice given to Seller on or prior to the last day of the Due Diligence Period, and neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination of this Agreement. If Buyer fails to terminate this Agreement on or prior to the last day of the Due Diligence Period, such failure shall not be deemed an election by Buyer to disapprove the Property. In addition, in the event that Buyer elects to terminate this Agreement (or is deemed to have terminated this Agreement) pursuant to this Section 8.2, then the Earnest Deposit, including any interest earned thereon, shall be promptly refunded to Buyer.

DocuSign Envelope ID: 477D1995-2332-4887-B061-ADAF7BF2C117

Buyer hereby agrees to indemnify, defend and hold harmless Seller from and against any losses, liabilities, damages, costs or expenses incurred by Seller as a result of Buyer's exercise of the right of inspection granted under this Section; provided, however, the foregoing indemnity shall not apply with respect to any claims arising from the mere discovery of any adverse condition at any Real Property, any preexisting conditions at a Real Property or any acts or omissions of Seller, its officers, directors, shareholders, agents or employees. Buyer acknowledges and agrees that any such Inspections conducted by Buyer or Buyer's agents and representatives shall solely be at the risk of Buyer. Buyer shall cause any agent or representative which performs such Inspections to carry commercial general liability insurance covering all activities conducted on the Real Property ("Liability Insurance"). In the event Buyer or its employees perform any such Inspections, Buyer shall also carry Liability Insurance. Such Liability Insurance shall have limits of not less than One Million Dollars ($1,000,000) for personal injury to or death of any one person, Two Million Dollars ($2,000,000) for personal injury to or death of any number of persons in any one accident and One Million Dollars ($1,000,000) for property damage, and shall name Seller as an additional insured. All of the obligations of Buyer under this Section shall survive Closing or the termination of this Agreement

8.3 - Confidentiality. Buyer agrees that it shall treat all Due Diligence Material as confidential and proprietary to Seller. Notwithstanding any other provision to the contrary contained herein, Buyer shall not disclose, summarize or otherwise provide any or all of the Due Diligence Materials to third parties except: (a) to the extent necessary in connection with its evaluation of the Property; (b) to the extent required by law; (c) to Buyer's mortgage lender(s) or investors, if any, involved in the transaction contemplated by this Agreement; or (d) with the express written consent of Seller. Prior to disclosing or providing access to any Due Diligence Material to any of the Buyer's agents or representatives, Buyer shall (i) advise such parties of this Section and Buyer's obligations hereunder and (ii) require that such parties treat the Due Diligence Material in accordance herewith. If this Agreement terminates in accordance with the terms hereof, Buyer shall promptly return to Seller or destroy all Due Diligence Material it received and shall not retain any copies of the Due Diligence Material; provided, however, that Buyer has the ability to keep a copy of the Due Diligence Material for compliance purposes or for the purpose of defending or maintaining litigation or threatened litigation. Notwithstanding any provision in this Agreement to the contrary, and except to the extent required by Law, neither Buyer nor Buyer's agents shall contact any governmental authority regarding Buyer's discovery of any Hazardous Substances (as hereinafter defined) on, or any environmental conditions at, a Real Property without Seller's prior written consent thereto. In addition, if Seller's consent is obtained by Buyer, Seller shall be entitled to receive at least five (5) business days prior written notice of the intended contact and to have a representative present when Buyer has any such contact with any governmental official or representative. For the purposes of this Agreement, the term "Hazardous Substances" shall have the same definition as is set forth in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 et seq.

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

(the "Superfund Act"); provided, however, that the definition of the term "Hazardous Substances" shall also include (if not included within the definition contained in the Superfund Act) petroleum and related byproducts, hydrocarbons, radon, asbestos, urea formaldehyde and polychlorinated biphenyl compounds. Buyer agrees that Seller may seek injunctive relief to prevent or limit an unauthorized disclosure of the Due Diligence Materials and may also pursue any other remedies available under law or equity as a result of a breach or anticipated breach of this Section. All of the obligations of Buyer under this Section 8.3 shall survive the termination of this Agreement.

## SECTION 9 - REPRESENTATIONS AND WARRANTIES.

9.1 - By Seller. Seller represents and warrants to Buyer that:

(a)     Big Lots Stores – PNS, LLC is a limited liability company duly organized and validly existing under the laws of the State of California.

(b)     Seller has the capacity and authority to execute this Agreement and perform the obligations of Seller under this Agreement. All actions necessary to authorize the execution, delivery and performance of this Agreement by Seller has been taken and such action has not been rescinded or modified.

(c)     To the best knowledge of Seller, the execution and delivery of this Agreement and performance by Seller will not conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment, decree, loan agreement, bond, note, resolution, indenture, mortgage, deed of trust or other agreement or instrument to which it is a party and which affects the Property.

(d)     Seller is not a "foreign Person" within the meaning of Section 1445 of the Internal Revenue Code.

(e)     Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(f)     Neither Seller nor any affiliate of Seller has granted any options or rights of first refusal to acquire any interest in of the Real Property (or any portion thereof) to any Tenant under the Leases or to any other party.

(g)     There are no pending or, to Seller's actual knowledge (with no duty of inquiry or investigation), threatened actions, suits, arbitrations, claims or proceedings, at law or in equity, affecting all or any portion of the Real Property or in which Seller is

4788834.5                                    - 12 -

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

or will be a party by reason of its ownership of the Real Property, including, without limitation, judicial, municipal or administrative proceedings in eminent domain, health and safety violations, personal injuries or property damages alleged to have occurred on the Real Property or by reason of the condition or use of the Real Property.

(h)   Seller has received no written notice of (1) any violations of any laws, rules, regulations, codes or ordinances of any governmental authority with respect to the Real Property (including, without limitation, Environmental Laws) or (2) defaults under any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement affecting the Real Property.

(i)   To Seller's actual knowledge, with no duty of inquiry or investigation, all operations or activities upon, or use or occupancy of, the Real Property by Seller and any current or prior tenant, occupant or owner of the Real Property is and has been in all material respects in compliance with all state, federal and local laws and regulations governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge, release or disposal (whether accidental or intentional) of any Hazardous Substance and neither Seller, nor to the Seller's actual knowledge, with no duty of inquiry, any current or prior tenant or occupant or owner of the Real Property has engaged in or permitted any dumping, discharge, disposal, spillage or leakage (accidental or intentional) of such Hazardous Substances at, on, in, under, or about the Real Property in violation of Environmental Laws.   To Seller's actual knowledge, with no duty of inquiry or investigation, there has been no production, storage or disposal on the Real Property of any Hazardous Substance. There are not now and have never been any underground storage tanks located on the Real Property.

(j)   Seller is in compliance with, and, to Seller's knowledge, all beneficial owners of Seller are, in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "**Order**") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "**OFAC Laws**").

(k)   To Seller's actual knowledge, with no duty of inquiry or investigation, Seller is not aware of any material inaccuracies in the Due Diligence Material delivered or made available to Buyer pursuant to this Agreement.

In the event that any representation or warranty by Seller is not accurate as of the Closing Date, Buyer, as its sole and exclusive remedy, shall have the right to terminate this Agreement, in which event the Earnest Deposit shall be returned to Buyer by Title Company, Seller shall pay for any title and survey fees and neither party hereto shall have any further obligations hereunder except for such obligations and indemnities which expressly survive the termination of this Agreement. Each of the representations and warranties of Seller contained in this Agreement is made as of the

4788834.5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

Effective Date and as of the Closing Date, and shall survive the Closing and recording of the Deed for a period of nine (9) months following the Closing (the "Survival Period").

        9.2 - <u>By Buyer</u>.  Buyer represents and warrants to Seller as of the Effective Date that:

(a)     Buyer is duly created and validly existing pursuant to the laws of the jurisdiction of its organization and is duly qualified to do business in the jurisdiction in which the Real Property are situated if and to the extent that such qualification is required.

(b)     Buyer has the capacity and authority to execute this Agreement and perform the obligations of Buyer under this Agreement.  All action necessary to authorize the execution, delivery and performance of this Agreement by Buyer has been taken, and such action has not been rescinded or modified.  Upon the execution of this Agreement, this Agreement will be legally binding upon Buyer and enforceable against Buyer in accordance with all of its provisions.  The person signing this Agreement on behalf of Buyer has been duly authorized to sign and deliver this Agreement on behalf of Buyer.

(c)     Buyer is not subject to any judgment or decree of a court of competent jurisdiction or governmental agency that would limit or restrict Buyer's right to enter into and carry out this Agreement.

(d)     Neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Buyer will constitute a breach under any contract or agreement to which Buyer is a party or by which Buyer is bound or affected.

(e)     No consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Buyer's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

(f)     None of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "USA Patriot Act").

(g)     Buyer is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

4788834.5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

Buyer shall fully disclose to Seller, immediately upon Buyer's becoming aware of its occurrence, any change in facts or circumstances of which Buyer becomes aware prior to the Closing Date that may affect the representations and warranties set forth above. In the event that any representation or warranty by Buyer is not accurate as of the Closing Date, Seller, as its sole and exclusive remedy, shall have the right to terminate this Agreement, in which event the Earnest Deposit shall be delivered and paid to Seller by Title Company and neither party hereto shall have any further obligations hereunder except for such obligations and indemnities which expressly survive the termination of this Agreement, and Seller expressly waives the right to sue Buyer for damages.

## SECTION 10 - DEFAULT.

10.1 - <u>Seller Default</u>.    Notwithstanding    any    provision    in    this Agreement to the contrary, if Closing does not occur by reason of a material default by Seller which continues for five (5) days after written notice from Buyer, then Buyer shall have the right, as its sole and exclusive remedy, to either (a) terminate this Agreement, in which event Buyer shall receive the Earnest Deposit and Seller shall reimburse Buyer for Buyer's actual and verifiable, out-of-pocket expenses incurred in connection with the transaction contemplated by this Agreement (not to exceed the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) and  neither of the parties hereto shall have any further rights or obligations hereunder, except for obligations that specifically survive the termination, or (b) sue Seller for specific performance. Other than the remedies set forth in the foregoing (a) and (b), no other remedy or relief shall be available to Buyer, and Buyer hereby waives any and all other remedies, including the right to sue Seller for damages. In the event that Buyer's right to sue for specific performance is unavailable as a remedy to Buyer because of Seller's affirmative acts, Buyer shall be entitled to pursue all rights and remedies available at law or in equity, provided, however, any recovery by Buyer shall not exceed the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) and shall be limited to Buyer's actual and verifiable, out-of-pocket expenses incurred in connection with the transaction contemplated by this Agreement. Notwithstanding any provision in this Agreement to the contrary, Buyer's right to sue Seller for specific performance is contingent upon Buyer filing suit against Seller for specific performance within ninety (90) days after the occurrence of Seller's material default delaying Closing and, in the event that Buyer does not file suit for specific performance within such ninety (90) day period, Buyer shall be deemed to have waived its right to sue Seller for specific performance, and the remedy set forth in Section 10.1(a) above to terminate this Agreement shall be Buyer's sole and exclusive remedy.

