**<u>Exhibit 5</u>**

# EXHIBIT 5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made by and among Big       Lots Stores – PNS, LLC, a California limited liability company, successor-by-conversion from PNS Stores, Inc. ( the "Seller"), and 6351 WESTMINSTER BLVD, LLC a Wyoming limited liability company ("Buyer"). The Effective Date of this Agreement shall be February 02, 2023 ("Effective Date").

SECTION 1 - THE PROPERTY.

> 1.1 - Agreement. Seller is the owner of the real property consisting of the property currently operating as a Big Lots Store located at the address commonly known as 6351 Westminster Blvd, Westminster, CA 92683 as more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all improvements located thereon (the "Real Property"). Seller is also the owner or holder of certain appurtenant easements, rights, permits, entitlements, privileges and other intangible property relating to the Real Property (the "Intangibles"). The Real Property and Intangibles are all sometimes referred to collectively as (the "Property"). On the terms and conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Property.

SECTION 2 - PURCHASE PRICE. Buyer agrees to pay Seller, as the purchase price for the Property, the sum of Six Million Eight Hundred Thousand and 00/100 Dollars ($6,800,000) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a)     Within three (3) business days following the Effective Date of this Agreement, Buyer shall deposit the sum of Two Hundred Thousand and 00/100 Dollars ($200,000.00) with the Title Company (as hereinafter defined) in escrow as an earnest money deposit (the "Earnest Deposit"). The Earnest Deposit shall be nonrefundable to Buyer upon the expiration of the Due Diligence Period (as hereinafter defined) except as otherwise expressly provided in this Agreement, but shall be applicable to the Purchase Price at Closing (as hereinafter defined).

(b)     Buyer shall deliver to the Escrow Agent (as hereinafter defined) the Purchase Price, less the Earnest Deposit and the credits authorized to Buyer, in immediately available funds, on or prior to the Closing Date (as hereinafter defined).

(c)     Concurrently with depositing the Earnest Deposit with Escrow Holder, Buyer shall deposit, for immediate release to Seller, the sum of $100.00 (the "Independent Consideration") as consideration for Buyer's right to purchase the Property and for Seller's execution, delivery and performance of this Agreement. The Independent Consideration (i) is in addition to and independent of any other consideration or payment provided for in this Agreement, (ii) is non-refundable and (iii) shall be retained by Seller notwithstanding any other provision of this Agreement.

SECTION 3 - ESCROW AND TITLE INSURANCE.

        3.1 - Escrow Agent.  The parties hereto designate Chicago Title Insurance Company - National Commercial Services, 12500 Reed Hartman Highway, Suite 120, Cincinnati, Ohio 45241, Attn: Rebecca Mishner ("Title Company") as the escrow agent ("Escrow Agent") in connection with this transaction.  This Agreement shall serve as escrow instructions and shall be subject to the usual conditions of acceptance of Escrow Agent, insofar as the same are not inconsistent with any of the terms hereof.  By execution of this Agreement, Title Company agrees that the Earnest Deposit shall be held as a deposit under this Agreement in an interest-bearing account and:  (a) applied against the Purchase Price if Closing occurs; or (b) delivered to Seller or Buyer, in accordance with the terms of this Agreement upon the written approval of Seller and Buyer, if Closing does not occur.  Interest on the Earnest Deposit shall be paid to the party entitled to receive the Earnest Deposit pursuant to this Agreement.

        3.2 - Title/Survey.

(a)    Buyer's obligation to acquire the Property shall be conditioned upon Seller's ability to convey to Buyer fee simple title to the Real Property, and the issuance by Title Company to Buyer of an ALTA Extended Coverage Owner's Policy of Title Insurance with respect to the Real Property ("ALTA Owner's Policy") in the amount of the Purchase Price, subject only to the Permitted Exceptions defined below.  Within ten (10) days after the Effective Date, Buyer shall have ordered from the Title Company one or more commitments (individually "Commitment" and collectively "Commitments") to issue one or more ALTA Owner's Policies of Title Insurance for the Real Property in an amount which equals the Purchase Price ( "Title Policy").  Buyer shall have the right to order and obtain, at its expense, one or more surveys of the Real Property ("Survey").  In the event Buyer desires to obtain a Survey, then Buyer shall obtain same no later than fifty (50) days after the Effective Date.  The Survey shall be prepared at Buyer's direction and certified to Seller, Buyer and the Title Company.  The Survey shall be in form and substance sufficient to delete the standard survey exception from the applicable Title Policy.

(b)    Buyer shall have the right to object to:  (i) any matters disclosed by the Commitment ("Title Objections") and (ii) any matters disclosed by the Survey ("Survey Objections"), provided that Buyer delivers written notice of any valid Title Objections or Survey Objections on or before the expiration of the Due Diligence Period; otherwise any such objections shall be deemed to be waived. With respect to new items identified in any supplemental title report or updated survey delivered after the expiration of the Due Diligence Period which materially and adversely affect the Real Property, Buyer shall have three (3) business days after receipt thereof (the "Supplemental Review Period") to disapprove any exceptions contained therein, otherwise such objections shall be deemed waived. If Buyer delivers in a timely manner written notice of any Title Objections and/or Survey Objections (including to any new items which Buyer timely objects to

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

during the Supplemental Review Period), then Seller shall have the right, in Seller's sole discretion, to: (i) cure the Title Objections and/or Survey Objections within ten (10) business days from the date of receipt of Buyer's objection to title and/or the Survey (the "Cure Period"), or (ii) at any time prior to or during the Cure Period, give notice to Buyer that Seller is either unable or unwilling to cure any or all of the Title Objections and/or Survey Objections (the "No Cure Notice"). If Seller does not fully cure the Title Objections and/or Survey Objections within the Cure Period, or if Seller delivers the No Cure Notice, then Buyer shall elect to do one (1) of the following: (x) terminate this Agreement, whereupon Escrow Agent shall promptly deliver the Earnest Deposit to Buyer, or (y) waive the Title Objections and/or Survey Objections and purchase the Property with such condition of title as Seller is able to convey and/or subject to the Title Objections and/or Survey Objections, without a reduction of the Purchase Price therefor, in which event the items objected to which were not cured shall be deemed to be acceptable to Buyer. Buyer shall make the foregoing election within two (2) business days after receiving the No Cure Notice or within two (2) business days after the expiration of the Cure Period, whichever is earlier; provided, however, that if Buyer fails to timely make such election, then Buyer shall be deemed to have elected to purchase the Property pursuant to the foregoing clause (y). All matters shown in the Commitment that are accepted by Buyer and/or are deemed to be accepted by Buyer pursuant to this Section 3.2 are collectively referred to herein as the "Permitted Exceptions."

