**Exhibit 10**

# EXHIBIT 10

                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                    .  Chapter 11
    IN RE:                          .
                                    .  Case No. 24-11967(JKS)
    BIG LOTS, INC., et al,          .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
                        Debtors. .
    . . . . . . . . . . . . . .  .  Thursday, December 19, 2024

                         TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE J. KATE STICKLES
                   UNITED STATES BANKRUPTCY JUDGE


    APPEARANCES:

    For the Debtors:            Robert Dehney, Esq.
                                Andrew R. Remming, Esq.
                                Sophie Rogers Churchill, Esq.
                                MORRIS, NICHOLS, ARSHT
                                 & TUNNELL, LLP
                                1201 North Market Street
                                16th Floor
                                Wilmington, Delaware 19899

                                Brian M. Resnick, Esq.
                                Adam L. Shpeen, Esq.
                                Stephen D. Piraino, Esq.
                                Vincent Cahill, Esq.
                                Kevin L. Winiarski, Esq.
                                Jacob Goldberger, Esq.
                                DAVIS, POLK & WARDWELL, LLP
                                450 Lexington Avenue
                                New York, New York 10017


    (Appearances Continued)

    Audio Operator:            Electronically Recorded
                               by Sean Moran, ECRO

    Transcription Company:     Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email:  gmatthews@reliable-co.com


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

APPEARANCES:

For the U.S. Trustee:            Linda Casey, Esq.
                                 OFFICE OF THE U.S. TRUSTEE
                                 844 King Street, Suite 2207
                                 Wilmington, Delaware 19801

For the Official Committee
of Unsecured Creditors:          Justin R. Alberto, Esq.
                                 Stacy L. Newman, Esq.
                                 COLE SCHOTZ, PC
                                 500 Delaware Avenue, Suite 1410
                                 Wilmington, Delaware 19801

                                 Darren Azman, Esq.
                                 MCDERMOTT, WILL & EMERY, LLP
                                 One Vanderbilt Avenue
                                 New York, New York 10017

For the RPI Landlords:           William D. Sullivan, Esq.
                                 SULLIVAN HAZELTINE ALLINSON, LLC
                                 919 North Market Street
                                 Suite 420
                                 Wilmington, Delaware 19801

For NP-AC Industrial
Holdings, LLC:                   Lawrence J. Kotler, Esq.
                                 DUANE MORRIS, LLP
                                 1201 North Market St, Suite 501
                                 Wilmington, Delaware 19801

For Various Landlords:           Leslie C. Heilman, Esq.
                                 BALLARD SPAHR, LLP
                                 919 North Market Street
                                 11th Floor
                                 Wilmington, Delaware 1980

                                 Ivan M. Gold, Esq.
                                 ALLEN, MATKINS, LECK, GAMBLE,
                                  MALLORY & NATSIS, LLP
                                 3 Embarcadero Center, 12th Floor
                                 San Francisco, California 94111

For Various Landlords and
the Tempur Sealy Parties:        Susan E. Kaufman, Esq.
                                 LAW OFFICE OF SUSAN E.
                                  KAUFMAN, LLC
                                 919 N Market Street
                                 Wilmington, Delaware 19801

(Appearances Continued)

APPEARANCES:  (Continued)

For Ollie's Bargain
Outlet:                          Josef W. Mintz, Esq.
                                 Lawrence R. Thomas, III, Esq.
                                 BLANK ROME, LLP
                                 1201 North Market Street
                                 Suite 800
                                 Wilmington, Delaware 19801

For Phillips Edison
& Company:                       Monique B. DiSabatino, Esq.
                                 SAUL EWING, LLP
                                 1201 North Market Street
                                 Suite 2300
                                 Wilmington, Delaware 19899

For Blue Owl Real
Estate Capital, LLC:             Domenic E. Pacitti, Esq.
                                 KLEHR HARRISON HARVEY
                                  BRANZBURG, LLP
                                 919 North Market Street
                                 Suite 1000
                                 Wilmington, Delaware 19801

For Loop 288 Properties,
LLC:                             Ericka F. Johnson, Esq.
                                 BAYARD, PA
                                 600 North King Street, Suite 400
                                 Wilmington, Delaware 19801

For the Kroger Parties:          Joshua B. Brooks, Esq.
                                 LANDIS, RATH & COBB LLP
                                 919 Market Street, Suite 1800
                                 Wilmington, Delaware 19801

For Gordon Brothers
Retail Partners, LLC:            Steven Fox, Esq.
                                 RIEMER & BRAUNSTEIN LLP
                                 Times Square Tower
                                 Seven Times Sq, Suite 2506
                                 New York, New York 10036

For PNC Bank, N.A.:              John F. Ventola, Esq.
                                 CHOATE, HALL & STEWART LLP
                                 Two International Place
                                 Boston, Massachusetts 02110

(Appearances Continued)

APPEARANCES:   (Continued)

1903P Loan Agent, LLC:        Chad B. Simon, Esq.
                              OTTERBOURG, P.C.
                              230 Park Ave. Suite 29
                              New York, New York 10169


APPEARANCES VIA ZOOM:   (On the Record)

For Peak Living, Inc.,
Delta Furniture
Manufacturing, LLC,
and Independent
Furniture Supply Co.,
Inc.:                         Danielle Mashburn-Myrick, Esq.
                              PHELPS DUNBAR, LLP
                              101 Dauphin Street, Suite 1000
                              Mobile, Alabama 36602

For Baltimore Gas and
Electric Company, et al:      Russell R. Johnson, III, Esq.
                              LAW FIRM OF RUSSELL R. JOHNSON,
                               III, PLC
                              14890 Washington Street
                              First Floor
                              Haymarket, Virginia 20169

For Simmons Bedding
Company:                      Beth E. Rogers, Esq.
                              ROGERS LAW OFFICES
                              River Ridge
                              9040 Roswell Road, Suite 205
                              Atlanta, Georgia 30350

For Burlington Coat
Factory Warehouse
Corporation:                  Kristhy M. Peguero, Esq.
                              JACKSON WALKER LLP
                              1401 McKinney Street, Suite 1900
                              Houston, Texas 77010

For Kimco Realty
Corporation:                  Rachel B. Mersky, Esq.
                              MONZACK, MERSKY, MCLAUGHLIN
                               & BROWDER, P.A.
                              1201 North Orange Street
                              Suite 400
                              Wilmington, Delaware 19801


(Appearances Continued)

APPEARANCES VIA ZOOM:  (On the Record - Continued)

Also Appearing:                 Kevin Abrams
                                CONROAD ASSOCIATES, LP

                                Emilio Amendola
                                A&G REAL ESTATE PARTNERS

INDEX

                                                              PAGE

STATUS CONFERENCE                                               7


MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I)                    58
AUTHORIZING AND APPROVING (A) THE DEBTORS' ASSUMPTION
OF AND PERFORMANCE UNDER THE PURCHASE AGREEMENT AND
(B) THE SALE OF THE WESTMINSTER ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS, (II) APPROVING THE SETTLEMENT AND (III)
GRANTING RELATED RELIEF

FOURTH NOTICE OF (A) BID DEADLINE, (B) SALE HEARING,          61
AND (C) POTENTIAL ASSUMPTION AND ASSIGNMENT OF
CERTAIN UNEXPIRED LEASES

MOTION TO FILE UNDER SEAL THE SUPPLEMENTAL DECLARATION        77
OF CLIFF ZUCKER IN SUPPORT OF THE APPLICATION ORDER
AUTHORIZING THE EMPLOYMENT AND RETENTION OF FTI
CONSULTING, INC. AS FINANCIAL ADVISOR FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS EFFECTIVE AS OF
SEPTEMBER 25, 2024



EXHIBIT                                                       EVID.

Amendola Declaration at ECF 1375                              62

1           (Proceedings commence at 1:05 p.m.)

2               THE COURT:  Good afternoon, everyone.  Please be

3  seated.

4               This is Judge Stickles.  We're on the record in Big

5  Lots, Case Number 24-11967.

6               Good afternoon.

7               MR. RESNICK:  Good afternoon, Your Honor.  For the

8  record, Brian Resnick of Davis Polk on behalf of the debtors.

9  And I'm joined today by several of my colleagues as well as

10  our co-counsel at Morris Nichols.

11               I'd like to thank Your Honor for scheduling time

12  for us today before the holidays, kind of a busy time.

13               Your Honor, we have, I think, two things that are

14  uncontested going forward on the agenda, but we also have an

15  important status update.  I'm happy to take it in whatever

16  order Your Honor would like.

17               THE COURT:  Whatever order you want to proceed in.

18               MR. RESNICK:  All right.  I'm going to start with

19  the status update --

20               THE COURT:  Okay.

21               MR. RESNICK:  -- because I think there's a lot

22  going on and we can cover the underbrush later in the

23  hearing.

24               So, Your Honor, I don't know if you saw the news,

25  but within the last two hours, we filed a press release that

1  announced that, unfortunately, the previously announced sale

2  to Nexus is not going to happen, unfortunately.

3  THE COURT:  Okay.  I had not seen that.

4  MR. RESNICK:  Yeah, it just hit the wires and we

5  hadn't filed anything on the docket yet to that effect, so

6  I'm not surprised.

7  Your Honor, it's an unfortunate development.

8  Basically, just to rewind from when we were last here, we --

9  as Your Honor was aware, we were trying to close the sale

10 December 2nd or 3rd.  And over that time period leading up to

11 that, Nexus informed us that they needed a little more time,

12 another week or so, a week or week and a half.

13 And in that intervening time, they informed us that

14 they're -- that a condition to closing would not be

15 satisfied, this being the minimum asset test.  There was a --

16 there was a condition that the asset level be at a certain

17 level and that that wouldn't be satisfied.  However, they did

18 inform us that they were hoping to still close the sale, they

19 just believed that additional liquidity was needed in the

20 business.  And so the debtors and Nexus searched in earnest

21 for other parties to put in additional liquidity into the

22 Nexus deal, and we worked very hard to try to get that done.

23 And then, leading up to, I guess last weekend, when

24 we had a sale closing milestone of December 13th, which was

25 last, you know, Friday, and we were unable to get the sale,

1    you know, done -- closed by then, and so we were in default

2    as of the 14th.

3            At the same time, in discussions with Nexus, it

4    became clear, they basically informed us that they did not

5    really see a likely pathway to being able to close by the

6    December 31st outside date, though they were happy to

7    continue trying.

8            So we've been in round-the-clock discussions with

9    the various parties, with Nexus, with the lenders, with the

10   committee, in terms of the way forward.  And what we've

11   determined we think is very important.  Given the time of

12   year we're at here, we think it's crucial that we start

13   going-out-of-business sales at all the remaining stores --

14   this would be the 870 stores -- and we start them as soon as

15   tomorrow, to try to take advantage of the holiday shopping

16   season.

17           Importantly, that would not preclude a going

18   concern sale.  And we are still in discussions with various

19   parties, including Nexus and including GBRP, who was our --

20   as you may recall, was the backup bidder at the auction and

21   is also the liquidator.  But they have submitted a bid to us

22   that would be intended to be sort of jointly with other

23   potential operating parties and would involve several hundred

24   of the stores being, you know, continued to be run.

25           So we have a few irons in the fire.  We're also in

1    discussions with various other parties.  And the fact that

2    we're doing GOB sales would not preclude us from continuing

3    to do a going concern sale, if we're able to get one done

4    very quickly in the next couple of weeks.

5            THE COURT:  Okay.  Does anybody else want to be

6    heard?