10.2 - <u>Buyer Default</u>.    Notwithstanding    any    provisions    of    this Agreement to the contrary, if the sale of the Property to Buyer is not consummated solely because of Buyer's material' default under the express terms of' this Agreement following the Due Diligence Period, Seller shall be entitled, as its sole and exclusive remedy, to terminate this Agreement, and the Earnest Deposit shall be delivered to Seller as agreed-upon

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

liquidated damages as Seller's sole remedy. Seller and Buyer acknowledge that: (a) it would be impossible to accurately determine Seller's damages in the event of Buyer's default; (b) the Earnest Deposit is fair and equitable; and (c) Seller expressly waives the right to exercise any and all other rights available at law or in equity. The limitation of damages set forth herein shall not apply to any indemnities, covenants or obligations of Buyer which expressly survive either the termination of this Agreement or Closing, for which Seller shall be entitled to all rights and remedies available at law or in equity. Buyer shall not be deemed to be in default under this Agreement unless Seller shall have given written notice to Buyer and Buyer shall not have cured such default within five (5) business days after receipt of Seller's notice. The Closing Date shall be extended, as necessary, to accommodate the notice and cure period provided that notice is delivered prior to the expiration of this Agreement. –

10.3 - <u>BROKERS</u>. Except Lipp CDS, Inc. and ROI Commercial Real Estate, Inc., which shall both be paid by Seller pursuant to a separate agreement, Seller and Buyer each represent and warrant that they have not been represented by any broker in connection with the sale of the Property and no commissions or fees are due to any other broker or finder by reason of either party's actions in this matter. Buyer and Seller shall each be responsible for all liability, if any, for any broker or finder fees payable with respect to the sale of the Property that are attributable to its actions. Seller and Buyer shall and do each hereby indemnify, defend and hold harmless the other from and against the claims, demands, actions and judgments of any and all brokers, agents and other persons or entities alleging a commission, fee or other payment to be owing by reason of their respective dealings, negotiations or communications in connection with this Agreement or the purchase and sale of the Property. The indemnity obligations in this Section shall survive the termination of this Agreement or the Closing.

<u>SECTION 11</u> - <u>EMINENT DOMAIN</u>. In the event of a taking of any portion of the Real Property by eminent domain for any public or quasi-public use which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price allocated to such Real Property  or more, or if notice of intent of a taking or a sale in lieu of taking, which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price or more, is received by Seller or Buyer, at or prior to Closing, then Buyer shall have the right, to be exercised within thirty (30) days after notice of such taking or intended taking by written notice to Seller, to notify Seller whether it elects to proceed with the transactions contemplated by this Agreement or to terminate this Agreement. Failure to deliver notice is deemed Buyer's election to terminate this Agreement.   If Buyer elects (or is deemed to have elected) to terminate this Agreement, Buyer shall receive the Earnest Deposit and neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination. In the event this Agreement is not terminated or Buyer is not entitled to terminate this Agreement pursuant to this Section, Buyer shall consummate this transaction on Closing Date (with no reductions in the Purchase Price), and Buyer

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

shall be entitled to participate in any such condemnation or eminent domain proceedings and to receive all of the proceeds attributable to any portion of the Real Property to be conveyed to Buyer.

SECTION 12 – CASUALTY. If prior to the Closing Date, all or any material portion of a Real Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall notify Buyer in writing of such fact (which writing shall detail the amount of insurance recoverable). In the event the cost, as reasonably determined by Seller, to restore the damaged portion of a Real Property is in excess of five percent (5%) of the Purchase Price allocated to such Real Property, Buyer shall have the option to terminate this Agreement upon notice to Seller given within thirty (30) days after Buyer's receipt of Seller's written notice aforesaid. Failure to deliver notice is deemed Buyer's election to terminate this Agreement. Upon such termination, Escrow Agent shall return the Earnest Deposit to Buyer, this Agreement shall terminate and neither party shall have any further obligation or liability to the other. In the event Buyer does not so elect to terminate this Agreement as aforesaid, and/or is not entitled to terminate pursuant to this Section, Seller shall assign to Buyer any insurance claims and the amount of any deductible shall be subtracted from the Purchase Price and Buyer shall acquire the Property pursuant to this Agreement without any reduction in the Purchase Price. In the event of an uninsured casualty, Buyer shall receive a credit against the Purchase Price in the amount of the cost to repair and restore the Property (as determined by a mutually agreed upon third-party contractor).

SECTION 13 – [Intentionally Omitted].

SECTION 14 - MISCELLANEOUS.

14.1 - Governing Law. This Agreement shall be governed by the laws of the State of Ohio, without regard to rules regarding conflicts of laws.

14.2 - Counterparts; Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Execution and delivery of this Agreement by electronic exchange bearing the copies of a party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

14.3 - Entire Agreement. This Agreement, together with the attached exhibit(s), contains all of the terms and conditions of the agreement between the parties hereto, and any and all prior and contemporaneous oral and written agreements are merged herein.

14.4 - Modifications and Waivers. This Agreement cannot be changed nor can any provision of this Agreement, or any right or remedy of any party, be waived orally. Changes and waivers can be made only in writing, and the change or waiver must be signed by the party against whom the change or waiver is sought to be enforced. Any waiver of any provision of this Agreement, or any right or remedy, given on any one or more occasions shall not be deemed a waiver with respect to any other occasion.

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

14.5 - <u>Parties Bound</u>.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors, and assigns of the parties hereto.

14.6 - <u>Assignment</u>.  Buyer may not assign its rights and obligations under this Agreement without Seller's prior written consent; <u>provided, however</u>, at and concurrently with a Closing hereunder, Buyer may assign its rights and obligations under this Agreement, in whole or in part, to one or more entities without the consent of Seller, provided and on the condition that: (a) Buyer shall have given Seller written notice of the assignment and the identity of the assignee(s) at least seven (7) days prior to Closing; (b) Buyer is an affiliate of each assignee; and (c) such assignee(s) shall have assumed Buyer's obligations hereunder by a written instrument of assumption in form and substance reasonably satisfactory to Seller. Notwithstanding any such assignment, Buyer shall nevertheless remain liable for all of Buyer's obligations hereunder.

14.7 - <u>Notices</u>.  All notices, requests and other communications under this Agreement shall be in writing and shall be deemed given when made by personal delivery, sent by registered or certified mail, postage prepaid, return receipt requested, next or second business day by delivery by a nationally recognized overnight courier, addressed as follows, or email followed by another permitted means of delivery.  Notice shall be deemed given on the date on which the notice is received or refused by a party in the case of personal delivery or email, the date on which it is deposited in the U.S. Mail, in the case of registered or certified mail, or on the next or second (whichever is applicable) business day immediately following receipt by the courier, in the case of an overnight courier:

If to Seller:    Big Lots Stores – PNS, LLC
4900 East Dublin Granville Road
Columbus, Ohio 43081
Attn: Chris Macke
Director, Real Estate Counsel
Email: cmacke@biglots.com

and

Big Lots Stores – PNS, LLC
4900 East Dublin Granville Road
Columbus, Ohio 43081
Attn: Ronald A. Robins, Jr. (Rocky)
EVP, Chief Legal and Governance Officer
Email: rrobins@biglots.com

With a copy to:    Jacinto A. Nunez
Vorys, Sater, Seymour and Pease LLP

DocuSign Envelope ID: 477D1995-2332-4887-B061-ADAF7BF2C117

> 50 S. Main Street
> Suite 1100
> Akron, Ohio 44224
> Email: janunez@vorys.com

If to Buyer:    6351 WESTMINSTER BLVD, LLC
> Att: David Lipp
> Email: David.lipp@backbayig.com
> 3857 Birch St #195
> Newport Beach, CA 92660

AND

> 6351 WESTMINSTER BLVD, LLC
> Att: Andrew Fielder
> Email: Andrew.Fielder@backbayig.com
> 3857 Birch St #195
> Newport Beach, CA 92660

With copy to:    Michael Steponovich
> STEPONOVICH & ASSOCIATES
> Email: mike@stepolaw.com
> 120 Vantis Drive, Suite 300
> Aliso Viejo, California 92656-2677

Section Headings. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

14.8 - Severability. If one or more of the provisions of this Agreement or the application thereof shall be invoked, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or any other application thereof shall in no way be affected or impaired.

14.9 - Time of the Essence. The parties agree that time is of the essence and that the failure of a party hereto to perform any act on or before the date specified herein for performance thereof shall be deemed cause for the termination hereof by the other party, without prejudice to other remedies available for default hereunder.

14.10 - Confidentiality. Without the prior written consent of the other party, neither Seller nor Buyer will disclose to any person, other than their legal counsel, auditors, accountants, investors or a proposed lender, either the fact that this Agreement has been entered into or any of the terms,

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

conditions or other facts with respect thereto, including the status thereof; provided, that either party hereto may make such disclosure if compelled by court order or to comply with the requirements of any law, governmental order or regulation.

14.11 - <u>Further Action</u>.  The parties hereto shall at any time, and from time to time on and after the Closing Date, upon the request of either, to, execute, acknowledge and deliver all such further acts, deeds, assignments and other instruments as may be reasonably required for the consummation of this transaction.

14.12 - <u>Construction</u>.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties hereto, it being recognized that both Seller and Buyer have contributed substantially and materially to the preparation of this Agreement.

14.13 - <u>No Recording</u>.    Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer.

14.14 - <u>Third-Party Beneficiary</u>.  The provisions of this Agreement are not intended to benefit any parties other than Seller and Buyer.

14.15 - <u>Attorneys' Fees and Costs</u>.  Notwithstanding anything to the contrary contained herein, in any action between the parties hereto seeking the enforcement of any of the terms and provisions of this Agreement, or in connection with the Property, the prevailing party in such action shall be awarded, in addition to damages, injunctive or other relief, its reasonable costs and expenses, and reasonable attorneys' fees.

14.16 - <u>1031 Exchange</u>.  If so requested by either party, the other party will cooperate in structuring and completing this transaction for the requesting party so as to effect a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended.   In particular, such other party will consent to the assignment by the requesting party prior to·the Closing hereunder of its rights hereunder to a "qualified intermediary" or other third party for such purposes.   The foregoing notwithstanding, in connection with any such exchange, neither party shall have any obligation to acquire title to any real property nor to enter into any contract: (a) that may create or impose upon such party any non-monetary obligation or negative covenant; (b) that does not provide that the sole and exclusive remedy of any seller for a breach shall be to retain as liquidated damages the deposit paid to said seller; or (c) that requires such party to execute any mortgage, deed of trust or similar financing instrument.  It is further agreed that: (a) neither party shall assume any responsibility for the tax consequences to any other party arising out of any exchange effected pursuant to this Section; (b) the requesting party shall reimburse the other

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

party for all additional costs and expenses (including reasonable attorney's fees) incurred by such other party in connection with any such exchange; and (c) the requesting party shall indemnify and hold the other party harmless from and against any and all loss, cost, damage, expense or other liability (including reasonable attorneys' fees) that such other party may incur or suffer in the performance of its obligations under this Section.

14.17 - <u>Exclusivity; Encumbrance</u>.  From the Effective Date through the Closing or earlier termination of this Agreement, Seller will not discuss, negotiate or execute any contract for the sale of the Property to any third party other than Buyer (or its permitted assignee), and Seller shall not voluntarily encumber or otherwise transfer the Property or enter into an agreement to transfer the Property or any of Seller's interest therein without the prior written consent of Buyer (in Buyer's sole and absolute discretion).

14.18 - <u>Post-Closing Obligations</u>.   Notwithstanding anything to the contrary herein (but without limiting Seller's obligations or liabilities hereunder), from and after the Closing and for the duration of the Survival Period, Seller shall maintain the resources and means necessary to satisfy all of its post-Closing obligations.