        3.3 - Release of Mortgages. Except for real estate taxes and assessments not yet due and payable as of the Closing and the Permitted Exceptions, it shall be a condition to Buyer's obligation to close that all mortgages, liens and other encumbrances of ascertainable amounts incurred by, for, or on behalf of the Seller shall be paid by Seller at or prior to Closing and removed from record by Title Company.

SECTION 4- CONVEYANCE. On the Closing Date, Seller shall convey title the Real Property by (as the case may be) grant deed or special or limited warranty deed, as applicable in the applicable jurisdiction in which the applicable Real Estate is situated ("Deed"), in form and substance reasonably acceptable to the parties hereto, based on consultations with their respective local counsel(s), as the case may be, and free and clear of all liens and encumbrances, except the Permitted Exceptions.

SECTION 5 - PRORATIONS AND CLOSING COSTS.

        5.1 - Property Operating Expenses. Operating Expenses (as hereinafter defined) for the Property shall be prorated as of 12:01 a.m., Pacific Time on the Closing Date. Seller shall pay all utility charges and other operating expenses, if any and excluding Taxes (collectively, the "Operating Expenses"), attributable to the Real Property incurred prior to, but not including, the Closing Date and Buyer shall pay all utility charges and other operating expenses attributable to the Real Property incurred on or after the Closing Date. If Seller is responsible for any public utility

expenses with respect to the Real Property, meters for all public utilities (including water) being used on the Real Property shall be ordered read by Seller on the day of giving possession to Buyer and all charges to said date shall be paid by Seller. To the extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, a proration shall be made at Closing based on the last available reading and post-closing adjustments between Buyer and Seller shall be made within twenty (20) days of the date that actual consumption for such pre-Closing period is determined, which obligation shall survive the Closing and shall not be merged therein. Seller shall not assign to Buyer any deposits which Seller has with any of the utility services or companies servicing the Real Property. Buyer shall arrange with such services and companies to have accounts opened in Buyer's name beginning at 12:01 a.m., Eastern Time, on the Closing Date.

### 5.2 - Real Estate Taxes and Assessments.

(a)      All real estate taxes and assessments, both general and special, with respect to the Real Property (collectively, "Taxes") for the current fiscal year of the applicable taxing authority in which the Closing Date occurs shall be prorated on a per diem basis as of 11:59 p.m. on the day prior to the Closing Date. Seller shall pay Taxes attributable to the Property to, but not including, the Closing Date and Buyer shall pay all Taxes attributable to the Property on or after the Closing Date. If the Closing occurs prior to the receipt by Seller of the bill for Taxes for the calendar year in which the Closing occurs, Taxes shall be prorated on the basis of the last officially certified and available tax duplicate. Seller shall be responsible for Taxes payable in respect to periods prior to the Closing, and shall be entitled to any rebates and refunds for such periods. Buyer shall be responsible for Taxes on the Real Property payable in respect to all periods after the Closing and shall be entitled to any rebates and refunds for such periods. Such proration of Taxes will be final.

### 5.3 - Costs to be Paid by Seller. Seller shall pay or be charged with the following costs and expenses in connection with this transaction:

(a)      All state (and if applicable county and city) documentary transfer, sales, stamp and similar taxes and conveyance fees on the sale and transfer of the Property;

(b)      one-half (1/2) of the escrow fee charged by Escrow Agent;

(c)      the premium for the standard coverage portion of the Title Policy;

(d)      Seller's share of prorations; and

(e)      the fees and expenses of Seller's attorney(s).

### 5.4 - Costs to be Paid by Buyer. Buyer shall pay the following costs and expenses in connection with this transaction:

(a)     the cost of recording the Deed;

(b)     one-half of the escrow fee charged by Escrow Agent;

(c)     the cost of: the title examination, the Commitment, and the portion of the premium for the Title Policy that is in excess of the premium attributable to the standard coverage portion of the Title Policy, including the cost of any endorsements thereto;

(d)     the cost of the Survey, if obtained;

(e)     Buyer's share of prorations;

(f)     all costs incurred by Buyer in connection with its due diligence or other activities related to the Property, including, without limitation, the cost of any environmental report, property condition report or zoning report ordered by Buyer; and

(g)     the fees and expenses of Buyer's attorney(s).

## SECTION 6 – POSSESSION AND CLOSING; CONTINGENCIES AND CONDITIONS.

6.1 - Closing. The transaction contemplated herein shall be closed at the office of Escrow Agent not later than thirty (30) days after the expiration of the Due Diligence Period. The time and date of such closing is referred to herein as the "Closing Date" or the "Closing".

6.2 - The obligations of Seller under this Agreement to sell the Property and consummate the transaction contemplated hereby shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that Seller waives any of such conditions in writing at or prior to Closing:

(a)     Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed and complied with by Buyer on or before the Closing Date.

(b)     Seller shall have received each of the items to be delivered to it or for its benefit under this Agreement (defined below).

(c)     Between the Effective Date and the Closing Date, no written order shall have been entered and be in effect by any court of competent jurisdiction, and no law shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transaction contemplated hereby.