7        (No verbal response)

8            THE COURT:  I shouldn't cut you off.  Is -- was

9    that --

10           MR. RESNICK:  That, I think, covers the

11   introductory remarks and brings Your Honor up to speed as --

12           THE COURT:  Okay.

13           MR. RESNICK:  -- to where things stand.

14           THE COURT:  All right.  Thank you.

15           MR. ALBERTO:  Good afternoon, Your Honor.  Justin

16   Alberto of Cole Schotz on behalf of the Official Committee of

17   Unsecured Creditors.

18           As a threshold matter, Your Honor, thank you for

19   entering the order shortening notice on our motion to compel

20   compliance with the final DIP order.

21           Mr. Resnick is correct, the parties have remained

22   in constant contact, and we thank the -- Davis Polk and

23   debtors' professionals for that throughout this process.

24           We thought the best path forward today was to hold

25   our matter in abeyance and, instead use this time as a status

1    conference.

2            It's tough news to hear, obviously not a great time

3    of year -- not that there's any good time -- to announce what

4    you just heard.

5            But I want to -- first, I want to go back a little

6    in time and talk about what necessitated the motion.  I'm not

7    going to argue it; and, if I do, I'll certainly stop because

8    it's not my intent.  But also I want to focus on where do we

9    go from here because, if it's not self-evident, there could

10   be a big problem here, no pun intended.

11           Your Honor, when the committee was formed, it

12   raised a number of objections informally on the final DIP,

13   including standard objections you see from committees:

14   Waiver of the estate's surcharge right, roll-up, a shortened

15   challenge period.  All of these objections were focused on

16   and designed to protect against the situation where the case

17   are -- or the cases are left administratively insolvent.

18           As you probably recall, several of the landlords,

19   some of whom are here today, also, filed their own

20   objections.

21           The parties worked collaboratively and settled all

22   of these issues.  And most notably, in exchange for the

23   committee's consent to the 506(c) waiver and roll-up, the

24   debtors and lenders delivered a revised budget that

25   contemplated payment of approximately $20 million of stub

1    rent, $50 million of 503(b)(9)'s.

2         In addition, the parties agreed to Paragraph 14(a)

3    of the final DIP order.  That's where it says the debtors are

4    authorized, but not directed, to draw on the ABL to cover

5    those amounts at various, you know, stages throughout the

6    budget period.

7         We left that hearing, and I believe certain of the

8    debtors' landlords and vendors left that hearing with some

9    degree of comfort that admin claims would be paid in these

10   cases.  And based on my understanding, many of these vendors

11   and landlords continued operating and doing business with the

12   debtors.

13        Fast-forward to the sale process.  While the

14   committee supported the deal with Nexus, it was not ignorant

15   to the cash shortcomings of the deal.  It comprised only $2.5

16   million of cash above and beyond the payment of the pre- and

17   post-petition secured debt, as well as the assumption of

18   other liabilities.  And given the lack of anticipated

19   distributable proceeds that that deal would have provided to

20   a then claims pool that we estimated at over half a billion

21   dollars -- I assume it's much larger today, certainly, with

22   this news --

23             THE COURT:  What was --

24             MR. ALBERTO:  -- we turned our attention to --

25             THE COURT:  What was the claims pool?  I'm sorry.

1    MR. ALBERTO:  At that point -- I'm using very rough

2    numbers -- I believe it was over 500 million at that time,

3    Your Honor, is a fair estimate.  The bar date had not run.

4    But recognizing the fact that that's a big

5    denominator, we looked at other ways to increase potential

6    recoveries for unsecured creditors.  The most obvious and one

7    of our largest work streams was to investigate potential

8    claims that could be brought against others, including the

9    pre-petition secured creditors.

10    On November 18th, Your Honor, we filed a motion to

11    extend the challenge period for a short period of time to

12    continue that investigation.  The debtors and lenders

13    objected to that motion.  And you heard from Nexus at the

14    sale hearing, Judge, that granting the committee's request

15    even for a short extension might threaten closing of the

16    sale.

17    And Your Honor, that was a very powerful argument,

18    and the committee certainly understands why Your Honor did

19    not grant its motion to extend the challenge period as a

20    result of that argument.  Later that day, we told the debtors

21    we would lay our swords down, not appeal, and work with the

22    company collaboratively to close this deal.

23    Fast-forward, here we are today.  Nexus didn't

24    close, the debtors don't have a clear path forward or a date

25    by when they are likely to select one.  All the while, admins

1    continue to accrue.

2            The challenge period has expired.  The lenders have

3    the full benefit of a 506(c) waiver and other protections

4    granted to them under the final DIP order.  They've received

5    the benefit of their bargain, I think they're fully

6    protected.  And creditors are sitting here wondering what's

7    next.

8            I would implore the parties that it's time to make

9    a decision.  These cases should not languish without a clear

10   direction.  I don't believe that's anyone's intent, but it is

11   certainly the committee's stated position that we want a

12   decision made fast.  We would like a stated path forward and

13   the presentation of a wind-down budget or other acceptable

14   budget, so that we know where these cases are going, and so

15   that creditors don't feel like they're hanging in the wind

16   and, you know, just being trampled on here.

17           THE COURT:  Mr. Alberto, has there been any -- I

18   heard what counsel for the debtor had to say with respect to

19   a path forward, but obviously, that wasn't a very fine point

20   on process.  So has there been those types of discussions?

21           MR. ALBERTO:  They were continuing in the hallway

22   before this hearing, Judge.  And given the public nature of

23   this hearing, I'm not very comfortable sharing where they

24   stand.  But suffice it to say, you know, what you heard from

25   Mr. Resnick is accurate.

15

1          We have been told that there -- in fact, I think

2    we've been given the bid that Mr. Resnick talked about on the

3    record.  And we support the debtors' efforts in trying to

4    find another white knight type purchaser here, but --

5          THE COURT:  But not at the expense of

6    administrative creditors.

7          MR. ALBERTO:  It's a double-edged sword, Your

8    Honor.  I wish we could give them as long as they need.  But

9    you know, creditors are being asked to undertake further

10   expenses here.  Landlords are being asked certain things,

11   vendors are being asked to ship products.  And you know,

12   sitting here right now, Your Honor, we don't have a budget

13   that covers any of these admin expenses.

14        (Participants confer)

15        MR. ALBERTO:  Again, not asking for anything today,

16   Your Honor, other than to say --

17        THE COURT:  Well, I --

18        MR. ALBERTO:  -- I think speed is important.

19        THE COURT:  I --

20        MR. ALBERTO:  We should make a decision and --

21        THE COURT:  I think speed is very important.  I am

22   not going to run an administratively insolvent case.

23        MR. ALBERTO:  One other thing I should mention,

24   Your Honor, as part of the agreement to hold today as a

25   status conference on our motion, the parties have agreed that

1   we set an outside date by when, subject to the Court's

2   availability, the motion would be heard.  It does not

3   prejudice the committee.  I believe, on 24 hours --

4               THE COURT:  The motion to convert.

5               MR. ALBERTO:  The motion that --

6               THE COURT:  Is that the --

7               MR. ALBERTO:  There's two aspects, Your Honor:

8   It's to compel compliance with the final DIP; or, in the

9   alternative, convert.  We are not advocating for conversion

10  today, that is not the committee's goal today.  Let me be

11  clear about that.  But we do want to set an outside date by

12  when this motion will be considered, subject to the

13  committee's ability, on notice to the company, to ask Your

14  Honor for an earlier date.  But we would like to set, subject

15  to Your Honor's availability, a hearing the week of January

16  6th, to go forward substantively with the committee's motion.

17              THE COURT:  Okay.  Let me hear from others.

18              MR. ALBERTO:  Of course.  Thank you, Your Honor.

19              THE COURT:  Put a pin in that.

20              MR. ALBERTO:  Sure.

21              THE COURT:  Let's not leave today without ...

22              MR. GOLD:  Good afternoon, Your Honor.

23              THE COURT:  Good afternoon, Mr. Gold.

24              MR. GOLD:  Ivan Gold of Allen Matkins on behalf of

25  multiple landlords at Docket 1353.

1          To a certain degree, Your Honor, we were the canary

2     in the coal mine with our request for a status conference.

3          My clients fall into a number of buckets here,

4     we've used that phrase throughout the case.  I've got some

5     landlords who are in the first groups of rejected leases that

6     were the objective of the stub rent resolution reflected in

7     Paragraph 14(a) of the final DIP order.  Those were leases

8     that were rejected prior to October 31st.  I've got clients

9     who are -- were part of the Nexus transaction.  I've got

10    clients who have unpaid post-petition expenses, the year-end

11    stuff, taxes and the like.  So we kind of go the whole

12    spectrum.

13         Your Honor, there's a pop song from the last decade

14    named "I have questions."  And I want to throw out some

15    questions that I think we need to address, either today or at

16    the next hearing.  I think it's important to have our agenda,

17    if you will, of questions.  And what can be answered today

18    should be answered today; what can't be answered today needs

19    to be prioritized.

20         So, of course, the big quest -- one question is how

21    did we get here.  That's an important question that,

22    ultimately, deserves attention, but it's not a question we

23    need to answer today, I want to make that clear.  The more

24    important questions are:  Where are we right now?  And where

25    are we going?  And that's been addressed by Mr. Resnick and

1    Mr. Alberto to a certain extent.

2           But there are certain things we know:

3           We know, from the committee's motion, that the

4    debtors are now in default under the DIP milestones.  The

5    debtors acknowledge that.

6           We also know that the debtors' use of case has not

7    yet been terminated by the secured lenders, at least as of

8    now.

9           We know that the debtor is subject to a five-

10   business-day notice of termination.  And I would suggest to

11   you that that sword hanging over all of our heads is no way

12   to run a case.

13          One question is:  Do the debtors currently have the

14   use of cash collateral?  If so, what are the conditions or

15   limitations on its use going forward?

16          Do debtors currently have access to the DIP

17   facility?  Same question:  If so, what are the conditions or

18   limitations on those disbursements?

19          I'll ask the question, I've been told the answer.

20   Are debtors incurring additional default interest at this

21   point?  The debtors have advised us the answer to that

22   question is yes.

23          Did debtors make any stub rent payments under

24   Paragraph 14(a) of the final DIP order and as provided in the

25   budget for the week ending 12/7?  What other budgeted

1    payments in the budget accompanying the final DIP order were

2    not made?  Who is deciding which budgeted payments are to be

3    made and which ones to skip?

4           Have the secured lenders been paid anything since

5    entry of the sale order?

6           What is the status of the sale order at this point?

7    We have a transaction that did not close.  We have a public

8    announcement that transaction did not close, nothing on the

9    docket, but we have the public announcement in connection

10   with the 8-K filing and the press release.  So we have an

11   order about assignment of leases that did not occur.  We have

12   an order about sale of causes of action that did not close.

13          We have to presume, as I think your comment just

14   did, this case is administratively insolvent.  But the thing

15   we need to realize is it's only going to get worse.  And let

16   me give you one example of how it's going to get worse.

17          The DIP order contemplated payments of stub rent

18   for the month of September for a subgroup of the debtors'

19   leases, those leases that were rejected at either the end of

20   September, the first month of the case, or the end of

21   October.  Now, under the new transactions contemplated,

22   which, according to Mr. Resnick, would involve a subset of

23   the Nexus transaction -- the Nexus transaction between seven

24   and 800.  We don't know, as we stand here today, is one of

25   these alternative transactions going to have 200, 300.  But

1    we do know that those leases that were part of Nexus, stub

2    rent was held in abeyance as part of the cure.  And at least

3    several hundred of those landlords will now move into a

4    different bucket.  So the stub rent number -- and that's

5    separate and apart from other admins, that's separate and

6    apart from 503(b)(9) -- that number is going to grow.