14.19 - <u>Business Day</u>.  As used herein, a business day shall mean any day other than Saturday, Sunday or other day that commercial banks in the State of Ohio are authorized or required to close under applicable law.  In the event that the expiration of any time period hereunder shall expire on a Saturday, Sunday or legal holiday, then such time period shall be extended until the close of business on the next following business day.

_[remainder of page intentionally left blank]

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the respective dates specified below.

**SELLER:**

**Big Lots Stores – PNS, LLC**, a California limited liability company

By: _Jonathan Ramsden_
Printed Name: <u>Jonathan Ramsden</u>
Its: <u>EVP, CF&AO</u>

Date: _February 3_, 2023

**BUYER:**

6351 WESTMINSTER BLVD, LLC, a Wyoming Limited Liability Company

By: _Andrew Fielder_
Printed Name: Andrew Fielder
Title: Manager

Date: <u>February</u> 02, 2023

By: _David Lipp_
Printed Name: David Lipp
Title: Manager

Date: <u>February</u> 02, 2023

4788834.5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

## ESCROW CONSENT AND ACKNOWLEDGMENT

The undersigned agrees to act as Title Company and Escrow Agent for the transaction described in the above Agreement as provided herein. Receipt of the Earnest Deposit is hereby acknowledged. The undersigned agrees to hold and deliver the Earnest Deposit in accordance with the terms of this Agreement

**Chicago Title Insurance Company**

Escrow No. _____     By: _____
_____ (Print Name)
Authorized Representative

Date: _____

4788834.5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

**Exhibit A**

Big Lots Store # 4107 – Westminster, CA

**6351 Westminster Blvd.**

**Westminster, CA 92683**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BIG LOTS, INC., *et al.*, | ) Case No. 24-11967 (JKS) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. [•]** |

## ORDER (I) AUTHORIZING AND APPROVING (A) THE DEBTORS' ASSUMPTION OF AND PERFORMANCE UNDER THE PURCHASE AGREEMENT AND (B) THE SALE OF THE WESTMINSTER ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (II) APPROVING THE SETTLEMENT AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"),[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, each, a "**Debtor**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 2002, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking entry of an order (this "**Order**"): (a) authorizing and approving (i) the Debtors' entry into and performance under that certain Purchase Agreement, attached as **Exhibit 1** to this Order, whereby Seller has agreed to sell, and Buyer has agreed to purchase, the Property, and (ii) the sale of the Property to Buyer free and clear

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (b) approving the Settlement of the Litigation, and (c) granting related relief, all as more fully set forth in the Motion; and upon the Ramsden Declaration and the Macke Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:**

A.      Notice. As evidenced by certificates filed with the Court [Docket No. [●]], proper, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the Motion; (ii) the entry of this Order; and (iii) the Sale contemplated under the Purchase Agreement have been provided to all parties entitled thereto. Such notice constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the

Motion and the entry of this Order under Bankruptcy Code §§102(1), 363 and 365 and Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, 6006, and 9019 and Local Rule 6004-1. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Order need be given to any entity.

B.    <u>Disclosures</u>.  The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Sale are sufficient under the circumstances.

C.    <u>Entry Into and Sale is in Best Interests of the Debtors' Estates</u>.  The Debtors' determination that a sale of the Property through a private sale on the terms and conditions set forth in the Purchase Agreement is in the best interests of the Debtors' estates and constitutes a valid and sound exercise of the Debtors' business judgment.  The total consideration provided to the Debtors for the Property represents the highest and best offer reasonably and practicably received by the Debtors for the Property.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Property for greater economic value to the Debtors' estates.  The Sale contemplated under the Purchase Agreement, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received for the Property by the Debtors and (ii) is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.  The assumption of the Purchase Agreement by the Debtors is therefore also in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

D.    <u>Good Faith</u>.  The sales process engaged in by Buyer and Seller, and the negotiation of the Purchase Agreement, was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  Buyer is acquiring the Property in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  Neither Buyer nor any

3

of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of its respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that: (1) Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the applicable Property; (2) all payments to be made by Buyer and other agreements or arrangements entered into, or to be entered into, by such Buyer in connection with the Sale have been disclosed; (3) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (4) the negotiation and execution of the Purchase Agreement, including the applicable Sale contemplated thereby, were at arms'-length and in good faith. There was no evidence of insider influence or improper conduct by Buyer or any of their affiliates in connection with the negotiation of the Sale with the Debtors.

E.     <u>No Collusion</u>.  The Sale and transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, Buyer, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

F.     <u>Purchasers Not Successors</u>.  By consummating the Sale substantially pursuant to the terms of the Purchase Agreement, neither Buyer nor its affiliates are a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between Buyer and any Debtor. By consummating the Sale substantially pursuant to the terms of the Purchase Agreement, Buyer and its affiliates shall not be deemed to

4

be holding itself out as a continuation of the Debtors based on the Sale, the Purchase Agreement, any subsequent documentation entered into for purposes of consummating such transaction, or this Order. Neither Buyer nor its affiliates are a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of any purchaser and the Debtors.

G. Binding Agreement. The Purchase Agreement is a valid and binding contract between the Seller and Buyer and shall be enforceable pursuant to its terms. The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia. The Purchase Agreement and the Sale itself, and the consummation thereof, shall be, to the extent provided in the applicable agreement, specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person. The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the applicable purchaser, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all persons asserting encumbrances (collectively, the "**Bound Parties**"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and

5

shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Order and the terms and provisions of the Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Order and the Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Purchase Agreement and this Order without the need for further order of the Court.

H.    <u>Free and Clear Sale</u>.  The Debtors may sell the Property free and clear of all claims against or interests in the Debtors, their estates, or any of the Property because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of claims or interests who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).  Those holders of claims or interests who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f), including that such holders of claims or interests are adequately protected by having their claims that constitute interests in the Property, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing.

I.      If the Sale was not free and clear of all claims or interests, or if Buyer would, or in the future could, be liable for any of such claims, such purchaser would not have entered into and consummated the Sale, thus adversely affecting the Debtors and their estates and creditors. In addition, the sale of the Property other than pursuant to a transfer that is free and clear of all claims, interests, and encumbrances, would be of substantially less benefit to the Debtors' estates. The total consideration to be provided under the Sale reflects Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the applicable assets free and clear of all claims.

J.      <u>Sound Business Purpose</u>. The Debtors have demonstrated good, sufficient and sound business purposes and justifications for approval of the Settlement, and the approval of and entry into the Settlement and any ancillary agreements thereto (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates and their stakeholders; and (iii) are reasonable and appropriate under the Circumstances.

K.      <u>The Settlement Is Fair</u>. Given the facts and circumstances of these Chapter 11 Cases and the natures of the claims and causes of action that may be asserted by or on behalf of the Debtors and their estates against Buyer and by Buyer against the Debtors and their estates, the compromises and obligations contained in the Settlement are fair, reasonable and adequate, in the best interests of the Debtors' estates and their creditors, and represent a valid and proper exercise of the Debtors' business judgment.

#99078720v6

L.      Reasonableness of Settlement. The compromise and settlement of claims set forth in the Settlement substantially exceeds the lowest point in the range of reasonableness. The benefits and consideration that Buyer will provide pursuant to the Settlement are fair, equitable and constitute adequate consideration for the releases and other consideration that Buyer is to receive pursuant to the Settlement and constitute reasonably equivalent value therefor.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Motion is granted and approved to the extent indicated herein, and the Sale and Settlement contemplated thereby are authorized and approved as set forth in this Order.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn or otherwise resolved are overruled on the merits and denied. All persons and entities with notice of the relief sought in the Motion and set forth in this Order that failed to timely object thereto are deemed to consent to such relief, including for purposes of section 363(f)(2) of the Bankruptcy Code.

3.      The Debtors are authorized to enter into, and perform under, the Purchase Agreement and all other ancillary documents, including, without limitation, all exhibits and schedules attached to the Purchase Agreement.

4.      The Purchase Agreement and all other ancillary documents, all of the terms and conditions thereof, and the Sale and Settlement contemplated thereby, are hereby approved in all respects, except as otherwise expressly set forth herein. The failure specifically to include any particular terms of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale and Settlement be authorized and approved in their entirety.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Property to Buyer pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (b) close the Sale as contemplated in the Purchase Agreement and this Order, (c) effectuate the Settlement as contemplated in the Purchase Agreement, and (d) execute and deliver, perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the Sale and Settlement, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

6.      This Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any claims against any Debtor, any holders of claims against or on some or all of the Property, all counterparties to any executory contract or unexpired lease of the Debtors, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property. The terms and provisions of the Purchase Agreement and this Order shall inure to the benefit of the Debtors, their estates and their creditors, Buyer and its affiliates, and any other affected third parties, including all persons asserting any claims in the Property to be sold pursuant to the Purchase Agreement, notwithstanding any

9

subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  This Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

7.    The transfer of the Property shall constitute a legal, valid, binding, and effective transfer of each such Property and, upon the Debtors' receipt of the purchase consideration, shall be free and clear of liens, claims, and encumbrances.  Those holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Property, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing.  Upon the closing, the Debtors shall transfer the Property to Buyer.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Property shall be free and clear of liens and all interests, liabilities, obligations, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code).

8.    All persons and entities holding liens or interests in the Property arising under or out of, in connection with, or in any way relating to the Debtors or the transfer of such Property to Buyer hereby are forever barred, estopped, and permanently enjoined from asserting against Buyer or its successors or assigns, its property, or such persons' or entities' liens or interests in and to the Property.

10

9.      Except to the extent of the Debtors' post-closing obligations to Buyer set forth in the Purchase Agreement, after the closing of the sale, the Debtors shall have no further liability with respect to the Property, and any claims, whether administrative or otherwise, relating to or arising from such Property after the closing of the sale asserted against the Debtors shall be deemed disallowed.

10.      All liens and interests in the Property held by the Debtors' DIP Lenders shall attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing. Notwithstanding anything to the contrary herein, the net cash proceeds of the Sale will not be transferred or applied other than in accordance with the Final DIP Order [Docket No. 584].

11.      A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to act to cancel any of the liens and other encumbrances of record.

12.      If any person or entity that has filed statements or other documents or agreements evidencing liens on, or interests in, any of the Property shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to such assets, the Debtors and Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to such assets.

13.      This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons

and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

14.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Property.

15.     The Sale contemplated by the Purchase Agreement is undertaken by the Seller and Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate any transaction shall not affect the validity of such transaction (including, for the avoidance of doubt, the sale of the Property free and clear of all claims), unless such authorization and consummation of such transaction was stayed pending such appeal. Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. Buyer has not colluded with any potential purchasers, or any other parties interested in the Property, and therefore the sale of the Property may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

16.     The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (a) allow Buyer to deliver any notice provided for in the

#99078720v6

Purchase Agreement and any ancillary documents and (b) allow Buyer to take any and all actions permitted under this Order, the Purchase Agreement, and any ancillary documents in accordance with the terms and conditions thereof.

17.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Purchase Agreement and this Order. The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Purchase Agreement and this Order and the relief granted pursuant to this Order.

18.     From time to time, as and when requested by any party, each party to the Sale shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to effectuate the Settlement and consummate the Sale, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in Buyer its right, title and interest in and to the Property, as applicable.

19.     Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply. Time is of the essence in closing the Sale and the Seller and Buyer intend to close the Sale as soon as practicable. The Debtors and Buyer are authorized to close the Sale immediately upon entry of this Order.