(d)     No suit or other proceeding shall be pending against Seller by any Person before any court or authority seeking to restrain or prohibit or declare illegal the

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

transaction contemplated by this Agreement, or seeking damages against Seller in connection with the transactions contemplated by this Agreement.

If any of the foregoing conditions are not fulfilled by the Closing, then Seller shall have the right, exercisable by delivering written notice to Buyer, to terminate this Agreement, then the Earnest Deposit, including any interest earned thereon, shall be promptly refunded to Buyer; provided, however, that in the event any failure of a condition constitutes a material default by Buyer under Section 10.2 below, then Seller shall be entitled to exercise the remedies set forth in Section 10.2.

6.3 - Buyer's Conditions to Close.  Escrow shall not close unless and until the following conditions precedent and contingencies have been satisfied or waived in writing by the Buyer:

(a)     All instruments described in Section 6.4 shall have been timely delivered to Escrow Agent;

(b)     On the Closing, Seller shall not be in default in the performance of any material covenant or agreement to be performed by Seller under this Agreement;

(c)     On the Closing, all representations and warranties made by Seller in Section 9.1 hereof shall be true and correct in all material respects as if made on and as of the Closing;

(d)     The Title Company is irrevocably committed to issue to Buyer the Owner's Title Policy;

(e)     All of the conditions in favor of Buyer set forth in Section 3 shall have been satisfied or waived by Buyer in the manner set forth therein;

(f)     No material adverse change shall have occurred with respect to the of the Real Property or the condition of title between the expiration of the Due Diligence Period and the Closing;

If any of the foregoing conditions are not fulfilled by the Closing, Buyer may elect to terminate this Agreement, in which event the Deposit shall be refunded to Buyer.

6.4 - Closing Deliveries.

(a)     Seller's Closing Deliveries.  Not later than 12:00 p.m. Eastern Time on the Closing Date, Seller shall deliver to Escrow Agent:

(i)      the Deed;

(ii)     signed counterparts of Assignment of Intangible Property, if any;

(iii)    a certificate and affidavit of non-foreign status;

(iv)     a completed 1099-S request for taxpayer identification number and certification and acknowledgment for Seller;

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

(v)    a title affidavit from Seller reasonably required by Escrow Agent that will enable Buyer to obtain the Title Policies free of any general exception for either mechanics' or materialmen's liens or parties in possession;

(vi)    resolution of Seller authorizing the sale of the applicable Property pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Seller;

(vii)    a settlement statement with respect to the Closing;

(viii)    exclusive possession of the Property to Buyer; and

(ix)    such other closing documents as may be reasonably necessary to consummate the transaction contemplated herein.

(b)    <u>Buyer's Closing Deliveries</u>. Not later than 12:00 p.m. Eastern Time on the Closing Date, Buyer shall deliver to Escrow Agent:

(i)    a settlement statement with respect to the Closing;

(ii)    such other closing documents as may be reasonably necessary to consummate the transactions contemplated herein; and

(iii)    the Purchase Price less the Earnest Deposit and any credits to which Buyer is expressly entitled hereunder.

(c)    <u>Title Company and Escrow Agent Obligations</u>.  At Closing, Title Company or Escrow Agent (as the case may be) shall:

(i)    pay to Seller the Purchase Price less any credits to which Buyer is entitled;

(ii)    deliver the Deed to Buyer by filing the Deed for record in the public records for the jurisdiction in which the Real Property is located;

(iii)    issue the Title Policy or Title Policies; and

(iv)    charge Seller and Buyer for the closing costs as set forth in Section 5 above.

6.5 - <u>Covenants of Seller Pending Closing</u>.

(a)    From and after the Effective Date through the Closing Date, Seller shall not modify, cancel, extend or otherwise change in any manner, the terms, covenants or conditions of any insurance policy insuring the Real Property, nor enter into any contracts for services or otherwise that may be binding upon the Property or upon Buyer, nor shall any easements be created or any licenses given on the Property, nor shall any legal action be taken with respect to the Property, without the express prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller intends to cease all operations of the Big Lot Store

presently operating from the Real Property at or prior to Closing. Seller shall remove from the Property prior to the Closing any of Seller's goods, trade fixtures, furniture, equipment, signage and other personal property located at the Real Property.

(b)     From the Effective Date through and including the Closing Date, Seller will not, without the prior written consent of Buyer, convey any interest in any license or permit or entitlement affecting any of the Property, and Seller will not subject any Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters which will not be eliminated prior to the Close of Escrow.

SECTION 7- CONDITION OF PROPERTY.

        7.1 - "As-Is" Condition.    BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER WILL HAVE, AS OF THE CLOSING, THOROUGHLY INSPECTED AND EXAMINED THE STATUS OF TITLE TO THE PROPERTY AND THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, SUBJECT TO SELLER'S EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT, AND EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PHYSICAL CONDITION OF THE PROPERTY BY BUYER AND THAT BUYER IS PURCHASING, AND AT CLOSING WILL ACCEPT, THE PROPERTY ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND/OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE; EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT.    BUYER ACKNOWLEDGES THAT SELLER HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE THE PROPERTY, OTHER THAN ANY ALTERATIONS OR REPAIRS WHICH ARE REQUIRED AS PART OF BUYER'S COVENANT IN SECTION 6.5(c).

Except as specifically set forth in this Agreement, Buyer acknowledges and agrees that it has not (and shall not) rely upon any statement and/or information from whomsoever made or given (including, but not limited to, any broker, attorney, agent, employee or other person representing or purporting to represent Seller) directly or indirectly, verbally or in writing, and Seller is not and shall not be liable or bound by any such statement and/or information.