7            So what is the path forward?  As Mr. Alberto said,

8    we do not have a wind-down budget.  We do not have a time

9    table.  At some point, the never-ending quest to preserve

10   optionality has to come to an end because the game of musical

11   chairs, at some point, is going to stop, and there's a lot of

12   administrative creditors who are going to be standing there

13   with no place to sit.  Who is picking and choosing who to pay

14   going forward?  Are we improperly creating sub-priority

15   classes without us knowing who they are?

16           So some of these questions can be and should be

17   answered today.  Those that can't be because decisions

18   haven't been made or the information is not readily available

19   need to be prioritized, they need to move to the top of the

20   list.  Whatever hearing date the Court sets on the

21   committee's motion, January 6th or something during that

22   week, we need answers to every single one of these questions

23   by that date because, as Your Honor said, you don't want to

24   run an administratively insolvent case.

25           Your Honor, I stand here recognizing I have more

1    gray hair than anyone in this courtroom.  And one fortunate

2    or unfortunate consequence of that is I experienced Sears, I

3    experienced Toys 'R Us, and in this court I experienced

4    Linens 'N Things.  And we all know how those cases ended and

5    it wasn't well.  And so what I'm saying is:  What guardrails

6    do we need to install going forward to prevent this case from

7    joining that list?  Thank you, Your Honor.

8                    THE COURT:  Thank you.

9                    Ms. Casey.

10                   MS. CASEY:  Good afternoon, Your Honor.  Linda

11   Casey on behalf of the United States Trustee.

12                   Unfortunately, I was not one of the parties that

13   have been kept in close contact since December 3rd and have

14   only known about this slightly longer than you have and have

15   not had sufficient time to consult with my client.

16                   What -- briefly, you know, under 1112(b), when you

17   have substantial continuing loss to the estate and no

18   likelihood of rehabilitation, the cases should convert.  We

19   should absolutely not run an administratively insolvent

20   estate, nor should we allow an out-of-court determination as

21   to who the preferred administrative creditors are.

22                   So, for today, all I can say is that we reserve our

23   right to seek conversion under 1112(b), and potentially to do

24   so on an expedited basis.  Thank you.

25                   THE COURT:  Okay.  Thank you.

1    I understand there are people on Zoom, but I don't

2    see any hands raised.  So, if you're on Zoom, can you appear?

3    MS. MASHBURN-MYRICK:  Danielle Mashburn-Myrick.

4    Are you able to hear me?

5    THE COURT:  Yes, I can hear you.

6    MS. MASHBURN-MYRICK:  If I may, we represent Peak

7    Living, Inc., Delta Furniture Manufacturing, LLC --

8    THE COURT:  I'm sorry.  There is some background.

9    If you're on Zoom and your phone is not mute, can you please

10   be mute until you're called?

11   Okay.  Could you please start over?  Because I

12   couldn't hear what you were saying.

13   MS. MASHBURN-MYRICK:  Yes, Your Honor.  Danielle

14   Mashurn-Myrick for Peak Living, Inc., Delta Furniture

15   Manufacturing, LLC, and Independent Furniture Supply Company,

16   Inc.  My *pro hac vice* admission is pending, Your Honor, and

17   my local co-counsel is in another evidentiary hearing this

18   morning, I believe.

19   We intend to join the committee's motion.  We saw

20   the utilities had also joined the committee's motion.

21   And I speak now just to point out one of my clients

22   entered a critical vendor agreement with the debtors post-

23   petition.  My clients jointly, post-petition, have delivered

24   almost $10 million in goods to the debtors.

25   The gentleman who just spoke about the continuing

1    and deepening insolvency spoke directly to one of our primary

2    concerns.  Are the debtors receiving additional goods today,

3    tomorrow, and the next day that are also going to assert

4    administrative expense, priority, and potentially

5    disadvantage creditors who have already shipped products and

6    goods to the debtors.

7         So we will be joining that motion, but I wanted to

8    speak for that constituency, as well.  I'm sure we're not the

9    only ones in that bucket.

10        THE COURT:  Okay.  Thank you.

11        Mr. Johnson.

12        MR. JOHNSON:  Thank you, Your Honor.  Russell

13   Johnson on behalf of Baltimore Gas and Electric and 27 other

14   utility companies.  Thank you for entering my *pro hac vice*

15   order and allowing me to appear via Zoom.

16        Your Honor, I don't want to repeat all the

17   arguments that have been made.  I think our joinder sets

18   forth the fact that (indiscernible) amounts to my clients

19   haven't been paid, even with termination notices for

20   nonpayment of (indiscernible) on deposits.  I don't think

21   I've ever seen anything like this, other than -- I may have

22   as much gray hair as the gentlemen mentioned before -- in

23   other cases, where termination notices are going out and the

24   debtors' counsel (indiscernible) payment agent and they're

25   just ignoring them.  So it's --

1    UNIDENTIFIED:  All I did was I took out any sale --

2    THE COURT:  Excuse me.  Someone is on the line who

3  is not mute.  Can you please mute your line?

4    My apologies for interrupting you, Mr. Johnson.

5    MR. JOHNSON:  That's okay, Your Honor.

6    So, Your Honor, I echo, I think it was Mr. Gold's

7  questions that need to be answered.  I don't want to

8  (indiscernible) need to.  Thank you, Your Honor.

9    THE COURT:  Thank you.

10    Ms. Rogers.

11    MS. ROGERS:  Thank you, Your Honor.  Beth Rogers

12  for Simmons Bedding Company.

13    I just want to point out, as did one of the other

14  attorneys, my client also entered into a critical vendor

15  agreement and has shipped almost an additional $4 million in

16  product for which it has not been paid, and they're being

17  asked to ship more product.  So I really am very concerned

18  about where this case is going to go.

19    THE COURT:  Thank you.

20    Is there anyone else on Zoom that wants to be

21  heard?

22    (No verbal response)

23    THE COURT:  Okay.  I'd like to hear from the

24  debtors about administrative payments.  And I don't know --

25  look, I don't know if the parties had a chance, if you need

1  to take a break and go talk to parties in the hall.  But I

2  want to assure that, between now and a scheduled hearing, I

3  want to know what -- I don't want deepening insolvency.  So

4  can you provide a little more color?

5       MR. RESNICK:  Absolutely, Your Honor.  And we're

6  very sympathetic to the concerns raised by and on behalf of

7  various administrative creditors.

8       Your Honor, starting tomorrow, the debtors are

9  commencing a process to sell all of the inventory that's

10  currently in their stores.  They're not expecting other vend

11  -- you know, vendors to ship new items.  We're not incurring

12  any -- to my knowledge, it's not our intent to be incurring

13  any admin expenses, other than those involved by necessity in

14  commencing these -- you know, these GOB sales.  So, while, of

15  course, any day that a debtor operates, there are certain

16  administrative expenses that are going to accrue, the debtors

17  are not out there expecting, you know, new product to be

18  shipped or anything like that.

19       THE COURT:  What about landlords?

20       MR. RESNICK:  My understanding is that the

21  expectation is that landlords will continue to be paid

22  currently for current rent.  The lenders can speak to that if

23  they have a different view, but that's my understanding is

24  that is our intent to pay landlords currently as -- you know,

25  as needed, since we are currently conducting the -- you know,

1  the sales in the various locations.

2          And I -- just to state the obvious, Your Honor, we

3  believe this pathway maximizes the value of the estate and

4  will maximize the recovery to all creditors.  You know, at

5  this point, if the debtors end up administratively insolvent,

6  it's still better to maximize the value here, so that we can

7  pay as much as possible to all administrative creditors, and

8  that's our goal and our effort.

9          We're trying to save as much of a business as we

10  can and we're trying to maximize the value, particularly

11  leading up to the holiday, in order -- you know, for the

12  benefit of all our constituents.  I can't promise that it's

13  going to result in, you know, ultimate administrative

14  solvency, it may very well not, but we do believe very

15  strongly that it will maximize value.  And I don't -- I

16  haven't heard anybody suggest otherwise.

17          THE COURT:  Do the debtors have continued use of

18  cash collateral?  Where do you stand with the DIP?

19          MR. RESNICK:  So we're currently in default under

20  the DIP.  The DIP lenders have not -- to their credit, they

21  have not issued a termination notice, so it's just a regular

22  default.

23          We are operating under a situation where the debtor

24  -- where -- my understanding is the lenders do have control

25  rights over our expenditures, and we've been operating

1    constructively with them to be able to make the payments that

2    we need to, in order to maximize the value here.

3             THE COURT:  Well, I'm concerned about the selection

4    of what -- which administrative creditors get paid.

5             MR. RESNICK:  That's a fair question, Your Honor.

6    We're making the payments that we believe we need to in order

7    to conduct -- in order for the debtors to operate under the -

8    - under its current construct, and that's being, you know,

9    determined by the debtors with the lenders.  And if there's

10   any additional process around that, we're happy to discuss.

11   But that's our current posture.

12          (Pause in proceedings)

13            THE COURT:  Talk to me in more detail about how you

14   would anticipate proceeding forward?

15            MR. RESNICK:  Sure.  So I think it's several paths,

16   right?  As I've mentioned, one path -- one thing that we're

17   definitely doing is, you know, all stores or 870 stores,

18   we're starting the GOB sales, you know, tomorrow, as soon as

19   we possibly can.  So we're going to file the notice on the

20   docket of the list, it's going to include all of the stores,

21   we're going to file that tonight.  And we're not wasting any

22   time, given the holidays, so we're going to start that

23   tomorrow.

24            At the same time, I know there are various parties

25   that are working very hard in a going concern bid.  When I

1     say "going concern," that means, you know, it probably won't

2     preserve all, you know -- what is it, eight, 900 stores that

3     we were hoping that the existing Nexus sale would preserve?

4     But our hope that it -- is that it would be as many of the

5     stores as possible.

6              And so what we have now are we have Nexus, it's

7     still at the table and about a possible smaller transaction.

8              We have GBRP that has submitted to us a bid.

9     Negotiations are ongoing.  We have -- and my understanding is

10    that the lenders are supportive of that bid and we have gone

11    -- and the committee has seen the bid and I think -- you

12    know, I don't want to speak for them, but I think -- we've

13    been going back and forth with GBRP on that bid.

14             That bid does say that they would intend to work

15    with at least one operating partner, who would assume a

16    substantial amount of leases, and so that certainly is a

17    possibility.  And this is not a -- this didn't come out of

18    left field.  This was, essentially -- in a slightly different

19    form, this was our backup bid --

20             THE COURT:  At the auction?

21             MR. RESNICK:  -- at the auction.

22             And then, third, as soon as -- you know, Nexus

23    raised the issue of needing additional capital.  Both Nexus

24    and the debtors worked very hard with some of the debtors'

25    most important counterparties and vendors, those who would,

1   you know, potentially be interested -- well, stand a lot to

2   lose with -- if Big Lots went away, and also may be

3   interested in putting in capital.  And discussions were very

4   positive with some of those and continue to be positive, and

5   so that's a -- sort of a third pathway and alternative.

6           We understand we do not have a lot of time.  Nobody

7   is suggesting that this is something that could happen, you

8   know, beyond, you know, a short number of weeks from now.

9   And so people are working round the clock on these pathways.

10  We do think, if they happen, they will, unquestionably, we

11  think, hopefully, if we can negotiate them successfully, you

12  know, be the best chance at maximizing value here and

13  improving recoveries for whomever the stakeholders, you know,

14  may be, whether it's admin creditors or whomever at that

15  point.  So that's our pathway.