#99078720v6

20.     The parties to the Sale may make any non-material modifications, amendments, or supplements to such agreement and to any related agreements, documents, or other instruments in accordance with the terms thereof without further order of this Court.

21.     Nothing contained in the Motion or this Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount, validity or priority of, or basis for any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a presumption, concession or admission by the Debtors of any fault, liability or wrongdoing as to any facts, claims or contentions that have been or might be alleged or asserted in connection with the Litigation that is the subject of the Settlement and the various releases contemplated thereby; or (h) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rules 6004(a) and the Local Rules are satisfied by such notice.

#99078720v6

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

24.     The Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement entered into for purposes of consummating the Sale and effectuating the Settlement, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Property or Settlement of the Litigation.

**Exhibit B**

**Purchase Agreement**

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made by and among Big Lots Stores – PNS, LLC, a California limited liability company, successor-by-conversion from PNS Stores, Inc. (the "Seller"), and 6351 Westminster Blvd, LLC, a Wyoming limited liability company ("Buyer"). The Effective Date of this Agreement shall be _____, 2024 (the "Effective Date").

## RECITALS

A. Seller and Buyer previously entered into a Purchase Agreement dated February 2, 2023 (the "Former Contract"), for the sale of the Property (defined below), which Former Contract Seller and Landlord acknowledge and agree is terminated, void, and of no further force or effect, and the parties acknowledge and agree that the Original Earnest Deposit (defined below) shall be applied as provided in this Agreement.

B. On April 7, 2024, Seller commenced a lawsuit against Buyer related to the Former Contract in the United States District Court for the Central District of California, commencing Case No. SACV 24-757-MWF (JDEx) (the "Litigation"). On or about August 9, 2024, Judgment was entered in the Litigation in favor of Seller. On September 4, 2024, Buyer filed a Notice of Appeal of the Judgment with the Ninth Circuit Court of Appeals, which commenced Appeal Docket No. 24-5432 (the "Appeal").

C. On September 9, 2024, Seller and various related entities filed voluntary chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing Bankruptcy Case No. 24-11970, which is being jointly administered with the other entities under Lead Case No. 24-11967 (JKS) (collectively, the "Bankruptcy Case").

D. Seller and Buyer acknowledge and agree that the Real Property (defined below) has previously been vandalized, but, nevertheless, Buyer remains interested in purchasing the Property from Seller.

E. Seller and Buyer acknowledge and agree that the Escrow Agent (defined below) is in possession of the Original Earnest Deposit, and hereby instruct the Escrow Agent to continue to hold and apply the Original Earnest Deposit as provided in this Agreement.

## SECTION 1 - THE PROPERTY.

1.1 - Agreement. Seller is the owner of the real property located at the address commonly known as 6351 Westminster Blvd., Westminster, CA 92683, as more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all improvements located thereon (the "Real Property"). Seller is also the owner or holder of certain appurtenant easements, rights, permits, entitlements, privileges and other intangible property relating to the Real Property (the "Intangibles"; the Real Property and Intangibles are all sometimes referred to collectively as the "Property"). On the terms and conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Property.

SECTION 2 - <u>PURCHASE PRICE</u>.  Buyer agrees to pay Seller, as the purchase price for the Property, the sum of Six Million One Hundred Thousand and 00/100 Dollars ($6,100,000.00) (the "<u>Purchase Price</u>").  The Purchase Price shall be paid as follows:

(a) Seller and Buyer acknowledge and agree that the Escrow Agent (as hereinafter defined) currently holds in escrow the amount of Two Hundred Thousand and 00/100 Dollars (the "<u>Original Earnest Deposit</u>") that Buyer deposited with the Escrow Agent pursuant to the Former Contract.  Buyer acknowledges and agrees that, except as expressly provided in Section 7.3 and Section 10.1 of this Agreement, the Original Earnest Deposit is not refundable to Buyer. Within three (3) business days following the Effective Date of this Agreement, Buyer shall deposit the additional sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000) with the Escrow Agent in escrow as an earnest money deposit (the "<u>2024 Earnest Deposit</u>"; together the Original Earnest Deposit and the 2024 Earnest Deposit, the "<u>Earnest Deposit</u>").  Except as expressly provided in this Agreement, the 2024 Earnest Deposit shall be nonrefundable to Buyer, but the Earnest Deposit shall be applicable to the Purchase Price at Closing (as hereinafter defined).

(b) Buyer shall deliver to the Escrow Agent (as hereinafter defined) the Purchase Price, less the Earnest Deposit and the credits authorized to Buyer, in immediately available funds, on or prior to the Closing Date (as hereinafter defined).

(c) Concurrently with depositing the 2024 Earnest Deposit with Escrow Holder, Buyer shall deposit, for immediate release to Seller, the sum of $100.00 (the "<u>Independent Consideration</u>") as consideration for Buyer's right to purchase the Property and for Seller's execution, delivery and performance of this Agreement.  The Independent Consideration (i) is in addition to and independent of any other consideration or payment provided for in this Agreement, (ii) is non-refundable and (iii) shall be retained by Seller notwithstanding any other provision of this Agreement.

SECTION 3 - <u>ESCROW AND TITLE INSURANCE</u>.

3.1 - <u>Escrow Agent</u>.  The parties hereto designate Chicago Title Insurance Company - National Commercial Services, 12500 Reed Hartman Highway, Suite 120, Cincinnati, Ohio 45241, Attn: Jordan Cohen, Jordan.Cohen@ctt.com ("<u>Title Company</u>") and as the escrow agent ("<u>Escrow Agent</u>") in connection with this transaction.  This Agreement shall serve as escrow instructions and shall be subject to the usual conditions of acceptance of Escrow Agent, insofar as the same are not inconsistent with any of the terms hereof.  By execution of this Agreement, Title Company agrees that the Earnest Deposit shall be held as a deposit under this Agreement in an interest-bearing account and: (a) applied against the Purchase Price if Closing occurs; or (b) delivered to Seller or Buyer, in accordance with the terms of this Agreement, if Closing does not occur.  Interest on the Earnest Deposit shall be paid to the party entitled to receive the Earnest Deposit (or portion thereof) pursuant to this Agreement.

3.2 - <u>No Due Diligence or Inspection Period</u>.  Buyer acknowledges and agrees that there is no diligence period or inspection period under this Agreement.  Buyers also acknowledges and agrees that there is no financing contingency or condition under this Agreement.

(a)     Buyer shall have the right to, at its sole cost and expense, obtain an ALTA Extended Coverage Owner's Policy of Title Insurance with respect to the Real Property ("ALTA Owner's Policy") in the amount of the Purchase Price from the Title Company, subject only to the Permitted Exceptions defined below, provided that Buyer acknowledges and agrees that Buyer's ability to obtain an ALTA Owner's Policy is not a condition or contingency under this Agreement.  Buyer acknowledges receipt of that certain Amended Preliminary Report #4, amended September 3, 2024 (the "Update Date"), Order No.: 00184037-987-OC1-JS9 (the "Original Commitment"), which was initially issued by the Title Company in connection with the Former Contract, to issue an ALTA Owner's Policies of Title Insurance for the Real Property in an amount equal to the Purchase Price (the "Title Policy").

(b)     Subject to Seller's obligations under Section 3.3 below, (i) all conditions, restrictions, reservations, easements, leaseholds, rights-of-way of record; (ii) all real estate taxes and assessments not yet due and payable; (iii) any portion of the Property situated within the confines of a publicly dedicated right-of-way or legal highway; (iv) all zoning ordinances and regulations; (v) all matters that would be disclosed by an accurate survey of the Real Property; and (iv) all matters identified in the Original Commitment are collectively referred to herein as the "Permitted Exceptions".

3.3 - Release of Mortgages.  Except for real estate taxes and assessments not yet due and payable as of the Closing and the Permitted Exceptions, it shall be a condition to Buyer's obligation to close that all mortgages, monetary liens and other encumbrances of ascertainable amounts incurred by, for, or on behalf of Seller shall be paid by Seller at or prior to Closing and removed from record by Title Company.

SECTION 4 - CONVEYANCE.  On the Closing Date, Seller shall convey title to the Real Property by grant deed (the "Deed"), in form and substance reasonably acceptable to the parties hereto, based on consultations with their respective local counsel, free and clear of all liens and encumbrances, except the Permitted Exceptions.

SECTION 5 - PRORATIONS AND CLOSING COSTS.

5.1 - Property Operating Expenses.  Operating Expenses (as hereinafter defined) for the Property shall be prorated as of 12:01 a.m. Pacific Time on the Closing Date.  Seller shall pay all utility charges and other operating expenses, if any and excluding Taxes (collectively, the "Operating Expenses"), attributable to the Real Property incurred prior to, but not including, the Closing Date and Buyer shall pay all utility charges and other operating expenses attributable to the Real Property incurred on or after the Closing Date.  If Seller is responsible for any public utility expenses with respect to the Real Property, meters for all public utilities (including water) being used on the Real Property shall be ordered read by Seller on the day of giving possession to Buyer and all charges to said date shall be paid by Seller.  To the extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, a proration shall be made at Closing based on the last available reading and post-closing adjustments between Buyer and Seller shall be made within twenty (20) days of the date that actual consumption for such pre-

- 3 -

Closing period is determined, which obligation shall survive the Closing and shall not be merged therein. Seller shall not assign to Buyer any deposits which Seller has with any of the utility services or companies servicing the Real Property. Buyer shall arrange with such services and companies to have accounts opened in Buyer's name beginning at 12:01 a.m., Eastern Time, on the Closing Date.

5.2 - <u>Real Estate Taxes and Assessments</u>. All real estate taxes and assessments, both general and special, with respect to the Real Property (collectively, "Taxes") for the current fiscal year of the applicable taxing authority in which the Closing Date occurs shall be prorated on a per diem basis as of 11:59 p.m. on the day prior to the Closing Date. Seller shall pay Taxes attributable to the Property to, but not including, the Closing Date and Buyer shall pay all Taxes attributable to the Property on or after the Closing Date. If the Closing occurs prior to the receipt by Seller of the bill for Taxes for the calendar year in which the Closing occurs, Taxes shall be prorated on the basis of the last officially certified and available tax duplicate. Seller shall be responsible for Taxes payable in respect to periods prior to the Closing and shall be entitled to any rebates and refunds for such periods. Buyer shall be responsible for Taxes on the Real Property payable in respect to all periods after the Closing and shall be entitled to any rebates and refunds for such periods. Such proration of Taxes will be final.

5.3 - <u>Costs to be Paid by Seller</u>. Seller shall pay or be charged with the following costs and expenses in connection with this transaction:

(a)     All state (and if applicable county and city) documentary transfer, sales, stamp and similar taxes and conveyance fees on the sale and transfer of the Property;

(b)     one-half (1/2) of the escrow fee charged by Escrow Agent;

(c)     the premium for the standard coverage portion of the Title Policy, if obtained by Buyer;

(d)     Seller's share of prorations; and

(e)     the fees and expenses of Seller's attorney(s).