Except as specifically set forth in this Agreement, Seller specifically disclaims any representation, warranty or guaranty with respect to the Property, express or implied, including, but not limited to, any representation or warranty as to the Property's condition, fitness for a particular purpose, quality, freedom from defects or contamination (whether or not detectable by

inspection), compliance with zoning or other legal requirements or as to the availability or existence of any utility or other governmental or private services or as to the amount of taxes assessed to the Property.

> 7.2 - <u>Release of Claims Under Environmental Laws</u>. Buyer, on behalf of itself and all future owners and occupants of the Real Property, hereby waives and releases Seller from, including, but not limited to, any claims for recovery of costs associated with conduct of any voluntary action or any remedial responses, corrective action or closure under any applicable federal, state or local environmental laws ("<u>Environmental Laws</u>"), including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., as amended from time to time; and any similar federal, state and local laws and ordinances and the regulations and rules implementing such statutes, laws and ordinances. The foregoing waiver and release of Seller under this Section 7.2 shall be set forth in the Deed and shall be binding upon all future owners and occupants of the Real Property. Notwithstanding the foregoing, the foregoing waiver and release under this Section 7.2 shall not modify, limit or otherwise affect Seller's representations and warranties set forth in Section 9.1 hereof or Seller's liability hereunder for any breach thereof; nor shall Seller be released from, and Buyer shall not waive its claims against Seller with respect to: (a) any breach of Seller's representations, warranties, covenants or other obligations under this Agreement or any documents executed pursuant to this Agreement, (b) any third-party personal injury which arises during Seller's period of ownership, or (c) Seller's fraud or willful misconduct.

<u>SECTION 8</u> – <u>DUE DILIGENCE</u>. The Close of Escrow is subject to and contingent on Buyer's approval, in its sole and absolute discretion, of all aspects of the Property on or before the expiration of the Due Diligence Period. Buyer may elect to approve or disapprove the Property (or any aspect thereof) in Buyer's sole and absolute discretion.

> 8.1 - <u>Seller's Due Diligence Materials</u>. To the extent not previously delivered, Seller shall, no later than three (3) business days after the Effective Date, deliver to Buyer's broker, with a copy to Buyer, copies of the following documents for review, if in Seller's actual possession and readily available (and to the extent said documents exist): a copy of an ALTA survey for each Property, copies of environmental reports, property condition reports, license agreements, plans, specifications, surveys, maintenance and repair records, permits and other approvals and licenses and entitlements related to the Real Property, zoning confirmations, drainage, engineering, utilities check, operating statements, operating expense reports, rent rolls related to the Real Property and reconciliations, tax bills, notices received from any governmental authority, any notices, correspondence and other documents relating to any litigation or condemnation affecting the Real Property, soil borings, service contracts,

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

tax receipts, title policies, utility information, tenant correspondence, primary contact information for each Tenant, the Leases and all amendments thereto and guaranties and assignments thereof, and site plans (collectively, the "Due Diligence Material"). Buyer hereby acknowledges that the Due Diligence Material is all the information necessary to facilitate Buyer's due diligence review of the Property and that Seller makes no representation or warranty about the accuracy or completeness of the Due Diligence Material.

8.2 - Inspections and Reports; Review of Title and Survey. Buyer shall have fifteen (15) days, commencing on the Effective Date (the "Due Diligence Period"), to perform any and all due diligence relating to the Property, and Seller shall permit Buyer and Buyer's representatives to enter any of the Real Property at any reasonable time for any purpose in connection with Buyer's proposed purchase, development or operation of the Real Property, including, without limitation, the right make such non-invasive inspections, investigations and tests as Buyer may elect to make or obtain, including without limitation, environmental (Phase I and/or Phase II), soils, seismic, geologic and engineering tests, analyses and studies' (collectively, the "Inspections"), provided Buyer shall provide Seller sufficient information to permit Seller to review and reasonably approve the scope of any invasive Inspections, including, without limitation, Phase II environmental sampling, soils, seismic, geologic and engineering tests, analyses, and studies. During the Due Diligence Period, pursuant to Section 3.2 above, Buyer shall also review the status of title to the Real Property and all matters relating to the Survey. Buyer shall promptly repair any damage to the Real Property attributable to the conduct of the Inspections, and shall promptly return the Real Property to substantially the same condition as existed prior to the conduct thereof. No Inspections shall be conducted without Seller's approval as to the time and manner thereof, which approval shall not be unreasonably withheld, conditioned or delayed and without at least twenty-four (24) hours prior notice from Buyer to Seller. At Seller's request, any such Inspection shall be performed in the presence of a representative of Seller.

If the results of the Inspections or the content of the Commitments, the Survey, and/or any reports or other written materials or information obtained or generated in connection with the conduct of the Inspections (the "Reports") are not acceptable to Buyer, then Buyer, in its sole discretion, may terminate this Agreement by written notice given to Seller on or prior to the last day of the Due Diligence Period, and neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination of this Agreement. If Buyer fails to terminate this Agreement on or prior to the last day of the Due Diligence Period, such failure shall not be deemed an election by Buyer to disapprove the Property. In addition, in the event that Buyer elects to terminate this Agreement (or is deemed to have terminated this Agreement) pursuant to this Section 8.2, then the Earnest Deposit, including any interest earned thereon, shall be promptly refunded to Buyer.