16          THE COURT:  Mr. Alberto.

17          MR. ALBERTO:  Thank you, Your Honor.  Justin

18  Alberto on behalf of the committee.

19          I neglected to say one thing before and I should

20  have.  The UCC believes it is value-maximizing at this time

21  to commence GOBs at the stores.  It's an unfortunate

22  realization, but we do believe that that is part of the path

23  forward.  It is prudent at this time to do that, we agree

24  with Mr. Resnick and the debtors.  My points are -- that I

25  made before are simply that it is both prudent and necessary

1    to come up with a larger path forward now.  But we agree with

2    the commencement of GOBs at this point.

3               THE COURT:  Okay.  Just one minute.  Ms. Rogers'

4    hand -- had her hand up, so I'll hear frm Ms. Rogers and then

5    I'll hear from others.  Everyone will have a chance to be

6    heard.

7               Ms. Rogers?

8               MS. ROGERS:  Thank you, Your Honor.

9               I'm concerned about what authority the debtor has

10   at this point to do going-out-of-business sales without any

11   kind of notice or motion, at least that I'm aware of.  And if

12   product is going to be sold on a going-out-of-business

13   concern, shouldn't creditors like my client have a right to

14   reclaim that product for which they have not been paid?

15              THE COURT:  Do you want to address that now?

16              MR. RESNICK:  Certainly, Your Honor.

17              So, look, on the first point, so we plan on

18   conducting the sales in accordance with the GOB sale motion.

19   You know, admittedly, there are notice provisions here, and I

20   think it's Paragraph 35, that mentions a five-day period for

21   the landlords to object.

22              Historically, Your Honor, we've closed -- my

23   understanding is we've closed 300 stores.  We've only

24   received less than a handful of objections in that time, and

25   they were all resolved consensually.  And so our view is, you

1   know, we're following the -- you know, the spirit of the

2   store closing motion and the substance is there, but we don't

3   believe that the estate can afford to wait five days before

4   commencing the sales.

5           If Ms. Rogers or any of the other landlords have

6   objections within that five-day period, we will certainly --

7   we're certainly happy to hopefully address them consensually,

8   as we have with a few others that haven't historically, or be

9   before Your Honor, if -- you know, if need be.  But the

10  value-maximization that's so important for starting tomorrow,

11  the debtors believe that is necessitated by just the

12  realities.

13          THE COURT:  Okay.

14          MR. RESNICK:  On the second point, I think, on

15  reclamation, my understanding is that that's subject to a

16  lender's prior lien, but that's my understanding of that

17  issue.  And I think -- you know, I think there's a

18  reclamation provision of the Code that deals with goods

19  delivered, I think 45 days before the petition date.  I

20  assume that the goods we're talking about now are post-

21  petition goods, so that's my understanding of the issue.  But

22  I am not prepared to argue that today.

23          THE COURT:  Address it.

24          Ms. Heilman, did you ...

25          MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

1    Heilman, Ballard Spahr, for the record, on behalf of a number

2    of landlords, including Mr. Gold's clients as Delaware

3    counsel.

4              Your Honor, I do rise, I wanted to address the

5    process question, which I -- Mr. Resnick did just introduce

6    to the Court.  Your Honor, the order does say that there has

7    to be five days' notice, and that point was actually

8    expressly negotiated by the landlords at the first-day

9    hearing.

10             So I think we are reintroducing new law here, Your

11   Honor, is the fact that one of the reasons that five-day

12   notice is required is that there are concerns and objections

13   to the going-out-of-business sales that landlords typically

14   would raise to any order and authorization to conduct,

15   subject to we resolve those orders -- those objections

16   through our side agreement.

17             And the five-day notice is specifically so that

18   landlords can negotiate and enter into a side agreement

19   before those sales commence.  And those side agreements speak

20   to things of exterior signage, use of the premises outside

21   the lease, may -- balancing the interests of other customers

22   in the shopping center, the number of signs that go into the

23   stores, the way the actual sales are conducted at the

24   individual lease location.

25             And so, Your Honor, I would say that there is harm

1  in just allowing the debtors to ignore the process that was

2  implemented in the going-out-of-business sales order to

3  commence their sales tomorrow, without giving notice to the

4  landlords and an opportunity to negotiate those side

5  agreements, which are necessary to be done because, once the

6  exterior signage is hung inconsistent with the side letter,

7  the damage has already been happening.  And if we're talking

8  about increased harm and administrative expenses to the

9  estates if the signage is hung and there's damages to the

10  front of the building, that, in addition, is another

11  administrative expense that this estate is going to -- is

12  going to incur.

13       In addition, Your Honor, as we stand here today, I

14  know of at least a handful of my clients that have defaulted

15  the debtor for non-payments of rents, property taxes in the

16  post-petition period.  So there's additional administrative

17  expenses that have been budgeted, but have not been paid in

18  these cases, in addition to the stub rent.

19       In addition, Your Honor, they have utilized the

20  stub rent in these cases, the nonpayment of the September

21  rents, to pay other post-petition expenses in these estates,

22  which is why the agreement, pursuant to the final DIP order,

23  was so important, that there would be budgeted amounts and an

24  opportunity to pay those administrative claims in exchange

25  for the 506(c) waiver.

1    So, Your Honor, we've talked a lot about, you know,

2  needing to maximize value, which I do agree we do need to

3  pivot and do something to hopefully, maybe have this company

4  survive.  But Your Honor, we can't do this on the backs of

5  the administrative creditors who have not been paid because

6  what we have done here is we've prioritized different

7  administrative creditors.  And we are going to -- if we just

8  continue to push forward in trying to maximize value, but not

9  put a plan in place to pay the administrative creditors both

10  the administrative expenses of the next wave of sales and the

11  ones that are still unpaid, Your Honor, we're going to be in

12  the same position a week from now, two weeks from now, on the

13  edge of a conversion.  And it's those administrative

14  creditors whose monies -- whose money was used to pay other

15  administrative creditors still not being paid.

16    So my suggestion, Your Honor, is we do need to hit

17  a pause button and try to put a plan in, meaning, if we do

18  commence sales, the proceeds of those sales should be

19  reserved, or any addition -- no other amounts are going out

20  of the estate, except for the administrative expenses of

21  maybe the GOB sales, which is the rent, the employees, and

22  the like.  But all other proceeds should be held until such

23  time as we can determine who should be getting those proceeds

24  and whether there's sufficient funds to pay administrative

25  creditors, all administrative creditors in these estates.

1          And Your Honor, Mr. Gold did mention some of the

2    past cases.  I, too, have been involved in all those cases.

3    And I stood here in Linens 'N Things arguing against

4    confirmation when there was a deficit of about $40 million in

5    stub rent that remained unpaid on confirmation, and then the

6    debtors could not confirm their plan because of the deficit

7    of administrative creditors.  And so the only administrative

8    creditors in Linens 'N Things that were not paid were the

9    landlords, whose spaces were used to conduct all the going-

10   out-of-business sales to liquidate the debtors' inventory and

11   the like, and those are the ones left holding the bag on

12   conversion to a Chapter 7.  Thank you, Your Honor.

13          THE COURT:  Mr. Gold.

14          MR. GOLD:  Thank you, Your Honor.  Just briefly.

15          We need a freeze until we have a wind-down budget.

16   It's a challenge for the debtors to multi-task right now, I

17   appreciate that, while they continue to explore what I'll

18   call "bulk sales."  I don't think "going concern" is an

19   accurate statement at this point.  But the fact is we need a

20   wind-down budget that you and the committee and interested

21   parties can look at and establish guardrails for this case

22   going forward.  Good intentions and we're doing the best we

23   can and we're prioritizing is all nice, but we need more

24   clarity given the severity of the situation here.  Thank you.

25          THE COURT:  Anyone else in the courtroom that wants

1    to be heard?

2        (No verbal response)

3            THE COURT:  Okay.  Let me hear from Mr. Fox.

4            MR. FOX:  Good afternoon, Your Honor.  Steven Fox,

5    Riemer & Braunstein, on behalf of Gordon Brothers Retail

6    Partners.

7            Your Honor, I'd like to address the Court in two

8    different ways today:  First, if I could respond in our

9    capacity as a consultant to the debtors, in connection with

10   their past conduct of going-out-of-business sales or store

11   closing sales Mr. Resnick had mentioned and, in part, in

12   response to Ms. Heilman's remarks.

13           As Mr. Resnick indicated, the debtors have

14   conducted over 300 store closing sales of locations

15   throughout these cases with the assistance of the consulting

16   services from GBRP.  We've done that seamlessly, smoothly,

17   and without any controversy, and certainly without objections

18   to the landlords because you haven't seen any from the

19   landlords in these cases.

20           With regard to the ability to satisfy the landlords

21   with regard to side letters, we have been successful to date

22   in each instance in which a side letter has been requested.

23   That has happened both before and after the commencement of

24   the store closing sales in each phase that have been

25   conducted to date.

1    I have every confidence, given our familiarity with

2    both process and people who are involved in these cases, that

3    that process will continue without any delay and certainly

4    without any controversy.  We know all the players, we've done

5    it in dozens and dozens of cases, including this one, and

6    there's no reason to believe that that won't continue on a

7    cooperative basis going forward.

8    And certainly, as the parties recognize, in the

9    event that we are unable to reach an agreement with any

10    particular landlord on the terms of a side letter, this Court

11    is always available on an expedited basis, as you've

12    demonstrated, to address any of those concerns, and we would

13    expect that that will become unnecessary as we go forward,

14    but it still is an option for the landlords.

15    With regard to the request for a pause or a delay

16    or a freeze, as Mr. Gold indicated, nothing along those lines

17    can produce anything positive for any of the creditors or the

18    debtors of these estates.  The delay in missing out on this

19    last critical period before the holiday is a value-

20    destructive step, not a value-maximizing step, as Mr. Alberto

21    seems to agree.

22    You know, with regard to the plan for going forward

23    and closing stores, it would be everybody's intention

24    involved with the estates, including GBRP, that all go

25    forward administrative expenses associated with the conduct

1  of the going-out-of-business sales would be satisfied.  I

2  believe that is -- while I can't put words in the mouths of

3  the lenders, I believe that's certainly the intent.  And we

4  understand the principle of do no further harm.

5          With regard --

6          THE COURT:  What do you mean by that?

7          MR. FOX:  -- to just pivoting?

8          THE COURT:  "Going forward expenses would be

9  satisfied."  What does that mean?

10          MR. FOX:  I don't have visibility into the

11  budgetary process, Your Honor, from the store closing

12  consultant side.  But you know, it is fairly commonplace and

13  would be expected that there would be no further harm done

14  from conduct of the store closing sales, and that is

15  everybody's expectation in this process.

16          But pivoting to some of Mr. Resnick's other

17  remarks, in terms of the options that the debtors are

18  exploring, as Mr. Resnick mentioned, GBRP was a participant

19  leading up to the auction that ultimately led to Nexus being

20  selected as the successful bidder.  While GBRP was not deemed

21  a qualified bidder at the time, GBRP has, nevertheless,

22  continued to be actively engaged with the debtors during this

23  period, exploring different options.

24          When the parties recognized that the Nexus

25  transaction might be in jeopardy, GBRP has submitted an

1    alternative proposal, different from what was presented back

2    in connection with the auction, and we continue to be

3    actively engaged with the debtors to see if there's a method

4    by which we can come to a final agreement.

5            That final agreement would contemplated, as has

6    been suggested, that one of our joint venture partners in

7    this transaction, perhaps, would succeed to as many as 400 or

8    more stores continuing to operate, employees at those stores

9    continue to have employment, the variety of corporate

10   employees necessary to support that process continue to be

11   employed, perhaps the inclusion of a handful of distribution

12   centers be included in that, all of which would be a very

13   positive value-maximizing result here.