5.4 - <u>Costs to be Paid by Buyer</u>. Buyer shall pay the following costs and expenses in connection with this transaction:

(a)     all state (and if applicable county and city) documentary transfer, sales, stamp and similar taxes and conveyance fees on the sale and transfer of the Property;

(b)     the escrow fee charged by Escrow Agent;

(c)     the cost of recording the Deed;

(d)     the cost of: the title examination, the Updated Commitment, and the premium for the Title Policy, if obtained by Buyer, including the cost of any endorsements thereto;

- 4 -

(e)     Buyer's share of prorations;

(f)     all costs incurred by Buyer in connection with its due diligence or other activities related to the Property, including, without limitation, the cost of any environmental report, property condition report or zoning report ordered by Buyer; and

(g)     the fees and expenses of Buyer's attorney(s).

## SECTION 6 – SETTLEMENT AND COMPROMISE

6.1 - <u>Release of Claims</u>. The Parties desire to fully and completely settle all disputes, claims, demands and causes of action against one another relating to the Litigation and/or the Appeal, including all causes of action brought or that could have been brought arising from the allegations raised in the Litigation (the "Compromise").

6.2 - Buyer, on behalf of itself, and its administrators, insurance companies, predecessors, successors, assigns, agents, servants, employees, members, corporations, officers, directors, partnerships, partners, associates, attorneys, representatives, principals, joint ventures, parents, trustees, subsidiaries, shareholders, past and present, or anyone else claiming by and through them, do hereby acknowledge full and complete satisfaction of and do hereby fully and forever release and discharge Seller, as well as its administrators, predecessors, successors, assigns, agents, servants, employees, members, corporations, insurance companies, officers, directors, partnerships, partners, associates, attorneys, representatives, principals, joint ventures, parents, trustees, subsidiaries, shareholders, past and present, and each of them, from any and all claims, demands and causes of action of any kind or nature whatsoever, whether known or unknown, suspected or unsuspected, whether concealed or hidden, which Buyer now owns, holds or may hereafter have against Seller, by reason of any matter relating to the Litigation.

6.3 - Seller on behalf itself and its administrators, insurance companies, predecessors, successors, assigns, agents, servants, employees, members, corporations, officers, directors, partnerships, partners, associates, attorneys, representatives, principals, joint ventures, parents, trustees, subsidiaries, shareholders, past and present, or anyone else claiming by and through it, does hereby acknowledge full and complete satisfaction of and does hereby fully and forever release and discharge Buyer, as well as its administrators, predecessors, successors, assigns, agents, servants, employees, members, corporations, officers, directors, partnerships, partners, associates, attorneys, representatives, principals, joint ventures, parents, trustees, subsidiaries, shareholders, past and present, and each of them, from any and all claims, demands and causes of action of any kind or nature whatsoever, whether known or unknown, suspected or unsuspected, whether concealed or hidden, which Seller now owns, holds or may hereafter have against Buyer, by reason of any matter relating to the Litigation.

6.4 - It is a condition hereof, and it is the intention of the Parties in executing this Agreement and in giving the releases set forth herein, that the same shall be effective as a bar to each and every claim, demand, and cause of action, matter or thing specified; and in furtherance of this specific intention, the Parties hereby expressly waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the California Civil Code which provides:

"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her would have materially affected his or her settlement with the debtor or released party."

6.5 - The Parties represent and warrant that they have been advised to seek advice from independent legal counsel of their own choosing regarding this Agreement and its terms and language, and understand and acknowledge the significance and consequence of these releases, and the specific waiver of Section 1542, and the Parties, and each of them, expressly consent that this Agreement and the releases set forth herein shall be given full force and effect according to each and all of their express terms and provisions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to any other claims, demands and causes of action herein above specified.

6.6 - The Buyer shall dismiss the Appeal within ten (10) business days of the Closing.

SECTION 7 - POSSESSION AND CLOSING; CONTINGENCIES AND CONDITIONS.

7.1 - Closing. The transaction contemplated herein shall be closed at the office of Escrow Agent within five (5) business days after (i) the date on which the Bankruptcy Court has entered an order approving this Agreement and Seller's sale of the Property to Buyer free and clear of any claims, liens, restrictions, security interests or other encumbrances of any kind under 11 U.S.C. § 363(f) and (ii) such order has become final and nonappealable. The time and date of such closing is referred to herein as the "Closing Date" or the "Closing".

7.2 - As soon as practicable after the Effective Date of this Agreement, Seller shall file with the Bankruptcy Court a motion seeking authority to approve the Compromise and the sale of the Property in accordance with the terms of this Agreement (the "Approval Motion"). Upon the Bankruptcy Court's entry of an order in form and substance reasonably satisfactory to Seller granting the Approval Motion (the "Bankruptcy Court Approval"), Seller shall promptly provide Buyer and Title Company with notice thereof. Either party may terminate this Agreement by written notice to the other if: (i) the Bankruptcy Court denies the Approval Motion; or (ii) the Bankruptcy Court fails to issue the Bankruptcy Court Approval within thirty (30) days after the filing of the above referenced motion by Seller; provided, however, that if the Bankruptcy Court fails to issue the Bankruptcy Court Approval within such thirty (30) day period and Buyer and Seller are using good faith efforts to obtain the Bankruptcy Court Approval, the thirty (30) day period shall be extended for an additional thirty (30) days. In the event of such termination, Escrow Agent shall disburse the Earnest Deposit in accordance with the provisions herein to Buyer and the parties shall have no further rights, duties or obligations under this Agreement, other than those which are expressly provided in this Agreement to survive the termination of this Agreement.

7.3 - The obligations of Seller under this Agreement to sell the Property and consummate the transaction contemplated hereby shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that Seller waives any of such conditions in writing at or prior to Closing:

(a)     Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed and complied with by Buyer on or before the Closing Date.

(b)     Seller shall have received each of the items to be delivered to it or for its benefit under this Agreement.

(c)     Between the Effective Date and the Closing Date, no written order shall have been entered and be in effect by any court of competent jurisdiction, and no law shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transaction contemplated hereby.

(d)     No suit or other proceeding shall be pending against Seller by any Person before any court or authority seeking to restrain or prohibit or declare illegal the transaction contemplated by this Agreement, or seeking damages against Seller in connection with the transactions contemplated by this Agreement.

(e)     Seller shall have filed a notice of this Agreement and Approval Motion in the Bankruptcy Court and either (i) no objections to this Agreement or the Approval Motion shall have been filed in the Case during the twenty-one (21) calendar day period immediately following the filing of such notice or any other such objection period as set forth in the Bankruptcy Court Approval (the "Objection Period") as evidenced by a copy of the docket in the Case or (ii) any objections filed within the Objection Period shall have been resolved and withdrawn, and in each of (i) or (ii), the Bankruptcy Court shall have entered an order granting the Approval Motion.

If any of the foregoing conditions are not fulfilled by the Closing, save and except those caused by the occurrence of Seller's material default, then Seller shall have the right, exercisable by delivering written notice to Buyer, to terminate this Agreement, then the 2024 Earnest Deposit shall be promptly refunded to Buyer, including any interest earned thereon, and the Original Earnest Money shall be promptly refunded to Seller, including any interest earned thereon; provided, however, that in the event any failure of a condition constitutes a material default by Buyer under Section 11.2 below, then Seller shall be entitled to exercise the remedies set forth in Section 11.2.

7.4 - Buyer's Conditions to Close.  Escrow shall not close unless and until the following conditions precedent and contingencies have been satisfied or waived in writing by Buyer:

(a)     All instruments described in Section 7.4 shall have been timely delivered to Escrow Agent;

(b)     On the Closing, Seller shall not be in default in the performance of any material covenant or agreement to be performed by Seller under this Agreement;

(c)     On the Closing, all representations and warranties made by Seller in Section 10.1 hereof shall be true and correct in all material respects as if made on and as of the Closing; and,

(d)     The Bankruptcy Court shall have entered an order granting the Approval Motion in a form satisfactory to Buyer to ensure the sale if approved free and clear of all liens, claims and interests in accordance with Bankruptcy Code Section 363(f) and which includes a finding that Buyer is a good faith purchaser as provided in Bankruptcy Code Section 363(m) ("Approval Order").

If any of the foregoing conditions are not fulfilled by the Closing, Buyer may elect to terminate this Agreement, in which event the Earnest Deposit shall be refunded to Buyer, including any interest earned thereon.

7.5 - Closing Deliveries.

(a)     Seller's Closing Deliveries. Not later than 12:00 p.m. Eastern Time on the Closing Date, Seller shall deliver to Escrow Agent:

   (i)      the Deed;

   (ii)     signed counterparts of an Assignment of Intangible Property, if any;

   (iii)    a certificate and affidavit of non-foreign status;

   (iv)     a completed 1099-S request for taxpayer identification number and certification and acknowledgment for Seller;

   (v)      a title affidavit from Seller reasonably required by Escrow Agent to aid Buyer to obtain the Title Policies free of any general exception, excluding coverage for zoning and mechanic's liens;

   (vi)     resolutions of Seller authorizing the sale of the applicable Property pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Seller;

   (vii)    a settlement statement with respect to the Closing;

   (viii)   exclusive possession of the Property to Buyer;

   (ix)     a certified copy of the Approval Order; and

   (x)      such other closing documents as may be reasonably necessary to consummate the transaction contemplated herein

(b)     Buyer's Closing Deliveries. Not later than 12:00 p.m. Eastern Time on the Closing Date, Buyer shall deliver to Escrow Agent:

   (i)      a settlement statement with respect to the Closing;

   (ii)     such other closing documents as may be reasonably necessary to consummate the transactions contemplated herein; and

- 8 -

(iii) the Purchase Price less the Earnest Deposit and any credits to which Buyer is expressly entitled hereunder.

(c) <u>Title Company and Escrow Agent Obligations</u>. At Closing, Title Company or Escrow Agent (as the case may be) shall:

(i) pay to Seller the Purchase Price less any credits to which Buyer is entitled;

(ii) deliver the Deed to Buyer by filing the Deed for record in the public records for the jurisdiction in which the Real Property is located;

(iii) if obtained by buyer, issue the Title Policy or Title Policies; and

(iv) charge Seller and Buyer for the closing costs as set forth in Section 5 above.

7.6 - <u>Covenants of Seller Pending Closing.</u>

(a) From and after the Effective Date through the Closing Date, Seller shall not modify, cancel, extend or otherwise change in any manner, the terms, covenants or conditions of any insurance policy insuring the Real Property, nor enter into any contracts for services or otherwise that may be binding upon the Property or upon Buyer, nor shall any easements be created or any licenses given on the Property (in each case, other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Property), without the express prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, subject to any requirements of the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller has ceased all operations of the Big Lots Store formerly operated at the Real Property.

(b) From the Effective Date through and including the Closing Date, Seller will not, without the prior written consent of Buyer, convey any interest in any license or permit or entitlement affecting any of the Property (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Property), and Seller will not subject any Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters which will not be eliminated prior to the Close of Escrow.