Buyer hereby agrees to indemnify, defend and hold harmless Seller from and against any losses, liabilities, damages, costs or expenses incurred by Seller as a result of Buyer's exercise of the right of inspection granted under this Section; provided, however, the foregoing indemnity shall not apply with respect to any claims arising out of the mere discovery of any adverse condition at any Real Property, any preexisting conditions at a Real Property or any acts or omissions of Seller, its officers, directors, shareholders, agents or employees. Buyer acknowledges and agrees that any such Inspections conducted by Buyer or Buyer's agents and representatives shall solely be at the risk of Buyer. Buyer shall cause any agent or representative which performs such Inspections to carry commercial general liability insurance covering all activities conducted on the Real Property ("Liability Insurance"). In the event Buyer or its employees perform any such Inspections, Buyer shall also carry Liability Insurance. Such Liability Insurance shall have limits of not less than One Million Dollars ($1,000,000) for personal injury to or death of any one person, Two Million Dollars ($2,000,000) for personal injury to or death of any number of persons in any one accident and One Million Dollars ($1,000,000) for property damage, and shall name Seller as an additional insured. All of the obligations of Buyer under this Section shall survive Closing or the termination of this Agreement

8.3 - Confidentiality. Buyer agrees that it shall treat all Due Diligence Material as confidential and proprietary to Seller. Notwithstanding any other provision to the contrary contained herein, Buyer shall not disclose, summarize or otherwise provide any or all of the Due Diligence Materials to third parties except: (a) to the extent necessary in connection with its evaluation of the Property; (b) to the extent required by law; (c) to Buyer's mortgage lender(s) or investors, if any, involved in the transaction contemplated by this Agreement; or (d) with the express written consent of Seller. Prior to disclosing or providing access to any Due Diligence Material to any of the Buyer's agents or representatives, Buyer shall (i) advise such parties of this Section and Buyer's obligations hereunder and (ii) require that such parties treat the Due Diligence Material in accordance herewith. If this Agreement terminates in accordance with the terms hereof, Buyer shall promptly return to Seller or destroy all Due Diligence Material it received and shall not retain any copies of the Due Diligence Material; provided, however, that Buyer has the ability to keep a copy of the Due Diligence Material for compliance purposes or for the purpose of defending or maintaining litigation or threatened litigation. Notwithstanding any provision in this Agreement to the contrary, and except to the extent required by Law, neither Buyer nor Buyer's agents shall contact any governmental authority regarding Buyer's discovery of any Hazardous Substances (as hereinafter defined) on, or any environmental conditions at, a Real Property without Seller's prior written consent thereto. In addition, if Seller's consent is obtained by Buyer, Seller shall be entitled to receive at least five (5) business days prior written notice of the intended contact and to have a representative present when Buyer has any such contact with any governmental official or representative. For the purposes of this Agreement, the term "Hazardous Substances" shall have the same definition as is set forth in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 et seq.

(the "Superfund Act"); provided, however, that the definition of the term "Hazardous Substances" shall also include (if not included within the definition contained in the Superfund Act) petroleum and related byproducts, hydrocarbons, radon, asbestos, urea formaldehyde and polychlorinated biphenyl compounds. Buyer agrees that Seller may seek injunctive relief to prevent or limit an unauthorized disclosure of the Due Diligence Materials and may also pursue any other remedies available under law or equity as a result of a breach or anticipated breach of this Section. All of the obligations of Buyer under this Section 8.3 shall survive the termination of this Agreement.

## SECTION 9 - REPRESENTATIONS AND WARRANTIES.

9.1 - By Seller. Seller represents and warrants to Buyer that:

(a)     Big Lots Stores – PNS, LLC is a limited liability company duly organized and validly existing under the laws of the State of California.

(b)     Seller has the capacity and authority to execute this Agreement and perform the obligations of Seller under this Agreement. All actions necessary to authorize the execution, delivery and performance of this Agreement by Seller has been taken and such action has not been rescinded or modified.

(c)     To the best knowledge of Seller, the execution and delivery of this Agreement and performance by Seller will not conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment, decree, loan agreement, bond, note, resolution, indenture, mortgage, deed of trust or other agreement or instrument to which it is a party and which affects the Property.

(d)     Seller is not a "foreign Person" within the meaning of Section 1445 of the Internal Revenue Code.

(e)     Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(f)     Neither Seller nor any affiliate of Seller has granted any options or rights of first refusal to acquire any interest in of the Real Property (or any portion thereof) to any Tenant under the Leases or to any other party.

(g)     There are no pending or, to Seller's actual knowledge (with no duty of inquiry or investigation), threatened actions, suits, arbitrations, claims or proceedings, at law or in equity, affecting all or any portion of the Real Property or in which Seller is

or will be a party by reason of its ownership of the Real Property, including, without limitation, judicial, municipal or administrative proceedings in eminent domain, health and safety violations, personal injuries or property damages alleged to have occurred on the Real Property or by reason of the condition or use of the Real Property.

(h)    Seller has received no written notice of (1) any violations of any laws, rules, regulations, codes or ordinances of any governmental authority with respect to the Real Property (including, without limitation, Environmental Laws) or (2) defaults under any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement affecting the Real Property.

(i)    To Seller's actual knowledge, with no duty of inquiry or investigation, all operations or activities upon, or use or occupancy of, the Real Property by Seller and any current or prior tenant, occupant or owner of the Real Property is and has been in all material respects in compliance with all state, federal and local laws and regulations governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge, release or disposal (whether accidental or intentional) of any Hazardous Substance and neither Seller, nor to the Seller's actual knowledge, with no duty of inquiry, any current or prior tenant or occupant or owner of the Real Property has engaged in or permitted any dumping, discharge, disposal, spillage or leakage (accidental or intentional) of such Hazardous Substances at, on, in, under, or about the Real Property in violation of Environmental Laws.    To Seller's actual knowledge, with no duty of inquiry or investigation, there has been no production, storage or disposal on the Real Property of any Hazardous Substance.  There are not now and have never been any underground storage tanks located on the Real Property.

(j)    Seller is in compliance with, and, to Seller's knowledge, all beneficial owners of Seller are, in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "**Order**") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "**OFAC Laws**").

(k)    To Seller's actual knowledge, with no duty of inquiry or investigation, Seller is not aware of any material inaccuracies in the Due Diligence Material delivered or made available to Buyer pursuant to this Agreement.