14           It doesn't solve all the problems, and I want to be

15   clear on that, but it certainly is a better outcome if we can

16   -- if it can come to fruition, than anything else that's

17   presented as alternatives.  And we will continue and we are

18   committed to continue to work with the debtors to see if we

19   can get that to a final conclusion and have it be presented

20   to the Court at the earliest possible date.  You have our

21   commitment that we will continue to work earnestly and around

22   the clock to make that happen, and we trust that all the

23   other parties involved in the case will continue to do the

24   same.

25           I'm happy to respond to any questions Your Honor

1    may have, but we do believe, both in our role as consultant

2    to the debtors in conducting store closing sales, as well as

3    a prospective transaction partner with the debtors, that ay

4    delay in commencing the store closing sales is detrimental to

5    the interests of all interested constituents here.

6            MR. VENTOLA:  Good afternoon, Your Honor.  John

7    Ventola of Choate, Hall & Stewart on behalf of PNC, the agent

8    for the DIP lenders.

9            So there's been various references to the "lenders"

10   throughout these -- the hearing today, so I just wanted to

11   try to address a couple of them briefly.

12           But first, Your Honor, I want to say it's always a

13   good day when I find myself agreeing with the committee's

14   counsel, and do on two really important points that Mr.

15   Alberto raised.  I was very happy to hear that the committee

16   does support the GOBs moving forward quickly.  We have one

17   weekend left before the biggest -- during the biggest

18   shopping period of the year, so I think the committee's

19   support of that goes -- really resonates, hopefully, with

20   everyone how important it is to get these sales going, and

21   any attempt to pause that or the like is just not feasible or

22   practical, and certainly is not good for the value of these

23   estates, so I was happy to hear that.

24           And then, second, Your Honor, we also agree with

25   the committee that the debtors do need to make a final

41

1    decision very soon.  This is an extraordinarily fluid

2    situation.  We have also worked very closely with the

3    debtors' professionals and we appreciate all the

4    communications with them, but a final decision needs to be

5    made soon.  But we can't wait and try to somehow delay these

6    sales from going forward.  The debtors made that decision

7    under these tough circumstances, I'm sure it was not an easy

8    decision by the board, but they made it, and that's what we

9    need to do, Your Honor.

10            And then, second Mr. Resnick asked me to confirm

11   this, I believe, earlier.  It is accurate there is a default,

12   I don't think there's any dispute about that, under the DIP,

13   so we issued a default notice.  We have not terminated the

14   use of cash collateral, Your Honor.  We have the right to, as

15   Mr. Resnick alluded to, but we haven't and we don't want to.

16            We want to keep doing what we have been doing with

17   working with all the stakeholders to keep this case afloat

18   and maximize value.  And if there is a going concern or some

19   version of a going concern sale to happen, I think it has to

20   happen extraordinarily soon.  But we're all for that, if it

21   can be made to happen.  But to try to stop this right now,

22   Your Honor, is just not practical.

23            So I'm happy to address any questions you may have

24   about the DIP, Your Honor, but that's --

25            THE COURT:  Well --

42

1    MR. VENTOLA:  I did want to make those points.

2    THE COURT:  Well, I am a little concerned that this

3    sale milestone was the 13th --

4    MR. VENTOLA:  Yes.

5    THE COURT:  -- and the DIP has been in default

6    since the 14th, and here we are the 19th without really a

7    clear path forward, and with no one making any representation

8    on this record as to satisfaction of administrative claims.

9    And I just heard counsel said going forward expenses would be

10    satisfied.  I hear that from a party who doesn't hold the

11    purse strings.

12    So, while it's good to talk about this, and I don't

13    disagree that, generally, maximizing value is where we want

14    to be, but at the same time, I can't hold the door open for

15    three weeks and let money go out of this estate and run an

16    administratively insolvent estate.  So I don't feel like I'm

17    getting any answers to the questions that are being raised.

18    And maybe it's not fair, I think you just happen to

19    be the last person who's at the podium.

20    (Laughter)

21    THE COURT:  But I -- first of all, I wanted to take

22    a break and go look at the prior GOB sale order because I

23    don't remember -- I recall that was entered on the first day

24    of this case.  I don't even recall what it says in it, in

25    terms of notice to parties.

1    And I do appreciate, you know, the landlords are

2    taking a big risk here and so are the other administrative

3    creditors, including professionals, in this case.  So I

4    applaud parties wanting to go forward in the best path

5    forward to maximize value, but I need to hear a little bit

6    more.

7            MR. VENTOLA:  Thank you, Your Honor.  Do want to

8    take a break now?

9            THE COURT:  I think that would be beneficial

10    because I'm not sure -- I mean, candidly, this was all to me

11    walking in the courtroom or sitting in the courtroom and

12    hearing it.  And I don't know if you've had an opportunity to

13    talk with some of the parties.

14            You know, obviously, this is going to take

15    modification of a prior order, if the prior order had

16    parameters, in terms of notice and that type of thing.  So I

17    think it would be prudent for the parties to take a little

18    bit of a break to talk about this, and I'd like to look at

19    the prior order.

20            Is there anything else I should be looking at?

21            MR. RESNICK:  I don't think so, Your Honor.  And --

22            THE COURT:  Well, has the debtor been working on a

23    budget?

24            MR. RESNICK:  Yes.

25            THE COURT:  Okay.

1          MR. RESNICK:  Absolutely.  And we're working with

2     the lenders on it and we'll be sharing it with the committee,

3     of course, yeah.

4          THE COURT:  I mean, is that a today issue?  What I

5     do not want to -- I don't want -- obviously, time is of the

6     essence.  This is what I would categorize as a melting ice

7     cube.

8          MR. RESNICK:  Yeah.

9          THE COURT:  We need to move expeditiously.  And

10    unfortunately, this is a bad time of year, in terms of

11    getting a hold --

12         MR. RESNICK:  Yeah.

13         THE COURT:  -- of parties.

14         MR. RESNICK:  Yeah.  Your Honor, and just to add

15    clarity then to -- based on this conversation, Your Honor's

16    statements and the statements of the other parties, and since

17    Your Honor is going to take a look at the order quick --

18    during the break, just to add clarity to the situation.

19         So Your Honor will look at Paragraph 35, in

20    particular.  And to the extent it's required, I guess we

21    would deem this to be an emergency oral motion to allow the

22    closings to occur concurrently with the five-day notice

23    period.

24         THE COURT:  Okay.

25         MR. RESNICK:  It looks like Mr. Abrams has a ...

45

1          THE COURT:  Mr. Abrams?

2      (No verbal response)

3          THE COURT:  Sorry, you're not -- you're on mute.

4          MR. ABRAMS:  I just want to add a little context.

5   This was a ridiculously, highly leverage transaction that the

6   Big Lots management signed onto.  This was predictable from

7   before the transaction was ever accepted by management.

8   Management has basically submitted SEC filings that indicated

9   it had a billion dollars plus of equity, when it did not.

10  The whole situation is bizarre.

11         Their excuse for not having paid stub rent, 45, 65,

12  75 days ago was ridiculous.  As recently as a couple -- as

13  yesterday and two days before, they -- they filed bogus

14  agendas for this hearing, knowing that none of those matters

15  were going to be heard.

16         So I just want to state for the record that, as a

17  landlord at two properties, I have no confidence in this

18  management.  I don't have -- I don't believe they have any

19  integrity.  And I think that, to ask for emergency motions is

20  absolutely ridiculous.  They made this bed and they need to

21  lie in it.  And I think all the creditors need to be treated

22  equitably and equally, and I don't trust anybody to be making

23  a decision regarding administrative expenses, other than the

24  Court.

25         THE COURT:  Thank you.

1           Mr. Gold.

2           MR. GOLD:  Thank you, Your Honor.

3           To expedite your break, the store closing order is

4    at Docket 576.

5           THE COURT:  Okay.  Thank you.

6           MR. GOLD:  And you should start at Paragraphs 34

7    and 35.

8           THE COURT:  Okay.  All right.

9           MR. GOLD:  Thank you.

10          THE COURT:  We're going to take a break.  I would

11   like the debtors' counsel to have an opportunity to talk with

12   parties.  How much time do you think?

13      (Participants confer)

14          MR. RESNICK:  Yeah, maybe an hour.

15          THE COURT:  Okay.

16          MR. RESNICK:  Maybe 3 p.m.

17      (Participants confer)

18          THE COURT:  Yeah, that's perfectly fine.  I'd like

19   to see if the parties can move things forward a little bit.

20   So why don't we -- sorry.

21      (Participants confer)

22          MR. RESNICK:  Yeah.  I think --

23          THE COURT:  Okay.

24          MR. RESNICK:  -- 3 p.m. is perfect.  Thank you,

25   Your Honor.

1         THE COURT:  All right.  We're going to reconvene at

2   3:05, so we're going to stand in recess.

3         MR. RESNICK:  Oh, 3:05.

4         THE COURT:  Thank you.

5      (Recess taken at 2:03 p.m.)

6      (Proceedings resume at 3:16 p.m.)

7         THE COURT:  Okay.  Please be seated.

8         MR. RESNICK:  Thank you, Your Honor.  For the

9   record, Brian Resnick of Davis Polk on behalf of the debtors.

10         So I'm pleased to report, Your Honor, that I have -

11   - you know, in the scheme of this case in the situation we

12   find ourselves in, I have some relatively good news, which is

13   that we were able to resolve consensually a way forward for

14   these current purposes --

15         THE COURT:  Okay.

16         MR. RESNICK:  -- with the lenders and the

17   committee, and we've discussed it with the landlord

18   representatives who are in the courtroom, and my

19   understanding is that they do not object.  And this is

20   basically a resolution that would allow us to commence our

21   GOB sales tomorrow.

22         And so I'd like to read to you the five points of

23   that proposed resolution.

24         THE COURT:  Okay.

25         MR. RESNICK:  Number one, the debtors are

1    committing and are representing that we're not placing any

2    new orders from vendors, period.  So that's not an issue.

3              Number two, we're going to file a budget next

4    Thursday by midnight, this is the -- Thursday, December 26th.

5    And we're going to work with the lenders and the committee

6    and our clients to -- you know, on a budget that makes sense

7    for the -- under the circumstances that we find ourselves.

8              THE COURT:  So wait.  You're going to file a budget

9    on --

10             MR. RESNICK:  Next Thursday.

11             THE COURT:  -- December 26th --

12             MR. RESNICK:  Correct.

13             THE COURT:  -- at midnight.

14             MR. RESNICK:  By midnight on December 26th.

15             THE COURT:  Okay.

16             MR. RESNICK:  We would request a status conference,

17   just in the interest of keeping Your Honor and all the

18   constituencies informed about the status of the case, as

19   early as Your Honor could hear us the following week or

20   Monday the twenty -- Monday, December 30th, or whenever works

21   for Your Honor that week.  We would propose that it be held

22   by Zoom, or at least parties not be penalized for appearing

23   by Zoom.  I think a lot of people are going to be away that

24   week.

25             We would file a notice of additional store closings

1    today that's going to list out the remaining -- I believe

2    it's about 870 stores.

3            THE COURT:  And make it clear that it's all of the

4    remaining stores.