## SECTION 8 - CONDITION OF PROPERTY.

8.1 - <u>"As-Is" Condition</u>. BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER WILL HAVE, AS OF THE CLOSING, THOROUGHLY INSPECTED AND EXAMINED THE STATUS OF TITLE TO THE PROPERTY AND THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PHYSICAL CONDITION OF THE PROPERTY BY BUYER AND THAT BUYER IS PURCHASING, AND AT CLOSING WILL ACCEPT, THE PROPERTY ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS,

WARRANTIES AND/OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE. BUYER ACKNOWLEDGES THAT SELLER HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE THE PROPERTY. WITHOUT LIMITING THE FOREGOING, BUYER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT MADE AND WILL NOT MAKE, NOR SHALL SELLER BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO (I) THE FITNESS, DESIGN OR CONDITION OF THE PROPERTY FOR ANY PARTICULAR USE OR PURPOSE, (II) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (III) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (IV) SELLER'S TITLE THERETO WHICH IS BEING CONVEYED AS IS, WITH ALL DEFECTS AND OBJECTIONS, (V) VALUE, (VI) COMPLIANCE WITH SPECIFICATIONS, (VII) LOCATION, (VIII) USE, (IX) CONDITION, (X) MERCHANTABILITY, (XI) QUALITY, (XII) DESCRIPTION, (XIII) DURABILITY, (XIV) OPERATION, OR (XV) THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE AND ALL RISKS INCIDENT THERETO WHICH ARE TO BE BORNE BY BUYER.   BUYER FURTHER ACKNOWLEDGES THAT THE PROPERTY HAS BEEN (OR WILL BE, SUBJECT TO THE TERMS OF THIS AGREEMENT) INSPECTED BY BUYER AND IS (OR WILL BE, SUBJECT TO THE TERMS OF THIS AGREEMENT) SATISFACTORY TO IT.   IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY PORTION OF THE PROPERTY OF ANY NATURE, WHETHER LATENT OR PATENT, SELLER SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS SECTION 8.1 HAVE BEEN NEGOTIATED WITH THE ADVICE OF COUNSEL AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES BY SELLER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR THE TERMINATION OF THIS AGREEMENT.

Buyer acknowledges and agrees that it has not (and shall not) rely upon any statement and/or information from whomsoever made or given (including, but not limited to, any broker, attorney, agent, employee or other person representing or purporting to represent Seller) directly or indirectly, verbally or in writing, and Seller is not and shall not be liable or bound by any such statement and/or information.

Seller specifically disclaims any representation, warranty or guaranty with respect to the Property, express or implied, including, but not limited to, any representation or warranty as to the Property's compliance with zoning or other legal requirements or as to the availability or existence of any utility or other governmental or private services or as to the amount of taxes assessed to the Property.

8.2 - <u>Release of Claims Under Environmental Laws</u>.  Buyer, on behalf of itself and all future owners and occupants of the Real Property, hereby waives and releases Seller from, including, but not limited to, any claims for recovery of costs associated with conduct of any voluntary action or any remedial responses, corrective action or closure under any applicable federal, state or local environmental laws ("<u>Environmental Laws</u>"), including, but not limited to,

- 10 -

the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., as amended from time to time; and any similar federal, state and local laws and ordinances and the regulations and rules implementing such statutes, laws and ordinances. The foregoing waiver and release of Seller under this Section 8.2 shall be set forth in the Deed and shall be binding upon all future owners and occupants of the Real Property. Notwithstanding the foregoing, the foregoing waiver and release under this Section 8.2 shall not modify, limit or otherwise affect Seller's representations and warranties set forth in Section 10.1 hereof or Seller's liability hereunder for any breach thereof; nor shall Seller be released from, and Buyer shall not waive its claims against Seller with respect to: (a) any breach of Seller's representations, warranties, covenants or other obligations under this Agreement or any documents executed pursuant to this Agreement, (b) any third-party personal injury which arises during Seller's period of ownership, or (c) Seller's fraud or willful misconduct.

## SECTION 9 – CONFIDENTIALITY.

9.1 - Confidentiality. Buyer agrees that it shall treat all the information provided by seller concerning the Property (collectively, "Background Material") as confidential and proprietary to Seller. Notwithstanding any other provision to the contrary contained herein, Buyer shall not disclose, summarize or otherwise provide any or all of the Background Material to third parties except: (a) to the extent necessary in connection with its evaluation of the Property; (b) to the extent required by law; (c) to Buyer's mortgage lender(s) or investors, if any, involved in the transaction contemplated by this Agreement; or (d) with the express written consent of Seller. Prior to disclosing or providing access to any Background Material to any of Buyer's agents or representatives, Buyer shall (i) advise such parties of this Section and Buyer's obligations hereunder and (ii) require that such parties treat the Background Material in accordance herewith. If this Agreement terminates in accordance with the terms hereof, Buyer shall promptly return to Seller or destroy all Background Material it received and shall not retain any copies of the Background Material; provided, however, that Buyer has the ability to keep a copy of the Background Material for compliance purposes or for the purpose of defending or maintaining litigation or threatened litigation. Notwithstanding any provision in this Agreement to the contrary, and except to the extent required by Law, neither Buyer nor Buyer's agents shall contact any governmental authority regarding Buyer's discovery of any Hazardous Substances (as hereinafter defined) on, or any environmental conditions at, a Real Property without Seller's prior written consent thereto. In addition, if Seller's consent is obtained by Buyer, Seller shall be entitled to receive at least five (5) business days prior written notice of the intended contact and to have a representative present when Buyer has any such contact with any governmental official or representative. For the purposes of this Agreement, the term "Hazardous Substances" shall have the same definition as is set forth in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 et seq. (the "Superfund Act"); provided, however, that the definition of the term "Hazardous Substances" shall also include (if not included within the definition contained in the Superfund Act) petroleum and related byproducts, hydrocarbons, radon, asbestos, urea formaldehyde and polychlorinated biphenyl compounds. Buyer agrees that Seller may seek injunctive relief to prevent or limit an unauthorized disclosure of the Background Material and may also pursue any other remedies available under law or equity as a result of a breach or anticipated breach of this Section. All of the obligations of Buyer under this Section 9.1 shall survive the termination of this Agreement.

# SECTION 10 - REPRESENTATIONS AND WARRANTIES.

10.1 - By Seller.  Seller represents and warrants to Buyer that:

(a)     Big Lots Stores – PNS, LLC is a limited liability company duly organized and validly existing under the laws of the State of California.

(b)     Seller has the capacity and authority to execute this Agreement and perform the obligations of Seller under this Agreement, subject to Seller obtaining Bankruptcy Court Approval as described in Section 7.2 above.  All actions necessary to authorize the execution, delivery and performance of this Agreement by Seller have been taken and such action has not been rescinded or modified.

(c)     To the best knowledge of Seller, the execution and delivery of this Agreement and performance by Seller will not conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment, decree, loan agreement, bond, note, resolution, indenture, mortgage, deed of trust or other agreement or instrument to which it is a party and which affects the Property, subject to Seller obtaining Bankruptcy Court Approval as described in Section 7.2 above.

(d)     Seller is not a "foreign Person" within the meaning of Section 1445 of the Internal Revenue Code.

10.2 - By Buyer.  Buyer represents and warrants to Seller as of the Effective Date that:

(a)     Buyer is duly created and validly existing pursuant to the laws of the jurisdiction of its organization and is duly qualified to do business in the jurisdiction in which the Real Property is situated if and to the extent that such qualification is required.

(b)     Buyer has the capacity and authority to execute this Agreement and perform the obligations of Buyer under this Agreement.  All action necessary to authorize the execution, delivery and performance of this Agreement by Buyer has been taken, and such action has not been rescinded or modified.  Upon the execution of this Agreement, this Agreement will be legally binding upon Buyer and enforceable against Buyer in accordance with all of its provisions.  The person signing this Agreement on behalf of Buyer has been duly authorized to sign and deliver this Agreement on behalf of Buyer.

(c)     Buyer is not subject to any judgment or decree of a court of competent jurisdiction or governmental agency that would limit or restrict Buyer's right to enter into and carry out this Agreement.

(d)     Neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Buyer will constitute a breach under any contract or agreement to which Buyer is a party or by which Buyer is bound or affected.

(e)     No consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Buyer's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

(f)     None of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "USA Patriot Act").

(g)     Buyer is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

Buyer shall fully disclose to Seller, immediately upon Buyer's becoming aware of its occurrence, any change in facts or circumstances of which Buyer becomes aware prior to the Closing Date that may affect the representations and warranties set forth above.

SECTION 11 - DEFAULT.

11.1 - Seller Default. Notwithstanding any provision in this Agreement to the contrary, if Closing does not occur by reason of a material default by Seller which continues for five (5) days after written notice from Buyer, then Buyer shall have the right, as its sole and exclusive remedy, to either (a) terminate this Agreement, in which event Buyer shall receive the Earnest Deposit and neither of the parties hereto shall have any further rights or obligations hereunder, except for obligations that specifically survive the termination, or (b) sue Seller for specific performance. Other than the remedies set forth in the foregoing (a) and (b), no other remedy or relief shall be available to Buyer, and Buyer hereby waives any and all other remedies, including the right to sue Seller for damages. In the event that Buyer's right to sue for specific performance is unavailable as a remedy to Buyer because of Seller's affirmative acts, Buyer shall be entitled to pursue all rights and remedies available at law or in equity, provided, however, any recovery by Buyer shall not exceed the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) and shall be limited to Buyer's actual and verifiable, out-of-pocket expenses incurred in connection with the transaction contemplated by this Agreement. Notwithstanding any provision in this Agreement to the contrary, Buyer's right to sue Seller for specific performance is contingent upon Buyer filing suit against Seller for specific performance within ninety (90) days after the occurrence of Seller's material default delaying Closing and, in the event that Buyer does not file suit for specific performance within such ninety (90) day period, Buyer shall be deemed to have waived its right to sue Seller for specific performance, and the remedy set forth in Section 11.1(a) above to terminate this Agreement shall be Buyer's sole and exclusive remedy. The failure or refusal of

the Bankruptcy Court to approve this Agreement and/or the Closing shall entitle Buyer to the sole and exclusive remedy of terminating this Agreement, in which event the Earnest Deposit shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

11.2 - <u>Buyer Default</u>. Notwithstanding any provisions of this Agreement to the contrary, if the sale of the Property to Buyer is not consummated solely because of Buyer's material default under the express terms of this Agreement or if any representation or warranty by Buyer is not accurate as of the Closing Date, in addition to Seller's remedies under that certain Settlement Agreement dated as of even date herewith by and between Seller and Buyer, Seller shall be entitled to terminate this Agreement, and the Earnest Deposit, including any interest earned thereon, shall be delivered to Seller as agreed-upon liquidated damages as Seller's sole remedies. Seller and Buyer acknowledge that: (a) it would be impossible to accurately determine Seller's damages in the event of Buyer's default; (b) the Earnest Deposit is fair and equitable; and (c) Seller expressly waives the right to exercise any and all other rights available at law or in equity. The limitation of damages set forth herein shall not apply to any indemnities, covenants or obligations of Buyer which expressly survive either the termination of this Agreement or Closing, for which Seller shall be entitled to all rights and remedies available at law or in equity. Buyer shall not be deemed to be in default under this Agreement unless Seller shall have given written notice to Buyer and Buyer shall not have cured such default within five (5) business days after receipt of Seller's notice. The Closing Date shall be extended, as necessary, to accommodate the notice and cure period, provided that notice is delivered prior to the expiration of this Agreement.

11.3 - <u>BROKERS</u>. Seller and Buyer each represent and warrant that they have not been represented by any broker in connection with the sale of the Property and no commissions or fees are due to any other broker or finder by reason of either party's actions in this matter. Buyer and Seller shall each be responsible for all liability, if any, for any broker or finder fees payable with respect to the sale of the Property that are attributable to its actions. Seller and Buyer shall and do each hereby indemnify, defend and hold harmless the other from and against the claims, demands, actions and judgments of any and all brokers, agents and other persons or entities alleging a commission, fee or other payment to be owing by reason of their respective dealings, negotiations or communications in connection with this Agreement or the purchase and sale of the Property. The indemnity obligations in this Section shall survive the termination of this Agreement or the Closing.