In the event that any representation or warranty by Seller is not accurate as of the Closing Date, Buyer, as its sole and exclusive remedy, shall have the right to terminate this Agreement, in which event the Earnest Deposit shall be returned to Buyer by Title Company, Seller shall pay for any title and survey fees and neither party hereto shall have any further obligations hereunder except for such obligations and indemnities which expressly survive the termination of this Agreement. Each of the representations and warranties of Seller contained in this Agreement is made as of the

Effective Date and as of the Closing Date, and shall survive the Closing and recording of the Deed for a period of nine (9) months following the Closing (the "Survival Period").

        9.2 - By Buyer.  Buyer represents and warrants to Seller as of the Effective Date that:

(a)    Buyer is duly created and validly existing pursuant to the laws of the jurisdiction of its organization and is duly qualified to do business in the jurisdiction in which the Real Property are situated if and to the extent that such qualification is required.

(b)    Buyer has the capacity and authority to execute this Agreement and perform the obligations of Buyer under this Agreement.  All action necessary to authorize the execution, delivery and performance of this Agreement by Buyer has been taken, and such action has not been rescinded or modified.  Upon the execution of this Agreement, this Agreement will be legally binding upon Buyer and enforceable against Buyer in accordance with all of its provisions.  The person signing this Agreement on behalf of Buyer has been duly authorized to sign and deliver this Agreement on behalf of Buyer.

(c)    Buyer is not subject to any judgment or decree of a court of competent jurisdiction or governmental agency that would limit or restrict Buyer's right to enter into and carry out this Agreement.

(d)    Neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Buyer will constitute a breach under any contract or agreement to which Buyer is a party or by which Buyer is bound or affected.

(e)    No consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Buyer's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

(f)    None of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "USA Patriot Act").

(g)    Buyer is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

Buyer shall fully disclose to Seller, immediately upon Buyer's becoming aware of its occurrence, any change in facts or circumstances of which Buyer becomes aware prior to the Closing Date that may affect the representations and warranties set forth above. In the event that any representation or warranty by Buyer is not accurate as of the Closing Date, Seller, as its sole and exclusive remedy, shall have the right to terminate this Agreement, in which event the Earnest Deposit shall be delivered and paid to Seller by Title Company and neither party hereto shall have any further obligations hereunder except for such obligations and indemnities which expressly survive the termination of this Agreement, and Seller expressly waives the right to sue Buyer for damages.

SECTION 10 - DEFAULT.

10.1 - Seller Default. Notwithstanding any provision in this Agreement to the contrary, if Closing does not occur by reason of a material default by Seller which continues for five (5) days after written notice from Buyer, then Buyer shall have the right, as its sole and exclusive remedy, to either (a) terminate this Agreement, in which event Buyer shall receive the Earnest Deposit and Seller shall reimburse Buyer for Buyer's actual and verifiable, out-of-pocket expenses incurred in connection with the transaction contemplated by this Agreement (not to exceed the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) and neither of the parties hereto shall have any further rights or obligations hereunder, except for obligations that specifically survive the termination, or (b) sue Seller for specific performance. Other than the remedies set forth in the foregoing (a) and (b), no other remedy or relief shall be available to Buyer, and Buyer hereby waives any and all other remedies, including the right to sue Seller for damages. In the event that Buyer's right to sue for specific performance is unavailable as a remedy to Buyer because of Seller's affirmative acts, Buyer shall be entitled to pursue all rights and remedies available at law or in equity, provided, however, any recovery by Buyer shall not exceed the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) and shall be limited to Buyer's actual and verifiable, out-of-pocket expenses incurred in connection with the transaction contemplated by this Agreement. Notwithstanding any provision in this Agreement to the contrary, Buyer's right to sue Seller for specific performance is contingent upon Buyer filing suit against Seller for specific performance within ninety (90) days after the occurrence of Seller's material default delaying Closing and, in the event that Buyer does not file suit for specific performance within such ninety (90) day period, Buyer shall be deemed to have waived its right to sue Seller for specific performance, and the remedy set forth in Section 10.1(a) above to terminate this Agreement shall be Buyer's sole and exclusive remedy.

10.2 - Buyer Default. Notwithstanding any provisions of this Agreement to the contrary, if the sale of the Property to Buyer is not consummated solely because of Buyer's material' default under the express terms of' this Agreement following the Due Diligence Period, Seller shall be entitled, as its sole and exclusive remedy, to terminate this Agreement, and the Earnest Deposit shall be delivered to Seller as agreed-upon

- 15 -

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

liquidated damages as Seller's sole remedy. Seller and Buyer acknowledge that: (a) it would be impossible to accurately determine Seller's damages in the event of Buyer's default; (b) the Earnest Deposit is fair and equitable; and (c) Seller expressly waives the right to exercise any and all other rights available at law or in equity. The limitation of damages set forth herein shall not apply to any indemnities, covenants or obligations of Buyer which expressly survive either the termination of this Agreement or Closing, for which Seller shall be entitled to all rights and remedies available at law or in equity. Buyer shall not be deemed to be in default under this Agreement unless Seller shall have given written notice to Buyer and Buyer shall not have cured such default within five (5) business days after receipt of Seller's notice. The Closing Date shall be extended, as necessary, to accommodate the notice and cure period provided that notice is delivered prior to the expiration of this Agreement. –

10.3 - <u>BROKERS</u>. Except Lipp CDS, Inc. and ROI Commercial Real Estate, Inc., which shall both be paid by Seller pursuant to a separate agreement, Seller and Buyer each represent and warrant that they have not been represented by any broker in connection with the sale of the Property and no commissions or fees are due to any other broker or finder by reason of either party's actions in this matter. Buyer and Seller shall each be responsible for all liability, if any, for any broker or finder fees payable with respect to the sale of the Property that are attributable to its actions. Seller and Buyer shall and do each hereby indemnify, defend and hold harmless the other from and against the claims, demands, actions and judgments of any and all brokers, agents and other persons or entities alleging a commission, fee or other payment to be owing by reason of their respective dealings, negotiations or communications in connection with this Agreement or the purchase and sale of the Property. The indemnity obligations in this Section shall survive the termination of this Agreement or the Closing.