5            MR. RESNICK:  Yes, we will do that.

6            And in terms of the -- any objections that the

7    landlords may have during the five-day period, which would

8    run contemporaneously with starting the sales, GBRP commits

9    to resolving any issues with the landlords or attempting to

10   resolve them in real time, basically, in -- you know, in a

11   matter of hours, right?  Getting back to landlords and not

12   using the fact that it's a weekend or that the sales have

13   commenced on -- you know, tomorrow as any sort of -- not that

14   they would, but as any reason to delay, and really use their

15   best efforts to resolve issues with landlords.

16           My understanding is that many of these landlords

17   already have side letters in place and it's a matter of

18   adding these new locations to it.  And they're going to --

19   GBRP, as I understand it, is going to be commencing the store

20   closings, you know, in accordance with the side letters that

21   exist and will work out side letters with any other landlords

22   in -- basically, in -- as much in real time as is

23   practicable.

24           And then the last point, Your Honor, I would just

25   note that, you know, because this is being done in real time

1    and there are a lot of constituents, there are people on the

2    Zoom, et cetera, you know, this is without prejudice to any

3    party's rights to seek relief before Your Honor, you know,

4    during that status conference, before or after or whatever.

5    We're not trying to sort of, you know, bind people to not

6    seek relief if they want to seek relief with respect to any

7    of these things.  But we would operate accordingly and start

8    the GOB sales tomorrow.

9             THE COURT:  Okay.  I guess it leads me back to,

10   essentially, my original concern.  And maybe this is better

11   directed at PNC and 1903.  But where does that stand with

12   respect to admin expenses?

13            MR. RESNICK:  So that will be reflected in the

14   budget that we file next week.  We have, you know, limited

15   use of our cash collateral.  And happy to have the lenders

16   address their views on, you know, what should be paid and

17   what should not, but --

18            THE COURT:  Was there a commitment to pay them

19   going forward?

20            MR. RESNICK:  There is -- I'm going to allow them

21   to --

22            THE COURT:  Okay.

23            MR. RESNICK:  -- answer those questions.

24            THE COURT:  And should we be escrowing funds

25   received from the going-out-of-business sales?

1          MR. VENTOLA:  Good afternoon again, Your Honor.

2     John Ventola on behalf of PNC.

3          So the lend -- excuse me.  The lenders know

4     expenses need to be paid.  We have the chicken-or-egg problem

5     that we don't have the budget yet.  That's exactly what we

6     spent the hour working on, and committing to all the parties

7     involved, including my clients, because we don't have the

8     budget right now.  It's being worked on, literally, right

9     now.  So it's impossible, Your Honor, for anyone to say that

10    we're going to pay everything in a budget that we haven't

11    seen yet.

12         But PNC is a regulated bank, we know how this

13    works.  We have to cover expenses to allow the liquidation to

14    occur.  So I'm not trying to be evasive, Your Honor, in any

15    way.  We just -- we haven't seen what is being proposed to be

16    the budget.

17         We did hear today some points from landlords, which

18    I have never heard before, that some post-petition rent

19    obligations, in the broad term, haven't been paid.  I was not

20    aware of that, Your Honor.  But we committed with them, when

21    we see the budget, if they're not in the budget, to work with

22    them on that.  So we know the freight has to be paid, Your

23    Honor, we just don't know what the freight is right now.

24         But we are very well aware, if GOBs are going to

25    continue, that we can't not pay those current expenses.  So

52

1  I'm doing my best to honor -- to answer, Your Honor.

2  THE COURT:  I think you're committing, but you want

3  to see the numbers.

4  MR. VENTOLA:  We want to see the numbers, that's

5  exactly right, Your Honor.

6  And if the -- if we can't agree on a budget, we

7  will be one of the parties Mr. Resnick just referred to

8  coming and asking for relief from this Court or issuing a

9  termination declaration or both of those things.  I'm very

10  glad Mr. Resnick said that because I was going to rise to say

11  that.

12  We reserve our rights, Your Honor, we just need to

13  see the budget.  And it's no knock on anyone, this is all

14  happening in real time.  But once we see it, we'll either

15  agree and we'll agree to cover those expenses or allow the

16  debtor to cover those expenses or we'll come back and let

17  Your Honor know that we don't have agreement.  Thank you.

18  MR. SIMON:  Your Honor, Chad Simon, Otterbourg, PC,

19  on behalf of 1903, as agent for the DIP term lenders.

20  Your Honor, I echo Mr. Ventola's comments.  We're

21  at a point here, we expect to get a budget that will reflect

22  what the costs are.  We understand that this is a process and

23  the path forward between now and when the next status

24  conference is.  We will -- we support that path.  We

25  understand that the GOB stores need to -- sales need to

1    commence.

2         All parties -- I'll say it again and perhaps last.

3    All parties' rights are reserved and Your Honor has the

4    ability to address any issues at a later date, if people come

5    in and have objections to what has transpired in the seven,

6    eight days that we'll be back before Your Honor.

7         THE COURT:  Okay.  Mr. Alberto.

8         MR. ALBERTO:  Thank you, Your Honor.  Justin

9    Alberto from Cole Schotz.

10        The question Your Honor asked about the escrowing

11   of proceeds is something that the committee raised during the

12   break.  We were -- we understand from counsel to the lenders

13   that it's not as easy as just pressing a button and

14   preventing proceeds -- as they get realized in real time,

15   preventing them from going to the lenders.

16        The comfort that we take, Your Honor, is, one the

17   point you raise is the point we raised, and we can come back

18   and say things should not have gone out of these estates,

19   monies should not have flown out of these estates.  We're not

20   dealing with a mom-and-pop thrift here as a lender; we have

21   PNC and 1903 in the case, so we're -- you know, we feel

22   protected in that regard.

23        THE COURT:  Okay.

24        MR. VENTOLA:  Your Honor, John Ventola again

25   briefly.  I'm sorry.  I didn't address that part of your

54

1    question and I want to say thank you to Mr. Alberto.

2            This came up with the cash management motion at the

3    very first day.  I'm told it's literally impossible to sort

4    of turn off this complicated automated system.  So that's

5    exactly what I told Mr. Alberto, and thank him again for

6    reminding me.  But again, if people think money came in that

7    shouldn't have gone back out, we can deal with it, and we'll

8    commit to working with the parties if that dispute arises.

9    And I apologize again for not addressing that, Your Honor.

10   Sorry.

11           THE COURT:  Anyone else?  Ms. Heilman.

12           MS. HEILMAN:  For the record, Leslie Heilman,

13   Ballard Spahr, on behalf of various landlords.

14           Your Honor, I rise just to -- just for one point.

15   You know, we understand that we can't like turn off the

16   spigot and turn off the sweeping.  But we did understand that

17   there may be -- that the parties are going to account for any

18   money that goes out the door.

19           I think it's very imperative that, except for the

20   current expenses -- because we've talked a lot about the

21   costs of the current GOBs are going to be covered.  But we do

22   know that there are defaults in payments of post-petition

23   rent obligations, not just stub, but other post-petition

24   expenses have not been paid.

25           So I think, from this point forward, if we can't

1    turn off the sweep, we need to account for what's going out

2    the door and also account for what has not been paid.  I

3    think that, at a minimum, the part -- everybody needs to be

4    on the same page as to what expenses have not been paid what

5    expense -- what monies are going tout the door.  Thank you,

6    Your Honor.

7         THE COURT:  Okay.  Is that part of the projected

8    budgeting process?

9         (Participants confer)

10        THE COURT:  Accounting for what's been paid and a

11   process for what is to be paid?

12        (Participants confer)

13        MR. RESNICK:  I'm not sure that would actually,

14   technically, normally, be part of a budget, but I assume -- I

15   mean, AlixPartners is -- I assume they're keeping close track

16   of everything that has been paid and will be paid, and we'll

17   make sure that that happens.  But I don't think that would

18   normally be part of a budget.  I don't think we were thinking

19   --

20        THE COURT:  Well, I understand.

21        MR. RESNICK:  -- of going with --

22        THE COURT:  But we're in unique territory.

23        MR. RESNICK:  Right.

24        THE COURT:  So I mean, at this juncture, do we even

25   know what outstanding admins there are?

1    MR. RESNICK:  I assume the finance function at the

2    company and AlixPartners has a good handle of payables and

3    outstanding admin.

4    THE COURT:  Okay.

5    MR. GOLD:  Good afternoon again, Your Honor.  Ivan

6    Gold for various landlords.

7    There's actually a term for what AlixPartners needs

8    to generate, it's a "variance report," in terms of the old

9    budget versus the current reality.  That's the snapshot that

10   I referred to in my earlier comments is where are we now.

11   The new wind-down budget that would be proposed by the 26th

12   is a suggestion as to where we're going.  So, to resolve that

13   question, I think we do need both.  The committee's motion

14   had some estimates, but I think we need a serious look at

15   what happened and didn't happen financially to get us to this

16   point.

17   THE COURT:  Well, and obviously, January 1 is a

18   pivotal date.  So I think we need to know where we're going

19   and who we owe what to get a very clear picture.

20   MR. GOLD:  Completely agree, Your Honor.  Thank

21   you.

22   THE COURT:  Look, I appreciate that -- well, I

23   should say does anybody else want to be heard?

24   (No verbal response)

25   THE COURT:  I do appreciate that the only thing

1   before me today is a request to continue the GOB sales.  And

2   I do think that, going forward, the GOB sale is the best

3   alternative here.  I think the committee stated it

4   accurately, we're in a position to need to maximize value.

5           So I will allow them to commence today.  I had a

6   few other comments with respect to my thought process, but I

7   think that you have addressed my concerns.  I'd like to make

8   sure there's a notice on the docket of what the path forward

9   is.

10          Will you be providing a modified order or just this

11  record?

12          MR. RESNICK:  I think the record suffices for our

13  purposes, Your Honor.

14          THE COURT:  Okay.  We -- I do want to give you

15  time.  I am not here the 26th or 27th, so I do want to give

16  you time on the 30th -- or wait, the -- when did you ask --

17          MR. RESNICK:  Yes.  Yeah --

18          THE COURT:  The 30th --

19          MR. RESNICK:  November 30th --

20          THE COURT:  -- is a Monday, right?

21          MR. RESNICK:  December 30th what was I requested,

22  Your Honor.

23          THE COURT:  Yes.  Let's do December 30th at 11 a.m.

24          MR. RESNICK:  Perfect.

25          THE COURT:  And I appreciate all parties' rights

1     are reserved.

2           MR. RESNICK:  Thank you, Your Honor.

3           And will Your Honor be here in person or by Zoom?

4     I know some of us may --

5           THE COURT:  I will be here in person.

6           MR. RESNICK:  Okay.  And would it be okay, Your

7     Honor, if some of us appearing by Zoom, being in different

8     jurisdictions?

9           THE COURT:  If you have substantial argument, I

10     would ask that you be here in person.

11           MR. RESNICK:  Okay.  We'll --

12           THE COURT:  But otherwise, you may be on Zoom.  It

13     will be a hybrid hearing.

14           MR. RESNICK:  Thank you, Your Honor.  Understood.

15           Okay.  I think that, with that, it just brings me

16     to the two things that were uncontested.  One was the

17     Westminster sale motion at Docket Number 1347.  We filed a

18     certificate of no objection to that.  I didn't know if Your

19     Honor had any questions or if there was a reason why a

20     substantive --

21           THE COURT:  Well, I didn't get to look at it,

22     honestly --

23           MR. RESNICK:  Okay.

24           THE COURT:  -- until last evening.  But I took my

25     notes into my office.  Can you wait one second while I --

1          MR. RESNICK:  Of course.

2          THE COURT:  -- grab my notes.

3          MR. RESNICK:  Of course.

4      (Off the record 3:31 p.m. to 3:32 p.m.)

5          THE COURT:  My apologies.  I walked out with my

6   notes.