<u>SECTION 12</u> - <u>EMINENT DOMAIN</u>. In the event of a taking of any portion of the Real Property by eminent domain for any public or quasi-public use which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price allocated to such Real Property or more, or if notice of intent of a taking or a sale in lieu of taking, which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price or more, is received by Seller or Buyer, at or prior to Closing, then Buyer shall have the right, to be exercised within thirty (30) days after notice of such taking or intended taking by written notice to Seller, to notify Seller whether it elects to proceed with the transactions contemplated by this Agreement or to terminate this Agreement. Failure to deliver notice is deemed Buyer's election to terminate this Agreement. If Buyer elects (or is deemed to have elected) to terminate this Agreement, Buyer shall receive the 2024 Earnest Deposit, including any interest earned thereon, and Seller shall receive the Original Earnest

- 14 -

Deposit, including any interest earned thereon, and neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination. In the event this Agreement is not terminated or Buyer is not entitled to terminate this Agreement pursuant to this Section, Buyer shall consummate this transaction on Closing Date (with no reductions in the Purchase Price), and Buyer shall be entitled to participate in any such condemnation or eminent domain proceedings and to receive all of the proceeds attributable to any portion of the Real Property to be conveyed to Buyer.

SECTION 13– [INTENTIONALLY OMITTED].

SECTION 14 - MISCELLANEOUS.

14.1 - Governing Law. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO AND/OR (II) THE PROPERTY. THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. The provisions of this Section shall survive the Closing or termination of this Agreement.

14.2 - Counterparts; Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Execution and delivery of this Agreement by electronic exchange bearing the copies of a party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

14.3 - Entire Agreement. This Agreement, together with the attached exhibit(s), contains all of the terms and conditions of the agreement between the parties hereto, and any and all prior and contemporaneous oral and written agreements are merged herein.

14.4 - Modifications and Waivers. This Agreement cannot be changed nor can any provision of this Agreement, or any right or remedy of any party, be waived orally. Changes and waivers can be made only in writing, and the change or waiver must be signed by the party against whom the change or waiver is sought to be enforced. Any waiver of any provision of this Agreement, or any right or remedy, given on any one or more occasions shall not be deemed a waiver with respect to any other occasion.

14.5 - Parties Bound. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors, and assigns of the parties hereto.

14.6 - Assignment. Buyer may not assign its rights and obligations under this Agreement without Seller's prior written consent; provided, however, at and concurrently with a Closing hereunder, Buyer may, subject to any requirements imposed by the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy, assign its rights and obligations under this Agreement, in whole or in part, to one or more entities without the consent of Seller, provided and on the condition that: (a) Buyer shall have given Seller written notice of the assignment and the identity of the assignee(s) at least seven (7) days prior to Closing; (b) Buyer is an affiliate of each

assignee; and (c) such assignee(s) shall have assumed Buyer's obligations hereunder by a written instrument of assumption in form and substance reasonably satisfactory to Seller. Notwithstanding any such assignment, Buyer shall nevertheless remain liable for all of Buyer's obligations hereunder.

14.7 - <u>Notices</u>. All notices, requests and other communications under this Agreement shall be in writing and shall be deemed given when made by personal delivery, sent by registered or certified mail, postage prepaid, return receipt requested, next or second business day by delivery by a nationally recognized overnight courier, addressed as follows, or email followed by another permitted means of delivery. Notice shall be deemed given on the date on which the notice is received or refused by a party in the case of personal delivery or email, the date on which it is deposited in the U.S. Mail, in the case of registered or certified mail, or on the next or second (whichever is applicable) business day immediately following receipt by the courier, in the case of an overnight courier:

<table>
<tr><td>If to Seller:</td><td>Big Lots Stores – PNS, LLC<br>4900 East Dublin Granville Road<br>Columbus, Ohio 43081<br>Attn: Chris Macke<br>Vice President, Legal – Real Estate<br>Email: cmacke@biglots.com</td></tr>
<tr><td>and</td><td>Big Lots Stores – PNS, LLC and Big Lots Stores, LLC<br>4900 East Dublin Granville Road<br>Columbus, Ohio 43081<br>Attn: Ronald A. Robins, Jr. (Rocky)<br>EVP, Chief Legal and Governance Officer<br>Email: rrobins@biglots.com</td></tr>
<tr><td>With a copy to:</td><td>Jacinto A. Nunez<br>Vorys, Sater, Seymour and Pease LLP<br>50 S. Main Street<br>Suite 1200<br>Akron, Ohio 44308<br>Email: janunez@vorys.com</td></tr>
<tr><td>If to Buyer:</td><td>6351 WESTMINSTER BLVD, LLC<br>Att: Andrew Fieler<br>Email: andrew.fielder@backbayig.com<br>3857 Birch St #195<br>Newport Beach, CA 92660</td></tr>
<tr><td>With a copy to:</td><td>James C. Bastian, Jr.<br>SHULMAN BASTIAN FRIEDMAN & BU LLP</td></tr>
</table>

- 16 -

100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
jbastian@shulmanbastian.com

AND

Michael J. Steponovich, Jr
STEPONOVICH & ASSOCIATES
A Professional Law Corporation
Email: mike@stepolaw.com
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656-2677
mike@stepolaw.com

14.8 - <u>Section Headings</u>. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

14.9 - <u>Severability</u>. If one or more of the provisions of this Agreement or the application thereof shall be invoked, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or any other application thereof shall in no way be affected or impaired.

14.10 - <u>Time of the Essence</u>. The parties agree that time is of the essence and that the failure of a party hereto to perform any act on or before the date specified herein for performance thereof shall be deemed cause for the termination hereof by the other party, without prejudice to other remedies available for default hereunder.

14.11 - <u>Confidentiality</u>. Without the prior written consent of the other party, neither Seller nor Buyer will disclose to any person, other than their legal counsel, auditors, accountants, investors or a proposed lender, either the fact that this Agreement has been entered into or any of the terms, conditions or other facts with respect thereto, including the status thereof; <u>provided,</u> that either party hereto may make such disclosure if compelled by court order or to comply with the requirements of any law, governmental order or regulation. Notwithstanding anything provided in this Agreement to the contrary, nothing herein shall prohibit Seller from taking any action that is required or appropriate in order to pursue or fulfill the requirements of the Bankruptcy Court Approval.

14.12 - <u>Further Action</u>. The parties hereto shall at any time, and from time to time on and after the Closing Date, upon the request of either, to, execute, acknowledge and deliver all such further acts, deeds, assignments and other instruments as may be reasonably required for the consummation of this transaction.

14.13 - <u>Construction</u>. This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties hereto, it being recognized that both Seller and Buyer have contributed substantially and materially to the preparation of this Agreement.

14.14 - <u>No Recording</u>. Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer.

14.15 - <u>Third-Party Beneficiary</u>. The provisions of this Agreement are not intended to benefit any parties other than Seller and Buyer.

14.16 - <u>Attorneys' Fees and Costs</u>. Notwithstanding anything to the contrary contained herein, in any action between the parties hereto seeking the enforcement of any of the terms and provisions of this Agreement, or in connection with the Property, the prevailing party in such action shall be awarded, in addition to damages, injunctive or other relief, its reasonable costs and expenses, and reasonable attorneys' fees.

14.17 - <u>Force Majeure</u>. Notwithstanding anything to the contrary contained in this Agreement, any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, judicial actions, civil commotions, fire or other casualty, epidemic, pandemic, disease, quarantine, or any other causes beyond the reasonable control of the party obligated to perform (collectively, "<u>Force Majeure</u>"), shall excuse the performance of any such party for a period equal to any such Force Majeure and, therefore, if this Agreement specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure, provided nothing in this Section shall excuse Buyer from the prompt payment of money or other charges required of Buyer in this Agreement.

14.18 - <u>Exclusivity; Encumbrance</u>. From the Effective Date through the Closing or earlier termination of this Agreement, Seller shall not voluntarily encumber or otherwise transfer the Property or enter into an agreement to transfer the Property or any of Seller's interest therein without the prior written consent of Buyer (in Buyer's sole and absolute discretion).

14.19 - <u>Jury Trial</u>. THE PARTIES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION CONTEMPLATED UNDER THE AGREEMENT OR ANY COURSE OF DEALINGS OR ACTIONS BY THE PARTIES RELATING TO THIS AGREEMENT. THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SURVIVES CLOSING UNDER OR TERMINATION OF THIS AGREEMENT. The provisions of this Section shall survive the Closing or termination of this Agreement.

14.20 - <u>Business Day</u>. As used herein, a business day shall mean any day other than Saturday, Sunday or other day that commercial banks in the State of Ohio are authorized or required to close under applicable law. In the event that the expiration of any time period hereunder shall expire on a Saturday, Sunday or legal holiday, then such time period shall be extended until the close of business on the next following business day.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the respective dates specified below.

**SELLER**:

**Big Lots Stores – PNS, LLC**, a California limited liability company

By: _____
    Jonathan Ramsden, EVP, CFO & CAO


Date: _____, 2024

**BUYER**:

**6351 Westminster Blvd, LLC**, a Wyoming limited liability company

By: _____

    Andrew Fielder, Manager

Date: _____, 2024


By: _____

    David Lipp, Manager

Date: _____, 2024

## ESCROW CONSENT AND ACKNOWLEDGMENT

The undersigned agrees to act as Title Company and Escrow Agent for the transaction described in the above Agreement as provided herein. Receipt of the Earnest Deposit is hereby acknowledged. The undersigned agrees to hold and deliver the Earnest Deposit in accordance with the terms of this Agreement.

### Chicago Title Insurance Company

Escrow No. _____          By: _____

_____ (Print Name)
Authorized Representative

Date: _____

## EXHIBIT A

The Real Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF WESTMINSTER, IN THE COUNTY OF ORANGE, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A: APN: 203-562-14

THAT PORTION OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 3, TOWNSHIP 5 SOUTH, RANGE 11 WEST, IN THE RANCHO LAS BOLSAS, AS SHOWN ON A MAP RECORDED IN BOOK 51, PAGE 13 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE CENTERLINE OF WESTMINSTER AVENUE AND WILLOW LANE, AS SHOWN ON A MAP OF TRACT NO. 2108, RECORDED IN BOOK 109, PAGES 3, 4 AND 5 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA; THENCE NORTH 89°25'00" EAST 280.00 FEET; THENCE NORTH 0°35'45" WEST 500.00 FEET TO THE SOUTH LINE OF SAID TRACT
NO. 2108; THENCE ALONG SAID SOUTH LINE AND ITS WESTERLY PROLONGATION SOUTH 89°25'00" WEST 280.00 FEET TO SAID CENTERLINE OF WILLOW LANE; THENCE SOUTH 0°35'45" EAST 500.00 FEET TO THE POINT OF BEGINNING. EXCEPT THAT PORTION THEREOF, INCLUDED WITHIN WILLOW LANE, AS SHOWN ON THE MAP OF SAID

TRACT NO. 2108.


PARCEL B:
NON-EXCLUSIVE EASEMENT FOR PARKING AS DESCRIBED IN THE AGREEMENT RECORDED JANUARY 17, 1961 IN BOOK 5632, PAGE 739 OF OFFICIAL RECORDS.