SECTION 11 - <u>EMINENT DOMAIN</u>. In the event of a taking of any portion of the Real Property by eminent domain for any public or quasi-public use which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price allocated to such Real Property or more, or if notice of intent of a taking or a sale in lieu of taking, which is reasonably estimated by Seller to be valued at five percent (5%) of the Purchase Price or more, is received by Seller or Buyer, at or prior to Closing, then Buyer shall have the right, to be exercised within thirty (30) days after notice of such taking or intended taking by written notice to Seller, to notify Seller whether it elects to proceed with the transactions contemplated by this Agreement or to terminate this Agreement. Failure to deliver notice is deemed Buyer's election to terminate this Agreement. If Buyer elects (or is deemed to have elected) to terminate this Agreement, Buyer shall receive the Earnest Deposit and neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination. In the event this Agreement is not terminated or Buyer is not entitled to terminate this Agreement pursuant to this Section, Buyer shall consummate this transaction on Closing Date (with no reductions in the Purchase Price), and Buyer

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

shall be entitled to participate in any such condemnation or eminent domain proceedings and to receive all of the proceeds attributable to any portion of the Real Property to be conveyed to Buyer.

SECTION 12 – CASUALTY. If prior to the Closing Date, all or any material portion of a Real Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall notify Buyer in writing of such fact (which writing shall detail the amount of insurance recoverable). In the event the cost, as reasonably determined by Seller, to restore the damaged portion of a Real Property is in excess of five percent (5%) of the Purchase Price allocated to such Real Property, Buyer shall have the option to terminate this Agreement upon notice to Seller given within thirty (30) days after Buyer's receipt of Seller's written notice aforesaid. Failure to deliver notice is deemed Buyer's election to terminate this Agreement. Upon such termination, Escrow Agent shall return the Earnest Deposit to Buyer, this Agreement shall terminate and neither party shall have any further obligation or liability to the other. In the event Buyer does not so elect to terminate this Agreement as aforesaid, and/or is not entitled to terminate pursuant to this Section, Seller shall assign to Buyer any insurance claims and the amount of any deductible shall be subtracted from the Purchase Price and Buyer shall acquire the Property pursuant to this Agreement without any reduction in the Purchase Price. In the event of an uninsured casualty, Buyer shall receive a credit against the Purchase Price in the amount of the cost to repair and restore the Property (as determined by a mutually agreed upon third-party contractor).

SECTION 13 – [Intentionally Omitted].

SECTION 14 - MISCELLANEOUS.

14.1 - Governing Law. This Agreement shall be governed by the laws of the State of Ohio, without regard to rules regarding conflicts of laws.

14.2 - Counterparts; Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Execution and delivery of this Agreement by electronic exchange bearing the copies of a party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

14.3 - Entire Agreement. This Agreement, together with the attached exhibit(s), contains all of the terms and conditions of the agreement between the parties hereto, and any and all prior and contemporaneous oral and written agreements are merged herein.

14.4 - Modifications and Waivers. This Agreement cannot be changed nor can any provision of this Agreement, or any right or remedy of any party, be waived orally. Changes and waivers can be made only in writing, and the change or waiver must be signed by the party against whom the change or waiver is sought to be enforced. Any waiver of any provision of this Agreement, or any right or remedy, given on any one or more occasions shall not be deemed a waiver with respect to any other occasion.

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

14.5 - <u>Parties Bound</u>. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors, and assigns of the parties hereto.

14.6 - <u>Assignment</u>. Buyer may not assign its rights and obligations under this Agreement without Seller's prior written consent; <u>provided, however</u>, at and concurrently with a Closing hereunder, Buyer may assign its rights and obligations under this Agreement, in whole or in part, to one or more entities without the consent of Seller, provided and on the condition that: (a) Buyer shall have given Seller written notice of the assignment and the identity of the assignee(s) at least seven (7) days prior to Closing; (b) Buyer is an affiliate of each assignee; and (c) such assignee(s) shall have assumed Buyer's obligations hereunder by a written instrument of assumption in form and substance reasonably satisfactory to Seller. Notwithstanding any such assignment, Buyer shall nevertheless remain liable for all of Buyer's obligations hereunder.

14.7 - <u>Notices</u>. All notices, requests and other communications under this Agreement shall be in writing and shall be deemed given when made by personal delivery, sent by registered or certified mail, postage prepaid, return receipt requested, next or second business day by delivery by a nationally recognized overnight courier, addressed as follows, or email followed by another permitted means of delivery. Notice shall be deemed given on the date on which the notice is received or refused by a party in the case of personal delivery or email, the date on which it is deposited in the U.S. Mail, in the case of registered or certified mail, or on the next or second (whichever is applicable) business day immediately following receipt by the courier, in the case of an overnight courier:

If to Seller:    Big Lots Stores – PNS, LLC
                 4900 East Dublin Granville Road
                 Columbus, Ohio 43081
                 Attn: Chris Macke
                 Director, Real Estate Counsel
                 Email: cmacke@biglots.com

and

                 Big Lots Stores – PNS, LLC
                 4900 East Dublin Granville Road
                 Columbus, Ohio 43081
                 Attn: Ronald A. Robins, Jr. (Rocky)
                 EVP, Chief Legal and Governance Officer
                 Email: rrobins@biglots.com

With a copy to:  Jacinto A. Nunez
                 Vorys, Sater, Seymour and Pease LLP

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

50 S. Main Street
Suite 1100
Akron, Ohio 44224
Email: janunez@vorys.com

If to Buyer:     6351 WESTMINSTER BLVD, LLC
Att: David Lipp
Email: David.lipp@backbayig.com
3857 Birch St #195
Newport Beach, CA 92660

AND

6351 WESTMINSTER BLVD, LLC
Att: Andrew Fielder
Email: Andrew.Fielder@backbayig.com
3857 Birch St #195
Newport Beach, CA 92660

With copy to:    Michael Steponovich
STEPONOVICH & ASSOCIATES
Email: mike@stepolaw.com
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656-2677

Section Headings. The captions in this
Agreement are for convenience only and shall not
be considered a part of or affect the construction or
interpretation of any provision of this Agreement.