7          MR. RESNICK:  Sure, Your Honor.

8          And my colleague Vincent Cahill is the expert on

9   this motion, so I'm going to cede the podium to him.

10         THE COURT:  I did read the motion.

11         Does anyone want to be heard with respect to this

12  motion or the proposed form of order?

13      (Participants confer)

14         THE COURT:  Okay.  I will authorize the sale and

15  approve the settlement.  I'm finding it is in the best

16  interests of the debtors and their estates.

17         Based on the Macke -- I believe is how you say it -

18  - declaration, the sale constitutes the highest and otherwise

19  best offer for the property, and the sale and the resolution

20  of the litigation was negotiated at arm's length and in good

21  faith.  The buyer is not an insider based on the Macke

22  declaration.  And the buyer conducted itself in good faith

23  and in a non-collusive manner.

24         Further, the uncontroverted evidence establishes an

25  additional marketing and sale would not justify the

1    associated costs and delay, and that no likely purchaser

2    would emerge for consideration exceeding the purchase price.

3         In addition, based on the facts and circumstances

4    of the case and the evidence present, I find the settlement

5    satisfies the Martin factors and the compromise is fair and

6    reasonable and in the best interests of the debtors and their

7    estates and creditors, so I will enter the order.

8         I just note, in Paragraph (a), that there is a

9    marker in Line 1 for a docket number that wasn't filled out.

10         MR. CAHILL:  Thank you, Your Honor.  We'll have

11    that updated and share a revised form of order with your

12    chambers this afternoon.

13         THE COURT:  And wait, I had one other question,

14    sorry.  I can't read my own writing.

15         I don't appreciate the difference between Paragraph

16    20 and 14, and if you can just look at that.  And if they're

17    duplicative, if you can just delete one of them.

18         MR. CAHILL:  Understood, Your Honor.  We'll plan to

19    do so.

20         THE COURT:  Okay.  And it just has to do with

21    modifying nonmaterial modifications.  I think it says the

22    same thing in both paragraphs.

23         MR. CAHILL:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. CAHILL:  Thank you, Your Honor.  I believe that

1    brings us to the December lease sale wave that is proceeding

2    today on an uncontested basis.  Certain potential disputes

3    have been consensually adjourned while parties continue to

4    negotiate.

5            Mr. Goldberger, my colleague has been handling that

6    motion and is available to handle any questions Your Honor

7    may have.

8            THE COURT:  Okay.

9            MR. GOLDBERGER:  Good afternoon, Your Honor.  Jacob

10   Goldberger, Davis Polk, co-counsel for the debtors.

11           The final item on the agenda is to authorization to

12   enter into the various lease termination and assumption and

13   assignment agreements for many of the leased properties for

14   which the debtors received bids on as part of the December

15   wave of the lease sale process.

16           This round was the most lucrative yet for the

17   debtors' estates due to multiple bidding wars.  The auction

18   resulted in gross proceeds inclusive of cure waiver of about

19   four and a half million dollars and over $2.9 million in net

20   proceeds to the estates after cures.

21           The foregoing is set forth in additional detail in

22   the declaration of Emilio Amendola of A&G Real Estate

23   partners filed at Docket 1375, which I'd propose to move into

24   evidence at this time.

25           THE COURT:  Does anyone object to the admission of

1  the evidence -- of the declaration into evidence?

2        (No verbal response)

3            THE COURT:  Okay.  I hear no one, it's admitted.

4        (Amendola Declaration at ECF 1375 received in evidence)

5            THE COURT:  Does anyone want to cross-examine the

6  declarant?

7        (No verbal response)

8            THE COURT:  Okay.  I hear no one, I see no hands on

9  Zoom.

10           MR. GOLDBERGER:  And I have a copy of that for Your

11 Honor.

12           THE COURT:  Okay.  You may approach.  Thank you.

13           MR. GOLDBERGER:  As Mr. Resnick noted, in an effort

14 to narrow the issues before Your Honor today, the debtors

15 worked collaboratively with the landlords and the new lease

16 counterparties to come before you consensually.

17           A total of nine objections were filed this round:

18           One objection, filed at Docket 1330, relates to a

19 lease that did not receive a bid this round.

20           Four objections relate to bids from Ollie's.

21 Ollie's has worked hard to resolve these objections and we

22 understand that side letters are finalized or nearly

23 finalized, resolving the objections relating to the Tampa and

24 Corpus Christi locations.  In addition, the debtors are

25 revising the cure amount on the Corpus Christi location to

1      $31,414.31.

2          We've added language to the order addressing the

3  Boone location objection and Ollie's has declined to pursue

4  the Lee's Summit location due to that objection.

5          The debtors greatly appreciate the effort that

6  Ollie's and their counsel --

7          THE COURT:  Wait.  I'm sorry.  Can I stop you a

8  minute?

9          MR. GOLDBERGER:  Yep.

10          THE COURT:  Was that the -- which one was that, was

11  that WPG?

12          MR. GOLDBERGER:  No, WPG is a Burlington --

13          THE COURT:  Okay.

14          MR. GOLDBERGER:  Yeah.

15          THE COURT:  Which one?

16          MR. GOLDBERGER:  Lee's -- the location is Lee's

17  Summit.

18          THE COURT:  Okay.  Part of --

19          MR. GOLDBERGER:  And --

20          THE COURT:  Thank you.

21          MR. GOLDBERGER:  And we greatly appreciate the

22  effort that Ollie's and their counsel have expended on

23  resolving these objections.

24          Three objections relate to bids from Burlington.

25          With the respect to the objection from WPG filed at

1    Docket 1325, we understand the parties have entered into a

2    side letter resolving the objection.  For the avoidance of

3    debt, the debtors are in agreement with the cure amount as

4    calculated in the objection and will be paying that cure

5    amount, and the side letter resolves all other issues.

6         The two other Burlington objections relate to a

7    lease situated next to a Ross Dress for Less location.  The

8    landlord and Ross have raised issues.  But in an effort to

9    provide more time to address those issues raised, the parties

10   have agreed to adjourn those objections and the potential

11   sale to the January omnibus hearing.

12        THE COURT:  Okay.  Are those -- which objections

13   are those?

14        MR. GOLDBERGER:  That's the objection of the

15   landlord from the Nashville location and Ross Dress for Less.

16        THE COURT:  Okay.

17        MR. GOLDBERGER:  I can get the exact -- the docket

18   numbers for Your Honor.

19        THE COURT:  I just want to make sure we

20   appropriately carry them to the next month.

21        MR. GOLDBERGER:  Yeah, we'll reach out with those -

22   - with that and provide that information to you.

23        And finally, with respect to the Burlington bid,

24   the Lancaster location, there no formal objection filed, but

25   we've -- the debtors have extended the objection deadline as

1    the parties were working in good faith to resolve certain

2    issues.  And we're going to include language in the order

3    that provides a little more time for the parties to finalize

4    a side letter and continue negotiating on the cure, which we

5    believe is something that we should be able to resolve

6    shortly.

7            THE COURT:  Okay.

8            MR. GOLDBERGER:  So that's for Burlington.  I don't

9    know if Kristhy -- if you -- if she has anything to add from

10   Burlington's perspective.

11           THE COURT:  Good afternoon.

12           MS. PEGUERO:  Good afternoon.  Good afternoon,

13   Kristhy Peguero from Jackson Walker on behalf of Burlington.

14           Nothing to add.  Thank you.  We --

15           THE COURT:  Okay.

16           MS. PEGUERO:  -- we are in agreement.

17           MR. GOLDBERGER:  Okay.  Thank you very much.

18           The final objection filed at Docket 1337 relates to

19   an Aldi bid.  And again, the parties have agreed to adjourn

20   the issue until the January hearing and we will get that --

21   the docket again for Your Honor.

22           The two that relate to the Ross lease location

23   issue are Dockets 1346 and 1350.  And we'll provide the --

24   similarly, provide the one for this final Aldi's bid, the

25   Vero Beach location, that is similarly being adjourned.

66

1    The proposed order is substantially the same as the

2   version used in the prior rounds, with just the addition of

3   paragraphs that reflect the adjournment agreements and

4   resolutions, as described and reached with certain

5   objections.  I have a copy of the redline here showing those

6   changes.  I can --

7    THE COURT:  That would be great.  Thank you.

8    Are there any applicable lease termination

9   agreements?  I noticed Exhibit B and Ce weren't attached, and

10   that's why I asked th question.

11    UNIDENTIFIED:  Yes.

12    THE COURT:  Thank you.

13   (Participants confer)

14    MR. GOLDBERGER:  Yes, Your Honor.  There are

15   termination agreements and assumption and assignment

16   agreements.  We held off on filing those because they hadn't

17   been finalized as parties worked through figuring out which

18   leases were going to be going forward and finalizing the

19   terms.  But we intend on filing the completed order with

20   those later today.

21    THE COURT:  Okay.  Terrific.  Thank you.

22    Before you proceed further, I see Ms. Mersky has

23   her hand raised.  Ms. Mersky?  Ms. Mersky, you're -- there

24   you are.

25    MS. MERSKY:  Yes.  Thank you, Your Honor.

1    I represent the landlords for the Bayside and

2    Montebello locations.  We do -- no longer have any objections

3    to those.  The Bayside lease is going to be signed with

4    Burlington and we've agreed on the cure (indiscernible)

5    original cure, and that is reflected in the exhibit that was

6    filed by the debtors and there is no objection to the Hobby

7    Lobby assignment of Montebello.  We worked with the parties

8    and were actively involved in an auction which helped

9    significantly increase the value to the debtor.  But the --

10   as long as the Burlington cure is as reflected in the

11   exhibit, there are no objections.

12           THE COURT:  Okay.  Thank you.

13           MR. GOLDBERGER:  So there are three added

14   paragraphs here, 24, 25, and 26:

15           Paragraph 24 describes the resolution for the Boone

16   objection at Docket 1288, which is essentially that Ollie's

17   is covering $24,000 towards the resolution of a claim of lien

18   on that real property.

19           And 25 and 26 are the agreements to have the

20   objections related to both the Vero Beach and Nashville

21   leases -- those are the Burlington bid and the Aldi bid --

22   pushed to January.  In both cases, the debtors are not taking

23   on any costs relating to January to may accrue, that

24   landlords have agreed to waive those amounts as we

25   facilitated extra time for the parties to negotiate and

1    resolve these issues.

2          And in addition, with respect to the Vero Beach

3    lease, there's a backup bidder who otherwise wouldn't have

4    been held to their backup bid through the end of January.

5    They have agreed to maintain their backup bid pursuant to

6    terms agreed to with the debtors through the January 21st

7    hearing, and that's reflected in Paragraph 25, as well.

8          So, if there's nothing further from Your Honor, we

9    would suggest that we get together the termination

10   agreements, the assumption and assignment agreements, and

11   submit a revised form of order later today.

12         THE COURT:  Okay.  I believe Ms. Heilman would like

13   to be heard.

14         At this time, anyone else who wants to be heard

15   with respect to this motion or the proposed form of order,

16   please come forward.

17         MS. HEILMAN:  Good afternoon.  Again, for the

18   record, Leslie Heilman for Ballard Spahr on behalf of --

19   subject to this motion and in addition to this motion, I have

20   four landlords, Your Honor.  Three of them are with respect

21   to three lease termination bids that were submitted outside

22   of the December lease sale process.  And then we do have one

23   that was submitted in connection with the December lease sale

24   process.

25         We'll take the first one.  The first one is for

1    Brixmor Property Group with respect to Wallkill Plaza at

2    thirteen -- Store Number 1377, Your Honor.  It is listed on

3    the schedule to the proposed order, and we have no objection

4    for it to be included in this order.