DocuSign Envelope ID: 9EC55277-4675-D-9654-FA9CD6E3F4E8

### COMMISSION AGREEMENT

TRANSACTION:          6351 Westminster Ave., Westminster, CA 92683

BROKER/PAYOR:          Lipp CDS, Inc.

CO-OP AGENT/PAYEE:  Back Bay Realty Group
                                      Attn: Andrew Fielder
                                      3857 BIRCH ST #195
                                      NEWPORT BEACH, CA 92660
                                      CA License ID:  02046883

FEE AMOUNT:          One hundred twenty thousand dollars ($120,000)

TERMS:          Payable within fifteen (15) days after close of escrow and receipt of funds.

AGREED AND ACCEPTED ON THIS ___3RD___ DAY OF MARCH 2023

LIPP CDS, INC.

_(signature)_

BY: Larry Lipp
ITS:  Broker

_(signature)_

Deron Conway

ITS:  Agent/Salesperson


**Back Bay Realty Group**
DocuSigned by:

_Andrew Fielder_

Andrew Fielder
ITS:  Founder & CEO



**CHICAGO TITLE
INSURANCE COMPANY**

**Chicago Title Insurance Company**
1 S. Main St., Suite 250
Dayton, OH 45402
Phone: (937)223-8378 Fax: 937-963-0843

**Closing Statement**

| | |
|---|---|
| **Settlement Date:** | January 31, 2025 |
| **Disbursement Date:** | January 31, 2025 |
| **Order Number:** | 38230047 |
| **Escrow Officer:** | Ruth Perry |
| **Buyer:** | 6351 Westminster Blvd, LLC, a Wyoming limited liability company<br>3857 Birch St. #195<br>Newport Beach, CA 92660 |
| **Seller:** | Big Lots Stores - PNS, LLC, a California limited liability company<br>4900 E Dublin Granville Rd<br>Westerville, OH 43081 |
| **Lender:** | BAI DEBT HOLDINGS A, LLC, a Delaware limited liability company |
| **Property:** | 6351 Westminster Blvd.<br>Westminster, CA 92683<br>Orange County<br>APN/Parcel ID: 203-562-14 |

| | Seller | | | Buyer | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | | **Debit** | **Credit** |
| | | **Sale Price** | | | |
| | 6,100,000.00 | Purchase Price | | 6,100,000.00 | |
| | | **Deposits** | | | |
| | | Deposit or Earnest Money | | | 250,000.00 |
| | | Deposit or Earnest Money | | | 200,000.00 |
| | | **Loan Amount** | | | |
| | | Principal Amount of New Loan | | | 4,400,000.00 |
| | | **Prorations/Adjustments** | | | |
| 2,429.49 | | County Tax Proration<br>30 days @ 80.983041 per day at $29,558.81<br>01/01/25-01/31/25 | | | 2,429.49 |
| | | **Loan Charges** | | | |
| | | Interest to be Wired to Lender at Close to BAI<br>DEBT HOLDINGS A, LLC, a Delaware limited<br>liability company | | 37,216.67 | |
| | | Broker Origination Fee to Venture West Funding<br>Inc. | | 44,000.00 | |
| | | Lender Original Issue Discount to BAI DEBT<br>HOLDINGS A, LLC, a Delaware limited liability<br>company | | 88,000.00 | |
| | | Processing Fee to Venture West Funding Inc. | | 795.00 | |
| | | UCC Search Fee to BAI DEBT HOLDINGS A, LLC,<br>a Delaware limited liability company | | 375.00 | |
| | | Background Searches to BAI DEBT HOLDINGS A,<br>LLC, a Delaware limited liability company | | 750.00 | |

## Closing Statement

| Seller | | | | Buyer | |
|---|---|---|---|---|---|
| Debit | Credit | | | Debit | Credit |
| | | **Loan Charges (continued)** | | | |
| | | Credit Report to BAI DEBT HOLDINGS A, LLC, a Delaware limited liability company | | 55.42 | |
| | | Appraisal Fee P.O.C.$5,000.00(B)* | | | |
| | | Appraisal Review Fee to BAI DEBT HOLDINGS A, LLC, a Delaware limited liability company | | 500.00 | |
| | | Phase I P.O.C.$2,300.00(B)* | | | |
| | | Review - Phase I to BAI DEBT HOLDINGS A, LLC, a Delaware limited liability company | | 500.00 | |
| | | Legal Fee P.O.C.$5,000.00(B)* | | | |
| | | Salis Law Fee to Salis Law | | 21,434.50 | |
| | | Insurance Invoice to Falcon West Insurance Brokers, Inc. Acct No. 10001 | | 6,143.34 | |
| | | Insurance Invoice to Falcon West Insurance Brokers, Inc. Invoice #272406/01003430670 | | 31,781.81 | |
| | | **Title/Escrow Charges** | | | |
| 1,500.00 | | Closing Fee to Chicago Title Insurance Company | | 1,500.00 | |
| | | Extended Owners Policy $6,100,000.00 (CLTA Standard Portion $7,162.00, ALTA Ext. Port. $1432.00) to Chicago Title | | 8,594.00 | |
| | | ALTA Lenders Policy $4,400,000.00 SI to Chicago Title | | 500.00 | |
| | | ALTA 8.2-06 - Commercial Environmental Protection Lien to Chicago Title | | 100.00 | |
| | | ALTA 9.2-06 - Restrictions, Encroachments, Minerals - Improved Land 2006 to Chicago Title | | 500.00 | |
| | | ALTA 9.9-06 - Private Rights to Chicago Title | | 500.00 | |
| | | ALTA 17-06 - Access and Entry to Chicago Title | | 75.00 | |
| | | ALTA 17-06 - Access and Entry to Chicago Title | | 75.00 | |
| | | ALTA 17.2-06 - Utility Access to Chicago Title | | 1,432.00 | |
| | | ALTA 18-06 - Single Tax Parcel to Chicago Title | | 100.00 | |
| | | ALTA 18-06 - Single Tax Parcel to Chicago Title | | 100.00 | |
| | | ALTA 26 - Subdivision 2021 to Chicago Title | | 716.00 | |
| | | ALTA 28-06 - Easement - Damage or Enforced Removal to Chicago Title | | 1,432.00 | |
| | | ALTA 28.1-06 - Encroachments - Boundaries and Easements to Chicago Title | | 1,432.00 | |
| | | ALTA 41-06 - Water - Buildings to Chicago Title | | 25.00 | |
| | | ALTA 41.1-06 - Water - Improvements to Chicago Title | | 716.00 | |
| 6,710.00 | | County Transfer Tax to Chicago Title | | | |

**Closing Statement**

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Title/Escrow Charges (continued)** | | |
| | | Recording Fees 2024000338972 to Chicago Title | 91.00 | |
| | | Recording Fees - Estimated to Chicago Title | 1,500.00 | |
| | | Recording Service Fee to Chicago Title | 45.00 | |
| | | ALTA 6-06 to Chicago Title | 0.00 | |
| | | ALTA 22.1-06 to Chicago Title | 0.00 | |
| | | ALTA 25-06 to Chicago Title | 0.00 | |
| | | ALTA 22-06 to Chicago Title | 0.00 | |
| | | ALTA 25-06 to Chicago Title | 0.00 | |
| | | SE-93 - Deletion of Arbitration 2006 Policy to Chicago Title | 0.00 | |
| | | ALTA 9-06 REM to Chicago Title | 0.00 | |
| | | ENDORSEMENT - SE 55 to Chicago Title | 0.00 | |
| | | **Miscellaneous Charges** | | |
| 15,489.20 | | 2nd half tax bill-Tax Parcel No. 203-562-14 to County of Orange | | |
| 26,128.69 | 6,100,000.00 | **Subtotals** | 6,350,984.74 | 4,852,429.49 |
| | | **Balance Due FROM Buyer** | | 1,498,555.25 |
| **6,073,871.31** | | **Balance Due TO Seller** | | |
| 6,100,000.00 | 6,100,000.00 | **Totals** | 6,350,984.74 | 6,350,984.74 |

*Paid outside of closing by buyer (B)

**See signature page to follow**

Docusign Envelope ID: 1B1A835F-4A64-4EAD-A9E5-A5A0C33258E9

# SIGNATURE PAGE TO BE ATTACHED TO THE FOLLOWING DOCUMENT:
### Closing Statement

**BUYER(S):**

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the Settlement Statement.

6351 Westminster Blvd, LLC, a Wyoming limited liability company

BY: _Andrew Fielder_

Andrew Fielder
Managing Member

**SELLER(S):**

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the Settlement Statement.

Big Lots Stores - PNS, LLC, a California limited liability company

By: Jonathan Ramsden
Its:  Executive Vice President, Chief Financial and Administrative Officer

To the best of my knowledge, the Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Chicago Title Insurance Company

BY: _____

Ruth Perry

## SIGNATURE PAGE TO BE ATTACHED TO THE FOLLOWING DOCUMENT:
### Closing Statement

**BUYER(S):**

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

6351 Westminster Blvd, LLC, a Wyoming limited liability company

BY:_____

    Andrew Fielder
    Managing Member

**SELLER(S):**

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

Big Lots Stores - PNS, LLC, a California limited liability company

_____

By: Jonathan Ramsden
Its: Executive Vice President, Chief Financial and Administrative Officer

To the best of my knowledge, the Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Chicago Title Insurance Company

BY:_____
    Ruth Perry

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS Inc. et al. | CASE NO: 24-11967 (JKS) |
| Debtors.1 | |

## CERTIFICATE OF SERVICE

I, Susan Barilich, of Susan Barilich, P.C. hereby certify that on the 4th day of August, 2025, I served a copy of the **REPLY OF LIPP CDS, INC. TO DEBTOR'S OBJECTION TO PROOF OF CLAIM** on the attached service list via electronic mail.

Susan Barilich, Esq. (CA Bar No. 159530)

## SERVICE LIST

**VIA CM/ECF:**

Robert J. Dehney, Sr., Esquire
Andre R. Remming, Esquire
Tamara K. Mann, Esquire
Sophie Rogers Churchhill, Esquire
Casey B. Sawyer, Esquire
**MORRIS, NICHOLS, ARSHT**
**& TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899


Brian M. Resnick, Esquire
Adam L. Shpeen, Esquire
Stephen D. Piraino, Esquire
Ethan Stern, Esquire
**DAVIS & POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017

Office of the United States Trustee
Attn: Linda Casey, Esquire
844 King Street, Suite 2207
Lockbox 35
Wilmington DE 19801

ORIGIN ID:JGKA        (818) 500-0377
SUSAN BARLICH
SUSAN BARLICH, P.C.
535 N. BRAND BLVD. STE. 504

GLENDALE, CA 91203
UNITED STATES US

SHIP DATE: 04AUG25
ACTWGT: 0.10 LB
CAD: 100267600/INET4535

BILL SENDER

TO **UNITED STATES BANKRUPTCY COURT**

**824 NORTH MARKET STREET**
**3RD FLOOR**
**WILMINGTON DE 19801**
(302) 252-2887        REF:
INV:
PO:                          DEPT:



TUE - 05 AUG 10:30A
**PRIORITY OVERNIGHT**

8833 0808 1490

## XA ZWIA        19801
                DE-US  PHL



4197 TUE 04/05 0744
824 MARKET ST
WILMINGTON DE
19801-3024-99
PRIORITY OVERNIGHT
773-1140SQ
STP-3  S9-P01100-Y  8833/0808/1490