14.8 - Severability. If one or more of the provisions of this
Agreement or the application thereof shall be invoked, illegal or
unenforceable in any respect, the validity, legality and enforceability of the
remaining provisions or any other application thereof shall in no way be
affected or impaired.

14.9 - Time of the Essence. The parties agree that time is of the
essence and that the failure of a party hereto to perform any act on or before
the date specified herein for performance thereof shall be deemed cause for
the termination hereof by the other party, without prejudice to other
remedies available for default hereunder.

14.10 - Confidentiality. Without the prior written consent of the
other party, neither Seller nor Buyer will disclose to any person, other than
their legal counsel, auditors, accountants, investors or a proposed lender,
either the fact that this Agreement has been entered into or any of the terms,

conditions or other facts with respect thereto, including the status thereof; provided, that either party hereto may make such disclosure if compelled by court order or to comply with the requirements of any law, governmental order or regulation.

14.11 - Further Action. The parties hereto shall at any time, and from time to time on and after the Closing Date, upon the request of either, to, execute, acknowledge and deliver all such further acts, deeds, assignments and other instruments as may be reasonably required for the consummation of this transaction.

14.12 - Construction. This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties hereto, it being recognized that both Seller and Buyer have contributed substantially and materially to the preparation of this Agreement.

14.13 - No Recording. Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer.

14.14 - Third-Party Beneficiary. The provisions of this Agreement are not intended to benefit any parties other than Seller and Buyer.

14.15 - Attorneys' Fees and Costs. Notwithstanding anything to the contrary contained herein, in any action between the parties hereto seeking the enforcement of any of the terms and provisions of this Agreement, or in connection with the Property, the prevailing party in such action shall be awarded, in addition to damages, injunctive or other relief, its reasonable costs and expenses, and reasonable attorneys' fees.

14.16 - 1031 Exchange. If so requested by either party, the other party will cooperate in structuring and completing this transaction for the requesting party so as to effect a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended. In particular, such other party will consent to the assignment by the requesting party prior to the Closing hereunder of its rights hereunder to a "qualified intermediary" or other third party for such purposes. The foregoing notwithstanding, in connection with any such exchange, neither party shall have any obligation to acquire title to any real property nor to enter into any contract: (a) that may create or impose upon such party any non-monetary obligation or negative covenant; (b) that does not provide that the sole and exclusive remedy of any seller for a breach shall be to retain as liquidated damages the deposit paid to said seller; or (c) that requires such party to execute any mortgage, deed of trust or similar financing instrument. It is further agreed that: (a) neither party shall assume any responsibility for the tax consequences to any other party arising out of any exchange effected pursuant to this Section; (b) the requesting party shall reimburse the other

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

party for all additional costs and expenses (including reasonable attorney's fees) incurred by such other party in connection with any such exchange; and (c) the requesting party shall indemnify and hold the other party harmless from and against any and all loss, cost, damage, expense or other liability (including reasonable attorneys' fees) that such other party may incur or suffer in the performance of its obligations under this Section.

14.17 - Exclusivity; Encumbrance. From the Effective Date through the Closing or earlier termination of this Agreement, Seller will not discuss, negotiate or execute any contract for the sale of the Property to any third party other than Buyer (or its permitted assignee), and Seller shall not voluntarily encumber or otherwise transfer the Property or enter into an agreement to transfer the Property or any of Seller's interest therein without the prior written consent of Buyer (in Buyer's sole and absolute discretion).

14.18 - Post-Closing Obligations. Notwithstanding anything to the contrary herein (but without limiting Seller's obligations or liabilities hereunder), from and after the Closing and for the duration of the Survival Period, Seller shall maintain the resources and means necessary to satisfy all of its post-Closing obligations.

14.19 - Business Day. As used herein, a business day shall mean any day other than Saturday, Sunday or other day that commercial banks in the State of Ohio are authorized or required to close under applicable law. In the event that the expiration of any time period hereunder shall expire on a Saturday, Sunday or legal holiday, then such time period shall be extended until the close of business on the next following business day.

[remainder of page intentionally left blank]

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the respective dates specified below.

**SELLER**:

**Big Lots Stores – PNS, LLC**, a California limited liability company

By: _Jonathan Ramsden_
Printed Name: Jonathan Ramsden
Its: EVP, CF&AO

Date: _February 3_, 2023

**BUYER**:

6351 WESTMINSTER BLVD, LLC, a Wyoming Limited Liability Company

By: _Andrew Fielder_
Printed Name: Andrew Fielder
Title: Manager

Date: February 02, 2023

By: _David Lipp_
Printed Name: David Lipp
Title: Manager

Date: February 02, 2023

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

## ESCROW CONSENT AND ACKNOWLEDGMENT

The undersigned agrees to act as Title Company and Escrow Agent for the transaction described in the above Agreement as provided herein. Receipt of the Earnest Deposit is hereby acknowledged. The undersigned agrees to hold and deliver the Earnest Deposit in accordance with the terms of this Agreement

**Chicago Title Insurance Company**

Escrow No. _____        By:    _____

_____ (Print Name)

Authorized Representative

Date: _____

4788834.5

DocuSign Envelope ID: 477D1995-2332-4867-B061-ADAF7BF2C117

**Exhibit A**

Big Lots Store # 4107 – Westminster, CA

**6351 Westminster Blvd.**

**Westminster, CA 92683**