5         Your Honor, we do have an objection, though, to the

6    Arcadia, California location being included in this order; it

7    is Store Number 4025.  I believe we had an agreement with the

8    debtor that we would be proceeding through a separate order

9    that would be submitted to Your Honor under certification of

10   counsel.

11        Because it wasn't noticed as part of the December

12   lease sale process, I think it makes more sense that we

13   proceed with a stipulated order with respect to that lease

14   termination.  And as of right before the hearing, Your Honor,

15   we understand that the additional -- we actually -- let me

16   back up.

17        The landlord submitted three separate lease

18   termination bids back in October for these properties.

19   Neither -- none of them were subject to any of the prior sale

20   processes.  And we -- the debtors accepted our offers in

21   November with respect to these three lease termination bids

22   and agreed to pull them from any further marketing and any

23   December -- end of December sale process.

24        We learned shortly after the December auction that

25   they were -- the debtors were retracting their agreement to

1    close on the -- on two of the bids, which was Inglewood,

2    California and National City, California.  And right before

3    the hearing today, we understand that they are now willing to

4    close on Inglewood, California.  So we need to add Inglewood,

5    California to this stipulated order, in addition to the

6    removal of Arcadia, California from the December sale

7    process, and submit them under a separate order.

8           With respect to the remaining property, Your Honor,

9    we understand that the debtors are proceeding to an auction

10   with respect to National City, California in January.  Your

11   Honor, we do object to proceeding to an auction.  We believe

12   that we had an offer in acceptance.  But we will reserve all

13   rights.  We will participate in that process, but the

14   landlord does reserve all rights in regard to contest

15   proceeding to an auction and not closing on our agreed deal.

16          But with respect to that, Your Honor, I think we

17   are proceeding through a stipulated order.  I believe Mr.

18   Goldberger can confirm that, but I just wanted to clarify

19   that we weren't proceeding under the current Exhibit A that's

20   under the December sale process.

21          THE COURT:  Okay.

22          MR. GOLDBERGER:  Yes, thank you.

23          Mrs. Heilman is -- Ms. Heilman is right about the

24   Arcadia lease, that one we're going to be removing.  It

25   wasn't part of the December wave of lease sales and it will

1    be submitted separately for Your Honor.

2         With respect to the other leases, the debtors have

3    had discussions with certain landlords outside of the context

4    of the lease sales.  Parties are aware of the possibility of

5    a lease being for sale well before the debtors file anything.

6    There's GOB sales that are going on and counterparties are

7    aware that a lease may be subject to a future wave of

8    auctions.

9         And we have landlords proactively reach out to A&G

10   and make an offer to terminate a lease an leave it outside of

11   the process of the auction.  And on occasion, A&G decides in

12   their business judgment that that offer -- this offer is the

13   best offer, and those are not part -- put into the next wave

14   of lease sales and are dealt with separately.

15        So the leases that Ms. Heilman is talking about

16   were not part of the December wave of lease sales.  The

17   debtors are still deciding how to treat those and we don't

18   think it's before Your Honor today.  But we respect the fact

19   that all rights are reserved with respect to those leases.

20        THE COURT:  Okay.  And they are.

21        MS. HEILMAN:  Sorry, Your Honor.  Leslie Heilman,

22   Ballard Spahr, for the record.

23        I think I do need confirmation from the debtors

24   that we are entering an order with respect to the two

25   properties, Arcadia, California and Inglewood, California, to

1    be terminated effective December 31st.

2                THE COURT:  I understood that was going to be a

3    stipulation.

4                MR. GOLDBERGER:  Yeah, that's the intention.  It's

5    the one lease that the debtors received alternative interest

6    in that we have to decide how to move forward on.

7                THE COURT:  Right.  But as to Arcadia, four oh two

8    -- Lease 4025, and Inglewood, I'm going to see a stipulation,

9    a form of order.

10               MR. GOLDBERGER:  Yes, that's our intention.

11               THE COURT:  Mr. Pacitti.

12               MR. PACITTI:  Good afternoon, Your Honor.  For the

13   record, Domenic Pacitti, Klehr Harrison Harvey Branzburg, on

14   behalf of Blue Owl.

15               Your Honor, I just want to confirm Mr. Goldberg's

16   representations with respect to the Lancaster, California

17   lease.  We are working with Burlington and the debtors to

18   finalize all the documents, we just couldn't get there before

19   today.  So we're just going to insert some reservation of

20   rights language in the proposed form of order that reserves

21   folks' rights until all of that documentation and

22   reconciliation of the cure amounts has been achieved.  Thank

23   you.

24               THE COURT:  Thank you.  I --

25               MR. GOLDBERGER:  Nothing --

1          THE COURT:  Do the debtors --

2          MR. GOLDBERGER:  No --

3          THE COURT:  -- have any issue --

4          MR. GOLDBERGER:   -- nothing further.

5          THE COURT:  -- with that representation?

6          MR. GOLDBERGER:  That's correct.

7          THE COURT:  Okay.  Anything further?

8      (No verbal response)

9          THE COURT:  Anyone on Zoom?

10     (No verbal response)

11         THE COURT:  Okay.  So, based on the record that has

12    been made and the withdrawal or resolution of all objections,

13    I'm prepared to approve this motion.

14         I'm satisfied the terminations or assumption and

15    assignment sales are in the best interests of the debtor,

16    their estates and creditors.  The proposed sale of the lease

17    assets constitutes a reasonable and sound exercise of the

18    debtors' business judgment.

19         Based on the -- Amendola?

20         MR. GOLDBERGER:  Amendola, yeah.

21         THE COURT:  Declaration at Docket 1375, the debtors

22    undertook a marketing process with respect to what I'll call,

23    quote, "wave four" properties and debtors did hold a

24    competitive auction, each of -- with respect to certain

25    leases.  Each of the purchase price represents the highest or

1    otherwise best offer.  Each sale agreement was negotiated at

2    arm's length and in good faith.  No purchaser acted in a

3    collusive or fraudulent manner and acted in good faith

4    entering into the sale agreements and consummating the sale

5    of each of the lease assets, is fair and reasonable and

6    represents the sound exercise of the debtors' business

7    judgment.  So I will enter that revised order when it's

8    uploaded.

9              MR. GOLDBERGER:  Thank you, Your Honor.

10             THE COURT:  I know there's a couple of housekeeping

11   matters we need to discuss, in terms -- including a date --

12             MR. ALBERTO:  Correct, Your Honor.

13             THE COURT:  -- for Mr. Alberto.

14             MR. ALBERTO:  That's all that we have left, from

15   the committee's perspective.

16             THE COURT:  And you wanted January 6th?

17             MR. ALBERTO:  Yes, Your Honor, preferably in the

18   afternoon, but we can make any time work.  It's just it's a

19   Monday after the holidays, so I was thinking of folks who

20   were traveling back, a 9 a.m. hearing might not be best.

21             THE COURT:  How about two o'clock on the 6th?

22             MR. ALBERTO:  That's fine.  That works for the

23   committee.  And I see Mr. Resnick shaking his head, as well,

24   for the debtors.

25             THE COURT:  Okay.  Okay.

75

1          MR. RESNICK:  That's fine, Your Honor.

2          MR. ALBERTO:  Thank you, Your Honor.

3          THE COURT:  Let's talk a minute about the 30th

4    because I know a lot of people are going to be traveling and

5    a lot of people are going to be out of the office.  I want to

6    make sure we're prepared to go forward on the 30th and that

7    the Court has any information the Court needs in advance of

8    that.

9          MR. RESNICK:  And I'm glad you raised it.  We've

10   been trying to figure it out because --

11         THE COURT:  And I don't know what that is, so ...

12         MR. RESNICK:  Yeah.  We -- in discussing it with

13   other parties, as well, there are a lot of people who are

14   going to be out of town, including Mr. Shpeen, myself, and

15   our litigator Mr. McClammy.  It's supposed to be a status

16   conference, but of course we can't preclude that from being

17   something more contentious or litigious.  So will Your Honor

18   --

19         THE COURT:  But we're going to limit it in scope to

20   this issue.

21         MR. RESNICK:  That is our hope, that it's limited

22   to this issue.

23         THE COURT:  Okay.  I'm out of chambers the 26th and

24   27th, so, if something arises and you need a duty judge, just

25   alert my chambers.

1        MR. RESNICK:  Thank you, Your Honor.

2        THE COURT:  I am here on the 23rd, I have --

3        MR. RESNICK:  Yeah.

4        THE COURT:  -- other matters.  But if we need to

5  make time for something, I will be here.

6        MR. RESNICK:  Thank you, Your Honor.

7        THE COURT:  So -- but at a minium, if I could get -

8  - you're going to file the budget.

9        MR. RESNICK:  We're going to file the budget.  And

10  we --

11        THE COURT:  The notice.

12        MR. RESNICK:  As far as we know, we're just

13  planning, on the 30th, planning on just keeping Your Honor

14  and the parties informed.  And if anybody has any, you know,

15  questions about the budget, the process, what we're doing

16  with the Gordon Brothers sales, the going concern sale

17  efforts, we're happy to address those.  You know, it's not

18  for us; it's for Your Honor and the parties, so we're happy

19  to do it any way people would like, but --

20        THE COURT:  All right.  Well, just so there are no

21  surprises, I think I've made my views pretty clear.  But I

22  will be wanting to know about the payment of administrative

23  expenses at that hearing and the continued path forward.

24        MR. RESNICK:  Absolutely, Your Honor.

25        THE COURT:  Okay?  Anything else for today?  Oh, I

1    have a question.

2              There is a pleading that was scheduled to go

3    forward today, but I think it wasn't -- I think it was

4    uncontested, but it has to do with FTI, FTI's retention.  And

5    I'm not sure, it was a motion to seal, and I haven't seen

6    like a cert or anything.  And I just want to make sure we're

7    proceeding on an uncontested path and I'm going to get a cert

8    or is there an issue.  It's Agenda Item 11, if that's --

9              MR. ALBERTO:  Thank you, Your Honor.  I, too, saw

10   it on the agenda.  There's no order or no objections.  We'll

11   make sure that we --

12             THE COURT:  Okay.

13             MR. ALBERTO:  -- upload --

14             THE COURT:  I just -- perfect.

15             MR. ALBERTO:  -- an order for Your Honor's

16   signature.

17             THE COURT:  Okay.

18             MR. ALBERTO:  I -- we'll file a CNO or a COC, as

19   appropriate.

20             THE COURT:  Okay.  Terrific.

21             MR. ALBERTO:  I don't have the exact --

22             THE COURT:  I just wanted --

23             MR. ALBERTO:  Sorry.

24             THE COURT:  -- to make sure that it -- I like to

25   keep a running list of what we need to file up on, so --

78

```
1              MR. ALBERTO:  We'll make sure you get what you need
2    --
3              THE COURT:  Okay.
4              MR. ALBERTO:  -- for this.  Thank you.
5              THE COURT:  Thank you.
6              Is there anything further for today?
7         (No verbal response)
8              THE COURT:  Okay.  Thank you all for your time.
9    I'm not going to wish you a Happy New Year.  Instead, I will
10   see you on the 30th of December.
11        (Laughter)
12             THE COURT:  Have a great afternoon, everyone.
13             COUNSEL:  Thank you.  Thank you, Your Honor.
14        (Proceedings concluded at 3:55 p.m.)
15                              *****
16
17
18
19
20
21
22
23
24
25
```

79

1                      CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11   _____        December 23, 2024

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For Reliable

15

16

17

18

19

20

21

22

23

24

25